Rob Bonta, State Bar No. 202668
Attorney General of California
Monica N. Anderson, State Bar No. 182970
Senior Assistant Attorney General
Damon McClain, State Bar No. 209508
Supervising Deputy Attorney General
Elise Owens Thorn, State Bar No. 145931
Namrata Kotwani, State Bar No. 308741
Deputy Attorneys General
  1300 I Street, Suite 125
  P.O. Box 944255
  Sacramento, CA 94244-2550
  Telephone: (916) 210-7318
  Fax: (916) 324-5205
  E-mail: Elise.Thorn@doj.ca.gov
*Attorneys for Defendants*

Hanson Bridgett LLP
Lawrence M. Cirelli, SBN 114710
Paul B. Mello, SBN 179755
Samantha D. Wolff, SBN 240280
Kaylen Kadotani, SBN 294114
David C. Casarrubias-González, SBN 321994
1676 N. California Blvd., Suite 620
  Walnut Creek, California 94596
  Telephone: 925-746-8460
  Facsimile: 925-746-8490
*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

### SACRAMENTO DIVISION

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>GAVIN NEWSOM, et al.<br><br>Defendants. | Case No. 2:90-CV-00520- KJM-SCR P<br><br>**DEFENDANTS' OBJECTIONS TO THE SPECIAL MASTER'S THIRTIETH ROUND MONITORING REPORT, PART D (ECF NO. 8359)**<br><br>Judge:  Hon. Kimberly J. Mueller |

20975607.1

Defs.' Objections Special Master's Thirtieth Round Monitoring Report, Part D (2:90-cv-00520 KJM- (PC))

# TABLE OF CONTENTS

Page

Introduction ............................................................................................................................. 1
Legal Standard ........................................................................................................................ 2
Objections ............................................................................................................................... 3
    I.    Defendants' Request for Information on Patient Reviews ..................................... 3
    II.   Defendants' Requests for Clarification of Document Requests are Not Efforts to Obstruct Monitoring ................................................................................ 3
    III.  The Report Contains Erroneous Findings Concerning Telepsychiatry .................. 3
    IV.  The Report Does not Provide Factual Support to Determine Whether a Representative Sample of the Population in Question was Audited. ...................... 5
    V.   The Report Omits Relevant Facts in Reporting on The Status and Impact of Data Remediation. ................................................................................................... 6
    VI.  The Report Applies Incorrect Thresholds for Determining Compliance. ............... 8
        A.   MHCB Initial Psychiatry Contacts. .............................................................. 8
        B.   Short-Term Restricted Housing (STRH) Routine Primary Clinician Contacts ........................................................................................................ 9
        C.   Confidentiality of Psychiatry and Primary Clinician Contacts. ................ 10
        D.   STRH Yard Time. ....................................................................................... 10
        E.   The Report Relies on the Wrong Requirements for Reception Center (RC) IDTTs. ............................................................................................... 11
        F.   The Report Erred in Finding that CCCMS IDTTs Violated Confidentiality Requirements. ................................................................... 11
        G.   Mainline CCCMS Group Treatment. ........................................................ 13
    VII. The Report Failed to Address Defendants' Concerns Regarding Staffing Data. ........................................................................................................................ 13
Conclusion ............................................................................................................................ 14
Certification .......................................................................................................................... 14

# TABLE OF AUTHORITIES

Page

**CASES**

*Coleman v. Brown*
    912 F. Supp. 1282 (E.D. Cal. 1995) ............................................................................ 14

*Cooter & Gell v. Hartmax Corp.*
    496 U.S. 384 (1990) ...................................................................................................... 15

*Operating Engineers Pension Trust v. A-C Co.*
    859 F.2d 1336 (9th Cir. 1988) ....................................................................................... 14

*United States v. Silverman*
    861 F.2d 571 (9th Cir. 1988) ........................................................................................... 2

**COURT RULES**

Federal Rule of Appellate Procedure
    Rule 8(a)(1)(A)'s ............................................................................................................ 15

Federal Rule of Civil Procedure
    Rule 11(b)(1) .................................................................................................................. 15
    Rule 11(b)(2) .................................................................................................................. 15
    Rule 53 ............................................................................................................................. 2
    Rule 53(e)(2) .................................................................................................................... 2
    Rule 53(f) ......................................................................................................................... 2
    Rule 53(f)(3) .................................................................................................................... 2
    Rule 53(f)(4) .................................................................................................................... 2
    Rule 62(c) ....................................................................................................................... 14

**INTRODUCTION**

On August 16, 2024, the Special Master filed his Thirtieth Round Monitoring Report –Part D on the California Department of Corrections and Rehabilitation (CDCR) Institutions with Correctional Clinical Case Management System (CCCMS) Programs Compliance with Provisionally Approved Plans, Policies, and Protocols (Report). (ECF No. 8359.) The Special Master provided the parties with a draft of the Report on May 29, 2024 (Draft Report). Defendants submitted objections to the Draft Report on June 28, 2024 (Objections) (*see* Ex. A to the Report, ECF No. 8359-1)[1] though the Special Master rejected most of the Objections.

On May 15, 2024, the Court adopted in full the thirtieth round monitoring report, part C. (ECF No. 8359.)  The order admonished Defendants and their counsel that objections containing arguments that have been resolved by prior court orders will result in monetary sanctions. (*Id.* at 7.)  Accordingly, although Defendants stand by the objections raised in response to the Draft Report (ECF No. 8359-1, Exhibit A), they are left with a Hobson's choice. Several of the objections are based on the same factual and legal positions Defendants have taken in the past, but with one important difference: each objection is directed at a new set of findings not previously reported to the Court.  Defendants acknowledge that the Report includes references to prior orders as a basis to relieve the Special Master from responding to Defendants' stated objections. (Report at 18, n. 5, and 21, n. 10.) However, such orders do not address the factual findings in the current Report, and Defendants maintain the right to assert such objections to avoid any claim the objection was waived if the matter is appealed.

Defendants can avoid sanctions by giving up their right to file objections to findings in the Report, or they can make objections to the new monitoring report and the facts it contains and risk sanctions.  Objections Defendants submitted in response to the Draft Report related to the adequacy of treatment, the parsing of staffing data, and medication management indicators are implicated.  Defendants' objections to the Draft Report are in the record and subject to review, but

---

[1] Page number citation is based on the Court's ECF pagination.  All references to "Report" are to ECF No. 8359 with the Court's ECF pagination, and all references to "Objections" are to ECF No. 8359-1 with the Court's ECF pagination.

Defendants will not repeat those objections formally. It is Defendants' hope that the Special Master will revisit those issues with Defendants.

## LEGAL STANDARD

The Order of Reference states that "[p]ursuant to Fed. R. Civ. P. 53(e)(2), the court shall accept the special master's findings of fact unless they are clearly erroneous." (ECF No. 640 at 8:18-20 [Order of Reference, Dec. 11, 1995].)  However, Rule 53 was "revised extensively" in 2003, and notably, the standard of review was changed for findings of fact made or recommended by a master. *See* Fed. R. Civ. P. 53(f) advisory committee's note to 2003 amendment.  Rule 53(f)(3) now states that "[t]he court must decide de novo all objections and findings of fact made or recommended by a master, unless the parties, with the court's approval," stipulate otherwise.  The parties have not done so here.

Back in 2009, the Court ruled that:

> The question of whether the provisions of Fed.R.Civ.P. 53(f)(3) should apply in these proceedings has not been briefed by the parties, and plaintiffs cite no authority mandating its application.  Accordingly, the findings cited by defendants will be reviewed under the "clearly erroneous" standard set forth in the December 11, 1995 Order of Reference.

(ECF No. 3731 at 1 n.1.)  Thereafter, in 2013, the Court again considered the application of rule 53(f)(3) to this case.  It ruled that: "[a]ll reports provided by the Special master to the parties in accordance with the Order of Reference filed December 11, 1995 (Doc. No. 640) are reviewed under the standards set forth in that order." (ECF No. 4925 at 1 n.1; *accord* ECF Nos. 7605 at 1 (applying clear error review), 7608 at 1-2 (same), 7609 at 2 (same), 7688 at 1 (same), 7808 at 2 (same).)

The Court must also review *de novo* any conclusions of law made or recommended by the Special Master.  (Fed. R. Civ. P. 53(f)(4).)  Under the *de novo* standard of review, the Court does not defer to the Special Master's findings or conclusions, but must freely consider the matter anew, as if no findings or conclusions had been rendered.  *See United States v. Silverman*, 861 F.2d 571, 576 (9th Cir. 1988).

# OBJECTIONS

## I. DEFENDANTS' REQUEST FOR INFORMATION ON PATIENT REVIEWS

The Report omits information Defendants requested regarding the identity of the twenty or fewer patients reviewed at each level of care at each institution. Defendants acknowledge and appreciate the Special Master's agreement to provide this important information in future reports. (See Report at 20, n. 9.) However, for the current Report, CDCR is unable to confirm the findings of fact in the report or correct the record, where necessary. This is especially concerning for institutions such as at Wasco State Prison (WSP) where the Special Master found that thirteen mainline CCCMS patients required routine psychiatry contacts and seven of those contacts did not occur at all. (Report at 418.) Without information regarding which patients were reviewed, including the timeframe of the review and the level of care, CDCR does not have the information available to properly review and comment on the Report.

## II. DEFENDANTS' REQUESTS FOR CLARIFICATION OF DOCUMENT REQUESTS ARE NOT EFFORTS TO OBSTRUCT MONITORING

The Report includes a narrative summary of the Special Master's document requests related to recent EOP review tours and standing objections that CDCR made in response to those objections. (Report at 19-23 and 38-44.) Defendants raised concerns about the Special Master's document requests in good faith, seeking to clarify whether remediated data would be used and asking detailed questions about the requests. (Objections at 9-12.) At no time did Defendants attempt to avoid document production and Defendants appreciate the Special Master's acknowledgment that "[u]ltimately, Defendants' standing objections did not result in the withholding of documents or information from the Special Master that he is otherwise entitled to under the Order of Reference with respect to the recently concluded focused EOP monitoring tours." (Report at 40, n. 25.)

Defendants look forward to working with the Special Master to develop a more streamlined process to work though concerns raised by any future document requests.

## III. THE REPORT CONTAINS ERRONEOUS FINDINGS CONCERNING TELEPSYCHIATRY

The Report incorrectly suggests that CDCR is having difficulty recruiting and retaining

staff through the Telepsychiatry Program, and that telepsychiatry has not had a positive impact on the overall psychiatry fill rate.  The data proves this suggestion is wrong.  In February 2024, the fill rate for line staff psychiatrists, including on-site (civil service and registry), telepsychiatry, and Psychiatric Nurse Practitioners, at the thirteen institutions included in the Report was 98 percent. (ECF No. 8177 at 5.)  This means that across the thirteen institutions there were only 1.26 psychiatry positions vacant.  With an overall vacancy rate of less than two percent, it is clear that any statement that psychiatry staffing is inadequate or that CDCR is struggling to hire psychiatrists for these institutions is wrong.  While it is correct that there was a 22 percent vacancy rate for telepsychiatry positions at the thirteen institutions combined, this percentage ignores the fact that several institutions hired more on-site staff than they were allocated, which resulted in the use of fewer allocated telepsychiatry positions.

The findings on the use of telepsychiatry at several institutions provide examples of the error in this reporting.  CCI, which is highlighted in the Report as having an 89 percent vacancy rate for telepsychiatrists, had a line staff psychiatrist fill rate of 119 percent in February 2024. (Report at 49, and ECF No. 8177 at 5.)  CCI had 4.07 on-site psychiatrist positions filled, despite only being allocated 2.50 positions.  (*Id.*)  The sole position allocated to telepsychiatry was filled with a 0.11 telepsychiatrist.  (*Id.*)  Similarly, both NKSP and WSP hired more on-site psychiatrists than they were allocated, resulting in fewer telepsychiatry positions being needed and filled.  (*Id.*) Regardless, NKSP and WSP had line staff psychiatry fill rates of 99 percent and 95 percent respectively.  (*Id.*)  Thus, any vacancies in the allocated telepsychiatry positions do not reflect a challenge in filling psychiatry positions.  The Report overlooks that the telepsychiatry vacancies at most institutions are a direct result of CDCR having more onsite psychiatrists, something CDCR always prioritizes and which CDCR understood was the Special Master's (and Plaintiffs') preference.

The Report also misconstrues the court-approved Telepsychiatry Policy when it reports that the Telepsychiatry Policy allows "unrestricted use of telepsychiatry for 3CMS patients." (Report at 47.)   Instead, the Telepsychiatry Policy states that "[t]elepsychiatry may replace on-site psychiatry at the CCCMS level of care provided all other conditions pertaining to the CCCMS

level of care contained within this policy are adhered to and good faith efforts to recruit on-site psychiatrists continue." (ECF No. 7826-1 at 4.) CDCR continues to make good faith efforts to recruit on-site psychiatrists at all levels of care as evidenced by institutions continuing to hire on-site staff above what is allocated and is in fact abiding by that policy. Yet the Report treats this as a negative mark against CDCR's staffing efforts.

The thirteen institutions reviewed in the Report had a combined line-staff psychiatry fill rate of 98 percent. Any negative findings related to staffing fills rates are unfounded.

IV. **THE REPORT DOES NOT PROVIDE FACTUAL SUPPORT TO DETERMINE WHETHER A REPRESENTATIVE SAMPLE OF THE POPULATION IN QUESTION WAS AUDITED.**

Defendants requested that the Special Master revise the Report to explain why the experts used sample sizes smaller than the sample sizes mandated by the data expert, and how that number meaningfully represents the conditions in the institutions. (Objections at 6.) Defendants presented the issue of sample size in relation to specific findings in the Draft Report. This issue has not been the subject of prior objections to monitoring reports and the Court has not issued a decision on the appropriate or required sample size.[2] The Report does not clarify whether appropriate sample sizes were considered or even address the issue of sample size in the general findings presented at pages 58 through 60.

According to the Special Master's data remediation expert, sample sizes for each indicator must include a review of at least 30 patients or requirements per institution (and sometimes level of care) to provide a representative sample from which conclusions can be drawn. (Objections at 6-7.) The Special Master did not address this and noted the recent practice of assessing timeliness of clinical contacts via manual review of patient records was necessitated by what the Court found to be defendants' presentation of misleading data regarding timeliness of psychiatric contacts. (Report at 20.) The statement does not explain what appears to be inconsistent positions concerning sample sizes. The Report contains a myriad of examples of improper sample sizes.

---

[2] Defendants acknowledge that the May 16, 2024 order references the term "sample size." The issue raised in these objections is distinguishable from that prior objection. The objection to Part C of the Thirtieth Round Report focused on the need and Defendants' request that remediated data be used in monitoring. (ECF No. 8108 at 12:12-25.) The objections here concern the proper sample size monitored and address the sample sizes identified in the Report.

Many of the findings in the Report are based on a review of only 20 patients per level of care. Even then, in many instances not all 20 patients in the sample required the contact or service measured, so the sample size was further reduced.

For instance, in the Special Master's team's review of 20 CCCMS patients at CRC, only seven patients required initial primary clinician evaluations. (Report at 329.) And of those seven, six were completed timely, resulting in an 86 percent compliance score. (*Id*.) Thus, the Special Master concluded that CRC was 86 percent compliant with CCCMS initial primary clinician evaluations based on a review of only seven patients, although the CCCMS population at CRC on January 22, 2024 (the day before the Special Master's tour began) was 1,300 patients. (Report at 316.) Some sample sizes were even smaller. Only two CCCMS patients of the 20 reviewed at CTF required an initial psychiatry evaluation and were evaluated to determine timely compliance with this requirement, despite CTF having a population of 882 mainline CCCMS patients shortly before the Special Master's monitoring tour. (Report at 357 and 338.) And only three CCCMS patients of the twenty reviewed at CIM required an initial Interdisciplinary Treatment Team (IDTT) and were evaluated to determine timely compliance with this requirement, despite CIM having a population of 781 mainline CCCMS patients shortly before the Special Master's monitoring tour. (*Id*. at 141 and 124.) All compliance findings related to timeliness of initial and routine primary clinician and psychiatry contacts, as well as initial and routine IDTTs were based on a review of twenty patients or fewer. In some cases, where the population being sampled is very small, such as Mental Health Crisis Beds (MHCB), this may be a sufficient sample size, but in most cases the sample size falls well below what has been recommended by the Special Master's data expert. Yet, despite the small sample size, these reviews were used to support generalized findings across the levels of care and institutions. (Report at 58-60.)

## V. THE REPORT OMITS RELEVANT FACTS IN REPORTING ON THE STATUS AND IMPACT OF DATA REMEDIATION.

The Report criticizes CDCR for asking that the Special Master's expert respond to their data remediation requests within a certain timeframe as an attempt to obstruct the Special Master's monitoring. Defendants objected to this criticism because the Report omits necessary context.

The data remediation process, including the required steps and the proposed timelines were created under the guidance of the Special Master and with input and agreement by Plaintiffs' counsel, including the week-long timeline for review of items released for stakeholder review. *See* Defendants' September 29, 2021, Data Activation Schedule for Data Remediation included the one-week timeline. (ECF No. 7334 at 27.)  The Special Master's team did not raise any concerns with the agreed upon timeline.  The e-mail referenced in the Report (Exhibit I) comports with the accepted practice that has been in place for the past several years (ever since CDCR began releasing indicators for stakeholder review as a part of the data remediation process), whereby CDCR sends a notice to the Special Master and Plaintiffs of the agreed upon deadlines and requests that they meet them.  This practice, and the deadlines that the Report criticized, taken together, are intended to help the parties and the Special Master meet the Court's global deadline for the completion of data remediation.  The Special Master and Plaintiffs have, in most instances, provided feedback within the requested week-long window without complaint.  The Draft Report is the first time this concern has ever been raised.

The context omitted from the Report is described in detail in Defendants' objections. (Objections at 12-14.)  In the complex data remediation process, all stakeholders have had delays in responding to requests, emails, or outstanding questions.  The goal of setting agreed upon deadlines for all steps of the process is to try to keep it moving forward, not to foreclose discussion of any indicator.  As designed, the data remediation process allows review and comments by the Special Master's team and Plaintiffs' counsel at nearly every step. (*See* ECF Nos. 8273 and 8274.)  Thus, discussions occur at numerous stages of the process.  Ultimately, regardless of a requested response date, indicators do not move forward without agreement from all stakeholders.  CDCR also regularly requests review of other items by a certain date.  For example, there is an informal agreement between the parties and the Special Master that policies will be reviewed within 30 days.  The Special Master has never raised concerns regarding CDCR's request for comments within 30 days of provision of a draft policy.

Finally, the Report adds a footnote concerning communications between the Special Master's data expert and CDCR's technical staff. (Report at 24, n. 11.)  This summary

demonstrates on-going efforts to complete data remediation in an efficient and transparent manner.

## VI. THE REPORT APPLIES INCORRECT THRESHOLDS FOR DETERMINING COMPLIANCE.

Several findings in the Report rely on incorrect timelines or requirements. Defendants objected to those findings and the Special Master corrected some, but not all of them. (Report at 24.) Defendants maintain their objections to the Report's incorrect findings regarding timeliness and Program Guide requirements that were not corrected for MHCB Initial Psychiatry Contacts; Short-Term Restricted Housing (STRH) Routine Primary Clinician Contacts; the confidentiality of psychiatry and primary clinician contacts; STRH yard time; requirements for Reception Center IDTTs; and Mainline CCCMS group treatment.

### A. MHCB Initial Psychiatry Contacts.

Several individual institution summaries note that timely initial psychiatry contacts for MHCB patients were compliant if they occurred before the initial IDTT and within 24 hours of arrival. (Report at 137, 233, 260, and 449.) However, that is not the appropriate standard for initial psychiatry contacts in the MHCB.

The Program Guide requires that a psychiatrist "evaluate each MHCB inmate-patient individually at least twice weekly to address psychiatric medication issues." (ECF No. 7333-1 at 85.) And initial IDTTs for MHCB patients "shall meet within 72 hours of an inmate-patient's admission…." (*Id*. at 83.) Title 22, section 79749(a)(2), which set the standard for mental health treatment in licensed Correctional Treatment Centers, requires patients to be evaluated "not later than seventy-two (72) hours from the time staff determines that the inmate-patient requires or may require psychotropic medication." Neither the Program Guide nor Title 22 require a psychiatrist to conduct an initial contact within 24 hours of patient admission.

Notably, the timeline for initial psychiatry contacts in MHCBs was discussed in the data remediation process in 2023. All stakeholders, including the Special Master's team agreed that the Program Guide and Title 22 supported an initial psychiatric contact timeline of 72 hours. The business rule regarding initial psychiatry contacts in MHCB completed BRMR discussions in November 2023.

20975607.1                                     8
Defendants' Objections to 30th Round Monitoring Report – Part D (2:90-cv-00520 KJM-DB (PC))

The Special Master did not revise the Report to use the agreed upon timeline because the agreement was reached after the review periods covered in the Report. (ECF No. 8359 at 24-25.) Yet, as discussed above, nothing in the Program Guide supports the 24-hour initial psychiatry contact timeline used by the Special Master. Although the data remediation agreement regarding the initial psychiatry contact timeline was not made until after the review periods in question, the timeline was not a change to the Program Guide or Title 22 requirements. Given the Program Guide does not support the 24-hour timeline used by the Special Master, the Report should be revised to apply the appropriate 72-hour timeline for initial psychiatry contacts in the MHCB.

      **B.**    **Short-Term Restricted Housing (STRH) Routine Primary Clinician Contacts**

Defendants objected to the Draft Report's findings on the basis that the Special Master applied a 7-day timeline requirement for routine primary clinician contacts in the STRH. (Objections at 15.) The Special Master did not revise the report to apply the stipulated definition of "weekly" because the review period for each institution pre-dated the December 18, 2023 stipulation. (Report at 24 and 116, n. 36.) Defendants acknowledge that the stipulation was reached during the review period for the CCCMS institutions. However, because the draft report was not finalized until almost six months later, the Special Master could have applied the appropriate, agreed upon standard. Accordingly, the Court should not adopt the Special Master's findings.

The Program Guide requires that "[a]ll patients shall be offered a weekly clinical contact with their primary clinician." (ECF No. 7333-1 at 444.) There was a dispute over the definition of "weekly" in the context of primary clinician contacts. (See ECF Nos. 8041; 8057; 8069.) After months of discussion and briefings, CDCR accepted the Special Master's proposal that "weekly" contacts be required to occur "at least once per calendar week, but not exceed ten days between contacts." (ECF No. 8090 at 2.) As presented in the Objections, the question regarding whether the same definition of "weekly" should apply to routine primary clinician contacts in the STRH/RHU CCCMS was discussed and all stakeholders confirmed agreement to use this definition in this context as well. (Objections at 15.) Given the stakeholder agreements, the

Special Master should have applied the agreed upon definition of "weekly" for routine primary clinician contacts in the STRH.

### C. Confidentiality of Psychiatry and Primary Clinician Contacts.

Non-confidential contacts are Program Guide compliant if conducted in response to a patient refusal. (ECF No. 7333-1 at 636 ("Each patient shall be offered individual treatment in a confidential setting. To be considered a clinical contact that meets . . . Program Guide requirements, patients must be seen: 1. In a confidential setting, OR 2. In a non-confidential setting in response to: a. The patient's refusal.")) Defendants pointed this out in their objections and asked that the Report reflect compliance in this regard. (Objections at 15-16.) The Report includes findings that the non-confidential contacts were the result of patient refusals, but it does not make clear that these contacts complied with the Program Guide. (Report at 116-117.) Accordingly, this objection stands and the Report's failure to indicate compliance here is clear error.

### D. STRH Yard Time.[3]

The Report includes a finding that "[r]eview of a sample of 24 weeks of 114-As for 20 STRH patients indicated 100 percent compliance for offering patients at least 18.5 weekly hours of yard…." (Report at 231.) Per the January 15, 2015 policy regarding STRH, "[i]nmates placed into a designated CCCMS-STRH will be offered 18.5 hours per week of exercise out of their cell." (ECF No. 7333-1 at 452.) Defendants objected to the Report's use of the required out-of-cell time as "yard" and not "exercise out of their cell." The Report was not revised to align the Report with the Program Guide requirement because the data Defendants provided to the Special Master to demonstrate their satisfaction of the policy requirement records hours of "yard" time offered as opposed to a more general reference to "out-of-cell exercise time." (Report at 25.) The Special Master should have indicated or acknowledged that the reported "yard" time satisfied the Program

---

[3] The Report finds that MHCB patients were provided "adequate out of cell time" in several places but does not define the term "adequate." CDCR objects to the application of any out-of-cell time minimum threshold as detailed in Defendants' recent objections to the 6th Re-Audit by the Special Master's suicide prevention expert and to the Special Master's proposed resolution of the data remediation dispute regarding SP15.1 (ECF Nos. 8179 and 8274).

Guide requirement for "out-of-cell exercise time."

### E. The Report Relies on the Wrong Requirements for Reception Center (RC) IDTTs.

Defendants identified a mistake in the Draft Report concerning CCCMS patients' initial IDTTs. (Objections at 17.) The Report does not correct the error and states, "[n]otably, RC patients were placed in RC 3CMS without an IDTT and generally transferred prior to a required annual IDTT." (Report at 443.) That RC patients were placed in CCCMS without an IDTT is not notable. The Report's implication of non-compliance conflicts with the Program Guide, which does not require initial IDTTs for RC CCCMS patients. This was discussed in detail during the review of AC4: Timely IDTTs in data remediation in early 2023 and early 2024. All stakeholders agreed that RC CCCMS patients are excluded from the initial IDTT business rule in April 2023. Despite the Report's suggestion to the contrary, it is also not significant that RC CCCMS patients transfer prior to the required annual IDTT. Per the Program Guide, RC CCCMS patients should transfer to a mainline CCCMS program within 90 days of referral or 60 days, if clinically indicated. (ECF No. 7333-1 at 19.)

The Special Master refused to correct this mistake on the basis that the agreement to exclude RC CCCMS patients from the initial IDTT business rule was reached after the review periods covered in the Report. (ECF No. 8359 at 24-25.) The Special Master's reasoning is wrong because there is no Program Guide requirement for RC CCCMS patients to have an initial IDTT. The agreement made in data remediation was simply an acknowledgement that there was no initial IDTT requirement for this group of patients. The Report should be revised to reflect that there is no such Program Guide requirement.

### F. The Report Erred in Finding that CCCMS IDTTs Violated Confidentiality Requirements.

The Report erred in finding that observed IDTTs "were not confidential, as there was a camera in the rooms at NKSP and WSP and officers stood in the room at WSP." (Report at 121.) This finding disregards the Program Guide. Placement of the fixed camera in the IDTT room does not render the IDTT non-confidential. Per the Program Guide "[a] confidential setting affords confidentiality of sight and sound from other inmates and confidentiality of sound from staff

members….." (ECF No. 7333-1 at 636.)  Generally, fixed cameras in treatment spaces do not have audio capabilities enabled.  CDCR has confirmed that the audio capabilities of the fixed cameras in the IDTT spaces at WSP are not enabled and the fixed cameras at NKSP were not functional at the time of the monitoring tour.  Therefore, the setting was still confidential as staff members reviewing the footage would only have a visual of what occurred.

The Report attempts to address Defendants' objection by raising concerns that patients perceived that the cameras inhibited confidentiality and that the concerns about "patients' level of discomfort in discussing private mental health issues should be primary…." (Report at 26.)  But patient perception does not render a discussion non-confidential.

Officer attendance at the IDTT at WSP also does not render the IDTT non-confidential.  The Program Guide includes custody officers as appropriate attendees at the IDTT.  (ECF No. 7333-1 at 42 ("Other staff who have direct knowledge of the inmate-patient are encouraged to attend or provide information: Licensed Psychiatric Technicians; Custody Officers."); and at 56 ("Other staff who have direct knowledge of the inmate-patient are encouraged to attend or provide information", and include licensed psychiatric technicians, custody officers, recreation therapists, registered nurses, licensed vocational nurses).)  Attachment A to the Program Guide specifically discusses attendance of custody officers at IDTTs and the duty to maintain confidentiality of the content of the discussion.  (*Id.* at 205 ("All staff that intentionally, accidentally or inadvertently overhears confidential communications (arising from clinical contacts such as cell front visits) is also responsible for maintaining confidentiality of the communication.  There are many familiar situations where strict and traditional healthcare confidentiality is compromised, such as during pill lines, during Interdisciplinary Treatment Teams (IDTT) meetings because the team composition includes custody officers, and during cell front visits. Custody officers, correctional counselors, and other staff who are members of an IDTT are bound to not discuss health-related inmate-patient information with anyone other than the team members.").)

Because neither the placement of a fixed camera nor the attendance by custody staff rendered the IDTTs at NKSP and WSP non-confidential, the Report's assertions that confidentiality was violated are misleading and those assertions should have been removed.

G. **Mainline CCCMS Group Treatment.**

Defendants requested that the Draft Report be revised to indicate that patients were provided care above and beyond what is required under the Program Guide. Instead, the Report includes the following statement that was revised, but not in a way that addressed Defendants' objection:

> Other than pre-release planning groups, recreation therapy groups were the only groups offered to mainline 3CMS patients during the reporting period. Staffing shortages and large caseloads prevented clinician-led groups from occurring at CCI.

(Report at 26, and 188.)

While CDCR strives to provide as much mental health treatment as possible to the incarcerated population, group treatment is not required in CCCMS programs. The above statement implies that CCI's mental health program is deficient because it does not provide "clinical groups," which, although not defined in the Report, likely means groups led by primary clinicians or psychiatrists. This service goes beyond what the Program Guide requires and the Special Master's criticism that groups are not lead by a psychiatrist or PC are unfounded.

VII. **THE REPORT FAILED TO ADDRESS DEFENDANTS' CONCERNS REGARDING STAFFING DATA.**

Defendants identified several factual issues in the Draft Report and asked the Special Master to correct or clarify those issues in the filed report. (ECF No. 8359-1 at 18- 20.) The Special Master addressed each of the issues except for the staffing data. (Report at 27.)

The staffing data in Sections I(A) and II(A) of the Report largely comes from Defendants' February 2024 Staffing Reports. (ECF No. 8177.) Yet, the staffing information provided in the institutional summaries does not in each case match the information provided in Sections I(A) and II(A). For example, the WSP institutional summary states that no telepsychiatry positions were allocated, although telepsychiatrists filled 4.0 positions. (Report at 391.) Yet, Section II(A) notes that WSP was allocated telepsychiatry positions and reported vacancies in those positions. (Report at 22.) Defendants' February 2024 Staffing Report shows WSP was allocated 5.0 telepsychiatry positions and 4.0 were filled and that WSP had a staff psychiatry fill rate of 95

1  percent.  (ECF No. 8177 at 5.)  Other allocated and filled position data in the WSP institutional

2  summary are inconsistent with Defendants' February 2024 Staffing Report.

3        The Report provides by way of an explanation that the monitoring relies not on

4  Defendants' filed reports with this court, but on rates his team calculates "from data from the

5  staffing data provided to the Special Master in response to his document request in advance of the

6  monitoring tours and is sometimes supplemented with additional, clarifying staffing data when

7  defendants' mental health staff identify discrepancies in the institution's response to the document

8  request." (Report at 27, n. 12.)  Clearly, the Report and previous reports present data that is

9  inconsistent with Defendants' official reports, and data that is not susceptible to fact checking.

10  The Court should direct the Special Master to revise the Report to align the staffing information in

11  all institutional reports with the February 2024 Staffing Report or provide the date of the staffing

12  data so that CDCR can compare the information to the filed staffing reports, which are the agreed

13  upon source of truth.

## CONCLUSION

15  Defendants respectfully request that their objections to the Report be considered by this

16  Court, and that any order flowing from the Report address the issues noted above. (ECF No. 8359-

17  1.)  The Court should not adopt in full the Report's findings.

## CERTIFICATION

19  In preparing this filing, Defendants' counsel certify that they have reviewed the following

20  relevant orders: *Coleman v. Brown*, 912 F. Supp. 1282 (E.D. Cal. 1995), ECF Nos. 640, 4232,

21  4335, 5711, 5850, 7283, 7807, 7847, 8069, 8144, 8239, and 8242.

22  These objections present arguments that have not been resolved by prior court orders as

23  they are specifically tailored to address the merits of Defendants' objections to the Report and not

24  objections to prior reports.  Counsel acknowledges this Court's prior orders concerning the some

25  of the issues raised in the objections (ECF Nos. 7847 and 8239), but those orders do not foreclose

26  the objections stated herein.  Counsel make this filing under their obligation to represent their

27  clients zealously under their right to relief under Fed. R. Civ. P. 62(c), *Operating Engineers*

20975607.1

14

Defendants' Objections to 30th Round Monitoring Report – Part D (2:90-cv-00520 KJM-DB (PC))

1  *Pension Trust v. A-C Co.*, 859 F.2d 1336, 1344 (9th Cir. 1988), and to satisfy Federal Rule of
2  Appellate Procedure 8(a)(1)(A)'s requirement.  Counsel certify that they have conducted a
3  reasonable inquiry and have determined that this filing is well grounded in fact, legally tenable,
4  and not presented for an improper purpose, to harass, cause unnecessary delay, or needlessly
5  increase the cost of litigation.  Fed. R. Civ. P. 11(b)(1); and *Cooter & Gell v. Hartmax Corp.*, 496
6  U.S. 384, 393 (1990) (internal quotation marks omitted).  Each factual contention made in this
7  filing is supported by a reference to evidence in the record and the legal contentions are warranted
8  by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law
9  or for establishing new law.  Fed. R. Civ. P. 11(b)(2).

DATED:  August 26, 2024

ROB BONTA
Attorney General of California
DAMON MCCLAIN
Supervising Deputy Attorney General

*/s/ Elise Owens Thorn*
Elise Owens Thorn
Deputy Attorney General
*Attorneys for Defendants*

HANSON BRIDGETT LLP

*/s/ Samantha D. Wolff*
PAUL B. MELLO
SAMANTHA D. WOLFF
DAVID C. CASARRUBIAS
*Attorneys for Defendants*