1   DONALD SPECTER – 083925          MICHAEL W. BIEN – 096891
    STEVEN FAMA – 099641             ERNEST GALVAN – 196065
2   MARGOT MENDELSON – 268583        LISA ELLS – 243657
    PRISON LAW OFFICE                JENNY S. YELIN – 273601
3   1917 Fifth Street                THOMAS NOLAN – 169692
    Berkeley, California  94710-1916 MICHAEL S. NUNEZ – 280535
4   Telephone:   (510) 280-2621      MARC J. SHINN-KRANTZ – 312968
                                     ALEXANDER GOURSE – 321631
5   CLAUDIA CENTER – 158255          BENJAMIN W. HOLSTON – 341439
    DISABILITY RIGHTS EDUCATION      MAYA E. CAMPBELL – 345180
6   AND DEFENSE FUND, INC.           LUMA KHABBAZ – 351492
    Ed Roberts Campus                JARED MILLER – 353641
7   3075 Adeline Street, Suite 210   ROSEN BIEN
    Berkeley, California  94703-2578 GALVAN & GRUNFELD LLP
8   Telephone:   (510) 644-2555      101 Mission Street, Sixth Floor
                                     San Francisco, California  94105-1738
9                                    Telephone:   (415) 433-6830

10  Attorneys for Plaintiffs

11              UNITED STATES DISTRICT COURT

12              EASTERN DISTRICT OF CALIFORNIA

13

14   RALPH COLEMAN, et al.,          Case No. 2:90−CV−00520−KJM−SCR

15          Plaintiffs,              **PLAINTIFFS' RESPONSE TO
                                     DEFENDANTS' OBJECTIONS TO
16      v.                           PART D OF THE SPECIAL
                                     MASTER'S THIRTIETH ROUND
17   GAVIN NEWSOM, et al.,           MONITORING REPORT**

18          Defendants.              Judge:  Hon. Kimberly J. Mueller

19

20

21

22

23

24

25

26

27

28

[4555444.8]

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

I.   THE COURT SHOULD ADOPT THE REPORT IN FULL BECAUSE
     DEFENDANTS HAVE NOT SHOWN THAT ANY OF THE FACTUAL
     FINDINGS ARE CLEARLY ERRONEOUS ........................................................ 1

II.  DEFENDANTS' OBJECTIONS ARE MERITLESS ............................................. 2

     A.   Defendants' Request for Patient Information Does not Attack a
          Factual Finding ...................................................................................... 2

     B.   Defendants' Attempt to Recast Their Actions as Non-Obstructive is
          Irrelevant and Should Be Rejected ......................................................... 2

     C.   Defendants' Objections to the Special Master's Reporting on
          Telepsychiatry Staffing Vacancies Fail .................................................. 3

     D.   Defendants' Objections Related to Sample Sizes Are Repeat
          Objections and Meritless ........................................................................ 5

     E.   Defendants' Objections Related to the Status and Impact of Data
          Remediation are Irrelevant and Do Not Negate Any Findings ................ 6

     F.   Defendants' Objection Related to MHCB Initial Psychiatry Contacts
          Does Not Show Clear Error ..................................................................... 8

     G.   Defendants' Objection Related to STRH Routine Primary Clinician
          Contacts Falls Flat and Should be Rejected ............................................ 8

     H.   Defendants' Objection to the Report's Findings of Non-Confidential
          Psychiatry and Primary Clinician Contacts Are Nothing More Than an
          Attempt to Wordsmith the Report ............................................................ 9

     I.   Defendants' Objection to the Reporting of Yard in the STRH is
          Contradictory to Their Own Data ............................................................ 9

     J.   Defendants' Objection to the Report's Reference to IDTTs in RCs
          Does Not Show Clear Error ................................................................... 10

     K.   Defendants' Objection to the Report's Discussion on Non-
          Confidential IDTTs is Void of Context and Meritless ............................ 10

     L.   Defendants' Objection to the Report's Discussion on Clinician-Led
          Group Treatment for CCCMS Patients Lacks Merit ............................... 11

     M.   Defendants' Objections Related to the Accuracy of the Special
          Master's Data in the Report Does Not Amount to Clear Error .............. 12

CONCLUSION ................................................................................................. 13

CERTIFICATION ............................................................................................. 13

# TABLE OF AUTHORITIES

**Page(s)**

Cases

*In re U.S.A. Motel Corp.,*
    450 F.2d 499 (9th Cir. 1971) ..................................................................................... 1

*McCormack v. Hiedeman,*
    694 F.3d 1004 (9th Cir. 2012) ................................................................................. 1

*Oil, Chemical & Atomic Workers Int'l Union v. N.L.R.B.,*
    547 F.2d 575 (D.C. Cir. 1976).................................................................................. 2

**INTRODUCTION**

On August 26, 2024, Defendants filed objections to the August 16, 2024 Special Master's Thirtieth Round Monitoring Report – Part D, on Defendants' Correctional Clinical Case Management ("CCCMS") Programs Compliance with Provisionally Approved Plans, Policies, and Protocols (hereinafter, "the Report"), in which the Special Master continued to find unacceptably high staffing vacancy rates and that the majority of patients across institutions reviewed received inadequate care.  *See* Thirtieth Round CCCMS Rpt., ECF No. 8359; Defs.' Objs. To Thirtieth Round CCCMS Rpt., ECF No. 8374 (hereinafter, "Defs' Objs.").  The Report also detailed a pattern of behavior by the Defendants that the Special Master finds to be "dangerously close to obstruction."  ECF No. 8359 at 43.  Defendants raise many "objections" to the Report, asserting, inter alia, that sections "lack context" and other meritless arguments, and requesting revisions to the Report.  But many of their points are not actually "objections" warranting court action, and those that are do not establish clear error.  Therefore, the Court should adopt the Report's findings in full.

**I.    THE COURT SHOULD ADOPT THE REPORT IN FULL BECAUSE DEFENDANTS HAVE NOT SHOWN THAT ANY OF THE FACTUAL FINDINGS ARE CLEARLY ERRONEOUS**

As Defendants concede, the clear error standard governs review of the factual findings in the Special Master's report.  *See* Defs' Objs. at 5; *see also* Order of Reference, ECF No. 640, at 8 (providing that "the court shall accept the special master's findings of fact unless they are clearly erroneous").[1]  A finding is "clearly erroneous if, on review of the entire evidence, the reviewing court arrives at the firm conviction that the finding is mistaken."  *In re U.S.A. Motel Corp.*, 450 F.2d 499, 503 (9th Cir. 1971); *see also* *McCormack v. Hiedeman*, 694 F.3d 1004, 1019 (9th Cir. 2012) ("To be clearly erroneous, a decision must strike the court as more than just maybe or probably wrong; it must …

---

[1] Page citations to documents in the docket are based on ECF pagination.

PLAINTIFFS' RESPONSE TO DEFENDANTS' OBJECTIONS TO PART D OF THE SPECIAL MASTER'S THIRTIETH ROUND MONITORING REPORT

1  strike [the court] as wrong with the force of a five-week-old, unrefrigerated dead fish."

2  (internal citations and quotation marks omitted)).  The objecting party has the burden of

3  proving clear error.  *See Oil, Chemical & Atomic Workers Int'l Union v. N.L.R.B.*, 547

4  F.2d 575, 580 (D.C. Cir. 1976).  As explained in greater detail below, because Defendants

5  have not met their burden of showing that *any* factual findings in the Report are clearly

6  erroneous, the Court should adopt the Report in full.

7  **II.    DEFENDANTS' OBJECTIONS ARE MERITLESS**

8      **A.    Defendants' Request for Patient Information Does not Attack a Factual
           Finding**
9

10      Defendants complain that the Report omits information on patient reviews

11  requested by Defendants.  Defs.' Objs. at 6.  This "objection" should be ignored, however,

12  because it does not attack a factual finding by the Special Master nor does it request that

13  the Court take any action with respect to the Report.  *See* Order of Reference at 8.

14  Defendants have at their disposal all patient information that the Special Master relies on

15  and can use their own records to refute findings if they have legitimate objections.  In any

16  event, the Special Master has agreed to provide this information going forward.  Report at

17  20 n.9.

18      **B.    Defendants' Attempt to Recast Their Actions as Non-Obstructive is
           Irrelevant and Should Be Rejected**
19

20      Defendants include in their objections a reference to the "narrative summary" in the

21  Report that lays out the Special Master's recent experience requesting routine documents

22  for his monitoring tours of new EOP units.  Report at 37.  The Report explains that after

23  requesting almost identical information for his tours "*for decades*," Defendants responded

24  with a "12-page letter outlining myriad demands, questions, concerns, and '*objections.*'"

25  Report at 38-39.  The Special Master says that while he does not make this statement

26  lightly, Defendants' "pattern of behavior comes dangerously close to the obstruction of the

27  Special Master's performance of his court-ordered responsibilities."  Report at 43-44.

28  Indeed, the Report details how the difficulty obtaining documents he is entitled to as part

1   of his monitoring is not an isolated incident.  Report at 41.  In response to Defendants'

2   objections to the draft Report, the Special Master did add a footnote that confirmed that

3   while the Defendants objected to document requests, the Special Master ultimately

4   received the documents to which he was entitled.  Report at 40 n.25.

5   However, Defendants continue to attempt to explain their actions and insist that

6   their concerns were raised "in good faith."  Defs.' Objs. at 6.  But this is not an objection

7   requiring any court action.  Defendants do not claim that the Special Master's explanation

8   of the series of events was inaccurate, nor do they ask the Court to reject this section of the

9   Report.  This "objection" is meritless and does not show clear error, and this Court should

10  reject it.

11      **C.    Defendants' Objections to the Special Master's Reporting on
              Telepsychiatry Staffing Vacancies Fail**

12

13  Defendants argue the Report "incorrectly suggests that CDCR is having difficulty

14  recruiting and retaining staff through the Telepsychiatry Program, and that telepsychiatry

15  has not had a positive impact on the overall psychiatry fill rate."  Defs.' Objs. at 6-7.   But

16  they do not identify any actual findings in the Report giving rise to this objection, in

17  contravention of the Order of Reference.

18  In any event, Defendants' second point is explicitly rebutted by the Report itself,

19  which states that the "Special Master and the Court support the use of telepsychiatry and

20  acknowledge that it has been helpful in reducing psychiatry vacancies."  Report at 50.

21  To support their first assertion, Defendants point only to their staffing data.  Defs.'

22  Objs. at 7.  But that data does not demonstrate that the Report's recitation of telepsychiatry

23  vacancies is clearly erroneous.  Defendants admit that the vacancy rate for telepsychiatry

24  positions relied on by the Special Master is correct, but they claim it is an "error in …

25  reporting" to ignore that institutions hired more on-site staff than allocated.  *Id.*  But the

26  Special Master does not ignore this:  He specifically reports that certain institutions had

27  more on-site staff psychiatrists than allocated, Report at 46, as well as reporting the

28  combined numbers including both telepsychiatry and on-site positions, Report at 50.  It is

1  not an error in reporting to provide data on the vacancies in the telepsychiatry program,

2  even if the on-site psychiatry vacancies are low, especially given the Court's involvement

3  in approving the policy.  Indeed, the Special Master has always reported the telepsychiatry

4  data separately from the on-site psychiatry staffing data, in addition to combining the data

5  points.  *See* ECF No. 7074 at 90-93; ECF No. 7716 at 33-35.  His recitation of the increase

6  in unfilled telepsychiatry positions as compared to the last round is instructive, and not

7  inaccurate.  *See* Report at 49.  Thus, the Special Master can, and should, provide this data.

8  Defendants also assert that "[t]he thirteen institutions reviewed in the Report had a

9  combined line-staff psychiatry fill rate of 98 percent."  Report at 8.  This is irrelevant and

10  should be ignored.  The Court's orders require Defendants to maintain a vacancy rate of

11  less than ten percent at each institution—the combined fill rate of psychiatrists across all

12  CCCMS institutions is therefore not instructive, nor does it negate the Special Master's

13  accurate findings that some of the institutions had high vacancy rates.

14  Instead of pointing to any factual inaccuracies, Defendants argue it is an "error" not

15  to include specific context they would have liked the Special Master to include in the

16  Report.  Defs.' Objs. at 7.  This is not error, and it is certainly not clear error.  Defendants

17  also argue that the Report "misconstrues" the Telepsychiatry Policy by stating that it

18  allows "unrestricted use of telepsychiatry for 3CMS patients."  *Id.*  They clarify the policy

19  allows for telepsychiatry provided all other conditions for CCCMS are adhered to and

20  good faith efforts to recruit on-site psychiatrists continue.  *Id.*  But this does not contradict

21  the Special Master's finding.  Requiring CCCMS conditions be adhered to and continuing

22  recruitment does not restrict the ability to use tele-psychiatrists in all contexts that on-site

23  psychiatrists may be used for this patient population.  Further, the Special Master made a

24  similar statement in his Thirtieth Round EOP Report, to which Defendants did not object.

25  *See* ECF No. 8095 at 48; ECF No. 8108.  That Defendants do not like the logical

26  conclusion the Special Master drew from this policy does not make his factual findings

27  inaccurate and nor does it show clear error.  Defendants conclude by asserting that "any

28  negative findings related to staffing fills rates are unfounded."  Defs.' Objs. at 8.  Again,

Defendants do not claim that any specific factual findings made by the Special Master are inaccurate. Instead, they simply do not agree with the conclusions the Special Master reasonably drew from the existing data. This is not clear error, and the Court should reject this argument.

### D.    Defendants' Objections Related to Sample Sizes Are Repeat Objections and Meritless

Defendants next object that the sample sizes used for certain compliance measures were "smaller than the sample sizes mandated by the data expert," and that the Special Master fails to explain "how that number meaningfully represents the conditions in the institutions." Defs.' Objs. at 8. According to Defendants' own representations to this Court, the data remediation process is years from completion. Any complaints about a supposed mismatch between the sample sizes in the Report and those being discussed in the data remediation process can and should be addressed in that forum—they do not form a basis for an objection to the Report itself.

Furthermore, as the Special Master notes, the Court has previously overruled similar objections related to sample sizes. Report at 20 n.8 (citing ECF No. 8239 at 6). Defendants argue that their objection has not been raised previously and the Court has not issued a decision on the appropriate sample size, citing an order from May 16, 2024 that "references the term 'sample size.'" Defs.' Objs. at 8 n.2. They attempt to distinguish their objection from the ones they raised prior by arguing their previous objection focused on a request that remediated data be used, but that this objection is specific to the sample sizes in this Report. Their argument is unconvincing. The previous objections tie Defendants' concerns about sample sizes to data remediation. *See* ECF No. 8108 at 9-10, 12. Their current objections similarly argue that the sample sizes are "improper" because Defendants claim they are inconsistent with the data remediation expert's requirements. Defs.' Objs. at 8. While the Court did not explicitly issue a decision on appropriate sample size, it did not have to do so to support overruling the related objections. Indeed, the Court overruled every objection to that Report and adopted it in full. *See* ECF No. 8239.

1    Therefore, these are objections that have been raised and rejected by the Court and are

2    therefore foreclosed.

3         Regardless, Defendants' objections concerning sample sizes are meritless.

4    Defendants argue that the Report contains  "myriad of [sic] examples of improper sample

5    sizes," but they do not present any contrary evidence to show that the sampled records

6    result in misleading or inaccurate compliance findings, or are otherwise anomalous.  Defs.'

7    Objs. at 8-9.  This is true even though Defendants have access to the myriad sources of

8    information underlying the Special Master's findings, including pre-tour and on-site

9    documents provided by Defendants, record reviews, on-site audits, treatment observation,

10   and interviews with staff and patients.  Defendants had every opportunity to demonstrate

11   their compliance rates are higher when accounting for more of the patient population, but

12   they tellingly did not do so.  Furthermore, the Special Master's prior reports have also used

13   a sample size of twenty, or even less, to assess compliance with these requirements.  *See,*

14   *e.g.*, ECF No. 7716 at 270, 331, 357, 372 (sample size of 20); *see also* ECF No. 7074 at

15   333 (sample size of 12 used to assess HDSP CCCMS program), 360 (sample size of 10

16   used to assess MCSP CCCMS program), 445 (sample size of 14 used to assess DVI

17   CCCMS program).  Defendants have failed to identify any cognizable basis for sustaining

18   this objection, which in any event is foreclosed by the Court's prior order rejecting it.

19        **E.    Defendants' Objections Related to the Status and Impact of Data
              Remediation are Irrelevant and Do Not Negate Any Findings**

20

21        Defendants claim the Report omits relevant facts about the status and impact of data

22   remediation.  In doing so, Defendants take the Report's reference to the data remediation

23   process out of context.  They argue that the Report characterizes CDCR's requests for

24   responses to data emails as an attempt to obstruct the Special Master's duties.  Defs.' Objs.

25   at 9.  Instead, the Report raised the data remediation process as an example of Defendants'

26   recent "resistance to the court-ordered duties of the Special Master and his role as an 'arm

27   of the court.'"  Report at 42.  The Report details how the Defendants set deadlines for

28   Plaintiffs and the Special Master while delaying or objecting to requests from the Special

Master to provide information on Defendants' timelines.  *Id.*  Defendants' emails contain quick turnarounds for deadlines and even threats that if stakeholders miss these expedited deadlines, Defendants will move those items forward without waiting for the Special Master (or Plaintiffs) to comment.  *Id.*  While Defendants assert they would not actually move items forward without stakeholder comments (ECF No. 8374 at 10), this does not negate the Special Master's findings.  The fact that their emails contain these threats, empty or not, goes to the Special Master's assertion that Defendants have begun treating the Special Master as "yet another litigant in this matter, not the neutral arm of the court that he is."  Report at 43.

Defendants' discussion does not point to any factual inaccuracies in the Report, but merely provides a recitation of the current way CDCR is managing data remediation, which is not inconsistent with the Special Master's assertion that Defendants currently "set deadlines for the Special Master . . . and require that the Special Master . . . request 'extensions.'"  Report at 43.  Defendants also analogize to the process for reviewing CDCR draft policies within 30 days and argue that the Special Master has never raised concerns regarding that process.  Defs.' Objs. at 10.  This is irrelevant for multiple reasons.  First, it is improper to compare a 30-day comment period to a six-day turnaround (Report at 42) accompanied with a threat that a particular indicator will move along if comments are not received in that time.  Second, Defendants ignore the fact that the data remediation process was specifically ordered by the Court to be conducted "under the Special Master's supervision," and that the process itself was necessitated by the fact that "defendants had knowingly presented misleading data to the court and Special Master."  Report at 40 (citing ECF No. 7847).  The Court has also previously reminded Defendants that they are "required to cooperate fully in response to the Special Master's requests and direction."  ECF No. 8069 at 20.  As such, Defendants' objection that the Special Master's Report omits necessary information on the data remediation process is meritless, does not negate any of the Report's findings, and should be overruled.

/ / /

[4555444.8]

7

1  **F.    Defendants' Objection Related to MHCB Initial Psychiatry Contacts Does Not Show Clear Error**

2

3      Defendants object that the Report used the wrong standard for initial psychiatry

4  contacts in the MHCB because the Program Guide requirement for psychiatric contacts is

5  twice weekly.  Defs.' Objs. at 11.  But Defendants have not identified any error in the

6  Special Master Report.  The Special Master found, for example, that in the CIM MHCB

7  "Seventy of 71 or 99 percent of *routine* psychiatry contacts occurred twice weekly as

8  required."  Report at 137 (emphasis added).  This is distinct from the initial psychiatry

9  contact in the MHCB, which the Special Master has been measuring separately as a

10  requirement for years.  *See, e.g.*, ECF No. 7074 at 319, 331, 380, 388, 417; ECF No. 7716

11  at 130 and 327.

12      Defendants also take issue with the fact that since the review period covered by the

13  Report, the parties reached an agreement in data remediation to require initial MHCB

14  psychiatry contacts within 72 hours.  Defs.' Objs. at 11.  Like the other objections related

15  to agreements reached after the Report's review period, discussed below, it is not clear

16  error for the Special Master to measure initial psychiatry contacts in the MHCB using the

17  then-operative requirement that he used for years.  This objection should be overruled.

18  **G.    Defendants' Objection Related to STRH Routine Primary Clinician Contacts Falls Flat and Should be Rejected**

19

20      Similarly, Defendants object to the Report's failure to use a later-agreed-upon

21  definition for "weekly" when analyzing compliance of routine primary clinician contacts

22  in Short-Term Restricted Housing.  Defs.' Objs. at 12.

23      The Special Master's decision not to apply a later-negotiated definition does not

24  amount to clear error.  At the time the Special Master reviewed the thirteen institutions in

25  this Report, the operative definition of weekly used in his monitoring tours was seven

26  days.  *See* ECF No. 7074 at 558, 688; ECF No. 7715 at 552.  The parties later agreed to

27  modify the definition of "weekly" during the data remediation process in order to provide

28  Defendants with operational flexibility by allowing the contacts to occur once every

[4555444.8]

8

1  calendar week.  *See* ECF No. 8069 at 18; *see also* Report at 116-17 n.36.  The Special

2  Master has agreed to use the newly negotiated definition of weekly going forward, *id.*, but

3  that does not establish that his findings in the current Report, which utilize the definition

4  he has historically employed, are clearly erroneous.  Indeed, switching the definition for

5  only one out of four Thirtieth Round Reports would create confusion and inconsistency in

6  compliance reporting.  This objection should be overruled.

7  **H.    Defendants' Objection to the Report's Findings of Non-Confidential**
       **Psychiatry and Primary Clinician Contacts Are Nothing More Than an**
8       **Attempt to Wordsmith the Report**

9       Defendants object that the Report includes findings that certain non-confidential

10  contacts resulted from patient refusals, without also stating that the contacts were Program

11  Guide-compliant.  Defs.' Objs. at 13.  The Report does not state that the contacts were

12  *non-compliant* with the Program Guide, so there is no inaccuracy in the Report.  And the

13  Special Master has previously reported non-confidential contacts as a result of patient

14  refusals in the same way.  *See, e.g.*, ECF No. 7716 at 271, 291, 296, 354.  Defendants'

15  objection amounts to inappropriate wordsmithing and should be rejected.

16  **I.    Defendants' Objection to the Reporting of Yard in the STRH is**
       **Contradictory to Their Own Data**
17

18      Defendants object that the Report uses the word "yard" and not "exercise out of

19  their cell" in assessing STRH compliance.  Defs.' Objs. at 13.  This objection falls flat.  As

20  the Special Master notes, Defendants' own data records yard, rather than the more general

21  "out-of-cell exercise time."  Report at 25.  Defendants do not dispute that all of the

22  required "out-of-cell exercise time" required by the STRH policy can consist of yard.  In

23  this case, as the Special Master reports, Defendants demonstrated full compliance with the

24  requirement by submitting data showing the amount of yard offered to STRH patients.

25  Again, Defendants have not identified any inaccuracy (much less clear error) in the Special

26  Master's reporting – they simply prefer their own word choice.  That is not a legitimate

27

28

[4555444.8]

9

1 basis for objection.[2]

2      **J.**    **Defendants' Objection to the Report's Reference to IDTTs in RCs Does Not Show Clear Error**

3

4      Defendants claim that they "identified a mistake" in the Report regarding IDTTs for

5 RC CCCMS, pointing to a sentence stating that RC patients did not receive an IDTT and

6 were generally transferred before required annual IDTTs.  Defs.' Objs. at 14.  But

7 Defendants identify nothing inaccurate about this statement.  It is factually true.  While

8 Defendants claim the Special Master's finding "impli[es] … non-compliance," *see id.*, the

9 Report makes no statement regarding compliance or non-compliance at all.   While the

10 parties subsequently clarified certain related Program Guide requirements during the data

11 remediation process, as the Special Master explains in his response, the relevant agreement

12 was reached after the review periods for the Report.  Report at 24-25.  Again, Defendants

13 identify no clearly erroneous factual finding, or any other valid basis for objection.

14      **K.**    **Defendants' Objection to the Report's Discussion on Non-Confidential IDTTs is Void of Context and Meritless**

15

16      Defendants object that the Report erred in finding certain IDTTs not confidential

17 due to the presence of cameras and officers in the room.  Defs.' Objs. at 14.  They first

18 argue that fixed cameras do not "render the IDTT non-confidential" and aver that they

19 "confirmed" the cameras in question either do not pick up sound or were not functional at

20 the time of the tour.  *Id.* at 14-15.  Notably, Defendants have never provided any evidence

21 to the Special Master or this Court substantiating that claim.

22      Furthermore, they do not dispute the Special Master's explanation that he received

23 no such confirmation at the time of the tour, supporting the Special Master's monitor's

24 "concerns about confidentiality secondary to the presence of cameras."  Report at 25-26.

25

26 _____

27 [2] Defendants also, in a footnote, object to any minimum threshold for out-of-cell time for MHCB patients.  Defs.' Objs. at 13 n.3.  The parties have briefed this issue, and Plaintiffs'

28 position remains the same as before.  *See* ECF No. 8287.

[4555444.8]

1   Nor is it apparent from the record that Defendants have taken any steps to ensure patients

2   understand the cameras are not relaying audio of their private mental health treatment – or

3   to ensure that the NKSP cameras, which were allegedly non-operable "at the time of the

4   monitoring tour," are not audio enabled and/or operable today.  Defs.' Objs. at 15.  In these

5   circumstances, the Special Master's finding that the presence of cameras inhibited IDTT

6   confidentiality when "patients' level of discomfort in discussing private, mental health

7   issues should be primary" is well supported and certainly not clearly erroneous.  *See*

8   Report at 26.

9        Defendants also object that the Report improperly included officer attendance at an

10  IDTT in WSP as a reason for its non-confidentiality.  Defs.' Objs. at 15.  While the

11  Program Guide permits custody officers with "direct knowledge of the inmate-patient" to

12  attend IDTTs, the Special Master explained that the officers in question did not appear to

13  the monitor to have any such knowledge regarding the patient.  Report at 26.  Further, the

14  Report details that the custody officers walked in and out of the room during the IDTT,

15  resulting in the door being open at various times, which indisputably renders the

16  conversation non-confidential.  *Id.*  This important context provided by the Special Master

17  supports his finding that the WSP IDTT was not confidential in the ways the Program

18  Guide contemplates.  Defendants have again identified no clear error in the Special

19  Master's findings, and their request to remove the finding that the IDTTs at NKSP and

20  WSP were non-confidential should therefore be overruled.

21       **L.    Defendants' Objection to the Report's Discussion on Clinician-Led
             Group Treatment for CCCMS Patients Lacks Merit**

22

23       Defendants object to the Report's reference to the lack of clinician-led groups for

24  CCCMS patients, asserting that group treatment is not required for CCCMS patients.

25  Defs.' Objs. at 16.  But, as usual, in pointing to the lack of a specific required minimum,

26  Defendants ignore the Program Guide's requirement that CCCMS patient care is to be

27  individually tailored, with group therapy "provided as clinically indicated."  ECF No.

28  7333-1 at 35-36.  Again, Defendants do not contest the accuracy of the Special Master's

[4555444.8]

11

1  finding that no such groups are available for the CCCMS patients who might need them,

2  nor do they contend that the Special Master erroneously makes a non-compliance finding

3  in this area.  And the Special Master has routinely reported on the availability of such

4  treatment in prior monitoring reports. *See* ECF No. 7716 at 113-14; ECF No. 7074 at 571.

5  This objection too is devoid of merit.

6      **M.**    **Defendants' Objections Related to the Accuracy of the Special Master's Data in the Report Does Not Amount to Clear Error**

7

8        Defendants lastly object that the staffing data provided by the Special Master report

9  is inaccurate because it is inconsistent with the Defendants' February 2024 Staffing

10  Report. Defs.' Objs. at 16-17.  They argue that because the data is "not susceptible to fact

11  checking" that it should not be used. *Id.* at 17.

12        The Special Master has already provided reasons for the seemingly inconsistent

13  data.  The institutional summaries reflect vacancies at the time of the monitoring tours,

14  which come from Defendants' pre-tour data productions as adjusted by Defendants'

15  institutional staff during the on-site inspections as appropriate.  Report at 27 n.12.  This is

16  a practice that the Special Master has used for "many rounds of monitoring." *Id.*  In

17  conducting fact-finding as a neutral arm of the Court, it is not unexpected that the Special

18  Master might collect data from the institutions that is inconsistent with the "official"

19  headquarters data Defendants may provide.  This does not render the Special Master's

20  reporting clearly erroneous, and Defendants have not been able to point to any reason to

21  believe the data is false besides that it is not from their preferred "official" source.

22        While Defendants claim the Report's cited data is "not susceptible to fact

23  checking," they do not (and cannot) dispute the fact that Defendants themselves provide all

24  of the data underlying the Special Master's calculations.  Defs' Objs. at 17.  Defendants

25  are aware of the dates of the monitoring tours for each institution and indeed attend all

26  tours, yet provide no contradictory numbers for the staffing levels at those dates in time.

27  Therefore, Defendants are unable to point to any actual factual inaccuracies or show that

28  the Report's institutional summary staffing data is clearly erroneous, and this objection

[4555444.8]

1  should be overruled.

2  **CONCLUSION**

3  The Court should reject all of Defendants' claimed objections and adopt the Special

4  Master's Report in full.

5

6  DATED:  September 9, 2024          Respectfully submitted,

7                                    ROSEN BIEN GALVAN & GRUNFELD LLP

8

9                                    By:  */s/ Luma Khabbaz*

10                                        Luma Khabbaz

11                                   Attorneys for Plaintiffs

12

13 **CERTIFICATION**

14 Plaintiffs' counsel certifies that she reviewed the following orders in preparing this

15 filing: ECF Nos. 640, 7229, 7808, 7847, 8069, 8239.

16

17 DATED:  September 9, 2024          Respectfully submitted,

18                                   ROSEN BIEN GALVAN & GRUNFELD LLP

19

20                                   By:  */s/ Luma Khabbaz*

21                                        Luma Khabbaz

22                                   Attorneys for Plaintiffs

23

24

25

26

27

28

[4555444.8]