**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF CALIFORNIA**

**RALPH COLEMAN, et al.,**
**Plaintiffs**

**vs.** **No. 2:90-CV-0520 KJM-SCR**

**GAVIN NEWSOM, et al.,**
**Defendants**

---

**SPECIAL MASTER'S DATA REMEDIATION STATUS REPORT**

The Special Master submits this report in response to the Court's August 16, 2024 Order directing the Special Master to "propose directly to the court a solution to expedite completion of the [data remediation] process without sacrificing any measure of quality in the final product." ECF No. 8358 at 4-5.

Following the Court's December 2019 finding that defendants had presented misleading mental health data and statistics regarding their compliance with the court-ordered remedy, working under the Special Master's supervision, defendants began the data remediation process. When this work began the Special Master envisioned an extremely arduous, time-consuming undertaking. Nearly five years later, the challenges encountered in remediating the original provisionally approved list of 148 (now 267) indicators have met and surpassed even that sober initial assessment. Despite concerted efforts by the stakeholders, and periodic efforts by the Special Master to bring better focus to the project, timely completion of this Sisyphean task has remained elusive.

Completion of data remediation will allow the court to rely on defendants' data when assessing the extent to which CDCR provides constitutionally adequate mental health care to the tens of thousands of people with serious mental illness confined in its prisons; it will permit

defendants to move ahead with deployment of CQIT, a critical step in the creation of an adequate mental health service delivery system and an important milestone toward the removal of federal court oversight; finally, it will free the resources of all stakeholders to focus on the primary task at hand: the provision and monitoring of the mental health treatment desperately needed by *Coleman* class members. In short, while great effort has been expended, and significant progress has been made, this undertaking must come to end as soon as possible without sacrificing the quality of the end product. *See* August 16, 2024 Order, ECF No. 8358 at 4-5 (directing the Special Master to "propose directly to the court a solution to expedite completion of the [data remediation] process without sacrificing any measure of quality in the final product").

As delineated below, the Special Master has concluded that business as usual will not be sufficient to bring data remediation to a timely and successful completion, something clearly mandated by the court and supported by all stakeholders. The Special Master's update on progress, identification of obstacles to more timely completion, and his proposed solutions are offered to the court in the spirit of acknowledging the extent of the work that remains, not apportionment of blame.

The Special Master is acutely aware that despite the highly diligent efforts of all stakeholders, the current arrangement is not producing results in a sufficiently timely manner. For example, 107 indicators remain unremedied and numerous overarching issues remain unresolved. He proffers his recommendations recognizing the potential risks involved in making significant changes to the process and to personnel at this stage of data remediation; but he is also aware that in retrospect, the current structure is insufficient to task and no single expert- no matter how highly skilled and accomplished – will be able to bring the project across the goal

line as quickly as this complex case requires. To that end, the Special Master has had intensive discussions with a large, global consulting firm aimed at harnessing the resources needed to bolster the Special Master's oversight of the data remediation process. Additionally, this firm's resources and expertise would facilitate the Special Master's reassessment of his team's existing processes for reviewing indicators and documentation as well as the long-term sustainability of the project overall (i.e. annual and periodic review process). The Special Master hopes to conclude these discussions, which have been ongoing for months, and bring forth a request for additional resources as soon as possible.

Relatedly, the court recently authorized the Special Master to work with the *Plata* Receiver, Mr. Clark Kelso, through the existing court coordination process to "work collaboratively on certain issues." September 24, 2024 Order, ECF No. 8406 at 1-3. The Special Master and *Plata* Receiver have agreed that data remediation should be one of the initial focal points of these coordination efforts. *Id.* at 3. Accordingly, this report also provides details on the specific aspects of the data remediation process that will be subject to the Special Master and *Plata* Receiver's initial collaborative efforts – namely, those indicators subject to the court's order regarding patient-wise and degree-of-impact summary statistics, the medication management indicators, and those indicators currently in the programming and verification stages of the remediation process. The Special Master sees great potential for this arrangement to make progress and create momentum toward completion of data remediation and appreciates the *Plata* Receiver's agreement to embark on these collaborative efforts forthwith. In addition, enhanced coordination with the *Plata* Receiver may enable the Special Master to reduce his team's role in what has proven at times to be an inefficient and contentious BRMR process, freeing up his team's resources to focus on other important remedial work in this complex case.

## I. Background

The Special Master has filed several reports on the status of the data remediation process and the development of CQIT key indicators. On June 8, 2020, the Special Master filed his Initial Report on Data Issues within the California Department of Corrections and Rehabilitation. ECF No. 6705. The Special Master attached a report from his data expert, Daniel Potter, Ph.D., to the Twenty-Eighth Round Monitoring Report, filed with the Court on March 5, 2021. ECF No. 7074 at 218-242. On May 6, 2021, the Special Master filed his Report on the Continuous Quality Improvement Tool Key Indicators, ECF No. 7151, which the Court adopted in a July 1, 2021 Order. ECF No. 7216.[1] As required by the Court's January 3, 2023 Order, ECF No. 7695, on June 30, 2023, the Special Master filed a report providing "status updates on data remediation generally and as it pertains to the finalization of the list of Continuous Quality Improvement Tool (CQIT) key indicators." ECF No. 7683 at 6. On October 13, 2023, the Special Master filed his most recent Data Remediation Status Report ("October 2023 Status Report") with the Court.[2] *See* ECF No. 8011.

In an order dated February 1, 2024, the court expressed its frustration with the persistent delays in the data remediation process and stated that it "will not tolerate further delay unless it is essential to remediation of the ongoing Eighth Amendment violations in this action, and remediation that is both complete and durable." *See* ECF No. 8121 at 1. In that order, the court

[1] With one modification, the Court provisionally approved the list of key CQIT indicators included in the Special Master's report. *See* ECF No. 7216 at 14 (striking one indicator from the Special Master's list as duplicative and provisionally approving the balance of Special Master's proposed list of key indicators).

[2] On November 13, 2023, defendants filed their objections to the Status Report, ECF No. 8065, and on December 22, 2023 plaintiffs filed their response to defendants' objections, ECF No. 8098. The Court issued an order adopting the Special Master's October 13, 2023 Data Remediation Status Report on February 1, 2024. ECF No. 8121.

extended the deadline for completion of the data remediation project to March 31, 2024, noting that "the Special Master and all stakeholders must always have a firm deadline in place to keep the necessary forward momentum." *See id.* at 3.

In an April 2, 2024 Order to Show Cause, the Court acknowledged the Special Master's informal report that the stakeholders had not met the March 31, 2024 deadline to complete data remediation. ECF No. 8181 at 1. The Court also discussed the status of two identifiable groups of indicators – a group of 41 indicators that had completed all steps of the remediation process and awaited the Special Master's data expert's final review, and another group of 38 indicators subject to the Court's ordering requiring implementation of patient-wise summary statistics. *Id.* at 2. The Court directed the Special Master to "take all steps necessary to complete the process of marking" the group of 41 indicators awaiting final review at that time "as remediated no later than April 25, 2024." *Id.* at 4.

In the weeks following the Court's April 2, 2024 Order to Show Cause, the stakeholders conducted focused reviews of the group of 41 indicators in a collective effort to complete remediation for as many of these indicators as possible. As the Special Master reported at a status conference on April 26, 2024, his data expert marked 32 of the original group of 41 indicators as remediated by April 25, 2024. April 26, 2024 Transcript of Proceedings, ECF No. 8244 at 20. While the stakeholders were not successful in remediating this entire group, the process used to conduct the focused review of this identifiable group of indicators has proven to be useful for purposes of narrowing and resolving issues common to similarly themed indicators, as discussed further below.

At the status conference held on April 26, 2024, the court and parties discussed the concept of focusing and accelerating the remediation process by prioritizing identifiable tranches

of indicators measuring similarly themed remedial requirements, such as those indicators measuring suicide prevention requirements. *See* ECF 8244 at 37-39. This concept has since been expanded to include tranches of medication management indictors and indicators in the programming, verification and final stages of remediation. This prioritization of indicators is intended to hasten the final remediation of these groups of indicators and make more substantial progress toward project completion.

In its August 16, 2024 order, the court again noted that "…the data remediation process is taking too long to complete." ECF No. 8358 at 4. While recognizing that "multiple factors are contributing to the delay," *id.*, the court explicitly rejected "…defendants' suggestion… that the process needs to take another two years," instead stating that "…there is no good reason the data remediation process cannot be completed in the relatively near term." *Id.* The court continued:

> To ensure this essential aspect of the case, as foundational to full deployment of the continuous quality improvement tool (CQIT) defendants will use to demonstrate compliance with the remedy, is not unnecessarily drawn out the court has directed the Special Master to propose directly to the court a solution to expedite completion of the process without sacrificing any measure of quality in the final product.

*Id.* at 4-5.

After providing updated information concerning the status of data remediation and outlining the overarching unresolved issues that impede more rapid completion of this daunting undertaking, the Special Master makes recommendations responsive to the court's direction that he propose solutions to expedite completion. As alluded to, the Special Master will vigorously pursue enhanced court coordination efforts with the *Plata* Receiver to jump-start progress on the patient-wise and medication management indicators, as well as those indicators currently in the programming and verification steps of the process.

In each of these categories of indicators, the *Plata* Receiver is well-positioned to provide assistance. With respect to the medication management indicators, the Special Master and *Plata* Receiver worked together to create the Medication Administration Process Improvement Program (MAPIP) audit tool. *See, e.g.*, Twenty-Eighth Round Monitoring Report, ECF No. 7074 at 125. Thus, the indicators measuring MAPIP requirements represent a natural starting point for these initial data remediation-related coordination efforts. In addition, the Special Master notes much of the technical work in the verification step of the data remediation process is performed by CCHCS staff. These factors, along with the *Plata* Receiver's deep knowledge of the department's data systems, bode well for this collaboration's potential to further accelerate progress on these groups of indicators. If these collaborative efforts with the *Plata* Receiver prove to be as productive as the Special Master expects, he will incrementally pursue additional data remediation-related coordination efforts in aid of completion of this incredibly complex project.

In addition, the Special Master has, for many months, been engaged in discussions with a large, global consulting firm to explore opportunities to bring their significant resources and expertise to the table to complete this daunting remedial project in an acceptable timeframe. To the extent these discussions bear fruit, the Special Master will separately and promptly bring forth a request for additional resources delineating this firm's scope of responsibilities for the court's consideration.[3]

---

[3] In some respects, these unresolved issues have also held up completion of remediation for several court-ordered resolutions to data remediation disputes. For instance, several indicators measuring timely transfer that have been the subject of court orders resolving data remediation disputes (i.e. AC6, AC7.1, AC7.4) are tied up in the disagreement regarding reporting of overdue requirements (i.e. the "done or overdue" problem, *see infra* Part IV.B).

## II. Review of Steps in the Data Remediation Process

The data remediation process consists of the following steps:

Step 1: DOCUMENTATION

CDCR Mental Health creates preliminary documentation for the indicator and its business rules. This documentation includes a list of business requirements that the indicator intends to measure and then describes how the software (or an audit) will operate to achieve this.

Step 2: VALIDATION

Stakeholders then validate the indicator's documentation (in the context of business requirements and workflows it is intended to measure) to ensure its design will create transparent and accurate data. When issues are discovered, stakeholders work by consensus to correct the deficiency or use the agreed dispute resolution process. Stakeholder validation takes place through written comments provided by the Special Master's team and plaintiffs along with detailed discussion during BRMR meetings.

Step 3: APPROVALS

The agreed-upon documentation approved by all stakeholders including the Special Master's data expert then enters CDCR's current change management process for approval by CDCR Mental Health.

Step 4: PROGRAMMING

The indicator is programmed according to the validated documentation by CDCR programmers under the supervision of MH.

Step 5: VERIFICATION

Software tests are created to confirm that the indicator is working as designed on an ongoing basis. These tests are created by a separate team of CDCR programmers working with CDCR subject matter experts in order to verify that the CDCR's data products (including row-level "case data" and summary statistics) are correctly generated per their previously validated designs.

Remediation of Individual Indicators

Finally, when indicators and their business rules complete the five-step validation and verification process, and there are no outstanding stakeholder disputes, the Special Master's data expert marks them as remediated and communicates the same to the date remediation stakeholders.

Data System Certification

In order for the data remediation process to be completed, the individual remediated indicators must operate in a system that is transparent and has adequate version

> control to enable users to easily track and compare current documentation to prior versions. This will provide for the durability of the gains made during the remediation endeavor. The Special Master's data expert has committed to reviewing and certifying that such processes are in place so that the significant achievements of the data remediation process are durable and that the Court can rely on the accuracy of defendants' mental health-related data after the remediation process has completed.

April 2, 2024 Order to Show Cause, ECF No. 8181 at 2-3 (citing Special Master's Report on Data Remediation, ECF No. 7863 at 28-30).

## III. Current Status

This section provides status updates on the presently identified list of 267 indicators derived from the provisionally approved list of key indicators.[4] It also provides more granular updates with respect to the status of the specific tranches or groupings of indicators referenced above (i.e. suicide prevention, medication management, and indicators in programming and verification).

### A. Overall Summary

As demonstrated in the tables below the original list of provisionally approved indicators has grown to 267 due to the splitting of indicators and creation of new ones as the process has unfolded.[5] The table also reflects the continued diligent efforts of all data remediation stakeholders in that 160 or 60 percent of the indicators have been fully remediated. These

[4] The 267 current indicators include those indicators derived from the original list of provisionally approved indicators, "extensions" of provisionally approved indicators to the measure requirements in the psychiatric inpatient program (PIPs) ("extended indicators"), and new indicators identified through the stakeholder review and dispute resolution processes.

[5] In its February 1, 2024 Order, the Court noted "at least one of the reasons the number of indicators appears to have ballooned is because some individual indicators have been split into multiple indicators," and that, "[a]t this juncture, the Special Master is in the best position to assess the impact of proposals to split indicators, or to add new indicators, and whether those proposals increase or decrease the efficiency of the data remediation process and the overall goals to be served by data remediation." ECF No. 8121 at 4.

focused efforts have resulted in meaningful progress since the time of the Court's April 2, 2024 Order and Order to Show Cause, when 101 indicators had been remediated. ECF No. 8181 at 3.

These positive developments notwithstanding, much work—indeed, too much work—remains to be done to complete this formidable task. Progress, while demonstrable, has not been sufficiently swift. The tireless work of all stakeholders and the significant resources devoted to data remediation have been outpaced by the magnitude of the task and available resources so that given the current structure of the project, disappointingly it is impossible to project completion of the project as currently constituted and resourced within an acceptable timeframe.

The Special Master reluctantly draws this conclusion based not only on (1) the number of indicators yet to be remediated (107), but also on (2) the number of unresolved foundational issues looming over the prospects for speedy remediation of the remaining indicators. Notably, the indicator status updates provided within this report do not account for the incorporation of the court-ordered patient-wise and degree of impact statistics, which under defendants' approach would result in dozens more additional indicators. The conundrum of how to address these overarching issues have tempered the Special Master's overall assessment of the state of remediation and caused him to rethink his proposed strategy for achieving success within an acceptable period of time.

These unsettled issues, discussed in greater detail below, go to the overall structure of the data remediation process but will also pose practical challenges with respect to many of the specific indicators yet to be remediated. They include, at minimum, implementation of the patient-wise approach, inclusive of flexible scoring and degree of impact statistics, for all 38 timely compliance indicators, divergent views concerning the most informative and transparent the way in which many reports should be structured (done or overdue, *infra* Part IV.B), and the

nature of the annual and periodic review of indicators after they have been remediated. *E.g.*, ECF No. 7074 at 209, 219; *see also* ECF No. 7334 at 36.

Other ongoing issues weighing down forward progress include the need to obtain greater transparency into the pre- and post-BRMR stages of remediation with regard to estimated completion dates and any obstacles encountered by the department in moving indicators through these steps and how to facilitate the free flow of needed information and exchange of ideas between the court's data expert and defendants' subject matter experts and technical personnel in a highly litigious context characterized by pervasive involvement by counsel.

B. Status of Indicators Derived from the Original List of Provisionally Approved Key Indicators

The table below reports on the status of the 267 indicators derived from the original list of 148 indicators. While 160, or 60 percent of the 267 indicators have been marked off as remediated, 59 remain either in the pre-BRMR or BRMR steps of the process. Another significant group of 40 are post BRMR, mostly in the programming and verification steps. *See infra* Part III.E (noting that some indicators have been in verification step for more than a year).

Table 1: Status of 267 Indicators Derived from Original List of Provisionally Approved Key Indicators (as of September 13, 2024)

| # | **Current Step** | **Description** | **Percentage** |
|---|---|---|---|
| 16 | Not yet in BRMR (Step One Initial Documentation Preparation) | CDCR prepares documentation for initial stakeholder review. There may be delays due to pending memos, labor negotiations, etc. | 6% |
| 43 | In BRMR (Step two Validation) | Stakeholders and CDCR review initial stakeholder feedback. As this occurs, typically, stakeholders agree on changes and improvements. In other cases, CDCR or a stakeholder may require a | 16% |

| | | | |
|---|---|---|---|
| | | bring-back. Dispute resolution is used as necessary | |
| 40 | After BRMR (Steps three, four and five, approvals, programing and verification) | Includes Programming and Verification steps; CDCR creates a final version of the BRMR documentation that CAPC must approve. Approved documentation is sent to the MH Programming and Verification teams for implementation (coding) and testing (verification). | 15% |
| 6 | Pending Remediation | After indicators/reports have been programmed and initial testing is complete, stakeholders perform their final review of the documentation. | 2% |
| 2 | Disputes Pending Before Court | Dispute Resolution | 1% |
| 160 | Remediated | SM Data Expert and the plaintiffs review the final documentation. If there are no outstanding issues, he marks the indicator or report off as remediated. | 60% |
| 267 | | | 100% |

C. Status of Suicide Prevention Indicators

During the April 26, 2024 Status Conference, defense counsel expressed support for plaintiffs' proposal to focus the stakeholders' collective efforts on completing remediation of the "tranche" of remaining suicide prevention indicators. *See* April 26, 2024 Transcript of Proceedings, ECF No. 8544 at 35-38. The table below provides a status update, reflecting that 70 percent of the suicide prevention indicators have been marked off as remediated.

Table 2: Suicide Prevention Indicators (as of 9/13/2024)

| # of indicators | Current Step | Description | % of Suicide Prevention Indicators |
|---|---|---|---|
| 2 | Not yet in BRMR [Initial Documentation Preparation] | CDCR prepares documentation for initial stakeholder review. There may be delays due to pending memos, labor negotiations, etc. | 4% |
| 2 | In BRMR [Stakeholder Review Step Two validation | Stakeholders and CDCR review initial stakeholder feedback. As this occurs, typically, stakeholders agree on changes and improvements. In other cases, CDCR or a stakeholder may require a bring-back. Dispute resolution is used as necessary | 4% |
| 10 | After BRMR [includes CAPC Approval, Programming and Verification] | Includes Programming and Verification steps; CDCR creates a final version of the BRMR documentation that CAPC must approve. Approved documentation is sent to the MH Programming and Verification teams for implementation (coding) and testing (verification). | 19% |
| 0 | Pending Remediation | After indicators/reports have been programmed and initial testing is complete, stakeholders perform their final review of the documentation. | 0% |
| 2 | Disputes Pending Before Court | Dispute Resolution | 4% |
| 37 | Remediated | SM Data Expert and the plaintiffs review the final documentation. If there are no outstanding issues, he marks the indicator or report off as remediated. | 70% |
| 53 | | | 100% |

D. Medication Management Indicators

Following the model of working on tranches of similarly themed indicators, the stakeholders recently agreed to focus on the medication management indicators as the second tranche. The table below provides a status update on these measures. The Special Master notes that many of the medication management indicators are also subject to the court's order to incorporate patient-wise and degree of impact statistics. ECF No. 8078.

Table 3: Medication Management Indicators (as of 9/13/2024)

| # | Current Step | Description | % of Medication Management Indicators |
|---|---|---|---|
| 0 | Not yet in BRMR [Initial Documentation Preparation] | CDCR prepares documentation for initial stakeholder review. There may be delays due to pending memos, labor negotiations, etc. | 0% |
| 18 | In BRMR [Stakeholder Review] | Stakeholders and CDCR review initial stakeholder feedback. As this occurs, typically, stakeholders agree on changes and improvements. In other cases, CDCR or a stakeholder may require a bring-back. Dispute resolution is used as necessary | 55% |
| 12 | After BRMR [includes CAPC Approval, Programming and Verification] | Includes Programming and Verification steps; CDCR creates a final version of the BRMR documentation that CAPC must approve. Approved documentation is sent to the MH Programming and Verification teams for implementation (coding) and testing (verification). | 36% |
| 1 | Pending Remediation | After indicators/reports have been programmed and initial testing is | 3% |

| | | | |
|---|---|---|---|
| | | complete, stakeholders perform their final review of the documentation. | |
| 2 | Remediated | SM Data Expert and the plaintiffs review the final documentation. If there are no outstanding issues, he marks the indicator or report off as remediated. | 6% |
| 33 | | | 100% |

E. Indicators in Programming and Verification Steps (as of 9/13/2024)

As of September 13, 2024, there were 40 indicators currently in the "After BRMR" stage of the remediation process (including CAPC, Programming, and Verification). In recent months, the Special Master has encouraged the parties to focus attention on this relatively large subset of indicators (40 of the 107 indicators that remain to be remediated). Having already undergone stakeholder review in the BRMR meetings, they are well along in the remediation process and so present an opportunity to make additional, significant progress in relatively short order. However, as revealed during a recent BRMR meeting, some of the indicators in the verification stage have been awaiting verification for more than a year – a process that often takes as little as six weeks to complete. *See* ECF No. 7523-1 at 5 (noting the verification stage is estimated to take six weeks to complete "under optimal circumstances"). [6]

[6] After a June 26, 2024 BRMR meeting wherein the stakeholders discussed collaborative approaches to expediting completion of data remediation, the Special Master's team sought additional information on the status of indicators in programming and verification, noting "the need for transparency in furtherance of the stakeholders' common understanding of the status of indicators in the later stages (i.e. programming and verification) of the remediation process." Email from Michael Ryan, Esq., *Coleman* Monitor, to the *Coleman* parties (June 28, 2024). In response, CDCR's Mental Health Verification team provided presentation reviewing the indicators in verification, including the length of time each indicator had been at this step of the process. The Special Master and CDCR exchanged additional emails on this topic, which are attached for reference. *See* Email from Michael Ryan, Esq., *Coleman* Monitor, to the *Coleman* Parties (July 19, 2024); Email from Kerry Walsh, Esq., Deputy Special Master Walsh, to

These 40 indicators measure remedial requirements in the following categories, as reflected in the table below: medication management; suicide prevention; access to care; Custody and Mental Health Partnership Plan; timely transfer; quality of care; specialized custody; restricted housing; and sustainable process.

Table 4: Indicators in Programming and Verification (as of September 13, 2024)

| **Number** | **Category** | **Indicator Codes/Names** |
|---|---|---|
| 12 | Medication Management | MM10 — Diagnostic Monitoring — QT Prolongation EKG 12 Months<br><br>MM10.1 — Diagnostic Monitoring – Carbamazepine<br><br>MM11.1 — Diagnostic Monitoring – Carbamazepine<br><br>MM11.2 — Diagnostic Monitoring – Lamotrigine<br><br>MM11.3 — Diagnostic Monitoring – Lithium<br><br>MM11.4 — Diagnostic Monitoring – Oxcarbazepine<br><br>MM11.5 — Diagnostic Monitoring – Valproic Acid<br><br>MM14 — Diagnostic Monitoring-Antidepressants<br><br>MM3 — Diagnostic Monitoring-Antipsychotics<br><br>MM4 — Diagnostic Monitoring-Clozapine<br><br>NM1 — Timely response to Critical Med non-adherence notification<br><br>NM2 — Timely Response to Non Critical Med Non Adherence Notification |
| 9 | Suicide Prevention | SP1 — Timely Clinical Discharge Follow-ups |

*Coleman* Parties (July 26, 2024); Email from Melissa Bentz, Esq., CDCR Office of Legal Affairs to Deputy Special Master Walsh (August 30, 2024), attached hereto as Exhibit A.

| | | |
|---|---|---|
| | | SP12.1 — Custody Follow Ups, Page 1<br><br>SP12.2 — Custody Follow Ups, Page 2<br><br>SP13 — Observation Orders Reviewed That Are Properly Documented<br><br>SP14 — MHCB Records with Rationale for Partial Issue<br><br>SP14E — MHCB Records with Rationale for Limited Issue<br><br>SP2.1 — Referrals That Received a SRE When DTS or Suspected Intentional OD Was Not Marked on The MH Referral<br><br>SP2.2 — Timeliness of Suicide Risk Evaluation Documentation<br><br>SP4E — Suicide Resistant Cells |
| 5 | Access to Care | AC1 — Timely MH Referrals<br><br>AC18 — Scheduled Appointments Completed or Refused<br><br>AC3 — Timely MHMD Contacts<br><br>AC4 — Timely IDTTs<br><br>SP22 — MHCB Daily Provider Contacts |
| 5 | CMHPP | CM1.3 — CMHPP MH Daily Huddles<br><br>CM2.2 — Health Care Staff Mandatory CMHPP Annual Training within the Last 12 Months<br><br>CM4.2 — Monthly Joint Executive Rounding Attended by Required Staff<br><br>CM4.3 — Monthly Joint Executive Rounds Conducted in each MH Program as Required<br><br>CM5.3 — ML CCCMS CMHPP Monthly Incarcerated Person Advisory Council Meetings |
| 3 | Timely Transfer | AC7.1 — Timely Transfers to EOP<br><br>AC7.4 — Timely Transfers from RC to CCCMS |

| | | |
|---|---|---|
| | | URM3 — Timely admission to MHCB |
| 2 | Quality of Care | QC1 — IDTT Required Staffing<br>QC12E — IDTTs Meeting All Audit Criteria |
| 2 | Specialized Custody | SC8.1 — Timely Submission of MH RVR MH Assessment Results<br>SC8.1E — Timely Submission of MH RVR MH Assessment Results |
| 1 | Restricted Housing | RH22 — Census (CQIT) |
| 1 | Sustainable Process | SUP1 — Whether the SusPro visits occurred at the required frequency in accordance with Defendant's 2012 Sustainable Process plan |
| 40 | | |

## IV. **Review of Unresolved Issues Slowing Progress Toward Completion of Data Remediation**

As noted above, there are several overarching, unresolved issues that, to date, have slowed the stakeholders' ability to move the data remediation process to completion.

A. Patient-wise indicators

On September 21, 2023, the Special Master filed his Report and Recommendation Regarding Third Level Data Remediation Dispute Regarding Timely Compliance Methodology (ECF No.7954, as amended by ECF Nos 8033 and 8033-1). Defendants filed objections, ECF No. 8025, and with leave of the court plaintiffs filed a response to defendants' objections. ECF NO. 8064. In his report, the Special Master recommended that, in addition to CDCR's preferred method of calculating and presenting data, for a subset of 38 indicators, defendants be required to report data focused on how many individual incarcerated persons subject to a particular requirement timely received that requirement (patient-wise) and that these data be supplemented

by a degree of impact (DOI) statistic demonstrating the extent of lateness for non-compliant cases.

In its order of December 5, 2023, the court adopted the Special Master's recommendation, ordering that his "…Recommendation shall be implemented *forthwith* through the data remediation process under his supervision". ECF No 8078 at 15 (emphasis added).

By the time of the Court's April 2, 2024 Order to Show Cause, despite many focused discussions on the patient-wise methodology over several years, defendants remained "uncertain about what precisely is required to accurately document, validate, program, and verify" the patient-wise indicators. ECF No. 8181 at 4. During the April 26, 2024 Status Conference, the Special Master suggested beginning the process of implementing the Court's patient-wise order by focusing first on a small number of indicators with an eye toward developing documentation that could be used as templates for the balance of the patient-wise indicators.

In furtherance of this effort, on August 16, 2024, the Special Master provided CDCR with a blueprint on how to design and implement various summary statistics for indicators that include patient-wise statistics. The data expert also provided a draft document utilizing indicator SC8.1, originally created by CDCR, which "provides SPO pages that consolidate the information needed for stakeholders and CDCR programmers to understand and compute these statistics for indicators focused on whether service requirement deadlines are being met timely." *See* Email from Kerry Walsh, Deputy Special Master, to Melissa Bentz, Esq., CDCR Office of Legal Affairs (August 16, 2024), attached hereto as Exhibit B.

Defendants are in the process of reviewing and responding to the data expert's draft document. While the Special Master is hopeful that this recent activity will lead to progress, to date, years of discussion and disagreement culminating in the court's December 2023 order have

yielded meager results. A reinvigorated—and perhaps entirely new—approach to the implementation of the patient-wise approach for these 38 indicators is called for. This is one of many areas requiring project management, and technical assistance and advice beyond the ability of one individual to provide.

B. <u>"Done or Overdue" and Other Unresolved Issues Regarding Report Parameters</u>

In brief, the Special Master's data expert has recommended that defendants' reports provide details on all outstanding requirements related to a specific indicator that were due in a given month in addition to those that *remain outstanding (or overdue) from a previous month*. In contrast, defendants prefer to provide details concerning only those requirements that had deadlines (i.e., became due) during the month being reported on.

For example, using the Special Master's expert's approach, a monthly report for May on timely transfer requirements would list the status of all transfers outstanding during May, even if the deadline for transfer first became due in April. In short, if a requirement is overdue in one reporting period and remains overdue in the next reporting period, it will remain overdue and will continue to be reported as overdue in subsequent monthly reports. In the Special Master's data expert's professional opinion, this approach allows for more transparent and accurate evaluation of CDCR's satisfaction of remedial requirements.

Using defendants' approach, the May report would only include the status of transfers that became due in May. Therefore, a transfer deadline missed in April and still not completed in May would only be reported as overdue in the April report.

To resolve this conflict, the Special Master's team suggested that for a given reporting period, mental health calculate and report its preferred summary statistic while also including

information on all active service requirements during the reporting period and allow access to the two following summary statistics,

- The percentage of service requirements more than [X%][7] overdue relative to all overdue service requirements.
- The percentage of service requirements more than [X%] overdue relative to all completed requirements or overdue requirements.

The Special Master shared this compromise proposal with defendants via email on March 19, 2024. Email from Deputy Special Master Walsh to *Coleman* parties (March 19, 2024), attached hereto as Exhibit C. As of the time of this writing, defendants are considering the Special Master's compromise proposal.

Similar to the "done or overdue" issue, there has been a recurring pattern of the defendants declining to incorporate what the Special Master, based on the advice of his data expert, believes to be modifications to a variety of indicators to incorporate basic functionalities necessary for monitoring. This includes, for instance, requests to include information as basic as the date and time a report was run as well as the incorporation of filtering capabilities to enable the end user to review data specific to an institution or level of care. The Special Master's concerns regarding report form, parameters, and filtering impact many indicators, have been raised repeatedly, and have taken up a significant amount of time in stakeholder review (both through BRMR meetings and written correspondence) but remain unresolved.

---

[7] Where the reporting interface is adjusted to allow users to select X. For example, setting X to 50% provides data on service requirements more than 50% overdue during a reporting period relative to all overdue requirements and relative to all requirements that were completed or overdue during the reporting period. For X equal to 0%, the second statistic is the percentage of non-timely service requirements present during the reporting period.

C. Sustaining Data Remediation: Annual and Periodic Review

From the outset, the data remediation process has been rooted in the need to ensure that the transparent and accurate measurement of mental health compliance data facilitated by the remediation process is sustained over time. *See, e.g.*, December 17, 2019 Order, ECF No. 6427 at 47 ("This court must ensure no court is called upon again in the future to consider whether and how misleading information has been presented to it."). To that end, the Special Master's data expert recommended early in the remediation process that defendants "hav[e] appropriate processes in place to ensure that the system remains accurate over time as the MHSDS evolves, and as the Court orders, and defendants' personnel change." Twenty-Eighth Round Monitoring Report, ECF No. 7074 at 219; *see also id.* at 209 ("General Deliverables of the Data Expert: … 2. Review the QA Change Management Process and work with CDCR to develop recommendations that, when implemented, will ensure that this process and its results are readily understandable to all relevant parties. These recommendations must include steps that CDCR can take to help ensure the QA system is maintained and operated in an accurate and transparent manner in the future. In other words, that they are sustainable.").

In their September 29, 2021 Preliminary Activation Schedules for Completion of Court-Ordered Data Remediation, defendants acknowledged their obligation to include a "Post-Certification Annual Review Cycle," as follows: "At least annually, all Key Indicators will be reviewed through the data remediation process. If at any point anything impacting the Key Indicator such as a policy or workflow changes, the indicator must again undergo the data remediation process." ECF No. 7334 at 36.[8] The September 29, 2021 Activation Schedule also

[8] In a January 31, 2024 letter to plaintiffs' counsel, defendants characterized the September 29, 2021 Preliminary Activation Schedule's conception of the annual review process as a "tentative

identified the following tasks associated with implementing the post-certification annual review cycle:

1. Schedule yearly review for each indicator as they complete the data remediation process
2. Schedule indicator for immediate review, if anything impacting the Key Indicator, such as a policy or workflow changes.

*Id.*[9]

Against this backdrop, the Special Master's data expert offers the following observations/recommendations regarding the Annual Review process.

- The design of each remediated indicator/report should be reviewed annually to confirm that the remediated design has not changed materially or needs to be changed due to changes to CDCR's data systems, policy, or requirements of the remedy.[10]

---

plan." *See* Letter from Nicholas Weber, Esq., CDCR Office of Legal Affairs, to Marc Shinn-Krantz, Esq., RBGG (January 31, 2024), attached here to as Exhibit D.

[9] In their objections to the Special Master's 29th Round Monitoring Report, defendants argued that the Special Master's brief reference to the annual review process referred to:

> a very preliminary view of the Post-Certification process that CDCR no longer holds. The process has evolved over the past fifteen months, resulting in significant modifications to the anticipated Post-Certification process. For instance, Defendants would not necessarily put all Key Indicators through the full data remediation process annually. Nor would stakeholder review (i.e. BRMR) be included in the Post-Certification process.

ECF No. 7733 at 8. Notwithstanding these objections, as of the time of this writing (as discussed below), there appears to be alignment between Dr. Potter and CDCR regarding the general contours of the annual review process.

[10] A material change occurs when the following occurs:

- Changes to the underlying row-level data collected, user interfaces, or design of the summary statistic(s) available with each indicator/report.
- Changes in the workflow(s) being measured are also material if they would result in requirements being measured to a different standard relative to the previously remediated/validated design.

- When updates to CDCR's data system, policy, or remedy requirements materially change the design of a previously remediated indicator/report, its design must be updated and re-validated with stakeholders, and the operation of the indicator/report must be re-verified.
- CDCR should communicate changes to its data system, policy, workflows, or remedy requirements that affect the design or operation of previously remediated/validated indicators.
- In general, CDCR already provides stakeholders with SharePoint "track changes" functionality to many pieces of indicator/report design documentation. In order for CDCR to achieve Data Certification, the Data Expert will recommend this be expanded to include all indicator/report documentation (including workflows, data elements, and currently un-tracked glossary items).
- When the design of an indicator/report needs to be updated, CDCR must provide redline / track changes to the documentation for stakeholders to understand the updates required.
- At a minimum, stakeholder review of updates and changes should occur via email.
- A dispute resolution process also needs to be considered.

While the stakeholders have had a variety of preliminary discussions about the contours of the annual review process throughout the data remediation process, they rekindled these discussions during the March 20, 2024 BRMR meeting. This discussion was productive and there is apparent agreement among the stakeholders as to the general contours of the annual review process. Resolution as to the scope and timing of the Special Master and plaintiffs' role in the annual review process is still required.

While all stakeholders acknowledge how vital the annual and ongoing review process is to the durability of the data remediation project, they have yet to reach consensus on the specific

contours of the post-certification annual review. This is another area needing a reassessment as to what is required and how to expeditiously implement those requirements.

D. Accelerating Progress of Un-remediated Indicators at all Steps[11]

There are currently 16 indicators in the pre-BRMR stage of data remediation and 40 in the post-BRMR stages of the process. The Special Master has repeatedly requested from the defendants, estimates regarding completion of pre-BRMR documentation and the same regarding the verification process. This information is important in order to craft approaches in the process that will speed remediation of indicators in these stages of the process. Defendants have provided updates with regard to the specific indicators in these various stages and during BRMR gave an overview of these verification process. Still, from the Special Master's perspective, detailed information sufficient to formulate a recommended plan to accelerate these processes has remained elusive.

With respect to the pre-BRMR stage, it has been apparent to the Special Master's data expert that deficits in the quality of initial documentation have persisted in the pre-BRMR stage of the process. In the Special Master's data expert's opinion, documentation sometimes takes too long to produce, and at times lacks the specificity needed to program/code, which leads to delays in latter steps of the process. Additional technical writing support at the initial stage of the process would likely expedite remediation of those indicators still in the pre-BRMR stage of the process.

[11] In recent weeks, defendants have expressed concern with the Special Master's data expert's practice of provisionally remediating indicators on the basis of defendants' commitment to making certain adjustments to the indicator's design and/or operation – in other words, remediating the indicator in principle. This is yet another issue affecting the entire process that remains unresolved years into this project.

Regarding the post-BRMR stages of the process, as noted, defendants have provided periodic status updates upon request and responded to various written inquiries regarding indicators in these stages. While the information regarding the status of indicators in this stage has provided a superficial overview of the status of these items, it remains unclear why certain items have languished for so long. Moreover, given the complexity of some of the indicators yet to reach the programming and verification stages, it is imperative to re-assess the stakeholders' approach and develop strategies to ensure efficient completion of these stages of the remediation process.

E. Efficient Communication

All stakeholders wish to move the remediation process forward in the quickest and most efficient manner possible without sacrificing accuracy or transparency. This shared goal has led the stakeholders to agree to adjustments to the remediation process as various times. For instance, the stakeholder review process has evolved significantly since the project began. Early in the data remediation project, plaintiffs' counsel did not attend BRMR meeting but instead would receive a report-out regarding BRMR-related business during regularly scheduled all-parties meeting. At present, plaintiffs' counsel are active participants in the BRMR meeting as part of the stakeholder review process.

A more recent revision to the stakeholder review process relates to the more frequent use of written communications, as opposed to BRMR meetings, to resolve so-called "bring-backs" and potential disputes. Relatedly, as discussed above, the stakeholders are now considering similarly themed indicator "tranches" holistically. The stakeholders have been able to narrow and/or resolve potential disputes regarding these tranches of indicators, often in writing, allowing BRMR meetings to be reserved for more complex issues.

While the stakeholders are continuously seeking to move the project forward efficiently, at various times throughout the course of the data remediation project, each of the stakeholders (including the Special Master) have faced challenges keeping up with myriad data remediation-related tasks and related correspondence. As the data remediation project continues and the stakeholders tackle the overriding, yet unresolved issues discussed in this report (including implementing patient-wise measurements as required by court order), it is imperative that all stakeholders remain aligned and on task. Based on this experience, the Special Master has determined that expeditious completion of data remediation requires additional, more intensive project management support.

F. Production of Documents for the Special Master's Monitoring Tours

While not directly related to the day-to-day machinations of the data remediation process, the Special Master, in his 30th Round Monitoring Report – Part D, expressed concern that defendants were beginning to use the data remediation process and its results to inappropriately limit the Special Master's access to information and data required for his ongoing monitoring of CDCR's MHSDS and to which he is clearly entitled to access under the Order of Reference (ECF No. 640 at 5-6):

> In response to the Special Master's less-than-three page document request, CDCR's Office of Legal Affairs replied with a 12-page letter outlining myriad demands, questions, concerns, and objections. Citing no authority, counsel's correspondence indicates that defendants will object to any and all requests for information from the Special Master which fall "outside of the scope of the provisionally approved key indicators" going forward….
>
> Defendants' "objections" to the document request for the focused EOP tour suggest that their aggressive litigation tactics may have crossed the line into resistance to (and impeding of) the Special Master's performance of his basic, court-ordered duties.

ECF No. 8359 at 39-40.

Despite the Special Master's "caution[ing] defendants against continuing the pattern of resistance that borders on obstruction of his court-ordered monitoring," the Special Master's concern regarding CDCR's production of information and data has deepened since he filed the Thirtieth Round Monitoring Report – Part D. ECF No. 8359 at 122. In advance of two recent monitoring tours, CDCR failed to provide adequate, timely access to requested documents and data and, as a result, impeded the Special Master's team ability to review, digest, and sufficiently prepare for these intensive site visits of the psychiatric inpatient programs (PIPs).

While over the years of the mastership, CDCR has periodically provided incomplete or delayed responses to requests for documents, during the 31st Monitoring Round CDCR has instituted a new practice of unilaterally setting its own deadlines for document production well beyond those established by the Special Master in his tour notices. This is concerning because the Special Master establishes these deadlines in order to afford his monitoring teams sufficient time to review as much documentation as possible *prior* to the site visit to ensure a thorough but efficient tour and to minimize disruption to the facility. Providing the bulk of a comprehensive response to a document request on the Friday evening before a monitoring tour that commences on the following Tuesday, needless to say, breeds inefficiency and meaningfully impedes the Special Master's monitoring of those institutions. *See* Emails between Deputy Special Master Patricia Williams and CDCR OLA (dated August 17, 2024, September 4, 2024, September 5, 2025, September 11, 2024, and September 13, 2024), attached hereto as Exhibit E. If defendants continue with this pattern of untimely production of documents, the Special Master's monitoring teams may be unable to complete their work during the site visit and, consequently, the Special Master will have to consider scheduling re-visits of these institutions; this would be inefficient, costly, and a waste of judicial resources. This inefficient and costly result can be avoided if

defendants improve their cooperation with the Special Master and produce requested information and data in accordance with the Special Master's timelines, as they have for so many years prior to this monitoring round.

In addition, during these recent 31st Round monitoring tours, CDCR has prevented institutional staff from supplementing the document production with additional, clarifying documentation where errors or inconsistencies were identified in the headquarters-produced documents.

While the Special Master expects and tolerates periodic, reasonable delays in the production of documents, the tactics CDCR has deployed thus far during the 31st Round—coupled with their stated position that defendants are not obligated to provide the Special Master with any information outside the four-corners of the provisionally approved indicators— are deeply concerning and call for resolution. Defendants' continuing pattern of behavior, which the Special Master previously characterized as coming "dangerously close to the obstruction" of the Special Master's monitoring, ECF No. 8359 at 43, must stop.

**CONCLUSION**

In developing his proposed solution to expedite completion of data remediation, the Special Master carefully considered the foregoing status of data remediation described above, including the number of still un-remediated indicators and their current stage within the process, the magnitude, scope, and nature of the unresolved, overarching issues described above impacting multiple indicators and the efforts of the stakeholders over many years to resolve them, and his overall experience since 2020 in supervising and overseeing this intricate, multifaceted, and highly technical process.

The Special Master has concluded that while meaningful progress has been made, in retrospect the daunting complexity of this project is beyond the ability of any one data expert—no matter how accomplished—to manage. This is particularly the case given the highly litigious context in which the work is being conducted, which hinders the free flow of technical information, as well as the competing demands for the time and resources of all stakeholders' staff. It should be clear to all stakeholders that the data remediation process requires renewed focus and a jump-start to tackle the remaining un-remediated indicators as well as the overarching issues discussed in the Report. The Special Master's plan – to immediately commence coordination with the *Plata* Receiver on the groups of indicators identified in this report (*see supra* p. 3) and continue discussions with a large, global consulting firm – is intended to harness the resources necessary to move this project to completion within an acceptable timeframe. This will allow the Special Master to significantly reduce the role of his current data expert, both with respect to work on the un-remediated indicators and the anticipated annual and ongoing review process. The Special Master is also hopeful that his proposal will permit his other experts and monitors who are deeply engaged in the data remediation process to devote more of their time to monitoring the provision of mental health services to members of the plaintiff class.

Accordingly, the Special Master proposes and plans to:

(1) Initially work through the existing court coordination process with the *Plata* Receiver to accelerate and complete remediation of:

a. Indicators subject to the court's December 5, 2023 Order regarding incorporation of patient-wise and degree-of-impact statistics, ECF No. 8078;

b. The medication management indicators; and

c. Those indicators in the programming and verification steps of the remediation process.

(2) As the Special Master deems appropriate, explore with the *Plata* Receiver incremental expansion of these data remediation-related coordination efforts; and

(3) Continue ongoing discussions with the identified outside vendor to provide, for instance, project management support, technical assistance, and expert advice to the Special Master to accelerate completion of remediation of indicators at all steps of data remediation process. To the extent these ongoing discussions bear fruit, the Special Master will separately and promptly bring forth a request for additional resources.

Respectfully submitted,

*/s/ Matthew A. Lopes, Jr.*
Matthew A. Lopes, Jr.
Special Master

September 30, 2024