1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                       FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   RALPH COLEMAN, et al.,                      No. 2:90-cv-0520 KJM DB P

12                    Plaintiffs,                ORDER

13        v.

14   GAVIN NEWSOM, et al.,

15                    Defendants.

16

17        On June 7, 2024, defendants filed the California Department of Corrections and

18   Rehabilitation's [CDCR] Revised 2022 Annual Report to the Legislature on Suicides in CDCR

19   and Annual Suicide Report (Revised 2022 Annual Suicide Report or Revised Report).[1]  ECF No.

20   8264.[2]  Plaintiffs have filed objections to the Revised Report.  ECF No. 8297.  For the reasons

---

        [1] As with the annual suicide report defendants filed for calendar year 2021, "the court
reviews the report only for compliance with the established requirements of this action and not
any that may be required by state law."  Dec. 15, 2022 Order at 1 n.1, ECF No. 7681.

        [2] Defendants filed their original 2022 Annual Suicide Report (Original Report) on October
24, 2023.  ECF No. 8027.  That Report included defendants' responses to comments from the
Special Master and plaintiffs to the draft Report defendants circulated prior to filing the Report.
*Id*. at 2.  Plaintiffs filed objections to the Original Report.  ECF No. 8042.  The Revised 2022
Annual Suicide Report is updated to include analysis of an additional inmate suicide completed in
2022.  ECF No. 8264 at 2.  It supersedes the Original Report.  *See* Mar. 19, 2024 Minute Order,
ECF No. 8162.  Defendants circulated the additional analysis to the Special Master and plaintiffs
as a draft addendum to the Original Report and incorporated their comments into the Revised
Report.  *Id*. at 4.

1

1   explained below, the court resolves plaintiffs' objections, directs the parties to meet and confer

2   concerning specific issues and directs defendants to amend their Revised Report. The court

3   defers final approval of the Revised Report pending its review of proposed amendments to the

4   California Department of Corrections and Rehabilitation (CDCR) Annual Suicide Report

5   Proposal (Proposal) required by this order. The court will issue a separate order in the future on

6   those proposed amendments, as explained below.

7   **I. BACKGROUND**

8       As the court explained in its December 15, 2022 order,

9       the court approved the CDCR's Annual Suicide Report Proposal (Proposal),
10      attached as Appendix A to ECF No. 7574, subject to the provisional approval
11      process outlined in the Proposal. [FN: The provisional approval process is as
12      follows: "Within thirty (30) days after adoption of the 2021 Annual Suicide Report
13      by the court, the parties, under the guidance of the Special Master, shall meet and
14      confer and the Special Master shall file a brief recommendation with the court as to
15      whether this proposal should become final." ECF No. 7574 at 15.] July 25, 2022
16      Order, ECF No. 7592 at 2. The Proposal represents the outcome of discussions
17      between CDCR Secretary Kathleen Allison and the Special Master, agreed to by the
18      parties, by which CDCR "will assume responsibility for drafting and filing the
19      annual suicide report" that, through calendar year 2020, were prepared and filed by
20      the Special Master and his experts. ECF No. 7574 at 7.

21      In relevant part, the Proposal contemplates a shift away from the analysis of
22      each individual inmate suicide used in the Special Master's Expert's annual suicide
23      reports, based on whether the suicide was "foreseeable" and/or "preventable" as the
24      definition of those terms has been used in this action for more than two decades.
25      *See id*. at 2. The new analysis will focus instead on the efficacy of CDCR's quality
26      improvement plans (QIP) resulting from those suicides, as they play a key role in
27      suicide prevention and response in CDCR's Mental Health Services Delivery
28      System (MHSDS). The Program Guide sets out the requirements for QIPs in
29      connection with suicide case reviews. *See* 2021 Program Guide, ECF No. 7331 at
30      192-195. All approved QIPs are incorporated into the individual suicide case review
31      report that led to their preparation. *Id*. at 192-93.

32      The Special Master has reported that "for years [he], his expert, and his
33      suicide prevention expert have believed CDCR's case review process and the
34      individual suicide case reviews resulting therefrom to be comprehensive" and QIPs
35      included in the case reviews "'thoughtful and targeted . . . for correcting deficiencies
36      and improving suicide prevention practices.'" ECF No. 7574 at 4. While the QIPs
37      themselves have proven adequate, the follow-up on and tracking of the
38      recommendations they contain has not. *Id*. at 3 & n.6 (quoting ECF No. 7511 at
39      52). [FN: This report, ECF No. 7511, has been accepted on the record with
40      defendants objections, ECF No. 7522, noted. August 29, 2022 Order, ECF No.

7609, at 12.  Defendants' objections to the report do not go to the finding quoted above.]  If adequately performed, follow-up tracking and analysis of the issues and patterns identified in the QIPs should provide an equivalent standard to the foreseeability and preventability analysis that has to date guided the court's assessment of defendants' compliance with the suicide prevention efforts required by the Eighth Amendment.

ECF No. 7681 at 2-4.[3]  In the same order, the court required defendants to file an amended report, deferred adoption of the 2021 Annual Suicide Report pending submission of the amended report, extended the provisional approval process for one year and directed that the thirty day meet and confer period would "commence following the court's approval of defendants' 2022 Annual Suicide Report."  *Id*. at 10-11.  Defendants filed the required amended report on January 30, 2023, ECF No. 7710, and the court adopted the 2021 Annual Report on Suicides in the CDCR – (Amended), on March 7, 2023.  Mar. 7, 2023 Order, ECF No. 7754.

The Revised Report sets out defendants' findings on annual suicides for the second calendar year as contemplated by the court's approval of their Proposal and the December 15, 2022 order.

## II.  STANDARD OF REVIEW

In the December 15, 2022 order, the court explained the standards that govern its review of defendants' annual suicide reports:

This court's review of the pending report is guided by the requirements of the Proposal, ECF No. 7574 at 13-15, and by the law of the case concerning the requirements for adequate remediation of the ongoing constitutional violation in suicide prevention in CDCR's prisons.  The ongoing violation is evidenced principally by (1) the proportion of inmates who commit suicide in CDCR prisons each year compared to the reported national average for state prisons; (2)  an ongoing "pattern of identifiable and describable inadequacies in suicide prevention in the CDCR"; and (3) analysis of the reasonable steps available to defendants to remedy those inadequacies and the extent to which defendants have taken those steps.  *Coleman v. Brown*, 938 F.Supp.2d 955, 973-74, 979 (E.D. Cal. 2013) (quoting *Brown v. Plata*, 563 U.S. 493, 504 & n.2).  The court also reviews the report with an eye to ensuring consistency with the law of the case.

ECF No. 7681 at 4.

---

[3] Except as otherwise noted, in this order citations to page numbers in documents filed in the Court's Electronic Case Filing (ECF) system are to page numbers assigned by ECF and located in the upper right hand corner of the page.

III. **ANALYSIS**

As the court explained in the December 15, 2022 order, until defendants assumed responsibility for reporting annually on inmate suicides, analysis of whether there was "an ongoing 'pattern of identifiable and describable inadequacies in suicide prevention in the CDCR' . . . and . . . the reasonable steps available to defendants to remedy those inadequacies and the extent to which defendants have taken those steps'" was "assessed with reference to the foreseeability and preventability analysis in the Special Master's Expert's Annual Suicide Reports." *Id*. at 5. The Proposal for defendants' annual inmate suicide reporting "contemplates that going forward the QIP analyses set out in the Proposal will take the place of the foreseeability and preventability analysis." *Id*. Plaintiffs' objections to the Revised Report challenge the adequacy of the analysis of the efficacy of QIPs, "whether the QIPs have been fully implemented," and the adequacy of "review of underlying problems that led to QIPs." ECF No. 8297 at 6-13. Plaintiffs also object to the adequacy of the Revised Report's analysis of emergency response issues and level-of-care issues. *Id*. at 13-15. The court addresses each objection in turn below.

A.      **Provisions of the Proposal Regarding QIPs**

The Proposal provides that CDCR will include in their annual suicide reports "Quality Improvement Plan Content and Analyses" and sets out the following regarding their reports' content and analyses of QIPs:

Quality Improvement Plans (QIPs)

CDCR will include a review of the identified areas for improvement within the suicide case reviews that lead to the assignment of QIPs, which provide a framework for how well current policies, procedures, and practices surrounding suicide prevention are serving our patients. Currently, CDCR reports on the determination and tracking of QIPs in its annual suicide report. It reports on the number of QIPs for each discipline and the average number of QIPs assigned per suicide case review.

CDCR is committed to enhancing this section in the annual suicide report to contain a comprehensive review of the QIPs for each discipline. The section will focus on the trends of QIPs, per discipline. A breakdown of the various categories of QIPs tracked by CDCR is attached. As part of the annual report, CDCR will categorize QIPs based on categories in the attachment, and report on the frequency or trends of QIPs in each category for a given year. CDCR maintains the right to modify this

4

list, depending on emerging trends or absence of particular QIPs identified in the suicide case reviews each year, and to revise or eliminate overlapping categories.

The QIP section of the annual suicide report will identify the number of QIPs assigned to institutions vs. those assigned to the statewide suicide prevention program for issues that are more systemic, rather than localized. For those systemic issues, the report will identify what meaningful steps are being taken to address the deficiency and improve the policies associated with care expected at the institutional level.

In the narrative of this section of the report, focus will be placed on an analysis of the more frequent QIPs that are assigned. The analysis will consider the trends of similar QIPs, frequency of repeated QIPs assigned to particular institutions, and frequency in which QIPs are assigned to the statewide suicide prevention program. CDCR will review QIPs across years for institutions that experienced multiple suicides and across institutions to better understand whether more targeted initiatives are needed.

The narrative will also include discussion about whether the QIPs have been fully implemented, and if not, what the delays and barriers are to full implementation. Additionally, an analysis of the efficacy of the QIPs will be reported, including reporting on the ongoing work of CDCR's Suicide Prevention Coordinators in each region with institutions to ensure that the QIPS as designed were appropriate to effectively address the problems in the first instance and that sustained improvement has been made. A description of ongoing work with institutions by CDCR's Suicide Prevention Coordinators in each region will be included to discuss the work being done to ensure sustained improvement has been made.

Compared to foreseeability/preventability determinations, this approach is focused on improving systems, which is the purpose of quality improvement plans that are devised as the result of the suicide case review. From a clinical and custodial perspective, reporting on this information furthers the overall ambition of CDCR/CCHCS to cultivate a culture of continuous learning and improvement.

ECF No. 7574 at 13-14.

**B.      Discussion**

**1.      Adequacy of analysis of efficacy and implementation status of QIPs**

Plaintiffs object that the "efficacy analysis in the Revised Report is inadequate" in several respects:  they contend the Revised Report (1) "does not clearly state which or how many QIPs were effective—that is, how many QIPs addressed the deficiency they were meant to correct, such that subsequent auditing and review from regional and local suicide prevention teams has not identified continued issues with that problem at that institution," ECF No. 8297 at 7 (citing ECF No. 8264 at 102-16); (2) "entirely omits an analysis of the efficacy of nursing and custody

1    QIPs," *id*. at 8; and (3) fails to provide adequate detail about criteria used to determine

2    deficiencies underlying QIPs have been sustainably resolved, the methodology for monitoring

3    QIP efficacy, or "any accounting of how many of the 2022 QIPs the Coordinators determined to

4    have been effective through their monitoring, and why." *Id*. at 9.

5         With respect to implementation, plaintiffs object that the Revised Report contains

6    insufficient information on "whether the QIPs have been fully implemented." *Id*. They contend

7    "full implementation" is shown "when the relevant actors, . . . , have taken all actions required by

8    the QIP, regardless of whether those actions ultimately correct the underlying deficiency" and

9    that the Revised Report does not make the required showing for the 31 QIPs in Region II or the

10   total number of QIPs that have been fully implemented or remain open for custody and nursing.

11   *Id*. at 9-10. They also contend the discussion of actions taken in connection with many QIPs is

12   "so vague as to be of minimal use" in that it provides no specifics regarding the general actions,

13   taken, e.g., audits and training, *id*. at 10, and that the Revised Report contains an incomplete

14   discussion of so-called "989 investigations"[4] that "were initiated related to 2022 suicides," *id*. at

15   11.

16        Plaintiffs object that the analysis of QIPs in the Revised Report is not comparable to the

17   analysis the Special Master provided in his annual suicide reports in that it (1) only lists issues

18   leading to QIPs identified more than twice, rather than more than once as listed by the Special

19   Master, *id*. at 12; and (2) contains many descriptions of "underlying problems" that "are so vague

20   that they fail to convey the essence of the problems," *id*. Defendants respond that common

21   deficiencies are described in the section on "Commonalities in Individual Case Reviews" and that

22   descriptions of underlying deficiencies are provided in Appendix B. ECF No. 8264 at 17 (citing

23   Report at 50-56 and 85).

24        As explained in footnote 2 above, defendants circulated to the Special Master and

25   plaintiffs drafts of their Original 2022 Annual Suicide Report and the subsequent addendum to

26   that Original Report, now filed together as the Revised Report. The Revised Report includes

---

[4] A "989 investigation" is initiation when a deficiency identified in a QIP is "referred to internal affairs for investigation. ECF No. 8264 at 17.

1   defendants' responses to the comments they received from the Special Master and plaintiffs to

2   both the draft Original Report and the draft addendum.   *See* ECF No. 8264 at 8-20.  With respect

3   to plaintiffs' comments on the analysis of the efficacy and status of implementation of QIPs,

4   defendants responded that "[t]he 'Analysis of Improvement Efforts' contains a discussion on the

5   most common QIPs that were issued during 2022," *id*. at 8-9, 17 (citing Report at 44-50).

6   Regarding plaintiffs' comments with respect to custody and nursing QIPs, defendants state they

7   "increased the discussion of the efficacy of custody and nursing QIPs related to the delay on

8   activating emergency medical services." *Id*. at 17.  Finally, defendants contend they have

9   provided adequate detail about the criteria used to determine "when a QIP has been resolved in a

10   sustainable manner" by outlining how they have followed "the four basic steps—plan, do, check

11   and act—of standard quality improvement" referenced by the Special Master. *Id*. at 9.

12   Defendants also take issue with this comment generally, both as raised by plaintiffs and as noted

13   by the Special Master, on the ground that the Proposal was the result of lengthy negotiations

14   between defendants, plaintiffs and the Special Master and any ambiguities about its meaning

15   "should have been raised before it was finalized." *Id*. at 9 n.5.

16        In response to plaintiffs' comment concerning the 31 QIPs in Region II, defendants

17   committed "to providing a table showing the total number of open and completed QIPs per region

18   in future reports." *Id*. at 17.  Good cause appearing, the court will require defendants to include

19   that table in the Amended Report required by this order.[5]  As with standards for assessment of

20   efficacy, defendants disagree their criteria for determining whether a QIP has been "sustainably

21   resolved" is too vague. *See*, *e.g.*, *id*. at 9.

22   /////

23   /////

---

[5] The court notes separately that the number of mental health QIPs identified and discussed in the Revised Report do not match:  at page 104, the report identifies 67 mental health (MH) QIPs in 2022, while the discussion on page 116 suggests a total of 71 MH QIPs were issued in 2022.  Also at page 104, defendants explain that some of the 134 total QIPs were issued jointly among more than one discipline, but it is not clear this explains the discrepancy in the total of MH QIPs reported.  Defendants should clarify this in the amendment to the Revised Report called for by this order.

1    Finally, defendants respond that common deficiencies are described in the section on

2  "Commonalities in Individual Case Reviews" and that descriptions of underlying deficiencies are

3  provided in Appendix B.  *Id*. at 17 (citing Report at 50-56 and 85).

4    Plaintiffs' objections suggest apparent ambiguities in the Proposal which must be resolved

5  now, before full transition of annual suicide reporting from the Special Master to defendants is

6  effected.  These include whether in the annual suicide report defendants must discuss the efficacy

7  of all QIPs issued in response to deaths by suicide during the calendar year reported on or,

8  instead, whether they must discuss the efficacy of QIPs for "the most common QIP issues" during

9  the calendar year; in the latter case, there is also an ambiguity about how many QIPs must reflect

10  the same issue for the issue to be considered "common."  *Compare* ECF No. 8264 at 107 (issues

11  identified in QIPs more than twice "could be viewed as a pattern of concern") *with* ECF No.

12  7405-2 at 167 (Table in Special Master's 2020 annual suicide report listing issues identified at

13  least twice in QIPs referred to as "Common Problems"); ECF No. 7239-1 at 207 (same).[6]

14  Similarly, plaintiffs are correct that the Revised Report is insufficiently clear about the criteria

15  defendants have used to report key determinations regarding the efficacy of the QIP process and

16  implementation status of QIPs, including what constitutes a "sustainable resolution" of issue(s)

17  presented in QIPs or an adequate descriptions of the methodology defendants use to monitor the

18  efficacy of QIPs.

19    The Proposal contemplates a process for raising and addressing such ambiguities:  it

20  provides that after the one year provisional period, which the court extended in December 2022,

21  the parties will meet and confer under the supervision of the Special Master and the Special

22  Master shall thereafter "file a brief recommendation with the court as to whether this proposal

23  should become final."  ECF No. 7574 at 15.  The Proposal cannot be finalized without

24  clarification of these ambiguities.  Accordingly, the parties will be directed to meet and confer

---

[6]  It is possible the Proposal is not ambiguous with respect to the number of times an issue must be identified in QIPs to qualify as a "common" issue, given defendants' representation that their annual suicide reports "will continue to track the contents and analysis found in the reports written by the Office of the Special Master," given that the record suggests the promised continuity requires issues identified at least twice be referred to as "Common Problems.", ECF No. 7574 at 13.

1    under the supervision of the Special Master and to present to the court within forty-five days

2    either an Amended Proposal that clarifies these ambiguities or a joint statement of their respective

3    positions on how the ambiguities should be clarified.  In meeting and conferring, the court directs

4    the parties to give great weight to "the need for continuity in the Annual Suicide Reports as the

5    responsibility for these reports is transitioned from the Special Master to defendants."  ECF No.

6    7681 at 6.  After the court provisionally approves an Amended Proposal, the court will direct

7    defendants to amend the Revised Report to include additional analysis, if any, required by the

8    Amended Proposal.

9                    **2.       Analysis of Emergency Response Issues**

10         Plaintiffs also object that the discussion of "emergency response factors" is not

11   comparable to the discussion in the Special Master's prior reports because it does not discuss

12   whether emergency restraints were used before or during emergency medical care, or the trend in

13   use of emergency restraints over the years.  ECF No. 8297 at 13.  Plaintiffs raised this in their

14   comments to the draft Original Report and defendants responded by stating they had "modified

15   the discussion in the 'Commonalities in Individual Case Reviews' accordingly."  ECF No. 9264

16   at 18 (citing Report at 50, 56-57).[7]).   Plaintiffs now object that the Revised Report still does not

17   discuss "the application of restraints to patients before or during provision of emergency medical

18   care" including on the section of the Revised Report cited by defendants.  ECF No. 8297 at 14.

19         The court sustains this objection.  There is no dispute the Special Master's annual suicide

20   reports tracked the use of restraints during emergency responses, *see*, *e.g.*, ECF No. 7405-1 at,

21   *e.g.*, 28, 30, 34; ECF No. 7239 at, *e.g.*, 34, and, as noted above, defendants represented they had

22   modified the draft report to include such discussion, ECF No. 8264 at 18.  The court has reviewed

23   the Revised Report and finds no discussion of the use of restraints during emergency responses

24   either in the section cited by defendants or elsewhere.  The court will direct defendants to amend

25   the Revised Report to include the required discussion.

_____

[7] The Revised Report is now filed as ECF No. 8264, and the corresponding ECF page numbers appear to be 109, 115, and 116, though that is not entirely clear.  In any event, the court has reviewed the entire section cited by defendants.

9

### 3.    Analysis of Level of Care Issues

Finally, plaintiffs object that the discussion of level-of-care issues is not comparable to the analysis the Special Master included in his prior reports, particularly "whether the level-of-care issues specifically involved failures to refer patients to higher levels of care, as opposed to other level-of-care deficiencies." *Id*. at 15.

In response, defendants represent they had addressed this objection in response to comments from the Special Master.  ECF No. 8264 at 18 (citing Section IIA of Revised Report).  Plaintiffs contend defendants' response is still inadequate.  ECF No. 8297 at 15.

The court sustains this objection.  There is no dispute the Special Master's annual suicide reports tracked evidence of the failure to refer patients to a higher level of care, *see* ECF No. 7405-1 at, *e.g.*, 4, 26, 30; ECF No. 7239 at, *e.g.*, 32, 35, and that the Special Master's annual suicide reports separately reported on other level of care issues, *see*, *e.g.*, ECF No. 7405-1 at, *e.g.*, 29 (failure to review "appropriateness of the patient's level of care" as factor in six suicide cases), 30 (distinguishing between failure to refer to higher level of care and "inappropriate reduction" in level of care), 31 (discussion definitions of "foreseeability" and "preventability," including issues related to changes in level of care among interventions that may be required when "a 'moderate risk of suicide'" is present), 34 (discussing increase in percentage of suicides among inmates with inpatient placements in general, in the year prior to their deaths, and in the week prior to their deaths); ECF No. 7239 at, *e.g.*, 35 (distinguishing between failure to refer to higher level of care and "inappropriate reduction" in level of care), 35-36 (discussing definitions of "foreseeability" and "preventability" and including issues related to changes in level of care among interventions that may be required when "a 'moderate risk of suicide'" is present).  In addition, as noted above, defendants represented they had modified the draft report to specifically report on failures to refer patients to higher levels of care separately from other level-of-care issues.   ECF No. 8264 at 18.

The court has reviewed the Revised Report and finds no discussion of the failure to refer to higher levels of care or other level of care issues in Section IIA. The Revised Report does include a discussion of the number of inmates who died by suicide in 2022 who had been in a CDCR inpatient psychiatric facility during their incarceration, and how many had been

10

1   discharged from an inpatient facility within twelve months of their suicide as compared to the

2   same statistic for 2021.  ECF No. 8264 at 89.  The Revised Report notes half of the suicide cases

3   in 2022 "were subsequently judged by case reviewers to have had inadequate treatment

4   planning", including "6 questions about Level of Care Issues"; it also compares common issues in

5   2021 and 2022 QIPs, including Level of Care issues, not further described, at Salinas Valley State

6   Prison.  *Id*. at 114-115. And the Revised Report includes information regarding ongoing work in

7   an inpatient discharge work group to ensure proper review and/or resolution of safety concerns

8   prior to discharge from mental health crisis beds (MHCBs) and psychiatric inpatient programs

9   (PIPs).  *Id*. at 136.

10      The Revised Report does not, however, specify the number or percentage of inmate

11   suicides in 2022 that reflected evidence of failure to refer the inmate to a higher level of care, *cf.*,

12   *e.g.*, ECF No. 7405-1 at 26, nor does it specify the number or percentage of inmate suicides in

13   2022 that included evidence of other level of care issues, for example, "failure to review the

14   appropriateness of the patient's level of care."  *Id*. at 29.  Once again plaintiffs' objection points

15   to "the need for continuity in the Annual Suicide Reports as the responsibility for these reports is

16   transitioned from the Special Master to defendants."  ECF No. 7681 at 6.

17      The court will direct defendants to amend the Revised Report to include this information.

18   **C.      CONCLUSION**

19      For the reasons explained in this order, the Proposal must be amended to clarify

20   ambiguities before defendants submit further annual suicide reports, and after the court approves

21   those amendments it will require defendants to amend the 2022 Revised Report as discussed in

22   this order. For these reasons, the court will defer for an additional year final adoption of

23   CDCR's Proposal for Assuming the Annual Suicide Monitoring Report.  The court sustains in

24   part plaintiffs' objections and grants in part their requests for revisions to the Annual Suicide

25   Report to the extent consistent with this order.

26   /////

27   /////

28   /////

11

In accordance with the above, IT IS HEREBY ORDERED that:

1.  Final approval of CDCR's Proposal of Assuming the Annual Suicide Monitoring Reporting is deferred for an additional reporting year following the amendments required by this order.

2.  Over a period of forty-five days from the date of this order the parties shall meet and confer under the supervision of the Special Master to resolve ambiguities in the Proposal identified in this order and by December 13, 2024 file either an Amended Proposal that clarifies these ambiguities or a joint statement of their respective positions on how the ambiguities should be clarified.

3.  Following the court's provisional approval of an Amended Proposal as required by this order, defendants will have forty-five days to file a further Revised 2022 Annual Suicide Report that includes all amendments required by this order and all clarifications to the Proposal as the court may approve.

4.  The court defers adoption of defendants' 2022 Annual Suicide Report pending submission of the Amended Revised Report required by this order.

5.  Plaintiffs' objections are sustained to the extent consistent with this order, as are plaintiffs' requests for amendments to the Revised Report.

DATED:  October 24, 2024.

_____
SENIOR UNITED STATES DISTRICT JUDGE

12