1    ROB BONTA, State Bar No. 202668
     Attorney General of California
2    MONICA N. ANDERSON, State Bar No. 182970
     Senior Assistant Attorney General
3    DAMON MCCLAIN, State Bar No. 209508
     Supervising Deputy Attorney General
4    ELISE OWENS THORN, State Bar No. 145931
     CHRISTIAN M. GEORGELY, State Bar No.
5    322952
     Deputy Attorneys General
6      1300 I Street, Suite 125
       P.O. Box 944255
7      Sacramento, CA 94244-2550
       Telephone: (916) 210-7318
8      Fax: (916) 324-5205
       E-mail: Elise.Thorn@doj.ca.gov
9    *Attorneys for Defendants*

HANSON BRIDGETT LLP
LAWRENCE M. CIRELLI, SBN 114710
PAUL B. MELLO, SBN 179755
SAMANTHA D. WOLFF, SBN 240280
KAYLEN KADOTANI, SBN 294114
DAVID CASARRUBIAS-GONZÁLEZ ,
SBN 321994
SAMANTHA M. BACON, SBN 351561
425 Market Street, 26th Floor
San Francisco, California 94105
Telephone:    415-777-3200
Pmello@hansonbridgett.com
*Attorneys for Defendants*

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

## SACRAMENTO DIVISION

|  |  |
|---|---|
| RALPH COLEMAN, et al.,<br><br>       Plaintiffs,<br><br>    v.<br><br>GAVIN NEWSOM, et al.<br><br>       Defendants. | Case No. 2:90-CV-00520- KJM-SCR<br><br>**NOTICE OF RE-FILING REDACTED SECOND GOLDING REPORT**<br><br>Judge:    Hon. Kimberly J. Mueller |

On October 8, 2024, Defendants filed a Notice of Redacted Second Golding Report (Report), consistent with this Court's October 3, 2024 minute order.  Defendants subsequently discovered that they had not redacted all private information.  Accordingly, Defendants requested that the filed Report be placed under seal (ECF No. 8423), and re-filed the Redacted Second Golding Report with additional redactions on October 9, 2024 (ECF No. 8425).  The Court granted the request to seal the previously filed Report on October 10, 2024.  (ECF No. 8426.)

Defendants later discovered additional private information that should have been redacted from the Report filed on October 9, 2024, and on October 24, 2024, filed a request that the Court

seal the Report filed on October 9, 2024, and further notified the Court that Defendants would file

a fully redacted Second Golding Report by October 28, 2024.  (ECF No. 8440.)  Attached as

**Exhibit A** is a true and correct copy of the Second Golding Report with redactions approved by

the Court as identified in the [Proposed] Order Granting Defendants' Motion for Order

Authorizing Redaction of the Second Golding Report.  (*See* ECF No. 7720-2.)


DATED: October 28, 2024                          ROB BONTA
                                                 Attorney General of California



                                        By:_____/s/ Damon McClain_____
                                           DAMON MCCLAIN
                                           Supervising Deputy Attorney General
                                           ELISE OWENS THORN
                                           Deputy Attorney General
                                           *Attorneys for Defendants*


DATED: October 28, 2024                          HANSON BRIDGETT LLP



                                        By:_____/s/ Samantha Wolff_____
                                           LAWRENCE M. CIRELLI
                                           PAUL B. MELLO
                                           SAMANTHA D. WOLFF
                                           *Attorneys for Defendants*

21220334.2

EXHIBIT A

# Letter to the Special Master

## from Michael Golding, M.D.

November 23rd 2022

Dear Mr. Lopes,

I am writing to you today to alert you to some issues I think you need to know for your work as the Special Master in the Coleman case, and to give you further details of the retaliation and demotions I mentioned last year, that are still continuing to this day, in violation of the Judge's order. As you will see, I think that the retaliation against me is part of what Judge Mueller seemed to suggest is a misguided legal strategy on the part of CDCR, and I request that the retaliations and demotions against me not be allowed to stand.

# Table of Contents

*Introduction* .................................................................................................................. 4

*The data war* ............................................................................................................... 19

    Obstructing rather than facilitating the finding and fixing of misleading data errors ...................... 19

    Patients referred to the hospital need to be seen more frequently than those not needing such a referral .................................................................................................................... 22

    Patients need to be seen promptly when they arrive, and they need to be seen before the interdisciplinary treatment team ................................................................................ 34

    Counting mere wellness checks as compliant full evaluations .......................................... 38

    Counting all consults as full psychiatry appointments .................................................... 44

    Crisis beds: interpreting "24 hours" to mean "48 hours" ................................................ 46

*The Program Guide as a Trojan horse* ....................................................................... 47

*Dr. ███ and UNA* ..................................................................................................... 49

*Vilification of the Special Master* ............................................................................. 58

*Are CDCR staff free to talk to the OSM?* .................................................................. 62

*Retaliation* .................................................................................................................. 67

    Retaliatory demotions: the Telepsychiatry program ...................................................... 67

    Retaliatory demotions: the MDO/OMHD program ........................................................ 77

    Retaliatory demotions: the PRN program .................................................................... 79

    Retaliatory demotions: the CME program .................................................................... 82

    Retaliatory demotions: the MAT program ................................................................... 83

    Retaliatory demotions: the MAPIP program ................................................................ 86

    Retaliatory demotions: my direction and management of the Statewide Psychiatry program ........ 87

**Retaliatory letters and meetings:** ███████████ ██████ ............................................98

**Retaliatory letters and meetings:** ███████████ ████ ............................................108

**Retaliatory letters and meetings:** ███████ ████..............................................113

**Retaliatory letters and meetings: disciplined for writing to the OSM** ...........................116

**Retaliatory letters and meetings: disciplined for writing about disappearing appointments** .........116

**Retaliatory letters and meetings: disciplined for writing about staffing issues** .............................125

**Retaliatory letters and meetings: disciplined for disagreeing with a** ██████████ **in front of the OSM** ............................................................................................................129

**Retaliatory letters and meetings: disciplined for saying that patients referred to acute or intermediate hospital should be mandatorily seen more frequently than every 10 or 30 days respectively** ............................................................................................................133

**Retaliatory letters and meetings: disciplined for saying during a pre-BRMR meeting that we are not permitted to communicate with the OSM during BRMR meetings** ...............................................141

*The chilling effect of the CDCR war against the Court and the OSM on staff members' willingness to raise and solve problems to improve patient care* ...........................................161

*Conclusion* .............................................................................................................164

*Addendum* ..............................................................................................................168

# Introduction

When I started working for CDCR in late 2013, CDCR employees and executives led me to believe that you and your experts were not to be trusted. I was specifically told not to talk to you unless you or one of your team were to ask me a direct question (and even then, it was clear that they considered it inadvisable to give any information). I was told that you were not trying to get our patients the care they need – that you were purely trying to make money. They held up as evidence for this contention the fact that the lawsuit had been going on for so long. I was told that the OSM team wanted the lawsuit to continue because you had "school tuition to pay."

At the time, I did not have any particular reason to doubt what everyone was telling me. In all my career, including working in a prison system in another state in which conditions were in many respects far worse than the conditions in California prisons, I had never seen anything like the dangerous lack of patient care that I was discovering in CDCR. I have never in my career seen such high rates of suicides and other needless deaths and injury as I was seeing in the CDCR system.

I could not fathom how the lawsuit had been going on for so long, yet even the most basic aspects of care had not been effected: terrified psychotic patients were not being seen by a psychiatrist regularly or in some cases at all. Psychiatry appointments were routinely happening in public places instead of in a private office. Patients were not getting vital medications. Catatonic patients were being left untreated, resulting in permanent injury and death in some cases. (Note that nothing much has changed in these respects, even now.)

But by early 2017 I and some of my colleagues had started noticing ways in which CDCR was not being entirely transparent with the Office of the Special Master, keeping

information from you and your staff that would have made a difference. Though I did not always agree with you, I could see that you were trying to help our patients despite what I had been told.

In mid-2017, when I had started to raise my concerns internally about whether the data CDCR was providing was accurate and about the role of psychiatry in CDCR, instead of collaborating with me to solve the problems I was identifying, as I had thought they would, people in CDCR started becoming noticeably less friendly and cooperative with me. Nevertheless, I was still optimistic that our new ███████████ would make a difference.

I and my colleagues started noticing some very odd ways in which data was being collected and reported to the Court. In March 2017, for example, when according to court rules patients were supposed to be seen by psychiatrists within 30 days at the EOP level of care, we noticed that CDCR had lengthened the allowable interval to 45-60 days. But even when discovering such irregularities, I initially assumed that it must have been a mistake, and that our ███████████ would of course tell the Court of CDCR's error and correct the record. I communicated with ███████████ about that issue in April 2017 when she returned from vacation. See attachment 1.

A year later, although CDCR had reversed the change to the allowable interval between EOP psychiatry appointments back down to 30 days, it did not seem as if the Court had been informed that the change had occurred. Given that that change would clearly affect data reports to the Court, that seemed troubling to me. Moreover, in the meantime, I had noticed a panoply of further data issues. Data issues are not mere numbers. Data reports misleadingly suggesting excellent levels of patient care when in fact patients are not getting the care reported can and do result in patients going untreated and dying needlessly. It really matters.

Such issues are further exacerbated by CDCR's strange policies whose effect has been to prevent our psychiatrists practicing psychiatric medicine consistent with their medical training, to protect our patients. See the Golding Report for more about that.

5

So in April 2018, I again brought up the issue of the EOP appointment interval erroneous rule change as an example of one of the data issues I had discovered. I thought that together we could solve the problem of such data issues and ultimately fix the problems resulting in inadequate patient care. See attachment 2.

████████ and ██████████████ reacted so unexpectedly badly to my raising my concern about the issue of their having lengthened the allowable EOP interval between psychiatric appointments, that I began to realize that CDCR actually must know it was misleading the Court, otherwise why wouldn't they have been transparent with the Court about the change?

From then onwards, and especially after I wrote the Golding Report, I started getting the feeling that I was being ostracized. People who had been very friendly before became cold or hostile. I was no longer "one of us." I was, it seemed, a traitor for raising a problem (that we could easily have solved!). This is so different from my experience of raising problems before I joined CDCR. In my experience, organizations providing excellent patient care appreciate hearing about problems and ideas for solutions, because they are actively committed to solving problem affecting patient care.

Eventually, I surmised that CDCR feels morally justified in pulling the wool over the eyes of the OSM and the Court, presumably because they mistakenly view the legal battle as a war with ill-intentioned enemies. Subterfuge is essential in war. Why else would they react with such bad faith when I raised that first data issue I had noticed? Why else would they ostracize me as a traitor for raising problems affecting patient care, that we could so easily solve?

Even after the evidentiary hearing in October 2019 about my October 2018 Golding Report about some of the issues I had found, most CDCR staff still seemed to believe that what I said in the Golding Report was not credible. They were not familiar with the Judge's ruling and CDCR's leadership had contradicted what was discovered in the evidentiary hearing.

See attachment 3. But Judge Mueller found:

> "Based on the substance of his testimony and his demeanor on the witness stand, the court finds Dr. Golding credible. His observations and conclusions overall are well-founded."

Case 2:90-cv-00520-KJM-DB Document 6427 Filed 12/17/19 Page 14 of 49

> "The ultimate question for the court to decide, as it does below, is whether defendants' presentation of misleading information was knowing and if so why."

Case 2:90-cv-00520-KJM-DB Document 6427 Filed 12/17/19 Page 21 of 49

> "….defendants have engaged in knowing presentation of misleading information to the court and to the Special Master"

Case 2:90-cv-00520-KJM-DB Document 6427 Filed 12/17/19 Page 22 of 49

> "Regarding the four matters before the court, without a full understanding of why defendants knowingly submitted misleading information to the court and Special Master, a proper solution cannot be identified."

Case 2:90-cv-00520-KJM-DB Document 6427 Filed 12/17/19 Page 23 of 49

> "Reasons Defendants Knowingly Presented Misleading Information
> In the final analysis, inexplicably, it is apparent defendants lost complete sight of the reasons remediation is required here. Defendants adopted a laser focus in an effort to obtain termination of court supervision, which led to a stark "ends justify the means" approach. Their litigation tactics have wholly missed the significance of the constitutional rights of the thousands of mentally ill persons defendants have in their custody."

Case 2:90-cv-00520-KJM-DB Document 6427 Filed 12/17/19 Page 44 of 49

To correct these errors, CDCR was ordered to participate in the data remediation process that they are (still!) so vigorously resisting.

On September 27, 2022, at a Coleman data discussion meeting with the Plaintiffs and CDCR representatives, Henry Delugacz of the Special Master's team said something like:

> "Where policy or an indicator says something, or frankly if it's silent on a material Program Guide requirement, it's part of data remediation to address that."

> "I probably don't need to remind the group that conflicts between how the Program Guide's provisions were being interpreted, not coding or computational errors, are exactly what got us into this mess in the first place."

By "this mess", I assume he was referring to the messy proceedings that have had to take place in the wake of the Golding Report.

Indeed, just validating whether an indicator measures what CDCR says it does – that is, checking for "computational errors" – is insufficient for the purpose of improving the care of our patients to an acceptable standard, which is what this is all supposed to be about.

For example, in my view, the indicator measuring compliance with assessment timelines should take into account the increasing needs of patients when they are referred to the hospital, not just the increasing needs of patients referred to the crisis bed that are taken into account in CDCR's existing rules.

OSM psychiatry expert Dr. Metzner described a letter that CDCR sent to the Plaintiffs and you and your OSM team concerning data remediation issues. In general, CDCR does not permit me to see controversial letters written to the Plaintiffs and you, particularly about data indicators that in CDCR attorneys' clinical judgement are appropriately measuring Program Guide mandated clinical care. But, at least in

retrospect, I can sometimes begin to figure out what has happened in the past, by reading the Court's public documents.

But in this case, Dr. Metzner commented about the letter that CDCR had sent, so I was able to glean something about it. He said something like the following:

> "The letter says CDCR developed that indicator with us. But as Henry Delugacz points out, we didn't know the business rules. It was not measuring what we thought it was measuring."

It seemed to me that Dr. Metzner was saying that CDCR had never informed you and the OSM team how various policies and the Program Guide were being interpreted, and so the OSM team assumed that they were being interpreted reasonably. Presumably this was also occurring before the Golding Report.

Dr. Metzner continued describing what CDCR's letter said is CDCR's interpretation of the purpose of data remediation:

> "Remediation is supposed to verify that what CDCR says the indicator is measuring is actually being measured."

████████████████████ has said the same thing to me too, instructing me not to challenge the scope of CDCR's data indicators in data remediation process (BRMR) meetings, on the grounds that the purpose of the BRMR data remediation process is to verify that CDCR's measurements reliably measure what CDCR designed them to measure.

According to Dr. Metzner, the Plaintiffs also agree that what CDCR says the current indicators are supposed to be measuring conflicts with what others thought the

indicators were measuring, because CDCR's views about the appropriate scope of the indicators are, said Dr. Metzner:

> "different from what we thought the indicator was supposed to be measuring" (or words to that effect).

That raises the question, what should the current indicator have been measuring? What is the proper scope of the indicator?

███████████, from the Plaintiffs, amplified these sentiments approximately as follows:

> "It's important not only that something is measuring what it says it's measuring, but that it be consistent with the correct policy, otherwise there could be a repeat of exactly what got us here in the first place. The issue is that CDCR misstates what a data result means, and the analysis they send to the Court about that data result doesn't actually provide any insight into whether the Program Guide is being followed."

CDCR absolutely rejects such arguments, on the grounds that the indicators have already been agreed in a collaborative process with the OSM. And whenever the OSM or the Plaintiffs or I or other CDCR staff members question whether the existing data indicators are fit for purpose, CDCR's position is that such concerns are outside the scope of this process and that what we are proposing is new indicators, and that any new indicators being proposed should be created later. (Similarly, in 2018, when they told me that the OSM had already agreed to CDCR's indicators, and that revisions could always be made at a later time, that also seemed like an effort to stop me expressing my concerns about CDCR's misleading data measures.)

Henry Delugacz pointed out that:

> "The Special Master's team did work with CDCR when it was developing CQIT, but we didn't do anything like the current review we're doing now. Not only did

10

we not think that that was necessary, it wouldn't have been possible because of the state of the documentation." (or words to that effect).

Presumably, the reason Mr. Delugacz had not previously thought that a careful review of CDCR's business rules was necessary, was that no one imagined that CDCR was being misleading in the way they label and describe data indicators.

Mr. Delugacz further stated:

"Where the scope of an indicator or a related policy needs to be modified or adjusted to be consistent with the Program Guide, that should be seen as a reasonable modification of an existing indicator or policy, not a request for an entirely new one." (or words to that effect).

CDCR is having none of it. At a joint meeting of CDCR, the Plaintiffs, and the OSM team on November 8th 2022, when ███████████ said:

"So far Defendants have said they don't want to talk about new indicators – unless Defendants have changed their mind?"

CDCR's attorney responded:

"No, we have not changed our mind."

Why is CDCR taking what seems like such an unreasonable position? Why, when the lawsuit has been going on for so long, is CDCR blocking what would seem to be the most important part of designing measurements, namely, designing them in a way that would enable us to know where and when adequate care is and is not occurring, so that if it is not adequate, we can fix things, so that our patients get the care they need?

From the way CDCR is fighting this process, it seems that they take the view that to cooperate would be to admit that mistakes were made; and that can't possibly be the case as far as CDCR is concerned, because, they say, the data indicators were created in

11

a collaborative process with you, and therefore any problems with the indicators is your fault, not CDCR's. To that end, CDCR has been characterizing virtually every correction to the indicators you request not as a needed correction but instead as a proposal for a brand new indicator never before requested. So if a hundred or even a few dozen new indicators now need to be created to make the data usable, given that CDCR has previously been nothing but a paragon of cooperative collaboration with the OSM, that makes the OSM look incompetent.

This looks to me like a misguided litigation tactic whose aim is to lay the blame for current problematic data reporting and analysis squarely on the OSM, rather than CDCR taking any responsibility themselves. CDCR seems to view this as a war against the Court's representatives, and it is our patients who suffer as a result.

We saw further evidence that CDCR views this as a war on November 16th 2022 when ███████████████ spoke to the mental health leadership meeting, highly praising ███████████████ for having been fighting the OSM instead of cooperating with them. "He's taking their lunch money!" she enthused. "And he *wins* too!" The assembled crowd erupted in thunderous applause. (Although ██████████ did then catch herself and say that "win" is perhaps the wrong word to have used, that was clearly how she felt.)

CDCR leaders in our institutions frequently request that headquarters leaders like ███████████████ approve their triage plans to see patients most in need rather than prioritize court mandates when they have insufficient staffing to meet court mandates. Some of our institutions, for example, have less than 50% of their mandated Psychology staff numbers. When CDCR is not meeting court mandates for frequency of patient appointments and the like, our compliance numbers being reported to the Court look bad, showing that we are out of compliance, indicating that patients are not getting the care they need. Triage means that we are prioritizing patients whose need is greatest and thus not ensuring that less sick patients be seen per the mandates. Thus triage on average lowers compliance numbers but saves lives.

Later in the same leadership conference, again in praising ███████████ ████████████████, a regional executive, said that ████████████████████ cannot put in writing that he wants clinicians to triage patients to make sure that those most in need be seen first when staffing levels are insufficient:

> "We *have* to do triage [because of low staffing. In] going against the Court [we are] putting our patients first. […] ███████████] can't put that in writing and say 'let's triage patient care' but he does favor triage [plans] when there is not enough staff. He has *told* me that! […] I'm not part of CDCR so I can say that."

> "Our people [our institutional clinicians] are doing a damn good job despite what is going against them."

That ████████ cannot put that in writing is an implicit admission that upper level executives are prioritizing compliance numbers over saving lives.

Despite what ████████████ seemed to be implying, I have never heard you or your team say that in those circumstances we should not do triage. Indeed two days later, on November 18th, perhaps in response to that incident on November 16th, at a CDCR quality management meeting, Office of the Special Master (OSM) expert psychiatrist Dr. Metzner said something like:

> "You need to prioritize with what you have been given in terms of your staffing: that means that you're going to be non-compliant with Coleman measures. So what else is new?"

But CDCR evidently prefers to try to make the numbers look good, as part of their information war.

That neither ████████████ nor ████████████ felt any need to hide their view that CDCR is at war with the Court and its representatives shows that this war is a deep part of CDCR culture. And unfortunately, it is our patients who suffer as a result.

It is not just the OSM and the Court that CDCR blames for any problems. If CDCR is the paragon of inerrant virtue they appear to be trying to paint themselves as, they also need to discredit and crush anyone else who raises issues, such as staff pointing out problems even just internally, within CDCR (let alone if they talk to the OSM or write a report detailing some of CDCR's data issues like I did!), to silence everyone.
"Loose Lips Sink Ships." "Careless Talk Costs Lives."

To that end, CDCR has been retaliating against me including demoting me in all but nominal title: essentially all of my leadership of statewide Psychiatry has been eliminated. This has had such a chilling effect on other staff that even colleagues who have raised issues in the past have been scared out of continuing to do so.

As I will show in this letter, in internal staff meetings, CDCR executives *vilify* the OSM, creating a warlike us-and-them atmosphere that very effectively discourages staff from cooperating with the enemy (while saying, out of the other side of their mouths, in writing, that we are perfectly free to communicate our concerns to you).

Just in case any staff were in any doubt that talking to the enemy will not be tolerated, I have received career-ending disciplinary action for talking to you. The message is very clear: we are at war with the OSM and the Court. Talking to the OSM makes you a traitor, and traitors will be crushed. The retaliation against me has been crushing and relentless, as I document.

If CDCR's retaliation against me and demotion of me is allowed to stand, the silencing effect this will continue to have on staff – particularly headquarters leadership staff, even discouraging them from raising issues *internally* – will continue to have a terrible effect on patient care in the system. A patient care system that, as in this case, as I show, prevents problems being solved instead of solving them is one in which patient care will remain inadequate, to the detriment of our patients. Unless this is corrected, patients will continue being needlessly harmed and even dying in some cases. So in this letter, I give the details of the demotions and other forms of retaliation against me and I show how all that relates to the bigger picture of CDCR's war against the Court and the Special Master and the remediation process.

14

CDCR really does seem to me to be viewing the court-ordered remediation process of the lawsuit as a war to fight every step of the way. Otherwise why is the lawsuit not yet over after 30+ years?!

CDCR would no doubt say that it is continuing because the Plaintiffs and the OSM keep moving the goal posts, not because of CDCR; but to me, that does not pass the sniff test. The problems affecting patient care would be easy and relatively cheap to fix if CDCR were willing. If patients were being seen regularly by their psychiatrist, and in a private office instead of not being seen, or not being seen privately, or not being seen for a proper evaluation, or not being seen by the same psychiatrist (lack of continuity of care), patients would be getting the care they need, being successfully treated, and ultimately the system would be less chaotic and more efficient too. Yet this most basic aspect of care (that I discussed in the Golding Report) that would solve so many of the system's problems, seems not to be being prioritized. Our patients are still not getting the care they need.

As I show in this letter, CDCR appears so unwilling to correct issues that in one case I cite, somehow even a roomful of clinicians, all of whom know better clinically, nevertheless remained silent even on the most clinically shockingly, obvious, egregious issue. They evidently did not feel able to say anything. Loose lips sink ships. This is war. Agreeing with the enemy makes you a traitor. Traitors will be crushed.

It seems to me that those in charge of CDCR perhaps do not realize that it is actually possible to fix the system so that our patients would be getting the care they need, otherwise I can't imagine why they would be continuing to fight every step of the way instead of fixing things. Perhaps they don't know that psychiatric medical care actually works?

If it is not that they are unduly pessimistic about our ability to create a workable system providing the care our patients need, perhaps they genuinely believe that no matter what changes we make, the OSM will just keep moving the goal posts, so why bother even trying to make things right? If they can't win the war by providing adequate care

that others recognize is adequate care, or if they don't think they themselves can organize well enough to actually provide adequate care, then that would explain some of the other things they are doing that otherwise seem so unreasonable and egregious. If rational engagement doesn't work, what is left are various varieties of (non-kinetic) warfare.

War is not won by honest engagement with the enemy. One must do whatever one can to undermine the enemy, hence CDCR's shocking disrespect for court-ordered processes, as I will show in this letter. One must vilify the enemy, as this unifies the troops to be willing to fight to protect themselves and their honor. And indeed, as you have undoubtedly noticed, and as I will show here, many CDCR leadership HQ clinicians do not cooperate with you even when they do know how to improve things.

In war, collaborators with the enemy are eliminated. As I detail in this letter, I have been fully demoted from my position as Statewide Chief Psychiatrist in retaliation for exposing CDCR's misleading data practices to the Court and the OSM, the enemy.

In war, it is not enough to remove a collaborator from power, actions designed to humiliate them in front of their peers help to ensure that no one will ever collaborate with the enemy again. In this letter I show how I have been subjected to such humiliation, and the chilling effect it has had on other staff, and how this adversely affects patient care by preventing people risking raising and trying to fix problems in the system.

Accusing others of what one oneself has done, a "false flag" operation, is another strategy employed in war. CDCR in effect accuses you, the Special Master, of being misleading when you point out that you were unaware of CDCR's measurements that CDCR says you agreed to in the past. So if data remediation is necessary, CDCR is saying, it is all your fault for having agreed in the first place, not CDCR's fault for having misled you about the measurements.

In war, previous treaty agreements and promises can be surreptitiously reinterpreted or downright ignored. When you or I or anyone else points out problems in the way

16

CDCR is interpreting a "treaty", the answer is always that what we are suggesting is a that a *new* "treaty" is needed, and now is not the time for *new* "treaties" – everyone is welcome to propose such *new* ideas, but now is not the time to implement them. We are at war, and we will look at such proposals when the time is right, in the future, when a committee has been able to take the time to look into them (which will take years – they must be thorough, after all).

Subterfuge is legitimate in war. As I show in this letter, CDCR appears to have no qualms about saying that they are being transparent with data reporting, and then not being transparent at all, as we saw above in the statement made by ██████ ███████████████ The compliance numbers per the Program Guide are supposed to look worse when patients are not getting the care they need, such as happens when staffing is insufficient. If CDCR is hiding such problems, including by interpreting the Program Guide perversely and prioritizing good-looking compliance numbers over patient care, then The Program Guide is not providing the "rules of war" needed to protect our patients. I show how CDCR runs interference and creates plausible deniability by creating specious arguments about words and definitions, citing explicit language or lack thereof in the Program Guide and policy to distract attention from the purpose and intent of those regulations, which is to correct the inadequate care CDCR has been providing for our patients. I show how CDCR thus seems to be turning the Program Guide into a Trojan horse, creating a false sense of trust between the parties as part of their effort to win the war against you and the Court.

Perhaps because CDCR is overly pessimistic about our ability to fix the system so that our patients can get the care they need, or because they honestly believe that the goal posts are being moved so cooperating with the remediation process would not help, it seems as if those in charge of CDCR are undermining the process and resisting every step of the way to win the war by wearing everyone down so much that you all just give up and go home. A war of attrition.

Whatever the reason for CDCR's astonishing lack of cooperation with what seems to me to be a very reasonable process, if you allow their war of attrition to succeed, it is our

patients who will suffer – who *are* suffering given the problems in the system leading to inadequate care.

The evidentiary hearing in October 2019 does not seem to have resulted in any positive changes to CDCR's culture, particularly its data culture. Having been given the benefit of the doubt and having been given another chance to rectify the problems, CDCR seems to have taken that as carte blanche to continue disrespecting the Court process and the OSM, violating court orders, ignoring things the Judge said to them in court, and continuing to do exactly the kinds of things they were doing that resulted in me writing the Golding Report.

To effect the changes to our system needed to bring about adequate care for our patients, CDCR's war of attrition needs to be stopped. To do that, its leadership must be fully held accountable for its problematic tactics including its disrespecting the Court processes and its disinformation about you and the Court and for the retaliation against me and others. The retaliation including demotion cannot be allowed to stand, because if it is, why would CDCR ever stop retaliating against anyone who tries to make a difference in our system to protect our patients and get them the care they need?

# The data war

## Obstructing rather than facilitating the finding and fixing of misleading data errors

CDCR executives frequently say out of one side of their mouth that we are always welcome to propose new policy or data measurements if we see problems that should be fixed – while out of the other, through their actions, they obstruct obstruct obstruct. In theory, if the OSM and CDCR want a rapid change, that can be done using a memo with approvals from stakeholders. Later, policies could be created to incorporate the memos, as that often takes longer. But just saying that proposals for future improvements are welcome does not mean that they will ever be approved. And that is where the obstruction comes in.

Take the BRMR data remediation process, for example. Notice how vigorously CDCR seems to be hellbent on turning it into a rubber stamping of everything CDCR is doing, as if no changes are needed except perhaps superficial changes in nomenclature and the like.

This has all been agreed in the past, they say. You had no idea we were measuring this indicator the way we are? Why not? You agreed it! So now you want to change it?! That's moving the goal posts! Changes are for the future, not now. We reject your attempts to broaden the scope of existing indicators. We reject the idea that you had no idea what we were doing. You have been involved for 30+ years! If you think we should have been doing x rather than y, why didn't you say that in the first place when we originally agreed all this stuff? CDCR has been nothing but cooperative and transparent, and you are unfairly moving the goal posts. We are very willing to

consider proposals for improvement in the future, but that is not what this process is about.

In case you thought that following the Golding Report, investigation, and associated evidentiary hearing, CDCR would have turned over a new leaf and now be being more careful not to be creating or reporting misleading data, and perhaps that they might even be embracing rather than obstructing staff members' efforts to identify data-related problems so that they can be solved, in this section, I present evidence that that is not so.

For the sake of brevity, in this letter I am just giving details of a few further concrete examples of CDCR's unchanged obstructionist-seeming attitude when it comes to identifying and resolving data problems in the system, but this is by no means an exhaustive list. I could give details about many more, including, for example:

1.  CDCR patients in segregation units have a right to certain items of their property. CDCR is supposed to measure and report to the Court whether inmates in fact have the property they are entitled to have. CDCR was claiming that its business rules (measurements) were adequate. Those business rules were recording whether measurement systems were in place in the institutions, but not what the findings of the measurement system were. There was no actual measurement of whether patients in segregation units ended up having the property they were entitled to, but only whether a process was in place to determine that. So by CDCR's measurement rules, inmates could be being denied the property they have a right to have, and CDCR's data in this respect would look compliant, as though the inmates did in fact have their needed property. Your team discovered this. But in what sense did anyone agree to this in the past?

2.  CDCR is supposed to be measuring continuity of care. So their measurement looks at whether a patient in the same location has a consistent psychiatrist. But CDCR was not counting the discontinuity of care when patients change locations (for example different cells in the same institutions or different institutions), even though

the psychiatrist is not the same, and even though this creates massive discontinuity of care in the system. I doubt your team agreed to this, either.

3. CDCR counts interdisciplinary treatment teams (IDTTs) as compliant when *any psychiatrist* is present, not the patient's treating (attending) psychiatrist as it should be. They count it this way knowing that because of staffing shortages, institutions routinely assign to attend the IDTTs a psychiatrist who is not the attending psychiatrist to represent multiple other psychiatrists who are actually the treating psychiatrists. Doing that ensures that CDCR can report high compliance with IDTT treatment team metrics, even though the assigned IDTT psychiatrist doesn't know the patients, which defeats the purpose of the psychiatrist being there to begin with. Treatment team meetings are scheduled around the primary psychologist's schedule and in that environment, from CDCR's perspective any psychiatrist will suffice to make it seem like there was an adequate treatment team for the patient, because he or she represents a countable warm-bodied psychiatrist. But this is very bad for our patients. I highly doubt CDCR told you that they were doing this, yet they claim you were a full part of the collaborative process in making these types of measurements.

4. CDCR is still not measuring whether our psychiatric outpatients on-plus-not-on psychiatric medications (CCC patients) are having psychiatric appointments when they first arrive at institutions. This is 4 years after the Golding Report. Were you aware?

5. I could have said a lot more about just how bad the compliance numbers are going to look if CDCR is ever compelled to count only proper evaluations as evaluations, instead of resetting the clock after the briefest public encounter in the prison yard and the like. Or about what would the numbers look like if patients who were actually not being seen on time for scheduled appointments were counted as being seen late? For example, consider if a psychiatrist thought that a CCC patient medically/psychiatrically needed to be seen in 14 days and was scheduled to be seen in 14 days, but instead the appointment happened 80 days later? As you know, CDCR would not count anything as being late in that scenario, even though the appointment was manifestly 66 days late. The reason nothing would be considered

late is that as long as the patient was seen within 90 days of the last appointment, according to CDCR rules, appointments are considered on time, and 80 days is less than 90 days.

and so on.

I honestly see no change whatsoever in CDCR's attitude to data issues, and I doubt there will be any change until CDCR leadership is held accountable. And in the meantime, patients are still going without the care they need. The following examples and their associated attachments illustrate the problematic attitude that CDCR executives still have toward data remediation.

## Patients referred to the hospital need to be seen more frequently than those not needing such a referral

When patients are referred to the hospital, obviously that strongly suggests that they need to be seen more frequently than patients not needing hospital treatment. That is so obvious that it should be a completely uncontroversial statement. And anywhere but CDCR, it would be. But in CDCR, as I relate later in this letter, I received retaliatory disciplinary action for making this argument.

If a patient needs to be in the acute or intermediate hospital (where mandatory minimum care frequency is at least initially every three days by psychiatrists for the first month), but is not yet there, and instead is still in the less safe lower level setting of an outpatient area, logically, if anything, such a patient should be seen *more* frequently than they would be seen in the hospital, because they are in a more dangerous setting – a setting not designed to cater for their particular psychiatric medical needs.

There is certainly no clinically reasonable argument for such a patient to be being seen less frequently than they would be being seen if they were in the hospital.

So what did CDCR say about that when I and my HQ psychiatry team colleagues raised the issue?

See attachment 4. At first glance you might think that Assistant ███████████ ████████ email was eminently reasonable. He seemed to be inviting our HQ psychiatry team specialists to propose a policy change. Even though there is no current policy explicitly written detailing how frequently patients should be seen when referred to the hospital, a new policy could be written.

> "Additionally, if the concern is that no business rules are measuring minimum treatment requirements for patients awaiting transfer to ICF in the ASU, then we need a policy that a business rule can measure. Anyone can suggest new or updated policy language. Our HQ Policy Unit helps everyone navigate this process."

See pages 6-7 of attachment 5. What ███████████ did not mention there is that when the HQ psychiatry team specialists had proposed a memo to guarantee that patients awaiting transfer to the intermediate hospital (ICF) be seen by a psychiatrist ("MHMD" in the cited memo) more frequently than merely within 30 days, ███████████ ████████ had rejected the idea.

At the time in 2021, in the spirit of compromise, instead of saying that patients should be seen at least every three days by a psychiatrist (which is what is mandatory currently when patients first go to any of our licensed hospitals), my psychiatry team suggested that psychiatrists be mandated to see the patient just once a week, but that psychologists see the patient at least once per week too, to guarantee the patient at least twice weekly care. And yet this compromise was rejected.

It is easy to say that anyone can suggest new or updated policy language. But even where there seems to be a common sense need for CDCR to care for patients in a particular way – and incidentally, as I will show later, even when there is firm guidance from the Program Guide about what should and should not happen – our leaders refuse

to allow the appropriate change or neglect to tell people what they are doing, so that others do not know to insist on change.

Only because OSM experts including Dr. Potter are now carefully scrutinizing what CDCR is doing (and sometimes because our senior specialist psychiatrists at HQ and I notice things) and also because the Plaintiffs are observant, is CDCR sometimes being forced to make changes and be more transparent.

On this issue of how frequently patients need to be seen when they have been referred for hospital treatment yet are not (yet) in the hospital perhaps because there is no bed available, CDCR was arguing that the mandatory minimum requirement should be far less than the compromise frequency suggested by my team. CDCR's potentially patient-endangering position was that patients referred to the intermediate hospital but still in outpatient locations, need be seen only every 30 days by a psychiatrist.

This 30-day argument applied to patients referred to an intermediate level hospital, while ten days was the standard to be applied for patients waiting to go to the acute hospital. CDCR used these intervals because these were the maximum intervals that were allowed before mandatorily having to find a bed and transport these patients to the hospital.

So the sickest of all of our patients, referred to an acute hospital and not yet getting the hospital care they need, might have to wait ten days to be seen by a psychiatric physician, despite the fact that outside CDCR, the sickest psychiatrically ill patients needing acute hospitalization would be seen within hours.

CDCR's contention is that the frequency of care mandated is determined by the program in which the patient is currently residing rather than the patient's referred level of care unless that rule would violate another rule already stated in policy or the Program Guide.

For example, in a BRMR data remediation meeting on September 21st 2022, when describing the amount of care that CDCR will offer to a patient who is referred for transfer to a different level of care, a CDCR attorney said:

> "It is primarily based on their [current, MG] location."

CDCR's interpretation of the Program Guide and other regulations perversely fails to take into account the intent or meaning of the words, not to mention clinical need. The Program Guide is clear and regulations and policy are clear that patients in hospitals (or at higher levels of care) require very much more frequent care. That implies that patients who need to be in the hospital but are not yet there similarly need to be seen more frequently. That CDCR has not yet arranged transportation or found beds for patients who have been referred to the hospital has no clinical bearing on the frequency of care such patients need.

No text, whether from the Program Guide or any other foundational document, can ever fully enumerate every possible circumstance or situation in which it applies. And thus when our leadership proposes a strategy for data remediation such that CDCR can ignore the intent of the Program Guide and other policies and rules mandating care for our patients, and can ignore even basic clinical common sense, to the detriment of our patients, that seems highly problematic.

And if intent does not matter, does CDCR also think it can ignore the intent or meaning in other agreements with the Court, the OSM and the Plaintiffs? And since this entire lawsuit is about CDCR's inadequate patient care, surely there should be some attempt to meet even the most basic, obviously necessary standards of patient care, that everyone outside CDCR would agree are needed?

See page 5 of attachment 6. ███████████ said concerning CDCR's position that there is no need to mandate that a psychiatrist see a patient referred to the intermediate hospital more than every 30 days:

> "No one can find a current policy that directly sets an expectation for treatment services when patients are referred to Acute or ICF [intermediate hospital] level of care but are awaiting transfer/admission in outpatient housing programs."

And:

> "OLA also offered a legal opinion on the Business Rules alignment with Program Guide expectations."

███████████ was agreeing with the interpretation of the Office of Legal Affairs that no mandatory increased frequency of care is needed when patients are referred to the hospital and that that position "align[s] with Program Guide expectations." Indeed, that was the position CDCR presented at the July 14th BRMR data remediation meeting with the OSM.

See page 2 of attachment 5. ███████ was also agreeing, in his email of September 23rd 2021 cited in attachment 5, that no additional care should be mandated. By September 23rd 2021, I reasoned that if (somehow) the intent of the Program Guide could not be considered to include that patients referred to the intermediate hospital should be seen mandatorily by a psychiatrist more frequently than every 30 days, then a new policy or memo (memos can be created far more rapidly) should be created to try to protect our patients.

But ████████ would not allow a psychiatry team proposed memo that would have corrected this issue. His position was that doing so would not be "consistent with other

PG [Program Guide] references" and he says there is a de facto standard in which a patient should be seen "as clinically appropriate". He wrote the following:

> "I understand that we don't currently have a formal standardization of this approach, but there is a de facto standard right now & it's basically 'as clinically appropriate' and consistent with other PG references, which I think is a good approach."

Again, to anyone outside CDCR, this might sound eminently reasonable. Doctors should use their clinical judgement. Who could argue with that? In general, mandates overriding doctors' clinical judgement risk creating worse outcomes than when doctors are free to use their medical knowledge and judgement.

The trouble is, CDCR is such a dysfunctional system that perfectly reasonable though that statement might sound to those outside CDCR, the reality in CDCR is such that in the absence of mandates that such patients be seen more frequently, they might not be seen at all. Why? Because the doctors do not care or are lazy? Far from it! The vast majority work incredibly hard and care very much.

The reason is that our prisons are disorganized places. Given frequent movement of patients, large caseloads, and doctors frequently switching caseloads, it is hard for doctors to keep track. We recently just created a notification so that psychiatrists would know when their patient was sent to a hospital as many were not finding out for weeks. So psychiatrists rely on "due date" reports to determine when patients need to be seen next. Schedulers frequently schedule patients as far apart as possible consistent with the maximum allowable time.

See page 3 of attachment 4. The following is the text of an October 17th, 2022 ticket submitted by clinicians at Corcoran who were concerned about this situation:

> "At CSP Corcoran, we currently have 6 IPs who are referred to Intermediate Care Facility (ICF) level of care, who are also AdSeg (ASU) placement (ASU ICF). There are currently no rules being applied to them for Psychiatry, PC Contact or

27

IDTT contacts. They do not show up on due dates for needing any of these types of contacts. I have attached a snip of the patients in question. I compared to those ICF patients we have that are not in ASU, and those patients have due dates listed for these contact types, so I believe it has something to do with the ASU designation."

See page 1 of attachment 4. ▮▮▮▮▮▮▮ responded to these concerns as well as similar concerns expressed by our CDCR HQ personnel. When our clinicians were asking for standardized "due dates" to mandate increased clinical care when patients are referred to the hospital, ▮▮▮▮▮▮▮ said (amongst other things):

"Most of our policies restrict clinical judgment in specified situations and set requirements that must be followed."

Well yes. In some sense following all rules mandated by the Court and the Program Guide, including seeing patients in prisons referred to the hospital more frequently, restrict clinical judgement in the short-term.

See page 2 of attachment 5. ▮▮▮▮▮▮▮ had said:

"I have not seen anything to suggest that anyone is actually coming to harm" [from not mandating increased care when patients are referred to the intermediate hospital]

▮▮▮▮▮▮▮'s implicit argument that an absence of evidence is evidence of absence is illogical, false and clinically very unwise. It also makes no sense in the context of existing Program Guide mandates. Per Program Guide mandates, at the EOP level of care patients are supposed to be being seen at least every 30 days and at the CCC level of care at least every 90 days. I pointed out to ▮▮▮▮▮▮▮ in a Psychiatry team meeting (in September 2021) that while we might not, off the top of our heads, be able to come up with specific cases of harm coming to patients who were seen a few days late at the CCC level of care (for example seen on day 92 at the CCC level of care, rather than by day 90), but who did not need to be in the hospital, nonetheless we would count those

patients seen on day 92 as having been seen late. An otherwise healthy CCC patient seen 2 days late would on average be in far less danger than a CCC patient who is so sick that they have been referred to the hospital, but for whom no care is provided for up to 30 days while they are waiting to be admitted. Yet ████████ sees no problem with not having a mandate for the latter (sicker, higher-need) case despite the fact that there is a mandate for the former (less sick) case.

See the bottom of the first page of attachment 5. ████████ responded at that September 2021 meeting that he did not want to compound one mistake with another, by mandating that patients referred to the hospital should also be being mandatorily seen more frequently. He said we should:

> "not compound the problem [that we have a mandatory minimum for CCC patients to be seen, MG], by additionally mandating that patients referred to the intermediate hospital should be seen more frequently." (or words to that effect).

████████'s argument that court-mandated rules "restrict clinical judgement" and ████████'s argument against seeing patients mandatorily more frequently who are referred to the hospital, seem unfortunately to be more general arguments against many of our Program Guide mandated rules. But our rules are useful.

For example, with a patient needing to be hospitalized, the rules enable the doctor to focus on what medications to give while the patient waits, and not whether psychologists and covering psychiatrists (whom the covering doctor often doesn't know) will see the patient next week when the current doctor is on vacation.

Patients who need to be in the hospital frequently become rapidly suicidal without necessarily saying anything. Some medically deteriorate rapidly. For example, patients with schizophrenia or extreme depression who are quiet and not bothering anyone may be slipping into catatonia, a life-threatening state in which they don't communicate at all. Quiet patients may not eat or drink, and may not announce that to anyone. When no one is checking on these patients, they can get quite sick, quickly, perhaps then needing a crisis bed admission or an acute hospital admission, not just an intermediate hospital

admission, in some cases actually to save their life. Such patients may even need hospitalization at a facility outside CDCR, if they decompensate.

Part of the reason to refer a patient to the hospital is to figure out what is wrong, which is why our licensed hospitals insist that psychiatric physicians are seeing patients at least twice per week and why a patient might be referred to an intermediate hospital to begin with. Amongst other reasons, the referral is being made in order to ensure that the patient is seen more regularly so that appropriate diagnosis will occur.

When onsite psychiatrists go on vacation, new contracting psychiatrists (whom the existing psychiatrists do not know) may be starting to cover them when they are gone, or a new psychiatrist from telepsychiatry may be covering, etc., so there is not always or even frequently an opportunity from one doctor to communicate with another about the patients whom they are seeing because often the doctor does not know.

It is rare indeed for psychiatrists going on vacation to fully describe to the next doctor covering their patients what needs to happen because often they don't even know who will be covering. Patients move locations and thus have different doctors all the time and doctors come and go frequently on the same ward. Even if a doctor refers the patient to the intermediate hospital, goes on vacation and before going on vacation orders that a patient be seen in three days while the patient waits for hospitalization, if the patient is *not seen* by the next doctor within three days, the appointment is in no way considered late. Doctors' orders for when a patient should be seen in no way determine whether our patients are seen late in our system. No reminders are generated that an additional doctor's appointment needs to occur and no new doctor would have any reason to think that anything was amiss. There is no new due date for an appointment generated because of missing doctor-ordered appointments, until the patient gets to the intermediate hospital, which according to CDCR rules may be up to 27 days later after the missed appointment that was supposed to happen within three days. That's why mandatory regular appointments are necessary for very sick patients, and is precisely why doctors are required to see patients at least every three days when patients first get to our (licensed) hospitals and why more frequent care is especially needed when the same patients have not yet gotten there.

30

When a system is such that information does not easily flow between psychiatrists about who will be doing what, each psychiatrist needs to have a heightened awareness of all patients, because of not being able to predict what other people will do, just as on the road when the traffic lights are not working, that makes it hard to predict what other drivers will do. The quality of clinical judgement falls in chaotic situations without rules, just like congestion increases on streets in which the traffic lights are not working.

Moreover, in CDCR, administrators frequently tell us to prioritize which patients we see, and to use our clinical judgement, but do not provide enough staff to actually cover the needs of all the patients.

Then, when bad outcomes occur, administrators can blame the psychiatrist for failure to use appropriate clinical judgement, rather than blame themselves for failing to staff the facility adequately. Whereas when there are mandatory clinical standards, then we can collect data documenting failure to meet those standards, and that forces administrators to consider that there might be inadequate staffing – or that the inefficient way CDCR often deploys staff needs to be improved so that doctors' time is not being wasted, for example wandering the prison trying to find their patients, as I described in the Golding Report.

If it is acceptable to say that a patient who needs to be in the hospital but is not in the hospital can be mandatorily seen merely every 30 or however many days because the Program Guide does not explicitly forbid that, then it follows that interpreting the Program Guide as mandating only what it says explicitly is not a good idea. In this case it is clinically very unwise. CDCR's reasoning does not help us to provide adequate care, which is the purpose of the Program Guide and the data remediation process, given that CDCR was interpreting the Program Guide perversely.

At a data remediation BRMR meeting on July 14th 2021, ████████ objected to rubber stamping CDCR's interpretation of the Program Guide, and made it very clear that willy nilly approving CDCR's current standards even if they are problematic would be

31

inappropriate. He stated that he never knew that CDCR had such a standard (that patients referred to the hospital but not yet in the hospital need not mandatorily be seen until they get into the hospital, which could be 30 days later).

Indeed who would ever have thought that they would need to ask CDCR to confirm that they were not utilizing such an egregious policy?

From the way the OSM experts reacted to learning of this policy of CDCR's, it seems unlikely that CDCR had ever sought their agreement or asked whether it is acceptable to wait 30 days before a psychiatrist sees a patient needing hospitalization, let alone whether the intent of the Program Guide implied that that is permissible (which it certainly doesn't).

In a later meeting (on around October 13th, 2021) on the same topic, Dr. Metzner asked incredulously whether anyone disagreed with the idea that a patient awaiting acute hospitalization should be being seen "*every* [single] *day*."

Yet CDCR persists in claiming that the Special Master and OSM experts have always been aware of – and thus implicitly understood – the scope of what our indicators are measuring.

For example, on September 27th 2022, a CDCR attorney seemed to be publicly claiming in front of you and the Plaintiffs, that you and your data experts were fully aware of many of these types of understandings that CDCR data experts are utilizing. She said (approximately):

> "The history of the CQI indicators is that it's been a collaborative process. So although the Special Master's team or Plaintiffs may not have understood some of the technical details of the indicators, to say that the whole scope of an indicator was unknown is just not plausible."

The above CDCR statement made orally in the meeting, that you and your team have agreed to the scope of our indicators, is a message that has been absorbed by many

(though not all) headquarters clinicians. See page 3 of attachment 4. As I mentioned, a few HQ psychiatrists and Corcoran clinicians were alarmed that for six patients in a segregation unit, referred to the intermediate hospital, there were currently no rules being applied to them for "Psychiatry, PC Contact or IDTT contacts."

See pages 1-2 of attachment 4. Thus after patients are referred to the hospital, there would be no guaranteed appointments, for example by psychiatrists. But an HQ regional leader said to our clinicians by way of reassurance that everything is all right in terms of these rules because:

> "the Business Rules are written in response to negotiations with the Plaintiffs and the OSM and that they may currently be accurate."

I am pretty sure this is not right. I would be very surprised indeed if you and your team had agreed, let alone the Plaintiffs, that patients in AdSeg, waiting to go a hospital, should not be mandatorily seen by their psychiatric physician as they wait up to 30 days to get into the hospital.

But this is what CDCR tells us all the time, and it is thus understandable that many of our clinicians believe it.

See page 1 of attachment 7. ███████ explicitly said:

> "This stage in the data process is to identify the existing system."

I once asked ███████ about a hypothetical situation in which an indicator measuring whether patients are being seen on time, instead asks us to count the number of cars in the parking lot. I asked him if that were hypothetically the case, then would the purpose of the BRMR meeting (at this stage) be to validate the correct counting of the number of cars in the parking lot? Or should we not be changing the scope of the indicator to enable it to help us to measure whether patients were being seen on time?

████████ said that as long as nothing in the Program Guide is violated by measuring that, given that the Special Master's team has in general agreed to our indicators, the purpose of the BRMR meetings is to validate whether we are correctly counting

"the number of cars in the parking lot."

He said that changing rules to improve quality of care could be made *later*, and in the hypothetical case I raised it should be. And he said there is a change process outside the BRMR meetings in which that can occur.

CDCR's strategy of saying that the forum to change CDCR's inadequate data collection and analysis is *later* and that such changes are not relevant in the current BRMR process, and that everything has already been agreed to by the OSM in the past, and that the OSM is just moving the goal posts, has, it seems, very effectively silenced a number of otherwise interested clinicians who may have been willing to speak up had that not been said.

Indeed the same type of argument was made to me in 2018 before I wrote the Golding Report. ████████████ and others said that the proper place to discuss additional measurements was at a later point in time after the staffing solution had been ruled on by Judge Mueller in 2018. Discussion of new measurements should occur in 2019.


## Patients need to be seen promptly when they arrive, and they need to be seen before the interdisciplinary treatment team

See page 4 of attachment 8, and page 20 of the Golding Report: Case 2:90-cv-00520-KJM-DB Document 5988-1 Filed 10/31/18 Page 20 of 161. In 2018 I raised the issue of CDCR's failure to ensure that patients be seen and evaluated by a psychiatrist within 14 days of arrival at a new institution, and before the interdisciplinary treatment team.

Sometimes in the CDCR system patients can (still!) go months before being seen, not just a few extra days. As I related on page 20 of the Golding Report, on July 27th 2018, ███████ asked why a particular patient still had not seen a psychiatrist since his arrival in *May*. That patient had had a major incident quite possibly related to his psychosis, and he was untreated. That is by no means an isolated example. I have been raising this issue for years.

Finally, in March 2020, I and colleagues were permitted to write a memo to try to correct this issue, with the agreement of the OSM team and the Coleman parties.

The memo first referenced the Program Guide, saying that the

> "Interdisciplinary Treatment Team (IDTT) shall be completed"

> "• No later than 14 <u>working</u> days of the arrival to a CCCMS program"

> "• No later than 14 <u>calendar</u> days of the arrival date to an EOP program."

The memo also said:

> "IDTT members, specifically primary clinicians (PC) and psychiatrists (PSY), shall complete their initial PC and PSY contacts consistent with the Mental Health Services Program Guide timelines and prior to the initial IDTT for <u>*all*</u> patient transfers."

The memo was titled

> "Requirement For Initial Contacts To Be Completed Prior to the Interdisciplinary Treatment Team."

With your OSM team's approval of this memo, presumably your team thought (as did I) that when patients transfer into new programs the mandatory initial psychiatric evaluations of our patients would now be happening before the mandatory

interdisciplinary treatment team meeting happening within 14 days of arrival.. But that's not how ███████████ or the CDCR data team ultimately interpreted the memo.

███████████ and the data team took the view that the memo was silent about what should happen in the event that the required initial interdisciplinary treatment team within 14 days of arrival does not occur. So to ███████████ and the data team, it was perfectly legitimate to interpret the memo to mean that patients for whom the required IDTT mistakenly does not happen, do not necessarily need to be seen by a psychiatrist within 14 days of arrival at their new program. And they evidently felt no need to run that perverse interpretation by the OSM.

When we later discovered that CDCR was interpreting the memo in this perverse way, and asked that that be corrected, ███████████, ███████████, and our lawyers argued that the memo only said that a mandatory psychiatric evaluation should occur before the 14-day mandatory interdisciplinary treatment team meeting. But (they argued) an appointment can only occur before an event (such as an interdisciplinary treatment team meeting), if the event actually happens. CDCR chose to interpret the memo to mean that the initial psychiatric evaluation before the interdisciplinary treatment team meeting was only mandatory when the mandatory interdisciplinary treatment team meeting was actually going to happen.

That would imply that if CDCR failed to ensure that the mandatory initial treatment team meeting happen as required, then for a patient entering the CCC level of care, the psychiatric evaluation could wait for 90 days! The result is cases like the one I cited above, in which ██████ was asking why a patient had not been seen in time to prevent a bad outcome. That is precisely what the memo was trying to prevent.

So despite the March 2020 memo, CDCR was choosing not to count initial psychiatric evaluations that failed to occur as non-compliant unless the mandatory treatment team meeting did occur as required. They were even not measuring whether psychiatric evaluations occurred before the treatment team meeting even if the treatment team meeting did happen.

36

Finally, after my repeated comments that no one intended that initial psychiatric appointments not be mandated if the mandatory treatment team meeting did not occur, I was told that they would "do research into it."

The results of that "research" were quite problematic. ███████████ presented the misleading business rule to the Office of the Special Master's team at a BRMR data remediation meeting around July 2021. CDCR had not informed the OSM and the Plaintiffs how they were interpreting the 2020 memo. Nor were they even informing them straightforwardly in that BRMR meeting. They also failed to mention my disagreement with their perverse interpretation. Instead, they presented their opinion as CDCD's so-called "consensus clinical opinion". Dr. Potter (and I think Dr. Metzner) and others were witnesses to this.

See attachment 9. But Dr. Potter noticed the problem. At first CDCR tried to make the argument that the reason the psychiatrist needed to see the patient before the treatment team meeting was to participate in the treatment team. Thus if the treatment team did not occur, for example by mistake, the psychiatric evaluation wasn't needed at that time either. But the OSM experts insisted that that perverse interpretation be changed. ███ ████████ then agreed in the meeting. Dr. Potter and others on your team, Mr. Lopes, were witness to CDCR's perverse interpretation of that memo. This kind of thing is typical.

And later, ████████████ apparently had a change of heart and then seemed to dissimulate (particularly during a BRMR meeting in August) claiming that of course everyone knew that psychiatric evaluations should occur when patients arrive at new programs, even if the mandatory treatment team meeting did not occur. But earlier he had presented the exact opposite to the OSM team (and argued the exact opposite to me) despite my vocal objection during internal pre-BRMR meetings.

Once again, CDCR *says* to do the right thing clinically, but acts in ways that do not actually facilitate that. If, for example, they were correctly measuring and reporting as 'not compliant' missing initial psychiatric evaluations, that would make CDCR's numbers look bad. This attitude of trying to engineer good looking data despite the

reality demonstrably harms patients. When you try to hide problems instead of identifying them, they remain unsolved. The tragedy is that CDCR does not seem to know that when you highlight problems instead of hiding them, people come up with solutions and things improve.

CDCR executives and attorneys seem to think that it is legitimate to interpret policies and memos in potentially patient-endangering ways unless there is specific policy or memo language explicitly contradicting their perverse interpretations (unless the OSM happens to notice that there is something amiss, as Dr. Potter did in this case). They appear to be not even trying to understand the intent of policies or finding ways to use the policies to better care for our patients, instead apparently trying to use the language of the policy to find a way to inflate compliance numbers.

## Counting mere wellness checks as compliant full evaluations

There are certain types of psychiatric encounters with patients that take up psychiatrists' time but cannot be considered Coleman compliant evaluations according to broadly understood interpretations of the Program Guide. For example, a psychiatrist might briefly interact with a patient and write a medical note when getting a patient to sign a form, but such an encounter does not constitute a psychiatric evaluation. Some psychiatrists do a lot of such work, so the system somehow needed to acknowledge that work. Before we came up with the idea of "wellness check only" encounters, psychiatrists were often maligned as lazy in CDCR, and as I discovered when I physically followed a number of them as they worked, that was very far from the case. (See the Golding Report for details.) So we came up with the idea of "wellness check only" encounters so that that work of the psychiatrists could be recorded as work in the medical record without those encounters being counted as a Coleman compliant full psychiatric evaluations.

At our approval body (CAPC) in early 2021 multiple psychiatrists presented this proposal for the system to show "wellness check only" encounters that would not count

as full, compliant psychiatric evaluations, and it was approved. Psychiatrists would be able to log their wellness check only work, and those encounters would *not* count as Coleman compliant psychiatric evaluations, with all that those imply. If the patient needs to be evaluated within 90 days of the previous evaluation, and has a wellness check only encounter with a psychiatrist on day 85, the patient still needs to be evaluated properly in the next 5 days for that evaluation to count as compliant with the mandate. The wellness check was designed *not* to reset the mandatory "within *n* days" clock.

But our HQ psychiatry specialist team then discovered, months later, that CDCR was counting wellness checks as Coleman compliant appointments despite the fact that we had specifically designed them *not* to count.

When we discovered that CDCR was nevertheless counting them, we naturally thought it must have been some type of unintentional error. Surely the data team and quality management team would not just ignore what those who had *designed* this had explicitly said about it when they formally proposed the idea to the data team at the CAPC meeting?!

See attachment 10. In fact, CDCR's counting these appointments as Coleman compliant visits was actually intentional.

See page 2 of attachment 10. ▮▮▮▮▮▮▮ wrote to ▮▮▮▮▮▮▮▮▮ (a CDCR Social Work leader in determining appropriate use of data) to draw her attention to what had been agreed at the formal CAPC meeting about wellness check only encounters not counting as evaluations, as follows:

> "Here's the slide (see snip below). The intent was that all 3 of these new check out codes wouldn't count for appointment completion in reporting……
>
> The purpose of wellness checks is to provide a way to capture times where the clinician talked with the patient, but it wasn't a clinically significant encounter (basically just a "hey, you OK?"), or it was a non-confidential telepsychiatry

39

appointment (which per Telepsychiatry policy, cannot count as a completed appointment for reporting purposes)…"

See page 1 of attachment 10. ██████████ replied:

"We can work on the non confid + tele psych = not meeting MHPG [mental health program guide, MG] requirement but…..we can't work on the welfare check one [until, MG] we have the policy' "

So ██████████ complained to ██████████, as follows:

"I discovered last Thursday that the 'Wellness Check Only' check out option is being counted in MH reports as a complete MHSDS-requirement-satisfying appointment, meaning that if an appointment is checked out as a wellness check, it will reset follow up timelines and look like a full appointment was done. I wrote an email to ██████████ where I included a link to the user story, a link to the RFC [request for change, MG] and a snip of the CAPC slide, and explained that in all of the discussions that led up to adding that Wellness Check option, the purpose of adding the option was always stated as giving clinicians a way to record a face-to-face encounter with a patient that shouldn't count as a completed appointment. To my recollection, everyone in those meetings agreed with the purpose … and this was discussed in CAPC as well.

I believed this was just an oversight on the part of MH Reporting that when this new checkout code was added to the MH Reports, they made it count as a full completed appointment. But per my conversation with ██████████ below, she says she cannot correct MH Reporting without there being a policy that explicitly states that Wellness Checks do not count as completed MHSDS-requirement-satisfying appointments…… This seems kind of crazy to me."

40

See attachment 11. ██████ wrote:

> "The code was created to give staff credit for non-confidential contacts that they are expected to complete if a patient no shows. There was nothing confusing about the reason behind creating wellness checks."

Moreover, on what basis (what "controlling policy") did our data-management colleagues utilize to determine that psychiatric wellness checks should default to being counted as compliant appointments despite their entire purpose being *not* to count? Indeed, according to ██████, on around April 26th 2021 CDCR physically changed the programming of the computer so that these appointments would count, despite there being no controlling policy saying that they should do that**.**

See pages 4, 8 and 9 of attachment 12. The official notes from the original CAPC meeting said the following about how wellness checks should (not be) be counted:

> "Update programing so that these are not counted for appointment completion in reporting."

Nonetheless, our data experts quietly changed the computer code to ensure that the "wellness check only" appointments *would* count. They defaulted to counting the appointment, until policy might someday be created to cause them to reverse what they had done. And they told neither the HQ psychiatry team specialists nor me, though we created this, and nor did they tell the Office of the Special Master.

And they did that despite the fact that CAPC had specifically approved the proposal so that wellness checks would *not* count as compliant psychiatry appointments and also after being told (again) after the CAPC meeting that those who had *designed* them specifically planned these "wellness check only" appointments *not* to count.

When challenged, the data team argued that they could find no policy that forbade them from counting "wellness check only" appointments as clock-resetting compliant

appointments, and if we wanted them not to count, we would always be welcome to propose a new policy.

See page 2 of attachment 12. ▮▮▮▮▮▮▮ even argued that an informal memo was insufficient to change the computer programming that his team decided to do when they determined that "wellness check only" appointments would count as Coleman compliant psychiatric evaluations despite their entire *raison d'etre* being to the contrary:

> "I appreciate the creative thinking, but I am concerned that an informal memo is inconsistent with our process. This information should definitely be expedited to CAPC as a change.
> + ▮▮▮▮▮▮▮ to ensure we are all on the same page."

"▮▮▮" refers to ▮▮▮▮▮ and ▮▮▮ refers to ▮▮▮▮▮▮▮, one of the psychiatrists from San Quentin who was brought in by ▮▮▮▮ to supervise me and the Psychiatry program after ▮▮▮▮▮ demoted me (which we will get to later).

See attachment 4. The unwillingness of CDCR's data team *not* to count "wellness check only" encounters as clock-resetting psychiatrically compliant appointments is noteworthy. It shows the clear bias of CDCR to default to misleadingly and falsely overreporting compliance, prioritizing good-looking compliance numbers over patient care. And it shows that, if discovered, CDCR disingenuously says that new policy can always be created later. ▮▮▮▮▮▮ said:

> "Anyone can suggest new or updated policy language. Our HQ Policy Unit helps everyone navigate this process."

But the data team is more than capable of creating misleading interpretations of policy at odds with what most stakeholders would find acceptable.

See attachment 13, my letter to your team about this. CDCR was quietly counting wellness checks without informing you or us, and you and your team had no idea about it until I told your team. Please note, this was all happening long after the evidentiary

42

hearing on the Golding Report. Again, this is just one example. I can give further examples if you are in any doubt that CDCR's shady data-interpretation practices seem not to have improved since Judge Mueller found that CDCR had been knowingly presenting misleading reports to the Court.

See page 1 of attachment 14. In 2018, ▇▇▇▇▇▇▇▇, a Senior Supervising Telepsychiatrist quoted ▇▇▇▇▇▇▇, who at the time was doing much of the statistics for the data team, as having admitted that they "err on the side of over-reporting compliance":

> "I just wanted to add that in the webinar meeting that ▇▇▇▇▇▇ and I attended with ▇▇▇▇▇▇ on 4/11/18, he did indicate that they 'err on the side of over-reporting compliance.'"

CDCR's stance on counting "wellness check only" encounters as compliant evaluations only changed after a huge argument between the HQ Psychiatry team and ▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇, followed by a public airing of the issue at a second CAPC meeting about a year after the original CAPC meeting in which the non-counting wellness check idea had been presented and approved.

This decision at the second CAPC meeting occurred after an actual data expert at that CAPC meeting – OSM expert Dr. Dan Potter – indicated in two or three words that counting those encounters would be misleading given the purpose for which they had been created.

See attachment 15. In other contexts, you and your team have made it clear that intent should be taken into account when trying to understand policy language.

Although attachments 10, 11, 12 and 13 about "wellness check only" appointments are long, it is instructive to read the whole thing, as it shows the mindset and thinking of CDCR's current data team. Do note, however, that ▇▇▇▇▇▇▇, a psychologist from the quality management team, agreed with our HQ senior psychiatry team about the wellness checks.

But the idea that the data team will "err on the side of overreporting compliance" as █████ was quoted as having said on April 11th 2018, and without telling the Office of the Special Master, continues to be concerning and is perhaps one of the reasons that your team is wise not to be too trusting that CDCR's CQIT data metrics are as they should be.

Even when CDCR leaders finally reluctantly agreed to change their shocking stance on the wellness checks counting, they still did not want to correct the record (all the misleading compliance data created by erroneously counting wellness checks) tabulated in our court-mandated compliance metrics. Their erroneous interpretation went on for more than a year.

## Counting all consults as full psychiatry appointments

It's not just "wellness check only" encounters that have been coded to count as compliant appointments. Many things have been programmed mistakenly to count towards compliance. The list is too long to discuss here, but you will want to look into this further. For example, our team discovered that even brief appointments that CDCR psychiatrists call "med-non-adherence appointments" – and multiple other appointment types – were also coded to count as if they were compliant full patient evaluations. And they were counted as such for years. They were not just counted as routine appointments, they were counted as initial evaluations – more comprehensive evaluations. (I do not know if they are still being counted that way or not, and if they are no longer being counted that way, I do not know if CDCR has corrected the record with the Court.)

Your OSM data team would have had no easy way of discovering that but for our team happening to discover it and telling your team about it. What if we had not? What if I were not here to give you this information? CDCR has done a very effective job of silencing others, as I will show later in this letter.

This discovery was made in around May 2021, long after the evidentiary hearing in 2019 in which CDCR was found to have knowingly misled the Court.

███████████ discovered that every single psychologist, social worker, and psychiatrist contact type was counting as not just a patient evaluation, but actually as a more comprehensive initial evaluation.

See attachment 16. ███████████ said:

> "[W]e recently became aware that every MHMD [psychiatrist, MG] and MHPC [psychologist and social worker, MG] contact type, whether a brief focused consult, a med non-adherence appointment, or a routine or initial appointment, satisfies the requirement for a MHMD or MHPC, respectively, routine or initial contact whichever is due, and resets the clock regarding when the next contact is due. For example, if a patient requires an MHMD initial evaluation by 6/4/21, and has a completed med non-adherence appointment on 6/2/21, that completed non-adherence appointment will satisfy the requirement for an initial MHMD evaluation, and set the clock start date for determining when the next psychiatry appointment is due.

> The retroactive part is interesting. It was argued that the data we have presented to the Court regarding timeliness of contacts was likely erroneous due to the above issue. I'm certainly curious to see how the compliance percentages compare before and after this change is enacted."

The "retroactive part" is indeed interesting. Perhaps all the previous data about psychiatric and psychologist compliance with court-mandated appointments is inflated, perhaps by some non-trivial amount. Has that error been corrected in reports sent to the Court?

Just like with the wellness checks, they reset the clock regardless of the extent of the consultation or whether the psychiatrists themselves thought it was an evaluation. I

ultimately pointed this out to your OSM team. But for years CDCR has been reporting overcompliance with meeting Coleman mandates by counting every brief med non-adherence consult and multiple other contact types between a patient and a psychiatrist or psychologist, not only as a psychiatric or psychological evaluation, but an initial (more comprehensive) evaluation. No doubt those familiar with our data system were fully aware of this, but apparently chose not to tell the OSM or the Court, even after the evidentiary hearing on the Golding Report. Would CDCR ever have told you without our HQ psychiatry specialists' intervention?

## Crisis beds: interpreting "24 hours" to mean "48 hours"

See attachment 17. Here is another example of CDCR misleadingly interpreting timelines to falsely elevate compliance. Dr. Potter figured this one out. On around September 22nd 2021, data expert Dr. Potter discovered that though patients are supposed to be being seen by a psychologist within one day of being in the hospital, CDCR was counting (in some circumstances) up to 48 hours as a "day", for many years, and without any controlling policy to that effect.

See page 2 of attachment 17. I wrote the following to the OSM on September 22nd, 2021 about this:

> "Dr. Potter discovered today, that CDCR has been counting our patients' appointments as compliant when patients are admitted to the crisis bed up to *48 hours after arrival at the crisis bed,* not 24 hours."

But the patients are supposed to be seen within 24 hours, not 48 hours. (I mistakenly said in my letter to you that it could occur up to 72 hours later; but 48 hours is bad enough.) Once Dr. Potter discovered they were doing this, by directly asking about it, CDCR did then change it, but notice that when they talked about this indicator at the BRMR data remediation meeting, in no way did CDCR volunteer that they had been misleadingly doing this for years. Your team had to discover it.

# The Program Guide as a Trojan horse

I have heard that it is being considered to make one of CDCR's self-monitoring tools (CQIT) a substitute for certain aspects of the Program Guide. In my view, although I do not know the legal arguments, there is a very good clinical reason to insist that the monitoring requirements (for example in CQIT) should become a substitute for certain provisions in the Program Guide, if that is being considered. As example after example shows (for example in the Golding Report, 2018, with further examples in this letter), CDCR tends to interpret the Program Guide in a perverse way that ignores basic standards of minimally adequate care, apparently to falsely elevate reported levels of compliance, and does not tell the OSM about it.

Those just reading the Program Guide and understanding its foundational role in helping to determine care for our patients, might imagine that our prisoners are getting good care because the Program Guide broadly mandates it. Those outside CDCR might think that a less-specific document (like the Program Guide) is preferable to a very specific document, because the Program Guide's basic provisions can be adapted to sets of circumstances that differ between institutions and programs and that differ between patients. In most circumstances a flexible document is a good document. I certainly would not have argued for rigorously enforced standards when I first arrived in 2013. But at that time I did not understand CDCR culture.

Given CDCR's history of providing what the Court determined in 2019 to be misleading information, and given what appear to be similar continuing practices that have not yet been corrected, and CDCR's history of perversely fighting not to correct even the most basic, uncontroversial patient-care-related issues, perhaps relying on CDCR's good intentions is not sufficient.

47

More and more egregious violations of common sense clinical standards are being discovered because of intense court scrutiny and particularly because of OSM data expert Dr. Potter's careful eye. Only because of this monitoring and the OSM's insistence, has CDCR been willing to correct some of its strange and misleading data practices.

On the face of it, the words of the Program Guide seem to build trust between CDCR, the Plaintiffs and the Special Master because one can (imperfectly) glean intent for a broad variety of circumstances that could not possibly be perfectly specified when one cares for individual patients.

But in the hands of our executives and lawyers, the Program Guide seems like a Trojan horse: it appears to build trust between those involved in this lawsuit because everyone can agree to a binding set of principles that everyone can work toward following. But CDCR has turned the Program Guide into a tool to justify egregious abuse of clinical common sense, to the detriment of our patients.

CDCR's seeming emphasis on what Judge Mueller called "litigation tactics" over patient care, at least in terms of data remediation, seems not to be changing, and if anything is getting worse, even as you and your team try to solve the problems. So unless CDCR is held to carefully constructed, validated, measurable, observable, and transparent standards for many years, I can't see how CDCR's data culture, with its potentially patient-endangering data practices, will change.

It seems that the Program Guide, initially thought of as something to build trust and understanding about how CDCR will treat patients, has been weaponized in CDCR's war against the Court and the OSM. Substituting for the broad Program Guide language more concrete, specific and straightforwardly-measurable data collection processes might well help bring about the changes needed for our patients to get the care they need.

#  and UNA

"UNA" (Unmet bed Needs Analysis) is, as you know, an evaluative court-ordered process that amongst other things makes sure that patients needing to be in the hospital are getting there.

The Court had previously found that CDCR was failing to hospitalize many of our sick patients needing to get into the psychiatric hospital. Thus, if, to determine how many licensed mental health hospital beds are needed in the California prison system, you were to look just at the number of patients actually in such hospitals in our system, the resulting figure would underestimate the number of beds needed. Measuring it that way also has the unfortunate consequence of incentivizing CDCR to keep patients needing hospitalization out of the hospital. It is expensive to build such hospital units, and they are more expensive to run than outpatient units.

CDCR's "Sustainability Process", amongst other things, is a process aiming to help to make sure that patients who need to be in the hospital are actually getting there. It has been suggested that this Sustainability Process ("SusPro") is not working as well as it should; i.e., that it is not succeeding in ensuring that patients needing to be hospitalized are actually hospitalized. ("MHARP" was a previous court-ordered UNA-like process.)

See attachment 18. As you rightly said in court, Mr. Lopes:

> "Your Honor, this isn't new. We've done these studies at least three or four times in this case, and it's taken longer to do this study development than it had one of its predecessors. And it's just mind boggling to me that it's taken so long. I think, in part, the defendants have rooted their position in the sustainability of their

49

sustainability effort that they have, and they haven't really focused clearly on the Court's order saying the sustainable process is unsustainable."

Line 6-14 Ca:90-cv-00520-KJM-DB Document 7461 Filed 02/15/22 Page 29 of 50

During the court-ordered MHARP process in the past, your OSM experts physically sat in groups with some of our leadership clinicians, and often with the treatment teams that directly took care of our patients in multiple institutions, to review whether patients were getting adequate care, assessing, for example, whether particular patients needed to be in the hospital.

Out of that, with your assistance, CDCR developed the Sustainable Process (SusPro) audit, in which instead of your experts working with our leaders, our own leaders were to emulate what you had previously been doing in MHARP, but your experts would then not need to be there.

It was hoped that aspects of the MHARP process would become incorporated into our SusPro tours and audits, but your team would then not be much involved at all with the day-to-day surveys. After MHARP, our sustainable process teams now conduct these SusPro audits, but unlike with MHARP, your team members are no longer there.

The Court has ordered another MHARP-like process, called "UNA", to help the Court determine, amongst other things, whether we are treating our personality-disordered patients appropriately, and whether patients who need to be in the hospital or a crisis bed are getting there.

If the CDCR Sustainable Process audits were working perfectly, then the right number of patients would be being referred to the hospital, and the Court could then use those numbers to help determine whether CDCR has enough licensed crisis/hospital beds for our patients. But the Court seems to want to verify that this process is working correctly, and CDCR's SusPro audit process has not been determined to be "sustainable".

In the new UNA process, your experts (just like in MHARP) will (and have been) sitting with our leaders (but with UNA this process is online) and again help us to see whether more (or possibly fewer) patients should be in the hospital, amongst other things. Thus this new UNA process needed to be a bit different from the previous SusPro audits, at the very least by having your experts work closely with CDCR to help CDCR to look at where the SusPro audits were suspected to have been going wrong.

Because of the suspicion that SusPro was going wrong, as well as for other considerations, your team helped propose, and worked with our team to create, a new set of questions and procedures, different from SusPro. But in your comments quoted above, Mr. Lopes, you seem to be saying that CDCR did not fully cooperate with you, in that they seemed to want to make many of the questions and procedures similar to what they were doing in SusPro.

████████'s reply in court to what you said above was:

> "I disagree very strongly with some of the characterizations that Mr. Lopes made, with all due respect. We are not trying to run SusPro as an UNA. I've been surprised at how little everyone seems to understand what SusPro actually is despite the fact that we keep filing these reports. MHARP and SusPro have a lot in common. There's a lot of similarities that we dispute because they were built that way. And that may be where some of the confusion is coming from. But we started – and I don't know how anyone could see anything different in our workers. We started with the criteria of MHARP and literally talked about each one and modified it to meet the new world that we're in today. In 2009 we didn't have an electronic medical record, we didn't have a lot of – we didn't have any sort of telemedicine which has happened over the last decade plus since MHARP. There were a lot of different things in MHARP that simply don't make it directly applicable to our current thing.
>
> Line 6-14 Ca:90-cv-00520-KJM-DB Document 7461 Filed 02/15/22 Page 32 of 50

I was surprised that ███████ was disagreeing with you by seeming to claim that CDCR was happy (or cooperating with you) to change its SusPro process to create a new UNA process. In private meetings ███████ had specifically said that he wanted to utilize something very much like the same SusPro process to accomplish UNA.

In a CDCR meeting during one of CDCR's internal pre-UNA discussion meetings around late November 2021, to about 10 or 15 people, ███████ had said that he wanted very much to continue doing the SusPro audit, with a few modifications to also accomplish the court-ordered UNA process simultaneously, because that way we could use existing staff and thus not interfere with CDCR operations. Though SusPro is not exactly an UNA, he thought doing something similar for UNA was reasonable because he felt the SusPro audits were in many ways similar to the previous court-ordered MHARP process and were gathering accurate information about patients and their needs.

And SusPro was developed and in some sense patterned after the previously court-ordered MHARP process. Running a modification of SusPro as an UNA was a way CDCR would not have to change much of what it was doing (which would be good given that its clinicians are so busy), but could collect the requisite data for the Court and then both sides could get what they needed, ███████ had said. Thus CDCR very much did want to pattern the new UNA audit like its previous SusPro audit, and it seemed to me he made that proposal to you and your team, which is why you may have thought CDCR was not being as cooperative as it could have been.

See attachment 19 for the agenda for the meeting with CDCR and your experts on December 1st 2021 about this topic. In the agenda it mentions CDCR's already existing, "Sustainability Process" and

> "Methodological Considerations and MHARP Adaptations to Study (including Excel spreadsheet)."

Despite what was said at that meeting by ███████, you (Mr. Lopes) and Dr. Metzner did not want to utilize the SusPro strategy as the foundation for the court-ordered UNA

strategy because, as I understand it, you thought the SusPro strategy was not effective in gathering the needed information.

See attachment 18. When ███████ said, "We are not trying to run SusPro as an UNA", he appeared to be saying that he recognizes that there would be substantial differences between the existing SusPro audits, and the future UNA process.

But in fact his apparent willingness for there to be substantial differences seemed to be mere words said in court. In fact, from what ███████ said in internal meetings, he wanted to make them so similar that the same staff could continue to do more or less the same thing that they had been doing before the court order, without interruption. He thought CDCR could use that data from their audits – with perhaps a few modifications – and said as much in a meeting with multiple participants. Thus, CDCR was in fact "[rooting] their position in the sustainability of their sustainability effort that they have, and they haven't really focused clearly on the Court's order saying the sustainable process is unsustainable", as you said.

Despite your team's objections, ███████ thought he still could get what he wanted and not have staff diverted from SusPro to do a separate project called UNA, but that their work could be modified to do UNA.

███████ said that Dr. Metzner and your team are very unfamiliar with CDCR's existing SusPro audit. He implied that your team was wrongly criticizing SusPro because of that unfamiliarity, and that many of the procedures, questions, and criteria utilized were reasonable, or if not reasonable at least very similar to what the OSM had wanted in the past, particularly because many procedures in SusPro actually were similar to the previous court-ordered MHARP process. He said:

> "Metzner just doesn't understand SusPro."

He clearly felt that SusPro was working properly and identifying which patients needed to be in the hospital, and that if only your team were aware that SusPro was very much like the previously agreed-upon MHARP process which was thought to

work, rather than what you allegedly mistakenly imagined SusPro to be, you would have agreed that our existing SusPro process was very much usable (with a few modifications) as an unmet bed needs analysis (UNA).

████████ suggested in the meeting that Dr. Metzner's (alleged) unfamiliarity with CDCR's SusPro meant that ████████ could propose many of the same old SusPro procedures and questions and criteria to Dr. Metzner as if they were brand new ideas that should be used for the brand new UNA process. He suggested that because they were, he said, things the OSM had previously agreed to and often sounded reasonable, Dr. Metzner would agree that those ideas should be used for the new UNA process.

████████ suggested that as long as Dr. Metzner didn't notice that he was being asked to agree to old ideas – as long as he thought these were new ideas – Dr. Metzner would go along with it for UNA. And by the time Dr. Metzner figured out that the "new" UNA processes were actually in many cases the old SusPro processes, it would have been too late, because he would have already agreed that they were good.

When ████████ said that, I found it so shifty and disingenuous that I called Dr. Metzner and left a message. Dr. Metzner called me back and I told him about CDCR's deceptive plan. Dr. Metzner no doubt remembers that call.

Concerning this process, like with the data remediation process, and in his general blatant disrespect, ████████ has repeatedly tried to undermine this UNA effort by casting aspersions on the OSM.

In early or mid-December 2021, in a public meeting with OSM team members, ██ ████████ visibly became angry and derisive toward the OSM team members for claiming that the sustainable process tours that CDCR was doing were not working properly.

At a subsequent meeting, I believe around December 21st 2021, ████████ publicly apologized to the group for his "intensity" at the previous meeting, and explained that the reason for his "intensity" was that he wanted to protect the regional teams who had been working so hard to do a good job in their Sustainable Process audits.

54

In his apology, ███████ admitted that the Court had found that CDCR's sustainability process had not been working properly.

But around January 31st 2022, ███████ again criticized the "team process" that had been proposed by the OSM. He said something to the effect that

"Metzner is not a part of the treatment team"

meaning that CDCR clinicians, not your team members, make treatment decisions for their patients and take the responsibility for those decisions.

Your team had proposed that groups of CDCR and DSH clinicians chosen to do UNA reviews, representatives of the Office of the Special Master's team, and members of the treatment team for the patient, would jointly weigh in on certain decisions made about a patient, for example to help determine whether a patient needed a different type of care or needed to be at a different level of care. In this way your team members would have an active voice in helping to determine the appropriate care for the patient and in particular whether the patient should be hospitalized.

But ███████ did not want that. ███████ had said to the Court that "MHARP and SusPro have a lot in common" to argue that what CDCR was actually doing as SusPro was very similar to what it had been ordered to do in the previous MHARP processes. Because of that similarity, much of the ongoing SusPro work could productively serve the Court and CDCR when doing the new UNA, if only the Court and the OSM understood what SusPro was really doing.

But all can agree that in at least one sense, what MHARP *was* and SusPro *is* are different things. A huge difference between MHARP and SusPro is that your team directly observed what our clinicians and our own experts were doing in the MHARP process, and contributed to determining whether those patients should be in the hospital. SusPro was an outgrowth of that, a process put into place so that CDCR clinicians, by

55

themselves, would review the work of CDCR treatment teams to ensure, amongst other things, that patients who needed to be in the hospital were getting there.

████████ considered SusPro better than MHARP in the sense that your team was not in the case of SusPro able to mandate that patients be in the hospital. ████████ objected to your allegedly trying to simulate this aspect of the MHARP team process in the new UNA process, because your new proposed team arrangement

> "is an opportunity [for you] to force us to hospitalize everyone."

So he did not want to let the OSM model the current UNA process, in that sense, like the last MHARP one. He repeated something similar on March 25th 2022, saying that when picking Chief Psychiatrists from the institutions to participate in the UNA process,

> "we need psychiatrists who won't be bullied by the OSM" [into saying that patients need to be in hospitals].

See attachment 20. On May 6th, 2022, writing to a psychiatrist who was frustrated because he had to leave his important work for a week to help out with UNA, ██ ████ said:

> "I don't want [you] to have to push everything off for a week to do a study for the court that, frankly, I've openly stated I think is a waste of time based on a misunderstanding."

But why is it a waste of time? Is it a waste of time because ████████ thinks we are appropriately gathering information from SusPro and other sources and making appropriate decisions about who needs to be in the hospital?

56

In which case, just as you said, Mr. Lopes:

> "the defendants have rooted their position in the sustainability of their sustainability effort that they have, and they haven't really focused clearly on the Court's order saying the sustainable process is unsustainable"

contrary to ████████'s vigorous denials in court.

# Vilification of the Special Master

I reported above that our leadership was very open about criticizing you about the UNA process. For example, ██████████ wanted to pick psychiatrists who would not be "bullied" by you and your team "to hospitalize everyone."

But there is far more, and it occurs on a regular basis.

For example, on about October 22nd 2021 during a large Psychiatry leadership meeting, our ██████████, ██████████, scathingly said that "the OSM is responsible for 30 years of failure" in the Coleman lawsuit. That intemperate, disrespectful statement of his may have been in response to something I had said earlier that day in a private meeting with him – I had mentioned that the Deputy Special Master Mr. Jones had publicly agreed with me that patients awaiting hospitalization should be mandatorily seen by psychiatrists more frequently than once per month.

In that same meeting on about October 22nd 2021 ██████████ also talked about how he so appreciated the new Judge who had been utilized previously in a settlement conference, because that Judge "isn't focused on relitigating the past", clearly implying that you, the Special Master, and your experts, are currently doing exactly that, and that you are compounding (what he alleges to be) your previous failure. And in that same meeting with many witnesses, he further publicly vilified and disrespected you and your team, saying that he wished you could be replaced by a Receiver.

██████████ has said that the Office of the Special Master is "delaying our improvement" by shutting down L1 hospital beds at CMF (because they are unlicensed). And on about May 17th 2022, ██████████ again said that in forcing CDCR into the data remediation process you are delaying our improvement of the CDCR system. But why shouldn't our

patients who need hospitalization have access to licensed facilities? And why shouldn't you and your team be very careful in reviewing CDCR's data reporting policies, given all that has occurred?

On around June 21st 2022 at an internal data discussion meeting with multiple participants, ███████ said about your team:

> "I am amazed at how ignorant the OSM is about our system. Did you hear them during the Telepsychiatry discussion? Metzner's lack of understanding of our Telepsychiatry position blew my mind!"

In terms of Telepsychiatry, your team had seemed to be making the very reasonable argument that we should not eliminate Telepsychiatry policy language that specified that for Telepsychiatry to operate at the EOP level of care, mandatory onsite psychiatrists should also be present.

In complaining about how the Court does not take CDCR's data analyses seriously, on around June 24th 2022 ███████ said:

> "The Court took a dump on the [CDCR's] Lessons Learned report."

CDCR's statistical analysis about our clinical performance during covid times was (in my view) too simplistic, ignoring multiple relevant factors, and there *is* reason to doubt its conclusions based on the analysis done.

I say the above even though I myself think and have long argued that continuity of care is absolutely critical to decreasing suicidality (and in my view this has been underemphasized in this class action lawsuit). But I should add, having seen and done research into this question, it is hard to find well-designed studies corroborating that.

███████ also said around June 24th 2022 that "Lindsay Hayes thinks we don't know anything" (in his monitoring of CDCR's use of the Suicide Risk Evaluation scale).

The OSM team may remember, as I do, when a CDCR attorney literally cursed at the Plaintiffs in a large meeting about a different issue.

On around July 29th 2022, during a particularly heated exchange between ██████████ and OSM experts about MAPIP issues, one of the OSM experts said:

> "I don't want this to get personal, and I feel that it is."

On around September 1st 2022 at the DSH meeting, ██████████ admitted to everyone:

> "I'm trying to tone down my rhetoric and be nicer."

██████████ is certainly one of the most combative, hostile, disrespectful meeting participants I have ever encountered, especially when he is meeting privately with me, but also sometimes in CDCR meetings, and sometimes even in meetings with your team too. As others have noticed, he has been far more angry and hostile than I have ever been during my time at CDCR. I have never "lost [my] sh[*]t!", as a CDCR psychiatrist exclaimed about ██████████ after one particularly shocking outburst on ██████████'s part in a meeting. But I would not consider ██████████'s habit of losing his temper in meetings to be worth mentioning here were it not for his highly inappropriate lack of respect for you, your team and the court process.

I have given just a few examples of many disparaging remarks ██████████ has made about the court-directed process. When our executive leaders behave in this manner, what are staff members to think? I think it highly likely that many, particularly those who are less familiar with the history, are likely to believe what ██████████ says, just as I myself believed what I was being told about the OSM when I first came to CDCR in late 2013. And if staff believe that the OSM and the court process is not actually about correcting inadequate care on CDCR's part, they are unlikely to cooperate with the process. This is undoubtedly at least part of the explanation of why excellent clinicians are often silent about even the most uncontroversial, obvious issues affecting our patients. In vilifying you and the Court, CDCR sows distrust in the staff (and then, as we will see later in this letter) accuses anyone who does speak up, of sowing distrust.

60

The staff see very clearly the party line on the Court and the OSM, and know the risk of dissenting from it.

# Are CDCR staff free to talk to the OSM?

When I joined CDCR, and again when I was instructed to start attending workgroup and other meetings at which the OSM team and sometimes the Plaintiffs would be present, I was told not to volunteer any information, and only to speak to you or a member of your team if asked a direct question. CDCR led me and others to believe that we are not legally allowed to speak to the Special Master except to answer a direct question.

When I first attended a meeting with the OSM and the Plaintiffs, and dutifully said nothing as ▮▮▮▮▮▮▮ and our attorneys had instructed, ▮▮▮▮▮▮, the Plaintiffs' attorney, asked me perhaps jokingly if I had been told not to speak, which made me start wondering why I was being instructed to attend meetings at which I must not speak unless asked a direct question. I later surmised that CDCR uses staff as window dressing, getting them to attend meetings but in effect preventing them from giving their opinions or playing any real part in the decision-making of the meeting, to create the false impression that CDCR welcomes our input in meetings with the OSM.

CDCR points to the fact that a staff member was present in meetings with the Special Master or the Plaintiffs, as evidence that the staff member was free to speak and even disagree with CDCR's policies in meetings with the Special Master. This tactic can clearly be seen in the argument made by the attorney representing CDCR in the evidentiary hearing in which CDCR was ultimately found to have provided misleading data to the Court in October 2019.

See attachment 21. During the evidentiary hearing, I was questioned by the attorney representing CDCR as follows:

 :

Q "Good morning, Doctor. Let me begin with some general topics with you, if I can."

Q "You mentioned that at some point in time in October of 2018 you felt as if you could not talk or communicate with the Special Master, right?"

A "Correct."

Q "And that's true, not withstanding the fact that in 2017 you attended any number of policy meetings multiple times throughout the year where the Special Master and his team were present, correct?"

A "That's correct."

Q "And in 2018 you attended on a more frequent basis, perhaps once a month, workgroup meetings where the Special Master and his team were also present, correct?"

A "Correct."

Case 2:90-cv-00520-KJM-DB Document 6377 Filed 11/01/19 Page 56 of 240

 :

"Q "Dr. Golding, you received a lot of questions from opposing counsel about your attendance at workgroup meetings and policy meetings where the Special Master was also present......."

Q "Did you feel free to express your opinions to the Special Master at those meetings?"

A "No, ma'am."

Case 2:90-cv-00520-KJM-DB Document 6377 Filed 11/01/19 Page 78 of 240

███████████ seemed to be trying to imply to the Court that although I had testified that I did not feel free to communicate with the Special Master, that was a lie. He seemed to be trying to give the impression to the Court that the fact that I had attended many meetings in which the Special Master's experts were present, was evidence that I was free to exchange ideas and even express ideas that differed from the opinions of our leadership. (Notice that CDCR employs a similar tactic in the data remediation process, in arguing that you, the Special Master, were involved in creating and approving all the data indicators so you absolutely knew what CDCR was measuring and how, and it is therefore unreasonable of you to be suggesting any changes now.)

███████ (Plaintiffs' counsel) did not allow that impression to stand. ███████ correctly made clear that being *present* at meeting and being *free to express your opinions* to the Special Master in those meetings are very different things.

I told the Judge that I did not think I was free to communicate with the Office of the Special Master when I was in court.

Judge Mueller: "All right. I understand that you did not raise your specific concerns with the Coleman Special Master at the time this was happening."

Michael Golding: "At that time, yes, ma'am."

Judge Mueller: "All right. And why not?"

Michael Golding: "I very much thought that we were not allowed to and thought that, indeed, that I might even, over the course of time, be prosecuted for

releasing information. That is a -- as a neutral expert said, that is a common thought amongst the psychiatrists whom we interviewed."

Judge Mueller: "But you understand today that you are able to contact the Special Master directly?"

Michael Golding: "Yes, ma'am."

Case 2:90-cv-00520-KJM-DB Document 6377 Filed 11/01/19 Page 21-22 of 240

See attachment 22. In her own testimony in the evidentiary hearing, █████████ ████████, the supervisor of both ████████████████████████, and ████ ████████████████ even said that it is permissible to communicate during meetings in which not only the Special Master is present, but the Plaintiffs as well, for example, "workgroup meetings":

Judge Mueller: "You've heard -- you've been in here, and you've heard testimony that at least some employees may perceive that they're not free to, for example, speak at a workgroup meeting. Do you think that's accurate that people have to have permission to speak their opinion at a workgroup meeting?"

████████████████: "I do not -- I do not believe that people need to have permission, but I also know that perceptions can vary from person to person. And so whatever we can do to correct misperceptions, we will do."

Judge Mueller: "Would you agree that it would be inappropriate to discipline an employee, a mental health clinician, for example, for speaking to the Special Master or his staff?"

████████████████: "Yes."

Case 2:90-cv-00520-KJM-DB Document 6378 Filed 11/01/19 Page 118-119 of 142

Since her testimony in the evidentiary hearing, as I detail later in this letter, far from letting the staff know that they have been under a misapprehension about not being allowed to speak to the OSM, ███████████████ and her executives have subjected me repeatedly to disciplinary retaliation for speaking to the Special Master. Has ██████ changed her mind about the permissibility of us expressing our concerns to the Special Master?

# Retaliation

Judge Mueller ordered CDCR not to retaliate against me, but they have been retaliating relentlessly except for during a brief period at the beginning of the pandemic when they needed my medical leadership to create rational policies that would save as many lives as possible. We needed to minimize chances for the virus to spread, and patients needed to be given the care they needed wherever they were, by the same team, as much as possible. I hoped that the increased continuity of care, and the reduced violence and illicit drug use, would result in a reduction in the number of suicides.

██████ has been suggesting that in fact I have not been subjected to retaliatory demotions, but merely "reassigned to different tasks", a bit like a military General might be running the war when there is a war, but then be reassigned to desk duties (while still retaining the title, "General") after the war is over. But in fact the retaliation including all the demotions are not at all like that case. The retaliation to which I have been subjected is more like the General being reassigned to desk duty and someone else taking over the General's role while the war is still going on.

## Retaliatory demotions: the Telepsychiatry program

My signed duty statement from 2014 makes clear that I am supposed to be supervising the Telepsychiatry program. See attachment 23.

It says:

> "Under the general direction of the of [sic] Statewide Mental Health ██████,
> Division of Correctional Health Care Services (DCHCS) of the California

Department of Corrections and Rehabilitation (CDCR) ….the Chief Psychiatrist Correctional and Rehabilitation Safety (C&RS) Behavioral Safety has responsibility for providing statewide clinical and administrative leadership for psychiatry; has primary responsibility for […] telemedicine programs; […]

Directs Psychiatric Telemedicine Unit operations including development of assessment tools to evaluate quality of service delivery, peer review processes and institutional satisfaction with psychiatric telemedicine services; overall clinical supervision of Telemedicine staff psychiatrists including clinical orientation, time schedules and clinical documentation standards; assesses the institutional needs for telemedicine staff psychiatrist services and implements new service or additional services when indicated."

Why does my signed duty statement say that I am supposed to be supervising Telepsychiatry?



My direct supervisor at the time in 2014, ███████████, who was the ███████ ████████████████████████████████████████████████ ████████████████ – a position which also supervises the Statewide Mental Health Program – told me that he wanted unified direction of Statewide Psychiatry. He wanted institutional psychiatrists, telepsychiatrists, and those psychiatrists doing administrative work and designing programs (currently headquarters specialists), and those making statewide clinical decisions, to have unified clinical direction from a single person, the Statewide Chief Psychiatrist, the position I was hired to fill, and my duty statement was written accordingly.

That I supervised Telepsychiatry was not mere words on my duty statement, it was a practical reality, as evidenced by the fact that the four previous Telepsychiatry chiefs before ███████ all say that I was their supervisor:

See attachment 24. █████████, describing his experience as CDCR ████
█████████ says:

> "Wanted to thank you for all the supervision and leadership you provided to me
> and the telepsych program in our time working together. The daily brief huddles
> where I reported to you on telepsychiatry and EHRS status were so helpful to me
> and crucial in moving these complex programs forward….
>
> I can truly say you have been one of the best, if not the best supervisors I have
> ever had in my career…
>
> You were available at all times to discuss telepsychiatry staffing, technology and
> processes as the services continued to expand. You approved my time cards, and
> approved time off when needed and were so supportive of efforts to ensure
> telepsychiatry work was accurately reflected in EHRS."

Please also see the last line of my Wednesday, November 29, 2017 4:04 PM email cited
in attachment 25, in which I referred to offering ████████ the Chief
Telepsychiatrist position:

> "And please give me the name of the person in Central Hiring whom I should
> write so that I can offer ████ the position that he earned with his great
> performance and wonderful interview."

See attachment 26. ████████████ says:

> "During my term as acting ████████████ at CDCR, Dr. Michael
> Golding served as my direct supervisor. Dr. Golding was supportive kind and
> empathic supervisor and provided significant guidance and mentoring on both
> clinical issues and leadership development. I am grateful to have had him
> supervise me."

███████████████, the ████████████████████, also recognized that I was his supervisor. See attachment 27. ███████████ was asking me to deal with a telepsychiatry employee whom he thought to be problematic. I could do that because I was the Statewide Chief Psychiatrist and thus ultimately responsible for the disciplinary process within Telepsychiatry.

Being the Statewide Chief Psychiatrist for the State prison system, I was asked by our leadership and our attorneys to deal with many issues, including statewide staffing issues that involved the interface of telepsychiatry and onsite psychiatry. As the Statewide Chief Psychiatrist I was responsible for directing psychiatric telemedicine unit operations, and thus I had the final psychiatric authority to move telepsychiatrists to areas of psychiatric staff shortages, and I had to take into account existing registry (contract) and civil servant psychiatrist numbers, and I tracked all of this very carefully.

For example, I was asked by our attorneys to help with Plaintiffs' clinical concerns about lack of psychiatric staffing to Mule Creek Prison (and RJD prison). See attachment 28. I was responsible for addressing concerns like that which would be raised frequently at upcoming Coleman conferences, since I had the final psychiatric authority to move telepsychiatrists to deal with shortages.

In the situation described in attachment 28, our California attorneys asked whether we should stop admissions to Mule Creek State Prison, the answer to which would depend upon whether or not we could or should add additional *telepsychiatry* staff. See the second page of attachment 28. Notice that the attorney asking the question did not send the email to ███████████, the ██████████████████, but he did send it to me. I was the overall supervisor of Psychiatry for the State, including over Telepsychiatry.

From 2014 when I became the Statewide Chief Psychiatrist, up until the last few years when I was demoted, these were some of the many statewide decisions I would routinely make.

70

In addition to my duty statement saying that I supervise Telepsychiatry, and the Telepsychiatry Chiefs in fact reporting to me, CDCR's leadership culture also clearly recognized this.

For example, when ██████████, the then ████████████████, left CDCR, I was responsible for planning his replacement, and so I wrote the new duty statement for the new Chief of Telepsychiatry. See attachment 29. "███" refers to ████████████████.

I appointed ████████████ to be the ████████████████████ after ███ ████████.

See attachment 30. ████████ says of her appointment to ████████████████:

> "I had only been at California Department of Corrections and Rehabilitation (CDCR) for 9 months before being appointed to the position of ████████, during this time I was clinically supervised by Dr. Golding. During my three month position the Telepsychiatry program went from serving 7 prisons to 12 and nearly doubled in staff from roughly 25 to around 50 psychiatrists; this rapid expansion would not have happened without the guidance and support provided by Dr. Golding. As a new supervisor within a complex bureaucracy, I would not have been able to successfully hire, train and initiate care in this many locations without his assistance."

See attachment 24. I approved vacations and time-off for the telepsychiatry chiefs and signed time cards until ████████ became ████████████████ and ultimately the ████████████████████.

Furthermore, I held the interviews for the new ████████████████ after ████████████ left. I picked the panel, interviewed the candidates, called the references, and ultimately picked ████████████ to be the ████████████████, replacing ████████████ ████████████, whom I had also selected. ████████ served in that role until he left CDCR.

When ███████ left CDCR, after discussions with many, I ultimately decided that ███ ████ should be the ████████████████████, and appointed him to that role. He served in that role until he left CDCR.

When, in connection with a lawsuit that had been filed by San Quentin's former ████ ██████████████████████, our executive leadership felt obliged to make ███ ████████ a second ████████████, they asked me as the Statewide Chief Psychiatrist to make sure that ██████████ would be a good additional C███ ██████████ and to onboard him. I did, including planning his onboarding process and planning his education as a ████████████████ and going over his hours. CDCR asked me to do that because I would be supervising him as a ██████ ████████████ as the Statewide Chief Psychiatrist. But ████████████ ultimately refused that promotion.

Despite

1. My CDCR-signed duty statement explicitly stating that I supervise Telepsychiatry,
2. ████████████████ enabling me to supervise Telepsychiatry, for example by empowering me to interview and select the chiefs of Telepsychiatry, and
3. My selecting the candidates for chief (with an interview panel)
4. Picking the acting Chiefs
5. Negotiating with CEO's and Regional CEO's to find telepresenters (staff in the institution that help the psychiatrists at a distance from the institution to appropriately teleconference),
6. Being involved with the disciplinary process of telepsychiatrists,
7. Substantially editing the currently-used Telepsychiatry policy and all previous ones since 2014, negotiating in a settlement conference with a Federal Judge (who was assisting Judge Mueller), and with the Plaintiffs in a settlement conference, to determine the word-for-word contents of the currently-used Telepsychiatry policy (incidentally, they did not even show me the new 2022 proposal until just after it was very recently sent to the OSM and the Plaintiffs – further evidence of my demotion),

8. Being the Statewide Chief Psychiatrist who had the final word on where telepsychiatrists should operate throughout the state,
9. Signing time cards and approving vacations of Chiefs of Telepsychiatry,
10. Searching for and finding telepsychiatry hub space and writing or directing the writing of proposals for that,

And despite

11. All former ████ prior to ████ saying that I was supervising them,
12. and HQ leadership treating me as the supervisor of Telepsychiatry,

CDCR executives now deny that I *ever* supervised the Telepsychiatry program.

When my supervision of the Telepsychiatry program was terminated is a bit more nebulous, but after the Golding Report, our executives started saying that chiefs can't supervise chiefs, and subtly changing how they referred to me, as "a" Chief Psychiatrist, where before they had always referred to me as "the" Statewide Chief Psychiatrist. Even before that, starting in 2018, if I disagreed about a data issue, my opinion might be brushed off as that of just "a" Chief Psychiatrist, although what they expected me to be responsible for never changed until several years later. In effect, the title changed first and then the responsibilities. And when ████ became the ████████, then they started suggesting that ████ was over Telepsychiatry and I was over the institutions, as if I was no longer over Telepychiatry, and as if I never had been.

This felt like retaliation to me. CDCR had subtly or not so subtly changed my title, and functionally, my authority. This had started when I had begun asking questions about data integrity.

See the first page of attachment 31 and the section titled "Retaliatory demotions: my direction and management of the Statewide Psychiatry program" below. Regardless of the subtle title change that was being ushered in, that did not affect what I was asked to be responsible for. In 2018, when certain Dashboard numbers (measuring quality of



care) at EOP institutions were not as high as they could have been, ██████████ directed me to stop "pars[ing] the data" and instead to

"immediately work on the actual management at our institutions",

which I did. ████████████ wanted me to spend time at multiple prisons housing EOP patients throughout the state.

But "a" Chief Psychiatrist could in no way visit and help manage multiple clinical local EOP programs at EOP institutions, as they already had local Chief Psychiatrists and a Chief of Mental Health. Only *the* Statewide Chief Psychiatrist could.

See attachment 32. When a given institution lost its chief or senior psychiatrist, say, and there was a particularly acute clinical need for supervision, consistent with my duty statement our senior executives expected me to supervise individual staff psychiatrists at institutions hundreds of miles from me. For example, in attachment 32, I say to the linestaff psychiatrist at a distant institution that I was her clinical supervisor (while the Chief of Mental Health was the administrative supervisor).

The Chief of Mental Health at the institution (a psychologist) can't clinically supervise a psychiatrist because the psychiatrist also practices as a physician and the psychologist does not have that medical training. In attachment 32, I provide some documentation of a supervisory interaction that I had with the linestaff psychiatrist. On the third page of attachment 32, there is an email from the ████████████████ (████████████) to a physician at the institution (████████████), about a clinical practice issue that had arisen at the institution involving my ████████████████. He wrote:

> "This issue with ████████ is quite disturbing. I'm hoping that her clinical superior may be able to help us with this situation. Perhaps the physicians should file grievances in order to document ████████████ behavior and her unsupported, offensive accusations. I'm looking through the emails that you sent to me to see if there is any type of action I may be able to take as her

"administrative" supervisor. Perhaps in the near future, we could discuss these issue on a conference call with Dr. Golding. Thanks much for your help!"

███████ was asking for me to intervene as her clinical supervisor in a local institution, because I was the Statewide Chief Psychiatrist. When it suited CDCR to have me be responsible, I was *the* statewide leader of Psychiatry.

When it suited CDCR, they deemed me to be merely the administrative supervisor of just four Senior Specialist psychiatrists at headquarters. When they wanted someone on whom to dump all the problems to solve – someone to hold responsible should the problems not be solved – then it suited them to deem me to be responsible for the entire State, including supervising individual psychiatrists across the State when their supervisors were absent. But I have always relished a challenge, and so managed to find ways to solve problems despite being given few or no resources with which to solve them. (█████████████████ herself seemed surprised and impressed when I created the MAT program lightning fast without the usual resources.)

Consistent with my duty statement, I signed the time sheets of the Chief Telepsychiatrists, the PRN psychiatrist (discussed later), my ████████████ (███████████ who was part of the Telepsychiatry org chart, the four psychiatrists in my HQ team, and ultimately the four regional psychiatrists. It was fully expected that I be the clinical supervisor for psychiatric practice for the entire state, until the demotions began. Indeed one of the reasons for creating the regional psychiatrist positions was precisely to help me with clinical supervision within the institutions. See ████████ comments in the section titled "Retaliatory demotions: my direction and management of the Statewide Psychiatry program".

After the evidentiary hearing, coinciding with the start of the pandemic, I thought things got a little better briefly. (Perhaps if I had been willing to violate my duty of care to our patients and stop raising issues affecting patient care, the retaliation would not have continued.) Official state documents still referred to me as *the* Statewide Chief Psychiatrist. See for example attachment 33, which is the institutional Chief Psychiatrists' duty statement in 2019, which also refers to the Statewide Chief

Psychiatrist as **the** Statewide Chief Psychiatrist. I believe this duty statement was released when ███████ released the document changing the reporting structure of institutional Chief Psychiatrists so that they report to the CEO. See attachment 34. This perhaps was a brief honeymoon period.

But on May 12th 2022, ████████████████████ literally said to me, in front of ██ ██████:

   "You were *never* over Telepsych[iatry]."

Thus not only did CDCR executive leaders demote me, █████████ denied the reality of my previous leadership of the program, which struck me as a remarkably Orwellian denial of and rewriting of factual CDCR history.

Recently, every three months, █████████ has been bringing in a new Chief Psychiatrist or Senior Psychiatrist to supervise me and to help █████████ with some of the psychiatric supervisory authority that CDCR executive leaders took from me, for example supervision of the Telepsychiatry program. This new supervisor has been given the title Acting Assistant Deputy Director for Psychiatric Services. I surmised that one reason CDCR executive leaders were doing this is so that when interviews occurred for this new statewide leader of Psychiatry position, those who have been brought in to supervise me and the Psychiatry program could be said now to have had the requisite experience. Those interviews have now happened.

Everyone (or everyone I know – I am told that there were others interviewed, who did not spend time as the Acting Assistant Deputy Director) who applied for this position, including I, was given a three-month opportunity to use the title, Acting Assistant Deputy Director for Psychiatry. Doing this job for three months to a small extent enabled me to do a few of the thing I was doing before my demotions when I led Statewide Psychiatry. But although the Acting Deputy Director is officially the Telepsychiatry supervisor there was no return of my previous responsibilities supervising Telepsychiatry during my tenure as the Acting Assistant Deputy Director. My three-month stint is over now and during my interview for the position I told those

interviewing me () about the retaliatory demotions and the retaliatory disciplinary actions taken by ███████ and senior CDCR executives. █████████ has subsequently left CDCR.

## Retaliatory demotions: the MDO/OMHD program

█████████, ████████ and █████████ eliminated my supervisory responsibility for the psychiatric aspects of the Offenders with Mental Health Disorders Program after Judge Mueller's ruling on the Golding Report in 2019. Called the Mentally Disordered Offenders Program (MDO) when I was the supervisor, this program works with inmates whose incarcerating offense and concomitant mental illness might make it legally mandatory that they be housed in a Department of State Hospital facility after they finish their sentence. I assigned Chief Psychiatrists in the institutions to do these evaluations so that the court could make an appropriate ruling, and occasionally did them myself. My duty statement says that I am in charge of the psychiatric aspect of the MDO Program. See attachment 23.

> "The Chief Psychiatrist, Correctional and Rehabilitation Safety (C&RS), Behavioral Medicine has responsibility for: providing statewide clinical and administrative leadership for psychiatry […] and provides for Mentally Disordered Offender (MDO) certifications."

My duty statement says I report to the , who was ███ ██████ at the time. (See attachment 35 for █████████ declaration about his position as both ██████ and █████████.) When █████████ left, there was temporarily no Statewide Mental Health Director, and (contrary to my duty statement) I was assigned to report to the new █████████████████.

Because the task of doing these evaluations became onerous for our Chief Psychiatrists, I successfully argued that we should create a new Chief Psychiatrist position specializing in doing this.

I was empowered by ███████████ and ████████████ to pick the panel, interview the candidates and call the references of those who applied to be the Chief Psychiatrist of the OMHD program and did so. I chose █████████ to be the ████ ████████. ████████ repeatedly called me his supervisor and casually said so in email.

See, for example, █████████'s comment in his July 15, 2020 2:24 PM email cited in attachment 36. When I (with the urging of █████████, the ████████████ at the time) instructed █████████ to create statewide learning ("LMS") slides for the OMHD program, █████████ sent an email to me asking that I sign something because he needed *his supervisor's* signature after completing the task:

> "█████████ sent me a course approval sheet to sign and it also requires my supervisor's signature. Would you please add your signature to his and mine on the course approval sheet. Then it goes to others to sign so that the program can be uploaded into the LMS system."

█████████ asked me for approval to take vacation and time off and informed me when he was sick or unable to make hearings, because I was his supervisor and thus ultimately responsible for making sure his assigned tasks were completed. I also intervened with stakeholders outside CDCR, with █████████, for example with the Board of Paroles, when there were questions about this program.

Despite

a.  the department empowering me to pick the panel and select █████████ to be chief of this program

b.  my duty statement putting me in charge of the program

c.  the department empowering me to negotiate with attorneys outside this program including in the Board of Parole

d.  discussing difficult cases / situations with █████████ (occasionally, particularly when others in CDCR disagreed with him)

78

e.  our department executives allowing me to supervise him

f.  ███████ considering me his supervisor

since ███████ became the ███████, our executives have been bizarrely denying my previous supervisory responsibility for the Program. ███████ now supervises the Program with plans to devolve at least some of that responsibility to the newly created Assistant Deputy Director position for Psychiatric Services.


## Retaliatory demotions: the PRN program

My work on the PRN program (psychopharmacology liaison service) began in about 2016. Leadership of certain of the Department of State Hospital (DSH) psychiatric inpatient programs was shifting to CDCR. ███████, the ███████ and I spoke frequently for about a year about how DSH could continue to help our complicated patients through the PRN program.

We thought that we could help CDCR by beginning a program at CDCR that had already been established by ███████ and ███████ at DSH, called the "PRN Program". This program allowed psychiatrists to ask questions of very experienced psychopharmacologists. There were some psychiatric positions left over from the DSH transfer that were yet to be filled and in addition there were unfilled telepsychiatry positions.

I suggested to our leadership that we create this program. I began organizing the position and indeed searched for nearly a year for a suitable candidate. I was empowered by our executive leadership to pick the panel, interview the candidate who applied, call the references, and to select the best candidate.

I eventually selected ███████ to be the new CDCR PRN psychiatrist. Consistent with my role as the Statewide Chief Psychiatrist providing unified overall clinical supervision of the entire CDCR psychiatric program, I supervised ███████

approved her time cards and vacations, negotiated with her to be able to spend time teaching at an academic center, reviewed and edited her monthly newsletters, directed and worked with her to establish weekly continuing medical education, and helped expand the Department of State Hospital's contract with UC Irvine to get our psychiatrists the opportunity for nearly weekly continuing medical education credit. Thus CDCR psychiatrists gained free, weekly CME that is still ongoing. They had no regular CME education before I worked with ▮▮▮▮▮▮ to set this up. I also edited specific clinical reviews ▮▮▮▮▮▮ did (particularly those with political implications), and she consulted me on psychopharmacological issues, etc.

See attachment 37. ▮▮▮▮▮▮ said:

> "Throughout my tenure, you were my direct supervisor, providing feedback as well as managing the administrative aspects of the position (approving leave and signing time cards.) We collaborated on several challenging consultations.

> I have been very fortunate to have had wonderful mentors throughout my career and I count you as one of them."

Please also see attachment 25, in which I, as ▮▮▮▮▮▮'s supervisor, refer to offering her the position:

> "Please send me the e-mail so that I can offer the PRN position and have central hiring also call our new PRN psychiatrist."

See attachment 38. In the circumstance described below, ▮▮▮▮▮▮ acknowledges that I am her supervisor in explaining something to me. She had taken several hours away from her desk without letting me know. In general when any of us are away from our desk, and thus in some way unreachable, we need to let our supervisors know so that supervisors can take responsibility or direct someone who may be trying to reach us to someone else. Supervisors also try to keep a sense of who is working and who is not at any moment in time. I knew that ▮▮▮▮▮▮ would have a very good reason for being

away from her desk without telling me. I trusted her not to be taking unauthorized time off.

On the contrary, I had to try to get her not to work so hard. So I responded to her telling me that she had taken some time off without telling me by saying that I trust her to make sure she is putting in plenty of hours. Her response indicates that she knows that I am her boss. See attachment 38. I said:

> "I trust you completely. You know that."

█████████ responded:

> "I know but you are still my boss."

See attachment 39:

> "Michael - I'm so sorry…. I've accepted a position with the DSH PRN group. █████████████ has some ideas to help make my departure as smooth as possible.
>
> I am so grateful that you gave me the chance to start the CDCR PRN Service. I will never forget this! Thank you. I have appreciated working for you and have learned a great deal."

I supervised █████████ from late 2017 to January 2021, when █████████ was set to leave CDCR. See attachment 40, and my response in attachment 41, and my message to you about that response, attachment 42. On January 15, 2021 at 4:40 PM, █████████ wrote the below informing me that I was not █████████'s supervisor:

> "It was later brought to my attention that █████████ had communicated that to you around 2 weeks prior, and that █████ (█████████'s direct supervisor) and █████████ █████████ co-Chief of Telepsychiatry) were not informed until later still."

This was the first I had heard that ███████ had taken away my supervision of this linestaff (non-managerial) psychiatrist position and given supervisory responsibility to ███████ Indeed, it was the first ███████ had heard of it too! Neither she nor I had ever been informed of the change until that moment.

See attachment 43 concerning the elimination of ███████ as my and the HQ senior psychiatrists' ███████. I was incredibly surprised to be informed that ███████ (my ███████ until ███████ eliminated my supervision of her – another retaliatory action against me) and I needed to submit our plans for ███████'s departure to the telepsychiatry chiefs for their approval; nevertheless I complied, as you can see in attachment 44. ███████ had eliminated my supervision of the PRN program and, as you can see in attachment 40, was now even denying that I ever was ███████'s supervisor.

Just as he had with respect to the telepsychiatry program and the OMHD program, ██ ███████ had retrospectively eliminated my role and was rewriting history, claiming that the Telepsychiatry department heads (not I) had always supervised ███████. All of these demotions occurred after I wrote The Golding Report. All of them are retaliation for my lack of silence about vital issues affecting our patients.

## Retaliatory demotions: the CME program

At the time ███████ took the PRN program supervision from me, he also took the CME (continuing medical education) part of my supervision of the PRN program away as well. Further retaliation. That too is now supervised by Telepsychiatry. I worked with ███████ to run the program and that is presumably now being done by Telepsychiatry. Though I originated that program (with ███████ and with ██ ███████'s administrative support), all of it was summarily eliminated when ███████ left.

The current plans are to have the Telepsychiatry program and/or the new Assistant Deputy Director for Psychiatry supervise Telepsychiatry, the OMHD program, the PRN program, and the Regional Psychiatrists (see below), removing that responsibility from me, though I had been the supervisor before ▮▮▮▮ took over.

I still receive the requests for approvals for the CME contract with the University of California at Irvine. This is so because I did in fact supervise the organization of the statewide new CME Program, with ▮▮▮▮ assisting me by doing much of the day-to-day activities to make it work, under my direction.

## Retaliatory demotions: the MAT program

▮▮▮▮ personally asked me to create the Medication Assisted Treatment program to help those with substance use disorders. I said that I would. My role in that is now being denied as well.

▮▮▮▮ is well aware that others (including in the medical department) were not initially willing to become involved. Thus, I wrote the initial set of policies for that program when the California legislature initially allocated money, assisted by ▮▮▮▮ under my direction.

Our HQ Psychiatry team, under my direction, brought together statewide medicine, dental, nursing, and pharmacy leadership to support that program. I wrote the initial set of policies and procedures for the Medication Assisted Treatment Program. I later asked ▮▮▮▮, a ▮▮▮▮, to help run the program, and I supervised her in that role.

▮▮▮▮ was responsible for onsite implementation of the program but she also helped redesign the initial policies. Ultimately the program was directed and coordinated from headquarters. I often spent entire weekends working on this as did

█████████, ███████████'s implementation under my direction was extraordinarily successful and her modification of the initial policy was also excellent. See attachment 30. █████████ says:

> "In June of 2016. Senate Bill 843 mandated a Medication Assisted Treatment (MAT) Pilot Program in CCHCS. I was asked to design and implement the pilot program at one male and one female prison under the direct supervision of Dr. Golding. With Dr. Golding's oversight, we designed and implemented a program, treated patients, and wrote a legislative report in eight months. Dr. Golding provided the needed guidance to ensure newly developed workflows, intake and note templates, and order sets were generated and available in the electronic medical record for the start of patient care six months after this bill was signed into law. Dr. Golding also provided the needed support for me to interact with the California Department of Public Health, California Department of HealthCare Services, County Behavioral Health Directors Association, Chief Probation Officers of California, and CDCR's Directors Stakeholders Advisory Group, to let external stakeholders know of this program within the first year. His ongoing support was ever present as we developed relationships with ALL 58 counties in California, over the first two years of the pilot program, to ensure the patients returning to ANY county in California would have easy access to continuity of care upon release. […]
>
> Although I resigned from CCHCS in December of 2019, I often think of Dr. Golding's guidance through the complex bureaucracy of CDCR and CCHCS and his compassion for patients and staff alike. His character and ethical standards are beyond reproach. He is always interested in delivering the highest level of care possible to all patients in need and to supporting the staff who work with him and under his supervision. I am blessed to have worked with him."

See page 3 of attachment 43. This list was created by the ███████ at the time, ███████ ███████, who describes one of her tasks in the MAT program as the person who

"Presented and defended data, in collaboration with the Statewide Chief Psychiatrist and local Psychiatry Supervisor to stakeholders inside and outside CDCR."

The local ███████████ was ███████████. I was the Statewide Chief Psychiatrist ultimately supervising the MAT program.

Ultimately I and those who worked for me (particularly ███████) created the CDCR MAT program and delivered to our executive leadership measurably effective clinically-documented good outcomes. As a result, and with keen interest from the legislature, at least in part because of the good outcomes our careful design allowed us to identify, large sums of money were going to be allocated to the program.

There was concern that had the program continued to be run out of Mental Health, the OSM would become involved, so it was decided to take responsibility from Mental Health and the psychiatric leadership who initiated this program and move it to the department of Medicine, under ███████. It was then vastly expanded.

███████ has bizarrely publicly denied the fact that it was I who initially created the highly successful MAT program for ███████ (with the help of others under my direction, particularly ███████ who helped modify the policies I had created, and implemented them with skill).

I also went to West Virginia as a representative of the California Department of Corrections Medication Assisted Treatment Program with ███████ and ███ ███████ to learn about the successful West Virginia Correctional Medication Assisted Treatment Program to improve our own. ███████'s rewriting of history in so many ways is very problematic and feels Orwellian.

## Retaliatory demotions: the MAPIP program

Consistent with my duty statement, I supervised the court-monitored psychiatric medication usage program (MAPIP) until that was taken away from me this year.

Your Special Master team is aware that I previously supervised the MAPIP medication algorithm program, as I initially negotiated with your experts about it in 2014 and 2015. And as your experts Dr. Metzner and Dr. Potter are presumably aware, that supervisory responsibility was taken from me this year (2022).

Earlier this year, one of our ███████████████, ██████████ (now promoted to ███████████), was brought in to supervise me and lead Statewide Psychiatry for three months in the position of ████████████████ ██████, created to help ████████ with statewide supervisory responsibilities after ██████, ██████ and ████████ demoted me from overall statewide psychiatric supervisory responsibility.

███████████ was then put in charge of negotiating and designing the new MAPIP program and interfacing with the Court about this. See attachment 45. He was apparently not told that I had been doing that for years.

See attachment 23. My duty statement explicitly states that I, the Statewide Chief Psychiatrist, am responsible for:

> "effective management and direction of the QM Medication Management program guidelines, audit procedures, court mandated clinical mandates, and the maintenance of quality clinical practice standards"
> "statewide clinical and administrative leadership for psychiatry"

And that I have

> "primary responsibility for ….. medication management….. programs"

"primary responsibility for development and training of medication algorithms"

Before the demotions, I supervised the statewide MAPIP program. Ms. Karen Rae, also working for you as your expert in nursing, and Dr. Metzner and Kerry Hughes, two psychiatrists working for you, are aware of what my role was in terms of MAPIP, which I fulfilled because the MAPIP medication monitoring algorithm is "a court mandated clinical mandate", "a quality clinical practice standard", and a "medication algorithm" and per my duty statement I was supposed to be in charge of those things.

## Retaliatory demotions: my direction and management of the Statewide Psychiatry program

███████, the ██████████████, ████████████ when he was ██████████, and the ██████████, always said there was a "dotted line" from institutional Chief Psychiatrists to me as the Statewide Chief Psychiatrist so that I could clinically supervise them.

After the Golding Report, █████████ told me to my face that she saw my position in Psychiatry the way she saw ████████████'s position in Medicine.

See attachment 46. I said to █████████, recalling a conversation we had had after the evidentiary hearing in which things briefly got better:

> "You previously told me, during one of our 1:1 conversations, that you consider me to be at the same level as ██████. Just as she is responsible for Statewide Medicine, I was responsible for Statewide Psychiatry, yet no ability to supervise what she previously supervised has been taken from her."

As you know ███████████ is the ████████████████████████████████. She reports to █████████████, the ██████████████████████████████). Consistent with ██████'s unequivocal statement to me, my duty statement says (as I

imagine ██████'s also does) that I report to the ██████ (currently ██████), not to the ██████████ (currently ██████) and not to the rotating group of Chief Psychiatrists/Supervising Psychiatrists from across the state whom ██████ has brought in to supervise me and the statewide psychiatry program after ██████, ██, ██, and ██████ demoted me.

See attachment 23. My signed duty statement says:

> "Under the General Direction of the Statewide Mental Health Director, Division of Correctional Health Care Services (DCHCS), the Chief Psychiatrist, Correctional and Healthcare Services (DCHCS),…"

The Statewide Chief Psychiatrist, both according to the Org Chart and according to how my place in it was implemented and interpreted over the years, was intended to be the top-level managing psychiatrist in the state.

They had no executive positions in the staffing plan allocated in Psychiatry when I became the Chief in 2014 (although they had nursing executives, (general) medical executives, custodial executives, (eventually) psychology executives, and administrative executives), so the best they could do was have the Statewide Chief Psychiatric leader *function* in that capacity, and that is exactly what ██████ had me do.

Thus I directed the Telepsychiatry program, OMHD, and specialty subprograms (the PRN program, MAT program, MAPIP, etc.), and was responsible for high level clinical decisions about patients transferring between CDCR and DSH and between CDCR institutions, until all of this was eliminated with the retaliatory demotions.

I was also the clinical supervisor of all the institutional Chief Psychiatrists. My duty statement says that as the Statewide Chief Psychiatrist I am responsible for providing:

> "statewide clinical and administrative leadership for psychiatry"

I thus had supervisory authority for the Chief Psychiatrists in the state, although that was an extraordinarily difficult task without support. Indeed the Org Chart, released from Dr. Toche's office in 2019, put a dotted line from the Chief Psychiatrists of the institutions to me; and in the duty statement of Chief and Senior Psychiatrists, I was referred to as **the** Statewide Chief Psychiatrist.

See attachment 33, which says:

> "Under the general direction of the Chief Executive Officer and with close consultation of the Statewide Chief Psychiatrist, the [Institutional] Chief Psychiatrist develops……"

The CEO was the administrative supervisor but was not (usually) a physician or psychiatrist, and thus could not clinically supervise. Clinical supervision was my responsibility, as the "Statewide Chief Psychiatrist".

There was no doubt amongst the Chief Psychiatrists about this until ▮▮▮▮▮▮ took over. One of the expert psychiatrists on your OSM team, Dr. Brett Johnson, will likely remember that I was the clinical supervisor of the Chief Psychiatrists of the institutions, since he was a Chief Psychiatrist at the Richard J. Donovan (RJD) correctional facility when I was his clinical supervisor.

Please see the far right of the diagram on attachment 47, which shows the official relationship of the Statewide Chief Psychiatrist ("Safety" and "Statewide Policy Oversight") to other Chiefs in the state, which was designed that way so that the Statewide Chief Psychiatrist could be the effective statewide clinical leader, because no executive positions had been created at the time. I believe this Oct 19, 2019 org chart was released from ▮▮▮▮▮▮▮'s office.

See attachment 48. ▮▮▮▮▮▮▮▮▮, the well-respected ▮▮▮▮▮▮▮▮▮ at San Quentin prison, said the following:

89

"From the time I became ███████████ at ██████████ in 2014 until present, it has been my understanding that Michael Golding, MD, as the Statewide Chief Psychiatrist, served as the clinical supervisor to myself and all other institutional chief psychiatrists […]

I recall being part of a statewide workgroup in 2019 that formally recommended Regional Psychiatrist positions be established. One of the primary reasons for this recommendation was to provide Dr. Golding some assistance as the clinical supervisory needs at all CDCR prisons….was too great for any one person. Ultimately, this goal was achieved and the Regional positions were established."

Indeed I wrote the budget concept proposal (BCP) asking the State to fund regional positions (and previous budget concept statements over previous years about this) and had been asking for regional psychiatrists for three or four years, with the hope that they would help me manage the institutions, as ██████████ says.

I added a request for four utilization management nurses to my more recent request, so that we could get access to length-of-stay information, and help with review of complex patients in institutions to help make our facilities more efficient. Indeed my name was on that BCP because I substantially wrote it (with some help as occurs with all collaborative projects like these). Please see attachment 49, which is an updated version that I submitted this year for review; but when ██████████ determined that he no longer wanted me to be supervising the regional psychiatrists either, he somewhat rewrote the final BCP to add an additional psychiatrist in each region, and took my name off it. (██████████ wrote the section on suicide prevention).

I was told that the previous BCP (similar to the one attached) was a good one, but it was not funded. I developed the proposal in the middle of the covid pandemic, and thus I was told that the State had other funding priorities, but that my proposal would likely be funded in the future because the positions are truly needed. Indeed, four Regional Psychiatrist positions were made permanent positions, and they currently report to me as the Statewide Chief Psychiatrist, though the positions were never formally funded.

90

████████ now says that I should not have been supervising them because what they have been doing is Chief Psychiatrist work and if the program is funded, Chief Psychiatrists cannot report to me anymore. Or perhaps, though the Regional Psychiatrists have been doing Chief Psychiatrist work, I am allowed to supervise them, now, because a chief can temporarily supervise a chief, but in the future I cannot continue to supervise them because their title will change. Or perhaps there will be a new role for a Senior Psychiatrist in the region, and then a new Chief Psychiatrist position will be created to supervise them in the region, and all of them will report to the new Assistant Deputy Director position for psychiatry, not me.

Thus CDCR plans to have the regionals who currently report to me instead report to the new leader of statewide Psychiatry replacing me, who will also supervise me and supervise the statewide Psychiatry program that I was supervising until the retaliatory demotions.

As you can see from attachment 46, I wrote to ████████ to express my frustrations with having still more demotions: this time eliminating my supervision of the regional psychiatrists.

Thus half the extremely reduced staff that ████████ has hitherto allowed to continue reporting to me will soon no longer report to me either. Another demotion.

The argument that regional chiefs cannot report to the statewide chief is the same argument that CDCR executive leaders have utilized to remove my former supervision of Telepsychiatry, institutional Chiefs, the OMHD program, etc.

Yet my duty statement says I report to the ██████ (currently ██████), not the ████████ ████, ████████, nor to the newly created Assistant Deputy Director for Psychiatry.

CDCR executives had previously held me clinically responsible for statewide Psychiatry. I picked the panel to interview Chiefs, participated repeatedly in doing so (and my answers were scored and utilized), empowered me to interview the

candidates, and in fact had Chief Psychiatrists directly report to me, including from Telepsychiatry and the OMHD program, which I have provided documentation of.

And CDCR empowered me to clinically supervise all of the institutional Chiefs as well, although with insufficient staff to do the job properly.

After I wrote the Golding Report and CDCR was found to have knowingly misled the Court, CDCR took away all that supervisory responsibility for statewide Psychiatry that they had previously expected of me, while blaming CalHR rules, but evidently that argument had not occurred to them in the years before that. This is a clear demotion. ███████ is fully aware of this. See, for example, attachment 46, in which I commented to her about my losing supervisory responsibility for the OMHD program, Telepsychiatry, the PRN program, MAPIP development, etc.

Please recall that ████████'s PRN position was a linestaff position, not a Chief position. If our executives really had a change of heart, and by coincidence after the Golding Report happened to decide then that it was time to change their interpretation of CalHR rules such that I could no longer be a supervisor of Telepsychiatry, the OMHD psychiatric program, regional psychiatrists, institutional Psychiatry, MAPIP, etc. per my duty statement, because I was merely "a" Chief Psychiatrist and not "the Statewide Chief Psychiatrist", then why would they also take away my supervision of the PRN program, the PRN psychiatrist being a linestaff position not a chief position? There is nothing about CalHR rules that would have prevented "a" Chief Psychiatrist from supervising the PRN linestaff psychiatrist.

Obviously the actual reason for all these demotions is nothing to do with any CalHR rules and everything to do with the Golding Report and my honoring my medical duty of care to our patients.

If new interpretations of CalHR rules about titles in fact no longer permitted the Statewide Chief Psychiatrist position to be supervising Telepsychiatry, or supervising regional psychiatrists or institutional chiefs and performing many of the other duties assigned to me in practice per my signed duty statement, the appropriate action would

have been for CDCR to give me whatever new job title reflects the duties I had per my duty statement and that I had been successfully doing for years.

Of note, Chiefs of Mental Health are Chief Psychologists: they are officially Chiefs according to CalHR rules, but they have an additional title "Chief of Mental Health" appended to their name. Yet because of this title, they have been allowed to supervise Chief Psychologists in the institutions, and for a long time (inappropriately) supervised Chief Psychiatrists in the institutions too. See attachment 50, which is an example of a duty statement that is for a psychologist in which the Class Title is the Chief Psychologist-Executive Director of the SQ PIP.

Note that this Chief Psychologist reports administratively to the Chief of Mental Health, who is also a Chief Psychologist. So more than clinically, this duty statement even allows administrative supervision of one Chief Psychologist over another. It says:

> [For the] "Chief Psychologist – Executive Director" [….]
>
> "Under the overall administrative authority of the Chief of Mental HealthSan [sic] Quentin (SQ) with functional oversight from the Director, Division of Correctional Health Care Services, the Executive Director is responsible for […] policy formation and decision-making to ensure effective operations of the PIP."

So chiefs supervise chiefs when they are accorded an additional title and when it suits CDCR's practical interests. See also attachment 51, the organizational chart from SAC, in which the Chief Psychologist is reporting to another Chief, the Chief of Mental Health. When it suited CDCR's practical interests to have me be the supervisor of other Chief Psychiatrists, they used the title *the* Statewide Chief Psychiatrist in official documents to denote my responsibility. See attachment 33, for example.

Just before and after writing the Golding Report in 2018 some executives, like █████████ █████████, started seeming to change my title to "*a* Chief Psychiatrist" and after the evidentiary hearing relating to the Golding Report in 2019, it no longer suited CDCR's

interests for someone who pointed out their intentionally misleading positions officially to have that position, and I was progressively demoted over the next several years.

There are more examples of Chiefs reporting to Chiefs. There was a direct administrative line between the Chief of Mental Health and the Chief of Psychiatry, the Chief Psychiatrist being supervised by the Chief of Mental Health, which is a Chief Psychologist position. Indeed, this is so ingrained that those in CDCR who advertise for us, still publicly announce (as of August 2022 when I last checked), that one Chief supervises another. In attachment 52, the Chief of Mental Health (a Chief position) is advertised to be the supervisor of another Chief, the institutional Chief of Psychiatry, because that is how it was for years, until, because of my strenuous urging and persuasion, ███████ changed that. See attachment 34.

I was the clinical supervisor of the institutional Chief Psychiatrists, while the Chief of Mental Health was their administrative supervisor, until ██████ placed the administrative supervisory authority of the Chief Psychiatrists under the CEO, not the Chief of Mental Health. Thus Chiefs certainly were allowed to supervise Chiefs and did so for years. I supervised Chief Psychiatrists in the institutions and in Telepsychiatry and in the various HQ programs. See the top right corner of attachment 47 and attachment 23.

In 2019, ████████, the former ████████████████, and others then competed with ████████ to be the ████████████████████. Despite the fact that I had always done this before, suddenly, after the Golding Report, CDCR executives would no longer allow me to pick the panel or even vote for the candidates for Telepsychiatry Chief. History had been re-written contrary to my duty statement, and I was no longer considered to be the director of the Telepsychiatry program.

Without taking into account the specific events that happened during the interviews for Chief Telepsychiatrist (which I am not sure whether I am at liberty to comment on), the panel (with no voting psychiatrists on it) chose ████████████ to be the ████ ████████████. ████████ was a non-managerial linestaff psychiatrist, whom ███

██████ (the former ██████████████████████) and others had suggested needed to learn certain team skills before becoming a supervisor.

██████████ was the ██████████████████████ after ██████████ left. ████████████ had successfully been the ██████████████ for years, but had left CDCR after the Golding Report.

██████████ had left because he saw no likelihood of the deeply antagonistic attitudes of the CDCR leadership toward Psychiatry changing. But after the Judge's ruling on the Golding Report, he was very surprised and happy and feeling more hopeful, and he then wanted to return to CDCR. ██████████ was certainly the candidate who had objectively vastly more experience than ██████████, and he had very successfully led the Telepsychiatry program for years, and had been very popular, presumably until CDCR heard his (characteristically diplomatic!) deposition for the evidentiary hearing relating to the Golding Report.

He was not chosen by CDCR's voting panel to be the Chief of Telepsychiatry. The reason given for the voting panel not including a single psychiatrist was that chiefs can't supervise or be involved in hiring other chiefs. Yet that had never been the case before the Golding Report. Indeed, chiefs do still supervise and hire chiefs in CDCR, as we have seen above. Moreover, Chiefs of Mental Health (a Chief position) sit on panels and vote for Chief Psychologists. I had previously been responsible for organizing the panel to pick the Telepsychiatry Chief.

In terms of how I did as the clinical supervisor, see the documentation of how Telepsychiatry Chiefs felt about my leadership, and how ██████████ in the PRN program felt, described above. Here is some commentary from the institutional chiefs:

See attachment 48. ██████████ wrote:

> "Dr. Golding has done an exceptional job in the capacity of clinically supervising institutional Chief Psychiatrists. Dr. Golding provides sage advice on how to

95

navigate challenging clinical scenarios within a large and complicated bureaucracy."

See attachment 53. ██████████, former ███████████████ of the ███████████████ ██████ concurred:

> "Throughout my time working under CDCR, Dr. Golding remained a beacon of availability, honesty, competency, enthusiasm, and hope that within his power to do so he would ensure that the patients under our care would be cared for in an ethical, medically-appropriate manner. He was available both clinically as well as administratively for supervision at any time. It was my experience that this was the case for all aspects of psychiatric care under the CDCR purview including inpatient, outpatient and telepsychiatry. In addition he promoted the utilization of the excellent DSH-run PRN Psychopharmacology Service. It was my experience that the other psychiatrists in the system also keenly felt the same way as they communicated to me personally and publicly whenever possible."

See attachment 54. One of our leadership pharmacists says of me:

> "I am always in awe of what you have contributed & stood for."

See attachment 55. At our last statewide Psychiatry leadership conference together (on about February 27, 2020), in front of ████████████, the ███████████████████ ████████, the statewide Psychiatry leadership including institutional Seniors and Chiefs gave me a standing ovation and a plaque reading as follows, a chief reading out its message:

<div align="center">

"DR. MICHAEL GOLDING

The BEST EVER

Statewide Chief Psychiatrist

for

California Department of

Corrections and Rehabilitation

</div>

We salute you for the courage,
dedication and sacrifices you made
for the department and the clinical
care that we provide
The sleepless nights, time away
from family, isolation,
financial burden and
a lot more that you endured,
will never be forgotten
Presented on Feb, 27, 2020 by
The Statewide Chiefs, Seniors
And Staff Psychiatrists of the
CDCR"

My supervision of CDCR's statewide Psychiatry program including the Telepsychiatry program, Offenders with Mental Health Disorders (OMHD) program (formerly the MDO program), PRN program (psychopharmacology liaison service), Continuing Medical Education program (CME), institutional Chief Psychiatrists, statewide psychiatric policy creation, court-monitored psychiatric medication usage program (MAPIP), MAT program, psychiatric interface with the Coleman monitors and the Court, statewide clinical supervision and approval of the movement of very sick patients, etc. has all been eliminated. And my supervision of regional psychiatrists will soon be eliminated as well.

Removing virtually all supervisory responsibility for someone who led the statewide CDCR Psychiatry program for years sends a clear message to anyone who would publicly disagree with CDCR policy and report to the Court's representatives about problematic issues. The demotions prevent me from ever leading psychiatrists again in an effort to improve our system. And as will be shown below, CDCR has destroyed my professional reputation with retaliatory disciplinary letters so that I will never be able to work in leadership again anywhere in the country.

## Retaliatory letters and meetings: ████████████  ████████

When I queried the first data issue I had discovered (the change in the allowable interval between EOP psychiatry appointments from 30 days to up to 60 days I mentioned earlier), the ████████████ held a leadership team meeting in which she threatened me with disciplinary action (but not directly ████████ who literally cursed at me) for having raised the issue, gaslighting me instead of being transparent with the OSM and the Court about the change. To my surprise, ████████████ then later even denied in court having known about the very issue she had disciplined me for raising.

See attachment 56, attachment 57 and attachment 1.

In March 2017, ████████████ and I discovered that ████████████ had in December 2016 increased the maximum allowable interval of mandated psychiatric evaluations of patients at the EOP level of care, violating the Court's mandated one-month maximum interval. The EOP level of care provides partial hospital (and sometimes day treatment) level of care for our patients in prison.

See the first page of attachment 57. At the time ████████████ said that she did not consider this change significant enough to report to the Court:

> "No, we don't tell them about every change. Since they use our numbers I do let them know when we make a major change that has significant impact."
>
> Case 2:90-cv-00520-KJM-DB Document 5988-2 Filed 10/31/18 Page 2 of 93

Incidentally, notice that in his November 2018 court response to the Golding Report, CDCR's ████████████ mistakenly stated:

> "The time frame was changed to once every calendar month, and additionally, to never exceed forty-five days between contacts."
>
> Case 2:90-cv-00520-KJM-DB Document 6012-3 Filed 11/20/18 Page 8 of 77

███████████ happens to have saved data documenting prolongation of the acceptable EOP interval reported to the Court, showing that during that time, intervals of up to 60 days were deemed compliant, not just 45 days.

And note that to make matters worse, CDCR was not even including EOP patients who were on no medications in the counting rules, and patients in overflow beds, in their compliance figures. EOP patients not on meds were supposed to be being seen by psychiatrists at least every month. For some of those EOP patients, particularly EOP patients not on medications, the interval in which a psychiatrist would not have seen a patient was a year or more, not weeks or months.

See attachment 1. In addition to ███████ and █████████, █████████  was also fully aware of these misleading changes. For example, in this message titled "New EOP Psychiatry Compliance Rules" I communicated to ████████ upon her return from vacation in April 2017, the following:

"1. The program guide says that EOP patients should be seen by psychiatrists within one month of their last visit to be compliant. But currently a person can be seen by psychiatry nearly 2-months after an appointment and that is considered compliant. ████████ provided an example of that publicly to ██████████ who admitted it looked odd. For example, if a patient were seen on 12/2/16 and then on 1/31/17, that would be considered compliant with monthly EOP visits. That does not pass the sniff test.

2. Given that I believe(?) this errant calculation-algorithm was used to provide numbers to the court, the numbers we gave the court about psychiatric timely compliance are likely wrong.

3. ████ is going to fix the EOP 2-month logic, as ██████ was able to publicly demonstrate to him that the calculation was mistaken, no doubt a "bug" in the program.

4. ██ now says that he is going to return to the 45-day logic from the 2-month logic, but that is not the 30-day logic which appears to be mandated by the court. The change to 45-days from 30-days, I gather, was made last December 2016, prior to giving the court the numbers. I will also speak with ██."

According to the neutral expert:

"Dr. Golding made his request on March 22, 2017, and it was apparently changed back in mid-April. CDCR produced a "release note" reflecting the change back to "30 calendar days" on April 23, 2017. CDCR000992. The rule change went "live" on April 24, 2017. CDCR0017054-55. In the interim period, on March 28, 2017, ████████ sent an email noting that the Governor's office had asked "to explain in more detail what metrics can be used to show that the care by psychiatry is adequate." CDCR0016999. On March 30, 2017, CDCR filed Defendants' Response to the Special Master's Report on the Status of Mental Health Staffing and the Implementation of Defendants' Staffing Plan, ECF No. 5591, relying upon data under the 45-day rule. ECF No. 6012 at 13."

It took less than 24 hours to make the change to dramatically relax the standards, from an email receipt at 1:57 PM requesting the change on December 5th 2016 to Dec 6th at 8:06 AM when a confirmatory email noted that the change was made. Though I requested that the rule be changed back on March 24th, 2017, it was only changed back a month later – after the misleading numbers had already been given to the Court.

If ████████ (who, before becoming our ████████, was negotiating with the Special Master as a ████████) did not consider that that change from 30 days to up to 60 days was a mistake, why did she order the interval to be changed back to 30 days? And why did she not tell the Court that the data just given to the Court a week or two earlier in CDCR's staffing report was mistaken? If you discover that you have made a mistake in your tax returns, you must submit an amended return to correct the mistake as soon as you discover it.

Furthermore, what if I had not taken a stand and insisted that CDCR return to the correct interval per the court mandate? The Program-Guide-violating lengthened interval rule might well still be in effect. Note that those responsible were not demoted and some have been given an even more honored and protected place in CDCR, and even more control over how CDCR measures and evaluates data.

See page 12 of attachment 3, in which, referring to this lengthening of the EOP compliance timeline from 30 to at least 45 days, Judge Mueller asked the following question, to be answered in the evidentiary hearing in 2019:

> "Why neither ██████████ nor ██████████ consulted with Dr. Golding in connection with the decision to change the definition of "monthly" in the relevant business rule, and why no one from CDCR informed the Special Master or any member of his team about this change."
>
> Document 6427 Filed 12/17/19 Page 12 of 49

See also page 22 of attachment 3. In delivering her ruling, Judge Mueller referred to this question and said that CDCR had

> "engaged in knowing presentation of misleading information to the court and to the Special Master"
>
> Document 6427 Filed 12/17/19 Page 22 of 49

As the Special Master, you are aware of the above circumstances because of the Golding Report, investigation and evidentiary hearing, but you may not be familiar with what I say below.

About a year after the lengthening of the EOP interval (in April 2018), ██████████ and I were continuing to notice other odd practices, including how CDCR was calculating timely appointments while "not tell[ing] them [i.e., you] about every change", including what seemed to me significant changes or unexpected ways of counting compliance.

101

So in a meeting on April 19th 2018, I again raised the issue of CDCR having increased the compliance timeframes from the 30 days which it is supposed to be, to at least 45 days, without telling the court monitors.

Because I mentioned that the Court had not been informed, and perhaps for other reasons, ██████████, the psychologist responsible for accurate data reporting to the Court, started screaming, yelling, and cursing, accusing me of accusing her of "fraud", though I had said no such thing. She then ran out of the room shouting angrily, "You can have my job if you want it!"

This disturbing incident is documented by three psychiatrists: ██████, ██████, and ██████, as you can see in attachment 2 and attachment 14.

See attachment 58. ██████████ was not at that particular meeting, but she called a team meeting about that April 19th 2018 meeting, for April 23rd 2018, to discuss my having raised that issue of CDCR having quietly increased the EOP maximum interval in violation of the court mandated interval. ██████████ wanted to discuss:

"how we manage and track psychiatry appointments"

See attachment 2. ██████h describes this meeting with ██████████ about this issue as follows:

"Our second meeting was on April 23, 2018 […]
This meeting started with ██████████ expressing her concern about the events of the meeting on April 19, 2018, and expressing her frustration with all participants. […] In that meeting you were asked to again discuss not only what you perceived happened in the meeting, but what your data concerns were. You indicated you had proof that an EOP measure had changed, which may result in different interpretations with regard to psychiatry access, staffing and patient care. You expressed concern about how the data was being presented. […] At some point it became clear the desired result from the meeting was not achieved, at which time ██████████ changed the tone of the meeting and indicated the

progressive discipline steps that would be forthcoming if any similar incident occurred."

The non-physicians in the team meeting were not sympathetic to my view. ██████, a ████████████ involved with the electronic health record, kept looking carefully at ██████████ and saying she would need to utilize discipline against me, on the grounds that:

> "He [Michael Golding] just doesn't get it."

See attachment 2. ██████ also recalls that ████████:

> "brought handouts to discuss the data collection methods with regard to measuring compliance in recurring treatment timeframes."

And ████████ reports that I, Michael Golding:

> "expressed concern about how the data was being presented" and "indicated you had proof that an EOP measure had changed"

In that April 23rd 2018 meeting, I said that I trusted ██████████, but I would not concede that it was reasonable for psychiatrists to decrease the frequency of their appointments to once every 45 days (let alone 60 days!) from the mandatory requirement of at least every 30 days for EOP patients. As ██████ said, I had evidence that an EOP measure had changed. I pointed out that this had occurred despite explicit court mandates to the contrary.

My continuing not to acquiesce to the required "consensus" did not go well. ████████ publicly agreed with me but ████████████ and the psychologists were angry.

As ████████ said:

"You expressed concern about how the data was being presented. You attempted to provide an analogy of data interpretation, which was not well received. At some point, it became clear the desired result from the meeting was not achieved, at which time ██████████ changed the tone of the meeting and indicated the progressive discipline steps that would be forthcoming if any similar incident occurred."

See the second page of attachment 59 – a disturbing, gaslighting email ████████ sent on April 24, 2018 7:38 PM, which she described as "memorializ[ing]" the meeting of April 23rd, in which she wrote the following about my having raised the EOP lengthening issue:

"I expressed my belief that there is deeply rooted mistrust which are not grounded in current fact but instead rooted in historical experiences. In order to unearth these issues, I shared that I have engaged a leadership guide who will interview the team…"

From ██████████'s perspective the surreptitious EOP lengthening issue had been resolved, because I had already told her about it and ██████████ had fixed the issue by the time we had the meeting in April 2018, so why was I still bringing it up, if not because I have some kind of strange animus towards psychologists – "deeply rooted mistrust not grounded in current fact"?

The trouble is, it had not exactly been resolved, in that although the change had been changed back to the court-mandated 30 days, the OSM or the Court had still not been informed that the change had occurred, and the point was that that was just one of a number of issues. So I brought it up in the April 19th 2018 meeting at which ██. ██████ behaved so extremely unprofessionally, and at the April 23rd meeting with ██████████, because we thought that such important data issues, particularly the EOP time interval lengthening, with such a potentially significant negative effect on the already dire patient care – not to mention that it violated the Court's mandates – should be reported to the OSM and the Court.

104

See attachment 59. Yet instead of thanking me for bringing the issue to her attention again and finally informing the Court, ███████████ threatened me (but not ███ █████ who had screamed and cursed at me) with discipline for having raised the issue! I was, she said, exhibiting "deeply rooted mistrust", and thus she wanted to "unearth these issues" with a "Christian minister" who was a "leadership guide" and she mandated that I (a Jew) attend. (I have nothing at all against Christians of course. But why mention the religion of the guide if that were not relevant?) I said I would attend and be polite, but would likely not say very much. Ultimately no mandatory re-education occurred. That was not the first or the last time that CDCR was gaslighting me and trying to silence me when I raised an issue affecting patient care.

See attachment 59. On October 24th 2018, about a year before the evidentiary hearing, I wrote the following to ███████:

> "But the fact is that ███████████████] (particularly) and ██████very well know that they had giving misleading reports to the court about several key issues. I think the popular term is that ██████ was "gas-lighting" me. (She was calling me essentially irrational, though the problem was and is a much more straightforward one: ██████ and the QM folks were misleading our leadership and the courts about the data). So there was and is reason to distrust the data. One does not need a leadership guide to learn to trust data that is not trustworthy."

What were I and my colleagues to think when, instead of correcting the issue and being transparent with the Court, the ███████████ was gaslighting me and disciplining me for raising what everyone knew was a clinically-significant data issue?

What were we to think about the fact that ███████████ had accused me of provoking the event, both in email and orally in the April 23rd meeting, and thus was implicitly blaming me, instead of directly threatening disciplinary action against the one person who had behaved unprofessionally, who had been swearing at me for asking about the change?

105

Had anyone been in any doubt before that April 23rd 2018 leadership team meeting, ███████████████████'s handling of that issue made it crystal clear that raising data issues *within* CDCR will not be tolerated.

This is just one of many examples of how CDCR executives silence people. Who is going to feel safe enough to mention a problem they have discovered if CDCR responds in such an alarming manner? And what is the effect of this culture of silence on the system's ability to improve and correct issues adversely affecting patient care?

Increasingly I became a pariah, starting from when I first started pointing out problems I was noticing, until the present. Everyone has seen how I have been treated since the Golding Report, and even team members have directly said that they do not want to bring up issues they know are problematic. For example, one asked not to be involved in analysis of compliance metrics any more, and said:

> "I don't want to fight anymore."

In 2017 and 2018 CDCR started denying me access to information I needed for my work. CDCR headquarters (HQ) staff who had for years been very friendly to me (when I was still believing the CDCR line that the Plaintiffs and the OSM unjustifiably criticize CDCR), became noticeably less cooperative and ostracized me. Does CDCR see this as a war, in which we must all "button [our] lip" because "loose lips sink ships", and anyone who is querying the propaganda must be cast out as a traitor? That is certainly my impression.

The handling of my raising of the EOP maximum psychiatry appointment interval was one of the first issues that gave me pause about how CDCR conducts itself when a mistake is made. I had thought that when I pointed it out, CDCR would correct it, and that they would inform the OSM/Court of the mistake and correct the record. The idea that they would surreptitiously make the change, not inform the OSM and the Court, then change it back when we complained, but still not be transparent with the Court, even though it was such a significant issue adversely affecting patient care, was shocking to me.

106

See attachment 21. Case 2:90-cv-00520-KJM-DB Document 6377 Filed 11/01/19 Page 83+ of 240 and attachment 1. And yet, despite my lengthy message to ██████████████ in 2017, and the several detailed conversations we had about the rule change lengthening the EOP appointment interval then, and despite the April 2018 hullabaloo and drama and ██████████████'s summoning us all to the come to Jesus meeting in which I stated my concerns again and she threatened me with disciplinary action and re-education with a Christian minister, and despite her subsequent gaslighting email about what had transpired, somehow, by the time of her testimony in court in October 2019, ████████ ████████ had forgotten all of that, and could not remember even having been informed about that EOP rule change issue before the Golding Report (October 3rd 2018):

> "My memory is that I first really became aware when I got the report from Dr. Golding in October."

> Q "Have you ever heard about the rule change prior to that?"

> A "It may have been part of some conversations, but I don't think I really connected the dots the way Dr. Golding laid it out in his report until I saw the report."
>
> Case 2:90-cv-00520-KJM-DB Document 6377 Filed 11/01/19 Page 83 of 240

> Attorney Ells: "So you testified today that you were not aware of the timely psychiatry contact metric being changed from 30 to greater than 30 until after Dr. Golding's report was released; is that right?"

> ████████████: "I think what I testified to is that that's when I first became fully aware, yeah. And there may have been some conversation, but I don't recall having any knowledge of it before."
>
> Case 2:90-cv-00520-KJM-DB Document 6377 Filed 11/01/19 Page 102-103 of 240

And:

107

████████████ : "I don't recall having any knowledge of it before the report came out."

Case 2:90-cv-00520-KJM-DB Document 6377 Filed 11/01/19 Page 103 of 240

See attachment 21. The attorney examining her in court said:

Q: "And you didn't pass those two institutions for certification the second page of your letter. So you put in your letter that you understood that there had been a change in the coding of this contact."

Q "On the second page here, you certified every institution except CHCF and CSP Sac, the two institutions that specifically told you that their compliance had been affected by that rule change."

A "Sure….."

Case 2:90-cv-00520-KJM-DB Document 6377 Filed 11/01/19 Page 108-110 of 240

## Retaliatory letters and meetings: ████████████████████████

After my report had been independently reviewed by the neutral expert, and before the evidentiary hearing in October 2019, perhaps around September 2019, ████████ ████████ a psychologist, told me that CDCR executive leadership had asked HQ clinicians to document and submit information about any interactions that they might have or have had with me in which my behavior was problematic. ████████████ and ████████████ both later independently confirmed this.

See attachment 60. After the Judge's ruling in the October 2019 evidentiary hearing supported much of what I had said in the Golding Report, the new (Acting) ████████ ████████████████████████████████████████, ████████████, told me on April

108

20th, 2020 that CDCR had been collecting a "stack" of reports criticizing me, beginning "about two and a half years [earlier]."

So in 2017, after I had been concerned about the lengthening of the EOP interval, and I had begun to query other data irregularities that ██████████ and I had been finding, according to ██████████, CDCR executive leadership had about then started soliciting "complaints" from my colleagues.

Needless to say there had been no complaints about me in the previous four years I had been at CDCR. As long as we all agree that no matter what CDCR does, no matter how many patients go without care, no matter how many are permanently injured or die, CDCR is providing excellent care and is being maligned by the enemy (the OSM and the Plaintiffs), somehow, we all get along fine; but when I start noticing irregularities affecting patient care, and *internally* suggesting that we fix them, suddenly I am deemed to be a bully and ostracized as a traitor. And if anyone even thinks of supporting me, they know that the same fate awaits them.

A few people privately told me they supported me, but their eyes said they were scared, and almost no one supported me publicly except for a few Chief Psychiatrists from the institutions who were not directly supervised out of headquarters, and a few HQ psychiatrists.

CDCR's strategy very effectively silences people. And the tragedy is that this actively prevents easily-fixable problems being solved, to the detriment of our patients.

See attachment 60. Despite the Judge having ordered that there be no retaliation, in April 2020, ██████████ called me into her office to discuss the "stack of complaints" that CDCR had collected. ██████████ said in her email following the meeting:

> "I shared with you, too, that there was no EEO nexus from the EEO Coordinator's analysis and the matter was considered supervisory in nature."

And:

"As I shared at the time, our conversation was not disciplinary in nature. I did not and will not be issuing any counseling record or a letter of instruction, nor will any information be placed in your official personnel file (OPF).

….this was not an investigation, but an analysis."

███████ told me that someone named ████████████ had done the investigation or "analysis" and that I was not allowed to hear about, know about, or respond to any of the "stack of complaints".

"You are correct that I stated there were problematic behaviors identified that I needed to address with you, and as your supervisor, having received complaints, I am required to communicate to you that complaints had been made, the general nature of the complaints and to advise you on those complaints."

She did not advise me about what "the general nature of the complaints" were, except to identify one "problematic behavior". After the evidentiary hearing, in which the Judge had seemed to suggest to ████████ that CDCR employees needed to know what had happened, yet no one at headquarters except those who had been directly involved seemed to have any idea what had transpired in the courtroom and people were still acting as though I had done something wrong in having written the Golding Report, and they had no idea that CDCR had been found to have misled the Court, I had (without comment on my part) sent a copy of the court document of the transcript of what the Judge said (attachment 61), to HQ staff.

███████ said that that had been deemed to be bullying on my part. Someone had thought that the highlighting in the transcript had been done by me. But that is not the case. I had found that court document complete with highlighting, linked in an article in *Mother Jones*. See https://www.motherjones.com/crime-justice/2019/11/california-whistleblower-mental-health-crisis-prisons/ for that article, and attachment 61 for the court transcript linked in that online article at the word "transcript". Click the link in the online document yourself to see that the highlighting in the transcript court

document linked in the online article is in the transcript document linked from the *Mother Jones* article, as opposed to having been added by me.

████████ delivered the message to me very professionally, but I did wonder if perhaps she was feeling pressured to deliver the message. Perhaps it was just an awkward situation, but my impression was that she was not wholly comfortable with delivering the message to me. ████████ had been a good supervisor.

I sent the transcript of the Judge's findings to HQ staff in the hope that they would understand that CDCR had made some significant mistakes that needed to be corrected and that the Judge and the Court had not found that my writing of the report was actually the problem. I wanted my colleagues to know what the Court thought, not just the misinformation toxic CDCR culture had communicated and what they had been led to believe about me. See attachment 62.

> "As the findings in this order make clear, and contrary to defendants' initial position -- maintained through the evidentiary hearing -- that no independent investigation of Dr. Golding's allegations was necessary, those allegations in significant part justified the independent investigation and factfinding the court has undertaken."
>
> Case 2:90-cv-00520-KJM-DB Document 6427 Filed 12/17/19 Page 4 of 49

I wanted to clear my name. And I felt the judge had exonerated me. And the Judge had even said something in court to ████████ suggesting that CDCR staff should be told.

After they read the Judge's ruling, some staff were very surprised indeed. CDCR leadership had kept everyone who didn't "need to know" in the dark.

A few HQ employees thanked me for having sent them the Judge's order. They said to me (very quietly and nervously, in private) that they thought that I was trying to improve things, despite what they had been told by CDCR leadership. Some even said that they knew all along that what I had said was true.

111

But this act of sending to HQ staff members the court document containing what the Judge had said, with no commentary of my own, was alleged to have been "bullying", according to █████████.

See attachment 60. In my email to █████████ about our meeting on April 20th, 2020, I wrote:

> "You also stated in the meeting that my sending the federal court's order to colleagues was seen as bullying……I stated that I had not bullied anyone and the opposite had occurred. I informed you that I made my whistleblower complaints because I placed patients as my first priority. I said that due to my exposing dishonesty on the part of my colleagues – dishonesty that hurt our patients – they utilized their power to try to silence me and intimidate me. They retaliated against me and no one apologized for what occurred."

█████████ responded:

> "With respect to your concerns about persons submitting misleading information to the Federal Court, those matters were addressed in the court proceedings."

In terms of the retaliation, █████████ said:

> "In your email, you also asked what actions CDCR will take to respond to your complaints of retaliation. I am not aware of any complaining of retaliation that may have been submitted and we did not discuss any complaint that you made verbally to anyone."

My lawyer had raised the retaliation problem in the evidentiary hearing so CDCR was very well aware that I had been complaining about their retaliation by then if not before. In fact they were very well aware long before that.

CDCR's ultimate decision about how to handle the "supervisory" issues that they deemed me guilty of was that I needed to take a class:

> "I did direct that you will need to sign up for a class on Team Skills and Communication…"

I took the class. Thus my immediate punishment from CDCR, in the context of the Judge's finding that CDCR had knowingly misled the federal Court, and in the context of the Judge's order not to retaliate against me, was for me to be singled out for "education". But more significant retaliatory punishments and demotions, as detailed in this letter, were already well under way even before the evidentiary hearing.


## Retaliatory letters and meetings: █████████

When I first met with ███████████, the ████████████████████, privately in his office within the first month or two of 2020, he said to me something like:

> "I won't be holding you responsible"

for the court results (CDCR having been found to have knowingly misled the Court).

Why did █████ say that? Why did he not say instead: "CDCR was responsible for misleading the Court. I am so sorry that occurred and thank you for pointing out the problem and giving us an opportunity to fix it. We should have fixed the problems when you first raised them."

Given that there had been no public acknowledgement that anyone had done something wrong within CDCR itself leading to Judge Mueller's ruling against CDCR, and certainly no apology to me, publicly or otherwise, for what CDCR had put me through, and no apparent apology to our patients, I wondered who else CDCR could be holding responsible for the debacle but me.

113

When ███████ and I were both hoping to be chosen as the new ███████ ███████ after ███████ left, for a while he and I were communicating openly. He told me that he had been speaking with ███████ about the open ███████ position, and had asked him about what would might happen in terms of the decision. ███████ told me that ███████ had said that I definitely would not be chosen, because:

"The wounds are too fresh."

███████ further said that I would have to change to earn back the trust of CDCR (and implicitly ███████ and ███████) and he said that no other executive/leadership positions would be open to me unless I did change, including the ███████ position.

I was thus being held responsible for CDCR being forced to change by the Court, contrary to what ███████ had said. Evidently my actions and thus also my continuing actions (requesting transparency and adequate patient care) would guarantee further ongoing retaliation. And short of violating my duty of care to our patients there was nothing I could do about that.

███████ was unsympathetic. He said something like or identical to:

"What are you going to do?!" (with implication that there wasn't anything I could do.)

He also said:

"What do you expect?!" (as if it is obvious that someone who writes a report detailing problems to resolve is definitely not CDCR executive material!)

Please see attachment 63 describing the initial set of interviews for the Assistant Deputy Director position, in which they chose ███████ (our ███████ ███████ who currently works for me). ███████ declined, which is why another

114

set of interviews has been completed. In my letter to the department about CDCR's unfair hiring practices after the interview but before the decision was made, I mentioned that CDCR was in the process of converting institutional Senior Psychiatry positions to Chief Psychiatry positions in institutions that did not already have a Chief position. I mentioned that before any of the interviews took place ██████ had said that the only one of the Senior Psychiatrists at institutions who would definitely not be given the Chief Psychiatrist position would be ██████ at the California Training Facility (CTF), because "he writes too many letters" and "he claims to be a whistleblower but isn't," and perhaps for other reasons.

In fact, that is exactly what happened. As far as I know, all the Senior Supervisors who were at institutions and applied to be Chiefs of their own institutions except ██████ became Chiefs, just as ██████ had said would happen. For further details see attachment 63, my letter to our HR department about ██████'s shocking statements. I was able to predict that only because ██████ had himself told us that that would happen *before the interviews took place*.



██████ did also mention ██████, at the ██████ as being another ██████ who should not be promoted, though ██████ was less forceful about that case than he was about ██████.

These unfair hiring practices (determining who will or will not be chosen before the interviews for those positions happen) seem very similar to ██████ telling me that ██████ had said that I would not be chosen for an executive position because "The wounds are too fresh." due to my having written the Golding Report.

The department clearly felt that I had wounded them, as if they are at war with the Office of the Special Master and the Court. By writing my report to try to protect our patients, I was, they appeared to think, siding with the enemy.

I later asked ██████ about why he had told ██████ that "The wounds are too fresh."

115

There was a long pause, and then he denied it.

## Retaliatory letters and meetings: disciplined for writing to the OSM

In addition to demoting me and closing off opportunities, CDCR has also sent me multiple disciplinary letters. These attack my integrity, character, professionalism and clinical competence. For a medical doctor, as CDCR executive leadership is well aware, such disciplinary actions are career-ending: potential employers always ask about past letters of expectation and instruction, including informal as well as formal disciplinary actions.

## Retaliatory letters and meetings: disciplined for writing about disappearing appointments

On January 15th 2021, ▮▮▮▮▮▮▮ gave me a disciplinary notice entitled a "Letter of Expectation" in the form of an email. This is a term of art in HR departments in that it is considered a type of "corrective action" in which a supervisor provides an allegedly corrective set of expectations when an employee is alleged to have done something wrong. It is a form of discipline in the sense that during job interviews, like the one I just had for Assistant Deputy Director of Psychiatry, questions are asked about whether one has received any "Letters of Expectation", or "Letters of Instruction" or "any disciplinary action, whether formal or informal", as one potential employer put it.

See attachment 40, and my response to ▮▮▮▮▮▮▮'s allegations, in attachment 41.

▮▮▮▮▮▮▮ gave many reasons for the disciplinary notice, including that I had reported to the Special Master the continuing problem of appointments that had disappeared from the record, called "disappearing appointments".

See attachment 40, my response to ████████'s disciplinary allegations in attachment 41, and my letter to your team in attachment 42.

████████ claimed that I should not have been speaking to the Office of the Special Master on Sept 15th 2020 about issues having to do with appointments that were being disappeared. ████████ and I had mentioned the disappearing appointments issue in the court proceedings. CDCR had denied in court that what ████████ and I had said was true.

████████ said that he had sent "a hastily written email" to the field to correct the disappearing appointments issue that I had mentioned again to the OSM. This had resulted in ████████ receiving multiple complaints. People in the field were worried about following his "hastily-written" instructions, because they were being asked to change how they interact with the EHRS in a way that would have been time consuming had they actually complied, though it would have made the "seen as scheduled" indicator accurate if they had been able or willing to do so.

Thus ████████ disciplined me for (again) reporting the truth to you about it, because he would like to have tried to solve the problem less "hastily". (Note that I had first raised this issue internally before the Golding Report in 2018, and ████████ was very well aware of that!)

Why would ████████ have had to try to solve the problem "hastily", after I reported the problem to you had it not been a problem in the first place, as CDCR claimed before and during the evidentiary hearing in 2019?

████████ here is missing the underlying explanation for the problem. The problem is that CDCR was claiming, before and in court during the evidentiary hearing, that the false reporting of overcompliance with the "seen as scheduled" indicator, that ██ ████████ and I had pointed out, was already solved, when actually it was not.

CDCR could have honestly told the Judge that in order to try to fix the "seen as scheduled" indicator, CDCR could measure, for example, a time window agreed to by

117

the relevant parties in the lawsuit (e.g., two hours before and two hours after) the time of the scheduled appointment. And if the appointment did *not* occur within that time window, then the appointment would be considered *not* to have been seen as scheduled. Or clinicians would have had to be asked to make multiple additional electronic health record clicks, which they would not want to do, and would be angry about being asked to do, and wouldn't always or usually do.

Had CDCR been transparent at the evidentiary hearing, that the problem was not solved, that the "seen as scheduled" indicator was still inaccurate, that it was giving a false impression of compliance, and that they needed more time to fix it, perhaps the Judge would have given CDCR more time.

Then ███████ would not have had to write his own "hastily written email" years later, making an incomplete attempt to fix the problem in response to my having again raised concerns with you about this problem that I had raised in 2018 before the Golding Report, that has still not been corrected.

If ███████ actually thought that the instructions he gave in his email solved the problem well, without clinicians refusing to do the task or getting angry or both, he would not have had to consider his otherwise straightforward email to be "hastily written"; he could have considered it appropriate and good.

Could it be that CDCR chose not to write such a letter to the field before the evidentiary hearing because to write such a letter would have been to acknowledge that there was a problem that should have been reported to the Court?

The actual problem is that to fix the "seen as scheduled" indicator requires a bit of programming work to make the system accurately report when patients do not come for appointments, and to make the system not burden psychiatrists with the need for a time-consuming number of computer clicks.

See attachment 40. In his letter of discipline to me, ████████ did not want me to be raising the disappearing appointments issue with the OSM, and did not want me to be raising two other issues, because:

> "all 3 of those problems were long-standing, but we had not discussed potential solutions that we may have been able to implement once I had taken over in my current role as ████████████".

> "**The expectations** that I want to make clear from all of these points is that you raise and discuss these issues internally prior to sending letters to the OSM or bringing them up in meeting where other CDCR colleagues have not had the chance to hear you concerns and potentially address them."

I *had* raised the disappearing appointments issue (and many others) in 2018, and CDCR had set about ostracizing me and gaslighting me and trying to silence me. That is why I wrote the Golding Report: because CDCR was showing no sign of properly correcting the issues we had found.

See the earlier section on "Are CDCR staff free to talk to the OSM?"

Secondly, based on what Judge Mueller had said to me in court in October 2019, and what ████████ had said to the Judge, I thought that contrary to what CDCR had said in the past, in fact I *am* allowed to communicate with the OSM. Yet here we are again, with CDCR disciplining me for raising issues with the OSM that I have previously raised with CDCR and that they had shown no intention of resolving for years.

Only now, after I raised the issue with the OSM in 2021, is CDCR finally now trying to solve the problem. It may even be resolved in the next year. (Would they have done so had I not communicated with the OSM? Given what ████████ wrote in this disciplinary notice, I very much doubt it.)

119

Even if it were reasonable to discipline me for giving CDCR insufficient time to fully hear about the issues and address the problems before communicating with the OSM, if *four years* was insufficient time, how many years *would* CDCR have needed?

Regardless, in fact I had had many conversations with ███████ after the evidentiary hearing in 2019 about how we should try to solve the disappearing appointments problem. I had told him, based on advice from colleagues as stated above, that we could measure whether the appointment occurred within two hours before or two hours after the scheduled time, in other words whether the appointment occurred within a four-hour window of the scheduled appointment. Perhaps you, Mr. Lopes, or your clinical experts, would think that four hours is too large a window in which an appointment should be considered to be "seen as scheduled", but some number could be agreed upon.

See attachment 64, and my letter to you in attachment 65.

Moreover, ███████ clearly acknowledged knowing about the disappearing appointments problem in his email to ███████ on September 12th, 2020. That is before I wrote to you on September 15th, 2020. Why didn't ███████ tell you himself, instead of chastising me for telling you that the issue discussed in the evidentiary hearing was not in fact solved as its experts had seemed to claim in court in October 2019?

See attachment 66. The larger issue is summarized by Judge Mueller:

> "Moreover, defendants are not correct in believing that missed appointments are not relevant to patient care. ███████'s deposition testimony is very instructive as to why properly tracking missed appointments is relevant. Such tracking contributes to qualitative analysis, including identification of trends and patterns at local institutions that is not available otherwise, absent a very detailed manual tracking."
>
> Case 2:90-cv-00520-KJM-DB Document 6427 Filed 12/17/19 Page 34 of 49

As with all these issues, CDCR's war against the Court and the OSM adversely affects our patients. Were these issues corrected, that would improve our patients' access to the care they need. We have estimated, by hand counting and other means, that across our California Prison system, 50% of scheduled psychiatry and psychology clinical appointments do not occur when they are scheduled to occur, and most of those appointments not occurring as scheduled do not occur even within as much as a four-hour window, two hours on each side of the appointment. That is a lot of patients not being seen when they need to be seen.

If our estimate is correct (and I think it is around that), this is a major explanation for the gross inefficiency that our psychiatrists experience when trying to do their work, and a good explanation for the frequent non-confidential brief cellside encounters that occur when patients have not made it to their appointments. Inefficiency in using psychiatrists' time (for example, if, as I detailed in the Golding Report, they spend a lot of their time *searching* for their patients instead of *seeing* their patients) that means less time seeing patients and likely less good care for our patients.

An overall measure, also broken down by institutions and yards, is very overdue, in my opinion. Even if you allow the narrow interpretation of "seen as scheduled" that CDCR prefers, saying that the "seen as scheduled" indicator measures just appointments missed because of factors within what CDCR says is in its "control", the "seen as scheduled" indicator is still not accurately measuring that (despite what CDCR suggested in court) because of the disappearing appointments issue.

███████████ and I had identified two major problems with the "seen as scheduled" indicator. One is that the definition of the indicator was wrong. In the evidentiary hearing in October 2019, CDCR claimed that that was the only problem, and thus that when the definition was fixed, the problem was solved.

But if appointments were being disappeared, as ▮▮▮▮▮▮▮▮ and I knew they were, then the numerical calculation was off too, not just the definition. But CDCR representatives seemed to deny this in court.

> Judge Mueller: "But you're aware that he [Dr. Golding, MG] has said that certain canceled appointments -- that records disappeared such that they couldn't be measured?"

> ▮▮▮▮▮▮▮▮▮▮: "I'm aware that he's alleged that. I think that's incorrect. I think, in fact -- and I think it actually may be in one of the filings already, but I think the way it works, if I understand it properly –"

> Case 2:90-cv-00520-KJM-DB Document 6377 Filed 11/01/19 Page 95 of 240

▮▮▮▮▮▮▮, the Plaintiffs' attorney, asked ▮▮▮▮▮▮▮:

> "And what about if a patient is checked in and out from an appointment, even if it didn't occur when the appointment was supposed to happen, say it occurred a couple of days later. So long as that patient was checked in and out, that patient -- that appointment could be seen as scheduled even if it was late; isn't that right?"

> ▮▮▮▮▮▮: "I'm not sure that is possible. If you check out an appointment, it does mean that it occurred in our system, and so I'm not positive. I don't know the answer to that exactly."

> Case 2:90-cv-00520-KJM-DB Document 6377 Filed 11/01/19 Page 222 of 240

In fact, if an appointment is scheduled in the morning and the patient does not come, but that morning appointment is checked in and out at a later time in the afternoon when the psychiatrist sees the patient cellside, or sees the patient the next day, CDCR does not count the initial appointment as *not* seen as scheduled, even though the initial appointment was not seen as scheduled. CDCR counts the later appointment as seen as scheduled, though it was late. Failing to reschedule a new appointment in the

ambulatory organizer when a patient fails to come to an appointment – the simplest thing for clinicians to do when patients don't come to the originally scheduled appointment – creates this problem in our current system.

████████ said:

> "And what if an appointment is checked in and out, even if it didn't occur when the appointment was supposed to happen,…."

████████ seemed to be exactly describing a situation in which an appointment is checked in and out *later*, because the appointment

> "didn't occur when the appointment was supposed to happen,…"

████████ continued:

> "…say it [the appointment, MG] occurred a couple of days later. So long as that patient was checked in and out, that patient -- that appointment could be seen as scheduled even if it was late; isn't that right?"

Case 2:90-cv-00520-KJM-DB Document 6377 Filed 11/01/19 Page 222 of 240

That is precisely the circumstance in which the initial appointment would have been disappeared and thus not counted as "not seen as scheduled" and the later appointment would be falsely counted as "seen as scheduled."

████████ gave an imprecise answer, saying that he is not sure that is possible. But it certainly is.

See the bottom of page 1 of attachment 65 citing a communication from September 12th, 2020, instructions from CHCF leadership, written nearly a year after the evidentiary hearing, describing how clinicians *should intentionally make that happen* (disappear a previous appointment).

123

Amongst other problems with this, it misleadingly elevates the appearance of compliance in the "seen as scheduled" indicator:

> "❖ **DO NOT:**
>
>> Check in or out or cancel the appointments if the patient cannot be found."

So when the psychiatrist goes to search around the yard and units for their patient to try to have their scheduled appointment, according to CHCF leadership, if the psychiatrist can't find the patient, they should *not* check the patient in our out or cancel that appointment.

Failing to "check in or out or cancel the appointments" will falsely elevate the "seen as scheduled" indicator, as was occurring at the time of the evidentiary hearing, despite what CDCR seemed to say about that in court.

Causing the "seen as scheduled" indicator to be falsely elevated was standard practice at the time of the hearing and afterwards.

██████████ at ██ ("██") confirmed that this has occurred at San Quentin in his discussions with ██████████. See the final page of attachment 65.

The "seen as scheduled" indicator was not corrected before the evidentiary hearing, as CDCR seemed to be mistakenly claiming in court.

See attachment 3. Judge Mueller said about the "seen as scheduled" indicator:

> "██████████ testified that he learned of the error from ██████████ sometime around October 9th, before [he] had any knowledge of the Golding report . . and

[he] basically changed it that day to match what it was really doing." 10/15/19
RT at 224:20-225:11.

Case 2:90-cv-00520-KJM-DB Document 6427 Filed 12/17/19 Page 31 of 49

But the definition of the "seen as scheduled" indicator could not match "what it was
really doing", as Judge Mueller was led to believe, because it wasn't really doing that.

When appointments get disappeared, the indicator won't work. It will falsely report
patients as seen as scheduled, when they were *not* seen as scheduled, regardless of
changing it "that day to match what it was really doing", as Judge Mueller was
mistakenly led to believe.

See attachment 40. Having the computer measuring whether an appointment occurred
within a specified amount of time around when it was scheduled to occur, would have
solved the problem of determining whether a patient was "seen as scheduled", had
CDCR been willing to do that. But that would have taken some additional computer
programming and a desire to know the result.

███████ felt he needed to discipline me for telling you and your OSM team that the
problem was still real, indeed longstanding, but he apparently felt no urgency to tell the
Court that CDCR had erred in suggesting to the Court that ██████ and I were
mistaken about that issue during the evidentiary hearing in 2019.


## Retaliatory letters and meetings: disciplined for writing about staffing issues

███████ also disciplined me for letting the OSM know that many psychiatrists were
concerned that CDCR's 2020 staffing plan to make substantial psychiatric staffing cuts
relative to the 2009 plan was clinically unsafe. Certainly our HQ specialist psychiatrists
did not agree with the proposed staffing cuts put forward by our attorneys in the 2020
staffing plan.

█████████ had explicitly asked me, and then again the whole Psychiatry team, not to raise certain issues about the staffing cuts with CDCR leadership. He said it would make CDCR psychiatric leadership (i.e., him) look bad, and that he himself would not raise certain issues. He said that we did not need to say anything because the Plaintiffs would take care of the problem for us.

Thus in 2020 our attorneys delivered their staffing plan to the Court, calling for major cuts in the number of psychiatric positions deemed to be needed, without support from psychiatrists for cutting psychiatry positions.

See attachment 67. On August 3rd, 2020, 9:47 PM, █████████ suggested that we agree to draft language in a staffing plan that called for having two nurse practitioners per psychiatric supervisor but otherwise fully count nurse practitioners as psychiatric providers of service, equivalent to a psychiatrist in the court-mandated psychiatric staffing count. Thus if the CDCR staffing plan had been adopted without any additional qualifying policy, CDCR could have freely used nurse practitioners, some with shockingly little training, as the primary psychiatrist in crisis and hospital beds.

As far as I know, the Office of the Special Master favored allowing nurse practitioners to practice only at the CCC level of care, effectively with our outpatients – a far more reasonable and safe idea, given how sick our patients are. But █████████'s thoughts about disagreeing with CDCR higher level executive leadership are noteworthy. See page 3 of attachment 67:

> "To the extent that the plaintiffs and OSM can fight this battle for us, let them, & we wish them good luck. I would carefully consider the effects of blowing up this and future negotiations over this. We will be working on many more policies together, and the results of the *process* for this one can have a lasting impact on the next ones."

We are lucky to have had the OSM and Plaintiffs, because, as many of our psychiatrists wanted, our policies do now insist that nurse practitioners help with our outpatients

not inpatients. In these settings, with appropriate supervision, nurse practitioners can be very helpful. But if CDCR psychiatrists are not even allowed to make a clinically-reasonable recommendation like your experts did, and our leader deems us to need to rely on the Plaintiffs and the OSM "to fight this battle for us", that does not reflect well on CDCR's ability to manage these decisions properly on its own. Why should we have to rely on the Plaintiffs and OSM to get us to do the right thing for patient care?

On November 20th 2020, ███████ was talking about the staffing plan with a group of psychiatrists including ██████, ████████, ████████████, ████████ and perhaps others. ████████ said he disagreed with several aspects of the staffing plan, but that it is good to make concessions because then "those in the Governor's office will be more likely to help us in the future." He said he thought the psychiatric staffing cuts CDCR was proposing were too drastic but that he needed to stay out of it "and let the lions fight it out", referring to the Plaintiffs, the OSM, and CDCR senior executives and attorneys. He said that Plaintiffs' attorneys "████████ and ████████████ are more than capable of fighting for the staffing we need" – though when challenged he did concede that sometimes they don't know enough to understand the situation.

Disciplining me for communicating with the Office of the Special Master about our staffing needs does not seem consistent with encouraging transparency amongst psychiatrists. Was ████████ worried that he too would be retaliated against if he raised the issues himself?

See page 4 of attachment 68.

> "[D]efendants have attested to their commitment to provide full and transparent access to all relevant data to the Special Master and to plaintiffs, see ████Decl., ECF No. 6457-1 […] As defendants move forward with the staffing plan adjustments called for by this order, the court expects defendants will be fully transparent with all key stakeholders, including but not limited to CDCR psychiatrists, and will continue to take all steps necessary to avoid the errors that required the court's intervention to correct. See ECF No. 6427 at, e.g., 41-43

(discussing defendants' marginalization of and failure to consult with psychiatrists in staffing planning)."

Case 2:90-cv-00520-KJM-DB Document 6938 Filed 11/04/20 Page 4 of 9

Somehow, this message seems not to have got through to CDCR. I have shown that CDCR is still not being transparent, and that I have been repeatedly retaliated against for communicating vital information to the Office of the Special Master that CDCR should have been transparent about in the first place. I have been disciplined for communicating with the OSM about our psychiatry staffing needs, when CDCR's attorneys were calling for the elimination of 100 or more psychiatry positions despite our psychiatrists being of the opinion that that would be dangerous for our patients. I have shown how CDCR is fighting the data remediation process every step of the way. None of that seems consistent with "avoid[ing] the errors that required the court's intervention to correct."

CDCR's initial new staffing proposal in 2020 once again proposed eliminating a dramatic number of psychiatry positions, as did its 2018 plan before the Golding Report. Judge Mueller said of CDCR's proposed radical change:

> "The evidence tendered by defendants does not support the broad assertion in their brief that the 2009 staffing plan is 'outdated and substantially flawed'."
> Case 2:90-cv-00520-KJM-DB Document 6938 Filed 11/04/20 Page 6 of 9

See attachment 69. Concerning my September emails to the Coleman Special Master, Deputy Special Master Mr. Mohamedu Jones wrote:

> "Mr. Lopes has concluded that he is obligated by his position to provide the information you sent him to the *Coleman* parties."

See attachment 70. Thus ultimately the letters that ▮▮▮▮▮▮ disciplined me for sending you, including apparently the September 17th email that I sent to you and your team, were also sent to all the Coleman parties.

If even you, the Special Master himself, felt obligated to send the information in my emails to the Coleman parties, then how can it have been appropriate for ███████ to discipline me for sending it to you? And how is that retaliatory discipline consistent with what Undersecretary ███████████ said in court in October 2019? See the earlier section, "Are CDCR staff free to talk to the OSM?"

## Retaliatory letters and meetings: disciplined for disagreeing with a Chief Telepsychiatrist in front of the OSM

███████ also disciplined me for communicating with your experts during a meeting about Telepsychiatry. See the first page of attachment 40, and my response on pages 13 and 14 of attachment 41.

> "You raised concerns with the [telepsychiatry] policy for the first time in a setting with court monitors and others".

███████ has known for years, since before he became the ███████████, that I have concerns about telepsychiatrists working from home (which was one issue raised), and that I have a concern that onsite psychiatrists might choose to leave their institution to work from home, since they get the same money in either situation, and working from home is obviously much more pleasant for them. Moreover, even if the pay were increased for onsite psychiatrists, unless it were substantially more, it will usually be cheaper and easier to hire telepsychiatrists to cover areas in which prisons are located (and otherwise) that are rural or poor, which will eliminate onsite psychiatry, to the detriment of our patients.

This is true regardless of whether CDCR claims to have a preference for utilizing onsite psychiatrists. If telepsychiatry by itself is ultimately considered adequate in day treatment (EOP) and partial hospital (EOP) care, there will be no incentive for CDCR to

create a large enough pay differential between those working onsite and those working as telepsychiatrists (offsite).

Ultimately it will be cheaper to utilize telepsychiatrists in all levels of care, perhaps even in inpatient settings, potentially using contracting telepsychiatrists from all over the United States and even the world. Or perhaps, civil servant telepsychiatrists will merely work from California, while registry telepsychiatrists will work from around the United States or the world.

So if it is considered adequate care over the long term to utilize telepsychiatry in partial hospital (EOP) and day treatment areas in prison settings (EOP), let alone in inpatient areas, regardless of policies saying that onsite psychiatrists are preferred, staffing will ultimately be adjusted so that onsite psychiatry will be eliminated, because, especially in remote locations, a given needed number of telepsychiatrists can be obtained more cheaply than a given needed number of onsite psychiatrists.

The attempt by CDCR to eliminate mandatory onsite EOP psychiatrists (in order to deem it acceptable to use just telepsychiatry for these patients), is one definitive step in eliminating onsite psychiatry in the prison system. Thus in writing prior telepsychiatry policies (that I used to be responsible for writing or having written), I was careful not to permit that.

See pages 3-4 of attachment 71. For example, I wanted the telepsychiatrists to work from telepsychiatry hubs and wrote proposals, with the help of former chiefs, to build a new hub at San Quentin. And I made sure that the last telepsychiatry policy I was responsible for carefully said that over the long term, onsite psychiatrists should also be present in the event that telepsychiatrists are allowed to be taking care of patients in EOP settings.

However during the covid pandemic, obviously there was a new issue to take into account, every person-to-person contact carrying with it the potential for transmission and death. In the exceptional situation of the pandemic, I saw that allowing

telepsychiatry from home would help limit movement into and out of our hubs for telepsychiatry, and into and out of prisons, thus reducing the chance of covid exposure.

See attachment 71. I still do have concerns about telepsychiatry from home, and still think it should be monitored carefully. Indeed, for the staffing proposal in 2020, I recommended to ███████ and ███████ that the hubs be rapidly expanded. Given that telepsychiatrists working from home seemed to work reasonably well during covid, I am less worried about it than I was, but I am still somewhat concerned about telepsychiatry from home for the following reasons:

1. it creates even greater incentives for our onsite psychiatrists to want to work from home,
2. it allows them to less frequently visit institutions to create the requisite camaraderie in the institution (because we then hire people who don't live near our centrally located telepsychiatry hubs, which are near institutions, so it is harder to visit regularly, and
3. it ultimately will encourage CDCR to try to contract out telepsychiatric services to companies around the nation or even just in California, that could even try to recruit our existing telepsychiatrists to leave CDCR to join the company, whether these recruited psychiatrists would live in California or not.

Regardless, it was and is reasonable for CDCR to monitor the performance of telepsychiatrists working from home. This is what the Coleman monitors said in the meeting in an OSM workgroup meeting in late 2020. I merely publicly *agreed* with them, a consistent position I have held for years and had communicated for years. For example, see point 2 on page 3 of attachment 71, in which I argued that the new psychiatry staffing plan should increase Telepsychiatry space in hubs. And before ███ ███ demoted me, I had been responsible for directing the Telepsychiatry program.

131

See attachment 40. But just for *agreeing* with the OSM in this conversation in the OSM workgroup meeting in late 2020, ███████ gave me a disciplinary letter of expectation email saying:

> "This was not helpful to the negotiation and had the potential to embarrass the Chief of Telepsychiatry in that meeting as well as CDCR in general, and yourself."

I received this disciplinary email despite ███████ having explicitly told Judge Mueller in court in October 2019 that we are free to communicate with the Special Master. See "Are CDCR staff free to talk to the OSM?"

See attachment 40. ███████ not only retaliated by sending me this January 15th 2021 disciplinary communication, he also retaliated by never again allowing me to attend any meetings to organize Telepsychiatry policies, whether with the Special Master present or not.

Indeed after January 15th 2021, his gradual elimination of my leadership of Telepsychiatry was complete. I had led Telepsychiatry since 2014.

When the newest Telepsychiatry policy was sent to the Plaintiffs and the OSM in 2022, I had never seen it, I had had no part in developing it, and I had had to request that a copy be sent to me after it was sent to the Plaintiffs. In the past I had been responsible for writing or having written, and read word-for-word and approved for Psychiatry, every single Telepsychiatry policy including those reviewed by the Office of the Special Master.

## Retaliatory letters and meetings: disciplined for saying that patients referred to acute or intermediate hospital should be mandatorily seen more frequently than every 10 or 30 days respectively

See the earlier sub-section titled "Patients referred to hospital need to be seen more frequently than those not needing such a referral" in the section titled "The data war", and attachment 72.

I received a retaliatory disciplinary note in August 2021 allegedly for having been rude at a July 14th 2021 BRMR meeting, but I think the real reason for ██████████'s note was that I had disagreed with a patient-endangering policy in front of the OSM's representative, and I had articulated an important clinical principle that anywhere else but CDCR would be entirely uncontroversial.

When patients are referred to the intermediate hospital, they should be mandatorily seem by psychiatrists in fewer than 30 days. For publicly, clearly, and politely saying that:

1. patients should be scheduled to be seen in fewer than 30 days, in contrast to what ████████████████████████ had said, and that
2. CDCR should utilize the BRMR data remediation process to see whether indicators were measuring what they were supposed to, not just to demonstrate the reliability of its indicators, and not just to see whether the indicators specifically violated literally stated provisions of the Program Guide, and that
3. CDCR should not retaliate when attempts are made to tell you and the OSM team about dangerous CDCR data measurement and analysis procedures

I received the letter of discipline after that meeting.

The July 14th 2021 meeting was discussing how frequently psychologists should see patients who have been referred to the hospital but who are not yet in the hospital and

133

are still in outpatient programs, but there is a similar issue with respect to how often such patients should be seen by psychiatrists too. I said that consistent with the fact that they have been referred to the hospital, such patients should be mandatorily seen by psychologists and psychiatrists more frequently than they would be in an outpatient context.

As I said earlier, CDCR's contention is that the frequency of care mandated is determined by and should continue to be determined by the program in which the patient is currently residing rather than the patient's referred level of care, unless that rule would violate another rule already stated in policy or the Program Guide.

This has been CDCR policy for a long time, and I politely challenged that at the July 2021 meeting when discussing the need for increased care when patients are waiting in outpatient facilities to go to the hospital.

I objected to CDCR's interpretation of the Program Guide and other regulations, because their interpretations perversely fail to take into account the intent or meaning of the words (not to mention clinical need). The Program Guide is clear and regulations and policy are clear that patients in hospitals (or at higher levels of care) require very much more frequent care. That implies that patients who need to be in the hospital but are not yet there similarly need to be seen more frequently.

I pointed out during the July 14th meeting for which I received discipline that no text, whether from the Program Guide or any other foundational document, can ever fully enumerate every possible circumstance or situation in which it applies. And thus when our leadership proposes a strategy for data remediation such that CDCR can ignore the intent of the Program Guide and other policies and rules mandating care for our patients, and can ignore even basic clinical common sense, to the detriment of our patients, that seems highly problematic.

And if intent does not matter, does CDCR also think it can ignore the intent or meaning in other agreements with the Court, the OSM and the Plaintiffs? And since this entire

134

lawsuit is about CDCR's inadequate patient care, surely there should be some attempt to meet even the most basic, obviously necessary standards of patient care?

I also said in that July 14th meeting that CDCR has retaliated when I have tried to communicate with the Office of the Special Master. And the knowledge that there could be retaliation is one factor that silences people.

You will recall, in that meeting on July 14th 2021 that none of several other psychiatrists and psychologists in the meeting spoke up against CDCR's clearly clinically unreasonable position in this matter. It is not that all those other clinicians are unaware that patients referred to the hospital absolutely need to be seen more frequently than those not referred. And it is not that they don't care about our patients. They definitely do. Many of them work incredibly hard to protect our patients in settings in which the OSM is not present. Yet they were silent about CDCR's highly inappropriate stance in that meeting that a patient needing to be in the intermediate hospital does not need to be mandatorily seen by a psychiatrist for 30 days (or that our very sickest patients, referred to the acute hospital, do not need to be mandatorily seen by a psychiatrist for 10 days).

Why do clinicians rationalize CDCR's clinically problematic interpretation of the Program Guide as being clinically acceptable, and rationalize that inappropriately infrequent care is sufficient? Clinicians would like to advance in their careers, and CDCR:

1. says that the Program Guide *does not* contradict CDCR's view. See for example page 2 of attachment 5, where ████████ says that not mandatorily seeing patients referred to the intermediate hospital is:

   "consistent with other PG [Program Guide, MG] references".

2. vilifies the Special Master as if the OSM were an enemy in war. See the section "Vilification of the Special Master".

135

3.  retaliates against those who do speak up, ostracizing and vilifying them as if they were traitors in a war. "Loose lips sink ships." "Careless talk costs lives."

CDCR has created a culture that prevents us from internally solving our problems, and it is our patients who suffer as a result of clinicians' feeling unable to speak up in the face of egregious, patient-endangering policies and other issues.

Before this July 14th meeting, but not since then, ███████ had said that clinicians are allowed to disagree at BRMR meetings.

See attachment 72. Yet because I had pointed out the obvious fact that CDCR's policy that frequency of care is in this case mistakenly determined by current program rather than the level of care to which the patient has been referred, and that CDCR had retaliated when pointing out patient-endangering practices to the OSM, ███████ said that I had:

> "injected…. distrust".

Well yes. The data is not trustworthy given these stances of CDCR. And I am not the only one thinking that CDCR's policies with respect to measuring and reporting data are not always as they should be. On or around August 31st, 2021, you, the Special Master, said that the CQIT audits may well be inaccurate because:

> "We don't trust your numbers".

I was not suggesting that an entire inpatient level of care program has to be implemented in an outpatient arena, only that more care than usual is needed when someone needs to be in the hospital.

In an earlier meeting (around July 6th 2021) before the July 14th 2021 BRMR meeting, I had asked a CDCR data group and ███████, the executive in charge of our data remediation process, the following question:

136

"In the case of a CCC patient who needs to be hospitalized per the psychiatrist's order, but who is not yet in the hospital, would it be permissible for a psychiatrist to wait up to 90 days to see that patient, if the Program Guide or other policy did not specifically mention seeing them sooner?"

Why did I ask that? Because our current policies and regulations mandate that psychiatrists see patients at least every three days when they are initially hospitalized, but there is nothing explicitly specified in the Program Guide and in policy or regulatory language about how often such patients should be seen while they are still in an outpatient area awaiting hospitalization.

I was implicitly asking ▮▮▮▮▮▮▮▮ whether he would be taking into account the clinical need in what he was going to be proposing to the OSM as CDCR's so-called "consensus clinical position".

▮▮▮▮▮▮▮▮ replied that if no language can be found in the Program Guide or other memos/policies mandating anything different, then it is CDCR's position that the CCC 90-day maximum interval would apply, and that no shorter interval should be mandated.

See page 1 attachment 72. In his August 2021 letter of discipline, ▮▮▮▮▮▮▮ said that I had been "misunderstanding" what ▮▮▮▮▮▮▮ had been saying at the July 14th 2021 BRMR meeting. But in the earlier meeting (around July 6th 2021) ▮▮▮▮▮▮▮ in fact *had* said that 90 days would and should be the mandatory minimum frequency of psychiatry visits for CCC patients awaiting hospitalization unless the Program Guide and regulations explicitly contradict that. There was no misunderstanding.

In fact the Program Guide does explicitly contradict that 90 day requirement. There is a requirement for transportation within 30 days to the intermediate hospital and within ten days to the acute hospital, thus care would not be delayed much more than 30 (or ten) days, but ▮▮▮▮▮▮▮ was willing to apply the principle whether we were discussing 30 days or even 90 days.

137

At the BRMR meeting on July 14th 2021 I was pointing out what I thought was a flaw in ██████████'s logic with patient care implications. Just because one can't find specific words in the Program Guide about what one should do about a patient who normally is seen about every 90 days (at the CCC level of care) or 30 days at the EOP level of care, but now needs to be in the hospital, doesn't mean that the mandatory maximum interval should still be every 90 (or 30) days.

My argument at the BRMR meeting for which I was disciplined was a logical, *reductio ad absurdum* one. If it is acceptable to say that a patient who needs to be in the hospital but is not in the hospital can be mandatorily seen merely every 90 days (or 30 days) because the Program Guide does not explicitly forbid that, then it follows that interpreting the Program Guide as mandating only what it says explicitly is not a good idea. In this case it is very clinically unwise. CDCR's reasoning does not help us to provide adequate care, which was the purpose of writing the Program Guide to begin with and the purpose of data remediation, given that CDCR was misleadingly interpreting the Program Guide.

The Office of the Special Master's representatives were at the July 14th 2021 BRMR meeting in which I was alleged to have been "disruptive" and in need of discipline for "injecting…. distrust" and a host of other allegations attacking my character and professionalism.

After the July 14th BRMR meeting, ██████████ and I had a 30-minute disciplinary meeting. In that meeting, I said that the OSM needed to know that CDCR is ignoring what appeared to be the intent of Program Guide policies, and that this discipline was retaliation for my having said something that I felt dutybound to say given my medical duty of care to our patients. I pointed out that what ██████████ was doing was dangerous for our patients and that it seemed that he was retaliating again for my trying to communicate with the OSM, just as I had warned about in the BRMR meeting itself.

See page 2 of attachment 72. But in his letter of discipline ██████████ included none of the above and bizarrely quoted me as having said the following:

138

> "yes it was contentious……I don't remember…..needless to say I don't agree with you….Indeed it was argued….my only response to you is to say, you know what, that's incorrect"

The fact that he would so egregiously misquote what I said speaks volumes.

Following that disciplinary letter and meeting, I briefly mentioned that discipline to Dr. Metzner, Mr. Delugacz, and Mr. Jones. They remembered the meeting about patients needing to be seen more frequently when awaiting hospitalization. Mr. Jones seemed surprised that ███████ had used Mr. Jones's alleged responses to me in the meeting as ammunition for his retaliatory discipline, and someone made a joke about needing to calm Mr. *Jones* down. They were laughing about their own comments and behavior in meetings, as though they had not noticed any unprofessional behavior on my own part at that meeting.

As an argument against mandatory clinical standards in our chaotic prisons, ███████, ███████, and our lawyers repeatedly assert that the purpose of the data remediation process in BRMR is to validate what CDCR is already doing, and that no changes need to be made in this process as long as no specific language in the Program Guide can be found that specifically contradicts how CDCR is measuring compliance. Clinical judgement, they say, determines what is clinically appropriate. Thus, CDCR seems to be fighting the entirely reasonable data remediation processes every step of the way.

See page 1 of attachment 7. As I said earlier, ███████ explicitly says:

> "This stage in the data process is to identify the existing system"

He stresses that the Special Master has in the past *agreed* to the scope of CDCR's data indicators, except for the "technical details", as an attorney put it. He says that changing rules to improve quality of care could happen later, and that there is a change process outside the BRMR meetings, in which that could occur.

139

If ▮▮▮▮▮▮ were speaking accurately and indeed if the Plaintiffs, the OSM, the Court and CDCR had agreed that the purpose of the BRMR meetings was to see whether CDCR's designed measurements were being reliably made, then it would not have been my place to voice substantive disagreements with what the indicator was measuring.

For example, if the OSM, CDCR, and the Plaintiffs had already agreed that patients needing to be in a crisis bed should be seen immediately, but it was acceptable to wait 30 days to see someone referred to the hospital – because that's what was already agreed to and because it was also already agreed that discussions about what an indicator should be measuring were supposed to be had later, but not during BRMR meetings – then it would not have been my place to challenge that at the BRMR meeting.

See attachment 5. Of course it was always argued that we could come up with brand new policies or memos and new indicators later if we wanted, and try to seek approval. But as can be seen, in just trying to get patients mandatorily seen within 30 days of a referral to a hospital, this too is overruled. And see the section above, titled "The data war", detailing the incredible hardships involved with getting our data team and policymakers to be willing to protect our patients by not arbitrarily designing their indicators so that they show high compliance with what is being measured regardless of the quality of the care delivered and about which your team was certainly not informed.

My bringing up data issues in 2017 and 2018 was deemed disruptive, just as was my bringing up similar types of issues in July 2021. ▮▮▮▮▮▮▮▮ threatened me with discipline for discussing these data issues within CDCR, and ▮▮▮▮▮ gave me retaliatory discipline for publicly recognizing that CDCR was once again trying to limit the ability of its own clinicians to point out and eliminate patient-endangering practices exacerbated by its misleading data indicators.

At the July 14th, 2021 BRMR meeting for which I received discipline, I briefly publicly disagreed that our role as clinicians in the BRMR process should merely be physicians

and psychologists helping to assess whether what CDCR stated it was measuring was what it was actually measuring. And before his disciplinary letter and before the July 14th 2021 meeting, ▮▮▮▮▮ had previously said that *it is permissible* to disagree at BRMR meetings, although I had received discipline for writing to the OSM and had been blocked from attending further Telepsychiatry policy discussions because I had agreed with what one of your experts said at a meeting discussing Telepsychiatry policy.

I again am left wondering whether CDCR's attempt to silence me at BRMR meetings, particularly after July 14th, and CDCR's insistence that its old indicators are fine and sometime in the future new indicators can be created, if needed, are really merely additional litigation tactics to evade responsibility for failing to adequately measure the quality of care being delivered in the prison system. That failure results in continued inadequate care for our patients.

Is the purpose of having CDCR clinicians at BRMR meetings to create the semblance of their agreement with the alleged "CDCR consensus clinical opinion" being presented?

## Retaliatory letters and meetings: disciplined for saying during a pre-BRMR meeting that we are not permitted to communicate with the OSM during BRMR meetings

At a subsequent BRMR meeting (on around October 13th 2021), we again discussed the rules relating to the frequency of psychiatric care needed for patients awaiting hospitalization. I politely made the same argument I had made at the July 14th meeting – that it should be mandatory for patients awaiting hospitalization to be seen more frequently. This time Mr. Jones from your team said something like:

> "I agree with Dr. Golding."

141

After that BRMR meeting on or around October 13th 2021, ███████ called me and, alluding to that statement by Mr. Jones, he said jubilantly: "You won!" I interpreted that to mean that ███████ was very pleased that the OSM team seemed to be disagreeing with the CDCR policy that even if a patient needs hospitalization and is awaiting transportation, CDCR should not be mandated to have the patient seen more frequently. (I replied something like: "If anyone 'won', it was our patients.")

But at a Psychiatry team meeting on October 22nd 2021, ███████ was absolutely furious about what had occurred during the October 13th BRMR meeting – so furious that one colleague said: "I have never seen ███████ so angry before!" and another said: "███████ lost his sh[*]t!"

One of the many things ███████ said was that the BRMR meeting is "not a game to win." It is not I who have ever thought patient care a game to "win." (Unlike ███████ ███████, apparently, who praised ███████ highly for waging CDCR's war against the Court's representatives. "He takes their lunch money! And he wins too!" she said, to loud applause from the assembled CDCR leadership crowd. She did catch herself and say that perhaps "win" was the wrong word to have used, but still – that was clearly how she felt.) On the contrary, I myself take my duty of care to patients very seriously indeed. If anyone is treating this as a game to win, it is surely CDCR, with its clinically terrible position that patients awaiting hospitalization do not need to be mandated to be seen more frequently than outpatients are seen.

Were we not operating in the clinically disastrous CDCR system, it would be unnecessary to state such a mandate, because elsewhere, patients needing hospitalization would be immediately sent to the hospital, or they would remain in an emergency room, watched continuously by doctors and nurses until they got there.

To my ear, there is something strategic about CDCR arguing that if the literal words of the Program Guide don't mention that patients need additional care when referred to hospitals, then that requirement is not a relevant part of an existing needed key performance indicator measuring whether we are seeing patients at an adequate minimum frequency.

142

Most clinicians know that more care is needed in situations in which patients need to be in hospitals, so it would seem surprising that amongst a whole group, no one would be willing to say so publicly. But once again like so many other meetings about diverse topics, at this Oct 13th meeting, not one amongst a whole group of clinicians would say something.

See pages 6-7 of attachment 5, and pages 2-3 of attachment 4. Some clinicians do try to do brave things, for example participating in creating a memo that would ensure care for patients referred to the hospital, even though it did not succeed, or trying to respond to the needs of clinicians at Corcoran who were worried about their patients referred to the hospital but with no organized appointments scheduled while they waited.



See page 3 of attachment 73. An hour or so before the October 22nd meeting in which ▮▮▮▮▮ was so angry, in a private supervisory meeting with me, I had said to ▮▮ ▮▮▮▮ that Mr. Jones had publicly said that he agreed with me about the need for additional mandatory care when patients are referred to the hospital. At the time, ▮▮ ▮▮▮▮ seemed calm and pleasant. But about an hour later, during the group team meeting with multiple participants, he said angrily something like or identical to:

> "Can you *imagine* telling your boss that you disagree with him and that the Special Master agrees with him?!"

Concerning our attending BRMR meetings ▮▮▮▮▮▮ said forcefully:

> "I don't need to include *any* of you!"
> [Subtext: keep quiet if you don't want to be excluded from future meetings.]

He also said angrily that he could stop allowing us to attend these meetings "at any time!" In other words, he was clearly threatening not to continue allowing me to attend those meetings with the OSM if I were to continue to state my clinical opinion per my medical duty of care to our patients. This is also when he launched into additional

143

vilification of you and your team. See the section titled "Vilification of the Special Master".

He also baselessly asserted that we as psychiatrists are not experts in the type of analysis needed at BRMR (subtext: so we should stay silent and let the 'experts' handle it). He said our psychologists are very well trained to do exactly what they were doing at the BRMR meeting because they have a PhD, whereas we are mere MDs:

> "have an MD with no specialized training [in using data to answer questions, unlike those with PhD's]"

See attachment 73, my letter to you and your team about the incident described above, and about the general retaliation that was occurring. Deputy Special Master Jones's response was to ask me to call him. As far as I know, your team hoped to meet with ███ ███ and me without attorneys about what I had been sharing with you about retaliation over the last few years. I agreed but Mr. Jones had said ███████ would not meet without CDCR attorneys so your team members, Mr. Jones, Mr. Delugacz, and Dr. Metzner met with me without ████████.

See attachment 74, the email I sent to you and your team before that meeting with Mr. Jones, the Deputy Special Master, Mr. Delugacz, and Dr. Metzner.

See attachment 75. In an email to ████████ following that Psychiatry team meeting on October 22nd, ████████ summarized what she remembered he had said at that Psychiatry team meeting:

> "I did hear you say that the pre-BRMR meetings are the appropriate venue for debating and objecting to items, and that the consensus position will be presented to OSM at BRMR for discussion."

None of the OSM team members attend the pre-BRMR meetings, so disagreeing only at the pre-BRMR meeting allows no opportunity for us to mention to the OSM team any clinical disagreement with CDCR's so-called "consensus clinical opinion," thus

144

potentially giving the misimpression that we agree with the stance CDCR is presenting as the "consensus clinical opinion."

She also said to ▮▮▮▮▮▮:

> "I just wanted to say that I never heard you say during a previous meeting that anyone would be uninvited to meetings if they spoke out or disagreed, or that people weren't allowed to object to anything at BRMR."

▮▮▮▮▮▮▮ was unaware of the context in which ▮▮▮▮▮▮ made those statements, namely that discipline had occurred because of what I said at a BRMR meeting, that letters of discipline had been written to me because I communicated with the Special Master even in writing, and for example she was not aware that I had been disinvited to Telepsych meetings because I had agreed with the Special Master's team about something that ▮▮▮▮▮▮ did not agree with, etc.

▮▮▮▮▮ also said at that October 22nd 2022 meeting that other opportunities for disagreement exist. One can vote against items at the CAPC meeting and one can write to the OSM.

I have pointed out to my team that you and your OSM team will not privately discuss controversial issues with me, and I understand why. That being said, I have occasionally communicated information orally one way (without comment on his part) to Dr. Metzner. And at the pre-BRMR meeting, where CDCR employees are supposed to do their "objecting" (as ▮▮▮▮▮▮ rightly said ▮▮▮▮▮ had said), there is also no interaction with the OSM, because the OSM is not present.

And at the CAPC meeting, where ▮▮▮▮▮ says we have a vote, the OSM is present but not available for interaction, other than saying a word or two or writing a word or two in the chat portion of a video conference screen. Also, at the CAPC meeting, many or now all of the BRMR disagreements are never presented, because these issues will have to be presented at a "dispute resolution conference", which none of our HQ senior psychiatry team can attend and neither can I. Furthermore, entire packages of

145

information about multiple topics have been bundled together for quick votes at CAPC, which do not allow proper analysis and discussion.

Thus ███████ was effectively eliminating all reasonable forums in which one *could* (even briefly) exchange ideas with the OSM experts about data issues affecting patient care.

At the time ███████ said that we could write to the Special Master, it was not clear to me whether he was saying that written objections to CDCR policy at the pre-BRMR meeting (with no OSM present) would be forwarded to the OSM team or not. I understand now he was *not* saying that written objections would be forwarded for further discussion at the BRMR meetings with OSM experts, where the OSM team is present. But he was allowing information to be communicated to the OSM independently, about remaining disagreements or other topics, for example by email. He has certainly said that he would allow private communication before. But as I have demonstrated above, in the sections titled "Retaliatory letters and meetings: disciplined for writing about disappearing appointments" and "Retaliatory letters and meetings: disciplined for writing about staffing issues", he also disciplines me for doing that.

But even if he did welcome us communicating with the OSM by email, that would not solve the problem. The problem is that I am often only hearing about CDCR's clinically unwise positions during the meetings at which ███████ seemed to be saying we should not be speaking, for example when your experts point something out that helps me understand something. So if we do not speak up in those meetings, in some cases it would be too late to raise the issue after the meeting.

See the section titled "Retaliatory letters and meetings: disciplined for disagreeing with a Chief Telepsychiatrist in front of the OSM". Although ███████ did not give me additional discipline for what I said in the October 13th BRMR meeting in which he expressed so much anger about my having voiced my opinion, his previous and subsequent actions and statements made it abundantly clear that he was functionally prohibiting disagreement at meetings in which the Court's experts are present:

1. I had received discipline when I had agreed with the Special Master's experts (disagreeing about a proposed CDCR Telepsychiatry policy) in front of the Special Master,

2. I had received discipline for communicating with the OSM about disappearing appointments,

3. I had been removed from subsequent telepsychiatry policy discussions because I had disagreed publicly with the department in front of the Special Master, and

4. ████████ clearly said that the place for disagreement was in the *pre*-BRMR meetings (i.e., not in the BRMR meetings) and in writing with the OSM, and at CAPC… (see below), and

5. I had disagreed at a BRMR meeting about patients needing to be seen more frequently when awaiting hospitalization and received discipline, and

6. After the second BRMR meeting discussing the same topic, ████████ had become very angry in the internal Psychiatry team meeting, and had "lost his sh[*]t" about that very issue I had been disagreeing about again, and

7. During the same Psychiatry meeting, ████████ warned us that he could "remove any of [us]" from the BRMR meetings "at any time" (the implication being, if we speak up again). And he said: "I don't need to include *any* of you!"

Although all of the above seven statements are correct, ████████ never actually said explicitly: "If you object to departmental policy at the BRMR meeting I will remove you from the meeting." But that was most definitely implied.

During a pre-BRMR meeting on November 16th, 2021, we were discussing a CDCR way of interpreting data that may have created misleading or inaccurate representations of our timely compliance, about using "percent weeks compliance" methodology to measure timeliness of psychiatry and psychology visits. Even CDCR now finally acknowledges this must be changed.

For many years, I argued that using "percent weeks compliance" methodology is not the best way of making measurements.

147

When I said that again to ██████████ in the pre-BRMR meeting on November 16th, 2021, he replied that that was what CDCR was going to present to the Special Master, and he suggested that I raise my disagreement at the upcoming BRMR meeting because there was not time to address my disagreement at this pre-BRMR meeting.

See attachment 76. Given what ██████████ had said at the Psychiatry team meeting on October 22nd 2021 (that it is in the *pre*-BRMR meetings that it is appropriate to raise concerns), I was surprised that ██████████ was making such a suggestion, and I queried that suggestion, mentioning to ██████████ what ██████████ had said. Yet ██████ ██████ later retaliated by giving me a career-ending letter of discipline (a letter of instruction) for having said that to ██████████.

Thus one is disciplined for raising clinically-significant disagreements in certain meetings, and one is disciplined for saying that one is not permitted to express one's disagreements in those meetings.

So at a pre-BRMR meeting on November 16th, 2021, where disagreement was said to be allowed, I had politely disagreed about a policy, the percent-weeks compliance policy mentioned above. ██████████ had said that there was not time to speak about that disagreement in the pre-BRMR meeting, but that I could bring up my disagreements at the upcoming BRMR meeting with the OSM, in which the issue would be discussed. I had politely queried that with him, given that ██████████ had said that we were to raise concerns in the *pre*-BRMR meetings (i.e., not in the BRMR meetings). ██████ ██████████ had disagreed, saying that I must have misheard ██████████ Then ██████████ had joined the meeting. I then pointed out that ██████████ had even suggested that we could even be removed from the BRMR meetings if we expressed our disagreement with departmental policy at the BRMR meeting, and ██████████ reacted furiously in front of everyone at the meeting, saying something very much like or identical to:

> "I strongly object to you saying that I said you can't communicate your disagreement to the Special Master. I did not say that."

148

"The purpose of the BRMR meetings is changing [such that they will just be] for a final check….. of what has been agreed."

██████ seemed to be saying that in the past, controversial issues might have been comprehensively discussed at the BRMR meeting, but moving forward, there would only be a "final check" at BRMR meetings, where CDCR was perhaps presenting just its consensus opinion ("what has been agreed") to the OSM experts. ██████ continued:

"But you are very welcome to put your disagreements in writing for the Special Master."

So ██████ was inviting me to write to the Special Master, but was not saying I could even briefly disagree about a data-related issue at the BRMR meeting, where interaction with the OSM could occur. ██████ again invited disagreement in *pre*-BRMR meetings (with no OSM experts present). He said that:

".... the issues can be discussed fully in the *pre*-meetings"

So ██████ was saying that the place for thorough discussion was at *pre*-BRMR meetings (where no interaction is possible with OSM experts) but he did not confirm what ██████ had suggested is the case, that disagreement is fine during the BRMR meetings too.

"But I NEVER said you can't disagree with departmental policy. I encourage you to fully express your disagreement in writing and in the pre-meetings."

So he was publicly reacting furiously to something I had not said. I had said that he was not permitting oral discussion of differing ideas at the BRMR meetings.

I responded calmly:

"Am I permitted to disagree with departmental policy during the BRMR meetings or not?"

149

█████ said something like:

> "I don't know how I can be ANY MORE CLEAR. The purpose of the BRMR
> meetings is changing, but you are welcome to disagree in the pre-meetings and
> in writing, that the Special Master will see."

█████ seemed to again be reiterating what he had previously said. The purpose of
the BRMR meeting will be a place for "a final check" about "what has already been
agreed" (in other words, no you may not disagree with departmental policy in BRMR
meetings).

So he again did not give a straight answer to the question of would he allow
disagreement at BRMR meetings (for which I had already received one disciplinary
note and remarkable anger when I had disagreed at a subsequent meeting after that).

I was hoping for a brief time to be able to discuss data issues in a forum in which the
OSM team could respond, given that your OSM team (for understandable reasons) will
not discuss controversial issues with me outside such meetings.

So once again, for the second time, █████ was not (publicly) responding to the
substance of what I said, even when asked a direct and simple question. So I calmly
asked a third time:

> "So am I allowed to or not?"

█████ responded, something like or identical to:

> "I think I have been *very clear*."

He then scathingly asked the large gathering of people (maybe 20 or more?)

> "Does anyone want to explain to Michael what I just said?"

150

as if everyone would know the answer to such an utterly stupid question. No one answered.

During the November 16th 2021 pre-BRMR meeting I also said that ███████ ████████ and ████████████ had heard that ████████ had threatened to remove us from the BRMR meeting if we objected at the BRMR meeting, and I asked them to comment. ████████████ felt very uncomfortable to have been put on the spot like that, and I apologized to her for having done so. She did not seem to be aware of the context of all the previous discipline that ████████ had given me for attempting to communicate with you and your team in public. ████████ subsequently used her being uncomfortable to try to accuse me of inappropriately using our HQ senior psychiatry team for nefarious purposes.

So after that meeting I told ████████ that I agreed with her that ████████ had never *explicitly* said that we could not disagree at all: but in my view he very much implied it, had acted on it, and he had disciplined me because I had expressed my concerns in BRMR meetings before and in other meetings with the Special Master, for example the workgroup with your team discussing whether telepsychiatry should operate from home.

Why does the issue of whether CDCR permits us to express our concerns during departmental meetings, and particularly in meetings in which the OSM experts are present, matter?

See the discussion of ████████████'s examination of me in court in the section titled "Are CDCR staff free to talk to the OSM?" CDCR has a history of claiming that people who were at various meetings were *ipso facto* free to speak at those meetings and involved in the decision-making. The attorney cross-examining me in the evidentiary hearing in October 2019 made precisely such an argument. So our silence in meetings signals agreement with whatever CDCR is saying in the meetings, and CDCR evidently feels free to later cite our silence as evidence that we agreed.

See attachment 76. In his December 27th 2021 disciplinary letter of instruction to me, ███
███ said that during the pre-BRMR meeting on or about November 16th 2021, that:

> "you stated falsely that I had told the psychiatrists that if they disagreed about
> data issues, they would not be allowed to attend any further data meetings."

The statement itself is false and straw manning. I was not talking about not being able
to disagree *anywhere*. ███████ had reserved most of his ire for when I was speaking in
front of the Special Master's team. That is why, during the pre-BRMR meeting for which
I received discipline, I specifically mentioned not being allowed to disagree *during the
BRMR meetings,* which take place in front of the OSM and in which an exchange of ideas
could occur.

Some of these issues discussed in BRMR meetings are such that even the OSM data
expert cannot realistically be expected to understand fully in the absence of the clinical
context in which situations arise, or without *a priori* knowing that the computer has
been coded to count things in a particular way.

Here is an example. When could (if ever) a psychiatric consult be also counted as an
initial evaluation of a patient?

See the section titled "Counting all consults as full psychiatry appointments". For many
years, until very recently in fact, CDCR was erroneously counting *all consults* (indeed
virtually *all contacts of any kind* between a psychiatrist or psychologist and patient) as if
they were completed full evaluations that reset the clock.

Though the OSM's experts certainly could appreciate and understand the nuances of
the question, how would they know that the computer has been coded to count
everything as a completed psychiatric assessment of the patient, unless CDCR were
transparent with them or someone else informed them that that is the case? How would
the OSM experts know that virtually every interaction with patients (including brief
cellside visits for med non-adherence appointments) were being coded and counted as

compliant Program Guide psychiatric evaluations, or even initial full psychiatric evaluations, for *years*, contrary to policy?

This occurred until our HQ specialist psychiatry team discovered that that is what CDCR was doing and let the OSM know about it, after the 2019 evidentiary hearing. I do not think you or your experts had any idea that that was the case. Or perhaps after HQ psychiatrists discovered it CDCR did tell the Court and has gone back and corrected all the misleading compliance figures reported to the Court?

███████ was straw manning about what I had said during the pre-BRMR meeting and in his letter of discipline describing the meeting.

And indeed, he did not even mention in his disciplinary letter the very specific question I had asked during that pre-BRMR meeting, about what is permissible at the BRMR meetings – perhaps because doing so would have made clear that his angry response was disingenuously acting as though I had said something I had not said.

See attachment 76. On December 27th 2021, ███████ subjected me to a disciplinary meeting followed up with a disciplinary letter of instruction on the same day. The letter is misleading in not stating that he had been threatening discipline should I disagree with departmental policy in subsequent BRMR meetings, and that the discipline was all about silencing disagreement in meetings at which the OSM experts are present (which really means, in effect, preventing communication with OSM experts that needs to happen per my medical duty of care to our patients).

And again he even misstated what I had said in the disciplinary meeting.

███████ misquoted me as having responded to the alleged "performance issues" as follows:

> "I think that it is something that I do on a regular basis throughout my life to improve my communication style with others…I invariably endeavor to improve

153

my communication style…the department [should change their behavior, and individuals within it were, AM] shaming their medical license."

In fact ████ had specifically asked me how I was going to improve my communications, and I had said that improving communication is something that I have tried to do throughout my life, something that we all should try to improve.

Saying that I will be "improving communications" was not, as he suggested, in response to alleged "performance issues", as if I were agreeing that there actually were performance issues that required my improving my communications.

I also said something to the effect that *he* and the department were debasing the medical license, and allowing harm to come to patients by his tactics.

But in his disciplinary letter to me he chose not to mention how I had actually responded in the disciplinary meeting.

Moreover, ████ stated in his letter of discipline that I conducted myself in an

"unprofessional and discourteous manner"

and that

"you are expected to exercise professional judgement at your management level and understand the difference between respectfully disagreeing and being unprofessionally combative."

This latter statement particularly seemed problematic to me because I had felt calm and had been speaking politely at the pre-BRMR meeting on November 16th 2021, while ████ ████ himself had seemed extremely angry, evasive and unprofessional in his demeanor.

154

████████'s disingenuous non-answers to my simple question in that meeting in some ways speak for themselves.

See attachment 77. I quote my administrative assistant who was at that meeting:

"Hi Dr. Golding,

As you requested, I am documenting how I felt after sitting in a BRMR type meeting in mid-November [it was a pre-BRMR meeting in 2021, MG]. My apologies for taking forever to do so, but this kept falling to the bottom of my priority list and I'm quite busy these days.

I recall speaking with you one afternoon after the meeting. In the meeting, you had been speaking to ████████ regarding ████████, stating you could not disagree with CDCR while in the meeting. ████████ stated ████████ would not have said that, and then almost immediately after that, ████████ appeared in the meeting. He had not been on the line previously. ████████ explained that you could write a letter to the Special Master or disagree at any of the pre meetings and then you asked again if you could disagree in a BRMR meeting....silence....and then ████████ shared that he was being very clear and that he didn't know how else to explain it to you. The next thing he did, was shocking to me, and it felt very uncomfortable and rude at the time. ████████ asked the group in what sounded like a very condescending tone, if anyone could explain this better to Michael. No one dared to speak up. The strange think to me was, it wasn't clear to me if you could disagree in a BRMR meeting or not and I wondered why ████████ didn't just answer you with a simple yes or no.

Also, I wanted to note, that you shared with me, there was communication that you had been disrespectful. I'm sorry but I've been in several meetings with you and you have never been rude, disrespectful or uncourteous. The meeting where this uncomfortable incident occurred, may have pushed some folks to react, however you handled it with dignity and respect, all while being put on blast by ████████. I clearly remember this because I spoke to you after the meeting and

shared with you how impressed I was that you had remained so composed. I was not sure that I would have been able to do the same."

See attachment 78, an email sent on December 1st 2021 in response to a November 19th meeting. On November 19th 2021, ██████████ held a disciplinary meeting with me about the events of November 16th 2021, that ██████████ described in her message above. Present at the disciplinary meeting was ██████████, who was ██████████ ██████████ ██████████ brought in to supervise me and help ██████████ take over some of the psychiatric supervisory authority that ██████████ had taken from me when he demoted me.

During the meeting, ██████████ made a litany of complaints attacking my integrity and character. ██████████ was shaking his head and contemptuously rolling his eyes to indicate his disapproval of me based on what ██████████ was falsely alleging about me. Then ██████████ and he conferred together about me in my presence as though they were conferring about a psychiatric patient who was not present, with ██████████ further humiliating me by telling ██████████ that I lack "insight", using the psychiatric clinical term used to describe someone who is psychiatrically ill and unaware of the fact. Thus ██████████ was highly unprofessionally gaslighting me in addition to subjecting me to humiliation.

See attachment 78, my email communication about our meeting.

"No doubt ██████████ would innocently like to join us and help. But his extensive eye-rolling and head shaking as you were disciplining me demonstrates that he has implicitly understood the cultural message, probably without needing to be told. If he wants to be the Assistant Deputy Director, and or just gain approval from upper level management, he needs to distance himself from me."

See page 1 of attachment 76. In his disciplinary notice of December 27th 2021, ██████████ responded to the letter that I had written on December 1st.

156



> "Several days after our November 19th meeting about the need for you to communicate professionally, you sent an unprofessional and disrespectful email that disparaged your supervisor, ███████████████. In addition to making comments denigrating ███████'s integrity, honesty, and professionalism, you inaccurately described ███████ as exhibiting extensive eye rolling and head shaking during the meeting we had with you on November 19, 2021. You assumed that ███████ had unprofessional or biased views, and did not seek to confirm your incorrect assumptions about ███████'s opinion of what we discussed at our November 19th meeting (the need for you to communicate professionally in the workplace) […]"

This November 19th meeting happened in the context of abuse, demotion, and previous disciplinary action, as documented extensively above. In this message, ███████ seems to be saying to me that I should have asked ███████ why he was shaking his head and rolling his eyes or perhaps whether my eyes were deceiving me that he was. In the context of being abused by ███████ in a meeting, while also previously experiencing significant demotion and abuse over several years, asking ███████ and the supervisor participating in this humiliation session for clarification about the nature of various aspects and manifestations of the abuse and particularly whether it is occurring, is not productive.

See attachment 79. Below is a further twist on that. As we have seen, ███████ did not give a straight answer to my question during the pre-BRMR meeting on November 16th 2021, about whether CDCR considers it permissible for us to speak to the OSM during the BRMR meeting. As of February 2nd 2022, he still had not given a straight answer to that question, so I emailed him to seek clarification again, this time Cc:ing the OSM.

See page 4 of attachment 79. In his reply dated February 9th 2022, ███████ astonishingly wrote:

> "I'll note that you did not reach out to me for clarification before sending this, and you included OSM folks in your initial email requesting clarification"

157

That is far from the truth, as he very well knows and as the above previous discussions document, I was *once again* asking him whether it is permissible to disagree with departmental policy in front of the OSM experts at the BRMR meeting, because he still had not given a straight answer.

See page 5 of attachment 79. In my February 2nd 2022 message, I asked him to clarify whether:

> "I or someone else could gently orally communicate *during the BRMR meeting* that an implication of a CDCR proposed measurement system is not being considered"

I was asking this question again because Dr. Potter, your data expert, had said at a BRMR meeting that during the meeting it could provide opportunities for suggestions from both sides that would allow:

> "on the fly improvements."

Here is the paragraph in which I asked that question:

> "Dr. Potter said we will want to have a conversation during BRMR ('on the fly improvements'). I am interpreting that to mean and hoping that it means (but could be mistaken) that I or someone else could gently orally communicate *during the BRMR meeting* that an implication of a CDCR proposed measurement system is not being considered (even if the person making the comment is mistaken and CDCR ultimately has a better interpretation). Sometimes, the OSM may well say something during BRMR that would best be orally answered by a non-executive (for example a member of the psychiatry team) and that comment could help make an 'on the fly improvement' and thus should occur. Do you agree?"

So I had asked the question explicitly again, this time in writing, about whether we may gently disagree with departmental policy at BRMR meetings; and, when he once again

158

did not answer the above question. I asked him again in my email of February 10th 2022, so now I had asked him perhaps for the fifth or sixth time.

> "I have asked repeatedly whether during the BRMR meetings, if I or a member of the psychiatry team are permitted to voice disagreements with CDCR suggestions, for example as stated by ███████████ at [pre-, MG] BRMR. Because in those contexts, our responses can lead to helpful interaction with the OSM. You have not seemed to answer..."

And I said to ███████████:

> 1.  If we can't let our continued disagreements be known in writing in a document that is being reviewed at BRMR and forwarded on the OSM in the document as a compendium, AND
> 2.  We can't speak at BRMR to let the OSM know there is disagreement, THEN, you have stopped our ability to interact with the OSM (and receive "on the fly" responses) about data issues of major importance to patient care.

See page 1 of attachment 79. After these multiple tries, and while responding in front of the OSM, and while he was falsely telling the OSM that I had not asked the question before and chiding me for having written to the OSM (again), ███████████ replied in an email of February 24th 2022:

> **"An oversimplified yes or no answer to your question would be misleading, as it would not be representative of the opportunities you and others have in our process.**"

And then he listed three opportunities:

> 1)  You may bring up further issues for discussion at CAPC, where the whole team votes on approval or disapproval of the item with OSM present.

159

2) You may submit an IT ticket and work with MH QM, as has always been the process; that option continues to be available to you and everyone else in the department, should you choose to use it.

3) You may express your views next time the indicator is discussed, […]

But in none of those "opportunities" (or meetings or processes) that he mentions is there an opportunity to interact with the Special Master team about data-related issues relevant to the data remediation process. This is not a matter of mere disagreements about numbers; some of these data problems have huge effects in terms of the care or lack thereof that our patients receive.

It is not clear what an "oversimplified yes or no" answer means in this context, except that concretely he was offering opportunities (again) to communicate with the OSM when there could be no interactions with the OSM team.

160

# The chilling effect of the CDCR war against the Court and the OSM on staff members' willingness to raise and solve problems to improve patient care

We have seen, for example in the section titled "Retaliatory letters and meetings: disciplined for saying that patients referred to acute or intermediate hospital should be mandatorily seen more frequently than every 10 or 30 days respectively", that in the toxic war CDCR seems to be hellbent on waging against you, your team and the Court, clinicians dare not express dissent even when CDCR's so-called "consensus clinical opinion" is clinically untenable.

We have seen how those in charge of CDCR, including ███████████ herself, let it be known that we are at war with the Court and the OSM, and that those willing to fight and win against the enemy are to be praised, and I have shown that those who take their medical duty of care to our patients seriously and thus cooperate with you, are relentlessly retaliated against.

If one can severely demote and punish those who might disagree with CDCR policy, most clinicians will not be willing to disagree with CDCR, even when there is a very problematic issue that affects our patients. Many will simply leave. And have.

But the retaliation does not have to be direct, immediate, or large. For clinicians looking for comfortable long-term careers, not being a "team player", not going along with the consensus, is enough to miss out on being invited to important meetings, and subtly losing out on promotion opportunities.

161

I have reported examples above of inappropriate data collection analysis processes that, though supported by our attorneys, our clinicians very well know are problematic, yet they are prevented from organizing to fix these issues or even publicly speaking about them in your presence. And most don't want to. For example, they know that patients referred to the hospital from a partial hospital or day treatment setting (EOP) or outpatient setting (CCC) should be mandatorily seen by a psychiatrist sooner than in one month in a system that is chaotic and in which patients are not being monitored properly.

And yet, as reported above, in public meetings not a single clinician who was part of the data groups reviewing this would say anything about a psychiatrist not being mandated to see the patient within 30 days when referred to the hospital. Nor would they suggest that we urgently try to develop new policy; nor did they in any way object to something that they know violates their most basic clinical oath to patients and just basic common sense.

Some psychiatrists will quietly tell me they disagree with CDCR about such issues and no doubt there are psychologists as well, but few to no leaders in HQ will say anything publicly or even otherwise raise such issues internally with CDCR (and if I make the mistake of mentioning that they have said something to me, they are often upset and even deny having said what they said to me, so it is not that they are telling me so that I myself will raise the issue with our executives).

See pages 6-7 of attachment 5. When the Court's representatives are not present, some brave clinicians will propose changes to protect patients. In the attached proposed memo, several of our psychiatrists tried to propose a memo which would ensure that patients referred to the acute hospital can only be housed in a crisis bed or an intermediate unit (where they will get frequent care) and if patients are referred to the intermediate hospital they will be seen in CCC or EOP areas more frequently.

See pages 2-3 of attachment 4, in which ███████████ and ███████████ were trying to figure out, as best they could, how they might be able to get patients mandatorily seen

162

by clinicians and psychiatrists when they are referred from a segregation unit to the intermediate hospital.

How to explain our clinicians' silence? Fear of retaliation or subtle retaliation can explain it, but it also cannot be the only factor or even a factor in certain circumstances, because clinicians often seem to also say they think they are doing the *right thing* when they are in fact withholding information or failing to fix policies that on some level they know are patient-endangering and wrong.

This also requires explanation. If, as CDCR portrays, the OSM is perceived to be *not* working to further the interests of our patients, then clinicians not wanting to cooperate with you except in minimally mandatory ways would make sense. I think that HQ clinicians would try to actively partner with you if they were not fearful of retaliation and in some cases unsure that you are trying to help our patients.

# Conclusion

I have shown how, as part of its war against you, CDCR has retaliated against me in multiple ways, ruining my reputation and my future career prospects, and how this war is impeding improvement in our system by silencing staff who would otherwise raise and solve problems in the system, which ultimately harms our patients. It seems to me that CDCR's war against you puts you too in an invidious position, in that you are trying to fix the system with CDCR running interference and fighting you all the way.

CDCR has a number of techniques for silencing dissent, as I have shown, including: retaliatory discipline for those who say something; vilifying you, the Special Master, so that clinicians don't want to cooperate with you; telling clinicians that you have already agreed to all but the "technical details" of our measurement indicators; not telling the staff the truth about the purpose of the data remediation process; and simply telling clinicians that the appropriate time to make substantive changes is in the future. The vast majority of CDCR staff do not even seem to be aware that CDCR lost the lawsuit and that we are supposed to be in the remediation phase resulting from that loss. They appear never to have been told that CDCR was found to be failing to provide the care our patients have a constitutional right to.

As we have seen, CDCR utilizes carrots, sticks, interference and subterfuge to create a culture in which staff get the message that CDCR is at war with you and the Court.

In 2018 and 2019, CDCR attorneys and executive leadership dismissed the Golding Report as baseless on the grounds that the OSM was (they alleged) fully aware of every significant detail of our data analysis system. These leaders continue to dismiss the implications of Judge Mueller's ruling on the Golding Report. Despite what Judge Mueller said in the evidentiary hearing, CDCR leaders continue to openly assert to our

clinicians that you and your team have always understood what CDCR was (and is) measuring. Thus the fact that you say you did not know is in effect presented as you being misleading, rather than CDCR.

You may recall that in 2018, when I was asking to help fix our misleading data indicators, CDCR found that disruptive to its processes because they were working on the Psychiatry staffing plan, and ████████████ threatened me with discipline, no doubt being fully aware that no one would have agreed to the cuts in psychiatric staffing called for in that plan had the data indicators been correctly measuring the lack of care that was in fact the case.

CDCR's insistence that the Special Master knew all along also gives our clinicians the impression that you are moving the goal posts, and that trying to fix our system is thus futile. Why should they change something as suggested by your experts, if after they do so you can simply ask them to change it yet again?

And because CDCR's retaliation against me (and others) has so far seemed unfettered, what HQ clinician-leader would ever try to help our patients in CDCR by reporting about dangerous practices now, knowing that their career and their future will be summarily ended with no consequence to those responsible? Why should they risk cooperation with you? And why would they want to participate and cooperate with you in any court-ordered process, for example the UNA process, given how their leadership vilifies and maligns you and what you are trying to do?

CDCR leaders have not just gotten away with hurting me or criticizing the Court. Their seemingly unfettered ability to mislead hurts our patients: it interferes with the entire court-ordered remediation process, with the result that the system is still failing to ensure that our patients get the care they need.

Those in charge of CDCR continue along this path by promoting to executive leadership positions those who are willing to challenge your credibility and "take… [your] lunch money." And who among the staff would dare go against ████████████ herself, who so clearly values ████████ precisely for his willingness to fight you? ("And he *wins* too!")

165

If CDCR clinicians were able to cooperate with you, the misleading indicators would be easy to correct. Even if there were hundreds of them, a willing and cooperative group of knowledgeable clinicians could help you quickly sort through what we should be measuring to help determine whether adequate care is occurring. But in a CDCR culture in which clinicians are being misled into not cooperating, that does not happen and is not happening. Indeed, to the extent that our clinicians believe the disinformation fed them by our executive leadership, they will continue to remain silent rather than cooperating with you, even when they know there are system-wide problems that endanger our patients. And the CDCR answer is that problems can always be fixed later.

CDCR is able to fight a war of attrition because its leadership has not been effectively held accountable for its actions, retaliation happens without consequence, and perhaps most critically, our clinicians don't understand why you and the Court are doing what you are doing.

I don't know what is legally possible. But CDCR linestaff clinicians and mid-level managers, for example at HQ, need to know why you are taking the actions you are taking, preferably every step of the way. When the citizens of even totalitarian regimes easily get access to different information, totalitarian leaders find it far harder to maintain their grip on power.

Information from the Court is known by almost none of the staff. Why are we doing UNA? What has the Court found about CDCR and its existing sustainability process and why it might not work? Why is the sustainability process unsustainable? Is the Special Master aware that there are Psychology staffing shortages in our prisons and are you trying to encourage CDCR to fix that? How? Why are we having investigations and needing data remediation? Why are we closing units like L1 at CMF that were taking care of our patients? Why do we need licensed hospital units as opposed to unlicensed units?

166

Our clinicians see these court-ordered process as inconveniences and hardships. They seem to see psychology staffing shortages, for example, as something the court representatives don't care about, because what you are actually trying to do has not been communicated to them. They have no idea you are trying to help. No wonder everyone applauded when ███████████ enthused that ██████████ "takes [your] lunch money!" They do not appreciate the massive work that you have done over the years or what you are trying to do.

Using triage plans is a signal that inadequate staffing is having a terrible effect on our ability to care for patients. In addition, as mentioned earlier, our quality indicators on average fall when we implement them, because we virtually have to stop seeing those who are less sick to protect the lives of the sick. Higher level CDCR executives know that if you knew the dire effect of inadequate staff on actual clinical care, because it was easily visible in dramatically decreased compliance metrics, you would have more evidence to advocate for more staff or higher salaries to attract staff, as well as other solutions that would help our patients – yet they somehow manage to make you the bad guy, and many of our staff buy that disinformation. No wonder ██████████'s secret approval of triage plans is seen as subversive and brave, as opposed to CDCR being cowardly for its willingness to punish those who would reveal that such plans are needed because our staffing, particularly psychology staffing at this time, is so minimal in many of our institutions.

We need your and the Court's version of this story, protection for those who would be brave, consequences for those who lie, and I respectfully request that CDCR's retaliation including all the retaliatory demotions not be allowed to stand.

Thank you for your consideration.

Michael Golding, M.D.

167

# Addendum

See attachment 80. This email shows clearly that ███████████ is asking me whether we can assign telepsychiatrists to help at CHCF when there were shortages of psychiatrists at CHCF. She asks me, "Can we do that?" Because I was the clinical supervisor of the telepsychiatrists, I could let her know whether I judged that we had sufficient telepsychiatrists to change where they provide service. But in this case I thought that the solution to the problem she was asking about did not involve utilizing telepsychiatrists. Rather, the solution was to assign Licensed Psychologists to the crisis bed and to assign unlicensed psychologists to less challenging patients.

See attachment 81. In this email I am able to direct the psychiatrists at CHCF (saying that they are not to supervise unlicensed psychologists), because as the Statewide Chief Psychiatrist, I was the psychiatrists' clinical supervisor.

See attachment 82. Please note that institutional ███████████ ███████ tells her CEO that I gave a "directive" to her, which I could do because I was recognized by the Chief Psychiatrists as their clinical supervisor.

See attachment 83. In this email I tell ███████████, the ███████████████████ ███████, and ███████, the ███████████████████████████, about a dangerous situation.

> "An absence of licensed psychologists willing to work in the crisis beds has precipitated a situation in which the psychology supervisors are trying to force the psychiatrists to sign orders in crisis beds, written by unlicensed psychologists, about patients whom the psychiatrists do not know. Obviously this is illegal and I put a stop to it, today, by utilizing significant persuasion."

I could put a stop to this highly dangerous (and I thought) illegal activity, because I was recognized as the Statewide Chief Psychiatrist, and I was supposed to be responsible for statewide psychiatric clinical practice, though without anywhere near the staff to accomplish that efficiently.

See attachment 84. In this email, ████████████████████████ is asking me, as the Statewide Chief Psychiatrist directing and managing the Statewide Psychiatry program, what my preference is for what telepsychiatrists should do at night in terms of the CIT team. I was the one asked questions about what should happen with telepsychiatrists, because I supervised the Telepsychiatry program.

Please see the email on page 3 of attachment 84, dated Feb 28, 2019 at 8:52 PM. The ████████████████████████, ████████████, describes my decision to utilize evening telepsychiatry for crisis situations (when patients can be brought into a confidential TTA setting) as a "directive" to staff. I could give these directives because I was the Statewide Chief Psychiatrist, and clinically supervised the local psychiatrists. See page 2 of attachment 84 – the reply from the ████ ████████████ ), who responds to my directive by saying, "This is good news". The CEO's also recognized that I was the clinical supervisor of the psychiatrists, statewide.

Now that I have been demoted the above decisions are no longer deemed to be mine to make. Nor could I given any of the above directives now, because I have been demoted by ████████, ████████ and ████████ .

attachment 1

**Golding, Michael@CDCR**

| | |
|---|---|
| **From:** | Golding, Michael@CDCR <michael.golding@cdcr.ca.gov> |
| **Sent:** | Wednesday, April 12, 2017 3:51 PM |
| **To:** | Golding, Michael@CDCR |
| **Subject:** | New EOP Psychiatry Compliance Rules |

**CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

New EOP Psychiatry Compliance Rules

Hi,

Welcome back from vacation.

I know ▮▮▮▮▮▮▮ feel busy with many projects, but I think these are important
Short version: I will speak with ▮▮▮ also. Could you speak with ▮▮▮ and ask her to ask ▮▮▮▮▮▮ to have the computer

1. Calculate the Psychiatry EOP compliance rate using the court-agreed 30-day rule, rather than 45-days
2. Calculate this for SAC and CHCF's EOP population, independent of the CCC, so we can get a sense how they are doing. If he can do it for all EOP populations in the state, we might see actual variability (where some places do better than others).

I need this data to correctly allocate resources.
My request: I will speak with ▮▮▮. Can you also mention to ▮▮▮ that it would be good if she would ask ▮▮▮ to do this in a somewhat timely manner.

Details:
In morning meetings I have been told repeatedly and consistently by ▮▮▮▮▮▮ and ▮▮▮ that psychiatric compliance with timely patient visits is excellent, which surprised me because psychiatrists keep telling me all the time they are short-staffed and not able to meet the mandates! Something just did not make sense so I started to look into it.

1. The program guide says that EOP patients should be seen by psychiatrists within one month of their last visit to be compliant. But currently a person can be seen by psychiatry nearly 2-months after an appointment and that is considered compliant. ▮▮▮▮ provided an example of that publicly to ▮▮▮▮▮ who admitted it looked odd. For example, if a patient were seen on 12/2/16 and then on 1/31/17, that would be considered compliant with monthly EOP visits. That does not pass the sniff test.
2. Given that I believe (?) this errant calculation-algorithm was used to provide numbers to the court, the numbers we gave the court about psychiatric timely compliance are likely wrong.
3. ▮▮▮ is going to fix the EOP 2-month logic, as ▮▮▮ was able to publicly demonstrate to him that the calculation was mistaken, no doubt a "bug" in the program.
4. ▮▮▮ now says that he is going to return to the 45-day logic from the 2-month logic, but that is not the 30-day logic which appears to be mandated by the court. The change to 45-days from 30-days, I gather, was made last December 2016, prior to giving the court the numbers. I will also speak with ▮▮▮

Of slightly more concern, I asked ▮▮▮ to do a calculation (using what the court says, using 30-days, not 45-days) at CHCF and SAC to get a sense of how far psychiatrists are behind at those institutions. I actually need that for clinical reasons, regardless of what numbers we are showing the court. We need to know about timely EOP visits in the EOP population.

1

We make clinical decisions about allocation of resources based on that kind of information. Unfortunately ▮▮▮ said that he had a long list of requests to take care of and perhaps did not see this as a priority, although I can't really be sure what he was thinking.

My request: I will speak with ▮▮▮. Can you also mention to ▮▮▮ that it would be good if she and ▮▮▮ could help us.


Best,
Michael




**Michael Golding, M.D.**
Statewide Chief Psychiatrist
Mental Health Support Program
California Department of Corrections and Rehabilitation

Phone: 916.662.6541
Email: michael.golding@cdcr.ca.gov



Learn easy ways to save water
during California's drought at
SaveOurWater.com

**From:** ▮▮▮▮▮▮▮▮▮▮▮▮
**Sent:** Wednesday, April 12, 2017 1:16 PM
**To:** Golding, Michael@CDCR
**Subject:** New EOP compliance rules

Hi Dr. Golding,

I have been reviewing Dashboard Psychiatrist Contact Timeframes compliance data, and ran across something that I thought would be of interest. As previously discussed, the EOP follow-up appointment timeframe was changed in December to "within 45 days or within one calendar month of the previous contact, whichever is shorter", rather than 30 days. I discovered in Dashboard that this means if someone is seen by the end of the following month, they are considered compliant. For example:

Patient A is seen 12/2/16 for a routine EOP psychiatry appointment. Current Due Dates states his next appointment is due by 1/16/17 (45 days later). The compliance checks are done every Sunday, so on 1/1/17, 1/8/17, 1/15/17, 1/22/17,

and 1/29/17 the program checks to see if the psychiatry contact timeframe is still within compliance. Since the next appointment is due 1/16/17, the compliance checks on 1/1, 1/8, and 1/15 all state "Yes" for compliance. However, the compliance checks on 1/22 and 1/29 also state "Yes" for compliance, because it is not yet the end of "one calendar month", if you interpret that to mean the entire month of January. This means the compliance for this EOP patient would be 100%, despite going almost 2 months (from 12/2/16 to 1/31/17) without being seen by psychiatry.

Further, let's say this patient was seen on 12/2/16, and his next appointment was not until 2/3/17. The weekly compliance checks in December and January would all state "Yes" for compliance. The first compliance check in February is on Sunday, 2/5/17, so all of the weekly compliance checks in February and March will state "Yes" for compliance because they'll see he was seen on 2/3/17. This EOP patient was seen twice in four months, yet is listed as 100% compliant for all of those months.

Last note, since compliance is checked weekly, the longer you can stretch that compliance interval, the less impact being out of compliance will have. If you use a strict 30 day deadline, and are late in seeing the patient by 1 week, your compliance percentage will be 4/5 = **80%** (because you have 4 weeks of compliance, and 1 of non-compliance). If you stretch the interval of compliance to almost two months (e.g. from 12/2/16 to 1/31/17) like the compliance reports are currently doing, and again are late in seeing the patient by 1 week, your compliance percentage is now 9/10 = **90%** (because you have 9 weeks of compliance, and 1 of non-compliance).

Hopefully this all makes sense. I attached a compliance report for one of the yards at CHCF for the month of January, and highlighted the relevant entries to help clarify the above. Let me know if you have any questions.

███████████████

Elk Grove - Headquarters

California Department of Corrections and Rehabilitation

██████████

Cell phone: ████████████

attachment 2

**Golding, Michael@CDCR**

| | |
|---|---|
| **From:** | ████████████████████████████ |
| **Sent:** | Wednesday, April 25, 2018 5:15 PM |
| **To:** | Golding, Michael@CDCR |
| **Subject:** | Recollections of the meetings |

**CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Hi Michael,

I was in two meetings that were rather difficult. These are my general recollections.

1) Our first meeting was on April 19, 2018, attended by in the room: myself, yourself, ████████ and ████████████ and ████████ were on the conference line. ████████ was invited but was not present.

This meeting started with you voicing a concern that the Psychiatry EOP data had the compliance timeframes extended. You had pointed out this was discovered by your staff at the time, and recounted it was discussed at that time with the data team and the measure was reverted back. You voiced concern about how this change could have occurred. You spoke about the importance of data and reporting integrity. ████████ was engaged in the discussion, up until a point at which I believe she perceived you had accused her of fraudulently manipulating the data, but you did not make any such accusation. At that point, she started to raise her voice, used some colorful language, and indicated she could not work with you. She then left the meeting and also left the meeting room door open. No one else raised their voice. The rest of the participants sat quietly for a few seconds, and were not sure how or whether to proceed. I then asked ████████ if there were ways to make the data more precise, to which he indicated there were. At that time, ████████ indicated he felt the meeting was over, and all parties agreed and ended the meeting. ████████ did later come to my office in which you were in at the time, and apologized for the outburst.

2) Our second meeting was on April 23, 2018, attended by all participants present in the room: myself, yourself, ████████████, ████████████, ████████ and ████████. All invitees attended.

This meeting started with ████████ expressing her concern about the events of the meeting on April 19, 2018, and expressing her frustration with all participants. She expressed the importance of leaders being role models, and the importance of cooperation. ████████ had brought handouts to discuss the data collection methods with regard to measuring compliance in recurring treatment timeframes. You apologized for anything you said that might have been hurtful to her. You made clear you find her to be a person of high integrity, and provided an example that if you gave her a certain amount of money, in a number of years that same amount of money would be returned to you intact. In that meeting you were asked to again discuss not only what you perceived happened in the meeting, but what your data concerns were. You indicated you had proof that an EOP measure had changed which may result in different interpretations with regard to psychiatry access, staffing and patient care. You expressed concern about how the data was being presented. You attempted to provide an analogy of data interpretation, which was not well received. All those involved were allowed time to offer their thoughts on the matter. At some point it became clear the desired result from the meeting was not achieved, at which time ████████ changed the tone of the meeting and indicated the progressive discipline steps that would be forthcoming if any similar incident occurred. We were also informed a CDCR staff member would be assisting us in teambuilding in the coming weeks, and of an off-site team building event to be planned as well.

Thank you,



Statewide Telepsychiatry Program
Mental Health Support Program
Elk Grove - Headquarters
California Correctional Health Care Services
California Department of Corrections and Rehabilitation



HEALTH CARE SERVICES



**Save Our Water**

Learn easy ways to save water
during California's drought at
SaveOurWater.com

**IMPORTANT WARNING:   This message is intended for the use of the person or entity to which it is addressed and may contain information that is privileged and confidential, the disclosure of which is governed by applicable law.  If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this information is STRICTLY PROHIBITED.  If you have received this message by error, please notify us immediately and destroy the related message.  You, the recipient are obligated to maintain it in a safe, secure and confidential manner.  Re-disclosure without appropriate patient consent or as permitted by law is prohibited.  Unauthorized disclosure or failure to maintain confidentiality could subject you to penalties described in Federal and State Law.**

attachment 3

1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   RALPH COLEMAN, et al.,                    No.  2:90-cv-0520 KJM DB P

12              Plaintiffs,

13        v.                                   <u>ORDER</u>

14   GAVIN NEWSOM, et al.,

15              Defendants.

16

17

18              As set by court order, the court held a focused evidentiary hearing on October 15

19   and 16, 2019, to address unresolved issues the court identified after reviewing Dr. Golding's

20   whistleblower report and the court's neutral expert's investigation into Dr. Golding's allegations.

21   *See* ECF Nos. 6242, 6288.  The court heard closing arguments from the parties on October 22,

22   2019.  In addition, as authorized by the court, Dr. Golding filed a written closing argument.  ECF

23   No. 6362.  On October 23, 2019, the court provided an oral pronouncement of its findings and

24   conclusions in open court.  Reporter's Transcript of Proceedings (10/23/19 RT), ECF No. 6380.

25   Those findings and conclusions, with record support, are memorialized in this order.

26

27

28

                                          1

I.  <u>INTRODUCTION</u>

    In 1995, the court found "the California Department of Corrections . . . significantly and chronically understaffed in the area of mental health care services. . . . [It] does not have sufficient staff to treat large numbers of mentally ill inmates in its custody." *Coleman v. Wilson*, 912 F.Supp. 1282, 1307 (E.D. Cal. 1995).  In 2011, the United States Supreme Court observed that the record before that Court supported the conclusion "that the prison system remained chronically understaffed through trial [before a three-judge court] in 2008." *Brown v. Plata*, 563 U.S. 493, 528 (2011).[1]  In October 2017, after more than two decades of remedial effort, this court issued an order requiring defendants to come into complete compliance with the staffing ratios in their 2009 Staffing Plan, ECF No. 3693, and the maximum ten percent staffing vacancy rate required by the court's June 13, 2002 order, ECF No. 1383, with compliance to be achieved by October 2018.  ECF No. 5711 at 30.[2]

    In its October 2017 order, the court included a lengthy discussion of defendants' request, made in a March 30, 2017 filing, *see* ECF No. 5591 at 4, for the court "to revisit the existing staffing ratios for psychiatrists." *Id*. at 12-20.[3]  The court made clear  defendants faced a

---

[1] *Brown v. Plata* is a decision by the United States Supreme court "on appeal . . . from a three-judge District Court order . . . applicable to both" this action and to *Plata v. Brown*, Case No. C01-1351 JST (N.D.Cal.).  *Brown*, 563 U.S. at 499-500.

[2] With the exception of citations to page numbers in Reporter's Transcripts of Proceedings and the deposition transcript of Dr. Kevin Kuich, references to page numbers in documents filed in the court's Electronic Case Filing (ECF) system are to the page number assigned by the ECF system and located in the upper right hand corner of the page.

[3] Defendants' March 30, 2017 filing, ECF No. 5591, was in response to the Special Master's Report on the Status of Mental Health Staffing and the Implementation of Defendants' Staffing Plan (hereafter Special Master's Staffing Report).  As noted, the court discussed it extensively in its October 10, 2017 order, ECF No. 5711.  It is one of the filings that has now, belatedly, been corrected by defendants as a result of the proceedings occasioned by the Golding Report.  *See* ECF No. 6302.  Although the Golding Report was issued in October 2018, and the Neutral Expert Report on issues raised by the Golding Report, ECF No. 6147, was issued in April 2019, defendants did not agree to correct this pleading until a meet and confer process required by court order and conducted by the parties in June and July 2019, *see* ECF No. 6187 at 2; the joint status report that followed that meet and confer process included defendants' agreement to correct the pleading, *see* ECF No. 6302 at 2 (citing ECF No. 6226 at 30).  Moreover, although the court does not in this order make specific findings about the adequacy of defendants' corrections, it

1    "heavy burden" in attempting to persuade the court those ratios should be revisited.  *Id.* at 14, 18-

2    19.  The court noted defendants' request could "only be construed as a request to increase the

3    existing caseload of prison psychiatrists" and that there was "scant evidence in the record to

4    suggest this change would advance remediation of the Eighth Amendment violation in this case;

5    rather there is strong evidence that such a change would slow progress toward the end of federal

6    court oversight."  *Id.* at 19.  Nonetheless, the court granted defendants limited leave to explore its

7    request, deciding "not to preclude defendants from raising with the Special Master the issue of

8    whether full implementation of the PMA [psychiatric medical assistant] program supports a

9    change in the staffing ratios for psychiatrists."  *Id.*  The court limited its permission because the

10   record did not support a more extensive revisiting of the 2009 Staffing Plan and the time for

11   defendants' compliance with the Plan was past due.  As of this writing, the record still does not

12   support a more extensive review, and the time for compliance is even more seriously past due.

13           For the year following the court's October 2017 order, the parties, supervised by

14   the Special Master, engaged in extensive negotiations over issues related to staffing compliance.

15   Ultimately, defendants presented to plaintiffs and the Special Master a staffing proposal that

16   would have cut by approximately twenty percent the total number of line psychiatry staff

17   positions allocated throughout the prison system.  *See* Reporter's Transcript of Proceedings,

18   October 15, 2019 (10/15/19 RT), ECF No. 6377, at 52:9-18.[4]  Plaintiffs were poised to accept the

19   proposal.  Before they did, however, on October 3, 2018, Dr. Michael Golding, Chief Psychiatrist

20

21   does note that defendants have replaced a chart attached as Exhibit 2 to the Tebrock Declaration,
     ECF No. 5591-2, and have corrected two lines of ECF No. 5591.  *See* ECF No. 6302 at  2-3.
22   They have not, however, revised the statements in the Tebrock Declaration that describe Exhibit
     2, *see* ECF No. 5591-2 ¶ 8, nor have they revisited the more general conclusion in the Tebrock
23   Declaration that relied on the now-corrected chart, asserted in their response to the Special
     Master's Staffing Report, that "CDCR clinicians, and particularly its psychiatrists, provide quality
24   treatment at very high compliance rates despite the current staffing vacancies."  ECF No. 5591 at
     14 (citing Tebrock Decl. ¶ 8).  The court is still reviewing the adequacy of defendants'
25   corrections, generally.

26
         [4] At 52:10, the question as transcribed refers to a "2008 staffing proposal."  The reference
27   is actually to a 2018 staffing proposal.  *See* 10/15/19 RT at 52:15-17.

28

                                                        3

1    for the California Department of Corrections and Rehabilitation (CDCR), sent a whistleblower

2    report to the *Plata*[5] Receiver.  *Id.* at 54:23-55:6. The parties brought the report to this court's

3    attention on October 5, 2018, and it is that report that has led to the proceedings culminating in

4    this order.  As the findings in this order make clear, and contrary to defendants' initial position --

5    maintained through the evidentiary hearing -- that no independent investigation of Dr. Golding's

6    allegations was necessary, those allegations in significant part justified the independent

7    investigation and factfinding the court has undertaken.

8            At this critical juncture, several key legal principles, articulated by the previously-

9    assigned judge in this action, bear repeating:

> 'Whatever rights one may lose at the prison gates, *cf. Jones v. North Carolina Prisoners' Union*, 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977) (prisoners have no right to unionize), . . . **Eighth amendment protections are not forfeited by one's prior acts.** Mechanical deference to the findings of state prison officials in the context of the eighth amendment would reduce that provision to a nullity in precisely the context where it is most necessary. **The ultimate duty of the federal court to order that conditions of state confinement be altered where necessary to eliminate cruel and unusual punishments is well established.'** *Spain v. Procunier*, 600 F.2d [189] at 193–94 [(9th Cir. 1979)] (emphasis added).

16   *Coleman v. Brown*, 28 F.Supp.3d 1068, 1077-78 (E.D.Cal. 2014) (emphasis included in 2014

17   order).  The same judge said not so very long ago, in his 2013 order denying defendants' motion

18   to terminate this action, "[t]he Eighth Amendment violation in this action is defendants' 'severe

19   and unlawful mistreatment' of prisoners with 'serious mental disorders,' through 'grossly

20   inadequate provision of ... mental health care.'"  *Coleman v. Brown*, 938 F.Supp.2d 955, 969

21   (E.D.Cal. 2013) (quoting *Brown v. Plata*, 563 U.S. at 500, 502)).  Just two years before that

22   denial of termination, in its 2011 decision, the United States Supreme Court had observed that

23   "[f]or years the ... mental health care provided by California's prisons has fallen short of

24   minimum constitutional requirements and has failed to meet prisoners' basic health needs.

25   Needless suffering and death have been the well-documented result."  *Brown v. Plata*, 563 U.S. at

26   501.

27   _____

[5] *Plata v. Newsom*, Case No. C01-1351-JST (N.D.Cal.).

28

4

As the prior presiding judge also noted,

> once an Eighth Amendment violation is found and injunctive relief ordered, the focus shifts to remediation of the serious deprivations that formed the objective component of the identified Eighth Amendment violation. *See Coleman v. Brown*, 938 F.Supp.2d at 988. Remediation can be accomplished by compliance with targeted orders for relief or by establishing that the 'violation has been remedied in another way.' *Id.*

*Coleman v. Brown*, 28 F.Supp.3d at 1077. Under no circumstances may remediation be accomplished by end runs and hiding the ball to create a false picture for the court, as has happened here.

Given the constitutional deprivations underlying this case, and the court's monitoring by way of a Special Master, defendants' expenditure of so much time and effort to create records designed to advance litigation as the primary way to achieve a complete remedy or termination by other means is confounding. This court's predecessor carefully constructed a process supervised by a Special Master that was intended to moderate court intrusion into defendants' own remedial efforts. Such a process is arguably more respectful of defendants' knowledge of their operations and their management prerogatives than a process whereby oversight is transferred to a receivership; it also is more hopeful that defendants can best determine how to meet their constitutional obligations to the seriously mentally ill inmates in their custody. At the same time, given the authority that here remains vested in defendants themselves, the importance of defendants' transparent and accurate reporting is paramount: the court and the Special Master must be able to rely fully on defendants' representations. As explained in this order, the court has concluded the reliability of those representations at multiple levels of the *Coleman* case structure is in serious doubt. If the approach of monitoring by a Special Master has contributed to play in the joints allowing for those misrepresentations, the court may need to revisit that structure in future proceedings. For now, that is a question for another day.

Before detailing its findings and conclusions, the court sets forth in greater detail the background leading up to the evidentiary proceedings, which are now concluded.

II.     BACKGROUND

A.     Matters Leading Up to Evidentiary Hearing

As noted, on October 10, 2017, this court issued its order requiring defendants, within one year, to come into complete compliance with the staffing ratios in their 2009 Staffing Plan, ECF No. 3693, and also with the maximum ten percent staffing vacancy rate required by the court's June 13, 2002 order, ECF No. 1383.  ECF No. 5711 at 30.  The court set a further status conference for October 11, 2018 and directed the parties to file a joint status report thirty days prior to the status conference; the status report was to address, as necessary, issues pertaining to enforcement of the order and the durability of the staffing remedy.  *Id.* at 31.  The court later continued the hearing to October 15, 2018, and expanded it to include an evidentiary hearing on the use of telepsychiatry to give defendants an opportunity to "prove that the changes they have effected, moving from limited use of telepsychiatry as a supplement to on-site psychiatry in the face of short-term staffing shortages, to the further expansion they appear to be implementing is consistent with the requirements of the Eighth Amendment."  ECF No. 5928 at 12; *see also* ECF No. 5933.

On October 5, 2018, ten days before the scheduled hearing, the court received requests from both parties; plaintiffs requested a status conference, ECF No. 5936, and defendants requested a stay of proceedings, ECF No. 5938.   The requests were based on the whistleblower report from Dr. Golding (hereafter Golding Report).  Following a special status conference on October 10, 2018, the court vacated the original status conference set to consider enforcement of the October 10, 2017 order and the evidentiary hearing on the use of telepsychiatry.  ECF No. 5949 at 5; ECF No. 5980.  After hearing from the parties and Dr. Golding's counsel both orally and in writing, ECF Nos. 5967, 5969, 5976-5978, on October 25, 2018, the court ordered the Golding Report filed on the public docket in redacted form.[6]  ECF

---

[6] The redactions approved by the court were relatively minor, and made to protect "(1) current and former employees' names; (2) current and former employees' employment titles, but only where an employment title is expressly linked to a name or a specific prison so as to disclose a person's identity; and (3) any other information that serves to identify an individual

1 | Nos. 5986-5988. A complete unredacted copy of the Golding Report is filed under seal. ECF No

2 | 5990.

3 |       B.    <u>Appointment of Neutral Expert</u>

4 |       The court held a series of hearings, ECF Nos. 5964, 5980, 5995, issued an order to

5 | show cause why the court could not appoint its own neutral expert, ECF No. 6002, and

6 | considered the parties' responses, ECF Nos. 6009-6012, 6015. On December 14, 2018, the court

7 | appointed Charles J. Stevens, Esq. of Gibson Dunn & Crutcher LLP as the court's neutral expert

8 | under Federal Rule of Evidence 706, "to assist the court in investigating allegations raised in [the

9 | verified Golding Report) to determine whether defendants have committed any fraud on the court

10 | or the Special Master, or have intentionally provided false or misleading information to the court

11 | or the Special Master." ECF No. 6033 at 1-2. The court filed an amended appointment order on

12 | January 8, 2019. ECF No. 6064. The amended order modified paragraphs A(2) and B(4) of the

13 | original appointment order, as requested by the neutral expert, and modified the first paragraph of

14 | that order to reflect events since the December 14, 2018 order was filed. *Id*. at 1 n.1.

15 |       The court tasked the neutral expert with conducting an independent investigation

16 | to identify facts, if any, that raised a question whether defendants committed fraud on the court or

17 | intentionally misled the court or Special Master regarding seven issues the court specifically

18 | identified in its appointment order, as follows:

19 |       a. Lengthening the intervals between psychiatric appointments
20 | beyond court-mandated timelines for inmate-patients at the Correctional Clinical Case Management System (CCCMS) and
21 | Enhanced Outpatient Program (EOP) levels of care who are transferred to new institutions by resetting the clock for such
22 | appointments from the time of transfer rather than from the last completed appointment, rescheduling such appointments at the
23 | maximum time allowed in the Program Guide, and reporting compliance with Program Guide requirements using the reset
24 | timelines. *See* Golding Report, ECF No. 5988-1 at 1, 14-23.

25 |       b. Lengthening the interval between psychiatrist appointments for EOP inmate-patients and reporting compliance based on the
26 | extended intervals. *See id*. at 2, 23-26.

27 | other than Dr. Golding, including government telephone numbers and email addresses." ECF No.
28 | 5986 at 9.

c. Combining CCCMS and EOP appointment compliance numbers into one reporting category. *See id.* at 26-27.

d. Inflating compliance numbers by counting every encounter between a psychiatrist and an inmate-patient as an appointment for purposes of measuring Program Guide timeline compliance, without regard to whether the encounter was a psychiatry appointment or, e.g., a wellness check or a cell-front attempt to communicate with an inmate patient. *See id.* at 5-6, 54-57.

e. The manner of reporting of scheduled appointments and missed appointments. *See id.* at 7-8, 35-47, 62-63.

f. Failing to report that psychiatric supervisors were also performing some or all the functions of staff psychiatrists. *See id.* at 5, 56-57.

g. The way in which medication non-compliance is measured. *See id.* at 8, 58-62.

*Id.* at 2-3.  The court did not delegate any ultimate fact-finding authority to the neutral expert, but reserved that critical role to itself.  *See* ECF No. 6187 at 2.

    C.    <u>The Neutral Expert Report</u>

The neutral expert conducted a four-month investigation, and on April 22, 2019, submitted a report to the court.  *See* ECF No. 6135 at 1.  Without objection, on May 3, 2019, the court filed the unredacted Neutral Expert Report on the public docket.  ECF Nos. 6146, 6147.

The Neutral Expert Report points to substantial indications of defendants' presenting misleading information to the court and/or the Special Master, including:

1. Defendants' making the December 2016 business rule change to redefine "monthly" to lengthen the intervals between Enhanced Outpatient (EOP) appointments from 30 days to up to 45 days.  While in effect, this business rule generated misleading data about defendants' compliance with Program Guide requirements for routine EOP evaluations.  ECF No. 6147 at 42, 48.

2. Defendants' reporting of "Timely Psychiatry Contacts," overstating compliance with Program Guide timeline requirements.  *Id.* at 67.  Specifically, California Department of Corrections and Rehabilitation (CDCR) data presented to the court and Special Master was inconsistent with Program Guide requirements and made defendants' reports in this area appear more compliant with Program Guide timeline requirements than defendants actually were.  *Id.*

8

3. Defendants' reporting of psychiatric evaluations, erroneously skewed toward confidential evaluations. *Id*. at 68. "EHRS [Electronic Health Records System] data on compliance with Program Guide timelines for compliance with psychiatric evaluations is potentially misleading because it includes non-confidential encounters. . . ." *Id*.

4. Between 2016 and October 2018, defendants' use of an incorrect and potentially misleading definition of the Appointments Seen as Scheduled performance indicator, resulting in data being provided to the court in June 2018 and to the Special Master as part of the Continuous Quality Improvement (CQI) evaluations in a "misleading manner." *Id*. at 75-76.

5. Defendants' submitting misleading data on "Timely Psychiatric Contacts" in support of their 2018 Staffing Proposal in that the data did not accurately reflect the extent to which appointments were seen by supervisors rather than line psychiatrists. *Id*. at 82.

6. Defendants' submitting misleading data on the timeliness of mental health referrals, "because for medication noncompliant patients it only counted those patients for whom a psychiatrist ordered a medication noncompliance counseling appointment as a matter of discretion," not all patients who require medication noncompliance appointments. *Id*. at 84. As a result, the performance indicator overstated compliance. *Id*. at 91.

7. Due to a bug in software, defendants counting cancelled noncompliance appointments as completed; however, "this inaccurate data was less favorable to CDCR than the corrected data." *Id*.

The court provided the parties an opportunity to file substantive responses to the Neutral Expert Report and then set the matter for a special status conference on June 10, 2019 to discuss issues raised in the briefing. ECF No. 6135 at 2.

D.    Review of Materials Defendants Claimed as Privileged

During the course of the neutral expert's investigation, defendants filed a motion for protective order, seeking to avoid producing to the neutral expert documents he requested but for which defendants asserted claims of attorney-client privilege and/or work product protection. ECF No. 6086. The court denied the motion for protective order, specifically noting the court had already provided those claims would not be waived by disclosure of "potentially privileged material . . . to the court's neutral expert during the investigation and then to the court subject to the claims of privilege." ECF No. 6096 at 6. Despite the court's order, defendants still did not produce the documents to the neutral expert. *See* ECF No. 6147 at 14. The neutral expert

9

1   declined to litigate the issues, concluding he "could make the findings requested by the Court

2   without" doing so.  *Id.*  His findings were, therefore, "subject to the qualification that [he] did not

3   review information claimed by Defendants to be protected by attorney-client or work product

4   privileges."  *Id.*

5           At the June 10, 2019 status conference, the court signaled it would require

6   defendants to produce the privileged documents to the court for *in camera* review, and the court

7   confirmed its tentative ruling by minute order the same day.  ECF No. 6180.  On June 14, 2019,

8   defendants filed both a motion for reconsideration by this court, ECF No. 6188, and an

9   emergency petition for writ of mandamus in the United States Court of Appeals for the Ninth

10   Circuit.  *See Newsom v. USDC-SAC*, CAD # 19-71493 (9th Cir. filed Jun. 14, 2019).  On June 18,

11   2019, this court denied the request for reconsideration, ECF No. 6200, and the appellate court

12   denied the mandamus request the next day.  ECF No. 6202.  Thereafter, defendants produced the

13   documents, which the court itself reviewed *in camera*; during its review, the court discussed

14   certain documents *in camera* on a few occasions with defendants.  *See, e.g.*, ECF Nos. 6270,

15   6323.[7]

16           As the procedural history reflects, defendants have resisted at every turn any

17   reliance by the court on any portion of any document for which they have asserted a claim of

18   privilege.  The court's general impression from its review of these documents is that defendants

19   have overreached in a number of their privilege claims, although some claims of privilege would

20   be sustained if not waived by reason of defense positions taken previously in these proceedings.

21   Nonetheless, the court has determined that to venture further into the thicket of these privilege

22   claims would waste valuable court time and resources and distract from the important, indeed

23   imperative, tasks that remain to achieve delivery of constitutionally adequate mental health care

24   to the plaintiff class.  The court therefore has not prolonged these proceedings by issuing further

---

26       [7] The court is maintaining as lodged documents those documents it reviewed *in camera*
and has made a record of all *in camera* proceedings, which is being maintained under seal until

27   further order of court.

1    orders defendants are likely to appeal.  Ultimately on the merits, after careful consideration, the

2    court has determined it need not rely on any of the privileged documents.[8]

3          For purposes of these proceedings, it is enough to say that nothing in the privileged

4    documents reviewed by the court supports a different conclusion than reached below.  That is to

5    say, nothing before the court indicates, directly or by way of inference, that anyone involved in

6    presenting misleading information to the court committed intentional fraud.  Rather, the picture

7    that emerges from the documents reviewed *in camera* is consistent with the picture that emerges

8    from the public record created over the course of the proceedings prompted by the Golding

9    Report.  It is this public record on which the court relies in making its findings and conclusions.

10   III.   EVIDENTIARY HEARING

11          A.      Orders Narrowing Issues for Hearing

12          In its June 14, 2019 order following the June 10, 2019 status conference, the court

13   found that in five of the seven areas referred to the neutral expert for investigation, he had

14   identified evidence that, "if confirmed through further proceedings and accepted by the court,

15   could establish that misleading data has been presented to the court and/or the Special Master."

16   ECF No. 6187 at 2.  These areas included Issues B, D, E, F and G as described in the court's

17   appointment orders.  *Id*.  The court set an evidentiary hearing to probe those five issues, "to take

18   evidence, as necessary, to determine (a) whether misleading data was presented to the court

19   and/or the Special Master; (b) if misleading data was presented, how and why that happened; and

20   (c) what action is required to correct the record and avoid future submission of misleading data."

21   *Id*.  The court also directed the parties to meet and confer in an effort to determine whether they

22   could "stipulate to one or more of the underlying facts suggested by the results of the neutral

23   expert's investigation."  *Id*.

24          On August 8, 2019, the court held a telephonic prehearing conference.  ECF No.

25   6236.  The court then filed an order on August 14, 2019, confirming and clarifying several

26   _____

27          [8]  In open court on October 23, 2019, the court ordered defendants to file the non-
     privileged portion of the document identified as CDCR-PRIV 0000408-412.  *See* 10/23/19 RT at
     443:18-23.  Defendants have complied with that order.  ECF No. 6370.

28

1    matters covered at that conference.  ECF No. 6242.  In particular, the court found the parties had

2    stipulated to several key facts suggested by the Neutral Expert Report and defendants had

3    admitted that misleading information was provided to the court.  *See id.* at 5-11; *see also*

4    10/23/19 RT at 444:67.  As a result, the court narrowed the scope of the evidentiary hearing,

5    identifying the issues remaining for hearing as follows:

6                •    Why neither Dr. Leidner nor Dr. Ceballos consulted with Dr. Golding in
                connection with the decision to change the definition of "monthly" in the relevant
7                business rule, and why no one from CDCR informed the Special Master or any
                member of his team about this change;
8

9                •    How the Appointments Seen as Scheduled indicator was developed
                incorrectly and in the absence of consultation with Dr. Golding or other quality
10               control measures, and what steps defendants plan to take to ensure indicators and
                definitions are developed with appropriate consultation and quality control in the
11               future; and

12               •    Why defendants did not disclose in their 2018 Staffing Proposal whether,
                and to what extent, the reporting of data related to average frequency of patient
13               contacts did not disclose the use of supervisory psychiatrists to complete caseload
                contacts with patients; and to what extent defendants knowingly relied on active
14               participation of supervisory psychiatrists in performing the duties of line
                psychiatrists both in defendants' 2018 Staffing Proposal and in supporting their
15               representation that, if adopted, the 2018 Staffing Proposal would bring defendants
                into compliance with the October 2017 staffing order.[9]
16

17

18   ECF No. 6242 at 5, 9-10; *see also* ECF No. 6288 at 2.

19        B.    Evidentiary Hearing Schedule

20               The court convened the evidentiary hearing commencing on October 15, 2019.

21   ECF No. 6345.  The court heard testimony from eight witnesses over two days, asking its

22   questions first and then allowing the parties to ask questions; the court admitted several exhibits

23   into evidence as moved by the parties.  ECF Nos. 6345, 6350.  In addition, the court received

24   deposition testimony from Dr. Kevin Kuich, a psychiatrist, in lieu of his live testimony.  *See*

25   _____

26        [9] The court accepted several other factual stipulations of the parties, drawn from evidence
     reported by the neutral expert, and referred issues related to those factual matters to the Special
27   Master.  *See* ECF No. 6242, *passim*.

28

                                      12

1    Annotated Deposition Transcript of Kevin Kuich, dated 9/19/2019 (Kuich Dep.), ECF No. 6406;

2    *see also* ECF No. 6357 (resolving objections to parts of Kuich Testimony).[10]  Additionally, in

3    accordance with the parties' stipulation, the court accepted declarations from defendants'

4    attorneys Rae Onishi, Esq., Nicholas Weber, Esq. and Melissa Bentz, Esq. in lieu of their live

5    testimony.  *See* ECF No. 6337; *see also* 10/23/19 RT at 444:2-7.

6            Following hearing, on October 22, 2019, the court heard closing argument from

7    plaintiffs and defendants.  ECF No. 6364; *see also* Reporter's Transcript of Proceedings

8    (10/22/19 RT), ECF No. 6379.  The court also received a written statement regarding the

9    evidence presented at hearing from Dr. Golding's counsel.  ECF No. 6362.  On October 23, 2019,

10   the court pronounced oral findings and conclusions in open court.  ECF No. 6365.  It is those

11   findings and conclusions that are memorialized in this order.

12       C.    Witnesses

13           As discussed above, the court heard live testimony from eight witnesses and

14   received the deposition testimony of a ninth witness.  The record memorializes the testimony of

15   all the witnesses and ultimately their testimony speaks for itself.  The court has considered all of

16   the testimony and exhibits. The court's assessment of certain witnesses in particular, including

17   their credibility and the substance of their testimony, is central to the court's findings and

---

20   [10] The court reviewed the annotated Kuich deposition transcript and ruled on the parties'
21   objections prior to the time the annotated deposition transcript was filed on the docket.  *Compare*
     ECF No. 6357 (filed 10/21/19) *with* ECF No. 6406 (filed 12/5/19).  The texts of the two
22   transcripts are identical.  For technical reasons not clear to the court at this time, the annotated
     version used by the court to rule on the parties' objections contained signals that suggested
23   objections were one page later in the transcript than the actual pagination, which did not show in
     this version after page 7.  For this reason, the page numbers cited in the court's October 21, 2019
24   order ruling on objections, ECF No. 6357, do not match the page numbers in the annotated Kuich
     deposition transcript filed on the docket at ECF No. 6406.  Accordingly, the court's October 21,
25   2019 order is deemed amended to change each page number cited in that order by subtracting one
26   from the cited page number.  For example, the first objection cited in the order is at **24**:25 to a
     question at 24:22-24, and the answer at **25**:1 is disregarded.  There is no suggestion in the record
27   that this change has prejudiced or will prejudice any party.

28

conclusions, and to the clarification, cleansing and purging necessary to move this case forward. The court therefore reviews its assessments of these selected witnesses below.

### 1. Dr. Michael Golding

The court first heard from Dr. Golding. Based on the substance of his testimony and his demeanor on the witness stand, the court finds Dr. Golding credible. His observations and conclusions overall are well-founded. When he learned that the psychiatrist compliance indicator for timeliness of EOP appointments on the Mental Health Dashboard[11] "had turned green," he asked a Senior Psychiatrist Specialist member of his headquarters team, Dr. Melanie Gonzalez,[12] to "look at the data to see what was going on." 10/15/19 RT at 45:2-7; 76:6-11. Working with Dr. Kuich,[13] *see* Kuich Dep. at 89:25-94:11, Dr. Gonzalez performed the requested analysis, and that analysis informs the conclusions in Dr. Golding's Report as well as in her report. The defendants' contentions articulated in their closing, that Dr. Golding "just about disagrees with everyone," 10/22/09 RT at 426:4, and that he has a pro-psychiatry bias, are not well-founded and even if they contain a grain of truth do not undermine the doctor's credibility. Whether or not Dr. Golding has a disagreeable side, which was not evident during his testimony, is irrelevant to whether he testified credibly and knowledgeably. And it would be understandable

---

[11] In his report, Dr. Golding describes the Mental Health Dashboard as "CDCR's self monitoring tool." ECF No. 5988-1 at 4. The Mental Health Dashboard uses red, yellow, and green color coding to illustrate the degree of compliance with a wide variety of measures. *See*, *e.g.*, Kuich Dep. at, *e.g.*, 109:1-20 ("institutions were very much . . . into the dashboard, very much into the metrics, very much into how they're performing. . . . Tremendous amount of pressure placed on the institutions by the regional staff to be able to get their metrics in the green. And not always did that effort to help the institution get in the green, look at the actual weeks and the details; it just involved work harder, work longer, get it done. I don't care how you get it done. So if you need a cell side appointment, that's what you need to do. If you need to do something, that's what you need to do. We need to go from red to yellow or yellow to green.").

[12] Dr. Gonzalez sent a whistleblower report to the *Plata* Receiver on or about October 24, 2018, three weeks after Dr. Golding delivered his whistleblower report. *See* ECF No. 6363 at 1; 10/15/19 RT at, *e.g.,* 54:23 (Golding Report issued October 3, 2018).

[13] Dr. Kuich worked for CDCR from August 1, 2013 to mid-January 2019, first as a staff psychiatrist at California Health Care Facility (CHCF) in Stockton, then as a senior psychiatrist specialist at CDCR headquarters, and finally as the chief telepsychiatrist. Kuich Dep. at 8:7-9:5. He now works in Hawaii, in the same profession. *Id*. at 8:7.

1    if he has a pro-psychiatry bias.  He is, after all, a chief psychiatrist with CDCR, and it is hard to

2    see how advocating for his professional counterparts and the integrity of the mental health care

3    delivery system in CDCR displays a bias that undermines his credibility.

4              Finally, contrary to defendants' attempt to paint Dr. Golding as a solo outlier, his

5    testimony and his report on the serious matters at issue here do not stand alone.  Both Dr.

6    Gonzalez's report and Dr. Kuich's deposition testimony corroborate Dr. Golding's position in

7    substantial and significant ways.  Dr. Kuich's deposition, in particular, provides a very helpful

8    narrative, placing essential pieces of evidence into context in a way that brings the considerable

9    bureaucratic dysfunction within defendants' operations into clearer focus.

10             Dr. Golding's explanation for why he was not able to satisfactorily resolve the

11   issues he raised internally and for why he provided his report to the *Plata* Receiver rather than the

12   *Coleman* Special Master also are both credible and evidence of the dysfunction illuminated by

13   these proceedings.

14             In one respect, the court does not find other evidence in the record to support Dr.

15   Golding's strong belief that the Governor's Office expressly directed the provision of misleading

16   data to the court.  Additionally, the court cannot on the present record and does not resolve

17   whether then-Deputy Director Tebrock told Dr. Golding that by telling her about fraud he had

18   "unburdened [him]self," 10/15/19 RT at 26:19-27:1, because she is an officer of the court, a

19   statement Ms. Tebrock denies making, s*ee id*. at 98:8-18.

20                              2.  Katherine Tebrock

21             At times relevant to the events that gave rise to the Golding Report, Ms. Tebrock

22   was Deputy Director of CDCR's Statewide Mental Health Program.  10/15/19 RT at 82:13-20.

23   She left that position voluntarily on July 12, 2019.  *Id*. at 82:18-22.  She is still employed by the

24   State of California, though she does not work for CDCR and is not a gubernatorial appointee.  *Id*.

25   at 105:1-9.  Ms. Tebrock is a person of obvious intelligence and significant abilities.  While the

26   court found her testimony credible, that testimony was also disappointing given the overall

27   message it sent.  Ms. Tebrock failed to fully accept responsibility for her own failures, including

28   failures in the leadership she was required to exercise given her role as Deputy Director.  Perhaps

                                              15

she too was a victim of the bureaucratic dysfunction so plainly evidenced by the record here, and

not provided adequate leadership training and support to manage the demands of the complex

environment in which she was working.  That said, Ms. Tebrock signed at least one key

declaration in this case during the relevant time frame and that declaration, which contained

misleading information, was filed with the court.  *See* 10/15/19 RT at 103:19-104:6 (discussing

ECF No. 5591-2, March 30, 2017 declaration of Ms. Tebrock containing data based on changed

business rule that extended timelines between EOP appointments from 30 to 45 days).  And she

did not ask anyone to correct the data in that declaration even after she became aware of Dr.

Golding's report.  10/15/19 RT at 103:19-104:26.[14]  She also signed at least five EOP

Administrative Segregation Unit (ASU) Hub certification letters[15] tendered to the Special Master

between January 2017 and May 2017, which contained data created with the changed business

rule.  *See* 10/15/19 RT at 105:20-25 (Tebrock testimony that she signed EOP ASU Hub

certification letters monthly); *see also* ECF No. 6330 at 4 (correcting EOP ASU Hub certification

letters submitted to the Special Master between January 2017 and May 2017).  Although

defendants initially took the position they did not have to correct these letters, *see* ECF No. 6257

at 26-27, on October 10, 2019, defendants did send a letter to the Special Master containing

corrected data for these letters.[16]  *See* ECF No. 6330.  Although Ms. Tebrock testified at hearing

that she would, if given the chance, correct any pleadings containing erroneous data, 10/15/19 RT

at 123:22-124:2, this offer comes too late and rings hollow.  Defendants have been given many

---

[14] *But see* note 3 *supra.*

[15] Since August 1, 2014, defendants have been required to "provide to the court and the Special Master monthly reports on whether each EOP ASU hub meets Program Guide requirements for an EOP ASU level of care."  ECF No. 5150 at 2-3 (revising ¶ 2c of ECF No. 5131 at 73:19-74:3).  Defendants are prohibited from admitting any *Coleman* class member receiving mental health treatment at the EOP level of care "to any EOP ASU hub that has failed to meet or exceed Program Guide requirements for a period of more than two consecutive months."  *Id.*

[16] Plaintiffs object that these corrections "do not go far enough."  ECF No. 6360 at 2.  The court is in the process of reviewing corrections filed by defendants to date, as well as plaintiffs' responses thereto and makes no findings at this time concerning the thoroughness or the accuracy of defendants' corrections to the record.

1   months since Dr. Golding filed his report to correct the record, including during the time Ms.

2   Tebrock remained at CDCR.  For reasons that are unclear to the court, Ms. Tebrock never availed

3   herself of those opportunities.

4          Ms. Tebrock's handling of the defendants' misguided 2018 staffing proposal was

5   also inexplicably constrained, as if carefully curated to preclude meaningful input from

6   psychiatry. Her explanation for her failure to give Dr. Golding a written draft of the staffing

7   proposal before it was finalized – that the proposal was a court document to be wordsmithed by

8   lawyers and therefore its substantive content tightly controlled by lawyers – is wholly

9   unsatisfactory, given lawyers' unbending obligation to ensure information submitted to the court

10  is, among other requirements, "not being presented for any improper purpose" and "factual

11  contentions have evidentiary support."  *See* 10/15/19 RT at 99:25-100:22; Fed. R. Civ. P. 11(b).

12  When Dr. Toche later was asked what she made of Ms. Tebrock's explanation in this respect, Dr.

13  Toche declined to defend it, which speaks volumes.  Reporter's Transcript of Proceedings

14  (10/16/19 RT), ECF No. 6378, at 351:19-352:10.

15                            3.  Dr. Laura Ceballos

16         Dr. Ceballos is a psychologist who serves as Mental Health Administrator of

17  Quality Management, Inpatient Facilities, for CDCR's Statewide Mental Health Program and was

18  appointed as Chief of Quality Management in 2009.  ECF No. 6012-2 at 1-2.  As plaintiffs

19  elicited in their questioning during hearing and pointed out in their closing, Dr. Ceballos designed

20  the Continuous Quality Improvement Tool (CQIT).  10/16/19 RT at 305:4-5; 10/22/19 RT at

21  402:17-24.   The CQIT is the measurement tool identified in this case as key to demonstrating

22  defendants' progress toward and ultimate compliance with a durable remedy.  *See* ECF No. 5477

23  at 3-4 (quoting ECF No. 4232 at 4-5).  Despite her central role, Dr. Ceballos's testimony betrayed

24  little to no appreciation for the letter or the spirit of the court orders underlying the development

25  of CQIT.  Rather, for most of her testimony Dr. Ceballos maintained a false distinction between

26  "internal" data she said defendants use without implicating any *Coleman* court orders, and

27  "external" data formally reported to the court.  *See, e.g.,* 10/16/19 RT at 255:14-25, 260:19-261:3.

28

1    In maintaining this distinction she consistently characterized her role as "a clinician . . . not an

2    attorney." *See, e.g.,* 10/16/19 RT at 304:25.

3           The Special Master has, in the past, considered Dr. Ceballos a key contact and

4    relied on her to tell him or members of his team about significant developments related to this

5    case.  Yet Dr. Ceballos testified that she viewed the business rule  change that lengthened the

6    interval between EOP appointments from 30 to 45 days as insignificant such that she did not have

7    to report that change to the Special Master or the court.  She was consistent in saying she thought

8    the change fell within the Program Guide requirement of "monthly" appointments for EOP

9    patients and was made simply to help psychiatrists improve "continuity of care."[17]  *See, e.g.*,

10   10/16/19 RT at 278:23-280:10, 282:10-19.  But her position does not withstand scrutiny in light

11   of the record as a whole.  Of particular significance, in late 2015 when the request to change the

12   business rule was first raised, it was not approved by Dr. Golding and it went nowhere, yet when

13   the request was made again a year later during a time when defendants were attempting to

14   develop a staffing proposal to address the ongoing psychiatrist shortage the request was granted

15   almost instantly, bypassing Dr. Golding altogether.  *See Section IV(B)(2)(a) infra.*

16          In sum, Dr. Ceballos's testimony was in critical respects simply not credible.

17   Whether the trust the Special Master previously placed in Dr. Ceballos can be maintained will be

18   up to him, but in the court's view it would be entirely reasonable for him to conclude that trust

19   has been irreparably undermined.

20                            4.  Dr. David Leidner

21          Despite plaintiff's arguments to the contrary, the court found Dr. Leidner's

22   testimony credible.  Fundamentally, Dr. Leidner distinguished himself from the witnesses other

23   than Dr. Golding as someone who exhibited a conscience during his testimony.  He understands

24   he made mistakes, did not shrink from explaining that he had and worried about the

25   consequences.  Overall, the record suggests Dr. Leidner was working at the direction of others

26

27          [17] In this context, "continuity of care" means allowing individual psychiatrists to follow
     their own patients on a continuous basis.  *See*, *e.g.*, 10/15/19 RT at 191:1-8.

28

                                      18

1   and working diligently in a dysfunctional system.  *See, e.g.,* 10/15/19 RT at 189:20-190:7,

2   195:15-16 (Leidner "took [his] marching orders from Dr. Ceballos and [his managers].")  While

3   he should have been more aware of the results of his actions at the time, and in particular the

4   change in the coding to effect the 30 to 45 day change in intervals between EOP appointments, he

5   was not the key decision-maker on the issues now before the court.

6           The court is not persuaded that Dr. Leidner's appearance as a witness in

7   proceedings in this case in 2013, *see* Reporter's Transcript of Proceedings (12/4/13 RT), ECF No.

8   5013, at 2582-2643, undermines the credibility of his testimony during his second appearance at

9   the October 2019 evidentiary hearing.  *Cf.* 10/22/19 RT at 402:25-403:17.

10          During the time relevant to these proceedings, Dr. Leidner worked at CDCR

11  Headquarters.  10/15/19 RT at, *e.g.,* 207:18-19.  Relatively recently, he opted to return to a former

12  position he held at California Men's Colony.  *Id.* at 207:18-21.  It is evident that Dr. Leidner's

13  colleagues and managers at CDCR Headquarters view his departure as a significant loss.  Their

14  assessment makes sense to the court.  In a properly designed system, with proper supervision, it

15  appears Dr. Leidner's significant skills could continue to play an important role both in these

16  remedial proceedings and at CDCR Headquarters more generally.

17          With these observations, the court turns to its broader findings and conclusions.

18  IV.     FINDINGS AND CONCLUSIONS

19          A.      Fraud on the Court

20          As the court has reviewed in earlier orders, the current proceedings are grounded

21  in this court's "authority . . . [and] duty, to protect the integrity of the judicial process," including

22  the court's "'power to conduct an independent investigation in order to determine whether [the

23  court] has been the victim of fraud.'"  ECF No. 6002 at 4 (internal citations omitted); *see also*

24  ECF No. 5786 at 2.  The court has identified the standards applicable to a determination of

25  whether there has been fraud on the court, as follows:

26          "In determining whether fraud constitutes fraud on the court, the
            relevant inquiry is not whether fraudulent conduct 'prejudiced the
27          opposing party,' but whether it "'harm[ed]" the integrity of the
            judicial process.'"  *United States v. Estate of Stonehill*, 660 F.3d 415,
28          555 (9th Cir. 2011) (internal citations omitted).  "Most fraud on the

                                    19

court cases involve a scheme by one party to hide a key fact from the court and the opposing party." *Id*. Fraud on the court is shown only "by clear and convincing evidence" that a party tried "to prevent the judicial process from functioning 'in the usual manner'"; it requires a showing of "more than perjury or nondisclosure of evidence, unless that perjury or nondisclosure was so fundamental that it undermined the workings of the adversary process itself." *Id*. at 445.

ECF No. 6002 at 4-5.

The standard for a finding of fraud on the court is a high one and, as the court found from the bench, is one not met here. In particular, the court does not find the kind of "'scheme . . . to hide a key fact from the court and the opposing party,'" with an emphasis on the word "scheme," that is at the core of fraud on the court.

B.    Knowing Presentation of Misleading Information

1.    Undisputed that Misleading Information Presented

On the other hand, it is clear defendants have presented misleading information to the court. Defendants have admitted that several filings need to be corrected, s*ee*, *e.g.*, ECF No. 6242 at, *e.g.*, 5, 8, 9 (citing ECF No. 6226 at 3-4, 12-13, 16), and although they do not specifically concede that the necessary corrections are to misleading data, they have begun the process of correcting the record, which continues. *See* ECF Nos. 6302, 6330.[18] As set forth in section IIC, *supra*, the neutral expert pointed to evidence suggesting defendants had presented misleading information to the court or the Special Master in several areas. The neutral expert's key suggestions concerning the defendants' presentation of misleading data are fully borne out, and then some, by the more developed record now before the court.

Beyond the three issues set for hearing, discussed below, the record also shows, as the neutral expert's report suggested, that defendants' reporting on "Timely Psychiatry Contacts" resulted in reporting of misleading data by overstating Program Guide timeline requirements in two ways: (a) by counting all "non-confidential psychiatry contacts entered into EHRS toward Program Guide timeline requirements for EOP and CCCMS psychiatric evaluations" and (b) by

---

[18] As noted, *see* note 3 *supra*, the court is in the process of review all of the pleadings relevant to a determination of the adequacy of defendants' corrections to the record.

1    defaulting appointments in EHRS to "confidential" without sufficient training and oversight to

2    ensure proper use of this mechanism.  ECF No. 6147 at 67-68.  Defendants do not dispute the

3    underlying facts, arguing instead that the Program Guide is insufficiently clear that these

4    evaluations need to be confidential.  *See* ECF No. 6242 at 7.  But the court resolved that question

5    in August 2019, concluding that an April 18, 2007 memorandum attached to the Program Guide

6    "and a plain reading of the Program Guide support the conclusion these psychiatric evaluations

7    must be confidential."  *Id*.  Defendants stipulated that they have provided, to the court and/or the

8    Special Master, data on Timely Psychiatry Contacts based on the interpretation the court found to

9    be erroneous , and the court directed defendants to provide a date certain by which corrected data

10   would be provided.  *Id*. at 8 (citing ECF No. 6226 at 12-13, ¶¶ 9-10).  Defendants' responses to

11   that order, ECF Nos. 6257 and 6330, and plaintiffs' responses thereto, ECF No. 6301and 6360,

12   are under submission.

13          The neutral expert also pointed to evidence that defendants submitted misleading

14   data on the timeliness of mental health referrals, "because for medication noncompliant patients it

15   only counted those patients for whom a psychiatrist ordered a medication noncompliance

16   counseling appointment as a matter of discretion," not all patients who require medication

17   noncompliance appointments.  ECF No. 6147 at 84.  As a result, the defendants' performance

18   indicator overstated compliance.  *Id*. at 91.  Based on representations of the parties, the court in its

19   August 14, 2019 order found this issue attributable at least in part to a dispute in the

20   "interpretation of how and why medication non-compliant patients are scheduled for follow-up

21   under the CCHCS Medication Adherence Procedure policy" and, perhaps, to a dispute over

22   "whether all medication non-compliance in fact must be captured."  ECF No. 6242 at 11.  The

23   parties' stipulation and for approval of a memorandum clarifying this policy is pending before the

24   court.  See ECF No. 6393.

25          The ultimate question for the court to decide, as it does below, is whether

26   defendants' presentation of misleading information was knowing and if so why.

27   /////

28   /////

## 2. Presentation of Misleading Information Was Knowing

Plaintiffs urge the court to find defendants knowingly presented misleading information to the court and the Special Master. *See, e.g.*, 10/22/19 RT at 390:21-391:6. Defendants respond by saying the court took no action on any misleading data, suggesting that it is only when a court takes action that reliance on misleading data creates a problem. *Id*. at 427:23-428:3.

Given defendants' argument with respect to the 2018 staffing proposal, it must be stressed there was no court action on that proposal because the then-impending agreement between the parties failed to materialize after Drs. Golding and Gonzalez issued their reports. Thus, the absence of court action on the proposal is because the whistleblower reports blocked the proposal's presentation to the court in the first place, and not because defendants recognized that aspects of the proposal were based on flawed data and took action to correct the flaws.

More broadly, as explained below, the weight of the evidence and the reasonable inferences to be drawn from the totality of the record before the court fully supports the finding that as to the first and third issues covered at hearing, defendants have engaged in knowing presentation of misleading information to the court and to the Special Master. With respect to the second issue, the record shows that the descriptor for "Appointments Seen As Scheduled" indicator did not accurately reflect the components of the indicator. While the court does not find defendants knowingly presented erroneous data created using this indicator, the failure to include an accurate descriptor should have been caught before any data was generated as part of a properly functioning quality management system.

As noted above, there were four other areas in which the neutral expert identified evidence suggesting misleading information had been referred to the court and/or the Special Master. *See* Section IIC *supra*. In its August 14, 2019 order, ECF No. 6242, the court determined those four issues did not require an evidentiary hearing. As to the second and third items, defendants' reporting of "Timely Psychiatry Contacts," which overstates compliance with the timeliness requirements for psychiatry evaluations at the EOP and CCCMS levels of care, the court found a material dispute centered on conflicting interpretations of the Program Guide and

1    whether psychiatry contacts must be confidential.  *See* ECF No. 6242 at 6-7.  The court resolved

2    that issue, rejecting defendants' interpretation of the Program Guide and concluding "that

3    psychiatric evaluations must be 'confidential' to satisfy the 30 and 90 day Program Guide

4    requirements."  *Id*. at 7.  The court concluded it was "not necessary to examine the intent behind

5    defendants' erroneous interpretation" and has referred this matter to the All-Parties Workgroup

6    for development of protocols consistent with the court's clarifications.  *Id*. at 8.As to the sixth and

7    seventh items, involving submission of misleading data related to timeliness of referrals for

8    medication non-compliant patients, the court determined no evidentiary hearing was required

9    because it was not disputed that a software bug caused one of the errors and the other arose from

10   a dispute over "interpretation of how and why medication non-compliant patients are scheduled

11   for follow-up under the CCHCS Medication Adherence Procedure policy."  *Id*. at 11.  That matter

12   was referred to the All-Parties Workgroup, *id*., and a stipulation and proposed order with a

13   proposed clarifying memorandum has been submitted to the court for review.  *See* ECF No. 6393.

14           Regarding the four matters before the court, without a full understanding of why

15   defendants knowingly submitted misleading information to the court and Special Master, a proper

16   solution cannot be identified.  Therefore, the court has undertaken its own effort to determine why

17   the misleading data was presented, as an essential step on the path to identifying appropriate

18   remedies for this serious roadblock impeding meaningful progress toward full global remediation.

19                          a.    Changing of EOP Business Rule from 30 to 45 Days

20                                   i.    Background

21           The remedial plan for this action, the Mental Health Services Delivery System

22   Program Guide (Program Guide) requires that a psychiatrist "evaluate each EOP inmate-patient at

23   least monthly to address psychiatric medication issues."  Program Guide, ECF No. 5864-1 at 58.

24   This requirement has been part of the remedial plan at least since 2006, when the court gave final

25   approval to all but a limited number of provisions of the Program Guide that remained in dispute

26   and then ordered the Guide's immediate implementation.  ECF No. 1753-4 at 8; ECF No. 1773.

27   As the neutral expert reported, "[i]t is undisputed that the Program Guide does not define

28

                                        23

'monthly.'"  ECF No. 6147 at 44.  However, the Special Master[19] informed the neutral expert that he "has consistently interpreted 'monthly' to be '30 days,' since he began monitoring EOP routine appointments in the late 1990s . . ."  ECF No. 6147 at 43.  He provided the neutral expert with record support for his position, *see id.*, which he has consistently articulated with the court. The neutral expert also noted documentary evidence showing that prior to the business rule change at issue defendants had also interpreted "monthly" in this context to mean 30 days.  *See, e.g., id.* at 45 ("documents show that CDCR used 30 days to measure compliance with the Program Guide requirement that EOP patients have 'monthly' psychiatric evaluations. In 2016, for example, in connection with the production of data for the Special Master for the 27th Round of monitoring, CDCR used a definition of 'every 30 calendar days after previous psychiatry contact' to measure compliance with the 'monthly' requirement for EOP psychiatric appointments. ECF No. 6012-2 at 154 (Ceballos Decl. at Ex. 3).").

"A business rule is, at the most basic level, a specific directive that constrains or defines a business activity. . .  Business rules can be applied to computing systems and are designed to help an organization achieve its goals.  Software is used to automate business rules using business logic."  *https://www.techopedia.com/definition/28018/business-rule*.  As relevant here, CDCR applies business rules to its computing systems to manage and report data.  *See, e.g.,* ECF No. 6012-3 at 2-4 (Leidner Decl.); 10/15/19 RT at 86:21-23 (testimony of Katherine Tebrock).  As Dr. Leidner explains, "[f]rom 2010 to 2017, CDCR collected data regarding mental health treatment through the Mental Health Tracking System (MHTS), a web-based tool developed to track clinical contacts, referrals, and other data related to the provision of mental health services."  ECF No. 6012-3 at 2.  Former Deputy Director Tebrock testified that MHTS "had been negotiated and discussed with the Special Master and his team over the course of many years" and that CDCR "had preserved or attempted to preserve, to the extent possible, all of those rules to maintain fidelity."  10/15/19 RT at 87:3-7.

---

[19] The Special Master has served in that capacity since November 1, 2007 and served as Deputy Special Master from February 15, 1996 until November 1, 2007.  ECF  Nos. 664, 2453.

"Beginning in 2016, CDCR implemented an electronic health record called the Electronic Health Record System (EHRS) which replaced MHTS."  ECF No. 6012-3 at 2.  Data collected in the EHRS is stored in the Health Care Data Warehouse, "a group of high-capacity computer servers into which data from numerous sources, including EHRS, CDCR's Strategic Offender Management System (SOMS), and the Department of State Hospitals, are routed and stored. Historical data, such as MHTS data, are also stored in the Data Warehouse." *Id*. at 2-3. Data in the system are used, among other things, to generate management reports, which "are designed to help staff provide timely patient care, manage resources, and give feedback on compliance with guidelines, including various requirements imposed by orders in this case." *Id*. at 3.  One such report is the Mental Health Performance Report, "which displays a set of indicators measuring performance in numerous areas, including compliance with mental health treatment required by the Program Guide, by health care regulations, and by CDCR health care policies and procedures." *Id*. at 3.  This report is comprised of "over 150 active indicators summarizing about 4,000,000 individual measurements each month. The logic underlying the indicators relies on over 230 business rules that stipulate a required action, the population it applies to, what triggers that requirement, and how much time is allowed to complete that requirement. All of these parameters are determined by the managers of the Statewide Mental Health Program." *Id*. at 4.

### ii.     Review of Evidence

Until December 2016, the relevant business rule for the Program Guide requirement that a psychiatrist "evaluate each EOP inmate-patient at least monthly to address psychiatric medication issues" used a period of 30 days to measure compliance. *See, e.g.,* 10/15/09 RT at 195:5-12 (testimony of David Leidner); 10/16/19 RT at 250:14-16 (testimony of Laura Ceballos); Neutral Expert Report, ECF No. 6147 at 45 (documents cited therein).  Certain persons working within CDCR raised questions about changes to this business rule, initially in late 2015.  The Neutral Expert Report points to evidence suggesting two psychiatrists who were

25

1    working at CHCF,[20] Drs. Jahangiri and Anand, raised the issue, which was then presented to

2    CDCR headquarters in an email from Julie Kirkman, "a Medication Court Administrator and Pre-

3    Release Coordinator at CHCF." *Id.*  At hearing, Dr. Leidner testified Dr. Jahangiri first raised the

4    issue with him at a weekly state-wide webinar Dr. Leidner conducted in November 2015.

5    10/15/19 RT at 189:10-17.  Dr. Leidner told Dr. Jahangiri it was "technically possible" to change

6    the business rule and told him to raise the issue with Dr. Golding.  *Id.* at 189:24-190:4.  The

7    neutral expert found evidence that Dr. Anand emailed Dr. Golding in February 2016, requesting

8    to change the business rule from "30 days" to "monthly" "so as to help ease psychiatrists'

9    tracking issues, reduce staffing needs, help psychiatrists manage their own outpatient caseloads,

10   and other issues."  ECF No. 6147 at 45-46.  No action was taken on the request at that time, *id.* at

11   46, and it is undisputed that Dr. Golding did not approve the request.

12          In December 2016, Ms. Kirkman raised the request again in a phone call with Dr.

13   Leidner.  10/15/19 RT at 191:1-13.  The same day, Dr. Leidner discussed the request in a

14   telephone call with Dr. Ceballos.  *Id.* at 192:6-193:5.  During the call, Dr. Ceballos approved the

15   request and told Dr. Leidner to make the change.  *Id.* at 193:22-194:4.  Dr. Ceballos also did not

16   consult with Dr. Golding about the renewed request before she approved it.  She testified that she

17   "forgot" to consult him about the change even though she sent him an email on December 5, 2016

18   about other EOP-related matters.  10/16/19 RT at 283:15-284:5.  Dr. Ceballos also did not discuss

19   the request with then-Deputy Director Tebrock before approving it or, apparently, at any time.

20   *See* 10/15/19 RT at 86:3-20.  As noted above, Dr. Ceballos did not report the change to the

21   Special Master or the court because she did not view it as "significant."  10/16/19 RT at 249:19-

22   250:11.

23          The Neutral Expert Report points to evidence that "[a]t least some of the

24   psychiatry team was notified of the rule change in January 2017. *See* CDCR0016721-22. An

25   email discussing the modified rule was forwarded to Dr. Golding by psychiatrists Dr. Mann and

---

[20]  CHCF is a medical and mental health care facility for inmate-patients in CDCR.  It
"provides medical care and mental health treatment to inmates who have the most severe and long
term needs."  https://www.cdcr.ca.gov/facility-locator/chcf/.

1    Dr. Lindgren, but it is unclear whether Dr. Golding read it. CDCR0016719-21." ECF No. 6147 at

2    46. In his whistleblower report. Dr. Golding averred he first became aware of the change in

3    March or April 2017, when the "headquarters psychiatry team noticed that all the 20 psychiatrists

4    across the institutions seemed to be doing better in terms of seeing EOP patients in a more timely

5    way." ECF No. 5988-1 at 23. At hearing, he testified he was certain the business rule change

6    would affect data provided to the court "because the dashboard for EOP had turned green, and

7    people were contacting us. Psychiatrists were contacting us across the state and laughing about

8    how much easier it was to be compliant at the EOP level of care, . . ." 10/15/19 RT at 44:12-45:6;

9    *see also id.* at 76:6-11 (Golding testimony that he learned about the business rule change because

10   Dr. Gonzalez told him "that the dashboard was looking greener than you expected it to be. . . .").

11   Dr. Golding first reported problems with the rule change to Drs. Ceballos and Leidner, who

12   agreed to change it back. *See id.* at 16:20-21, 195:13-19. Specifically, Dr. Golding raised the

13   issue with them on or about March 21, 2017, *id.* at 16:20-21, and Dr. Leidner changed the rule

14   back on or about April 14, 2017, *id.* at 195:19.

15           In her whistleblower complaint, Dr. Gonzalez avers that in December 2016, when

16   she was working as a staff telepsychiatrist at CDCR headquarters, she noticed that her EOP

17   patients "were suddenly due for follow-up appointments every 45 days or by the end of the next

18   calendar month (whichever was sooner), rather than every 30 days." ECF No. 6363 at 6. When

19   she learned there had been no policy change regarding the required frequency of EOP psychiatry

20   appointments, she reported the change in the Current Due Dates report to Dr. Golding and he

21   "asked [her] to look into it further." *Id.* She discovered that the change could actually permit a

22   gap of 8 weeks between appointments to be reported as 75 percent compliant. *Id.* She reported

23   her findings to Dr. Golding, who "followed up" with quality management staff regarding the rule

24   change, which was "reverted back to 30 days shortly thereafter." *Id.*

25           At his deposition, Dr. Kuich testified that during the time frame the 30-day rule

26   was changed "[t]here was a tremendous focus on EOP" to see if individuals at this level of care

27   were properly placed. Kuich Dep. at 91:17-93:8. He testified that the push "was a systemwide

28   push, not from psychiatry but from the system, to be able to look at EOP patients specifically and

1  to find out" whether their needs were being met or could "be met at a lower level of care." *Id*. at

2  91:21-24.  He also noticed a "significant improvement" in compliance in this area, which he

3  "liken[ed] to an improvement he noticed during a quality management meeting having to do with,

4  . . . , use of nonformulary medications, that suddenly everyone who was noncompliant became

5  compliant, and we couldn't quite figure out what happened.  And tracing it back, they had

6  changed the formula for that, and that resulted in a better value, . . ." *Id*. at 93:5-13.  Dr. Kuich

7  believed that the change in the business rule from 30 to 45 days was not consistent with Program

8  Guide requirements.  *Id*. at 94:12-24.

9          There is no dispute that defendants "submitted data using the modified [business]

10  rule to the [c]ourt in" at least two court filings.  *See* ECF No. 6242 at 5 (citing ECF No. 6226 at 3-

11  4, Issue B(A)(4), (11), (12)); *see also* ECF No. 6147 at 48 (citing ECF No. 5591 at 14

12  (Defendants' Response to the Special Master's Report on the Status of Mental Health Staffing

13  and the Implementation of Defendants' Staffing Plan); ECF No. 5591-2 at 4, 9 (Tebrock Decl.

14  ¶ 10, Ex. 2); ECF No. 5601 at 8-9 (Defendants' Reply to Plaintiffs' Objections and Request for

15  Additional Relief)).  The Neutral Expert Report cites evidence that "CDCR also reported

16  compliance figures from the "Timely Psychiatry Contacts" indicator during this time frame on at

17  least one ASU EOP HUB certification. This report was not filed with the Court, but was

18  submitted to the Special Master. *See* PLTF005299 (RJD)."  ECF No. 6147 at 44.

19          As noted, Dr. Golding made his request that the rule be changed back to 30 days

20  on or about March 21, 2017.  The Neutral Expert Report cites evidence that before the rule was

21  changed back on April 14, 2017,  "on March 28, 2017, Deputy Tebrock sent an email noting that

22  the Governor's office had asked 'to explain in more detail what metrics can be used to show that

23  the care by psychiatry is adequate.' CDCR0016999," and that "[o]n March 30, 2017, CDCR filed

24  Defendants' Response to the Special Master's Report on the Status of Mental Health Staffing and

25  the Implementation of Defendants' Staffing Plan, ECF No. 5591, relying upon data under the 45-

26  day rule. ECF No. 6012 at 13."  ECF No. 6147 at 48.

27  /////

28  /////

28

### iii.    Findings

The change in the business rule from 30 to 45 days was a material change that was inconsistent with implementation of the relevant Program Guide requirement as established through more than a decade of practice. The change should have been thoroughly vetted before it was implemented; thorough vetting would have included, at a minimum, consultation with Deputy Director Tebrock and Dr. Golding and reporting to the Special Master in advance of the change.

Defendants' argument that the change was prompted by a request from the field to improve continuity of care does not go far enough to explain why it was accomplished without the proper vetting. The request does appear to have come from a medication administrator at CHCF, and while implemented it apparently provided some relief to psychiatrists in the field by, for example, allowing them to go on vacation and still see the same patients in what Dr. Ceballos saw as a reasonable time frame. But the first time the request was made, in 2015, it went nowhere because Dr. Golding did not approve it. The second time the request was made, during a critical juncture when the Special Master was preparing a court-ordered "stand-alone report on the status of mental health staffing and implementation of defendants' staffing plan," *see* ECF No. 5564 at 6-7 (citing ECF No. 5477 at 8-9), no one checked with psychiatry and the change sailed through. Drs. Golding, Gonzalez and Kuich all learned of the change only after relevant "dashboards" designed to measure compliance with remedial requirements of this court changed from red to green overnight and then undertook an investigation to try to understand the reasons behind the change, which was not at all transparent. Given its timing, the rule change affected a period when the Special Master had been tasked with receiving monthly updates on the status of defendants' implementation of their January 10, 2017 updated staffing plan and filing a stand-alone report on the status of mental health staffing and defendants' implementation of that plan. *See, e.g.,* ECF Nos. 5477, 5564. The context supports the clear inference of willful blindness at least, or reckless indifference to defendants' obligations in this action. And, in specific answer to the questions posed for hearing on this issue in the August 14, 2019 order, this willful blindness or reckless indifference is attributable to Dr. Ceballos, the individual who authorized the change

in December 2016. To a lesser extent, it is also attributable to systemic failures of CDCR management to ensure that all staff, including those tasked with developing key software codes, have a complete understanding of the remedial requirements of this action so that they can, to the extent possible, make sure the data reports produced to support defendants' provision of constitutionally adequate mental health care will accurately measure the remedial requirements for this action.

As noted above, defendants have undertaken to correct at least some of the misleading information in the record uncovered as a result of the Golding Report. *See*, *e.g.*, ECF Nos. 6302, 6330. But they have undertaken that effort only after the court set this matter for evidentiary hearing and directed the parties to meet and confer in an effort to narrow the scope of issues for hearing. As noted, the court is currently in the process of reviewing the parties' filings to determine whether in fact the record has been completely corrected and will address that question in a subsequent order.

b.  <u>"Appointments Seen As Scheduled" Indicator</u>

i.  <u>Background</u>

The *Plata* Receiver initially developed the "Appointments Seen As Scheduled" indicator, 10/15/19 RT at 197:21-24, apparently for use as a metric to assess efficiency in scheduling and completing medical appointments. Annette Lambert, Deputy Director of Quality Management, Informatics and Improvement for California Correctional Health Care Services (CCCHS), run by the Receiver, told the neutral expert

> the "Appointments Seen as Scheduled" indicator was developed independently from the Program Guide by the medical unit, and adopted by Mental Health around 2016. She stated, "[F]rom the medical perspective we introduced seen as scheduled as an efficiency metric. And what we were primarily looking at is how much are we seeing cancellations of clinics based on factors that arguably are under our control." Lambert Tr. at 82:16-20.

ECF No. 6147 at 73. Similarly, Dr. Ceballos told the neutral expert

> that CDCR Mental Health updated its "Appointments Seen as Scheduled" indicator sometime in 2016 to match the CCHCS Health Care Dashboard indicator, and thereby include only those

30

1    appointments that were missed due to a factor within CDCR's
     control. Ceballos Tr. at 147:8-16, 148:9-10, 148:22-149:3.

2

3    *Id.*

4                    ii.    Review of Evidence

5          At hearing, Dr. Leidner testified that "[a]t some point" he "was asked to replicate

6    that" indicator on a performance report for mental health appointments.  10/15/19 RT at 197:25-

7    198:2.  Witnesses told both the neutral expert and this court that the indicator was not directly

8    connected to any Program Guide requirement or *Coleman* court order.  *See id.* at 198:18-25

9    (Leidner testimony); *see also* ECF No. 6147 at 73 ("CDCR witnesses generally reported that the

10   "Appointments Seen as Scheduled" . . . indicator[] [was] developed for internal use only for

11   measuring the performance of the institutions. . . .").  Dr. Leidner testified that the criteria used in

12   creating the indicator were the *Plata* Receiver's criteria developed for medical appointments, and

13   that while he had to recode the indicator to make it applicable to mental health appointments he

14   did not make any substantive changes and tried "to just replicate their [the *Plata*] methodology."

15   10/15/19 RT at 198:5-17.  Dr. Rekart testified that after the Golding Report came out he heard the

16   description of the indicator had not been updated to reflect certain changes that had been made to

17   the indicator itself.  10/15/19 RT at 166:16-167:6.  Dr. Leidner testified to the same

18   understanding.  *Id.* at 201:14-16.  He also testified he thought "perhaps" the description matched

19   the indicator initially, but he "failed to update" the description of the indicator when the

20   Receiver's staff changed some criteria in the indicator sometime before February 2016.  *Id.* at

21   202:5-10, 208:7-10.  Dr. Leidner testified that he learned of the error from Dr. Ceballos

22   "sometime around October 9th,  before [he] had any knowledge of the Golding report . . . and

23   [he] basically changed it that day to match what it was really doing."  10/15/19 RT at 224:20-

24   225:11. "At some point during the neutral expert's investigation," after the neutral expert's

25   investigation was over and before Dr. Leidner left CDCR headquarters he reported it to Dr.

26   Ceballos and also discussed it during a telephone conference call.  *Id.* at 206:13-207:9.  Dr.

27

28

                                              31

1    Leidner left CDCR headquarters at the end of July 2019 and has not been involved in correcting

2    the descriptor to match the indicator.  *Id*. at 207:15-19.[21]

3                    Most testimony suggested that, substantively, the indicator was developed as a

4    means of determining how many appointments were cancelled for reasons within CDCR's

5    control.  The day after Dr. Leidner's testimony, in lieu of recalling him to the stand, defense

6    counsel made an offer of proof in lieu of further testimony from Dr. Leidner, explaining that Dr.

7    Leidner had, subsequent to testifying, clarified that

8                    the indicator is a ratio where the denominator is all mental health
                     appointments that were either seen or canceled and not rescheduled
9                    for one of the four controllable cancellation reasons:  Technical
                     difficulties, modified program, lack of transport or provider
10                   unavailable.    The numerator is all appointments from the
                     denominator that were seen.
11

12   10/16/19 RT at 247:20-248:1.[22]  Despite this stated purpose, and although there seems to be

13   general agreement that the "Appointments Seen As Scheduled" indicator was not directly related

14   to any specific provision of the Program Guide, Dr. Golding testified he thinks "many aspects" of

15   the Program Guide make measuring appointments seen as scheduled quite relevant.  10/15/19 RT

16   at 68:9-69:7.  It is undisputed that data generated using this indicator were provided to the court

17   and to the Special Master.  The neutral expert identified these specific ways in which these data

18   were transmitted:

19                • Defendants' May 17, 2018 Staffing Proposal, ECF No. 5841-
                     2 at 4 n.5 (stating "[a]ppointments occurred as scheduled
20                   98% to 100% of the time" over the prior 12 months to support

21   _____

22        [21] Dr. Leidner also testified that "at some point during . . . the neutral expert's
     investigation" he learned that the criteria for the *Plata* Receiver's Appointments Seen As
23   Scheduled indicator and the criteria for the mental health Appointments Seen As Scheduled
     indicator did not match, even though the original instruction to him had been to replicate the
24   *Plata* indicator for mental health.  10/15/19 RT at 205:13-206:20.  He did not know "when they
     diverged . . . [or] if they ever exactly matched, but the intent was that they were supposed to."  *Id*.
25   at 206:17-20.  After the neutral expert's investigation was over and before leaving CDCR
     headquarters he reported this to Dr. Ceballos and also discussed it during a telephone conference
26   call.  *Id*. at 206:13-207:9.  Here as well, he does not know what has happened to the indicator
     since.  *Id*. at 207:15-19.
27

28        [22] Plaintiffs accepted this offer of proof as a correction of the record.  *Id*. at 248:4-7.

                                                  32

the assertion that "CDCR is meeting the needs of class members in the desert institutions").

• CQI data provided to the Special Master. *See, e.g.*, PLTF000894, "CEN Mental Health Performance Report for 4/1/16 to 10/24/16" (reporting 100% of "Appointments Seen as Scheduled"); PLTF000896, "LAC Mental Health Performance Report for 3/1/16 to 9/26/16" (reporting 91% of "Appointments Seen as Scheduled").

• At least one CQI Report to the Special Master. *See* CDCR0019053, Regional Continuous Quality Improvement Review for RJD, October 10-14, 2016 at 12 ("ML EOP had 94% of appointments seen as scheduled" and "ML CCCMS had 94% (n=16,333) of their appointments seen as scheduled").

ECF No. 6147 at 73.

iii.     Findings

Even accepting that the "Appointments Seen As Scheduled" indicator was created originally for "internal" measurement purposes and is not required by the Program Guide, Dr. Golding is correct that the Special Master relies on information generated using the indicator in conducting his monitoring.  And even if the court credits Dr. Ceballos' testimony that Dr. Golding does not understand the data, *see* 10/16/19 RT at 294:19-295:25, that testimony only highlights a more significant issue:  defendants have not adopted processes necessary to make their data methodology fully transparent and understandable to all key stakeholders, including the chief psychiatrist.  *See also* 10/15/19 RT at 36:1-21 (Golding testimony concerning psychiatrists' lack of access to data for independent evaluation and that psychiatry leadership "can't organize and program data to look across institutions to be able to see whether there are errors being made in medical care.").

As for the flawed descriptor, the error appears to have been unintentional, and Dr. Leidner brought it to the attention of Dr. Ceballos and others soon after he became aware of it.  10/15/19 RT at 207:2-5 At the same time, because the descriptor is the public-facing information about the code, it is critical to transparency that the descriptor be accurate.  This is the type of error that a system needs to catch quickly, if not avoid altogether.  Thus, Dr. Leidner's testimony

33

1   that he does not know whether the descriptor has been corrected since he left CDCR headquarters

2   at the end of July 2019, *id*. at 207:13-19, is troubling.

3          Moreover, defendants are not correct in believing that missed appointments are not

4   relevant to patient care.  Dr. Kuich's deposition testimony is very instructive as to why properly

5   tracking missed appointments is relevant.  Such tracking contributes to qualitative analysis,

6   including identification of trends and patterns at local institutions that is not available otherwise,

7   absent a very detailed manual tracking.  The court credits Dr. Toche's testimony concerning

8   remedial measures to be explored, which sounds promising assuming there is transparency and

9   full communication with the Special Master and the court going forward.  The court will address

10   this issue further, as appropriate in its forthcoming remedial order.

11          Finally, one of the specific questions posed in the court's August 14, 2019 order

12   with respect to this issue is how the Appointments Seen As Scheduled indicator was developed

13   incorrectly and in the absence of consultation with Dr. Golding or other quality control measures,

14   and what steps defendants plan to take to ensure indicators and definitions are developed with

15   appropriate consultation and quality control in the future.  The answer is found largely in one of

16   the most significant issues surfaced through the hearing:  the extent to which court-ordered

17   coordination between this action and the *Plata* action, as well as defendants' obligation to work

18   with the Special Master in this case, appear to have gone off track.  As the discussion in Section

19   IV(C)(2) demonstrates, the boundaries between *Plata* and *Coleman* appear to have blurred in key

20   respects.  A return to robust and transparent coordination between the efforts in this action to

21   remediate constitutionally inadequate mental health care and the efforts in *Plata* to remedy

22   constitutionally inadequate medical care must be a key focus and priority going forward.

23                              c.   Supervisors Acting As Line Staff

24                                   i.        Background

25          In 2009, the court ordered defendants to "take all steps necessary to resolve all

26   outstanding [mental health] staffing allocation issues" and "[t]o that end, . . . complete a staffing

27   plan by the end of August 2009."  ECF No. 3613 at 2.  After receiving an extension of time,

28   defendants filed the required plan on September 30, 2009.  ECF No. 3693.  Defendants' 2009

Staffing Plan is the controlling plan prescribing necessary levels of mental health care staffing in CDCR's Mental Health Care Delivery System (MHSDS). "The plan provides staffing ratios for the programs at each level of defendants' MHSDS and other ancillary programs. *See* ECF No. 3693 at 12-33. These ratios are expressed as one mental health staff person per x number of inmate patients. *See id.*" ECF No. 5711 at 3.

The 2009 Staffing Plan contains ratios for staff psychiatrists at each level of the MHSDS, with the exception of intermediate and acute levels of inpatient care. *See id.* at 17-18 (citing ECF No. 3693 at 12-24). The 2009 Staffing Plan also provides ratios for supervising senior psychiatrists only in mental health crisis bed (MHCB) units and in mental health outpatient housing units (MH-OHUs). *Id.* at 18. Those ratios are extremely high relative to those for staff psychiatrists in the same units: in MHCB units, the ratio of staff psychiatrists to patients is 2.5 to 25, while the ratio of supervising senior psychiatrists to patients is 1:50, and in MH-OHUs, the ratio of staff psychiatrists to patients is 1:9 and the ratio for supervising senior psychiatrists to patients is 1:150. *Id.* at 18. The job description of Senior Psychiatrist, Supervisor in the 2009 Staffing Plan is as follows:

> Approximately one third of CDCR prisons will have a Senior Psychiatrist, Supervisor. Senior Psychiatrist, Supervisor positions will be allocated to prisons that do not have a Chief Psychiatrist but have a significant number of staff psychiatrists providing services to a largely stable inmate-patient population. Senior Psychiatrist, Supervisor positions will also be allocated to several prisons that have a Chief Psychiatrist and that have large and complex mental health services. Senior Psychiatrist, Supervisors will provide clinical supervision of staff psychiatrists, as well as various administrative tasks related to formulary, medication management, and continuity of psychiatric medications. Senior Psychiatrist, Supervisors are responsible for the generation and periodic reviews of LOPs pertaining to the practice of psychiatry and for ensuring that practices are consistent with the most recent departmental policies. Further, Senior Psychiatrist, Supervisors share responsibility for quality improvement activities including peer/professional review processes.

ECF No. 3693 at 32.

ii.    Review of Evidence

The neutral expert provided evidence that supervising psychiatrists see inmate patients for clinical appointments, that some level of participation by supervising psychiatrists in

35

1   clinical patient care is appropriate, that the EHRS does not track the extent to which supervising

2   psychiatrists see patients, and that "it does not appear that CDCR had ready access to a data set

3   based on supervisor-only appointments." *See* ECF No. 6147 at 80-82 and evidence cited therein.

4   These facts were all confirmed in testimony at hearing.

5         There is no dispute that CDCR supervising psychiatrists see inmate patients for

6   clinical appointments, or that some level of participation in clinical care by supervising

7   psychiatrists is appropriate. *See*, *e.g.,* 10/15/19 RT at 74:9-14; Kuich Dep. at 206:21-207:5. At

8   hearing, Angela Ponciano, Associate Director for CDCR's Statewide Mental Health Program,

9   testified that CDCR has not "tracked specifically" "how the number of patients seen by

10  psychiatric supervisors providing direct patient care affects staffing ratios," 10/15/19 RT at

11  134:19-22, that the EHRS does not include a performance report "that allows accurate reporting"

12  of when supervisors act as line staff, 10/15/19 at 147:15-19, and that because of this the analysis

13  of supervising psychiatrist patient contacts she conducted after the Golding Report came out was

14  a multi-step process. *Id*. at 147:17-25. Dr. Golding contends this information can be tracked; at

15  hearing he described two different methods for tracking the extent to which clinical services are

16  provided by supervising psychiatrists. 10/15/19 RT at 50:3-51:21. Both methods involved

17  running a caseload report using supervising psychiatrists' names and generating a list of patients;

18  these reports were then analyzed under two different methodologies, one controlling for caseload

19  ratios at each level of care and the other by comparing the frequency of supervising psychiatrists'

20  patient visits with those of line psychiatrists. *Id*. Dr. Golding also testified that at least since

21  2018 his staff has called each institution monthly to determine the level of psychiatric coverage at

22  the institution and "whether supervisors are providing coverage." 10/15/19 RT at 48:17-20. He

23  further testified that "[on numerous occasions" the reports generated by these calls "have been in

24  the hands of Deputy Tebrock, Ms. Ponciano and Ms. Brizendine" and that "[at] one point they

25  tried to get" Dr. Golding and his team to stop this monthly tracking, but the team continued to

26  conduct the tracking. 10/15/19 RT at 48:17-24.

27  /////

28  /////

In his report, Dr. Golding avers that

> [t]he staffing ratios CDCR reported to the court in the 2018 staffing report are incorrect. Sixty percent of psychiatric supervisors were seeing patients like line staff at least part time, and in some cases full time. The work was being done by a larger ratio of psychiatrists to patient that was reported, suggesting that fewer psychiatrists are needed per patient than is in fact the case.

ECF No. 5988-1 at 5. At hearing, he testified that psychiatric supervisors spend about fifty percent of their time conducting line visits. 10/15/19 RT at 51:9-21. At his deposition, Dr. Kuich estimated that psychiatric supervisors have performed line duties more than a third but less than fifty percent of the time. Kuich Dep. at 30:14-31:1.

After Dr. Golding issued his report, Ms. Ponciano conducted an analysis "on the number of CCCMS and EOP psychiatry appointments involving supervisors and chiefs at each institution." ECF No. 6147 at 80; *see also* 10/15/19 RT at 135:1-15. She testified she "found that there were not 60 percent of supervisors carrying a full line staff caseload for those levels of care." 10/15/19 RT at 136:3-5. She later performed a second analysis, which showed that if supervisors' clinical contacts were removed from the "frequency of contacts" report on which defendants' 2018 staffing proposal was based, the frequency of psychiatrist contacts for both CCCMS and EOP patients decreased. 10/15/19 RT at 138:13-139:6; *see also* ECF No. 6242 at 10 (citing ECF No. 6226 at 20 ¶ 6).

The neutral expert conducted interviews in the field with psychiatrists who report variation in responsibilities from institution to institution, supporting the inference that Ms. Ponciano's analysis underrepresents the actual amount of time psychiatrist supervisors spend performing the duties of line psychiatrists:

> Psychiatrists agreed that this issue varied significantly by institution, but all acknowledged that it was not uncommon for psychiatry supervisors to see patients. One psychiatrist noted that at some institutions, a single psychiatrist (sometimes a supervisor or chief) handles all IDTT appointments. Another psychiatrist noted that as a supervisor, she was assigned the case load of three line staff. One Chief Psychiatrist described that [s]he provides a lot of the care, but could not provide a specific volume. [S]he commented that if [s]he did not provide direct care, the institution would be out of compliance. Another Chief Psychiatrist reported that [s]he did not routinely see patients or have a set patient load.

37

A senior supervising psychiatrist said it was expected that supervisors perform the same duties as line staff when there are staffing shortages—the culture of leadership was that psychiatrists should be utilized. That psychiatrist explained that when [s]he took on the senior supervisor position [s]he was doing line staff work at least 50% of the time, and [s]he currently still covers IDTTs and other line work when other psychiatrists are not available.

The anecdotal evidence from multiple psychiatrists suggests that Ms. Ponciano's data analysis undercounts the amount of patient care being provided by supervisors. It is clear, however, that the degree to which supervisors provide direct care varies widely by institution and over time, and so we were unable to more precisely quantify this activity.

ECF No. 6147 at 81-82.

As the court discussed in its August 14, 2019 order, the parties have stipulated "that the data on timely psychiatric contacts prepared in support of CDCR's 2018 Staffing Proposal to reduce the number of psychiatrists was 'potentially misleading' because the proposal did not disclose that appointments with psychiatric supervisors were included in the data." ECF No. 6242 at 10. The neutral expert also suggested other documents contain representations about staffing without accounting for "contributions from psychiatrist supervisors, including:

> • Monthly reports on staff psychiatrist vacancy rates. *See, e.g.,* PLTF005201, PLTF005207.
>
> • Defendants' Response to the Special Master's Report. ECF No. 5591 at 14 ("Over the past year, inmates were seen timely . . . by their psychiatrist ninety percent of the time.") (emphasis added), 15 (reporting 74% average fill rate for psychiatrists).
>
> • 27th Round Monitoring Data, Tab B: Staffing. *See* ECF No. 6012-2 at 69.
>
> • Other representations CDCR made to the Special Master and the Court regarding the adequacy of their current staff psychiatry staffing levels. *See, e.g.*, Joint Status Report RE: October 11, 2018 Status Conference (Sept. 15, 2018), ECF No. 5922 at 4 ("CDCR expects that implementation of the proposed staffing plan will immediately lead to CDCR being at or above the staffing levels required in the Court's June 13,

38

> 2002 Order (ECF No. 1383), and therefore immediately bring CDCR into compliance with the October 10, 2017 Order [ECF No. 5711 at 30]."").

ECF No. 6147 at 79-80.  Again, the court is in the process of reviewing all relevant parts of the record to determine the scope and adequacy of necessary corrections.

<div align="center">iii.     Findings</div>

Taken together, all of the information in the record makes clear that psychiatry supervisors carry a significantly higher caseload than is contemplated by the 2009 Staffing Plan governing the remedy in this action.  Defendants contend that the first analysis performed by Ms. Ponciano was not intended to show how much supervisor time was required, but, instead, to determine how much clinical time was necessary in the field, 10/22/19 RT at 422:14-25, but this argument misses the relevant point.  Ms. Ponciano's first analysis, conducted to support the ill-fated 2018 staffing proposal, masked the time supervisors spend providing line care and yielded numbers that overstated appointment timeliness compliance.  At hearing, she testified to a second analysis she conducted subsequently, which showed that if supervisor contacts were removed from timely CCCMS contacts, the report would have showed CCCMS patients being seen on average .98 times every 90 days, rather than 1.07 times every 90 days.  10/15/19 RT at 137:21-139:6.  The latter analysis was not shared with the court or the Special Master before these proceedings.  Ms. Ponciano also testified that discussions with the Special Master about CDCR's use of psychiatric supervisors to perform line psychiatrist clinical duties have not begun but are planned for the "near future."  10/15/09 RT at 139:14-23.

Dr. Golding tried, apparently unsuccessfully, to surface the issue of supervisors serving as line staff in CDCR meetings he attended as a representative for psychiatry.  *See*, *e.g.*, 10/15/19 RT at 54:5-20.  While Dr. Golding and Dr. Kuich disagree on the exact percentage of time supervisors have spent providing line care, with Dr. Golding estimating fifty percent and Dr. Kuich estimating from thirty-three to fifty percent, the difference is not material here.  Regardless of which range the court credits, supervisors have clinical responsibilities far in excess of those contemplated in the 2009 Staffing Plan and defendants misleadingly withheld this information in

<div align="center">39</div>

1  an effort to make compliance numbers look better and to support significant reductions in

2  psychiatrist staffing levels.

3           Here the specific questions posed for hearing on this issue are why defendants did

4  not disclose in their 2018 Staffing Proposal whether, and to what extent, the reporting of data

5  related to average frequency of patient contacts did not disclose the use of supervisory

6  psychiatrists to complete caseload contacts with patients; and to what extent defendants

7  knowingly relied on active participation of supervisory psychiatrists in performing the duties of

8  line psychiatrists, both in defendants' 2018 Staffing Proposal and in supporting their

9  representation that, if adopted, the 2018 Staffing Proposal would bring defendants into

10  compliance with the October 2017 staffing order?  The answers are found in the actions of critical

11  players including Ms. Ponciano, in an environment of pervasive bureaucratic dysfunction as the

12  hearing here revealed.  Defendants failed either to consult key headquarters psychiatrists or to

13  heed the clearly relevant information those psychiatrists attempted to provide concerning the

14  overuse of supervising psychiatrists in performing clinical duties.  Defendants thus failed to

15  acknowledge the many negative consequences of the failure to either understand the extent of this

16  overuse or its ramifications for the field.  Dr. Golding testified that at one point he was even

17  instructed to stop collecting institutional data on the extent to which supervising psychiatrists

18  were performing line duties.  This instruction appears to have come at a time in 2018, when

19  defendants were under a court order to come into compliance with their Staffing Plan and the

20  court-ordered vacancy rate and when they were engaged in their misguided attempt to artificially

21  reduce the number of psychiatrists required to deliver constitutionally adequate mental health care

22  to the plaintiff class.

23                    3.  Overall Summary

24           All of the foregoing compels the conclusion that two of the issues discussed above,

25  the change in the EOP timeline business rule and the failure to properly quantify and identify the

26  extent to which supervising psychiatrists perform the duties of line staff psychiatrists, involved

27  the knowing presentation of misleading information to the court.  With respect to the

28  Appointments Seen As Scheduled indicator, the court finds no knowing presentation of

40

1   misleading information but, instead, a public-facing error in the descriptor that should have been

2   caught sooner and that caused misunderstanding of the nature of the information presented.

3          Taken together with defendants' admissions prior to hearing, defendants have

4   knowingly presented misleading information to the court in numerous areas critical to the remedy

5   in this case and measuring compliance with that remedy.

6          C.     Other Concerns Identified Through Hearing

7                 1.   Marginalization of Psychiatry

8          On a broader level, the record created through the evidentiary hearing

9   demonstrates a marginalization of psychiatry that impedes defendants' ability to achieve full

10  compliance with the constitutional requirements embodied in the court-approved remedy.

11         Dr. Kuich's testimony explains the pressures and disincentives created by reliance

12  on automation and electronic data:  Psychiatrists are being made to practice in an environment

13  that, among other things, "causes data to have to be massaged in certain ways to allow

14  information to be more presentable to say we don't need psychiatrists so we can get out of the

15  lawsuit." Kuich Dep. at 162:22-25.  "And the more you automate this process to make sure that

16  compliance happens, the more you take control out of the clinician to be able to determine what's

17  clinically relevant for the patient." *Id.* at 167:14-18.

18         In critical policy decisions affecting this case, psychiatry's ability to provide

19  substantive input also was severely constrained.  As noted above, in preparing the 2018 staffing

20  proposal, Deputy Director Tebrock declined to provide a copy of the proposal to Dr. Golding

21  before it was finalized, and instead only read bullet points to him and then asked him to sign off.

22  This process for incorporating the views of a psychiatric professional, given the stakes, is

23  completely inadequate.  Moreover, in addition to not being fully involved in discussions and

24  development of the 2018 staffing proposal, Dr. Golding testified he was told to wait to talk about

25  his staffing concerns until  after that proposal was to have been filed with the court.  10/15/19 RT

26  at 27:2-29:22.

27         Non-psychiatrist members of the CDCR Mental Health management team also

28  asked Dr. Golding and his team to stop their monthly tracking of staffing at various institutions, at

41

1   a time when the team was tracking information CDCR officially said could not be tracked.  Dr.

2   Kuich's access to data compiled by Ms. Ponciano and her team was extremely limited.  *See* Kuich

3   Dep. at 38:24-39:11.  And Ms. Ponciano pulled Dr. Kuich out of one meeting for "about five

4   minutes" to run some numbers by him for providing on-call services through telepsychiatry

5   without giving him context, full information or time to evaluate the information she was putting

6   together to support the staffing proposal.  *Id.* at 65:3-21; 68:21-70:6. This exchange too is not the

7   kind of meaningful discussion required under the circumstances, even if it enabled Ms. Ponciano

8   to say honestly she had talked with D. Kuich.  While Ms. Ponciano came across as credible in her

9   testimony, she is an administrator who oversees operations and labor negotiations, who was

10  tasked with coming up with the number of psychiatrists to hire and to cut.  She did not have the

11  full knowledge base to develop proposals on her own that would satisfy the requirements of this

12  case.

13          The headquarters environment described by Dr. Golding, led by former Deputy

14  Director Tebrock, is also concerning.  Dr. Golding had the impression, which he testified to

15  credibly, that he was not able to speak to the Special Master.  10/15/19 RT at 21:14-23.  Dr.

16  Golding testified he now understands he can contact the Special Master directly as necessary.  *See*

17  10/15/19 RT at 21:24-22:1. But his reasons for submitting his report to the Receiver instead of the

18  Special Master were clearly articulated, consistent with his sense that he was not supposed to

19  communicate with the Special Master directly; they also reflected his concern about reporting

20  issues up the *Coleman* chain of command.  10/15/19 RT at 40:14-41:3.  Dr. Kuich described

21  multiple instances where he just gave up trying to report problems or make necessary changes,

22  because his voice was never heard.  *See*, Kuich Dep. at, *e.g.*, 163:14-25.

23          The actions reviewed above run counter to a key principle articulated in this case

24  since the very beginning:  "In order to provide inmates with access to constitutionally adequate

25  mental health care, defendants must employ mental health staff in 'sufficient numbers to identify

26  and treat, in an individualized manner, those treatable inmates suffering from serious mental

27  disorders.'"  *Coleman v. Wilson*, 912 F.Supp. at 1306 (internal citation omitted).  Psychiatrists are

28  critical to appropriate mental health staffing, given that they are medical doctors bound by the

1 Hippocratic Oath  *See* Kuich Dep. at 33:8-9 ("Psychiatrists as physicians do have the Hippocratic

2 Oath to do the best we can for our patients.").  This does not mean psychiatrists must always

3 prevail in internal policy- and decision-making processes.  But they must be meaningfully

4 consulted; their professional views must be heard, considered and accounted for.  Defendants'

5 marginalization of psychiatry and their clumsiness in the process reflects a significant lack of

6 good judgment and bureaucratic dysfunction that, if allowed to continue, presents a major

7 obstacle to successful remediation in this action.

8                         2.  Boundaries Between *Plata* and *Coleman*

9           While there are areas of overlap between the *Plata* class action and this one, the

10 two cases are distinct and it is clear defendants were not policing the boundaries between the two

11 to protect and advance the remedies required in this case.

12           For example, the Appointments Seen as Scheduled indicator, developed by the

13 *Plata* Receiver, was simply adopted by CDCR Mental Health staff without any tailoring, as Dr.

14 Leidner testified.  More generally, the Receiver's team is making changes to healthcare business

15 rules that affect mental healthcare indicators, and it is the Receiver's team running validation

16 processes to check that code.  *See*, *e.g.*, 10/16/19 RT at 269:17-270:2.  It appears defendants have

17 tasked no one with a systemic review of changes to business rules to ensure compatibility with

18 this *Coleman* case.   Regardless of how the current practices have developed, all practices and

19 procedures related to *Coleman* data collection and reporting must be made fully transparent

20 immediately.

21           Additionally, defendants' Mental Health quality management team was heavily

22 involved in the *Plata* Receiver's development of the EHRS.  As the record developed through the

23 evidentiary hearing disclosed, many of psychiatry's requests for a solution to critical scheduling

24 problems linked to diagnosis and prescriptions have not been incorporated into EHRS.  *See* Kuich

25 Dep. at 174:15-175:7  Psychiatry's requests for changes to EHRS "languished and were not

26 addressed."  *Id*. at 146:7-10; *see also id.* at, *e.g.*, 147:17-148:1.  More broadly, EHRS is not

27 tailored, as far as the court can tell, to take account of specific mental health issues implicated by

28 this case.  *See*, *e.g.,* Golding Report, ECF No. 5988-1 at 71-75.  A person entering data using

1    EHRS can self-select his or her own title, *see* 10/15/19 RT at 148:10-20, a feature developed,

2    according to Ms. Ponciano, to allow psychiatrists to change their title to supervisor in order to

3    prescribe nonformulary medication. *Id.* at 161:15-19. It also appears that the training of

4    psychiatrists, who defendants rely on for data entry, regarding the use of EHRS has been uneven

5    and incomplete. *See* Kuich Dep. at 48:1-4 (regular training was "made available" but not

6    mandatory); *id.* at 47:17-22 (training manual was "bare bones", with refinements not transmitted

7    to line staff level); *id.* at 23:17-20 (supervising psychiatrists' acting as line staff impaired the

8    needed "unobstructed time and undivided attention to train their psychiatrists in the ways of

9    EHRS."). Defendants acknowledge a need for more training; they must act on this

10   acknowledgment and promptly initiate a robust training process to address all the deficiencies

11   identified through the hearing.

12          On a parallel track, this court will closely manage renewed coordination effort

13   involving the Special Master in this case and the *Plata* Receiver, with the presiding judges at the

14   table as appropriate.

15          In the meantime, as the court cautioned from the bench, no one should rush into

16   the breach to cement any new plan for improved data collection analysis and reporting, without

17   obtaining this court's advance approval.

18          D.      Reasons Defendants Knowingly Presented Misleading Information

19          In the final analysis, inexplicably, it is apparent defendants lost complete sight of

20   the reasons remediation is required here. Defendants adopted a laser focus in an effort to obtain

21   termination of court supervision, which lead to a stark "ends justify the means" approach. Their

22   litigation tactics have wholly missed the significance of the constitutional rights of the thousands

23   of mentally ill persons defendants have in their custody.

24          As the court said in its oral pronouncement following hearing, legal cases are not

25   just words on a piece of paper and a series of jousting matches. Almost all legal cases have hearts

26   and souls, as does this one in particular. This court's predecessor, Judge Karlton, put his heart

27   and his soul into this case, as reflected in the care he paid and his orders which stand today. This

28   is a case that cries out for every single player to consult their hearts daily and keep their eyes

44

1  hourly on those souls who are the members of the plaintiff class:  the seriously mentally ill

2  individuals housed behind bars in this state who have the absolute, undeniable right to

3  constitutionally adequate treatment and care.

4       The question of how and why defendants lost sight of this case's touchstone is at

5  once complicated and straightforward.  Timing played a role, with awareness of the schedule of

6  the Special Master's monitoring rounds.  The end of the prior Governor's term does appear to

7  have contributed to a pressure cooker environment.  While no evidence has emerged of anyone in

8  the Governor's Office ever instructing any player to mislead the court, the Neutral Expert Report

9  does capture a telling interaction.  In March 2017, Ms. Tebrock sent an email noting that the

10 Governor's Office had asked for an explanation in more detail of what metrics could be used to

11 show that the care by psychiatry is adequate.  *See* ECF No. 6147 (citing CDCR0016999).  This

12 missive signaled an attention to data and a focus on compiling data to show that care was

13 adequate, with the court as the audience.  In the same general time frame, Ms. Tebrock's

14 explanation of the need for lawyers to wordsmith the court documents, as a reason for not

15 showing the staffing proposal to Dr. Golding, also exposes that "ends justifying the means"

16 approach, as opposed to one of engaging in responsible problem solving.

17      The push to get dashboards from red to green is another marker.  As Dr. Kuich, as

18 someone who has left the department, explains:  "[M]ental health felt that they were performing

19 very well in many areas, that they could police themselves with data, that they were a structure.

20 That they were sustainable. And the only piece that was the problem was that there weren't

21 enough psychiatrists. And so if there was some way to show that with fewer psychiatrists we were

22 meeting the metrics, that final block would tumble, and there would be no basis for the lawsuit."

23 Kuich Dep. at 122:15-23. In approving the change from 30 to 45 days, Dr. Ceballos facilitated

24 dashboards turning to green overnight.  A dashboard that's green, makes it look as if a remedy is

25 complete.

26      In sum, litigation once again has trumped substantive compliance, a path

27 defendants have taken repeatedly.  It is not for this court to tell a party how to litigate its case, if it

28

45

1   chooses litigation, believes it has that right and plays within bounds.  The litigation efforts in this

2   case, however, have exacted a steep, steep price at the expense of the plaintiff class.

3           Despite defendants' knowing presentation of misleading information to the court

4   and the Special Master, and their having lost sight of the remedial purposes of this action, there

5   are some hopeful signs.  Dr. Toche has signaled that she has concrete plans going forward.  She

6   appears to have an ability to listen and to hear what others are saying.  The court expects that she

7   is thinking deeply about a proper response to plaintiffs' counsel's question about how she can

8   work to make clear to those who work for and with her that "CDCR has been found to have

9   violated the Constitution as to the mental health program and is under a remedial order supervised

10   by this court" and that "*Coleman* is not just a word" but signifies a federal court order, "upheld by

11   the United States Supreme Court[,] that governs a remedial process."  10/16/19 RT at 359:12-

12   360:4.  The court will direct that Dr. Toche provide a report on her answer to that question at its

13   next status conference with the parties in early 2020.

14           There also is a relatively new administration and with any new administration

15   comes the chance to turn over a new leaf.  The Deputy Legal Affairs Secretary for Criminal

16   Justice in Governor Newsom's office, Kelli Evans, has been present in the courtroom for the

17   evidentiary proceedings.  She also has attended settlement discussions convened by another judge

18   of this court.  Ms. Evans and her boss have an opportunity to step into the breach, to take the

19   lessons from what has occurred and move forward in a way that can bring this case to a proper

20   conclusion, if defendants can learn the lessons of their past mistakes, internalize the reasons

21   behind those mistakes and identify meaningful solutions.

22           The court will play its part by convening regular status conferences, resolving

23   disputes as necessary and guiding the Special Master as appropriate.

24   V.      REMEDIES

25           These proceedings have made clear the need for appropriate remedies.  As noted

26   above, defendants have been given an opportunity to fully cleanse and purge the record of

27   misleading information.  To some extent, they have availed themselves of that opportunity, and

28   the court acknowledges those efforts.  *See, e.g.*, ECF Nos. 6302, 6330.  Defendants have not,

however, come forward to provide their own cogent, believable, supported and complete explanation as to why they presented misleading information. Rather, they have offered only partial excuses that do not fully acknowledge the totality of the record, pointing to inadvertent errors, absence of course correctors and vagueness in the Program Guide. *See, e.g.*, 10/22/19 RT at 420:10-423:8. Moreover, this is the second time in less than ten years that defendants have embarked on a litigation strategy that delayed and frustrated compliance with staffing requirements, *see*, *e.g.*, *Coleman v. Brown*, 938 F.Supp.2d at 984-989 (discussing ongoing significant staffing vacancies in order denying defendants' motion to terminate this action), giving the court great pause. Against that backdrop, in the absence of defendants' full acceptance of responsibility, the court has reached its own conclusions and any corresponding remedies must address the court's findings.

The parties are in apparent general agreement on the need for data certification. As required by the court's bench order, they have now presented their individual views on proper approaches to such certification and that matter is submitted. *See* ECF Nos. 6383, 6384.

Prior to hearing, plaintiffs identified a series of remedies, and they have now filed a brief setting forth their proposed remedies post-hearing, *see* ECF No. 6374, to which defendants have responded, ECF No. 6388. The court is prepared to seriously consider plaintiffs' proposed remedies because fundamentally they are correct that this is the time to effect a sea change. This court must ensure no court is called upon again in the future to consider whether and how misleading information has been presented to it.

The remediation called for by these proceedings will allow a long-delayed return to the big picture and the proper laser focus on quality of care for California's seriously mentally ill prison inmates. Nothing has prevented work on that overarching goal during these proceedings, and it must be abundantly clear that focus on the quality of care for this class of prisoners is what will guide defendants' true relief from court oversight.

With respect to staffing in particular, ten years ago it was defendants themselves who submitted a staffing plan to this court followed by a budget change proposal to the California Legislature to "'fully implement'" the staffing model described in that plan. *Coleman v. Brown*,

1    938 F.Supp.2d at 984 (quoting Ex. K to Kahn Decl., ECF No. 4325, at 93).  The budget change

2    proposal described the critical flaws in defendants' prior staffing model and represented that the

3    2009 staffing plan identifies appropriate staffing levels to meet constitutional standards.  Still

4    today, however, psychiatrist staffing vacancies hover at the 30 percent mark.  The court has heard

5    many times the explanation of supply and demand, that there is insufficient supply, given the

6    remote locations where psychiatrists are needed, to meet the needs of the plaintiff class. But these

7    hearings have provided additional explanations and identified other contributors to the challenge

8    in identifying psychiatrists, including an uninviting dysfunctional workplace that does not value

9    the essential treatment perspectives that psychiatrists have to offer and creates an atmosphere

10   where morale is low. While a change from 30 to 45 days, as one example, might provide a

11   modicum of relief to an insufficient number of overburdened psychiatrists, here it was a

12   misguided, unthinking fix, applying a very tiny bandage to a festering wound while the infection

13   spreads throughout the body.

14           Defendants simply must come to terms with the substance of the staffing plan and

15   involve all key stakeholders in working with the proper focus to satisfy it.  If, after addressing the

16   problems these hearings have exposed, defendants honestly believe that their staffing plan,

17   embodied in court orders, needs to be modified, they have the option, as they always have had, of

18   seeking a modification from the court.  Any such request would need to be properly justified and

19   honestly supported, of course.  In any event, defendants must acknowledge and account for the

20   substantial findings in this court's October 11, 2017 order, describing the heavy burden that must

21   be met to support any increase in psychiatrists' caseloads.

22           In closing, the court repeats its observation from the bench, that nothing prevents

23   the defendants coming forward with a more transformational option.  In 2014, Judge Karlton

24   observed, "California is not alone in 'criminalizing mental illness,'" adopting the perspective of

25   the sheriff of Cook County, Illinois quoted in a published article.  *Coleman v. Brown*, 28

26   F.Supp.3d at 1073 n.5.  "'We've systematically shut down all of the mental health facilities, so

27   the mentally ill have nowhere else to go.  [The prison system has] become the de facto mental

28   health hospital.'"  *Id*. (internal citation omitted).

Since the time this court assumed responsibility for this case, the mental health prison population numbers have risen.  *See* ECF No. 5213 (August 29, 2014 Order reassigning case to undersigned).  Given its experience with the case so for, the court agrees "that many of the problems giving rise to this suit and ongoing efforts at remediation arise from the inevitable tensions created by the distinct needs of custody supervision and the distinct need for mental healthcare."  *Coleman v. Brown*, 28 F.Supp.3d at 1073 n.5.  If there is a transformational and pragmatic alternative to the prison as de facto mental health hospital, as a way to address a root contributor to the constitutional violation in this case, this court would entertain such a proposal. Unless or until such a constructive reform is possible, the staffing remedy in this case calls for defendants' staffing plan in the context of the Program Guide to chart the way forward and be put front and center. Relatedly, *Coleman* data collection and reporting must be fixed, and it must be fixed to serve the policies and orders in this case, not the other way around. The policies and orders must not be drained of meaning in an effort to squeeze a square peg into a round hole. And the data must be fixed with all the key stakeholders at the table. It must be, as Dr. Toche appears to recognize, checked and double checked. All with an eye toward allowing the defendants ultimately, when they truly can, to accurately demonstrate to the court that the Constitution is finally satisfied.

A remedial order will issue in the near future.  A hearing will be set if the court needs to hear more from the parties before that order issues.

IT IS SO ORDERED.

DATED:  December 17, 2019.

attachment 4

**Golding, Michael@CDCR**

| | |
|---|---|
| **From:** | ███████████ |
| **Sent:** | Monday, October 17, 2022 5:44 PM |
| **To:** | ████████████████████████████ |
| | ████████████████ |
| **Cc:** | Golding, Michael@CDCR; ████████████████ |
| **Subject:** | RE: Business rules for ASU + ICF patients |

If ICF-referred patients in ASU are not being offered clinically necessary treatment, we need immediate action. ███████ you raised this concern in your email. Do you know if any barriers prevent providers from offering clinically necessary treatment? I didn't see anything in this email thread that confirmed patients weren't being seen. ████████████ email indicated that COR staff manually track these patients and offer services as clinically appropriate.

Additionally, if the concern is that no business rules are measuring minimum treatment requirements for patients awaiting transfer to ICF in the ASU, then we need a policy that a business rule can measure. Anyone can suggest new or updated policy language. Our HQ Policy Unit helps everyone navigate this process.

When discussing the role of clinical judgment, policies, and business rules, it's important to remember:
- All providers have achieved the minimum education and licensure requirements (or operate under the clinical supervision of a licensed provider) authorizing them to provide clinically necessary mental health services in California.
- Most of our policies restrict clinical judgment in specified situations and set requirements that must be followed.
- Business rules are based on policy language (or questions), expressed in a way that can be measured precisely.

Ensuring providers can offer clinically necessary treatment is paramount. If we need to write a policy to establish minimum standards or business rules to measure those standards, we can start that process today.


████████████████████
███████████████
Statewide Mental Health Program, CDCR
██ ██████████ I ██████████
████████████████

| | |
|---|---|
| **From:** | ████████████████████████████ |
| **Sent:** | Friday, October 14, 2022 12:04 PM |
| **To:** | ████████████████████████████████████ |

████████████████████████████████████
████████████████████████████
**Cc:** Golding, Michael@CDCR <Michael.Golding@cdcr.ca.gov>; ██████████████
████████████████████████████

**Subject:** RE: Business rules for ASU + ICF patients

I don't believe we can resolve this through a SC Ticket as I believe that the Business Rules are written in response to negotiations with the Plaintiffs and OSM and that they may currently be accurate as I think that the PIPs don't have formal treatment requirements for frequency of contacts like our LOCs in our institutions do. Because we don't have a PIP in R3, I am certainly no expert, but that is what I seem to recall.

█████████████

██████████████████

████████████████

███████████ cell

██████████ – office

**From:** █████████████████████████

**Sent:** Friday, October 14, 2022 11:59 AM

**To:** ██████████████████████████████████

████████████████████████████████████████████

████████████████

**Cc:** Golding, Michael@CDCR <Michael.Golding@cdcr.ca.gov>; ███████████████

████████████████████████████████████████

██████████████████

**Subject:** RE: Business rules for ASU + ICF patients

Thanks ████████. I think we absolutely need to add or adjust the business rule to capture this correctly. I would say that either the report is *not* working as designed, or we need to change the design of the report. In any case, I don't think we should wait until ████████ returns (I believe she's out for one month).

Could we resolve this by simply submitting a ticket? If so, great! Let's do that. Or do you think this will need to go through CAPC? And if so, I think it should be an expedited request. It's pretty bad that ICF referred patients are not getting treatment, and even worse that this is working 'as designed'. (This scenario actually came up in one of our many meetings with OSM when we talked about treatment minimums for referred, but not yet transferred, patients)

Also, do we have an idea of how long this has been happening?

█████████████

██████████████████

Statewide Mental Health Program

**From:** ████████████████████████

**Sent:** Friday, October 14, 2022 11:04 AM

**To:** ███████████████████████████████████

██████████████████████████

**Cc:** Golding, Michael@CDCR <Michael.Golding@cdcr.ca.gov>; █████████████████

████████████████████████████

**Subject:** RE: Business rules for ASU + ICF patients

I got an update that COR has escalated this issue to their ███████████████████████████ so I'm adding them to this discussion. I also heard that staff at COR are manually tracking these patients and using ML ICF rules to provide care while the patients await transfer to ICF, which is great.

**From:** ████████████████████

**Sent:** Friday, October 14, 2022 10:44 AM

**To:** ████████████████████████████████████

████████████████████████████████

**Cc:** Golding, Michael@CDCR <Michael.Golding@cdcr.ca.gov>

**Subject:** Business rules for ASU + ICF patients

2

Good morning,

Corcoran submitted a ticket that went to MH Reporting, but looks like an issue we need to bring up. The ticket text is:

*At CSP Corcoran, we currently have 6 IPs who are referred to Intermediate Care Facility (ICF) level of care, who are also AdSeg (ASU) placement (ASU ICF). There are currently no rules being applied to them for Psychiatry, PC Contact or IDTT contacts. They do not show up on due dates for needing any of these types of contacts. I have attached a snip of the patients in question. I compared to those ICF patients we have that are not in ASU, and those patients have due dates listed for these contact types, so I believe it has something to do with the ASU designation.*

The response from MH Reporting was that the report is working as designed, because there are no business rules for MH treatment for patients in ASU + ICF. ▮▮▮▮▮▮ out right now, but I was thinking we could either submit a ticket requesting that MH Reporting adds a business rule for ASU + ICF, or just email ▮▮▮▮▮ once she's back requesting that her team creates a user story to add this business rule. Any thoughts?

Thanks,

▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮
Elk Grove - Headquarters
California Department of Corrections and Rehabilitation
▮▮▮▮▮▮▮▮▮▮▮

attachment 5

**Golding, Michael@CDCR**

**Subject:**        FW: Memo Review - MH Care for Patients Pending LOC Changes
**Attachments:**    Not Mandating Increased Care for Hospitalization.docx

**From:** Golding, Michael@CDCR
**Sent:** Thursday, September 23, 2021 11:08 AM
**To:** dpotter@alumni.brown.edu; DocKC99 (DocKC99@aol.com) <DocKC99@aol.com>; Metzner, Jeffrey (JEFFREY.METZNER@CUANSCHUTZ.EDU) <JEFFREY.METZNER@CUANSCHUTZ.EDU>; Jones Mohamedu <mjones@pldolaw.com>
**Cc:** mlopes@pldolaw.com
**Subject:** FW: Memo Review - MH Care for Patients Pending LOC Changes

Hi,
This is the document memorializing what essentially all of our psychiatrists thought was needed and which ███████ is overruling. ███████ thought that we should mandate increased care when patients are referred to the hospital, ███ did, ███████ did, ███████ did, ███████ did, ███████ did, and in the end, ███████ (I guess?) acquiesced, or said something to that effect. I was not able to ask ███████ or ███████.

One of the major issues, as I see it, is that if a patient is referred from CCC to EOP, it is not appropriate to mandate that the psychiatrist sees the patient only every 90 days, the CCC (lower level of care) minimum. The patient is being increased to EOP for a reason, because the treatment team thinks that the current mandatory minimum is inadequate. Because we are slow to transfer, does not mean we should punish the patient.

For similar reasons, I think it is dangerous not to mandate that someone who is awaiting intermediate hospital level of care, and in an EOP setting, be seen only every month (at the EOP rate). In the community that simply would not happen and our patients are far more likely to slip through the cracks than those in the community. I and multiple other psychiatrists have agreed to this.

When I argued that if the goal is for clinicians not to have a mandatory minimum, and to do "as clinically appropriate", why mandate that patients be seen at the CCC level of care at least every 90 days at all? Why have any mandates? Surely seeing these CCC patients late who are not referred to the hospital is less risky than failing to demand that patients referred to the hospital from CCC be seen more frequently.

███████ says, below:
    We've been following the current practice for decades, and I have not seen anything to suggest that anyone is actually coming to harm

I bet if we did a data analysis looking to see how many patients seen late at the CCC level of care ended up "coming to harm", the numbers would be small. But that is not an argument for failing to have a CCC minimum. The exception often helps us understand why we have rules. Most of the time we would also be OK if we did not lock our house.

███████ response was that it would be better if we were able to not follow the CCC mandatory minimums and instead instruct our clinicians to do what is clinically appropriate (without the mandate). He said we should not compound the problem that we have a mandatory minimum for CCC patients to be seen, by additionally mandating that patients referred to intermediate [hospital, MG], say at the CCC level of care, be seen in a mandatorily more frequent manner. Thus he argued against mandating that patients be seen more frequently when referred to the intermediate

1

hospital, in addition to arguing against the Program Guide mandatory minimum at the CCC level of care. You can see his response below about referrals to the hospital..

I think all of this is dangerous for our patients. Our psychiatrists very likely will not speak out publicly, since they very well know the implications of that. They would like to be considered for promotion and/or have a comfortable life being honored members of the CDCR team.

When the state allows and encourages retaliation, it directly endangers our patients because it silences all future discussion and thus appropriate clinical decision making, even if there were no concern about people currently experiencing retaliation.

Best,
Michael


**From:**
**Sent:** Thursday, September 23, 2021 9:15 AM
**To:**



Golding, Michael@CDCR <Michael.Golding@cdcr.ca.gov>;


**Cc:**

**Subject:** RE: Memo Review - MH Care for Patients Pending LOC Changes

Hello,

Thank you all for working on this salient issue. It was helpful to see that            (and others) has received questions about this before; to me that also suggests that people do think about it and will reach out if there's any question. My telepsych experience was that we were all expected to see the patient at *least* at the higher frequency while they waited, and higher if clinically indicated (that was also back when they may have waited longer). I understand that we don't currently have a formal standardization of this approach, but there is a de facto standard right now & it's basically "as clinically appropriate" and consistent with other PG references, which I think is a good approach. As we openly discussed with OSM recently in the context of TMHUs, the transfer timelines exist because we acknowledge that a lower LOC yard is not staffed or designed to offer the higher LOC, and the transfer timeline represents the number of days that the writers (at the time of writing) thought was an appropriate/safe number of days to wait for transfer. (And as mentioned earlier in this thread, certain transfers do have explicit instructions in this regard, suggesting intent consistent with this.)

In the debrief on 7/15/21 we discussed and agreed that having an APP referral wait in outpt is already counter to practice & inconsistent with best practices, and is already peeled out for monitoring by IRU (as seen in our breakdown of weekly reporting in the Work Group), & is not really occurring. For ICF, the clinical treatment team should have some say in individualizing care for the patient that they know best; as much as I understand why we can't just trust everyone to do the right thing all the time, we have to strike a balance with having flexibility in the system for the benefit of individual patients. We've been following the current practice for decades, and I have not seen anything to suggest that anyone is actually coming to harm (not that we have to wait for that to occur before making a change, but if that had occurred in any suicide case review, CAT, or other analysis, this issue would have been raised at that time).

I don't think the work that has gone into this has been for nothing; we should keep this draft, and I can imagine some other points in the near future where this may come up for discussion again. If there is additional information or a new perspective, I am very happy to consider it again together. At this time though, I think the remaining policy points that

would need resolution and the technical problems with implementing any actual monitoring (as pointed out by ███████ and others) make this a larger project than the proposed benefit to any actual practice or patient. With so many priorities and less-than-infinite resources, I suggest we set this one aside in the interests of helping a greater number of people to a greater extent with the other policies that we are currently focusing on.

Thank you all!

-█

**From:** ████████████████████████████
**Sent:** Wednesday, September 1, 2021 3:18 PM
**To:** ████████████████████████████████████████

████████████████████████████████████ Golding, Michael@CDCR
<Michael.Golding@cdcr.ca.gov>; ████████████████████████████
████████████████████████████████████████████████████████

**Cc:** ██████████████████████████████████████
████████████████████████████████

**Subject:** RE: Memo Review - MH Care for Patients Pending LOC Changes

Good afternoon,

Thank you, ████████████, for consolidating various comments and discussions down to the remaining unresolved comments. My remaining comments can be removed because I do not want to contribute to any further delays in the policy routing and approval process. Instead, we should begin requesting feedback from the next group of internal stakeholders (OLA, QM, Regional staff, etc.) so the proposed policy can benefit from their input.

For now, I have included ████████ in this email, so he is aware of some unresolved issues.

| ████████: There is internal disagreement regarding the expansion of requirements proposed by this table. After discussion, it appears there are two opposing rationales. Some believe that the spirit of the PG and community standards support the expansion of requirements proposed by this table. Others have questioned the need for this expansion and the need to remove clinical judgment when there are already mechanisms in place to meet each patient's unique needs.<br><br>At this point, I have reservations about the proposed expansion of requirements and welcome feedback that would help me reconcile the need to replace clinical judgment with a one-size-fits-all policy. Additionally, I cannot overlook the actions of the PG authors when they included specific requirements for CCCMS patients awaiting transfer to EOP | **From:** **Setting/Level of Care** | **Pending Transfer To: Setting/Level of Care** | **Appointment Contact Frequency** |
|---|---|---|---|
| | Non-MHSDS, Correctional Clinical Case Management System (CCCMS) | Enhanced Outpatient Program (EOP) | Shall be seen by the MHPC at a minimum every seven (7) calendar days and by an MHMD or psychiatric nurse practitioner (PNP) at a minimum of every 30 calendar days until transfer. |
| | EOP | CCCMS/non-MHSDS | Shall be seen by the MHPC at a minimum of every seven (7) calendar days and by the MHMD or PNP at a minimum of every 30 calendar days until transfer. |
| | Non-MHSDS/CCCMS/EOP | Intermediate Care Facilities (ICF) | Shall be seen by the MHPC and MHMD at a |

3

| and any patient awaiting transfer to MHCB, Acute, and ICF. The fact that the PG authors expressly created requirements for certain transfers strongly suggests they did not intend additional requirements. The PG authors certainly knew how to explicitly memorialize transfer requirements when they meant to do so. | | minimum of every seven (7) calendar days until transfer. |
| --- | --- | --- |

Thank you,

███████████████████

Statewide Mental Health Program, CDCR

███████████ ██

███████████████

**From:** ██████████████████████████ >
**Sent:** Monday, August 30, 2021 2:31 PM
**To:** ███████████████████████████████████████
███████████████████████████████████████████ Golding,
Michael@CDCR <Michael.Golding@cdcr.ca.gov>; ██████████████
███████████████████████████████████████████████

**Cc:** ███████████████████████████████████
████████████████████

**Subject:** RE: Memo Review - MH Care for Patients Pending LOC Changes

This looks pretty straightforward to me.

**From:** █████████████████████████
**Sent:** Monday, August 30, 2021 12:38 PM
**To:** ████████████████████████████
██████████████████████████████████ Golding, Michael@CDCR
<Michael.Golding@cdcr.ca.gov>; ██████████████████████████
██████████████
██████████████

**Cc:** ████████████████████████████████
███████████████████████

**Subject:** RE: Memo Review - MH Care for Patients Pending LOC Changes

Hi everyone,

Per our discussion a little bit ago, I made some edits to the memo to help clean things up a bit.

Please let me know if there are any questions or if I misunderstood something and changed it incorrectly. I removed some of the comments that were already addressed or seemed to be captured in another comment.

Please let me know if you have any questions.

Have a good day

█████

-----Original Appointment-----

**From:** ████████████████████████ >

**Sent:** Monday, August 23, 2021 12:54 PM

**To:** ████████████████████████████████████

████████; Golding, Michael@CDCR; ████████████████████

████████████████

**Cc:** ████████████████████████████████

**Subject:** Memo Review - MH Care for Patients Pending LOC Changes

**When:** Monday, August 30, 2021 11:00 AM-12:00 PM (UTC-08:00) Pacific Time (US & Canada).

**Where:** Microsoft Teams Meeting

The purpose of this meeting is to discuss the most recent draft of MH Care for Patients Pending LOC Changes memo, review the comments, and finalize the language.

---

# Microsoft Teams meeting

### Join on your computer or mobile app

Click here to join the meeting

### Join with a video conferencing device

267586065@t.plcm.vc

Video Conference ID: 117 269 057 6

Alternate VTC instructions

### Or call in (audio only)

+1 916-701-9994,,272835001#   United States, Sacramento

Phone Conference ID: 272 835 001#

Find a local number | Reset PIN

Learn More | Meeting options

---

 **CALIFORNIA CORRECTIONAL**
**HEALTH CARE SERVICES** 

# MEMORANDUM

| Date: | |
|---|---|
| **To:** | Chief Executive Officers |
| | Chiefs of Mental Health |
| | Chief Psychiatrists |
| | Senior Psychiatrist Supervisors |
| **From:** | |
| | AMAR MEHTA M.D. |
| | Deputy Director |
| | Statewide Mental Health Program |
| **Subject:** | **MENTAL HEALTH CARE OF PATIENTS PENDING TRANSFER TO A NEW LEVEL OF CARE SETTING** |

This memorandum outlines the appointment contact frequency for patients in the Mental Health Services Delivery System (MHSDS) who are pending placement/transfer in housing to a different program due to a level of care (LOC) change. The following table summarizes the timeframes only for the mental health primary clinician (MHPC) and psychiatrist (MHMD) contact frequencies.

Patients pending transfer to an Acute level of care shall be housed at the Mental Health Crisis Bed (MHCB) or Intermediate Care Facility (ICF).

| From:<br>Setting/Level of Care | Pending Transfer To:<br>Setting/Level of Care | Appointment Contact Frequency |
|---|---|---|
| Non-MHSDS, Correctional Clinical Case Management System (CCCMS) | Enhanced Outpatient Program (EOP) | Shall be seen by the MHPC at a minimum every seven (7) calendar days and by an MHMD or psychiatric nurse practitioner (PNP) at a minimum of every 30 calendar days until transfer. |
| EOP | CCCMS/non-MHSDS | Shall be seen by the MHPC at a minimum of every seven (7) calendar days and by the MHMD or PNP at a minimum of every 30 calendar days until transfer. |
| Non-MHSDS/CCCMS/EOP | Intermediate Care Facilities (ICF) | Shall be seen by the MHPC and MHMD at a minimum of every seven (7) calendar days until transfer. |

# MEMORANDUM

All patients housed in inpatient settings (MHCB, Acute, ICF) shall continue to follow contact requirements as defined by Title 22.

If you have questions or require additional information related to this memorandum, you may contact the Mental Health Policy Unit by email:  CDCR MHPolicyUnit@CDCR.

cc: Steven Cartwright, Psy.D.
　　Laura Ceballos, Ph.D.
　　Travis Williams, Psy.D.
　　Michael Golding, M.D.
　　Toni Martello, M.D.
　　Sophia Le, M.D.
　　Shama Chaiken, Ph.D.
　　Amber Carda, Psy.D.
　　Daisy Minter, Ph.D.
　　Laurie Ball
　　Jennifer Johnson
　　Regional Mental Health Administrators
　　Regional Health Care Executives

attachment 6

**Golding, Michael@CDCR**

| | |
|---|---|
| **From:** | █████████████████████████████ |
| **Sent:** | Monday, July 12, 2021 8:19 PM |
| **To:** | Golding, Michael@CDCR |
| **Subject:** | RE: Business rules internal meeting - extra review |
| **Attachments:** | DRAFT Data Certification Plan Overview (7.13.21).pdf |

> **CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Hello Dr. Golding,

Did you attend the last Data meeting, on 6/29/21? At that meeting, the process was discussed with plaintiffs and OSM and █████ (& others) present. If our CDCR internal review moves on to another indicator, that does not mean it will automatically be approved by BRMR, let alone be made into a constitutional minimum. There are many more steps of testing and review and discussion and approval before it is final. You and I have discussed this several times. The data certification process overall will be talked about again in the Data meeting tomorrow, I hope you are able to attend; the attached flowchart was sent out with the agenda.

Matty, Mohamedu, and I met with you on 5/12/21 to give you a direct line to Mohamedu. I don't know if you've ever taken advantage of that offer, but given your statements below, I think this is the sort of issue that lends itself to that process. Please give Mohamedu a call, and ask him his understanding of the process. Moving this business rule from CDCR internal review to BRMR does not represent final validation/ verification of anything for the court.

You can also call █████ afterwards. I spoke to her again today to confirm that is her understanding; it is.

Regarding your statements 1, 2, and 3 below: of course all are welcome to raise "challenge[s]" within CDCR & with the OSM anytime, not just limited to those groups; I've repeated that many times. You have made your position about this rule clear to everyone on the CDCR team in several emails, and you yourself refer to "the robust BRMR discussion" on the topic. You are welcome to raise the issue again in the BRMR meeting on Wednesday. My intent in these emails is to explain to you that this CDCR audience is saturated at this time; you have made yourself abundantly clear. This internal group will move on to other topics. Your participation can help make our policies better, but you are not the final arbiter of the constitutional minimum level of care.

I have been trying for some time to direct you to the correct processes to propose a policy change internally. Starting a policy development work group can answer questions like how often this occurs and whether there are any bad outcomes associated with it (or if teams simply refer the patient to settings such as the MHCB when the patient needs more frequent visits). I'd note that the same answers may be generated by the test writing stage of the attached data certification plan, which can also lead to a policy development work group at that time.

There are other misunderstandings below, but I am attempting to remain focused on items that can help with forward progress. Thanks,

██

**From:** Golding, Michael@CDCR <Michael.Golding@cdcr.ca.gov>
**Sent:** Thursday, July 8, 2021 4:49 PM

**To:** ███████████████████

**Subject:** RE: Business rules internal meeting - extra review

"Hello,
I want to be clear about separating out the discussion of Program Guide rules, best practices, etc. We are being transparent in saying this is the way it *has been measured*. To change the way anything is measured, we have a change process, which pre-dates BRMR."

"This stage in the data process is to identify the existing system."

Hi,

I was not aware that the OSM's and judges approval of the BRMR rules we are currently utilizing is merely an "identif[ication of] the existing system." I think you must not mean that.

The issue is whether something that we recommend as being approved at the current BRMR meeting, regardless of how we have been measuring it, meets a constitutional minimum level of care. If it is approved at BRMR, ultimately by the judge, then arguably it does, regardless of what more stringent policy is written later.

If approval at the BRMR meeting means (for example by the OSM) that we and the OSM think that the current BRMR rules *do meet a minimal constitutional standard*, then we have an ethical obligation to let the OSM representatives know when the standard we are currently holding ourselves to does not appear to meet a minimal constitutional standard.

So if we have been measuring something in a way that enables practices that fall beneath a minimal constitutional standard, we need to call that out to the OSM. If you are saying that we should not do that at pre-BRMR meetings, then it needs to be done at the BRMR meeting, right? If you do not want practices that are thought not to meet minimal constitutional standards to be called out prior to the BRMR meeting or at the BRMR meeting itself, does the OSM know that that is your instruction to us?

Changing a process later, by for example later adding a policy that is a more stringent policy (after BRMR has already approved a more lenient one) would not seem to be sufficient. It would be not sufficient because it would make adopting that subsequent policy something that CDCR could voluntarily do, rather than something that was mandatory for CDCR to do for constitutional reasons.

Please let me know if you are saying that
1. Existing ways of measuring things that are thought to violate a minimal constitutional standard should not be challenged at pre-BRMR meetings, but should be challenged at BRMR meetings.
2. Existing ways of measuring things that are thought to violate a constitutional minimal standard should not be challenged at the BRMR meeting, but should be challenged at pre-BRR meetings.
3. Existing ways of measuring things that are thought to violate a minimal constitutional standard should neither be challenged at the BRMR meeting, nor at the pre-BRMR meetings.

Thanks for your consideration.

Best,
Michael

Michael Golding, MD
Statewide Chief Psychiatrist
California Department of Corrections

**From:** ███████████████████████████ >
**Sent:** Thursday, July 8, 2021 4:06 PM
**To:** Golding, Michael@CDCR <Michael.Golding@cdcr.ca.gov>; ███████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████

**Subject:** RE: Business rules internal meeting - extra review

Hello,

I want to be clear about separating out the discussion of Program Guide rules, best practices, etc. We are being transparent in saying this is the way it *has been measured*. To change the way anything is measured, we have a change process, which pre-dates BRMR. This stage in the data process is to identify the existing system. There may be more serious problems that affect far more patients which are not being recognized/ prioritized if we frequently stop to turn it into a meeting about ideal related policies. None of our policies are perfect, and there are other avenues to request and prioritize changes.

**I appreciate everyone doing their best to clarify the issues, and I don't feel further emails on the subject will result in anything else productive at this point**. At the risk of inviting more confusion, I will just make one final recommendation if there is concern about anything acute occurring, though it hasn't come up in many years of doing things this way: currently, if someone in this situation needs to be seen more frequently, the treatment team would be expected to consider a referral to MHCB rather than leaving them in outpatient.

Thank you,

███

**From:** Golding, Michael@CDCR <Michael.Golding@cdcr.ca.gov>
**Sent:** Thursday, July 8, 2021 10:58 AM
**To:** ████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████
**Cc:** ████████████████████████████████
**Subject:** RE: Business rules internal meeting - extra review

Hi,

1. During this meeting [6/3-/21], we discussed the Business Rule: *"PC Contact - Acute/ICF referral awaiting transfer/admission in outpatient programs"*(changes discussed)." 
Yes we did discuss this," *ICF referral awaiting transfer/admission in outpatient programs."*

█████████

But we (and ████████) also discussed something else. You said that there did not need to be a BRMR rule that specified that patients waiting for ICF *hospitalization* did not need to be seen more than the Program minimum. That's what we disagreed about.

My argument was that their current level of care (not just the Program) needed to be taken into account. So if their level of care was elevated, their frequency of care for the psychiatrist and psychologist should be more like the referral level and NOT the mandated program minimum frequency.

That does not seem to be mentioned in the discussion below. I said that pts referred to the intermediate hospital who are at the CCC level of care, in fact (as a Constitutional minimum) do need to be seen more frequently (and it must be specified in the BRMR rule) than for example every 90 days or even every 30 days. ██████████ █████████. I disagreed with the argument made during this meeting and still do. If you now also think that patients should be seen at least every week who are referred to the inpatient hospital, I am glad that there has been a change.

2. At that time [7/6/21], I again pointed out that the current Business Rule measures compliance with an Initial PC contact and a weekly Routine PC contact [implicitly, I think for *"PC Contact - Acute/ICF referral awaiting transfer/admission in outpatient programs,"* MG] .

█████████

Ok. I have no disagreement with that for *outpatients awaiting transfer to outpatient programs*. I raised the question about patients *referred to the hospital* in the 7/6/21 meeting. The disagreement last week, that prompted the robust BRMR discussion, is whether BRMR rules should allow patients referred to hospitals (for example currently in a CCC Program) to be seen at the program minimum frequency. I said that the minimum should be more stringent because the patients level of care has been raised. To see a patient every 90 or even 30 days by a psychologist, when that patient has been referred to the hospital, I think that is a dangerously low minimum and certainly not consistent with community standards. I have argued that BRMR rules need to reflect that as they may well set a Constitutional minimum.

Best,
Michael


Michael Golding, MD
Statewide Chief Psychiatrist
California Department of Corrections

**From:** ████████████████████████
**Sent:** Thursday, July 8, 2021 9:46 AM
**To:** ████████████████████████████████
████████████████████████████████████████

Golding, Michael@CDCR
<Michael.Golding@cdcr.ca.gov>;

**Cc:**

**Subject:** RE: Business rules internal meeting - extra review

Good morning,

Looking over the various emails discussing this topic, my efforts to engage the group in a healthy discussion and my periodic summary statements on this matter may not be fully understood by everyone. I'll take this opportunity to clarify:

6/30/21: Business Rules Internal Meeting - Extra Review
1. During this meeting, we discussed the Business Rule: "*PC Contact - Acute/ICF referral awaiting transfer/admission in outpatient programs*"(changes discussed).
2. Some critical points sparked a robust discussion:
   i. No one can find a current policy that directly sets an expectation for treatment services when patients are referred to Acute or ICF level of care but are awaiting transfer/admission in outpatient housing programs.
   ii. However, the current Business Rule measures compliance with an Initial PC contact "no later than 14 Calendar Days" and a Routine PC Contact every calendar week after that.
   iii. We also discussed adding a higher Initial Contact standard for patients waiting in the ASU, PSU, or SHU - "no later than 5 Calendar Days."
   iv. As written, we discussed how the current Business Rule stems from the Program Guide expectations for CCCMS patients referred to EOP level of care but are awaiting transfer/admission in outpatient housing programs. OLA also offered a legal opinion on the Business Rules alignment with Program Guide expectations.
3. Some attendees stated that a new policy was needed to clearly define expectations for treatment services when patients are referred to Acute or ICF level of care but are awaiting transfer/admission in outpatient housing programs.
   v. I confirmed that at any point, anyone may initiate the process to create a new policy or modify an existing policy.
   vi. I also asked if the group had any concerns about the current Business Rule not representing the current Program Guide requirements. After the meeting, I followed up with an email to all attendees asking the same question, requesting feedback by 7/7/21.

- 7/6/21: MHR Pre-BRMR Internal Review
4. During this meeting, the attendees briefly revisited the discussion of the Business Rule: "*PC Contact - Acute/ICF referral awaiting transfer/admission in outpatient programs.*"
   vii. At that time, I again pointed out that the current Business Rule measures compliance with an Initial PC contact and a weekly Routine PC contact.
   viii. My statements seemed to assuage concerns about the current treatment expectations and our intent to continue this expectation.

I hope this helps clear up any confusion. At this point, I am not aware of any concerns that this Business Rule is not representing the current Program Guide requirements. Consequently, I see no reason this Business Rule cannot move forward to BRMR review as written (clean BR version for BRMR).

Thank you,

5

Statewide Mental Health Program, CDCR

**From:**
**Sent:** Wednesday, June 30, 2021 3:55 PM
**To:**

Golding, Michael@CDCR
&lt;Michael.Golding@cdcr.ca.gov&gt;;

**Cc:**
**Subject:** RE: Business rules internal meeting - extra review
**Importance:** High

Good afternoon,

Are there any concerns that the indicator we discussed today (see email below) does not represent the current Program Guide requirements? If so, help me see what you see by providing specific Program Guide language.

I need all **feedback by Wednesday (7/7/21)** to ensure the planned BRMR Agenda is accurate.

Thank you,

Statewide Mental Health Program, CDCR

**From:**
**Sent:** Wednesday, June 30, 2021 3:07 PM
**To:**

**Cc:**
**Subject:** RE: Business rules internal meeting - extra review

Good afternoon,

Here are the changes made to the DRAFT_PC Contact - Acute/ICF referral awaiting transfer/admission in outpatient programs. Changes are highlighted in green on SPO:
https://cdcr.sharepoint.com/sites/cchcs_mh_reporting_com/SitePages/Draft/Business%20Rules-%20Draft/DRAFT_PC-Contact%20-%20Acute%20ICF.aspx

Here is the version (clean version) for BRMR next week:
https://cdcr.sharepoint.com/sites/cchcs_mh_reporting_com/SitePages/HQ/Business%20Rules/PC-Contact%20-%20Acute%20ICF.aspx

Here are the changes we made today during our pre-BRMR meeting:

| Section | From | To |
|---|---|---|
| Title | DRAFT_PC Contact - Acute/ICF referral awaiting transfer/admission | DRAFT_PC Contact - Acute/ICF referral awaiting transfer/admission in outpatient programs |
| Overview | Measurement of Primary Clinician (PC) contact for Acute and ICF patients awaiting transfer/admission timeframes annotated to Mental Health Program Guide or other policies. | Measurement of Primary Clinician (PC) contact  patients referred to Acute or ICF level of care awaiting transfer/admission in outpatient housing programs. |
| Rule Population | All patient with MHI of Acute or ICF in ML program. These patients are referred to Acute or ICF and are awaiting transfer/admission to DSH or PIP. (ML.*:Acute, ML.*ICF). This business rule does not apply to Acute or ICF in ASU program. | All patient with MHI of Acute or ICF. These patients are referred to Acute or ICF and are awaiting transfer/admission to DSH or PIP. |
| Trigger | Initial: Most recent institution arrival Date or Program Start or MHI start<br>Routine: See below table for routine timeframe. | Initial: Most recent institution arrival Date or Program Start<br>Routine: first triggered by initial PC contact. See below table for routine timeframe. If there is no institution changes or program changes, the MHI start will be the trigger for routine. |
| Fulfillment | | Copy from BRMR reviewed language from today's meeting |
| Timeframe – table heading | Coming from | Previous housing |
| Timeframe | Housing program | Split to Housing program and MHI column |
| Timeframe – initial | Grace period: No sooner than 5 working days when patient previous housing = DSH or PIP | Review grace period. All Acute or ICF patients housed in ML program will have 14 calendar days for initial (see trigger for details. The group agreed that Acute or ICF referral (without |

| | | housing or institution changes) should not trigger initial) |
|---|---|---|
| Timeframe | None | when a patient with Acute or ICF MHI change housing program to ASU, SHU or PSU, the rule will be triggered. We are mirroring the ASU/SHU/PSU timeframe in these cases (i.e. no later than 5 calendar days for initial and weekly routine). Since the group agreed that Acute or ICF referral (without housing or institution changes) should not trigger initial, acute or ICF referral in ASU/SHU/PSU will not trigger an initial. However, "If there is no institution changes or program changes, the MHI start will be the trigger for routine (see trigger section)." Routine contact requirement will be 1x weekly. |
| Known issue | This rule does not apply to ASU or SHU/PSU. | Addressed. remove |

Please let me know if you have any questions. Thank you.

███████████
███████████████
Statewide Mental Health Program
California Correctional Health Care Services

███████████████
Email ███████████
Work hours: M-F 0730-1630; every other Mondays off

**CONFIDENTIALITY NOTICE:**
This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

-----Original Appointment-----
**From:** ███████████████████████
**Sent:** Monday, June 28, 2021 2:49 PM
**To:** ███████████████████████████████
████████████████ Golding, Michael@CDCR; ██████████████
███████████████████████████
███████████████
**Subject:** Business rules internal meeting - extra review

**When:** Wednesday, June 30, 2021 1:00 PM-2:00 PM (UTC-08:00) Pacific Time (US & Canada).
**Where:** Microsoft Teams Meeting

Action Items:

1. Bring recommendations regarding rules for ICF/ACUTE patients pending transfer
2. Bring recommendations regarding language in rules table
3. Finalize discussion regarding rules and documentation for ICF/ACUTE patients pending transfer

https://cdcr.sharepoint.com/sites/cchcs_mh_reporting/Lists/Internal_BR/calendar.aspx

# Microsoft Teams meeting

**Join on your computer or mobile app**
Click here to join the meeting

**Join with a video conferencing device**
267586065@t.plcm.vc
Video Conference ID: 117 264 147 9
Alternate VTC dialing instructions

**Or call in (audio only)**
+1 916-701-9994,,873747400#   United States, Sacramento
Phone Conference ID: 873 747 400#
Find a local number | Reset PIN

Learn More | Meeting options

attachment 7

**Golding, Michael@CDCR**

| | |
|---|---|
| **From:** | ████████████████ |
| **Sent:** | Thursday, July 8, 2021 4:06 PM |
| **To:** | Golding, Michael@CDCR; ██████ ████████████████ |
| | ████████████████████████████ |
| | ████████████████████████ |
| | ████████████████ |
| **Subject:** | RE: Business rules internal meeting - extra review |

**CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Hello,

I want to be clear about separating out the discussion of Program Guide rules, best practices, etc. We are being transparent in saying this is the way it *has been measured*. To change the way anything is measured, we have a change process, which pre-dates BRMR. This stage in the data process is to identify the existing system. There may be more serious problems that affect far more patients which are not being recognized/ prioritized if we frequently stop to turn it into a meeting about ideal related policies. None of our policies are perfect, and there are other avenues to request and prioritize changes.

**I appreciate everyone doing their best to clarify the issues, and I don't feel further emails on the subject will result in anything else productive at this point**. At the risk of inviting more confusion, I will just make one final recommendation if there is concern about anything acute occurring, though it hasn't come up in many years of doing things this way: currently, if someone in this situation needs to be seen more frequently, the treatment team would be expected to consider a referral to MHCB rather than leaving them in outpatient.

Thank you,





**From:** Golding, Michael@CDCR <Michael.Golding@cdcr.ca.gov>
**Sent:** Thursday, July 8, 2021 10:58 AM
**To:** ████████████████████████████████

**Subject:** RE: Business rules internal meeting - extra review

Hi,
"
1. During this meeting [6/3-/21], we discussed the Business Rule: *"PC Contact - Acute/ICF referral awaiting transfer/admission in outpatient programs"*(changes discussed)."
Yes we did discuss this," *ICF referral awaiting transfer/admission in outpatient programs."*

1

But we (and ▮▮▮▮▮▮) also discussed something else. You said that there did not need to be a BRMR rule that specified that patients waiting for ICF *hospitalization* did not need to be seen more than the Program minimum. That's what we disagreed about.

My argument was that their current level of care (not just the Program) needed to be taken into account. So if their level of care was elevated, their frequency of care for the psychiatrist and psychologist should be more like the referral level and NOT the mandated program minimum frequency.

That does not seem to be mentioned in the discussion below. I said that pts referred to the intermediate hospital who are at the CCC level of care, in fact (as a Constitutional minimum) do need to be seen more frequently (and it must be specified in the BRMR rule) than for example every 90 days or even every 30 days. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. I disagreed with the argument made during this meeting and still do. If you now also think that patients should be seen at least every week who are referred to the inpatient hospital, I am glad that there has been a change.

2. At that time [7/6/21], I again pointed out that the current Business Rule measures compliance with an Initial PC contact and a weekly Routine PC contact [implicitly, I think for "*PC Contact - Acute/ICF referral awaiting transfer/admission in outpatient programs,*" MG] .

▮▮▮▮▮▮▮▮

Ok. I have no disagreement with that for *outpatients awaiting transfer to outpatient programs*. I raised the question about patients *referred to the hospital* in the 7/6/21 meeting. The disagreement last week, that prompted the robust BRMR discussion, is whether BRMR rules should allow patients referred to hospitals (for example currently in a CCC Program) to be seen at the program minimum frequency. I said that the minimum should be more stringent because the patients level of care has been raised. To see a patient every 90 or even 30 days by a psychologist, when that patient has been referred to the hospital, I think that is a dangerously low minimum and certainly not consistent with community standards. I have argued that BRMR rules need to reflect that as they may well set a Constitutional minimum.

Best,
Michael



Michael Golding, MD
Statewide Chief Psychiatrist
California Department of Corrections

**From:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Sent:** Thursday, July 8, 2021 9:46 AM
**To:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Subject:** RE: Business rules internal meeting - extra review

2

Good morning,

Looking over the various emails discussing this topic, my efforts to engage the group in a healthy discussion and my periodic summary statements on this matter may not be fully understood by everyone. I'll take this opportunity to clarify:

<u>6/30/21: Business Rules Internal Meeting - Extra Review</u>

1. During this meeting, we discussed the Business Rule: "*PC Contact - Acute/ICF referral awaiting transfer/admission in outpatient <u>programs</u>*"<u>(changes discussed)</u>.
2. Some critical points sparked a robust discussion:
   i. No one can find a current policy that directly sets an expectation for treatment services when patients are referred to Acute or ICF level of care but are awaiting transfer/admission in outpatient housing programs.
   ii. However, the current Business Rule measures compliance with an Initial PC contact "no later than 14 Calendar Days" and a Routine PC Contact every calendar week after that.
   iii. We also discussed adding a higher Initial Contact standard for patients waiting in the ASU, PSU, or SHU - "no later than 5 Calendar Days."
   iv. As written, we discussed how the current Business Rule stems from the Program Guide expectations for CCCMS patients referred to EOP level of care but are awaiting transfer/admission in outpatient housing programs. OLA also offered a legal opinion on the Business Rules alignment with Program Guide expectations.
3. Some attendees stated that a new policy was needed to clearly define expectations for treatment services when patients are referred to Acute or ICF level of care but are awaiting transfer/admission in outpatient housing programs.
   v. I confirmed that at any point, anyone may initiate the process to create a new policy or modify an existing policy.
   vi. I also asked if the group had any concerns about the current Business Rule not representing the current Program Guide requirements. After the meeting, I followed up with an email to all attendees asking the same question, requesting feedback by 7/7/21.

- <u>7/6/21: MHR Pre-BRMR Internal Review</u>
4. During this meeting, the attendees briefly revisited the discussion of the Business Rule: "*PC Contact - Acute/ICF referral awaiting transfer/admission in outpatient programs.*"
   vii. At that time, I again pointed out that the current Business Rule measures compliance with an Initial PC contact and a weekly Routine PC contact.
   viii. My statements seemed to assuage concerns about the current treatment expectations and our intent to continue this expectation.

I hope this helps clear up any confusion. At this point, I am not aware of any concerns that this Business Rule is not representing the current Program Guide requirements. Consequently, I see no reason this Business Rule cannot move forward to BRMR review as written (<u>clean BR version</u> for BRMR).

Thank you,

██████████████████

████████████

Statewide Mental Health Program, CDCR

██████████████

████████████

3

**From:** ▋
**Sent:** Wednesday, June 30, 2021 3:55 PM
**To:** ▋

Golding, Michael@CDCR <Michael.Golding@cdcr.ca.gov>; ▋

**Subject:** RE: Business rules internal meeting - extra review
**Importance:** High

Good afternoon,

Are there any concerns that the indicator we discussed today (see email below) does not represent the current Program Guide requirements? If so, help me see what you see by providing specific Program Guide language.

I need all **feedback by Wednesday (7/7/21)** to ensure the planned BRMR Agenda is accurate.

Thank you,

▋

Statewide Mental Health Program, CDCR
▋

**From:** ▋
**Sent:** Wednesday, June 30, 2021 3:07 PM
**To:** ▋

Golding, Michael@CDCR <Michael.Golding@cdcr.ca.gov>; ▋

**Subject:** RE: Business rules internal meeting - extra review

Good afternoon,

Here are the changes made to the DRAFT_PC Contact - Acute/ICF referral awaiting transfer/admission in outpatient programs. Changes are highlighted in green on SPO:
https://cdcr.sharepoint.com/sites/cchcs_mh_reporting_com/SitePages/Draft/Business%20Rules-%20Draft/DRAFT_PC-Contact%20-%20Acute%20ICF.aspx

Here is the version (clean version) for BRMR next week:
https://cdcr.sharepoint.com/sites/cchcs_mh_reporting_com/SitePages/HQ/Business%20Rules/PC-Contact%20-%20Acute%20ICF.aspx

4

Here are the changes we made today during our pre-BRMR meeting:

| Section | From | To |
|---|---|---|
| Title | DRAFT_PC Contact - Acute/ICF referral awaiting transfer/admission | DRAFT_PC Contact - Acute/ICF referral awaiting transfer/admission in outpatient programs |
| Overview | Measurement of Primary Clinician (PC) contact for Acute and ICF patients awaiting transfer/admission timeframes annotated to Mental Health Program Guide or other policies. | Measurement of Primary Clinician (PC) contact  patients referred to Acute or ICF level of care awaiting transfer/admission in outpatient housing programs. |
| Rule Population | All patient with MHI of Acute or ICF in ML program. These patients are referred to Acute or ICF and are awaiting transfer/admission to DSH or PIP. (ML.*:Acute, ML.*ICF).<br><br>This business rule does not apply to Acute or ICF in ASU program. | All patient with MHI of Acute or ICF. These patients are referred to Acute or ICF and are awaiting transfer/admission to DSH or PIP. |
| Trigger | Initial: Most recent institution arrival Date or Program Start or MHI start<br>Routine: See below table for routine timeframe. | Initial: Most recent institution arrival Date or Program Start<br>Routine: first triggered by initial PC contact. See below table for routine timeframe. If there is no institution changes or program changes, the MHI start will be the trigger for routine. |
| Fulfillment |  | Copy from BRMR reviewed language from today's meeting |
| Timeframe – table heading | Coming from | Previous housing |
| Timeframe | Housing program | Split to Housing program and MHI column |
| Timeframe – initial | Grace period: No sooner than 5 working days when patient previous housing = DSH or PIP | Review grace period. All Acute or ICF patients housed in ML program will have 14 calendar days for initial (see trigger for details. The group agreed that Acute or ICF referral (without housing or institution changes) should not trigger initial) |
| Timeframe | None | when a patient with Acute or ICF MHI change housing program to ASU, SHU or PSU, the rule will be triggered. We are mirroring the ASU/SHU/PSU timeframe in these cases (i.e. no later than 5 calendar days for initial and weekly routine). |

| | | Since the group agreed that Acute or ICF referral (without housing or institution changes) should not trigger initial, acute or ICF referral in ASU/SHU/PSU will not trigger an initial. However, "If there is no institution changes or program changes, the MHI start will be the trigger for routine (see trigger section)." Routine contact requirement will be 1x weekly. |
|---|---|---|
| Known issue | This rule does not apply to ASU or SHU/PSU. | Addressed. remove |

Please let me know if you have any questions. Thank you.

██████████████

██████████████████████████

Statewide Mental Health Program
California Correctional Health Care Services
*Cell:* ███████████████

███████████████████

████████████████████████████

**CONFIDENTIALITY NOTICE:**
This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

-----Original Appointment-----
**From:** ████████████████████████████████
**Sent:** Monday, June 28, 2021 2:49 PM
**To:** ████████████████████████████████████
███████████ Golding, Michael@CDCR; ███████████████████
████████████████████████████████████████
**Subject:** Business rules internal meeting - extra review
**When:** Wednesday, June 30, 2021 1:00 PM-2:00 PM (UTC-08:00) Pacific Time (US & Canada).
**Where:** Microsoft Teams Meeting

Action Items:

1. Bring recommendations regarding rules for ICF/ACUTE patients pending transfer
2. Bring recommendations regarding language in rules table
3. Finalize discussion regarding rules and documentation for ICF/ACUTE patients pending transfer

https://cdcr.sharepoint.com/sites/cchcs_mh_reporting/Lists/Internal_BR/calendar.aspx

# Microsoft Teams meeting

**Join on your computer or mobile app**
Click here to join the meeting

**Join with a video conferencing device**
267586065@t.plcm.vc
Video Conference ID: 117 264 147 9
Alternate VTC dialing instructions

**Or call in (audio only)**
+1 916-701-9994,,873747400#   United States, Sacramento
Phone Conference ID: 873 747 400#
Find a local number | Reset PIN

Learn More | Meeting options

attachment 8

| From: | ▮▮▮▮▮▮▮▮ |
|---|---|
| To: | Coleman Team - RBG Only (ColemanTeam-RBGOnly@rbgg.com); Coleman Special Master Team (ColemanSpecialMasterTeam@rbgg.com); Steven Fama (sfama@prisonlaw.com); elise.thorn@doj.ca.gov; Namrata Kotwani; Damon McClain (Damon.McClain@doj.ca.gov); Paul B. Mello; Samantha Wolff; Kaylen Kadotani; ▮▮▮▮ |
| Subject: | Coleman - Draft Policy Re Contact Requirements for Patients in the MHSDS Prior to IDTT |
| Date: | Wednesday, May 25, 2022 12:56:53 PM |
| Attachments: | Contact Requirements for Patients in the MHSDS Before IDTT and After Discontinuation of Medications 05.24.2022.docx |
| | 03.16.20 MH HQ Memo - Requirement for Initial Contacts to be Completed Prior to the IDTT.pdf |

Good morning,

Attached is a draft policy superseding the March 16, 2020 policy regarding Requirement for Initial Contacts to be Completed Prior to the IDTT. The 2020 policy is also attached. Please provide us with any comments or questions by June 25, 2022. Also, please let us know if you would like to meet and discuss these changes before then.


▮▮▮▮▮▮▮

Attorney
Department of Corrections & Rehabilitation
1515 S Street, Suite 314S
Sacramento, CA 95811-7243


CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.


This message was sent from outside the company. Please do not click links or open attachments unless you recognize the source of this email and know the content is safe.

 

# HEALTH CARE SERVICES

# MEMORANDUM

| | |
|---|---|
| **Date:** | |
| **To:** | Chief Executive Officers<br>CDCR CCHCS Institutional Mental Health Leadership |
| **From:** | AMAR MEHTA M.D.<br>Deputy Director<br>Statewide Mental Health Program |
| **Subject:** | **CONTACT REQUIREMENTS FOR PATIENTS IN THE MENTAL HEALTH SERVICES DELIVERY SYSTEM BEFORE INTERDISCIPLINARY TREATMENT TEAM MEETINGS, AND AFTER DISCONTINUATION OF MEDICATIONS FOR CORRECTIONAL CLINICAL CASE MANAGEMENT SYSTEM AND ENHANCED OUTPATIENT PROGRAM PROGRAMS** |

This memorandum supersedes the "Requirement for Initial Contacts To Be Completed Prior to Interdisciplinary Treatment Team Meetings" memorandum dated March 16, 2020 (attached), and clarifies additional psychiatry contact requirements, especially as related to participation in interdisciplinary treatment team (IDTT) meetings.

The Mental Health Services Delivery System (MHSDS) Program Guide requires all members of the treatment team to be involved in the IDTT (Program Guide 12-3-8, 12-4-6). IDTT members, specifically primary clinicians (MHPC) and psychiatrists (MHMD) must complete their MHPC and MHMD initial evaluations before the initial IDTT for all new intakes and for all patients who have changed institutions and/or level of care.

For the psychiatrist to be meaningfully involved in treatment planning, they must have evaluated the patient prior to IDTT. To ensure the delivery of quality care, the frequency of those visits is defined below.

- The initial IDTT requirements in the MHSDS Program Guide apply to all patients in the MHSDS, whether prescribed psychotropic medication or not. The psychiatrist must complete their initial evaluations within 10 working days after arrival to a Correctional Clinical Case Management System (CCCMS) program, or within 14 calendar days after arrival to an Enhanced Outpatient Program (EOP) and before the initial IDTT for all new intakes and patient transfers. This will align reporting of psychiatric contact requirements with the reporting of the mental health primary clinician requirements.
- For any CCCMS IDTT that is not an initial IDTT (e.g., a routine IDTT), a psychiatric contact shall occur within 90 calendar days prior to the IDTT, whether or not the patient is prescribed psychotropic medication. If the IDTT does not occur on time, the psychiatry contact must still have occurred within 90 days of the delayed IDTT.

# MEMORANDUM

For CCCMS patients for whom psychotropic medication has been discontinued, the psychiatrist shall continue to have routine follow up appointments with the patient for six months, or longer as clinically indicated, after the discontinuation of medication.

If you have questions or require additional information about this memorandum, you may contact the Mental Health Policy Unit by email:  CDCR MHPolicyUnit@CDCR.


Attachment


cc: Toni Martello, M.D.
    Steven Cartwright, Psy.D.
    Travis Williams, Psy.D.
    Michael Golding, M.D.
    Sophia Le, M.D.
    Amber Carda, Psy.D.
    Daisy Minter, Ph.D.
    Lee Lipsker, Ph.D.
    Gretchen Huntington Psy.D.
    Laurie Ball
    Jennifer Johnson
    Pak Yan Leung
    Regional Psychiatrists
    Regional Mental Health Administrators
    Regional Health Care Executives

 # HEALTH CARE SERVICES 

## MEMORANDUM

| | |
|---|---|
| **Date:** | 3/16/2020 |
| **To:** | Chief Executive Officers |
| | Chiefs of Mental Health |
| | Chief Psychiatrists |
| | Senior Psychiatrist, Supervisors |
| **From:** | |

EUREKA C. DAYE, Ph.D., MPH, MA, CCHP
Deputy Director (A)
Statewide Mental Health Program

**Subject:** REQUIREMENT FOR INITIAL CONTACTS TO BE COMPLETED PRIOR TO THE INTERDISCIPLINARY TREATMENT TEAM

As a reminder, per the Mental Health Services Delivery System Program Guide, an initial Interdisciplinary Treatment Team (IDTT) shall be completed for patients at the Correctional Clinical Case Management System (CCCMS) and Enhanced Outpatient Program (EOP) levels of care (LOC):

- No later than 14 _working_ days of the arrival to a CCCMS program.

- No later than 14 _calendar_ days of the arrival date to an EOP program.

IDTT members, specifically primary clinicians (PC) and psychiatrists (PSY), shall complete their initial PC and PSY contacts consistent with the Mental Health Services Delivery Program Guide timelines and prior to the initial IDTT for _all_ new intakes and _all_ patient transfers.

If you have questions or require additional information related to this memorandum, you may contact the Mental Health Policy Unit by email: CDCR MHPolicyUnit@cdcr.

cc: Angela Ponciano                           Amber Carda, Psy.D.
    Laura Ceballos, Ph.D.                      Wendy Worrell, Psy.D.
    Michael Golding, M.D.                      Steven Cartwright, Psy.D.
    Amar Mehta, M.D.                           Jennifer Johnson
    Shama Chaiken, Ph.D.                       Regional Mental Health Administrators
    Travis Williams, Psy.D.                    Regional Health Care Executives

attachment 9

## Golding, Michael@CDCR

| | |
|---|---|
| **From:** | Golding, Michael@CDCR <michael.golding@cdcr.ca.gov> |
| **Sent:** | Tuesday, August 24, 2021 12:31 PM |
| **To:** | ██████████████████████████ |
| **Cc:** | |
| **Subject:** | RE: Clarification of psychiatry contacts for IDTT |

**CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Hi,

Your response to ████████ is not clear to me, you said :
Yes indeed. That is the *intent*

Did you mean  Yes! This memo does modify the PG and has been discussed in workgroups including OSM.

There was a memo stating almost exactly that in 2020. The intent of that memo, signed by the OSM, the Plaintiffs, and CDCR was for the psychiatrist to see the patient before the mandatory 14 day treatment team. CDCR managed to interpret it to say that if the treatment team did not take place (endangering the patient), then the memo specified that it would OK to endanger the patient even more by not mandating that the psychiatrist see the patient before 14 days. Instead because one mistake was made (the treatment team did not occur within 14 days), it would be OK to make a second mistake and not mandate that the psychiatrist see the patient before the 14 day treatment team. No one who wrote and signed the memo thought that.

So yes it has been discussed with the OSM and codified several years ago, but our colleagues have not allowed that idea to be implemented (for many years).

Remarkably, they did not even measure whether a psychiatrist visit occurred before 14 days (even when the treatment team did occur). Thus they were not even following the part of the memo they claimed to understand. They thus continued to endanger patients despite the memo being signed and understood by all. Indeed the memo was signed because of concerns raised about that precise issue in the Golding Report.

Now, they subsequently challenged the memo by presenting the vague rule at BRMR that it would be OK for the psychiatrist to see someone after 90 days if the 14-day treatment team *did not* occur.

But Dr. Potter caught them. At that point CDCR then claimed they understood that of course that 2020 memo meant that even if the treatment team did not occur, surely the psychiatrist should see them before the 14 days. In a previous meeting they had argued that it was not clear at all, though quickly changed their mind when confronted by the OSM. In other words, when I challenged this, it was decided to nonetheless go ahead and present the (deceptive) rule at BRMR. When the OSM caught them, they acknowledged they needed to change.

I do not know what is considered a modification of the Program Guide. If one takes into account the intent of the Program Guide then there is no modification. If one does not, then it does modify the Program Guide.

So the brief answer to your question is
Yes! This memo has been discussed in workgroups including OSM and agreed to and now even agreed to by our colleagues. It became agreed to by our colleagues when the OSM challenged them on that.  In terms of

1

whether it modifies the Program Guide, I do not understand what CDCR would say about that, but suspect there is not necessarily mutual agreement about that amongst all the parties.

So I do not know if it is considered a material modification of the Program Guide. It might be that if it is, it then has more significance as a rule that should be followed into the future, even when the OSM leaves? I just don't know.

I would say to ███████,
"Whether it modifies the Program Guide depends upon what that means, therefore I would consult with our attorneys."

Best,
Michael


Michael Golding, MD
Statewide Chief Psychiatrist
California Department of Corrections

**From:** ███████████████████████████
**Sent:** Tuesday, August 24, 2021 11:53 AM
**To:** Golding, Michael@CDCR <Michael.Golding@cdcr.ca.gov>; ████████████
███████████████████
**Subject:** RE: Clarification of psychiatry contacts for IDTT

Dr. Golding,
This morning I couldn't remember where this memo was in the process.

Current delay is due to this memo still pending clarification from you. The policy team will most likely ask our team( psychiatry) for an update at the next policy tracking meeting.

████████

**From:** ████████████████
**Sent:** Tuesday, August 17, 2021 11:56 AM
**To:** Golding, Michael@CDCR <Michael.Golding@cdcr.ca.gov>; ████████████
███████████████
**Subject:** RE: Clarification of psychiatry contacts for IDTT

Dr. Golding,
Can you please provide some clarification?

████████ asked :
Does this modify the program guide? I tried to look up the timelines in the PG and while referring to page 12-3-9 and was unable to find psychiatry contact timelines. I see that the PG states:
        Each CCCMS inmate-patient on psychiatric medication shall be reevaluated by a psychiatrist a minimum of every 90 days regarding psychiatric medication issues. The psychiatrist shall respond to inmate requests and staff referrals for medication issues according to the time frames established for inmate and staff responses (i.e., Emergent [immediately], Urgent [within 24 hours], or Routine [5 working days]).
Has this memo been discussed with any other workgroups that OSM is involved?

Your response to ▮▮▮▮▮▮ is not clear to me, you said :
Yes indeed. That is the *intent*

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮memo▮▮▮▮▮▮▮▮▮▮▮and▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮including OSM

OR ?

▮▮▮▮▮

**From:** Golding, Michael@CDCR <Michael.Golding@cdcr.ca.gov>
**Sent:** Monday, August 16, 2021 1:11 PM
**To:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Subject:** RE: Clarification of psychiatry contacts for IDTT

Yes indeed. That is the *intent*

But relying on people to understand the intent has allowed all kinds of unfortunate misreading of things that the OSM, the Plaintiffs, and CDCR had previously agreed to and understood.

We need to include a discussion of the initial IDTT because "ALL" other IDTT's covers the initial and we do not intend that.

Thanks.


Best,
Michael

Michael Golding, MD
Statewide Chief Psychiatrist
California Department of Corrections


**From:** Golding, Michael@CDCR
**Sent:** Monday, August 16, 2021 1:01 PM
**To:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Subject:** RE: Clarification of psychiatry contacts for IDTT

Hi,
That language is in error.
All other IDTT's are not supposed to occur within **30 days**. In fact the intial is supposed to occur either before the initial **IDTT or before 14 days**, whichever is sooner.

I will get this edited and send it back to you Ms. Basa.

Thanks

Michael Golding, MD
Statewide Chief Psychiatrist
California Department of Corrections

**From:** █████████████████████████
**Sent:** Monday, August 16, 2021 12:49 PM
**To:** █████████████████████████████████████████
█████

**Cc:** Golding, Michael@CDCR <Michael.Golding@cdcr.ca.gov>
**Subject:** RE: Clarification of psychiatry contacts for IDTT

Good afternoon,

I am getting ready to send the Psychiatry Contact Requirements for Patients in CCCMS memo to OLA for their review. I will send some background information once I submit it, can you please clarify the following:

- **Does this modify the program guide?** I tried to look up the timelines in the PG and while referring to page 12-3-9 and was unable to find psychiatry contact timelines. I see that the PG states:
  Each CCCMS inmate-patient on psychiatric medication shall be reevaluated by a psychiatrist a minimum of every 90 days regarding psychiatric medication issues. The psychiatrist shall respond to inmate requests and staff referrals for medication issues according to the time frames established for inmate and staff responses (i.e., Emergent [immediately], Urgent [within 24 hours], or Routine [5 working days]).
- **Has this memo been discussed with any other workgroups that OSM is involved?**

Thank you very much!


███████████████

██ Policy Support
Statewide Mental Health Program
Division of Health Care Services


*CONFIDENTIALITY NOTICE: This communication and contents may have sensitive, confidential and/or legally privileged information. Any unauthorized disclosure, distribution, or action in reliance on the contents of this communication is strictly prohibited and may be unlawful. If you are not the intended recipient, please contact the sender and destroy all events of this communication. For IT issues contact our Solutions Center at 1-888-735-3470.*

**From:** █████████████████████████
**Sent:** Monday, July 19, 2021 3:56 PM
**To:** ███████████████████████████████████

**Cc:** Golding, Michael@CDCR <Michael.Golding@cdcr.ca.gov>; ███████████████████████████

**Subject:** RE: Clarification of psychiatry contacts for IDTT


███████████

Is this already routing? Or can you use the latest version emailed by ███████████ earlier today(Email attached). As per Dr. Golding' email on Friday( at 6:51 pm) changes were made based on feedback from ███████████( email attached) .

███

**From:** ███████████████████████████████
**Sent:** Monday, July 19, 2021 8:16 AM
**To:** ████████████████████████████ ██████████████████████
**Cc:** Golding, Michael@CDCR <Michael.Golding@cdcr.ca.gov>; ████████████████████████
███████████████████████████████
**Subject:** RE: Clarification of psychiatry contacts for IDTT

Hi ████████,

Yes we received this request.

Thank you!



███████████████
███
Policy Support
Statewide Mental Health Program
Division of Health Care Services


*CONFIDENTIALITY NOTICE: This communication and contents may have sensitive, confidential and/or legally privileged information. Any unauthorized disclosure, distribution, or action in reliance on the contents of this communication is strictly prohibited and may be unlawful. If you are not the intended recipient, please contact the sender and destroy all events of this communication. For IT issues contact our Solutions Center at 1-888-735-3470.*

**From:** ███████████████████████████
**Sent:** Friday, July 16, 2021 4:23 PM
**To:** ██████████████████████████████████████
███████████████████
**Cc:** Golding, Michael@CDCR <Michael.Golding@cdcr.ca.gov>; ████████████████████
████████████████████████
**Subject:** Clarification of psychiatry contacts for IDTT

Hi ████████████,
I cannot remember if I sent this to policy team for routing(and I cannot find this in my sent emails) .
Please let me know if I have, if not please accept for internal routing.

████████

attachment 10

**Golding, Michael@CDCR**

█████████████████████████████████████████████████████████████

**From:** ███████████████████████████████████████████████

**Sent:** Monday, February 7, 2022 12:25 PM

**To:** ██████████████████████████████████████

**Subject:** FW: Wellness Checks

Hi ███████

I discovered last Thursday that the "Wellness Check Only" check out option is being counted in MH Reports as a completed MHSDS-requirement-satisfying appointment, meaning that if an appointment is checked out as a wellness check, it will reset follow up timelines and look like a full appointment was done. I wrote an email to ████████ where I included a link to the user story, a link to the RFC, and a snip of the CAPC slide, and explained that in all of the discussions that led up to adding that Wellness Check option, the purpose of adding the option was always stated as giving clinicians a way to record a face-to-face encounter with a patient that shouldn't count as a completed appointment. To my recollection, everyone in those meetings agreed with that purpose. I believe the meetings had ██████████████ maybe ████████?, and other people from MH and Psychiatry present, and this was discussed in CAPC as well.

I believe this was just an oversight on the part of MH Reporting that when this new checkout code was added to the MH Reports, they made it count as a full completed appointment. But per my conversation with ████████ below, she says she cannot correct MH Reporting without there being a policy that explicitly states that Wellness Checks do not count as completed MHSDS-requirement-satisfying appointments. This seems kind of crazy to me. If we have to go that route, ████████ offered to edit the "Clarification of Clinical Contacts, No Show vs Refusal of Clinical Contact" memo that's currently routing, to add a sentence about what Wellness Checks are, and that they don't count as a completed appointment. But before we do that, we thought it would be a good idea to check in with you to get your thoughts on how to proceed.

Thank you,

████████

**From:** ████████████████████████████████████

**Sent:** Friday, February 4, 2022 9:57 AM

**To:** ████████████████████████████████████████████████

████████████████████████████

**Subject:** RE: Wellness Checks

We can work on the non confid + tele psych = not meeting MHPG requirement but... we can't work on the welfare check one we have the policy.

Thank you.

████████ L.C.S.W.

1

Quality Management and Informatics- HQ
Statewide Mental Health Program
California Correctional Health Care Services

████████████████

████████████████████████

████████████████████████████████

**CONFIDENTIALITY NOTICE:**
This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

**From:** ████████████████████████████████
**Sent:** Friday, February 4, 2022 9:54 AM
**To:** ████████████████████████████████████████████
**Subject:** RE: Wellness Checks

Thank you, ████████! ☺ That totally makes sense.

**From:** ████████████████████████████████████
**Sent:** Friday, February 4, 2022 9:53 AM
**To:** ████████████████████████████████████████████
████████████████████████ ≥
**Subject:** RE: Wellness Checks

This story is under EHRS PC and I don't see a story added or spitted from this request... that's why it was missed.

Adding a story now and will work on it very soon. Sorry about this and thank you for finding the story.

████████████████

████████████████████

████████████████████████████

Statewide Mental Health Program
California Correctional Health Care Services

████████████████

████████████████████████

████████████████████████████████

**CONFIDENTIALITY NOTICE:**
This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

**From:** ████████████████████████████████
**Sent:** Friday, February 4, 2022 9:47 AM
**To:** ████████████████████████████████████████████
**Subject:** RE: Wellness Checks

I found the user story: User Story 107234: *New Change Request* Add Check Out Codes in EHRS / Update Programing in Reporting - Boards

Here's the slide (see snip below). The intent was that all 3 of these new check out codes wouldn't count for appointment completion in reporting. It's unfortunate that the slide lists that item 2nd, and wellness check 3rd, since it makes it a little

2

confusing whether #2 applies to wellness check or just to item #1, but it was intended to apply to all of the new check out codes added with this user story.

The purpose of wellness checks is to provide a way to capture times where the clinician talked with the patient, but it either wasn't a clinically significant encounter (basically just a "hey, you ok?"), or it was a non-confidential telepsychiatry appointment (which per Telepsychiatry policy, cannot count as a completed appointment for reporting purposes). I don't have the Telepsychiatry policy in front of me, but I did snip the 2/7/2020 Clinical Contacts memo, which reiterates that non-confidential telepsych appointments don't count. I don't know of any policy that defines "wellness check" and that it won't be counted, but I know in the meetings we had regarding these check out codes, everyone agreed that wellness checks wouldn't count.

Here's the RFC: IT RFC Portal - Power Apps Unfortunately, again, the text of the request implies that all of the new contact modes are being added due to a need for having some contact mode options that won't count as completed appointments, but it doesn't explicitly state that it won't count.

Do you think this could count as a bug? If not, would the best course be for me to submit a CAPC user story to fix this?

Thanks!

# Add Check Out Codes in EHRS

## STORY ID: 107234



### RISK MATRIX

| | Catastrophic | Critical | Marginal |
|---|---|---|---|
| Very Likely | H | H | M |
| Likely | H | M | L |
| Possible | H | M | L |
| Unlikely | M | L | L |
| Remote | L | L | L |

## REQUEST – (01/04/2021)

1. Add Check out codes in EHRS:
"Incomplete – IP Refused Remainder of Appt" and "Incomplete-RemainderofApptCanceled"
2. Update programing so that these are not counted for appointment completion in reporting.
3. Wellness check only

**PRESENTER:** ▇▇▇▇▇

## RATIONALE

**REQUEST TYPE: EHRS REPORTING**

This is to address the need to only count clinically significant encounters. When an appointment is terminated prematurely and no clinically significant interaction occurs, we need to be able to identify that with check out codes so that these can be "out counted" from complete appointments.

Integrated Reviewed (No)          CLAC Approved (No)

# MEMORANDUM

| | |
|---|---|
| **Date:** | 2/7/2020 |
| **To:** | Chief Executive Officers |
| | Chiefs of Mental Health |
| | Chief Psychiatrists |
| | Senior Psychiatrist Supervisors |
| **From:** | |
| | EUREKA C. DAYE, Ph.D., MPH, MA, CCHP |
| | Deputy Director (A) |
| | Statewide Mental Health Program |
| **Subject:** | **CLINICAL CONTACTS AND DOCUMENTATION** |

This memorandum provides direction to mental health clinicians (psychiatrists, psychologists, social workers, psychiatric nurse practitioners) regarding clinical contacts and documentation.

**Clinical Contact**

Each patient shall be offered individual treatment in a confidential setting. To be considered a clinical contact that meets Mental Health Services Delivery System (MHSDS) Program Guide requirements, the patient must be seen:

1. In a confidential setting[1], OR

2. In a non-confidential setting in response to:
   a. The patient's refusal, as defined below, OR
   b. Temporary Medical Isolation that requires confinement to quarters or isolation in a medical setting per the Health Care Department Operations Manual 1.2.14, Medical Classification System (Attached).

A non-confidential contact for reasons other than in response to a refusal or medical isolation due to medical illness shall not be considered a Program Guide required clinical contact.

Non-confidential contacts for telepsychiatry shall not be considered a Program Guide required clinical contact under any circumstances.

**From:** ███████████████████████
**Sent:** Friday, February 4, 2022 8:49 AM
**To:** ███████████████████████████████
███████████████████████ >
**Subject:** RE: Wellness Checks

Good morning,

Didn't mean to scare both of you ☺

I looked. So wellness check are coded as completed and therefore, it is counting as MHPG requirement at this time.

Was there ever a published memo that say wellness check should never count?

Thank you.

██████████████
████████████
Statewide Mental Health Program
California Correctional Health Care Services
*Cell:* ██████████
███████████████████████

**CONFIDENTIALITY NOTICE:**
This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

**From:** ███████████████████████
**Sent:** Friday, February 4, 2022 8:06 AM
**To:** ███████████████████████████████
**Subject:** RE: Wellness Checks

I think ████████ question was whether in the current Check out options, if a staff chooses Wellness Check only, does reporting count this as a contact? It sounds like some staff are being advised to cancel these rather than check them in and out, because they don't want to inappropriately get credit when telepsychiatrists do a cell-front. Am I summarizing this right ████████? If it's true it's causing a dilemma, on one hand appointments shouldn't really be cancelled if they're seen (cell-front), but on the other hand tele-psych shouldn't be getting credit for seeing the patient.

Exactly my question! Thanks ████████. ☺ And sorry, ████████. I definitely didn't mean to stress you out. I just want Telepsych to be able to use the Wellness Check checkout option (I thought they already were, and was surprised when they said they're still cancelling all of their completed non-confidential appointments), but if I recommend that to them, I want to make sure I'm not telling them something that's going to mess up their reporting to the Court (by non-confidential appointments satisfying MHSDS appointment requirements). I'll try to do some digging on my own to see if Wellness Checks are being counted as MHSDS appointments that satisfy timelines.

**From:** ███████████████████████
**Sent:** Thursday, February 3, 2022 3:52 PM
**To:** ███████████████████████████████
**Subject:** RE: Wellness Checks

Hi ███,

I'm so sorry, I did not mean to raise your blood pressure!  I know how many changes you have pending. ...

I think ███ question was whether in the current Check out options, if a staff chooses Wellness Check only, does reporting count this as a contact?  It sounds like some staff are being advised to cancel these rather than check them in and out, because they don't want to inappropriately get credit when telepsychiatrists do a cell-front.  Am I summarizing this right ███?  If it's true it's causing a dilemma, on one hand appointments shouldn't really be cancelled if they're seen (cell-front), but on the other hand tele-psych shouldn't be getting credit for seeing the patient.

The other point I was bringing up is that in the approved/revised check out codes, which are pending the currently routing memo to explain the new process, there is an attached reporting change that would accomplish this – the check-out codes for wellness check automatically don't count as MHPG sessions.  I'm not sure what the time frame for this memo is – the plan is we'd make the EHRS changes once it is released.

Does this help?

███

**From:** ███
**Sent:** Thursday, February 3, 2022 3:38 PM
**To:** ███
███
**Subject:** RE: Wellness Checks

Good afternoon,

mm... I think so ... I have to say my heart rate rise after reading this email... like did I miss a critical thing?

I am kind of lost.... We have so many things about check in/out and scheduling project.... I think I am waiting on the code combination thing but yes, we cannot implement that until the memo is released. But I think telepsych contact may already spell out on a published memo? Did we already change the confidential options (from yes and no to 3 options)? Did we make all EHRS changes? I don't remember seeing that story to change confidential section....

I have Adinn to search for telepsych policy. If there is already a memo re: telepsych contact, we will have to work on it regardless of the memo we are waiting on.

Thank you.

███
███
███
Statewide Mental Health Program
California Correctional Health Care Services
*Cell:* ███
███
███

**CONFIDENTIALITY NOTICE:**
This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including Electronic Communications Privacy Act.  If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

**From:** ███████
**Sent:** Thursday, February 3, 2022 1:21 PM
**To:** ███████████████████████
**Subject:** RE: Wellness Checks

███████ is this change pending the updates to the check-out codes that will happen when the corresponding memo is released? I know that the MHR check out code combinations that we worked out all stipulate that the "Other – Wellness Check" option in the upcoming Contact Status check out code will not count as an MHPG contact (regardless of any of the other options selected). I wasn't sure if reporting was waiting for the EHRS change before implementing this on the back end.

████████

**From:** ████████████████
**Sent:** Thursday, February 3, 2022 12:41 PM
**To:** ███████████████████████
**Subject:** RE: Wellness Checks

I think the Wellness Check check out option satisfied that request. Since the Wellness Check option is in the Contact Mode field, it's possible for the Telepsychiatrist to capture that it was a Wellness Check and that it occurred CellFront. So as long as Wellness Checks don't count as MHSDS-compliant appointments, I don't think we need that user story anymore.

**From:** ████████████████
**Sent:** Thursday, February 3, 2022 12:38 PM
**To:** █████████████████████████
████████████████

**Subject:** RE: Wellness Checks

I found it…. It's an RFA <u>User Story 98751: RFA: MHR Rule: Change how telepsychiatry appts are captured - Boards</u> but # 18
Now that we have Adinn, let me assign this to him so that we can get this started.

Thank you.

██ ████ ███
██████████████████
███████████████

Statewide Mental Health Program
California Correctional Health Care Services
*Cell:* ███████████
Email: ████████████████
███████ M-F 0730-1630; every other Mondays off

**CONFIDENTIALITY NOTICE:**
This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and ███ all copies of the communication.

**From:** ████████████████
**Sent:** Thursday, February 3, 2022 12:36 PM
**To:** █████████████████████████
**Subject:** RE: Wellness Checks

I don't know of any change requests following the original request to add the Wellness Check option. If I remember correctly, when the Wellness Check option was added to check out, it was specifically added as a way to record that an appointment occurred but that the appointment shouldn't count for fulfilling MHSDS requirements. But I can go try to look for the user story or discussions from back then.

**From:** ███████████████████████████████
**Sent:** Thursday, February 3, 2022 12:31 PM
**To:** █████████████████████████████████████████████████
██████████████████████████
**Subject:** RE: Wellness Checks

Good afternoon,

Before telling Telepsychiatry to use Wellness Check for any non-confidential telepsych appointment, I just wanted to confirm that Wellness Checks aren't counted by MH Reporting as MHSDS-compliant appointments. ← mm… not that I am aware of… was there an existing policy? was there a change request?

Thank you.

████████  ███████
████████████████████
███████████████████████
Statewide Mental Health Program
California Correctional Health Care Services
*Cell:* ████████████████
█████████████████████████
█████████████████████████████████

**CONFIDENTIALITY NOTICE:**
This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

**From:** ████████████████████████████████
**Sent:** Thursday, February 3, 2022 11:37 AM
**To:** ████████████████████████████████████████████████████
**Subject:** RE: Wellness Checks

Thanks ████████

**From:** ████████████████████████████████
**Sent:** Thursday, February 3, 2022 11:34 AM
**To:** ████████████████████████████████████████████████████
**Subject:** RE: Wellness Checks

Hi ███████

Yes, the wellness check option has been in there for some time (even before the still pending changes). I'm not sure that reporting was updated yet, she can better answer that part of your question.

████████

Content Mode ①

In Person · Complete
Complete · IP Refused Remainder of Appt
Complete-RemainderOfAppointmentCanceled
Incomplete~IP Refused Remainder of Appt
Incomplete-Remainder Of Appt Canceled
MHPC Temp Tele-health
Wellness Check Only
Phone Only
Telepsychiatry
Temp Tele-health MHMD
IDTT/Committee Held in Absentia

**From:** ███████████████████████
**Sent:** Thursday, February 3, 2022 10:37 AM
**To:** ███████████████████████████████████
**Subject:** Wellness Checks

Hi ███████

I was just talking with Telepsych, and they said they're still cancelling non-confidential telepsychiatry appointments. I thought the Wellness Check check-out option went into EHRS several months ago (███████ please correct me if I'm wrong). Before telling Telepsychiatry to use Wellness Check for any non-confidential telepsych appointment, I just wanted to confirm that Wellness Checks aren't counted by MH Reporting as MHSDS-compliant appointments.

Thanks!

██████

███████████████████
███████████████████
Elk Grove - Headquarters
California Department of Corrections and Rehabilitation
Cell phone: ████████████

We brought that up with them.r

One of our psychiatry colleagues said about this:
"I believe this was just an oversight on the part of MH Reporting that when this new checkout code was added to the MH Reports, they made it count as a full completed appointment. But per my conversation with ████████ below, she says

she cannot correct MH Reporting without there being a policy that explicitly states that Wellness Checks do not count as completed MHSDS-requirement-satisfying appointments. This seems kind of crazy to me."

We can work on the non confid + tele psych = not meeting MHPG requirement but... we can't work on the welfare check one we have the policy.

Thank you.

**From:** ███████████████████████████████
**Sent:** Friday, March 4, 2022 12:47 PM
**To:** ████████████████████████████████████████████
████████████████████████████ Michael@CDCR <Michael.Golding@cdcr.ca.gov>; ███████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████
**Subject:** RE: CAPC results

Here you go!

**From:** ███████████████████████████
**Sent:** Friday, March 4, 2022 12:41 PM
**To:** █████████████████████████████████████████████
████████████████ Golding, Michael@CDCR <u>Michael.Golding@cdcr.ca.gov</u>; ██████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████ █ ██████████████████████████████
**Subject:** RE: CAPC results

Here's the Wellness Check Only slide. Per TFS, it was approved in CAPC on 1/7/21. I don't have the minutes from that meeting, though.

11

## Add Check Out Codes in E



## STORY ID: 107234

L. ▮
L. ▮
O. ▮

## RISK MATRIX



| | Catastrophic | Critical | Marginal |
|---|---|---|---|
| Very Likely | H | H | M |
| Likely | H | M | L |
| Possible | H | M | L |
| Unlikely | M | L | L |
| Remote | L | L | L |

## REQUEST – (01/04/2021)

1.    Add Check out codes in EHRS: "Incomplete – IP Refused Remainde RemainderofApptCanceled"
2.    Update programing so that the completion in reporting.
3.    Wellness check only

## RATIONALE

This is to address the need to only count clinically significant encounters. When an appointment is terminated prematurely no clinically significant interaction occurs need to be able to identify that with che codes so that these can be "out counted from complete appointments.

Integrated Reviewed (No)                CLAC A

---

**From:** ▮
**Sent:** Friday, March 4, 2022 12:28 PM
**To:** ▮ Golding, Michael@CDCR <Michael.Golding@cdcr.ca.gov>; ▮
▮
▮
**Subject:** CAPC results

I *think* I found it... story number 114025. It's on the agenda in more detail on 8/12/21 with those minutes reflecting an RFA to look at what should count towards MHPG requirements. Final vote on 9/9/21 and the minutes are pretty vague about it other than the product of a HQ workgroup.

Best,

attachment 11

**Golding, Michael@CDCR**

| | |
|---|---|
| **From:** | ▓▓▓▓▓▓▓▓ |
| **Sent:** | |
| **To:** | ▓▓▓▓▓▓▓▓▓▓▓▓▓▓ |
| **Cc:** | ▓▓▓▓▓▓▓▓▓ |
| **Subject:** | RE: Wellness Checks |
| **Attachments:** | Clinical Contacts and Documentation 02.04.2022 psych response 2 track change version.docx |

> **CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

1. "Making a change without a clear controlling policy" – With all due respect, I am having a difficult time agreeing with this. Are we saying that no changes are or will be made without a clear controlling policy? This code was created to give staff credit for non-confidential contacts that they are expected to complete if a patient no shows. There was nothing confusing about the reason behind creating wellness checks.

   ".. rushing to a ch▓▓▓▓▓▓ have been discussing "wellness checks" for years now, I remember having these discussions with ▓▓▓▓▓ a few years ago ( not saying it was approved, just that it was discussed)

   "alternative names"- IMO the best name for a patient contact to check on their wellbeing is a wellness check.

   "…. the breakdown occurred because there wasn't clear controlling documentation of our understanding and agreement." – Do we have confirmation that THAT is what happened? To be honest, I really can't wrap my head around how this mistake was made.

2. If we don't fix the problem now, we are basically back to counting those non confidential visits as completed appointments. Requiring policy to guide this "fix" will sets bad precedent. IMO.

3. The reason we created wellness checks - If a patient no shows for their appointment, most MH staff are asked/encouraged ( whatever you want to call it) to go find the patient and complete a wellness check. With the changes to our appointment resolution codes we will not be counting these as completed appointments. So here is what line staff clinicians and psychiatrists are dealing with  -
- They still need to go find the patient and do a wellness check.
- It doesn't count as a completed appointment, so compliance starts to fall – for which staff get in trouble.
- Now supervisors who are keeping an eye on their staff's performance start to question where they've been spending all their time since the time they spend on wellness checks (which in my personal experience could be a majority of your work day) isn't counted.

Our system does not reward staff for doing the right thing, in fact it punishes staff for doing the right thing, and rewards staff for doing the wrong thing.

With all that being said, I have made changes to the refusals memo and attached it for everyone's review and approval. Once approved, I request an expedited routing for this edit (since the memo has completed internal routing).

▓▓▓▓▓▓▓gram

| | |
|---|---|
| **From:** | ▓▓▓▓▓▓▓▓ |
| **Sent:** | M▓▓ |
| **To:** | ▓▓▓▓▓▓▓▓▓▓▓▓▓▓ |

1

**Subject:** RE: Wellness Checks

Hmmm ok I understand people are very incensed about needing a policy to make a change. Understanding the likely response of going against that group feeling, and you all knowing that I understand that... please consider the following in that context.

Making a change without a clear controlling policy is what got us into this mess. If we should have been clearer in the first instance to avoid the problem, we should be clearer here to fix it right.

Who's to say that everyone in CDCR is currently using this the way we think they are? We have called other things "wellness checks" before in the context of telepsychiatry. Is it really just a bug fix? If we change it, we may be better off basing that on something, some message, that can clarify what happened.

I'm not saying we've done it perfectly every time before; but I can also tell you with certainty that we've gotten ourselves into a worse mess by rushing to a change many times before.

That also answers ▇▇▇▇ last question, about how the breakdown occurred. There was a lot of crazy stuff happening during COVID, we were trying to patch a leaky ship that was already at the bottom of the ocean. But the breakdown occurred because there wasn't clear controlling documentation of our understanding and agreement. Which, again, I agree that that WAS our understanding and agreement (that wellness checks shouldn't count), and we need to fix the system to reflect that.

Maybe we could change the name of the indicator to something more clear at the same time we fix the measurement? Something that means more like "non-Program Guide visit." I agree we shouldn't throw the baby out with the bathwater and lose the whole visit type, but if I can come up with a couple alternatives just thinking about it for 30 seconds, shouldn't people think it through a little bit and see if there are other options?

▇▇

**From:** ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
**Sent:** Monday, February 7, 2022 5:02 PM
**To:** ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

**Subject:** RE: Wellness Checks

I also agree that "Wellness Check Only" can yield valuable information.

Personally, I like the idea of a bug fix. In all of the meetings I attended, I do remember consensus on the methodology of how the system will 'count' wellness checks, so I don't think there would need to be any additional discussions. As others have mentioned, there may need to be some discussion on how far to back-date. I also agree that we ought to be thoughtful about unintended consequences, but this seems rather straightforward (which is why I'm sure it's not, lol).

I'm not sure I fully agree with the sentiment that correcting MH Reporting requires something explicit in policy (especially if it was truly an error or unintended), nor do I think that has been our practice.

I think another problem here, maybe the more fundamental issue, is how, where, and why the breakdown occurred to have a policy, and the interpretation of that policy, have a different methodology than what was decided by all

stakeholders. This seems like a simple error, but I do think it would be fruitful to prevent these types of errors in the future.

██████ ██

████████████████

Statewide Mental Health Program

**From:** █████████████████████████████████████████
**Sent:** Monday, February 7, 2022 3:52 PM
**To:** ████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
██████████████████████████████
██ ████████████████████████████████
**Subject:** RE: Wellness Checks

I definitely don't think the right solution is to remove "Wellness Check Only" from the check out options. It has a purpose – prior to adding it (well, currently, since it's being counted as a completed appointment) we had no way in the system to record brief encounters with patients that weren't clinically significant, but were nonetheless time spent with the patient. That's valuable information, and makes the record more accurate. If a patient no shows to an appointment, the clinician doesn't have time to do a full appointment with them later that day, but at least stops by their cell to get affirmation that they're okay, that's important info to have in the chart (especially if there's a bad outcome later).

I get not wanting to rush into a solution, and there will need to be discussion of the implementation date and whether to go back and fix previous data, but from ████████'s response it sounds like at least from her perspective, there won't be any changes made until "wellness checks don't count as completed appointments" is written in policy. So maybe we could start there. Do we need to edit a policy to add a sentence or two about wellness checks? If yes, we can do that. If no, then is the next step a CAPC slide?

**From:** ████████████████████████████████████
**Sent:** Monday, February 7, 2022 3:48 PM
**To:** ████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
██████████████████████████████
██ ████████████████████████████████
**Subject:** RE: Wellness Checks

I am glad this is a discussion.

IMO, the wellness check option would serve its purpose, if done right. I hope a mistake in the code will not be considered failure to do what it is meant to; I think we have to try to do it right, and then decide if it works.

And yes, we have to think about when do we stop counting.

Warm Regards,

████████████████████

Statewide Mental Health Program

**From:** ████████████████████████████████
**Sent:** Monday, February 7, 2022 3:36 PM

3

**To:** █████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████

**Subject:** RE: Wellness Checks

I was just texting this to ██████████ but figured I should share with the group.

Even if we don't answer the question of how to correct past data right now:
I don't know the precise best option, but just off the top of my head I can imagine solutions such as just removing the option entirely if it is not serving its purpose and doesn't have a clear benefit. I don't want to rush into a solution that we then have to quickly take back, re-do, change again, etc. It's been this way for over 9 months; a rushed solution can make the problem worse before it gets better. Even if we change it today, when do we start counting from? Do those appts stop counting from now forward, or do we count backwards--ignoring the wellness checks--to the last full appt?

Thoughts are welcome

██

**From:** █████████████████████████████████████
**Sent:** Monday, February 7, 2022 3:21 PM
**To:** █████████████████████████████████████████████████████████

████████████████████████████████████████

████████████████████    ████████████████████

**Subject:** RE: Wellness Checks

I suggested treating it as a bug, since it's not functioning the way it was supposed to function. Bug fixes don't require a big process for approval.

But if we don't treat it as a bug fix, we could submit an expedited user story to CAPC for approval to fix this.

**From:** █████████████████████████████████
**Sent:** Monday, February 7, 2022 3:16 PM
**To:** ████████████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████    ████████████████████

**Subject:** RE: Wellness Checks

I would imagine the solution is as simple as- stop coding wellness checks as completed…but I admit I don't know what I don't know about the process.

████████████

Warm Regards,

██████████████████████

████████████████████████████

Statewide Mental Health Program

**From:** ███████████████████████████
**Sent:** Monday, February 7, 2022 3:08 PM
**To:** ████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

**Subject:** RE: Wellness Checks

Ah ok thanks, that's clarified. Then yeah I am not sure the best way to fix this but let's proceed on this discussion...

thx
██

**From:** █████████████████████████████
**Sent:** Monday, February 7, 2022 3:05 PM
**To:** ████████████████████████████████████████
██████████████████████████████████
████████████████████████████████████████

**Subject:** RE: Wellness Checks

Wellness Check Only was added to PROD on 4/26/21. "Wellness Check Only" was added to be used for patient contacts that weren't a clinically significant contact with the patient, and shouldn't count as a completed appointment. The telepsych vs on-site cellfront appointments is a separate issue, but got brought in to this discussion due to me suggesting telepsych could use that wellness check option as a way to record that there was a face-to-face, without actually getting credit in reports for it.

In ████████ email below she says "*So wellness check are coded as completed and therefore, it is counting as MHPG requirement at this time.*" That's the real issue.

If an on-site psychiatrist sees a patient cellfront in response to a refusal, they check the appointment out as "In Person — Complete", location CellFront, due to appointment refusal, and that appointment counts as a completed appointment. We wouldn't tell them to use Wellness Check Only for that.

**From:** ███████████████████████████
**Sent:** Monday, February 7, 2022 2:53 PM
**To:** ████████████████████████████████████████
██████████████████████████████████
████████████████████████████████████████

**Subject:** RE: Wellness Checks

So we have not been having telepsych check out anything cell-side, including wellness checks, and it's a good thing we didn't because they'd still be counting towards PG timelines.

Also the terms are murky – "wellness checks" are what we'd been calling it when people do cell-sides when a patient no shows/refuses, but with COVID I think more things are happening cell-side. In any case we're not checking it out in telepsych, just canceling and documenting the encounter.

We've been mostly waiting for the telepsychiatrist designation in EHRS before we have telepsychiatrists check anything out because even with telepsychiatrist as a dropdown option at check out, I know there are lots of people in the field who might use that when teleworking, even though there's an option for temp telework, and that could confuse the data.

Best,

███

**From:** ████████████████████████

**Sent:** Monday, February 7, 2022 2:47 PM

**To:** ████████████████████████████████

████████████████████████████████████████

██ ████████████████████████████████████████

**Subject:** RE: Wellness Checks

Oh no, wait. If we're talking about the difference between telepsychiatry and on-site but tele-working psychiatry, this may be a semantic confusion.

If the patient refuses and telepsych does a cell front that they think served to address any concerns they would have dealt with in a session, that still does **NOT** count. We call it a wellness check.

But if an on-site person is tele-working and they do the same it **DOES** count. I think same for like cell-front visits during quarantine or something, if it was a 'sufficient' visit.

Other terms: "rounding" (a quick check on a patient because there is not enough staff, largely intended to screen for severe problems) shouldn't ever count as a full session. Are we confusing terminology?

We can ask████████████ too about the use of these words... it got murky, but there is definitely some category of cell-front visits that count for on-site but not telepsych, and maybe that's what's being caught here?

██

**From:** ████████████████

**Sent:** Monday, February 7, 2022 2:41 PM

**To:** ████████████████████████████████

████████████████████████

██ ████████████████████████████████

**Subject:** RE: Wellness Checks

Oh dear lord. I remember those conversations as well and that is my understanding too. When was the check-out code added? I'm not sure what our communication was like with MH reporting team at the time... For what it's worth, here's a ██ memo from 3/25/2020 which is the first mention of it that I can find with a quick text search, & a later re-issue by me 5/28/2021. (Not helpful in terms of directly stating whether it counts, just for reference.) Looping in ████ if other things come to mind.

Yes we gotta fix it. The question is how far back in time is it worth trying to correct the data, given all the other changes that have propagated through and our decisions about other data that may or may not make any historical-data-which-is-updated-now potentially wildly inaccurate.

██

**From:** ████████████████████████

**Sent:** Monday, February 7, 2022 12:25 PM

**To:** ████████████████████████

**Cc:** ██████████████████████████████████████████████████████

**Subject:** FW: Wellness Checks

Hi ████

I discovered last Thursday that the "Wellness Check Only" check out option is being counted in MH Reports as a completed MHSDS-requirement-satisfying appointment, meaning that if an appointment is checked out as a wellness check, it will reset follow up timelines and look like a full appointment was done. I wrote an email to ████████ where I included a link to the user story, a link to the RFC, and a snip of the CAPC slide, and explained that in all of the discussions that led up to adding that Wellness Check option, the purpose of adding the option was always stated as giving clinicians a way to record a face-to-face encounter with a patient that shouldn't count as a completed appointment. To my recollection, everyone in those meetings agreed with that purpose. I believe the meetings had ████████████████████████████?, and other people from MH and Psychiatry present, and this was discussed in CAPC as well.

I believe this was just an oversight on the part of MH Reporting that when this new checkout code was added to the MH Reports, they made it count as a full completed appointment. But per my conversation with ████████ below, she says she cannot correct MH Reporting without there being a policy that explicitly states that Wellness Checks do not count as completed MHSDS-requirement-satisfying appointments. This seems kind of crazy to me. If we have to go that route, ████████ offered to edit the "Clarification of Clinical Contacts, No Show vs Refusal of Clinical Contact" memo that's currently routing, to add a sentence about what Wellness Checks are, and that they don't count as a completed appointment. But before we do that, we thought it would be a good idea to check in with you to get your thoughts on how to proceed.

Thank you,

████████

**From:** ████████████████████████████████████████

**Sent:** Friday, February 4, 2022 9:57 AM

**To:** ████████████████████████████████████████████████████

████████████████████████████████

**Subject:** RE: Wellness Checks

We can work on the non confid + tele psych = not meeting MHPG requirement but... we can't work on the welfare check one we have the policy.

Thank you.

████████████████████

████████████████████

████████████████████████

Statewide Mental Health Program

California Correctional Health Care Services

████████████████████

████████████████████

████████████████████████████████

**CONFIDENTIALITY NOTICE:**

This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

**From:** ██████
**Sent:** Friday, February 4, 2022 9:54 AM
**To:** ██████
**Subject:** RE: Wellness Checks

Thank you, ██████ ! ☺ That totally makes sense.

**From:** ██████
**Sent:** Friday, February 4, 2022 9:53 AM
**To:** ██████
**Subject:** RE: Wellness Checks

This story is under EHRS PC and I don't see a story added or spitted from this request... that's why it was missed.

Adding a story now and will work on it very soon. Sorry about this and thank you for finding the story.

██████
██████
██████
Statewide Mental Health Program
California Correctional Health Care Services
*Cell:* ██████
██████
██████

**CONFIDENTIALITY NOTICE:**
This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

**From:** ██████
**Sent:** Friday, February 4, 2022 9:47 AM
**To:** ██████
**Subject:** RE: Wellness Checks

I found the user story: User Story 107234: *New Change Request* Add Check Out Codes in EHRS / Update Programing in Reporting - Boards

Here's the slide (see snip below). The intent was that all 3 of these new check out codes wouldn't count for appointment completion in reporting. It's unfortunate that the slide lists that item 2nd, and wellness check 3rd, since it makes it a little confusing whether #2 applies to wellness check or just to item #1, but it was intended to apply to all of the new check out codes added with this user story.

The purpose of wellness checks is to provide a way to capture times where the clinician talked with the patient, but it either wasn't a clinically significant encounter (basically just a "hey, you ok?"), or it was a non-confidential telepsychiatry appointment (which per Telepsychiatry policy, cannot count as a completed appointment for reporting purposes). I don't have the Telepsychiatry policy in front of me, but I did snip the 2/7/2020 Clinical Contacts memo, which reiterates that non-confidential telepsych appointments don't count. I don't know of any policy that defines "wellness check" and that it won't be counted, but I know in the meetings we had regarding these check out codes, everyone agreed that wellness checks wouldn't count.

8

Here's the RFC: IT RFC Portal - Power Apps Unfortunately, again, the text of the request implies that all of the new contact modes are being added due to a need for having some contact mode options that won't count as completed appointments, but it doesn't explicitly state that it won't count.

Do you think this could count as a bug? If not, would the best course be for me to submit a CAPC user story to fix this?

Thanks!

# Add Check Out Codes in E

## STORY ID: 107234



### RISK MATRIX

|  | Catastrophic | Critical | Marginal |
|---|---|---|---|
| Very Likely | H | H | M |
| Likely | H | M | L |
| Possible | H | M | L |
| Unlikely | M | L | L |
| Remote | L | L | L |

## REQUEST – (01/04/2021)

1.  Add Check out codes in EHRS: "Incomplete – IP Refused Remainde RemainderofApptCanceled"
2.  Update programing so that the completion in reporting.
3.  Wellness check only

## RATIONALE

This is to address the need to only count clinically significant encounters. When an appointment is terminated prematurely no clinically significant interaction occurs need to be able to identify that with che codes so that these can be "out counted from complete appointments.

**Integrated Reviewed (No)**           **CLAC A**

# Add Check Out Codes in EHRS

## STORY ID: 107234

## REQUEST – (01/04/2021)    PRESENTER:

1. Add Check out codes in EHRS:
   "Incomplete – IP Refused Remainder of Appt" and "Incomplete-RemainderofApptCanceled"
2. ~~Update – reprogramming so that these are not counted for appointment completions in reporting.~~
3. Wellness check only

## RISK MATRIX

| | Catastrophic | Critical | Marginal |
|---|---|---|---|
| Very Likely | H | H | M |
| Likely | H | M | L |
| Possible | H | M | L |
| Unlikely | M | L | L |
| Remote | L | L | L |

## RATIONALE

~~This is to address the need to only count clinically significant encounters.~~ When an appointment is terminated prematurely and no clinically significant interaction occurs, we need to be able to identify that with check out codes so that these can be "out counted" from complete appointments.

## REQUEST TYPE: EHRS REPORTING

Integrated Reviewed (No)    CLAC Approved (No)

# MEMORANDUM

| | |
|---|---|
| **Date:** | 2/7/2020 |
| **To:** | Chief Executive Officers |
| | Chiefs of Mental Health |
| | Chief Psychiatrists |
| | Senior Psychiatrist Supervisors |
| **From:** | |
| | EUREKA C. DAYE, Ph.D., MPH, MA, CCHP |
| | Deputy Director (A) |
| | Statewide Mental Health Program |
| **Subject:** | **CLINICAL CONTACTS AND DOCUMENTATION** |

This memorandum provides direction to mental health clinicians (psychiatrists, psychologists, social workers, psychiatric nurse practitioners) regarding clinical contacts and documentation.

**Clinical Contact**

Each patient shall be offered individual treatment in a confidential setting. To be considered a clinical contact that meets Mental Health Services Delivery System (MHSDS) Program Guide requirements, the patient must be seen:

1. In a confidential setting[1], OR

2. In a non-confidential setting in response to:
    a. The patient's refusal, as defined below, OR
    b. Temporary Medical Isolation that requires confinement to quarters or isolation in a medical setting per the Health Care Department Operations Manual 1.2.14, Medical Classification System (Attached).

A non-confidential contact for reasons other than in response to a refusal or medical isolation due to medical illness shall not be considered a Program Guide required clinical contact.

Non-confidential contacts for telepsychiatry shall not be considered a Program Guide required clinical contact under any circumstances.

**From:** ███████████████████████████
**Sent:** Friday, February 4, 2022 8:49 AM
**To:** ██████████████████████████████████████████
███████████████
**Subject:** RE: Wellness Checks

Good morning,

Didn't mean to scare both of you ☺

I looked. So wellness check are coded as completed and therefore, it is counting as MHPG requirement at this time.

Was there ever a published memo that say wellness check should never count?

Thank you.

██████████████
████████
█████████████████████████

Statewide Mental Health Program
California Correctional Health Care Services
*Cell:* ███████████
█████████████████████

**CONFIDENTIALITY NOTICE:**
This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

**From:** █████████████████████████
**Sent:** Friday, February 4, 2022 8:06 AM
**To:** ███████████████████████████
**Subject:** RE: Wellness Checks

I think ██████ question was whether in the current Check out options, if a staff chooses Wellness Check only, does reporting count this as a contact? It sounds like some staff are being advised to cancel these rather than check them in and out, because they don't want to inappropriately get credit when telepsychiatrists do a cell-front. Am I summarizing this right ██████? If it's true it's causing a dilemma, on one hand appointments shouldn't really be cancelled if they're seen (cell-front), but on the other hand tele-psych shouldn't be getting credit for seeing the patient.

Exactly my question! Thanks ████████. ☺ And sorry, ████████ I definitely didn't mean to stress you out. I just want Telepsych to be able to use the Wellness Check checkout option (I thought they already were, and was surprised when they said they're still cancelling all of their completed non-confidential appointments), but if I recommend that to them, I want to make sure I'm not telling them something that's going to mess up their reporting to the Court (by non-confidential appointments satisfying MHSDS appointment requirements). I'll try to do some digging on my own to see if Wellness Checks are being counted as MHSDS appointments that satisfy timelines.

**From:** █████████████████████████
**Sent:** Thursday, February 3, 2022 3:52 PM
**To:** ██████████████████████████████████
**Subject:** RE: Wellness Checks

I'm so sorry, I did not mean to raise your blood pressure! I know how many changes you have pending. ...

I think          question was whether in the current Check out options, if a staff chooses Wellness Check only, does reporting count this as a contact? It sounds like some staff are being advised to cancel these rather than check them in and out, because they don't want to inappropriately get credit when telepsychiatrists do a cell-front. Am I summarizing this right          ? If it's true it's causing a dilemma, on one hand appointments shouldn't really be cancelled if they're seen (cell-front), but on the other hand tele-psych shouldn't be getting credit for seeing the patient.

The other point I was bringing up is that in the approved/revised check out codes, which are pending the currently routing memo to explain the new process, there is an attached reporting change that would accomplish this – the check-out codes for wellness check automatically don't count as MHPG sessions. I'm not sure what the time frame for this memo is – the plan is we'd make the EHRS changes once it is released.

Does this help?

**From:**
**Sent:** Thursday, February 3, 2022 3:38 PM
**To:**
**Subject:** RE: Wellness Checks

Good afternoon,

mm... I think so ... I have to say my heart rate rise after reading this email... like did I miss a critical thing?

I am kind of lost.... We have so many things about check in/out and scheduling project.... I think I am waiting on the code combination thing but yes, we cannot implement that until the memo is released. But I think telepsych contact may already spell out on a published memo? Did we already change the confidential options (from yes and no to 3 options)? Did we make all EHRS changes? I don't remember seeing that story to change confidential section....

I have          to search for telepsych policy. If there is already a memo re: telepsych contact, we will have to work on it regardless of the memo we are waiting on.

Thank you.

Statewide Mental Health Program
California Correctional Health Care Services
*Cell:*

**CONFIDENTIALITY NOTICE:**
This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

**From:** ███████████████████████
**Sent:** Thursday, February 3, 2022 1:21 PM
**To:** ████████████████████████████████████████████████████
**Subject:** RE: Wellness Checks

████████, is this change pending the updates to the check-out codes that will happen when the corresponding memo is released? I know that the MHR check out code combinations that we worked out all stipulate that the "Other – Wellness Check" option in the upcoming Contact Status check out code will not count as an MHPG contact (regardless of any of the other options selected).  I wasn't sure if reporting was waiting for the EHRS change before implementing this on the back end.

█████████

**From:** ██████████████████████████
**Sent:** Thursday, February 3, 2022 12:41 PM
**To:** ████████████████████████████████████████
**Subject:** RE: Wellness Checks

I think the Wellness Check check out option satisfied that request. Since the Wellness Check option is in the Contact Mode field, it's possible for the Telepsychiatrist to capture that it was a Wellness Check and that it occurred CellFront. So as long as Wellness Checks don't count as MHSDS-compliant appointments, I don't think we need that user story anymore.

**From:** █████████████████████
**Sent:** Thursday, February 3, 2022 12:38 PM
**To:** ████████████████████████████████████████

**Subject:** RE: Wellness Checks

I found it…. It's an RFA User Story 98751: RFA: MHR Rule: Change how telepsychiatry appts are captured - Boards but # 18
Now that we have ████████ let me assign this to him so that we can get this started.

Thank you.

████████████
███████████
Statewide Mental Health Program
California Correctional Health Care Services
*Cell:* ███████████
███████████████████

**CONFIDENTIALITY NOTICE:**
This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including Electronic Communications Privacy Act.  If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

**From:** ██████████████████████████
**Sent:** Thursday, February 3, 2022 12:36 PM

**To:** ███████████████████████████████████████████████

**Subject:** RE: Wellness Checks

I don't know of any change requests following the original request to add the Wellness Check option. If I remember correctly, when the Wellness Check option was added to check out, it was specifically added as a way to record that an appointment occurred but that the appointment shouldn't count for fulfilling MHSDS requirements. But I can go try to look for the user story or discussions from back then.

**From:** ███████████████████████████████████

**Sent:** Thursday, February 3, 2022 12:31 PM

**To:** █████████████████████████████████████████████

████████████████████████████

**Subject:** RE: Wellness Checks

Good afternoon,

Before telling Telepsychiatry to use Wellness Check for any non-confidential telepsych appointment, I just wanted to confirm that Wellness Checks aren't counted by MH Reporting as MHSDS-compliant appointments. ← mm… not that I am aware of… was there an existing policy? was there a change request?

Thank you.

███████████████████

███████████████████████████

Statewide Mental Health Program
California Correctional Health Care Services
*Cell:* ████████████████

████████████████████████

███████████████████████████

**CONFIDENTIALITY NOTICE:**
This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

**From:** ███████████████████████████████████ >

**Sent:** Thursday, February 3, 2022 11:37 AM

**To:** ████████████████████████████████████████████████████████ >

**Subject:** RE: Wellness Checks

Thanks ████████ !

**From:** ███████████████████████████████ >

**Sent:** Thursday, February 3, 2022 11:34 AM

**To:** ████████████████████████████████████████████████

**Subject:** RE: Wellness Checks

Hi ████████

Yes, the wellness check option has been in there for some time (even before the still pending changes). I'm not sure that reporting was updated yet, she can better answer that part of your question.

Jonathan

*Contact Mode* ①

In Person - Complete
Complete - IP Refused Remainder of Appt
Complete -RemainderOfAppointmentCanceled
Incomplete-IP Refused Remainder of Appt
Incomplete -Remainder Of Appt Canceled
MHPC Temp Tele-health
Wellness Check Only
Phone Only
Telepsychiatry
Temp Tele-health MHMD
IDTT /Committee Held in Absentia

**From:** ███████████████████████████████
**Sent:** Thursday, February 3, 2022 10:37 AM
**To:** ████████████████████████████████████████
**Subject:** Wellness Checks

Hi ████████

I was just talking with Telepsych, and they said they're still cancelling non-confidential telepsychiatry appointments. I thought the Wellness Check check-out option went into EHRS several months ago (████████, please correct me if I'm wrong). Before telling Telepsychiatry to use Wellness Check for any non-confidential telepsych appointment, I just wanted to confirm that Wellness Checks aren't counted by MH Reporting as MHSDS-compliant appointments.

Thanks!

████████

████████████████████
████████████████████████
Elk Grove - Headquarters
California Department of Corrections and Rehabilitation
████████████████████████

attachment 12

**Golding, Michael@CDCR**

**Subject:**                    FW: Wellness Checks

**From:** ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
**Sent:** Wednesday, March 16, 2022 1:04 PM
**To:** ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
Golding, Michael@CDCR <Michael.Golding@cdcr.ca.gov>; ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

**Subject:** RE: Wellness Checks

**CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

I really don't think it should wait for the memo. Wellness checks counting means wellness checks are resetting timelines for the next required appointment. If a clinician is conscientiously using wellness checks to record patient encounters that they do not believe meet the standards for a completed appointment, their patients' care will be negatively impacted because those wellness checks will cause the due date for the next required appointment to be moved out by x days (whatever the MHSDS PG required interval is for that LOC) from the wellness check, and schedulers schedule based on the Current Due Dates report, so likely no one will catch that the patient isn't getting appointments as frequently as they're supposed to.

I agree with ▓▓▓▓ that this item already went through CAPC and was approved, so shouldn't have to go back to CAPC. However, if re-presenting it at CAPC would help speed up this process, I'm happy to present it tomorrow. I drafted the below slide, and request that it be expedited, if we are going this route.

## Update MH Reporting to reflect that Wellness Checks do not count as completed appointments

**STORY ID: XXXXX**

▓▓▓▓▓▓▓

M. Golding

▓▓▓▓▓▓▓

**RISK MATRIX**

| | | |
|---|---|---|
| H | H | M |
| H | M | L |
| H | M | L |
| M | L | L |
| L | L | L |

**REQUEST** – (3/16/22)                    **PRESENTER:** ▓▓▓▓▓▓▓

On 1/7/21 CAPC approved adding Wellness Check and two other options to the check out screen to give clinicians a way to record appointments that do not count as MHSDS Program Guide-satisfying completed appointments. We recently discovered that Wellness Checks are actually being counted in MH reporting as completed appointments, so requesting that this error be fixed.

**RATIONALE**                    **REQUEST TYPE:** EHRS MD

Wellness Check was added to the check out options to provide a means of recording a patient interaction that was not a clinically significant completed appointment (e.g. very brief cell front encounters, non-confidential telepsychiatry appointments, patient initiated brief encounters in non-confidential settings, etc) As long as wellness checks are counted as completed appointments they will inappropriately reset timelines for the next required appointment, which negatively impacts patient care.

Integrated Reviewed (No or Date or N/A)              CLAC Approved (No or Date or N/A)

1

**From:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Sent:** Wednesday, March 16, 2022 12:56 PM
**To:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
                            Golding, Michael@CDCR <Michael.Golding@cdcr.ca.gov>; ▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**Subject:** RE: Wellness Checks

Good afternoon,

Sorry for all the confusion, this change has already gone through CAPC and been approved. The question is do we need to wait for the memo to come out before we make the change in reporting. Because this memo has taken a very long time to be reviewed/approved and it sounds like from psychiatry there may be a more urgent need to get this change in reporting out to production sooner that is why I recommended the informal announcement indicating the memo is coming. This is what I was instructed to do with another issue (max custody) where we needed to get the change in production but, the memo was taking too long.

I guess it is up to psychiatry on how immediately they need this change in production, can it wait for the memo?

Thank you.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Statewide Mental Health Program, Quality Management

▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮

**From:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮>
**Sent:** Wednesday, March 16, 2022 12:36 PM
**To:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
Golding, Michael@CDCR <Michael.Golding@cdcr.ca.gov>; ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**Subject:** RE: Wellness Checks
**Importance:** High

I appreciate the creative thinking, but I am concerned that an informal memo is inconsistent with our process. This information should definitely be expedited to CAPC as a change.

+▮▮▮▮▮▮▮▮  to ensure we are all on the same page.

▮▮▮▮▮▮▮▮

**From:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮≥
**Sent:** Wednesday, March 16, 2022 12:33 PM
**To:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  Golding, Michael@CDCR <Michael.Golding@cdcr.ca.gov>; ▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Cc:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Subject:** RE: Wellness Checks

That works for me. I don't mind drafting an email, if that would be helpful.

**From:** ████████████████████████████

**Sent:** Wednesday, March 16, 2022 12:21 PM

**To:** ████████████████████████ Golding, Michael@CDCR

<Michael.Golding@cdcr.ca.gov>; ████████████████████

**Cc:** ████████████████████████████████

**Subject:** RE: Wellness Checks

Good afternoon,

Great summary ██████

Michael, the "it" ██████ was referring to is that the CAPC minutes do not reflect whether we discussed if we would wait to make this change until the memo was released or make the change immediately upon CAPC approval.

Given ████ was the BAL and I am covering in her absence, my suggestion is to send an informal announcement in email form out to the field that we are making this change and that a formal memo will follow. Once we send out the informal email, ██████ team can make the change. How does this sound?

Thank you.

████████████████████████

Statewide Mental Health Program, Quality Management

███████████████

**From:** ██████████████████████████████

**Sent:** Wednesday, March 16, 2022 11:23 AM

**To:** Golding, Michael@CDCR <Michael.Golding@cdcr.ca.gov>; ████████████████

████

**Subject:** RE: Wellness Checks

I think maybe the confusion is over viewing this as a change versus a fix. At the time that wellness checks were added, if it hadn't been clearly stated that they wouldn't count, and that the intention of adding that option was to provide a way for clinicians to record an interaction with a patient that wasn't clinically significant/wasn't a completed appointment, then it would make sense for them to be programmed into reports as completed appointments, and us requesting them to not count would be a **change**, and would require justification via a new policy. But since the intentions were clearly stated, and we all believed wellness checks were being captured by reporting as appointments that don't count, and just recently found out that they are counting, I view this as a **fix**, which shouldn't require a new policy.

Once we found out that they are being counted, and you asked for a policy to explain wellness checks, we edited a memo to include it, but at the time that wellness checks were discussed in CAPC and approved, no one suggested that a new memo would be required before adding the wellness check option to the check out screen and programming it to not count. I think adding it to a memo was a great suggestion, btw, and will be helpful to the field, but I don't think the memo is necessary to proceed with fixing wellness checks. I agree that there will likely be questions about policy re scheduling that arise from this, but there have been so many scheduling questions since the 2020 memo was released – we're still getting them on a not infrequent basis, so I don't think that should stop us either. We definitely should try to get the memo out ASAP, though.

**From:** ██████████████████████████████

**Sent:** Wednesday, March 16, 2022 10:37 AM

**To:** ████████████████████
██ ████████████████████████████ ████████████████████
████████████████████████████

**Subject:** RE: Wellness Checks

"although it was not captured on the vote"
PL

Hi,
Not sure what "it" is referring to.

The vote occurred, everyone (and I publicly) said that Wellness Checks would not count and that the reason we are creating Wellness checks is so that they wouldn't count. There was no other reason other than to have something that psychiatrist could utilize to NOT COUNT appointments when they checked out. And that absolutely explicit intention, stated in front of the OSM, was even captured in the notes of the meeting.

Here is a quote from the notes from the CAPC meeting,

"Update programing so that these are not counted for appointment completion in reporting.
Wellness check only"

FYI

Best,
██

**From:** ████████████████████████████
**Sent:** Tuesday, March 15, 2022 5:20 PM
**To:** ████████████████████████████████
**Cc:** Golding, Michael@CDCR <Michael.Golding@cdcr.ca.gov>
**Subject:** RE: Wellness Checks

Good afternoon,

I am a little confused... although it was not captured on the vote, I thought we are waiting for the memo before we can make any programming changes?

We also have an active and approved RFA that is ready to go once the memo is released.
User Story 126650: (pending memo) RFA: MHR: check out code combination - Boards

This RFA will cover the wellness check and other combinations, but without the release of the memo, we are unable to process with the final CAPC approval. We did get the RFA done and ready, just pending memo release before bringing this back to CAPC for a change request.

4

I think I think changes had not been made to wellness check not counting is because once we release the change, the field is going to start asking about policy which is not ready. I think maybe policy first then programming changes?

I am not a BAL and I don't know how to proceed. However, I can say once the memo is out, my plan is to push the RFA forward within 2 weeks of the memo release (we need some time to catch up with all other EHRS changes re; check out code if any, re-read the finalize memo etc, and placed the item on agenda). Once we have CAPC approval and set an effective date, we can work on it. This is a fairly complex change so I don't have an ETA. However, changes implemented will be retroactively applied to the date CAPC decided.


Thank you.


████████████████
██████████████████

Statewide Mental Health Program
California Correctional Health Care Services
*Cell:* █████████████
██████████████████████
███████████████████████████

**CONFIDENTIALITY NOTICE:**
This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.


**From:** ███████████████████████████████
**Sent:** Tuesday, March 15, 2022 4:24 PM
**To:** ███████████████████████████████████████████
**Cc:** Golding, Michael@CDCR <Michael.Golding@cdcr.ca.gov>
**Subject:** RE: Wellness Checks


Thanks ████. Preferably, this would go into production sooner rather than later, and I'm not sure the memo is that close to being released. So I'd vote for before the memo is released, but I'm open to whatever you and Michael decide.


**From:** ██████████████████████████████
**Sent:** Tuesday, March 15, 2022 4:03 PM
**To:** ████████████████████████████████████████████
**Cc:** Golding, Michael@CDCR <Michael.Golding@cdcr.ca.gov>
**Subject:** RE: Wellness Checks


Hi,

Yes, I think it was covered in the CAPC discussion and captured in the minutes correctly so I do not think it needs to go back to CAPC/committees. As ████████ said, part of the build may have been missed due to my team mis-organizing the CAPC approvals which we can remedy quickly.


Are we waiting on the release of the memos to put this into production? (I ask because I am still not completely clear where in the process the memos are to be released, soon or not).


Thank you.


████████████████████████
██████████████████

Statewide Mental Health Program, Quality Management

███████████
███████████

**From:** ████████████████████████████
**Sent:** Tuesday, March 15, 2022 3:42 PM
**To:** ████████████████████████████
**Cc:** Golding, Michael@CDCR <Michael.Golding@cdcr.ca.gov>
**Subject:** RE: Wellness Checks

This is the same one that we talked about a couple weeks ago. There isn't a released policy or memo that defines wellness checks (as far as I know), but the memo that is still a draft does define them and explicitly states they do not count. We discussed this as a team with ████ about 1.5 weeks ago, looked at the minutes and CAPC slide, and talked about everyone's recollection of the CAPC meeting when this was passed, and everyone who had been present remembered it being clearly presented and approved as a check out option that would not count as a completed appointment, so ████ recommended reaching out to MH QM to see if the slide and minutes are sufficient, or if we need a CAPC slide.

**From:** ████████████████████████████
**Sent:** Tuesday, March 15, 2022 3:36 PM
**To:** ████████████████████████████
**Cc:** Golding, Michael@CDCR <Michael.Golding@cdcr.ca.gov>
**Subject:** RE: Wellness Checks

Good afternoon,

I am looking at the story. This is another one (or the same one?) not being split correctly when CAPC approves this. Since it was never placed in MHR Kanban, it was placed on our radar.

Was the memo released clear about welfare check not counting as MHPG requirement, like the one re: telepsychiatrist + non-confidential contact? Or is this the one we are waiting for the revised memo?

Thank you,

███████████
███████████
███████████
Statewide Mental Health Program
California Correctional Health Care Services
*Cell:* █████████
███████████

**CONFIDENTIALITY NOTICE:**
This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

**From:** ████████████████████████████
**Sent:** Tuesday, March 15, 2022 2:49 PM
**To:** ████████████████████████████
**Cc:** Golding, Michael@CDCR <Michael.Golding@cdcr.ca.gov>
**Subject:** Wellness Checks

Good afternoon ██████████████,

██████ recommended reaching out to MH QM with the CAPC slide and minutes from the discussion regarding Wellness Checks to attempt to clarify the intent that wellness checks would be added as a way to record appointments in EHRS that should not count as a completed appointment. I have pasted snips of each below. To recap, currently MH reporting captures Wellness Checks as Program Guide-satisfying completed appointments, but the checkout option of Wellness Check was added to EHRS specifically to give clinicians a way to record appointments that shouldn't count (e.g. very brief cell front encounters, non-confidential telepsychiatry appointments, patient initiated brief encounters in non-confidential settings, etc). We have discussed this topic in our psychiatry meetings recently, and multiple members of our team were present for the CAPC discussions and remember that all three of these new check out codes (see slide below) were approved to be added as methods to record appointments that shouldn't count. We would like to fix this in reporting, so that appointments checked out as "Wellness Check" are not counted. I believe a memo regarding refusals and no shows is routing (or is about to route), and language has been added to that memo explicitly stating that wellness checks do not count. But in the meantime, I'm wondering if the snips below are enough to warrant changing wellness checks in reporting, or if a CAPC slide is required.

Thanks!

██████████

# Add Check Out Codes in EHRS

**STORY ID: 107234**

## REQUEST – (01/04/2021)    PRESENTER:

1. Add Check out codes in EHRS:
   "Incomplete – IP Refused Remainder of Appt" and "Incomplete-Remainder of Appt Canceled"
2. ~~Update Programming so that these are not counted for appointment completion in reporting.~~
3. Wellness check only

## RATIONALE    REQUEST TYPE: EHRS REPORTING

~~This is to address the need to only count clinically significant encounters.~~ When an appointment is terminated prematurely and no clinically significant interaction occurs, we need to be able to identify that with check out codes so that these can be "out counted" from complete appointments.

| | Catastrophic | Critical | Marginal |
|---|---|---|---|
| **RISK MATRIX** | | | |
| Very Likely | H | H | M |
| Likely | H | H | L |
| Possible | H | M | L |
| Unlikely | M | L | L |
| Remote | L | L | L |

Integrated Reviewed (No)    CLAC Approved (No)

CHANGE ADVISORY PRIORITIZATION COMMITTEE
(CAPC)

| Date: | 1/7/2021 11:00 | Recorder: | |
|---|---|---|---|

**Voting Details**

| Area | User Story ID | More Info Req. | Bring Back Date |
|---|---|---|---|
| EHRS | 107234 | ☐ | |

Original Request ☑: Add Check Out Codes in EHRS

Add Check out codes in EHRS:
"Incomplete – IP Refused Remainder of Appt" and
"Incomplete–RemainderofApptCanceled"

Update programing so that these are not counted for appointment completion in reporting.

Wellness check only

**Risk Matrix**

| | Catastrophic | Critical | Marginal |
|---|---|---|---|
| Very Likely | H | H | M |
| Likely | H | M | L |
| Possible | H | M | L |
| Unlikely | M | L | L |
| Remote | L | L | L |

| Member | Designee? | Vote | |
|---|---|---|---|
| Deputy Director or Designee | ☐ | | |
| Asst. Deputy Director or Designee | ☐ | Yes | |
| Assoc. Director or Designee | ☐ | | |
| Chief Psychiatrist or Designee | ☐ | Yes | |
| Chief Psychiatrist (Telepsychiatry) or Designee | ☐ | Yes | |
| Field Psychiatrist or Designee | ☐ | Yes | |
| MHA (Inpatient Programs & QM) or Designee | ☐ | Yes | |
| MHA (Clinical Support & Suicide Prevention) or Designee | ☐ | Yes | |
| Total: | | YES | NO |
| Pass / Fail: | | Pass | |
| Deputy Director Veto: ☐ | | PASS ☑ | FAIL ☐ |

CAPC Approved Request ☑

Elk Grove - Headquarters
California Department of Corrections and Rehabilitation

attachment 13

**Golding, Michael@CDCR**

| | |
|---|---|
| **From:** | Golding, Michael@CDCR <michael.golding@cdcr.ca.gov> |
| **Sent:** | Tuesday, March 15, 2022 2:05 PM |
| **To:** | mjones@pldolaw.com; Metzner, Jeffrey (JEFFREY.METZNER@CUANSCHUTZ.EDU) |
| **Subject:** | FW: CAPC results |

**CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

FY!

**From:** Golding, Michael@CDCR
**Sent:** Tuesday, March 15, 2022 2:03 PM
**To:** ███████████████████████████
**Subject:** FW: CAPC results

"It does not appear that QM was refusing to change the process"
AM

"I believe this was just an oversight on the part of MH Reporting that when this new checkout code was added to the MH Reports, they made it count as a full completed appointment. But per my conversation with ███████ below, she says she cannot correct MH Reporting without there being a policy that explicitly states that Wellness Checks do not count as completed MHSDS-requirement-satisfying appointments. This seems kind of crazy to me."
MelG

"Rather, what occurred, as shown in your communications below, is that QM asked for the policy to ensure they were making the correct change, which is an appropriate response"
███

Though it was stated in the minutes of CAPC, though I personally explained the Wellness Check would not count in front of the OSM at CAPC, though we publicly reported that the reason created was so we would have a way of not counting this, and though this was explained to our QM colleagues, they in fact refused to change it. They assumed the CONTROLLING POLICY was that it WOULD COUNT, despite argument and hard evidence to the contrary.

I find that disturbing.

How can ████████ seem to (implicitly) argue that QM can assume any controlling policy it wants about this issue (almost invariably the one that increases CDCR compliance), in violation of what everyone said, unless we can prove we said it and that the contrary was written down. ████████ would likely deny that formulation of his thinking, but regardless, it follows. He is denying the relevance of intent in making policy, which is very disturbing from a medical perspective. I suspect it would be disturbing to lawyers as well, but I am not one of them.

MG

"This information should definitely be taken back to QM staff and/or expedited to CAPC as a change"
███

1

"Have you or anyone on your team reached out to show QM the minutes to clarify the misunderstanding and ask if that suffices for them to change it, or whether a CAPC slide is required?"



Hard for me to fathom why only the minutes would suffice to get QM to change its mind? What "controlling policy" is QM citing when they assumed it should count?

Regardless, let us please present the minutes to QM and see if now they will change their mind or whether we need to bring another slide to CAPC.

Best,
MGolding

**From:** ███████████████████████████████
**Sent:** Tuesday, March 15, 2022 1:22 PM
**To:** Golding, Michael@CDCR <Michael.Golding@cdcr.ca.gov>
**Cc:** ████████████████████████████
**Subject:** RE: CAPC results

Dr. Golding,
Thank you for bringing this to my attention. Yes, the team spoke about this issue at length that day, and we had been investigating the issue for the prior few weeks, as in the emails below. As we discussed how to fix this without creating more problems, I specifically asked the team to find the CAPC where it occurred, check the minutes, and see if our recollection of the directive was documented in the minutes, to support our request. I am glad to see that ████████ found that it was, though I believe there is actually still some uncertainty as to which part of the slide that phrase was referring to.

This information should definitely be taken back to QM staff and/or expedited to CAPC as a change. The OSM will be present at CAPC, but certainly can be informed before that if you would like. Were you asking for permission to do so? The most important goal for me is to correct the mistake, and let the OSM know. Have you or anyone on your team reached out to show QM the minutes to clarify the misunderstanding and ask if that suffices for them to change it, or whether a CAPC slide is required?

As you had assumed earlier, there was an error or misunderstanding that occurred here. It does not appear that QM was refusing to change the process. Rather, what occurred, as shown in your communications below, is that QM asked for the policy to ensure they were making the correct change, which is an appropriate response. Please let me know if you think anything further needs to be done at this time.

Thank you,


**From:** Golding, Michael@CDCR <Michael.Golding@cdcr.ca.gov>
**Sent:** Friday, March 4, 2022 2:32 PM
**To:** ████████████████████████████████
████████████████████████████████
**Subject:** RE: CAPC results

Hi,
The notes from the CAPC meeting say this about Wellness Checks:

"Update programing so that these are not counted for appointment completion in reporting.

Wellness check only"

So it was approved at CAPC that Wellness Checks would not count as Coleman Compliant appointments, in public, in front of the OSM. I presented it that way, as well, at the meeting.

But our QM colleagues continued to count Wellness Checks as approved appointments. We assumed there must simply have been an error.

". So wellness check are coded as completed and therefore, it is counting as MHPG requirement at this time."

So ███████ asked ██████ that it be changed to not count them, because that was not our intent. We specifically brought it up at CAPC so **they would not count**. We wanted Wellness Checks to be utilized to help our psychiatrists document that they are doing work when they are attempting to try to find patients who do not come to appointments and in whom brief

But our QM colleagues refused to change it.

"We can work on the non confid + tele psych = not meeting MHPG requirement but... **we can't work on the welfare check one we have the policy** [emphasis mine, MG]**.**

Thank you**."**

Our psychiatry colleague responded as follows to you:
"I believe this was just an oversight on the part of MH Reporting that when this new checkout code was added to the MH Reports, they made it count as a full completed appointment. But per my conversation with ████ below, she says she cannot correct MH Reporting without there being a policy that explicitly states that Wellness Checks do not count as completed MHSDS-requirement-satisfying appointments. **This seems kind of crazy to me** {emphasis mine, MG}"

A remarkably complex discussion ensued (see below).

We were falsely counting Wellness Checks as compliant appointments though it was never the intent to do so and we told the OSM publicly that we would not.  Not sure CDCR has admitted to the OSM that CDCR QM was doing that.

It seems rather easy to err on the side of counting non-compliant appointments as compliant and rather difficult to get it changed back. I continue to be concerned about CDCR defaulting to the position that appointments will count toward court mandates when they shouldn't. This arbitrarily inflates our numbers and is misleading to our stakeholders and the OSM.

Best,
Michael Golding, MD
Statewide Chief Psychiatrist
California Department of Corrections

**CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Oh, never mind. We're covering this in our HQ Psych/Telepsych meeting just now, so no need to discuss on Friday.

**From:** ███████████████
**Sent:** Thursday, March 3, 2022 8:56 AM
**To:** ████████████████████████████████████████████████
████                                    Golding, Michael@CDCR <Michael.Golding@cdcr.ca.gov>
**Subject:** RE: Wellness Checks

I have something to add to the agenda too, if there's time: Should refusals count towards MAPIP compliance? (IMO, no, but we could add a refusal powerform for psychiatrists to fill out, and then have a drilldown in the MAPIP indicator to show the reason for non-compliance for all who were non-compliant. But I'd like to discuss this with the group)

**From:** ██████████████████████████████
**Sent:** Tuesday, March 1, 2022 2:49 PM
**To:** ████████████████████████████████
**Cc:** ████████████████████████████████████████████
Golding, Michael@CDCR <Michael.Golding@cdcr.ca.gov>
**Subject:** FW: Wellness Checks

Following up on the "clinical contacts and documentation memo"( aka refusals memo). Can you please add this to the Friday meeting agenda, if we do not have time to discuss this before that?

Warm Regards,
███████████████████
Statewide Mental Health Program

**From:** ████████████████████
**Sent:** Friday, February 11, 2022 2:04 PM
**To:** ████████████████████████████████████████████████
████████████████████████████████████████████████████████████
**Cc:** Golding, Michael@CDCR <Michael.Golding@cdcr.ca.gov>;████████████████████
████████████████████████████████
**Subject:** RE: Wellness Checks

Please see attached email with edited document from Dr. Golding.

I have also attached the version I emailed on Wednesday.

Warm Regards,
███████████████████
Statewide Mental Health Program

**From:** ████████████████████
**Sent:** Wednesday, February 9, 2022 10:26 AM
**To:** ████████████████████████████████████████████████
████████████████████████████████████████████████████████████
**Cc:** Golding, Michael@CDCR <Michael.Golding@cdcr.ca.gov>;████████████████████
████████████████████████
**Subject:** RE: Wellness Checks

1. "Making a change without a clear controlling policy" – With all due respect, I am having a difficult time agreeing with this. Are we saying that no changes are or will be made without a clear controlling policy?  This code was created to give staff credit for non-confidential contacts that they are expected to complete if a patient no shows. There was nothing confusing about the reason behind creating wellness checks.

   ".. rushing to a change" – we have been discussing "wellness checks" for years now, I remember having these discussions with ████████ a few years ago ( not saying it was approved, just that it was discussed)

   "alternative names"- IMO the best name for a patient contact to check on their wellbeing is a wellness check.

   "…. the breakdown occurred because there wasn't clear controlling documentation of our understanding and agreement." – Do we have confirmation that THAT is what happened? To be honest, I really can't wrap my head around how this mistake was made.

2. If we don't fix the problem now, we are basically back to counting those non confidential visits as completed appointments. Requiring policy to guide this "fix" will sets bad precedent. IMO.

3. The reason we created wellness checks -  If a patient no shows for their appointment, most MH staff are asked/encouraged ( whatever you want to call it) to go find the patient and complete a wellness check. With the changes to our appointment resolution codes we will not be counting these as completed appointments. So here is what line staff clinicians and psychiatrists are dealing with  -
- They still need to go find the patient and do a wellness check.
- It doesn't count as a completed appointment, so compliance starts to fall – for which staff get in trouble.
- Now supervisors who are keeping an eye on their staff's performance start to question where they've been spending all their time since the time they spend on wellness checks (which in my personal experience could be a majority of your work day) isn't counted.

Our system does not reward staff for doing the right thing, in fact it punishes staff for doing the right thing, and rewards staff for doing the wrong thing.

With all that being said, I have made changes to the refusals memo and attached it for everyone's review and approval. Once approved, I request an expedited routing for this edit (since the memo has completed internal routing).

Respectfully,

████████
████████████████
Statewide Mental Health Program

**From:** ████████████████████████
**Sent:** Monday, February 7, 2022 5:49 PM
**To:** ████████████████████████████████████████
████████████████████████████████████
**Subject:** RE: Wellness Checks

Hmmm ok I understand people are very incensed about needing a policy to make a change. Understanding the likely response of going against that group feeling, and you all knowing that I understand that… please consider the following in that context.

Making a change without a clear controlling policy is what got us into this mess. If we should have been clearer in the first instance to avoid the problem, we should be clearer here to fix it right.

Who's to say that everyone in CDCR is currently using this the way we think they are? We have called other things "wellness checks" before in the context of telepsychiatry. Is it really just a bug fix? If we change it, we may be better off basing that on something, some message, that can clarify what happened.

I'm not saying we've done it perfectly every time before; but I can also tell you with certainty that we've gotten ourselves into a worse mess by rushing to a change many times before.

That also answers ████████ question, about how the breakdown occurred. There was a lot of crazy stuff happening during COVID, we were trying to patch a leaky ship that was already at the bottom of the ocean. But the breakdown occurred because there wasn't clear controlling documentation of our understanding and agreement. Which, again, I agree that that WAS our understanding and agreement (that wellness checks shouldn't count), and we need to fix the system to reflect that.

Maybe we could change the name of the indicator to something more clear at the same time we fix the measurement? Something that means more like "non-Program Guide visit." I agree we shouldn't throw the baby out with the bathwater and lose the whole visit type, but if I can come up with a couple alternatives just thinking about it for 30 seconds, shouldn't people think it through a little bit and see if there are other options?

██

**From:** ██████████████████████████
**Sent:** Monday, February 7, 2022 5:02 PM
**To:** ████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████
**Subject:** RE: Wellness Checks

I also agree that "Wellness Check Only" can yield valuable information.

Personally, I like the idea of a bug fix.  In all of the meetings I attended, I do remember consensus on the methodology of how the system will 'count' wellness checks, so I don't think there would need to be any additional discussions.  As others have mentioned, there may need to be some discussion on how far to back-date.  I also agree that we ought to be thoughtful about unintended consequences, but this seems rather straightforward (which is why I'm sure it's not, lol).

I'm not sure I fully agree with the sentiment that correcting MH Reporting requires something explicit in policy (especially if it was truly an error or unintended), nor do I think that has been our practice.

I think another problem here, maybe the more fundamental issue, is how, where, and why the breakdown occurred to have a policy, and the interpretation of that policy, have a different methodology than what was decided by all stakeholders.  This seems like a simple error, but I do think it would be fruitful to prevent these types of errors in the future.

█████████████
█████████████████████████
Statewide Mental Health Program

**From:** ████████████████████████████
**Sent:** Monday, February 7, 2022 3:52 PM
**To:** ████████████████████████████████████████████
████████████████████████████████████████
████████████████████████████
**Subject:** RE: Wellness Checks

I definitely don't think the right solution is to remove "Wellness Check Only" from the check out options. It has a purpose – prior to adding it (well, currently, since it's being counted as a completed appointment) we had no way in the

system to record brief encounters with patients that weren't clinically significant, but were nonetheless time spent with the patient. That's valuable information, and makes the record more accurate. If a patient no shows to an appointment, the clinician doesn't have time to do a full appointment with them later that day, but at least stops by their cell to get affirmation that they're okay, that's important info to have in the chart (especially if there's a bad outcome later).

I get not wanting to rush into a solution, and there will need to be discussion of the implementation date and whether to go back and fix previous data, but from ▓▓▓▓'s response it sounds like at least from her perspective, there won't be any changes made until "wellness checks don't count as completed appointments" is written in policy. So maybe we could start there. Do we need to edit a policy to add a sentence or two about wellness checks? If yes, we can do that. If no, then is the next step a CAPC slide?

**From:** ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
**Sent:** Monday, February 7, 2022 3:48 PM
**To:** ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓
**Subject:** RE: Wellness Checks

I am glad this is a discussion.

IMO, the wellness check option would serve its purpose, if done right. I hope a mistake in the code will not be considered failure to do what it is meant to; I think we have to try to do it right, and then decide if it works.

And yes, we have to think about when do we stop counting.

Warm Regards,
▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓
Statewide Mental Health Program

**From:** ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
**Sent:** Monday, February 7, 2022 3:36 PM
**To:** ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
**Subject:** RE: Wellness Checks

I was just texting this to ▓▓▓▓ but figured I should share with the group.

Even if we don't answer the question of how to correct past data right now:
I don't know the precise best option, but just off the top of my head I can imagine solutions such as just removing the option entirely if it is not serving its purpose and doesn't have a clear benefit. I don't want to rush into a solution that we then have to quickly take back, re-do, change again, etc. It's been this way for over 9 months; a rushed solution can make the problem worse before it gets better. Even if we change it today, when do we start counting from? Do those appts stop counting from now forward, or do we count backwards--ignoring the wellness checks--to the last full appt?

Thoughts are welcome

▓▓

**From:** ████████████████████████████
**Sent:** Monday, February 7, 2022 3:21 PM
**To:** ████████████████████████████████████████
████████████████████████████████████████
██████████████████████████
████████  ████████████████████
**Subject:** RE: Wellness Checks

I suggested treating it as a bug, since it's not functioning the way it was supposed to function. Bug fixes don't require a big process for approval.

But if we don't treat it as a bug fix, we could submit an expedited user story to CAPC for approval to fix this.

**From:** ██████████████████████████
**Sent:** Monday, February 7, 2022 3:16 PM
**To:** ████████████████████████████████████████
████████████████████████████████████████
██████████████████████████
████████  ████████████████████
**Subject:** RE: Wellness Checks

I would imagine the solution is as simple as- stop coding wellness checks as completed…but I admit I don't know what I don't know about the process.

████████?

Warm Regards,
████████████████
████████████████
Statewide Mental Health Program

**From:** ████████████████████
**Sent:** Monday, February 7, 2022 3:08 PM
**To:** ████████████████████████████████████████
████████████████████████████████
██████████████████████████
**Subject:** RE: Wellness Checks

Ah ok thanks, that's clarified. Then yeah I am not sure the best way to fix this but let's proceed on this discussion…

thx
██

**From:** ██████████████████████
**Sent:** Monday, February 7, 2022 3:05 PM
**To:** ████████████████████████████████████████
██████████████████████████████
██████████████████████████
**Subject:** RE: Wellness Checks

Wellness Check Only was added to PROD on 4/26/21. "Wellness Check Only" was added to be used for patient contacts that weren't a clinically significant contact with the patient, and shouldn't count as a completed appointment. The telepsych vs on-site cellfront appointments is a separate issue, but got brought in to this discussion due to me suggesting telepsych could use that wellness check option as a way to record that there was a face-to-face, without actually getting credit in reports for it.

In ████████'s email below she says *"So wellness check are coded as completed and therefore, it is counting as MHPG requirement at this time."* That's the real issue.

If an on-site psychiatrist sees a patient cellfront in response to a refusal, they check the appointment out as "In Person – Complete", location CellFront, due to appointment refusal, and that appointment counts as a completed appointment. We wouldn't tell them to use Wellness Check Only for that.

**From:** ███████████████████████████████
**Sent:** Monday, February 7, 2022 2:53 PM
**To:** ████████████████████████████████████
████████████████████████████████████████████
██ ███████████████████████████████████████

**Subject:** RE: Wellness Checks

So we have not been having telepsych check out anything cell-side, including wellness checks, and it's a good thing we didn't because they'd still be counting towards PG timelines.

Also the terms are murky – "wellness checks" are what we'd been calling it when people do cell-sides when a patient no shows/refuses, but with COVID I think more things are happening cell-side. In any case we're not checking it out in telepsych, just canceling and documenting the encounter.

We've been mostly waiting for the telepsychiatrist designation in EHRS before we have telepsychiatrists check anything out because even with telepsychiatrist as a dropdown option at check out, I know there are lots of people in the field who might use that when teleworking, even though there's an option for temp telework, and that could confuse the data.

Best,
██

**From:** ████████████████████████████████
**Sent:** Monday, February 7, 2022 2:47 PM
**To:** ███████████████████████████████████████
████████████████████████████████████████████
████████████████████
██ ███████████████████████████████████████

**Subject:** RE: Wellness Checks

Oh no, wait. If we're talking about the difference between telepsychiatry and on-site but tele-working psychiatry, this may be a semantic confusion.

If the patient refuses and telepsych does a cell front that they think served to address any concerns they would have dealt with in a session, that still does **NOT** count. We call it a wellness check.

But if an on-site person is tele-working and they do the same it **DOES** count. I think same for like cell-front visits during quarantine or something, if it was a 'sufficient' visit.

9

Other terms: "rounding" (a quick check on a patient because there is not enough staff, largely intended to screen for severe problems) shouldn't ever count as a full session. Are we confusing terminology?

We can ask █████████ too about the use of these words... it got murky, but there is definitely some category of cell-front visits that count for on-site but not telepsych, and maybe that's what's being caught here?

██

**From:** ████████████████
**Sent:** Monday, February 7, 2022 2:41 PM
**To:** ██████████████████████████████████████
███████████████████████████
██ █████████████████████████████████████
**Subject:** RE: Wellness Checks

Oh dear lord. I remember those conversations as well and that is my understanding too. When was the check-out code added? I'm not sure what our communication was like with MH reporting team at the time... For what it's worth, here's a ████ memo from 3/25/2020 which is the first mention of it that I can find with a quick text search, & a later re-issue by me 5/28/2021. (Not helpful in terms of directly stating whether it counts, just for reference.) Looping in ██████ if other things come to mind.

Yes we gotta fix it. The question is how far back in time is it worth trying to correct the data, given all the other changes that have propagated through and our decisions about other data that may or may not make any historical-data-which-is-updated-now potentially wildly inaccurate.

██

**From:** ███████████████████████████
**Sent:** Monday, February 7, 2022 12:25 PM
**To:** ██████████████████████████
**Cc:** ███████████████████████████████████████
**Subject:** FW: Wellness Checks

Hi █████,

I discovered last Thursday that the "Wellness Check Only" check out option is being counted in MH Reports as a completed MHSDS-requirement-satisfying appointment, meaning that if an appointment is checked out as a wellness check, it will reset follow up timelines and look like a full appointment was done. I wrote an email to ██████ where I included a link to the user story, a link to the RFC, and a snip of the CAPC slide, and explained that in all of the discussions that led up to adding that Wellness Check option, the purpose of adding the option was always stated as giving clinicians a way to record a face-to-face encounter with a patient that shouldn't count as a completed appointment. To my recollection, everyone in those meetings agreed with that purpose. I believe the meetings had ███████████████████████████?, and other people from MH and Psychiatry present, and this was discussed in CAPC as well.

I believe this was just an oversight on the part of MH Reporting that when this new checkout code was added to the MH Reports, they made it count as a full completed appointment. But per my conversation with ██████ below, she says she cannot correct MH Reporting without there being a policy that explicitly states that Wellness Checks do not count as completed MHSDS-requirement-satisfying appointments. This seems kind of crazy to me. If we have to go that route, ████████ offered to edit the "Clarification of Clinical Contacts, No Show vs Refusal of Clinical Contact" memo that's currently routing, to add a sentence about what Wellness Checks are, and that they don't count as a completed

appointment. But before we do that, we thought it would be a good idea to check in with you to get your thoughts on how to proceed.

Thank you,

███████

**From:** ████████████████████████ ≥
**Sent:** Friday, February 4, 2022 9:57 AM
**To:** ████████████████████████████████████
████████████████████████
**Subject:** RE: Wellness Checks

We can work on the non confid + tele psych = not meeting MHPG requirement but... we can't work on the welfare check one we have the policy.

Thank you.

███████████████
███████████████████
████████████████████
Statewide Mental Health Program
California Correctional Health Care Services
*Cell:* ████████████
████████████████
███████████████████████

**CONFIDENTIALITY NOTICE:**
This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

**From:** ████████████████████████████████
**Sent:** Friday, February 4, 2022 9:54 AM
**To:** ██████████████████████████████████████
**Subject:** RE: Wellness Checks

Thank you, ████████ ☺ That totally makes sense.

**From:** ████████████████████████████
**Sent:** Friday, February 4, 2022 9:53 AM
**To:** ████████████████████████████████████
████████████████
**Subject:** RE: Wellness Checks

This story is under EHRS PC and I don't see a story added or spitted from this request... that's why it was missed.

Adding a story now and will work on it very soon. Sorry about this and thank you for finding the story.

███████████████
███████████████████
███████████████████████
Statewide Mental Health Program
California Correctional Health Care Services

*Cell:* ██████████

██████████████████████████

**CONFIDENTIALITY NOTICE:**

This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

**From:** ████████████████████████████

**Sent:** Friday, February 4, 2022 9:47 AM

**To:** ████████████████████████████████

**Subject:** RE: Wellness Checks

I found the user story: <u>User Story 107234: *New Change Request* Add Check Out Codes in EHRS / Update Programing in Reporting - Boards</u>

Here's the slide (see snip below). The intent was that all 3 of these new check out codes wouldn't count for appointment completion in reporting. It's unfortunate that the slide lists that item 2nd, and wellness check 3rd, since it makes it a little confusing whether #2 applies to wellness check or just to item #1, but it was intended to apply to all of the new check out codes added with this user story.

The purpose of wellness checks is to provide a way to capture times where the clinician talked with the patient, but it either wasn't a clinically significant encounter (basically just a "hey, you ok?"), or it was a non-confidential telepsychiatry appointment (which per Telepsychiatry policy, cannot count as a completed appointment for reporting purposes). I don't have the Telepsychiatry policy in front of me, but I did snip the 2/7/2020 Clinical Contacts memo, which reiterates that non-confidential telepsych appointments don't count. I don't know of any policy that defines "wellness check" and that it won't be counted, but I know in the meetings we had regarding these check out codes, everyone agreed that wellness checks wouldn't count.

Here's the RFC: <u>IT RFC Portal - Power Apps</u> Unfortunately, again, the text of the request implies that all of the new contact modes are being added due to a need for having some contact mode options that won't count as completed appointments, but it doesn't explicitly state that it won't count.

Do you think this could count as a bug? If not, would the best course be for me to submit a CAPC user story to fix this?

Thanks!

# Add Check Out Codes in EHRS

## STORY ID: 107234



### RISK MATRIX

| | | |
|---|---|---|
| H | H | M |
| H | M | L |
| H | M | L |
| M | L | L |
| L | L | L |

## REQUEST – (01/04/2021)

**PRESENTER: L.** 

1.  Add Check out codes in EHRS:
"Incomplete – IP Refused Remainder of Appt" and "Incomplete-RemainderofApptCanceled"
2.  Update programing so that these are not counted for appointment completion in reporting.
3.  Wellness check only

## RATIONALE

**REQUEST TYPE: EHRS REPORTING**

This is to address the need to only count clinically significant encounters. When an appointment is terminated prematurely and no clinically significant interaction occurs, we need to be able to identify that with check out codes so that these can be "out counted" from complete appointments.

Integrated Reviewed (No)          CLAC Approved (No)

# MEMORANDUM

**Date:**  2/7/2020

**To:**  Chief Executive Officers
Chiefs of Mental Health
Chief Psychiatrists
Senior Psychiatrist Supervisors

**From:**

EUREKA C. DAYE, Ph.D., MPH, MA, CCHP
Deputy Director (A)
Statewide Mental Health Program

**Subject:**  **CLINICAL CONTACTS AND DOCUMENTATION**

This memorandum provides direction to mental health clinicians (psychiatrists, psychologists, social workers, psychiatric nurse practitioners) regarding clinical contacts and documentation.

**Clinical Contact**

Each patient shall be offered individual treatment in a confidential setting. To be considered a clinical contact that meets Mental Health Services Delivery System (MHSDS) Program Guide requirements, the patient must be seen:

1.  In a confidential setting[1], OR

2.  In a non-confidential setting in response to:
    a.  The patient's refusal, as defined below, OR
    b.  Temporary Medical Isolation that requires confinement to quarters or isolation in a medical setting per the Health Care Department Operations Manual 1.2.14, Medical Classification System (Attached).

A non-confidential contact for reasons other than in response to a refusal or medical isolation due to medical illness shall not be considered a Program Guide required clinical contact.

Non-confidential contacts for telepsychiatry shall not be considered a Program Guide required clinical contact under any circumstances.

**From:** ██████████████████████████
**Sent:** Friday, February 4, 2022 8:49 AM
**To:** ████████████████████████████████████████
████████████████████████

**Subject:** RE: Wellness Checks

Good morning,

Didn't mean to scare both of you ☺

I looked. So wellness check are coded as completed and therefore, it is counting as MHPG requirement at this time.

Was there ever a published memo that say wellness check should never count?

Thank you.

████████████████
██████████████████

Statewide Mental Health Program
California Correctional Health Care Services
*Cell:* ██████████████
████████████████████
████████████████████████████

**CONFIDENTIALITY NOTICE:**
This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

**From:** ████████████████████████████
**Sent:** Friday, February 4, 2022 8:06 AM
**To:** ████████████████████████████████████████████
**Subject:** RE: Wellness Checks

I think ████████ s question was whether in the current Check out options, if a staff chooses Wellness Check only, does reporting count this as a contact? It sounds like some staff are being advised to cancel these rather than check them in and out, because they don't want to inappropriately get credit when telepsychiatrists do a cell-front. Am I summarizing this right ████████? If it's true it's causing a dilemma, on one hand appointments shouldn't really be cancelled if they're seen (cell-front), but on the other hand tele-psych shouldn't be getting credit for seeing the patient.

Exactly my question! Thanks ████████. ☺ And sorry, ████████ I definitely didn't mean to stress you out. I just want Telepsych to be able to use the Wellness Check checkout option (I thought they already were, and was surprised when they said they're still cancelling all of their completed non-confidential appointments), but if I recommend that to them, I want to make sure I'm not telling them something that's going to mess up their reporting to the Court (by non-confidential appointments satisfying MHSDS appointment requirements). I'll try to do some digging on my own to see if Wellness Checks are being counted as MHSDS appointments that satisfy timelines.

**From:** ████████████████████████████████
**Sent:** Thursday, February 3, 2022 3:52 PM
**To:** ████████████████████████████████████████████████
**Subject:** RE: Wellness Checks

Hi ████,

I'm so sorry, I did not mean to raise your blood pressure! I know how many changes you have pending. …

I think ████s question was whether in the current Check out options, if a staff chooses Wellness Check only, does reporting count this as a contact? It sounds like some staff are being advised to cancel these rather than check them in and out, because they don't want to inappropriately get credit when telepsychiatrists do a cell-front. Am I summarizing this right ████? If it's true it's causing a dilemma, on one hand appointments shouldn't really be cancelled if they're seen (cell-front), but on the other hand tele-psych shouldn't be getting credit for seeing the patient.

The other point I was bringing up is that in the approved/revised check out codes, which are pending the currently routing memo to explain the new process, there is an attached reporting change that would accomplish this – the check-out codes for wellness check automatically don't count as MHPG sessions. I'm not sure what the time frame for this memo is – the plan is we'd make the EHRS changes once it is released.

Does this help?

████

**From:** ████████████████████████
**Sent:** Thursday, February 3, 2022 3:38 PM
**To:** ████████████████████████
████████████████
**Subject:** RE: Wellness Checks

Good afternoon,

mm… I think so … I have to say my heart rate rise after reading this email… like did I miss a critical thing?

I am kind of lost…. We have so many things about check in/out and scheduling project…. I think I am waiting on the code combination thing but yes, we cannot implement that until the memo is released. But I think telepsych contact may already spell out on a published memo? Did we already change the confidential options (from yes and no to 3 options)? Did we make all EHRS changes? I don't remember seeing that story to change confidential section….

I have ████to search for telepsych policy. If there is already a memo re: telepsych contact, we will have to work on it regardless of the memo we are waiting on.

Thank you.

████████████
████████████
████████████████
Statewide Mental Health Program
California Correctional Health Care Services
*Cell:* ████████████
████████████████

**CONFIDENTIALITY NOTICE:**
This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

**From:** ████████████
**Sent:** Thursday, February 3, 2022 1:21 PM
**To:** ████████████████████████████████████
**Subject:** RE: Wellness Checks

████████, is this change pending the updates to the check-out codes that will happen when the corresponding memo is released? I know that the MHR check out code combinations that we worked out all stipulate that the "Other – Wellness Check" option in the upcoming Contact Status check out code will not count as an MHPG contact (regardless of any of the other options selected). I wasn't sure if reporting was waiting for the EHRS change before implementing this on the back end.

████████

**From:** ████████████████████████
**Sent:** Thursday, February 3, 2022 12:41 PM
**To:** ████████████████████████████████████
**Subject:** RE: Wellness Checks

I think the Wellness Check check out option satisfied that request. Since the Wellness Check option is in the Contact Mode field, it's possible for the Telepsychiatrist to capture that it was a Wellness Check and that it occurred CellFront. So as long as Wellness Checks don't count as MHSDS-compliant appointments, I don't think we need that user story anymore.

**From:** ████████████████████████████
**Sent:** Thursday, February 3, 2022 12:38 PM
**To:** ████████████████████████████████
████████████████
**Subject:** RE: Wellness Checks

I found it…. It's an RFA User Story ●8751: RFA: MHR Rule: Change how telepsychiatry appts are captured - Boards but # 18
Now that we have ████, let me assign this to him so that we can get this started.

Thank you.

████████████████
████████████████
████████████████████
Statewide Mental Health Program
California Correctional Health Care Services
*Cell:* ████████████
████████████████████
████████████████████████

**CONFIDENTIALITY NOTICE:**
This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

**From:** ████████████████████████
**Sent:** Thursday, February 3, 2022 12:36 PM
**To:** ████████████████████████████████████
**Subject:** RE: Wellness Checks

I don't know of any change requests following the original request to add the Wellness Check option. If I remember correctly, when the Wellness Check option was added to check out, it was specifically added as a way to record that an appointment occurred but that the appointment shouldn't count for fulfilling MHSDS requirements. But I can go try to look for the user story or discussions from back then.

**From:** ██████████████████████████
**Sent:** Thursday, February 3, 2022 12:31 PM
**To:** ████████████████████████████████████████
████████████████████████████
**Subject:** RE: Wellness Checks

Good afternoon,

Before telling Telepsychiatry to use Wellness Check for any non-confidential telepsych appointment, I just wanted to confirm that Wellness Checks aren't counted by MH Reporting as MHSDS-compliant appointments. ← mm... not that I am aware of... was there an existing policy? was there a change request?

Thank you.

████████████████████
███████████████████████
████████████████████████████
Statewide Mental Health Program
California Correctional Health Care Services
*Cell:* ██████████████████
████████████████████████████
████████████████████████████████

**CONFIDENTIALITY NOTICE:**
This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

**From:** ████████████████████████████
**Sent:** Thursday, February 3, 2022 11:37 AM
**To:** █████████████████████████████████████████████████████████ ≥
**Subject:** RE: Wellness Checks

Thanks ████████ !

**From:** ████████████████████████████
**Sent:** Thursday, February 3, 2022 11:34 AM
**To:** ████████████████████████████████████████████
**Subject:** RE: Wellness Checks

Hi ██████████

Yes, the wellness check option has been in there for some time (even before the still pending changes).  I'm not sure that reporting was updated yet, she can better answer that part of your question.

██████████

In Person - Complete
Complete - IP Refused Remainder of Appt
Complete-RemainderOfAppointmentCancelled
Incomplete-IP Refused Remainder of Appt
Incomplete-Remainder Of Appt Canceled
MHPC Temp Tele-health
Wellness Check Only
Phone Only
Telepsychiatry
Temp Tele-health MHMD
IDTT/Committee Held in Absentia

**From:** ███████████████████████████ >
**Sent:** Thursday, February 3, 2022 10:37 AM
**To:** ████████████████████████████████████████
**Subject:** Wellness Checks

Hi ███████

I was just talking with Telepsych, and they said they're still cancelling non-confidential telepsychiatry appointments. I thought the Wellness Check check-out option went into EHRS several months ago ███████ please correct me if I'm wrong). Before telling Telepsychiatry to use Wellness Check for any non-confidential telepsych appointment, I just wanted to confirm that Wellness Checks aren't counted by MH Reporting as MHSDS-compliant appointments.

Thanks!

████████

████████████████████
████████████████████████
Elk Grove - Headquarters
California Department of Corrections and Rehabilitation
████████████████████████

We brought that up with them.r

One of our psychiatry colleagues said about this:
"I believe this was just an oversight on the part of MH Reporting that when this new checkout code was added to the MH Reports, they made it count as a full completed appointment. But per my conversation with ███████ below, she says

she cannot correct MH Reporting without there being a policy that explicitly states that Wellness Checks do not count as completed MHSDS-requirement-satisfying appointments. This seems kind of crazy to me."

We can work on the non confid + tele psych = not meeting MHPG requirement but... we can't work on the welfare check one we have the policy.

Thank you.

**From:** ████████████████████████████████████
**Sent:** Friday, March 4, 2022 12:47 PM
**To:** ████████████████████████████████████████████████████████████████
████████████████████████████; Golding, Michael@CDCR <Michael.Golding@cdcr.ca.gov>; ████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████

**Subject:** RE: CAPC results

Here you go!

**From:** ████████████████████████████████
**Sent:** Friday, March 4, 2022 12:41 PM
**To:** ██████████████████████████████████████████████████████████████████
████████████████████████████Golding, Michael@CDCR <Michael.Golding@cdcr.ca.gov>; ████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████████████████████
████████████████████████████████████████████

**Subject:** RE: CAPC results

Here's the Wellness Check Only slide. Per TFS, it was approved in CAPC on 1/7/21. I don't have the minutes from that meeting, though.

# Add Check Out Codes in E

## STORY ID: 107234



## REQUEST – (01/04/2021)

1. Add Check out codes in EHRS: "Incomplete – IP Refused Remainde RemainderofApptCanceled"
2. Update programing so that the completion in reporting.
3. Wellness check only

## RISK MATRIX



| | Catastrophic | Critical | Marginal |
|---|---|---|---|
| Very Likely | H | H | M |
| Likely | H | M | L |
| Possible | H | M | L |
| Unlikely | M | L | L |
| Remote | L | L | L |

## RATIONALE

This is to address the need to only count clinically significant encounters. When ar appointment is terminated prematurely no clinically significant interaction occurs need to be able to identify that with che codes so that these can be "out counted from complete appointments.

Integrated Reviewed (No)          CLAC A

**From:**
**Sent:** Friday, March 4, 2022 12:28 PM
**To:** Golding, Michael@CDCR <Michael.Golding@cdcr.ca.gov>;

**Subject:** CAPC results

*I think I found it...* story number 114025. It's on the agenda in more detail on 8/12/21 with those minutes reflecting an RFA to look at what should count towards MHPG requirements. Final vote on 9/9/21 and the minutes are pretty vague about it other than the product of a HQ workgroup.

Best,

attachment 14

**Golding, Michael@CDCR**

| | |
|---|---|
| **From:** | ███████████████████████████ > |
| **Sent:** | Friday, April 27, 2018 9:26 AM |
| **To:** | ███████████; Golding, Michael@CDCR |
| **Subject:** | RE: April 19th Meeting with QM team |

---

**CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

---

Thank you!

Warm Regards,

████████████████
██████████████████

Statewide Mental Health Program
Division of Health Care Services
California Department of Corrections and Rehabilitation

**From:** ████████████████
**Sent:** Friday, April 27, 2018 8:50 AM
**To:** ███████████████████████████ Golding, Michael@CDCR <Michael.Golding@cdcr.ca.gov>
**Subject:** RE: April 19th Meeting with QM team

Hi ██████████

Thank you for this summary. This is also how I recalled the meeting going. I agree with your summary.

I just wanted to add that in the webinar meeting that ██████████ and I attended with ██████████ on 4/11/18, he did indicate that they "err on the side of over-reporting compliance."

Thanks,

███████████████████████
██████████████████████████
██████████████

**From:** ████████████████
**Sent:** Wednesday, April 25, 2018 3:32 PM
**To:** Golding, Michael@CDCR <Michael.Golding@cdcr.ca.gov>
**Cc:** ████████████████████
**Subject:** April 19th Meeting with QM team

Hello Dr Golding,

1

I wanted to recap our meeting with the QM team last week, before my memory starts to fade.

The goal of our meeting on 4/19 was to meet with ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ to propose some changes to the Psychiatry compliance measures.

Background - This meeting had followed a conversation ▓▓▓▓▓▓ and I had with ▓▓▓▓▓▓. - ▓▓▓▓▓ and I wanted to know more about how Psychiatry compliance was being reported, so ▓▓▓▓▓▓ invited us to the "Weekly discussion - Solution Center tickets" webinar on 4/11/2018. While answering our questions, ▓▓▓▓▓▓ admitted that one of the reasons for choosing the current Psychiatry measures was to be able to over report compliance( not in those exact words).  The Psychiatry team met and came up with a set of measures, that we felt would more accurately reflect the Psychiatric care that was being provided to CDCR Inmates. The meeting on the 19th was scheduled to discuss the new measures.

My recollection of what happened during the meeting is – you, Dr Golding started the meeting by talking about how we were intentionally over report Psychiatry compliance. A few minutes into the meeting, ▓▓▓▓▓▓ interrupted and said we should ask ▓▓▓▓▓▓ about the current measures, and you asked to continue as we had already consulted with ▓▓▓▓▓▓. A few more minutes later, before you were done talking, ▓▓▓▓▓▓ got very upset and left the meeting abruptly. She stated that that you were accusing her of fraud( which is not what you said), that she could lose her job over this,  that she can't work with you anymore, and that you can have her job if you wanted ( for the sake of professionalism, I kept the language clean). I did not perceive your statement as accusing her  personally, or questioning her integrity. Everyone in the room remained calm after ▓▓▓▓▓▓ left, but ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ did not feel comfortable continuing the discussion at that point. ▓▓▓▓▓▓ did state that there were ways of making the information more accurate, and that we can look into that.

I know that sometimes we all perceive events differently, which is why I am including ▓▓ ▓▓▓▓▓ in this email. ▓▓▓▓▓▓ attended all the same meetings that I did. ▓▓▓▓▓▓, I know I don't remember everything exactly as it happened, but if there is anything in my statement that misrepresents what happened, please feel free to correct me.

Warm Regards,

▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
Statewide Mental Health Program
Division of Health Care Services
California Department of Corrections and Rehabilitation

attachment 15

**Golding, Michael@CDCR**

**From:** █████████████████████████████
**Sent:** Wednesday, August 25, 2021 10:52 AM
**To:** ██████████████████████
**Subject:** RE: Intent of Program Guide

**CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Hi,
I heard that too. I thought I also heard Mr. Jones agree with him during the BRMR meeting.
I have heard similar things before!

Best,
Michael

Michael Golding, MD
Statewide Chief Psychiatrist
California Department of Corrections

**From:** █████████████████████████████
**Sent:** Wednesday, August 25, 2021 10:51 AM
**To:** Golding, Michael@CDCR <Michael.Golding@cdcr.ca.gov>
**Subject:** RE: Intent of Program Guide

Yes, I did hear that comment by Dr. Potter.

**From:** Golding, Michael@CDCR <Michael.Golding@cdcr.ca.gov>
**Sent:** Wednesday, August 25, 2021 10:49 AM
**To:** █████████████████████████████
**Subject:** Intent of Program Guide

Hi,
Did you hear him say that they look at the intent of the Program Guide, after he just looked at (I think) Program Guide language?
Best,
Michael

Michael Golding, MD
Statewide Chief Psychiatrist
California Department of Corrections

attachment 16

**Golding, Michael@CDCR**

| | |
|---|---|
| **From:** | ███████████████████████████████████ |
| **Sent:** | Wednesday, May 5, 2021 4:12 PM |
| **To:** | ████████████████ ; Golding, Michael@CDCR; ████████ |
| **Cc:** | ████████████ |
| **Subject:** | RE: EHRS Updates! |

**CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Hi ████

████ can give you more details, but briefly, we recently became aware that every MHMD and MHPC contact type, whether a brief focused consult, a med non-adherence appointment, or a routine or initial appointment, satisfies the requirement for a MHMD or MHPC, respectively, routine or initial contact (whichever is due), and resets the clock regarding when the next contact is due. For example, if a patient requires an MHMD initial evaluation by 6/4/21, and has a completed med non-adherence appointment on 6/2/21, that completed non-adherence appointment will satisfy the requirement for an initial MHMD evaluation, and set the clock start date for determining when the next psychiatry appointment is due.

The retroactive part is interesting. It was argued that the data we have presented to the Court regarding the timeliness of contacts was likely erroneous due to the above issue. I'm certainly curious to see how the compliance percentages compare before and after this change is enacted.

I'm sure you're already savvy to this, but if a psychiatrist does complete a consult and feels that the appointment was comprehensive enough to count as a routine or initial appointment, they can always put in a scheduling order for an initial or routine appointment and ask the scheduler to stack it with the consult appointment.

Thanks,

████████

| | |
|---|---|
| **From:** ██████████████████████████ |
| **Sent:** Wednesday, May 5, 2021 3:42 PM |
| **To:** Golding, Michael@CDCR <Michael.Golding@cdcr.ca.gov>; ███████████████ |
| ████████████████████████████████ |
| **Cc:** ██████████████████████████ |
| **Subject:** FW: EHRS Updates! |

If you guys know it, we're curious about the back story of this compliance rule change. The retroactive part is interesting and I infer possibly related to the Golding report Coleman proceedings. Let me know what you can. I'll likely share it with the psychiatry group down here. Thanks.

████████████

San Quentin State Prison

415.721.3542

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication immediately.

## MH Reporting Announceme



**In Progress**

## Consults no longer count as PC & Psyc Contact

- Consults will no longer count as initial PC contact, rc contact, initial MHMD contact or routine MHMD cor
- Changes will apply retrospectively to 11/1/2017

Berganza, O.



**From:** ▮
**Sent:** Tuesday, 04 May 2021 14.00
**To:** ▮

**Subject:** EHRS Updates!

Good afternoon, MH Management Team.

I just shared a folder titled 2021-05-04_MH EHRS Updates with you all that has pictures that I took of some of the slides today in the MH HQ QM webinar.

There are some significant changes happening in EHRS as soon as today.

Please go over these slides with your team members ASAP.

Thanks much!

Blessings,
Dr. ▮
--
▮ **Psy.D.** | ▮
California State Prison - San Quentin
1 Main Street, San Quentin, CA 94964
iPhone: ▮
SQ MH QM email: ▮
Monday–Thursday 06:00-16:00; Friday RDO


Sent from my iPhone

attachment 17

## Golding, Michael@CDCR

| | |
|---|---|
| **From:** | Golding, Michael@CDCR <michael.golding@cdcr.ca.gov> |
| **Sent:** | Wednesday, September 22, 2021 4:19 PM |
| **To:** | ▮▮▮▮▮▮ |
| **Subject:** | FW: CQIT and MSF |

---

**CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

---

**CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

---

Hi ▮▮▮▮▮,
Thank you for your last message about the check-out codes.
I also think one should try to do the right thing!

Failing to provide information, calculating percent-weeks methodologies behind closed doors, codes of silence, failing to tell the truth about the nature of meetings, denying access to relevant information, and retaliation for telling the truth have a cost. Even if the cost to the individual employee were irrelevant (and I assure you it is not), retaliation stops people from being willing to do the right thing to protect our patients. You and I have seen example upon example of that.

Thank you for trying to do the right thing with the check-out codes.

Best,
Michael

**From:** Golding, Michael@CDCR
**Sent:** Wednesday, September 22, 2021 2:21 PM
**To:** Metzner, Jeffrey (JEFFREY.METZNER@CUANSCHUTZ.EDU) <JEFFREY.METZNER@CUANSCHUTZ.EDU>; ▮▮▮▮▮
▮▮▮▮▮▮; dpotter@alumni.brown.edu; ▮▮▮▮▮▮

**Cc:** Lopes Matthew (mlopes@pldolaw.com) <mlopes@pldolaw.com>; Jones Mohamedu <mjones@pldolaw.com>; ▮▮▮

**Subject:** FW: CQIT and MSF

Hi,
I want to share with you this situation described in the emails below

I think relevant information clearly is being withheld, despite denials. My understanding is that Judge Mueller said that there should not be retaliation.

1

There is.

But, our patients depend on our ability to straightforwardly contribute to and openly discuss problematic issues, without the predictable retaliation

Today we find out that *for years*, CDCR has been violating the Program Guide when patients are admitted to the crisis hospital. The Program Guide says that patients are supposed to be seen within 24 hours by a psychologist when they are admitted to the crisis hospital. It turns out, as Dr. Potter discovered today, that CDCR has been counting our patient's appointments as compliant when patients are admitted to the crisis bed up to *48 hours after arrival at the crisis bed*, not 24 hours.

That means that since it takes up to 24 hours for a patient to get into a crisis bed after referral, it is possible for them not to have been seen by a clinician for 72 hours after an emergency referral (24 hour transportation and 48 hours while waiting to be seen). The community standard is usually within a few hours, not 3 days.

Remarkably, essentially all of us know that that is not a reasonable standard of care when a patients is manic, suicidal, in crisis, etc. This is especially so since psychiatrists don't have to see a person for 4 days or so after referral for an emergency.

Do we really think that our clinicians are so foolish that none of them knew about this misleading data reporting and patient endangerment occurring *for years*, until the OSM pointed that out today? I would not bank on their being stupid.

Then what other reason is there for a unified group of clinicians who know that something violates their sacred duty to patients, is immoral, and violates court orders, not to openly report the problem? Why is there this code of silence?

Unfortunately all of us, if we are being honest with ourselves, know perfectly well the answer.

Allowing retaliation comes with a major price for our patients, irrespective of the personal individual cost which also is not insubstantial.

Best,
Michael

**From:** Golding, Michael@CDCR
**Sent:** Tuesday, September 21, 2021 5:16 PM
**To:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮>
**Cc:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Subject:** FW: CQIT and MSF

Hi ▮▮▮▮▮▮▮▮,

You said,
"You may have a misunderstanding about what is discussed at the Monday meeting.  As I have explained before, the Monday meeting is a meeting in which logistical processes are discussed only."
▮▮▮▮▮▮▮▮▮

It is difficult to understand your above comment given what others describe about these same meetings in which I am not invited. I am not sure whether your comments above are meant to reassure me, but you seem to be quite mistaken. Far more than "logistics" is being discussed, as I have maintained based on what others say.

In a meeting with the OSM and the Plaintiffs today 9/21/2021 at about 2:45-2:55, ████████clearly briefly identifies what in fact is discussed in the Monday QAC meetings that you say are "only" about "logistical processes". He identifies important content that is being discussed. He calls these items,

> "Major things ..... we discussed..." in the "QAC" [quality assurance certification workgroup, MG.]

For example in these recent QAC meeting, ████████said in today's meetings with the OSM and the Plaintiffs that they are *analyzing*,

> "measures of timely compliance.....strengths and weaknesses of different approaches. "

Also today ████████continued approximately as follows, giving more details. He said that in today's meeting with the OSM and Plaintiffs that at the Monday QAC meeting, they

> "Looked through approaches [to measure timely compliance to determine] "which are best".

████████said that they were thinking of adding to that workgroup,

> "Thoughts of adding" .... "Power BI [software, MG]", because it "helps with explanatory data analysis."

████████addends this meeting, as do the psychologist's ████████ and ████. The Social Worker ████████ also attends. As I have said to you repeatedly (and you have denied repeatedly), this clearly is a meeting in which data analytics are being discussed, not just logistics. ████████has now publicly said so explicitly. This is a topic in which I have given extensive thought to over years and reported to the court about.

You say to me,

> "Again, as I've stated to you in the past, I do not believe that repeating my decisions or instructions to you in these emails are a productive...."

I agree that it is not helpful. The problem is that it is difficult to have a productive conversation given some of the content that you say.
Best,
Michael

**From:** Golding, Michael@CDCR
**Sent:** Tuesday, September 21, 2021 10:03 AM
**To:** ████████████████████ />
**Cc:** ████████████████████ />
**Subject:** RE: CQIT and MSF

Hi,

"Thank you for clarifying your requests.  You may have a misunderstanding about what is discussed at the Monday meeting.  As I have explained before, the Monday meeting is a meeting in which logistical processes are discussed only.  The merits of individual business rules/indicators are not discussed in that meeting"
AM

[Possible attorney client privileged information].          has briefly] discussed that data was being run [about percent weeks compliant data and other methodologies] to check on what the results would be given various sets of rules. It was not in enough detail to understand let alone to contribute to a discussion about the rules ….. []. Nor were results shared.

"with all voting members of CAPC voting will receive all materials"
That has not been true in the past. For example we were literally voting about materials that the plaintiffs and the OSM had questions about, yet that information was not forwarded at a recent CAPC. Certainly I am not now (neither is my team) contributing to the analysis and discussion of the ways in which various methodologies are being utilized to calculate percent weeks compliant appointments, and other measures that have historically been misleadingly utilized to characterize CDCR's performance. CDCR is doing that now and we have no information about it. You are certainly controlling what information I can receive about data issues, calculating results in private, framing the discussion with the OSM in ways that you deem best, and that others do not have access to.

I am also very concerned about your plans for the Acting Deputy Director Position. You have split and fragmented my team, prevented me from doing my job and now you are planning to have assign multiple new bosses from my team, many of whom previously worked for me, to determine the direction of psychiatric practice. You have demoted me.

These are very hurtful acts in so many ways. I have transformed this department for the better and needed to expose intentionally misleading acts. Because of that you and our leadership continues to engage in repeated, significant, and life altering retaliatory acts against me.

I can only ask you to please stop.

Thanks,
Michael

**From:**                                            >
**Sent:** Monday, September 20, 2021 6:24 PM
**To:** Golding, Michael@CDCR <Michael.Golding@cdcr.ca.gov>
**Subject:** RE: CQIT and MSF

Dr. Golding,

4

Thank you for clarifying your requests. You may have a misunderstanding about what is discussed at the Monday meeting. As I have explained before, the Monday meeting is a meeting in which logistical processes are discussed only. The merits of individual business rules/indicators are not discussed in that meeting, let alone decided. Decisions are *only* made after all data and information are collected and organized, and you along with all voting members of CAPC voting will receive all materials, including the original letters and commentary highlighting specific changes. There are 5 psychiatrists out of 9 voting positions, and all voting members will have an opportunity to review the data and documents well ahead of any voting. Therefore, you and the other voting members will be able to make informed decisions. In other words, as you know, you will have a significant role in the decision-making process. Given that you are already attending many meetings during the week and the Monday meeting has nothing to do with your role, you have no need to be at this meeting.

If you have specific concerns about our process, I have informed you before that you have many avenues to express your concerns. These are the following:

1) If there are specific program elements that you would like to discuss solutions for, we have a weekly meeting where you can raise these issues at any time and still can in the future. I always make myself available between those meetings as needed. I'm happy to continue discussing specific solutions when you develop them. As a general matter, I will continue to provide you and others in our department with constructive feedback where warranted.

2) You can also discuss the matter with my direct supervisor, ██████████████. You have reported that you have 1 on 1 sessions with him weekly and you are free to discuss with ██████ any concerns about my decisions or management.

3) If you have concerns you want to express to the OSM, you have unfettered access to meet with the Special Master himself or his representatives. In fact, you have met with the OSM often when I am not present. I have encouraged you to raise issues in these meetings as appropriate, and MH has established procedures for raising issues and proposing solutions. All stakeholders have agreed to these procedures, and if you have any questions about them, please raise them to me directly, or to ██████████████ (with whom we had a special meeting with Special Master Lopes to ensure it was clear you had direct an unfettered access to at all times). I would appreciate it if you would engage constructively with everyone else in the department who is trying to fix these problems in numerous work groups and initiatives.

4) As always, you have access to all of the employee resources available at CDCR. If you have concerns related to any actions taken, please take advantage of these resources, or any other process that you feel is appropriate for your concerns.

Again, as I've stated to you in the past, I do not believe that repeating my decisions or instructions to you in these emails are a productive us of our time, although you are free to email me with any specific new concerns or questions. We have much work to be done to improve our program and provide quality clinical care to our patients.

Thank you,

██

**From:** Golding, Michael@CDCR <Michael.Golding@cdcr.ca.gov>
**Sent:** Tuesday, September 14, 2021 8:05 AM
**To:** ▮                                ▮>
**Subject:** Re: CQIT and MSF

"Because the OSM and their expert are performing their required monitoring duties, you should not assume the additional task of taking on that work"

Hi,

That is not an accurate description of what I am requesting.

As a simple example, individuals of many ranks are participating in a Monday meeting in which data about measuring percent weeks compliance (appointment frequency) are being discussed on Mondays. This is a highly relevant quality management measure and misleading reports about this to the court lead to patient harm. CDCR representatives of many ranks are presenting a perspective to the OSM about this issue in that Monday meeting.

No one would assume to do what the OSM does. But what the chosen representatives of CDCR tell the OSM about how policy is being interpreted (concerning this and other data issues) is highly relevant to understand, as it frames the OSM's and Plaintiff's responses. Not allowing our psychiatry team to know what CDCR representatives are claiming, behind closed doors, has led to significant problems in the past.

The same is true about the CQIT indicators.

Thanks,
Michael
Sent from my iPhone

On Sep 13, 2021, at 7:14 PM, ▮                                        ▮wrote:

Dr. Golding,

I appreciate the interest you have shown in these matters. However, similar to what we discussed about your role in the MSF discussion below, it should not be your responsibility to take on the role of monitoring CDCR's communication with the court. In fact, that duty falls on the OSM-retained expert. The court ordered the OSM to hire an expert in the field of data analysis, and in concert with the rest of the OSM team (both lawyers and clinicians), it is that expert's job to examine the data and provide accurate, complete, and independent reports to the court. The OSM expert should be trusted to provide accurate reports and analysis of CDCR's data. In fact, all of the members of the OSM team have been performing HQ monitoring for a couple of years now, attending any meetings they wish, and gathering CDCR information for themselves. Those people will be responsible for any lapses or misses in their monitoring duties, and have the power of the court (which is supervising the OSM's work) to act on anything they wish, including addressing any errors or incomplete data provided by CDCR, if any.

6

Also, as we've discussed, the Monday morning meeting you mentioned is a high-level meeting to discuss logistical processes with the OSM that does not involve your specific job duties. You should note that I often do not attend meetings because of my workload priorities as well; ██ ██████ attends the Monday logistical meeting as my designee. You have attended many meetings that occur most days of the week that discuss Coleman data issues touching on your work, as have many psychiatrists interested in the discussions. You are certainly encouraged to keep participating in the process and to engage frankly with other clinicians and stakeholders. Because the OSM and their expert are performing their required monitoring duties, you should not assume the additional task of taking on that work, nor would anyone want to take you away from your core job duties, as would exist regardless of the presence of the court case altogether. Your work for the MH department in CDCR results from your status as a licensed psychiatrist, and clinical SME. Your clinical role is valuable–there is much policy work that needs to be done, and many improvements that need to be made for patient care within the scope of your duties.


thank you



**From:** Golding, Michael@CDCR <Michael.Golding@cdcr.ca.gov>
**Sent:** Thursday, September 9, 2021 9:20 AM
**To:** ████████████████████████████████>
**Subject:** RE: CQIT and MSF

Hi,

Appreciate your comments.

I am very interested in clinical details.

The department can and has provided me with access to email communication from the plaintiffs and the OSM about data related issues when it has chosen to .
These are clinical issues because CDCR has a history of being misleading in its reporting about these clinical matters. It is critical to see what CDCR is telling the plaintiffs and the OSM given its history of intentional and unintentional provision of misleading information to the court.

For example, now, you have not allowed me to attend Monday workgroup meetings in which exchanges with the OSM regularly occur about highly significant data related issues that I have analyzed for years and helped bring to the attention of the court. For example, the issue of "percent-weeks compliant" appointments vs. "on-time" appointments vs. other measures has been a topic that is being discussed at this meetings with the OSM and our psychologists with ████████████████████, ████████ and I believe ████████, and our ████████████████. These issues are being specifically discussed with the OSM's data expert Dr. Potter and it directly affects the reporting that we do, and Dr. Potter's suggests have elicited disagreement with the OSM that I indirectly hear about.

It is precisely an issue in which there has been a major question about CDCR, its data measurement processes, and its honesty and it is an issue with great clinical import. It is disingenuous to claim (if you are) that my knowing about these data related issues takes my focus from appropriate clinical issues. On the contrary, not letting people know, has injured our patients over many years.

Failing to release information about CQIT indicators (vitally important to develop trust with the Plaintiffs and the OSM) further prevents critical understanding of issues of vital importance to our patients.

I respectfully request that you stop denying me vital clinical information. It would be excellent for example, if you allowed me to attend the critical Monday meeting with the OSM about data related issues, in which non-executives and executives freely participate, about many issues that I personally brought to the OSM's and court's attention,

Thank you.

Michael

Michael Golding, MD
Statewide Chief Psychiatrist
California Department of Corrections

**From:** ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇>
**Sent:** Wednesday, September 8, 2021 8:36 PM
**To:** Golding, Michael@CDCR <Michael.Golding@cdcr.ca.gov>
**Subject:** Re: CQIT and MSF

Dr. Golding,
Thank you for your emails. As I stated before, I appreciate your interest in these matters, and you should be assured that our attorneys have been working effectively with the plaintiffs' attorneys and the OSM to assist us to provide competent psychiatric care to our patients. Below are my responses to your specific questions.

1) As a ▇▇▇▇▇▇▇▇ in this ▇▇▇▇▇▇▇▇ myself, I have taken my responsibilities seriously and have been monitoring information provided by the attorneys to determine how it impacts our practice and whether further input is needed. I am extremely open with information to staff. But I have found that it is highly inefficient to provide all data in real time and without some framework because we end up spending a large amount of time explaining things to clinical and program staff who are not directly impacted by many of the discussions and rightfully have patient care as their priority. As you can understand, it would be extremely inefficient if you and every person on our team had the task of reviewing all correspondence and information distributed among attorneys and the OSM, and attempting to digest that information to find some application to our practice.  As your supervisor and the supervisor of everyone else in the department, I do, and should, have the responsibility of being a point person in this process and to share relevant data, as well as distribute workload as appropriate to people's experience, expertise, and the nature of their role.

2) You have been present, and/or been invited to, many meetings where CQIT indicators have been discussed over the last year at least; they've been a major topic of conversation in a wide variety of settings, and a number of attorneys and clinicians have been working diligently on this matter for years. It came up in the small work group meetings in which you took part, when we were awaiting OSM feedback on the Guidebook. There was a later court filing with a provisional list filed by Matty that was a matter of public record, and you've told me several times that you review the public documents. If you recall, Matty advised the SMEs that we were not to discuss it any further in the small work group until it was decided by the Court; you then skipped the case conference on 8/4/21 to listen to the court hearing where it was discussed again at length. You did not express any additional interest in the CQIT indicators at any of those points or others in the past, or at least you have not expressed the same level of interest you are now expressing.

It is unclear why you are now requesting that we compile for you an exhaustive and comprehensive list of any and all "letters over the last 6-months from the Plaintiffs, CDCR, and/or the OSM about CQIT indicators." Please note that responding to your request could require significant staff resources at a time when we have been ordered by the court to work with stakeholders to develop deadlines and demonstrate progress. You have not clarified how this information would assist you in your psychiatric care of our patients. I trust and value your clinical opinion, and that does not depend on the opinions of the plaintiffs' or the OSM's lawyers in letters. You do not need plaintiffs' lawyers' opinions to make determinations of the best clinical practices for CDCR regardless of any court case, which is your area of expertise.

Additionally, as you know, all of the CQIT indicators are going through the BRMR group, and are being explained and discussed exhaustively in that setting. The CQIT Guidebook does not discuss how things are measured; it is a bunch of questions and processes for the on-site audit. That will also go through the BRMR work group. As I stated before, I appreciate the interest you are showing, but we need to work efficiently and devote resources to completing the important work ordered by the court in this process.

Nevertheless, I've attached the 100-ish page filing from 5/6/2021 that is a matter of public record and has been accessible to you at any time. That includes the lists and indicators you've seen, as well as relevant emails including those between various attorneys. I hope we are able to maintain focus on clinical issues in the future,

Thank you,

█

**From:** Golding, Michael@CDCR <Michael.Golding@cdcr.ca.gov>
**Sent:** Thursday, September 2, 2021 8:35 AM
**To:** ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓>
**Subject:** RE: CQIT and MSF

1)  Have you asked �incorrect█████ for the correspondence, after she mentioned it?  I recommend that you speak directly to ████████ about her comments.  It is probably more efficient for you to communicate directly about this rather than to me, unless you encounter a problem in obtaining information from someone else. I am in and out of time-off this week and have a lot of things to handle, and even at the "usual" levels of busy-ness, I probably shouldn't be your first stop.  Please let me know if you encounter any difficulty and I will try to assist you.

Hi,

This CQIT information was brought up and discussed by ████████ at the data meeting with the Plaintiffs and the OSM. I gather from the discussion that there were several letters sent back and forth but I can't be sure, because one does not know what one does not know, and therefore one does not know even what one should ask specifically for.

Thus I ask that you authorize our attorneys to send communications between the OSM and Plaintiffs involving issues relating to psychiatric practice so I can help take care of our patients. You could authorize our attorneys to globally do that, but clearly you have not.

I would hope that you would want the psychiatry team to know about the negotiations occurring about CQIT data questions that ████████ and our psychologists have apparently had access to or even contributed to. Again, I can't tell how much or what communication has occurred, since none of the emails are being shared and I just heard about it at the data meeting when ████████ was discussing it.

Multiple communications between the OSM and the Plaintiffs and CDCR about issues that I have involvement with have not been shared with me over a long period of time, making it very difficult to follow the conversations at these public meetings. Invariably I have had to discover what I am not being sent by the Plaintiffs or the OSM because, again, one doesn't know what one doesn't know. If you would permit our attorneys to send their correspondence about relevant issues to me and the psychiatry team, that would be far superior than trying to discover (because of off-handed remarks) that there was correspondence between our attorneys and psychologists and mental health administrators about data issues, for example.

Are you authorizing ▮▮▮▮▮ and ▮▮▮▮▮ to release all of the communications they receive from the OSM and the Plaintiffs (presumably via our attorneys), or just the information they feel comfortable with sharing? Is your suggestion that if I happen to discover something is missing that is needed, then I should appeal to you?

1) I shared my updates with you and ▮▮▮▮ together this morning, and I'm happy to continue doing so. I definitely want you aware and participating, but I don't want you to feel like updating others on this should be your responsibility. This is a multi-disciplinary project, and as we've been unable to complete it in the past through MH alone, I think it best that ▮▮▮ owns and takes responsibility for this process at this time. The MH policy piece is absolutely something I hope you and ▮▮▮▮ can get done expeditiously. Thank you, again, for wanting to take an active role.

Understood.

Best,
Michael

Michael Golding, MD
Statewide Chief Psychiatrist
California Department of Corrections

**From:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Sent:** Tuesday, August 31, 2021 3:17 PM
**To:** Golding, Michael@CDCR <Michael.Golding@cdcr.ca.gov>
**Subject:** RE: CQIT and MSF

Thank you for your interest in these matters, Dr. Golding.

1) Have you asked ▮▮▮▮▮ for the correspondence, after she mentioned it? I recommend that you speak directly to ▮▮▮▮ about her comments. It is probably more efficient for you to communicate directly about this rather than to me, unless you encounter a problem in obtaining information from someone else. I am in and out of time-off this week and have a lot of things to handle, and even at the "usual" levels of busy-ness, I probably shouldn't be your first stop. Please let me know if you encounter any difficulty and I will try to assist you.

2) I shared my updates with you and ▮▮▮▮ together this morning, and I'm happy to continue doing so. I definitely want you aware and participating, but I don't want you to feel like updating others on this should be your responsibility. This is a multi-disciplinary project, and as we've been unable to complete it in the past through MH alone, I think it best that ▮▮▮ owns and takes responsibility for this process at this time. The MH policy piece is absolutely something I

hope you and ▮▮▮▮▮can get done expeditiously. Thank you, again, for wanting to take an active role.

■

**From:** Golding, Michael@CDCR <<u>Michael.Golding@cdcr.ca.gov</u>>
**Sent:** Tuesday, August 31, 2021 9:54 AM
**To:** ▮▮▮▮▮▮▮▮▮▮▮▮▮>
**Subject:** CQIT and MSF

Hi,

1. CQIT

I am interested in understanding how we are measuring compliance with Program Guide requirements. ▮▮▮▮▮ mentioned today that we are awaiting responses from the Plaintiffs about (I think she said) our CQIT guidebook. Correspondence between the OSM, the Plaintiffs, and CDCR about how we are measuring things would be helpful to have. These measures relate to many other measures that we are also making. Thank you for your consideration.

2. MSF and CCC patients

I have asked ▮▮▮▮▮ to keep me in the loop about this psychiatry project. It sounds like from this morning's meetings that there have been exchanges about this project. I seem to be responsible for updating people on how this is going. Any emails that would help me to understand the direction we are taking in this would be helpful.

Thanks,
Michael

Michael Golding, MD
Statewide Chief Psychiatrist
California Department of Corrections

attachment 18

```
1                  IN THE UNITED STATES DISTRICT COURT
                       EASTERN DISTRICT OF CALIFORNIA
2


3
        RALPH COLEMAN, et al.,
4              Plaintiffs,

                                          Sacramento, California
5       vs.                               No. 2:90-CV-00520-KJM-DB
                                          Friday, February 11, 2022
6       GAVIN NEWSOM, et al.,             2:04 p.m.
               Defendants.
7       _____/

8

9

10
                              ---oOo---
11

                       TRANSCRIPT OF PROCEEDINGS
12

                         STATUS CONFERENCE
13

           BEFORE THE HONORABLE KIMBERLY J. MUELLER, CHIEF JUDGE
14

               (Proceedings held via videoconference.)
15
                              ---oOo---
16

17

18

19      Official Court Reporter:         Thresha Spencer,
                                         CSR, RPR
20                                       501 I Street
                                         Sacramento, CA 95814
21

22

23

24
        Proceedings recorded by mechanical stenography, transcript
25      produced by computer-aided transcription
```

```
 1   APPEARANCES:

 2     For the Plaintiffs:          ROSEN BIEN GALVAN & GRUNFELD
                                    LLP
 3                                  101 Mission Street, 6th Floor
                                    San Francisco, CA  94105
 4                                  By:  MICHAEL BIEN
                                         ERNEST GALVAN
 5                                       LISA ELLS
                                         JENNY YELIN
 6                                       CARA TRAPANI
                                         STEVEN FAMA
 7                                  Attorneys at Law

 8
                                    PRISON LAW OFFICE
 9                                  1917 Fifth Street
                                    Berkeley, CA  94710
10                                  By:  MARGOT KNIGHT MENDELSON
                                    Attorney at Law
11

12     For the Defendants:          DEPARTMENT OF JUSTICE
                                    1676 N. California Blvd.,
13                                  Suite 620
                                    Walnut Creek, CA  94596
14                                  By:  PAUL MELLO
                                    Attorney at Law
15
                                    DEPARTMENT OF JUSTICE
16                                  OFFICE OF THE ATTORNEY GENERAL
                                    1300 I Street
17                                  Sacramento, CA  95814
                                    By:  ELISE THORN
18                                  Attorney at Law

19                                  DEPARTMENT OF JUSTICE
                                    OFFICE OF THE ATTORNEY GENERAL
20                                  455 Golden Gate Avenue,
                                    Suite 11000
21                                  San Francisco, CA  94102
                                    By:  DAMON GRANT McCLAIN
22                                  Attorney at Law

23

24

25     (Appearances continued on following page)
```

```
 1   APPEARANCES (Continued):

 2
     Special Master:              MATTHEW LOPES
 3

 4   Also Present:                Kathleen Allison
                                  Dr. Amar Mehta
 5                                Dr. Steven Cartwright
                                  Dr. Travis Williams
 6                                Kristopher Kent
                                  Nicholas Weber
 7                                Monica Anderson
                                  Namrata Kotwani
 8                                Laurel O'Connor
                                  David Cassarrubias
 9                                Melissa Bentz
                                  Nicholas Weber
10                                Christine Ciccotti
                                  Antonia Radditz
11                                David Sanders

12

13                      --o0o--

14

15

16

17

18

19

20

21

22

23

24

25
```

1    SACRAMENTO, CALIFORNIA, FRIDAY, FEBRUARY 11, 2022, 2:04 PM

2                              --o0o--

3    (Proceedings were held via the Zoom application.)

4              THE CLERK:  Calling civil case 90-520; Coleman, et

5    al., versus Newsom, et al.  This is on for a further status

6    conference.

7              THE COURT:  All right.  Good afternoon.  I'm going to

8    ask for appearances and a lead counsel to then identify members

9    of the team.  And I just want to clarify, this is status, this

10   is housekeeping, case management, and so I am not wearing my

11   robe.

12       My plan is for future sessions such as this, we'll be in

13   the courtroom; thus, we're in the virtual courtroom.  But if I

14   don't need to issue orders -- I may have my robe handy as I do

15   here today -- but I'm not -- I just want to clarify.  Right now

16   I'm the case management judge and we're in problem-solving

17   mode, a global picture.  So that's why you see me without my

18   robe, if you even notice those kinds of details on Zoom.

19       So for the plaintiffs, who is acting as lead counsel today?

20             MR. GALVAN:  Good afternoon, your Honor.  Ernest

21   Galvan.  And with me are Michael Bien, Lisa Ells, Jenny Yelin,

22   Steve Fama, Margot Mendelson, and Cara Trapani.

23             THE COURT:  All right.  Good afternoon to all of you.

24       And lead for the defense?

25             MR. MELLO:  Good afternoon, your Honor.  Paul Mello.

1    I'm joined by Elise Thorn, Damon McClain, and I don't know if

2    I'm missing clients on our team.

3        I am also joined by our clients Secretary Allison, Doctors

4    Mehta, Cartwright, and Williams.  Thank you.

5              THE COURT:  All right.  I do see Ms. Kotwani, just so

6    that's clear.  And I see Secretary Allison.  Good afternoon

7    Secretary Allison.

8              SECRETARY ALLISON:  Hello, your Honor.

9              THE COURT:  Hello.  Is there any member of your team

10   who has not been identified?

11             SECRETARY ALLISON:  No, ma'am.

12             THE COURT:  All right.  Is there anyone appearing who

13   has not been identified in terms of appearing this afternoon?

14   If so, please speak up now.

15             SECRETARY ALLISON:  I apologize, I do have additional

16   counsel on the line; I didn't see them.  I didn't realize there

17   were two screens.  We do have Nick Weber, Melissa Bentz, and

18   Christine Ciccotti on the line as well.

19             THE COURT:  All right.  Thank you.  I thought there

20   were a few folks we hadn't picked up.

21             MR. SANDERS:  Your Honor, this is David Sanders from

22   California Correctional Peace Officers Association, just sort

23   of monitoring.

24             THE COURT:  All right.  I was going to ask.  I didn't

25   think I heard your name, but noted that you're monitoring.

1        Anyone else who's appearing who's name has not been called

2    or who has not identified themselves?

3        All right.  So I did publish an agenda.  I just wanted to

4    let you know some additional thoughts I had.  Under "staffing,"

5    I would like to talk briefly about the status of the

6    telepsychiatry pilot.

7        And then under "additional items," the things I just want

8    to tick off.  I just want to talk briefly about settlement with

9    respect to the guard one cases and TTMs, just to make certain

10   we're on the same page there.  And just note items on the

11   planning calendar with respect to DHS staffing review, max

12   custody and the PIPs, data remediation, and then I also want to

13   just check in on the notice regarding the regulation-making

14   process.

15       So let me ask, first, Mr. Galvan, any other issue that

16   plaintiffs want discussed this afternoon?

17            MR. GALVAN:  No, your Honor.

18            THE COURT:  Mr. Mello, for the defense?

19            MR. MELLO:  It sounds like you touched on data

20   remediation.  We filed an errata and know that we wanted to

21   speak to that issue, your Honor.  Thank you.

22            THE COURT:  All right.  Secretary Allison, just

23   checking with you.  I know you're represented, but you're one

24   of the key problem solvers here in my mind, so anything else

25   you wanted to talk about?

1          SECRETARY ALLISON:  Not at this time.  I'm not aware

2     of any other major pending issues.

3          THE COURT:  All right.  Thank you.

4       So on the return to program guide level of care, I just

5     wanted to touch base and let you know what I'm thinking and see

6     if anyone disagrees with this, because otherwise I -- my

7     tentative is to issue a simple order just clarifying.

8       It appears to the Court that the need for further reporting

9     on COVID-19 departures is obviated by the upcoming 29th round

10    report.  And, you know, clearly the backdrop is COVID is here

11    to stay, and so we're just all learning how to live with it.

12    We're going to live with it, I assume, for the rest of my life,

13    certainly my life as a judge.

14      So to the extent the Special Master finds deficiencies in

15    any areas that he's monitoring as measured by the proposed CQIT

16    indicators and identifies the deficiencies as tied to COVID,

17    then I would be made aware of that through his report, and then

18    we could address deficiencies.

19      Is there any reason not to proceed in that way and,

20    therefore, just make very clear that any Court action is

21    deferred pending the filing of the complete 29th round

22    monitoring report?

23      Let me ask Mr. Galvan, your thoughts based on that

24    suggestion?

25          MR. GALVAN:  Your Honor, I met and conferred with

1     defense counsel about this agenda item.  What we were going to

2     propose was that the monthly filing should end, and the parties

3     should meet and confer to resolve disputes we have about the

4     remaining departures.  In the filings there are five departures

5     that the defense had listed as needed to go on indefinitely

6     that we believe should be terminated.

7          We were going to propose that we spend the next 30 days

8     trying to work out that dispute, and that if we can't work out

9     those disputes, that we would ask for leave to present them by

10    motion.

11         And the reason I think that that might be preferable to

12    waiting for the 29th report is the 29th report, my

13    understanding, isn't coming until the fall of this year.  And,

14    from plaintiffs' point of view, the things that are still

15    lacking in treatment and other programs for our clients should

16    be remedied sooner than that.  So that's why we prefer the more

17    advanced timeline.

18              THE COURT:  All right.  Well, if you've met and

19    conferred and are making that joint proposal, let me just

20    check.

21         Mr. Mello, that's your joint proposal?

22              MR. MELLO:  Yeah.  That's very much -- Mr. Galvan has

23    stated we're working well together.  We met and conferred; we

24    think that makes sense.

25         Also, I totally agree with Mr. Galvan that waiting until

1    the end of the 29th round on certain things may be problematic,

2    so that is the deal that we agreed to and I'm very supportive

3    of it.  Thank you, Mr. Galvan.

4          THE COURT:  All right.  Well, I'm prepared to bless

5    that.  It doesn't preclude the Special Master from pointing out

6    in the 29th round report any deficiencies that he and his team

7    believe are tied to ongoing COVID-19 management practices.

8       Agreed, Mr. Galvan?

9          MR. GALVAN:  Yes, your Honor.

10          THE COURT:  Mr. Mello?

11          MR. MELLO:  Yes, your Honor.

12          THE COURT:  All right.  Well, then I will do a minute

13    order following this hearing, bless that proposal, note that

14    you'll meet and confer.  And if you don't resolve all the

15    outstanding issues here, then you will seek leave to file a

16    motion.

17       All right.  Secretary Allison, generally, in terms of the

18    COVID-19 management practices, is there anything you believe

19    the Court should know, just programatically?

20          SECRETARY ALLISON:  Sure.  Sure.  Well, as of this

21    morning we have 3,093 active cases amongst the population,

22    1,631 amongst the staff.  We currently have three in outside

23    hospitals, and, of course, we monitor this very, very closely.

24    We've implemented a variety of measures to keep the population

25    safe to include closing the intake, opening the intake at

1  different times as recommended by our healthcare professionals

2  as well as public health guidance.

3      So we're following all of those as it relates to, you know,

4  masking protocols and a variety of different things.  We are

5  hopeful as we -- you know, just like when the community saw a

6  big spike in Omicron and then a sudden dip, we are seeing the

7  exact same thing amongst our population.  So we are hopeful

8  that we will be able to -- but we did have to do a modified

9  program statewide for a couple of weeks just to kind of catch

10 our breath, kind of try to contain this as best as possible.

11 And we're hopeful we'll go off that modified program on Monday

12 the 14th, and then we will go back to the individual

13 case-by-case based on what we call the roadmap to reopening so

14 that based on individual institutions and at individual yards

15 be able to program based on their current outbreak.

16     And so we're hopeful to get that going here very, very

17 soon, and look forward to getting some kind of -- more

18 operational stuff and more programming back within our

19 facilities.

20            THE COURT:  All right.  And I know there are

21 outstanding issues related to vaccinations, but -- I don't need

22 to hear more about the status of vaccination programs right

23 now.

24            SECRETARY ALLISON:  Well, our numbers are actually --

25 so 82 percent of the population is vaccinated and 72 percent of

1    our staff, which is a pretty significant increase from just a

2    month ago.  And so we are following the California Department

3    of Public Health's order as it relates to vaccines.  So we're

4    definitely hopeful that -- we're actually tracking -- compared

5    to the national standards, we're actually looking pretty good

6    as far as vaccination numbers.

7            THE COURT:  Okay.  Thank you for sharing that; those

8    numbers are higher than I would have expected.

9       All right.  On the DHS evidentiary hearing, I've seen the

10   responses to my order asking why I shouldn't find the issues

11   raised at the October 23rd, 2020, hearing moot.  In fact, I'm

12   prepared to issue an order shortly finding that the issues are,

13   in fact, moot.  I have everything before me to make a final

14   decision on that question, correct, Mr. Galvan?

15           MR. GALVAN:  Yes, your Honor.  Although I think the

16   facts, as we briefed them, that was back in September, a lot of

17   time has passed since then, but I don't think it's that

18   significantly different since September.  So, yes, your Honor,

19   you do have everything.

20           THE COURT:  All right.  Mr. Mello?

21           MR. MELLO:  I think it is fully briefed, and I won't

22   restate our position on DHS should we prevail and it is not

23   moot, because the issue of whether they should take emergency

24   action is still out there, but I believe you have that in front

25   of you, your Honor.  Thank you.

1          THE COURT:  On the question of resumption of

2     assessing fines for delays in transfer, here's the question:

3     Would the plaintiffs say I should separately -- assume I find

4     the issues raised on October of 2020 moot and given plaintiffs'

5     position, should I say if you want the Court to focus on what

6     you've said most recently, seek to bring a motion within

7     14 days to tee up formally whether or not I need to grant

8     permission for ongoing application of COVID-19 exceptions to

9     transfers?

10        On that issue specifically, Mr. Galvan?

11         MR. GALVAN:  Your Honor, let me see if I understand

12     the question.  Plaintiffs would be required within 14 days of

13     the Court's order to move for the resumption of the contempt

14     sanctions for delay of transfers; is that right?

15         THE COURT:  Taking account of the COVID backdrop.  If

16     you really believe such a motion is warranted and you'd seek --

17     you know, you'd meet and confer and you'd seek -- maybe 14 days

18     is a bit aggressive, but is that the way to resolve any

19     outstanding issue here?  That's really the case management

20     question.  Should I signal -- all right.

21         MR. GALVAN:  Well, I was going to also add, your

22     Honor, I agree 14 days is short for that.  I think 30 days

23     would be more workable.

24         THE COURT:  All right.  Any thoughts on any other way

25     to account for what plaintiff is bringing to the Court's

1    attention?

2         MR. GALVAN:  Your Honor, I think what you've

3    identified is the one that is best grounded in the existing

4    orders, and so it certainly does get us to a remedy quicker if

5    we already have that framework in place.  So, no, I wouldn't

6    offer anything else.

7         THE COURT:  Your thoughts on this, Mr. Mello?

8         MR. MELLO:  I know that the parties were meeting and

9    conferring on these subjects, and I would hope that we would

10   continue to meet and confer on these subjects in light of the

11   backdrop that is the pandemic.  But I have no additional

12   thoughts, your Honor.

13        THE COURT:  All right.  I'll provide for the 30 days.

14   And again, that will be an order following hearing -- or

15   following status.  Following status.

16      All right.  Anything else on -- well, on staffing?  Here

17   are my other issues.  There are two staffing motions out there

18   given the way the Court is now proceeding.  There's a motion to

19   clarify application of the ten percent vacancy rate, a motion

20   to modify the 2009 staffing plan.

21      Can I clarify that those are submitted and I'll resolve

22   them shortly, Mr. Galvan?

23        MR. GALVAN:  I would like to defer to Ms. Ells on

24   that.

25        THE COURT:  All right.  Ms. Ells?

 1                  MS. ELLS:  Thank you, your Honor.  We have met and
 2     conferred with defendants on this issue, and we would like
 3     seven days to try and resolve anything that we can around these
 4     two motions.  If we can't resolve them by next Friday, we'll
 5     submit something to the Court asking that they be ruled on.
 6                  THE COURT:  All right.  Mr. Mello, agreed?
 7                  MR. MELLO:  I believe that is the agreement, your
 8     Honor.  Maybe -- I think we may have considered maybe some
 9     supplemental briefing, but that is the agreement we are going
10     to meet and confer for a week, your Honor.  Thank you.  And
11     thank you, Ms. Ells.
12                  THE COURT:  All right.  I'll look for an update then
13     in seven days.  And if you're requesting the opportunity to
14     provide supplemental briefing, clarify how many pages and what
15     that supplemental briefing would cover.
16         All right.  In terms of the ongoing staffing shortages in
17     the PIPs.  I mean, I gather the global picture is that the
18     total staffing numbers are looking not bad, it's the PIPs -- or
19     at least some plaintiffs think there's a serious problem -- and
20     some of the numbers do raise questions about PIP staffing.
21         The Special Master is in the field with the 29th round
22     monitoring and I believe can get to the Court an accelerated
23     report on PIP staffing.  And so split that off as a subset of
24     the 29th round report that would be filed sooner rather than
25     later.  I'm inclined to ask him to do that.  Any reason not to?

1    Is this also Ms. Ells?

2              MS. ELLS:  Yes, your Honor.  We think that is

3    appropriate and warranted.

4              THE COURT:  Mr. Mello?

5              MR. MELLO:  I know that there's action on staffing,

6    but I didn't anticipate you going there, your Honor, so I think

7    that's fine, your Honor.

8              THE COURT:  At least it gets information before the

9    Court -- the parties and the Court.  So Secretary Allison here,

10   is there anything that you want the Court to know about what's

11   going on in the PIPs with staffing or do you want to wait and

12   see the Special Master's report?

13             SECRETARY ALLISON:  Well, I do want to highlight

14   something, your Honor.  The state is committed to providing

15   mental health care to our sickest patients as evident by the

16   narrative statement released in the governor's budget.  The

17   state is committed -- so his statement in the budget states,

18   "The state is committed to the delivery of mental health

19   services to the population with continued efforts to provide

20   proper staffing for those who require our highest level of

21   care."

22        So he's highlighting his commitment; we're going through

23   that process currently.

24             THE COURT:  All right.  Noted.

25        On telepsychiatry -- Ms. Ells, I'm sorry.  Ms. Ells?

1          MS. ELLS:  Could I make one more statement?  I think

2    I wanted to make clear that we certainly appreciate the

3    expediting of the Special Master's PIP report.  We've been

4    meeting and conferring with defendants for a few months now

5    about these issues which are of great concern to us.

6         We have requested aggressive action from them with a plan

7    for attacking this problem, which is getting worse month to

8    month.  And so we have requested action within a month; we may

9    be seeking leave with the Court to file a motion if we don't

10   feel like things are progressing quickly enough, and I just

11   wanted to highlight that for the Court.  Defendants are already

12   aware of that.

13          THE COURT:  All right.  Thank you.  I think all of us

14   would benefit from keeping this on the front burner for now.

15   And with the Special Master focusing on that, it will give us

16   all something to review together.

17        On the telepsychiatry pilot, I think I had mentioned this

18   previously.  The pilot ends April 1st, and then the Court

19   previously has set in place a pretty long schedule for parties

20   determining whether any alterations are needed.  If disputes,

21   they go to the Special Master, the Special Master ultimately

22   makes recommendations on any disagreements, and then there is

23   an objection period taking us all the way almost to the end of

24   the year.

25        My question is:  Is there -- based on how that pilot is

1    going, is there a way to re-visit the schedule and shorten it?

2    Are people prepared to address that today, Mr. Galvan?

3         MR. GALVAN:  Your Honor, I've looked at the schedule,

4    and it does take us out to October 28th.  I went and mapped out

5    all the dates.  That would be the last day for the parties to

6    respond to the Special Master's telepsychiatry report, if

7    necessary.

8         There are points in the schedule where the process could

9    naturally end.  I mean, they could end May 1st if the parties

10   determine that no alterations are necessary, for example.  Or

11   it could end on May 31st if the parties agree on alterations.

12   And it could end on June 30th if -- well, June 30th is when the

13   parties would submit disputes to the Special Master.  But even

14   after that there's a 30-day period where the Special Master is

15   working on it.

16        So there are points where we could, without modifying the

17   schedule, we could resolve it all earlier if we reach

18   agreement.

19        I don't know from how the pilot is going how likely that is

20   because I'm not sure yet what defendants are going to propose

21   as a result of that.

22             THE COURT:  Okay.  Who is speaking on this for the

23   defense?  Mr. Mello?

24             MR. MELLO:  Yeah.  I think Mr. Galvan is -- we are of

25   like mind as to the fact that the process may end earlier.

1   Obviously, as mentioned in the lessons learned report, you

2   know, the landscape has changed.  But I -- I think maybe at the

3   end of the process if we're unable to reach agreement, maybe

4   some of those deadlines at the end could be tightened up.  But

5   I think those initial first three or so make a lot of sense to

6   allow the parties to meet and confer and work with the Special

7   Master on the front end.  Because maybe we will hit one of

8   those earlier dates that Mr. Galvan spoke to.

9           THE COURT:  All right.  So does it make sense for the

10  Court to just underscore the May 31st date on my internal

11  planning calendar in thinking about future dates for statuses?

12    Because I might want to, you know, shine the spotlight on

13  this issue again as soon as possible after May 31st to see if

14  we can expedite the schedule if there are disagreements

15  outstanding.

16    So that's what you're saying, right?  May 31st, within

17  seven days or so after May 31st the Court could check in on

18  that, Mr. Galvan?

19          MR. GALVAN:  Yes.  That's right, your Honor.  Because

20  at that point you'd know whether we reached a deal or whether

21  we're going to start using up the Special Master's energy.

22          THE COURT:  All right.  Mr. Mello?

23          MR. MELLO:  I agree, your Honor.

24          THE COURT:  All right.  Then I'll tentatively think

25  about a status in that early June time frame to check in on

 1    that unless you tell me it's all resolved by the end of May.

 2        All right.  Anything else on telepsychiatry?  Secretary

 3    Allison, do you want the Court to know anything on this pilot?

 4              SECRETARY ALLISON:  I will defer to Dr. Mehta.

 5              THE COURT:  Dr. Mehta?

 6              DR. MEHTA:  Thank you, your Honor.  You know,

 7    telepsychiatry is near and dear to my heart.  We're very proud

 8    of it.  I'm looking forward to talking with the plaintiffs and

 9    resolving it, but I think that's a perfect schedule, your

10    Honor.

11              THE COURT:  All right.  Very good.

12        Suicide prevention, which I know is near and dear to the

13    secretary's heart.  Here's what I'm seeing.

14        First, I am aware that the Special Master is going to be

15    filing a report on trend lines over the past five years on or

16    about February 21st, so that's -- I'll be seeing that quite

17    shortly now.

18        I've also noted the recent update to the activation

19    schedules, changing one deadline.  But upon some further

20    checking, I don't think the Special Master or the -- his expert

21    see any issue there, and I've previously heard from the defense

22    that they believe the schedule is on track.

23        And I'm expecting the fifth re-audit report to be

24    circulated by July 1st and filed with the Court by

25    September 1st, so that September 1st deadline.  And I don't

1    think that can be expedited unless someone tells me otherwise.

2    That September 1st deadline would drive my checking in again.

3         There is this issue, however.  I understand from the

4    Special Master that he's had some discussions, they're taking

5    account of some, you know, personal schedules, but he is

6    discussing with the secretary the foreseeability and

7    preventability issue.  And so my suggestion is, is to request

8    that the Special Master report to me by the end of April, that

9    that would give enough time.

10        And so I wanted to ask the secretary, does she agree that

11   that's a generous but not too long a time for the Special

12   Master and you to exhaust your discussions about resolving that

13   issue?

14        First of all, let me ask Special Master Lopes, am I stating

15   correctly your thoughts?

16             SPECIAL MASTER:  Yes, your Honor, you have.  I have

17   worked very closely with the secretary on many projects in the

18   past, and I'm confident that we can reach an agreement that

19   will be acceptable to you and to the plaintiffs.

20             THE COURT:  All right.  Does that sound right to you,

21   Secretary Allison?

22             SECRETARY ALLISON:  Yes, we look forward to those

23   further conversations.  And as Matty said, we've worked a lot

24   on things over many, many years together.

25             THE COURT:  All right.  So I will confirm following

1  this hearing that the Special Master will report to me by

2  April 30th.  And if there's a specific proposal, there would be

3  an objection period, if there is any objection, and I would try

4  to resolve that as promptly as possible.

5      Anything else on suicides, even though that's a cursory

6  review, I mean, this is definitely a front burner issue.

7      Anything further, Mr. Galvan?

8          MR. GALVAN:  Not if Ms. Ells doesn't have anything,

9  your Honor.

10         THE COURT:  Ms. Ells?

11         MS. ELLS:  No, your Honor.

12         THE COURT:  Mr. Mello?

13         MR. MELLO:  Nothing further, your Honor.

14         THE COURT:  All right.  Secretary Allison, here, is

15  there anything else you would like the Court to know?

16         SECRETARY ALLISON:  Nothing further.

17         THE COURT:  All right.  Unmet bed needs, which I

18  understand is a bit of a thorny issue right now.  Let's just

19  talk about it and see if the Court can play a role in

20  clarifying.

21      Who's the principal on point for unmet bed needs?

22  Mr. Mello?

23         MR. MELLO:  Dr. Mehta.

24         THE COURT:  Dr. Mehta, all right.  Does that sound

25  right to you, Secretary Allison?

```
1              SECRETARY ALLISON:  Yes, ma'am.

2              THE COURT:  Okay.  So here's what I understand.  That

3    Special Master -- and he can correct me if I'm wrong -- has

4    reported that planning is 90 percent complete as to phase

5    one -- there's some issues regarding correctional officer

6    input -- not complete as to phase two.  I had ordered to try to

7    get folks off the dime here, that planning be completed by the

8    9th.

9         Just for -- you know, I've reviewed information -- because

10   this is not the first time there's been an unmet bed need

11   study.  So I have reviewed, just to get a sense of what's the

12   time something like this should take, recognizing there are

13   many balls in the air.

14        But in 2009 when there were a lot of balls in the air,

15   phase one was complete within 29 days from the date of the

16   Court's order, and the full report was complete in just under a

17   year.

18        And right now the parties are on some kind of process that

19   just -- is much expanded at a time when it's really critical to

20   get this done, now that it's been ordered.  I realize the

21   people may not be happy with the Court's ordering, but it's

22   ordered.

23        So, I mean, my thought is that there can't be any further

24   delays here if you look back at the Court's prior order.  And

25   my question is, is there any lack of clarity about the order
```

1    issued on September 13th of 2021?  Docket 7305, if it is the

2    defendants' as soon as practical -- I didn't think I needed to

3    put a date in but I've since reconsidered -- under the guidance

4    and supervision of the Special Master who shall have final

5    authority over the scope of and methodology for the study

6    undertaken assessment.

7        So that's the overarching question I'm going to come back

8    and ask, particularly Dr. Mehta or Mr. Mello, in the first

9    instance to answer.  Is there some lack of clarity there?

10   Because, if not, here's my understanding -- again, the Special

11   Master can correct me if he thinks I got this wrong -- but he's

12   thinking that the full assessment could be completed by

13   September of this year.

14       And so my thought would be to ask him, given the authority

15   given him in that September order to file promptly -- he can

16   tell me how long he needs -- an executive summary of the plan

17   and a schedule for completion allowing for the study to move

18   forward without further delay.

19       I'm aware of the possible proposal to take over projecting

20   needs without renewing the contract with Navigant Consulting.

21   I can't get into the weeds on that one.  But if the Special

22   Master tells me there's a dispute that needs to be resolved,

23   then I'm going to say, "How does that get before me as promptly

24   as possible so I can resolve it?"

25       Or does the Special Master, in light of the September

1    order, have authority just to say, "Well, I note the defense

2    position but here's how we're proceeding."  And the time has

3    passed to try to work things out, it's just got to get going.

4    That's my view.

5        Because it dovetails some other things on the calendar that

6    need to be treated as tied confirmed dates, so that's kind of

7    an overview.

8        Special Master Lopes, do I have right your thought that the

9    assessment can be done by September?

10        SPECIAL MASTER:  Yes, your Honor.  The actual touring

11    and evaluation, to the extent that they are necessary, can be

12    done in that period of time.  And then, as you said, the

13    original MHARP took roughly a year, so there's a period that

14    the defendants would have to spend writing up their report and

15    working with us on that, so that it wouldn't be before the

16    Court probably until the end of the year.  But, yes, the

17    evaluations that need to take place and the tours that

18    accompany those could be completed in that time.

19        And to your point, your Honor, if you ordered me to put

20    together a proposal in the form of an executive summary, we

21    could do that within two weeks.

22        THE COURT:  All right.  So who wants to respond first

23    to this?  Is this Mr. Mello or Dr. Mehta?

24        MR. MELLO:  I can start, your Honor, if I may.

25        So I think that the fact that there may be a dispute as to

1    methodology, and it goes to your order that says that the

2    Special Master will have the final say on methodology.  I think

3    the way to resolve that issue is to get the methodology would

4    be to get the Special Master's methodology in a report that

5    sets forth with specificity that methodology would be helpful

6    for defendants.

7         I think defendants would like to comment on it before the

8    Court ordered a specific methodology, but if it's going to be

9    put in writing, then I think that would be helpful for our

10   clients.  Because I think there is -- there are some disputes

11   that are not resolved at this point with respect to

12   methodology.

13        And with that I can turn it to Dr. Mehta if he has anything

14   more, but that's sort of the threshold issue, your Honor.

15              THE COURT:  Dr. Mehta?

16              DR. MEHTA:  Yes.  Thank you, your Honor.  You know,

17   CDCR is more or less done with our part of the plan.  There's,

18   I think, one small issue remaining, but other than that it's

19   more or less done.

20        We know our system really well, we know how to make this

21   study useful to our system and a real benefit, and that's what

22   we designed the study around.

23        In terms of the schedule, your Honor, I must be honest, I

24   have some concern.  You know, we've created a Lindsey Hayes

25   schedule, we've created a data remediation schedule.  We keep

1    adding things on and not changing the existing schedules

2    despite the additional workload.  And, of course, not to

3    mention COVID on top of everything else.  And I don't mean to

4    say things were easy in 2009, but it is a lot of different

5    priorities to try to keep together, your Honor.

6        We've initially proposed having a rate rather than a

7    specific date to finish on where we can complete a certain

8    number of hundreds of evaluations per month.  It's very hard to

9    predict what the total size of the pool is going to be, and

10   it's very hard to predict what will happen with COVID.

11       And in every one of our UNA meetings we've all agreed that

12   we should not be going into them if it's difficult or unsafe or

13   it's going to overburden the institution, we shouldn't be

14   stopping other processes which are important for maintaining

15   quality of care for 30,000 patients that we treat every day.

16   And keeping that program running is a huge responsibility in

17   addition to everything else.

18       We certainly keep the Court priorities front and center, to

19   be very clear, but we have all of these different things going

20   on at the same time that we want to do the study properly and

21   in a way that will be helpful, and I'm not sure that

22   September 1st would allow us to do that.

23            THE COURT:  So if the Special Master gives me a

24   proposed plan spelling out methodology within 14 days, you're

25   asking for a chance to object to that?

 1            DR. MEHTA:  I would -- I'm sorry.  Please, go ahead.

 2            MR. MELLO:  No.  I think defendants would like the

 3    opportunity to comment on it before methodology is selected,

 4    your Honor.  And would do that quickly because I think they've

 5    done a ton of planning already in coordination with the Special

 6    Master's team.

 7            THE COURT:  All right.  Let me ask Mr. Galvan.  Do

 8    plaintiffs have a view on how to move this forward as promptly

 9    as possible?

10            MR. GALVAN:  I'll defer to Ms. Ells on that one, your

11    Honor.

12            THE COURT:  All right.  Ms. Ells?

13            MS. ELLS:  Your Honor, we have been involved in the

14    planning meetings, and we have grave concerns about numerous

15    aspects of defendants' proposal.  Key parts of it are still not

16    completed even though the planning deadline passed two days

17    ago.

18        And at this point we spent so much time on planning, and,

19    frankly, defendants' proposal looks to us like they're a

20    sustainable process which this Court has already made clear is

21    not an acceptable approach.

22        At this point the Court should just ask the Special Master

23    to submit the methodology.  Defendants' understood from the

24    start the Court's order said that he has final say over the

25    methodology.  Allowing for an objection period right now would

 1    only delay resolution and starting this process.

 2        Defendants' proposed timeline at this point wouldn't even

 3    start until July and it is estimated to take more than two

 4    years, so there's a serious disconnect in the urgency of this

 5    project.  We know that there are some other priorities for

 6    defendants that are not court ordered, like their forthcoming

 7    CQIT tours, and those can be deferred if there are resource

 8    issues.

 9        This is something that has been pending for or needed for

10    three years, and it's time to move forward and complete it as

11    quickly as possible.  Not only because there are patients out

12    there, we believe -- we believe there are many patients out

13    there who need inpatient care and have not been identified --

14    but also the bed planning is inherently tied to the results of

15    this process.

16        So we think it's important to just move forward with the

17    original plan that your Honor laid out in the September order.

18            THE COURT:  All right.  And I do have that order in

19    front of me to remind myself what I said about it.

20        All right.  Anything else anyone wants me to know about

21    this?  I'll think about it and issue something shortly.

22            SPECIAL MASTER:  Your Honor, if I may.  I agree with

23    everything that Attorney Ells just stated.  The longer that we

24    go on, the more this project will be delayed.  It's important

25    to understand if there is an unmet bed need.  If there's not

1    and it is a cornerstone of defendants' argument that there's

2    sustainability.  If there is an unmet bed need then it drives

3    everything:  It drives telepsychiatry, it drives the bed

4    planning, it drives all the resources that need to be brought

5    to bear here.

6        Your Honor, this isn't new.  We've done these studies at

7    least three or four times in this case, and it's taken longer

8    to do this study development than it had one of its

9    predecessors.  And it's just mind boggling to me that it's

10   taken so long.  I think, in part, the defendants have rooted

11   their position in the sustainability of their sustainability

12   effort that they have, and they haven't really focused clearly

13   on the Court's order saying the sustainable process is

14   unsustainable.

15       So when we have conversations to discuss the use of the

16   sustainability process, it almost flies in the face of the

17   order and it causes significant delays.

18       I believe that we should -- we should move on, I'll put the

19   methodology in, and I think we should start the process.

20       Dr. Mehta is right that there is -- you know, COVID is a

21   factor in terms of whether tours need to be discontinued at a

22   certain point.  If there's an outbreak, we certainly want

23   everyone to be safe.  But, your Honor, the 2009 period -- and

24   Dr. Mehta wasn't here for that -- was the most explosive year

25   in the Court's history in this case.  We had the three judge

1  court that was just wrapping up, we had an MHARP, we had bed

2  planning, we had training around bed planning, we had two

3  Special Master's reports, we were in Court continuously.  And

4  the defendants in their bed planning had to come up with a

5  long-term, short-term, an intermediate-term bed planning

6  effort, and they were constantly going back to the legislature

7  and through the various processes to make sure that

8  previously-ordered bed facilities were brought online.

9      So there were constant efforts by the department that were

10  herculean to make sure that treatment space, like the one at

11  CMF, was brought online, but they had to go through all

12  different sorts of funding mechanisms that the state requires

13  to get those things done.  So we were meeting constantly, and

14  our efforts were exhausted.

15      That is -- clearly we weren't in a pandemic, I fully

16  acknowledge that.  Okay, now that we will, to your point, your

17  Honor, have to live with for the rest of our lives.  But I

18  would be remiss if I let it lay out there the statement that or

19  the feeling that, excuse me, this is a more explosive time.

20      This is a difficult time, we have a lot of reports, we have

21  a lot of deadlines, but everyone is committed to ending this

22  case.

23      And in order to end the case we all have to roll up our

24  sleeves and stick to those timelines.  Further delays for this

25  project, I think, would be -- could possibly be harmful to

 1    patients who need the additional care.

 2         Conversely, it's a strong marker if there is no need, that

 3    the defendants have moved in the right direction in this case

 4    and have an argument about sustainability.

 5              THE COURT:  Understood.  I understood that general

 6    interrelationship with sustainability.

 7         Dr. Mehta?

 8              DR. MEHTA:  Thank you, your Honor.

 9              MR. MELLO:  May I be heard too, your Honor?

10              THE COURT:  Wait.  Only one at a time.  Who wants to

11    speak?  Dr. Mehta and Mr. Mello?

12              DR. MEHTA:  Yes, your Honor -- Mr. Mello.

13              MR. MELLO:  Just real quick.  I would just point out,

14    your Honor, that we're very happy that the Special Master, his

15    methodology will be put forth.

16         I think this Court has now heard descriptions of our

17    concerns and thoughts and descriptions of our purported

18    methodology, but I think it would be -- it would lack some

19    process if we would not have the opportunity to actually put

20    those comments and thoughts in our methodology -- proposed

21    methodology in writing for the Court to consider before

22    ordering it.  It wouldn't take a lot of time.

23         But with that I will defer to Dr. Mehta for additional

24    information.  Thank you.

25              THE COURT:  All right.  Dr. Mehta?

1      DR. MEHTA:  Thank you, your Honor.  I disagree very

2   strongly with some of the characterizations that Mr. Lopes

3   made, with all due respect.

4      We are not trying to run SusPro as an UNA.  I've been

5   surprised at how little everyone seems to understand what

6   SusPro actually is despite the fact that we keep filing these

7   reports.

8      MHARP and SusPro have a lot in common.  There's a lot of

9   similarities that we dispute because they were built that way.

10  And that may be where some of the confusion is coming from.

11  But we started -- and I don't know how anyone could see

12  anything different in our workers.  We started with the

13  criteria of MHARP and literally talked about each one and

14  modified it to meet the new world that we're in today.

15     In 2009 we didn't have an electronic medical record, we

16  didn't have a lot of -- we didn't have any sort of telemedicine

17  which has happened over the last decade plus since MHARP.

18  There were a lot of different things in MHARP that simply don't

19  make it directly applicable to our current thing.

20     And if I'm being honest, I'm concerned that if the Special

21  Master writes a report and there's no opportunity for us to

22  comment, they will mandate or include things that are simply

23  not practical within the system as it exists today.  And that's

24  been one of the difficulties that we've been having, your

25  Honor, in reaching agreement is, as I said, we know our system

1    very well, and there are aspects of this that we're very --
2    we're struggling with.
3        We want to get this done as quickly as possible, but it
4    can't work both ways.  If we're told to do things that we can't
5    accomplish and accomplish them in any reported time frame, I
6    just don't see how that's possible, your Honor.
7            THE COURT:  I may need to follow up with more focused
8    discussion on this, but help me understand.  What's the -- so
9    when would you say the study with the report to the Court could
10   be fully completed?  If Special Master says completion of the
11   assessment by September, report by the end of the year, what's
12   your schedule?
13           DR. MEHTA:  Your Honor, I have not seen a written
14   account of what the Special Master's proposed policy is, so
15   it's hard to say how long that would take because we haven't
16   seen that yet.
17       But I do think that the schedule that we set out is, I
18   think, reasonable.  I think it can be accelerated, I don't
19   think it requires two years from starting, but I think it is
20   definitely longer than September, your Honor.
21           THE COURT:  The other thing is, I'm looking at
22   certain dates that I think are perhaps connected to what
23   happens with the unmet bed need study.  And that is, for
24   example, CMF L-1 deactivation.  Right now there's a plan due to
25   the Special Master and the plaintiffs April 22nd, a waiver

1    expires October 15th.

2        So at this point the Court sees those dates as firm.  Do

3    you -- can those dates be firm regardless of what happens with

4    the unmet bed need study?  Dr. Mehta?

5            DR. MEHTA:  Sorry, excuse me.  Yes, your Honor, I do

6    believe so.  I think that we are -- that is working on

7    projections and past data which helps us figure the range of

8    need that we have, and I do think we can continue those

9    conversations.

10       By no means do I deny the connection, you're absolutely

11   correct on that, but I think we can still make progress on

12   that.

13           THE COURT:  With waiver expiring October?

14           DR. MEHTA:  Yes, your Honor.  So with having a plan

15   for -- with everyone's comment in April, your Honor.

16           THE COURT:  All right.  Let me think about what I've

17   heard, and again, I might want to talk with you again more even

18   next week about this because we cannot delay any further.

19           DR. MEHTA:  Thank you, your Honor.

20           THE COURT:  All right.  Let's just touch base on --

21   on settlement, I just wanted to say this:  I understand the

22   parties want to seek settlement regarding the guard one cases.

23       With that, please make a request to me saying exactly what

24   you want, scope, timeline, who would be involved so that I can

25   approve that or not.

1      On TTMs, I've already approved the parties' stipulation.

2  Just let me -- just notify me if you are going to Judge Newman

3  and tell me what you're taking to him so I know.  I'm not

4  changing my approval of the stip, but just so -- so I have

5  that, again, on my radar.

6            MR. MELLO:  I'm sorry, your Honor, I want to make

7  sure I understand.  With respect to the dispute, the complaint

8  in there with regard to that stipulation, is that what you're

9  referring to, your Honor?

10            THE COURT:  Is there a stipulation before me?  I'm

11  sorry, I don't have every document in front of me that's been

12  filed in this docket which has now reached how many?

13            MR. MELLO:  No, no, no.  We presented it to the

14  Special Master, I'm sorry, and I apologize.

15            THE COURT:  Ahh.

16            MR. MELLO:  But you are referring to that dispute,

17  the guard one issue and the complaint?  I just wanted to make

18  sure I was following.  Thank you, your Honor.

19            THE COURT:  Those are the two issues right now.  One

20  will go to Judge Newman under the TTM stip, just notify me.

21  The other one I have not approved just going to Judge Newman

22  regarding the guard one cases.

23            MR. MELLO:  Okay.  Thank you, your Honor.

24            THE COURT:  And then in terms of -- I just wanted

25  to -- let's leave data remediation, because I understand the

1    defense wants to talk about that.

2         I just wanted to make certain we were on the same page, if

3    I can find my notes here.  There is, I believe, still pending

4    before me your September 29th filing, docket 7332, joint

5    response regarding the August 3rd order, 2020.

6         I've now issued the February 7th order confirming how I see

7    the CQIT process unfolding and how that suspends the need for

8    filing a program guide update this coming fall.

9         I understand that, nevertheless, I now have the joint

10   notice and annual updating process agreement to the extent it

11   applies to the regulatory and policy making process.  So it's

12   Exhibit A, docket 7332-1.

13        I think there might be some changes to the language to

14   reflect my February 7th order, but am I right that the parties

15   understand that that joint notice and annual updating process

16   agreement is before me for consideration, because I'm prepared

17   to address that.

18        Mr. Galvan?

19             MR. GALVAN:  Yes, your Honor.  The parties didn't

20   withdraw it so it is -- it is still before the Court.  And from

21   plaintiffs' point of view it would be useful to have a notice

22   process when they're going to change things.  So the annual

23   updating part, I think, is somewhat mooted by the February

24   order that your Honor referred to, but the notice part is still

25   useful.

1          I have not talked to defendants about this; I don't know

2     their position.

3               THE COURT:  Well, I wanted to -- because I -- I think

4     I put on a date by which you would let me know, you didn't, and

5     I had said that if I didn't hear otherwise then I would turn to

6     the September 29th filing, and so because I have heard nothing

7     else, that's what I'm doing now.

8               MR. GALVAN:  Yes, your Honor.  Actually, we did

9     talk -- the parties did talk about an alternative exhibit in

10    the form of the pared-down version that had gone along with the

11    remedial plan process, but then we decided not to submit that

12    so I think -- I think all the parties then understood that

13    things would revert back to docket 7332.  That's my

14    understanding.

15              THE COURT:  All right.  Mr. Mello?

16              MR. MELLO:  Yeah, I won't speak to the issues on the

17    in camera and the settlement issues, but I believe that the 929

18    filing is still out there, though I do believe it may be

19    impacted obviously by your subsequent orders.

20         And again, with respect to that filing, that filing and

21    that process was part of a larger resolution and issue when the

22    defendants filed that Exhibit A.  And so I think the landscape

23    has changed in light of subsequent orders.

24         But, yes, we cannot withdraw what we filed on the 29th, it

25    is still before the Court, but I do believe the landscape has

 1    changed in light of subsequent orders and actions.  Thank you.

 2            THE COURT:  My question is, do you want me to modify

 3    the joint notice at 7332-1, or do you want to meet and confer

 4    and let me know if you agree on how it would be modified to

 5    take account of the February 7th order?

 6        Mr. Galvan -- or Mr. Mello, you can go first.

 7            MR. MELLO:  You know, I think we would like to meet

 8    and confer again more on the subject because there are some

 9    unknowns out there, but I think we prefer to meet and confer.

10        But, of course, your Honor can do what she sees fit with

11    that September 29th filing, but I think defendants would prefer

12    to meet with opposing counsel, meet and confer.

13            THE COURT:  All right, Mr. Galvan, agree, meet and

14    confer might be useful just to clarify in light of the

15    February 7th order?

16            MR. GALVAN:  Yes, your Honor.

17            THE COURT:  How much time do you need to propose --

18    what I would say is keeping the spirit of 7332-1 but modifying

19    it in light of the February 7th order?

20            MR. GALVAN:  I would suggest 14 days, your Honor.

21            THE COURT:  Mr. Mello, does that work?

22            MR. MELLO:  14 days makes sense to me.  And again, it

23    will be a meet and confer.  I don't want to create false -- any

24    false expectations that we've reached an agreement.  I think we

25    may reach agreement, we are working well with plaintiffs'

 1    counsel, but I don't want to create a false expectation that we

 2    will do that.  I just don't know yet, your Honor.

 3            THE COURT:  All right, 14 days.  I'll hold off for

 4    14 days, and I'll confirm that up in a minute order following

 5    this hearing.

 6       I just want to put dates out there based on what I believe

 7    is on the calendar.  Dr. Mehta mentioned there are a lot of --

 8    there are a lot of moving parts, but that's always been the

 9    case in this case.

10       So in terms of max custody in the PIPs, I have that on the

11    calendar -- there's a March 9th implementation date with a

12    September 9th report to the Court.  That's on track.  Is this

13    for Secretary Allison, or who is the person to just confirm

14    that's on track?

15       Mr. Mello.

16            MR. MELLO:  I think that's on track, your Honor.  I

17    mean, there is some question as to when the stipulation was

18    approved, but I think that is on track, your Honor, and we are

19    achieving the March date that you gave, your Honor.

20            THE COURT:  In terms of the DHS staffing review,

21    there's a year-long monitoring period that's ending March 28th,

22    and so my assumption is the Special Master will report on that

23    in the 29th round.

24       Agreed, Mr. Mello?

25            MR. MELLO:  I believe that is correct, your Honor.

```
 1                THE COURT:  All right.  Anything to say on those
 2    issues, Mr. Galvan?
 3                MR. GALVAN:  No, your Honor.  My reckoning matches
 4    the Court's reckoning.
 5                THE COURT:  All right.  Is there anything else before
 6    we talk about data remediation?
 7         Mr. Galvan?
 8                MR. GALVAN:  No, your Honor.
 9                THE COURT:  Mr. Mello?
10                MR. MELLO:  No, your Honor.
11                THE COURT:  Secretary Allison?
12                SECRETARY ALLISON:  No, your Honor.
13                THE COURT:  Special Master Lopes?
14                SPECIAL MASTER:  No, your Honor.
15                THE COURT:  All right.  So data remediation, I see an
16    April date coming up.  April 7th for an update that I believe
17    the defendants will be filing.
18         I don't know if Special Master Lopes wants to say more
19    before I hear from the parties.  I know, Mr. Mello, you said
20    you wanted to address this.
21         I had asked the Special Master if this can be expedited
22    because it's so critical.  I believe his understanding is that
23    that it is going to take some time, and so I'll let him briefly
24    explain what he's told me just so it's out there, and then I'll
25    hear whatever Mr. Mello has to say and then plaintiffs.
```

1          Special Master Lopes.

2          SPECIAL MASTER:  Thank you, your Honor.  Generally, I

3  just want to say that we have -- my data expert and my team

4  meet with the defendants throughout every week and have had

5  countless meetings with them, and we then have had biweekly

6  data meetings to review what is being done.

7      We've had some disputes but we've had great successes, and

8  my team believes that we're still on schedule with the

9  activation schedule that is already before us.

10     There was a filing that was made recently which seems to

11  indicate that it would shave time off of the process as well,

12  and we are in discussions with the defendants to have the

13  plaintiffs join in on our regular meetings, which means we'll

14  be getting real-time input from the plaintiffs.  And barring

15  unforeseen circumstances, we should all be able to meet the

16  deadlines that have already been set.

17     I hesitate to say that that schedule could be accelerated.

18  Many of the same people who are working on data remediation for

19  the defendants are working on all of these other deadlines and

20  projects as well.  The same with my team.

21     The defendants have put in, as I understand it, a so-called

22  PCP or made a budgetary request for additional staff,

23  programmers, and the like, and -- but that budget process goes

24  through June, and then you have to hire the people and then

25  they have to come in and be trained.

1     But certainly once those folks are on board then there may

2     be some chance to move forward.  But technical writers, subject

3     matter experts, data scientists, the defendants just don't have

4     enough bandwidth right now.  And I'm not sure that they have --

5     again, they have a lot of people who are doing good work, but

6     they're all doing some of these other projects that we're

7     talking about as well.  Accelerating that timeline might cause

8     them to have to duplicate themselves or replicate themselves;

9     it's going to be challenging.

10          THE COURT:  All right.  Mr. Mello, your thoughts?

11          MR. MELLO:  I, again, want to turn it over to

12    Dr. Cartwright who is running this project for the department.

13    But, initially, I think you wanted to speak to the errata just

14    for complete transparency that was alluded to earlier, and I

15    think you wanted to speak to where we are and the fact that

16    there's some uncertainty at the end of the process and how that

17    makes determining when we will be through data remediation for

18    a particular item or all items difficult really to pin down.

19      And so we're like looking for a little bit of guidance from

20    the Court on that particular issue.  But I'll turn it over to

21    Dr. Cartwright just to update you and speak to those issues.

22    Thank you, your Honor.

23          THE COURT:  All right.  Dr. Cartwright.

24          DR. CARTWRIGHT:  Thank you.  In addition to the

25    details that were filed in the errata, I just wanted to

1   underscore that my team identified the potential

2   miscalculation.  We conducted a full audit and we fixed the

3   root causes for that calculation, we've established enhanced

4   procedures.  And the result, as was mentioned, is that our

5   current calculation shows that we're a bit more ahead of

6   schedule than we initially filed earlier this year.  But that

7   is with known work, and so, you know, we have a certain number

8   of steps that have been defined, a certain number of

9   provisionally-improved key indicators that we know about.

10      However, we still have concerns with some of the delays and

11  the items that we mentioned in our original filing that could

12  threaten the overall timeline.  They still remain, to some

13  extent, although we are working closely and very hard to

14  mitigate them.

15      But we also -- we don't fully understand how data

16  remediation is achieved.  There's some steps towards the end of

17  the process that aren't clear, they haven't been defined, and

18  so it's difficult for us to fully say that -- with confidence

19  that the timeline -- we're completely on time with the

20  projected data remediation timeline.

21          THE COURT:  All right.  I do see the -- I notice the

22  errata, I have not studied it carefully, but I did see that it

23  has been filed, so I will take a closer look at that.

24      All right.  Just so I'm clear, are you suggesting that

25  there is more the Court can do?

1          MR. MELLO:  Steve, I can take that.  I think that we

2     are hoping that the Court can provide some clarity as to the

3     process by which individual indicators are taken up, how they

4     are reported on in terms of whether or not in writing --

5     whether they're reported on whether or not they have made it

6     through data remediation or not, an opportunity to address

7     whether or not a particular item, if it isn't approved or

8     through the data remediation process.  So those last steps that

9     are the data remediation expert steps, we're looking for some

10    clarity on that.

11         We put sort of that information in one of the early

12    activation schedules, but we're looking for that clarity.

13         And also note some sort of description as to why something

14    might not be provided or deemed to be through the process, why

15    it fails data remediation or not.

16         I think we're looking for sort of three specific answers to

17    those questions so that Dr. Cartwright's team could really put

18    an end date on this and possibly speed it up.

19         And I think there's also concern about taking up all the

20    indicators at the end of the process and not doing them

21    individually.  Because it would afford us the opportunity to,

22    one, learn from individual circumstances, and also, two, not

23    wait until the end and respond to everything at once.

24         But again, Dr. Cartwright is the expert, and to the extent

25    I don't have that right and that's not what you're looking for,

1    Dr. Cartwright, feel free to chime in.

2       Thank you for the opportunity to speak to these issues,

3    your Honor.

4             THE COURT:  Dr. Cartwright?

5             DR. CARTWRIGHT:  Nothing further to add, your Honor,

6    that's exactly right.  Those are the issues towards the end

7    that we're looking to seek clarity on, really how the process

8    will be certified at the end of each of the indicators being

9    reviewed.

10            THE COURT:  Special Master Lopes, in a nutshell, just

11   give me your view.  I think it may be that in the same way that

12   I need to drill down on the unmet bed needs study, it may be

13   data remediation or something I drill down on sooner rather

14   than later, have some more -- a little bit more time than with

15   unmet bed needs.

16      So, in a nutshell, tell me what you're thinking, Special

17   Master Lopes, in response to what you've heard.

18            SPECIAL MASTER:  I'm thinking that these concerns are

19   overblown.  I think that we've spent more time working with the

20   defendants on data remediation than we have at any other time

21   for any other project.

22      The data expert has regular meetings with Dr. Cartwright

23   and his team; he has regular meetings with Dr. Leidner.  We

24   have an indicator that, if I understand it correctly, the

25   defendants have already gone through the remediation process

1   with what they are essentially asking for, in my view, is that

2   they want court reports along the way when, in fact, we're

3   working together as a team.

4       And so I don't know that there's any other way for us to

5   give them better information than the daily, weekly, hourly

6   meetings that we're having together.  And I do believe that

7   it's an appropriate time, perhaps at the next status

8   conference -- to the extent your Honor feels the same -- to

9   have Dr. Potter here would be very important because he's the

10  subject matter expert, he's the expert in this area, and he

11  could, in a granular way, let you know all the steps that are

12  being taken.  But I can only say that the data remediation

13  process has been one of the most intense, regularly-scheduled

14  reviews that we have conducted in this case.

15          THE COURT:  Well, it sounds to me as if it makes

16  sense to set a status on data remediation as soon as possible

17  following the second update due on April 7th.  Does that make

18  sense?

19          SPECIAL MASTER:  Absolutely.

20          THE COURT:  Have Dr. Potter here, Dr. Cartwright.

21  And the Court would be focusing on the three points Mr. Mello

22  raised.  Are there -- just looking closely at the process, and

23  is there any way without adding to the burdens, that the Court

24  can provide guidance to streamline and have things move along?

25      Let me just ask plaintiffs, does a status following the

1       second update due April 2nd make sense?

2         Mr. Galvan?

3               MR. GALVAN:  I'll defer to Ms. Trapani.

4               THE COURT:  Ms. Trapani.

5               MS. TRAPANI:  Hello, your Honor.  Yes, that makes

6       sense to us, and I also want to echo what Special Master Lopes

7       said, and Dr. Cartwright mentioned that this has been a very

8       complex process, we've been meeting constantly.

9         And since the defendants filed their updated activation

10      schedule, we are going to engage in a new revision to the

11      process where we'll be attending more of those meetings and

12      hopefully cutting out some of the later steps.  That's going to

13      get going in early March, and so we're hopeful -- that was

14      intending for both of us to shave off some time, and we're

15      hopeful we could have an update for you by the time of

16      April 7th.

17              THE COURT:  All right.  Does that time framework for

18      you, Mr. Mello?

19              MR. MELLO:  Yes, I think it might be helpful too if

20      defendants or the parties could submit a writing prior to

21      that -- to that status conference just with -- maybe to really

22      focus the issues -- those three issues that I probably didn't

23      do justice on; this is a very important project.  But that

24      makes sense to us, your Honor.  Thank you.

25              THE COURT:  All right.  That will be the plan then.

1   So we'll have a -- I'll currently plan to put a status on the

2   calendar following May 31st for the telepsychiatry pilot, that

3   would be a primary agenda item, but also something mid-April in

4   data remediation.  One could be more focused than the other.

5   It seems data remediation might take a whole -- a whole

6   session.

7       And then I'm going to think carefully about the unmet bed

8   needs study.  And if I need a follow up, I'll set a phone call.

9   If I just need -- do I need all of you, or if Ms. Schultz just

10  tells Mr. Galvan and Mr. Mello, "Here are the Court's follow-up

11  questions," then they can identify who needs to be on a call if

12  I want another call early next week on that?

13      Does that process work for you, Mr. Galvan?

14          MR. GALVAN:  Yes, your Honor.

15          THE COURT:  Mr. Mello?

16          MR. MELLO:  Yes, your Honor.

17          THE COURT:  All right.

18      I think we've covered everything I mentioned at the

19  beginning.  Anything else at this point, Special Master Lopes,

20  that I missed?

21          SPECIAL MASTER:  No, your Honor.  But I would like to

22  offer if there is a call next week, I would need to have -- or

23  I would recommend that a couple of the experts from my team

24  join in who have studied -- who have done most of these studies

25  before.  I don't think anybody from the defendants have done

THRESHA SPENCER, OFFICIAL COURT REPORTER, USDC

 1   one of the studies, and it would be helpful to get that

 2   perspective.

 3            THE COURT:  Yeah.  Given the -- there's clearly some

 4   passion behind Dr. Mehta's comments here, and I do want to make

 5   certain I fully understand, but also it keeps us on track.

 6       So -- but I'm happy to hear from everyone.  You know, I

 7   could just hear from the Special Master's experts offline, but

 8   I think it makes sense to be transparent here.

 9       So I'll follow up with you and let you know if I need more

10   early next week before I make a final decision on that.

11       Anything else, Mr. Galvan?

12            MR. GALVAN:  No, your Honor.

13            THE COURT:  Mr. Mello?

14            MR. MELLO:  No, your Honor.

15            THE COURT:  And Secretary Allison, anything else that

16   you would like the Court to know?

17            SECRETARY ALLISON:  No, ma'am -- no, your Honor.

18            THE COURT:  All right.  Well, thank you very much.  I

19   will get some statuses on the calendar for mid-April/early June

20   and let you know on the bed needs study.

21       And then if at any point you jointly think we need a status

22   like this just to do housekeeping and to focus calendaring, let

23   me know.

24       All right.  Thank you very much.  Have a good weekend.

25            MR. GALVAN:  Thank you, your Honor.

1          THE CLERK:  Court is in recess.

2          (Proceedings adjourned:  3:16 p.m.)

3                    ---o0o---

4  I certify that the foregoing is a correct transcript from the

5  record of proceedings in the above-entitled matter.

6

7                         /s/ Thresha Spencer
                         THRESHA SPENCER
8                         CSR No. 11788, RPR

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

attachment 19

# Second Unmet Bed Needs Study Meeting

December 1, 2021

2:00 p.m. – 3:00 p.m. pst/5:00 p.m. – 6:00 p.m. est

VIA <u>TEAMS</u>
or
Call In: (916) 701-9994 / Password: 213994288

## <u>AGENDA</u>

1. Sustainability Process

2. Methodology Considerations and MHARP Adaptations to Study (including Excel spreadsheet)

3. Implications of COVID-19 on Criteria

4. New Business

attachment 20

**Golding, Michael@CDCR**

| | |
|---|---|
| **From:** | ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ |
| **Sent:** | Friday, May 6, 2022 8:23 PM |
| **To:** | ▮▮▮▮▮▮▮▮▮▮Golding, Michael@CDCR |
| **Subject:** | RE: UNA and IRU |

---

**CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

---

I understand, and agree with many many of those points. We tried to define the UNA process in a way that makes sense for CDCR; it was an exceptionally frustrating struggle, and unfortunately we lost, soundly.

This is not a problem with me understanding how long it takes to do Solution Center tickets, or your other very important tasks, believe me. I don't want you to have to push everything off for a week to do a study for the court that, frankly, I've openly stated I think is a waste of time based on a misunderstanding. I didn't want to have to do that with my week of tasks either; most of them I simply can't move, so I've been doing them between 8 and 10pm these last couple of weeks. It was also not my desire or idea to have so many required participants, especially psychiatrists.

I am sorry this had to happen, and I understand what you went through; I respect your weekly tasks and I have a genuine appreciation for how much time they require, and how difficult they can be. I'm happy to talk about this at some point; right now my hours available by phone are a bit... limited. But know that a lot of people share your frustration right now,

▮

**From:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Sent:** Friday, May 6, 2022 12:01 PM
**To:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮Golding,
Michael@CDCR <Michael.Golding@cdcr.ca.gov>
**Subject:** UNA and IRU

Drs. ▮▮▮▮▮▮▮ and Golding –
I covered UNA this week for ▮▮▮▮▮▮▮ I know that you covered for her before me, and I don't know how you did it. I found it to be stressful and confusing, but I was able to make sense of it fairly quickly. I realize that the current structure may be a done deal, but if it is not, I would suggest that we stop, take a week or so and restart it on a much smaller scale. I think that if someone can look at what cases were recommended so far for a higher level of care (HLOC), we probably can vastly narrow the criteria down, and thus limit the number of cases to review. Similarly, we can provide a very short synopsis of all cases via email or SharePoint, and only meet to discuss those of greater interest to CDCR and/or OSM. If we do those things, we can narrow the scope of this work and spend a lot less time on it. UNA and IRU blew up my week. I've had to push over many things to next week. I've realized that perhaps I haven't explained how much time I spend on solution center tickets and non-ticket EHRS questions. While I can answer most questions easily, a significant minority take hours to answer or solve, and some involve collaborating with Medical, Nursing, Cerner or IT. Our electronic record is clunky and not very intuitive. Thus, training it, keeping up to date on it, solving problems and improving it all take a lot of time and energy. I will try to keep you up to date better with what I do.
I respectfully request that we try to avoid further tasks that require all of us to stop our regular tasks (I can't entirely) to do something else.

Respectfully,

1

attachment 21

```
 1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF CALIFORNIA
 2                              --oOo--

 3   RALPH COLEMAN, ET AL.,      ) Docket No. 90-CV-520
                                 ) Sacramento, California
 4                 Plaintiff,    ) October 15, 2019
                                 ) 9:05 a.m.
 5            v.                 )
                                 )
 6   GAVIN NEWSOM, ET AL.,       ) Re: Evidentiary Hearing
                                 ) Day 1
 7                 Defendants.   )

 8                    TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE KIMBERLY J. MUELLER
 9                 UNITED STATES DISTRICT JUDGE

10   APPEARANCES:

11   For the Plaintiff:      ROSEN BIEN GALVAN & GRUNFELD, LLP by
                             MS. LISA ADRIENNE ELLS
12                           MS. CARA ELIZABETH TRAPANI
                             MR. MICHAEL W. BIEN
13                           MS. JESSICA L. WINTER
                             101 Mission Street, 6th Floor
14                           San Francisco, CA 94105

15   For Dr. Golding and     STEWART & MUSELL
     Dr. Gonzalez:           MS. WENDY ELLEN MUSELL
16                           2200 Powell Street, Suite 440
                             Emeryville, CA 94104
17

18   Also Present:           Gregorio Winter, paralegal

19

20      (Appearances cont'd next page.)

21
                      JENNIFER COULTHARD, RMR, CRR
22                       Official Court Reporter
                       501 I Street, Suite 4-200
23                        Sacramento, CA 95814
                         jenrmrcrr2@gmail.com
24                          (312)617-9858

25        Mechanical Steno - Computer-Aided Transcription
```

Case 2:90-cv-00520-KJM-DB Document 6467 Filed 10/23/19 Page 2 of 1019

```
1    APPEARANCES (CONT'D)

2    For the Defendant:        OFFICE OF THE ATTORNEY GENERAL
                               XAVIER BECERRA by
3                              MS. ELISE OWENS THORN
                               MR. TYLER VANCE HEATH
4                              1300 I Street, Suite 125
                               Sacramento, CA 94244
5                              MR. ADRIANO HRVATIN
                               MR. JEFFREY THOMAS FISHER
6                              MR. KYLE ANTHONY LEWIS
                               455 Golden Gate Avenue
7                              Suite 11000
                               San Francisco, CA 94102
8                              MS. SHARON A. GARSKE
                               1515 Clay Street, 20th Floor
9                              P.O. Box 70550
                               Oakland, CA 94612
10
                               ROBINS KAPLAN, LLP
11                             MR. ROMAN SILBERFELD
                               GLENN A. DANAS
12                             2049 Century Park East, Suite 3400
                               Los Angeles, CA 90067-3208
13

14

15

16

17

18

19

20

21

22

23

24

25
```

Case 2:90-cv-00520-KJM-DB Document 6467 Filed 10/28/19 Page 414 of 1019

1                    I N D E X

2   WITNESSES                                    PAGE

3   MICHAEL GOLDING
        Exam By The Court ......................... 13
4       Exam By Ms. Ells .......................... 41
        Exam By Mr. Silberfeld .................... 56
5       Exam By Ms. Ells .......................... 75

6   KATHERINE TEBROCK
        Exam By The Court ......................... 82
7       Exam By Mr. Lewis ......................... 116
        Exam By The Court ........................ 125
8
    ANGELA PONCIANO
9       Exam By The Court ........................ 134
        Exam By Ms. Ells ......................... 143
10      Exam By Ms. Garske ....................... 155
        Exam By Ms. Ells ......................... 162
11
    JOHN REKART
12      Exam By The Court ........................ 165
        Exam By Ms. Trapani ...................... 175
13
    DAVID LEIDNER
14      Exam By The Court ........................ 188
        Exam By Ms. Trapani ...................... 211
15      Exam By Mr. Fisher ....................... 223
        Exam By Ms. Trapani ...................... 228
16      Exam By Mr. Fisher ....................... 231

17

18

19

20

21

22

23

24

25

1                          E X H I B I T S

2

    PLAINTIFFS' EXHIBITS                          ADMITTED
3

            No. 101    ............................... 232
4           No. 172    ............................... 131
            No. 173    ............................... 131
5           No. 174    ............................... 131
            No. 175    ............................... 131
6           No. 176    ............................... 129
            No. 210    ............................... 239
7           No. 212    ............................... 239
            No. 214    ............................... 239
8           No. 215    ............................... 239
            No. 240    ............................... 232
9

    JOINT EXHIBITS
10

            No. 0      ............................... 159
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 2:90-cv-00520-KJM-DB Document 6467 Filed 10/23/19 Page 5 of 624

1      SACRAMENTO, CALIFORNIA, TUESDAY, OCTOBER 15, 2019

2                            --oOo--

3      (In open court.)

4           THE CLERK:  Calling Civil Case 90-520, Coleman, et al.

5      v. Newsom, et al.  This is on for an evidentiary hearing.

6           THE COURT:  All right.  Good morning.  Appearances,

7      please, starting with the plaintiffs.

8           MS. ELLS:  Good morning, Your Honor.  This is Lisa

9      Ells for the plaintiffs.

10          I have with me Michael Bien, Jessica Winter, Cara

11     Trapani; and our paralegal, Gregorio Gonzalez.

12          THE COURT:  All right.  Good morning to you all.

13          And for the defense?

14          MR. SILBERFELD:  Good morning, Your Honor; Roman

15     Silberfeld, Robins Kaplan, for the defendants.

16          MR. DANAS:  Good morning, Your Honor; Glenn Danas,

17     Robins Kaplan, for the defendants.

18          MS. THORN:  Elise Thorn, for defendants.

19          MR. LEWIS:  Morning, Your Honor; Kyle Lewis for

20     defendants.

21          MR. HRVATIN:  Good morning, Your Honor; Adriano

22     Hrvatin for defendants.

23          MS. GARSKE:  Good morning, Your Honor; Sharon Garske

24     for defendants.

25          MR. FISHER:  Good morning, Your Honor; Jeffrey Fisher

1    for defendants.

2         MR. HEATH:  And good morning, Your Honor; Tyler Heath

3    for the defendants.

4         THE COURT:  All right.  Good morning to you all.

5         MS. MUSELL:  Good morning, Your Honor; Wendy Musell on

6    behalf of Dr. Golding and Dr. Gonzalez, both of whom are

7    present in the courtroom.

8         THE COURT:  All right.  Good morning, Ms. Musell.  I

9    was going to acknowledge your presence in the audience for now.

10        Just a couple of housekeeping matters, and then I'd

11   like to proceed to questioning.  I acknowledge receipt of the

12   supplemental attorney declarations, and we'll talk about that

13   before the end of the day.

14        MR. SILBERFELD:  Thank you, Your Honor.

15        THE COURT:  Dr. Rekart is available by video beginning

16   at 2:00 p.m. Pacific Standard Time; is that correct?

17        MR. LEWIS:  Yes, Your Honor.  That is correct.

18        THE COURT:  All right.  And so we will work to fit him

19   in then.

20        And recognizing the plaintiff's desire to have

21   Dr. Rekart appear in person, you're satisfied that the video

22   arrangements are made so that he can appear that way today,

23   Ms. Ells?

24        MS. ELLS:  We understand those arrangements were made.

25   We were not brought in to review any of those arrangements, but

1    that is our understanding of how we're proceeding, and we're

2    satisfied with that, so long as the Court is also satisfied

3    with that.

4            THE COURT:  All right.  Well, we'll see how it goes.

5            Are there any witnesses besides Dr. Golding who have

6    schedule restrictions that are on the list for today that

7    anyone knows of?

8            MR. LEWIS:  None, Your Honor.

9            THE COURT:  All right.  Just for now, so it's clear, I

10   said we'll talk about the attorneys' supplemental declarations

11   later.  We're keeping the Wednesday afternoon schedule.  I'm

12   not vacating that at this point.  Is there anything else we

13   need to discuss before the Court begins with Dr. Golding?

14           MS. ELLS:  Yes, Your Honor.  Plaintiffs would move to

15   exclude the witnesses from the courtroom unless they are

16   testifying, that's all.

17           THE COURT:  Any objection, Mr. Silberfeld?

18           MR. LEWIS:  Your Honor, Kyle Lewis for the defense.

19           Your Honor, this has been a very long process.  It's

20   been going on for a year.  The witnesses are entitled to

21   participate in this process and by being here they are

22   participating fully in what is a very important process to both

23   the Court and to CDCR and to the witnesses themselves.  This is

24   also a way to restore trust among all the parties in allowing

25   them to observe the proceedings and also participate, as Your

1  Honor has indicated, and we would ask that they be permitted to

2  stay in the courtroom to witness this and also assist with our

3  management of the case.

4          THE COURT:  What was the last part?

5          MR. LEWIS:  They are management for CDCR, so they are

6  part of this case and part of the overall things we're trying

7  to address here, Your Honor.

8          THE COURT:  All right.  Ms. Ells, your response to

9  that?

10          MS. ELLS:  Your Honor, if I may, that would not

11  rebuild trust.  In fact, having the witnesses hear the

12  testimony of the other witnesses, it would give us concerns

13  that that testimony may change with what they hear from the

14  other witnesses, and it's very standard to exclude the

15  witnesses.  I'm not hearing anything from defendants that would

16  make it appropriate in this case.  It's very standard to

17  exclude the witnesses, and we would request that you do so.

18          MR. LEWIS:  Your Honor, if I may?

19          THE COURT:  Apart from whether it's standard, I mean,

20  given the specific questions I anticipate asking, I think it

21  does make some sense to exclude.  What's the reason they need

22  to be present?

23          MR. LEWIS:  Your Honor, as part of this whole process,

24  this brings in all of the relevant parties, some of whom are

25  clients and have been clients in the past.  They are the

1  representatives of the agency at the highest levels involved in

2  this, so their participation in this, both to observe and to

3  give Your Honor information, is essential to the process.  And

4  part of this whole, basically, evidentiary hearing that we're

5  having is to make sure they can become involved and have full

6  participation.

7           THE COURT:  Well, I'm granting the motion, so any

8  witnesses on the list for today should leave the courtroom now,

9  and they'll be called back in when it's time for them to

10  testify.

11           MS. ELLS:  Thank you, Your Honor.

12           THE COURT:  So I don't necessarily recognize all of

13  them.  If the defense can make certain that anyone who's

14  present is now leaving.

15           MS. MUSELL:  Your Honor, may I ask for a point of

16  clarification?

17           THE COURT:  You may, Ms. Musell.

18           MS. MUSELL:  Thank you, Your Honor.

19           THE COURT:  Can the court reporter hear Ms. Musell?

20           COURT REPORTER:  Yes.

21           THE COURT:  All right.

22           MS. MUSELL:  Dr. Gonzalez is here.  I understand she

23  is not on the witness list.  I don't know if she will be called

24  as a rebuttal witness.  How would Your Honor like to handle

25  that?

1          THE COURT:  What are the parties' positions?  The

2     Court's thought is she would not need to leave the courtroom.

3     I don't anticipate her being called.

4          MS. ELLS:  We also agree that we don't see any reason

5     to exclude her.  She's not on the witness list.

6          MR. LEWIS:  Your Honor, one point of clarification.

7     For example, Dr. Diana Toche is here.  She is a named defendant

8     witness within the suit and is entitled to observe these

9     proceedings, which are very germane to her job and her

10    position.  So it's along those lines that we believe it is

11    important that not only Dr. Toche but many of the others who

12    are --

13         THE COURT:  Well, you've made a distinction regarding

14    Dr. Toche as a named party.  Does that change anything in your

15    view, Ms. Ells?

16         MS. ELLS:  No, Your Honor.  Ms. Toche can review the

17    transcript and, you know, it seems to us that it doesn't make

18    sense for her to hear all of the other witnesses' testimony.

19    She has access to it through the transcripts, and we don't

20    think it's appropriate.

21         We'd also --

22         THE COURT:  Dr. Toche is the only named party?

23         MR. LEWIS:  Yes, Your Honor.  But in addition, these

24    are our clients, so --

25         THE COURT:  I understand that, but I'm going to make

1    an exception for Dr. Toche as a named party.  So Dr. Toche may

2    remain of the persons on the list.  I think that accords with

3    notions of fair play; but otherwise, the witnesses shall be

4    excluded.

5              MS. ELLS:  Your Honor --

6              THE COURT:  All right.  So have the witnesses been

7    excluded except for Dr. Toche?

8              MS. ELLS:  Your Honor --

9              THE COURT:  If you can answer that for me.

10             MS. ELLS:  Just a question of clarification.  Are you

11   including the attorney witnesses?

12             MR. SILBERFELD:  That's what I was going to ask, Your

13   Honor, actually.

14             THE COURT:  Yes.

15             MS. ELLS:  Yes?  Okay.

16             THE COURT:  Anyone who's not a party.

17             All right.  Does the defense represent that all but

18   Dr. Toche now has left the courtroom?

19             MR. LEWIS:  We'll need a minute, Your Honor.

20             THE COURT:  All right.

21             MR. SILBERFELD:  May we be excused for one moment just

22   to make arrangements?

23             THE COURT:  Is there any other housekeeping?

24             MS. ELLS:  Not for plaintiffs, Your Honor.

25             THE COURT:  All right.

1          MR. LEWIS:  Your Honor, one matter.

2          Plaintiffs yesterday submitted designations as to

3 Dr. Kuich's deposition.  We received that late in the day

4 without any meeting and conferring regarding that, so we would

5 ask that we have until the end of tomorrow, the close of

6 Wednesday, to submit our counter-designations.

7          THE COURT:  All right.  Any reason not to allow that,

8 Ms. Ells?

9          MS. ELLS:  That's fine, Your Honor.

10         THE COURT:  All right.  That request is granted.

11         MR. LEWIS:  Thank you.

12         THE CLERK:  The Court also has just recently received

13 that information, and so I will, by Friday, have completed my

14 review of the Dr. Kuich materials.

15         Anything else?  Any other housekeeping, Ms. Ells?

16         MS. ELLS:  No, Your Honor.

17         THE COURT:  Mr. Silberfeld?

18         MR. SILBERFELD:  No, Your Honor.

19         THE COURT:  All right.  I'd like to ask Dr. Golding

20 then to come forward.  And Ms. Musell, where would you request

21 to sit?

22         MS. MUSELL:  Wherever Your Honor would like me to sit.

23         THE COURT:  Can we make room at counsel table?

24         MR. SILBERFELD:  Sure.

25         THE COURT:  All right.  Looks like there's one empty

Golding - Exam by The Court

1    chair there, so perhaps defense attorneys can move down.

2            Dr. Golding, please come forward.

3            THE WITNESS:  Your Honor, this is a blank pad --

4            THE COURT:  Well, we'll cover that once you're in the

5    stand.

6            THE WITNESS:  Okay.

7            THE CLERK:  Please step into the witness stand, remain

8    standing and raise your right hand.

9            THE WITNESS:  Okay.  May I affirm?

10           THE COURT:  Yes, you may affirm.

11       (Witness duly affirmed and takes the stand.)

12           THE CLERK:  Thank you.  Please be seated.

13           Please say and spell your first and last name for the

14   record.

15           THE WITNESS:  Michael Golding, M-I-C-H-A-E-L,

16   G-O-L-D-I-N-G.

17                   MICHAEL GOLDING, WITNESS, SWORN

18                           EXAMINATION

19   BY THE COURT:

20   Q    All right.  Good morning, Dr. Golding.

21   A    Good morning, ma'am.

22   Q    And you are represented by Ms. Musell, correct?

23   A    Yes, ma'am.

24   Q    And she is present?

25   A    Yes, ma'am.

1  Q    I have several questions for you.  I'm dividing them by the

2  areas, the subject matter areas I've identified for this

3  hearing, and I'm going to pose questions to you, and I would

4  ask for short answers.  If I have follow-up questions, I'll ask

5  you the follow-up questions.

6  A    Sure.

7  Q    So I'm not asking for lengthy narratives.  If you don't

8  understand a question, let me know.  All right?

9  A    Yes, ma'am.

10 Q    So I'm starting first with the issue of lengthening EOP

11 guidelines from 30 to 45 days.  And you had indicated, as you

12 were walking towards the witness stand, that you have brought

13 with you an empty pad of paper?

14 A    Yes, ma'am.

15 Q    And so you're just making some notes on that pad of paper?

16 A    Yes, if it's okay.

17 Q    That's fine.  But, again, if you don't understand a

18 question, let me know.

19 A    Yes, ma'am.  Sometimes it helps me to organize my thoughts.

20 Q    All right.  Can you pull the microphone a bit closer to

21 you.  I realize this is a not traditional setup, but the court

22 reporter needs to make certain that she can hear you.

23 A    Yes, ma'am.

24 Q    Also, if you don't know the answer to a question, just let

25 me know that.  I'm not trying to put words in your mouth.  I'm

1   just trying to gather some additional information to help me

2   understand what's happened in this case. You understand that?

3   A   I do.

4   Q   All right. So just to clarify in my mind, did any person

5   in CDCR's management structure provide you with information

6   about the origin of the 30 to 45 days rule change?

7   A   In the management structure? I don't -- no. I mean, there

8   were senior specialists at headquarters whom I read told me in

9   January in that neutral expert's report that there was a

10   change. The neutral expert said -- I don't recall, but the

11   neutral expert said that apparently someone from -- my two

12   specialists emailed me, Dr. Mann and Dr. Lindgren.

13   Q   When you say "January," which January?

14   A   January of 2017, ma'am.

15   Q   All right. Did any person in CDCR's management tell you

16   the reasons for the rule change at any point in time?

17   A   No, ma'am.

18   Q   What do you understand to be the reasons for the rule

19   change, as you sit here today?

20   A   Oh, at that time, I think after they had made the change

21   there was -- that there was an explanation.

22   Q   And what was that explanation?

23   A   The explanation was that it would be easier for the

24   psychiatrists to be compliant with that rule, given their

25   vacations and such.

1  Q   And who told you that?

2  A   I heard that from Dr. Ceballos, I believe.

3  Q   And did that explanation make sense to you?

4  A   No.

5  Q   Did you disbelieve it?

6  A   Yes.

7  Q   Why did you disbelieve it?

8  A   Because the rule change would have -- I mean, it would have

9  made it easier for the psychiatrists, but at the expense of

10 following court mandates and -- as specified in the program

11 guide.  Thus, I thought that the purpose was to help meet court

12 mandates.

13 Q   All right.  In your report, I believe it's page 25 of your

14 report, but I'm not asking you to refer to your report, you

15 said you told your senior executive that the change from 30 to

16 45 was truly problematic.  Just so I'm perfectly clear, who was

17 the senior executive to whom you refer?

18 A   I told many people, but Deputy Tebrock --

19 Q   All right.

20 A   -- as well as Dr. -- I mean, I told Executive Ceballos.  I

21 also told Executive Leidner on March 21st, 2017.

22         THE COURT:  Cell phones need to be off, and they're

23 subject to seizure.  I hear a cell phone.

24         THE WITNESS:  March 21st I told --

25

BY THE COURT:

Q   But so who's the senior executive you referred to in your

report?  You said Dr. Tebrock.  Is that the senior executive?

A   Not doctor.  The senior executive is Deputy Tebrock.

Q   I mean Ms. Tebrock.

A   Yes.  Yes.

Q   So how did you explain the problem to her?

A   I told her in -- well, I have email documentation on April

12th, which -- 2017 that I told her that we had increased the

rule to allow appointments up to 45 to 60 days and actually a

little bit over 60 days.  I told her in that email, which I

delivered to Linda Patterson Turl, that that violated -- that

was wrong and violated the Court mandates.

    I also, on April 13th forward an email to Deputy Tebrock

that I had also sent to Dr. Ceballos saying that Deputy Tebrock

had given me permission to disambiguate the rule and figure out

what the difference would be between their change and what

actually it was.  And, indeed, on April 10th, 2018, Deputy

Tebrock said that it would be misrepresenting the data to

combine CCC and EOP in that way.  I also --

Q   All right.  So did Deputy Director Tebrock provide any

other response to your telling her about the truly problematic

rule change?

A   In what time frame, Your Honor?

Q   Within a short period of time after your first telling her.

1    You've identified a number of things she did.

2    A    I think that I don't -- I don't recall her doing something.

3    I know that at some point on April 12th -- and I inferred that

4    she ordered this on April 12th -- the rule change was changed

5    back from 60 days to 45 days.  And on April 23rd, it was

6    changed from 45 days back to 30 days.  So it was a two-step

7    process.  And I assume that that was -- and believe that Deputy

8    Tebrock had ordered it reversed, but I'm not sure who ordered

9    it reversed.

10   Q    Do you consider the problem fixed now?

11   A    No, because the problem was not just making a mistake.  The

12   issue was failing -- we all make mistakes.  The issue was

13   failing to report the mistake.

14   Q    All right.  I understand that.  So just focusing on the

15   business rule, has the business rule been changed, if "business

16   rule" is the right terminology?  Has the businesses rule been

17   changed permanently such that it's back to 30 days?

18   A    I -- yes, ma'am.  To my knowledge, it's at least within 30

19   days; although, they still combine a plethora of CCC patients,

20   like 28,000 of them, with EOP patients, which blurs the -- with

21   EOP patients only about 6,000 or so, and that blurs, so you

22   can't tell that EOP patients are not being seen in a timely

23   way.  So that aspect of the problem, which was going on at that

24   time, has not been corrected.

25   Q    All right.  Just so I'm clear, do you believe that the rule

1  was changed as part of an intentional effort to artificially

2  inflate --

3  A    Oh, yes --

4  Q    -- compliance data?

5  A    Yes.

6  Q    Let me finish.

7  A    I'm sorry.  I'm sorry.

8  Q    So I was saying, do you believe the rule was changed as

9  part of an intentional effort to artificially inflate

10  compliance data?

11  A    Yes, ma'am.

12  Q    And why?

13  A    Because when I brought that rule up again and spoke on

14  April 17th to a group of Dr. Leidner -- April 17th, 2018,

15  Dr. Leidner, Ms. Ceballos, Dr. Mann, Dr. Rekart, Dr. Kuich and

16  others, I confronted them with that, and Dr. Ceballos said that

17  I had accused her of fraud and was quite angry and used

18  colorful language.  But interestingly, April 24th Deputy

19  Tebrock had a meeting, and during that meeting and then

20  confirmed by an email on April --

21  Q    Was this a meeting you were in?

22  A    Yes.

23  Q    All right.

24  A    -- a meeting on April 25th -- I'm sorry.  April 24th was a

25  meeting with her, Dr. Rekart Dr. Kuich, Deputy Brizendine.  And

1 in that meeting, she said that she objected to me saying that

2 that interval had been lengthened. She said that I had

3 attacked the integrity of Dr. Ceballos, though I have three

4 letters saying that I had attacked the integrity of the data.

5 She --

6 Q   And the "she" here is Director --

7 A   Deputy Tebrock.

8 Q   Deputy Director Tebrock?

9 A   Yes.  Deputy Director Tebrock.  She --

10 Q   Did she say anything to support your conclusion that the

11 change had been an intentional effort to artificially inflate

12 data?

13 A   She had previously said -- well, in that context, I felt

14 that she was saying that I had trust issues in order to deflect

15 but also on April -- I'm sorry, on March 28th, 2017, before

16 the -- before the data had gone to the Court on March 30th,

17 Deputy Tebrock had said that they had gotten word from the

18 Governor's Office that they were looking for data that would

19 demonstrate compliance with the program guide -- with -- I'm

20 sorry -- with the adequacy of care.

21     And I had suggested to her that we use 30-day readmission

22 rates, and her response to that was that that -- to send the

23 data over to her but she thought that that might not be

24 favorable to us.  So she was -- so that appeared to me that she

25 was looking for data that would be compliant and also the fact

1  that she ordered the data reversed, though she knew about it

2  beforehand.

3  Q   She ordered it -- you mean the 30 to 45 days, she ordered

4  that reversed?

5  A   Reversed.  And also the 45 -- well, someone ordered the 45

6  to 60 days reversed first and the 45 to 30 days reversed on two

7  different dates.  That indicated to me also that there was a

8  sense that they thought that it was wrong but needed to change

9  the data to get the data out prior to reversing.

10  Q   And are you saying there's something about the timing of

11  the reversal orders?

12  A   Yes.  They occurred after the data was given to the Court

13  on, I believe, March 30th.

14  Q   All right.  I understand that you did not raise your

15  specific concerns with the Coleman Special Master at the time

16  this was happening.

17  A   At that time, yes, ma'am.

18  Q   All right.  And why not?

19  A   I very much thought that we were not allowed to and thought

20  that, indeed, that I might even, over the course of time, be

21  prosecuted for releasing information.  That is a -- as a

22  neutral expert said, that is a common thought amongst the

23  psychiatrists whom we interviewed.

24  Q   But you understand today that you are able to contact the

25  Special Master directly?

1   A   Yes, ma'am.

2   Q   All right.  I want to move on to -- and I'm just asking the

3   questions I have to clarify the record in my mind.  So the

4   category of "Appointments seen as scheduled."

5   A   Yes, ma'am.

6   Q   I don't have particular questions for you.  Is there

7   anything not covered by your report or the neutral expert's

8   findings --

9   A   Yes, ma'am.

10  Q   -- that's not in the record --

11  A   Yes.

12  Q   -- that you believe I need to know?

13  A   Yes, ma'am.

14  Q   And again, not a narrative.

15  A   I understand.

16  Q   So if there is, give me a bullet point of what I need to

17  know that's not currently in the record, as you understand it.

18  A   Well, the big thing that's not in the record is that --

19  well, two things are not in the record.  One is that on July --

20  on or around July 10th, I specifically --

21  Q   July 10th of?

22  A   Of 2018.  I specifically told her about a problem at Sac in

23  which eleven patients might be scheduled and three were seen

24  and it was as if those eight patients had or those eight other

25  patients with appointments had been canceled or not counted.

1       And furthermore --

2   Q   When you say "her."

3   A   Deputy Tebrock.  I'm sorry.

4   Q   And Sac is CSP Sac?

5   A   Yes, ma'am.

6   Q   All right.

7   A   Furthermore, I compiled in --

8   Q   Is this a separate bullet point?

9   A   Yes.

10  Q   All right.

11  A   It's a separate bullet point.

12      Furthermore, I compiled in August -- I'm sorry, in July and

13  we compiled it -- I think we gave it to Deputy Tebrock, though

14  no attorney had asked us to compile any of this.  We compiled

15  significant data about all of our institutions; and,

16  furthermore, I gave it to Deputy Tebrock and Jason Scholl and

17  many others and not attorneys, and she rapidly classified that

18  as attorney-client privilege, but in those documents --

19  Q   So July of 2018 as well?

20  A   It was -- no.  There was one document delivered --

21  delivery, which was, I believe, towards the end of August or

22  early September, which was voluminous data.

23  Q   Of 2018?

24  A   Yes, ma'am.

25  Q   All right.

Golding - Exam by The Court

1    A    That was rapidly classified as attorney-client privilege in

2    which, amongst other things, I said that patients were not

3    being seen as scheduled.  And in a separate part of the report

4    on CSP Sac, I told her that it seemed that appointments that

5    were canceled and refused were in some way eliminated from

6    being counted.  And --

7    Q    All right.  So just to go back, on the July 10th, 2018 --

8    A    Around then.

9    Q    -- communication, on or about, when you say eight were

10   canceled --

11   A    Or refused.

12   Q    -- did they show up in a report as canceled?

13   A    No.  I had visited CSP Sac -- no.  I think I had visited

14   CSP Sac on July 10th, and July 12th is when I wrote to Deputy

15   Tebrock.  And so we went -- physically went, Dr. Mann and I,

16   there.  We met Dr. Roman, who we could see that he had told us

17   how his appointments were counting -- how they were doing the

18   counting rules in a very unusual way.  And they were not

19   basically counting as not seen as scheduled patients who had

20   been canceled or refused.  I mean, he said --

21   Q    So did the eight show up on some report someplace?

22   A    Actually, yes.  The answer to that question is yes and no.

23   Appointments can actually be disappeared as well.  There are --

24   Q    Well, that's -- so these eight that you're talking about,

25   just as an example, did they show up?

1    A    That was -- that, ma'am, is a -- was a hypothetical example

2    that I gave to her, but we did see actual numbers and we did

3    research Dr. Gonzalez and the actual numbers of patients that

4    went from his own report in which patients had canceled and

5    refused appointments that counted but also canceled and refused

6    appointments that disappeared.  It took us awhile to figure out

7    how the disappearance of the appointments occurred.

8    Q    So disappeared with no record?

9    A    No record.  Absolutely.  Right.  Absolutely not.

10   Q    So in terms of the report you delivered in or about August

11   of 2018 --

12   A    Yes, ma'am.

13   Q    -- you did not provide that with your report to the Court.

14   A    That's -- that's correct because --

15   Q    And why not?

16   A    Because it was attorney-client privileged data.

17   Q    But do you still have that report?

18   A    Yes.  It's not large.  It just says patients are not being

19   seen -- I have the whole report of all the data, but in terms

20   of this specific subject area it's just two things.  It says,

21   patients are not being seen as scheduled and that the canceled

22   and refused appointments seemed to be eliminated in some way.

23   Q    All right.  Was there any other bullet points you wanted to

24   provide under this heading, "appointments seen as scheduled"

25   indicator?

1  A   I would just say that I repeatedly tried to tell people
2  about this bullet point.
3       For example, on August 4th, August 27th, August 31st,
4  September 4th and September 17th I spoke personally with
5  Dr. Jeff Metzner and asked him to ask me -- I have telephone
6  records -- about that, and --
7  Q   About specifically appointments seen as scheduled?
8  A   Yes.
9  Q   And this is --
10 A   As well as other -- as well as I wanted to reveal a whole
11 bunch of the problems.  I wanted to reveal a whole bunch of the
12 problems to him, but he was not able to ask me -- he hinted
13 that he had heard that there were -- that I was something like
14 some other psychiatrists who had had some personnel problems
15 and so they didn't -- the Special Master didn't get involved
16 with personnel problems.
17 Q   And this was all in 2018?
18 A   Correct.
19      In addition, in one-to-one conversations with Deputy
20 Tebrock that were uncalendared, some of which she invited me to
21 and some of which I knocked on her door and she allowed me to
22 speak with her, I let her know that I thought that this failure
23 with the seen as scheduled as well as other things was, in
24 fact, fraudulent.  Her response to me was that she was a
25 representative of the court, herself, as an attorney and,

1  therefore, I had unburdened myself.

2      Furthermore, she said that -- and Dr. Brizendine also

3  repeated this -- that I would be able to tell the Special

4  Master in January.

5      Finally, on September --

6  Q   In January of 2019?

7  A   Yes.  January of 2019.  That was the very, very common

8  theme of --

9  Q   What was happening in January of 2019 that would give you

10  that opportunity?

11  A   Ms. Tebrock as well as Dr. Brizendine repeatedly said to me

12  that the Special Master would be reviewing the data then, and I

13  could save everything until then because that's when it would

14  be addressed.  It was further put off by -- on September 26th I

15  told a meeting full of attorneys, including Ms. Thorn --

16  Q   This is all information that's not in your report?

17  A   Correct.  To my knowledge.  I don't -- including

18  Ms. Thorn --

19      MR. SILBERFELD:  Pardon me, Your Honor.  I'm sorry to

20  interrupt Dr. Golding, but from the preface of his answer, it

21  seems like he's about to go into attorney-client privileged

22  material, and I'll be happy to state I need to object.

23  BY THE COURT:

24  Q   Well, what's the -- before you describe the meeting, what

25  was the purpose of the meeting?

1          MR. SILBERFELD:  That you're just starting to discuss.

2          THE WITNESS:  The purpose --

3    BY THE COURT:

4    Q    September 26th of 2018.

5    A    The purpose of the meeting was to discuss the report, the

6    staffing issues affecting --

7    Q    Who called the meeting?

8    A    It was a standard CDCR weekly meeting, to the best of my

9    knowledge.  There may have been an extra one in there, but I

10   don't quite remember.

11   Q    Who called the meeting?

12   A    The answer to that is I don't know.

13   Q    All right.  Well, I may come back to that.  Let me move on

14   to the --

15          MS. MUSELL:  Your Honor, may I be heard on this very

16   briefly, Your Honor, on whether there's attorney-client

17   privilege for this one sentence that Dr. Golding would like to

18   share with the Court?

19          THE COURT:  You may.

20          MS. MUSELL:  The information that I'm aware that

21   Dr. Golding would share with you, Your Honor, is not any advice

22   that he was being provided.  He was simply reporting fraud,

23   which of course is not attorney-client privilege.

24          THE COURT:  Well, I haven't heard from Dr. Golding,

25   but if it's not -- if no one is seeking advice, agreed it's not

1    covered by attorney-client, Mr. Silberfeld?

2            MR. SILBERFELD:  No, Your Honor.  It's a communication

3    with counsel and a representative of the client.  It's a

4    privileged communication.

5    BY THE COURT:

6    Q   I'm not persuaded by the breadth of the defense claims of

7    attorney-client privilege, just so that's clear.  If you have

8    one sentence, let me just ask you this:  At the meeting was

9    anyone seeking attorney advice?

10   A   Not specifically about the issue that I was bringing up,

11   no.

12   Q   Was any attorney saying that that attorney was providing

13   legal advice?

14   A   No.

15   Q   Well, what's the -- what's the one sentence?

16   A   The one sentence is that Elise Thorn -- that I told Elise

17   Thorn that I would be happy to provide detailed information to

18   her, and she scheduled an appointment for me on October 9th to

19   discuss it after the staffing agreement was to be made, similar

20   to Deputy Tebrock and Brizendine wishing to speak -- wishing

21   that I would hold off until January of 2019 to speak with the

22   Special Master then.

23   Q   Did you have a meeting with Ms. Thorn on October 9th?

24   A   No, because on October 3rd a report came out and --

25   Q   All right.  So let me ask you about psychiatric supervisors

1  acting as line staff.

2  A   Sure.

3  Q   Would you say that you're familiar with the 2009 staffing

4  plan?

5  A   May I get a little bit of water, please.

6  Q   Yes, you may.

7  A   Thank you.  I'm sorry.

8          THE COURT:  The Court anticipates maybe 10 to 15 more

9  minutes with this witness, and then I would give the parties a

10  chance.  This one witness will take longer, slightly longer

11  than my estimate for other witnesses.

12  BY THE COURT:

13  Q   So my question is would you say that you're familiar with

14  the 2009 staffing plan?

15  A   I am familiar with aspects of it, but I won't claim

16  comprehensive knowledge.

17  Q   In your report do you believe you purport to draw

18  conclusions about whether or not CDCR is complying with that

19  plan?

20  A   I believe that I am writing -- I believe that I wrote a

21  report that showed that what the Special Master and what the

22  program guide anticipated was not being followed.

23  Q   With emphasis on the program guide?

24  A   The program guide but also what the Special Master had told

25  us was the agreed-upon interpretation of the program guide.

1  Q   All right.  Do you understand that psychiatric supervisor

2  job descriptions do not provide for those supervisors

3  administering direct patient care?

4  A   No.  I actually did not know that.  My assumption was

5  that --

6  Q   Don't read anything into my question.  I'm not testifying.

7  A   Okay.  I'm sorry.

8  Q   I said is that your understanding.

9  A   No.

10 Q   All right.  What is your understanding about psychiatric

11 supervisor job descriptions when it comes to providing direct

12 patient care?

13 A   My understanding is that it was reasonable for them to fill

14 in, particularly in crisis beds, and I think the program guide

15 says that that's okay.

16 Q   And has that always been okay, in your view?

17 A   I think it is not okay if they are doing anything other

18 than sort of consulting and helping.  They're supposed to be

19 acting in a supervisory role and not as line staff.

20 Q   Is it your position that supervising psychiatrists, chiefs

21 and other supervisors are currently performing duties of staff

22 psychiatrists?

23 A   Oh, I'm sorry.  Yes, ma'am.  They are.

24 Q   When did -- so they are today?

25 A   Oh, yes.

1   Q    Was there a point in time when chiefs and supervisors'
2   duties changed to include greater provision of line care?
3   A    I think that -- I mean, I think certainly when there are
4   more shortages they do line staff stuff, but I think it has
5   always been the extension of CDCR that psychiatrists weren't --
6   in terms of the management weren't really needed to manage the
7   clinic structural organized care, that they could be considered
8   effectively line staff.
9   Q    But on an as-needed basis?
10  A    No.  They were -- I'm sorry.  No, ma'am.  They were asked
11  to regularly see patients as line staff.
12  Q    And do you think of a point in time as when that first
13  started?
14  A    I don't know of the point in time it first started.
15  Q    All right.  So as long as you've been at CDCR that's been
16  going on?
17  A    Yes.
18  Q    So I'm not certain you can answer this question, given what
19  you said about the 2009 staffing plan, but do you have a
20  position about the effect of using psychiatric supervisory to
21  provide direct patient care on CDCR's obligation to comply with
22  staffing ratios for psychiatrists, as set forth in the 2009
23  staffing plan?
24  A    Yes, ma'am.
25  Q    What is your position?

1    A    My position is that the staffing plan talks about frequency

2    of mandatory visits and that they were trying to decrease the

3    frequency CDCR from, for example, at EOP from 1.5 visits on

4    average, which is the keyword, on average per month to 1, which

5    would actually violate the program guide because the program

6    guide says that one should be seen at least every 30 days, and

7    a ratio of 1 would not be consistent with that.

8    Q    But how does that relate to the staffing ratios?

9    A    I'm sorry.  It relates to the staffing ratio like this:

10   Because if you do not have people organizing care, each little

11   bit of care that is done per patient is less complete and less

12   well done and, thus, fewer supervisors creates a need for

13   greater frequency of care, not lesser frequency of care.

14        And in the staffing plan they were arguing for lesser

15   frequency of care precisely because you eliminate the

16   organization of care, which is really what CDCR has done.  Then

17   you really, in my view, decimate the ability of our

18   psychiatrists to take care of our patients.  We need

19   psychiatric supervisors to be helping to organize and manage

20   care so that it's quality care.

21   Q    So do you believe that there's a tradeoff between achieving

22   the staffing ratios set forth in the 2009 staffing plan and

23   proper care?

24   A    Not necessarily, ma'am.  I mean, if CDCR were willing to

25   reorganize care radically, and that would mean that they would

1    have to allow psychiatrists to supervise people, then

2    psychiatrists wouldn't have to be the -- you wouldn't have to

3    have the CEO to be the secretary, metaphorically.  And when you

4    do that, then of course you could decrease the number of

5    psychiatrists dramatically, as most organizations do.  But if

6    we are going to insist that psychiatrists are not involved in

7    management and leadership and have to take care of each detail

8    of care and are not permitted to organize it, then yes, it

9    becomes entirely inappropriate to cut a psychiatric staff.

10   Q    So one last question as tied to the 2009 staffing plan.  Do

11   you believe the use of psychiatric supervisors to provide

12   direct patient care is part of an effort to achieve a 10

13   percent vacancy rate?

14   A    Could you rephrase?

15   Q    If you know.

16   A    Could you rephrase?

17   Q    I understand what you're saying, but you're making a

18   different point than what I'm trying to get at.

19   A    Okay.

20   Q    So do you have any opinion regarding whether or not the use

21   of psychiatric supervisors to provide direct patient care is

22   related to an effort to achieve 10 percent vacancy?

23   A    Yes, it is.  It's an effort to decrease the absolute number

24   of psychiatrists.  They can show compliance on a variety of

25   measures and, thus, fewer psychiatrists are needed because look

1    at the compliance with various non-quality measures.  Look at

2    how people are frequently being seen by a psychiatrist.  Look

3    how -- without taking into account that it's supervisors who

4    are doing that.  So, yes, it's part of the effort to decrease

5    the absolute numbers of psychiatrists.

6    Q    All right.  So let me ask you now some general questions

7    before I give the parties a chance to ask you questions.

8         You filed your report, as you've indicated, because you

9    believed you were unable to work internally to correct the use

10   of proper business rules and proper reporting to the Court.

11   That's a generalization.

12        To the extent there were impediments --

13   A    Yeah.

14   Q    You might quibble with my wording, but to the extent there

15   were impediments prior to your filing of your report, which

16   made its way to the Court, have those impediments been removed

17   at this point?

18   A    No.

19   Q    So you currently do not believe you're able to work through

20   internal channels and raise any and all issues you believe need

21   to be raised?

22   A    Not entirely.  I think it's -- I think correlated with

23   Court scrutiny it has improved.

24   Q    If you had to identify concretely the impediments, what are

25   the impediments that are still in place?

Golding - Exam by The Court

1    A    Well, in terms of data, the -- we still lack any ability to

2    program the EHRS database to get information that we need, and

3    it is being very much -- we are very much excluded from that.

4    Q    When you say "we," you mean psychiatrists?

5    A    The psychiatry leadership, not -- the psychiatrists who

6    work, for example, for Dr. Ceballos can do that, but they're

7    not allowed to independently evaluate data.  CDCR says that if

8    we were to get that, it would be -- it would violate data

9    integrity for them to allow us to have access to the data.

10       Furthermore --

11   Q    So your not having access means you -- how is that an

12   impediment?

13   A    It's an impediment because we are unable to point out

14   severe problems and causes and solve problems.  For example --

15   Q    So that means you can't see?  You aren't able to see,

16   yourself, the business rules?

17   A    No.  We can see the business rules, but we can't organize

18   data and program data to look across institutions to be able to

19   see whether there are errors being made in medical care;

20   therefore, we cannot organize medical care appropriately

21   because of that denial of information.

22   Q    All right.  During your work -- during the time you've

23   worked for CDCR, has any person ever directed you to manipulate

24   data for any purpose related to remediation in Coleman?

25   A    Close.  The psychiatry team was desperate to demonstrate

1  the productivity of MAs and as hard --

2  Q   That's the team led by you?

3  A   Say again?

4  Q   The team that you lead?

5  A   Yes.  Yes.

6  Q   All right.

7  A   And we looked as hard, as hard, as hard as we could to try

8  to find a way that the MAs increased productivity.

9  Q   "MAs" meaning medical assistants?

10  A   Yes.  And we could not find any such way.  And we reported

11  that, much to the chagrin of our compatriots who, on the other

12  side of the house, actually compiled, I would say, at very best

13  extraordinarily misleading data.

14  Q   When you say "compatriots on the other side of the house,"

15  who do you mean?

16  A   Dr. Ceballos' team.  Extraordinarily misleading data about

17  that issue and --

18  Q   Was that data provided to the Court?

19  A   No, it wasn't, only because we were just so -- as a former

20  researcher, I was just appalled by that attempt to do it, and I

21  let -- and I let them know that the data that I think it was

22  Ms. Ponciano's team had compiled was utter statistical rubbish.

23  Q   And in that case your message was heard?

24  A   It was.

25      Furthermore, the major problem in terms of data -- there

1    are many other problems, but the major problem in terms of data
2    is that the receiver is now supposedly doing a lot of our data
3    analysis, but the very same people who -- in mental health are
4    the very same people guiding those in receiver to tell them
5    what should be included in things, and it is not really the
6    case that our team is the one that -- and therefore -- that is
7    asked and, therefore, my view, therefore, is that data will --
8    unless something else happens, unless there's some external
9    monitoring by others, by the plaintiffs and by the Office of
10   the Special Master with an external team that there's just no
11   way that our data can become reliable and reasonable.
12   Q    Do you have specific information?  Do you know that the
13   receiver is providing data analysis for the Coleman case?
14   A    Yes.
15   Q    And how do you know that?
16   A    Because Annette Lambert works for the receiver, and they're
17   absolutely getting our data and organizing things and helping
18   us, and we have meetings concerning that.
19   Q    For the purposes of preparing reports for the Court?
20   A    I don't 100 percent know that, but certainly -- I don't
21   know what reports have recently been given to the Court, but
22   certainly --
23   Q    You understand -- are there separate data analysis
24   processes, one for Coleman, one for PLATA?
25   A    There was.  Dr. Leidner was running the database, and then

1    Annette Lambert's team has been far more active recently.

2    Q   So you believe they are no longer separate?

3    A   I don't think Dr. -- you could ask Dr. Leidner, ma'am.

4    Q   I just trying to understand what you are saying.

5    A   Yes.

6    Q   Do you believe there is a margin of error that's acceptable

7    in reporting of Coleman data to the Court?

8    A   Yes.

9    Q   All right.  How would you describe that?  What margin of

10   error is acceptable?

11   A   It depends on what the data is.  Some data requires

12   precision.  Some -- most does not.  That's the type of data

13   that we are -- but we're not talking 10 percent here, which I

14   tend not to be a stickler in that way, but in my -- in just the

15   way I look at things.  But when you're talking 50 percent or

16   when you're talking about, you know, a report by Ms. Ponciano

17   to the neutral expert that is off by a factor -- that leads the

18   neutral expert to come to conclusions that are off by a factor

19   of 7 or 8, then I start having a problem.

20   Q   Would you say you've personally ever agreed it was all

21   right to provide inaccurate data to the Court?

22   A   I think all data is, to some extent, inaccurate because we

23   have no direct knowledge of reality, so by -- nothing can be

24   perfect, if that's the question.  But no.  I want it to be very

25   precise, but just -- I don't know that there is a way of

1    getting it exactly precise.

2    Q    So last question for now.  Do I understand that you

3    officially provided your whistleblower report to the receiver

4    in the PLATA case?

5    A    Yes, ma'am.

6    Q    Just so I understand, why did you submit it to the receiver

7    alone?

8    A    Well, I also gave it to OLA and Ms. Thorn, for example.

9    Q    Looking at the court cases, there's Coleman and there's

10   PLATA.

11   A    Yes.

12   Q    I'm just -- was there --

13   A    Yes.

14   Q    Was there a reason you provided it to the receiver and not

15   the Special Master?

16   A    Yes.  I knew that the receiver's physicians had every right

17   to all of the data that we have because they consult with us

18   all the time and we share it with them.  I had been told that

19   when -- I can't communicate with Coleman directly unless they

20   ask and I was worried about litigation being directed against

21   me were I to do so.  So it seemed to me that the easiest

22   approach at that point and the best would be to give it to

23   someone whom I knew that -- I suspected that I would be legally

24   allowed to give it to.  And then my thought was that the

25   receiver could then give it to the Office of the Special

1   Master.  Indeed, I called Dr. Metzner and left a message on his

2   phone, I believe, if I'm remembering correctly, saying that he

3   could now get access to the data because the receiver had it.

4          THE COURT:  All right.  All right.  Those are the

5   Court's questions for now.  We didn't talk about order, but I

6   would give the plaintiffs the first opportunities to ask

7   questions.

8          MS. ELLS:  Thank you, Your Honor.

9          THE COURT:  And I had said 15 minutes.  I'll let you

10  know when you hit 15 minutes; and if you need more, you can let

11  me know.

12         MS. ELLS:  Thank you, Your Honor.

13                         EXAMINATION

14  BY MS. ELLS:

15  Q   Good morning, Dr. Golding.

16  A   Good morning, ma'am.

17  Q   So Dr. Golding, in your earlier testimony, you described a

18  series of events in April of 2017, and I'd like to just ask a

19  little bit more about that.

20      You said on April 12th that you typed up an email to

21  Katherine Tebrock expressing concerns about the data that was

22  being presented to the Court.  Is that accurate?

23  A   Yes.

24  Q   Okay.  And did you expressly raise in that email the

25  concern that the data for the timely psychiatry contact

1  indicator had been changed to be more than 30 days?

2  A   Yes.

3  Q   And did you send that email to Katherine Tebrock?

4  A   No.  I hand delivered that email to her administrative

5  assistant, Linda Patterson Turl.

6  Q   And that was on April 12th; is that correct?

7  A   I can't -- on or around April 12th.

8  Q   Okay.  And do you know -- do you have any -- did you ever

9  speak with Katherine Tebrock about that email around that same

10  time frame or, I'm sorry, about that document that you gave to

11  her assistant?

12  A   Yes.  Well, we had spoken previously in March, in or around

13  that date.  I don't recall having a direct conversation with

14  her around April 12th, as I'm thinking back.  I've certainly

15  subsequently had conversations about that issue in detail in

16  April of 2018 or on or around April 23rd, but I don't recall --

17  Q   Do you mean April 2017 --

18  A   April 23rd, 2018.

19  Q   2018?

20  A   In detail.

21  Q   A year later?

22  A   Yes.

23  Q   Okay.  And so I think you just testified that before this

24  document that you handed to her assistant on April -- on or

25  around April 12th that you had already mentioned orally some

1  concerns to Ms. Tebrock; is that correct?

2  A   Yes, it is.  And I have documentation on March 29th that I

3  sent an email to Dr. -- I believe it was -- I can't quite

4  remember, to either Dr. Gonzalez or Ms. Lambert saying that we

5  had -- that Deputy Tebrock had given us permission to

6  disambiguate the data, separating it from -- EOP from CCC data,

7  which was key, and also removing the 45-day rule as well as the

8  60-day rule and to look at and to understand them, and we later

9  on -- we did do an analysis.  They wouldn't -- obviously

10  they -- I'm sorry.  They don't allow us to do analyses

11  system-wide, so what we did is we did an analysis on one ward

12  at CHCF to be able to figure out the kinds of major differences

13  that would be readily obvious had they been willing to

14  separate.  So Deputy Tebrock gave us permission to do it, but

15  Dr. Leidner did a little bit of work but did not disambiguate

16  the CCC and EOP data, which is what one would need to do to see

17  the difference.

18  Q   Okay.  So I just want to be clear.  So sometime in March

19  prior to this email that you sent on March 29th describing this

20  conversation that you had had with Katherine Tebrock --

21  A   Yes.

22  Q   -- you had a conversation with Katherine Tebrock where you

23  raised a concern that the timely psychiatric indicator had been

24  changed from 30 to more than 30 days?

25  A   Oh, yes.  Yes.

1   Q   Okay.  So when you gave her this -- gave her assistant this
2   document on 4/12, had you already asked Ms. Tebrock to have
3   Dr. Leidner rerun the data to see if changing it from 30 to
4   more than -- more than 30 days would have had a significant
5   impact on the data, see if it made a difference?
6   A   I think we -- Deputy -- yes, because on March 29th Deputy
7   Tebrock had said -- I don't know March 29th.  On -- it may have
8   actually been considerably before then.  Maybe towards the
9   middle of March, for example, Deputy -- I don't exactly
10  remember, but, yes, Deputy Tebrock had given us permission to
11  disambiguate the data.
12  Q   Okay.  So I understand you have a concern that the data for
13  EOPs and CCCMS class members was being combined, but I want to
14  talk very specifically about this concern you had about moving
15  the EOP timely psychiatry contact --
16  A   Got it.
17  Q   -- indicator from 30 to 45 days.
18  A   Got it.
19  Q   So I want to be very clear.  You expressly told her you had
20  concerns about that change and how it might affect the data in
21  March of 2017; is that right?
22  A   Oh, yeah.  Yeah.
23  Q   Okay.  And so it sounds like you asked her permission if
24  you could review that data to see if there had been -- if it
25  would have affected the numbers in any significant way that had

1  been provided to the Court.  Is that right?

2  A   We were very sure that it would because the dashboard for

3  EOP had turned green, and people were contacting us.

4  Psychiatrists were contacting us across the state and laughing

5  about how much easier it was to be compliant at the EOP level

6  of care, so this was no secret.  This was an obvious, major,

7  significant change.

8  Q   Okay.  But you had, am I understanding you correctly, asked

9  for and received permission from Ms. Tebrock to rerun that data

10 to see exactly how different the data would have been if it had

11 been 30 days as opposed to more than 30 days for that timely

12 psychiatry contact indicator for EOPs?

13 A   Yes.  And furthermore, I put in an email to her on April

14 13th, I said something like -- I forwarded the email I sent to

15 Dr. Ceballos asking her to rerun it, and I asked her to please

16 put additional pressure on Dr. Leidner and Ms. Ceballos to

17 rerun the data to make it accurate so we could document what we

18 knew to be huge changes.

19 Q   So you did not have the ability to run that data yourself

20 because of what you've described about not being given

21 permission to do that?

22 A   No.

23 Q   Okay.

24 A   We can run it from an individual institution --

25 Q   Okay.

1    A    -- but nobody will allow us to do it.

2    Q    You had gotten information from Deputy Director Tebrock to

3    have Dr. Leidner, who is the data guy, rerun the data to see

4    the difference between 30 and more than 30 days for the timely

5    psychiatry contact indicator --

6    A    Yes.

7    Q    -- for EOPs?

8    A    He said he was too busy.

9    Q    He said he was too busy?

10   A    Correct.

11   Q    And did you tell his boss, Dr. Ceballos, that you needed

12   this data and Ms. Tebrock had told you that you could have

13   access to this data and did that make a difference?  When did

14   they give you that data?

15   A    They -- we got a little bit of data from them, but they

16   didn't fully, in any way, run it the way we needed to, to be

17   able to demonstrate the differences.

18        We needed them to disambiguate it and look institution by

19   institution, what is EOP and what is CCC compliance, and then

20   you could tell.  And I -- and I have that email from April

21   13th.

22   Q    Okay.  And are you aware whether Ms. Tebrock asked Laura

23   Ceballos or Dr. Leidner herself for that data to see if the

24   data that she had submitted to the Court would have been any

25   different?  Are you aware?

1   A   No.

2   Q   Okay.  And I don't think that we actually have these

3   documents that you're referring to in the record from April

4   12th and April 13th referring to your conversations that you

5   had had and the notification you provided to Ms. Tebrock of

6   your concerns about this change.  I don't believe you filed

7   those with your report.  Do you have access to those documents?

8   A   Yes, I have them.  I may have them today.

9   Q   So you could produce those if the Court wanted to see them?

10  A   Sure.

11  Q   Okay.  So I want to -- let me ask you one more question

12  about your concern about conflating and combining the EOP and

13  CCCMS data for this timely psychiatry contact indicator.

14  A   Sure.

15  Q   I understand your concern that combining them masks, to

16  some degree --

17  A   A large degree.

18  Q   -- the effects on EOP specifically --

19          THE COURT:  Just a reminder, one at any time.

20          THE WITNESS:  I'm sorry.

21          THE COURT:  All right.

22  BY MS. ELLS:

23  Q   -- the effect on EOP specifically, but you would still

24  expect to potentially see an effect from just fixing the EOP

25  rule; even if it was combined with the CCCMS data, it might not

1    be as significant an effect as you might otherwise expect if

2    they were separated, but you would expect to potentially still

3    see an effect; is that right?

4    A    Yes.  And -- yes.  One would see an effect.

5    Q    Okay.  And my understanding from what you've said today is

6    that you had knowledge throughout your career that

7    psychiatrists who perform supervisory duties in the

8    institutions were also performing direct patient care; is that

9    accurate?

10   A    I have detailed knowledge.

11   Q    Okay.  And that was a common theme that you were hearing

12   from the field throughout your time in headquarters?

13   A    Not only did we hear it.  Every single month we'd call the

14   institutions and we'd compile a report every month.

15   Q    And what exactly did you -- can you describe that process

16   for us, please?

17   A    Sure.  At least since 2018, Ms. Janiton, the telepsych

18   admin calls each institution and we get survey results and we

19   talk with them about what the coverage would be and whether

20   supervisors are providing coverage.

21        On numerous occasions, those reports have been in the hands

22   of Deputy Tebrock, Ms. Ponciano and Ms. Brizendine.  At one

23   point they tried to get us to stop doing it, but we absolutely

24   do that.

25   Q    And why do you do that?

1   A    We do that because we would like the supervisor to not

2   necessarily have to always see patients, and it helps us then

3   to provide telepsychiatric support for those institutions so

4   that the supervisors can do what they're supposed to do, which

5   is supervise and organize care rather than fail to do so.

6   Q    And if there were sufficient numbers of line psychiatrists

7   to provide direct patient care, would supervisors need to

8   perform those duties?

9   A    Almost never.  It might be the case that a supervisor would

10  consult with a line staff psychiatrist on a patient, but the

11  answer is, to be brief, you're correct.

12  Q    Do the supervisors have other important duties that they

13  are required to do as supervisors, separate from providing

14  direct patient care?

15  A    Absolutely.

16  Q    And does providing direct patient care take away from their

17  ability to do those jobs?

18  A    Absolutely.

19  Q    And you have described today that it is, in your experience

20  and your knowledge, based on these monthly phone calls and

21  other things, that it's routine for supervisory staff to

22  provide direct patient care in the prisons?

23  A    Yes.

24  Q    Have you ever attempted -- so CDCR has represented to the

25  neutral expert that they have no ability to track how often

1   that occurs.  Do you agree with that?

2   A   No.  That's false.

3   Q   Could you explain -- it sounds to me like you have actually

4   tried to study this problem.  Is that accurate?

5   A   Yes, ma'am.

6   Q   And did you find that you were able to get information

7   about how often supervisors were providing direct patient care?

8   A   Sure.

9   Q   How did you do that?

10  A   What you do is you use the caseloads report and you put in

11  the supervisors' names.  There are many ways of doing this.  We

12  did it in two different ways.  And then you get a list of the

13  patients.  You can control for the various ratios that people

14  use; for example, in CCC there's a 1 to 280 ratio most of the

15  time I think and then in EOP -- I'm coming up with these

16  numbers as I go.  It's like 1 to 120, I believe.  And I think

17  in the acute units it's 1 to 15, I think.  And in the

18  intermediate unit I believe it's 1 to 35.  And so you can look

19  at the number of patients that they're covering and where

20  they're covering it, and you can then calculate that each

21  supervisor is covering, at a bear minimum -- and this is --

22  this is absolutely a bear minimum because it's a massive

23  underestimate -- it would be about one-third of a caseload each

24  using the formal rules.

25          Furthermore --

Golding - Exam by Ells

1          THE COURT:  Is that -- you mentioned two methods.  You

2     need to telescope it here.

3          THE WITNESS:  Okay.  I'm sorry, Your Honor.

4          THE COURT:  Very summary.

5          THE WITNESS:  Yes, ma'am.

6          THE COURT:  You're still on the first method?

7          THE WITNESS:  Yes, ma'am, I am.

8          THE COURT:  So just bullet point on the second.

9          THE WITNESS:  The second method is comparing the

10     frequency of visits of the line staff, the psychiatrists or

11     hours of visits, if you'd like, but really the frequency of

12     visits of line staff psychiatrists to supervising

13     psychiatrists, actually the reverse.  And if you do it that

14     way, it's -- I think that's more approximate, but you get that

15     about -- supervisors spend about overall throughout the state

16     about 50 percent of their time doing that, which is very

17     different from what the neutral expert concluded from Deputy

18     Tebrock's -- I'm sorry, from Deputy Ponciano's work, that all

19     of the supervisors together are doing 1.75 caseload.  50

20     percent or a third is considerably different than 1.75

21     full-time equivalents.

22          THE COURT:  All right.  So before the next question,

23     you've gone about 16 minutes.  Do you think can you wrap up in

24     5?

25          MS. ELLS:  Yes.

1        THE COURT:  All right.

2   BY MS. ELLS:

3   Q   So it sounds line it is possible that you have methods that

4   you have personally utilized in order to study exactly how

5   prevalent it is for supervising psychiatrists to perform line

6   staff patient care; is that right?

7   A   We could be -- if we had access to the database, we could

8   be more precise, yes.

9   Q   And I wanted to talk to you a little bit about your

10  involvement in the 2008 staffing proposal.  You're aware that

11  there was a proposal to cut approximately 20 percent of the

12  allocated line psychiatry staff throughout the system; is that

13  right?

14  A   Yes, ma'am.

15  Q   And that was -- there were many versions of that provided

16  to the Special Master and plaintiffs over the spring and summer

17  of 2018.  Did anyone ever provide that proposal to you for your

18  comments before it was provided to the Special Master?

19  A   In May, Deputy Tebrock and Deputy Brizendine read to

20  Dr. Kuich and me aspects of it, not the whole thing, but would

21  not give it to us.  And I think -- I can't quite recall, but

22  sometime maybe in May, which may have been right before they

23  delivered it in June or possibly right after, but it might have

24  been right before, I did get a -- I believe I did get a copy.

25  Q   Did they give you that copy?

1    A    I think they may have.  I'm not sure.

2    Q    Okay.  Did you -- were you ever -- so it sounds like the

3    first time you heard about it, you were in a meeting and they

4    read you pieces from a document.  Were you given that document

5    to look at while you were discussing it?

6    A    No.

7    Q    Did they ask for your feedback as to whether or not you

8    thought these numbers of reductions were appropriate?

9    A    No.  They asked me to sign an affidavit that I agreed with

10   it, and I told them that unless I were able to read it that I

11   certainly wouldn't do that.

12   Q    And do you -- so it sounds to me like you were not given

13   any ability to evaluate whether the numbers that were being

14   proposed in the workgroup were appropriate; is that correct?

15   A    You know, "any" is a comprehensive term, but very very

16   little ability, I would say next to none, to evaluate whether

17   it was appropriate, except, perhaps, the allocation of the

18   telepsych piece in which they said they were going to have

19   eight psychiatrists cover the whole state call for a year --

20   I'm sorry, eight -- somehow -- all the time in the evening,

21   which was impossible.

22   Q    And you were asked to provide feedback on that number?

23   A    We tried to but were overruled by Ms. Ponciano.

24   Q    What feedback did you give?

25   A    It was ridiculous.

1  Q   Okay.  And did you provide any other broad feedback on

2  whether or not you thought this staffing reduction of 20

3  percent of allocated line staff was appropriate, given what you

4  knew about how the system was functioning at the time?

5  A   Yes.  We told them that it was entirely inappropriate, and

6  that's -- in April meetings, for example, I told Deputy Tebrock

7  about the supervisors acting as line staff and a variety of

8  things, yes, absolutely.  And Deputy Tebrock knew -- by the end

9  of April, she knew that we were -- did not think -- I had no

10 idea what they were actually planning, but -- in detail, but --

11 Q   And so it sounds like you specifically raised a concern

12 that the staffing proposal was reliant on supervisors acting as

13 line staff without making clear that it was doing so; is that

14 right?  Did you articulate that in those April meetings?

15 A   Absolutely.  In addition to many other bits of data,

16 including the medication referrals, including the Map It

17 problem, including the lack of confidentiality problem,

18 including the not -- you know, there were -- in detail we told

19 them that they were not counting correctly and, therefore,

20 providing false information.

21         THE COURT:  You have one more minute.

22 BY MS. ELLS:

23 Q   Why did you release your report on October 3rd, that

24 specific day?

25 A   I didn't exactly know when an agreement was going to come

1    about, but it seemed clear to me that my supervisors were not

2    willing to let people know about that issue and other issues

3    that I thought the Court needed to know about and needed to

4    know about and, therefore, I felt desperate and concerned in

5    that sense, and so I released it to the receiver, whom I

6    thought could take care of it.

7    Q    And when you articulated concerns about the nature of the

8    2018 staffing proposal, were any adjustments made to that

9    proposal, the numbers that were recommended for being reduced?

10   Did they take any feedback from you and adjust it, so far as

11   you know?

12   A    Nothing except the one thing I remember is that Deputy

13   Tebrock allowed me to say in a meeting that the -- I believe I

14   said in a meeting with you guys that the eight was -- the eight

15   was inappropriate.  I think I said that.  I can't exactly

16   remember.

17   Q    But you felt that?

18   A    I'm sorry?

19   Q    You had that concern?

20   A    Oh, yes, and told -- oh, no.  We were -- we were --

21   Deputy -- I mean, I'm sorry.  Dr. Kuich and I were really angry

22   about that part of it because it was utterly unrealistic.

23          MS. ELLS:  And prior to that workgroup call you had

24   articulated that?

25          THE COURT:  Last question.

1        THE WITNESS:  Yes.

2        MS. ELLS:  Thank you.

3        THE COURT:  All right.

4     (Off-the-record discussion.)

5                           EXAMINATION

6  BY MR. SILBERFELD:

7  Q    Good morning, Doctor.  Let me begin with some general

8  topics with you, if I can.

9        You mentioned that at some point in time in October of 2018

10 you felt as if you could not talk or communicate with the

11 Special Master, right?

12 A    Correct.

13 Q    And that's true, not withstanding the fact that in 2017 you

14 attended any number of policy meetings multiple times

15 throughout the year where the Special Master and his team were

16 present, correct?

17 A    That's correct.

18 Q    And in 2018 you attended on be a more frequent basis,

19 perhaps once a month, workgroup meetings where the Special

20 Master and his team were also present, correct?

21 A    Correct.

22 Q    Now, you are the chief psychiatrist at CDCR correct?

23 A    You used "The chief psychiatrist."  It's an interesting

24 question.  Say "A chief."  No.  Basically the report says, "A

25 chief psychiatrist."

1  Q   I don't want to fuss about whether it's "a" --

2  A   Okay.

3  Q   -- or "the."  You are the subject matter expert as a

4  psychiatrist at headquarters, correct?

5  A   About what?

6  Q   Psychiatry, sir, in your field.

7  A   I think -- yeah, I'm supposed to be.  To the extent that I

8  have access to the right information to be the subject matter

9  expert, I am.

10  Q   And there are other chief psychiatrists at other various

11  institutions across the state, correct?

12  A   That is correct.

13  Q   And as the chief psychiatrist or a chief psychiatrist at

14  CDCR, you have access to any number of internal processes, do

15  you not, sir?

16       MS. MUSELL:  Objection, vague and ambiguous.

17       THE WITNESS:  I don't know which internal -- I have

18  access to some internal processes, and some I don't.

19       THE COURT:  I'm going to let the question and answer

20  stand.

21  BY MR. SILBERFELD:

22  Q   Okay.  Let me be more specific.  You have access, do you

23  not, to the quality management staff at CDCR, true?

24  A   It depends on what you mean by "access."  I can speak with

25  them.  That doesn't mean that they will respond to me.

1   Q    They're available to you, true?

2   A    Depends on what you mean by "available."  They're not

3   available to do things that I request.

4   Q    Do you know what a weekly webinar is that the QM staff

5   conducts?

6   A    Yes.

7   Q    Okay.  And you've attended weekly webinars, have you not?

8           MS. MUSELL:  Vague and ambiguous as to time.

9   BY MR. SILBERFELD:

10  Q    April of 2017.

11  A    No.  At that time we very much trusted our colleagues.  It

12  was much more of a programming kind of a seminar where they

13  were dealing with programmatic issues.  So, no, it wasn't a

14  normal thing for me to attend that meeting.

15  Q    But one of the things that happens at the webinars is that

16  announcements are made about changes, right?

17          MS. MUSELL:  Vague and ambiguous as to time.  Calls

18  for speculation.  Overbroad.

19          THE COURT:  Sustained as to time.

20  BY MR. SILBERFELD:

21  Q    In 2017 and '18, sir.  That's what the purpose of the

22  weekly webinars is; is that true?

23  A    I'm not aware that the purpose is -- I think the -- no.

24  I'm not aware that the purpose is to inform higher level staff

25  about changes that are being made, no.

Golding - Exam by Silberfeld

1  Q   You had over time, in 2017 and '18, access to Dr. Leidner,

2  for example, correct?

3  A   I could write him emails, yes.

4  Q   Okay.  And would he respond to you?

5  A   Sometimes.  Often he would not.

6  Q   All right.

7  A   I mean, he would answer in an email or -- but he would say

8  he was busy or couldn't.

9  Q   You were aware, broadly speaking, that the performance

10 report provides 150 separate indicators of certain analyses of

11 information that are in the system.  You know that, don't you?

12 A   I know that there are a lot of them, but measurements can't

13 tell you whether they are accurate.

14 Q   It's not a question of measurement.  It's a question of

15 whether this information is available.  There's 150 separate

16 indicators, correct?

17 A   There are.  I take your word for it that it's 150.

18 Q   All right.  And then in addition to that, the system can

19 run what are called "custom queries," right?

20 A   Yes.

21 Q   Okay.  And you could submit, if you wanted to, a custom

22 query to answer a particular question that you thought should

23 be answered, correct?

24 A   There were many times that we attempted to do that.  After

25 awhile, we stopped doing it because our requests were not

1  prioritized and were put very low, and it just wasn't

2  considered relevant.

3  Q   Before you issued your report, did you ever check the

4  accuracy of any of the statements you made in the report with

5  CDCR staff?

6  A   Yes.

7  Q   When was the first time you did that?

8  A   Well, in April of -- I'm sorry.  In March of -- I'm sure

9  well -- long, long before March of 2017 there was a very -- but

10  in March of 2017 I was very much telling Deputy Tebrock about

11  the problems in -- I mean, I don't know how many -- how many

12  dates do you want?  I could --

13  Q   Well, that's fine.  Let's stick with that one for a moment.

14  A   Okay.

15  Q   Ms. Tebrock and you had a discussion, I think, in the

16  spring and summer of 2018 about your idea for a clinic model.

17  Do you remember that?

18  A   Yes.

19  Q   And, in essence, your idea was to cluster or aggregate

20  patients to come to a place so that psychiatrists could be more

21  efficient.  Is that a sort of lay description of what the idea

22  was?

23  A   Yes.

24  Q   Okay.  And Ms. Tebrock encouraged you in that effort,

25  right?

1  A   Not really, because -- she encouraged me to go to the

2  institutions, but she refused to enable me to have -- she said

3  that I was, quote, "parsing the data" when I asked about the

4  individual -- she told me that in May of 2018 that I should

5  stop parsing the data when I was asking for specific

6  information about whether patients were being seen

7  confidentially or not.  I had a whole host of information that

8  I needed to be able to clinically manage the institution and

9  make the appropriate changes, but Deputy Tebrock refused to

10 allow me to have that information and, instead, told me that I

11 was parsing the data and I needed to get more involved with

12 direct management.

13 Q   All right.

14 A   So that's false.

15 Q   So you wanted to pursue your clinic model idea, and she

16 said go ahead, true?

17         MS. MUSELL:  Misstates testimony.

18         THE WITNESS:  I don't --

19         THE COURT:  Overruled.  You may answer.

20         THE WITNESS:  Could you ask it again, please.

21 BY MR. SILBERFELD:

22 Q   Sure.

23     You suggested studying the clinic model idea, and

24 Ms. Tebrock said, "Go ahead"?

25 A   She didn't say --

Golding - Exam by Silberfeld

 1   Q    That's a yes or no --

 2   A    -- comprehensively --

 3   Q    -- Doctor, if you could --

 4   A    She did not --

 5   Q    -- in the interest of time.

 6   A    She did not say "study," because she did not allow us to

 7   have access to the information that I requested to be able to

 8   study it.

 9   Q    Well, you did a study and you provided her a report in

10   September of 2018, right, about your clinic model idea?

11   A    Yes, but without the relevant -- but without relevant data

12   that we needed to put in it, sir.

13   Q    And that was all going on at the same time that you were

14   preparing your report that brings us here today, the 161-page

15   report, correct?

16   A    I think I was collecting -- yeah.  I was collecting data as

17   best as I -- as best as I could, but she -- yeah.  I mean,

18   that's true.

19   Q    When did --

20   A    And speaking with her about it.

21   Q    Sure.

22   A    I'm sorry.

23   Q    When did the work actually begin, Dr. Golding, that

24   resulted in the completed 161-page report?  When did you start

25   writing?

1    A    Oh, I think probably in 2017 as issues came up I was trying

2    to get them resolved, and so I kept notes in my mind of the

3    various things that were problematic.

4    Q    All right.  And so from 2017 until October of 2018, did you

5    ever tell anyone at CDCR leadership that you were in the

6    process of writing this report, or did you keep it secret, sir?

7              MS. MUSELL:  Exceeds the scope, Your Honor.

8              THE COURT:  Overruled.

9              THE WITNESS:  There's nothing secret.  I told people

10   that I was absolutely compiling this data and that I very much

11   hoped that -- and I told Deputy Tebrock repeatedly about that

12   data and others, as I've testified to, in hopes that they would

13   come clean and tell people.

14   BY MR. SILBERFELD:

15   Q    Are you in the process of writing another report now?

16             MS. MUSELL:  Exceeds the scope, Your Honor.

17             THE COURT:  Sustained.

18   BY MR. SILBERFELD:

19   Q    Let's turn to the Issue B that the Court has asked you

20   about.  This is the change from 30 to 45 days.  You first

21   learned about this, did you not, in January of 2017?

22   A    The neutral expert report said that I got -- well, there's

23   a slight problem with your question.  I don't accept that it

24   was 30 to 45 days.  They allowed appointments up to 60 days

25   because they rounded.

Golding - Exam by Silberfeld

1    Q   I'm just describing the topic, sir, that's all.  I'm sorry

2    if I used the wrong words.  The change in the definition of

3    monthly.  You first learned about that in January of 2017,

4    correct?

5    A   I wasn't cognizant of knowing about it in January of 2017,

6    and know the neutral expert says that there's an email from

7    Dr. Mann and Dr. Lindgren that I apparently received.

8    Q   Dr. Mann wrote to you and this is -- Dr. Mann is someone on

9    your team, correct?

10   A   Correct.

11   Q   Dr. Mann wrote to you in January of 2017 agreeing with the

12   rule change.  Do you remember that?

13   A   No.

14   Q   Is Dr. Mann wrong at the time when Dr. Mann agreed that the

15   rule change was reasonable?

16   A   Absolutely.

17   Q   Okay.  The rule change was in effect for a grand total of

18   about four months, correct, from December of '16 to roughly --

19   A   That's what I -- I don't have direct knowledge of that, but

20   I think that's true.

21   Q   Close enough.  Maybe it's five months.

22       And the reason for the rule change began as far back as

23   2015.  Do you remember that?

24   A   No.

25   Q   Who is Julie Kirkman?

1   A   I am told that she is -- I think the report said that she's

2   a court administrator at CHCA.

3   Q   The subject matter of changing the definition of monthly

4   goes back to 2015 when Ms. Kirkman raised the issue from the

5   field.  You understand that to be true, don't you?

6   A   Yes.

7           MS. MUSELL:  Calls for speculation.

8           THE COURT:  You may answer, if you're able.

9           THE WITNESS:  Yes.  However, I get dozens of rule

10  change requests from the field on an extraordinarily --

11  BY MR. SILBERFELD:

12  Q   Right.

13  A   -- regular basis.

14          THE COURT:  Before we go further, CHCF stands for?

15          THE WITNESS:  Oh.  California Health Care Facility.

16          THE COURT:  All right.

17          THE WITNESS:  In Stockton.

18          THE COURT:  All right.  In Stockton.  All right.

19  BY MR. SILBERFELD:

20  Q   And this proposed rule change came from the field.  It

21  didn't come from CDCR headquarters, correct?

22  A   That's -- I don't think that's accurate.  I don't think --

23  to my knowledge, no one, Dr. Mann or no one else, would approve

24  allowing 45 to 60 days, nor did they request that.

25  Q   I'm just talking about the genesis of the idea.  The idea,

1    you know well, came from the field, from Ms. Kirkman, in 2015,

2    but the first action on it was in late 2016.  You know that,

3    don't you?

4    A    No.  I don't agree that the idea for what they did

5    originated there.

6    Q    And the rationale for this change that came from the field

7    was that it would solve tracking issues, reduce staffing needs,

8    prevent cross-coverage, and increase the continuity of care for

9    patients.  You understood --

10              MS. MUSELL:  Objection.

11              THE WITNESS:  That's nonsense.

12              MS. MUSELL:  Objection, Your Honor, compound.  Also

13    calls for speculation.  And if Dr. Golding could actually be

14    allowed to answer the questions that are asked of him rather

15    than being cut off.

16              THE COURT:  Sustained.

17              MR. SILBERFELD:  Well, I would like to actually finish

18    the question.

19              THE COURT:  Sustained as to compound.

20    BY MR. SILBERFELD:

21    Q    You understood that this rule change came about for

22    continuity of care purposes, correct?

23    A    False.

24    Q    So to the extent that other people, not at headquarters but

25    in the field, said at the time that the idea is to provide

Golding - Exam by Silberfeld

1    greater continuity of care to patients, they would be wrong

2    about that, correct?  That's your view?

3    A    What was implemented provided less --

4              MS. MUSELL:  Speculation --

5              COURT REPORTER:  I'm sorry?

6              THE COURT:  Hold on one second.

7              THE WITNESS:  -- continuity of care.

8              THE COURT:  Hold on one second.  What's the objection?

9              MS. MUSELL:  Calls for speculation and incomplete

10   hypothetical.

11             THE COURT:  Sustained.

12   BY MR. SILBERFELD:

13   Q    On this topic of this change, you asked that it be changed

14   back, correct, to 30 days?

15   A    Yes.

16   Q    And it was?

17   A    It was; certainly not immediately, and it was done in two

18   separate steps.  It was done -- on April 12th it was changed

19   from 60 days back to 45 days.  It actually was a minimum 60

20   days.  And then on April 23rd, it was changed back, but it

21   certainly wasn't immediately changed back, and it was done only

22   after the report to the Court had been submitted on March 30th.

23   Q    And you agree, do you not, Dr. Golding, that the program

24   guide requirement of 12 visits per year was never changed?

25   A    That's false.

1  Q   Do you agree with the neutral expert that there was no

2  intent to mislead the Court or the Special Master on this

3  topic?

4  A   No.

5  Q   Do you agree that there was no intent to falsify

6  information presented to the Court or the Special Master on

7  this topic?

8  A   No.

9  Q   Moving on to Issue E.  And this is the one about

10  appointments seen as scheduled.  You understand and agree, do

11  you not, Dr. Golding, that the "appointments seen as scheduled"

12  indicator does not relate to any program guide requirement?

13  A   I think the Special Master was using it to monitor

14  compliance in many of his rounds, like the 26th and the 27

15  round.

16  Q   Yeah.

17  A   And so to the extent that the Special Master needs certain

18  types of information to be accurate to measure compliance, then

19  I think it is relevant.

20  Q   Well, thank you for the answer.  That wasn't the question.

21  The question was:  Is the "appointments seen as scheduled"

22  indicator a program guide requirement, as you understand the

23  program guide?  That's a yes or a no, sir, and I'll let you

24  explain if you need to.

25  A   I think an interpretation of the program guide could

1    legitimately be that we need to understand seen as scheduled.

2    I don't think that the -- if you're asking me whether the

3    program guide explicitly says in words that you will monitor

4    seen as scheduled, it doesn't -- doesn't say that.

5    Q    Okay.

6    A    But I think many aspects of the program guide make that

7    measure quite relevant.

8    Q    You understand that the purpose of that indicator is simply

9    to see whether appointments were not completed due to factors

10   within CDCR's control?

11   A    That's false in a number of ways.  It's false, one, because

12   the most common reason that appointments are not seen as

13   scheduled is that people say "Canceled unspecified" and

14   "Refused."  But particularly the canceled -- or no, no, not

15   refused -- "no show."  That the very most common reason that

16   psychiatrists check that is because they don't know.  And it is

17   utterly, utterly false that that cannot be controlled.  It

18   absolutely can and is controlled whether patients bring

19   patients, and so --

20   Q    You're missing my question, Doctor.  I'm sorry to

21   interrupt, but I'm limited to time here.

22        The reason that the "seen as scheduled" indicator was used

23   the way it was, was to match the indicator used for the

24   healthcare program as opposed to the mental healthcare program.

25   You understood that to be the case, right?

1    A    That's false.

2    Q    That's why that happened?

3    A    No.  That's false.

4    Q    All right.

5    A    The denominators on both of them are not in any way

6    equivalent, and the denominator for the CCHCS indicator has far

7    more terms in it than the denominator for the CDCR one.  So it

8    doesn't even match the CCHCS one.

9    Q    When did you first come to realize that, as you say, this

10   was being improperly applied, this particular indicator?  When

11   was that, what point in time?

12   A    The 30 to --

13   Q    No, not the 30 to 45 days.  The "appointments seen as

14   scheduled" indicator.

15   A    I started having a pretty good idea around July 10th, yeah.

16   Around July 10th, 2018.

17   Q    A month and a year will do.

18   A    '18.

19   Q    July 2018?

20   A    Yes.

21   Q    Okay.  And did you report that to anyone within CDCR

22   leadership?

23   A    Yes.

24   Q    Who?

25   A    On July 10th, I sent an email to, as I told the Judge, sent

1    an email to Deputy Tebrock giving the hypothetical example.

2    Q    Of the eight and the eleven?

3    A    Of the three patients --

4    Q    Okay.

5    A    -- and the eight and the eleven.  I also put it in

6    attorney-client privileged data in August or September in the

7    notebook.  I also repeatedly told Deputy Tebrock when we were

8    speaking together, and her response to that was that if

9    patients don't come to their appointments, it is their choice

10   because they are -- they have capacity and they're competent.

11           THE COURT:  All right.  You have time for maybe two

12   more questions.

13           MR. SILBERFELD:  Your Honor, if I could have a few

14   more minutes, I have one more topic that I haven't even

15   touched.

16           THE COURT:  How much total time do you need?  I'm also

17   thinking about the break that we need for the court reporter.

18           MR. SILBERFELD:  I'm happy to take a break if --

19           THE COURT:  How much total time do you estimate you

20   need?

21           MR. SILBERFELD:  Perhaps five or six minutes.

22           THE COURT:  All right.  Madam Court Reporter, can you

23   go for that long?

24           COURT REPORTER:  Yes.

25           THE COURT:  All right.  I'll give you five more

1  minutes.

2       MR. SILBERFELD:  Thank you.

3       THE COURT:  There will be a couple minutes rebuttal

4  after we come back from the break, if the plaintiffs want a few

5  more questions.

6  BY MR. SILBERFELD:

7  Q   Dr. Golding, the issue you raised in your report of October

8  3rd, 2018, as to appointments seen as scheduled was fixed

9  within a week, wasn't it?

10 A   No.

11 Q   Okay.  Let's move on -- oh.  By the way --

12 A   It wasn't fixed because changing --

13      THE COURT:  Wait.  Wait, wait, wait.

14      THE WITNESS:  I'm sorry.

15      THE COURT:  Wait for the next question.

16      MR. SILBERFELD:  Yeah.

17 BY MR. SILBERFELD:

18 Q   The next question is you described this issue, Issue E, as

19 arbitrary and not useful in your report.  I note with some

20 interest that you didn't say it was misleading, right?

21 A   I don't exactly recall the exact words I used.  I take your

22 word for it.

23 Q   Yeah.  You'll adopt whatever word --

24 A   I believe you.

25 Q   Okay.  Let's do the last issue, psychiatric contacts.  This

1    indicator or this report came up as part of the 2018 staffing

2    proposal?

3    A    Psychiatric contacts, which -- what exhibit?

4    Q    This is the supervisor versus line staff --

5    A    Okay.  Got it.

6    Q    -- question.  All right?  Are we on the same page?

7    A    Yes, sir, we are.

8    Q    Good.  The object of this report was to try to understand

9    how many line staff psychiatrists would be needed to deal with

10   the CCC and EOP populations, correct?

11   A    No, because you can't determine the number of line staff

12   psychiatrists that are needed to deal with the EOP and CCC

13   populations unless you've also determined whether there is

14   supervision.  The absence of supervision means you need far

15   more line staff psychiatrists.  And the presence of supervisors

16   and organization -- appropriate organization of care, only that

17   leads to need for less or fewer.

18   Q    The measurement that was being made was how many patients

19   are being seen by psychiatrists, whether they are supervisors

20   or line staff, for the purpose of figuring out on a

21   going-forward basis how many line staff psychiatrists would be

22   needed.

23   A    That's false.  The purpose would be -- each person you have

24   to measure the quality of the interaction; and without

25   supervisor's organizing care, the care provided to each person

Golding - Exam by Silberfeld

1  is less --

2  Q    Okay.

3  A    -- and the quality is less.  And so part of the assumption

4  of whether a patient is seen is not if they're seen with

5  someone waiving at them and saying "hello" or someone who's not

6  sick or extremely sick.  Part of the assumption about whether

7  patients are seen is whether there's some quality involved in

8  them being seen.

9  Q    There's no doubt in your mind that everyone involved in

10  Coleman:  You, staff, the Special Master's Office, perhaps even

11  the Court and certainly counsel know that supervisors,

12  supervising psychiatrists, see patients as a broad concept.

13  You know that, right?

14  A    I think they -- no.  They do know, yes.

15  Q    And with regard to the staffing proposal in 2018, you know

16  that the Special Master had no objection to the changes that

17  were being proposed at the time?

18          MS. MUSELL:  Calls for speculation, overbroad,

19  incomplete hypothetical, vague and ambiguous.

20          THE COURT:  Overruled.  Just answer yes or no if

21  you're able.

22          THE WITNESS:  The Special Master did not -- could not

23  have made an informed choice without knowing that 50 percent of

24  the supervisor's time may have been spent being line staff.

25

 1 | BY MR. SILBERFELD:

 2 | Q   Okay.  And do you agree with the neutral expert's finding

 3 | on this point that no false or misleading statements were made

 4 | to the Court or to the Special Master?

 5 | A   No.

 6 | Q   Okay.  The information about this subject was never adopted

 7 | by the Court in any proceeding or hearing or order; you

 8 | understand that, right?

 9 | A   I don't understand the question.

10 |         MR. SILBERFELD:  You don't understand.

11 |         That's all I have.  Thanks.

12 |         THE COURT:  All right.  Let's take a break, 20-minute

13 | break.  Be back here at 10:00 after 11:00.

14 |     (Recess at 10:51 a.m.)

15 |         THE COURT:  You may be seated.  Does plaintiff's

16 | counsel have another two minutes of questions for Dr. Golding?

17 |         MS. ELLS:  Yes, Your Honor.

18 |         THE COURT:  All right.

19 |                             EXAMINATION

20 | BY MS. ELLS:

21 | Q   Briefly, Dr. Golding.  Defense counsel asked you about

22 | Julie Kirkman.  Is it your understanding that she is not a

23 | clinician?

24 | A   Yes.

25 | Q   She's not a psychiatrist or any kind of mental health

1 clinician?

2 A    No, she isn't.

3 Q    And she's the one who initiated that request to change the

4 30 to 45-day rule?

5 A    To my knowledge, yes.

6 Q    Dr. Golding, you also testified in your report that you

7 learned about the 30 to 45-day change because Dr. Gonzalez, who

8 worked for you, told you that the dashboard was looking greener

9 than you expected it to be, and you asked her to look at the

10 data to see what was going on.  Is that accurate?

11 A    That's correct.

12        MS. ELLS:  I'd like to introduce an exhibit that's

13 premarked as Plaintiffs' 164.

14        THE COURT:  All right.  Any objection?  I know there

15 were some objections filed, but now the time has come.

16        MS. THORN:  Yes, Your Honor.  That's the report of I

17 believe Dr. Gonzalez, so the objection is it's hearsay.

18        THE COURT:  Are you moving to introduce it?

19        MS. ELLS:  Yes.

20        THE COURT:  What's the exception?

21        MS. ELLS:  The exception is that it is nonhearsay

22 because it is by a party opponent.  Dr. Gonzalez performed this

23 in the line of her duty.  She was on the job when she looked at

24 this data.  She did it at the direction of her boss.  She still

25 works for CDCR.  It is not hearsay.

1     THE COURT:  And your response to that?

2     MS. THORN:  Our response is that there's no formal

3   proceeding filed or initiated by Dr. Melanie Gonzalez against

4   any of the defendants in this action, so she's not a nonparty

5   opponent.

6     MS. ELLS:  She is a whistleblower.  It is entitled

7   "Whistleblower Complaint Regarding Patient Care and Safety,

8   Coleman v. Brown."

9     THE COURT:  Well, I'm going to allow questioning based

10  on the document at this point, and I'm inclined to allow it to

11  be admitted, but I may check the record more carefully before

12  more formal admission.  But in any event, it would be the Court

13  relying on this document.  Whether or not it's admitted into

14  the record formally I'll let you know, but you can ask

15  questions at this point.

16  BY MS. ELLS:

17  Q   Dr. Golding, have you reviewed this complaint, which is

18  dated October 24th, 2018?  It's entitled "Whistleblower

19  Complaint Regarding Patient Care and Safety, Coleman v. Brown."

20  A   Yes.

21  Q   And did you review it before Ms. Gonzalez provided it to

22  the Court or, I'm sorry, to the PLATA receiver?

23  A   Not the entirety of it, but virtually -- I knew all about

24  it, yes.

25  Q   Okay.  And there's a number of emails and analyses in here

1  about her concerns about why the performance report indicators

2  were not accurate.  Did you direct her to look into that --

3  those issues?

4  A  I -- yes.

5  Q  And you did that in the course of her employment?

6  A  Yes.

7  Q  Dr. Golding, you --

8       THE COURT:  You're now at three minutes.

9       MS. ELLS:  This is one last question.

10      THE COURT:  All right.

11      MS. ELLS:  Literally one last.

12 BY MS. ELLS:

13 Q  Dr. Golding, you received a lot of questions from opposing

14 counsel about your attendance at workgroup meetings and policy

15 meetings where the Special Master was also present.  Did you

16 feel free to express your opinions at those meetings --

17 A  Absolutely not.

18 Q  Wait until I finish, please.

19 A  I'm sorry.

20 Q  Did you feel free to express your opinions to the Special

21 Master at those meetings?

22 A  No, ma'am.

23      MS. ELLS:  Thank you.

24      THE COURT:  All right.  At this point the Court feels

25 the need to move on, and so I'm going to allow Dr. Golding to

1    step down.

2           He is available for the rest of today, Ms. Musell?

3           MS. MUSELL:  Yes, Your Honor.  And if we could have

4    clarity regarding the ruling at the beginning of the day that

5    witnesses should not be in the courtroom, given that

6    Dr. Golding has now been -- provided testimony from all parties

7    and the Court, would he be allowed to stay in the courtroom,

8    Your Honor?

9           THE COURT:  Once a witness has completed testimony,

10   the witness can remain in the courtroom.  My question for the

11   parties will be are there additional critical questions you

12   believe must be posed to Dr. Golding before he is excused as a

13   witness?

14          MR. SILBERFELD:  Not at this time, depending upon what

15   the rest of the day brings, though, Your Honor, and for that

16   reason we ask that Dr. Golding, as with the other witnesses, be

17   excluded for now.

18          THE COURT:  Ms. Ells, your position on that before I

19   turn back to Ms. Musell?

20          MS. ELLS:  Well, Your Honor, it's -- again, it makes

21   sense for Dr. Golding to testify.  He has already completed

22   his -- or I'm sorry.  It makes sense for him to remain in the

23   room.  He's already completed his testimony.

24          Defense counsel has no idea if they have any further

25   questions for him or what reason there would be to ask

1  additional information from him or recall him at this point.

2  THE COURT: Ms. Musell?

3  MS. MUSELL: I agree with that, Your Honor. He has

4  been -- the parties were allowed to ask whatever they wished of

5  Dr. Golding, as has the Court. It seems he has completed his

6  duty and then probably a lot more than that and should be

7  allowed in the courtroom.

8  THE COURT: All right. I'm going to allow Dr. Golding

9  to remain in the courtroom. I believe his testimony is

10  concluded. Moreover, he may not be named as a party, but he

11  is -- it's his report that has prompted these proceedings.

12  MR. SILBERFELD: Your Honor, if I --

13  THE COURT: And so to the extent he's asked any

14  further questions, his presence in the courtroom can be used

15  for impeachment value.

16  MS. MUSELL: Thank you, Your Honor.

17  THE COURT: Mr. Silberfeld?

18  MR. SILBERFELD: Your Honor, one additional reason

19  Dr. Golding should be excused from the courtroom, and that is,

20  there may well be an intimidation factor associated with his

21  presence in the courtroom during the testimony of other

22  witnesses.

23  MS. MUSELL: If I may --

24  THE COURT: If that becomes evident, I'll reconsider

25  at that point.

1          MS. MUSELL:  If I may just simply state, Your Honor,

2     that that is far more a factor for Dr. Golding as a

3     whistleblower, as demonstrated throughout these proceedings

4     about the retaliation which we have raised with the Court and

5     the treatment that Dr. Golding has experienced after trying to

6     raise these issues internally with CDCR and gotten nowhere.  So

7     if there's any intimidation factor, your Honor, and I'd like

8     this to be stated explicitly, that's towards Dr. Golding.

9          THE COURT:  All right.  I understand that position.

10    I'm not resolving the merits of any such arguments today.

11         Dr. Golding, you may step down.

12         THE WITNESS:  Thank you, Your Honor.

13         THE COURT:  And you may remain in the courtroom.

14         THE WITNESS:  Thank you, ma'am.

15    (Witness excused.)

16         THE COURT:  Former Deputy Director Tebrock will be

17    next.

18         MR. LEWIS:  Yes, Your Honor.  We're getting her right

19    now.

20         THE COURT:  All right.

21         THE CLERK:  Ms. Tebrock, please come forward, step

22    into the witness stand and remain standing.  Please raise your

23    right hand.

24    (Witness duly sworn and takes the stand.)

25         THE WITNESS:  I do.

1          THE CLERK:  Thank you.  Please be seated.

2          Will you please say and spell your first and last name

3     for the record.

4          THE WITNESS:  Sure.  Good morning or afternoon.  My

5     name is Katherine Tebrock, K-A-T-H-E-R-I-N-E, last name

6     Tebrock, T-E-B, as in "brother," R-O-C-K.

7                KATHERINE TEBROCK, WITNESS, SWORN

8                          EXAMINATION

9     BY THE COURT:

10    Q    I believe it's still morning, Ms. Tebrock.

11    A    Oh, good.

12    Q    I'm hoping we still have some morning time.

13         So first clarify for me, you were deputy director of CDCR?

14    A    Of the state-wide mental health program, that's correct.

15    Q    Of the mental health program?

16    A    That's correct.

17    Q    From what date to what date?

18    A    I was appointed in the late 2015 time frame but didn't

19    actually assume the job until January 1st of 2016.  Last day

20    was July 12th of this year.

21    Q    And you left on your own accord?

22    A    That's correct.

23    Q    Do you continue to be represented in this case, in this

24    matter today by the Attorney General's Office?

25    A    I am, yes.

1    Q    All right.  And for 2015 what was your title?  Remind me.

2    A    Sure.  Chief Deputy General Counsel at the Office of Legal

3    Affairs at CDCR.

4    Q    All right.  I have a series of questions for you organized

5    by topic.  So first, I want to ask you some questions about

6    what I'm describing generally as the lengthening of EOP

7    timelines from 30 to 45 days for a period of time.  When did

8    you first learn of the rule change that lengthened the timeline

9    from 30 to 45 days?

10   A    Sure.  Before I answer that, I just want to take a moment

11   to thank you for including me, not withstanding the fact that

12   I'm not with the agency anymore.  I appreciate coming and

13   having the opportunity to talk.  The issues are important, and

14   so I'm glad that I have a voice now answering your question

15   about when I became aware.  My memory is that I first really

16   became aware when I got the report from Dr. Golding in October.

17   Q    Have you ever heard about the rule change prior to that?

18   A    It may have been part of some conversations, but I don't

19   think I really connected the dots the way Dr. Golding laid it

20   out in his report until I saw the report.

21   Q    What's your understanding of why the rule change happened

22   in the first place?

23   A    Sure.  My understanding of why the rule change occurred was

24   that there was a request that came in from the field, from

25   psychiatry in particular, to make a change to ease some of the

1  demands on psychiatry in the field and that that was the

2  impetus for the change.

3  Q    And when you say "in the field," how do you define that?

4  A    From an institution.  I believe the request came from a

5  psychiatry team out at CHCF.

6  Q    All right.  And that stands for?

7  A    The California Health Care Facility.  It's in Stockton.

8  Q    Did the change in the rule allow the generation of data

9  that was more favorable to the defendants in making its reports

10 in this case?

11 A    So I think that was -- it was a question of debate

12 certainly around whether that change made an impact.  Certainly

13 one can imagine that it -- that it could have.  I haven't --

14 I'm not aware of anybody having run the reports either way, but

15 I'm assuming that that would probably show a slightly more

16 favorable results.  But I think it's important to note that

17 there was never an intent to drive any kind of more favorable

18 result in this case.  That wouldn't have been -- certainly

19 wasn't for me or for those who work with me an intent to

20 somehow create more favorable information.

21 Q    You said it was a question of debate.  Who debated that?

22 A    Oh.  What I mean is once the report same out I think there

23 was -- and I think it's actually in the pleadings and filings

24 between defendants and plaintiffs around what the import of

25 that change was.

1    Q    Is there any chance that the change was made because of a

2    request from the Governor's Office to find ways to generate

3    favorable data?

4            MR. LEWIS:  Objection, Your Honor.  To the extent that

5    this could get into attorney-client privilege, we are all about

6    transparency, perhaps the witness can answer to the best of her

7    knowledge based on information she may not have had or

8    conversations she may not have had with attorneys.

9    BY THE COURT:

10   Q    Well, you can answer the question.

11   A    Sure.  The request came in through the field.  It did not,

12   to my knowledge, come in through the administration in any way

13   and it was, my understanding, intended to help line

14   psychiatrists in getting some of their work done.

15   Q    So once you learned of the rule change, what specific steps

16   did you take to address it?

17   A    So by the time I really was aware of the rule change, the

18   rule itself had already been changed back.  Dr. Golding had

19   interacted with Dr. Ceballos and others about it and

20   Dr. Leidner corrected it soon after Dr. Golding raised the

21   issues.  So by the time I really had an understanding of what

22   was happening, it was already cured.

23   Q    So your approval was not needed either to make the change

24   in the first place --

25   A    Correct.

1   Q   -- or to change it back?

2   A   Correct.

3   Q   Is the change from 30 to 45 days, is that a change that

4   should have been raised with the Special Master in the Coleman

5   case before it was ever implemented?

6   A   It probably should have.  It probably should have come to

7   me.  And if it had come to me, I would have gone to the Special

8   Master.  The Special Master and I have had a long, productive

9   working relationship, and we talked about things both favorable

10  and unfavorable, and we often had some pretty lively debates

11  about things.

12      There were times when I shared things that were unfavorable

13  to defendants and raised things and kind of worked through

14  issues with him, and he was great about working through those

15  things.  So there's no reason I wouldn't have raised something

16  like that, had I known about it.

17  Q   You said it probably should have come to you.  Should it

18  absolutely have come to you before the change was ever made in

19  the first place?

20  A   Yeah.  So in retrospect, of course, the answer is yes.

21      The challenge is that the system is quite large and there

22  are -- as you know, there are many many data points for which

23  you have to have business rules.  And I generally didn't get

24  into each of those business rules with the team.  I had teams

25  of people who specialized in those areas, and I trusted their

1    judgment.

2        I was also aware that prior to the implementation of

3    CERNER, CDCR had the MHTS.net program, which had been

4    negotiated and discussed with the Special Master and his team

5    over the course of many years, and I really understood that we

6    had preserved or attempted to preserve, to the extent possible,

7    all of those rules to maintain fidelity.

8    Q    Had you provided the staff working under you with

9    directions about what qualified as an issue to raise with the

10   Special Master before implementation of any change?

11   A    No.  We didn't have -- the short answer is no.

12   Q    Once Dr. Golding filed his report, did you then clarify

13   when issues needed to be raised with the Special Master before

14   implementation?

15   A    It became clear after the report had issued that a lot of

16   the communication needed to stop internally so that we could

17   make sure we were organizing in a way that allowed us to

18   continue to communicate completely and transparently with the

19   Special Master team.  So certainly any changes thereafter

20   people understood.  And I certainly gave direction that it

21   should come up through the Special Master team.

22   Q    And how did you provide that direction?

23   A    It actually came -- I think we paused the mental health

24   change committee, and I think there may have been a

25   communication that came through -- and in fact, I think it came

1  through legal to the staff just directing a pause.

2  Q    Was some policy or procedure memorialized in writing?

3  A    We didn't complete a new policy.  We simply paused the

4  activity so that we could make sure that we were lining up

5  those conversations with the Special Master and whomever else,

6  understanding at the time -- not anticipating that it would be

7  such a long pause, going a year.

8  Q    What's your explanation as to why the change happened

9  without your knowing, without the Special Master knowing in the

10  first place?

11  A    Yeah.  I think -- I've thought a lot about this.  I think

12  that the system itself moves very quickly, and there are a lot

13  of small decisions that people have to be able to make at their

14  level.  And I think it was an inadvertent oversight.  I think

15  it's clear now that those things should have gone up through

16  the channels and over to the Special Master.  I think it was

17  inadvertent oversight.

18  Q    And when you say "the system," what do you mean by the

19  system moving quickly?

20  A    Yeah.  Day to day a lot of activity occurs at headquarters

21  and trying to move certain pieces of -- whether it be policy

22  development or going out to institutions or identifying system

23  fixes like system bugs that might be apparent in the CERNER

24  system, those are things that have to be handled on a

25  day-to-day basis.

1  Q   All right.  I want to move to appointments seen as

2  scheduled.

3  A   Yes.

4  Q   What role did you play in the 2016 update to the CDCR

5  Mental Health "appointments seen as scheduled" indicator?

6  A   I generally didn't interact on those rules.  As I said

7  earlier, the rules setting for the business rules in the CERNER

8  system were not issues that I dealt with directly.  There were

9  committees with CCHCS, including all of our representatives

10  from mental health, both Dr. Rekart was there, Dr. Kuich and

11  otherwise, to identify any changes that needed to be made.  And

12  that was done in concurrence with CCHCS.

13  Q   So you were not in those meetings?

14  A   I was not in those meetings.

15  Q   And so you said you generally didn't act on those rules,

16  but specifically with regard to the 2016 update did you have

17  any role to play in the quote/unquote update to match the PLATA

18  healthcare dashboard indicator?

19  A   No.  I think I was generally aware that there was some work

20  being done to -- to make those measurements consistent, but I

21  didn't have the time or the expertise to opine and left it to

22  the special -- the subject matter experts to address that.

23  Q   And who were those subject matter experts, in your mind?

24  A   We had a number of folks who were experts in CERNER.

25  Dr. Rekart was one, Dr. Kuich was another.  They attended

1  meetings together on behalf of mental health and those -- they

2  met with CCHCS task force members on -- and I'm missing the

3  name of the -- oh.  It was CLAC.  Stands for something, and of

4  course I'm completely forgetting the acronym.

5  Q   C-L-A-C?

6  A   C-L-A-C.

7  Q   All right.  So taking into account what you just said,

8  still, are you aware of any other data indicators that CDCR

9  Mental Health changed during your tenure to match the

10 receiver's healthcare dashboard?

11 A   Oh, gosh.  Offhand the answer is no.  I'm sure there are a

12 number.  I know there was some medication management

13 indicators.  I think there was a meeting before I left related

14 to medication management with the Special Master team and

15 nursing and others to talk through those medication management

16 changes.  That's just one example that comes to mind.

17 Q   You used the word "consistent" previously, that is, making

18 the mental health information consistent with the receiver's

19 information.  Was that a goal of CDCR, as you understand it?

20 A   I think the issue for the overall management of CDCR's

21 healthcare system to include the mental health system is that

22 locally at the institution you have a CEO who oversees the

23 healthcare program, and it can be a little confusing, I think,

24 when you have different measurements for different things.  And

25 so we're trying to make sure that it was understandable across

1    the board.

2    Q    Is the confusion a reason to merge the data, to eliminate

3    distinctions across cases?

4    A    I think at least relative to medication management, as an

5    example, there's some utility in having similar metrics.  And

6    that being said, there are some unique metrics that each system

7    should maintain, specifically those outlined with specificity

8    in the program guide, for example, like you might have a

9    different time frame for when you need to see a patient in a

10   program guide than you might have under the PLATA policies and

11   procedures.  That being said, there are probably some

12   indicators that across the board would make sense to look at in

13   the same way, access to care, those kind of things.

14   Q    Did you see it as part of your job to, at your level,

15   monitor and ensure that the distinctions critical to the

16   separate reporting required in Coleman as compared to PLATA

17   were observed?

18   A    Yes.  I mean, it's -- it was clear that we -- there were

19   always some pieces that were unique to mental health, and we

20   took pains to make sure that folks understood that that needed

21   to be retained and honored.  And that wasn't a hard -- hard

22   process.  It was just making sure that people were aware of the

23   requirements.

24   Q    And who's the "we" there, we took pains?

25   A    Oh, gosh.  The CDCR Mental Health has a number of folks at

1    headquarters who interacted regularly with partners in nursing

2    and QM and medical and other areas, and those people each have,

3    you know, an obligation to make sure that the mental health

4    program and its requirements are maintained and honored.  So it

5    wouldn't only be me.  It's incumbent on all of the staff.

6    Q    But what -- just so I -- I'm just trying to understand the

7    system you're describing here.  To the extent the buck stops

8    with someone on -- okay.  We have obligations to the PLATA

9    Court, we have obligations to the Coleman Court, and sometimes

10   the same numbers work and sometimes they absolutely don't.

11   Where did the buck stop to ensure that the data being reported

12   to the Coleman Court was fully compliant with court orders in

13   this case?

14   A    So it should have come up through me, and I should have

15   communicated with counsel, both in-house and at the Attorney

16   General's Office, to ensure that it was proper.  To the extent

17   somebody else was signing a declaration, I think they, too,

18   would be under an affirmative obligation to ensure that the

19   information they were submitting and signing was correct.

20   Q    Were there processes in place to ensure that the reports

21   were consistent with the Coleman criteria separate from the

22   PLATA criteria, or was it just --

23   A    I'm not sure I understand the question.  Do you -- well --

24   Q    Again, I'm just playing off of your word "consistency,"

25   that there's a utility in achieving consistency but not to

1   eliminate court requirements.

2   A   Correct.

3   Q   So what steps were in place to ensure that consistency

4   didn't trump a court requirement that might be different in

5   Coleman as compared with PLATA?

6   A   Sure.  So in -- early on, before CERNER was implemented

7   there was a lot of conversation with the Special Master team.

8   And if my memory serves, plaintiffs were participants at some

9   point.  And this was, gosh, back in the 2013 time frame,

10  talking about MHTS.net.  And folks went through and talked

11  about business rules and, you know, I think that after that

12  CERNER process was engaged, recalling, of course, that it was a

13  process implemented by and through the receiver and mental

14  health got the benefit of being a part of that --

15  Q   So Rekart -- Drs. Rekart and Kuich were the representatives

16  of mental health?

17  A   Correct.

18  Q   They were the voice for mental health and, thus, the

19  watchdogs for the Coleman case in --

20  A   Correct.

21  Q   All right.

22      So once you learned about the incorrect indicator, as

23  reported by Dr. Golding, what steps did you take to learn

24  whether or not the specific information he pointed to was

25  reported incorrectly to the Court?

1    A    So this was the -- now we're talking about the seen as
2    scheduled; is that correct?
3    Q    Yes.
4    A    It's my understanding that the indicator itself, the
5    definition didn't match the indicator.  I didn't know that.  So
6    that was very quickly addressed, I understand, by making the
7    adjustment to the definition associated, the business rule
8    associated with the indicator so that it correctly captured the
9    information that -- so that the title of the report correctly
10   captured the information that was being pulled into that
11   report.
12   Q    And who made the change?
13   A    Dr. Leidner did.
14   Q    And what was your role with respect to that change?
15   A    Minimal, because I think when he saw that it was an error,
16   he very quickly took action to cure it.
17   Q    And is that the kind of information that should have been
18   reported to the Special Master at the time the change was first
19   made?
20   A    Had we known that it would have been helpful to do that,
21   yes, I agree.
22   Q    Dr. Golding has reported that with respect to certain
23   appointments of inmates in the mental health program that some
24   appointments were canceled but not recorded as such and, in
25   fact, any record disappeared of the cancellation.  Do you know

1   what issue I'm talking about?

2   A   I do a little bit.  I would be remiss if I started trying

3   to describe CERNER and its --

4   Q   I'm talking more generally because I'm -- like you, I'm not

5   the computer.

6   A   Right.

7   Q   But you're aware that he has said that certain canceled

8   appointments -- that records disappeared such that they

9   couldn't be measured?

10  A   I'm aware that he's alleged that.  I think that's

11  incorrect.  I think, in fact -- and I think it actually may be

12  in one of the filings already, but I think the way it works, if

13  I understand it properly --

14  Q   Let me ask you this --

15  A   Yeah.

16  Q   -- did he deliver a report to you in or about August of

17  2018 laying out his position on this point?

18  A   I don't recall a report from him on this point.  I'd be

19  happy to have my recollection refreshed on that, but I don't

20  remember seeing a report on that.

21  Q   All right.  When you became aware of his concerns, what did

22  you do about them?

23  A   That was when the report issued.  And as I noted,

24  Dr. Leidner had already taken steps to correct it.

25  Q   So you did nothing more?

Tebrock - Exam by The Court

1    A    I had no need to do any more.

2    Q    All right.  Regarding psychiatric supervisors acting as

3    line staff, were you aware of this issue before reviewing the

4    Golding report?

5    A    Well, the answer is yes and no.  I was aware that

6    supervisors sometimes acted as line staff, but I didn't

7    appreciate Dr. Golding's concern about it particularly because

8    we had long talked, he and I, about the fact that there were

9    some supervisors doing work but, you know, I didn't -- I didn't

10   think that it was as problematic as he did or may still

11   consider it, in part because I view it really as part of the

12   obligation for -- clearly if you have vacancies as an example,

13   to use an example, one of your staff goes on --

14   Q    Let me ask, so you didn't agree with him?

15   A    Correct.

16   Q    That was before you saw his report?

17   A    Right.

18   Q    Did your view change after you saw his report?

19   A    It did not.

20   Q    So did you do anything based on the information contained

21   in his report provided in October of 2018 with respect to

22   psychiatric supervisors acting as line staff?

23   A    I did not.

24   Q    So you did not see a need for any change?

25   A    No.  I think that I -- you know, there will always be some

1　vacancies, and there will be a time for -- when a supervisor

2　will have to step in to cover needed appointments, and

3　that's -- that's a tough challenge, but it's certainly one that

4　I think can be expected in that -- in that job.

5　Q    In forming your views on this question, were you exercising

6　your independent judgment?

7　A    I'm not sure what you mean by that.

8　Q    Were you acting at the direction of any other person?

9　A    No.  That's my judgment.  I've been a manager for a long

10　time; and certainly if there are vacancies, I understand that

11　you attempt to fill those vacancies, but in the interim, you

12　have to still do the work.  So that comes from my experience

13　directly.

14　Q    So did Dr. Golding approach you in the fall of 2018 to

15　share with you his concerns that data on which CDCR was relying

16　in preparing staffing proposals was fraudulent?

17　A    I seem to recall that he had a difference of opinion about

18　whether the information was correct.  I attributed some of that

19　to what seemed to me to be his desire to have different

20　measurements taken.  Now, what gave me comfort was a few pieces

21　of information.  We used the best information we had, which is

22　the information we shared.  We also knew that the staffing

23　report itself, the proposal, was going to be monitored.  In

24　fact, the Special Master and his team made a point -- made this

25　point over and over during our negotiations that whatever

1    agreement we came to would be tested.

2        I also --

3    Q    So just back to what Dr. Golding -- did he ever tell you he

4    thought the staffing data was fraudulent?

5    A    I don't remember him using the phrase "fraudulent."  That

6    has certain connotations.  I don't -- I don't recall him using

7    that kind of language.

8    Q    Do you recall telling him at some point in response to

9    whatever he said in that conversation, raising concerns about

10   the accuracy of data, that you were an officer of the court and

11   that by his telling you of his concerns that he had satisfied

12   his obligations to the Court?

13   A    No.  I don't remember that at all.  In fact, if I said I

14   was an officer of the court, then I might have referred to my

15   own obligation to ensure that the information that I was

16   declaring to was accurate, but at no point did I tell him that

17   he was precluded from raising concerns.  In fact, to the

18   contrary.

19       I engaged Dr. Golding over and over about his concerns and

20   tried to really tease out from him what his main concerns were.

21   In fact, the staffing proposal you'll see includes not only the

22   proposals on adjustments to the 2009 assumptions, but it also

23   includes an entire section that has to do with improvements to

24   EHRS, a section dedicated to the clinic model.

25       In fact, I asked him -- directed him to have his team go

1 out and do a review of the clinics from a clinical perspective

2 throughout the state to really get a sense of whether

3 psychiatrists could function at their -- in the best way

4 possible, and --

5 Q Was Dr. Golding able to review the proposal in full before

6 it was submitted to the Court?

7 A Well, he certainly saw the drafts --

8 Q That's not my question.  Was he given a chance to review a

9 draft and comment on it before it was filed with the Court?

10 A Before it was filed with the Court?  Yes.  He saw the

11 drafts that went back and forth with plaintiffs, and he was

12 present in the meetings with plaintiffs.  In fact, at one point

13 he raised a concern with me --

14 Q Before anything was shared with the plaintiffs or the

15 Court?

16 A He and I sat with Dr. Brizendine and Dr. Kuich, and I

17 talked through each of the proposals with him.  I don't recall

18 having shared a hard copy of the document with him, which kind

19 of makes sense because what I needed to understand was whether

20 the proposal itself and the modifications to the assumptions

21 from 2009 were going to be safe and whether he agreed with

22 them.

23 Q Why would you -- so you talk it through with him --

24 A Uh-huh.

25 Q -- then there's a written proposal prepared.  Why would he

1  not see that and have a chance to comment on it before it's

2  finalized?

3  A   So the way -- the way the process really works, we had an

4  idea drafted, and it went over to counsel.  And obviously it's

5  a document written for the Court, and so it really needed to be

6  to drafted with an eye toward attention to the Court, and so it

7  necessarily would have changed over time; not substantively but

8  some kind of tweaking language, and so --

9  Q   Are you saying Dr. Golding had nothing to offer of

10  substance in terms of the written document?

11  A   I'm saying that normally when you write for a court, you

12  use a slightly different skill-set than the clinical review,

13  and he was really -- I needed his clinical perspective on

14  whether it was safe to make the adjustments, but this was

15  primarily not a clinical document.  It was a document having to

16  do with staffing numbers and the assumptions that underlie the

17  2009 agreement.  And those staffing assumptions are really

18  based primarily on what folks thought the work would entail.

19  So really getting his buyoff initially on the clinical

20  appropriateness was important to me, but then how it was then

21  word-smithed was -- he didn't -- he didn't necessarily need to

22  have that exchange.

23  Q   Did you feel pressure at any point from the Governor's

24  Office to massage the data being presented to the Coleman Court

25  to make compliance look more favorable?

Tebrock - Exam by The Court

1   A   Not at all.

2   Q   During your tenure at CDCR did any person ever direct you

3   to manipulate data for any purpose related to Coleman?

4   A   Not at all.

5   Q   Did you ever direct anyone to do so?

6   A   I did not.

7   Q   Did any person ever direct you to provide inaccurate data

8   to the Special Master?

9   A   No.

10   Q   Did anyone ever direct you to provide data that, in

11   context, could be misleading and you knew that?

12   A   No.

13   Q   Did any person ever direct you not to correct misleading or

14   inaccurate data once you became aware of it and its provision

15   to the Court?

16   A   No.  I think, Your Honor, are you referring to the earlier

17   2017?

18   Q   I'm not.  I'm talking generally.

19   A   The answer is no.

20   Q   The same for the Special Master.  Any person ever direct

21   you not to correct misleading or inaccurate data that had been

22   presented to the Special Master?

23   A   No.

24   Q   Have you ever agreed that it was all right to provide

25   inaccurate data to the Court?

1   A   No.

2   Q   Do you consider that a margin of error is acceptable with

3   respect to reporting data in the Coleman case to the Court?

4   A   No.  I don't -- I don't -- well, I don't know how that

5   would come up, but I think to the extent there is a margin of

6   error, that would simply need to be called out to say "this is

7   accurate give or take."  I mean, you would just have to call it

8   out.

9           THE COURT:  All right.  Those are my questions for

10  now.

11          Ms. Ells?

12          And here I'll let you know at 15 minutes.  We'll need

13  to take a lunch break at some point.

14          MS. ELLS:  Thanks.

15                          EXAMINATION

16  BY MS. ELLS:

17  Q   Good morning, Ms. Tebrock.  I think it is still morning.

18  A   So it seems, yes.

19  Q   So you testified today that you were not aware of the

20  timely psychiatry contact metric being changed from 30 to

21  greater than 30 until after Dr. Golding's report was released;

22  is that right?

23  A   I think what I testified to is that that's when I first

24  became fully aware, yeah.  And there may have been some

25  conversation, but I don't recall having any knowledge of it

Tebrock - Exam by Ells

1    before.

2    Q    What do you mean by "fully aware"?

3    A    I don't recall having any knowledge of it before the report

4    came out.

5    Q    Okay.

6    A    If you have something that can refresh my recollection, I'm

7    happy to look at it.

8    Q    You used a very specific phrase there you were not "fully

9    aware" of it until after that, and that's why I was asking did

10   you have some vague awareness that Dr. Golding or anybody else

11   had concerns about the way the timely psychiatry metric had

12   been measured for a time period?

13   A    Sure.  Let me -- let me clarify to the extent I have been

14   confusing.

15        I don't remember knowing that there was a concern about it.

16   Q    Until after Dr. Golding's report was released?

17   A    Correct.

18   Q    After that happened, did you ask to rerun the data that you

19   had -- I'm sorry.  After Dr. Golding's report was released and

20   you became aware that there was this issue where there was a

21   five-month time period where there was a more generous measure

22   for the 30 to 45 or, I'm sorry, for the timely psychiatry

23   contact, did you ask anyone to rerun the data?

24   A    You can well imagine that once the report was released and

25   the issue was a matter of the Court's attention that I didn't

Tebrock - Exam by Ells

1   go in and do my own investigation.

2   Q    My question is a yes-or-no question.  Did you ask anyone to

3   rerun the data in your declaration to the Court on March 30th,

4   2017, after you found out that that data was based on a metric

5   that was more than 30 days?

6   A    I did not.

7   Q    And it's now been a year.  Have you ever asked anybody to

8   rerun that data so you could see how much it mattered?

9   A    I have not done that because all of this has been before

10  the Court, and I wasn't interested in doing my own

11  investigation.  I thought it was really important for this

12  process to be fully completed.

13  Q    Right.  You were not at all curious whether the data that

14  you sponsored to the Court would have been different if it had

15  been using the 30-day metric?

16  A    I'm sorry.  Are you asking about my curiosity?

17  Q    Yeah.  You weren't curious if the data that you had

18  sponsored to the Court was actually incorrect?

19  A    I trusted that this Court's proceeding would address all of

20  the data in an open and transparent way.

21  Q    You've still never filed a declaration changing the

22  statements in your declaration from May 30th, 2017, or

23  correcting the data in that chart that you sponsored?

24  A    I am no longer an employee of CDCR, so I couldn't do it

25  today.

Tebrock - Exam by Ells

1    Q    Why could you not do that?  Do you work for the executive

2    office, the defendant in this case?

3    A    Currently?

4    Q    Yes.

5    A    No.  I don't work for CDCR.

6    Q    I'm not asking about CDCR.  Do you work for the governor?

7    A    I'm not appointed by the governor.

8    Q    Do you work for the State of California, Katherine?

9    A    Yes.  I work for the State of California.

10   Q    So you felt like you didn't need to find out how

11   significant the change was to the data that you had sponsored

12   to the Court after you found out that it was based on a much

13   more generous metric; is that correct?

14   A    I'm sorry.  Is that a question?

15   Q    Yes.

16   A    I don't recall having done an investigation.

17          MS. ELLS:  I'd like to offer at this time Plaintiffs'

18   Exhibit 176.

19   BY MS. ELLS:

20   Q    Ms. Tebrock, you were required by court order to personally

21   certify that segregation units holding EOP class members were

22   complying with program guide mandates; is that accurate?

23   A    Correct.

24   Q    And you were required to do that every month?

25   A    I did.

Tebrock - Exam by Ells

1    Q    So do you recognize this document, which is dated June

2    22nd?

3    A    That looks like my signature, yes.

4    Q    So this is one of your certifications --

5    A    Uh-huh.

6    Q    -- for the segregation units holding EOP class members?

7    A    Yep.

8              THE COURT:  And the year is 2017.

9              MS. ELLS:  Oh.  Pardon me, Your Honor.  Thank you.

10   BY MS. ELLS:

11   Q    Could you please turn to page 6 of this document.  So this

12   is a document produced to you by CHCF, and it says at the top

13   that it covers the period 4/4/2017 through 5/4/2017.  Do you

14   recognize that document?

15   A    It's been a couple of years, but it looks like a document

16   that I would have sent, yes.

17   Q    And on the next page, page 7 of this document, in the last

18   section there it says timely psychiatry contacts 4/4/2017 to

19   5/4/2017 were at 80 percent.  "For explanation, please see

20   addendum," which is Section 3, "attached."  Could you please

21   turn to the next page?  So here --

22             THE COURT:  You're now on page 7?

23             MS. ELLS:  Page 8, Your Honor.

24             THE COURT:  Page 8.  All right.

25             MS. ELLS:  Thank you.

 1   BY MS. ELLS:

 2   Q   So here -- and this is a document CHCF provided to you,

 3   right?

 4   A   Uh-huh.

 5   Q   And you would have reviewed this for your personal

 6   certification of the EOP segregation units that month?

 7   A   Uh-huh.

 8           THE COURT:  Yes or no, please.

 9           THE WITNESS:  Yes.

10   BY MS. ELLS:

11   Q   So this says "CHCF uses the current due dates report to

12   schedule for ASU EOP hub psychiatry.  When the rule was recoded

13   on April 24th, 2017, to have a psychiatry contact once every 30

14   calendar days versus monthly or 45 calendar days, whichever

15   came first, CHCF ASU psy" -- you understand that means

16   psychiatry -- "contacts were all affected; however, from the

17   heat grids shown for those same months prior to April 24th, we

18   were in the green."

19       So you reviewed this document and then in your cover letter

20   on page 1 it says here in the third paragraph that you found

21   that CHCF did not pass certification due to the timely

22   psychiatry contacts being 80 percent, and you referenced a new

23   coding for the indicator that went into effect on April 24th

24   requiring contacts to be held every 30 calendar days versus

25   monthly or every 45 calendar days based on whatever came first.

1    Prior to the coding change, 19 of 22 contacts were

2    compliant.  The remaining 3 were due to scheduling errors, and

3    the scheduling staff has since been retrained.

4    Now, the second paragraph below that referring to CSP

5    Sacramento also did not pass certification, you say in your

6    letter, due to the timely psychiatry contacts 83 percent.  That

7    paragraph also references the coding change that went into

8    effect of April 24th requiring contacts to be held every 30

9    calendar days versus monthly or every 45 calendar days.  And

10   your signature is on the next page, right?

11   A    Yes.

12   Q    This is dated June 22nd, 2017?

13   A    Uh-huh.

14   Q    And you didn't pass those two institutions for

15   certification on the second page of your letter.  So you put in

16   your letter that you understood that there had been a change in

17   the coding of this contact.  Did you not understand what you

18   were saying in that letter?

19   A    Well, what I -- I think what I wrote -- of course this was

20   now two years ago, but what I'm noting is that the coding had

21   been corrected, and I'm relying on the new standard to reflect

22   that CHCF and Sac did not pass pursuant to the current rules.

23   Q    Right.  But you understood that there had been a coding

24   error and CHCF specifically told you that when the prior coding

25   was used, all of their contacts were in the green.  What do you

1    understand "in green" to mean?

2    A    I understood in green meant that it was generally

3    acceptable.

4    Q    And you mean by that compliant with the program guide?

5    A    I mean that it was -- it was, yeah, generally -- generally

6    acceptable.

7    Q    Again, do you mean compliant with the program guide when

8    you say "generally acceptable"?  Yes or no answer.

9    A    So green in the performance report, it's an interesting

10   question you raise because --

11   Q    I'm just asking you, do you agree that saying something is

12   in the green to you meant the institution understood that they

13   were in compliance with the program guide for that specific

14   indicator about timely psychiatry contacts?

15   A    I would guess that -- so there's a yes-and-no answer to

16   that.  Generally, yes.  If you are compliant, then we would

17   argue that you're in compliance with the program guide.  Of

18   course, there has been robust debate, as you know, about

19   whether being in the green, in fact, is the same as being

20   compliant.

21   Q    But you failed them because they were at 80 percent?

22   A    Sure.  If you're not in the green, then you can't be --

23   Q    Now, none of the institutions in there report to you in

24   this document that you signed certifying that the EOP

25   institution -- EOP ad seg hub institutions where EOP class

Tebrock - Exam by Ells

1   members are held in segregation were compliant with program

2   guide standards, none of the other institutions made any

3   reference of whether or not their psychiatry contact timeliness

4   had been affected by this rule change.  Did you ask them

5   whether or not this rule change that two institutions said

6   dramatically changed their compliance, did you ask the other

7   institutions if they also had had their compliance affected?

8   A   I don't recall having had that conversation.

9   Q   But you certified those institutions anyway?

10      On the second page here, you certified every institution

11  except CHCF and CSP Sac, the two institutions that specifically

12  told you that their compliance had been affected by that rule

13  change?

14  A   Sure.  What I would have done is looked at their data.

15  Q   I'm not asking what you would have done.  I'm asking did

16  you certify them and did you ask them whether or not their

17  compliance had been affected by that rule change?

18  A   I don't think I needed to look at that in order to look at

19  their current --

20  Q   So you didn't --

21          THE COURT:  All right.  Just answer this person's

22  questions.

23          THE WITNESS:  I don't remember what I did in June of

24  2017.

25  BY MS. ELLS:

1   Q    But you did certify those institutions as complying with

2   the program guide?

3   A    Correct.

4   Q    Now, you mentioned that you didn't see the notion that

5   supervisors were sometimes performing line staff duties to be a

6   big deal and that you didn't feel like even after you found out

7   about Dr. Golding's concerns that you needed to take any

8   corrective action on that.  Is that accurate?

9   A    I'm not sure I used the phrase "Not a big deal."  I mean,

10  it's always --

11  Q    I believe you did.

12  A    Okay.  Well, let me rephrase because I think --

13  Q    Did you think it was significant enough to make any

14  changes?  I'm just trying to be efficient with our time here.

15  A    Oh.  I think I already answered no.

16  Q    Okay.  So I believe you also said that in your view it's

17  appropriate for supervisors to step in to cover needed contacts

18  when they're -- you know, someone's on vacation or absent due

19  to disability leave.  Is that accurate?

20  A    Correct.

21  Q    Do you think it's appropriate for supervisors to carry

22  permanent line staff duties for an indefinite period of time?

23  A    I think there are duty statements that actually create the

24  expectation for some line staff duties.

25  Q    Is there anything in the 2009 staffing plan saying that

1   supervisors are expected to permanently carry caseloads?

2   A    I don't recall that being in there.

3   Q    Is there anything in the program guide, with the exception

4   of MHCB units, that sets an expectation that supervisors will

5   provide line staff duties?

6   A    I'm not -- I'm not sure that's articulated.

7   Q    Did Dr. Golding tell you that he disagreed with the

8   staffing proposal that you were working with him on to some

9   degree in 2018?

10  A    He raised a couple of concerns, but he didn't -- I don't

11  recall him saying he disagreed with the proposal in total.  In

12  fact, I had express conversations with him wherein he agreed

13  with the approach.  And so I was a little surprised also

14  noting, by the way, that he was present during those meet and

15  confers.  Lisa, you were there.  I mean, you recall the back

16  and forth and there was a lot of discussion with you and your

17  team asking questions, and I don't recall him raising concerns

18  except one time --

19  Q    I'm actually --

20  A    -- he did --

21  Q    -- asking about internally before it came to the Special

22  Master and plaintiffs.  You said that you met with him and that

23  you orally discussed --

24  A    Uh-huh.

25  Q    -- a proposal.

1   A    I did.

2   Q    And at that -- at that meeting did you specifically tell

3   him that the reductions that you were anticipating would cut 20

4   percent of supervisory -- or excuse me, of psychiatry line

5   staff positions?

6   A    No.  At that time we hadn't actually associated any numbers

7   with any of it.  We were talking conceptually --

8   Q    So conceptually --

9   A    -- about what it would look like.

10  Q    But you didn't discuss any numbers of actual cuts with him?

11  A    I didn't have numbers at that time.

12  Q    At the point --

13  A    It was very early in that time.

14       THE COURT:  One at a time.

15  BY MS. ELLS:

16  Q    There were numbers, though, transmitted in the very first

17  version of the staffing proposal sent to plaintiffs --

18  A    Correct.

19  Q    -- and the Special Master in May of 2018?

20  A    Right.

21  Q    Had you run those numbers by him at the time that you sent

22  that?

23  A    I don't think I ran those numbers through him, but he

24  certainly saw them, and he was present at the meetings.  He did

25  raise one concern after a meeting, and we corrected that the

1    next meeting that we had.

2    Q    What was that?

3    A    We engaged with him directly.

4    Q    What was the correction that you made?

5                THE COURT:  One at a time.

6                THE WITNESS:  Sure.  Happy to share.

7                THE COURT:  What were those meetings, because there's

8    been some blurring of the lines.  Were those meetings internal

9    meetings or meetings with plaintiffs and others?

10               THE WITNESS:  Sure.  So in the meeting -- so we had a

11   meet and confer --

12               THE COURT:  I'm just asking for a definition.  You

13   just used the word "In the meetings."

14               THE WITNESS:  Yeah.  Let me -- let me clarify.  We had

15   meet-and-confer meetings --

16   BY MS. ELLS:

17   Q    Are you talking --

18   A    -- between plaintiffs and the Special Master.  And after

19   one of those meetings, we had an internal discussion wherein

20   Dr. Golding raised concerns.  I had conversations then later

21   with some folks and at the following meet and confer, which

22   occurred the next week -- and I don't remember the dates, of

23   course, but we made a point to make sure that we corrected

24   Dr. Golding -- addressed Dr. Golding's concern head-on.  And,

25   in fact, if my memory serves, Dr. Kuich made a presentation

1    during that meeting to correctly frame the issue that was --

2    that would address Dr. Golding's concern.

3         THE COURT:  You need to yield the witness so the

4    defense can have 16 minutes before lunch.

5         MS. ELLS:  Okay.  Did you say wrap it up?

6         THE COURT:  Well --

7         MS. ELLS:  Couple more minutes.

8         THE COURT:  How much more time do you think you need?

9         MS. ELLS:  I mean, I would appreciate five more

10   minutes to explore this topic, but I understand the Court's

11   constraints.

12        THE COURT:  I'll give you two more questions.

13   BY MS. ELLS:

14   Q    Okay.  So you said that you provided Dr. Golding and

15   Dr. Kuich with the physical proposal at some point before it

16   was provided to the plaintiffs and Special Master; is that

17   correct.

18   A    That's not what I said.

19   Q    Okay.

20   A    What I said was that he certainly got a copy of it when it

21   went to plaintiffs and the Special Master team.

22   Q    Now, how did he get that copy?  Was he transmitted on the

23   emails that --

24   A    I don't -- I don't know how.

25   Q    How do you know he got that copy?  Did you give it to him?

 1   A   I didn't personally hand it to him.  We normally send

 2   things electronically, so it would have been distributed to him

 3   in some way.

 4   Q   Could you produce that email?  I will represent to you that

 5   he is not --

 6   A   I have no idea.

 7   Q   -- copied --

 8        MR. LEWIS:  Your Honor --

 9   BY MS. ELLS:

10   Q   -- on any of the --

11        THE COURT:  Okay.  This is where -- you'll have a

12   chance for wrap-up argument, so you've got your answer.  I

13   think at this point we need to give the defense equal time

14   before lunch, and then we'll talk about whether or not we're

15   done with this witness.

16        MS. ELLS:  Thank you, Your Honor.

17        THE COURT:  All right.  And I'm sorry, I'm not --

18   Mr. Lewis --

19        MR. LEWIS:  Thank you, Your Honor.

20        THE COURT:  -- you're going to question this witness?

21                        EXAMINATION

22   BY MR. LEWIS:

23   Q   Good afternoon, Ms. Tebrock.  You said you no longer work

24   at CDCR.  Have the Golding allegations had -- have they had an

25   effect on you?

Tebrock - Exam by Lewis

1    A    Oh, sure.  It's been a long year.

2    Q    Have they had a personal effect on you?

3    A    Yes and no.  They've -- it had a little bit of an effect on

4    the family.  Last night -- I loved my job at CDCR, but I was --

5    tell you a story.  I was driving my then 14-year-old son to

6    school, and he had a very candid conversation with me about my

7    presence at home, and it gave me great pause.  And while I

8    don't normally take employment advice from a teenager, in this

9    instance I had to take a minute to think about whether I was

10   taking home some of the stress.  So it was then that I decided

11   to look for other employment.

12   Q    And at its core -- you answered the Court's questions but I

13   want to reaffirm this -- you at no time have ever been

14   pressured to falsify data or to produce misleading --

15   intentionally misleading information to the Court or the

16   Special Master or plaintiffs in this case, have you?

17   A    I have not.

18   Q    Did you have an issue with Dr. Golding raising his

19   allegations in a report filed in October of 2018 rather than

20   using some of the internal processes at CDCR?

21   A    I wish he would have handled it a little differently.  We

22   had been meeting to try to address his concerns.  He was not

23   shy about having -- having broad concerns about the system and

24   the structure and, in fact, has taken, I think, pains to

25   express that he disagrees with a lot of the requirements of the

1    program guide and the order and mandates and agreements of the

2    case.  So I was really trying to sit and tease out with him

3    those issues that he felt were most important and to try to

4    distill what we could do to try to address his concerns because

5    I didn't want to be dismissive of him, and I thought we were

6    still in the throes of doing that.  In fact, I had engaged with

7    him -- I kind of bought in on some of his -- some of his

8    perspective, particularly as it related to the clinic model, as

9    an example.  He expressed concern about the way the

10   psychiatrists were treated and marginalized at the

11   institutional level, and part of that was felt because the

12   patients weren't being brought to psychiatrists and it was

13   making them less efficient and less productive, and I get that.

14   It makes sense to me.

15        And so I asked him to go out with his team and look at the

16   clinic space across the state and he produced a report to me in

17   mid-September that we were scheduled to sit down and talk

18   about, but we never actually got to actually meet about it.

19   That's actually why we included that component to -- within the

20   staffing plan, itself, because not withstanding the cuts that

21   we were going to propose, we really felt like one of the safety

22   nets that was built into the proposal was that we would have

23   additional efficiencies through those elements, that kind of

24   second half of the staffing proposal that included the EHRS

25   improvements that were needed, which would address a lot of the

1  EHRS-centric concerns that Dr. Golding raised and the clinic

2  model, which would address some of the efficiencies and

3  productivity and also that sense of working in an environment

4  that's more conducive to the physician psychiatrists.  So we

5  were dedicated to making that happen.  So when I saw the

6  report, I would say I was a little bit heartbroken because I

7  felt like we had been making progress, and I was dismayed that

8  it didn't --

9  Q    So I'd like to ask you about some of the things that were

10  going on at CDCR before he issued his report, in particular as

11  to the -- what's known as the Issue B, the monthly that was

12  extended from 30 to 45 days.  I understand that there was some

13  kind of business change or rule change committee that was

14  enacted to cover these things, are you familiar with that, to

15  make sure this stuff didn't happen back in the early 2018 time

16  frame?

17  A    Yeah.  There was a change committee that was initiated that

18  was intended to bring stakeholders from mental health into the

19  room to talk about each of the issues that were coming from the

20  field so that there was no concern about it.  And that was an

21  initiative led by Dr. Ceballos to try to make sure that the --

22  there was more transparency in that process.  Now, that

23  committee, although folks sat and voted on issues, didn't

24  preclude others from raising issues in the CLAC committee

25  meeting.  That was the meeting having to do with the CERNER

1    EHRS pieces.  And I think the name has now been changed to

2    something different, but it wasn't a barrier to additional

3    communication in CLAC, but it was intended to create some

4    consensus within the division on the EHRS changes.

5    Q   And then you said that there were meetings going on.  If

6    you could maybe explain, did you have an opportunity to have

7    regular meetings with Dr. Golding?

8    A   So we had periodic meetings.  There were times when they

9    ended up being canceled, but I tried to have one-on-one

10   meetings with him or meetings with him and Dr. Kuich, depending

11   on what was going on at the time.

12   Q   Okay.  And then so going back into the 2017 time frame when

13   you were the deputy director, did you have meetings with

14   Dr. Golding during 2017 about various issues that he would

15   bring to you on psychiatry?

16   A   Yeah.  So I want to be clear that Dr. Golding and I talked

17   every day.  I mean, we met in the -- had a morning meeting with

18   my team every morning, and we talked about what was going on

19   each morning, and that often led to additional meetings or

20   conversations being scheduled or ad hoc conversations that

21   would occur as needed.  So there were routine meetings, and

22   then there were additional ad hoc kind of conversations.

23   Q   So would there have been opportunity before he released his

24   report in October of 2018 to come to you with problems of data

25   manipulation or data misrepresentations?

1    A    Absolutely.

2    Q    And did he ever, to your recollection, come to you with

3    allegations of fraud?

4    A    He didn't come with allegations of fraud.  We did talk

5    about problems related to EHRS.  And that, again, I can't

6    emphasize this enough, is really why we included that piece in

7    the staffing plan.  It was in recognition of the concerns that

8    he had raised because we knew we needed to do a little better

9    and we used the best information that we had and then we knew

10   we could further improve the system.

11   Q    While you were talking with Dr. Golding about the staffing

12   plan, did he ever raise any objection about the potential to be

13   losing line psychiatrist positions?

14   A    I think when we initially talked, he and Dr. Kuich and

15   Dr. Brizendine and I, it was clear that there were going to be

16   some cuts that might occur, and he didn't seem to have too much

17   of a problem with that in concept.  But, again, really

18   important to it was also recognizing that we needed to make

19   further system improvements so that the psychiatrists were able

20   to be most productive and that they feel valued and can do the

21   best job they can.

22   Q    If Dr. Golding had raised the issues that he raised in the

23   report internally with CDCR through you or through other --

24   perhaps your boss, would CDCR have taken action on those

25   besides having him file a report?

1  A   Yeah, absolutely.  Listen, I was actively trying to talk
2  with him about his concerns.  I didn't think that we had
3  concluded those conversations.  In fact, it was early August we
4  were having pretty frequent conversations about concerns, and
5  it was -- felt a little bit like he didn't want to have
6  complete conversations.  In fact, he had indicated to me that
7  he had a -- well, I asked for some documentation of his
8  concerns so that I can understand.  Sometimes Dr. Golding
9  speaks in generalities and maybe speaks at a little bit higher
10 level than me or than I do, so I think we talked across each
11 other a bit.  So hoping -- having something documented would
12 have given me some assistance.  He indicated that he had a
13 report that he wasn't sure what to do with.  I asked to have a
14 copy of it.  He said no.
15 Q   Now, you said that there were times that he'd be talking
16 over you.  In some of these meeting did you have other duty
17 experts with you, such as people who worked in data or worked
18 in other fields?
19 A   Sure.
20 Q   So who were those people?
21 A   So it was usually Dr. Kuich, Dr. Rekart, Dr. Ceballos.
22 Those are the folks that I would deal with directly.
23 Q   And if Dr. Golding may have had issues with data or
24 reporting metrics, those were the people he could address them
25 to right then and there, correct?

1    A    Yeah.  And I think that there were a lot of conversations

2    that took place, but certainly I had an expectation that the

3    team would be talking -- I didn't have to be in every

4    conversation.  They needed to be able to work things out at

5    their level as well.

6    Q    Now, in your role as the Deputy Director of Mental Health

7    Programs, did you have other things to do besides verifying

8    reports, verifying letters, et, cetera that were submitted to

9    the Court regarding Coleman?

10   A    Sure.  I relied on the subject matter experts to give me

11   good information, and we sat and talked about things so that I

12   could understand what was happening.  But certainly I had other

13   obligations, other duties to include being an external face

14   with other executive staff as well as outside agencies and the

15   legislature and those kinds of things.

16   Q    So you didn't have an opportunity to review every single

17   line of data or reporting that was given to you for your review

18   and signature?

19   A    Certainly not.  There are thousands of data points.  I

20   wouldn't have reviewed all of those business rules.  Just

21   impossible.

22   Q    But at no time did you intend to mislead the Court, Special

23   Master or plaintiffs regarding those findings?

24   A    Absolutely not.

25   Q    And if given the chance, you would correct them if you had

1    the opportunity?

2    A    Correct.

3    Q    Did Dr. Golding ever come to you and tell you that you or

4    people working for you were falsifying data?

5    A    I don't remember the word "false" or "fraud" being used.

6    Certainly he expressed concerns about the data points, and

7    that's part of why we were engaging in our conversations.

8    Q    And so you were attempting, you said, to tease more

9    information out of him?

10   A    Correct.

11   Q    Did he ever ultimately give you something that you could

12   act upon?

13   A    No.  Unfortunately, he didn't.  And in fact, he refused to

14   give me the document that he -- ultimately was his October 3rd

15   report.  It would have been helpful to have had that before.

16   Q    Did you ever advise him that he couldn't release the report

17   because it would be subject to attorney-client privilege?

18   A    His report?

19   Q    A report of any kind.

20   A    I didn't tell him that he couldn't release his report of

21   any kind.  There was one exchange I recall where he raised a

22   legal issue, legal was engaged, legal opined, and he asked

23   whether it was attorney-client privileged, and I indicated that

24   was a privileged exchange.

25   Q    But you never prevented him or took any steps to prevent

1   him from reporting his issues to anyone within CDCR or outside

2   CDCR?

3   A   Certainly not.

4   Q   Did you, at any time, feel that CDCR -- did you have reason

5   to believe that CDCR was misrepresenting the data they were

6   presenting to the Court or Special Master?

7   A   No.

8   Q   If you had, would you have taken steps to correct it?

9   A   Absolutely.

10  Q   Do you believe that the people working for you would have

11  done the same thing?

12  A   Absolutely.

13  Q   Do you trust the people that were working for you back in

14  2017 and 2018 in the Quality Management Division?

15  A   I do.

16  Q   Would you trust them today?

17  A   Absolutely.

18          MR. LEWIS:  No further questions, Your Honor.  Thank

19  you.

20                          EXAMINATION

21  BY THE COURT:

22  Q   All right.  The Court has just one follow-up question.

23      You just said in response to a question that if given the

24  chance, you would correct any document that, in retrospect, was

25  misleading or contained inaccurate information.  So as you sit

1    here now, are there any documents that you can think of that

2    you would correct?  You're being given the chance.

3    A    Sure.  I think I -- to Ms. Ells' point, I think probably

4    would pull if it's possible, and I don't know if it's possible

5    to pull the old --

6    Q    Just assume that there's no barrier.  In your mind, do you

7    have a list of documents that, if given the chance, which you

8    are being given --

9    A    Sure.

10   Q    -- you could correct, what would those documents be?

11   A    That would be the one, the one from 2017.

12   Q    That's the only one?

13   A    I would just look to see if there was a difference and

14   submit that.

15   Q    That's the only document?

16   A    That's the only one I'm aware of that I think would make a

17   difference.  The other items I don't think were issues that

18   were actually submitted that would require a correction at E

19   and F.

20           THE COURT:  All right.  All right.  Let's take a lunch

21   break and be back here at 1:30.  I'd like to propose a change

22   in order for this afternoon, assuming we're ready to move on.

23           For what period of time is Dr. Rekart available?

24           You may step down, ma'am.

25           THE WITNESS:  Thank you.

Tebrock - Exam by The Court

1            THE COURT:  Don't assume you're excused.

2            MR. FISHER:  From 2:00 until at least 6:00, so --

3            THE COURT:  2:00 to 6:00 p.m.?

4            MR. FISHER:  Yes, Your Honor.

5            THE COURT:  I'd like to propose Assistant Deputy

6    Director Ponciano and then Dr. Rekart, and then we would return

7    to Leidner and Ceballos.

8            MR. LEWIS:  So, Your Honor --

9            THE COURT:  And to the extent we need to spill over,

10   we'd spill over to tomorrow afternoon.  Is there any reason

11   that we can take the witnesses in that order so we can fit

12   Dr. Rekart?

13           MS. GARSKE:  Your Honor, we have no objection to that

14   order.  Dr. Brizendine --

15           COURT REPORTER:  I'm sorry, could you please speak up

16   a little bit?

17           MS. GARSKE:  Sure.  Your Honor, we have no objection

18   to that order; however, Dr. Brizendine is also here and on the

19   list to testify, and I did not hear her name.

20           THE COURT:  I thought I just said --

21           MR. LEWIS:  You said Dr. Ceballos, Your Honor.

22           THE COURT:  Dr. Ceballos and Dr. Leidner.  There's

23   Brizendine and Undersecretary Toche --

24           MR. LEWIS:  Yes, Your Honor.

25           THE COURT:  -- are still on the list.  So it's taking

1   a little longer than the Court had hoped.  What I just said is

2   that to the extent we need more time, we would spill over until

3   tomorrow afternoon when the Court has already blocked time for

4   this case.

5           So is there any witness that cannot appear tomorrow

6   afternoon, if we don't get to them today, who's currently on

7   the list?

8           MR. LEWIS:  I do not believe so, no, Your Honor.

9           THE COURT:  All right.  All right.  So that's the

10  plan, to fit Dr. Rekart in there and get him over with.

11          I think -- I think Ponciano, Ms. Ponciano and

12  Mr. Rekart will take a little less time than Drs. Leidner and

13  Ceballos.

14          MR. LEWIS:  And so, Your Honor, after lunch would be

15  Ms. Ponciano and then Dr. Rekart?

16          THE COURT:  Yes.

17          MR. LEWIS:  Very well, Your Honor.

18          THE COURT:  All right.  Very good.  See you here at

19  1:30.

20      (Recess at 12:36 to 1:34 p.m.)

21          THE COURT:  All right.  Any objection to Ms. Tebrock's

22  being excused at this point subject to potential recall,

23  Ms. Ells?

24          MS. ELLS:  I would like to ask her to --

25          THE COURT:  I need you to use the microphone.

1      MS. ELLS:  I am.  Can you hear me?

2      THE CLERK:  Sorry, Your Honor.  That was me.

3      MS. ELLS:  Pardon me.

4      THE COURT:  All right.

5      MS. ELLS:  I did have two questions for her that I

6   would like to ask, but --

7      THE COURT:  Two more?

8      MS. ELLS:  Yes.

9      THE COURT:  Did you have more questions, just so I'm

10   clear, Mr. Lewis?

11      MR. LEWIS:  No, Your Honor.

12      THE COURT:  All right.  Well, five minutes.  I'll

13   allow up to five minutes.

14      MS. ELLS:  Yeah.

15      THE COURT:  So we'll bring Ms. Tebrock back, and then

16   we'll move straight to Ms. Ponciano.

17      Can I, in the meantime, clarify?  I understood that

18   Plaintiffs' 176 was admitted without objection.  Was that your

19   intent to admit that document, Ms. Ells?

20      MS. ELLS:  That was one of the housekeeping items I

21   intended to wrap up, which I never formally attempted to move

22   it into evidence, but we would like to move that in.

23      THE COURT:  Any objection?

24      MR. LEWIS:  No objection, Your Honor.

25      THE COURT:  All right.  So Plaintiffs' 176 is in

1    evidence.  The Court has deferred a ruling on Plaintiffs' 164.

2         (Plaintiffs' Exhibit 176 admitted in evidence.)

3              THE COURT:  Ms. Tebrock, please come forward.

4              Plaintiffs' counsel has two briefs follow-up

5    questions.  You continue to respond under oath.

6              THE WITNESS:  Okay.

7              THE COURT:  Ms. Ells.

8              MS. ELLS:  Thank you, Your Honor.

9                             EXAMINATION

10   BY MS. ELLS:

11   Q    Ms. Tebrock, the Court offered you the opportunity to

12   correct any reference that you felt like should be corrected

13   that had been provided to the Court or Special Master.  We

14   discussed an EOP ad seg hub report for prisoners in segregation

15   for the month of April 2017 when we spoke last.

16        There were four prior reports covering the months of

17   December through March, December 2016 through March 2017, that

18   all used that same formula of greater than 30 days to calculate

19   timeliness.  If given the opportunity, would you go back and

20   adjust those at all?

21   A    It's my understanding there was something recently filed

22   related thereto, so it may be that the defendants have already

23   spoken about that.  To the extent that you are looking for my

24   thoughts on it, I think it would be incumbent on defendants to

25   go back and take a look at it and then they could resubmit if

 1    they found it made sense.  I haven't seen those filings, so I

 2    don't know.  All of that activity is post my departure, so I --

 3    it sounds like folks have already contemplated that --

 4    Q    If given the opportunity --

 5    A    -- and I would defer to them.

 6    Q    Pardon me.  If given the opportunity, though, would you go

 7    back and rereview your certifications that you personally

 8    signed during that time period that you now know used data that

 9    was greater than 30 days to measure timeliness for psychiatry

10    contacts?

11          MR. LEWIS:  Objection, Your Honor, to the extent this

12    assumes an incomplete hypothetical and, frankly, it calls for

13    data that the witness no longer has access to.

14          THE COURT:  Overruled.  You may answer to the extent

15    you're able.

16          THE WITNESS:  Sure.  My answer is that I think that

17    the defendant certainly should do that and can go back and look

18    at that information and file updates.  Unfortunately, as you

19    can imagine, I don't have control over access to that

20    information.

21          MS. ELLS:  Thank you.  Your Honor, I would like to

22    move Plaintiffs' 172 through 175 into the record at this point.

23    Those are the EOP ASU certifications for the months that we

24    just discussed.

25          THE COURT:  Any objection?

1          MR. LEWIS:  No objection, Your Honor.

2          THE COURT:  All right.  Plaintiffs' 172 to 175 are

3    also admitted.  Do you have copies for the Court?

4          MS. ELLS:  I do.

5          THE COURT:  All right.  You can just provide those to

6    Ms. Schultz on the next break.

7          (Plaintiffs' Exhibits 172, 173, 174 and 175 admitted in

8          evidence.)

9    BY MS. ELLS:

10   Q    One last question.  The Special Master was conducting the

11   27th round through the end of 2017 and held two or more tours

12   in the month of January 2017.  CDCR, your department, provides

13   pretour data in advance of those tours that included this

14   timely psychiatry contact metric and this, again, is during the

15   time frame when that metric was more than 30 days.  If given

16   the opportunity, would you go back and adjust the data that you

17   provided to the Special Master for those tours?

18         MR. LEWIS:  Same objection, Your Honor, also lacks

19   foundation.

20         THE COURT:  Overruled.  You can answer if you're able.

21         THE WITNESS:  Yeah.  I think one of the important

22   factors to remember about the Special Master's monitoring is

23   that there is a time frame for the data to be produced to the

24   Special Master, and it's a retrospective look, so I don't know

25   exactly what the data set would have included.  For that

1    January 2017 tour my understanding and expectation is that it

2    would be six months in arrears, meaning they likely would not

3    have had information that included that modified time frame in

4    there, I think, but I would have to go back and look.  And

5    again, one of the challenges for me right now is that I don't

6    have access to the information.

7    BY MS. ELLS:

8    Q    But if it did include that metric being -- when it was --

9    when the metric reflected greater than 30 days would you go

10   back and revisit that and provide updated data if you had the

11   opportunity?

12   A    I think I wouldn't do that.  I think the agency could take

13   a look at that and the agency could share that information.

14   I'm not sure it would make a material difference to the Special

15   Master's conclusions vis-á-vis that, but I think that's -- that

16   would be up to him to make that determination through

17   discussion with the agency.

18            MS. ELLS:  Thank you.

19            THE COURT:  All right.  Now may Ms. Tebrock be

20   excused?

21            MR. LEWIS:  Yes, Your Honor.  No further questions.

22            THE COURT:  Ms. Ells?

23            MS. ELLS:  Yes, Your Honor.  Thank you.

24            THE COURT:  All right.  You're excused.  You may step

25   down.

1          THE WITNESS:  Thank you.

2      (Witness excused.)

3          THE COURT:  All right.  Ms. Ponciano?

4          THE CLERK:  Ms. Ponciano, please come to the witness

5  stand, remain standing and raise your right hand.

6      (Witness duly sworn and takes the stand.)

7          THE WITNESS:  Yes.

8          THE CLERK:  Thank you.  You may be seated.  Please say

9  and spell your first and last name for the record.

10          THE WITNESS:  Angela Ponciano, A-N-G-E-L-A,

11  P-O-N-C-I-A-N-O.

12                ANGELA PONCIANO, WITNESS, SWORN

13                          EXAMINATION

14  BY THE COURT:

15  Q   Good afternoon, Ms. Ponciano.

16  A   Good afternoon, Your Honor.

17  Q   I have a few questions for you.  And these are within the

18  subject matter of psychiatric supervisors acting as line staff.

19      So to your knowledge, has CDCR tracked how the number of

20  patients seen by psychiatric supervisors providing direct

21  patient care affects staffing ratios?

22  A   It is not something that has been tracked specifically.

23  Q   Has there been an attempt to analyze how reliance on

24  psychiatric supervisors providing direct patient care would

25  affect staffing ratios?

1  A    When I became aware of the concern, I looked into the

2  number of contacts by supervisors to the specific levels of

3  care in which the staffing proposal was related to.  The

4  staffing proposal was related to the CCCMS and EOP ratios only.

5  And when the issue was brought to my attention after the report

6  was issued, I did look to see how many supervisor contacts were

7  being made.

8  Q    All right.  So when you say "The reporting," you're talking

9  about the Golding report?

10 A    Correct.

11 Q    And so when exactly did you first become aware of the

12 issue?

13 A    When I read the Golding report.

14 Q    And when was that?

15 A    October of 2018.

16 Q    '18.  All right.  And so you said you did look to see how

17 many contacts were being made by supervisors?

18 A    At the time the proposal was developed is that or after?

19 Q    Well, you said after the Golding report.

20 A    After the Golding report, yes.

21 Q    Isn't that what you said?

22 A    Yes.

23 Q    All right.  So when you say you looked to see, what did you

24 find?

25 A    Well, I looked to see in regards to the allegations in the

1   Golding report.  And what I found when it came specific to the
2   CCCMS and EOP levels of care, again, because that's what the
3   staffing proposal was focused on, I found that there were not
4   60 percent of supervisors carrying a full line staff caseload
5   for those levels of care.
6   Q   And did you put that in the form of a written report?
7   A   I did put it into a chart, yes.
8   Q   All right.  To whom did you provide that chart?
9   A   I provided it up my chain of command to my supervisors, and
10  then I also provided it to Gibson Dunn when I met with them.
11  Q   All right.  So when you say "Up the chain of command," just
12  so I'm clear, how does that work or how did it work in October
13  of 2018?
14  A   That would have been to Brittany Brizendine and Katherine
15  Tebrock.
16  Q   But then you also, when I asked for clarification, you
17  referenced the staffing proposal.
18  A   Correct.
19  Q   Did you also do an analysis that was relied on in
20  preparation of the internal document that served as the CDCR
21  staffing proposal?
22  A   After the fact I did.
23  Q   So after the fact?
24  A   Yes.
25  Q   After what fact?

1    A    When I became aware of the concern about supervisors, I

2    looked to see if I was to remove supervisor contact from the

3    data, again, provided just two of the initiatives in the

4    proposal.  The staffing proposal had numerous initiatives and

5    the data set in question in regards to the supervisor was only

6    related to two sections of the staffing proposal.  And so when

7    it was just specific to that staffing proposal, had I not

8    included supervisors -- because the point of the report was

9    really to look at the frequency that patients were being seen.

10   The staffing model had an assumption back in 2009 that patients

11   at the CCCMS and EOP levels of care would be seen one and a

12   half times every 90 or 30 days, and so really was looking at

13   what the patient needs were and the frequency of the patient

14   contacts, not necessarily who was doing the contacts.  It was

15   about the patient needs to see the frequency because the

16   proposal was to change the one-and-a-half times assumption

17   that's used to calculate the ratio.

18   Q    So what I'm trying to understand is you described an

19   analysis you performed after reading the Golding report.

20   A    Correct.

21   Q    Did you do a second analysis also after, a separate,

22   distinct analysis?

23   A    So if I removed the supervisor contacts, it would have been

24   under --

25   Q    Just --

1   A    I'm sorry.

2   Q    Just yes or no.

3   A    Yes.

4   Q    I can't tell if I'm hearing you describe two separate

5   analyses.

6   A    Yes.

7   Q    All right.  So you've already described one to me that you

8   undertook after reading the Golding report.

9   A    Yes.

10  Q    So just clarify for me the second analysis, when did that

11  occur -- when did that occur compared to the analysis you've

12  already described?

13  A    The second analysis occurred later.  That occurred earlier

14  this year when there were subsequent orders regarding this

15  issue and whether or not new data would or should be provided

16  that had been provided previously.

17  Q    All right.  So that was in 2019?

18  A    Yes.

19  Q    And what was the result of that analysis?

20  A    The result of that shows that it would have been

21  underreporting the frequency of contacts for the EOP and CCCMS

22  levels of care, which was the analysis used to propose and

23  where we landed going from assumption and building of ratios of

24  patients being seen one and a half times to patients being seen

25  one and a quarter times, but --

1    Q    So specifically what would have been underreported?

2    A    So where -- what the reports show is that for the CCCMS

3    patients, they were being seen on average 1.07 times every 90

4    days.  Had I removed the supervisor contacts, it would have

5    shown that they were being seen .98 times every 90 days, which

6    would have been an underreporting.

7    Q    All right.  Do you know was the result of that latter

8    analysis shared with the Court in any way?

9    A    No.

10   Q    Was it shared with the Special Master?

11   A    No.

12   Q    Or any member of the Special Master's team?

13   A    No.

14   Q    At any point in time did you discuss with the Special

15   Master how the use of psychiatric supervisors to perform direct

16   patient care was affecting CDCR's ability to comply with the

17   2009 staffing plan?

18   A    No.  We have not had those discussions yet.

19   Q    When do you plan to?

20   A    We plan to have them in the near future.  It is one of the

21   items that was delegated to the Special Master.  The Special

22   Master's team has been in headquarters and we've been working

23   on a number of issues, and that is on the list to discuss.

24   Q    Is there a reason that you have not previously raised the

25   issue with the Special Master?

1   A   May I ask what issue?

2   Q   The results of your analyses, for example.  Any issues

3   related to the use of psychiatric supervisors performing direct

4   patient care and how that affects compliance with the 2009

5   staffing plan?

6   A   So, Your Honor, I don't believe it's an issue.  I believe

7   that when -- for all classifications, when you have a vacancy,

8   when you have a line staff member out on vacation or leave,

9   that when you have that void, supervisors will come in and fill

10  in on some of the work.  I also -- in the program guide it

11  specifically states in the crisis bed level of care that the

12  supervisors will see patients.  And I --

13  Q   You think is there a tipping point?  If supervisors spend a

14  certain percentage of their time does it go beyond their

15  filling in, as you say?

16  A   So I think that the priority is the patient care.  And then

17  I think from there what you see as positions or vacancies are

18  filled then the supervisor's work begins to decrease.

19  Q   Right.  But, still, is there a way to know when the filling

20  in has gone too far, in your view?  If a supervisor is spending

21  30 percent of his or her time filling in, is that beyond --

22  A   I haven't done an analysis to determine how that impacts

23  the supervisor's other responsibilities.

24  Q   Do you, in your own mind, see a certain percentage of time

25  beyond which, that is, beyond what is contemplated by the

1    staffing plan?

2    A   Well, what I have seen is in the analysis that I completed

3    and provided to Gibson Dunn, what that chart shows is that

4    there's actually one supervisor at one institution that had the

5    highest caseload, and that individual was spending about 50

6    percent of his or her time seeing patients.  At that point that

7    institution had about a 52 to 55 percent vacancy rate.

8        I reran the same data for the spring of 2019, and that

9    supervisor is no longer seeing patients and is at an 83 percent

10    fill rate.  So for approximately a year and a half, that

11    supervisor spent a portion of his or her time filling in behind

12    the line staff and then once he was able to fill positions is

13    no longer spending that same time.

14    Q   So it would have been a concern if it continued beyond that

15    period of time?

16    A   I think it would be a concern, yes.

17    Q   So the Court has been receiving errata.  Are you familiar

18    with the errata or corrections that the Court has been

19    receiving in the last week, two weeks?

20    A   I'm not.

21    Q   All right.  So you're not involved in preparing those for

22    the Court?

23    A   No.

24    Q   All right.  So during your work with CDCR Mental Health,

25    has any person ever directed you to manipulate data for any

 1  purpose --

 2  A    No.

 3  Q    -- related to remediation in Coleman?

 4  A    Sorry.  No.

 5  Q    Have you ever directed anyone else to manipulate data?

 6  A    No.

 7  Q    Has any person ever directed you to provide misleading data

 8  to the Special Master?

 9  A    No.

10  Q    Has any person ever directed you not to correct misleading

11  data that you knew had been presented to the Court --

12  A    No.

13  Q    -- to the Special Master?

14  A    No.

15  Q    And have you ever played a role in telling someone not to

16  correct inaccurate data presented to the Court --

17  A    No.

18  Q    -- or the Special Master?

19  A    No, Your Honor.

20  Q    Have you ever agreed that incorrect information could be

21  filed with the Court?

22  A    No.

23  Q    Do you think there's a margin of error that could be

24  applied to Coleman data reporting, that is, as long as the

25  number is within a certain percentage one way or the other

Ponciano - Exam by Ells

1  that's still accurate?

2  A   I'm not involved in the details of the data reporting.

3  That's really not what I'm over, so I don't make those

4  decisions or have any part of that or determining if there is a

5  percentage.

6         THE COURT:  All right.  Those are my only questions at

7  this point in time.

8         Ms. Ells?

9         MS. ELLS:  Thank you, Your Honor.

10                        EXAMINATION

11  BY MS. ELLS:

12  Q   Good afternoon, Ms. Ponciano.

13  A   Good afternoon.

14  Q   I believe that you were just discussing with the Court an

15  analysis you performed in 2019 where you looked at whether or

16  not there had been underreporting of frequency of contacts, and

17  you describe that you found there had been for the CCCMS

18  population and it went, and correct me if I'm wrong, from 1.07

19  to .98 times per every 90 days when you took out the

20  supervisors; is that right?

21  A   Correct.  So for the purpose of the report in regards to

22  the actual frequency of patients being seen, which was the

23  purpose of the report, for that portion of the proposal, and

24  when you remove the supervisor contacts, yes, it decreases the

25  frequency, which is underreporting if you don't include the

1    supervisors.

2    Q    Okay.  Did you perform a similar analysis for EOP patients?

3    A    I did.  I don't recall how it changed it, but it decreased

4    it as well.

5    Q    Okay.  So you found that there had been some degree of

6    underreporting with respect to the EOPs as well?

7    A    No.

8         MS. GARSKE:  Objection, misstates testimony, Your

9    Honor.

10        THE COURT:  Sustained.  As the --

11   BY MS. ELLS:

12   Q    My understanding is that you said that the -- what

13   terminology would you use for the change that occurred when you

14   studied the EOP population and took out the portion of the

15   contacts that were conducted by supervisors?

16   A    Had I not included supervisors like I did --

17   Q    Right.

18   A    -- I provided a report that included all contacts, which I

19   believe is the accurate report to provide for the proposal.

20        If I was to have removed the supervisor contacts and then

21   provided that report to everybody, I would have been

22   underreporting.

23   Q    So the number would have gone down?

24   A    Correct.

25   Q    Okay.  So you provided -- so -- but you have not provided

1    that analysis to the Special Master or plaintiffs or the Court?

2    A    No.

3    Q    And you didn't bring it with you today?

4    A    No.

5    Q    And you also produced some data to the neutral expert

6    during the investigation, and that's a separate pot of data

7    than what you're talking about today, right?

8    A    Correct.

9    Q    Okay.  Or so far.

10        All right.  So for that -- for that data, you included an

11   ad hoc analysis of November 2017 through March 2018, and you've

12   included a chart.  And I'm going to provide that to you so that

13   we can talk about it.  This is Plaintiffs' Exhibit 201.

14        And could you please turn to what's marked at the bottom as

15   page 81?  This is the Gibson Dunn neutral expert report that

16   was filed with the Court, ECF 6147.  Is this the chart that you

17   provided?

18   A    Yes, it is.

19   Q    So this chart only shows 20 prisons; is that right?

20   A    Correct.

21   Q    What happened to the other 15?

22   A    So this chart shows all of the prisons that a supervising

23   psychiatrist or chief psychiatrist had a contact with a CCCMS

24   or EOP level of care.

25   Q    So you're saying that for the 15 prisons that are not

1   included, there were zero supervisory contacts performed in

2   this time period?

3   A    For CCCMS and EOP levels of care, yes.

4   Q    And so that's true even though --

5   A    Excuse -- may I correct myself?

6   Q    Sure.

7   A    I apologize.

8        The other thing to understand is this is specific to

9   initial and routine contacts.  It does not include IDTTs and

10  it -- because the staffing proposal and the data related to the

11  staffing proposal was specific to CCCMS, EOP initial and

12  routine contacts, this analysis matches that same report.

13  Q    Okay.  So even though there were EOP programs at multiple

14  institutions not included in this chart, which also had

15  supervisory staff at work, none of those places had any

16  supervisory contacts during this time frame?

17  A    When I ran the supervisor's name, which is how we did this

18  report because we know EHRS is not reliable, we ran by

19  supervisor name and by this specific type of contact and no,

20  there were none in the EHRS system.

21  Q    Okay.  And is every contact captured in the EHRS system

22  that you're aware of?

23  A    As long as it's entered by the provider.

24  Q    And is it uncommon for people not to enter contacts?

25          MS. GARSKE:  Objection, calls for speculation.

Ponciano - Exam by Ells

1    BY MS. ELLS:

2    Q    Are you aware whether or not it occurs with any frequency

3    that appointments are not entered into the system properly in

4    EHRS?

5              MS. GARSKE:  Objection, calls for speculation.

6              THE COURT:  Just answer yes or no.  Overruled.  Are

7    you aware?

8              THE WITNESS:  I have been told.  I have not

9    independently observed that.

10   BY MS. ELLS:

11   Q    But you've been told that?

12   A    Yeah.

13   Q    I'd like to talk to you briefly about the tracking of

14   supervisors acting as the line staff.

15        I believe you've testified that there is no mechanism to do

16   that right now in EHRS; is that correct?

17   A    I believe what I said is it's not something we do do.

18   There's not a performance report in EHRS that allows accurate

19   reporting of that.  In order for me to develop a report, do an

20   ad hoc query, it takes multiple steps.  We do an ad hoc query

21   to pull down every contact and then I have a State

22   Comptroller's Office appointments report so I can verify the

23   name of the actual supervisor and that they are in the

24   classification of supervisor, and then I do a cross-reference,

25   and so I will run that individual's name.

1   Q    Okay.  And have you looked into creating a formalized
2   process rather than this ad hoc process for tracking these
3   contacts?
4   A    I have not.
5   Q    And have you ever evaluated how often supervisors engage in
6   other direct patient care, such as attending IDTTs, performing
7   medication reconciliations or any of those other direct patient
8   care duties?
9   A    I have not looked into that.
10  Q    Have you ever asked anyone if it's possible to create a
11  report that pulls all of the contact or other line staff duties
12  that are performed by supervisors, whether that's even
13  possible?
14  A    I haven't asked, but to my knowledge, because line staff
15  are able to change their title in the EHRS system to
16  supervisor, to my knowledge I don't believe it's possible, as
17  long as that is able to occur.
18  Q    So people are just allowed to change their title to pick
19  anything they want?
20  A    That's my understanding.
21  Q    Okay.  And do you have any -- a mechanism available to
22  track whether patients are assigned to a supervisor as their
23  primary psychiatrist?
24  A    Not that I'm aware of.
25  Q    Okay.  And have you ever made any phone calls to

1  institutions to find out how often that is occurring?

2  A   No, I have not.

3  Q   Have you conducted any survey to ask them -- knowing that

4  you're aware that not all contacts are captured in EHRS, have

5  you ever tried to conduct a survey or do anything else to

6  actually directly engage with the institutions to find out that

7  information?

8  A   I did not.  And because the proposal -- the one initiative

9  in the proposal was just specific to that one-and-a-half-time

10 assumption, which was even more specific to the routine

11 contacts, that was what we were analyzing to verify against the

12 staffing proposal.  So, no, I did not look at those other

13 things.

14 Q   And you were largely responsible for the design and

15 development of the 2018 staffing proposal, right?

16 A   Yes.

17 Q   And that proposal ultimately would have resulted in cutting

18 79 line psychiatry positions system-wide, which is

19 approximately 20 percent?

20 A   Correct.

21 Q   And if that had happened and been ordered by the Court,

22 that would have put CDCR in compliance with the prior court

23 orders requiring a 90 percent fill rate, correct?

24 A   As I recall, based on the allocating numbers and filled at

25 that time.  As you know, they change frequently, so at that

1  time, yes.

2  Q    So the numbers in that proposal, did you come up with those

3  numbers?

4  A    Which numbers?

5  Q    The numbers in the proposal of reductions.  Numbers of

6  staff to be reduced that were presented in those -- in that

7  staffing proposals.

8  A    Well, those were calculated based on the change in the

9  assumptions and methodologies.

10  Q    So did you do that calculation?

11  A    Yes.

12  Q    So you provided those numbers.  And so Dr. Golding was the

13  chief of psychiatry.  Did you ask him if he felt like

14  reductions of those numbers and magnitude would allow for the

15  system to provide constitutionally adequate patient care?

16  A    In my discussions with Dr. Golding in regards to the

17  staffing proposal, they were specific to his input and/or

18  agreement on the changes of the methodologies and assumptions.

19  Whatever the bottom line number was going to be, if we all

20  agreed that the assumptions and the methodology used back in

21  2009 no longer applies today, the calculation of the bottom

22  number is what it is based on the change of those

23  methodologies.

24  Q    But did you ever provide him those numbers and ask if he

25  thought that psychiatrists across the system could provide

1    adequate patient care with those kinds of reductions?

2    A    I don't know that I asked specifically.  He has stated to

3    me previously that he thinks we have too many psychiatrists.

4    Q    Interesting.  Okay.  You might not be surprised to hear

5    that he does not currently hold that position.

6         So Dr. Golding, did you actually send him ever the copy of

7    the staffing proposal in any iteration?

8    A    No.  That's -- Michael or Dr. Golding does not report to

9    me.  I'm not his supervisor, so --

10   Q    Okay.  But during the development of this process, you did

11   not provide the head of psychiatry for the department with the

12   actual proposal to reduce 20 percent of his staff, the

13   allocations of 20 percent of his staff?

14   A    So my portions of the proposal I submitted to my boss,

15   which is what I'm responsible to do, and then we have the

16   internal discussions, so that proposal, to my knowledge, was

17   shared because I later was in a meeting with Dr. Golding and

18   Dr. Kuich in which we talked about each of the initiatives in

19   the proposal.

20   Q    But you never provided it to him?

21   A    I did not.

22   Q    Okay.  And your direct supervisor is Dr. Brizendine?

23   A    Dr. Brizendine and then Katherine Tebrock was.

24   Q    So you had meetings during the development of this proposal

25   with Dr. Brizendine and with Ms. Tebrock; is that correct?

1    A    Yes.

2    Q    And you didn't bring in Dr. Golding.  Did you bring in

3    Dr. Kuich at that point during the development of the proposal?

4    A    No.  I you spoke to Dr. Kuich in the development of the CIT

5    portion of the proposal.

6    Q    And that's the proposal where there would be a reduction in

7    crisis intervention staff and a replacement of those staff with

8    eight telepsychiatrists to perform on-call work for the entire

9    system.  Is that what you're referring to?

10   A    Correct, but it wasn't for the entire system, but yes.

11   Q    Okay.  And that number eight, did you come up with that

12   number?

13   A    It was a suggested number, yes.

14   Q    You mean you were --

15   A    Yes.  I suggested the number.

16   Q    Okay.  So you came up with that number.  Did you perform

17   any analysis before you --

18   A    I had a discussion with Dr. Kuich.

19   Q    Did you ever have another --

20        THE COURT:  One at a time.

21        MS. ELLS:  Pardon me.

22   BY MS. ELLS:

23   Q    Did you propose that number to Dr. Kuich?

24   A    I don't recall if that's the specific number.  I recall

25   having a discussion with him about this and asking specifically

1   how many institutions the current provider was covering at that

2   time, which he informed me that it was six.  And he and I

3   talked about could that increase to more; how many nights per

4   week that person was working if we were to add more and, you

5   know, just kind of six or seven times, eight, and how many

6   nights per week.

7       But also part of that discussion was we would be able --

8   how many would we be able to hire?  At that time telepsychiatry

9   had been advertising for that nighttime shift and really had

10  not been receiving a lot of applications.

11      So part of that discussion was, you know, how about eight.

12  Let's do the math.  How many nights per week, how many

13  institutions.  In addition, the on-site staff have a right

14  to --

15  Q   Could I just follow up --

16  A   Yes.

17  Q   -- on a portion of what you said?

18          MS. GARSKE:  Your Honor, may I --

19          THE COURT:  You're at 15 minutes.

20          MS. GARSKE:  -- request that the witness be allowed to

21  answer, not be interrupted?

22          THE COURT:  Well, it's been a two-way street.

23          MS. GARSKE:  Well, just this last portion, Your Honor.

24  I think --

25          THE COURT:  Okay.  Well, you need to not talk over

 1    me --
 2              MS. GARSKE:  I'm sorry, Your Honor.
 3              THE COURT:  -- while you're at it.
 4              MS. GARSKE:  I'm sorry.
 5              THE COURT:  You're at 15 minutes, and I didn't even
 6    take my time.
 7              MS. ELLS:  I need about 2 minutes --
 8              THE COURT:  All right.
 9              MS. ELLS:  -- is that acceptable?
10              THE COURT:  If it's focused questions and just answer
11    the question --
12              THE WITNESS:  Yes.
13              THE COURT:  -- no narrative.  All right?
14    BY MS. ELLS:
15    Q    So you proposed the number eight to Dr. Kuich?
16    A    I believe so, yes.
17    Q    And part of your reason for picking that number is you were
18    concerned that you couldn't hire more than eight?
19    A    Both of our concerns.
20    Q    Did Dr. Kuich -- did you provide some data analysis to
21    Dr. Kuich that he could look over and think about before he got
22    back to you as to whether or not eight was an appropriate
23    number?
24    A    No.  He and I sat together and talked and discussed the
25    math.

1    Q    Did you pull him out of a meeting when he was meeting with

2    other people to discuss that math with him?

3    A    I don't recall that.

4              THE COURT:  That's more than two questions.

5              MS. ELLS:  That's it.  Thank you, Your Honor.

6              THE COURT:  All right.  Ms. Garske?

7              MS. GARSKE:  Yes, Your Honor.

8              THE COURT:  All right.  You may proceed.

9                              EXAMINATION

10   BY MS. GARSKE:

11   Q    Ms. Ponciano, we've talked a lot about topics and I'd like

12   to bring you back to the 79 positions that were being proposed

13   to be cut under the 2018 staffing proposal.  Are you familiar

14   with how that breakdown was identified in the proposal?

15   A    Yes.  I -- yes.  I have a recollection of that breakdown.

16   Q    And we talked about there was a number 8 for

17   telepsychiatrists.  Was that part of the 79 positions that was

18   involved -- that was proposed to being cut?

19   A    No.  Those positions would remain.

20   Q    And how many would the eight telepsychiatry positions

21   impact the 2018 staffing proposal?

22   A    The original proposal was to reduce all of the positions

23   allocated for crisis intervention.  The 2009 staffing model

24   allocated a half-time PY specific to covering weekends and

25   holidays for crisis intervention.  And nine years later we knew

1  it was not implemented as assumed or proposed in the 2009

2  staffing model.

3       After further discussions of trying to help with retention

4  and assist on-site staff with on call and sort of a pilot of a

5  nighttime telepsych provider who was helping some of the

6  institutions, there were discussions about holding back some of

7  that original reduction of the CIT positions to staff more of

8  the nighttime telepsych, to assist with on call and help with

9  retention.

10 Q   And was it your understanding and belief that Dr. Golding

11 and Dr. Kuich was supportive of that proposition?

12 A   Yes, it was.  We -- I spoke with Dr. Kuich.  He was the

13 chief of telepsychiatry at the time, and that's who this would

14 impact.  And what we discussed is we weren't sure if eight was

15 the right number.  We knew there was no magic to come up with

16 that number.  We wanted to keep positions aside for that and we

17 both had a concern of whether or not we would be able to fill

18 all of those nighttime positions.

19      And we also discussed if we were able to fill them and we

20 needed more, we would be able to augment that and provide more

21 positions.  So it was never an eight or nothing and no change

22 going forward.  It was a proposal.

23 Q   Did Dr. Golding ever tell you it was ridiculous to consider

24 only eight telepsychiatrists to cover the state?

25 A   No, he did not.

1  Q    How many line psychiatrists were being proposed cut in that

2  total number of 79 in the 2018 staffing proposal?

3  A    All 79.

4  Q    Of those 79 --

5         THE COURT:  Can you pull the microphone closer to you?

6         MS. GARSKE:  Sure.

7  BY MS. GARSKE:

8  Q    Of those 79, how many would have those supervising care for

9  the CCCMS and EOP patient level of care?

10  A    The number specific to changing from a one-and-a-half-time

11  assumption to one-and-a-quarter-time assumption was

12  approximately 25 of the 79.

13  Q    And was that number discussed with Dr. Golding and

14  Dr. Kuich?

15  A    That number was provided to everybody in one of the all

16  parties workgroups.

17  Q    And when you say "everybody," who are you referring to?

18  A    The plaintiffs, the Special Master team and the mental

19  health, headquarters leadership team that attended the

20  workgroups, including Dr. Golding.

21  Q    At any time during those meetings did anyone ask you

22  whether or not it was the issue of -- having senior

23  psychiatrists performing line work was an issue with regard to

24  the data that you were providing?

25  A    No.  It was never raised in the work-up discussions.

1   Q   Did you ever discuss or infer to anybody that the data that

2   you provided in the 2018 staffing proposal was only line

3   psychiatrists?

4   A   No.

5           MS. GARSKE:  I'm going to refer Court and counsel to

6   the Joint Exhibit O.

7   BY MS. GARSKE:

8   Q   I believe it's in a binder that's available.  Is there a

9   binder there, Ms. Ponciano?

10  A   Yes.

11  Q   Okay.  Do you have it there in front of you?

12  A   I do.

13  Q   Do you recognize what's been marked as Joint Exhibit O?

14  A   I do.

15  Q   And what is it?

16  A   This would be the staffing proposal as to where we were in

17  negotiations in June of 2018.

18  Q   And this is the document that was provided to the

19  plaintiffs and the Special Master?

20  A   Yes.

21  Q   And this is the document that you helped prepare?

22  A   Yes.

23  Q   And does it fairly and accurately depict the 2018 staffing

24  proposal as it was submitted to the Special Master and the

25  plaintiffs?

1   A    Yes.  This was before the final with additional

2   negotiations, but, yes, this is where we were at that time.

3            MS. GARSKE:  Your Honor, we would request to move

4   Joint Exhibit O into evidence.

5            THE COURT:  Any objection?

6            MS. ELLS:  No, Your Honor.

7            THE COURT:  All right.  O is admitted.  It's filed on

8   the Court's docket.

9        (Joint Exhibit O admitted in evidence.)

10           MS. GARSKE:  Thank you, Your Honor.

11  BY MS. GARSKE:

12  Q    Ms. Ponciano, I'd like to refer you -- we've talked a lot

13  about the data and the reporting and the underreporting that

14  you were looking at, and I would like for you to turn to page

15  32 of Joint Exhibit O.  What is this document?

16  A    This document was specific to the initiative in the

17  staffing proposal in which the assumption in the 2009 staffing

18  model is that EOP patients would be seen by their psychiatrists

19  one and a half times every 30 days.

20       This report is specific to the frequency of the patients

21  being seen.

22  Q    Does the impact of the frequency in your mind when you

23  prepared this report have anything to do with who was seeing

24  them?

25  A    No.

1    Q    Why not?

2    A    This was specific to identifying what the patient's needs

3    were and determining whether or not they actually were in line

4    with the 2009 assumption.

5         So if the patients are scheduled -- excuse me -- are

6    scheduled to be seen every 30 days, this shows if they actually

7    are being seen one and a half times every 30 days regardless of

8    who they're being seen by, because we didn't believe that

9    psychiatrists were scheduling to see their patients one and a

10   half times in the 30 days.  That would be something that they

11   would have to initiate themselves.  We didn't know that that

12   was the needs of all of the CCCMS or EOP patients, so it was

13   really about focusing on the patient need.

14   Q    And you performed the same type of analysis for the EOP

15   patient level care?

16   A    This is the EOP.  I think page 31 is the CCC.

17   Q    Oh.  I apologize.  You're right.  I'm looking at the ECF

18   number.  So before I was asking about the EOP.  You performed

19   the same level of care for the CCCMS level of care, correct?

20   A    Yes.

21   Q    Okay.  And you had indicated that if you had removed the

22   contacts being done by the senior psychiatrists, it would have

23   decreased the frequency rate.  Why was that a concern?

24   A    That was a concern because we were in negotiations and when

25   we discussed this data in the workgroups and we showed that for

1 the CCCMS it was an average of 1.07 times every 90 days and

2 even a little less for the EOP, every 30 days, even though the

3 negotiations where we landed was developing the calculation,

4 including a ratio, an assumption of 1.25 times, so one and a

5 quarter times. So that's even left a little bit of a buffer

6 for some extra contacts that may need to occur.

7      If we would have removed the supervisor, the number that we

8 would have been negotiating with would have started even lower

9 because the initial proposal was to make the assumption in line

10 with the program guide, which is just the one time. By showing

11 the actual frequency, we landed a little bit higher.

12 Q    Okay. And earlier we talked about this issue of promoting

13 oneself in the EHR system. What do you mean by promoting

14 yourself?

15 A    So to my knowledge, I'm not an EHRS expert, but from what I

16 understand, in order for a psychiatrist to prescribe a

17 nonformulary medication, the system was developed with the

18 ability for a psychiatrist to change their title to a

19 supervisor in order for that medication to be prescribed.

20 Q    Before Dr. Golding issued his October 2018 report, did he

21 ever come to you and indicate that he had concerns with the

22 data that you prepared -- for the CCCMS level of care and the

23 EOP level of care that were used to support the 2018 staffing

24 proposal?

25 A    No, he did not.

1    Q   Ms. Ponciano, did you knowingly submit false data to the

2    Court in an attempt to comply with the Court's order?

3    A   No, I did not.

4            MS. GARSKE:  Your Honor, at this time I have no

5    further questions for Ms. Ponciano.

6            THE COURT:  All right.  Do you have any follow-up

7    questions, Ms. Ells?

8            MS. ELLS:  Yes, just about two to three minutes.

9            THE COURT:  All right.

10                           EXAMINATION

11   BY MS. ELLS:

12   Q   So Ms. Ponciano, I want to talk a little bit more about the

13   charts that you were just discussing at pages 31 and 32 of

14   Joint Exhibit O.  So these charts show how often contacts

15   occurred; is that correct?

16   A   Correct.

17   Q   Now, the system was staffed at about 73 percent of

18   psychiatry at this point.  Is it possible that people needed to

19   be seen more often than this but there simply weren't enough

20   staff to do it?

21   A   That was part of our discussion in our workgroups, in our

22   negotiations, and where he landed at the 1.25.

23   Q   So it is possible that they needed to be seen more

24   frequently than this but that there simply weren't sufficient

25   numbers of psychiatrists to see them?

1    A    Correct, which is why we agreed to the 1.25.

2    Q    And so you don't actually know how many of these -- you

3    don't know -- .94 on page 32, you don't know how much that went

4    down when you reran that data without the -- without the

5    supervisors, right?

6    A    I don't recall.

7    Q    Okay.  Could you flip to page 30 of that same exhibit?  So

8    this is a chart called "Timely psychiatry contacts from 10/1/17

9    through 3/31/18 for main line CCCMS."  And this reports on how

10   timely psychiatry contacts were occurring; is that correct?

11   A    Yes.

12   Q    And included in this is all of the supervisory contacts,

13   correct?

14   A    It should include -- this is a performance report off of --

15   this was not an ad hoc query.  This is based off of the -- this

16   is a performance report.

17   Q    So any contributions from supervisory staff would count

18   towards this compliance rate, correct?

19   A    I believe so.

20        MS. ELLS:  Thank you.

21        THE COURT:  All right.  May this witness be excused,

22   Ms. Ells?

23        MS. ELLS:  Yes, Your Honor.

24        THE COURT:  Ms. Garske?

25        MS. GARSKE:  Yes, Your Honor.

1    THE COURT:  All right.  You're excused, ma'am.  You

2  may step down.

3    (Witness excused.)

4    THE COURT:  We're going to take a short break just to

5  get the video set up, and then we'll have Dr. Rekart on the

6  line.

7    (Recess at 2:23 p.m. to 2:33 p.m.)

8    THE COURT:  All right.  We're back on the record.  We

9  have Dr. Rekart on the video monitors.

10    Dr. Rekart, you can hear us?

11    THE WITNESS:  Yes, I can.

12    THE COURT:  All right.  Can plaintiffs see Dr. Rekart

13  on their video monitor?

14    MS. ELLS:  Yes.

15    THE COURT:  All right.  And defendants?

16    MR. FISHER:  Yes, Your Honor.

17    THE COURT:  All right.  So I'm going to have

18  Ms. Schultz swear Dr. Rekart.  Ms. Schultz, can you -- are you

19  able to communicate with Dr. Rekart?

20    THE CLERK:  Yes, Your Honor.

21    THE COURT:  All right.

22    THE CLERK:  Doctor, please stand and raise your right

23  hand.

24    THE COURT:  You can remain seated, how about that.

25    THE WITNESS:  Okay.

1    (Witness duly sworn and takes the stand.)

2        THE WITNESS:  Yes, I do.

3        THE CLERK:  Thank you.  You may put your hand down.

4        Please say and spell your first and last name for the

5    record.

6        THE WITNESS:  It's John Rekart, J-O-H-N, R-E-K-A-R-T.

7            JOHN REKART, WITNESS, SWORN

8                EXAMINATION

9    BY THE COURT:

10   Q    All right.  Dr. Rekart, I know you can see me.  I can see

11   an image of what you can see.  I don't think the way the camera

12   is set up that there's eye contact, but you can see and hear

13   me?

14   A    Yes, I can.

15   Q    All right.  I am going to ask you several questions in the

16   general subject area of the "appointments seen as scheduled"

17   indicator.  You know what I mean when I reference that?

18   A    Yes, I do.

19   Q    All right.  What role did you have in the development of

20   the "appointments seen as scheduled" indicator?

21   A    None.

22   Q    When did you learn that it had been developed incorrectly?

23   A    Sorry.  I think the premise of the question I'm having a

24   hard time with.  I don't think it was developed incorrectly.

25   Q    All right.  What would you say?  Was it changed at some

1    point?

2    A    I think it was functioning as it was designed, from what I

3    can read from the business rules.

4    Q    All right.  At all points in time, say from 2015 to

5    present?

6    A    To be honest, I didn't look at that very frequently.  It

7    wasn't a very important measure, as far as I was concerned.

8    Q    And why is that?

9    A    It was a measure that was designed for the chiefs of mental

10   health to help with their resourcing as basically kind of an

11   indicator that was supposed to help them get a sense of how

12   their schedulers were doing.

13   Q    Was it not also shared at some point with the Special

14   Master, the information generated using the indicator?

15   A    I don't know.

16   Q    When did you learn that there was some dispute about that

17   the "appointments seen as scheduled" indicator was accurate?

18   A    It might have --

19       I'm sorry.  Can I ask the Court a clarifying question?

20   Q    You may.  I can decline to answer.

21   A    Okay.  Are you talking about the description or the

22   indicator itself?

23   Q    Well, why don't you respond in a way that helps me

24   understand your position?

25   A    Oh, okay.  I think I heard about it possibly after the

Rekart - Exam by The Court

1    Golding report came out. And the only thing that I'd heard was
2    incorrect was that it had -- the description had not been
3    updated to reflect the changes of elements outside of the
4    institution's control.
5    Q    And do you believe it should have been updated?
6    A    Yes.
7    Q    And do you understand why it was not?
8    A    From what I heard, it was just an oversight.
9    Q    All right. I'm just being -- is there a court reporter in
10   the room with you?
11        COURT REPORTER: Yes, there is. I am here.
12        THE COURT: Why is there a court reporter there? Who
13   arranged for a court reporter?
14        MR. FISHER: I think that was an oversight on our
15   part. We didn't intend to arrange for a court reporter. We
16   just intended to arrange for --
17        THE COURT: I'm sorry. I was not realizing. I don't
18   see that person, but I now see on the table. There's only one
19   official court record, and that's being created by this Court.
20        MR. FISHER: Yes, Your Honor.
21        THE COURT: Can I direct the court reporter to cease
22   and --
23        MR. FISHER: Yes.
24        THE COURT: -- leave the room?
25        MR. FISHER: Yes, ma'am.

1    COURT REPORTER:  Yes.  Yes, your Honor.

2    THE COURT:  I'm sorry there's some misunderstanding,

3  but we have a court reporter who's able to see and hear, and we

4  can only have one record, as I'm certain you appreciate.

5    COURT REPORTER:  Yes, Your Honor.  I'll be glad to.

6    THE COURT:  All right.  We'll give you a moment to

7  depart.

8    COURT REPORTER:  Thank you.

9    THE COURT:  Is there anyone else in the room with you,

10  Dr. Rekart?

11    THE WITNESS:  No.

12    COURT REPORTER:  I need to make two trips.

13    THE COURT:  All right.

14    COURT REPORTER:  Thank you.  All clear.  Thank you.

15  BY THE COURT:

16  Q   All right.  So now, Dr. Rekart, there's no one else in the

17  room?

18  A   There's no one else in the room.

19    THE COURT:  All right.  And to the extent there's any

20  issue about any record that was being created, that is

21  disregarded in its entirety.  This Court is creating the record

22  of this proceeding.

23    MR. FISHER:  Yes, Your Honor.

24  BY THE COURT:

25  Q   So we were talking, Dr. Rekart, about the description.  You

1    made a distinction between the indicator and a description and

2    you thought that was, in fact, inaccurate.  Do I have that

3    correct?

4    A    Yes.  It failed to note that events beyond their control

5    were not counted as a missed appointment or a moved

6    appointment, I should say.

7    Q    And when you use the word "description," what exactly is

8    that applied to, in your mind?

9    A    It's the descriptor of the actual indicator.  And usually

10   it -- if it's a ratio, it talks about the denominator and

11   enumerator and what those mean and where the data points are

12   pulled from.  It's to help people reading it to understand what

13   they're looking at.

14   Q    And why was that description incorrect, do you know?

15   A    I think it -- I had heard, I think, from -- I'm not sure, I

16   think from Dave that it had just -- they had missed that step

17   in updating the description.

18   Q    And when you say "Dave," who do you mean?

19   A    David Leidner, sorry.  Dr. Leidner.

20   Q    And what "they" had missed.  Who's the "they"?  "They had

21   missed that step in updating the description."  Who's "they"?

22   A    You know, that's a good question.  I think it was either

23   Dave or sometimes Dave had help updating that.

24   Q    And where was that help residing?

25   A    Sometimes another one of my staff actually helped

Rekart - Exam by The Court

1   Dr. Leidner update those.

2   Q   Anyone else?

3   A   Not that I'm aware of.

4   Q   So once he became aware of the description being

5   inaccurate, what steps did you take to ensure it was correct?

6   A   This happened all without my awareness.  This -- I had

7   found out about all of this after the fact.

8   Q   Are you saying it was corrected by the time you found out

9   about it?

10  A   As far as I'm aware, yes.

11  Q   How do you know that it's been corrected if, in fact, it

12  has, or do you?

13  A   Yeah.  At that point I don't know factually.  I was told it

14  was.

15  Q   By whom?

16  A   I don't recall at this point.

17  Q   Do you know if any data reported using the incorrect

18  indicator was ever reported to the Special Master in the

19  Coleman case?

20  A   I'm not aware of that.

21  Q   Was any information using the incorrect indicator or

22  descriptor reported to the Court?

23  A   I'm not sure about that either.

24  Q   Do you have any indication that it was?

25  A   No, I don't.

1    Q    Do I understand correctly that you're one of two or you

2    were one of two CDCR Mental Health representatives to what some

3    people have been referring to as the CERNER committee?

4    A    Yes.  I was the business owner for mental health on the

5    deployment of the electronic health record.

6    Q    For what period of time?

7    A    I don't recall the dates, but it was pre-go live when they

8    were going into testing and some of development of the content

9    all the way through the completion of the adoption state-wide

10   and well into post -- where the project went from a project to

11   being maintenance and operations.

12   Q    So roughly what time frame, if you had to assign years to

13   it?

14   A    Oh, may be 2014 up through 20 -- up until I left in 2019.

15   Q    And when you say "business owner," what does that mean to

16   you?

17   A    Basically, the buck stopped with me about -- initially

18   trying to make sure that we had a very good adoption and that I

19   interfaced with CERNER and our -- the clinical advisory team

20   around decisions and relaying decisions that our team had made

21   about how to configure the system up through configuration of

22   the system post go live.

23        I also helped develop the training because we developed a

24   lot of content that was not in CERNER and as well as the

25   strategy for go live and implementation.  I had some help in

1    the design of that.  I mean, I was instrumental in the design

2    of that for the mental health department.

3    Q    So when you say "we," you at all times are referencing

4    yourself as a representative of mental health?

5    A    Yes.

6    Q    All right.  Were you the only quote/unquote business owner

7    for mental health on the CERNER committee?

8    A    I'm sorry.  I was up until they appointed Dr. Tebrock to

9    also be a business owner for psychiatry and we split that off.

10   Q    So as compared to psychiatry did you have a distinct

11   specialty?

12   A    No.  I -- for most of mental health minus psychiatry.  I

13   worked with Dr. Kuich very closely around the integration of

14   those requirements.

15   Q    As a member -- as a business owner for mental health on

16   that committee --

17   A    Yes.

18   Q    -- was it your responsibility to be certain that data being

19   collected for reporting to the Coleman court was maintained in

20   a way that would comply with Coleman court orders?

21   A    No.  That's a completely different committee.  That

22   committee was more of a change management committee that worked

23   with any changes to the electronic health record.

24   Q    With no implications for Coleman?

25   A    Not directly.  Indirectly, you know, it's the data on

1   the -- how the data is being collected on the front end, you

2   know, will affect how it's being reported on in the back end.

3   Q   Correct.  So couldn't that have implications for reports

4   made to the Court?

5   A   Yes, indirectly.

6   Q   But it was not -- if you were the business owner, why was

7   it not part of your profile to be alert to that issue?

8   A   Well, I was for -- so I spent a lot of time and we

9   developed a number of -- Dave Leidner and I and Laura Ceballo

10  developed a number of data flags to ensure compliance with the

11  workflow so that the -- it led to data integrity.  So the

12  biggest single threat to data integrity is workflow variation.

13  So we did a number of things, including analytics and sending

14  graphs out to the chiefs about compliance around data -- data

15  collection.

16  Q   And was the data collection for -- what was the purpose of

17  the data collection, as you understood it?

18  A   So, you know, primarily it's for the patient care and

19  patient safety, so access to care.  It was designed to try to

20  maximize and optimize access to care and patient safety and

21  with a mind to reporting on Coleman court requirements and the

22  program guide.

23  Q   Was the same database being used for reporting in the PLATA

24  case?

25  A   That -- it's the same domain, so, yeah, essentially it's

1    the same database.

2    Q    So were there separate programs written, if that's the

3    right language, to subsequent reports for Coleman specifically

4    as contrasted to PLATA?

5    A    Yes.  We had different dashboards and sometimes different

6    indicators.

7    Q    And was it your job to know what the differences were

8    between the two cases, in terms of reporting requirements?

9    A    Well, I didn't focus a lot on PLATA.  I was focused mainly

10   on the Coleman court requirements.

11   Q    So was it your job to get up to speed yourself, or was

12   someone telling you what was needed?

13   A    It was my job to get up to speed, but I also worked in

14   consultation with my superior, Laura Ceballos, and other

15   stakeholders in the case as well.

16   Q    All right.  And you said you didn't focus a lot on PLATA,

17   but you did some?

18   A    Right.  Well, I would sometimes attend the larger QM

19   meeting that medical had, and those indicators came up.  And

20   sometimes if there were different indicators and they had

21   different results, trying to work out why we had different

22   results, why we had different ways of measuring it.

23   Q    Comparing Coleman to PLATA?

24   A    Yeah.  But to be honest, for a large part of my tenure

25   between when I started there and roughly through go live

1    2017 -- no.  That was 2018 -- I was focused primarily on the

2    adoption of the electronic health record.

3            THE COURT:  All right.  I have no more questions at

4    this time.  Ms. Ells, are you questioning?

5            MS. TRAPANI:  Your Honor, I'm Cara Trapani.  I will be

6    questioning Dr. Rekart for the plaintiffs.

7            THE COURT:  I believe you can do it from there.  I

8    think the key is to use the microphone.

9            THE WITNESS:  I can hear her fine.

10           THE COURT:  Actually, she's going to come to the

11   podium, actually.  That's what our IT folks have directed.  All

12   right.  Ms. Trapani.

13                            EXAMINATION

14   BY MS. TRAPANI:

15   Q    Good afternoon, Dr. Rekart.  Can you hear me okay?  I'm

16   going to turn this monitor so now I can see you.

17   A    Yes, now I can.

18   Q    Excellent.  So as you were discussing with the Court, CDCR

19   has admitted that in 2016 the appointments in the scheduled

20   indicator methodology was changed.  You're aware of that,

21   right?

22   A    Yes.

23   Q    And when it was changed, it was measuring only four things:

24   The provider being unavailable, it measured that; the lack of

25   transport, it measured when that happened; it measured when a

Rekart - Exam by Trapani

 1   program was modified, and it also measured when appointments

 2   didn't happen due to technical difficulties.  Are you aware of

 3   all of that?

 4   A   Yes, vaguely.

 5   Q   And you just testified that you discovered that the

 6   definition for this indicator was not updated when those

 7   changes were made.  Is that accurate?

 8           MR. FISHER:  Objection, that does misstate the

 9   testimony.

10   BY MS. TRAPANI:

11   Q   I can rephrase my question, Dr. Rekart.

12           THE COURT:  All right.  Rephrase.

13   BY MS. TRAPANI:

14   Q   You testified to the Court that you became aware of the

15   definition of this indicator, the "appointments seen as

16   scheduled" indicator not being accurate after Dr. Golding

17   submitted his whistleblower report; is that true?

18   A   I believe so, yes.

19   Q   And you're aware that the indicator was defined between

20   2016 and later on before this was changed to show that it

21   measured all scheduled appointments, correct?

22   A   I believe that was the case, yes.

23   Q   And is it accurate to say no one caught this error until

24   Dr. Golding submitted his report?

25   A   I don't know --

1          MR. FISHER:  Objection, calls for speculation.

2    BY MS. TRAPANI:

3    Q   To your knowledge?

4          THE COURT:  Overruled.  You may answer based on what

5    you know.

6          THE WITNESS:  I don't know.

7    BY MS. TRAPANI:

8    Q   Was there any independent entity that was validating the

9    updates that would occur to these indicators --

10         MR. FISHER:  Objection, vague.

11         THE COURT:  Overruled.

12   BY MS. TRAPANI:

13   Q   -- to your knowledge?

14         THE COURT:  If you're able to answer, you may.

15         THE WITNESS:  I'm not sure what you mean by

16   "independent."

17   BY MS. TRAPANI:

18   Q   Was there a person or a committee that was reviewing

19   changes before they were made and before they affected the

20   entire system?

21         MR. FISHER:  Objection, vague as to time period.

22         THE COURT:  Well, let's talk specifically about

23   changes to the "appointments seen as scheduled" indicator.  So

24   construe the question in that way.

25         THE WITNESS:  Could you repeat it again, please.

Rekart - Exam by Trapani

1    BY MS. TRAPANI:

2    Q    It's true, isn't it, that no committee or person reviewed

3    the change made to the "appointments seen as scheduled"

4    indicator in 2016 when it was changed, no one reviewed that the

5    underlying definition was corrected; is that true?

6    A    I don't -- I'm not aware of that.

7    Q    Now, the neutral expert found in his report that there were

8    other problems with this "appointments seen as scheduled"

9    indicator other than the definition being incorrect, and I'd

10   like to ask you some questions about that.

11        The neutral expert found in his report that if a patient

12   checks -- if a psychiatrist checks a patient in and out during

13   an appointment, then that appointment would count for the

14   program guide compliance purposes; is that correct?

15             MR. FISHER:  Objection calls for --

16             THE WITNESS:  Yes.

17             THE COURT:  Overruled.

18   BY MS. TRAPANI:

19   Q    And based on that, is my understanding correct that

20   appointments that are neither rescheduled nor canceled can be

21   marked as having been seen as scheduled even --

22   A    No.

23   Q    -- if the appointments -- if I can --

24   A    I think you're conflating --

25             THE COURT:  Dr. Rekart, let her finish.

Rekart - Exam by Trapani

1          THE WITNESS:  Oh, I'm sorry.  Sorry.

2          MS. TRAPANI:  Thank you.

3          THE COURT:  Just start over and state the whole

4    question.

5    BY MS. TRAPANI:

6    Q    So is my understanding correct that appointments that are

7    neither rescheduled or canceled can still be marked as

8    compliant even if they occur late, so long as the patient is

9    checked in and out whenever they're seen?

10   A    Yes.  If the appointment is not moved or rescheduled, it's

11   a 1 in that indicator, I think.

12   Q    And you were aware that psychiatrists were experiencing

13   difficulties using the scheduling module in EHRS, correct?

14   A    Can you define "difficulty"?

15   Q    You were aware that psychiatrists were complaining about

16   using this scheduling module; isn't that right?

17   A    Yes, I was aware of that.

18   Q    And you were part of the team, as you just testified to the

19   Court, that created the EHRS and customized it for CDCR's use,

20   correct?

21   A    That's correct.

22   Q    And were there any headquarters psychiatrists involve in

23   the development and rollout of the EHRS?

24   A    Yes.

25   Q    How many?

Rekart - Exam by Trapani

1   A   At what time period?

2   Q   At any time period.

3   A   Probably anywhere from one to several.

4   Q   Can you be any more specific as to several?

5   A   When I left, I think that I had two psychiatrists that

6   worked for me in quality management and there were several --

7   one, two, three psychiatrists that worked for Dr. Golding, that

8   worked on our modified electronic health record.

9   Q   And when you were first rolling out the EHRS before go

10  live, were any psychiatrists helping you with development of

11  the EHRS at that time?

12  A   Yes.

13  Q   And was that Dr. Kuich who was helping with that?

14  A   Yes, it was.

15  Q   And were there other clinical staff from headquarters

16  involved?

17  A   Yes.

18  Q   And were those other staff people psychologists, for the

19  most part?

20  A   It depended on what -- the area of expertise we needed.  It

21  depended on who the stakeholder was.

22  Q   What do you mean by that?

23  A   For example, if we had to develop modules for or content

24  for a rec therapist, we connected with rec therapists and

25  looked at their current practice, their current state and what

1  they were trying to do along with other stakeholders in charge

2  of that area.

3  Q   And did Dr. Kuich, when he was working with you on the

4  EHRS, ever raise concerns to you about inefficiencies with the

5  scheduling module in EHRS?

6  A   I would say he -- initially he was very supportive of it

7  and then as we went live, he had gotten some feedback from the

8  field and, in particular, what he wanted -- so we had

9  created -- which I thought was going to be very helpful -- we

10 were able to, in the orders, put a lock on the requested end

11 date, which would prevent schedulers from scheduling past a

12 certain date, and those were based on the business rules in the

13 program guide.  And so what his issue was, was they wanted to

14 open that up so that psychiatrists could schedule beyond that

15 or request longer time frames.

16 Q   But you were aware, weren't you, that psychiatrists were

17 not using the scheduling module in EHRS as it was designed to

18 be used; isn't that right?

19 A   No.

20 Q   The neutral expert found that Dr. Ceballos was aware of

21 problems with scheduling and was attempting --

22 A   Yes.

23 Q   -- to address those problems through additional training;

24 is that accurate?

25 A   Yes.

1   Q   And you just --

2   A   They weren't always checking in and checking out.

3   Q   Did you provide any additional change to address that?

4   A   No.  That was -- I was -- that was psychiatry's purview.

5   Q   And you testified earlier that you would develop data flags

6   for situations where providers were not adhering to work flows?

7   A   Correct.

8   Q   Did any data flags apply to this situation with the

9   check-in and check-out functions that were being --

10  A   Yes.

11  Q   -- misused by psychiatrists?

12  A   I'm not going to say they were misused.  I'm just going to

13  say they're not compliant with the workflow.

14  Q   And you still never provided any training to the

15  psychiatrists in that regard to improve their use of the

16  system?

17  A   That was beyond my scope.

18  Q   I'd like to --

19  A   So we provided --

20          THE COURT:  Wait for the next question.

21          THE WITNESS:  Okay.  Certainly.

22  BY MS. TRAPANI:

23  Q   Thank you.  Given my limited time, I'd like to move along.

24  A   Sure.

25  Q   I'd like to ask you some questions now to the 2018 staffing

 1   proposal that was proposed by CDCR in the summer of 2018.  As
 2   part of mental health leadership, you were consulted on the
 3   development of the proposals in that plan, right?
 4   A   No, I wasn't.
 5   Q   Were you part of the proposal to standardize the scheduling
 6   module within that staffing plan?
 7   A   I'm not aware of the staffing plan.  I was not involved in
 8   that in any way.
 9   Q   And were you shown a copy of it before it was given to the
10   Special Master or to the plaintiffs?
11   A   No, I was not.
12   Q   And are you aware that the "appointments seen as scheduled"
13   indicator was used -- was cited to in that proposal?
14   A   Am I aware now?
15   Q   Are you aware now, yes.
16   A   I believe so.
17   Q   So even though you knew that there were inefficiencies in
18   the way that psychiatrists were using the scheduling module,
19   you weren't part of the proposal to address some of those
20   things as part of the staffing plan; is that accurate?
21   A   Again, I wouldn't use the word "inefficiencies.  I would
22   say it was a matter of compliance with the work flow and as I
23   was aware of them, but I was told very clearly to stay in my
24   own lane and that psychiatry would handle any kind of problem
25   with that or any issue.

Rekart - Exam by Trapani

1    Q    And who told you that?

2    A    Dr. Kuich.

3    Q    Did anyone else tell you that?

4    A    Not that I recall.

5    Q    Did Dr. Kuich ever ask you for data related to psychiatry

6    within the EHRS?

7    A    Yes.

8    Q    Did he ask you about these things in June of 2017 after you

9    and Dr. Kuich went to CHCF at the direction of Dr. Brizendine?

10   A    I don't recall that.

11   Q    Do you remember going to CHCF with Dr. Kuich sometime in

12   2017 to conduct an audit?

13   A    I don't recall that.

14   Q    But you do remember that Dr. Kuich was asking for data

15   related to the EHRS so that he could determine the

16   psychiatrists' productivity rates; isn't that correct?

17   A    Yes.  Yes, I do.

18   Q    And did you ever provide him with that data he was asking

19   for?

20   A    No, I did not.  It got -- it got moved to the larger QM's

21   queue, and there -- because we were really busy, so I think

22   Dr. Ceballos had asked a larger QM to complete that task, which

23   I went to a few subsequent meetings where they did actually run

24   through some data for him.

25            THE COURT:  You have two more minutes.

Rekart - Exam by Trapani

```
 1              MS. TRAPANI:  Okay.  Thank you, Your Honor.
 2   BY MS. TRAPANI:
 3   Q    And when you talk about the larger QM committee meeting,
 4   are you speaking about the committee known as CLAC --
 5   A    No.
 6   Q    -- or are you talking about the internal mental health
 7   change committee?
 8   A    No.  I'm actually talking about the medical quality
 9   management division, which we were a subcommittee of.  The
10   mental health quality management was a subcommittee of the
11   larger quality management.
12   Q    And on that larger committee did you have a vote?
13   A    No, I did not.
14   Q    Are you familiar with a committee called CLAC?
15   A    I am.
16   Q    And what is that -- what is the purpose of that committee?
17   A    It was advisory, and it was also a change management
18   committee.
19   Q    And did you have a vote on that committee?
20   A    Yes, I did.
21   Q    Did anyone else from mental health have a vote on that
22   committee?
23   A    Yes.  Dr. Kuich.
24   Q    Did he always have a vote on that committee?
25   A    No.
```

1    Q    So he didn't get a vote on the committee until after he

2    started complaining that psychiatry needed to have their own

3    independent representation on that committee; isn't that right?

4    A    I think as soon as he asked to be put on the committee, he

5    was put on the committee.

6    Q    And after the time that that committee received Dr. Kuich,

7    Dr. Kuich was able to have a vote on that larger committee,

8    that was around the same time that CDCR decided to implement an

9    internal mental health change management committee; isn't that

10   right?

11   A    I think so.

12   Q    And how many psychiatrists were on the internal change

13   management committee?

14   A    I don't think it was that formal.  I think anybody could

15   come.

16          THE COURT:  You're at 15 minutes.

17          MS. TRAPANI:  Thank you.  If I could ask one more

18   question, Your Honor.

19          THE COURT:  One more.

20   BY MS. TRAPANI:

21   Q    Is it accurate to say that there were significantly more

22   psychologists on that internal mental health management change

23   committee that controlled EHRS than there were psychiatrists?

24   A    I think there were more psychologists in the room but not

25   that -- not that many more.

1      MS. TRAPANI:  Thank you.  No further questions.

2      THE COURT:  All right.  For the defense.

3      MR. FISHER:  We have no questions for this witness,

4  Your Honor.

5      THE COURT:  All right.  Is Dr. Rekart excused?

6      MR. FISHER:  As far as defendants are concerned.

7      THE COURT:  Ms. Ells?  Ms. Trapani?

8      MS. TRAPANI:  Yes, Your Honor.

9      THE COURT:  All right.  Thank you, Doctor.  You're

10  excused.  We're going to disconnect you now.

11      THE WITNESS:  Thank you.

12      (Witness excused.)

13      THE COURT:  We'll take another short break, and then

14  let's just talk about schedule.  I think we'll get through

15  Dr. Leidner.  I don't know if we'll get through other

16  witnesses.  And so at this point, I would -- while I'm not

17  excusing them for today, I think at most Dr. Ceballos could

18  remain.  I don't think there's any chance we would get to

19  Deputy Director Brizendine or Undersecretary Toche today.

20  Undersecretary Toche can, of course, continue observing.

21      So let's just take a full break, 15, 20 minutes, and

22  then we'll get through Dr. Leidner and see where we are at that

23  point, and then we can do some housekeeping.  It may be that we

24  need some time on Thursday morning for any closing argument

25  you'd like to provide.  So that's my current thinking.

 1              MR. FISHER:  Yes, Your Honor.

 2              THE COURT:  All right.

 3         (Recess at 3:10 p.m. to 3:29 p.m.)

 4              THE COURT:  All right.  So we're ready for

 5    Dr. Leidner.  And it may be, I'm doubtful, given the way things

 6    are going, but it may be that we could actually get through

 7    most of Brizendine today yet as well, so I think Ms. Schultz

 8    told you to switch up your order --

 9              MR. FISHER:  Yes, Your Honor.

10              THE COURT:  -- of having people stay.

11              All right.  So Dr. Leidner.

12              THE CLERK:  Doctor, please step into the witness

13    stand, remain standing, and raise your right hand.

14         (Witness duly sworn and takes the stand.)

15              THE WITNESS:  I do.

16              THE CLERK:  Thank you.  Please be seated.  Please say

17    and spell your first and last name for the record.

18              THE WITNESS:  David Leidner, D-A-V-I-D, L-E-I-D-N-E-R.

19                   DAVID LEIDNER, WITNESS, SWORN

20                            EXAMINATION

21    BY THE COURT:

22    Q    Good afternoon, Dr. Leidner.

23    A    Good afternoon.

24    Q    So you're the data guy?

25    A    Yeah.  I'm the data guy.

1   Q    That's what I've heard.

2   A    Yes, Your Honor.

3   Q    All right.  I have some questions for you.

4   A    Yeah.

5   Q    I'm going to organize them by topic.

6   A    Okay.

7   Q    So first is lengthening EOP timelines from 30 to 45 days --

8   A    Okay.

9   Q    -- as a general header.

10       As you probably know, the neutral expert's report states,

11  Dr. -- I believe it's Jahangiri and Dr. Anand first raised the

12  issue of changing the EOP timeline from 30 to 45 days with you

13  in late 2015.

14  A    That's correct, Your Honor.  My memory is that it was

15  Dr. Jahangiri who attended my state-wide webinar that I ran

16  weekly sometime -- I think it was November of 2015 and brought

17  that issue up with me.

18  Q    Just to clarify for the record what was your response at

19  that time?

20  A    As I recall, my response was -- my job was to sort of opine

21  about whether it was technically possible, could we do it.

22  People would come and bring ideas about all sorts of things and

23  I would really say, "Well, yes, we could do it" or "No, we

24  can't."  So my response was, "Yes, it's technically possible."

25  And then I gave my standard response, which was when someone

1  from the field had an idea about I'd like to change some rule,

2  I'd say, "Okay. Take it to headquarters. Specifically talk to

3  Dr. Golding about it." Because that part of the decision, you

4  know, would have to be made by headquarters. I didn't make

5  decisions to change rules. But I did give input on, you know,

6  could it be done, how could we do it, you know, what it would

7  look like and so forth.

8  Q   So after you said that, "take it to headquarters," no

9  follow-through, as far as you know?

10 A   Not that I remember.

11 Q   But then in 2016 --

12 A   Right.

13 Q   -- the request comes forward again?

14 A   Correct.

15 Q   And then very quickly the change gets made --

16 A   Yeah.

17 Q   -- fair?

18 A   Yes. Yes.

19 Q   So why did it occur so quickly, then, in 2016?

20 A   Right. So my memory there is that on December, sometime

21 around the 5th, I don't know if it was the 5th or before, but

22 anyway, an analyst from CHCF, same institution where

23 Dr. Jahangiri worked and someone I knew, you know, I worked

24 with --

25 Q   Ms. Kirkman.

1   A   -- Ms. Kirkman, yes.  She called me and then basically made

2   the same argument, you know, this is about trying to figure out

3   a better way to preserve continuity of care, you know,

4   psychiatrists were -- if they were taking a week off then they

5   weren't able to see their patients within 30 days, and so they

6   had to get some other psychiatrist to see them versus, you

7   know, if they had more time then they could just see them when

8   they came back.

9   Q   She's making this pitch to you?

10   A   She's making the pitch to me, right.  And she's asking --

11   you know, my recollection is not very clear about the

12   conversation other than the general idea, which was, you know,

13   is there a way to do it.  And what happened during that

14   conversation I remember, it was kind of an epiphany for me.  I

15   mean, up to that point the way I had always thought about it

16   was we either had to do every 30 days -- sorry for the detail.

17   This can get tricky.

18   Q   Well, I don't know that I need all the details --

19   A   Okay.

20   Q   -- specifically given that we don't have all day --

21   A   Yeah.

22   Q   -- or all afternoon at this point.

23   A   Okay.

24   Q   My only question is did you say to Dr. Kirkman --

25   Ms. Kirkman, "Well, take it to headquarters"?

1  A    I did.  I said, you know, go up the regular -- take it to

2  headquarters.  I guess at that time it was through the MH

3  policy group.

4  Q    All right.

5  A    Yeah.  That, again, was my standard response.

6  Q    So then you heard very quickly?

7  A    No.  No, no.  So what happened next was -- actually, I was

8  reviewing my emails.  I think about 1:30 that afternoon I had

9  emailed Dr. Ceballos about this -- about some other topic all

10 together.  I said, "Do you have some minutes for a phone call"

11 about this other topic?  And I presume that that was -- after

12 that, that's when we had a phone conversation.  And during that

13 phone conversation I mentioned this idea to her.

14      I thought it was a good idea because the thing I'd realized

15 about it was we could actually do two things here.  We could

16 actually do -- require the rule -- the monthly, the

17 psychiatrist's contact to be monthly and also still limit it to

18 some number of days; in other words, 45 days.  That's something

19 I didn't realize before, that is, I thought it had to be

20 either/or.  You either had to do days or once a month.

21      And I already knew that CDCR didn't want to allow, you

22 know, 60 days between contacts, but this seemed like a new

23 approach.  And so I was -- I thought, okay, I'll tell her about

24 it.  And at that point she says --

25 Q    So Dr. Ceballos -- Dr. Ceballos didn't call you to say,

1  "What do you think about this?"  She called you about something

2  else entirely?

3  A   I don't recall exactly the reason for the phone call.  I

4  don't know if I called her or she called me.  But I presume it

5  was about something else, yes.

6  Q   You said you had an epiphany.  What explains that?  Why

7  were you able to see this solving more than one problem, a

8  solution at this time?

9  A   I think just talking through it and realizing, oh, you can

10 actually kind of code it so that it's both requirements at the

11 same time.  That is, you could say it has to be one once every

12 calendar month and it has to be every certain amount of days,

13 for example, every 45 days.  That's a hybrid rule.  And just

14 from a programming perspective, that's something I didn't think

15 about before.  And what that would allow was, yes, it's still

16 once every calendar month, per my understanding of the policy,

17 but still you can limit it to even a shorter amount of time

18 than that and hopefully improve, you know, the continuity of

19 care, address that issue that they were bringing up.  So that

20 was -- that's why I thought, oh, here's a new idea about how to

21 solve this issue.

22 Q   And that all happened very quickly, didn't it, from the

23 time Ms. Kirkman called you to the time the rule got changed in

24 2016 was a matter of not even hours?

25 A   Well, no.  It was more than hours.  I mean, on the phone

1    call Dr. Ceballos did said, "Okay.  Do it."

2    Q    So approval?

3    A    Yeah.  Approval.  Approval happened, you know, very

4    quickly.

5         I do wish I had done what I've since started doing, which

6    was write out the decision, you know, and send it back to her

7    and say, "Is this what we agreed on?"  I think that's a

8    really -- obviously something I didn't do that I should have.

9    That would have been really helpful.

10   Q    But in any event, it's been changed back now to 30 days?

11   A    Yeah.  Yes.

12   Q    So does the current business rule for EOP timeline, does it

13   use -- does it use 30 days, as those terms are defined, in an

14   email you sent in March of 2017?  You went through in one of

15   your emails, which you've previously provided to the Court

16   attached to a declaration, methodologies.  So do you recall a

17   March 22nd, 2017, email?

18   A    Are you referring to the one where there was kind of a

19   table talking about different units of time, like a day, hour,

20   a week --

21   Q    Correct.

22   A    -- month?

23   Q    Trigger date, time frame, due date.

24   A    Okay.  And it talked about different time frames, correct?

25   So yes.  Okay.  So if you were using 24 hours, the due date

 1  would be different than if you were using one day, for example,

 2  yeah.

 3  Q    Right.  So that's the methodology that is currently being

 4  applied?

 5  A    Well, currently now 30 days is being applied to all EOP

 6  psychiatry rules.  It was reversed back --

 7  Q    Right.

 8  A    -- when I was asked to change it.

 9  Q    Well, that's my question.  So is the 30 days as currently

10  implemented, does that return to the business rule exactly the

11  way it was before it was changed in -- towards the end of 2016?

12  A    Yes.

13  Q    Once the issue was raised by Dr. Golding, who made the

14  decision to change it back to the prior business rule?

15  A    Dr. Ceballos.  I guess I can say I took my marching orders

16  from Dr. Ceballos and my managers.  So for me I would have had

17  to have been told by Dr. Ceballos to change it.  And I have an

18  email that I can recall from April 13th instructing me to

19  change it back, and then I changed it back by April 14.

20  Q    Do you have an understanding about whether or not that kind

21  of change to that business rule should have been raised with

22  the Special Master before implemented?

23  A    I don't know.  That wasn't something I ever did.  I didn't

24  communicate with the Special Master about those -- about rule

25  changes.  I'm a rank-and-file employee, so, you know, I left

1    that to my managers.

2    Q    So you have no understanding?  You would not say, "I think

3    this was a good idea but I understand you have to run this by

4    the Special Master"?  That would not occur to you to say?

5    A    No.  It was really outside the realm of my expertise what

6    needs to be discussed with the Special Master and what doesn't,

7    you know, and who else needs to be consulted and so forth.

8    That wasn't something that I was involved with.

9    Q    All right.  I'm just curious, you also provided -- there's

10   the March 22nd, 2017, email.  There's also a July 1st, 2015

11   email that you've previously provided to the Court.

12   A    Right.

13   Q    Also has the chart that you've talked about with slightly

14   different information --

15   A    Right.

16   Q    -- in the chart.  Do you know were -- was any of that

17   definitional information ever provided to the Special Master?

18   A    I don't recall specifically, but I -- I sure feel like we

19   had conversations, for example, about weekly.  So, you know,

20   main line EOP patients are required to be seen weekly by their

21   primary clinicians.  That's from the program guide.

22       And for years we've defined weekly as you can see them on

23   Monday and you can see them again, you know, on Friday the next

24   week, that's okay.  Once every calendar week versus once every

25   seven days.

1    Q    But when you say "we had conversations," who's the "we"?

2    A    Well, I recall that I did give a presentation to the

3    monitors about our weekly compliance statistics sometime some

4    years ago, and I guess I'm thinking that at that time, for

5    example, we may have talked about the weekly time frame.

6    Q    Ah.  But weekly only?

7    A    Yes.  Correct.  Monthly was not even in that 2015 email, so

8    that was --

9    Q    So would the presentation have been pre-2015?

10   A    I don't recall.  I'm sorry.

11   Q    So that -- how often would you give presentations to the

12   Special Master?

13   A    Oh, just a handful of times.  I was asked to talk about our

14   methodology a couple of times, maybe two or three, I think,

15   over the years.

16   Q    All right.  So I want to move on to appointments seen as

17   scheduled, reporting of scheduled --

18   A    Okay.

19   Q    -- and missed appointments.

20   A    Okay.

21   Q    So who decided to exclude from the "appointments seen as

22   scheduled" indicator methodology appointments that were not

23   seen due to refusals or no shows?

24   A    That indicator was from the PLATA receiver, and I was asked

25   at some point, 2014 or earlier, I'm not sure when, but I know

1    it existed at least in 2014.  I was asked to replicate that on
2    our performance report using -- for mental health appointments.
3    So the criteria were theirs and then as they changed them over
4    time, I would change them on our end to match.
5    Q    The criteria were the PLATA receiver's criteria?
6    A    Correct.
7    Q    All right.  So when you replicated them in the Coleman
8    performance report is that what you're saying?
9    A    Correct.  Yes.
10   Q    You just imported it without any change?
11   A    No, no.  I had to recode it because it was for our mental
12   health appointments; whereas, the receiver's indicator was for
13   medical.
14   Q    So was the recoding making substantive changes to the
15   information collected?
16   A    No.  The -- I was trying to just replicate their
17   methodology.
18   Q    While taking account of any differences that might be
19   imposed by the Coleman court orders?
20   A    No.  I wasn't doing this -- my understanding is this
21   indicator doesn't connect to any program guidelines or none
22   that I'm aware of or any -- any court orders.  This was simply
23   the receiver's indicator that they thought was important and
24   they wanted or CDCR wanted that indicator on our performance
25   report too.

1    Q   Who at CDCR?

2    A   Well, I don't recall specifically, but I think Dr. Ceballos

3    would have been the one who would have asked me to first create

4    that indicator, again, because she was the one who would

5    typically instruct me to do things like that.

6    Q   So then still I'm not certain I got an answer to my initial

7    question.  The context is helpful but --

8    A   Yes.

9    Q   -- just so I'm clear, do you agree that appointments not

10   seen due to refusals or no shows is not included in the

11   "appointments seen as scheduled" indicator methodology?

12   A   I have to this think about this.  It's a -- the question is

13   appointments not seen -- I'm sorry, could you repeat that

14   question?

15   Q   Appointments that didn't occur due to inmate refusals or no

16   shows.  Is that information excluded in the "appointments seen

17   as scheduled" indicator methodology?  I'm speaking as a

18   layperson.

19   A   Yeah.  And I'm trying to think it through.  The way I

20   understand the indicator is that it is -- all scheduled

21   appointments is the denominator.  The numerator is the same

22   number of appointments minus those appointments that were

23   canceled for controllable reasons and also excluding

24   rescheduled appointments.  Does that answer the question?

25   Q   So no separate counting of refusals or no shows?

1    A    Correct.  Not to my knowledge.  Not to my recollection.

2    Q    And is that because that's the way the receiver does it?

3    A    Yes.  Yeah.

4    Q    And no other reason?

5    A    No.  The indicator was not designed by me or by mental

6    health, to my knowledge, so we were just, you know, replicating

7    their requirements.

8    Q    So recognizing all of that, have you ever conducted an

9    analysis to determine the impact of the methodology on the

10   percentage of missed appointments for the Coleman class?

11   A    You know, so I think you're asking me have I tried to,

12   maybe, take out that percentage or put it -- see how it would

13   change if we left them in or took them out?  I have not done

14   that, no.

15   Q    All right.  For any subclass:  Individuals, groups, IDTTs?

16   A    Not to my recollection, no.  I can say I just looked at how

17   much of the appointments that are included in that indicator

18   are psychiatry appointments because I knew that would be --

19   that's a topic.  So for 2018, about 8.5 percent of all the

20   appointments in that indicator -- all the mental health

21   appointments are psychiatry appointments, and the others are

22   group appointments or primary clinician or IDTT.

23        The indicator itself is not about psychiatry appointments.

24   It's about -- an efficiency measure, you know, are we

25   scheduling things that then are getting canceled in a way that

1    we, you know, we can control.

2         If I'm scheduling appointments and there's a lockdown,

3    maybe I can do something about it.  That's the idea behind the

4    indicator.  It's not about compliance with the time frames or

5    anything like that.

6    Q    So can you answer this question:  What was the rate of

7    missed appointments for individuals for the three-month period

8    prior to changes being made to the "appointments seen as

9    scheduled" indicator methodology?

10   A    I don't know.

11   Q    Would you have the ability to find out?

12   A    Well, I think so, yes.

13        I guess you're asking before the "seen as scheduled"

14   indicator was changed.  The issue at hand, as I understand it,

15   was that the definition was incorrect but that the code was

16   always correct.  When was it changed?  You know, it was changed

17   sort of over time as the receiver changed their criteria, but

18   I'm not thinking of a specific point in time when that was --

19   there was some big change.  Maybe I'm forgetting or something,

20   but . . .

21   Q    So just help me understand --

22   A    Yeah.

23   Q    -- what that means to you if the definition was correct of

24   the indicator.

25   A    Yeah.

1   Q   Well, so doesn't changing the definition affect the --

2   what's collected and can be generated?

3   A   Right.  Sorry.  It wasn't clear.  The description, just the

4   verbal description of the indicator, yeah.  Okay.  I get it.

5   Q   So the description doesn't correspond to any coding?

6   A   No.  I think perhaps it did initially, I think and know I'm

7   right.  And then when it was changed because the receiver

8   changed some criteria, which would have been sometime before

9   2016, before February 2016, I can tell you that, I failed to

10  update the label, right, the description of the definition.

11  Q   Well, so help me understand.

12  A   Okay.

13  Q   Do you understand that changes made to the "appointments

14  seen as scheduled" indicator methodology resulted in

15  differences in reported percentages of missed appointments?

16  A   That seems quite plausible, yes.  And as you change the

17  criteria, you're going to change -- the numbers are going to

18  change, yes.

19  Q   Have you ever run any reports to demonstrate that?

20  A   No, I haven't.  I don't know which way the numbers changed.

21  I never looked at that.

22  Q   And to the extent you are making any changes in that

23  indicator, you would not have reported that to the Special

24  Master?

25  A   No.

1  Q    At most, Ms. Ceballos would know?

2  A    Right.  Yeah.

3  Q    Would she know everything you were doing at that level

4  working with the "appointments seen as scheduled" indicator?

5  A    I don't know.  I don't recall.  I'm not sure.

6  Q    Is there anyone else you would report to?

7  A    No.  No.  I mean, maybe colleagues.  Maybe I presented it

8  in a webinar or something when it was talking about it, but I

9  don't -- I don't recall specifically.

10 Q    Are there any other indicators that CDCR Mental Health

11 changed to match the receiver's healthcare data collection

12 methods?

13 A    Let me think.

14      None come to mind.  I know that we actually just pull

15 directly their data sometimes; for example, for a Map It,

16 medication compliance.  And we report it on our dashboards so

17 that -- our performance report so that if they change their

18 methodology, it would change on our report as well, but that

19 would be automatic.  I wouldn't be doing any programming.

20 "Seen as scheduled" is the only indicator I can think of where

21 I, you know, recreated the code for us.

22 Q    And when data is pulled over, as I believe you described

23 it --

24 A    Yes.

25 Q    -- just now is there any thought given to whether or not

1    that is introducing distinctions into the Coleman data that

2    don't conform to Coleman court orders?

3    A    Well --

4    Q    Do you ever think about that?  Have you been told to think

5    about that?

6    A    No, not that I can think of.

7    Q    Are you aware of any problems that could be introduced by

8    pulling PLATA data into a Coleman database?

9    A    Well, just to clarify, it's all the same database, that is,

10   we all share the same healthcare data warehouse database.  So

11   we really are all pulling from in this case mostly EHRS data,

12   the Health Record System data, and maybe some other sources

13   too.

14   Q    But you said you pulled it over.

15   A    Uh-huh.  Okay.

16   Q    What does that mean to you?

17   A    What it means to me is the receiver -- the PLATA receiver's

18   quality management team actually wrote the code to calculate

19   the indicators.  I'm talking now about the medication, the Map

20   It indicators.  They wrote the code.  And that code applies to

21   psychiatry as well as to, you know, physicians in general.

22   Q    And we're not going -- we could go into that at some

23   point --

24   A    Yeah.

25   Q    -- but we're not doing that today.

1    A    Thank you.

2    Q    So I know what you're talking about --

3    A    Yeah.

4    Q    -- but it's not on my agenda right now.

5    A    Right.  So when I say "pull it in," they make the

6    calculations, they store it in a table and then I write

7    basically just a query, you know, I pull the data in to also

8    display on our performance report.

9         And I do take care to make sure that the data we display

10   are the data that they have as well, but I don't -- I don't do

11   anything to the rules.  That's their indicator, and they've

12   decided what to do.

13        "Seen as scheduled" was very similar except there was no

14   data for mental health appointments; it was just medical.  So

15   some point a long time ago I was asked, "Okay.  Write the code

16   to do what we do with the medical appointments, with the mental

17   health appointments.  Replicate our rules.  Use our counting

18   rules."

19   Q    All right.  Let me ask a question from a different angle --

20   A    Okay.

21   Q    -- and just see.  In the neutral expert's report --

22   A    Yeah.

23   Q    -- he does indicate that in March 2019, you informed the

24   neutral that you reviewed information relevant to the updating

25   or changing of the mental health database --

1  A    Right.

2  Q    -- to reflect what was going on with the receiver's

3  database.

4  A    Right.

5  Q    But you said you did not know when the "appointments seen

6  as scheduled" indicator had diverged from the receiver, so

7  whether they had ever precisely matched.

8  A    Right.  Right.

9  Q    So just help me --

10  A    Yeah.

11  Q    Taking into account everything you just said, what did you

12  mean by that?

13  A    Okay.  So -- right.  I wrote the code to replicate the

14  rules.  And then at some point during the neutral -- sorry --

15  the neutral expert's investigation, I was shown some comparison

16  of the -- of the criteria, and it became clear to me at that

17  point that they don't.  They don't seem to actually line up.  I

18  don't know when they diverged.  I don't know if they -- if they

19  ever exactly matched, but the intent was that they were

20  supposed to.

21        So I had that information and I shared that with CDCR after

22  the investigation was over.  And I'm not sure, I know that -- I

23  believe they're moving forward to rectify that, but I don't

24  know the status of that now.  I'm not up at headquarters

25  anymore.

1 Q Who did you report that to at CDCR?

2 A I reported it to Dr. Ceballos and I think some other people

3 in -- well, I know I reported it to Dr. Ceballos, and there was

4 a meeting also at -- larger phone con that I talked about it as

5 well.

6 Q And what were you telling people on that phone

7 conversation?

8 A That I knew that the -- you know, I'd been shown

9 information that told me that they don't match.

10 Q And did you make a recommendation as to what should be done

11 about that?

12 A I don't recall that I did, no.

13 Q Since then you've done nothing with the indicator, the

14 coding, the description?

15 A I attended a meeting in July where we discussed with the

16 PLATA receiver taking steps to -- it was a phone conversation

17 where we discussed reconciling the measure, but I was not

18 involved in that.  And then I left headquarters at the end of

19 July, so I don't know the status of that now.

20 Q So where are you now?

21 A I'm at my local prison, California Men's Colony.

22 Q All right.  Was that a move that you made by choice?

23 A Yes.

24 Q So what did the "appointments seen as scheduled" indicator

25 measure before the 2016 change?

1    A    I don't know because I don't have -- I could only go back
2    in my records and look at the code starting in about February
3    of 2016.  And in February 2016 it was almost exactly what it
4    does now, minus the rescheduled piece that was -- it was -- I'm
5    trying to remember.  It was including rescheduled.
6        And then I saw that there was a code change in May of 2016,
7    I believe, where rescheduled were also taken out.  And so
8    basically as of May 2016, it was what it is now.  And at some
9    point along the line I failed to update the label, the
10   description of the indicator.
11   Q    And prior to the change in 2016, to what use were you
12   putting the reports generated using the indicator?
13   A    I was just putting it on the performance report, making
14   sure that it showed up on the -- on the mental health
15   performance report.  That's the only thing I did with it.
16   Q    And again, you don't know whether that was reported to the
17   Special Master or the Court?
18   A    I'm sorry.  Which part, the indicator or --
19   Q    The information generated using the indicator, yes.
20   A    Right.  No.  I don't know how it was used or who it was
21   reported to.
22   Q    So if the information were -- if the indicator or
23   information generated were reported to the Court, do you know
24   why that would be, to the Coleman Court?
25   A    I don't.  That's not -- to my knowledge, that's not a

1    Coleman, you know, requirement kind of indicator.  It's not

2    about any of the orders or guidelines.  To the best of my

3    knowledge, it's really about just sort of efficiency of our

4    scheduling.  It seems -- it seems like it was misconstrued

5    to -- you know, it was supposed to be some kind of compliance

6    measure, never -- never intended to be.

7    Q    Misconstrued by?

8    A    Dr. Golding, I think.

9    Q    But if it were provided to the Court, it's possible the

10   Court might misconstrue it?

11   A    Yes.  You're right.  Absolutely.

12   Q    So the Court has been receiving some errata --

13   A    Yes.

14   Q    -- corrections.

15   A    Yeah.

16   Q    Are you involve in preparing those?

17   A    I am.

18   Q    You filed a declaration recently, I believe.

19   A    Yes.

20   Q    As far as you know, is the effort to identify the need to

21   file errata ongoing?

22   A    You mean for things that I've said?

23   Q    To the extent you're involved in verifying.

24   A    No.  I don't know.  I'm not involved in any other errata

25   filing or efforts.

Leidner - Exam by The Court

1    Q    So to the extent you have identified a need for the Court

2    to be informed of a correction, your job is done?

3    A    Yes, as far as I know and -- yes.

4    Q    So during your tenure has any person ever directed you to

5    manipulate data for any purpose related to Coleman remediation?

6    A    Can you define what you mean by "manipulate data"?

7    Q    Right.  You may know all the ways to manipulate data.

8    A    Yeah.  You mean like in this --

9    Q    Massage the -- to create data to make it look as if

10   defendants are closer to compliance than they are.

11   A    So in other words, presented inaccurately in some way?  No,

12   I have not.

13   Q    Have you ever directed anyone else to do that?

14   A    No.

15   Q    Has any person ever told you not to correct any misleading

16   data that had been presented to the Court?

17   A    I want to say no, other than in the context of this

18   investigation.  I'd have to think about it, but, you know,

19   there was -- I was told don't -- don't go back and, you know,

20   make changes to business rules or fix things that you think

21   might be, you know, erroneous.  There was kind of a freeze on

22   changes during the investigation.  So other than that, no.

23   Q    Is that freeze still in effect?

24   A    Well, I left in July, so --

25   Q    It was up -- it was in effect until you left?

 1  A   Well, as far as I know, business rules still weren't being,

 2  you know, updated when I left.

 3      I should say if we knew about bugs; in other words, if

 4  something wasn't working as it was designed to or if data were

 5  incorrect, we were always fixing those.  That never stopped.

 6  Yeah.

 7          THE COURT:  All right.  Those are my questions for

 8  now.

 9          Who's questioning Dr. Leidner?

10          MS. TRAPANI:  Your Honor, Cara Trapani.

11          THE COURT:  Ms. Trapani?

12          MS. TRAPANI:  Yes.

13          THE COURT:  All right.

14                        EXAMINATION

15  BY MS. TRAPANI:

16  Q   Good afternoon, Dr. Leidner.

17  A   Good afternoon.

18  Q   I'd like to ask you some questions about this business rule

19  change that you made in December 2016.

20  A   Uh-huh.

21  Q   I'm going to hand you an email that was sent to you on

22  December 5th, 2016.  It's been marked as Plaintiffs'

23  Exhibit 101.

24      If you could turn to page 4, Dr. Leidner.  Is this the

25  email that Ms. Julie Kirkman sent to you on December 5th, 2016,

1   requesting you to make the business rule change?

2   A   This is the email she sent to the policy unit requesting

3   the business rule change, and I was Cc'd on it.  I would not

4   have been the one to approve or deny the request.

5   Q   But you're Cc'd on this email, correct?

6   A   Correct.

7   Q   And are there any psychiatrists in the recipient list?

8           THE COURT:  There's some interference we have not

9   experienced so far yet today.

10          THE WITNESS:  It's me.

11          THE COURT:  We need a brief recess to see if we can

12  get to the bottom of this.  So Ms. Schultz, I'll ask you to

13  call IT, I guess.

14          THE CLERK:  Okay.

15          THE COURT:  Unless there's someone here who thinks

16  they know what's going on and can help solve the problem.

17      (Recess at 4:06 p.m. to 4:12 p.m.)

18          THE COURT:  All right.  We think we identified the

19  culprit.  You were mid-question, so hopefully you can start

20  with the question you were posing.

21          MS. TRAPANI:  Yes, Your Honor.

22  BY MS. TRAPANI:

23  Q   Dr. Leidner, I was asking you about this exhibit that's

24  been marked Plaintiffs' 101 at page 4.  This is an email that

25  you just said you received from -- you were Cc'd on it from

1    Ms. Kirkman on December 5th of 2016.  And my question to you

2    was, are there any psychiatrists who are Cc'd on this email

3    along with you?

4    A    I'm not exactly sure.  I know that Christopher Barr is not

5    a psychiatrist.  I don't think that Yosha Dara Row is, but I'm

6    not certain.

7    Q    So, to your knowledge, no one here is a psychiatrist?

8    A    I'm not sure.

9    Q    Okay.

10   A    I don't believe so.

11   Q    And after you received this email, it's time stamped at

12   1:57 p.m., you called Dr. Ceballos; is that right?

13   A    No.  I don't recall whether she called me.  I don't -- or I

14   called her.

15   Q    You spoke to Dr. Ceballos; is that right?

16   A    I spoke with Dr. Ceballos sometime on December 5th.  I

17   don't know if it was before or after this email.

18   Q    Okay.  And when you spoke to Dr. Ceballos on December 5th,

19   she told you you could change the rule to the time frame

20   between EOP psychiatry contacts, correct?

21   A    Correct.

22   Q    And you never consulted with anyone except Dr. Ceballos

23   before you made that change; is that right?

24   A    Not to my recollection, no.

25   Q    You understand, do you not, that at the time you made this

1    business rule change in December of 2016, that coincided with

2    the time frame that the Special Master was evaluating CDCR's

3    psychiatry staffing?

4    A    I don't know that.

5    Q    But it's true, right, that the business rule change that

6    you made in December of 2016 at that same time made it easier

7    for the psychiatrists to comply with their time frames to see

8    their patients, right?

9             MR. FISHER:  Objection, calls for speculation.

10            THE COURT:  Overruled.  You may answer if you're able.

11            THE WITNESS:  I can say that it allowed -- in most

12   cases, it allowed more time for psychiatrists to see their

13   patients for EOP, yeah.

14   BY MS. TRAPANI:

15   Q    I want to turn to how this rule change applied to the

16   segregation units now.

17   A    Okay.

18   Q    You're aware that the program guide requires that patients

19   housed in administrative segregation units, that's the ASU EOP

20   hubs, are required under the program guide to be seen by a

21   psychiatrist every 30 days, right?

22   A    I am now, yes.

23   Q    You are now?

24   A    Yes.

25   Q    And you understand that this requirement, this 30-day

1  requirement means that the absolute minimum requirement for a

2  patient to be seen is literally 30 days?

3  A   I do understand that, yes.

4  Q   But when you changed the rule in December of 2016 for

5  psychiatry contacts for EOP patients to be up to 45 days and in

6  some cases even up to 60 days, you applied that change to the

7  segregation hubs, correct?

8  A   Not correct.  I did not change the rule to be up to 60 days

9  in any case.

10 Q   Did you change the rule to be more than 30 days for the

11 segregation hubs despite the fact that the program guide

12 literally said that patients in those units need to be seen

13 every five days?

14 A   I did.  That was a mistake.  There was -- rule change was

15 not intended ever to apply in a case where the program guide

16 used 30 days, only in cases where it used the term "monthly."

17 That was the intent.

18 Q   But that is not what actually happened; is that right?

19 A   Correct.

20 Q   Did you also change -- apply this longer time frame rule to

21 the psychiatric services units, which is another certification

22 unit for EOP patients?

23 A   Yes.

24 Q   And did you ever tell anyone about that?

25 A   Well, I announced it at two statewide webinars in December,

1  December 7th and 8th.  The rule changes for all the different

2  areas where it was applied were visible on the compliance rules

3  report, which is a report that all of our users could call up

4  at any time.  And that was visible for the duration of the rule

5  change.  So in those two ways I did.

6  Q   And when you made those changes, you said they're available

7  through this compliance rules report and also that you

8  announced them through webinars, but did you ever make a

9  written statement about the rule changes that you made -- that

10 you made and to which population it applied to?

11 A   I don't recall that I did.

12 Q   So you never sent an email about the change alerting

13 Dr. Golding or anyone else in headquarters about it?

14 A   Not that I recall.

15 Q   And when you made these changes on the compliance rules

16 report, were there any highlights or red lines to show where

17 your changes had occurred?

18 A   No.  The compliance rules report is an automatic report

19 that actually looks at the code itself and so then just reports

20 what was actually coded.  So it's a very accurate

21 representation.  And so with the rule changes, the description

22 changes.

23     During the webinars, I pulled up the compliance rules

24 report and, you know, we have showed the different definitions.

25     I should -- I would like to say that report also pops --

1  any given rule pops up from the performance report when you

2  click on -- you know, any given observation in the performance

3  report, you click on it, it will show you the rule that's being

4  applied, including, for example," "monthly not to exceed 45

5  days."

6  Q    Okay.  So someone would have to go and seek that out and

7  click on it to be able to see that the rule change occurred; is

8  that correct?

9  A    That's correct.

10  Q    But even if they did that, they would not have known that

11  this applied to the segregation hubs despite that the program

12  guide requirement for those units was different; is that right?

13  A    They would have known.  The rule -- there's a different

14  rule for every area, so it would have shown for PSU, main line,

15  ASU hubs.  And so you would see every one of those.

16      Also, if you were looking, for example, at the ASU EOP

17  performance report timely psychiatrist indicator and then you

18  looked at the details and click on one of those, the ASU EOP

19  version of that rule would pop up.  So it should be clear that

20  that's the criteria that was being used at the time, if you did

21  that at the time.

22  Q    But isn't it true that you didn't catch that you had done

23  that until just last week?

24  A    It is true.

25  Q    And when you had your webinars, did you publish any written

1  meeting minutes to go over the changes that you discussed in

2  those webinars?

3  A   No.  We didn't start putting out notes on the changes we

4  made until March of 2017, and that's when we started our

5  release notes process where we really do now log all the

6  different changes, like that would have been on there if we had

7  been doing it at the time.

8  Q   Okay.  But that was about six months or so after you made

9  the change.

10  A   Yeah.  Something like that.  Four months, yeah.

11  Q   Four months, sure.

12      So I'd like to go back to the time frame that you made this

13  change --

14  A   Uh-huh.

15  Q   -- December of 2016.  Is it true that at that time you had

16  the power to make changes to the performance reports without

17  any other person ever reviewing or proofing your work?

18  A   Can you clarify what you mean by I had the power to?

19  Q   Did you have the authority to make a change without anyone

20  double checking that your change was accurate and that it

21  followed the compliance requirements of the program guide?

22  A   No.  I didn't have that authority.  I had to get all

23  approval -- any substantive approvals to any business rules

24  from my managers.

25  Q   And was that Dr. Ceballos who approved those changes?

1  A   It was Dr. Ceballos, also Dr. Rekart was a manager of mine.

2  And then above them would have been Dr. Brizendine and

3  Katherine Tebrock.

4  Q   But in this case it was Dr. Ceballos only who approved your

5  rule change; is that correct?

6  A   That is correct.

7  Q   And at the time, in December 2016 when you made this rule

8  change, there was no independent entity that was outside of

9  CDCR Mental Health that was validating the rule changes that

10  you were making to the performance report; is that correct?

11  A   That's correct.

12  Q   And is there any outside entity doing those kind of

13  validations right now, to your knowledge?

14  A   I left in the end of July, so I don't know what's happened

15  since then, but up to the time of my departure -- an entity

16  outside of CDCR?

17  Q   Outside of CDCR Mental Health.  And if I may --

18  A   Yeah.

19  Q   -- and as you may know, the receiver in PLATA has hired a

20  consulting firm to validate their data and look at the

21  dashboard and ensure that that is accurate, and that's in the

22  PLATA case.  I'm wondering if there's anything like that in the

23  Coleman case for the performance report changes you were

24  making?

25  A   So as of the time I left, not to my knowledge, no.

1   Q    CDCR submits special court-ordered reports on the

2   timeliness of psychiatry contacts for EOP patients held in

3   segregation to the Special Master each month, and these are

4   called the self-certification letters for CDCR's ASU EOP hubs

5   and the PSUs.  Are you familiar with those self-certification

6   letters?

7   A    I don't have any -- I know they exist.  I don't know much

8   more about them than that.

9   Q    And you're aware that the timely psychiatry contact

10  indicator is one of the measures that's used in those reports,

11  right?

12  A    I'm not actually aware of that.  It certainly seems likely

13  that it would be.

14  Q    And it's true you never told the Special Master or anyone

15  on his team that you made this business rule change in December

16  2016, right?

17  A    That is correct.

18          THE COURT:  I think you have about two more minutes.

19          MS. TRAPANI:  Okay.

20          THE COURT:  Giving you credit for -- not counting the

21  break against you, of course.

22          MS. TRAPANI:  Thank you, Your Honor.

23  BY MS. TRAPANI:

24  Q    Did you ever ask anyone if you should report the change

25  that you made to the business rule in 2016 to the Special

1    Master or to the Court?

2    A    No, not that I recall.

3    Q    And you understood that change to be a significant change

4    to the program guide, right?

5    A    No.  I didn't understand it that way.

6    Q    So the 45 days was not a significant change to the program

7    guide for segregation units, for example, which literally

8    required 30 days between contacts?

9    A    That is -- that was not -- that was a mistake.  It should

10   not have been applied to those.  So I guess if I had known at

11   the time that it had been applied to those, I would have said

12   something because that's wrong and that was my mistake.  That

13   was never an intended change.

14   Q    I'd like to ask you a couple of questions about this second

15   issue in my limited time left, the "appointments seen as

16   scheduled" indicator.  You said you were aware that the

17   definition was altered and that the methodology for that

18   indicator was altered in about 2016 and that the underlying

19   description for the indicator was not updated; is that correct?

20   A    I'm sorry.  All I can -- all I know for sure is that by

21   February 2016 it had basically the current criteria it uses

22   now.  So it had to have -- the change had to have been before

23   February 2016.  And I can say I would have been the one to make

24   the change, and I did not change the description to match it.

25   That seems clear to me.  So that was my oversight.

1   Q   All right.  And there were other problems that the neutral

2   expert found plagued the "appointments seen as scheduled"

3   indicator that made it inaccurate, and I'd like to ask you one

4   question about that.

5       Is my understanding correct that rescheduled appointments

6   were counted as completed under this indicator if the scheduler

7   did not mark those appointments as canceled?

8   A   I don't know.  That's -- not to my knowledge.  I'm not

9   aware that that was the case.

10  Q   And what about if a patient is checked in and out from an

11  appointment, even if it didn't occur when the appointment was

12  supposed to happen, say it occurred a couple of days later.  So

13  long as that patient was checked in and out, that patient --

14  that appointment could be seen as scheduled even if it was

15  late; isn't that right?

16  A   I'm not sure that is possible.  If you check out an

17  appointment, it does mean that it occurred in our system, and

18  so I'm not positive.  I don't know the answer to that exactly.

19          THE COURT:  That would be your time.

20          MS. TRAPANI:  Thank you, Your Honor.

21          THE COURT:  All right.  Any questions from the

22  defense?

23          MR. FISHER:  Yes, Your Honor.

24          THE COURT:  All right.  And I'm sorry, I really should

25  know this.  Is this Mr. Heath?

1        MR. FISHER:  This is Mr. Fisher.

2        THE COURT:  Mr. Fisher.  All right.

3        MR. FISHER:  Sorry.  I'll announce myself.

4        THE COURT:  It was either Heath or Fisher.  All right.

5   You may proceed.

6                        EXAMINATION

7   BY MR. FISHER:

8   Q    Good morning, Dr. Leidner.

9   A    Good afternoon.

10  Q    The Court had asked about your July 2019 change in

11  position.  I was going to ask you did you like your position at

12  headquarters?

13  A    Yeah.  I loved it.  It was a great job, great colleagues,

14  great boss, got to work remotely.  That was really great.

15  Q    Why did you decide to leave?

16  A    Well, you know, when the investigation started, I thought,

17  okay, we'll go through the investigation, we'll say what

18  happened and then everything will be okay, we'll move on with

19  fixing whatever problems there are.  But after the Court issued

20  its June order, I think for this hearing, I became afraid,

21  basically, that, you know, any new error or change I made or,

22  you know, disagreement about some methodology would be taken up

23  as an allegation, you know, by the Court and I was -- I got

24  afraid.  And I asked my managers are these concerns overblown,

25  you know, am I being paranoid?  And they told me the concerns

1    were legitimate, so I decided I needed to leave just to sort of

2    protect myself.

3    Q    Sure.  Now, you discussed a couple of errors with the

4    indicators, one we'll talk about.  It's the issue redefining

5    monthly.  When you learned that you should change that back did

6    you do so?

7    A    Sorry?  Could you please repeat the question?

8    Q    Sure.  There was one issue that's been referred to in the

9    briefing and -- such as Issue B relating to the definition of

10   monthly for purposes of timely psychiatry contacts.

11   A    Yes.

12   Q    When you learned about that problem did you remedy it?

13   A    Yes, I did.

14   Q    How long did it take you to do that?

15   A    So let's see.  I was asked to do it on April 13 by

16   Dr. Ceballos, and then I had it all coded by April 14th.  And

17   then it needed to be validated by somebody other than me, and

18   so then we rolled it out with the next scheduled release of

19   changes, which was April 23rd.

20   Q    And now regarding the second issue we've been discussing,

21   this "appointments scheduled as seen" indicator.

22   A    Yeah.

23   Q    At some point you learned that there was an inconsistency

24   between what the indicator measured and what the indicator was

25   described as; is that right?

1  A   Yeah.

2  Q   Do you recall when you learned of that?

3  A   Dr. Ceballos asked me sometime around October 9th, I think,

4  before I had any knowledge of the Golding report.  I think she

5  asked me "Is this right?"  And I said "Oh, no, it's not."  And

6  I basically changed it that day to match what it was really

7  doing.

8  Q   Those were going to be my next questions.  Did you fix it?

9  A   Yeah.

10  Q   And how long did it take you to fix it?

11  A   Same day.

12  Q   And to your knowledge, did anything change from when you

13  started working in quality management to when your time at

14  quality management ended to get better control over changes to

15  indicators and other metrics using the data?

16  A   No.  Well, obviously a lot has changed.  Maybe I'll just

17  start from when these issues occurred to the present.  You

18  know, I've been there for ten years --

19  Q   Sure.

20  A   -- so a lot has changed, of course.  You know, one thing

21  I've learned is it is very important to make sure you get

22  all -- and this is a requirement now -- get all approvals

23  written down, you know, reiterate them in an email and then get

24  the person to approve them, to confirm it or modify it or

25  whatever.  That really helps, of course, to make sure you

1    actually agree on the same thing.  It memorializes the change

2    and also gives the person another chance to, you know, look

3    over it, make sure nothing's, you know, been left out or, you

4    know, an oversight or anything like that.

5         We went to a -- we now batch -- well, as of the time I

6    left, we went to putting out all of our changes in batches,

7    which we call "releases," which is a much better way to sort of

8    control the changes and to validate them.  And then, of course,

9    when we do that, there are notes that go out now with all the

10   changes.  And the notes are now posted in perpetuity on a --

11   probably a place that everyone can look at them.

12        We also send out an email to everyone whenever we put out

13   one of these releases with a link to the notes.  It also --

14   here's the link to how to report issues or questions or

15   whatever.  And we started a ticketing process, which is another

16   way to help people report their issues without having to come

17   to a webinar or whatever.

18   Q   Can you briefly describe what a ticketing process is?

19   A   Yeah.  You could create a problem ticket.  You simply just

20   go to a website managed by the CDCR and you can say, "Okay.

21   I'm noticing this problem with the report" or "I have a

22   question about how this works."  And my team and I would meet

23   twice a week and review the tickets, you know.  And a lot of

24   them they can just answer themselves, but if they needed my

25   input, I would give my input.  So we churned through a lot more

1   bug fixes and so forth.

2       And in 2018 -- I know you didn't ask -- we fixed I think

3   400 bugs and did 200 design changes to the reports, so there

4   was a lot of fixing and tweaking going on.

5   Q   And were there any other, I don't know, steps or processes

6   put in place to control changes to these indicators or the

7   data?

8   A   Well, the change management committee was established,

9   change control -- I forget which it's called now.  Change

10  management, I think.

11  Q   Can you describe what its purpose was?

12  A   Yeah, that -- where, you know, all the important stake --

13  the relevant stakeholders, right, would meet and review any

14  requested changes to reports, business rules, things like that

15  and then approve them so that it's done, you know, by committee

16  and that everyone important gets to chime in.

17  Q   Okay.  Now, these are just my last few.  Did you ever

18  change any data, business rules or indicators, for purposes of

19  making CDCR appear more compliant with program guide

20  requirements?

21  A   No.

22  Q   Did you ever feel pressure to change any data, business

23  rules or indicators, for purposes of making CDCR appear more

24  compliant with the program guide?

25  A   No.

1  Q   Did you ever intentionally prepare or create code that

2  would prepare false or misleading compliance data?

3  A   No.

4          MR. FISHER:  I have no further questions.

5          THE COURT:  All right.  May Dr. Leidner be excused?

6          MS. TRAPANI:  Your Honor, I have a few follow-up

7  questions I'd like to ask.

8          THE COURT:  All right.

9                          EXAMINATION

10 BY MS. TRAPANI:

11 Q   Dr. Leidner, you said that you were able to -- you were

12 ordered by Dr. Ceballos to change the business rule back on

13 April 12th of 2017, and that you made that change on April 13th

14 of 2017.

15 A   Did I -- I thought it was April 13 and April 14.

16 Q   I may have misstated your testimony.

17 A   Yeah.

18 Q   Please tell me --

19 A   Okay.  Yes.

20 Q   -- if I'm wrong.

21 A   So I got an email from her and, to my memory, on April 13th

22 asking me to change it, and then I changed it -- I changed it

23 by the end of the 14th.

24 Q   And you stated that it took another few weeks through a

25 validation process until that rule change went live on about

Leidner - Exam by Trapani

1   April 23rd or 24th of 2017; is that correct?

2   A   So it wasn't a few weeks, right.  That would have been one

3   week.

4   Q   Ten days?

5   A   Nine days.  Yeah.  That's correct.  It really couldn't have

6   happened sooner because we were now on that release schedule I

7   talked about where we were putting things out in batches.  So

8   that was the next scheduled release.  So it went out,

9   basically, as quickly as it could in the next release.

10  Q   So it's fair to say that it took much longer to change the

11  rule back than it did to make the original rule change, which

12  you did in about 8 minutes after Dr. Ceballos approved the rule

13  change; is that correct?

14          MR. FISHER:  Objection, misstates the testimony.

15          THE COURT:  Overruled.

16          THE WITNESS:  No, it's not correct.  It still took

17  me -- well, I don't know about 8 minutes for anything, but I --

18  it still took me a time to code the rule change, and I know

19  that it was changed by December 7th, but it would be highly

20  unlikely that I could make the rule change within 8 minutes and

21  I'm -- yeah.  So it probably took me about the same time to

22  code the rule change as it did to uncode it.

23  BY MS. TRAPANI:

24  Q   But based on what -- go ahead.

25  A   The difference is that by the time we uncoded the rule

 1   change, now we had a process in place that was better for

 2   quality management that included validation and batched

 3   releases, so it did take longer to finally roll out; but in

 4   terms of me changing it, it was about the same amount of time,

 5   I believe, roughly.

 6   Q   You said earlier to the Court that you were never told to

 7   think very much about the Coleman Court's orders when you made

 8   your business rule changes.  I'd like to introduce into

 9   evidence a transcript of your testimony that you made before

10   the Court in 2013.  It's marked as Plaintiffs' Exhibit 240.

11           THE COURT:  Is it two documents?

12           MS. TRAPANI:  This is a single document, Your Honor.

13           THE COURT:  All right.

14   BY MS. TRAPANI:

15   Q   Do you recall, Dr. Leidner, testifying before the Court in

16   December of 2013 in the segregation trial?

17           MR. FISHER:  Objection.  This is Dr. Leidner.

18           THE COURT:  What's the objection?

19           MR. FISHER:  Apologies.  I misinterpreted the

20   question.

21           THE COURT:  All right.

22           THE WITNESS:  Yes.  I recall testifying about a report

23   relating to ad seg, yeah.

24   BY MS. TRAPANI:

25   Q   And you were aware at that time that the Court was looking

Leidner - Exam by Fisher

1  at your report about the segregation units and relying on the

2  report that you created to make findings in this case about

3  segregation; is that correct?

4  A   I honestly don't recall.  I remember I was just asked to

5  sort of explain the genesis and purpose of the report.  I don't

6  recall knowing that much about the purpose, no.

7  Q   And do you recall the Court asking you questions about your

8  report?

9  A   Yes.

10  Q   And so you were aware that the Court was looking at your

11  reports that you created for determining its order in this

12  case?

13  A   I don't -- I don't recall.  I don't know that I was aware

14  specifically what they were using the report for.

15       MS. TRAPANI:  Thank you, Your Honor.  No further

16  questions.

17       THE COURT:  All right.  Now, anything further,

18  Mr. Fisher?

19       MR. FISHER:  Yeah.  Just one clarifying question, Your

20  Honor.

21       THE COURT:  All right.

22                        EXAMINATION

23  BY MR. FISHER:

24  Q   Dr. Leidner, during your prior testimony, I believe you

25  mentioned making approximately 200 design changes to reports.

1   Those were reports internal to CDCR; is that correct?

2   A    Yes.

3        MR. FISHER:  Okay.  That's my last question.  Thank

4   you.

5        THE COURT:  All right.  Now is Dr. Leidner excused?

6        MS. TRAPANI:  Your Honor, I apologize.  I would like

7   to move into evidence Exhibits 101 and Plaintiffs' Exhibit 240.

8        THE COURT:  Any objection?

9        MS. THORN:  What was the second one?

10       MS. TRAPANI:  Exhibit marked Plaintiffs' 240.

11       MS. THORN:  No objection to the first.  The second one

12   is a transcript -- (inaudible.)

13       COURT REPORTER:  I'm sorry, Counsel, could you please

14   use the microphone?

15       THE COURT:  Actually, Mr. Fisher should be handling

16   these.

17       MR. FISHER:  No objections, Your Honor.

18       THE COURT:  All right.  So 101 and 240 are admitted.

19     (Plaintiffs' Exhibit 101 and 240 admitted in evidence.)

20       THE COURT:  All right.  You may step down and you are

21   excused.

22     (Witness excused.)

23       THE COURT:  All right.  At this point the Court

24   believes it does not make sense to start with Ms. Brizendine,

25   and so let me just ask the plaintiffs, I did read the parties'

1   stipulation regarding the attorney testimony.  The plaintiffs'

2   position at this point is that it's prepared to accept the

3   declarations provided if the Court determines that it does not

4   need to ask questions of the attorneys?

5               MS. ELLS:  Yeah.  Your Honor, I just want to make our

6   role clear.  That stipulation was to indicate that we did not

7   consider these stipulations to be a waiver.

8               We have not been privy to a lot of the information

9   that Your Honor has been able to review, so we can't speak to

10  whether or not these are sufficient, for the Court's purposes,

11  to answer your inquiries.  So we defer to you.  We do not

12  consider these a waiver.  If you believe that these are

13  sufficient to satisfy you based on what you've reviewed, we

14  will agree to that.

15              THE COURT:  All right.  At this point I'm inclined to

16  accept the declarations, but if anything changes tomorrow

17  afternoon, then we will revisit that question.

18              So we will start tomorrow at 1:30 with Dr. Ceballos

19  and then Assistant Deputy Director Brizendine and then

20  Undersecretary Toche, and I believe we will complete those

21  witnesses tomorrow.  There should be more than enough time if I

22  hold us all to the clock, including myself, and I don't believe

23  that would allow enough time for closing.  If I recall

24  correctly, you want to make closing argument, agreed, Ms. Ells?

25              MS. ELLS:  Yes.  I think some short closing argument

1   would be appropriate here.

2           THE COURT:  All right.  So my thought is that we

3   schedule Thursday morning, 10:00 a.m., half hour each.  Does

4   that work, Ms. Ells?

5           MS. ELLS:  We can make that work.  We had understood

6   that the Court would not hold these proceedings on Thursday,

7   but we can make that work.

8           THE COURT:  I had not planned to, but my plan has been

9   working towards some kind of pronouncement on Friday to be

10  memorialized in an order.  I still hope to get there, so that's

11  why I'm proposing burdening all of our schedules with an

12  additional hour on Thursday.  Does that work for the defense?

13  Who's the lead?

14          MR. LEWIS:  Your Honor, if I can clarify.  So it would

15  be both Thursday and then Friday morning as well?

16          THE COURT:  Thursday would be for you to make your

17  closings.

18          MR. LEWIS:  And then would we be coming back to court

19  on Friday to hear the Court's announcement?

20          THE COURT:  Yes.  So I previously told you your

21  closings are on Friday?

22          MS. ELLS:  Yes, Your Honor.

23          THE COURT:  Ah, okay.

24          MR. LEWIS:  And, Your Honor, perhaps -- and I don't

25  want to get into what your decision process may be, but if we

1  do move tomorrow, we could possibly be prepared tomorrow

2  afternoon for closings.  As you said, they would be brief and

3  we could obviate the need for that issue to come up.  So

4  perhaps if you wanted to bring us back on Thursday morning --

5  and I, of course, would respect Your Honor's schedule, but I'm

6  just trying to determine if you need us here for Thursday and

7  Friday.

8          THE COURT:  All right.  Well, if I told you closings

9  on Friday, then I was getting ahead of myself because I want to

10  think about your closings before I make a final decision.  But

11  maybe I can recess and do that.

12          All right.  Well, let's see how it goes tomorrow.  If

13  we were, in fact -- I think at least two of the witnesses will

14  take as much time as some of the longer witnesses today, and

15  I'm not -- I set aside the afternoon, so starting at 1:30.  So

16  we'll see where we are at the end of the day tomorrow.

17          Ms. Musell, you'd like to say something?  Why don't

18  you come forward so we can hear you properly.  Do you wish to

19  make a closing as well?

20          MS. MUSELL:  Well, Your Honor, it was a separate

21  issue.  There was some testimony today that indicated that

22  Dr. Golding had not made communications, and we have emails

23  that would demonstrate that that's false or incorrect to the

24  Court.  So my question, Your Honor, is, given that we were

25  unaware that that's how certain witnesses would testify, that

Leidner - Exam by Fisher

1   communications did not occur when we do have emails that

2   demonstrate that they do, would the Court like that information

3   in the record in order to make your determination?

4          THE COURT:  I believe that would make sense, yes, to

5   supplement the record.  So if you can -- could you provide by

6   tomorrow afternoon copies?  You can mark them as exhibits for

7   ease of identification and then have copies for the parties.

8          MS. MUSELL:  I'm happy to do that.  The way that we

9   had provided -- we've provided thousands of pages, Your Honor,

10  to the neutral expert, assuming that Your Honor would have

11  received those, but we are happy to do that here so that all

12  parties can see the same information as to those specific

13  communications.

14         THE COURT:  I have not previously opened up discovery.

15  I've consciously not allowed full discovery.  Are you -- you're

16  talking about selected emails --

17         MS. MUSELL:  Select.

18         THE COURT:  -- within the --

19         MS. MUSELL:  Yes.  We did understand, Your Honor, that

20  there had not been a mechanism to provide it to either party,

21  so we did not without an order directly from Your Honor.  We

22  wanted to honor whatever orders Your Honor had made --

23         THE COURT:  All right.

24         MS. MUSELL:  -- so we did not distribute that.

25         But as to these very particular issues that were

1   testified to today that indicated that there were no

2   communications with Dr. Golding when I've seen emails that said

3   they did, I think Your Honor may be interested in that.

4           THE COURT:  Yes.  Provide a packet to me with courtesy

5   copies for the parties.  Your position is there's no privilege

6   implicated by any of the --

7           MS. MUSELL:  That is my position.

8           My position additionally as to the 20 -- the report

9   that Dr. Golding had made of the inspection, if you will, going

10  to the particular institutions is also not attorney-client

11  privilege, but it was designated so after the fact even though

12  no attorney was provided it.  So I suppose that I should ask

13  Your Honor can I include that or not, given that it was

14  subsequently designated.  But my personal understanding is it

15  would not meet any definition of attorney-client privilege that

16  I'm aware of in practicing law.

17          THE COURT:  Is that the April 2018 document?

18          MS. MUSELL:  Yes, Your Honor.

19          THE COURT:  Well, why don't you prepare three sets,

20  provide them all to the Court tomorrow afternoon, I'll review

21  them and we'll go through a process.

22          I see you, Mr. Silberfeld, standing.

23          So if I think, based on all I know about potential

24  claims of privilege, I'll give the defense a chance to register

25  that objection.

1          MR. SILBERFELD:  Appreciate that.  I was going to

2    address one other thing, Your Honor.

3          MS. MUSELL:  Thank you, Your Honor.

4          THE COURT:  Do you want to make some closing statement

5    to the Court, Ms. Musell?

6          MS. MUSELL:  We had not contemplated it, Your Honor,

7    but we certainly -- Dr. Golding has views on these issues, as

8    you might imagine.  If it would help Your Honor, we're happy to

9    do so.

10         THE COURT:  All right.  I'll let you know.

11         MS. MUSELL:  Thank you.

12         THE COURT:  All right.  Mr. Silberfeld?

13         MR. SILBERFELD:  Your Honor, the only thing I'd like

14   to reserve is the opportunity, depending upon what these

15   documents show, we may ask to call Dr. Golding back.

16         THE COURT:  All right.  May not be the only witness

17   implicated by the emails.  It could reopen portions of the

18   hearing entirely.

19         MR. SILBERFELD:  Yes, Your Honor.

20         THE COURT:  All right.  Ms. Ells?

21         MS. ELLS:  Your Honor, just one small housekeeping

22   matter.

23         We'd like to introduce into evidence Plaintiffs' 210,

24   212, 214 and 215.  These are the various iterations of the 2018

25   staffing plan.  And my understanding is, defendants are

1    stipulating to their admissibility.

2            THE COURT:  All right.  Agreed?

3            MR. FISHER:  Yeah, no objections.

4            THE COURT:  All right.  So those exhibits are

5    admitted.  You can provide courtesy copies to the Court before

6    you leave today.

7        (Plaintiffs' Exhibits 210, 212, 214 and 215 admitted in

8        evidence.)

9            THE COURT:  In terms of Exhibit 164, my request is

10   that you each identify for me the case law, a handful of cases.

11   I don't need argument.  Just let me know what the cases are

12   that you think guide my decision as to whether or not 164

13   qualifies as a document not covered by the hearsay rule.  And

14   if you could do that by tomorrow noon, you can email it to

15   Ms. Schultz and -- I mean, you can file the document just in

16   the form of a letter, "Here are the case."  Just simultaneous

17   filings by noon tomorrow.

18           MS. ELLS:  One clarification, Your Honor.  Do you want

19   any analysis in that?  Did you want argument in that or just

20   literally the case citation?

21           THE COURT:  Just the cases.

22           MS. ELLS:  Thank you.

23           THE COURT:  If I need argument, I'll let you know when

24   I see you tomorrow afternoon.

25           MS. ELLS:  Thank you.

Leidner - Exam by Fisher

1          THE COURT:  All right.  Any other housekeeping from

2    either side?  Any of the plaintiff class representatives?

3          MS. ELLS:  Not today, Your Honor.

4          THE COURT:  All right.  Any defense?

5          MR. LEWIS:  Nothing further, Your Honor.

6          THE COURT:  All right.  We'll see you tomorrow at

7    1:30.

8       (Concluded at 4:49 p.m.)

9

10

11              C E R T I F I C A T E

12

13    I certify that the foregoing is a true and correct

14    transcript of the record of proceedings in the above-entitled

15    matter.

16

      */s/ JENNIFER L. COULTHARD*          October 28, 2019

17                                         DATE

18

19    JENNIFER L. COULTHARD, RMR, CRR
      Official Court Reporter

20

21

22

23

24

25

attachment 22

1    process built into place, that's my understanding.  And that

2    data that would be reported to the Court is data that staff is

3    currently using to treat patients, and so we want that data to

4    be accurate.

5    Q   I understand that, but do you agree that there should be an

6    additional step before something is provided to the Special

7    Master, one question; and then the second question, should

8    there be an additional step before information is provided to

9    this Court, which is another level of authority in this case?

10   A   I would need to think about how that would look and how

11   that would work.

12   Q   Okay.  Are you willing to issue a directive, as suggested

13   by the Court, that would allow mental health staff to

14   communicate freely to the Special Master and his team?

15   A   Oh.  To issue a memo saying that they're free to --

16   Q   Yes.

17   A   Yes.

18   Q   Okay.  And is that current policy?

19   A   I believe it's current policy.

20   Q   You've heard -- you've been in here, and you've heard

21   testimony that at least some employees may perceive that

22   they're not free to, for example, speak at a workgroup meeting.

23   Do you think that's accurate that people have to have

24   permission to speak their opinion at a workgroup meeting?

25   A   I do not -- I do not believe that people need to have

1    permission, but I also know that perceptions can vary from

2    person to person.  And so whatever we can do to correct

3    misperceptions, we will do.

4    Q    Would you agree that it would be inappropriate to

5    discipline an employee, a mental health clinician, for example,

6    for speaking to the Special Master or his staff?

7    A    Yes.

8    Q    Do you agree that every effort should be made to correct

9    any pleadings, in other words, court filings that have been

10   made in this case that defendants now believe are inaccurate?

11   A    Of course.

12   Q    One impression that has come through, at least to me

13   sitting in the courtroom, is that it's not clear that CDCR

14   officials understand that CDCR has been found to have violated

15   the Constitution as to the mental health program and is under a

16   remedial order supervised by this Court.  What efforts do you

17   think could be made to make clear to CDCR Mental Health

18   employees and officials that their -- Coleman is not just a

19   word, but this is a court order of a federal court upheld by

20   the United States Supreme Court that governs a remedial

21   process?

22        MR. LEWIS:  Objection, Your Honor.  This is an

23   argumentative question.  It also calls for a legal conclusion.

24        THE COURT:  Overruled, given the overarching

25   responsibilities Dr. Toche has said she carries.

attachment 23

STATE OF CALIFORNIA

DEPAARTMENT OF CORRECTIONS AND REHABILITATION
DIVISION OF CORRECTIONAL HEALTH CARE SERVICES

# DUTY STATEMENT

SHADED AREA TO REFLECT RECLASS POSITION NUMBER ONLY

| RPA/647# | EFFECTIVE DATE: |
|---|---|

| CDCR INSTITUTION OR DEPARTMENT | POSITION NUMBER (Agency - Unit - Class - Serial) |
|---|---|
| Division of Health Care Services | 065-923-9774-001 |

| UNIT NAME AND CITY LOCATED | CLASS TITLE |
|---|---|
| Mental Health Program, Psychiatry Support, Elk Grove, CA | Chief Psychiatrist, Correctional Facility |

| WORKING DAYS AND WORKING HOURS | SPECIFIC LOCATION ASSIGNED TO |
|---|---|
| 8 a.m. to 5 pm (Approximate only for FLSA exempt classifications) | 9272 Laguna Springs, 95758 |

| PROPOSED INCUMBENT (If known) | CURRENT POSITION NUMBER (Agency - Unit - Class - Serial) |
|---|---|
| Michael Golding | 065-923-9774-001 |

YOU ARE A VALUED MEMBER OF THE DEPARTMENT'S TEAM. YOU ARE EXPECTED TO WORK COOPERATIVELY WITH TEAM MEMBERS AND OTHERS TO ENABLE THE DEPARTMENT TO PROVIDE THE HIGHEST LEVEL OF SERVICE POSSIBLE. YOUR CREATIVITY AND INGENUITY ARE ENCOURAGED. YOUR EFFORTS TO TREAT OTHERS FAIRLY, HONESTLY, AND WITH RESPECT ARE CRITICAL TO THE SUCCESS OF THE DEPARTMENT'S MISSION.

Under the general direction of the Statewide Mental Health Director, Division of Correctional Health Care Services (DCHCS) of the California Department of Corrections and Rehabilitation (CDCR), the Chief Psychiatrist, Correctional and Rehabilitation Safety (C&RS), Behavioral Medicine has responsibility for: providing statewide clinical and administrative leadership for psychiatry; has primary responsibility for pharmacy, medication management and telemedicine programs; recruits, trains, hires and provides Quality Management (QM) psychiatrists' supervision; primary responsibility for tracking and ensuring effective statewide heat plan implementation; development and training of medication algorithms; ensures competent statewide implementation of Keyhea processes; and provides for Mentally Disordered Offender (MDO) certifications. **Statewide travel is required.**

| % of time performing duties | Indicate the duties and responsibilities assigned to the position and the percentage of time spent on each. Group related tasks under the same percentage with the highest percentage first. (Use additional sheet if necessary) |
|---|---|
| | **ESSENTIAL FUNCTIONS** |
| 30% | Provides for management and supervision of QM Senior and Staff Psychiatrists with effective management and direction of the QM Medication Management program guidelines, mental health clinical program guidelines, audit procedures, court mandated clinical mandates and the maintenance of quality clinical practice standards commensurate with community programs; ensures that institutional issues regarding Pharmacy and Medication Management are addressed to the DCHCS Headquarters (HQ) Pharmacy and Medication Management Subcommittee and when indicated moves these issues up to the DCHCS HQ Quality Management Committee; ensures that specific institutional concerns regarding psychiatry programming are addressed at the DCHCS level or referral made to other Departments or appropriate individuals; conducts quality management monitoring of key indicators in telemedicine to maintain compliance with DCHDC clinical program guidelines, pharmacy guidelines and court mandated clinical mandates. |
| 20% | Directs Psychiatric Telemedicine Unit operations including development of assessment tools to evaluate the quality of service delivery, peer review processes and institutional satisfaction with psychiatric telemedicine services; overall clinical supervision of Telemedicine staff psychiatrists including clinical orientation, time schedules and clinical documentation standards; assesses the institutional needs for telemedicine staff psychiatrist services and implements new service or additional services when indicated. |

| | |
|---|---|
| **20%** | Reviews MDO psychological evaluation reports and render opinion if criteria are met under the MDO statute for certification; actively participate in reviewing and updated MDO policy and procedures, especially when there is impacting litigation; liaison with the Department of Mental Health (DMH) staff on MDO program coordination policy and procedures compliance; direct the orientation and training of institutional staff on MDO policy and procedures including the legal reporting requirements; review Department of Mental Health Requests including forensic psychological reports for the transfer of care of patients under the 7301 statute criteria making determinations when clinically appropriate for transfer to CDCR institutions; prepares MDO written responses for the DCHCS Director and assist during CDCR Director Review Board meetings as the clinical subject matter expert. |
| **15%** | Facilitates the hiring process by conducting interviews, evaluating and recommending candidates for appointment utilizing various methods of filling vacancies (e.g. recruitment, team building, training and development assignments, certification lists, etc.); conduct probationary and annual performance evaluations on all assigned psychiatrists in a timely manner applying consistent and fair evaluation practices; active in the recruitment, retention and promotion activities for Senior Psychiatrists and staff psychiatrists for Telemedicine, QM including field institutional employment within the CDCR; conducts In-service Training for the field to provide information and ensure proper implementation of the standard of medical and mental health care utilizing communication and management skills, correct policies and procedures, as needed; evaluates and provides feedback to employees under supervision to ensure performance objectives/standards are met by monitoring work, assignments and/or behaviors as defined by various laws, administrative rules, policies, procedures, etc. |
| **10%** | Consults on psychiatry-related policy and program development and contributes to development of psychotropic medication treatment guidelines/algorithms in various workgroups; assure effective institutional Keyhea processes and assume liaison duties with the legal affairs department tracking system; provide oversight with effective management of the DCHCS statewide Heat Plan Program and participate in revisions of the CDCR Heat Plan teaching manual; provide subject matter expert consultation to the Suicide Prevention committees and the Health Care Placement Unit headquarters services; assists in the CCAT weekly conferences by recommending transfer of patients to appropriate levels of mental health care and providing recommendations in mental health treatment and individual medication management with follow-up, as needed in difficult placement cases; participates in the development of policies and standards for the mental health program to assure compliance with existing laws, regulations and court mandates; reviews medical and psychological examination findings for evidence of organic disturbances as well as other complicating features (e.g. physical illnesses, developmental problems, seizure disorders, medication side-affects, etc.) related to mental disorders when consulting on complex clinical cases ensuring appropriate placement and treatment of patients; provides input to the parole outpatient clinic personnel for the management of patients placed on parole to assure continuity of care and to maintain the safety of the community in cases where there is a threat of violence utilizing knowledge of controlling laws, rules, regulations, court mandates, and appropriately communicating with persons and agencies; consults with professional departmental staff, on all phases of the Department's mental health program to provide technical advice, expertise, to assist in the resolution of clinical problems that may arise, etc. utilizing various resources (e.g. professional skills, laws, rules, regulations, court mandates, etc.) as necessary. |
| **05%** | Based on operational need performs other duties as required. |

**KNOWLEDGE AND ABILITIES**

Knowledge of: Principles and methods of psychiatry including diagnosis and treatment of behavior problems, mental and emotional disturbances, and developmentally disabled; modern methods and principles of general medicine and neurology and skill in their application; literature and recent developments in the field of psychiatry; principles and practices of clinical psychology and psychiatric social work; principles and techniques of social psychiatric research; modern techniques, practices, and trends in the correction and prevention of delinquency and criminality; principles of effective supervision and personnel management; and principles, methods, and objectives of training treatment personnel.

Ability to: Apply the principles and methods of psychiatry including diagnosis and treatment of behavior problems, mental and emotional disturbances, and mental deficiency; coordinate, supervise, and evaluate the work of professional employees, and instruct and advise them in their work; formulate and effect practical and comprehensive plans for the psychiatric care and treatment of adult and juvenile offenders; establish and maintain cooperative relations with those contacted in the work; prepare clear and concise reports; and communicate effectively.

**DESIRABLE QUALIFICATIONS**

Empathetic understanding of patients of a State correctional facility and of the problems of the mentally ill, delinquency, and adult criminality; demonstrated leadership ability; willingness to work in a State correctional facility; emotional stability; alertness; keenness of observation; tact; and patience.

**SPECIAL PHYSICAL CHARACTERISTICS**

Persons appointed to this position must be reasonably expected to have and maintain sufficient strength, agility, and endurance to perform during stressful (physical, mental, and emotional) situations encountered on the job without compromising their health and well-being or that of their fellow employees or that of inmates or youthful offenders.

Assignments may include sole responsibility for the supervision of inmates or youthful offenders and/or the protection of personal and real property.

| SUPERVISOR'S NAME (Print) | SUPERVISOR'S SIGNATURE | DATE 11/7/14 |

The statements contained in this duty statement reflect general details as necessary to describe the principal functions of this job. It should not be considered an all-inclusive listing of work requirements. Individuals may perform other duties as assigned, including work in other functional areas to cover absence of relief, to equalize peak work periods or otherwise balance the workload.

| EMPLOYEE'S NAME (Print) Dr. Michael Golding | EMPLOYEE'S SIGNATURE | DATE Nov 17, 2014 |

attachment 24

From: ███████@yahoo.com
Subject: Leadership thanks
Date: May 14, 2022 at 1:09 PM
To: Michael Golding mlionson428@gmail.com

Hi Michael,

Hard to imagine it's been over 3 years.

Wanted to thank you for all the supervision and leadership you provided to me and the telepsych program in our time working together. The daily brief huddles where I reported to you on telepsychiatry and EHRS status were so helpful to me and crucial in moving these complex programs forward. While most at work were asking "what is in it for me" you always asked if we were serving our patients. I can truly say you have been one of the best, if not the best, supervisors I have had in my career.

You were available at all times to discuss telepsychiatry staffing, technology and processes as the service continued to expand. You approved my time cards, and approved time off when needed, and were so supportive of efforts to ensure telepsychiatry work was accurately reflected in the EHRS.

As I implemented the EHRS as a lonely force of one until reinforcements came in you were thoughtful of and supportive to me traveling throughout the state, truly expressing concern for my well being when help was not available.

The department should feel lucky to have you, but as I felt in my own departure I suspect they struggle with that realization.

Thank you for always supporting me and the programs I was involved in. Be well and take care.

███████

attachment 25

## Golding, Michael@CDCR

| From: | ████@CDCR <████@cdcr.ca.gov> |
|---|---|
| Sent: | Thursday, November 30, 2017 8:16 AM |
| To: | Golding, Michael@CDCR; ████████@CDCR |
| Cc: | ████████@CDCR |
| Subject: | RE: PRN and ████ position |

**CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Hi Dr. Golding,

I will send you the email for the PRN position.

As for Dr. ████, we are trying to see if we are set to move forward with the 1st as his start date. So please hold. I will include you on the follow up email to HR.

**From:** Golding, Michael@CDCR
**Sent:** Wednesday, November 29, 2017 4:04 PM
**To:** ████@CDCR ████████@cdcr.ca.gov>; ████████@CDCR ████████h@cdcr.ca.gov>
**Subject:** PRN and ████ position

Hi,

I am not finding the needed e-mails amongst the hundreds of others.

This week we were diverted twice and I am just getting to e-mails (that are not emergencies) right now.

Please send me the e-mail so that I can offer the PRN position and have central hiring also call our new PRN psychiatrist.

And please give me the name of the person in Central Hiring whom I should write so that I can offer ████ the position that he earned with his great performance and wonderful interview.

Michael

**Michael Golding, M.D.**
Statewide Chief Psychiatrist
Mental Health Support Program
California Department of Corrections and Rehabilitation

Phone: 916.662.6541
Email: michael.golding@cdcr.ca.gov

1



Learn easy ways to save water
during California's drought at
SaveOurWater.com

**Golding, Michael@CDCR**

| | |
|---|---|
| **From:** | l@gmail.com> |
| **Sent:** | Monday, October 9, 2017 6:25 PM |
| **To:** | Golding, Michael@CDCR; ████████h@cdcr.ca.gov |
| **Cc:** | ██████ |
| **Subject:** | PRN Interview Follow-Up |

---

**CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

---

Dear Drs. Golding and ████████,

Thank you for the opportunity to interview for the PRN position. I left the interview excited and intrigued by the position. It seems to combine several things that are important to me -- teaching and learning, caring for patients (and getting them better!) in a really challenging environment, and professional growth. The past year I've been in the trenches, managing an entire unit of pretty ill patients at Salinas Valley PIP. The PRN position would allow me to use that experience in collaboration with others to improve patient care within CDCR.

For a couple of reasons, the format of the interview caught me a bit off guard. Thus, I didn't ask the questions that I have about the position. If it's not convenient to answer them via e-mail, possibly we can schedule another phone call. Without further ado:

1. Can you describe your vision of:
    1. The composition of the CDCR PRN group
    2. What our training with the DSH PRN group would look like (duration, location(s), etc)
    3. How closely CDCR CME would match DSH CME
    4. Staff support (clerical and IT for CME, travel, etc)
    5. Timeline of training, launch of CDCR PRN, launch of CME
    6. How this position would collaborate with other CDCR departments and other branches of medicine
    7. The opportunities for interaction w/ colleagues in this position
2. The position is listed under telepsychiatry, I know there are several different CDCR Telepsychiatry centers. Would I be based at one of these centers or somewhere else?
3. You mentioned that there would be a component of travel. Can you estimate the percent travel this position entails?
4. Could we arrange for me to continue to do some small amount of direct patient care? And, where would that be?
5. This position can't function w/o institutional PubMed access. What is the plan for that?
6. Who would I be reporting to?

Again, if it's not convenient to answer these questions via e-mail, I'd appreciate it if we could schedule another phone call to discuss them.

1

There was some mention of references during our conversation. One of my former supervisors -- ███████ ██████ -- is best reached on his personal cell. His number is ███████████. Please let me know if you need additional references and contact numbers.

Thanks again for taking the time to talk with me this morning. I look forward to learning more about the PRN position and how we can move forward.

████

attachment 26

**From:** ███████@gmail.com
**Subject:** Request
**Date:** May 12, 2022 at 4:18 PM
**To:** Michael Golding mlionson428@gmail.com

Date: 5/12/2022

To Whom It May Concern,

My name is Dr ████████. During my time serving as ██████████ at CDCR, Dr Michael Golding served as my direct supervisor. Dr. Golding was a supportive, kind and empathic supervisor and provided significant guidance and mentoring on both clinical issues and leadership development. I am grateful to have had him supervise me.

Please let me know if you have any further questions.

Best,
Dr ██████████

attachment 27

## Golding, Michael@CDCR

| | |
|---|---|
| **From:** | ██████████@CDCR ███████████ @cdcr.ca.gov> |
| **Sent:** | Wednesday, May 25, 2016 9:16 AM |
| **To:** | Golding, Michael@CDCR |
| **Subject:** | FW: on call |
| **Attachments:** | taamu.ad7309.5.24.16.on call.pdf |
| **Importance:** | High |

---

**CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Hi Michael

I am asking for your help with ████████ Clearly its inappropriate for her to use the medical record as a forum for expressing concerns with logistical issues at SAC. However, when we try and direct or correct her behavior, she typically files grievances and complaints.

Further complicating the matter, her caseload appears to be too low. Yet, if we ask that her caseload is increased, she may accuse us of retaliation. We just want everyone to carry their fair share of the caseload.

Please advise,

█



 CALIFORNIA CORRECTIONAL
# HEALTH CARE SERVICES

### CONFIDENTIALITY NOTICE

The information contained within this transmittal is confidential and may be legally privileged and protected as inside information. This information is for use only by the recipient(s) intended. If you have received this information in error, please notify the sender immediately and destroy all copies of this communication. any unauthorized disclosure, distribution, or taking any action based on unauthorized use of this information is strictly prohibited and may be unlawful.

**From:** ████████████
**Sent:** Wednesday, May 25, 2016 7:52 AM
**To:** ████████@CDCR; ████████████@CDCR; ████████████@CDCR

**Cc:** ▮▮▮▮▮▮▮▮▮@CDCR; ▮▮▮▮▮▮▮▮Golding, Michael@CDCR
**Subject:** on call

Hello,

I was on call last night and wanted to raise concern, detailed in note.  Please read and assist in improving patient care received and support to on call providers.

Regards,

▮▮▮▮▮▮▮▮▮▮▮▮

California Department of Corrections and Rehabilitation
Telepsychiatrist assigned to Pelican Bay State Prison Extended Outpatient Program
P.O. Box 425
San Quentin, CA 94964
office: ▮▮▮▮▮▮▮▮▮▮▮▮
Office hours Tuesday to Friday 0700-1700

## CONFIDENTIALITY NOTICE

The information contained within this transmittal is confidential and may be legally privileged and protected as inside information.  This information is for use only by the receipient(s) intended.  If you have received this information in error, please notify the sender immediately and destroy all copies of this communication.  any unauthorized disclosure, distribution, or taking any action based on unauthorized use of this information is strictly prohibited and may be unlawful.

attachment 28

## Golding, Michael@CDCR

**Subject:**                    FW: All Parties Meeting

**From:** Golding, Michael@CDCR <michael.golding@cdcr.ca.gov>
**Sent:** Friday, May 27, 2016 11:35 AM
**To:** ████████, ████████@CDCR ████████@cdcr.ca.gov>; ████████@CDCR
<████████@cdcr.ca.gov>
**Subject:** FW: All Parties Meeting

---

**CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

---

**CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

---

No.
We don't have to react immediately and send psychiatrists.
Yes, on Tuesday, we need to carefully evaluate the staff that are at each of these places (██ can call them to verify that our data is correct, including registry, guesses at future registry, and telepsych).
With that information in hand we can defend not sending more psychiatrists or deciding to change.

Yes, I will be asked, so I need good numbers.

Thanks ██
Michael


**Michael Golding, M.D.**
Statewide Chief Psychiatrist
Mental Health Support Program
California Department of Corrections and Rehabilitation

Phone: 916.662.6541
Email: michael.golding@cdcr.ca.gov



**Learn easy ways to save water
during California's drought at
SaveOurWater.com**

1

**From:** ████████████████
**Sent:** Friday, May 27, 2016 11:14 AM
**To:** ████████ @CDCR; ████████ @CDCR; ████████ @CDCR; ████████ @CDCR; Golding, Michael@CDCR
**Subject:** FW: All Parties Meeting

FYI. Another agenda suggestion from plaintiffs. Are staffing shortages so severe at MCSP and RJD that intake should stop?



Department of Corrections & Rehabilitation
1515 S Street, Suite ███
Sacramento, CA 95811-7243
Office (████████

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

**From:** Steven Fama [mailto:sfama@prisonlaw.com]
**Sent:** Friday, May 27, 2016 11:14 AM
**To:** Kerry Walsh; Matt Lopes
**Cc:** Coleman Team - RBG Only; ccenter@aclu.org; Margot Mendelson; ████████ @CDCR; ████████; ████████ @DSH
**Subject:** RE: All Parties Meeting

Dear all,

A matter that I believe should be discussed at the 6/10/16 all-parties meeting has come to my attention since yesterday's letter from Krista regarding proposed agenda items.

Please consider for the agenda the status of transfers of MHSDS patients into Mule Creek including that prison's in-fill, and transfers of MHSDS patients into RJD now and when the in-fill opens in approximately 60 days, given the very high vacancy rates for staff psychiatrists at both prisons and of staff psychologists Mule Creek. I will shortly send specific emails regarding these matters. The question is whether CDCR should stop transfers of new patients into those prisons until clinical staffing shortages are resolved, and what additional clinical staffing will be allocated to RJD for the expected additional patients to be housed in the in-fill.

Thank you for considering this matter for the all-parties meeting agenda.

Steven Fama
Staff Attorney
Prison Law Office

attachment 29

**Golding, Michael@CDCR**

| | |
|---|---|
| **From:** | ████@CDCR <█████@cdcr.ca.gov> |
| **Sent:** | Wednesday, January 17, 2018 9:46 AM |
| **To:** | Golding, Michael@CDCR |
| **Cc:** | ████████@CDCR; ██████████@CDCR |
| **Subject:** | RE: ??? RC Regional Office |

---

**CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

---

Hi Dr. Golding,

I have updated the duty statement and have sent the request to HR to correct the job posting. I will forward you the new job link once it has been updated.

**From:** Golding, Michael@CDCR
**Sent:** Wednesday, January 17, 2018 9:43 AM
**To:** ████████CDCR <████████@cdcr.ca.gov>
**Cc:** ████████@CDCR ████████@cdcr.ca.gov>
**Subject:** RE: ??? RC Regional Office

Hi,
Yes. The position that Dr. ██████ is vacating should be out of San Quentin and not Rancho.
Please pull the position posting, now, and run it out of SQ.
Thank you.
Michael

**Michael Golding, M.D.**
Statewide Chief Psychiatrist
Mental Health Support Program
California Department of Corrections and Rehabilitation

Phone: 916.662.6541
Email: michael.golding@cdcr.ca.gov



**Learn easy ways to save water
during California's drought at
SaveOurWater.com**

1

**From:** ▮▮▮▮▮ CDCR
**Sent:** Wednesday, January 17, 2018 9:38 AM
**To:** ▮▮▮▮▮▮▮▮ @CDCR; Golding, Michael@CDCR
**Subject:** RE: ??? RC Regional Office

Hi Dr. Golding,
Per our conversation we did post the position and it is out of San Bernadino County with Rancho Cucamonga listed as the location.

I will reach out to HR to make changes to the headquarters location so that it is listed with San Quentin as the new location.

**From:** ▮▮▮▮▮▮▮ @CDCR
**Sent:** Wednesday, January 17, 2018 9:27 AM
**To:** Golding, Michael@CDCR <Michael.Golding@cdcr.ca.gov>; ▮▮▮▮▮▮▮▮▮▮ @cdcr.ca.gov>
**Subject:** RE: ??? RC Regional Office

It's ▮▮ s position.

▮▮▮▮▮▮▮▮▮
Statewide Mental Health Program
Division of Health Care Services
Office 916.691.0265

CONFIDENTIALITY NOTICE: This communication and any documents, files or previous e-mail messages attached to it may be privileged and confidential. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that any review, disclosure, copying, distribution, or taking of action in reliance on the contents of this communication is strictly prohibited and may be unlawful. If you are not the intended recipient, please contact the sender and destroy all copies of this communication. For IT issues contact our Public Service Center at 2-358-7359.

**From:** Golding, Michael@CDCR
**Sent:** Wednesday, January 17, 2018 8:58 AM
**To:** ▮▮▮▮▮ @CDCR; ▮▮▮▮▮▮▮▮▮ @CDCR
**Subject:** FW: ??? RC Regional Office

Hi,
With some urgency, can you tell me what position this is.
Michael

**Michael Golding, M.D.**
Statewide Chief Psychiatrist
Mental Health Support Program
California Department of Corrections and Rehabilitation

Phone: 916.662.6541
Email: michael.golding@cdcr.ca.gov

**Save Our Water**

Learn easy ways to save water
during California's drought at
SaveOurWater.com

**From:** ████████@CDCR
**Sent:** Wednesday, January 17, 2018 8:20 AM
**To:** Golding, Michael@CDCR
**Subject:** ??? RC Regional Office

Is this ████ position? It seems strange to have it at "Regional Office – Rancho Cucamonga"

Thanks,

████

# Chief Psychiatrist, Correctional and Rehabilitative Services (Safety)

**Job Number:** 5538058
**Location:** Regional Office – Rancho Cucamonga
**Department Name:** CDCR
**Region:** Southern California
**Time Base/FT/PT:** Full Time
**Closing Date/FFD:** 2/22/2018

**Chief Psychiatrist, Correctional & Rehabilitative Services (Safety)**
$287,136 - $349,200 Annual Range (Board Certified)
$281,736 - $340,668 Annual Range (Non Board Certified)

A Chief Psychiatrist, Correctional and Rehabilitative Services (Safety), under general direction, in a State correctional facility or headquarters in the Department of Corrections and Rehabilitation, either (1) in a diagnostic or outpatient clinic to plan and direct the preventive and corrective psychiatric work with offenders; or (2) to plan and direct the psychiatric and mental health services programs in a correctional institution; or (3) in headquarters, has statewide responsibility for the Department's mental health program in such areas as program development, planning, standards, and evaluation; to maintain order and supervise the conduct of inmates or youthful offenders; to protect and maintain the safety of persons and property; and to do other related work.

You must have List, Lateral or Reinstatement eligibility in order to apply for this position. To obtain list eligibility, click on the Exam Bulletin.

Apply for this position by clicking "Apply Now" at the top or bottom of this job posting. The Human Resources Contact is available to answer questions regarding the position or application process. ███████ ████████
████████ 886. ███.



Mental Health Support Program
Elk Grove - Headquarters
California Correctional Health Care Services
California Department of Corrections and Rehabilitation





CALIFORNIA CORRECTIONAL
**HEALTH CARE SERVICES**

4



**Learn easy ways to save water during California's drought at SaveOurWater.com**

**IMPORTANT WARNING:** This message is intended for the use of the person or entity to which it is addressed and may contain information that is privileged and confidential, the disclosure of which is governed by applicable law. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this information is STRICTLY PROHIBITED. If you have received this message by error, please notify us immediately and destroy the related message. You, the recipient are obligated to maintain it in a safe, secure and confidential manner. Re-disclosure without appropriate patient consent or as permitted by law is prohibited. Unauthorized disclosure or failure to maintain confidentiality could subject you to penalties described in Federal and State Law.

attachment 30



**From:** **Golding, Michael@CDCR** Michael.Golding@cdcr.ca.gov
**Subject:** Fwd: Follow up on phone call
**Date:** October 16, 2022 at 10:23 AM
**To:** michael golding mlionson428@gmail.com

Sent from my iPhone

Begin forwarded message:

**From:** Shannon Robinson <SRobinson@healthmanagement.com>
**Date:** October 16, 2022 at 10:10:39 AM PDT
**To:** "Golding, Michael@CDCR" <Michael.Golding@cdcr.ca.gov>
**Subject: Follow up on phone call**

---

**CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

---

Here you go. 😊

Shannon



**Shannon Robinson, MD**
Principal | Costa Mesa, CA
Direct: (657) 279-3493 | Mobile: (619) 417-2992
www.healthmanagement.com

---

The information contained in this e-mail, including any attachments, is confidential and intended solely for the named recipient(s) and may be subject to protection under federal and state laws. If you are not the intended recipient, please inform the sender immediately by reply e-mail that the message was sent in error and delete the message. Thank you.

---

10.14.22

It is a pleasure to write a letter of reference for Dr. Michael Golding. I worked with Dr. Golding within California Correctional Healthcare Services (CCHCS) from 2014-2019. I had only been at California Department of Corrections and Rehabilitation (CDCR) for 9 months before being appointed to the position of Acting Chief, during this time, I was clinically supervised by Dr. Golding. During my three-month position the Telepsychiatry program went from serving 7 prisons to 12 and nearly doubled in staff from roughly 25 to almost 50 psychiatrists; this rapid expansion would not have happened without the guidance and support provided of Dr. Golding. As a new supervisor within a complex bureaucracy, I would not have been able to successfully hire, train and initiate care in this many locations without his assistance.

In 2016, one of the psychiatrists at one of the California prisons committed suicide. Dr. Golding came from northern California to Southern California to deliver care to this psychiatrist's patients and to provide support for the staff at the facility. This level of compassion and concern, for the patients and staff in a time of need, is exceptional.

In June of 2016, Senate Bill 843 mandated a Medication Assisted Treatment (MAT) Pilot Program in CCHCS. I was asked to design and implement the pilot program at one male and one female prison

under the direct supervision of Dr. Golding. With Dr. Golding's oversight, we designed and implemented a program, treated patients, and wrote a legislative report in eight months. Dr. Golding provided the needed guidance to ensure newly developed workflows, intake and note templates, and order sets were generated and available in the electronic medical record for the start of patient care six months after this bill was signed into law. Dr. Golding also provided the needed support for me to interact with California Department of Public Health, California Department of HealthCare Services, County Behavioral Health Directors Association, Chief Probation Officers of California, CDCR's Directors Stakeholder Advisory Group, to let external stakeholders know of this program within the first year. His ongoing support was ever present as we developed relationships with ALL 58 counties in California, over the first two years of the pilot program, to ensure that patients returning to ANY county in California would have access to continuity of care upon release.

In July of 2018, the supervision of the MAT program moved from mental health department to the medical department; however, I continued to work closely with Dr. Golding to ensure that all mental health providers (prescribers and non-prescribers) were included in all educational efforts regarding substance use disorder treatment and medication for alcohol and opioid use disorders.

Although I resigned from CCHCS in December of 2019, I often think of Dr. Golding's guidance through the complex bureaucracy of CDCR and CCHCS and his compassion for patients and staff alike. His character and ethical standards are beyond reproach. He is always interested in delivering the highest level of care possible to all patients in need and to supporting the staff who work with him and under his supervision. I am blessed to have worked with him.

Sincerely,

Shannon 10.14.22

Shannon Robinson, MD

10.14.22

It is a pleasure to write a letter of reference for Dr. Michael Golding. I worked with Dr. Golding within California Correctional Healthcare Services (CCHCS) from 2014-2019. I had only been at California Department of Corrections and Rehabilitation (CDCR) for 9 months before being appointed to the position of Acting Chief, during this time, I was clinically supervised by Dr. Golding. During my three-month position the Telepsychiatry program went from serving 7 prisons to 12 and nearly doubled in staff from roughly 25 to almost 50 psychiatrists; this rapid expansion would not have happened without the guidance and support provided of Dr. Golding. As a new supervisor within a complex bureaucracy, I would not have been able to successfully hire, train and initiate care in this many locations without his assistance.

In 2016, one of the psychiatrists at one of the California prisons committed suicide. Dr. Golding came from northern California to Southern California to deliver care to this psychiatrist's patients and to provide support for the staff at the facility. This level of compassion and concern, for the patients and staff in a time of need, is exceptional.

In June of 2016, Senate Bill 843 mandated a Medication Assisted Treatment (MAT) Pilot Program in CCHCS. I was asked to design and implement the pilot program at one male and one female prison under the direct supervision of Dr. Golding. With Dr. Golding's oversight, we designed and implemented a program, treated patients, and wrote a legislative report in eight months. Dr. Golding provided the needed guidance to ensure newly developed workflows, intake and note templates, and order sets were generated and available in the electronic medical record for the start of patient care six months after this bill was signed into law. Dr. Golding also provided the needed support for me to interact with California Department of Public Health, California Department of HealthCare Services, County Behavioral Health Directors Association, Chief Probation Officers of California, CDCR's Directors Stakeholder Advisory Group, to let external stakeholders know of this program within the first year. His ongoing support was ever present as we developed relationships with ALL 58 counties in California, over the first two years of the pilot program, to ensure that patients returning to ANY county in California would have access to continuity of care upon release.

In July of 2018, the supervision of the MAT program moved from mental health department to the medical department; however, I continued to work closely with Dr. Golding to ensure that all mental health providers (prescribers and non-prescribers) were included in all educational efforts regarding substance use disorder treatment and medication for alcohol and opioid use disorders.

Although I resigned from CCHCS in December of 2019, I often think of Dr. Golding 's guidance through the complex bureaucracy of CDCR and CCHCS and his compassion for patients and staff alike. His character and ethical standards are beyond reproach. He is always interested in delivering the highest level of care possible to all patients in need and to supporting the staff who work with him and under his supervision. I am blessed to have worked with him.

Sincerely,

*Shannon 10.14.22*

Shannon Robinson, MD

attachment 31

## Golding, Michael@CDCR

| | |
|---|---|
| **From:** | ▮▮▮▮▮▮▮ ▮ |
| **Sent:** | Wednesday, May 23, 2018 2:42 PM |
| **To:** | Golding, Michael@CDCR |
| **Subject:** | RE: 30-Day Compliant Appointments |

**CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

While I understand your questions about compliance, I'd like to spend some time trying to manage the system a little more actively. We can do more to get better results. I sent you a note directing you and Brittany to immediately work on the actual management at our institutions. This needs to be a priority over trying to parse the data because today, I cant say we are managing our system in an optimal way. That should be our first priority.

**From:** Golding, Michael@CDCR
**Sent:** Wednesday, May 23, 2018 12:56 PM
**To:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Subject:** Fwd: 30-Day Compliant Appointments

Hi,

Just trying to see whether I have represented the way we currently calculate timely appointments accurately.

One way to do that is look at the same data (just a few hypothetical patients and it should not take more than 20-minutes) and see if we get the same answer when we analyze.

If we can get the same answer, then we can move forward since everyone will understand what we are doing.

If I have made a mistake in rendering the way in which ▮▮▮▮▮▮▮ and the team are representing things, I will change what I am doing immediately to make sure I get their answers.

Best,
Michael

Sent from my iPhone

Begin forwarded message:

> **From:** "Golding, Michael@CDCR" <Michael.Golding@cdcr.ca.gov>
> **Date:** May 23, 2018 at 11:41:27 AM PDT
> **To:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

1

Cc: ███████████████

**Subject: 30-Day Compliant Appointments**

Hi,

Please consider the below as a representation of EOP appointments over nearly nine weeks, with patients becoming EOP at different times. I have also attached a word document, where it is much easier to see than in this message. There is an explanation below the box.

1.    Please evaluate (if you have a moment) the weeks compliant divided by total weeks at the end of the box below and let me know whether the algorithm I am using is calculating those numbers correctly.

2.    To calculate (a weighted average) of the whole table's appointments, one could add up all the numerators and divide by the sum of the denominators.

I am hoping that I can render your team's ideas about calculating % weeks-compliant as a measure of timely appointments. Then we can compare the results to other ways looking at timely appointments like

1. %-on time appointments

2. %-days compliant

3. Any of the above with grace periods of varying lengths

Finally by varying the way the random appointments are generated, we can see when any of the 4-methods yield similar or different results. And we can think clinically about which measures relevant to psychiatric performance should be calculated as %-weeks compliant vs. %-on time appointments, and whether we should add grace periods

2

attachment 32

## Golding, Michael@CDCR

| | |
|---|---|
| **From:** | Golding, Michael@CDCR <michael.golding@cdcr.ca.gov> |
| **Sent:** | Tuesday, September 2, 2014 10:39 AM |
| **To:** | ▮▮▮▮▮▮▮▮▮ |
| **Cc:** | ▮▮▮▮▮▮▮▮▮▮ |
| **Subject:** | Supervision |

---

**CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

---

Hi,

How are you?

I have been told that you do not have a clinical supervisor. I am the new Statewide Chief for Psychiatry Support. Until we work something out down there for supervision, I will be your clinical supervisor. I will be out of the country from Sept. 4th to the 17th, and during that time ▮▮▮▮▮▮▮ will be your clinical supervisor. After that, I will resume.

Best Wishes,
Michael


**Michael Golding, M.D.**
Chief, Statewide Psychiatry Support (A)
Mental Health Program
California Department of Corrections and Rehabilitation

Phone: 916.662.6541
Email: michael.golding@cdcr.ca.gov

1

## Golding, Michael@CDCR

| | |
|---|---|
| **From:** | Golding, Michael@CDCR <michael.golding@cdcr.ca.gov> |
| **Sent:** | Wednesday, October 15, 2014 2:18 PM |
| **To:** | ▉▉▉▉▉▉▉▉ |
| **Subject:** | Supervision |

---

**CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

---

Hi,

It was nice talking with you.

We discussed the importance of you very much looking for possible medical issues with patients, as you are a psychiatrist, but that general medical physicians will make formal medical diagnosis and prescribe work-up for these diagnoses.

We also discussed the importance of checking Depakote levels, as it is a requirement (even though you said that you had checked timely liver function studies, but since the patient was only on 250 mg of Depakote, you did not think a Depakote level would help clinical care.) I said that you may be right clinically in this one case, but in general it is very much expected and required that Depakote levels be checked.

I did enjoy our conversations.

Thanks,

Michael


**Michael Golding, M.D.**
Chief, Statewide Psychiatry Support (A)
Mental Health Program
California Department of Corrections and Rehabilitation

Phone: 916.662.6541
Email: michael.golding@cdcr.ca.gov

**Golding, Michael@CDCR**

| | |
|---|---|
| **From:** | ████████████████████████████ |
| **Sent:** | Thursday, October 16, 2014 2:03 PM |
| **To:** | ██████████ |
| **Cc:** | Golding, Michael@CDCR; ████████████ |
| **Subject:** | ████████████ |

**CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Hey ████

This issue with ████████ is quite disturbing. I'm hoping that her clinical superior may be able to help us with this situation. Perhaps the physicians should file grievances in order to document ████████ behavior and her unsupported, offensive accusations. I'm looking through the emails that you sent to me to see if there is any type of action I may be able to take as her "administrative" supervisor.

Perhaps in the near future, we could discuss these issue on a conference call with Dr. Golding.

Thanks much for your help!

**From:** ████████████████
**Sent:** Thursday, October 16, 2014 7:03 AM
**To:** ████████████████
**Cc:** Golding, Michael@CDCR; ████████████████
**Subject:** RE: ████████████████

Hey ████ ,

Attached is the response to this issue which I forwarded to Dr. Golding previously. I was unaware it had not been addressed with ████████ , and am disturbed that she continues to reach out to many other members of the medical team to address her concerns. As you and I have discussed, our physicians at CVSP are reacting to this hostility and the undermining of their medical care by ████████ , in a justifiably negative way. Her portrayal of herself as the last line of defense against what she perceives as substandard medical care, is both offensive and completely unsupported by the evidence. It is my hope that her clinical supervisor will be able to refocus ████████ attention to her scope of practice within the CDCR. Barring that, I am certain that I have several physicians who will grieve these hostile activities. Perhaps that is the only solution remaining to be attempted.

Thanks, as always, for your continued help and support,

████████████
████████████████
██████████████
████████████████████
████████████
████████████
████████████████

**From:** ████████████████
**Sent:** Wednesday, October 15, 2014 2:40 PM

**To:** ▮
**Subject:** Fwd: ▮

Hi ▮
Another email from ▮ re medical issues. Would this be a one to send forward to her new clinical supervisor?
Thanks
▮

Sent from my iPhone

Begin forwarded message:

> **From:** "▮
> **To:** ▮
> ▮
> **Subject:** ▮

Hi,
STD LAB :
Patient has long term problems with elevated CPK . Past Hx of Psychotropic meds and self request for psychotropic medications .
Dx Bipolar disorder . I have eUHR updated for lab work and 2009 lab work showed CT ( Chlamydia ) positive in April and June. Patient reported he had some meds on the way to Parole . He return to CDCR but STD was not screened .
9/29/14 I have referred the patient to Unit Physician and the NURSE decided to do Telemetry Reumatology instead STD screen ( telemetry didn't address any of the STD and Public Health has no report on this patient and Chlamydia is reportable on PM-100 .
With my request for STD consult to unit physician I have included lab work from 2009 . Today Patient came to my office and NOTHING was done about STD screening .
I am last physician recording the results so until consult is done all responsibility on me .
I went to RN ▮ and asked her to investigate why the consult ( public Health ) was not done and she had some kind of conference with rest of the nurses . Who is gate holder for all CVSP internal consults and why Public health was not address promptly I am not sure .
WELL Until they finish their investigation I have ordered LAB work for my Depakote As well as STD screening since NURSE cannot order lab .
Please address that . When I ask for consult Unit Physician I need more than one line of comment . If I have information important I share them and need Unit physician to be proactive for my consults .
If this is Nurses Problem I believe ▮ will take care of that and I need to know why my consult to UNIT PHYSICIAN for STD was INGORED .



attachment 33

*SHADED AREA TO REFLECT RECLASS POSITION NUMBER ONLY*

# DUTY STATEMENT

| | RPA/647#- | EFFECTIVE DATE: |
|---|---|---|
| | - | |

| CDCR INSTITUTION OR DEPARTMENT | POSITION NUMBER (Agency - Unit - Class - Serial) |
|---|---|
| INSTITUTION NAME | xxx-220-xxxx-xxx |

| UNIT NAME AND CITY LOCATED | CLASS TITLE |
|---|---|
| Health Care Services | Chief Psychiatrist |

| WORKING DAYS AND WORKING HOURS | SPECIFIC LOCATION ASSIGNED TO |
|---|---|
| a.m. to  a.m. (Approximate only for FLSA exempt classifications) | Mental Health Department |

| PROPOSED INCUMBENT (If known) | CURRENT POSITION NUMBER (Agency - Unit - Class - Serial) |
|---|---|
| | xxx-220-xxxx-xxx |

YOU ARE A VALUED MEMBER OF THE DEPARTMENT'S TEAM. YOU ARE EXPECTED TO WORK COOPERATIVELY WITH TEAM MEMBERS AND OTHERS TO ENABLE THE DEPARTMENT TO PROVIDE THE HIGHEST LEVEL OF SERVICE POSSIBLE. YOUR CREATIVITY AND INGENUITY ARE ENCOURAGED. YOUR EFFORTS TO TREAT OTHERS FAIRLY, HONESTLY, AND WITH RESPECT ARE CRITICAL TO THE SUCCESS OF THE DEPARTMENT'S MISSION.

Under the general direction of the Chief Executive Officer and with close consultation of the Statewide Chief Psychiatrist, the Chief Psychiatrist develops, oversees, and directs the quality and operations of Physician Services within psychiatry for the psychiatric treatment of individuals housed at NAME OF INSTITUTION HERE.

| % of time performing duties | Indicate the duties and responsibilities assigned to the position and the percentage of time spent on each. Group related tasks under the same percentage with the highest percentage first. *(Use additional sheet if necessary)* |
|---|---|

| | **ESSENTIAL FUNCTIONS** |
|---|---|
| 45% | **Leadership and Quality**: Develop, oversee, and champion all quality management and quality improvement activities related to Psychiatrist Physician Services within the Mental Health program. Administrative program management including oversight of implementation and monitoring of Mental Health Program Guide requirements as well as court ordered and headquarters procedures. Work collaboratively with other institutional executive department heads in the delivery of a comprehensive and integrated Health Care Program. Coordinate program interface with other departments by attending meetings such as Executive Staff meetings, Quality Management Committee, Local Governing Body, Suicide Prevention and Response Focused Improvement Team meetings, and Pharmacy and Therapeutics Committee meetings. Co-chair the Mental Health Subcommittee. Oversee production of key indicator reports as a means of proof of practice of Psychiatry Services program compliance. Oversee the appropriate use and timely completion of Quality Improvement Plans and Corrective Action Plans related to Psychiatry Services. |
| 30% | **Operational Oversight**: Ensure the provision of safe, effective, timely, and evidence-based psychiatry services for crisis intervention, inpatient, and outpatient clinical care. Oversee development, revision, and operational compliance with local operating procedures related to the Psychiatrist Physician Services within the Mental Health program. Maintain effective procedures for availability of Physician Services within psychiatry during weekends, holidays, and on-call after hours. Monitor, assess, and improve clinical operations and access to care in partnership with custody, nursing, mental health, laboratory, radiology, pharmacy, and medical administration. |
| 10% | **Staff Recruitment/Development:** Participate in psychiatric clinical and psychiatric support staff recruitment, hiring, development, and retention programs. Develop, implement, and monitor clear and realistic expectations for psychiatrist psychiatric support staff. Lead Psychiatric Physician Services provider meetings. Encourage and monitor continuous professional development and improvement. Facilitate as needed corrective and/or disciplinary action in conjunction with the Hiring Authority and Health Care Employee Relations Officer. As indicated, serve as a leader in the development or expansion of partnerships with academic psychiatric training programs (e.g., medical schools, psychiatric residencies, psychiatric fellowships). |
| 5% | **Courts/Grievances:** Ensures compliance with all regulatory and reporting requirements for relevant reports including those for Penal Code 2602 and 2604 hearings, the Attorney General's Office, the Office of the Special Master, the courts, and others as required. In conjunction with the Health Care Grievance Office, ensure that health care grievances related to Psychiatry Services are completed timely. |
| 5% | **Budget:** Expenditures for the Psychiatry Services Program are managed appropriately and remain within the institutional budgetary allotment. |
| 5% | **Headquarters/Training:** Communicate with the Statewide Chief Psychiatrist and the Deputy Director, Mental Health with regard to program activation, policy implementation, compliance matters, and other special requests for information. Attend regional and statewide meetings, traveling as necessary. Responsible for meeting yearly In-Service Training requirements and other departmental trainings. Participation in Continuing Medical Education and other activities required to maintain licensure to practice. Provide direct patient care if necessary. |

# DUTY STATEMENT

RPA/647-     -

| % of time | Indicate the duties and responsibilities assigned to the position and the percentage of time spent on each. Group related tasks under the same percentage with the highest percentage first. *(Use additional sheet if necessary)* |
|---|---|
| | **SUPERVISORY RESPONSIBILITIES:** Directly supervises the Senior Psychiatrist Supervisor and/or Staff Psychiatrists, Psychiatric Nurse Practitioners, and Registry Psychiatrists, as well as Medical Assistants and as allocated support staff (e.g., Health Program Specialist I, Office Technician). |

**QUALIFICATIONS:** To perform this job successfully, an individual must be able to perform each essential duty satisfactorily. The requirements listed below are representative of the knowledge, skill, and/or ability required. Reasonable accommodations may be made to enable individuals with disabilities to perform the essential functions.

**EDUCATION and/or EXPERIENCE:** Possession of the legal requirements for the practice of medicine in California as determined by the Medical Board of California or the California Board of Osteopathic Examiners. AND: Possession of a valid certificate in psychiatry issued by the American Board of Psychiatry and Neurology or the American Osteopathic Board of Neurology and Psychiatry. **AND:** Two years of experience as a psychiatrist in a correctional facility, in a psychiatric outpatient clinic or in a diagnostic clinic.

**LANGUAGE SKILLS:** Ability to read, analyze and interpret medical journals, texts, medical records, consultation notes, policies and procedures; interview and provide information to people of varying backgrounds; accurately and clearly complete medical records, abstracts, and other reports; and communicate effectively.

**MATHEMATICAL SKILLS:** Ability to work with concepts such as probability and statistical inference; apply such concepts as fractions, percentages, ratios, and proportions to practical situations; and calculate dosages.

**REASONING ABILITY:** Ability to organize and prioritize work; interpret conflicting or ambiguous information; and analyze situations accurately and adopt an effective course of action.

**CERTIFICATES, LICENSES, REGISTRATIONS:** Possession of the legal requirements for the practice of medicine in California as determined by the Medical Board of California or the California Board of Osteopathic Examiners and possession of a valid license issued by an American Medical Society Board or an American Osteopathic Board as a specialist in one of the fields of medicine, or eligibility for examination for such a certificate as evidenced by a written statement from the Secretary of an American Specialty.

**OTHER SKILLS AND ABILITIES:** Ability to plan and direct the psychiatric activities in an institution. Prepare and supervise the preparation of case histories and the keeping of hospital records; prepare comprehensive medical reports; manage medical emergencies according to community standards of care.

**OTHER QUALIFICATIONS:** Knowledge of principles and methods of psychiatry including diagnosis and treatment of behavior problems, mental and emotional disturbances, and developmentally disabled; modern methods and principles of general medicine and neurology and skill in their application; literature and recent developments in the field of psychiatry; principles and practices of clinical psychology and psychiatric social work; principles and techniques of social psychiatric research; modern techniques, practices, and trends in the correction and prevention of delinquency and criminality; principles of effective supervision and personnel management; principles, methods and objectives of training treatment personnel.

**SPECIAL PERSONAL CHARACTERISTICS:** Empathetic understanding of patients of a State correctional facility; willingness to work in a State correctional facility; emotional stability; patience; tact; and alertness; and keenness of observation.

**SPECIAL PHYSICAL CHARACTERISTICS:** Persons appointed to this position must be reasonably expected to have and maintain sufficient strength, agility and endurance to perform during stressful (physical, mental and emotional) situations encountered on the job without compromising their health and well-being or that of their fellow employees or that of inmates. Assignments may include sole responsibility for the supervision of inmates and/or the protection of personal and real property.

**PHYSICAL DEMANDS:** The physical demands described here are representative of those that must be met by an employee to successfully perform the essential functions of this job. Reasonable accommodations may be made to enable individuals with disabilities to perform the essential functions.

| SUPERVISOR'S STATEMENT: *I HAVE DISCUSSED THE DUTIES OF THE POSITION WITH THE EMPLOYEE* | | |
|---|---|---|
| SUPERVISOR'S NAME (Print) | SUPERVISOR'S SIGNATURE | DATE |

EMPLOYEE'S STATEMENT: *I HAVE DISCUSSED WITH MY SUPERVISOR THE DUTIES OF THE POSITION AND HAVE RECEIVED A COPY OF THE DUTY STATEMENT*

The statements contained in this duty statement reflect general details as necessary to describe the principal functions of this job. It should not be considered an all-inclusive listing of work requirements. Individuals may perform other duties as assigned, including work in other functional areas to cover absence of relief, to equalize peak work periods or otherwise balance the workload.

Chief Psychiatrist
Job Description
Page 3

| | |
|---|---|
| The following is a definition of the on-the-job time spent in physical activities: | |
| Constantly: | Involves 2/3 or more of a workday |
| Frequently: | Involves 1/3 to 2/3 of workday |
| Occasionally: | Involves 1/3 or less of workday |
| N/A: | Activity or condition is not applicable |

**Standing:**  Occasionally - to stand next to cells and communicate with inmates inside approximately three times per day and to confer with other staff.
**Walking:**  Frequently- to walk from the sally port to the work area at the beginning and end of each day, within the medical offices for meetings and to gather information, within the infirmary or inmate living areas to provide patient care daily, and back and forth to other facilities to attend meetings or access other records.
**Sitting:**  Frequently - to attend meetings or prepare records and reports for periods up to several hours at a time, with the ability to stand and walk as desired, and for briefer periods while interviewing inmates.
**Lifting:**  Occasionally - to handle paperwork and office supplies weighing under one pound, some files weighing several pounds, a couple of files at one time weighing five to ten pounds, and a 15 pound protective vest when working in the AD SEG unit.
**Carrying:**  Occasionally - to move individual files weighing several pounds.  A wheeled cart may be used to transport multiple medical files to and from the office.  A 15 pound vest is worn in the AD SEG unit.
**Bending/Stooping:**  Occasionally - to reach items in lower drawers.
**Reaching in Front of Body:**  Occasionally to Frequently - to acquire supplies from shelves or drawers and to work at a desk taking notes, reviewing files, or answering a telephone.
**Reaching Overhead:**  Occasionally - to obtain supplies from an upper cabinet.
**Climbing:**  Occasionally - to ascend and descend one flight of stairs in and out of medical administration office area to attend meetings, and stairs to second tier of housing units.
**Balancing:**  N/A
**Pushing/Pulling:**  Occasionally - to open and close doors, gates and drawers and to move a wheeled cart carrying medical records.
**Kneeling/Crouching:**  Occasionally - to talk to inmates in the infirmary.
**Crawling:**  N/A
**Fine Finger Dexterity:**  Occasionally to Frequently - to take notes, complete forms, operate a computer, and turn pages in files.
**Hand/Wrist Movement:**  Frequently - to perform office tasks including handling paperwork, using a telephone, writing, using a computer and moving files individually or in a wheeled cart and to open and close doors, drawers, and gates.
**Driving Cars/Trucks/Forklifts or Other Moving Equipment:**  N/A
**Hearing/Speech:**  Constantly - to evaluate and diagnose patients, and to maintain awareness and safety.
**Sight:**  Constantly - to review records, evaluate and diagnose patients, and to maintain awareness and safety.

**WORK ENVIRONMENT:**  The work environment characteristics described here are representative of those an employee encounters while performing the essential functions of this job.  Reasonable accommodation may be made to enable individuals with disabilities to perform the essential functions.

The Chief Psychiatrist works in his/her own enclosed office, as well as in clinic, infirmary and emergency room areas of an inmate housing facility.  All of these areas are linoleum covered concrete floors, have florescent lighting and are thermostatically controlled.  The Chief Psychiatrist will also go outside to move between facilities, traveling on asphalt and going through sally port areas which are subject to delays.  On very rare occasions, the Chief Psychiatrist may go into cell areas or a prison yard to respond to emergencies.

| | |
|---|---|
| The following is a definition of the on-the-job time spent in exposure to the environmental conditions listed: | |
| Constantly: | Involves 2/3 or more of workday |
| Frequently: | Involves 1/3 to 2/3 of workday |
| Occasionally: | Involves 1/3 or less of workday |
| N/A | Activity or condition is not applicable |

**Fumes or Dust:**  Occasionally to N/A - may be evident in some inmate living areas.
**Temperature Extremes:**  Occasionally - exposed to some outdoor weather conditions when traveling between facilities.
**Architectural Barriers:**  N/A
**Working Surfaces:**  concrete, linoleum, asphalt.
**Risks of Electrical Shock:**  N/A
**Toxic or Caustic Chemicals:**  N/A
**Noise or Vibration:**  N/A
**Work in High, Precarious Places:**  N/A
**Bloodborne Pathogens:**  Occasionally - uses proper equipment and patient care procedures to limit exposure to blood and other body fluids in a population with some incidents of hepatitis and HIV.

**MACHINES, TOOLS, EQUIPMENT, AND WORK-AIDS:**  Usual office equipment, personal computer, telephone, stethoscope, opthalmoscope, otoscope, laryngoscope, sigmoidoscope, anoscope, electrocardiogram, cardiac monitor, defibrillator, syringes, scapels, basic medical supplies, other surgical instruments, gloves, gurney, beeper, telephone, fax machine, cellular phone, whistle, personal alarm, and protective vest.

**COMMENTS:**  Normal work hours are from 9:00 a.m. to 5:00 p.m., Monday through Friday.  However, the Chief Psychiatrist is expected to be available if there is a need for on-site physician coverage and during institutional emergencies such as a large-scale disturbance.

Information for this job description was obtained by reviewing the California State Personnel Board Specification for this classification and interview with the incumbent Chief Psychiatrist.

attachment 34

# Memorandum

Date     :   November 26, 2019

To       :   Chief Executive Officers

Subject      **TRANSITION OF CHIEF PSYCHIATRISTS SUPERVISION TO THE CHIEF EXECUTIVE OFFICER**

The purpose of this memorandum is to announce the transition in supervision of the Chief Psychiatrist and/or Senior Psychiatrist (Supervisor) to the Chief Executive Officer (CEO), effective, December 6, 2019.

Included in this packet is the new Chief Psychiatrist and Senior Psychiatrist (Supervisor) Duty Statements as well as your Institution-specific Organizational Chart (Org Chart), which reflects this change in supervision.

Please ensure the following tasks are completed as directed and submitted to your Regional Health Care Executive's office as proof of practice on or before Friday, December 6, 2019:

1. A fully signed and dated copy of the Chief Psychiatrist or Senior Psychiatrist (Supervisor) Duty Statement from your institution.

2. A fully signed and dated copy of your Institution-specific Org Chart reflecting the change in supervision of the Chief Psychiatrist or Senior Psychiatrist (Supervisor) to the CEO.

3. A copy of your institution's attendee documents and committee charters that require the Chief Psychiatrist/Senior Psychiatrist (Supervisor) to attend institutional leadership meetings and quality committees (e.g., Mental Health Sub-Committee, Pharmacy and Therapeutics, Quality Management Committee [QMC], and Local Governing Body [LGB]), consistent with the requirements of your institution's complex of health care missions and facility designation (e.g., Basic or Intermediate).

4. A copy of your institution's health care governance meeting minutes (QMC) or (LGB) that reflect your Institution's acknowledgement of this change in supervision as proof of practice on or before Friday, December 6, 2019.

DIANA L. TOCHE, D.D.S.
Undersecretary
Health Care Services

CDC 1617 (3/89)

Chief Executive Officers
Transition of Chief Psychiatrists Supervision to the Chief Executive Officer
Page 2


Attachments

cc: J. Clark Kelso, Receiver
    Richard Kirkland, Chief Deputy Receiver
    R. Steven Tharratt, M.D., MPVM, FACP, Director, Health Care Operations
    Yulanda Mynhier, Director, Health Care Policy and Administration
    Eureka Daye, Ph.D., MPH, MA, CCHP, Deputy Director, Statewide Mental Health
        Program (A)
    Jasinda Muhammad, Deputy Director, Human Resources
    Rainbow Brockenborough, Regional Health Care Executive (RHCE), (A), Region I
    Donald McElroy, RHCE, Region II
    Christopher Podratz, RHCE, Region III
    Robert Herrick, RHCE, Region IV

*SHADED AREA TO REFLECT RECLASS POSITION NUMBER ONLY*

# DUTY STATEMENT

| | RPA/647#- | EFFECTIVE DATE: |
|---|---|---|

| CDCR INSTITUTION OR DEPARTMENT | POSITION NUMBER (Agency - Unit - Class - Serial) |
|---|---|
| **INSTITUTION NAME** | **xxx-220-xxxx-xxx** |

| UNIT NAME AND CITY LOCATED | CLASS TITLE |
|---|---|
| **Health Care Services** | **Chief Psychiatrist** |

| WORKING DAYS AND WORKING HOURS | SPECIFIC LOCATION ASSIGNED TO |
|---|---|
| a.m. to  a.m. (Approximate only for FLSA exempt classifications) | **Mental Health Department** |

| PROPOSED INCUMBENT (If known) | CURRENT POSITION NUMBER (Agency - Unit - Class - Serial) |
|---|---|
| | xxx-220-xxxx-xxx |

YOU ARE A VALUED MEMBER OF THE DEPARTMENT'S TEAM. YOU ARE EXPECTED TO WORK COOPERATIVELY WITH TEAM MEMBERS AND OTHERS TO ENABLE THE DEPARTMENT TO PROVIDE THE HIGHEST LEVEL OF SERVICE POSSIBLE. YOUR CREATIVITY AND INGENUITY ARE ENCOURAGED. YOUR EFFORTS TO TREAT OTHERS FAIRLY, HONESTLY, AND WITH RESPECT ARE CRITICAL TO THE SUCCESS OF THE DEPARTMENT'S MISSION.

Under the general direction of the Chief Executive Officer and with close consultation of the Statewide Chief Psychiatrist, the Chief Psychiatrist develops, oversees, and directs the quality and operations of Physician Services within psychiatry for the psychiatric treatment of individuals housed at NAME OF INSTITUTION HERE.

| % of time performing duties | Indicate the duties and responsibilities assigned to the position and the percentage of time spent on each. Group related tasks under the same percentage with the highest percentage first. (Use additional sheet if necessary) |
|---|---|

| | **ESSENTIAL FUNCTIONS** |
|---|---|
| **45%** | **Leadership and Quality**: Develop, oversee, and champion all quality management and quality improvement activities related to Psychiatrist Physician Services within the Mental Health program. Administrative program management including oversight of implementation and monitoring of Mental Health Program Guide requirements as well as court ordered and headquarters procedures. Work collaboratively with other institutional executive department heads in the delivery of a comprehensive and integrated Health Care Program. Coordinate program interface with other departments by attending meetings such as Executive Staff meetings, Quality Management Committee, Local Governing Body, Suicide Prevention and Response Focused Improvement Team meetings, and Pharmacy and Therapeutics Committee meetings. Co-chair the Mental Health Subcommittee. Oversee production of key indicator reports as a means of proof of practice of Psychiatry Services program compliance. Oversee the appropriate use and timely completion of Quality Improvement Plans and Corrective Action Plans related to Psychiatry Services. |
| **30%** | **Operational Oversight**: Ensure the provision of safe, effective, timely, and evidence-based psychiatry services for crisis intervention, inpatient, and outpatient clinical care. Oversee development, revision, and operational compliance with local operating procedures related to the Psychiatrist Physician Services within the Mental Health program. Maintain effective procedures for availability of Physician Services within psychiatry during weekends, holidays, and on-call after hours. Monitor, assess, and improve clinical operations and access to care in partnership with custody, nursing, mental health, laboratory, radiology, pharmacy, and medical administration. |
| **10%** | **Staff Recruitment/Development:** Participate in psychiatric clinical and psychiatric support staff recruitment, hiring, development, and retention programs. Develop, implement, and monitor clear and realistic expectations for psychiatrist psychiatric support staff. Lead Psychiatric Physician Services provider meetings. Encourage and monitor continuous professional development and improvement. Facilitate as needed corrective and/or disciplinary action in conjunction with the Hiring Authority and Health Care Employee Relations Officer. As indicated, serve as a leader in the development or expansion of partnerships with academic psychiatric training programs (e.g., medical schools, psychiatric residencies, psychiatric fellowships). |
| **5%** | **Courts/Grievances:** Ensures compliance with all regulatory and reporting requirements for relevant reports including those for Penal Code 2602 and 2604 hearings, the Attorney General's Office, the Office of the Special Master, the courts, and others as required. In conjunction with the Health Care Grievance Office, ensure that health care grievances related to Psychiatry Services are completed timely. |
| **5%** | **Budget:** Expenditures for the Psychiatry Services Program are managed appropriately and remain within the institutional budgetary allotment. |
| **5%** | **Headquarters/Training:** Communicate with the Statewide Chief Psychiatrist and the Deputy Director, Mental Health with regard to program activation, policy implementation, compliance matters, and other special requests for information. Attend regional and statewide meetings, traveling as necessary. Responsible for meeting yearly In-Service Training requirements and other departmental trainings. Participation in Continuing Medical Education and other activities required to maintain licensure to practice. Provide direct patient care if necessary. |

# DUTY STATEMENT

RPA/647-    -

| % of time | Indicate the duties and responsibilities assigned to the position and the percentage of time spent on each. Group related tasks under the same percentage with the highest percentage first. *(Use additional sheet if necessary)* |
|---|---|
| | **SUPERVISORY RESPONSIBILITIES:** Directly supervises the Senior Psychiatrist Supervisor and/or Staff Psychiatrists, Psychiatric Nurse Practitioners, and Registry Psychiatrists, as well as Medical Assistants and as allocated support staff (e.g., Health Program Specialist I, Office Technician). |
| | **QUALIFICATIONS:** To perform this job successfully, an individual must be able to perform each essential duty satisfactorily. The requirements listed below are representative of the knowledge, skill, and/or ability required. Reasonable accommodations may be made to enable individuals with disabilities to perform the essential functions. |
| | **EDUCATION and/or EXPERIENCE:** Possession of the legal requirements for the practice of medicine in California as determined by the Medical Board of California or the California Board of Osteopathic Examiners. AND: Possession of a valid certificate in psychiatry issued by the American Board of Psychiatry and Neurology or the American Osteopathic Board of Neurology and Psychiatry. **AND:** Two years of experience as a psychiatrist in a correctional facility, in a psychiatric outpatient clinic or in a diagnostic clinic. |
| | **LANGUAGE SKILLS:** Ability to read, analyze and interpret medical journals, texts, medical records, consultation notes, policies and procedures; interview and provide information to people of varying backgrounds; accurately and clearly complete medical records, abstracts, and other reports; and communicate effectively. |
| | **MATHEMATICAL SKILLS:** Ability to work with concepts such as probability and statistical inference; apply such concepts as fractions, percentages, ratios, and proportions to practical situations; and calculate dosages. |
| | **REASONING ABILITY:** Ability to organize and prioritize work; interpret conflicting or ambiguous information; and analyze situations accurately and adopt an effective course of action. |
| | **CERTIFICATES, LICENSES, REGISTRATIONS:** Possession of the legal requirements for the practice of medicine in California as determined by the Medical Board of California or the California Board of Osteopathic Examiners and possession of a valid license issued by an American Medical Society Board or an American Osteopathic Board as a specialist in one of the fields of medicine, or eligibility for examination for such a certificate as evidenced by a written statement from the Secretary of an American Specialty. |
| | **OTHER SKILLS AND ABILITIES:** Ability to plan and direct the psychiatric activities in an institution. Prepare and supervise the preparation of case histories and the keeping of hospital records; prepare comprehensive medical reports; manage medical emergencies according to community standards of care. |
| | **OTHER QUALIFICATIONS:** Knowledge of principles and methods of psychiatry including diagnosis and treatment of behavior problems, mental and emotional disturbances, and developmentally disabled; modern methods and principles of general medicine and neurology and skill in their application; literature and recent developments in the field of psychiatry; principles and practices of clinical psychology and psychiatric social work; principles and techniques of social psychiatric research; modern techniques, practices, and trends in the correction and prevention of delinquency and criminality; principles of effective supervision and personnel management; principles, methods and objectives of training treatment personnel. |
| | **SPECIAL PERSONAL CHARACTERISTICS:** Empathetic understanding of patients of a State correctional facility; willingness to work in a State correctional facility; emotional stability; patience; tact; and alertness; and keenness of observation. |
| | **SPECIAL PHYSICAL CHARACTERISTICS:** Persons appointed to this position must be reasonably expected to have and maintain sufficient strength, agility and endurance to perform during stressful (physical, mental and emotional) situations encountered on the job without compromising their health and well-being or that of their fellow employees or that of inmates. Assignments may include sole responsibility for the supervision of inmates and/or the protection of personal and real property. |
| | **PHYSICAL DEMANDS:** The physical demands described here are representative of those that must be met by an employee to successfully perform the essential functions of this job. Reasonable accommodations may be made to enable individuals with disabilities to perform the essential functions. |

| SUPERVISOR'S STATEMENT: *I HAVE DISCUSSED THE DUTIES OF THE POSITION WITH THE EMPLOYEE* | | |
|---|---|---|
| SUPERVISOR'S NAME (Print) | SUPERVISOR'S SIGNATURE | DATE |

EMPLOYEE'S STATEMENT: *I HAVE DISCUSSED WITH MY SUPERVISOR THE DUTIES OF THE POSITION AND HAVE RECEIVED A COPY OF THE DUTY STATEMENT*

The statements contained in this duty statement reflect general details as necessary to describe the principal functions of this job. It should not be considered an all-inclusive listing of work requirements. Individuals may perform other duties as assigned, including work in other functional areas to cover absence of relief, to equalize peak work periods or otherwise balance the workload.

Chief Psychiatrist
Job Description
Page 3

| The following is a definition of the on-the-job time spent in physical activities: | |
|---|---|
| Constantly: | Involves 2/3 or more of a workday |
| Frequently: | Involves 1/3 to 2/3 of workday |
| Occasionally: | Involves 1/3 or less of workday |
| N/A: | Activity or condition is not applicable |

**Standing:** Occasionally - to stand next to cells and communicate with inmates inside approximately three times per day and to confer with other staff.
**Walking:** Frequently- to walk from the sally port to the work area at the beginning and end of each day, within the medical offices for meetings and to gather information, within the infirmary or inmate living areas to provide patient care daily, and back and forth to other facilities to attend meetings or access other records.
**Sitting:** Frequently - to attend meetings or prepare records and reports for periods up to several hours at a time, with the ability to stand and walk as desired. and for briefer periods while interviewing inmates.
**Lifting:** Occasionally - to handle paperwork and office supplies weighing under one pound, some files weighing several pounds. a couple of files at one time weighing five to ten pounds, and a 15 pound protective vest when working in the AD SEG unit.
**Carrying:** Occasionally - to move individual files weighing several pounds. A wheeled cart may be used to transport multiple medical files to and from the office. A 15 pound vest is worn in the AD SEG unit.
**Bending/Stooping:** Occasionally - to reach items in lower drawers.
**Reaching in Front of Body:** Occasionally to Frequently - to acquire supplies from shelves or drawers and to work at a desk taking notes, reviewing files, or answering a telephone.
**Reaching Overhead:** Occasionally - to obtain supplies from an upper cabinet.
**Climbing:** Occasionally - to ascend and descend one flight of stairs in and out of medical administration office area to attend meetings, and stairs to second tier of housing units.
**Balancing:** N/A
**Pushing/Pulling:** Occasionally - to open and close doors, gates and drawers and to move a wheeled cart carrying medical records.
**Kneeling/Crouching:** Occasionally - to talk to inmates in the infirmary.
**Crawling:** N/A
**Fine Finger Dexterity:** Occasionally to Frequently - to take notes, complete forms, operate a computer, and turn pages in files.
**Hand/Wrist Movement:** Frequently - to perform office tasks including handling paperwork, using a telephone, writing, using a computer and moving files individually or in a wheeled cart and to open and close doors, drawers, and gates.
**Driving Cars/Trucks/Forklifts or Other Moving Equipment:** N/A
**Hearing/Speech:** Constantly - to evaluate and diagnose patients, and to maintain awareness and safety.
**Sight:** Constantly - to review records, evaluate and diagnose patients, and to maintain awareness and safety.

**WORK ENVIRONMENT:** The work environment characteristics described here are representative of those an employee encounters while performing the essential functions of this job. Reasonable accommodation may be made to enable individuals with disabilities to perform the essential functions.

The Chief Psychiatrist works in his/her own enclosed office, as well as in clinic, infirmary and emergency room areas of an inmate housing facility. All of these areas are linoleum covered concrete floors, have florescent lighting and are thermostatically controlled. The Chief Psychiatrist will also go outside to move between facilities, traveling on asphalt and going through sally port areas which are subject to delays. On very rare occasions, the Chief Psychiatrist may go into cell areas or a prison yard to respond to emergencies.

| The following is a definition of the on-the-job time spent in exposure to the environmental conditions listed: | |
|---|---|
| Constantly: | Involves 2/3 or more of workday |
| Frequently: | Involves 1/3 to 2/3 of workday |
| Occasionally: | Involves 1/3 or less of workday |
| N/A | Activity or condition is not applicable |

**Fumes or Dust:** Occasionally to N/A - may be evident in some inmate living areas.
**Temperature Extremes:** Occasionally - exposed to some outdoor weather conditions when traveling between facilities.
**Architectural Barriers:** N/A
**Working Surfaces:** concrete, linoleum, asphalt.
**Risks of Electrical Shock:** N/A
**Toxic or Caustic Chemicals:** N/A
**Noise or Vibration:** N/A
**Work in High, Precarious Places:** N/A
**Bloodborne Pathogens:** Occasionally - uses proper equipment and patient care procedures to limit exposure to blood and other body fluids in a population with some incidents of hepatitis and HIV.

**MACHINES, TOOLS, EQUIPMENT, AND WORK-AIDS:** Usual office equipment, personal computer, telephone, stethoscope, opthalmoscope, otoscope, laryngoscope, sigmoidoscope, anoscope, electrocardiogram, cardiac monitor, defibrillator, syringes, scapels, basic medical supplies, other surgical instruments, gloves, gurney, beeper, telephone, fax machine, cellular phone, whistle, personal alarm, and protective vest.

**COMMENTS:** Normal work hours are from 9:00 a.m. to 5:00 p.m., Monday through Friday. However, the Chief Psychiatrist is expected to be available if there is a need for on-site physician coverage and during institutional emergencies such as a large-scale disturbance.

Information for this job description was obtained by reviewing the California State Personnel Board Specification for this classification and interview with the incumbent Chief Psychiatrist.

Case 2:90-cv-00520-KJM-SCR    Document 8446    Filed 10/28/24    Page 703 of 1019

attachment 35

KAMALA D. HARRIS
Attorney General of California
PATRICK R. MCKINNEY
Supervising Deputy Attorneys General
ELISE OWENS THORN, State Bar No. 145931
CHRISTINE M. CICCOTTI, State Bar No. 238695
Deputy Attorneys General
  1300 I Street, Suite 125
  P.O. Box 944255
  Sacramento, CA 94244-2550
  Telephone:  (916) 324-4921
  Fax:  (916) 324-5205
  E-mail:  Elise.Thorn@doj.ca.gov

*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **RALPH COLEMAN, et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**EDMUND G. BROWN JR., et al.,**<br><br>Defendants. | 2:90-cv-00520 LKK DAD<br><br>**DECLARATION OF DR. TIMOTHY BELAVICH IN SUPPORT OF DEFENDANTS' OBJECTIONS AND RESPONSES TO SPECIAL MASTER'S MAY 30, 2014 REPORT** |

I, Timothy Belavich, declare as follows:

1.    I am both Deputy Director of the Statewide Mental Health Program and Director of Division of Health Care Services for the California Department of Corrections and Rehabilitation (CDCR).  I am competent to testify to the matters set forth in this declaration and if called upon to do so, I would and could so testify.  I make this declaration in support of Defendants' Objections and Responses to the Special Master's May 30, 2014 Report.

2.    As CDCR's Director of Division of Health Care Services,. I am familiar with the extensive policies and procedures that govern the prison mental health care delivery system at the institutional level.

1

3.   In December 2013, I was appointed as CDCR's Statewide Mental Health Program Deputy Director.  As Deputy Director, I am responsible for and supervise the Field Operations Unit, Policy and Clinical Support Unit, Health Care Placement Oversight Program, and compliance with Coleman mandates.

4.   CDCR provides inpatient mental health services to female inmates at the Psychiatric Inpatient Program at the California Institute for Women.  Mental health services are provided by the Department of State Hospitals to male inmates within CDCR prisons at the Vacaville Psychiatric Program, the Salinas Valley Psychiatric Program, and the California Health Care Facility.

5.   I have reviewed the Special Master's Report on Adequacy of Inpatient Mental Health Care for Inmates of the California Department of Corrections and Rehabilitation filed on May 30, 2014.  (ECF No. 5156.)  The recommendations set forth at pages 55 and 56 of the Special Master's report seek further review and evaluation of policies and procedures already in place at the California Institute for Women Psychiatric Inpatient Program.

6.   CDCR continuously evaluates its existing clinical staffing levels and works to retain appropriate, qualified mental health professionals.  CDCR tracks and reports to the Special Master monthly the staffing levels at Psychiatric Inpatient Program at the California Institute for Women.  As part of our regular review, CDCR is willing, if appropriate, to adjust clinical staffing levels to ensure that patients receive the treatment they need.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.  Executed in Sacramento, California on June 30, 2014.

/s/ Timothy Belavich, Ph.D.

Timothy Belavich, Ph.D.
Director of Health Care Services (A)

***(original signature retained by attorney)***

Doc. No. 32007300

2

attachment 36

## Golding, Michael@CDCR

| | |
|---|---|
| **From:** | ███████████ ███████████ |
| **Sent:** | Tuesday, July 21, 2020 8:38 AM |
| **To:** | Golding, Michael@CDCR |
| **Cc:** | ███████████ |
| **Subject:** | FW: Chief Psychiatrist's OMHD Training - Final Approval |
| **Attachments:** | OMHDCourse Approval Sheet (███████████).docx; OMHD Review Supp.docx; PSYCH OMHD (3).doc |
| | |
| **Importance:** | High |

---

**CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

---

Hello Dr. Golding!

Forgive me if I have overlooked your reply with a signed Legal Course Approval sheet, but to my knowledge I have not yet received it and it is critical to the project moving forward through the approval process.

Please advise, thank you!

███████

**From:** ███████████████████████
**Sent:** Wednesday, July 15, 2020 2:24 PM
**To:** Golding, Michael@CDCR <Michael.Golding@cdcr.ca.gov>
**Cc:** ███████████
**Subject:** Re: Chief Psychiatrist's OMHD Training - Final Approval

Good afternoon Dr. Golding,

███████████ sent me a course approval sheet to sign and it also requires my supervisor's signature. Would you please add your signature to his and mine in the course approval sheet. Then it goes along to others to sign so that the program can be uploaded into the LMS system.

Thank you,

█

**From:** ████████████████████████
**Sent:** Wednesday, July 15, 2020 1:27 PM
**To:** ███████████████
**Subject:** RE: Chief Psychiatrist's OMHD Training - Final Approval

Hello █

1

I have completed the edits and provided you with a revised print of the course. Also, the Review Supplement is attached for the two slides that have multiple layers.

In addition, I have attached the Course Approval sheet for you and Dr. Golding to sign, indicating your approval of the course. When I say sign, I simply mean editing the document in Word and adding your name and today's date. If you would like to physically sign it, then please print it out, sign it, scan it, and send it to Dr. Golding for his signature, and then back to me, so that I can forward the course to my management team for review and approval.

Concurrently, I will send ▮▮▮▮▮▮▮ the Legal Approval sheet as well.

Please let me know if you have any questions and thank you for all your help on this project!
Michael

**From:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Sent:** Tuesday, July 14, 2020 5:09 PM
**To:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Subject:** Re: Chief Psychiatrist's OMHD Training - Final Approval

Good evening ▮▮▮▮▮

You are correct. Thank you for the email reminder. I was waiting until the end of today, which is officially now. The only two changes are:

slide 11, paragraph 1, lines 10 and 11, should say "...requires treatment at a State Hospital."

slide 22 line 1 from "A patient was admitted to DSH pursuant to PC 1370, incompetent to stand trial court orders 6 months ago..." to "A patient was admitted to DSH pursuant to PC 1370, incompetent to stand trial per court order six months earlier, ..."

Thank you so much. With these last two changes, I think you can go ahead and put it into the training portal, since no one else made any other corrections.

Have a great evening,



**From:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Sent:** Tuesday, July 14, 2020 2:39 PM
**To:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Subject:** RE: Chief Psychiatrist's OMHD Training - Final Approval

Hello ▮▮▮

I believe today is the cut-off for edits.

When you're ready, please provide me with a list of verbatim changes and I will make the revisions.

I would like to get your approval this week, if possible.

Thank You!

2

**From:** ███████████████████████████
**Sent:** Thursday, July 9, 2020 10:03 AM
**To:** ███████████████████████████████
**Subject:** Re: Chief Psychiatrist's OMHD Training - Final Approval

You're welcome.

Have a great day and talk to you soon,

██

**From:** ████████████████████████████████
**Sent:** Thursday, July 9, 2020 9:57 AM
**To:** ███████████████████████
**Subject:** RE: Chief Psychiatrist's OMHD Training - Final Approval

Awesome, thanks██

**From:** ███████████████████████████
**Sent:** Thursday, July 9, 2020 9:40 AM
**To:** ████████████████████████████████
**Subject:** Re: Chief Psychiatrist's OMHD Training - Final Approval

Good morning ████████

Absolutely not a problem.  Great idea. I will wait one week and if I don't hear from all recipients, I will assume we are good to go with whatever changes come until then.  I will redo the two suggestions that ████████████
made at the end of that week, along with any others.

Thank you,

██

**From:** █████████████████████████████████
**Sent:** Thursday, July 9, 2020 9:10 AM
**To:** ████████████████████████
**Subject:** RE: Chief Psychiatrist's OMHD Training - Final Approval

Hello ██

Can we do like before, wait until all the feedback has come in and then have you provide me a comprehensive list?

It just makes things easier to document and organize.

Thank You!
████████

3

**From:** ████████████████████████

**Sent:** Tuesday, July 7, 2020 7:55 PM

**To:** ██████████████████████████████████████

██████████████████████

**Subject:** Re: Chief Psychiatrist's OMHD Training - Final Approval

Good evening ████████████

I can see where that would make it sound better.

████████ can you change slide 22 line 1 from "A patient was admitted to DSH pursuant to PC 1370, incompetent to stand trial court orders 6 months ago..." to "A patient was admitted to DSH pursuant to PC 1370, incompetent to stand trial per court order six months earlier, ..."

Thanks, again, to you both,

██

**From:** █████████████████████████████████

**Sent:** Tuesday, July 7, 2020 5:43 PM

**To:** ██████████████████████████

**Subject:** RE: Chief Psychiatrist's OMHD Training - Final Approval

Ok, but on slide 22, is it meant as something like: "...incompetent to stand trial per court order six months earlier, ..."?

It may just be me, sorry.

**From:** ██████████████████████████

**Sent:** Tuesday, July 7, 2020 5:39 PM

**To:** ████████████████████████████████████████

█████████████████████

**Subject:** Re: Chief Psychiatrist's OMHD Training - Final Approval

Good evening ████████████

Thank you. Regarding slide 11, you are absolutely correct. The phrase on slide 11, paragraph 1, lines 10 and 11, should say "...requires treatment at a State Hospital." This was an old slide that we just tweaked, so I didn't catch that before. ████████, can you make that correction, please?

Regarding slide 22, the question states that the patient was admitted to a State Hospital 6 months ago, was found competent two months ago and was sentenced one month ago. His EPRD is one month from now. So, with that information, he only received two months of treatment post-sentencing. This is what we want the Chief Psychiatrists (CPs) to understand, that he did not get the required 90 days of treatment. He would not meet criterion 5, since the other treatment times don't count for criterion 5. If you or ████████ can come up with a better way to say this that might be less confusing, that would be great, but all the information is there for the CPs to decide if he meets this criterion or not.

I hope that makes sense.

BTW, if those are all the corrections we get, we don't have to send the slide set out again for all to see. Let's wait and see what the others come up with.

Thanks again,



**From:**
**Sent:** Tuesday, July 7, 2020 4:47 PM
**To:**
**Subject:** RE: Chief Psychiatrist's OMHD Training - Final Approval

Just a couple of very minor comments:

Slide 11: maybe a typo? Re "...whether or not the patient meets the criteria and 'require treatment at the state hospital.'" Is it meant to be "require<u>s</u> treatment at <u>a</u> state hospital?"

Slide 22: something also seems slightly off re the phrase: "...incompetent to stand trial court orders six months ago..." I am not sure what was meant.



CALIFORNIA CORRECTIONAL
**HEALTH CARE SERVICES**

The contents of this e-mail message, including any attachments, are intended solely for the use of the person or entity to whom the e-mail was addressed. It contains information that may be protected by the attorney-client privilege, work-product doctrine, or other privileges, and may be restricted from disclosure by applicable state and federal law. If you are not the intended recipient of this message, be advised that any dissemination, distribution, or use of the contents of this message is strictly prohibited. If you have received this message in error, or are not the named recipient(s), please notify the sender immediately by reply e-mail or by phone and delete this message.

**From:**
**Sent:** Tuesday, July 7, 2020 1:52 PM
**To:** Golding,
Michael@CDCR <Michael.Golding@cdcr.ca.gov>;

**Subject:** Chief Psychiatrist's OMHD Training - Final Approval

Hello All!

5

I have updated the course according to the requested edits. Attached are revised printouts.

*PSYCH OMHD* – This is a static representation of the course in Word format for quick viewing.
*OMHD Review Supp* – This is a copy of the content on Slide 15, which involves many layers of text.

To view the course in the LMS, please go to https://cchcsdemo.myabsorb.com/#/login and enter your first and last names, separated by a period (ex. John.Doe). The default password is Training123!. If you require login assistance, please click the *Forgot Password* link.

If you would like to suggest any changes or agree that the slide set is appropriate as-is, please let us know. Otherwise, if we don't hear from you in 1 week, we will assume it is acceptable and will upload it as the final training set for the Chief Psychiatrists.

Please let me know if you have any questions, thank you!

**From:**
**Sent:** Tuesday, June 16, 2020 8:06 AM
**To:**                                                                                          Golding,
Michael@CDCR <Michael.Golding@cdcr.ca.gov>;

**Subject:** RE: Final draft of Chief Psychiatirst's OMHD traning slide set

Hello!

Attached are review documents, representative of the course, but as eLearning, it should be reviewed in the LMS.

You have all been enrolled in a new instance of the course and will receive an automatic email from the LMS. This demo version of the LMS operates the same way the live LMS does, but is used for development purposes and course review.

*PSYCH OMHD* – This is a static representation of the course in Word format for quick viewing.
*OMHD Review Supp* – This is a copy of the content on Slide 15, which involves many layers of text.

Please funnel all change requests through            so we can be sure to address each request systematically.

If you require assistance accessing the course, please let me know.

Thank You!

6



**From:** ██████████████████████████
**Sent:** Monday, June 15, 2020 11:00 PM
**To:** ████████████████████████████ Golding, Michael@CDCR <Michael.Golding@cdcr.ca.gov>;
███████████████████████████████████████████████
███████████████████████████████
████████████████████
**Subject:** Final draft of Chief Psychiatirst's OMHD traning slide set

Good evening all,

After an extensive revision of the original slide set, with weeks of hard work and effort put in with the amazing assistance of ███████████████████████, we have completed what we believe is a quality version of the final draft of the training slides for the OMHD process for the Chief Psychiatrists.

I apologize that this took so long to complete, but we wanted to make sure that this slide set would provide an appropriate educational experience and thorough explanation of what is expected of Chief Psychiatrists in their roles of the OMHD process.

████████████ will send out an enrollment link to be able to view the program.

Please go through the slide set as if you were in training, and feel free to make any suggestions you believe would make this an even better learning experience.

I would like to thank both ████████████ for their assistance, thoroughness, and patience with me during this revision.

Have a great day all,
██

attachment 37

May 26, 2022

Dear Dr. Golding,

This letter is to memorialize our working relationship which began when your administrative assistant, ███████████████, contacted me requesting that I apply for the ███ ████████████████████████████████ consulting position in the fall of 2017 and continuing until I left that position in March 2021.

On October 9, 2017, I interviewed for the ███████████ with you and ██████████████. During the interview, you told me that the position would be listed under the umbrella of Telepsychiatry. To assuage my worries about mentoring and support for the position, you arranged a lunch with ██████████████ on December 22, 2017. She promised us that the DSH PRN group would provide guidance. You hired me for the ███████████ and I transitioned from being a ███ to being a ████████████████ on February 1, 2018. You arranged for an office for me in the ████████████████. The █████████████ transitioned from a limited term position to a regular position in February 2019. It remained under the umbrella of Telepsychiatry.

As we started to build the PRN consultation service, you shared your goal of the service being for physicians rather being used as a tool of administrators. This worked well and the service grew. You sent me consultations, reviewed consultations, and provided feedback. You sent me ideas for projects and reviewed the monthly "Clinical Notes" that I wrote, and which was distributed by █████████ I attended weekly meetings of the Headquarters psychiatrists. Throughout my tenure, you were my direct supervisor, providing feedback as well as managing the administrative aspects of the position (approving leave and signing timecards). We collaborated on several challenging consultations.

I have been very fortunate to have had several wonderful mentors throughout my career and I count you as one of them.

Very truly yours,

████████████

████████████████

attachment 38

**Golding, Michael@CDCR**

| | |
|---|---|
| **From:** | |
| **Sent:** | Wednesday, January 27, 2021 4:20 PM |
| **To:** | Golding, Michael@CDCR |
| **Subject:** | RE: Yikes! I think I forgot to ask you |

---

CAUTION: This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

---

I know but you are still my boss!

**From:** Golding, Michael@CDCR <Michael.Golding@cdcr.ca.gov>
**Sent:** Wednesday, January 27, 2021 4:19 PM
**To:**
**Subject:** RE: Yikes! I think I forgot to ask you

You are so fine it's not even funny.
I trust you completely. You know that.

**From:**
**Sent:** Wednesday, January 27, 2021 4:17 PM
**To:** Golding, Michael@CDCR <Michael.Golding@cdcr.ca.gov>
**Subject:** Yikes! I think I forgot to ask you

This is bad. I had to go to DSH-Napa last week for pre-employment stuff (physical and fingerprinting) and I think that I forgot to ask you if I could go. I'm so sorry. I can't believe that I did that. I think it was because of anxiety/anticipation about the inauguration.

Tomorrow, I need to get a second TB test for them that I can do at a local clinic. It will take about an hour in the middle of the day. Is that ok?

attachment 39

**Golding, Michael@CDCR**

| | |
|---|---|
| **From:** | |
| **Sent:** | Thursday, December 17, 2020 1:13 PM |
| **To:** | Golding, Michael@CDCR |
| **Subject:** | I'm sorry I couldn't tell you this on the phone... |

---

CAUTION: This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

---

Michael - I'm so sorry.... I've accepted a position with the DSH PRN group. ▮▮▮▮▮ has some ideas to help make my departure as smooth as possible.

I am so grateful that you gave me the chance to start the ▮▮▮▮▮▮▮. I will never forget this! Thank you. I have appreciated working for you and have learned a great deal.

▮▮

1

attachment 40

## Golding, Michael@CDCR

| | |
|---|---|
| **From:** | |
| **Sent:** | Friday, January 15, 2021 4:40 PM |
| **To:** | Golding, Michael@CDCR |
| **Subject:** | Summary of our 1/14/2021 conversation |

---

**CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

---

Hello Dr. Golding,

Today we spoke about several instances of sharing information. First, you emailed me on 12/29/20 stating "Taking a little bit of time off but need to speak with you about some thing, if possible. Call if you wish." We spoke, and you let me know that ████████ would be leaving state service. It was later brought to my attention that ████████ had communicated that to you around 2 weeks prior, and that ████ (████████ direct supervisor) and ████ (████ ████████) were not informed until later still. I noted that if we had been able to discuss things sooner, we may have been able to offer ████████ concessions that could have affected her decision to leave. I don't claim we would have been able to change the decision, but I would like to request that such information be communicated to the relevant parties earlier in the process.

Second we spoke about 3 e-mails that you sent to the OSM:
1) 9/15/20, subject: "Data Disappearing Redux"
2) 9/17/20, subject: "Psychiatric Staffing Suggestions"
3) 9/20/20, subject: " 'Severe' Staffing Shortages Very much Present"

All three of these emails represented long-standing problems in the MH dept. I mis-spoke in the call, apologies: you did inform me that you were going to send the first email on 9/10/20. The other 2 emails were not shared with me until I received them from my supervisor, who received them from the OSM. Email 1 resulted in a hastily written email to the field that actually caused its own set of problems, and prevented a more measured and considered approach. You were then placed in charge of a work group to determine solutions to the various problems; I would just note that if had you requested this prior to sending the email, that could have been done first. The issues raised in Emails 2 and 3 were things that had been discussed with OSM and were continuing to be discussed. Both emails contained errors, and did not present the arguments in the most effective way; Email 2 specifically addressed issues which had already been removed from the draft policy in a work group that you participated in. Due to this, the emails are more likely to have weakened our efforts to achieve those same goals rather than assisted them.

I repeated again that you and anyone else can communicate directly with the OSM whenever you choose. However, in order for me to be able to do my job, I need to be able to respond effectively to attempt to fix problems when they are raised, and to respond to questions or concerns that arise after emails like that. As I mentioned above, all 3 of those problems were long-standing, but we had not discussed potential solutions that we may have been able to implement once I had taken over in my current role as ████████.

Finally, third, we spoke about an issue you raised in an OSM Work Group about the telepsychiatry-from-home policy. You had many opportunities to raise concerns before; we had set up additional meetings between you and ████████ (████████████) shortly before that, and you had been included on emails containing multiple drafts of the policy. However, you raised concerns with the policy for the first time in a setting with court monitors and others, where it was more difficult for us to explain to you that these problems had already been raised in the process and addressed in various ways. This was not helpful to the negotiation, and had the potential to embarrass the ████████ in that meeting as well as CDCR in general, and yourself.

1

**The expectations** that I want to make clear from all of these points is that you raise and discuss these issues internally prior to sending letters to the OSM or bringing them up in meetings where other CDCR colleagues have not had the chance to hear your concerns and potentially address them. I would also like you to help provide solutions. Should you feel that the response is unsatisfactory, or that your proposals are not receiving the attention they deserve, I would repeat that you are of course always welcome to communicate directly with the OSM. However, as your direct supervisor and the person who is currently responsible for the department's response to these issues, I must be included in that discussion in an effort to address the issues at the lowest level to ensure a timely response and that the correct information is brought up with the OSM.

You noted concerns of your own about information being intentionally withheld from you. I request that you address that as a separate topic from the response to this email, and we will give that the individual attention it deserves.


Thank you,




**HEALTH CARE SERVICES**

*CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication. This e-mail is intended for CDCR usage only.  Unauthorized access or distribution is prohibited by all applicable laws.*

attachment 41

**Golding, Michael@CDCR**

| | |
|---|---|
| **From:** | Golding, Michael@CDCR <michael.golding@cdcr.ca.gov> |
| **Sent:** | Tuesday, January 26, 2021 4:45 PM |
| **To:** | ▉▉▉▉▉▉▉▉ |
| **Cc:** | ▉▉▉▉▉▉▉▉ |
| **Subject:** | Your 01_15_21 email |
| **Attachments:** | Psychiatric Staffing Suggestions; Fwd: "Severe" Staffing Shortages Very Much Present; Capture.PNG; Data Disappearing Redux |

---

**CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

---

**CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

---

Hi,

There are multiple untruths, errors, and misperceptions in the email that you sent me on 1/15/21 at 4:39 PM. Following your message below, I address the latter concerns in the letter first, as I think there is more urgency to those. Then below that, I address the initially stated concern.


Hello Dr. Golding,

Today we spoke about several instances of sharing information. First, you emailed me on 12/29/20 stating "Taking a little bit of time off but need to speak with you about some thing, if possible. Call if you wish." We spoke, and you let me know that ▉▉▉▉▉▉ would be leaving state service. It was later brought to my attention that ▉▉▉▉ had communicated that to you around 2 weeks prior, and that ▉▉▉▉▉▉ direct supervisor) and ▉▉▉▉▉▉ ▉▉▉▉▉▉▉▉▉▉▉ ) were not informed until later still. I noted that if we had been able to discuss things sooner, we may have been able to offer ▉▉▉▉▉ concessions that could have affected her decision to leave. I don't claim we would have been able to change the decision, but I would like to request that such information be communicated to the relevant parties earlier in the process.

Second we spoke about 3 e-mails that you sent to the OSM:
1) 9/15/20, subject: "Data Disappearing Redux"

1

2) 9/17/20, subject: "Psychiatric Staffing Suggestions"

3) 9/20/20, subject: " 'Severe' Staffing Shortages Very much Present"

All three of these emails represented long-standing problems in the MH dept. I mis-spoke in the call, apologies: you did inform me that you were going to send the first email on 9/10/20. The other 2 emails were not shared with me until I received them from my supervisor, who received them from the OSM. Email 1 resulted in a hastily written email to the field that actually caused its own set of problems, and prevented a more measured and considered approach. You were then placed in charge of a work group to determine solutions to the various problems; I would just note that if had you requested this prior to sending the email, that could have been done first. The issues raised in Emails 2 and 3 were things that had been discussed with OSM and were continuing to be discussed. Both emails contained errors, and did not present the arguments in the most effective way; Email 2 specifically addressed issues which had already been removed from the draft policy in a work group that you participated in. Due to this, the emails are more likely to have weakened our efforts to achieve those same goals rather than assisted them.

I repeated again that you and anyone else can communicate directly with the OSM whenever you choose. However, in order for me to be able to do my job, I need to be able to respond effectively to attempt to fix problems when they are raised, and to respond to questions or concerns that arise after emails like that. As I mentioned above, all 3 of those problems were long-standing, but we had not discussed potential solutions that we may have been able to implement once I had taken over in my current role as ▮▮▮▮▮▮▮▮.

Finally, third, we spoke about an issue you raised in an OSM Work Group about the telepsychiatry-from-home policy. You had many opportunities to raise concerns before; we had set up additional meetings between you and ▮▮▮▮▮ (▮▮▮▮▮▮▮▮▮▮) shortly before that, and you had been included on emails containing multiple drafts of the policy. However, you raised concerns with the policy for the first time in a setting with court monitors and others, where it was more difficult for us to explain to you that these problems had already been raised in the process and addressed in various ways. This was not helpful to the negotiation, and had the potential to embarrass the ▮▮▮▮▮▮▮▮▮ in that meeting as well as CDCR in general, and yourself.



**The expectations** that I want to make clear from all of these points is that you raise and discuss these issues internally prior to sending letters to the OSM or bringing them up in meetings where other CDCR colleagues have not had the chance to hear your concerns and potentially address them. I would also like you to help provide solutions. Should you feel that the response is unsatisfactory, or that your proposals are not receiving the attention they deserve, I would repeat that you are of course always welcome to communicate directly with the OSM. However, as your direct supervisor and the person who is currently responsible for the department's response to these issues, I must be included in that discussion in an effort to address the issues at the lowest level to ensure a timely response and that the correct information is brought up with the OSM.

You noted concerns of your own about information being intentionally withheld from you. I request that you address that as a separate topic from the response to this email, and we will give that the individual attention it deserves.

2

Thank you,



You correctly state that you were aware of my "Data Disappearing Redux" email to the OSM before I sent it to the OSM.

Given that I had indeed conveyed my concerns to you and that, when your response to my raising them was in no way collaborative, I had specifically told you that I would raise my concerns with the OSM. Why do you now say that that email that I wrote to the OSM "resulted in a hastily written email to the field that actually caused its own set of problems, and prevented a more measured and considered approach."?

Why, ▮▮▮▮▮▮▮ did you write that "hasty" email? I agree that it could be perceived that you acted hastily, and that your actions did appear to cause an additional set of problems, and that perhaps you should have utilized a more "measured and considered" approach.

You then say:

"You were then placed in charge of a work group to determine solutions to the various problems; I would just note that if you had requested this prior to sending the email, that could have been done first."

But ███████ my concern about the disappearing appointments was an issue that you were well aware of long before all this, not merely because of my email to you about it, but because I had told you about all the issues I was/am concerned about starting from when you first started coming to work for me at Elk Grove: you had familiarized yourself with the Golding Report and CDCR's responses and we had many conversations about all of it before you wrote your amicus brief declaration that was filed on May 28 2019 (Case 2:90-cv-00520-KJM-DB Document 6166 Filed 05/28/19), so it is disingenuous to suggest that I was suddenly springing this on you. Indeed, as I have told you many times, I have been very disappointed in your unwillingness to address the many issues that you know adversely affect our patients.

Surely when you became the ████████████, it should have been a priority for you to fix this and allow the judge to understand this *data error* and all the others that you have been aware of since before May 28 2019? I think the OSM needed to know about this one, too, especially since CDCR experts were denying knowledge of the issue in court, not subsequently investigating to see if it was a problem, and not pursuing a solution, all of which you and I discussed at that time.

Even if somehow our CDCR data experts did not really understand that this was happening as they claimed during the court proceedings, and also remarkably enough,

if they somehow did not think it worthwhile to check into the problem, you yourself certainly could have at any time.

Why did you not think it worthwhile to make sure that the Court and the Special Master knew that CDCR in fact had a problem with disappearing appointments, and still does? The lack of action by CDCR could make the OSM think that many appointments not occurring are not "disappeared", though many are. Failing to address this might even cause the OSM to think that ███████ and I spoke inaccurately in court.

Even now (today) the appointments are still being "disappeared".

And you say:

"You were then placed in charge of a work group to determine solutions to the *various problems* [emphasis mine, MG]. I would just note that if you had requested this prior to sending the email that could have been done first."

When ███████ and I noticed the "various problems" with the metrics we were using to measure scheduled appointments, and pointed it out in 2018 or earlier, we estimated that our patients were getting to their scheduled mental health psychiatry appointments only about 45%-50% of the time.

This was one of the "various" problems that that workgroup you asked me to lead was supposed to help us accurately measure and *you agreed* that we would solve the problem.

5

Yet once again, instead of efficiently addressing the problem, you have chosen to create the mere appearance of working on the problem, while putting off solving it for another two years (*4 years total*). We need to know precisely the frequency of appointments not occurring when scheduled to happen, throughout our institutions, and we need to know in which wards in the institutions that this is a problem. You are choosing not to have this measured. Were it being measured, the problems would be being solved, as you know and have known since we first started talking about all the issues when you first started coming to Elk Grove (while you were still a linestaff telepsychiatrist).

When I specifically told you that four years seemed like too long a time not to have a basic answer to this basic question, you stated that the department had other priorities. When I pointed out to you that our QM team was not able to fix our scheduling problems right now, including modifying the input parameters so appointments would no longer disappear, you simply explained that we lacked programming resources to do this immediately but would.

Do you not think that *you* might have an obligation to tell the OSM that ▇▇▇▇▇▇ and I were telling the truth about the disappearing appointments and that the problem persists even now? I told the OSM because I have an ethical obligation to do so. This is especially true since CDCR has been denying knowledge of any problem. I still am not aware of official CDCR acknowledgement (for example to the Plaintiffs) that this problem persists, and that ▇▇▇▇▇▇ and I were telling the truth.

In addition, did you yourself not have an obligation to tell the OSM that we do not have the programming resources needed to be able to ascertain (apparently for several more years) the frequency with which appointments that occur on a given day (and

6

have not been previously cancelled), will also occur in a confidential office, and will in fact happen within two hours before or after the scheduled time? A recent attempt at data collection suggests that appointments occur as scheduled less than 45% of the time, so I may have *overestimated* CDCR's percentages in the Golding Report.

The OSM should know about it, because when that doesn't happen, that dramatically wastes our psychiatrists' time, and our patients suffer. When our psychiatrists get their schedule in the morning for that day, on average more than 50% of the time a given patient does not show up in their office, two hours before or after their appointment time. Why not share that with the OSM? Why not have all this measured and make the data available so that we can instantly see where there are problems and swiftly solve them?

You created a workgroup to give the appearance of trying to solve the problem instead of devoting programming resources to it that would actually efficiently solve the problem. You put off for another 2 years the central issue of documenting when individual appointments don't occur, and we have no idea when disappearing appointments will stop disappearing.

You continue:

"The issues raised in emails two and three where things that have been discussed with OSM and were continuing to be discussed"

and you say:

"Both emails contain errors and did not present the arguments in the most effective way."

And:

"These emails are more likely to have weakened our efforts to achieve those same goals rather than assisted them."

And about the latter two emails you say they:

"were not shared with me until I receive them from my supervisor, who received them from the OSM."

In terms of the letter that went to the OSM on 9/17/20 that you say you did not see, please note what the letter itself says:

"Below is the letter I sent to █████ *in early August* [emphasis mine, MG]...."

As you know, █████ is your █████. I sent that letter to █████ because when I and many on our psychiatry team were raising and discussing in detail our concerns in meetings with you and █████████ had *told me to* put the concerns I had raised orally in those meetings *in writing to him,* so I did so.

I sent that email to █████ as instructed in early August, notably *more than a month* before I sent the email that you are complaining about, my letter to the OSM on 9/17/2020. There was ample time to act on my concerns if CDCR had chosen to do so. And had █████ wanted to share that email with you, he surely could have. I don't

control what ██████ shares with you and thus I don't understand why you are blaming me for that.

Regardless, you and ██████ clearly heard the arguments I and others made in those meetings, and read our various written comments on the proposal, that ultimately did become part of the email I sent to ██████ as instructed.

In *November* (substantially after my mid-September 2020 email to the OSM and substantially after I emailed ██████ in early August), Judge Mueller said about CDCR's proposal:

"The evidence tendered by defendants does not support the broad assertion in their brief that the 2009 Staffing Plan is "outdated and substantially flawed." (Case 2:90-cv-00520-KJM-DB Document 6938 Filed 11/04/20 Page 6 of 9)

Our psychiatrists (and I especially) were repeatedly trying to convey to you that the 2009 plan was good, just needing a few tweaks. We needed that message to go the OSM, because most of our psychiatrists did not want substantial cuts to the positions allocated in the 2009 staffing plan. We thought the allocations in 2009 were mostly reasonable.

*Yet you objected to my making my opinion (and our psychiatrists' opinions) known* in August 2020, instead claiming that the Plaintiffs would take care of the most problematic parts of CDCR's plan and we as psychiatrists shouldn't. But why should we not have told the truth? Would you also have experienced retaliation?

9

I specifically asked you and the psychiatrists what you planned on doing if CDCR continued to propose large cuts to psychiatric allocations relative to the 2009 staffing plan, should they fail to take our arguments into account, as I anticipated would be the case. You continued to say the Plaintiffs would take care of the significant problems, and I should not say what I though, and that doing so would only make all the psychiatrists look bad to our CDCR leadership.

Logically you either (more or less) agreed with the CDCR lawyers' contention that the 2009 Staffing Plan was outdated and substantially flawed (and you in fact told our team that you did agree that it was) or you didn't. Even if you agreed with our lawyers about the 2009 plan, the Special Master needed to know what most of our psychiatrists thought. If the Special Master had no way of knowing that our psychiatrists largely agreed with the number of psychiatry allocated positions in the 2009 plan, and thus disagreed with our lawyers, then of course I had to speak with the OSM, so that he would know, since you yourself were not publicly sharing that with the OSM. It was a *psychiatry* staffing plan!

But if you also more or less disagreed with our lawyers, but could not say anything publicly for whatever reason, then it would also be important for the OSM to be told: because again, he had a right to know in some detail our psychiatrists' opinions about the 2009 *psychiatry* staffing allocations.

Please note again, CDCR was not hearing what our psychiatrists said *even up to November 2020* when Judge Mueller wrote her order comments on the ▮▮▮▮ brief, let alone in August and September 2020 when I wrote the emails you are complaining about. We feared that CDCR was substantially veering from the 2009 staffing plan and

indeed it demonstrably was. CDCR planned to cut large numbers of psychiatry allocations, but the judge intervened.

There is even more to this: I had no idea what decisions you and the CDCR attorneys were making behind closed doors about the staffing plan in addition to our CDCR attorneys determining that the 2009 Staffing Plan was seriously in error.

Certainly our psychiatrists did not participate in – let alone agree to – the type of decision that led to the large scale near-dismissal of the 2009 staffing plan that was part of attorney ███████████'s staffing proposal and also in the "Defendants Response To the Court's July 30, 2020" (Case 2:90-cv-00520-KJM-DB Document 6853 Filed 09/14/20 Page 1 of 35).

But you informed us that you agreed with our attorneys that the 2009 staffing plan was seriously flawed. Please also note that the ████ psychiatry staffing proposal (September 8, 2020) was not even sent to me or our team before being sent to the Coleman OSM and the Plaintiffs' attorneys (I found it on the Court's website attached to this Plaintiffs' response. Case 2:90-cv-00520-KJM-DB Document 6852-1 Filed 09/14/20 Page 2 of 9.)

There was a major lack of transparency on the part of CDCR, no representation of our psychiatry team's argument against radically changing the 2009 plan, and no indication that our argument would have any effect. Indeed it was *after* our arguments mostly supporting the 2009 staffing plan that ███████ wrote CDCR's staffing plan and sent it (September 8, 2020) to the OSM and the Plaintiffs. This clearly demonstrated that our attorneys' interaction with the court system in no way took into account our psychiatrists' opinions about staffing allocation cuts and the 2009 staffing

plan. Thus the OSM needed to know that our psychiatry team did not favor substantial cuts in the 2009 staffing allocations.

Muhamadu Jones (the Deputy Special Master) said, concerning my "Sept 15 and 20 emails to *Coleman* Special Master…" that Mattie Lopes is "obligated by his position to provide the information… [I sent him] to the *Coleman* parties." Ultimately the September 17th email that I sent to the OSM was also apparently also sent to the Coleman parties by Mr. Lopes.

If even the Special Master himself felt obliged to send the information in my emails to the Coleman parties, why did you yourself not first send the information to him?

You knew and could have told the OSM at the time that:

1.    There are still places that are experiencing severe staffing shortages, given the COVID pandemic and geographical challenges, as was and is stated repeatedly by linestaff and by our supervisors and as quoted in the message I sent to the OSM.

2.    Our attorneys were mistaken in their "broad assertion" in the ███ brief, that the 2009 staffing plan is "outdated and substantially flawed" (per Judge Mueller).

3.    Our psychiatrists almost universally supported the number of psychiatrist allocations in the 2009 staffing plan (they did not want the allocations cut, unlike what our attorneys argued should happen).

4.    The scheduling problems had not been fixed and appointments were still disappearing (and are still disappearing).

5.    There were no investigations by our data people of the disappearing appointments after the court hearing, when our experts claimed not to know anything about it in court.

And in addition, why didn't you (later) publicly state to the OSM and others that:

6.      It's going to take two more years to figure out how frequently our patients are being seen confidentially and where these inefficiencies are occurring, because CDCR has other priorities for our programmers.

You did know the above and you certainly had ample opportunity to publicly share it with the OSM and the Plaintiffs.

You were not giving the OSM the critical information that I had repeatedly told you about. Thus I shared it with the OSM as I had told you I would. I had an ethical obligation to do so.

In addition to the above complaints, you also claim that my oral communication with the psychiatrist experts from the Office of the Special Master's team (and others) was problematic, at a time when you, ▇▇▇▇▇▇▇▇ and I were discussing the telepsychiatry policy with them.

In that conversation, I had and have stated to you that I am concerned that we need to carefully evaluate and reevaluate our policy of allowing our telepsychiatrists to work from home. I was concerned and still am concerned that CDCR will expand telepsychiatry from home to ultimately employ psychiatrists working from around the country, who know nothing about our patients. That would eliminate the psychiatric contribution to the mental health cultural milieu in CDCR.

I said again during that meeting that we need to evaluate and reevaluate at-home telepsychiatry very carefully for this reason, recognizing nonetheless that we *should* do at-home telepsychiatry during the pandemic. But we need to be aware of the risk that we are taking.

It was not until the October 15, 2019 evidentiary hearing about my report, that I learned that I am free to communicate with the OSM. One of your predecessors had specifically told me not to say anything in meetings with the OSM, and that I may only *answer their questions.* CDCR was using me as window dressing, my presence at the meetings giving the false impression to the OSM and the Plaintiffs that I was being included when I was not.

Quoting from the 11/01/19 transcript of the October 15, 2019 evidentiary hearing:

Case 2:90-cv-00520-KJM-DB Document 6377 Filed 11/01/19 Page 56 of 240

SILBERFELD: You mentioned that at some point in time in October of 2018 you felt as if you could not talk or communicate with the Special Master, right?

Golding: Correct.

Silberfeld:  And that's true, not withstanding the fact that in 2017 you attended any number of policy meetings multiple times throughout the year where the Special Master and his team were present, correct?

Golding: That's correct.

14

Silberfeld: And in 2018 you attended on a more frequent basis, perhaps once a month, workgroup meetings where the Special Master and his team were also present, correct?

Golding: Correct.

Case 2:90-cv-00520-KJM-DB Document 6377 Filed 11/01/19 Page 78 of 240

In response, opposing counsel said:

Ells: "Dr. Golding, you received a lot of questions from opposing counsel about your attendance at workgroup meetings and policy meetings where the Special Master was also present....

Ells: "Did you feel free to express your opinions to the Special Master at those meetings?

Golding: No, ma'am.

The clear implication from this exchange is that CDCR is going to try to claim that its employees can communicate with the Special Master because of attending meetings with him. But as your recent reprimands show, the truth is that that is false. You are complaining that I have communicated with the OSM, despite claiming the opposite in the very message you just sent.

During the phone conversation about telepsychiatry that you criticize me for, for example, I *merely agreed with the OSM psychiatry experts*! I am very confident that they remember that.

It *is* reasonable to have telepsychiatry from home carefully evaluated and re-evaluated given the potential for abuse of this modality. For saying that, you subsequently excluded me from further discussion about that and now I receive this further retaliatory email from you stating that my oral communication with the OSM:

"…. was not helpful to the *negotiation* [emphasis mine, MG] and had the potential to embarrass the ███████████████ in that meeting as well as CDCR in general and yourself."

███████ I would never feel embarrassed for advocating for our patients as I was and I will continue to do so given our ethical obligations. I am sorry you think it hurt your "negotiation", but what I said was to the best of my knowledge true.

You say I can give information to the OSM but you also say it was inappropriate for me to do so and then stop me going to further meetings where the issues are being discussed.

Your criticisms also raise the question: why would you, as the ██████████████, criticize me for giving critical information to the OSM, when it seemed to be your obligation to do so, but *you* didn't? Why would you not share that we still had (have!) significant staffing shortages, that appointments were (and are!) still being disappeared, that ███████████ and I were right to report those disappearances to the Judge, that our psychiatrists profoundly disagreed with veering far from the staffing allocations in the 2009 plan, that you were not showing me or our psychiatrists the ███████ staffing plan (before it was sent to the OSM and the plaintiffs) and that there were and are legitimate concerns about CDCR utilizing telepsychiatry from home?

And why now do you want to stifle dissent so much that it becomes a cause for reprimand if one merely publicly *agrees* with the OSM psychiatrists about the need to monitor telepsychiatry from home? This feels like yet more retaliation to me.

Let me now turn to the events surrounding █████████ resignation.

You claim that █████████ communicated to me "around 2 weeks prior [to 12/29/20]" that she "would be leaving state service."

It is true that she did tell me, but it is not true that it was two weeks before 12/29/20, and it is not true that I saw her message then.

█████████ sent an email message to me on 12/17/2020 informing me that she was taking a job with DSH. But two weeks prior to 12/29/2020 is around 12/13/2020, not 12/17/20. And the message was not received by me on 12/17/20.

Indeed on the phone call with you, I explicitly told you that I needed to look into those dates because they did not sound right. Instead, you repeated (in quite an angry/frustrated tone) that you had *spoken* with █████████ and she *told* you that she had told me two weeks prior to my conversation with you about her departure. Thus you knew that that had occurred. The implication was that I was not telling you the truth.

I gently challenged you again: I needed to investigate, because it did not fit with what I remembered. But you insisted one more time that █████████ had **told you** otherwise.

In fact I did confirm what happened, and as you can see from the email snippet that I have attached to this email, ▇▇▇▇▇ sent me an email on 12/17/2020, and the email was unfortunately missed: you can see the bolded blue beneath my name and the bolded line next to it on 12/17/20, indicating that the email was not opened.

▇▇▇▇▇ said in retrospect that she just could not call me to tell me that she was leaving, because she was so grateful to me and CDCR for the opportunity to have worked here. Instead around Christmas (perhaps 12/24), ▇▇▇▇▇ (a leader at DSH) called me and told me that ▇▇▇▇▇ was leaving to join DSH. I got in contact with ▇▇▇▇▇ and confirmed with her, tried to persuade her otherwise, then spoke with you on 12/29/20, *while I was on vacation*, to give you the news. I thus told you around 5 days later, during a holiday, after I heard the news, and I certainly did not wait "2 weeks" to tell you from the time I knew, as you falsely and angrily alleged.

In addition, despite your explicitly saying repeatedly that you had *spoken to her*, she *denies* that you did, or that you even emailed her (in the relevant time frame). She offers as evidence an email from her in which the tone of it seems to make clear that you *had not* spoken with her. And note that the e-mail from you to her was from 1/11/2021, many days *after* we spoke at the end of December when you had said that you had already spoken to her. I note that you yourself seem to be offering her an opportunity, buy quite belatedly, relative to the time I spoke to you about her leaving. You wrote to her,

"I have no doubt that you had to make a very difficult decision, and I am not writing to make it any more complicated for you. Just wanted to say thank you so much for all the amazing good you've done for so many of our patients, not to mention our doctors (both helping them make better doctors, and helping them keep working for CDCR

patients). You have been a huge boon to us for as long as we could hve you 😊. I wish ▮▮▮▮▮▮ had spoken to me a little earlier…we could definitely cut back/prioritize referrals to 1 per week or similar, and we have some multiple-Boarded telepsych that we (cautiously) think are great and could have started helping more or less right away a couple weeks ago…"

It is nice to know that we will be able to utilize a new PRN psychiatrist virtually immediately (or even that we could have several weeks ago), but as you know that does not seem to be the reality. As you are no doubt ware, the double boarded med-psych candidate whom we agreed should interview for a future PRN job (or join us as a new *acting* PRN psychiatrist) has not even agreed to convert from a contractor to be a civil servant yet, and is thus not even close to beginning as a PRN psychiatrist.

I am very concerned about your response to me. You clearly disbelieved me when I had doubts about the timeline, and then you repeatedly provided information to me about your interactions that themselves seem to not be wholly accurate.

There are two other issues related to this that should be mentioned.

1. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ You state that ▮▮▮▮ was ▮▮▮▮▮▮▮ "direct supervisor". In that case, presumably ▮▮▮▮▮▮ told her supervisor that she was leaving? But actually, ▮▮▮▮▮ was not aware that ▮▮▮ was her supervisor just as I was not until now, because that was never the case before. Why did you not tell me that ▮▮▮ had been made her supervisor? (Why did you also not tell her of the change, so that she would have informed her new supervisor instead of me?) When this position was developed, we utilized the telepsych org structure to accommodate

her because we had no other psychiatry positions at HQ, itself a continuing problem.

But everyone considered me ▮▮▮▮▮▮ supervisor.

I had been signing ▮▮▮▮▮▮ timesheets and approving her vacations, just as, incidentally, I had done for the previous ▮▮▮▮▮▮▮▮▮▮▮▮.
In addition, to the best of my recollection I wrote her PRN duty statement and as you know, the PRN duty statement is *not* a telepsych duty statement!

In addition to performing the administrative duties with ▮▮▮▮▮▮ I had been reviewing consultations, editing the clinic notes when appropriate, working with her on her hours, negotiating with her (successfully) when last time she wanted to leave because of a better offer at DSH, and etc. *She* certainly perceived me as her supervisor, as well. In short I have in every way *been* her supervisor.

▮▮▮▮ no doubt a capable new ▮▮▮▮▮▮▮▮▮▮, with a few months' experience in that new role, is now said to have been her supervisor, with no notice to me or ▮▮▮▮▮, and with no justification for the change.

This seems like another demotion. Does this indicate that in the future the PRN psychiatrists will be under telepsychiatry? Your letter seems to imply that, since you seem quite willing to even retrospectively eliminate my contributions as a leader in this department, just as you have previously done in trying to erase my history of supervising the Chief and Supervisors of the telepsychiatry program.

2.    ▮▮▮▮▮▮ departure : ▮▮▮▮▮▮, a new ▮▮▮▮▮▮▮▮, seemed not to be happy with my oral descriptions to her of how ▮▮▮▮▮▮ departure would be handled. She insisted on detailed plans and repeatedly raised the issue to me, as if she

were my supervisor and she seemed to be raising the issue to you, after I had told you about it. I orally presented to her my detailed plans, but this clearly was not sufficient and so we had to have urgent meetings to make sure the plans would work out.

But we work with competent people, like ▇▇▇▇▇ herself and ▇▇▇▇▇▇▇. I did not need them to put all of their plans in writing, because they told me what they were going to do, but I did so anyway and then put a plan together in writing, with time to make sure that any errors could be corrected, when the plan was reviewed, to keep peace. Having to do this kind of thing, seems very much as if you are demoting me and implicitly asking me to report to ▇▇▇▇▇!

I sent a whistleblower report to the CCHCS Receiver documenting deficiencies in patient care called the Golding Report and have given the OSM vital information that you and fellow executives have failed to give him, and I am sad that you have joined with CDCR in their actions against me. Trying to cut me off from speaking with the Office of the Special Master while explicitly denying doing so adds an Orwellian twist.

You have hurt me personally and professionally. My view is that the Office of the Special Master needs to be made aware of these false allegations that you are making about me, and of your attempts to prevent appropriate communication with the Office of the Special Master. I also think the Special Master needs to be aware of your apparent unwillingness to share needed information with him.

Please consider this my notice to you that I need to sending this message to the Office of the Special Master, so he can be aware of CDCR's continuing attempts to stop me communicating with him and its continuing retaliation for bringing important issues to his attention when CDCR has failed to do so.

Sincerely,

Michael Golding, MD

Statewide Chief Psychiatrist

attachment 42

**Golding, Michael@CDCR**

| | |
|---|---|
| **Subject:** | FW: Restrictions on Communications with the OSM |
| **Attachments:** | ATTACH001.eml; ATTACH002.eml; ATTACH003.eml; 6853  RESPONSE by Gavin Newsom to 6794 Order. (Thorn Elise) Modified on 9152020 (Plummer M). (Entered- 09142020 033111931993.pdf; Capture.PNG |

**From:** michael.golding@cdcr.ca.gov <michael.golding@cdcr.ca.gov>
**Sent:** Sunday, June 5, 2022 10:22 AM
**To:** Golding, Michael@CDCR <Michael.Golding@cdcr.ca.gov>
**Subject:** FW: Restrictions on Communications with the OSM

---

**CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

---

-----Original Message-----
From: michael.golding@cdcr.ca.gov
Sent: 01/27/21 04:54 PM
To: mlopes@pldolaw.com; jeffrey.metzner@cuanschutz.edu; dockc99@aol.com; dpotter@alumni.brown.edu
Subject: Restrictions on Communications with the OSM

Hi,

Below please find my email that I sent to ▉▉▉▉ yesterday, in response to an email he sent me on 1/15/21. I am concerned about CDCR's implicit and explicit restrictions that are being placed on my communications to you and on CDCR's continuing refusal to offer transparent communication about issues of concern. I think you should be aware of these circumstances.

Issues related to ▉▉▉▉ departure do not as directly influence your ability to ensure adequate patient care, but I include them because they were included in ▉ ▉▉▉▉ email to me.

Best,

Michael Golding, MD

Statewide Chief Psychiatrist

Hi,

There are multiple untruths, errors, and misperceptions in the email that you sent me on 1/15/21 at 4:39 PM. Following your message below, I address the latter concerns in the letter first, as I think there is more urgency to those. Then below that, I address the initially stated concern.

Hello Dr. Golding,

Today we spoke about several instances of sharing information. First, you emailed me on 12/29/20 stating "Taking a little bit of time off but need to speak with you about some thing, if possible. Call if you wish." We spoke, and you let me know that ▮▮▮▮▮▮ would be leaving state service. It was later brought to my attention that ▮▮▮▮▮ had communicated that to you around 2 weeks prior, and that ▮▮▮▮▮▮▮▮ direct supervisor) and ▮▮ ▮▮▮▮▮▮▮▮▮▮▮ ) were not informed until later still. I noted that if we had been able to discuss things sooner, we may have been able to offer ▮▮▮▮▮ concessions that could have affected her decision to leave. I don't claim we would have been able to change the decision, but I would like to request that such information be communicated to the relevant parties earlier in the process.

Second we spoke about 3 e-mails that you sent to the OSM:
1) 9/15/20, subject: "Data Disappearing Redux"
2) 9/17/20, subject: "Psychiatric Staffing Suggestions"
3) 9/20/20, subject: " 'Severe' Staffing Shortages Very much Present"

All three of these emails represented long-standing problems in the MH dept. I mis-spoke in the call, apologies: you did inform me that you were going to send the first email on 9/10/20. The other 2 emails were not shared with me until I received them from my supervisor, who received them from the OSM. Email 1 resulted in a hastily written email to the field that actually caused its own set of problems, and prevented a more measured and considered approach. You were then placed in charge of a work group to determine solutions to the various problems; I would just note that if had you requested this prior to sending the email, that could have been done first. The issues raised in Emails 2 and 3 were things that had been discussed with OSM and were continuing to be discussed. Both emails contained errors, and did not present the arguments in the most effective way; Email 2 specifically addressed issues which had already been removed from the draft policy in a work group that you participated in. Due to this, the emails are more likely to have weakened our efforts to achieve those same goals rather than assisted them.

I repeated again that you and anyone else can communicate directly with the OSM whenever you choose. However, in order for me to be able to do my job, I need to be able to respond effectively to attempt to fix problems when they are raised, and to respond to questions or concerns that arise after emails like that. As I mentioned above, all 3 of those problems were long-standing, but we had not discussed potential solutions that we may have been able to implement once I had taken over in my current role as ▮▮▮▮▮▮▮▮ .

Finally, third, we spoke about an issue you raised in an OSM Work Group about the telepsychiatry-from-home policy. You had many opportunities to raise concerns before; we had set up additional meetings between you and ▮▮▮▮ (▮▮▮▮▮▮▮▮ ) shortly before that, and you had been included on emails containing multiple drafts of the policy. However, you raised concerns with the policy for the first time in a setting with court monitors and others, where it was more difficult for us to explain to you that these problems had already been raised in the process and addressed in various ways. This was not helpful to the negotiation, and had the potential to embarrass the Chief of Telepsychiatry in that meeting as well as CDCR in general, and yourself.

2

**The expectations** that I want to make clear from all of these points is that you raise and discuss these issues internally prior to sending letters to the OSM or bringing them up in meetings where other CDCR colleagues have not had the chance to hear your concerns and potentially address them. I would also like you to help provide solutions. Should you feel that the response is unsatisfactory, or that your proposals are not receiving the attention they deserve, I would repeat that you are of course always welcome to communicate directly with the OSM. However, as your direct supervisor and the person who is currently responsible for the department's response to these issues, I must be included in that discussion in an effort to address the issues at the lowest level to ensure a timely response and that the correct information is brought up with the OSM.

You noted concerns of your own about information being intentionally withheld from you. I request that you address that as a separate topic from the response to this email, and we will give that the individual attention it deserves.

Thank you,

███████████

██████████

███████████████

█████████

█████████████

You correctly state that you were aware of my "Data Disappearing Redux" email to the OSM before I sent it to the OSM.

Given that I had indeed conveyed my concerns to you and that, when your response to my raising them was in no way collaborative, I had specifically told you that I would raise my concerns with the OSM. Why do you now say that that email that I wrote to the OSM "resulted in a hastily written email to the field that actually caused its own set of problems, and prevented a more measured and considered approach."?

Why, ██████████, did you write that "hasty" email? I agree that it could be perceived that you acted hastily, and that your actions did appear to cause an additional set of problems, and that perhaps you should have utilized a more "measured and considered" approach.

You then say:

"You were then placed in charge of a work group to determine solutions to the various problems; I would just note that if you had requested this prior to sending the email, that could have been done first."

But ███████, my concern about the disappearing appointments was an issue that you were well aware of long before all this, not merely because of my email to you about it, but because I had told you about all the issues I was/am concerned about starting from when you first started coming to work for me at Elk Grove: you had familiarized yourself with the Golding Report and CDCR's responses and we had many conversations about all of it before you wrote your amicus brief declaration that was filed on May 28 2019 (Case 2:90-cv-00520-KJM-DB Document 6166 Filed 05/28/19), so it is disingenuous to suggest that I was suddenly springing this on you. Indeed, as I have told you many times, I have been very disappointed in your unwillingness to address the many issues that you know adversely affect our patients.

Surely when you became the ████████████, it should have been a priority for you to fix this and allow the judge to understand this *data error* and all the others that you have been aware of since before May 28 2019? I think the OSM needed to know about this one, too, especially since CDCR experts were denying knowledge of the issue in court, not subsequently investigating to see if it was a problem, and not pursuing a solution, all of which you and I discussed at that time.

Even if somehow our CDCR data experts did not really understand that this was happening as they claimed during the court proceedings, and also remarkably enough, if they somehow did not think it worthwhile to check into the problem, you yourself certainly could have at any time.

Why did you not think it worthwhile to make sure that the Court and the Special Master knew that CDCR in fact had a problem with disappearing appointments, and still does? The lack of action by CDCR could make the OSM think that many appointments not occurring are not "disappeared", though many are. Failing to address this might even cause the OSM to think that ▮▮▮▮▮▮ and I spoke inaccurately in court.

Even now (today) the appointments are still being "disappeared".

And you say:

"You were then placed in charge of a work group to determine solutions to the *various problems* [emphasis mine, MG]. I would just note that if you had requested this prior to sending the email that could have been done first."

When ▮▮▮▮▮▮ and I noticed the "various problems" with the metrics we were using to measure scheduled appointments, and pointed it out in 2018 or earlier, we estimated that our patients were getting to their scheduled mental health psychiatry appointments only about 45%-50% of the time.

This was one of the "various" problems that that workgroup you asked me to lead was supposed to help us accurately measure and *you agreed* that we would solve the problem.

Yet once again, instead of efficiently addressing the problem, you have chosen to create the mere appearance of working on the problem, while putting off solving it for

another two years (*4 years total*). We need to know precisely the frequency of appointments not occurring when scheduled to happen, throughout our institutions, and we need to know in which wards in the institutions that this is a problem. You are choosing not to have this measured. Were it being measured, the problems would be being solved, as you know and have known since we first started talking about all the issues when you first started coming to Elk Grove (while you were still a linestaff telepsychiatrist).

When I specifically told you that four years seemed like too long a time not to have a basic answer to this basic question, you stated that the department had other priorities. When I pointed out to you that our QM team was not able to fix our scheduling problems right now, including modifying the input parameters so appointments would no longer disappear, you simply explained that we lacked programming resources to do this immediately but would.

Do you not think that *you* might have an obligation to tell the OSM that ▬▬▬▬▬ and I were telling the truth about the disappearing appointments and that the problem persists even now? I told the OSM because I have an ethical obligation to do so. This is especially true since CDCR has been denying knowledge of any problem. I still am not aware of official CDCR acknowledgement (for example to the Plaintiffs) that this problem persists, and that ▬▬▬▬▬ and I were telling the truth.

In addition, did you yourself not have an obligation to tell the OSM that we do not have the programming resources needed to be able to ascertain (apparently for several more years) the frequency with which appointments that occur on a given day (and have not been previously cancelled), will also occur in a confidential office, and will in fact happen within two hours before or after the scheduled time? A recent attempt at

6

data collection suggests that appointments occur as scheduled less than 45% of the time, so I may have *overestimated* CDCR's percentages in the Golding Report.

The OSM should know about it, because when that doesn't happen, that dramatically wastes our psychiatrists' time, and our patients suffer. When our psychiatrists get their schedule in the morning for that day, on average more than 50% of the time a given patient does not show up in their office, two hours before or after their appointment time. Why not share that with the OSM? Why not have all this measured and make the data available so that we can instantly see where there are problems and swiftly solve them?

You created a workgroup to give the appearance of trying to solve the problem instead of devoting programming resources to it that would actually efficiently solve the problem. You put off for another 2 years the central issue of documenting when individual appointments don't occur, and we have no idea when disappearing appointments will stop disappearing.

You continue:

"The issues raised in emails two and three where things that have been discussed with OSM and were continuing to be discussed"

and you say:

"Both emails contain errors and did not present the arguments in the most effective way."

And:

"These emails are more likely to have weakened our efforts to achieve those same goals rather than assisted them."

And about the latter two emails you say they:

"were not shared with me until I receive them from my supervisor, who received them from the OSM."

In terms of the letter that went to the OSM on 9/17/20 that you say you did not see, please note what the letter itself says:

"Below is the letter I sent to ███████ *in early August* [emphasis mine, MG]…."

As you know, ███████ is your supervisor. I sent that letter to ███████ because when I and many on our psychiatry team were raising and discussing in detail our concerns in meetings with you and ███████████ had *told me to* put the concerns I had raised orally in those meetings *in writing to him,* so I did so.

I sent that email to ███████ as instructed in early August, notably *more than a month* before I sent the email that you are complaining about, my letter to the OSM on 9/17/2020. There was ample time to act on my concerns if CDCR had chosen to do so. And had ███████ wanted to share that email with you, he surely could have. I don't control what ███████ shares with you and thus I don't understand why you are blaming me for that.

Regardless, you and ███████ clearly heard the arguments I and others made in those meetings, and read our various written comments on the proposal, that ultimately did become part of the email I sent to ███████ as instructed.

In *November* (substantially after my mid-September 2020 email to the OSM and substantially after I emailed ███████ in early August), Judge Mueller said about CDCR's proposal:

"The evidence tendered by defendants does not support the broad assertion in their
brief that the 2009 Staffing Plan is "outdated and substantially flawed."
(Case 2:90-cv-00520-KJM-DB Document 6938 Filed 11/04/20 Page 6 of 9)

Our psychiatrists (and I especially) were repeatedly trying to convey to you that the
2009 plan was good, just needing a few tweaks. We needed that message to go the
OSM, because most of our psychiatrists did not want substantial cuts to the positions
allocated in the 2009 staffing plan. We thought the allocations in 2009 were mostly
reasonable.

*Yet you objected to my making my opinion (and our psychiatrists' opinions) known* in August
2020, instead claiming that the Plaintiffs would take care of the most problematic parts
of CDCR's plan and we as psychiatrists shouldn't. But why should we not have told
the truth? Would you also have experienced retaliation?

I specifically asked you and the psychiatrists what you planned on doing if CDCR
continued to propose large cuts to psychiatric allocations relative to the 2009 staffing
plan, should they fail to take our arguments into account, as I anticipated would be the
case. You continued to say the Plaintiffs would take care of the significant problems,
and I should not say what I thought [MG], and that doing so would only make all the
psychiatrists look bad to our CDCR leadership.

Logically you either (more or less) agreed with the CDCR lawyers' contention that the
2009 Staffing Plan was outdated and substantially flawed (and you in fact told our
team that you did agree that it was) or you didn't. Even if you agreed with our lawyers
about the 2009 plan, the Special Master needed to know what most of our psychiatrists
thought. If the Special Master had no way of knowing that our psychiatrists largely
agreed with the number of psychiatry allocated positions in the 2009 plan, and thus
disagreed with our lawyers, then of course I had to speak with the OSM, so that he

9

would know, since you yourself were not publicly sharing that with the OSM. It was a *psychiatry* staffing plan!

But if you also more or less disagreed with our lawyers, but could not say anything publicly for whatever reason, then it would also be important for the OSM to be told: because again, he had a right to know in some detail our psychiatrists' opinions about the 2009 *psychiatry* staffing allocations.

Please note again, CDCR was not hearing what our psychiatrists said *even up to November 2020* when Judge Mueller wrote her order comments on the ▇▇▇ brief, let alone in August and September 2020 when I wrote the emails you are complaining about. We feared that CDCR was substantially veering from the 2009 staffing plan and indeed it demonstrably was. CDCR planned to cut large numbers of psychiatry allocations, but the judge intervened.

There is even more to this: I had no idea what decisions you and the CDCR attorneys were making behind closed doors about the staffing plan in addition to our CDCR attorneys determining that the 2009 Staffing Plan was seriously in error.

Certainly our psychiatrists did not participate in – let alone agree to – the type of decision that led to the large scale near-dismissal of the 2009 staffing plan that was part of attorney ▇▇▇▇▇▇ staffing proposal and also in the "Defendants Response To the Court's July 30, 2020" (Case 2:90-cv-00520-KJM-DB Document 6853 Filed 09/14/20 Page 1 of 35).

But you informed us that you agreed with our attorneys that the 2009 staffing plan was seriously flawed. Please also note that the ▇▇▇ psychiatry staffing proposal (September 8, 2020) was not even sent to me or our team before being sent to the

Coleman OSM and the Plaintiffs' attorneys (I found it on the Court's website attached to this Plaintiffs' response. Case 2:90-cv-00520-KJM-DB Document 6852-1 Filed 09/14/20 Page 2 of 9.)

There was a major lack of transparency on the part of CDCR, no representation of our psychiatry team's argument against radically changing the 2009 plan, and no indication that our argument would have any effect. Indeed it was *after* our arguments mostly supporting the 2009 staffing plan that ███████ wrote CDCR's staffing plan and sent it (September 8, 2020) to the OSM and the Plaintiffs. This clearly demonstrated that our attorneys' interaction with the court system in no way took into account our psychiatrists' opinions about staffing allocation cuts and the 2009 staffing plan. Thus the OSM needed to know that our psychiatry team did not favor substantial cuts in the 2009 staffing allocations.

Muhamadu Jones (the Deputy Special Master) said, concerning my "Sept 15 and 20 emails to *Coleman* Special Master..." that Mattie Lopes is "obligated by his position to provide the information... [I sent him] to the *Coleman* parties." Ultimately the September 17th email that I sent to the OSM was also apparently also sent to the Coleman parties by Mr. Lopes.

If even the Special Master himself felt obliged to send the information in my emails to the Coleman parties, why did you yourself not first send the information to him?

You knew and could have told the OSM at the time that:

1.    There are still places that are experiencing severe staffing shortages, given the COVID pandemic and geographical challenges, as was and is stated repeatedly by linestaff and by our supervisors and as quoted in the message I sent to the OSM.

2.      Our attorneys were mistaken in their "broad assertion" in the ████ brief, that the 2009 staffing plan is "outdated and substantially flawed" (per Judge Mueller).

3.      Our psychiatrists almost universally supported the number of psychiatrist allocations in the 2009 staffing plan (they did not want the allocations cut, unlike what our attorneys argued should happen).

4.       The scheduling problems had not been fixed and appointments were still disappearing (and are still disappearing).

5.      There were no investigations by our data people of the disappearing appointments after the court hearing, when our experts claimed not to know anything about it in court.

And in addition, why didn't you (later) publicly state to the OSM and others that:

6.      It's going to take two more years to figure out how frequently our patients are being seen confidentially and where these inefficiencies are occurring, because CDCR has other priorities for our programmers.

You did know the above and you certainly had ample opportunity to publicly share it with the OSM and the Plaintiffs.

You were not giving the OSM the critical information that I had repeatedly told you about. Thus I shared it with the OSM as I had told you I would. I had an ethical obligation to do so.

In addition to the above complaints, you also claim that my oral communication with the psychiatrist experts from the Office of the Special Master's team (and others) was problematic, at a time when you, ██████████, and I were discussing the telepsychiatry policy with them.

12

In that conversation, I had and have stated to you that I am concerned that we need to carefully evaluate and reevaluate our policy of allowing our telepsychiatrists to work from home. I was concerned and still am concerned that CDCR will expand telepsychiatry from home to ultimately employ psychiatrists working from around the country, who know nothing about our patients. That would eliminate the psychiatric contribution to the mental health cultural milieu in CDCR.

I said again during that meeting that we need to evaluate and reevaluate at-home telepsychiatry very carefully for this reason, recognizing nonetheless that we *should* do at-home telepsychiatry during the pandemic. But we need to be aware of the risk that we are taking.

It was not until the October 15, 2019 evidentiary hearing about my report, that I learned that I am free to communicate with the OSM. One of your predecessors had specifically told me not to say anything in meetings with the OSM, and that I may only *answer their questions*. CDCR was using me as window dressing, my presence at the meetings giving the false impression to the OSM and the Plaintiffs that I was being included when I was not.

Quoting from the 11/01/19 transcript of the October 15, 2019 evidentiary hearing:

Case 2:90-cv-00520-KJM-DB Document 6377 Filed 11/01/19 Page 56 of 240

SILBERFELD: You mentioned that at some point in time in October of 2018 you felt as if you could not talk or communicate with the Special Master, right?

Golding: Correct.

Silberfeld:  And that's true, not withstanding the fact that in 2017 you attended any number of policy meetings multiple times throughout the year where the Special Master and his team were present, correct?

Golding: That's correct.

Silberfeld: And in 2018 you attended on a more frequent basis, perhaps once a month, workgroup meetings where the Special Master and his team were also present, correct?

Golding: Correct.

Case 2:90-cv-00520-KJM-DB Document 6377 Filed 11/01/19 Page 78 of 240

In response, opposing counsel said:

Ells: "Dr. Golding, you received a lot of questions from opposing counsel about your attendance at workgroup meetings and policy meetings where the Special Master was also present….

Ells: "Did you feel free to express your opinions to the Special Master at those meetings?

Golding: No, ma'am.

The clear implication from this exchange is that CDCR is going to try to claim that its employees can communicate with the Special Master because of attending meetings with him. But as your recent reprimands show, the truth is that that is false. You are complaining that I have communicated with the OSM, despite claiming the opposite in the very message you just sent.

During the phone conversation about telepsychiatry that you criticize me for, for example, I *merely agreed with the OSM psychiatry experts*! I am very confident that they remember that.

It *is* reasonable to have telepsychiatry from home carefully evaluated and re-evaluated given the potential for abuse of this modality. For saying that, you subsequently excluded me from further discussion about that and now I receive this further retaliatory email from you stating that my oral communication with the OSM:

".... was not helpful to the *negotiation* [emphasis mine, MG] and had the potential to embarrass the ▇▇▇▇▇▇▇▇ in that meeting as well as CDCR in general and yourself."

▇▇▇▇▇▇ I would never feel embarrassed for advocating for our patients as I was and I will continue to do so given our ethical obligations. I am sorry you think it hurt your "negotiation", but what I said was to the best of my knowledge true.

You say I can give information to the OSM but you also say it was inappropriate for me to do so and then stop me going to further meetings where the issues are being discussed.

Your criticisms also raise the question: why would you, as the ▇▇▇▇▇▇▇▇, criticize me for giving critical information to the OSM, when it seemed to be your obligation to do so, but *you* didn't? Why would you not share that we still had (have!) significant staffing shortages, that appointments were (and are!) still being disappeared, that ▇▇▇▇▇▇ and I were right to report those disappearances to the Judge, that our psychiatrists profoundly disagreed with veering far from the staffing allocations in the 2009 plan, that you were not showing me or our psychiatrists the ▇▇▇ staffing plan (before it was sent to the OSM and the plaintiffs) and that there

15

were and are legitimate concerns about CDCR utilizing telepsychiatry from home? And why now do you want to stifle dissent so much that it becomes a cause for reprimand if one merely publicly *agrees* with the OSM psychiatrists about the need to monitor telepsychiatry from home? This feels like yet more retaliation to me.

Let me now turn to the events surrounding ██████████ resignation.

You claim that ██████████ communicated to me "around 2 weeks prior [to 12/29/20]" that she "would be leaving state service."

It is true that she did tell me, but it is not true that it was two weeks before 12/29/20, and it is not true that I saw her message then.

██████████ sent an email message to me on 12/17/2020 informing me that she was taking a job with DSH. But two weeks prior to 12/29/2020 is around 12/13/2020, not 12/17/20. And the message was not received by me on 12/17/20.

Indeed on the phone call with you, I explicitly told you that I needed to look into those dates because they did not sound right. Instead, you repeated (in quite an angry/frustrated tone) that you had *spoken* with ██████████ and she *told* you that she had told me two weeks prior to my conversation with you about her departure. Thus you knew that that had occurred. The implication was that I was not telling you the truth.

I gently challenged you again: I needed to investigate, because it did not fit with what I remembered. But you insisted one more time that ██████████ had **told you** otherwise.

In fact I did confirm what happened, and as you can see from the email snippet that I have attached to this email, ██████████ sent me an email on 12/17/2020, and the email

16

was unfortunately missed: you can see the bolded blue beneath my name and the bolded line next to it on 12/17/20, indicating that the email was not opened.

████████ said in retrospect that she just could not call me to tell me that she was leaving, because she was so grateful to me and CDCR for the opportunity to have worked here. Instead around Christmas (perhaps 12/24), ████████ (a leader at DSH) called me and told me that ████████ was leaving to join DSH. I got in contact with ████████ and confirmed with her, tried to persuade her otherwise, then spoke with you on 12/29/20, *while I was on vacation*, to give you the news. I thus told you around 5 days later, during a holiday, after I heard the news, and I certainly did not wait "2 weeks" to tell you from the time I knew, as you falsely and angrily alleged.

In addition, despite your explicitly saying repeatedly that you had *spoken to her*, she *denies* that you did, or that you even emailed her (in the relevant time frame). She offers as evidence an email from her in which the tone of it seems to make clear that you *had not* spoken with her. And note that the e-mail from you to her was from 1/11/2021, many days *after* we spoke at the end of December when you had said that you had already spoken to her.  I note that you yourself seem to be offering her an opportunity, but quite belatedly, relative to the time I spoke to you about her leaving.  You wrote to her,

"I have no doubt that you had to make a very difficult decision, and I am not writing to make it any more complicated for you. Just wanted to say thank you so much for all the amazing good you've done for so many of our patients, not to mention our doctors (both helping them make better doctors, and helping them keep working for CDCR patients). You have been a huge boon to us for as long as we could hve you ☺. I wish Michael had spoken to me a little earlier…we could definitely cut back/prioritize referrals to 1 per week or similar, and we have some multiple-Boarded telepsych that we (cautiously) think are great and could have started helping more or less right away a couple weeks ago…"

It is nice to know that we will be able to utilize a new PRN psychiatrist virtually immediately (or even that we could have several weeks ago), but as you know that does not seem to be the reality. As you are no doubt ware, the double boarded med-psych candidate whom we agreed should interview for a future PRN job (or join us as a new *acting* PRN psychiatrist) has not even agreed to convert from a contractor to be a civil servant yet, and is thus not even close to beginning as a PRN psychiatrist.

I am very concerned about your response to me. You clearly disbelieved me when I had doubts about the timeline, and then you repeatedly provided information to me about your interactions that themselves seem to not be wholly accurate.

There are two other issues related to this that should be mentioned.



1. █████████████████████████ You state that █████ was █████████ "direct supervisor". In that case, presumably █████████ told her supervisor that she was leaving? But actually, █████████ was not aware that █████ was her supervisor just as I was not until now, because that was never the case before. Why did you not tell me that █████ had been made her supervisor? (Why did you also not tell her of the change, so that she would have informed her new supervisor instead of me?) When this position was developed, we utilized the telepsych org structure to accommodate her because we had no other psychiatry positions at HQ, itself a continuing problem. But everyone considered me █████████ supervisor.

I had been signing █████████ timesheets and approving her vacations, just as, incidentally, I had done for the previous █████████████████ and █████████. In addition, to the best of my recollection I wrote her PRN duty statement and as you know, the PRN duty statement is *not* a telepsych duty statement!

In addition to performing the administrative duties with ▆▆▆▆▆, I had been reviewing consultations, editing the clinic notes when appropriate, working with her on her hours, negotiating with her (successfully) when last time she wanted to leave because of a better offer at DSH, and etc. *She* certainly perceived me as her supervisor, as well. In short I have in every way *been* her supervisor.

▆▆▆ no doubt a capable new ▆▆▆▆▆▆▆▆▆, with a few months' experience in that new role, is now said to have been her supervisor, with no notice to me or ▆▆▆▆▆, and with no justification for the change.

This seems like another demotion. Does this indicate that in the future the PRN psychiatrists will be under telepsychiatry? Your letter seems to imply that, since you seem quite willing to even retrospectively eliminate my contributions as a leader in this department, just as you have previously done in trying to erase my history of supervising the Chief and Supervisors of the telepsychiatry program.

2.      ▆▆▆▆▆ departure : ▆▆▆▆▆▆▆▆▆▆▆▆ seemed not to be happy with my oral descriptions to her of how ▆▆▆▆▆ departure would be handled. She insisted on detailed plans and repeatedly raised the issue to me, as if she were my supervisor and she seemed to be raising the issue to you, after I had told you about it. I orally presented to her my detailed plans, but this clearly was not sufficient and so we had to have urgent meetings to make sure the plans would work out.

But we work with competent people, like ▆▆▆▆▆ herself and ▆▆▆▆▆. I did not need them to put all of their plans in writing, because they told me what they were going to do, but I did so anyway and then put a plan together in writing, with time to make sure that any errors could be corrected, when the plan was reviewed, to keep

19

peace. Having to do this kind of thing, seems very much as if you are demoting me and implicitly asking me to report to ██████████!

I sent a whistleblower report to the CCHCS Receiver documenting deficiencies in patient care called the Golding Report and have given the OSM vital information that you and fellow executives have failed to give him, and I am sad that you have joined with CDCR in their actions against me. Trying to cut me off from speaking with the Office of the Special Master while explicitly denying doing so adds an Orwellian twist.

You have hurt me personally and professionally. My view is that the Office of the Special Master needs to be made aware of these false allegations that you are making about me, and of your attempts to prevent appropriate communication with the Office of the Special Master. I also think the Special Master needs to be aware of your apparent unwillingness to share needed information with him.

Please consider this my notice to you that I need to ~~sending~~ [MG] this message to the Office of the Special Master, so he can be aware of CDCR's continuing attempts to stop me communicating with him and its continuing retaliation for bringing important issues to his attention when CDCR has failed to do so.

Sincerely,

Michael Golding, MD

Statewide Chief Psychiatrist

attachment 43

## Golding, Michael@CDCR

| | |
|---|---|
| **From:** | Golding, Michael@CDCR <michael.golding@cdcr.ca.gov> |
| **Sent:** | Wednesday, March 3, 2021 12:08 PM |
| **To:** | |
| **Subject:** | RE: AGPA  Support |

**CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

**CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Hi,

I think it is important to say what happened. In terms of your comments about "weaponiz[ing]" and etc.., those perhaps seem like a global all-purpose response to not have to deal with what sadly happened? I mean by "what happened", the response by CDCR to what I needed to do a few years ago to protect and care for our patients and enable our staff to do so. The AGPA is part of that discussion. It is quite unusual that a program of our size and scope does not have any support staff reporting to us at all!

And you did say,

"You don't supervise anyone."

No doubt you were exaggerating and did not intend for me to take it literally, but you did say it.

In terms of "trying to establish a certain version of the facts", that comment is a little distressing.

When you were appointed our ██████ and before, a lot of attempts were made to eliminate my responsibility for positive changes in the department from the understanding of what happened. I think it is important to correct that.

Immediately below is what you could put in writing that would be helpful. ☺

"██████ and ██████ will continue to be available to help the HQ psychiatry team, as much as now, if needed. They will step in to help if the new borrowed AGPA resource is unable to help and they know what to do or can find out what to do."

And below is the list of tasks that we need our new AGPA to be able to do, if possible. This is the list I am going to send to ██████ and ██████

Best,

Michael

### AGPA Duties/Tasks:

1

Hi,

The type of work that our psychiatry team does has historically involved a lot of creative projects. We are a tiny team that therefore cannot specialize in one or a few types of projects. We have to be involved with virtually every aspect of our mental health program which requires enormous flexibility.

An AGPA who supports this enormous flexibility, needed by the psychiatry team, therefore must be quiet flexible (!), in addition to quite bright, and hard working to order to adapt very quickly to new and often complicated tasks. It thus would be very difficult to create a list of tasks that the AGPA should do, because the list keeps changing!

I mentioned this to ▓▓▓▓▓▓ and his response was that I should create a list that includes the type of variable and surprise tasks that our psychiatric AGPA's *have done*, to give a sense of that psychiatric AGPA tasks that *will need to be done* in the future. Within this list are also routine tasks, which really are the minority given the size of our team and what we must respond to.

Here are some examples of a smattering of projects that our psychiatry assistants have done as AGPA's (a few similar tasks were also done by the AGPA when she promoted.)

-Psychiatry EOP clinic visit – Prepare psychiatry EOP clinic model survey, type and edit clinic summaries, create portfolios and binder detailing all EOP clinic visits for presentation to executive leadership
-Institutional caseload project – Prepare caseload information for every psychiatrist and PNP statewide, create a spreadsheet with various caseloads, incorporate this into the Statewide Psychiatry Staffing PowerPoint *to be presented to the Governor's office*
-Create, implement and track MDO (now OHMD) so as to make back up plan for ▓▓▓▓▓▓ absences/when there were multiple hearings
-Track institutional psychiatry staffing (fill rates) – create reports based on this information, provide recommendations to leadership about where psychiatric staffing should be.
-Repeated tracking and assistance in editing psychiatric policies and procedures and sometimes make suggestions about improvements in policy from an administrative point of view.
-Assist in tracking statewide psychiatric training, while helping to design procedures to do so.
-Maintain CME Coordinator/Liaison list, send invites to liaisons statewide, present the lecture, export the attendance list from WebEx and send to UCI contact and CME liaisons, gather scheduling credit sheets and reviewed them two times a year to send to UCI contact
-Maintain time off requests and calendar for Statewide Chief psychiatrist, HQ Senior psychiatrists and Regional psychiatrists
-Assist in writing and editing multiple psychiatry BCS's and BCP's under considerable time constraints, gathering all needed information and organizing it. Reaching out to multiple participants to gather and organize data to help prepare BCS/BCP.
-Track Statewide Chief Psychiatrist, HQ psychiatrists and regional psychiatrists licensing information (CA Medical License, DEA, BLS)
-Review HQ psychiatrists and regional psychiatrists' CalATERS information and monthly 998s prior to submission to Statewide Chief Psychiatrist to ensure accuracy. This involves tracking and double checking vacations and sick days.
-Create, organize, track and review statewide psychiatry surveys
-Plan and organize bi-annual Psychiatry Leadership Summit – obtain location and speakers, create slide deck for PowerPoint for summit, create, print and organize summit materials, organize snacks and meals
-Organize psychiatry participation in Coleman site visits to institutions
-Assistance in onboarding of new employees – obtain office/cubicle, equipment, appropriate access (both computer and building), collect, review and track onboarding documents
-Assist in creating memos/emails to be sent out to psychiatrists statewide
-Pull and analyze data to recognize/demonstrate psychiatry trends (and work on addressing any issues) – completed/canceled/refused appointments, admissions, suicide attempts, etc.
-Complete psychiatry spending plan yearly (including travel, training, license renewal, equipment, recruitment efforts)

-Assist in interview planning

-Serve as a psychiatric representative in meetings (when a psychiatrist is unable to attend) – take notes and discuss outcomes with Statewide Chief Psychiatrist

-Assist in the organization of the statewide psychiatry peer review process

## In the Past (for MAT) our AGPA did the following. I expect similar projects in the future.

-Supported MAT program administration by developing strategic planning documents

-Monitored program implementation by tracking and analyzing relevant program data

- Helped the local psychiatry supervisor collect and document information and received feedback from the

-Developed associated briefings used by executive leadership in meetings with legislative members, ▮▮▮▮▮, and helped to organize information presented to the State Legislature.

-Conducted program evaluation and to support improvement of MAT activities

-Developed MAT database with over 100 data points for every MAT participant

-Collected, analyzed, audited, and summarize program data from database (using visual analytics and in written reports)

-Worked closely with the HQ Quality Management Department (CCHCS, not just CDCR) to support the development of a new registry (an automated system that collects clinical and custodial data to assess specified outcomes) for the MAT program.

-Presented coherent explanations for grant writing two times for MAT, edited grant material.

-Identified and corrected data errors and discrepancies between the existing database and the registry under development

-Creating MAT Binder Portfolio containing vital operational information for the MAT program and all substance-use disorder programs within DRP, DAI (Inmate Leisure Time Activity Groups [ILTAG] programs), and CCHCS.

-Presented and defended data, in collaboration with the Statewide Chief Psychiatrist and local Psychiatry Supervisor to stakeholders inside and outside CDCR.

-Assisted in writing the Executive Summary for the 2nd MAT Legislative Report

-Consulted with HQ administrators from CCHCS and the CDCR ▮▮▮▮▮ sometimes via the Statewide Chief Psychiatrist and sometimes via the local Supervising Psychiatrist, quarterly during the HQ Advisory Group Meeting and participated in quarterly Advisory Meetings at both MAT institutions

-Presented a summary of the patient information regarding MAT during abovementioned meetings, as well as suggestions and/or recommendations based on analysis of the information

-Led Electronic Health Records System (EHRS) issues with the MAT system, consulting with HQ psychiatry EHRS personnel

-Worked closely with ▮▮▮▮▮ in headquarters in charge of EHRS issues for the statewide psychiatry program.

-Assist with the writing of the Policy and Procedure (P&P) and Local Operating Procedures (LOP) for the MAT program, in order to clarify workflow and expectations. Received edits from JCET and COT, worked with HQ psychiatry and the Statewide Chief to create appropriate policy.

-Aided with the implementation of the P&P and LOP by setting up all necessary work stations, attending and participating in several administrative meetings, suggesting improvements and updating the program flow sheet

-Coordinated MAT trainings for all disciplines (including primary care, mental health, dental, pharmacy, Division of Rehabilitative Programs (DRP) Substance Use Disorder Treatment staff, and DAI Administration)

-Created and maintained a detailed contact list for MAT administration

-Act as a liaison with the Alkermes Company in order to cultivate a list of providers throughout California who have prescribed MAT medications used within CDCR

-Coordinate and communicate with Primary Care clinics, Behavioral Health Clinics, and Public Health Clinics within counties in California.

-Assemble a thorough but focused directory of important contacts throughout the state

-Coordination and submission of a federal grant for the MAT program with a one month deadline

-Create a comprehensive budget plan outlining the anticipated expenditures for the $1,000,000 budget the grant offered.
-The grant also required the creation and implementation of a detailed library of MAT references and articles, both electronic and hard copy
-Responsible for identifying necessary expenditures involving equipment, travel and personnel costs for a comprehensive budget change proposal for a statewide MAT program
-Give a visual representation of the data provided by DRP and DAI databases for an Executive Leadership Project (ELI)
-Participate in regular HQ planning meetings
-Implementation of MAT in two institutions
-Help develop patient and family education material and healthcare forms


Global Skills needed of the AGPA

-Strategic program planning - attending meetings, discussing possible outcomes and solutions to current problems/issues
-Data analysis - using OnDemand reports and extracting data, providing analysis of data
-Collaborate with Statewide Chief Psychiatrist and others on the HQ psychiatry team to provide feedback/input on P&P
-Navigate several logistical styles at different institutions/regions for onboarding, equipment, space, processes
-Assist with any or many projects for the HQ psychiatry team which are varied and rapidly changing.
-Maintenance of multiple calendars to coordinate the activities of HQ and Regional Psychiatrists.
-Working with people of all disciplines to get important meetings scheduled


**From:** ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
**Sent:** Tuesday, March 2, 2021 6:17 PM
**To:** Golding, Michael@CDCR <Michael.Golding@cdcr.ca.gov>
**Subject:** RE: AGPA Support


Dr. Golding,

I disagree with many of the statements below, & I did not say many of those things. As we've discussed in prior emails, I do not have the time nor desire to devolve every conversation into a series of written point-by-point rebuttals, as I have not found this to be helpful in any of our past discussions. It feels like you are trying to establish a certain version of the facts and weaponize that. I do not wish to do this. But if you would like to discuss things further on Friday, I'm willing to do so.

In order to move forward, I will reiterate the things we agreed would be done after our Friday discussion:

1) You would provide a list of more specific tasks that you need help with, so that the appropriate resources can be devoted to the task, and so that we can request additional resources if we are unable to accommodate those tasks. We looked at other examples in the dept. that made parallel requests, and the high degree of detail

4

required by everyone, and we discussed what sort of tasks you might use in your description. That list would be brought into the discussion with Jenn, which I believe was rescheduled to Wed.

2) Provide, in your own words, what sort of agreement you think would help you feel comfortable that we are adding resources to you here, not taking them away. I cannot write this for you, as this a request by you to address a specific concern of yours.

Thank you,

█

**From:** Golding, Michael@CDCR <Michael.Golding@cdcr.ca.gov>
**Sent:** Tuesday, March 2, 2021 11:04 AM
**To:**
**Subject:** AGPA Support

Hi,

We spoke last Friday February 26th about an AGPA for the psychiatry team which includes 8 HQ psychiatrists, plus the enormous supervision that we are responsible for. These individuals travel and interact with professionals across the state. Not having the services of an AGPA has been quite problematic.

You said that we would have to wait a year given financial circumstances to hire an AGPA or we could borrow an AGPA from Jenn Johnson's unit. As bad as that would be, I expressed that I would indeed be willing to wait a year to be able to hire someone who was good, while continuing to utilize ████████ and ████████ borrowed from Telepsychiatry. Apparently that can't be done.

In the past I supervised both telepsychiatry and the PRN team, and I clinically supervised the psychiatrists in the field, based on "dotted lines" to me and oral understandings. It is true that they were supervised in at least one other chain so it was difficult to do and in addition there was little support for that function, which made it even harder. I also supervised the development of the Medication Assisted Treatment Program, a highly successful pilot program that was subsequently funded heavily and now managed by our medical colleagues.

The telepsychiatry supervision and the PRN supervision were taken away by you as your role matured. In addition, my clinical supervision of those in the field has been curtailed.

While we were discussing whether the psychiatry team should supervise the AGPA, I pointed out that there were many psychiatrists that I was supervising and you responded,

"You don't supervise anyone."

I recognize that this an exaggeration and you were trying to make a point, but the message was heard. Prior to eliminating my supervisory role in telepsychiatry, I had access to a telepsychiatry AGPA, ████████. I was able to fully use her to help our psychiatry team because the telepsychiatrists were supervised by me, so our HQ psychiatry team did have at least one person in my chain of command. Yes she was quite good.

Subsequent to your taking away my telepsychiatry supervision, the telepsychiatry team began using ████████ time more and more, forcing me to begin borrowing additional resources. ████████ became a borrowed resource once

5

telepsychiatry supervision was taken away, and because she was busy with Telepsychiatry, ████████ and then ████████ were also then periodically borrowed from telepsychiatry for intermittent help. And I continue to periodically ask permission to utilize their services from ████████, one of the chiefs of telepsychiatry.

Your solution to having to intermittently borrow ████████, ████████ and ████████ time is to have your HQ psychiatry team borrow still a new resource from ████████.

When I pointed out to you that supervising someone is often significantly better than borrowing from someone else for tasks, you pointed out that there was no guarantee that someone who was hired would be good. You pointed out that borrowing could be better, and you gave an example of a bad hire that did not work out, presumably to argue that borrowing could be better or as good?

I would merely respectfully respond that no one would ever hire and supervise anyone in the workplace if it were expected to be equally advantageous to borrow a resource that others supervise and choose to loan.

You did helpfully say that I could continue to borrow and utilize ████████ services and ████████ services if the new borrowed help from ████████ were unable to help with particular services. I genuinely appreciate that. ████████ and ████████ are talented people. When I supervised telepsychiatry, I was able to utilize ████████ services for MAT projects, since she too, was in my chain of command.

You asked me to create a list of duties that I do that I need help with. I pointed out to you that it is often the surprise projects which require the most creativity and ingenuity and that is what the team needs as much as help with routine projects. You then asked me to provide examples of those surprise projects that ████████ and ████████ have helped me with. I will do that. They include helping me respond to multiple deadlines for reports to the governor's office attorneys. ████████, the legislature for medication assisted treatment, etc. etc.

Given your instructions, presumably the person who will be loaned to us from ████████s shop would perhaps then need to be as genuinely talented in emergency situations as ████████ and ████████ are. Presumably then (?), creating and presenting that list will help ████████ pick someone to help our psychiatry team who is talented in the same way that ████████ and ████████ are, and it will also help pick someone who can help with routine tasks.

You helpfully said that I could continue to borrow and utilize ████████ services and ████████ services, if the new AGPA resource were unable to help with particular task. I genuinely appreciate that.

████████ and ████████ are talented people. Thus if you do not plan to additionally withdraw the borrowed help of these known talented people from our psychiatry HQ team, to replace them with unknown expertise, that is genuinely positive. At least it would seem that things would not get worse in terms of support for our HQ psychiatry team.

You said that you would put in writing that ████████ (or perhaps ████████ or ████████) would continue to be available to help as much as now, if needed, and would certainly step in to help if the new borrowed resource were unable to help. I would very much appreciate that!

Thanks,

Michael

attachment 44

**Golding, Michael@CDCR**

| | |
|---|---|
| **From:** | |
| **Sent:** | Tuesday, February 16, 2021 8:44 AM |
| **To:** | Golding, Michael@CDCR |
| **Cc:** | |
| **Subject:** | RE: Release Date Negotiation- |

---

**CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

---

This sounds good. Thank you.

**From:** Golding, Michael@CDCR <Michael.Golding@cdcr.ca.gov>
**Sent:** Friday, February 12, 2021 5:15 PM
**To:**
**Cc:**

**Subject:** RE: Release Date Negotiation-

"Hi, so sounds like today is her last day with CDCR? "

I don't think so.....

But thanks!

She is official until the 26th. She's taking vacation.

Also I would think she needs her accounts on to fill out her final timesheet using Docusign that Friday.

She will be turning in her stuff (I guess computer phone dictation stuff, key chits, cleaning out office as SVSP, etc.)

She's also (STILL!) helping a few people who reach out to her. She can't help herself! So she needs her accounts.

We'll ask Ms.            or Ms.            (if OK with you)  to make sure her computer accounts are closed out when she officially leaves CDCR, gets her timesheet in and all that other stuff.

Best,
Michael

**From:**
**Sent:** Friday, February 12, 2021 4:02 PM
**To:** Golding, Michael@CDCR <Michael.Golding@cdcr.ca.gov>

1

**Cc:** ▉▉▉▉▉▉▉▉▉▉▉
**Subject:** RE: Release Date Negotiation ▉▉▉▉▉▉

Hi, so sounds like today is her last day with CDCR?  Do you need any help with closing out her accounts?

▉▉▉▉

**From:** Golding, Michael@CDCR <Michael.Golding@cdcr.ca.gov>
**Sent:** Friday, February 12, 2021 3:14 PM
**To:** ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
**Cc:** ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉>
**Subject:** RE: Release Date Negotiation ▉▉▉▉▉▉

Hi,
She is planning to go on vacation for two weeks. So we do not have additional plans for her.

Best,
Michael

**From:** ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
**Sent:** Friday, February 12, 2021 12:15 PM
**To:** Golding, Michael@CDCR <Michael.Golding@cdcr.ca.gov>
**Cc:** ▉▉▉▉▉▉▉▉▉▉▉▉
**Subject:** FW: Release Date Negotiation ▉▉▉▉▉▉

Dr. Golding,

It looks like the earliest that ▉▉▉▉▉ can start at DSH is March 2, 2021.  Do we have plans for her here at CDCR until that date?

▉▉▉▉

**From:** ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
**Sent:** Wednesday, February 10, 2021 12:44 PM
**To:** ▉▉▉▉▉▉▉▉▉▉▉▉▉▉
**Cc:** ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉   ▉▉▉▉▉▉▉▉▉▉▉▉
▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
**Subject:** FW: Release Date Negotiation ▉▉▉▉▉▉

Hello,

Please see below.

▉▉▉▉▉

CALIFORNIA CORRECTIONAL
**HEALTH CARE SERVICES**

2

Confidentiality Notice: This communication with its content may contain confidential and/or legally privileged information. It is solely for use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

**From:** ██████████████

**Sent:** Wednesday, February 10, 2021 12:36 PM

**To:** ██████████████████████████████████████████████████████

**Cc:** ████████████████████████████

**Subject:** RE: Release Date Negotiation ████████████

Good morning,

Yes, that date would work for us. Please let me know if you need anything else. Thank you.

██████████

████████████████

██████████

**From:** ████████████████████████████████

**Sent:** Wednesday, February 10, 2021 12:34 PM

**To:** ██████████████████████████

**Cc:** ████████████████████████████████████████████

**Subject:** RE: Release Date Negotiation ████████████

This would need to go to her immediate supervisor(s). ██████ and/or ████████████ should be able to assist. I've included them both on this email.

████████████████████████

████████████████████████

████████████████████████

CALIFORNIA CORRECTIONAL
**HEALTH CARE SERVICES**

For Employment Opportunities visit **www.cchcs.ca.gov**

**From:** ████████████████████████████████

**Sent:** Wednesday, February 10, 2021 12:23 PM

**To:** ██████████████████████████████

**Subject:** FW: Release Date Negotiation ████████████

Hello,

Would you be able to assist with the inquiry below? If not, can you direct to me to who can assist?

Thank you,

██████████████

3

 

**CALIFORNIA CORRECTIONAL**
# HEALTH CARE SERVICES

Confidentiality Notice: This communication with its content may contain confidential and/or legally privileged information. It is solely for use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

**From:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Sent:** Wednesday, February 10, 2021 12:16 PM
**To:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**Subject:** FW: Release Date Negotiation ▮▮▮▮▮▮▮

CAUTION: This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Good afternoon,

Are one of able to assist with this request?

Thank you,




California Department of
## State Hospitals
"Caring Today for a Safe and Healthy Tomorrow"

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. DO NOT DISCLOSE THIS EMAIL TO OTHERS. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

**From:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Sent:** Wednesday, February 10, 2021 11:02 AM
**To:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Subject:** Release Date Negotiation ▮▮▮▮▮▮▮

Good morning,

The above mentioned employee has accepted a ████████████████████████ ██████ here at DSH-Patton and we would like to negotiate a start date. Our next new employee orientation is Tuesday, March 2, 2021.

Please advise if this date works for your agency.

Thank you,





California Department of
**State Hospitals**
*"Curing Today for a Safe and Healthy Tomorrow"*

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. DO NOT DISCLOSE THIS EMAIL TO OTHERS. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

attachment 45

Case 2:90-cv-00520-KJM-SCR    Document 8446    Filed 10/28/24    Page 782 of 1019

**Golding, Michael@CDCR**

| | |
|---|---|
| **From:** | ▬▬▬▬▬▬▬▬▬ |
| **Sent:** | Wednesday, May 4, 2022 4:43 PM |
| **To:** | ▬▬▬▬▬▬ Golding, Michael@CDCR |
| **Cc:** | ▬▬▬▬▬▬▬▬ |
| **Subject:** | RE: MAPIP BRMR |

---

**CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

---

Sounds good; I'll wait to hear back. Thanks, ▬▬▬

**From:** ▬▬▬▬▬▬▬▬▬▬
**Sent:** Wednesday, May 4, 2022 4:34 PM
**To:** ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ Golding,
Michael@CDCR <Michael.Golding@cdcr.ca.gov>
**Cc:** ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬
▬▬▬▬▬▬▬▬▬▬▬▬▬▬

**Subject:** RE: MAPIP BRMR

Yes. I was under the impression that the next step was to set a meeting between the appropriate CDCR parties and OSM outside of BRMR.

Both ▬▬▬▬ and ▬▬▬▬ may be unavailable now, but I'm sure we will get confirmation if that is the next steps and how we should go about that from them soon.

Respectfully,

ATTORNEY/CLIENT COMMUNICATION AND/OR ATTORNEY WORK PRODUCT – DO NOT FORWARD
COMMUNICATION WITHOUT THE EXPRESS PERMISSION OF THE AUTHOR.

**From:** ▬▬▬▬▬▬▬▬▬▬▬▬
**Sent:** Wednesday, May 4, 2022 4:32 PM
**To:** ▬▬▬▬▬▬▬▬ Golding, Michael@CDCR <Michael.Golding@cdcr.ca.gov>;
Bentz, ▬▬▬▬▬▬▬▬
**Cc:** ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬
▬▬▬▬▬▬▬▬▬▬▬

**Subject:** RE: MAPIP BRMR

Hi everyone,

1

Yes, it's my intention to follow through with MAPIP. ████ are you talking about a meeting between Psychiatry and OSM outside of BRMR, or something else? Regardless, let me know next steps and I'm happy to be involved.

███

**From:** ████████████████████████████
**Sent:** Wednesday, May 4, 2022 3:22 PM
**To:** Golding, Michael@CDCR <Michael.Golding@cdcr.ca.gov>; ████████████████████
**Cc:** ████████████████████████████████████

████████████████

**Subject:** RE: MAPIP BRMR

Hi,

It's my understanding that ████████ was still going to continue to see this effort through, so I'd still include him in the conversation. He is much more familiar with the new version of MAPIP that he has been working on with you all, though I would be happy to pick up where needed.

Best,

███

**From:** Golding, Michael@CDCR <Michael.Golding@cdcr.ca.gov>
**Sent:** Wednesday, May 4, 2022 3:18 PM
**To:** ██████████████████████████
**Cc:** ████████████████████████████████

████████████████████████████

**Subject:** RE: MAPIP BRMR

Hi,

Last I heard ████████ had sent information to OLA and we were waiting to hear back.

If ████████ and ████████ approve the current version of MAPIP developed by ████████ in consultation with HQ psychiatry, then I think we could set up a meeting with MH.

Not exactly clear who would go to that meeting -- the psychiatry team, plus lawyers, plus our data team, and HQ leadership?

Best,
MG


Michael Golding, MD
Statewide Chief Psychiatrist
California Department of Corrections

*Questions about Gender Minority Care?*
*Email: m_MHTransCareConsult@cdcr.ca.gov*

**CALIFORNIA CORRECTIONAL**
## HEALTH CARE SERVICES

**From:** ████████████████████████
**Sent:** Wednesday, May 4, 2022 3:14 PM
**To:** Golding, Michael@CDCR <Michael.Golding@cdcr.ca.gov>
**Cc:** ██████████████████████████████████████
██████████████████████

**Subject:** RE: MAPIP BRMR

I have added ████████████ and ████████ here. I thought that direction had been given that a meeting with MH could be set up if Psychiatry is ready. ████████████ and ████, please correct me if I am wrong.

Respectfully,

ATTORNEY/CLIENT COMMUNICATION AND/OR ATTORNEY WORK PRODUCT – DO NOT FORWARD
COMMUNICATION WITHOUT THE EXPRESS PERMISSION OF THE AUTHOR.

**From:** Golding, Michael@CDCR <Michael.Golding@cdcr.ca.gov>
**Sent:** Wednesday, May 4, 2022 2:52 PM
**To:** ██████████████████████████
**Cc:** ████████████████████████████████
**Subject:** MAPIP BRMR

Hi,

During the BRMR meeting, I mentioned that ████████████ had said that had delivered his recommendations (after consulting with the HQ team) to OLA.

I mentioned that today when asked about its status on the BRMR meeting. You said something to the effect that we should take conversation off-line.

What is the status of MAPIP review at present?

Best,
MG

Michael Golding, MD
Statewide Chief Psychiatrist
California Department of Corrections

***Questions about Gender Minority Care?***
*Email: m_MHTransCareConsult@cdcr.ca.gov*

3

 HEALTH CARE SERVICES

attachment 46

**Golding, Michael@CDCR**

| | |
|---|---|
| **From:** | Golding, Michael@CDCR <michael.golding@cdcr.ca.gov> |
| **Sent:** | Monday, May 9, 2022 2:19 PM |
| **To:** | ▮▮▮▮▮▮ |
| **Subject:** | CCHCS 2023-24 BCS MG Regionals (003).doc |
| **Attachments:** | CCHCS 2023-24 BCS MG Regionals (003).doc |

**CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

and clinical policy development and implementation at both the HQ

Hi,

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮

When I spoke with ▮▮▮▮▮▮▮▮▮▮ told me that he plans to change my request for senior specialists to Chief Psychiatrists, saying that regional specialists cannot write policy. ▮▮▮▮▮, who has worked for me for years and the other seniors at HQ have helped write QM policy for years. I certainly supervise them and make sure that the policy writing is good.

Regardless, given the way CalHR rules are now being interpreted, ▮▮▮▮▮ plan would eliminate still more of the supervisory responsibility that I used to have in the department since the release of the Golding Report.

So in addition to stopping my supervision of telepsychiatry, the psychiatric aspects of the OMHD program, the PRN group, statewide psychiatric QM policies and interface with the court, and statewide clinical decision-making and protocol development, and more, it seems that now ▮▮▮▮▮ also plans to eliminate my supervisory responsibility for Regional Psychiatry.

You previously told me, during one of our 1:1 conversations, that you consider me to be at the same level as ▮▮▮▮▮ Just as she is responsible for Statewide Medicine, I was responsible for Statewide Psychiatry, yet no inability to supervise what she previously supervised has been taken from her.

In addition to ruining any potential for a future career in administration and damaging me psychologically and personally due to the scurrilous and false HR allegations made against me and placed in my permanent

1

record, my supervisory responsibilities are being further eroded where I work now, because I asked that CDCR report honestly about its data with the Golding Report.

I ask that this please stop, including the department's move to strip me of responsibility for Regional Psychiatry.

Thank you for your consideration.

Best,
Michael Golding, MD
Statewide Chief Psychiatrist
California Department of Medicine

attachment 47

California Correctional Health Care Services
**Proposed Institution Structure**
Management Overview



attachment 48



**From:** ▮▮▮▮▮▮▮▮▮ 📎
**Subject:** Clinical Supervision of Chief Psychiatrists
**Date:** May 16, 2022 at 4:36 PM
**To:** mlionson428@gmail.com

Hello,

From the time I became ▮▮▮▮▮▮▮▮ at San Quentin in 2014 until present, it has been my understanding that Michael Golding MD, as the Statewide Chief Psychiatrist, served as the clinical supervisor to myself and all other institutional Chief Psychiatrists. More recently, institutional CEOs began serving as onsite direct supervisors to Chief Psychiatrists for non-clinical administrative matters. The snip below from the San Quentin org chart reflects these reporting relationships, as does the attached org chart and Chief Psychiatrist duty statement both approved for statewide use in 2019.

Dr Golding has done an exceptional job in the capacity of clinically supervising institutional Chief Psychiatrists. Dr Golding provides sage advice on how to navigate challenging clinical scenarios within a large and complicated bureaucracy. I recall being part of a statewide workgroup in 2019 that formally recommended Regional Psychiatrist positions be established. One of the primary reasons for this recommendation was to provide Dr Golding some assistance as the clinical supervisory needs at all CDCR prisons, especially those without Chief Psychiatrists, was too great for any one person. Ultimately, this goal was achieved and the Regional positions were established.

Let me know if you have any questions or if I can be of further assistance.

▮▮



image001.png
Downloading...

▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮

**CONFIDENTIALITY NOTICE:  This communication with its contents may contain confidential and/or legally privileged information.  It is solely for the use of the intended recipient(s).  Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act.  If you are not the intended recipient, please contact the sender and destroy all copies of the communication immediately.**



Mail
Attachment.eml



Duty Statement
Chief P...).docx



Proposed
Institut...19).pdf

Zero KB    Downloading...

attachment 49

attachment 50

**Golding, Michael@CDCR**

| | |
|---|---|
| **From:** | ███████████ █████████ |
| **Sent:** | Thursday, August 18, 2022 6:24 PM |
| **To:** | Golding, Michael@CDCR |
| **Subject:** | PIP ED/Chief Psychologist duty statement - SQ |
| **Attachments:** | SQ PIP Duty Statement - Executive Director 6 24 2014.doc |

CAUTION: This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

One used at SQ. Reports to CMH



**CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication immediately.**

STATE OF CALIFORNIA
DEPARTMENT OF CORRECTIONS AND REHABILITATION
DIVISION OF CORRECTIONAL HEALTH CARE SERVICES

*SHADED AREA TO REFLECT RECLASS POSITION NUMBER ONLY*

# DUTY STATEMENT

| RPA | EFFECTIVE DATE: |
|---|---|

| CDCR INSTITUTION OR DEPARTMENT | POSITION NUMBER (Agency – Unit – Class – Serial) |
|---|---|
| San Quentin | 095-220-9859-XXX |

| UNIT NAME AND CITY LOCATED | CLASS TITLE |
|---|---|
| Correctional Treatment Center, San Quentin | Chief Psychologist-Executive Director |

| WORKING DAYS AND WORKING HOURS | SPECIFIC LOCATION ASSIGNED TO |
|---|---|
| | |

| PROPOSED INCUMBENT (If known) | CURRENT POSITION NUMBER (Agency – Unit – Class – Serial) |
|---|---|
| | 095-220-9859-XXX |

YOU ARE A VALUED MEMBER OF THE DEPARTMENT'S TEAM. YOU ARE EXPECTED TO WORK COOPERATIVELY WITH TEAM MEMBERS AND OTHERS TO ENABLE THE DEPARTMENT TO PROVIDE THE HIGHEST LEVEL OF SERVICE POSSIBLE. YOUR CREATIVITY AND INGENUITY ARE ENCOURAGED. YOUR EFFORTS TO TREAT OTHERS FAIRLY, HONESTLY AND WITH RESPECT ARE CRITICAL TO THE SUCCESS OF THE DEPARTMENT'S MISSION.

Under the overall administrative authority of the Chief of Mental HealthSan Quentin (SQ) with functional oversight from the Director, Division of Correctional Health Care Services, the Executive Director is responsible for the development, organization, and management of the SQ Psychiatric Inpatient Program (PIP). The Executive Director is responsible for policy formation and decision-making to ensure effective operations of the PIP.

| % of time performing duties | Indicate the duties and responsibilities assigned to the position and the percentage of time spent on each. Group related tasks under the same percentage with the highest percentage first. *(Use addition sheet if necessary)* |
|---|---|
| | **ESSENTIAL FUNCTIONS** |
| 30% | Ensures that the mission of the PIP at SQ is accomplished through the development of policies and procedures which facilitate and implement laws, state mandates, and Department Special Orders that govern the overall operations of the PIP. Ensures that the Department of Public Health regulations, standards of clinical practice, Title 22, OSHA, The Joint Commission Standards for Behavioral Health Care, and all other applicable Standards and Regulations are consistently met at the highest achievable level of compliance. |
| 25% | Ensures an integrated strategic planning process which is responsive both to the goals and objectives established in the Department of Corrections & Rehabilitation and California Correctional Health Care Services (CCHCS) Strategic Plan and to the needs and expectations of internal and external stakeholders. Ensures that the strategic planning processes provide for continuous evaluations and improvement of PIP operations through an effective PIP-wide performance improvement program (PIP Quality Management Subcommittee). As a member of the CCHCS Executive Team, the Executive Director has responsibility for PIP performance improvement process. |
| 25% | Effectively manages the human, physical, financial, and information resources within the annual budget allocation for the PIP; ensures that strategic planning objectives and priorities are considered in the annual budget development for the PIP; and negotiates with the California Department of Corrections and Rehabilitation to ensure that the PIP has adequate resources to meet its goals and objectives. Uses Equally Effective |

| | |
|---|---|
| | Communication in accordance to the Americans with Disability Act (ADA) and the *Armstrong* and *Clark* Remedial Plans to ensure communication with individuals with disabilities is equally effective as with others. |
| 15% | Positively represents the hospital and Department; maintains positive relationships between the PIP and the California Department of Corrections & Rehabilitation; fosters good relationships between the PIP and the SQ as well as community resources; maximizes opportunities to educate the public and professional community about mental illness, its personal and public impact, and the availability of services; and coordinates projects with California Department of Corrections & Rehabilitation management, local governmental officials, advisory groups, volunteer associations, professional groups, and others to meet program goals and objectives. Uses Therapeutic Strategies and Interventions (TSI) techniques to observe behavior and to identify and/or in collaboration with custody staff, intervene in security breaches that could lead to injuries or escape; responsible for the control of patients in collaboration with custody and nursing staff; and the protection of personal and real property.  In an emergency situation or extenuating circumstance, assist by attending to staffs' needs within the scope of your license and discipline/ training until authorized assistance can be provided or the circumstance is mitigated. |
| 5% | Maintains a valid, active license as applicable to job classification from the State of California and must possess valid Basic Life Support Certification and Advanced Cardiac Life Support Certification.  Performs other duties as required. |

# DUTY STATEMENT                                                    RPA –    -

| % of time performing duties | Indicate the duties and responsibilities assigned to the position and the percentage of time spent on each.  Group related tasks under the same percentage with the highest percentage first.  *(Use addition sheet if necessary)* |
|---|---|
| | **KNOWLEDGE AND ABILITIES**<br><br>Knowledge of psychological theories and research; principles, techniques and problems in developing and coordinating a specialized psychological treatment program; principles, techniques and trends in psychology with particular reference to normal and disordered behavior, human development, motivation, personality learning, individual differences, adaptation and social interaction; methods for the assessment and modification of human behavior; characteristics and social aspects of mental disorders and retardation; research methodology and program evaluation, institutional and social process, group dynamics; functions of psychologists in various mental health services; current trends in the field of mental health; professional training; community organization and allied professional services; State and Department's Affirmative Action Program objectives; a manager's role in the Affirmative Action Program and the processes available to meet affirmative action objectives; principles and techniques of effective supervision.<br><br>Ability to plan, organize, and work in a specialized psychological treatment program involving members of other treatment disciplines; provide professional consultation and program leadership; teach and participate in professional training; recognize situations requiring the creative application of technical skills; develop and evaluate creative |

approaches to the assessment, treatment, and rehabilitation of mental disorders to the conduct of research, and to the development and direction of a psychological program; plan, organize and conduct research, data analysis and program evaluation; conduct assessment and psychological treatment procedures; secure the cooperation of professional and lay groups; analyze situations accurately and take effective action; communicate effectively; plan, organize and direct the work of others; effectively contribute to the Department's affirmative action objectives.

## DESIRABLE QUALIFICATIONS

Possession of a valid license as a Psychologist issued by the California Board of Psychology and possession of an earned Doctorate Degree in Psychology from an educational institution meeting the criteria of Section 2914 of the Medical Board of California's Business and Professions Code. and Either I At least two years' experience as a licensed Psychologist in the Department of Corrections.

## OR II

At least three years' experience as a licensed Psychologist in a forensic setting such as a local jail or community-based forensic treatment unit.

## SPECIAL PERSONAL CHARACTERISTICS

Empathetic understanding of patients of a State correctional facility; willingness to work in a correctional facility; emotional stability; patience; scientific and professional integrity; alertness; tact; and demonstrated leadership ability; and keenness of observation.

## SPECIAL PHYSICAL CHARACTERISTICS

Persons appointed to this position must be reasonably expected to have and maintain sufficient strength, agility and endurance to perform during stressful (physical, mental and emotional) situations encountered on the job without compromising their health and well-being or that of their fellow employees or that of inmates.

Assignments may include sole responsibility for the supervision of inmates and/or the protection of personal and real property.

SUPERVISOR'S STATEMENT:  *I HAVE DISCUSSED THE DUTIES OF THE POSITION WITH THE EMPLOYEE*

| SUPERVISOR'S NAME (Print) | SUPERVISOR'S SIGNATURE | DATE |
| --- | --- | --- |
|  |  |  |

EMPLOYEE'S STATEMENT:  *I HAVE DISCUSSED WITH MY SUPERVISOR THE DUTIES OF THE POSITION AND HAVE RECEIVED A COPY OF THE DUTY STATEMENT*

The statements contained in this duty statement reflect general details as necessary to describe the principal functions of this job. It should not be considered an all-inclusive listing of work requirements. Individuals may perform other duties as assigned, including work in other functional areas to cover absence of relief, to equalize peak work periods or otherwise balance the workload.

| EMPLOYEE'S NAME (Print) | EMPLOYEE'S SIGNATURE | DATE |
| --- | --- | --- |
|  |  |  |

attachment 51



California Correctional Health Care Services
Mental Health Services
(Page 13 of 19)
Effective January 1, 2022

Red = Vacant
Orange = Temporary Help
----- = Indirect Reporting

Updated/Reviewed on 09/08/21

attachment 52

**Golding, Michael@CDCR**

| | |
|---|---|
| **From:** | ███████████ █ |
| **Sent:** | Friday, August 5, 2022 1:48 PM |
| **To:** | ███████ |
| **Cc:** | Golding, Michael@CDCR; █████████████████ |
| | ███████ |
| **Subject:** | Inaccurate position descriptions for psychiatry leadership positions |

---

CAUTION: This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

---

Here are some snips from CalHR site both from SVSP PIP/POP and actually at CHCF also—all of which have psychiatry leaders reporting to CMH.



## Job Description and Duties

**Effective May 01, 2022, employees in this class, employed within the California Department of Corrections and Rehabilitation, and and assigned to the Psychiatric Inpatient Program, shall receive a pay differential equivalent to 15% of their monthly base pay.**

**Only employees who provide direct patient care, treating patients' in-person, on grounds or at a facility more than 50% of the pay differential.**

Under the direction of the Chief of Mental Health, the Chief Psychiatrist, CF is responsible to plan and direct the psychiatric and m in a correctional institution. In addition, the position supervises professional and support staff to assure that mental health practice delivered.

1



California Correctional Health Care Services

JC-309177 - Chief Psychiatirst, Corr. & Rehab. Services (Safety); Salinas
Valley State Prison, Soledad
CHIEF PSYCHIATRIST, CORRECTIONAL AND REHAB SERVICES
(SAFETY)
$25,663.00 - $31,031.00 per Month

**Final Filing Date: 8/8/2022**

**Apply Now**

**Application Methods:**
Electronic (Using your CalCareer Account)
By Mail
Drop-off

Print Job

## Job Description and Duties

Effective May 01, 2022, employees in this class, employed within the California Department of Corrections and Rehabilitation, and who are physically located at and assigned to the Psychiatric Inpatient Program, shall receive a pay differential equivalent to 15% of their monthly base pay.

Only employees who provide direct patient care, treating patients' in-person, on grounds or at a facility more than 50% of the pay period, are eligible for this pay differential.

Under the direction of the Chief of Mental Health, the Chief Psychiatrist, CF is responsible to plan and direct the psychiatric and mental health services programs in a correctional institution. In addition, the position supervises professional and support staff to assure that mental health practice is effectively and efficiently delivered.

attachment 53

From: ████████████████████
Subject: See draft below
Date: May 25, 2022 at 8:51 PM
To: mlionson428@gmail.com



Feel free to edit and return to me for concurrence.

To whom it may concern:

I am writing this letter in support of Michael Golding, M.D. It is my pleasure and privilege to do so in that I have the utmost respect for Dr. Golding both as a former clinical(and administrative) supervisor as well as advocate of what is best for the patients in the California Department of Corrections and Rehabilitation(CDCR) receiving Psychiatric services.

At the time CDCR took over control of the Salinas Valley State Prison(SVSP) Psychiatric Inpatient Program(PIP) from the Department of State Hospitals(DSH) in July of 2017, I was serving as the ████████████████ of the program. I was later promoted to the permanent position in September, 2017. My local dotted line administrative supervisors were technically psychologists, ████████████ and ████████████ . They were both honorable, hard-working people though their loyalty was to the psychology-led agenda and of course, had no clue what they were doing in terms of how to run a Psychiatric Inpatient Program. However, they both ceded the medical decision to me as the Chief Psychiatrist. As such, I had been interacting with Dr. Golding in the months prior in anticipation of the takeover as well as throughout my tenure at CDCR through August of 2019.

I was apprehensive regarding the takeover as CDCR had a well-earned reputation for disrespecting the value of Psychiatric leadership at the expense of optimum patient care and in the interests of promoting the power of a fading specialty in the health care delivery system at large, psychology. Nevertheless, I chose to stay on to see if I could help make a difference. My apprehension arose not only from the fact that there continued to be the need for court oversight of the Psychiatric services but also because of historical and ongoing mismanagement of the department by non-medically trained and incompetent administrators. In addition, through the Golding Report I became aware of those same persons attempting to mislead the federal court monitor ("Special Master") regarding the value of, need for psychiatrists as well as the need for safety in housing the acutely mentally ill in the PIP. Dr. Golding had attempted to let the Special Master know the truth about what had happened in CDCR in relation to Psychiatric patient care.

Throughout my time working under CDCR, Dr. Golding remained a beacon of availability, honesty, competency, enthusiasm, and hope that within his power to do so he would ensure that the patients under our care would be cared for in an ethical, medically-appropriate manner. He was available both clinically as well as administratively for supervision at any time. It was my experience that this was the case for all aspects of psychiatric care under the CDCR purview including inpatient, outpatient and telepsychiatry. In addition he promoted the utilization of the excellent DSH-run PRN Psychopharmacology Service. It was my experience that the other psychiatrists in the system also keenly felt the same way as they communicated to me personally and publicly whenever possible.

Given his unquestionable dedication to duty along with the history of corruption in the non-psychiatric leadership of CDCR Mental Health at the state and local and regional lelvels, it is of no surprise to me that Dr. Golding is experiencing further retaliation at this time. I personally experienced retaliation by the non-psychiatric leadership of CDCR Mental Health during my tenure by the ████████████████ as well as local (████████████████) along with regional(████████████ ) I was told to cease and desist in a letter signed by ████████████ and the CEOs after I communicated my concerns publicly at a CDCR Psychiatry Meeting in Sacramento that was led by Dr. Golding. There was no press present at that meeting. It was to have been an internal meeting to share thoughts and feelings about the state of the department, organization and future of both. As it turned out, there were attorneys present who informed and retaliation ensued. Unfortunately, this type of unethical behavior was all too common in CDCR towards psychiatrists. Part of the agenda was the elevation of psychology, an unqualified non-medically trained discipline, to a position of leadership and medical authority. It is my understanding that Dr. Golding was kept out of departmental meetings at the state level and not informed of planning or developments that he would need in order to best do his job. This middle school level of exclusivity behavior is not uncommon in CDCR. Again, with all of this political gamesmanship it is no surprise that the state has had to spend so much money and time and still be no closer to being able to gain full, autonomous control of the psychiatric care of the inpatient-patients in its charge.

Thank goodness that the "Golding Report" came out though I know this bruised the fragile, self-preserving egos of those politicking in their own self interests. Frankly, this entire process reeks of the typical CDCR floom so well known to the psychiatric community in California and the rest of the country for decades. I am certain that the series of attempted humiliations, demotions, removal of responsibilities that he would need in order to best do his job. This middle Golding's file come as a direct response to the Golding Report and its brave, courageous author. He knew what he was risking but that's what the courageous do, act when afraid because they know they're doing the right thing. Now as all reformers do, he is being punished by those whose agendas were threatened and thwarted. I can only hope that he can do what Churchill said: when you find yourself going through hell, keep walking.

Sincerely,

attachment 54

## Golding, Michael@CDCR

| | |
|---|---|
| **From:** | ▮▮▮▮▮▮▮▮ ▮ |
| **Sent:** | Tuesday, June 21, 2022 9:23 PM |
| **To:** | Golding, Michael@CDCR |
| **Subject:** | Re: Clozapine monitoring |

**CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

You are the best !!
We've had so little contact in these lost years of COVID ...we should catch up one of these days .

Thank you as always - I am always in awe of what you have contributed & stood up for !

▮▮▮▮

Get Outlook for iOS

**From:** Golding, Michael@CDCR <Michael.Golding@cdcr.ca.gov>
**Sent:** Tuesday, June 21, 2022 4:09 PM
**To:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Cc:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮

**Subject:** FW: Clozapine monitoring

Hi,
Will look into it immediately with the Chief Psychiatrist.

Please send the patients name ASAP.

Thanks,
MG

**From:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Sent:** Tuesday, June 21, 2022 3:15 PM
**To:** ▮▮▮▮▮▮▮▮▮▮▮▮▮
**Subject:** Clozapine monitoring

Hello ▮▮▮▮
Is there any policy that Pharmacists have to do Clozapine monitoring? Is this part of Psychiatry program?
At SAC, Pharmacists are assisting Psychiatrists in monitoring ANC values and reporting it to REMS. We are having tough time at SAC getting ANC values in a timely manner because of staff shortage and Inmate refusals. We have one guy here whose labs are pending for over 7 weeks and Psychiatrists are not discontinuing the order. We don't mind helping Psychiatry but at the same time we don't want to risk our license. Please advise.

1

Thanks,

attachment 55

DR. MICHAEL GOLDING

The BEST EVER
Statewide Chief Psychiatrist
for
California Department of
Corrections and Rehabilitation



We salute you for the courage,
dedication and sacrifices you made
for the department and the clinical
care that we provide

The sleepless nights, time away
from family, isolation,
financial burden and
a lot more that you endured,
will never be forgotten

Presented on Feb. 27, 2020 by
The Statewide Chief's, Senior's
and Staff Psychiatrists of the
CDCR



attachment 56

## Golding, Michael@CDCR

| | |
|---|---|
| **From:** | ████████████████ |
| **Sent:** | Tuesday, March 21, 2017 11:27 PM |
| **To:** | Golding, Michael@CDCR |
| **Cc:** | ████████████████ |
| **Subject:** | RE: EOP compliance changed from 30 days to 45 days |

You can always check the current Psychiatry Contact rule parameters (as well as all other contact rules) on the Compliance Rules grid. Here's the rule for EOP and EOPMod:

First Psychiatrist Contact required no later than 30 Calendar Days after the Arrival Date or Program Start or MHI Start or Psychotropic Start, whichever happened last. Then Routinely within 1 Month, or 45 Calendar Days if that is sooner, of the prior completion.

The rule was changed to the above in December  If you and ████ feel it should be otherwise, let me know and I will modify.

████

**From:** Golding, Michael@CDCR
**Sent:** Tuesday, March 21, 2017 4:45 PM
**To:** ████████████████
**Cc:** ████████████████
**Subject:** FW: EOP compliance changed from 30 days to 45 days

Hi Dave,
Has something changed? What are we missing?
Michael


**Michael Golding, M.D.**
Statewide Chief Psychiatrist
Mental Health Support Program
California Department of Corrections and Rehabilitation

Phone: 916.662.6541
Email: michael.golding@cdcr.ca.gov



Learn easy ways to save water
during California's drought at
SaveOurWater.com


**From:** ████████████████
**Sent:** Tuesday, March 21, 2017 2:37 PM

1

**To:** Golding, Michael@CDCR; ███████████████

**Subject:** EOP compliance changed from 30 days to 45 days

Hi Michael and ████

I have attached a copy of Current Due Dates that my OT sent me in October 2016, which correctly shows my EOP patients' appointments were due 30 days after their last appointment.

Also attached is a copy of Current Due Dates for EOP patients from today, which shows the EOP patients' appointments are not due until 45 days after their last appointment. I ran Current Due Dates at multiple institutions, and all show a 45 day window for EOP Psychiatry appointments.



attachment 57

*[handwritten: 3/22/17]*

*[handwritten: changing the rule without notifying Heat]*

**To:** Golding, Michael@CDCR
**Cc:** ▮
**Subject:** RE: ML EOP Psychiatry Rule Change Proposition

*[handwritten: no date visible]*

No we don't tell them about every change. Since they use our numbers I do let them know when we make a major change that has a significant impact. For example, the change we are making regarding 5 day follow ups. We can certainly change the rule back to 30 days if you believe that speaks more to the spirit of "monthly". The problem is and has always been that the Program Guide is not always written clearly – at least not as concretely as needed for computer rules. For example Does monthly mean once per month? Does it mean every 30 days?

Do you want us to change it back?



Save Our Water

Learn easy ways to save water
during California's drought at
SaveOurWater.com

CONFIDENTIALITY NOTICE: ... and may be unlawful. If you are not the intended ... Center at 1-888-735-3421

**From:** Golding, Michael@CDCR
**Sent:** Wednesday, March 22, 2017 3:01 PM
**To:** ▮
**Subject:** RE: ML EOP Psychiatry Rule Change Proposition

HI,

Thanks. I hope you are doing well.

My rules would be very different. I have no doubt the court experts would not agree with me!!

But thank you for letting us look at this. ▮ is reporting that even the 4th visit or so for an inmate is 45-days after the last visit, even if the patient does not move to another locations. If she is right about that, that does seem to very clearly violate the program guide. So check this out: If a psychiatrist sees somebody 7 weeks after their last appointment (three weeks after the program guide says for once monthly EOP visits), we will report to the court that the person is 6/7 or 86% compliant. Hmmm. That does not pass the sniff test. Three weeks late for mandatory monthly appointments and we are 86% compliant? That seems weird!!

I am more concerned that if we change a rule, and if that rule has a large impact on our numbers and what we report, we probably ought to let the court know. I am now wondering whether they have seen all of the updates that could have made *a significant change* in the way we report our numbers. Have we done a lot of this? It may be that this change has no real impact on the numbers. If so, then I get it. I just think that should be evaluated.

Has anything we are giving the court for staffing incorporated these new rules, without at least looking at how much the reporting will change the % compliance that we are telling the court? It started in December. For example we are looking at EOP Timely Compliance between 8/1/2016 and 1/31/2017 which would utilize the new rule (presumably) for two months.

By the way, this has nothing to do with my personal opinion! If it were up to me, I would group all CCC and EOP together and maybe separate inmates by level of violence, so that the non-violent can have access to safety (and create) a reason not to be violent. I personally would give clinicians far more choice about how frequently to see patients, etc. and judge outcomes (30 day readmission rates, rates of hospitalization, etc.) But it is not up to me.

Best,
Michael

**Michael Golding, M.D.**
Statewide Chief Psychiatrist
Mental Health Support Program
California Department of Corrections and Rehabilitation

Phone: 916.662.6541
Email: michael.golding@cdcr.ca.gov



**Save Our Water**

Learn easy ways to save water
during California's drought at
SaveOurWater.com

**From:** ▓▓▓▓▓▓▓▓
**Sent:** Wednesday, March 22, 2017 2:14 PM
**To:** Golding, Michael@CDCR
**Cc:** ▓▓▓▓▓▓▓▓
**Subject:** FW: ML EOP Psychiatry Rule Change Proposition

Here is the original request. Some of the issue is the computer is literal. PG says "Monthly". We previously translated that to every 30 days, since most months have around 30 days. Julie's email below though explains how the new rule actually can also meet that requirement. Let us know if you disagree and want it changed back. I thought I consulted with you on this (at least I should have). We always try to keep the rules as true to the PG rules as possible while also ensuring patient care is the focus.





Save Our
Water

Learn easy ways to save water
during California's drought at
SaveOurWater.com

CONFIDENTIALITY NOTE: ...this communication is intended for use... confidential and/or legally privileged information. Any unauthorized disclosure, distribution or action in reliance on the contents of this communication is strictly prohibited and may be unlawful. If you are not the intended recipient, please contact the sender and delete all copies of this communication. For IT issues contact our Solution Center at 1-866-725-3434.

**From:** ███████████████

**Sent:** Wednesday, March 22, 2017 2:09 PM

**To:** ███████████

**Subject:** Fwd: ML EOP Psychiatry Rule Change Proposition

Sent from my iPhone

Begin forwarded message:

> **From:** ████████████████████
>
> **Date:** December 5, 2016 at 1:57:15 PM PST
>
> **To:** ████████████████████
>
> **Cc:** ███████████████████████████████████
>
> **Subject:** ML EOP Psychiatry Rule Change Proposition

Good Afternoon,

I would like to propose an update to the EOP Psychiatry rule. Per the Program Guide 12-4-9 a psychiatrist will see each EOP inmate patient monthly...We have found that the rule of once every 30 days makes it very difficult for the doctors to schedule their caseloads to be seen if they have time off, etc. Most doctors would like to continue continuity of care, therefore when they take a week off they would be able to schedule the inmates to be seen around that week and still remain compliant, without needing backup coverage. I spoke with ████████ and we discussed how the rule could be rewritten to still remain compliancy within the once a month rule.

Psychiatrist contact due within 45 days or within one calendar month of the previous contact, whichever is shorter.

An example:
If an inmate was seen on March 20th, then he would have to be seen by April 30th which would not exceed one month, or if an inmate was seen on the 1st of the month, then he would need to be seen by the 15th of the next month in order to be compliant with the once monthly rule.

The way the rule is written now, once every 30 days, actually makes for more than 12 contacts per year. An inmate seen on the 1st, would have to be seen on 30th of the same month.

With psychiatry retention so low here at CHCF, we are trying to find ways to make the job more appealing to the doctors and I think that with this small change in the verbage, it would help them to feel like we are trying to work for them and help make their jobs more manageable.



CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communication Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of this communication. Thank you.

attachment 58

## Golding, Michael@CDCR

| | |
|---|---|
| **From:** | |
| **Sent:** | Thursday, April 19, 2018 2:08 PM |
| **To:** | Golding, Michael@CDCR; |
| **Subject:** | Repairing Team |
| **Importance:** | High |

All:

It has come to my attention that our leadership team is broken. As you can well imagine, we must find a way for our team to work productively with each other for the benefit of the system. To be sure, when our leadership team does not function as a high performing team, we have no hope of being successful. This group will meet on Monday at noon to discuss. The meeting will be mandatory and you must appear in person. I will not entertain additional emails or conversations about this between now and our Monday meeting.

The meeting will be managed in three parts:

1. a discussion of where we are as a team and an establishment of expectations for behavior and performance.
2. a discussion of the concerns with data integrity. Together, we will come to some consensus and plan next steps. (To that end, please bring current business rules for EHRS or have them available as they relate to how we manage and track psychiatry appointments. Also, if there are other data sources or reports we have around the data, please bring that. I am informed and believe that Michael and Kevin may have some additional reports that can help inform our future work.)
3. a discussion of more deeply rooted strains in our leadership team, the impact of such strains on the entire HQ team as well as the field, and plans to bring us together.

You can expect to see a meeting notice shortly.



**CONFIDENTIALITY NOTICE:** This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.



Learn easy ways to save water during California's drought at SaveOurWater.com

attachment 59

**Golding, Michael@CDCR**

| | |
|---|---|
| **From:** | Golding, Michael@CDCR <michael.golding@cdcr.ca.gov> |
| **Sent:** | Wednesday, October 24, 2018 6:44 PM |
| **To:** | ▮▮▮▮▮ |
| **Cc:** | ▮▮▮▮▮▮▮▮▮▮▮▮ |
| **Subject:** | FW: memorialization of meeting on 4/23 |

---

**CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

---

Hi,

The context of the below was that in the meeting (with ▮▮▮, me, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮),
▮▮▮▮▮ had said that I was having difficulties with our HQ psychologists because I had conflated past actual difficulties with psychologists with current difficulties and that these current difficulties were no longer real (not grounded in "current fact").

Thus she was going to bring us a minister in a mandatory meeting (that I was to attend with others) so I could learn to trust, given that the problem was that I did not trust ▮▮▮ and her team. In fact the problem is that the data they were presenting and their attitude toward including us in decisions, should have very much caused me to trust them. Indeed I trusted way way too much, otherwise I would have figured the data problems out years ago.

In a subsequent meeting (with ▮▮▮▮▮▮▮▮▮▮, and me), ▮▮▮▮▮ got visibly upset when I told her that I would certainly go to a meeting that she mandated I attend. But I told her that I spoke with an attorney. I told her that I would be polite, but that if the QM folk and ▮▮▮ were going to use it as another attempt to attack my character, I would not say very much.

When I reminded her that she had pretty clearly said that the reason I needed to go to the meeting is that I essentially was being irrational vis a vis trusting ▮▮▮, she exploded at me.

So I sent a letter to ▮▮▮ showing that I remembered very well what ▮▮▮▮▮ had written. She explicitly said that the purpose of the meeting was to deal with "deeply rooted mistrust which are not grounded in current fact". And because of this "mistrust" she planned to make me go to a meeting with a minister "leadership guide".

But the fact is that ▮▮▮ (particularly) and ▮▮▮ very well knew that they had giving misleading reports to the court about several key issues. I think the popular term is that ▮▮▮▮▮ was "gas-lighting" me. (She was calling me essentially irrational, though the problem was and is a much more straightforward one": ▮▮▮▮▮ and the QM folks were misleading our leadership and the courts with the data.) So there was and is reason *to distrust the data*. One does not need a leadership guide to learn to trust data that is not trustworthy.

▮▮▮▮▮ seemed particularly mad that I had shared her criticisms of me after the meeting with others on the psychiatry team............

Michael

**From:** ▮▮▮▮▮▮▮▮▮▮
**Sent:** Friday, April 27, 2018 5:36 PM
**To:** Golding, Michael@CDCR <Michael.Golding@cdcr.ca.gov>
**Subject:** Re: memorialization of meeting on 4/23

1

I did not know the context of the conversation before the meeting this afternoon. I am a neutral party in this. Let's talk on Monday.

**From:** Golding, Michael@CDCR
**Sent:** Friday, April 27, 2018 3:53:37 PM
**To:** ▉▉▉▉▉▉▉▉▉▉
**Cc:** ▉▉▉▉▉▉▉▉
**Subject:** FW: memorialization of meeting on 4/23

"I expressed my belief that there is **deeply rooted mistrust which are not grounded in current fact** but instead rooted in historical experiences. In order to unearth these issues, I shared that I have engaged a leadership guide"

It's what you said.
Michael

**Michael Golding, M.D.**
Statewide Chief Psychiatrist
Mental Health Support Program
California Department of Corrections and Rehabilitation

Phone: 916.662.6541
Email: michael.golding@cdcr.ca.gov



**Learn easy ways to save water
during California's drought at
SaveOurWater.com**

**From:** ▉▉▉▉▉▉▉▉▉▉▉▉
**Sent:** Tuesday, April 24, 2018 7:38 PM
**To:** ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉; Golding,
Michael@CDCR
**Subject:** memorialization of meeting on 4/23

All: This email serves to memorialize the meeting I held with this group on 4/23 at noon in my office regarding expectations for performance and behavior in the work environment here in the MH division at CCHCS.

During our meeting we discussed:
1.      The fact that this group was in a meeting on 4/19 wherein one person unprofessionally challenged the integrity of their counterpart. In response, that person responded in an unprofessional and inappropriate manner. As discussed, I am dismayed by the unprofessional interaction. Antagonistic , condescending, and otherwise unprofessional behavior will not be tolerated in the MH division. During our meeting, I gave clear direction that each time I witness, or am made

aware, that there has been unprofessional conduct, I will provide written correction to offending staff consistent with the agency processes and requirements.

2.      We also talked about how to productively push back if there is a dispute or conflict.  We work in a fast paced and often times stressful environment and we must develop tools to respond to these circumstances.  Specifically, we discussed how we could have changed the approach regarding legitimate questions and concerns with data integrity. The most important thing to remember here is that we are all on the same team.  We must assume good faith of our partners.  We work together with a common vision about delivery of excellent care to patients needing mental health care.  We discussed setting a series of meetings to make sure we have an open and complete conversation about concerns regarding data integrity.  That series is being scheduled.

3.      Finally, we discussed more deeply rooted strains in our leadership team.  I expressed my belief that there is deeply rooted mistrust which are not grounded in current fact but instead rooted in historical experiences.  In order to unearth these issues, I shared that I have engaged a leadership guide who will interview the team and who will develop a strategy to help us bridge the gaps between us so that we can work more cohesively as a team.  I continue to believe that we are in a unique time in the MH division's history that will allow us to dramatically improve our system.  However, we will lose this opportunity if we continue to in-fight and breed mistrust and discontent.  To the extent that this has occurred, it ends today.

In conclusion, I hope the team understands that I am committed to the success of the system and to each of your personally.



**CONFIDENTIALITY NOTICE**: This communication with its contents may contain confidential and/or legally privileged information.  It is solely for the use of the intended recipient(s).  Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act.  If you are not the intended recipient, please contact the sender and destroy all copies of the communication.



**Save Our Water**

Learn easy ways to save water during California's drought at SaveOurWater.com

attachment 60

## Golding, Michael@CDCR

| | |
|---|---|
| **From:** | ▮▮▮▮▮▮▮▮▮▮ |
| **Sent:** | Sunday, April 26, 2020 6:37 PM |
| **To:** | Golding, Michael@CDCR |
| **Cc:** | ▮▮▮▮▮▮▮▮▮ |
| **Subject:** | RE: Our Meeting |
| **Attachments:** | training 2020-SDU-Calendar.pdf |
| | |
| **Importance:** | High |
| **Sensitivity:** | Private |

---

**CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

---

Dr. Golding,

I hope you are doing well. This response is to our phone meeting on April 20, 2020 and your below email on April 21, 2020 regarding our meeting.

As I shared at the time, our conversation was not disciplinary in nature. I did not and will not be issuing any counseling record or a letter of instruction, nor will any information be placed in your official personnel file (OPF). I also mentioned to you that as a Hiring Authority, I have an obligation to assure due diligence when staff issues are raised to me. Therefore, I had the internal HQs EEO coordinator analyze the staff complaints for any EEO nexus.

I shared with you, too, that there was no EEO nexus from the EEO Coordinator's analysis and the matter was considered supervisory in nature. This was not an investigation, but an analysis. You are correct that I stated there were problematic behaviors identified that I needed to address with you, and as your supervisor, having received complaints, I am required to communicate to you that complaints had been made, the general nature of the complaints and to advise you on those complaints. I also did direct that you will need to sign up for a class on Team Skills and Communication when able once the COVID-19 social distancing expires (attached is the HQs Training Calendar).

During the meeting you requested copies of emails and other documents that were submitted in support of complaints made against you. Contrary to the statement in your April 21ˢᵗ email, I did not say that you should receive a copy of those documents. What I did say was that those documents are confidential and I would have to consult legal as I am not at liberty to release any of those documents to anyone.

In your email you also asked what actions CDCR will take to respond to your complaint of retaliation. I am not aware of any complaint of retaliation that you may have submitted and we did not discuss any complaint that you may have made verbally to anyone. If you have submitted a complaint to the EEO, please contact that office regarding its status.

With respect to your concerns about persons submitting misleading information to the federal court, those matters were addressed in the court proceedings.

Dr. Golding, you are a valued member of the HQs-MH team and I look to your leadership and will continue to look to your leadership as we carry out the important work that we are charged to do. Thank you.



**HEALTH CARE SERVICES**

*CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication. This e-mail is intended for CDCR usage only.   Unauthorized access or distribution is prohibited by all applicable laws.*

**From:** Golding, Michael@CDCR <Michael.Golding@cdcr.ca.gov>
**Sent:** Tuesday, April 21, 2020 9:20 PM
**To:**
**Subject:** Our Meeting

Hi

I am writing to you to confirm the substance of our meeting yesterday and to reiterate my complaint of retaliation. You informed me that you had received a report from Human Resources evaluating a stack of complaints against me, indicating that I had bullied my colleagues over the last 2.5 years. You indicated that over the last two months there were no complaints or concerns brought to your attention regarding me. You indicated that the problem with my conduct was "back in time" and the team had more recently grown together. You also stated that you currently had no concerns about bullying by me now. You further informed me that you had not brought these issues up earlier because you were addressing the Corona virus emergency.

You also informed me that there was an investigation of these complaints by                                        . You informed me that there was no "nexus" to the alleged EEO violations. You indicated that you needed to "close the loop" and do your "due diligence" by speaking to me and giving me this counseling as my supervisor. You indicated that there was enough problematic behavior that you needed to raise this issue with me. You also indicated that the investigative report indicated that team building should be conducted. You stated that              report and the stack of complaints about me were with Human Resources. In response to my question about whether these complaints would be placed in my personnel file, you indicated they would not.

I requested to find out what the substance of the complaints against me were, a copy of the emails and evidence used to come to the conclusions, and a copy of the investigative report. You agreed that I should have a copy of the investigative reports and the accompanying written complaints, but indicated that you would have to consult with legal counsel and get back to me.

2

I asked you for details of the complaints against me, and you declined to provide them during the meeting. I informed you that I had previously been told by Dr. ▮▮▮▮▮ that employees were in fact collecting evidence of my alleged lack of cooperation with the mental health team before the evidentiary hearing before the federal court. I asked you whether you thought the allegations against me were retaliation and you said you would not use labels. You also stated in the meeting that my sending the federal court's order to colleagues was seen as bullying.

I stated that I had not bullied anyone and the opposite had occurred. I informed you that I made my whistleblower complaints because I placed patients as my first priority. I said that due to my exposing dishonesty on the part of my colleagues – dishonesty that hurt our patients – they utilized their power to try to silence me and intimidate me. They retaliated against me and no one apologized for what occurred.

I am reiterating my request to receive the complaints against me, the investigative report, and the accompanying stack of documentation that was sent to HR. I am deeply concerned I was investigated without being informed or interviewed. I don't understand how I could have been found to have acted in any impermissible manner without informing me of the issues and obtaining my response. This is ongoing retaliation for my raising that CDCR mislead the federal court and for raising issues concerning the health and safety of our patients. As you are aware the federal judge, after prolonged investigation and evidentiary hearing, found my complaints to have merit, that I was credible, and that substantial changes to the policies and practices of CDCR were required. While I had hoped that the retaliation against me would stop so I could continue to do the job that I love and focus on patient care, it is clear that retaliation is continuing.

Please inform me what actions CDCR will take to respond to my complaint of retaliation and if CDCR is requiring that I take other actions to process my complaint. I ask that I be informed in writing what specifically is required, if anything else is, other than informing you orally and in writing.

Sincerely,
Michael Golding, MD

3

attachment 61

```
 1                  UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF CALIFORNIA
 2                          --o0o--

 3   RALPH COLEMAN, ET AL.,      ) Docket No. 90-CV-520
                                 ) Sacramento, California
 4                  Plaintiff,   ) October 23, 2019
                                 ) 2:00 p.m.
 5             v.                )
                                 )
 6   GAVIN NEWSOM, ET AL.,       ) Re: Evidentiary Hearing
                                 ) Day 4
 7                  Defendants.  )

 8                  TRANSCRIPT OF PROCEEDINGS
         BEFORE THE HONORABLE KIMBERLY J. MUELLER
 9              UNITED STATES DISTRICT JUDGE

10   APPEARANCES:

11   For the Plaintiff:    ROSEN BIEN GALVAN & GRUNFELD, LLP by
                           MS. LISA ADRIENNE ELLS
12                         MS. CARA ELIZABETH TRAPANI
                           MR. MICHAEL W. BIEN
13                         MS. JESSICA L. WINTER
                           101 Mission Street, 6th Floor
14                         San Francisco, CA 94105

15   For Dr. Golding and   STEWART & MUSELL
     Dr. Gonzalez:         MS. WENDY ELLEN MUSELL
16                         2200 Powell Street, Suite 440
                           Emeryville, CA 94104
17

18        (Appearances cont'd next page.)

19
     ALSO PRESENT:  KERRY WALSH
20                  SPECIAL MASTER LOPES (telephonically)

21              JENNIFER COULTHARD, RMR, CRR
                    Official Court Reporter
22                  501 I Street, Suite 4-200
                    Sacramento, CA 95814
23                  jenrmrcrr2@gmail.com
                      (312)617-9858
24

25        Mechanical Steno - Computer-Aided Transcription
```

1    APPEARANCES (CONT'D)

2    For the Defendant:        OFFICE OF THE ATTORNEY GENERAL
                               XAVIER BECERRA by
3                              MS. ELISE OWENS THORN
                               1300 I Street, Suite 125
4                              Sacramento, CA 94244
                               MR. ADRIANO HRVATIN
5                              MR. KYLE ANTHONY LEWIS
                               455 Golden Gate Avenue
6                              Suite 11000
                               San Francisco, CA 94102
7
                               ROBINS KAPLAN, LLP
8                              MR. ROMAN SILBERFELD
                               GLENN A. DANAS
9                              2049 Century Park East, Suite 3400
                               Los Angeles, CA 90067-3208
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1          SACRAMENTO, CALIFORNIA, WEDNESDAY, OCTOBER 23, 2019
 2                              --oOo--
 3       (In open court.)
 4          THE CLERK:  Calling civil case 90-520, Coleman, et al.
 5   v. Newsom, et al.  This is on for an evidentiary hearing, and
 6   today is day four.
 7          THE COURT:  All right.  Good afternoon.  Appearances
 8   just for the record for the plaintiffs.
 9          MS. ELLS:  Good afternoon, Your Honor; Lisa Ells,
10   Michael Bien, Cara Trapani, Jessica Winter for the plaintiff
11   class.
12          THE COURT:  Good afternoon to you.
13          MR. LEWIS:  Good afternoon, Your Honor, Kyle Lewis,
14   Roman Silberfeld, Glenn Danas, Adriano Hrvatin and Elise Thorn.
15          THE COURT:  Good afternoon to all of you.  And in the
16   audience, we have?
17          MS. MUSELL:  Good morning, Your Honor; Wendy Musell on
18   behalf of Drs. Golding and Gonzalez.
19          THE COURT:  And Dr. Golding is not present.  Is
20   Dr. Gonzalez present, just so it's clear?
21          MS. MUSELL:  Yes.  She's present in the courtroom,
22   Your Honor.
23          THE COURT:  All right.  All right.  In the courtroom,
24   Mr. Walsh is representing the Special Master, Mr. Kerry Walsh.
25          And the Special Master, Mr. Lopes, are you on the
```

1    telephone?

2              MR. LOPES:  I am, Your Honor.

3              THE COURT:  All right.  I am prepared to provide my

4    summary of how I size up the conclusions that are appropriate

5    based on the Golding proceedings, and it will take me some time

6    to do that, so I'm going to primarily read, explain as I go

7    along.  I've obviously done this on a pretty short time frame,

8    but I'm confident that this represents my core conclusions

9    based on what I've seen, heard, read, and considered.  And then

10   I will memorialize, as soon as I can, in a written order with

11   full record support.

12             I feel the need, given what has happened here, to step

13   way back and invoke the overarching reason that we are here in

14   this case.  And so I am going to just remind folks of what

15   judges before me have said.

16             "Whatever rights one may lose at the prison gates,

17   Eighth Amendment protections are not forfeited by one's prior

18   acts.  Mechanical deference to the findings of state prison

19   officials in the context of the Eighth Amendment would reduce

20   that provision to a nullity in precisely the context where it

21   is most necessary.  The ultimate duty of the federal court to

22   order that conditions of state confinement be altered where

23   necessary to eliminate cruel and unusual punishment is well

24   established."  The district judge who preceded me in one of his

25   remedial orders.

1    At this critical juncture, it bears repeating as that

2 same judge said in 2013, not so very long ago, that "The Eighth

3 Amendment violation in this action is defendant's severe and

4 unlawful mistreatment of prisoners with serious mental

5 disorders through grossly inadequate supervision of mental

6 healthcare."

7    Before that, in 2011, the Supreme Court had observed

8 "For years the mental healthcare provided by California's

9 prisons has fallen short of minimum constitutional requirements

10 and has failed to meet prisoners' basic health needs.  Needless

11 suffering and death have been the well-documented result."

12    Once an Eighth Amendment violation is found and

13 injunctive relief ordered, the focus shifts to remediation of

14 the serious deprivations that form the objective component of

15 the identified Eighth Amendment violation.  Remediation can be

16 accomplished by compliance with targeted orders for relief, as

17 the Court has issued here, or by establishing that the

18 violation has been remedied in another way.  The Court is aware

19 of that alternative, but here the Court is called on, this

20 Court, is called upon to make clear what should be patently

21 obvious, and that is that remediation may not be accomplished

22 by end runs and hiding the ball to create a false picture to

23 the Court.

24    This Court is so called because Dr. Golding, followed

25 by Dr. Gonzalez, just before defendants planned to submit a

1    staffing proposal seeking permission to very significantly

2    reduce the number of psychiatrists serving the mental health

3    population, a proposal plaintiffs indicate they were poised to

4    accept, Dr. Golding came forward.  Needless to say, the

5    plaintiffs' acceptance was withdrawn, and plaintiffs to this

6    day have made clear their trust has not been restored.

7          Once Dr. Golding issued his report -- I've looked back

8    at the history of what's happened in this case.  The defendants

9    rushed in with a defense telling this Court that no

10   investigation was needed.  The Court, however, determined that

11   the seriousness of the allegations required a process to ensure

12   full, fair and transparent consideration of the allegations and

13   at that point just that, allegations.

14         The Court, again, through a deliberative process,

15   ultimately identified a neutral expert with unassailable

16   credentials to investigate and report without delegating to

17   that expert any of the Court's authority or responsibility to

18   ultimately resolve the questions Dr. Golding raised.

19         Based on the neutral's report and Dr. Golding's

20   report, the Court has now conducted its own further development

21   and evaluation of the record, including in the last week.  And

22   I have to say the proceedings, particularly the most recent

23   proceedings, have borne out in the Court's mind the necessity

24   of the approach it's taken, even though it has taken some time.

25         Since the neutral expert provided his report, which

1    helped focus the Court's exercise of its authority, the Court

2    has signaled more than once that defendants have had the

3    opportunity to come forward and come clean and not just by

4    acknowledging that problems have occurred.  And I do want to

5    acknowledge the steps that defendants have taken.

6           In fact, as of July 22nd, as the Court has

7    memorialized in an August 2019 order, the defendants have

8    admitted that misleading information was provided to the Court.

9    There are at least two court filings on the docket that embody

10   the acknowledgment that the redefinition of monthly in the

11   business rules resulted in the reporting of misleading data and

12   data reported in two separate filings.  The defendants

13   acknowledge the hub certification letters were based on data

14   generated with erroneous business rules.  Misleading

15   information was provided to the Court, make no mistake.

16          The defendants have had the opportunity to fully

17   cleanse and purge the record of misleading information.  They

18   have filed errata, some only as recently as the last week or

19   two.  There are objections pending I will resolve.  I'm not

20   going to resolve those from the bench today.  But I note that

21   at least some errata have been filed, some only very recently.

22   Most importantly, though, nothing has prevented defendants from

23   coming forward to provide a cogent, believable, supported,

24   full-blown explanation as to why misleading information was

25   provided.  And without an understanding of the why, a proper

1   solution simply cannot be identified.

2          At best, defendants have offered various explanations,

3   including in closing yesterday, of inadvertent errors, program

4   guide vagueness, innocent absences of system course correctors,

5   but it's because the defendants have not answered the

6   fundamental question of why, the Court has gone in search of it

7   herself.  I have reached the core conclusions I'm sharing with

8   the parties today and, again, my order in full will issue.  But

9   just to review the framing of the most recent proceedings, and

10  to review the neutral expert's conclusions, which, as I

11  signaled in a passing comment to Mr. Silberfeld yesterday were

12  essentially conclusions helped to focus the Court's own work,

13  it is ultimately for this Court to make the decisions called

14  for by Dr. Golding's report.  And while it is possible to find

15  some parts of the neutral expert's report that could be read as

16  exonerating defendants, I think it has to be said the neutral

17  expert himself did not let defendants off the hook.  Rather, he

18  pointed to serious examples of misleading information being

19  presented or apparently presented.

20         Wherever the neutral expert pointed to or suggested

21  that presentation of misleading data, the record now before the

22  Court bears out his observations and then some.  Just a few

23  examples:  The business rule change redefining monthly to

24  lengthen intervals between EOP appointments from 30 to 45 days.

25  That rule, while in effect, generated misleading data about

1    CDCR compliance with routine EOP evaluations.  That's the

2    neutral expert's report.

3         CDCR's reporting of timely psychiatry contacts

4    overstated CDCR's compliance with program guide timeline

5    requirements.  The data presented to the Court and the Special

6    Master was inconsistent with those requirements and made CDCR

7    reports appear more compliant with the program guide than it

8    actually was.

9         And thirdly, just among examples, CDCR should have

10   been aware many psychiatrists were not reporting whether visits

11   were nonconfidential.  Therefore, reports to the Special Master

12   and the Court were misleading because erroneously skewed

13   towards confidential evaluations.

14        To quote the neutral, "EHRS data on compliance with

15   program guide timelines for compliance with psychiatric

16   evaluations is potentially misleading because it includes

17   nonconfidential encounters."

18        So after review of that report, the Court narrowed the

19   focus for development of evidence to three areas to facilitate

20   reaching its own conclusions.  Everyone here knows those three

21   areas, the 30 to 45-day change, the monthly definition being

22   exploited, "appointments seen as scheduled" indicator and the

23   supervising psychiatrists acting as line staff.

24        I want to address my preparations for the hearings we

25   had last week.  Before hearing, as the parties know, the Court

1    did review quite a few documents, essentially a banker's box

2    full of documents claimed as confidential by defendants and not

3    provided to the neutral.  I had several in camera discussions

4    with defendants in assessing claims of confidentiality.  A

5    record has been created.  It will be sealed, but it's created.

6         Regarding the confidential documents, the defendants

7    have resisted at every turn any reliance by the Court on any

8    portion of any document covered by a claim of privilege.  As

9    I've said before in this courtroom, if the Court were to have

10   relied on any such document, I would have disclosed the

11   document to the plaintiffs for full and transparent

12   proceedings.

13        Having reflected on defendant's position, which has

14   been consistent, if hard fought, the Court declines to engage

15   the questions raised by the privilege claims more fully.

16        My general impression is that defendants have

17   overreached in a number of instances, while certain of their

18   claims might be sustained if not waived by the positions

19   defendants have taken during the Golding proceedings.

20        But to venture into that thicket would lead the Court

21   and all of us astray and be a litigation adventure of the kind

22   that I have been trying to discourage in this case while

23   recognizing the parties' rights to go there.

24        I am today making a record of my general conclusions

25   based on the review of those documents, and I'm doing so now in

1    summary form.  Nothing in the documents provided the Court is

2    the proverbial "smoking gun."  Nothing in the documents

3    supports a conclusion, including by inference, that anyone

4    involved in presenting misleading information to the Court

5    committed intentional fraud.  And I'm talking now about the

6    confidential documents specifically.  I'll come back to a more

7    general conclusion towards the end of my observations.

8         If there were unwritten directions to engage in

9    intentional fraud or the equivalent, the author left no trail.

10   Rather, the picture that emerges from the documents is

11   consistent with the picture emerging from the public record

12   completed here in open court.  It is the public record on which

13   the Court relies in making its findings and drawing its

14   conclusions here.

15        One minor note, I did have in camera discussions with

16   the defendants about one document in particular.  A portion of

17   that document the defendants agree is not subject to a claim of

18   privilege.  And that's a document that is currently identified

19   as CDCR crib 409 to 412.  And Ms. Thorn will know certainly

20   what I'm talking about.  I'm directing the defendants to file

21   the nonprivileged portion of that document with the plan that

22   it references because it may be relevant to what happens

23   following these proceedings.  And the plan it references is the

24   Healthcare Services Performance Improvement Plan, 2016 to 2018.

25   The Court may not be looking in the right places, but it hasn't

1    been able to find that plan on its own.

2          Relatedly, with respect to the record, I'm confirming

3    that I'm accepting the declarations of Mr. Onishi, Mr. Weber

4    and Ms. Bentz, in lieu of their live testimony.  That probably

5    is implicit from the way the proceedings wrapped up, but I'm

6    accepting the parties' stipulations and their declarations the

7    Court considers to be part of the record.

8          So I have findings and I first want to -- I felt it

9    necessary to consider the testimony of certain witnesses, and

10   so I'm going to provide summary assessments of witnesses before

11   I lead into conclusions based on the subject areas that the

12   hearing covered.  And I think it's part of the clarifying,

13   cleansing and purging that's required at this stage.

14         So first, Dr. Golding.  Based on Dr. Golding's

15   testimony, observing him, listening to him on the stand, I find

16   him credible.  I find his observations and conclusions overall

17   are well-founded.  He acknowledges there can be margins of

18   error.  He says he's not a stickler, but here there were

19   boundaries crossed that he could not countenance.  He's not a

20   data guy, and I don't think he held himself out to be a data

21   guy, but he did, looking at the totality of the record, call in

22   a team of people who do understand the data, and those persons'

23   analyses, and that includes Dr. Gonzalez's analysis of some of

24   what was going on informed Dr. Golding's conclusions.

25         The defendants suggest that Dr. Golding disagrees with

1    everyone.  Now, I don't know Dr. Golding apart from what I've

2    seen here in the courtroom and in his written report, so he may

3    well have a disagreeable streak.  I'm not here to make that

4    judgment.  But even if he does, I would just observe that

5    ofttimes it takes a difficult person to see a problem and to

6    right a wrong.

7         Dr. Golding may have a pro psychiatry bias.  That

8    would be understandable.  He is the defendant's own chief of

9    psychiatry.  That bias does not mean his report and his

10   testimony is stripped of value.  I have considered the question

11   because the defendants have argued that that bias is critical

12   in assessing his credibility, but I find still his testimony is

13   sound, his report is fundamentally sound.  There are a few

14   exceptions I'm going to get to and note for now.

15        Moreover, Dr. Golding is not alone in his assessment

16   of what's happened here, and I think the defendants'

17   characterization of his views does not fail to account for the

18   views of Dr. Gonzalez and Dr. Kuich.  Dr. Gonzalez's report and

19   Dr. Kuich's deposition, both in the record, are required

20   reading to understand the totality of the record before the

21   Court.  And I would say that Dr. Kuich's deposition is like

22   reading a good book, regardless of whose side you're on.  He

23   provides a very helpful narrative, explaining context in a way

24   that fits with the rest of the essential pieces of the evidence

25   here.  And he manages to interject colorful language that keeps

1    the reader's attention, such as being "gobsmacked" when he

2    sees, you know, dashboards turn from red to green or

3    understanding the reasons for that.  He talks about the

4    reptilian brain.  Required reading, I think, for everyone here.

5         So in terms of Dr. Golding's ultimate position when it

6    comes to the three areas that the Court probed through the

7    hearing on the 30 to 45 days, the key takeaways are psychiatry

8    was not consulted in advance, certainly not the second time

9    around.  Psychiatry learned only after investigating with

10   Drs. Gonzalez and Kuich doing much of the legwork trying to

11   figure out why those dashboards turned from red to green

12   dramatically overnight.

13        The Court notes that Dr. Golding continues to have

14   concerns about what he calls "disambiguation," precluding

15   proper analysis resulting from the merging of data from both

16   CCCMS and the EOP.  He may be right, but that's beyond the

17   Court's purview at this point.  At most, I would refer that

18   issue to the Special Master.

19        On the "appointments seen as scheduled" indicator,

20   while the defendants argue that indicator is not tied to the

21   Coleman program guide, Dr. Golding is correct that the Special

22   Master relies on information generated using that indicator in

23   conducting his monitoring.

24        While the indicator has revised, here as well

25   Dr. Golding believes it still does not allow reporting of

1    appointments that are missed.

2         I listened carefully, have thought about what

3    Dr. Ceballos has said, including her view that Dr. Golding

4    doesn't understand the data.  That may be, but given that the

5    processes have not been in place to make data methodology fully

6    transparent and understandable, including to the chief

7    psychiatrist, who is a key stakeholder, I'm not reaching

8    ultimate conclusions on that point.  Again, perhaps something

9    for the Special Master to get to the bottom of.

10        In terms of supervisors acting as line staff,

11   Dr. Golding's observations are well-founded.  Here, again,

12   they're bolstered by Dr. Kuich's very clear explanations for

13   the reasons that clear data matter.

14        It did matter to me to understand why Dr. Golding felt

15   unable to surface his concerns internally.  Courts generally

16   like exhaustion.  The Court wants to know that there's an

17   internal process for someone who has concerns to work through

18   those, and that would be the sign of a healthy organization.

19   But here, again, Dr. Golding's narrative is supported by

20   Dr. Gonzalez and Dr. Kuich.  And I'll get into that in a bit.

21   His explanation for providing the report to the receiver

22   instead of the Special Master, despite its implications for the

23   Coleman case, also make sense in context.

24        Where I'm not accepting Dr. Golding's conclusions,

25   just so it's clear, they're fairly minor, but they don't

1   materially -- and they don't materially affect my conclusions

2   here, I don't find support in the record for his strong belief

3   that the Governor's Office -- essentially his strong belief

4   that the Governor's Office directed the provision of misleading

5   data.  I have an observation about that, but I'm not accepting

6   his strong conclusion.

7          I also can't get to the bottom of Dr. Golding's belief

8   that Ms. Tebrock told him that his telling her of fraud was

9   sufficient to quote/unquote unburden himself because she's an

10  officer of the court, based on the current record.  Ms. Tebrock

11  denies saying that.  It may be that attorneys use language in a

12  certain way that means something else to others not in the

13  attorney's discipline.  Apart from that cautionary observation,

14  I'm not feeling the need to resolve that question.

15         In terms of other key witnesses, I'm not going to

16  cover every witness here today, but I do want to give a sense

17  of how I size up testimony.  And I can't say that I take great

18  pleasure in doing this, but I think it's a part of my job at

19  this stage, given what the Court has heard and seen.

20         So first, Ms. Tebrock.  On the one hand, I don't find

21  Ms. Tebrock not credible, but I found her testimony ultimately

22  disappointing for the lack of full acceptance and the absence

23  of leadership that it displayed, given her obvious intelligence

24  and her significant abilities.  And the Court has no reason to

25  disbelieve that she loved and cared about her job.

1          Perhaps she, as others, I believe, perhaps she is/was

2     a victim of bureaucratic dysfunction and not given adequate

3     training and support to manage in a very complex environment,

4     but Ms. Tebrock signed key declarations in this case in the

5     relevant time period, and she did not ask anyone to correct any

6     reports or filings she made to this Court after becoming aware

7     of Dr. Golding's report.  She did testify last week in this

8     Court that if given the chance, she would correct, but that

9     comes across as more than a day late and many, many dollars

10    short.

11         The Court, as it has noted, has provided the

12    defendants the chance many months now to correct the record,

13    and so the chance has been provided.

14         I also find Ms. Tebrock's handling of the staffing

15    proposal inexplicably constrained, as if designed to preclude

16    meaningful input from psychiatry, and it informs the Court's

17    disappointment.

18         The defense argues that Ms. Tebrock was, at all times,

19    available to Dr. Golding; but as I've signaled, I find her

20    carefully curing interactions with him lacking.  I'm not saying

21    that was the sum total of her interactions, but she was a

22    leader in that department.  In particular, her explanation of

23    the need to keep the precise wording of court documents close

24    to the vest and controlled by lawyers alone is completely

25    unsatisfactory to this Court, and that verges on a part of the

1   foundation of how misleading information got to the Court.

2          Dr. Ceballos.  As the plaintiffs point out,

3   Dr. Ceballos, the psychologist, designed CQIT, the tool central

4   to defendants demonstrating they are in compliance with Coleman

5   court orders; and, yet, her testimony betrayed little to no

6   appreciation for the letter or the spirit of those orders.

7          She maintained, for the bulk of her testimony, a false

8   distinction between internal and external data and seemed to

9   think of her role as a limited role of just being a clinician.

10         The Special Master has considered her in the past a

11  key contact.  I raised that with her, a person they assumed

12  would report changes affecting the substance of Coleman to

13  them.  But as the record documents, when Dr. Golding asked her

14  initially, Dr. Ceballos said the Court had not been notified of

15  the 30 to 45-day change and said, "Well, we don't inform the

16  Court about every change, only major changes that have

17  significant impact."  And Dr. Ceballos has been consistent in

18  her testimony that she thought the change fell within the

19  program guide's requirement of monthly and that this was purely

20  a decision to help the field improve patient continuity of care

21  and quote/unquote "very clearly within the policy

22  requirements," but her clarity on that point is -- goes too

23  far.  And given her significant role and her significant

24  contact position with the Special Master's Office, it is --

25  it's fair for the Special Master, if he so decides.  It's for

1    him ultimately to decide.  But if the trust previously placed

2    on Dr. Ceballos is out the window, it would be believable and

3    hard to imagine that it could be restored.

4        The Court believes the change from 30 to 45 days is a

5    material change because it affected reporting to the Special

6    Master and, therefore, the Court.

7        Dr. Leidner, plaintiffs argue that Dr. Leidner cannot

8    claim ignorance of the context in which he works or worked.

9    Having testified in the 2013 termination proceedings before the

10   Court, they also point to his belated discovery of an error or

11   not even his own discovery of an error with respect to the PIP

12   indicator.  While both are true, in this respect I -- I do not

13   accept the plaintiff's assessment of Dr. Leidner.  I see him,

14   although a psychologist, in a more positive light.

15       Given that the record suggests he was working at the

16   direction of others, working diligently in a dysfunctional

17   system, he should have been more aware.  He was working

18   diligently while making human errors, but he was not the key

19   decision-maker, as the Court sees it, with respect to the

20   matters that the Court has probed here.

21       In a properly designed structure with proper

22   supervision, it appears to this Court that Dr. Leidner could,

23   even today, continue to play an important role, given his

24   significant skills.

25       And as importantly, as someone who assesses

1    credibility, the Court believes Dr. Leidner distinguished

2    himself here by exhibiting a conscience on the stand.  He

3    understands he made mistakes, and he didn't seem to shrink from

4    accepting that and explaining that, in fact, he had.

5        So make no mistake here, Dr. Leidner did not depart

6    his position in CDCR Mental Health based on anything the Court

7    has observed about his role as related to the Golding

8    proceedings.

9        Those are the witnesses whose testimony I'm sharing my

10   assessment of at this point in time.  And therefore, I'm going

11   to move on to my conclusions regarding the substantive areas

12   covered by the proceedings.

13       So the 30 to 45 days, you've already heard me say

14   this, but that change was a material change inconsistent with

15   the program guide as implemented through a long period of

16   practice.  It should have been thoroughly vetted before any

17   implementation.

18       While the defendants argue the change was prompted by

19   a request from the field to improve continuity of care, that

20   does not go far enough to explain the change, I believe.  The

21   requests did come from the field, a medication admin at CHCF,

22   and there was apparently some relief provided to psychiatrists

23   seeing patients.  They could go on vacation and still see the

24   same patient in a reasonable time frame, as the folks who made

25   the change saw it at the time.  But the request went nowhere

1    the first time because Dr. Golding did not approve it.

2          The second time, at a critical time with respect to

3    one of the Special Master's monitoring rounds, the request

4    sailed through without any checking with psychiatry.  And,

5    again, it did materially affect reporting to the Special

6    Master.

7          Specifically the rule change affected a period where

8    the Special Master had been tasked with receiving monthly

9    updates on the status of defendant's implementation of their

10   staffing plan and filing a stand-alone report on the status of

11   mental health staffing and, again, implementation of that plan.

12         So here I find plaintiff's suggestion the Court draw

13   an inference of willfulness is quite persuasive.  At a minimum,

14   it's a matter of willful blindness or reckless indifference,

15   given the context in which the decision was made.

16         In terms of appointments seen as scheduled, here there

17   was a descriptor.  The Court got clarity on this issue during

18   the hearings.  The descriptor was not changed to track changes

19   to code, and Dr. Leidner fixed it once the error was

20   identified.  It appears to the Court the error in not updating

21   was unintentional, but plaintiffs are correct that the

22   descriptor is what's public facing, and so critical to

23   transparency.  This kind of error needs a system to catch it

24   promptly, if it happens at all.  I question the correction that

25   was made in October of 2018, but it was made through the wrong

1    kind of identification of the error in the first place.

2         The Court has the very strong impression at this point

3    in time that the real problem is that the failure to modify

4    coding or the EHR system more broadly to capture data relevant

5    to treatment, that is the real problem that must be fixed.

6         And the defendants simply are not correct in believing

7    that missed appointments are not relevant to patient care.  And

8    here, again, Dr. Kuich's deposition includes a good explanation

9    of why properly tracking missed appointments is relevant.  Such

10   tracking contributes to qualitative analysis, which could

11   include identification of a number of trends and patterns at a

12   local institution that currently simply are not available

13   without a very detailed manual tracking, if that occurs.  Here

14   as well, I'm going to refer that issue to the Special Master

15   for some more work along the lines that has already begun.

16        With respect to the appointments seen as scheduled, I

17   do want to credit Dr. Toche's testimony concerning remedial

18   measures to be explored and taken, assuming transparency and

19   full communication with the Special Master and the Court going

20   forward.  And there's much more to be done to assure that.

21   I'll talk about that in just a moment.

22        The third area, supervising psychiatrists acting as

23   line staff.  Here defendants contend that Ms. Ponciano's

24   analysis was not intended to show how much supervisor time was

25   required but, instead, to ascertain how much clinical time, how

1   many line staff going forward was required in the field.  But

2   here as well, I conclude defendant's argument misses the point

3   or at least the full point.

4          Ms. Ponciano's analysis masked the time that

5   supervisors spent providing line care and yielded a number that

6   was significantly understated.  And here it appears Golding did

7   attempt to surface the issue -- Dr. Golding attempted to

8   surface the issue at meetings where he was representing

9   psychiatry.  Here Dr. Golding and Dr. Kuich disagree on the

10  percentage of time that supervisors spend providing line care.

11  I don't think anyone disagrees that some provision of line care

12  is appropriate and not out of line, but Dr. Golding estimates

13  it's 50 percent.  Dr. Kuich estimates a third to a half of

14  their time.  But regardless of what range the Court credits,

15  supervisors have clinical responsibilities far in excess of

16  those contemplated by the 2009 staffing plan.

17         I would note that Ms. Ponciano testified that the

18  results of her analysis showed that if supervisor contacts were

19  removed from timely CCCMS contacts, it would have shown that

20  those patients were being seen on average .98 times every 90

21  days rather than 1.07 times every 90 days.  That analysis was

22  not shared with the Court or the Special Master prior to these

23  proceedings.

24         Ultimately, with respect to this indicator, here

25  again, I think Dr. Kuich provides a narrative that rings true.

1    "Psychiatrists were practicing in an environment that, among

2    other things, causes data to have to be massaged in certain

3    ways to allow information to be more presentable to say we

4    don't need psychiatrists so we can get out of the lawsuit."

5         He testified, "The more you automate this process to

6    make sure that compliance happens, the more you take control

7    out of the clinician to be able to determine what's clinically

8    relevant for that patient."  And that approach runs counter to

9    a key principle articulated in this case since the very

10   beginning, since 1995 at least, and that is, "In order to

11   provide inmates with access to constitutionally adequate mental

12   healthcare, defendants must employ mental health staff in

13   sufficient numbers to identify and treat, in an individualized

14   manner, those treatable inmates suffering from serious mental

15   disorders."  That's this case, 1995.

16        There's some backdrop concerns that emerged for the

17   Court, and I'll just touch on those because they inform the

18   Court's answer to the "why" question.  I do think -- I know

19   there's this:  Well, it's psychologist versus psychiatrists,

20   and I'm trying to rise above that, as I think everyone here

21   must.  But I think the record as a whole does support the

22   conclusion that psychiatrists were marginalized to the point

23   where their input carried insufficient weight in the

24   decision-making process.  It doesn't mean they had to win, but

25   they had to be meaning fully consulted.  They are the ones who

1    take the hippocratic oath.

2          And so Ms. Tebrock's, with Ms. Brizendine's reading

3    bullet points to Dr. Golding, never showing him the staffing

4    report before it's finalized, asking him to sign something that

5    he could not, it just doesn't cut it.

6          Ms. Ponciano pulling Dr. Kuich out of another meeting

7    for, as he estimates, about five minutes to run some numbers by

8    him without giving him context, full information or time to

9    evaluate numbers she was putting together to support the

10   staffing proposal.  He expressed general concerns.  That was

11   it.  Ms. Ponciano could say honestly she talked with him.

12   That's not a meaningful discussion of the sort that should be

13   occurring.

14         Ms. Tebrock and Ms. Brizendine, if not Ms. Ponciano as

15   well, asked Dr. Golding and his team to stop with their own

16   monthly staffing tracking.  They were tracking information that

17   CDCR has said could not be tracked.  They were asked to stop

18   doing that.  So marginalization of psychiatry is a backdrop.  I

19   heard Dr. Toche say she's aware of an issue there.  I don't

20   know how she defines it, but she's aware of an issue and she's

21   working on it, and I credit her with that.

22         A second backdrop is what can only be described as

23   significant bureaucratic dysfunction and negative messaging

24   preventing internal reporting or hearing internal reports when

25   key persons attempt to make them.

1          So while Dr. Golding may have put a target on

2    Ms. Tebrock's back, the context that he describes and for which

3    she had responsibility as a leader is concerning.  He had the

4    impression, credibly, that he was not able to speak to the

5    Special Master.  That was the impression that was corrected

6    after his report was filed.

7          He credibly said he was told to wait to talk about his

8    staffing concerns until some date after the staffing report was

9    planned for filing with the Court.

10         He provided -- he went as far as to provide his report

11   to the receiver for clearly articulated reasons that signaled

12   his concern about reporting it up through the Coleman chain of

13   command.

14         Dr. Kuich here as well describes multiple instances

15   where he says he just gave up on trying to report, on trying to

16   make changes that he saw as necessary because they were never

17   heard.

18         Dr. Ponciano, she may be a very diligent public

19   servant, and she's credible in her testimony as far as it goes,

20   but she is in administration.  She oversees operations and

21   labor negotiations, and that's the person who was tasked with

22   coming up with the numbers of psychiatrists to hire and to cut

23   and did not have the full knowledge base to reach a meaningful

24   conclusion that satisfies the Coleman Court requirements.

25         A third backdrop, the boundaries that should be in

1    place between PLATA and Coleman, despite their overlaps, were

2    not being policed.  And I'm just talking about the Coleman side

3    of the house.  So the "appointments seen as scheduled"

4    indicator was adopted, an indicator developed by the receiver's

5    team without any tailoring.  The receiver's team makes changes

6    to healthcare business rules that affect mental healthcare

7    indicators, and it's the receiver's team running validation on

8    code.

9         I'm not pointing at the receiver as the source of a

10   problem here.  It's for mental health.  It's for the Coleman

11   side of the house to push back and maintain the line.  And in

12   many instances, it appears that has not happened.

13        Mental health QM was heavily involved in development

14   of the EHRS, and many of psychiatry's requests for a solution

15   to critical scheduling problems linked to diagnosis and

16   prescriptions have not been incorporated into EHRS.  EHRS is

17   not tailored, as far as the Court can tell, to the mental

18   health concerns in the Coleman case; examples being that a

19   person who enters data can self-select their own title, doesn't

20   allow tracking of key treatment data.  And it's not clear to

21   this Court that psychiatrists, who are relied upon to enter

22   data, were ever fully properly trained.  I've heard the defense

23   say they acknowledge a need for more training.  I think it

24   might need to be a more robust process than sending memos to

25   the field.

1       Another backdrop I would just observe, it appears to

2   the Court there's a proliferation of committees and

3   subcommittees.  I realize some of them are on hold, but there

4   are committees, there are subcommittees, there are mental

5   health subcommittees, receiver committees, the webinars.

6   Dr. Toche at least has acknowledged the limitations of the

7   webinars that were being held.

8       And there's a clear system in place for improving

9   transparency with respect to coding changes, but I am asking

10   for a list, just so you know, from the Special Master and the

11   receiver, so I can see what all the committees are, even if

12   they've been put on hold, to try to understand the structure.

13   I think the structure does not support the goals of the Coleman

14   case currently.  So the fundamental question of why, which

15   informs what the solutions here must be.

16       I think there was a laser focus.  The defendants

17   adopted a laser focus on an effort to obtain termination of

18   Court supervision, which led to a stark "ends justifying the

19   means" scenario, and it appears that they lost complete sight

20   of the reasons that remediation has been required in this case

21   for some time.

22       Mr. Bien asked the one question going to the heart of

23   that, that issue of Dr. Toche.  She was not prepared for it, to

24   her credit.  She said she needed to think about it, and I do

25   believe her that she will think about it and be thoughtful in

1    solutions that she may propose going forward.  But it should be

2    clear to everyone here -- and this Court has not felt the need

3    to say it, but legal cases are not just words on a piece of

4    paper, and I think it needs to be said at this point in time

5    legal cases have hearts and souls.  And there was never a

6    question in this Court's mind but that the predecessor judge,

7    Judge Karlton, put his heart and his soul into this case, as

8    reflected in his orders, which stand today.  And this case

9    cries out for every single player to consult their hearts daily

10   and keep their eyes daily on those souls who are the mentally

11   ill housed behind bars in this state who have the absolute,

12   undeniable right to adequate treatment and care,

13   constitutionally adequate care.

14          So how did the defendants lose sight?  I do think

15   timing played a role, awareness of Special Masters' rounds, I

16   think the end of a prior governor's term.  There's no evidence,

17   I repeat, that anyone in the Governor's Office ever instructed

18   any player to mislead, but the neutral expert's report does

19   capture an interaction that I think provides some insight.

20          In March of 2017, Ms. Tebrock sent an email noting

21   that the Governor's Office had asked to explain in more detail

22   what metrics can be used to show that the care by psychiatry is

23   adequate.  What metrics can be used to show that the care by

24   psychiatry is adequate.  I think when a Governor's Office asks

25   those who work for it in the agencies to jump, it is natural

1    that those in the agencies may say "How high?"  On the one

2    hand, I believe there was attention to data and an effort to

3    review the data and to make certain it was data generated from

4    the data warehouse ultimately through the Coleman indicators,

5    but with the direction that the job was to show that care was

6    adequate.  So the chosen method to lay groundwork for

7    litigation.

8         Ms. Tebrock's explanation of the need for lawyers to

9    wordsmith the court documents as a reason for not showing the

10   staffing report to Dr. Golding exposes that "ends justifying

11   the means" approach, as opposed to engaging in responsible

12   problem solving.  I think it's fair to say that litigation

13   trumped substantive compliance.  And so far, at least, that

14   road has not worked for the defendants.

15        It's not for this Court to tell either party how to

16   litigate its case, if it chooses litigation, and if it believes

17   it has that right, but I would just make an observation that

18   given the litigation results to date, following that road has

19   exacted a steep, steep price.  And that price is at the cost of

20   the plaintiff class.

21        Other examples?  Getting the dashboards from red to

22   green.  And here, again, Dr. Kuich provides a narrative

23   explanation that pulls it together, having heard the other

24   testimony in the case.  His observation, someone who's left the

25   department:  "Mental health felt that they were performing very

1    well in many areas, that they could police themselves with

2    data" -- that echos Dr. Ceballos's testimony -- "that they were

3    a structure.  That they were sustainable.  And the only piece

4    that was the problem was that there weren't enough

5    psychiatrists.  And so if there was some way to show that with

6    fewer psychiatrists we were meeting the metrics, that final

7    block would tumble, and there would be no basis for the

8    lawsuit."  If dashboards turn from red to green, it helps

9    demonstrate there's no need for the lawsuit.

10          Before turning to some overarching conclusions, I just

11   want to note, the Court has often thought that there's some

12   irony, given the structure of this case, that defendants have

13   so often resorted to litigation.  The Special Master approach,

14   carefully constructed by my predecessor actually moderates

15   court intervention into defendant's own efforts to remediate,

16   in contrast to a receivership.

17          And so, arguably, it's more respectful and more

18   hopeful that defendants can figure this out on themselves -- by

19   themselves.  It does mean that the Court relies on defendants'

20   representations to the Court.  And so if the approach of using

21   a Special Master has, in some way, contributed to the problems

22   here, there is at least irony, if not a need to revisit the

23   structure because at this point, as the parties now know, the

24   Court cannot help but conclude that the status of defendant's

25   representations is in doubt.

1    So the overarching conclusions.  In determining

2    whether there has been fraud on the Court, the relevant inquiry

3    is whether the conduct at issue harmed the integrity of the

4    judicial process.  Most fraud on the Court cases involve a

5    scheme by one party to hide a key fact from the Court and the

6    opposing party.  It's a high standard.  The Court does not find

7    the kind of scheme necessary for fraud satisfied here.

8    Plaintiffs, I listened carefully yesterday --

9    plaintiffs urged instead that the Court find that defendants

10   acted knowingly in presenting misleading information.

11   The defendants argue that the Court took no action,

12   based on incorrect data.  The Court did not approve the

13   staffing plan, they say, but that is because it blew up in the

14   face of Dr. Golding's report followed by Dr. Gonzalez's report.

15   And that is thanks to Dr. Golding.

16   It is the case that the Special Master, an arm of the

17   Court, has received data and relied on it in monitoring rounds.

18   It is the case that documents, including hub

19   certification letters, have been filed with the Court.  And

20   that means -- again, it should not need repeating, but any

21   document filed with the Court is covered by Federal Rule of

22   Civil Procedure 11, 11(b), which provides that the attorney or

23   other person presenting certifies that to the best of the

24   person's knowledge, information and belief, formed after an

25   inquiry reasonable under the circumstances, it is not being

1    presented for any improper purpose, including needlessly

2    increasing the cost of litigation.

3           And, as relevant here, the factual contentions have

4    evidentiary support.  And documents residing on the Court's

5    docket, there are thousands of such documents in this case, as

6    the parties know.

7           Even if the Court has not expressly acknowledged it, a

8    document residing on the Court's docket is a tangible thing.

9    It is not merely bits of Os and 1s.  It is not a digital

10   remnant.  And Rule 11 violations are sanctionable.  I'm not

11   going there at this point in time, as you'll hear, but

12   plaintiffs' characterization is well taken, piecing together

13   the evidence and drawing reasonable inferences from the

14   totality of the record before the Court.  And so at this point

15   in time, I am prepared to adopt their naming of the defendant's

16   collective provision of misleading information to the Court.

17   They have engaged in knowing presentation of misleading

18   information.

19          That said, there are hopeful signs.  And before

20   turning to remedies, I want to acknowledge those.  Dr. Toche

21   presents as a hopeful sign for the future.  She has not just

22   arrived on the scene, but she has concrete plans.  Her presence

23   here in this courtroom demonstrated her ability to listen, to

24   hear what others are saying.  As I said, I have no doubt that

25   she is thinking about how to respond to Mr. Bien's question.

1    She is looking at structural issues.  And so I look forward to

2    hearing what her input may be on any proposal to revive the

3    change committee, the monthly prioritization committee and how

4    that dovetails with CLAC and mental health QM and receiver QM

5    and whatever else is out there; her description of the release

6    note process, formalizing what was going on through very

7    informal webinars; perhaps well-meaning webinars, but not

8    documented in any way that was transparent.  It sounds to me as

9    if there's a hopeful process there.

10         There is a new administration, and with any new

11    administration comes the chance to turn over a new leaf.  I

12    have acknowledged Ms. Evans' presence in the courtroom in the

13    past.  She is not a witness.  There was no need to have her as

14    a witness.

15         But Ms. Evans and her boss have an opportunity here, I

16    believe, to step into the breach and to take the lessons from

17    what has occurred and move forward in a way that really can

18    bring this case to a conclusion.

19         When I first inherited this case, I naively said I

20    thought we were on a glide path.  We have not been on a glide

21    path, and I'm not going to repeat that image, but I do hope

22    that in the lifetime of this judge as an active judge that this

23    case might come to conclusion.  And I don't rule that

24    possibility out, but it has to be because people have learned

25    the lessons from the mistakes and understand the reasons.

1        Another hopeful sign, that there is a renewed effort

2    to coordinate between the Special Master in Coleman and the

3    Receiver in PLATA with the judges at the table.  There has been

4    one meeting with some positive signs, and there will be more

5    such meetings and the Court will be thinking very deliberately

6    about how to structure coordination going forward.

7        I would caution that no one should rush into the

8    breach before this Court approves any new plan for improved

9    data collection analysis and reporting.  I've asked the Special

10   Master to work on that issue.  I'm going to ask him to speed up

11   his report back to me.  I had given him initially six months.

12   I believe our December status will occur before the six-month

13   period runs.  I want this issue on the agenda for our December

14   status.

15       If the PLATA receiver is the service provider, given

16   the past coordination and the creation of the data warehouse,

17   if that receiver is the service provider for data, it has to be

18   understood this Court and its Special Master are the client,

19   and the client is going to negotiate and make certain that the

20   Coleman class and its interests are served.  I, of course, will

21   look to the parties to weigh in on that.

22       Hopeful signs don't preclude the need for remedies.

23   The plaintiffs have identified a series of remedies.  It

24   appears to the Court that the parties agree on certification.

25   The Court has previously required certification.  I believe I

1    heard Mr. Silberfeld say the defendants are willing to certify.

2            I direct the parties to meet and confer on this

3    question and to present to the Court within 7 days a proposal

4    or their competing proposals for certification.

5            And I would ask -- in the past I've asked that the

6    defendant certify that they've read past orders.  I still

7    believe that's important because there's turnover.  It's a long

8    docket.  There should be a bible at this point of court orders

9    that are the law of the case that every person working on this

10   case should read.  And that's separate from the program guide,

11   which is the bible for remediation.  But to understand

12   remediation, as I signaled at the beginning, persons need to

13   understand the history of this case.

14           The parties can let me know what kind of

15   certification, if any, apart from what is expected of officers

16   of the court and public servants can convey to this Court that

17   the players appreciate the big picture and are not losing sight

18   of the real people behind this case and the reason for the

19   ordered injunctive relief and the reason remediation is being

20   required.

21           In terms of plaintiff's other proposed remedies, I'm

22   directing that they memorialize those in a brief.  It can be a

23   summary brief to be filed within 7 days.  Defendants shall

24   respond within 14 days with any opposition.  The parties are

25   free to meet and confer.  I am prepared to order remedies.  And

1    I'm willing to very seriously consider plaintiff's proposed

2    remedies because, fundamentally, plaintiffs are correct that

3    this is the time to effect a sea change, to make certain that

4    no court is back here again at any time in the future.

5          I will plan to issue a remedial order before December.

6    If I need to hear from the parties before I do that, I'll set a

7    special hearing.

8          The targeted remediation called for by these

9    proceedings will allow a long, delayed return to the big

10   picture and the proper focus, a laser focus on quality of care

11   for the patient population.  Nothing has prevented working on

12   that while these Golding proceedings have proceeded on a

13   parallel track.  It is the case that a focus on the quality of

14   care for the patient population is what will guide defendant's

15   true relief from court oversight.

16         And once again, in closing, I just want to put in

17   perspective how important it is to maintain the proper focus,

18   however it may be maintained.  This is the second time in less

19   than 10 years that defendants have embarked on a litigation

20   strategy that delayed and frustrated compliance with staffing

21   requirements.  It was 10 years ago that defendants themselves

22   submitted their 2009 staffing plan to this Court followed by a

23   budget change proposal to the California Legislature to

24   quote/unquote fully implement the staffing model described in

25   that plan.

1          The budget change proposal described the critical

2    flaws in defendant's prior staffing model and represented that

3    the 2009 staffing plan identifies appropriate staffing levels

4    to meet constitutional standards.

5          Still today, psychiatrist staffing vacancies hover at

6    the 30 percent mark.  The Court has heard many times the

7    explanation of supply and demand.  There's insufficient supply,

8    particularly given the location where psychiatrists must serve,

9    to meet the needs of the plaintiff class.  But these hearings

10   have provided additional explanations and contributors to the

11   challenge in identifying psychiatrists, I believe, including an

12   uninviting dysfunctional workplace that does not value the

13   essential treatment perspectives that psychiatrists have to

14   offer and creates an atmosphere where morale is low.  And so

15   where a change from 30 to 45 days might provide a modicum of

16   relief against that backdrop to solve that problem, here it was

17   misguided and a symptom of an approach marked by a quick,

18   really unthinking fix and applying a very tiny bandage to a

19   festering wound while the infection spreads throughout the

20   body.

21          So, for now, defendants must come to term with the

22   substance of the staffing plan, involve all key stakeholders in

23   working with the proper focus to satisfy it.  The Court

24   believes that is not a litigation focus.

25          And to continue to relitigate or to turn to data in an

1    effort to create reports, to provide metrics that make it look

2    as if the goal is being met, is, itself, a form of insanity.

3           If, after addressing the problems these hearings have

4    exposed, it really is the case the defendants honestly believe

5    that the staffing plan needs to be monitored, their staffing

6    plan, which the Court has adopted, the defendants have the

7    option, as they always have had, of approaching the Court,

8    seeking a modification, explaining in full what the problems

9    are.  Any such request would need to be properly justified,

10   honestly supported.  It could be, once again, supported by the

11   plaintiffs if they are able to regain their trust with proper

12   remedies following these proceedings.  Nothing would prevent

13   the defendants coming forward with a more transformational

14   option.  I realize it can be hard to think that way, but one

15   hint of a transformational option was put forth by Judge

16   Karlton in 2014, and the Court wants to read that into the

17   record once again.  "California is not alone in criminalizing

18   mental illness," he observed.  He was quoting a published

19   article, actually, from a newspaper, but he adopted the

20   perspective.  "We've systematically shut down all of the mental

21   health facilities, so the mentally ill have nowhere else to go.

22   The prison system has become the de~facto mental health

23   hospital."

24          The mental health population numbers have risen since

25   the time the Court has assumed responsibility for this case.

1      It is this Court's view, as Judge Karlton observed,

2   that many of the problems giving rise to this suit and the

3   ongoing efforts at remediation arise from the inevitable

4   tensions created by the distinct needs of custody supervision

5   and the distinct need for mental healthcare.

6      If there is a transformational and realistic

7   alternative to the prison as de~facto mental health hospital,

8   this Court is all ears.  At the same time, I'm not a dreamer.

9   And so in the meantime, it is the staffing plan in the context

10   of the program guide that charts the way forward and must be

11   put front and center.  Data must be fixed, and it must be fixed

12   so that it serves the policies set by this case, not the other

13   way around.  The policies must not be drained of meaning to fit

14   a square peg in a round hole.  And the data must be fixed with

15   the key stakeholders at the table.  It must be, as Dr. Toche

16   recognizes, checked and double checked.  The data must be

17   pulled together, gathered and collected in a form that allows

18   the defendants ultimately, when they truly can, accurately to

19   demonstrate to the Court that the Constitution is finally

20   satisfied.

21      Those are my observations today.  I will issue an

22   order memorializing them with greater explanation and record

23   support.  I will look for your filings as directed, and I will

24   see you in December, if not before.  Thank you very much.

25      THE CLERK:  Court is adjourned.

1     (Concluded at 3:12 p.m.)

2

3                    C E R T I F I C A T E

4

5        I certify that the foregoing is a true and correct

6    transcript of the record of proceedings in the above-entitled

7    matter.

8
     _/s/ JENNIFER L. COULTHARD_              October 30, 2019
9                                                 DATE

10

11   JENNIFER L. COULTHARD, RMR, CRR
     Official Court Reporter
12

13

14

15

16

17

18

19

20

21

22

23

24

25

attachment 62

for the California Department of Corrections and Rehabilitation (CDCR), sent a whistleblower

report to the *Plata*[5] Receiver. *Id.* at 54:23-55:6. The parties brought the report to this court's

attention on October 5, 2018, and it is that report that has led to the proceedings culminating in

this order. As the findings in this order make clear, and contrary to defendants' initial position --

maintained through the evidentiary hearing -- that no independent investigation of Dr. Golding's

allegations was necessary, those allegations in significant part justified the independent

investigation and factfinding the court has undertaken.

At this critical juncture, several key legal principles, articulated by the previously-

assigned judge in this action, bear repeating:

> 'Whatever rights one may lose at the prison gates, *cf. Jones v. North Carolina Prisoners' Union*, 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977) (prisoners have no right to unionize), . . . **Eighth amendment protections are not forfeited by one's prior acts.** Mechanical deference to the findings of state prison officials in the context of the eighth amendment would reduce that provision to a nullity in precisely the context where it is most necessary. **The ultimate duty of the federal court to order that conditions of state confinement be altered where necessary to eliminate cruel and unusual punishments is well established.'** *Spain v. Procunier*, 600 F.2d [189] at 193–94 [(9th Cir. 1979)] (emphasis added).

*Coleman v. Brown*, 28 F.Supp.3d 1068, 1077-78 (E.D.Cal. 2014) (emphasis included in 2014

order). The same judge said not so very long ago, in his 2013 order denying defendants' motion

to terminate this action, "[t]he Eighth Amendment violation in this action is defendants' 'severe

and unlawful mistreatment' of prisoners with 'serious mental disorders,' through 'grossly

inadequate provision of ... mental health care.'" *Coleman v. Brown*, 938 F.Supp.2d 955, 969

(E.D.Cal. 2013) (quoting *Brown v. Plata*, 563 U.S. at 500, 502)). Just two years before that

denial of termination, in its 2011 decision, the United States Supreme Court had observed that

"[f]or years the ... mental health care provided by California's prisons has fallen short of

minimum constitutional requirements and has failed to meet prisoners' basic health needs.

Needless suffering and death have been the well-documented result." *Brown v. Plata*, 563 U.S. at

501.

---

[5] *Plata v. Newsom*, Case No. C01-1351-JST (N.D.Cal.).

1    As the prior presiding judge also noted,

2    once an Eighth Amendment violation is found and injunctive relief
     ordered, the focus shifts to remediation of the serious deprivations
3    that formed the objective component of the identified Eighth
     Amendment violation. *See Coleman v. Brown*, 938 F.Supp.2d at 988.
4    Remediation can be accomplished by compliance with targeted
     orders for relief or by establishing that the 'violation has been
5    remedied in another way.' *Id.*

6    *Coleman v. Brown*, 28 F.Supp.3d at 1077.  Under no circumstances may remediation be

7    accomplished by end runs and hiding the ball to create a false picture for the court, as has

8    happened here.

9          Given the constitutional deprivations underlying this case, and the court's

10   monitoring by way of a Special Master, defendants' expenditure of so much time and effort to

11   create records designed to advance litigation as the primary way to achieve a complete remedy or

12   termination by other means is confounding.  This court's predecessor carefully constructed a

13   process supervised by a Special Master that was intended to moderate court intrusion into

14   defendants' own remedial efforts.  Such a process is arguably more respectful of defendants'

15   knowledge of their operations and their management prerogatives than a process whereby

16   oversight is transferred to a receivership; it also is more hopeful that defendants can best

17   determine how to meet their constitutional obligations to the seriously mentally ill inmates in

18   their custody.  At the same time, given the authority that here remains vested in defendants

19   themselves, the importance of defendants' transparent and accurate reporting is paramount:  the

20   court and the Special Master must be able to rely fully on defendants' representations.  As

21   explained in this order, the court has concluded the reliability of those representations at multiple

22   levels of the *Coleman* case structure is in serious doubt.  If the approach of monitoring by a

23   Special Master has contributed to play in the joints allowing for those misrepresentations, the

24   court may need to revisit that structure in future proceedings.  For now, that is a question for

25   another day.

26         Before detailing its findings and conclusions, the court sets forth in greater detail

27   the background leading up to the evidentiary proceedings, which are now concluded.

28

5

attachment 63

**Golding, Michael@CDCR**

| | |
|---|---|
| **From:** | Golding, Michael@CDCR <michael.golding@cdcr.ca.gov> |
| **Sent:** | Thursday, July 8, 2021 3:00 PM |
| **To:** | ▓▓▓▓▓▓@CDCR |
| **Cc:** | ▓▓▓▓▓@CDCR |
| **Subject:** | RE: Unfairness |

**CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

You too.
Thanks.
Michael

Michael Golding, MD
Statewide Chief Psychiatrist
California Department of Corrections

**From:** ▓▓▓▓▓▓▓▓@CDCR ▓▓▓▓▓▓▓▓@cdcr.ca.gov>
**Sent:** Thursday, July 8, 2021 2:58 PM
**To:** Golding, Michael@CDCR <Michael.Golding@cdcr.ca.gov>
**Cc:** ▓▓▓▓▓▓@CDCR ▓▓▓▓▓▓@cdcr.ca.gov>
**Subject:** Re: Unfairness

Hi Dr. Golding,

I have received your updated information with the corrected date via email today, July 8th.

We are still reviewing your Merit Issue Complaint and will review these documents as well.

Thank you and have a great day.



Get Outlook for iOS

**From:** Golding, Michael@CDCR <Michael.Golding@cdcr.ca.gov>
**Sent:** Thursday, July 8, 2021 7:46:47 AM
**To:** ▓▓▓▓▓▓▓▓@CDCR ▓▓▓▓▓▓▓▓@cdcr.ca.gov>
**Cc:** ▓▓▓▓▓▓@CDCR ▓▓▓▓▓▓@cdcr.ca.gov>
**Subject:** RE: Unfairness

Hi,
The email I sent yesterday contained the wrong date. It said April 2nd 2020 and it should have said April 2nd 2021.

I therefore send the letter again, with the corrected date. The letter is otherwise the same.

Thanks,
Michael

I wish to share with you an experience I had that was shared by several psychiatrists on April 2nd 2021, in which Dr. ████ made a decision about not hiring someone before the interview took place and indeed before the position was even posted. I believe the position has still not been posted. I think this may be relevant to your current deliberations.

During a discussion on April 2nd 2021, I believe at around 12:30 PM., Dr. ████ discussed that we would likely be able to convert all the institutional senior psychiatrist positions to chief psychiatrist positions if the institution did not already have an allocation for a chief. By doing that, the psychiatric leader of the institution would then become a chief and not a senior. ████████████, ████████████, ████████████, █████, and ████████████ were at the video conference, perhaps others.

Dr. ████ said that the current senior psychiatrists in the institutions would have to apply for the new chief positions at their institutions, when the senior positions were eliminated and converted to chief positions. He pointed out that there would be advantages to doing that because there are current senior psychiatrists who are currently in this position but who should not be the highest-ranking psychiatrist in the institution. They would lose their title as senior psychiatrist and would be forced to apply to be the chief to maintain their leadership role. If the senior were not chosen to be the chief, he or she could transfer to another open senior position elsewhere, under an existing Chief Psychiatrist.

Thus the transferring leader would no longer be the psychiatric leader of an institution. If the senior applied and others did also for the new chief positions, and yet no one was thought talented enough to be the psychiatric chief, then that position, he said, would stay open and the senior would have to transfer elsewhere. He seemed to be describing a way of orchestrating demotions, in addition to offering opportunities for senior psychiatrists to be chief psychiatrists.

Dr. ████ explained that there are two seniors who should not be able to retain their job (to which this new change would ideally "apply") when the new Chief Psychiatrist positions are posted, namely Dr. █████ and Dr. ████ But not being rehired as a Chief (when the senior positions are eliminated) would likely only be practically relevant (would "apply") for one psychiatrist, Dr. █████, but not Dr. █████. He said that Dr. ████ was well liked at his institution by the leadership, so would be able to maintain his job unless a better candidate also applied for the chief position. In other words, they would not leave the Chief Position vacant at Dr. ████████ institution if no one better applied.

But with ████████, they would leave the position open, if no one thought to be better than ████████ applied for the new Chief Psychiatrist position. Dr. ████ went so far to explain what ████████ could do to maintain his role as a █████ ████████; given personnel rules: he explained that he could choose to leave CTF and be a ████████████; at neighboring SVSP, but he would then work under the current Chief Psychiatrist. Thus he would no longer be the top psychiatrist in the institution. (That change would seem to be, in some relevant sense, a demotion.) And Dr. ████ said that he thought that it may even be unlikely that SVSP would allow ████████ to become a █████ there, because he is not well liked there, either.

Dr. ████ explained why ████████ would not get the new Chief Psychiatrist position at CTF. He said ████████, "writes too many letters" and "claims to be a whistleblower", but isn't. No doubt Dr. ████ has other reasons as well, but these were the stated ones. Dr. ████ explained that ████████ is not a whistleblower, though ████████ thinks he is, because the OSM knows about the things ████████ is reporting to the OSM, related to psychiatric staffing. Dr. ████ knows that the OSM already knows, Dr. ████ said, because HQ and the OSM had already discussed these issues in more detail than ████████ had done.

██████ is thought to be quite challenging, per Dr. ████, because (amongst other reasons) he has written letters to the OSM (and _____ ) and did not go through the proper chain of command to get his points across, before doing so. Dr. ████ explained that the OSM already knows about the issues ███████ raised. In terms of _____ , apparently _____ expressed that the issues should be dealt with at a lower level and Dr. ████, told us he agreed.

Dr. ████ specified in a letter to me something very similar. I needed to take a prescribed set of actions before being allowed to speak with the OSM.

Dr. ████ put in writing to me something similar in a letter of expectation, that I enclose:

**"The expectations** that I want to make clear from all of these points is that you raise and discuss these issues internally prior to sending letters to the OSM"

And,

" I would repeat that you are of course always welcome to communicate directly with the OSM. However, as your direct supervisor and the person who is currently responsible for the department's response to these issues, I must be included in that discussion in an effort to address the issues at the lowest level to ensure a timely response and that the correct information is brought up with the OSM."

Failing to do the above would be cause for further letters of expectation and thus (implicitly) discipline.

Dr. ████ thinking on this, by the way, directly contradicts what Judge Mueller said to me in open court. I was supposed to be able to freely speak with the OSM, because I had reported in court that I had not been allowed. The Special Master has told me (in front of Dr. ████), that his understanding (and thus implicitly his understanding of what the judge has ordered) is that I can have private conversations with him without notifying anyone. That is important, given the circumstances in the department in which intentionally misleading information (according to the judge) was submitted to her by CDCR and ultimately discovered because of my whistleblower complaint. Dr. ████ letter is a way of silencing communication with the OSM. When discussing critical patient care issues, privacy can't properly be maintained, whether communicating with the OSM or not.

Dr. ████ knows very well that physicians are always asked if they ever had previous disciplinary action on job applications.  And they are denied good jobs if they report even one instance. Implicit threats of further letters of expectation and then possible discipline are thus very effective ways of silencing physicians who may ultimately apply for higher level jobs.

Thus even though the OSM has made it clear that *I can speak with him privately and implicitly that this is the Judge's intent*, Dr. ████ has made it clear (in writing) that he won't allow it (while also claiming the opposite.) Furthermore, the OSM would have no reason to intervene should Dr. ████ follow through on his threats. CDCR claims that letters of expectation are a personnel matter and the Special Master does not intervene in personnel matters.

Thus Dr. ████ has felt free to violate the letter and spirit of Judge Mueller's statements and what the OSM said, as his letter of expectation makes clear. And thus in Orwellian fashion, Dr. ████ can say that I can freely speak with the OSM and also that I can't. This seems very similar to what he said about ███████ communication with the OSM – claiming that it was wrong for ███████ to contact the OSM because he did not work at the lowest level before contacting the Special Master.

Because ███████ did not properly or effectively communicate with CDCR representatives before speaking with the OSM, _____ apparently feels that it is appropriate to hold that against him when/if ███████ applies for the upcoming ███████████ posting at CTF.

In addition, I find it disturbing that Dr. ████ has determined that a candidate, before the interview ███████ ), will not be getting the job as ███████████ when in the future that job is posted. He even explained what ███████ would be

3

allowed to do in order that the decision to remove his ███████████████ position would be considered appropriate from a personnel point of view: ██████ would be able to be considered for a senior position at a neighboring institution, while working under another psychiatrist. This also seems like a similar conversation that I had with Dr. █████ concerning my own career: Dr. █████ told me that I could not get the Deputy Director position or the Assistant Deputy Director Position because the "wounds are too fresh" because of my own whistleblower report (quoting the high ranking executive Dr. ███ ), but (implicitly) I could stay the Chief Psychiatrist and then work under other future psychiatric leaders.

Concerning ████████, it is said that he "writes too many letters" and "claims to be a whistleblower". No doubt Dr. ██████ has other concerns as well. But this is an example of Dr. ██████ determining whether issues being raised are actually whistleblower issues. It is also an example of him making a hiring decision, in advance, before an interview takes place. And note that he made that determination, though he is not the hiring authority. Thus he knows that he can use his influence as ████████████ to make it so. And he said what was going to happen in front of multiple people.

Dr. █████ should not be able to claim that he does not make hiring decisions before interviews, because he told us what would be happening with ████████ and even described what would be done to offer ████████ an alternative as a ██████ ████████ at another institution, when he will be removed from his current senior position. And he said that in front of several people.

I write this to yOu now, because I suspect that this issue is relevant to your current investigation and also subsequent hiring decisions in which Dr. ██████ will have an influence.

Best,
Michael


Michael Golding, MD
Statewide Chief Psychiatrist
California Department of Corrections


Michael Golding, MD
Statewide Chief Psychiatrist
California Department of Corrections

**From:** Golding, Michael@CDCR
**Sent:** Tuesday, June 15, 2021 10:55 AM
**To:** ██████████████ @CDCR ██████████████ @cdcr.ca.gov>
**Cc:** █████████████ @CDCR ██████████████@cdcr.ca.gov>
**Subject:** RE: Unfairness

Thank you.
Appreciated.
Michael

Michael Golding, MD
Statewide Chief Psychiatrist
California Department of Corrections


**From:** ███████████████ @CDCR ██████████████ @cdcr.ca.gov>
**Sent:** Tuesday, June 15, 2021 9:14 AM

**To:** Golding, Michael@CDCR <Michael.Golding@cdcr.ca.gov>
**Cc:** ▓▓▓▓▓▓▓▓▓▓ @CDCR ▓▓▓▓▓▓▓▓▓s@cdcr.ca.gov>
**Subject:** RE: Unfairness

Good Morning Dr. Golding,

I apologize for the delay in getting back to you.  Please see attachment above.  We will have a completed response to you by August 9, 2021.  Thank you so much for your patience.

▓▓▓▓▓▓▓▓▓a
▓▓▓▓▓▓▓▓▓▓▓▓▓ r, Human Resources
Employment Services, Disability Management,
and Support Services

▓▓▓▓▓▓▓ Office
▓▓▓▓▓▓▓ Cell


HEALTH CARE SERVICES

CONFIDENTIALITY NOTICE: This communication and its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws, including the Electronic Communication Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of this communication.

**From:** Golding, Michael@CDCR <Michael.Golding@cdcr.ca.gov>
**Sent:** Monday, June 14, 2021 2:08 PM
**To:** B▓▓▓▓▓▓▓▓ @CDCR ▓▓▓▓▓▓▓▓ ▶cdcr.ca.gov>; ▓▓▓▓▓▓▓▓▓@CDCR <▓▓▓▓▓▓▓ a@cdcr.ca.gov>
**Subject:** RE: Unfairness

Hi,
Any updates?

Best,
Michael

Michael Golding, MD
Statewide Chief Psychiatrist
California Department of Corrections

**From:** Golding, Michael@CDCR
**Sent:** Thursday, June 3, 2021 1:41 PM
**To:** ▓▓▓▓▓▓▓ @CDCR ▓▓▓▓▓▓▓▓▓▓ ▶cdcr.ca.gov>; ▓▓▓▓▓▓▓▓▓@CDCR ▓▓▓▓▓▓▓▓▓ a@cdcr.ca.gov>
**Subject:** FW: Unfairness

Hi,
Has a determination been made?
Best,
Michael

Michael Golding, MD

Statewide Chief Psychiatrist
California Department of Corrections

**From:** Golding, Michael@CDCR
**Sent:** Wednesday, May 19, 2021 7:25 PM
**To:** ▮▮▮▮▮▮▮▮▮▮ @CDCR ▮▮▮▮▮▮▮▮▮▮ @cdcr.ca.gov>
**Subject:** Re: Unfairness

Thanks.
Michael

Sent from my iPhone

On May 19, 2021, at 1:28 PM, ▮▮▮▮▮▮▮▮▮▮ @CDCR ▮▮▮▮▮▮▮▮▮▮ @cdcr.ca.gov> wrote:

Good afternoon Dr. Golding,

As ▮▮▮▮ stated below, complaints involving CCHCS hiring practices are taken very seriously.  Executive Recruitment will be looking into your Merit Issue concerns regarding your ADD interview for Mental Health.

Thank you for your patience while we research the facts regarding the recruitment and interview for this position.

▮▮▮▮▮▮▮▮▮▮▮ a ▮▮▮▮▮ B
▮▮▮▮▮▮▮▮▮▮▮▮▮, Human Resources
Employment Services, Disability Management,
and Support Services

▮▮▮▮▮▮▮▮ 8 Office
▮▮▮▮▮▮▮ 6 Cell

<image002.jpg>

CONFIDENTIALITY NOTICE  This communication and its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws, including the Electronic Communication Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of this communication.

**From:** ▮▮▮▮▮▮▮▮▮▮ @CDCR ▮▮▮▮▮▮▮▮▮▮ s@cdcr.ca.gov>
**Sent:** Tuesday, May 18, 2021 1:20 PM
**To:** Golding, Michael@CDCR <Michael.Golding@cdcr.ca.gov>
**Cc:** ▮▮▮▮▮▮▮ /@CDCR ▮▮▮▮▮▮▮▮ h@cdcr.ca.gov>; ▮▮▮▮▮▮▮ @CDCR ▮▮▮▮▮▮▮▮ @cdcr.ca.gov>; ▮▮▮▮▮▮▮ @CDCR ▮▮▮▮▮▮▮▮ r@cdcr.ca.gov>; ▮▮▮▮▮▮ ▮▮▮ @CDCR ▮▮▮▮▮▮▮▮▮ @cdcr.ca.gov>
**Subject:** RE: Unfairness
**Importance:** High

Good afternoon Dr. Golding,

6

Human Resources (HR), California Correctional Health Care Services (CCHCS) is in receipt of your email regarding the Assistant Deputy Director position in Mental Health for which you applied and your concerns.

At CCHCS, complaints involving allegations of disparity or inconsistency with our hiring practices are taken very seriously. As such, HR will be looking into the facts regarding the recruitment for the Assistant Deputy Director position.

Since the Assistant Deputy Director position falls under Executive Recruitment for recruitment and hiring, I have included ██████ and ██████, who would be able to further assist with looking into your Merit Issue Concerns.

Thank you,

██████████████████████
Classification & Pay/Transactions & Benefit Services
Human Resources
California Correctional Health Care Services
████████████ Office
████████████ Fax
███████████cdcr.ca.gov

**<image003.jpg>**

CONFIDENTIALITY NOTICE: This communication and its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws, including the Electronic Communication Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of this communication.

**From:** Golding, Michael@CDCR <Michael.Golding@cdcr.ca.gov>
**Sent:** Wednesday, May 12, 2021 2:59 PM
**To:** ████████████ @CDCR ████████████s@cdcr.ca.gov>
**Subject:** FW: Unfairness

Hi,
Please see my email below concerning the Assistant Deputy Director position that I recently applied for.
Thanks,
Michael Golding, MD


Michael Golding, MD
Statewide Chief Psychiatrist
California Department of Corrections


**From:** ██████████ @CDCR ████████████@cdcr.ca.gov>
**Sent:** Tuesday, May 11, 2021 6:00 PM
**To:** Golding, Michael@CDCR <Michael.Golding@cdcr.ca.gov>
**Subject:** RE: Unfairness

Dr. Golding,

Thank you for your email. I am sorry to hear that you feel that your interview for the Assistant Deputy Director position was unfair. I am not part of the selection panel for this position, and it would therefore be improper for me to comment or opine on anyone's interview, including yours. You are free

to submit your concerns in the form of a merit issue complaint. If you wish to do so, please contact ██████████ , ████████████ , Classification & Pay/Transactions and Benefits Services for further information about the process.

████

████████
██████████ Health Care Services
#VaccinateALL58

**From:** Golding, Michael@CDCR <Michael.Golding@cdcr.ca.gov>
**Sent:** Monday, May 10, 2021 9:50 AM
**To:** ████████ @CDCR ████████████ @cdcr.ca.gov>
**Subject:** Unfairness

Hi Dr. ████,

Several events have happened that seem to be fundamentally unfair.

For example, the interview process for the Assistant Deputy Director position was clearly unfair. Just a simple example. There is no employee working for the department of mental health who has more fundamentally transformed the policies of the department for the good of our patients and for the entire system, particularly concerning psychiatric practice, than I have over the last few years. I have made a positive difference to the organizational structure, the policies underlying vast swaths of changes in our quality management measurements, our use of force policies, telepsychiatry and MAPIP policies, what should count as a mental health visit, how we should schedule, who should be consulted when there is policy change, the management structure of psychiatrists in the institution, how the proper role of various disciplines in mental health should be arranged, the role of psychiatry in the treatment team, the proper utilization of psychiatrists in emergencies, the development of consultation practices and policies (the PRN consultation), the development of the medication assisted treatment program for substance use disorders, what policies concerning Medical Assistants we should utilize, what counts as a consultation versus an evaluation, how we should we evaluate patients for ECT, what should be done with our most seriously ill patients, and even what our initial telepsychiatry policies should be like. And if the state were to allow us to collect the data that would enable problems to be highlighted and thereby solved, you could add to that list making the whole thing run much more efficiently, which ultimately would save money in addition to being better for patients and staff alike. ███████████ like ████████ and ████████ and the ████████ who heads the Department of State Hospitals (████████████ ) and many, many others are fully familiar with these and other significant transformations.

I do not mean to be immodest. But no other employee in the mental health department in recent years has come close to having helped to bring about the fundamental changes that I have with regard to psychiatric practice and even overall. And I did that in the context of a department and culture that was not at all sympathetic to making certain changes that ultimately a Federal Judge decided we had to do.

Yet during the interview for the position of Assistant Deputy Director, I was asked what policy I had written *on my own* in the last year, with something in the introduction to the question about why it is important to be able to write policy.

Dr. ████ knows very well my record of directing and influencing significant parts of the entire mental health set of policies, particularly as they relate to psychiatric practice. It is part of my job to direct those who work for me to write policies. It is not my job to write them entirely by myself because I work on so

8

many at a time. I can write policies on my own and have, when that was appropriate. When I owned a Critical Access Behavioral Health Care Contract Agency of the State of North Carolina, it was I personally, alone, who wrote, designed, and supervised implementation of all the policies and procedures needed to earn Joint Commission National Certification. But the question Dr. ▮▮▮ asked was what policy I had written completely on my own *in the last year.*

As a capable Chief Psychiatrist, I would not have written any specific policy completely on my own over the last year. That's because I directed those who worked for me to write aspects of them, while also substantially influencing the ideas involved. Obviously I highly valued the creative ideas of teammates and incorporated them. And naturally, other disciplines and our attorneys influenced the process and often changed what was written in ways that I liked or sometime thought was not idea.

Dr. ▮▮▮ question about policy was clearly designed to try to exclude me from mentioning accomplishments in directing and in supervising major swaths of policy development over years. Nothing about what broadly had been accomplished (using policy change) was asked in that question, *regardless if the intention of the question was to indirectly ask me whether policies are developed individually or as a team.*

In trying to make policy changes, I had often been working just to try to move the Department towards patterns of practice, not ones that I personally determined to be the right standard, but rather towards the bare minimum standard that the court often explicitly mandated that we meet in order to provide constitutionally adequate care. Given the fierce, sometimes overtly hostile and insulting responses that I've received over the years when trying to make these incremental changes (including yelling, screaming, cursing, and very frequently harsh and loud works in response to suggested policy change), being able to accomplish what has been done while maintaining civility and a sense of compassion was somehow deemed not relevant in a wording of a question about policy. That's but one example.

Worse, before I interviewed for the Deputy Director position, indeed before Dr. ▮▮▮ had accepted the position of ▮▮▮▮▮▮▮▮▮▮ , Dr. ▮▮▮ had clearly told me that he had been told that the Department had no intention of choosing me to be either the Deputy Director or the Assistant Deputy Director. He said that when Dr. ▮▮ had offered him the Acting Deputy Director Position, Dr. ▮▮ had told him (direct quote): "The wounds are too fresh" for me to be chosen, and that I am hated by the department. He said "What do you expect [given what you did]?!"

In other words, because I had met my duty of care as a Medical Doctor to point out that there were significant problems adversely affecting patient care in my report to the Receiver, and because Judge Mueller ultimately found that CDCR and been "intentionally misleading" to the Federal court, Dr. ▮▮ had told Dr. ▮▮▮ I was not eligible for a leadership position.

When I later asked Dr. ▮▮ why he had told Dr. ▮▮▮ that I was not eligible for the Deputy Directorship because he had told Dr. ▮▮▮ that "The wounds are too fresh", Dr. ▮▮ responded with a very long pause and then denied it.

Having told me that he had already been told that I would not be chosen for either position, Dr. ▮▮▮ asked me pointedly, "What are you going to do?", emphasizing his earlier statement that there was no chance the department would pick me.

The Department has a history of retaliation against whistleblowers and I am quite concerned about these issues and I am hoping you can help to resolve them expeditiously.

Thanks,

Michael Golding, MD

Michael Golding, MD
Statewide Chief Psychiatrist
California Department of Corrections

attachment 64



>> From: ▮▮▮ @CDCR ▮▮▮ @cdcr.ca.gov<mailto▮▮▮ @cdcr.ca.gov>>
>> Sent: Saturday, September 12, 2020 9:52 AM
>> To: ▮▮▮ CDCR ▮▮▮ @cdcr.ca.gov<mailto▮▮▮ @cdcr.ca.gov>>
>> Cc: ▮▮▮ CDCR ▮▮▮ @cdcr.ca.gov<mailt▮▮▮ @cdcr.ca.gov>>; ▮▮▮ @CDCR ▮▮▮ @cdcr.ca.gov<mailto▮▮▮ @cdcr.ca.gov>>
>> Subject: Re: MH at SQ
>>
>> Both options have been used historically for individual appts depending on the situation, and the various messages the schedulers received since go-live. The rescheduling option has been used less this year. Groups are in fixed/scheduled blocks so can't reschedule those.
>>
>> ▮▮▮, M.D.
>>
>> ▮▮▮
>>
>> San Quentin State Prison
>>
>> ▮▮▮
>> ▮▮▮ @cdcr.ca.gov<mailto▮▮▮ @cdcr.ca.gov>
>>
>>
>>
>> CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication immediately.
>>
>> On Sep 12, 2020, at 9:47 AM, ▮▮▮ @CDCR ▮▮▮ @cdcr.ca.gov▮▮▮ @cdcr.ca.gov>> wrote:
>> Thank you. Just confirming, do the staff all cancel and re-order? Or is there any just "re-scheduling" of the initial order?
>>


attachment 65

## Golding, Michael@CDCR

| | |
|---|---|
| **From:** | Golding, Michael@CDCR <michael.golding@cdcr.ca.gov> |
| **Sent:** | Tuesday, September 15, 2020 4:06 PM |
| **To:** | mlopes@pldolaw.com; rgribbin@pldolaw.com |
| **Cc:** | Metzner, Jeffrey; dpotter@alumni.brown.edu |
| **Subject:** | Data Disappearing Redux |

**CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

**CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Hi,

At the bottom of this email is a set of recent instructions from CHCF leadership to psychiatrists that has the effect of causing the psychiatry appointments to disappear, if the patient does not come for the appointment. Below that is a communication from the ▮▮▮▮▮▮▮▮▮▮ at San Quentin three days ago, last Saturday (9/12/20), demonstrating that the procedures that cause disappearing appointments have been utilized at SQ off and on for years, even though SQ is one of our flagship institutions.

This process has the effect of making CDCR look efficient in dashboard measurements and makes the psychiatrist look like he or she is lazy because he or she is not scheduling many appointments. We have been told many times that psychiatrists are doing very little work, as opposed to patients not coming or being brought to appointments and psychiatrists having to find them.

The psychiatry team has been aware of this problem for several years and brought it to the attention of the court, but CDCR denied that the problem of disappearing appointments occurred and/or that it was relevant. This issue has been on-going since the new ERHS was implemented.

CDCR leadership has been repeatedly told that this is a problem. I am raising it, now, in this forum. It is not clear to me that the court knew and/or the OSM knew that CDCR did not seem to be telling the truth about this during hearings in which this phenomena was discussed and in relevant court documents. This may be why Dr. Potter (the OSM's data expert) has not, to the best of my knowledge, seemed to have mentioned this issue in discussions about certifying CDCR's data.

Yet here are instructions for making it occur, in black and white, from CHCF. All you have to do is follow the instructions and the appointments will disappear, because it says *not to* "check....out or cancel....the appointments if the patient cannot be found." Appointments not checked out are programmed not to count as having been scheduled, though they were. See the full set of instructions at the end of this message, including comments from Dr. ▮▮▮▮ (the SQ ▮▮▮▮▮▮▮▮▮▮) describing that this phenomena occurred on and off since the new EHRS was created.

From CHCF:

❖ **DO NOT:**

Check in or out or cancel the appointments if the patient cannot be found.

Doing the above will have the effect in our counting metrics of making a greater percentage of patients be counted as being seen as scheduled, and cause it to appear that our psychiatrist's schedule very few patients per day, because the scheduled appointments are eliminated when they don't happen. This is so because the EHRS is designed so that when someone does not close a scheduled appointment (whether it is initially opened or not), the subsequent appointment at a later time in the day or even at a later day is the one that is then counted: And the previous appointment is effectively eliminated from being counted.

I have previously pointed out the highly unusual way that "seen as scheduled" is defined, so that perhaps in only 50% of no-show situations is an appointment recorded as not seen as scheduled. But worse, even when the CDCR definition of a no-show appointment would cause an appointment to be counted as not occurring as scheduled, the "disappearing appointment" phenomena has the effect of actually *eliminating all scheduled appointments* from being counted as not seen as scheduled, when the appointment does not occur.  As stated above, this occurs because the EHRS is programmed so that this occurs.

I think it would be easy to blame personnel at CHCF for not doing things correctly, but that would be a mistake in my view. I don't think anyone intentionally did anything wrong at CHCF. Throughout the state prison system we have found that this phenomena commonly occurs. This case is an example of an EHRS system that was designed to work with people's inclinations, to create falsely elevated reports of compliance. Like many other examples that Dr. ▓▓▓▓▓ and I reported to the court, *the less the psychiatrist does, the more compliant CDCR looks*. In this case, it is much easier *not to close* a patient encounter in the EHRS when the patient is a no-show for the appointment, when he or she refuses, or **"cannot be found"**. And it is also less work not to have to reschedule the patient in those circumstances.

Please note the assumption in the instruction. It is clearly a common experience for the psychiatrist not to be able to find the patient, since that is a default condition in instructions for what to do if a patient happens not to come to the appointment. In other words, they appear to be saying that a major reason that a patient does not come to appointments at CHCF is the patient "cannot be found".  Psychiatrists routinely search. And yet there is no record of an appointment not occurring, let alone a psychiatrist trying and failing to find the patient when the patient does not come.

Note also that the quoted instructions at the bottom of this email say that   "Refusals in person" should also "not be checked in or out". And the same is presumably true for cancellations. Thus, these very intuitive instructions would, if fully utilized, eliminate most or even all appointments that don't occur from in any way counting as not occurring. The appointments are "disappeared".

Note, there do not need to be memos instructing people to do the wrong thing, although we just found this set of instructions. It just seems much easier for psychiatrists to not close out appointments and reschedule them, when

1. so many of their patients don't come, and
2. one can just see them later or the next day, and
3. the EHRS seems fine with that, with no prompts or warning or anything of the kind, and
4. it's not obvious to the psychiatrist that the originally scheduled appointment will somehow be lost when they do things that way.

Our psychiatrists are human. So education about what is required in this EHRS goes against the grain, since the straightforward approach works efficiently with the EHRS, enables documentation of notes, and seems to work well: but it creates the wrong result, CDCR's denials notwithstanding.

All of the data about the number of appointments not occurring in CDCR, as reported on the Dashboard, is therefore suspect. Therefore data about the workload of psychiatrists (or psychologists) is not accurate. We can't know the extent of this problem until someone measures the extent of this inefficiency and also the effect of this on psychiatric productivity. No one knows how much time is wasted when many appointments that are scheduled don't occur. No one know how much time is wasted by psychiatrists trying to find patients who don't show up. We just don't measure it.

Our psychiatry team has put out a memo previously to try to fix things. We have done education when we do the EHRS trainings and have two videos which we show to try to teach psychiatrists how to check in and out patients. And we are now going to do a new training. But the natural thing for psychiatrists to do is to drift away from these instructions over time when new psychiatrists enter the system and training gets old. In many situations, the EHRS works best and easiest with the psychiatrist's workflow when the psychiatrist is doing those things that precisely (falsely) increase CDCR's compliance.

I don't know whether this example or many others contributed to Judge Mueller saying that CDCR was being intentionally misleading in its reporting of data.

Given that precisely this type of data will be certified by the OSM and in addition that CDCR essentially denied that this phenomena occurred or was relevant in court, if Dr. Potter is not clearly made aware that this data reported in our record is inaccurate, he may come to the wrong conclusion. In addition, perhaps he may wish to talk with the psychiatry team about these issues and other data related issues that we suspect are relevant to certifying the data.

I can understand wanting to trust what CDCR said in court about this issue and others, but there is a history here.

Finally, I can't fathom attempts to eliminate psychiatric staffing without first making some demonstration that adequate care is being provided. One wonders whether it is really an accident that we cannot get the figures of the appointments *not occurring* after an appointment is made. Surely that inefficiency is relevant in determining how many psychiatrists are needed. We need more psychiatrists than otherwise anticipated when we cannot get a sizeable percentage of our patients to appointments and the data very likely would show that, because we have looked at issues like that before.

Please see the below.

It is the exact instructions given to the CHCF psychiatrists that cause the appointments to disappear. Below that email are comments from ▓▓▓▓▓▓▓▓▓ , ▓▓▓▓▓▓▓▓▓▓▓ t at SQ, in response to questions from Dr. ▓▓▓▓ . He too says that this phenomena has been happening, even at SQ, off and on for several years (since EHRS Go-Live).

**From CHCF**

"Refusals

❖ Patient shows up:
   Check in & out during the appointment.

3

If the Psychiatrist lays eyes on the patient and has a dialogue, then check in and out and chart your notes.

❖ Refusal in person:

If the Psychiatrist does not lay eyes on the patient or have a dialogue, the MA will have the refusal form signed, the appointment will not be checked in or out. The appointment will be rescheduled by the scheduler within 7 days.

❖ No Show:

If the patient does not come to the appointment and cannot be found the appointment will be rescheduled within 7 days.

❖ DO NOT:

Check in or out or cancel the appointments if the patient cannot be found.

After (2) appointments have been rescheduled the patient has to be tracked down ie; call the unit the day before and let the officer know the patient has an appointment the next day.

If 3 appointments are missed IDTT will be scheduled to discuss reasons for refusals with the inmates. Transfer to an onsite psychiatrist may be considered if there is a clinical reason for refusal."

The below are emails from last Saturday between the ▓PII PII PII PII PII▓ of San Quentin (Dr. ▓PII PII PII▓) and our ▓PII PII PII▓ r (Dr. ▓PII PII PII PII▓), also documenting the phenomena of disappearing appointments at SQ.

September 12, 2020

"Thank you. Just confirming, do the staff all cancel and re-order? Or is there any just "re-scheduling" of the initial order?"



"Both options have been used historically for individual appts depending on the situation, and the various messages the schedulers received since go-live."[Note that cancelling and rescheduling will lead to appointments that are not counted when they don't occur. They disappear. MG].



Best,

Michael

4

attachment 66

1   that he does not know whether the descriptor has been corrected since he left CDCR headquarters

2   at the end of July 2019, *id*. at 207:13-19, is troubling.

3              Moreover, defendants are not correct in believing that missed appointments are not

4   relevant to patient care. Dr. Kuich's deposition testimony is very instructive as to why properly

5   tracking missed appointments is relevant. Such tracking contributes to qualitative analysis,

6   including identification of trends and patterns at local institutions that is not available otherwise,

7   absent a very detailed manual tracking. The court credits Dr. Toche's testimony concerning

8   remedial measures to be explored, which sounds promising assuming there is transparency and

9   full communication with the Special Master and the court going forward. The court will address

10  this issue further, as appropriate in its forthcoming remedial order.

11             Finally, one of the specific questions posed in the court's August 14, 2019 order

12  with respect to this issue is how the Appointments Seen As Scheduled indicator was developed

13  incorrectly and in the absence of consultation with Dr. Golding or other quality control measures,

14  and what steps defendants plan to take to ensure indicators and definitions are developed with

15  appropriate consultation and quality control in the future. The answer is found largely in one of

16  the most significant issues surfaced through the hearing: the extent to which court-ordered

17  coordination between this action and the *Plata* action, as well as defendants' obligation to work

18  with the Special Master in this case, appear to have gone off track. As the discussion in Section

19  IV(C)(2) demonstrates, the boundaries between *Plata* and *Coleman* appear to have blurred in key

20  respects. A return to robust and transparent coordination between the efforts in this action to

21  remediate constitutionally inadequate mental health care and the efforts in *Plata* to remedy

22  constitutionally inadequate medical care must be a key focus and priority going forward.

23                          c.  Supervisors Acting As Line Staff

24                              i.      Background

25             In 2009, the court ordered defendants to "take all steps necessary to resolve all

26  outstanding [mental health] staffing allocation issues" and "[t]o that end, . . . complete a staffing

27  plan by the end of August 2009." ECF No. 3613 at 2. After receiving an extension of time,

28  defendants filed the required plan on September 30, 2009. ECF No. 3693. Defendants' 2009

attachment 67

## Golding, Michael@CDCR

| | |
|---|---|
| **From:** | Golding, Michael@CDCR <michael.golding@cdcr.ca.gov> |
| **Sent:** | Tuesday, August 4, 2020 10:11 AM |
| **To:** | PIIPIIPIIPII @CDCR |
| **Cc:** | PIIPIIPIIPIIPIIPII @CDCR; PIIPIIPIIPII @CDCR; PIIPIIPIIPII, PIIPII @CDCR; PIIPIIPIIPII i@CDCR; PIIPIIPIIPIIPIIPII @CDCR |
| **Subject:** | FW: Internal, small group staffing discussion |
| **Attachments:** | Staffing Updates 8.3.2020 draft.docx |

---

**CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Hi,

I know you have been very busy and all of this is quite complicated.

You say that this documentation that is attached is a recommendation to Dr. PII

"It is a recommendation from us to him."

The document says this as the title of section ii:

"Including Psychiatric Nurse Practitioners in the Fill Rate"

And below that it says:

"This document proposes that the current fill rate calculation be changed to count PNP's [psychiatric nurse practitioners, MG] as filled psychiatry positions."

You say that psychiatric nurse practitioners should count as 1:1 replacements for psychiatrists, but that we should supervise them carefully and no doubt create other restrictions in policy.

You say in your notes justifying your decision:

"we cannot show a single healthcare system that does not count them, even ones similar to prison."

Maybe there's just a little bit of (unintentional) equivocation in how you are using the word "count".

The way the word "count" is being used as applied to NP's in the document you submitted, and what is at issue here, is whether NP's should count as one-to-one replacements for psychiatrists as constitutionally adequate providers of psychiatric medical diagnosis and care to our inmate/patients, not whether they can count as being helpful as part of a physician-led team. That they should count as constitutionally adequate providers of psychiatric medical care to our patients in prison has in no way been decided by the Federal court or nationally.

But in the document you sent to Dr. PII , you said you agreed (given a lot of considerations) that NP's should count as 1:1 replacements of psychiatrists in terms of meeting constitutional mandates for providing minimally adequate care:

"This document proposes that the current fill rate calculation be changed to count PNP's as filled psychiatry positions."

Almost all of our psychiatrists and almost all of our leadership psychiatrists do not agree that they are 1:1 substitutes for psychiatrists, even given the caveats you mention. It is bad for patient care.

What's more, I'm not sure, given all the considerations you mention, that you yourself agree with that, either?!

For example you say:

"To the extent the plaintiffs and the OSM can fight this battle for us, let them, & we wish them good luck. I would carefully consider the effects of blowing up this and *future negotiations* [emphasis mine, MG] over this. We will be working on many more policies together, and the results of the *process* for this one can have a lasting impact on the next ones."

It seems like you are saying that we can't recommend what we actually think is needed to protect our patients, because if we do, that will have a lasting impact on future negotiations. Who is making this threat (if anyone)? And why is it *we* whom you deem to be blowing this up as you put it, as opposed to our leaders who need us to say we agree when we actually don't? What is the point of making recommendations we actually do not recommend?

Best,
Michael


**From:** ███████ ▸@CDCR ███████ @cdcr.ca.gov>
**Sent:** Monday, August 3, 2020 9:47 PM
**To:** Golding, Michael@CDCR <Michael.Golding@cdcr.ca.gov>; ███████ ▸@CDCR ███████ @cdcr.ca.gov>; ███████ ▸@CDCR ███████ ▸@cdcr.ca.gov>; ███████ ▸@CDCR ███████ ▸@cdcr.ca.gov>; ███████ ▸@CDCR ███████ ▸@cdcr.ca.gov>; ███████ ▸CDCR ███████ ▸@cdcr.ca.gov>
**Cc:** ███████ ▸@CDCR ███████ @cdcr.ca.gov>
**Subject:** RE: Internal, small group staffing discussion

Ok, here's the document. Notes:

1) Telepsych section: made some minor edits with ██ nothing too controversial.
2) Psychiatry "recruiter": after some debate we decided to say that for now, we could work to standardize our recruitment process across regions, potentially utilizing our regional psychiatrists as exemplary models of our psychiatrists. I think this is reasonable. (Otherwise, where would the position come from? Converted from linestaff? We'd be paying them the full salary to just recruit? We're thinking about getting rid of █████ ██████... it'd still be a lot of work, but selling that idea would be a lot of work too.)
3) CIT positions: we removed the whole issue about whether to count them or not and whether it would be to our advantage because we could fill or not; we just recommended re-directing them to "night shift" for improved quality of care, and quality of life.
4) CCCMS reductions: we changed "0-12" to "estimated to be about 10 positions." I understand, ██████ your position on any reduction. I don't think this locks us in, but if we are making the argument it will be more than 0 after data analysis, we want to say something concrete here even if we have to correct it a bit in the future.
5) PNPs: stripped this whole section down quite a lot; it was overly repetitive and redundant. Changed 2 per institution to 2 per supervisor; that made more logical sense, and for most institutions it doesn't functionally matter much. NOTE: Ultimately removed the line about "HQ psychiatry believes..."
   a. **Reported rationale:** Dr ██ is happy that we all participated in this process and honestly have changed nearly every word from the original policy (check the redlined version). However, this document is noted not to be a "negotiation." It is a recommendation from us to him, given our expertise. It can't always contain every single thing we want, given the realities of the system and the world we live in.

    b. **My personal 2 cents**: I will do what the group decides. But I would note that we got a lot in to this policy. I understand the larger context of the PNP issue, but we cannot show a single healthcare system that does not count them, even ones similar to prison. There are larger issues about personnel/hiring/human resources/reality/etc. that have to be taken into account. To the extent that the plaintiffs and OSM can fight this battle for us, let them, & we wish them good luck. I would carefully consider the effects of blowing up this and future negotiations over this. We will be working on many more policies together, and the results of the *process* for this one can have a lasting impact on the next ones.

    c. **Nevertheless**: if you disagree with this, that is everyone's prerogative (I genuinely mean that without malice). If you feel that you would like to voice your opinion separately, do so. We can send that to <span style="background:red;color:red">PII</span>, or whatever else you think is appropriate to do with your words. And if you want me to do something differently, I will listen, let's talk.

6) <u>Supervisors</u>: we could not complete this topic tonight. It has been a long day. I am going home, so I can immediately turn around and come back in a few hours.

I will be sending out this same document as a draft to the larger group; the only difference is that I will be deleting some of the comments, which I left in the attached version so you could see where some of the changes occurred.



-----Original Appointment-----
**From:** <span style="background:red;color:red">PIIPIIPIIPII</span>r@CDCR
**Sent:** Tuesday, July 28, 2020 10:01 AM
**To:** <span style="background:red;color:red">PIIPIIPIIPII</span>r@CDCR; Golding, Michael@CDCR; <span style="background:red;color:red">PIIPIIPIIPIIPII</span>e@CDCR; <span style="background:red;color:red">PIIPIIPIIPIIPII</span>t@CDCR; <span style="background:red;color:red">PIIPIIPIIPII</span><span style="background:red;color:red">PIIPII</span>y@CDCR; <span style="background:red;color:red">PIIPIIPIIPII</span>i@CDCR; <span style="background:red;color:red">PIIPIIPIIPIIPII</span>h@CDCR
**Cc:** <span style="background:red;color:red">PIIPIIPII</span>a@CDCR
**Subject:** Internal, small group staffing discussion
**When:** Friday, July 31, 2020 3:00 PM-4:00 PM (UTC-08:00) Pacific Time (US & Canada).
**Where:** WebEx

**Join by clicking this link:**
https://cchcs.webex.com/meet<span style="background:red;color:red">PIIPIIPIIPII</span>

**Join by video system**

Dial <span style="background:red;color:red">PIIPIIPIIPII</span>a@cchcs.webex.com
Or you can dial 173.243.2.68 and enter your meeting number <span style="background:red;color:red">PIIPIIPIIPIIPII</span>).

**Join by phone**

+1-213-306-3065 United States Toll (Los Angeles)
+1-415-655-0003 United States Toll
Access code: <span style="background:red;color:red">PIIPIIPIIPIIPII</span>

attachment 68

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, et al., | No. 2:90-cv-0520 KJM DB P |
| Plaintiffs, | |
| v. | ORDER |
| EDMUND G. BROWN, JR., et al., | |
| Defendants. | |

This court filed an order on October 10, 2017, directing the California Department of Corrections and Rehabilitation (CDCR) to, within one year, "take all steps necessary to come into complete compliance with the staffing ratios in their 2009 Staffing Plan and the maximum ten percent vacancy rate required by the court's June 13, 2002 order." October 10, 2017 Order, ECF No. 5711, at 30. Defendants did not timely comply with the October 10, 2017 order and they remain out of compliance. *See* Defs.' Monthly Psychiatry Vacancy Report for Sept. 2020, ECF No. 6929, at 5. The court has delayed enforcement proceedings for two separate reasons, as explained further below. Initially, it did so in light of the whistleblower report made by CDCR Chief Psychiatrist Dr. Michael Golding in October 2018, which led the court to issue a ruling in December 2019. More recently, the court has taken time since the onset of the novel coronavirus

1

(COVID-19) pandemic in the first quarter of this year to consider the pandemic's impacts on the *Coleman* class and Program Guide compliance generally.

COVID-19 persists and has not been suppressed, with ongoing effects on all aspects of delivery of mental health care to class members. But the legitimate need for effective management of the pandemic in the prison system co-exists with defendants' Eighth Amendment obligation to employ a sufficient number of competent mental health staff to identify and provide individualized treatment to members of the plaintiff class. *See Coleman v. Wilson*, 912 F. Supp. 1282, 1305 (E.D.Cal. 1993). The COVID-19 pandemic did not excuse defendant's initial noncompliance, nor does it fully excuse defendants' ongoing noncompliance with the October 10, 2017 order; it also does not provide a basis for a permanent exemption from compliance. Indeed, plaintiffs have filed evidence suggesting that seriously mentally ill prison inmates are at increased risk for contracting COVID-19 and for adverse outcomes from the virus and that the change in conditions of confinement associated with management of the pandemic may exacerbate mental illness. *See* Plaintiffs' Brief Re: Evidence Supporting Serious Mental Illness As Risk Factor for COVID-19 and Need for Additional Mental Health Interventions, ECF No. 6751; Bien Decl., ECF No. 6752, and exhibits attached thereto. Most recently, in the face of the court's providing notice of its plans to refocus on enforcement of its 2017 staffing order by the end of this year, defendants have signaled their desire to begin anew with a clean slate and propose a replacement staffing plan for presumably extended discussion in a workgroup setting. *See* ECF No. 6853 at, *e.g.*, 28[1] (defendants' request, among other things, for court-ordered "time and motion study to determine appropriate staffing ratios"). Plaintiffs meanwhile appear to believe the court can proceed directly to the same kind of enforcement proceedings it had planned in October 2018. *See* ECF No. 6854 at, *e.g.*, 25-30.

/////

/////

---

[1] References to page numbers in documents filed in this action are to the page number assigned by the Court's Electronic Case Filing (ECF) system, located in the upper right hand corner of the page.

1   　　　The court has carefully considered the parties' positions, and reviewed the record

2   as a whole as it relates to the Staffing Plan.  While the court continues to believe the time has

3   come to refocus on enforcement if needed, the current record supports the need for a few modest

4   revisions to the Staffing Plan, which can be made efficiently and soon without lengthy detours.

5   This order directs the preparation of those revisions by the time of the fourth quarterly status

6   conference for this year, so the court can turn its full attention to compliance with the October 10,

7   2017 order and enforcement as needed by the first quarterly status conference in 2021.

8   　　　I.　　BACKGROUND

9   　　　In the year that followed issuance of the October 10, 2017 order, the court issued

10  numerous orders in an effort to facilitate defendants' compliance without the necessity of

11  enforcement proceedings.  *See, e.g.*, Feb. 15, 2018 Order, ECF No. 5786, *passim*; Feb. 21, 2018

12  Order, ECF No. 5794, at 2-4; July 3, 2018 Order, ECF No. 5850, *passim*; Sept. 20, 2018 Order,

13  ECF No. 5928, *passim*.

14  　　　A.  Golding Report

15  　　　On October 5, 2018, five days before the deadline for defendants to come into

16  compliance with the October 10, 2017 order, the court received notice from both parties of a

17  whistleblower report on staffing issues prepared by CDCR's Chief Psychiatrist, Dr. Michael

18  Golding.  ECF Nos. 5936, 5938.  Given the serious nature of Dr. Golding's allegations, the court

19  appointed a neutral expert "to assist the court in investigating allegations raised in the verified

20  report" of Dr. Golding (Golding Report), ECF No. 5988, "to determine whether defendants have

21  committed any fraud on the court or the Special Master or have intentionally provided false or

22  misleading information to the court or the Special Master," Dec. 14, 2018 Order, ECF No. 6033,

23  at 1-2.  The court received notice of a second whistleblower report dated October 24, 2018, by

24  Dr. Melanie Gonzalez, *see, e.g.*, Nov. 7, 2018 Order, ECF No. 5999, and the court ultimately

25  received that report into evidence during the evidentiary hearing it held in October 2019.

26  *See* ECF No. 6359.

27  /////

28  /////

The court received the Neutral Expert Report on April 22, 2019; the court shared the report with the parties and counsel for Drs. Golding and Gonzalez, and filed it without objection on the docket on May 3, 2019. ECF Nos. 6146, 6147. The court subsequently identified specific issues it needed to resolve, and set and held the October 2019 evidentiary hearing on those issues. *See* June 14, 2019 Order, ECF No. 6187, at 2; Dec. 17, 2019 Order, ECF No. 6427, at 1. The court's findings and conclusions from that hearing are set out in a forty-nine page order filed December 17, 2019. ECF No. 6427. Those findings and conclusions are incorporated in full in this order. Since the court issued its order, defendants have attested to their commitment to provide full and transparent access to all relevant data to the Special Master and to plaintiffs, *see* Toche Decl., ECF No. 6457-1, the court has authorized the Special Master to appoint a data expert, *see* April 29, 2020 Order, ECF No. 6646, and at the December 18, 2020 status conference the court will set a firm schedule for completion of all necessary data and quality assurance remediation work. ECF No. 6847. As defendants move forward with the staffing plan adjustments called for by this order, the court expects defendants will be fully transparent with all key stakeholders, including but not limited to CDCR psychiatrists, and will continue to take all steps necessary to avoid the errors that required the court's intervention to correct. *See* ECF No. 6427 at, *e.g.*, 41-43 (discussing defendants' marginalization of and failure to consult with psychiatrists in staffing planning).

B. COVID-19

As noted above, in light of the onset of the COVID-19 pandemic the court also deferred completion of the staffing remedy and acknowledged certain temporary variances from the well-established requirements of the Program Guide. July 28, 2020 Order, ECF No. 6791, at 3. But as defendants' management of the COVID-19 pandemic in the prison system moved from the initial emergency stage to development and implementation of ongoing management strategies consistent with public health requirements, the court issued a series of orders designed ultimately to refocus attention on compliance with the October 10, 2017 order, among other considerations.

4

On July 2, 2020, the court issued an order inviting briefing on "issues that . . . may frame the court's consideration of how best to resume Program Guide enforcement, including but not limited to enforcement of its orders regarding compliance with defendants' 2009 staffing plan, under the circumstances the state's prisons are facing with the extremely troubling advance of the COVID-19 pandemic." July 2 Order, ECF No. 6750, at 1. The parties filed responses on July 15, 2020. *See* ECF Nos. 6766-6770.

On July 30, 2020, the court issued a further order directing the parties to brief, *inter alia*, the size of the mentally ill population that can be served by defendants' current complement of mental health staff, which has remained below required levels, and whether defendants would voluntarily undertake to develop a plan to adjust the mentally ill population to match those levels. July 30, 2020 Order, ECF No. 6794, at 8. The court also directed briefing on additional remedies, if any, available to the court to enforce the October 10, 2017 order. *Id*. The parties filed responses on September 14, 2020. *See* ECF Nos. 6852-6858.

On September 21, 2020, the court issued an order setting October 1, 2020 as the start of the eighteen-month provisional period for monitoring telepsychiatry policy provisions the court previously had approved on March 27, 2020. Sept. 21, 2020 Order, ECF No. 6874, at 2, 6.

On September 25, 2020, following defense counsel's representation at a court hearing on September 24, 2020, that "defendants could use the number of mental health positions actually filled . . . to determine the size of the mental health population that could be served under the ratios required by the 2009 Staffing Plan," the court directed defendants to file a report "prepared under the Special Master's supervision, that describes with specificity and including charts as necessary the number of class members at each level of the Mental Health Care Delivery System (MHSDS) that can be served by the current filled mental health staffing positions using the positions and the ratios set out in the 2009 Staffing Plan, including telepsychiatrists as authorized under the provisionally approved telepsychiatry policy, as well as regular contractors and allowing for a ten percent vacancy rate." Sept. 25, 2020 Order, ECF No. 6886, at 1-2. Defendants filed a response to this order on October 2, 2020. *See* ECF No. 6896.

/////

5

II.    DISCUSSION

The court has reviewed the briefing and evidence filed by the parties in response to the July 2, 2020, July 30, 2020, and September 25, 2020 orders and also has consulted with the Special Master.  Based on this review the court reaches the following conclusions.

First, the record supports a finding that some discrete adjustments to the 2009 Staffing Plan may be appropriate before the court moves finally to full enforcement of the October 10, 2017 order.  The evidence tendered by defendants does not support the broad assertion in their brief that the 2009 Staffing Plan is "outdated and substantially flawed." ECF No. 6853 at 32.  At the same time, defendants' filing points to certain revisions that may well warrant consideration, by attaching a letter dated September 8, 2020 from Melissa Bentz, Esq., to Special Master Lopes and plaintiffs' counsel.  Bentz Letter, Attach. A to Bick Decl., ECF No. 6855, at 9-16 (hereafter Bentz Letter).  The Bentz Letter identifies several concrete proposals for modifications to the Staffing Plan including (1) review of the assumptions underlying frequency of psychiatric contacts for Correctional Clinical Case Management System (CCCMS) and EOP patients that inform the psychiatrist staffing ratios for these distinct levels of care and potential adjustment of those ratios based on the review; (2) review of psychiatrist ratios for the CCCMS caseload and relevant data in light of the fact that the existing ratios are based on psychiatrist contact with every CCCMS patient a minimum of once every ninety days, exceeding the Program Guide requirement that applies this minimum review period only to CCCMS patients on psychiatric medication; (3) redirecting psychiatry positions designated for crisis intervention on weekend and holidays to on-call telepsychiatry positions; (4) including psychiatric nurse practitioners (PNPs) in the psychiatrist fill rate; and (5) calculating staffing ratios based on actual numbers of patients, rather than numbers of inpatient beds.  *See* Bentz Letter at 13-15.

The Special Master advises the court that the proposals in the Bentz Letter are substantially similar to proposals the parties discussed in 2018; as they are not new ideas, to the extent they represent positions the parties and the Special Master agree on they should be readily susceptible to finalization in the near term; to the extent the parties do not agree they should be able to articulate their positions without prolonged study and deliberation.  Accordingly,

6

1    defendants will be directed to propose modifications to the Staffing Plan in accordance with the

2    foregoing provisions of the Bentz Letter, to work with the Special Master and the COVID-19

3    Task Force (hereafter Task Force) to achieve consensus on the proposed modifications to the

4    extent possible, and to file a proposed revised Staffing Plan on or before December 11, 2020.

5    Plaintiffs may then file their response to the proposed revisions, if any, on or before December

6    15, 2020.  The court will direct the Special Master to report orally to the court on the status of the

7    defendants' provision of proposed modifications and Task Force discussions.  If by December 3,

8    2020, it appears to the court that defendants are not on track to file a proposed revised staffing

9    plan by December 11, 2020, the court reserves the right at that point to direct the Special Master

10   to file a proposed revised plan for the court's consideration subject to the parties' formal

11   comments and objections, if any.

12           Second, and relatedly, as the court has recognized "there is basic agreement among

13   the parties that PNPs have a role to play, albeit one requiring careful clarification, in the provision

14   of mental health care to class members. . . ."  ECF No. 6886 at 2.  In early 2019, defendants

15   presented the Special Master with a draft policy for the use of PNPs in providing mental health

16   care to class members.  The Special Master has informed the court that defendants have recently

17   presented him with an updated draft PNP policy for discussion in the Task Force.  Such a policy

18   is necessary for the court to properly consider the Bentz Letter's fourth proposal.  Good cause

19   appearing, defendants shall file a proposed final PNP policy on or before December 11, 2020,

20   together with the proposed revised staffing plan required above.  As with the proposed revised

21   staffing plan, the court will direct the Special Master to report orally to the court on the status of

22   Task Force consideration of and defendants' efforts to finalize the PNP policy.  If by December 3,

23   2020, it appears to the court that defendants are not on track to file a proposed final PNP policy

24   by December 11, 2020, the court reserves the right at that point to direct the Special Master to file

25   a proposed policy for the court's consideration subject to the parties' formal comments and

26   objections, if any.

27           Finally, by December 15, 2020, defendants also shall provide the court with

28   updated information showing how the proposed revised staffing plan will allow defendants to

                                                    7

come into compliance with the court's October 10, 2017 order in light of the size of the mentally ill prison population as part of an overall effort to achieve the necessary staffing remedy in this case.

In accordance with the above, IT IS HEREBY ORDERED:

1. Defendants shall make such minimal modifications to the Staffing Plan as are required to include a role for psychiatric nurse practitioners (PNPs) and to reflect the proposals made in the September 8, 2020 letter authored by Melissa Bentz, Esq. Defendants also shall consult with the Special Master and the Task Force as appropriate to ensure that their proposed modifications are the product of consensus of all stakeholders to the maximum extent possible, and they shall file their proposed revised Staffing Plan by December 11, 2020.

2. Defendants shall file a proposed policy for the use of PNPs in the delivery of mental health care to class members, finalized in consultation with the Special Master and the Task Force as appropriate. They shall file this proposed policy on or before December 11, 2020.

3. The Special Master shall report to court informally and orally on defendants' progress to finalize the proposed revised Staffing Plan and proposed PNP policy as required by this order so the court may, if necessary, by December 3, 2020 direct the Special Master to file by December 11, 2020 a proposed revised Staffing Plan and/or proposed PNP policy for the court's consideration subject to the parties' formal comments and objections.

4. Any response to the proposed revised Staffing Plan and the proposed policy for use of PNPs presented to the court shall be filed on or before December 15, 2020.

5. The proposed revised Staffing Plan and the proposed PNP policy required by this order will be included on the agenda for discussion at the fourth quarterly status conference set for December 18, 2020.

6. California Department of Corrections and Rehabilitation Secretary Kathleen Allison shall appear in person at the fourth quarterly status conference set for December 18, 2020, to discuss the proposed revised Staffing Plan with the court.

DATED: November 3, 2020.

attachment 69

**Golding, Michael@CDCR**

| | |
|---|---|
| **From:** | Jones Mohamedu <mjones@pldolaw.com> |
| **Sent:** | Monday, September 21, 2020 10:18 AM |
| **To:** | Golding, Michael@CDCR |
| **Cc:** | Lopes Matthew; Walsh Kerry F.; Tavares, Zelia M |
| **Subject:** | September 17th  to Coleman Special Master Lopes |

**CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

**CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Dr. Golding

I inadvertently left out your September 17th email to Mr. Lopes forwarding your August 5th email to Br.██ from my earlier email and telephone conversation with you. As with the others, Special Master Lopes will also be sharing this one with the parties. You indicated in our second phone conversation that you believe it is necessary that all three emails should be provided to the *Coleman* parties along with any email strings embedded in them.

**From:** Jones Mohamedu
**Sent:** Monday, September 21, 2020 1:04 PM
**To:** Golding, Michael@CDCR <Michael.Golding@cdcr.ca.gov>
**Cc:** Lopes Matthew <mlopes@pldolaw.com>; Walsh Kerry F. <kwalsh@pldolaw.com>; Tavares, Zelia M <ztavares@pldolaw.com>
**Subject:** Your September 15 and 20 Emails to Coleman Special Master Lopes

Dr. Golding

Hi. As we discussed this morning regarding your September 15 and 20 emails to *Coleman* Special Master Lopes with copies to some members of his staff captioned  - Data Disappearing Redux- and - "Severe" Staffing Shortages Very Much Present – Mr. Lopes has concluded that he is obligated by his position to provide the information you sent him to the *Coleman* parties. You indicated that you have no objections to his disclosing your  name and indeed you're pleased that the information will be provided to the parties. Please contact me if you have any questions. Thanks

**Golding, Michael@CDCR**

| | |
|---|---|
| **From:** | Jones Mohamedu <mjones@pldolaw.com> |
| **Sent:** | Monday, September 21, 2020 12:33 PM |
| **To:** | Lisa Ells; Kyle Lewis |
| **Cc:** | PIIPIIPIIPII @CDCR; PIIPIIPIIPIIPII @CDCR; Golding, Michael@CDCR |
| **Subject:** | Emails received from Dr. Golding Regarding Staffing and Data on September 15, 17, and 20, 2020 |
| **Attachments:** | Fwd: Data Disappearing Redux; Fwd: Psychiatric Staffing Suggestions; FW: "Severe" Staffing Shortages Very Much Present |

---

CAUTION: This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

---

CAUTION: This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

---

Counselors

In light of the upcoming staffing hearing, and out of an abundance of caution, Special Master Lopes requested that I share with you the attached three emails listed below that he received from CDCR's Chief Psychiatrist, Dr. Michael Golding. Please contact me with any questions.

September 15, 2020 - Subject: Data Disappearing Redux
September 17, 2020: - Subject: Psychiatric Staffing Suggestions
September 20, 2020: - Subject: "Severe" Staffing Shortages Very Much Present

Best Regards

Mohamedu F. Jones, Deputy Special Master

attachment 70

**Golding, Michael@CDCR**

| | |
|---|---|
| **From:** | Golding, Michael@CDCR |
| **Sent:** | Thursday, September 17, 2020 10:36 AM |
| **To:** | Lopes Matthew (mlopes@pldolaw.com); Gribbin Rachel (rgribbin@pldolaw.com) |
| **Cc:** | Metzner, Jeffrey (JEFFREY.METZNER@CUANSCHUTZ.EDU); DocKC99 (DocKC99 @aol.com) |
| **Subject:** | Psychiatric Staffing Suggestions |

Hi,

Below is the letter I sent to Dr. ▆PII▆ in early August after receiving a draft version of the CDCR psychiatry staffing plan. As you can see from the letter, the headquarters psychiatry team does not support the staffing proposal.

I discovered the psychiatry staffing plan in the same way I discovered the economist's report about psychiatry staffing, by looking on the court website. As you can see from the staffing plan that was submitted to the Court, and my letter to Dr. ▆PII▆, the opinion of the HQ psychiatry team about staffing cuts was not taken into account after we received the proposals from our executives.

We did not review the proposal that the expected average frequency of psychiatry contact visits with patients should be decreased from 1.5 visits (per minimal Program Guide mandated interval) to 1.25 visits (per minimal Program Guide mandated interval) at the EOP and CCC level of care, which would mean even fewer psychiatrists being deemed to be needed, as that was not in the draft we were shown. Had this been in the draft we were shown, I would have commented on that too when I wrote the below letter to Dr. ▆PII▆

I think this latter proposal is also a mistake because the right patient is often not seen at the right time in CDCR due to the fact that supervising psychiatrists who are supposed to be organizing this are instead required to see patients due to staffing shortages. Thus the quality of needed care per visit is lower on average. So more frequent visits are required because of these supervisory shortages. If a doctor does not know who is sick because triage is not organized by supervisors – and triage often isn't organized in CDCR – patients need to be seen more frequently to ensure that no one slips through the cracks.

Ultimately the staffing proposal is seriously flawed: CDCR should not be deemed to be adequately staffed until CDCR demonstrates convincingly that we are providing adequate care for our patients.

CDCR's attorney, ▆▆▆▆▆▆, said in documents on the court website:

"The [2018 psychiatry staffing, MG] agreement did not come to fruition due to the release of Dr. Golding's allegations." [Document 6855 filed 9/14/2020, p. 13 of 16.]

And indeed, the thrust of CDCR's current psychiatric staffing plan seems to be doubling down on the highly ill-advised 2018 staffing proposal. The effect of adopting CDCR's plan would be an even bigger problem of poor psychiatry retention and even more inadequate patient care. As I have been saying to our leaders for years now, CDCR should focus on solving the problem of inadequate patient care (which is absolutely doable and need not be expensive) instead of using numbers to create the semblance of adequate patient care.

Below is my letter to Dr. ▆PII▆

Best,

Michael Golding, MD

Statewide Chief Psychiatrist

**From:** Michael.Golding@cdcr.ca.gov <Michael.Golding@cdcr.ca.gov>
**Sent:** Tuesday, September 15, 2020 5:26 PM
**To:** Golding, Michael@CDCR <Michael.Golding@cdcr.ca.gov>
**Subject:** FW: Psychiatric Staffing Suggestions

> **CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

-----Original Message-----
From: michael.golding@cdcr.ca.gov
Sent: 08/05/20 10:30 AM
To: PII PII PII PII PII PII PII PII
Subject: Psychiatric Staffing Suggestions

Hi Dr. PII

You asked me to provide my thoughts and concerns in writing about the staffing plan. As I said when we spoke on Friday, I agree with what our psychiatry team said when we discussed this issue. There are sometimes very concerning clinical situations our psychiatrists find themselves in when there are not enough psychiatrists to take care of their patients. I therefore suggest that cutting mandatory court-required psychiatric positions, or filling them with those who are not qualified psychiatrists, is not a good idea.

My understanding is that in October 2017 the court ordered CDCR to come into complete compliance with the staffing ratios in the 2009 staffing plan within one year, with a maximum vacancy rate of 10%. For the reasons set forth in the court's decision after the last evidentiary hearing, and because of the "Golding Report," the October 2018 staffing hearing did not occur, but the judge said that the time for compliance with the staffing plan was "even more seriously past due". The court found that the 2009 staffing plan was developed by CDCR to meet their constitutional obligations to mentally ill patients, and, according to the judge, the staffing ratios in that plan are still properly viewed as the minimum necessary to meet those obligations. The judge has ordered a hearing for September 10, 2020 to address the lack of compliance with the October 10, 2017 order, and to look at how many seriously mentally ill patients need to be released from prison to bring CDCR into compliance with the ratios in the 2009 staffing, and to consider what remedies are available to the court to enforce its October 10, 2017 order with respect to CDCR's 2009 staffing plan.

The headquarters psychiatry team was presented with the psychiatry staffing plan in the last week of July for our review, giving us just a few days to understand it, comment on it, criticize it, or object to it.

As I stated in the meetings, I am deeply concerned by the staffing cuts proposed for psychiatry positions. According to the draft plan we reviewed, we would in effect be saying that CDCR can provide constitutionally adequate psychiatric medical care with a hundred fewer mandated psychiatry positions. That did not appear reasonable to any of our psychiatry team. Indeed if these plans were approved by the judge, it would be communicating that that we would, as currently staffed, have about 99% of needed psychiatrists. Given the maximum ten percent vacancy rate mandate, it would in effect be saying that we could be providing constitutionally adequate care with even fewer psychiatrists than we currently have. Dr ███████ pointed out that the stated percentage fill rate should reflect the reality on the ground and that the reality on the ground is that we have a serious dearth of psychiatrists in many institutions and that the care is in no way adequate. Our HQ psychiatry team agreed with her.

The team made some important suggestions that could help CDCR fix problems over the longer term, including having better data analysis, more psychiatrists in leadership positions, trying to fill positions not previously offered to psychiatrists, utilizing nurse practitioners only in a safe and effective way, and not counting a nurse practitioner as a psychiatrist for staffing plan fill rate purposes, etc.

Here are some suggestions to address staffing issues. Indeed the below 5 are direct recommendations from the economist's report that was commissioned by the Office of the Special Master. I agree that CDCR should

(1) Provide a system of consistent and larger salary increase opportunities for psychiatrists throughout their tenure at CDCR and DSH.
(2) Provide a system of compensation differentials to incentivize psychiatrists to fill [CDCR] Central Valley positions, and to retain incumbents in those positions.
(3) Increase and improve the office space and facilities provided to [CDR and DSH] psychiatrists to perform their job functions at its facilities.
(4) Improve the working environment for CDCR and DSH psychiatrists.
(5) In conjunction with improving CDCR and DSH psychiatrists' overall working conditions, better inform psychiatrists of the value of their compensation and their compensation relative to their peers.

I asked to see early versions of this economist's report, or hear about it, but that request was not granted. I eventually found it on the court's website. I think this report is useful and relevant. It mentions specific areas that should be addressed to develop a staffing plan that will allow us to get closer to a constitutionally mandated level of care.

Additionally, here are some of my thoughts about how we can come into compliance with the October 2017 order in a timeframe that it appears the court is mandating:

1. As soon as possible, implement the recommendations from the Special Master's economist's report;
2. Rent already-finished office space in desirable locations in San Diego and San Francisco to rapidly hire telepsychiatric staff. Some spaces are fully furnished and set up with appropriate internet access and good offices. (Note that tele-presenters and equipment are also needed). Over the longer term, utilize trailers in desirable locations like at San Quentin in San Francisco to less expensively but consistently expand telepsychiatric services.
3. Hire at least one superstar psychiatric supervisor recruiter (for example Dr. █) to significantly help with recruiting. That should be close to a full time job for that psychiatric recruiter.


Another suggestion I have is not a short-term solution but I mention it again here because it could make a huge difference to CDCR's costs and to patient care in the longer term: there are thousands of medical graduates per year (I have seen estimates of 8000 medical graduates and foreign physicians per year) who are desirous of American physician residencies and who have passed quite challenging United States Medical Licensing exam parts 1 and 2 and thus are eligible for internships. And, given appropriate California legislative action, they could earn their place as citizens of the United States by committing to work as physicians – including psychiatric physicians –

in underserved California prisons. Unlike nurse practitioners, these doctors are highly educated physicians who just need a bit of supervision and an opportunity to work supervised for a certain number of years. They would require far less supervision than nurse practitioners because of their knowledge. Moreover, though they are far more medically educated than nurse practitioners, their rate of pay could be lower because these physicians would be getting the education needed to take their boards, so we would be providing them a service that would be valuable to them. For example with supervision, we could count 3-4 years of service to us as a year of formal internship. Then we should make them eligible to take Boards Part 3 after these years of service. If they pass, they should be allowed to apply to any residency program. With appropriate legislation, we would rapidly have thousands of inexpensive, highly educated physicians able to provide good care for our patients, which would solve our physician shortages throughout our prisons, and throughout California. There is no need to risk using lots of non-physician nurse practitioners to take care of our most vulnerable citizens with complex medical conditions. We can do it more safely for our patients, and more cheaply and with less supervision than will be needed for nurse practitioners.

Our psychiatry HQ team has already suggested

(1) We should not count NP's as psychiatrists for the purpose of staffing, although they can be properly utilized as part of a physician-led team. NP's do not have the training to be counted as psychiatrists and CDCR would have little or no incentive to hire psychiatrists if NP's count equally toward meeting compliance standards and Coleman staffing mandates as a psychiatrist would. NP's do not have the medical training and education that psychiatrists have to diagnose patients, create their treatment plan, and prescribe medications to our patients, who tend to be amongst the most complex psychiatrically. This is not to denigrate NP's: NP's are very useful in many contexts. However, they are no substitute for psychiatric physicians.

(2) We need our crisis psychiatrists and could hire into those positions if we were allowed to do so. We need them to help with crisis intervention on the holidays and weekends, as intended. There may be a role for telepsychiatry utilizations of these psychiatrists to help statewide with emergencies on holidays and weekends, as the psychiatry team has suggested. Patients don't have medical issues only on weekdays and we need to ensure a constitutionally adequate level of care even on weekends and holidays.

(3) Psychiatrists do have an obligation to take care of CCCMS patients not on medications in non-routine situations. Our team members slightly differ about the advisability of cuts. Some including I think that 0-10 positions could be reasonably eliminated, especially if other issues and efficiencies were addressed. Other team members argue that the workload has increased since 2009 so much that none of these positions should be eliminated.

(4) Our team suggested that we study the utilization and proper number of psychiatrists in inpatients settings and want the assistance of the Office of the Special Master's data expert, Dr. Potter, to help us figure out what is best. In the meantime, we do not favor basing psychiatric fill rates in hospitals on patient census, rather than number of beds. On a practical level, the CDCR proposal leads to perverse incentives. For example, we are currently unable to staff the crisis bed with a psychiatrist at High Desert State Prison. In the past, that often would mean that we would close High Desert Crisis Beds. Thus because it would be closed, there would be no need for psychiatric staff there and therefore no lack of them. This would lead to increasing the average number of patients covered by each psychiatrist and involve transporting more patients. So closing hospitals because of lack of psychiatric staff would bring CDCR into full compliance with their proposed staffing mandates. That just makes no sense and would decrease patient care to further unsafe levels.

In 2017, the court found that with respect to staffing, "the stark reality of the record before this court is that defendants have for 15 years been under an order to keep their mental health staff vacancy rate below 10%"….."The long history of failure to hire a sufficient number of psychiatrists….raises a question about whether defendants will ever be able to hire sufficient staff to meet their constitutional obligations as long as the size of the seriously mentally ill patient population…remains at current levels or continues to grow. The time is now to resolve the question." In July, 2020, the court signaled that "targeted reduction of the mentally ill prison population might

4

be the only path remaining" (for CDCR) "to achieve constitutional compliance in this case. While much has changed in the intervening three years, nothing has brought defendants closer to compliance or suggested that defendants can adequately staff their mental health care delivery system given the present size of the plaintiff class".

The judge ordered CDCR and the plaintiffs to file briefs specifying the size of the reduction of the population of our patients for CDCR to come into compliance with the ratios in that 2009 staffing plan within a month of her July 30, 2020 order.

There is, as I am sure you will agree, a serious question about whether patients with serious mental illness such as depression with psychosis and schizophrenia, etc., in which that was the cause of the conduct at issue, should have been incarcerated in state prison, or whether, perhaps, it might have been better both for them and for the state (and the taxpayers!) if they were being treated in psychiatric hospitals and clinics outside the prison system. While this is a larger policy and legislative issue, I mention it here for completeness.

Best,

Michael

attachment 71

**Golding, Michael@CDCR**

Subject:                           FW: Psychiatry Staffing

From: <span style="background:red;color:white">PIIPIIPIIPII</span> i@CDCR <span style="background:red;color:white">PIIPIIPIIPIIPII</span> @cdcr.ca.gov>
Sent: Sunday, August 2, 2020 5:12 PM
To: Golding, Michael@CDCR <Michael.Golding@cdcr.ca.gov>
Cc: <span style="background:red;color:white">PIIPIIPIIPII</span> r@CDCR <<span style="background:red;color:white">PIIPIIPIIPII</span> @cdcr.ca.gov>; <span style="background:red;color:white">PIIPIIPIIPIIPIIPII</span> e@CDCR <span style="background:red;color:white">PIIPIIPIIPIIPIIPIIPII</span> @cdcr.ca.gov>;
<span style="background:red;color:white">PIIPIIPIIPIIPII</span> t@CDCR <<span style="background:red;color:white">PIIPIIPIIPII</span> @cdcr.ca.gov> <span style="background:red;color:white">PIIPIIPIIPIIPIIPIIPII</span> v@CDCR <span style="background:red;color:white">PIIPIIPIIPIIPIIPIIPII</span> @cdcr.ca.gov>;
<span style="background:red;color:white">PIIPIIPIIPIIPIIPII</span> h@CDCR <span style="background:red;color:white">PIIPIIPIIPIIPIIPII</span> @cdcr.ca.gov>
Subject: Re: Psychiatry Staffing

CAUTION: This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Hi everyone,

Thank you Michael for the important background. I think we all agree that many of the initially proposed changes are not clinically appropriate and I'm glad that we had the opportunity to say so, even if it was late in the game. I don't think there is any way to show that we are or will be in compliance with staffing ratios within the next couple months, as we all know that these are longstanding problems with no immediate fix. I do think we have a rare opportunity to voice our opinion on how we can move in the right direction.

To your points, Michael:
1. 100% agree that increased pay has proven successful and has dramatically shifted the situation in the PIPs in recent months. This will be a hard sell given the current economic climate, but may come down to falling back on the economist's report and the very real possibility of our growth rate once again turning negative by the time of the hearing due to the stressful conditions related to COVID compounded by the recent pay cuts, as well as the growing discrepancy between registry and civil service incomes. Hopefully by then we'll have more data to show to that effect. This measure may come down to the judge ordering increased salaries (which I think would be a very reasonable solution but otherwise unlikely to happen).

2. I do believe the continue growth of telepsychiatry is a reasonable path to higher fill rates, as long as the rate of attrition elsewhere does not keep up. However, given the slow-churn of business ops and, again, the current economic climate, I don't think new hubs are an immediate fix as it takes about 2 years to get a new hub up and running and we were already told BEFORE COVID that the new building at SQ would be prohibitively expensive. I think telepsychiatry from home (at least in the short term/during COVID) is our quickest way to be able to hire more telepsychiatrists once we inevitably fill up the hubs this fall. We should emphasize that otherwise we will no longer be able to hire and the staffing rates are likely to plateau or even begin to fall again.

3. 100% agree about the psychiatrist recruiter and actually seems relatively attainable.

4. I agree with potentially releasing patients that we are unable to care for, and I agree that many of them should never have been incarcerated in the first place. The ideal way to do this would be to bolster resources in the community (and the unfortunate reality is that community resources are only being further cut). Your suggestion of releasing through DSH and subsequently OMHD is a very intriguing one, though I am not familiar enough with the institutions/processes to be able to comment on the feasibility of this plan. But I like that it provides some plan to mitigate the risk to our patients

1

once they reach the community, rather than just booting them to the street with little to no support and largely dooming this effort to be an inevitable failure, at least in terms of their wellbeing.

I have no other edits to suggest to the document - it's not perfect but an impressive effort given the short notice that we had. Thanks again everyone for your teamwork.

Best,


On Aug 1, 2020, at 5:29 PM, Golding, Michael@CDCR <Michael.Golding@cdcr.ca.gov> wrote:

Hi,

Made one small edit that is highlighted, but have a comment about the whole thing.

First, I very much appreciate the analysis in the attached documents.

Understanding a brief history of these staffing plans may be helpful.

In October 2017, the court ordered CDCR to come into complete compliance with the staffing ratios in their 2009 Staffing Plan within one year, with a maximum vacancy rate of ten percent. Because of the Golding Report, the October 2018 staffing hearing did not happen, but the Judge said that the time for compliance with the staffing plan was even more seriously past due.

The court found that the 2009 staffing plan was developed by CDCR to meet their constitutional obligations to our mentally ill patients, and, according to the judge, the staffing ratios in that plan are still properly viewed as the minimum necessary to meet those constitutional obligations.

The judge has ordered an evidentiary hearing for Sept 10, 2020 to address the lack of compliance with the October 10, 2017 order, and to look at how many seriously mentally ill patients need to be released from prison to bring CDCR into compliance with the ratios in the 2009 staffing plan, and to consider what remedies are available to the court to enforce its Oct. 10 2017 order with respect to CDCR's 2009 staffing plan.

So the purpose of the proposed staffing plan is presumably to make a good case for why we need fewer psychiatrists than the 2009 staffing plan anticipated. The judge seems to be saying in her 7/30/2020 order that indeed she is considering mandating the release of a number of our patients because of inadequate staffing, yet we were just told by our leaders that our ability to staff our prisons with psychiatrists was not a particularly relevant factor in the prisoner release issue.

According to the draft plan we reviewed, CDCR would be saying that we can provide constitutionally adequate psychiatric medical care with 100 fewer mandated psychiatry positions being filled. That did not appear reasonable to any of us. Indeed if that plan were approved by the judge, it would be communicating that we would now be about 99% compliant with needed psychiatric staffing. It would be saying that we could be providing constitutionally adequate care with even fewer psychiatrists than we currently have. We all agreed with Dr. <span style="background-color: red; color: white;">PIIPII</span> statement that the stated percentage fill rate should reflect the reality on the ground and that the reality on the ground is that we have a serious dearth of psychiatrists in many institutions, and that the care is in no way adequate.

We received that plan at the end of last week. Our response to the substance of this plan has been very important, I think. We have said that many of the proposed changes are not clinically appropriate and so

would not enable our patients to receive constitutionally adequate care, which, according to the judge herself, is one of the purposes of the staffing plan.

Given that the judge had indicated that CDCR should involve psychiatrists in creating any new staffing plan, CDCR presumably hoped that the psychiatry leadership would agree with their proposed plan, which would make it easier to persuade the plaintiffs and the special master to accept it.

Probably none of us would say that the edits and comments we have made, in the short time we were given, would help CDCR persuade anyone that they are currently or will soon be 90% compliant with mandated psychiatric staffing numbers. Yet this is what CDCR leadership seems to be requesting of us, although it was not stated directly.

Furthermore there is an economist's report indicting significant problems with psychiatry retention, implying that salary increases are needed. CDCR has neither followed the implied advice of the economist's report nor allowed the psychiatry team to see it until very recently. Only within the last week or two did CDCR send us a copy of it.

We have made some critical suggestions for improving things in the future, including having better data analysis, more psychiatrists in leadership positions, trying to fill positions not previously offered to psychiatrists, utilizing NP's only in a safe and effective way and not counting an NP as a psychiatrist for staffing plan fill rate purposes, etc.

So we may well have come up with aspects of a plan that might help CDCR to fix things *over the long term.* But we have not come up with a plan that would enable CDCR to plausibly argue that they are already very close to having enough psychiatrists to provide constitutionally adequate psychiatric medical care. Nor have we given them an idea of how to actually come into compliance with the 2009 staffing plan almost immediately.

CDCR appears to be asking us to help provide an alternative staffing plan that will persuade the court and all the parties that basically we are in compliance or will be in the next few months, or that actually fewer psychiatrists are needed than was thought in the 2009 plan. I cannot give very specific recommendations any more than anyone else can, since doing so would require careful study, as we all recognize.

But I think we can give some general suggestions, and if our leader and the team like this idea, I am very willing to play my part in our team's efforts.

How can we come into very rapid compliance? Here are some ideas I've had to help us become compliant within a period of time I hope will be acceptable to the judge.

1. Given the sudden influx of registry staff into the PIPs immediately following the raising of registry rates, CDCR should immediately raise all psychiatry salaries as implied by the economist's report, with differential pay rates for those working in telepsychiatry, those working onsite in EOP and CCC and those working onsite in PIPs and crisis beds. Instead there has effectively been a 10% pay cut. Given that telepsychiatry provides a more pleasant working environment than working onsite in CDCR institutions, and it is less difficult to hire and retain telepsychiatrists, telepsychiatrists should earn somewhat less than onsite staff. Those working onsite in PIPS and crisis beds should be paid the most.

2. We should endeavor to achieve very rapid increases in telepsychiatry hiring into (hub) space in desirable locations like San Diego and San Francisco. There should be aggressive hiring of psychiatrists into those spaces. (Note that telepresenters and equipment are also needed.)

3. We should hire at least one superstar psychiatric supervisor recruiter (e.g., Dr. ██) to significantly help with recruiting. It should be close to a full time job for that psychiatric recruiter.

4. If CDCR doesn't want to hire more staff by increasing rates, there may be no other option but to release many patients from prison, as the judge suggested, by sending our patients to the Department of State Hospitals, which has a safer way of releasing them using our OMHD program.

In 2017, the court found that with respect to staffing, "the stark reality of the record before this court" is that defendants have for 15 years been under an order to keep their mental health staff vacancy rate below 10%......."The long history of failure to hire a sufficient number of psychiatrists, .... raises a question about whether defendants will ever be able to hire sufficient staff to meet their constitutional obligations as long as the size of the seriously mentally ill inmate population....remains at current levels or continues to grow. The time is now to resolve that question."

In July 2020, the court signaled that "targeted reduction of the mentally ill prison population might be the only path remaining" for CDCR "to achieve constitutional compliance in this case. While much has changed in the intervening three years, nothing has brought defendants closer to compliance or suggested that defendants can adequately staff their mental health care delivery system given the present size of the plaintiff class."

The Judge ordered CDCR and the Plaintiffs to file briefs specifying the size of the reduction of the population of our patients for CDCR to come into compliance with the ratios in the 2009 staffing plan within a month of her July 30 2020 order.

To my mind, many of our patients with serious mental illness such as catatonia, schizophrenia, etc. should never have been incarcerated to begin with, and should have been treated in hospitals and clinics rather than ending up in prison. I hope that this will be a focus and a goal for the State in the coming years, as it should be for all States.

Best,
Michael

**From:** ██████████ @CDCR ██████████ @cdcr.ca.gov>
**Sent:** Friday, July 31, 2020 6:40 PM
**To:** Golding, Michael@CDCR <Michael.Golding@cdcr.ca.gov>; ████████████@CDCR ██████████ @cdcr.ca.gov> ████████ @CDCR ████████ @cdcr.ca.gov>; ████████ ████ @CDCR ██████████████ @cdcr.ca.gov>; ████████ @CDCR ██████████ @cdcr.ca.gov> █████████████ @CDCR ██████████████ @cdcr.ca.gov>; ████████ CDCR ████████ @cdcr.ca.gov>; ████████████ @CDCR ██████████ @cdcr.ca.gov>
**Subject:** RE: Psychiatry Staffing

Final draft for review. Thank you all very, very much for your work.

We can't hold back the tide any longer--whatever we have by Sunday night goes out to legal Monday morning.

Happy weekend,
██

attachment 72

EMPLOYEE COUNSELING RECORD
CDC 1123 (8/88)

**DISTRIBUTION:**  Original to Supervisor
Copy to Employee

### THIS DOCUMENT IS NOT TO BE PLACED INTO THE EMPLOYEE'S PERSONNEL FILE

| Employee | Civil Service Classification | Date |
|---|---|---|
| Michael Golding | Chief Psychiatrist, Statewide | 8/3/2021 |

LIST NAMES AND TITLES OF PERSONS ATTENDING DISCUSSIONS
PIIPIIPIIPII

Michael Golding

This is to memorialize our discussion on 8/3/2021 concerning your unprofessional conduct at the Business Rules and Indicator Review Meeting on July 14, 2021, which was unacceptable. As I had informed you at our discussion, your accusatory tone and statements directed at a colleague were disruptive and distracted from the important purpose of that meeting.

This Employee Counseling Record (ECR) is a formal record regarding an area of your job performance that requires improvement. This ECR documents a specific problem and sets forth specific measures for addressing this problem in an effort to help you improve your job performance, particularly your communication with your colleagues. This ECR is not intended to be disciplinary in nature.

On or about July 14, 2021, you failed to follow the department's code of conduct policy when you were rude and discourteous during the Business Rules and Indicator Review Meeting. During this meeting, you failed to demonstrate professionalism and failed to treat fellow attendees with dignity and respect. The meeting consisted of staff from CDCR as well as outside participants assigned to the Coleman Special Master's Team. Those meeting participants did not need to witness or be involved in the type of unprofessional communication from you described below.

Specifically, during the meeting, Dr. PIIPIIPII discussed a situation regarding what frequency of primary clinician contact is expected for patients awaiting transfer/admission in outpatient programs. While Dr. PIIPIIPIIPII explained the reasoning behind the business rule, you interrupted and stated words to the effect of "No, you argued for lowering it to once every 90 days". Dr. PIIPIIPIIPII attempted to clarify your misunderstanding and continue with the meeting, but you became defensive and continued to accuse Dr. PIIPIIPII of being dishonest by responding to his statements with words to the effect of "No, that is not true". Despite Dr. PIIPIIPIIPII efforts to address your concerns and resume the meeting agenda, you did not appear to listen and continued to make accusatory statements directed at Dr. PIIPIIPIIPII of dishonesty and workplace intimidation. Mohamedu Jones, from the Coleman Special Masters Team attempted to move the meeting back on track on at least two occasions by stating to you, "this is not the place to discuss this" and "we need to move on." Or words to that effect. You ignored these attempts and continued to escalate a polite but tense disagreement into an unprofessional argument, and by doing so, you unnecessarily injected personal animosity and distrust into the work environment.

Your behavior during this meeting was distracting and discourteous to those who were trying to use their time efficiently and productively. Additionally, your accusations against Dr. PIIPIIPII were unprovoked and derailed the meeting from its agenda. While it is reasonable for employees to disagree in the workplace, there is no reason to personally attack colleagues or disparage them in front of others. My expectation is that members of this team communicate as frequently as needed about their concerns in the most constructive and professional manner possible. I expect that staff will observe you exhibiting a cordial and respectful demeanor in the workplace

State of California

Department of Corrections and Rehabilitation

**EMPLOYEE COUNSELING RECORD**
CDC 1123 (8/88)

**DISTRIBUTION:** Original to Supervisor
Copy to Employee

(continued), Page 2 of 2

immediately.

In response to the above issue(s), you stated "yes it was contentious... I don't remember... needless to say I don't agree with you... Indeed, it was argued... my only reasonable response to you is to say, you know what, that's incorrect", or words to that effect.

Your actions violated the California Code of Regulations (CCR), Title 15, Sections 3391–Employee Conduct, and Department Operations Manual (DOM) Sections 33030.3.1–Code of Conduct, and 33030.3.2–General Qualifications. You are reminded to be professional at all times and adhere to all departmental rules and regulations concerning employee behavior.

Your conduct on this occasion was unacceptable and will not be tolerated by this Department. If you engage in similar conduct in the future, the Department will take adverse action against you based on the incidents cited in this memorandum, as well as any future incidents.

This ECR will be placed in your supervisory file for a period of 12 months.
================================================================================

## ACTION PLAN

You are instructed to correct your behavior and interact professionally with your supervisor and co-workers at all times. In addition, you shall complete the following:

1. Display professionalism and courteous behavior while interacting with all employees.
2. Review and familiarize yourself with CCR, Title 15, Sections 3391-Employee Conduct, 3392-Punctuality, and DOM Sections 33030.3.1-Code of Conduct, and 33030.3.2-General Qualifications.
3. Submit a signed CDCR Form 844, Training Participation Sign-In Sheet, documenting your adherence to this instruction, and provide the form to me by the end of your shift on 8/3/2021.

I will follow up with you within 30 days from the issuance of this ECR. It is expected that you will demonstrate immediate and sustained improvement in the areas noted in this ECR.

Follow-up meetings to be held on          8/5/21 & 8/27/21

Statewide Mental Health Program
California Correctional Health Care Services

State of California                                          Department of Corrections and Rehabilitation

**EMPLOYEE COUNSELING RECORD**                       **DISTRIBUTION:**   Original to Supervisor
CDC 1123 (8/88)                                                            Copy to Employee

(continued), Page 3 of 3

================================================================================================
This is to confirm that I have participated in and have knowledge of the above discussion on 8/3/2021. In signing this, I
do not necessarily agree with the conclusion of my supervisor.

                                          Employee declined to sign ("I'm not going to sign it")
                                          EMPLOYEE SIGNATURE

================================================================================================
Employee Comments:

Dr. Golding noted that he would not sign the ECR because he did not know the legal implications of signing or not
signing this form, without discussing it with his legal counsel. It was explained again that this is not meant to be
disciplinary in nature as written above (and I would expect that as a supervisor himself Dr. Golding would have some
familiarity with this process).

Dr. Golding also declined to sign the IST 844 Training Participation Sign-In Sheet, initially stating he did not know what
that form was. When shown the form on a shared screen, Dr. Golding stated he was not sure that an actual training had
occurred. It was reviewed that the regular HR process involved the use of this form (this is a widely familiar form, and
expected to be a familiar process to supervisors).

State of California                                          Department of Corrections and Rehabilitation

**EMPLOYEE COUNSELING RECORD**                              **DISTRIBUTION:**  Original to Supervisor
CDC 1123 (8/88)                                                                Copy to Employee

(continued), Page 3 of 3

=================================================================================

This is to confirm that I have participated in and have knowledge of the above discussion on 8/3/2021.  In signing this, I do not necessarily agree with the conclusion of my supervisor.

<div align="center">

Michael Golding, MD

Michael Golding, MD Received Do not agree.
EMPLOYEE SIGNATURE
</div>

=================================================================================

Employee Comments:

Employee initially declined to sign ("I'm not going to sign it") due to:

Dr. Golding noted that he would not sign the ECR because he did not know the legal implications of signing or not signing this form, without discussing it with his legal counsel. It was explained again that this is not meant to be disciplinary in nature as written above (and I would expect that as a supervisor himself Dr. Golding would have some familiarity with this process).

I don't agree with the mis-characterizations above. Michael Golding, MD

Dr. Golding also declined to sign the IST 844 Training Participation Sign-In Sheet, initially stating he did not know what that form was. When shown the form on a shared screen, Dr. Golding stated he was not sure that an actual training had occurred. It was reviewed that the regular HR process involved the use of this form (this is a widely familiar form, and expected to be a familiar process to supervisors).

I don't agree with the mischaracterizations above. Michael Golding, MD

Later responded:
"I am told that there is a way of appropriately signing the documents that you are discussing.
Please feel free to send them to me."
and the forms were cleared and provided.


This form is received. Do not agree.

*Michael Golding*    8/4/21

**Golding, Michael@CDCR**

| | |
|---|---|
| **From:** | Michael.Golding@cdcr.ca.gov |
| **Sent:** | Saturday, June 4, 2022 3:42 PM |
| **To:** | Golding, Michael@CDCR |
| **Subject:** | FW: RE: ECR discussion 8/3/2021 |
| **Attachments:** | image001.jpg |

**CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

-----Original Message-----
From: michael.golding@cdcr.ca.gov
Sent: 08/04/21 02:44 PM
To: ▓▓▓▓▓▓@cdcr.ca.gov
Subject: RE: ECR discussion 8/3/2021

Well... what I said is that I would have to speak with an attorney to figure out what to do but did not refuse, unless refusal meant that I would not sign it *immediately*. So it was not "unambiguously",
Thanks,
Michael

Michael Golding, MD
Statewide Chief Psychiatrist
California Department of Corrections

From ▓▓▓▓▓▓ CDCR
Sent: Tuesday, August 3, 2021 6:47 PM
To: Golding, Michael@CDCR
Subject: RE: ECR discussion 8/3/2021

Thank you Dr. Golding. I will note that you responded unambiguously in our meeting, and the action plan in the email below reflects that. The form was pre-written with that expectation, and your reply was noted underneath the quoted text.

If you have changed your mind at this time, I am happy to provide you another opportunity to sign the attached forms. Please return the signed copies by COB tomorrow, 8/4/2021.

Thank you,
▓▓

From: Golding, Michael@CDCR <Michael.Golding@cdcr.ca.gov>
Sent: Tuesday, August 3, 2021 6:06 PM

1

State of California                                    Department of Corrections and Rehabilitation

**EMPLOYEE COUNSELING RECORD**                        **DISTRIBUTION:**   Original to Supervisor
CDC 1123 (8/88)                                                            Copy to Employee

(continued), Page 3 of 3

=================================================================================
This is to confirm that I have participated in and have knowledge of the above discussion on 8/3/2021. In signing this, I
do not necessarily agree with the conclusion of my supervisor.

                                          Michael Golding, MD

                                          Michael Golding, MD Received Do not agree.
                                          EMPLOYEE SIGNATURE

=================================================================================
Employee Comments:

Employee initially declined to sign ("I'm not going to sign it") due to:

Dr. Golding noted that he would not sign the ECR because he did not know the legal implications of signing or not
signing this form, without discussing it with his legal counsel. It was explained again that this is not meant to be
disciplinary in nature as written above (and I would expect that as a supervisor himself Dr. Golding would have some
familiarity with this process).
                          I don't agree with the mis-characterizations above. Michael Golding, MD
Dr. Golding also declined to sign the IST 844 Training Participation Sign-In Sheet, initially stating he did not know what
that form was. When shown the form on a shared screen, Dr. Golding stated he was not sure that an actual training had
occurred. It was reviewed that the regular HR process involved the use of this form (this is a widely familiar form, and
expected to be a familiar process to supervisors).

                          I don't agree with the mischaracterizations above. Michael Golding, MD

Later responded:
"I am told that there is a way of appropriately signing the documents that you are discussing.
Please feel free to send them to me."
and the forms were cleared and provided.


     This form is received. Do not agree.

     *Michael Golding*     8/4/21

attachment 73

## Golding, Michael@CDCR

| | |
|---|---|
| **From:** | Jones Mohamedu <mjones@pldolaw.com> |
| **Sent:** | Tuesday, October 26, 2021 4:30 PM |
| **To:** | Golding, Michael@CDCR |
| **Cc:** | hdlugacz@blhny.com; Kerry Hughes; Metzner, Jeffrey; Dan Potter; Lopez, Lana L.; Lopes Matthew |
| **Subject:** | Re: Patient Care Issues, Again |

---

**CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

---

**CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

---

Dr Golding
Hi. Please call me at your convenience.
Thanks

Mohamedu F. Jones, Esq.
from my iPhone

> On Oct 26, 2021, at 4:06 PM, Golding, Michael@CDCR <Michael.Golding@cdcr.ca.gov> wrote:

**CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Hi,

I write to again express my concerns about the California Department of Corrections, its treatment of patients, and its failure to fix entrenched problems with patient care.

When a doctor refers a patient to the hospital, the patient presumably needs the extra care provided by the hospital, or the referral would not have been made. I have therefore argued that

1

patients should be mandatorily seen more frequently if they are referred to the hospital. Every leadership psychiatrist has told me that they favor such mandates to ensure that our patients get the care they need. Remarkably, CDCR is against the idea.

During the BRMR meeting, when psychologist Dr. ▉▉▉▉▉▉▉▉▉▉, made CDCR's argument against mandatorily providing that needed care Mohamedu Jones, the Assistant Special Master criticized the argument as: "way beyond [the bounds of] rationality." When asked, Dr. Metzner clearly specified that his position is that the needed increased frequency of care should be mandatory.

I expressed that patients should not be penalized for our delay in referring patients to the higher level of care facility, just because it takes CDCR time time to transfer them, and therefore they should be seen more frequently to account for that. I said that there is far less risk for a non-suicidal patient who is seen one day late at the EOP level of care (yet that appointment is counted late) than there is for a patient *referred to the  hospital* and not seen more frequently. Furthermore I said this was supported by the Program Guide because the Program Guide mandates increased frequency of care for patients needing higher levels of care and Dr. Metzner agreed with that.  Mr. Jones also said something very much like,

"I agree with Dr. Golding".

Dr. ▉▉▉▉ was not at that meeting, yet subsequently in a meeting with a large group of HQ psychiatrists, he expressed significant anger about that BRMR group meeting. He said that he could choose to remove any of us from these data groups "at any time". He told us that we could not orally speak any more at the BRMR meeting if we wish to disagree with Departmental Policy. Obviously the OSM will be asking questions and CDCR representatives will thus have to answer at those BRMR meetings. Thus Dr. ▉▉▉▉ is essentially saying that only those who agree with CDCR policy are allowed to speak at the BRMR meeting and receive OSM feedback. Those who do not follow this mandate will be removed from the meeting.

Disagreeing with Dr. ▉▉▉▉ , even when someone is merely *agreeing with the OSM*, should not be cause for our ▉▉▉▉▉▉▉▉▉▉ "losing his (---)" (as one of my colleagues put it) and threatening to stop us attending the meetings in which vital patient care issues are being decided and in which *vital interactions with the OSM* are facilitated. When precisely are we free to speak to the OSM *and get the OSM's opinion about what we thin*k? The OSM does not in general offer opinions about controversial issues during private conversations (even if private conversations also did not lead to subsequent punishment, which is its own problem.)

To my knowledge all our leadership psychiatrists say they favor mandating the extra care ordered, but Dr. ▉▉▉▉ s angry threatening reprimand has effectively silenced them. Some have explicitly confirmed that they will not speak up about it or vote for it in a public setting (at CAPC). Thus Dr. ▉▉▉▉ is creating a culture of fear in which people cannot even appear to dissent even when they know that CDCR's policy harms our patients.

Just an hour or so before the meeting with all the HQ psychiatrists, in which Dr. ▉▉▉▉ angrily threatened to stop us attending the meetings if we disagree with CDCR's patient-harming policies, I had had a private meeting with him. Speaking about the need for mandating increased frequency of visits, I said that CDCR's policy on this is a mistake, and I mentioned that the OSM happens to agree with me.

In the meeting about an hour later with the HQ leadership psychiatrists, Dr. ▓▓ said (as if outraged and evidently wanting to shame me publicly):

> "Can you imagine telling your boss that you disagree with him and that the Special Master agrees with him?!"

Then, in response to my idea that maybe the Special Master's view should be taken seriously, Dr. ▓▓ railed against what he called the "thirty years" of "failure" of the OSM and talked about why he so appreciates the new Judge's involvement (who is being utilized in a settlement conference), saying that that Judge isn't focused on "relitigating the past", (implying that the OSM has been doing that). Dr. ▓▓ has subsequently talked about how there are many times that he wants a Receivership, rather than to be subjected to the OSM. Only when I publicly challenged Dr. ▓▓'s strongly negative views of the OSM's work did he grudgingly concede that the OSM has done *some* good.

Regardless of all of that, mandating that patients referred to the hospital be seen more frequently (consistent with the referral order) IS reasonable, regardless of Dr. ▓▓'s anger, his attempt to shame me, and his bullying and silencing tactics. Dr. ▓▓'s verbal prosecutorial demeanor and overt abusive hostility to me in private settings leaked just a little into the public sphere so that his disdain for my advocacy to protect our patients came out in the open and was shocking.

It is sad for me to have to reiterate that Judge Mueller stated that retaliation against me is prohibited. My role continues to be diminished, in effect I am being demoting me more and more.

Even if it were the case that injuring me is of no consequence, was it appropriate for Dr. ▓▓ to respond with such opprobrium to my merely agreeing with the OSM about an issue of straightforward importance for patient care? Was it appropriate for Dr. ▓▓ to threaten to stop us going to the meetings if we aren't willing to remain silent in the face of significant concerns that a given policy is adversely affecting patient care? And is it appropriate for him to be trying to sew profound distrust in and disrespect for the OSM? Silencing people's legitimate patient-care-related concerns by making it unsafe for people to interact to the OSM has been a hallmark of Dr. ▓▓'s executive leadership. Virtually nothing else has been so consistent as a departmental policy.

Continuing to allow these bullying practices prevents our department from ultimately being able to self-monitor and take care of our patients, to the detriment of all.

None of this bodes well. I urgently ask all concerned to please stop allowing these bullying tactics. When medical doctors, with our duty of care to our patients, feel too unsafe to voice their concerns for fear of potentially career-ending entirely unjust and unfair disciplinary action, it is the patients who really suffer.

Best,

Michael Golding, MD

Statewide Chief Psychiatrist

California Department of Corrections

This message was sent from outside the company. Please do not click links or open attachments unless you recognize the source of this email and know the content is safe.

attachment 74

## Golding, Michael@CDCR

| | |
|---|---|
| **From:** | Golding, Michael@CDCR <michael.golding@cdcr.ca.gov> |
| **Sent:** | Monday, November 1, 2021 7:56 AM |
| **To:** | dockc99@aol.com; hdlugacz@blhny.com; Metzner, Jeffrey (JEFFREY.METZNER@CUANSCHUTZ.EDU) |
| **Cc:** | Jones Mohamedu; Lopes Matthew (mlopes@pldolaw.com) |
| **Subject:** | FW: Memo About Patient Care |
| **Attachments:** | Memo About Patient Care |

CAUTION: This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

FYI

Michael

1

# MEMORANDUM

**TO:**        OFFICE OF THE SPECIAL MASTER

**FROM:**     MICHAEL GOLDING, MD

**SUBJECT:**   CDCR CREATING DANGER TO PATIENTS

**DATE:**     OCTOBER 31, 2021

- **Patients referred to higher levels of care** should be mandatorily seen more frequently while they await transfer
    - This is especially true while awaiting transfer to intermediate or acute hospitals
    - The Program Guide mandates more frequent care when patients require higher levels of care
    - The inability to access our data bases to investigate this prevents uncovering patient injuries related to this and other mistakes
    - I have received disciplinary action for discussing this issue
    - Dr. ▮PIIPII▮ is now explicitly refusing to allow disagreement with department policies, like this one, during data (BRMR) meetings, preventing relevant oral interaction with the OSM and further endangering patients related to this and other issues

- **Our "CQI" (T)ool (continuous quality improvement tool) does not measure quality** of care when it only counts whether specific documents are being completed, not whether they are being completed appropriately. This endangers patients.
    - Our lawyers, Dr. ▮PIIPII▮ and Dr. ▮PIIPIIPIIPII▮ have strenuously prevented me and our psychiatry team from bringing this issue up with the OSM, saying that the court has already settled what type of data will be measured by CQIT
    - It is not safe for patients to have audits of their care that measure only whether forms were completed, but not whether they were completed well.

- **Dr. ▮PIIPII▮ repeatedly badmouths the OSM,** claiming that the OSM has created "30 years of failure". This antagonism by him and CDCR executives coalesces support for Dr. ▮PIIPII▮ and CDCR against the OSM, creating derision for communicating with the OSM and for the actions that the OSM is taking to protect patients.
    - Dr. ▮PIIPII▮ said, "Can you imagine telling your boss that you disagree with him and that the Special Master agrees with him?!"
    - The OSM is reticent to privately discuss controversial issues so private conversation is not a solution.
    - Even if private conversation sometimes could work, Dr. ▮PIIPII▮ says he permits private discussion with the OSM, has also said the opposite, and punished me for doing so.

- **Judge Mueller forbade retaliation against me** for the Golding Report. **Please stop this retaliation.**

- My role in CDCR has been progressively diminished
  - No longer the supervisor of my own team both as a consequence of Dr. ▮PII▮PII▮ undermining actions and just now because a new Assistant Deputy Director for Psychiatry has been appointed to lead our team.
  - PRN (consultation) program taken away
  - I no longer supervise telepsychiatry
  - Dr. ▮PII▮ has engaged in prosecutorial tactics and intimidation, while also encouraging others to write negative things about me.
  - Dr. ▮PII▮ has told me that Dr. ▮PII▮ had said that the "wounds are too fresh" for me to be the Deputy Director or the Assistant Deputy Director, in effect saying that he intended to retaliate for the Golding Report
  - Dr. ▮PII▮PII▮ had previously pointed out my powerlessness by telling me "what do you plan to do?" [what recourse do you have] given Dr. ▮PII▮ had determined that I can't be chosen for an executive position.
  - When CDCR is allowed to retaliate when clinicians report dangerous patient care activity, as I did with the Golding Report, that sends a clear message to others that they cannot honestly report dangerous clinical behavior to supervisors and the OSM, and thus devastates the ability of CDCR to become a self-monitoring entity appropriately caring for patients.

Michael Golding, MD

attachment 75

## Golding, Michael@CDCR

**From:** ▓▓▓▓▓▓▓▓▓ @CDCR <▓▓▓▓▓▓▓▓▓ @cdcr.ca.gov>
**Sent:** Tuesday, November 16, 2021 3:11 PM
**To:** ▓▓▓▓▓ @CDCR
**Subject:** Pre-BRMR meeting today

Hi ▓▓▓,

That was a particularly uncomfortable meeting today. I just wanted to say that I never heard you say during a previous meeting that anyone would be uninvited to meetings if they spoke out or disagreed, or that people weren't allowed to object to anything during BRMR. I did hear you say that the pre-BRMR meetings are the appropriate venue for debating and objecting to items, and that the consensus position will be presented to OSM at BRMR for discussion.

Thank you,

▓▓▓

▓▓▓▓▓▓▓▓▓ ▓▓
▓▓▓▓▓▓▓▓▓▓▓
Elk Grove - Headquarters
California Department of Corrections and Rehabilitation
Cell phone: ▓▓▓▓▓▓

attachment 76

 **CALIFORNIA CORRECTIONAL**
# HEALTH CARE SERVICES

## MEMORANDUM

| Date | : | December 27, 2021 |
|---|---|---|
| To | : | Michael Golding, MD, Chief Psychiatrist<br>Statewide Mental Health Program<br>California Correctional Health Care Services |
| From | : | ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ r<br>Statewide Mental Health Program<br>California Correctional Health Care Services |
| Subject | : | **LETTER OF INSTRUCTION** |

This Letter of Instruction (LOI) memorializes our discussion on December 27, 2021 regarding your unacceptable conduct. This documentation sets forth measures for addressing this issue in an effort to help you improve your work performance, especially your communications with your colleagues.

On or about August 3, 2021, you received an Employee Counseling Record (ECR) for your unprofessional conduct at the Business Rules and Indicator Review Meeting. You were reminded it is a violation of department policy to personally attack or disparage colleagues, and were further instructed to exhibit a cordial and respectful demeanor in the workplace.

On or about August 16, 2021, you received and signed the Statewide Mental Health Program's Job Expectations, which outlined several job-related requirements you are expected to know and abide by as a departmental employee. These requirements include the expectation that you are expected to support a collaborative relationship between all disciplines and professionals. Despite being made aware of the need to improve your conduct and correct this important area of your work performance, you have failed to do so, as described below.

On or about November 16, 2021, you conducted yourself in an unprofessional and discourteous manner in the Pre-BRMR Meeting. Specifically, you stated falsely that I had told the psychiatrists that if they disagreed about data issues, they would not be allowed to attend any further data meetings. This untrue statement resulted in causing unnecessary disruption and low morale among your colleagues. You made no attempt to confirm or clarify your understanding about what I allegedly told you at any time during your meetings with me, including one-on-one meetings we had on 10/22/21 and 11/12/21. You repeatedly pushed others, including your subordinates, to support your

Michael Golding, MD, Chief Psychiatrist

# MEMORANDUM

position, despite their unwillingness to do so. You also continued to misrepresent yourself as speaking for other employees after I had asked you not to, as the other psychiatrists have come to me at various times to report that you do not speak for them. Your statements at the November 16, 2021 meeting about my communications were inaccurate and misrepresented my instruction that the team would have multiple opportunities to freely voice their opinions about data issues to the Office of the Special Master. Furthermore, you are expected to exercise professional judgment at your management level and understand the difference between respectfully disagreeing and being unprofessionally combative. You have attended pre-BRMR meetings since their inception around March 2021, and their purpose is the discussion of data elements and the methodology of indicators. Since being counseled on August 3, 2021, you have continued to display an argumentative and unproductive attitude in these meetings, that resulting in unnecessary delays of discussion of agenda items and subjecting staff to your unprovoked and unfounded accusations.

Furthermore, when meeting with you on November 19, 2021 regarding your continued misconduct in these meetings, we discussed that you needed to clarify your understanding of my instructions with me before relaying those instructions to others, especially in a group setting and when those instructions regard procedures and communications. As we discussed, providing inaccurate information about my instructions to your colleagues only causes disruption and unnecessarily undermines workplace relationships. Several days after our November 19th meeting about the need for you to communicate professionally, you sent an unprofessional and disrespectful email that disparaged your supervisor, PIIPIIPIIPIIPIIPIIPIIPIIPIIPIIPIIPIIPIIPIIPII. In addition to making comments denigrating Dr. PIIPIIPIIPIIPII integrity, honesty, and professionalism, you inaccurately described Dr. PIIPIIPIIPII as exhibiting extensive eye-rolling and head shaking during the meeting we had with you on November 19, 2021. You assumed that Dr. PIIPIIPIIPII had unprofessional or biased views, and did not seek to confirm your incorrect assumptions about Dr. PIIPIIPIIPII opinion of what we discussed at our November 19th meeting (the need for you to communicate professionally in the workplace) prior to sending your email. You further copied the PIIPIIPIIPIIPIIPIIPIIPIIPIIPIIPIIPIIPIIPIIPIIPIIPIIPIIPIIPIIPIIPII y, who did not need to be a part of these communications. Your unprofessional communication only served to create further unnecessary disruption and discredit you to others in our office. The fact you sent a communication disparaging your supervisor only a few days after we had discussed the importance of you *not* making such unprofessional communications is unacceptable.

Michael Golding, MD, Chief Psychiatrist

# MEMORANDUM

In response to the above performance issues, you stated "I think that it is... something that I do on a regular basis throughout my life to improve my communication style with others... I invariably endeavor to improve my communication style... the department [should change their behavior, and individuals within it were] shaming their medical license," or words to that effect.

Your actions violated California Department of Corrections and Rehabilitation, Department Operations Manual (DOM), Sections 33030.3.1 – Employee Code of Conduct and Section 33030.3.2 – General Qualifications; as well as California Code of Regulations (CCR), Title 15, Section 3391 – Employee Conduct.

You are to immediately bring your conduct to the established expectations and sustain it at that level. Your conduct will continue to be monitored and deficiencies documented.

Additionally, you are instructed to comply in an immediate, consistent, and sustained manner, with the following steps:

1. Display professionalism while interacting with all employees.
2. Review and comply with the job expectations signed on August 16, 2021.
3. Abide by all lawful orders given to you by a supervisor, without exception.
4. Read and familiarize yourself with the established policies listed above.
5. Submit a signed CDCR Form 844, Training Participation Sign-In Sheet, documenting your adherence to this instruction, and provide the form to me by the end of your shift on 12/27/2021.

Your conduct on this occasion was unacceptable and will not be tolerated by this Department. If you engage in similar conduct in the future, the Department will take adverse action against you based on the incidents cited in this memorandum, as well as any future incidents.

I will follow-up with you within 30 days from issuance of this LOI to ensure your compliance with expected conduct standards.

This LOI will be placed in your Official Personnel File (OPF) and supervisory file for 12 months. Upon your written request to the Hiring Authority, this LOI will be removed from your OPF and given to you unless you request it to be destroyed.

Your signature below verifies your receipt of this LOI.

_____        _____

MICHAEL GOLDING, MD, Chief Psychiatrist        Date
Statewide Mental Health Program
California Correctional Health Care Services

Michael Golding, MD, Chief Psychiatrist

# MEMORANDUM

Page 4 of 4

---

**APPROVED/~~DISAPPROVED~~** for placement in OPF:



_____

Statewide Mental Health Program
California Correctional Health Care Services

12/27/21
_____
Date

Attachments (if any)

cc:  Supervisory File - Michael Golding, MD, Chief Psychiatrist
OPF - Michael Golding, MD, Chief Psychiatrist

attachment 77

## Golding, Michael@CDCR

| | |
|---|---|
| **From:** | ██████████ @CDCR ██████████ @cdcr.ca.gov> |
| **Sent:** | Thursday, July 14, 2022 1:36 PM |
| **To:** | Golding, Michael@CDCR |
| **Subject:** | Disrespect |

---

**CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

---

Hi Dr. Golding,

As you requested I am documenting how I felt after sitting in a BRMR type meeting in mid-November. My apologies, for taking forever to do so, but this kept falling to the bottom of my priority list and I'm quite busy these days.

I recall speaking with you one afternoon after a meeting. In the meeting, you had been speaking to Dr. ██████ t regarding Dr. ████, stating you could not disagree with CDCR while in the meeting. Dr. █████████ stated Dr. ████ would not have said that, and then almost immediately after that, Dr. ████ appeared in the meeting. He had not been on the line previously. Dr. ████ explained that you could write a letter to the Special Master or disagree at any of the pre meetings and then you asked again if you could disagree in a BRMR meeting...silence...and then Dr. ████ shared that he was being very clear and he didn't know how else to explain it to you. The next thing he did, was shocking to me, and it felt very uncomfortable and rude at the time. Dr. ████ asked the group in what sounded like a very condescending tone, if anyone could explain this better to Michael. No one dared to speak up. The strange thing to me was, it wasn't clear to me if you could disagree in a BRMR meeting or not and I wondered why Dr. ████ didn't just answer you with a simple yes or no.

Also, I wanted to note, that you shared with me, there was communication that you had been disrespectful. I'm sorry but I've been in several meetings with you and you have never been rude, disrespectful or uncourteous. The meeting where this uncomfortable incident occurred, may have pushed some folks to react, however you handled it with dignity and respect, all while being put on blast by Dr. ████. I clearly remember this because I spoke to you after the meeting and shared with you how impressed I was that you had remained so composed. I was not sure that I would have been able to do the same.

██████  ;  ██████
███████████████████████████████
Statewide Mental Health Program
California Department of Corrections

  **HEALTH CARE SERVICES**

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication. To request confidential information in an alternate format call our HIPAA Privacy Compliance Center: 1-916-254-2311

attachment 78

**Golding, Michael@CDCR**

**Subject:**                                    FW: Discussion from earlier today

**From:** Golding, Michael@CDCR <michael.golding@cdcr.ca.gov>
**Sent:** Wednesday, December 1, 2021 2:31 PM
**To:** ▮▮▮▮▮▮▮▮▮ @CDCR ▮▮▮▮▮▮▮▮▮▮ ; @cdcr.ca.gov>; ▮▮▮▮▮▮▮▮ @CDCR ▮▮▮▮▮▮▮▮ a@cdcr.ca.gov>
**Cc:** ▮▮▮▮▮▮▮▮▮▮ @CDCR ▮▮▮▮▮▮▮▮ @cdcr.ca.gov>; ▮▮▮▮▮▮▮▮ @CDCR ▮▮▮▮▮▮▮▮ @cdcr.ca.gov>
**Subject:** RE: Discussion from earlier today

**CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

**CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Thanks.

I'm not sure that Dr. ▮▮▮▮▮▮ is aware that you told me that Dr. ▮▮ had said the "wounds are too fresh" for me to be considered to be the Deputy Director of Assistant Deputy Director, prior to the opening of the Deputy Director and the Assistant Deputy Director position.

He no doubt is not aware what you also said after that.
"What are you going to do [when you [Michael Golding) are not selected to be the Deputy Director or the Assistant Deputy Director]?"

I also don't think you informed Dr. ▮▮▮▮▮▮ that you have been progressively restricting my role as the Statewide Chief Psychiatrist in order for you and other executives to demonstrate what disobedience (creating the Golding Report and other continuing lawful and in some sense mandatory work) will lead to.

No doubt Dr. ▮▮▮▮▮▮ would innocently like to join us and help. But his extensive eye-rolling, head shaking, etc, as you were disciplining me, demonstrates that he has implicitly understood the cultural message, probably without needing to be told: if he wants to be the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ , and /or just gain approval from upper level management, he has to distance himself from me, particularly my continued attempts to make sure we can convey information to the OSM, get honest feedback, access and report data that is problematic, etc.

You accuse Mr. Lopes of "playing games" with you when you publically disagree with him and have said that the OSM has a history of "30 years of failure".

Perhaps at least some of the challenges in meeting court mandates have arisen because of the culture that you and other executives clearly continue to create for those who work for you: Your public distrust, as our leader, sends a clear message that your employees should also distrust the OSM's intentions and interventions.

We do need to interrupt what you call "30 years of failure". Please begin in a small way by no longer hurting me and thus implicitly letting others know that it is OK to hurt me. In addition to being a terrible/immoral thing to do, you are stopping others who would otherwise have been and would be willing to openly and publically engage and disagree with departmental policy when it endangers our patients. The department has demonstrated its hostility to openness and transparency, and appropriate change (yes, according to the court) by continuing to deliver Constitutionally inadequate

1

care after 30 years of litigation. In one small (but relevant to me) way, that hostility is overtly manifest in your demotion of me and continued hostility to allowing open *interaction* with the Office of the Special Master. As I have told you, the OSM in general will not privately discuss controversial issues, even if you also did not punish me for privately doing so.

I ask that we try to make a dent in this retaliation by starting with our own communications. Those particularly beholden to you for approval, advancement, attendance at choice meetings, good hours of work, and etc. in the department, are not neutral observers to our interactions.

Therefore in the interests of openness and transparency, I am hopeful that even in one small circumstance in which your conversation has been (in my view) particularly problematic, you please allow a support person in the room who can sign whatever privacy documents are necessary, and/or allow our conversations to be recorded, to ensure humane communication.

Best,
Michael

**From:** ▮▮▮▮▮▮▮▮ @CDCR ▮▮▮▮▮▮▮▮ @cdcr.ca.gov>
**Sent:** Tuesday, November 30, 2021 6:55 PM
**To:** Golding, Michael@CDCR <Michael.Golding@cdcr.ca.gov>
**Cc:** ▮▮▮▮▮▮▮▮ @CDCR ▮▮▮▮▮▮▮▮ k@cdcr.ca.gov>
**Subject:** RE: Discussion from earlier today

Our discussions involve personnel and operational matters that are not appropriate for non-supervisory staff. Another person, your ▮▮▮▮▮▮▮▮ r, will be present moving forward. We have just implemented this new step of required written confirmation on a historically difficult topic, let's see how it goes,

thanks


**From:** Golding, Michael@CDCR <Michael.Golding@cdcr.ca.gov>
**Sent:** Tuesday, November 30, 2021 11:50 AM
**To:** ▮▮▮▮▮▮▮▮ @CDCR ▮▮▮▮▮▮▮▮ @cdcr.ca.gov>
**Cc:** ▮▮▮▮▮▮▮▮ @CDCR ▮▮▮▮▮▮▮▮ @cdcr.ca.gov>
**Subject:** RE: Discussion from earlier today

Hi,
I respectfully request that a support person be in the room with me or that you allow us to record what is being said to ensure accuracy, transparency, and an appropriate venue for constructive interaction.
Best,
Michael

**From:** ▮▮▮▮▮▮▮▮ CDCR ▮▮▮▮▮▮▮▮ cdcr.ca.gov>
**Sent:** Tuesday, November 30, 2021 11:43 AM
**To:** Golding, Michael@CDCR <Michael.Golding@cdcr.ca.gov>
**Cc:** ▮▮▮▮▮▮▮▮ @CDCR ▮▮▮▮▮▮▮▮ @cdcr.ca.gov>
**Subject:** RE: Discussion from earlier today

Thank you Dr. Golding. We will continue to discuss these issues, and I remain hopeful about this new strategy. Your direct supervisor will participate in these discussions moving forward,



**From:** Golding, Michael@CDCR <Michael.Golding@cdcr.ca.gov>
**Sent:** Wednesday, November 24, 2021 2:27 PM
**To:** ▉PII▉ CDCR ▉PII▉ @cdcr.ca.gov>
**Cc:** ▉PII▉ CDCR ▉PII▉ cdcr.ca.gov>
**Subject:** RE: Discussion from earlier today

Hello Dr. Golding,
This is to memorialize our meeting today, as we discussed. I have included Dr. ▉PII▉ as he is your ▉PII▉t s ▉PIIPII▉ and was present at the meeting.

Unfortunately we continue to have the kind of problems described in the ECR from August [attached]. Specifically, you've continued being "distracting and discourteous to those who were trying to use their time efficiently and productively... your accusations... were unprovoked and derailed the meeting from its agenda.

Hi,
Your previous allegations were false in the ECR. During the November 16th meeting, the issue of what you said at a mid to late October meeting had already been raised and we moved on. But you later came to that meeting (or were called to it) and re-engaged on that issue. I am sorry that you chose to not speak with me about any concerns you had in private, but chose that public time to engage with me. As it turned out, you used that opportunity to publically and inaccurately correct me.

While it is reasonable for employees to disagree in the workplace, there is no reason to personally attack colleagues or disparage them in front of others.

Indeed. So why would you publicly say in front of others that you had been very clear and would anyone else in a large public group want to explain to me what you said. That seemed to be prolonging the disagreement. And someone else also said you were being incredibly rude when you did that.

My expectation is that members of this team communicate as frequently as needed about their concerns in the most constructive and professional manner possible. I expect that staff will observe you exhibiting a cordial and respectful demeanor in the workplace immediately." This occurred most recently in a meeting with many others in the department present on Tuesday 11/16/21.

Generally when that behavior occurs, I receive several unsolicited emails and contacts, including from the psychiatry team, disagreeing with your memory and interpretation of past events, and stating explicitly that you do not speak for them and your statements to the contrary make them feel misrepresented, pressured, and uncomfortable.

You are not being very specific here so it is hard to comment. I also receive interesting responses when you speak. I agree that Dr. ▉PIIPII▉ did not say that you threatened to remove us from the meetings. That was the intent of what you said at the late October meeting, but she did not say that. I was going to correct myself as soon as I said it, but things happened so quickly I did not get a chance

You did say on November 16th at the public something like the below:

▉PIIPII▉ :

"But I NEVER said you can't disagree with departmental policy. I encourage you to fully express your disagreement in writing and in the pre-[BRMR, MG] meetings"

Or you said something very close to that

I responded something very close to
Dr. Golding: "Am I allowed to orally disagree with department policy during the BRMR meetings or not? Yes or no?"

You responded something like the following:

[REDACTED]: "I don't how I can be ANY MORE CLEAR. The purpose of the BRMR meetings is changing, but you are welcome to disagree in the pre-[BRMR, MG] meetings and in writing that the Special Master will see."

I responded again, something very much or identical to
Dr. Golding: "So am I allowed to or not?"

And you responded scathingly, very much like or identical to this (as though I am stupid)
[REDACTED] I think I've been very clear".

You then invited any of a large group of people to try to explain to me what you said.

In this case (as in others before), both of the people you asked to speak in the meeting emailed me promptly and without prompting, stating this again. They are highly capable and experienced professional psychiatrists, and can speak for themselves.

I am familiar with the views of those individuals, in terms of what they said to me. It would be helpful to see what both of them said to you, to be able to accurately comment. Dr [REDACTED] did not directly say previously that you had threatened to remove us from the group for disagreeing about departmental policy at the BRMR meeting. As soon as I said that I knew it was incorrect and wanted to correct it. But the topic was changing so rapidly that I did not have a chance.

I've consulted with others and I suggest we institute a rule that we can document going forward. Whenever you would like to inform people in a group setting about new instructions from me regarding procedures and communications, especially about your communications with the OSM, I would like you to first confirm with me whether your understanding of the instructions is correct.

I confirm with you frequently. The problem is that in a retaliatory environment, your style is to make one statement and the opposite statement at different times, both about the same situation. And your style *is also* to be repeatedly ambiguous, so that using both of those methods, I am stuck in a "darned-if-you-do-and-darned-if-you-don't" situation.

Further clarification does not help, because like what I documented above, you repeatedly give the same ambiguous answer. Actually I had asked for clarification several times more during the above meeting! Although ambiguous answer make for good politics, they lead to bad (actually quite dangerous) patient care, particularly your attempts to prevent substantive interaction with the OSM about controversial issues and your punishing me for speaking with the OSM.

I'll give you written confirmation. Absent that, a potentially erroneous understanding only creates unnecessary confusion and makes people uncomfortable at meetings. I said I would send you an email confirming your

4

understanding of this discussion too; this is that email. You are of course welcome to discuss the protocols we've established with others.

You give oral directives, all the time to me and (appropriately) expect me to follow them. Needless to say, I would very much like to record what you say to me during our supervisory settings. Absent that, I strongly request that you allow me to have a support person in the room when you supervise me.

Thank you for your consideration.

Best,
Michael

Given what has occurred publically and repeatedly, I want to make sure the information you convey is accurate to avoid confusion, avoid disrupting meetings and our efforts to improve care, and avoid upsetting others that are forced to participate at least passively despite their discomfort with the situation. Otherwise I have to clarify and contradict you in front of others, which I also do not want to do, as it does not help either of us for you to be less effective in your job. I'll note that this is not a disciplinary procedure at this point, but this behavior is described clearly in the attached ECR and you are in violation of the expectations laid out in that document. We will continue to work together on this behavior.

Should you have any other concerns, as we have discussed several times and as I have provided to you in writing at least 3 times, I encourage you to take advantage of the many resources available to you as a CDCR employee. These include but are not limited to:
1) Further discussion with me in our regular check in and any extra meetings that you might request,
2) You can discuss any dissatisfaction with my direct supervisor, Dr. ▮▮ in your regular check ins,
3) You have full, complete, and unfettered access to the OSM, as confirmed by Special Master Lopes himself in a meeting where you were provided with the Deputy Special Masters direct cell phone number,
4) All of the many employee resources at CDCR we've discussed, including EEO, ERO, EAP, labor, the Union, etc., depending on however you may wish to proceed. You are a supervisor yourself and we have both made the same suggestions to others seeking assistance.

I'd also remind you once again that if people report to you, as a supervisor, that they are being intimidated or silenced, you have a mandatory obligation to report such allegations as soon as you become aware of it. If you do not wish to report those names to me (so I can address their concerns) that is fine, the people who you can report to, including those listed above, do not report to me. As physicians, we are familiar with numerous mandated reporting obligations; our department has a zero tolerance policy on these issues. I rarely attend the data meetings, and I expect you to abide by that policy so that we can ensure staff in attendance are not being intimidated by others.

Thank you, and I look forward to working together on this,
▮▮▮▮▮

From: ▮▮▮▮▮▮▮▮ @CDCR ▮▮▮▮▮▮▮▮ a@cdcr.ca.gov>
Sent: Friday, November 19, 2021 7:24 PM
To: Golding, Michael@CDCR <Michael.Golding@cdcr.ca.gov>
Cc: ▮▮▮▮▮▮▮▮ @CDCR ▮▮▮▮▮▮▮▮ ;@cdcr.ca.gov>
Subject: Discussion from earlier today

Hello Dr. Golding,

This is to memorialize our meeting today, as we discussed. I have included Dr. ██████ here as he is your ██ ██████ , and was present at the meeting.

Unfortunately we continue to have the kind of problems described in the ECR from August [attached]. Specifically, you've continued being "distracting and discourteous to those who were trying to use their time efficiently and productively... your accusations... were unprovoked and derailed the meeting from its agenda. While it is reasonable for employees to disagree in the workplace, there is no reason to personally attack colleagues or disparage them in front of others. My expectation is that members of this team communicate as frequently as needed about their concerns in the most constructive and professional manner possible. I expect that staff will observe you exhibiting a cordial and respectful demeanor in the workplace immediately." This occurred most recently in a meeting with many others in the department present on Tuesday 11/16/21.

Generally when that behavior occurs, I receive several unsolicited emails and contacts, including from the psychiatry team, disagreeing with your memory and interpretation of past events, and stating explicitly that you do not speak for them and your statements to the contrary make them feel misrepresented, pressured, and uncomfortable. In this case (as in others before), both of the people you asked to speak in the meeting emailed me promptly and without prompting, stating this again. They are highly capable and experienced professional psychiatrists, and can speak for themselves.

I've consulted with others and I suggest we institute a rule that we can document going forward. Whenever you would like to inform people in a group setting about new instructions from me regarding procedures and communications, especially about your communications with the OSM, I would like you to first confirm with me whether your understanding of the instructions is correct. I'll give you written confirmation. Absent that, a potentially erroneous understanding only creates unnecessary confusion and makes people uncomfortable at meetings. I said I would send you an email confirming your understanding of this discussion too; this is that email. You are of course welcome to discuss the protocols we've established with others.

Given what has occurred publically and repeatedly, I want to make sure the information you convey is accurate to avoid confusion, avoid disrupting meetings and our efforts to improve care, and avoid upsetting others that are forced to participate at least passively despite their discomfort with the situation. Otherwise I have to clarify and contradict you in front of others, which I also do not want to do, as it does not help either of us for you to be less effective in your job. I'll note that this is not a disciplinary procedure at this point, but this behavior is described clearly in the attached ECR and you are in violation of the expectations laid out in that document. We will continue to work together on this behavior.

Should you have any other concerns, as we have discussed several times and as I have provided to you in writing at least 3 times, I encourage you to take advantage of the many resources available to you as a CDCR employee. These include but are not limited to:

1) Further discussion with me in our regular check in and any extra meetings that you might request,
2) You can discuss any dissatisfaction with my ██████████ , ██████ , in your regular check ins,
3) You have full, complete, and unfettered access to the OSM, as confirmed by Special Master Lopes himself in a meeting where you were provided with the Deputy Special Masters direct cell phone number,
4) All of the many employee resources at CDCR we've discussed, including EEO, ERO, EAP, labor, the Union, etc., depending on however you may wish to proceed. You are a supervisor yourself and we have both made the same suggestions to others seeking assistance.

I'd also remind you once again that if people report to you, as a supervisor, that they are being intimidated or silenced, you have a mandatory obligation to report such allegations as soon as you become aware of it. If you do not wish to report those names to me (so I can address their concerns) that is fine, the people who you can report to, including those listed above, do not report to me. As physicians, we are familiar with numerous mandated reporting obligations; our department has a zero tolerance policy on these issues. I rarely attend the data meetings, and I expect you to abide by that policy so that we can ensure staff in attendance are not being intimidated by others.

Thank you, and I look forward to working together on this,

PIIPII

attachment 79

## Golding, Michael@CDCR

**Subject:** FW: BRMR meeting and Data verification process

**From:** ▓▓▓▓▓▓ @CDCR ▓▓▓▓▓▓ a@cdcr.ca.gov>
**Sent:** Thursday, February 24, 2022 3:06 PM
**To:** Golding, Michael@CDCR <Michael.Golding@cdcr.ca.gov>
**Cc:** mjones@pldolaw.com; dpotter@alumni.brown.edu; Metzner, Jeffrey (JEFFREY.METZNER@CUANSCHUTZ.EDU)
<jeffrey.metzner@cuanschutz.edu>; HDlugacz@BLHNY.com;    @CDCR ▓▓▓▓▓▓ @cdcr.ca.gov>;
▓▓▓▓▓▓▓▓ @CDCR ▓▓▓▓▓▓▓▓ t@cdcr.ca.gov>
**Subject:** RE: BRMR meeting and Data verification process

---

**CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

---

Dr. Golding,

I believe that I have been clear about the process in my previous email and my other communications with you. **An oversimplified yes or no answer to your question would be misleading, as it would not be representative of the opportunities you and others have in our process.** Everyone on the team has the opportunity to provide feedback during the feedback stage, including you. However, when that stage is over, we must move forward to finalize the work product as agreed. Further improvement can be made separately in multiple ways, as I've informed you many times. Those include:

1) You may bring up further issues for discussion in CAPC, when the whole team votes on approval or disapproval of that item with OSM present.
2) You may submit an IT ticket and work with MH QM, as has always been the process; that option continues to be available to you and everyone else in the department, should you choose to use it.
3) You may express your views next time the indicator is discussed, which is built to be an annual process for review and further improvement.



**From:** Golding, Michael@CDCR <Michael.Golding@cdcr.ca.gov>
**Sent:** Thursday, February 10, 2022 12:43 PM
**To:** ▓▓▓▓▓▓ @CDCR ▓▓▓▓▓▓ a@cdcr.ca.gov>
**Cc:** mjones@pldolaw.com; dpotter@alumni.brown.edu; Metzner, Jeffrey (JEFFREY.METZNER@CUANSCHUTZ.EDU)
<JEFFREY.METZNER@CUANSCHUTZ.EDU>; HDlugacz@BLHNY.com; ▓▓▓▓▓▓@ ▓▓▓▓▓▓▓▓ @cdcr.ca.gov>;
▓▓▓▓▓▓▓▓ @CDCR ▓▓▓▓▓▓▓▓ t@cdcr.ca.gov>
**Subject:** RE: BRMR meeting and Data verification process

" I'll be happy to clarify them now so we are all on the same page. I'll note that you did not reach out to me for clarification before sending this, and you included the OSM folks in your initial email requesting clarification."


Hi Dr. ▓▓▓▓ a,

I respectfully disagree with you about the "reaching out" part. We've discussed many (many) times what can and can't be said or done at BRMR and your answers have been ambiguous, despite multiple attempts! That's why I am writing.

1

You said,

"I'm a bit puzzled by your statement that members of the psychiatry team will be able to add comments to "a shared document that will be saved and showed to stakeholders, including the OSM and possibly Plaintiffs, even if the conclusion of our executive leadership is that it would best not be mentioned." The Data Remediation process has never included a category of things that "would best not be mentioned" as concluded by "executive leadership" or anyone else. We've discussed at length on several occasions (both in large groups and in one-on-one meetings) your apparent misperception that there are areas that would not be discussed in our process."



Perhaps I can decrease the confusion. As I understand the process, CDCR will be creating a document to share at BRMR with stakeholders. I or members of my psychiatry team may have comments to add and will write them down in a SharePoint document, which we will discuss in pre-BRMR meetings with attorneys. A joint document will be presented to the stakeholders that reflects what our CDCR leadership thinks is best. This process can be called creating a consensus or not, or "finalizing our feedback" or not, as you suggest. That is my understanding. But perhaps I am mistaken

It is possible that I or members of my HQ team agree with the "finaliz[ed]...feedback" (or perhaps not), that will be presented at the BRMR meeting. If we don't agree, I am asking whether our disagreement will be forwarded in written form to the OSM, as part of the document or in conjunction with it, if pre-BRMR discussion does not resolve the disagreement?

"However, that does not extend to determining what the priorities of larger groups must focus on"



But my request was not for that. It was only that (no doubt occasional) remaining written disagreement be forwarded on to the OSM as part of (or in conjunction with) the document, not that it should be "focus[ed] on". You and our executive leadership ultimately determine what is focused on.

When you say,

"As mentioned above, we all omit some internal discussions when moving to the next review stage in order to achieve a final, workable product."



I think your above statement means that if there is remaining disagreement by me or members of the HQ psychiatry team, then that written disagreement will not be forwarded on as part of (or in conjunction with) the written "final, workable product".

But perhaps I am mistaken. Am I right? Please clarify.

I also said the following in my message to you. I think it is important that,

"I or someone else [be able to] orally communicate *during the BRMR meeting* that an implication of a CDCR proposed measurement system is not being considered"....
MG

"Sometimes, the OSM may well say something during BRMR that would best be orally answered by a non-executive (for example a member of the psychiatry team), and that comment could help make an 'on the fly improvement' and thus should occur".
MG

I asked whether I or my psychiatry team would be allowed, during the BRMR meeting, to interact to make "on the fly" comments about what is being suggested, even if those comments disagree with CDCR's "finaliz[ed]" feedback.

I note that you did not seem to answer the question, though I have asked it many times before.

Instead you repeated that I can speak to the OSM, which has itself had consequences. Regardless, OSM representatives do not respond to suggestions made in a private meeting with them, and I can well understand why. Therefore "on the fly" improvements (interactive helpful communications) can't occur in a private meeting with an OSM representative because he/she needs to respond in a public way to suggestions.

I have spoken with you repeatedly about what is permitted at BRMR meetings in which OSM representatives and CDCR employees (including me) are present. You repeatedly don't really answer the question -- a little like you are doing now -- or perhaps you change your mind.

You exhibited remarkable public anger in a meeting with the psychiatry team, after one of the BRMR meetings. During the BRMR meeting, I was disagreeing with Dr. ▇▇▇▇▇▇▇ when I was suggesting that patients referred to the acute or intermediate hospital from outpatient settings should be mandatorily seen more frequently. Dr. ▇▇▇▇▇▇▇ disagreed with me during the BRMR meeting. The issue discussed was an important patient care issue that I thought could use interaction and comment from the OSM experts to get their thoughts.  What the OSM representatives said, in fact, was very helpful to me and others. During your angry presentation after the BRMR meeting (when meeting with the psychiatry team),  you said amongst other disturbing things that you did not need to allow any of us to attend the BRMR meetings (!)

I have asked repeatedly whether during the BRMR meetings, if I or a member of the psychiatry team are permitted to voice disagreements with CDCR suggestions, for example as stated by Dr. ▇▇▇▇▇▇▇ at BRMR: Because in those contexts, our responses can lead to helpful interaction with the OSM. You have not seemed to answer. I also note that in court hearings, CDCR has implied that because I attended meetings, my silence suggested agreement. You seem to be creating a "darned if you do and darned if you don't" situation.

And again, you do not seem to be answering the question about whether I or members of my HQ team can orally disagree with a stated CDCR position at the BRMR meeting and ask for OSM feedback.

Also,
1. If we can't let our continued disagreements be known in writing in a document that is being reviewed at BRMR and forwarded on to the OSM in the document or as a compendium, AND,
2. We can't speak at BRMR to let the OSM know there is disagreement, THEN,

you have stopped our ability to interact with the OSM (and receive "on the fly" responses) about data issues of major importance to patient care.
Thanks for your consideration. Much appreciated.

Best,
Michael

**From:** PIIPIIPIIPII @CDCR PIIPIIPIIPII a@cdcr.ca.gov>
**Sent:** Wednesday, February 9, 2022 5:47 PM
**To:** Golding, Michael@CDCR <Michael.Golding@cdcr.ca.gov>
**Cc:** mjones@pldolaw.com; dpotter@alumni.brown.edu; Metzner, Jeffrey (JEFFREY.METZNER@CUANSCHUTZ.EDU)
<JEFFREY.METZNER@CUANSCHUTZ.EDU>; HDlugacz@BLHNY.com; PIIPIIPIIPII @ PIIPIIPIIPIIPIIPII @cdcr.ca.gov>;
PIIPIIPIIPIIPII @CDCR PIIPIIPIIPIIPII t@cdcr.ca.gov>
**Subject:** RE: BRMR meeting and Data verification process

Hello Dr. Golding,

Hmm, I think there are several points of potential misunderstanding; I'll be happy to clarify them now so we are all on the same page. I'll note that you did not reach out to me for clarification before sending this, and you included the OSM folks in your initial email requesting clarification. As we have previously discussed, they do not need to be included on this thread with me, unless you had already attempted to clarify with me and still have concerns, or if they asked to be included. You can always communicate with them separately as you wish.

I'm a bit puzzled by your statement that members of the psychiatry team will be able to add comments to "a shared document that will be saved and showed to stakeholders, including the OSM and possibly Plaintiffs, even if the conclusion of our executive leadership is that it would best not be mentioned." The Data Remediation process has never included a category of things that "would best not be mentioned" as concluded by "executive leadership" or anyone else. We've discussed at length on several occasions (both in large groups and in one-on-one meetings) your apparent misperception that there are areas that would not be discussed in our process. It would be helpful if you can help me understand why this misunderstanding continues to be repeated. While not included in your email below, I understand Dr. Potter clarified in the meeting that *all* stakeholders would have internal discussions in this process, but to make the process more productive, the stakeholders will only share their *finalized* feedback with the rest of the larger group. This practice is consistent with our internal approach to finalizing our feedback, sharing plaintiffs' feedback, and transparency expectations within Data Remediation.

You also appear to be asking if adding comments to a shared document is an appropriate way to alert OSM "that there are [internal] differences remaining." As mentioned above, we all omit some internal discussions when moving to the next review stage in order to achieve a final, workable product. You are, of course, welcome to speak to the OSM whenever you like, as we've discussed on dozens of occasions. However, that does not extend to determining what the priorities of larger groups must focus on. It is also impractical for CDCR to share all internal discussions and all OSM discussions with the plaintiffs, who do not have their own separate experts; the OSM can certainly decide to share anything they wish with the plaintiffs at any time, and they do. But consistent with Dr. Potter's statement above, many of the branches we discard on the way to our final decision do not add value and can promote inefficiency and confusion. And as noted by Mohamedu (as I understand it; it was also not included in your email), OSM does not direct CDCR in matters of our deliberative process such as this. I would add that OSM representatives are also not leading these meetings, as we've repeatedly been told that this is CDCR's data remediation project and process.

We have been ordered by the court to complete this process as expeditiously as possible, and we routinely file schedules with the court updating our planned time of completion based on procedural changes. The written process before BRMR will contribute to this efficiency. It also affords everyone time to consider items under review and have their voices heard equally before moving on to the next steps of the process. There will always be additional improvements to be made, which is why this process cycles around and repeats every year. At some point, after giving everyone an opportunity to voice their views, we must end discussion and move forward. Otherwise, we will never make the improvements we've already identified.

As you know, nothing is decided in BRMR. The conclusion of that process is a recommendation that goes to CAPC, on which you have a vote. Four of the eight votes are "member[s] of the psychiatry team," plus three psychologists, plus a non-clinician. Final decisions for CDCR are made at that committee, attended by the OSM, where all voting members (including you) will again be able to share all of your concerns with your colleagues, including new ones, and the OSM

4

will hear those as well. You had a role in creating that committee and the policy and procedures under which it functions. Based on the strengths of the different arguments, I have confidence that all committee members, yourself included, will vote for the best option for CDCR.



**From:** Golding, Michael@CDCR <Michael.Golding@cdcr.ca.gov>
**Sent:** Wednesday, February 2, 2022 11:07 AM
**To:** ▉PIIPIIPIIPII▉ @CDCR ▉PIIPIIPIIPII▉ ▉@cdcr.ca.gov>
**Cc:** mjones@pldolaw.com; dpotter@alumni.brown.edu; Metzner, Jeffrey (JEFFREY.METZNER@CUANSCHUTZ.EDU) <JEFFREY.METZNER@CUANSCHUTZ.EDU>; HDlugacz@BLHNY.com; ▉PIIPIIPIIPII▉@▉PIIPIIPIIPIIPIIPII▉ @cdcr.ca.gov>; ▉PIIPIIPIIPIIPII▉ @CDCR ▉PIIPIIPIIPIIPIIPII▉ ▉cdcr.ca.gov>
**Subject:** BRMR meeting and Data verification process

Hi,

We had a good discussion about BRMR.

Do you agree with the following or am I misinterpreting something about what our new BRMR process and data review process will be?

1.  We will be able (for example members of the psychiatry team) will be able to add comments to a shared document that will be saved and showed to stakeholders, including the OSM and possibly Plaintiffs, even if the conclusion of our executive leadership is that it would best not be mentioned. But, all attempts will be made internally to come to an agreement. Regardless, the OSM should be aware that there are differences remaining, if there are, while also being aware what the executive leadership of CDCR formally wants. Do you agree?
2.  Dr. Potter said we will want to have a conversation during BRMR ("on the fly improvements"). I am interpreting that to mean and hoping that it means (but could be mistaken) that I or someone else could gently orally communicate *during the BRMR meeting* that an implication of a CDCR proposed measurement system is not being considered (even if the person making the comment is mistaken and CDCR ultimately has a better interpretation.) Sometimes, the OSM may well say something during BRMR that would best be orally answered by a non-executive (for example a member of the psychiatry team),  and that comment could help make an "on the fly improvement" and thus should occur.  Do you agree?

Best,
Michael


Michael Golding, MD
Statewide Chief Psychiatrist
California Department of Corrections

***Questions about Gender Minority Care?***
*Email: m_MHTransCareConsult@cdcr.ca.gov*

 
HEALTH CARE SERVICES

attachment 80

## Golding, Michael@CDCR

| | |
|---|---|
| **From:** | Golding, Michael@CDCR <michael.golding@cdcr.ca.gov> |
| **Sent:** | Wednesday, August 24, 2016 3:37 PM |
| **To:** | PIIPIIPIIPIIPIIPII e@CDCR |
| **Subject:** | RE: Unlicensed clinician orders |

**CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Ok. Can we do that?

I think more efficiently than having them go down there as line staff psychiatrists. I will talk with PII and see what we can do.

But I am wondering why they are using unlicensed psychologists in their crisis beds? Perhaps they should be using their licensed staff to take care of the more difficult patients (then they would not need a psychiatrist to cosign the unlicensed psychologist's order). So instead of having two people evaluate a patient, they would only need one (the licensed psychologist).

Perhaps her licensed staff don't want to work in the crisis bed (by the way, they assigned their psychiatric NP to their crisis bed and we forced them to move her to a lower level of care.) Unfortunately it is very common to have the least experienced people take care of the hardest patients. I have to figure out how many licensed psychologists they have and where they work.

That needs to be part of the discussion.

Thanks,
Michael

**Michael Golding, M.D.**
Statewide Chief Psychiatrist
Mental Health Support Program
California Department of Corrections and Rehabilitation

Phone: 916.662.6541
Email: michael.golding@cdcr.ca.gov



# Save Our Water

Learn easy ways to save water
during California's drought at
SaveOurWater.com

**From:** ███████████ @CDCR
**Sent:** Wednesday, August 24, 2016 3:29 PM
**To:** Golding, Michael@CDCR
**Subject:** Re: Unlicensed clinician orders

Ok. Can we do that?

Sent from my iPhone

On Aug 24, 2016, at 3:25 PM, Golding, Michael@CDCR <Michael.Golding@cdcr.ca.gov> wrote:

> Hi,
> Would be more efficient to assign telepsychiatrists.
> Best,
> Michael
>
>
>
> **Michael Golding, M.D.**
> Statewide Chief Psychiatrist
> Mental Health Support Program
> California Department of Corrections and Rehabilitation
>
> Phone: 916.662.6541
> Email: michael.golding@cdcr.ca.gov
>
> <image001.jpg>
>
> **From:** ███████████ @CDCR
> **Sent:** Wednesday, August 24, 2016 3:24 PM
> **To:** Golding, Michael@CDCR
> **Subject:** Re: Unlicensed clinician orders
>
> Agree w the concerns that Dr █████ is raising. It's clear that dr. █████ trying to cover the work despite having insufficient psychiatry staff. What if we had some of the Elk Grove telepsychiatry staff go out to help do some of the rounding you are talking about?
>
> Sent from my iPhone
>
> On Aug 24, 2016, at 3:19 PM, Golding, Michael@CDCR <Michael.Golding@cdcr.ca.gov> wrote:
>
> > Yes.
> > Michael

**Michael Golding, M.D.**
Statewide Chief Psychiatrist
Mental Health Support Program
California Department of Corrections and Rehabilitation

Phone: 916.662.6541
Email: michael.golding@cdcr.ca.gov

<image001.jpg>

**From:** ▮▮▮▮▮▮▮▮▮▮ @CDCR
**Sent:** Wednesday, August 24, 2016 3:20 PM
**To:** Golding, Michael@CDCR
**Cc:** ▮▮▮▮▮▮ @CDCR; ▮▮▮▮▮▮▮▮ @CDCR
**Subject:** Re: Unlicensed clinician orders

Agreed we need to get together and talk. Dr. ▮▮▮▮ will be here tomorrow. Can it wait until tomorrow?

Sent from my iPhone

On Aug 24, 2016, at 3:15 PM, Golding, Michael@CDCR <Michael.Golding@cdcr.ca.gov> wrote:

> Hi,
>
> I think that for a psychiatrist to cosign the orders of an unlicensed clinician a psychiatrist would have to do a thorough assessment of the patient to make sure that the orders are reasonable (because the psychiatrist, not the unlicensed clinician, is ethically and legally responsible.)
>
> Since that is so, I kind of wonder why they would have the unlicensed clinician write the orders to begin with (unless the unlicensed person were presenting a case to the psychiatrist, who might then think that it is reasonable to sign the orders).
>
> If the psychiatrist were rounding with the unlicensed person, seeing each patient and having the orders presented to him or her, that might be different because then the contact would be direct between the psychiatrist, the unlicensed clinician, and the patient. But we don't round in CDCR.
>
> Dr. ▮▮▮▮ says there are about 30-such orders per day for each psychiatrist, which presumably means 30 or so assessments. That seems like too much, unless I am misunderstanding. Presumably they should have their

3

licensed clinicians in the crisis beds. Training programs usually have different ratios.

If as alleged, Dr. ██████ is ordering Dr. █████ (using the 5% part of Dr. ██████s duty statement) to order her psychiatrists (not directly but in effect) to be comfortable with the clinical decision-making of unlicensed people, I am not sure that is smart from a medico-legal or an efficiency point of view.

We already lost virtually all our psychiatrists previously working at CIW including one of our very best psychiatrists. Not sure that we should repeat the fun at CHCF!

My inclination is to get on the phone with Dr. ████████ and see if we can't figure out what is going on and particularly why licensed clinicians are not working in the crisis beds.

Thanks,
Michael

**Michael Golding, M.D.**
Statewide Chief Psychiatrist
Mental Health Support Program
California Department of Corrections and Rehabilitation

Phone: 916.662.6541
Email: michael.golding@cdcr.ca.gov

<image002.jpg>

**From:** ██████████@CDCR
**Sent:** Wednesday, August 24, 2016 12:20 PM
**To:** Golding, Michael@CDCR; ████████████@CDCR
**Cc:** ██████████@CDCR
**Subject:** FW: Unlicensed clinician orders
**Importance:** High

Hi Mike/███:

I am being directed to direct my psychiatrists to co-sign on the unlicensed clinician orders in MHCB stating that this falls under the "5% work" that they can be directed to do.

Psychiatrists have expressed liability concerns stating they do not want to

4

**Golding, Michael@CDCR**

| | |
|---|---|
| **From:** | ▮▮▮▮▮▮▮▮▮▮@CDCR <▮▮▮▮▮▮▮▮@cdcr.ca.gov> |
| **Sent:** | Wednesday, August 24, 2016 12:20 PM |
| **To:** | Golding, Michael@CDCR; ▮▮▮▮▮▮▮▮▮▮@CDCR |
| **Cc:** | ▮▮▮▮▮▮▮▮▮▮▮@CDCR |
| **Subject:** | FW: Unlicensed clinician orders |
| | |
| **Importance:** | High |

---

CAUTION: This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

---

Hi Mike/▮▮ :

I am being directed to direct my psychiatrists to co-sign on the unlicensed clinician orders in MHCB stating that this falls under the "5% work" that they can be directed to do.

Psychiatrists have expressed liability concerns stating they do not want to this.  I spoke to Dr. ▮▮▮▮ regarding this and she informed me that the MHCB should only have licensed psychologists and psychiatrists and an unlicensed clinician should not be writing orders.  She also stated that legally only the identified supervising licensed clinician should be signing off on an unlicensed clinician work of any kind.

I have told them that I am not able to provide such directive to the psychiatrist at the present (I fear they will just walk over DSH).  Dr. ▮▮▮▮ (▮▮▮▮ who was recently licensed) moved over to DSH because such a request was being made of him.

Please advice.



▮▮▮▮▮▮▮  ▮▮▮▮▮▮▮  𝓜.𝔇
▮▮▮▮▮▮▮  ▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮
**CALIFORNIA HEALTH CARE FACILITY, STOCKTON**
DIVISION OF CORRECTIONAL HEALTH CARE SERVICES

▮▮▮▮▮▮▮▮▮▮**IPHONE PREFERRED**
▮▮▮▮▮▮▮▮ **OFFICE**
▮▮▮▮▮▮▮▮**@CDCR.CA.GOV**

**Success is not measured by the heights one attains, but by the obstacles one overcomes in its attainment. – Booker T. Washington**

On Jul 25, 2016, at 1:06 PM, ▮▮▮▮▮▮▮▮▮▮ @CDCR <▮▮▮▮▮▮▮▮▮▮l@cdcr.ca.gov>
wrote:

> That is correct. The issue is we don't have staff on 1A to sign these. Dr.
> ▮▮▮▮▮ is off today and there is no licensed clinician on 1A. I spoke to
> Dr. ▮▮▮▮▮ and she did 15 clinician orders already and was not able to
> write orders for whole unit due to her own case load.
>
> I'm signing all of them today but was writing to see what our game plan
> is moving forward. My understanding is that both psychiatrists and
> licensed clinicians are hesitant in signing orders for patients they don't
> know clinically.
>
> Thanks,
>
> ▮▮▮▮▮
>
> ▮▮▮▮▮▮▮▮▮, M.D.
> ▮▮▮▮▮▮▮▮▮▮ t ▮▮▮▮▮▮ CHCF Stockton.
> Cell - ▮▮▮▮▮▮▮▮▮ (preferred)
> Desk - ▮▮▮▮▮▮▮
> Email - ▮▮▮▮▮▮▮▮▮▮▮▮ @cdcr.ca.gov
>           ▮▮▮▮▮▮▮▮▮▮▮▮
>
> Please note, I am out of office on Fridays (RDO).
> HIPAA NOTICE: The documents accompanying this electronic transmission, or this
> transmission itself, may contain Protected Health Information. This information belongs
> to the sender and is legally privileged. The information is intended only for the use of
> the individual or entity named above. If you are not the intended recipient, you are
> hereby notified that you may not disclose, copy, distribute or take action on the
> information in these documents. All such activities are strictly prohibited. If you have
> received this e-mail in error, please delete the e-mail immediately and empty your
> deleted items folder or take any steps necessary to ensure permanent deletion.
>
> **From:** ▮▮▮▮▮▮▮ @CDCR
> **Sent:** Monday, July 25, 2016 12:44 PM
> **To:** ▮▮▮▮▮▮▮▮▮ @CDCR
> **Cc:** ▮▮▮▮▮▮▮▮▮ @CDCR; ▮▮▮▮▮▮▮▮▮ @CDCR; ▮▮▮▮▮▮
> ▮▮ @CDCR
> **Subject:** Re: Unlicensed clinician orders
>
> Any licensed psychologist or licensed psychiatrist can sign, according to
> our P&P.
>
> ▮▮▮▮▮▮ , ▮▮
> ▮▮▮▮▮▮▮▮▮
> CHCF-Stockton
> Cell Phone # (Preferred): ▮▮▮▮▮▮▮

On Jul 25, 2016, at 12:07 PM, ████████ @CDCR
████████ l@cdcr.ca.gov> wrote:

Hello Dr. ████

A1A nursing staff brought clinician orders for 15
patients, in need of signature to me as both Drs. ████
and ████ are unlicensed. Please let me know how to
proceed as this I'm afraid is going to be a recurring
issue.

Thanks,

████

████  ████

████ , CHCF Stockton.
Cell - ████ (preferred)
Desk - ████
Email - ████ @cdcr.ca.gov

Please note, I am out of office on Fridays (RDO).

HIPAA NOTICE: The documents accompanying this electronic
transmission, or this transmission itself, may contain Protected
Health Information. This information belongs to the sender and is
legally privileged. The information is intended only for the use of
the individual or entity named above. If you are not the intended
recipient, you are hereby notified that you may not disclose, copy,
distribute or take action on the information in these documents. All
such activities are strictly prohibited. If you have received this e-
mail in error, please delete the e-mail immediately and empty your
deleted items folder or take any steps necessary to ensure
permanent deletion.

attachment 81

**Golding, Michael@CDCR**

| | |
|---|---|
| **From:** | Golding, Michael@CDCR <michael.golding@cdcr.ca.gov> |
| **Sent:** | Friday, September 16, 2016 1:25 PM |
| **To:** | ██████████@CDCR; ██████████@CDCR; ██████████@CDCR |
| **Cc:** | ██████████@CDCR; ██████████@CDCR |
| **Subject:** | Letter for Treatment Plans |

**CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Dr. ██████████ and Dr. ██████

Please distribute this to your psychiatrist and psychologist colleagues at CHCF.

CDCR staff psychiatrists at CHCF-Stockton have not been and will not provide clinical supervision to unlicensed psychologists.

If a CDCR staff psychiatrist signs any documents related to interdisciplinary treatment team meetings (that have been signed or will be signed by an unlicensed psychologist), the staff psychiatrist's signature does not imply or convey that the staff psychiatrist is acting as the clinical supervisor of the unlicensed psychologist.

Thanks,
Michael

**Michael Golding, M.D.**
Statewide Chief Psychiatrist
Mental Health Support Program
California Department of Corrections and Rehabilitation

Phone: 916.662.6541
Email: michael.golding@cdcr.ca.gov



**Learn easy ways to save water
during California's drought at
SaveOurWater.com**

**From:** PIIPIIPIIPIIPII @CDCR
**Sent:** Friday, September 16, 2016 9:56 AM
**To:** Golding, Michael@CDCR
**Cc:** PIIPIIPIIPIIPIIPIIPII @CDCR
**Subject:** Draft

Michael, what do you think of the wording? CHCF needs this today. I can send it out for you.

Sent on behalf of Michael Golding MD, Statewide Chief Psychiatrist.

CDCR staff psychiatrists at CHCF-Stockton have not and will not provide clinical supervision to unlicensed psychologists.

If a CDCR staff psychiatrist signs any documents related to interdisciplinary treatment team, that have been signed or will be signed by an unlicensed psychologist, the staff psychiatrist's signature does not imply or convey that the staff psychiatrist is acting as the clinical supervisor of the unlicensed psychologist.

PIIPIIPIIPIIPIIPII PIIPII
PIIPIIPIIPIIPIIPIIPIIPIIPIIt
California Correctional Health Care Services
California Department of Corrections and Rehabilitation
PIIPIIPIIPII Cell
PIIPIIPIIPII @cdcr.ca.gov





**Learn easy ways to save water
during California's drought at
SaveOurWater.com**

2

**From:** ▮▮▮▮▮▮▮▮ CDCR
**To:** ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮ @CD ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮
**Cc:** ▮▮▮▮▮▮▮ CDCR
**Subject:** RE: IDTT supervision for unlicensed psychologists
**Date:** Wednesday, September 14, 2016 12:40:00 PM

Thank you for the email Dr. ▮▮▮▮▮▮ .

I have requested Headquarters to weigh in on this so that we can obtain a definitive answer and clarification on this issue. Dr. Golding and Dr. ▮▮▮▮ will be joining us through conference call in today's staff meeting. I will be requesting Dr. ▮▮ to join us too so that moving forward we are all on the same page.

Sincerely,

▮▮▮▮ ,
▮▮▮▮▮▮▮▮▮▮▮▮ .
▮▮▮▮▮▮▮▮▮▮ t ▮▮▮▮▮▮ , CHCF Stockton.
Cell - ▮▮▮▮▮▮▮▮
Email - ▮▮▮▮▮▮▮▮▮▮▮ @cdcr.ca.gov

Please note, I am out of office on Fridays (RDO).

HIPAA NOTICE: The documents accompanying this electronic transmission, or this transmission itself, may contain Protected Health Information. This information belongs to the sender and is legally privileged. The information is intended only for the use of the individual or entity named above. If you are not the intended recipient, you are hereby notified that you may not disclose, copy, distribute or take action on the information in these documents. All such activities are strictly prohibited. If you have received this e-mail in error, please delete the e-mail immediately and empty your deleted items folder or take any steps necessary to ensure permanent deletion.

**From:** ▮▮▮▮▮▮▮▮▮▮ @CDCR
**Sent:** Wednesday, September 14, 2016 12:32 PM
**To:** ▮▮▮▮▮▮▮▮▮▮ @ ▮▮▮▮▮▮▮▮▮▮▮▮ @CDCR
**Cc:** ▮▮▮▮▮▮▮▮ @CDCR; ▮▮▮▮▮▮▮▮ @CDCR; ▮▮▮▮▮▮▮▮ @CDCR; ▮▮▮▮▮▮▮▮ @CDCR
**Subject:** RE: IDTT supervision for unlicensed psychologists

Good afternoon Drs. ▮▮▮▮▮▮ and ▮▮▮▮ .

We again did not have licensed psychologists or supervisors in our IDTTs today, though Dr. ▮▮▮▮▮▮ was in her office. We had 15 IDTTs. When we spoke with Ms. ▮▮▮▮▮▮ yesterday, she alluded to a discussion with Dr. Golding about a resolution to this. As you know, we have no licensed psychologists in our unit, and we are eager to have our staff clinicians appropriately supervised. Thank you in advance,

▮▮▮▮▮▮▮▮▮▮▮▮▮▮ .
▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮ @cdcr.ca.gov


CALIFORNIA CORRECTIONAL
**HEALTH CARE SERVICES**

**From:** ██████████@CDCR
**Sent:** Monday, September 12, 2016 10:44 AM
**To:** ██████████@CDCR
**Cc:** ██████████CDCR; ██████████@CDCR; ██████████@CDCR; ██████████@CDCR
**Subject:** RE: IDTT supervision for unlicensed psychologists

Hello Dr. ██████
I am planning to discuss this with Dr. ██ today and will update you after the meeting.
Thanks,

████
██████ , ██ ,
██████ st ██████ , CHCF Stockton.
Cell - ██████
Email - ██████@cdcr.ca.gov

Please note, I am out of office on Fridays (RDO).

HIPAA NOTICE: The documents accompanying this electronic transmission, or this transmission itself, may contain Protected Health Information. This information belongs to the sender and is legally privileged. The information is intended only for the use of the individual or entity named above. If you are not the intended recipient, you are hereby notified that you may not disclose, copy, distribute or take action on the information in these documents. All such activities are strictly prohibited. If you have received this e-mail in error, please delete the e-mail immediately and empty your deleted items folder or take any steps necessary to ensure permanent deletion.

**From:** ██████████@CDCR
**Sent:** Monday, September 12, 2016 10:13 AM
**To:** ██████████@CDCR; ██████████@CDCR
**Cc:** ██████████ @CDCR; ██████████@CDCR; ██████████@CDCR
**Subject:** IDTT supervision for unlicensed psychologists

Good morning Drs. ██████ and ██████

We did not have a supervising psychologist in IDTT to supervise the unlicensed psychologists today. It is unclear if their IDTT documents are being reviewed by their supervisors. Are we any closer to a resolution on this? I want to be on the same page as the rest of the psychiatrists.
Thank you in advance,

██████████
████████ ,
                Office
██████ @cdcr.ca.gov


CALIFORNIA CORRECTIONAL
**HEALTH CARE SERVICES**



| From: | ██████████CDCR |
|---|---|
| To: | ██████████CDCR |
| Cc: | ██@C██        ██C██        ██CDCR |
| Subject: | RE: Unlicensed clinician orders |
| Date: | Monday, July 25, 2016 2:23:00 PM |

Thanks.

**PIIPIIPIIPIIPIIPIIPII**

**PIIPIIPIIPIIPIIPIIPIIPIIPIIPII**, CHCF Stockton.

Cell - **PIIPIIPIIPIIPII** (preferred)

Desk - **PIIPIIPIIPIIPII**

Email - **PIIPIIPIIPIIPIIPII**@cdcr.ca.gov

Please note, I am out of office on Fridays (RDO).

HIPAA NOTICE: The documents accompanying this electronic transmission, or this transmission itself, may contain Protected Health Information. This information belongs to the sender and is legally privileged. The information is intended only for the use of the individual or entity named above. If you are not the intended recipient, you are hereby notified that you may not disclose, copy, distribute or take action on the information in these documents. All such activities are strictly prohibited. If you have received this e-mail in error, please delete the e-mail immediately and empty your deleted items folder or take any steps necessary to ensure permanent deletion.

**From:** **PIIPIIPIIPII** @CDCR
**Sent:** Monday, July 25, 2016 2:01 PM
**To:** **PIIPIIPIIPIIPIIPII** @CDCR; **PIIPIIPIIPIIPII** @CDCR
**Cc:** **PIIPIIPIIPIIPII** @**PIIPIIPIIPIIPIIPIIPII**    @CDCR; **PIIPIIPIIPIIPIIPII** CDCR
**Subject:** Re: Unlicensed clinician orders

Looping in Dr **PIIPIIPII** She has offered to be part of the solution.

**PIIPIIPIIPIIPIIPII**
**PIIPIIPIIPIIPIIPII**
CHCF-Stockton
Cell Phone # (Preferred): **PIIPIIPIIPII**

On Jul 25, 2016, at 1:06 PM, **PIIPIIPIIPIIPIIPIIPII**CDCR**PIIPIIPIIPIIPIIPIIPII** cdcr.ca.gov> wrote:

> That is correct. The issue is we don't have staff on 1A to sign these. Dr. **PIIPIIPII** 's off today and there is no licensed clinician on 1A. I spoke to Dr. **PIIPIIPII** and she did 15 clinician orders already and was not able to write orders for whole unit due to her own case load.
>
> I'm signing all of them today but was writing to see what our game plan is moving forward. My understanding is that both psychiatrists and licensed clinicians are hesitant in signing orders for patients they don't know clinically.

Thanks,

███████
███████████████████
██████████████ t ████████, CHCF Stockton.
Cell - ██████████████ (preferred)
Desk - ███████████████
Email - ███████████████████@cdcr.ca.gov

Please note, I am out of office on Fridays (RDO).

HIPAA NOTICE: The documents accompanying this electronic transmission, or this transmission itself, may contain Protected Health Information. This information belongs to the sender and is legally privileged. The information is intended only for the use of the individual or entity named above. If you are not the intended recipient, you are hereby notified that you may not disclose, copy, distribute or take action on the information in these documents. All such activities are strictly prohibited. If you have received this e-mail in error, please delete the e-mail immediately and empty your deleted items folder or take any steps necessary to ensure permanent deletion.

**From:** ███████████ @CDCR
**Sent:** Monday, July 25, 2016 12:44 PM
**To:** ██████████████@CDCR
**Cc:** ██████████████@CDCR; ██████████████████ CDCR; ██ ████████ @CDCR
**Subject:** Re: Unlicensed clinician orders

Any licensed psychologist or licensed psychiatrist can sign, according to our P&P.

██████████████████
██████████████████
CHCF-Stockton
Cell Phone # (Preferred): ██████████████

On Jul 25, 2016, at 12:07 PM, ████████████████ @CDCR
████████████████ cdcr.ca.gov> wrote:

Hello Dr. ██████
A1A nursing staff brought clinician orders for 15 patients, in need of signature to me as both Drs. █████ and █████ are unlicensed. Please let me know how to proceed as this I'm afraid is going to be a recurring issue.
Thanks,
███████
█████████████████
██████████████ t ████████ CHCF Stockton.
Cell - ██████████████ (preferred)
Desk - ███████████████

Email - PIIPIIPIIPIIPIIPIIPIIPII cdcr.ca.gov

Please note, I am out of office on Fridays (RDO).

HIPAA NOTICE: The documents accompanying this electronic transmission, or this transmission itself, may contain Protected Health Information. This information belongs to the sender and is legally privileged. The information is intended only for the use of the individual or entity named above. If you are not the intended recipient, you are hereby notified that you may not disclose, copy, distribute or take action on the information in these documents. All such activities are strictly prohibited. If you have received this e-mail in error, please delete the e-mail immediately and empty your deleted items folder or take any steps necessary to ensure permanent deletion.

| | |
|---|---|
| **From:** | ████@CDCR |
| **To:** | ████ DCR |
| **Cc:** | ██████████ CC ████████ @C ████████ PII PIIPIIPIIPIIPII @CDCR; Golding, Michael@CDCR |
| **Subject:** | RE: Unlicensed Providers in Crisis Beds |
| **Date:** | Thursday, August 25, 2016 10:52:31 AM |

Looping in Dr. ██

██████████████ ████ ████
██████████████ ████ ████
█████████████ '

CALIFORNIA HEALTH CARE FACILITY, STOCKTON

DIVISION OF CORRECTIONAL HEALTH CARE SERVICES

██████████ PHONE PREFERRED
██████████ OFFICE
██████████ @CDCR.CA.GOV

**Success is not measured by the heights one attains, but by the obstacles one overcomes in its attainment.** – Booker T. Washington

**From:** ████████@CDCR
**Sent:** Thursday, August 25, 2016 10:40 AM
**To:** Golding, Michael@CDCR
**Cc:** ████████ @█████████ @██████████ @CDCR
**Subject:** RE: Unlicensed Providers in Crisis Beds

Hi Mike:

As previously stated licensed psychologists do not want to work in MHCB even though that is not only a program guide requirement abut also a licensing requirement. Also I understood from Dr. ██████ that there was never blanket approval for unlicensed staff to work in MHCB. Each person had to receive a special approval. Psychiatrists in MHCB are already burdened with extra unnecessary work when paired with 6 licensed social workers in the MHCB.

There are 24 licensed psychologists at CHCF - 19 licensed psychologists at and 5 licensed psychologist specialists. Only 7 of these are in the 100 bed MHCB.
There are 11 unlicensed psychologists at CHCF out of which 7 unlicensed psychologists are in MHCB.
There are 16 licensed social workers at CHCF out of which 6 are in MHCB.


Here is a break down of the numbers


> 1) Number of licensed psychologists in each of our programs - MHCB, E EOP,
C/D EOP, C/D CCCMS and ASU

```
MHCB          7
Facility E 5
C/D EOP       2
C/D CCCMS     1
ASU/CCCMS     3
Specialist 1
```

> 2) Number of unlicensed psychologists in each of our programs - MHCB, E EOP, C/D EOP, C/D CCCMS and ASU

```
MHCB          7
Facility E 3
C/D EOP       1
C/D CCCMS     0
ASU           0
```

> 3) Number of licensed social workers in each of our programs - MHCB, E EOP, C/D EOP, C/D CCCMS and ASU

```
MHCB          1 plus 5 registry LSCW
Facility E 7
C/D EOP       2
C/D CCCMS     1
ASU
```

> 4) Number of unlicensed social workers in each of our programs - MHCB, E EOP, C/D EOP, C/D CCCMS and

```
MHCB
Facility E  1
C/D EOP
C/D CCCMS
ASU
```

There are only have 7 psychiatrists currently assigned to MHCB full time essentially carrying the 100 bed MHCB managing a case load of 15 patients each (if everyone is present) to 30 patients when their colleague is off (RDO) or vacation/holidays. We have been able to stay afloat with the help of 0.25's that I had gotten approved last year. Psychiatrists have continued to express liability concerns with this kind of case loads which Ms. ██████ and Dr. ██████ became aware in their all staff meeting and other meetings in the last few weeks.

They have expressed serious liability concerns now with the new directive being asked of me to give to them by the current ███████████████ Dr. ███ and Dr. ██████ in a informal meeting yesterday.

Kindly review and advice .



CALIFORNIA HEALTH CARE FACILITY, STOCKTON
DIVISION OF CORRECTIONAL HEALTH CARE SERVICES

 PHONE PREFERRED
OFFICE
@CDCR.CA.GOV

**Success is not measured by the heights one attains, but by the obstacles one overcomes in its attainment. – Booker T. Washington**

**From:** Golding, Michael@CDCR
**Sent:** Wednesday, August 24, 2016 5:02 PM
**To:** ████████████ @CDCR
**Subject:** Unlicensed Providers in Crisis Beds

Hi,

1. How come unlicensed psychologists are working in crisis beds? Is the reason that the licensed ones don't want to or that there simply are none working at CHCF?

2. How many line-staff licensed psychologists DO NOT work in crisis beds.

The answer to question 2 would help me a lot in my discussion (because if there are a lot, I can argue that more licensed folk should be working in the crisis bed, so as not to force the patient to be seen twice (by the psychiatrist and by the unlicensed psychologist).

Thanks,
Michael


**Michael Golding, M.D.**
Statewide Chief Psychiatrist
Mental Health Support Program
California Department of Corrections and Rehabilitation

Phone: 916.662.6541
Email: michael.golding@cdcr.ca.gov



Learn easy ways to save water
during California's drought at
SaveOurWater.com

attachment 82

**Golding, Michael@CDCR**

| | |
|---|---|
| **From:** | ▮▮▮▮▮▮▮▮▮▮@CDCR <karuna.anand@cdcr.ca.gov> |
| **Sent:** | Monday, August 29, 2016 1:58 PM |
| **To:** | ▮▮▮▮▮▮▮▮@CDCR |
| **Cc:** | ▮▮▮▮▮▮▮CDCR; ▮▮▮▮▮▮▮▮▮@CDCR; Golding, Michael@CDCR; ▮▮▮▮▮▮ ▮▮@CDCR |
| **Subject:** | RE: Phone call |

CAUTION: This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Thank you Mr. ▮▮▮▮▮▮:

Actually in the meeting it was only stated that Dr. Golding had said "that psychiatrists can co-sign unlicensed clinician orders if they both shared the patient".

Whereas my understanding of Dr. Golding's email is that the psychiatrists "can sign orders from unlicensed clinicians in crisis beds", "as long as both share the patient", "there is DPH approval for the unlicensed clinician", "and the psychiatrist fully knows the patient and agrees with the order".

Unfortunately, currently there are a number of unlicensed psychologists in MHCB currently that have yet to receive a Department of Public Health approval to work there. They have been working there without an approval. I have requested Dr. ▮▮ for the same and was made aware by our HPS I that it is still pending. Once I have received that I will send our Dr. Golding's directive to the psychiatry staff.

I will fully support Dr. ▮▮ in correcting any mental health program related deficiencies and brining them into licensing compliance at CHCF including correcting the licensing requirements of CHCF MHCB to have only licensed clinical psychologists and have unlicensed as an exception and only if there are no licensed psychologists in CHCF. moved into it especially as we have many in other programs.

I understand and agree with Dr. Golding that it will take Dr. ▮▮ time to move the numerous licensed psychologists currently in the unlicensed programs at CHCF into MHCB and assure you that she will have my full support in the mean time as long as nothing unethical or illegal is being requested of me or that of the psychiatrists.

Respectfully

▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮
California Health Care Facility, Stockton Division of Correctional Health Care Services

▮▮▮▮▮▮▮▮▮ iPhone Preferred

1

██████████ Office
██████████ @cdcr.ca.gov

Success is not measured by the heights one attains, but by the obstacles one overcomes in its attainment. -
Booker T. Washington

-----Original Message-----
From: ██████████ @CDCR
Sent: Monday, August 29, 2016 8:23 AM
To: ██████████ a@CDCR
Cc: ██████████ @CDCR; ██████████ a@CDCR; ██████████ @CDCR; Golding, Michael@CDCR;
██████████ a@CDCR
Subject: RE: Phone call

Dr. █████ ,
I believe this is consistent with what was discussed at our meeting/conversation Friday. Please work directly
with Dr. ███ if there are any questions or concerns.
Thanks,

██████████;
██████████;
California Health Care Facility (CHCF) Stockton
Office: ██████████
Cell: ██████████

-----Original Message-----
From: ██████████ a@CDCR
Sent: Saturday, August 27, 2016 3:54 AM
To: ██████████ @CDCR
Cc: ██████████ @CDCR; ██████████ a@CDCR; ██████████ @CDCR; Golding, Michael@CDCR;
██████████a@CDCR
Subject: RE: Phone call

Looping in Mr. ████████ who has replaced Ms. ████████

██████████
██████████
California Health Care Facility, Stockton Division of Correctional Health Care Services
██████████ iPhone Preferred
██████████ Office
██████████ cdcr.ca.gov

"Passion is energy. Feel the power that comes from focusing on what excites you." - Oprah Winfrey

.

2

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication. This e-mail is intended for CDCR usage only.  Unauthorized access or distribution is prohibited by all applicable laws.

---

From: Golding, Michael@CDCR
Sent: Friday, August 26, 2016 3:54 PM
To: ▮▮▮▮▮▮▮▮▮▮@CDCR
Cc: ▮▮▮▮▮▮▮ @CDCR; ▮▮▮▮▮▮▮▮ @CDCR; ▮▮▮▮▮▮▮▮▮ @CDCR; ▮▮▮▮▮▮▮▮▮ @CDCR
Subject: RE: Phone call

Hi,

Yes, psychiatrists can sign orders from unlicensed clinicians in crisis beds as long as both share the patient, there is DPH approval for the unlicensed clinician, and the psychiatrist fully knows the patient and agrees with the order. Sometimes psychiatrists are out for a day and a psychiatrist might be covering a double caseload for the day.

Particularly if a psychiatrist would not normally know the patient, it is reasonable for the unlicensed provider to present the patient to the psychiatrist so that the psychiatrist (or licensed psychologist) can understand and fully agree to the intervention, before he or she signs.

I think the reason for the need for DPH approval for each unlicensed provider is that each such individual working in crisis beds should be considered a "one-off", not a common or expected provider in the crisis bed. No doubt you know that.

So giving a psychiatrist 15 or 30 orders on a series of patients that he or she would not normally know, as apparently happened, and expecting him/her to sign (without fully presenting the cases) is quite problematic. Ordering a psychiatrist to sign under those circumstances is certainly unethical and perhaps far more.......

Dr. ▮▮▮▮▮▮ figures are as follows:

"There are 24 licensed psychologists at CHCF - 19 licensed psychologists at and 5 licensed psychologist specialists.  Only 7 of these are in the 100 bed MHCB.
There are 11 unlicensed psychologists at CHCF out of which 7 unlicensed psychologists are in MHCB.
There are 16 licensed social workers at CHCF out of which 6 are in MHCB."

So if accurate, there would seem to be only 7 of 20 clinicians working in the crisis beds who can sign orders, yet you have 24 psychologists in your facility who can. I very much know that it will take you time to sort this out and move the correct people. And everyone just started!

I just was concerned that as it is sorted out, there is care in doing so.

Thank you Dr. ▮▮▮▮▮▮ for your assistance in helping CHCF.

Thanks,
Michael


Michael Golding, M.D.
Statewide Chief Psychiatrist
Mental Health Support Program
California Department of Corrections and Rehabilitation

Phone: 916.662.6541
Email: michael.golding@cdcr.ca.gov



-----Original Message-----
From: ████████████CDCR
Sent: Friday, August 26, 2016 1:16 PM
To: Golding, Michael@CDCR; ██████████CDCR
Subject: Phone call

Michael and ,

I'm sorry but something came up and I'm unable to join you for a call this afternoon. You may want to invite Dr. ███ as she's familiar with the issues and I emailed her yesterday to reiterate that psychiatrists can co-sign when the unlicensed clinician and psychiatrist share the patient.

████

..

attachment 83

**Golding, Michael@CDCR**

| | |
|---|---|
| **From:** | Golding, Michael@CDCR <michael.golding@cdcr.ca.gov> |
| **Sent:** | Thursday, August 25, 2016 5:42 PM |
| **To:** | PIIPIIPIIPIIPII @CDCR; PIIPIIPIIPII @CDCR |
| **Subject:** | Apropos of Our Conversation |

---

**CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

---

HI Drs. PIIPIIPIIPIIPIIPII ,

Nothing for either of you to do, at all. The situation described below is being handled. This is just an FYI given the conversation I had with Dr. PIIPIIPII today.

There is an awkwardness in the relationship between psychiatrists and psychologists. I thought the below e-mail string was apropos, given our earlier conversation! At CHCF, basically they have assigned a preponderance of unlicensed psychologists to the crisis beds and allowed their far more numerous licensed psychologists to work elsewhere at CHCF.

An absence of licensed psychologists willing to work in the crisis beds has precipitated a situation in which the psychology supervisors are trying to force the psychiatrists to sign orders in crisis beds, written by unlicensed psychologists, about patients whom the psychiatrists do not know. Obviously this is illegal and I put a stop to it, today, by utilizing significant persuasion.

As PIIPIIPIIPIIPIIPIIPIIPII said, "psychiatrists" and he mentions licensed psychologists are "hesitant in signing orders for patients they don't know clinically."…" But, I'm signing all of them today but was writing to see what our game plan is moving forward."

But this kind of awkward situation (psychiatrists getting orders from psychologists to write orders) is very common in my experience in CDCR, unfortunately.

Best,
Michael


Hi Mike:

As previously stated licensed psychologists do not want to work in MHCB even though that is not only a program guide requirement abut also a licensing requirement. Also I understood from Dr. PIIPIIPII that there was never blanket approval for unlicensed staff to work in MHCB. Each person had to receive a special approval. Psychiatrists in MHCB are already burdened with extra unnecessary work when paired with 6 licensed social workers in the MHCB.

There are 24 licensed psychologists at CHCF - 19 licensed psychologists at and 5 licensed psychologist specialists. Only 7 of these are in the 100 bed MHCB.
There are 11 unlicensed psychologists at CHCF out of which 7 unlicensed psychologists are in MHCB.
There are 16 licensed social workers at CHCF out of which 6 are in MHCB.


Here is a break down of the numbers

> 1) Number of licensed psychologists in each of our programs - MHCB, E EOP, C/D EOP, C/D CCCMS and ASU

```
MHCB          7
Facility E    5
C/D EOP       2
C/D CCCMS     1
ASU/CCCMS     3
Specialist 1
```

> 2) Number of unlicensed psychologists in each of our programs - MHCB, E EOP, C/D EOP, C/D CCCMS and ASU

```
MHCB          7
Facility E    3
C/D EOP       1
C/D CCCMS     0
ASU           0
```

> 3) Number of licensed social workers in each of our programs - MHCB, E EOP, C/D EOP, C/D CCCMS and ASU

```
MHCB          1 plus 5 registry LSCW
Facility E    7
C/D EOP       2
C/D CCCMS     1
ASU
```

> 4) Number of unlicensed social workers in each of our programs - MHCB, E EOP, C/D EOP, C/D CCCMS and

```
MHCB
Facility E    1
C/D EOP
C/D CCCMS
ASU
```

There are only have 7 psychiatrists currently assigned to MHCB full time essentially carrying the 100 bed MHCB managing a case load of 15 patients each (if everyone is present) to 30 patients when their colleague is off (RDO) or vacation/holidays.  We have been able to stay afloat with the help of 0.25's that I had gotten approved last year.  Psychiatrists have continued to express liability concerns with this kind of case loads which Ms. <span style="background:black;color:red">PIIPIIPII</span> and Dr. <span style="background:black;color:red">PIIPIIPII</span> became aware in their all staff meeting and other meetings in the last few weeks.

They have expressed serious liability concerns now with the new directive being asked of me to give to them by the current <span style="background:black;color:red">PIIPIIPIIPIIPIIPIIPIIPIIPIIPII</span> Dr. <span style="background:black;color:red">PII</span> and Dr. <span style="background:black;color:red">PIIPIIPII</span> in a informal meeting yesterday.

Kindly review and advice .



**CALIFORNIA HEALTH CARE FACILITY, STOCKTON**
**DIVISION OF CORRECTIONAL HEALTH CARE SERVICES**

PIIPIIPII██PII IPHONE PREFERRED
PIIPIIPIIPIIPII OFFICE
PIIPIIPIIPIIPII
PIIPIIPIIPIIPII @CDCR.CA.GOV

**Success is not measured by the heights one attains, but by the obstacles one overcomes in its attainment.** – Booker T. Washington

**From:** Golding, Michael@CDCR
**Sent:** Wednesday, August 24, 2016 5:02 PM
**To:** PIIPIIPIIPIIPII @CDCR
**Subject:** Unlicensed Providers in Crisis Beds

Hi,

1. How come unlicensed psychologists are working in crisis beds? Is the reason that the licensed ones don't want to or that there simply are none working at CHCF?

2. How many line-staff licensed psychologists DO NOT work in crisis beds.

The answer to question 2 would help me a lot in my discussion (because if there are a lot, I can argue that more licensed folk should be working in the crisis bed, so as not to force the patient to be seen twice (by the psychiatrist and by the unlicensed psychologist).

Thanks,
Michael

Hi Mike PII :

I am being directed to direct my psychiatrists to co-sign on the unlicensed clinician orders in MHCB stating that this falls under the "5% work" that they can be directed to do.

Psychiatrists have expressed liability concerns stating they do not want to this. I spoke to Dr. PIIPIIPII regarding this and she informed me that the MHCB should only have licensed psychologists and psychiatrists and an unlicensed clinician

should not be writing orders. She also stated that legally only the identified supervising licensed clinician should be signing off on an unlicensed clinician work of any kind.

I have told them that I am not able to provide such directive to the psychiatrist at the present (I fear they will just walk over DSH). Dr. ▇▇▇▇ (a clinician who was recently licensed) moved over to DSH because such a request was being made of him.

Please advice.

▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇

**CALIFORNIA HEALTH CARE FACILITY, STOCKTON**
**DIVISION OF CORRECTIONAL HEALTH CARE SERVICES**

▇▇▇▇▇▇
▇▇▇▇▇▇ **IPHONE PREFERRED**
▇▇▇▇▇▇ **OFFICE**
▇▇▇▇▇▇ **@CDCR.CA.GOV**

**Success is not measured by the heights one attains, but by the obstacles one overcomes in its attainment.** – Booker T. Washington

On Jul 25, 2016, at 1:06 PM, ▇▇▇▇▇▇▇▇ @CDCR ▇▇▇▇▇▇▇▇ l@cdcr.ca.gov> wrote:

That is correct. The issue is we don't have staff on 1A to sign these. Dr. ▇▇▇▇ is off today and there is no licensed clinician on 1A. I spoke to Dr. ▇▇▇▇ and she did 15 clinician orders already and was not able to write orders for whole unit due to her own case load.

I'm signing all of them today but was writing to see what our game plan is moving forward.  My understanding is that both psychiatrists and licensed clinicians are hesitant in signing orders for patients they don't know clinically.

Thanks,

▇▇▇

▇▇▇▇▇▇▇▇▇,
▇▇▇▇▇▇▇▇▇▇▇▇▇ r, CHCF Stockton.
Cell - ▇▇▇▇▇▇ (preferred)
Desk - ▇▇▇▇
Email - ▇▇▇▇▇▇▇▇▇@cdcr.ca.gov

Please note, I am out of office on Fridays (RDO).

HIPAA NOTICE: The documents accompanying this electronic transmission, or this transmission itself, may contain Protected Health Information. This information belongs to the sender and is legally privileged. The information is intended only for the use of the individual or entity named above. If you are not the intended recipient, you are hereby notified that you may not disclose, copy, distribute or take action on the information in these documents. All such activities are strictly prohibited. If you have received this e-mail in error, please delete the e-mail immediately and empty your deleted items folder or take any steps necessary to ensure permanent deletion.

**From:** ██████████ @CDCR
**Sent:** Monday, July 25, 2016 12:44 PM
**To:** ██████████████ @CDCR
**Cc:** ██████████████ @CDCR; ██████████████ @CDCR; ██████████████ @CDCR
**Subject:** Re: Unlicensed clinician orders

Any licensed psychologist or licensed psychiatrist can sign, according to our P&P.

██████████████
██████████████
CHCF-Stockton
Cell Phone # (Preferred): ████████████

On Jul 25, 2016, at 12:07 PM, ██████████████ @CDCR ██████████████ cdcr.ca.gov> wrote:

Hello Dr. ██████
A1A nursing staff brought clinician orders for 15 patients, in need of signature to me as both Drs. ████ and ████ are unlicensed. Please let me know how to proceed as this I'm afraid is going to be a recurring issue.
Thanks,
██████

██████████ , ████
██████████████ st ████████r, CHCF Stockton.
Cell - ████████████ (preferred)
Desk - ██████████████
Email - ██████████████@cdcr.ca.gov

**Michael Golding, M.D.**
Statewide Chief Psychiatrist
Mental Health Support Program
California Department of Corrections and Rehabilitation

Phone: 916.662.6541
Email: michael.golding@cdcr.ca.gov



Learn easy ways to save water
during California's drought at
SaveOurWater.com

attachment 84

**Golding, Michael@CDCR**

| | |
|---|---|
| **From:** | ▮▮▮▮▮▮▮▮▮▮▮ @CDCR ▮▮▮▮▮▮▮▮▮▮▮▮ cdcr.ca.gov> |
| **Sent:** | Friday, March 1, 2019 1:48 PM |
| **To:** | Golding, Michael@CDCR |
| **Cc:** | ▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ CDCR |
| **Subject:** | RE: Evening Telepsych- Dr. Golding's Directive |

---

**CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

---

PPOC and Telepsych are available for consult to the CIT team. Let me know if you would like every after hour CIT intervention to include the TElepsych doc? Otherwise, the CIT team can continue with consult model. Also, I need to know your preference when there is not psychologist for CIT (e.g., say their shift ends at 2000 hours, but the 1st watch telepsych is on duty until 0800 hours the next morning) do you want the tele-psychiatrist to activate CIT (to include the Ltn. And SRN) when he/she has to do a face to face for an emergent issue? Totally up to know. Let me know your preference and I will give direction to COR.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
Statewide Mental Health Program

▮▮▮▮▮▮▮▮ iPhone
▮▮▮▮▮▮▮ Office
▮▮▮▮▮▮▮▮▮▮ cdcr.ca.gov

**CONFIDENTIALITY NOTICE**: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

**From:** Golding, Michael@CDCR
**Sent:** Friday, March 01, 2019 1:17 PM
**To:** ▮▮▮▮▮▮▮▮▮▮▮ CDCR ▮▮▮▮▮▮▮▮▮▮▮ cdcr.ca.gov>
**Cc:** ▮▮▮▮▮▮▮▮▮▮▮ CDCR ▮▮▮▮▮▮▮▮▮▮▮ cdcr.ca.gov>; ▮▮▮▮▮▮▮▮ CDCR ▮▮▮▮▮▮▮▮ cdcr.ca.gov>
**Subject:** Re: Evening Telepsych- Dr. Golding's Directive

Hi,

Just to be aware we are not in favor of using the telepsychiatrist in the evening in place of a CIT psychologist at night.

Similarly when we added MAs, it was not helpful that they simply removed schedulers from our psychiatrists.

These kind of substitutions just show that there is a certain amount of help that our institutions think should properly go to psychiatrists and their patients.

And if that amount is exceeded by a headquarter's intervention that helps psychiatrists and their patients, then resources must then be removed from the psychiatrist (and thus the patient) locally to make up for the HQ help.

The assumption by the leadership (psychologists and administrators) is that psychiatrists don't deserve additional help in trying to take care of their patients.

If the goal is to help our psychiatric practitioners take better care of patients, locally removing support from our patients and psychiatrists when headquarters adds some, is not a good way to start.

Sure, we can help every now and then if a Clinician is not there, but it is a little bit concerning what is said below. We should watch this carefully. Psychologist should be on crisis intervention teams. If the psychologist will be removed because the psychiatrist is added, that is a problem.

My experience echoes what she says below. Because psychiatrists are unable to control the incentives in institutions (because there are no psychiatric executives and no regional support), attempts at the headquarters level to help, lead to withdrawal of support to psychiatric patients at a local level.

Thanks
Sent from my iPhone

On Mar 1, 2019, at 1:35 PM,

.....The politics at the prison level is a different game and the same as in anything else the clinician will be moved and then psychiatry will end up doing all CIT and leaving the burden on the on call. I think for Cor it should be very clear that first and foremost it will be medication related contacts otherwise it's not a help for psychiatry here and you are just helping Psychology and they already have enough staff and monopoly. You may want to play as a team but they do not. So if you are not clear then it's pointless.....

Sent from my iPhone

Begin forwarded message:

## Subject: Re: Evening Telepsych- Dr. Golding's Directive

This is good news! Now that we've lost 300 EOP, central fill pharmacy is doing the MHCB medication reconciliation's, and 1W Tele psychiatry will be taking a lot of calls, our psychiatrists will get the relief (and sleep) they've been asking for. Thank you Dr. Golding.

Sent from my iPhone
PIIPIIPII
PIIPIIPIIPIIPII

On Mar 1, 2019, at 8:41 AM, PIIPIIPIIPIIPII CDCR PIIPIIPIIPIIPII @cdcr.ca.gov> wrote:

Fyi..



Mental Health
Corcoran State Prison PII
PIIPIIPIIPIIPIIPII extension PII Office
PIIPIIPIIPIIPII Cell
PIIPIIPIIPIIPII @cdcr.ca.gov

2

CONFIDENTIALITY NOTICE. This communication with its contents contains confidential and/or legally privileged information. It is solely for the use of the intended recipient (s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

**From:** ▮▮▮▮▮▮CDCR
**Sent:** Thursday, February 28, 2019 8:52 PM
**To:** ▮▮▮▮▮ @CDCR ▮▮▮▮▮ @cdcr.ca.gov>; ▮▮▮▮▮▮CDCR ▮▮▮▮▮▮ cdcr.ca.gov>; ▮▮▮▮▮▮ CDCR ▮▮▮▮▮▮ @cdcr.ca.gov>
**Subject:** Fwd: Evening Telepsych

Here's his directive...

Sent from my iPhone

Begin forwarded message:

> **From:** "Golding, Michael@CDCR"
> <Michael.Golding@cdcr.ca.gov>
> **Date:** February 28, 2019 at 7:56:05 PM PST
> **To:** ▮▮▮▮▮ @CDCR" ▮▮▮▮▮ @cdcr.ca.gov>
> **Subject: Fwd: Evening Telepsych**
>
> FYI
>
> Sent from my iPhone
>
> Begin forwarded message:
>
>> **From:** Michael.Golding@cdcr.ca.gov
>> **Date:** February 28, 2019 at 10:55:49 PM EST
>> **To:** ▮▮▮▮▮ l@cdcr.ca.gov
>> **Cc:** ▮▮▮▮▮ )cdcr.ca.gov, ▮▮▮▮▮ ,
>> ▮▮▮▮ @CDCR"
>> ▮▮▮▮▮ cdcr.ca.gov>
>> **Subject: Evening Telepsych**
>>
>> Hi,
>>
>> The night Telepsych can and should help with CIT.
>>
>> The trick is that the patient needs to be brought to the TTA.
>>
>> Though this sounds weird, at night we have not gotten approval for the Tele psychiatrist to see the patient cell side, using a camera.
>>
>> So the CIT team, minus the psychiatrist, can see a

3

patient cellside who will not go to the TTA. The
CIT team can then present the patient to the evening
telepsychiatrist for advice.

Best,
Michael

Sent from my iPhone

# CERTIFICATE OF SERVICE

Case Name:   <u>**Coleman v. Newsom, et al.,**</u>     No.   <u>**2:90-cv-00520 KJM-SCR**</u>

I hereby certify that on <u>October 28, 2024</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

**NOTICE OF RE-FILING REDACTED SECOND GOLDING REPORT**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on <u>October 28, 2024</u>, at Los Angeles, California.

<table>
<tr><td>J. Sissov</td><td><i>/s/ J. Sissov</i></td></tr>
<tr><td>Declarant</td><td>Signature</td></tr>
</table>

CF1997CS0003
67196172.docx