ROB BONTA, State Bar No. 202668
Attorney General of California
DAMON G. MCCLAIN, State Bar No. 209508
Supervising Deputy Attorney General
ELISE OWENS THORN, State Bar No. 145931
CHRISTIAN M. GEORGELY, State Bar No. 322952
Deputy Attorney General
　1300 I Street, Suite 125
　P.O. Box 944255
　Sacramento, CA 94244-2550
　Telephone: (916) 210-7318
　Fax: (916) 324-5205
　E-mail: Elise.Thorn@doj.ca.gov
*Attorneys for Defendants*

HANSON BRIDGETT LLP
LAWRENCE M. CIRELLI, SBN 114710
PAUL B. MELLO, SBN 179755
SAMANTHA D. WOLFF, SBN 240280
KAYLEN KADOTANI, SBN 294114
DAVID C. CASARRUBIAS-GONZALES, SBN 321994
MOLLIE LEVY, SBN 333744
SAMANTHA M. BACON, SBN 351561
　425 Market Street, 26th Floor
　San Francisco, CA 94105
　Telephone: (415) 777-3200
　E-mail: PMello@hansonbridgett.com
*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **RALPH COLEMAN, et al.,**<br><br>　　　　　　　　　　Plaintiffs,<br><br>　v.<br><br>**GAVIN NEWSOM, et al.,**<br><br>　　　　　　　　　　Defendants. | 2:90-cv-00520 KJM-SCR<br><br>**DEFENDANTS' RESPONSE TO THE SPECIAL MASTER'S SEPTEMBER 30, 2024 DATA REMEDIATION REPORT** |

**TABLE OF CONTENTS**

**Page**

Introduction .................................................................................................................................. 1

Response to the Data Remediation Report ................................................................................. 1

    I.     Defendants Agree in Part to The Special Master's Proposal ................................. 1

    II.    The Report's Criticisms of Defendants' Response to Requests for Data and Documents are unfounded. .................................................................................. 3

        A.    CDCR's Data Production is Tied to Data Remediation. ............................. 4

        B.    The Special Master's Data Requests Do Not Align with Data Remediation. .................................................................................................. 5

        C.    CDCR has Timely and in Good Faith Attempted to Address Issues Concerning Data Production. ....................................................................... 6

        D.    CDCR's Request for Minimum Time to Provide Documents Is Reasonable. ................................................................................................... 8

        E.    On-Site Document Requests. ..................................................................... 10

Conclusion ................................................................................................................................ 11

Certification of Orders ............................................................................................................. 12

i

Defendants' Response to Special Master's 9/30/24 Report on Data Remediation (2:90-cv-00520 KJM-SCR)

**INTRODUCTION**

On August 16, 2024, the Court directed the Special Master to "propose directly to the court a solution to expedite completion of the [data remediation] process without sacrificing any measure of quality in the final product." (ECF No. 8358 at 4-5.) On September 30, 2024, the Special Master filed a Data Remediation Status Report (Report) that outlines proposed solutions to expedite the completion of data remediation and discusses the Special Master's views on some of the obstacles to more timely completion. (ECF No. 8410.) The Report notes that its contents are offered "in the spirit of acknowledging the extent of the work that remains, not apportionment of blame." (*Id.* at 2.)

Defendants appreciate the Special Master's acknowledgment of the "highly diligent efforts of all stakeholders" and the "significant progress [that] has been made." (ECF No. 8410 at 2.) Defendants also share the Special Master's sentiment that "this undertaking must come to an end as soon as possible without sacrificing the quality of the end product." (*Id.*) To that end, Defendants are encouraged by, and supportive of, the Special Master's decision to collaborate with the *Plata* Receiver on this important task. Defendants, too, see "great potential for this arrangement to make progress and create momentum toward completion of data remediation." (*Id.*) Defendants strongly believe that close coordination with the *Plata* Receiver on data remediation is likely to yield efficiencies and bring the parties closer to their shared goal of completion.

With that goal in mind, Defendants' response to the Report focuses on the Special Master's proposed solutions to expedite the data remediation process and the specific findings and recommendations set forth in Section IV.F. on the data production for monitoring tours.

**RESPONSE TO THE DATA REMEDIATION REPORT**

**I.    DEFENDANTS AGREE IN PART TO THE SPECIAL MASTER'S PROPOSAL**

The Report sets forth a three-part plan intended to expedite the completion of data remediation. (ECF No. 8410 at 30-31.) Defendants agree to the first two parts—which include the *Plata* Receiver's participation in the process—but are unable to comment on the third part of

1

the plan because it lacks the necessary detail to assess its potential to expedite the completion of data remediation.

The first two parts of the plan involve the Special Master's work with the *Plata* Receiver. First, the Special Master proposes that he continue to work with the *Plata* Receiver through the existing court-coordination process to accelerate and complete remediation of indicators that require patient-wise and degree-of-impact statistics, medication management indicators, and indicators in the programming and verification steps of the remediation process. Second, the Special Master proposes that, at his discretion, he explore with the *Plata* Receiver expanding the aforementioned data remediation-related coordination efforts. While the details and parameters of such an expansion are not provided in the Report, Defendants do not object to the Special Master's continued work with the *Plata* Receiver, and indeed are encouraged by it.[1]

The third part of the plan indicates that the Special Master has had "intensive discussions" with a large, global consulting firm to assist in bolstering his oversight of the data remediation process. While Defendants share the Special Master's desire to conclude the data remediation process in an expeditious manner so that all available mental health resources can focus on providing mental health services to the *Coleman* class, Defendants are concerned about the proposal to bring in a third-party "large, global consulting firm." The Report does not provide sufficient detail for Defendants to fully understand the proposal, meaningfully respond to it, or articulate specific objections. But as an initial matter, Defendants are concerned that this outside consulting group would need time to simply gain even a rudimentary understanding of the Mental Health Services Delivery System, the California Department of Corrections and Rehabilitation's (CDCR) reporting, and the status of data remediation, before it could meaningfully assist with the project. Given the time this would all take, it is unclear whether bringing in such a firm would have the intended effect of expediting the completion of data remediation. Defendants look

---

[1] Defendants do not agree with the Report's presentation of all of the outstanding issues concerning data remediation but believe the continued work in data remediation and the court coordination processes may resolve the Reported issues. To the extent disputes arise that cannot be resolved, any disputes will be brought to the Court through the court-approved process.

forward to receiving additional information, including a proposal outlining the scope of this potential work, as well as an opportunity to respond.

**II.    THE REPORT'S CRITICISMS OF DEFENDANTS' RESPONSE TO REQUESTS FOR DATA AND DOCUMENTS ARE UNFOUNDED.[2]**

The Special Master wrongly accuses Defendants of inappropriately limiting his access to information and data required to monitor the Statewide Mental Health Program. (ECF No. 4810 at 27-29.) The history in this case supports CDCR's use of caution when providing data to the Special Master, and a review of all of the relevant facts on CDCR's response to the document requests shows that CDCR has responded to each request as expeditious as possible, and that the responses are not the product of litigation tactics or a pattern of behavior that the Special Master describes as "coming close to the obstruction of his monitoring." (*Id.* at 27.)

CDCR fully acknowledges the authority granted to the Special Master by the order of reference to have access to information and documents. But the background and impetus for the data remediation process justifies CDCR's caution in providing data from multiple unremediated sources of data. Indeed, as Secretary Macomber recently wrote to Special Master Lopes, "given the previous finding that CDCR intentionally misled the Court, CDCR is acutely aware of its responsibility to provide consistent and accurate data to your team," and "seeking clarification is sometimes necessary to ensure that we are providing consistent and accurate data that is responsive to the request." (Thorn Decl. ¶ 2, Ex. A.) The Report's description of CDCR's pre-tour production of documents fails to recognize data remediation's impact on the importance of identifying the most accurate sources of data and reports. As the parties and the Special Master successfully complete the data remediation process, CDCR's data sources and production must be updated to align with the remediated data. CDCR's requests for clarification on the requests and

---

[2] Defendants acknowledge the Court's October 30, 2024 order on the Special Master's Thirtieth Round Monitoring Report, Part D. (ECF No. 8447.) While the order addresses Defendants' objections concerning the Special Master's characterization of Defendants' request as "efforts to obstruct monitoring," Defendants present this response to address data and document production issues in the context of data remediation. Because the Report raises issues that were not raised in the Thirtieth Round Report and makes additional allegations regarding data and document requests for the Thirty-First Monitoring round, Defendants object to the Report on the bases discussed below.

applicable data sources is not a litigation tactic, but rather, a cautious effort to ensure the accuracy of information that is provided. The Special Master's characterization of these efforts as obstructionist is misplaced.

### A. CDCR's Data Production is Tied to Data Remediation.

The Report correctly points out that the data remediation process is a response to the Court's 2019 finding that Defendants knowingly provided misleading data to the Special Master. (ECF No. 8410 at 1.) Since that 2019 order, Defendants have dedicated significant resources to achieve and maintain a clear, consistent, and transparent reporting process. That objective also influences CDCR's approach to responding to the Special Master's data requests, and CDCR has worked hard to ensure that all data provided to the Special Master is carefully reviewed and vetted through CDCR's headquarters for accuracy and consistency. In a system with 33 institutions and thousands of mental health staff inputting millions of data points each month, CDCR centralized the review process for data and document requests to ensure that the data and documents provided for monitoring are accurate, consistent, and reliable. When inconsistencies or errors are found in the data, CDCR seeks to understand the reasons and to resolve the data issues instead of providing data from a different, unvalidated source. Standardization of data queries and search parameters at the headquarters level ensures consistency in the data provided over time and across the prison system.

The Report faults CDCR for processing the data and document requests through CDCR headquarters rather than allowing individual institutions to provide local data upon demand. In doing so, the Report disregards the data remediation process, which is designed to compile data using the methodologies developed and agreed upon in data remediation in one centralized source that can be used to evaluate CDCR's mental-health program. CDCR's caution in providing unremediated, unverified data should come as no surprise, nor does it indicate gamesmanship or improper litigation tactics. The production of ad-hoc, unremediated, and unverified reports and data directly from the institutions puts CDCR at risk of adverse findings by the Special Master without understanding the bases for the Special Master's findings and recommendations, where the data relied upon is not always clearly identified.

1    The headquarters production process allows CDCR to maintain consistency in how data is pulled, shared, and tracked, and ensures the use of accurate, remediated data. To the extent possible, the Special Master's monitoring and reports should be based on data sources that have been remediated. After all, the purpose of data remediation is to create a common factual basis, compiled through methodologies agreed to by the parties and the Special Master, to accurately assess CDCR's performance. Data pulled from different, untested, and unverified sources at the local level without an understanding of the methodology used to collect such data will not further the goal of ensuring that Defendants provide accurate, consistent data to the Special Master and the Court.

### B.    The Special Master's Data Requests Do Not Align with Data Remediation.

Data remediation is the court-ordered process that must be completed before CDCR is allowed to fully implement its self-monitoring tool, the Continuous Quality Improvement Tool (CQIT). (ECF No. 6846 at 10.) The Special Master's monitoring, including the data requested and used in monitoring, should be consistent with data remediation objectives and requirements.

Prior to each monitoring tour, the Special Master sends CDCR a lengthy request for data and information for each toured institution that requires CDCR to provide narrative responses and produce documents in response to hundreds of individual requests for information, not including subparts. (Thorn Decl. ¶, Exhibit B.) However, many of those requests do not align with the process CDCR follows to collect and track data as required by data remediation. For example, for the focused EOP tours, the Special Master submitted an abbreviated document request asking that CDCR produce the allocated and filled staffing data only for the EOP program. (Thorn Decl. ¶ 4, Exhibit C at 3.) But the remediated staffing reports do not break out allocations by level of care. (ECF No. 8413 at 5-26.) CDCR's response to the data and document requests include a description of the reports that are responsive to the requests and caveats to the limits of the available data. (Thorn Decl. ¶ 5, Exhibit D.)

Another example of the Special Master's request not aligning with remediated data is the standard request for each local institution's staffing data for mental health (including administrative staff), nursing, and custody positions. (Thorn Decl. ¶ 3, Exhibit B, Request III.3A

5

at 4-6.) Although CDCR has previously provided the remediated staffing reports that are filed with the Court, the Special Master's team seeks local reports prepared with unremediated data. This is problematic insofar as local institutions are likely to use different metrics and data points such that local data is unlikely to perfectly align with the remediated reports upon which this Court and the parties rely.

Many of the Special Master's data requests require reference to multiple reports. For example, Request 7 from for the focused EOP tours required CDCR to provide six reports, four separate reports and one report that had to be filtered and run in two different ways to provide specific information. (Thorn Decl. ¶ 4, Exhibit C at 2-3.) The data is available, but not easily reproduced from regular reports and this takes time and resources.

The Special Master's team also requests data that is not related to any key performance indicator, including nursing and custody staffing data; caseload data; and the number of patients assigned to PIP groups and manner of assignments, any waitlist, the range and average number of patients participating in each group per week, and the number of groups provided in a language other than English. (Thorn Decl. ¶ 3, Exhibit B, Request IV.4 at 8.) In addition to seeking information that extends beyond Program Guide requirements, satisfying the requests is problematic because it requires manual data searches and compilations that take time. Since these are not data points that are routinely tracked, these responses are compiled after-the-fact and lack clear, *a priori* methodology or consistency across institutions.
 and that will not provide data in a consistent manner across all institutions.

### C.  CDCR has Timely and in Good Faith Attempted to Address Issues Concerning Data Production.

The Report describes CDCR's responses to the Special Master's data and document requests as using the data remediation process and its results to inappropriately limit the Special Master's access to information and data required for his ongoing monitoring of the Statewide Mental Health Program. (ECF No. 8410 at 27-28.) The Report also describes periodic and reasonable delays in the production of documents as "tactics CDCR has deployed thus far during the 31st Round," and that Defendants have taken the position that they are not obligated to

provide the Special Master with any information outside the four-corners of the provisionally approved indicators. (ECF No. 8410 at 29.) These statements attribute positions to Defendants that are not supported by the record. Instead, as the Special Master has confirmed in earlier reports, Defendants have acknowledged the Special Master's entitlement to the information requested for the monitoring tours (ECF No. 8359 at 40), and that Special Master has always received all documents he is entitled to under the order of reference. (*Id.* at n. 25.)

The communications between CDCR and the Special Master team demonstrate that CDCR is not only fully cooperative in the document production process, but that at each step of the process, CDCR remains willing to work with the Special Master team to provide data that exists and can be produced. The Report includes several e-mails between Defendants and the Special Master team that describe some of the issues with CDCR's data production (ECF No. 8410-1 at 48-57), but it omits e-mails that demonstrate CDCR's efforts to cooperate with the Special Master and work through document-request issues. For example, CDCR sent several e-mails to the Special Master team inviting a discussion of the document production, including the timelines for production, clarification regarding the document requests, and clarification regarding the Special Master team's on-site requests to improve future document production. (Thorn Decl. ¶¶ 5-9, Exhibits D, E, F, G, and H.) Those e-mails show CDCR's efforts to produce documents promptly, demonstrate the need for additional time to make the production, and provide explanations for mishaps in a given production. Defendants have not received a response to those e-mails. (Thorn Decl. ¶ 10.) Instead, the Special Master's team discussed the document production issues with defense counsel on September 17, 2024, at the California Medical Facility (CMF) Psychiatric Inpatient Program (PIP) tour, and it was agreed that the document production requests would be reviewed and any issues concerning production would be discussed as they arose. (Thorn Decl., ¶11.) The fact that those discussions took place and CDCR's commitment to work with the Special Master's team were omitted from the Report.

Since the Report was filed, CDCR and the Special Master's team have worked to resolve data and document production issues. On October 10, 2024, the Special Master met with CDCR's counsel to discuss document production concerns. (Thorn Decl. ¶ 12.) And on October

7

17, 2024, CDCR Secretary Jeff Macomber wrote to Special Master Lopes to address the data and document production issues raised in the Report and reiterate CDCR's commitment to providing accurate, responsive data in response to the Special Master team's requests. In that letter, Secretary Macomber also urged the Special Master to reach out to himself directly to resolve any further concerns, or to contact himself, Undersecretary Dr. Diana Toche, or General Counsel Jennifer Neill if his team believes that CDCR's actions are obstructing his team's ability to tour facilities. (Thorn Decl. ¶ 2, Exhibit A.)

### D. CDCR's Request for Minimum Time to Provide Documents Is Reasonable.

One of the Report's main criticisms under Section IV.F. is that CDCR does not provide the requested documents sufficiently in advance of the monitoring tours: "[i]f defendants continue with this pattern of untimely production of documents, the Special Master's monitoring teams may be unable to complete their work during the site visit, and consequently, the Special Master will have to consider scheduling re-visits of these institutions; this would be inefficient, costly, and a waste of judicial resources." (ECF No. 8410 at 28.) While Defendants acknowledge that CDCR was not in every instance able to meet the Special Master's production deadlines, the Report does not describe how or whether any monitoring efforts were actually impeded. Nor does the Report acknowledge that the Special Master team's requests for documents have provided CDCR with increasingly shorter lead times for production, thus impacting CDCR's ability to timely respond.

On August 17, 2024, the Special Master's team sent the document requests for the recent PIP tours to CDCR with a September 3 deadline for production, providing CDCR with only 17 days to gather and produce data and documents before the tours began. (Thorn Decl. ¶ 3, Exhibit B.) Given the scope and number of requests, the data that must be provided in response, and the number of coinciding tours, it is extremely difficult for CDCR to meet production deadlines shorter than 30 days. CDCR carefully assesses every document request to ensure that data and documents from the most up-to-date and accurate sources are provided. For each request and its subparts, CDCR prepares and produces to the Special Master a cover sheet that explains the nature of the available data and documents requested, whether CDCR has a report or source that

provides the information requested, the date the data is pulled, the status of applicable or available indicators in data remediation, and any caveats for the data. (Thorn Decl. ¶ 5, Exhibit D; cover sheets produced with documents to the Special Master via CDCR's Sharepoint on September 16, 2024.)

While the Special Master's team asserts that monitoring tour document requests have been the same for over twenty years, they miss the critical point that much has changed since these requests were first initiated and the information that is now available—largely because of the data remediation process—has significantly changed. Data remediation has changed the sources of data and the methods for reporting data based on agreements in the Business Rules and Methodology Review (BRMR). It has also provided CDCR with a better understanding of the nuances in the data and what is most responsive to the Special Master's requests. In accordance with these agreements, and the clarity gained through data remediation, CDCR cannot and does not simply rely on sources that were used in prior rounds or earlier tours due to changes in the reporting system resulting from data remediation and report updates. In other words, because the data remediation process is constantly changing the landscape of available, validated data, it is not always clear from one document request to the next exactly what information would be most responsive or from which sources it should be produced. So, although the Special Master's data requests seem to be the same, the lens through which CDCR considers its responses and available data has changed. For each request, CDCR must consider how to provide as much data as possible from remediated sources to maintain transparency and consistency, and also considers whether there is anything more that would provide any additional, responsive data.

The lead times for document production have also changed; decreasing since the last monitoring round and affording CDCR significantly less time to respond. For the PIP monitoring tours, the timeline allowed for production was significantly shorter in the 31st round (between 17 and 24 days) as compared with the 30th monitoring round (between 35 and 37 days). (Thorn Decl. at ¶ 13.)

CDCR has repeatedly requested a production timeline of at least 30 days to provide the requested information. (*See* Thorn Decl. ¶¶ 2, 5, and 9, Exhibits A, D, and H.) And it is possible

1   CDCR may need more than 30 days in some instances, for example, when there are simultaneous
2   document requests made at the beginning of a cycle of tours, such as the Enhanced Outpatient
3   Program or Correctional Clinical Case Management System tours.  CDCR understands that the
4   Special Master's team needs sufficient time to review the data and documents before the on-site
5   tour.  However, it is equally important that CDCR be provided sufficient time to assess the
6   document requests, determine the appropriate responsive data, clarify requests and sources with
7   the Special Master's team if necessary, and organize and prepare it for electronic production so
8   the Special Master's team has current, reliable, and accurate data and documents.  This is not a
9   matter of CDCR engaging in delay tactics, and, as Secretary Macomber recently reiterated,
10  CDCR needs at least 30 days, or longer where reasonably requested, to respond to the data and
11  document requests.  (Thorn Decl. ¶ 2, Ex. A.)

   CDCR proposes that the Special Master meet and confer with Defendants to work out a
schedule for production for all future tours that includes consideration of factors that impact
CDCR's ability to respond to document requests that are as short if not shorter than document
production under the Federal Rules of Civil Procedure.  When CDCR needs a greater lead time
for the production, reasonable requests for additional time should be granted.

   **E.    On-Site Document Requests.**

   The Report states that during "recent 31st Round monitoring tours, CDCR has prevented
institutional staff from supplementing the document production with additional, clarifying
documentation where errors or inconsistencies were identified in the headquarters-produced
documents." (ECF No. 8410 at 29.)  While it is true that CDCR headquarters, consistent with the
data remediation process, insisted that any corrections or supplement to headquarters-produced
data should be provided by headquarters, local institutional staff were not prevented from
providing on-site data.  Indeed, during the tours, the Special Master's team is provided with
patient rosters, group and treatment team schedules, as well as patient-specific data. (Thorn Decl.
¶ 14.)

   Onsite requests for local staff to pull data to correct or check the headquarters data cited in
the Report were addressed during the tours.  There was no effort to stonewall or block access to

data. For example, at the CMF PIP tour, the Special Master's team was not able to locate individual patient data that had been provided to them as part of the headquarters production in response to Request IV.7 for weekly treatment hours, and they asked local staff to re-run the data. (Thorn Decl. ¶ 15.) CDCR staff and counsel attending the tour promptly reviewed the issue with the Special Master team and showed the team how to access the data in the electronic file on the Sharepoint site. (*Id.*) CDCR also agreed to supplement the original document production if the Special Master's team needed additional data. (*Id.*) Although the local institution could access and provide a manual report on its patients' treatment data, that data would not have necessarily matched the parameters for the data pulled and produced by headquarters in response to the requests.

Producing data and documents predominantly through CDCR headquarters is consistent with CDCR's goal to provide remediated data whenever possible, and reliable and accurate reports. If an error is found in the data production, CDCR has explained why the error occurred and corrected the data. (*See* Thorn Decl. ¶ 6, Exhibit E, 9/19/24 e-mail Re: PIP Request for Treatment Offered.) CDCR conveyed to the Special Master team its goal of providing consistent source data across all institutions so that the Special Master's team is not relying on different types of non-remediated reports with different methodologies for different institutions. (*Id.*) Local institutions manually track patient data for their day-to-day operations using spreadsheets that do not necessarily follow the same methodologies, parameters, and filters that CDCR headquarters uses to provide data and may not align with agreements in data remediation or court requirements. (*Id.*) And each institution tracks things differently in response to their unique needs. The use of multiple data sources can result in inconsistent reporting, reports with errors, and reports that cannot be reconciled with statewide remediated data.

## CONCLUSION

Defendants agree that data remediation needs to be completed as expeditiously as possible. While the timeline to complete data remediation has not proceeded as first estimated in 2021, the reasons for the changed timeline are due to the complexity of the data system and a significant increase in the number of indicators required to audit the Statewide Mental Health Program. As

the Report indicates, "despite the highly diligent efforts of all stakeholders, the current arrangement is not producing results in a sufficiently timely manner." (ECF No. 8410 at 2.) Defendants agree with the Special Master's plan to work with the *Plata* Receiver to accelerate the completion of any part of data remediation process. However, to the extent the Special Master intends to engage the resources of a global consulting firm to assist in data remediation, Defendants request more information relating to the role of this firm as well as an explanation of how it would be able to expedite data remediation. Defendants also would request an opportunity to respond to any proposals relating to this global consulting firm's involvement in this case.

Regarding Defendants' responses to the document requests in advance of monitoring tours, Defendants have made and will continue to make every effort to respond timely with accurate information. Suggestions to the contrary, including those that CDCR is acting in an obstructionist or nefarious manner, are entirely misplaced. Rather, given this Court's past findings relative to Defendants' production of data, Defendants' caution in producing reliable and responsive data is reasonable. But Defendants also believe that the Special Master's reports should be based on remediated data and reports that are compiled using agreed-upon and Court-sanctioned methodologies to the extent possible.

Finally, if there are remaining concerns with CDCR's approach to the document productions, the Special Master and his team are encouraged to engage in discussions with Defendants (including with CDCR leadership at the highest levels) to resolve their questions and issues. And notably, the Report does not include any evidence that delays in document production have in fact hindered the Special Master's ability to fully monitor the Statewide Mental Health Program.

**CERTIFICATION OF ORDERS**

Defendants' counsel certifies that they reviewed the following orders relevant to this filing: ECF Nos. 640, 6427, 7216, 7695, 8078, 8121, 8181, 8358, 8406, and 8447.

Dated: October 30, 2024

Respectfully submitted,

ROB BONTA
*Attorney General of California*
DAMON MCCLAIN
*Supervising Deputy Attorney General*

***s/ Elise Owens Thorn***
*Elise Owens Thorn*
*Deputy Attorney General*
*Attorneys for Defendants*

HANSON BRIDGETT LLP

***/s/ Samantha D. Wolff***
PAUL B. MELLO
SAMANTHA D. WOLFF
DAVID C. CASARRUBIAS
*Attorneys for Defendants*

CF1997CS0003