Rob Bonta, State Bar No. 202668
Attorney General of California
Monica N. Anderson, State Bar No. 182970
Senior Assistant Attorney General
Damon McClain, State Bar No. 209508
Supervising Deputy Attorney General
Elise Owens Thorn, State Bar No. 145931
Christian M. Georgely, State Bar No. 322952
Deputy Attorneys General
 1300 I Street, Suite 125
 P.O. Box 944255
 Sacramento, CA 94244-2550
 Telephone: (916) 210-7318
 Fax: (916) 324-5205
 E-mail: Elise.Thorn@doj.ca.gov
*Attorneys for Defendants*

HANSON BRIDGETT LLP
LAWRENCE M. CIRELLI, SBN 114710
PAUL B. MELLO, SBN 179755
SAMANTHA D. WOLFF, SBN 240280
KAYLEN KADOTANI, SBN 294114
DAVID C. CASARRUBIAS-GONZÁLEZ, SBN 321994
SHANDYN H. PIERCE, SBN 336421
425 Market Street, 26th Floor
San Francisco, California 94105
Telephone:     415-777-3200
Pmello@hansonbridgett.com
*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **RALPH COLEMAN, et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**GAVIN NEWSOM, et al.,**<br><br>Defendants. | Case No. 2:90-cv-00520 KJM-DB (PC)<br><br>**PARTIES' JOINT REPORT CONCERNING CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION'S ANNUAL SUICIDE REPORT PROPOSAL IN RESPONSE TO OCTOBER 25, 2024 ORDER (ECF NO. 8441)**<br><br>Judge: The Hon. Kimberly J. Mueller |

## INTRODUCTION

On June 7, 2024, Defendants filed the California Department of Corrections and Rehabilitation's (CDCR) Revised 2022 Annual Report to the Legislature on Suicides in CDCR and Annual Suicide Report (ECF No. 8264.) Plaintiffs filed objections to the revised report on June 26, 2024. (ECF No. 8297.)

On October 25, 2024, the Court sustained Plaintiffs' objections and ordered the parties to meet and confer under the supervision of the Special Master to resolve two ambiguities identified in the order related to CDCR's Annual Suicide Report Proposal (Proposal) and, by December 13, 2024, file either an Amended Proposal that clarifies the ambiguities or a joint statement of their respective positions on how the ambiguities should be clarified. (ECF No. 8441.) The first ambiguity is "whether in the annual suicide report defendants must discuss the efficacy of all QIPs issued in response to deaths by suicide during the calendar year reported on or, instead, whether they must discuss the efficacy of QIPs for 'the most common QIP issues' during the calendar year; in the latter case, there is also an ambiguity about how many QIPs must reflect the same issue for the issue to be considered 'common.' " (*Id.* at 8.) The second ambiguity is that "the Revised Report is insufficiently clear about the criteria defendants have used to report key determinations regarding the efficacy of the QIP process and implementation status of QIPs, including what constitutes a 'sustainable resolution' of issue(s) presented in QIPs or an adequate descriptions of the methodology defendants use to monitor the efficacy of QIPs." (*Id.*) On December 16, 2024, at the parties' request, the Court extended the deadline to December 23, 2024. (ECF No. 8493.)

On December 6, 2024, CDCR circulated proposed revisions to the Annual Suicide Report plan to address the ambiguities. Plaintiffs provided their response to CDCR's proposed revisions on December 11, 2024. On December 16, CDCR provided an updated draft of the Annual Suicide Report plan to address Plaintiffs' concerns, and Plaintiffs provided further input and revisions in response. On December 18, 2024, both Plaintiffs and CDCR circulated further revisions to the Annual Suicide Report plan and the parties met to resolve the ambiguities on December 19, 2024. Finally, on December 20, 2024, CDCR sent Plaintiffs a final proposed revision to the Annual Suicide Report plan. A copy of the December 20 red-lined draft is attached as Exhibit A. Plaintiffs notified Defendants on December 20 that the updated proposal did not adequately clarify the two ambiguities that the Court identified in the October 25 order.

The parties submit below their respective positions on how the ambiguities identified in the October 25 order should be clarified.

**JOINT STATEMENT**

Although the parties disagree about the contours of Defendants' revised Annual Suicide Report plan, the parties agree that after the Court approves revisions to the plan, Defendants will file revisions to the 2022 Annual Suicide Reports' Quality Improvement Plan (QIP) section as attached addendum rather than reopening the settled report to extensive edits. Defendants will prepare and file revisions to the 2023 Annual Suicide Reports' Quality Improvement Plan (QIP) section as an addendum to the filed 2023 suicide report. Defendants will file the addendum simultaneously with the 2023 annual suicide report. This will preserve the existing reports and provide the Court with an updated status on the efficacy of the 2022 and 2023 QIPs.

**DEFENDANTS' POSITION**

Defendants revised the 2022 Annual Suicide Report plan to both resolve the ambiguities the Court identified and to address Plaintiffs' concerns and requested revisions. Plaintiffs' response to the latest revised plan was only that "it does not adequately clarify the two ambiguities that the court identified in her October 25, 2024 Order: and object to eliminating the reporting requirements that Defendants propose deleting in this version of the plan." Defendants request that the Court approve the December 20 revision of the Annual Suicide Report plan, attached as Exhibit A, because it comports with the court's October 24, 2024 order by resolving the identified ambiguities.

**I.    CDCR'S ANNUAL SUICIDE REPORT WILL REPORT ON QIPS THAT OCCURRED TWICE OR MORE IN THE REPORTING YEAR**

The first ambiguity is "whether in the annual suicide report defendants must discuss the efficacy of all QIPs issued in response to deaths by suicide during the calendar year reported on or, instead, whether they must discuss the efficacy of QIPs for 'the most common QIP issues' during the calendar year; in the latter case, there is also an ambiguity about how many QIPs must reflect the same issue for the issue to be considered 'common.'" (ECF No. 8441 at 8.) Defendants' revised proposal resolves this ambiguity by committing to discussing common QIPs in the Annual Suicide Report consistent with the Special Master's past suicide reports.

Defendants' revised proposal states that "all identified problems that appear in two or more suicide case reviews completed in the reporting year" will be reported in the annual report. The report will note whether those common QIPs were assigned to the institution or headquarters and may include additional tables or figures to highlight findings such as disciplines involved, year, and level of oversight. The report will also include information on whether those common QIPs were "fully implemented" at the time the report is issued or an explanation for those QIPs not fully implemented. The report will provide further examination to those problems "that most challenge the integrity of its suicide prevention program" based on factors such as frequency and seriousness of the problem. This approach is consistent with the Special master's past suicide reports in that both CDCR's reports and the Special Master's past reports define a common QIP as one that is identified at least twice during the reporting period. (*See* ECF No 8441 at 8 and fn. 6.)

## II. CDCR's Revised Annual Suicide Report Plan Describes How CDCR Determines QIP Efficacy and Sustainable Resolution of Problems Raised by QIPs

The second ambiguity is "the criteria defendants have used to report key determinations regarding the efficacy of the QIP process and implementation status of QIPs, including what constitutes a 'sustainable resolution' of issue(s) presented in QIPs or an adequate descriptions of the methodology defendants use to monitor the efficacy of QIPs." (ECF No. 8441 at 8.) CDCR's revisions to the proposal reflect clearer criteria for determining whether QIPs are effective and whether QIPs have been sustainably resolved, as explained below.

First, CDCR will employ an approach to measure, assess, and improve the review of QIPs for efficacy. To determine a QIP's efficacy, this process measures whether there has been "[a] reduction in the percentage of deaths involving the targeted problem" that gave rise to the QIP. Second, CDCR will measure sustained resolution of the implemented QIP by assessing whether there has been a "sustained reduction in the percentage of deaths involving the targeted problems year over year." Although QIPs must be completed within Program Guide timelines, measuring whether a QIP has effectively remedied a given problem in a sustainable manner may take more

time than the reporting period. Thus, measuring QIP effectiveness on a year-over-year basis is necessary to determine sustainability.

The Annual Suicide Report will identify the problems subject to QIPs and will "review the improvement efforts associated with" those problems in order to "determine whether the efforts constitute a sufficient remedy," and will further identify whether "a year over year reduction in the percentage of deaths involving the problems occurred." When QIPs have not effectively rectified the concern, the Annual Suicide Report will present recommendations to address the issue. These recommendations will be directed to CDCR's statewide SPRFIT committee for further consideration. Defendants' revised proposal also includes two hypothetical examples of how the annual report will integrate discussion of QIP efficacy, assessment, and improvement.

Finally, Defendants' revised proposal outlines how CDCR monitors QIP efficacy. Those monitoring efforts include reviewing, revising, and creating statewide training criteria, procedures, audits, and local policies; creating new key performance indicators or revising existing ones; evaluating and implementing changes in physical environment; improving medical record workflow; and assigning monitoring tasks to regional suicide prevention coordinators.

### III. THE COURT SHOULD REJECT PLAINTIFFS' OBJECTIONS AND ADOPT CDCR'S REVISED PROPOSAL[1]

As discussed above, , CDCR's revised proposal adequately clarifies both ambiguities identified by the order. Plaintiffs might also object to certain deletions from the 2022 Proposal. However, CDCR's proposed deletions remove ambiguous language regarding QIP efficacy and sustained resolution, replacing it with the aforementioned clarifications.

CDCR deleted language that discussed the frequency, trends, and number of QIPs assigned to institutions and statewide programs. The deleted passages were replaced with a clarification of what constitutes a "common" QIP and how CDCR will address, within the report, whether the QIPs were effective at remedying the identified problems. The proposed deletions include:

---

[1] Because Plaintiffs have not provided detailed objections outside of proposed text revisions to the 2022 plan, and because the parties' positions were exchanged simultaneously, Defendants submit this section to address potential objections concerning deleted sections of the plan.

1. "[T]he number of QIPs for each discipline and the average number of QIPs assigned per suicide case review" as well as language discussing "trends of QIPs, per discipline."

2. "[T]he frequency or trends of QIPs in each category of [type of QIP] for a given year"

3. "[T]he number of QIPs assigned to institutions vs. those assigned to the statewide suicide prevention program for issues that are more systemic, rather than localized. For those systemic issues, the report will identify what meaningful steps are being taken to address the deficiency and improve the policies associated with care expected at the institutional level."

4. "In the narrative of this section of the report, focus will be placed on an analysis of the more frequent QIPs that are assigned. The analysis will consider the trends of similar QIPs, frequency of repeated QIPs assigned to particular institutions, and frequency in which QIPs are assigned to the statewide suicide prevention program. CDCR will review QIPs across years for institutions that experienced multiple suicides and across institutions to better understand whether more targeted initiatives are needed."

The first deletion, regarding trends per discipline, was replaced with the following clarifying language: "[t]he report will also note whether the problems were assigned to institutions or the statewide suicide prevention program. As indicated, the section may include additional tables or figures to highlight findings. For example, tables that sort identified problems by discipline, state oversight, or year may be included." (Ex. A at 2.)

The second deletion regarding "frequency or trends in each category," was replaced with language regarding common QIPs to address ambiguities. CDCR's process for assessing efficacy is premised on identifying common QIPs (e.g. those occurring twice or more in a reporting year) and reporting on "the number of times the identified problem occurred." (*Id.*) Implicitly, the report will identify common QIPs by type and the frequency of their occurrence.

For the third deletion, regarding the number of QIPs assigned to institutions versus those assigned to the statewide suicide prevention program, CDCR's proposed revision explicitly states that "[t]he report will also note whether the problems were assigned to institutions or the statewide suicide prevention program." (*Id.*) Thus, CDCR's Annual Suicide Report will still

report on common QIPs and note whether they are assigned to institutions or headquarters for review. And the report will trace the efficacy of each type of QIP.

Finally, for the fourth deletion regarding analysis of "more frequent QIPs", CDCR's revision addresses this deletion by committing to report on common QIPs, or "all identified problems that appear in two or more suicide case reviews completed in the reporting year." (*Id.*) The court should adopt CDCR's revised proposal because it addresses the court's two identified ambiguities. It requires that the annual report discuss common QIPs – those that occurred at least twice in a reporting year – and it sets forth the framework for CDCR to determine efficacy and sustained resolution.

## IV. DEFENDANTS' CERTIFICATION OF ORDERS

Defendants' counsel has reviewed the following orders that are relevant to this filing: ECF Nos. 7592, 7609, 7681, 7754, and 8441.

**PLAINTIFFS' POSITION**

Defendants' proposed amended annual suicide reporting plan does not adequately clarify either of the two ambiguities that the court identified and eliminates several valuable reporting requirements in the currently operative version of the plan. First, Defendants' plan gives Defendants total discretion to pick and choose which QIPs they report on regarding efficacy. Second, Defendants proposal fails to include specific "criteria defendants have used to report key determinations regarding the efficacy of the QIP process," instead providing only a vague and inappropriate metric for judging efficacy. Finally, Defendants' proposal goes beyond the Court's order to modify the existing plan only to clarify the ambiguities, by proposing to eliminate several key reporting requirements regarding QIPs, including reporting on the work of the Regional Coordinators, trends in QIPs, and QIPs at institutions that experienced multiple suicides.

When Plaintiffs negotiated the currently operative annual suicide reporting plan (ECF No. 7574), they agreed to forego requiring the foreseeability and preventability determinations in the annual suicide reports in exchange for more robust QIP reporting. Defendants' proposal

threatens to significantly undermine this bargain by weakening and eliminating QIP reporting requirements.

The Court should reject Defendants' December 20 revision of the plan. The Court should instead require Defendants to report on efficacy of all QIPs that arose two or more times in the reporting year to be consistent with the Special Master's prior annual suicide reports. The Court should also require Defendants to include in the plan more specific and concrete information about the criteria used to determine whether a QIP is effective. Finally, the Court should reject Defendants' proposed deletion of the four specific reporting requirements discussed in section III below.

**I.    Defendants' Proposal Would Give Defendants Unfettered Discretion Over Reporting on QIP Efficacy**

Defendants have proposed a multi-year schedule for reporting on QIP efficacy. Defendants propose that, in the first annual suicide report to address QIPs for a given year, they will select a subset of "problems that appear in two or more suicide case reviews completed in the reporting year" for "further examination," which "may" include an examination of "whether the associated QIPs and related improvement efforts constitute a sufficient remedy." Defendants' Proposal at 2. In subsequent annual suicide reports, Defendants propose to "assess efficacy" by examining "problems identified in previous years using the measure, assess, and improve approach," including reviewing "the improvement efforts associated with problems identified in previous years to determine whether the efforts constitute a sufficient remedy" and "whether a year-over-year reduction in the percentage of deaths involving the problems occurred." *Id.* at 3.[2]

Plaintiffs support Defendants' intent to review the efficacy of QIPs over more than a single year, as doing so is likely to result in a more robust analysis of deficiencies and how the QIPs are working to fix them systemwide.

---

[2] It is not clear whether the reporting cycle for a set of QIPs for a given year would span two years or more than two years. *Compare id.* at 3 (stating that the annual suicide report would "review the improvement efforts associated with problems identified in previous *years*" (emphasis added)) *with id.* at 3 Figure 1 (stating that assess step would include discussing "new problems" and "previous *year's* problems" (emphasis added)).

1    But Plaintiffs disagree with how Defendants' revised plan proposes to select QIPs for the
2    efficacy analysis in the annual reports.  As the Court pointed out, the ambiguity in the existing
3    plan is whether Defendants should be required to report on the efficacy of all QIPs or only the
4    most common ones.  ECF No. 8441 at 8.  Defendants' proposal does not resolve this ambiguity,
5    and in fact introduces a new one—it gives Defendants complete discretion to select which QIPs to
6    examine, yet provides no clarity about how many QIPs Defendants will analyze or what criteria
7    they will use to choose them.  Defendants' Proposal at 2 (Defendants will select QIPs that "most
8    challenge the integrity of [their] suicide prevention program" for "further examination"); *id.*
9    (providing two examples of criteria that Defendants *may* use without a commitment to a
10   minimum number or percentage of QIPs that Defendants will select for further examination and
11   giving Defendants discretion over whether to report on QIP efficacy at all in the first year).  The
12   Proposal appears to obligate reporting on QIP efficacy in subsequent annual suicide reports but
13   only for those QIPs that Defendants selected for "further examination" in the previous year's
14   annual suicide report.  *Id.* (Stating that "[t]o assess efficacy, problems identified in previous years
15   using the measure, assess, and improve approach will be examined.").

16   This approach is unacceptable.  It would render Defendants' commitment to report on QIP
17   efficacy largely illusory because it would permit Defendants to report on efficacy for even only a
18   small share of QIPs, leaving Plaintiffs, the Court, and the public in the dark regarding the efficacy
19   of most of Defendants' suicide-related quality improvement efforts.  It would also undermine the
20   accountability function of reporting on QIP efficacy because Defendants would be able to choose
21   to report on only common QIPs that effectively resolved problems while remaining silent about
22   any QIPs that did not.

23   In contrast, the Special Master's prior annual suicide reports reported on the foreseeability
24   and preventability of every suicide and all deficiencies that arose two or more times in a given
25   year and led to QIPs.  Report on Suicides Completed in the CDCR January 1, 2020 –
26   December 31, 2020 (Dec. 21, 2021), ECF No. 7405 ("Special Master's 2020 Suicide Report") at
27   29-32, App'x B4 ECF No. 7405-2 at 167; Special Master's Report on His Expert's Report on
28   Suicides Completed in the CDCR, January 1, 2019 – December 31, 2019 (July 16, 2021), ECF

No. 7239 ("Special Master's 2019 Suicide Report") at 37-40, 206.[3] The Court should reject Defendants' Proposed resolution of this ambiguity. Instead, to be consistent with the Special Master's prior annual suicide reports, the Court should require that the annual suicide reporting plan include, at a minimum, a report on the efficacy of all QIPs issued to address deficiencies identified in two or more suicide case reviews in the relevant year. *Id.*; see also October 25, 2024 Order at 8 n.6.

## II. Defendants' Proposal Does not Adequately Resolve the Ambiguity Regarding the Criteria that Defendants Use to Determine QIP Efficacy

Regarding the criteria used to evaluate QIP efficacy, Defendants' Proposal states: "A reduction in the percentage of deaths involving the targeted problems is evidence of efficacy. A sustained reduction in the percentage of deaths involving the targeted problems year over year indicates that a sustainable resolution has been achieved." Defendants' Proposal at 3.

This proposal is deficient in several ways. First, it does not clarify the "criteria" defendants *have already used* "to report key determinations regarding the efficacy of the QIP process." ECF No. 8441 at 8. Instead it sets forth a misguided and vague metric that Defendants propose to use to measure QIP efficacy *prospectively* if the Court adopts their proposal. This metric is plainly inadequate to measure QIP efficacy. QIPs are intended to resolve underlying deficiencies with Defendants' practices and procedures such as, for example, inadequate clinical contacts, inadequate treatment planning, failure to complete SREs, and emergency response delays. MHSDS Program Guide (Sept. 29, 2021), ECF No. 7333-1 at 192 ("[w]hen warranted, the MHSR shall recommend a QIP [. . . ], based on the findings from the review of the case, which shall address and make recommendations to improve identified problems with clinical care and compliance with policy and procedure."); *see also* Special Master's 2020 Suicide Report at 29-31 (Summarizing QIPs).

However, Defendants' Proposal inappropriately equates efficacy with a reduction of the percentage of deaths associated with a particular problem rather than with whether the underlying

---

[3] In Plaintiffs' portion of this Joint Statement, page citations to documents filed on the docket are based on ECF pagination.

1   problem itself has been reduced or eliminated.  This approach to QIP efficacy troublingly
2   suggests that, rather than proactively measuring whether an underlying problem has been reduced
3   or eliminated before it contributes to further suicides, Defendants will instead simply wait to see
4   how many more deaths involve the problem.  Problematically, this approach ignores that
5   appropriately implemented QIPs can have other important positive impacts, including reducing
6   non-fatal self-harm incidents, improving emergency response processes, and making clinical
7   treatment more effective.  Furthermore, under this misguided view of efficacy, a QIP could be
8   deemed effective even if the frequency of underlying problem stayed flat or even increased, as
9   long as the *percentage of deaths involving the problem* declines over some unspecified number of
10  subsequent years.  In fact, under this metric, a QIP would be deemed effective even if there were
11  more deaths involving a problem year over year as long as the *percentage* of deaths involving the
12  problem decreased during that same time period, which is possible when there is a significant
13  increase in the number of suicides from one year to the next, such as the increase from twenty
14  suicides in 2022 to thirty suicides in 2023.[4]  The Sixth Re-Audit and Update of Suicide
15  Prevention Practices in the Prisons of the CDCR and Re-Audit of Suicide Prevention Practices in
16  the Psychiatric Inpatient Programs (March 1, 2024), ECF No. 8143-1 at 86.  And Defendants
17  could deem a QIP effective regardless of the *degree of decrease* in the percentage of deaths
18  involving the problem.

19       During the meet and confer process, the Special Master's experts and Plaintiffs repeatedly
20  asked Defendants to include real examples of how they analyzed the efficacy of important QIPs
21  from past years, to provide clarity about how Defendants' "measure, assess, and improve"
22  methodology works to assess efficacy in concrete terms.  The first several versions of
23  Defendants' revised plan omitted any examples, and the December 20 version (Ex. A) includes
24  only two "fictional examples," which do little to address Plaintiffs' concerns with the criteria that
25  Defendants have identified for making QIP efficacy determinations.  Defendants' Proposal at 3-4.

---

[4] For example, a QIP would be effective under this metric if five out of twenty suicides (25%) had involved a particular problem in 2022 and six out of thirty suicides (20%) had involved the problem in 2023.

[4624004.2]                          11

1   The examples do not describe the criteria Defendants used other than by vaguely stating that
2   Defendants "reviewed the problem, the associated improvement effort, and the frequency of the
3   problem during the reporting year." *Id.* There is no explanation of why these fictional QIPs were
4   deemed effective.

5   Defendants' proposal does not adequately resolve the ambiguity the Court identified
6   regarding how the efficacy of QIPs is assessed. ECF No. 8441 at 8. The Court should require
7   Defendants to include in the plan more specific and concrete information about the criteria used
8   to determine whether a QIP is effective, including actual examples of significant and common
9   QIPs from past years and how Defendants analyzed whether the implementation of those QIPs
10  resulted in a reduction of the issue giving rise to the identified deficiency. For example, did
11  Defendants rely only on reporting from the institution? Did they audit the issue subsequently,
12  and if so, who performed the audit, when did it occur, with what frequency, and what was the
13  outcome? The Court should reject Defendants' December 20 Proposal for this reason as well.

**III.    Defendants Proposal Improperly Eliminates Several Existing Reporting Requirements**

16  In their Proposal, Defendants have also deleted several reporting requirements related to
17  QIPs from the existing version of the plan. Defendants' Proposal at 2. The deleted reporting
18  requirements include reporting on "the frequency or trends of QIPs in each category for a given
19  year," "QIPs across years for institutions that experienced multiple suicides and across
20  institutions," "the ongoing work of CDCR's Suicide Prevention Coordinators in each region with
21  institutions to ensure that the QIPS as designed were appropriate to effectively address the
22  problems in the first instance and that sustained improvement has been made," and, for systemic
23  issues, "what meaningful steps are being taken to address the deficiency and improve the policies
24  associated with care expected at the institutional level." *Id.*

25  The Court should reject these proposed revisions. These deletions are improper because
26  they go beyond the scope of the Court's order, which directed the parties only to propose
27  modifications to clarify the two ambiguities that the Court identified. October 25, 2024 Order at
28  8-9, 11-12. More importantly, the information required by the provisions Defendants propose

[4624004.2]                                    12

deleting provides the Court, the parties, and the public with valuable insight into Defendants' suicide prevention program.  For example, Defendants propose eliminating the obligation to report on the work of their Regional Coordinators, yet Defendants rely on their Regional Coordinators audits to assess their suicide prevention program. *See generally* Defs.' Objections to Special Master's Report on His Expert's Sixth Re-Audit and update of Suicide Prevention Practices in the Prisons of the CDCR and Re-Audit of Suicide Prevention Practices in the Psychiatric Inpatient Programs (April 1, 2024), ECF No. 8179 (arguing that Regional Coordinator audits demonstrate compliance with various court-ordered suicide prevention recommendations). Similarly, Defendants propose eliminating reporting on QIPs at institutions with multiple suicides, but information required by this reporting obligation informs the parties about the types of problems associated with deaths at institutions that struggle most with suicide.

Defendants have identify no reason why any of these reporting requirements should be eliminated, much less any good reasons to eliminate them.  The October 25 Order was not an invitation to re-write the suicide reporting plan entirely because Defendants do not like parts of it.  The Court should decline to adopt Defendants' proposed revision.

## IV. Plaintiffs' Certification of Orders

Plaintiffs' counsel has reviewed the following orders that are relevant to this filing:  ECF Nos. 8441, 8493.

| | | |
|---|---|---|
| 1 | Dated: December 23, 2024 | ROB BONTA |
| 2 | | Attorney General of California |
| | | DAMON MCCLAIN |
| 3 | | Supervising Deputy Attorney General |
| 4 | | *Elise Owens Thorn* |
| | | ELISE OWENS THORN |
| 5 | | Deputy Attorney General |
| | | *Attorneys for Defendants* |
| 6 | | HANSON BRIDGETT LLP |
| 7 | | *Paul B. Mello* |
| | | PAUL B. MELLO |
| 8 | | SAMANTHA D. WOLFF |
| | | *Attorneys for Defendants* |
| 9 | | |
| 10 | Dated: December 23, 2024 | ROSEN BIEN GALVAN & GRUNFELD LLP |
| 11 | | *Michael Nunez* |
| | | MICHAEL NUNEZ |
| 12 | | *Attorneys for Plaintiffs* |

# Exhibit A

CDCR's Proposal for Assuming the Annual Suicide Monitoring Report

*Content of the CDCR Annual Suicide Report*

At the request of the Special Master, CDCR hereby submits the following proposal to assume the duties of writing and filing the annual suicide monitoring report from the Special Master, which was developed in consultation with the Special Master's experts. Just as they currently do, CDCR's reports will continue to track the contents and analysis found in the reports written by the Office of the Special Master. Specifically, CDCR will report on:

- Suicide Incident Factors
- Individual Risk Factors
- Institutional/Environmental Risk Factors
- Mental Health Risk Factors
- Mental Health Evaluation and Treatment Factors
- Emergency Response Factors
- Individual Suicide Case Review Analyses
- Quality Improvement Plan Content and Analyses
- Recommendations
- Conclusions

It should be noted that CDCR is responsible for producing a similar report to the California Legislature, pursuant to SB960 (2018). In 2021, CDCR merged its annual report and the report submitted to the Legislature due to the overlap of content. CDCR will continue this practice moving forward. The specific expectations to report to the Legislature are:

- Progress toward completing adequate suicide risk evaluations
- Progress toward completing 72-hour treatment plans in a sufficient manner
- Progress toward ensuring that all required staff receive training related to suicide prevention and response
- A description of the Department's progress in implementing the recommendations made by the Special Master regarding inmate suicides and attempts, to include the results of any audits the Department conducts at the Headquarters or Regional level, as part of its planned process to measure the success of changes the Department implements as a result of these recommendations
- Progress in identifying and implementing initiatives designed to reduce risk factors associated with suicide
- Description of the Department's efforts and progress to expand upon its process of notification pursuant to Penal Code Section 5022, including expansion of those notifications in cases of suicide attempts when deemed appropriate by the Department, and when inmates have consented to allow release of that information.

*Quality Improvement Plans (QIPs)*

CDCR will include a review of the identified areas for improvement ~~within~~in the suicide case reviews that lead to the assignment of QIPs~~, which provide~~. The review will provides a framework for assessing how well current policies, procedures, and practices surrounding suicide prevention are serving our patients. Currently, CDCR reports on the determination and tracking of QIPs in its annual suicide report. ~~It reports on the number of QIPs for each discipline and the average number of QIPs assigned~~

[4103318.3]

per suicide case review.

CDCR is committed to enhancing this section ~~in~~of the annual suicide report to ~~contain~~include a comprehensive review of the QIPs for each discipline. ~~The section will focus on the trends of QIPs, per discipline.~~ A breakdown of the various categories of QIPs tracked by CDCR is attached. As part of the annual report, CDCR will categorize QIPs based on categories in the attachment~~, and report on the frequency or trends of QIPs in each category for a given year~~. CDCR ~~maintains~~reserves the right to modify this list, depending on emerging trends or the absence of particular QIPs identified in the suicide case reviews each year, and to revise or eliminate overlapping categories.

~~The QIP section of the annual suicide report will identify the number of QIPs assigned to institutions vs. those assigned to the statewide suicide prevention program for issues that are more systemic, rather than localized. For those systemic issues, the report will identify what meaningful steps are being taken to address the deficiency and improve the policies associated with care expected at the institutional level.~~

~~In the narrative of this section of the report, focus will be placed on an analysis of the more frequent QIPs that are assigned. The analysis will consider the trends of similar QIPs, frequency of repeated QIPs assigned to particular institutions, and frequency in which QIPs are assigned to the statewide suicide prevention program. CDCR will review QIPs across years for institutions that experienced multiple suicides and across institutions to better understand whether more targeted initiatives are needed.~~

~~The narrative will also include discussion about whether the QIPs have been fully implemented, and if not, what the delays and barriers are to full implementation. Additionally, an analysis of the efficacy of the QIPs will be reported, including reporting on the ongoing work of CDCR's Suicide Prevention Coordinators in each region with institutions to ensure that the QIPS as designed were appropriate to effectively address the problems in the first instance and that sustained improvement has been made. A description of ongoing work with institutions by CDCR's Suicide Prevention Coordinators in each region will be included to discuss the work being done to ensure sustained improvement has been made.~~

~~Compared to foreseeability/preventability determinations, this approach is focused on improving systems, which is the purpose of quality improvement plans that are devised as the result of the suicide case review. From a clinical and custodial perspective, reporting on this information furthers the overall ambition of CDCR/CCHCS to cultivate a culture of continuous learning and improvement.~~

The narrative of this section of the report will adopt a methodology common in quality management: measure, assess, and improve. To measure, the annual report will present, in tabular form, all identified problems that appear in two or more suicide case reviews completed in the reporting year, as well as include the number of times the identified problem occurred. The report will also note whether the problems were assigned to institutions or the statewide suicide prevention program. As indicated, the section may include additional tables or figures to highlight findings. For example, tables that sort identified problems by discipline, state oversight, or year may be included. The section will also specify the total number of QIPs issued in the reporting year and the percentage of those that were fully implemented (i.e., performed and completed) as of the date the report was issued. For QIPs in the table that have not yet been fully implemented, the report will describe why.

To assess, the department will examine the identified problems in the table and select those that most challenge the integrity of its suicide prevention program. In selecting problems for further examination, the department may, for example, weigh factors such as the frequency and seriousness of the problem. In addition, the department may examine whether the associated QIPs and related improvement efforts constitute a sufficient remedy. The department's examination will inform the recommendations made

[4103318.3]

at the conclusion of the report.

To improve, these recommendations will be presented at the statewide SPRFIT meeting so that the appropriate type of improvement effort can be considered and initiated.

The goal of the measure, assess, and improve approach is to reduce the occurrence of the targeted problems in future years. A reduction in the percentage of deaths involving the targeted problems is evidence of efficacy. A sustained reduction in the percentage of deaths involving the targeted problems year over year indicates that a sustainable resolution has been achieved. To assess efficacy, problems identified in previous years using the measure, assess, and improve approach will be examined. More specifically, this section of the report will (a) review the improvement efforts associated with problems identified in previous years to determine whether the efforts constitute a sufficient remedy and (b) whether a year-over-year reduction in the percentage of deaths involving the problems occurred. The review will inform recommendations made at the conclusion of the report. The overall process is depicted in Figure 1.



Figure 1: Methodology for Addressing Quality Problems

The following fictional examples illustrate how the department would apply the measure, assess, and improve approach to identified problems.

> Example 1: Initial Health Screening
>
> During a reporting year, the following problem was identified in multiple suicide case reviews: Incarcerated individuals processed by an institution's Receiving and Release department during 1st watch did not receive initial health screenings because nurses were only assigned to 2nd and 3rd watch shifts. The annual report identified the problem as (a) occurring more two times and (b) assessed it as serious because it revealed a system-wide gap in the department's ability to screen new arrivals for suicide risk promptly. Thus, the report included a recommendation to address the screening process. The recommendation was taken up by the statewide suicide prevention team meeting and an improvement project was initiated. After analysis, the statewide suicide prevention team determined that the existing workflow deferred screening for incarcerated individuals arriving on 1st watch to the 2nd watch team. To eliminate the delay in screening, the statewide policy was amended to require staff to process all incarcerated individuals arriving on 1st watch in the Treatment and Triage Area, which is staffed around the clock. In addition, the

department created a key performance indicator that assessed the percentage of initial health screenings completed for new arrivals. The annual report of the following year reviewed the problem, the associated improvement effort, and the frequency of the problem during the reporting year. The report concluded that policy change constituted a sufficient remedy.

Example 2: Suicide Risk Management Program

During a reporting year, the following problem was identified in multiple suicide case reviews: patients identified as being at high chronic risk of suicide did not receive treatment tailored to reduce their risk. The annual report identified the problem as (a) occurring more two times and (b) assessed it as serious because it revealed a system-wide gap in the department's ability to reduce suicide risk via mental health treatment. Thus, the report included a recommendation to address the screening process. The recommendation was taken up by the statewide suicide prevention team meeting and an improvement project was initiated. After analysis, the team concluded that while institutions maintained lists of high-risk patients, statewide policy provided no guidance for augmenting care. To address the gap, the department implemented several improvements. It established a suicide risk management program that specified inclusionary criteria; revised treatment plans in the electronic health record to prompt providers to include tailored goals and interventions; created a state-wide report to help institutions track patients in the program; and it created a key performance indicator that assessed what percentage of qualifying patients were enrolled in the program. In the following year, the annual report reviewed problem, the associated improvement effort, and the frequency of the problem during the reporting year. The report concluded that policy change constituted a sufficient remedy.

The department can and has addressed identified problems in a variety of ways. These include, but are not limited to:

- Reviewing, revising, and creating statewide training curricula
- Reviewing, revising, and creating statewide procedures
- Reviewing, revising, or creating statewide or local policy
- Creating new key performance indicators or revising existing ones
- Adding new monitoring areas to the statewide SPRFIT Measurement Plan
- Revising the agenda of local or statewide SPRFIT meetings to include new areas for system surveillance
- Creating or revising statewide non-automated audits
- Prescribing local audits
- Initiating progressive discipline
- Training individual staff
- Referring staff to peer review
- Initiating investigations of staff misconduct
- Evaluating and implementing changes in the physical environment
- Assessing the existing suicide prevention infrastructure to identify value-added improvements
- Improving medical record workflows and forms
- Initiating workgroups focused on generating solutions to unique problems
- Assigning monitoring tasks to regional suicide prevention coordinators

The measure, assess, and improve approach (a) focuses on addressing problems that pose the most serious challenges to the integrity of the department's suicide prevention program, (b) leverages established quality management concepts, and (c) further enhances a departmental culture of continuous improvement.

*Comprehensive Case Reviews*

[4103318.3]

Because CDCR conducts a comprehensive suicide case review, which analyzes all aspects of the factors surrounding a suicide and develops findings and quality improvement plans, it is redundant to generate additional reviews of each suicide. In lieu of drafting a comprehensive suicide case review for each suicide report and appending them to the annual suicide report, CDCR will instead append, and conditionally lodge under seal, each individual suicide case review, and any addendum reports, with the annual suicide report. The identifying patient information contained within the suicide reviews and any addendum reports is sensitive, private, confidential, and subject to the protective order entered in this action on February 25, 2020. (Protective Order, ECF No. 6482.) CDCR will follow the requirements under the February 25, 2020 order and LR 141 for the conditional filing of documents under seal.

Nothing in this proposal precludes litigants in other matters from obtaining the suicide reviews or addendum reports if they are otherwise legally entitled to receive them.

*Input of Stakeholders in the Annual Suicide Report*

CDCR values the expertise and diverse perspectives of the external stakeholders involved in the Coleman case. As such, CDCR welcomes feedback by the Special Master and the Plaintiffs as we develop each year's report. As part of the drafting of the annual suicide report, CDCR will provide the Special Master and Plaintiffs thirty days to review and comment on a complete draft of each annual suicide report. After the thirty-day period ends, CDCR will review the recommendations from the Special Master and Plaintiffs, finalize the report, and file the report with the court. The filed report will include copies of any feedback received from Plaintiffs or the Special Master. The final report will include a cover report that provides a response to that feedback. Thereafter, Plaintiffs will have 10 days to file formal objections to the final report with the Court. All formal objections and comments shall be identical to those objections and comments previously submitted by the Plaintiffs or the Special Master in response to the draft report, except that Plaintiffs and the Special Master may raise, as appropriate, objections and comments to new information, if any, in the final report that was not included in the draft report. Defendants will have ten (10) days to seek leave of court to file responses to Plaintiffs' formal objections. The Special Master will respond to the final report if the Court so directs. The finalized report will also be uploaded to the CDCR and CCHCS public webpages.

Within thirty (30) days after adoption of the 2021 Annual Suicide Report by the court, the parties, under the guidance of the Special Master, shall meet and confer and the Special Master shall file a brief recommendation with the court as to whether this proposal should become final.

[4103318.3]