1   ROB BONTA, State Bar No. 202668
    Attorney General of California
2   MONICA N. ANDERSON, State Bar No. 182970
    Senior Assistant Attorney General
3   DAMON MCCLAIN, State Bar No. 209508
    Supervising Deputy Attorney General
4   ELISE OWENS THORN, State Bar No. 145931
    CHRISTIAN M. GEORGELY, State Bar No.
5   322952
    Deputy Attorneys General
6    1300 I Street, Suite 125
     P.O. Box 944255
7    Sacramento, CA 94244-2550
     Telephone: (916) 210-7318
8    Fax: (916) 324-5205
     E-mail: Elise.Thorn@doj.ca.gov
9   *Attorneys for Defendants*

    HANSON BRIDGETT LLP
    LAWRENCE M. CIRELLI, SBN 114710
    PAUL B. MELLO, SBN 179755
    SAMANTHA D. WOLFF, SBN 240280
    DAVID C. CASARRUBIAS-GONZÁLEZ,
    SBN 321994
    SAMANTHA M. BACON, SBN 351561
    425 Market Street, 26th Floor
    San Francisco, California 94105
    Telephone:    415-777-3200
    Pmello@hansonbridgett.com
    *Attorneys for Defendants*

10                    **UNITED STATES DISTRICT COURT**

11                    **EASTERN DISTRICT OF CALIFORNIA**

12                          **SACRAMENTO DIVISION**

13

14
      RALPH COLEMAN, et al.,              Case No. 2:90-CV-00520- KJM-DB
15
                 Plaintiffs,             **DEFENDANTS' RESPONSE**
16                                        **CONCERNING APPOINTMENT OF A**
          v.                              **TEMPORARY RECEIVER**
17
      GAVIN NEWSOM, et al.                **[ECF No. 8494]**
18
                 Defendants.             Judge:    Hon. Kimberly J. Mueller
19

20
      _____
21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...........................................................................................................1

II.   RELEVANT BACKGROUND ....................................................................................2

    A.    The Court's 1994 findings led to the appointment of a special master......................2

    B.    Defendants have made significant progress in delivering mental health care
        to the Plaintiff class. .............................................................................................4

III.  PROCEDURAL HISTORY ..........................................................................................5

IV.   LEGAL STANDARD ....................................................................................................8

V.    ARGUMENT ................................................................................................................10

    A.    Defendants never stipulated that the receivership standard was met. ......................10

    B.    Under the unique circumstances of this case, due process requires an
        evidentiary hearing, including examination of witnesses, before a receiver
        can be appointed. ..................................................................................................11

    C.    The standard for the appointment of a receiver has not, and cannot be, met..........13

            1.    There is no showing of a grave and immediate threat or actuality of
                harm to Plaintiffs that would warrant the appointment of a
                temporary receiver..................................................................................14

                    a.    Screening Procedures ..................................................................14

                    b.    Electronic Health Records System...............................................14

                    c.    Policy Reforms ............................................................................14

                    d.    Medication Administration ..........................................................15

                    e.    Data Remediation.........................................................................15

                    f.    Suicide Prevention.......................................................................15

                    g.    Transfer Timelines and Capacity Compliance.............................17

                    h.    Staffing Improvements.................................................................18

             2.    There is no showing that imposition of less extreme measures would
                be futile....................................................................................................20

             3.    The other factors also do not support the appointment of a temporary
                receiver. ...................................................................................................20

    D.    If a temporary receiver is appointed, the Court would lose jurisdiction after
        the remedy is fully implemented or, alternatively, should only retain
        jurisdiction for a maximum of one year. ..............................................................211

VI.     CONCLUSION ................................................................................................222

VII.    CERTIFICATION..............................................................................................23

1

<u>**TABLE OF AUTHORITIES**</u>

2

**Page(s)**

3

**Federal Cases**

4

*Armstrong v. Newsom*,

5

    58 F.4th 1283 (9th Cir. 2023)................................................................. 9

6

*Armstrong v. Schwarzenegger*,

    622 F.3d 1058 (9th Cir. 2010)................................................................. 9

7

*Balla v. Idaho State Bd. of Corrs.*,

8

    955 F. Supp. 1558 (D. Idaho 1984)........................................................ 2

9

*Bell v. Wolfish*,

10

    441 U.S. 520 (1979) ........................................................................ 8, 9

11

*Brown v. Plata*,

    563 U.S. 493 (2011) ...................................................................... 9, 12

12

*Bruce v. Ylst*,

13

    351 F.3rd 1283, 1290 (9th Cir. 2003) .................................................... 8

14

*Dixon v. Berry*,

15

    967 F. Supp. 535 (D. D.C. 1997) ........................................................... 8

16

*Gilmore v. California*,

    220 F.3d 987 (9th Cir. 2000)................................................................. 8

17

*Goldberg v. Kelly*,

18

    397 U.S. 254 (1970) ........................................................................... 12

19

*Miller v. French*,

20

    530 U.S. 327 (2000) ............................................................................. 9

21

*Missouri v. Jenkins*,

    495 U.S. 33 (1990) ............................................................................. 21

22

*Plata v. Newsom*,

23

    N.D. Cal. Case No. 4:01-cv-01351-JST (Oct. 29 Amended Receivership

    Transition Plan Order)..................................................................... 6, 22

24

*Plata v. Schwarzenegger*,

25

    No. C01-1351-TEH, 2005 WL 2932243 (N.D. Cal. May 10, 2005) ..............*passim*

26

27

28

**Federal Statutes**

18 U.S.C.
§ 3626(a)(1)(A) ............................................................................... 8, 9, 21, 22
§ 3626(b) ................................................................................................ 22

**State Statutes**

Cal. Penal Code § 2602............................................................................ 4, 15

**Rules**

Fed. R. Civ. P. 53(f)(3)............................................................................. 12

Fed. R. Evid. 706..................................................................................... 12

**Other Authorities**

Black's Law Dictionary (12th Ed. 2024) ..................................................... 13

Walter Pavlo, *Prisons Across Country Face Challenge of Finding Workers*, Forbes,
Jan. 11, 2025.......................................................................................... 19

# I.    INTRODUCTION

Since this Court first indicated it was considering the appointment of a receiver in this case—in July 2024—Defendants have been transparent about their position, stating repeatedly in court and in filings that they do not believe the standards have been and can be met, and requesting an evidentiary hearing. Nonetheless, Defendants have twice indicated that they would forgo their right to appeal the appointment of two outstanding candidates to serve as receiver because of their unique qualifications, experiences, and deep-rooted systemic knowledge, as well as Defendants' dedication to bring this case to a speedy conclusion. This Court's suggestion that these efforts and Defendants' position is some sort of "gotcha" litigation strategy is unfair, untrue, and contrary to the evidence in the record.

Despite these best efforts, neither candidate was able to accept the position and the Court has now requested the parties file "closing briefs" on their respective positions concerning appointment of a "temporary" receiver in this case. Dec. 16, 2024 Order at 5:17-19, ECF No. 8494.[1] The order also directs the parties to address the question of durability of the remedy, including "(1) how long after full implementation of the remedy they believe the court should retain jurisdiction to ensure the remedy is durable; and (2) if there is any lawful reason not to provide that the temporary receiver's tenure include a period of durability." *Id.* at 5:19-23. As explained below, Defendants' position remains the same: the standard cannot be met here for appointment of a receiver.

It is undisputed that significant progress has been made as a result of this case, and that the current Mental Health Services Delivery System (MHSDS) and the care that is now delivered to patients does not resemble the system in place at the initiation of this matter. Progress has been slow at times but it has not stalled, and even just recently, the parties worked together to make significant systemic improvements—including agreeing upon a telemental health policy (which had been the subject of extensive litigation in the past) and agreeing to modify the Program Guide

---

[1] Citations to page numbers in documents filed in the Court's Electronic Case Filing (ECF) system are to pages assigned by ECF and located in the upper right hand corner of the pages.

to permit two new classifications of mental health providers to serve the patient population, vastly expanding the pool of mental health clinician candidates. In short, the parties are motivated to work together to address remaining deficiencies and Defendants are dedicated to supporting these efforts.

The appointment of a receiver, especially one lacking the unique qualifications and experience from the earlier candidates, would only stall the parties' progress, given the amount of time required for a receiver to learn the system, Program Guide, extensive remedial orders that are in place, and shared systems and processes with the California Correctional Health Care Services. If this Court intends to proceed with receivership proceedings, Defendants again request that an evidentiary hearing be held so they may present evidence of the progress that has been made and the status of the delivery of care showing that the appointment of a receiver is not appropriate at this time.

## II.    RELEVANT BACKGROUND

### A.    The Court's 1994 findings led to the appointment of a special master.

Three years after the Plaintiff class filed this lawsuit, Magistrate Judge Moulds issued detailed Findings and Recommendations following a 39-day bench trial. ECF No. 547. Magistrate Judge Moulds concluded that CDCR's mental health system lacked elements essential to a constitutionally adequate mental health care system and found that "the evidence of defendants' deliberate indifference [was] manifest; defendants have for years ignored the considered advice of their own experts about the woeful deficiencies in their system." ECF No. 547 at 16:10-13.

Magistrate Judge Moulds outlined six essential components of a constitutionally adequate mental health care system: (1) a systemic program for screening and evaluating inmates to identify those in need of mental health care; (2) a treatment program that involves more than segregation and close supervision; (3) employment of a sufficient number of trained mental health professionals; (4) maintenance of accurate, complete and confidential mental health treatment records; (5) administration of psychotropic medication with appropriate supervision and periodic evaluation; and (6) a basic program to identify, treat, and supervise inmates at risk for suicide. *Id.* at 14:13-24; *see also*, *Balla v. Idaho State Bd. of Corrs.*, 955 F. Supp. 1558, 1577 (D. Idaho 1984)

1  (finding the same essential hallmarks of a constitutional correctional mental health services

2  program). Magistrate Judge Moulds found that CDCR was lacking in each of these essential areas.

3        Specifically, he found that CDCR had no system in place to screen and identify mentally

4  ill inmates, and as a result, "[t]hese inmates either go undetected and without care, or they come to

5  the attention of staff only when they behave in bizarre and inappropriate ways." ECF No. 547 at

6  30:7-9. And when they did behave bizarrely or inappropriately, they were often punished, rather

7  than treated. *Id.* at 30:9-11. CDCR was also "significantly and chronically understaffed in the area

8  of mental health care," resulting in lengthy waits for necessary treatment. *Id.* at 30:12-15. In

9  particular, CDCR's budget only authorized 376.6 positions despite Defendants' own consultants

10  from Scarlett Carp opining that 732 staff positions would be necessary to adequately staff a system

11  of 119,000 inmates. *Id.* at 37:7-12. Nor did CDCR have an effective quality assurance or peer

12  review program to assess the competence of its mental health care staff, and Defendants' own

13  expert opined that a large system like CDCR's "could probably not provide adequate mental

14  health care without some sort of management information system and some form of quality

15  assurance." *Id.* at 41:1-7; 41:23-42:1. CDCR also had a "profoundly inefficient medical

16  recordkeeping system," and in some instances, no records of treatment were kept. *Id.* at 30:15-20.

17        In terms of the actual care received, the Court found that there were "significant and

18  unacceptable delays at each level of care," and "[f]requently, such inmates receive no care at all or

19  only medication; they are often housed in administrative segregation or security housing units

20  while awaiting care." ECF No. 547 at 44:5-11. In November 1991, there was a backlog of over

21  400 inmates waiting to transfer to other institutions for psychiatric evaluations. *Id.* at 46:23-26.

22  This meant that inmates waited several weeks or months, during which time they received no

23  psychiatric treatment other than medication. *Id.* at 47:22-48:1. Even so, medication management

24  practices were severely lacking, and the Court found that "Defendants' supervision of the use of

25  medication is completely inadequate; prescriptions are not timely refilled, there is no adequate

26  system to prevent hoarding of medication, inmates on psychotropic medication are not adequately

27  monitored, and it appears that some very useful medications are not available because there is not

28  enough staff to do necessary post-medication monitoring." *Id.* at 50:10-17.

1    The Court described myriad concerns and inadequacies in the system that then-existed. In

2    light of those findings, the Magistrate Judge recommended the appointment of a special master to

3    "monitor defendants' compliance with the court-ordered injunctive relief." ECF No. 547 at 77:13-

4    23.

5    **B.    Defendants have made significant progress in delivering mental health care to the
     Plaintiff class.**

6

7    Defendants have enacted significant reforms throughout the life of this litigation to comply

8    with the Court's remedial orders. Defendants have successfully implemented robust screening

9    procedures requiring all incarcerated persons to undergo intake screening within 24 hours of

10   arrival and mental health screening within the first seven days. ECF No. 7333-1 at 23. Defendants

11   have also successfully implemented an electronic health records system at all institutions

12   statewide. ECF No. 6171 at 8. Further, CDCR's MHSDS now provides its patients with robust

13   treatment at various levels of care, follows strict timeframes for the transfer of patients to higher

14   levels of care when needed, and no longer punishes patients with administrative segregation for

15   exhibiting conduct that is merely a manifestation of a mental health disorder. *See*, ECF Nos. 7865

16   & 8066 (providing access to care), 8495 (following strict timeframes for patient transfer), 7333-1

17   at 563-567 (Sept. 11, 2015 Memorandum Re Implementation of Revised Rules Violation Report

18   Process Involving Inmate Participants in the MHSDS and Developmental Disability Program

19   discussing discipline of administrative segregation patients).

20   With respect to the administration of psychotropic medication, Defendants developed, in

21   coordination with the *Plata* Receiver and *Coleman* Special Master, the Medication Administration

22   Process Improvement Program (MAPIP) which is an audit tool that has "been implemented at all

23   CDCR institutions by the time of the Twenty-Seventh Monitoring Report and was in use at all

24   institutions during the Twenty-Eighth Monitoring Round." ECF No. 7074 at 125 (28th Round

25   Report). Additionally, in 2012, the state enacted Penal Code section 2602, setting a permanent

26   process for initiating involuntary medication for incarcerated persons.

27   Since the Court authorized the Special Master to work collaboratively with the Plata

28   Receiver on certain issues through the existing court coordination process, the Continuous Quality

Improvement indicators are also moving through the data remediation process more rapidly than they had been previously. ECF No. 8406 at 1.

Regarding the implementation of a "basic" suicide prevention program, extensive progress has been made including the implementation of a Suicide Case Review process (ECF No. 8180-3 at ¶ 23), which the Special Master's expert has described as "comprehensive," noting that "thoughtful and targeted QIPs [quality improvement plans]" are included to correct deficiencies and improve suicide prevention practices (ECF No. 8143-1 at 64).

As for transfer timelines and capacity compliance, Defendants' monthly filings on census, waitlists, and transfer timelines compliance reports for inpatient mental health care ("Inpatient Referral Reports") show that CDCR has successfully achieved and maintained compliance with remedial orders in this case. ECF No. 8495 at 2:9-15. Separately, Defendants' Unmet Needs Assessment (UNA) Report also demonstrates, and this Court found persuasive, that "CDCR has enough inpatient beds and mental health crisis beds (MHCBs) to meet class member need for these levels of care." ECF Nos. 8066 at 3:10-12; 7865-3. As the Court noted, the UNA Report "reflects a very comprehensive assessment conducted both diligently and collaboratively by all stakeholders." ECF No. 8066 at 3:9-10.

Finally, with regard to staffing, CDCR has dramatically improved staffing since the 1994 Findings and Recommendations. The issue of staffing challenges has already been extensively briefed and argued before this Court, and CDCR has objectively come a long way in terms of its mental health provider staffing and remains dedicated to further improvement. *See*, *generally*, ECF No. 8019.

### III.    PROCEDURAL HISTORY

On July 12, 2024, the Court issued an Order to Show Cause (OSC) in writing why it should not "*initiate formal proceedings* to appoint a temporary receiver to assume responsibility, with this court's oversight, for completion of all tasks necessary to implementation of the remedy in this action." ECF No. 8330 at 15:20-24 (emphasis added). The show-cause hearing was set for August 20, 2024. *Id.* at 15:27-28.

Prior to the hearing, the parties met, conferred, and agreed that the Court's order presented

a unique opportunity to complete the work of building and operating a mental healthcare system that satisfies the Eighth Amendment by appointing J. Clark Kelso as receiver. ECF No. 8347 at 2:2-5. Consequently, the parties filed a joint response to the Court's OSC agreeing the Court should appoint Mr. Kelso as receiver and stipulating that they would not appeal an order reflective of their agreement. *Id.* at 2:15-20. Mr. Kelso's role as the Receiver in the *Plata v. Newsom* matter in the Northern District of California, and the results yielded in that litigation under his tenure as *Plata* Receiver were the primary reasons for jointly requesting his appointment. *Id.* at 2:6-20.

At the August 20, 2024 hearing, the Court and the parties discussed the issues outlined in the July 12 OSC and the potential appointment of Mr. Kelso as receiver. ECF No. 8360; Reporter's Transcript of August 20, 2024 Proceedings, *passim*. The following day, the Court ordered the parties to appear for a further show cause hearing. ECF No. 8362. During that hearing, the Court and parties further discussed the possibility that Mr. Kelso could be appointed as the receiver in this case. Reporter's Transcript of Aug. 21, 2024 Videoconference Proceedings, ECF No. 8394. The Court stated that it was going to discuss Mr. Kelso's potential appointment with Judge Tigar of the Northern District of California—who oversees the *Plata* matter—to ensure there was no court objection to Mr. Kelso's appointment as the *Coleman* receiver. *See id.* at 3:21-4:4. The Court then stated that if Mr. Kelso would not consider the appointment, or if Judge Tigar would not allow Mr. Kelso to accept the appointment, then the Court would "*resolve the question* [of the appointment of a temporary receiver] *by an evidentiary hearing.*" *Id.* at 11:21-22 (emphasis added).

On August 30, 2024, the Court informed the parties that Mr. Kelso was open to the appointment as *Coleman* receiver subject to additional discussion with the Special Master. ECF No. 8382. The Court authorized those discussions, and the Special Master reported positively on their status on September 11, 2024. ECF No. 8397. The Special Master stated that he would further report back to the Court by September 20, 2024. *Id.*

On September 24, 2024, the Court informed the parties that Mr. Kelso had withdrawn his name from consideration as receiver due to the significant differences between the *Plata* and *Coleman* Court's remedial challenges. ECF No. 8406 at 1:19-24. The Court then stated that it

would continue to move forward with identifying and hiring a receiver for this action and would issue an order setting out next steps. *Id*. at 2:1-2.

On September 30, 2024, at a hearing unrelated to the contemplated receivership, the Court stated it would move forward with the appointment of a receiver and shared the Court's contemplated process with the parties. ECF No. 8414. The Court directed the parties to meet and confer and file a joint statement regarding their respective positions and suggestions respecting the appointment of a receiver by October 14, 2024. *Id.*

The parties filed their joint statement and informed the Court that they were in discussions with two potential receiver candidates "with the goal of reaching agreement to propose a candidate for the Court's consideration." ECF No. 8430 at 1:25-2:1. However, Defendants continued to maintain the position articulated throughout the receivership proceedings: that the standard for the appointment of a receiver had not been met, and could not be met. *Id*. at 2 n.1. Defendants also explained that they would continue to participate in good faith in the identification of a candidate, despite their belief that a receivership was not appropriate. *Id.*

The parties filed a joint update on October 25, 2024, and identified a new receiver candidate that they would fully support if the Court and the candidate agreed to the appointment. ECF No. 8442 at 2:7-10; *see* ECF No. 8431. The Court subsequently ordered the parties to submit the resume of the candidate by October 28, 2024. ECF No. 8443. After receiving the resume, the Court informed the parties that it would schedule an in camera discussion with the candidate as soon as possible. ECF No. 8444. That candidate was later identified publicly as Martin Hoshino. ECF No. 8463. Mr. Hoshino was unavailable to serve as receiver but offered to serve as an uncompensated advisor for the Court to help identify other possible candidates. *Id.* The Court accepted Mr. Hoshino's offer and on December 3, 2024, the Court ordered a special status conference to discuss the communications it received from Mr. Hoshino. ECF Nos. 8471, 8479, 8482. At the conference, the parties discussed a new candidate, Michael Wilkening. Reporter's Transcript of Dec. 5, 2024 Status Conference at 4:7-11. Although Plaintiffs stated that they believed Mr. Wilkening was a viable candidate that the parties could informally agree to, Defendants made clear that they did not agree, and once again repeated their request for an

DEFENDANTS' RESPONSE CONCERNING APPOINTMENT OF A TEMPORARY RECEIVER

1  evidentiary hearing on the appointment of a receiver—whether that be related to Mr. Wilkening or

2  someone else.[2] *Id.* at 6:8-25, 8:16-9:2.

3       On December 16, 2024, the Court issued the underlying order requesting "closing briefs"

4  on their respective positions concerning appointment of a "temporary" receiver in this case. ECF

5  No. 8494 at 5:17-19. The Court did so without holding the evidentiary hearing it had stated on

6  July 12, 2024 it would hold and that Defendants had repeatedly requested as set forth above. The

7  Court also considered Defendants' willingness to participate in the identification of two candidates

8  as a concession that the receivership standard had been met.

9  **IV.    LEGAL STANDARD**

10       Federal courts possess the power to appoint receivers to remedy constitutional violations;

11  however, courts should "exercise restraint," use the "least possible power adequate to the end

12  proposed," and be "mindful of the interests of state and local authorities in managing their own

13  affairs." *Plata v. Schwarzenegger*, No. C01-1351-TEH, 2005 WL 2932243 at *6 (N.D. Cal. May

14  10, 2005), *citing, e.g.*, *Dixon v. Berry*, 967 F. Supp. 535, 550 (D. D.C. 1997). Indeed, federal

15  courts must remember that the duty to protect inmates' constitutional rights "does not confer the

16  power to manage prisons or the capacity to second-guess prison administrators," for which federal

17  courts are ill-equipped. *Bruce v. Ylst*, 351 F.3rd 1283, 1290 (9th Cir. 2003). For that reason, in

18  fashioning equitable relief, a court's remedy must be consistent with the policy of minimal

19  intrusion into the affairs of state prison administrators. *Id.*

20       Additionally, the Prison Litigation Reform Act (PLRA) imposes strict requirements with

21  respect to the implementation of prospective relief. 18 U.S.C. § 3626(a)(1)(A). Congress enacted

22  the PLRA in response to ever-increasing judicial intrusion into prison administration. *Gilmore v.*

23  *California*, 220 F.3d 987, 996-97 (9th Cir. 2000). Though "courts are ill equipped to deal with the

24  increasingly urgent problems of prison administration," *Bell v. Wolfish*, 441 U.S. 520, 531 (1979),

25  courts frequently ignore "the need for deference to experienced and expert prison administrators

26  faced with the difficult and dangerous task of housing large numbers of convicted criminals,"

27

28  _____
[2] Mr. Wilkening later declined being considered as a receiver candidate. ECF No. 8501.

1   *Brown v. Plata*, 563 U.S. 493, 511 (2011). But "operation of our correctional facilities is

2   peculiarly the province of the Legislative and Executive Branches of our Government, not the

3   Judicial." *Bell*, 441 U.S. at 548. The PLRA thus restrains the power of federal courts in prison

4   condition cases by "curbing the[ir] equitable discretion." *Miller v. French*, 530 U.S. 327, 339

5   (2000).

6       The PLRA implements that objective by requiring courts to "find[ ] that the set of reforms

7   being ordered—the 'relief'—corrects the violations of prisoners' rights with the minimal impact

8   possible on defendants' discretion over their policies and procedures." *Armstrong v.*

9   *Schwarzenegger*, 622 F.3d 1058, 1070-71 (9th Cir. 2010). Specifically, the Court must find the

10  prospective relief is "narrowly drawn, extends no further than necessary to correct the violation of

11  the Federal right, and is the least intrusive means necessary to correct the violation of the Federal

12  right." 18 U.S.C. § 3626(a)(1)(A). Foundational to that mandate is a threshold finding of an Eighth

13  Amendment violation that the order seeks to remedy. *See id.* The mere fact that a district court is

14  supervising a case in its remedial phase does not excuse it from that requirement. *See Armstrong v.*

15  *Newsom*, 58 F.4th 1283, 1301 (9th Cir. 2023) (reversing in part because the court did not make

16  sufficient PLRA findings to support part of new remedial order). Because the appointment of a

17  receiver would constitute prospective relief, compliance with these PLRA mandates is required.

18  *See Plata*, 2005 WL 2932243 at *6.

19      Further, and specific to the appointment of a receiver, courts generally look to see if two

20  conditions have been met: (1) there is a grave and immediate threat or actuality of harm to

21  plaintiffs, and (2) the imposition of less extreme measures would be futile. *Plata*, 2005 WL

22  2932243 at *7. Courts also look to see whether "continued insistence that compliance with the

23  Court's orders would lead only to confrontation and delay," whether there is a lack of leadership,

24  whether there is bad faith, whether resources are being wasted, and whether a receiver would

25  likely provide a quick and efficient remedy. *Id*. As explained below, the demanding standard for a

26  receiver cannot be met here.

27  / / /

28  / / /

# V.   ARGUMENT

**A.   Defendants never stipulated that the receivership standard was met.**

The Court's December 16, 2024 order mischaracterized Defendants' willingness to stipulate to the appointments of either Mr. Kelso or Mr. Hoshino as receivers as a "type of attempted 'gotcha' litigation strategy," and concluded that because Defendants were willing to stipulate to two specific candidates, Defendants could not dispute that the standards had been met for appointment of a receiver. ECF No. 8494 at 5:7-12. The Court's characterization of Defendants' position on the appointment of a receiver is inaccurate.

From the start, Defendants specifically, and consistently, stated their belief that the standards had not been met for the appointment of a receiver. *E.g.* ECF No. 8347 at 6:2-3 & 11-12 & 17-20; ECF No. 8430 at 2 n.1. Notwithstanding, given Mr. Kelso's unique qualifications and current role, Defendants agreed not to appeal his appointment. ECF No. 8347 at 6:12-17.

When Mr. Kelso declined the appointment, Defendants again reiterated that they did not believe the standards had been met for the appointment of a receiver but, in good faith and in an effort to avoid litigation, agreed to consider the appointment of Mr. Hoshino because of Mr. Hoshino's unique experiences in State service and familiarity with CDCR. *See* ECF No. 8430 at 2 n.1.; ECF No. 8442 at 2:7-11. However, Mr. Hoshino was not available for an appointment as receiver. ECF No. 8463. That Defendants twice worked amicably, and in good faith, with Plaintiffs to find a suitable candidate for an extremely challenging job was not a concession that the standards for the appointment of a receiver, temporary or otherwise, had been met. Nor should those good-faith actions to reach agreement and avoid litigation be characterized as a "gotcha" litigation strategy.

Importantly, throughout the receivership discussions in this case, Defendants never represented that they would stipulate to the appointment of a receiver other than Mr. Kelso or Mr. Hoshino, and consistently maintained their position that the standard for the appointment of a receiver had not been met, and could not be met. Defendants' transparency about their position and open willingness to work with Plaintiffs to come up with a mutually agreeable candidate notwithstanding their position cannot be characterized as gamesmanship.

**B.**   **Under the unique circumstances of this case, due process requires an evidentiary hearing, including examination of witnesses, before a receiver can be appointed.**

The Court has not provided Defendants an evidentiary hearing despite their multiple requests and the Court's own statement that it would hold an evidentiary hearing prior to appointing a receiver. Reporter's Transcript of Aug. 21, 2024 Videoconference Proceedings, ECF No. 8394 at 11:21-22. The Court therefore should hold an evidentiary hearing before taking the extraordinary step of appointing a receiver. *E.g. Plata*, 2009 WL 799392 at *2 (N.D. Cal. March 24, 2009). The *Plata* model included: (1) notice via an OSC why a receiver should not be appointed to manage health care delivery for CDCR until defendants prove that they are capable and willing to do so without Court intervention; (2) an evidentiary hearing in which the parties presented evidence relating to the OSC that included testimony from court experts, state employees in positions critical to the prison medical system, the state's medical consultant, and eighty-two exhibits; (3) amicus briefing on behalf of the Service Employees Internation Union Local 1000 and other unions representing state prison medical personnel; (4) legal briefs from the parties addressing the receivership in light of the evidence elicited at the hearing and the unions' amicus brief; and (5) a hearing on the OSC. *Plata*, *supra*, 2005 WL 2932253 at *2. By contrast, this Court has not afforded Defendants the same procedural safeguards prior to its stated intention to appoint a receiver upon submission of the parties' "closing" briefs, has not provided any guidance as to what it means by "temporary" receiver, and has sent mixed signals on how it will proceed.

For example, the Court's initial OSC concerning the appointment of a receiver asked for a written response as to why it should not "*initiate formal proceedings* to appoint a temporary receiver to assume responsibility, with this court's oversight, for completion of all tasks necessary to implementation of the remedy in this action." ECF No. 8330 at 15:20-24 (emphasis added). The OSC expressly contemplated the initiation of formal proceedings—*i.e.* proceedings that, like in *Plata*, would presumably include notice, an evidentiary proceeding, stakeholder briefing, and a hearing. None of that has occurred.

Later, the Court again told the parties that if Mr. Kelso would not consider the

1   appointment, or if Judge Tigar would not allow Mr. Kelso to accept the appointment, then the

2   Court would "*resolve the question by an evidentiary hearing.*" *Id.* at 11:21-22 (emphasis added).

3   That evidentiary hearing has never occurred. As a result, Defendants were surprised by the Court's

4   recent order seeking "closing briefs," notwithstanding the fact that there has been no filing of

5   "opening briefs," no trial briefs, and no opportunity for the formal presentation of evidence

6   (including live testimony) as to why the standard for appointing a receiver—temporary or

7   otherwise—has not been, and cannot be, met.

8        Therefore, the Court should hold an evidentiary hearing with appropriate procedural and

9   adversarial safeguards prior to the appointment of any receiver. ECF No. 8347 at 12:8-14;

10  Reporter's Transcript of Sept. 30, 2024 Proceedings at 8:18-9:6; ECF No. 8430 at 2 n.1;

11  Reporter's Transcript of Dec. 5, 2024 Proceedings at 6:13-25.[3]

12       The concern with relying on uncross-examined bases for the findings of a court-appointed

13  special master in fashioning a PLRA remedy is doubled where, as here, the Court has almost

14  exclusively reviewed and adopted the Special Master's reported findings using the outdated clear

15  error standard of review. *See* ECF No. 8503 (Defendants' motion to modify the order of reference

16  in order for objections to special master reports to be reviewed *de novo*); *see also*, Fed. R. Civ. P.

17  53(f)(3) ("Reviewing Factual Findings. The court must decide de novo all objections to findings of

18  fact made or recommended by a master . . ."), and ECF No. 640 at 4:19-5:4 (contemplating

19  objections to special masters' reports that would be resolved via adversarial proceedings). Thus,

20  although the Court observes that Defendants can file objections and rebuttal evidence to the

21  Special Master's reports, those objections are rarely sustained under the clear error standard the

22

-----

23  [3] While Defendants acknowledge the Court's view that the Special Master's experts are insulated
    from cross examination under Federal Rule of Evidence 706 due to the Special Master's status as

24  an arm of the Court, other judges may disagree. In *Brown v. Plata*, Justice Scalia criticized the
    Three-Judge Court's overreliance on special master reports when implementing remedies, stating

25  that "[r]elying on the uncross-examined findings of an investigator, sent into the field to prepare a
    factual report and give suggestions on how to improve the prison system, bears no resemblance to

26  ordinary judicial decisionmaking." 563 U.S. 493, 558 (2011) (Scalia, J., dissenting); *see also*,
    *Goldberg v. Kelly*, 397 U.S. 254, 267-69 (1970) ("In almost every setting where important

27  decisions turn on questions of fact, due process requires an opportunity to . . . cross-examine

28  adverse witnesses.")

1    Court currently applies in its review. And Defendants are charged with engaging in obstructive

2    "litigation strategy" when they object. *E.g.* ECF No. 8238 at 26-27.[4]

3         Because it appears the Court will rely on the Special Master's reports based on uncross-

4    examined evidence that has been previously adopted in this case using the outdated clear error

5    standard, and because Defendants maintain their position that they are entitled to an evidentiary

6    hearing on the question of whether the Court should appoint any receiver, the Court should hold

7    an evidentiary hearing prior to the appointment of any receiver. In fact, the *Plata* Court, in

8    conducting an evidentiary hearing regarding the appointment of a receiver, permitted live

9    testimony from the Court Experts and Defendants' representatives. *Plata*, *supra*, No. C01-1351-

10   TEH, 2005 WL 2932253 at *2 (N.D. Cal. Oct. 3, 2005); *see also Plata*, 2005 WL 2932243 at *10

11   (N.D. Cal. May 10, 2005). Such a hearing would give Defendants the opportunity to demonstrate

12   the progress they have made in this case, and the lack of need of a receiver in addition to a special

13   master, as briefly discussed below.[5]

14   **C.    The standard for the appointment of a receiver has not, and cannot be, met.**

15        As stated above, the standard for the appointment of a receiver requires the Court to

16   consider: (1) whether there is a grave and immediate threat or actuality of harm to plaintiffs; (2)

17   whether the imposition of less extreme measures would be futile; and (3) other factors including

18   whether continued insistence that compliance with the court's orders would lead only to

19   confrontation and delay, whether there is a lack of leadership, whether there is bad faith, whether

20

21   [4] Defendants also note that while the Court says Defendants can file "evidence as necessary" to

22   object to the Special Master's reports, they have historically been prevented from even gathering
     evidence of their own system in this case. *See* ECF No. 7897 (enjoining Defendants' experts from

23   assessing CDCR's mental health program, staffing levels and staffing ratios, and delivery of
     mental health care); *see also*, ECF No. 8144 at 10:6-9 (describing the Special Master's uncross-

24   examined periodic monitoring reports as "unbiased, objective assessments of the delivery of
     mental health care throughout the [Mental Health Services Delivery System]").

25

26   [5] By submitting this brief, Defendants do not concede that it qualifies as a true "closing brief" that
     ordinarily follows a trial or evidentiary hearing, that amounts to a final statement requesting that

27   the Court consider the evidence and apply the law in their favor. *See* Black's Law Dictionary (12th
     Ed. 2024), closing argument. Defendants reserve their right to challenge the appointment of any

28   receiver on this record and without an evidentiary hearing.

resources are being wasted, and whether a receiver would likely provide a quick and efficient

remedy. *Plata*, 2005 WL 2932243 at *7. This Court cannot make the requisite findings to support

the appointment of a receiver given the record and the status of Defendants' remedial efforts.

      1.    There is no showing of a grave and immediate threat or actuality of harm to
                Plaintiffs that would warrant the appointment of a temporary receiver.

Because the Court has not held an evidentiary hearing, there has been no showing made of

a grave and immediate threat or actuality of harm to Plaintiffs that would warrant the appointment

of a receiver. Indeed, the record in this case shows the opposite. Defendants have enacted

significant reforms throughout the life of this litigation to comply with the Court's remedial orders

as highlighted below.

      a.    Screening Procedures

Defendants have successfully implemented robust screening procedures. Chapter 2 of the

Program Guide (ECF No. 7333-1 at 23) requires all incarcerated persons to undergo intake

screening within 24 hours of arrival and mental health screening within the first seven days. No

one leaves the reception center without intake screening as it is now standard processing.

Implementation of this requirement is evidenced by the simple growth of the *Coleman* class. The

growth of the class size (*see, e.g.*, ECF No. 8291 at 4:1-5 (noting a more than doubling of the class

size)) is, at least in part, attributable to the effectiveness of that screening.

      b.    Electronic Health Records System

As indicated in the Court's original findings, one component of a constitutionally adequate

mental health care system is maintenance of accurate, complete and confidential mental health

treatment records. ECF No. 547 at 14:13-24. The *Plata* Receiver previously reported in his Forty-

First Tri-Annual Report that the Electronic Health Records System (EHRS) "was successfully

implemented at all institutions statewide as of November 2017." ECF No. 6171 at 8.

      c.    Policy Reforms

CDCR's MHSDS now provides its patients with robust treatment at various levels of care,

follows strict timeframes for the transfer of patients to higher levels of care when needed, and no

longer places patients within administrative segregation as a punitive measure for exhibiting

conduct that may be a manifestation of a mental health disorder. *See* ECF Nos. 7865 & 8066 (providing access to care), 8495 (following strict timeframes for patient transfer), 7333-1 at 563-567 (Sept. 11, 2015 Memorandum Re Implementation of Revised Rules Violation Report Process Involving Inmate Participants in the MHSDS and Developmental Disability Program discussing discipline of administrative segregation patients). Indeed, in June of 2024, CDCR developed a Restrictive Housing Unit (RHU) policy that demonstrates the progress CDCR has made in the area, stating that the purpose of the policy is "[t]o assure all incarcerated individuals have access to mental health services while housed in a restrictive housing unit setting," and to provide MHSDS patients with "enhanced mental health services to prevent decompensation." ECF No. 8337 at Ex. B.

### d.  Medication Administration

With respect to the administration of psychotropic medication, Defendants developed, in coordination with the *Plata* Receiver and *Coleman* Special Master, the Medication Administration Process Improvement Program (MAPIP). MAPIP is an audit tool that has "been implemented at all CDCR institutions by the time of the Twenty-Seventh Monitoring Report and was in use at all institutions during the Twenty-Eighth Monitoring Round." ECF No. 7074 at 125 (OSM 28th Round Report). Additionally, in 2012, the state enacted Penal Code section 2602, setting a permanent process for initiating involuntary medication for incarcerated persons.

### e.  Data Remediation

Since the Court authorized the Special Master to work collaboratively with the *Plata* Receiver on certain issues through the existing court coordination process, the Continuous Quality Improvement indicators are moving through the data remediation process more rapidly than they had been previously. ECF No. 8406 at 1. Last year, on January 1, 2024, CDCR had remediated 98 indicators, and this number has increased to 182 remediated indicators as of January 13, 2025. CDCR is hopeful that with the collaboration between the Special Master and the *Plata* Receiver, all indicators will be remediated by the court's May 1, 2025 deadline. ECF No. 8485 at. 2.

### f.  Suicide Prevention

With respect to the implementation of a basic suicide prevention program, the Special

1    Master's suicide prevention expert conducted an audit of CDCR's suicide prevention practices in

2    2013 and made 33 recommendations. ECF No. 8143 at 2. Three of those recommendations were

3    later withdrawn, and the Special Master's suicide prevention expert recently found that

4    Defendants still need to implement 14 recommendations.[6] *Id.* at 3, 8. The Special Master's suicide

5    prevention expert believes more work remains, but extensive progress has been made—including

6    recently. In fact, since issuing the OSC regarding appointment of a receiver, this Court found

7    Defendants to be in compliance, or very close to compliance, with four additional

8    recommendations. ECF No. 8478 (compliance with Recommendation 8); ECF No. 8433

9    (September 30, 2024 Report's Transcript) at 39:16-22 (Recommendation 12), 39:23-25

10   (Recommendation 13), 40:2-4 (Recommendation 18). Defendants are also now largely compliant

11   with Recommendation 3 regarding suicide prevention trainings. Whereas in 2023, seven

12   institutions failed to achieve 90% compliance across all three disciplines (custody, health care, and

13   mental health), in 2024, that number dropped to just four non-compliant institutions. Declaration

14   of Travis Williams, PsyD, In Support of Defendants Response Concerning Appointment of a

15   Temporary Receiver ¶4. Of those four institutions, two were essentially at the 90% threshold (with

16   SVSP at 89.9% for custody and PBSP at 89.7% for mental health), and the other two institutions

17   were within three percentage points or less. *Id.* This continued progress reinforces that

18   appointment of a receiver is not necessary to come into compliance with this aspect of the remedy.

19          The suicide prevention program that is currently in place is far more robust, thorough, and

20   extensive than the program that existed in 1995—and even the design of that program was deemed

21   "adequate," though the Court found the program had not been fully implemented due to staffing

22   and therefore ordered the special master to report on the adequacy of suicide prevention. ECF No.

23   547 at 75:1-9. Indeed, "a strength of CDCR's suicide prevention system [is] the Suicide Case

24   Review process" (ECF No. 8180-3 at ¶ 23), which the Special Master's expert has described as

25

26   [6] In its November 27, 2024 Order, the Court found that Defendants achieved 95 percent
     compliance with one of those measures—measure 8—in 2023. ECF No. 8478 at 3. The Court also
27   stated that Defendants' compliance with recommendations 12, 13, and 18 was "close" and did not
     warrant contempt proceedings. Reporter's Transcript of Sept. 30, 2024 Hearing, ECF 8433 at
28   39:16-22 (Recommendation 12), 39:23-25 (Recommendation 13), 40:2-4 (Recommendation 18).

1    "comprehensive," noting that "thoughtful and targeted QIPs [quality improvement plans]" are

2    included to correct deficiencies and improve suicide prevention practices (ECF No. 8143-1 at 64).

3                    g.        Transfer Timelines and Capacity Compliance

4            Defendants' monthly filings on census, waitlists, and transfer timelines compliance reports

5    for inpatient mental health care ("Inpatient Referral Reports") show that CDCR has successfully

6    achieved and maintained compliance with remedial orders in this case. Indeed, Defendants' recent

7    Inpatient Referral Reports filing reflects that of the 208 patients referred to inpatient programs in

8    December 2024, 189 were admitted to an inpatient program within Program Guide transfer

9    timelines, one patient was admitted outside Program Guide transfer timelines but under transfer

10   timeline exceptions, and the remaining 18 patient referrals were rescinded or rejected, or the

11   patients were discharged or paroled. ECF No. 8516 at 2:9-15. The filing further reflects that there

12   is sufficient capacity to meet the needs of patients at all levels of inpatient care. *Id.*

13           Additionally, CDCR's monthly Inpatient Referral Reports reflect that there has been no

14   waitlist since July 2023. ECF No. 7921 (Aug. 2023); ECF No. 7947 (Sept. 2023); ECF No. 8014

15   (Oct. 2023); ECF No. 8067 (Nov. 2023); ECF No. 8086 (Dec. 2023); ECF No. 8109 (Jan. 2024);

16   ECF No. 8132 (Feb. 2024); ECF No. 8158 (March 2024); ECF No. 8199 (April 2024); ECF No.

17   8237 (May 2024); ECF No. 8280 (June 2024); ECF No. 8333 (July 2024); ECF No. 8357 (Aug.

18   2024); ECF No. 8402 (Sept. 2024); ECF No. 8432 (Oct. 2024); ECF No. 8464 (Nov. 2024); ECF

19   No. 8495 (Dec. 2024); ECF No. 8516 (Jan. 2024). With regard to transfer timelines, the Court

20   stated that it was "encouraged by the progress defendants have made in returning to earlier gains

21   in timely access to inpatient care." *Id.* at 5:2-3. Defendants' bi-annual filings on the transfer

22   timelines for class members housed in the desert institutions also show that CDCR achieves and

23   maintains compliance with remedial orders in this case. ECF No. 8506.

24           Separately, Defendants' Unmet Needs Assessment (UNA) Report also demonstrates, and

25   this court found persuasive, that "CDCR has enough inpatient beds and mental health crisis beds

26   (MHCBs) to meet class member need for these levels of care." ECF Nos. 8066 at 3:10-12; 7865-3.

27   As the Court noted, the UNA Report "reflects a very comprehensive assessment conducted both

28   diligently and collaboratively by all stakeholders." ECF No. 8066 at 3:9-10.

1

h.      Staffing Improvements

2      Notwithstanding the fact that this Court held Defendants in contempt for failing to comply

3 with prior staffing orders, the data shows that CDCR has dramatically improved staffing since the

4 1994 Findings and Recommendations. ECF No. 547. In the context of filled positions, CDCR now

5 employs over 1,300 *more* mental health clinicians than it did at the time of the 1994 Findings and

6 Recommendations. *Compare* ECF No. 8303 at 22 (indicating a total of 1,611.08 positions filled

7 with civil service and registry providers across all classifications) *with* ECF No. 547 at 37:7-12

8 (indicating 376.6 total allocated positions of which 25% were vacant, i.e., a total of approximately

9 280 filled positions). The issue of staffing challenges has already been extensively briefed and

10 argued before this Court, and the data shows that CDCR has come a long way in terms of its

11 mental health provider staffing and remains dedicated to further improvement. *See generally* ECF

12 No. 8019 (Defs.' Closing Brief).

13      Indeed, since the staffing contempt proceeding, CDCR continues to demonstrate the will,

14 capacity, and leadership necessary to further improve mental-health staffing. Through CDCR's

15 good-faith efforts, the social worker staffing levels have increased from 83% in July 2024 (when

16 this Court signaled its consideration of receivership proceedings) to 90% as of November 2024.

17 *Compare* ECF No. 8384 at 7, *with* ECF No. 8508 at 7. In fact, as of November 2024, staffing

18 levels for three of the five classifications that were at issue in the contempt proceeding are

19 compliant with Court-ordered staffing levels.[7] ECF No. 8508 at 5 (Statewide Psychiatry positions

20 90%), *id.* at 7 (Statewide Clinical Social Worker Positions 90%), *id.* at 8 (Statewide Recreational

21 Therapist Positions 99%).[8]

22

_____

23 [7] The Court's December 16, 2024 order says that only institutional fill rates for psychiatrists and clinical social workers are above the 90 percent rate. ECF No. 8494 at 4:5-7. It fails to credit the

24 99% fill rate for Statewide Recreational Therapists. ECF No. 8508 at 8.

25 [8] While these staffing numbers demonstrate compliance, as explained during the staffing contempt proceeding, staffing positions are reallocated twice yearly based on population changes. ECF No.

26 8019 (Defs.' Closing Brief) at 16:10-18. Compliance rates therefore fluctuate accordingly, and compliance is rarely achieved in the immediate months following a reallocation increasing

27 positions. Plaintiffs even acknowledged in their staffing contempt Opening Brief that the months following the twice-yearly staffing allocations that occur in January in June should warrant some

28

1    Additionally, CDCR has continued to successfully implement its telemental health

2    program and implementation and hiring has surpassed even CDCR's best estimates provided at the

3    staffing contempt trial. Specifically, at trial, Defendants expected to begin filling vacant onsite

4    psychology and clinical social worker roles through the telemental health program starting in

5    December 2023 and estimated the program would be in full operation over one or two years

6    following the October 2023 contempt proceeding. ECF No. 8019 (Defs.' Closing Brief) at 14:28-

7    15:6. As of November 2024—just 13 months after contempt proceedings concluded—Defendants

8    had filled 48 telepsychology positions (out of an allocated total of 60 positions) and 47 teleclinical

9    social worker positions (out of an allocated total of 40 positions). ECF No. 8508 at 6, 7;

10   Declaration of Jasinda Muhammad In Support of Defendants' Response Concerning Appointment

11   of a Temporary Receiver ("Muhammad Decl."), ¶ 3. Hiring remains ongoing and interest is

12   exceeding available positions. ECF No. 8508 at 6, 7; *see also*, Muhammad Decl., ¶ 5. Also, nine

13   telepsychologists and six teleclinical social workers are in the hired or pre-employment pipeline.

14   *Id.*

15   Further, since the conclusion of staffing contempt proceedings, CDCR has worked with

16   stakeholders to expand the classifications that can provide mental-health services under the

17   Program Guide. In August 2024, the Court approved the parties' stipulation modifying the

18   Program Guide to permit the use of Marriage and Family Therapists (MFTs) and Clinical

19   Counselors (CCs) as mental health primary clinicians. ECF No. 8376. The addition of two new

20   classifications to fulfill the role of mental health primary clinicians significantly expands the pool

21   of available clinicians from which to recruit. Indeed, CDCR has hired 19 MFTs and 2 CC registry

22   providers, with another 27 MFTs and 2 CCs who are in the process of being hired. Muhammad

23   Decl., ¶ 6. Defendants have also worked with all stakeholders to modify the 2009 Staffing Plan to

24   incorporate the new classifications. Defendants have reduced these needed modifications to a

25   stipulation and expect to submit that to the Court for approval pending the Special Master's input.

26

27   level of acceptance of noncompliance because Defendants should be afforded time to fill the new

28   positions if allocations increase. ECF No. 7952 at 7:22-24.

1    These efforts have led to improvements in staffing and the delivery of mental-health services,

2    notwithstanding severe nationwide staffing shortages. Walter Pavlo, *Prisons Across Country Face*

3    *Challenge of Finding Workers*, Forbes, Jan. 11, 2025.[9]

4                2.       There is no showing that imposition of less extreme measures would be futile.

5            In light of the progress accomplished to date and Defendants' commitments to address the

6    work that remains, less extreme measures remain fruitful (and thus not futile) and therefore the

7    appointment of a receiver is neither appropriate nor necessary. As discussed above and

8    summarized in the Special Master's regular reports, significant progress has been made to create a

9    robust mental-health treatment program in California's prisons. There are other alternatives that

10   the Court can explore before taking such a drastic step. Thus, no showing has or can be made that

11   imposition of less extreme measures would be futile.

12              3.       The other factors also do not support the appointment of a temporary receiver.

13           As for the remaining factors, none of them support the appointment of a receiver. First,

14   there is no showing that continued insistence on compliance with the Court's orders would lead

15   only to confrontation and delay. Defendants have demonstrated a willingness to work

16   cooperatively with Plaintiffs to enact the remedy in this case. For example, the parties are

17   currently—and appear to have reached—an agreement to modify the Program Guide to add the

18   MFT and CC classifications. Defendants also negotiated a telemental health and telepsychiatry

19   policy, notwithstanding the parties' longstanding differences on the subject. This shows that

20   Defendants are earnestly trying to address ongoing issues without the need for Court intervention.

21           Second, there is no showing of a lack of leadership. Defendants are "ready, willing, and . . .

22   able to remedy the deprivation of constitutional rights themselves." *Missouri v. Jenkins*, 495 U.S.

23   33, 51 (1990) (holding district court abused discretion when it acted on behalf of a local

24   government). While this Court has extensively noted its frustration with the pace in which reforms

25   have been implemented in this case, significant reforms have objectively occurred throughout this

26

27   ───────────────
     [9] Article available at https://www.forbes.com/sites/walterpavlo/2025/01/11/prisons-across-

28   country-face-challenge-of-finding-workers/.

---

DEFENDANTS' RESPONSE CONCERNING APPOINTMENT OF A TEMPORARY RECEIVER

1  litigation and Defendants' leadership remain committed to enacting lasting reforms and ending

2  this case. *See* ECF No. 8347 at 6:1-10:21.

3        Third, there is no showing of bad faith. Indeed, Defendants' willingness to identify not

4  one, but two potential receiver candidates who were uniquely positioned to serve in this role based

5  on their experience, and Defendants' agreement to not appeal the appointment of those candidates

6  is just one example of their good faith efforts to bring the remedial phase of this case to a prompt

7  conclusion. Similarly, Defendants have effectively worked with Plaintiffs to negotiate a mutually

8  agreeable telemental health policy, as well as the creation of two new classifications to expand the

9  pool of mental health clinicians and improve staffing.

10        Fourth, there is no showing that resources are being wasted. Defendants work closely and

11  carefully to ensure that all reforms are implemented as ordered and there is no evidence to suggest

12  that resources have been wasted.

13        Fifth, and finally, there is no showing that a receiver would provide a quick and efficient

14  remedy. The Court's order does not explain whether the Special Master would have a continued

15  role should a receiver, temporary or otherwise, be appointed. Defendants' independent research

16  did not reveal any case under the PLRA where a court has appointed both a special master and a

17  receiver to aid in the remedial phase of the litigation. *See also Plata*, 2005 WL 2932243 at *7

18  (factors to consider when determining to appoint a receiver include use of limited resources).

19  Indeed, as explained in their earlier joint filings with Plaintiffs, one of the primary reasons that Mr.

20  Kelso or Mr. Hoshino were uniquely qualified to be receivers in this action is that it would not

21  take them years to get up to speed with the litigation, the remedy, and the Court's orders. Indeed,

22  given the complexity of this case, it will take a significant amount of time for any receiver to get

23  up to speed, potentially delaying implementation of the remedy and undermining the momentum

24  and progress, particularly in recent months.

25  **D.**    **If a temporary receiver is appointed, the Court would lose jurisdiction after the
26  remedy is fully implemented or, alternatively, should only retain jurisdiction for a
maximum of one year.**

27        Because the PLRA contemplates "immediate termination of prospective relief" once there

28  is no longer an ongoing constitutional violation, it follows that the Court would lose jurisdiction

1   after full implementation of the remedy and a finding that there is no ongoing constitutional

2   violation. *See* 18 U.S.C. § 3626(b) (providing for the immediate termination of prospective relief

3   where there is no longer an ongoing violation of a federal right).

4           Notwithstanding the above, Defendants understand the need to ensure a durable remedy

5   has been implemented and Defendants' substantial compliance is sustainable. Defendants

6   therefore would agree that at most, any temporary receiver should retain durability jurisdiction for

7   a maximum of one year after implementation of the remedy. Doing so would be consistent with

8   the delegation procedure currently followed by the *Plata* Court. *See Plata v. Newsom*, N.D. Cal.

9   Case No. 4:01-cv-01351-JST (Oct. 29, 2021 Amended Receivership Transition Plan Order) at 3 ¶

10  11 (providing that a one-year period after delegating all medical functions back to the State would

11  create a rebuttable presumption of constitutional adequacy and sustainability and giving plaintiffs

12  120 days to file a motion challenging the presumption). If left unchallenged, the Court could then

13  promptly order the termination of the receivership and dismiss the case. *See*, *id.*

14          This approach contemplates a *Coleman* receivership that mirrors the current receivership in

15  *Plata*. However, this Court has referred to the appointment of a "temporary receiver" in this

16  matter, and it remains unclear what is intended by the term "temporary." ECF No. 8494, *passim*.

17  Temporary suggests some limitation on a *Coleman* receiver's powers, including temporal

18  limitations, though the term is undefined in the Court's orders. Defendants' above response

19  regarding durability therefore assumes that a *Coleman* receiver would assume full control over the

20  Mental Health Delivery System until such time as substantial compliance has been achieved, but

21  to the extent this assumption is incorrect in any way, Defendants reserve their right to seek an

22  opportunity for further briefing.

## VI.    CONCLUSION

23

24          For the foregoing reasons, Defendants oppose the appointment of a temporary receiver and

25  do not believe that the Court has made, or can make, the requisite findings on this record to justify

26  such appointment.

27  / / /

28  / / /

## VII.    CERTIFICATION

In preparing this request, Defendants' counsel reviewed the following Court orders relevant to the issues in this filing: ECF Nos. 547, 7897, 8144, 8192, 8238, 8368, 8377, 8414, 8431, 8443, 8444, 8457, 8463, 8471, 8479, 8482, 8494, 8501.

DATED: January 15, 2025          ROB BONTA
                                Attorney General of California


By: _____*/s/ Elise Owens Thorn*_____
        DAMON MCCLAIN
        Supervising Deputy Attorney General
        ELISE OWENS THORN
        Deputy Attorney General
        *Attorneys for Defendants*


DATED: January 15, 2025          HANSON BRIDGETT LLP


By: _____*/s/ Paul B. Mello*_____
        LAWRENCE M. CIRELLI
        PAUL B. MELLO
        SAMANTHA D. WOLFF
        DAVID C. CASARRUBIAS-GONZÁLEZ
        SAMANTHA M. BACON
        *Attorneys for Defendants*