DONALD SPECTER – 083925
STEVEN FAMA – 099641
MARGOT MENDELSON – 268583
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California 94710-1916
Telephone: (510) 280-2621

CLAUDIA CENTER – 158255
DISABILITY RIGHTS EDUCATION
AND DEFENSE FUND, INC.
Ed Roberts Campus
3075 Adeline Street, Suite 210
Berkeley, California 94703-2578
Telephone: (510) 644-2555

MICHAEL W. BIEN – 096891
ERNEST GALVAN – 196065
LISA ELLS – 243657
JENNY S. YELIN – 273601
THOMAS NOLAN – 169692
MICHAEL S. NUNEZ – 280535
MARC J. SHINN-KRANTZ – 312968
ALEXANDER GOURSE – 321631
ADRIENNE PON HARROLD – 326640
BENJAMIN W. HOLSTON – 341439
MAYA E. CAMPBELL – 345180
LUMA KHABBAZ – 351492
JARED MILLER – 353641
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone: (415) 433-6830

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>GAVIN NEWSOM, et al.,<br><br>　　　　Defendants. | Case No. 2:90−CV−00520−KJM−SCR<br><br>**PLAINTIFFS' CLOSING BRIEF RE APPOINTMENT OF RECEIVER**<br><br>Judge: Hon. Kimberly J. Mueller |

[4630119.10]

**TABLE OF CONTENTS**

Page

INTRODUCTION .................................................................................................. 1

I.  A RECEIVERSHIP IS FULLY JUSTIFIED UNDER THE
    CIRCUMSTANCES OF THIS CASE. .......................................................... 1

    A.  There is a Grave and Immediate Threat of Harm to the Plaintiff Class
        as a Result of Defendants' Severe, Ongoing Non-Compliance with
        Their Remedial Obligations ................................................................ 2

        1.  Understaffing in CCCMS and EOP Programs ................................... 4

        2.  Understaffing in Inpatient Programs .................................................. 8

        3.  Inadequate Suicide Prevention Practices and Policies ........................ 9

    B.  The Court has Exhausted All Available Less-Extreme Measures and
        Continued Reliance on Such Measures Would be Futile ............................. 11

        1.  Remedial Plans and Special Master Oversight ................................. 11

        2.  Overcrowding and Population Reduction ......................................... 12

        3.  Contempt ...................................................................................... 14

    C.  Remaining Receivership Factors .................................................................... 15

II. THE APPOINTMENT OF A RECEIVER IS NOT "PROSPECTIVE
    RELIEF" FOR PURPOSE OF THE PLRA, BUT THE STATUTE'S
    REQUIREMENTS ARE SATISFIED HERE IN ANY EVENT ........................... 16

III. NO FURTHER HEARING IS REQUIRED BECAUSE THE EXISTING
     RECORD AMPLY SUPPORTS THE APPOINTMENT OF A RECEIVER ........ 17

IV. ANSWERS TO THE COURT'S QUESTIONS REGARDING
    DURABILITY OF THE REMEDY .......................................................................... 18

    A.  The Court Should Retain Jurisdiction For at Least Five Years
        Following Full Implementation of the Remedy, in Order to Ensure
        Durability and to Assess Defendants' Ability to Self-Monitor ..................... 18

    B.  The Court May Include a Period of Durability in the Receiver's
        Term—and Should Do So ................................................................................ 21

CONCLUSION ....................................................................................................... 22

CERTIFICATION .................................................................................................. 22

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES

**Page**

## CASES

*Bd. of Educ. v. Dowell*,
    498 U.S. 237 (1991) ........................................................................................ 19, 21

*Brown v. Plata*, 563 U.S. 493 (2011) ........................................................................ passim

*Citronelle-Mobile Gathering, Inc. v. Watkins*,
    934 F.2d 1180 (11th Cir. 1991) ............................................................................. 17

*Coleman v. Brown*,
    28 F. Supp. 3d 1068 (E.D. Cal. 2014) .................................................................... 3

*Coleman v. Brown*,
    756 F. App'x 677 (9th Cir. 2018) ........................................................................... 11

*Coleman v. Brown*,
    938 F. Supp. 2d 955 (E.D. Cal. 2013) ............................................................... 3, 16

*Coleman v. Brown*,
    952 F. Supp. 2d 901 (E.D. & N.D. Cal. 2013) ..................................................... 8, 19

*Coleman v. Newsom*,
    424 F. Supp. 3d 925 (E.D. Cal. 2019) .............................................................. 12, 16

*Coleman v. Schwarzenegger*,
    922 F. Supp. 2d 882 (E.D. & N.D. Cal. 2009) ............................................. 3, 13, 19

*Coleman v. Wilson*,
    912 F. Supp. 1282 (E.D. Cal. 1995) ................................................................. passim

*Coleman v. Wilson*,
    933 F. Supp. 954 (E.D. Cal. 1996) ........................................................................ 16

*Consumer Advisory Bd. v. Harvey*,
    697 F. Supp. 2d 131 (D. Me. 2010) ........................................................................ 19

*Evans v. Fenty*,
    701 F. Supp. 2d 126 (D.D.C. 2010) ....................................................................... 19

*Freeman v. Pitts*,
    503 U.S. 467 (1992) .................................................................................. 18, 19, 21

*Horne v. Flores*,
    557 U.S. 433 (2009) ............................................................................................. 18

*Jackson v. Los Lunas Community Program*,
    880 F.3d 1176 (10th Cir. 2018) ............................................................................. 19

*John B. v. Emkes,*
  710 F.3d 394 (6th Cir. 2013) ................................................................... 19

*Madrid v. Gomez,*
  940 F. Supp. 247 (N.D. Cal. 1996), *aff'd jointly sub nom Wilson v. U.S. Dist. Ct.*, 103 F.3d 828 (9th Cir. 1996) ........................................................ 16

*Marin Cnty. Chapter of Nat'l Org. for Women v. Cnty. of Marin,*
  2023 WL 2095931 (N.D. Cal., Feb. 17, 2023) ......................................... 19

*Morgan v. McDonough,*
  540 F.2d 527 (1st Cir. 1976) ...................................................................... 2

*Peery v. City of Miami,*
  977 F.3d 1061 (11th Cir. 2020) ................................................................ 19

*Petties ex rel. Martin v. District of Columbia,*
  662 F.3d 564 (D.C. Cir. 2011) .................................................................. 19

*Plata v. Schwarzenegger,*
  603 F.3d 1088 (9th Cir. 2010) ............................................................. 2, 22

*Plata v. Schwarzenegger,* No. C01-1351 TEH, 2005 WL 2932253, at *23 (N.D. Cal. Oct. 3, 2005) ......................................................................... 2, 15, 16

*Sterling Savings Bank v. Citadel Dev. Co., Inc.,*
  656 F. Supp. 2d 1248 (D. Or. 2009) ......................................................... 17

*U.S. v. Tennessee,*
  986 F. Supp. 2d 921 (W.D. Tenn. 2012) .................................................. 19

*U.S. v. Washington,*
  573 F.3d 701 (9th Cir. 2009) .................................................................... 19

*United States v. Hinds Cnty. Bd. of Supervisors,* 120 F.4th 1246, 1267-68 (5th Cir. 2024) ...................................................................................... 2, 15

*United States v. Hinds Cnty.,*
  No. 3:16-CV-489-CWR-BWR, 2023 WL 1186925 (S.D. Miss. Jan. 30, 2023), *aff'd in part, rev'd in part* 120 F.4th 1246 (5th Cir. 2024) ......... 16

*Wayne County Jail Inmates v. Wayne County Chief Exec. Officer,*
  178 Mich. App. 634 ................................................................................... 17

*Williams v. Edwards,*
  87 F.3d 126 (5th Cir. 1996) ..................................................................... 16


**STATUTES**

18 U.S.C. § 3626 ............................................................................................ 16

1

**OTHER AUTHORITIES**

2

Parkin, Jason, *Aging Injunctions and the Legacy of Institutional Reform Litigation*,
70 VAND. L. REV. 167, 217-19 (2017) ...................................................................... 21

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' CLOSING BRIEF RE APPOINTMENT OF RECEIVER

1

**INTRODUCTION**

2    The appointment of a receiver with full powers over Defendants' system of mental

3    health care is necessary and reasonable under the relevant legal standards.  This Court has

4    deferred to Defendants' expertise in implementing the remedies in this action, and has

5    avoided wading into daily administration.  The Court has pursued almost every remedy

6    short of receivership, including decades of monitoring, enforcement orders, population

7    reduction, the threat of contempt, and actual contempt.  At this point, a full receivership is

8    not only a reasonable option but a necessary and powerful remedial tool that should be

9    utilized by this Court to finally correct the longstanding constitutional violations in this

10    case.

11    Defendants' response to the Court's Order to Show Cause admitted as much.  They

12    claim that they "do not believe that a receiver is the appropriate or necessary next step,"

13    while simultaneously admitting that appointing the *Plata* receiver, Clark Kelso, as the

14    *Coleman* Receiver "would jumpstart progress on the outstanding areas of compliance in

15    this case" and "move this case forward constructively."  ECF No. 8347 at 6.[1]  Defendants

16    subsequently expressed support for a receivership under the direction of another candidate,

17    Martin Hoshino, as well.  Dec. 16, 2024 Order, ECF No. 8494 at 3.

18    The Court should appoint a receiver based on this case's extensive record of failed

19    remediation and should include a period of durability in the receiver's tenure.  This case's

20    long history also calls for the Court to retain jurisdiction for at least five years following

21    the conclusion of the receivership and return of all powers to Defendants, in order to

22    ensure that the  remedy is sustainable and durable.

23    **I.    A RECEIVERSHIP IS FULLY JUSTIFIED UNDER THE CIRCUMSTANCES OF THIS CASE.**

24

25    "[R]eceiverships are recognized equitable tools available to the courts to remedy

26    otherwise uncorrectable violations of the Constitution[.]"  *Plata v. Schwarzenegger*, 603

27

---

28    [1] Page citations to documents in the docket are based on ECF pagination.

F.3d 1088, 1093-94 (9th Cir. 2010). "The test" for appointment of a receiver "is one of reasonableness under the circumstances." *Morgan v. McDonough*, 540 F.2d 527, 533 (1st Cir. 1976); *see also Shaw v. Allen*, 771 F. Supp. 760, 762 (S.D.W.Va. 1990); *Dixon v. Barry*, 967 F. Supp. 535, 550 (D.D.C. 1997); *Plata v. Schwarzenegger*, No. C01-1351 TEH, 2005 WL 2932253, at *23 (N.D. Cal. Oct. 3, 2005). In assessing whether it would be reasonable to appoint a receiver in this case, this Court must consider at least the following factors, giving "predominant weight" to the first two factors:

> (1) Whether there is a grave and immediate threat or actuality of harm to plaintiffs;
>
> (2) Whether the use of less extreme measures of remediation have been exhausted or prove futile;
>
> (3) Whether continued insistence [on] compliance with the Court's orders would lead only to confrontation and delay;
>
> (4) Whether there is a lack of leadership to turn the tide within a reasonable period of time;
>
> (5) Whether there is bad faith;
>
> (6) Whether resources are being wasted; and
>
> (7) Whether a receiver is likely to provide a relatively quick and efficient remedy.

*Plata*, 2005 WL 2932253, at *23; *United States v. Hinds Cnty. Bd. of Supervisors*, 120 F.4th 1246, 1267-68 (5th Cir. 2024).

Here, all seven factors weigh strongly in favor of appointing a receiver.

**A.    There is a Grave and Immediate Threat of Harm to the Plaintiff Class as a Result of Defendants' Severe, Ongoing Non-Compliance with Their Remedial Obligations**

The Court's July Order to Show Cause correctly notes that "the record is replete with evidence of both threatened and actual harm to members of the plaintiff class as a result of defendants' ongoing non-compliance" with various orders. July 12, 2024 Order and Order to Show Cause, ECF No. 8330 at 12. By way of evidentiary proceedings from the original trial in this case that led to the Court's 1995 remedial order, *see Coleman v. Wilson*, 912 F. Supp. 1282 (E.D. Cal. 1995), as well as the findings after trial by the three-

1   judge court in 2009, affirmed by the Supreme Court in 2011, *see Coleman v.*

2   *Schwarzenegger*, 922 F. Supp. 2d 882 (E.D. & N.D. Cal. 2009); *Brown v. Plata*, 563 U.S.

3   493 (2011)), and substantive hearings connected to Defendants' premature motion to

4   terminate the case in 2013 and Plaintiffs' enforcement motions in 2014, *see Coleman v.*

5   *Brown*, 938 F. Supp. 2d 955 (E.D. Cal. 2013); *Coleman v. Brown*, 28 F. Supp. 3d 1068

6   (E.D. Cal. 2014), there is a long, documented history of Defendants' failure to remedy the

7   ongoing constitutional violations causing serious harm to the Plaintiff class.  More

8   recently, in October of 2023, the weeklong trial related to enforcement of the Court's

9   staffing orders starkly illustrated how persistent understaffing has led directly to the

10  provision of unconstitutional care.  *See, e.g.,* Tr. 10-5-23 at 31:12-34:13.

11         The Special Master's regular monitoring of CDCR institutions and CDCR's suicide

12  prevention practices has also established, in detail, the ongoing and serious harms that

13  class members continue to experience as a result of Defendants' non-compliance.  *See*

14  *generally* ECF No. 8359 (30th Round CCCMS Report); ECF No. 8095 (30th Round EOP

15  Report); ECF No. 7833 (30th Round PIP Report); ECF No. 8143-1 (Expert's 6th Re-Audit

16  of Suicide Prevention Practices).  Indeed, for two years in a row and in four of the last six

17  years the suicide rate for people incarcerated in CDCR has exceeded 31 per 100,000—

18  nearly double the average suicide rate in the federal prison system between 2015 and 2019

19  (the most recent years for which data is available) and surpassing the suicide rate of every

20  single prior year in the 35-year history of this litigation.  *See* Declaration of Lisa Ells In

21  Support of Plaintiffs' Closing Brief re Appointment of Receiver ("Ells Decl.," filed

22  herewith) ¶¶ 2-3, 5 & Ex. B at 5, 26 Table 17; ECF 8143-1 at 86; ECF No. 5259 at 3-4;

23  CDCR 2019 Annual Suicide Rpt. at 7 (Oct. 1, 2020).[2]

24         Defendants remain non-compliant with several critical court orders, including the

25  Court's staffing orders for CDCR's non-PIP programs; the Court's staffing orders for

26  CDCR's PIP programs; and the Court's orders regarding CDCR's implementation of

27

28  [2] *See* https://cchcs.ca.gov/wp-content/uploads/sites/60/MH/CDCR-2019-SB-960.pdf

1   suicide prevention requirements.  Defendants' continued failures to comply with their

2   remedial obligations "present[ ] [a] grave and unacceptable risk of harm to *Coleman*

3   patients across levels of care."  ECF No. 8095 at 37.

### 1.    Understaffing in CCCMS and EOP Programs

5       This Court's recent finding holding Defendants in civil contempt of the Court's

6   staffing orders underscores the continued and longstanding problems with understaffing

7   that have caused real harm to the Plaintiff class.  *See* June 25, 2024 Order, ECF No. 8291.

8   The Court's original 1995 ruling found extensive evidence of class members

9   "languish[ing] for months, or even years, without access to necessary care," causing

10  decompensation, persistent hallucinations, increased suicidality, and other malignant

11  effects of untreated mental health care.  *Coleman*, 912 F. Supp. at 1316.  The Court found

12  that a major cause of this suffering was the lack of sufficient staff; the vacancy rate in

13  allocated mental health care positions was 25 percent, leading to a lack of timely,

14  responsible, and adequate mental health care.  *Id.* at 1306-08 & n.30.

15      The Special Master's extensive monitoring of CDCR institutions confirms that the

16  harms of understaffing are as real today as they were 30 years ago.  The Special Master's

17  30th Round Monitoring Report on EOP institutions described how, during that monitoring

18  period, 14 CDCR institutions, including ten of the 15 institutions providing services at the

19  EOP level of care, had instituted triage plans due to staffing shortages, directing resources

20  to emergent needs rather than regular contact with patients.  *See* ECF No. 8095 at 35-36.

21  These ten EOP institutions collectively housed 49 percent of CDCR's MHSDS population,

22  and 82 percent of its EOP population.  *Id.*  Leadership at these institutions admitted that the

23  triage plans meant that they were not able to provide care consistent with the Program

24  Guide.  *Id.*

25      The report also described how excessive patient caseloads led to inadequate

26  development and implementation of patient treatment plans; untimely clinical contacts;

27  untimely Interdisciplinary Treatment Team (IDTT) meetings; the replacement of

28  meaningful therapeutic contacts with non-confidential wellness checks; and untimely

1    transfers to higher levels of care, among other issues. *Id.* at 37-41. Even when patients

2    were seen, the Special Master found that the quality of care was deficient: Case reviews

3    showed that 63 percent of patients received inadequate care. *Id.* at 73-76. Based on these

4    findings, the Special Master concluded that Defendants' understaffing had "plac[ed]

5    *Coleman* class members at grave and unacceptable risk of harm." *Id.* at 11.

6        The same was true of the Special Master's August 2024 report on Defendants'

7    CCCMS institutions: Triage plans caused by staffing shortages led to "profoundly

8    negative impacts on access to required and clinically indicated mental health services" for

9    CCCMS patients. ECF No. 8359 at 31-32. The Special Master's monitoring found that 11

10   of 13 monitored institutions were noncompliant with timely primary clinician (PC) initial

11   assessments, including four institutions that had compliance rates under 50 percent, and

12   that eight of 13 institutions were noncompliant with timely routine PC contacts. *Id.* at 32,

13   70-71. Similar to the EOP population, in only 63 percent of case reviews did patients

14   receive adequate care. *Id.* at 58-60. Inadequate care, in turn, led to decompensation

15   resulting in the need for admission into crisis units or higher levels of care, as shown by

16   the specific examples included in the 2024 CCCMS Report. *See, e.g.*, *id.* at 493-97; 566-

17   68; 627-28; 640-41; 685-87.

18        These findings are corroborated by the testimony of CDCR's own mental health

19   managers at the four-day staffing contempt trial in 2023. CDCR clinicians testified that

20   understaffing was continuing to cause class members to suffer due to the lack of

21   appropriate care. *See, e.g.*, Tr. 10/5/23 at 31:12-34:13 ("We can't provide Program Guide

22   services. We're not even providing what you could consider to be standard of care in the

23   community at this point. Clinical continuity is nonexistent. We're doing the best we can,

24   and it is nowhere near good enough for the needs of our patients."); *id.* at 35:6-36:22

25   (Dr. David: "I have patient safety concerns every day. It's exhausting and draining and

26   difficult to know that we have men in our care who are ill, who are sick, who are coming

27   to us for help, and we are not able to give them the help that they need. It is not why I

28   came into this field. It is not why my employees came into this field."); *id.* at 116:19-

117:15, 120:10-12, 122:14-123:25 (Dr. Minor: High caseloads has led to triage of care, causing CCCMS and EOP patients to be seen less frequently; "these patients are very fragile; they're very emotionally dysregulated; they have trust issues; they have problems connecting with others. … [I]f I'm EOP and I'm not being seen, I end up in the crisis bed or I end up in the acute program and into the intermediate program and the PIP.").  These clinicians also testified that the lack of routine care has caused increases in rules violations, self-harm incidents, and patient decompensation.  *Id.* at 124:6-125:5, 125:15-126:6, 126:23-127:3.

Defendants' own analyses of completed CDCR suicides further confirm the ongoing harms caused by understaffing.  According to CDCR analysts, more than a quarter of the 30 class-members who died by suicide in 2023 received inadequate care because of understaffing.  *See* Sealed Decl. of Michael Nunez, ECF No. 8250 ¶¶ 2-17 & Exhibits; *see also* Plaintiffs' Response to Defendants' General Objections to Special Master's Sixth Suicide Prevention Re-Audit, ECF No. 8241 at 14-15.  One of these class members did not receive a single mental health appointments at all for *seven months* before he hanged himself with a bedsheet.  *Id.* ¶¶ 16-17 & Ex. O at Pls-1051, 1081.  Another class member with a history of cutting himself was not evaluated for a higher level of care for more than seven months, despite multiple warnings that his condition was deteriorating.  *Id.* ¶¶ 12-13 & Ex. K at Pls-0641-43, 653-54.  Others received appointments far less often than required by the Program Guide, and some received only brief, non-confidential cell-front appointments in the months before they killed themselves.  *Id.* ¶¶ 4-5, 7, 9-10, 12-14.  One CDCR suicide report concluded that, due to understaffing, the class member who committed suicide had not received "even minimally adequate mental health treatment consistent with ethical and general community standards of care."  *Id.* ¶ 4.

Similar problems appear in Defendants' analyses of suicides that occurred in 2024. As of the date of this filing Plaintiffs' counsel have received final reports on 24 of the 29 suicides that occurred in 2024.  *See* Ells Decl., ¶¶ 2, 4.  At least 11 of the 24 reports produced to Plaintiffs' counsel thus far—more than 45 percent— reveal that understaffing

1  resulted in the class member receiving inadequate care in the months leading up to their

2  death.  *See* Under Seal Decl. of Alexander Gourse ("Gourse Decl.," lodged herewith) ¶¶ 2-

3  12 & Exs. A-K.  None of these class members received anything close to the required

4  number of clinical appointments and group treatment hours mandated by the Program

5  Guide, and many were not properly evaluated for suicide risk.  *Id.*  One went seven months

6  without a single appointment with his primary clinician, despite a history of suicide

7  attempts.  *Id.* ¶ 2 & Ex. A at PLS-020, 022-23, 026.

8          The fact that Defendants have, for the first time, for a single month, reached 90-

9  percent compliance for staffing levels for psychiatrists, social workers, and recreational

10  therapists does not mean that CDCR has sufficient clinicians to provide minimally

11  adequate care.  *See* November 2024 Staffing Vacancy Report, ECF No. 8508 at 5-9.  These

12  classifications represent a small fraction of CDCR's court-ordered mental health staff, and

13  the overall fill rate for all CDCR's court-ordered positions is still only 75.4 percent—

14  similar to the 75 percent fill rate when this Court found that Defendants were providing

15  unconstitutional levels of care in 1995.  *Id.*; *see Coleman*, 912 F. Supp. at 1306 n.30.  And

16  the fill rate for Defendants' primary clinician positions—the lifeblood of the CDCR's

17  mental health system tasked with providing class members regular, therapeutic contacts —

18  remains only 71.9 percent.  ECF No. 8508 at 6-7.

19          Moreover, a continued rise in both the CCCMS population and those at higher,

20  more intensive levels of care calls into question whether these proportional staffing

21  improvements will sustain as staffing needs only increase in the future.  CCCMS and EOP

22  populations have increased consistently since 2021.  *See* Spring 2024 Mental Health Bed

23  Study, ECF No. 8259 at 23, 28-29.  And the recent passage of Proposition 36 will almost

24  certainly exacerbate the problem: Proposition 36's increase in criminal sentences is

25  projected to increase California's prison population by 35 percent in the next five years.

26  *See* Ells Decl. ¶ 7 & Ex. D.  Defendants have announced no plans for how they will

27  accommodate this population increase, despite years of urging by the Special Master and

28  the Court to address the issue.  *See, e.g.*, ECF No. 8095 at 41-45.  Rather, they appear to be

1   projecting, and planning accordingly, for population *decreases* over the next several years,

2   consistent with their chronic underestimation of the likelihood of growth.  *See* ECF No.

3   8259 at 23, 28-29; *Coleman v. Brown*, 952 F. Supp. 2d 901, 934 (E.D. & N.D. Cal. 2013)

4   (finding "defendants' projections consistently underestimated the state prison population").

5   In the likely event that Proposition 36 flips the projected decreases into increases, staffing

6   shortages will get worse, causing more harm to the Plaintiff class.

7          The recent, slight improvements to staffing rates do not materially undermine the

8   well-documented conclusion that ongoing and future harm to the Plaintiff class persists

9   due to Defendants' staffing shortages.

10                    **2.       Understaffing in Inpatient Programs**

11         As the Court noted in the Order to Show Cause, Defendants have also failed to

12  come in compliance with CDCR's Staffing Plan for its Psychiatric Inpatient Program

13  ("PIP") units.  *See* ECF No. 8330 at 4.  On June 24, 2024, the Court set a fine schedule

14  enforceable through civil contempt if compliance was not achieved within four months,

15  starting on July 1, 2024.  June 28, 2024 Order, ECF No. 8301.  The most recent staffing

16  data, from November 2024, shows that CDCR's PIPs are non-compliant with the ordered

17  90-percent fill rates in all four mental health disciplines, with fill rates for psychologists

18  and social workers at an alarmingly high 59 and 63 percent, respectively.  ECF No. 8508 at

19  11-14.

20         The documented harm of these staffing shortages at CDCR's highest level of care,

21  reserved for its sickest patients, is likewise pervasive in the record.  The Special Master's

22  most recent PIP monitoring report, from May 2023, documents how these shortages led to

23  "less frequent individual clinical contacts, the utilization of nonconfidential contacts,

24  extremely limited amount of structured treatment, and the absence of core mental health

25  groups."  ECF No. 7833 at 42.  The Special Master observed patients frequently going two

26  to three weeks without documented psychiatry sessions in these inpatient psychiatric

27  hospitals reserved for the most ill class members in the system, *id.* at 80; the deactivation

28  of inpatient beds due to staffing shortages, *id.* at 89; certain PIPs suspending routine chart

1 audits, utility management meetings, and other quality management activities, *id.* at 104;

2 the widespread use of non-therapeutic groups run by recreational therapists rather than

3 therapeutic groups run by clinicians, *id.* at 51; and the overall triaging of care, leading to

4 basic services not being provided. *Id.* As the Special Master noted, "the potential harm to

5 members of the *Coleman* class—especially those class members whose illness requires

6 inpatient hospitalization—who go without needed treatment due to [staffing] vacancies is

7 unacceptable." *Id.* at 43.

8 **3.    Inadequate Suicide Prevention Practices and Policies**

9 Defendants have also failed to institute appropriate procedures and policies intended

10 to safeguard against people with mental illness from committing suicide. This Court

11 identified Defendants' failure to fully implement its suicide prevention program as a core

12 constitutional violation in 1995. *See* 912 F. Supp. at 1315. In 2015, as CDCR continued

13 to experience a disproportionately high suicide rate, the Court ordered Defendants to

14 implement 32 measures related to suicide prevention practices and policies that the Special

15 Master and his expert had recommended—recommendations that the United States Depart-

16 ment of Justice has approved and sought in similar cases. *See* Apr. 5, 2013 Order, ECF

17 No. 4539 at 32-43; Jan. 6, 2023 Order, ECF No. 7696 at 3-4; United States' Response to

18 Court's Jan. 6, 2023 Order, ECF No. 7713 at 8. A decade later, after six re-audits of

19 Defendants' suicide prevention practices, Defendants, by their own admission, remain

20 non-compliant with at least 11 of these recommendations. *See* ECF No. 7696 at 3-9; Tr. of

21 Sep. 30, 2024 Status Conference, ECF No. 8433 at 16-36; ECF No. 8282 at 9-48; *see also*

22 ECF No. 7713 at 7-8 (DOJ noting that delay in implementing adequate suicide prevention

23 measures is "unacceptable").

24 The real harm caused by Defendants' inaction is grave: The Special Master

25 expert's report highlights numerous examples of inadequate treatment linked to the

26 suicides of persons in CDCR custody, including instances identified by CDCR's own case

27 reviewers. These include examples of class member suicides where the patient's earlier

28 disclosures that they were suicidal were discounted by staff as disingenuous, *see, e.g.*, ECF

1    No. 8143-1 at 99-100; when the patient was not seen by mental health clinicians for

2    several months, in violation of Program Guide requirements, *see, e.g.*, *id.* at 161; when the

3    patient was not considered for higher levels of care when clinically indicated, *see, e.g.*, *id.*

4    at 202; and where the patient was not observed appropriately or given an adequate safety

5    plan after discharge from a crisis bed, *see, e.g.*, *id.* at 135.  The 2019, 2020, 2023, and 2024

6    suicide rates remain the highest in CDCR since at least 1990.  *See* Ells Decl. ¶¶ 2-3; ECF

7    8143-1 at 86; ECF No. 5259 at 3-4; CDCR 2019 Annual Suicide Rpt. at 7 (Oct. 1, 2020).[3]

8           The Special Master expert has also documented how Defendants' failure to properly

9    staff their institutions has stymied proper implementation of suicide prevention practices.

10   ECF No. 8143-1 at 13-15.  For example, at least six facilities in 2023 had paused the

11   activation of their Crisis Intervention Teams—specifically designed to appropriately

12   respond to suicidal patients – due to staffing shortages.  *Id.* at 13.  At several institutions,

13   proper safety planning for at-risk patients being released from crisis beds or alternative

14   housing was not conducted due to understaffing, *id.* at 14, and required supervisory review

15   of safety plans was nearly non-existent, due to several supervisory positions being left

16   vacant*, id.* at 45-46.  In addition, staff did not complete required suicide-prevention

17   training due to a lack of staff available to cover their caseloads. *Id.* at 37.  Defendants'

18   recent annual report on suicides in CDCR concedes that inadequate mental health staffing

19   plays a significant role in the unusually and unacceptably high suicide rate among people

20   incarcerated in CDCR institutions.  *See* ECF No. 8264 at 66; *see also* ECF No. 8282 at 51-

21   55 (citing further evidence that directly links Defendants' non-compliance with suicide-

22   prevention requirements to understaffing).  During the staffing contempt proceedings,

23   CDCR staff also admitted that Defendants' inability to increase staffing levels has

24   hampered compliance with several different suicide prevention recommendations.  Tr.

25   10/4/23 at 138:2-140:10.

26

27

28   [3] *See* https://cchcs.ca.gov/wp-content/uploads/sites/60/MH/CDCR-2019-SB-960.pdf

**B.    The Court has Exhausted All Available Less-Extreme Measures and Continued Reliance on Such Measures Would be Futile**

The Order to Show Cause also correctly notes that "the court has exhausted virtually every mechanism for prodding Defendants to finally achieve compliance," including issuing "dozens of orders directing less extreme measures."  ECF No. 8330 at 2, 12.

**1.    Remedial Plans and Special Master Oversight**

From the outset of the remedial phase of this litigation nearly 30 years ago, the Court has made every effort to limit its intrusion into the day-to-day minutia of prison administration.  Instead, the Court has repeatedly deferred to Defendants' penological expertise and allowed them to develop their own remedial plans in consultation with a court-appointed Special Master and his team of nationally recognized correctional mental-health experts.  *See Coleman*, 912 F. Supp. at 1302; July 3, 2018 Order, ECF No. 5850 at 6-7.  Defendants' plans comprise the Program Guide, which, along with its appendices, "sets out the objective standards that the Constitution requires in this context."  *Coleman v. Brown*, 756 F. App'x 677, 679 (9th Cir. 2018).  The Court has also directed the Special Master to monitor and file reports on Defendants' implementation of and compliance with its remedial plans, including the Program Guide, Compendium, and other court-ordered remedial requirements.  Order of Reference, ECF No. 640 at 4-5.  To date, the Special Master has completed thirty rounds of monitoring.  March 6, 2024 Order, ECF No. 8144 at 9.

This process provides Defendants with thorough and accurate information about their compliance (or lack thereof) with specific remedial obligations, as well as expertise to help them fix problems on their own without giving up control over their mental health system.  *See id.* at 8-10.

For the process to work, however, Defendants must be willing to work collaboratively with the Special Master and commit to meaningful changes when problems are identified.  The record shows that Defendants are either unable or unwilling to do their part in this regard.  For example, in 2019, after a whistleblower report revealed that high-

ranking CDCR officials had knowingly provided the Court and the Special Master with misleading data intended to "make compliance numbers look better" and justify reduced staffing, *Coleman v. Newsom*, 424 F. Supp. 3d 925, 952 (E.D. Cal. 2019), Defendants promised to reform an internal culture at CDCR that treats the Special Master as an adversary and compliance with *Coleman* remedial orders as an afterthought.  *See* Declaration of Diana Toche, ECF No. 6451-1 ¶¶ 4, 9.  Three years later, however, a second whistleblower report revealed that little had changed, and that CDCR's then-Secretary and current Deputy Director for Mental Health were expressly encouraging agency staff to resist cooperation with the Special Master and prioritizing an "information war" with the Court rather than complying with its remedial orders.  *See, e.g.*, Second Golding Whistleblower Rpt., ECF No. 8446 at 15-21; Declaration of Cara E. Trapani ISO Pls' Resp. re Second Golding Rpt., ECF No. 7721-1 ¶ 2 & Ex. A.  This institutional culture persists today and is fundamentally incompatible with the hands-off approach to remediation that this Court has prioritized throughout the history of this case.  *See, e.g.*, ECF No. 8291 at 58 (noting multiple Defendants' failure to testify at the fall 2023 staffing contempt hearing, resulting in "a gaping hole in the record" regarding Defendants' compliance efforts).  As a result of Defendants' unwillingness to take their remedial obligations seriously, they remain severely non-compliant with multiple critical aspects of the remedy in this case nearly thirty years after the original judgment.

### 2.      Overcrowding and Population Reduction

Another major barrier to Defendants' compliance is the overwhelming number of patients their mental health system must treat.  The number of CDCR prisoners diagnosed with serious mental disorders more than doubled between 1997 and 2007, from fewer than 15,000 in 1997 to over 30,000 in 2007.  ECF No. 8291 at 11.  The class grew in propor-tional as well as absolute terms, comprising almost a quarter of the overall incarcerated population by 2008.  *Compare Coleman*, 912 F. Supp. at 1301, *with* ECF No. 8095 at 43.  Understaffing plagued the system, and overcrowding worsened both the caseload of current clinicians and the difficulty of recruiting new hires.  July 23, 2007 Order, ECF No.

1  2320 at 6-7. Patients in crisis got worse without care, driving up the need for psychiatric

2  hospitalization, which in turn caused "the unmet need[ for mental health care to] spiral

3  higher and higher." Special Master's Response, ECF No. 2253 at 9-10. Patients

4  "languish[ed] in horrific conditions without access to necessary mental health care, raising

5  the acuity of mental illness throughout the system and increasing the risk of inmate

6  suicide." *Coleman*, 922 F. Supp. 2d at 888.

7        In 2007, Plaintiffs requested that a three-judge court convene pursuant to the Prison

8  Litigation Reform Act (PLRA) and order Defendants to reduce the number of people

9  incarcerated in CDCR so that it would be feasible to provide those who remained with

10  constitutionally adequate medical and mental health care. *See* ECF No. 2320 at 1-2. After

11  a period of discovery that included extensive expert tours of the prisons, as well as 14 days

12  of testimony from nearly 50 witnesses, the three-judge court ordered Defendants to reduce

13  overcrowding in their prisons to 137.5% of design capacity. *See Coleman*, 922 F. Supp. 2d

14  at 916, 934-35. The Supreme Court affirmed in 2011, holding that overcrowding was a

15  primary cause of the "deterioration" of Defendants' medical and mental health systems,

16  and that this deterioration resulted in "[n]eedless suffering and death." *Plata*, 563 U.S. at

17  501-507, 528-29.

18        Defendants significantly reduced the total prison population in response to the

19  Supreme Court's decision, but the number of incarcerated people with serious mental

20  illness remains unmanageably high. Indeed, by 2016 both the size and the acuity of the

21  *Coleman* class were higher than at the height of overcrowding. *See* Special Master's

22  Report on the Status of Mental Health Staffing and the Implementation of Defendants'

23  Staffing Plan, ECF No. 5564 at 22. Four years later, during the COVID-19 emergency,

24  Defendants safely and methodically released another 30,000 incarcerated people, including

25  more than 5,000 *Coleman* class members. Declaration of Jay Powell, ECF No. 6855-2 at

26  3, 7-11. But these releases still left 32,000 people with serious mental illness in

27  California's prison system, and the mental health caseload quickly returned to pre-

28  pandemic levels as the proportion of incarcerated people with serious mental illness

continued to rise.  ECF No. 8095 at 42-44.  Today, the mental health caseload is approxi-
mately 34,000, representing approximately 35 percent of CDCR's overall prison popu-
lation, and Defendants remain severely non-compliant with numerous core components of
their court-ordered remedial plans.  *Id.*

With the passage of Proposition 36 and the election of tough-on-crime District
Attorneys in various parts of California, population pressures will only get worse over the
next few years, exacerbating the already existing overcrowding and understaffing plaguing
CDCR institutions.  *See* Ells Decl. ¶ 8 & Ex. E.

### 3.    Contempt

The Court has initiated a series of civil contempt proceedings aimed at coercing
Defendants' compliance with clinical staffing and suicide-prevention requirements.  The
first of these contempt proceedings focused on Defendants' failure to comply with their
outpatient mental health staffing plan.  *See generally* ECF No. 8291.  In February 2023,
the Court announced a series of prospective, conditional fines that would begin
accumulating on a monthly basis if Defendants did not fill at least 90 percent of their
court-ordered mental health positions after a designated grace period.  Feb. 28, 2023
Order, ECF No. 7742 at 5-7.  The Court gave Defendants numerous opportunities to
reduce or avoid these fines by filling the vacant positions.  *Id.* at 6.  But the threat of
contempt sanctions did not work.  Defendants not only failed to improve their staffing
levels in the months that followed, they allowed vacancies to *increase* in every single
category of court-ordered mental health position.  *See* ECF No. 8291 at 59-61.  Only after
the Court found Defendants in contempt, more than a year and a half later, did Defendants
begin to implement long-delayed necessary initiatives to address understaffing, such as the
addition of new classifications, hybrid work, and measures to improve compensation.  *Id.*
at 55-58; Aug. 27, 2024 Order, ECF No. 8376; Aug. 29, 2024 Order, ECF No. 8381.
Unfortunately, Defendants chose to halt some of the most critical initiatives, such as
recruitment and retention bonuses and increased compensation, in the wake of their
successful motion to stay the contempt fines order pending appeal.  *See* ECF No. 8381;

1   Nov. 12, 2024 Order, ECF No. 8462; Ells Decl. ¶ 9 & Ex. F.

2          The Court also initiated two more contempt proceedings relating to Defendants'

3   failure to comply with inpatient mental-health staffing and suicide prevention

4   requirements.  *See* ECF No. 8330 at 2.  But the threat of contempt sanctions has not

5   coerced Defendants into compliance with these requirements either, and Defendants have

6   indicated that they plan to fully litigate these contempt proceedings before they make any

7   significant efforts to comply.

8          Because the Court has exhausted every other remedial tool at its disposal, a

9   receivership is not only an appropriate next step but a *necessary* one in light of the

10  Supreme Court's clear command that this Court not "allow constitutional violations to

11  continue simply because a remedy would involve intrusion into the realm of prison

12  administration."  *Plata*, 563 U.S. at 511.

13         **C.     Remaining Receivership Factors**

14         In addition to the factors discussed above, the Court should consider whether

15  continued insistence on compliance with the Court's orders would lead only to

16  confrontation and delay, whether there is a lack of leadership to turn the tide within a

17  reasonable period of time, whether there is evidence of bad faith, whether resources are

18  being wasted, and whether a receiver is likely to provide a relatively quick and efficient

19  remedy.  *See Plata*, 2005 WL 2932253, at *23; *Hinds Cnty.*, 120 F.4th at 1267.  Each of

20  these factors also weighs in favor of a receivership.

21         The long and tortuous history of this case—which has been marked by, among other

22  things, Defendants' intransigence across multiple administrations and a steadfast resistance

23  to change even when faced with more than $170 million in contempt fines—clearly

24  indicates that Defendants will not "turn the tide within a reasonable period of time."  And

25  Defendants' continued prioritization of a "distracting and costly scorched earth litigation

26  strategy" over compliance efforts shows that if the Court keeps simply reiterating the need

27  for compliance, without something more, the result will only be "further confrontation and

28  delay."  ECF No. 8330 at 12 (quoting Jan. 6, 2023 Order, ECF No. 7699 at 3-4).  This

1  strategy is itself a product of the same lack of leadership that previously led Defendants to

2  violate ethical rules regarding *ex parte* communication with represented parties, *see*

3  *Coleman*, 938 F. Supp. 2d at 962-69, and knowingly present misleading information to the

4  Court and to the Special Master, *Coleman*, 424 F. Supp. 3d 925, in their single-minded

5  focus on ending the case at all costs.  Regardless of whether the Court labels this pattern of

6  behavior "bad faith"—and it need not do so to justify a receivership, *see Plata*, 2005 WL

7  2932253 at *30—this too weighs in favor of appointing a receiver.  Given the alternative

8  of continued endless adversarial litigation, a receivership would clearly conserve resources

9  and provide a comparatively quick and efficient remedy as well.

10      In sum, the existing record in this case includes more than enough evidence to

11  justify the appointment of a receiver.

12  **II.    THE APPOINTMENT OF A RECEIVER IS NOT "PROSPECTIVE**
**RELIEF" FOR PURPOSE OF THE PLRA, BUT THE STATUTE'S**
13  **REQUIREMENTS ARE SATISFIED HERE IN ANY EVENT.**

14      The Prison Litigation Reform Act requires that any "prospective relief" relating to

15  prison conditions extend no further than necessary to correct the underlying Eighth

16  Amendment violations and be the least intrusive means necessary to correct those

17  violations.  *See* 18 U.S.C. § 3626(a)(1)(A).  This requirement does not apply to the

18  appointment of a receiver because, like the appointment of a Special Master, a receivership

19  is merely a "means of facilitating relief" rather than "relief itself."  *See Coleman v. Wilson*,

20  933 F. Supp. 954, 956-57 (E.D. Cal. 1996), and *Madrid v. Gomez*, 940 F. Supp. 247, 250-

21  51 (N.D. Cal. 1996), *aff'd jointly sub nom Wilson v. U.S. Dist. Ct.*, 103 F.3d 828 (9th Cir.

22  1996); *see also Williams v. Edwards*, 87 F.3d 126, 133 (5th Cir. 1996).  Nevertheless, for

23  many of the same reasons discussed above, an order appointing a receiver would also

24  satisfy the PLRA's requirements and this Court should make findings to that effect out of

25  an abundance of caution.  *See, e.g.*, *Plata*, 2005 WL 2932253, at *25; *United States v.*

26  *Hinds Cnty.*, No. 3:16-CV-489-CWR-BWR, 2023 WL 1186925, at *2 (S.D. Miss. Jan. 30,

27  2023), *aff'd in part, rev'd in part* 120 F.4th 1246 (5th Cir. 2024).

28      This Court has attempted for *decades* to bring Defendants into compliance with the

1  Eighth Amendment using measures short of a receivership.  It has deferred to Defendants'
2  penological expertise and allowed them to develop their own remedial plans in
3  consultation with the Special Master, rather than ordering them to adopt measures of the
4  Court's (or Special Master's) choosing.  It has given Defendants the benefit of the doubt
5  and waited many, many years for them to implement these plans before ordering
6  Defendants to do so, and then waited years more for Defendants to comply with those
7  orders before resorting to coercive civil contempt sanctions.  None of these measures have
8  worked.

9      This Court "cannot allow constitutional violations to continue simply because a
10  remedy would involve intrusion into the realm of prison administration."  *Plata*, 563 U.S.
11  at  511.  Under the circumstances here, a receivership is a narrowly drawn remedy that
12  extends no further than necessary to correct the underlying Eighth Amendment violations
13  and is the least intrusive means necessary to correct those violations.

14  **III.    NO FURTHER HEARING IS REQUIRED BECAUSE THE EXISTING**
     **RECORD AMPLY SUPPORTS THE APPOINTMENT OF A RECEIVER**
15

16      Defendants previously argued that an additional evidentiary hearing is necessary
17  before the Court appoints a receiver.  ECF No. 8347 at 12.  But courts "may approve of the
18  appointment of a receiver without a hearing where the record discloses sufficient facts to
19  warrant it," *Citronelle-Mobile Gathering, Inc. v. Watkins*, 934 F.2d 1180, 1189 (11th Cir.
20  1991), so long as the parties received notice and an opportunity to provide written
21  submissions on the matter, *Sterling Savings Bank v. Citadel Dev. Co., Inc.*, 656 F. Supp. 2d
22  1248, 1259-60 (D. Or. 2009).  *See also Wayne County Jail Inmates v. Wayne County Chief*
23  *Exec. Officer*, 178 Mich. App. 634, 661-62 (1989) (appointing receiver without a hearing
24  where monitoring reports disclosed "fully adequate facts" to support the appointment).  A
25  further hearing is not necessary here because the record already includes more than enough
26  facts to justify a receivership, and because the Court has provided the parties with
27  sufficient notice and multiple opportunities to provide written submissions, including
28  declarations and other documentary evidence not already in the record.  *See* ECF Nos.

8330, 8494.  Indeed, in Defendants' previous written submission they praised the receivership in *Plata* and expressed support for a similar model in this case.  *See* ECF No. 8347 at 2-5.  Defendants have failed to identify any factual issues in dispute that would justify the time, expense, and delay of an evidentiary hearing before the appointment of a receiver.  The Plaintiff class has waited, and suffered, long enough.

## IV.   ANSWERS TO THE COURT'S QUESTIONS REGARDING DURABILITY OF THE REMEDY

In its Order, the Court asked the parties to address "the question of durability of the remedy, including but not limited to (1) how long after the full implementation of the remedy they believe the court should retain jurisdiction to ensure the remedy is durable; and (2) if there is any lawful reason not to provide that the temporary receiver's tenure include a period of durability."  ECF No. 8494 at 5.  Given the long history and many detours that this case has taken on the road to compliance, Plaintiffs recommend that the Court retain jurisdiction for at least five years following Defendants' full implementation of the remedy.  The Receiver's tenure should also include a period of durability, as is the case in *Plata* and in other cases where receiverships have been imposed.  *See, e.g.*, *Plata v. Newsom*, No. 4:01-cv-01351-JST, Dkt. No. 3729 (filed 10/29/21) at 2-3.  This period of durability will ensure that Defendants are able to successfully manage all delegated functions before the receivership terminates.

### A.   The Court Should Retain Jurisdiction For at Least Five Years Following Full Implementation of the Remedy, in Order to Ensure Durability and to Assess Defendants' Ability to Self-Monitor

As this Court has recognized, termination of a remedial plan is only appropriate when a "durable remedy" has been implemented.  *Horne v. Flores*, 557 U.S. 433, 450 (2009); Feb. 1, 2024 Order, ECF No. 8121 at 1.  The requirement of durability has been a longstanding facet of institutional reform cases:  Supervision must continue as long as necessary not only to address ongoing violations of federal law, but also to safeguard against future violations.  *Freeman v. Pitts*, 503 U.S. 467, 491 (1992) (requiring that an institution demonstrate its "good-faith commitment" to upholding the court's decree and

1  avoiding future violations of federal law); *Bd. of Educ. v. Dowell*, 498 U.S. 237, 247-48

2  (1991) (requiring compliance for a "reasonable of time" sufficient to establish that "it was

3  unlikely that the school board would return to its former ways" without oversight).  The

4  three-judge court in this case has also repeatedly held that equity only supports

5  modification or termination when a "durable remedy" has been achieved.  *See, e.g.*,

6  *Coleman*, 922 F. Supp. 2d at 1043-44; *Coleman*, 952 F. Supp.2d at 932-34.

7      The *Horne* Court did not spell out what constitutes a "durable" remedy, but lower

8  courts have generally held durability hinges on whether "the State would continue that

9  compliance in the absence of continued judicial supervision."  *John B. v. Emkes*, 710 F.3d

10  394, 412 (6th Cir. 2013); *see also Peery v. City of Miami*, 977 F.3d 1061, 1075 (11th Cir.

11  2020); *Jackson v. Los Lunas Community Program*, 880 F.3d 1176, 1200-01 (10th Cir.

12  2018); *Petties ex rel. Martin v. District of Columbia*, 662 F.3d 564, 571 (D.C. Cir. 2011);

13  *Evans v. Fenty*, 701 F. Supp. 2d 126, 171-72 (D.D.C. 2010); *Marin Cnty. Chapter of Nat'l*

14  *Org. for Women v. Cnty. of Marin*, 2023 WL 2095931, at *3 (N.D. Cal., Feb. 17, 2023).

15  This Court's inquiry should remain flexible, should rely on its history overseeing the

16  litigation, and can focus on many different factors, including "the party's commitment to

17  compliance, the duration of the party's compliance with federal law, and whether or not

18  the effects of the violation of federal law persist."  *Jackson*, 880 F.3d at 1200-03 (citing

19  *Freeman*, 503 U.S. at 490); *see also U.S. v. Washington*, 573 F.3d 701, 710 (9th Cir. 2009)

20  (describing *Freeman* factors).  In particular, the presence of a "mechanism for future

21  compliance" can also serve as the equivalent of a durable remedy, once remediation is

22  otherwise complete.  *Evans*, 701 F. Supp. 2d at 171; *see also Consumer Advisory Bd. v.*

23  *Harvey*, 697 F. Supp. 2d 131, 135-37 (D. Me. 2010); *U.S. v. Tennessee*, 986 F. Supp. 2d

24  921, 935 (W.D. Tenn. 2012).

25      A minimum five-year monitoring period following full implementation of the

26  remedy is appropriate in this case, to ensure that "the State would continue that compliance

27  in the absence of continued judicial supervision."  This case's enforcement phase has

28  lasted nearly 30 years, with many areas that have shifted into compliance and back out of

1   compliance over time, repeatedly. *See, e.g.,* March 24, 2017 Order, ECF No. 5583 at 6.

2   The unprecedented scope of this case, as well as Defendants' many detours away from

3   progress towards full remediation, requires a continued exercise of the Court's jurisdiction

4   to provide that the processes implemented by the Receiver remain in place and continue to

5   guarantee constitutional care.

6       This Court has long stated that, because a "quality assurance program and a quality

7   improvement process are required parts of the remedy in this action," termination requires

8   both "durable implementation of all material aspects of court-ordered relief" and a

9   demonstration of Defendants' "ability to assume full-responsibility for self-monitoring."

10  Dec. 17, 2020 Order, ECF No. 6996 at 2, 8 (citing *Coleman*, 912 F. Supp. at 1308; *see also*

11  Sep. 3, 2020 Order, ECF No. 6846 at 28-29.  The development of Defendants' continuous

12  quality improvement tool (CQIT) serves both those purposes, by providing objective

13  measures of Defendants' compliance with certain aspects of the remedial plan, while

14  simultaneously providing Defendants with a tool to self-monitor and self-correct going

15  forward. *See* ECF No. 6996 at 7-8.  After years of Defendants' delays, the Special Master

16  and the *Plata* Receiver have made great progress in completing the remediation of

17  Defendants' data, such that the Court will soon be able to finalize the CQIT key indicators

18  by which Defendants' remedial compliance will, in part, be judged. *See* Dec. 6, 2024

19  Order, ECF No. 8485.

20      The completed development of CQIT key indicators will assist  the Court in

21  adequately ensuring durability of the remedy once Defendants have regained authority

22  over the mental health system and demonstrated compliance under that authority.  But, as

23  noted previously be Plaintiffs, not all aspects of the remedy are captured in CQIT, and the

24  quantitative reporting of the CQIT key indicators may signify constitutional compliance

25  only in combination with an overall systemic and qualitative review of care, including

26  review of a significant number of individual patient cases to determine whether there are

27  systemic failures that are creating a substantial risk of serious harm to CDCR's population.

28  *See* Plaintiffs' Response to Sept. 3, 2020 Order, ECF No. 6937 at 4.  Only once

1  Defendants have successfully proven their ability to consistently and objectively conduct

2  such an analysis, and to address identified problems,  will Defendants have fully

3  implemented this case's remedy.

4         Once the Court has determined that full implementation is complete, and the

5  Receiver has delegated responsibility back to Defendants, the case should move into a self-

6  monitoring period in which Defendants must demonstrate to the Court that they remain in

7  compliance, with gradually diminished monitoring by the Receiver and the Special Master.

8  This self-monitoring period should last a minimum of five years.

9         This process will ensure enforcement of the remedy lasts until the Court can ensure

10  that mechanisms are in place to prevent Defendants from sliding immediately back into the

11  provision of unconstitutional care—but no longer.  *See Freeman*, 503 U.S. at 490-92

12  (district court's gradual, partial withdrawal of supervision aligns with goal of returning

13  control to local government as soon as possible).  That exercise of jurisdiction is consistent

14  with the appropriate monitoring of institutions "for a reasonable period of time" to ensure

15  that it is "unlikely that the [institution] would return to its former ways."  *Dowell*, 498 U.S.

16  at 247-48; *see also* Parkin, Jason, *Aging Injunctions and the Legacy of Institutional Reform*

17  *Litigation*, 70 VAND. L. REV. 167, 217-19 (2017) (blessing imposition of self-monitoring

18  requirements as consistent with ensuring a "durable remedy" under *Horne*).

19         **B.    The Court May Include a Period of Durability in the Receiver's Term—**
          **and Should Do So**

20

21         The *Plata* Court's plan regarding transition from the receiver to CDCR provides

22  that, while the Court maintains the power to end the receivership at any time, the receiver

23  will otherwise remain in place "and retain his powers over the prison medical care system

24  until this case terminates."  *Plata*, Dkt No. 3729, at 2-3.  The *Plata* court noted that, while

25  its receiver's responsibilities will decrease as more functions and institutions are delegated

26  back to CDCR, the possible revocation of delegations, wherein CDCR institutions do not

27  show sustained compliance, mandates that the receiver remain in place until the case's end.

28  *Id.*  The same should be true here:  The Receiver should remain in place until a "durable

1   remedy" has been achieved—i.e., the end of the case—because it is only at that point that

2   it is no longer possible that the Court may need to revoke certain authority due to a finding

3   of non-compliance.

4        In *Plata*, the Ninth Circuit assumed without deciding that a receivership constitutes

5   "prospective relief" for purposes of the PLRA—an assumption Plaintiffs dispute—but

6   nevertheless found that the receivership in that case was narrowly drawn, extended no

7   further than necessary to correct the constitutional violations, and was the least intrusive

8   means to correct them.  *See* 603 F.3d at 1098.  The gradual delegation of powers back to

9   Defendants is exactly what the PLRA's need-narrowness-intrusiveness inquiry envisions.

10  *See Plata*, 563 U.S. at 531 ("[T]he scope of the order must be determined with reference to

11  the constitutional violations established.").  Just as the Court maintaining jurisdiction past

12  the first moment that Defendants establish compliance is appropriate in order to preserve a

13  "durable remedy," the Receiver in this case should retain power until the case is concluded

14  to correct back-sliding and assure a "durable remedy."

## CONCLUSION

16       The Court should appoint a receiver based on this case's extensive record and

17  include a period of durability in the receiver's tenure.

## CERTIFICATION

19       Plaintiffs' counsel certifies that he reviewed the following orders in preparing this

20  filing: ECF Nos. 8494, 8485, 8462, 8381, 8376, 8330, 8301, 8291, 8144, 8121, 7742,

21  7699, 7696, 6996, 6846, 5850, 5583, 4539, 2320, 640, *Coleman v. Wilson*, 912 F. Supp.

22  1282 (E.D. Cal. 1995), *Coleman v. Wilson*, 933 F. Supp. 954 (E.D. Cal. 1996), *Coleman v.*

23  *Schwarzenegger*, 922 F. Supp. 2d 882 (E.D. & N.D. Cal. 2009), *Coleman v. Brown*,

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

1   938 F. Supp. 2d 955 (E.D. Cal. 2013), *Coleman v. Brown*, 952 F. Supp. 2d 901 (E.D. &

2   N.D. Cal. 2013) *Coleman v. Brown*, 28 F. Supp. 3d 1068 (E.D. Cal. 2014), *Coleman v.*

3   *Newsom*, 424 F. Supp. 3d 925 (E.D. Cal. 2019).

4

5   DATED:  January 15, 2025               Respectfully submitted,

6                                          ROSEN BIEN GALVAN & GRUNFELD LLP

7                                          By:  */s/ Alexander Gourse*

8                                               Alexander Gourse

9                                          Attorneys for Plaintiffs

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28