1  DONALD SPECTER – 083925
   STEVEN FAMA – 099641
2  MARGOT MENDELSON – 268583
   PRISON LAW OFFICE
3  1917 Fifth Street
   Berkeley, California 94710-1916
4  Telephone: (510) 280-2621

5  CLAUDIA CENTER – 158255
   DISABILITY RIGHTS EDUCATION
6  AND DEFENSE FUND, INC.
   Ed Roberts Campus
7  3075 Adeline Street, Suite 210
   Berkeley, California 94703-2578
8  Telephone: (510) 644-2555

MICHAEL W. BIEN – 096891
ERNEST GALVAN – 196065
LISA ELLS – 243657
JENNY S. YELIN – 273601
THOMAS NOLAN – 169692
MICHAEL S. NUNEZ – 280535
MARC J. SHINN-KRANTZ – 312968
ALEXANDER GOURSE – 321631
ADRIENNE PON HARROLD – 326640
BENJAMIN W. HOLSTON – 341439
MAYA E. CAMPBELL – 345180
LUMA KHABBAZ – 351492
JARED MILLER – 353641
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone: (415) 433-6830

10 Attorneys for Plaintiffs

12              UNITED STATES DISTRICT COURT

13            EASTERN DISTRICT OF CALIFORNIA

15 RALPH COLEMAN, et al.,

16            Plaintiffs,

17       v.

18 GAVIN NEWSOM, et al.,

19            Defendants.

Case No. 2:90−CV−00520−KJM−SCR

**DECLARATION OF LISA ELLS IN SUPPORT OF PLAINTIFFS' CLOSING BRIEF RE APPOINTMENT OF RECEIVER**

Judge: Hon. Kimberly J. Mueller

[4633219.1]

I, Lisa Ells, declare:

1.      I am an attorney duly admitted to practice before this Court.  I am a partner in the law firm of Rosen Bien Galvan & Grunfeld LLP, counsel of record for Plaintiffs.  I have personal knowledge of the facts set forth herein, and if called as a witness, I could competently so testify.  I make this declaration in support of Plaintiffs' Closing Brief re Appointment of Receiver.

2.      The suicide rate in CDCR for 2024 was 31.32 deaths per 100,000 people.  Twenty-nine incarcerated people died by suicide in CDCR in 2024.

3.      A paralegal employed at my firm working under my direction and supervision calculated these figures by using the total in-custody population figure for June 30, 2024 that is reported in CDCR's Monthly Total Population Report.  Attached hereto as **Exhibit A** is a true and correct copy of the CDCR population report used for this calculation, available at https://www.cdcr.ca.gov/research/wp-content/uploads/sites/174/2024/07/Tpop4_d2406.pdf, which shows that the total in-custody population as of June 30, 2024 was 92,582 incarcerated people.  To calculate the total number of suicides per year, the paralegal, under my supervision, used CDCR's Suicide Death Notifications received to date, which Defendants regularly provide to Plaintiffs' counsel in this case.  We have, as of today, received 29 Suicide Death Notices for suicides occurring in 2024.  To calculate the suicide rate per 100,000 for 2024, the paralegal multiplied the number of 2024 suicides (29) by 100,000, and then divided the resulting number by the total in-custody population as of June 30, 2024 (92,582).

4.      As part of the regular course of business in this case, Defendants provide Plaintiffs' counsel with the final versions of written reports that CDCR mental-health staff prepare when the cause of an incarcerated person's death is confirmed to be suicide.  Defendants typically produce these Final Suicide Reports to Plaintiffs' counsel approximately 60 days after the incarcerated person's death.  As of today, Plaintiffs' counsel have received Final Suicide Reports relating to 24 of the 29 incarcerated people who died by suicide in CDCR between January 1, 2024 and December 31, 2024.

[4633219.1]

DECLARATION OF LISA ELLS IN SUPPORT OF PLAINTIFFS' CLOSING BRIEF RE APPOINTMENT OF RECEIVER

5. Attached hereto as **Exhibit B** is a true and correct copy of a report published by the U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics entitled Suicide in Local Jails and State and Federal Prisons, 2000-2019 – Statistical Tables, October 2021, NCJ 300731, available at https://bjs.ojp.gov/sites/g/files/xyckuh236/files/media/document/sljsfp0019st.pdf.

6. Attached hereto as **Exhibit C** is a true and correct copy of a Legislative Analyst's Office report entitled Analysis of Measure: Proposition 36 Allows Felony Charges and Increases Sentences for Certain Drug and Theft Crimes. Initiative Statute, November 5, 2024 Ballot, available at https://lao.ca.gov/BallotAnalysis/Proposition?number=36&year=2024.

7. Attached hereto as **Exhibit D** is a true and correct copy of a Prison Policy Initiative article by Sarah Staudt entitled California May Take a Big Step Backwards Towards More Incarceration with Proposition 36, October 17, 2024, available at https://www.prisonpolicy.org/blog/2024/10/17/prop-36/.

8. Attached hereto as **Exhibit E** is a true and correct copy of a CalMatters article by Cayla Mihalovich entitled Two California Prosecutors Promised a Different Kind of Justice. Voters Turned on Them, November 26, 2024, available at https://www.kqed.org/news/12015912/2-california-prosecutors-promised-a-different-kind-of-justice-voters-turned-on-them.

9. Attached hereto as **Exhibit F** is a true and correct copy of a November 19, 2024 email exchange between counsel for Defendants and Plaintiffs' counsel.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, and that this declaration is executed at San Francisco, California this 15th day of January, 2025.

*/s/ Lisa Ells*
Lisa Ells

DECLARATION OF LISA ELLS IN SUPPORT OF PLAINTIFFS' CLOSING BRIEF RE
APPOINTMENT OF RECEIVER

# Exhibit A

California Department of Corrections and Rehabilitation
Division of Correctional Policy Research and Internal Oversight
Office of Research
July 1, 2024

Monthly Report of Population
As of Midnight June 30, 2024

## Total CDCR Population

| Population | Felon/ Other | Change Since Last Month | Change Since Last Year | Design Capacity | Percent Occupied | Staffed Capacity |
|---|---|---|---|---|---|---|
| A. Total In-Custody/CRPP Supervision | 92,582 | -373 | -3,451 | | | |
| I.  In-State | 92,582 | -373 | -3,451 | | | |
| (Men, Subtotal) | 88,819 | -368 | -3,452 | | | |
| (Women, Subtotal) | 3,763 | -5 | +1 | | | |
| 1. Institution/Camps | 91,330 | -337 | -2,751 | 78,994 | 115.6 | 109,490 |
| Institutions | 89,686 | -275 | -2,706 | 75,526 | 118.7 | 106,022 |
| Camps(CIW and SCC) | 1,644 | -62 | -45 | 3,468 | 47.4 | 3,468 |
| 2. In-State Contract Beds | 5 | -2 | -624 | | | |
| Community Participant Mother Program | 5 | -2 | -1 | | | |
| 3. Department of State Hospitals | 160 | +2 | +45 | | | |
| 4. CRPP Supervision | 1,087 | -36 | -121 | | | |
| Alternative Custody Program | 63 | -4 | -64 | | | |
| Female Community Reentry Program | 386 | -12 | +3 | | | |
| Male Community Reentry Program | 583 | -21 | -61 | | | |
| Medical Parole | 48 | +1 | +3 | | | |
| Medical Reprieve Program | 7 | 0 | -2 | | | |
| B. Parole | 35,019 | -3 | -1,176 | | | |
| Community Supervision | 33,558 | -9 | -1,171 | | | |
| Interstate Cooperative Case | 1,461 | +6 | -5 | | | |
| C. Non-CDCR Jurisdiction | 756 | -2 | +20 | | | |
| Other State/Federal Institutions | 215 | -3 | -19 | | | |
| Out of State Parole | 519 | +5 | +44 | | | |
| Out of State Parolee at Large | 22 | -4 | +3 | | | |
| D. Other Populations | 7,039 | -28 | -1,377 | | | |
| Temporary Release to Court and Hospital | 1,479 | -16 | -169 | | | |
| Escaped | 193 | -1 | -1 | | | |
| Parolee at Large | 5,367 | -11 | -1,207 | | | |
| Total CDCR Population | 135,396 | -406 | -5,984 | | | |

This report contains the latest available reliable population figures from SOMS.  They have been carefully
audited, but are preliminary, and therefore subject to revision.

California Department of Corrections and Rehabilitation
Division of Correctional Policy Research and Internal Oversight
Office of Research
July 1, 2024

Monthly Report of Population
As of Midnight June 30, 2024

---

Monthly Institution Population Detail

---

| Institutions | Felon/ Other | Design Capacity | Percent Occupied | Staffed Capacity |
|---|---|---|---|---|
| Avenal State Prison (ASP) | 4,654 | 2,909 | 160.0 | 4,359 |
| Calipatria State Prison (CAL) | 2,900 | 2,308 | 125.6 | 3,433 |
| California Correctional Institution (CCI) | 1,658 | 1,508 | 109.9 | 2,227 |
| Central California Women's Facility (CCWF) | 2,214 | 1,986 | 111.5 | 2,946 |
| Centinela State Prison (CEN) | 3,006 | 2,308 | 130.2 | 3,433 |
| California Health Care Facility - Stockton (CHCF) | 2,173 | 2,953 | 73.6 | 2,953 |
| California Institution for Men (CIM) | 2,244 | 1,604 | 139.9 | 2,225 |
| California Institution for Women (CIW) | 1,167 | 1,281 | 91.1 | 1,743 |
| California Men's Colony (CMC) | 2,194 | 2,613 | 84.0 | 2,642 |
| California Medical Facility (CMF) | 2,052 | 2,319 | 88.5 | 2,761 |
| California State Prison, Corcoran (COR) | 2,510 | 3,114 | 80.6 | 4,502 |
| California Rehabilitation Center (CRC) | 2,775 | 1,822 | 152.3 | 2,654 |
| Correctional Training Facility (CTF) | 3,934 | 2,800 | 140.5 | 4,125 |
| Chuckawalla Valley State Prison (CVSP) | 273 | 1,738 | 15.7 | 2,603 |
| Folsom State Prison (FOL) | 2,610 | 2,065 | 126.4 | 3,021 |
| High Desert State Prison (HDSP) | 2,548 | 2,337 | 109.0 | 3,442 |
| Ironwood State Prison (ISP) | 3,147 | 2,200 | 143.0 | 3,285 |
| Kern Valley State Prison (KVSP) | 3,269 | 2,448 | 133.5 | 3,574 |
| California State Prison, Los Angeles County (LAC) | 3,199 | 2,300 | 139.1 | 3,400 |
| Mule Creek State Prison (MCSP) | 3,967 | 3,284 | 120.8 | 4,105 |
| North Kern State Prison (NKSP) | 3,321 | 2,694 | 123.3 | 4,011 |
| Pelican Bay State Prison (PBSP) | 2,183 | 1,804 | 121.0 | 2,429 |
| Pleasant Valley State Prison (PVSP) | 2,395 | 2,308 | 103.8 | 3,433 |
| RJ Donovan Correctional Facility (RJD) | 3,345 | 2,992 | 111.8 | 4,038 |
| California State Prison, Sacramento (SAC) | 1,868 | 1,828 | 102.2 | 2,493 |
| California Substance Abuse Treatment Facility (SATF) | 4,971 | 3,424 | 145.2 | 5,111 |
| Sierra Conservation Center (SCC) | 4,019 | 4,972 | 80.8 | 5,804 |
| California State Prison, Solano (SOL) | 4,000 | 2,594 | 154.2 | 3,866 |
| San Quentin Rehabilitation Center (SQ) | 3,361 | 3,084 | 109.0 | 3,985 |
| Salinas Valley State Prison (SVSP) | 2,527 | 2,452 | 103.1 | 3,509 |
| Valley State Prison (VSP) | 3,145 | 1,961 | 160.4 | 2,931 |
| Wasco State Prison (WSP) | 3,701 | 2,984 | 124.0 | 4,447 |
| **Institution Total** | 91,330 | 78,994 | 115.6 | 109,490 |

California Department of Corrections and Rehabilitation
Division of Correctional Policy Research and Internal Oversight
Office of Research
July 1, 2024

Monthly Report of Population
As of Midnight June 30, 2024

---

### Notes

---

Felon/Other counts are felons, county contract boarders, federal boarders, state boarders, safekeepers, county diagnostic cases, Department of Mental Health boarders, and Division of Juvenile Justice boarders.

Interstate Cooperative Cases are parolees from other states being supervised in California.

Non-CDCR Jurisdiction are California cases being confined in or paroled to other states or jurisdictions.

Welfare and Institution Code (W&IC) 1731.5(c) covers persons under the age of 21 who were committed to CDCR, had their sentence amended, and were incarcerated at the Division of Juvenile Justice for housing and program participation.

Other Population includes inmates temporarily out-to-court, inmates in hospitals, escapees, and parolees at large.

# Exhibit B

**U.S. Department of Justice**
Office of Justice Programs
*Bureau of Justice Statistics*

October 2021, NCJ 300731

# Suicide in Local Jails and State and Federal Prisons, 2000–2019 – Statistical Tables

E. Ann Carson, Ph.D., *BJS Statistician*

The total number of suicides in state, federal, and local correctional facilities increased from 499 in 2001 to 695 in 2019 (**figure 1, table 1**). From 2001 to 2019, suicides accounted for 5% to 8% of all deaths among state and federal prisoners and 24% to 35% of deaths among local jail inmates. Most jail inmates and state and federal prisoners who died by suicide were males, were non-Hispanic whites, and died by means of suffocation, including hanging and self-strangulation. More than half of all suicides in local jails occurred within the first 30 days of incarceration, while the overwhelming majority of suicides in state and federal prisons took place after the prisoners had served more than a year of their sentence.

In 2019, a total of 355 local jail inmates died by suicide. Almost 13% of jails operating above their rated or design capacity had one or more suicides, compared to approximately 9% of jails operating at or below capacity. Deaths by suicide

**FIGURE 1**
**Number of suicides in local jails and state and federal prisons, 2000–2019**



Note: Jail counts exclude and prison counts include deaths in the combined jail and prison systems in Alaska, Connecticut, Delaware, Hawaii, Rhode Island, and Vermont. See table 1 for counts.
*Includes deaths in publicly and privately operated state facilities. Includes deaths in Federal Bureau of Prisons facilities and excludes deaths in privately operated federal facilities. See *Methodology*.
Source: Bureau of Justice Statistics, Federal Law Enforcement Agency Deaths in Custody Reporting Program, 2015–2019; Mortality in Correctional Institutions, 2000–2019; and National Prisoner Statistics program, 2001–2019.

## Highlights

- From 2001 to 2019, the number of suicides increased 85% in state prisons, 61% in federal prisons, and 13% in local jails.

- During 2010-19, suffocation, including hanging and self-strangulation, accounted for nearly 90% of suicide deaths in local jails.

- During 2015-19, about 12% of deaths by suicide in local jails occurred within the first 24 hours of incarceration, a decrease from almost 22% during 2000-04.

- The average suicide rate for white inmates in local jails was 93 per 100,000 during the 5-year period of 2015-19, which is 5 times the rate for black inmates (18 per 100,000) and more than 3 times the rate for Hispanic inmates (26 per 100,000).

- Almost 60% of state prisoners who died by suicide during 2001-19 were white.

- During 2001-19, state prisoners who had been sentenced for a violent offense accounted for almost 72% of suicides in state prisons.

- During 2015-19, about 75% of suicides in state prisons and 64% of suicides in federal prisons occurred after the first year of imprisonment.

- Persons serving time in federal prison for weapons offenses and sex offenses each accounted for about 20% of suicides in federal facilities during 2015-19.

- In 2019, suicides occurred in 217 state and federal prisons, 19% of all prison facilities.



in 2019 were concentrated in the largest jails. More than half of local jails housing 1,000 or more inmates on June 30, 2019 reported at least one inmate suicide.

In 2019, 340 state and federal prisoners died by suicide. Similar to local jails, suicides were more likely to occur in large state and federal prison facilities. About 45% of state and federal prisons that held 2,500 or more prisoners at midyear 2019 reported one or more suicides.

This report fulfills a House Appropriations Committee request to publish data in 2021 on suicides in jails and prisons. These statistical tables present data from the Mortality in Correctional Institutions collection, through which the Bureau of Justice Statistics (BJS) obtained data on deaths in jails from 2000 to 2019 and deaths in state prisons from 2001 to 2019. Data on deaths in federal prisons were obtained from aggregate counts reported to BJS's National Prisoner Statistics program from 2001 to 2014, and from individual-level death data collected through the Federal Law Enforcement Agency Deaths in Custody Reporting Program from 2015 to 2019.

Deaths are aggregated into 5-year periods in this report so stable suicide rates can be calculated from the suicide counts. The tables describe geographic, demographic, and criminal justice characteristics of jail inmate and prisoner suicides, as well as circumstances surrounding the deaths. Suicides that occurred in 2019 are linked to data from BJS's *2019 Census of Local Jails* and *2019 Census of State and Federal Correctional Facilities* to describe characteristics of facilities that had a suicide.

### Suicides in local jails

- Local jails had 355 deaths by suicide in 2019, an increase from 289 in 2000.

- During the 20-year period of 2000-19, California had a total of 615 suicides in local jails, Texas had 448, Florida had 333, and Pennsylvania had 325 (**table 2**).

- The suicide rate among local jail inmates in 2019 (49 per 100,000) was similar to the rate in 2000 (48 per 100,000) (**figure 2**).

- The suicide rate in local jails peaked in 2015 at 52 per 100,000 inmates.

- During 2000-19, local jails in the South had 2,608 suicides, compared to 1,494 for jails in the West, 1,350 for jails in the Midwest, and 765 for those in the Northeast (**table 3**).

### Demographic characteristics of local jail inmates who died by suicide

- During 2000-19, 90% of local jails inmates who died by suicide were male (**table 4**).

- The number of deaths by suicide among female local jail inmates increased from 124 to 204 deaths between the periods of 2000-04 and 2015-19, rising almost 65%.

- Seventy-four percent of local jail inmates who died by suicide during 2015-19 were white, while almost 12% were Hispanic and 11% were black.

- During 2000-19, American Indians and Alaska Natives accounted for 2% (120 deaths) and Asians, Native Hawaiians, and Other Pacific Islanders accounted for about 1% (74) of suicides in local jails.

- Sixty percent of inmates who died by suicide in local jails during 2000-19 were ages 25 to 44.

### FIGURE 2
**Rate of suicides per 100,000 inmates in local jails and 100,000 prisoners in state and federal prisons, 2000–2019**



Rate of suicides per 100,000 inmates/prisoners

Note: Jail rates exclude and state prison rates include deaths in the combined jail and prison systems in Alaska, Connecticut, Delaware, Hawaii, Rhode Island, and Vermont. Data may have been revised from previously published statistics. See *Methodology*. See table 1 for rates.
[a]Based on the annual number of suicides and the average daily population (ADP) in local jails. In 2000, the ADP was estimated by taking the average of January 1 and December 31 inmate population counts.
[b]Based on the annual number of suicides and the December 31 custody population in state prisons. Includes deaths and populations in publicly and privately operated state facilities.
[c]Based on the annual number of suicides and the December 31 custody population in federal prisons. Includes deaths and populations in Federal Bureau of Prisons facilities and excludes deaths and populations in privately operated federal facilities. See *Methodology*.
Source: Bureau of Justice Statistics, Federal Law Enforcement Agency Deaths in Custody Reporting Program, 2015–2019; Mortality in Correctional Institutions, 2000–2019; and National Prisoner Statistics program, 2001–2019.

- Among jail inmates who died by suicide, the percentage who were age 55 or older increased from 3% during 2000-04 to 9% during 2015-19.

- The average suicide rate during 2000-19 for white inmates was 86 per 100,000, more than 5 times the rate for black inmates (16 per 100,000) and almost 3.5 times the rate for Hispanic inmates (25 per 100,000) (**table 5**).

- The average suicide rate for local jail inmates age 24 or younger was highest during 2000-04 (36 per 100,000) and lowest during 2015-19 (20 per 100,000).

- At 78 deaths per 100,000, local jail inmates age 55 or older had the highest average suicide rate among all age groups during 2000-19.

### Criminal justice characteristics of local jail inmates who died by suicide

- Unconvicted inmates accounted for almost 77% of those who died by suicide in local jails during 2000-19 (**table 6**).

- Inmates held for a violent offense accounted for the largest portion of suicides in local jails during the 20-year period and in each of its intervening 5-year periods.

- During 2015-19, about 18% of suicides in local jails were of persons held for assault, and almost 10% were of those held for murder or nonnegligent manslaughter.

- Local jail inmates held for property or public order offenses during 2000-19 each accounted for about 19% of suicides, while those in jail for drug offenses accounted for 10%.

- During 2010-19, about 92% of jail suicides were of persons held for local law enforcement agencies or courts, 6% for state or federal prisons or other authorities, 2% for the U.S. Marshals Service, and 1% for U.S. Immigration and Customs Enforcement.

### Circumstances of suicide deaths in local jails

- Two-thirds (66%) of local jail suicides during 2015-19 occurred within the first 30 days of incarceration, and 44% occurred within the first week (**figure 3**).

- The percentage of jail suicides that occurred in the first 24 hours decreased between the periods of 2000-04 (22%) and 2015-19 (12%).

**FIGURE 3**

**Percent of suicides in local jails, by time served between admission and death, 2000–04 and 2015–19**

Percent of suicides



**Time served in jail on current admission**

Note: Excludes deaths in the combined jail and prison systems in Alaska, Connecticut, Delaware, Hawaii, Rhode Island, and Vermont. Details may not sum to totals due to rounding and missing data. Data may have been revised from previously published statistics. See *Methodology*. See table 6 for percentages.
Source: Bureau of Justice Statistics, Mortality in Correctional Institutions, 2000–19.

- Jail inmates who had spent more than 6 months in custody made up 10% of suicides in 2015-19.

- Suicides in local jails were less common between 6 a.m. and 12 p.m. than at other times of day (**table 7**).

- During 2010-19, almost 73% of jail suicides occurred in the person's cell and 8% occurred in jail segregation units.

- During 2010-19, almost 14% of inmates who died by suicide had at least one overnight stay in a mental health services unit since entering jail.

### Characteristics of jail facilities with suicides in 2019

- In 2019, a total of 282 local jail facilities, representing 278 jail jurisdictions, reported at least one suicide (**tables 8 and 9**).

- Twelve percent of jail facilities operated by a private company reported at least one suicide in 2019, compared to 11% for regional jails, 9% for jails operated by counties, and almost 7% for city-operated jails.

- Among jail facilities that reported work or prerelease as one of their jail functions in 2019, 91% did not have a death by suicide during that year.

- The median rated capacity of jails that had two or more suicides in 2019 was 1,296 beds, compared to a median capacity of 305 beds in jails with one suicide and 110 beds in jails with no suicides.

- Almost 13% of jails operating above 100% capacity at midyear 2019 had a suicide during the calendar year, compared to about 8% of jails operating at 100% capacity or less.

- More than half of all jail jurisdictions with an average daily population (ADP) of 1,000 or more inmates in 2019 had at least one suicide that year, and more than 35% of these jurisdictions reported two or more suicides.

- Eleven percent of jail jurisdictions that held 50% or more of their inmates for felonies in 2019 had a death by suicide that year.

- In jail jurisdictions reporting multiple deaths by suicide in 2019, the ratio of inmates to correctional staff was 4.6, compared to 4.4 for jurisdictions with one suicide and 3.8 for jurisdictions with no suicides.

## Suicides in state prisons

- From 2001 to 2019, the number of suicides in state prisons increased 85% from 168 to 311, while total deaths from all causes in these facilities grew more than 34% (**table 1**).

- The number of prisoner suicides in states in the South nearly doubled between 2010-14 (343) and 2015-19 (631) (**table 10**).

- The number of prisoners who died by suicide between 2010-14 and 2015-19 tripled in three states (Arkansas, Georgia, and West Virginia) and more than doubled in five states (Alabama, Florida, Mississippi, North Carolina, and Tennessee).

- The average annual suicide rate grew from 15 per 100,000 state prisoners to 21 per 100,000 between the 4-year period of 2001-04 and the 5 year period of 2015-2019 (**table 11**).

- Over the 19 years of data collection on deaths in state prisons, the Northeast (22 per 100,000) had the highest average annual suicide rate, compared to the West (21 per 100,000), Midwest (16 per 100,000), and South (15 per 100,000).

## Demographic characteristics of state prisoners who died by suicide

- Almost 95% of all persons in state prison who died by suicide during 2001-19 were male (**table 12**).

- During 2015-19, 57% of persons in state prison who committed suicide were white, almost 24% were black, and almost 15% were Hispanic.

- State prisoners who were Asian, Native Hawaiian, and Other Pacific Islander and those who were American Indian and Alaska Native each accounted for less than 2% of suicides during 2015-19.

- Among state prisoners who died of suicide, the portion who were age 24 or younger decreased from almost 17% during the 4-year period of 2001-04 to 10% during the 5-year period of 2015-19.

- In state prisons, the suicide rate increased 49% between the 4-year period of 2001-04 and 5-year period of 2015-19 (**table 13**).

- Asian state prisoners had average suicide rates during 2015-19 that were double those of black or Hispanic state prisoners.

- With the exception of state prisoners age 24 or younger (15 per 100,000), the average suicide rates among all age groups during 2001-19 were between 17 and 19 per 100,000.

## Criminal justice characteristics of state prisoners who died by suicide

- Thirty percent of suicides during 2001-19 were of prisoners serving time for murder or nonnegligent manslaughter (**table 14**).

- Prisoners serving sentences for a drug offense accounted for 8% of suicides during the 4-year period of 2001-04 and 4% during the 5-year period of 2015-19.

- Almost 70% of suicides in state prisons were of prisoners who served more than 1 year under state correctional authority.

- Persons who served more than 10 years in state prison accounted for 13% of suicides in these facilities during 2001-04 and almost 25% during 2015-19 (**figure 4**).

## Circumstances of suicide deaths in state prisons

- As in local jails, the majority of suicides in state prisons during 2010-19 were by suffocation, including hanging and self-strangulation (**table 15**).

- During 2015-19, almost 76% of suicides of persons in state prison took place in the person's cell or room, 11% in a segregation unit, and 4% in a special medical or mental health services unit.

- About 15% of persons in state prison who died by suicide during 2010-19 had spent at least one night in a mental health facility after admission to prison, while 51% had not, with this characteristic unknown for 32%.

## Suicides in federal prisons

- Suicides in federal prisons increased 61%, from 18 in 2001 to 29 in 2019.

- Federal prisons had an average suicide rate of 16 per 100,000 prisoners during 2015-19 (**table 17**).

## Demographic and criminal justice characteristics of federal prisoners who died by suicide

- During 2015-19, males accounted for 98% of suicides among persons in federal prison, and whites accounted for 59% (**table 16**).

- During 2015-19, white prisoners were 8.5 times as likely as Hispanic prisoners and 5 times as likely as black prisoners to die by suicide in federal prisons on average.

- From 2015-19, 13% of federal prisoners who died by suicide had been sentenced for drug offenses (**table 18**).

- Almost two-thirds (64%) of federal prisoners who died by suicide during 2015-19 had served more than 1 year of their sentence.

- Death by suffocation accounted for about 81% of all suicides in federal prisons during 2015-19 (**table 19**).

## Characteristics of state and federal prison facilities with suicides in 2019

- Suicides were recorded in 217 state or federal prison facilities in 2019, with 71 of those facilities having multiple suicides (**table 20**).

### FIGURE 4

**Percent of suicides in state and federal prisons**, by time served between admission and death, 2001–04 and 2015–19



Percent of suicides

Time served in prison on current sentence

Note: Details may not sum to totals due to rounding and missing data. Data may have been revised from previously published statistics. See *Methodology*. See tables 14 and 18 for percentages.
[a]Includes deaths in publicly and privately operated state facilities and in the combined jail and prison systems in Alaska, Connecticut, Delaware, Hawaii, Rhode Island, and Vermont.
[b]Includes deaths in Federal Bureau of Prisons (BOP) facilities and excludes deaths in privately operated federal facilities. As of December 30, 2001, sentenced felons from the District of Columbia were the responsibility of the BOP. See *Methodology*.
Source: Bureau of Justice Statistics, Federal Law Enforcement Agency Deaths in Custody Reporting Program, 2015–2019; and Mortality in Correctional Institutions, 2001–2019.

- In 2019, about 19% of state, 17% of federal, and 12% of privately operated prison facilities under contract to both state and federal authorities experienced one or more suicides.

- Almost 13% of the 979 prison facilities whose main function was general housing of adult prisoners reported a single suicide event during 2019, and another 6% reported two or more suicides.

- The median capacity of prisons that had two or more suicides in 2019 was 1,738 beds, compared to 1,365 beds for facilities reporting one suicide and 927 beds for those with no suicides.

- Eighty-four percent of prisons operating at 100% capacity or less on June 30, 2019, and 77% of facilities operating above 100% capacity, experienced no suicides in the calendar year.

- State and federal prisons holding 2,500 or more prisoners were more likely to report one or more

suicides (45% of these facilities) than prisons with smaller populations (**table 21**).

- Thirty-five percent of prison facilities whose security level was administrative, maximum, or super maximum had at least one suicide in 2019, compared to 15% of medium security and 4% of minimum security prisons.

- State and federal prisons reporting two or more suicides in 2019 held 11% of prisoners in restricted housing status, while facilities with no suicides held approximately 5% in restricted housing.

- Prisons reporting zero suicides in 2019 had a larger percentage of staff assigned to security duties (73%) than facilities with one suicide or two or more suicides (68% each).

# Terms and definitions

**Average daily population**—The number of inmates in jail each day for a year, divided by the number of days in the year.

**Capacity, design**—The number of inmates or prisoners a facility can hold, as set by the architect or planner.

**Capacity, rated**—The number of inmates, prisoners, or beds a facility can hold, as set by a rating official.

**Custody count**—Inmates held in the physical custody of local jails, or prisoners held in the physical custody of state or federal prisons, regardless of sentence length or which authority has jurisdiction over the person.

**Federal prison**—The system that houses persons under the jurisdiction of the Federal Bureau of Prisons, which holds adult prisoners in secure federal prison facilities, nonsecure community corrections facilities, and privately operated facilities, and holds persons age 17 or younger in privately operated facilities.

**Jail**—A confinement facility generally operated under the authority of a sheriff, police chief, or county or city administrator. A small number of jails are privately operated. Regional jails include two or more jail jurisdictions with a formal agreement to operate a jail facility. Facilities include jails, detention centers, county or city correctional centers, special jail facilities (such as medical or treatment centers and prerelease centers), and temporary holding or lockup facilities that are part of a facility's combined function. Jails are intended for adults but can hold juveniles before or after their cases are adjudicated.

**Jails**—

- hold inmates sentenced to jail facilities who usually have a sentence of 1 year or less

- receive individuals pending arraignment and hold them as they await trial, conviction, or sentencing

- readmit probation, parole, and bail bond violators and absconders

- detain juveniles pending their transfer to juvenile authorities

- hold mentally ill persons pending their movement to appropriate mental health facilities

- hold individuals for the military, for protective custody, as witnesses for courts, and for contempt of court

- release convicted inmates to the community on completion of sentence

- transfer inmates to federal, state, or other authorities

- house inmates for federal, state, or other authorities due to crowding of their facilities

- operate community-based programs as alternatives to incarceration.

**Jail jurisdiction**—A county (parish in Louisiana) or municipal government that administers one or more local jails and represents the entity responsible for managing jail facilities under its authority.

**Jail reporting unit**—Most jail jurisdictions consist of a single facility, but some have multiple facilities, or multiple facility operators, called reporting units. For example, a single jail jurisdiction may have legal authority over five jail facilities, with four managed by a single operator and one managed by a different operator (i.e., one jail jurisdiction with two reporting units and five jail facilities).

**Prison**—A long-term confinement facility that is run by a state or the federal government and typically holds felons, or offenders with sentences of more than 1 year imposed by state or federal courts. Sentence length may vary by state. Alaska, Connecticut, Delaware, Hawaii, Rhode Island, and Vermont each operate an integrated system that combines prisons and jails, and all of their inmates are counted in this report as prisoners. Prisoners under the jurisdiction of state or federal correctional officials can be held in publicly or privately operated secure or nonsecure facilities, including state or federal prisons, boot camps, halfway houses, treatment facilities, hospitals, local jails, or another state's facilities.

**Prison jurisdiction**—The legal authority of state or federal correctional officials over a prisoner, regardless of where the prisoner is held.

**Suicide**—A self-inflicted death by—

- suffocation, including hanging, strangulation, asphyxia, anoxia, and other methods of reducing oxygen intake

- exsanguination, including all types of sharp force trauma or other injuries that cause acute loss of blood

- poisoning, including drug overdoses

- firearm

- other methods, including self-inflicted blunt force trauma, dehydration, and unknown or unreported causes.


# List of tables

**TABLE 1.** Total deaths and number and rate of suicides in local jails and state and federal prisons, 2000–2019

**TABLE 2.** Aggregated number of suicides in local jails, by state and region, 2000–19

**TABLE 3.** Average rate of suicides per 100,000 inmates in local jails, by state and region, 2000–19

**TABLE 4.** Percent of suicides in local jails, by demographic characteristics of inmates, 2000–19

**TABLE 5.** Average rate of suicides per 100,000 inmates in local jails, by demographic characteristics of inmates, 2000–19

**TABLE 6.** Percent of suicides in local jails, by criminal justice characteristics of inmates, 2000–19

**TABLE 7.** Percent of suicides in local jails, by circumstances of death, 2000–19

**TABLE 8.** Percent of local jails, by number of suicides and facility characteristics, 2019

**TABLE 9.** Percent of local jail jurisdictions, by number of suicides and population characteristics, 2019

**TABLE 10.** Aggregated number of suicides in state and federal prisons, by state and region, 2001–19

**TABLE 11.** Average rate of suicides per 100,000 prisoners in state and federal prisons, by state and region, 2001–19

**TABLE 12.** Percent of suicides in state prisons, by demographic characteristics of prisoners, 2001–19

**TABLE 13.** Average rate of suicides per 100,000 prisoners in state prisons, by demographic characteristics of prisoners, 2001–19

**TABLE 14.** Percent of suicides in state prisons, by criminal justice characteristics of prisoners, 2001–19

**TABLE 15.** Percent of suicides in state prisons, by circumstances of death, 2001–19

**TABLE 16.** Percent of suicides in federal prisons, by demographic characteristics of prisoners, 2015–19

**TABLE 17.** Average rate of suicides per 100,000 prisoners in federal prisons, by demographic characteristics of prisoners, 2015–19

**TABLE 18.** Percent of suicides in federal prisons, by criminal justice characteristics of prisoners, 2015–19

**TABLE 19.** Percent of suicides in federal prisons, by circumstances of death, 2015–19

**TABLE 20.** Percent of state and federal prisons, by number of suicides and facility characteristics, 2019

**TABLE 21.** Percent of state and federal prisons, by number of suicides and population characteristics, 2019

*Continued on next page*

## List of figures

FIGURE 1. Number of suicides in local jails and state and federal prisons, 2000–2019

FIGURE 2. Rate of suicides per 100,000 inmates in local jails and 100,000 prisoners in state and federal prisons, 2000–2019

FIGURE 3. Percent of suicides in local jails, by time served between admission and death, 2000–04 and 2015–19

FIGURE 4. Percent of suicides in state and federal prisons, by time served between admission and death, 2001–04 and 2015–19

## List of appendix tables

APPENDIX TABLE 1. Number of correctional facilities, by type and operator, 2019

**TABLE 1**
**Total deaths and number and rate of suicides in local jails and state and federal prisons, 2000–2019**

| | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Local jails** | | | | | | | | | | | | | | | | | | | | |
| Total deaths | 903 | 942 | 969 | 1,001 | 1,021 | 1,045 | 1,094 | 1,099 | 959 | 961 | 918 | 888 | 960 | 987 | 1,053 | 1,096 | 1,076 | 1,103 | 1,138 | 1,200 |
| Suicides | 289 | 313 | 314 | 296 | 299 | 286 | 278 | 283 | 228 | 304 | 305 | 311 | 301 | 328 | 368 | 369 | 334 | 317 | 339 | 355 |
| Suicide rate per 100,000 local jail inmates[a] | 48 | 49 | 47 | 43 | 42 | 39 | 36 | 36 | 29 | 41 | 42 | 43 | 40 | 46 | 50 | 52 | 47 | 43 | 46 | 49 |
| **State prisons** | | | | | | | | | | | | | | | | | | | | |
| Total deaths | / | 2,869 | 2,935 | 3,152 | 3,123 | 3,168 | 3,233 | 3,389 | 3,452 | 3,417 | 3,233 | 3,351 | 3,357 | 3,478 | 3,484 | 3,708 | 3,734 | 3,954 | 4,137 | 3,848 |
| Suicides | / | 168 | 168 | 199 | 199 | 213 | 219 | 215 | 197 | 202 | 215 | 185 | 205 | 192 | 249 | 219 | 254 | 261 | 312 | 311 |
| Suicide rate per 100,000 state prisoners[b] | : | 14 | 14 | 16 | 16 | 17 | 17 | 16 | 15 | 15 | 16 | 14 | 16 | 15 | 20 | 18 | 21 | 22 | 26 | 27 |
| **Federal prisons[c]** | | | | | | | | | | | | | | | | | | | | |
| Total deaths | / | 301 | 335 | 346 | 333 | 388 | 328 | 368 | 399 | 376 | 387 | 387 | 350 | 400 | 444 | 455 | 388 | 381 | 378 | 381 |
| Suicides | / | 18 | 17 | 6 | 11 | 13 | 12 | 18 | 21 | 21 | 11 | 17 | 19 | 14 | 24 | 20 | 18 | 24 | 29 | 29 |
| Suicide rate per 100,000 federal prisoners[b] | : | 13 | 12 | 4 | 7 | 8 | 7 | 11 | 13 | 12 | 6 | 10 | 11 | 8 | 14 | 12 | 12 | 16 | 19 | 20 |

Note: Jail counts exclude and state prison counts include deaths in the combined jail and prison systems in Alaska, Connecticut, Delaware, Hawaii, Rhode Island, and Vermont. Data may have been revised from previously published statistics. See *Methodology*.
:Not calculated.
/Not collected.
[a]Based on the annual number of suicides and the average daily population (ADP) in local jails. In 2000, the ADP was estimated by taking the average of January 1 and December 31 inmate population counts.
[b]Based on the annual number of suicides and the December 31 custody population in state or federal prisons.

[c]Includes deaths in Federal Bureau of Prisons (BOP) facilities and excludes deaths in privately operated federal facilities. From 2001 to 2014, the BOP provided an aggregate count of deaths in BOP-operated facilities, by cause of death. From 2015 to 2019, the BOP provided individual-level death records from both BOP- and privately operated federal facilities. To allow for comparability over time, nine deaths in private federal prisons in 2015, seven in 2016, seven in 2017, five in 2018, and nine in 2019 were excluded. Among these deaths, one suicide was in 2015, one in 2016, and none in 2017, 2018, and 2019. As of December 30, 2001, sentenced felons from the District of Columbia were the responsibility of the BOP. See *Methodology*.
Source: Bureau of Justice Statistics, Federal Law Enforcement Agency Deaths in Custody Reporting Program, 2015–2019; Mortality in Correctional Institutions, 2000–2019; and National Prisoner Statistics program, 2001–2019.

**TABLE 2**
**Aggregated number of suicides in local jails, by state and region, 2000–19**

| | 2000–04 | 2005–09 | 2010–14 | 2015–19 | 2000–19 |
|---|---|---|---|---|---|
| U.S. total | 1,511 | 1,379 | 1,613 | 1,714 | 6,217 |
| **Northeast** | 194 | 171 | 199 | 201 | 765 |
| Maine | 7 | 6 | 8 | 6 | 27 |
| Massachusetts | 14 | 18 | 22 | 26 | 80 |
| New Hampshire | 8 | 8 | 7 | 10 | 33 |
| New Jersey | 26 | 30 | 33 | 27 | 116 |
| New York | 55 | 42 | 53 | 34 | 184 |
| Pennsylvania | 84 | 67 | 76 | 98 | 325 |
| **Midwest** | 316 | 288 | 356 | 390 | 1,350 |
| Illinois | 43 | 42 | 42 | 42 | 169 |
| Indiana | 29 | 31 | 45 | 49 | 154 |
| Iowa | 9 | 12 | 13 | 12 | 46 |
| Kansas | 39 | 23 | 23 | 28 | 113 |
| Michigan | 44 | 40 | 50 | 38 | 172 |
| Minnesota | 21 | 12 | 17 | 30 | 80 |
| Missouri | 36 | 36 | 52 | 51 | 175 |
| Nebraska | 15 | 10 | 8 | 12 | 45 |
| North Dakota | 4 | 5 | 5 | 4 | 18 |
| Ohio | 52 | 51 | 65 | 76 | 244 |
| South Dakota | 4 | 5 | 3 | 7 | 19 |
| Wisconsin | 20 | 21 | 33 | 41 | 115 |
| **South** | 654 | 598 | 655 | 701 | 2,608 |
| Alabama | 40 | 34 | 36 | 37 | 147 |
| Arkansas | 34 | 16 | 26 | 20 | 96 |
| District of Columbia | 1 | 4 | 5 | 5 | 15 |
| Florida | 63 | 82 | 94 | 94 | 333 |
| Georgia | 75 | 68 | 66 | 73 | 282 |
| Kentucky | 21 | 21 | 23 | 15 | 80 |
| Louisiana | 25 | 30 | 28 | 34 | 117 |
| Maryland | 33 | 37 | 36 | 38 | 144 |
| Mississippi | 28 | 33 | 27 | 29 | 117 |
| North Carolina | 41 | 31 | 41 | 62 | 175 |
| Oklahoma | 28 | 28 | 25 | 32 | 113 |
| South Carolina | 16 | 17 | 29 | 26 | 88 |
| Tennessee | 38 | 48 | 41 | 59 | 186 |
| Texas | 135 | 94 | 114 | 105 | 448 |
| Virginia | 66 | 53 | 51 | 57 | 227 |
| West Virginia | 10 | 2 | 13 | 15 | 40 |
| **West** | 347 | 322 | 403 | 422 | 1,494 |
| Arizona | 29 | 26 | 25 | 39 | 119 |
| California | 156 | 132 | 167 | 160 | 615 |
| Colorado | 35 | 45 | 28 | 59 | 167 |
| Idaho | 6 | 12 | 16 | 8 | 42 |
| Montana | 11 | 10 | 18 | 10 | 49 |
| Nevada | 27 | 13 | 19 | 25 | 84 |
| New Mexico | 23 | 12 | 28 | 18 | 81 |
| Oregon | 15 | 10 | 16 | 22 | 63 |
| Utah | 21 | 25 | 32 | 31 | 109 |
| Washington | 17 | 33 | 48 | 42 | 140 |
| Wyoming | 7 | 4 | 6 | 8 | 25 |

Note: For details on regions, see U.S. Census Bureau. (n.d.). *Census regions and divisions of the United States.* https://www2.census.gov/geo/pdfs/maps-data/maps/reference/us_regdiv.pdf. Excludes deaths in the combined jail and prison systems in Alaska, Connecticut, Delaware, Hawaii, Rhode Island, and Vermont. Data may have been revised from previously published statistics. See *Methodology*.
Source: Bureau of Justice Statistics, Mortality in Correctional Institutions, 2000–19.

**TABLE 3**
**Average rate of suicides per 100,000 inmates in local jails, by state and region, 2000–19**

|  | 2000–04 | 2005–09 | 2010–14 | 2015–19 | 2000–19 |
|---|---|---|---|---|---|
| U.S. total | 46 | 36 | 44 | 48 | 43 |
| **Northeast** | 42 | 33 | 42 | 50 | 41 |
| Maine | 96 ! | 74 ! | 131 ! | 82 ! | 94 |
| Massachusetts | 24 | 27 | 43 | 53 | 36 |
| New Hampshire | 114 ! | 80 ! | 67 ! | 118 ! | 91 |
| New Jersey | 32 | 33 | 42 | 48 | 38 |
| New York | 37 | 27 | 38 | 31 | 33 |
| Pennsylvania | 54 | 36 | 41 | 58 | 47 |
| **Midwest** | 56 | 45 | 58 | 63 | 55 |
| Illinois | 43 | 38 | 40 | 48 | 42 |
| Indiana | 38 | 35 | 53 | 52 | 44 |
| Iowa | 52 ! | 59 | 63 | 51 | 56 |
| Kansas | 125 | 62 | 63 | 73 | 79 |
| Michigan | 53 | 44 | 59 | 47 | 51 |
| Minnesota | 70 | 33 | 52 | 85 | 60 |
| Missouri | 82 | 65 | 90 | 84 | 80 |
| Nebraska | 122 | 66 | 46 ! | 62 | 70 |
| North Dakota | 108 ! | 106 ! | 87 ! | 54 ! | 83 |
| Ohio | 57 | 51 | 71 | 78 | 64 |
| South Dakota | 62 ! | 64 ! | 36 ! | 71 ! | 58 |
| Wisconsin | 29 | 29 | 50 | 63 | 42 |
| **South** | 41 | 32 | 36 | 38 | 37 |
| Alabama | 62 | 45 | 50 | 49 | 51 |
| Arkansas | 116 | 47 | 71 | 46 | 67 |
| District of Columbia | 8 ! | 27 ! | 39 ! | 53 ! | 30 |
| Florida | 24 | 26 | 34 | 35 | 29 |
| Georgia | 40 | 30 | 31 | 36 | 34 |
| Kentucky | 28 | 24 | 25 | 13 | 21 |
| Louisiana | 19 | 21 | 18 | 23 | 20 |
| Maryland | 56 | 56 | 60 | 82 | 62 |
| Mississippi | 55 | 60 | 47 | 43 | 51 |
| North Carolina | 57 | 34 | 44 | 64 | 49 |
| Oklahoma | 71 | 53 | 51 | 55 | 57 |
| South Carolina | 30 | 26 | 49 | 46 | 38 |
| Tennessee | 35 | 36 | 34 | 41 | 37 |
| Texas | 46 | 29 | 35 | 31 | 35 |
| Virginia | 57 | 37 | 35 | 41 | 42 |
| West Virginia | 62 | 10 ! | 62 | 64 | 49 |
| **West** | 49 | 40 | 53 | 56 | 49 |
| Arizona | 44 | 33 | 36 | 59 | 42 |
| California | 42 | 32 | 43 | 42 | 40 |
| Colorado | 65 | 67 | 46 | 93 | 68 |
| Idaho | 39 ! | 61 | 88 | 39 ! | 57 |
| Montana | 123 | 108 | 179 | 79 | 120 |
| Nevada | 88 | 37 | 54 | 70 | 61 |
| New Mexico | 67 | 27 | 66 | 51 | 52 |
| Oregon | 44 | 29 | 51 | 70 | 48 |
| Utah | 71 | 74 | 90 | 85 | 80 |

*Continued on next page*

**TABLE 3 (continued)**
**Average rate of suicides per 100,000 inmates in local jails, by state and region, 2000–19**

|  | 2000–04 | 2005–09 | 2010–14 | 2015–19 | 2000–19 |
|---|---|---|---|---|---|
| Washington | 30 | 50 | 79 | 70 | 57 |
| Wyoming | 115 ! | 50 ! | 77 ! | 109 ! | 86 |

Note: For details on regions, see U.S. Census Bureau. (n.d.). *Census regions and divisions of the United States.* https://www2.census.gov/geo/pdfs/maps-data/maps/reference/us_regdiv.pdf. Rates are based on the annual number of suicides and the average daily population (ADP) in local jails. In 2000, the ADP was estimated by taking the average of January 1 and December 31 inmate population counts. Excludes deaths and populations in the combined jail and prison systems in Alaska, Connecticut, Delaware, Hawaii, Rhode Island, and Vermont. Data may have been revised from previously published statistics. See *Methodology*.

! Interpret with caution. Estimate is based on 10 or fewer cases.

Source: Bureau of Justice Statistics, Mortality in Correctional Institutions, 2000–19.

**TABLE 4**
**Percent of suicides in local jails, by demographic characteristics of inmates, 2000–19**

| Inmate characteristic | 2000–04 | 2005–09 | 2010–14 | 2015–19 | 2000–19 |
|---|---|---|---|---|---|
| Total suicides | 1,511 | 1,379 | 1,613 | 1,714 | 6,217 |
| **Sex** | 100% | 100% | 100% | 100% | 100% |
| Male | 91.7 | 92.2 | 90.5 | 88.1 | 90.5 |
| Female | 8.2 | 7.8 | 9.5 | 11.9 | 9.5 |
| **Race/ethnicity** | 100% | 100% | 100% | 100% | 100% |
| White[a] | 70.5 | 69.2 | 71.5 | 74.0 | 71.4 |
| Black[a] | 14.1 | 15.0 | 13.0 | 11.3 | 13.2 |
| Hispanic | 12.2 | 11.0 | 11.8 | 11.5 | 11.6 |
| American Indian/Alaska Native[a] | 1.6 | 2.6 | 2.0 | 1.6 | 1.9 |
| Asian/Native Hawaiian/Other Pacific Islander[a] | 1.3 | 1.4 | 0.9 | 1.2 | 1.2 |
| Other[a,b] | 0.1 | 0.3 | 0.6 | 0.2 | 0.3 |
| **Age** | 100% | 100% | 100% | 100% | 100% |
| 24 or younger | 22.9 | 19.6 | 16.0 | 11.0 | 17.1 |
| 25–34 | 31.2 | 28.8 | 32.8 | 32.9 | 31.5 |
| 35–44 | 30.1 | 30.0 | 26.2 | 28.6 | 28.6 |
| 45–54 | 12.3 | 16.5 | 17.6 | 18.4 | 16.3 |
| 55 or older | 3.3 | 4.9 | 7.3 | 9.0 | 6.3 |

Note: Excludes deaths in the combined jail and prison systems in Alaska, Connecticut, Delaware, Hawaii, Rhode Island, and Vermont. Details may not sum to totals due to rounding and missing data. Data may have been revised from previously published statistics. See *Methodology*.
[a]Excludes persons of Hispanic origin (e.g., "white" refers to non-Hispanic whites and "black" refers to non-Hispanic blacks).
[b]Includes persons of two or more races or other unspecified races.
Source: Bureau of Justice Statistics, Mortality in Correctional Institutions, 2000–19.

**TABLE 5**
**Average rate of suicides per 100,000 inmates in local jails, by demographic characteristics of inmates, 2000–19**

| Inmate characteristic | 2000–04 | 2005–09 | 2010–14 | 2015–19 | 2000–19 |
|---|---|---|---|---|---|
| Total | 46 | 36 | 44 | 48 | 43 |
| **Sex** | | | | | |
| Male | 48 | 38 | 46 | 49 | 45 |
| Female | 32 | 22 | 32 | 38 | 31 |
| **Race/ethnicity** | | | | | |
| White[a] | 90 | 70 | 91 | 93 | 86 |
| Black[a] | 16 | 15 | 18 | 18 | 16 |
| Hispanic | 30 | 21 | 24 | 26 | 25 |
| American Indian/Alaska Native[a] | 56 | 72 | 54 | 47 | 57 |
| Asian/Native Hawaiian/Other Pacific Islander[a] | 52 | 48 | 43 | 63 | 52 |
| Other[a,b] | 1 ! | 2 ! | 3 ! | 1 ! | 2 |
| **Age** | | | | | |
| 24 or younger | 36 | 25 | 27 | 20 | 27 |
| 25–34 | 44 | 33 | 43 | 45 | 41 |
| 35–44 | 53 | 46 | 55 | 65 | 54 |
| 45–54 | 53 | 45 | 56 | 62 | 54 |
| 55 or older | 65 | 55 | 80 | 103 | 78 |

Note: Rates are based on the annual number of suicides and the average daily population (ADP) in local jails. In 2000, the ADP was estimated by taking the average of January 1 and December 31 inmate population counts. Excludes deaths in the combined jail and prison systems in Alaska, Connecticut, Delaware, Hawaii, Rhode Island, and Vermont. Data may have been revised from previously published statistics. See *Methodology*.
! Interpret with caution. Estimate is based on 10 or fewer cases.
[a]Excludes persons of Hispanic origin (e.g., "white" refers to non-Hispanic whites and "black" refers to non-Hispanic blacks).
[b]Includes persons of two or more races or other unspecified races.
Source: Bureau of Justice Statistics, Annual Survey of Jails, 2000–19; Mortality in Correctional Institutions, 2000–19; National Inmate Survey, 2007–09 and 2011–12; and Survey of Inmates in Local Jails, 2002.

**TABLE 6**
**Percent of suicides in local jails, by criminal justice characteristics of inmates, 2000–19**

| Inmate characteristic | 2000–04 | 2005–09 | 2010–14 | 2015–19 | 2000–19 |
|---|---|---|---|---|---|
| Total suicides | 1,511 | 1,379 | 1,613 | 1,714 | 6,217 |
| **Legal status** | 100% | 100% | 100% | 100% | 100% |
| Convicted | 18.3 | 16.8 | 16.9 | 19.2 | 17.8 |
| Unconvicted | 72.7 | 75.0 | 79.3 | 79.2 | 76.7 |
| Other/unknown | 9.0 | 8.3 | 3.8 | 1.6 | 5.5 |
| **Most serious offense**[a] | 100% | 100% | 100% | 100% | 100% |
| Violent | 47.8 | 47.6 | 49.5 | 46.9 | 48.0 |
| Murder[b] | 12.0 | 10.8 | 10.0 | 9.7 | 10.6 |
| Kidnapping | 3.6 | 3.1 | 4.1 | 3.3 | 3.5 |
| Rape/sexual assault | 8.9 | 8.9 | 9.1 | 8.8 | 8.9 |
| Robbery | 5.2 | 5.6 | 5.4 | 4.0 | 5.0 |
| Assault | 13.9 | 17.0 | 18.4 | 18.1 | 16.9 |
| Other | 4.2 | 2.4 | 2.5 | 3.1 | 3.1 |
| Property | 18.6 | 18.4 | 19.1 | 18.1 | 18.6 |
| Burglary | 6.2 | 6.6 | 6.1 | 5.4 | 6.1 |
| Larceny/theft | 7.4 | 7.6 | 9.1 | 7.6 | 7.9 |
| Motor vehicle theft | 1.3 | 0.8 | 0.9 | 1.3 | 1.1 |
| Arson | 0.7 | 0.8 | 0.7 | 0.5 | 0.7 |
| Fraud | 3.1 | 2.5 | 2.2 | 3.4 | 2.8 |
| Drugs | 10.9 | 8.3 | 9.7 | 11.9 | 10.3 |
| Possession | 5.8 | 3.8 | 4.5 | 6.2 | 5.1 |
| Trafficking | 3.7 | 2.5 | 3.1 | 4.0 | 3.4 |
| Other/unknown | 1.4 | 2.0 | 2.2 | 1.8 | 1.8 |
| Public order | 20.1 | 20.4 | 17.9 | 19.2 | 19.3 |
| Weapons offense | 1.4 | 0.9 | 1.1 | 1.1 | 1.1 |
| Obstruction of justice | 3.3 | 3.9 | 3.5 | 5.4 | 4.1 |
| DUI/DWI | 2.3 | 2.8 | 2.2 | 1.8 | 2.2 |
| Traffic offense excluding DUI/DWI | 2.7 | 2.3 | 1.7 | 1.2 | 1.9 |
| Probation/parole violation and escape | 6.5 | 6.6 | 6.0 | 6.9 | 6.5 |
| Other | 3.9 | 4.0 | 3.5 | 2.7 | 3.5 |
| Other offenses/unreported | 2.7 | 5.3 | 3.7 | 3.9 | 3.9 |
| **Time served in jail on current admission** | 100% | 100% | 100% | 100% | 100% |
| Less than 1 day | 12.2 | 9.5 | 7.3 | 5.1 | 8.4 |
| 1 day | 9.6 | 9.4 | 10.0 | 6.8 | 8.9 |
| 2–7 days | 25.7 | 28.7 | 30.1 | 31.9 | 29.2 |
| 8–30 days | 16.9 | 14.9 | 19.7 | 22.4 | 18.7 |
| 31–60 days | 10.1 | 10.5 | 8.4 | 9.0 | 9.5 |
| 61–120 days | 9.2 | 11.9 | 10.0 | 9.9 | 10.2 |
| 121–180 days | 5.1 | 5.0 | 3.7 | 4.8 | 4.6 |
| More than 6 months | 9.9 | 9.4 | 10.6 | 9.9 | 10.0 |
| **Hold status**[c] | / | / | 100% | 100% | 100% |
| Local law enforcement/court | / | / | 94.5 | 88.9 | 91.6 |
| U.S. Immigration and Customs Enforcement | / | / | 0.8 | 0.8 | 0.8 |
| U.S. Marshals Service | / | / | 1.4 | 2.5 | 2.0 |
| Other authority[d] | / | / | 3.4 | 7.8 | 5.7 |

Note: Excludes deaths in the combined jail and prison systems in Alaska, Connecticut, Delaware, Hawaii, Rhode Island, and Vermont. Details may not sum to totals due to rounding and missing data. Data may have been revised from previously published statistics. See *Methodology*.
/Not collected.
[a]Refers to the most serious offense for which the individual is being held in jail, where violent offenses are most serious, followed by property, drug, public order, and all other offenses.
[b]Includes nonnegligent manslaughter.
[c]Includes contractual, temporary, courtesy, or ad hoc holds for federal, local, or state authorities. A jail inmate may have multiple hold statuses. The 2000–19 category reflects 2010–19 percentages because these data were first collected in 2010.
[d]Includes state or federal prison, the Bureau of Indian Affairs, or any other jail jurisdiction.
Source: Bureau of Justice Statistics, Mortality in Correctional Institutions, 2000–19.

**TABLE 7**
**Percent of suicides in local jails, by circumstances of death, 2000–19**

| Circumstance of death | 2000–04 | 2005–09 | 2010–14 | 2015–19 | 2000–19 |
|---|---|---|---|---|---|
| Total suicides | 1,511 | 1,379 | 1,613 | 1,714 | 6,217 |
| Time of death | 100% | 100% | 100% | 100% | 100% |
| Morning (6 a.m.–12 p.m.) | 18.9 | 20.5 | 20.8 | 18.8 | 19.7 |
| Afternoon (12 p.m.–6 p.m.) | 25.0 | 26.9 | 28.8 | 31.3 | 28.2 |
| Evening (6 p.m.–12 a.m.) | 27.0 | 26.3 | 27.8 | 26.4 | 26.9 |
| Overnight (12 a.m.–6 a.m.) | 27.2 | 23.7 | 21.6 | 22.2 | 23.6 |
| Method of suicide | / | / | 100% | 100% | 100% |
| Suffocation[a] | / | / | 85.6 | 91.4 | 88.6 |
| Exsanguination[b] | / | / | 1.4 | 1.2 | 1.3 |
| Poisoning[c] | / | / | 2.1 | 0.9 | 1.5 |
| Firearm | / | / | 0.7 | 0.3 | 0.5 |
| Other[d] | / | / | 10.2 | 6.2 | 8.2 |
| Location of suicide event[e] | 100% | 100% | 100% | 100% | 100% |
| Inmate's cell/room | 79.4 | 80.1 | 72.5 | 72.6 | 72.5 |
| Temporary housing | 9.1 | 8.6 | 6.1 | 5.5 | 5.8 |
| Common area within jail facility[f] | 4.0 | 4.2 | 4.2 | 4.5 | 4.3 |
| Segregation unit | / | / | 8.1 | 8.1 | 8.1 |
| Special medical unit/infirmary | / | / | 3.3 | 3.0 | 3.2 |
| Special mental health services unit | / | / | 1.0 | 1.3 | 1.1 |
| Elsewhere within jail facility | / | / | 1.7 | 1.9 | 1.8 |
| Outside of jail facility | 1.1 | 0.6 | 0.6 | 0.9 | 0.8 |
| Other | 5.2 | 5.2 | 1.9 | 0.6 | 1.3 |
| Inmate had an overnight stay in a mental health facility after jail admission | / | / | 100% | 100% | 100% |
| Yes | / | / | 14.3 | 13.6 | 13.9 |
| No | / | / | 71.4 | 72.2 | 71.8 |
| Unknown | / | / | 14.1 | 14.1 | 14.1 |

Note: Excludes deaths in the combined jail and prison systems in Alaska, Connecticut, Delaware, Hawaii, Rhode Island, and Vermont. Details may not sum to totals due to rounding and missing data. Data have been revised from previously published statistics. The 2000–19 category reflects 2010–19 percentages because data were first collected in 2010. See *Methodology*.

/Not collected.

[a]Includes hanging, strangulation, asphyxia, anoxia, and other methods of reducing oxygen intake.

[b]Includes all types of sharp force trauma or other injuries that cause acute loss of blood.

[c]Includes drug overdoses and ingestion or use of other poisonous substances.

[d]Includes self-inflicted blunt force trauma, dehydration, and unknown or unreported causes.

[e]Location where inmate attempted to commit suicide. May not reflect actual location of death.

[f]Includes temporary holding areas or lockups and common areas within the facility, such as jail yards, cafeterias, or kitchens.

Source: Bureau of Justice Statistics, Mortality in Correctional Institutions, 2000–19.

**TABLE 8**
**Percent of local jails, by number of suicides and facility characteristics, 2019**

| Facility characteristic | Number of jail facilities | Total | No suicides | 1 suicide | 2 or more suicides |
|---|---|---|---|---|---|
| Total | 3,116 | 3,116 | 2,834 | 226 | 56 |
| **Jail operator** | | | | | |
| County | 2,693 | 100% | 90.8% | 7.4% | 1.8% |
| City | 310 | 100% | 93.1 | 5.3 | 1.7 |
| Regional | 79 | 100% | 89.3 | 10.7 | 0.0 |
| Private | 34 | 100% | 87.7 | 3.4 | 8.9 |
| **Inmate sex** | | | | | |
| Both male and female | 2,763 | 100% | 90.5% | 7.7% | 1.9% |
| Female only | 10 | 100% | 90.5 | 9.6 | 0.0 |
| Male only | 276 | 100% | 95.0 | 3.9 | 1.1 |
| **Jail purpose[a]** | | | | | |
| Temporary holding place for detainment of up to 72 hours | 1,659 | 100% | 91.3% | 7.0% | 1.8% |
| Detention facility with authority to hold for more than 72 hours | 2,864 | 100% | 90.7 | 7.4 | 1.9 |
| Correctional facility for felons with sentences of more than 1 year | 1,027 | 100% | 88.2 | 9.3 | 2.5 |
| **Jail function[b]** | | | | | |
| General adult confinement | 3,032 | 100% | 90.8% | 7.4% | 1.8% |
| Confinement of persons returned to custody | 2,897 | 100% | 90.5 | 7.6 | 1.9 |
| Work release/prerelease | 1,603 | 100% | 91.4 | 6.8 | 1.8 |
| Reception/diagnosis/classification | 1,627 | 100% | 88.5 | 8.8 | 2.7 |
| Juvenile confinement | 339 | 100% | 83.5 | 10.5 | 6.0 |
| Medical treatment/hospitalization | 655 | 100% | 83.1 | 11.9 | 5.0 |
| Mental health/psychiatric care | 794 | 100% | 83.8 | 11.6 | 4.5 |
| Alcohol treatment | 472 | 100% | 85.4 | 10.3 | 4.2 |
| Drug treatment | 513 | 100% | 84.9 | 11.0 | 4.1 |
| Boot camp | 9 | 100% | 77.8 | 0.0 | 22.2 |
| Protective custody | 1,152 | 100% | 86.4 | 10.3 | 3.3 |
| **Capacity[b]** | | | | | |
| Jail facilities operating at 100% capacity or less | 2,646 | 100% | 91.5% | 6.9% | 1.6% |
| Jail facilities operating at more than 100% capacity | 470 | 100% | 87.3 | 9.5 | 3.2 |
| Median rated capacity | | | 110 beds | 305 beds | 1,296 beds |
| Mean rated capacity | | | 244.4 | 561.5 | 1,540.4 |

Note: See *Terms and definitions* for the distinctions between jail jurisdictions, jail reporting units, and jail facilities. Includes jails with a suicide in their facilities, single-jail jurisdictions with a suicide whose location of death was at an outside medical facility or hospital, and multiple-jail jurisdictions with a suicide whose location of death was outside the facility but whose death record specified a facility associated with that death. Excludes one facility and seven jurisdictions for which the suicide could not be linked to a specific jail facility in the 2019 Census of Local Jails. Excludes deaths in the combined jail and prison systems in Alaska, Connecticut, Delaware, Hawaii, Rhode Island, and Vermont. Details may not sum to totals due to rounding and missing data. Data may have been revised from previously published statistics. See *Methodology*.
[a]Jail facilities can have multiple purposes and functions.
[b]As of midyear (last weekday in June). Facilities operating above 100% capacity held more inmates than their rated or design capacity. See *Terms and definitions*.
Source: Bureau of Justice Statistics, Census of Local Jails, 2019; and Mortality in Correctional Institutions, 2019.

**TABLE 9**
**Percent of local jail jurisdictions, by number of suicides and population characteristics, 2019**

| Population characteristic | Number of jail jurisdictions | Total | No suicides | 1 suicide | 2 or more suicides |
|---|---|---|---|---|---|
| Total | 2,845 | 2,845 | 2,566 | 217 | 61 |
| **Average daily population** | | | | | |
| 49 or fewer inmates | 1,002 | 100% | 97.2% | 2.8% | <0.1% |
| 50–99 | 514 | 100% | 95.0 | 4.8 | 0.2 |
| 100–249 | 643 | 100% | 91.3 | 7.5 | 1.1 |
| 250–499 | 348 | 100% | 84.4 | 13.2 | 1.2 |
| 500–999 | 202 | 100% | 77.6 | 19.7 | 2.7 |
| 1,000–2,499 | 113 | 100% | 49.1 | 23.1 | 27.8 |
| 2,500 or more | 23 | 100% | 46.1 | 18.1 | 35.8 |
| **Felony status** | | | | | |
| 50% or more are felons | 2,026 | 100% | 89.5% | 8.0% | 2.6% |
| Less than 50% are felons | 819 | 100% | 92.0 | 6.9 | 1.1 |
| **Conviction status** | | | | | |
| 50% or more are unconvicted | 2,105 | 100% | 89.2% | 8.3% | 2.5% |
| Less than 50% are unconvicted | 740 | 100% | 93.0 | 5.9 | 1.1 |
| **Inmates per correctional staff member** | | | 3.8 inmates | 4.4 inmates | 4.6 inmates |
| **Inmates per any staff member** | | | 3.0 inmates | 3.4 inmates | 3.6 inmates |
| **Annual admissions per inmate in custody on June 30, 2019\*** | | | 15 admissions | 14 admissions | 11 admissions |

Note: See *Terms and definitions* for the distinctions between jail jurisdictions, jail reporting units, and jail facilities. Details may not sum to totals due to rounding and missing data. Excludes deaths in the combined jail and prison systems in Alaska, Connecticut, Delaware, Hawaii, Rhode Island, and Vermont. Data may have been revised from previously published statistics. See *Methodology*.

\*Includes persons officially booked into jail facilities by a formal legal document and the authority of the courts or some other official agency, repeat offenders booked on new charges, and persons serving weekend sentences when they come into jail for the first weekend.

Source: Bureau of Justice Statistics, Census of Local Jails, 2019; and Mortality in Correctional Institutions, 2019.

**TABLE 10**
**Aggregated number of suicides in state and federal prisons, by state and region, 2001–19**

|  | 2001–04 | 2005–09 | 2010–14 | 2015–19 | 2001–19 |
|---|---|---|---|---|---|
| U.S. total | 786 | 1,131 | 1,131 | 1,477 | 4,525 |
| **Federal** | 52 | 85 | 85 | 120 | 342 |
| **State total** | 734 | 1,046 | 1,046 | 1,357 | 4,183 |
| **Northeast** | 124 | 183 | 194 | 196 | 697 |
| Connecticut | 22 | 20 | 18 | 20 | 80 |
| Delaware | 6 | 9 | 10 | 8 | 33 |
| Maine | 1 | 1 | 1 | 1 | 4 |
| Massachusetts | 4 | 21 | 22 | 14 | 61 |
| New Hampshire | 7 | 1 | 3 | 1 | 12 |
| New Jersey | 10 | 20 | 16 | 7 | 53 |
| New York | 43 | 64 | 71 | 69 | 247 |
| Pennsylvania | 19 | 41 | 43 | 66 | 169 |
| Rhode Island | 7 | 6 | 8 | 6 | 27 |
| Vermont | 5 | 0 | 2 | 4 | 11 |
| **Midwest** | 162 | 196 | 202 | 225 | 785 |
| Illinois | 32 | 33 | 37 | 35 | 137 |
| Indiana | 14 | 25 | 18 | 30 | 87 |
| Iowa | 10 | 6 | 9 | 9 | 34 |
| Kansas | 9 | 3 | 6 | 13 | 31 |
| Michigan | 26 | 34 | 48 | 26 | 134 |
| Minnesota | 7 | 8 | 7 | 5 | 27 |
| Missouri | 10 | 26 | 16 | 20 | 72 |
| Nebraska | 1 | 2 | 10 | 7 | 20 |
| North Dakota | 1 | 0 | 0 | 3 | 4 |
| Ohio | 24 | 30 | 35 | 45 | 134 |
| South Dakota | 5 | 3 | 5 | 4 | 17 |
| Wisconsin | 23 | 26 | 11 | 28 | 88 |
| **South** | 232 | 371 | 343 | 631 | 1,577 |
| Alabama | 4 | 6 | 10 | 26 | 46 |
| Arkansas | 11 | 13 | 8 | 31 | 63 |
| Florida | 19 | 43 | 39 | 96 | 197 |
| Georgia | 22 | 30 | 19 | 74 | 145 |
| Kentucky | 4 | 7 | 6 | 8 | 25 |
| Louisiana | 3 | 12 | 11 | 16 | 42 |
| Maryland | 19 | 29 | 16 | 18 | 82 |
| Mississippi | 8 | 12 | 10 | 28 | 58 |
| North Carolina | 12 | 14 | 11 | 31 | 68 |
| Oklahoma | 6 | 26 | 30 | 30 | 92 |
| South Carolina | 7 | 13 | 20 | 39 | 79 |
| Tennessee | 8 | 20 | 14 | 35 | 77 |
| Texas | 91 | 133 | 133 | 170 | 527 |
| Virginia | 15 | 13 | 14 | 23 | 65 |
| West Virginia | 3 | 0 | 2 | 6 | 11 |
| **West** | 216 | 296 | 307 | 305 | 1,124 |
| Alaska | 6 | 7 | 9 | 14 | 36 |
| Arizona | 16 | 32 | 40 | 35 | 123 |
| California | 114 | 172 | 162 | 148 | 596 |
| Colorado | 13 | 17 | 23 | 26 | 79 |
| Hawaii | 8 | 7 | 7 | 6 | 28 |
| Idaho | 8 | 7 | 11 | 13 | 39 |
| Montana | 5 | 4 | 5 | 5 | 19 |

*Continued on next page*

**TABLE 10 (continued)**
**Aggregated number of suicides in state and federal prisons, by state and region, 2001–19**

|  | 2001–04 | 2005–09 | 2010–14 | 2015–19 | 2001–19 |
|---|---|---|---|---|---|
| Nevada | 6 | 11 | 11 | 12 | 40 |
| New Mexico | 6 | 9 | 6 | 8 | 29 |
| Oregon | 10 | 11 | 9 | 7 | 37 |
| Utah | 11 | 10 | 10 | 10 | 41 |
| Washington | 11 | 8 | 12 | 17 | 48 |
| Wyoming | 2 | 1 | 2 | 4 | 9 |

Note: For details on regions, see U.S. Census Bureau. (n.d.). *Census regions and divisions of the United States.* https://www2.census.gov/geo/pdfs/maps-data/maps/reference/us_regdiv.pdf. State counts include deaths in publicly and privately operated state facilities and in the combined jail and prison systems in Alaska, Connecticut, Delaware, Hawaii, Rhode Island, and Vermont. Federal counts include deaths in Federal Bureau of Prisons (BOP) facilities and exclude deaths in privately operated federal facilities. As of December 30, 2001, sentenced felons from the District of Columbia were the responsibility of the BOP. Data may have been revised from previously published statistics. See *Methodology.*

Source: Bureau of Justice Statistics, Federal Law Enforcement Agency Deaths in Custody Reporting Program, 2015–19; Mortality in Correctional Institutions, 2001–19; and National Prisoner Statistics program, 2001–14.

**TABLE 11**
**Average rate of suicides per 100,000 prisoners in state and federal prisons, by state and region, 2001–19**

|  | 2001–04 | 2005–09 | 2010–14 | 2015–19 | 2001–19 |
|---|---|---|---|---|---|
| U.S. total | 14 | 15 | 15 | 21 | 16 |
| **Federal** | 8 | 9 | 8 | 13 | 9 |
| **State total** | 15 | 16 | 16 | 22 | 18 |
| **Northeast** | 18 | 20 | 23 | 26 | 22 |
| Connecticut | 30 | 21 | 21 | 28 | 25 |
| Delaware | 22 ! | 26 ! | 30 ! | 27 ! | 27 |
| Maine | 13 ! | 10 ! | 10 ! | 9 ! | 10 ! |
| Massachusetts | 10 ! | 39 | 40 | 32 | 32 |
| New Hampshire | 72 ! | 7 ! | 23 ! | 8 ! | 24 |
| New Jersey | 10 ! | 16 | 14 | 7 ! | 12 |
| New York | 16 | 21 | 26 | 29 | 23 |
| Pennsylvania | 12 | 18 | 17 | 28 | 19 |
| Rhode Island | 52 ! | 33 ! | 51 ! | 44 ! | 44 ! |
| Vermont | 80 ! | 0 | 20 ! | 49 ! | 31 ! |
| **Midwest** | 17 | 15 | 15 | 18 | 16 |
| Illinois | 18 | 15 | 15 | 17 | 16 |
| Indiana | 17 | 20 | 13 | 22 | 18 |
| Iowa | 30 ! | 14 ! | 20 ! | 20 ! | 20 |
| Kansas | 25 ! | 7 ! | 13 ! | 27 | 18 |
| Michigan | 13 | 14 | 22 | 13 | 16 |
| Minnesota | 24 ! | 18 ! | 15 ! | 11 ! | 16 |
| Missouri | 8 ! | 17 | 10 | 13 | 12 |
| Nebraska | 6 ! | 9 ! | 41 ! | 27 ! | 23 |
| North Dakota | 23 ! | 0 | 0 | 36 ! | 15 ! |
| Ohio | 13 | 12 | 14 | 18 | 14 |
| South Dakota | 42 ! | 18 ! | 28 ! | 21 ! | 26 |
| Wisconsin | 27 | 23 | 10 | 24 | 21 |
| **South** | 11 | 13 | 12 | 24 | 15 |
| Alabama | 4 ! | 5 ! | 7 ! | 23 | 10 |
| Arkansas | 23 | 20 | 11 | 39 | 24 |
| Florida | 6 | 9 | 8 | 20 | 11 |
| Georgia | 11 | 11 | 8 | 31 | 15 |
| Kentucky | 8 | 9 | 9 | 13 | 10 |
| Louisiana | 4 | 12 | 12 | 20 | 12 |
| Maryland | 20 | 26 | 14 | 18 | 20 |
| Mississippi | 13 ! | 14 | 13 ! | 41 | 20 |
| North Carolina | 9 | 7 | 6 | 17 | 10 |
| Oklahoma | 7 ! | 22 | 24 | 22 | 20 |
| South Carolina | 8 ! | 11 | 18 | 40 | 19 |
| Tennessee | 11 ! | 21 | 14 | 34 | 21 |
| Texas | 15 | 17 | 17 | 23 | 18 |
| Virginia | 12 | 8 | 9 | 15 | 11 |
| West Virginia | 20 ! | 0 | 7 ! | 20 ! | 12 |
| **West** | 19 | 19 | 22 | 23 | 21 |
| Alaska | 33 ! | 27 ! | 31 ! | 61 | 38 |
| Arizona | 13 | 17 | 20 | 17 | 17 |
| California | 18 | 20 | 23 | 23 | 21 |
| Colorado | 17 | 15 | 22 | 26 | 20 |
| Hawaii | 38 ! | 26 ! | 26 ! | 23 ! | 28 |
| Idaho | 36 ! | 20 ! | 30 | 34 | 30 |
| Montana | 44 ! | 27 ! | 32 ! | 29 ! | 32 |

*Continued on next page*

**TABLE 11 (continued)**
**Average rate of suicides per 100,000 prisoners in state and federal prisons, by state and region, 2001–19**

|  | 2001–04 | 2005–09 | 2010–14 | 2015–19 | 2001–19 |
|---|---|---|---|---|---|
| Nevada | 14 ! | 17 | 18 | 18 | 17 |
| New Mexico | 25 ! | 28 ! | 18 ! | 23 ! | 23 |
| Oregon | 21 ! | 16 | 13 ! | 10 ! | 14 |
| Utah | 62 | 39 ! | 37 ! | 41 ! | 43 |
| Washington | 17 | 9 ! | 14 | 19 | 15 |
| Wyoming | 31 ! | 11 ! | 18 ! | 33 ! | 23 ! |

Note: For details on regions, see U.S. Census Bureau. (n.d.). *Census regions and divisions of the United States.* https://www2.census.gov/geo/pdfs/maps-data/maps/reference/us_regdiv.pdf. Rates are based on the annual number of suicides and the December 31 custody population in state or federal prisons. State rates include deaths and populations in publicly and privately operated state facilities and in the combined jail and prison systems in Alaska, Connecticut, Delaware, Hawaii, Rhode Island, and Vermont. Federal rates include deaths and populations in Federal Bureau of Prisons (BOP) facilities and exclude deaths and populations in privately operated federal facilities. As of December 30, 2001, sentenced felons from the District of Columbia were the responsibility of the BOP. Data may have been revised from previously published statistics. See *Methodology*.

! Interpret with caution. Estimate is based on 10 or fewer cases.

Source: Bureau of Justice Statistics, Federal Law Enforcement Agency Deaths in Custody Reporting Program, 2015–19; Mortality in Correctional Institutions, 2001–19; and National Prisoner Statistics program, 2001–19.

## TABLE 12
**Percent of suicides in state prisons, by demographic characteristics of prisoners, 2001–19**

| Prisoner characteristic | 2001–04 | 2005–09 | 2010–14 | 2015–19 | 2001–19 |
|---|---|---|---|---|---|
| Total suicides | 734 | 1,046 | 1,046 | 1,357 | 4,183 |
| Sex | 100% | 100% | 100% | 100% | 100% |
| Male | 94.7 | 95.5 | 93.8 | 95.1 | 94.8 |
| Female | 5.3 | 4.5 | 6.2 | 4.9 | 5.2 |
| Race/ethnicity | 100% | 100% | 100% | 100% | 100% |
| White[a] | 57.4 | 59.3 | 60.1 | 57.0 | 58.4 |
| Black[a] | 23.2 | 19.5 | 18.7 | 23.7 | 21.3 |
| Hispanic | 15.0 | 17.6 | 15.6 | 14.7 | 15.7 |
| American Indian/Alaska Native[a] | 1.2 | 1.1 | 2.3 | 1.8 | 1.7 |
| Asian/Native Hawaiian/Other Pacific Islander[a] | 2.2 | 1.9 | 2.6 | 1.9 | 2.1 |
| Other[a,b] | 0.7 | 0.3 | 0.2 | 0.4 | 0.4 |
| Age | 100% | 100% | 100% | 100% | 100% |
| 24 or younger | 16.9 | 13.6 | 11.1 | 10.5 | 12.5 |
| 25–34 | 35.6 | 31.7 | 31.1 | 31.0 | 32.0 |
| 35–44 | 29.0 | 29.9 | 25.9 | 29.7 | 28.7 |
| 45–54 | 13.8 | 18.4 | 21.5 | 17.5 | 18.1 |
| 55 or older | 4.8 | 6.4 | 10.4 | 11.2 | 8.7 |

Note: Includes deaths in publicly and privately operated state facilities and in the combined jail and prison systems in Alaska, Connecticut, Delaware, Hawaii, Rhode Island, and Vermont. Details may not sum to totals due to rounding and missing data. As of December 30, 2001, sentenced felons from the District of Columbia were the responsibility of the Federal Bureau of Prisons. Data may have been revised from previously published statistics. See *Methodology*.
[a]Excludes persons of Hispanic origin (e.g., "white" refers to non-Hispanic whites and "black" refers to non-Hispanic blacks).
[b]Includes persons of two or more races or other unspecified races.
Source: Bureau of Justice Statistics, Mortality in Correctional Institutions, 2001–19.

## TABLE 13
**Average rate of suicides per 100,000 prisoners in state prisons, by demographic characteristics of prisoners, 2001–19**

| Prisoner characteristic | 2001–04 | 2005–09 | 2010–14 | 2015–19 | 2001–19 |
|---|---|---|---|---|---|
| Total | 15 | 16 | 16 | 22 | 18 |
| Sex | | | | | |
| Male | 15 | 16 | 16 | 23 | 18 |
| Female | 12 | 10 | 15 | 15 | 13 |
| Race/ethnicity | | | | | |
| White[a] | 25 | 28 | 30 | 41 | 31 |
| Black[a] | 8 | 8 | 9 | 16 | 10 |
| Hispanic | 12 | 15 | 13 | 15 | 14 |
| American Indian/Alaska Native[a] | 11 ! | 11 | 28 | 29 | 19 |
| Asian/Native Hawaiian/Other Pacific Islander[a] | 33 | 32 | 40 | 36 | 35 |
| Other[a,b] | 3 ! | 1 ! | <0.5 ! | 1 ! | 1 ! |
| Age | | | | | |
| 24 or younger | 14 | 14 | 13 | 23 | 15 |
| 25–34 | 16 | 7 | 15 | 21 | 17 |
| 35–44 | 15 | 18 | 17 | 25 | 18 |
| 45–54 | 15 | 27 | 19 | 22 | 18 |
| 55 or older | 16 | 48 | 19 | 20 | 19 |

Note: Rates are based on the annual number of suicides and the December 31 custody population in state prisons. Includes deaths and populations in publicly and privately operated state facilities and in the combined jail and prison systems in Alaska, Connecticut, Delaware, Hawaii, Rhode Island, and Vermont. As of December 30, 2001, sentenced felons from the District of Columbia were the responsibility of the Federal Bureau of Prisons. Data may have been revised from previously published statistics. See *Methodology*.
! Interpret with caution. Estimate is based on 10 or fewer cases.
[a]Excludes persons of Hispanic origin (e.g., "white" refers to non-Hispanic whites and "black" refers to non-Hispanic blacks).
[b]Includes persons of two or more races or other unspecified races.
Source: Bureau of Justice Statistics, Mortality in Correctional Institutions, 2001–19; and National Prisoner Statistics program, 2001–19.

**TABLE 14**
**Percent of suicides in state prisons, by criminal justice characteristics of prisoners, 2001–19**

| Prisoner characteristic | 2001–04 | 2005–09 | 2010–14 | 2015–19 | 2001–19 |
|---|---|---|---|---|---|
| Total suicides | 734 | 1,046 | 1,046 | 1,357 | 4,183 |
| Most serious offense[a] | 100% | 100% | 100% | 100% | 100% |
| Violent | 69.1 | 71.4 | 74.3 | 71.9 | 71.9 |
| Murder[b] | 26.3 | 29.3 | 32.9 | 29.0 | 29.6 |
| Kidnapping | 3.5 | 2.7 | 3.0 | 3.7 | 3.2 |
| Rape/sexual assault | 15.0 | 14.9 | 14.3 | 13.5 | 14.3 |
| Robbery | 11.0 | 9.8 | 11.5 | 11.9 | 11.1 |
| Assault | 11.2 | 13.1 | 11.5 | 12.2 | 12.1 |
| Other | 2.0 | 1.7 | 1.2 | 1.6 | 1.6 |
| Property | 16.9 | 14.5 | 15.0 | 14.1 | 14.9 |
| Burglary | 9.1 | 8.0 | 7.9 | 7.7 | 8.1 |
| Larceny/theft | 3.4 | 2.5 | 3.4 | 3.8 | 3.3 |
| Motor vehicle theft | 1.2 | 1.0 | 0.8 | 0.7 | 0.9 |
| Arson | 0.8 | 1.4 | 1.4 | 1.0 | 1.2 |
| Fraud | 2.3 | 1.6 | 1.5 | 1.0 | 1.5 |
| Drugs | 8.5 | 5.8 | 4.3 | 4.4 | 5.4 |
| Possession | 2.7 | 2.6 | 2.2 | 2.1 | 2.3 |
| Trafficking | 4.8 | 2.4 | 1.4 | 2.0 | 2.4 |
| Other/unknown | 1.0 | 0.9 | 0.7 | 0.3 | 0.7 |
| Public order | 4.0 | 5.9 | 4.7 | 7.7 | 5.9 |
| Weapons offense | 1.2 | 1.4 | 1.7 | 2.1 | 1.7 |
| Obstruction of justice | 0.7 | 0.8 | 0.7 | 1.6 | 1.0 |
| DUI/DWI | 0.7 | 1.2 | 0.7 | 1.0 | 0.9 |
| Traffic offense excluding DUI/DWI | 0.4 | 0.2 | 0.1 | 0.2 | 0.2 |
| Probation/parole violation and escape | 0.4 | 1.4 | 0.6 | 1.0 | 0.9 |
| Other | 0.5 | 1.0 | 1.0 | 1.8 | 1.2 |
| Other offenses/unknown | 1.6 | 2.3 | 1.7 | 2.0 | 1.9 |
| Time served in prison on current sentence | 100% | 100% | 100% | 100% | 100% |
| 1 week or less | 4.1 | 3.6 | 2.9 | 3.2 | 3.4 |
| 1.1 weeks–1 month | 4.2 | 4.8 | 4.8 | 3.7 | 4.3 |
| 1.1–6 months | 16.4 | 13.6 | 11.7 | 10.8 | 12.7 |
| 6.1 months–1 year | 12.5 | 10.7 | 8.6 | 7.0 | 9.3 |
| 1.1–5 years | 31.6 | 29.3 | 30.4 | 32.0 | 30.8 |
| 5.1–10 years | 17.7 | 18.3 | 17.1 | 18.3 | 17.9 |
| 10.1 years or more | 13.2 | 19.5 | 24.2 | 24.6 | 21.2 |

Note: Includes deaths in publicly and privately operated state facilities and in the combined jail and prison systems in Alaska, Connecticut, Delaware, Hawaii, Rhode Island, and Vermont. As of December 30, 2001, sentenced felons from the District of Columbia were the responsibility of the Federal Bureau of Prisons. Details may not sum to totals due to rounding and missing data. Data may have been revised from previously published statistics. See *Methodology*.
[a]For prisoners convicted of more than one crime, the most serious offense is the one that carries the longest sentence.
[b]Includes nonnegligent manslaughter.
Source: Bureau of Justice Statistics, Mortality in Correctional Institutions, 2001–19.

**TABLE 15**
**Percent of suicides in state prisons, by circumstances of death, 2001–19**

| Circumstance of death | 2001–04 | 2005–09 | 2010–14 | 2015–19 | 2001–19 |
|---|---|---|---|---|---|
| **Total suicides** | 734 | 1,046 | 1,046 | 1,357 | 4,183 |
| **Time of death** | 100% | 100% | 100% | 100% | 100% |
| Morning (6 a.m.–12 p.m.) | 19.6 | 22.8 | 24.4 | 24.8 | 23.3 |
| Afternoon (12 p.m.–6 p.m.) | 27.1 | 27.9 | 28.0 | 29.6 | 28.4 |
| Evening (6 p.m.–12 a.m.) | 24.5 | 25.3 | 25.1 | 25.9 | 25.3 |
| Overnight (12 a.m.–6 a.m.) | 23.2 | 20.6 | 20.9 | 18.3 | 20.4 |
| **Method of suicide** | / | / | 100% | 100% | 100% |
| Suffocation[a] | / | / | 86.4 | 88.2 | 87.4 |
| Exsanguination[b] | / | / | 3.6 | 3.9 | 3.8 |
| Poisoning[c] | / | / | 4.6 | 3.5 | 4.0 |
| Firearm | / | / | 0.2 | 0.0 | 0.1 |
| Other[d] | / | / | 4.9 | 4.0 | 4.4 |
| **Location of suicide event[e]** | 100% | 100% | 100% | 100% | 100% |
| Prisoner's cell/room | 78.6 | 79.9 | 74.8 | 75.7 | 75.3 |
| Special medical/mental health services unit | / | / | 5.9 | 4.4 | 5.1 |
| Segregation unit[f] | / | / | 9.4 | 10.8 | 10.2 |
| Elsewhere within prison facility[g] | 7.1 | 6.4 | 5.2 | 6.8 | 6.1 |
| Outside of prison facility[h] | 1.9 | 1.9 | 1.6 | 0.2 | 0.8 |
| Other[i] | 4.5 | 3.1 | 0.8 | 0.7 | 0.7 |
| **Prisoner had an overnight stay in a mental health facility after prison admission** | / | / | 100% | 100% | 100% |
| Yes | / | / | 18.6 | 12.4 | 15.1 |
| No | / | / | 47.1 | 54.6 | 51.4 |
| Unknown | / | / | 30.6 | 32.4 | 31.6 |

Note: Includes deaths in publicly and privately operated state facilities and in the combined jail and prison systems in Alaska, Connecticut, Delaware, Hawaii, Rhode Island, and Vermont. As of December 30, 2001, sentenced felons from the District of Columbia were the responsibility of the Federal Bureau of Prisons. Details may not sum to totals due to rounding and missing data. Data may have been revised from previously published statistics. The 2001–19 category reflects 2010–19 percentages because data were first collected in 2010. See *Methodology*.
/Not collected.
[a]Includes hanging, strangulation, asphyxia, anoxia, and other methods of reducing oxygen intake.
[b]Includes all types of sharp force trauma or other injuries that cause acute loss of blood.
[c]Includes drug overdoses and ingestion or use of other poisonous substances.
[d]Includes self-inflicted blunt force trauma, dehydration, and unknown or unreported causes.
[e]Location where prisoner attempted to commit suicide. May not reflect actual location of death.
[f]Includes prisoners on death row.
[g]Includes temporary holding areas or lockups and common areas within the facility, such as prison yards, cafeterias, or kitchens.
[h]Includes community medical or mental health facilities not associated with the prison.
[i]Includes deaths that occurred while in transit to an external medical or mental health center.
Source: Bureau of Justice Statistics, Mortality in Correctional Institutions, 2001–19.

**TABLE 16**

**Percent of suicides in federal prisons, by demographic characteristics of prisoners, 2015–19**

| Prisoner characteristic | 2015–19 |
|---|---|
| Total suicides | 120 |
| **Sex** | 100% |
| Male | 98.3 |
| Female | 1.7 |
| **Race/ethnicity** | 100% |
| White[a] | 59.2 |
| Black[a] | 17.5 |
| Hispanic | 11.7 |
| American Indian/Alaska Native[a] | 9.2 |
| Asian/Native Hawaiian/Other Pacific Islander[a] | 2.5 |
| Other[a,b] | 0.0 |
| **Age** | 100% |
| 24 or younger | 2.5 |
| 25–34 | 20.0 |
| 35–44 | 35.8 |
| 45–54 | 25.8 |
| 55 or older | 15.8 |

Note: Includes deaths in Federal Bureau of Prisons (BOP) facilities and excludes deaths in privately operated federal facilities. As of December 30, 2001, sentenced felons from the District of Columbia were the responsibility of the BOP. Details may not sum to totals due to rounding and missing data. Data may have been revised from previously published statistics. See *Methodology*.

[a]Excludes persons of Hispanic origin (e.g., "white" refers to non-Hispanic whites and "black" refers to non-Hispanic blacks).

[b]Includes persons of two or more races or other unspecified races.

Source: Bureau of Justice Statistics, Federal Law Enforcement Agency Deaths in Custody Reporting Program, 2015–19.

**TABLE 17**

**Average rate of suicides per 100,000 prisoners in federal prisons, by demographic characteristics of prisoners, 2015–19**

| Prisoner characteristic | 2015–19 |
|---|---|
| Total | 16 |
| **Sex** | |
| Male | 17 |
| Female | 4 |
| **Race/ethnicity** | |
| White[a] | 43 |
| Black[a] | 9 |
| Hispanic | 5 |
| American Indian/Alaska Native[a] | 77 |
| Asian/Native Hawaiian/Other Pacific Islander[a] | 26 ! |
| Other[a,b] | 0 |
| **Age** | |
| 24 or younger | 9 ! |
| 25–34 | 11 |
| 35–44 | 16 |
| 45–54 | 19 |
| 55 or older | 21 |

Note: Rates are based on the annual number of suicides and the December 31 custody population in federal prisons. Includes deaths and populations in Federal Bureau of Prisons (BOP) facilities and excludes deaths and populations in privately operated federal facilities. As of December 30, 2001, sentenced felons from the District of Columbia were the responsibility of the BOP. Data may have been revised from previously published statistics. See *Methodology*.

! Interpret with caution. Estimate is based on 10 or fewer cases.

[a]Excludes persons of Hispanic origin (e.g., "white" refers to non-Hispanic whites and "black" refers to non-Hispanic blacks).

[b]Includes persons of two or more races or other unspecified races.

Source: Bureau of Justice Statistics, Federal Law Enforcement Agency Deaths in Custody Reporting Program, 2015–19; and National Prisoner Statistics program, 2015–19.

**TABLE 18**

**Percent of suicides in federal prisons, by criminal justice characteristics of prisoners, 2015–19**

| Prisoner characteristic | 2015–19 |
|---|---|
| Total suicides | 120 |
| Most serious offense[a] | 100% |
| Homicide/aggravated assault | 10.0 |
| Sex offense | 19.2 |
| Robbery | 10.8 |
| Drugs | 13.3 |
| Burglary/larceny | 6.7 |
| Fraud/bribery/extortion | 3.3 |
| Weapons/explosives | 20.0 |
| Immigration | 3.3 |
| Court charge | 0.8 |
| Time served in prison on current sentence | 100% |
| 1 week or less | 0.8 |
| 1.1 weeks–1 month | 3.3 |
| 1.1–6 months | 9.2 |
| 6.1 months–1 year | 7.5 |
| 1.1–5 years | 33.3 |
| 5.1–10 years | 18.3 |
| 10.1 years or more | 12.5 |
| Hold status | 100% |
| Federal prison | 76.7 |
| Other authority[b] | 10.8 |

Note: Includes deaths in Federal Bureau of Prisons (BOP) facilities and excludes deaths in privately operated federal facilities. As of December 30, 2001, sentenced felons from the District of Columbia were the responsibility of the BOP. Details may not sum to totals due to rounding and missing data. Data may have been revised from previously published statistics. See *Methodology*.

[a]For prisoners convicted of more than one crime, the most serious offense is the one that carries the longest sentence.

[b]Includes persons held for states, the U.S. military, or the District of Columbia; under treatment or hospital care; or on supervised release in a federal community corrections center.

Source: Bureau of Justice Statistics, Federal Law Enforcement Agency Deaths in Custody Reporting Program, 2015–19.

**TABLE 19**

**Percent of suicides in federal prisons, by circumstances of death, 2015–19**

| Circumstance of death | 2015–19 |
|---|---|
| Total suicides | 120 |
| Time of death[a] | 100% |
| Morning (6 a.m.–12 p.m.) | 29.6 |
| Afternoon (12 p.m.–6 p.m.) | 18.5 |
| Evening (6 p.m.–12 a.m.) | 25.9 |
| Overnight (12 a.m.–6 a.m.) | 25.9 |
| Method of suicide | 100% |
| Suffocation[b] | 80.8 |
| Exsanguination[c] | 5.8 |
| Poisoning[d] | 6.7 |
| Firearm | 3.3 |
| Other[e] | 3.3 |
| Location of death[f] | 100% |
| General housing within prison facility/on prison grounds | 13.3 |
| Segregation unit | 13.3 |
| Medical/nursing care services unit within prison facility | 3.3 |
| Medical/urgent care center outside of prison facility | 57.5 |
| Other/unspecified/unknown | 12.5 |

Note: Includes deaths in Federal Bureau of Prisons (BOP) facilities and excludes deaths in privately operated federal facilities. As of December 30, 2001, sentenced felons from the District of Columbia were the responsibility of the BOP. Details may not sum to totals due to rounding and missing data. Data may have been revised from previously published statistics. See *Methodology*.

[a]The 2015–19 category reflects 2019 percentages because these data were collected only in 2019.

[b]Includes hanging, strangulation, asphyxia, anoxia, and other methods of reducing oxygen intake.

[c]Includes all types of sharp force trauma or other injuries that cause acute loss of blood.

[d]Includes drug overdoses and ingestion or use of other poisonous substances.

[e]Includes self-inflicted blunt force trauma, dehydration, and unknown or unreported causes.

[f]The BOP reported only the actual location of death, not where the suicide event occurred.

Source: Bureau of Justice Statistics, Federal Law Enforcement Agency Deaths in Custody Reporting Program, 2015–19.

**TABLE 20**
**Percent of state and federal prisons, by number of suicides and facility characteristics, 2019**

| Facility characteristic | Number of prison facilities | Total | No suicides | 1 suicide[a] | 2 or more suicides |
|---|---|---|---|---|---|
| Total | 1,161 | 1,161 | 944 | 146 | 71 |
| **Prison operator** | | | | | |
| Federal | 111 | 100% | 82.9% | 14.4% | 2.7% |
| State/joint state and local | 968 | 100% | 80.6 | 12.7 | 6.7 |
| Private | 82 | 100% | 87.8 | 8.5 | 3.7 |
| **Prison main function[b]** | | | | | |
| General adult housing | 979 | 100% | 80.8% | 12.8% | 6.4% |
| Alcohol/drug treatment | 49 | 100% | 95.9 | 4.1 | 0.0 |
| Reception/diagnostic | 41 | 100% | 70.7 | 19.5 | 9.8 |
| Medical treatment | 19 | 100% | 68.4 | 21.1 | 10.5 |
| Mental health/psychiatric treatment | 21 | 100% | 81.0 | 19.1 | 0.0 |
| Work facility/boot camp[c] | 8 | 100% | 100 | 0.0 | 0.0 |
| Other[d] | 44 | 100% | 88.6 | 6.8 | 4.5 |
| **Programs offered[b,e]** | | | | | |
| Drug treatment | 918 | 100% | 80.3% | 13.7% | 6.0% |
| Alcohol treatment | 915 | 100% | 79.7 | 14.1 | 6.2 |
| Psychiatric care | 721 | 100% | 77.1 | 15.5 | 7.4 |
| Anger management | 774 | 100% | 78.6 | 14.2 | 7.2 |
| Employment training | 795 | 100% | 79.0 | 14.3 | 6.7 |
| Life skills | 856 | 100% | 79.0 | 14.5 | 6.5 |
| Parenting skills | 669 | 100% | 81.2 | 13.2 | 5.7 |
| **Capacity[b,f]** | | | | | |
| Prison facilities operating at 100% capacity or less | 715 | 100% | 84.1% | 10.6% | 5.3% |
| Prison facilities operating at more than 100% capacity | 216 | 100% | 76.9 | 16.7 | 6.5 |
| Median rated/design capacity | | | 927 beds | 1,365 beds | 1,738 beds |
| Mean rated/design capacity | | | 1,004.9 | 1,598.0 | 1,998.4 |

Note: Includes state and federal confinement facilities. Excludes state and federal community corrections facilities where offenders spend 50% or more of the day outside of confinement. Includes deaths in publicly and privately operated state facilities and in the combined jail and prison systems in Alaska, Connecticut, Delaware, Hawaii, Rhode Island, and Vermont. Includes deaths in Federal Bureau of Prisons (BOP) facilities and excludes deaths in privately operated federal facilities. As of December 30, 2001, sentenced felons from the District of Columbia were the responsibility of the BOP. Details may not sum to totals due to rounding and missing data. Data may have been revised from previously published statistics. See appendix table 1 for number of facilities by type and operator. See *Methodology*.

[a]Excludes three suicides reported to BJS's Mortality in Correctional Institutions collection by facilities that were not considered confinement facilities in the Census of State and Federal Correctional Facilities.

[b]As of midyear (last weekday in June).

[c]Includes facilities that primarily hold probation and parole violators, prerelease facilities, and other facilities that may allow movement in the community for less than 50% of the day.

[d]Includes housing for specific populations, such as juvenile offenders, sex offenders, or low security non-U.S. citizens; vocational and work camps; faith-based facilities; and geriatric care facilities.

[e]Prison facilities can offer multiple programs. The 2019 Census of State and Federal Correctional Facilities did not measure whether prisoners who died by suicide had participated in or had access to the programs.

[f]Facilities operating above 100% capacity held more prisoners than their rated or design capacity. A total of 275 facilities did not report either type of capacity. See *Terms and definitions*.

Source: Bureau of Justice Statistics, Census of State and Federal Correctional Facilities, 2019; Federal Law Enforcement Agency Deaths in Custody Reporting Program, 2019; and Mortality in Correctional Institutions, 2019.

**TABLE 21**

**Percent of state and federal prisons, by number of suicides and population characteristics, 2019**

| Population characteristic | Number of prison facilities | Total | No suicides | 1 suicide[a] | 2 or more suicides |
|---|---|---|---|---|---|
| Total | 1,161 | 1,161 | 944 | 146 | 71 |
| Prisoners in facility[b] | | | | | |
| 499 or fewer | 315 | 100% | 97.1% | 2.2% | 0.6% |
| 500–999 | 280 | 100% | 87.9 | 9.3 | 2.9 |
| 1,000–1,499 | 281 | 100% | 79.0 | 15.3 | 5.7 |
| 1,500–1,999 | 137 | 100% | 61.3 | 26.3 | 12.4 |
| 2,000–2,499 | 65 | 100% | 61.5 | 21.5 | 16.9 |
| 2,500 or more | 83 | 100% | 55.4 | 24.1 | 20.5 |
| Security level | | | | | |
| Maximum[c] | 376 | 100% | 64.6% | 21.3% | 14.1% |
| Medium[d] | 451 | 100% | 84.7 | 11.8 | 3.6 |
| Minimum | 289 | 100% | 96.2 | 3.5 | 0.4 |
| Uncategorized | 47 | 100% | 91.5 | 6.4 | 2.1 |
| Prisoners in restricted housing[b,e] | | | 5.5% | 6.5% | 11.5% |
| Facility staff with security responsibilities[b] | | | 72.8% | 68.0% | 68.0% |
| Prisoners per security staff member[b,f] | | | | | |
| Daytime shift | | | 16.9 prisoners | 16.5 prisoners | 17.2 prisoners |
| Nighttime shift | | | 24.0 | 24.1 | 24.6 |
| Overnight shift | | | 51.4 | 53.8 | 61.9 |
| Total security staff | | | 4.9 | 4.7 | 4.8 |

Note: Includes state and federal confinement facilities. Excludes state and federal community corrections facilities where offenders spend 50% or more of the day outside of confinement. Includes deaths in publicly and privately operated state facilities and in the combined jail and prison systems in Alaska, Connecticut, Delaware, Hawaii, Rhode Island, and Vermont. Includes deaths in Federal Bureau of Prisons (BOP) facilities and excludes deaths in privately operated federal facilities. As of December 30, 2001, sentenced felons from the District of Columbia were the responsibility of the BOP. Details may not sum to totals due to rounding and missing data. Data may have been revised from previously published statistics. See appendix table 1 for number of facilities by type and operator. See *Methodology*.

[a]Excludes three suicides reported to BJS's Mortality in Correctional Institutions collection by facilities that were not considered confinement facilities in the Census of State and Federal Correctional Facilities.

[b]As of midyear (last weekday in June).

[c]Includes super maximum facilities, administrative facilities, and facilities reporting a range of security levels with the highest level being maximum.

[d]Includes facilities that reported multilevel physical security in which the closest security level was medium.

[e]Includes prisoners held in protective custody, in administrative segregation, for disciplinary reasons, on death row, on suicide watch, or in other types of housing apart from the facility's general population. Percentages are based on the total number of prisoners in facilities with restricted housing programs.

[f]Ratios are based on prison facilities that reported staffing levels for all shifts.

Source: Bureau of Justice Statistics, Census of State and Federal Correctional Facilities, 2019; Federal Law Enforcement Agency Deaths in Custody Reporting Program, 2019; and Mortality in Correctional Institutions, 2019.

# Methodology

## Data sources

### *Mortality in Correctional Institutions, 2000-2019*

The Mortality in Correctional Institutions (MCI), formerly the Deaths in Custody Reporting Program (DCRP), was an annual Bureau of Justice Statistics (BJS) data collection from 2000 to 2019. The MCI obtained national-, state-, and incident-level data on adults who died while in the physical custody of the 50 state departments of corrections (DOCs) or in the physical custody of the approximately 2,800 local jail jurisdictions with adult populations nationwide. BJS defines a jail as a locally operated correctional facility that confines persons before or after adjudication for more than 72 hours, excluding temporary lockups.

The DCRP began in 2000 in response to the Death in Custody Reporting Act of 2000 (DICRA; P.L. 106-297) and was the only national statistical collection providing comprehensive information about deaths in adult correctional facilities. Starting in 2000, BJS collected data directly from the approximately 2,800 jail jurisdictions in the U.S. and maintained an average annual response rate of 98%. The jail universe for the MCI included all jails operating at the time of data collection each year. BJS updated the jail frame annually to document jails that had closed, consolidated, or otherwise eliminated operations. The most recent jail universe identified 2,925 jurisdictions that represented 3,130 jail facilities. Of these, 2,858 jurisdictions (98%) participated in the MCI in 2019. A jail jurisdiction is a legal entity that manages jail facilities. Jail jurisdictions typically operate at the county level, and a sheriff's office or jail administrator usually manages the local facilities. MCI data identify the jail facility where an inmate died, but data are summarized at the jail jurisdiction level.

Collection of data from state DOCs began in 2001, and BJS maintained a 100% response rate over all years. Until 2015, the Federal Bureau of Prisons (BOP) submitted aggregate counts of the number of male and female deaths to BJS, by cause of death. The BOP started reporting decedent-level data to BJS in 2015, including individual demographic and criminal justice characteristics through the Federal Law Enforcement Agency Deaths in Custody Reporting Program. In 2017, BJS changed the name from the DCRP to MCI to more accurately describe the data collection.

In the MCI, custody refers to the physical holding of a person in a facility or to the period during which a correctional authority maintains a chain of custody over an inmate. For instance, if a jail transports an ill inmate to a hospital for medical services and that inmate dies in the hospital while in the chain of custody of the jail, then that death is counted as a death in custody. A death that occurs when an inmate is not in the custody of a correctional authority is considered beyond the scope of the MCI. Deaths were considered out of scope for inmates who were on escape status or under the supervision of community corrections, such as on probation, parole, or home electronic monitoring. Local jail and state correctional officials were asked to determine whether the inmate was in the physical custody of the jurisdiction at the time of death, regardless of the reason the inmate was being held. Some local jails hold state prisoners, but if a prisoner dies in the custody of the local jail, the death is attributed to the jail, not the state DOC.

Custody is further complicated by the functions of some sheriff's offices, including dual responsibilities for law enforcement and jail administration. As a result, some deaths that respondents reported as jail deaths occurred before the jail had custody of the decedent. Deaths that occurred in the process of arrest were identified by BJS and excluded by using information about the circumstances surrounding the death.

Mortality data measured by the MCI included the location and type of facility where the inmate died, decedent characteristics (sex, race or ethnicity, and age), admission date, conviction status, and admission offense. MCI respondents were instructed to report on the cause of death as determined by autopsy or another official medical investigation. For the MCI, deaths due to accidental intoxication, other accidents, suicides, and homicides were considered discrete causes of death. Although the manner and cause of death are distinct from one another, no such distinction was made in the MCI. When reporting a death due to illness, accident, suicide, intoxication, or homicide, BJS requested that respondents describe the events surrounding these deaths. Clinical data specialists converted text entries that described illness-related deaths into standard medical codes from the World Health Organization's International Statistical Classification of Diseases and Related Health Problems, Tenth Revision (ICD-10).

The MCI also collected data on the circumstances surrounding the death (the cause, time, and location of death), whether an autopsy was conducted, and the availability of autopsy results to the respondent. Specifically for suicide deaths, from 2008 to 2019, BJS asked respondents to briefly describe the event in the MCI and to report whether the decedent had spent at least one night in a mental health facility since admission to prison or jail.

BJS ceased collection of mortality data in state and local correctional facilities after the 2019 reference year. When DICRA was reauthorized in 2014 (P.L. 113-242), it included additional enforcement and reporting compliance requirements that are incompatible with BJS's authorizing statute as a federal statistical agency. The U.S Department of Justice (DOJ) determined it would be more appropriate for the Bureau of Justice Assistance (BJA) to administer the program and collect mortality data for the DOJ starting with quarter 1 of fiscal year 2019 (October to December 2019). State departments of corrections and local jails now report their death information on a quarterly basis to centralized state agencies, which compile and submit these data to BJA to comply with all applicable requirements in P.L. 113-242.

### Census of Jails, 2019

BJS conducts the Census of Jails (COJ) periodically to collect jail data through a complete enumeration of local jail facilities and BOP detention facilities. The 2019 COJ was the eleventh administration since 1970. Data were collected through a web-based survey during the fall of 2019, with a reference date of June 30, 2019.

The COJ gathers data from jails holding inmates beyond arraignment, usually for a period exceeding 72 hours. Jail facilities are intended to hold adults, but some also hold juveniles (persons age 17 or younger). The universe of the COJ consists of all local jail jurisdictions (including county, city, regional, and privately operated jail facilities) and BOP detention facilities that function as jails.[1] The COJ universe excludes separate temporary holding facilities (such as drunk tanks and police lockups) that do not hold persons after they have been formally charged in court. However, temporary holding facilities that are operated as part of a local jail are included. The combined jail

and prison systems in Alaska, Connecticut, Delaware, Hawaii, Rhode Island, and Vermont are excluded from the COJ, as they are operated by state DOCs, and included in BJS's Census of State and Federal Correctional Facilities.

The COJ uses two data collection forms for multiple-facility jail jurisdictions. The CJ-3A obtains information on the count, race or ethnicity, conviction status, citizenship, holding agency, and average daily population (ADP) for jurisdictions that have multiple facilities under a single legal authority and have one or more reporting units. The jurisdictions also submit one CJ-3A Addendum form for each facility under their legal authority. The CJ-3A Addendum requests information on the purposes and functions of each jail, the rated capacity, and the existence of any consent decrees placed on the facilities. Single-facility jurisdictions received a CJ-3 form in the 2019 COJ, which combined the questions from the CJ-3A and CJ-3A Addendum forms.

MCI data on suicides that occurred in 2019 were linked to the 2019 COJ at both the jurisdiction and facility levels. Jurisdiction matching was based on the common jurisdiction identification number that BJS uses in jail collections. One suicide reported to the MCI occurred in a single-facility jurisdiction that did not respond to the 2019 COJ. This suicide was excluded from analyses of the linked collections at both the jurisdiction and facility levels.

COJ facility-level data were linked to MCI suicides from 2019 using the facility name, city, and state. Two jurisdictions reported suicides to the MCI but did not indicate the facilities or cities where they occurred. These deaths were excluded from the analysis of linked COJ-MCI data at the facility level. Additionally, a medical facility outside of the jail was reported as the location of death for multiple suicides in 2019. When these occurred in single-jail jurisdictions, BJS could attribute the suicide to their jail facility. However, five multiple-jail jurisdictions had suicides whose locations of death were community medical facilities not associated with the jails. Because these suicides could not be attributed to any particular jail, they were excluded from the facility-level analysis of the linked COJ-MCI data.

Because the 2019 COJ represents a complete enumeration of local jails in the U.S., the results are not subject to sampling error. However, the results were affected by unit and item nonresponse, and adjustments were made to account for nonresponse.

---

[1]Regional jail jurisdictions are created by two or more local governing bodies through cooperative agreements.

The 2019 COJ had a response rate of 94%. Seventy-four jail jurisdictions did not respond to the census. To reduce nonresponse bias, nonresponse weighting was implemented. To calculate the nonresponse weight, missing data were first imputed for two variables (confined inmate population and the number of juveniles), using a carry-forward cold-deck procedure. The missing data were replaced with the most recent prior-year data that the same jail jurisdictions reported to the 2016, 2017, or 2018 Annual Survey of Jails (ASJ) or the MCI Annual Summary File. For cases with no prior-year data, a weighted sequential hot-deck procedure was implemented to impute missing data, where the donor for each missing item was randomly selected from a set of similar jails, sorted by related auxiliary population values (e.g., jail size, inmate sex distribution, state or region, and county classification). Next, all jail jurisdictions were classified into 10 strata based on their reported or imputed values of confined population, the presence of juveniles, and whether they were operated as a regional jail in the 2019 COJ. The nonresponse weight was calculated as the total confined population of all active jail jurisdictions in each state and stratum, divided by the sum of the confined population of all jail jurisdictions in each state and stratum that responded to the 2019 COJ—

$$w_{sh} = \frac{\sum_{i=1}^{n_{sh}} p_{shi} \times A_{shi}}{\sum_{i=1}^{n_h} p_{shi} \times R_{shi}}$$

where—

$n_{sh}$ = number of jail jurisdictions in state $s$ and stratum $h$,

$p_{shi}$ = confined population for jail jurisdiction $i$ in state $s$ and stratum $h$,

$A_{shi}$ = active status indicator for jurisdiction $i$ in state $s$ and stratum $h$ (1 = active, 0 = out of scope), and

$R_{shi}$ = response indicator of jurisdiction $i$ in state $s$ and stratum $h$ (1 = respondent, 0 = nonrespondent).

### Census of State and Federal Correctional Facilities, 2019

BJS conducted the Census of State and Federal Correctional Facilities (CCF) between September 2019 and March 2020, with a reference date of June 30, 2019. Based on the primary function of the facility and the percentage of prisoners who were allowed to leave the facility unaccompanied for work or study release, BJS classified prisons as confinement or community corrections facilities. Of the 1,982 prison facilities in the original universe for CCF, 282 were deemed ineligible, and 23 did not respond to the survey. This resulted in an overall response rate of 98.6%. In linking CCF data to MCI suicide records, BJS included only the confinement prisons because these aligned with the MCI definition of in-custody deaths. This resulted in a file of 1,189 confinement facilities, of which 220 had at least one suicide. Because of the high response rate, CCF data were not weighted. BJS combined state and federal facilities in the analysis for tables 20 and 21 because disaggregation of the smaller number of federal facilities by count of suicides and other characteristics could allow for the identification of individuals.

### National Prisoner Statistics program, 2001-2019

Data on state and federal prison populations used as denominators for mortality rates were obtained from BJS's National Prisoner Statistics (NPS) program, which collects information from state DOCs and the BOP on custody and jurisdiction populations, admissions to and releases from prison, the capacity of state and federal prison systems, and some demographic characteristics of prisoners. BJS used the NPS and individual-level data from the National Corrections Reporting Program (NCRP) and the Federal Justice Statistics Program (FJSP) to obtain the age distribution of the prison population.

The original DICRA legislation did not require federal law enforcement or correctional authorities to report deaths in prisons. However, from 2001 to 2014, the BOP reported aggregate counts of deaths in BOP-operated facilities to the NPS. Then in 2015, the reauthorized DICRA legislation made federal reporting of deaths a requirement, and the BOP began providing individual-level death records to BJS from both BOP- and privately operated federal facilities as part of the Federal Law Enforcement Agency Deaths in Custody Reporting Program. In the current analysis of suicides, BJS excluded deaths in private federal prisons from 2015 to 2019 to allow for comparability over time. Table 1 in this report shows total deaths from all causes, as well as the number of suicides per year in BOP-operated facilities. A total of nine deaths in private federal prisons in 2015, seven in 2016, seven in 2017, five in 2018, and seven in 2019 were excluded.

Among these deaths, one suicide in 2015, one in 2016, and none in 2017, 2018, and 2019.

### Federal Justice Statistics Program

The federal prison data from BJS's FJSP are an annual collection of administrative records for each prisoner who was in custody on December 31. BJS obtains these records from the BOP. Data elements include demographic, criminal justice, and sentencing characteristics. For this report, BJS used the age distributions obtained from the FJSP annual prison files as denominators for suicide rates by age in the BOP.

### National Corrections Reporting Program

Similar to FJSP, the NCRP obtains individual-level administrative records for all persons in the custody of state- or privately operated prison facilities at year-end. BJS obtained annual age distributions for state prisoners from the NCRP and used them to calculate suicide rates by age for this report.

## Reported statistics

Mortality data in this report include the number of deaths by suicide, suicide rates by year, the cause of death, selected decedent and suicide event characteristics, the state where the death occurred, and characteristics of facilities that experienced one or more suicides in 2019. The data are separated by type of facility (local jail, state DOC, or BOP). The jail and prison populations differ substantially from the U.S. resident population in terms of age, race or ethnicity, and sex distributions. These differences preclude direct comparison of suicide rates between incarcerated populations and the U.S. resident population.

Suicide mortality rates are calculated per 100,000 local jail inmates and per 100,000 state or federal prisoners, with the denominators providing estimates of the number of person-years of exposure to custody in institutional corrections (*person-years* combines time in a correctional institution with the number of inmates to measure actual exposure to a correctional institution setting).

The mortality rate for local jails is calculated as the number of deaths per year divided by the average daily population (ADP), with the resulting quotient multiplied by 100,000. The ADP for jails is defined as the average daily number of inmates held in a jail

jurisdiction during a calendar year, from January 1 through December 31. The ADP is used as the denominator for mortality rates to accommodate the high turnover and daily fluctuation in local jail populations. Compared to a single-day inmate count, the ADP is a better indicator of the number of days per year that an inmate is exposed to the risk of death. Jail populations have a much higher turnover than prison populations. Mean length of stay is about 26 days in local jails, compared to 2 years in state prisons. The ADP reflects the annual number of admissions and mean length of stay, and it can be expressed as the product of these two values. When mean length of stay is expressed in years, the ADP is equivalent to the number of person-years spent by inmates during a given year.

ADP data are received directly from jails through the MCI using the CJ-9A summary form. Starting in 2002, BJS collected the ADP directly from respondents. Prior to 2002, the ADP was calculated by taking the average of the January 1 count from the prior year and the December 31 count from the reference year.

The mortality rate for state or federal prisoners is calculated as the number of deaths per year divided by the December 31 population of state or federal prisoners in custody, with the resulting quotient multiplied by 100,000. The population of state prisoners used in rate calculations includes prisoners held in privately operated facilities, while the population in federal prisons does not. To improve comparability between years, this report includes mortality rates of state prisons that were reestimated for prior years using updated year-end custody populations, including privately operated facilities.

## Estimating population characteristics of inmates to calculate mortality rates by demographic subgroups

Data from several data collections were used to generate distributions of sex, race or ethnicity, and age among inmates in local jails and to estimate how these demographic characteristics were distributed by ADP. These collections were chosen because they were conducted closest in time to the 2019 reference year. They include two types of data: (1) in-person survey data, where jail inmates are asked directly to identify their date of birth, sex at birth, race, and ethnicity and (2) administrative data, which is derived from the official operational records maintained by the jail facility and may differ from how an inmate

would self-identify (especially in terms of race and ethnicity) if given the chance. BJS's administrative data collections on jails include—

- the MCI, conducted annually

- the ASJ, conducted annually

- the COJ, conducted every 5 to 6 years, including in 2013 and 2019.

BJS's in-person inmate survey data on jails include—

- the Survey of Inmates in Local Jails (SILJ), last conducted in 2002

- the National Inmate Survey (NIS), conducted in 2006, 2007 to 2009, and 2012.

Prior to 2010, the ASJ provided estimates of local jail inmates by sex for each year of the MCI collection. The ASJ percentages were applied to each year's ADP from the MCI to estimate the ADP of male and female inmates. Starting in 2010, sex-specific data on ADP from the MCI were used to calculate the denominators for mortality rates for males and females. Data from the SILJ, NIS, and COJ were used to estimate the relative distribution of adults by race or ethnicity for different periods. Because the SILJ (2002), NIS (2007 to 2009), and COJ (2013) are not fielded annually, the population estimates were smoothed before being applied to MCI data for specific time periods. The SILJ estimates were used to cover the period from 2000 to 2004, the NIS estimates to cover years 2005 to 2012, and the COJ estimates to cover years 2013 to 2019. In all cases, the percentages associated with the distribution of race or ethnicity were applied to the ADP.

To estimate the distribution of local jail inmates by age, BJS first obtained an estimate of the number of inmates age 17 or younger from the ASJ (2000 to 2012 and 2014 to 2016) and the 2013 COJ. An estimate of the ADP of inmates age 17 or younger was obtained by applying the annual percentage of inmates age 17 or younger from the ASJ and COJ to the annual ADP collected in the MCI. To estimate the distribution of adult inmates by age, data from the 2002 SILJ were used to estimate the relative distribution of adults by age for the years 2000 to 2006, and data from the NIS collections were used for the years 2007 to 2016. Estimates were directly available from these sources for 2002, 2007, 2009, and 2012. The age distribution for 2002 (SILJ) was applied to MCI data for 2000 and 2001, and the distribution

from 2012 (NIS) was used for 2013 to 2018. Estimates were smoothed to account for gaps in reference years when age estimates were not available (2003 to 2006, 2008, 2010, and 2011).

Age and sex distributions of the state and federal prison populations were estimated using the NPS, NCRP, and FJSP data collections. Rates for race or ethnicity were also derived from these collections. They have been updated from previous years and may not match previously reported rates. Race or ethnicity reported in the NPS, NCRP, and FJSP come from administrative records of prisoners and may not reflect self-reporting by prisoners. Distributions of race or ethnicity were adjusted based on self-reported data collected from interviews with prisoners through BJS's national prisoner surveys. Previously, distributions of race or ethnicity were derived from BJS's 2004 Survey of Inmates in State and Federal Correctional Facilities. In 2017, BJS updated estimates of prisoners' race or ethnicity using new data from the 2016 Survey of Prison Inmates (formerly the Survey of Inmates in State and Federal Correctional Facilities). Annual distributions of race or ethnicity were weighted by the number of years from the most recent prisoner survey (2004 or 2016). For complete details on the methodology used to estimate distributions of race or ethnicity, see *Prisoners in 2016* (NCJ 251149, BJS, January 2018).

### Interpreting rates among small populations

MCI data on deaths in local jails are not subject to sampling error because the data represent a full enumeration of deaths. However, according to Brillinger and NCHS, mortality data from a complete enumeration may be subject to random error because "the number of deaths that actually occurred may be considered as one of a large series of possible results that could have arisen under the same set of circumstances."[2,3] The random variation can be large when the number of deaths is small. Therefore, caution is warranted when interpreting statistics that are based on small numbers of deaths.

Using the NCHS and Brillinger methods, BJS quantified random variation by assuming that the

[2]See Brillinger, D. R. (1986). The natural variability of vital rates and associated statistics. *Biometrics, 42*(4), 693–734.

[3]See Xu, J., Kochanek, K. D., Murphy, S. L., & Tejada-Vera, B. (2010). *Deaths: Final data for 2007* (National Vital Statistics Reports, Vol. 58, No. 19). National Center for Health Statistics. https://www.cdc.gov/nchs/data/nvsr/nvsr58/nvsr58_19.pdf

appropriate underlying probability distribution for the number of deaths was a Poisson distribution. This provided a simple and reasonable approach for estimating variances in mortality statistics when the probability of dying is low. Variances were calculated based on the assumption of a Poisson process. From these variances, estimates of relative random error were calculated. These estimates are comparable to the relative standard error because the relative random error is the ratio of random error derived from the Poisson variance to the number of deaths. Following NCHS practice, when the relative random error exceeded 30%, estimated mortality rates were flagged with an "!" symbol to show the instability of the rate. (i.e., Interpret with caution. Estimate is based on 10 or fewer cases.)

### APPENDIX TABLE 1
**Number of correctional facilities, by type and operator, 2019**

| Operator | All facilities* | Confinement | Community-based |
|---|---|---|---|
| Total | 1,677 | 1,161 | 516 |
| Public | 1,266 | 1,079 | 187 |
| Federal | 111 | 111 | 0 |
| State | 1,155 | 968 | 187 |
| Private | 411 | 82 | 329 |

*There were 139 additional facilities linked to another facility for which data could not be reported separately. Data from these facilities were merged with data for 96 facilities.

Source: Bureau of Justice Statistics, Census of State and Federal Adult Correctional Facilities, 2019.



The Bureau of Justice Statistics of the U.S. Department of Justice is the principal federal agency responsible for measuring crime, criminal victimization, criminal offenders, victims of crime, correlates of crime, and the operation of criminal and civil justice systems at the federal, state, tribal, and local levels. BJS collects, analyzes, and disseminates reliable statistics on crime and justice systems in the United States, supports improvements to state and local criminal justice information systems, and participates with national and international organizations to develop and recommend national standards for justice statistics. Doris J. James is the acting director.

This report was written by E. Ann Carson. Stephanie Mueller, Lauren G. Beatty, Emily Buehler, Zhen Zeng, and Laura Maruschak verified the report.

Edrienne Su and Eric Hendrixson edited the report. Carrie Epps-Carey produced the report.

October 2021, NCJ 300731



NCJ 300731

**Office of Justice Programs**
**Building Solutions • Supporting Communities • Advancing Justice**
**www.ojp.gov**

# Exhibit C

# LAO

## PROPOSITION 36
## Allows Felony Charges and Increases Sentences for Certain Drug and Theft Crimes. Initiative Statute.

## ANALYSIS OF MEASURE

### BACKGROUND

### Punishment Depends on Seriousness of Crime and Criminal History

*Punishment for Felonies.* A felony is the most serious type of crime. People can be sentenced to county jail or state prison for felonies, depending on the crime and their criminal history. In some cases, people can be supervised in the community by a county probation officer instead of serving some or all of their sentence in jail or prison. This is called county community supervision. The length of a sentence mostly depends on the crime. For example, murder can be punished by 15 years or more in prison. In contrast, selling drugs can be punished by up to five years in jail or prison, depending on the drug. Sentences can also be lengthened due to details of the crime. For example, sentences for selling certain drugs (such as fentanyl, heroin, cocaine, or methamphetamine) can be lengthened based on the amount sold.

*Punishment for Misdemeanors.* A misdemeanor is a less serious crime. Examples include assault and drug possession. People can be sentenced to county jail, county community supervision, and/or a fine for misdemeanors. Sentences can be up to one year in jail.

### Proposition 47 Reduced Punishments for Some Theft and Drug Crimes

In 2014, Proposition 47 changed some theft and drug crimes from felonies to misdemeanors. For example, shoplifting (stealing items worth $950 or less from a store) and drug possession generally became misdemeanors.

### PROPOSAL

Proposition 36 makes several key changes related to punishments for theft and drug crimes. First, it increases punishment for some of these crimes. Second, it creates a new treatment-focused court process for some drug possession crimes. Third, it requires courts to warn people convicted of selling or providing illegal drugs to others that they can be charged with murder if they keep doing so and someone dies.

## Increases Punishment for Some Theft and Drug Crimes

Proposition 36 increases punishment for some theft and drug crimes in three ways:

- ***Turns Some Misdemeanors Into Felonies.*** For example, currently, theft of items worth $950 or less is generally a misdemeanor. Proposition 36 makes this crime a felony if the person has two or more past convictions for certain theft crimes (such as shoplifting, burglary, or carjacking). The sentence would be up to three years in county jail or state prison. These changes undo some of the punishment reductions in Proposition 47.

- ***Lengthens Some Felony Sentences.*** For example, Proposition 36 allows felony sentences for theft or damage of property to be lengthened by up to three years if three or more people committed the crime together.

- ***Requires Some Felonies Be Served in Prison.*** For example, as discussed above, sentences for selling certain drugs (such as fentanyl, heroin, cocaine, or methamphetamine) can be lengthened based on the amount sold. Currently, these sentences are served in county jail or state prison depending on the person's criminal history. Proposition 36 generally requires these sentences be served in prison.

## Creates New Court Process for Some Drug Possession Crimes

Proposition 36 allows people who possess illegal drugs to be charged with a "treatment-mandated felony," instead of a misdemeanor, in some cases. Specifically, this applies to people who (1) possess certain drugs (such as fentanyl, heroin, cocaine, or methamphetamine) and (2) have two or more past convictions for some drug crimes (such as possessing or selling drugs). These people would generally get treatment, such as mental health or drug treatment. Those who finish treatment would have their charges dismissed. Those who do not finish treatment could serve up to three years in state prison. This change undoes some of the punishment reductions in Proposition 47.

## Requires Warning of Possible Murder Charges for Selling or Providing Drugs

Proposition 36 requires courts to warn people that they could be charged with murder if they sell or provide illegal drugs that kill someone. This warning would be given to people convicted of selling or providing certain drugs (such as fentanyl, heroin, cocaine, and methamphetamine). This could make it more likely for them to be convicted of murder if they later sell or provide illegal drugs to someone who dies.

## FISCAL EFFECTS

Proposition 36 would have various fiscal effects on the state and local governments. The size of these effects would depend on uncertain factors, such as what decisions local prosecutors would make.

***Increases State Criminal Justice Costs.*** Proposition 36 would increase state criminal justice costs in two main ways.

- ***Increase in State Prison Population.*** It would require some people who now serve their sentences at the county level to serve them in state prison. Also, it lengthens some prison sentences. In total, the prison population could increase by around a few thousand people. (There are about 90,000 people in prison now.)

LAO

- *Increase in State Court Workload.* This is because felonies usually take more time to resolve than misdemeanors. Also, treatment-mandated felonies would increase court workload.

In total, Proposition 36 would **increase state criminal justice costs, likely ranging from several tens of millions of dollars to the low hundreds of millions of dollars each year (annually)**. This amount is less than one-half of 1 percent of the state's total General Fund budget. (The General Fund is the account the state uses to pay for most public services, including education, health care, and prisons.)

*Increases Local Criminal Justice Costs.* Proposition 36 would increase local criminal justice costs in two main ways.

- *Net Increase in County Jail and Community Supervision Population.* In some ways, Proposition 36 would reduce the jail and community supervision population. This is because some people would go to state prison instead of the county level. In other ways, it would increase this population. This is because some people would spend more time in county jail or on community supervision. Overall, Proposition 36 likely would increase the county population. This increase could be around a few thousand people. (There are about 250,000 people at the county level now.)
- *Increase in Local Court-Related Workload.* It would also increase workload for local prosecutors and public defenders. This is because felonies usually take more time to resolve than misdemeanors. Also, treatment-mandated felonies would create workload for some county agencies (such as probation or behavioral health departments).

In total, Proposition 36 would **increase local criminal justice costs, likely by tens of millions of dollars annually**.

*Reduces Amount State Must Spend on Certain Services.* Proposition 47 created a process in which the estimated state savings from its punishment reductions must be spent on mental health and drug treatment, school truancy and dropout prevention, and victim services. These estimated savings totaled $95 million last year. By undoing parts of Proposition 47, Proposition 36 reduces the state savings from Proposition 47. This would reduce the amount the state must spend on mental health and drug treatment, school truancy and dropout prevention, and victim services. This reduction likely would be in the low tens of millions of dollars annually.

*Other Fiscal Impacts.* Proposition 36 could have other fiscal effects on the state and local governments. For example, if the increased punishments or mandated treatment reduce crime, some state and local criminal justice costs could be avoided. However, it is unknown if these or other effects would occur.

LAO

## YES/NO STATEMENT

A **YES** vote on this measure means: People convicted of certain drug or theft crimes could receive increased punishment, such as longer prison sentences. In certain cases, people who possess illegal drugs would be required to complete treatment or serve up to three years in prison.

A **NO** vote on this measure means: Punishment for drug and theft crimes would remain the same.

## SUMMARY OF LEGISLATIVE ANALYST'S ESTIMATE OF NET STATE AND LOCAL GOVERNMENT FISCAL IMPACT

- Increased state criminal justice costs, likely ranging from several tens of millions of dollars to the low hundreds of millions of dollars annually, primarily due to an increase in the prison population.

- Increased local criminal justice costs, likely in the tens of millions of dollars annually, primarily due to county jail, community supervision, and court-mandated mental health and drug treatment workload.

## BALLOT LABEL

**Fiscal Impact**: State criminal justice costs likely ranging from several tens of millions of dollars to the low hundreds of millions of dollars annually. Local criminal justice costs likely in the tens of millions of dollars annually.



# Exhibit D

1/15/25, 11:29 AM                California may take a big step backwards towards more incarceration with Proposition 36 | Prison Policy Initiative

Case 2:90-cv-00520-KJM-SCR     Document 8818-1     Filed 01/15/25     Page 51 of 72

**PRISON**
POLICY INITIATIVE

# California may take a big step backwards towards more incarceration with Proposition 36

*The measure would defund prevention and reentry services, and is projected to grow the state prison population by 35% over the next 5 years.*

by Sarah Staudt, October 17, 2024

Update: Californians approved Proposition 36 in the November 2024 elections.

This November, Californians will see an initiative on their ballots proposing a way to curb retail theft and drug use. In reality, this measure would undo a decade of progress towards unraveling mass incarceration without any public safety benefit. Bankrolled primarily by major retail brands like Walmart and Target, the ballot initiative known as Proposition 36 would cut millions of dollars from reentry and prevention services in favor of more prison sentences for theft and drug charges. It would punish people with substance use disorder who relapse, increase penalties for many people who use and sell drugs by increasing penalties and makes some small scale thefts eligible for felony charges. Overall, by 2029, Prop 36 is projected to fully undo hard fought progress made in reducing California's prison population.



Prop 36 is part of a wave of recent measures across the country attempting to resurrect "tough-on-crime" policies. But this one is particularly concerning because it directly repeals decade-old reforms that have been proven to reduce both prison populations and recidivism. Californians who are interested in basing their criminal legal system policy on facts, not fear, should reject the measure — and other states should be on the lookout for similar efforts in their legislatures and on their ballots.

## Prop 36 defunds critical prevention and reentry services

The text of Prop 36 doesn't *say* it defunds prevention and reentry services, but that's exactly what it does. In order to understand Prop 36, it's important to examine another ballot initiative from a decade ago: Proposition 47 in 2014. Sixty percent of Californians voted for Prop 47 that year, a transformative initiative that reduced certain drug possession and theft crimes from felonies into misdemeanors. Lowering charges to misdemeanors decreases the long-term impact of criminal convictions on people's housing and employment, and misdemeanors have shorter sentences than felonies. Changing these common low-level charges from felonies to misdemeanors dramatically lowered the prison population over time.

The most innovative part of Prop 47, however, was its re-investment provision. It required that the money saved by incarcerating fewer people be calculated by the state and then re-invested in a grant program for local reentry, diversion, substance and mental health treatment and crime prevention programs. So far, Prop 47 has saved the state almost a billion dollars, which has been funneled directly into local programs.

Now, Prop 36 will *grow* prison populations by reversing the sentencing policy changes of Prop 47. However, because Prop 36 has no funding stream of its own, it will cut into those same Prop 47 savings that fund essential local programs. This will leave local communities without the resources they need to reduce recidivism, house people, treat mental health and substance use disorders, and help people reenter society successfully after incarceration. In other words, it will stoke many of the problems that have fueled tough-on-crime narratives in the first place: fewer reentry programs mean higher recidivism rates, higher homelessness rates, and lower employment rates. Re-conviction rates for participants in Prop 47 reentry programs were 15.3% — 2-3 times lower than the average for people who have served prison sentences. The proportion of Prop 47 reentry participants who were homeless decreased by 60%, and the proportion of people who were unemployed dropped by 50%. These programs are demonstrably effective and essential public safety measures that address homelessness and poverty while reducing crime.

## Prop 36 will directly harm Californians, especially those who use drugs

Prop 36 would raise the prison population by filling jails and prisons mostly with people charged with low-level theft and drug possession, while also draining resources from local community programs, and providing less effective treatment for people with substance use disorders and lengthening prison terms.

**Draining resources**: Prop 36's proponents claim that they are promoting treatment for drug use *even though the proposition drains funding from substance use programs*. Instead of helping increase the availability of desperately-needed substance use disorder treatment, Prop 36 is an unfunded mandate, allowing prosecutors to seek "treatment mandated felonies" for people who are charged for a third time with drug possession without providing the funding to make that treatment possible. People who successfully complete these treatment mandates could have their charges dismissed, but people who *do not* successfully complete these programs would be convicted of a felony and potentially sentenced to prison or jail. **And remember, Prop 36 does not do anything to fund these mandatory programs, so cash-strapped county governments will be left to pick up the slack**.

**Less effective treatment**: One concerning feature of drug courts and similar mandatory treatment programs is that they put the rules and regulations of treatment programs in the hands of the courts, not medical professionals. People in community-based voluntary programs work with medical professionals who understand that relapse is part of recovery, while people in court-mandated programs may be labeled as a failure for one relapse and incarcerated. The proposition's language allows courts and prosecutors to declare that the person has "failed" the program for incredibly broad reasons, including, "If at any time, it appears that the defendant is performing unsatisfactorily in the program, is not benefitting from treatment [or] is not amenable to treatment."

Mandatory treatment programs are significantly less effective than voluntary treatment programs, and they have higher rates of relapse and overdose deaths. A recent review of 45 studies linking incarceration records with overdose deaths found that, in the first two weeks of release from mandatory treatment programs, opioid overdose deaths were 27 times higher than the general population. People in mandatory treatment programs often spend time in jail, either while awaiting evaluation or as a sanction for relapse and other violations. Even one day in jail can trigger a cascade of problems that are particularly acute for drug users — including heightened risk of death and suicide. Jail also disconnects them from effective treatment: only 24% of jails provide medication assisted treatment (considered the "gold standard" for opioid use disorder care).

**Longer sentences**: Prop 36 also increases penalties for many people who use and sell drugs by implementing sentencing enhancements for distribution and possession with intent to distribute fentanyl. The impact of expanding these excessively long sentencing enhancements to fentanyl could be disastrous, because fentanyl is so prevalent in the drug supply that most people who buy, use, and sell drugs do not know whether their drugs contain fentanyl. In one recent study, 83% of the study cohort tested positive for fentanyl — but only 18% reported that they *intended* to use fentanyl. This means that these sentencing enhancements will not just target the people putting fentanyl into the drug supply — they will target the majority of drug users. Prop 36 is likely to simply increase drug offense penalties across the board for Californians, rather than aiming policy at "the worst of the worst".

Case 2:90-cv-00520-KJM-SCR   Document 8518   Filed 01/15/25   Page 54 of 72

## Prop 36 would make California's already-punitive theft laws harsher, looking up more people for low-level theft.

Prop 36 claims to be a response to rising retail theft, and two of the biggest donors supporting the initiative are Walmart and Target. Although retailers have worked hard to claim they are losing large amounts of money and goods from retail theft, it is far from clear that this is true.

What Prop 36 would actually do is make thefts of less than $950 dollars — *with no minimum* — a "strike" for the purposes of future felony charges. In other words, stealing a candy bar at some point would be enough to enhance someone's later charge to a felony. Incarcerating more people for retail theft is likely to have notably disproportionate impacts, since people arrested for retail theft are disproportionately young and Black despite white people being more likely to engage in shoplifting. Turning more theft and drug charges into felonies instead of misdemeanors also specifically harms immigrant communities by making more people deportable for minor crimes — even people who are legally in the United States.

These changes aren't necessary, even according to their own logic. California already has one of the lowest thresholds for felony theft in the nation, and just last month, Governor Gavin Newsom signed a series of "tough on crime" retail theft bills that allow businesses to aggregate the total amount stolen in multiple thefts to reach felony charging thresholds. Prop 36's draconian punishment for a non-violent crime — crime that is driven most often by poverty and need — is neither needed nor helpful.

## Conclusion

Prop 36 is not an isolated policy effort. It is part of a wave of measures across the country that are trying to resurrect "tough on crime" policies that claim to improve public safety or combat drug use or homelessness. But those approaches didn't work in the past and won't work now. What communities all over the United States need is more investment in communities, treatment, and reentry — the exact kind of investment that Prop 47 provides in California today, and the exact kind of investment that Prop 36 would undo. If you are interested in learning more about the efforts to defeat Prop 36, California United for a Responsible Budget has compiled a set of resources and ways to get involved. Californians — and people around the country — should reject punitive policies that will simply reboot mass incarceration instead of investing in proven solutions.

*Sarah Staudt is the Policy and Advocacy Director at the Prison Policy Initiative.* (Other articles | Full bio | Contact)

# Exhibit E



Donate

Politics    Education    Housing    Economy    Environment    Inequality    California Voices    Events

**JUSTICE**

# Two California prosecutors promised a different kind of justice. Voters turned on them

  BY CAYLA MIHALOVICH
NOVEMBER 26, 2024

Republish



Illustration by Adriana Heldiz, CalMatters; iStock

Case 2:90-cv-00520-KJM-SCR      Document 8518-1      Filed 01/15/25      Page 57 of 72

## IN SUMMARY

George Gascón and Pamela Price were California's best known 'progressive' district attorneys. They lost their offices in 2024 when voters backed a more traditional approach.

California's two best known "progressive" prosecutors were doing what they promised the voters who elected them.

Pamela Price, elected as Alameda County District Attorney in 2022, implemented a policy to guard against racial biases in sentencing enhancements and exposed the exclusion of Black and Jewish people from death penalty juries. A court-order to review those biases is currently underway.

George Gascón, a former San Francisco police chief first elected as Los Angeles County District Attorney in 2020, established policies that prohibited his prosecutors from pursuing exorbitant sentencing enhancements, transferring juvenile cases into adult courts, and advocating against offender reentry at parole board hearings.

But their movement suffered a serious setback in this month's election when Price failed to defeat a recall, and Gascón lost his bid for reelection in a landslide to Nathan Hochman, a former federal prosecutor who ran for attorney general as a Republican two years ago. Those defeats followed on the heels of San Francisco's former progressive district attorney, **Chesa Boudin**, who was recalled in 2022.

The ousting of the two district attorneys  punctuates a change in statewide views on law enforcement and public safety approaches. California voters this election overwhelmingly approved **Proposition 36**, a tough-on-crime measure that stiffened penalties for some drug and theft crimes.

"You can't just burn the system down," said Anne Marie Schubert, former Sacramento County District Attorney, who battled former Gov. Jerry Brown over his criminal justice policies. "They get elected and then all of a sudden, they implement policies that are so far removed from being a real prosecutor who is seeking balance and accountability."

It's a sobering moment for criminal justice advocates who backed progressive prosecutors around the nation over the past decade.

"All successful movements experience setbacks, and the movement to course correct the criminal justice system is no different," said Anne Irwin, founder and director of the criminal justice advocacy group Smart Justice California. "We will regroup and continue to fight for the values that animate our work."

**Roots of the progressive prosecutor movement**

Nearly a decade ago, criminal justice advocates looked to who they saw as the most important decision makers in the state's criminal justice ecosystem – prosecutors.

In an attempt to counteract the over-incarceration of Black and brown people that resulted from decades of tough-on-crime prosecution, leaders of the movement encouraged prosecutors to use tools that weren't entirely dependent on incarceration as a way to address harm in a community.

According to Cynthia Chandler, policy director for Price, that has meant addressing the root causes of violence and giving prosecutors flexibility in how they respond to crime, such as sending more people to diversion programs as an alternative to incarceration.

"Ultimately, what's behind the vision of a progressive prosecutor is a prosecutor who is committed to the ethical mandate placed on prosecutors to search for truth and justice," Chandler said. "And the search for truth is not furthered by seeking out a pound of flesh."

Case 2:90-cv-00520-KJM-SCR    Document 8518-1    Filed 01/15/25    Page 59 of 72



Former Alameda County District Attorney Pamela Price speaks during a press conference in Oakland on Nov. 8, 2023. Photo by Jane Tyska, Bay Area News Group

The movement picked up in 2016 **with funding from Democratic mega-donor George Soros**. For the most part, progressive prosecutors have  been on the rise since then, with candidates finding success in places such as Chicago, Philadelphia and Brooklyn.

This election, two progressive prosecutors won their races in Orlando, Florida and Austin, Texas. But UC Berkeley political science professor Eric Schickler says progressive defeats in California suggest the need for recalibration.

"Social movements often come onto the scene with a very big, bold kind of vision," Schickler said. "And to the extent that they're successful and then get involved in actual governance, there tend to be forces that push back. It's hard to change everything all at once. There's built-in resistance both bureaucratically and also in public opinion."



**Are California prisons stiffing inmates on $200 release payments? Lawsuit says they are**

A 51-year-old California law requires the state to give $200 to prisoners upon release. Many wind up with less, according to a new class-action lawsuit.

SEPTEMBER 13, 2024

In California, these district attorneys faced an additional hurdle because the state allows voters to recall prosecutors before their term is up. Price lost her office just two years into a six-year term.

"Some of these prosecutors have been put in really tricky positions, and particularly with the ones who faced a recall, (they) were barely able to implement anything in office before wealthy interests had mobilized to gather enough signatures to try to drive them out," said Becca Goldstein, assistant professor of Law at UC Berkeley.

Dan Schnur, a political analyst and professor at the University of Southern California attributes the defeat of Price and Gascón to ideological and management factors. When voters expressed growing concern over what they viewed as a lenient response to public safety and criminal justice, Schnur said the DAs failed to recognize them.

"The best politicians are those who are able to adjust to and address those changes in public opinion," Schnur said. "Those who aren't able to adjust become former elected officials."

## What's next in L.A., Alameda County?

In the wake of their defeats, criminal justice reform advocates are taking a closer look at their strategy.

Boudin, now executive director of UC Berkeley's Criminal Law & Justice Center, said criminal justice reform advocates have to do a better job of messaging the vision for their policies.

"You can't expect elected prosecutors to do the work of solving homelessness and substance use. They don't have the tools (or) the mandate…so how can we, as a movement, make sure that we're not just electing progressive prosecutors, but we're electing mayors and boards of supervisors and city councils who are willing to do the policy work of solving these problems?" he said. "Because if we keep dumping them on the criminal justice system, it's not going to work."

District attorneys, he said, cannot and should not be expected to solve all of the world's problems.



Former Los Angeles County District Attorney George Gascón speaks at a Los Angeles County Democratic Party news conference outside the Staples Center in Los Angeles in 2020. Photo by Damian Dovarganes, AP Photo

"To think that it is the DA's job to clean up Skid Row, it's absurd," said Garrett Miller, president of the Los Angeles Public Defenders' union. "That is a societal failure…it's not just the DA, nor is it really his responsibility — even though he may claim it is."

It's unclear who will succeed Price. The Alameda County Board of Supervisors will appoint an interim replacement to lead the office until 2026. In Los Angeles County, the choice is definitive, with Hochman expected to make sweeping changes as soon as he replaces Gascon on Dec. 2.

"We're definitely afraid for our clients," Miller said. "It's a drastic change. Many more will do significantly more time. That's the reality of it."

Case 2:90-cv-00520-KJM-SCR   Document 8518-1   Filed 01/15/25   Page 62 of 72

Michele Hanisee, president of the Association of Deputy District Attorneys of Los Angeles, said "everyone's really excited" to see Hochman take over.

"We're immediately going to see the highly trained professionals of this office use their experience and knowledge to make decisions about the best outcomes for cases based upon the facts — rather than on blanket policies," she said. "Which is the best thing for the defendants, for the victims, and for public safety."

Alameda County Chief Public Defender Brendon Woods said district attorneys in the mold of Gascón and Price "moved prosecution in the right direction, but it really is the direction it should have been moving in all along."

"I think there's a space for prosecutors to do the right thing, independent of your label," he continued.

## What do voters want?

In Alameda County, Price was recalled with roughly 65% of votes. Nathan Hochman defeated Gascón with roughly 60% of votes.

"To be truthful, I would like to believe it's the end of (the progressive prosecutor movement)," Schubert said. "Any mainstream career prosecutor is going to tell you, yes – we support reforms. But at the end of it all, it cannot be extreme. It must be driven by the facts in the law. Every case is unique."

Those concerns were echoed by Napa County District Attorney Allison Haley, who backed Prop. 36.

"There seems to be this sort of sentiment that everyone, if they just took a class, would get better and engage in no more criminal activities. That kind of naivete is harmful," Haley said. "That can be true for many of the people we see through the criminal justice system. But we've done too good of a job of sanitizing what we do, because I believe that there exists cruelty."

Case 2:90-cv-00520-KJM-SCR    Document 8518-1    Filed 01/15/25    Page 63 of 72



Nathan Hochman talks to reporters during a news conference at the state Capitol in Sacramento on Oct. 17, 2022. Photo by Rich Pedroncelli, AP Photo

Groups that supported Gascón and Price say their defeats don't necessarily signal a far departure from voters' investment in criminal justice reform. Proponents of Prop. 36, for example, talked about steering more **people convicted of drug crimes to treatment**.

Hochman changed his political affiliation from a lifelong Republican to an independent before his run for district attorney. During his candidacy, he cited the need for more rehabilitation opportunities for incarcerated people and more community service programs for first-time, non-violent offenders.

That tells some who supported progressive prosecutors that voters have not walked away from those values, but they've expressed frustration that things aren't changing quickly enough, said Cristine Soto DeBerry, executive director of a nationwide organization that supports reform-oriented approaches to public safety.

"I think there is a need and an eagerness from voters and residents in California to see a justice system that actually works – that's not just a revolving door or a dungeon – and that we can find ways to problem solve,

Case 2:90-cv-00520-KJM-SCR    Document 8518-1    Filed 01/15/25    Page 64 of 72

that we can find ways to rehabilitate people, that we can find better ways to help victims heal," said Soto DeBerry.

Irwin said California prosecutors who are "repudiating" their tough-on-crime identity signals a shift.

"That's really the story of the progressive prosecution's evolution in California – that now, it's become mainstream for candidates in prosecutor races up and down the state to actually embrace reform," Irwin said. "They know that the approach they have taken for the last 30 years is no longer palpable for Californians. I really hope that they genuinely do the work of reform-minded prosecution rather than just paying it lip service at election time."

*This story was updated to correct the spelling of Alameda County Public Defender Brendon Woods' name.*

*CalMatters reporter Joe Garcia contributed to this report.*

*Cayla Mihalovich and Joe Garcia are California Local News fellows.*

**MORE ON CRIMINAL JUSTICE**



**California lets defendants challenge racism in court. Few have succeeded**

NOVEMBER 21, 2024



**Why Californians got tougher on crime: Bleak downtowns and attention-getting retail thefts**

NOVEMBER 6, 2024

Case 2:90-cv-00520-KJM-SCR     Document 8518-1     Filed 01/15/25     Page 65 of 72

## THE LATEST



**'Literally off the charts': LA's critically dry conditions stun scientists as fires rage**



**Newsom committed California to making its own insulin. It's at least a year behind his schedule**



**LA colleges move classes online, offer services to students affected by fire**



**New California bill would block trans females from playing in girls' sports**



**California abandons diesel truck ban and other clean-air rules before Trump is sworn in**

© 2025 CalMatters

# Exhibit F

| | |
|---|---|
| **From:** | Damon McClain |
| **To:** | Michael W. Bien; Jared Miller; Jenny Yelin; Lisa Ells; Matt Lopes; Kerry F. Walsh; Melissa Bentz; Nick Weber |
| **Cc:** | Jeffrey Metzner; Ernest Galvan; Pmello@hansonbridgett.com; Samantha Wolff ; David C. Casarrubias-González; Samantha M Bacon; Elise Thorn; Henry D. Dlugacz; Michael Ryan; Patricia M. Williams; Coleman Team - RBG Only; Donald Specter; Steve Fama |
| **Subject:** | RE: Coleman - Cancelation of Wednesday Standing Meeting |
| **Date:** | Tuesday, November 19, 2024 3:52:41 PM |

---

<div style="background-color: #fce5b0;">

**[EXTERNAL MESSAGE NOTICE]**
</div>

Hi Mike,

In accordance with the Ninth Circuit's stay, Defendants will not make the payments.

-Damon

---

**From:** Michael W. Bien <MBien@rbgg.com>
**Sent:** Tuesday, November 19, 2024 12:04 PM
**To:** Damon McClain <Damon.McClain@doj.ca.gov>; Jared Miller <JMiller@rbgg.com>; Jenny Yelin <JYelin@rbgg.com>; Lisa Ells <LElls@rbgg.com>; Matt Lopes <mlopes@pldolaw.com>; Kerry F. Walsh <kwalsh@pldolaw.com>; Melissa Bentz <Melissa.Bentz@cdcr.ca.gov>; Nick Weber <Nicholas.Weber@cdcr.ca.gov>
**Cc:** Jeffrey Metzner <jeffrey.metzner@cuanschutz.edu>; Ernest Galvan <EGalvan@rbgg.com>; Pmello@hansonbridgett.com; Samantha Wolff <SWolff@hansonbridgett.com>; David C. Casarrubias-González <DCasarrubias-Gonzalez@hansonbridgett.com>; Samantha M Bacon <SBacon@hansonbridgett.com>; Elise Thorn <Elise.Thorn@doj.ca.gov>; Henry D. Dlugacz <hdlugacz@blhny.com>; Michael Ryan <mryan@pldolaw.com>; Patricia M. Williams <harconwil@gmail.com>; Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>; Donald Specter <dspecter@prisonlaw.com>; Steve Fama <sfama@prisonlaw.com>
**Subject:** RE: Coleman - Cancelation of Wednesday Standing Meeting

<div style="background-color: #fcf3cf;">

**EXTERNAL EMAIL:** This message was sent from outside DOJ. Please do not click links or open attachments that appear suspicious.
</div>

We disagree.  But more important, are Defendants going to make the November payments to employees and for working conditions or not?

Michael Bien
ROSEN BIEN GALVAN & GRUNFELD LLP
101 Mission St.  Sixth Floor
San Francisco, CA 94105
(415) 433-6830 (telephone)
(415) 433-7104 (fax)
(415) 439-9821 (cell)
mbien@rbgg.com
www.rbgg.com

CONFIDENTIALITY NOTICE The information contained in this e-mail message may be privileged, confidential and protected from disclosure. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this e-mail message in error, please e-mail the sender at mbien@rbgg.com.

**From:** Damon McClain <Damon.McClain@doj.ca.gov>
**Sent:** Tuesday, November 19, 2024 11:33 AM
**To:** Michael W. Bien <MBien@rbgg.com>; Jared Miller <JMiller@rbgg.com>; Jenny Yelin <JYelin@rbgg.com>; Lisa Ells <LElls@rbgg.com>; Matt Lopes <mlopes@pldolaw.com>; Kerry F. Walsh <kwalsh@pldolaw.com>; Melissa Bentz <Melissa.Bentz@cdcr.ca.gov>; Nick Weber <Nicholas.Weber@cdcr.ca.gov>
**Cc:** Jeffrey Metzner <jeffrey.metzner@cuanschutz.edu>; Ernest Galvan <EGalvan@rbgg.com>; Pmello@hansonbridgett.com; Samantha Wolff <SWolff@hansonbridgett.com>; David C. Casarrubias-González <DCasarrubias-Gonzalez@hansonbridgett.com>; Samantha M Bacon <SBacon@hansonbridgett.com>; Elise Thorn <Elise.Thorn@doj.ca.gov>; Henry D. Dlugacz <hdlugacz@blhny.com>; Michael Ryan <mryan@pldolaw.com>; Patricia M. Williams <harconwil@gmail.com>; Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>; Donald Specter <dspecter@prisonlaw.com>; Steve Fama <sfama@prisonlaw.com>
**Subject:** RE: Coleman - Cancelation of Wednesday Standing Meeting

[EXTERNAL MESSAGE NOTICE]

Dear Mike,

Defendants disagree with Plaintiffs' interpretation of the Ninth Circuit's stay order. The expenditure order is necessarily dependent on the now-stayed June 25 and 27 contempt orders. In addition, the context of the contempt proceedings and the briefing on the motion to stay make Plaintiffs' position untenable. The motions panel denied the first stay motion *without prejudice* and with instructions to direct any further stay motion to the merits panel so that panel could decide the issue. It has now done so.

-Damon

**From:** Michael W. Bien <MBien@rbgg.com>
**Sent:** Saturday, November 16, 2024 10:56 AM
**To:** Damon McClain <Damon.McClain@doj.ca.gov>; Jared Miller <JMiller@rbgg.com>; Jenny Yelin <JYelin@rbgg.com>; Lisa Ells <LElls@rbgg.com>; Matt Lopes <mlopes@pldolaw.com>; Kerry F. Walsh <kwalsh@pldolaw.com>; Melissa Bentz <Melissa.Bentz@cdcr.ca.gov>; Nick Weber <Nicholas.Weber@cdcr.ca.gov>
**Cc:** Jeffrey Metzner <jeffrey.metzner@cuanschutz.edu>; Ernest Galvan <EGalvan@rbgg.com>; Pmello@hansonbridgett.com; Samantha Wolff <SWolff@hansonbridgett.com>; David C. Casarrubias-González <DCasarrubias-Gonzalez@hansonbridgett.com>; Samantha M Bacon <SBacon@hansonbridgett.com>; Elise Thorn <Elise.Thorn@doj.ca.gov>; Henry D. Dlugacz

<hdlugacz@blhny.com>; Michael Ryan <mryan@pldolaw.com>; Patricia M. Williams
<harconwil@gmail.com>; Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>; Donald
Specter <dspecter@prisonlaw.com>; Steve Fama <sfama@prisonlaw.com>
**Subject:** RE: Coleman - Cancelation of Wednesday Standing Meeting
**Importance:** High

EXTERNAL EMAIL: This message was sent from outside DOJ. Please do not click links or open attachments that appear suspicious.

Damon and Paul

Having more carefully reviewed the Ninth Circuit's order granting the stay pending appeal in the context of the contempt proceedings, it is clear that the August 29, 2024 and September 6, 2024 Orders remains fully in effect and must be fully performed.  The Ninth Circuit stayed only the two June Orders, meaning that Defendants will no longer have to file certifications or make *additional* monthly deposits of fines pending the resolution of the appeal.  The Ninth Circuit previously *denied* a stay as to the payment of the then accumulated fines, which Defendants subsequently deposited in to the Special account, ceding full control of those funds to the Special Master and the federal court, as reflected in the September 6 Stipulation and Order.  While Defendants reserved their rights to appeal the August 29, 2024 and September 6 Orders, Defendants have not requested nor obtained a stay of the August 29, 2024 or September 6 Orders, and the Ninth Circuit, though informed of the existence of those orders,  agreed with plaintiffs that staying the plan to spend the fines for compensatory purposes such as recruitment and retention bonuses and improvements to working conditions would be inappropriate, harmful and against the public interest.

We expect that Defendants will comply with the requirements of the September 6 Order and Plan using the funds already deposited in the Special Fund on the court-ordered schedule.

Michael Bien

ROSEN BIEN GALVAN & GRUNFELD LLP
101 Mission St.  Sixth Floor
San Francisco, CA 94105
(415) 433-6830 (telephone)
(415) 433-7104 (fax)
(415) 439-9821 (cell)
mbien@rbgg.com
www.rbgg.com

CONFIDENTIALITY NOTICE The information contained in this e-mail message may be privileged, confidential and protected from disclosure. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this e-mail message in error, please e-mail the sender at mbien@rbgg.com.

**From:** Michael W. Bien
**Sent:** Wednesday, November 13, 2024 11:28 AM
**To:** Damon McClain <Damon.McClain@doj.ca.gov>; Jared Miller <jmiller@rbgg.com>; Jenny Yelin <JYelin@rbgg.com>; Lisa Ells <LElls@rbgg.com>; Matt Lopes <mlopes@pldolaw.com>; Kerry F. Walsh <kwalsh@pldolaw.com>; Melissa Bentz <Melissa.Bentz@cdcr.ca.gov>; Nick Weber <Nicholas.Weber@cdcr.ca.gov>
**Cc:** Jeffrey Metzner <jeffrey.metzner@cuanschutz.edu>; Ernest Galvan <EGalvan@rbgg.com>; Pmello@hansonbridgett.com; Samantha Wolff <SWolff@hansonbridgett.com>; David C. Casarrubias-González <DCasarrubias-Gonzalez@hansonbridgett.com>; Samantha M Bacon <SBacon@hansonbridgett.com>; Elise Thorn <Elise.Thorn@doj.ca.gov>; Henry D. Dlugacz <hdlugacz@blhny.com>; Michael Ryan <mryan@pldolaw.com>; Patricia M. Williams <harconwil@gmail.com>; Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>; Donald Specter <dspecter@prisonlaw.com>; Steve Fama <sfama@prisonlaw.com>
**Subject:** RE: Coleman - Cancelation of Wednesday Standing Meeting

Damon and Paul

We urge Defendants to move forward voluntarily with the positive steps to improve recruitment and retention that we have been working on—including the bonuses—as they have been broadly communicated to CDCR MH clinicians and are reasonably expected to be paid within weeks.  The State's failure to follow through on these now promised bonuses will exacerbate the critical and ongoing staffing crisis plaguing CDCR MH programs, putting patients' lives at risk.

Whether or not the 9th Circuit affirms or reverses the Contempt finding, CDCR remains in violation of the underlying staffing orders and remains unable to provide minimally adequate mental health care.  There is nothing preventing CDCR and the State from moving forward with the bonuses as planned.  We sincerely hope that the Governor and the Secretary, and their attorneys,  will allow these already budgeted and allocated funds to be paid to CDCR's hard working and dedicated MH clinicians to encourage them to remain employed and to help recruit others to join.

Thank you.

Michael Bien
ROSEN BIEN GALVAN & GRUNFELD LLP
101 Mission St.  Sixth Floor
San Francisco, CA 94105
(415) 433-6830 (telephone)
(415) 433-7104 (fax)
(415) 439-9821 (cell)
mbien@rbgg.com
www.rbgg.com

CONFIDENTIALITY NOTICE The information contained in this e-mail message may be privileged, confidential and protected from disclosure. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this e-mail message in error, please e-mail the sender at mbien@rbgg.com.

---

**From:** Damon McClain <Damon.McClain@doj.ca.gov>
**Sent:** Wednesday, November 13, 2024 10:48 AM
**To:** Jared Miller <JMiller@rbgg.com>; Jenny Yelin <JYelin@rbgg.com>; Michael W. Bien <MBien@rbgg.com>; Lisa Ells <LElls@rbgg.com>; Matt Lopes <mlopes@pldolaw.com>; Kerry F. Walsh <kwalsh@pldolaw.com>; Melissa Bentz <Melissa.Bentz@cdcr.ca.gov>; Nick Weber <Nicholas.Weber@cdcr.ca.gov>
**Cc:** Jeffrey Metzner <jeffrey.metzner@cuanschutz.edu>; Ernest Galvan <EGalvan@rbgg.com>; Pmello@hansonbridgett.com; Samantha Wolff <SWolff@hansonbridgett.com>; David C. Casarrubias-González <DCasarrubias-Gonzalez@hansonbridgett.com>; Samantha M Bacon <SBacon@hansonbridgett.com>; Elise Thorn <Elise.Thorn@doj.ca.gov>; Henry D. Dlugacz <hdlugacz@blhny.com>; Michael Ryan <mryan@pldolaw.com>; Patricia M. Williams <harconwil@gmail.com>
**Subject:** Coleman - Cancelation of Wednesday Standing Meeting

[EXTERNAL MESSAGE NOTICE]

Dear Plaintiffs' Counsel and Special Master Lopes,

In light of the Ninth Circuit's ruling staying the contempt orders, Defendants propose canceling today's standing meeting to discuss the plan for expenditure of fines so the parties can consider whether it makes sense to continue to hold these meetings, and discuss that topic next Wednesday. Please let us know if that makes sense to everyone.  Thank you.

-Damon

**Damon G. McClain**
**Supervising Deputy Attorney General**
**455 Golden Gate Avenue, Suite 11000**
**San Francisco, CA 94102-7004**
tel.: (415) 510-3596
fax: (415) 703-5843
damon.mcclain@doj.ca.gov

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.