# EXHIBIT A



mlopes@pldolaw.com

January 6, 2025

Samantha Wolff, Esquire                    Ernest Galvan, Esquire
Hanson Bridgett LLP                        ROSEN BIEN GALVAN & GRUNFELD LLP
1676 N. California Blvd., Suite 620        101 Mission Street, 6th Floor
Walnut Creek, CA  94596                    San Francisco, CA 94105
SWolff@hansonbridgett.com                  egalvan@rbgg.com

Dear Attorneys Wolff and Galvan:

This letter provides my team's comments to the Parties' Agreed Upon Unified Telemental Health-Telepsychiatry Policy [hereinafter "Parties' Agreed-Upon Policy"],[1] which defense counsel distributed on December 6, 2024.

While this letter delineates our concerns with some provisions contained in the Parties' Agreed-Upon Policy, I also want to acknowledge the significant effort the parties' have directed to settling disputes related to the appropriate scope of telemental health services which have, in some instances, been simmering for years without resolution.  While this letter communicates specific concerns we have with the parties' proposal, we do not seek to stand in the way of the parties' compromise moving forward but rather offer these comments in the spirit of helping to make the expanded use of telemental health services in CDCR successful.

Briefly, our concerns relate to what we consider gaps in the Parties' Agreed-Upon Policy which, for practical purposes, could lead to unfettered use of telemental health in higher levels of care. While the statewide minimum on-site allocation of 50 percent is helpful, we are concerned that the lack of minimums for on-site staff at the institutional level could have a detrimental impact on the environment of care for patients at EOP and higher levels of care.  Our concerns are compounded by the inclusion of what we consider to be an insufficient requirement of only one site visit per year.  Finally, where the Parties' Agreed-Upon Policy specifies services that have to be provided by on-site staff, there is at least one significant omission (Crisis Intervention Team (CIT) services) that should be addressed prior to finalizing the policy.

---

[1] The Parties' Agreed Upon Policy would serve as a unified policy governing remote mental health services provided psychiatrists, psychologists, clinical social workers, marriage and family therapists, and professional clinical counselors, superseding both the Telepsychiatry Policy and Telemental Health Policy.

Northwoods Office Park
1301 Atwood Avenue, Suite 215 N  Johnston, RI  02919
tel 401 824 5100    fax 401 824 5123

pldolaw.com

Samantha Wolff, Esquire
Ernest Galvan, Esquire
January 3, 2025
Page 2

Overarching Concerns

My clinical experts and I have historically supported significant use of remote psychiatry
services for the vast majority of the MHSDS patients (i.e., those at the Correctional Clinical Case
Management Services (3CMS) level of care). *See, e.g.*, ECF No. 7682 at 5 (noting "CDCR is
able to provide psychiatry via telehealth for Correctional Clinical Case Management System
(3CMS), who comprise the vast majority of Coleman class members, without limitation").[2]
Similarly, we have also supported significant use of telemental health by psychologists and
clinical social workers as well as development of a hybrid model, whereby on-site clinical staff
could work part of their week remotely. ECF No. 8165 at 28-30. However, we continue to have
reservations about unfettered utilization of telemental health for patients at higher levels of care.[3]
As previously reported, these concerns relate to the "relative disconnection" we have observed
between telemental health providers and their patients' "challenging environment of care" as
opposed to the unique ability of on-site providers to positively impact the treatment milieu. ECF
No. 8165 at 29.

Consistent with our position on telepsychiatry, my clinical experts and I "support the use of
telemental health as one tool to help address the staffing crisis among primary clinician[s]" in
CDCR. Special Master's Report and Proposed Telemental Health Policy, ECF No. 8165 at 1.
However, providing mental health services remotely is not a "panacea" solution to all of
defendants' staffing problems. ECF No. 8165 at 1. Indeed, we remain concerned that by
introducing "telemental health…on an unprecedented scale without minimal safeguards, there
could be unintended collateral consequences inapposite to the objective of bringing defendants
into compliance with the court-ordered remedy in this matter." *Id.* at 1-2.

---

[2] As of October 28, 2024, class members at the 3CMS level of care comprised 74 percent of the
MHSDS population. See Mental Health Services Delivery System (MHSDS) Management
Information Summary (MIS) Report (Oct. 28, 2024), provided to the Special Master via
SharePoint as part of the *Coleman* Monthly Package.

[3] "Telepsychiatry is not clinically desirable as a frontline approach to providing psychiatric
services for [patients] with the most intensive or emergent needs. The higher the acuity of
mental illness, the less telepsychiatry should be relied on as a permissible method of treatment.
…Although the efficacy of telepsychiatry for EOP [patients] is not clear or recommended as a
permanent solution at this time, it would be recommended that a psychiatrist be on-site at least
quarterly to treat EOP [patients], given the frequency of psychiatric contacts required by the
Program Guide." ECF No. 7682 at 54 n. 32.



Samantha Wolff, Esquire
Ernest Galvan, Esquire
January 3, 2025
Page 3

Our experience monitoring the provision of telemental health services in CDCR institutions demonstrates that CDCR can in fact deploy a robust telemental health program and significantly improve staffing fill rates while observing minimal safeguards and protections for patients at higher levels of care.  Indeed, the previously approved Telepsychiatry Policy included minimum requirements for on-site psychiatry staff in EOPs and only permitted telepsychiatry in MHCBs and PIPs under "emergency circumstances."  These minimal guardrails have not presented a barrier to improving psychiatry staffing levels; in fact, defendants have made significant strides toward consistently filling 90 percent of psychiatry positions in recent years.  *See* Special Master's Report and Recommendation on a Final Proposed Telepsychiatry Policy, ECF No. 7682 at 6 ("The expansion of telepsychiatry during the provisional approval period permitted the replacement of on-site psychiatry for 3CMS patients, who comprise the vast majority of *Coleman* class members, *see supra* note 1, and allowed CDCR the flexibility to appropriately utilize telepsychiatry at other levels of care in the face of psychiatric staffing shortages.  As will be demonstrated below, this expansion enabled CDCR, for the first time, to fill a sufficient number of psychiatry positions statewide to satisfy the Court's 2002 mental health staffing vacancy order.").

Our view has been that CDCR could also make progress addressing the primary clinician vacancy crisis by deploying a telemental health policy with similar guardrails in place, aimed at ensuring some degree of on-site clinician presence *in each institution* with EOP programs.  As discussed below, the Parties' Agreed-Upon Policy departs from this approach by instituting *statewide* allocation limits on telemental health providers rather than institution-specific protections.

Concerningly, the Parties' Agreed-Upon Policy does not include any direction as to the distribution of on-site staff across institutions, mental health levels of care, or within treatment teams.  In doing so, the Parties' Agreed-Upon Policy would permit entirely virtual treatment teams for patients at the EOP level of care, and in some cases at the MHCB and PIP levels of care as well.  Elsewhere, institutions with complex mental health programs (i.e. EOP and higher levels of care) could be left with de minimis on-site staff presence.  We remain concerned that leaving prisons with complex mental health programs "with only a nominal onsite clinical presence" could "alter[] the balance between the twin imperatives of custody and treatment." ECF No. 8165 at 3.

Moreover, we note that the modifications to the policies governing the delivery of telemental health services contemplated in the Parties' Agreed-Upon Policy come on the heels of CDCR opening new EOP programs in several institutions that have not historically provided this level of care.  In his 30th Round Monitoring Report – Part D, the Special Master expressed his "reservations about introducing this more intensive mental health program to already understaffed and, in some cases, geographically remote, institutions." ECF No. 8359 at 36.  Indeed, our monitoring of these new EOP programs to date has revealed that some of these institutions, despite the efforts of dedicated staff members, were not prepared to take on the task of caring for these EOP patients.  With these concerns in mind, we urge CDCR to be mindful of



Samantha Wolff, Esquire
Ernest Galvan, Esquire
January 3, 2025
Page 4

the need to staff these new EOP programs with mental health that have on-site experience providing EOP level of care.

To be fair, the Parties' Agreed-Upon Policy is not devoid of any assurance of on-site mental health staff; instead, it presents a new approach to ensuring some degree of on-site mental health staff not previously contemplated in either the Telepsychiatry Policy, the Special Master's proposed telemental health policy, or CDCR's telemental health policy. These include a new requirement that at least 50 percent of psychiatry and primary clinician staff must be on-site. The Parties' Agreed-Upon Policy also requires that CDCR "ensure there are a sufficient number of on-site staff to provide in-person services" for a number of mental health services,[4] another new approach upon which the parties had not previously reached consensus.

We appreciate the parties' desire to settle longstanding conflicts regarding the deployment of telemental health services by trying a new approach, anchored by a statewide allocation cap and requirements that on-site staff provide certain mental health services. While we would continue to strongly believe that guaranteeing on-site mental health staff *at the institution level* better preserves the treatment milieu and is most consistent with the provision of adequate mental health services in a prison setting, we respect the parties' compromise proposal and will monitor and report on any concerns going forward.

---

[4] The Parties' Agreed-Upon Policy requires that institutions "ensure there are a sufficient number of on-site staff to provide in-person services for" the following:

- Use of Force incidents;
- PREA evaluations;
- Follow ups on patients who refuse or did not show for scheduled appointments and require assessment due to clinical concerns, but cannot be adequately assessed remotely;
- Assessment of patients for whom there are clinical concerns that cannot be adequately assessed remotely either due to patient presentation/cooperation or inability to conduct a remote contact;
- Physical assessments, such as for restraints/seclusion, or emergent concerns related to neurological (placeholder for lack of a better term – thinking tone, cogwheeling, movement disorders, etc.) or medication side effects;
- Treatment for patients that the treatment team determined telemental health is not an appropriate treatment modality;
- Treatment in situations where technical limitations or malfunctions interfere with telemental health services; and,
- On-site specific duties during on-call coverage.

Parties Agreed-Upon Policy at 6. The Special Master notes a lingering "placeholder" in bullet number 5 regarding "physical assessments, such as for restraints/seclusion" that needs to be finalized.



Samantha Wolff, Esquire
Ernest Galvan, Esquire
January 3, 2025
Page 5

<u>Additional Recommendations</u>

In addition to the overarching concerns noted above, we would also request the parties consider incorporating the following targeted adjustments to their Agreed-Upon Proposal.

First, consistent with the Special Master's Proposal Telemental Health Policy, we recommend amending the Parties' Agreed-Upon Proposal to require that Crisis Intervention Teams (CIT) services be provided by on-site staff absent emergency circumstances.  ECF No. 8165 at 33 ("The Special Master's proposed policy includes language limiting the use of telemental health "to respond to emergent/urgent mental health referrals or incidents involving danger to self/suicidality/self-harm, except as a last resort in emergency situations when the institution's assigned on-site crisis clinician (i.e. psychologist and/or licensed clinical social worker (LCSW)) personnel are not available."); *see also id.* at 33 n. 20 (noting "CDCR's CIT policy requires that, 'The CIT sees each patient in-person, in a confidential setting, together as a team, and as close to the patient's housing unit as possible.'").

Second, we strongly recommend increasing the number of site visits required per year to be consistent with the previously approved telepsychiatry policy.  Incorporating additional site visits by telemental health providers to the institutions they serve would ameliorate some of our overarching concerns with the relative disconnection between telemental health providers and the patients and institutions they serve.

Third, on page 9, the Parties' Agreed-Upon Policy contemplates primary clinicians and psychiatrists potentially serving as telepresenters and provides the following: "When the telepresenter is a Mental Health Primary Clinician (MHPC) or Mental Health Medical Doctor (MHMD), the clinical contact shall be considered a joint appointment."  While we are not opposed to joint appointments (and agree that in some instances, joint appointments may be clinically indicated), we recommend the adjusting this language, as follows (in redline format): "When the telepresenter is a Mental Health Primary Clinician (MHPC) or Mental Health Medical Doctor (MHMD), the clinical contact ~~shall~~ may be considered a joint appointment <u>if each clinician has a meaningful contact with the patient consistent with policy</u>."

Thank you for the opportunity to provide these comments and suggested amendments to the Parties' Agreed-Upon Policy.  We are available to meet and confer with the parties to discuss our concerns further and facilitate resolution where possible.

Sincerely,


*/s/ Matthew A. Lopes, Jr.*


Matthew A. Lopes, Jr.
Special Master

