## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN, et al.,

    Plaintiffs

        v.                     No. 2:90-cv-0520-KJM-SCR

GAVIN NEWSOM, et al.,

    Defendants

### THE *COLEMAN* SPECIAL MASTER'S THIRTY-FIRST ROUND FOCUSED HEAT PLAN MONITORING REPORT

Matthew A. Lopes, Jr., Esq.

Special Master

PANNONE LOPES DEVEREAUX & O'GARA LLC

Northwoods Office Park, Suite 215-N

1301 Atwood Avenue

Johnston, RI 02908

(401) 824-5100

Fax: (401) 824-5123

February 28, 2025

## <u>TABLE OF CONTENTS</u>

THE COLEMAN SPECIAL MASTER'S THIRTY-FIRST ROUND FOCUSED HEAT
PLAN MONITORING REPORT ......................................................................... 1

I.      INTRODUCTION .......................................................................................... 1

      A.     Background and History .................................................................. 3

      B.     CDCR's 2024 Heat Plan and Updates Memorandum............................ 5

      C.     CDCR's Expectations Relative to Institutional Oversight of Heat Plan
           Operations Memo................................................................................ 7

      D.     Special Master's Responses to Defendants' Objections to the Draft Report .......... 8

      E.     Special Master's Responses to Plaintiffs' Comments regarding the Draft
           Report................................................................................................ 20

II.     SUMMARY OF THE SPECIAL MASTER'S FINDINGS ............................. 22

      A.     Local Operating Procedures (LOP) ...................................................... 22

      B.     Institutional Response to Headquarters' Expectations Memo ............................. 23

      C.     Monthly Summary Reports.................................................................... 24

      D.     Staff Knowledge of Heat Plan and Procedure ...................................... 26

      E.     Outdoor Temperature Logs .................................................................. 28

      F.     Indoor Temperature Logs...................................................................... 30

      G.     Monitor's Temperature Measurements ................................................ 33

      H.     Accommodations and Cooling Measures .............................................. 34

      I.     Annual Heat Pathologies Training ........................................................ 36

CONCLUSION................................................................................................ 37

INSTITUTIONAL SUMMARIES ..................................................................... 41

CALIFORNIA CORRECTIONAL INSTITUTION (CCI) .................................. 42

CENTRAL CALIFORNIA WOMEN'S FACILITY (CCWF) .................................. 47

CALIFORNIA HEALTH CARE FACILITY – PSYCHIATRIC INPATIENT PROGRAM
(CHCF-PIP) .................................................................................................... 55

CALIFORNIA INSTITUTION FOR WOMEN (CIW)................................................................ 60

CALIFORNIA MEDICAL FACILITY – PSYCHIATRIC INPATIENT PROGRAM
(CMF-PIP) ............................................................................................................................. 67

CALIFORNIA REHABILITATION CENTER (CRC)................................................................ 72

CALIFORNIA SUBSTANCE ABUSE TREATMENT FACILITY (CSATF)............................ 77

CALIFORNIA STATE PRISON/CORCORAN (CSP/Corcoran) ................................................ 84

CALIFORNIA STATE PRISON/LOS ANGELES COUNTY (CSP/LAC).................................. 91

CALIFORNIA STATE PRISON/SACRAMENTO (CSP/Sac) ..................................................... 97

KERN VALLEY STATE PRISON (KVSP).................................................................................. 103

MULE CREEK STATE PRISON (MCSP).....................................................................................110

PLEASANT VALLEY STATE PRISON (PVSP)...........................................................................116

SALINAS VALLEY STATE PRISON – PSYCHIATRIC INPATIENT PROGRAM
(SVSP-PIP) ............................................................................................................................. 121

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN, et al.,

     **Plaintiffs,**

     **vs.**                         No. 2:90-cv-0520 KJM-SCR

GAVIN NEWSOM, et al.,

     **Defendants.**

### THE COLEMAN SPECIAL MASTER'S THIRTY-FIRST ROUND FOCUSED HEAT PLAN MONITORING REPORT

### I.    INTRODUCTION

While "[d]eveloping plans to monitor incarcerated persons on" heat-sensitive medication[1] "is a foundational remedial requirement" and has been subject to the Special Master's monitoring "throughout the mastership," the Special Master began the Thirty-First Round of monitoring with a focused review of defendants' heat plan implementation. *See* Thirtieth Round Monitoring Report – Part D, ECF No. 8359 at 44 (citing *Coleman v. Wilson*, 912 F. Supp. 1282, 1309-11 (E.D. Cal., Sept. 13, 1995). The Special Master conducted this focused review of defendants' heat plan implementation based on the excessive heat impacting the State of California during the 2024 heat season as well as specific "concerning practices and policy

---

[1] *See* CDCR "2024 Heat Plan and Updates" Memorandum at 2 (April 8, 2024), attached hereto as Exhibit A ("The Department must develop, implement, and maintain a [heat plan] to prevent serious threats of life and health to incarcerated person[s] taking medications that can impair the body's ability to regulate temperature during periods of high heat."); *see also* Centers for Disease Control, "Heat and Medications – Guidance for Clinicians," available at https://www.cdc.gov/heat-health/hcp/clinical-guidance/heat-and-medications-guidance-for-clinicians.html (last accessed December 20, 2024) (noting "[s]ome medications" – including "some antipsychotic medications [and] some antidepressants" – "interfere with thermoregulation and/or fluid balance, amplifying the risk of harm from hot weather.").

violations" uncovered during monitoring tours of newly-established EOP programs in CDCR institutions. *Id.*

Unfortunately, as described herein, this focused review revealed continuing challenges with full and adequate implementation of the heat plan. More than three decades after the parties stipulated to the heat plan remedy in this case, the risk of failing to adequately care for and monitor patients on heat-sensitive medication remains grave;[2] and yet, defendants' consistent implementation of the heat plan requirements across CDCR in many ways remains elusive.

This Report includes the monitor's findings from focused heat plan monitoring tours of the following 14 CDCR institutions during the 31st Monitoring Round: California Correctional Institution (CCI), Central California Women's Facility (CCWF), California Institution for Women (CIW), California State Prison/Corcoran (CSP/Corcoran), California Rehabilitation Center (CRC), California Substance Abuse Treatment Facility (CSATF), California State Prison/ Los Angeles County (CSP/LAC), California State Prison/Sacramento (CSP/Sac), Kern Valley State Prison (KVSP), Mule Creek State Prison (MCSP), Pleasant Valley State Prison (PVSP), California Health Care Facility – Psychiatric Inpatient Program (CHCF-PIP), California Medical Facility – Psychiatric Inpatient Program (CMF-PIP), and Salinas Valley State Prison – Psychiatric Inpatient Program (SVSP-PIP).

This report covers defendants' compliance with remedial requirements related to *Coleman* class members on heat-sensitive medication, including CDCR's 2024 Heat Plan and Updates Memorandum dated April 8, 2024, CDCR's Expectations Relative to Institutional Oversight of Heat Plan Operations Memorandum dated August 2, 2024 (herein after

---

[2] *See infra* note 4 and accompanying text (discussing 1991 "heat and medication related" deaths of three CMF patients); *see also infra* note 7 and accompanying text (discussing July 2024 case of a suspected heat related death at CCWF).

"Expectations Memo"), and plans, policies, and protocols provisionally approved by the Court in 1997, known as the Mental Health Services Delivery System (MHSDS) Program Guide and its progeny.

The monitoring focus areas[3] in this Report include heat alert activation data, heat-related illnesses, staff knowledge of heat plan policy and procedures, completion of temperature logs, in-cell temperatures, cooling measures and reasonable accommodations, heat pathologies training, and institution-specific operating procedures. The summaries of the monitoring focus areas appear below in Part II. Appendix A is comprised of institution-by-institution summaries of the monitor's findings during the respective monitoring tours.

A.    **Background and History**

In 1992, during the pendency of this action and following the "heat and medication related deaths" of three incarcerated individuals at the California Medical Facility (CMF)[4] in Vacaville, California, Plaintiffs renewed their 1991 motion for a preliminary injunction concerning the procedures to be utilized by CDCR during periods of excessive heat. *Coleman v. Wilson*, 912 F. Supp. 1282 at 1311 (E.D. Cal., Sept. 13, 1995). A stipulated order for preliminary

---

[3] In a small number of cases, the monitor was unable to assess compliance for some monitoring focus areas during the focused heat plan tours. The Special Master will revisit these monitoring focus areas at these institutions during his next full scale monitoring tours during the 31st round of monitoring.

[4] As the Court noted in its September 13, 1995 decision, "Plaintiffs originally sought a preliminary injunction in this action on August 1, 1991, following the heat and medication related deaths of three inmates on psychotropic medications. That request for preliminary injunctive relief was denied on the basis of a memorandum submitted by defendants at the time of the hearing on the request for preliminary injunction and evidence of some steps being taken by defendants to address the problem. Since the preliminary injunction was denied in the fall and trial was then set for early summer, the matter was not revisited until April 2, 1992, when plaintiffs renewed their motion for preliminary injunction. In the interim, defendants had done almost nothing to have a permanent plan ready for the summer. The matter was resolved on the eve of hearing by stipulated injunction, after settlement negotiations with the magistrate judge." *Coleman*, 912 F. Supp. 1282 at 1311.

3

injunctive relief followed on May 7, 1992 which created the foundational framework for what is described today as the Heat Plan and Updates Memorandum which is annually updated and most recently circulated to CDCR prisons on April 8, 2024.   After trial the Court ordered the stipulated preliminary injunction permanent, "regretfully conclude[ing] that without an order" requiring defendants to monitor incarcerated persons on heat sensitive medication, "defendants [were] likely not to do so." *Id.*

The May 7, 1992 Stipulated Order applied to part of the Plaintiff class who are at "heat risk," i.e. those inmates who were prescribed, or who will be prescribed, "psychotropic drugs" in this litigation.  ECF No. 232 at 2.  The 1992 Stipulated Order required that CDCR institutions maintain a weekly list[5] of the inmates prescribed the heat-risk medications.  *Id.* at 3.  In addition, institutions were required to keep records concerning outside air temperatures in excess of 90 degrees, inside air temperatures in excess of 90 degrees, and medical incidents significantly related to heat exposure.  *Id.* at 5-6.  The stipulated order also established requirements for three stages of Heat Alerts (Stages I, II, and III).  *See id.* 8-10; *see also infra* pp. 5-6 for discussion of the three Heat Alert stages.  Whenever, in a clinician's judgement, a heat risk inmate was suffering from a medical condition that is related to heat exposure, it was required to be documented on a standard form "heat incident log".  ECF No. 232 at 8.  Finally, the stipulated order required staff to receive annual training regarding the heat plan and its requirements.  *Id.* at 11.

---

[5] Since the original stipulated order was entered, this requirement has changed to daily.  *See* "2024 Heat Plan and Updates" Memorandum at 2 (April 8, 2024), attached hereto as Exhibit A.

### B.    CDCR's 2024 Heat Plan and Updates Memorandum

In advance of each year's heat season (May 1 through October 31), CDCR releases a memorandum to the field reiterating heat plan requirements.  CDCR's 2024 Heat Plan and Updates Memorandum was released on April 8, 2024.  *See generally* "2024 Heat Plan and Updates" Memorandum (April 8, 2024), attached hereto as *Exhibit A*.

Consistent with the 1992 stipulated plan, the 2024 Heat Plan and Update Memorandum:

- Requires institutions to "generate and distribute daily a list of all incarcerated persons currently prescribed" medication on the Heat Alert Medications List.  *Exhibit A* at 2.[6]

- Identifies signs and symptoms of heat stress and provides direction for treating and documenting incidents of heat stress.  *Exhibit A* at 3.

- Establishes requirements for monitoring and recording both outside ambient temperature and indoor air temperature.  *Exhibit A* at 3-4.

- Defines the three Heat Alert stages and establishes staff responsibilities for each stage, as follows:

    o Stage I Heat Alert: A Stage I Heat Alert is triggered when "*outside* temperature rises to 90 degrees or more" and requires heat-risk incarcerated persons to return to housing, unless "cooling measures" are initiated.  In addition, heat-risk incarcerated persons "are restricted to a maximum of 30 minutes outside to perform officially sanctioned activities, such as returning to housing units and receiving medications."  *Exhibit A* at 4.

---

[6] There are now 48 medications on the list of heat risk medications.  *Exhibit A* at 8.

5

- o <u>Stage II Heat Alert</u>: A Stage II Heat Alert is triggered when "the temperature *inside* any area occupied by heat-risk incarcerated person rises to 90 degrees or more." During a Stage II Heat Alert, "[s]taff *must* initiate cooling and hydration measure, which may include cool drinking water, misting, and cool showers." In addition, staff are required to "increase observation of heat-risk incarcerated persons." *Exhibit A* at 4.

- o <u>Stage III Heat Alert</u>: A Stage III Heat Alert is triggered when "the temperature *inside* any area occupied by heat-risk incarcerated persons rises to 95 degrees or more." During a Stage III Heat Alert, "[n]ursing or other medically trained personnel must perform medical rounds to observe each heat-risk incarcerated person at least once every two hours." Further, staff must provide cooling measures or send incarcerated persons showing signs or symptoms of heat-related illness to the Triage and Treatment Area (TTA). *Exhibit A* at 4-5.

- Requires institutions to submit a "Heat Plan Monthly Summary Report" to headquarters each month, to include indoor and outdoor temperature logs and Stage II Heat Alert logs. *Exhibit A* at 5-6.

- Requires institutions to maintain updated Heat Plan Local Operating Procedures (LOP). *Exhibit A* at 6.

- Requires institutions to "devise and include any reasonable accommodations" to ensure "heat-risk incarcerated persons are afforded equal access to programs" during extreme temperatures. Examples of reasonable accommodations include modified yard times, night or morning yard, additional dayroom and/or recreation gymnasium programs. *Exhibit A* at 6-7.

- Annual In-Service training regarding the institution's heat plan, "including what to do when heat stress symptoms are identified and/or reported." *Exhibit A* at 7.

### C. CDCR's Expectations Relative to Institutional Oversight of Heat Plan Operations Memo

In addition to CDCR's 2024 Heat Plan and Updates Memorandum that is distributed annually at the beginning of each heat season, CDCR and CCHCS jointly issued a memorandum on August 2, 2024, which further delineated specific heat planrelated responsibilities and activities, which fall within the purview of the Wardens and CEOs of each CDCR institution. *See generally* "Expectations Relative to Institutional Oversight of Heat Plan Operations," (August 2, 2024), attached hereto as Exhibit B [hereinafter "Expectations Memorandum"]. The Expectations Memorandum placed direct responsibility on this executive staff to ensure implementation of these activities immediately upon issuance with full implementation due no later than August 31, 2024. *Exhibit B* at 3.

The Expectations Memorandum required institutions to convene an executive team to meet daily during the weekdays for the duration of a heat advisory—which is defined in the memorandum as any condition where the heat index is expected to reach 100 degrees Fahrenheit or higher--for the purposes of addressing and managing heat alerts and heat related concerns. *Exhibit B* at 1-2. The daily meetings were required to cover and document all heat-related issues and action plans per policy, to include the operational plan and response to the heat conditions. *Exhibit B* at 1-2.

In addition to these executive responsibilities, the AW, HCAU, and CSE were required to collaborate to ensure that monthly oversight of heat plan policy and procedures occur via the resource management subcommittee (RMS). *Exhibit B* at 2. Specifically, the RMS was required to ensure a complete Heat Plan Package was submitted, reviewed, and discussed during the

7

monthly RMS meeting, and was reported to the Quality Management Committee during the months of April through October.  *Exhibit B* at 2.

The Correctional Plant Manager (CPM) was also required to ensure testing of all internal and external thermometers in April and July of each year to ensure accuracy.  Upon completion of the testing, the CPM or designee was required to provide a proof of practice memorandum to the institution Heat Plan Coordinator verifying that all thermometers were tested and were in working order.  *Exhibit B* at 2.

The Special Master's monitor reviewed the policy's implementation process at each institution during the focused heat plan monitoring tour during the weeks of August 19, 2024 to August 28, 2024.  The Special Master's monitor observed the daily heat advisory meetings at CCWF, CIW, CSATF, CSP/LAC, CSP/Sac, and MCSP which reflected collaboration and effective communication to address both small and large concerns across each yard, including plant operation issues, heat illnesses, heat mitigation strategies, program impacts, and activation of any stages of the heat plan.  Heat-related issues and patient-specific concerns were addressed by custody staff in an effective way, though it was unclear whether this information would be communicated to mental health staff during daily huddles.  At multiple facilities, CPMs followed the Special Master's monitors to take note of any broken thermometers, ice machines, and other cooling measures that were not functioning properly.

D.    **Special Master's Responses to Defendants' Objections to the Draft Report**

On December 20, 2024, the Special Master provided the *Coleman* parties with a draft version of the Thirty-First Round Focused Heat Plan Monitoring Report ("Draft Report"), covering 14 CDCR institutions.  As required by the Order of Reference, ECF No. 640 at 4-5, 8, plaintiffs and defendants provided their preliminary comments and objections to the Draft Report on January 21, 2025.  *See* Letter from Nick Weber, Esq., CDCR Office of Legal Affairs, to

Special Master Lopes (January 21, 2025), attached hereto as *Exhibit C* and Letter from Luma Khabbaz, Esq. to Special Master Lopes (January 21, 2025), attached hereto as *Exhibit D*.

The Special Master carefully reviewed defendants' comments and objections to the Draft Report and made revisions to the final version of the report as warranted. Below is a brief summary of the Special Master's responses to defendants' comments and objections.

1. *CDCR requests that the Special Master defer discussion of a possible heat-related death at CCWF in July of 2024 until a finalized autopsy report has been issued.*

In their response, defendants objected to the Draft Report's statements concerning a possible heat-related death of a heat-risk MHSDS patient at CCWF in July of 2024. The defendants requested that the Special Master defer discussion of this death in the Report until a finalized autopsy report has been issued. *See Exhibit C* at 1. In support of their objections, the defendants argued:

> To date, no coroner report or other conclusive medical autopsy has been finalized, and the patient's cause of death remains unknown. The Special Master cites to an article in the Sacramento Bee as a source for the Report's claim that the death was heat related…The cited article is not the type of factual support that the Special Master should rely on to support factual findings that will be submitted to the Court. A media article is not a conclusive medical determination of a cause of death…

> Despite the lack of reliable evidence, the draft Report uses charged language when discussing this death which should be removed from the final report… These statements, represented as facts in the draft Report, assume the death was heat-related, but that has not been established by the coroner, the medical examiner or other medical authority.

> CDCR requests that such language be stripped from the final Report and that conclusions about cause of death be omitted until a conclusive coroner's report is received by CDCR.

> Finally, to the extent that discussion of the death remains in the final Report, CDCR requests that the patient's level of care be changed from EOP to 3CMS, the date of death be accurately reflected as July 6, 2024, and it be noted that the coroner's report, documenting the official cause of death is still pending.

*Exhibit C* at 2.

As requested, the Special Master corrected the level of care of the decedent patient and also added a footnote explaining that the coroner's report is pending. *See infra* pp. 26, 37 n.8,

and 48.  However, the Special Master declined to "strip" the report's discussion of the CCWF patient death.

First, while defendants are correct that the Draft Report referenced a newspaper article, the Special Master did not endeavor to make a medical determination as to this patient's cause of death.  Although informative, the Special Master did not rely on this article to formulate any conclusions regarding CCWF's compliance with the Heat Plan and Updates Memorandum. Rather, given the indicia of heat-related complications, the Special Master pointed to this case as a "tragic reminder of the very real harm that can result from failing to properly monitor and treat patients on heat sensitive medication." *See infra* pp. 37.

In light of defendants' concerns, the Special Master provides the following additional information – generated by defendants prior to the time the Draft Report was distributed – regarding the patient death at CCWF discussed in the Draft Report.

On July 8, 2024, the Special Master received a "Notification of Class Member Death" from defendants that indicated that on July 5, 2024 at approximately 0203 hours, a CCWF incarcerated person, who was a member of the MHSDS program in the 3CMS level of care, was pronounced deceased.  *See Exhibit E.*  The CDCR representative indicated that "[t]he cause of death [was] listed as loss of consciousness, status, epilepticus, *heat stroke*, and possible overdose." (emphasis added).  *Id.*  The *manner* of death was listed as "unknown".  *See id.*

Later that evening, on July 8, 2024, Plaintiff's counsel forwarded the notice and indicated to the defendants and Special Master that at the time of her death, the deceased patient was prescribed Lithium, a CCHCS-listed heat sensitive medication. *See Exhibit F.*

In their request for additional information, Plaintiff's counsel indicated that a review of the patient's EHRS record included a July 6, 2024 document titled "Outside Records – Hospital"

which stated that the patient's body temperature upon arrival on July 4, 2024 at approximately 2300 hours was 106.7 degrees Fahrenheit and that "[p]er prison guards" the patient had been "outside all day". *Id*.

On August 13, 2024, counsel for the defendants responded to plaintiffs inquires and provided indoor and outdoor temperature logs for the week of July 1, 2024. *See Exhibit G.* The defendants did not indicate that the date of the patient's death was different than what was initially reported in the July 8, 2024 death notification. The defendants also indicated that the cause of death "may have been the result of an ongoing medical condition and not heat related but will be determined by the coroner's office." *See id.* Notably, the defendants did not provide any information which supported their assertion that death may not have been heat-related as was initially determined by a medical authority. Additionally, in the August 13, 2024 correspondence, the defendant's indicated that on July 4, 2024, the day of the patient's hospitalization, "the swamp cooler in Building 514 was blowing warm air but was fixed the same day." *See id*.

The monitor reviewed the indoor and outdoor temperature logs attached to the August 13, 2024 email which reflected that on July 4, 2024, a Stage I heat alert was activated at CCWF at 10:00 A.M. and remained active through 9:00 P.M. with outside temperatures reaching as high as 101 degrees. *See Exhibit H.* Further, indoor temperature logs from the patient's housing unit 514 indicated that indoor temperatures reached as high as 87.3 degrees on July 4, 2024. *See Exhibit I.*

Defendant's contention that the Special Master assumed that the death was heat related and that those assumptions were not established by medical authority as being heat related, is misplaced. CDCR's *own representative*, in its death notification to the Special Master, indicated

that the patient's cause of death was heat related and that the date of death was July 5, 2024 and

not July 6, 2024 as the defendants' indicate in their January 21, 2025 letter.  Additionally, CDCR

offered no additional medical support to substantiate the claims made on August 13, 2024 that

the death was not heat related as previously indicated by medical authority.

Therefore, the Special Master finds this possible heat-related death relevant to the Court's

consideration of CDCR's compliance with the 2024 Heat Plan and Updates Memorandum,

Expectations Relative to Institutional Oversight of Heat Plan Operations Memorandum, and the

May 7, 1992 Stipulated Order.  Accordingly, as noted, the report has only been amended to

reflect that the patient was at the 3CMS level of care at the time of her death and that the

coroner's report is still pending.

2. *CDCR Objects to the Special Master's Determination that Inaccurate Monthly Summary Reports Constitute Noncompliance.*

Defendants object to the Draft Report's findings that four institutions, including CCWF,

CHCF, SATF, and PVSP, were not compliant with the 2024 Heat Plan's requirement for reporting

accurate monthly summary report data.  *See Exhibit C* at 2.  The defendants argue that three of

the four identified noncompliant institutions, including CCWF, CHCF, and SATF, "demonstrated

relatively minor policy deviations []" and requested that the Special Master "reconsider whether

such minor policy violations reasonably support the Special Master's determination that those

institutions are truly not compliant with this element of the heat plan." *Id*.

The May 7, 1992 Stipulated Order, which created the foundational framework for the

Heat Plan and Updates Memorandum, requires that "[r]ecords will be kept at all institutions

encompassed by this Order concerning outside air temperature in excess of 90 degrees, inside air

temperatures in excess of 90 degrees, and medical incidents significantly related to heat

exposure.  The faithful and accurate recordation of [these] events…are procedures adopted in

lieu of a mandated, burdensome and onerous (to the Department of Corrections) special monitor process.  The Plaintiffs have agreed to such record keeping and dissemination based on the assumed good faith of the Department of Corrections to ensure that data is collected."  *See* ECF No. 232 at 5-6.

Because the stipulated order requires "faithful and accurate recordation" of heat-related events, it is to be expected that CDCR would require accurate and complete record keeping, especially for a task as feasible – and critically important from a patient safety perspective - as tracking the number of heat alerts and heat-related illnesses for six months of the year.

The Special Master declined to revise his findings regarding compliance with Monthly Summary Report requirements as to CCWF, CSATF, and PVSP as each of these institutions had multiple inconsistencies in their summary reports.  Upon review, the Special Master revised the final version of the Report to reflect CHCF-PIP was deemed compliant notwithstanding minor deviations from policy.

3. *CDCR objects to the Special Master's determination that CCWF was found not compliant because it did not report the alleged heat-related illness in the Monthly Summary Reports.*

The defendants also objected to the draft report's findings that CCWF was not compliant with its requirement to report the number of patients who experienced a heat-related illness in the institution's monthly summary reports because CCWF did not report the possible heat-related death that occurred in July 2024.  *See Exhibit* C at 2. The defendants cite the reasons identified in the preceding paragraphs to justify why the incident was not reported as a heat-related illness and not recorded on the proper heat incident log.  *See supra p. 9.*

However, the May 7, 1992 Stipulated Order states that "[w]henever, in a clinician's judgement, a heat-risk inmate is suffering from a medical condition that is *related* to heat exposure, that fact shall be documented on a standard form 'heat incident log'…" *See* ECF No.

232 at 8 (emphasis added).  Additionally, the 2024 Heat Plan and Updates Memorandum states that "[p]er HCDOM 1.2.7, Institution Patient Safety Program 'All California Department of Corrections and Rehabilitation/California Correctional Health Care Services (CCHCS) staff have a duty to report health care incidents using the centralized electronic Health Care Incident Reporting (eHCIR) system *within 24 hours* of occurrence or discovery.'… Therefore, in addition to following established local operating procedures for completing [the Heat Incident Log] for each heat related illness, institutional healthcare staff must also report each heat related illness using the eHCIR system…" (emphasis added).  *Exhibit A* at 5.

In CDCR's July 8, 2024 death notification to the Special Master and Plaintiff's counsel, a medical provider determined that the patient's cause of death included a "heat stroke."  Given this objective medical finding that the patient's medical condition was at least related to heat exposure, based on a medical provider's initial assessment, both the Court and the 2024 Heat Plan and Updates Memorandum requires CDCR to *at least* document the event in a Heat Incident Log.  This was not done so; therefore the institution was found not to be compliant with the required policy.  The Special Master did not revise the Draft Report in response to this preliminary objection.

4.  *CDCR objects to the Special Master's finding that seven institutions were out of compliance with the 2024 Heat Plan's requirement that staff be knowledgeable about the heat plan policy and procedure.*

The defendants request the Special Master to reconsider his findings of noncompliance for four institutions (CCWF, CIW, SATF, PVSP) that purportedly "showed high levels of compliance despite a few instances of observed policy violations." *See Exhibit C* at 3.

a.  *Staff Knowledge at CCWF.*

In their response to the Draft Report, the defendants argue that the Special Master team audited fourteen housing units at CCWF and found noncompliance with staff's knowledge of

14

heat plan policy and procedure because of minor discrepancies. *Id.*  The defendant's state that "first, a few officers reported the heat risk patient list was provided weekly instead of daily. Second, officers in just one of the fourteen housing units noted that patients return from outdoors during heat alerts only during hourly unlock periods and that these hourly returns may occur in a second housing unit if staffing was an issue." *See id.*  The defendants argue that although the Draft Report did not find issues with staff knowledge of the heat plan in most housing units, CCWF was found noncompliant, and the Draft Report should be amended to reflect compliance. *See id.*

The 2024 Heat Plan and Updates Memorandum requires that *all* custody officers and leadership staff at each institution maintain knowledge of heat plan activation and act in accordance with their custodial responsibilities at each stage.  Custody officers at CCWF utilized a heat plan resource folder and were encouraged to use the folder to assist in answering the monitor's interview questions.  Even with these resources, officers still reported that it was an institution-wide policy that patients are only allowed back into their housing units during "unlock periods" which occurred once per hour.  Although interviewed officers demonstrated knowledge of heat plan policy and procedures, the use of unlock periods, as reported by officers was not compliant with required policy.

Additionally, officers indicating that the heat-risk medication list was updated weekly and not daily as required is critical to heat plan implementation as the heat-risk medication list helps officers prevent risk of heat illness or death.  A new heat-risk patient being added to the list without custody knowledge jeopardizes the health and safety of patients in the housing unit.

Given that the officers had resources to help answer interview questions about the requirements of the heat plan and still did not answer the questions correctly, the institution was

found noncompliant, and the Special Master will not make changes to this section of the Draft Report.

      b.  *Staff Knowledge at CIW.*

The defendant's next argue that the Special Master audited ten different housing units but reported noncompliance because some officers indicated that the heat medication list was updated weekly as opposed to daily. *Id*. The defendants state that those same custody staff produced the most up-to-date heat risk incarcerated persons list when prompted. *Id*. The defendants also argued that CIW was found noncompliant for use of alleged unlock periods similar to CCWF, but that the basis for this finding was from patient interviews, not staff interviews which should not be the basis for finding that CIW staff lacked knowledge of the heat plan requirements. *Id*.

The Special Master need not repeat why staff knowledge of updates to the heat-risk patient list is critical to the heat plan's proper implementation and safety to the incarcerated population. Additionally, the Special Master obtains information from a variety of sources including, but not limited to paper review, and staff and patient interviews. Patient interviews have been utilized throughout the mastership and reported on in the Special Master's monitoring reports to give unique perspectives of their experience while receiving treatment in the MHSDS and living conditions within CDCR. In this case, patients reported not being able to return to their housing units during recall for Stage I heat alerts. Patients reported waiting outside for extended periods of time until the scheduled lockout was over. These reports paint a stark contrast to the institution's heat plan local operating procedures, 2024 Heat Plan and Updates memorandum, and officer interviews.

As multiple patients corroborated CIW's scheduled lockout system, the Special Master will not remove this information or change his compliance findings.

  c. *Staff Knowledge at SATF.*

  The defendant's next object to the Special Master's finding that at SATF, of the twelve housing units audited, officers on Facility G were unable to locate the current heat-risk incarcerated persons list. *See id.* The defendants argue that "this example of a single officer's lack of knowledge is not sufficient to find SATF noncompliant with staff knowledge of the heat plan" and requested that the report be amended. *Id.*

  Defendants misstate the Draft Report's findings as to CSATF. Contrary to defendants' representation that "[t]he only issue found was on Facility G where '[t]he officer was unable to locate a current heat-risk incarcerated persons list,'" the Draft Report also reported the same housing unit's officers lack of familiarity "with the stages of the heat plan and their responsibilities at each stage." *Infra* p. 79. Staff knowledge of the heat plan and custody staff's responsibilities at each stage as well as the ability to produce the daily list of heat-risk incarcerated persons are not only fundamental components of the heat plan since the inception of this case, but a critically important safeguard to prevent serious injury or death. Given this, the Special Master did not amend his report to as defendants requested.

  d. *Staff Knowledge at PVSP.*

  CDCR objected to this portion of the Draft Report on the basis that the "findings [for PVSP] are confusing and requested that this section be clarified and that the finding of noncompliance be reconsidered. *See Exhibit* C at 4.

> "First, the Report states that officers on Facilities A, B, C, and D demonstrated adequate knowledge of the Heat Plan faulting only officers in MSF dorms one and two. Then, when discussing the daily list, the Report states that custody staff on A, B, C, and D, were not aware of the daily requirement and were unable to provide the most current heat-risk

incarcerated persons list during the interview.  The use of the word again implies that staff on A, B, C, and D had noncompliance before, yet the preceding sentence states that those same staff demonstrated adequate knowledge."

*Id*.

The Special Master agrees to remove the word "again" to prevent confusion.  *Infra* p. 118.  The Special Master does not agree to reconsider the finding of noncompliance given the officers on the MSF yard not knowing the requirements of the heat plan, not aware of the heat-risk medication list requirements, and not being able to produce the most recent copy of the heat-alert medication list.  Additionally, understanding the requirements of the heat plan on MSF yards is especially important given the relative lack of nursing support on MSF yards.

5.  *CDCR objects to the Special Master's finding of noncompliance with respect to indoor temperature log requirements.*

The defendant's next object to the Special Master's findings regarding indoor temperature logs, indoor thermometer placement, and indoor thermometer functionality.  The defendants request that the Special Master reconsider his findings of noncompliance at three institutions.  *Id*. at 4.

a.  *Indoor Temperature Logs at CCI*

The defendants contend that at CCI, "the Special Master found that the institution had adequate temperature logs and thermometer placement but found that the institution was noncompliant with this element of the Heat Plan because in two of its twenty-one housing units (A5 and B5) the thermometers were not working properly."  *See Exhibit* C at 4.  The defendants argue that "[t]his indicates a high level of compliance with the heat plan because ninety percent of the housing units at CCI were compliant with indoor temperature logs, thermometer placement, and thermometer function."  *See id*.

However, it is clear in the Draft Report that Special Master's monitor toured five total buildings each with three housing units. *See Infra* pp. 44.  Six of those housing units contained

18

broken thermometers, reflecting 40 percent of the examined housing units used broken thermometers. *See id.* Given that CCI maintained the highest in-cell temperatures of any toured institution, with in-cell and day room temperatures reaching 90 degrees and triggering Stage II heat alerts while on site, broken thermometers in six total housing units constituted noncompliance. *See id.* The Special Master declines to amend the Draft Report.

    *b.  Indoor Temperature Logs at CSP/Corcoran.*

The defendants also argue that CSP/Corcoran had "adequate temperature logs and thermometer placement, but [the Special Master] found the institution noncompliant… because in three of its thirty-three housing units (4A1, 4A3, and 3A3) the thermometers were not working properly. *See Exhibit* C at 4. The defendants state that "[t]his indicates a high level of compliance with the heat plan because ninety percent of the housing units at [CSP/Corcoran] were compliant with indoor temperature logs, thermometer placement, and thermometer function." *See id.* at 4-5.

However, broken thermometers on any housing unit demonstrate noncompliance with a fundamental component of the 1992 Stipulated Order and the 2024 Heat Plan and Updates Memorandum. Further, the monitor noted concerns regarding the thermometer probe placement and whether the probe collected the correct temperature for each unit. Additionally, two facilities at CSP/Corcoran lacked individual thermometers in each housing unit. Recording temperatures from a broken or otherwise misplaced temperature gauge, regardless of if they are completed timely and recorded on the correct form, affects the overall objective of recording accurate temperatures and maintaining safe living conditions for heat-risk patients. The Special Master did not revise the Draft Report to reflect compliance.

*c.  Indoor Temperature Logs at MCSP.*

Defendants also argue that at MCSP, the Special Master found that "the institution had adequate thermometer placement and function but found the institution noncompliant with this element of the Heat Plan because two of its twenty-two housing units (C14 and B7) did not properly log temperatures." *Exhibit C* at 5.  Defendants state that "[t]he special master should reconsider this finding as ninety-one percent of MCSP housing units were fully compliant with indoor temperature readings." *Id*.

Although a custody officer at MCSP did not record temperatures in Unit B7, which constitutes noncompliance, the Special Master's noncompliant findings also stem from an officer pre-recording indoor temperatures for housing unit C14.  To be clear, CDCR is asking the Special Master to find the institution compliant when an officer presented the Special Master with pre-recorded temperature data not contemporaneously read from a thermometer and with the intent to represent the temperature as an accurate recording for a later period of time.  The Special Master did not amend his findings of noncompliance.

6.  *Defendant's Miscellaneous Comments*

In addition to the above objections, the defendants make three requests for modifications and/or edits to language contained in the Draft Report. *See Exhibit C* at 5.  The Special Master agrees to implement these changes.  *See infra* pp. 24, 43, 44, 50, 57, 63, 69, 74, 79, 84, 86, 87, 93, 99, 105, 112, 113, 123.

E.    **Special Master's Responses to Plaintiffs' Comments regarding the Draft Report**

The Special Master also carefully reviewed plaintiffs' comments to the Draft Report and acknowledge their concerns regarding the rising temperatures in the State of California and the danger it presents to its vulnerable class members.  In response to the Draft Report, the plaintiffs

did not make objections to the Special Master's findings but requested that the Special Master make five recommendations to the Court to clarify the heat plan procedures and implement additional methodology to address the overall objectives of the heat plan. *See Exhibit D*. The requested recommendations include: (1) that CDCR install air conditioning throughout its prisons; (2) that CDCR consistently use a heat index for all heat plan requirements as the most accurate measure of heat-related danger; (3) that CDCR measure and log in-cell temperatures, regardless of tier level and whether the cell represents the highest non-airconditioned location; (4) that CDCR improve staff knowledge and training for the heat plan; and (5) that CDCR test all ice machines and swamp coolers prior to the heat season, similar to the requirements that institutional plant managers test the indoor and outdoor thermometers before the heat season. *See id* at 1-4.

However, new developments relevant to plaintiff's proposed recommendations are ongoing. In addressing the importance of air conditioning throughout its prisons, CDCR recently submitted a budget request to "install and evaluate air cooling alternatives to improve indoor environments" at four prisons, including CCWF, CMF, KVSP, and LAC. See Air Cooling Pilot Program Budget Request, Dep't of Fin., 5225-066-BCP-2025-GB (January 10, 2025), attached hereto as *Exhibit J*.

Further, the use of a heat index is a newly implemented element of the Expectations Memo which requires the Warden of each institution to convene an executive team to meet daily for the duration of a heat advisory, i.e. when the heat index is expected to reach 100 degrees Fahrenheit or higher. A period of time to implement the newly released Expectations Memo and understand the value of using the heat index for a full heat season is more appropriate at this time.

21

The Special Master acknowledges the plaintiffs' concerns with the findings of the Draft Report and appreciates the gravity of the issues when temperature warming in the State of California has accelerated with seven of the last eight years being the warmest on record. *See id.* at 2. However, given that both the *Plata* and *Armstrong* courts have shown interest in heat concerns for their respective classes, the Special Master declines to recommend modifications to the heat plan at this time.

## II.    SUMMARY OF THE SPECIAL MASTER'S FINDINGS

### A.    Local Operating Procedures (LOP)

CDCR requires each institution's heat plan LOP to incorporate the requirements of the Heat Plan and Updates Memorandum distributed annually each year. Specifically, the 2024 Heat Plan and Updates Memorandum requires institutions to develop, implement, and maintain a heat plan to prevent serious threats of life and health to patients taking heat risk medications. The Special Master's team reviewed LOPs at 14 institutions to determine compliance with the 2024 Heat Plan and Updates Memorandum. Eleven institutions, including CCI, CCWF, CIW, CMF-PIP, CRC, CSP/Corcoran, CSP/LAC, CSP/Sac, KVSP, MCSP, and SVSP-PIP, produced LOPs that complied with the requirements of the 2024 Heat Plan and Updates Memorandum.

CHCF-PIP's institution-wide LOP was not compliant because it incorporated a Heat Plan and Updates Memorandum from 2019 rather than the most recent policy. CSATF's LOP was not compliant because it did not include specific instructions requiring staff to record the highest indoor temperature reading within each housing unit when completing the heat log during each required time block. PVSP's LOP was not compliant because it required all patients, including those who were not prescribed heat-risk medications, to go inside during Stage I heat alerts. This practice was inconsistent with the 2024 Heat Plan and Updates Memorandum which specifically

requires that the heat plan "shall only apply to incarcerated person[s] who are taking Heat Alert Medications."

**Summary – Local Operating Procedures (LOP)**

LOPs were reviewed at 14 institutions to determine compliance with the requirements of the 2024 Heat Plan and Updates Memorandum.  Of the 14 institutions, 11, including CCI, CCWF, CIW, CMF-PIP, CRC, CSP/Corcoran, CSP/LAC, CSP/Sac, KVSP, MCSP, and SVSP-PIP were in compliance, while CHCF-PIP, CSATF, and PVSP were not in compliance.

**B.**    **Institutional Response to Headquarters' Expectations Memo**

In addition to CDCR's 2024 Heat Plan and Updates Memorandum, CDCR implemented an Expectations Relative to Institutional Oversight of Heat Plan Operations Memorandum (Expectations Memorandum), issued to the field on August 2, 2024.  This Expectations Memorandum placed direct responsibility on the executive staff at each institution to ensure implementation of additional heat-related activities.

The Expectations Memorandum required an executive team to meet daily during the weekdays for the duration of a heat advisory for the purposes of addressing and managing heat alerts and heat-related concerns.  The daily meetings were required to cover and document all heat-related issues and action plans in response to extreme heat conditions at each institution.

The Special Master's team attended executive heat meetings at six institutions, including CCWF, CIW, CSATF, CSP/LAC, CSP/Sac, and MCSP during the review period.  The committee included leadership from each facility at each institution as well as plant operations staff and the heat plan coordinator of each institution.  Updates were provided at all six meetings regarding heat related concerns on facilities, implementation of heat mitigation strategies, program impacts

due to heat plan activation, plant operations updates related to ice machines and swamp cooler issues, and patient heat illnesses.

Plant operations at all six institutions indicated continuing to test all thermometers in the housing units as required and reported on preventative maintenance work orders that were submitted.

All six institutions reported purchasing heat mitigation resources at daily heat meetings, including replacing misters and canopies for yards, additional water coolers, floor fans, cooling towels, new indoor thermometers, and personal fans.

### Summary – Institutional Response to Expectations Memo

In addition to CDCR's 2024 Heat Plan and Updates Memorandum, CDCR implemented an Expectations Memorandum, issued to the field on August 2, 2024, which required each institution to convene an executive team to meet daily during a heat advisory for the purposes of addressing and managing heat alerts and heat-related concerns. The Special Master's team attended executive heat meetings at six institutions, including CCWF, CIW, CSATF, CSP/LAC, CSP/Sac, and MCSP during the review period. These meetings reflected collaborative discussions of heat-related issues and reflected compliance with the Expectations Memorandum requirements.

### C.    Monthly Summary Reports

Pursuant to the 2024 Heat Plan and Updates memo, each institution must submit a Monthly Summary Report, signed by the Warden and CEO to headquarters from May 1 through October 31 each year. Thirteen institutions – CCWF, CHCF-PIP, CIW, CMF-PIP, CRC, CSATF, CSP/Corcoran, CSP/LAC, CSP/SAC, KVSP, MCSP, PVSP, and SVSP-PIP, submitted Monthly Summary Reports which ranged from May through September. The data reflected that there were 730 Stage I heat alerts, 182 Stage II heat alerts, and 45 Stage III heat alerts during the five-

month period.  Of note, the Monthly Summary Reports indicated data for the entire institutions and did not only reflect the PIP or EOP units.

Ten institutions – CHCF-PIP, CIW, CMF-PIP, CRC, CSP/Corcoran, CSP/LAC, CSP/SAC, KVSP, MCSP, and SVSP-PIP submitted Monthly Summary Reports that were compliant with the 2024 Heat Plan and Updates Memo, while CCWF, CSATF, and PVSP were noncompliant due to submitting inconsistent heat alert activation data.  Notably, CHCF-PIP reported a minor inconsistency in heat alert activation data but was found compliant given the small discrepancy.

The 2024 Heat Plan and Updates Memorandum also required institutions to report the number of patients who experienced a heat related illness in the Monthly Summary Report.  The patient's information and details regarding the heat related illness must also be documented in a Heat Incident Log maintained by the institution.  Five institutions – CCI, CMF-PIP, CRC, CSP/Corcoran, and CSP/SAC reported that a total of 17 patients experienced a heat related illness during the reporting period.  Four institutions – CMF-PIP, CRC, CSP/Corcoran, and CSP/SAC provided adequately completed heat incident logs with information regarding the patients' level of care, prescribed medications, location of the heat-incident, and prognosis following treatment.

Although heat-illness information was not requested from CCI, a custody officer reported that the one patient who experienced a heat-related illness had received immediate medical attention and was discharged the same day.  Additionally, CCWF reported that there were no heat-related illnesses during the review period, however, there was a reported heat-related death of a 3CMS patient who was prescribed heat-risk medication in July 2024.  Notably, the heat plan

coordinator and the chief nurse executive at CCWF each had reported different data regarding heat-related illness during the reporting period.

<u>**Summary – Monthly Summary Reports**</u>

Of the 13 institutions who submitted Monthly Summary Reports, ten institutions – CHCF-PIP, CIW, CMF-PIP, CRC, CSP/Corcoran, CSP/LAC, CSP/SAC, KVSP, MCSP, and SVSP-PIP - were compliant with the requirement to submit Monthly Summary Reports that were consistent with the 2024 Heat Plan and Updates Memorandum.  However, the remaining three institutions – CCWF, CSATF, and PVSP - were noncompliant due to submitting inconsistent heat alert activation data.

There were 17 patients who experienced a heat related illness across five institutions during the reporting period; four institutions adequately completed heat incident logs which satisfied the requirements of the 2024 Heat Plan and Updates Memorandum.

**D.    <u>Staff Knowledge of Heat Plan and Procedure</u>**

According to the 2024 Heat Plan and Updates Memorandum, all custody officers and leadership staff at each institution were required to maintain knowledge of heat plan activation and act in accordance with their custodial responsibilities at each stage.  Each institution was also required to generate, print, and distribute a daily list of all patients currently prescribed any of the designated heat alert medications.  The Special Master's team interviewed custody officers regarding these policies and protocols at 14 institutions that housed heat-risk patients during the review period.  During the interviews officers were asked about their knowledge of heat plan activation in accordance with this policy, including identifying which months of the year the heat plan was in effect, what temperatures activated the heat plan, custody responsibilities at each stage of activation, signs and symptoms of heat related illness, and how often the heat-risk

patient list was updated.  Officers were also asked how the policies were put into practice at each institution.

<u>Staff Interviews</u>

Custody staff at seven institutions–CCI, CHCF-PIP, CMF-PIP, CRC, CSP/Corcoran, CSP/LAC, and CSP/Sac– demonstrated adequate knowledge of heat plan protocols and reported acting in accordance with their responsibilities at each stage of activation, thus reflecting compliance.

Custody staff at seven institutions–CCWF, CIW, CSATF, KVSP, MCSP, PVSP, and SVSP-PIP–were noncompliant with these requirements.  At CCWF and CIW, interviewed staff and patients reported that, during a heat alert, heat-risk patients attending yard were only allowed back into their housing units during "unlock periods" which occurred once per hour regardless of how long the patient had been outside.  This reflected noncompliance given that, according to the 2024 Heat Plan and Updates Memorandum, heat risk patients must be restricted to a maximum of 30 minutes outside to perform officially sanctioned activities, such as returning to housing units and receiving medications.

Similar concerns were noted on facility E at MCSP where staff would account for heat-risk patients returning to the housing unit during a Stage I activation but would not take further action if the patient did not come inside voluntarily following announcement as required by the 2024 Heat Plan and Updates Memorandum.

At each of the remaining five noncompliant institutions–CSATF, KVSP, MCSP, PVSP, and SVSP-PIP–custody staff in at least one facility did not demonstrate adequate knowledge of heat plan policy or procedure, which reflected noncompliance.

Distribution of Daily List of All Patients Prescribed Heat Medications

With respect to generating, printing, and distributing the daily list of patients prescribed any of the designated heat alert medications, interviewed custody staff at ten of the 14 institutions–CCI, CCWF, CHCF-PIP, CIW, CMF-PIP, CRC, CSP/Corcoran, CSP/Sac, KVSP, and SVSP-PIP–produced a correct copy of the most recent patient list.

## Summary – Staff Knowledge of Heat Plan and Procedures

Custody staff at 14 institutions demonstrated varying levels of compliance regarding knowledge of heat plan policy and procedure during the review period.  Of the 14 institutions, custody staff at seven–CCI, CHCF-PIP, CMF-PIP, CRC, CSP/Corcoran, CSP/LAC, and CSP/Sac–achieved compliance while seven–CCWF, CIW, CSATF, KVSP, MCSP, PVSP, and SVSP-PIP–did not.  Three of the noncompliant institutions–CCWF, CIW, and MCSP–reported concerning practices that did not comport with the requirements of the 2024 Heat Plan and Updates Memorandum, including keeping patients outside during heat alert activation until institution-wide "unlock periods" allowed access to the housing unit, and staff allowing patients to potentially remain outside during heat alert activations.  For maintaining and distributing up-to-date heat-risk patients lists for their housing units, custody staff at ten institutions–CCI, CCWF, CHCF-PIP, CIW, CMF-PIP, CRC, CSP/Corcoran, CSP/Sac, KVSP, and SVSP-PIP–achieved compliance.

### E.    Outdoor Temperature Logs

The 2024 Heat Plan and Updates Memorandum requires that the warden of each institution or their designee ensure an accurate thermometer is located in a central, heat neutral location to monitor outside ambient air temperatures.  These temperatures must then be recorded every hour, every day, from May 1 through October 31 of each year.

Of the 11 institutions reviewed for outdoor thermometer placement, thermometers were placed in central, heat neutral locations that accurately measured outside ambient air temperatures at nine institutions, including CHCF-PIP, CMF-PIP, CRC, CSP/Corcoran, CSP/Sac, KVSP, MCSP, PVSP, and SVSP-PIP.  Two institutions–CIW and CSATF–were noncompliant.  At CIW, staff recorded outdoor temperatures in the central control tower using a cell phone's weather application rather than an outside thermometer probe as required by the 2024 Heat Plan and Updates Memorandum.  At CSATF, the outside thermometer probe was taped to the back window of the air-conditioned central control booth, which significantly impacted the accuracy of the outdoor temperature readings; this was evinced by the neighboring institution, CSP/Corcoran, activating a Stage I heat alert more than four hours prior to CSATF on the same day.

The 2024 Heat Plan and Updates Memorandum also requires that outside temperatures be recorded every hour, every day from May 1 through October 31.  Of the 14 reviewed institutions, 13–including CCI, CCWF, CHCF-PIP, CIW, CMF-PIP, CRC, CSATF, CSP/Corcoran, CSP/Sac, KVSP, MCSP, PVSP, and SVSP-PIP–complied with this requirement. Missing outside temperature recordings were also noted at CSP/LAC.

### Summary – Outdoor Temperature Logs

Of the 13 institutions reviewed for outside thermometer placement and the recording of temperatures every hour, ten– CCI, CHCF-PIP, CMF-PIP, CRC, CSP/Corcoran, CSP/Sac, KVSP, MCSP, PVSP, and SVSP-PIP–complied with both requirements.

Appropriate placement of outside thermometers was reviewed at 11 institutions and the same ten–CCI, CHCF-PIP, CMF-PIP, CRC, CSP/Corcoran, CSP/Sac, KVSP, MCSP, PVSP, and SVSP-PIP reflected compliance, while CIW and CSATF were noncompliant.

Recording of outdoor air temperatures every hour of every day from May 1 through October 31 was reviewed at all 14 institutions; all except CSP/LAC reflected compliance.

### F.    <u>Indoor Temperature Logs</u>

The warden or designee was responsible for ensuring that inside air temperatures were measured in all non-air conditioned living areas that house heat-risk patients.  Temperatures were to be taken at the highest non-air conditioned location where heat risk incarcerated persons were housed and must be recorded every three hours.  Eight institutions–CCWF, CHCF-PIP, CIW, CMF-PIP, CRC, CSATF, CSP/Sac, and SVSP-PIP–adequately complied with indoor temperature logging requirements in accordance with policy.

<u>Thermometer Placement and Functionality</u>

<u>Thermometer Placement</u>

All observed thermometers were appropriately placed at eight institutions, namely CCWF, CIW, CRC, CSATF, CSP/LAC, MCSP, PVSP, and SVSP-PIP.  At CSP/Sac, all observed thermometers were also appropriately placed, except for on facility A where the thermometers were improperly placed near air registers.  Accordingly, all ten of these institutions adequately complied with the requirement that thermometers be placed in the highest non-air-conditioned location where heat risk incarcerated persons were housed.

Regrettably, improper thermometer placement was reported throughout two institutions– CSP/Corcoran and KVSP–which constituted noncompliance.  At CSP/Corcoran, one thermometer in one section, as opposed to one thermometer in each section, of facility A was used which violated policy.  Further compromising the institutions' ability to obtain accurate temperature readings, this thermometer was placed in the air ducts next to the common return air vent which produced an average temperature reading of the multiple units rather than one singular reading for each individual housing unit.  At KVSP, three observed housing units each

had three separate sections with only one working thermometer in one of the three sections and a broken or missing thermometer in the other two; the one thermometer was improperly used to record temperatures for the entire unit. Additionally, unit 6A's thermometer was in the air-conditioned control booth; the officer in this control booth reported that he took temperature recordings from the unit 6B thermometer, despite this unit not having a thermometer.

Thermometers were not observed at CHCF-PIP or CMF-PIP given that both were air conditioned.

Thermometer Functionality

All observed thermometers were in proper working order at six institutions–CCWF, CRC, CSP/Sac, MCSP, PVSP, and SVSP-PIP–while most, but not all, observed thermometers were in proper working order at three institutions, namely CCI, CIW, and CSATF. At CCI, the indoor thermometers in all three sections of A5 did not indicate accurate ambient day room temperatures and the thermometers in unit B5 were not working; at CIW, at least one thermometer on three separate units was out of order; and, at CSATF, one thermometer on one unit was out of order. Accordingly, all nine of these institutions–CCI, CCWF, CIW, CRC, CSATF, CSP/Sac, MCSP, PVSP, and SVSP-PIP–maintained thermometers that were in proper working order.

Broken thermometers were reported throughout three institutions–CSP/Corcoran, CSP/LAC, and KVSP; missing thermometers were reported from KVSP as well. Accordingly, these three institutions were noncompliant due to not having functioning thermometers.

Thermometers were not observed at CHCF-PIP or CMF-PIP given that both were air conditioned.

Temperature Logging

All reviewed temperature logs at seven institutions–CCI, CCWF, CIW, CRC, CSATF, CSP/Corcoran, and SVSP-PIP–complied with the requirement of recording temperatures every three hours.  CSP/Sac complied with this requirement as well, though the heat log in RHU-1 was signed in advance without a temperature recording and the CTC II's temperature log had one missing temperature.

Temperature logs were missing multiple temperature recordings in multiple units at three institutions–CSP/LAC, KVSP, and PVSP; those institutions, therefore, were noncompliant with this requirement.  At MCSP, the temperature log in unit C14 had a prerecorded temperature and one missing temperature in unit B7.  KVSP was particularly problematic.  There, an officer reported not knowing that temperatures needed to be recorded and, consequently, did not have a temperature log for that day for his unit; however, when the monitor returned the following day, the same officer produced a completed temperature log from the prior two days which he stated he retroactively filled in from memory.

CHCF-PIP and CMF-PIP did not record indoor temperatures given that both were air conditioned; however, officers at both institutions kept working handheld thermometers or temperature guns if in-cell temperatures became a concern.

## Summary – Indoor Temperature Logs

Eight institutions– CCWF, CHCF-PIP, CIW, CMF-PIP, CRC, CSATF, CSP/Sac, and SVSP-PIP–adequately complied with indoor temperature logging requirements, while six–CCI, CSP/Corcoran, CSP/LAC, KVSP, MCSP, and PVSP–were noncompliant.  CSP/Corcoran had improperly placed or broken thermometers; CSP/LAC had broken thermometers and improperly logged temperatures; and MCSP and PVSP had improperly logged temperatures.  KVSP was the

most problematic institution; thermometers were frequently improperly placed, broken, or missing altogether, and temperatures were improperly logged or not logged altogether. Furthermore, at KVSP, one custody officer reported recording temperatures from a unit that did not have a thermometer, while another officer stated that he was not aware that temperatures needed to be logged and then retroactively recorded two days of temperature logs from memory.

### G.    Monitor's Temperature Measurements

Pursuant to the 2024 Heat Plan and Updates Memorandum, inside air temperatures are required to be measured in all non-air conditioned living areas housing heat-risk patients and areas that are air conditioned but could exceed 90 degrees.

During housing unit tours at ten institutions – CCI, CCWF, CIW, CMF-PIP, CRC, CSATF, CSP/Corcoran, CSP/LAC, CSP/SAC, and MCSP, the Special Master's team utilized personal hand-held thermometers to collect in-cell and day room temperature measurements. CCI, CSP/LAC, and MCSP had the highest recorded temperatures at 90 degrees, 86 degrees, and 85 degrees, respectively.  Five institutions – CCWF, CIW, CSATF, CSP/SAC, and CSP/Corcoran had maximum temperature readings ranging from 80 to 84 degrees.  CMF-PIP and CRC recorded the lowest maximum temperature readings at 78 and 75 degrees, respectively.  Of note, CRC, CHCF-PIP, CMF-PIP, and SVSP-PIP were air-conditioned housing units, while all but one of the remaining institutions (CCI) were all equipped with swamp coolers.

The Special Master's monitors did not complete in-cell or day room temperature measurements at CHCF-PIP, KVSP, PVSP, and SVSP-PIP.

### Summary – Monitor's Temperature Measurements

Ambient air temperatures of patient cells and housing unit day rooms were measured using personal hand-held thermometers to collect temperature measurements.  CCI was the only institution with temperature readings that exceeded 90 degrees, while MCSP and CSP/LAC had

maximum temperatures of 85 and 86 degrees, respectively.  The air-conditioned housing units had the lowest maximum temperature readings ranging from 75 to 78 degrees.

### H.    Accommodations and Cooling Measures

To ensure that heat-risk patients were afforded equal access to programs, services, and activities during extreme weather conditions, the 2024 Heat Plan and Updates Memorandum required institutions to devise and include any reasonable accommodations and alternatives to yard activities when revising their LOP.  Any reasonable accommodation provided to patients during heat alert activation must be documented in the institution's Daily Activity Report (DAR) as well.  Six institutions, including CHCF-PIP, CMF-PIP, CRC, CSP/Sac, KVSP, and PVSP provided patients with a form of reasonable accommodations following a Stage I heat alert and documented the same in accordance with policy.  Most institutions also indicated providing additional cooling measures following a Stage I heat alert as well.

Offering Reasonable Accommodations

Eleven institutions–CCI, CHCF-PIP, CIW, CMF-PIP, CRC, CSATF, CSP/Corcoran, CSP/Sac, KVSP, MCSP, and PVSP– offered patients a form of reasonable accommodations during Stage I heat alerts during the review period.  Offered accommodations included additional day room at eight institutions (CCI, CRC, CSATF, CSP/Corcoran, CSP/Sac, KVSP, MCSP, and PVSP), programming privileges at CRC, and alternative yard time at CSP/Sac.

Although they offered accommodations to patients, four institutions, including CIW, CSATF, CSP/Corcoran, and MCSP did not document the accommodations in the DAR and were therefore not compliant with required policy.  The monitors were unable to review DARS at CCI and therefore compliance with this requirement could not be assessed.

Two institutions–CCWF and CSP/LAC–failed to offer or document reasonable accommodations during Stage I heat alerts and thus, were noncompliant.

34

Compliance could not be ascertained for SVSP-PIP during the review period.

Cooling Measures

Facility-wide cooling systems varied by institution during the review period.  Swamp coolers were used at seven institutions, including CCWF, CIW, CSP/Corcoran, CSATF, CSP/LAC, CSP/Sac, and MCSP's lower facilities.  Air conditioning was utilized at CSP/Corcoran's RHU, CRC's EOP housing unit, CSATF's CTC, upper facilities at MCSP, all MHCB's, and all three examined PIPs.  Notably, CCI did not have any cooling system in place and utilized fans in some examined day rooms.  The Special Master's team did not report on the facility-wide cooling system at KVSP or PVSP during the review period.

Although the 2024 Heat Plan and Updates Memorandum only requires that staff provide cooling and hydration measures to patients during Stage II and Stage III heat alerts, additional cooling measures were observed across multiple institutions during non-activation periods and Stage I heat alerts.  Cooling measures, including ice and water coolers, water fountains, cold showers, shade structures, misters, floor fans, personal fans, and port-a-coolers were provided at eight institutions, namely CIW, CRC, CSATF, CSP/Corcoran, CSP/LAC, CSP/Sac, MCSP, and PVSP.  Working ice machines were also observed at eight institutions including CCWF, CIW, CSP/Corcoran, CRC, CSP/LAC, CSP/Sac, KVSP, and MCSP.   At CSATF and KVSP, ice machines were broken on various units and custody staff reported running out of ice during Stage II heat alerts.

## Summary – Accommodations and Cooling Measures

Most institutions complied with the provision of reasonable accommodations in accordance with the 2024 Heat Plan and Updates Memorandum.  Of the 14 institutions reviewed, seven, including CCI, CHCF-PIP, CMF-PIP, CRC, CSP/Sac, KVSP, and PVSP, adequately

complied with required policy, while four additional institutions provided accommodations but did not appropriately document them in the correct form.  Two institutions, CCWF and CSP/LAC, failed to offer or document accommodations for patients during a Stage I heat alert.  Eight institutions – CIW, CRC, CSATF, CSP/Corcoran, CSP/LAC, CSP/Sac, MCSP, and PVSP– provided additional cooling measures during Stage I heat alerts.

### I.    <u>**Annual Heat Pathologies Training**</u>

The 2024 Heat Plan and Updates memo required that heat plan training be provided to custodial and non-custodial staff by the in-service training officer each year.

For non-custody staff attendance at the annual heat pathologies training, five institutions – CIW, CRC, PVSP, CHCF-PIP, and SVSP-PIP – reported compliance, while CCWF and CSATF reported noncompliance.

For custody staff attendance at the annual heat pathologies training, CSP/Corcoran was the only institution to report compliance; however, CIW and CCWF neared compliance with 89 and 82 percent attendance, respectively.  Five institutions – CRC, CSATF, PVSP, CHCF-PIP, and SVSP-PIP reported noncompliance.

Three institutions – CSP/LAC, KVSP, and MCSP, reported the total amount of custody and non-custody staff who completed the training.  However, all three institutions did not produce the number of staff who were required to complete the training so compliance could not be determined.  Similarly, CSP/Corcoran reported the total number of non-custody staff who completed the training and MCSP reported the total amount of custody staff who completed the training; but both institutions were unable to provide the number of staff who were required to complete the training.

Annual heat pathologies training information was not requested during the site visits at CCI, therefore compliance could not be ascertained. CSP/Sac did not provide training data for non-custody or custody staff; and MCSP did not provide training data for non-custody staff.

### Summary – Heat Related Pathologies Training

No institution reported compliance for both custody and mental health staff attendance at the annual heat pathologies training. CIW was the only institution near compliance by required custody and mental health staff, reporting 89 and 100 percent attendance at the annual heat pathologies training, respectively. CSATF was the only institution to report noncompliance for required custody and mental health staff attendance. Three institutions did not provide the total number of staff who were *required* to complete the training; as such, compliance could not be ascertained. CSP/Sac and MCSP did not provide training data for custody and/or mental health staff.

### CONCLUSION

Sadly, with the suspected heat-related death of a female incarcerated person at CCWF on July 5, 2024,[7] this year's heat season began with a tragic reminder of the very real harm that can result from failing to properly monitor and treat patients on heat sensitive medication.[8]

This focused review of defendants' heat plan implementation for monitoring and treating class members on heat-sensitive medications revealed ongoing deficiencies in implementing the requirements of this 32-year-old remedy. Indeed, performance was variable, with some institutions commendably implementing solutions which exceeded the requirements of the heat plan and others failing to approach compliance with some of the plan's most basic requirements.

---

[7] *See* Megan Vaz, *A California Inmate Died During the Heat Wave. What do state prison conditions look like?*, The Sacramento Bee (July 9, 2024), https://www.sacbee.com/news/california/article289867299.html (last accessed Dec. 18, 2024).

[8] The coroner's report, documenting the official cause and manner of death, is still pending.

As reflected in the figures below, the majority of reviewed institutions (CCWF, CHCF-PIP, CIW, CSATF, CSP/LAC, MCSP, PVSP, SVSP-PIP) were noncompliant in three or more of the seven focus areas reviewed in this report.  CMF-PIP and CRC were the highest performing programs, achieving compliance with six of seven monitoring focus areas each.

Across institutions, the focus areas with the most room for improvement were staff knowledge of the heat plan (50% of reviewed institutions were compliant), provision of accommodations and cooling measures (50% of reviewed institutions were compliant), and annual training (no institution was compliant).



| Institution | Local Operating Procedures | Monthly Summary Reports | Staff Knowledge of Heat Plan Policy | Outdoor Temperature Logs | Indoor Temperature Logs | Accommodations and Cooling Measures | Heat Pathologies Training |
|---|---|---|---|---|---|---|---|
| CCI | Compliant | Unable to Report | Compliant | Compliant | Not Compliant | Compliant | Unable to Report |
| CCWF | Compliant | Not Compliant | Not Compliant | Unable to Report | Compliant | Not Compliant | Not Compliant |
| CHCF-PIP | Not Compliant | Compliant | Compliant | Compliant | Compliant | Compliant | Not Compliant |
| CIW | Compliant | Compliant | Not Compliant | Not Compliant | Compliant | Not Compliant | Not Compliant |
| CMF-PIP | Compliant | Compliant | Compliant | Compliant | Compliant | Compliant | Unable to Report |
| CRC | Compliant | Compliant | Compliant | Compliant | Compliant | Compliant | Not Compliant |
| CSATF | Not Compliant | Not Compliant | Not Compliant | Not Compliant | Compliant | Not Compliant | Not Compliant |
| CSP/Corcoran | Compliant | Compliant | Compliant | Compliant | Not Compliant | Not Compliant | Unable to Report |
| CSP/LAC | Compliant | Compliant | Compliant | Not Compliant | Not Compliant | Not Compliant | Unable to Report |
| CSP/Sac | Compliant | Compliant | Compliant | Compliant | Compliant | Compliant | Not Compliant |
| KVSP | Compliant | Compliant | Not Compliant | Compliant | Not Compliant | Compliant | Unable to Report |
| MCSP | Compliant | Compliant | Not Compliant | Compliant | Not Compliant | Not Compliant | Unable to Report |
| PVSP | Not Compliant | Not Compliant | Not Compliant | Compliant | Not Compliant | Compliant | Not Compliant |
| SVSP-PIP | Compliant | Compliant | Not Compliant | Compliant | Compliant | Not Compliant | Not Compliant |

The Special Master offers this report and the critiques contained herein not to adjudicate blame for poor performance but rather as part of his ongoing, court-ordered obligation to provide "advice to defendants to ensure that their decisions regarding the provision of mental health care to class members conforms to the requirements of the federal constitution and to advise the court regarding assessment of defendants' compliance with their constitutional obligations." Order of Reference, ECF No. 640 at 2. The Special Master urges defendants to review the findings

contained in this report and work proactively to correct deficiencies in advance of the 2025 heat season.

Respectfully submitted,

*/s/ Matthew A. Lopes, Jr.*
Matthew A. Lopes, Jr.
Special Master

February 28, 2025

## **INSTITUTIONAL SUMMARIES**

## <u>CALIFORNIA CORRECTIONAL INSTITUTION (CCI)</u>

(July 23, 2024 – July 24, 2024)

On July 23, 2024, the Special Master's team reviewed the California Correctional Institution's (CCI) policies, procedures, and implementation of CDCRs 2024 Heat Plan and Updates memorandum, dated April 8, 2024. The monitors interviewed custody and mental health leadership, reviewed the institution's heat plan record keeping, and observed heat plan implementation across the EOP program. Overall, as described herein below, CCI's implementation of the 2024 Heat Plan and Updates memorandum was noncompliant.

Local Operating Procedures (LOP)

CDCR required that each institution's heat plan local operating procedure incorporate the requirements of the April 8, 2024 Heat Plan and Updates memorandum. CCI's Heat Plan LOP, dated April 2024, complied with CDCR policy.

Institutional Response to Headquarters' Expectations Relative to Institutional Oversight of Heat Plan Operations Memorandum (Expectations Memo)

In addition to CDCR's 2024 Heat Plan and Updates memorandum, CDCR issued an Expectations Memo, dated August 2, 2024, delineating the specific responsibilities of the warden and CEO. CDCR's Expectations Memo was not released to the field until after the CCI site visit.

Monthly Summary Reports

The 2024 Heat Plan and Updates memorandum required that each institution submit a Heat Plan Monthly Summary Report (Summary Report), signed by the warden and CEO, to headquarters each month from May 1 to October 31. The Heat Plan and Updates memorandum also required institutions to include with the monthly submission a Heat Incident Log documenting the number of patients who experienced a heat-related illness. The Heat Incident

42

Log must include the patient's information and details regarding the heat-related illness. The Special Master did not request this information during the site visit; therefore, compliance could not be ascertained.

The day prior to the site visit, on July 22, 2024, officers reported that a patient experienced a heat-related illness following his work program. The patient received immediate medical attention and was discharged on the same day.

Staff Knowledge of Heat Plan Policy and Procedures

The 2024 Heat Plan and Updates memorandum required all custody officers and leadership staff to maintain knowledge of heat plan activation and act in accordance with the requirements of each stage. The monitor toured five EOP housing units during the site visit, including A5, A6, A7, B5 and B8. Interviewed custody officers demonstrated adequate knowledge of heat plan policy and procedures, including identifying which temperatures activated the heat plan, custody responsibilities at each stage, and signs and symptoms of heat-related illness.

The policy also required that when the Heat Plan was in effect, institutional staff must generate and distribute *daily* a list of all incarcerated persons currently prescribed any of the designated Heat Alert Medications. Interviewed custody staff at CCI were familiar with this requirement and provided a copy of the current list.

The institution's custody staff interviews reflected compliance with the requirements of the 2024 Heat Plan and Updates memorandum.

Outdoor Temperature Logs

To ensure proper and accurate temperature recording, the Annual Heat Plan and Updates memorandum required the warden or designee to ensure an accurate thermometer was in a

central, heat-neutral location to monitor outside ambient air temperatures which must be recorded every hour, every day, from May 1 through October 31 of each year.  Reviewed outdoor temperature logs were properly completed and thus complied with the 2024 Heat Plan and Updates memorandum's outdoor temperature requirements.

Indoor Temperature Logs

The warden or  designee is responsible for ensuring that inside air temperatures are measured in all non-airconditioned living areas that house heat-risk incarcerated persons. Temperatures must be taken at the highest non-air-conditioned location where heat-risk incarcerated persons are housed and must be recorded every three hours.  Indoor thermometers were appropriately installed in the highest feasible location of each dayroom in all toured housing units.  However, the indoor thermometers in all three sections of unit A5 did not indicate an accurate ambient dayroom temperature when tested using the institution's hand-held temperature thermo-gun.  All three dayroom thermometers indicated that the ambient temperature of the dayrooms was 80 degrees Fahrenheit, but when tested using the thermo-gun, each section's thermometer surface indicated that it was 89 degrees Fahrenheit.

Dayroom temperatures in Units A6, A7, and B8 each reflected temperatures between 85 and 89 degrees Fahrenheit, and the indoor thermometers were in working order.  The dayroom thermometers in B5 were not working at the time of the alert.  Units B5B and B5C were each placed on Stage II heat alert following a thermo-gun reading of 91 and 90.1 degrees Fahrenheit, respectively.

Although indoor temperature logs were properly completed, temperature discrepancies and broken thermometers resulted in noncompliance.

Monitor's Temperature Measurements

The 2024 Heat Plan and Updates required temperatures to be taken at the highest non-air-conditioned location where heat-risk incarcerated persons were housed, *which could include a temperature taken within an incarcerated person's* cell.  Utilizing CCI's thermos-gun thermometer, the monitor measured the ambient air temperatures of random patient cells, including at least three cells in each of the five housing units toured.  Cells in units A5, A6, A7, and B8 registered temperatures between 85 and 89 degrees Fahrenheit on the floor, back wall, and ceiling.  Cells in unit B5 registered temperatures that exceeded 90 degrees Fahrenheit. Following these observations, the unit was placed on a Stage II heat alert, and the floor officers performed the required responsibilities.

Accommodations and Cooling Measures

In an effort to ensure that heat-risk incarcerated persons were afforded equal access to programs, services, and activities during extreme weather conditions, the 2024 Heat Plan and Updates memorandum required institutions to devise and include any reasonable accommodations and alternatives to yard activities when revising their LOP.  All reasonable accommodations provided to heat-risk incarcerated persons during heat alert activation must be documented in the institution's Daily Activity Report (DAR).  Staff reported offering heat-risk incarcerated persons additional dayroom during Stage I heat alerts; however, the monitor was unable to confirm compliance with documentation of the accommodation in the DAR.  Staff also reported that CCI did not allow individual cell doors and food ports to be opened to allow air flow in each cell, and only the door to the dayroom from the access hallway was allowed to be partially open. This was a particular concern given that none of the toured housing units had

dayrooms or individual cells that were equipped with air conditioning, fans, swamp coolers, or misters to mitigate indoor temperatures.

Although there were serious concerns with the lack of air conditioning and swamp coolers in the housing units, because the institution offered accommodations to heat-risk incarcerated persons as required, the institution was compliant with the 2024 Heat Plan and Updates memorandum.

Heat-Related Pathologies Training

The 2024 Heat Plan and Updates memorandum required annual training on the institution's Heat Plan, including measures when heat stress symptoms are identified and/or reported, to be provided to custodial and clinical staff by the In-Service Training Officer.  The monitor was unable to review this information during the site visit; therefore compliance could not be ascertained.

Conclusion

Due to the above-mentioned deficiencies, including a lack of swamp coolers or air conditioning, using broken thermometers for indoor temperature measurements, not measuring patient cell temperatures, and failing to document provision of adequate cooling measures, CCI's implementation of the 2024 Heat Plan and Updates memorandum was not compliant during the review period.

## CENTRAL CALIFORNIA WOMEN'S FACILITY (CCWF)

(August 22, 2024)

On August 22, 2024, the Special Master reviewed the Central California Women's Facility's (CCWF) policies, procedures, and implementation of CDCR's 2024 Heat Plan and Updates Memorandum, dated April 8, 2024. While on site, the monitors interviewed custody and mental health leadership, reviewed the institution's heat plan record keeping, and observed heat plan implementation across the institution. Overall, as described below, CCWF's implementation of the 2024 Heat Plan and Updates memorandum was noncompliant.

Local Operating Procedures (LOP)

CDCR required that each institution's heat plan local operating procedure incorporate the requirements of the April 8, 2024 Heat Plan and Updates memorandum. CCWF's heat plan LOP was updated in April 2024 and complied with CDCR policy.

Institutional Response to Headquarters' Expectations Relative to Institutional Oversight of Heat Plan Operations Memorandum (Expectations Memo)

In addition to CDCR's 2024 Heat Plan and Updates memorandum, CDCR issued an Expectations Memo, dated August 2, 2024, delineating the specific responsibilities of the warden and CEO. These included daily meetings during days of anticipated heat advisories to address and manage heat alerts and related concerns. The institution's executive leadership staff reported several heat mitigation strategies that were initiated at CCWF during the review period. Leadership reported that institutional captains rounded daily to review and discuss any heat-related concerns. Plant operation crews reportedly toured the facilities daily to resolve any outstanding heat-related work orders. Cooling stations were identified and made available to heat-risk incarcerated persons with the locations sent to them on their tablets. Although ice machines were observed to be working properly in the central and satellite kitchens, leadership

47

reported that they had entered in a contract to purchase additional ice.  Repair or replacement of misters and canopies that were in disrepair on the yards were in process at the time of the tour. CCWF reported they purchased water coolers (igloos), floor fans, and cooling towels for use in the housing units and on the yards; all were observed throughout the tour.

<u>Monthly Summary Reports</u>

The 2024 Heat Plan and Updates memorandum required that each institution submit a Heat Plan Monthly Summary Report (Summary Report), signed by the warden and CEO, to headquarters each month from May 1 to October 31.  The monitor reviewed CCWFs available Summary Reports and compared them to the inside and outside temperature logs for May, June, and July 2024.  These reports reflected 53 Stage I, seven Stage II, and no Stage III heat alerts during the three months.  Summary Reports were consistent with the reviewed temperature logs in May and July; however, during June 2024, the Summary Report indicated that there were three Stage II heat alerts while the examined temperature logs revealed that there had been four Stage II heat alerts.  This inconsistency compromised the reliability of the information in the Summary Reports during the review period.

The Heat Plan and Updates memorandum also required institutions to include with the monthly submission a Heat Incident Log documenting the number of patients who experienced a heat-related illness.  The Heat Incident Log must include the patient's information and details regarding the heat-related illness.  Alarmingly, reviewed Summary Reports indicated that there were no heat-related illnesses during the review period, despite a reported death of a 3CMS patient prescribed heat-risk medication at CCWF due to heat stroke and possible overdose on July 5, 2024.

As a result of the inconsistent heat alert activation and heat-related illness data, CCWF's Summary Reports were not compliant with the 2024 Heat Plan and Updates memorandum.

Staff Knowledge of Heat Plan Policy and Procedures

The 2024 Heat Plan and Updates memorandum required all custody officers and leadership staff to maintain knowledge of heat plan activation and act in accordance with the requirements of each stage. To determine compliance, monitors interviewed custody staff and patients in 11 housing units, the RHU, Reception Center, and the MHCB. Each toured housing unit maintained a heat plan resource folder at the custody officers' station. Custody officers utilized this resource and demonstrated adequate knowledge of heat plan policy and procedures.

The policy also required that when the Heat Plan was in effect, institutional staff must generate and distribute *daily* a list of all incarcerated persons currently prescribed any of the designated Heat Alert Medications. At CCWF, the daily heat-risk incarcerated persons list was produced in all toured housing units, though a few interviewed officers incorrectly reported that the heat-risk incarcerated persons list was required to be provided weekly instead of daily.

Additionally, the 2024 Heat Plan and Updates memorandum required that heat-risk incarcerated persons be restricted to a maximum of 30 minutes outside to perform officially sanctioned activities, such as returning to housing units and receiving medications. Concerningly, custody staff in unit 514 reported that the institution only allowed incarcerated persons back into their housing units during "unlock periods" which occurred only once per hour. According to the officer, following a Stage I heat alert, heat-risk incarcerated persons were required to wait until the next "unlock period" to enter their housing unit, which could be up to an hour depending on the time of the announcement.

Interviewed custody staff in unit 513 demonstrated familiarity with the heat-risk incarcerated persons housed in their unit and allowed them to enter the unit regardless of unlock periods.  However, they also reported that, on occasion, this proved difficult due to staffing shortages.

As a result of the above-mentioned deficiencies, CCWF's heat plan procedures did not comply with the requirements of the 2024 Heat Plan and Updates memorandum during the site visit.

Outdoor Temperature Logs

To ensure proper and accurate temperature recording, the Annual Heat Plan and Updates memorandum required the warden or designee to ensure an accurate thermometer was in a central, heat-neutral location to monitor outside ambient air temperatures, which must be recorded every hour, every day, from May 1 through October 31 of each year.  Because the monitor was unable to examine the location of the outdoor thermometer, compliance with the 2024 Heat Plan and Updates memorandum's outdoor temperature requirements could not be ascertained.

Indoor Temperature Logs

The warden or designee is responsible for ensuring that inside air temperatures are measured in all non-airconditioned living areas that house heat-risk incarcerated persons.  Temperatures must be taken at the highest non-air-conditioned location where heat-risk incarcerated persons are housed and must be recorded every three hours.  Temperature logs in toured housing units were appropriately maintained.  Custody officers reported that they recorded temperatures on the heat log using the highest temperature from thermometers located

50

on the second tier of a housing unit or by using the highest temperatures recorded in the various wings in a housing unit.

During patient interviews it was often reported that the swamp coolers in the mainline housing units and RHU frequently broke. Specifically, interviewed patients in housing unit 514 reported that the swamp coolers in the unit had not been utilized for several weeks because they were broken and leaking. The monitors observed a significant number of missing ceiling tiles in the unit during the visit, which corroborated this report. In addition, the large oscillating fans observed in the housing unit wings were unplugged in unit 514.

Staff from plant operations reported that new ducts and chillers were being added to the swamp coolers in the mainline housing units, RHU and the reception center. In addition, it was reported that institutional leadership discussions to upgrade the cooling systems at CCWF to air conditioning were ongoing.

Although there were serious concerns with the functionality of the swamp coolers during the review period, the institution's indoor temperature recording procedures complied with the 2024 Heat Plan and Updates memorandum.

<u>Monitor's Temperature Measurements</u>

The 2024 Heat Plan and Updates required temperatures to be taken at the highest non-air-conditioned location where heat-risk incarcerated persons were housed, *which could include a temperature taken within an incarcerated person's* cell. During housing unit tours, the monitors utilized personal hand-held thermometers to collect temperature measurements. The highest reported temperature recorded by the monitors during the visit to CCWF was in housing unit 514, where the recorded temperature was 80.6 degrees Fahrenheit.

The heat plan coordinator reported that while CCWF had approximately six handheld thermometers on site, they were not utilized as the design of the device posed a safety concern. Consequently, in-cell temperatures were not taken.

Accommodations and Cooling Measures

In an effort to ensure that heat-risk incarcerated persons are afforded equal access to programs, services, and activities during extreme weather conditions, the 2024 Heat Plan and Updates memorandum required institutions to devise and include any reasonable accommodations and alternatives to yard activities when revising their LOP. All reasonable accommodation provided to heat-risk incarcerated persons during heat alert activation must be documented in the institution's Daily Activity Report as well. A review of the daily activity reports (DAR) during the month of July 2024 revealed that there were 30 Stage I heat activations; however, there was no documentation of reasonable accommodations for heat-risk incarcerated persons due to the loss of yard time. Custody leadership acknowledged this issue and reported that corrective action would be taken.

Following a Stage I heat alert activation, heat-risk incarcerated persons were often required to return to their dorms due to insufficient custody staff to open the dayroom. Interviewed custody staff and patients reported that the institution would activate modified programming during these staffing shortages.

The MHCB featured air-conditioning, which was observed to be fully operational at the time of the visit. However, the MHCB had been reduced to just three beds until the week prior to the monitor's visit, as the air conditioning was not fully operational.

In the RHU, custody staff reported efforts to offer early morning yard to heat-risk incarcerated persons, when possible, as alternative activities were not available to them during

Stage I heat alerts.  Patients interviewed in the RHU reported they had drinkable water available in their cells and were offered showers every other day.  They reported they were unable to request cold water or cold showers other than on their assigned day, regardless of the heat.

Each toured housing unit had a working water fountain which provided cold water.  Floor fans and igloo coolers with ice and water were observed on most toured housing units as well. Interviewed custody staff and patients reported that they had access to water at any time during dayroom but not if they were confined to their cells.  Patients housed in dorms also had access to cold water and showers.

Because the institution failed to offer or document reasonable accommodations or adequate cooling measures during Stage I heat alerts, it did not comply with the 2024 Heat Plan and Updates memorandum.

Heat-Related Pathologies Training

The 2024 Heat Plan and Updates memorandum required annual training on the institution's Heat Plan, including measures when heat stress symptoms are identified and/or reported, to be provided to custody and clinical staff by the In-Service Training Officer.  For custody staff, 469 of 570 or 82 percent completed the training while 147 of 226 or 65 percent of non-custody staff completed the training. The number of custody and non-custody staff who completed the required heat-related pathologies training did not comply with the 2024 Heat Plan and Updates memorandum.

Conclusion

Due to the above-mentioned deficiencies, including inconsistent monthly summary report data which failed to reflect any mention of the heat-related death of a patient in July 2024, deficient heat alert procedures, and failing to offer or document reasonable accommodations or

provide adequate cooling measures, CCWF's implementation of the 2024 Heat Plan and Updates

memorandum was not compliant during the review period.

## CALIFORNIA HEALTH CARE FACILITY – PSYCHIATRIC INPATIENT PROGRAM (CHCF-PIP)

(October 15, 2024 – October 17, 2024)

On October 15, 2024, the Special Master reviewed the California Health Care Facility – Psychiatric Inpatient Program's (CHCF-PIP) policies, procedures, and implementation of CDCR's 2024 Heat Plan and Updates Memorandum, dated April 8, 2024.  While on site, the monitors met with custody and mental health leadership, reviewed the institution's heat plan record keeping, and observed heat plan implementation across the psychiatric inpatient program. Overall, as described herein below, CHCF-PIP's implementation of the 2024 Heat Plan and Updates memorandum was noncompliant.

Local Operating Procedures (LOP)

CDCR required that each institution's heat plan local operating procedure incorporate the requirements of the April 8, 2024 Heat Plan and Updates memorandum.  CHCF's heat plan LOP was last revised in May 2024 and was not compliant with the headquarters' directive as the LOP incorporated a heat plan memorandum from 2019.

Institutional Response to Headquarters' Expectations Relative to Institutional Oversight of Heat Plan Operations Memorandum (Expectations Memo)

In addition to CDCR's 2024 Heat Plan and Updates memorandum, CDCR issued an Expectations Memo, dated August 2, 2024, delineating the specific responsibilities of the warden and CEO.  These included daily meetings during days of anticipated heat advisories to address and manage heat alerts and related concerns.  The monitor was unable to attend a daily heat meeting with custody leadership during the site visit.

55

Monthly Summary Reports

The 2024 Heat Plan and Updates memorandum required that each institution submit a Heat Plan Monthly Summary Report (Summary Report), signed by the warden and CEO, to headquarters each month from May 1 to October 31.  CHCF-PIP produced Summary Reports for May, June, and July, which reflected that there were 54 Stage I heat alerts and no Stage II or Stage III heat alerts during the three months.  However, reviewed daily activity reports (DARs) for the three months indicated that there were only 52 Stage I heat alert activations during the three months.  This inconsistency compromised the reliability of the information in the Summary Reports.  Of note, CHCF-PIPs Summary Reports and DARs included data for the entire institution during the three months and not only the psychiatric inpatient program.

The Heat Plan and Updates memorandum also required institutions to include with the monthly submission a Heat Incident Log documenting the number of patients who experienced a heat-related illness.  The Heat Incident Log must include the patient's information and details regarding the heat-related illness.  There were no heat-related illnesses reported during the three months at CHCF-PIP.

CHCF-PIP's Monthly Summary Reports were deemed compliant with the 2024 Heat Plan and Updates memorandum not withstanding minor deviations from policy.

Staff Knowledge of Heat Plan Policy and Procedures

The 2024 Heat Plan and Updates memorandum required all custody officers and leadership staff to maintain knowledge of heat plan activation and act in accordance with the requirements of each stage.  Six PIP housing units were toured during the site visit, including two acute care units, two ICF units, and both maximum custody units.  Interviewed custody officers demonstrated adequate knowledge of heat plan policy and procedures, including

identifying which temperatures activated the heat plan, custody responsibilities at each stage, signs and symptoms of heat-related illness, and keeping a daily list of patients who take heat-risk medications in their housing unit.

The policy also required that when the Heat Plan was in effect, institutional staff must generate and distribute *daily* a list of all incarcerated persons currently prescribed any of the designated Heat Alert Medications. CHCF updated and distributed heat-risk incarcerated person lists daily as required.

The institution's custody staff interviews reflected compliance with the requirements of the 2024 Heat Plan and Updates memorandum.

Outdoor Temperature Logs

To ensure proper and accurate temperature recording, the Annual Heat Plan and Updates memorandum required the warden or designee to ensure an accurate thermometer was in a central, heat-neutral location to monitor outside ambient air temperatures, which must be recorded every hour, every day, from May 1 through October 31 of each year. The outside thermometer was located in the central control booth at CHCF. Examined outdoor temperature logs were properly completed.

The institution's outdoor temperature recording procedures complied with the 2024 Heat Plan and Updates memorandum.

Indoor Temperature Logs

The warden or designee is also responsible for ensuring that inside air temperatures are measured in all non-air-conditioned living areas that house heat-risk incarcerated persons. Temperatures must be taken at the highest non-air conditioned location where heat-risk incarcerated persons are housed and must be recorded every three hours. The institution

indicated that all 14 PIP housing units were air-conditioned throughout the review period. Interviewed custody staff indicated that they did not record indoor temperatures due to the air conditioning but kept working digital thermometers at their desk. Staff was knowledgeable of their responsibilities if the air conditioning units malfunctioned. The institution's indoor temperature recording procedures complied with the 2024 Heat Plan and Updates memorandum.

Monitor's Temperature Measurements

Since all units had working air conditioners, the monitor did not complete in-cell or dayroom temperature measurements during the site visit.

Accommodations and Cooling Measures

In an effort to ensure that heat-risk incarcerated persons were afforded equal access to programs, services, and activities during extreme weather conditions, the 2024 Heat Plan and Updates Memorandum required institutions to devise and include any reasonable accommodations and alternatives to yard activities when revising their LOP. All reasonable accommodations provided to heat-risk incarcerated persons during heat alert activation must be documented in the institution's Daily Activity Report (DAR). Reviewed daily activity reports indicated that mainline heat-risk incarcerated persons were offered accommodation during a Stage I heat alert activation. Because the unit was air-conditioned, there were no observable cooling measures for heat-risk incarcerated persons in the CHCF-PIP.

The institution's documenting of reasonable accommodations complied with the requirements of the 2024 Heat Plan and Updates memorandum.

Heat-Related Pathologies Training

The 2024 Heat Plan and Updates memorandum required annual training on the institution's Heat Plan, including measures when heat stress symptoms are identified and/or

reported, to be provided to custodial and clinical staff by the In-Service Training Officer. For heat-related pathologies training, 599 of 1,045 or 57 percent of custody staff and 91 of 93 or 98 percent of non-custody staff completed the training. Although the number of non-custody staff who completed the annual training was compliant with the 2024 Heat Plan and Updates memorandum, the number of custody staff who completed the training was not compliant.

Conclusion

While PIP custody staff were knowledgeable of heat plan policy and procedures and recorded temperatures appropriately during the review period, the institution's LOP did not incorporate the most up-to-date Heat Plan and Updates memorandum, and custody staff were deficient in the annual heat-related pathologies training. Consequently, CHCF-PIP's implementation of the 2024 Heat Plan and Updates Memorandum was noncompliant during the review period.

## CALIFORNIA INSTITUTION FOR WOMEN (CIW)

(August 26, 2024)

On August 26, 2024, the Special Master reviewed the California Institution for Women's (CIW) policies, procedures, and implementation of CDCR's 2024 Heat Plan and Updates Memorandum, dated April 8, 2024.  While on site, the monitors met with custody and mental health leadership, reviewed the institution's heat plan record keeping, and observed heat plan implementation across the institution.  Overall, as described herein below, CIW's implementation of the 2024 Heat Plan and Updates memorandum was noncompliant.

Local Operating Procedure (LOP)

CDCR required that each institution's heat plan local operating procedure incorporate the requirements of the April 8, 2024 Heat Plan and Updates memorandum.  CIW's heat plan LOP was updated in May 2024 and comported with headquarters' directive.  The LOP also contained requirements that exceeded those delineated in the Heat Plan and Updates memorandum. Specifically, the LOP required the Tower I officer to monitor and record the outside air temperature year-round rather than only during heat-risk months.  Additionally, to avoid standing in the heat longer than 30 minutes during a Stage I heat alert, CIW gave priority access to health care services to heat-risk incarcerated persons.  The LOP also authorized the opening of doors at the end of the housing unit hallways at 6:30 A.M. until yard recall.

Institutional Response to Headquarters' Expectations Relative to Institutional Oversight of Heat Plan Operations Memorandum (Expectations Memo)

In addition to CDCR's 2024 Heat Plan and Updates memorandum, CDCR issued an Expectations Memo, dated August 2, 2024, delineating the specific responsibilities of the warden and CEO.  These included daily meetings during days of anticipated heat advisories to address and manage heat alerts and related concerns.

The monitors observed CIW's daily heat meeting, which focused on any heat-related issues or concerns during the day. CIW leadership reported plans to provide personal fans to any heat-risk incarcerated persons who did not have one, beginning initially with indigent incarcerated persons. In addition, the CIW leadership reported they would be providing cold water year-round and identified the air-conditioned auditorium as a cooling station for the population.

Monthly Summary Report

The 2024 Heat Plan and Updates memorandum required that each institution submit a Heat Plan Monthly Summary Report (Summary Report), signed by the warden and CEO, to headquarters each month from May 1 to October 31. CIW produced Summary Reports for May, June, and July which indicated that there were 38 Stage I heat alerts, one Stage II heat alert, and no Stage III heat alerts in the three months.

The Heat Plan and Updates memorandum also required institutions to include with the monthly submission a Heat Incident Log documenting the number of patients who experienced a heat-related illness. The Heat Incident Log must include the patient's information and details regarding the heat-related illness. CIW reported no heat-related illnesses during this period.

Accordingly, the institution's Summary Reports were compliant with the 2024 Heat Plan and Updates memorandum.

Staff Knowledge of Heat Plan Policy and Procedures:

The 2024 Heat Plan and Updates memorandum required all custody officers and leadership staff to maintain knowledge of heat plan activation and act in accordance with the requirements of each stage. The Special Master's monitors interviewed custody staff and patients in the Correctional Treatment Center, the psychiatric inpatient program, EOP Support

61

Care Unit (SCU), Barneberg unit, Walker unit, Wilson unit, Miller unit, Latham unit, Emmons unit, and the RHU.

Though interviewed officers utilized heat plan resources and required prompting, most were familiar with the stages of the heat plan, their responsibilities at each stage, and symptoms of heat-related illnesses.

The policy also required that when the Heat Plan was in effect, institutional staff must generate and distribute *daily* a list of all incarcerated persons currently prescribed any of the designated Heat Alert Medications.  Interviewed custody staff produced the most up-to-date heat-risk incarcerated persons list, though some officers indicated that it was updated weekly as opposed to daily.

Concerningly, the institution implemented "unlock periods" during yard, which only allowed heat-risk incarcerated persons access to the housing unit once per hour during said "unlock period."   Interviewed patients indicated that during heat alert activations, heat risk incarcerated persons were not allowed to enter the housing unit until the "unlock period", regardless of how long they had been outside.   Patients indicated that they were often required to remain outside for up to an hour after a heat alert activation.  This practice conflicted with the institution's heat plan LOP and the 2024 Heat Plan and Updates memorandum, which allowed for a maximum of 30 minutes for heat-risk incarcerated persons to return to their housing units upon activation of a Stage I heat alert.  The LOP and 2024 Heat Plan and Updates memorandum also directed that this amount of time be allotted only to perform officially sanctioned outdoor activities.

As a result of these concerns, the institution's custody staff interviews and heat plan procedures did not reflect compliance with the requirements of the 2024 Heat Plan and Updates memorandum during the site visit.

Outdoor Temperature Logs

To ensure proper and accurate temperature recording, the Annual Heat Plan and Updates memorandum required the warden or designee to ensure an accurate thermometer was in a central, heat-neutral location to monitor outside ambient air temperatures which must be recorded every hour, every day, from May 1 through October 31 of each year. CIW recorded outdoor temperatures in the central control tower every hour during the review period. While reviewed temperature logs appeared to be properly completed and reflected hourly temperature recordings, concerningly, CIW officers utilized a cell phone weather application as the official outdoor temperature daily as opposed to a fixed temperature measuring device at the institution as required by the Annual Heat Plan and Updates memorandum.

Due to officers using a cell phone weather application and not using an on-site thermometer, the institution's outdoor temperature recording procedures did not comply with the 2024 Heat Plan and Updates memorandum.

Indoor Temperature Logs

The warden or designee is also responsible for ensuring that inside air temperatures are measured in all non-airconditioned living areas that house heat-risk incarcerated persons. Temperatures must be taken at the highest non-air-conditioned location where heat-risk incarcerated persons were housed and must be recorded every three hours. At CIW, the EOP SCU, the CTC, the PIP, the Walker Unit, and the auditorium were air-conditioned, while the remaining units utilized swamp coolers. Most units had three working analog thermometers

placed in each hall of each housing unit.  However, at least one thermometer in the Wilson unit, Barneberg unit, and the EOP SCU were broken during the site visit.  Though officers were equipped with handheld thermometers during the review period, they reported taking temperature readings of the highest temperature of the wall-mounted thermometers and did not use handheld devices for routine indoor temperature readings.  Reviewed temperature logs were completed appropriately.

While the monitor observed three broken thermometers, overall, the institution's indoor temperature recording procedures complied with the 2024 Heat Plan and Updates memorandum.

Monitor's Temperature Measurements

The 2024 Heat Plan and Updates required temperatures to be taken at the highest non-air-conditioned location where heat-risk incarcerated persons were housed, *which could include a temperature taken within an incarcerated person's* cell.  The monitor took ambient temperature measurements of the dayroom and patient cells in the EOP SCU, Barneberg unit, and Wilson unit during the site visit.  The highest temperature recorded by the monitor during the visit was in a cell on the long hall in Barneberg, where the temperature was 83.5 degrees Fahrenheit.  The maximum temperature taken in the EOP SCU was 78 degrees Fahrenheit on the second tier, near cell 100.  The maximum temperature taken in the Barneberg unit was 83.5 degrees Fahrenheit in the long hall of Side B.  The highest temperature recorded in Wilson was 81.2 degrees Fahrenheit in the long hall.

Accommodations and Cooling Measures

In an effort to ensure that heat-risk incarcerated persons were afforded equal access to programs, services, and activities during extreme weather conditions, the 2024 Heat Plan and Updates memorandum required institutions to devise and include any reasonable

accommodations and alternatives to yard activities when revising their LOP.  All reasonable accommodation provided to heat-risk incarcerated persons during heat alert activation must be documented in the institution's Daily Activity Report (DAR).  While custody staff reported providing dayroom to heat-risk incarcerated persons during Stage I heat alerts, only two instances of reasonable accommodations were documented in the DARs.

Regarding the provision of cooling measures during heat alerts, custody staff reported providing coolers of ice and water for heat-risk incarcerated persons each day during heat alerts.  Most observed housing units had working water fountains inside the units.  However, interviewed patients indicated that ice and cold water were not always provided during the review period.

Observed ice machines in the central kitchen and the EOP SCU were working; however, staff and patients indicated that two of the five ice machines in the icehouse were often inoperable.  Plant operations staff reported that the machines would be serviced.  In addition to observed water stations on the yards, medication distribution areas provided a shaded structure for patients waiting to receive prescriptions.

Although there were observed accommodations offered to patients during the site visit, the institution did not document the offering of accommodations in the DARs during Stage I heat alerts, therefore the institution was not in compliance with the 2024 Heat Plan and Updates memorandum.

Heat-Related Pathologies Training

The 2024 Heat Plan and Updates memorandum required annual training on the institution's Heat Plan, including measures when heat stress symptoms are identified and/or reported, to be provided to custodial and clinical staff by the In-Service Training Officer.  CIW

reported that 465 of 525, or 89 percent of custody staff members attended the heat pathologies training, while all 50 or 100 percent of the required non-custody staff attended.  Although the number of non-custody staff who completed the annual training was compliant with the 2024 Heat Plan and Updates memorandum, the number of custody staff who completed the training was not compliant.

Conclusion

Due to the above-mentioned deficiencies, including custody staff not allowing heat-risk incarcerated persons to return to housing units during Stage I heat alerts until an "unlock period" occurred and use a cell phone weather application rather than an onsite thermometer to measure outdoor temperatures, CIW's implementation of the 2024 Heat Plan and Updates Memorandum was not compliant during the review period.

## CALIFORNIA MEDICAL FACILITY – PSYCHIATRIC INPATIENT PROGRAM (CMF-PIP)

(September 17, 2024 – September 20, 2024)

On September 17, 2024, the Special Master reviewed the California Medical Facility – Psychiatric Inpatient Program's (CMF-PIP) policies, procedures, and implementation of CDCR's 2024 Heat Plan and Updates memorandum, dated April 8, 2024.  While on site, the monitors met with custody and mental health leadership, reviewed the institution's heat plan record keeping, and observed heat plan implementation across the psychiatric inpatient program.  Overall, as described herein below, CMF-PIP's implementation of the 2024 Heat Plan and Updates memorandum was compliant.

Local Operating Procedures (LOP)

CDCR required that each institution's heat plan local operating procedure incorporate the requirements of the April 8, 2024 Heat Plan and Updates memorandum.  CMF's heat plan local operating procedure was last revised in April 2024 and complied with CDCR policy.

Institutional Response to Headquarters' Expectations Relative to Institutional Oversight of Heat Plan Operations Memorandum (Expectations Memo):

In addition to CDCR's 2024 Heat Plan and Updates memorandum, CDCR issued an Expectations Memo, dated August 2, 2024, delineating the specific responsibilities of the warden and CEO.  These included daily meetings during days of anticipated heat advisories to address and manage heat alerts and related concerns.  The monitor was unable to attend a daily heat meeting with custody leadership during the site visit.

Monthly Summary Reports

The 2024 Heat Plan and Updates memorandum required that each institution submit a Heat Plan Monthly Summary Report (Summary Report), signed by the warden and CEO, to

headquarters each month from May 1 to October 31.  CMF produced Summary Reports for May, June, and July, which reflected that there were 40 Stage I heat alerts, 16 Stage II heat alerts, and one Stage III heat alert in the three-month period.  Of note, the Summary Reports and Daily Activity Reports (DARs) indicated data for the entire institution during the three months and did not only reflect the psychiatric inpatient program at CMF.

The Heat Plan and Updates memorandum also required institutions to include with the monthly submission a Heat Incident Log documenting the number of patients who experienced a heat-related illness.  The Heat Incident Log must include the patient's information and details regarding the heat-related illness.  One CMF-PIP patient experienced a heat-related illness in July 2024 due to heat exhaustion.  The heat incident log was completed and included appropriate details.

Accordingly, the institution's Summary Reports were compliant with the 2024 Heat Plan and Updates memorandum.

Staff Knowledge of Heat Plan Policy and Procedures

The 2024 Heat Plan and Updates memorandum required all custody officers and leadership staff to maintain knowledge of heat plan activation and act in accordance with the requirements of each stage.  Interviewed custody staff demonstrated adequate knowledge of heat plan policy and procedure including their assigned responsibilities at each stage.

The policy also required that when the Heat Plan was in effect, institutional staff must generate and distribute *daily* a list of all incarcerated persons currently prescribed any of the designated Heat Alert Medications.  Interviewed custody staff was able to produce the most current heat-risk incarcerated persons list, which was updated daily as required.

68

Therefore, interviews with the institution's custody staff reflected compliance with the requirements of the 2024 Heat Plan and Updates memorandum.

Outdoor Temperature Logs

To ensure proper and accurate temperature recording, the Annual Heat Plan and Updates memorandum required the warden or designee to ensure an accurate thermometer was in a central, heat-neutral location to monitor outside ambient air temperatures, which must be recorded every hour, every day, from May 1 through October 31 of each year.  CMF's Second Floor Grill Gate officer obtained and recorded the outdoor temperatures at CMF during the review period; reviewed temperature logs were properly completed.

The institution's outdoor temperature recording procedures complied with the 2024 Heat Plan and Updates memorandum.

Indoor Temperature Logs

The warden or designee was also responsible for ensuring that inside air temperatures were measured in all non-air-conditioned living areas that house heat-risk incarcerated persons. Temperatures must be taken at the highest non-air-conditioned location where heat-risk incarcerated persons are housed and must be recorded every three hours.  CMF-PIP staff reported that all housing units were air-conditioned throughout the review period.  Custody officers recorded indoor temperatures when the air conditioning malfunctioned, and interviewed officers indicated that the air conditioning was broken for two days during the review period.  Officers also reported that they used handheld thermometers or temperature guns to check in-cell temperatures at patients' request.

The institution's indoor temperature recording procedures complied with the 2024 Heat Plan and Updates memorandum.

Monitor's Temperature Measurements

The 2024 Heat Plan and Updates required temperatures to be taken at the highest non-air-conditioned location where heat-risk incarcerated persons were housed, *which could include a temperature taken within an incarcerated person's* cell.  During the site visit, the monitor obtained ambient air temperatures in patient cells and dayrooms; no temperature exceeded 78 degrees Fahrenheit.

Accommodations and Cooling Measures

In an effort to ensure that heat-risk incarcerated persons were afforded equal access to programs, services, and activities during extreme weather conditions, the 2024 Heat Plan and Updates memorandum required institutions to devise and include any reasonable accommodations and alternatives to yard activities when revising their LOP.  All reasonable accommodation provided to heat-risk incarcerated persons during heat alert activation must be documented in the institution's DARs.  Reviewed DARs indicated that mainline heat-risk incarcerated persons were offered accommodations during Stage I heat alert activations.

The monitor did not examine mainline housing units, however the institution's documenting of reasonable accommodations complied with the requirements of the 2024 Heat Plan and Updates memorandum.

Heat-Related Pathologies Training

The 2024 Heat Plan and Updates memorandum required annual training on the institution's Heat Plan, including measures when heat stress symptoms are identified and/or reported, to be provided to custodial and clinical staff by the In-Service Training Officer.  The CMF-PIP staff reported that 746 custody staff and 142 non-custody staff members completed the heat-related pathologies training as required.  CMF did not produce the number of custody and

non-custody staff that were required to complete the training, and therefore, compliance could not be determined.

Conclusion

As the interviewed staff demonstrated adequate knowledge of heat plan policy and procedures, recorded temperatures appropriately, and documented providing accommodations, CMF-PIP's implementation of the 2024 Heat Plan and Updates memorandum was compliant during the review period.

**CALIFORNIA REHABILITATION CENTER (CRC)**

(October 22, 2024 – October 24, 2024)

On October 22, 2024, the Special Master reviewed the California Rehabilitation Center's (CRC) policies, procedures, and implementation of CDCR's 2024 Heat Plan and Updates memorandum, dated April 8, 2024.  While on site, the monitors met with custody and mental health leadership, reviewed the institution's heat plan record keeping, and observed heat plan implementation across the EOP program.  Overall, as described herein below, CRC's implementation of the 2024 Heat Plan and Updates memorandum was compliant.

Local Operating Procedures (LOP)

CDCR required that each institution's heat plan local operating procedure incorporate the requirements of the April 8, 2024 Heat Plan and Updates memorandum.  CRC's heat plan local operating procedure (LOP) was last revised in May 2024 and complied with CDCR policy.

Institutional Response to Headquarters' Expectations Relative to Institutional Oversight of Heat Plan Operations Memorandum (Expectations Memo)

In addition to CDCR's 2024 Heat Plan and Updates memorandum, CDCR issued an Expectations Memo, dated August 2, 2024, delineating the specific responsibilities of the warden and CEO.  These included daily meetings during days of anticipated heat advisories to address and manage heat alerts and related concerns.  The monitor was unable to attend a daily heat meeting with custody leadership during the site visit.

Monthly Summary Reports

The 2024 Heat Plan and Updates memorandum required that each institution submit a Monthly Summary Report (Summary Report), signed by the warden and CEO to headquarters each month from May 1 to October 31.  CRC produced Summary Reports for July, August, and

72

September which reflected that there were 60 Stage I heat alerts, 64 Stage II heat alerts, and 36 Stage III heat alerts during the three months. Of note, the Summary Reports reflected data for the entire institution during the three months and did not only reflect the three EOP units reviewed during the site visit.

The Heat Plan and Updates memorandum also required institutions to include with the monthly submission a Heat Incident Log documenting the number of patients who experienced a heat-related illness. The Heat Incident Log must include the patient's information and details regarding the heat-related illness. CRC reported three heat-related illnesses during the reporting period; all occurred in September. The institution's Summary Reports were compliant with the 2024 Heat Plan and Updates memorandum.

Staff Knowledge of Heat Plan Policy and Procedure

The 2024 Heat Plan and Updates memorandum required all custody officers and leadership staff to maintain knowledge of heat plan activation and act in accordance with the requirements of each stage. Interviewed custody staff in the EOP housing unit demonstrated adequate knowledge of heat plan policy and procedure.

The policy also required that when the Heat Plan was in effect, institutional staff must generate and distribute *daily* a list of all incarcerated persons currently prescribed any of the designated Heat Alert Medications. The heat-risk incarcerated persons list was updated daily as required.

Accordingly, interviews with the institution's custody staff reflected compliance with the requirements of the 2024 Heat Plan and Updates memorandum.

73

Outdoor Temperature Logs

To ensure proper and accurate temperature recording, the Annual Heat Plan and Updates memorandum required the warden or designee to ensure an accurate thermometer was in a central, heat-neutral location to monitor outside ambient air temperatures, which must be recorded every hour, every day, from May 1 through October 31 of each year. CRC's outside thermometer was located in central control outside of Tower 5 and measured the outside air temperature for the entire institution year round. Reviewed outside temperature logs were completed hourly as required. The outside patrol sergeant was responsible for auditing the Tower 5 temperature log sheets daily before the completion of each shift.

The institution's outdoor temperature recording procedures complied with the 2024 Heat Plan and Updates memorandum.

Indoor Temperature Logs

The warden or  designee was also responsible for ensuring that inside air temperatures were measured in all non-airconditioned living areas that house heat-risk incarcerated persons. Temperatures must be taken at the highest non-air-conditioned location where heat-risk incarcerated persons are housed and must be recorded every three hours. The EOP housing unit at CRC was air-conditioned at the time of the site visit. Observed indoor thermometers were in working order and were located in the highest feasible location inside the housing unit. Interviewed custody staff reported taking indoor temperatures every three hours year round and recording them on the indoor temperature log. Reviewed logs revealed that officers were recording temperatures as required. The housing facility sergeants were responsible for auditing the temperature log daily during each shift. The institution's indoor temperature recording procedures complied with the 2024 Heat Plan and Updates memorandum.

74

<u>Monitor's Temperature Measurements</u>

The 2024 Heat Plan and Updates required temperatures to be taken at the highest non-air-conditioned location where heat-risk incarcerated persons were housed, *which could include a temperature taken within an incarcerated person's* cell.   During the site visit, the monitor obtained the ambient air temperatures of dayrooms and patient cells.  Cells and dayrooms in the EOP housing units did not exceed 75 degrees Fahrenheit.

<u>Accommodations and Cooling Measures</u>

In an effort to ensure that heat-risk incarcerated persons were afforded equal access to programs, services, and activities during extreme weather conditions, the 2024 Heat Plan and Updates memorandum required institutions to devise and include any reasonable accommodations and alternatives to yard activities when revising their LOP.  All reasonable accommodations provided to heat-risk incarcerated persons during heat alert activation must be documented in the institution's Daily Activity Report (DAR).

Reviewed daily activity reports indicated that heat-risk incarcerated persons were offered dayroom and programming privileges during Stage I heat alert activation.  Observed coolers of ice and water were offered to patients inside the dayroom as well.  Additionally, the monitor observed two working ice machines on the unit.  The institution also used a flag system to alert heat-risk incarcerated persons to a Stage I heat alert activation.

The institution's documenting of reasonable accommodations complied with the 2024 Heat Plan and Updates memorandum.

<u>Heat-Related Pathologies Training</u>

The 2024 Heat Plan and Updates memorandum required annual training on the institution's Heat Plan, including measures when heat stress symptoms are identified and/or

reported, to be provided to custodial and clinical staff by the In-Service Training Officer.  CRC reported completion of the heat-related pathologies training by 518 or 795 or 65 percent of custody staff and 28 of 31 or 90 percent of non-custody staff.  Although the number of non-custody staff who completed the annual training was compliant with the 2024 Heat Plan and Updates memorandum, the number of custody staff who completed the training was non-compliant.

Conclusion

Although there were significant concerns with the number of Stage III heat alerts institution-wide, interviewed EOP housing unit staff were knowledgeable of heat plan policy and procedures, recorded temperatures appropriately, and provided adequate accommodations and adequate cooling measures.  Therefore, CRC's implementation of the 2024 Heat Plan and Updates memorandum was compliant during the review period.

**<u>CALIFORNIA SUBSTANCE ABUSE TREATMENT FACILITY (CSATF)</u>**

(August 19, 2024 – August 20, 2024)

On August 19, 2024, the Special Master reviewed the California Substance Abuse Treatment Facility (CSATF) policies, procedures, and implementation of CDCR's 2024 Heat Plan and Updates memorandum, dated April 8, 2024. While on site, the monitors met with custody and mental health leadership, reviewed the institution's heat plan record keeping, and observed heat plan implementation across the institution. Overall, as described herein below, CSATF's implementation of the 2024 Heat Plan and Updates memorandum was noncompliant.

<u>Local Operating Procedures (LOP)</u>

CDCR required that each institution's heat plan local operating procedure incorporate the requirements of the April 8, 2024 Heat Plan and Updates memorandum. CSATF's LOP was last updated in April 2024; however, it did not conform with the required policy. Notably, the institution's LOP did not provide directions to staff to document the highest temperature reading gathered within each housing unit as the official indoor temperature for a particular time block.

<u>Institutional Response to Headquarters' Expectations Relative to Institutional Oversight of Heat Plan Operations Memorandum (Expectations Memo)</u>

In addition to CDCR's 2024 Heat Plan and Updates memorandum, CDCR issued an Expectations Memo, dated August 2, 2024, delineating the specific responsibilities of the warden and CEO. These included daily meetings during days of anticipated heat advisories to address and manage heat alerts and related concerns. The monitors attended the warden's daily heat meeting while on-site. During the meeting, staff reported on compliance with the distribution of the daily heat risk list, any plant operations issues, any staff or patient heat illnesses, and the activation of any stages of the heat plan. During the meeting, it was noted that one ice machine was not working; however, it was repaired the same day.

Monthly Summary Reports

      The 2024 Heat Plan and Updates memorandum required that each institution submit a Heat Plan Monthly Summary Report (Summary Report), signed by the warden and CEO, to headquarters each month from May 1 to October 31.  CSATF produced Summary Reports for May, June, and July, which reflected that there were 65 Stage I heat alerts, 12 Stage II heat alerts, and two Stage III heat alerts during the three-month timeframe.  However, examined indoor temperature logs revealed that although there were no reported Stage II heat alerts in May's Summary Report, the indoor temperature log for unit C7 on May 13, 2024 reflected the activation of a Stage II heat alert.  For the month of June, the Summary Report again indicated that no Stage II heat alerts occurred; however, reviewed indoor temperature logs for units A3 and F3 on June 25, 2024 reflected that a Stage II heat alert was activated.  Reviewed outdoor temperature logs revealed that there were 17 Stage I heat alerts in the month of May, while the Summary Report for May only reported nine Stage I heat alerts.  These inconsistencies compromised the reliability of the information in the Summary Reports during the review period.

      The Heat Plan and Updates memorandum also required institutions to include with the monthly submission a Heat Incident Log documenting the number of patients who experienced a heat-related illness.  The patient's information and details regarding the heat-related illness must also be documented in a Heat Incident Log maintained by the institution.  CSATF reported no heat-related illnesses during May, June, or July of the review period.

      As a result of the inconsistent heat alert activation data, the institution's Summary Reports were not compliant with the 2024 Heat Plan and Updates memorandum.

Staff Knowledge of Heat Plan Policy and Procedures

The 2024 Heat Plan and Updates memorandum required all custody officers and leadership staff to maintain knowledge of heat plan activation and act in accordance with the requirements of each stage.  The policy also required that when the Heat Plan was in effect, institutional staff must generate and distribute *daily* a list of all incarcerated persons currently prescribed any of the designated Heat Alert Medications.

The monitors toured 12 housing units on Facilities A through G, the 3CMS RHU, MHCB, and CTC during the site visit.  Officers on all facilities demonstrated adequate knowledge of heat plan policy and procedures, except for officers on Facility G who were not familiar with the stages of the heat plan or their responsibilities at each stage.  The officer was unable to locate a current heat-risk incarcerated persons list, a significant concern given a Stage I heat alert occurred on the date of the interview.

As a result of these concerns, the institution's custody staff interviews and heat plan procedures did not reflect compliance with the requirements of the 2024 Heat Plan and Updates memorandum during the site visit.

Outdoor Temperature Logs

To ensure proper and accurate temperature recording, the Annual Heat Plan and Updates memorandum required the warden or  designee to ensure an accurate thermometer was placed in a central, heat-neutral location to monitor outside ambient air temperatures, which must be recorded every hour, every day, from May 1 through October 31 of each year.  Outdoor temperature measurements were a significant concern at CSATF during the site visit.  It was noted that CSATF did not activate a Stage I heat alert until 3:15 P.M., while the neighboring institution, CSP/Corcoran, activated a Stage I heat alert at approximately 11:00 A.M. the same

day.  It was later discovered that the outside temperature probe was taped to the back window of the central control booth, which was air-conditioned.  Although central control custody officers monitored the thermometer hourly and recorded outdoor temperatures appropriately, the location of the temperature probe had a significant impact on the accuracy of the outdoor temperature, as reflected by the four-hour delay in activating Stage I heat alert compared to CSATF's neighboring institution (CSP/Corcoran) during the monitoring tour.

As a result, the institution's outdoor temperature recording procedures did not comply with the 2024 Heat Plan and Updates memorandum.

Indoor Temperature Logs

The warden or  designee was also responsible for ensuring that inside air temperatures were measured in all non-airconditioned living areas that house heat-risk incarcerated persons. Temperatures must be taken at the highest non-air-conditioned location where heat-risk incarcerated persons are housed and must be recorded every three hours.  The process for recording indoor temperatures at CSATF varied by facility depending on the housing structure, but all completed the required temperature recording appropriately.  For Facility A's dorm housing, the inside temperature was measured in each of the three sections, and the housing unit staff documented the highest temperature on the inside temperature log.  For Facility F and G's dorm housing, each housing unit had four pods in each building, with the temperature recorded in each pod.  Officers indicated that they documented the highest temperature of the four pods on the inside temperature log.  Of note, one pod in unit F-3 was eight degrees hotter than the thermometer in the housing unit.  Plant operations staff indicated that they would replace the thermometer.  For Facilities B, C, D, and E, working thermometers were observed in the highest feasible locations of each housing unit.  Although the RHU, MHCB, and CTC were air-

conditioned, working thermometers were observed as well.  All indoor temperature logs at all facilities were completed appropriately.

CSATF's indoor temperature recording procedures complied with the 2024 Heat Plan and Updates memorandum.

Monitor's Temperature Measurements

The 2024 Heat Plan and Updates required temperatures to be taken at the highest non-air-conditioned location where heat-risk incarcerated persons were housed, *which could include a temperature taken within an incarcerated person's* cell.  CSATF indicated that swamp coolers supplied cool air to dayrooms and patient cells through air ducts in all housing units with the exception of the CTC and standalone RHU, which were air-conditioned during the site visit.  During the site visit, the monitor obtained the ambient temperature of dayrooms, cells, and pods on Facilities B, C, D, and G.  On Facilities B, C, and D; no cell, dayroom, or pod exceeded 80 degrees Fahrenheit.  Facility G dayroom temperatures reached a maximum 83.7 degrees Fahrenheit, pods no higher than 82.7 degrees Fahrenheit, and a program room of 83 degrees Fahrenheit.

Accommodations and Cooling Measures

In an effort to ensure that heat-risk incarcerated persons were afforded equal access to programs, services, and activities during extreme weather conditions, the 2024 Heat Plan and Updates memorandum required institutions to devise and include any reasonable accommodations and alternatives to yard activities when revising their LOP.  All reasonable accommodations provided to heat-risk incarcerated persons during heat alert activation must be documented in the institution's Daily Activity Report (DAR).

Although the warden indicated not documenting this information in the daily activity reports, interviewed custody officers reported offering mainline patients opportunities for dayroom activities as a replacement for yard during Stage I heat alerts. During the visit, the monitor observed patients playing games, table tennis, watching television, and socializing in dayrooms during a Stage I heat alert.

Additional cooling measures were offered to heat-risk incarcerated persons during Stage I heat alerts, including ice and cold water, opportunities for additional showers, and additional fans and port-a-cool units. Though the monitor observed that all but one ice machine worked, Facilities C and D staff reported using the central kitchen for ice as they did not have an available machine on these facilities. Staff indicated that during the heat plan months, producing large quantities of ice was difficult and caused machines to break. Kitchen staff reported filling five-gallon buckets and other pans with water make additional ice when possible. Unfortunately, multiple officers in the 3CMS RHU reported not offering heat-risk incarcerated persons alternative activities to yard during the review period.

Although accommodations were observed during the site visit, because the institution did not document the offering of accommodations in the DARs during Stage I heat alerts or provide alternatives to yard activities to incarcerated persons, the institution was not in compliance with the 2024 Heat Plan and Updates memorandum.

Heat-Related Pathologies Training

The 2024 Heat Plan and Updates memorandum required annual training on the institution's Heat Plan, including measures when heat stress symptoms are identified and/or reported, to be provided to custodial and clinical staff by the In-Service Training Officer. For custody staff, 516 of 978, or 53 percent, attended the required heat-related pathologies training,

while 70 of 145 or 48 percent of non-custody staff attended the training. The number of staff who completed the required heat-related pathologies training did not comply with the 2024 Heat Plan and Updates memorandum.

Conclusion

Due to the above-mentioned deficiencies, including inconsistent monthly summary report data, deficient staff knowledge of heat plan policy, and inadequate temperature recording procedures, CSATF's implementation of the 2024 Heat Plan and Updates memorandum was not compliant during the review period.

## CALIFORNIA STATE PRISON/CORCORAN (CSP/Corcoran)

(August 20, 2024 – August 21, 2024)

On August 20, 2024, the Special Master reviewed the California State Prison/Corcoran's (CSP/Corcoran) policies, procedures, and implementation of CDCR's 2024 Heat Plan and Updates memorandum, dated April 8, 2024.  While on site, the monitors met with custody and mental health leadership, reviewed the institution's heat plan record keeping, and observed heat plan implementation across the institution.  Overall, as described below, CSP/Corcoran's implementation of the 2024 Heat Plan and Updates memorandum was not compliant.

Local Operating Procedures (LOP)

CDCR required that each institution's heat plan local operating procedure (LOP) incorporate the requirements of the April 8, 2024 Heat Plan and Updates memorandum. CSP/Corcoran's heat plan LOP was last revised in April 2024 and, with one exception noted below, comported with the required policy.  The LOP was only reviewed and approved by the warden and did not include the CEO's signature, as required.  However, the LOP included multiple requirements that exceeded the 2024 Heat Plan and Updates memorandum requirements, including requiring custody officers to record indoor temperatures every hour once a Stage II or Stage III heat alert was activated and requiring the delivery of meals to heat-risk incarcerated persons during Stage I heat alerts.  Concerningly, however, the LOP also included provisions that allowed custody staff, with permission from the physician, to initiate a controlled use of force if a heat-risk incarcerated person was not taking appropriate cooling measures during a Stage II or Stage III heat alert.

While the institution was overall compliant with LOP requirements, defendants should ensure CSP/Corcoran removes the controlled use of force provisions from its LOP going forward.

<u>Institutional Response to Headquarters' Expectations Relative to Institutional Oversight of Heat</u>
<u>Plan Operations Memorandum (Expectations Memo)</u>

In addition to CDCR's 2024 Heat Plan and Updates memorandum, CDCR issued an Expectations Memo, dated August 2, 2024, delineating the specific responsibilities of the warden and CEO. These included daily meetings during days of anticipated heat advisories to address and manage heat alerts and related concerns. The monitor was unable to attend a daily heat meeting with custody leadership during the site visit.

<u>Monthly Summary Reports</u>

The 2024 Heat Plan and Updates memorandum required that each institution submit a Heat Plan Monthly Summary Report (Summary Report), signed by the warden and CEO, to headquarters each month from May 1 to October 31. CSP/Corcoran produced Summary Reports for May, June, and July, which indicated that there were 74 Stage I heat alerts, 25 Stage II heat alerts, and no Stage III heat alerts during the three months. However, examined daily activity logs and indoor temperature logs for the month of July indicated that there were 16 Stage II heat alerts, while the July Summary Report only reflected 15 Stage II heat alerts. This inconsistency compromised the reliability of the information in the Summary Reports during the review period.

The Heat Plan and Updates memorandum also required institutions to include with the monthly submission a Heat Incident Log documenting the number of patients who experienced a heat-related illness. The Heat Incident Log must include the patient's information and details regarding the heat-related illness. CSP/Corcoran reported two heat-related illnesses during the three months; both occurred in July 2024. CSP/Corcoran produced appropriately completed heat incident logs with information regarding the patient's level of care, prescribed medications, location of the heat incident, and prognosis following treatment.

85

Notwithstanding one inconsistent heat alert activation datapoint in July, the institution's Summary Reports were compliant with the 2024 Heat Plan and Updates memorandum.

Staff Knowledge of Heat Plan Policy and Procedures

The 2024 Heat Plan and Updates memorandum required all custody officers and leadership staff to maintain knowledge of heat plan activation and act in accordance with the requirements of each stage. The monitors interviewed custody officers at 14 different housing units, including EOP and 3CMS facilities, the MHCB, and RHU. Custody staff across all facilities at CSP/Corcoran demonstrated adequate knowledge of heat plan policy and procedure during the review period. Very few officers relied on additional resources during the interviews. Custody officers on each unit explained their procedures to recall heat-risk incarcerated persons during heat alert activation as well.

The policy also required that when the Heat Plan was in effect, institutional staff must generate and distribute *daily* a list of all incarcerated persons currently prescribed any of the designated Heat Alert Medications.

The institution's custody staff interviews and heat plan procedures reflected compliance with the requirements of the 2024 Heat Plan and Updates memorandum during the site visit.

Outdoor Temperature Logs

To ensure proper and accurate temperature recording, the Annual Heat Plan and Updates Memorandum required the warden or designee to ensure an accurate thermometer was in a central, heat-neutral location to monitor outside ambient air temperatures which must be recorded every hour, every day, from May 1 through October 31 of each year. CSP/Corcoran used their boiler plant as their central control station to obtain an outside temperature for the entire institution. The probe used for measuring the outside temperature was located on the

upper side of the building and encased in a metal box.  Staff explained that they recorded outdoor temperatures hourly and tracked outdoor temperatures year-round.  The observed hourly temperature log was properly completed.

Therefore, the institution's outdoor temperature recording procedures complied with the 2024 Heat Plan and Updates memorandum.

Indoor Temperature Logs

The warden or designee was also responsible for ensuring that inside air temperatures were measured in all non-air-conditioned living areas that house heat-risk incarcerated persons. Temperatures must be taken at the highest non-air-conditioned location where heat-risk incarcerated persons were housed and must be recorded every three hours.  Although staff at CSP/Corcoran documented inside air temperatures every three hours as required by policy, there were concerns with thermometer probe placement in some housing units and whether the probe was collecting the correct temperatures for each unit.  In Facilities 4A1 and 4A3, there were no individual thermometers located in each section, rather, the unit officers relied on one thermometer for all sections and placed the probe in the air ducts next to the common return air vent.  This produced an average temperature reading rather than getting one singular reading for each individual housing unit.    Broken thermometers were also noted on Facility 3A3 sections A and B.  This was reported to plant operations on-site.

As a result, the institution's indoor temperature recording procedures did not comply with the 2024 Heat Plan and Updates memorandum.

Monitor's Temperature Measurements

The 2024 Heat Plan and Updates required temperatures to be taken at the highest non-air-conditioned location where heat-risk incarcerated persons were housed, *which could include a*

*temperature taken within an incarcerated person's* cell.  CSP/Corcoran reported that except the

standalone RHU and MHCB, which were air-conditioned units, all housing units utilized swamp

coolers that supplied cool air to dayrooms and patient cells through air ducts.  The monitor

toured ten housing units on Facilities 3A, 4A, and the standalone RHU to collect ambient

dayroom and in-cell temperatures.  Dayroom temperatures in Facilities 3A1 through 3A5 did not

exceed 81.4 degrees Fahrenheit, and in-cell temperatures in these facilities did not exceed 80.4

degrees Fahrenheit.  On Facility 4A1, dayroom temperatures did not exceed 81.8 degrees

Fahrenheit, and in-cell temperatures did not exceed 80.7 degrees Fahrenheit.  On Facility 4A3,

dayroom temperatures did not exceed 79.4 degrees Fahrenheit, and in-cell temperatures did not

exceed 79.8 degrees Fahrenheit.  The standalone RHU's dayroom did not exceed 76.3 degrees

Fahrenheit, and in-cell temperatures did not exceed 78.6 degrees Fahrenheit.

Accommodations and Cooling Measures

In an effort to ensure that heat-risk incarcerated persons were afforded equal access to

programs, services, and activities during extreme weather conditions, the 2024 Heat Plan and

Updates memorandum required institutions to devise and include any reasonable

accommodations and alternatives to yard activities when revising their LOP.  All reasonable

accommodation provided to heat-risk incarcerated persons during heat alert activation must be

documented in the institution's Daily Activity Reports (DARs.)

A review of DARs for July 2024 revealed that custody staff did not document the

provision of reasonable accommodations heat-risk incarcerated persons during Stage I heat alert

activation.  However, interviewed staff reported providing heat-risk incarcerated persons with

accommodations during Stage I heat alerts throughout the review period, including access to

additional dayroom, cool water and ice upon request, and cold showers.  The monitor observed

coolers filled with ice and water in all toured dayrooms. Patients housed in the 3CMS RHU building 4A1R reported receiving a bag of ice for their cells every day. Oscillating fans were located throughout the dayrooms and treatment areas as well. Water fountains were accessible in most dayrooms.

There were observable shade structures with misters on some yards; however, the CSP-Corcoran staff reported that covered areas were not permitted on Level III and IV yards due to safety concerns. Instead, misters were attached to the framework of the pop-up canopies in these yards.

Although the institutional staff reported providing accommodations to heat-risk incarcerated persons during Stage I heat alerts, the accommodations were not documented in the DAR as required, therefore the institution was not compliant with the 2024 Heat Plan and Updates memorandum.

Heat-Pathologies Training

The 2024 Heat Plan and Updates memorandum required annual training on the institution's Heat Plan, including measures when heat stress symptoms are identified and/or reported, to be provided to custodial and clinical staff by the In-Service Training Officer. For custodial training, the warden, chief deputy warden, all correctional administrators, all captains, and all correctional officers attended the required training. Thirty-seven of 38 or 97 percent of lieutenants and 84 of 88 or 95 percent of sergeants attended the training. The institution indicated that at least 66 noncustodial staff attended the training but did not produce the number of non-custody staff required to complete the training and therefore compliance could not be assessed.

Although the institution was compliant with custody training, compliance with the 2024 Heat Plan and Updates memorandum could not be ascertained as non-custody data was not produced.

Conclusion

Overall, CSP/Corcoran's implementation of the 2024 Heat Plan and Updates memorandum was compliant during the review period. The institution should take corrective action to ensure accommodations are documented in DARs and thermometers are placed to accurately record indoor temperatures.

**CALIFORNIA STATE PRISON/LOS ANGELES COUNTY (CSP/LAC)**

(August 27, 2024)

On August 27, 2024, the Special Master reviewed the California State Prison/Los Angeles County (CSP/LAC)) policies, procedures, and implementation of CDCR's 2024 Heat Plan and Updates memorandum, dated April 8, 2024. During the site visit, the monitors met with custody and mental health leadership, reviewed the institution's heat plan record keeping, and observed heat plan implementation across the institution. Overall, as described herein below, CSP/LAC's implementation of the 2024 Heat Plan and Updates memorandum was noncompliant.

Local Operating Procedures (LOP)

CDCR required that each institution's heat plan local operating procedure incorporate the requirements of the April 8, 2024 Heat Plan and Updates memorandum. CSP/LACs heat plan LOP was last revised in May 2024 and complied with headquarters' directive. Notably, the LOP required year-round implementation of the heat plan at CSP/LAC.

Institutional Response to Headquarters' Expectations Relative to Institutional Oversight of Heat Plan Operations Memorandum (Expectations Memo)

In addition to CDCR's 2024 Heat Plan and Updates memorandum, CDCR issued an Expectations Memo, dated August 2, 2024, delineating the specific responsibilities of the warden and CEO. These included daily meetings during days of anticipated heat advisories to address and manage heat alerts and related concerns. CSP/LAC's executive leadership staff reported implementation of heat mitigation strategies, including new thermometers; two igloos of iced water in each housing unit; cooling towels for individuals on heat risk medications; two fans for each housing unit; 15 portable misters; and a new shade structure for the yard.

91

<u>Monthly Summary Reports</u>

The 2024 Heat Plan and Updates memorandum required that each institution submit a Heat Plan Monthly Summary Report (Summary Report), signed by the warden and CEO, to headquarters each month from May 1 to October 31.  CSP/LAC produced Summary Reports for May, June, and July, which reflected that there were 72 Stage I heat alerts, four Stage II heat alerts, and no Stage III heat alerts in the three months.

The Heat Plan and Updates memorandum also required institutions to include with the monthly submission a Heat Incident Log documenting the number of patients who experienced a heat-related illness.  The Heat Incident Log must include the patient's information and details regarding the heat-related illness.  CSP/LAC reported no heat-related illnesses during the review period.

CSP/LAC adequately complied with Summary Reports requirements.

<u>Staff Knowledge of the Heat Plan Policy and Procedures</u>

The 2024 Heat Plan and Updates memorandum required all custody officers and leadership staff to maintain knowledge of heat plan activation and act in accordance with the requirements of each stage.  The monitors visited 15 housing units, the 3CMS RHU, the CTC, the gymnasium, the two satellite kitchens, and the central kitchen during the tour.

Interviewed custody officers demonstrated adequate knowledge of heat plan policy and procedure, including identifying which temperatures activated the heat plan, custody responsibilities at each stage, signs and symptoms of heat-related illness, and maintenance of a daily list of heat-risk incarcerated persons in their housing unit.

The policy also required that when the Heat Plan was in effect, institutional staff must generate and distribute *daily* a list of all incarcerated persons currently prescribed any of the

designated Heat Alert Medications.  In several housing units, placards were placed on cell doors to identify heat risk incarcerated persons.  However, interviewed staff in the CTC and the 3CMS RHU could not produce a daily heat-risk incarcerated persons list.

While staff in two housing units were unable to produce the daily list of incarcerated persons prescribed Heat Alert Medications, overall, CSP/LAC's staff's knowledge of heat plan policies and protocols was compliant.

Outdoor Temperature Logs

To ensure proper and accurate temperature recording, the Annual Heat Plan and Updates memorandum required the warden or  designee to ensure an accurate thermometer was installed in a central, heat-neutral location to monitor outside ambient air temperatures, which must be recorded every hour, every day, from May 1 through October 31 of each year.  Reviewed temperature logs revealed regularly missed temperature recordings in central control during the review period.

As a result, CSP/LAC was noncompliant with outdoor temperature logging requirements.

Indoor Temperature Logs

The warden or designee was responsible for ensuring that inside air temperatures were measured in all non-airconditioned living areas that house heat-risk incarcerated persons.  Temperatures must be taken at the highest non-air-conditioned location where heat-risk incarcerated persons are housed and must be recorded every three hours.  The monitors toured housing units on Facilities A through D, the CTC, and RHU during the site visit.  Facilities A through D were equipped with a swamp cooler, while the CTC and RHU were air-conditioned.  Notably, hot air was blowing out of the vents and into observed housing units on C and D yard,

93

and the air conditioning was broken in the gymnasium, which was designated as a cooling station during the review period.

Custody officers from all units reported that they recorded temperatures from either digital or non-digital thermometers which were located on the second tier of each housing unit. Broken thermometers were noted in satellite kitchen A and unit C1.  Multiple observed indoor temperature logs were missing temperature recordings in units A1, A3, D5, the CTC, and the RHU.

Due to multiple broken thermometers and missing log entries, CSP/LAC was noncompliant with indoor temperature logging requirements.

<u>Monitor's Temperature Measurements</u>

The 2024 Heat Plan and Updates required temperatures to be taken at the highest non-air-conditioned location where heat-risk incarcerated persons were housed, *which could include a temperature taken within an incarcerated person's* cell.  The monitors collected temperature measurements using personal ambient air temperature thermometers in all toured housing units. The highest temperature reading across the institution reflected 86 degrees Fahrenheit in the Facility C visiting area.  The satellite kitchen's air temperature reflected 79.4 degrees Fahrenheit during the site visit; though the kitchen thermometer was broken.  Facilities A through D temperatures did not exceed 77.3 degrees Fahrenheit, and patient cells did not exceed 76.4 degrees Fahrenheit.

<u>Accommodations and Cooling Measures</u>

In an effort to ensure that heat-risk incarcerated persons were afforded equal access to programs, services, and activities during extreme weather conditions, the 2024 Heat Plan and Updates memorandum required institutions to devise and include any reasonable

accommodations and alternatives to yard activities when revising their LOP.  All reasonable accommodations provided to heat-risk incarcerated persons during heat alert activation must be documented in the institution's Daily Activity Reports (DARs).

The monitor reviewed DARs for May through July 2024; none included documentation of reasonable accommodations or alternative activities for heat-risk incarcerated persons during Stage I heat alerts.

For cooling measures, the ice machine in the central kitchen and one of the two in the satellite kitchens were working.  Though water fountains were present in most housing units, they did not work in units A3, B1, B2, B3, and B5 at the time of the site visit. Further, while D yard had igloos on the yard and in the housing units, there were no water or igloo coolers observed on Facilities A, B or C.  Additionally, patients throughout the institution reported the inability to control the shower temperatures and that showers were too hot.

Based on the foregoing, CSP/LAC was not compliant with the provision of accommodations to heat-risk incarcerated persons during Stage I heat alerts.

<u>Heat-Related Pathologies Training</u>

The 2024 Heat Plan and Updates memorandum required annual training on the institution's Heat Plan, including measures when heat stress symptoms are identified and/or reported, to be provided to custodial and clinical staff by the In-Service Training Officer. CSP/LAC indicated that 454 custody and 530 non-custody staff completed the required annual heat pathologies training.  Because the institution did not produce the number of staff who were *required* to complete the training, compliance could not be assessed.

Conclusion

 Due to the above-mentioned deficiencies, including deficient temperature recording practices and failure to offer or document reasonable accommodations or provide adequate cooling measures, CSP/LAC's implementation of the 2024 Heat Plan and Updates memorandum was not compliant during the review period.

**CALIFORNIA STATE PRISON/SACRAMENTO (CSP/Sac)**

(August 26, 2024)

On August 26, 2024, the Special Master reviewed the California State Prison/ Sacramento's (CSP/Sac) policies, procedures, and implementation of CDCR's 2024 Heat Plan and Updates memorandum, dated April 8, 2024. While on site, the monitors met with custody and mental health leadership, reviewed the institution's heat plan record keeping, and observed heat plan implementation across the institution. Overall, as described herein below, CSP/Sac's implementation of the 2024 Heat Plan and Updates memorandum was compliant.

Local Operating Procedures

CDCR required that each institution's heat plan local operating procedure incorporate the requirements of the April 8, 2024 Heat Plan and Updates memorandum. CSP/Sac's heat plan LOP was last updated in April 2024 and conformed to required policy.

Institutional Response to Headquarters' Expectations Relative to Institutional Oversight of Heat Plan Operations Memorandum (Expectations Memo)

In addition to CDCR's 2024 Heat Plan and Updates memorandum, CDCR issued an Expectations Memo, dated August 2, 2024, delineating the specific responsibilities of the warden and CEO. These included daily meetings during days of anticipated heat advisories to address and manage heat alerts and related concerns. During the site visit, the monitor observed a daily meeting that included members of the warden's leadership team from each facility, as well as plant operations staff and the heat plan coordinator. Updates were provided regarding heat-related concerns on the facilities, education centers, treatment areas, and kitchens. Leadership provided updates about newly acquired resources, including pop-up tents for the yards, and mister replacements. Contingency plans to create cooling stations were discussed during the meeting as well.

97

<u>Monthly Summary Reports</u>

The 2024 Heat Plan and Updates memorandum required that each institution submit a Heat Plan Monthly Summary Report (Summary Report), signed by the warden and CEO, to headquarters each month from May 1 to October 31.  CSP/Sac produced Summary Reports for May, June, and July, which reflected that there were 42 Stage I heat alerts, 38 Stage II heat alerts, and four Stage III heat alerts during the three months.  Daily Activity Reports (DARs) supported the Summary Reports and included the exact time each heat alert went into effect.

The Heat Plan and Updates memorandum also required institutions to include with the monthly submission a Heat Incident Log documenting the number of patients who experienced a heat-related illness.  The Heat Incident Log must include the patient's information and details regarding the heat-related illness.  CSP/Sac reported ten heat-related illnesses during the review period; all occurred in July 2024, and four involved patients who were prescribed heat-risk medications.  Seven of those ten patients were at the EOP level of care.  The Chief Nurse Executive reported that patients who exhibited symptoms for heat-related illness were immediately referred to the TTA for treatment.  CSP/Sac produced an appropriately completed heat incident log with all required details.

The institution's Summary Reports complied with the 2024 Heat Plan and Updates memorandum.

<u>Staff Knowledge of Heat Plan Policy and Procedures</u>

The 2024 Heat Plan and Updates memorandum required all custody officers and leadership staff to maintain knowledge of heat plan activation and act in accordance with the requirements of each stage.  The monitors interviewed custody officers in 15 housing units on Facilities A, B, C, and the CTC; all interviewed custody staff demonstrated adequate knowledge

of heat plan policy and procedures, There were no reported issues with the execution of responsibilities during any heat plan activation.

The policy also required that when the Heat Plan was in effect, institutional staff must generate and distribute *daily* a list of all incarcerated persons currently prescribed any of the designated Heat Alert Medications.

The institution's custody staff interviews reflected compliance with the requirements of the 2024 Heat Plan and Updates memorandum.

Outdoor Temperature Logs

To ensure proper and accurate temperature recording, the Annual Heat Plan and Updates memorandum required the warden or  designee to ensure an accurate thermometer was placed in a central, heat-neutral location to monitor outside ambient air temperatures, which must be recorded every hour, every day, from May 1 through October 31 of each year.  CSP/Sac central control staff recorded outside air temperatures during the review period.  The monitors observed the outside thermometer and noted that outside temperature logs were properly completed every hour.  Reviewed DARs were consistent with outside temperature logs and supported the activation of Stage I heat alerts.

The institution's outdoor temperature recording procedures complied with the 2024 Heat Plan and Updates memorandum.

Indoor Temperature Logs

The warden or designee was also responsible for ensuring that inside air temperatures were measured in all non-airconditioned living areas housing heat-risk incarcerated persons. Temperatures must be taken at the highest non-air conditioned location where heat-risk incarcerated persons were housed and must be recorded every three hours.  Digital thermometers

were used to record all indoor temperatures at CSP/Sac. The temperature probes were placed in the highest feasible locations in each examined dayroom, except for housing units on Facility A. In those housing units, the temperature probes were placed near the air registers for all three sections of the unit. Although this was identified as the hottest air in the unit, it only provided an overall temperature or average for the entire unit rather than each housing section. It was noted that the institution was working to place individual temperature probes in each housing unit in order to create a heat map of the entire institution, accessible in one location through Bluetooth capabilities, an encouraging practice that defendants should consider expanding to other institutions.

Temperatures were appropriately recorded every three hours at almost all facilities, with the exceptions of an RHU-1 heat log being signed in advance without a temperature recording and one missing temperature recording in CTC II's temperature log.

Despite the improper placement of thermometers on facility A and the two instances of improper temperature logging, overall CSP/Sac complied with indoor temperature recording procedures in accordance with the 2024 Heat Plan and Updated memorandum.

Monitor's Temperature Measurements

The 2024 Heat Plan and Updates required temperatures to be taken at the highest non-air-conditioned location where heat-risk incarcerated persons were housed, *which could include a temperature taken within an incarcerated person's* cell. During the site visit, the monitor obtained ambient air temperatures of patient cells. Temperatures on Facility A ranged from 76 to 80 degrees Fahrenheit and did not vary more than two degrees from the institution's thermometers, while temperatures on Facilities B and C ranged from 70 to 80 degrees Fahrenheit in the afternoon and likewise did not vary from the institution's temperature readings. All

toured facilities utilized swamp coolers that supplied cool air to dayrooms and patient cells through air ducts.

Accommodations and Cooling Measures

In an effort to ensure that heat-risk incarcerated persons were afforded equal access to programs, services, and activities during extreme weather conditions, the 2024 Heat Plan and Updates memorandum required institutions to devise and include any reasonable accommodations and alternatives to yard activities when revising their LOP. All reasonable accommodation provided to heat-risk incarcerated persons during heat alert activation must be documented in the institution's Daily Activity Report as well.

CSP/Sac staff reported offering patients access to cold water and ice following a Stage I heat alert, offered heat-risk incarcerated persons alternative yard time, including night yard and additional dayroom activities if custody staffing allowed. This was supported by the institution's DARs, which indicated that patients were offered dayroom and in-cell activities if preferred. Most toured housing units maintained coolers with ice and water. All observed ice machines were working during the site visit.

The institution's offering of and documenting reasonable accommodations complied with the 2024 Heat Plan and Updates memorandum

Heat-Related Pathologies Training

The 2024 Heat Plan and Updates memorandum required annual training on the institution's Heat Plan, including measures when heat stress symptoms are identified and/or reported, to be provided to custodial and clinical staff by the In-Service Training Officer. CSP/Sac did not provide the annual heat pathologies training data and was, therefore, noncompliant with the 2024 Heat Plan and Updates memorandum.

Conclusion

Although the institution's indoor temperature recording practices were noncompliant during the review period and the institution did not furnish training data, the remaining requirements were met and therefore the institution's implementation of the 2024 Heat Plan and Updates memorandum was compliant during the review period.

## KERN VALLEY STATE PRISON (KVSP)

### (July 16, 2024 - July 17, 2024)

On July 16, 2024, the Special Master reviewed the Kern Valley State Prison's (KVSP) policies, procedures, and implementation of CDCR's 2024 Heat Plan and Updates memorandum, dated April 8, 2024.  While on site, the monitors met with custody and mental health leadership, reviewed the institution's heat plan record keeping, and observed heat plan implementation across the EOP program.  Overall, as described herein below, KVSP's implementation of the 2024 Heat Plan and Updates memorandum was noncompliant.

Local Operating Procedures (LOP)

CDCR required that each institution's heat plan local operating procedure incorporate the requirements of the April 8, 2024 Heat Plan and Updates memorandum.  KVSP's LOP was updated in April 2024 and comported with headquarters' directive.

Institutional Response to Headquarters' Expectations Relative to Institutional Oversight of Heat Plan Operations Memorandum (Expectations Memo)

In addition to CDCR's 2024 Heat Plan and Updates memorandum, CDCR issued an Expectations Memo, dated August 2, 2024, delineating the specific responsibilities of the warden and CEO.  These included daily meetings during days of anticipated heat advisories to address and manage heat alerts and related concerns.  The monitor was unable to attend a daily heat meeting with custody leadership during the site visit.

Monthly Summary Reports

The 2024 Heat Plan and Updates memorandum required that each institution submit a Heat Plan Monthly Summary Report (Summary Report), signed by the warden and CEO, to headquarters each month from May 1 to October 31.  KVSP produced Summary Reports for May, June, and July, which reflected that there were 61 Stage I heat alerts, two Stage II heat

alerts, and no Stage III heat alerts during the three months.  Of note, the Summary Reports reflect data for the entire institution during the three months.

The Heat Plan and Updates memorandum also required institutions to include with the monthly submission a Heat Incident Log documenting the number of patients who experienced a heat-related illness.  The Heat Incident Log must include the patient's information and details regarding the heat-related illness.  KVSP reported no heat-related illnesses during the three-month period.

Overall, the institution's Summary Reports were compliant with the 2024 Heat Plan and Updates memorandum.

<u>Staff Knowledge of Heat Plan Policy and Procedure</u>

The 2024 Heat Plan and Updates memorandum required all custody officers and leadership staff to maintain knowledge of heat plan activation and act in accordance with the requirements of each stage.  The monitors interviewed custody staff on EOP Units 6, 7, and 8; the custody officers demonstrated varying knowledge of the Heat Plan and most officers required prompting to answer questions.  Specifically, officers in Unit 6 on July 16, 2024 were not familiar with the three stages of the Heat Plan, what triggers each stage, or their responsibilities at each stage.  Interviewed officers expressed frustration with the process as heat-risk incarcerated persons who were brought inside the unit during Stage I activation would leave the unit to go to group but would not report to group and would go back out onto the yard.  Custody staff on Units 7 and 8 did not know their responsibilities during heat plan activation without detailed prompting from the monitors.

The policy also required that when the Heat Plan was in effect, institutional staff must generate and distribute *daily* a list of all incarcerated persons currently prescribed any of the designated Heat Alert Medications.

As a result of the above-described deficiencies, the custody staff interviews and heat plan procedures did not comply with the requirements of the 2024 Heat Plan and Updates memorandum.

Outdoor Temperature Logs

To ensure proper and accurate temperature recording, the Annual Heat Plan and Updates memorandum required the warden or designee to ensure an accurate thermometer was placed in a central, heat-neutral location to monitor outside ambient air temperatures, which must be recorded every hour, every day, from May 1 through October 31 of each year. KVSP central control recorded outdoor temperatures. Reviewed outdoor temperature logs indicated that temperatures were recorded every hour as required.

The institution's outdoor temperature recording procedures complied with the 2024 Heat Plan and Updates memorandum.

Indoor Temperature Logs

The warden or designee is also responsible for ensuring that inside air temperatures are measured in all non-airconditioned living areas that house heat-risk incarcerated persons. Temperatures must be taken at the highest non-air-conditioned location where heat-risk incarcerated persons were housed and must be recorded every three hours. During housing unit tours, the monitors noted significant concern regarding the condition or lack of indoor thermometers and troubling indoor temperature recording practices. Housing unit tours revealed broken or non-existent thermometers in six of nine sections, incomplete temperature logs, staff

misrepresenting daily temperatures, and, in one case, an officer's complete lack of knowledge of the requirement to log housing unit temperatures.  In most of the units without adequate thermometers, fans were routinely missing and thus dayroom temperatures could not be adequately recorded.  During the tour, staff and patients reported heat-related concerns due to the sweltering heat.

The monitor reviewed indoor thermometers and temperature logs in Unit 6 on the first and second day of the site visit.  Although the unit had three sections, only Section A had a thermometer, which was recorded as the ambient dayroom temperature of all three sections of the housing unit.  Officers reported that the three sections routinely differed in temperature throughout the review period.  Further examination revealed that the temperature probe for unit 6A was located in the air-conditioned control booth rather than in the highest feasible location of each housing unit.  This compromised the reliability of the indoor temperature logs for this unit.  Notably, the control booth custody officer indicated taking temperature recordings from a thermometer located in Unit 6B; however, there was no thermometer located in Unit 6B.

Thermometers and temperature logs were also examined in Unit 7 on the first and second day of the site visit.  Although the unit had three sections, the only working thermometer was in Section B and was recorded as the ambient dayroom temperature of all three sections of the housing unit.  Section A had a broken thermometer, and Section C did not have a thermometer at all.  Concerns were noted with the control booth officer in Unit 7, who indicated that he did not know about the requirement to take indoor temperatures of the housing unit and could not identify the correct form.  He also reported not recording temperatures anywhere else in the control booth.  When the monitors returned to Unit 7 on the second day of the tour, the same control booth officer produced a completed temperature log from the prior two days.  Following

106

interview questions about these logs, the officer stated that he did not record temperatures for the past two days but retroactively filled in the temperature log from his memory.  This compromised the reliability of all previous temperature logs from this unit.

Unit 8's thermometers and temperature logs were also examined during the site visit. Although this unit had three sections, the only working thermometer was in Section A and was used to represent the ambient dayroom temperature of all three sections of the housing unit. Section B did not have a thermometer and Section C had a broken thermometer.

Due to the serious concerns noted throughout the three toured units and given the broken or non-existent thermometers in six of nine sections, incomplete temperature logs, and staff misrepresenting daily temperatures, KVSP's indoor temperature recording procedures were not compliant with the 2024 Heat Plan and Updates memorandum.

Monitor's Temperature Measurements

The 2024 Heat Plan and Updates required temperatures to be taken at the highest non-air-conditioned location where heat-risk incarcerated persons were housed, *which could include a temperature taken within an incarcerated person's* cell.  The monitors did not obtain cell or dayroom temperature measurements during the site visit.  KVSP used swamp coolers to cool all toured EOP units during the review period.

Accommodations and Cooling Measures

In an effort to ensure that heat-risk incarcerated persons were afforded equal access to programs, services, and activities during extreme weather conditions, the 2024 Heat Plan and Updates memorandum required institutions to devise and include any reasonable accommodations and alternatives to yard activities when revising their LOP.  All reasonable

accommodation provided to heat-risk incarcerated persons during heat alert activation must be documented in the institution's Daily Activity Reports (DARs).

Reviewed DARs reflected that heat-risk incarcerated persons were offered dayroom as accommodation during a Stage I heat alert activation. Interviewed custody officers indicated that heat-risk incarcerated persons were offered cold water and ice when brought inside during Stage II heat alerts. However, the monitor observed broken ice machines across multiple units, with only one machine working in the kitchen of Units 5 and 6 at the time of the monitoring tour. Custody staff indicated that the ice machine in the Unit 7 and 8 kitchens had been broken for a long period of time and the facility routinely ran out of ice shortly after a Stage II heat alert. Staff also reported difficulty obtaining access to the ice machine as it was routinely locked throughout the day with only kitchen staff holding a key.

While the multiple broken ice machines were a significant operational concern, overall, the institution was compliant in providing and documenting adequate accommodations to heat-risk incarcerated persons during heat alert activations.

Heat-Related Pathologies Training

The 2024 Heat Plan and Updates memorandum required annual training on the institution's Heat Plan, including measures when heat stress symptoms are identified and/or reported, to be provided to custodial and clinical staff by the In-Service Training Officer. KVSP reported that 505 custody staff and 25 non-custody staff completed the required training during the reporting period. KVSP did not produce the number of custody and non-custody staff required to complete the training and therefore compliance with the 2024 Heat Plan and Updates memorandum could not be assessed.

Conclusion

      Due to the serious concerns noted throughout the institution, including broken or non-existent thermometers in six of nine housing sections, incomplete temperature logs, and staff not recording and then misrepresenting daily temperatures, the institution's implementation of the 2024 Heat Plan and Updates memorandum was not compliant during the review period.

## MULE CREEK STATE PRISON (MCSP)

(August 27, 2024)

On August 27, 2024, the Special Master reviewed the Mule Creek State Prison (MCSP) policies, procedures, and implementation of CDCR's 2024 Heat Plan and Updates memorandum, dated April 8, 2024.  While on site, the monitors met with custody and mental health leadership, reviewed the institution's heat plan record keeping, and observed heat plan implementation across the institution.  Overall, as described below, MCSP's implementation of the 2024 Heat Plan and Updates memorandum was compliant.

Local Operating Procedures (LOP)

CDCR required that each institution's heat plan local operating procedure incorporate the requirements of the April 8, 2024 Heat Plan and Updates memorandum.  MCSP's heat plan LOP was last updated in April 2024 and conformed with the required policy.

Institutional Response to Headquarters' Expectations Relative to Institutional Oversight of Heat Plan Operations Memorandum (Expectations Memo)

In addition to CDCR's 2024 Heat Plan and Updates memorandum, CDCR issued an Expectations Memo, dated August 2, 2024, delineating the specific responsibilities of the warden and CEO.  These included daily meetings during days of anticipated heat advisories to address and manage heat alerts and related concerns.  MCSP held daily heat-risk meetings during heat plan months regardless of anticipated heat advisories.  During the observed daily meeting, custody leadership from each facility reported on spot checks of temperatures within the housing units, the outside temperature fluctuations throughout the day, and heat-related repairs reported by plant operations staff.  Of note, MCSP implemented an orange flag system that was flown on each yard to alert staff and patients that a Stage I heat alert was in effect.

Monthly Summary Reports

The 2024 Heat Plan and Updates memorandum required that each institution submit a Heat Plan Monthly Summary Report (Summary Report), signed by the warden and CEO, to headquarters each month from May 1 to October 31.  MCSP produced Summary Reports for May, June, and July, which reflected that there were 60 Stage I heat alerts, eight Stage II heat alerts, and two Stage III heat alerts during the three months.  Daily Activity Reports (DARs) and rounding logs indicated the exact time that each heat alert went into effect, including the specific location and temperature at activation, as well as when nursing staff completed medical rounds.

The Heat Plan and Updates memorandum also required institutions to include with the monthly submission a Heat Incident Log documenting the number of patients who experienced a heat-related illness.  The Heat Incident Log must include the patient's information and details regarding the heat-related illness.  MCSP reported no heat-related illnesses during May, June, or July of the review period.

The institution's Summary Reports were compliant with the 2024 Heat Plan and Updates memorandum.

Staff Knowledge of Heat Plan Policy and Procedures

The 2024 Heat Plan and Updates memorandum required all custody officers and leadership staff to maintain knowledge of heat plan activation and act in accordance with the requirements of each stage.  The monitors interviewed custody officers in 20 housing units on Facilities A through E, and the Minimum Support Facility (MSF).  Staff was generally knowledgeable of the Heat Plan except for custody staff in housing units B8, C14, and D17.

The policy also required that when the Heat Plan was in effect, institutional staff must generate and distribute *daily* a list of all incarcerated persons currently prescribed any of the

designated Heat Alert Medications.  Upon request, custody staff in housing units B14 and D17 did not produce an updated heat-risk incarcerated persons list, which was concerning given that a Stage I heat alert went into effect within an hour of the staff interview.

A custody officer in C14 demonstrated poor knowledge of the stages of the heat plan and her responsibilities at each stage.  She indicated that she was familiar with the heat-risk incarcerated persons list but stated that she did not use it.  She also reported going cell to cell to ask heat-risk incarcerated persons to show their heat risk passes when the temperature reached 100 degrees outside.  The officer clearly did not know the temperature triggers for each stage of the Heat Plan, and further, the 2024 Heat Plan and Updates memorandum noted that heat risk passes were no longer utilized due to improvements in electronic health record access.  This same officer also pre-recorded the indoor room temperature in the heat log for the entire day.

Although knowledgeable of heat plan policy and procedures, custody officers on Facility E20 had difficulty putting the heat plan procedures into practice.  Specifically, while custody officers accounted for heat-risk incarcerated persons returning to the housing unit during a Stage I activation, they took no further action if the heat-risk incarcerated person did not come inside voluntarily following the announcement.

As a result of the above-noted deficiencies, the institution's custody staff interviews and heat plan procedures were not compliant with the requirements of the 2024 Heat Plan and Updates memorandum.

Outdoor Temperature Logs

To ensure proper and accurate temperature recording, the Annual Heat Plan and Updates Memorandum required the warden or  designee to ensure an accurate thermometer was placed in a central, heat-neutral location to monitor outside ambient air temperatures which must be

recorded every hour, every day, from May 1 through October 31 of each year. Outside temperatures at MCSP were recorded by central control during the review period. The temperature probe was appropriately placed outside of the control center and outside temperature logs were completed every hour with the outside temperature.

 The institution's outdoor temperature recording procedures complied with the 2024 Heat Plan and Updates memorandum.

Indoor Temperature Logs

 The warden or designee is also responsible for ensuring that inside air temperatures are measured in all non-airconditioned living areas that house heat-risk incarcerated persons. Temperatures must be taken at the highest non-air-conditioned location where heat-risk incarcerated persons are housed and must be recorded every three hours. Indoor temperatures were appropriately taken from a digital thermometer that had a probe placed in the highest feasible location of each housing unit at MCSP. Temperatures were logged correctly every three hours in almost all indoor temperature logbooks except for housing unit C14, which had a pre-recorded temperature in the logbook, and housing unit B7, which was missing a temperature recording.

 Due to missing temperature recordings and pre-recorded logbooks, the institution's indoor temperature recording procedures were not compliant with the 2024 Heat Plan and Updates memorandum.

Monitor's Temperature Measurements

 The 2024 Heat Plan and Updates required temperatures to be taken at the highest non-air-conditioned location where heat-risk incarcerated persons were housed, *which could include a temperature taken within an incarcerated person's* cell. During the site visit, the monitor

obtained ambient air temperatures of patient cells.  In-cell temperature readings in the late morning and early afternoon hours varied between 75 and 85 degrees Fahrenheit with particularly high temperatures noted on Facility B6 and all of Facility C.  MCSP reported that the two newest facilities, D and E were air-conditioned while Facilities A through C used swamp coolers for dayrooms and patient cells through air ducts.

Accommodations and Cooling Measures

In an effort to ensure that heat-risk incarcerated persons were afforded equal access to programs, services, and activities during extreme weather conditions, the 2024 Heat Plan and Updates memorandum required institutions to devise and include any reasonable accommodations and alternatives to yard activities when revising their LOP.  All reasonable accommodations provided to heat-risk incarcerated persons during heat alert activation must be documented in the institution's Daily Activity Reports (DARs) as well.

Although MCSP's DARS did not indicate whether heat-risk incarcerated persons were offered accommodations during a Stage I heat alert, interviewed staff reported providing heat-risk incarcerated persons with additional dayroom and access to cold water, additional showers, and ice upon request.  All observed ice machines on each facility were in working order.  In some housing units, heat-risk incarcerated persons did not have access to alternative dayroom during Stage I heat alerts due to custody staffing shortages. Patient interviews confirmed access to one cold shower; shower time was limited to five minutes per incarcerated person.

Although MCSP reportedly offered heat-risk incarcerated persons accommodations during heat alert activations, the institution staff did not document the accommodations in the DARs as required.  Therefore, MCSP was not compliant during the review period.

Heat-Related Pathologies Training

The 2024 Heat Plan and Updates memorandum required annual training on the institution's Heat Plan, including measures when heat stress symptoms are identified and/or reported, to be provided to custodial and clinical staff by the In-Service Training Officer.  Heat-related pathologies training was completed by 382 custody staff members, including, three correctional administrators, four captains, 15 lieutenants, 38 sergeants, 17 CC Is, 8 CC IIs, four CC IIIs, 291 correctional officers, and two fire captains.  The institution did not provide non-custodial training data or the number of custody staff required to complete the training, therefore compliance with the 2024 Heat Plan and Updates memorandum could not be assessed.

Conclusion

Primarily due to the institution's failure to document reasonable accommodations in DARs and deficient indoor temperature monitoring practices (including pre-recording temperatures), MCSP's implementation of the 2024 Heat Plan and Updates memorandum was not compliant during the review period.

115

## PLEASANT VALLEY STATE PRISON (PVSP)

(October 29, 2024 – October 30, 2024)

On October 29, 2024, the Special Master reviewed the Pleasant Valley State Prison's (PVSP) policies, procedures, and implementation of CDCR's 2024 Heat Plan and Updates memorandum, dated April 8, 2024.  While on site, the monitors met with custody and mental health leadership, reviewed the institution's heat plan record keeping, and observed heat plan implementation across the institution.  Overall, as described herein below, PVSP's implementation of the 2024 Heat Plan and Updates memorandum was noncompliant.

Local Operating Procedures (LOP)

CDCR required that each institution's heat plan local operating procedure incorporate the requirements of the April 8, 2024 Heat Plan and Updates memorandum.  PVSP's heat plan local operating procedure was revised in May 2024.  However, in Section VII, the LOP requires that all patients who were *not* prescribed heat-sensitive medications were also required to return to their assigned housing unit at the onset of a Stage I heat alert.  The chief of mental health reported that this sentence was taken from an earlier version of the LOP.  They reported that it would be removed and that they would inform facility staff accordingly.

As a result of this inconsistency, the institution's LOP was not compliant with the 2024 Heat Plan and Updates memorandum.

Institutional Response to Headquarters' Expectations Relative to Institutional Oversight of Heat Plan Operations Memorandum (Expectations Memo)

In addition to CDCR's 2024 Heat Plan and Updates memorandum, CDCR issued an Expectations Memo, dated August 2, 2024, delineating the specific responsibilities of the warden and CEO.  The monitor was unable to attend a daily heat meeting with custody leadership during the site visit.

116

Monthly Summary Reports

The 2024 Heat Plan and Updates memorandum required that each institution submit a Heat Plan Monthly Summary Report, signed by the warden and CEO, to headquarters each month from May 1 to October 31.  PVSP produced Summary Reports for May through September, which reflected that there were 99 Stage I heat alerts, five Stage II heat alerts, and no Stage III heat alerts during the five-month period.  However, examined daily activity reports (DARs) and daily heat logs for June indicated that there were 24 Stage I heat alerts compared to June's Summary Report, which reflected only 14.  Additionally, the DARs and daily heat logs for July indicated that there were six Stage II heat alerts compared to July's Summary Report, indicating that there were only four.  Further, the DARs and daily heat logs for August indicated that there were five Stage II heat alerts, while August's Summary Report indicated that there was only one Stage II heat alert.

The Heat Plan and Updates memorandum also required institutions to include with the monthly submission a Heat Incident Log documenting the number of patients who experienced a heat-related illness.  The Heat Incident Log must include the patient's information and details regarding the heat-related illness.  PVSP reported no heat-related illnesses during the reporting period.

As a result of the inconsistent heat alert activation data in each month of the review period, the institution's Summary Reports were not compliant with the 2024 Heat Plan and Updates memorandum.

Staff Knowledge of Heat Plan Policy and Procedures

The 2024 Heat Plan and Updates memorandum required all custody officers and leadership staff to maintain knowledge of heat plan activation and act in accordance with the

117

requirements of each stage. Custody officers on Facilities A, B, C, and D demonstrated adequate knowledge of the Heat Plan. However, officers in Minimum Support Facility (MSF) Dorms one and two did not know the three stages of the heat plan.

The policy also required that when the Heat Plan was in effect, institutional staff must generate and distribute *daily* a list of all incarcerated persons currently prescribed any of the designated Heat Alert Medications. Custody staff on Facilities A, B, C and D was not aware of the daily requirement and were unable to provide the most current heat-risk incarcerated persons list during the interview.

Therefore, interviews with the institution's custody staff did not reflect compliance with the requirements of the 2024 Heat Plan and Updates memorandum during the site visit.

Outdoor Temperature Logs

To ensure proper and accurate temperature recording, the Annual Heat Plan and Updates memorandum required the warden or designee to ensure an accurate thermometer was placed in a central, heat-neutral location to monitor outside ambient air temperatures, which must be recorded every hour, every day, from May 1 through October 31 of each year. The outside temperatures were measured by the central control sergeant and properly recorded in the appropriate form during the review period.

PVSP's outdoor temperature recording procedures complied with the 2024 Heat Plan and Updates memorandum.

Indoor Temperature Logs

The warden or designee is also responsible for ensuring that inside air temperatures are measured in all non-airconditioned living areas that house heat-risk incarcerated persons. Temperatures must be taken at the highest non-air-conditioned location where heat-risk

incarcerated persons are housed and must be recorded every three hours.  The monitor observed appropriately placed working thermometers in all toured housing units.  Temperature logs were maintained in each housing unit; however, missing temperature entries were noted in units C4, C5, D2, and D3.  Additionally, the temperature log in MSF Dorm 2 was missing five entries from October 28, 2024, and one entry from October 29, 2024.  The temperature log in the RHU reflected a temperature for each of the eight housing sections and not only the highest temperature of them all.

Due to the missing temperature entries in many units, PVSP's indoor temperature recording procedures did not comply with the 2024 Heat Plan and Updates memorandum

Monitor's Temperature Measurements

The 2024 Heat Plan and Updates required temperatures to be taken at the highest non-air-conditioned location where heat-risk incarcerated persons were housed, *which could include a temperature taken within an incarcerated person's* cell.  The monitor was unable to obtain in-cell or dayroom temperature measurements during the site visit.

Accommodations and Cooling Measures

In an effort to ensure that heat-risk incarcerated persons were afforded equal access to programs, services, and activities during extreme weather conditions, the 2024 Heat Plan and Updates memorandum required institutions to devise and include any reasonable accommodations and alternatives to yard activities when revising their LOP.  All reasonable accommodations provided to heat-risk incarcerated persons during heat alert activation must be documented in the institution's Daily Activity Reports (DARs).

Reviewed DARs reflected that PVSP staff offered dayroom to heat-risk incarcerated persons as an accommodation during Stage I heat alert activations.  Additionally, PVSP staff

119

offered ice and cold water in their housing units during Stage I heat alerts.  Notably, PVSP issued a memorandum dated May 17, 2024 that required the placement of ice water on each facility during a Stage I heat alert activation.  The monitor observed working ice machines, fans, and water fountains on all facilities.

The institution's offering of and documenting reasonable accommodations complied with the 2024 Heat Plan and Updates memorandum.

Heat-Related Pathologies Training

The 2024 Heat Plan and Updates memorandum required annual training on the institution's Heat Plan, including measures when heat stress symptoms are identified and/or reported, to be provided to custodial and clinical staff by the In-Service Training Officer. PVSP's annual mandatory heat-related pathologies training for custody staff was deficient.  Of the 874 custody staff required to take the training, 662 or 76 percent attended.  All required mental health staff attended the training.  For nurses, 59 of 62 or 95 percent attended the training. The number of required custody and non-custody staff who completed the heat-related pathologies training did not comply with the 2024 Heat Plan and Updates memorandum.

Conclusion

Due to the above-mentioned deficiencies, including a noncompliant LOP, inconsistent monthly summary report data, deficient staff knowledge of heat plan policy and procedures, and inadequate indoor temperature recording, PVSP's implementation of the 2024 Heat Plan and Updates memorandum was not compliant during the review period.

## SALINAS VALLEY STATE PRISON – PSYCHIATRIC INPATIENT PROGRAM (SVSP-PIP)

(September 17, 2024 – September 20, 2024)

On September 17, 2024, the Special Master reviewed the Salinas Valley State Prison – Psychiatric Inpatient Program's (SVSP-PIP) policies, procedures, and implementation of CDCR's 2024 Heat Plan and Updates Memorandum, dated April 8, 2024. While on site, the monitors met with custody and mental health leadership, reviewed the institution's heat plan record keeping, and observed heat plan implementation across the psychiatric inpatient program. Overall, as described herein below, SVSP-PIP's implementation of the 2024 Heat Plan and Updates memorandum was noncompliant.

Local Operating Procedures

CDCR required that each institution's heat plan local operating procedure incorporate the requirements of the April 8, 2024 Heat Plan and Updates memorandum. SVSP's LOP was updated in April 2024 and was compliant with headquarters' directive.

Institutional Response to Headquarters' Expectations Relative to Institutional Oversight of Heat Plan Operations Memorandum (Expectations Memo)

In addition to CDCR's 2024 Heat Plan and Updates memorandum, CDCR issued an Expectations Memo dated August 2, 2024, delineating the specific responsibilities of the warden and CEO. The monitor was unable to attend a daily heat meeting with custody leadership during the site visit.

Monthly Summary Reports

The 2024 Heat Plan and Updates memorandum required that each institution submit a Heat Plan Monthly Summary Report (Summary Report), signed by the warden and CEO, to headquarters each month from May 1 to October 31. SVSP produced Summary Reports for

121

May, June, and July, which reflected that there were 12 Stage I heat alerts and no Stage II or Stage III heat alerts during the three months. Of note, the Summary Reports and daily activity reports reflected data for the entire institution during the three months and did not only reflect the psychiatric inpatient program at SVSP.

The Heat Plan and Updates memorandum also required institutions to include with the monthly submission a Heat Incident Log documenting the number of patients who experienced a heat-related illness. The Heat Incident Log must include the patient's information and details regarding the heat-related illness. SVSP reported no heat-related illnesses during the three months.

The institution's Summary Reports were compliant with the 2024 Heat Plan and Updates memorandum.

Staff Knowledge of Heat Plan Policy and Procedures

The 2024 Heat Plan and Updates memorandum required all custody officers and leadership staff to maintain knowledge of heat plan activation and act in accordance with the requirements of each stage. Interviewed custody staff on all four PIP units reflected adequate knowledge of Heat Plan policies and procedures, including their responsibilities at each stage of the heat plan. However, custody officers on units TC2 and C5 did not know which months the heat plan was in effect, and officers on C5 and C6 did not know that nursing or other medically trained personnel were required to conduct medical rounds during Stage III heat alerts.

The policy also required that when the Heat Plan was in effect, institutional staff must generate and distribute *daily* a list of all incarcerated persons currently prescribed any of the designated Heat Alert Medications. All interviewed officers produced the most current heat-risk incarcerated persons list, which was updated daily.

Due to the above-noted deficiencies regarding knowledge of the heat plan stages, the institution's custody staff interviews and heat plan procedures did not reflect compliance with the requirements of the 2024 Heat Plan and Updates memorandum during the site visit.

Outdoor Temperature Logs

To ensure proper and accurate temperature recording, the Annual Heat Plan and Updates memorandum required the warden or  designee to ensure an accurate thermometer was placed in a central, heat-neutral location to monitor outside ambient air temperatures, which must be recorded every hour, every day, from May 1 through October 31 of each year.  The outdoor thermometer was in the central control booth during the review period.  Examined outdoor temperature logs were properly recorded.

The institution's outdoor temperature recording procedures complied with the 2024 Heat Plan and Updates memorandum.

Indoor Temperature Logs

The warden or  designee is also responsible for ensuring that inside air temperatures were measured in all non-airconditioned living areas that house heat-risk incarcerated persons.  Temperatures must be taken at the highest non-air-conditioned location where heat-risk incarcerated persons were housed and must be recorded every three hours.  During the site visit, the monitor observed working thermometers in all toured housing units, and temperature logs were completed appropriately.

SVSP-PIP's indoor temperature recording procedures complied with the 2024 Heat Plan and Updates memorandum.

Monitor's Temperature Measurements

The 2024 Heat Plan and Updates required temperatures to be taken at the highest non-air-conditioned location where heat-risk incarcerated persons were housed, *which could include a temperature taken within an incarcerated person's* cell. The monitor was unable to complete in-cell or dayroom temperature measurements during the site visit.

Accommodations and Cooling Measures

In an effort to ensure that heat-risk incarcerated persons were afforded equal access to programs, services, and activities during extreme weather conditions, the 2024 Heat Plan and Updates memorandum required institutions to devise and include any reasonable accommodations and alternatives to yard activities when revising their LOP. All reasonable accommodations provided to heat-risk incarcerated persons during heat alert activation must be documented in the institution's Daily Activity Report as well.

Reviewed daily activity reports did not indicate whether mainline heat-risk patients were offered accommodations during a Stage I heat alert activation. Because the PIP units were air-conditioned during the review period, there were no observable cooling measures for heat-risk incarcerated persons.

Because the institution's DARs did not reflect whether heat-risk incarcerated persons were offered accommodations during a Stage I heat alert activation, the institution was not compliant with the requirements of the 2024 Heat Plan and Updates memorandum.

Heat-Related Pathologies Training

The 2024 Heat Plan and Updates memorandum required annual training on the institution's Heat Plan, including measures when heat stress symptoms are identified and/or reported, to be provided to custodial and clinical staff by the In-Service Training Officer. For

heat-related pathologies training, 526 of 819 or 64 percent of institution-wide custody staff and all 45 required non-custodial PIP staff completed the training. Although non-custody staff training data was compliant with the 2024 Heat Plan and Updates memorandum, custody staff training data was noncompliant.

<u>Conclusion</u>

Due to the significant concerns with staff knowledge of heat plan policy and procedures, SVSP-PIP's implementation of the 2024 Heat Plan and Updates memorandum was not compliant during the review period.