# EXHIBIT A

DocuSign Envelope ID: 8F758C1E-775E-46B1-85F3-7298803C504D

 **CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES** 

## MEMORANDUM

| | |
|---|---|
| **Date:** | 4/8/2024 |

| | |
|---|---|
| **To:** | Chief Executive Officers |
| | Wardens |
| | Chief Medical Executives |
| | Chiefs of Mental Health |
| | Chief and Senior Psychiatrists |
| | Chief Nurse Executives |
| | Pharmacists in Charge |
| | Litigation Coordinators |

**From:**

RAINBOW BROCKENBOROUGH
Regional Health Care Executive
Region I

BRITTANY BRIZENDINE, Psy.D.
Regional Health Care Executive
Region II

CHRISTOPHER PODRATZ
Regional Health Care Executive
Region III

SHEREEF AREF
Regional Health Care Executive
Region IV

AMAR MEHTA, M.D.
Deputy Director
Statewide Mental Health Program

JARED D. LOZANO
Deputy Director
Division of Adult Institutions

BARBARA BARNEY-KNOX
Deputy Director, Nursing Services
Californuia Correctional Health Care
Services

RENEE KANAN, M.D.
Deputy Director, Medical Services
California Correctional Health Care
Services

| | |
|---|---|
| **Subject:** | 2024 HEAT PLAN AND UPDATES |

This memorandum is to remind institutions of the annual statewide Heat Plan (HP) implementation, highlight the major requirements of the HP, and provide important updates.

DocuSign Envelope ID: 8F758C1E-775E-46B1-85F3-7298803C504D

# MEMORANDUM

The Department must develop, implement, and maintain a HP to prevent serious threats of life and health to incarcerated person taking medications that can impair the body's ability to regulate temperature during periods of high heat.

As in previous years, all institutions shall review, revise, and activate institutional policies and procedures, train staff, distribute log forms, and maintain a tracking system to compile, file, and forward summary HP documentation to headquarters.

## Seasonal Implementation

The HP is in effect from May 1 through October 31 of each year, and whenever temperatures warrant.

## Heat Alert Medications List

The Department must maintain and distribute annually a list of Heat Alert Medications for the purposes of the HP, pursuant to California Correctional Health Care Services (CCHCS) Health Care Department Operations Manual (HCDOM), Chapter 3, Article 5.43, Heat Alert Medications. Heat Alert Medications have the potential to impair thermoregulation, which is the body's ability to regulate temperature. Any incarcerated person prescribed any of the medications found on the current *Heat Alert Medications List* (Attachment A) is at greater risk for heat-related illness as a result of being on any such medication.

## Identification of Heat-Risk Incarcerated Person

The HP shall only apply to incarcerated person who are taking Heat Alert Medications. These incarcerated person are referred to as heat-risk incarcerated person for the purposes of the HP.

When the HP is in effect, institutional staff must generate and distribute daily a list of all incarcerated persons currently prescribed any of the designated Heat Alert Medications. The list shall be generated using the Quality Management Heat Medications – Custody Report list that allows access to the Heat Medication Patient Registry. The Heat Medication Patient Registry can be found at: http://qmtools/Reports/report/QM/NonClinical/HeatMedicationsCustody .

You can find information on how to request access to the Custody Heat Medication Report at: https://cdcr.sharepoint.com/sites/cchcs_qm_com/Patient_Registry_Resource_Center/Forms/All Documents.aspx?id=%2Fsites%2Fcchcs_qm_com%2FPatient_Registry_Resource_Center%2FHeat Med_Report_Custody - How_to_Access%2Epdf&parent=%2Fsites%2Fcchcs_qm_com%2FPatient Registry Resource Center .

In order to ensure continuity and daily production of the list, please ensure this list is printed from your Health Care Access unit Monday through Friday and from your Triage Treatment Area

DocuSign Envelope ID: 8F758C1E-775E-46B1-85F3-7298803C504D

# MEMORANDUM

on weekends and holidays prior to 0600 hours and provided to the Watch Commander to ensure distribution to appropriate areas.

**Heat Stress Symptoms**

Upon being prescribed a Heat Alert Medication, the primary care physician or prescribing provider must inform each incarcerated person, including those who are not enrolled in the Mental Health Services Delivery System (MHSDS), of heat stress symptoms, which could be a result of taking the medication, as well as any recommended precautions, using Effective Communication.  This encounter shall be documented in the incarcerated person's health care record.

Prompt medical attention must be provided whenever staff observe or an incarcerated person reports heat stress symptoms.

When a heat-risk incarcerated person is observed to have, or complains of, one or more of the following heat stress symptoms, staff shall immediately refer the incarcerated person to health care staff for evaluation and/or treatment:

- Flushed or dry feeling
- Red, flushed or mottled (discolored spots or blotches) skin, or skin that is turning bluish
- Cramping of muscles
- Mental confusion, sleepiness, non-coordination, or convulsive behavior
- Fainting, dizziness, lightheadedness, giddiness, or severe headaches
- Nausea or vomiting

All heat related encounters must be documented in the health care record.

**Heat-Risk Passes**

Due to improvements in providing real time information via the electronic health record, it is no longer necessary to print heat-risk passes.  For movement purposes the daily list of inmates on heat meds will be utilized.

**Monitoring Temperatures**

The Warden or designee must ensure an accurate thermometer is located in a central, heat-neutral location to monitor outside ambient air temperatures. Outside air temperatures must be recorded every hour, every day, from May 1 through October 31 of each year.

The Warden or designee must also ensure inside air temperatures are measured in all non-air conditioned living areas housing heat-risk incarcerated person and areas that are air conditioned

DocuSign Envelope ID: 8F758C1E-775E-46B1-85F3-7298803C504D

# MEMORANDUM

but could exceed 90 degrees (i.e., kitchen areas). Temperatures must be taken at the highest non-air-conditioned location where heat-risk incarcerated persons are housed, which could include a temperature taken within an incarcerated person's cell. Inside air temperatures must be recorded every three hours, daily from May 1 through October 31. Any interruption in the functioning of an air-conditioned area shall require immediate temperature monitoring.

**Stage I Heat Alert**

A Stage I Heat Alert occurs when the outside temperature rises to 90 degrees or more. The Warden or designee must activate and announce the Stage I Heat Plan institution-wide and heat-risk incarcerated person must be called for "Return to Housing." Heat-risk incarcerated persons are not required to return to their housing units when outside temperatures rise to 90 degrees, if cooling measures, such as misters, are initiated or incarcerated persons are working, or otherwise present, in air conditioned environments that remain below 90 degrees. All other heat-risk incarcerated persons must be called back to their housing units. All heat-risk incarcerated persons are restricted to a maximum of 30 minutes outside to perform officially sanctioned activities, such as returning to housing units and receiving medications. This time is not to be used for leisure activities.

A Stage I Heat Alert shall be deactivated when the temperature has fallen below 90 degrees for one hour.

**Stage II Heat Alert**

A Stage II Heat Alert occurs when the temperature inside any area occupied by heat-risk incarcerated person rises to 90 degrees or more. The Warden or designee must activate the Stage II Heat Plan in the affected area. Staff must initiate cooling and hydration measures, which may include cool drinking water, misting, and cool showers. Staff must also increase observation of heat-risk incarcerated person for signs of heat-related illness, and report any symptoms to health care staff.

A Stage II Heat Alert shall be deactivated when the inside temperature has fallen below 90 degrees for one hour.

**Stage III Heat Alert**

A Stage III Heat Alert occurs when the temperature inside any area occupied by heat-risk incarcerated persons rises to 95 degrees or more. The Warden or designee must activate the Stage III Heat Plan in the affected area. The Physician on Call (POC) shall be notified after normal business hours. The Chief Executive Officer shall decide whether the POC may remain off grounds or shall be physically present at the institution.

DocuSign Envelope ID: 8F758C1E-775E-46B1-85F3-7298803C504D

# MEMORANDUM

Nursing or other medically trained personnel must perform medical rounds to observe each heat-risk incarcerated person at least once every two hours during the period the inside temperature remains at 95 degrees or above, and record the incarcerared person's condition. If any incarcerated person shows signs or symptoms of heat related illness, they must be provided cooling measures or be sent to the Triage and Treatment Area.

A Stage III Heat Alert shall be deactivated when the inside temperature has fallen below 95 degrees for one hour.

**Tracking and Reporting**

Institutions must submit a CDCR Form 7711-1, *Heat Plan Monthly Summary Report* (Attachment B), to  headquarters each month, signed by the Warden and Chief Executive Officer.

Additionally, the following documents are to be gathered at the institution monthly, from May 1 through October 31 of each year, filed for review in an easily accessible manner with the institution's HP Coordinator, and retained consistent with departmental records retention policies and procedures.  Copies shall also be included with the monthly submission of the CDCR MH-7711-1.

1. CDCR Form 2030, *Outside Temperature Record* (Attachment C)
2. CDCR Form 2031, *Inside Temperature Record* (Attachment D)
3. CDCR Form MH-7711-2, *Heat Incident Log* (Attachment E)
4. CDCR Form MH-7711-3, *Medical Rounds Log (Stage III)* (Attachment F)
5. Weekly List of Heat-Risk Incarcerated Persons

Electronic versions of these forms can also be found on the Mental Health Quality Management (QM) Portal at http://intranet/Pro/dhcs/mentalhealth/Pages/New-QMforms.aspx.

Per HCDOM 1.2.7, Institution Patient Safety Program "All California Department of Corrections and Rehabilitation/California Correctional Health Care Services (CCHCS) staff have a duty to report health care incidents using the centralized electronic Health Care Incident Reporting (eHCIR) system within 24 hours of occurrence or discovery.  The eHCIR is available to all staff via Lifeline and allows health care incidents to be submitted anonymously." Therefore, in addition to following established local operating procedures for completing CDCR MH 7711-2 for each heat related illness, institutional healthcare staff must also report each heat related illness using the eHCIR system at http://patientsafety/. The HCIR has been updated to include a checkbox indicating that the incident is a "Heat Medication Related Illness." Please note that all heat related illnesses should be reported via both the CDCR MH-7711-2 and the HCIR, whether they are due to a heat alert medication or not.

Institution HP Coordinators must submit a CDCR MH-7711-1, containing the previous month's heat related activities to the Statewide Mental Health Program headquarters by the fifth working

DocuSign Envelope ID: 8F758C1E-775E-46B1-85F3-7298803C504D

day of the following month.  The form shall be reviewed and signed by the Warden and Chief Executive Officer, and include the following information in chronological order:

• Temperature Logs:  A notation that the Inside and Outside Temperature Records have been collected and are on file and available with the institution's Heat Plan Coordinator.

• Stage II Heat Alert Log:  Date, hour, and location by housing unit, where inside temperatures of 90 degrees and above have been recorded, and documentation if hydration and access to cooling measures such as ice and/or showers were provided to any at-risk incarcerated persons.  Please indicate "none" if an inside temperature of 90 degrees was not reached in any housing unit.

The first CDCR MH-7711-1 for May 2024 is due by June 7, 2024.  The form shall be submitted to the, Statewide Heat Plan Coordinator, via email: m_MHProgramHeatPlan@cdcr.ca.gov .

**Local Operating Procedure**

Institutions are required to identify and include in their updated HP Local Operating Procedure (LOP), the classification(s) of staff members (such as nursing or other medically trained personnel) who must be assigned to perform the Stage III rounds/monitoring.

Submit the revised 2024 HP LOP, with any changes identified, to the following email address: m_MHProgramHeatPlan@cdcr.ca.gov by May 9, 2024.

**Reasonable Accommodations**

In an effort to ensure heat-risk incarcerated persons are afforded equal access to programs, services, and activities during extreme weather conditions, institutions must devise and include any reasonable accommodations when revising their LOP.  The following are some examples institutions could provide to heat-risk incarcerated persons as possible forms of reasonable accommodations:

- Modified yard times (scheduled during cooler periods of the day)
- Night yard or morning yard
- Additional dayroom/inner wing program opportunities
- Recreation gymnasium programs during summer/warmer months

Institution LOPs must include what specific reasonable accommodations will be provided in each facility for incarcerated persons who are on the heat alert list and are recalled from outdoor activities.

DocuSign Envelope ID: 8F758C1E-775E-46B1-85F3-7298803C504D

All reasonable accommodations provided to incarcerated persons during heat alert activation must be documented in the institution's Daily Activity Report.

**Traditional Sweat Lodge**

Conditions in the Traditional Sweat Lodge (high temperature and high humidity) pose very serious health risks for heat-related illness, thus prohibiting incarcerated persons prescribed Heat Alert Medications from participating.  When prescribing Heat Alert Medications to those incarcerated persons who wish to participate in Sweat Lodge Ceremonies, it is essential that the informed consent process include discussion of the benefits of taking the proposed Heat Alert Medication versus the risks inherent in participating in a ceremony that involves excessive heat and humidity, as well as the incarcerated person's right to refuse such medication when a Penal Code 2602 order is not in effect.

The prescriber shall explain that discontinuing use of a Heat Alert Medication for a period of time before a Sweat Lodge Ceremony may not provide sufficient time to safely reduce the risk of heat-related illness.  When available and deemed clinically appropriate, alternative medications which do not cause increased heat risk should be considered and discussed with incarcerated persons. All such discussions shall be documented in the electronic health record.

incarcerated persons may also be encouraged to consult with their Native American Spiritual Leaders to consider alternatives to the Sweat Lodge Ceremony that do not involve excessive heat or humidity.  Each institution's Warden and CEO, and/or designees, shall identify staff responsible for meeting with the institution's Native American Spiritual Leader on an annual basis to discuss alternatives to the Sweat Lodge Ceremony which satisfy the spiritual needs of incarcerated persons prescribed Heat Alert Medications.

**Training**

Annual training on your institution's HP, including what to do when heat stress symptoms are identified and/or reported, must be provided to custodial and clinical staff by the In-Service Training Office.

If you have any questions, please contact Kia Moua, Statewide Heat Plan Coordinator, Policy Support, Statewide Mental Health Program, CCHCS, via email: m_MHProgramHeatPlan@cdcr.ca.gov .

Attachments

cc:     Associate Directors, Division of Adult Institutions
        Mental Health Regional Administrators
        Regional Health Care Executives

DocuSign Envelope ID: 8F758C1E-775E-46B1-85F3-7298803C504D

# Heat Risk Medications

Which medications are considered "Heat Risk Medications" because of their potential to impair thermoregulation?

## Antipsychotics

Aripiprazole (ABILIFY)

Asenapine (SAPHRIS, SECUADO)

Brexipiprazole (REXULTI)

Cariprazine (VRAYLAR)

Chlorpromazine (THORAZINE)

Clozapine (CLOZARIL)

Fluphenazine (PROLIXIN)

Haloperidol (HALDOL)

Iloperidone (FANAPT)

Loxapine (LOXITANE)

Lumateperone (CAPLYTA)

Lurasidone (LATUDA)

Mesoridazine (SERENTIL)

Molindone (MOBAN)

Olanzapine (ZYPREXA, LYBALVI)

Paliperidone (INVEGA)

Perphenazine (TRILAFON)

Pimozide (ORAP)

Prochlorperazine (COMPAZINE)

Quetiapine (SEROQUEL)

Risperidone (RISPERDAL)

Thioridazine (MELLARIL)

Thiothixene (NAVANE)

Trifluoperazine (STELAZINE)

Ziprasidone (GEODON)

## Antiparkinson

Benztropine (COGENTIN)

Biperiden (AKINETON)

## Antidepressants

Amitriptyline (ELAVIL)

Amoxapine (ASENDIN)

Clomipramine (ANAFRANIL)

Desipramine (NORPRAMIN)

Doxepin (SINEQUAN)

Imipramine (TOFRANIL)

Maprotiline (LUDIOMIL)

Nortriptyline (PAMELOR)

Phenelzine (NARDIL)

Protriptyline (VIVACTIL)

Tranylcypromine (PARNATE)

Trazodone (DESYREL)

Trimipramine (SURMONTIL)

## Stomach, Intestinal, Bladder

Diphenoxylate/Atropine (LOMOTIL)

Glycopyrrolate (ROBINUL)

Hyoscyamine (LEVSIN)

Propantheline (PROBANTHINE)

Scopolamine (SCOPACE)

## Mood Stabilizers & Anticonvulsants

Lithium (ESKALITH, LITHOBID)

Topiramate (TOPAMAX)

Zonisamide (ZONERGAN)

## Miscellaneous Agents

Promethazine (PHENERGAN)

| Monthly Summary Report |
|---|

Institution: _____

**Memorandum**

Date: _____

To:        Statewide Heat Plan Coordinator

Subject:  Heat Plan Activity - _____

The following is a summary of the heat related activity for the month of _____ ,

at _____ (Institution)

1. Were outside temperatures 90 degrees or above (Stage I Alerts)?: _____

   Number of days Stage I Alert initiated: _____

2. Were cooling and/or hydration measures instituted in housing units reaching 90 degrees or more (Stage II Alert)? _____

   Number of days Stage II Alert initiated: _____

3. Were medical rounds performed in housing units reaching 95 degrees or more (Stage III Alert)? _____

   Number of days Stage III Alert initiated: _____

4. Weekly list of heat risk patients archived?: _____

5. Number of patients with heat related illness._____ List these patients on the Heat Incident Log and include the patients name, CDCR #, list of heat risk medications, Mental Health Services Delivery System designation, description of the symptoms diagnosis at the time of the heat related illness, a brief summary of the medical treatment rendered, where the incident occurred, and the ultimate disposition of the patient. The Heat Incident log shall be submitted each month with the Monthly Summary Report if heat related illnesses have occurred.

Weekly list of Heat-Risk Patients is generated automatically. A hard copy is distributed to the Facility Lieutenants, Classifications and Parole Representative, Food Manager, Outpatient Housing Unit and Mental Health Department. An e-mail copy is distributed to the Litigation Coordinator, Associate Warden, Facility Captains, Prison Industry Authority, Education Staff and Medical Staff.

Inside and Outside Temperature Logs, Medical Rounds Logs, Heat Incident Logs and Weekly lists of Heat-Risk Patients have been collected and are on file and easily accessible in the office of the institution's Heat Plan Coordinator.

_____
Warden Name

_____
Chief Executive Officer Name

_____
Warden Signature

_____
Chief Executive Officer Signature

*Unauthorized collection, creation, use, disclosure, modification, or destruction of personally identifiable information and/or protected health information may subject individuals to civil liability under applicable federal and state laws.*

DocuSign Envelope ID: 8F758C1E-775E-46B1-85F3-7298803C504D

STATE OF CALIFORNIA                                          DEPARTMENT OF CORRECTIONS AND REHABILITATION
**OUTSIDE TEMPERATURE RECORD**
CDCR 2030 (04/18)

INSTITUTION: _____

From May 1st through October 31st, the warden shall designate staff to be responsible to monitor and log the OUTSIDE ambient air temperature.

Using an accurate thermometer located in a central, heat neutral location, the outside air temperature is to be taken every hour, seven (7) days a week.

Thermometer Location: _____

**Immediately notify the Watch Commander at extension _____ when the air temperature reaches 90 degrees.**

| Date | Time | Temp. | Printed Name | | Date | Time | Temp. | Printed Name |
|------|------|-------|--------------|---|------|------|-------|--------------|
| | 0100 | | | | | 0100 | | |
| | 0200 | | | | | 0200 | | |
| | 0300 | | | | | 0300 | | |
| | 0400 | | | | | 0400 | | |
| | 0500 | | | | | 0500 | | |
| | 0600 | | | | | 0600 | | |
| | 0700 | | | | | 0700 | | |
| | 0800 | | | | | 0800 | | |
| | 0900 | | | | | 0900 | | |
| | 1000 | | | | | 1000 | | |
| | 1100 | | | | | 1100 | | |
| | 1200 | | | | | 1200 | | |
| | 1300 | | | | | 1300 | | |
| | 1400 | | | | | 1400 | | |
| | 1500 | | | | | 1500 | | |
| | 1600 | | | | | 1600 | | |
| | 1700 | | | | | 1700 | | |
| | 1800 | | | | | 1800 | | |
| | 1900 | | | | | 1900 | | |
| | 2000 | | | | | 2000 | | |
| | 2100 | | | | | 2100 | | |
| | 2200 | | | | | 2200 | | |
| | 2300 | | | | | 2300 | | |
| | 2400 | | | | | 2400 | | |

DISTRIBUTION:  Original: Institution Heat Plan Coordinator

STATE OF CALIFORNIA                                                                                    DEPARTMENT OF CORRECTIONS AND REHABILITATION
**INSIDE TEMPERATURE RECORD**
CDCR 2031 (04/18)

From May 1st through October 31st, the warden shall designate staff to be responsible to monitor and log the INSIDE ambient air temperature in all non-air-conditioned housing units where an inmate on the heat risk list may be housed. (Note: Air-conditioned housing units will also be monitored when the air conditioner is malfunctioning).

Using an accurate thermometer on the highest location in the housing unit (e.g., top tier) where an inmate on the heat risk list is housed. The inside air temperature is to be taken every three (3) hours, seven (7) days a week.

Institution: _____   Housing Unit: _____   Temp. Reading Location: _____
(e.g., 1st tier, 2nd tier, 3rd tier, etc.)

**Immediately notify the Watch Commander at extension _____ when the inside air temperature reaches 90 degrees and again at 95 degrees.**

### Monday
| Date | Time | Temp. | Name (Print) |
|---|---|---|---|
|  | 0300 |  |  |
|  | 0600 |  |  |
|  | 0900 |  |  |
|  | 1200 |  |  |
|  | 1500 |  |  |
|  | 1800 |  |  |
|  | 2100 |  |  |
|  | 2400 |  |  |

### Tuesday
| Date | Time | Temp. | Name (Print) |
|---|---|---|---|
|  | 0300 |  |  |
|  | 0600 |  |  |
|  | 0900 |  |  |
|  | 1200 |  |  |
|  | 1500 |  |  |
|  | 1800 |  |  |
|  | 2100 |  |  |
|  | 2400 |  |  |

### Wednesday
| Date | Time | Temp. | Name (Print) |
|---|---|---|---|
|  | 0300 |  |  |
|  | 0600 |  |  |
|  | 0900 |  |  |
|  | 1200 |  |  |
|  | 1500 |  |  |
|  | 1800 |  |  |
|  | 2100 |  |  |
|  | 2400 |  |  |

### Thursday
| Date | Time | Temp. | Name (Print) |
|---|---|---|---|
|  | 0300 |  |  |
|  | 0600 |  |  |
|  | 0900 |  |  |
|  | 1200 |  |  |
|  | 1500 |  |  |
|  | 1800 |  |  |
|  | 2100 |  |  |
|  | 2400 |  |  |

### Friday
| Date | Time | Temp. | Name (Print) |
|---|---|---|---|
|  | 0300 |  |  |
|  | 0600 |  |  |
|  | 0900 |  |  |
|  | 1200 |  |  |
|  | 1500 |  |  |
|  | 1800 |  |  |
|  | 2100 |  |  |
|  | 2400 |  |  |

### Saturday
| Date | Time | Temp. | Name (Print) |
|---|---|---|---|
|  | 0300 |  |  |
|  | 0600 |  |  |
|  | 0900 |  |  |
|  | 1200 |  |  |
|  | 1500 |  |  |
|  | 1800 |  |  |
|  | 2100 |  |  |
|  | 2400 |  |  |

### Sunday
| Date | Time | Temp. | Name (Print) |
|---|---|---|---|
|  | 0300 |  |  |
|  | 0600 |  |  |
|  | 0900 |  |  |
|  | 1200 |  |  |
|  | 1500 |  |  |
|  | 1800 |  |  |
|  | 2100 |  |  |
|  | 2400 |  |  |

### Notes
_____
_____
_____
_____
_____
_____
_____
_____
_____

DISTRIBUTION:  Original: Institution Heat Plan Coordinator

DocuSign Envelope ID: 8F758C1E-775E-46B1-85F3-7298803C504D

HEAT INCIDENT LOG Case 2:90-cv-00520-KJM-SCR     Document 8558-1     Filed 02/28/25
CDCR MH-7711-2 (02/17)

| Heat Incident Log | | |
|---|---|---|
| Institution: _____ Date: _____ | | Number of Heat Incidents: _____ |

**1. Patient Name:** _____  CDCR#: _____  Housing: _____

MHSDS Designation: _____  Level of Care: _____  Date of Heat Incident: _____

Location of Incident: _____  Change in Level of Care: _____

List of Heat Risk Medications: _____

Chief Medical Complaint: _____

Diagnosis of Heat Related Illness (specify): _____

Treatment Rendered: _____

Medication Changes Made: _____

Ultimate Disposition of Patient: _____

Clinician's Name and Title: _____

**2. Patient Name:** _____  CDCR#: _____  Housing: _____

MHSDS Designation: _____  Level of Care: _____  Date of Heat Incident: _____

Location of Incident: _____  Change in Level of Care: _____

List of Heat Risk Medications: _____

Chief Medical Complaint: _____

Diagnosis of Heat Related Illness (specify): _____

Treatment Rendered: _____

Medication Changes Made: _____

Ultimate Disposition of Patient: _____

Clinician's Name and Title: _____

**3. Patient Name:** _____  CDCR#: _____  Housing: _____

MHSDS Designation: _____  Level of Care: _____  Date of Heat Incident: _____

Location of Incident: _____  Change in Level of Care: _____

List of Heat Risk Medications: _____

Chief Medical Complaint: _____

Diagnosis of Heat Related Illness (specify): _____

Treatment Rendered: _____

Medication Changes Made: _____

Ultimate Disposition of Patient: _____

Clinician's Name and Title: _____

**Heat Incident Log**
CDCR MH-7711-2 (02/17)

Confidential Patient Information

*Unauthorized collection, creation, use, disclosure, modification, or destruction of personally identifiable information and/or protected health information may subject individuals to civil liability under applicable federal and state laws.*
**DISTRIBUTION:** Litigation Coordinator, Heat Plan Coordinator

| Heat Incident Log (continued) |
|---|

4. Patient Name: _____    CDCR#: _____    Housing: _____

MHSDS Designation: _____    Level of Care: _____    Date of Heat Incident: _____

Location of Incident: _____    Change in Level of Care: _____

List of Heat Risk Medications: _____

Chief Medical Complaint: _____

Diagnosis of Heat Related Illness (specify): _____

Treatment Rendered: _____

Medication Changes Made: _____

Ultimate Disposition of Patient: _____

Clinician's Name and Title: _____

---

5. Patient Name: _____    CDCR#: _____    Housing: _____

MHSDS Designation: _____    Level of Care: _____    Date of Heat Incident: _____

Location of Incident: _____    Change in Level of Care: _____

List of Heat Risk Medications: _____

Chief Medical Complaint: _____

Diagnosis of Heat Related Illness (specify): _____

Treatment Rendered: _____

Medication Changes Made: _____

Ultimate Disposition of Patient: _____

Clinician's Name and Title: _____

---

6. Patient Name: _____    CDCR#: _____    Housing: _____

MHSDS Designation: _____    Level of Care: _____    Date of Heat Incident: _____

Location of Incident: _____    Change in Level of Care: _____

List of Heat Risk Medications: _____

Chief Medical Complaint: _____

Diagnosis of Heat Related Illness (specify): _____

Treatment Rendered: _____

Medication Changes Made: _____

Ultimate Disposition of Patient: _____

Clinician's Name and Title: _____

**Heat Incident Log**
CDCR MH-7711-2 (02/17)

Confidential Patient Information

*Unauthorized collection, creation, use, disclosure, modification, or destruction of personally identifiable information and/or protected health information may subject individuals to civil liability under applicable federal and state laws.*
**DISTRIBUTION:** Litigation Coordinator, Heat Plan Coordinator

| Heat Incident Log (continued) |
|---|

**7. Patient Name:** _____   **CDCR#:** _____   **Housing:** _____

**MHSDS Designation:** _____   **Level of Care:** _____   **Date of Heat Incident:** _____

**Location of Incident:** _____   **Change in Level of Care:** _____

**List of Heat Risk Medications:** _____

**Chief Medical Complaint:** _____

**Diagnosis of Heat Related Illness (specify):** _____

**Treatment Rendered:** _____

**Medication Changes Made:** _____

**Ultimate Disposition of Patient:** _____

**Clinician's Name and Title:** _____

**8. Patient Name:** _____   **CDCR#:** _____   **Housing:** _____

**MHSDS Designation:** _____   **Level of Care:** _____   **Date of Heat Incident:** _____

**Location of Incident:** _____   **Change in Level of Care:** _____

**List of Heat Risk Medications:** _____

**Chief Medical Complaint:** _____

**Diagnosis of Heat Related Illness (specify):** _____

**Treatment Rendered:** _____

**Medication Changes Made:** _____

**Ultimate Disposition of Patient:** _____

**Clinician's Name and Title:** _____

**9. Patient Name:** _____   **CDCR#:** _____   **Housing:** _____

**MHSDS Designation:** _____   **Level of Care:** _____   **Date of Heat Incident:** _____

**Location of Incident:** _____   **Change in Level of Care:** _____

**List of Heat Risk Medications:** _____

**Chief Medical Complaint:** _____

**Diagnosis of Heat Related Illness (specify):** _____

**Treatment Rendered:** _____

**Medication Changes Made:** _____

**Ultimate Disposition of Patient:** _____

**Clinician's Name and Title:** _____

**Heat Incident Log**
CDCR MH-7711-2 (02/17)

Confidential Patient Information

*Unauthorized collection, creation, use, disclosure, modification, or destruction of personally identifiable information and/or protected health information may subject individuals to civil liability under applicable federal and state laws.*
**DISTRIBUTION:** Litigation Coordinator, Heat Plan Coordinator

DocuSign Envelope ID: 8F758C1E-775E-46B1-85F3-7298803C504D

| Heat Incident Log (continued) |
|---|

**10. Patient Name:** _____ CDCR#: _____ Housing: _____

MHSDS Designation: _____ Level of Care: _____ Date of Heat Incident: _____

Location of Incident: _____ Change in Level of Care: _____

List of Heat Risk Medications: _____

Chief Medical Complaint: _____

Diagnosis of Heat Related Illness (specify): _____

Treatment Rendered: _____

Medication Changes Made: _____

Ultimate Disposition of Patient: _____

Clinician's Name and Title: _____

**11. Patient Name:** _____ CDCR#: _____ Housing: _____

MHSDS Designation: _____ Level of Care: _____ Date of Heat Incident: _____

Location of Incident: _____ Change in Level of Care: _____

List of Heat Risk Medications: _____

Chief Medical Complaint: _____

Diagnosis of Heat Related Illness (specify): _____

Treatment Rendered: _____

Medication Changes Made: _____

Ultimate Disposition of Patient: _____

Clinician's Name and Title: _____

**12.. Patient Name:** _____ CDCR#: _____ Housing: _____

MHSDS Designation: _____ Level of Care: _____ Date of Heat Incident: _____

Location of Incident: _____ Change in Level of Care: _____

List of Heat Risk Medications: _____

Chief Medical Complaint: _____

Diagnosis of Heat Related Illness (specify): _____

Treatment Rendered: _____

Medication Changes Made: _____

Ultimate Disposition of Patient: _____

Clinician's Name and Title: _____

**Heat Incident Log**
CDCR MH-7711-2 (02/17)

Confidential Patient Information

*Unauthorized collection, creation, use, disclosure, modification, or destruction of personally identifiable information and/or protected health information may subject individuals to civil liability under applicable federal and state laws.*

**DISTRIBUTION:** Litigation Coordinator, Heat Plan Coordinator

| Medical Rounds Log (Stage III) |
|---|

Institution: _____

Date: _____    Time: _____    Housing Unit: _____

Name /Title of Health Care Staff Performing Rounds: _____    Heat Related Illnesses Identified: ☐ Yes  ☐ No

Heat incidents identified on rounds (Include patient name, CDCR number, MHSDS designation, list of heat risk medications, and brief summary of medical treatment):

1. _____

2. _____

3. _____

4. _____

Date: _____    Time: _____    Housing Unit: _____

Name /Title of Health Care Staff Performing Rounds: _____    Heat Related Illnesses Identified: ☐ Yes  ☐ No

Heat incidents identified on rounds (Include patient name, CDCR number, MHSDS designation, list of heat risk medications, and brief summary of medical treatment):

1. _____

2. _____

3. _____

4. _____

**Medical Rounds Log (Stage III)**
CDCR MH-7711-3 (02/17)

Confidential Patient Information

*Unauthorized collection, creation, use, disclosure, modification, or destruction of personally identifiable information and/or protected health information may subject individuals to civil liability under applicable federal and state laws.*
**DISTRIBUTION:** Litigation Coordinator, Heat Plan Coordinator

# EXHIBIT B

Docusign Envelope ID: 2AE65B44-7CDB-4078-9FDE-03D6A9C2F601





# MEMORANDUM

| Date: | August 2, 2024 |
|---|---|
| To: | Chief Executive Officers<br>Wardens |
| From: | DocuSigned by:<br>*Brittany Brizendine*<br>—A0C9F0C2BC7D465...<br>Brittany Brizendine, PsyD, MBA<br>Deputy Director, Institution Operations<br>California Correctional Health Care Services | DocuSigned by:<br>*Jennifer Benavidez*<br>—4624D27581A4426...<br>Jennifer Benavidez,<br>Deputy Director, Facility Operations<br>Division of Adult Institutions |

| Subject: | Expectations Relative to Institutional Oversight of Heat Plan Operations |
|---|---|

Heat is the leading cause of weather-related death in the United States, with almost 2,300 deaths in 2023. Older people and those with medical conditions are at an elevated risk for heat-related illness.

As excessive heat warnings and seasonal implementation of the Heat Plans are operational from May 1st through October 31st of each year, (more often as temperatures warrant), it is imperative the Warden and Chief Executive Officer (CEO) work collaboratively to protect staff and incarcerated people by ensuring institution Heat Plans are current and active with appropriate levels of oversight and compliance in place.   The expectations outlined within this memorandum delineate specific responsibilities and activities, which fall within the purview of the Wardens and CEOs.  It is the expectation all Wardens and CEOs jointly review the requirements herein with your teams and ensure implementation of these activities immediately.

The Warden and CEO have overall responsibility to ensure adherence to the Statewide Heat Plan, the Local Institutional Heat Plans, and the expectations set forth herein. The Warden and CEO shall designate the Associate Warden, Healthcare Access Unit (AW HCAU) and Chief Support Executive (CSE) to partner as the operational owners responsible for the Heat Plan. The AW HCAU and CSE are responsible to ensure complete implementation, oversight and documentation of the provisions of the Heat Plan.

The Warden and CEO are responsible for communicating to staff and incarcerated people the following information, at minimum:

- Characteristics that might make a person particularly susceptible to heat-related illness
- Signs and symptoms of heat-related illness
- When to seek urgent help
- The resources available to staff and incarcerated people during periods of excessive heat.
- Educational materials Excessive Heat Resources

If an institution is expected to be under Heat Advisory, which is defined as a condition where the heat index is expected to reach 100°F or higher, the Warden, CEO, and their executive teams must convene

Docusign Envelope ID: 2AE65B44-7CDB-4078-9FDE-03D6A9C2F601

daily during the weekdays for the duration of the heat advisory. If the Heat Advisory is expected over the weekend/holidays, the team shall meet on the last weekday prior to. The purpose of this meeting is to address and manage the situation, including any Stage Heat Alerts or heat related concerns. These daily meetings must cover and document all heat-related issues and action plans per policy, to include the operational plan and response to the heat conditions. The institution shall complete and maintain meeting minutes.  To ensure the well-being of both staff and incarcerated individuals, daily discussions should include, but are not limited to, the following heat-related topics:

- Heat Plan Stage Alerts and routine temperature monitoring (indoor and outdoor)
- Program impacts.
- Staff related impacts.
- Incarcerated persons related impacts.
- Facility related issues (i.e. Plant Operations, Chiller, Electrical, Central Kitchen functionality, etc.)
- Medical Warehouse (i.e. ensure the items requiring temperature control are maintained appropriately; if relocation is needed, ensure space and plan for relocation is documented in meeting minutes.)
- Pharmacy (i.e., appropriate oversight of all medication refrigerators, contingency plan in case of outage, generator availability, etc.)
- Space Allocation (contingency plan)
  - Identify adequate space for approximately 100 of the most vulnerable incarcerated persons to relocate if necessary.
  - Identify additional space for staff to relocate if necessary.
- Cooling stations (locations, as well as additional cooling and hydration measures, etc.)
- Daily documentation.
  - Daily verification of the temperature records and all heat incident logs as required.
  - Daily verification of the housing unit logbook upon Stage III Heat Alert.
  - Upon Stage III Heat Alert, daily verification of the Medical Rounds Log.
  - Completion of meeting minutes.
- Reasonable accommodations as necessary.

The AW HCAU and CSE shall collaborate to ensure monthly oversight occurs, via the Resource Management Subcommittee (RMS). Specifically, the RMS shall ensure a complete Heat Plan Package is submitted, reviewed and discussed during the monthly RMS meeting, and reported up to the institution Quality Management Committee (QMC) during the months of April – October.

The Correctional Plant Manager (CPM) shall ensure testing of all thermometers located within the housing unit(s) and outdoors will be conducted in April and July of each year to ensure accuracy.  This testing requirement will be generated through the preventive maintenance (PM) work order system for auto scheduling every April and July. Upon completion of the testing, the CPM or designee shall provide a proof of practice memorandum to the institution Heat Plan Coordinator verifying all thermometers have been tested, noting the condition of each thermometer, and confirmation they are of working order.

Docusign Envelope ID: 2AE65B44-7CDB-4078-9FDE-03D6A9C2F601

The Heat Plan Coordinator shall provide the proof of practice memorandum to the RMS for review. A complete Heat Plan Package must include the following:

- Meeting minutes.
- CDCR Form 7711-1, Heat Plan Monthly Summary Report (Attachment B), signed by the Warden and CEO.
- CDCR Form 2030, Outside Temperature Record (Attachment C)
- CDCR Form 2031, Inside Temperature Record (Attachment D)
- CDCR Form MH-7711-2, Heat Incident Log (Attachment E)
- CDCR Form MH-7711-3, Medical Rounds Log (Stage III) (Attachment F)
- Weekly List of Heat-Risk Incarcerated Persons for the respective month in review.

Each Warden and CEO shall send a confirmation email to their respective RHCE and AD noting compliance to this directive no later than August 31, 2024.

Attachments enclosed

cc:     Joseph Bick, MD, Director, Health Care Services
        Ron Broomfield, Director, Division of Adult Institutions
        Dave Lewis, Director, Facility, Planning and Construction Management
        Joseph (Jason) Williams, Director, Corrections Services
        Amar Mehta, MD, Deputy Director, Mental Health Services
        Renee Kanan, MD, Deputy Director, Medical Services
        Barbara Barney Knox, Deputy Director, Nursing Services
        Kevin Myers, DDS, Deputy Director, Dental
        Annette Lambert, Deputy Director, Quality Management
        Antronne Scotland, Deputy Director (A), Corrections Services
        Jared Lozano, Deputy Director, Division of Adult Institutions
        Michelle Weaver, Deputy Director, Facility, Planning and Construction Management
        Regional Health Care Executives
        Associate Directors, Division of Adult Institutions

# EXHIBIT C

STATE OF CALIFORNIA —DEPARTMENT OF CORRECTIONS AND REHABILITATION                                              GAVIN NEWSOM, GOVERNOR

**OFFICE OF LEGAL AFFAIRS**
Jennifer Neill
General Counsel
P.O. Box 942883
Sacramento, CA 94283-0001



January 21, 2025

Special Master Lopes
Pannone Lopes Devereaux and O'Gara LLC
Northwoods Office Park, Suite 215N
1301 Atwood Avenue
Johnston, RI 02919

VIA EMAIL

Special Master Lopes,

I write regarding your draft Thirty-First Round Focused Heat Plan Monitoring Report (Report). Outlined below are the California Department of Corrections and Rehabilitation's (CDCR) comments or objections to the Report's findings and conclusions.

I.      July 2024 Death at Central California Women's Facility (CCWF)

The draft Report makes numerous references to a July 6, 2024 death of a Correctional Clinical Case Management System (CCCMS) patient at Central California Women's Facility (CCWF) which the Special Master believes to be a heat-related death.[1]  (See Report at 5[2], 15, 26, 37, 42-43.)[3]

CDCR requests that the Special Master defer discussion of this death in the Report until a finalized autopsy report has been issued.  To date, no coroner report or other conclusive medical autopsy has been finalized and the patient's cause of death remains unknown.  The Special Master cites to an article in the Sacramento Bee as a source for the Report's claim that the death was heat related.  (Report at 26, fn. 7.)  The cited article is not the type of factual support that the

---

[1] The report inaccurately describes the patient as EOP and having passed away on July 5, 2024.  (Report at 15, 26, and 37.)

[2] Pages are reference to the PDF page number.

[3] Report at page 5, fn. 2, "July 2024 case of a suspected heat related death at CCWF;" Report at page 15, "CCWF reported that there were no heat-related illnesses during the review period, however, there was a reported heat-related death of an [Enhanced Outpatient Program (EOP)] patient who was prescribed heat-risk medication in July 2024;" Report at page 26, "Sadly, with the suspected heat-related death of a female incarcerated person at CCWF on July 5, 2024, this year's heat season began with a tragic reminder of the very real harm that can result from failing to properly monitor and treat patients on heat sensitive medication;" Report at page 37, "Alarmingly, reviewed Summary Reports indicated that there were no heat-related illnesses during the review period, despite a reported death of an EOP patient prescribed heat-risk medication at CCWF due to heat stroke and possible overdose on July 5, 2024;" and Report at pages 42-43, "Due to the above-mentioned deficiencies, including inconsistent monthly summary report data which failed to reflect any mention of the heat-related death of a patient in July 2024 provide adequate cooling measures, CCWF's implementation of the 2024 Heat Plan and Updates memorandum was not compliant during the review period."

Special Master Lopes
Page 2

Special Master should rely on to support factual findings that will be submitted to the Court. A media article is not a conclusive medical determination of a cause of death. In fact, the cited article spends just seven sentences discussing this patient and relies entirely on statements from the patient's family in drawing its conclusion about the cause of death. The article cites no medical sources or other reliable evidentiary sources to buttress its conclusion.

Despite the lack of reliable evidence, the draft Report uses charged language when discussing this death which should be removed from the final report. For instance, the death is described as "a tragic reminder" of the dangers of heat. (Report at 26.) And CCWF was found non-compliant because "alarmingly" their internal summary report did not note a heat-related death in July 2024. (Report at 37.) These statements, represented as facts in the draft Report, assume the death was heat-related, but that has not been established by the coroner, the medical examiner or other medical authority.

CDCR requests that such language be stripped from the final Report and that conclusions about cause of death be omitted until a conclusive coroner's report is received by CDCR.[4] Finally, to the extent that discussion of the death remains in the final Report, CDCR requests that the patient's level of care be changed from EOP to CCCMS, the date of death be accurately reflected as July 6, 2024, and it be noted that the coroner's report, documenting the official cause of death, is still pending. (Report at 15, 26, and 37.)

II.    Monthly Summary Reports

The Special Master found four[5] institutions out of compliance with the 2024 Heat Plan's requirement for monthly summary reports. (Report at 14.) Three of those four – CCWF, California Health Care Facility (CHCF) Psychiatric Inpatient Program (PIP), and Substance Abuse Treatment Facility (SATF) – demonstrated relatively minor policy deviations. The Special Master should reconsider whether such minor policy violations reasonably support the Special Master's determination that those institutions are truly not compliant with this element of the heat plan.

For instance, as mentioned above, CCWF was found not compliant because it did not report on an alleged heat-related death in July 2024. (Report at 15, 37.) For the reasons stated above, CDCR objects to this finding as a basis of noncompliance. Further CCWF was found noncompliant because the June 2024 Summary Report noted three Stage II heat alerts while the examined local temperature logs noted four Stage II heat alerts. (Report at 37.) This is a minor discrepancy found in one month's data and should not be the basis for finding CCWF noncompliant.

Similar minor discrepancies at CHCF PIP and SATF were cited as the basis for finding them noncompliant. CHCF PIP's Summary Report noted 54 Stage I heat alerts while the local documentation noted 52. (Report at 45.) At SATF, the Summary Report noted zero Stage II

---

[4] CDCR will provide an update to the Special Master and Plaintiffs regarding this patient's cause of death upon receipt of the coroner's report.
[5] CCWF, California Health Care Facility, Substance Abuse Treatment Facility, and Pleasant Valley State Prison.

alerts in the month of May 2024, but an indoor temperature log from unit C7 on May 13, 2024 noted the unit had reached Stage II. (Report at 67.) The June Summary Report noted no Stage II alerts but a unit log in A3 and F3 on June 25, 2024 noted the unit had reached Stage II. (*Id*.)

These minor discrepancies, while worthy of a suggestion that the institutions check the reason for the discrepancies for future tracking, should not be the basis for finding CCWF, CHCF PIP or SATF noncompliant with this element of the Heat Plan. The final Report should be revised accordingly.

III.     Staff Knowledge of Heat Plan Policy and Procedures

The Special Master found seven institutions out of compliance with the 2024 Heat Plan's requirement that staff be knowledgeable about the heat plan policy and procedure. (Report at 16.) The Special Master should reconsider his finding for four of those institutions (CCWF, California Institution for Women, SATF, Pleasant Valley State Prison) because the institutions showed high levels of compliance despite a few instances of observed policy violations.

At CCWF, the Special Master team audited fourteen housing units ("11 housing units, the RHU, Reception Center, and the MHCB") and concluded that CCWF was noncompliant because of minor discrepancies. (Report at 38.) First "a *few* interviewed officers" reported the heat risk patient list was provided weekly instead of daily. (*Id*., emphasis added, noting that the list was nonetheless "produced in all toured housing units.") Second, officers in just one of the fourteen housing units noted that patients returned from outdoors during heat alerts only during hourly "unlock periods" and that these hourly returns may occur in a second housing unit if staffing was an issue. (*Id*. at 38-39.) Although the Report did not find issues with staff knowledge of the heat plan in the vast majority of housing units, CCWF was found noncompliant. The final report should be amended to reflect that CCWF was compliant.

Second, at California Institution for Women (CIW), the Special Master audited ten different housing units but reported noncompliance because "*some* officers indicated that [the heat medication patient list] was updated weekly as opposed to daily." (Report at 51, emphasis added.) The Report indicates that, despite this mistake, those same custody staff "produced the most up-to-date heat-risk incarcerated person list." (*Id*.)

The Special Master also faulted CIW for staff knowledge based on alleged "unlock periods." (*Id*.) However, the basis for this criticism appears to be patient interviews, not staff. (*Id*., "[i]nterviewed patients indicated...the 'unlock period,'" "[p]atients indicated that they were often required to remain outside.") Patient interviews should not be a basis for finding that CIW *staff* lacked knowledge of the heat plan requirements, and the Report should be amended accordingly.

Third, at SATF, the Special Master team audited twelve housing units. (Report at 68.) The only issue found was on Facility G where "[t]he officer was unable to locate a current heat-risk incarcerated persons list." (*Id*.) This example of a single officer's lack of knowledge is not sufficient to find SATF noncompliant with staff knowledge of the heat plan. The Report should be amended.

Special Master Lopes
Page 4

Fourth, at Pleasant Valley State Prison (PVSP), the Special Master audited housing units on Facilities A, B, C and D as well as the Minimum Support Facility (MSF). The Report's findings are confusing. First, the Report states that "officers on Facilities A, B, C, and D demonstrated adequate knowledge of the Heat Plan" faulting only officers in MSF dorms one and two. (Report at 107.) Then, when discussing the daily list, the Report states, "*[a]gain,* custody staff on Facilities A, B, C and D was not aware of the daily requirement and were unable to provide the most current heat-risk incarcerated persons list during the interview." (*Id.*, emphasis added.) The use of the word "again" implies that staff on Facilities A, B, C, and D had shown noncompliance before, yet the preceding sentence states that those same staff "demonstrated adequate knowledge." CDCR requests that this section be clarified and that the finding of noncompliance be reconsidered. For instance, if only the MSF officers demonstrated noncompliance then only two of PVSP's twenty-two[6] audited housing units showed noncompliance – a compliance rate of over ninety percent. This is consistent with the institution's exit call where the monitor stated that "[a]ll housing units and officers except for dorms one and two were knowledgeable of the heat plan and had a current heat risk list available." (Exit Transcript, Minute 10:00.)

CDCR requests that the Special Master reconsider whether there is adequate evidence to find CCWF, CIW, SATF and PVSP noncompliant with staff knowledge of the heat plan. Although some discrepancies were observed, they occurred in a small fraction of the number of housing units and total number of staff audited at those institutions.

IV.    Indoor Temperature Logs

The Special Master monitored indoor temperature logs, thermometer placement, and thermometer functionality. (Report at 19-22.) CDCR requests that the Special Master reconsider his finding of noncompliance at three institutions as discussed below.

First, at California Correctional Institution (CCI), the Special Master found that the institution had adequate temperature logs and thermometer placement but found that the institution was noncompliant with this element of the Heat Plan because in two of its twenty-one housing units (A5 and B5) the thermometers were not working properly. (Report at 20, 33.) This indicates a high level of compliance with the heat plan because ninety percent of the housing units at CCI were compliant with indoor temperature logs, thermometer placement, and thermometer function.

Second, at California State Prison, Corcoran (COR), the Special Master found that the institution had adequate temperature logs and thermometer placement but found the institution noncompliant with this element of the Heat Plan because in three of its thirty-three housing units (4A1, 4A3, and 3A3) the thermometers were not working properly. (Report at 20, 76.) This indicates a high level of compliance with the heat plan because ninety percent of the housing

---

[6] Twenty GP housing units on Facilities A through D and two housing units on the MSF. It is unclear from this section of the report whether this same audit occurred at the PVSP's CCCMS RHU – a twenty-third housing unit. Other sections of this Report make clear that the Special Master team audited PVSP's CCCMS RHU (see Report at 108) but it is not clear from the narrative whether they surveyed staff knowledge while in that housing unit.

Special Master Lopes
Page 5

units at COR were compliant with indoor temperature logs, thermometer placement, and thermometer function.

Finally, at Mule Creek State Prison (MCSP), the Special Master found that the institution had adequate thermometer placement and function but found the institution noncompliant with this element of the Heat Plan because two of its twenty-two housing units (C14 and B7) did not properly log temperatures.  (Report at 21, 102.)  The Special Master should reconsider this finding as ninety-one percent of MCSP housing units were fully compliant with indoor temperature readings.

V.     Miscellaneous Comments

The header at the bottom of page 13 is titled "Summary – Outdoor Temperature Logs" but relates to the August 2024 Heat Plan and Updates Memorandum.  CDCR believes the header is in error and should be modified to reflect the August 2024 memorandum.  A summary for outdoor temperature log findings appears again, appropriately, at the top of page 19.

References are made throughout the Report to the "warden or *his* designee."  (Report at 19, 32, 33, 39, 46, 52, 58, 63, 68, 69, 75, 76, 82, 88, 94, 101, 102, 107, and 112, emphasis added.)  CDCR requests that these references be modified to "warden or designee" or "warden or their designee" to reflect gender diversity of CDCR wardens.

Although the Special Master found Corcoran's Heat Plan Local Operating Procedure (LOP) compliant, he raised concerns about language that authorized controlled use of force if a heat risk patient was not taking appropriate cooling measures during Stage II or Stage III, stating that "permission from the Primary Clinician" was necessary to force showers.  (Report at 73.)  CDCR requests the report be amended to reflect that the LOP references the "physician" not the primary clinician.  Second, consistent with the Special Master's recommendation, COR will remove this language from its LOP and future Heat Plan LOPs.

Thank you for your consideration of our comments and objections.


Sincerely,

*/s/ Nick Weber*

NICK WEBER
Assistant Chief Counsel
Office of Legal Affairs

# EXHIBIT D



101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
T: (415) 433-6830 ▪ F: (415) 433-7104
www.rbgg.com

Luma Khabbaz
Email: lkhabbaz@rbgg.com

January 21, 2025

<u>VIA ELECTRONIC MAIL ONLY</u>

Matthew A. Lopes, Jr.
*Coleman* Special Master
mlopes@pldolaw.com

Re:    *Coleman v. Newsom*: Plaintiffs' Comments Regarding the Special Master's
Thirty-First Round Focused Heat Plan Monitoring Draft Report
<u>Our File No. 0489-03</u>

Dear Special Master Lopes:

We write to provide Plaintiffs' comments regarding the Special Master's Thirty-First Round Focused Heat Plan Monitoring Draft Report.

## I.    Request for the Special Master to Tour HDSP

In Tom Nolan's July 26, 2024 letter regarding heat plan issues ("Plaintiffs' Heat Plan Letter"), Plaintiffs raised concerns that the staff in HDSP's new EOP unit were not properly trained to implement the heat plan. That letter is attached hereto as **Exhibit 1**. While we understand that the Special Master did not tour HDSP during this round, we request that the Special Master include HDSP in his next round of monitoring of Defendants' heat plan implementation.

## II.    Installing Air Cooling

In Plaintiffs' Heat Plan Letter, Plaintiffs also urged CDCR to install air conditioning throughout its prisons, given the rising temperatures and danger caused by heat. CDCR recently recognized the importance of air cooling in a budget request to "install and evaluate air cooling alternatives to improve indoor environments" at CCWF, CMF, KVSP, and LAC. *See* Air Cooling Pilot Program Budget Request, attached hereto as **Exhibit 2**. In its budget request, CDCR cited the *Coleman* Heat Plan as well as the barriers to rehabilitation caused by excessive heat. Exhibit 2 at 2. While Plaintiffs are encouraged by Defendants' proactive steps toward installing air cooling systems at four

[4635795.2]

Matthew A. Lopes, Jr.
January 21, 2025
Page 2

prisons in the next few years, Plaintiffs request that the Special Master recommend that CDCR consider this option for all heat-affected prisons.

### III.    Requiring the Use of Heat Index as Trigger for Heat Plan

In Plaintiffs' Heat Plan Letter, Plaintiffs also requested that CDCR switch to using a heat index as the trigger for heat alerts and precautions, rather than bare temperatures. In the 30 years since the heat plan has been in place, climate change has increased statewide temperatures.  A heat index is also a more accurate measure to determine the risk of heat-related illnesses.  According to the National Weather Service, and illustrated in the chart below, a temperature of 90 degrees can have a heat index of up to 132 degrees.  A forecast of 90 degrees and 60% humidity will feel like 100 degrees.  This does not even include the effects of direct sunlight, which can increase the heat index by up to 15 degrees.  *See* "What is the heat index?", National Weather Service, (Jan. 21, 2025), https://www.weather.gov/ama/heatindex#:~:text=%22It's%20not%20the%20heat% 2C%20it's,combined%20with%20the%20air%20temperature.



CDCR has already recognized the value of using a heat index.  Its August 2, 2024 memorandum "Expectations Relative to Institutional Oversight of Heat Plan Operations" requires institutions to "convene an executive team to meet daily during the weekdays for the duration of a heat advisory—which is defined … as any condition where the *heat index* is expected to reach 100 degrees Fahrenheit or higher…."  Special Master Draft Heat Plan Report at 7 (emphasis added).  Plaintiffs ask the Special Master to recommend

[4635795.2]

Matthew A. Lopes, Jr.
January 21, 2025
Page 3

that CDCR consistently be required to use a heat index for all heat plan requirements as the most accurate measure of heat-related danger.

## IV.    Requiring the Measurement of In-cell Temperatures

In Plaintiffs' Heat Plan Letter, Plaintiffs urged that the heat plan be changed to require temperatures to be measured in the highest location **and any other location, including cells, which may be hotter**.  Exhibit 1 at 3.  While the 2024 Heat Plan and Updates memorandum requires temperatures to be taken at the highest non-air conditioned location, which could include a cell, it does not require temperatures to be taken in other cells, which may be hotter and not in the highest location.  Exhibit B of Plaintiffs' Heat Plan Letter outlines examples of high in-cell temperatures that should have, but did not, trigger a higher stage alert.  The Special Master's draft report echoes similar concerns.  At CCI, the monitor measured in-cell temperatures, with some cells registering temperatures above 90 degrees.  It was only after the measurements were taken that the unit activated a Stage II alert.  Draft Report at 31.  Plaintiffs request that the Special Master include in his final report a requirement to measure and log in-cell temperatures, regardless of height.

## V.    Other Recommendations

Ahead of the Special Master's focused heat plan tour, Plaintiffs also requested other improvements to properly implement the heat plan that remain largely unaddressed.  We request that the Special Master consider including recommendations regarding the following concerns in his final report.

### A.    Training and Staffing

The Special Master found that no institution was compliant with custody and mental health staff attendance at the annual heat pathologies training.  Draft Report at 23.  Only fifty percent of the institutions achieved compliance regarding knowledge of the heat plan policy and procedure.  *Id.* at 14.  At three of the seven noncompliant institutions, the Special Master found "concerning practices that did not comport with the requirements of the 2024 Heat Plan and Updates Memorandum."  *Id.*

In Plaintiffs' Heat Plan Letter, Plaintiffs also noted similar concerns with staff knowledge and training.  *See* Exhibit B (TN July 15, 2024 Email) to Exhibit 1. One officer told Plaintiffs' counsel, "I'm not sure what a heat-related illness symptom would be."

As the Special Master recognized in his report, the stakes are high for class members when institutions fail to comply with the heat plan requirements.  In July 2024,

[4635795.2]

Matthew A. Lopes, Jr.
January 21, 2025
Page 4

a class member at CCWF died by a suspected heat stroke.  Given the extreme risk, Plaintiffs ask that the Special Master include a specific recommendation to improve staff knowledge and training for the heat plan.

Relatedly, Plaintiffs also request that the Special Master report on how staffing shortages may impede the ability of existing staff to comply with heat plan requirements.

### B.     Ice Machines and Other Cooling Measures

The Special Master report found accommodations and cooling measures to be one of the areas with the most room for improvement, with fifty percent compliance.  Draft Report at 24.  The draft report notes instances of broken, faulty, or limited ice machines.  *Id.* at 51, 61, 68, 94.  Plaintiffs similarly reported issues with ice machines in Plaintiffs' Heat Plan Letter, including broken and locked ice machines.  This was also an issue for swamp coolers.  *Id.* at 31, 37.  Plaintiffs request that the Special Master include a recommendation in his final report for CDCR to test ice machines and swamp coolers prior to the heat season, similar to CDCR's new requirement for Plant Managers to test their thermometers before the heat season.  *See* Draft Report, Exhibit B at 2.  Further, the Special Master should recommend that CDCR test all heat plan-related equipment and maintain backups, including backup thermometers, ice machines, and swamp coolers, for when existing ones inevitably break or are undergoing repair.

Sincerely,

ROSEN BIEN
GALVAN & GRUNFELD LLP

*/s/ Luma Khabbaz*

By:   Luma Khabbaz

LK:DLE:cg
Exhibits:  A and B

cc:  Co-Counsel                          Elise Thorn
    *Coleman* Special Master Team   Damon McClain
    CDCR Office of Legal Affairs     Paul Mello
    Nicholas Weber                   Samantha Wolff
    Sundeep Thind

[4635795.2]

# Exhibit 1



**ROSEN BIEN
GALVAN & GRUNFELD LLP**

101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
T: (415) 433-6830 ▪ F: (415) 433-7104
www.rbgg.com

Thomas Nolan
Email:  tnolan@rbgg.com

July 26, 2024

VIA EMAIL ONLY

```
┌─────────────────────────┐
│     CONFIDENTIAL         │
├─────────────────────────┤
│      SUBJECT TO          │
│  PROTECTIVE ORDERS       │
└─────────────────────────┘
```

Nick Weber
Melissa Bentz
Sundeep Thind
CDCR Office of Legal Affairs
Nicholas.Weber@cdcr.ca.gov
Melissa.Bentz@cdcr.ca.gov
Sundeep.Thind@cdcr.ca.gov

Re:    *Coleman v. Newsom*
       Serious Heat Plan Issues Underscored by Current Heat Wave and Recent
       Likely Heat-Related Death at CCWF
       Our File No. 0489-3

Dear OLA:

        We write regarding multiple reports from our clients, our colleagues monitoring
CDCR prisons, and the Special Master's monitors of severe problems with the adequacy
of CDCR's heat plans, with excessive temperatures in the housing units and cells where
medically fragile patients on heat-sensitive medications live, and with CDCR's troubled,
halting implementation of the remedial cooling and surveillance efforts required by the
statewide *Coleman* heat plan.  In addition to the July 5, 2024 death of ██████
████████████, at CCWF, which, as detailed in Steve Fama's July 8, 2024 e-mail
(attached hereto as **Exhibit A**) appears to have been heat related, we have received
numerous troubling reports about heat plan related problems.  The Special Master's 30th
Round report also noted that two CMF patients experienced heat-related illness in
September of 2022.  *See* 30th Round EOP Report, ECF 8095 at 331.

        Plaintiffs also received a report this week that over the weekend of July 20-21, in
the new EOP units at HDSP, the new custody staff were not trained regarding their
obligations under the heat plan, and they all crowded into one of two air conditioned
custody offices while the heat risk EOP class members sweltered in their hot housing

[4535023.2]

CONFIDENTIAL
Nick Weber at al.
CDCR Office of Legal Affairs
July 26, 2024
Page 2

units with no heat plan mitigation measures being provided.  The EOP patients reported to us that they refused to return to their cells until the appropriate heat mitigation measures including ice were provided late in the day on Sunday, after the worst of the heat was over.

The Special Master team similarly reported during yesterday's (July 25, 2024) exit conference call from the KVSP EOP tour that during a period of triple digit temperatures at KVSP there were "extreme policy violations" with respect to the heat plan, including a lack of preparedness, broken thermometers, the use of the wrong thermometers, thermometers placed inside the air conditioned tower rooms, broken ice machines and the fact that officers were huddled in tiny closets with air conditioning and not monitoring for heat problems.  **As we argue below, for the sake of staff and incarcerated people alike, we think it is critical that CDCR move to install air conditioning in all cells, dorms, program areas and living areas that regularly reach triple digit temperatures**.

We also urge the following additional remedies for heat issues:

- CDCR should use the heat index, which includes humidity levels, and not just temperature alone as the trigger for heat alerts.

- CDCR should require temperature measurements in both dormitories and in cells in all housing units, in addition to dayroom temperature measurements, and use the highest heat index temperatures as the triggers for the respective heat plan stages.

- CDCR should purchase standard, high quality thermometers both for fixed temperature measurements in dayroom, and for portable measurements made in cells and dorms and other hot areas.

- CDCR should require the use of mandatory overtime and use other emergency staffing measures when staffing shortages interfere with the completion of heat plan mitigation measures or would potential require heat risk individuals to be inside hot cells when dayrooms are cooler and allow for cooling showers.

- CDCR should purchase new ice machines and have a plan to ensure they remain working and unlocked.  CDCR should have back up ice machines and thermometers available for when these devices inevitably break.

[4535023.2]

CONFIDENTIAL
Nick Weber at al.
CDCR Office of Legal Affairs
July 26, 2024
Page 3

- Staff training in taking temperatures, providing mitigation measures and in not returning people from air conditioned program areas to much hotter housing units should be urgently and quickly provided to all CDCR custody and program staff.

- Use designated cooling areas for incarcerated people during hot weather.

Among the problems discussed below and in my recent emails about heat plan problems at different prisons (attached hereto as **Exhibit B**) we believe many require urgent modification or clarification of the current heat plan.

1. **In Cell (and in Dorm) Temperatures Must Be Routinely Measured in All Housing Units and Used for Heat Alert Triggers**

The current state-wide heat plan, attached hereto as **Exhibit C**, requires staff to measure temperatures as follows:

> The Warden or designee must also ensure inside air temperatures are measured in all non-air conditioned living areas housing heat-risk incarcerated persons and areas that are air conditioned but could exceed 90 degrees (i.e., kitchen areas). Temperatures must be taken at the highest non-air-conditioned location where heat-risk incarcerated persons are housed, which could include a temperature taken within an incarcerated person's cell. Inside air temperatures must be recorded every three hours, daily from May 1 through October 31.

April 8, 2024 Heat Plan Memo at 3-4. This language is arguably open to interpretation, but our understanding is that, because the heat deaths in 1992 which gave rise to the heat injunctions in *Gates* and *Coleman* took place on the third floor at CMF, the intention is for heat to be measured at the physically highest location, on the belief that heat rises so the highest location will be the hottest location. However, because cell temperatures can be and often are higher than the dayroom temperatures, this policy is inadequate

**The heat plan must be changed to require temperatures to be measured in both the highest location and any other location, including cells, which might be even hotter**. Monitoring in-cell temperature levels should be required in all housing units, especially when individuals are confined to their cells during hot periods.

Recent reports document the fact that in-cell or in-dormitory temperatures are often hotter than dayroom temperatures, and sometimes class members and other

CONFIDENTIAL
Nick Weber at al.
CDCR Office of Legal Affairs
July 26, 2024
Page 4

vulnerable individuals are required to stay in hot cells when their dayrooms are cooler. This is especially common now due to severe staffing shortages in many locations.

For example the Special Master found during his tour of CCWF last summer that: *"Shockingly, staff reported some cells reaching 99 degrees in July 2023. At that time, staff allowed cell doors to remain open and an industrial fan blew air down the hall while patients were ordered to remain in their cells. Interviewed staff unanimously reported that the "swamp cooler" system did not work properly once unit temperatures exceeded 80 degrees."* 30th Round EOP Report, ECF 8095 at 684 (report pagination) (emphasis supplied). The 30th Round EOP Report also noted regarding CCWF that "due to custody staff shortages, when patients were recalled inside due to a Stage I heat alert, patients were not offered dayroom but were sent directly to their cells." *Id.* Also, it was reported that only 55 percent of custody and mental health staff attended the annual mandatory heat pathologies training at CCWF. *Id.* As discussed below, similar problems at SATF were recently found by Prison Law Office monitors.

While the heat plan does not explicitly require in cell temperatures, SATF's local operating does require this. Specifically, the SATF LOP at 5 provides (underline added):

Each housing unit shall record air temperature on the highest tier to which a Heat Risk inmate is assigned. <u>In the event of a report of elevated temperature within a cell, staff shall utilize the hand held temperature gauge to measure and record the reading as compared to the dayroom temperature reading.</u> The hand held temperature gauge is stored within each Complex Control.

Despite this requirement, *Armstrong* monitors at SATF found numerous problems earlier this month, as we previously reported to you, including (1) failures to measure extremely high in cell temperatures and call appropriate heat alerts for different UHT stages in response to those temperatures, (2) locking people in their hot cells when they should have been allowed in the dayroom and provided with cooling measures, including ice water and free and ready access to showers, (3) measurements of temperatures in dayroom locations that were not the highest locations either in terms of height or temperature, (4) broken ice machines, hand held thermometers and swamp coolers, (5) failure to provide personal fans to help cool hot cells. The monitors also found a lack of staff knowledge about heat plan issues. *See* **Exhibit B** hereto (e-mail about reports of heat problems at SATF and various other prisons). The monitors documented instances where cell temperatures were between 5 and 15 degrees warmer in cells than in the adjacent dayrooms.

[4535023.2]

CONFIDENTIAL
Nick Weber at al.
CDCR Office of Legal Affairs
July 26, 2024
Page 5

Prison Law Office monitors heard of similar serious heat plan issues on their recent *Armstrong* CMF tour. For example, in M-3, the third-floor EOP RHU, they learned that class members are not allowed out of their hot cells on weekends due to staffing issues.

**We request that the heat plan be modified to specifically require in cell temperatures and to increase the frequency of temperature readings. The heat plan should be clear that the most elevated temperature in any cell or dayroom or housing area should be the trigger for a heat plan emergency, using the staged UHT temperatures**. Staff should also take temperatures at the hottest parts of cells or dormitories.

## 2.    Use of the Heat Index to Trigger Heat Alerts and Heat Precautions

The current state-wide heat plan has been in place for more than 30 years, since 1992, when three *Coleman* class members died of heat illness on the third floor of CMF during a heat wave. During that 30 year period, climate change has made the summers in California hotter and more dangerous.

Because of the changes in the climate, we request that CDCR switch to using a heat index for triggering heat alerts, rather than the bare temperature, while keeping the heat trigger levels the same for the different stages of heat alerts. This will require more heat alerts because the heat index, which includes humidity, is generally higher than the bare temperature. Below is a sample heat index chart from NOAA:

CONFIDENTIAL
Nick Weber at al.
CDCR Office of Legal Affairs
July 26, 2024
Page 6

Moving to the use of heat indexes would of course require CDCR to purchase portable humidity monitoring devices.

3.    **Provide and Maintain Proper Equipment for Measuring Heat and For Providing Ice and Other Mitigation Measures Required**

Proper implementation of the Coleman heat plan requires working, high quality thermometers, placed and/or used in the proper locations, and working ice machines. We also think going forward it will require widespread retrofitting to install air conditioning.

We have received numerous reports of **broken or locked ice machines** interfering with the ability of staff to provide appropriate mitigation measures. The reports include the KVSP report from the Special Master team tour this week that ice machines were broken in Buildings 6 and 7. As noted previously, at SATF, the *Armstrong* monitors earlier this month were told by the acting Warden that ice machines in the kitchens on some yards were broken. It was reported that the G-Yard ice machine was broken. They also documented broken water fountains.

During the week of July 9, 2024, our office received reports of broken ice machines or a lack of ice being provided from numerous prisons and yards including C-Yard at SATF, F-Yard at SATF, D-Yard at LAC, and a report that the ice machines at CSP-Sacramento were locked and no one knew where the key was located, and that no ice water or cooling measures were being provided there.

We have also heard numerous reports of **broken or unworkable thermometers**, including from the Prison Law Office monitors at SATF, where there were no batteries for some thermometers, and from the Special Master's exit call this week at KVSP. The Special Master's 30th Round EOP Report also noted broken thermometers at LAC, ECF 8095 at 725, and in multiple housing units at CSP-Corcoran including 4B3L, 4B3R, and 4B4R, *id*. at 648.

4.    **Swamp Coolers Should Be Replaced with Air Conditioning**

It is clear that swamp coolers are not adequate to manage the extreme heat that is now a regular occurrence during the summers in California. As noted above, the Special Master found in his 30th Round EOP Report that swamp coolers at CCWF "did not work properly once unit temperatures exceeded 80 degrees." *Id* at 684. Prison Law Office monitors made similar findings at SATF earlier this month.

It is well known there are limits to evaporative cooling. For example, in noting the limitations of evaporative cooling for home use, the US Department of Energy notes

CONFIDENTIAL
Nick Weber at al.
CDCR Office of Legal Affairs
July 26, 2024
Page 7

that "evaporative coolers should not be used in humid climates because they add humidity to the air in your home. Also, they do not cool your house down as low as an air conditioner would." *See* US Department of Energy Information Page at https://www.energy.gov/energysaver/evaporative-coolers (accessed on July 26, 2024). Numerous charts by sellers of evaporative cooling also explain that it does not work well in humid conditions.

CDCR should seek to replace its swamp coolers with more effective air conditioners, and should also air condition program areas so programs are not interrupted by heat alerts.

**5.     CDCR Should Train Staff in the Heat Plan and Require Mandatory Overtime When Needed to Ensure Heat Plan Mitigation Measures**

The recent reports Plaintiffs have received from class members and our own monitors, and from the Special Master's monitoring in recent weeks all strongly suggest intensive and immediate staff training on heat issues is urgently needed. *See* Exit Report on KVSP Tour (this week); 30th Round EOP Report, ECF 8095 at ECF pp 684, 648, 725 (noting that at LAC "multiple interviewed officers on Facilities A, C and D yard were unaware of the heat plan's three stages."). There were also reports at SATF and elsewhere this month of custody shortages interfering with the ability of staff to provide mandated heat plan mitigation measures and, for example, affecting the ability to allow incarcerated people to be in the dayroom where they are mandated to have access to cooling showers. *See, e.g.*, *id*. at 684 (CCWF staffing shortages impacting ability to provide dayroom during heat alerts). There were also reports in the 30th Round Report of poor monitoring of heat generally and poor recordkeeping with respect to heat logs. *See id*. at 331 (CMF lacked documentation of accommodations and required nursing rounds), 531 (problems with temperature logs at KVSP).

**CDCR must train staff on heat plan requirements, and must require mandatory overtime to ensure adequate heat plan mitigation measures are provided during heat alerts.**

**6.     Cooling Centers and Other New Heat Mitigation Measures**

As is done in the community by public health officials during heat waves, CDCR should implement the use of drop-in cooling centers for elderly and other heat-risk individuals in its prisons during periods of extreme heat. Defendants should also consider using shade structures and misters on the yards. They should also consider

CONFIDENTIAL
Nick Weber at al.
CDCR Office of Legal Affairs
July 26, 2024
Page 8

providing fans for in-cell use to indigent individuals with heat-risk conditions, heat risk medications, or of advanced age.

We look forward to hearing back from Defendants as soon as possible about these critical life-safety issues affecting our clients.

Please contact me with any questions about this letter.

Sincerely,

ROSEN BIEN
GALVAN & GRUNFELD LLP

*/s/ Thomas Nolan*

By:  Thomas Nolan
     Of Counsel

TN:fgl

Enclosures:  Exhibit A (Steve Fama E-mail Re CCWF Death), Exhibit  B (TN E-mail Re Heat Problem Reports from Class Members), Exhibit C (2024 Heat Plan Memo)

cc:  *Coleman* Team-RBGG
     *Coleman* Special Master Team
     Steve Fama
     Elise Thorn
     Damon McClain
     Paul Mello
     Samantha Wolff
     Namrata Kotwani
     Dr. Amar Mehta
     Dr. Steven Cartwright
     Dr. Michael Golding
     Carrie Stafford
     Dawn Laurie
     Jennifer Neill
     Tammy Foss
     Diana Toche

[4535023.2]

# Exhibit A

| From: | Steven Fama |
|---|---|
| To: | Matt Lopes; Kerry F. Walsh; Patricia M. Williams; Nick Weber; Thind, Sundeep@CDCR; CDCR OLA Coleman CAT Mailbox; Namrata Kotwani; Elise Thorn; Damon.McClain@doj.ca.gov; Samantha Wolff; Paul B. Mello; Stafford, Carrie@CDCR |
| Cc: | Coleman Team - RBG Only; Don Specter; Marissa Hatton; Margot Mendelson; ahardy@prisonlaw.com; sophieh@prisonlaw.com |
| Subject: | Coleman: requests re CCWF 7/5/24 death (person on heat sensitive psychiatric medication) |
| Date: | Monday, July 8, 2024 4:18:58 PM |
| Attachments: | ▬▬▬▬▬▬ (CCWF) CDCR death notification.pdf |

---

**[EXTERNAL MESSAGE NOTICE]**

Dear Special Master Lopes, CDCR-OLA, and all,

The attached CDCR notice states that ▬▬▬▬▬▬▬▬▬ (CCWF) died on 7/5/24 and that heat stroke is listed as a cause of death.   EHRS includes a 7/4/24 "Outside Records -- Emergency Dept" and a 7/6/24 "Outside Records -- Hospital" records; the latter states ▬▬▬▬▬ temperature upon arrival on 7/4/24 at approximately 2300 hours was 41.5 degrees Celsius (which converts to 106.7 degrees Fahrenheit) and that "[p]er prison guards" ▬▬▬▬▬ had been "outside all day." EHRS also documents that ▬▬▬▬ was ordered and regularly took Lithium, a CCHCS-listed heat sensitive medication.  Accuweather documents the high temperatures in Chowchilla on 7/2, 7/3, as 7/4/24 as 104, 108, and 109 degrees, respectively.  *See* https://www.accuweather.com/en/us/chowchilla/93610/july-weather/2154370.  Based on experience, the outside temperatures on those dates would have been 90 degrees or higher for several consecutive hours.

We ask the Special Master to specially review and report on ▬▬▬▬▬ death, including investigating and reporting on whether heat sensitive medication played a role and whether all elements of the CDCR Heat Plan were followed at CCWF and as it pertained to ▬▬▬▬ in the hours and days immediately prior to their being sent to the hospital on 7/4/24.

We also ask CDCR to immediately and fully report on the statement in hospital records that per prison guards ▬▬▬▬ had been "outside all day."  Which officers so stated?  What was basis of their knowledge?  Regardless, what is known, and how, regarding ▬▬▬▬ being outside on 7/4/24?  Relatedly, please provide a copy of the outside temperature for CCWF for 7/4/24, and that for temperatures in ▬▬▬▬ housing unit.  Further, what steps were taken regarding Heat Alerts on 7/4/24, including with respect to ▬▬▬▬ and the apparent statement about being "outside all day"?  Please include whether there was some special reason, including modified program, job assignment, or the like that required or caused ▬▬▬▬ to be outside on 7/4/24, both for any required activities or otherwise.

We further ask CDCR to review all elements of the CCWF Heat Plan including  whether such matters are fully implemented and being followed, and in addition whether they require revision to adequately safeguard residents' health.

Thanks in advance to all for your consideration of these matters.  Given forecasted 100 degree plus high temperatures in Chowchilla, and the likelihood of such temperatures occurring again in coming weeks, we ask for a prompt response to our requests.

Sincerely,

Steven Fama
Staff Attorney
Prison Law Office

# Exhibit B

| From: | Thomas Nolan |
|---|---|
| To: | Nick Weber; Melissa Bentz |
| Cc: | Coleman Team - RBG Only; Steve Fama; Coleman Special Master Team; Foss, Tammy@CDCR; Neill, Jennifer@CDCR; rlomio; rlomio; Armstrong Team - RBG only; "arm-plo@prisonlaw.com"; Donald Specter; Margot Mendelson; Gay C. Grunfeld |
| Subject: | RE: Coleman -- Reports on Ongoing Heat Related Concerns During Current Heat Wave at Various Prisons [IMAN-DMS.FID12440] |
| Date: | Monday, July 15, 2024 12:40:04 PM |

Hi All –

In addition to the heat concerns reported in the thread below, we received the following detailed report over the weekend from Rita Lomio at the Prison Law Office about the heat-related problems she observed last week at SATF. Below her report, I also include some excerpt from the Special Master's Thirtieth Round EOP Report discussing similar problems with extremely high heat in cells, swamp coolers not working, failures to provide and document heat plan accommodations, etc:

> Hi *Coleman* team/all,
>
> I wanted to share information from our SATF tour this past week related to temperatures in the housing units. The short version is that people are living in suffocating heat without access to mitigating measures like cool water. Staff are determining UHT stages based on temperature measurements in areas that do not represent the in-cell/-pod temperatures incarcerated people experience, and that in some cases are at least ten degrees cooler than the cells in which people are confined – something the acting warden, acting chief deputy warden, and ADAC all believed was required by policy.
>
> **Is that really the policy – to go by dayroom temperature even if the dayroom is closed and people are locked in cells and pods that are much hotter?** I am attaching the statewide heat plan and SATF OP.
>
> <u>Temperature measurements and class member experience</u>
>
> We checked out handheld thermometers from central control on the complexes (the same ones staff are supposed to use) and measured the temperature in a few cells housing people with disabilities. I took the temperature where someone's head would be if they were sleeping on their bed (that generally was hotter than the vents at the top of the cells, possibly because that is where the window is and/or the bed is pressed up against concrete that is baked in the sun). We also looked at the thermometer mounted in the dayroom. On E yard (Level II, 270), thermometers were mounted between the first and second tiers, on the side of the second-tier floor facing the open dayroom. On G yard (Level II, 6- to 8-person pods), a thermometer was mounted above the door in the housing unit section that opened to the central officer area – a location many yards from the pods.
>
> Here are some of the readings:

| Day | Time | Unit | Cell/Pod | Cell Temp | Dayroom Temp | Outdoor |
|---|---|---|---|---|---|---|

| | | | | | | | Temp* |
|---|---|---|---|---|---|---|---|
| 7/10 | 1749 | E4 | 131 | **90.2/90.3** | 84 or 85 | | 105 |
| We took readings on two separate thermometers. This is the cell of [redacted], DPO, who is on heat meds according to a sign on his door. The ADA Coordinator told me that only the ambient dayroom temperature would trigger stage 2, and it was beneath 90 degrees. No ice or ice water was available for incarcerated people, and no extra fans were available. There are no food ports in the doors that can be left open overnight, and the cell doors are shut overnight. [redacted] reported that he has mostly been locked down except for that day, when program was running for part of the day. He said "it's horrible," he felt nauseous and dizzy yesterday but staff wouldn't call a man down. He said he can't sleep and staff don't do rounds. This heightened his anxiety and fear. He has a little fan but it didn't produce much of a breeze. | | | | | | | |
| 7/10 | 1515 | E5 | 142 | 83 | 70 | | 103-105 |
| This is a DPW cell. | | | | | | | |
| 7/11 | 0926 | G1 | 3-3L | 81.3 | 84 (61% humidity) | | 83-87 |
| [redacted], EOP, DPO, 65 years old, reported he's struggling with the heat. Per EHRS, on 7/7: "IP was found on the floor lethargic and not obeying to verbal commands." 7/8: "Patient states that he just does not do well in the heat. Vitals were normal patient was encouraged to hydrate and was sent back to housing area." 7/12: "I/P c/o feeling hot and lightheaded. Vitals taken B/P 106/67, pulse 65, temp 98.8, 02 96%, R 16, Blood sugar 157, pain 0/10. Educated patient on the importance of staying hydrated in this heat and to apply wet wash cloths on forehead to stay cooler." He filed a 602 with help from someone else on 7/8: "I had told Miss Tickle that I've heat strokes in past, she said that's not my business July 4 when we came back in noon. I informed I need toilet paper I'm took not and faint she stated she doncare even no he was housed in hospitals before because of issues. I said I could not breath and needed water, cool. It was 87.9 on the wall when sgt. Came on the downstairs 93 upstairs that's at 945 pm. So they now it really hot and the don't care it 87.8 in dayroom and ninetys in cells accordin to our clock with temp. please help me before I have stroke of heart attack." He got an OOG acknowledgement that says he'll receive a response no later than 9/7/24. | | | | | | | |
| 7/11 | 1802 | E1 | 142 | **91.9** | | 76 (handheld) 80 (mounted) | 108 |
| Stage 2 was not called. [redacted], DPW, TABE 01.0, Spanish speaker, 57 years old, was sweating profusely, using a rag to mop his forehead. He was miserable and frustrated, had a small fan in his cell that weakly blew hot around, and the igloo in the unit was empty. He didn't know if anything was available to help him because of the heat. We asked housing officers to refill the igloo with ice water and to explain to him in Spanish that it was available and how to get it as he was locked in his cell. Housing officers said they could crack his cell door. | | | | | | | |

\* This comes from timeanddate.com. I used the closest time available on that website or a range of temperatures if it fell between two listed times.

People on some yards at SATF largely have been locked in their cells/pods lately. That's for a variety of reasons, including staff shortages, altercations on the yard, and because that dayroom is closed whenever someone is on suicide precautions in the unit (four people were placed on suicide precautions in one unit on E yard the day I was there).

A lot of people at SATF are on heat meds. In F3 (Level II EOP), the housing officer estimated that 80% of the residents were on heat meds. People reported being unable to sleep because of the heat, excessive sweating, nausea, dizziness, and fatigue.

Staff interpretation of heat plan requirements

SATF management (acting warden, acting chief deputy warden, and ADAC) interprets the heat plan to be based on "ambient dayroom temperature," even when residents are not allowed in the dayroom and are locked in cells much hotter. Because of that interpretation, although we measured temperatures in cells that were over 90 degrees, staff would not call a stage 2 because the dayroom temperature was below 90 degrees.

We witnessed the ADAC specifically tell staff that although we had just measure a cell temperature above 90 degrees in the cell for someone on heat meds, staff should not call a stage 2 because the "ambient dayroom temperature" – as taken by a thermometer mounted between the first and second tier in an area of increased airflow – was below 90 degrees. That meant no mitigation measures were activated; ice water was not made available. Instead, people had access only to small squirts of hot water in their sink. (I tested the cold water button in one cell and only hot water came out.)

We also witnessed an exchange between the ADAC and an IAC representative in D2 (Level IV SNY, 270) related to heat.

| | |
|---|---|
| ADAC | UHT is based on the thermometer/ambient temperature in the dayroom, per policy. Could we do something different from policy? Yes. Open tray slots, provide cold water. |
| IAC Representative | Things are being brought to me, people are reporting heat-related illness, not being allowed to open their food ports. |
| ADAC | There's no capacity for ice; demand would break the ice machines. Can provide cool water. Director came down a few weeks ago and said to try to say yes. |

The one exception is on C yard, where staff told us that in-cell measurements can be the basis to go up a UHT stage. That interpretation, however, was squarely rejected by the acting warden, acting chief deputy warden, and ADAC.

Lack of working equipment

SATF is ill equipped for the heat. A few examples are below – this is by no means a full list.

- The acting warden said that **ice machines** in the kitchens on some yards were broken. The acting chief deputy warden said that they would not provide ice in the supply warehouse outside the perimeter because it had to be kept on standby in case a stage 2 was called.
- **Swamp coolers** had stopped working and staff had put in multiple work order slips over a period of weeks because cell **vents were blowing hot air**. In D5, for example, staff said several cells aren't blowing cold air (240, 241, 140, 141) and that they have submitted work orders. The circuits/power went out in 142 also, so currently running an extension cord so the occupant can turn on their fan. There's also an electrical access issue in 209.
- On Thursday, we were unable to take many temperatures because the **handheld**

**thermometers** were not working. Staff told us that the batteries had died, and staff did not know how to change the batteries (that is, how to remove the plastic cover) or where spare batteries were. In some cases, there may have been one thermometer that was working but it had been checked out. (For example, on G yard as of Thursday morning, seven of the eight thermometers were not operational.)

- Staff did not have **personal fans** to issue to people who were too poor to buy their own. A couple housing unit officers said they wished they had some to give out. The captain of C yard said that there's no program for loaner fans for individuals because we have nothing to give.

- Class member in D1-142 (Level IV SNY, 270 design) reported that the in-cell temperature had been tested and showed 94 degrees. A captain reportedly came to the unit and took a picture of the heat log that morning (another class member said this was around 8 am). The class member reported that people can ask for in-cell temperatures to be measured, but those temperatures are not routinely taken. He reported that there is no ice available and no fans for loan, and tray slots weren't opened. Per the captain, there are no **fans in the dayroom**, but there are work orders (seven in the last two months).

- In D4, there is cold water available from the **water fountain** in C Section but not in A Section. Staff told us that's been a problem for four months. Plant Ops reportedly is coming to install new water fountains in A Section, but no ETA.

<u>Staff indifference and lack of knowledge</u>

Staff at all levels – from yard officers to the acting warden – demonstrated little urgency or concern about how the heat was affecting the incarcerated population. Staff mostly were in heavily air conditioned spaces not available to our clients or, if on E yard, under a shade structure (purchased by CCPOA) with misters that were off-limits to incarcerated people. The small amount of shade cast by housing buildings themselves was in the out of bounds area most of the day. On E yard, yard officers said that the only shade on the yard available for people was that cast by the wall on the handball court – and indeed, we saw incarcerated people squished together like pigeons in the small amount of shade that cast. On C3 (Level III PF, 180 design), a housing officer told us "I'm not sure what a heat-related illness symptom would be."

<u>Our efforts on site</u>

At the end of the day on Monday, we told ADA staff that a class member had reported sweltering temperatures in his cell and that his request to be allowed to have his food port open overnight to allow some air circulation and relief had been denied. We asked them to reconsider. The next day, ADA staff told us they had contacted the sergeant who said that would be no problem. We do not know if they actually directed food ports to be open.

Sara relayed some of our observations from Wednesday's walking tour related to heat to Tammy, Jenn, and Tamiya. The acting warden asked to speak with me about it on Thursday. I met with her and the acting chief deputy warden that afternoon. They largely wanted to

present the steps they had taken after being contacted by headquarters.

It was unimpressive.

The acting warden told me she had sent an email Wednesday night to the captains to tell them not to come to Thursday's morning meeting and instead to check on their yards. She said that she told staff at the morning meeting to provide ice water in all housing units where yard ice machines were working, even if not on stage 2.

Basically, the only immediate steps they reported taking where:

- Ice water was to be provided in all housing units if the yard ice machines were operational (they said some weren't, and mentioned the G yard ice machine as one of those that were broken)
- People would be permitted showers

They said they had started the procurement process for a few items which, they said, would require going through the three-bid process and receiving funding, and could take a long time to get. They also reminded me that California is in a "budget crisis."

- 30-inch industrial fans (I think they said they want to purchase 40 of them)
- Parts for swamp coolers in the building (it sounds like they had ordered this previously but the "parts are still on order"). They acknowledged that the water for the swamp coolers are not designed to be cooled.

**Is there no process to acquire equipment and supplies during emergencies, including extreme heat events?**

They also said they were "researching" a few options:

- Whether they can purchase misters (Corcoran across the street has them).
- Whether they can turn on the showers on the yard (apparently the water was turned off a while ago).
- Whether they can crack cell doors on D (Level IV SNY, 270) and E (Level II PF, 270) to allow airflow, but it is "all or nothing," except for in E1, which used to be administrative segregation.
- Whether they can create cooling stations/spaces at the prison. The acting chief deputy warden said they simply cannot find the space. They reminded me that dining halls (e.g., D yard) and gyms (e.g., E yard I believe) currently are closed because they need serious structural repair.

When I asked whether they could get small fans to issue to indigent people suffering from the heat, the acting chief deputy warden said there was no policy that would require them to do so ("no policy or procedure in place to do that") and they "don't have the money to provide that."

When I explained that temperatures in cells were over 90, even if dayroom temperatures were lower, the acting chief deputy warden said that their hands were bound by policy, which required them to act based on dayroom temperatures.

I told the acting warden that tensions between incarcerated people and staff were simmering on some of the yards, more than I had ever seen at SATF before. (In one very sad instance, Marie and I heard from people on G yard that they had asked for ice the night before, been refused, and things escalated and resulted in a use of force against someone who reported having a developmental disability.)

After meeting with the acting warden on Thursday afternoon, we visited more housing units during third watch, when the temperatures usually are the highest at the prison. We saw that ice water was in fact **not** available in the housing units, that staff were not aware of the acting warden's new direction to provide ice water, and that the captain of F yard (Level II, closed door pods of 6 to 8 people) did not know of that direction either. The ADAC told me he had been in the morning meeting and that to his memory the acting warden had not given any specific direction about providing ice water. He said he also had seen no email directing it.

He apparently reported to the acting warden Thursday evening and, on Friday morning, she told me that she sent an email to direct ice water to be provided on the housing units even if the units were not on stage 2. I do not know if she in fact sent that email or if staff are complying with it, as we didn't visit housing units on Friday.

* * * * *

That's a high-level summary of heat concerns at SATF. Please let me know if you would like any additional information. On a personal note, our team tried to take as many precautions as possible. We tried to limit our time in hot environments and took breaks in air conditioned spaces largely not available to incarcerated people. We had access to cold water, spray bottles, and wet towels. But it still was oppressively hot. I cannot imagine what it would be like to be locked in a cell there without ready access to cold water.

Rita

Rita K. Lomio (she/her)
Senior Staff Attorney
Prison Law Office
1917 Fifth Street
Berkeley, CA 94710

Here is some more related information:

The heat plan requires staff to measure housing unit temperatures in the hottest location, including

in cells if that is the hottest location.  However, in our experience, it is pretty rare for staff to measure temperatures in cell.

In the 30th Round Report, the Special Master Team notes numerous problems with heat plan issues and with cooling equipment in some institutions.  For example, CCWF, where the recent heat death took place, the 30th round report found that "**Shockingly, staff reported some cells reaching 99 degrees in July 2023. At that time, staff allowed cell doors to remain open and an industrial fan blew air down the hall while patients were ordered to remain in their cells. Interviewed staff unanimously reported that the "swamp cooler" system did not work properly once unit temperatures exceeded 80 degrees**." Thirtieth Round EOP Report, ECF 8095 at 684 (report pagination).  The Thirtieth Round Report also noted that "due to custody staff shortages, when patients were recalled inside due to a Stage I heat alert, patients were not offered dayroom but were sent directly to their cells."  Id.  Also, it was reported that only 55 percent of custody and mental health staff attended the annual mandatory heat pathologies training at CCWF.  Id.

At LAC, the 30th report noted poor staff awareness of the heat plan processes:  "Interviewed officers from Facilities A, B, C, and D, and the MHCB and STRH, demonstrated varying knowledge of the heat plan.  **For example, multiple interviewed officers on Facilities A, C, and D yard were unaware of the heat plan's three stages**."  Id at 725.  The report also discussed broken thermometers at LAC:

> Furthermore, **officers in Facility B-2 relied on a broken wall-mounted thermometer to record the housing unit's temperature.  In that unit, this thermometer indicated approximately 69/70 degrees Fahrenheit, but the unit was considerably hotter, and the monitor and several custody officers were sweating profusely, indicating that the thermometer was inaccurate and that the recorded temperatures were erroneous**.  Further, all recorded temperatures during the week of the site visit were either 69 or 70 degrees Fahrenheit.

> The monitor addressed this thermometer issue with Facility B custody officers and the regional lieutenants during the site visit.  One custody officer stated that a work order had been placed to fix the thermometer and there would be follow-up.  The following day, the chief deputy warden reported being aware of this issue and that he would personally handle it.  **Alarmingly, as of several days after the site visit, reviewed temperature logs from Facility B-2 still indicated a temperature of 69/70 degrees Fahrenheit and that the thermometer had yet to be fixed**.

Other problems noted included at Corcoran ("However, it was noted that **indoor thermometers in Facilities 4B3L, 4B3R, and 4B4R were not operational during the first two weeks of the month**, but were operational during the site visit.")  Id. at 648.

And at KVSP, the monitors reported staff were logging temperatures ahead of time on the log:  "Concerningly, review of the temperature logs during the site visit revealed that staff had signed their name to some of the time frames ahead of time and before a temperature was logged for a particular hour, which compromised the data's reliability, particularly when identifying who reported the data. Staff reported not offering accommodations for yard time when a heat alert resulted in

yard's cancellation." *Id* at 531.

And at CMF "**The institution lacked documentation of accommodations provided to patients during heat alerts and of required nursing rounds during Stage III heat alerts**. Two **non-MHSDS patients experienced a heat-related illness** in September 2022." Id at 331.

Does CDCR have any state-wide processes for tracking incidents of heat-related illness?

Please let us know what CDCR is doing to address these serious problems related to the management of the heat plan and related procedures.

Tom.

---

**From:** Thomas Nolan
**Sent:** Thursday, July 11, 2024 1:38 PM
**To:** Nick Weber <Nicholas.Weber@cdcr.ca.gov>; Melissa Bentz <Melissa.Bentz@cdcr.ca.gov>
**Cc:** Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>; Steve Fama <sfama@prisonlaw.com>; Coleman Special Master Team <colemanspecialmaster@pldo.com>; Foss, Tammy@CDCR <Tammy.Foss@cdcr.ca.gov>; Neill, Jennifer@CDCR <Jennifer.Neill@cdcr.ca.gov>; Rita Lomio <rlomio@prisonlaw.com>
**Subject:** RE: Coleman -- Reports on Ongoing Heat Related Concerns During Current Heat Wave at Various Prisons [IMAN-DMS.FID12440]

Hi All –

Following up on my e-mail from Tuesday (below), we have received some more concerning information about heat plan compliance this week at CSP-Sacramento and at SATF:

First, during an Armstrong tour this week at SATF, the Prison Law Office monitors found some serious problems with the measurement of heat in various housing units, and with the provision of mandated heat plan accommodations.  Below are some notes on heat issues at SATF from the tour yesterday:

| Yard | 108 degrees on yard early afternoon. No ice on the yard. Tent and misters on yard are only available for staff. Shaded areas against buildings are out of bounds. |
|------|---|
| E3 | Housing officer said he had put in three work orders because the vents on A section are blowing out hot air. He thinks those emails were sent on 6/7, 6/12, and 7/4. |
| E4 | At 5.49 pm, the bed area of ▆▆▆▆▆▆▆▆▆▆▆, DPO, was 90.2/90.3 degrees (we took the reading on two separate thermometers, and those were the two readings). He's in cell 131  He is on heat medications.<br><br>The ADA Coordinator told me that only the ambient dayroom temperature would trigger |

| | |
|---|---|
| | stage 2, and it was beneath 90 degrees (84 or 85 degrees). However, they are measuring dayroom temperatures through mounted thermometers that are in the large open dayroom (not where people are sleeping/locked in). |
| | No ice was available for people, and no extra fans were available for anyone. There are no food ports in the doors that can be left open overnight, and the cell doors are shut overnight. ▓▓▓▓ reported that he has mostly been locked down except for today, when program was running for part of the day. He said "it's horrible," he felt nauseous and dizzy yesterday but staff wouldn't call a man down. He said he can't sleep and staff don't do rounds. This heightened his anxiety and fear. He has a little fan but it didn't produce much of a breeze. |
| | Cell 142 (DPW) had no cold water in the sink. No ice or ice water available to him. |
| E5 | At 3.15 pm, cell 142 (DPW) was 83 degrees by the bed. At the same time, the thermometer on the bannister outside in the dayroom read 70 degrees. So what the staff use to determine heat plan stages was 13 degrees cooler than what the living area showed. |

The Prison Law Office was also able to review an 1824 appeal about heat issues and the lack of fans at SATF, Log No 551498 dated 4/24/2024 from a likely Coleman Class member ▓▓▓▓▓▓▓▓▓▓ who alleged trouble sleeping due to heat in his cell and noted he was on heat medications. He asked for a fan as an accommodation. He was told he was not alleging a disability or asking for an accommodation and his request was denied.

Second, we received a message yesterday from Coleman class member ▓▓▓▓▓▓▓▓▓▓, at CSP-Sacramento. He reported that on Tuesday, there was an incident on the yard, and he was in a holding cage in the Sally Port, and the temperature was 102-degrees. He was held in the holding care in the heat for 5 hours without any water provided. He repeatedly asked for water and was denied. At the time there was an incident on the yard, but there were lots of staff around in the area. He also reported that yesterday he was back in the cell on lock down, and he was feeling dizzy, and he asked for ice water and explained he is on heat medications, and he was asked for a chrono to show he is on heat medications, which he does not have. He says he was told by staff that someone had locked the ice machine and that they did not know where the key for the lock was located.

Once again, given the intense heat, we would appreciate it if Defendants can remind institutional leadership and staff of their objections under the heat plan.

Thanks,

Tom

**From:** Thomas Nolan

**Sent:** Tuesday, July 9, 2024 1:54 PM
**To:** Nick Weber <Nicholas.Weber@cdcr.ca.gov>; Melissa Bentz <Melissa.Bentz@cdcr.ca.gov>
**Cc:** Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>; Steve Fama
<sfama@prisonlaw.com>; Coleman Special Master Team <colemanspecialmaster@pldo.com>
**Subject:** Coleman -- Reports on Ongoing Heat Related Concerns During Current Heat Wave at
Various Prisons [IMAN-DMS.FID12440]

Hi Nick and Melissa –

We wanted to share the fact that we have been receiving numerous calls from class members at
LAC, COR, SATF and MCSP about excessive heat in their housing units yesterday and today, and the
failure of staff to initiate appropriate cooling measures and implement other heat plan
requirements.  We did not get permission to share names for most of the individuals but provide
one name below where we are concerned about the individual's safety in the heat.  Here is a
summary of the caller information:

- ███████████████, COR, GP B-yard:  We received a third-party call today reporting that ███
  ██ is experiencing heat illness and staff are not helping him or complying with heat plan
  accommodations. The caller said Mr. Perez went man down due to the heat but did not
  receive help.

- EOP Class Member in D-2 EOP Building at LAC:  We received a report yesterday that the high
  temperature was going to be 114 yesterday at LAC, and that the air condition was not working
  n the housing unit.  We were told that in fact the heat is turned on in the unit.  Please
  investigate whether AC and appropriate cooling measures are taking place in that building and
  in the other D-Yard EOP buildings.

- EOP Class Member in G-Yard EOP program at SATF:  This EOP class member also called
  yesterday to report high temperatures and how staff are not adhering to the heat plan. He
  reports temperatures in mid 90s, staff not checking or logging temperature, and not taking
  cooling measures. Says that a lot of people are on heat medications.

- CCCMS Class Member on Heat Medications, at SATF on C-Yard:  We received a call yesterday
  reporting extreme heat and saying there is no air conditioning, no ice and no water.

- CCCMS Class Member on Heat Medications, at SATF, on F-yard:  We received a call yesterday
  reporting extreme heart and no ice or heat relief.

- GP Armstrong Class Member on A-Yard at MCSP:  We received a call yesterday reporting
  extreme heat, that HVAC units are not working, and that people are passing out.

- We received another call complaining about heat at LAC and lack of cooling measures for class
  members on heat medications

In light of the ongoing heat in the Central Valley, we ask that you have mental health leaders check

on the conditions in housing units at these prisons where class members reside and ensure that all appropriate heat plan measures are being complied with by institutions.

If you have not done so already, we also ask that you remind institutions of their heat plan requirements generally given the ongoing heat wave.  We would also like to know if the Department has any general procedures for when air condition and other cooling measures fail during periods of extreme heat.

Please feel free to contact me with any questions.

Thanks and regards,

Tom

Thomas Nolan
*Of Counsel*



101 Mission Street, 6th Floor
San Francisco, CA 94105
(415) 310-2097 (cell)
(415) 433-6830 (telephone)
(415) 433-7104 (fax)
tnolan@rbgg.com

CONFIDENTIALITY NOTICE
The information contained in this e-mail message may be privileged, confidential and protected from disclosure. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this e-mail message in error, please e-mail the sender at tnolan@rbgg.com.

# Exhibit C

DocuSign Envelope ID: 8F758C1E-775E-46B1-85F3-7298803C504D

 **CALIFORNIA CORRECTIONAL**
# HEALTH CARE SERVICES


# MEMORANDUM

**Date:** 4/8/2024

**To:** Chief Executive Officers
Wardens
Chief Medical Executives
Chiefs of Mental Health
Chief and Senior Psychiatrists
Chief Nurse Executives
Pharmacists in Charge
Litigation Coordinators

**From:**

*Rainbow Brockenborough*
45E33710A2B54BF...
RAINBOW BROCKENBOROUGH
Regional Health Care Executive
Region I

*C. W. Podratz*
CE01E15BDC1A403...
CHRISTOPHER PODRATZ
Regional Health Care Executive
Region III

**Amar Mehta**
46AE21AE5D5B4D3...
AMAR MEHTA, M.D.
Deputy Director
Statewide Mental Health Program

**Barbara Barney-Knox**
55A02F23D8BD44B...
BARBARA BARNEY-KNOX
Deputy Director, Nursing Services
Califorunia Correctional Health Care
Services

*B. Brizendine*
A0C9F2CC8DC7D46E...
BRITTANY BRIZENDINE, Psy.D.
Regional Health Care Executive
Region II

*Dr. Shereef K. Aref*
12BC4800437B4BA...
SHEREEF AREF
Regional Health Care Executive
Region IV

*Jared Lozano*
82C0C3D609364C8...
JARED D. LOZANO
Deputy Director
Division of Adult Institutions

*Dr. Renee Kanan*
D65BF861AB2A44B...
RENEE KANAN, M.D.
Deputy Director, Medical Services
California Correctional Health Care
Services

**Subject:** 2024 HEAT PLAN AND UPDATES

This memorandum is to remind institutions of the annual statewide Heat Plan (HP)
implementation, highlight the major requirements of the HP, and provide important updates.

DocuSign Envelope ID: 8F758C1E-775E-46B1-85F3-7298803C504D

The Department must develop, implement, and maintain a HP to prevent serious threats of life and health to incarcerated person taking medications that can impair the body's ability to regulate temperature during periods of high heat.

As in previous years, all institutions shall review, revise, and activate institutional policies and procedures, train staff, distribute log forms, and maintain a tracking system to compile, file, and forward summary HP documentation to headquarters.

## Seasonal Implementation

The HP is in effect from May 1 through October 31 of each year, and whenever temperatures warrant.

## Heat Alert Medications List

The Department must maintain and distribute annually a list of Heat Alert Medications for the purposes of the HP, pursuant to California Correctional Health Care Services (CCHCS) Health Care Department Operations Manual (HCDOM), Chapter 3, Article 5.43, Heat Alert Medications. Heat Alert Medications have the potential to impair thermoregulation, which is the body's ability to regulate temperature.  Any incarcerated person prescribed any of the medications found on the current *Heat Alert Medications List* (Attachment A) is at greater risk for heat-related illness as a result of being on any such medication.

## Identification of Heat-Risk Incarcerated Person

The HP shall only apply to incarcerated person who are taking Heat Alert Medications.  These incarcerated person are referred to as heat-risk incarcerated person for the purposes of the HP.

When the HP is in effect, institutional staff must generate and distribute daily a list of all incarcerated persons currently prescribed any of the designated Heat Alert Medications.  The list shall be generated using the Quality Management Heat Medications – Custody Report list that allows access to the Heat Medication Patient Registry. The Heat Medication Patient Registry can be found at: http://qmtools/Reports/report/QM/NonClinical/HeatMedicationsCustody .

You can find information on how to request access to the Custody Heat Medication Report at: https://cdcr.sharepoint.com/sites/cchcs_qm_com/Patient_Registry_Resource_Center/Forms/All Documents.aspx?id=%2Fsites%2Fcchcs_qm_com%2FPatient_Registry_Resource_Center%2FHeat Med_Report_Custody_-_How_to_Access%2Epdf&parent=%2Fsites%2Fcchcs_qm_com%2FPatient Registry Resource Center .

In order to ensure continuity and daily production of the list, please ensure this list is printed from your Health Care Access unit Monday through Friday and from your Triage Treatment Area

DocuSign Envelope ID: 8F758C1E-775E-46B1-85F3-7298803C504D

# MEMORANDUM

on weekends and holidays prior to 0600 hours and provided to the Watch Commander to ensure distribution to appropriate areas.

**Heat Stress Symptoms**

Upon being prescribed a Heat Alert Medication, the primary care physician or prescribing provider must inform each incarcerated person, including those who are not enrolled in the Mental Health Services Delivery System (MHSDS), of heat stress symptoms, which could be a result of taking the medication, as well as any recommended precautions, using Effective Communication. This encounter shall be documented in the incarcerated person's health care record.

Prompt medical attention must be provided whenever staff observe or an incarcerated person reports heat stress symptoms.

When a heat-risk incarcerated person is observed to have, or complains of, one or more of the following heat stress symptoms, staff shall immediately refer the incarcerated person to health care staff for evaluation and/or treatment:

- Flushed or dry feeling
- Red, flushed or mottled (discolored spots or blotches) skin, or skin that is turning bluish
- Cramping of muscles
- Mental confusion, sleepiness, non-coordination, or convulsive behavior
- Fainting, dizziness, lightheadedness, giddiness, or severe headaches
- Nausea or vomiting

All heat related encounters must be documented in the health care record.

**Heat-Risk Passes**

Due to improvements in providing real time information via the electronic health record, it is no longer necessary to print heat-risk passes. For movement purposes the daily list of inmates on heat meds will be utilized.

**Monitoring Temperatures**

The Warden or designee must ensure an accurate thermometer is located in a central, heat-neutral location to monitor outside ambient air temperatures. Outside air temperatures must be recorded every hour, every day, from May 1 through October 31 of each year.

The Warden or designee must also ensure inside air temperatures are measured in all non-air conditioned living areas housing heat-risk incarcerated person and areas that are air conditioned

DocuSign Envelope ID: 8F758C1E-775E-46B1-85F3-7298803C504D

but could exceed 90 degrees (i.e., kitchen areas). Temperatures must be taken at the highest non-air-conditioned location where heat-risk incarcerated persons are housed, which could include a temperature taken within an incarcerated person's cell. Inside air temperatures must be recorded every three hours, daily from May 1 through October 31. Any interruption in the functioning of an air-conditioned area shall require immediate temperature monitoring.

## Stage I Heat Alert

A Stage I Heat Alert occurs when the outside temperature rises to 90 degrees or more. The Warden or designee must activate and announce the Stage I Heat Plan institution-wide and heat-risk incarcerated person must be called for "Return to Housing." Heat-risk incarcerated persons are not required to return to their housing units when outside temperatures rise to 90 degrees, if cooling measures, such as misters, are initiated or incarcerated persons are working, or otherwise present, in air conditioned environments that remain below 90 degrees. All other heat-risk incarcerated persons must be called back to their housing units. All heat-risk incarcerated persons are restricted to a maximum of 30 minutes outside to perform officially sanctioned activities, such as returning to housing units and receiving medications. This time is not to be used for leisure activities.

A Stage I Heat Alert shall be deactivated when the temperature has fallen below 90 degrees for one hour.

## Stage II Heat Alert

A Stage II Heat Alert occurs when the temperature inside any area occupied by heat-risk incarcerated person rises to 90 degrees or more. The Warden or designee must activate the Stage II Heat Plan in the affected area. Staff must initiate cooling and hydration measures, which may include cool drinking water, misting, and cool showers. Staff must also increase observation of heat-risk incarcerated person for signs of heat-related illness, and report any symptoms to health care staff.

A Stage II Heat Alert shall be deactivated when the inside temperature has fallen below 90 degrees for one hour.

## Stage III Heat Alert

A Stage III Heat Alert occurs when the temperature inside any area occupied by heat-risk incarcerated persons rises to 95 degrees or more. The Warden or designee must activate the Stage III Heat Plan in the affected area. The Physician on Call (POC) shall be notified after normal business hours. The Chief Executive Officer shall decide whether the POC may remain off grounds or shall be physically present at the institution.

Nursing or other medically trained personnel must perform medical rounds to observe each heat-risk incarcerated person at least once every two hours during the period the inside temperature remains at 95 degrees or above, and record the incarcerared person's condition. If any incarcerated person shows signs or symptoms of heat related illness, they must be provided cooling measures or be sent to the Triage and Treatment Area.

A Stage III Heat Alert shall be deactivated when the inside temperature has fallen below 95 degrees for one hour.

**Tracking and Reporting**

Institutions must submit a CDCR Form 7711-1, *Heat Plan Monthly Summary Report* (Attachment B), to  headquarters each month, signed by the Warden and Chief Executive Officer.

Additionally, the following documents are to be gathered at the institution monthly, from May 1 through October 31 of each year, filed for review in an easily accessible manner with the institution's HP Coordinator, and retained consistent with departmental records retention policies and procedures.  Copies shall also be included with the monthly submission of the CDCR MH-7711-1.

1. CDCR Form 2030, *Outside Temperature Record* (Attachment C)
2. CDCR Form 2031, *Inside Temperature Record* (Attachment D)
3. CDCR Form MH-7711-2, *Heat Incident Log* (Attachment E)
4. CDCR Form MH-7711-3, *Medical Rounds Log (Stage III)* (Attachment F)
5. Weekly List of Heat-Risk Incarcerated Persons

Electronic versions of these forms can also be found on the Mental Health Quality Management (QM) Portal at http://intranet/Pro/dhcs/mentalhealth/Pages/New-QMforms.aspx.

Per HCDOM 1.2.7, Institution Patient Safety Program "All California Department of Corrections and Rehabilitation/California Correctional Health Care Services (CCHCS) staff have a duty to report health care incidents using the centralized electronic Health Care Incident Reporting (eHCIR) system within 24 hours of occurrence or discovery.  The eHCIR is available to all staff via Lifeline and allows health care incidents to be submitted anonymously." Therefore, in addition to following established local operating procedures for completing CDCR MH 7711-2 for each heat related illness, institutional healthcare staff must also report each heat related illness using the eHCIR system at http://patientsafety/. The HCIR has been updated to include a checkbox indicating that the incident is a "Heat Medication Related Illness." Please note that all heat related illnesses should be reported via both the CDCR MH-7711-2 and the HCIR, whether they are due to a heat alert medication or not.

Institution HP Coordinators must submit a CDCR MH-7711-1, containing the previous month's heat related activities to the Statewide Mental Health Program headquarters by the fifth working

DocuSign Envelope ID: 8F758C1E-775E-46B1-85F3-7298803C504D

day of the following month.  The form shall be reviewed and signed by the Warden and Chief Executive Officer, and include the following information in chronological order:

   • Temperature Logs:  A notation that the Inside and Outside Temperature Records have been collected and are on file and available with the institution's Heat Plan Coordinator.

   • Stage II Heat Alert Log:  Date, hour, and location by housing unit, where inside temperatures of 90 degrees and above have been recorded, and documentation if hydration and access to cooling measures such as ice and/or showers were provided to any at-risk incarcerated persons.  Please indicate "none" if an inside temperature of 90 degrees was not reached in any housing unit.

The first CDCR MH-7711-1 for May 2024 is due by June 7, 2024.  The form shall be submitted to the, Statewide Heat Plan Coordinator, via email: m_MHProgramHeatPlan@cdcr.ca.gov .

**Local Operating Procedure**

Institutions are required to identify and include in their updated HP Local Operating Procedure (LOP), the classification(s) of staff members (such as nursing or other medically trained personnel) who must be assigned to perform the Stage III rounds/monitoring.

Submit the revised 2024 HP LOP, with any changes identified, to the following email address: m_MHProgramHeatPlan@cdcr.ca.gov by May 9, 2024.

**Reasonable Accommodations**

In an effort to ensure heat-risk incarcerated persons are afforded equal access to programs, services, and activities during extreme weather conditions, institutions must devise and include any reasonable accommodations when revising their LOP.  The following are some examples institutions could provide to heat-risk incarcerated persons as possible forms of reasonable accommodations:

- Modified yard times (scheduled during cooler periods of the day)
- Night yard or morning yard
- Additional dayroom/inner wing program opportunities
- Recreation gymnasium programs during summer/warmer months

Institution LOPs must include what specific reasonable accommodations will be provided in each facility for incarcerated persons who are on the heat alert list and are recalled from outdoor activities.

DocuSign Envelope ID: 8F758C1E-775E-46B1-85F3-7298803C504D

All reasonable accommodations provided to incarcerated persons during heat alert activation must be documented in the institution's Daily Activity Report.

**Traditional Sweat Lodge**

Conditions in the Traditional Sweat Lodge (high temperature and high humidity) pose very serious health risks for heat-related illness, thus prohibiting incarcerated persons prescribed Heat Alert Medications from participating.  When prescribing Heat Alert Medications to those incarcerated persons who wish to participate in Sweat Lodge Ceremonies, it is essential that the informed consent process include discussion of the benefits of taking the proposed Heat Alert Medication versus the risks inherent in participating in a ceremony that involves excessive heat and humidity, as well as the incarcerated person's right to refuse such medication when a Penal Code 2602 order is not in effect.

The prescriber shall explain that discontinuing use of a Heat Alert Medication for a period of time before a Sweat Lodge Ceremony may not provide sufficient time to safely reduce the risk of heat-related illness.  When available and deemed clinically appropriate, alternative medications which do not cause increased heat risk should be considered and discussed with incarcerated persons. All such discussions shall be documented in the electronic health record.

incarcerated persons may also be encouraged to consult with their Native American Spiritual Leaders to consider alternatives to the Sweat Lodge Ceremony that do not involve excessive heat or humidity.  Each institution's Warden and CEO, and/or designees, shall identify staff responsible for meeting with the institution's Native American Spiritual Leader on an annual basis to discuss alternatives to the Sweat Lodge Ceremony which satisfy the spiritual needs of incarcerated persons prescribed Heat Alert Medications.

**Training**

Annual training on your institution's HP, including what to do when heat stress symptoms are identified and/or reported, must be provided to custodial and clinical staff by the In-Service Training Office.

If you have any questions, please contact Kia Moua, Statewide Heat Plan Coordinator, Policy Support, Statewide Mental Health Program, CCHCS, via email: m_MHProgramHeatPlan@cdcr.ca.gov .

Attachments

cc:    Associate Directors, Division of Adult Institutions
       Mental Health Regional Administrators
       Regional Health Care Executives

DocuSign Envelope ID: 8F758C1E-775E-46B1-85F3-7298803C504D

# 🌡️ **Heat Risk Medications**

Which medications are considered "Heat Risk Medications" because of their potential to impair thermoregulation?

### Antipsychotics

Aripiprazole (ABILIFY)
Asenapine (SAPHRIS, SECUADO)
Brexipiprazole (REXULTI)
Cariprazine (VRAYLAR)
Chlorpromazine (THORAZINE)
Clozapine (CLOZARIL)
Fluphenazine (PROLIXIN)
Haloperidol (HALDOL)
Iloperidone (FANAPT)
Loxapine (LOXITANE)
Lumateperone (CAPLYTA)
Lurasidone (LATUDA)
Mesoridazine (SERENTIL)
Molindone (MOBAN)
Olanzapine (ZYPREXA, LYBALVI)
Paliperidone (INVEGA)
Perphenazine (TRILAFON)
Pimozide (ORAP)
Prochlorperazine (COMPAZINE)
Quetiapine (SEROQUEL)
Risperidone (RISPERDAL)
Thioridazine (MELLARIL)
Thiothixene (NAVANE)
Trifluoperazine (STELAZINE)
Ziprasidone (GEODON)

### Antiparkinson

Benztropine (COGENTIN)
Biperiden (AKINETON)

### Antidepressants

Amitriptyline (ELAVIL)
Amoxapine (ASENDIN)
Clomipramine (ANAFRANIL)
Desipramine (NORPRAMIN)
Doxepin (SINEQUAN)
Imipramine (TOFRANIL)
Maprotiline (LUDIOMIL)
Nortriptyline (PAMELOR)
Phenelzine (NARDIL)
Protriptyline (VIVACTIL)
Tranylcypromine (PARNATE)
Trazodone (DESYREL)
Trimipramine (SURMONTIL)

### Stomach, Intestinal, Bladder

Diphenoxylate/Atropine (LOMOTIL)
Glycopyrrolate (ROBINUL)
Hyoscyamine (LEVSIN)
Propantheline (PROBANTHINE)
Scopolamine (SCOPACE)

### Mood Stabilizers & Anticonvulsants

Lithium (ESKALITH, LITHOBID)
Topiramate (TOPAMAX)
Zonisamide (ZONERGAN)

### Miscellaneous Agents

Promethazine (PHENERGAN)

DocuSign Envelope ID: 8F758C1E-775E-46B1-85F3-7298803C504D
STATE OF CALIFORNIA
HEAT PLAN - MONTHLY SUMMARY REPORT
CDCR MH-7711-1 (02/17)
DEPARTMENT OF CORRECTIONS AND REHABILITATION
Case 2:90-cv-00520-KJM-SCR     Document 8558-1     Filed 02/28/25     Page 66 of 100     Page 1 of 1

| Monthly Summary Report |
|---|

Institution: _____

## Memorandum

Date: _____

To:       Statewide Heat Plan Coordinator

Subject:  Heat Plan Activity - _____

The following is a summary of the heat related activity for the month of _____,

at _____ (Institution)

1. Were outside temperatures 90 degrees or above (Stage I Alerts)?: _____

   Number of days Stage I Alert initiated: _____

2. Were cooling and/or hydration measures  instituted in housing units reaching 90 degrees or more (Stage II Alert)? _____

   Number of days Stage II Alert initiated: _____

3. Were medical rounds performed in housing units reaching 95 degrees or more (Stage III Alert)? _____

   Number of days Stage III Alert initiated: _____

4. Weekly list of heat risk patients archived?: _____

5. Number of patients with heat related illness._____ List these patients on the Heat Incident Log and include the patients name, CDCR #, list of heat risk medications, Mental Health Services Delivery System designation, description of the symptoms diagnosis at the time of the heat related illness, a brief summary of the medical treatment rendered, where the incident occurred, and the ultimate disposition of the patient. The Heat Incident log shall be submitted each month with the Monthly Summary Report if heat related illnesses have occurred.

Weekly list of Heat-Risk Patients is generated automatically. A hard copy is distributed to the Facility Lieutenants, Classifications and Parole Representative, Food Manager, Outpatient Housing Unit and Mental Health Department.  An e-mail copy is distributed to the Litigation Coordinator, Associate Warden, Facility Captains, Prison Industry Authority, Education Staff and Medical Staff.

Inside and Outside Temperature Logs, Medical Rounds Logs, Heat Incident Logs and Weekly lists of Heat-Risk Patients have been collected and are on file and easily accessible in the office of the institution's Heat Plan Coordinator.

_____
Warden Name

_____
Chief Executive Officer Name

_____
Warden Signature

_____
Chief Executive Officer Signature

DocuSign Envelope ID: 8F758C1E-775E-46B1-85F3-7298803C504D

STATE OF CALIFORNIA                                                DEPARTMENT OF CORRECTIONS AND REHABILITATION
**OUTSIDE TEMPERATURE RECORD**
CDCR 2030 (04/18)

INSTITUTION: _____

From May 1st through October 31st, the warden shall designate staff to be responsible to monitor and log the OUTSIDE ambient air temperature.

Using an accurate thermometer located in a central, heat neutral location, the outside air temperature is to be taken every hour, seven (7) days a week.

Thermometer Location: _____

**Immediately notify the Watch Commander at extension _____ when the air temperature reaches 90 degrees.**

| Date | Time | Temp. | Printed Name | Date | Time | Temp. | Printed Name |
|------|------|-------|--------------|------|------|-------|--------------|
|      | 0100 |       |              |      | 0100 |       |              |
|      | 0200 |       |              |      | 0200 |       |              |
|      | 0300 |       |              |      | 0300 |       |              |
|      | 0400 |       |              |      | 0400 |       |              |
|      | 0500 |       |              |      | 0500 |       |              |
|      | 0600 |       |              |      | 0600 |       |              |
|      | 0700 |       |              |      | 0700 |       |              |
|      | 0800 |       |              |      | 0800 |       |              |
|      | 0900 |       |              |      | 0900 |       |              |
|      | 1000 |       |              |      | 1000 |       |              |
|      | 1100 |       |              |      | 1100 |       |              |
|      | 1200 |       |              |      | 1200 |       |              |
|      | 1300 |       |              |      | 1300 |       |              |
|      | 1400 |       |              |      | 1400 |       |              |
|      | 1500 |       |              |      | 1500 |       |              |
|      | 1600 |       |              |      | 1600 |       |              |
|      | 1700 |       |              |      | 1700 |       |              |
|      | 1800 |       |              |      | 1800 |       |              |
|      | 1900 |       |              |      | 1900 |       |              |
|      | 2000 |       |              |      | 2000 |       |              |
|      | 2100 |       |              |      | 2100 |       |              |
|      | 2200 |       |              |      | 2200 |       |              |
|      | 2300 |       |              |      | 2300 |       |              |
|      | 2400 |       |              |      | 2400 |       |              |

From May 1st through October 31st, the warden shall designate staff to be responsible to monitor and log the INSIDE ambient air temperature in all non-air-conditioned housing units where an inmate on the heat risk list may be housed. (Note: Air-conditioned housing units will also be monitored when the air conditioner is malfunctioning).

Using an accurate thermometer on the highest location in the housing unit (e.g., top tier) where an inmate on the heat risk list is housed. The inside air temperature is to be taken every three (3) hours, seven (7) days a week.

Institution: _____    Housing Unit: _____    Temp. Reading Location: _____
(e.g., 1st tier, 2nd tier, 3rd tier, etc.)

**Immediately notify the Watch Commander at extension _____ when the inside air temperature reaches 90 degrees and again at 95 degrees.**

### Monday

| Date | Time | Temp. | Name (Print) |
|------|------|-------|--------------|
|      | 0300 |       |              |
|      | 0600 |       |              |
|      | 0900 |       |              |
|      | 1200 |       |              |
|      | 1500 |       |              |
|      | 1800 |       |              |
|      | 2100 |       |              |
|      | 2400 |       |              |

### Tuesday

| Date | Time | Temp. | Name (Print) |
|------|------|-------|--------------|
|      | 0300 |       |              |
|      | 0600 |       |              |
|      | 0900 |       |              |
|      | 1200 |       |              |
|      | 1500 |       |              |
|      | 1800 |       |              |
|      | 2100 |       |              |
|      | 2400 |       |              |

### Wednesday

| Date | Time | Temp. | Name (Print) |
|------|------|-------|--------------|
|      | 0300 |       |              |
|      | 0600 |       |              |
|      | 0900 |       |              |
|      | 1200 |       |              |
|      | 1500 |       |              |
|      | 1800 |       |              |
|      | 2100 |       |              |
|      | 2400 |       |              |

### Thursday

| Date | Time | Temp. | Name (Print) |
|------|------|-------|--------------|
|      | 0300 |       |              |
|      | 0600 |       |              |
|      | 0900 |       |              |
|      | 1200 |       |              |
|      | 1500 |       |              |
|      | 1800 |       |              |
|      | 2100 |       |              |
|      | 2400 |       |              |

### Friday

| Date | Time | Temp. | Name (Print) |
|------|------|-------|--------------|
|      | 0300 |       |              |
|      | 0600 |       |              |
|      | 0900 |       |              |
|      | 1200 |       |              |
|      | 1500 |       |              |
|      | 1800 |       |              |
|      | 2100 |       |              |
|      | 2400 |       |              |

### Saturday

| Date | Time | Temp. | Name (Print) |
|------|------|-------|--------------|
|      | 0300 |       |              |
|      | 0600 |       |              |
|      | 0900 |       |              |
|      | 1200 |       |              |
|      | 1500 |       |              |
|      | 1800 |       |              |
|      | 2100 |       |              |
|      | 2400 |       |              |

### Sunday

| Date | Time | Temp. | Name (Print) |
|------|------|-------|--------------|
|      | 0300 |       |              |
|      | 0600 |       |              |
|      | 0900 |       |              |
|      | 1200 |       |              |
|      | 1500 |       |              |
|      | 1800 |       |              |
|      | 2100 |       |              |
|      | 2400 |       |              |

### Notes

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

DISTRIBUTION: Original: Institution Heat Plan Coordinator

DocuSign Envelope ID: 8F758C1E-775E-46B1-85F3-7298803C504D

STATE OF CALIFORNIA                                    DEPARTMENT OF CORRECTIONS AND REHABILITATION
HEAT INCIDENT LOG  Case 2:90-cv-00520-KJM-SCR    Document 8558-1    Filed 02/28/25    Page 69 of 100    Page 1 of 4
CDCR MH-7711-2 (02/17)

| Heat Incident Log |
|---|

| Institution: | Date: | Number of Heat Incidents: |
|---|---|---|

**1. Patient Name:** _____ CDCR#: _____ Housing: _____

MHSDS Designation: _____ Level of Care: _____ Date of Heat Incident: _____

Location of Incident: _____ Change in Level of Care: _____

List of Heat Risk Medications: _____

Chief Medical Complaint: _____

Diagnosis of Heat Related Illness (specify): _____

Treatment Rendered: _____

Medication Changes Made: _____

Ultimate Disposition of Patient: _____

Clinician's Name and Title: _____

**2. Patient Name:** _____ CDCR#: _____ Housing: _____

MHSDS Designation: _____ Level of Care: _____ Date of Heat Incident: _____

Location of Incident: _____ Change in Level of Care: _____

List of Heat Risk Medications: _____

Chief Medical Complaint: _____

Diagnosis of Heat Related Illness (specify): _____

Treatment Rendered: _____

Medication Changes Made: _____

Ultimate Disposition of Patient: _____

Clinician's Name and Title: _____

**3. Patient Name:** _____ CDCR#: _____ Housing: _____

MHSDS Designation: _____ Level of Care: _____ Date of Heat Incident: _____

Location of Incident: _____ Change in Level of Care: _____

List of Heat Risk Medications: _____

Chief Medical Complaint: _____

Diagnosis of Heat Related Illness (specify): _____

Treatment Rendered: _____

Medication Changes Made: _____

Ultimate Disposition of Patient: _____

Clinician's Name and Title: _____

**Heat Incident Log**
CDCR MH-7711-2 (02/17)

Confidential Patient Information

*Unauthorized collection, creation, use, disclosure, modification, or destruction of personally identifiable information and/or protected health information may subject individuals to civil liability under applicable federal and state laws.*

DocuSign Envelope ID: 8F758C1E-775E-46B1-85F3-7298803C504D

| Heat Incident Log (continued) |
|---|

**4. Patient Name:** _____  CDCR#: _____  Housing: _____

MHSDS Designation: _____  Level of Care: _____  Date of Heat Incident: _____

Location of Incident: _____  Change in Level of Care: _____

List of Heat Risk Medications: _____

Chief Medical Complaint: _____

Diagnosis of Heat Related Illness (specify): _____

Treatment Rendered: _____

Medication Changes Made: _____

Ultimate Disposition of Patient: _____

Clinician's Name and Title: _____

**5. Patient Name:** _____  CDCR#: _____  Housing: _____

MHSDS Designation: _____  Level of Care: _____  Date of Heat Incident: _____

Location of Incident: _____  Change in Level of Care: _____

List of Heat Risk Medications: _____

Chief Medical Complaint: _____

Diagnosis of Heat Related Illness (specify): _____

Treatment Rendered: _____

Medication Changes Made: _____

Ultimate Disposition of Patient: _____

Clinician's Name and Title: _____

**6. Patient Name:** _____  CDCR#: _____  Housing: _____

MHSDS Designation: _____  Level of Care: _____  Date of Heat Incident: _____

Location of Incident: _____  Change in Level of Care: _____

List of Heat Risk Medications: _____

Chief Medical Complaint: _____

Diagnosis of Heat Related Illness (specify): _____

Treatment Rendered: _____

Medication Changes Made: _____

Ultimate Disposition of Patient: _____

Clinician's Name and Title: _____

**Heat Incident Log**
CDCR MH-7711-2 (02/17)

Confidential Patient Information

| Heat Incident Log (continued) |
|---|

**7. Patient Name:** _____ CDCR#: _____ Housing: _____

MHSDS Designation: _____ Level of Care: _____ Date of Heat Incident: _____

Location of Incident: _____ Change in Level of Care: _____

List of Heat Risk Medications: _____

Chief Medical Complaint: _____

Diagnosis of Heat Related Illness (specify): _____

Treatment Rendered: _____

Medication Changes Made: _____

Ultimate Disposition of Patient: _____

Clinician's Name and Title: _____

**8. Patient Name:** _____ CDCR#: _____ Housing: _____

MHSDS Designation: _____ Level of Care: _____ Date of Heat Incident: _____

Location of Incident: _____ Change in Level of Care: _____

List of Heat Risk Medications: _____

Chief Medical Complaint: _____

Diagnosis of Heat Related Illness (specify): _____

Treatment Rendered: _____

Medication Changes Made: _____

Ultimate Disposition of Patient: _____

Clinician's Name and Title: _____

**9. Patient Name:** _____ CDCR#: _____ Housing: _____

MHSDS Designation: _____ Level of Care: _____ Date of Heat Incident: _____

Location of Incident: _____ Change in Level of Care: _____

List of Heat Risk Medications: _____

Chief Medical Complaint: _____

Diagnosis of Heat Related Illness (specify): _____

Treatment Rendered: _____

Medication Changes Made: _____

Ultimate Disposition of Patient: _____

Clinician's Name and Title: _____

**Heat Incident Log**
CDCR MH-7711-2 (02/17)

Confidential Patient Information

*Unauthorized collection, creation, use, disclosure, modification, or destruction of personally identifiable information and/or protected health information may subject individuals to civil liability under applicable federal and state laws.*

**DISTRIBUTION:** Litigation Coordinator, Heat Plan Coordinator

| Heat Incident Log (continued) |
|---|

10. Patient Name: _____  CDCR#: _____  Housing: _____

MHSDS Designation: _____  Level of Care: _____  Date of Heat Incident: _____

Location of Incident: _____  Change in Level of Care: _____

List of Heat Risk Medications: _____

Chief Medical Complaint: _____

Diagnosis of Heat Related Illness (specify): _____

Treatment Rendered: _____

Medication Changes Made: _____

Ultimate Disposition of Patient: _____

Clinician's Name and Title: _____

11. Patient Name: _____  CDCR#: _____  Housing: _____

MHSDS Designation: _____  Level of Care: _____  Date of Heat Incident: _____

Location of Incident: _____  Change in Level of Care: _____

List of Heat Risk Medications: _____

Chief Medical Complaint: _____

Diagnosis of Heat Related Illness (specify): _____

Treatment Rendered: _____

Medication Changes Made: _____

Ultimate Disposition of Patient: _____

Clinician's Name and Title: _____

12.. Patient Name: _____  CDCR#: _____  Housing: _____

MHSDS Designation: _____  Level of Care: _____  Date of Heat Incident: _____

Location of Incident: _____  Change in Level of Care: _____

List of Heat Risk Medications: _____

Chief Medical Complaint: _____

Diagnosis of Heat Related Illness (specify): _____

Treatment Rendered: _____

Medication Changes Made: _____

Ultimate Disposition of Patient: _____

Clinician's Name and Title: _____

**Heat Incident Log**
CDCR MH-7711-2 (02/17)

Confidential Patient Information

Unauthorized collection, creation, use, disclosure, modification, or destruction of personally identifiable information and/or protected health information may subject individuals to civil liability under applicable federal and state laws.
**DISTRIBUTION:** Litigation Coordinator, Heat Plan Coordinator

| Medical Rounds Log (Stage III) |
|---|

Institution: _____

Date: _____ Time: _____ Housing Unit: _____

Name /Title of Health Care Staff Performing Rounds: _____     Heat Related Illnesses Identified: ☐ Yes  ☐ No

Heat incidents identified on rounds (Include patient name, CDCR number, MHSDS designation, list of heat risk medications, and brief summary of medical treatment):

1. 

2. 

3. 

4. 

Date: _____ Time: _____ Housing Unit: _____

Name /Title of Health Care Staff Performing Rounds: _____     Heat Related Illnesses Identified: ☐ Yes  ☐ No

Heat incidents identified on rounds (Include patient name, CDCR number, MHSDS designation, list of heat risk medications, and brief summary of medical treatment):

1. 

2. 

3. 

4. 

**Medical Rounds Log (Stage III)**
CDCR MH-7711-3 (02/17)

Confidential Patient Information

Unauthorized collection, creation, use, disclosure, modification, or destruction of personally identifiable information and/or protected health information may subject individuals to civil liability under applicable federal and state laws.
**DISTRIBUTION:** Litigation Coordinator, Heat Plan Coordinator

# Exhibit 2

| Fiscal Year | Business Unit Number | Department |
|---|---|---|
| 2025-26 | 5225 | California Department of Corrections and Rehabilitation |

| Hyperion Budget Request Name | Relevant Program or Subprogram |
|---|---|
| 5225-066-BCP-2025-GB | 4550059 - Fac Plan & Const Mgmt Special Repairs |

**Budget Request Title**
Air Cooling Pilot Program

**Budget Request Summary**

The California Department of Corrections and Rehabilitation (CDCR) requests $23.6 million one-time General Fund in 2025-26, and $45.4 million one-time General Fund in 2026-27, for a pilot program to install and evaluate air cooling alternatives to improve indoor environments at the Central California Women's Facility (CCWF), California Medical Facility (CMF), Kern Valley State Prison (KVSP), and California State Prison, Los Angeles (LAC).

A subsequent analysis of the alternatives used at the identified institutions will assist CDCR in developing a statewide effort to address the indoor temperatures at buildings that severely impact incarcerated individuals. The Department also requests provisional language to extend the expenditure and encumbrance period through June 30, 2028.

| Requires Legislation (submit required legislation with the BCP)<br>☐ Trailer Bill Language<br>☒ Budget Bill Language          ☐ N/A | Code Section(s) to be Added/Amended/Repealed | |
|---|---|---|
| **Does this BCP contain information technology (IT) components?** ☐ Yes   ☒ No<br><br>*If yes, departmental Chief Information Officer must sign.* | **Department CIO** | **Date** |

**For IT requests, specify the project number, the most recent project approval document (FSR, SPR, S1BA, S2AA, S3SD, S4PRA), the approval date, and the total project cost.**

**Project No.    Project Approval Document:**

**Approval Date:**                          **Total Project Cost:**

**If proposal affects another department, does other department concur with proposal?** ☐ Yes ☐ No

*Attach comments of affected department, signed and dated by the department director or designee.*

| Prepared By<br>Michelle Weaver | Date<br>1/10/2025 | Reviewed By<br>Cynthia Mendonza | Date<br>1/10/2025 |
|---|---|---|---|
| Department Director<br>Dave Lewis | Date<br>1/10/2025 | Agency Secretary<br>Jeff Macomber | Date<br>1/10/2025 |

**Department of Finance Use Only**

**Additional Review:** ☐ Capital Outlay ☐ ITCU ☐ FSCU ☐ OSAE ☐ Dept. of Technology

| Principal Program Budget Analyst<br>Lynne Ishimoto | Date submitted to the Legislature<br>1/10/2025 |
|---|---|

## A. Problem Statement

In the 1980s, CDCR Design Criteria Guidelines (DCG) were created to set design and construction standards for all CDCR institutions. DCG require cooling be provided for housing areas to maintain an indoor temperature, which provides a quality indoor environment suitable for thermal comfort that is related to one's metabolic heat production, the transfer of heat to the environment, physiological adjustments, and body temperature. The temperature identified in DCG to meet this standard is 89 Fahrenheit (°F) or cooler. Thermal comfort and body temperature are unique concerns for incarcerated individuals on specific medications. Depending on the severity of outdoor temperatures, existing systems used at CDCR institutions are not always capable of meeting the current standard of 89°F.

Recognizing this concern, the *Coleman* court mandated CDCR to establish and adhere to a Prevention Plan for Heat Related Pathologies. The Prevention Plan addresses the policies and procedures institutions must implement when "heat-risk incarcerated individuals" (incarcerated individuals on specified medications that face health risks in high heat conditions) are exposed to extreme high temperatures. This Plan requires institutions to initiate Stage I alerts when outside temperatures reach 90°F and remain in effect until temperatures fall back below 90°F. Stage II and III heat alerts are initiated when the inside temperature of a building housing "heat-risk incarcerated individuals" reaches 90°F and 95°F, respectively.

## Heat Stage Activation Measures

Stage I (Outside temperatures reach 90°F or more):
- Return to Housing - All heat-risk incarcerated persons are restricted to a maximum of 30 minutes outside to perform officially sanctioned activities, such as returning to housing units and receiving medications. This time is not to be used for leisure activities.

Stage II (Inside temperatures reach 90°F or more):
- Staff must initiate cooling and hydration measures, which may include cool drinking water, misting, and cool showers.
- Staff must also increase observation of heat-risk incarcerated person for signs of heat-related illness and report any symptoms to health care staff.

Stage III (Inside temperatures reach 95°F or more):
- Medically trained personnel must perform medical rounds to observe each heat-risk incarcerated person at least once every two hours during the period when the inside temperature remains at 95°F or above, and record the incarcerated person's condition.
- If any incarcerated person shows signs or symptoms of heat related illness, they must be provided cooling measures or be sent to the Triage and Treatment Area.

Additionally, excessive heat conditions are not conducive to the rehabilitative mission as excessive heat makes it difficult to focus and participate in programming, negatively impacting morale for the incarcerated population and staff. In March 2023, Governor Gavin Newsom unveiled the state's plan (California Model) to transform the criminal justice system. The goals of which are not only to reimagine the correctional landscape for the people in CDCR's care, but also to change how prisons operate, how employees interact with both each other and incarcerated people, and how safe and engaged incarcerated people feel in CDCR's care.

All regions of California have warmed over the last century, although at varying rates. Southern California is warming about twice as fast as Northern California, contributing to a statewide annual mean temperature increase of 2.5°F. Additionally, warming has accelerated recently, with seven of the last eight years being the warmest on record.

On July 24, 2024, the Occupational Safety and Health Standards Board (OSHSB) approved a regulation requiring employers to take steps to protect workers from heat illness/injury when indoor temperatures reach 82°F, with additional requirements when temperatures reach 87°F. OSHSB is in the process of developing an industry-specific regulation for workers in local and state correctional

facilities. CDCR is taking a proactive approach to determine which strategy/strategies will reduce indoor temperatures, balancing the effectiveness and cost. CDCR recognizes the importance of how environmental conditions aid in providing a conducive setting for rehabilitation and is committed to maintaining established standards to ensure the physical safety and well-being of staff and the incarcerated population.

## B. Justification

Most of CDCR's institutions were built at a time when the comfort level of the incarcerated population was not a consideration or priority. As such, many Housing Units (HUs) and support buildings throughout the state were originally equipped with only air handling units or evaporative cooling systems; neither of which are sufficient to provide adequate relief from excessive heat during summer months. Although there have been efforts to retrofit several housing units and various buildings used for rehabilitative programs at multiple institutions over the years, a significant number remain that require air cooling upgrades or other alternatives to address rising indoor temperatures.

An engineering study was completed in April 2024 to analyze the existing cooling systems at five typical HUs and provide system replacement recommendations for systems potentially capable of meeting indoor temperatures at or near 78°F. Recognizing the variety of buildings that exist within CDCR's portfolio, the best approach to improve indoor conditions may differ based on construction type, materials used, existing cooling systems (where present), orientation of the structure(s), and geographical location of the institution. As such, the four institutions selected provide a wide range of buildings to test the three alternative approaches:

- Option 1 – Thermal Insulation only
- Option 2 – Air Cooling only
- Option 3 – Thermal Insulation and Air Cooling

These options will be installed at CCWF, CMF, KVSP, and LAC. These prisons offer a variety of housing unit styles that will allow CDCR to evaluate and determine the effectiveness of each option. Identified buildings include: 180-style (Two Tiered - 128 Cells), 270-style (Two Tiered - 100 Cells), Mainline (3 story Dorm/Cells with varying Design Capacity), and Cross-Top (Dorms – 128 Capacity) HUs. The varied HU styles, along with heat log data, and other historical records related to indoor temperatures will help CDCR determine the optimal option for each style, while accounting for the physical characteristics identified above.

The pilot program will install air cooling alternatives at the following locations:

### CCWF - Facility B, Buildings 506, 507 and 508 (Cross-Top Housing Units)
- Building 506: insulation at exterior walls only
- Building 507: air cooling only
- Building 508: air cooling and insulation at exterior walls

### CMF - Facility A, Wing H51/P-Wing (Mainline Housing Units)
- Wing H51: one wing consisting of three floors to receive air cooling and insulation at exterior walls

### KVSP - Facility C, Buildings 341, 342, and 344 (180-style Housing Units)
- Building 341: insulation at exterior walls only
- Building 342: air cooling only
- Building 344: air cooling and insulation at exterior walls

### LAC - Facility D, Buildings 348, 349 and 3410 (270-style Housing Units)
- Building 348: insulation at exterior walls only
- Building 349: air cooling only
- Building 3410: air cooling and insulation at exterior walls

This project will allow CDCR to develop a future statewide plan to address the indoor temperatures at buildings that severely impact the correctional landscape for the people in CDCR's care, including institution staff and incarcerated individuals.

The project will include design and installation of the three air cooling options at the identified institutions. CDCR is requesting provisional language to extend the expenditure and encumbrance period through June 30, 2028, to ensure that funding remains available for the duration of the project.

**C. Departmentwide and Statewide Considerations**

This proposal supports the Administration's policies, priorities, and initiatives to comply and complete requirements associated with ongoing court cases, including increasing the delivery of program and rehabilitative services, and enhancing conservation measures and sustainable design. This proposal supports CDCR's Organizational Goals in Risk Management/Organizational Effectiveness as well as CDCR's Programmatic Goals in Health Care Delivery by providing indoor environments that reduce the health risks to incarcerated individuals, most significantly for those who are adversely impacted by high temperatures. This proposal will also assist in improving living conditions at institutions statewide.

**D. Outcomes and Accountability**

CDCR will develop a comprehensive report/analysis of the results, detailing the effectiveness of each alternative approach to improve indoor conditions at the pilot institutions. The report will include effectiveness, cost evaluation, and recommendations for statewide implementation.

**E. Implementation Plan**

CDCR will begin the design and installation of the various air cooling options at the identified institutions. Exterior Insulation will begin in 2025-26 followed by air-cooling system installation in 2026-27, with final completion anticipated in 2028-29. CDCR will evaluate and determine the effectiveness of each option and develop a statewide effort to address indoor temperatures throughout CDCR.

**F. Supplemental Information**

Attachment A – Provisional Language

Air Cooling Pilot Program BCP

5225-001-0001 – For support of Department of Corrections and Rehabilitation

Provisions:

X.      Of the amount specified in Schedule X of this item, up to $69,000,000 is specified for the purpose of the Air Cooling Pilot Program and shall be available for encumbrance or expenditure until June 30, 2028.

# BCP Fiscal Detail Sheet

BCP Title: Air Cooling Pilot Program

BR Name: 5225-066-BCP-2025-GB

Budget Request Summary

## Operating Expenses and Equipment

| Operating Expenses and Equipment | FY25 Current Year | FY25 Budget Year | FY25 BY+1 | FY25 BY+2 | FY25 BY+3 | FY25 BY+4 |
|---|---|---|---|---|---|---|
| 5324 - Facilities Operation | 0 | 23,606 | 45,399 | 0 | 0 | 0 |
| Total Operating Expenses and Equipment | $0 | $23,606 | $45,399 | $0 | $0 | $0 |

## Total Budget Request

| Total Budget Request | FY25 Current Year | FY25 Budget Year | FY25 BY+1 | FY25 BY+2 | FY25 BY+3 | FY25 BY+4 |
|---|---|---|---|---|---|---|
| Total Budget Request | $0 | $23,606 | $45,399 | $0 | $0 | $0 |

## Fund Summary

### Fund Source

| Fund Source | FY25 Current Year | FY25 Budget Year | FY25 BY+1 | FY25 BY+2 | FY25 BY+3 | FY25 BY+4 |
|---|---|---|---|---|---|---|
| State Operations - 0001 - General Fund | 0 | 23,606 | 45,399 | 0 | 0 | 0 |
| Total State Operations Expenditures | $0 | $23,606 | $45,399 | $0 | $0 | $0 |
| Total All Funds | $0 | $23,606 | $45,399 | $0 | $0 | $0 |

## Program Summary

### Program Funding

| Program Funding | FY25 Current Year | FY25 Budget Year | FY25 BY+1 | FY25 BY+2 | FY25 BY+3 | FY25 BY+4 |
|---|---|---|---|---|---|---|
| 4550059 - Fac Plan & Const Mgmt Special Repairs | 0 | 23,606 | 45,399 | 0 | 0 | 0 |
| Total All Programs | $0 | $23,606 | $45,399 | $0 | $0 | $0 |

# EXHIBIT E

sfama@prisonlaw.com    Sign Out    

# [encrypt] ,Coleman v. Newsom: Notification of a Class Member Death

**AC**    **Albertson, Cassandra** <Cassandra.Albertson@cdcr.ca.gov>    Reply all |
Today, 8:56 AM
Darcy Edmundson <dedmundson@rbgg.com>; Elise Thorn <elise.thorn@doj.ca +24 more

Encrypt: This message is encrypted. Recipients can't remove encryption.

Dear Special Master Lopes:

I write to inform you of a class member's death. The class member was housed at California Correctional Women's Facility.

██████████████ was a 47-year-old African-American female. On July 4, 2024 she was transferred to Mercy Hospital Merced (MHM). Her health deteriorated and she was pronounced deceased on July 5, 2024 at 0203 hours by a MHM physician. The cause of death is listed as loss of consciousness, status epilepticus, heat stroke and possible overdose. The manner of death are listed as unknown. Once it is clarified we will send an update.

██████████ was a participant in the Mental Health Services Delivery System at the Correctional Clinical Case Management System level of care.

## Cassandra Albertson (She/Her)
**Health Program Specialist I**
Suicide Prevention and Response Unit | Policy and Program Support Unit | Statewide Mental Health Program | CCHCS | CDCR
**(916) 691-3840**
cassandra.albertson@cdcr.ca.gov

 

*CONFIDENTIALITY NOTICE: This communication and contents may have sensitive, confidential and/or legally privileged information. Any unauthorized disclosure, distribution, or action in reliance on the contents of this communication is strictly prohibited and may be unlawful. If you are not the intended recipient, please contact the sender and destroy all events of this communication. For IT issues contact our Solutions Center at 1-888-735-3470.*

🔒 Message Encryption by Microsoft Office 365

# EXHIBIT F

**Young, Mitchell J.**

| | |
|---|---|
| **From:** | Lopes Matthew |
| **Sent:** | Monday, July 8, 2024 7:29 PM |
| **To:** | Coleman Special Master |
| **Subject:** | Fwd: Coleman: requests re CCWF 7/5/24 death (person on heat sensitive psychiatric medication) |
| **Attachments:** | ███████████ (CCWF) CDCR death notification.pdf |

*[I'm sending this email quickly from my handheld device. Please excuse the brevity and/or typos made in my desire to communicate promptly with my thunder thumbs.]*

**Matthew A. Lopes Jr., PARTNER**
mlopes@pldolaw.com
P 401.824.5156 • F 401.824.5123
_____

**Pannone Lopes Devereaux & O'Gara LLC**
Northwoods Office Park  Suite 215 N
1301 Atwood Avenue, Johnston, RI 02919
www.pldolaw.com  •  Legal Disclaimer

Begin forwarded message:

> **From:** Steven Fama <sfama@prisonlaw.com>
> **Date:** July 8, 2024 at 7:19:26 PM EDT
> **To:** Lopes Matthew <mlopes@pldolaw.com>, "Walsh Kerry F." <kwalsh@pldolaw.com>, harconwil@gmail.com, "Weber, Nicholas@CDCR" <Nicholas.Weber@cdcr.ca.gov>, "Thind, Sundeep@CDCR" <Sundeep.Thind@cdcr.ca.gov>, CDCR OLA Coleman CAT Mailbox <OLAColemanCAT@cdcr.ca.gov>, Namrata Kotwani <namrata.kotwani@doj.ca.gov>, Elise Thorn <elise.thorn@doj.ca.gov>, Damon.McClain@doj.ca.gov, Samantha Wolff <SWolff@hansonbridgett.com>, "Paul B. Mello" <Pmello@hansonbridgett.com>, "Stafford, Carrie@CDCR" <Carrie.Stafford@cdcr.ca.gov>
> **Cc:** Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>, Don Specter <dspector@prisonlaw.com>, Marissa Hatton <mhatton@prisonlaw.com>, Margot Mendelson <mmendelson@prisonlaw.com>, Alison Hardy <ahardy@prisonlaw.com>, Sophie Hart <sophieh@prisonlaw.com>
> **Subject: Coleman: requests re CCWF 7/5/24 death (person on heat sensitive psychiatric medication)**

Dear Special Master Lopes, CDCR-OLA, and all,

The attached CDCR notice states that ███████████████████ (CCWF) died on 7/5/24 and that heat stroke is listed as a cause of death.   EHRS includes a 7/4/24 "Outside Records -- Emergency Dept" and a 7/6/24 "Outside Records -- Hospital" records; the latter states ████████ temperature upon arrival on 7/4/24 at approximately 2300 hours was 41.5 degrees Celsius (which converts to  106.7 degrees Fahrenheit) and that "[p]er prison guards" ████████ had been "outside all day."  EHRS also documents that Boulware was ordered and regularly took Lithium, a CCHCS-listed heat sensitive

1

medication. Accuweather documents the high temperatures in Chowchilla on 7/2, 7/3, as 7/4/24 as 104, 108, and 109 degrees, respectively. *See* https://www.accuweather.com/en/us/chowchilla/93610/july-weather/2154370. Based on experience, the outside temperatures on those dates would have been 90 degrees or higher for several consecutive hours.

We ask the Special Master to specially review and report on ███████ death, including investigating and reporting on whether heat sensitive medication played a role and whether all elements of the CDCR Heat Plan were followed at CCWF and as it pertained to ███████ in the hours and days immediately prior to their being sent to the hospital on 7/4/24.

We also ask CDCR to immediately and fully report on the statement in hospital records that per prison guards ███████ had been "outside all day." Which officers so stated? What was basis of their knowledge? Regardless, what is known, and how, regarding ███████ being outside on 7/4/24? Relatedly, please provide a copy of the outside temperature for CCWF for 7/4/24, and that for temperatures in ███████ housing unit. Further, what steps were taken regarding Heat Alerts on 7/4/24, including with respect to ███████ and the apparent statement about being "outside all day"? Please include whether there was some special reason, including modified program, job assignment, or the like that required or caused ███████ to be outside on 7/4/24, both for any required activities or otherwise.

We further ask CDCR to review all elements of the CCWF Heat Plan including whether such matters are fully implemented and being followed, and in addition whether they require revision to adequately safeguard residents' health.

Thanks in advance to all for your consideration of these matters. Given forecasted 100 degree plus high temperatures in Chowchilla, and the likelihood of such temperatures occurring again in coming weeks, we ask for a prompt response to our requests.

Sincerely,

Steven Fama
Staff Attorney
Prison Law Office

This message was sent from outside the company. Please do not click links or open attachments unless you recognize the source of this email and know the content is safe.

# EXHIBIT G

**Young, Mitchell J.**

---

| | |
|---|---|
| **From:** | Lopes Matthew |
| **Sent:** | Tuesday, August 13, 2024 5:15 AM |
| **To:** | Coleman Special Master |
| **Subject:** | Fwd: Coleman: requests re CCWF 7/5/24 death (person on heat sensitive psychiatric medication) |
| **Attachments:** | CCWF- Outside Temp 7.4 - 7.5.pdf; Facility A Heat Log 7.1.24-7.7.24- 501-504.pdf; July 1-7 Heat Log Fac B- 505-508.pdf; FAC HEAT LOG 7-1 TO 7-7-24- 509-512.pdf; FAD HEAT LOG 7-1 TO 7-7-2024- 513-516.pdf |

*[I'm sending this email quickly from my handheld device. Please excuse the brevity and/or typos made in my desire to communicate promptly with my thunder thumbs.]*

### Matthew A. Lopes Jr., PARTNER
mlopes@pldolaw.com
P 401.824.5156 • F 401.824.5123

_____

**Pannone Lopes Devereaux & O'Gara LLC**
Northwoods Office Park  Suite 215 N
1301 Atwood Avenue, Johnston, RI 02919
www.pldolaw.com  •  Legal Disclaimer

Begin forwarded message:

> **From:** "Bentz, Melissa@CDCR" <Melissa.Bentz@cdcr.ca.gov>
> **Date:** August 12, 2024 at 12:58:59 PM EDT
> **To:** "Steven Fama (sfama@prisonlaw.com)" <sfama@prisonlaw.com>, Sophie Hart <sophieh@prisonlaw.com>, Lopes Matthew <mlopes@pldolaw.com>, "Walsh Kerry F." <kwalsh@pldolaw.com>, harconwil@gmail.com
> **Cc:** "Weber, Nicholas@CDCR" <Nicholas.Weber@cdcr.ca.gov>, "Thind, Sundeep@CDCR" <Sundeep.Thind@cdcr.ca.gov>, CDCR OLA Coleman CAT Mailbox <OLAColemanCAT@cdcr.ca.gov>, Elise Thorn <elise.thorn@doj.ca.gov>, Damon McClain <damon.mcclain@doj.ca.gov>, "Sam Wolff (swolff@hansonbridgett.com)" <swolff@hansonbridgett.com>, "Paul B. Mello" <Pmello@hansonbridgett.com>, "Stafford, Carrie@CDCR" <Carrie.Stafford@cdcr.ca.gov>, Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>, Don Specter <dspecter@prisonlaw.com>, Marissa Hatton <mhatton@prisonlaw.com>, Margot Mendelson <mmendelson@prisonlaw.com>, Alison Hardy <ahardy@prisonlaw.com>
> **Subject: RE: Coleman: requests re CCWF 7/5/24 death (person on heat sensitive psychiatric medication)**

Steve and Sophie,

I write in response to your emails dated July 8th regarding the heat at CCWF during the week of June 30th. Please note that the first request in Sophie's email is being handled separately through *Plata*. However, all other requests are being handled through *Coleman* as the heat plan is a *Coleman* requirement.

1

Both emails reference the death of ████████ on July 6th. The cause of death may have been the result of an ongoing medical condition and not heat related but will be determined by the coroner's office.

Both emails also ask for temperature logs, including the outside temperature logs of July 4th as well as the internal temperature logs for all housing units for the first week of July. Both are attached. The internal temperatures for the 270-design buildings are taken on the second tier. For the single-story cross top design buildings, internal temperatures are taken in each wing and at the officer's station. The highest internal temperature of the five is recorded as the temperature for the building. Although no Stage 2 Heat Alerts were activated on July 4th, all buildings were provided with ice water in igloo coolers that were refilled as needed and large industrial floor fans to ventilate the housing units to proactively cool each wing.

On July 4th, the swamp cooler in Building 514 was blowing warm air but was fixed the same day. No other issues regarding the swamp coolers have been reported during the week of July 1st.

CDCR has reiterated the heat plan requirements to all institutions and is assessing the letter from Tom Nolan received on July 26th. We will provide a response to that letter separately.

In the future, we would appreciate if Plaintiffs could consolidate advocacies regarding similar issues when possible.

Respectfully,

*Melissa C. Bentz*
Attorney IV, Class Action Team
Office of Legal Affairs
California Department of Corrections and Rehabilitation
Email: Melissa.Bentz@cdcr.ca.gov
Phone: (916) 628-5385

ATTORNEY/CLIENT COMMUNICATION AND/OR ATTORNEY WORK PRODUCT – DO NOT FORWARD COMMUNICATION WITHOUT THE EXPRESS PERMISSION OF THE AUTHOR.

---

**From:** Steven Fama <sfama@prisonlaw.com>
**Sent:** Monday, July 8, 2024 4:19 PM
**To:** Matthew A. Lopes, Jr <mlopes@pldolaw.com>; Walsh Kerry F. <kwalsh@pldolaw.com>; Patricia.Williams <harconwil@gmail.com>; Weber, Nicholas@CDCR <Nicholas.Weber@cdcr.ca.gov>; Thind, Sundeep@CDCR <Sundeep.Thind@cdcr.ca.gov>; CDCR OLA Coleman CAT Mailbox <OLAColemanCAT@cdcr.ca.gov>; Namrata Kotwani <Namrata.Kotwani@doj.ca.gov>; Elise Thorn <elise.thorn@doj.ca.gov>; Damon.McClain@doj.ca.gov; Samantha Wolff <swolff@hansonbridgett.com>; Paul B. Mello <pmello@hansonbridgett.com>; Stafford, Carrie@CDCR <Carrie.Stafford@cdcr.ca.gov>
**Cc:** Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>; Don Specter <dspecter@prisonlaw.com>; Marissa Hatton <mhatton@prisonlaw.com>; Margot Mendelson <mmendelson@prisonlaw.com>; Alison Hardy <ahardy@prisonlaw.com>; Sophie Hart <sophieh@prisonlaw.com>
**Subject:** Coleman: requests re CCWF 7/5/24 death (person on heat sensitive psychiatric medication)

**CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Dear Special Master Lopes, CDCR-OLA, and all,

The attached CDCR notice states that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (CCWF) died on 7/5/24 and that heat stroke is listed as a cause of death. EHRS includes a 7/4/24 "Outside Records -- Emergency Dept" and a 7/6/24 "Outside Records -- Hospital" records; the latter states ▮▮▮▮▮▮ temperature upon arrival on 7/4/24 at approximately 2300 hours was 41.5 degrees Celsius (which converts to 106.7 degrees Fahrenheit) and that "[p]er prison guards" ▮▮▮▮▮ had been "outside all day." EHRS also documents that ▮▮▮▮▮ was ordered and regularly took Lithium, a CCHCS-listed heat sensitive medication. Accuweather documents the high temperatures in Chowchilla on 7/2, 7/3, as 7/4/24 as 104, 108, and 109 degrees, respectively. *See* https://www.accuweather.com/en/us/chowchilla/93610/july-weather/2154370. Based on experience, the outside temperatures on those dates would have been 90 degrees or higher for several consecutive hours.

We ask the Special Master to specially review and report on ▮▮▮▮▮ death, including investigating and reporting on whether heat sensitive medication played a role and whether all elements of the CDCR Heat Plan were followed at CCWF and as it pertained to ▮▮▮▮ in the hours and days immediately prior to their being sent to the hospital on 7/4/24.

We also ask CDCR to immediately and fully report on the statement in hospital records that per prison guards ▮▮▮▮ had been "outside all day." Which officers so stated? What was basis of their knowledge? Regardless, what is known, and how, regarding ▮▮▮▮ being outside on 7/4/24? Relatedly, please provide a copy of the outside temperature for CCWF for 7/4/24, and that for temperatures in ▮▮▮▮▮ housing unit. Further, what steps were taken regarding Heat Alerts on 7/4/24, including with respect to ▮▮▮▮ and the apparent statement about being "outside all day"? Please include whether there was some special reason, including modified program, job assignment, or the like that required or caused ▮▮▮▮ to be outside on 7/4/24, both for any required activities or otherwise.

We further ask CDCR to review all elements of the CCWF Heat Plan including whether such matters are fully implemented and being followed, and in addition whether they require revision to adequately safeguard residents' health.

Thanks in advance to all for your consideration of these matters. Given forecasted 100 degree plus high temperatures in Chowchilla, and the likelihood of such temperatures occurring again in coming weeks, we ask for a prompt response to our requests.

Sincerely,

Steven Fama
Staff Attorney
Prison Law Office

This message was sent from outside the company. Please do not click links or open attachments unless you recognize the source of this email and know the content is safe.

# EXHIBIT H

STATE OF CALIFORNIA ATTACHMENT A DEPARTMENT OF CORRECTIONS AND REHABILITATION

**OUTSIDE TEMPERATURE RECORD**

CDCR 2030 (04/18)

INSTITUTION: _____CCWF_____

From May 1st through October 31st, the warden shall designate staff to be responsible to monitor and log the OUTSIDE ambient air temperature.

Using an accurate thermometer located in a central, heat neutral location, the outside air temperature is to be taken every hour, seven (7) days a week.

Thermometer Location: _____Central Control_____

Immediately notify the Watch Commander at extension __5551__ when the air temperature reaches 90 degrees.

| Date | Time | Temp. | Printed Name | Date | Time | Temp. | Printed Name |
|------|------|-------|--------------|------|------|-------|--------------|
| | 0100 | 82 | Stml | | 0100 | 80 | Stanly |
| | 0200 | 80 | Stml | | 0200 | 78 | Stanly |
| | 0300 | 79 | Stml | | 0300 | 78 | Stanly |
| | 0400 | 79 | Stml | | 0400 | 76 | Stanly |
| | 0500 | 77 | Stml | | 0500 | 75 | Stanly |
| | 0600 | 78° | Bazan | | 0600 | 73° | Alonso |
| 7-24-24 | 0700 | 80 | Bazan | 7-25 | 0700 | 76° | Alonso |
| | 0800 | 83° | Bazan | July | 0800 | 81° | Alonso |
| | 0900 | 86° | Bazan | | 0900 | 89° | Alonso |
| | 1000 | 92° | Bazan | | 1000 | 90° | Alonso |
| | 1100 | 94° | Bazan | | 1100 | 92° | Alonso |
| | 1200 | 97° | Bazan | | 1200 | 94° | Alonso |
| | 1300 | 100 | Bazan | | 1300 | 97° | Alonso |
| | 1400 | 101 | Stanly | | 1400 | 99 | Stanly |
| | 1500 | 100 | Stanly | | 1500 | 102 | Stanly |
| | 1600 | 100 | Stanly | | 1600 | 102 | Stanly |
| | 1700 | 100 | Stanly | | 1700 | 101 | Stanly |
| | 1800 | 100 | Stanly | | 1800 | 99 | Stanly |
| | 1900 | 98 | Stanly | | 1900 | 98 | Stanly |
| | 2000 | 97 | Stanly | | 2000 | 95 | Stanly |
| | 2100 | 91 | Stanly | | 2100 | 91 | Stanly |
| | 2200 | 88 | Stanly | | 2200 | 91 | Stanly |
| | 2300 | 86 | Stanly | | 2300 | 89 | Stanly |
| | 2400 | 86 | Stanly | | 2400 | 89 | Stanly |

Stage 1 Activated: _1000_ 90°
Deactivated: _2140_ 88

Stage 1 Activated: _1012_
Deactivated: _2215_

DISTRIBUTION: Original: Institution Heat Plan Coordinator

# EXHIBIT I

STATE OF CALIFORNIA                                                     DEPARTMENT OF CORRECTIONS AND REHABILITATION
INSIDE TEMPERATURE RECORD
CDCR 2031 (04/18)

From May 1st through October 31st, the warden shall designate staff to be responsible to monitor and log the INSIDE ambient air temperature in all non-air-conditioned housing units where an inmate on the heat risk list may be housed (Note: Air-conditioned units will also be monitored when the air conditioner is malfunctioning).

Using an accurate thermometer on the highest location in the housing unit (e.g., top tier) where an inmate on the heat risk list is housed. The inside air temperature is to be taken every three (3) hours, seven (7) days a week.

Institution: **CCWF** Housing Unit: 514  Temp. Reading Location: Dayroom A,B,C,D WING

(e.g., 1st tier, 2nd tier, 3rd tier, etc.)

**Immediately notify the Watch Commander at extension 5551 when the inside air temperature reaches 90 degrees and again at 95 degrees.**

### MONDAY

| Date | Time | Temp. | Name (Print) |
|---|---|---|---|
| July 1, 2024 | 0300 | 70 | ZAALLA |
| | 0600 | 70 | Henkle |
| | 0900 | 70 | Henkle |
| | 1200 | 72 | Henkle |
| | 1500 | 80 | Henke |
| | 1800 | 80 | S.Coz |
| | 2100 | 70 | Zavala |
| | 2400 | 70 | Zavall |

### TUESDAY

| Date | Time | Temp. | Name (Print) |
|---|---|---|---|
| JULY 2,2024 | 0300 | 70 | Zacla |
| | 0600 | 76.4 | S.Crz |
| | 0900 | 76 | S. Cruz |
| | 1200 | 78.4 | S. Cruz |
| | 1500 | 81.3 | R.H Tavek o |
| | 1800 | 80 | Villa or. |
| | 2100 | 7 | R HGUERV |
| | 2400 | 72 | Zavala |

### WEDNESDAY

| Date | Time | Temp. | Name (Print) |
|---|---|---|---|
| July 3, 2024 | 0300 | 60 | EAVALA |
| | 0600 | 70 | AVALA |
| | 0900 | 77.8 | AnO Phea |
| | 1200 | 72 | Randomtor |
| | 1500 | 81 | REnGuerra |
| | 1800 | 78 | R HRUBErs |
| | 2100 | 76 | R HGUErrd |
| | 2400 | 72.0 | ZAVALA |

### THURSDAY

| Date | Time | Temp. | Name (Print) |
|---|---|---|---|
| July 4, 2024 | 0300 | 70 | Zacala |
| | 0600 | 77.8 | S Curter |
| | 0900 | 79.4 | Paraumna |
| | 1200 | 80.4 | Rayaumut |
| | 1500 | 81.3 | R. Her VERMA |
| | 1800 | 83.2 | R HGuera |
| | 2100 | 80 | R HGuvera |
| | 2400 | 79 | R HGUERA |

### FRIDAY

| Date | Time | Temp. | Name (Print) |
|---|---|---|---|
| July 5, 2024 | 0300 | 72.0 | JAN ALIA |
| | 0600 | 80.0 | Randmaua |
| | 0900 | 80.4 | Randuaua |
| | 1200 | 80.7 | Ransumur |
| | 1500 | 74 | L.Thao |
| | 1800 | 74 | L.Than |
| | 2100 | 76 | L.Than |
| | 2400 | 74 | S ESCobar |

### SATURDAY

| Date | Time | Temp. | Name (Print) |
|---|---|---|---|
| July 6, 2024 | 0300 | 72 | StEScobar |
| | 0600 | 80 | V.Ramolote |
| | 0900 | 81 | V.Ramolote |
| | 1200 | 82 | V Ramlote |
| | 1500 | 83.2 | R HAUERA. |
| | 1800 | 85.2 | R HIGUERA. |
| | 2100 | 85.4 | R HIGUERA |
| | 2400 | 82 | S.EScobar |

### SUNDAY

| Date | Time | Temp. | Name (Print) |
|---|---|---|---|
| July 7, 2024 | 0300 | 79 | S.EScobar |
| | 0600 | 81 | M.Picardo |
| | 0900 | 83 | V.Ramolote |
| | 1200 | 84 | M.Picardo |
| | 1500 | 86 | S.Cruz |
| | 1800 | 86.1 | S.Gob |
| | 2100 | 81 | S Rvz |
| | 2400 | 85 | D.Thao |

### Notes

|  |
|---|
|  |
|  |
|  |
|  |
|  |
|  |
|  |
|  |

**DISTRIBUTION: Original: Institution ADA Coordinator**

# EXHIBIT J

| Fiscal Year 2025-26 | Business Unit Number 5225 | Department California Department of Corrections and Rehabilitation |
|---|---|---|

| Hyperion Budget Request Name 5225-066-BCP-2025-GB | Relevant Program or Subprogram 4550059 – Fac Plan & Const Mgmt Special Repairs |
|---|---|

**Budget Request Title**
Air Cooling Pilot Program

**Budget Request Summary**
The California Department of Corrections and Rehabilitation (CDCR) requests $23.6 million one-time General Fund in 2025-26, and $45.4 million one-time General Fund in 2026-27, for a pilot program to install and evaluate air cooling alternatives to improve indoor environments at the Central California Women's Facility (CCWF), California Medical Facility (CMF), Kern Valley State Prison (KVSP), and California State Prison, Los Angeles (LAC).

A subsequent analysis of the alternatives used at the identified institutions will assist CDCR in developing a statewide effort to address the indoor temperatures at buildings that severely impact incarcerated individuals. The Department also requests provisional language to extend the expenditure and encumbrance period through June 30, 2028.

| Requires Legislation (submit required legislation with the BCP) <br> ☐ Trailer Bill Language <br> ☒ Budget Bill Language        ☐ N/A | Code Section(s) to be Added/Amended/Repealed |
|---|---|

| Does this BCP contain information technology (IT) components? ☐ Yes    ☒ No <br><br> *If yes, departmental Chief Information Officer must sign.* | Department CIO | Date |
|---|---|---|

**For IT requests, specify the project number, the most recent project approval document (FSR, SPR, S1BA, S2AA, S3SD, S4PRA), the approval date, and the total project cost.**

**Project No.    Project Approval Document:**

**Approval Date:**                    **Total Project Cost:**

**If proposal affects another department, does other department concur with proposal?** ☐ Yes ☐ No

*Attach comments of affected department, signed and dated by the department director or designee.*

| Prepared By Michelle Weaver | Date 1/10/2025 | Reviewed By Cynthia Mendonza | Date 1/10/2025 |
|---|---|---|---|
| Department Director Dave Lewis | Date 1/10/2025 | Agency Secretary Jeff Macomber | Date 1/10/2025 |

**Department of Finance Use Only**

**Additional Review:** ☐ **Capital Outlay** ☐ **ITCU** ☐ **FSCU** ☐ **OSAE** ☐ **Dept. of Technology**

| Principal Program Budget Analyst Lynne Ishimoto | Date submitted to the Legislature 1/10/2025 |
|---|---|

## A. Problem Statement

In the 1980s, CDCR Design Criteria Guidelines (DCG) were created to set design and construction standards for all CDCR institutions. DCG require cooling be provided for housing areas to maintain an indoor temperature, which provides a quality indoor environment suitable for thermal comfort that is related to one's metabolic heat production, the transfer of heat to the environment, physiological adjustments, and body temperature. The temperature identified in DCG to meet this standard is 89 Fahrenheit (°F) or cooler. Thermal comfort and body temperature are unique concerns for incarcerated individuals on specific medications. Depending on the severity of outdoor temperatures, existing systems used at CDCR institutions are not always capable of meeting the current standard of 89°F.

Recognizing this concern, the *Coleman* court mandated CDCR to establish and adhere to a Prevention Plan for Heat Related Pathologies. The Prevention Plan addresses the policies and procedures institutions must implement when "heat-risk incarcerated individuals" (incarcerated individuals on specified medications that face health risks in high heat conditions) are exposed to extreme high temperatures. This Plan requires institutions to initiate Stage I alerts when outside temperatures reach 90°F and remain in effect until temperatures fall back below 90°F. Stage II and III heat alerts are initiated when the inside temperature of a building housing "heat-risk incarcerated individuals" reaches 90°F and 95°F, respectively.

### Heat Stage Activation Measures

Stage I (Outside temperatures reach 90°F or more):
- Return to Housing - All heat-risk incarcerated persons are restricted to a maximum of 30 minutes outside to perform officially sanctioned activities, such as returning to housing units and receiving medications. This time is not to be used for leisure activities.

Stage II (Inside temperatures reach 90°F or more):
- Staff must initiate cooling and hydration measures, which may include cool drinking water, misting, and cool showers.
- Staff must also increase observation of heat-risk incarcerated person for signs of heat-related illness and report any symptoms to health care staff.

Stage III (Inside temperatures reach 95°F or more):
- Medically trained personnel must perform medical rounds to observe each heat-risk incarcerated person at least once every two hours during the period when the inside temperature remains at 95°F or above, and record the incarcerated person's condition.
- If any incarcerated person shows signs or symptoms of heat related illness, they must be provided cooling measures or be sent to the Triage and Treatment Area.

Additionally, excessive heat conditions are not conducive to the rehabilitative mission as excessive heat makes it difficult to focus and participate in programming, negatively impacting morale for the incarcerated population and staff. In March 2023, Governor Gavin Newsom unveiled the state's plan (California Model) to transform the criminal justice system. The goals of which are not only to reimagine the correctional landscape for the people in CDCR's care, but also to change how prisons operate, how employees interact with both each other and incarcerated people, and how safe and engaged incarcerated people feel in CDCR's care.

All regions of California have warmed over the last century, although at varying rates. Southern California is warming about twice as fast as Northern California, contributing to a statewide annual mean temperature increase of 2.5°F. Additionally, warming has accelerated recently, with seven of the last eight years being the warmest on record.

On July 24, 2024, the Occupational Safety and Health Standards Board (OSHSB) approved a regulation requiring employers to take steps to protect workers from heat illness/injury when indoor temperatures reach 82°F, with additional requirements when temperatures reach 87°F. OSHSB is in the process of developing an industry-specific regulation for workers in local and state correctional

facilities. CDCR is taking a proactive approach to determine which strategy/strategies will reduce indoor temperatures, balancing the effectiveness and cost. CDCR recognizes the importance of how environmental conditions aid in providing a conducive setting for rehabilitation and is committed to maintaining established standards to ensure the physical safety and well-being of staff and the incarcerated population.

## B. Justification

Most of CDCR's institutions were built at a time when the comfort level of the incarcerated population was not a consideration or priority. As such, many Housing Units (HUs) and support buildings throughout the state were originally equipped with only air handling units or evaporative cooling systems; neither of which are sufficient to provide adequate relief from excessive heat during summer months. Although there have been efforts to retrofit several housing units and various buildings used for rehabilitative programs at multiple institutions over the years, a significant number remain that require air cooling upgrades or other alternatives to address rising indoor temperatures.

An engineering study was completed in April 2024 to analyze the existing cooling systems at five typical HUs and provide system replacement recommendations for systems potentially capable of meeting indoor temperatures at or near 78°F. Recognizing the variety of buildings that exist within CDCR's portfolio, the best approach to improve indoor conditions may differ based on construction type, materials used, existing cooling systems (where present), orientation of the structure(s), and geographical location of the institution. As such, the four institutions selected provide a wide range of buildings to test the three alternative approaches:

- Option 1 – Thermal Insulation only
- Option 2 – Air Cooling only
- Option 3 – Thermal Insulation and Air Cooling

These options will be installed at CCWF, CMF, KVSP, and LAC. These prisons offer a variety of housing unit styles that will allow CDCR to evaluate and determine the effectiveness of each option. Identified buildings include: 180-style (Two Tiered - 128 Cells), 270-style (Two Tiered - 100 Cells), Mainline (3 story Dorm/Cells with varying Design Capacity), and Cross-Top (Dorms – 128 Capacity) HUs. The varied HU styles, along with heat log data, and other historical records related to indoor temperatures will help CDCR determine the optimal option for each style, while accounting for the physical characteristics identified above.

The pilot program will install air cooling alternatives at the following locations:

### CCWF - Facility B, Buildings 506, 507 and 508 (Cross-Top Housing Units)
- Building 506: insulation at exterior walls only
- Building 507: air cooling only
- Building 508: air cooling and insulation at exterior walls

### CMF - Facility A, Wing H51/P-Wing (Mainline Housing Units)
- Wing H51: one wing consisting of three floors to receive air cooling and insulation at exterior walls

### KVSP - Facility C, Buildings 341, 342, and 344 (180-style Housing Units)
- Building 341: insulation at exterior walls only
- Building 342: air cooling only
- Building 344: air cooling and insulation at exterior walls

### LAC - Facility D, Buildings 348, 349 and 3410 (270-style Housing Units)
- Building 348: insulation at exterior walls only
- Building 349: air cooling only
- Building 3410: air cooling and insulation at exterior walls

This project will allow CDCR to develop a future statewide plan to address the indoor temperatures at buildings that severely impact the correctional landscape for the people in CDCR's care, including institution staff and incarcerated individuals.

The project will include design and installation of the three air cooling options at the identified institutions. CDCR is requesting provisional language to extend the expenditure and encumbrance period through June 30, 2028, to ensure that funding remains available for the duration of the project.

## C. Departmentwide and Statewide Considerations
This proposal supports the Administration's policies, priorities, and initiatives to comply and complete requirements associated with ongoing court cases, including increasing the delivery of program and rehabilitative services, and enhancing conservation measures and sustainable design. This proposal supports CDCR's Organizational Goals in Risk Management/Organizational Effectiveness as well as CDCR's Programmatic Goals in Health Care Delivery by providing indoor environments that reduce the health risks to incarcerated individuals, most significantly for those who are adversely impacted by high temperatures. This proposal will also assist in improving living conditions at institutions statewide.

## D. Outcomes and Accountability
CDCR will develop a comprehensive report/analysis of the results, detailing the effectiveness of each alternative approach to improve indoor conditions at the pilot institutions. The report will include effectiveness, cost evaluation, and recommendations for statewide implementation.

## E. Implementation Plan
CDCR will begin the design and installation of the various air cooling options at the identified institutions. Exterior Insulation will begin in 2025-26 followed by air-cooling system installation in 2026-27, with final completion anticipated in 2028-29. CDCR will evaluate and determine the effectiveness of each option and develop a statewide effort to address indoor temperatures throughout CDCR.

## F. Supplemental Information
Attachment A – Provisional Language

Air Cooling Pilot Program BCP

5225-001-0001 – For support of Department of Corrections and Rehabilitation

Provisions:

X.     Of the amount specified in Schedule X of this item, up to $69,000,000 is specified for the purpose of the Air Cooling Pilot Program and shall be available for encumbrance or expenditure until June 30, 2028.

# BCP Fiscal Detail Sheet

**BCP Title:** Air Cooling Pilot Program

**BR Name:** 5225-066-BCP-2025-GB

Budget Request Summary

## Operating Expenses and Equipment

| Operating Expenses and Equipment | FY25 Current Year | FY25 Budget Year | FY25 BY+1 | FY25 BY+2 | FY25 BY+3 | FY25 BY+4 |
|---|---|---|---|---|---|---|
| 5324 - Facilities Operation | 0 | 23,606 | 45,399 | 0 | 0 | 0 |
| **Total Operating Expenses and Equipment** | **$0** | **$23,606** | **$45,399** | **$0** | **$0** | **$0** |

## Total Budget Request

| Total Budget Request | FY25 Current Year | FY25 Budget Year | FY25 BY+1 | FY25 BY+2 | FY25 BY+3 | FY25 BY+4 |
|---|---|---|---|---|---|---|
| **Total Budget Request** | **$0** | **$23,606** | **$45,399** | **$0** | **$0** | **$0** |

## Fund Summary

### Fund Source

| Fund Source | FY25 Current Year | FY25 Budget Year | FY25 BY+1 | FY25 BY+2 | FY25 BY+3 | FY25 BY+4 |
|---|---|---|---|---|---|---|
| State Operations - 0001 - General Fund | 0 | 23,606 | 45,399 | 0 | 0 | 0 |
| **Total State Operations Expenditures** | **$0** | **$23,606** | **$45,399** | **$0** | **$0** | **$0** |
| **Total All Funds** | **$0** | **$23,606** | **$45,399** | **$0** | **$0** | **$0** |

## Program Summary

### Program Funding

| Program Funding | FY25 Current Year | FY25 Budget Year | FY25 BY+1 | FY25 BY+2 | FY25 BY+3 | FY25 BY+4 |
|---|---|---|---|---|---|---|
| 4550059 - Fac Plan & Const Mgmt Special Repairs | 0 | 23,606 | 45,399 | 0 | 0 | 0 |
| **Total All Programs** | **$0** | **$23,606** | **$45,399** | **$0** | **$0** | **$0** |