**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF CALIFORNIA**

**RALPH COLEMAN, et al.,**

**Plaintiffs**

**v.** **No. CIV S-90-0520 KJM-SCR**

**GAVIN NEWSOM, et al.,**

**Defendants**

# THE *COLEMAN* SPECIAL MASTER'S THIRTY-FIRST ROUND FOCUSED MONITORING REPORT ON NEWLY ACTIVATED EOP PROGRAMS

Matthew A. Lopes, Jr., Esq.
Special Master
PANNONE LOPES DEVEREAUX & O'GARA LLC
Northwoods Office Park, Suite 215-N
1301 Atwood Avenue
Johnston, RI 02908
(401) 824-5100
Fax: (401) 824-5123
May 29, 2025

**ACRONYMS AND ABBREVIATIONS**

| | |
|---|---|
| 3CMS: | Correctional Clinical Case Management System |
| AA/NA: | Alcoholics Anonymous/Narcotics Anonymous |
| ADA: | Americans with Disabilities Act |
| ADHD: | Attention Deficit Hyperactivity Disorder |
| ADL: | Activities of Daily Living |
| AIMS: | Abnormal Involuntary Movement Scale |
| APP: | Acute Psychiatric Program |
| ASAP: | As Soon As Possible |
| ASH: | Atascadero State Hospital |
| ASP: | Avenal State Prison |
| ASPD: | Antisocial Personality Disorder |
| ASU: | Administrative Segregation Units |
| CBT: | Cognitive Behavioral Therapy |
| CC I: | Correctional Counselor I |
| CC II: | Correctional Counselor II |
| CCCMS: | Correctional Clinical Case Management System |
| CCI: | California Correctional Institution |
| CDCR: | California Department of Corrections and Rehabilitation |
| CEO: | Chief Executive Officer |
| CHCF: | California Health Care Facility |
| CIM: | California Institution for Men |
| CIT: | Crisis Intervention Team |
| CMC: | California Men's Colony |

| | |
|---|---|
| CNA: | Certified Nursing Assistant |
| CRC: | California Rehabilitation Center |
| CSATF: | California Substance Abuse Treatment Facility |
| CSP/Corcoran: | California State Prison/Corcoran |
| CSP/LAC: | California State Prison/Los Angeles County |
| CSP/Sac: | California State Prison/Sacramento |
| CSR: | Classification Service Representative |
| CTC: | Correctional Treatment Center |
| DBT: | Dialectical Behavior Therapy |
| DD1: | Developmental Disability 1 |
| DD2: | Developmental Disability 2 |
| DDP: | Developmental Disability Program |
| DNH: | Hearing Impaired |
| DSH: | Department of State Hospitals |
| DPP: | Disability Placement Program |
| DRP: | Division of Rehabilitative Programs |
| EHRS: | Electronic Health Records System |
| EKG: | Electrocardiogram |
| EOP: | Enhanced Outpatient Program |
| EPRD: | Earliest Possible Release Date |
| FBI: | Federal Bureau of Investigation |
| FBI: | Foreign Body Ingestion |
| FLX: | Inpatient Flex Bed |

| | |
|---|---|
| FSP: | Folsom State Prison |
| FTE: | Full-Time Equivalent |
| GAD: | Generalized Anxiety Disorder |
| GAF: | Global Assessment of Functioning |
| GED: | General Education Development |
| GIQ: | Gender Identity Questionnaire |
| GP: | General Population |
| HCDOM: | Health Care Department Operations Manual |
| HDSP: | High Desert State Prison |
| HIV: | Human Immunodeficiency Virus |
| HLOC: | Higher Level of Care |
| ICC: | Institutional Classification Committee |
| ICF: | Intermediate Care Facility |
| ICU: | Intensive Care Unit |
| IDST: | Interdisciplinary Support Team |
| IDTT: | Interdisciplinary Treatment Team |
| IEX: | Indecent Exposure |
| IP: | Inmate Profile |
| IPOC: | Individualized Plan of Care |
| ISUDT: | Integrated Substance Use Disorder Treatment |
| KOP: | Keep on Person |
| KVSP: | Kern Valley State Prison |
| LAC: | Los Angeles County |

| | |
|---|---|
| LCSW: | Licensed Clinical Social Worker |
| LOC: | Level of Care |
| LRH: | Least Restrictive Housing |
| MA: | Medical Assistant |
| MAT: | Medication-Assisted Treatment |
| MCA: | Medication Court Administrator |
| MCRP: | Male Community Reentry Program |
| MCSP: | Mule Creek State Prison |
| MH: | Mental Health |
| MHA: | Mental Health Assessment |
| MHCB: | Mental Health Crisis Bed |
| MHPC: | Mental Health Placement Chrono |
| MHSDS: | Mental Health Services Delivery System |
| MIS: | MHSDS Management Information Summary |
| MSF: | Minimum Support Facility |
| NDPF: | Non-Designated Program Facility |
| NKSP: | North Kern State Prison |
| NKSP-RC: | North Kern State Prison-Reception Center |
| NLTG: | Nursing-Led Treatment Groups |
| NOS: | Not Otherwise Specified |
| OAH: | Office of Administration Hearings |
| OHU: | Outpatient Housing Unit |
| OLA: | Office of Legal Affairs |

| | |
|---|---|
| PBSP: | Pelican Bay State Prison |
| PC: | Primary Clinician |
| PCP: | Patient Care Plan |
| PIE: | Permanent Intermittent Employees |
| PIP: | Psychiatric Inpatient Program |
| PNP: | Psychiatric Nurse Practitioner |
| PREA: | Prison Rape Elimination Act |
| PRN: | As Needed *pro re nata* |
| PSU: | Psychiatric Services Unit |
| PTSD: | Post-Traumatic Stress Disorder |
| PVSP: | Pleasant Valley State Prison |
| R&R: | Receiving & Release |
| RCGP: | Restricted Custody General Population |
| RHU: | Restricted Housing Unit |
| RJD: | Richard J. Donovan Correctional Facility |
| RN: | Registered Nurse |
| RT: | Recreation Therapist |
| RVR: | Rules Violation Report |
| SMART: | Specific, Measurable, Achievable, Relevant, and Time-bound |
| SMI: | Serious Mental Illness |
| SNY: | Special Needs Yard |
| SOMS: | Strategic Offender Management System |
| SPRFIT: | Suicide Prevention and Response Focused Improvement Team |
| SQ: | San Quentin State Prison |

| | |
|---|---|
| SRASHE: | Suicide Risk and Self-Harm Evaluation |
| SRMP: | Suicide Risk Management Program |
| SSRI: | Selective Serotonin Reuptake Inhibitor |
| STA: | Structured Treatment Activities |
| SVSP: | Salinas Valley State Prison |
| TABE: | Test of Adult Basic Education |
| TTM: | Therapeutic Treatment Module |
| TTA: | Triage and Treatment Area |
| UCC: | Unit Classification Committee |
| WSP: | Wasco State Prison |

# TABLE OF CONTENTS

ACRONYMS AND ABBREVIATIONS ........ i

THE *COLEMAN* SPECIAL MASTER'S THIRTY-FIRST ROUND FOCUSED MONITORING REPORT ON NEWLY ACTIVATED EOP PROGRAMS ........ 1

I. INTRODUCTION ........ 1

Special Master's Responses to Defendants' Objections to the Draft Report ........ 2

A. Recent Growth in Enhanced Outpatient Program Population ........ 19

B. Enhanced Outpatient Program Mission Changes ........ 21

i. Staffing in the New EOP Programs ........ 23

ii. Housing and Treatment of Patients in New EOP Programs ........ 28

a. Inappropriate Housing of EOP Patients ........ 28

b. Structured Therapeutic Activities Provided to Patients in New EOP Programs Has Suffered ........ 31

C. New EOP Population Initiatives ........ 32

II. SUMMARY OF THE SPECIAL MASTER'S FINDINGS ........ 41

A. Mental Health Vacancy Rates Overall and by Discipline During the EOP Focused Tours ........ 41

B. Overall Quality of Care ........ 45

C. Medication Management Summary ........ 61

D. Access to Higher Levels of Care ........ 64

E. Custody and Mental Health Partnership Plan ........ 66

F. RVRs ........ 66

G. Use of Force ........ 66

H. Program Access ........ 66

I. MHSDS Patients in Restrictive Housing Units ........ 68

CONCLUSION ........ 69

APPENDIX A INSTITUTIONAL SUMMARIES ........ 73

APPENDIX B CLINICAL CASE REVIEWS.......................................................................... 184

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF CALIFORNIA**

**RALPH COLEMAN, et al.,**

**Plaintiffs,**

**vs.** **No. 2:90-cv-0520 KJM-SCR**

**GAVIN NEWSOM, et al.,**

**Defendants.**

# THE *COLEMAN* SPECIAL MASTER'S THIRTY-FIRST ROUND FOCUSED MONITORING REPORT ON NEWLY ACTIVATED EOP PROGRAMS

## I. INTRODUCTION

The *Coleman* Special Master began this monitoring round by conducting focused reviews of defendants' Heat Plan implementation and CDCR's newly activated Enhanced Outpatient Program (EOP) units. The Special Master filed his Thirty-First Round Focused Heat Plan Report on February 28, 2024. ECF No. 8558.

In this Draft Report, the Special Master presents his findings from focused monitoring tours conducted at eight CDCR institutions with newly activated EOP programs, as follows: California Correctional Institution (CCI), California Institution for Men (CIM), California Rehabilitation Center (CRC), High Desert State Prison (HDSP), Kern Valley State Prison (KVSP), Pelican Bay State Prison (PBSP), Pleasant Valley State Prison (PVSP), and San Quentin Rehabilitation Center (SQ). Of these eight institutions, six (CCI, CIM, CRC, HDSP, PBSP, and PVSP) had not operated EOP programs in recent years. Two institutions, KVSP and SQ, expanded their existing EOP programs and the Special Master reviewed these new EOPs during the focused monitoring tours covered in this Draft Report.

The monitoring focus areas for this review included: Mental Health Staffing Vacancies, Quality of Care, Medication Management, Access to Higher Levels of Care, Custody and Mental Health Partnership Plan, Rules Violation Reports, Use of Force, Program Access, and MHSDS Patients in Restrictive Housing Units (RHUs). As noted, the focused reviews of the eight institutions discussed in this Draft Report were limited to the newly activated EOP programs. The Special Master is scheduled to conduct full-scale monitoring tours of these institutions in the coming months.

The summaries of the monitoring focus areas appear below in Part II. Appendix A is comprised of institution-by-institution summaries of the monitor's findings during the respective monitoring tours. Appendix B is comprised of the Special Master's clinical reviews of individual patient cases.

**Special Master's Responses to Defendants' Objections to the Draft Report**

On March 27, 2025, the Special Master provided the *Coleman* parties with a draft version of the Thirty-First Round Focused Monitoring Report on Newly Activated Enhanced Outpatient Program (EOP) Programs ("Draft Report"). As required by the Order of Reference, ECF No. 640 at 4-5, 8, defendants provided their preliminary comments and objections to the draft Report on April 28, 2025. *See* Letter from Nick Weber, Esq., CDCR Office of Legal Affairs, to Special Master Lopes (April 28, 2025), attached hereto as Exhibit A. Plaintiffs did not submit preliminary comments or objections to the Draft Report.

The Special Master carefully reviewed defendants' comments and objections to the Draft Report. At the outset, the Special Master appreciates defendants' acknowledgement of certain deficiencies as well as their representations regarding steps CDCR and the institutions have

taken to remedy those deficiencies.[1] The Special Master looks forward to returning to these institutions and monitoring whether these initial steps have led to sustainable improvements. However, the Special Master is concerned that, with the number of mental health supervisory staff charged with oversight of CDCR's mental health program, some of these obvious, undisputed deficiencies were not identified and rectified prior to the focused reviews reported on in this report. *E.g., infra* p. 93 (discussing physical plant limitations rendering a room used to conduct IDTTs at CIM nonconfidential). Finally, because the report accurately reflects the state of affairs during the respective review periods (or, as applicable, at the time of the monitoring tour) for the institutions, the Special Master only revised the final version of the report as necessary. *See infra* pp. 37, 91, 92, 101, 125, 134, 136, 137, 144, 155.

Below is a brief summary of the Special Master's responses to defendant's comments and objections.

---

[1] In their April 28, 2025 correspondence, defendants identified the following actions taken in response to the Special Master's preliminary findings from the respective focused monitoring tours: Specifically, defendants indicated that they increased the number of clinicians at PVSP to address the significant increase in EOP patient population. Exhibit A at 4. At CIM, staff moved the RHU IDTTs to a different treatment room to address the Special Master's concerns and reportedly made repairs to a mainline EOP IDTT room that was not confidential due to physical plant issues. *Id*. at 5-6. Similar plant operations remedies were noted with the painting of "out of bounds" lines on the floors outside of all clinical spaces, including outside of group rooms to prevent interruptions. *Id*. at 7. The defendants' also noted that CIM was currently working with the on-site psychiatrist to improve timely IDTTs and noted improvements for the first quarter of 2025. *Id*. at 6. Finally, CDCR reported that CIM custody staff began participating in daily huddles as required, which CDCR reports has improved communication between custody and mental health. *See* Letter from Nick Weber, Esq., CDCR Office of Legal Affairs, to Special Master Lopes (April 28, 2025), attached hereto as Exhibit A at 7.

1. *CDCR alleges that the Draft Report contains some inaccurate statements concerning the "Enhanced Outpatient Program to Correctional Clinical Case Management System Step Down" and two follow-up proposals entitled "EOP to CCCMS Step Down Proposal," and "CDCR MH EOP Population Assessment".*

   a. *Personality Disordered Program*

In its letter, CDCR objected to a footnote in the Draft Report discussing the personality disorders program, specifically objecting to the statement contained in the Draft Reports that "defendants expressed doubts about this program's likelihood for success." *See* Letter from Nick Weber, Esq., CDCR Office of Legal Affairs, to Special Master Lopes (April 28, 2025), attached hereto as Exhibit A at 1.

In response, CDCR stated that:

> [t]he factual support for this statement is a statement taken out of context where CDCR wrote, '[t]he goal [of the Program] is to benefit a core group of patients, but graduation and remission rates may be low for these severely disordered patients which may limit the overall impact on the EOP population.'…The statement regarding low graduation rates is based in clinical evidence from the studies reviewed with the Special Master's subject matter experts, who can confirm its accuracy. It also simply describes the numbers being considered, which suggest that the program will have a limited impact (even if it is 100 percent successful) because the population of patients who qualify for the treatment is small compared to the total EOP population, not because the program itself will not be a success.

*See id*. at 1 (citing CDCR MH EOP Population Assessment, attached hereto as Exhibit L). Upon review, the Special Master refined the footnote's discussion of the personality disorder program. *See infra* p. 37. (revising Draft Report's language to the following: "…defendants have expressed their view that this program's overall impact may be limited.").

   b. *Housing of EOP patients in the Step-Down Program*

Concerning the Step-Down Proposal, CDCR indicated that the Draft Report's concerns regarding the possibility that patients at the EOP level of care would be at risk of premature discharge and housed in the general population were unfounded and not supported by the text of the memorandum or in the proposal. Specifically, CDCR stated that

> [t]he Special Master notes some overarching concerns about the step-down proposal, including that it will result in EOP patients being housed in the general population…This concern is not supported by any text in the memorandum or in the proposal since the units at issue are EOP units, not general population units, and the criteria for discharge are unchanged.

*See* Letter from Nick Weber, Esq., CDCR Office of Legal Affairs, to Special Master Lopes (April 28, 2025), attached hereto as Exhibit A at 2.

The Special Master strongly disagrees with defendants' characterizations of the draft report's discussion regarding the EOP step-down proposal, particularly their contention that these concerns are divorced from the text of the proposals. Moreover, the Special Master's recitation of these concerns regarding the proposal's myriad ambiguities in a monitoring report is, among other things, reflective of defendants' desire to move proposals forward absent consensus and prior to clarifying these substantive ambiguities.[2] As discussed in detail below, *see infra* p 33, the Special Master is generally supportive of the Step-Down Proposal but disagrees with CDCR's assessment that the concerns regarding the potential for premature discharge and inappropriate housing were not supported by text in the memorandum. For instance, there is conflicting language in the Proposal Document that, on the one hand, identifies patients in the

---

[2] In its response to the Draft Report, CDCR discussed its intention to implement the program despite unresolved concerns and stated that

> CDCR's plan in October 2024 was to work with the Special Master to resolve any concerns. But given the need to address the growing EOP population and the delay in receiving feedback to the memorandum and proposal, CDCR has moved forward with implementing it.

*See* Letter from Nick Weber, Esq., CDCR Office of Legal Affairs, to Special Master Lopes (April 28, 2025), attached hereto as Exhibit A at 2. As discussed in detail below, *see infra* p. 37, the step-down proposal is a deviation from Program Guide requirements and therefore would require court approval prior to implementation. However, to date, CDCR has not sought leave to do so. *See* ECF No. 8243 at 5-6 (discussing whether defendants must inform the Court of the changes being made to the Program Guide remedy by implementing a new policy).

Step-Down Program as "limited to those who would have remained EOP if [the Step-Down Program] was not available", Proposal Document at 2, and, on the other hand, identifies Step-Down Program patients as encompassing those who may be "clinically appropriate for CCCMS." *Id*. at 2.

Although the criteria for discharge to a lower level of care is unchanged, the conflicting language in the text of the Proposal Document may create confusion in the field. More importantly, as the Special Master's monitoring during the current round continues to reveal, inappropriate housing of EOP patients is extremely dangerous and must be diligently monitored. *See infra* p. 28 ("Patients who are placed in non-EOP designated beds run the risk of not receiving Program Guide required treatment for a multitude of reasons, including increased custody restrictions, clinician availability, patient safety, and lack of available treatment modalities.").[3] Without proper guardrails and specific language that clearly delineates patients who qualify for the Step-Down Program, EOP patients may be at an increased risk for decompensation if placed in a general population setting. Therefore, as supported in further detail below, *see infra* pp. 32-41, the Special Master did not revise the report in response to defendant's statements. The Special Master will continue to closely monitor developments related to housing of EOP patients going forward and will report to the Court and coordinate with the Receiver-nominee as appropriate.

[3] *See* 2021 Program Guide Update, ECF No. 7331-1 at 51 (PG 12-4-1) (citing "The Program Guide requires separate housing units for EOP patients: "The [EOP] program is characterized by a separate housing unit and structured activities for mentally ill in-mate patients who, because of their illness, experience adjustment difficulties in a General Population (GP) setting, yet are not so impaired as to require 24-hour inpatient care."); *see also id.* at 54 (PG 12-4-4: "Participants in the MHSDS EOP are placed in designated housing units that provide increased clinical custodial support and limit contact with members of the institution's GP [general population] inmates.").

2. *CDCR states that the Draft Report lacks a defined standard for Quality of Care, and requests that the Special Master provide additional information to show how the monitors and experts determine whether care was adequate or inadequate.*

In response to the Draft Report's assessment of the adequacy of care through record review across the eight institutions, CDCR revived its at least twice-overruled objection and requested additional information regarding how the Special Master's monitors and experts determine whether care was adequate or inadequate. *See* Letter from Nick Weber, Esq., CDCR Office of Legal Affairs, to Special Master Lopes (April 28, 2025), attached hereto as Exhibit A at 2 ("The metrics used to assess the overall quality appear to be subjective, without any stated definition or brightline test that would help both CDCR headquarters and institutional staff understand how to correct any practices and treatment deemed inadequate.").

In its order adopting the Twenty-Ninth Round Monitoring Report – Part D, the Court previously overruled the substance of this objection. There, defendants objected to the Special Master's clinical experts' use of the terms "adequate quality," "marginally adequate quality," and "inadequate quality" in the detailed case reviews appended to that report, arguing that these terms were undefined. ECF 7733 at 12. There, the court concluded this objection was "without merit" as "[t]he words 'adequate' and 'inadequate' are clear on their face, and the term "marginally adequate" was defined in the Special Master's Twenty-Ninth Round Monitoring Report – Part D. April 13, 2023 Order, ECF No. 7808 at 10.

In their objections to the Thirtieth Round Monitoring Report – Part C (reporting on CDCR's EOP programs), defendants again objected to these terms (adequate, inadequate, marginally adequate) used to assess quality of care, arguing that the Special Master's report "fail[ed] to include clear definitions for the application of these terms." ECF No. 8108 at 7. In response, the Court "summarily overruled" defendants' objections, noting it "ha[d] repeatedly rejected [defendants'] position, which defendants raise[d] yet again nonetheless." May 16, 2024

Order, ECF No. 8239 at 5. Because defendants' present objections are substantially similar to those the Court has previously "summarily overruled," the Special Master did not revise the report in response to this objection.[4] *Compare* ECF No. 7733 at 12 (objecting to "*undefined* terms to report on quality of care") and ECF No. 8108 at 7-8 (objected to report's lack of "clear definitions for the application" of terms used to assess quality of care), *with* Exhibit A at 2 (objecting to the "*lack[] of a defined* standard for the quality of care") (emphasis added).

3. *CDCR states that the Draft Report is critical of several institutions' compliance with the telemental health policy. In some cases, CDCR alleges that the report misstates the policy requirements and in others, CDCR requests clarification of the findings as reported.*

    a. *High Desert State Prison*

CDCR specifically requested clarification regarding telemental health participation in an IDTT meeting at HDSP during the site visit. CDCR's responses to the Draft Report stated that

> [t]he Draft Report raises concerns about technical issues with the use of telemental health in IDTTs. The monitors observed three mainline EOP IDTTs at HDSP where all required disciplines were present but notes that the "telepsychiatrist and correctional counselor in attendance were not the ones assigned to the patients…The tele-social worker was also remote. This posed technological challenges for both the tele-social worker and the telepsychiatrist to be able to see the room and each other." (Draft Report at 116). CDCR expects each participating tele-worker to call into a shared WebEx room with a split screen that shows the same visual as the office. CDCR requests that the Draft Report be clarified to reflect whether the technical challenges occurred because tele-staff were not calling into a shared WebEx meeting or whether another technical issue occurred.

*See* Letter from Nick Weber, Esq., CDCR Office of Legal Affairs, to Special Master Lopes (April 28, 2025), attached hereto as Exhibit A at 2-3.

---

[4] *See* August 30, 2012 Order, ECF No. 4232 at 4 n.2. ("The Special Master's time is a resource that going forward need not be spent on objections that have been raised and, as evidenced by defendants' decision not to tender them to the court, he has resolved. While the parties are required to raise before the Special Master any objection they intend to raise here, the Special Master is not required to respond to any objections that are frivolous or repetitive of objections that were previously resolved or withdrawn."); *see also* ECF No. 8239 at 6.

Based upon CDCR's clarification that all remote participants are able to see each other and the IDTT room, the Special Master revised the Draft Report to reflect the same. *See infra* pp. 124-125.

*b. Pelican Bay State Prison*

In its responses to the Draft Report, CDCR also argued that the Special Master's experts determined that the clinical documentation section within the patient record did not indicate whether the contact was conducted via telepsychiatry. CDCR then stated that

> [i]t appears that the Special Master team only reviewed the documentation section of the patients' electronic health records and not the check-out screens, which indicate whether the contact was via telepsychiatry or telemental health. It is not clear from the Draft Report why the electronic health record was not credited as showing that the contacts occurred through telepsychiatry and telemental health. Further, non-confidential telepsychiatry appointments are not counted as compliant Program Guide contacts in CDCR reporting. The findings of noncompliance with the policy should be changed to compliant.

*See* Letter from Nick Weber, Esq., CDCR Office of Legal Affairs, to Special Master Lopes (April 28, 2025), attached hereto as Exhibit A at 3.

Given this additional clarifying information, the Special Master revised the draft report and amended his findings of compliance. *See infra* pp. 143-44. However, as also discussed below, to facilitate communication among health care providers, best clinical documentation practices require that critical information that is central to the patient's treatment, including the method by which the contact was conducted (i.e. remote treatment modalities like telepsychiatry) be included in the clinical documentation charted in the provider's note.

In its responses and objections to the Draft Report, CDCR also referenced a statement in the Draft Report discussing a medical assistant's absence from the room where a telemental health appointment was being conducted at PBSP. *See* Letter from Nick Weber, Esq., CDCR

Office of Legal Affairs, to Special Master Lopes (April 28, 2025), attached hereto as Exhibit A at 3. CDCR specifically stated that

> [t]he telemental health policy in place at the time of the site visit to PBSP did not require telepresenters to be in the room for the entirety of an encounter unless they are requested to stay for part or all [sic] of an encounter at the telemental health provider's direction…To the extent that this is a criticism or implies non-compliance, this statement should be corrected or deleted from the draft report.

*Id*.

The Special Master did not make a compliance determination based upon the presence or absence of a medical assistant in the treatment room during a mental health appointment. This statement was an observation of the telemental health contact for a patient who was otherwise assigned an on-site primary clinician but experienced treatment with a newly hired tele-social worker. The Special Master did not make any revisions to the Draft Report.

4. *CDCR requests the basis for the information reported in HDSP's institutional summary which indicated that "HDSP leadership reported that they were initially informed that the new mainline EOP program's capacity would be 120 patients and that the population would be limited to 'single celled' Level IV mainline EOP patients."*

In response to the concerning findings regarding HDSP's newly activated EOP program, CDCR requested additional information regarding the Draft Report's statement that "HDSP leadership reported that they were initially informed that the new mainline EOP program's capacity would be 120 patients and that the population would be limited to 'single celled' Level IV mainline EOP patients." Specifically, CDCR stated:

> CDCR is unclear who informed HDSP leadership that the population would be limited to single cell; no notifications were sent from Headquarters to reflect this. It would be helpful if the report could provide the basis of that information so corrective action can be taken as needed to rectify this miscommunication and any similar communications that may arise in the future.

*Id.*

Upon review, the Special Master notes the Draft Report's statement is sufficiently clear and did not revise the report in response to this preliminary objection.

5. *The Draft Report's Findings Regarding Medication Non-adherence at PVSP.*

In response to the Draft Report's findings that some PVSP patients experienced a discontinuation of medications based upon non-adherence, CDCR confirmed the practice at PVSP but "notes that it is done on a case-by-case basis" and that "[d]ecisions to discontinue medications are based on clinical judgement and occur when patients are observed to maintain their functionality despite not complying with therapeutic doses of medication." *Id*. at 4.

Although CDCR did not present an objection to the Special Master's findings in the Draft Report, PVSP's process of discontinuing medications based on nonadherence is not new. *See* Special Master's Thirtieth Round Monitoring Report – Part D, ECF No. 8359 at 300. In the Thirtieth Round Report, which covered institutions with only 3CMS programs, the Special Master indicated that "PVSP psychiatry discontinued medications for some patients due to noncompliance without a face-to-face assessment; psychiatry then scheduled a follow-up appointment after the medication discontinuation." *Id*.

In the Thirty-First Round, the Special Master reported that problems with medication nonadherence was at least in part due to the medication distribution system at PVSP, in that there were insufficient staff to distribute and administer the medications. *See infra* pp. 163-164. Medication lines became extremely long which resulted in patients returning to their housing units without their medications. *See id.* (citing "EOP patients reported that medication administration was a major issue because of long medication administration lines due to D yard being combined for EOP, 3CMS, and GP individuals who took medications for physical and psychiatric conditions. Patients reported that the lines were so long that multiple EOP patients would not wait and, as a group, would turn back to the EOP housing unit without taking their medications.").

However, regardless of the reason for nonadherence, patients run the risk of significant decompensation, injury, or death if their medications are not discontinued in an appropriate manner. In discontinuing medications for any reason, it is critical to consider the range of medications used to treat different mental health conditions. For example, patients prescribed antipsychotic medications used to treat schizophrenia may require continuation even with improved symptoms. Similarly, selective serotonin reuptake inhibitors (SSRI)–the most commonly used antidepressants–should not be abruptly discontinued and, whenever possible, should be tapered over several weeks to minimize discontinuation-emergent symptoms.

Although the psychiatrist may rely on clinical judgement to make a medication-related decision, the continuing concerns identified in the past two monitoring periods supports that the institution should consider the barriers to medication adherence within the current system and, at the very least, conduct an evaluation of each patient before discontinuing medications based on observations that the patient has "maintain[ed] their functionality despite note complying with therapeutic doses of medications." Exhibit A at 4.

6. *In response to the Draft Report's findings that custody participation in IDTT meetings at PVSP was "generally poor", CDCR requests clarification regarding what is needed to improve custody participation in IDTT meetings.*

The Draft Report discussed the substance of IDTT meetings at PVSP and noted the lack of custody participation, specifically indicating that it was "generally poor". The Draft Report further stated that "[t]he correctional counselor spent his time on his laptop, had poor eye contact and rapport with the patients, and had little to contribute except to assert in more than one meeting that he was not responsible for calculating or communicating good time credits." CDCR requested that the Special Master "clarify what is needed to improve custody participation from poor to good." *See* Letter from Nick Weber, Esq., CDCR Office of Legal Affairs, to Special Master Lopes (April 28, 2025), attached hereto as Exhibit A at 4.

The responsibilities for overall treatment planning at the EOP level of care rests with the interdisciplinary treatment team (IDTT). *See* ECF No. 7333-1 at 56. The Program Guide requires that the patient's assigned correctional counselor is a required participant that may provide custody-related input relative to the Program Guide's requirements. *Id*. To the extent that defendants request that the Special Master provides specific information related to what is needed to "improve custody participation" in IDTTs, defendants need only read this report and prior reports for examples of the same. *See, e.g.*, ECF No. 8447 at 6 ("After thirty rounds of monitoring, defendants and their agents are well aware of the substantive areas monitored by the Special Master and the substantive information he requires to complete his monitoring responsibilities. If defendants are not aware of the current status of their compliance with Program Guide requirements, which the Special Master regularly monitors, they have access to all the records necessary to glean that information.").[5]

[5] *E.g., infra* p. 137 ("In contrast, the correctional counselor was well-prepared, provided patients with case specific information, answered questions, and provided patients with information on available Division of Rehabilitative Programs groups and a form to sign up for any of those groups."); Thirtieth Round Monitoring Report – Part D, ECF No. 8359 at 417 ("The observed correctional counselor had access to SOMS, was able to answer patient questions, and educated patients on how to access their assigned correctional counselor."); Thirtieth Round Monitoring Report – Part C, ECF No. 8095 at 370 ("“[E]ither patients raised questions about available groups, or correctional counsels presented group options."); *id.* at 727 ("The psychiatrist and correctional counselor were also attentive and engaged, displaying professional interactions."); Twenty-Ninth Round Monitoring Report – Part D, ECF No. 7716 at 161 ("IDTT observation demonstrated a well-prepared correctional counselor who was familiar with all patients and who provided useful information."); Twenty-Ninth Round Monitoring Report – Part C, ECF No. 7715 at 528 ("The correctional counselor was actively engaged and was familiar with both patients, providing feedback and encouragement as appropriate."); *id.* at 553 ("“The correctional counselor participated actively, using a computer to access the patient's information. The correctional counselor appeared familiar with and knowledgeable about each patient and where each patient was with regard to custody status and process."); *id.* at 554 ("the correctional counselor discussed custody levels, placement options related to level of care concerns, and ICC scheduling/status for each patient.").

7. *CDCR objects to information contained in the Draft Report regarding the reporting on MHCB Transfers, Structured Therapeutic Activities, and IDTT meetings at KVSP.*

   a. *MHCB Transfers at KVSP*

CDCR objected to the Draft Report's discussion regarding the number of KVSP patients who were timely transferred to an MHCB during the review period. In his Draft Report, the Special Master indicated that "68 of 77 or 88 percent of MHCB transfers were timely." However, CDCR indicates that "[t]hose figures appear incorrect and inconsistent with the data produced to the Special Master prior to the tour. Data produced to the SharePoint as part of Request No. 17[6] shows that there were 110 MHCB admissions during the reporting period, not 77 and that all but nine were admitted timely (91% compliance)…" *See* Letter from Nick Weber, Esq., CDCR Office of Legal Affairs, to Special Master Lopes (April 28, 2025), attached hereto as Exhibit A at 4.

The Special Master notes multiple inconsistencies and incorrect statements in CDCR's objection but did correct the information contained in the Draft Report regarding MHCB transfers. *See infra* p. 134. First, the document which CDCR references and attached to the April 28, 2025 letter was produced on July 12, 2024 and was the second set of information concerning MHCB transfers that was provided to the Special Master's staff in response to his document request. Additionally, the 110 MHCB admissions identified by the defendants included all MHCB admissions from January 1, 2024 through May 31, 2024. The review period in which the Special Master used in calculating the "number of MHCB referrals during the review period," was from January 1, 2024 through March 31, 2024.

---

[6] Request No. 17 of the Special Master's Focused EOP Review Document Request, dated July 6, 2024, states "[p]rovide transfer timelines for all EOP patients who were placed in your program since opening and were transferred to a HLOC including MHCB, PIP, and DSH.

A review of the documentation produced on July 12, 2024 (also produced as an attachment to defendants' April 28, 2025 letter) reflects that, from January 1, 2024 through March 31, 2024, 63 of 68 or 93 percent of referred patients were timely transferred to the MHCB. The Special Master revised his report to reflect the same. *See infra* p. 134.

*b. Structured Therapeutic Activities at KVSP*

In their preliminary objections to the Draft Report, CDCR indicated that "[t]he Draft Report states that KVSP was unable to produce data regarding structured therapeutic activities scheduled, offered, attended, or refused (Draft Report at 61). CDCR provides this information now for the relevant review period and requests that the Draft Report be updated to reflect this information." *See* Letter from Nick Weber, Esq., CDCR Office of Legal Affairs, to Special Master Lopes (April 28, 2025), attached hereto as Exhibit A at 4.

For clarification purposes, in its letter, CDCR referenced the statement in the Draft Report under the section titled "MHSDS Patients in Restrictive Housing Units." The documentation submitted with the April 28, 2025 letter reflects data from June 1, 2024 to July 12, 2024, which was not within the review period of January 1, 2024 through March 31, 2024 and does not parse RHU patients from mainline patients nor indicate any patients' levels of care. Accordingly, the Special Master did not amend his findings that KVSP was unable to produce information regarding structured treatment hours for EOP RHU patients during the review period.

*c. IDTTs at KVSP*

CDCR made multiple objections to the Draft Report's discussion of IDTTs at KVSP and pointed to conflicting observations made by regional mental health administrators that were assigned to accompany each *Coleman* monitor on each tour.

In the letter responding to the Draft Report, CDCR stated that

> [t]he Draft Report is critical of the observed IDTTs at KVSP, noting that patients were rarely seen by the psychiatrist and primary clinician for an initial assessment prior to the IDTT… However, CDCR's regional psychologists, who accompanied the *Coleman* monitors on the tour, confirm that of the eight IDTTs observed, five were initial IDTTs and three were routine IDTTs…. Additionally, the mental health primary clinician initial assessments were completed before all five initial IDTTs. Only the initial psychiatry assessments were not done in advance for two out of the five initial IDTTs. Only the initial psychiatry assessments were not done in advance for two out of the five initial IDTTs. CDCR requests that the Draft Report be revised to clarify which of the eight IDTTs are referenced.

*See* Letter from Nick Weber, Esq., CDCR Office of Legal Affairs, to Special Master Lopes (April 28, 2025), attached hereto as Exhibit A at 4-5 (emphasis added). The Special Master provides responses to these objections as follows.

The Draft Report stated that "[m]ental health supervisory staff reported, and case reviews confirmed, that they were not always able to meet timeframes for initial assessments and IDTTs. Patients were rarely seen by the psychiatrist and primary clinician for an initial assessment prior to the IDTT." The Special Master made revisions to the Draft Report to clarify that this information was ascertained from staff interviews and did not specifically reference the observed IDTTs referenced in the report. *See infra* p. 136.

CDCR then objected to the Draft Report's statement that "patients were rarely told the purpose of the meeting." In its letter, CDCR states that "CDCR's regional psychologists observed that the purpose of the IDTT was reviewed in three of the meetings. CDCR requests that the regional psychologists observations be included in the report and that the Draft Report's reference be corrected as appropriate." *See* Letter from Nick Weber, Esq., CDCR Office of Legal Affairs, to Special Master Lopes (April 28, 2025), attached hereto as Exhibit A at 5.

The Special Master declined to include CDCR's proposed alternative findings in the final report as the monitor's expert determined that patients were rarely told the purpose of the

meeting and, when the meeting did occur, it was often only because the supervisor participating would explain the purpose of the IDTT when the facilitating clinician did not do so. To ensure clarity, the Special Master included this additional information obtained from the monitor's expert in the final report. *See infra* p. 137.

8. *CDCR requests that the Special Master adopt a process that will confirm the list of patients selected for chart reviews so that all parties are working with the same factual basis.*

Also in its April 28, 2025 letter, CDCR indicated that its region three mental health administrators requested the names of the patients that the Special Master's team planned to review for its clinical case reviews so that they could review those same patients prior to the on-site tour. CDCR stated that

> However, the patients listed in the Redacted Patient list provided with the Draft Report are different from the patients identified by the Special Master prior to the review. The region three administrators are unable to provide any input on those cases or the findings on those cases without reviewing the records for the new list of patients. CDCR requests that the Special Master adopt a process that will confirm the list of patients selected for chart reviews so that all parties are working with the same factual basis.

*See* Letter from Nick Weber, Esq., CDCR Office of Legal Affairs, to Special Master Lopes (April 28, 2025), attached hereto as Exhibit A at 5.

Included with each of the Special Master's monitoring reports are individual patient record reviews developed from a random sample of patients at each reviewed institution. *See infra* pp. 184 - 562. As discussed in prior monitoring reports, the Special Master's expert's individual patient record reviews are conducted retrospectively and not contemporaneously with the Special Master's monitoring tours. *See* Special Master's Thirtieth Round Monitoring Report – Part D, ECF No. 8359 at 18 n. 5. Therefore, although in some cases patients are randomly selected during monitoring tours, these are preliminary selections and are subject to change.

Consistent with the Order of Reference, ECF No. 640, the Special Master provides the parties with a copy of the Draft Report and affords both parties a reasonable time within which to submit specific written objections to the Special Master. Distributed with each Draft Report is a list of the patients that were selected for review. This process enables the parties to review these records and provide input and certainly does not compromise anyone's ability to "[work] with the same factual basis" as suggested in the April 28, 2025 letter. *See* Letter from Nick Weber, Esq., CDCR Office of Legal Affairs, to Special Master Lopes (April 28, 2025), attached hereto as Exhibit A at 5.

In fact, this Court has expressed similar views and has summarily ruled upon the defendant's objections to the Special Master's review of patient records. In its order adopting the Special Master's Thirtieth Round Monitoring Report – Part D, covering 3CMS institutions, the Court has stated that

> [t]he patient records at issue are created and maintained by defendants and their agents and made available to the Special Master by defendants and their agents. Defendants are responsible in the first instance for complying with Program Guide requirements…As part of their duty to provide adequate mental health treatment to the plaintiff class, defendants and their agents at prison institutions that provide mental health care should know routinely whether Program Guide requirements…are being met and if not, why not…If defendants are not aware of the current status of their compliance with Program Guide requirements, which the Special Master regularly monitors, they have access to all the records necessary to glean that information. The court overruled this objection.

*See* ECF No. 8447 at 5-6.

As this court-approved process does not prevent either party from identifying the patients that were reviewed, assessing their patient record, and providing the Special Master with any response or objection that they see fit, the Special Master declines to adopt an additional process going forward.

9. *CDCR objects and responds to information contained in the Draft Report regarding the reporting on MHCB staffing, structured treatment, and IDTT staff participation at CIM.*

In response to defendants objections regarding the Draft Report's statements regarding MHCB staffing and structured treatment requirements at CIM, the Special Master revised the draft report as necessary to reflect that MHCB staff were not forced to work weekends as a result of the activation of the new EOP program and to reflect the exact structured treatment requirements as required by the Program Guide. *See infra* pp. 91 - 92.

Regarding CIM's compliance with required staff attendance in IDTTs, the Special Master declined to revise the Draft Report as the statements represent an accurate reflection of whether the 188 reviewed IDTTs followed Program Guide requirements that the patient's assigned clinician be present.

**A. <u>Recent Growth in Enhanced Outpatient Program Population</u>**

In his preceding monitoring round report, the Special Master reported on the growth in the population of incarcerated persons at the Enhanced Outpatient Program (EOP) level of care, noting that "reductions in CDCR's overall population have far outpaced those of the plaintiff class." Thirtieth Round Monitoring Report – Part C, ECF No. 8095 at 41; *see also* Twenty-Ninth Round Monitoring Report – Part A, ECF No. 7555 at 37 n. 16 (noting "reductions in the size of the *Coleman* population have not kept pace with decreases in the overall incarcerated persons population."). By and large, reductions in the size of Mental Health Services Delivery System (MHSDS) population have been driven by reductions in population for those class members at the Correctional Clinical Case Management System (3CMS) level of care. *See* ECF No. 8095 at 42; *see also id.* at 42 n. 29.

As of the time of the filing of the Thirtieth Round Monitoring Report, compared to the CDCR population at the time of the Three-Judge Court proceedings in 2008, CDCR's overall

population declined nearly 40 percent. With respect to the *Coleman* class, during the same time period, the MHSDS population had only decreased by 3.5 percent, while the EOP population *increased* by 41 percent. *See* ECF No. 8095 at 42-43.

Indeed, since the filing of the Thirtieth Round Monitoring Report, CDCR's EOP population has continued to grow, with 7,218 mainline EOP patients and an additional 750 EOP patients housed in Restrictive Housing Units (RHUs), for a total of 7,968 EOP patients as of December 30, 2024. This represents a 12 percent increase (878 patients) in the EOP population compared to July 31, 2023.[7] As of the same date, CDCR reported housing four percent more EOP patients (7,787 patients) than capacity (7,471 beds). *See* MHSDS Management Information Summary (MIS) Report, uploaded to CDCR's Secure Website for Monthly *Coleman* Reports (reporting census data as of December 30, 2024). Finally, as of December 30, 2024, EOP patients comprised approximately 23 percent of CDCR's MHSDS population and nearly nine percent of CDCR's overall population. *See id.*

This population growth significantly impacts the operation of CDCR's MHSDS and, critically, reflects the increasing mental health acuity of the plaintiff class, with the EOP population representing an historically high 23 percent of the MHSDS population. Patients at the EOP level of care, "*because of their illness, experience adjustment difficulties in a General Population (GP) setting*, yet are not so impaired as to require 24-hour inpatient care." As a result, the Program Guide requires EOP patients to be housed in "*designated housing unit* with *restricted access and alternative educational, work, and recreational opportunities* specifically

[7] *Compare* Joint List of Stipulated Facts (filed September 22, 2023), ECF No. 7956 at 7 (reporting EOP population of 7,090 as of July 31, 2023), *with* MHSDS Management Information Summary (MIS) Report, uploaded to CDCR's Secure Website for Monthly *Coleman* Reports (reporting an EOP population of 7,968 patients as of December 30, 2024).

provided for inmate-patients whose mental illness precludes their placement and participation in the GP programs." ECF No. 7331-1 at 51 (Program 12-4-1) (emphasis added).[8]

As again confirmed in this focused review, in the absence of appropriate, designated EOP housing, EOP patients are placed in non-EOP settings – sometimes in RHUs – where they go without Program Guide required and clinically indicated monitoring and mental health treatment and, as a result, are subject to unacceptable risk of decompensation. Staff in these non-EOP units are placed in an untenable position, with some staff lacking experience caring for patients requiring residential mental health treatment (i.e. EOP level of care) and most operating without the resources needed to do so adequately.

**B. <u>Enhanced Outpatient Program Mission Changes</u>**

In recognition of the necessity to appropriately house this growing portion of the MHSDS population,[9] in August-September 2023, CDCR convened an "internal workgroup aimed at 'provid[ing] proposals to mental health leadership regarding which institutions would be suited to add EOP patients to their mission." ECF No. 8359 at 33 (quoting ECF No. 8095 at 44 n. 33). Thereafter, CDCR moved forward with activating 790 new EOP beds across nine housing

---

[8] *See also* ECF No. 7331-1 at 54 (Program Guide 12-4-4: "Participants in the MHSDS EOP are placed in *designated housing units* that provide increased clinical and custodial support and *limit contact with members of the institution's GP inmates*.") (emphasis added).

[9] The Program Guide requires separate housing units for EOP patients: "The [EOP] program is characterized by a *separate housing unit* and structured activities for mentally ill inmate-patients who, because of their illness, experience adjustment difficulties in a General Population (GP) setting, yet are not so impaired as to require 24-hour inpatient care." *See* 2021 Program Guide Update, ECF No. 7331-1 at 51 (PG 12-4-1) (emphasis added); *see also id.* at 54 (PG 12-4-4: "Participants in the MHSDS EOP are placed in *designated housing units* that provide increased clinical custodial support and limit contact with members of the institution's GP [general population] inmates.") (emphasis added).

units at eight institutions with activation dates ranging from November 1, 2023 to August 5, 2024.[10]

In the months following activation, CDCR further increased the number of EOP beds across these eight institutions beyond their original authorizations. By the date of each site visit, the number of new EOP beds expanded to 1,010; an increase of 28 percent. Significant EOP bed increases were noted at CCI, which experienced a 50 percent increase from 80 to 120 beds, CIM which experienced a 33 percent increase from 150 to 200 beds, and PVSP which experienced the largest increase from 100 to 184 beds; an increase of 84 percent in 85 days.

The newly activated EOP housing units together with each date of activation and bed allocations on the date of each site visit are depicted in the table below:

**Table 1: Newly Activated EOP Housing Units**

| Institution | Housing Unit | Bed Type | Date of Activation | Number of Beds at Activation | Date of Site Visit | Number of Beds at Site Visit |
|---|---|---|---|---|---|---|
| CCI | A7 | EOP IV | December 18, 2023 | 80 | July 23, 2024 | 120 |
| CIM | C - Alpine | EOP II | February 12, 2024 | 150 | July 9, 2024 | 200 |
| HDSP | D1 | EOP IV | January 29, 2024 | 80 | July 9, 2024 | 80 |
| HDSP | D2 | EOP IV | January 29, 2024 | 80 | July 9, 2024 | 80 |
| KVSP | C6 | EOP IV | November 1, 2023 | 80 | July 15, 2024 | 86 |
| PBSP | B3 | EOP IV | January 22, 2024 | 80 | May 29, 2024 | 80 |

[10] *See* Letter from Nicholas Weber, Esq., CDCR Office of Legal Affairs, to Special Master Lopes and plaintiffs' counsel (October 17, 2023), attached hereto as Exhibit B at 2; Letter from Nicholas Weber, Esq., CDCR Office of Legal Affairs, to Special Master Lopes and plaintiffs' counsel (October 26, 2023), attached hereto as Exhibit C at 2; Letter from Sundeep Thind, Esq., CDCR Office of Legal Affairs, to Special Master Lopes and plaintiffs' counsel (June 5, 2024), attached hereto as Exhibit D at 1; and Letter from Sundeep Thind, Esq., CDCR Office of Legal Affairs, to Special Master Lopes and plaintiffs' counsel (June 21, 2024), attached hereto as Exhibit E at 1.

| Institution | Housing Unit | Bed Type | Date of Activation | Number of Beds at Activation | Date of Site Visit | Number of Beds at Site Visit |
|---|---|---|---|---|---|---|
| PVSP | D4 | EOP II | August 5, 2024 | 100 | October 29, 2024 | 184 |
| CRC | D408 | EOP II | July 8, 2024 | 40 | October 22, 2024 | 80 |
| SQ | B H3 | EOP II | January 1, 2024 | 100 | July 30, 2024 | 100 |

*See supra* note 10; *see also infra* pp. 74, 86, 104, 114, 132, 142, 161, and 174.

**i. <u>Staffing in the New EOP Programs</u>**

As alluded to in his Thirtieth Round Monitoring Report, the Special Master had significant preliminary concerns with defendants' decision to place some of these programs in institutions that were geographically remote and had struggled to maintain adequate levels of mental health staff. *See* Thirtieth Round Monitoring Report – Part D; ECF No. 8359 at 36.

Following the Thirtieth Round Monitoring Report Part D, wherein the Special Master stated that the "defendants had made limited progress filling newly allocated staff positions to support the new EOP activations," institution-wide staffing levels remained deficient throughout the Special Master's focused review. *See id*.

The below tables reflect each institution-wide functional vacancy rate for all psychiatry and primary clinician positions in February 2024, as reported in the Thirtieth Round Monitoring Report – Part D, and at the end of the Special Master's EOP Focused tour in October 2024.[11]

**<u>Table 2: Institutions with Newly Activated EOP Units: Psychiatry Functional Vacancy Rates[12]</u>**

| Institution | Psychiatry – February 2024 | Psychiatry – October 2024 |
|---|---|---|
| **CCI** | 0% | 13% |

[11] Functional vacancy rate data in these figures were taken from defendants' monthly mental health staffing vacancy report for the months of February 2024 and October 2024. *See* ECF Nos. 8177 and 8477.

[12] Functional vacancy rates for psychiatry staff included in Table 2 reflect the combined psychiatry functional vacancy rate, including civil service and registry psychiatrists, telepsychiatrists, and PNPs.

| | | |
|---|---|---|
| **CIM** | 34% | 12% |
| **HDSP** | 37% | 23% |
| **KVSP** | 7% | 22% |
| **PBSP** | 8% | 16% |
| **PVSP** | 0% | 5% |
| **CRC** | 0% | 0% |
| **SQ** | 6% | 0% |

**Table 3: Institutions with Newly Activated EOP Units: Primary Clinician Functional Vacancy Rates**[13]

| Institution | Primary Clinicians – February 2024 | Primary Clinicians – October 2024 |
|---|---|---|
| **CCI** | 35% | 11% |
| **CIM** | 11% | 5% |
| **HDSP** | 53% | 67% |
| **KVSP** | 35% | 39% |
| **PBSP** | 33% | 18% |
| **PVSP** | 36% | 45% |
| **CRC** | 11% | 14% |
| **SQ** | 31% | 4% |

During the eight-month period between February 2024 and October 2024, the number of institutions with psychiatrist functional vacancy rates that exceeded ten percent increased from two to five institutions. Additionally, of the six institutions which maintained primary clinician functional vacancy rates greater than ten percent, two institutions, HDSP and PVSP, maintained extremely high primary clinician functional vacancy rates of 67 and 45 percent respectively.

Although increasing EOP bed capacity was necessary in light of the growth in the EOP population, mental health staffing vacancy rates at the newly activated EOP institutions suggest that at least six institutions did not have the resources necessary to provide Program Guide compliant care to a new EOP population. Based on the Special Master's monitoring in the

[13] Functional vacancy rates for primary clinician staff reflect the combined psychologist and clinical social worker functional vacancy rates, including civil service, registry, and telemental health positions for these classifications.

preceding round, these institutions were already struggling to meet PG requirements.[14] The addition of a new, more complex mental health mission further stretched already insufficient resources.

Nonetheless, CDCR moved forward with the mission change at each institution. As noted, six, including CCI, CIM, CRC, HDSP, PBSP, and PVSP, have not operated EOP programs in recent years. This required institutional leadership to hire additional staff, reallocate staffing positions, dedicate time to train staff, find additional confidential individual and group treatment space, and ensure that MHCBs were equipped with enough resources to support increased referrals and admissions. *See infra* pp. 90-91, 99-100, 120-123, 135, 147, 150, 153-154, 165, and 169. Line staff also took on additional responsibilities and were not only required to deliver adequate mental health care to their existing caseloads but needed to learn new Program Guide requirements for EOP patients, including additional group curriculum, and complete the necessary training to safely and adequately deliver care. *See infra* pp. 99, 109-110, 119, 123, 128, 153, 162, and 169.

Concerningly, the three institutions with the largest new EOP bed capacities, CIM, HDSP, and PVSP, reflected EOP program-specific functional staffing vacancy rates between 36 and 53 percent. *See infra* pp. 86, 116-117, and 161-162. As a result of these vacancies, the three institutions reported significant impacts to the quality of care provided to EOP patients, including staff caseloads exceeding established EOP ratios which lead to untimely evaluations

---

[14] In his Thirtieth Round Monitoring Report, the Special Master noted that the delivery of adequate mental health care was assessed across facilities through detailed healthcare record reviews. The overall quality of care at the six institutions was assessed as follows during the Thirtieth Round: 75 percent inadequate at CCI, 53 percent inadequate at CIM, 63 percent inadequate at HDSP, 43 percent inadequate at PBSP, 67 percent inadequate at PVSP, and 50 percent inadequate at KVSP. *See* ECF Nos. 8095 at 73 and 8359 at 58.

and clinical contacts at CIM and HDSP,[15] leadership positions taking on caseloads, deficient offering of structured therapeutic activities, and collateral impacts to other areas of programming throughout each institution. *See infra* pp. 91-92, 99-100, 116, 127-128, and 162-163.

At CIM, MHCB staff were redirected to the EOP program which caused a staffing deficiency in its 35-bed MHCB. *See infra* pp. 90-91. This resulted in increased workloads for MHCB staff, increased frequency of cell-front contacts, and little time available to complete required documentation. *See id.* at 90. At PVSP, there were no on-site psychologists and only two clinical social workers on-site for three days per week which required the psychology supervisors and psychology specialists from the 3CMS programs to cover EOP caseloads. *See infra* pp. 162-163.

---

[15] The following sections provide support for the Special Master's findings that caseloads exceeding established ratios contributed to untimely clinical evaluations and contacts at CIM and HDSP:

- *Infra* pp. 91 and 98-99: At CIM, "Of the six staff members with discernable EOP patient caseloads, four exceeded the staffing plan's required ratio…The monitor randomly selected and reviewed the healthcare records of 40 mainline EOP patients … Forty patients required initial psychiatry evaluations; 31 or 78 percent [were] timely… Thirty-two patients required routine psychiatry contacts; 82 percent [were] timely… Thirty-nine patients required routine primary clinician evaluations; three patients did not receive them and 79 percent [were] timely."

- *Infra* pp. 116 and 127-128: "HDSP reported that its mainline EOP program had only one telepsychiatrist and one primary clinician who was a full-time tele-social worker. Both clinicians were assigned to all Level IV mainline EOP patients…The monitor randomly selected and reviewed the healthcare records of 40 mainline EOP patients … Forty patients required initial psychiatry evaluations; 14 or 35 percent [were] timely … Twenty patients required routine psychiatry contacts; 42 percent [were] timely … Of the 40 patients who required initial primary clinician evaluations, 19 or 48 percent were [timely] … Thirty patients required routine primary clinician evaluations; 58 percent [were] timely..."

At HDSP, there was one telepsychiatrist and one tele-social worker assigned to treat the entire 160-bed EOP program and its overflow. *See infra* p. 116-117.[16] As a result, no EOP patient at HDSP received any in-person treatment. *See id*. Notably, HDSP indicated that due to these staffing deficiencies, it had only been able to provide two hours of weekly treatment groups, none of which were clinician-led, and the primary clinician scheduled patients every three to four weeks for routine contacts (which are required to occur weekly per the Program Guide),[17] with some patients not being seen for six to eight weeks.[18] *See id*. at 123 (reporting "EOP patients were generally offered one or two hours of weekly treatment groups and the primary clinician typically scheduled patients every three weeks for routine contacts. The primary clinician stated that, for various reasons, including alarms and delays in searching and escorting patients to the clinic for their telemental health appointments, some patients on their caseload had not been seen in six to eight weeks").

Unfortunately, most of the institutions that were selected for mission changes had historically high staffing vacancies and resource issues across all program areas. In anticipation of the expansion of the EOP programs, institutions were unable to hire the requisite staff and were forced to re-direct their already limited staff to the needs of the new EOP program. As

[16] By comparison, defendant's 2009 Staffing Plan requires staffing ratios for psychiatrists and primary clinicians treating mainline EOP patients to not exceed 120 patients per psychiatrist or 26 patients per primary clinician. *See* Defendant's 2009 Staffing Plan; ECF No. 3693 at 2.

[17] *See* 2021 Program Guide Update, ECF No. 7331-1 at 59 (Program Guide 12-4-9, requiring "Weekly clinical contact with PC either individually or in group psychotherapy; individual clinical contact at least every other week.").

[18] This significant lack of basic treatment for EOP patients resulted in the Special Master strongly encouraging CDCR to discontinue their plan to house Level IV mainline EOP patients at HDSP altogether "as it was clear the mainline EOP program was dysfunctional and there was no clear plan for implementing the EOP program with all of its requirements in the near future." *See infra* p. 115. Following the July 9, 2024 site visit, on July 15, 2024, CDCR closed the HDSP EOP program to intake. *See* Exhibit E.

discussed in greater detail in this Draft Report, these staffing deficiencies became the catalyst of non-compliant mental health treatment for the vulnerable EOP population and had cascading effects on patient welfare and security across the eight institutions.

**ii. Housing and Treatment of Patients in New EOP Programs**

Outside of staffing, the Special Master's preliminary concerns regarding institutional readiness to take on the significant challenge of housing and treating patients at the EOP level of care were confirmed in many respects following the focused monitoring tours. Institutions struggled to find appropriate housing for some class members and the insufficient amount of offered structured therapeutic activities were among the most notable issues identified at the newly activated programs.

**a. Inappropriate Housing of EOP Patients**

Despite opening 1,010 new EOP beds across nine housing units at eight institutions, during the focused review (and up until the time of this writing), defendants struggled to find appropriate, designated EOP housing for some class members resulting in a significant number of EOP patients being placed in non-EOP Beds. Patients who are placed in non-EOP designated beds run the risk of not receiving Program Guide required treatment for a multitude of reasons, including increased custody restrictions, clinician availability, patient safety, and lack of available treatment modalities.

Each week, CDCR provides an "Open and Closed Health Care Programs" report which provides the number of EOP patients at each institution that are housed in non-EOP Beds on a weekly basis.[19] *See* Exhibit G. From February 12, 2024 to October 31, 2024, 26 weekly reports

[19] The document states that "[c]ensus in Non-EOP Beds: Patients with an EOP Mental Health Code but not in a designated EOP bed according to SOMS. EOP patients housed in Specialized Medical Beds (i.e., CTC, OHU, HSP), Mental Health Inpatient Programs (i.e. MHCB, PIP, ICF,

revealed that at the eight newly activated institutions there were 714 instances of EOP patients housed in non-EOP Beds. Weekly totals across the eight institutions averaged 27 patients per week and ranged from seven patients to 76 patients per week.

The following chart reflects the number of EOP patients at each institution that were housed in non-EOP Beds over the 26 examined weeks:




Of note, five of the eight institutions, including CCI, HDSP, KVSP, PBSP, and SQ, housed more than ten EOP patients in non-EOP Beds for at least one reviewed week. Additionally, most patients were not housed in non-EOP beds for longer than one week at a time. Concerns that at least ten or more patients were placed in non-EOP housing for multiple weeks in a row were noted at SQ, which maintained at least 11 patients in non-EOP Beds from February 12, 2024 to February 20, 2024, HDSP, which maintained at least 16 patients in non-

FLX), or Restricted Housing Units are excluded from the Census in Non-EOP Beds." *See* Exhibit G.

EOP Beds from July 15, 2024 through July 29, 2024, and CCI which maintained at least 20 patients and upwards of 36 patients from August 26, 2024 to October 28, 2024.[20]

Findings during the Special Master's focused review of HDSP revealed concerns that lend to the harm that can result from housing EOP patients in non-EOP Beds. During the review period, HDSP activated overflow housing of its 160-bed EOP program and began housing mainline EOP patients in the 3CMS RHU. *See infra* pp. 116 and 122. Notably, mainline EOP patients housed in the RHU reported being offered one 90-minute recreation therapy group per week,[21] significantly less than the ten weekly hours of structured therapeutic activity that the Program Guide requires be offered to mainline EOP patients. *See infra* p. 122.

Notwithstanding HDSP's inability to care for the then-current EOP patient census, the institution remained open to intake and continued to receive new patients in their overflow unit through July 15, 2024. *See* Email from M. Bentz, Esq., CDCR Office of Legal Affairs, to Special Master Lopes and plaintiffs' counsel (July 18, 2024), attached hereto as Exhibit F.

As indicated above, following activation, the population of some of these eight new EOP units quickly exceeded capacity. This caused at least 714 different instances where an EOP patient was placed into a non-EOP Bed, compromising each patient's access to treatment. With minimal staff to support the growing populations, the treatment offered quickly fell below and, in

---

[20] The Special Master's site visit occurred on July 23, 2024 through July 24, 2024. Therefore, the Special Master was unable to ascertain where these patients were housed, whether they received Program Guide compliant treatment, or the number of patients who were housed in non-EOP beds for consecutive weeks.

[21] The Restricted Housing Unit Program: Mental Health Services Policy, dated July 19, 2024 and effective August 1, 2024 (hereinafter "RHU Policy") requires that patients are offered 90 minutes of confidential, structured group therapeutic activity weekly.

some cases, never met minimum standards, including the offering of structured therapeutic activities, for EOP patients.

**b. Structured Therapeutic Activities Provided to Patients in New EOP Programs Has Suffered**

As a result of the severe staffing deficiencies and inappropriate housing noted above, the amount of structured therapeutic activities provided to EOP patients in some new EOP programs was woefully low and not compliant with Program Guide requirements.

According to the Program Guide, each patient receiving services at the EOP level of care must be offered at least ten hours per week of structured therapeutic activities. For patients contraindicated for ten hours of structured therapeutic activity per week, the patient's IDTT is required to meet monthly to review and increase the amount of structured therapeutic activities or consider referral to a higher level of care. *See* 2021 Program Guide, ECF No. 7333-1 at 58 (PG 12-4-8).

Of the eight institutions with newly activated EOP programs, three, CCI, PBSP, and SQ, offered patients at least ten hours of treatment on average across institution-wide EOP populations. *See infra* pp. 78, 148, and 178. Both CRC and PVSP were close to compliance, offering an average of nine hours and 8.8 hours respectively. *See infra* pp. 107 and 166. However, the two institutions with the highest and third highest EOP bed capacity, CIM and HDSP, offered patients an average of four hours and two hours of structured therapeutic activities per week, respectively. *See infra* pp. 92 and 123. Of note, HDSP indicated that they did not offer any clinician-led treatment groups during the review period and that outside of a primary clinician contact every three to four weeks, structured treatment was typically completed by the recreation therapist. *See infra* p. 126.

While the adequacy of structured treatment delivery is addressed in Part II of this report, the quantity of structured treatment when measured against Program Guide requirements was insufficient to address the needs of patients at the EOP level of care.

### C. New EOP Population Initiatives

Relatedly, defendants recently requested the Special Master and plaintiffs' counsel to meet and confer regarding an EOP to 3CMS "step down" housing pilot program. On October 22, 2024, defendants distributed a draft memorandum entitled "Enhanced Outpatient Program to Correctional Clinical Case Management System Step Down." *See generally* Exhibit H. This memo announced a "test project for step down of Enhanced Outpatient Program (EOP) to Correctional Clinical Case Management System (CCCMS) level of care patients" at specified housing units within three CDCR institutions, as follows:

> San Quentin: "Patients at SQRC whose level of care changes from EOP to CCCMS may remain in their same housing unit on B1, B2, or B3. These patients will not be moved between buildings or beds to group them together. When possible, they will remain with their current mental health care team."
>
> CSP-LAC: "At LAC, patients housed on Facility D in buildings 1, 2, 3, and 4 who have a level of care change to, or is currently CCCMS, may be moved to another institution or reviewed for housing in D4. Patients in CCCMS will be celled together at LAC."
>
> SATF: "At SATF-CSP, patients housed on Facilities F & G in buildings F3, G1, and G3, whose level of care changes or who are currently CCCMS will either be moved to CCCMS pods within F3, G1, or G3, or will be moved to G2, F1, or F2 depending on the availability of bed space in existing CCCMS pods within those units. For patients to remain in a building otherwise designated as EOP housing, they must be housed in pods within the units in those buildings with patients at their current level of care, CCCMS with CCCMS and EOP with EOP, so that mingling of patients at different levels of care within the same pods will not be permitted."

*Id.* at 2-3. In addition, the draft memo indicates that, "[f]or clinical and operational purposes," the "test project" units at these three institutions "will remain designated as EOP beds and managed as such." *Id.* at 2.

According to the memo, placement in the test step down program is left to the discretion of institutional mental health staff: "Patients whose level of care changes from EOP to CCCMS per an Interdisciplinary Treatment Team (IDTT) decision may remain in the same facility, with the same care team, until staff agree that a suitable housing option has been found." Memo at 2. Similarly, discharge from the step down program is at the treatment team's discretion, as follows: "Clinical readiness to move out of the unit is determined by IDTT and may occur at any time the team determines appropriate." *Id.* at 2.

Plaintiffs submitted written comments and questions on the October 22, 2024 memo on November 20, 2024. *See generally* Exhibit I. The Special Master provided written comments on defendants' draft memo in a November 21, 2024 letter. *See generally* Exhibit J. In their written comments, both plaintiffs' counsel and the Special Master indicated their conceptual support for an initiative to ease the transition from the EOP to CCCMS levels of care but expressed numerous specific concerns and questions with the memo as drafted. Among their comments and questions, both plaintiffs and the Special Master inquired about CDCR's goals and objectives for this test project and sought more definitive information regarding timing of the project's rollout, admission and discharge criteria, and anticipated length of stay for patients in the step down program. Moreover, both plaintiffs and the Special Master noted that the memo and the test project contemplated deviations from key remedial requirements and, as a result, would require leave of court to modify the Program Guide.[22]

---

[22] The EOP "is characterized by a *separate housing unit* and structured activities for mentally ill inmate-patients who, *because of their illness, experience adjustment difficulties in a General Population (GP) setting*, yet are not so impaired as to require 24-hour inpatient care." ECF No. 7331-1 at 51 (PG 12-4-1) (emphasis added). The Program Guide requires "[a] *designated housing unit* with *restricted access and alternative educational, work, and recreational opportunities* specifically provided for inmate-patients whose mental illness precludes their placement and participation in the GP programs." ECF No. 7331-1 at 51 (Program 12-4-1)

The parties met and conferred under the Special Master's supervision on November 26, 2024, to discuss the memo and related correspondence. Given the number of ambiguities in the draft memo and questions raised during the meet and confer, defendants agreed to provide a written proposal outlining the goals and objectives of their test step down project.

On January 24, 2025, defendants redistributed the October 22, 2024 memo accompanied by two supplemental documents, one entitled "EOP to CCCMS Step Down Proposal" [hereinafter Proposal Document], attached hereto as Exhibit K, and the other entitled "CDCR MH EOP Population Assessment." [hereinafter Assessment Document], attached hereto as Exhibit L. In a subsequent February 11, 2024 email, defendants indicated they intended to implement the EOP to CCCMS memo on March 1, 2025. *See* Email from N. Weber, CDCR Office to Legal Affairs, to plaintiffs' counsel (February 11, 2025), attached hereto as Exhibit M.[23]

Substantively, the Proposal Document overlaps with much of the content of the October 22, 2024 memo but also provides additional detail as to the potential benefits of the proposed step down program:

> Benefits to the patient from the proposal include fewer disruptions to their lives because their MH level of care will no longer be an obstacle to:
>
> 1) Maintaining consistency of programming,
> 2) School or job assignments,

---

(emphasis added); *see also* ECF No. 7331-1 at 54 (Program Guide 12-4-4: "Participants in the MHSDS EOP are placed in *designated housing units* that provide increased clinical and custodial support and *limit contact with members of the institution's GP inmates*.") (emphasis added).

[23] On January 27, 2025, defense counsel indicated via email that the step down memo had "not been finalized as the parties have not finalized discussions." *See* Email from N. Weber, Esq., CDCR Office of Legal Affairs, to plaintiffs' counsel (January 27, 2025), attached hereto as Exhibit N. However, as noted, defendants later indicated their intent to implement the test project on March 1, 2025. In a February 13, 2025 email, plaintiffs' counsel objected to implementation of the step down memo prior to conclusion of the meet and confer process. See Email from plaintiffs' counsel to N. Weber, CDCR Office of Legal Affairs (February 13, 2025), attached hereto as Exhibit O.

3) Geographic benefits for family visits,
4) Feelings of familiarity and security,
5) Positive and stable influences with friends in their peer group,
6) Continuity of care from the same treatment team,
7) Enjoyment of and ongoing participation in certain groups without interruption (as clinically appropriate), and
8) Being in the least restrictive setting, as legally appropriate (note: not LRH, as in inpatient assessments)

Proposal Document at 2-3. With respect to the designation and management of the step down beds, the Proposal Document expounds upon the October 22, 2024 memo as follows:

> Other than the beds remaining designated as EOP, this proposal functions like an inpatient "flex" policy where an Acute patient may flex down to an Intermediate patient but remains in the same cell, minimizing disruptions. Bed vacancies will be filled by EOP patients only; no CCCMS patients from other locations will be transferred into buildings housing EOP patients (this includes Facility D at LAC, where D4 will house only CCCMS patients who were recently EOP).

Proposal Document at 1.

The Assessment Document outlined a series of near-term, medium-term, and long-term efforts "to address the growing EOP population" and ensure "patients at the EOP level of care are appropriately assessed and treated." Assessment Document at 1. Among the near-term initiatives, CDCR offered the "limited cohabitation" of CCCMS and EOP patients as contemplated in the October 22, 2024 Memo; considering higher (and lower) levels of care "as clinically appropriate," and "continuing to engage with the institutional EOP staff and patient population on their thoughts about increases in the overall EOP population, and what could be done to provide more services to patients."[24]

---

[24] The Special Master notes defendants recently engaged staff regarding efforts to improve working conditions in CDCR institutions with complex mental health missions. These efforts sprung from the Court's order directing defendants to develop (in consultation with the Special Master and plaintiffs' counsel) a plan for expenditure of accumulated staffing fines on projects that would improve working conditions and procure supplies at their respective institutions and programs. *See generally* June 25, 2024 Order, ECF No. 8291 (holding three named defendants "in contempt of this court's orders to come into full compliance with defendants' 2009 Staffing Plan and the ten percent maximum mental health staffing vacancy rate required by the June 13,

In addition, the Assessment Document outlines the following medium-term initiatives: reactivating Crisis Intervention Teams; expanding MSF/MCRPs to include EOP patients; ensuring "proxy measurements are not taking away from clinical judgment" (where the term "proxy measurements" appears to refer to the Program Guide's minimum requirement that EOP patients be offered ten hours per week of structured therapeutic activities, *see* ECF No. 7331-1 at 58 (PG 12-4-8));[25] and working with custody to facilitate security level overrides to facilitate placement in appropriate EOP settings. Finally, the long-term effort identified in the Assessment

---

2002 order"); July 12, 2024 Order and Order to Show Cause, ECF No. 8330 at 16 (directing the parties to develop under the Special Master's supervision "a written plan for expenditure of accumulated fines…to remedy ongoing mental health understaffing in the CDCR units covered by the 2009 Staffing Plan"); *see also* Parties' Jt. Submission of Plan for Expenditure of Staffing Contempt Fines and [Proposed Order], ECF No. 8372. Defendants' appeal of the Court's order findings defendants in contempt with the Court's orders regarding mental health staffing is pending. While CDCR has voluntarily moved forward with at least one project included in their plan for expenditure of staffing fines (i.e., the Hybrid Work Policy), defendants have not opted to move forward with these other projects that are intended to improve working conditions, as is their right.

[25] The full context of the Assessment Document's reference to "proxy measurements" is included below for reference:

> 3. Ensure that patients are evaluated based on their unique individual strengths and goals, and that proxy measurements are not taking away from clinical judgment.
>
> > a. For example, some patients receive many hours of DRP programming each week, but only four of those hours count towards EOP structured treatment minimums. CDCR believes that there a sub-group of EOP patients who would be best served by continuing that activity schedule. There may be limited benefit to offering additional hours of structured weekly MH groups because those groups may not assist with the patients' individual progress. Teams should be empowered to consider the EOPMod classification as appropriate for more EOP patients who are able to participate in more intensive DRP programming including education, job assignment, ISUDT, etc.

Assessment Document at 2.

Document is CDCR's program for incarcerated persons with personality disorders, though defendants have expressed their view that this program's overall impact may be limited.[26]

While the Special Master and plaintiffs' counsel have both offered conceptual support for CDCR's step down proposal, as of the time of this writing, the parties' meet and confer process regarding CDCR's EOP to 3CMS step down proposal is ongoing. However, CDCR recently announced its intent to implement the proposal prior to completing the meet and confer process, which is particularly concerning in light of the unanswered questions surrounding the proposal and the Program Guide modifications contemplated in the Draft Memorandum. *See supra* note 23 and accompanying text. The Special Master urges defendants to reconsider their intent to implement this proposal prior to exhausting the meet and confer process and, at the appropriate time, seek leave of court to implement this Program Guide modification.[27] Given defendants' intent to move forward, the Special Master notes the following overarching concerns with CDCR's step down test project.

Because the intent of the test project is to ease the transition from EOP to 3CMS (i.e., create a "more gentle path to discharge," Proposal Document at 2), the Special Master assumed patients in the test project would be clinically appropriate for a level of care reduction to 3CMS level of care. However, the Memorandum and Proposal Document, read together, leave open the

[26] Regarding the personality disorders program, defendants noted, "The goal is to benefit a core group of patients, but graduation and remission rates may be low for these severely disordered patients which may limit the overall impact on the EOP population." Exhibit L at 3.

[27] *See* ECF No. 8243 at 5-6 (discussing whether defendants must inform the Court of the changes being made to the Program Guide remedy by implementing a new policy, the Court stated that "nothing in this court's February 2022 order relieves defendants of their longstanding obligation to "immediately implement the Program Guide…if the parties have an actual dispute, it must be resolved in the context of either a motion to modify or enforce this court's previous orders…Unless or until the court grants such a motion or approves a stipulation, the court's previous orders and the Program Guide and the Compendium remain in full force and effect.").

possibility that patients who continue to require EOP level of care would be enrolled in the test project and in some cases housed in the general population. Consider the following language from the Proposal Document:

> This proposal does not impact the treat and return policy for inpatient referrals; patients who transfer out of the unit and whose custody case factors remain after discharge from an inpatient bed will be returned to the same unit. This will minimize the impact on the overall number of EOP beds in the system; *the patients that remain in an EOP bed after graduating to CCCMS are limited to those who would have remained EOP if this option was not available*, and now they are on a more gentle path to discharge.

Proposal Document at 2 (emphasis added). Here, the Proposal Document explicitly acknowledges that, but for the availability of this new test project allowing the patient to stay in their same housing situation, at least some of these patients "would have remained" at the EOP level of care. *Id.*

Similarly, the Proposal Document states:

> The overlap period where a recently discharged EOP patient remains in a similar housing situation will serve to acclimate the patient to a lower LOC and focus primarily on the upcoming adjustment to a GP/CCCMS yard. *If the patient is clinically appropriate for CCCMS*, they will receive CCCMS programming at that time, and may still take advantage of the additional options that may be available on the EOP yard.

Proposal Document at 2. Here, by referring to those patients "clinically appropriate for CCCMS" using a conditional statement ("*If* the patient is clinically appropriate for CCCMS…"), the Proposal Document again acknowledges that, in all likelihood, some patients will *not* be appropriate for the 3CMS level of care at the time of the level of care reduction and subsequent placement in the step down test project.

Without incorporating additional protections into the Memorandum and supporting documents, the Special Master is concerned that the step-down program could facilitate premature or inappropriate discharge of patients who require EOP level services to the general

population. Comingling of EOP and general population patients resulting from inappropriate discharge to 3CMS could result in not just a technical violation of the Program Guide's requirement that EOP patients be housed separately from the general population but could place these patients at significant risk of victimization and/or decompensation. These risks of decompensation and harm are particularly acute under current conditions, with many large institutions facing staffing shortages and, consequently, operating under triage plans where patients in mainline 3CMS programs are lowest priority and often go without routine IDTTs, where treatment team members consider, among other things, referrals to higher level of care in response to patient worsening symptoms.[28] At minimum, defendants should ensure robust monitoring of patients in these programs as well as leadership oversight and review of level of care decisions.

The Memorandum and supporting documents indicate these step down beds will be occupied by patients with a recent level of care reduction to 3CMS but will continue to be managed and counted as EOP beds for "clinical and operational purposes." Considering the challenges defendants have had in recent months finding appropriate housing for class members

---

[28] *E.g.*, 2021 Program Guide Update, ECF No. 7331-1 at 65 (PG 12-4-15: "The IDTT shall generally be responsible for developing and updating treatment plans. This process shall include input from the inmate-patient and other pertinent clinical information that may indicate the need for a different level of care. Referrals to higher levels of care shall be considered when the inmate-patient's clinical condition has worsened or the inmate-patient is not benefiting from treatment services available at the current level of care. Consideration of appropriate level of care shall be documented by the IDTT on a CDCR 7230-MH, Interdisciplinary Progress Note, and shall include the justification for maintaining the current level of care or referral to a different level of care.").

at the EOP level of care,[29] the Special Master is also concerned about the test project's impact on EOP bed availability.

In addition, there are a number of ambiguities in the Memorandum and Proposal Document that require clarification. For instance, it is unclear whether patients in the step down program will receive mental health care consistent with the 3CMS or EOP levels of care – or something in between. In addition, the Memorandum and Proposal Document are silent as to admission criteria, discharge criteria, and anticipated length of stay for patients in the step down test project. Finally, it is unclear how staffing ratios will be addressed for treatment team members working in these blended EOP/step-down housing units.

The Special Master remains openminded about defendants' step down proposal and recognizes the potential benefit of implementing such a policy. However, defendants should resist the urge to hastily implement such a significant change in their remedial plan with so many unanswered questions, ambiguities, and concerns regarding patient welfare outstanding in the context of chronic understaffing.[30] Instead, defendants should work with the Special Master and

---

[29] *See supra* Parts I(A) and (B); *see also* Exhibit J (Special Master's November 21, 2024 letter regarding defendants' EOP to 3CMS step down memorandum, noting that as of November 4, 2024, the three test project institutions were housing EOP patients in non-EOP beds as follows: "Based on defendants' data, SQ had two, LAC had 59, and SATF had 20 EOP patients not in a designated EOP bed.").

[30] Similar to the current situation, defendants faced challenges with EOP population growth in 2017. In response, CDCR activated new EOP beds and pursued a "review of the entire EOP population to ensure all [incarcerated persons] continue[d] to meet the criteria required for EOP placement." Twenty-Seventh Round Monitoring Report, ECF No. 5779 at 131. While a step-down program was not contemplated at that time, importantly, defendants pursued these efforts to evaluate the EOP population in collaboration with the Special Master and plaintiffs' counsel in the context of the All-Parties Workgroup. *See id.* This type of collaboration is again called for with respect to all of the EOP population initiatives described herein and is particularly important in the context of defendants' desire to modify a key component of their longstanding remedial plan through the proposed step-down program.

plaintiffs to update the Memorandum and Proposal Document with clarifying direction to staff in the field and additional protections addressing the concerns delineated above prior to seeking leave of court to implement. *See supra* note 27.

## II. SUMMARY OF THE SPECIAL MASTER'S FINDINGS

### A. Mental Health Vacancy Rates Overall and by Discipline During the EOP Focused Tours

The eight CDCR institutions with newly activated EOP programs reported high staffing vacancy rates for mental health staff treating EOP patients during respective site visits. Except for senior psychologist supervisors, the one senior psychologist at CIM, and staff psychiatry, functional vacancy rates for all disciplines at the eight newly activated EOP programs exceeded ten percent, contrary to the requirements of the Court's June 13, 2002 Order. ECF No. 1383 at 4.

Although there were no functional vacancies for staff psychiatrists across the eight examined institutions, there was a 31 percent functional vacancy rate for all primary clinician positions. Staff psychologists reported a 33 percent functional vacancy rate, and clinical social workers reported a functional vacancy rate of 27 percent, respectively. There were three telepsychiatrists at HDSP, KVSP, and PBSP and one telesocial worker at HDSP at the time of respective site visits.

Staff Psychiatrists

The reviewed institutions reported 13.90 allocated staff psychiatrist positions, of which five were filled by on-site psychiatrists and three were filled by telepsychiatrists, resulting in a 42 percent vacancy rate. However, seven registry staff psychiatrists eliminated the functional vacancy rate.

CCI, CRC, and SQ reported no functional vacancies for staff psychiatrists during their respective site visits. Similarly, because there were no on-site staff psychiatrists, HDSP and

PBSP's use of telepsychiatry eliminated their functional vacancy rates. CIM reported a negligible three percent functional vacancy rate. Two institutions reported functional vacancy rates greater than ten percent even when accounting for the use of registry and telepsychiatry, as follows: the use of telepsychiatry reduced KVSP's functional vacancy rate to 15 percent and PVSP reported a 35 percent functional vacancy rate.

Senior Psychologist Supervisor

Seven senior psychologist supervisors filled 6.87 allocated positions.

The number of senior psychologist supervisors either filled or exceeded the number of allocated positions at CCI, CRC, PBSP, and SQ. All positions at HDSP were vacant while 42 percent were vacant at KVSP. Two institutions, including CIM and PVSP did not allocate a senior psychologist supervisor position for their respective EOP programs.

Senior Psychologists

One senior psychologist position was filled at CIM. No other institution reported an allocated senior psychologist position.

Staff Psychologists

Of the 48.33 allocated staff psychologist positions, 26.75 positions were filled with on-site staff psychologists for a 45 percent vacancy rate. Accounting for the addition of two registry positions and four positions representing redirected staff from other mental health programs, and the reduction of a 0.5 FTE position on long-term leave, the functional vacancy reduced to 33 percent.

CRC and SQ were the only institutions with functional vacancy rates of less than ten percent. HDSP and PVSP each reported a 100 percent functional vacancy rate, while CCI,

KVSP, and PBSP each reported 30 percent functional vacancy rates. CIM reported a 20 percent functional vacancy rate.

There were no telepsychologists treating EOP patients at any of the examined institutions during their respective site visits.

Social Workers

There were 21.78 allocated clinical social worker positions. Fourteen on-site positions and one tele-social worker position were filled for a 31 percent vacancy rate. The use of one registry clinical social worker position reduced the functional vacancy rate to 27 percent.

Two institutions, CIM and PVSP reported functional vacancy rates of less than ten percent while CCI was close to compliance with a 17 percent functional vacancy rate. HDSP, PBSP, and SQ reported functional vacancy rates between 27 and 29 percent respectively, while KVSP reported a 46 percent functional vacancy rate. CRCs allocated 0.86 FTE clinical social worker position was vacant.

Recreation Therapists

There were 36.04 allocated recreation therapists' positions of which 20 positions were filled, resulting in a 45 percent vacancy rate. Registry staff filled an additional three positions resulting in a 36 percent functional vacancy rate.

No institution reported functional vacancy rates below ten percent at the time of their respective site visits. SQ and KVSP reported 15 and 16 percent functional vacancy rates respectively, while CCI, CRC, HDSP, and PVSP reported functional vacancy rates between 28 and 40 percent. PBSP reported a 63 percent functional vacancy rate and CIM reported no filled recreation therapist positions during the site visit.

Office Techs

There were 24.92 reported office tech positions, of which 20 were filled for a 20 percent vacancy rate.

Three institutions, including, CCI, CRC, and KVSP reported vacancy rates below ten percent while CIM and PVSP reported 20 percent vacancy rates respectively. HDSP and PBSP each reported a 38 percent vacancy rate while SQ reported an 80 percent vacancy rate.

Custody Staffing

Across all institutions, all but 0.6 custody staff positions were filled, and most institutions reported that custody vacancies or absences in the EOP Program were filled by staff redirected from other parts of the institution.

**Summary of Summary**

Overall staffing vacancies across all disciplines except for senior psychologist supervisors, senior psychologists, and staff psychiatrists exceeded ten percent at the eight CDCR institutions with newly activated EOP programs. This included a 33 percent functional vacancy rate for staff psychologists, 27 percent functional vacancy rate for clinical social workers, 36 percent functional vacancy rate for recreation therapists, and a 20 percent functional vacancy rate for office techs.

There was no functional vacancy rate for staff psychiatrists while the overall functional vacancy rate for primary clinicians was 31 percent. Two or 25 percent of institutions reported functional vacancy rates above ten percent for staff psychiatrists while six of eight or 75 percent of institutions reported functional vacancy rates above ten percent for staff psychologists and clinical social workers, respectively.

## B. Overall Quality of Care

The delivery of adequate mental health care was assessed across institutions through detailed healthcare record reviews. In addition to evaluations of treatment planning, treatment delivery, and documentation, an overall assessment of the adequacy of mental health treatment was provided for each case reviewed. A total of 230 patient records were reviewed. Of the records reviewed, 65 patients, or 28 percent, were determined to have received adequate care. The remaining 165 patients, or 72 percent, were determined to have received care that was inadequate to meet their identified mental health needs in keeping with the expectations set forth in the Program Guide. The graph and table that follow illustrate the adequacy of care within the EOPs across the institutions reviewed.

| | CCI | CIM | CRC | HDSP | KVSP | PBSP | PVSP | SQ | ALL SITES |
|---|---|---|---|---|---|---|---|---|---|
| **Adequate** | 37% | 20% | 77% | 0% | 21% | 35% | 4% | 36% | 28% |
| **Inadequate** | 63% | 80% | 23% | 100% | 79% | 65% | 96% | 64% | 72% |




As the data demonstrate, the majority of patients were determined to be receiving inadequate care at each institution, except CRC, where 23 of the 30 cases reviewed, or 77 percent, were determined to be receiving adequate care. HDSP and PVSP were of most concern, where 100 percent (33 of 33 cases) and 96 percent (25 of 26 cases) of patients, respectively, were assessed to be receiving inadequate care.

**Treatment Planning Concerns**

Treatment planning concerns were noted across institutions including failure to hold IDTT meetings are required by the Program Guide, treatment goals which did not align with the patient's identified needs, nonspecific treatment goals, inadequate identification of treatment interventions, and inadequate rationale for the patient's placement at the EOP level of care. One additional and serious concern noted at many institutions was the total absence of a treatment plan within IDTT documentation.

Timely Interdisciplinary Treatment Team (IDTT) Meetings

Across all institutions reviewed, IDTT meetings were not held as required, either later than required or not all. This was the case in 84 of the 230 cases reviewed (37 percent). At CCI, 20 of the 30 cases reviewed, or 67 percent, failed to hold a timely IDTT. At HDSP and SQ, timely IDTTs were not held in 64 percent of cases (21 of 33 and 16 of 25 cases, respectively). In the majority of cases, IDTT meetings were held later than required and often, while initial IDTT meeting were held with patients, routine meetings which were required to occur every 90 days, were not held resulting in no review of the patient's treatment progress or necessary updates to the patient's treatment plan. Additionally, as was the case with CCI Patient H, HDSP Patient A, HDSP Patient B, HDSP Patient E, HDSP Patient J, PVSP Patient R, PVSP Patient V, and PVSP Patient Y, no initial IDTT meeting was held. In the specific case of HDSP Patient J, the patient had not had an initial IDTT meeting within 60 days of arrival, despite having been discharged from the MHCB level of care to HDSP's EOP.

Treatment Goals

The Special Master's expert noted that treatment goals were absent, nonspecific, or did not address the patient's documented symptoms and/or treatment targets in 73 of the 230 cases reviewed, or 32 percent. The issue was noted across all institutions except CCI. Specifically, the lack of adequate treatment goals was identified as a problem in 64 percent of cases at SQ (16 of 25), 58 percent of cases at HDSP (19 of 33), 39 percent of cases of KVSP (13 of 33), 37 percent of cases (11 of 30) at CIM, 35 percent of cases at PVSP (9 of 26), 13 percent of cases (three of 23) at PBSP, and seven percent of cases (2 of 30) at CRC. This was concerning as treatment goals are foundational to the provision of adequate treatment and provide the primary means by which the efficacy of treatment can be assessed over time.

In addition to the failure to document adequate treatment goals, the use of goals which did not address the patient's identified needs were identified in 30 percent of the cases reviewed (70 of 230 cases). This issue was especially prevalent at PVSP, where it was noted in 50 percent of the cases reviewed (13 or 26). Additionally, 15 of 33 cases at HDSP (45 percent) and 13 of 30 cases at CRC (43 percent) were assessed to have had treatment goals that did not match the patient's identified needs. For example, CRC Patient L was noted as needing treatment to address anxiety, depression, auditory hallucinations, and sleep disturbance. The treatment goals for this patient addressed auditory hallucinations and danger to self, with no mention of anxiety, depression, or sleep disturbance. Similarly, HDSP Patient I was identified as struggling with symptoms of depression and psychosis, with medications prescribed to target both, including a PC 2602 order to support medication adherence. This patient's treatment plan included no specific treatment goals but included an outdated plan of care addressing depression, with no mention of psychosis or challenges with medication adherence.

The Special Master's expert noted that in some cases, treatment goals failed to integrate issues identified in initial assessments conducted by psychiatrists, instead focusing almost exclusively on the issues identified by primary clinicians. This was the case for PVSP Patient I whose treatment plan addressed hallucinations, which were identified by the primary clinician as the patient's only treatment need, but failed to identify reducing depression, anxiety, and substance use which were identified by the psychiatrist as necessary goals of treatment.

Treatment goals were not updated despite changes in patients' clinical presentations since prior IDTTs at a number of institutions. It was often the case that the patient's IDTT simply carried forward the patient's previous treatment goals, even when the patient's needs had changed, the goals were no longer relevant, and/or the goals did not apply to the current setting

as the patient was newly transferred to the EOP setting. For example, HDSP Patient Q had been placed at the inpatient level of care for competency restoration prior to his placement at the EOP level of care. The IDTT failed to update the patient's treatment goals such that competency restoration was identified as a current need, despite having been resolved during his inpatient stay and not identified as a treatment need during the patient's initial assessments.

Treatment Interventions

Non-specific treatment interventions, a lack of appropriate treatment interventions, and even an absence of planned treatment interventions were noted as concerns in IDTT documentation. This was a serious concern as the treatment interventions included within treatment plans direct the care of the patient and support continuity of care across the IDTT, especially when there are staffing shortages and a high frequency of staff turnover. The lack of appropriate treatment interventions was identified as a concern in 100 of the 230 cases reviewed, or 43 percent. This included 21 of 30 cases at CCI (70 percent), 20 of 33 cases at HDSP (61 percent), 17 of 33 cases at KVSP (52 percent), 11 of 25 cases at SQ (44 percent), 13 of 30 cases at CIM (43 percent), seven of 26 cases at PVSP (27 percent), six of 23 cases at PBSP (26 percent), and five of 30 cases at CRC (17 percent). Examples include CCI Patient V whose treatment plan was developed to target depression, anxiety, substance use, and avoiding gang-related activities without any interventions being listed to support these goals; HDSP Patient A whose IDTT documented a plan to reduce depressive symptoms, anger, and increase problem-solving without including interventions; and KVSP Patient U whose treatment plan included no interventions to target the patient's depression.

Of further concern was the lack of rationale for the use of recreational therapy as the primary, and often only, therapeutic interventions provided to patients in group settings. The

Special Master's expert did not identify any cases where the use of recreational therapy groups was identified in a patient's treatment plan as the primary modality being implemented to address a specific treatment need. Instead, recreational therapy was being provided to patients without rationale as to what was being targeted by these groups and how these groups supported the patients' identified symptoms and treatment needs.

Rationale for Placement at the EOP Level of Care

At all institutions reviewed, IDTTs failed to document adequate rationale for the patient's need for treatment at the EOP level of care. Overall, this concern was noted in 116 of the 230 cases reviewed, or 50 percent. At the institutional level, this issue ranged from 30 percent of cases at HDSP (10 or 30 cases) to 80 percent of cases at CRC (24 of 30 cases). This was concerning for a number of reasons. First, IDTTs are charged with understanding a patient's needs and identifying the least restrictive level of care necessary to address those needs. The Program Guide explicitly directs IDTTs at the EOPs to assess the patient's appropriateness for placement at the EOP level of care, yet this was not occurring. Further, CDCR opened these new EOP programs to address a shortage of EOP beds across the system, and yet IDTTs were not routinely assessing whether this level of care was necessary for patients or how this level of care was addressing the patients' needs. Finally, without identifying the rationale for placement at the EOP level of care, IDTTs were at a disadvantage in being able to determine when patients would be appropriate for a transfer to a lower level of care or require placement at a higher level of care.

Absence of Treatment Plans

On November 3, 2023, CDCR mental health leadership released an email to the field indicating that an updated treatment plan format was to be used for all patients. The instructions

for completing the updated form indicated that the section entitled "Treatment Plan" was required and was not to be left blank. While not explicitly tracked in every case, the Special Master's expert found at least 60 of the 230 cases reviewed (26 percent) where the treatment plan form was not used. This included 15 of 25 cases at SQ (60 percent), 18 of 33 cases at HDSP (55 percent), nine of 30 cases at CCI (30 percent), six of 23 cases at PBSP (26 percent), six of 26 cases at PVSP (23 percent), three of 30 cases (ten percent) at CIM, and three of 33 cases at KVSP (nine percent). In addition to the absence of treatment plans, case reviews also revealed a number of instances where the treatment plan contained content that was pulled forward from the patient's previous institution and not updated, as noted above. Examples include CCI Patient R, HDSP Patient FF, KVSP Patient L, KVSP Patient M, KVSP Patient N, KVSP Patient O, KVSP Patient Y, SQ Patient B, and SQ Patient D.

It was clear from these findings that clinicians working in newly developed EOPs were inadequately trained or failed to understand the manner in which treatment plans should be documented for patients.

Familiarity with Patients' Needs

In order to develop a meaningful and effective treatment plan, MHPCs and psychiatrists must complete initial assessments and be familiar with patients. This necessity is reflected in Program Guide requirement for the completion of initial assessments prior to the IDTT and the fact that assigned MHPCs and psychiatrists to be present during IDTTs. During reviews, a number of cases (53 out of 230, or 23 percent) were identified where the patient was not seen for an initial assessment prior to the initial IDTT and/or where the clinicians present during the IDTT (i.e., psychiatrist, MHPC) had not met the patient at any point prior to the IDTT meeting. This concern was noted in 12 of the 26 cases reviewed at PVSP (46 percent), 12 of the 33 cases

at KVSP (36 percent), nine of the 30 cases at CIM (30 percent), five of 23 cases at PBSP (22 percent), six of 25 cases at SQ (24 percent), four of 33 cases at HDSP (12 percent) and less than ten percent of cases at CCI, CRC, and HDSP. Examples of patients without initial MHPC assessments included KVSP Patient U, PVSP Patient V, SQ Patient I, and SQ Patient K. KVSP Patient U did not have an initial MHPC assessment nor an initial psychiatric assessment prior to his initial IDTT meeting and no treatment plan was developed for the patient at the meeting. Additionally, CIM Patient AA, KVSP Patient W, KVSP Patient X, HDSP Patient B, PVSP Patient R, PVSP Patient T, PVSP Patient Z, SQ Patient K, and SQ Patient N, among others, were not seen for initial psychiatric assessments prior to the initial IDTT meeting. For PVSP Patient U, as an example, a psychiatric initial assessment was completed after the IDTT and was completed by a different psychiatrist than the one who attended the patient's IDTT meeting further negatively impacting continuity of care.

Collaboration Regarding Patient Needs

One additional concern noted in some IDTT meetings, especially prevalent at PVSP, was poor collaboration among the IDTT members over the needs of the patient and the direction of treatment. Overall, concerns related to poor collaboration among IDTT members was noted in 52 of the 230 cases reviewed (23 percent). Sixteen of the 26 cases at PVSP were noted to have this issue. At the other institutions, the issue was noted in a number of cases ranging from 12 to 26 percent of cases. In the majority of cases, this lack of collaboration was reflected in IDTT documentation taken solely from the MHPC’s initial assessment with no input from the psychiatric assessment or other IDTT members as well as an absence of psychiatric interventions including medications. Other areas where collaboration among IDTT members was lacking was regarding the diagnoses included on the patient’s treatment plan. For example, PVSP Patient W

made no mention of the diagnostic discrepancies offered by the MHPC versus the psychiatrist. The treatment plan for KVSP Patient F targeted the patient's depression which was identified by the MHPC but failed to include the psychotic symptoms being targeted by the psychiatrist. In fact, there was no mention of psychiatric interventions in the treatment plan. Poor collaboration among IDTT members was evidenced in the cases of PVSP Patients D, E, F, H, I, K, M, N, O, P, Q, T, W, X, Z, and AA as well as five patients at CCI, five patients at CIM, six patients at CRC, four patients at HDSP, seven patients at KVSP, six patients at PBSP, and three patients at SQ.

**Delivery of Treatment**

The provision of effective and adequate mental health services is essential to the delivery of adequate overall care. During the review of records, the Special Master's expert noted patterns with regard to inadequate delivery of treatment across institutions including an absence of adequate initial clinical assessments; absence of required treatment contacts by both MHPCs and psychiatrists; lack of interventions documented on treatment plans being provided to patients; failure to delivery adequate structured treatment including core clinical groups and total treatment hours; lack of adequate response to patient treatment refusals; and lack of confidentiality of clinical contacts.

Initial Assessments

Initial assessments by the patient's MHPC and psychiatrist are required to occur within 14 days of arrival to an EOP and prior to the patient's initial IDTT. *See* Program Guide 12-4-7. Across cases found to not meet this requirement, deficiencies were noted as failing to complete an initial assessment, failing to update information contained within the initial assessment such that content was minimally updated from prior assessments, and/or failing to complete the assessment in a timely manner. In 36 percent of cases (83 of 230 cases) the initial MHPC

assessment was not completed timely and/or adequately. This included 17 of 33 cases at HDSP (52 percent), 14 of 30 cases at CCI (47 percent), 11 of 26 cases at PVSP (42 percent), 10 of 30 cases at CRC (33 percent), nine of 30 cases at CIM (30 percent), 10 of 33 cases at KVSP (30 percent), and one case at PBSP. Examples of deficiencies included CCI Patient N, CCI Patient P, CRC Patient M, CRC Patient Q, HDSP Patient H, HDSP Patient K, HDSP Patient P , KVSP Patient U, and KVSP Patient W whose initial assessments consistent almost entirely of previously documented information with minimal updates providing limited information to inform patient's current treatment needs; PVSP Patient Y, KVSP Patient V and CIM Patient Z who had no MHPC initial assessments documented; and CIM Patient AA, HDSP Patient N, and HDSP Patient P whose initial MHPC assessments were not completed timely in accordance with Program Guide requirements.

Initial psychiatric assessments were not completed timely and/or adequately in 79 of the 230 cases reviewed (34 percent). Deficiencies were noted in 21 of the 33 cases at HDSP (64 percent), 19 of the 30 cases at CCI (63 percent), ten of the 25 cases at SQ (40 percent), eight of the 26 cases at PVSP (31 percent), ten of the 33 cases at KVSP (30 percent), six of the 30 cases at CIM (20 percent), three of the 23 cases at PBSP (13 percent), and two of the 30 cases at CRC (seven percent). Examples included late initial psychiatric assessments for CCI Patient L, CCI Patient M, CCI Patient P, HDSP Patient M, KVSP Patient V, KVSP Patient W, KVSP Patient X, and KVSP Patient Y as well as HDSP Patient N and PVSP Patient R who did not have initial psychiatric assessments completed.

Routine Psychiatric and MHPC Contacts

The Program Guide requires that if a patient is prescribed psychotropic medications, confidential routine psychiatric contacts are to occur at least monthly. *See* ECF No. 7333-1 at

59. In 89 of the 230 cases reviewed, or 39 percent, timely routine psychiatric contacts were not documented and the missed contacts negatively impacted the patient's overall care. At the institutional level, routine psychiatric contacts were not completed for 23 of 30 patients, or 77 percent, at CCI; 21 of 33 patients, or 64 percent, at KVSP; 20 of 33 patients, or 61 percent, at HDSP; 11 of 30 patients, or 37 percent, at CIM; eight of 26 patients, or 31 percent at PVSP; three of 25 patients, or 12 percent at SQ; two of 23 patients, or nine percent at PBSP; and one of 30 patients, or three percent, at CRC. Examples include CCI Patient C who was not seen by a psychiatrist for seven weeks following discontinuation of all psychotropic medications; CCI Patient F, who despite increasing reliance on as-needed medications, frequent treatment refusals, and increased medical and mental health crises, was not seen as required by the psychiatrist; and KVSP Patient EE who was not seen as required by the psychiatrist despite increased depressive symptoms and recent medication adjustments.

Additionally, confidential clinical contacts with an MHPC, either by individual or group psychotherapy, are to occur at least weekly, with individual clinical treatment being mandatory every other week. *See* ECF No. 7333-1 at 65. This element of treatment was evaluated with respect to the needs of the patient and the overall effect on adequacy of care. In other words, simply missing a single contact was not considered deficient on its face, but instead, the Special Master's expert considered the impact that a lack of timely contacts had on the treatment provided to the patient. Adequate timely PC contacts were not evident in 73 of the 230 cases reviews, or 32 percent of the time. Specifically, MHPC contacts did not occur as required for 27 of 33 patients at HDSP (82 percent), 13 of 26 patients (50 percent) at PVSP, 14 of 30 patients (47 percent) at CIM, eight of 33 patients (24 percent) at KVSP, four of 30 patients (13 percent) at CCI, three of 25 patients (12 percent) at SQ, two of 23 cases at PBSP (nine percent), and two of

30 patients (seven percent) at CRC. Examples include CIM Patient A and PVSP Patient A who were not offered sufficient treatment with the MHPCs despite frequent treatment refusals and increased violence as well as HDSP Patient E who was not seen by an MHPC for routine contacts at any point during the review period despite crisis episodes, treatment refusals, and an upcoming release date.

Treatment Interventions in Keeping with the Treatment Plan

Across a number of institutions, it was noted that the treatment interventions contained within IDTT documentation or in accordance with the patients' needs were not documented as being provided to patients. While this issue arose in 55 of the 230 cases reviewed (24 percent), it was noted as especially problematic at CCI and SQ where it occurred in 40 percent of cases (12 of 30 and 10 of 25 cases, respectively), at PVSP where it occurred in 38 percent of cases (10 of 26), and KVSP where it occurred in 36 percent of cases (12 of 33).

Structured Treatment

According to Program Guide requirements, each patient receiving services at the EOP level of care shall be offered at least ten hours per week of structured therapeutic activities. If a patient was scheduled for less than ten hours per week, the patient's IDTT is required to meet monthly to review and increase the amount of structured therapeutic activities or refer the patient to a higher level of care. *See* ECF No. 7333-1 at 58. While not systematically assessed in terms of hours, the Special Master's expert assessed whether the number and type of structured treatment provided to the patient was adequate to meet the patient's identified treatment needs. In other words, simply failing to provide a full 10 hours of treatment did not automatically result in the expert noting inadequacy of structured treatment. In 92 of the 230 cases reviewed (40 percent), there was evidence of a lack of adequate structured treatment being provided to

patients. Institutions which appeared to struggle the most with structured treatment included HDSP (30 of 33 cases, 91 percent), CIM (22 of 30 cases, 73 percent), and SQ (14 of 25 cases, or 56 percent).

Adequacy of structured treatment delivery within the EOPs was assessed, in part, by determining if the group treatment included clinical services targeting mental health needs beyond recreational and leisure groups. Both clinician-led and nursing-led treatment groups were considered clinical groups. While the lack of clinical groups was noted within 23 percent, or 54 of the 230 cases reviewed across the sites, specific institutions were noted to offer little more than recreational groups. These included HDSP (20 of 33 cases, or 61 percent), PVSP (11 of the 26 cases, or 42 percent), and SQ (eight of 25 cases, or 32 percent).

Response to Patient Refusals

The Special Master's expert noted that in 26 percent of cases (59 of 230), clinical documentation evidenced inadequate responses to patient's refusal of offered treatment. Specifically, these findings included a failure of IDTT members to work with the patient to address medication non-adherence and lack of attendance with clinical contacts including group and individual treatment services offered. The issue was noted to be occurring most often at HDSP (15 of 33 cases, 45 percent), KVSP (12 of 33 cases, 36 percent), PVSP (nine of 26 cases, 35 percent), and PBSP (seven of 23 cases, 30 percent). Examples include HDSP Patient C who was not seen by the psychiatrist to address medication nonadherence for five weeks; KVSP Patient D and PVSP Patient C who refused most clinical contacts without additional interventions or adequate attempts to assess the patients; and PBSP Patient B whose treatment plan did not target increased participation in treatment despite frequent refusals and increased agitation.

Confidentiality

The provision of adequate mental health care requires that patients are offered treatment in a confidential manner. While not a pervasive problem across programs, 48 percent of patients at KVSP (16 of 33) and 32 percent of patients at SQ (eight of 25) were not offered treatment in confidential settings for reasons other than patient refusal. Reasons included lack of confidential space, custody restrictions, and program modifications.

**Documentation Issues**

Diagnostic Formulation and Agreement

Clarity of a patient's diagnostic picture is foundational to the provision of adequate mental health care. IDTT members need to have a clear understanding of what symptoms and conditions are being targeted for treatment so that efforts can be coordinated and progress can be tracked over time. Despite this foundational aspect of treatment, 70 of the 230 cases reviewed (30 percent) included problems with diagnostic formulations including lack of adequate documentation to support diagnoses and conflicting diagnoses from IDTT members without acknowledgment of these differences or efforts to rectify the contradictions. This issue was especially problematic at PVSP (16 of 26 cases, 62 percent), CIM (14 of 30 cases, 47 percent), CCI (11 of 30 cases, 37 percent), and SQ (eight of 25 cases, 32 percent).

One additional concern, which was limited to PVSP, included the use of outdated diagnostic methods. In 2013, the American Psychiatric Association moved away from the use of a multiaxial system of diagnoses to better align with international diagnostic systems and to provide a more concise manner of documenting diagnoses. Despite this change occurring over a decade ago, the use of the multiaxial system was present in 46 percent of the cases reviewed at PVSP (12 of 26).

<u>Continuity and Consistency</u>

Documentation within a patient's record serves two fundamental purposes, to memorialize the clinical interaction with the patient and to provide a narrative of changes in the patient over time. These two purposes provide the foundation for clinical continuity not only from session to session with a single clinician, but to communicate with other treatment team members about clinical changes. In order to achieve these purposes, unique entries are required for each clinical contact. Including templated and redundant entries from contact to contact, especially in the form of text copied over sessions, is problematic not only in its accuracy, but in allowing for an understanding of patient functioning and progress toward treatment goals. Documentation copied over sessions was noted to be problematic in 14 of 33 cases at KVSP (42 percent) and nine of 25 cases at SQ (36 percent). Examples included KVSP Patient V whose MHPC included very similar documentation in progress notes 10 days apart which referenced recent self-harm making it difficult to determine if there was more than one such incident and SQ Patient H whose MHPC copied progress note content, including the patient's mental status, week after week, making it difficult to determine the patient's current level of functioning.

Additionally, in 20 of the 26 cases reviewed at PVSP (77 percent), the case formulation documented in patient's records was formulaic and largely unchanged across patients with a focus on substance use and domestic violence even when those elements were absent from the patients' histories. Examples include PVSP Patients A, C, E, I, K, and M.

Adequate clinical documentation requires that IDTT members review the patient's record and ensure that the patient's reported history is consistent with previous documentation, and if not, ensure that inconsistencies are explored and rectified. Further, IDTT members should review recent clinical documentation to assess changes in the patient's presentation and follow

up on issues identified during previous contacts including significant health changes, symptoms changes, relationship issues, and other patient concerns. At least 70 of the 230 cases reviewed (30 percent) included clear inconsistencies between clinicians or within the documentation of a single clinician that were neither acknowledged nor rectified. Institutions where this was noted to be a pervasive issues included PVSP (62 percent, 16 of 26 cases), CCI (40 percent, 12 of 30 cases), SQ (36 percent, nine of 25 cases) and KVSP (30 percent, 10 of 33 cases). Examples include PVSP Patient X whose health record showed no evidence of group attendance yet the MHPC documented that the patient was attending groups; CCI Patient A whose initial psychiatric assessment noted that the patient was believed to be psychopathic and not suffering from schizophrenia and yet the patient's PC 2602 order was renewed secondary to grave disability; SQ Patient F whose record reflected that the patient was on modified EOP status while having a full treatment schedule; and KVSP Patient J whose record included discrepancies within and across psychiatric documentation such that the patient's clinical status was unclear.

Further, at PVSP and SQ, the Special Master's expert noted that in 42 percent (11 of 26) and 32 percent (eight of 25) of the cases reviewed at these institutions, respectively, there was clear evidence that the patient's electronic health care record had not been adequately reviewed by IDTT members as identified issues did not receive proper attention or follow up. Examples include PVSP Patient W whose IDTT failed to update his treatment plan to include goals beyond substance use despite increased distress, suicidal ideation, and a recent MHCB admission as well as SQ Patient J whose record evidenced disparate findings among IDTT members with no acknowledgment of these discrepancies or attempts to rectify them and SQ Patient L who was documented by clinicians completing five-day follow up contacts that the patient was medication adherent when he was not.

### C. Medication Management Summary

The activation of new EOP programs posed medication management and administration challenges for most institutions covered in this focused EOP review. These barriers resulted in clinically meaningful impacts, most notably at CCI and HDSP, such as canceled yard time or absences from group therapy. *See infra* p. 119 (due to medication administration in the housing unit at HDSP, "priority healthcare ducats were honored during the transport times, [however] yard time was not due to concerns for safety…") and p. 76 ("[m]edication lines often ran late, which resulted in frequent cancelation of recreation therapy yard and absences in group therapy sessions"). Institutions noted that EOP patients required more frequent psychiatric visits and laboratory monitoring, and greater intensity of nursing time and interventions when compared to patients at the 3CMS level of care. This was of particular concern given the ongoing staffing limitations present at many institutions. Physical plant issues such as limited space also raised concerns. Finally, two areas of particular importance to patients at the EOP level of care — PC 2602 involuntary medications and clozapine (an antipsychotic requiring careful monitoring) — were reviewed, without significant concerns. Issues observed during this focused EOP tour will require continued monitoring during the upcoming comprehensive EOP monitoring tour.

Medication Management and Administration

Despite an increase in allocated psychiatrists with EOP program activation, the increased frequency of required psychiatry visits taxed already limited psychiatric resources at several institutions. As an example, HDSP had no on-site psychiatrists prior to EOP activation. All EOP patients at HDSP and PBSP received care exclusively by telepsychiatry, which did was inconsistent with CDCR's telepsychiatry policy which requires minimal on-site psychiatry presence supplemented by the use of telepsychiatry at the EOP level of care. *See* ECF No. 7830 and ECF No. 7826-2.

Challenges in medication administration were of particular importance. Multiple institutions noted that EOP patients on average required more medications than 3CMS patients to address more severe mental health issues. This increased the number of medications which nursing staff must administer. Institutions such as PBSP reported that while they received additional nursing positions in the EOP staffing package, they were already struggling to hire nursing staff prior to EOP activation. Thus, an augmentation of nursing positions was currently of limited value.

Several institutions implemented creative solutions to address both this increased workload, as well as physical plant limitations; some of these did not conform to policy. Of particular concern was HDSP where the lack of space required nursing staff to push a medication cart across the yard multiple times per day. In accordance with policy, yard time was halted for safety reasons when the cart crossed the yard. Additionally, HDSP had only one medication window available which was insufficient for the volume of EOP patients at the institution. HDSP administered some medications, while CCI and SQ administered all medications in the EOP housing units, which deviated from policy requiring medication administration for mainline patients at a medication window. While not consistent with policy, staff at SQ reported some benefits from administering medications in the housing units, including reduced medication refusals due to inclement weather. In contrast, CRC constructed two medication windows and reported no difficulties with wait times.

Despite an increase in nursing workload, most institutions reported that medication lines did not exceed mandated maximum durations. An exception to this was CCI at which medication lines ran late, resulting in the cancelation of recreation therapy yard and absences from group therapy. CCI reported this was due to not having a dedicated psychiatric technician

for the EOP program and redirecting nursing from other programs. While PVSP reported overall compliance with required medication administration timelines, in contrast, interviewed patients reported long lines with patients unable or unwilling to wait. Patients at PVSP reported psychiatrists discontinued medications due to reported non-adherence, despite the patients' desire to take prescribed medications.

Additionally, the increased medications necessitated increased medication monitoring demands. KVSP and PVSP reported that EOP patients had an increased frequency of medication and laboratory monitoring refusals when compared with 3CMS patients, necessitating increased staff time to counsel the patients on the importance of adherence. At HDSP, given the mental health staffing levels, primary clinicians did not see their patients within Program Guide requirements; however, admirably, HDSP nurses reported attempting to have more frequent contact with EOP patients in an effort to monitor for any clinical concerns.

PC 2602 Medications

While institutions reported sizeable increases in PC 2602 involuntary medication-related issues since time of activation of these new EOP programs, most adapted smoothly to these demands. As illustrative examples, CCI reported an average of two-to-four patients on PC 2602 medications before EOP activation and 23 patients after activation. HDSP reported more PC 2602 renewals in the prior four *months* when compared with the total number in the five *years* prior to EOP activation. CRC did not have a staff member in the medication court administrator role but planned to begin training one soon. Institutions did not report any barriers to the PC 2602 process such as difficulty interfacing with the Office of Legal Affairs, Office of Administrative Hearings, or the administrative law judge.

Clozapine

Of the new EOP programs, only SQ was a CDCR-designated clozapine institution; no challenges were identified. The remaining institutions did not report any challenges, such as patients on clozapine inappropriately transferred to their institutions.

**D. Access to Higher Levels of Care**

Transfers to Inpatient Care

Acute Inpatient Care

The Program Guide requires that patients referred to acute inpatient care must be transferred within ten days of referral and 72 hours of bed assignment. *See* ECF No. 7333-1 at 19 (PG 12-1-16). SQ made 12 acute care referrals, all of which resulted in timely transfers within ten days of referral; CCI, CIM, and CRC made no acute care referrals; and HDSP did not provide adequate data to assess compliance.

Intermediate Inpatient Care

The Program Guide requires that EOP patients referred to intermediate inpatient care must be transferred within 30 days of referral and 72 hours of bed assignment. *See* ECF No. 7333-1 at 19 (PG 12-1-16). KVSP and PBSP reported three and one intermediate inpatient care referrals, respectively; all resulted in timely transfers within 30 days of referral. SQ reported 34 referrals resulting in 31 transfers, two rejections, and one rescission; all 31 transfers occurred timely within 30 days of referral. CCI, CIM, and CRC reported no intermediate care referrals, while HDSP did not provide adequate data to assess compliance.

Transfers to MCHBs

The Program Guide requires transfers to MHCBs within 24 hours of referral. *See* 7333-1 at 75 (PG 12-5-4). Six of eight institutions – CCI, CIM, CRC, PBSP, PVSP, and SQ – achieved 99 or 100 percent compliance with transfer timelines. KVSP neared compliance, as 68 of 77 or

88 percent of MHCB transfers were timely. HDSP did not provide adequate data to assess compliance.

Transfers to EOP RHUs

Patients at the EOP level of care must be transferred to an EOP RHU within 30 calendar days from the date of initial placement in RHU or change in level of care. *See* Cal. Code of Regs., tit.15 § 3335.2; *see also* ECF No. 8355 at 5 (RHU Transfer Timeline Exceptions). Two institutions – CIM and CRC – reflected 100 percent compliance with transfer timelines; regrettably, none of the other six institutions were compliant. CCI and SQ were 69 and 76 percent compliant, respectively; none of HDSP's 13 transfers were compliant; PVSP could not provide data from the review period but, at the time of the site visit, two of three patients housed in the 3CMS RHU were beyond transfer timelines; and KVSP and PBSP failed to produce any data.

**Summary – Access to Higher Levels of Care**

The eight monitored institutions were generally compliant with acute care, intermediate care, and MHCB transfer timelines and generally noncompliant with EOP RHU transfer timelines. All acute and intermediate care transfers were timely, and MHCB transfers were timely at six of eight institutions – namely CCI, CIM, CRC, PBSP, PVSP, and SQ – while KVSP neared compliance at 88 percent. Regrettably, HDSP failed to provide adequate documentation for acute and intermediate inpatient care and MHCB transfers. EOP RHU transfers were timely at two of eight institutions – CIM and CRC. CCI and SQ were 69 and 76 percent compliant, respectively; HDSP was zero percent compliant; and KVSP, PBSP, and PVSP failed to produce data from the review period, though two of three EOP patients housed in PVSP's 3CMS RHU at the time of the site visit exceeded transfer timelines.

### E. <u>Custody and Mental Health Partnership Plan</u>

The custody and mental health partnership plan was broadly monitored at three institutions – CCI, CRC, and PBSP. All three institutions reported varying degrees of compliance with the components of the custody and mental health partnership plan.

At CCI, mental health staff reported a collaborative working relationship with custody staff. At CRC, executive joint rounding and daily huddles were occurring in accordance with policy, though EOP orientation groups and quarterly round table training had not yet been implemented.

Huddles were observed at CRC and PBSP; both complied with the requirements of the custody and mental health partnership plan. Both had required staff in attendance and discussed the relevant topics.

### F. <u>RVRs</u>

HDSP and SQ staff reported an increase in the number of RVR-MHAs filed since activation or expansion of their EOP programs. At SQ, in May 2023 (prior to the expansion of their EOP program), 63 MHAs were completed of which 20 or 32 percent were generated from EOP patients; after expansion of the EOP program in May 2024, 92 MHAs were completed, of which 56 or 60 percent were generated from EOP patients.

### G. <u>Use of Force</u>

One immediate use of force incident was reported at CRC; patients described the incident as egregious and concerning.

### H. <u>Program Access</u>

Program access was monitored at three institutions – CIM, HDSP, and PBSP.

For access to jobs, patients reported limitations at all three institutions; staff reported the same at PBSP. Five of 64 or eight percent of mainline EOP patients at PBSP had jobs, though the only available jobs were porter or barber.

With respect to education opportunities, patients again reported limitations at both institutions where it was monitored – CIM and PBSP.

For access to religious services, patients reported adequate access at CIM and limitations at HDSP and PBSP.

Regarding law library access, staff and patients reported limitations at HDSP and PBSP.

For canteen access, patients reported adequate access at CIM and limitations at PBSP.

Patients reported adequate pill line access at CIM.

PBSP patients reported limitations with respect to tablet access, AA/NA group access (which staff also reported), obtaining in-cell packets resulting in their inability to earn milestone credits, and dining hall access resulting in all meals being served cell-side.

**Summary – Program Access**

CIM, HDSP, and PBSP generally reflected noncompliance with the various monitored components of program access. Patients reported limited job access at all three institutions; limited education opportunities at both institutions where it was monitored; limited access to religious services at two of three institutions; limited law library access at both institutions where it was monitored; and limited canteen access at one of two institutions where it was monitored. Adequate pill line access was reported at CIM, and various other limitations were reported at PBSP.

### I. <u>MHSDS Patients in Restrictive Housing Units</u>

Of the eight CDCR institutions with newly activated EOP programs, seven maintained 3CMS RHUs during the review period.[31] All EOP patients who required EOP RHU placement were housed in a 3CMS RHU while they awaited transfer.

Notably, the Restricted Housing Unit Program: Mental Health Services Policy, dated July 19, 2024 and effective August 1, 2024 (hereinafter "RHU Policy")[32], does not speak to treatment requirements for EOP patients awaiting transfer from a 3CMS RHU to an EOP RHU. Therefore, treatment of EOP RHU patients housed in a 3CMS RHU was assessed using 3CMS RHU requirements during the monitoring tour; to that end, the RHU Policy requires that any patient placed in a 3CMS RHU receive 90 minutes of structured therapeutic activities each week.

---

[31] CRC did not have an RHU and transferred all newly placed RHU patients to CIM's 3CMS RHU to await appropriate placement.

[32] On July 19, 2024, CDCR released to the field the Restricted Housing Unit Program: Mental Health Services Policy which governs the provision of mental health treatment to EOP and 3CMS patients housed in an RHU setting. The policy, which took effect on August 1, 2024, replaced the following court-ordered remedial requirements and policies:

- Chapters Seven through Nine of the 2021 MHSDS Program Guide (ECF No. 7331-1 at 126-167);
- Creation of Correctional Clinical Case Management System Short Term and Long Term Restricted Housing Memorandum, dated January 15, 2015 (ECF No. 7331-1 at 449-54);
- Short-term and Long-term Restricted Housing Policies Memorandum, dated February 4, 2016 (ECF No. 7331-1 at 446-48);
- Short-term Restricted Housing Mental Health Requirements Policy, dated February 8, 2016 (ECF No. 7331-1 at 443-45);
- Long term Restricted Housing Mental Health Requirements Policy, dated February 8, 2016 (ECF No. 7331-1 at 469-71);
- Transfer of Correctional Clinical Case Management System Inmate-Patients to Male Short Term Restricted Housing Units Memorandum, dated March 3, 2016 (ECF No. 7331-1 at 455-59).

*See* August 14, 2024 Stipulation and Order, ECF No. 8355 at 1-3; *see also* June 11, 2024 Stipulation and Order, ECF No. 8267 at 3-5.

Of the seven monitored institutions with 3CMS RHUs, five – CIM, HDSP, PBSP, PVSP, and SQ – offered patients 90 minutes of structured therapeutic activities weekly. At CIM, two-hour groups were offered to all RHU patients and were held three times per week, which included four hours of recreation therapy and one two-hour clinical group. PBSP offered two 90-minute groups weekly, while PVSP and HDSP offered one 90-minute group weekly. At SQ, a two hour clinical group was observed, however it was unclear whether SQ offered the two hour group to patients awaiting transfer during the review period.

The two remaining institutions – CCI and KVSP – were unable to produce any data regarding structured therapeutic activities scheduled, offered, attended, or refused.

**Summary – MHSDS Patients in Restricted Housing Units**

Five of seven institutions – CIM, HDSP, PBSP, PVSP, and SQ – offered patients 90 minutes of structured therapeutic activities weekly in accordance with the RHU Policy; the remaining two institutions – CCI and KVSP – were unable to produce any data.

**CONCLUSION**

Concurrent with recent reductions in CDCR's overall population, *see supra* p. 19 (discussing changes in CDCR’s population), the proportion of incarcerated people that require mental health treatment has increased significantly, as has proportion of the incarcerated population that requires residential mental health treatment through CDCR’s EOP. *See supra* p. 20; *see also* ECF No. 8095 at 42 and Exhibit H. To effectively address the growing patient caseload and treat this complex population effectively, the remedy requires, *inter alia*, that patients be placed into adequate housing compatible to their level of care and that institutions have sufficient staffing to provide the Program Guide compliant care. ECF No. 7331-1 at 54 (Program Guide 12-4-4: “Participants in the MHSDS EOP are placed in *designated housing units* that provide increased clinical and custodial support and *limit contact with members of the*

*institution's GP inmates*.") (emphasis added); *see also* ECF No. 8291 at 16 ("[s]ince the 2009 Staffing Plan's adoption with minimal modifications approved by the court...this Plan has been a necessary component of defendants' remedial plans, which they must fully implement to remedy the ongoing constitutional violations in this action.") citing *e.g.* ECF No. 6846 at 5; *see also* Jan. 6, 2023 Order at 2, ECF No. 7699 ("[b]y 2009, defendants produced a staffing plan that, if implemented, would have brought the state into compliance.").

As the Special Master has previously noted, defendants have a number of options available to address this growing proportion of CDCR's population of incarcerated persons. For instance, defendants could pursue targeted population reductions among the *Coleman* class or clustering of higher acuity class members at institutions with relatively better staffing. *See, e.g.*, Thirtieth Round Monitoring Report – Part C, ECF No. 8095 at 44-45.

In lieu of pursuing one of these alternatives, with a total of 7,218 mainline EOP patients as of December 30, 2024, and a mainline EOP program over capacity by almost four percent, CDCR's efforts to activate more mainline EOP units at different institutions across the state appeared reasonable. However, by activating these new beds in the midst of a mental health staffing crisis without ensuring sufficient staffing resources to provide adequate mental health care, defendants did not put these programs in a position to succeed.

Following his review of the eight newly activated institutions, the Special Master found that most of the new EOP programs did not have the resources or bandwidth necessary to provide Program Guide compliant and clinically indicated mental health care to many patients in these new units. Many of the selected institutions had preexisting staffing shortages and lacked sufficient time and/or resources to train staff appropriately. Some institutions were in geographic locations that were historically difficult to recruit and retain staff.

As a result of the understaffing identified above, many patients were deprived of adequate mental health care, as reflected in untimely evaluations and clinical contacts, struggles to at least offer adequate amounts structured out-of-cell treatment, and being housed in non-EOP beds. For instance, at HDSP, patients did not receive any in-person treatment, if any treatment at all, with only one telepsychiatrist and one tele-social worker assigned to the entire 160 bed EOP program.

Unfortunately, for these patients who were identified as requiring more intensive mental health care in what are functionally residential treatment units, they were placed in institutions that were wholly unprepared to house or treat them. As a result, collateral impacts were noted across almost all institutional programs and almost all examined EOP programs were found noncompliant with the most basic remedial requirements.

This Draft Report contains a focused review of each new institution's development of its EOP program and is intended to provide guidance to defendants on areas that require significant attention in hopes that each program attains success as quickly as possible.

In addition to drafting the Thirty-First Round Inpatient Report, covering the Psychiatric Inpatient Programs and the three DSH institutions with designated *Coleman* beds, the Special Master is currently in the process of conducting full reviews of all MHSDS institutions, including each of the programs discussed in this report. The Special Master reiterates the "mental health staffing crisis should not be allowed to normalize a standard of care that falls short of what the Program Guide requires." ECF No. 8095 at 139.

Central to the Special Master's full review during the Thirty-First Round will be an assessment of the continued impact that institutional triage plans, which authorize understaffed programs to provide mental health care below the minimum requirements outlined in the

Program Guide, have on the plaintiff class. *See* Thirtieth Round Monitoring Report – Part C, ECF No. 8095 at 13-14. Given the number of institutions that are currently operating with an institutional triage plan, defendants must focus efforts on returning to Program Guide compliant during in the Thirty-First Round. Indeed, defendants' must provide resources needed to provide mental health care commensurate with the minimum requirements of their remedial plan – not unilaterally rewrite the remedial plan to align with their current staffing capacity, under the guise of triage planning.

The Special Master offers no formal recommendations and makes no request for additional court orders at this time.[33]

Respectfully submitted,

*/s/ Matthew A. Lopes, Jr.*
Matthew A. Lopes, Jr.
Special Master

May 29, 2025

[33] Though the Special Master has strongly encouraged CDCR to consider discontinue housing Level IV mainline EOP patients at HDSP altogether, the Special Master does not seek court-intervention to do so at this time.

# APPENDIX A

## INSTITUTIONAL SUMMARIES

**CALIFORNIA CORRECTIONAL INSTITUTION (CCI)**

Site Visit: July 23, 2024 – July 24, 2024
Review Period: January 1, 2024 – March 31, 2024

Census:

CCI activated an 80 bed EOP unit on December 18, 2023.[34] *See* Exhibit B. By July 23, 2024, the capacity had increased to 120 double-celled patient beds. However, based on the number of patients on single-cell status during the review period, the institution reported an ongoing operational capacity of 75 patients. On July 23, 2024, CCI reported a census of 87 mainline EOP patients and five EOP patients awaiting transfer in the general population RHU. As a result, CCI was operating at 123 percent operational capacity at the time of the site visit.

Staffing:

CCI reported the following staffing allocations and vacancy rates as of July 16, 2024:

Two senior psychologist supervisors filled the 1.5 allocated positions.

Of the 2.5 allocated staff psychiatrist positions, two were filled resulting in a 20 percent vacancy rate. However, the use of 1.75 on-site registry staff eliminated the functional vacancy rate.

Eight of the 11.5 clinical psychologist positions were filled, resulting in a 30 percent vacancy rate. No registry staff was used.

Of the six allocated clinical social worker positions, five were filled resulting in a 17 percent vacancy rate.

Of the three allocated recreation therapist positions, two were filled for a 33 percent vacancy rate.

---

[34] Letter from N. Weber, CDCR Office of Legal Affairs, to Special Master, Matthew Lopes (October 17, 2023).

Eight office technicians filled 6.5 allocated positions.

For custody staffing, all eight housing unit positions were filled, as were all five health care access correctional officer positions. CCI indicated that if any EOP custody staffing post was left vacant, it was immediately filled using regular working staff, coverage working staff, or overtime staff as necessary.

The mandated staffing ratio for on-site psychiatrists treating EOP patients is 120 patients per psychiatrist while the mandated staffing ratio for on-site primary clinicians is 26 patients per clinician. *See* ECF No. 3693 at 17. All psychiatrist and primary clinician caseloads were within established staffing ratios.

Telemental Health:

Except for the statewide telepsychiatry program providing after-hours and on-call services, CCI did not utilize telemental health services during the review period.

Telework:

CCI did not utilize telework services during the review period.

Medication Management:

Clozapine:

CCI reported no patients on clozapine during the monitoring period, or at the time of the site visit.

PC 2602:

A senior psychologist specialist served as the PC 2602 medication court administrator, with two additional backup coordinators when needed. The PC 2602 coordinator reported an increase in workload since the EOP program activation due to the significant increase in the number of patients receiving involuntary medications under the PC 2602 process. There was an

average of two to four patients on PC 2602 medications prior to EOP activation, and on July 19, 2024, CCI reported 23 patients, including 17 at EOP and six at the 3CMS level of care. There were four renewals, but no initial petitions filed during the monitoring period; all renewal petitions were granted. No timelines were missed due to administrative errors. The PC 2602 coordinator denied any challenges interfacing with Office of Legal Affairs (OLA), Office of Administration Hearings (OAH), or the administrative law judge. Accordingly, PC 2602 administration was compliant.

Medication Lines:

CCI had limited space for medication lines, with medication lines occurring in the housing unit by podium pass. This deviated from HCDOM 3.5.29 (c)(3)(A), which stated that mainline medication administration should occur at a medication window.

Medication lines often ran late, which resulted in frequent cancelation of recreation therapy yard and absences in group therapy sessions. Interviewed nursing staff stated the reasons for running late included not having a dedicated psychiatric technician for the EOP program; instead, nursing staff were redirected from other programs. Therefore, medication lines were not compliant.

Transfers to Higher Levels of Care:

There were no intermediate or acute care referrals during the review period.

The Program Guide requires transfers to MHCBs within 24 hours of referral. *See* 7333-1 at 75. There were seven MHCB referrals; all were timely admitted within 24 hours of referral.

According to Cal. Code of Regs., tit.15 § 3335.2, patients at the EOP level of care must be transferred to an EOP RHU within 30 calendar days from the date of initial placement in RHU or change in level of care. *See also* ECF No. 8355 at 5 (RHU Transfer Timeline Exceptions).

Twenty-five of 36 or 69 percent of EOP RHU transfers were timely. The eleven delayed transfers were 14 days late on average and ranged from three to 47 days late. Delays included investigation into potential patient safety concerns and patients receiving RVRs while awaiting transfer.

CCI lowered 18 patients' level of care from EOP to 3CMS during the reporting period.

Although CCI was compliant with MHCB transfer timelines, it was not compliant with RHU transfer timelines during the reporting period.

Programming:

EOP Patients in Restricted Housing:

The Restricted Housing Unit Program: Mental Health Services Policy, dated July 19, 2024 and effective August 1, 2024 (hereinafter "RHU Policy"), does not speak to treatment requirements for EOP patients awaiting transfer from a 3CMS RHU to an EOP RHU. Therefore, treatment of EOP RHU patients housed in a 3CMS RHU was assessed using 3CMS RHU requirements during the monitoring tour. Headquarters data reflected that one psychiatrist and one LCSW treated EOP patients awaiting transfer. However, CCI did not provide adequate data regarding treatment that was scheduled, offered, attended, or refused.

The treatment space in RHU included a one-to-one treatment room with an ADA compliant TTM, and a non-contact visitors booth if necessary; however, leadership reported trouble hearing the patient in the visitor's booth.

Impact of EOP Programming on Crisis Intervention:

CCI maintained an institution-wide crisis intervention team (CIT) during the review period. Staff reported that each primary clinician was responsible for responding to their assigned patient's CIT calls. Mental health staff informally covered for one another when the

assigned primary clinician was not working. The CIT also included nursing and custody staff as required. During the reporting period, CCI experienced 84 institution-wide CIT activations, of which 32 or 38 percent involved EOP patients. Of the eight CIT activations resulting in MHCB admissions, five or 62 percent involved EOP patients.

Despite the increase in CIT calls since the EOP program began, staff indicated that they generally managed crises effectively and did not refer many patients to a higher level of care.

<u>Mainline EOP Programming</u>:

*Structured Therapeutic Activities*

The Program Guide requires that each EOP patient be offered at least ten hours per week of structured therapeutic activities. If the patient was scheduled for less than ten hours of treatment activities per week, the patient's IDTT was required to meet monthly to review and increase the amount of structured therapeutic activities or refer the patient to a higher level of care as clinically indicated. *See* ECF No. 7333-1 at 58.

CCI reported an average of 16.6 scheduled hours of group per week, with 11.7 hours offered; however, only an average of 4.9 hours was attended. CCI noted that 7.3 hours were due to refusals, with cancellations largely accounting for the remaining difference. CCI reported that 82 percent of EOP patients were offered at least the requisite ten hours of structured treatment per week. Reasons given for the 18 percent not offered mandated hours included group cancellations due to recreation therapist unavailability and custody-related issues. Consequently, CCI was not compliant with offering the required ten hours per week of structured therapeutic activities.

The monitor's expert observed a primary care caseload group that was not confidential as the treatment room door was open due to extreme heat. The group began 15 minutes late, which

the primary clinician reported was typical. The group content was appropriate and included cognitive-behavioral therapy, thinking errors, and the differences between perception and reality. The primary clinician facilitator had a good rapport with his patients. Overall, the group was clinically beneficial.

The monitor's expert observed two recreation groups. One group was conducted in the main area of treatment space, which was 88 degrees. The group was labeled as a coping group and consisted of various games, including dominos, chess, and puzzles. Another recreation therapy group consisted of watching a movie and engaging in a discussion with patients. Both groups delayed starting for 30-45 minutes due to custodial factors allowing patients to participate in only 30 of the 75 scheduled minutes. The recreation therapists were engaged and active.

Group treatment at CCI was not compliant due to non-confidential groups and patients not receiving the required amount of time in their groups due to late starts and early dismissals.

*IDTTs*

The Program Guide requires that a patient receive an initial IDTT to be completed within 14 calendar days of arrival to the institution and routine IDTTs every 90 days thereafter. *See* ECF No. 7333-1 at 59. The required attendees include the patient's assigned primary clinician, assigned psychiatrist, assigned correctional counselor, and the patient themselves. *See* ECF No. 7333-1 at 56. The IDTT should address treatment needs, develop treatment plans, assess treatment progress, and include pre-release and discharge planning. *See generally id*.

Healthcare records of 40 mainline EOP patients were selected to assess IDTT compliance with Program Guide timeframes during their stays. All 40 patients required initial IDTTs; 12 or 30 percent occurred within 14 calendar days of arrival or a level of care change. Required staff

attended 37 of 38 or 97 percent of reviewed initial IDTTs, and patients attended 31 of 37 or 84 percent of initial IDTTs.

Eighteen reviewed patients required routine IDTTs during the review period; 89 percent occurred timely at least every 90 calendar days. All required staff were present for all 18 routine IDTTs while patients were present in 14 of 18 or 78 percent of cases. Of note, the Program Guide required attendance of the assigned psychiatrist and primary clinician at both initial and routine IDTTs, however, assignment was not clearly discernable for all cases.

Accordingly, as described above, reviewed initial and routine IDTT timelines were not compliant with Program Guide timeframes.

The monitor's expert observed seven IDTTs; five initial IDTTs, one routine IDTT, and one routine EOP Mod IDTT. There were no IDTTs scheduled for EOP patients in the RHU during the monitoring tour. The IDTT space was adequate in size and air-conditioned.

Patients attended all IDTTs as did the EOP supervisor, the three EOP primary clinicians, the EOP psychiatrist, and a CC1. All staff accessed computers during the IDTT. The psychiatrist and primary clinicians had evaluated all patients prior to the IDTT, and patients with initial IDTTs appeared to have already been assigned and offered groups.

While the treatment team knew their patients well, had a good rapport and were attentive to clinical needs and concerns, the IDTTs displayed fundamental inadequacies such as lacking adequately identified and discussed functional impairments, missing case conceptualizations, deficient discussion of medications by name, and also lacking measurable treatment goals, missing level of care justification, and limited custody participation. Due to these fundamental inadequacies, observed IDTTs were not compliant.

*Individual Treatment*

The Program Guide requires that EOP patients receive an initial psychiatry evaluation before their initial IDTT and within 14 calendar days of arrival or level of care change. *See id.* It also requires that confidential routine psychiatric contacts are to occur at least every 30 calendar days after the initial psychiatric evaluation. *See* ECF No. 7333-1 at 65.

Healthcare records of 40 mainline EOP patients were selected to assess psychiatry and primary clinician compliance with Program Guide timeframes during their stays. Forty EOP patients required initial psychiatry evaluations, of which only 17 or 43 percent had timely initial psychiatry evaluations, meaning it occurred before the initial IDTT and within 14 calendar days of patient arrival or level of care change. Twenty-seven or 68 percent were conducted in a confidential setting. Reasons for non-confidentiality included patient refusals and modified programming. Telepsychiatry was not utilized for any initial psychiatry evaluations. CCI was not compliant with the timely completion of initial psychiatry evaluations.

Thirty-three patients required routine psychiatry contacts; there were 53 expected timeframes, of which only ten or 19 percent were timely and occurred at least every 30 calendar days. Of the 41 reviewed routine psychiatry contacts, 32 or 78 percent occurred in a confidential setting. Reasons for non-confidentiality included patient refusals and modified programming. CCI was not compliant with the timely completion of routine psychiatry contacts or the confidentiality requirement of the Program Guide.

Forty EOP patients required initial primary clinician evaluations during the reporting period; 37 or 93 percent were completed within 14 calendar days of arrival or change in level of care. Twenty-eight or 70 percent were conducted in a confidential setting. Reasons for non-confidentiality included patient refusals, modified programming, and unavailable confidential treatment space. No initial primary clinician evaluations were conducted utilizing telehealth.

CCI was compliant with the provision of timely initial primary clinician evaluations; however, they were not compliant with confidentiality as required by the Program Guide.

All 40 patients required routine primary clinician contacts; only 69 percent occurred at least every ten calendar days. Of the 182 reviewed routine primary clinician contacts, 96 or 53 percent were conducted in confidential settings. Reasons for non-confidentiality included patient refusals, modified programming, and unavailable confidential treatment space. No routine primary clinician contacts were conducted using telehealth. CCI was not compliant with the timeliness or confidential setting requirements for the completion of routine primary clinician contacts.

Although initial primary clinician contacts were completed timely and therefore compliant, initial and routine psychiatry contacts and routine primary clinician contacts were not compliant during the review period.

*Staff and Patient Interviews*

Interviewed CCI EOP supervisory and line staff reported that all primary clinicians were psychologists who volunteered to work in the EOP program. The primary clinicians described an excellent working relationship with the EOP psychiatrist and program supervisor. In addition, staff reported a generally collaborative relationship with custody staff. Staff also reported that caseload ratios were currently manageable but were concerned that anticipated upcoming admissions without a commensurate increase in staffing would overwhelm existing staff, causing them to leave.

EOP staff also identified additional factors impacting service such as mass transfers of EOP patients from other institutions occurring with little notice, patients sent without their property, patients often sent to CCI on Fridays with little staff to orient them, and the incorrect

level of care placement of patients. Particularly troubling to staff was the fact that incorrectly placed patients disrupted or were not interested in treatment and the onerous discharge process made it difficult to move those patients to the appropriate level of care.

Further, mental health staff reported concerns regarding operating over capacity as the program continues to progress. Staff reported that the program was originally intended to support 60 patients, but at the time of the site visit, it exceeded 90 patients, and they were anticipating more patients in the near future.

Staff and patients further reported that the lack of recreation therapists led to many group cancellations due to the lack of backup coverage. Finally, the lack of psychiatric technicians and nursing staff led to excessively long pill lines, which resulted in severe delays in group start times and/or group cancellations.

Patients reported positive aspects of their mental health providers and treatment, including caring clinicians attempting to do their best. Unfortunately, they also reported issues with custody that included inadequate training prior to the arrival of EOP patients, not wanting an EOP program, not activating CIT appropriately, and custody staff resistance to escorting patients, which made attending groups more difficult.

Patients reported other issues that impeded their treatment, including patient safety issues, scheduling conflicts, a lack of confidentiality for individual therapy contacts, and frequent group cancellations. Concerningly, patients interviewed reported they were not offered the required ten hours of treatment per week, and patients reported not receiving recreation yard time due to medication line delays.

Other Issues:

Access to Care and Treatment Space:

Mental health staff and leadership emphasized that they were at or near capacity for the number of EOP patients that CCI could manage. Staff reported an influx of up to 30 EOP patients in one day, frequently on Fridays. As EOP timelines start at the time of arrival to a program, this created pressure to complete all required assessments and IDTTs on time. The monitor's expert recommended to CCI mental health leadership that CDCR reduce the speed with which they transfer EOP patients to new EOP programs.

Treatment space in the EOP program building was inadequate. Space was limited, lacked confidentiality, and consisted of a reconfigured dining room with a large main space in the center and two rooms on either end with doors that could be closed to provide confidential space. Custody officers sat in the middle of the main room. The treatment space was uncomfortably hot during the site visit, particularly the two rooms at either end. The expert's monitor got light-headed and had to leave a group observation due to the excessive heat and the number of flies in one of the end rooms, even though the door was left open, and a fan was brought in for the monitoring tour.

The treatment spaces did not provide sufficient privacy for sight or sound. In fact, the monitor's expert could visually observe a patient during his individual therapy while simultaneously observing a recreation therapy group on the other side of the room. This lack of confidential space translated into direct clinical impacts, with patients reporting reticence to discuss sensitive matters, such as trauma.

The treatment space for mental health patients in the RHU included a one-on-one treatment room, with an ADA-compliant TTM. Additional one-on-one contacts occurred in the

non-contact visitor booths. As noted above, mental health leadership and staff reported it was difficult to hear in the visitor booths. The treatment space at CCI was not compliant.

Custody and Mental Health Partnership:

CCI's mental health staff reported a collaborative working relationship with custody staff, while patients reported that custody staff required more training on how to interact appropriately with EOP patients.

**CALIFORNIA INSTITUTION FOR MEN (CIM)**

Site Visit: July 9, 2024 – July 10, 2024

Review Period: January 1, 2024 – May 31, 2024

Census:

On February 12, 2024, CIM activated a 150 bed EOP.[35] *See* Exhibit C. By July 9, 2024, the capacity had increased to 200 beds and CIM's EOP population included 173 patients; 161 of which were mainline EOP, nine EOP patients were in the RHU, and three EOP patients were in the MHCB. Of the nine EOP patients in the RHU, two were awaiting transfer, one was out to court and six were layovers in transit from another facility. During the reporting period, the average EOP census was 131 patients, with a high of 180 patients.

Staffing:

CIM's staffing for the mainline EOP program included 16.36 allocated positions, of which only four allocated positions were filled. The remaining staff were comprised of one registry psychiatrist, a 0.5 reassigned psychiatrist, four psychologists (all redirected from other programs), and one clinical social worker redirected from another program. As a result, the EOP program's functional vacancy rate was 36 percent at the time of the site visit.

As of July 9, 2024, there were 1.55 allocated staff psychiatrist positions; only one position was filled and it was by a registry psychiatrist. A 0.5 full-time equivalent position was temporarily filled by a staff psychiatrist who also carried a full 3CMS caseload and provided coverage in the MHCB. This reduced the functional vacancy rate to three percent.

The one senior psychologist position was filled.

---

[35] Letter from N. Weber, CDCR Office of Legal Affairs, to Special Master, Matthew Lopes (October 26, 2023).

There were five allocated staff psychologist positions; none were filled by permanent staff. Four staff psychologists were redirected to the mainline EOP program, reducing the functional vacancy rate to 20 percent.

There were 2.14 allocated clinical social worker positions with one permanent position filled and one position filled by staff redirected from other programs, resulting in a functional vacancy rate of 6.5 percent.

All of the 4.17 recreation therapist positions were vacant.

Two of the 2.5 allocated office technician positions were filled by permanent staff, leaving a 20 percent vacancy rate.

Custody staffing included three custody officers assigned to the two EOP housing units on first watch and five officers assigned to the two housing units on second and third watch. CIM reported that all correctional officer absences in the EOP program were filled by custody staff redirected from other programs. CIM did not assign additional sergeants to Facility C as a result of the new EOP program.

Telemental Health:

Telepsychiatry was used to cover nights, weekends, and holidays, as well as for patients awaiting transfer to an EOP RHU.

Telework:

Telework was rarely utilized by institutional staff and was not permitted for clinical contacts. Clinical staff were permitted to telework once per month to complete documentation and training requirements.

Medication Management

Clozapine:

CIM was not a CDCR-designated clozapine initiation or maintenance institution during the monitoring period.

PC 2602:

The institution reported eight EOP patients received PC 2602 involuntary medications. The institution filed no emergency initial petitions, one non-emergency initial petition, and seven renewal petitions; all petitions were granted. CIM reported no patients with a planned non-renewal, or an order that lapsed due to lack of follow-up.

Medication Administration:

Due to increased needs of the EOP population, CIM reported an increased need for medication management related staff, including psychiatrists, nurses, psychiatric technicians, and medical assistants. The reasons reported included: need for more frequent visits with psychiatrists; increased medications prescribed to the EOP population; and higher refusal rates for medications and laboratory studies.

Transfers to Higher Levels of Care:

There were no intermediate or acute care referrals during the review period.

The Program Guide requires transfers to MHCBs within 24 hours of referral. *See* 7333-1 at 75. There were 75 MHCB referrals during the review period; all were timely admitted within 24 hours of referral and therefore compliant with Program Guide timeframes.

EOP patients placed into the 3CMS RHU during the review period were required to be transferred to an EOP RHU within 30 calendar days from the date of initial placement or level of care change. *See* Cal. Code of Regs., tit.15 §§ 3335.2; *see also* ECF No. 8355 at 5 (RHU

Transfer Timeline Exceptions). CIM data indicated that 18 EOP patients were placed in the 3CMS RHU during the reporting period, and all transferred within timeframe guidelines. The average time to transfer was 1.94 days and ranged from zero to six days.

CIM was compliant with MHCB and EOP RHU transfers during the review period.

<u>Programming</u>:

<u>EOP Patients in Restricted Housing</u>:

The Restricted Housing Unit Program: Mental Health Services Policy, dated July 19, 2024 and effective August 1, 2024 (hereinafter "RHU Policy"), did not speak to treatment requirements for EOP patients awaiting transfer from a 3CMS RHU to an EOP RHU. Therefore, treatment of EOP RHU patients housed in a 3CMS RHU was assessed using 3CMS RHU requirements during the monitoring tour. Given the short stays, caseload ratios for clinical staff treating EOP patients were not discernable.

The institution indicated that two-hour groups were offered to all RHU patients and were held three times per week, which included four hours of recreation therapy and one two-hour clinical group. An additional hour of group treatment was available to EOP patients when housed in the RHU. One reviewed EOP RHU patient was offered an average of five hours of structured treatment per week since arriving in the RHU on June 24, 2024. EOP patients placed in the RHU attended group sessions with 3CMS RHU patients.

The monitor's expert observed one initial IDTT for an EOP patient housed in the RHU. The primary clinician who conducted the IDTT was not the patient's assigned clinician and had only met the patient once previously. The telepsychiatrist was also not patient-assigned and was accompanied by the medical assistant in the room. There was no connectivity issue noted.

The small IDTT room was cramped and included one large table covered with computers. Unfortunately, the height of the computer monitors made it nearly impossible for seated staff to see the patient. The treatment team discussion was superficial and included vague goals and interventions. The meeting was not collaborative and did not include sufficient discussion of the patient's history, case formulation, treatment progress, or current psychotropic medications.

Although the IDTT was not compliant with Program Guide requirements, EOP RHU patients were offered the required amount of structured treatment, therefore CIM's 3CMS RHU was compliant with the RHU Policy.

Impact of EOP Programming on MHCB and the Crisis Intervention Team:

MHCB staff reported an increase in admissions and patients placed on suicide watch since the activation of the EOP at CIM. At the time of the site visit, there were 35 active beds in CIM's MHCB.

Interviewed staff reported that the increased workload since the opening of the EOP program impacted the quality of care delivered to patients, increased the frequency of cell-front contacts, and minimized the time available to complete clinical documentation. Staff attributed the increase in MHCB placements to the lack of EOP programming on the units, as patients' symptoms amplified due to increased time in their cells, direct after-hours admissions, safety concerns, and drug use. MHCB staff also anticipated further increased admissions with the newly activated EOP program at CRC, which did not have an MHCB and transferred patients to CIM for MHCB treatment.

MHCB staff reported feeling overwhelmed, specifically due to staffing shortages during the review period. While staff were often reassigned to cover vacant positions in the EOP program, permanent MHCB staff reported feeling challenged to take time off due to the

additional coverage burdens placed on co-workers. The increased workload forced weekend staff to respond to many five-day follow-ups and emergent mental health referrals at all levels of care.

The Crisis Intervention Team (CIT) was activated four times since the opening of the EOP program, each time the patient was referred to the MHCB. Three of the four activations included all members of the CIT, which included mental health, custody, and nursing, with nursing missing from one of the four activations. Three referrals were due to suicidal ideation, and one was due to psychotic symptoms.

Mainline EOP Programming:

Overall, despite the mental health staff's clear dedication and commitment to the success of the new EOP program, there were significant areas of concern, which if not addressed, may negatively impact staff retention and impair the functioning of the full MHSDS at CIM.

The institution's mainline EOP program opened on February 12, 2024, with mainline patients residing in the Alpine housing unit on Facility C. The unit had a total capacity of 200 beds, but the designated EOP capacity upon opening was 150 beds.

During the reporting period, a consistent area of concern in the mainline EOP program was staffing and its effect on CIM's MHSDS. Current workloads and staff reassignment from other program areas were not sustainable and led clinicians to report feeling overwhelmed and burnt out. Of the six staff members with discernable EOP patient caseloads, four exceeded the staffing plan's required ratio. The one registry psychiatrist in the mainline EOP program was assigned 121 patients, which exceeded the caseload ratio by one patient. The other 0.5 FTE staff psychiatrist who also carried a 3CMS caseload and provided MHCB coverage, carried a caseload of 40 EOP patients. The information required to determine whether this exceeded the established

ratio was not available. Additionally, of the five primary clinicians redirected to the EOP program, three exceeded caseload ratios, averaging 36 patients each. The mandatory staffing ratio for primary clinicians is 26 patients per primary clinician.

*Structured Treatment*

The Program Guide requires that "[e]ach inmate patient shall be offered at least ten hours per week of scheduled structured therapeutic activities as approved by the IDTT. It is recognized that not all inmate-patients can participate in and/or benefit from ten hours per week of treatment services. For some inmate-patients, ten hours per week may be clinically contraindicated. For those inmate-patients scheduled for less than ten hours per week of treatment services, the PC shall present the case and recommended treatment program to the IDTT for approval. The CDCR 7388, Mental Health Treatment Plan, must include a detailed description of the diagnosis, problems, level of functioning, medication compliance, and rationale for scheduling less than ten hours. For inmate-patients who are scheduled for less than ten hours of treatment activities per week, the IDTT shall meet at least monthly and be responsible to review and increase the treatment activities or refer to a higher level of care as clinically indicated." *See* ECF No. 7333-1 at 58.

CIM provided data for 155 patients covering January 1, 2024 to May 31, 2024, which reflected that 14 percent of patient weeks had at least ten hours of scheduled, structured treatment activities with an average of 5.1 hours of scheduled, structured treatment activities per patient per week. Concerningly, there were 44 instances of patients not being scheduled for *any* structured treatment for an entire week during the reporting period.

Even fewer scheduled treatment hours were offered to patients during the review period; CIM was unable to provide an explanation for this occurrence. On average four hours of

treatment were offered to patients weekly, with only 55 or six percent of patient weeks reflecting at least ten hours of treatment offered per week during the reporting period. There were 57 instances of patients not being offered *any* treatment for an entire week during the reporting period. Notably, CIM reported that no patients were placed on EOP-modified programming throughout the reporting period or at the time of the site visit.

On average, EOP patients attended 2.5 hours of structured treatment each week during the reporting period. CIM indicated that six percent of appointments were cancelled due to custody reasons. At the time of the site visit, 41 percent of patients were refusing to attend at least 50 percent of their offered programming. Leadership indicated that the primary reasons for the high group refusal rate was believed to be drug use and heat-related concerns.

Noncompliance with structured treatment requirements persisted following the review period. In the month between the end of the review period and the date of the site visit, data was produced for 166 patients, which reflected that only eight patients, or five percent had been offered at least ten hours of treatment per week.

For these reasons, CIM was not compliant with the offering of ten hours of structured therapeutic activities to EOP patients.

*IDTTs*

The monitors experts observed four routine IDTTs during the site visit. The IDTT room was adequate in size and located in the treatment clinic on Facility C. As the IDTT room was formerly a patient holding area and automatically locked when the door was closed, staff left the door ajar during the IDTTs. This resulted in significant noise from the hallway making it difficult to hear and was disruptive to the IDTT process. Mental health leadership reported that discussion from inside the room could be heard in the hallway, which also impacted

confidentiality. CIM provided data for 178 meetings, 177 or 99 percent were reportedly held in confidential locations.

Required clinicians were present for the four IDTTs, although for one patient, neither the assigned primary clinician nor psychiatrist was present. For another patient, his assigned psychiatrist was present for the meeting but had not met the patient previously. The strength of each IDTT was psychiatric input and communication between each staff member and the patients. When interacting with the patients, each staff member spoke clearly, respectfully, and was kind and empathic - a sign of a positive working relationship. The meetings were collaborative as well.

Clinical discussions included each patient's current symptoms, diagnosis, and programming. Patient progress since the previous IDTT, treatment goals and group treatment were referenced but specific details were not provided. Content in need of further discussion included review of relevant mental health history, case conceptualization, treatment interventions (excluding medications) and rationale for level of care. There was no mention of the amount of structured treatment available to patients during the IDTT meetings. It could not be determined from the discussions whether patients were being offered ten hours of treatment each week. None of the patients were formally assigned a modified EOP program schedule.

CIM indicated that of the 188 IDTT meetings held during the reporting period, only 59 or 31 percent included the required staff. In 115 or 61 percent of the IDTTs, a psychiatrist other than the patient's assigned psychiatrist was present for the meeting, and in 27 or 14 percent of the IDTTs, a primary clinician other than the patient's assigned clinician was present for the meeting. Seventeen or nine percent of the reviewed IDTT meetings had neither the assigned psychiatrist nor the assigned primary clinician. In 12 or six percent of reviewed IDTTs, no correctional

counselor was present. Notably, during one IDTT, there was no psychiatrist present for the meeting.

The Program Guide required that a patient receive an initial IDTT within 14 calendar days of arrival to the institution and routine IDTTs every 90 days thereafter. *See id*. at 59. The required attendees include the patient's assigned primary clinician, assigned psychiatrist, assigned correctional counselor, and the patient themselves. *See id.* The IDTT should address treatment needs, develop treatment plans, assess treatment progress, and include pre-release and discharge planning. *See generally id*.

Forty EOP patients who required initial IDTTs were randomly selected for review; 23 or 58 percent occurred timely within 14 calendar days of arrival or level of care change, while two did not occur at all. Of the 38 that occurred, 37 or 97 percent were attended by all required staff and patients.

One patient required a routine IDTT; the IDTT occurred timely. The required staff and the patient were in attendance.

Observed IDTTs lacked a review of relevant mental health history, case conceptualization, treatment interventions (excluding medications) and rationale for level of care. Therefore, observed IDTTs were not compliant with Program Guide requirements. Although the one patient who required a routine IDTT was compliant with required timeframes, initial IDTTs were not compliant.

*Group Treatment*

EOP patients at CIM were offered group treatment including clinical groups, recreation therapy groups, ISUDT groups, primary clinician caseload groups, and nursing led treatment

groups (NLTG) in ten-week cycles and were prioritized for scheduling based upon the patient's date of arrival. EOP orientation group did not occur at the time of the site visit.

Primary clinicians and psychology interns provided clinical groups on topics including coping skills, relaxation, cognitive behavioral therapy, depression, anxiety, stress management, anger management, self-help, and dialectical behavior therapy. One psychologist also offered a group to Spanish-speaking patients.

Four recreation therapists were also pulled from other assignments in the institution to provide recreation therapy to EOP patients once per week. Psychiatric technicians and registered nurses offered NLTG groups as well. Most groups were scheduled to include up to ten patients.

The monitor's expert observed two clinical groups and one recreation therapy group during the site visit. One clinical group was facilitated by a psychologist, and the other by a psychology intern. For the first observed clinical group, which focused on coping skills, no patients arrived for the group's scheduled start time. Over the next 15 minutes, five patients arrived in a staggered fashion, while three refused. The group room was on the upper floor of the EOP housing unit and was of adequate size, but was very hot, causing two patients to leave prematurely due to the heat. A large fan was used to mitigate the heat; however, the noise and disruption made communication among group members more challenging. Although the content of the group was adequate and had good patient participation, the temperature of the room clearly impacted patients' ability to attend and engage fully.

The group facilitated by the intern was designed to address 'coping with anxiety.' At the start of the group, one patient was in attendance, with another arriving 15 minutes after the group began. The group was held in the same room where the previous group had been observed, so the conditions remained the same; the fan continued to make communication a challenge. The

content of the group could have been clinically adequate, had the patients been higher functioning; however, the content was too abstract in nature for the patients in attendance to fully understand. The intern worked to engage patients and return them to the topic at hand when they were tangential, but ultimately, it did not appear that patients benefited from the group.

The recreation therapy group was focused on decision-making and was held in a room on the lower level of the EOP housing unit. It was of adequate size, and the patients brought in their smaller personal fans to keep them cool. There were five EOP patients in attendance, as well as two peer mentors. Two patients arrived after the group had begun. The group was primarily facilitated by peer mentors, with input from the recreation therapist from time to time. Overall, the group was adequate and appeared to be helpful to the patients.

The monitor's expert attempted to attend an NLTG group on July 9, 2024, but the group was canceled due to staff re-direction.

Of note, there were challenges with the ducating process in the EOP program. Patients arrived at groups later than scheduled and others asked if they were scheduled for the group only to learn that they were not. Staff reported that each day, clinicians provided a list of the patients scheduled for their groups to the custody officers who presumably alerted patients when they needed to go to groups. However, this system did not work, and staff were working to remedy it.

Overall, observed groups were adequate and had good patient participation and were therefore compliant with Program Guide requirements.

*Individual Treatment*

The Program Guide required that EOP patients receive an initial psychiatry evaluation before their initial IDTT and within 14 calendar days of arrival or level of care change. *See id.*

It also required that confidential routine psychiatric contacts were to occur at least every 30 calendar days after the initial psychiatric evaluation. *See id*.

The monitor randomly selected and reviewed the healthcare records of 40 mainline EOP patients to assess compliance with Program Guide timeframes during their stays.[36]

Forty patients required initial psychiatry evaluations; 31 or 78 percent timely occurred before the initial IDTT and within 14 calendar days of arrival or change in level of care. One patient did not receive an initial psychiatric evaluation. Of the 39 reviewed initial psychiatry evaluations, 38 or 97 percent were conducted in confidential settings. Non-confidential contacts were due to patient refusal.

Thirty-two patients required routine psychiatry contacts; 82 percent timely occurred at least every 30 calendar days. Of the 45 reviewed routine contacts, 38 or 84 percent were conducted in confidential settings. Patient refusals accounted for non-confidentiality. Telepsychiatry was not utilized for any initial or routine psychiatry contacts.

Additionally, within 14 calendar days of arrival or level of care change, EOP patients must receive an initial primary clinician evaluation followed by confidential primary clinician contacts, either by individual or group psychotherapy, at least weekly, with individual clinical treatment mandatory every other week. *See id*.

Following review of forty patients, all required initial primary clinician evaluations; 36 or 90 percent were completed within 14 calendar days of arrival or change in level of care while 39

[36] Compliance solely focused on the occurrence of a primary clinician or psychiatric contact and did not assess the quality of the contact. Consequently, the indication of an initial assessment did not verify that a comprehensive initial assessment was completed during the first contact with the primary clinician or psychiatrist. Additionally, the review of routine primary clinician or psychiatric contacts did not distinguish between a brief check-in (wellness/status check) or a meaningful therapeutic contact.

or 98 percent were conducted in a confidential setting. Non-confidential initial primary clinician evaluations stemmed from patient refusal.

Thirty-nine patients required routine primary clinician evaluations; three patients did not receive them and 79 percent timely occurred at least every ten calendar days. There were 173 total group and individual routine primary clinician contacts; of the 173 reviewed routine individual contacts, 160 or 92 percent were conducted in confidential settings. Reasons for non-confidentiality included patient refusals and modified programming.

Overall, except for initial primary clinician evaluations, individual patient treatment was not compliant with Program Guide timeframes.

*Staff Interviews*

Mental health staff members provided input regarding the rollout of the new EOP program. One psychiatrist indicated that no training had been provided since his arrival and no regular meetings were held to discuss patient treatment or programming as concerns arose. Other interviewed mental health clinicians reported they had previously worked with EOP patients and had a good working knowledge of the Program Guide requirements and EOP patient treatment protocols.

Staff indicated that the Alpine building on Facility C, the EOP housing unit, was generally chaotic. Custody officers were overwhelmed, did not enforce the rules, and appeared to not know how to handle EOP patients appropriately. This led to staff and patient safety concerns, particularly in unlocked group rooms in the housing unit. A clinician described an incident where he found multiple patients doing drugs openly in the group room during the review period.

Additional concerns included the significant number of crisis bed admissions due to drug overdoses and the location of clinical offices inside the housing units, which invited interruption by patients.

*Patient Interviews*

Eleven EOP patients were interviewed during the site visit. All patients reported seeing the same psychiatrist monthly and in a confidential setting; however, one patient reported seeing multiple psychiatrists. Eight patients reported having routine weekly contacts with their assigned primary clinician in confidential locations. One patient reported having seen several different primary clinicians and that contacts were not always held weekly. Another patient reported that he was not seen by his primary clinician in over three weeks; this was verified and addressed by leadership. A third patient reported that his assigned primary clinician had left the institution and that a new primary clinician had not been assigned to him. Most patients reported that they found their primary clinicians helpful and individual treatment was useful. Patients reported attending at least one IDTT meeting since their arrival at CIM, but few were able to identify their treatment goals. One patient reported being unaware of his diagnosis.

The patients' primary complaints centered around the heat, lack of access to drinking water, and correctional officers' lack of understanding about the needs of EOP patients. Patients reported that the housing unit, specifically their cells, were unbearably hot, especially in the evenings when their cell doors were closed. Patients said that when they were allowed to have their cell doors open, it allowed more airflow, but this rarely occurred during the review period. Patients reported that there were no drinking fountains in the housing units or on the yard and access to cold water was only made available when the heat plan was activated.

Due to heat plan protocols that limited visitation time, patients reported requesting heat-sensitive medication dosages to be decreased, stopped completely, or administered at a different time during the day. Patients reported being unable to tolerate the physical symptoms and effects of the heat-sensitive medications during the day due to the heat as well. As a result of these medication changes, patients reported fears about their mental health and the potential risks of being undermedicated.

Other Issues:

Program Access:

At CIM, patients consistently reported there were not enough groups, especially recreation therapy groups. One patient reported that there were not enough ISUDT groups to accommodate patient demand. Few patients reported having formal jobs or education. However, patients consistently reported having access to religious services, canteen, and the pill line, each of which was accessed without the need for a custody escort.

Treatment Space:

Psychiatric staff met with patients in designated office space in the Facility C medical clinic. The office space was appropriate and confidential. Group treatment spaces and primary clinician spaces were located on both levels of the Alpine housing unit. There were two group rooms on the first and second floors of the housing unit, adjacent to the dayroom. The two group rooms were large but allowed full visibility into the rooms from the day room. Rooms were sufficient with regard to confidentiality and size. Staff reported that these rooms were not routinely locked, and patients socialized in the rooms unsupervised. There were additional staff offices, which were subsequently locked with 'out of bounds' signage posted.

There were three offices on the lower level and three offices on the upper level of the Alpine building that were designated as primary clinician treatment spaces. On the lower level, two rooms had a small window, while the third room did not have a window, which required the door to be left open, thus compromising confidentiality. Similarly, in the three offices on the upper level, two of the three offices did not have windows, which was problematic and required clinicians to leave the door open during clinical contacts as well. On the upper level, one of the office doors only locked from the outside, thus the clinician was unable to secure the room while inside. Concerningly, clinical staff offices in the Alpine housing unit were excessively hot, often reaching temperatures over 85 degrees during the day. Staff reported not working in their offices due to the physical conditions and safety concerns.

EOP Huddles:

The monitor's expert and monitor observed an afternoon huddle on July 10, 2024. The huddle occurred virtually and was solely attended by mental health staff who discussed pertinent patient information. The EOP supervisor reported that custody staff regularly attended the morning huddle on the unit but had not attended the afternoon huddle since the opening of the EOP program.

Substance Abuse:

Substance abuse was an area of concern at CIM. Given the open access to group treatment space, staff reported that patients were often found assembling in group rooms and engaging in drug activity, which created safety issues for staff and patients in the housing unit. Reviewed healthcare records indicated a relationship between substance use and MHCB admissions for at least two patients randomly selected for case reviews.

Training:

Several high-level stakeholder meetings were held prior to the opening of the program. These stakeholder meetings included regional staff and institutional leadership during which much of the focus of the meetings was preparing the physical plant for the arrival of the EOP population.

The chief of mental health reported one training session was held for all staff, which included mental health, nursing, and custody staff early in the start-up of the EOP program; however, no subsequent training was held for staff. Quarterly roundtable training was not held during the review period as well. However, the institution reported some progress towards initiating these trainings in the near future. All staff reported they would benefit from additional training.

## CALIFORNIA REHABILITATION CENTER (CRC)

Site Visit: October 22, 2024 – October 24, 2024
Review Period: July 8, 2024 – October 24, 2024

Census:

On July 8, 2024, CRC activated a 40 bed EOP unit.[37] *See* Exhibit E. By October 22, 2024, the capacity had increased to 80 beds and CRC's mainline EOP program had a census of 76 patients. During the review period, the average EOP patient census was 48 in July 2024; 78 in August 2024; and 80 in September 2024.

Staffing:

On October 17, 2024, CRC reported the following staffing data for its EOP program:

One senior psychologist supervisor filled the 0.4 allocated position.

One staff psychiatrist filled the 0.62 allocated position.

Three clinical psychologists filled the 2.0 allocated positions.

The 0.86 allocated social worker position was vacant.

One office technician filled the 1.0 allocated position.

One recreation therapist filled the 1.67 allocated positions for a 40 percent vacancy rate.

For custody staff, all four allocated correctional officer positions were filled.

Five of six primary clinicians and all psychiatrists had caseloads within established ratios; one primary clinician exceeded the established ratio by one patient.

Telemental Health:

The EOP program did not utilize telemental health during the review period or at the time of the site visit.

[37] Letter from Sundeep Thind, CDCR Office of Legal Affairs, to Special Master, Matthew Lopes (June 21, 2024).

Telework:

The institution reported that no clinical staff teleworked.

Medication Management:

CRC was not a clozapine-designated institution and reported no patients on clozapine during the reporting period or at the time of the monitoring tour.

CRC reported three EOP patients received involuntary medications under the PC 2602 process. Of these, CRC initiated one of the petitions for danger to self. The institution reported that no petitions were denied, withdrawn, intentionally not renewed, or expired due to tracking issues. CRC did not have a dedicated Medication Court Administrator (MCA) but was exploring options for this at the time of the site visit.

The institution constructed two medication windows on the EOP yard, which afforded protection from the elements. While nursing reported an increased but manageable workload, CRC denied any challenges with individual patient wait times or total length of medication line.

Transfers to Higher Levels of Care:

CRC had one acting senior psychologist specialist who served as the inpatient coordinator; this individual also served as the SPRFIT coordinator. The inpatient coordinator reported no DSH or PIP referrals during the monitoring period.

No patients were referred to acute care or intermediate care during the review period.

The Program Guide requires transfers to MHCBs within 24 hours of referral. *See* 7333-1 at 75. CRC made 16 transfers to an MHCB; all 16 were timely admitted.

Twelve EOP patients transferred to CIM's 3CMS RHU to await transfer to an EOP RHU; all 12 transferred timely. In an example of best practice, a CRC clinician attended CIM ICCs for CRC EOP patients who had recently transferred to CIM.

Two patients transferred from EOP to 3CMS level of care during the review period.

CRC was compliant with Program Guide and RHU Policy transfer timelines during the review period.

Programming:

Crisis Intervention Team:

The institution reported that three clinicians rotated shifts covering crisis issues Monday through Friday, from 7:00 A.M. until 5:00 P.M. The team was co-located in the TTA to facilitate collaboration with nursing. When available, the crisis team assisted in covering other clinical tasks, including five-day follow ups when necessary. After hours and weekend crises were covered by on-call staff and nighttime telepsychiatry coverage. The team was reportedly adept at working with other disciplines and in resolving patient concerns. Thus, no formal activations of the CIT were required during the monitoring period.

Mainline EOP Programming:

The EOP housing unit 408 had a capacity of 80 patients. The unit was divided in half housing 40 patients on each side. There were two dayroom areas; one was used for games and the other for television. The housing unit was air conditioned and set to a comfortable temperature during the monitoring tour. The housing unit had cut-down and Narcan kits to treat opiate overdoses; both were clearly labeled and easily assessable.

*Initial Assessments*

The Program Guide requires initial psychiatric and primary clinician evaluations to occur within 14 days of patient arrival and prior to the patient's initial IDTT. *See* ECF No. 7333-1 at 57. Initial assessments and follow-up visits at CRC generally timely occurred within the 14-day requirement. Patients reported seeing their clinicians every other week, alternating with caseload groups, and seeing psychiatry at least monthly. Patients reported knowing the names of both

their primary clinician and psychiatrist. They also knew how to request help if they were in crisis and felt that their concerns would be addressed and taken seriously.

*Structured Treatment*

According to Program Guide requirements, each EOP patient shall be offered at least ten hours per week of structured therapeutic activities. If the patient was scheduled for less than ten hours of treatment activities per week, the patient's IDTT is required to meet monthly to review and increase the amount of structured therapeutic activities or refer the patient to a higher level of care as clinically indicated. *See* ECF No. 7333-1 at 58.

The average per patient frequency of structured treatment at CRC fell just below Program Guide Requirements as patients were not offered the required ten hours of STA weekly. The institution provided data during the site visit which indicated that, on average, patients were offered nine hours of STA weekly; of that average, 7.6 hours were attended, and 1.6 hours were refused. On average, patients were scheduled for 14 hours of STA weekly; and 5.3 hours were canceled.

Although close to the required number of structured treatment hours offered, CRC was not compliant with the Program Guide requirement of offering ten hours of structured treatment.

*IDTTs*

The Program Guide requires an initial IDTT to be completed within 14 days of arrival at the institution and every 90 days thereafter. *See* ECF No. 7333-1 at 57 and 59. The required attendees include the patient's assigned primary clinician, assigned psychiatrist, assigned correctional counselor, and the patient themselves. *See* ECF No. 7333-1 at 56. The IDTT should address treatment needs, develop treatment plans, assess treatment progress, and include pre-release and discharge planning. *See generally id.*

The monitor randomly selected and reviewed the healthcare records of 30 mainline EOP patients to assess compliance with Program Guide timeframes during their stays. Thirty patients required initial IDTTs; 20 or 67 percent occurred timely within 14 calendar days of arrival or level of care change. Eighteen or 60 percent were attended by all required staff and 28 or 93 percent were attended by the patients. The assigned staff member most often replaced by an alternate was the psychiatrist. Seven patients required routine IDTTs. All timely occurred within expected timeframes every 90 calendar days. Of the seven reviewed routine IDTTs, required staff attended six or 86 percent and patients attended 100 percent.

CRC was not compliant with initial IDTTs and compliant with routine IDTT frequencies during the review period.

The monitor's expert observed ten routine mainline EOP IDTTs; all met Program Guide requirements. All required disciplines attended as required and accessed computers when necessary. The IDTTs were held in an adequately lit group room which was large and at a comfortable temperature. The primary clinician and psychiatrist who attended the IDTTs were the assigned clinicians, and they knew their patients well, though the covering CC I provided limited input unless the primary clinician specifically asked them a question.

Strengths included allowing sufficient time for patients to express themselves and addressing higher level of care indicators. Challenges included linking diagnosis and symptoms, and intermittently using language that was too advanced for the patients. Notably, milestone credits were of intense interest for many patients; however, there was confusion between the numbers of milestone credits earned which were reported differently by clinical and custodial staff.

Observed IDTTs were compliant with Program Guide requirements during the site visit.

*Group Treatment*

According to the group schedule, groups occurred every weekday between 9:00 A.M. and 2:15 P.M. Most groups had 12 patients assigned. Recreational therapy or leisure activities occurred every weekday except Friday. Assigned primary clinicians facilitated a weekly caseload group. Clinical groups occurred daily and included the following topics: stress management, cognitive-behavior therapy, coping, specific mental health issues, chronic illness support/pain management, process, mood management, social skills/communication, clinical pre-release, and specific mental health issues.

NLTG groups were not available at the time of the site visit due to staffing.

The monitor's experts observed five groups, including clinical and recreational therapist groups. The clinical group topics were appropriate; one group was centered on acceptance and commitment therapy, and the other dealt with chronic pain. The clinical space was appropriate, although the divider in one group room allowed noise to enter from the group next door. Patients were overall engaged. Some patients arrived late to group due to issues receiving ducats for their appointments.

An observed anger management group, assessed as adequate, was attended by eleven patients. As the last group for the cycle, the capable psychologist appropriately used the time to review skills learned and progress in treatment. Discussion was facilitated between group members who were actively engaged.

One recreational therapist group was held on the yard and contained approximately 12 patients. Several patients were engaged in activities, while others performed actions by themselves. The recreation therapist adequately engaged with all group members. The second recreation therapist group had 13 patients in attendance. The recreation therapist easily engaged

with patients and demonstrated a good sense of humor. The patients were attentive and engaged during the group. A television show, entitled "Pitbulls and Parolees," that highlighted individuals who had paroled from prison employed at a dog rescue facility was shown. After watching part of the show, the recreation therapist engaged the patients in a discussion about non-criminal opportunities following prison release. The group room was stuffy and warm despite the mid-morning timeframe and a portable air conditioner unit was utilized, which contributed to difficulty hearing the video.

In an example of best practice, CRC worked diligently to maximize opportunities for groups, education, and substance abuse treatment. The institution balanced these competing demands by creating morning and afternoon treatment tracks. CRC stated that the group cycle was changing the following week. This, in concert with having staff members out, necessitated canceling of most clinical groups, although caseload groups would continue. The monitor's expert raised concerns about the plan to cancel most EOP groups; however, CRC leadership reported this was unavoidable with the available staff.

Observed group treatment at CRC was compliant with Program Guide requirements during the site visit.

*Individual Treatment*

The Program Guide required that EOP patients receive an initial psychiatry evaluation before their initial IDTT and within 14 calendar days of arrival or level of care change. *See id.* It also required that confidential routine psychiatric contacts were to occur at least every 30 calendar days after the initial psychiatric evaluation. *See id.*

The monitor randomly selected and reviewed the healthcare records of 30 mainline EOP patients to assess compliance with Program Guide timeframes during their stays. Thirty patients

required initial psychiatry assessments; 28 or 93 percent timely occurred before the initial IDTT and within 14 calendar days of arrival or change in level of care and in confidential settings; non-confidential contacts were held in the dayroom due to medical restrictions.

Thirty patients required routine psychiatry contacts; 100 percent were timely with contacts that occurred at least every 30 calendar days. Sixty-seven routine contacts were reviewed and all were conducted in confidential settings. Telepsychiatry was not utilized for initial or routine psychiatry contacts.

Additionally, within 14 calendar days of arrival or level of care change, EOP patients must receive an initial primary clinician evaluation followed by confidential primary clinician contacts, either by individual or group psychotherapy, at least weekly, with individual clinical treatment mandatory every other week. *See id*.

Thirty patients required initial primary clinician evaluations; 28 or 93 percent were completed within 14 calendar days of arrival or change in level of care and all 30 were conducted in confidential settings.

Thirty patients required routine primary clinician evaluations; 90 percent timely occurred at least every ten calendar days. There were 172 total group and individual routine primary clinician contacts; of the 126 reviewed routine individual contacts, 125 or 99 percent were conducted in confidential settings. Forty-six or 27 percent of weekly primary clinician contacts occurred in the group setting; all were compliant except for three which were held back-to-back. Two unlicensed primary clinicians accounted for 30 or 17 percent of primary clinician contacts.

CRC was compliant with timely completing initial and routine psychiatry and primary clinician contacts.

*Staff and Patient Interviews*

Patients interviewed inside of the housing unit reported having access to tablets and phone calls. However, custodial staff reported challenges regarding knowing how to interact with EOP patients.

The monitor's expert interviewed 21 EOP patients during the site visit. Overall, patients were satisfied with EOP treatment at CRC. Patients reported timely, useful primary clinician and psychiatric contacts and that the providers were responsive. In addition, they reported that IDTTs and groups were beneficial. Patients indicated that they knew how to access mental health via emergency and non-emergency procedures. Additionally, patients reported that they had access to medication; however, while there were two windows for pill lines, the addition of another nurse would have been helpful.

Two concerns were raised by patients. First, patients asked if custody staff had training on mental health issues and indicated that, at times, staff could be impatient, verbally inappropriate, and physical with patients. Staff similarly reported concerns about select custody officer interactions with patients. These concerns were discussed with the facility captain who was unaware of these issues but indicated that he would investigate. Notably, there was only one reported immediate use of force incident during the review period which patients described as egregious and concerning. Monitors spoke with the respective disciplines based on these concerns and leadership indicated that additional training would be discussed. The second concern raised by patients was their difficulty accessing milestone information; CDCR regional custody staff was present during this discussion and indicated that they would follow up.

Other Issues:

Treatment Space:

Individual and group treatment occurred in building 701 which was conveniently located near the EOP housing unit. Three clinicians shared two offices for individual contacts. The building was shared with ISUDT.

Psychiatric staff met with patients in designated office space that doubled as an IDTT room. There were two offices utilized for individual primary clinician contacts. Two group rooms were available daily, and one group room was available two days a week. Two group rooms were created by dividing a larger room with a partition that was not completely soundproof. Individual and IDTT treatment space was confidential.

There was not enough individual or group treatment space with the current census and staff, which was below the required staffing.

Custody and Mental Health Partnership Plan:

While executive leadership joint rounding had been implemented, EOP orientation groups and quarterly round table training were not occurring at the time of the site visit.

Huddles occurred in the custody office on the housing unit. The monitor observed an afternoon huddle attended by custody and mental health staff; the huddle was adequate. The huddle form was utilized, and custody and mental health staff addressed issues or concerns regarding specific patient functioning which included appropriate information.

**HIGH DESERT STATE PRISON (HDSP)**
Site Visit: July 9, 2024 – July 11, 2024
Review Period: January 1, 2024 – May 31, 2024

HDSP staff, across all disciplines, worked very hard to make the newly activated Level IV mainline EOP program succeed; however, the institution did not receive the necessary resources to do so. HDSP also maintained a ten-bed MHCB; the MHCB was closed for approximately one year but reopened shortly before the monitoring tour in April 2024. Despite the newly activated MHCB and large Level IV mainline EOP program, HDSP had no onsite psychiatry staff, with only one telepsychiatrist and one tele-primary clinician attempting to manage 143 or more high acuity patients. Further, as explained by leadership, given its location, HDSP has historically been extremely difficult to staff.

Inadequate staffing resulted in missed clinical contact timeliness and was thought to be a contributory factor in the suicide of a mainline EOP patient on June 19, 2024. While the suicide reviewers in that case did not meet with the tele-primary clinician, during the monitor's expert's interview, the tele-primary clinician referenced a central office representative's statement to staff that they did nothing wrong regarding the suicide; the tele-primary clinician additionally stated that central office was correct that "HDSP did nothing wrong," and that headquarters "broke a functioning prison" by continuing to send high-risk patients without the resources to care for them. The tele-primary clinician indicated that the voices of the mental health staff and leadership were ignored when they repeatedly reported that HDSP could not manage this population; a regional administrator stated the same.

Furthermore, HDSP leadership reported that, even if they were able to fill all vacant positions, the institution did not have sufficient workspace for staff or treatment space to meet minimum requirements based on the size of their populations. Additionally, CDCR leadership

explained to the staff that the placement of mainline EOP patients at HDSP was not "ideal" and indicated that the state budget likely would not allow for the construction of additional space.

Accordingly, the Special Master strongly encouraged CDCR to consider discontinuing their plan to house Level IV mainline EOP patients at HDSP altogether, as it was clear the mainline EOP program was dysfunctional and there was no clear plan for implementing the EOP program with all of its requirements in the near future.

Census:

HDSP activated an EOP unit on January 28, 2024 with a capacity of 160 beds.[38] *See* Exhibit C. On July 9, 2024, HDSP housed 143 mainline EOP patients and an additional 829 mainline 3CMS patients. According to HDSP leadership, many of the patients that transferred in were highly complex Level IV EOP patients, including "PIP redirects[39]" or discharges and other high acuity/complexity patients from various institutions, most frequently, SVSP.

HDSP leadership reported that they were initially informed that the new mainline EOP program's maximum capacity would be 120 patients and that the population would be limited to "single-celled" Level IV mainline EOP patients. HDSP's census, however, was consistently over 120 EOP patients throughout the review period, with a reported daily maximum of 170, resulting in overflow housing activation. Further, patients and mental health staff reported that HDSP was required to begin double-celling patients, including patients who reportedly voluntarily transferred to HDSP based on agreements with custody staff at sending institutions who ensured single-celled housing at HDSP. Consequently, the change to double-celling resulted in increased

[38] Letter from N. Weber, CDCR Office of Legal Affairs, to Special Master, Matthew Lopes (October 26, 2023).

[39] Patients who could not return to their sending institution due to enemy concerns or other similar reasons were considered "PIP redirects."

fear and anxiety within the EOP population, and the one assigned primary clinician wrote numerous single-cell chronos as a temporary measure to address the issue despite pushback from custody classification staff.

As noted above, a result of the overage in the Level IV mainline EOP patient population, HDSP activated an overflow unit in D4 on July 5, 2024. Prior to this overflow activation in unit D4, the population overage was housed in the RHU until one week prior to the site visit, when CDCR Regional staff expressed their concern and urged custody leadership to move those patients to a different housing unit. As of July 10, 2024, eleven mainline EOP patients remained housed in the D4 overflow unit. Non-overflow EOP patients were primarily housed in D1 and D2. Despite HDSP's inability to care for the current EOP patients, as evidenced by extreme departures from Program Guide minimum requirements for care and inability to meet minimum custodial programming requirements, the institution remained open to intake and continued to receive new patients in their overflow unit during the site visit.

Staffing:

On July 9, 2024, and since the activation of the new EOP program, HDSP reported that its mainline EOP program had only one telepsychiatrist and one primary clinician who was a full-time tele-social worker. Both clinicians were assigned to all Level IV mainline EOP patients, and both of their caseloads exceeded established ratios of 120 for telepsychiatrists and 26 for social workers, as the mainline EOP population was 143 patients. *See* ECF No. 3693 at 17. Notably, HDSP had no onsite psychiatrists, and the chief psychiatrist, who also worked remotely, managed the MHCB and assisted with coverage via telehealth.

The 0.99 FTE staff psychiatrist position was filled by a telepsychiatrist.

The 0.64 FTE senior psychologist supervisor position was vacant.

The 3.20 staff psychologist positions were all vacant.

One telesocial worker filled the 1.37 clinical social worker positions resulting in a 27 percent vacancy rate.

Three of five recreation therapist positions were filled, reflecting a 40 percent vacancy rate. All three provided services in both the RHU 3CMS and mainline EOP programs.

One office tech filled the 1.6 allocated positions resulting in a 38 percent vacancy rate.

HDSP had seven vacant psych tech positions and four filled MA positions, one of whom was registry; these MAs served the EOP and RHU populations. The monitor was unable to ascertain how many psych tech or MA positions were otherwise allocated or filled.

Nursing staff also reported feeling overwhelmed by the rise in population. HDSP implemented new changes for medication administration that required nurses to administer medications within some of the housing units. Nurses anticipated that moving the medication cart across the yard during extremely cold and icy weather would be very challenging and a potential safety hazard.

Regarding custody staff, the warden explained that custody officers were initially excited to undertake the new challenge of the EOP program activation, but custody leadership feared that the more experienced officers would continue bidding off the mainline EOP yard, resulting in newer and less experienced officers being responsible for the population with the highest needs.

Telemental Health:

As stated above, one telepsychiatrist and one tele-social worker were assigned to the entire EOP population. HDSP's chief psychiatrist also worked remotely and covered clinical responsibilities in the MHCB and MSF. The institution reported no on-site psychiatry presence for an estimated ten years. Onsite leadership explained that, due to the organizational structure

of telemental health, they were generally unable to direct or supervise these two providers. For example, leadership attempted to stop telemental health cell-front contacts due to their inherent limitations and safety concerns expressed by the medical assistants responsible for carrying laptops to the cell doors; however, headquarters instructed on-site leadership that telemental health providers had their own supervisors and, thus, cell-front telehealth contacts continued.

Both providers reported significant challenges stemming from the activation of the mainline EOP program. For example, the telepsychiatrist reported to leadership that their caseload was unmanageable and that they often sought assistance from the chief psychiatrist. Of note, the one primary clinician tele-social worker reported that, after ten years at HDSP, they were leaving the institution based on headquarters' failure to provide necessary resources to care for the EOP population. They reported often working until 7 P.M. to consult and debrief with the assigned telepsychiatrist. This provider also discussed the recent suicide on her caseload and indicated that patients remained at-risk based on the lack of staffing resources for providing minimal care requirements, monitoring, identifying, and referring to higher levels of care timely, and maintaining a reasonably sized caseload that allowed for recognizing whether patients were getting better or worse in the program.

Medication Management:

PC 2602:

With the activation of the new EOP program, HDSP noted a significant increase in the number of PC 2602 involuntary medication-related matters. As of July 5, 2024, HDSP had 43 patients receiving involuntary PC 2602 medications. The chief psychiatrist reported they had more PC 2602 renewals in the last four months–approximately four to five per month – than in the prior five years; this echoed higher level of care referrals, for which the chief psychiatrist

also reported a sizeable increase. Staff reported increasing from an estimated one PC 2602 hearing per year to four or five per month.

While the PC 2602 coordinator had only been in the position since December 2023, they were knowledgeable and organized. There were no reported challenges with interfacing with Office of Legal Affairs, Office of Administrative Hearings, or the administrative law judge.

Medication Administration:

Despite the efforts of caring and dedicated nursing staff, the monitor's expert saw multiple examples of barriers in the medication administration process, access to yard, and other programming. Due to a physical plant issue, the Board of Pharmacy would not approve the placement of an Omnicell – the device for storing medications securely – in the EOP medication room. As such, the nurses had to push a cart multiple times per day from the central clinic to the housing unit. While priority healthcare ducats were honored during the transport times, yard time was not due to concerns for safety, which aligned with policy. Multiple nursing staff members expressed concern for this during inclement weather, especially the upcoming winter snows.

Multiple nursing staff were in the cramped EOP medication room. Both the room and the medication distribution window were insufficient for the number of EOP patients in the housing units. Thus, the EOP housing units alternated, with each unit getting the medications at the window while the other housing unit released a few patients at a time to go to the housing unit rotunda to receive medications. This deviated from CDCR policy[40] which states that mainline

[40] All general population (GP) patients, including those housed in Level IV 180 design units, shall receive all medications at a medication window as a routine function of regular programming. Cell front medication delivery shall not occur in a GP setting unless there is no other reasonable alternative available as determined by the Chief Executive Officer (CEO), or designee, in consultation with the Warden or designee. *See* HCDOM 3.5.29(c)(3)(A).

patients were to receive their medications on the yard. *See* HCDOM 3.5.29(c)(3)(A). Even with this "work around," staff and leadership reported that the medication line routinely ran over the maximum allowed two-hour mark.

Nursing staff reported that, due to mental health staff being unable to see the EOP patients at the required frequency, nursing attempted to see the patients as frequently as possible during medication administration. Furthermore, nursing staff also reported that custody officers were frequently not present during P.M. medication administration in violation of CDCR policy, which states that "[c]ustody staff shall be present at the designated medication distribution points to directly observe the medication process, maintain order, and provide assistance if necessary." *See* HCDOM Policy 3.5.29(c)(3)(B). This issue was raised with both local and regional custody leadership.

<u>Transfers to Higher Levels of Care/Admissions</u>:

Aside from RHU transfers, HDSP did not provide adequate data to determine compliance regarding transfers to higher levels of care.

RHU policy required that patients transfer to a 3CMS or EOP RHU within 30 calendar days from the date of initial placement or within 30 calendar days from the date the patient was made EOP or 3CMS. *See* Cal. Code of Regs., tit.15 §§ 3335.2; *see also* ECF No. 8355 at 5 (RHU Transfer Timeline Exceptions). During the monitoring period, 13 EOP patients transferred to EOP RHUs at other institutions; none transferred timely within 30 days. The length of stay ranged from 34 to 153 days and averaged 65 days. Accordingly, HDSP was noncompliant with timely transfers to EOP RHUs.

Regarding EOP admissions, both mental health and custody staff reported issues surrounding the patients transferred to HDSP. Many patients arrived with single-cell chronos

and orders for lower bunks or lower tiers but were all moved to double-cell. Mental health leadership also reported that the initial number of planned EOP patients was much smaller than the resulting population and that the target number increased multiple times during the review period.

Programming:

EOP Patients in Restricted Housing:

In May and June 2024, HDSP placed approximately 25 EOP patients in the 3CMS RHU due to a lack of beds in the EOP housing units.[41] This practice stopped the week before the monitoring tour and, as of July 11, 2024, no EOP patients were housed in RHU due to a lack of available mainline EOP beds.

The Restricted Housing Unit Program: Mental Health Services Policy, dated July 19, 2024 and effective August 1, 2024 (hereinafter "RHU Policy"), did not speak to treatment requirements for EOP patients awaiting transfer from a 3CMS RHU to an EOP RHU. Therefore, treatment of EOP RHU patients housed in a 3CMS RHU was assessed using 3CMS RHU requirements during the monitoring tour.

3CMS RHU staff reported a four-fold increase in their caseloads since activation of the EOP program and that their caseloads ranged from 60 to 70 patients, of which 20 to 30 were either EOP RHU or mainline EOP patients. Primary clinicians reported seeing their patients every other week for clinical contacts.

The RHU Policy requires that EOP RHU patients awaiting transfer are required to receive 90 minutes of structured therapeutic activities per week. *See* Restricted Housing Unit Program:

[41] The exact number of mainline EOP patients placed into the 3CMS RHU was unclear due to imprecise data provided by the institution.

Mental Health Services Policy, dated July 19, 2024 and effective August 1, 2024. EOP RHU patients reported receiving one 90 minute recreation therapy group per week during the review period. Interviewed primary clinicians were unable to state how much group time their patients received, as they were focused on their own workloads.

The 3CMS RHU had three dedicated confidential mental health treatment offices, of which one was ADA compliant. The non-ADA offices contained TTMs and were too small to allow for social distancing. The group room was appropriately sized and at a comfortable temperature. There were eight Restart chairs, of which one appeared to be ADA-compliant.

The monitor's expert observed ICCs for seven EOP patients in the 3CMS RHU. Five or 71 percent of those patients were in the 3CMS RHU for safety reasons, including being victims of assault; one assaulted patient had been in the 3CMS RHU for eight days. During the ICC, the primary clinician stated that the patient was at high risk of mental health decompensation, though it was unclear how this information was incorporated into the remainder of the ICC. Following the ICC, custody leadership reported that this patient was placed for expedited transfer.

HDSP staff encountered multiple difficulties with timely transfers due to other institutions not completing portions of the work correctly or within timeframes. For example, RVR documentation was often incomplete which required HDSP to contact the issuing institution; RJD was particularly problematic with this issue.

No RHU EOP patients were scheduled for IDTTs during the monitoring tour and, therefore, the monitor's expert was unable to observe them during the monitoring tour.

During the review period mainline EOP patients were inappropriately placed into a 3CMS RHU as overflow housing and were further prevented from receiving required EOP

treatment. As a result of this significant concern, the institution was not compliant with the RHU Policy.

Impact of EOP Programming on MHCB and Crisis Intervention:

Mental health and custody leadership reported that, amid receiving more patients than planned, their ten-bed MHCB – which had been closed for approximately one year – reopened to intake in April 2024. Leadership added that, while their MHCB census averaged three patients at any given time prior to the MHCB closure, the MHCB generally remained at full occupancy (ten patients) once the new EOP program was activated. Crisis referrals (CIT response) also increased from approximately 20 in February 2024 to over 140 during May and June 2024.

Mainline EOP Programming:

*Structured Treatment*

The Program Guide requires each EOP patient to be offered at least ten hours per week of structured therapeutic activities. *See* ECF No. 7333-1 at 58. If a patient was scheduled for less than ten hours of treatment activities per week, the patient's IDTT is required to meet monthly to review and increase the amount of structured therapeutic activities or refer the patient to a higher level of care as clinically indicated. *See id.* at 58.

HDSP indicated that due to staffing deficiencies, it had been unable to provide the required ten hours of structured therapeutic activities as required by the Program Guide. Instead, EOP patients were generally offered one or two hours of weekly treatment groups and the primary clinician typically scheduled patients every three weeks for routine contacts. The primary clinician stated that, for various reasons, including alarms and delays in searching and escorting patients to the clinic for their telemental health appointments, some patients on their caseload had not been seen in six to eight weeks. Additionally, the primary clinician reported

that, at times, they waited up to two hours to see their patients due to either custody not escorting in time or a lack of communication between the primary clinician and custody staff. HDSP did not offer the Level IV mainline EOP patients sufficient out-of-cell time either through dayroom or yard. Further, EOP patients' visiting time was cut in half due to concerns about mixing classification levels.

As a result, HDSP was noncompliant with the requirements for offering a minimum ten hours of weekly structured therapeutic activities.

*IDTTs*

Following admission to an EOP program, patients are required to receive an initial IDTT within 14 calendar days of arrival or level of care change, and a routine IDTT every 90 calendar days thereafter. *See* ECF No. 7333-1 at 57-59.

Forty EOP patients who required initial IDTTs were randomly selected for review; nine or 23 percent occurred timely within 14 calendar days of arrival or level of care change. Of the 27 initial IDTTs that did occur, all were attended by required staff and 24 or 88 percent were attended by the patients. Of note, 13 or 33 percent of patients did not receive an initial IDTT. No patients required a routine IDTT during the review period. Accordingly, HDSP was noncompliant with the requirements for initial IDTTs, and compliance for routine IDTTs could not be assessed.

The monitor's expert observed the three mainline EOP IDTTs, including two initial and one routine; both initial IDTTs were held *in absentia* while the patient attended the routine IDTT. The IDTT room was large, bright, and at a comfortable temperature. While all required disciplines were present, the telepsychiatrist and correctional counselor in attendance were not

the ones assigned to the patients. Information from the RT and nursing staff was helpful and informative. The tele-social worker was also remote.

Both initial IDTTs were noncompliant with the Program Guide mandate that the initial EOP IDTT occur within 14 days of arrival. In one case, the primary clinician reported the patient arrived on April 30, 2024, yet the initial IDTT did not occur until July 9, 2024 (70 days later). In another case, the primary clinician stated that it was difficult to recall information due to the length of time between their initial assessment and the IDTT. The routine IDTT occurred within timeframes.

Observed IDTTs lacked adequate discussion of symptoms, functional impairments, and how treatment plan goals linked back to these. In one case, the primary clinician reported mutually exclusive diagnoses for the patient. Treatment goals and interventions were general and lacked specificity. IDTTs routinely covered substance use and IUSDT involvement where appropriate. Additionally, the covering telepsychiatrist's information was useful, including the names, indications, and compliance with medications, as well as additional helpful information beyond medications. All cases included rationales for why the patients continued to require EOP level of care; however, higher level of care considerations were not discussed in a systematic manner.

On a positive note, a patient discharged from the PIP acute level of care expressed a desire to exit the EOP level of care. While he originally requested being lowered to the 3CMS level of care, when the treatment team did not agree, he requested a return to a higher level of care, such as intermediate — a level of care the primary clinician recommended to the patient in a prior meeting. The primary clinician stated that they would submit the intermediate referral by the end of the day.

The two cases held *in absentia* deserved special consideration for the appropriateness of the level of care. In one case, the patient with a history of aggression toward staff and under a PC 2602 involuntary medication order had only attended one of the eight groups offered. The attending correctional counselor proactively contacted the floor officers to find out whether the patient left his cell regularly, which he did not. The primary clinician reported that the patient's failure to exit his cell regularly was a positive, as it reduced the risk of aggression; however, this comment ignored the negative mental health impacts of isolation, as well as this being a consideration for requiring a higher level of care. The primary clinician reported they would request the MA complete a cell-side check on the patient, and the RN added the patient to the nursing line for the following day as the patient was also refusing medical appointments.

In the other IDTT held in *absentia*, the patient had a history of suicide attempts, including while in intermediate level of care. The patient had recent fighting, IEX, and an RVR for using an incendiary device. Despite these multiple concerns, there was no formal review of higher level of care indicators.

For the preceding reasons, observed IDTTs at HDSP were not compliant with Program Guide requirements.

*Mainline EOP Groups*

The three recreation therapists offered mainline EOP patients one weekly group; some patients enrolled in ISUDT had a second weekly group. There were no clinician-led groups. The RTs were also expected to round in the units once per week; however, they did not conduct any type of mental status examination during those rounds. Patients complained that they were primarily coloring during the one RT group offered weekly, and one patient explained that he felt like a child in those groups. Patients also reported frequent treatment, programming, and group

cancellations for custody reasons and that the first Wednesday of the month was a "down day" where no programming was offered. The expert attempted to observe a scheduled Wednesday RT group, but the group was cancelled.

*Individual Treatment*

Following admission to the EOP program, the Program Guide required that patients receive an initial psychiatry evaluation before the initial IDTT and within 14 calendar days of arrival or level of care change, and a routine psychiatry contact every 30 calendar days thereafter. *See* ECF No. 7333-1 at 59.

The monitor randomly selected and reviewed the healthcare records of 40 mainline EOP patients to assess compliance with Program Guide timeframes during their stays. All reviewed contacts were conducted via telemental health.

Forty patients required initial psychiatry evaluations; 14 or 35 percent timely occurred before the initial IDTT and within 14 calendar days of arrival or change in level of care. Of the 30 initial psychiatry evaluations that occurred, 29 or 97 percent were conducted in confidential settings; the one non-confidential contact was due to a patient refusal.

Twenty patients required routine psychiatry contacts; 42 percent timely occurred at least every 30 calendar days. All routine psychiatry contacts that occurred were conducted in confidential settings.

Additionally, within 14 calendar days of arrival or level of care change, EOP patients must receive an initial primary clinician evaluation followed by confidential primary clinician contacts, either by individual or group psychotherapy, at least weekly, with individual clinical treatment mandatory every other week. *See id.*

The monitor randomly selected and reviewed the healthcare records of 40 EOP patients to assess compliance with Program Guide timeframes during their stays. Of the 40 patients who required initial primary clinician evaluations, 19 or 48 percent were completed within 14 calendar days of arrival or change in level of care. Of the 35 initial primary clinician evaluations that occurred, 33 or 94 percent were conducted in confidential settings. Non-confidential evaluations stemmed from patient refusals.

Thirty patients required routine primary clinician evaluations; 58 percent timely occurred at least every ten calendar days. There were no group primary clinician contacts offered or completed among the sample. Of the 93 reviewed contacts, 29 or 31 percent were conducted in confidential settings. Reasons for non-confidentiality included patient refusal and lack of treatment space.

Overall, initial and routine psychiatry and primary clinician contacts were not compliant with Program Guide timeframes.

*Mainline EOP Patient Interviews*

Treatment refusal rates were relatively low at HDSP, suggesting that EOP patients desired treatment commensurate with their level of care. Interviewed patients, emphasized that HDSP effectively did not have an EOP program based on their scheduling of primary clinician contacts every three weeks – some of which were reportedly cancelled – and offering of only one or two weekly structured therapeutic activity hours with RTs. One patient reported seeing his primary clinician on a weekly basis and patients generally had few concerns with telepsychiatry.

Lack of individual group treatment was consistently raised as a concern among patients during the site visit as well. Patients reported that groups were scheduled two hours per week every two to three weeks, but that these sessions were sometimes canceled for unclear reasons.

Patients enrolled in ISUDT were more likely to have two weekly groups. Many mainline EOP patients expressed anger and frustration that they were missing opportunities for milestone credits due to HDSP's inability to offer more than one or two hours of weekly groups. Some patients in the overflow unit requested to return to RHU due to receiving more services, programming, and interaction with staff. The monitor's expert also learned from custody staff that the overflow unit did not offer dayroom or yard time.

Patients reported law library access issues in at least one housing unit (on the kiosk and on the tablets); not having access to chapel services; and inadequate yard and dayroom time. Patients indicated that yard was scheduled for two hours per day but were often truncated due to emergencies, lockdowns, or long medication lines. Notably, EOP patient visiting hours were cut in half due to sharing with GP incarcerated persons.

Patients and mental health staff repeatedly asked why mainline EOP patients were being sent to an institution unable to provide EOP services. Patients also accurately indicated that the RHU offered more treatment than the mainline EOP, as all RHU patients were offered two weekly groups.

*Five-Day Follow-Ups*

Five-day Follow-Up evaluations are required for any patient who was referred to and has been discharged from an MHCB, DSH facility, PIP, OHU, or Alternative Housing for suicidal ideation or behavior. *See* 7333-1 at 390. After the activation of the mainline EOP program, HDSP staff reported a sizeable increase in the need for five-day follow-ups after discharge from MHCB, PIP, or DSH. Despite the increased clinician workloads, the chief of mental health stated this was a top priority. A daily email was sent with the list of patients needing to be seen that day. Custody staff struggled with adequate completion of five-day follow-ups. Compliance

was reported as follows: 93 percent for mental health, 73 percent for custody 30-minute checks, and 49 percent for custody supervisor review in April 2024; 100 percent for mental health, 75 percent for custody 30-minute checks, and 74 percent for custody supervisor review in May 2024; and 100 percent for mental health, 71 percent for custody 30-minute checks, and 57 percent for custody supervisor review in June 2024. Therefore, mental health staff was compliant with the completion of five-day follow-ups; however, custody staff was not.

*Mainline EOP Patient Refusal Practices at HDSP*

HDSP local leadership recently changed the Level IV mainline EOP patient refusal practice. For the new practice, MAs requested that patients sign refusal forms instead of bringing laptops to patients' cell doors as was the practice earlier. Leadership for telemental health providers, however, reported that HDSP would return to MAs bringing laptops to the cell doors for direct patient interaction when there was a refusal. Unfortunately, neither approach allowed for sufficient mental status examination and, as local leadership pointed out, MAs expressed safety concerns as they were unable to attend to their surroundings when coordinating telemental health at the cell front.

<u>Other Issues</u>:

<u>Program Access</u>:

Patients and staff reported that patients had limited access to the law library and religious services. Additionally, patients reported limited job opportunities but stated that porters and barber positions were available to EOP patients.

<u>RVRs</u>:

HDSP staff reported an increase in the number of RVR-MHAs filed since activation of the EOP program.

Mental Health Referrals:

An increase in mental health referrals was also reported by HDSP mental health staff; their assigned primary clinician was encouraging them to use the 7362 process between contacts.

DDP Classifications:

With many of EOP patients also designated DDP, mental health leadership reported that HDSP struggled to provide sufficient resources to accommodate their needs also due to lack of staff. Further, staff reported having limited housing options for DDP and DPP classifications.

**KERN VALLEY STATE PRISON (KVSP)**
Site Visit: July 15, 2024 – July 17, 2024
Review Period: January 1, 2024 – March 31, 2024

Census:

On November 1, 2023, KVSP activated an additional 80 beds to its existing EOP program.[42] *See* Exhibit B. By July 15, 2024, the number of newly activated beds had not increased, however, KVSP reported that there were 86 EOP patients placed in the newly activated housing unit. The institution indicated that the maximum housing capacity of the newly activated unit was 96 patients.

In total, on July 15, 2024, KVSP's institution-wide EOP population consisted of 247 EOP patients, a decrease of 12 patients since January 2024 and increase of 78 patients since the 30th Monitoring Round site visit on June 12, 2023.

Staffing:

Mental health leadership reported problems filling vacant positions, in part due to either regional or statewide systemic delays in the hiring and onboarding process.

On May 31, 2024, KVSP reported the following staffing allocations for its EOP program:

One senior psychologist supervisor filled the 1.72 allocated positions leaving a 42 percent vacancy rate.

For 2.66 allocated staff psychiatrist positions, one position was filled with a telepsychiatrist resulting in a 62 percent vacancy rate, however, registry staff filled 1.25 positions which reduced the functional vacancy rate to 15 percent.

Six clinical psychologists filled the 8.60 allocated positions for a 30 percent vacancy rate.

---

[42] Letter from N. Weber, CDCR Office of Legal Affairs, to Special Master Matthew Lopes (October 17, 2023)

Two clinical social workers filled the 3.69 allocated positions for a 46 percent vacancy rate.

Four office technicians filled 4.30 allocated positions for a seven percent vacancy rate.

Six recreation therapists filled 7.17 allocated positions for a 16 percent vacancy rate.

For custody staff, both of the allocated correctional sergeant positions were filled as well as all 35 correctional officers' positions.

All staff had caseloads within established ratios.

Telemental Health:

Per CDCRs approved telepsychiatry policy, at least one on-site psychiatrist must be assigned to each EOP program per yard at each institution. Additionally, a dedicated and appropriately trained tele-presenter is required to provide clinical support and coordinate the presentation of the patient. *See* CDCR Policy 12-08-100.

As noted above, one telepsychiatrist filled a staff psychiatrist position.

Telework:

KVSP reported no onsite mental health staff teleworked during the reporting period.

Medication Management:

Clozapine:

KVSP was not an approved clozapine initiation or maintenance institution, and reported no patients on clozapine during the monitoring period or at the time of the site visit.

PC 2602:

At the time of the monitoring tour, KVSP reported 64 patients received involuntary PC 2602 medications, of whom 40 were at the EOP level of care. KVSP filed 12 initial PC 2602

petitions, of which eight were emergency and four were non-emergency, and 52 renewal petitions; all were granted. KVSP reported no planned non-renewals or orders lost to follow-up.

KVSP staff reported that the EOP activation required more resources to administer medications, given that EOP patients were frequently on more medications compared with 3CMS patients. EOP patients also had higher rates of medication refusals, negatively impacting compliance with required metrics.

Transfers to Higher Levels of Care:

The Program Guide requires that EOP patients referred to intermediate inpatient care must be transferred within 30 days of referral and 72 hours of bed assignment. *See* ECF No. 7333-1 at 19. KVSP reported three EOP patients were referred to intermediate care during the review period; all transferred within required timeframes.

The Program Guide requires transfers to MHCBs within 24 hours of referral. *See* 7333-1 at 75. KVSP reported that 63 of 68 or 93 percent of MHCB referrals were timely during the review period.

KVSP did not provide data to determine EOP RHU transfer timelines.

Though KVSP was compliant with transfers to intermediate inpatient care, the institution was not compliant with MHCB transfers during the reporting period.

Programming:

EOP Patients in Restricted Housing:

The Restricted Housing Unit Program: Mental Health Services Policy, dated July 19, 2024 and effective August 1, 2024 (hereinafter "RHU Policy"), did not speak to treatment requirements for EOP patients awaiting transfer from a 3CMS RHU to an EOP RHU. Therefore, treatment of EOP RHU patients housed in a 3CMS RHU was assessed using 3CMS RHU

requirements during the monitoring tour. KVSP did not provide information regarding treatment of EOP RHU patients awaiting transfer.

Mainline EOP Programming:

*Initial Assessments*

One psychiatrist and interviewed patients reported that all new patients were placed on "orientation" status for 30 days at KVSP, though this was neither a custodial nor mental health requirement. While on "orientation" status, patients were not allowed to leave their cells or to attend groups; this was in direct conflict with Program Guide requirements to offer patients ten hours of structured therapeutic activities weekly. The monitor brought this to the attention of both mental health leadership and the warden, who assured further investigation of this practice.

EHR reviews also revealed that initial assessments included a substantial amount of documentation that was pulled forward from the patient's prior facility. This practice contributed to a lack of clinical value in the documentation and difficulty identifying current symptoms and related interventions.

*IDTTs*

The Program Guide required that EOP patients receive an initial IDTT within 14 calendar days of arrival to the institution and routine IDTTs every 90 days thereafter. *See id*. at 59. The required attendees include the patient's assigned primary clinician, assigned psychiatrist, assigned correctional counselor, and the patient themselves. *See id.* The IDTT should address treatment needs, develop treatment plans, assess treatment progress, and include pre-release and discharge planning. *See generally id.*

Of the 40 randomly selected patients charts that were reviewed by the monitor, 20 required initial IDTTs. Sixteen or 80 percent occurred timely within 14 calendar days of arrival

or level of care change. All 20 were attended by all required staff, and nine or 45 percent were attended by the patients.

Twenty-seven patients required routine IDTTs; 68 percent of expected timeframes timely occurred every 90 calendar days. Of the 41 reviewed routine IDTTs, required staff attended 40 or 98 percent, and patients attended 22 or 54 percent.

Mental health supervisory staff reported, and case reviews confirmed, that staff were not always able to meet timeframes for initial assessments and IDTTs. Patients were rarely seen by the psychiatrist and primary clinician for an initial assessment prior to the IDTT.

The monitor's expert observed eight IDTTs during the site visit including one initial IDTT and seven routine IDTTs. The quality of IDTTs varied by provider. All disciplines were present at observed IDTTs, but not always the patient's assigned psychiatrist.

IDTTs and related treatment plans included inadequate conceptualization of the patients, a lack of objective behaviorally based treatment goals, and the lack of evidence-based clinical interventions. In some cases, diagnostic clarification was never addressed in the treatment team meetings as well as an underutilization of the modified program for EOP. Clinicians appeared uncertain about how to address patient noncompliance issues since clinicians did not add any treatment goals that a patient did not approve. Unfortunately, this practice prevented patients from receiving higher level of care (HLOC) determinations until an on-site supervisor directed clinicians to include a treatment goal related to non-compliance.

There was a patient attendance and treatment compliance problem at KVSP. Provided data indicated that at least half of the EOP patients refused 50 percent or more of their treatment. From attending meetings and speaking with staff, it was clear that there was a fundamental lack

of understanding of how to address treatment non-compliance and a lack of awareness of the need to review and discuss HLOC considerations.

During the observed initial IDTT meetings, patients were rarely told the purpose of the meeting and when it did occur, it was often only because the participating supervisor would explain the purpose of the IDTT when the facilitating clinician did not do so. The treatment team did not interact in a natural and cohesive manner, but each member spoke when called upon by the facilitator. During the routine IDTT meetings, treatment groups were not discussed with the patient nor were the clinical benefits of treatment discussed.

In contrast, the correctional counselor was well-prepared, provided patients with case specific information, answered questions, and provided patients with information on available Division of Rehabilitative Programs groups and a form to sign up for any of those groups.

In addition to the eight observed IDTTs referenced above, another IDTT was observed and reflected many concerns related to telepsychiatry. The IDTT used a laptop instead of the state issued equipment (DX80) and sound issues were apparent and confirmed by the MA in attendance. The MA confirmed that cell front telepsychiatry contacts occurred at KVSP and it was difficult for the MA to hold the laptop up to the hole in the cell for the patient to hear in a level IV unit.

IDTTs were not compliant at KVSP during the review period due to non-compliant timeframes, lack of assigned psychiatrists being present at IDTTs, and inadequately addressed treatment needs, treatment goals and treatment progress for patients.

*Group Treatment*

Leadership reported that clinician-led groups were discontinued due to the patient population increase and staffing issues. With the inclusion of ISUDT, NLTG, jobs, and

education, EOP patients appeared to meet the Program Guide weekly minimum structured treatment hours. Concerningly, those hours were only met with the inclusion of unstructured activity hours which was not compliant with the Program Guide requirements.

Two of the five observed groups were adequate. These groups were adequately structured and utilized education materials/curriculum to foster therapeutic conversation that fostered insight, social skills, and adaptive coping mechanisms.

Three of the five observed groups were not adequate. Based on these observations, the monitor's expert shared with mental health leadership that prompt intervention was required to address concerns, including ensuring recreation therapists interacted with patients to be considered therapeutic, groups should be paired down to less than 15 patients to optimize therapeutic value, groups should not continue starting an average of 15 minutes late, and patient-led groups, although beneficial as adjunctive therapeutic activities, should not be considered structured therapeutic treatment hours.

Overall, KVSP did not meet Program Guide compliance for structured treatment hours.

*Individual Treatment*

The Program Guide required that EOP patients receive an initial psychiatry evaluation before their initial IDTT and within 14 calendar days of arrival or level of care change. *See id.* It also required that confidential routine psychiatric contacts were to occur at least every 30 calendar days after the initial psychiatric evaluation. *See id.*

The monitor randomly selected and reviewed the healthcare records of 40 mainline EOP patients to assess compliance with Program Guide timeframes for psychiatry contacts during their stays. Twenty-two patients required initial psychiatry evaluations; nine or 41 percent timely occurred before the initial IDTT and within 14 calendar days of arrival or change in level of care.

Twelve or 55 percent of initial psychiatry evaluations were conducted in confidential settings; non-confidential contacts were due to patient refusals. Telepsychiatry was utilized for nine or 41 percent of initial psychiatry contacts.

Thirty-four patients required routine psychiatry contacts. There were 76 expected timeframes, 30 or 39 percent of which occurred timely at least every 30 calendar days. Of the 88 reviewed routine contacts, 47 or 53 percent were conducted in confidential settings. Patient refusals, modified programming, and "unspecified custody factors" accounted for non-confidentiality. Telepsychiatry was utilized for 49 or 56 percent of routine psychiatry contacts.

Additionally, within 14 calendar days of arrival or level of care change, EOP patients must receive an initial primary clinician evaluation followed by confidential primary clinician contacts, either by individual or group psychotherapy, at least weekly, with individual clinical treatment mandatory every other week. *See id*.

The monitor randomly selected and reviewed the healthcare records of 40 mainline EOP patients to assess compliance with Program Guide timeframes for primary clinician contacts during their stays. Nineteen patients required initial primary clinician evaluations; 16 or 84 percent were timely completed within 14 calendar days of arrival or change in level of care and one or five percent were conducted in a confidential setting. Non-confidential initial primary clinician evaluations stemmed from patient refusals and modified programming.

All 40 patients required routine primary clinician contacts. There were 186 timeframes, of which 139 or 75 percent timely occurred at least weekly with no more than ten calendar days between contacts. Of the 203 reviewed routine contacts, 75 or 37 percent were conducted in confidential settings. Reasons for non-confidentiality were primarily patient refusals and also

included modified programming, COVID-19, safety concerns, day room and yard contacts, and clinician availability.

Frequency of psychiatry and primary clinician contacts were not compliant with Program Guide requirements during the review period.

*Staff and Patient Interviews*

Patients reported difficulties receiving ducats and not being released in time for group treatment. Patients reported that custody released them up to 15 minutes late for groups. Mental health staff reported that there is a 15-minute rule, and patients are turned away from attending treatment if they arrive after 15 minutes. Mental health leadership explained the rule is in place for accountability reasons. The monitor's expert suggested that although accountability measures should remain for patients, staff need to work out ways in which patients can access their treatment safely and effectively. Patients also reported that they would like to see therapist-led groups return since the recreation therapist-led groups they were presently attending would routinely finish 20-25 minutes earlier than scheduled. The monitor expert observed two recreation therapy groups, both of which ended 20 minutes earlier than scheduled.

KVSP assigned patients to cohorts which allowed them to create and maintain therapeutic relationships with other patients. However, patients reported that this model often led them to groups that were not relevant to their therapeutic needs. Further, patients requested more group opportunities. According to the data provided, just over 50 percent of patients were scheduled for ten or more hours of treatment, far below Program Guide requirements. Patients reported that they were left in their cells when they were not in groups.

Group rooms were too small for the 15 patient groups that occupied them. Patients spoke about the need for group rooms to be commensurate with the size of their groups.

Other Issues:

*Custody Related Concerns*

Patients reported that custody officers frequently reported they were understaffed and unable to offer programming as a result. The chief of mental health confirmed that officers were often redirected either due to violence on the yards or for transportation.

**PELICAN BAY STATE PRISON (PBSP)**

Site Visit: May 29, 2024 – May 30, 2024

Review Period: January 1, 2024 – March 31, 2024

Census:

PBSP activated an EOP unit on January 22, 2024 with a capacity of 80 beds.[43] *See* Exhibit C attached hereto. On May 24, 2024, PBSP housed 68 EOP patients, including 64 mainline EOP and four housed in the 3CMS RHU awaiting transfer. During the review period, the census ranged from 18 to 74 EOP patients.

Staffing:

PBSP reported the following staffing allocations and vacancy rates for the EOP as of March 31, 2024:

One telepsychiatrist filled a 0.99 FTE staff psychiatrist position.

The 0.64 FTE senior psychologist supervisor position was filled.

For staff psychologists, 2.25 of 3.2 positions were filled for a 30 percent vacancy rate.

One of the 1.37 clinical social worker positions was filled for a 27 percent vacancy rate.

One of 1.6 office technician positions was filled for a 38 percent vacancy rate. The institution reported that the 2.67 recreation therapist positions were vacant as of March 31, 2024. However, one recreation therapist started working with EOP patients the week of the site visit.

Registry staff did not cover any positions at PBSP at the time of the site visit.

The mandated staffing ratio for primary clinicians is 26 patients per clinician. *See* ECF No. 7333-1 at 59. CDCR headquarters produced data reflecting that two telepsychiatrists and as many as eight different on-site primary clinicians carried EOP caseloads ranging from one to 65 patients. PBSP indicated that these primary clinicians were redirected from elsewhere in the

---

[43] Letter from N. Weber, CDCR Office of Legal Affairs, to Special Master, Matthew Lopes (October 26, 2023).

institution, therefore caseload ratios were not discernable. The monitor's expert's on-site observations were consistent with the headquarters' reports.

Given that functional vacancy rates for clinical positions exceeded ten percent, PBSP was not compliant.

Telemental Health:

CDCR policy requires at least one on-site psychiatrist to be assigned to each EOP program per yard at each institution. ECF No. 7826-2 at 2. Additionally, if the institution utilizes a telepsychiatrist for EOP treatment, a dedicated and appropriately trained tele-presenter must provide clinical support and coordinate the presentation of the patient. *See id.*

During the site visit, the monitor's expert noted that there were two telepsychiatrists who were assigned EOP patient caseloads; one who treated mainline EOP patients and one who treated EOP RHU patients awaiting transfer in addition to their 3CMS RHU caseload. The monitor's expert also noted that, other than in the MHCB, there were no on-site psychiatrists assigned to EOP patients during the review period. Medical assistants and certified nursing assistants (CNA) supported the telepsychiatrists and remained in the room during each session. Concerningly, interviewed patients indicated that the medical assistant was not usually introduced during the session, nor was their role explained.

Staff reported good internet connectivity, with some initial issues that were ultimately resolved. PBSP reported high patient refusal rates for telepsychiatry appointments during the review period, which resulted in frequent cell-side telepsychiatry contacts. Both the medical assistant and the telepsychiatrists often had to encourage patients to come out of the cell for a confidential session. Although electronic health records reflected when cell-side contacts occurred, the documentation frequently did not state that the contact was conducted using

telepsychiatry. To the extent that EHRS reflects that a cell-front contact was conducted via telepsychiatry in a tab other than the "documentation" tab, and was conducted confidentially, the cell-front contact was compliant with the then-applicable telepsychiatry policy. However, best practices should still require that critical information, including the method by which the contact was conducted (i.e. remote treatment modalities like telepsychiatry), be included in the clinical documentation charted in the providers' note. *See id.* at 4.

As previously indicated, given that telepsychiatry was not used in compliance with the Court-approved Telepsychiatry Policy and cell-front telepsychiatry contacts were not indicated as such, PBSP was not compliant.

Regarding telepsychology and tele-social work, there were no tele-psychologists or tele-social workers assigned EOP patient caseloads during the reporting period. However, during the site visit, one tele-social worker, who was starting her first week at PBSP, covered an on-site psychologist's EOP patient caseload. Of the five tele-social worker appointments scheduled on one day of the site visit, only one patient attended. The contact lasted less than 15 minutes and the medical assistant was not present in the room during the appointment. PBSP staff indicated that patients who refused their tele-social worker appointments often refused their telepsychiatry appointments as well.

<u>Transfers to Higher Levels of Care</u>:

The Program Guide requires that EOP patients referred to intermediate inpatient care must be transferred within 30 days of referral and 72 hours of bed assignment. *See* ECF No. 7333-1 at 19. PBSP referred one patient to intermediate care during the review period; the patient was timely transferred to CHCF-PIP within 30 days.

The Program Guide requires that a patient referred to MHCB level of care be transferred to an MHCB within 24 hours of referral. *See id.* at 75. PBSP made eleven MHCB referrals during the review period; all were timely admitted within 24 hours of referral.

EOP patients placed into the 3CMS RHU during the review period were required to be transferred to an EOP RHU within 30 calendar days from the date of initial placement in RHU or level of care change. *See* Cal. Code of Regs., tit.15 §§ 3335.2; *see also* ECF No. 8355 at 5 (RHU Transfer Timeline Exceptions). At the time of the site visit, four EOP patients were housed as single-cell status within the 3CMS RHU, however PBSP did not provide data to determine EOP RHU transfer timelines.

As a result, patient transfers to higher levels of care were compliant during the review period while RHU transfer timelines were unable to be assessed.

<u>Programming</u>:

<u>EOP Patients in Restricted Housing</u>:

The Restricted Housing Unit Program: Mental Health Services Policy, dated July 19, 2024 and effective August 1, 2024 (hereinafter "RHU Policy"), does not speak to treatment requirements for EOP patients awaiting transfer from a 3CMS RHU to an EOP RHU. Therefore, treatment of EOP RHU patients housed in a 3CMS RHU was assessed using 3CMS RHU requirements during the monitoring tour.

Two 90-minute groups were offered weekly to EOP patients in the RHU. There was no RHU IDTTs scheduled during the site visit. The monitor's expert observed one recreation therapy group in RHU with one EOP patient in attendance; the remaining three patients refused. A social worker facilitated the group and initially provided a picture and markers for coloring. Upon patient request, the social worker then reviewed a worksheet about automatic negative

thoughts with the patient; this content was both relevant and appropriate to the patient's individual needs.

As the institution offered patients at least 90 minutes of structured therapeutic activity, the institution was compliant with RHU policy requirements.

Impact of EOP Programming on MHCB and Crisis Intervention:

While the monitoring tour centered on the newly activated EOP program and mission change, staff interviews indicated clear impacts to other areas of programming at PBSP, including the mental health crisis bed (MHCB). MHCB staff reported a sizeable increase in crisis evaluations, MHCB referrals, and resultant five-day follow-ups since EOP patient arrival. Staff also reported little to no notification of patients returning from outside MHCB placement to mainline EOP programming, which occurred primarily on weekends. Additionally, limited custody staffing on weekends created challenges with movement and escorts to treatment areas for confidential sessions. This forced clinicians to treat patients in open areas of the housing unit, including cell-front and in the day room.

PBSP did not have an active crisis intervention team during the review period and thus could not provide information regarding formal crisis referrals.

Mainline EOP Programming:

PBSP leadership and staff reported rapid growth in the new EOP program with census data reflecting 18 mainline EOP patients on January 31, 2024 and an increase to 64 mainline EOP patients as of the date of the site visit. This required increased staffing allocations and "on-the-fly" training for existing staff assigned to the new program.

*Initial Assessments*

The Program Guide requires initial psychiatric and primary clinician evaluations to occur within 14 days of patient arrival and prior to the patient's initial IDTT. *See* ECF No. 7333-1 at 57. While the initial assessments at PBSP were reportedly completed timely, the quality of these assessments was variable. Primary clinicians reported, at times, the increased workload with new EOP patients interfered with their ability to complete comprehensive initial assessments. As a result, initial assessments were completed by record review and a brief non-confidential evaluation.

Mental health staff at PBSP reported there was pressure to reduce the level of care for EOP patients to 3CMS upon arrival. Staff reported they were asked to reevaluate whether the new EOP patient arrivals merited continued placement in the EOP level of care. Interviewed patients revealed similar concerns that their level of care would be reduced from EOP to 3CMS. The monitor's experts attempted to review and validate this issue, however headquarters, regional, and institutional staff indicated there was no reliable way to provide a list of patients who had their level of care reduced after arrival to the institution.

While initial assessments were reportedly completed in accordance with Program Guide timeframes, initial assessments were completed by record review and brief non-confidential contacts rather than an initial primary clinician evaluation. Therefore, initial assessments of EOP patients at PBSP were not compliant with required policy.

*Structured Treatment*

According to Program Guide requirements, each EOP patient shall be offered at least ten hours per week of structured therapeutic activities. *See* ECF No. 7333-1 at 58. If the patient was scheduled for less than ten hours of treatment activities per week, the patient's IDTT is required

to meet monthly to review and increase the amount of structured therapeutic activities or refer the patient to a higher level of care as clinically indicated. *Id.*

Structured treatment at PBSP was largely noncompliant during the review period. PBSP provided data for 30 patients covering 118 patient weeks from January 28, 2024 to March 31, 2024 which reflected that reviewed patients were offered ten or more hours of weekly structured treatment in 86 of 118 or 73 percent of reviewed patient weeks. However, from the data provided, the monitor's expert was unable to determine how often structured treatment was cancelled as opposed to refused. At the time of the site visit, PBSP staff reported that 65 percent of patients refused over 50 percent of offered treatment each week.

On average, patients were offered 12.75 hours of weekly structured therapeutic activities.

For the 32 weeks where patients were not offered ten or more hours of weekly structured treatment, no explanation was provided. The institution was unable to indicate whether these patients were placed on modified programming or whether the patients' IDTT met monthly as required. It was also unclear whether primary clinicians were reviewing the patients' program participation monthly as required. One observed routine primary clinician contact did not discuss modified EOP programming for a patient who had refused more than 50 percent of his scheduled activities.

There were two patients placed on EOP modified programming (EOP Mod) prior to arriving at PBSP and remained on EOP Mod during their stay. A review of the patients' charts revealed that the patients were not provided with a reduced programming schedule, did not have their scheduled programming reviewed during IDTT, and did not receive a monthly IDTT as required. The IDTT documentation did not acknowledge the patients' status as being on

modified programming. When the lack of EOP modified programming was discussed with PBSP clinical leadership, they acknowledged that training was necessary.

Although on average, patients were offered 12.75 hours of weekly structured therapeutic activities during the review period, patients were not offered at least ten hours of structured therapeutic activity in 27 percent of reviewed patient weeks. Additionally, because patients designated as modified programming did not receive a reduced programming schedule, did not have their scheduled programming reviewed during IDTT, and did not receive a monthly IDTT as required, PBSP was not compliant with Program Guide requirements.

*IDTTs*

The Program Guide requires an initial IDTT to be completed within 14 days of arrival to the institution and routine IDTTs every 90 days thereafter. *See* ECF No. 7333-1 at 57 and 59. The required attendees include the patient's assigned primary clinician, assigned psychiatrist, assigned correctional counselor, and the patient. *See* ECF No. 7333-1 at 56. The IDTT should address treatment needs, develop treatment plans, assess treatment progress, and include pre-release and discharge planning. *See generally id*.

The monitor randomly selected and reviewed the healthcare records of 40 mainline EOP patients to assess compliance with IDTT timeframes during their stays. Thirty-nine patients required initial IDTTs; 31 or 79 percent occurred timely within 14 calendar days of arrival or level of care change. Required staff attended 29 or 74 percent of initial IDTTs and patients attended 26 or 67 percent of IDTTs.

Seven patients required routine IDTTs. One of seven, or 14 percent of expected timeframes occurred every 90 calendar days. Required staff attended four, or 57 percent of the reviewed routine IDTTs, while patients attended two or 28 percent. The reasons IDTTs were

held in *absentia* were either unknown or due to patient refusals. Of note, the Program Guide requires attendance of the assigned psychiatrist or primary clinician at all IDTTs, however, assignment was not clearly discernable in all cases.

The monitor's expert observed three mainline EOP IDTTs during the site visit; all included the required staff and were adequate and timely. All patients were seen by their assigned telepsychiatrists and primary clinicians prior to the IDTTs. The IDTT space was large, conducive to its purpose, and set to a comfortable room temperature. The schedule included two initial and one routine IDTT; one patient was in attendance for his initial IDTT while the other two patients refused. Presentations were appropriate in scope, covering germane aspects such as past psychiatric history, current impairments, goals, and interventions. Limitations included the lack of discussing treatment plan modifications to address high refusal rates to attend both groups and primary clinician sessions. In one case, the team discussed possibly lowering the level of care for a patient with a high treatment refusal rate, despite this being a consideration for a higher level of care.

Although the telepsychiatrist provided adequate information in the IDTT, the small laptop screen, though facing the patient when necessary, limited full interdisciplinary collaboration among staff. The small screen made seeing the psychiatrist difficult when turned towards the treatment team to discuss the two patient refusals. The setup used an external speaker, and the sound quality was adequate.

Timeliness of both initial and routine IDTTs were not compliant during the review period.

Observed IDTTs lacked discussion of treatment plan modifications to address high patient refusal rates, however, the IDTTs included the required clinicians, were appropriate in

scope, and covered germane aspects of the patient's mental health history. Therefore, the observed IDTTs at PBSP were compliant with Program Guide requirements.

*Group Treatment*

PBSP conducted groups daily and included 42 hours of activity per week; 30 hours of unstructured leisure groups and 12 hours of core clinical groups held on Tuesdays and Thursdays. The unstructured leisure groups titled "Out of Cell Activities" were scheduled in two-hour increments three times per day and were monitored by nursing and licensed clinical staff. Concerningly, the licensed clinical staff did not provide meaningful clinical content while engaging with the group, but rather were used to monitor the unstructured leisure group.

PBSP also offered ten hours of education and four hours of integrated substance use disorder treatment (ISUDT) groups to EOP patients. Nursing led treatment groups (NLTG) were not offered to patients at the time of the site visit; PBSP reported plans to implement NLTG groups in the future.

The monitor's expert observed five mainline EOP groups during the site visit; two core clinical groups, two leisure groups, and one recreation therapy group. The core clinical groups were both two-hour Cognitive Behavioral Therapy (CBT) and Dialectal Behavioral Therapy (DBT) groups facilitated by a psychologist and social worker, respectively. Facilitators conducted the groups in a room within the EOP program area, and the room was of sufficient size and allowed for confidentiality.

The CBT group included five of the 12 scheduled patients and started late as patients arrived at various times over the initial 15 minutes of the group. The group watched a full episode of the TV show *Survivor* and then completed a worksheet that included a list of thinking errors to discuss what was observed during the episode. While the concept of the group would

have supported the identification and exploration of thinking errors, the group did not stay on track and the concepts were not reviewed in detail. Overall, the patients were engaged in discussions with each other and the psychologist, however the clinical utility of the group would have been improved by discussing the concepts as they appeared on the show and supplementing discussion with definitions and examples.

Two of the eleven scheduled patients attended the observed DBT group. The group reviewed the DBT skill of emotional acceptance and was well-structured and engaging for the patients. Overall, the DBT group was clinically useful.

The leisure groups titled “Out of Cell Activities” were held within a large open area in the EOP programming unit. Though the space was adequately sized, it was not confidential as staff and patients walked through this area to access clinical offices and a smaller group space. Group participants were not separated from patients who were also waiting for other appointments in one of the adjoining offices. The leisure group included patients engaged in various activities including watching TV, listening to music, drawing, playing games, doing puzzles, and talking to each other in pairs or small groups; there was no structured or guided activity.

One of the “out of cell activities” observed was supervised by an RN and the other was supervised by both an RN and a newly hired recreation therapist. Staff noted that other disciplines, including psychologists and social workers, also covered this group in the past but similarly did not provide supervised activity during the two-hour period. PBSP leadership indicated that because this was designated a recreation therapy group, only recreation therapists could provide recreation therapy.

The observed mainline EOP recreation therapy group was a positive and interactive Zen meditation group. The group began with a discussion about individual patient stress. The

recreation therapist then guided the patients through creating a Zen table on paper and provided examples to assist the patients. As the patients filled in the details of their Zen table with markers, pens, and pencils, the recreation therapist played classical music. Three of the four patients were actively engaged and focused on the activity, while one patient spent much of the activity writing in a journal. The group appeared useful and appropriate, and most patients were engaged.

Overall group treatment at PBSP was compliant with policy requirements as the clinical group and EOP recreation group were well-structured, engaging, and appeared useful to the patients. Although one clinical group lacked clinical utility, it supported the identification and exploration of thinking errors, which increased patient engagement.

*Individual Treatment*

The Program Guide required that EOP patients receive an initial psychiatry evaluation before their initial IDTT and within 14 calendar days of arrival or level of care change. *See id.* It also required that confidential routine psychiatric contacts were to occur at least every 30 calendar days after the initial psychiatric evaluation. *See id*.

The monitor randomly selected and reviewed the healthcare records of 40 mainline EOP patients to assess compliance with timeframes during their stays. All 40 patients required initial psychiatry assessments; 36 or 90 percent timely occurred before the initial IDTT and within 14 calendar days of arrival or change in level of care. Twenty-nine or 76 percent of initial psychiatry evaluations were conducted in confidential settings; non-confidential contacts were primarily due to patient refusals. Telepsychiatry was reported as utilized for 30 or 79 percent of initial psychiatry contacts.

Thirty-six patients required routine psychiatry contacts; 80 percent timely occurred at least every 30 calendar days, and 79 percent were conducted in confidential settings. Patient refusals accounted for most non-confidential appointments, or no explanation was provided. Patients who refused were seen at cell front. Telepsychiatry was reported as utilized in 37 or 79 percent of routine psychiatry contacts.

Additionally, within 14 calendar days of arrival or level of care change, EOP patients must receive an initial primary clinician evaluation followed by confidential primary clinician contacts, either by individual or group psychotherapy, at least weekly, with individual clinical treatment mandatory every other week. *See id*.

All 40 patients required initial primary clinician assessments; 39 or 98 percent were completed within 14 calendar days of arrival or level of care change and 32 or 80 percent were conducted confidentially. Non-confidential initial primary clinician evaluations resulted from patient refusals.

Thirty-nine patients required routine primary clinician contacts; 87 percent timely occurred at least every ten calendar days, and 80 percent occurred in confidential settings. Reasons for non-confidentiality were primarily due to patient refusals, and in other instances, the contact occurred cell side due to "weather conditions (fog), count, other programming going on and conflicting schedule availability." There were no documented primary clinician contacts utilizing tele-psychologist or tele-social worker.

Patients reported they were familiar with their treatment goals but were unsure that the services or resources they needed to achieve them would be available.

For patient treatment timeframes, PBSP was compliant with reviewed initial psychiatry and primary clinician evaluations and routine primary clinician contacts during the review

period. Resultantly, the institution was not compliant with routine psychiatry treatment timeframes.

*Staff and Patient Interviews*

Clinicians reported concerns about the rapid growth of the EOP program and the large influx of patients in a short period of time. They expressed feeling undertrained and underprepared for the start-up of the EOP program. After receiving large busses of patients, the staff reported it was a challenge to complete the initial assessments and all other required paperwork timely, and while they worked tirelessly to do so, occasionally the quality of the documentation suffered. Mental health staff reported they were still learning about EOP program requirements. Some of the challenges reported included knowledge of EOP Program Guide requirements and documentation. Staff indicated they would continue to benefit from more advanced training. Staff expressed concern that CDCR had "put the cart before the horse," with the addition of the EOP program as the institution was not prepared to treat these patients.

Likewise, patients indicated the institution was not prepared for them and reported challenges getting to mental health appointments since their arrival. EOP patients did not have the freedom of movement that general population individuals had; and as a result, they reported feeling as though they were being punished for their mental illness.

The monitor's expert interviewed at least 20 EOP RHU and mainline EOP patients during the site visit. Most patients reported arriving at PBSP within 60 days of the interview, while a few arrived in January. Patients reported telepsychiatrist contacts every 30 days; most patients reported being seen by the same psychiatrist.

All patients reported being offered weekly confidential sessions with their primary clinicians. Patients indicated they were seen consistently by their assigned primary clinician,

with primary clinician coverage used only when a clinician was on vacation or otherwise unavailable.

Patients reported attending an initial IDTT and awareness of their treatment goals. Most patients reported that their goals were appropriate to address their mental health needs and felt that primary clinician contacts supported their treatment goals.

Interviewed patients reported groups were generic, unstructured, and mostly not supportive of their treatment goals. These patients reported that while they did not find group time useful, some chose to attend because they believed that missing groups would result in removal from the EOP program. Other patients reported that they did not routinely attend all assigned groups because they were either held too early in the morning or they were too long to attend. Patients who participated in core clinical groups found them to be helpful and relevant to their needs.

Patients reported having access to two hours of groups daily, one to two hours of yard, and one hour of dayroom. Patients reported that, at times, yard conflicted with afternoon groups and occasionally clinical appointments, requiring patients to choose between outdoor recreation and treatment. Some patients reported that custody staff had more influence over their daily programming than mental health staff. Specifically, patients reported that whether they had access to mental health staff was managed by custody during times of crisis. Conversely, other patients reported that custody staff were supportive of patients and their mental health needs.

Patients also expressed concerns about not having access to water and toilet facilities when on the yard, while yard could last up to two hours, with no ability to re-enter the housing unit. Some patients refused to attend unstructured yards out of fear for their safety given the proximity, both visual and physical, between the GP and EOP yard. Interestingly, patients had

requested to use the restricted custody general population (RCGP) individual management yards as a way to access fresh air without fear of verbal or physical assault from other incarcerated individuals.

One patient reported he was scheduled to be released to parole in August 2024. He indicated that he had not had contact with anyone regarding his release since his arrival at PBSP. He reported preliminary contact from the pre-release coordinator at his prior institution. He acknowledged that he was most concerned about completing his application for social security benefits. It was not clear from this interview what, if any, pre-release services or resources were available to EOP patients.

Other Issues:

Program Access:

Patients and staff reported that EOP patients had limited access to jobs. Of the 64 mainline EOP patients, five had jobs; and the only available jobs were porter or barber, with some patients filling both roles. Additionally, staff and patients reported concerns about the lack of access to religious services. One staff member compared the chaplain's cell front visits with EOP patients to the rigidity of those that occurred in RCGP. Patients and staff raised concerns about the inability to access the law library and to attend AA/NA groups as well. Further, EOP patients did not have access to the dining hall; all meals were served cell side. The monitor's expert confirmed that two meals per day were hot meals. Staff reported some patients expressed reservations about eating the food served, out of fear that GP incarcerated persons had adulterated it. Patients in the EOP housing unit also reported limited access to canteen and tablets.

Patients reported their educational opportunities were limited. They reported they did not receive in-cell packets which allowed them to earn milestone credits as they had at other institutions. Similarly, patients expressed distress that the move to PBSP had further separated them from their families who they relied on for support.

Access to Care:

The monitoring tour revealed serious concerns regarding EOP patient access to care. The primary issues related to the location of the EOP housing unit. Specifically, given the fact that PBSPs EOP housing unit was a Non-Designated Program Facility (NDPF), custody policy required that patients remain separated from the general population (GP) and the restricted custody general population (RCGP). EOP patients were often late to appointments due to movement restrictions to allow GP incarcerated persons to exit the yard. The planned move of EOP patients from housing unit B-3 to B-2 would mitigate some of the access concerns but not fully eliminate them. The move to B-2 would also provide staff with office space to meet with patients, further eliminating some movement issues for patients. However, despite the concerns expressed by staff and patients, institutional leadership indicated this issue had not interfered with a patient's access to care.

The *Coleman* experts and monitors toured housing unit B-2, the planned relocation unit for EOP patients. Like the current housing unit in B-3, B-2 was a 180-design housing unit, divided into sections A, B, and C. In two of the sections, there were 20 double cells and in the third section, there were 44 single cells which regional staff reported were to be retrofitted into double cells prior to the move.

Patients and mental health staff reported additional delays in transport to patient appointments, groups, canteen, and other programs (e.g., education) due to a lack of custody

escort staff. A lack of custody escorts for patients often required weekend mental health staff to conduct non-confidential sessions in the rotunda, including five-day follow-up contacts. PBSP staff also reported that, on occasion, the telepsychiatrist had to wait for up to three hours for patients to arrive for appointments. It was not clear whether delays were due to logistical issues related to proximity to general population patients, or lack of available custody staff for transport, or both.

Further, staff reported that within the EOP housing unit, a group of patients formed a "gang" which intimidated and extorted other patients. While this issue was reportedly resolved, it may have had a lasting impact on the culture of the unit regarding patient safety.

Treatment Space

PBSP leadership attempted to optimize available EOP treatment space. As an example, IDTTs occurred in a room in the PSU treatment area, to maximize available EOP group space. The PSU open area was also the likely site of NLTG groups, scheduled to begin in July 2024. Similarly, the EOP treatment area was a large, open area, surrounded by multiple clinician offices.

EOP Huddles:

According to the Custody and Mental Health Partnership Plan, designated mental health and custody leadership and line staff from each program will attend a daily huddle on second and third watch to discuss high level and urgent patient issues. *See* ECF No. 5916 at 15. The monitor's expert observed one afternoon EOP huddle. All required participants were present, with several joining by Microsoft Teams. The huddle followed the statewide format, with relevant topics discussed. The huddle discussed an EOP patient recently admitted to the MHCB level of care, where the patient's bed at PBSP was not held for him. This was a deviation from

policy which required that a patient's bed be held in a housing unit for a minimum of ten days when admitted to MHCB. The monitor's expert conveyed this non-compliance with policy to both institutional and headquarters mental health staff.

Overall, the huddle complied with CDCR policy as it followed the statewide format and discussed relevant topics.

**PLEASANT VALLEY STATE PRISON (PVSP)**

Site Visit: October 29, 2024 – October 30, 2024
Review Period: August 5, 2024 – September 30, 2024

Census:

On August 5, 2024, PVSP activated a 100 bed EOP.[44] *See* Exhibit D. By October 29, 2024, the capacity had increased to 184 beds and PVSP's population included 86 EOP patients, including 83 mainline EOP and three in RHU. Of note, the EOP census increased from 45 patients to 86 patients in less than 90 days. Additionally, PVSP leadership reported that during that same time period, over 400 3CMS patients transferred to PVSP, essentially doubling PVSP's 3CMS population. This rapid increase in population placed an additional burden on mental health staff in the provision of adequate care throughout the institution.

Staffing:

PVSP reported insufficient clinical staffing for the EOP during the review period and at the time of the site visit. On October 30, 2024, PVSP reported the following staffing data:

The one senior psychologist supervisor position was filled.

The 1.55 staff psychiatry positions were vacant, though one registry psychiatrist reduced the functional vacancy rate to 35 percent.

For staff psychologists, 0.5 of five positions was filled, resulting in a 90 percent vacancy rate; however, that psychologist was on long-term leave, resulting in a 100 percent functional vacancy rate.

Two of the 2.14 clinical social worker positions were filled for a seven percent vacancy rate.

Two of the 2.5 office technician positions were filled for a 20 percent vacancy rate.

---

[44] Letter from Sundeep Thind, CDCR Office of Legal Affairs, to Special Master, Matthew Lopes (June 5, 2024).

Three of the 4.17 recreation therapist positions were filled, resulting in a 28 percent vacancy rate.

On-site leadership reported that, in addition to the above staffing allocations, three psychologist supervisors and three psychologist specialists were redirected from the 3CMS program to assist the EOP staff with initial assessments, routine primary clinician contacts, consults, and IDTTs.

For psychiatry, EHRS erroneously assigned all EOP patients to a 3CMS psychiatrist. Consequently, the patient's assigned psychiatrist was listed as an *alternate* on IDTT documentation and did not receive direct communication about medication non-adherence or other issues through EHRS. The chief psychiatrist reported that the issue was being addressed and that the 3CMS psychiatrist forwarded all communications to the patients' treating psychiatrists, an inefficient workaround requiring corrective action to prevent patient harm.

The mandated staffing ratio for primary clinicians in the EOP is twenty-six patients. *See* ECF No. 3693 at 17. The two primary clinician social workers exceeded the staffing ratio with caseloads of 30 EOP patients each and maintained additional responsibilities in responding to institution-wide crisis calls and CIT. The remaining 26 patients were distributed among the psychologist supervisor, who carried a caseload of ten EOP patients, and five other psychologists redirected from the 3CMS program.

For custody staff, eight of the 8.6 allocated correctional officer positions were filled for a seven percent vacancy rate.

As the EOP program did not staff any on-site psychologists, maintained a 35 percent functional vacancy rate for psychiatry, and staffed only two primary clinician social workers for 86 EOP patients, the program was forced to distribute patient caseloads to supervisors and non-

EOP clinical staff. For these reasons and given the overall functional vacancy rate for clinical positions was 45 percent, PVSP's staffing for the EOP program was noncompliant.

Telemental Health:

The EOP program did not utilize telemental health at the time of the site visit.

Tele-work:

The two clinical social workers assigned to the EOP provided on-site services for 12 hours three days per week and teleworked for four hours weekly. The social workers did not provide direct patient care remotely; telework was limited to documentation completion.

Medication Management:

Clozapine:

PVSP was not a clozapine-designated institution, and no patients were prescribed clozapine during the monitoring period or at the time of the site visit.

PC 2602:

PVSP reported two EOP patients received involuntary medications under the PC 2602 process. The institution filed one emergency and one non-emergency PC 2602 petition; both were granted. There were no renewal petitions, planned non-renewals, or cases lost to follow-up.

Medication Administration:

Since activation of the EOP program, PVSP reported an increase in medication administration workload, including for counseling due to medication refusals. Fights on the yard had at times necessitated halting medication administration.

While the institution reported overall compliance with rare exception, EOP patients reported that medication administration was a major issue because of long medication administration lines due to D yard being combined for EOP, 3CMS, and GP individuals who took

medications for physical and psychiatric conditions. Patients reported that the lines were so long that multiple EOP patients would not wait and, as a group, would turn back to the EOP housing unit without taking their medication. They reported that, in some instances, psychotropic medications were discontinued due to non-adherence, even when patients wanted to take their medications. Patients expressed the view that there were insufficient nursing staff available to administer medications and noted that, while there were sometimes three medication windows open, one or two of these windows would be closed due to lack of staff. No EOP patients were aware of institutional efforts to maintain an EOP-specific medication window.

Upon follow-up by the monitor's expert, nursing leadership reported that the issue was studied and only 39 EOP patients were prescribed medications; however, the monitor's expert's data review revealed that 72 EOP patients were prescribed psychotropic medications and the number provided medications through a medical provider was not known. Further, leadership reported that two to three nurses were posted for every medication pass, with one nurse posted to provide medications specifically to EOP patients. However, when the monitor's expert observed a medication pass, two nurses passed medications but neither was specific to EOP patients. The nurse at the medication window reported that a medication line specifically for EOP patients was not possible with two nurses.

Transfers to Higher Levels of Care:

The Program Guide required that a patient referred to MHCB level of care be transferred to an MHCB within 24 hours of referral. *See* ECF No. 7333-1 at 75. During the review period, PVSP referred ten EOP patients to the MHCB level of care; nine were referred from mainline and one from RHU. PVSP transferred all patients timely within 24 hours and was therefore compliant with Program Guide requirements.

There were no CIT referrals during the reporting period.

EOP patients placed into a 3CMS RHU were required to be transferred to an EOP RHU within 30 calendar days from the date of initial placement in RHU, or within 30 calendar days from the date the patient was made EOP level of care. *See* Cal. Code of Regs., tit.15 §§ 3335.2; *see also* ECF No. 8355 at 5 (RHU Transfer Timeline Exceptions). PVSP's RHU documentation was inaccurate, therefore, the monitor was unable to determine EOP RHU transfer timelines during the review period. However, of the three EOP patients housed in RHU during the site visit, two were beyond the 30-day transfer requirement. Leadership indicated that the two transfers were delayed due to a statewide shortage of EOP RHU beds.

While MHCB transfers at PVSP were compliant with program guide requirements, two EOP RHU patients did not transfer within the 30-day timeframe and were further prevented from receiving required EOP treatment. As a result of this significant concern, PVSP was not compliant with transfers to higher levels of care during the review period.

<u>Programming</u>:

<u>EOP Patients in Restricted Housing</u>:

The Restricted Housing Unit Program: Mental Health Services Policy, dated July 19, 2024 and effective August 1, 2024 (hereinafter "RHU Policy"), did not speak to treatment requirements for EOP patients awaiting transfer from a 3CMS RHU to an EOP RHU. Therefore, treatment of EOP RHU patients housed in a 3CMS RHU was assessed using 3CMS RHU requirements during the monitoring tour.

The RHU Policy required that any patient placed in a 3CMS RHU receive 90 minutes of structured therapeutic activities each week. PVSP offered EOP RHU patients one 90-minute group weekly that included 3CMS patients.

According to the RHU Policy, EOP RHU patients awaiting transfer in a 3CMS RHU were required to receive an IDTT within ten calendar days of arrival. There were no scheduled IDTTs for EOP patients housed in the RHU during the site visit, and thus the monitor's expert was unable to observe for quality.

The three EOP RHU patients received the required programming while awaiting transfer in the 3CMS RHU and therefore were in compliance with the RHU Policy.

<u>Mainline EOP Programming</u>:

*Structured Therapeutic Activities*

The Program Guide required that each EOP patient be offered at least ten hours per week of structured therapeutic activities. If a patient was scheduled for less than ten hours per week, the patient's IDTT was required to meet monthly to review and increase the amount of structured therapeutic activities or refer the patient to a higher level of care. *See* ECF No. 7333-1 at 55-59. PVSP did not meet this standard throughout the review period.

PVSP provided data for 52 patients covering 166 individual patient weeks from August 1, 2024 to September 30, 2024 which reflected that EOP patients were offered ten hours of structured therapeutic activities in 67 percent of weeks and averaged 8.8 hours weekly. No patients were identified on modified programming status during the reporting period and, thus, monthly IDTT meetings were not held.

Regarding treatment attendance, EOP patients attended an average of 6.4 hours per week of structured therapeutic activities, ranging from zero to 16.1 hours per week. EOP patients refused an average of 2.6 hours weekly.

For cancellations, data reflected that on average, during the reporting period, 7.4 hours per week of structured therapeutic activities were cancelled, ranging from zero to 25 hours per

week per patient. PVSP reported that structured therapeutic treatment cancellations were caused by scheduling and staffing changes and none were due to custody issues. Two primary factors drove cancellations: a glitch in the scheduling system whereby 120-minute groups were scheduled for only 60 minutes requiring total cancellation, and a recreation therapist leaving employment, resulting in all scheduled activities assigned to this individual being cancelled.

Of the 52 reviewed EOP patients during the reporting period, 14 or 27 percent were enrolled in work or education in addition to individual and group treatment.

Three recreation therapists provided most groups at PVSP; one was newly hired at the time of the site visit, and two were redirected from the RHU. Group treatment consisted of structured and unstructured groups in two-hour blocks Monday through Thursday. Groups were held in the gym, day room, or on the yard. Additionally, one EOP orientation group was held on Fridays, and the two EOP social workers held caseload groups on Sundays.

The monitor's expert observed one recreation therapy group, which was held in the dayroom due to security concerns on the yard and in the gym. Due to the space limitation, the group included the combination of two scheduled groups wherein patients engaged in leisure activities, including playing games with each other. The recreation therapists were engaged with patients during the activities. Of note, the provided group schedule listed the groups as "Mindfulness" and "Coping Skills," yet the groups were mostly unstructured and recreational.

Due to scheduling, the monitor was unable observe the clinical caseload groups. PVSP indicated that caseload groups were unstructured therapeutic groups held with up to ten patients and provided an opportunity for patient to process their daily challenges, needs, and concerns. It was described as a support group for patients.

Data reflected that two EOP patients were enrolled in ISUDT treatment groups; one received substance use treatment as part of re-entry programming.

PVSP began offering NLTGs to EOP patients in October 2024. Data reflected that during the week of October 20, 2024, 48 percent of EOP patients were offered NLTGs.

Overall, because patients were not offered ten hours of structured therapeutic activities in 33 percent of reviewed patient weeks and because there were no monthly IDTTs to discuss modified programming for these patients, the institution's offering of ten hours of structured therapeutic activities was not compliant with Program Guide requirements.

*IDTTs*

The Program Guide required that a patient receive an initial IDTT within 14 calendar days of arrival to the institution and routine IDTTs every 90 days thereafter. *See* id. at 59. The required attendees include the patient's assigned primary clinician, assigned psychiatrist, assigned correctional counselor, and the patient themselves. *See id.* The IDTT should address treatment needs, develop treatment plans, assess treatment progress, and include pre-release and discharge planning. *See generally id.*

Thirty EOP patients who required initial IDTTs were randomly selected for review. Of the 30 reviewed IDTTs, 23 or 77 percent were completed within 14 calendar days of arrival or level of care change. Patients were present for 29 of 30 or 97 percent and the required staff were present for all IDTTs.

From the date of EOP program activation through the date of the site visit, no EOP patients at PVSP were required to receive a routine IDTT.

The monitor's expert observed four EOP patients' IDTTs during the site visit; none of the IDTTs were clinically adequate. The IDTT meeting space had adequate size and was partially

confidential regarding sight and sound; during one meeting another patient briefly pressed his face against the large window in the door to the room and peered into the meeting and, at several points, loud overhead announcements made it difficult to hear what was being said in the meetings. Required staff were present except for the assigned primary clinician; in all four IDTTs, a covering primary clinician attended.

Regarding psychiatry attendance, as noted above, PVSP informed the monitor's expert that an EHRS system error resulted in EOP patients being assigned to the wrong psychiatrist; however, the psychiatrist who attended the IDTT meetings was, in fact, the assigned psychiatrist.

While computers were available to all staff during the IDTTs, the primary clinician did not utilize the computer to look up information when requested by one patient. Patients attended all four observed IDTTs.

In each IDTT meeting the patient's psychiatric history was briefly reviewed, but no case conceptualizations were mentioned. Psychotropic medications were identified and their effectiveness and side effects, along with patient medication adherence, were discussed. The patient's diagnoses were identified, but there was no discussion regarding the team's consensus around the diagnoses or the supporting symptoms. Functional impairments were discussed in only one of the IDTTs and, in this case discussion, focused on physical rather than psychiatric impairment. Patient strengths were not consistently identified; when identified, they were not used to build the treatment plan. Treatment plans were discussed, objective and measurable treatment goals were identified, and the goals appeared appropriate to patients' needs. Barriers to treatment were not explicitly identified except in the context of medication non-adherence.

Discussion of non-pharmacological interventions was inconsistent and generic rather than patient-specific when discussion occurred. The availability of EOP groups was mentioned, but

the types of groups, their content, and how they related to individualized treatment goals were not discussed. Two patients had recent safety plans; these were not mentioned during their IDTTs. The patients' substance use history was briefly discussed in three of four IDTTs; in the IDTT where discussion was omitted, the patient had an extensive history of substance use. One patient, currently prescribed buprenorphine-naloxone through the ISUDT, expressed a strong desire to receive substance use counseling and was told there was a waiting list for that program.

Pre-release planning was briefly discussed in one IDTT where the patient was clearly focused on his upcoming release date. Despite the patient's strong interest in obtaining information about his release, it appeared that the covering clinician wished to avoid further engagement on this topic and informed the patient that their assigned primary clinician would assist with release planning later. Justification for EOP level of care was not discussed in any IDTT meeting.

The quality of custody participation was generally poor. The correctional counselor spent his time on his laptop, had poor eye contact and rapport with the patients, and had little to contribute except to assert in more than one meeting that he was not responsible for calculating or communicating good time credits.

Overall, IDTT meetings were moderately collaborative, and patient input was sought. However, given the room's partial confidentiality, lack of case conceptualizations, consensus of diagnosis, and functional impairment discussion as well as inconsistent and generic discussion of non-pharmacological interventions and poor custodial participation, the EOP program's IDTTs were not compliant with Program Guide requirements.

*Individual Treatment*

The Program Guide required that EOP patients receive an initial psychiatry evaluation before their initial IDTT and within 14 calendar days of arrival or level of care change. *See id.* It also required that confidential routine psychiatric contacts were to occur at least every 30 calendar days after the initial psychiatric evaluation. *See id*.

Thirty EOP patients who required initial psychiatry evaluations during the reporting period were randomly selected for review. Of the 30 EOP patients, 27 or 90 percent received a timely initial psychiatry evaluation before the patient's initial IDTT and within 14 calendar days of arrival or level of care change. Twenty-seven of 30 or 90 percent of initial psychiatry evaluations were conducted confidentially. According to EHRS documentation, non-confidential contacts were due to patient refusals.

A random sample of 30 EOP patients who required routine psychiatry evaluations during the reporting period was also randomly selected. There were 44 expected timeframes, of which 43 or 98 percent occurred every 30 calendar days as required. Forty-three of 44 or 98 percent also occurred in a confidential setting with the one patient refusing his routine psychiatry contact.

Additionally, within 14 calendar days of arrival or level of care change, EOP patients must receive an initial primary clinician evaluation followed by confidential primary clinician contacts, either by individual or group psychotherapy, at least weekly, with individual clinical treatment mandatory every other week. *See id*.

Thirty EOP patients who required initial primary clinician evaluations were randomly selected for review. Of the 30 patients, 27, or 90 percent received a timely primary clinician evaluation within 14 calendar days of arrival or level of care change, while 29 or 97 percent were

conducted in a confidential setting. The one non-confidential evaluation was due to patient refusal.

A random sample of 30 EOP patients who required routine primary clinician evaluations were randomly selected for review as well. Across the 30 EOP patients, there were 155 expected timeframes of which 140 or 90 percent were completed weekly (i.e. at least once per calendar week, not to exceed ten calendar days between contacts) with either the patient's assigned primary clinician or in group psychotherapy with their assigned primary clinician. There were 85 individual contacts, and 70 group psychotherapy contacts reviewed. Of the 85 individual contacts, 82 or 96 percent were conducted in a confidential setting. Non-confidentiality was due to patient refusals.

Overall, the institution was compliant with initial and routine psychiatry and primary clinician contacts during the review period.

*Patient Interviews*

The monitor and monitor's expert interviewed approximately 15 EOP patients participating in a recreation therapy group. Due to the availability of the dayroom for all EOP patients, patients participating in the interviews left, joined, or rejoined the interviews at will.

Most patients reported seeing their primary clinician every week, either individually or in a group. Some patients reported seeing their primary clinician twice in the same week, or even twice on the same day, in a group and individual contact every other week, with no primary clinician contact occurring during the alternate week. One patient asserted that he did not have a primary clinician assigned to him for his first two weeks of EOP care. All patients reported that they were seen by their psychiatrist at least every 30 days and that these contacts were in person

and not by telepsychiatry. Most patients reported that they were aware of their diagnoses and treatment goals, found their initial IDTT meetings helpful, and felt safe in the housing unit.

Patients reported adequate access to the dayroom in the EOP housing unit and to the open yard shared with 3CMS and general population incarcerated persons, so long as they were ready to leave their cells or unit during the time the doors were open at the top of each hour. Patients also reported that one side of the housing unit did not receive hot water and that cells were uncomfortably cold at night and in the morning.

Additionally, patients reported that most groups involved leisure activities and were run by recreation therapists and that they received at most, eight or nine hours of group activity each week. Patients voiced a desire for more group therapy that involved mental health-related discussions and greater access to NLTGs.

*Treatment Space*

The monitor's expert toured all areas where mental health services were provided to EOP patients at the time of the site visit, as well as the space that was being considered for treatment. Overall, space was adequate at the time of the visit; however, it will become inadequate should the size of the population reach capacity and staffing increase to conform with established ratios.

The space used for individual and group treatment was adequate for size and confidentiality. NLTGs were held in a visiting room with a correctional officer present. There was also a room with a video but no audio camera on the housing unit that could be used for small group or individual sessions but would need to be examined for safety risks and cleaned prior to use.

**SAN QUENTIN REHABILITATION CENTER (SQ)**
Site Visit: July 30, 2024 -July 31, 2024
Review Period: January 1, 2024 – March 31, 2024

Census:

On February 5, 2024, SQ activated an additional 100 EOP beds to its existing EOP program increasing its EOP program capacity from 200 to 300 patients.[45] *See* Exhibit C. During five months of the review period, the average patient census was as follows: 171 patients in January 2024; 190 patients in February 2024; 200 patients in March 2024; 225 patients in April 2024; and 248 patients in May 2024.

Staffing:

On July 16, 2024, SQ reported the following staffing for its EOP program:

Two senior psychologist supervisors filled the 1.97 allocated positions.

Two staff psychiatrists filled the 3.04 allocated positions for a 34 percent vacancy rate. The use of 1.5 registry staff eliminated the functional vacancy rate.

Seven clinical psychologists filled the 9.83 allocated positions for a 29 percent vacancy rate. Two registry staff reduced the functional vacancy rate to eight percent.

Three clinical social workers filled the 4.21 allocated positions for a 29 percent vacancy rate.

One office technician filled the 4.92 allocated positions for an 80 percent vacancy rate.

Four recreation therapists filled the 8.19 allocated positions for a 51 percent vacancy rate; three registry staff reduced the functional vacancy rate to 15 percent.

For custody staff, all nine allocated correctional officer positions were filled.

[45] Letter from N. Weber, CDCR Office of Legal Affairs, to Special Master, Matthew Lopes (October 26, 2023).

All staff had caseloads within established ratios.

Telemental Health:

The EOP program did not utilize telemental health during the review period or at the time of the site visit.

Tele-work:

Given the significant office space shortages, clinicians were working part-time at home to complete documentation requirements.

Medication Management:

Clozapine

SQ was a CDCR-designated clozapine initiation and maintenance institution during the monitoring period. The institution reported 17 patients were prescribed clozapine, of whom five were at the EOP level of care.

PC 2602

The institution reported 23 patients received PC 2602 involuntary medications, of whom 12 were at the EOP level of care.

Medication Administration

SQ denied any significant impact to medication administration or required monitoring. Nursing staff administered medications within the housing unit, which the institution reported reduced no-shows due to inclement weather.

Transfers to Higher Levels of Care:

The Program Guide requires that EOP patients referred to acute inpatient care must be transferred within 10 days of referral and 72 hours of bed assignment. *See* ECF No. 7333-1 at 19. Additionally, the Program Guide requires that EOP patients referred to intermediate inpatient

care must be transferred within 30 days of referral and 72 hours of bed assignment. *See* ECF No. 7333-1 at 19. SQ made 12 acute and 34 intermediate care referrals during the review period; two intermediate care referrals were rejected and one intermediate care referral was rescinded. All 12 acute and all 31 intermediate care accepted referrals transferred timely.

The Program Guide requires transfers to MHCBs within 24 hours of referral. *See* ECF No. 7333-1 at 75. Of the 139 transfers to the on-site MHCB, 138 or 99 percent were timely admitted within 24 hours; the one untimely transfer was delayed by approximately 25 minutes.

According to Cal. Code of Regs., tit.15 § 3335.2, patients at the EOP level of care must be transferred to an EOP RHU within 30 calendar days from the date of initial placement in RHU or change in level of care. *See also* ECF No. 8355 at 5 (RHU Transfer Timeline Exceptions). Of the 21 EOP patients who transferred out of the 3CMS RHU during the review period, 16 or 76 percent transferred out timely within 30 days. Of the five delayed transfers, three were due to the headquarters classification service representative (CSR) initially rejecting the referral due to insufficient casework completion by custody; one was due to the patient not receiving a timely endorsement; and one was due to a lack of available bus seats.

Two EOP RHU patients were housed in the 3CMS RHU at the time of the visit; neither patient exceeded the 30-day transfer requirement.

SQ met Program Guide timeframes for transfers to higher levels of care during the review period but did not comply with the RHU policy for timely transfers.

<u>Programming</u>:

<u>EOP Patients in Restricted Housing:</u>

SQ's 3CMS RHU housed EOP patients awaiting transfer to an EOP RHU during the review period. The 3CMS RHU lieutenant reported that the influx of additional EOP patients did

not significantly impact the 3CMS RHU and that there were no problems with transferring patients within the 30-day timeframe; however, as noted above, 24 percent of transfers exceeded the 30-day timeframe during the review period.

The Restricted Housing Unit Program: Mental Health Services Policy, dated July 19, 2024 and effective August 1, 2024 (hereinafter "RHU Policy"), did not speak to treatment requirements for EOP patients awaiting transfer from a 3CMS RHU to an EOP RHU. Therefore, treatment of EOP RHU patients housed in a 3CMS RHU was assessed using 3CMS RHU requirements during the monitoring tour. The RHU clinical supervisor reported that it was difficult to provide mental health services to EOP patients in the unit due to their short stays; however, they offered groups and scheduled one-on-one contacts.

The monitor's expert observed a coping skills group facilitated by a recreational therapist and attended by the two EOP patients in the RHU. The group covered interactive situational stressor scenarios and appropriate coping mechanisms for the same; the patients were engaged for the two-hour session and benefitted from attending.

Staff reported a significant increase in the number of RVR MHAs during the reporting period. For example, in May 2023, SQ completed 63 MHAs of which 20 or 32 percent were generated from EOP patients. In comparison, during May 2024, SQ completed 92 MHAs, of which 56 or 60 percent were generated from EOP patients.

SQ's 3CMS RHU offered EOP RHU patients awaiting transfer at least 90 minutes of structured treatment during the site visit and the observed RHU group proved to be beneficial to EOP RHU patients, therefore, the institution was compliant with the RHU policy.

Impact of EOP Programming on MHCB and Crisis Intervention:

Since the prior site visit, SQ's MHCB increased from six to 12 beds, which resulted in transfers from other institutions. According to SQ nursing staff, during the reporting period there was a substantial increase in the number of patients admitted to the MHCB and one-to-one suicide watch. It was unclear if this increase in admissions was due to the additional beds, additional EOP patients, or other factors including transfer of the condemned population to other facilities. Staff reported that the MHCB may increase by another six beds in the coming months.

SQ did not activate CIT for any EOP patients during the review period.

Mainline EOP Programming:

Beginning in February 2024, SQ's H unit began receiving additional mainline EOP patients while staffing allocations and treatment space remained the same until May 31, 2024, when the mental health staff previously assigned to the condemned population was reassigned to treat mainline EOP patients.

*Structured Treatment*

According to Program Guide requirements, each EOP patient shall be offered at least ten hours per week of structured therapeutic activities. If the patient was scheduled for less than ten hours per week, the patient's IDTT is required to meet monthly to review and increase the amount of structured therapeutic activities or refer the patient to a higher level of care. *See* ECF No. 7333-1 at 55-59.

During the review period, mainline EOP patients were offered an average of 11.5 hours of weekly structured treatment, meeting the Program Guide requirement of ten hours per week. However, as a result of staffing issues, the weekly average hours of structured therapeutic activities offered to EOP patients during the most recent 12-week treatment cycle (which ended

during the site visit) decreased to seven hours per week. Additionally, provided data indicated a high percentage of scheduled groups were canceled by mental health staff. However, SQ indicated that this was a data entry issue, which had since been corrected with training and supervision.

The Special Master's team attended four mainline EOP therapy groups on July 30, 2024; 13 to 25 patients attended each group. The facilitating clinicians were prepared and conscientious. Many of the patients were actively engaged in the therapies, but the size of two of the groups (19 and 25 patients) resulted in significant limitations.

The patients reported being offered five to seven hours of weekly therapeutic activities during the most recent treatment cycle. They confirmed meeting with their primary clinician every week and psychiatrist monthly. However, these meetings, often occurred in non-confidential settings due to office space limitations. Continuity of medications was not an issue. Patients reported wanting more process/core therapy groups, which they described as very helpful, and that the larger-sized groups were not as helpful as the smaller groups. The patients uniformly reported that pre-release planning services were not available to them, though the information provided by the pre-release supervisor indicated otherwise. Very few EOP patients reported participating in educational activities, jobs, or ISUDT services.

The expert also observed two recreational groups that were adequately facilitated by recreational therapists.

SQ held community meetings weekly in each EOP dorm to discuss concerns and programming questions. The monitor's expert observed multiple community meetings which were poorly attended and essentially informational meetings.

Although the number of hours of structured therapeutic activities offered to patients decreased below Program Guide requirements in the 12 weeks leading up to the site visit, the institution was compliant with the ten hour requirement during the review period. Though the size of the groups provided limitations, clinicians were prepared, and patients were actively engaged.

*IDTTs*

The Program Guide requires that a patient receive an initial IDTT within 14 calendar days of arrival to the institution and every 90 days thereafter. *See id*. at 59. The required attendees include the patient's assigned primary clinician, assigned psychiatrist, assigned correctional counselor, and the patient themselves. *See id.* The IDTT should address treatment needs, develop treatment plans, assess treatment progress, and include pre-release and discharge planning. *See generally id*.

The monitor randomly selected and reviewed the healthcare records of 40 mainline EOP patients to assess compliance with Program Guide timeframes during their stays. Of those, 21 patients required initial IDTTs; ten or 48 percent timely occurred within 14 calendar days of arrival or level of care change. Required assigned staff were present at 20 or 95 percent and patients attended 14 or 67 percent of initial IDTTs. The reasons initial IDTTs were held in *absentia* included patient refusals.

Twenty-five patients required routine IDTTs. There were 26 expected timeframes, of which five or 19 percent timely occurred every 90 calendar days. Of the seven routine IDTTs that occurred during the review period, required staff attended six or 86 percent and patients attended three or 43 percent. Routine IDTTs were held in *absentia* due to patient refusals.

Randomly selected patient case reviews revealed additional concerns, including: initial psychiatric and PC assessments were not consistently completed prior to IDTTs; IDTT documentation rarely included treatment goals, rationale for EOP level of care, or discharge criteria; routine IDTTs occurred infrequently; and diagnostic discrepancies between the psychiatrist and PC often went unnoticed and were not addressed in IDTTs or in documentation.

Mental health staff reported that, during the review period, a triage system was in place; consequently, routine IDTTs were not scheduled and priority was placed on IDTTs for newly admitted EOP patients. The triage system was no longer in place at the time of the site visit and, as a result, routine IDTTs generally occurred timely.

Overall, initial and routine IDTTs did not occur timely and were deficient due to initial assessments not being completed prior to the IDTT, insufficient documentation, and diagnostic discrepancies were not addressed as required. Therefore, SQ's IDTTs were not compliant with Program Guide requirements.

*Individual Treatment*

The Program Guide requires that EOP patients receive an initial psychiatry evaluation before their initial IDTT and within 14 calendar days of arrival or level of care change. *See* ECF No. 7333-1 at 55-59. It also requires that confidential routine psychiatric contacts are to occur at least every 30 calendar days after the initial psychiatric evaluation. *See id*.

The monitor randomly selected and reviewed the healthcare records of 40 mainline EOP patients to assess compliance with Program Guide timeframes during their stays.

Twenty patients required initial psychiatry evaluations. Sixteen or 80 percent timely occurred before the initial IDTT and within 14 calendar days of arrival or change in level of care; 17 or 85 percent were conducted in confidential settings. SQ did not utilize telepsychiatry in any

capacity. SQ was not compliant with the timely completion of initial psychiatry evaluations, though the institution neared compliance.

Thirty-eight EOP patients required routine psychiatry contacts; 77 percent timely occurred at least every 30 calendar days. Of the 98 reviewed routine contacts, 23 percent were conducted in confidential settings. The reasons for non-confidential contacts included lack of available treatment space, patient refusals, or modified programming. SQ was not compliant with the timely completion of routine psychiatry contacts in confidential settings.

Additionally, within 14 calendar days of arrival or level of care change, EOP patients must receive an initial primary clinician evaluation followed by confidential primary clinician contacts, either by individual or group psychotherapy, at least weekly, with individual clinical treatment mandatory every other week. *See id.*

Twenty-one EOP patients required initial primary clinician evaluations; 19 or 90 percent were timely completed within 14 calendar days of arrival or change in level of care and 16 or 76 percent were conducted in confidential settings. Reasons for non-confidentiality included modified programming, unavailability of custody escorts, and lack of confidential space. SQ was compliant with the completion of timely initial primary clinician evaluations.

All 40 patients required routine primary clinician contacts; 89 percent timely occurred weekly with no more than ten calendar days between contacts. Of the 291 reviewed contacts, only 84 or 29 percent were conducted in confidential settings. Reasons for non-confidentiality included a lack of available treatment space, modified programming, or lack of available custody escorts. SQ reported no routine contacts conducted via tele-Psychologists or tele-Social Workers. However, SQ utilized psychology interns and unlicensed psychologists for primary

clinician contact and groups. While close to compliance, SQ was not compliant with the completion of timely routine primary clinician contacts.

# APPENDIX B

## CLINICAL CASE REVIEWS

**California Correctional Institution (CCI)**
**July 23, 2024 – July 25, 2024**

**Patient A**

This 34-year-old EOP patient's healthcare record was reviewed to assess the quality of mental health care provided at CCI. The patient was previously provided diagnoses of schizophrenia and opioid use disorder, moderate. He received intramuscular aripiprazole by a PC 2602 order due to danger to self and grave disability. Benztropine was prescribed prn for extrapyramidal symptoms; the patient almost never requested that medication. The patient received MAT, and he was prescribed buprenorphine-naloxone for opioid use disorder.

Following discharge from a nearly six-month stay at the CHCF PIP, the patient arrived at CCI on January 26, 2024 and was placed in the EOP.

The patient had been incarcerated in CDCR from 2009 to 2011, 2012 to 2015, and 2019 to present. He first began receiving mental health services in 2013 at the 3CMS level of care, and since then received treatment at the EOP, EOP modified, MHCB, 3CMS, acute and intermediate levels of care. The patient had a history of three suicide attempts in the community. While in the CDCR, he presented with disorganized thinking, labile mood, hallucinations, avolition, blunted affect, alogia, delusions of reference, and delusions that his food was adulterated with feces, urine, and razors. The delusions resulted in meal refusal and significant weight loss in 2023. He had a history of childhood sexual abuse and early-onset alcohol, cannabis, opioid and methamphetamine use, as well as medical conditions including thrombocytopenia, previously treated hepatitis C, and hernia repair.

Five-day follow-up contacts at CCI occurred timely; although, the patient declined confidential settings, and full assessment was not possible. Custody wellness checks were discontinued by the psychiatrist on day two, and mental health follow-up contacts were discontinued after the fifth follow-up encounter.

The initial mental health assessment occurred timely, but evaluation of current mental status and treatment needs were limited because the patient declined a confidential setting and was seen only briefly at cell front. The assessment and accompanying SRASHE relied extensively on prior assessments in the healthcare record. The patient was assessed with high chronic and low acute suicide risk. The initial psychiatric assessment occurred timely and documented the psychiatrist's concerns that the patient was psychopathic and did not suffer from schizophrenia, and that the utility of the patient's medication was questionable. The psychiatrist provided diagnoses of antisocial personality disorder with prominent psychopathic traits; opioid, stimulant, alcohol, and cannabis use disorders; and possible methamphetamine-induced psychotic disorder.

The initial and routine IDTT meetings occurred timely. The patient and required team members attended those meetings in person; although, the IDTT documentation did not indicate whether the participating correctional counselor was assigned to the patient. No case formulation was documented, and the treatment plan template was not utilized. An outdated interdisciplinary plan of care auto-populated into the initial treatment plan form but did not reflect current treatment

planning. The quarterly IDTT documentation reflected the patient's desire to taper aripiprazole. The patient was appropriately retained at the EOP LOC at that time.

The patient was seen by his assigned psychiatrist in person and in confidential settings on March 28, May 24, and July 11, 2024. Psychiatric progress notes documented the rationale for reducing the dosage of aripiprazole on May 24 and July 11, 2024. On July 16, 2024, the PC 2602 order was renewed due to danger to self and grave disability.

The patient was offered treatment weekly by his primary clinician through caseload group and individual encounters. Most individual encounters occurred in a confidential setting, but occasionally occurred at cell front due to the patient's refusal of a confidential setting, short staffing, or custody issues. Progress notes did not document any interventions provided, and progress notes on February 27, 2024 and March 11, 2024 were identical in wording and typographical errors. The patient declined to attend all but three caseload group sessions. Quarterly follow-up SRASHEs were completed timely and determined that the patient remained at high chronic risk but low acute risk, with no warning signs of imminent suicide.

During the 22 weeks of EOP care reviewed, the patient was offered an average of 9.51 hours of structured mental health treatment weekly. On average, he attended only 3.94 hours which primarily consisted of recreational therapy and board games. Recreational therapy progress notes on March 11, March 13, March 25, and July 9, 2024 indicated both that the sessions were cancelled and that the patient attended.

During the review period, the patient received multiple RVRs for battery on a prisoner, fighting, refusing to accept assigned housing, and delaying a peace officer. Mental health assessments found no contribution of mental illness to the alleged violations.

**Findings**

The care and treatment provided to this patient were inadequate.

Treatment plans did not include a case formulation, a concern given the disparate views of the patient's psychiatric conditions and treatment needs articulated in earlier assessments. Treatment plan documentation failed to identify treatment targets, measurable goals, and interventions. Psychiatric care was balanced and methodical but not provided with sufficient frequency. Primary clinician progress notes for individual encounters did not document interventions and largely consisted of monitoring the patient's mental health. Primary clinician and recreational therapy progress notes occasionally appeared to be cut-and-paste records of prior sessions; and in several cases, the documentation was unclear as to whether the recreational therapy session occurred. The reasons for the patient's persistent refusal of structured therapeutic activities, including caseload group sessions, were not adequately explored or addressed.

**Patient B**

This 36-year-old EOP patient's healthcare record was reviewed to assess the quality of mental health care provided at CCI. The patient was provided diagnoses of PTSD; major depressive disorder, recurrent, with psychotic features; and amphetamine-type substance use disorder, moderate, in sustained remission. Opioid use disorder, severe, and cannabis use disorder,

moderate to severe, were also noted. He was prescribed aripiprazole, duloxetine, mirtazapine, and hydroxyzine to treat depression and anxiety; the patient also received MAT and was prescribed buprenorphine-naloxone to treat opioid use disorder. He was medication adherent.

The patient transferred to CCI on April 18, 2024 and was continued at the EOP level of care.

The patient had been incarcerated in the CDCR since 2009 and began receiving CDCR mental health services two months after intake. Prior to incarceration, he had two psychiatric hospitalizations. In the CDCR, he received mental health services at the 3CMS, EOP/EOP modified, MHCB, and acute levels of care. The frequency of his MHCB placements increased over time. According to the patient, his MHCB placements were driven by substance use. He had a history of childhood sexual and physical abuse and recurrent self-harm, including cutting, ingestion and insertion of foreign bodies, suicidal ideation, and multiple suicide attempts. Medical conditions included thalassemia with iron deficiency, talipes planus, benign prostatic hyperplasia, dysphasia, gastroesophageal reflux disease, inactive tuberculosis, bruxism, constipation due to opioid therapy, congenital hearing loss, successful hepatitis C treatment, and a history of San Joaquin Valley fever.

The initial psychiatric assessment at CCI was timely, thorough, and included an explanation for adding the antipsychotic aripiprazole for treatment of the patient's depression. The documentation did not indicate whether the assessment was in person or conducted in a confidential setting. The initial mental health assessment was not completed until May 7, 2024, and was limited due to the patient's unwillingness to participate long enough to obtain current clinical information. However, it was conducted in a confidential setting. In an accompanying SRASHE, the psychologist concluded that the patient was at moderate chronic risk and low acute risk for suicide.

The initial IDTT meeting occurred on May 15, 2024 and was attended by the patient and required team members; although, IDTT documentation did not indicate whether the participating correctional counselor was assigned to the patient. The patient was included in the SRMP. CBT and DBT-informed treatment were selected to address the patient's risk for self-injurious/suicidal ideation. The treatment plan documented the patient's participation, identification of treatment goals, strengths, and three treatment problems with accompanying objectives, measurable goals, and interventions. Although the goals were measurable, no baseline measurement was provided. The patient was noted to be stable, motivated, and improving.

The patient was placed in the RHU for safety reasons on May 24, 2024 after meeting with his PC and reporting that he had relapsed on methamphetamine and had information to provide to custody regarding the presence of illicit drugs, cell phones, and weapons in the EOP. The initial psychiatric assessment for this placement occurred on May 29, 2024, and the mental health assessment occurred the following day. Both assessments were conducted in person in a confidential setting and were adequate.

The initial RHU IDTT meeting occurred on June 4, 2024, and was attended by the patient and required team members. The patient was continued in the SRMP. CBT and specific skills training were identified to address risk for suicidal ideation. The patient's strengths and

verbalized treatment goals were documented. The treatment plan problems, objectives, goals, and interventions were unchanged from the May 15, 2024 treatment plan.

During the review period, the patient was seen by his assigned primary clinicians weekly. Most encounters were conducted in a confidential setting; the exceptions occurred in the RHU, when the patient refused a confidential setting. Progress notes demonstrated careful attention to the patient's mental status and documented specific interventions that followed the treatment plan. The patient was seen by his assigned psychiatrist monthly. The documentation confirmed collaborative and effective treatment with medications. The patient was cooperative with mental health appointments, adherent with medications, engaged in CBT treatment with workbooks, and largely abstinent from illicit substances.

During the seven weeks of EOP care reviewed, the patient was offered an average of 5.48 hours of structured treatment weekly but attended a weekly average of only 3.04 hours of that treatment. He was engaged in GED classes, computer classes, and the Transitions program prior to being placed in the RHU.

**Findings**

The care and treatment provided to this patient were adequate.

Despite delays in completing the initial mental health assessment and the initial IDTT meeting; the assessment and treatment planning process was effective in identifying the patient's risks and treatment needs and the interventions to be provided. Interventions were clinically appropriate, and required individual encounters were provided and followed the treatment plan. Continuity of treatment was maintained when the patient was transferred to the RHU for safety reasons. Patient engagement with treatment was good. Areas for improvement include obtaining baseline measures for treatment goals and providing sufficient structured therapeutic activities.

**Patient C**

This 31-year-old EOP patient's healthcare record was reviewed to assess the quality of mental health care provided at CCI. The patient was previously provided diagnoses of unspecified schizophrenia spectrum and other psychotic disorder; a provisional diagnosis of unspecified bipolar disorder was also documented. He was prescribed olanzapine and loxapine for psychotic symptoms and impulsivity, and hydroxyzine prn for anxiety. The medications were subsequently discontinued during the review period.

The patient transferred to CCI on January 3, 2024 and was continued in the EOP at that time.

The patient was incarcerated in the CDCR from 2011 to 2015 without the need for mental health treatment. The patient was re-incarcerated in 2016 and began receiving mental health services at the 3CMS level of care at that time. The patient subsequently received mental health services at the EOP, MHCB, and acute levels of care. He had a childhood history of losing his father, running away, multiple group/foster homes, gang membership, criminal activity, and cannabis and alcohol use. The patient had one suicide attempt while incarcerated. Medical conditions included elevated blood pressure, obesity, bilateral ocular hypertension, herpes simplex, chronic shoulder pain, asthma, tinea pedis, and tinea kerion of the beard.

The initial mental health and psychiatric assessments occurred timely but were cursory. The initial mental health assessment did not indicate whether it occurred in a confidential setting and largely relied on historical information pulled from the electronic healthcare record. The initial psychiatric assessment occurred at cell front. The psychiatrist found no signs or symptoms of a mood or psychotic disorder and provided diagnoses of stimulant, cannabis, and alcohol use disorders, possible stimulant-induced psychotic disorder, with provisional diagnoses of synthetic cannabis use disorder, and possible synthetic cannabinoid-induced psychotic disorder.

The initial IDTT meeting occurred on January 17, 2024 and was attended by the required team members; although, the IDTT documentation did not indicate whether the participating correctional counselor was assigned to the patient. Although the patient had three or more MHCB admissions during the prior six months and was therefore flagged for consideration of referral to a higher level of care; it was determined that the patient was stable and would be retained in the EOP and maintained in the SRMP. DBT, CBT, and psychoeducation were identified as interventions to improve the patient's coping skills and medication adherence. The treatment plan template was not used, and measurable goals were not identified.

Routine IDTT meetings occurred timely and were attended by the required team members, but the documentation did not indicate whether the participating correctional counselor was assigned to the patient, and the patient declined to attend. Although the assigned psychiatrist attended, no psychiatric reviews of the updated treatment plans were present. Updated treatment plans did not include documentation of the patient's strengths, verbalized treatment goals, problems/symptoms, short-term objectives, measurable long-term goals, or interventions. The IDTT documentation indicated that the patient was removed from the SRMP during the March 27, 2024 IDTT meeting and again during the June 12, 2024 IDTT meeting.

Following the initial psychiatric assessment, the patient was seen by the assigned psychiatrist four times during the review period on January 17, January 26, February 27, April 23, and June 12, 2024. The patient was switched from olanzapine to loxapine to reduce risks of further weight gain, and loxapine was then tapered and discontinued at the patient's request. Hydroxyzine was also discontinued to avoid risk of glaucoma. The psychiatric documentation provided evidence of collaboration with the patient as well as monitoring of the patient's mental status and potential side effects of medication.

The patient was seen for individual primary clinician encounters every other week. Documentation of those encounters was consistent with "check-ins" rather than treatment, and interventions were not documented. Four sessions occurred at cell front due to time constraints or other factors. The patient did not attend nearly half of PC caseload group sessions. Notes for group sessions did not include narrative comments about the patient's participation. Quarterly follow-up SRASHEs were completed timely and determined that the patient remained at high chronic risk but low acute risk, with no warning signs of imminent suicide.

During the 25 weeks of EOP services reviewed, the patient was offered an average of 11.04 hours of structured mental health treatment weekly. Of those, he attended an average of 6.85 hours weekly. He prioritized attending education classes and pursuing his GED, which resulted in him being discontinued from the DBT group and missing six of 13 PC caseload groups. When he requested to be re-enrolled in the DBT group, he was placed on a waiting list.

On February 28, 2024, a mental health assessment occurred for an RVR alleging indecent exposure on April 28, 2023 that occurred well prior to the patient's arrival in the CCI EOP. The assessment concluded that mental illness did not contribute to the alleged violation and that, should the patient be found guilty of the RVR, he should be permitted to retain access to the yard, reading and writing materials, and group therapy.

**Findings**

The care and treatment provided to this patient were inadequate.

The initial and quarterly treatment plans were not adequate to guide treatment or to measure treatment progress. Psychiatric treatment did not occur as frequently as needed, and the patient was not seen for seven weeks following complete discontinuation of all psychotropic medication. Primary clinician documentation did not record the provision of interventions and often appeared to reflect brief wellness monitoring rather than treatment interventions. Symptoms of depression that emerged after discontinuation of psychotropic medications were not adequately addressed. A significant concern was conflicting ducats and schedules. The patient's education classes were held at the same time as assigned groups, including the PC's caseload group, resulting in missed PC contacts through much of the review period.

**Patient D**

This 34-year-old EOP patient's healthcare record was reviewed to assess the quality of mental health care provided at CCI. The patient was provided diagnoses of unspecified schizophrenia spectrum and other psychotic disorder; somatic symptom disorder; amphetamine-type substance use disorder, moderate; cannabis use disorder, moderate to severe; alcohol use disorder, moderate to severe; opioid use disorder, mild; and antisocial personality disorder. He was prescribed quetiapine, fluphenazine, aripiprazole, venlafaxine, valproic acid, and buspirone for his psychotic, mood, and anxiety symptoms. Metformin was prescribed to manage metabolic side effects of quetiapine. The patient was partially adherent with those medications.

The patient arrived at CCI on January 5, 2024 and received EOP care from January 5 to May 15, 2024, when he was transferred to the HDSP RHU after an altercation.

The patient had a history of substance use, expulsion from school, homelessness, juvenile and adult incarceration, and community psychiatric hospitalizations for psychosis. His criminal history was significant for attempted murder of a cellmate in county jail and alleged murder of a cellmate in the CDCR, with trial pending at the time of this review. His record indicated three prior suicide attempts by hanging, jumping from a bridge, and overdosing, as well as a TABE score of 1. He was incarcerated in the CDCR from 2010 to 2011, 2013 to 2018, and 2019 to present. His CDCR mental health treatment began in 2016 with multiple levels of care changes between the 3CMS, MHCB, ICF, and EOP levels of care. Prior to his arrival at CCI, the patient's psychiatric symptoms included delusions that his family was using magic and voodoo to sexually assault and/or kill him. He filed multiple police reports and PREA allegations driven by those beliefs, and psychotic symptoms were noted to persist despite high doses of antipsychotic medications. Additionally, the patient had a small ventricular septal defect, left

ventricular hypertrophy, and a heart murmur. A mass on his scalp, stage two chronic kidney disease, and a left knee brace for arthritis were also noted in his healthcare record.

Following his arrival at CCI, he reported that family members were instructing him to kill someone in the CDCR and that spirits, demons, angels, Jesus, and Satan were sexually assaulting him. He reported command auditory hallucinations telling him to harm others. The patient was seen promptly for those symptoms. The initial mental health and psychiatric assessments also occurred timely and prior to the initial IDTT meeting. Neither assessment indicated whether the encounter was in a private and confidential setting. Both assessments appeared adequate.

The initial IDTT meeting occurred on January 17, 2024 and was attended by the patient and required team members, although documentation did not indicate whether the participating correctional counselor was assigned to the patient. The team noted that the patient had four prior MHCB stays in December 2023 but determined that he did not require transfer to a higher level of care because he was stable and may have reported symptoms strategically to obtain MHCB placement. It was determined to place him in a CBT group to develop positive problem-solving skills and insight into maladaptive behavior, as well as to monitor his symptoms and consider lowering his level of care to 3CMS if he remained stable. The patient's strengths and verbalized treatment goals were not documented, but appropriate and measurable treatment goals and interventions were documented. The assigned psychiatrist indicated that the patient's psychotic disorder was substance induced.

The quarterly IDTT meeting occurred timely and was attended by the patient and required team members. During the meeting, the team determined to provide the patient with psychoeducation on how to address psychosocial stressors and to add a prn dose of fluphenazine at noon to address anxiety that was thought to interfere with group attendance. Patient strengths and verbalized treatment goals were not documented. Treatment objectives, goals, and interventions were continued without change, and the patient's progress and response to treatment were not documented. The initial and routine IDTT treatment plans erroneously stated that the patient was prescribed oxcarbazepine. A psychiatric progress note accompanying the routine IDTT meeting indicated a plan to pursue a PC 2602 order.

The patient was seen by his assigned psychiatrist regularly at least monthly during the review period. Those encounters were confidential, in person, and in general were well-documented. Significant efforts were made to address the patient's anxiety, agitation, and psychotic thinking, along with the patient's preference for his medications in liquid rather than pill form. Multiple medication trials were provided, and additional doses of scheduled and prn antipsychotic medications were prescribed at the patient's request.

However, psychiatric documentation regarding the patient's psychotropic medications was internally inconsistent and incomplete. Several psychotropic medications were discontinued without accompanying psychiatric documentation. An order for quetiapine expired and had to be renewed by a covering psychiatrist; the patient did not receive the medication dose for two weeks, from April 28, 2024 to May 12, 2024. Additionally, two recommendations from a covering psychiatrist that the patient be evaluated for the addition of an antidepressant received no documented response from the assigned psychiatrist; additionally, an antidepressant was

discontinued as of January 29, 2024 without an accompanying psychiatric note providing the rationale.

The primary clinician met with the patient on average three times a month during the review period, including caseload group and individual encounters. Several individual encounters occurred at cell front and mentioned that time constraints impacted the clinician's ability to see the patient in a confidential setting. Primary clinician progress notes did not document the interventions directed by the treatment plan, and treatment efforts to enhance the patient's ability to cope with auditory hallucinations and stress were largely missing from those notes. The notes included consideration that the patient may have been using methamphetamine in the EOP. No laboratory results were obtained until April 19, 2024, when toxicology results were negative for illicit substances but positive for buprenorphine and norbuprenorphine. The patient was not prescribed buprenorphine-naloxone until after departing the CCI EOP.

During the 15 weeks of CCI EOP care reviewed, the patient was offered an average of 9.86 hours of structured mental health treatment weekly. Of those, he attended an average of 4.25 hours weekly; the groups were primarily recreational therapy and leisure activities such as board games.

The patient's stay in the CCI EOP was significant for multiple RVRs and medical first responder incidents. Mental health assessments were conducted for alleged rule violations including indecent exposure at CSP/Corcoran; and at CCI, failure to present for count, being out of bounds, and delaying a police officer in performance of duties. In each case, the psychologist found no contribution of mental illness to the alleged behaviors and recommended that the patient be permitted to retain reading, writing, and therapeutic materials in the event he was sanctioned for the RVRs. Progress notes referred to another indecent exposure RVR in the CCI EOP. No mental health assessment for that RVR was located.

Multiple first medical responder encounters, as well as primary and secondary assessments were required due to the patient's reports of falling and having a transmitter implanted in his scalp, having his intestines burned by unidentified others, experiencing chronic chest wall or heart pain, or experiencing anxiety and wanting his medications early. In each case, medical findings were negative except for a finding of premature ventricular contractions.

**Findings**

The care and treatment provided to this patient were inadequate.

Although the treatment plan was appropriately developed with specific goals and interventions, subsequent documentation did not confirm that the planned interventions were provided. The patient's progress towards treatment goals and acquisition of identified coping skills were not documented. The patient's refusal to participate in substantive therapeutic groups was not adequately addressed. Psychiatric care appeared to be thoughtful, but the underlying reasons for the patient's nonadherence were not adequately explored. Changes to psychotropic medications were sometimes not accompanied by psychiatric documentation, and multiple medication changes did not result in stabilization of the patient's symptoms or behavior. The lapse of an

evening dose of antipsychotic medication for two weeks due to an expired order may have contributed to the patient's psychiatric and behavioral challenges.

**Patient E**

This 31-year-old EOP patient's healthcare record was reviewed to assess the quality of mental health care provided at CCI. The patient was provided diagnoses of major depressive disorder, recurrent, mild, and PTSD. He was prescribed aripiprazole for transient, stress-related psychotic symptoms and antidepressant augmentation, fluoxetine for depression, diphenhydramine prn for anxiety, and melatonin prn for insomnia. He received his psychotropic medications by a PC 2602 order due to danger to self, and he used diphenhydramine with increasing frequency over the course of the review period; he used melatonin only occasionally.

The patient returned to CCI on January 25, 2024 from a short RHU stay at CMC while he attended a court hearing. He was continued in the CCI EOP at that time.

The patient had a history of substance use, childhood physical, emotional and sexual abuse, special education classes, juvenile arrests, adolescent and adult cocaine and cannabis use, and multiple episodes of self-injurious or suicidal behavior that reportedly began in early adolescence. He was incarcerated in the CDCR from 2014 to 2016 when he received mental health services at the 3CMS level of care. The patient returned to the CDCR in 2018 when he received mental health services at the 3CMS, MHCB, acute, and EOP levels of care. A PC 2602 order due to danger to self was granted on March 23, 2023 and was renewed for six months on February 20, 2024.

At CMC prior to the patient's most recent return to CCI, the patient was identified as transgender (male to female) in a January 16, 2024 mental health consult and a January 22, 2024 initial psychiatric assessment. Male pronouns were listed in the EHRS banner and used throughout the CCI EOP records, and no records from his current EOP stay referred to the patient as transgender. Medical conditions included chronic eczema, allergic rhinitis, hyperlipidemia, a history of traumatic brain injury, and a history of arterial repair in the right elbow following a self-inflicted injury during a suicide attempt.

An abbreviated initial mental health assessment was conducted timely and was adequate given the patient's very recent assessments and treatment in the CCI EOP from December 21, 2023 to January 12, 2024. The initial psychiatric assessment occurred late on February 13, 2024, but was otherwise adequate. The patient's aripiprazole dose was lowered due to concerns that fluoxetine was causing aripiprazole levels to be elevated.

The initial IDTT meeting occurred late on February 14, 2024. The patient and required team members attended. The documentation did not indicate whether the participating correctional counselor was assigned to the patient. The IDTT documentation adequately addressed the patient's failure to attend at least half of his mental health appointments, identified interventions to improve his attendance, and incorporated a thoughtful case formulation. The patient's strengths and verbalized treatment goals were documented, but the treatment plan template was not utilized. As a result, the treatment plan did not identify target problems or symptoms, short-term objectives, measurable long-term goals, or interventions.

The update IDTT meeting occurred timely and documented the patient's ongoing depression and non-attendance with mental health appointments. Again, the patient and required team members attended. The treatment plan template was again not utilized. The patient's progress was noted to be unchanged in the psychiatry review of the treatment plan.

Following the initial psychiatric assessment, the patient was seen just once in a confidential setting by his assigned psychiatrist. That encounter occurred on February 15, 2024, two days after the initial psychiatric assessment. The patient was not seen again until April 19, 2024. The encounter occurred at cell front, because the patient declined to receive services in a confidential setting. The aripiprazole dosage was increased due to worsening symptoms of depression. The psychiatrist saw the patient again on June 7, 2024 and July 6, 2024. Both encounters also occurred at cell front, as the patient declined a confidential setting. Medication administration records for that period indicated that the patient's use of diphenhydramine increased in frequency.

The primary clinician offered weekly contacts with the patient that alternated between caseload group and individual sessions. The patient attended only two of the eight group sessions documented in the healthcare record; those progress notes did not include any individual comments about the patient's participation. Most individual encounters occurred in a confidential setting, but the patient refused such settings on several occasions, resulting in brief, nonconfidential encounters. Apart from a single instance in which the progress notes indicated the PC provided empathy and active listening, there was no documentation of the treatment interventions provided.

During the 22 weeks of EOP care reviewed, the patient was offered an average of 12.42 hours of structured mental health treatment weekly. Of those, he attended an average of 5.42 hours weekly.

On July 4 and July 6, 2024, the patient declared an emergency, reported that he was suicidal, and then denied that he was suicidal. SRASHEs completed on those dates assessed the patient with low acute risk and high chronic risk, and there were no signs of imminent suicide risk present. Those assessments represented an increase in his chronic risk for suicide, as the April 8, 2024 SRASHE concluded that the patient was at moderate rather than high chronic risk. No instances of self-harming behavior were documented during the review period.

**Findings**

The care and treatment provided to this patient were inadequate.

The initial IDTT meeting occurred late, and the treatment plan documentation did not provide measurable goals or specify interventions. The identification of the patient as transgender at CMC shortly before return to CCI was not recognized or explored by the EOP team. Psychiatric care did not occur timely or with sufficient frequency, and in many cases did not occur in a confidential setting to ensure accurate and collaborative assessment of the patient's concerns and symptoms. Individual primary care contacts occurred regularly but often appeared brief and did not document interventions to address the patient's symptoms. It was unclear how or if the patient's PTSD was addressed. His refusal of mental health appointments, increased reliance on

prn diphenhydramine, and behaviors such as declaring medical emergencies and suicidal crises suggested that the patient's symptomatology worsened during the review period.

**Patient F**

This 65-year-old EOP patient's healthcare record was reviewed to assess the quality of mental health care provided at CCI. The patient was provided diagnoses of unspecified depressive disorder; delusional disorder; stimulant use disorder, severe; alcohol use disorder, moderate to severe; PCP use disorder, moderate to severe; and cannabis use disorder, moderate to severe. He was prescribed and was consistently adherent with mirtazapine.

The patient transferred from an ASU Hub to CCI on January 25, 2024 and was continued in the EOP at that time.

The patient had a lengthy history of incarceration and mental health treatment in the CDCR. His first incarceration was in 1986, and he was continuously incarcerated since 1996 when his mental health treatment in the CDCR began. He received mental health services at the 3CMS, EOP, EOP modified, MHCB, and ICF levels of care. From 2013 to 2015, he received his psychotropic medications by a PC 2602 order due to danger to others. He had no history of self-injurious or suicidal behavior. Medical conditions included cardiomyopathy, benign essential hypertension, dyslipidemia, a history of acute coronary syndrome, bifascicular block, gastroesophageal reflux disease, stage two chronic kidney disease, benign prostatic hyperplasia, chronic low back and right knee pain.

The initial mental health assessment was completed timely at CCI and contained an adequate mental status examination but was largely populated by information from prior EHRS entries. The initial psychiatric assessment was completed 21 days after the patient's arrival and found the patient to be free of mood or thought disorder. While the assessment acknowledged historical diagnoses of unspecified depressive disorder and delusional disorder, the psychiatrist provided only substance use disorder and medical diagnoses. Mirtazapine was continued without documentation of rationale or target symptoms.

The initial IDTT meeting occurred on February 21, 2024, nearly a month after his arrival. The patient and required team members attended. The IDTT documentation appropriately discussed the patient's refusal of treatment, determined to retain him at the EOP level of care, and identified appropriate interventions to address treatment refusal, tangential communication, to support pre-release planning, and to evaluate the patient for modified EOP by the next IDTT meeting. IDTT documentation incorporated a January 16, 2024 entry that indicated the diagnosis of unspecified depressive disorder was added, because the patient was prescribed mirtazapine at that time without a corresponding diagnosis. The February 21, 2024 treatment plan documented one patient strength and the patient's verbalized treatment goal. The treatment plan template was not used; therefore, symptoms, problems, objectives, measurable goals and interventions were not identified. Psychiatry review of the treatment plan documented that mirtazapine was prescribed for depression and anxiety, and that the patient was improving.

The quarterly IDTT meeting occurred on May 1, 2024, but the IDTT documentation did not pass a CDCR internal audit, and the IDTT met again on May 29, 2024 to update and correct the May

29, 2024 IDTT documentation. The patient attended the May 1 but not the May 29, 2024 IDTT meeting. The required team members attended both meetings. Neither the May 1 nor the May 29, 2024 treatment plan was completed, although both templates reflected a February 21, 2024 interdisciplinary plan of care for depressed mood.

Following the initial psychiatric assessment, the patient was seen only twice for a psychiatric encounter, on April 26, 2024 and June 27, 2024. Both encounters were conducted in person by the assigned psychiatrist; the first occurred in a confidential setting, and the second occurred at cell front. In those encounters, the psychiatrist documented possible delusional thinking and included a diagnosis of delusional disorder by history. Mirtazapine was continued.

The patient was offered weekly contacts with his assigned PC, alternating between individual encounters and caseload group sessions. Most individual encounters occurred in a confidential setting but were brief. The documentation did not reflect the provision of interventions and instead focused on recording patient statements, mental status including the presence of tangential and non-bizarre delusional thinking in several encounters, and overall stability. The patient did not attend eight of ten caseload group sessions offered during the review period, and the documentation for the two sessions he attended did not include any narrative about the patient's participation. Initial and quarterly SRASHEs were completed timely and determined that the patient was at low acute and chronic suicide risk with no signs of imminent suicidality present.

During the 22 weeks of EOP care reviewed, the patient was offered an average of 11.77 hours of structured mental health treatment weekly. Of those, he attended an average of only 4.06 hours of treatment weekly.

**Findings**

The care and treatment provided to this patient were inadequate.

The initial IDTT meeting was late, and the treatment plan template was not used in any of the three IDTT meetings reviewed. As a result, measurable treatment goals and corresponding interventions were not documented. Reconciliation of the delusional disorder diagnosis and treatment were not documented. Despite the patient's delusional thinking, there was no documentation of pharmacological treatment for this symptom or the clinical rationale for not providing such treatment. The diagnosis of unspecified depressive disorder was not resolved, which was problematic particularly given that the diagnosis was driven by a prescription of mirtazapine rather than assessment of signs and symptoms of depression. The PC encounters did not document the provision of therapeutic interventions. The patient's refusal of structured programming was not adequately addressed, and the planned evaluation of the patient's potential need for modified EOP was not completed. Insufficient psychiatric follow-up was provided, and the rationale for prescribing mirtazapine was not documented.

**Patient G**

This 37-year-old EOP patient's healthcare record was reviewed to assess the quality of mental health care provided at CCI. The patient was provided diagnoses of unspecified schizophrenia spectrum and other psychotic disorder; adjustment disorder with disturbance of conduct; and

antisocial personality disorder. Provisional diagnoses of stimulant use disorder, stimulant-induced psychotic disorder, and cannabis use disorder, moderate to severe were also documented. He was prescribed olanzapine for possible psychotic symptoms for a brief portion of the review period.

The patient arrived at CCI on October 26, 2022, and was placed at the EOP level of care on December 21, 2023.

The patient was born and raised in Mexico and reported that he was sexually molested at age 14. He came to the United States at age 19; his primary language was Spanish with limited English comprehension, and he had a TABE score of 2. He was incarcerated in the CDCR from 2011 to 2012 without the need for mental health services. He returned to the CDCR at the beginning of 2014 when he was placed at the 3CMS level of care later that year. He denied receiving mental health services prior to 2014. Since then, the patient received mental health services at the 3CMS, MHCB, EOP, EOP modified, acute, and intermediate levels of care. He also had a history of SNY classification. He was remanded for competency restoration treatment in 2020, and he received his psychotropic medications by a PC 2602 order due to grave disability and danger to others in 2020 and 2021. The patient's medical history included a childhood seizure disorder and clostridium difficile enteritis as an adult. He continued treatment for a seizure disorder at CCI.

His transfer from 3CMS to EOP occurred due to an increase in psychotic symptoms and threatening behavior after antipsychotic medication was discontinued due to nonadherence.

The initial psychiatric and mental health assessments occurred timely and on the same day. The initial psychiatric assessment found the patient to be free of psychotic signs and symptoms and noted that the patient had a documented history of bragging that he had feigned psychotic symptoms. The initial mental health assessment documented the patient's persecutory delusions that he was being stalked and chased by someone using technology with the intent of harming him, that scars on his abdomen were evidence of that persecution, that the patient did not know how or when the injuries occurred, and that the district attorney was investigating the issues. This assessment also referenced the possibility that the patient's symptoms were feigned or substance induced. Neither assessment provided recommendations for reconciling the diagnostic ambiguity. A SRASHE completed with the initial mental health assessment found no history of self-harm or suicide attempts and concluded that the patient's acute risk was low and chronic risk was moderate, with no warning signs of imminent suicide present.

The initial and routine IDTT meetings occurred timely and were attended by the required team members, although documentation did not indicate whether the correctional counselor was assigned to the patient. The patient refused to attend those meetings. Patient strengths and verbalized treatment goals were documented, and an interdisciplinary plan of care for delusions was incorporated; but the treatment plan template was not used on either occasion. Accordingly, there were no target symptoms/problems, objectives, measurable goals or interventions listed in the treatment plan. The case formulation was inadequate, failed to answer the template's prompting questions, and was inconsistent with the routine IDTT conclusion that the patient's behavior was antisocial in nature. Although a plan to consider the patient for a higher level of care due to psychotic symptoms was documented by the primary clinician prior to the routine

IDTT meeting, the routine IDTT documentation did not contain any information reflecting the possibility of a psychotic disorder or the need for increased treatment.

Following the initial psychiatric assessment, the patient was seen by his assigned psychiatrist only twice in a confidential setting, on January 4, 2024 and March 29, 2024. He was seen at cell front for brief psychiatric encounters on February 9, 2024, May 30, 2024, and July 9, 2024; in each case the patient declined to meet in a confidential setting. On January 4, 2024, the psychiatrist suspected that the patient was engaged in negative impression management or exhibiting signs of substance-induced psychosis. On February 9, 2024, March 29, 2024, and May 30, 2024, the psychiatrist found the patient to be free of signs, symptoms, or sequalae of psychosis. On July 9, 2024, the psychiatrist recommended placement in a higher level of care where the patient could be more closely monitored and assessed for diagnostic clarification.

During that time, olanzapine was briefly prescribed for psychotic symptoms but discontinued from January 25, 2024 to July 10, 2024 due to medication nonadherence and the psychiatrist's determination that the patient did not have a psychotic disorder. The January 25, 2024 order to discontinue the antipsychotic medication was entered by another psychiatrist and not by the assigned psychiatrist and was accompanied by a note that asserted that the patient did not have a primary psychotic disorder. The patient was not seen by the psychiatrist who discontinued the medication. Olanzapine was prescribed again on July 10, 2024 due to possible decompensation, odd and dangerous behaviors for which secondary gains could not be identified, and very poor judgment. The patient remained nonadherent with olanzapine but accepted a single dose on the morning he was transferred from CCI.

In contrast to psychiatric findings, the PC repeatedly observed the patient to be paranoid, delusional, disjointed, incoherent, agitated, pressured, impulsive, odd or bizarre, uncooperative, and combative. Elevated mood was also occasionally noted. Eleven of the 15 individual PC encounters during the review period occurred in nonconfidential settings due to the patient's refusal or custody issues. Of those, eight sessions were conducted at cell front. Of the ten PC caseload group sessions offered during the review period, the patient attended only one full session and half of two other sessions. The primary clinician was bilingual and encouraged the patient to speak in Spanish to support clarity of communication.

During the 23 weeks of EOP care reviewed, the patient was offered an average of 9.75 hours of structured mental health treatment weekly. However, he attended an average of only 1.85 hours of such treatment each week and reported that he did not like groups because he had no mental illness.

During his EOP stay, the patient was placed in the RHU overnight following an altercation with another incarcerated individual. Additionally, five mental health assessments were conducted for RVRs alleging behavior which could lead to violence, possession of a deadly weapon, refusing to accept assigned housing, fighting, and battery on a prisoner. The assessments found that mental illness did not contribute to the alleged behavior and recommended that the patient retain access to yard, reading and writing materials, group therapy, and exercise should he be found guilty of the RVRs. In contrast, a July 10, 2024 chart review note indicated that the treatment team and supervising psychologist concluded that the patient's "decompensated mental health" was the primary driver of the behaviors resulting in RVRs.

The patient remained at the EOP level of care until July 12, 2024 when he transferred to the SVSP PIP for intermediate care, and an emergency petition for a PC 2602 order was initiated due to grave disability and a danger to others.

**Findings**

The care and treatment provided to this patient were inadequate.

The EOP team failed to recognize the severity of the patient's mental illness until multiple RVRs were incurred. That failure occurred despite the primary clinician's repeated documentation of delusional, incoherent, paranoid, and pressured thinking. There was inadequate reconciliation of discrepant diagnostic impressions, inadequate case formulation, inadequate consideration of the patient's prior history of involuntary treatment, and inadequate treatment planning. Most care provided by the assigned psychiatrist and assigned primary clinician occurred in nonconfidential settings. Discontinuation of antipsychotic medication was ordered by a psychiatrist who had not seen the patient during the current course of treatment. The mental health assessments conducted for the patient's RVRs failed to detect the role of the patient's paranoia and thought disorder in the alleged behaviors, failed to recognize the patient's gravely impaired insight, and failed to appreciate that the patient's violence towards others in the EOP was part of a previously identified pattern of being a danger to others due to mental illness. The referral to a higher level of care was appropriate but considerably delayed.

**Patient H**

This 40-year-old EOP patient's healthcare record was reviewed to assess the quality of mental health care provided at CCI. The patient was provided diagnoses of bipolar I disorder, schizoaffective disorder, bipolar type, opioid use disorder, and antisocial personality disorder. He was prescribed aripiprazole for mood stability, buspirone and hydroxyzine for anxiety, and mirtazapine for dysthymia and anxiety. The patient was inconsistently adherent with those medications. The patient received MAT, and he was prescribed buprenorphine-naloxone for opioid use disorder and was adherent with that medication.

The patient arrived at CCI on January 22, 2024 and was continued at the EOP level of care.

The patient had five prior incarcerations in the CDCR, the first occurred in 2008; the most recent CDCR incarceration occurred in June 2022. The patient began receiving CDCR mental health services in 2017 that included treatment at the 3CMS, EOP, EOP modified, MHCB, and intermediate levels of care. He had a history of self-injurious and suicidal behavior, early loss of his father, extensive childhood and adult substance use, homelessness, and gang membership since childhood. The patient's medical conditions included congenital scoliosis, back pain, carpal tunnel syndrome, hand pain, and glaucoma.

The initial mental health assessment was completed timely and adequately. The initial psychiatric assessment was completed on February 9, 2024 and was adequate. The psychiatrist indicated that the patient's atypical reports of auditory hallucinations raised doubts about whether the patient had a psychotic or mood disorder. The psychiatrist provided diagnoses of stimulant, opioid, cannabis, and alcohol use disorders, each of which was moderate or severe.

The initial IDTT meeting did not occur until April 24, 2024, three months after the patient arrived to the EOP. The patient and required team members attended, although documentation did not indicate whether the correctional counselor was assigned to the patient. The treatment plan identified impulsive behavior as the treatment target, remaining free of rules violations as the objective, releasing to the community on the expected parole release date as the long-term goal, and CBT as the intervention. Administrative challenges in coordinating the patient's treatment and work schedules were identified as driving an appearance of high treatment refusal, and it was determined to maintain the patient in the EOP.

The patient transferred to the RHU from June 19, 2024 to June 25, 2024 after receiving an RVR for possession of a deadly weapon. He was returned to the EOP on June 25, 2024. Initial mental health and psychiatric assessments upon his return occurred timely; the mental health assessment was cursory. An initial EOP IDTT meeting occurred on July 3, 2024. Again, the patient and required team members attended. The case formulation addressed the patient's history of substance use and criminal behavior, but not his anxiety. The administrative challenges in coordinating his schedule identified in the earlier IDTT meeting persisted, resulting in the patient being identified as a high treatment refuser. The IDTT determined to retain the patient in the EOP. The treatment plan was unchanged and did not indicate the patient's response to interventions.

After the February 9, 2024 initial psychiatric assessment, the patient was not seen by the psychiatrist until April 19, 2024. The psychiatrist saw the patient on two more occasions in April, twice in May, and twice in June 2024; those contacts occurred as a result of wellness checks, responses to patient requests, regularly scheduled clinic appointments, and the second initial psychiatric assessment following the patient's release from the RHU and return to EOP. The order for aripiprazole expired on April 1, 2024 and was not renewed; however, no psychiatric documentation provided justification for the decision to discontinue the antipsychotic medication. However, in a May 30, 2024 encounter, the psychiatrist discontinued diagnoses of bipolar disorder and schizoaffective disorder due to lack of evidence for those conditions. Instead, the patient was provided a diagnosis of unspecified anxiety disorder. During the June 28, 2024 initial psychiatric assessment, the psychiatrist resumed aripiprazole at a low dose to support mood stability. The diagnosis of unspecified anxiety disorder was continued.

Individual and group caseload sessions were provided weekly during the review period, except during June 2024 when only one PC encounter occurred. With one exception, primary clinician progress notes for individual encounters did not document the provision of any therapeutic interventions. The exception occurred when a psychologist covering for the assigned PC assisted the patient in identifying goals that made life worth living. Otherwise, individual encounters appeared to be brief and focused on monitoring the patient's overall status and conducting a brief mental status assessment. The patient attended just two of the ten caseload group sessions offered during the review period. Progress notes for those two group sessions did not include individual comments regarding the patient's participation.

During the 19 weeks of EOP care reviewed, the patient was offered an average of 10.00 hours of structured mental health treatment weekly. Of those, he attended only 4.35 hours each week. During the April 24, 2024 IDTT meeting, the patient reported that he was not being released from his job to attend his EOP groups due to conflicts with his work schedule. Separately, on

July 17, 2024, the patient's toxicology report was positive for methamphetamine, indicating a need for dual diagnosis treatment.

One mental health evaluation for an RVR occurred during the review period. The RVR alleged possession of a deadly weapon, and the assessment found that there was no contribution of mental illness to the alleged behavior and recommended that the patient retain access to yard, reading, writing and therapy materials, and exercise.

**Findings**

The care and treatment provided to this patient were inadequate.

The initial psychiatric assessment was completed several days late, and no IDTT meeting occurred during the first three months of the patient's stay in the EOP. The case formulation did not address his target symptom of anxiety, and a clear rationale for the diagnosis of unspecified anxiety disorder was not documented. Treatment was limited. A 67-day gap between psychiatric encounters occurred between February 9, 2024 and April 19, 2024. Only one primary clinician contact occurred during the month of June 2024. Interventions provided by the primary clinician during individual sessions were not documented, and it was unclear how individual PC sessions followed the treatment plan. Persistent scheduling conflicts between the patient's work assignment and mental health groups were not timely resolved. The patient's failure or inability to attend 80 percent of the offered caseload group sessions resulted in greatly diminished contact with his primary clinician and with CBT interventions.

**Patient I**

This nearly 49-year-old transgender (male-to-female) patient's EOP healthcare record was reviewed to assess the quality of mental health care provided at CCI. The EHRS banner indicated no preference for pronouns and male pronouns were used throughout the CCI healthcare record; however, the patient expressed preference for female pronouns during EOP treatment. She was provided diagnoses of bipolar I disorder, most recent episode depressed, moderate, and hypersomnolence disorder. She was prescribed aripiprazole for antidepressant augmentation, fluoxetine for anxiety and depression, prazosin for trauma-related symptoms, lamotrigine for depression, propranolol for anxiety, and diphenhydramine prn for insomnia and extrapyramidal symptoms. She was generally adherent with scheduled medications and did not take the prn diphenhydramine.

The patient arrived at CCI on February 9, 2024, having transferred from an ASU Hub, and was continued at the EOP level of care

The patient had been incarcerated in the CDCR continuously since 1994 and first received mental health treatment in 2006. After an extended period of treatment at the 3CMS level of care, she was first placed at the EOP level of care on November 7, 2013. Since that time, she had received mental health services at the EOP, EOP modified, MHCB, and acute levels of care. Periods of placement at the 3CMS level of care in 2017 were brief and were followed by MHCB placements. She had a history of traumatic brain injury and coma in infancy, childhood physical abuse, foster care, gender dysphoria in adolescence, head-banging, four suicide attempts including three by hanging, and use of alcohol, cannabis, methamphetamines, and cocaine. Her

medical conditions included chronic kidney disease, degenerative joint disease, lumbar spondylosis, pes planus, neck and shoulder pain due to a suspected torn rotator cuff, hypertension, successfully treated hepatitis C, tinea versicolor, and benign prostatic hyperplasia.

On February 13, 2024, she submitted health care services requests indicating she was changing her gender and requesting gender-affirming medication and transgender services, including a gender identity questionnaire (GIQ) interview. A request for transgender evaluation was approved through the medical utilization management program the following day. On February 21, 2024, the patient was seen for a mental health consult after reporting depression due to not wanting to be housed at CCI. During the encounter, the patient reported concerns about personal safety due to her transgender identity. She was referred to a DBT group, and the correctional counselor was contacted regarding the patient's request for a GIQ interview.

The initial mental health assessment did not occur until February 29, 2024, and was not entered into the healthcare record until March 4, 2024. The documentation of the assessment consisted primarily of information populated from prior assessments and encounters, and identified treatment goals as reduction of automatic thinking patterns that caused poor mood and expansion of distress tolerance skills to control angry outbursts. An accompanying SRASHE found the patient to be at high chronic and low acute suicide risk with no signs of imminent suicide present. The initial psychiatric assessment did not occur until March 27, 2024. Regarding the patient's existing diagnosis of bipolar disorder, the psychiatrist concluded that there was no compelling history to support that diagnosis. Instead, the psychiatrist offered mental health diagnoses of antisocial personality disorder, and stimulant, opioid, cannabis, and alcohol use disorders, with a provisional diagnosis of adjustment disorder.

The initial IDTT meeting did not occur until April 3, 2024, almost two months after the patient arrived to CCI. The patient and required team members attended, although IDTT documentation did not clarify whether the correctional counselor was assigned to the patient. The patient's non-attendance at groups was explored, and the patient was retained in the EOP. Although the case formulation that populated from a prior evaluation at another institution was well done and remained clinically appropriate; it was not updated. The IDTT documentation did not identify the patient's strengths or verbalized treatment goals. The treatment plan template was not used; therefore, no target problems/symptoms, short-term objectives, long-term measurable goals, or interventions were provided.

A timely routine IDTT meeting occurred on June 12, 2024. The patient and required team members attended. IDTT documentation did not indicate if the correctional counselor was assigned to the patient, did not list the patient's strengths or verbalized treatment goals, and did not utilize the treatment plan template. No discussion that the patient met criteria for gender dysphoria was recorded, and the case formulation was not updated considering her transgender identity.

Following the initial psychiatric assessment, the patient was seen by the assigned psychiatrist on April 9, 2024, June 6, 2024, and July 4, 2024. A psychiatric encounter was also recorded for June 12, 2024, likely in connection with the IDTT meeting on that date. A diagnosis of unspecified depressive disorder was made on April 9, 2024 and continued through the remaining encounters. The documentation reflected attention to the patient's symptoms and psychotropic

medications, including potential interactions among prescribed medications, and medication adjustments were accompanied by documentation of the rationale for the changes. No discussion of gender dysphoria or transgender issues was documented in those encounters.

The patient was seen regularly by her primary clinician during the review period through individual and caseload group contacts. Seven of the 12 individual sessions offered during the review period occurred in a confidential setting; of those, four progress notes specified the interventions provided. Those interventions were consistent with the IDTT documentation. Four PC encounters occurred at cell front due to time constraints or custody-related issues, and the patient refused one session. She attended all but one of the caseload group sessions; progress notes for those contacts did not include any individual comments regarding her participation, but group content was clinically appropriate for her treatment needs. She attended ten of 17 DBT groups provided during the review period.

During the 20 weeks of EOP care reviewed, the patient was offered an average of 12.32 hours of structured mental health treatment weekly. She attended an average of 4.85 hours of those activities weekly. While some of her refusals occurred for recreational groups, the majority occurred for education classes. During the June 12, 2024 IDTT meeting, she reported that she was concerned for her safety on the yard and therefore was not attending education classes.

The primary clinician completed a mental health gender dysphoria diagnostic criteria assessment on April 16, 2024. The patient was found to meet the criteria for a diagnosis of gender dysphoria, and a referral for gender-affirming hormone therapy or other medically-related care was made. The patient reported a desire to commence hormone treatment; separately, she submitted a health care request asking for gender-affirming surgery. The referral for hormone therapy was pending at the time of this review.

A mental health assessment occurred on February 28, 2024 for an RVR alleging refusal to accept assigned housing. The assessment documented the patient's safety concerns regarding celling with aggressive or agitated individuals and noted that a diagnosis of borderline personality disorder had previously been recommended for consideration. The assessment found that there was no contribution of mental illness to the alleged behavior.

**Findings**

The care and treatment provided to this patient were inadequate.

Some of the treatment provided was appropriate. The gender dysphoria evaluation was completed timely, enrollment in the DBT group was clinically appropriate, notes from several PC individual encounters documented clinically appropriate interventions, and medications were adjusted to address changing symptoms and potential medication interactions. However, the initial mental health assessment, initial psychiatric assessment, and initial IDTT meeting occurred late and did not adequately address the treatment needs arising from the patient's history of trauma. Divergent diagnoses were not adequately reconciled, the diagnoses of unspecified depressive disorder and hypersomnolence disorder were not resolved, and the potential diagnosis of borderline personality disorder that was referenced in the IDTT and RVR mental health assessment, was insufficiently explored. The impact of the patient's transgender

identity and gender dysphoria were not considered in documented formulations of the patient's treatment needs, and the patient was addressed in the records by her non-preferred pronouns.

**Patient J**

This 41-year-old EOP patient's healthcare record was reviewed to assess the quality of mental health care provided at CCI. The patient was provided diagnoses of schizophrenia and polysubstance dependence. At the time of his transfer to CCI, he was prescribed paliperidone palmitate intramuscularly every four weeks for psychosis. The patient arrived at CCI on January 20, 2024 and was continued at the EOP level of care.

The patient had a history of psychiatric hospitalizations since late teenage years associated with childhood ADHD, fire setting, cruelty to animals, assaults, running away, and psychosis. He required competency restoration services at the time of his most recent arrest for a reportedly unprovoked murder. His CDCR incarceration started in 2013, and he had received mental health services at the 3CMS, EOP, EOP modified, MHCB, acute, and intermediate levels of care. The patient's symptoms included severe self-neglect, poor hygiene, disorganized and bizarre behavior, social withdrawal, depression, confusion, catatonia, paranoid and delusional thinking, agitation, and poor insight. He received treatment under a PC 2602 order from 2013 to February 24, 2022 due to danger to self, danger to others, and grave disability. Some mental health documentation recorded a history of self-injury and suicide attempts, while other assessments indicated that he had no known suicide attempts.

He had a history of alcohol use disorder, amphetamine use disorder, and cannabis use disorder dating to age 10. The psychiatrist documented simultaneous use of crack cocaine, PCP, heroin, and methamphetamine in the community, as well as episodic substance use in the CDCR. The patient's medical conditions included a vitamin D deficiency, constipation, a right hydrocele, and hypertension. He tested positive for hepatitis C antibody during the review period.

The initial mental health and initial psychiatric assessments occurred on January 25, 2024. The patient refused to leave his cell or engage with either the psychologist or the psychiatrist for those assessments; as a result, he was seen at cell front. The assessments consisted largely of visual observation and historical information gleaned from the patient's healthcare record.

Prior to his arrival at CCI, the patient had refused injections of paliperidone palmitate in December 2023 and January 2024. At CCI, his next dose was offered on February 1, 2024. He refused, and the medication was discontinued on February 29, 2024 due to the patient's consistent refusals and the psychiatrist's assessment that the patient appeared euthymic and free from signs or sequelae of psychosis. Aside from a brief and refused trial of oral paliperidone, no other psychotropic medications were prescribed during the review period.

The initial IDTT meeting occurred timely and was attended on site by the required team members but not the patient, who refused to attend. The documentation did not indicate whether the participating correctional counselor was assigned to the patient. The team determined that the patient did not meet criteria for consideration of transfer to a higher level of care, despite extensive treatment refusal. Although the treatment plan incorporated a May 3, 2023 IPOC, the treatment template was not used. The patient's current strengths, short-term objectives,

measurable long-term goals, and interventions were not documented. A psychiatry review for this IDTT meeting was started but not completed as of mid-July 2022.

A second IDTT meeting occurred on April 24, 2024. Again, the required team members attended, the patient declined to attend, and the documentation did not indicate whether the correctional counselor was assigned to the patient. The team noted that the patient had refused to participate in treatment, was psychiatrically stable, and may be exhibiting possible negative symptoms of schizophrenia including alogia, apathy, lack of emotion, social withdrawal, and avolition. He reportedly maintained his hygiene and possessed strong self-advocacy skills. Patient strengths, treatment objectives, goals, and interventions were not documented. A third IDTT meeting occurred on May 30, 2024, and it was noted that the April 24, 2024 treatment plan did not pass an internal CDCR audit. The May 30, 2024 treatment plan essentially repeated the April 24, 2024 documentation but with a stronger statement that the patient was exhibiting negative symptoms of schizophrenia. Again, the treatment plan template was not used.

Throughout the review period, psychiatric and primary clinician contacts occurred exclusively at cell front due to the patient's refusal to be seen in the treatment office. Following the initial psychiatric assessment, the patient was seen by psychiatry once more in February, once in March, and twice in May, and the most recent psychiatric encounter on May 14, 2024. On each occasion, the patient refused to engage with the psychiatrist, and the psychiatrist found the patient to be stable, uncooperative, and free from overt signs of psychosis.

Between February 8, 2024 and July, 15, 2024, the PC saw the patient twice a month. In each case, the patient refused to acknowledge or engage with the PC. The documentation demonstrated attention to the patient's hygiene, demeanor, and the cleanliness of his cell, as well as to collateral information provided by correctional officers. Both psychiatric and primary clinician contacts consisted of monitoring of the patient's mental health status from those signs, as the patient did not engage in treatment.

The patient's overall course showed little therapeutic movement. He initially refused dinner plates to protest not receiving a kosher diet. He consistently refused group programming, refused to leave his cell, and refused to acknowledge or engage with mental health staff when they came to his cell. He did not shower but was thought to use his sink to clean himself.

The patient submitted repeated and at times nearly identical health care services requests focused on his diet, his scrotum, and concerns that he had colon cancer. In the health services requests and medical encounters, the patient indicated that he needed a kosher diet to address his scrotal swelling and needed nutritional supplementation because he had colon cancer. With few exceptions, he nevertheless also refused medical care offered in response to his requests. He refused most laboratory work, vitals, medical appointments, and medications.

Beginning on March 24, 2024, the patient asserted in several health care services requests that he was engaged in a hunger strike to obtain desired dietary supplementation and medical care. He was placed on a hunger strike monitoring protocol on April 2, 2024 and often refused to speak with nursing staff who were monitoring him. He consistently refused laboratory monitoring for his hunger strike. On April 10, 2024, he received an RVR for failure to respond to notices, and the subsequent mental health assessment concluded that there were no contributory mental health

factors to the violation. His hunger strike ended on April 12, 2024 when he was provided a liquid nutritional supplement with an agreement that it would be ordered for him for 31 days. Weight monitoring indicated he lost nearly 18 pounds between January 30, 2024 and April 15, 2024, a concerning development that was not reflected in the mental health documentation.

During the 23 weeks of EOP care reviewed, the patient was offered an average of 9.29 hours of structured treatment weekly. He refused nearly all those services, attending only an average of 0.05 hours of such treatment weekly. There was minimal improvement in his engagement following his hunger strike.

**Findings**

The care and treatment provided to this patient were inadequate.

The treatment team did not establish current treatment goals or provide active treatment interventions addressing the patient's symptoms and behavior. Those included persistent negative emotional, interpersonal, and volitional symptoms, somatic preoccupation that included the false belief that he was suffering from colon cancer, a hunger strike resulting in an 18-pound weight loss associated with this thinking, and persistent refusal to acknowledge treatment providers' presence let alone engage in treatment. The patient's lengthy history of involuntary treatment for psychotic symptoms prior to arriving at the EOP appeared to have received little consideration. The possibility of somatic delusions and potential role of mental illness in his hunger strike and rule violation report were not adequately explored. Insufficient psychiatric and primary clinician encounters were offered. Conflicting documentation that the patient had engaged in self-injury and suicide attempts, and that the patient had not engaged in such behavior, was not reconciled.

**Patient K**

This 55-year-old patient's healthcare record was randomly selected to assess the adequacy of care provided in the newly established CCI EOP. He was provided diagnoses of antisocial personality disorder and intermittent explosive disorder; however, his providers provided alternative diagnoses. He was prescribed Zyprexa, Strattera, Remeron, and Effexor.

The patient transferred to CCI on January 10, 2024.

The initial primary clinician assessment was completed at cell front, as the patient refused a confidential session. Other than a history of traumatic brain injuries, chronic auditory hallucinations, and an unclear suicide attempt history; the documentation did not include sufficient clinical information regarding psychiatric history, current symptoms, or impact on functioning. Some sections of the initial assessment were not completed, and others included outdated information from April and July 2023, which lacked context. The documented diagnoses of intermittent explosive disorder, antisocial personality disorder, and bipolar I disorder, depressed with psychotic features lacked clinical rationale.

The initial psychiatric assessment included current symptoms of grief, hypersomnia, and auditory hallucinations; however, the patient's treatment and psychiatric history were not documented. His hallucinations were assessed as atypical, and he had not been observed

responding to internal stimuli. The documented diagnoses included unspecified depressive disorder, cannabis and opioid use disorder, and stimulant use disorder, with a likely history of stimulant induced bipolar disorder. The documentation indicated a long history of stability on his current medication regimen which was not changed.

The initial and routine IDTT meetings were completed in absentia due to patient refusals. The assigned providers were in attendance, but it was unclear if the correctional counselor was assigned to the patient. The patient had a long history of treatment refusals which continued at CCI. The documentation indicated that the patient isolated to avoid peer conflict. The primary clinician also attributed the lack of treatment engagement to ongoing pain and lack of motivation. The provided nonreferral rationale and treatment modifications were reasonable. Individualized and measurable treatment goals and interventions were not established.

The primary clinician contacts alternated between caseload groups and individual contacts. Most primary clinician contacts occurred at cell front, primarily due to treatment refusals followed by lack of clinician time to conduct a confidential session. The clinician made reasonable attempts to engage and to encourage the patient to attend treatment. Treatment interventions were occasionally offered and included in-cell programming and breathing exercises. The documentation from June 11, 2024 indicated a change in the patient's diagnoses that included removal of bipolar disorder and intermittent explosive disorder and the addition of a diagnosis of unspecified depression which was not updated in EHRS.

Monthly psychiatric contacts occurred with the assigned provider except during March and June 2024. Cell front contacts occurred due to patient refusals. The patient was stable and without reported distress on most of the reviewed dates. However, in May 2024, he experienced mild depressive symptoms after his medications were tapered and discontinued due to refusing laboratory studies. After completion of the necessary laboratory studies, the medications were resumed. During June 2024, the patient reported feeling agitated and reported auditory hallucinations. The auditory hallucinations were assessed as atypical, and the clinicians determined that the patient was not experiencing hallucinations. The patient had a pattern of variable medication adherence that was not addressed by the psychiatrist.

Except for clinician caseload groups, most groups were provided by recreational therapists. The patient consistently refused group treatment. The rationale for group assignment was not clearly documented.

**Findings**

The care and treatment provided to this patient were marginally adequate.

The patient appropriately was seen by his assigned primary clinician timely, and the primary clinician attempted to engage this treatment-resistant patient; additionally, the overall psychiatric care was appropriate. However, insufficient initial provider assessments and treatment planning, lack of attention to medication nonadherence, and lack of diagnostic clarification with clinical rationale rendered the assessment of care as marginal. Coordinated care by providers and custody was needed to address his lack of treatment attendance and to develop safe ways for him to engage in treatment and to improve his perception that he could safely attend treatment. It

was unclear whether the providers fully understood the extent of the patient's traumatic brain injuries and psychiatric history and their impact on his functioning. Routine consultation with custody regarding the patient's functioning was also needed. It was unclear how the current recreational group assignment met this patient's treatment needs.

**Patient L**

This 32-year-old patient's healthcare record was randomly selected to assess the adequacy of care provided in the newly established CCI EOP. The patient was provided diagnoses of bipolar I disorder by history, antisocial personality disorder with prominent sociopathic traits, and provisional diagnoses of schizotypal personality disorder and autism spectrum disorder; additionally, the patient was provided several substance use disorder diagnoses. He was prescribed lithium and Wellbutrin, and he received his psychotropic medications by a PC 2602 order. At the time of the review, he was housed on A yard.

He transferred to CCI on April 4, 2024.

The initial primary clinician assessment was overly brief regarding current clinical presentation. Diagnoses, psychotropic medication, and a history of cutting for "self-modification" were documented as presenting problems. Documentation of the patient's psychiatric history was insufficient. Specifically, the history of present illness section was copied by multiple providers from at least January 2023 but was not documented as unoriginal. As documentation was not indicated as unoriginal; the included current mental status was a misrepresentation, and the documentation did not provide a useful summary of the patient's mental health history. Other documentation was copied from November 2023 and January 2024. A suicide risk assessment indicated that the patient's most recent self-harm incident occurred in 2020, and he was assessed with low acute and high chronic suicide risk.

The initial psychiatric assessment was not completed until April 25, 2024. The psychiatrist noted the presence of odd beliefs, such as the patient had his own religion that he created, and a history of self-harm for cosmetic purposes. It was documented that the patient had inserted a razor in his eye for spiritual and religious purposes which resulted in blindness. The patient attended his only routine psychiatric contact on June 25, 2024. At that time, his medications were adjusted to address depressive symptoms, and he was assessed as stable.

The patient attended the initial IDTT meeting that occurred on May 8, 2024, almost one month after his arrival to CCI. The assigned providers were in attendance. Despite documentation in IDTT and the initial primary clinician assessment that the patient wanted to work on impulsivity, anger, and defiance; treatment goals were not developed to address the stated treatment needs. Instead, measurable treatment goals targeted substance use and depression, with identified evidence-based treatment interventions of CBT and DBT.

The patient attended routine biweekly primary clinician contacts which generally occurred in a confidential setting. The two nonconfidential individual contacts were attributed to security issues. The documentation included a mental status and a brief summary of the patient's functioning. Treatment interventions were not documented.

Except for the biweekly primary clinician caseload groups, most groups were offered by recreational therapists. The patient's group attendance was poor; however, that concern was rarely addressed by the primary clinician.

**Findings**

The care and treatment provided to this patient were inadequate.

There were delays in the completion of the initial psychiatric assessment, routine psychiatric follow-up, and the initial IDTT meeting. The initial primary clinician assessment was insufficient, and clinical interventions were not utilized during primary clinician contacts. Treatment goals were not collaborative, as they did not include the patient's identified treatment needs. It was unclear how the current recreational group assignment met the patient's treatment needs.

**Patient M**

This 43-year-old patient's healthcare record was randomly selected to assess the adequacy of care provided in the newly established CCI EOP.. He was provided diagnoses of antisocial personality disorder, ADHD, and bipolar disorder. He was prescribed Trileptal, Benadryl, loxapine and Strattera. He previously received mental health services at the 3CMS, EOP, and ICF levels of care. He was housed on A yard at the time of the review.

He transferred to CCI on March 27, 2024.

The patient transferred to CCI from an MHCB where he was placed after making a suicidal statement. The patient reportedly made the suicidal statement to obtain a medication adjustment. The primary clinician documented the patient's presenting problem as "longstanding history of impression management…reckless and violent behavior in the context of severe ASPD [antisocial personality disorder] traits." The documentation in the history of present illness section was copied documentation from previous sources, including an initial MHCB IDTT and a brief paragraph from another unknown provider and timeframe. While the clinical summary section included a relevant summary of the patient's current clinical presentation, case formulation and sufficient psychiatric and psychosocial history were not included.

The delayed initial psychiatric assessment occurred on April 12, 2024. While the psychiatrist was reviewing the patient's medications, the patient stated, "see ya" and left the interview. Based on a healthcare record review, the psychiatrist questioned the veracity of the presence of bipolar disorder and opined that given the use of a "3rd line mood stabilizer," lack of manic symptoms, and long history of substance use; the more likely diagnosis was substance induced bipolar disorder.

The patient attended the initial IDTT meeting conducted on May 8, 2024, and the assigned treatment providers were in attendance. The patient was identified on the higher level of care report as a high treatment refuser. The pattern of missed appointments was attributed to frequently going out to court. The patient had been engaged in treatment since his arrival to CCI; thus, treatment modifications were not established. The IDTT documentation indicated that the patient wanted to work on increasing distress tolerance, coping with intermittent suicidal

ideation, decreasing reliance on higher level of care placement, and increasing his comfort level around peers; however, for reasons that were unclear, treatment goals to target those stated treatment needs were not implemented. The treatment plan section included a goal to eliminate suicidal ideation which was established on March 18, 2024; that coincided with his MHCB placement and was documented as met. The patient was continued at the EOP level of care; however, the rationale was not documented. Instead, generic discharge language criteria that lacked specificity was documented, such as six months without functional impairments. Of note, the patient's current functional impairments were unclear.

Monthly psychiatric contacts occurred with the assigned provider. The patient reported feeling depressed with intermittent, transient suicidal ideation without plan or intent. Strattera was requested due to past reports of benefit with depression and inattention. The patient was assessed as "exaggerating to some degree." The following month, the patient reported continued depression and daily suicidal ideation. He was assessed as not objectively exhibiting depressive symptoms. However, unspecified depressive disorder was added to the psychiatric diagnosis, and loxapine was added to target mood instability and impulsivity. During both contacts, the suicide risk assessment documented no change from the March 18, 2024 risk assessment, without consideration of an updated risk assessment on June 6, 2024 performed as a 90-day follow-up assessment.

In July 2024, the patient reported increased arguing and belief that "people are trying to make me do something"; however, he was not described with hypervigilance or signs of paranoia. Similarly, reports of hearing voices contrasted with observations that the patient did not appear to be responding to internal stimuli. It was determined that the patient did not have an underlying primary psychotic disorder.

Primary clinician contacts with the assigned clinician, which occurred on an alternating basis between individual contacts and caseload groups, generally occurred timely. Therapeutic interventions were sporadically offered for emotion regulation and anger management, but the overall focus of the contacts was monitoring the patient's mental status, adjustment and functioning. In contrast to psychiatric contacts, report of suicidal ideation was not documented by the primary clinician.

In addition to caseload groups, the patient was offered a DBT group. Most groups were offered by recreational therapists. The rationale for group assignment was not clearly documented.

**Findings**

The care and treatment provided to this patient were inadequate.

The initial psychiatric assessment and initial IDTT meeting did not occur timely, and individualized treatment goals for identified treatment needs were not completed. Overall, there was a lack of coordination of care between the psychiatrist and primary clinician for this patient who presented differently with both providers. Of concern, the psychiatrist failed to conduct or to refer the patient for a suicide risk assessment or communicate the patient's suicidal ideation to the primary clinician. It was unclear how the current recreational group assignment met the patient's treatment needs.

**Patient N**

This 36-year-old patient's healthcare record was randomly selected to assess the adequacy of care provided in the newly established CCI EOP. He was provided diagnoses of unspecified schizophrenia spectrum and other psychotic disorder, amphetamine-type substance use disorder, and "depression." He was prescribed Zyprexa prn.

The patient arrived at CCI on February 23, 2024.

The patient had received mental health services at the 3CMS, MHCB, acute and intermediate levels of care; his most recent inpatient hospitalization occurred in 2020, and the most recent MHCB placement occurred in 2022. His onset of mental health symptoms occurred during childhood.

The initial primary clinician assessment did not provide an appropriate summary of the patient's mental health history, recent symptoms, or functioning to assist with treatment planning. The documentation in the assessment was primarily copied from previous providers and was outdated (October 10, 2023 and January 3, 2023), and some the clinical and case formulation sections were not completed. Original documentation on the day of the assessment included diagnoses, medication, indication of suicide attempts, RVRs, safety concerns, and the stated goals of working on anxiety and coping with auditory hallucinations.

The initial psychiatric assessment included an appropriate assessment of psychiatric symptoms. The patient was assessed with stability and was provided diagnoses of stimulant use disorder, methamphetamine induced psychotic disorder, and cannabis and alcohol use disorders. It was unclear if the documentation of childhood onset of symptoms was considered in this diagnostic formulation. One psychiatric contact occurred during May 2024. During that contact, the patient reported feeling paranoid with intermittent auditory hallucinations and discussed odd and delusional thought content. His symptoms were assessed as likely due to long-term substance abuse and impression management. The rationale for a determination of impression management was not documented. At the patient's request, Zyprexa was discontinued, and Thorazine was initiated.

The initial IDTT meeting did not occur until May 15, 2024, more than two months after the patient's arrival to CCI. The patient and assigned providers attended. The patient was identified for consideration of referral to a higher level of care due to a pattern of treatment refusals. Treatment modifications of motivational interviewing and psychoeducation were appropriate but were not utilized in subsequent contacts. The nonreferral rationale included his stability, appropriate ADL's, self-advocacy and engagement in life-sustaining behaviors. However, the clinician's assessment of the patient's limited insight was not included, nor was specific information included regarding the patient's symptoms of grandiose delusional thinking or poor functioning, including isolating in his cell. Treatment goals and interventions were not established, including a treatment goal for discharge planning which was indicated. The patient was continued at the EOP level of care, but a rationale for continuation was not documented.

Primary clinician contacts alternated between individual and caseload groups. The patient did not attend groups, as he preferred to remain in his cell. Individual contacts frequently occurred

at cell front due to refusals and clinician scheduling. At times, the patient's thought content was delusional. There was some discussion of discharge planning, but otherwise treatment interventions were not utilized, and the documentation primarily indicated monitoring of the patient's clinical presentation.

Group treatment was primarily recreational therapy in content without clear rationale for group assignment.

**Findings**

The care and treatment provided to this patient were inadequate.

The initial primary clinician assessment was insufficient, and the initial IDTT meeting was delayed. Monthly psychiatric contacts did not occur timely. Treatment planning was not completed. Primary clinician contacts were not indicative of a meaningful therapeutic interaction. It was unclear how the current recreational group assignment met the patient's treatment needs. Psychiatric and EHRS diagnoses were discrepant and warranted clarification with rationale.

**Patient O**

This 37-year-old patient's healthcare record was randomly selected to assess the adequacy of care provided in the newly established CCI EOP. He was provided diagnoses of antisocial personality disorder, persistent depressive disorder, and schizophrenia. He was prescribed Zyprexa, Cymbalta, Remeron, and Vistaril prn. At the time of the review, he was housed on A yard.

The patient transferred to CCI on February 15, 2024.

The patient primarily received mental health services at the EOP level of care. He previously received mental health services at the 3CMS, MHCB, acute and intermediate levels of care. He was discharged from ICF level of care in April 2022.

The patient's current treatment needs were difficult to determine from the primary clinician assessment; in part, due to the patient's refusal to attend the assessment that by necessity was completed at cell front. Additionally, the documentation did not provide a sufficient summary of the patient's recent or historical treatment needs. Specifically, the mental status examination was not completed, the presenting problem section stated, "hx [history] of schizophrenia," without clinical information, and the history of present illness section was noted as "retained". Further, the documentation from an unknown timeframe and author provided an overview of various levels of care and dates without information regarding the patient's symptoms or functioning. Other documentation from the 'most recent charted response' was outdated, as it was from October 2023.

A thorough assessment of the patient's current symptoms was completed during the initial psychiatric assessment. The patient reported continued depression and vague paranoia and requested Wellbutrin for those symptoms. The patient was not willing to try alternative medication, and the psychiatrist determined that treatment with Wellbutrin was contraindicated

given his history of substance abuse and cheeking of medications. The patient was prescribed Zyprexa, Cogentin, Risperdal, Cymbalta and Vistaril. The assessment and documentation review did not support a primary diagnosis of a psychotic disorder and did not assess an indication for antipsychotic medication treatment; although, details were not specified. Risperdal was discontinued, and Zyprexa was decreased. The patient was provided diagnoses of stimulant, opioid, alcohol and PCP use disorders.

The initial IDTT meeting was delayed and did not occur until March 6, 2024. The documentation in the initial and routine IDTT meetings indicated that the assigned psychiatrist and primary clinician were in attendance. No higher level of care indicators were identified. The documentation indicated that the patient's report of symptoms was inconsistent with his clinical presentation during the recent psychiatric assessment. Consequently, the IDTT opined that the patient's clinical presentation was exaggerated to influence his level of care. It was documented that treatment goals would address improving coping skills and depressive symptoms; however, goals and interventions were not documented in the treatment plan. The plan was to discharge the patient to the 3CMS level of care at his second routine IDTT meeting. A rationale for continued treatment at the EOP level of care was not provided. The treatment team agreed that the patient did not have a diagnosis of schizophrenia but did have a diagnosis of persistent depressive disorder.

Primary clinician contacts alternated between individual and caseload groups as permitted and generally occurred timely. The patient did not attend caseload groups but generally attended individual primary clinician contacts; although, he was reportedly less engaged during the sessions after testing positive for methamphetamine during mid-April 2024. The documentation provided an overview of the patient's symptoms and functioning; although, there was no documentation of the provision of clinical interventions.

Monthly psychiatric contacts did not occur timely; there was no documentation of psychiatric contacts during April or June 2024. Medication adjustments occurred to target depression and insomnia. The psychiatric documentation was thorough and appeared appropriately based on the patient's clinical presentation. It appeared that it was determined that the patient exaggerated his symptoms, but the reason for his exaggerated presentation was unclear.

Groups were primarily facilitated by recreational therapists. The rationale for group assignment was not documented.

**Findings**

The care and treatment provided to this patient were inadequate.

The initial IDTT meeting and routine psychiatric care did not occur timely. The initial primary clinician assessment was insufficient for treatment planning development. During IDTT meetings, measurable treatment goals with clinical interventions were not developed. Clinical interventions were not utilized during clinician contacts. It was unclear how the current recreational group assignment met the patient's treatment needs. EHRS and provider diagnoses warranted clarification with clear rationale provided.

**Patient P**

This 32-year-old patient's healthcare record was randomly selected to assess the adequacy of care provided in the newly established CCI EOP. He was provided diagnoses of antisocial and narcissistic personality disorders, intermittent explosive disorder, substance induced bipolar disorder, PTSD, unspecified ADHD, and unspecified depressive disorder. He was prescribed Trileptal and clonidine. At the time of the review, he was housed on A yard.

The patient transferred to CCI on February 8, 2024.

The initial primary clinician assessment included minimal original clinical information regarding the patient's current symptoms, functioning, psychiatric history and treatment needs. Specifically, the documentation identified the patient's presenting problem as anger, irritability and feeling sad during the holidays. Most of the documentation was copied from December 2023, and the same information was copied throughout the document; the documentation was not responsive to prompts for specific information, nor did it provide a meaningful summary of the patient's history.

The initial psychiatric assessment did not occur until March 29, 2024, almost two months after arrival at CCI. The focus of the assessment was on the patient's current clinical presentation, and a descriptive narrative review of his psychiatric history was needed. The patient disclosed several losses and reported depression and anxiety. His medications were adjusted at his request. Without rationale, the diagnoses were changed to stimulant, opioid, cannabis, alcohol and PCP use disorders which did not account for identified symptoms of depression and anxiety.

The initial IDTT meeting did not occur until April 3, 2024, which was two months after CCI placement. The assigned providers and the patient attended the initial and routine IDTT meetings. The patient was identified at the initial IDTT meeting for consideration of referral to a higher level of care due to a pattern of treatment refusals; however, by the subsequent routine IDTT meeting, the issue was resolved as his refusals were attributed to scheduling issues. Treatment goals and interventions were not developed during the initial or routine IDTT meetings. The patient was continued at the EOP level of care; although the rationale for continuation was unclear. During the routine IDTT meeting, a plan to discharge the patient to 3CMS level of care at the next IDTT meeting in 30 days was documented; again, no clear rationale was provided.

Patient attendance was variable for primary clinician contacts which alternated between individual and caseload groups as permitted by the Program Guide. The primary clinician contacts appeared indicative of meaningful therapeutic interactions, and open discussion of various stressors including ongoing substance use with methamphetamine and heroin was documented.

Psychiatric contacts generally occurred monthly except during May 2024, when no contact was documented. At the time of this review on July 25, 2024, the patient was past due for a monthly psychiatric contact, as his previous contact occurred on June 7, 2024. After a period of improved symptomatology, the patient reportedly again misused his prescribed Trileptal, and the medication was subsequently changed to liquid form. The patient initially refused to take the

liquid medication, and it was discontinued, but it was subsequently resumed after the patient agreed to take the liquid form.

The rationale for group assignment was not documented. Most groups were recreationally based.

**Findings**

The care and treatment provided to this patient were marginally adequate.

The presence of meaningful primary clinician contacts did not outweigh the delay in the initial psychiatric assessment, untimely routine psychiatric contacts, delayed IDTT meetings, insufficient provider assessments, and lack of measurable, individualized treatment goals and clinical interventions. It was unclear how the current recreational group assignment met the patient's treatment needs. The plan to discharge the patient to a lower level of care without clear rationale was an area of concern.

Of note, the primary clinician documented active substance use; however, there was no indication that the issue was addressed in treatment or that the patient was referred for substance use treatment.

**Patient Q**

This 34-year-old patient's healthcare record was randomly selected to assess the adequacy of care provided in the newly established CCI EOP. He was provided diagnoses of adjustment disorder with mixed anxiety and depressed mood, as well as opioid, cannabis, and alcohol use disorders. He was prescribed BuSpar, Lexapro and Vistaril. The patient had received mental health services at the 3CMS and the MHCB levels of care. At the time of the review, he was housed on A yard.

The patient transferred to CCI on February 29, 2024.

The patient refused the initial primary clinician assessment which was then conducted at cell front. The documentation provided a summary of the patient's psychiatric and psychosocial history and recent stressors. It was documented that the patient acknowledged a history of "impression management" during several occasions of suicidal ideation to gain MHCB admission to have his needs met. That included his most recent MHCB admission in December 2023, when he reported suicidal ideation to obtain a phone call to speak with his ailing mother.

The initial psychiatric assessment did not occur until April 4, 2024, well over one month after CCI placement. Current symptoms were assessed, and the patient presented as mildly distressed due to familial concerns but was otherwise stable. His psychotropic medications were continued as prescribed, and the need for improved medication adherence was discussed. Routine psychiatric contacts were deficient. The patient was seen for a timely wellness check after his medications were discontinued due to a pattern of refusal of laboratory studies. The medications were resumed after adherence with laboratory orders in early May 2024; however, a follow-up contact was not scheduled until June 28, 2024 when the patient refused as he wanted to take a

shower. At the time of this review on July 26, 2024, the patient had not been seen for psychiatric contact in almost three months.

During the initial primary clinician assessment, treatment goals were documented as distress tolerance and avoiding misuse of mental health services. The assigned treatment providers and the patient attended the initial IDTT meeting. During the initial IDTT meeting, the patient's stated goals were to target depression, anxiety, and substance use; however, measurable goals and interventions were not documented in initial or routine IDTT documentation. The rationale for continued treatment at the EOP level of care with a plan to discharge the patient to the 3CMS level of care in 90 days was not clearly documented in the initial IDTT documentation. Similarly, the change of plan during the subsequent routine IDTT meeting to continue mental health services at the EOP level of care due to active participation and benefit of treatment was unclear, and specific details were not provided.

The primary clinician contacts alternated between individual and caseload groups as permitted by the Program Guide and generally occurred timely. The patient rarely attended caseload groups. Individual primary clinician contact documentation provided a brief summary of the patient's response to stressors, mental status, and overall functioning.

The primary group treatment modality was recreational in content and not routinely attended by the patient. The rationale for group assignment was not documented.

**Findings**

The care and treatment provided to this patient were inadequate.

The initial and routine psychiatric care was delayed, and the patient was not appropriately monitored. The patient was not seen for a timely initial IDTT meeting, and appropriate treatment planning with collaborative development of measurable, individualized treatment goals and interventions did not occur. The patient was routinely monitored by the primary clinician, but the documentation did not indicate that a meaningful therapeutic contact occurred with treatment interventions to assist the patient in managing distress. It was unclear how the current recreational group assignment met the patient's treatment needs.

**Patient R**

This 43-year-old patient's healthcare record was randomly selected to assess the adequacy of care provided in the newly established CCI EOP. He was provided diagnoses of antisocial personality disorder, unspecified anxiety and depressive disorders, as well as stimulant, opioid, cannabis, and alcohol use disorders. He was prescribed clonidine and Prozac. At the time of the review, he was housed on A yard.

The patient transferred to CCI on December 29, 2023.

The initial primary clinician assessment did not include an appropriate summary of the patient's current, recent, or historical mental health symptoms or their impact on functioning. Most of the documentation was copied from other sources. Original documentation was limited and indicated that the patient wanted to work on communication skills and loneliness in treatment.

The patient also reported "depression that has to do with hunger" and memory problems. Insufficient detail was included to assist with treatment planning.

The initial psychiatric assessment included an appropriate assessment of the patient's current functioning but lacked sufficient detail regarding psychiatric history, including the patient's history of delusional statements. It was opined that the patient might have a history of substance induced psychotic or bipolar disorder, but there was not enough evidence to support primary psychotic or mood disorder diagnoses. The patient was assessed with stability, and no psychotropic medications were prescribed.

The initial and routine IDTT meetings were attended by the assigned treatment providers. At the initial IDTT meeting, the patient was identified in the higher level of care indicator report due to several recent RVRs and for treatment refusals. The nonreferral rationale was reasonable during the initial IDTT meeting, but clarification was needed regarding the nonreferral rationale provided during the routine IDTT meeting. The treatment modifications were reasonable; although, a more in-depth assessment of cognitive functioning was warranted. The patient was retained at the EOP level of care with appropriate rationale provided. Treatment planning was unclear and did not target the patient's stated goals of communication, loneliness, and depression during the initial primary clinician assessment or the IDTT meeting. Although IPOCs were discontinued to guide treatment planning, an IPOC for depression was documented in the routine IDTT documentation. In addition, a goal to target delusions, established on November 28, 2023, was included in the updated treatment plan section. The treatment plan was not updated during the initial or routine IDTT meetings. The providers' clinical assessment of presence or absence of delusions was also not clearly documented.

Routine psychiatric contacts did not occur monthly as required. There were no psychiatric contacts documented during April or June 2024, and the February 24, 2024 wellness check was insufficient to be considered a psychiatric contact. During March and May 2024 psychiatric contacts, the patient presented with stability and mild emotional distress including dysthymia and generalized anxiety; clonidine and Prozac were prescribed. Language output oddities were assessed as mild cognitive impairment due to a long history of substance use and overdoses.

Primary clinician contacts which alternated between individual and caseload groups generally occurred timely. The documentation of individual contacts was descriptive and indicative of meaningful therapeutic interaction.

**Findings**

The care and treatment provided to this patient were inadequate.

This patient with cognitive limitations paroled from CDCR on June 6, 2024 without any actual discharge planning. Both providers identified the patient's cognitive limitations and difficulty in clear communication with tangential and at times odd thought processes; those symptoms warranted further coordinated evaluation and consideration of a neuropsychological evaluation. The patient was not appropriately followed by the psychiatrist, and treatment goals with appropriate clinical interventions were not documented.

**Patient S**

This 29-year-old patient's healthcare record was randomly selected to assess the adequacy of care provided in the newly established CCI EOP. He was provided a diagnosis of adjustment disorder with depression. He was prescribed clonidine, Abilify, and Zoloft.

The patient arrived at CCI on April 19, 2024.

The patient had received mental health services at the 3CMS level of care since 2022. However, prior to CCI transfer, he was admitted to the MHCB due to suicidal ideation. His distress was attributed to the recent loss of his daughter and ongoing family discord and loss of support. He was discharged to the EOP level of care. Within days of CCI transfer, he was placed in the RHU for safety reasons. He was briefly discharged to the mainline EOP, and then returned to the RHU several days later after a fight.

The required five-day follow-up contacts were not completed timely, as there was no assessment on April 21, 2024.

The initial provider assessment documentation was brief and did not provide a comprehensive summary of the patient's psychosocial or mental health history. The documentation focused on the patient's current clinical presentation. During the initial primary clinician assessment, the patient reported anxiety, depression, and rumination due to grief and loss of family support. During provider contacts, he provided varying information regarding stressors and the loss of a child.

Following timely initial assessments, initial IDTT meetings occurred after both RHU placements. No higher level of care indicators were identified. The development of measurable treatment goals with clinical interventions were not documented during either IDTT meeting. The patient was continued at the EOP level of care at the May 7, 2024 IDTT meeting with appropriate rationale provided, and the documentation noted symptoms and functional impairment. During the May 28, 2024 IDTT meeting, the patient was discharged to the 3CMS level of care. The documentation indicated questionable substance use and that the patient was "feigning symptoms" to "impact housing." The patient reported suicidal ideation regarding the level of care change and was seen by the CIT.

While awaiting the CIT assessment, the patient tied a t-shirt around his neck and laid on the ground. There was conflicting documentation regarding whether the t-shirt was attached to an anchor point. Regardless, the patient was assessed as breathing, and no medical intervention was determined necessary. During the CIT assessment, the patient expressed safety concerns and was verbally aggressive in response to the clinician's attempt to review clinical interventions. The documentation from a transcribed telephone call with his wife indicated that the patient misrepresented his mental status to facilitate transfer closer to her. He stated, "Trying to keep up a lie…it was hard to become EOP…I am one step closer and then I am right there with you." The transcript indicated that the couple discussed various prison locations with EOPs located closer to his wife.

The patient was assessed with moderate chronic and low acute suicide risk which likely underestimated his risk. The patient was returned to the RHU at the 3CMS level of care with no additional intervention or monitoring provided.

**Findings**

The care and treatment provided to this patient were inadequate.

There was insufficient review of historical information to aid in treatment planning, which was not developed. Regardless of the patient's assessment of feigning symptoms with the goal to affect a transfer; a more thoughtful and coordinated multidisciplinary approach was needed rather than changing his level of care shortly after placement in a high-risk environment such as restricted housing. Given the patient's clinical presentation, suicide monitoring and five-day follow-up contacts should have been considered. Of note, after a period of disengagement from mental health services, the patient engaged in head banging which required emergency medication and resulted in MHCB placement.

**Patient T**

This 27-year-old patient's healthcare record was randomly selected to assess the adequacy of care provided in the newly established CCI EOP. He was provided a diagnosis of adjustment disorder with depressed mood. He was prescribed BuSpar, clonidine, Remeron and Benadryl. At the time of the review, he was housed on A yard.

The patient transferred to CCI on January 31, 2024.

The initial psychiatric assessment was not completed until February 23, 2024. Neither the initial primary clinician nor initial psychiatric assessment provided a meaningful, cohesive summary of the patient's treatment needs. There were varying reports of current symptoms of anxiety and anger; however, grief was not identified, and the patient's mental health history was not clearly documented. Copied documentation indicated that the patient was treated in the MHCB in November 2023, and that he had a recent overdose that may not have been accidental after receiving news that his son's mother died. Further details were unclear.

The assigned primary clinician attended the initial IDTT meeting, which occurred prior to the initial psychiatric assessment. No psychiatrist was present at the initial IDTT meeting. At both the initial and subsequent IDTT meetings, the patient was identified as meeting the criteria for consideration of referral to a higher level of care due to low treatment attendance. Treatment modifications were appropriate at the initial IDTT meeting. Treatment refusals increased prior to the routine IDTT meeting which was attributed to a conflict with his education schedule and substance use which were addressed with a multidisciplinary plan. The EOP level of care was continued to assist with processing guilt related to his crime; further details were not provided. Treatment goals were loosely discussed in the IDTT documentation; however, individualized, measurable treatment goals and interventions were not documented in the treatment plan section during both the initial or routine IDTT meetings; appropriate treatment goals and interventions were necessary for continuity of care.

Routine psychiatric contacts occurred in April and June 2024. The patient's anxiety and depressive symptoms were described as mild and stable.

Primary clinician contacts which alternated between individual and caseload groups generally occurred timely. The patient was engaged in individual treatment, and the documentation of those contacts was indicative of a meaningful therapeutic interaction. Most of the documentation of the individual PC contacts indicated that the content focused on adjustment related concerns. Caseload group refusals were not addressed.

Two suspected overdoses occurred on May 26 and May 27, 2024 that were not clearly or sufficiently addressed during primary clinician contacts. The patient also reported misusing psychotropic medication. It was unclear that this information was communicated to the psychiatrist, as it was not addressed during the subsequent psychiatric contact. The patient began treatment with Suboxone in late June 2024.

The primary group treatment modality was recreational in content, and the patient did not routinely attend. The rationale for group assignment was not documented.

**Findings**

The care and treatment provided to this patient were marginally adequate.

Meaningful primary clinician contacts were appropriate and would have been improved with targeted, measurable treatment goals and interventions and a sufficient initial assessment. The initial psychiatric assessment was insufficient, and the initial psychiatric assessment and routine psychiatric contacts did not occur timely. It was unclear how recreational therapy groups addressed the patient's treatment needs.

**Patient U**

This 34-year-old EOP patient's healthcare record was reviewed to evaluate the quality of care provided at CCI. The patient was provided diagnoses of antisocial personality disorder; stimulant use disorder, severe; opioid use disorder, severe; alcohol use disorder, severe; and cannabis use disorder. He was provided a provisional diagnosis of major depressive disorder, recurrent, moderate. His prescribed medications at CCI during the review period were Cymbalta, hydroxyzine, and mirtazapine. The patient arrived at CCI on March 5, 2024, after he was discharged from the MHCB at WSP.

The patient was incarcerated since 2010 and a participant in the MHSDS since October 26, 2023; he received mental health services at the 3CMS, EOP, and MHCB levels of care. The patient did not have any history of verified self-harm or suicide attempts while in CDCR.

The patient was provided two SRASHEs during the review period. A SRASHE was administered on March 14, 2024 after the patient reported safety concerns and engaged in superficial self-harm that did not require any medical care; it was determined to be an attempt to manipulate his housing placement. The PC noted that the patient did not appear acutely depressed or anxious and did not present with any signs of psychosis or acute substance

intoxication. His chronic and acute suicide risk were assessed as low. The patient was provided a subsequent SRASHE on June 10, 2024, as one of four 90-day follow-up evaluations after discharge from the MHCB. At that time, his chronic risk level was elevated to moderate while his acute risk rating remained low. The patient was reportedly engaged in mental health programming.

The patient was seen timely for appropriately documented five-day follow-up contacts between March 6 and March 10, 2024 after his arrival at CCI. The patient consistently denied suicidal ideation or significant distress at each contact, and the five-day follow-up contacts were discontinued appropriately.

A timely initial PC assessment occurred on March 7, 2024. The assessment occurred in a confidential setting. The PC noted that the patient's chief complaint was anxiety due to safety concerns. The PC reported that the patient denied suicidal ideation but described the patient as anxious and almost tearful. The patient expressed concerns about his safety on the EOP yard at CCI, reported that he was a recent gang dropout, and had unresolved conflicts with active gang members. The PC noted that the patient did not appear paranoid or delusional and opined that the patient's fears were likely reality based. His mental status examination was within normal limits, and he demonstrated full insight and fair judgment. The EOP functional evaluation was completed appropriately, and the clinical summary was updated to reflect the current evaluation. The patient stated that his primary goals were to participate in the EOP, to maintain his sobriety, and to avoid acquiring any RVRs. The PC noted that after the evaluation, custody staff met with the patient to discuss his safety concerns.

A psychiatry consult note dated March 14, 2024 indicated that an emergent psychiatric consult was requested after the patient reported feeling overwhelmed and endorsed suicidal ideation without a plan. He was described as fully oriented, and he did not demonstrate significant symptoms or gross impairment. The patient was placed in the RHU that day for further assessment of his reported safety concerns. An initial PC note dated March 15, 2024 indicated that when he was placed in the RHU, the patient denied suicidal and homicidal ideation and requested to see the psychiatrist regarding his medications. The patient was described as motivated to program and was trying to avoid RVRs to increase his chances for early parole. His mental status was described as within normal limits, and he denied any safety concerns or significant symptoms or stressors.

The patient was seen for his first initial psychiatric assessment on March 27, 2024 while he was housed in the RHU. The patient denied suicidal ideation during the assessment. The psychiatrist noted the patient's history of depression and impression management including "instrumental suicidal ideation" and opined that the patient's reported suicidal ideation was not a symptom of mental illness but rather an attempt to transfer to a different institution. The RHU psychiatrist adjusted the patient's medication doses, prescribed Zoloft, and began to taper duloxetine and Remeron. The progress note incorrectly identified the patient's level of care as 3CMS and indicated a plan to follow-up with the patient in three months.

The patient was not seen for an initial psychiatric assessment or contact with the mainline EOP psychiatrist until April 5, 2024, one month after his arrival at CCI. The patient endorsed mild to

moderate depressive symptoms but denied suicidal ideation, homicidal ideation, paranoia and exhibited no evidence of delusional thinking. He was provided diagnoses of unspecified depressive disorder, antisocial personality disorder, and polysubstance use disorder, severe. The psychiatrist stated that the patient remained with low acute and chronic suicide risk, and he did not demonstrate any acute agitation or anxiety. The patient reported his intention to program. The psychiatrist increased the Zoloft dosage to address depression.

The initial EOP IDTT meeting occurred on May 22, 2024, approximately seven weeks after the patient's CCI arrival. The IDTT meeting was attended by the required staff including the entire EOP clinical team, the program supervisor, and a CCI. The patient was present and participated. The treatment team noted that the patient had recently been released from the RHU after he was discovered with a weapon. He reportedly continued to endorse safety concerns but regretted arming himself with the resulting RVR. The patient reportedly agreed to engage in journaling exercises to process difficult emotions and to clarify his goals. The treatment team noted the patient's ongoing commitment to abstinence from illicit substances and that he was working through a handout/worksheet on CBT and stoic philosophy. The team also noted the patient's engagement and benefit from treatment, and he was retained at the EOP level of care. The level of care justification and discharge criteria were appropriate. The treatment plan contained one IPOC for anger which was inappropriate for the patient and did not align with his problem list. The problem list identified depression and anxiety as the patient's primary mental health concerns and included objective and measurable short and long-term goals and specific interventions to promote those goals. The interventions identified in the clinical summary were also individualized and appropriate for the patient's goals and clinical needs. Overall, the treatment plan was adequate and appropriate despite the inappropriate IPOC for anger.

Psychiatric contacts and documentation were inadequate. The patient was not provided timely routine psychiatric contacts during the review period. He refused a routine contact on May 13, 2024, and was not provided another routine psychiatric contact until May 31, 2024. The patient was seen for a wellness check by a covering psychiatrist on May 20, 2024; that documentation indicated that the patient reported his Remeron and Zoloft had been discontinued, and he requested that the medications be restarted as soon as possible. The covering psychiatrist reviewed the patient's healthcare record and submitted a consult for the patient to see the EOP psychiatrist; however, the psychiatrist did not restart the patient's medications at that time. The EOP psychiatrist responded to the consult request on May 22, 2024 and noted that the patient's medications were discontinued due to nonadherence, but that was not noted previously in the documentation. The psychiatrist indicated that the patient reported increased anxiety without the medications that were restarted. The patient denied any suicidal and homicidal ideation or significant impairment. At his only routine psychiatric contact during the review period on May 31, 2024, the patient reported hypersomnia which interfered with his participation in daytime programming, and he requested discontinuation of Remeron. The patient also reported increased anxiety and intermittent dysthymia. The psychiatrist discontinued Remeron and prescribed Vistaril prn for insomnia.

Review of PC progress notes indicated that the patient was seen consistently for scheduled individual PC contacts during the review period, including during his brief stays in the RHU. The individual PC contacts were well documented, and the interventions and goals discussed in

the progress notes aligned with the treatment plan. The PC progress notes referenced goals of focusing on anger management, changing criminal thinking behaviors, improving coping skills related to safety concerns, and interventions including group attendance, supportive therapy, and CBT handouts. The PC had good rapport with the patient, and the patient was reportedly engaged in programming including attending his assigned groups and completing homework provided in his individual PC contacts. The patient's mental status was consistently described as stable, and his anxiety and depressive symptoms appeared to decrease over time in response to treatment. The patient consistently denied suicidal or homicidal ideation and remained future oriented during the review period.

The patient was offered biweekly PC caseload groups during the review period. The patient did not attend a PC caseload group until April 23, 2024, and did not attend consistently until June 2024. The group notes indicated that the patient was highly engaged and participated fully in the groups. PC caseload group topics were appropriate and included radical acceptance, therapeutic journaling, stoic philosophy, and CBT. The patient was offered and attended several recreational therapy groups per week, and review of progress notes suggested the patient's group attendance improved during the review period. Recreational therapy group topics included life skills, coping, current events, and leisure activities. It appeared many of the groups, regardless of title, involved playing games or watching movies.

**Findings**

The care and treatment provided to this patient were adequate.

The patient appeared to benefit from the care provided and remained stable throughout the review period. Although he was seen timely for the initial PC assessment, the patient did not meet with the mainline psychiatrist until April 5, 2024 despite arriving at CCI with psychotropic medication orders. He was also not seen timely for the initial IDTT meeting. Despite the delayed assessments and IDTT meeting, the quality of care provided was adequate and appropriate. The PC developed good rapport with the patient, and the patient was increasingly engaged in treatment as he adjusted to the EOP. The treatment plan was individualized and appropriate, and PC progress notes aligned with the treatment plan goals and prescribed interventions. The patient was offered consistent PC contacts via individual contacts and PC caseload groups, and he participated in recreational therapy groups.

**Patient V**

This 44-year-old EOP patient's healthcare record was reviewed to evaluate the quality of care provided at CCI. He was provided diagnoses of antisocial personality disorder and polysubstance use disorder. He was prescribed Zyprexa, Trileptal, as well as Vistaril and Effexor XR prn. The patient arrived at CCI on March 6, 2024 from CMC.

The patient was incarcerated since 1998, and he received mental health services at the 3CMS, EOP, and MHCB levels of care. He had a history of one documented suicide attempt on September 17, 2023 by hanging with minor to no injury; the patient reported that the attempt was in response to safety concerns. He was admitted to the MHCB and discharged to the EOP level

of care on October 4, 2023. A SRASHE on March 18, 2024 completed as 90-day follow-up after MHCB discharge assessed the patient with high chronic and low acute suicide risk.

The initial PC assessment occurred timely on March 18, 2024. The patient reported symptoms of anxiety and depression, and no functional impairment was noted. His mental status was described as within normal limits, and the PC noted full insight and good judgement. The PC provided diagnoses of other stimulant dependence and opioid use, unspecified. The initial treatment goals were focused on decreasing the severity of depressive and anxiety symptoms, increasing insight and prosocial coping skills, and reducing RVRs. The clinical summary was not updated appropriately, and the case formulation was pulled forward from previous treatment plans.

The initial psychiatric assessment on April 25, 2024 was extremely late. The psychiatrist noted the patient demonstrated normal mood and euthymic affect with linear and goal-directed thought processes. He was provided diagnoses of stimulant use disorder, possible stimulant-induced psychotic disorder, opioid use disorder, cannabis use disorder, and alcohol use disorder, all ranging from moderate to severe. The patient reported that his prescribed medications were helpful in managing anxiety and sleep, and he reported no suicidal or homicidal ideation. The plan included continuing medications and routine follow-up contacts.

The initial IDTT meeting occurred on May 8, 2024, over two months after the patient's arrival at CCI. The IDTT meeting was attended by the appropriate staff and the patient. Diagnoses of adjustment disorder with mixed anxiety and depressed mood (provisional), antisocial personality disorder, and polysubstance use disorder were documented. The treatment goals focused on reducing depression and anxiety, abstaining from illicit drug use, and avoiding involvement in gang-related activities; however, no specific interventions were provided to achieve those goals. No IPOCs were included in the treatment plan, and no specific patient strengths were identified during the meeting. The treatment plan lacked a clear justification for the current level of care and did not identify specific criteria for discharge. Overall, treatment planning was inadequate and required individualization for the patient's specific treatment needs.

The frequency of psychiatric contacts was inadequate, and the patient was not seen for routine psychiatric contact during May or most of June 2024. A brief medication note dated May 8, 2024 indicated that the patient was seen in IDTT when he reported difficulty waking in the mornings. In response, the psychiatrist decreased the Zyprexa dose and discontinued Trileptal due to nonadherence. At the next psychiatric contact on June 27, 2024, the patient reported a normal mood and stated that he was not depressed; however, he reported intermittent panic attacks every other week upon waking. His recent medication nonadherence was discussed during that appointment. Despite the lack of routine psychiatric contacts, the patient's mental status remained unchanged, and he was described as stable throughout the review period.

During the review period, the patient was offered regularly scheduled confidential individual sessions with his PC; however, it was noted that the area where the sessions occurred lacked true confidentiality as it was located in the same area as recreational therapy groups. The patient was also offered bi-weekly PC caseload groups, but his attendance was inconsistent. Progress notes were not always well-documented; only one note included goals from the treatment plan. The

remaining notes consisted of free text entries providing subjective patient reports and mental status updates but lacked information on treatment goals and interventions. The patient consistently reported safety concerns and worried about going to the yard after leaving a gang. Despite those challenges, the patient participated in various groups including yoga, Zumba, and journaling. The PC was supportive during the individual sessions. In one progress note, the IPOC listed in the note was not included in the treatment plan and focused on addressing depressed mood and attending and actively participating in unit programming daily, without specifying the frequency or duration. Overall, the patient's engagement in treatment and participation in various activities was consistent; however, the lack of detail provided in the progress notes underscored the need for consistent documentation of treatment goals and interventions.

During the review period, the patient participated in various group therapy sessions, including biweekly PC caseload groups, a DBT group with a psychologist, and recreational therapy groups focusing on daily living skills, leisure activities, coping, current events, and yard activities. The patient's attendance was inconsistent and sporadic. The patient struggled to attend the biweekly PC caseload groups regularly. Similarly, his attendance in the DBT group with a psychologist was also sporadic which impacted his ability to benefit from the therapeutic interventions offered. In addition, his participation in the recreational therapy groups was inconsistent, often due to scheduling conflicts with education and other programming. Unfortunately, the patient never attended yard activities due to safety concerns, which limited his opportunities for social interaction and physical activity. Overall, the patient's inconsistent attendance in group therapy sessions hindered his progress in therapy and limited his exposure to various therapeutic interventions.

**Findings**

The care and treatment provided to this patient were inadequate.

Clinical contacts did not occur timely. The initial psychiatric assessment was significantly delayed, and subsequent contacts also did not occur timely, despite issues with medication nonadherence. The IDTT meeting was also delayed and incomplete, and treatment planning lacked IPOCs and specific interventions. Although biweekly individual PC contacts were offered timely, the documentation of those interactions was inadequate. Additionally, a DBT group was offered, but it was unclear why this intervention was provided, as it was not consistent with the treatment plan or the identified problems which did not include DBT or a diagnosis of a personality disorder. Overall, the patient's group attendance was inconsistent, highlighting the need for improvement in engagement and participation.

**Patient W**

This 48-year-old EOP patient's healthcare record was reviewed to evaluate the quality of care provided at CCI. He was provided diagnoses of unspecified schizophrenia and opioid use disorder, with a history of heroin and fentanyl use. The patient was prescribed Abilify and naloxone. The patient arrived at the CCI EOP on March 12, 2024 after discharge from the CHCF MHCB where he had been treated since February 29, 2024.

Prior to his MHCB admission, the patient was housed at SVSP. He was placed in the MHCB due to delusional statements about the FBI and custody staff at SVSP trying to harm him, as well as suspicions of a plot to kill him by another inmate. The delusional content appeared specific to SVSP, and the patient did not report or demonstrate any issues with CHCF MHCB staff. The patient was discharged from the MHCB to the CCI EOP. He had previously received mental health services at the MHCB, EOP, and 3CMS levels of care.

The patient was provided five-day follow-up contacts after his arrival to CCI. During the five-day follow-up contacts from March 13 to March 17, 2024, the patient's progress was closely monitored and documented each day. A safety plan was deemed unnecessary due to the removal of the primary stressor which was the SVSP staff. The patient consistently denied suicidal ideation and had no self-injurious behavior.

The initial PC assessment occurred on March 14, 2024. The patient participated in the assessment but declined a confidential setting. Despite missing information in the presenting problem section, the PC assessment overall was adequate. It was noted that the patient had a history of methamphetamine use, auditory and visual hallucinations, paranoia, and occasional delusions exacerbated by past gang involvement and the prison environment. The patient was prescribed Lexapro, Abilify, and Vistaril prn, and was assessed with partial insight and fair judgment. The EOP functional evaluation identified the need for breaks and reminders for the patient to go to pill pass and to be provided access to drinking water. The clinical summary was thorough and updated appropriately, including historical and current clinical data to inform treatment, as well as preliminary treatment goals. The patient expressed intention to participate in EOP groups and treatment, and the case formulation from the MHCB admission was carried forward and remained appropriate.

The initial psychiatric assessment on April 11, 2024 noted that the patient reported depressed mood and frustration that he had not received his property. The patient discontinued the contact when he realized that the psychiatrist could not assist him with the property issue. The patient reported that his medication helped with his temper, and he denied medication side effect, suicidal or homicidal ideation, auditory or visual hallucinations, paranoia, delusions, or manic symptoms. The psychiatrist described the patient as stable and euthymic, but a history of impression management and diversion of Suboxone was noted. Overall, the patient did not exhibit significant symptoms or clinical distress during the assessment.

During the initial IDTT meeting on April 24, 2024, the required staff including the senior psychiatric supervisor were present as well as the patient who actively participated in the discussion. The IDTT noted that the patient met the higher level of care indicator of treatment attendance below 50 percent; however, the PC reported the patient attended individual and group sessions since arriving at CCI. The treatment team attributed the patient's previous lack of treatment participation to safety concerns at his previous institution, and those concerns were not present at CCI leading to improved treatment participation. Since the patient's arrival to CCI, there were no significant symptoms or deficits observed, and he was medication adherent and demonstrated no self-injurious behavior. The patient did not require a safety plan and agreed to work on goals such as stabilizing psychotic symptoms through medication management,

exercising, therapeutic journaling, attending groups, maintaining contact with family, and preparing for release from prison. Additionally, the patient agreed to continue attending groups to be removed from the high treatment refuser list. An IPOC was established for delusions, but no specific interventions or objective goals were identified during the IDTT meeting. While the discharge criteria were deemed appropriate, they were generic and not specific for the patient.

During the review period, the patient had one contact with the psychiatrist on June 5, 2024. The patient denied experiencing recent depressive symptoms, suicidal or homicidal ideation, psychotic symptoms, or medication side effects. It was noted that the patient began working in the kitchen and enjoyed cooking. He was provided diagnoses of adjustment disorder, unspecified, antisocial personality disorder, and polysubstance use disorder.

The patient was not seen for individual PC contact until April 9, 2024. At that time, he expressed concerns regarding custody interfering with his mail, and complaints about not having his property were discussed. The patient appeared to be doing well, denied suicidal ideation, and was satisfied with his medication treatment. Despite the persecutory delusional statements, the patient remained generally stable. He expressed a desire for placement at the 3CMS level of care soon after his arrival at CCI. However, the patient continued to experience paranoid ideation and had not received his property as of June 3, 2024, which maintained a source of frustration. The patient was placed in the RHU on June 18, 2024, and he remained at the EOP level of care despite plans for removal to the 3CMS level of care at the next IDTT meeting. Although the patient attended PC caseload groups and engaged well, the progress notes lacked specific interventions and treatment goals. Overall, the patient showed signs of stabilization and improvement during the review period despite the lack of consistent contacts.

The patient was offered a variety of recreational therapy groups including yard, life skills, coping, current events, and leisure activities. Most groups appeared to be very similar in content despite their titles. The patient's initial attendance was low, but his engagement and attendance improved over time in response to encouragement from his treatment team.

**Findings**

The care and treatment provided to this patient were inadequate.

Clinical contacts did not occur timely or at the required frequency. Despite the lack of timely contacts, the patient's symptoms appeared to stabilize during the review period, and his delusional thoughts and paranoia were significantly decreased. The patient demonstrated consistent participation after encouragement in both individual and group therapy sessions, including PC caseload groups and recreational therapy.

A significant achievement for the patient was obtaining a job in the kitchen. His stability and treatment participation led to consideration of transfer to a lower level of care; however, that positive trajectory was interrupted when the patient was placed in the RHU due to possession of a weapon. Despite the positive aspects of improvement, there were still areas of significant concern and provision of care that was not consistent with Program Guide requirements.

**Patient X**

This 43-year-old EOP patient's healthcare record was reviewed to evaluate the quality of mental treatment provided at CCI. He was provided a diagnosis of adjustment disorder with anxious and depressed mood. He arrived at CCI with prescribed medications of BuSpar and Vistaril. The patient arrived at CCI from CSATF on January 19, 2024.

The patient had a history of substance-induced psychosis and reported multiple suicide attempts, including cutting his wrist in 2019 and attempting hanging in the LAC RHU. Despite those reports, none of the suicide attempts were verified. The documentation indicated that the patient had a history of using self-injury and suicidal behavior for goal attainment, with three incidents of self-injurious behavior documented in CDCR records without the intent to die. The patient reported abstinence from alcohol and drugs since October 2023, and his primary goals upon arrival were to maintain sobriety and to manage anxiety. The patient had a history receiving mental health services at the 3CMS, EOP, and MHCB levels of care, and he had 12 MHCB placements with the most recent occurring in February 2023. A SRASHE assessed the patient with moderate chronic and low acute suicide risk.

The initial PC assessment occurred timely on January 22, 2024. The assessment occurred in a confidential setting, and the patient participated. The assessment included specific and relevant details in the clinical summary, presenting problem, problem history, and medications sections. However, the documentation in the assessment overall was incomplete and lacked crucial information such as mental status examination, EOP functional evaluation, suicide/self-harm risk assessment, and risk of violence sections.

The initial psychiatric assessment occurred one week late on February 8, 2024. The patient expressed satisfaction with his medications and requested regular dosing rather than prn administration. The medications were reportedly beneficial for sleep, anxiety, and managing voices; although, the psychiatrist noted that the patient had no verified history of psychosis other than self-report. The patient denied recent depressive symptoms, suicidal ideation, auditory or visual hallucinations, and serious symptoms or distress. The diagnoses provided by the psychiatrist included antisocial personality disorder with sociopathic traits, unspecified depressive disorder, unspecified anxiety disorder, and severe polysubstance use. The patient's prescribed medications were Zyprexa, Vistaril, and BuSpar. The psychiatric treatment plan involved continuing the current medications and scheduling routine follow-up appointments for monitoring and further assessment.

The initial IDTT meeting occurred two weeks late and almost one month after CCI placement on February 14, 2024. No psychiatric review of the IDTT was located in the healthcare record. The IDTT included the full EOP clinical team and a CCI, but the patient was absent. The PC later met with the patient, who reported not receiving a ducat and not knowing to attend the IDTT meeting. The PC informed the patient of the IDTT treatment goals which included sobriety, anxiety management, and treatment participation, and the patient agreed with those goals. No higher level of care indicators were identified, and a safety plan was not developed. The treatment plan included an IPOC for depressed mood, but there were no specific interventions provided. The discharge criteria were generic and included a requirement of six months of

sobriety. The EOP functional evaluation was completed which determined that the patient did not require assistance but should be reminded about medications and provided breaks from programming for pill pass.

On April 24, 2024, an update IDTT meeting occurred that included the necessary attendees and the patient. Although the patient was identified as a high treatment refuser, the treatment team noted that any refusals were likely due to scheduling conflicts with family visits and education rather than due to symptoms or lack of motivation. The patient reported experiencing increased anxiety due to an upcoming court date, but he was adherent to medication and treatment as well as attending groups. An IPOC was initiated for anxiety, but specific interventions and goals were not clearly stated.

The patient was not provided with timely routine psychiatric contacts. He was seen for only two routine psychiatric contacts during the review period. During the March 29, 2024 contact, the patient reported frequent depressive symptoms such as low energy, lack of motivation, and disinterest in usual activities; however, he denied any thoughts of self-harm, auditory or visual hallucinations, or psychotic symptoms. Concerns regarding the metabolic side effects of Zyprexa were discussed which led to a medication change. The psychiatrist discontinued Zyprexa and initiated Prozac for depression and anxiety; loxapine was prescribed for mood and agitation, and Buspar and Vistaril were continued. The patient responded well to the medication change and reported feeling stable and euthymic with no significant depressive symptoms.

The PC contacts were initially inconsistent. The patient was offered routine PC contacts beginning on January 22, 2024, but he was not offered a PC contact between February 22 and March 17, 2024. The patient was subsequently offered PC contacts every seven to ten days, either in caseload group or individual sessions. Despite a few instances when there were lapses of up to three weeks between contacts, the patient remained stable, attended most PC groups, and completed assigned homework in his cell. He also reported achieving six months of sobriety. A positive rapport was noted between the patient and the PC, and the patient successfully navigated significant stressors like a court date, resentencing, and grieving the loss of his mother in June 2024. Overall, the patient's progress in maintaining sobriety and stability was evident in the documented clinical contacts.

The patient was offered at least one recreational therapy group daily during most of the review period. Review of the recreational therapy group progress notes indicated that the patient attended most of his offered groups and participated appropriately.

**Findings**

The care and treatment provided to EOP patient was inadequate due to the timeliness or frequency of clinical contacts and poor documentation.

There were problems with consistent PC contacts early in the review period and a persistent lack of psychiatric contacts throughout the review period. Although the patient faced several significant stressors and was not seen timely, he maintained stability and a positive rapport with his providers. His medications were adjusted appropriately, leading to increased stability.

Several issues were identified regarding documentation, including a lack of interventions in treatment planning, a missing psychiatric review of the initial IDTT, and an incomplete initial PC assessment. Progress notes also lacked updates on IPOCs and treatment goals.

**Patient Y**

This 43-year-old EOP patient's healthcare record was reviewed to evaluate the quality of care and treatment provided at CCI. The patient was provided a diagnosis of bipolar I disorder, most recent episode depressed with psychotic features. When he arrived at CCI, the patient was prescribed Zyprexa, Geodon, and Vistaril prn. The patient arrived at CCI on March 7, 2024 from CMC.

The patient had been in prison since 2007 for his current CDCR prison term. He had received mental health services at the 3CMS, EOP, and MHCB levels of care. The patient was most recently admitted to the MHCB from January 24 to February 1, 2024 due to suicidal ideation. He discharged to the EOP level of care at CMC and subsequently transferred to CCI.

The patient was provided a SRASHE on June 13, 2024 for one of four 90-day follow-ups following MHCB discharge. His chronic risk was assessed as moderate, and his acute suicide risk was assessed as low. The patient had no documented history of self-injurious behaviors or suicide attempts.

The initial PC assessment occurred timely on March 18, 2024. The PC provided a diagnosis of bipolar I disorder with a current or most recent episode depressed, with psychotic features. The treatment goals included managing auditory hallucinations, decreasing depression and anxiety, and enhancing prosocial coping skills. The patient displayed normal mental status, a euthymic mood, partial insight, and fair judgment. An EOP functional evaluation was completed, and no accommodations were deemed necessary. The clinical summary, however, was incomplete.

The initial psychiatric assessment indicated that medication reconciliation occurred upon the patient's CCI arrival, but the initial assessment did not occur until April 11, 2024, which was over two weeks late. The patient reported no issues with his medications and mentioned that they helped with auditory hallucinations and anxiety. The patient reported mild depressive symptoms and very infrequent transient suicidal ideation without a specific plan or intent. The patient did not exhibit psychotic symptoms and appeared euthymic and stable. The psychiatrist expressed doubt regarding the accuracy of the patient's bipolar disorder diagnosis, as there was no evidence of mood or psychotic symptoms. Instead, diagnoses of antisocial personality disorder, unspecified depressive disorder, unspecified anxiety disorder, and polysubstance use were provided. The psychiatrist continued the prescribed medications.

The initial IDTT meeting occurred on April 24, 2024, which was six weeks after arrival. The necessary staff attended as well as the patient. The patient was described as guarded and minimally cooperative during the IDTT meeting. No functional impairments were noted. Although there were no IPOCs, the treatment plan included very appropriate, objective, and measurable short and long-term goals. Interventions for depression, anxiety, and psychotic symptoms were also outlined and were appropriate. It was noted that the patient consistently

attended his job and performed appropriately at work. The treatment plan appeared to be individualized to the patient's specific needs, and the inclusion of measurable goals and corresponding interventions suggested a comprehensive approach to addressing the patient's mental health concerns.

The patient was seen for one routine psychiatric contact during the review period on June 6, 2024. The progress note indicated that the patient had worsening depression and anxiety after his mother's recent death. He reported frequent anxiety, night sweats, and auditory hallucinations weekly with sleep disturbance. The psychiatrist noted that the patient was prescribed two antipsychotic medications at suboptimal doses. Consequently, Geodon and Zyprexa were discontinued, and loxapine and Sertraline were prescribed. The patient appeared to respond well to the medication change.

The PC documentation noted that the patient had improving rapport with the PC. Early in the review period, the PC discovered that the patient's work schedule conflicted with PC caseload group therapy sessions, leading to the patient being excused from attending caseload groups. The patient missed medication doses on multiple occasions and expressed distrust in the prison food service due to racial concerns. Despite being deeply involved in prison politics, the patient maintained a future-oriented mindset and focused on his upcoming parole. His engagement with the PC increased following his mother's death. The PC offered consistent support, including visits to the patient's workplace and providing cell front contacts when needed. In early June 2024, the patient signed a do not resuscitate order and requested to discontinue all blood pressure medications, citing fatigue from his prolonged incarceration. The PC appropriately met with the patient and discussed those decisions with him. Overall, the patient's mental health treatment involved addressing his grief, managing his symptoms, and navigating challenges within the prison environment. The PC maintained a supportive and proactive approach, adapting interventions to meet the patient's evolving needs.

The patient was offered multiple group sessions weekly; however, his attendance was infrequent due to conflicts with his work schedule. When able to attend groups, his participation was described as very good.

**Findings**

The overall care and treatment provided to this patient was inadequate.

Although the care provided by the PC was adequate, the psychiatric care was inadequate due to lack of contacts, especially considering the patient's periods of medication nonadherence in April 2024, and grief issues related to his mother's death; neither of which resulted in psychiatric contact. However, the psychiatrist appropriately adjusted the patient's medications and clarified his diagnosis based on his clinical presentation. The initial IDTT meeting also did not occur timely.

**Patient Z**

This 51-year-old EOP patient's healthcare record was reviewed to evaluate the quality of mental healthcare and treatment at CCI. . The patient was provided diagnoses of schizoaffective disorder and antisocial personality disorder. Upon arrival at CCI, he had been prescribed Trileptal, venlafaxine, and Cymbalta. The patient arrived at CCI from WSP on January 22, 2024 and was released from prison during the review period on April 28, 2024

The patient reported a history of one suicide attempt in either 2004 or 2008. He had received mental health services at the 3CMS, EOP, MHCB, and inpatient levels of care. His symptoms historically included auditory and visual hallucinations, mood swings, anxiety, and paranoia. He also had a history of severe substance use disorder, particularly with crack and methamphetamine, although he was reportedly not using illicit substances during the review period.

The initial PC assessment occurred timely on January 30, 2024. The patient reported moderate anxiety and depression. He was reportedly stable and requested continuation of his previous treatment plan. The PC assessment was completed and documented appropriately.

The initial psychiatric assessment occurred late on February 9, 2024. The patient continued to report significant anxiety, but he denied other significant symptoms. The patient repeatedly requested treatment with Wellbutrin which was denied due to his history of substance abuse. The patient also reported hearing voices daily; however, the psychiatrist opined that those symptoms may have been due to past drug use rather than a psychotic or mood disorder. The patient declined treatment with Wellbutrin when informed that abstinence from illicit substances and random drug screens would be required.

The initial IDTT meeting occurred late on February 14, 2024. The necessary participants and the patient were in attendance. The patient again requested treatment with Wellbutrin, which he stated he was prescribed in a county jail, and he agreed to random urine drug screening. No signs of acute distress were noted during the IDTT meeting, and a unique case formulation was developed for the patient. The patient and treatment team agreed to focus on his upcoming pre-release and parole. An IPOC was established for hallucinations, however, there were no IPOCs for depression and anxiety which appeared to be the patient's primary symptoms. The patient's problem list included depression and included measurable short and long-term goals, and CBT was planned as an intervention. There were no functional impairments noted, and no accommodations were deemed necessary. Overall, the IDTT meeting was productive and focused on addressing the patient's mental health needs in preparation for his upcoming release.

The psychiatric contacts did not occur timely, but the content of the contacts and medication management were generally appropriate based on the patient's presentation and history. Several concerning incidents occurred, such as the patient being discovered inhaling another patient's Wellbutrin in late March 2024, and he refused his Effexor. The PC reportedly spoke with the psychiatrist about those concerns on March 28, 2024 and requested that the psychiatrist see the patient; however, the psychiatrist did not see the patient until one week later on April 4, 2024. The psychiatrist responded to the patient's self-advocacy and adjusted his medications

appropriately and provided appropriate psychoeducation and procedural safeguards. The psychiatrist effectively addressed the report of the patient inhaling another patient's Wellbutrin, and consistent psychoeducation was provided, particularly given the patient's history of seizures. By the time of parole, the patient was prescribed seizure medications, utilized a heart monitor, had negative urine drug screens, and was adherent with his Wellbutrin.

The PC contacts were characterized by good rapport and consistent bi-weekly individual sessions. The PC provided a provisional diagnosis of acute adjustment disorder with mixed disturbance of emotions and conduct as well as a diagnosis of depressive disorder. Biweekly PC groups were offered, but the patient's attendance was inconsistent, and he did not remain for the entire group when he attended. The topics discussed in the groups were clinically appropriate for the patient.

The patient was typically offered multiple recreational therapy groups and yard sessions daily; however, he rarely attended his recreational therapy groups. Despite that, the patient was documented as present with full attendance at recreational therapy yard groups that were noted as cancelled in the comment section but were still recorded as conducted in the patient's healthcare record. That discrepancy caused concern about the accuracy and integrity of the attendance records for recreational therapy groups. It also suggested a potential issue with the documentation process and the communication between staff members regarding the scheduling and cancellation of recreational therapy activities.

**Findings**

The care and treatment provided to this patient were adequate.

Some deficiencies were noted in the care provided. The initial IDTT meeting and psychiatric contacts did not occur timely. Conversely, the PC contacts were timely and effective, leading to the development of a good rapport with the patient. The psychiatrist appropriately managed medication issues, eventually prescribing Wellbutrin when the conditions were deemed appropriate. That decision contributed to the patient's stability as he prepared for and successfully paroled. The pre-release contacts were also beneficial, and the progress notes indicated responsiveness to the patient's concerns and assistance in obtaining his preferred parole placement location.

**Patient AA**

This 40-year-old EOP patient's healthcare record was reviewed to evaluate the quality of care provided at CCI. The patient had been in prison since 2005, and he historically was provided diagnoses of schizoaffective disorder, bipolar type and polysubstance use disorder. The patient received his psychotropic medications by a PC 2602 order due to danger to self and others; the order would expire on May 23, 2024. He was prescribed Invega with prn backup medications in the event of medication refusal. The patient arrived at CCI on January 25, 2024 from MCSP and was scheduled for parole later in 2024.

The patient had received mental health services at all levels of care. He had a history of self-injurious behavior without intent to die, such as ingesting objects or various medications at non-lethal doses. Despite those behaviors, his acute and chronic suicide risk were assessed as low when he arrived at CCI.

The initial PC assessment occurred timely on February 5, 2024, and the patient actively participated in the assessment. During the assessment, the PC noted that the patient exhibited a bizarre appearance, lacked insight, and displayed poor judgment. Despite those observations, the EOP functional evaluation determined that no accommodations or additional supports were necessary. The primary treatment goals established for the patient included increasing insight and impulse control, as well as decreasing aggressive behaviors.

The initial psychiatric assessment was slightly delayed on February 10, 2024. The patient reported a stable mood but exhibited symptoms of depression including low energy and motivation and decreased appetite. He denied thoughts of self-harm or harm to others as well as auditory or visual hallucinations. The patient requested treatment with BuSpar and Effexor for his symptoms. During the assessment, the patient demonstrated fair insight and judgment. The psychiatrist noted that he did not observe symptoms or a history consistent with a diagnosis of schizoaffective disorder, but indicated the possibility of a diagnosis of substance-induced bipolar disorder. Consequently, the updated diagnoses included unspecified bipolar disorder, unspecified anxiety disorder, stimulant use disorder, and cannabis use disorder. The psychiatrist also indicated the plan to begin treatment with Effexor and BuSpar while maintaining Invega.

On April 24, 2024, the initial IDTT occurred late by three months. The necessary staff and the patient attended the meeting. An IPOC was created for pre-release planning, but it lacked any problem list items, goals, or interventions. The patient was removed from the SRMP due to the absence of current inclusion criteria. Additionally, there were no discharge criteria or actual goals established during the meeting. A functional evaluation was completed which identified several accommodations for the patient, including using slow, simple language, repeating information as needed, and prompting the patient for any priority ducats scheduled during the patient’s work or school assignments.

The patient was not seen for psychiatric contact for two and a half months from March to May 2024. After his PC 2602 order was allowed to expire on May 23, 2024, the patient remained medication adherent and stable with only mild depression reported. When he was seen by the psychiatrist, the patient’s medications were adjusted appropriately. Throughout the review period between January 25, 2024 and June 30, 2024, the patient was seen for only three routine psychiatric contacts; however, he remained stable and future oriented.

The PC noted during PC contacts that the patient had a somewhat bizarre appearance with clean clothes worn in multiple layers. The patient engaged with his PC when needed, particularly in situations involving disputes or conflicts with custody. The patient denied any worsening mental health symptoms during the review period, despite facing stressors such as possible delayed release after receiving an RVR. The PC supported pre-release efforts and assisted in preparing the patient for parole. The patient demonstrated future oriented behaviors and remained stable. Pre-release IPOCs were tracked in some progress notes. The patient was enrolled in the PC

caseload group and DBT groups; however, the patient had poor and inconsistent attendance to both groups. The topics discussed in the PC caseload group were clinically relevant and appropriate for the patient.

The patient was offered recreational therapy groups almost daily, often several groups per day; however, his attendance was inconsistent.

During the pre-release contacts, the patient received counseling and assistance to prepare for his transition back into the community. He was proactive in seeking out various services such as medi-Cal, tattoo removal, and dental work. The patient showed dedication by consistently meeting with his providers during the review period.

**Findings**

The care and treatment provided to this patient were adequate.

The patient had a positive relationship with his PC and was able to build rapport with them. He was seen consistently and timely for regular PC contacts and clinical group sessions, including weekly DBT and daily recreational therapy groups. During the individual sessions, the patient primarily discussed pre-release and custody-related issues, indicating a strong desire to address those concerns. There were areas for needed improvement regarding the timeliness of contacts; however, the patient's relationship with his providers was positive, and he remained stable and motivated to work towards his parole objectives.

**Patient BB**

This 59-year-old EOP patient's healthcare record was reviewed to evaluate the quality of care provided at CCI. The patient was provided diagnoses of major depressive disorder with recurrent episodes, moderate severity, and possible brief psychotic disorder. He was prescribed Zyprexa and Celexa. The patient arrived at CCI on February 9, 2024 from CSP-LAC.

The patient had one documented suicide attempt in 1987; however, the patient reported four total suicide attempts. He was placed in the MHSDS in 2021, and he received mental health services at the 3CMS, EOP and MHCB levels of care. The patient had multiple MHCB placements since September 2023; the most recent MHCB placement occurred in November 2023 due to suicidal ideation. The patient had a history of opioid use but was reportedly abstinent six months prior to arrival at CCI.

A SRASHE on February 15, 2024 assessed the patient with high chronic and low acute suicide risk. The assessment also indicated the presence of adequate protective factors including a strong future orientation, active engagement in treatment, and a supportive network of interpersonal and family relationships.

During the initial PC assessment on February 15, 2024, the patient actively participated and reported his goals to work on managing depression, improving coping skills, attending groups, and spending time in the yard. His mental status was described as within normal limits, and the

patient had good insight and fair judgment. A functional evaluation was conducted that revealed no need for special accommodations at work; however, other limitations were identified, including difficulty with sharp objects, working in hot weather conditions due to taking heat sensitive medications, and functioning in large groups. No clinical summary was provided in the assessment. Preliminary treatment goals were to decrease depressive symptoms and to address maladaptive behaviors.

The initial psychiatric assessment on March 28, 2024 did not occur timely, and was completed approximately seven weeks after the patient's arrival at CCI. During the assessment, the patient reported normal mood and denied recent depressive or anxiety symptoms. Additionally, the patient denied any thoughts of self-harm, psychotic symptoms, or symptoms of severe mental illness. The mental status examination was within normal limits, and the patient appeared stable with no major complaints or distress. The psychiatrist provided diagnoses of stimulant use disorder, severe; mild to moderate opioid use disorder; and moderate to severe alcohol use disorder. The patient was prescribed Zyprexa and Celexa. Very limited information was documented within the assessment, and the assessment failed to mention the patient's medication nonadherence that was documented in the PC progress notes during that time.

The initial IDTT meeting on April 10, 2024 also did not occur timely and was completed two months after the patient's arrival at CCI. The IDTT meeting was attended by the EOP clinical staff and CCI, but the patient refused to attend the meeting. It was recommended during the meeting that the patient be discharged to 3CMS level of care. The problem list included depression, and there were appropriate goals and interventions that were carried forward from a previous IDTT meeting. In the discharge section of the treatment plan, it was noted that the patient was psychiatrically stable and had likely reached the maximum benefit from the EOP. The patient was identified as a high treatment refuser, having refused 6.4 hours weekly of treatment. The patient reportedly requested to be discharged from the EOP, stating that the issues that resulted in EOP placement were resolved.

The patient attended most of his individual PC and psychiatric appointments since his arrival at CCI. The assigned PC agreed that the patient had likely reached the maximum benefit from the EOP and supported the decision to discharge the patient to 3CMS level of care.

The PC progress note of February 22, 2024 revealed that the patient had stopped taking his medications and attending groups as of February 19, 2024, despite previously adherence. Subsequent progress notes indicated that the patient reported attending groups and had stable mood with some mild depression. As he neared transfer from the EOP, it was noted that the patient had not taken Celexa at all and only intermittently took Zyprexa. He, however, continued to attend groups and individual sessions and remained psychiatrically stable. He was offered biweekly PC caseload groups as part of his ongoing treatment plan.

The patient was offered between one and three recreational therapy groups and yard weekly. The patient attended sporadically, but he was engaged and participated appropriately when he attended.

**Findings**

The care and treatment provided to this patient were inadequate.

The psychiatric care was inadequate. The patient was removed from the EOP level of care only two weeks after the initial psychiatric assessment. That assessment was not provided timely, it did not address medication nonadherence or the reasons for the delayed contact, and it was the only psychiatric contact for the patient, despite his medication nonadherence. Additionally, the IDTT meeting was significantly late.

**Patient CC**

This 28-year-old EOP patient's healthcare record was reviewed to evaluate the quality of care provided at CCI. He was provided diagnoses of bipolar I disorder, current episode depressed in partial remission and antisocial personality disorder. The patient was reportedly medication adherent with his prescribed Zyprexa and Depakote. The patient arrived at CCI on January 2, 2024 from CMC.

The patient received an RVR on February 3, 2024 and was immediately placed in the MHCB after he reported suicidal ideation. The MHCB admission was rescinded on the same day, and the patient was placed in the RHU from February 4 to February 12, 2024. He remained at the EOP level of care upon release from the RHU. He returned to the RHU on April 10, 2024 due to safety concerns and was eventually transferred to HDSP on May 2, 2024.

Notably, the patient's healthcare record did not contain any EOP form documents, such as initial assessments, between his arrival on January 2, 2024 and his release from the RHU and placement in the mainline EOP on February 13, 2024. At the time of arrival to CCI, the patient received his psychotropic medications by a PC 2602 order due to danger to others that expired on February 1, 2024. He had a significant history of reporting suicidal ideation and medical complaints such as chest pain for secondary gain, but he had no history of suicide attempts. He primarily received mental health services at the EOP level of care, but he also had three ICF admissions and 25 MHCB placements since 2019.

The initial psychiatric assessment occurred timely on January 9, 2024 when the patient denied depression, significant symptoms, or distress. He denied adverse medication side effects. His mental status examination was described as normal, and no mood, psychotic, or anxiety symptoms were observed or reported. The patient had a history of impression management and utilizing self-injurious behavior to have his needs met or when he was frustrated. The patient reported difficulty adjusting to prison, particularly in the RHU. The psychiatrist provided diagnoses of adjustment disorder with mixed disturbance of conduct and emotions and antisocial personality disorder. At that time, the PC 2602 order was in effect, and his medications were continued without changes.

The initial PC assessment occurred on February 13, 2024, and the entire assessment document was blank and incomplete, with only pulled forward sections and the clinical summary completed. The patient was described as stable. The PC reported that the patient was adjusting

well to the EOP and was coping adequately with his symptoms, adhering to his medications, and getting along with his cellmate. The clinical summary section included information from a previous initial PC assessment provided on February 5, 2024 in the RHU. That assessment referred to an initial IDTT meeting on January 10, 2024 which included treatment goals such as attending therapy, avoiding unwarranted claims of suicidal ideation to address non-mental health issues, and focusing on preparing for parole. A pre-parole IPOC was documented. The patient reported that his medications were helpful in managing his mood, but he also expressed a need for a higher level of care and requested an updated DD2 assessment. The initial PC assessment noted that the patient's anger, mood swings, and impulsivity were contributing factors in some of his RVRs. Overall, the assessment provided insight into the patient's mental health status and his progress in treatment and included areas of improvement and the patient's goals for the future.

The patient was provided an initial PC assessment on April 10, 2024, when he was placed in the RHU after he reported safety concerns. During the assessment, the patient requested printouts and specifically asked for a specific clinician to be his primary care provider. The EOP functional evaluation indicated that the patient required cognitive support in various areas such as understanding instructions, prioritizing tasks, and needing extra time to complete tasks. The patient reportedly showed partial insight and poor judgment, and his thought content was deemed appropriate. Overall, the assessment was completed appropriately.

The initial psychiatric assessment in the RHU occurred on April 10, 2024, and the patient expressed relief that he would soon transfer from CCI. His medication regimen was noted to include Prozac, carbamazepine, and Vistaril; those medications were continued unchanged.

Although there was no documentation of the completion of an initial IDTT meeting, on April 3, 2024 an update IDTT meeting occurred. The required staff and the patient attended the meeting. During the IDTT meeting, it was noted that the patient was in the SRMP, but he was appropriately removed after he acknowledged that his suicidal ideation statements were made for secondary gain and were a misuse of mental health resources. The patient was described as exhibiting manipulative behavior, such as feigning "man down" or suicidal ideation when he was frustrated with perceived delays in addressing his needs. The IDTT noted that the maladaptive behavior was observed for several years at different institutions. Although the treatment team encouraged the patient to reduce those behaviors and to establish that as a primary treatment goal; the patient stated that he disagreed with that goal, as he did not see anything wrong with his behavior. Despite recently receiving an RVR after assaulting an officer in the RHU during February 2024, the patient was described as less aggressive toward custody staff. The treatment team set appropriate treatment goals to address the patient's maladaptive behavior and anger management, framing that goal as preparation for eventual parole. Emphasis was also placed on working with custody staff to address misuse of resources and not reinforcing the patient's negative behaviors with attention. While an IPOC for pre-release was established, there were no interventions or measurable goals developed.

On April 16, 2024, an initial IDTT meeting in the RHU occurred that included the necessary participants and the patient. The treatment plan included an IPOC for pre-release planning that included measurable and objective goals for the patient's transition back into the community.

Interventions such as contacting transitional housing programs were identified to support the patient in achieving those goals. The treatment team provided a thorough and appropriate level of care justification.

The patient was seen consistently for psychiatric contacts. He was prescribed various medications to address impulsivity and depression, including loxapine, Lexapro, guanfacine, Prozac, and Tegretol. The patient was resistant to taking oral medications which led to the administration of intramuscular backup injections on multiple occasions in March 2024. On March 15, 2024, the psychiatrist discontinued the patient's PC 2602 medications with the rationale that the patient's behaviors were driven by antisocial personality disorder and not a mental illness. Vistaril was continued. Despite the patient's reported but not observed depression, Prozac was restarted on March 21, 2024 but was later discontinued. Tegretol was prescribed for impulsivity. The psychiatrist ultimately recommended discharge to the 3CMS level of care, as the patient did not exhibit symptoms of a psychotic disorder, mood disorder, or significantly impaired functioning. His diagnosis was confirmed as antisocial personality disorder with pronounced psychopathic traits, and the psychiatrist strongly opined that by the patient receiving more intensive services, it reinforced his negative behaviors and allowed him to use mental illness as an excuse to maladaptive behavior. The patient was seen frequently in response to urgent or emergent consult requests, usually regarding suicidal ideation.

The PC documentation indicated that CBT interventions were utilized in some sessions. The patient showed progress overall with a decrease in suicidal ideation and self-harm incidents in February and March 2024. The patient stopped taking medications after the expiration of the PC 2602 order on February 1, 2024. The PC progress notes indicated that behavioral interventions and positive reinforcement were used to encourage adaptive coping mechanisms and behaviors in response to maladaptive patterns, and some improvement in the patient's insight was noted. Psychological testing was attempted on March 22, 2024, but the patient had an argument with an officer upon exiting his cell and subsequently refused to participate. The PC responded appropriately to the patient's maladaptive behaviors and incidents, and a special IDTT was conducted to address the patient's escalating behaviors. The patient reported that his behaviors escalated when he felt upset or frustrated. The patient was provided with specific psychoeducation and worksheets targeting frustration tolerance. The patient was typically pleasant and cooperative during interactions with the PC, and contacts with the patient were provided at least weekly, sometimes several times weekly. As the patient approached transfer to HDSP, his behaviors escalated, and his frustration increased; this resulted in several instances of report of chest pains and suicidal ideation when his expectations were not met.

The patient was offered multiple recreational therapy group sessions with consistent attendance and active participation. The patient's behavior during those sessions was described as calm and engaged.

**Findings**

The care and treatment provided to this patient were adequate.

Despite missing documentation in the EHRS, relevant clinical information was referenced and pulled forward from other sources. The initial assessments and IDTT meetings occurred timely and were documented appropriately. The patient was seen frequently for clinical contacts with his PC and psychiatrist. Collaboration and frequent consultations between the PC, psychiatrist and custody resulted in effective behavior interventions and a cohesive approach to care. The continuity of care was highlighted by the clarification of the patient's diagnosis, medication adjustments, behavior interventions, and overall improved functioning. The treatment team worked together to address the patient's complex needs.

**Patient DD**

This 43-year-old EOP patient's healthcare record was reviewed to evaluate the quality of care provided at CCI. The patient was provided diagnoses of major depressive disorder, recurrent and methamphetamine use disorder. The patient was prescribed Vistaril, Remeron, and Zyprexa. The patient arrived at CCI on January 22, 2024 from NKSP and was housed at CCI until transfer to WSP on June 25, 2024.

The patient entered CDCR in 2016. The patient had one documented incident of self-harm in 2004 and two MHCB placements; the most recent occurred in 2006. The patient had a history of auditory hallucinations, polysubstance use, traumatic brain injury, and a gamma-hydroxybutyrate overdose. Additionally, the patient had a significant history of severe childhood trauma, and sexual and gender identity issues.

The initial PC assessment occurred on January 29, 2024 and was completed appropriately. The assessment noted the patient's history of depression and command auditory hallucinations. The problem list included major depressive disorder, opioid use, and stimulant dependence. The mental status examination was normal with full insight and good judgment. An EOP functional evaluation was completed and indicated that precautions should occur due to treatment with heat risk medications. The initial treatment goals were to decrease depression symptoms, to maintain sobriety, and to gain clarity on personal identity.

The initial psychiatric assessment occurred several days late on February 9, 2024. The patient requested an increase in Zyprexa; they reported visual hallucinations and command auditory hallucinations to kill themself. The psychiatrist did not observe any evidence of those symptoms and noted that the patient had a history of reporting psychotic symptoms without observable evidence. The patient also reported depressed mood, and the psychiatrist suggested that Zyprexa would address their mood symptoms. The psychiatrist provided diagnoses of unspecified depressive disorder, antisocial personality disorder, severe stimulant use disorder, severe opioid use disorder (currently on suboxone), severe cannabis use disorder, and severe alcohol use disorder. The psychiatrist increased the Zyprexa dosage while continuing all other medications unchanged.

The initial IDTT meeting occurred on February 14, 2024, and the necessary participants and the patient attended the meeting. The patient reported their treatment goals which included reducing depression, exploring their sense of identity, working on sobriety, and securing a job within the prison. Additionally, the patient expressed a desire to participate in as many groups as possible,

including AA/NA, and to improve their chances for parole. A comprehensive case formulation revealed a history of complex trauma. The IPOC identified depressed mood as a primary concern with appropriate goals outlined but lacking specific clinical interventions beyond goal setting. The EOP functional evaluation determined that no accommodations were indicated.

In the update IDTT meeting on April 4, 2024, the necessary participants and the patient attended the meeting. Although the patient was identified as a high treatment refuser, the IDTT noted that they had made progress and attended most groups. The patient had not received any significant RVRs since arriving at CCI, and there were no significant changes to the treatment plan. The PC noted that the patient was mistakenly enrolled in GED classes despite already having a GED, which contributed to his refusal. The patient also expressed disappointment at not having clinical groups and questioned the benefit of recreational therapy groups. The treatment team encouraged the patient to attend recreational therapy groups, and the patient reportedly was receptive. The treatment team indicated that the patient was stable and did not require a higher level of care. IPOCs were not listed or identified in the current treatment plan.

The patient was seen monthly by the psychiatrist; although, there was an instance when the contact interval exceeded 30 days. The patient was not seen for a routine psychiatry contact in May 2024. In June 2024, the patient reported improvement in their symptoms which they attributed to medication treatment. Overall, the treatment and medication adjustments made by the psychiatrist were effective in managing the patient's symptoms.

The initial PC contact occurred as a telehealth wellness check on January 27, 2024, when the patient requested to see the psychiatrist to have their medications reconciled. The patient did not see the psychiatrist until the initial psychiatric assessment on February 9, 2024. Throughout the review period, the patient engaged in biweekly individual sessions and biweekly PC caseload group sessions; additionally, they attended DBT groups. The PC provided effective therapy focusing on sexual and gender identity issues and trauma work, resulting in improvements in the patient's mental status, depression, and insight. After receiving treatment at CCI, the patient was endorsed to FSP to continue their gender identity treatment and therapy. It was noted that the patient appeared to benefit significantly from the treatment received, and appropriate interventions were documented in the progress notes. The patient consistently attended group sessions with active participation.

**Findings**

The care and treatment provided to this patient were adequate.

The PC provided therapeutic support with timely contacts through individual sessions and caseload groups. Although the psychiatric contacts were not always timely, the psychiatrist adjusted the patient's medications appropriately resulting in improvement in symptoms. The treatment plan was brief and lacked specific clinical interventions, but it included most necessary components, and the patient's clinicians provided clinically appropriate interventions during individual contacts and groups. The patient remained stable throughout the review period and showed improvement. Additionally, an updated IDTT meeting was appropriately conducted

when the patient was identified as a high treatment refuser. The treatment plan addressed the patient's needs effectively, and treatment adherence improved significantly.

**California Institution for Men (CIM)**
**July 9, 2024 – July 11, 2024**

**Patient A**

This 62-year-old patient's healthcare record was reviewed to assess the quality of care provided in the EOP at CIM. The patient was provided diagnoses of schizophrenia; panic disorder; alcohol use disorder, severe; and antisocial personality disorder. He was prescribed Thorazine, Prozac, Cogentin, and Vistaril. An active PC 2602 involuntary medication order was in place with an expiration date of September 4, 2024. The patient was described as medication adherent. The patient arrived at the CIM EOP (C-Yard) on March 27, 2024; he was initially placed at the EOP modified level of care, but his level of care changed to EOP on March 29, 2024. His symptoms included mood irritability, and anxiety, as well as auditory and visual hallucinations.

The patient had multiple previous CDCR prison terms since 1983. He re-entered CDCR for his current term on November 23, 2016. In 2020, the patient attacked a psychologist during an IDTT meeting and was convicted of battery on emergency personnel. The patient was serving a life sentence with the possibility of parole with an EPRD of September 15, 2037.

The patient initially entered the MHSDS at the 3CMS level of care in 1996 and received treatment at various levels of care since that time including 3CMS, EOP, MHCB, acute and ICF levels of care. The patient had a history of severe alcohol abuse beginning at an early age. Additionally, he experienced panic attacks, head trauma, and multiple suicide attempts, one of which occurred by overdose while incarcerated in November 2017 and resulted in hospitalization. The most recent MHCB admission occurred on July 5, 2022.

The primary clinician's initial assessment was completed timely on April 10, 2024; however, the clinician primarily verified past documentation with the patient which was copied from past assessments including the suicide and self-harm history from December 30, 2022. The clinical summary and case summary were limited in content and relied on the March 07, 2024 initial treatment plan.

The initial psychiatric assessment was completed timely on April 11, 2024 in a confidential setting onsite, but was not conducted by the patient's assigned psychiatrist. The patient expressed his concerns regarding insomnia; and the psychiatrist discontinued Remeron and added Prozac. Additionally, Thorazine and Cogentin were increased. The initial assessment by the assigned psychiatrist occurred on April 23, 2024; the patient was seen in response to a request that he submitted due to insomnia. At that visit, Vistaril was prescribed to address insomnia and anxiety. The assigned psychiatrist was not present at the IDTT meeting and had not seen the patient monthly since April 23, 2024; as the patient was not present at the institution on April 24, 2024, and the patient refused subsequent appointments on April 26, 2024, May 10, 2024, May 17, 2023, and May 29, 2024. No psychiatric follow-up was provided even though the patient had been refusing treatment.

The initial IDTT meeting at CIM did not occur timely. When the IDTT did convene on April 12, 2024, the patient and all required members except for the assigned psychiatrist attended. The

treatment plan included information pulled forward from the assigned PC assessment which had been reviewed with the patient. The IDTT acknowledged that the patient met the higher level of care criteria for participating in less than 50 percent of group treatment; however, they documented that a referral was not indicated due to the patient's stability at the current level of care, his participation and engagement during individual PC contacts, and his ability to verbalize his concerns and to advocate for himself.

The treatment plan modifications included the PC encouraging the patient to increase treatment participation, to engage in problem-solving, to advocate for needs, and to decrease stress through deep breathing. Although modifications included encouraging the patient to advocate for his needs, this was listed as a justification why referral to a higher level of care was not initiated. The treatment plan listed short and long-term goals to address the patient's irritability, paranoia, and anxiety. The goals were specific and measurable; however, no baseline measures were included nor were expected durations established for a less restrictive level of care. The therapeutic activities including duration outcome and expectation as well as anticipated length of stay were lacking. The interventions that were noted were appropriate and consisted of DBT distress tolerance and CBT to address the patient's irritability and paranoia respectively; however, the intervention for anxiety consisted of increasing the patient's tolerance without a specific plan on how to do so. Despite the patient's lack of participation in group treatment, there was no documentation of consideration of placement at the EOP modified level of care, increased PC contacts, nor were specific interventions aimed at increasing group adherence addressed.

Notably, the primary clinician did not meet with the patient weekly and had only two confidential therapy contacts with the patient within eight weeks of placement in the CIM EOP other than the initial mental health assessment, ICC meeting, and an IDTT meeting. At the PC clinical contact on April 26, 2024, the patient was reportedly found sleeping with irritability noted. The PC used motivational interviewing and active listening, and the patient was able to discuss coping skills of exercising, reading, and listening to the radio.

On May 21, 2024, the patient described hearing other inmates say that he was a child molester and that there was a camera monitoring him; but he was able to conclude on his own that his beliefs were not reality-based, and he did not believe them to be true. The patient also reported isolating but planned to exercise by running. No additional communications to the psychiatrist or referrals were made to increase treatment, nor did the PC increase contacts with the patient to provide additional support.

The patient was scheduled for an average of 1.89 hours of structured therapeutic groups weekly and was offered .95 hours per week on average due to cancellations. He refused .94 hours on average and attended .01 hours of structured treatment over an eight-week period or 22 percent of his therapeutic appointments.

The patient received multiple RVRs during his incarceration. The most recent RVR occurred on March 30, 2024 for disobeying an order which involved lying in bed and not standing for count. He also received RVRs on February 26, 2024 for fighting, in 2022 for refusing housing and

fighting, in 2020 for battery on a non-prisoner that involved attacked a psychologist at an IDTT meeting when told that he would be discharged, and in 2018 for fighting.

**Findings**

The overall care provided to this patient was inadequate.

The initial IDTT meeting was not completed timely. Notably, the patient did not participate in structured therapeutic activities, and there was no assessment to identify barriers to participation, preventing the ability to address those barriers adequately. In addition, the patient was not offered more frequent individual contacts in lieu of group treatment, placed on EOP modified programming, or adequately assessed for a higher level of care. Further, the PC failed to follow up weekly with the patient as required. Moreover, the assigned psychiatrist only met once with the patient, and the patient was not seen monthly by the psychiatrist as required. Lastly, the treatment plan lacked baseline measures for tracking progress as well as specificity regarding therapeutic activities, including duration outcome and expectation as well as anticipated length of stay.

**Patient B**

This 62-year-old EOP patient's healthcare record was reviewed to assess the quality of care provided at CIM. The patient was provided diagnoses of major depressive disorder and opioid use disorder. His symptoms included irritability, anxiety, and depressed mood; he also had a history of suicide attempts. The patient was initially prescribed Prozac and received treatment with Suboxone for opioid use disorder. He was transferred to the CIM EOP (C yard) on March 6, 2024.

He had prior CDCR incarceration and was currently serving his sixth term. He entered CDCR on December 1, 2016 at the EOP level of care to serve a 17-year sentence for voluntary manslaughter with an EPRD of May 7, 2027. He had a history of MHSDS treatment at the 3CMS, EOP, and MHCB levels of care, as well as DSH hospitalizations in 2012. He was initially placed in the MHCB in January 2010 following a suicide attempt that resulted in hospitalization.

On March 12, 2024, the patient met with his assigned psychiatrist who noted that the patient was not adherent to his medication as prescribed. The patient requested that Prozac be discontinued. The psychiatrist noted that the patient was psychiatrically stable and at baseline and discontinued the medication. Later, the patient also reported that he wanted to discontinue Suboxone.

The initial psychiatric assessment occurred on March 13, 2024 but was not conducted by the assigned psychiatrist. The evaluation largely relied on previous assessments. The patient was assessed to require mental health services at the EOP level of care due to his depressive symptoms which presented as irritability. Although the patient denied experiencing depressive symptoms, he reported isolation due to his dislike and mistrust of others. The patient was noted to have a history of childhood sexual abuse and had attempted suicide twice. The first attempt in 2010 occurred while he was incarcerated; it was prompted by increased depression following the

deaths of his son and his son's partner in a car accident as well as with the anniversary of his father's death. The second suicide attempt occurred on January 27, 2012, when the patient was admitted to DSH after he made self-inflicted injuries to his chest and wrist following transfer of his cellmate. The documentation indicated that attempt was considered a "gesture", as the patient reported no intent to die. The patient saw a psychiatrist who was not his assigned psychiatrist on March 19, 2024.

The initial IDTT meeting occurred timely on March 19, 2024; however, the assigned psychiatrist and PC were not present as required. An alternative PC, psychiatrist, CCI, psychiatric technician, and a senior psychologist were present at the meeting as well as the patient. During the IDTT meeting, the patient was described with moderate depression and anxiety but was assessed as stable and not in acute distress. The patient was not prescribed psychotropic medications at that time. The IDTT documentation largely referenced prior reports. Even though the patient had a previous diagnosis of major depressive disorder with a history of suicide attempts; the signs and symptoms justifying the diagnosis were not discussed. Furthermore, despite the patient's two prior suicide attempts while incarcerated; a SRASHE was not completed or updated. The treatment plan did identify problem areas of anger, substance use, and ineffective coping but lacked specificity regarding how progress toward the goals would be measured. Additionally, the rationale for retaining the patient at the EOP level of care and discharge criteria were vague. The patient was referred for MAT to address his opioid use disorder.

On March 22, 2024, the patient was again seen by an alternate PC. On March 25, 2024, he admitted to using illicit substances the day prior and was seen by medical for complaints of nausea. On March 28, 2024, he refused his morning dose of Suboxone, and on May 30, 2024, he reportedly experienced withdrawal due to refusing half of the Suboxone doses. On March 30, 2024, he refused to meet with his PC, so he was assessed at cell-front in a non-confidential setting. Subsequently, the patient refused to provide a urine sample and subsequently received an RVR. The patient declined to participate in a mental health evaluation on May 1, 2024, and the patient tested positive for multiple illicit substances. Over the course of a 12-week period, the assigned PC did not meet with the patient timely. Rather, the PC only met with the patient four times, which was inadequate to address his clinical needs given his level of care.

Although at the time of the initial IDTT meeting it was documented that the patient attended groups; during the 12 weeks of placement in the CIM EOP, the patient was scheduled for an average of 2.34 hours of structured treatment weekly, and due to cancellations was only offered an average of 1.92 hours of treatment. In addition, he attended an average .42 hours of structured treatment weekly or 31 percent of offered groups.

**Findings**

The care and treatment provided to this patient were inadequate.

The assigned PC and psychiatrist did not attend the initial IDTT meeting. Additionally, the PC failed to meet with the patient weekly as required, having only met with the patient four times over 12 weeks. The treatment plan did not specifically address the patient's major depressive

disorder and lacked specificity regarding therapeutic activities, including duration, expected outcomes, and the anticipated length of stay. Further, the signs and symptoms justifying a diagnosis were not discussed. The patient had two prior suicide attempts while incarcerated; however, a SRASHE was not completed or updated. Although the treatment plan listed problem areas to address; it lacked specificity regarding how the progress toward the goals would be measured. The rationale for maintaining the patient at the EOP level of care and discharge criteria were vague. Lastly, the patient did not participate in structured therapeutic activities and was not offered additional treatment such as an increase in individual contacts or modified EOP status which was contrary to the recommended care.

**Patient C**

This 64-year-old EOP patient's healthcare record was reviewed to assess the quality of care provided at CIM. The patient was provided diagnoses of bipolar 1 disorder and opioid use disorder. His symptoms included a history of depression, anxiety, and mania with poor sleep and high energy. The patient also had a significant polysubstance use history. He was prescribed BuSpar, Depakote, and Zyprexa; additionally, he was subsequently prescribed Suboxone to address his opioid use disorder. The patient was medication adherent. He transferred to the CIM EOP on March 5, 2024.

The patient had a history of multiple CDCR incarcerations beginning in 1999. His last term began on December 4, 2023, when he received a 10-year sentence for assault with a deadly weapon with an EPRD of July 10, 2028. The patient had a history of involvement in the MHSDS at the 3CMS and EOP levels of care.

The PC met timely with the patient for the initial assessment on March 13, 2024; however, the patient refused to attend the session, so it was conducted at cell-front in a non-confidential setting. The patient denied any concerns or psychiatric symptoms and was minimally engaged; therefore, the PC reported that they could not assess the patient and relied primarily on prior documentation. Four previous PC assessments were noted, including the most recent ones conducted on February 20, 2024 and December 14, 2023. Notably, the patient had a history of a suicide attempt by overdose in 1996. In addition, during the February 20, 2024 assessment, the patient reported a past suicide attempt by overdose while in custody in 2010. The review also revealed that the patient had a recent substance use history of cocaine, methamphetamine, and alcohol. The patient also admitted in a previous evaluation to abusing Suboxone obtained from another incarcerated person, and he requested to be placed on Suboxone. Treatment goals of reducing feelings or cravings for drug use were documented, but those goals did not specifically address how long the patient would need to rate his cravings within a specified level and how his depressed mood in remission would be measured. Additionally, appropriate treatment interventions were not documented.

The PC again met with the patient on March 18, 2024 for weekly contact in a confidential setting, and the patient reported struggling with drug cravings after abusing Suboxone before arriving at CIM. He denied any mental health concerns, and the PC used appropriate therapeutic empathetic and reflective listening, discussed the use of coping skills to manage negative emotions, and developed a relapse prevention plan.

The psychiatrist met initially with the patient on March 13, 2024 when he was described as stable with no evidence of acute mood, anxiety, or psychotic episodes warranting immediate intervention or hospitalization. A brief suicide risk assessment was conducted, and the patient was assessed with low suicide risk. His medications were reviewed, and no side effects were noted. The psychiatrist provided supportive therapy and psychoeducation, and the patient was continued on his current psychotropic medications.

The PC again met with the patient on March 18, 2024 for the weekly routine contact in a confidential setting and developed a relapse prevention plan. The patient reported that he continued to struggle with drug cravings, and he last used before arriving at CIM. He reported a history of weekly heroin use, mania, mood swings, poor sleep, and high energy, but he stated that his symptoms had improved after medication treatment. The patient denied current mental health concerns. The PC utilized interventions and engaged the patient in discussing coping skills and in developing relapse prevention.

The IDTT meeting occurred timely on March 19, 2024, and the patient was present. The assigned PC, an alternate psychiatrist, a CCI, and psychiatric technician were present at the onsite meeting; however, the assigned psychiatrist was not present. The suicide safety plan from February 20, 2024 was included in the treatment plan, but did not include an updated suicide evaluation. In addition, the clinical summary and case formulation were carried over from previous assessments, and a sufficient rationale was not provided for maintaining the patient at the EOP level of care. Mental health substance use/abuse and depressed mood IPOCs were developed but did not include the duration of monitoring. Long-term goals were not specific regarding how sobriety would be measured, nor was it specific regarding how mania in remission would be measured but did include the duration in which the goals would be met. Appropriate interventions were included for the goals, such as motivational interviewing and CBT. However, the type of therapeutic activities including schedule, duration, outcome, and expectations, compliance with structured treatment, and the patient's anticipated length of stay were not included in the treatment plan. The patient's request for Suboxone was addressed; subsequently, the patient was evaluated by the primary care provider for MAT on March 25, 2024, and a follow-up was conducted on March 29, 2024 when the patient requested an increase in his Suboxone dosage.

The patient was seen by the assigned PC on March 29, 2024 for a weekly treatment contact in a confidential setting. He was assessed for mental health symptoms using open-ended questioning as well as empathetic and reflective listening skills. The patient identified boredom as a trigger for his drug cravings. The patient engaged in relapse prevention planning to target his mental health symptoms. The PC also discussed coping skills and managing negative emotions. The patient again met with his PC two weeks later on April 12, 2024, and the same clinical interventions from the previous session were utilized. The patient was seen by an alternate PC on April 19, 2024, and coping skills were discussed. On April 23, 2023, the patient was seen at cell-front in a nonconfidential setting; as the PC office was under construction, and there was reportedly no other available confidential space. The patient denied any current mental health concerns at that contact. The patient discussed coping skills, and the clinical interventions copied from the previous sessions were utilized.

The PC also facilitated a PC-led therapeutic group on May 13, 2024, and the patient attended and was described as cooperative. On May 22, 2024, the PC met with the patient to assess his current symptoms, safety risks, and a relapse prevention plan. The PC conducted a therapeutic group on May 28, 2024 to discuss distraction to manage negative emotions, and the patient was in attendance and cooperative. On June 5, 2024, the patient refused to meet with PC, and he was seen at the cell-front by the PC; he reported being sick and was minimally engaged.

The psychiatrist did not meet timely with the patient monthly. The second psychiatric contact occurred on May 1, 2024. Although the patient reported doing well, he also reported experiencing some anxiety related to his criminal case which impaired his sleep and resulted in low mood due to anxiety. The patient agreed to the psychiatrist decreasing the Zyprexa dose and increasing Depakote with follow-up in 30 days. On May 29, 2024, the psychiatrist attempted to meet with the patient for a scheduled appointment, but the patient refused. No concerning behaviors were noted, as the patient was medication adherent; the patient was rescheduled to be seen within one to two weeks.

The patient was involved in the ISUDT, and he was seen on June 4, 2023 when he requested an increased Suboxone dosage.

During the review period, the patient was scheduled for an average of 1.66 hours of structured therapeutic treatment but was only offered an average of 1.12 hours weekly due to cancellations. He refused .38 hours of structured treatment and attended an average of .75 hours weekly or 66 percent of offered treatment.

**Findings**

The care and treatment provided to this patient were inadequate.

The PC and psychiatric contacts did not occur timely. Additionally, the patient was not offered the required 10 hours of structured treatment. Furthermore, there was no implementation of additional structured treatment to address the patient's reported trigger of drug cravings reportedly due to boredom, nor was there an increase in the frequency of weekly PC contacts. Moreover, the decision to maintain the patient at the EOP level of care lacked a supporting rationale. There was also a failure to consider placement in the EOP modified program or consideration of referral to a higher level of care. Additionally, the treatment plans were inadequate, lacked a safety risk plan, specific therapeutic activities including schedule, duration, outcome, and expectations, or clearly defined measurable goals for monitoring the patient's progress.

**Patient D**

This 51-year-old patient's healthcare record was reviewed to evaluate the quality of care provided in the CIM EOP. He was provided a diagnosis of bipolar I disorder, current or most recent episode hypomanic. He was prescribed Wellbutrin and BuSpar; additionally, he was

prescribed gabapentin by his medical provider. The patient had a history of medication adherence. The patient transferred to the CIM EOP on March 28, 2024.

The patient entered CDCR in August 2016 to serve a life sentence with parole for attempted murder. His EPRD was June 30, 2041. The patient had received mental health services at the EOP, MHCB, and inpatient levels of care. He first entered the MHSDS at the MHCB level of care on February 6, 2017; he remained there until March 1, 2017 when he transferred to the EOP level of care.

His symptoms upon arrival at CIM included depressed mood, anxiety, irritability, low energy, negative thoughts, loss of interest in activities, and occasional suicidal ideation. He also had facial pain syndrome and temporomandibular joint arthropathy resulting in chronic pain.

The initial mental health assessment was conducted timely on April 8, 2024. The PC assessed the patient and reviewed prior healthcare records including the patient's suicide and self-harm summary. The patient had two prior significant suicide attempts in 2014 by a police officer, and in 2017 while out to court in Oregon by fashioning a noose but was interrupted. The PC assessed the patient's mental health symptoms and functional impairments but relied heavily on previous assessments to develop treatment goals and interventions. The PC also met with the patient on April 23, 2024 when they encouraged the patient to remain focused on the present to avoid negative thoughts. The PC also challenged the patient's negative thoughts, and his relapse prevention for depression was reviewed to which the patient was receptive.

The initial psychiatric assessment occurred on April 16, 2024, and it included a brief suicide assessment. The patient was described with chronic, low-level passive suicidal thought processes. His medications were reviewed and continued. A psychiatric treatment plan was developed on April 23, 2024 to address the patient's anxiety and depression, and his medications were continued.

The initial IDTT meeting on April 23, 2024 did not occur timely, and all necessary participants including the patient were present. As the patient had not been attending structured treatment, the treatment team inquired about his lack of participation; however, the patient did not provide a reason. The PC indicated that it was likely due to the patient's chronic pain and low energy due to depression. The PC also documented that the lack of participation was due to "psychosis," but it was unclear where the PC obtained information to support that statement. The decision to not refer the patient to a higher level of care was based on the patient's limited time to avail himself to the benefits of treatment in the new treatment setting including executing his new goal to engage in treatment and to interact with others in a group setting. Motivational interviewing was provided to encourage attendance and active listening skills. The treatment goals included a decrease in depressed mood, not experiencing suicidal thoughts, taking medications as prescribed, attending treatment, and using coping skills with limited prompts. Treatment planning included initiating the depressed mood IPOC. Although the goal to target depressed mood was specified, it was not specific regarding the frequency and duration the patient had to maintain a self-report of an "8 to 6 or less" on a depression rating scale. In addition, the treatment plan did not address the patient's anxiety, suicidal ideation, or lack of participation in

treatment. Furthermore, the treatment plan did not contain the schedule, duration, outcome expectations of therapeutic activities, and anticipated length of stay.

The patient was consistently seen every 30 days by his assigned psychiatrist in a confidential setting. The treatment appropriately addressed the patient's needs. On May 6, 2024, the patient's mood was assessed, and he reported adjusting to the program and having social contacts. He did endorse wariness around new people in the yard but reported also having social support in the community. His medications were reviewed and continued, and the psychiatrist noted that the patient was engaged in physical therapy to manage osteoarthritis in his knee. He was subsequently seen on June 4, 2024, and the patient reportedly was doing well. He discussed new insights that he had, and his medications were reviewed and continued.

The PC met timely with the patient for individual therapeutic contacts in a confidential setting on May 3, 2024. The patient's coping skills, relapse prevention for depression, and positive thinking were discussed. The patient responded well to the discussion. Furthermore, on May 6, 2024, the PC used cognitive behavioral therapy and mindfulness techniques to assist the patient with positivity with beneficial outcomes. On May 24, 2024, the PC utilized active listening skills to focus on the positive aspects and suggested that the patient seek medical attention due to reports of nausea. On June 6, 2024, the PC also used appropriate treatment to address the patient's negative thinking and noted that the patient's depressed mood had decreased.

During the review period, the patient was scheduled for an average of 3.05 hours of structured treatment weekly of which he was offered an average of 2.55 weekly hours. He attended an average of 1.18 hours, or 22 percent of therapeutic structured treatment.

**Findings**

The care and treatment provided to the CIM patient were inadequate.

Although the initial IDTT meeting did not occur timely, the psychiatrist and PC met with the patient timely and utilized appropriate therapeutic techniques to address his depression. However, treatment planning was deficient. The treatment plan lacked specific measurable goals to target and assess the patient's progress, including duration and frequency. In addition, the patient was not offered the minimum required structured treatment hours weekly, nor was he seen more frequently by the PC to provide additional treatment when indicated. In addition, he not seen by the IDTT monthly, nor was he appropriately assessed to determine barriers to his attendance so that those barriers could be addressed. In addition, the patient was not placed on modified EOP status which may have been clinically beneficial.

**Patient E**

This 74-year-old EOP patient's healthcare record was reviewed to assess the quality of care provided at CIM. The patient was provided a diagnosis of schizoaffective disorder, bipolar type; he had not been prescribed psychotropic medications for the past 10 years. Additionally, the patient had a history of poor impulse control, command auditory hallucinations and severe cognitive deficits. The patient transferred to CIM EOP on February 27, 2024

The patient was serving a one-year four-month sentence for failure to register with an EPRD of August 25, 2024. He had served multiple CDCR terms and began his last term on January 04, 2024.

The initial psychiatric assessment indicated that the patient had three prior suicide attempts, a history of violence, and was assessed as DD2. On March 4, 204, the initial PC assessment was completed timely. The initial IDTT meeting occurred timely on March 8, 2024. The assigned PC, CCI, and the patient were present at the meeting; however, the assigned psychiatrist was not present at the meeting and instead was attended by an alternate psychiatrist. The PC noted that the patient did not participate in the required structured treatment hours, but the PC reviewed the record and noted that the patient had attended EOP groups and individual therapy sessions. Additionally, the patient was classified as DD2 with cognitive decline, and he required constant prompts. Despite this, the patient was not placed on EOP modified status or offered more individual contacts to increase therapeutic interactions. Moreover, despite the patient's history of suicide attempts; there were no details provided regarding his previous suicide attempts, including precipitating factors or triggers specific to the patient. IPOCs for negative symptoms and grave disability were initiated, but the goals were not specific in terms of duration, frequency, and means by which the goals would be measured. Despite the patient's placement on a high refuser list, not attending the required minimum hours of structured treatment, and being noted to require multiple prompts; the IDTT did not list any barriers to treatment and did not include appropriate interventions in treatment planning.

On June 7, 2024 the treatment plan was updated timely, and a grave disability IPOC was initiated to improve the patient's self-care and insight without including measurable goals or adequate interventions. The discharge plan also lacked specificity and did not list the barriers to treatment or adequately justify the level of care.

The PC met with the patient timely in a confidential setting each week and provided encouragement and support to help the patient attend to his ADLs and to improve socialization. The treatment interventions were similar across each session. The patient was, however, not seen monthly for psychiatric contacts as required. Notably, the patient was described as psychiatrically stable and was not prescribed psychotropic medications.

During the review period, the patient attended 49 percent of the offered structured therapeutic treatment. Although he was scheduled for an average of 6.87 hours weekly; due to cancellations, he was only offered an average of 5.21 hours. On average, he refused 2.05 hours weekly and attended an average of 3.37 hours each week.

**Findings**

The care and treatment provided to this patient were inadequate.

Although the patient was not prescribed psychotropic medications, he was not seen timely by his assigned psychiatrist. In addition, diagnostic clarification was not sought to determine the

patient's appropriate diagnosis, given the patient had not been prescribed psychotropic medications in 10 years.

Moreover, despite the patient's history of suicide attempts; no details were provided of the patient's previous suicide attempts, including precipitating factors or triggers that could be identified for treatment. Justification for continuation at the EOP level of care was not provided. The goals were not specified and measurable in terms of frequency, duration, and means. The IDTT did not identify barriers to treatment nor identify a plan to address any barriers present. It also appeared that the patient was not considered for EOP modified status which may have been clinically beneficial considering his limited group participation.

**Patient F**

This 39-year-old EOP patient's healthcare record was reviewed to assess the quality of care provided at CIM. The patient was provided diagnoses of unspecified bipolar and related disorder; schizoaffective disorder, bipolar type; and borderline personality disorder. The patient was prescribed bupropion and was mostly adherent. He arrived at CIM at the EOP level of care on March 28, 2024.

During a previous incarceration, the patient was placed at all levels of care including several inpatient placements. He was released from custody in 2021 from Coalinga State Hospital. The patient was re-incarcerated in January 2024, and was placed immediately at the EOP level of care at the reception center.

Upon arrival at CIM, a physician noted a problematic interaction between a psychotropic medication and a medication the patient was taking for hepatitis C. The patient reported that he had been "spitting out" the psychotropic medication. A referral was made to the psychiatrist to evaluate the patient and to discontinue the oxcarbazepine.

On April 4, 2024, the patient was seen for an initial PC assessment which included minimal updates from prior assessments. There was also a generic case formulation. There was mention of provisional diagnoses of bipolar disorder, most recent episode depressed and borderline personality disorder with no rationale provided. An initial psychiatric assessment was completed on April 8, 2024, and the concerns regarding the patient's medications were addressed. The patient was described as "hypomanic at least" with evidence of tangentiality, elevated mood, flight of ideas, pressured speech, and distractibility. The psychiatrist provided diagnoses of unspecified mood disorder and ADHD, with a provisional diagnosis of bipolar disorder.

An initial IDTT meeting occurred on March 9, 2024. The patient's assigned PC was present; however, the psychiatrist was not assigned to the patient and had not met him previously. A correctional counselor was in attendance, but it was not indicated whether the individual was assigned to the patient. A nurse and senior psychologist were also in attendance, as was the patient. The clinical summary was taken directly from the initial PC assessment and included outdated information that was presented as if it were recent, and the generic case formulation remained unchanged. New individual plans of care were documented to address hallucinations and depressed mood; however, hallucinations and depressed mood were not evidenced in any

initial assessments. The treatment goal was to reduce the patient's ratings of depression, yet no baseline rating was provided. The only intervention listed was "CBT." There was no mention of the psychiatric assessment or medications. No rationale was provided for retaining the patient at the EOP level of care.

The patient was seen for individual contacts with a PC weekly; however, the contacts were offered by three different PCs. The patient refused contacts with his assigned PC, who was a social worker, but agreed to see covering psychologists. The patient primarily complained about the lack of meaningful groups offered to him. The patient did not present with depression or psychosis, despite treatment goals being developed to target those symptoms. A psychiatrist saw the patient more frequently than minimally required. The patient was seen for routine contacts by his assigned psychiatrists, but covering psychiatrists saw the patient for medication nonadherence. Continuity of psychiatric care was maintained, despite the various providers seeing the patient. The psychiatrists universally documented the patient as being tangential, hypomanic, pressured, hyperverbal, and difficult to redirect, while PCs rarely mentioned this presentation. There was no documentation acknowledging nor reconciling those disparate views of the patient.

On average, the patient was offered 1.26 hours of structured treatment and attended 0.26 hours weekly during his stay. The most treatment offered any given week was 2.17 hours. While initially all groups offered to the patient were recreational therapy groups; starting in April 2024, the patient was offered groups facilitated by a psychologist, but he did not attend.

**Findings**

The care and treatment provided to this patient were inadequate.

The patient's presentation and diagnostic picture were documented quite differently by PCs versus psychiatrists, yet there was no apparent attempt to reconcile those differences, even during the patient's IDTT meeting. The treatment goals were inconsistent with the patient's needs or identified symptoms. PC contacts did not consistently evidence the use of interventions to address the patient's needs. The patient was not offered adequate treatment groups. When groups were offered, the patient typically refused, yet there was no documentation of an attempt to address his refusals. The psychiatric care appeared adequate.

**Patient G**

This 59-year-old EOP patient's healthcare record was reviewed to assess the quality of care provided at CIM. The patient was provided a diagnosis of major depressive disorder, recurrent episode, with psychotic features. The patient was prescribed bupropion, mirtazapine, olanzapine, and oxcarbazepine and was adherent. He was transferred to CIM on February 15, 2024.

The patient had multiple periods of incarceration beginning in 1982 and began receiving mental health services in 1996 at the EOP level of care. He had received mental health services at the 3CMS, EOP, MHCB, and APP levels of care. He was most recently incarcerated on January 3,

2024, was placed at the EOP level of care while at the reception center on January 12, 2024, transferred to CIM on February 15, 2024, and released from custody on May 10, 2024.

An initial PC assessment was completed adequately on February 21, 2024; however, the PC only noted one of the patient's currently prescribed medications. The initial psychiatric assessment was completed on February 29, 2024 which was adequate. The initial IDTT meeting occurred on February 29, 2024, yet the assigned psychiatrist who had completed the initial assessment earlier in the day was not present for the meeting. The assigned PC, the chief psychologist, a senior psychiatric technician, and a correctional counselor were also present. It was not documented whether the correctional counselor was assigned to the patient or not. This was significant, as the patient had reported to the psychiatrist that he was frustrated with the correctional counselor who had been present for the patient's classification committee meeting earlier in the day. The patient was present at the meeting. The IDTT documentation was minimally adequate; however, it was not collaborative, as most of the content was pulled directly from the PC's initial assessment and did not include input from the psychiatrist who noted other diagnostic impressions and medications, nor did it include input from other team members. The patient did provide input into his goals. A single treatment goal was included which addressed the patient's mental health needs; however, the goal did not include baseline information. Additionally, the patient was due to be released from prison within the next three to four months, but there was no mention of that fact in the IDTT documentation, despite the PC having been present at the patient's classification committee meeting where his upcoming release date was discussed.

The patient was seen at least weekly by his PC, and there was evidence of interventions consistent with the treatment plan as well as discussion of the patient's upcoming parole. On March 21, 2024, the patient submitted a request to speak with the pre-release planner individually. The patient was seen for a pre-release assessment on March 25, 2024, which evidenced coordination of ongoing mental health services, transportation and housing through his parole office, and documentation that benefit applications were submitted. It was also documented that the patient needed to undergo a mental health assessment to determine if hospitalization was required upon release, yet there was no further mention of this in the patient's healthcare record. Of note, only the first section of the pre-release assessment was completed, with the remainder left blank. The patient requested another individual pre-release contact on March 27, 2024 and was seen on April 5, 2024, and there was adequate documentation that the patient's needs were addressed.

Two routine psychiatric contacts were completed with the patient. Both occurred timely. The contact in April 2024 was completed by a covering psychiatrist who added a medication to the patient's regimen two weeks prior to his release date; however, no further psychiatric follow-up was completed to assess the effectiveness of the medication prior to the patient's release. There was evidence of coordination of medications for parole.

The patient was seen for an "updated" IDTT on April 4, 2024 to determine his ability to participate in the Male Community Reentry Program (MCRP) program. Neither the PC nor the psychiatrist who attended the meeting were assigned to the patient, and the correctional counselor was different than the individual who had been present at the patient's initial IDTT meeting. The patient was present. It was determined that the patient was eligible for MCRP

placement from a mental health standpoint. No further mention of the program or the patient's participation was documented.

On average, the patient was offered 5.92 hours of treatment weekly while in the EOP, and he attended 2.64 hours. The most treatment the patient was offered in any given week was 7.67 hours. Groups were primarily facilitated by recreational therapists. There were nursing-led treatment groups documented, but the topics were unrelated to mental health. There was evidence that the patient was enrolled in pre-release groups as well.

**Findings**

Overall, the treatment of this patient at the EOP level of care was minimally adequate.

Of concern was the fact that he was not offered the number of required treatment hours, group treatment was primarily recreational in nature, documentation of follow-up regarding release planning and assessments was not entered into the healthcare record, and no goal addressing the patient's upcoming release was created. The individual treatment provided to the patient by his PC and psychiatrist addressed the patient's needs. There was adequate evidence of pre-release planning.

**Patient H**

This 37-year-old EOP patient's healthcare record was reviewed to assess the quality of care provided at CIM. The patient was provided diagnoses of unspecified depressive disorder; adjustment disorder, with mixed anxiety and depressed mood; opioid use disorder; and amphetamine type substance use disorder, severe. The patient was prescribed mirtazapine and olanzapine and was moderately adherent. The patient was also prescribed buprenorphine-naloxone. He was transferred to CIM on February 17, 2024.

The patient did not receive mental health services during two prior periods of incarceration. Most recently, the patient entered CDCR in 2021 and was placed at the 3CMS level of care within the first month of his incarceration. He was discharged from the MHSDS for approximately five months before being transferred to CIM on February 7, 2024 for placement at the MHCB level of care after the patient reported suicidal ideation with a plan. He was discharged to the EOP level of care on February 15, 2024, transferred to mainline CIM on February 17, 2024, and released from custody on May 29, 2024.

The patient was seen for five-day follow-up contacts upon discharge from the MHCB. All but the contact on the final day indicated that the safety plan had been reviewed with the patient but not updated. This was concerning, as the safety plan created when the patient was discharged from the MHCB was inadequate and included the same entries for all items regarding clinical impressions and interventions. The entries were focused on substance use and made no mention of suicidality. On the final day of the five-day follow up contacts, the safety plan was not reviewed with the patient, and no rationale was documented.

An initial psychiatric assessment was completed on February 21, 2024 and was adequate. The assessment included a statement that the patient had no family, while other documentation in the record indicated that the patient had a nine-year old son. The psychiatrist provided diagnoses of unspecified schizophrenia and other psychotic disorder, depression, and opioid use disorder which were inconsistent with the diagnoses of record. Rationale for diagnoses was not provided. An initial PC assessment was completed on February 23, 2024 which was largely unchanged from previous assessments. There were minimal updates, and there was no indication that the psychiatric assessment was reviewed.

The initial IDTT meeting occurred on March 1, 2024. The patient's assigned PC and the patient were present; however, the psychiatrist in attendance was neither the assigned psychiatrist nor the psychiatrist who completed the initial assessment. A senior psychiatric technician and a correctional counselor were also present, but it was not documented whether the correctional counselor was assigned to the patient. The IDTT documentation included the patient's safety plan; however, the documentation noted that the patient did not need a safety plan, therefore it was not reviewed during the meeting. It was unclear how that was determined, as the patient had recently been discharged from the MHCB level of care after expressing suicidal ideation with a plan. There were no strengths or goals verbalized by the patient documented. Treatment goals targeted auditory hallucinations and depression with vague objectives and interventions which did not clearly support the objectives and goals. Further, one of the goals was related to substance use, yet there was no mention of the patient's involvement in substance use treatment or medication-assisted treatment. There was no rationale for the patient's placement at the EOP level of care, and no discussion of diagnostic discrepancies.

The patient was not seen as required by his PC during the reporting period, and documentation of sessions was of variable quality. There was some mention of interventions and homework to address the patient's mental health needs, but not consistently. Psychiatric contacts occurred as required for both routine appointments as well as to address medication nonadherence. There was no evidence that the patient was seen for an individual pre-release assessment or individual release planning sessions prior to his transition to the community. The patient was offered seven pre-release groups which he mostly attended.

This patient was offered 6.05 hours of treatment weekly and attended 1.63 hours, on average. The patient was offered at least 10 hours of treatment during two of the weeks in the EOP at CIM. Groups were facilitated primarily by clinicians and appeared to be relevant to the patient's mental health needs.

Prior to his placement at the EOP level of care, the patient underwent an assessment while he was still in the MHCB to determine if he required hospitalization at the time of release,. There was no mention of that assessment in the healthcare record prior to the patient's release.

**Findings**

The care and treatment provided to this patient were inadequate.

The initial PC assessment and the treatment plan were lacking. Weekly sessions with the PC were not offered to the patient nor was sufficient structured treatment. When the patient was seen for treatment, the interventions appeared appropriate. While the patient was offered pre-release planning groups, there was no evidence of individualized release planning, nor any documentation of what plans were in place for the patient upon his release. Diagnostic discrepancies were not addressed, and safety planning was managed poorly.

**Patient I**

This 32-year-old EOP patient's healthcare record was reviewed to assess the quality of care provided at CIM. The patient was provided diagnoses of unspecified anxiety disorder; amphetamine-type substance use disorder, severe; and alcohol use disorder; mild. The patient was prescribed several medications during the reporting period including chlorpromazine, mirtazapine, olanzapine, aripiprazole, and hydroxyzine. He was generally adherent; however, all medications except hydroxyzine ordered prn were discontinued in May 2024. Fluoxetine was started on May 30, 2024, so adherence was not assessed. He was transferred to the mainline EOP at CIM on February 16, 2024.

This patient served three periods of incarceration; during most of which, he was placed at the 3CMS level of care or not enrolled in the MHSDS. His most recent period of incarceration began in November 2023, and the patient was immediately placed at the MHCB level of care on the day of his arrival into CDCR. He was discharged to the 3CMS level of care, returned to the MHCB level of care five days later, was again discharged to the 3CMS level of care only to return to the MHCB in less than one week. The patient was transferred to CIM on February 5, 2024 for placement at the MHCB level of care secondary to paranoia, delusions, and active psychosis which were later determined to have been due to methamphetamine use. He was discharged to the EOP level of care on February 14, 2024.

An initial PC assessment was completed on February 16, 2024 which was mostly adequate. Five-day follow up contacts were completed with the patient; however, the documentation of the contacts was minimal until day four, when it was noted that an emergent consult was submitted by custody and nursing staff due to the patient's "bizarre and aggressive behavior." He was subsequently referred again to the MHCB, where it was again determined that his symptoms resulted from drug use. The patient was discharged back to the EOP level of care on February 29, 2024. Five-day follow-up contacts were completed for six days; however, none of the clinicians who saw the patient reviewed the patient's recent MHCB placement, despite two of the contacts being completed by the patient's assigned PC.

An initial PC assessment was conducted on March 11, 2024, which included additional diagnoses of major depressive disorder, recurrent, moderate without explanation and substance-induced psychosis. Overall, the assessment documentation was minimally adequate. An initial psychiatric assessment was completed on the same day when the patient denied depression but reported anxiety. The psychiatrist provided diagnoses of major depressive disorder, recurrent episode, moderate; adjustment disorder with mixed anxiety and depressed mood; amphetamine-type substance use disorder, severe; and alcohol use disorder, in early remission. The

psychiatrist prescribed mirtazapine to address depression and anxiety, despite the patient denying the presence of depressive symptoms.

An initial IDTT meeting occurred on March 12, 2024 with the required staff and the patient present; however, it could not be determined if the correctional counselor was assigned to the patient. The chief psychologist and a registered nurse were also present. The IDTT noted that the patient had more than three MHCB referrals in the last six months, but decided not to refer the patient to a higher level of care. The rationale was that the patient "will not benefit from a higher LOC at this time," and that his substance abuse issues could be addressed in the EOP. There was no mention of the fact that the patient used illicit substances which required a return to MHCB within four days of discharge from an MHCB to the EOP at CIM. Enhanced interventions included education and cognitive behavioral interventions to support sobriety along with referrals for ISUDT and MAT, yet the patient was already enrolled in ISUDT and had been receiving MAT since December 2023. Treatment goals were created for the patient to address delusions, anxiety, and substance use, yet there were no short-term objectives established and some of the listed interventions were nonspecific. The discharge criteria were generic. There was no mention of diagnostic discrepancies or the need for diagnostic clarification.

Routine psychiatric contacts were not offered as required. When the patient reported to the psychiatrist that he stopped taking his MAT medications, no interventions or referrals were documented. Weekly contacts with multiple different PCs were offered to the patient. The content of sessions was variable, with some PCs providing interventions consistent with the patient's treatment plan, while others simply documented the patient's status. Of note, when the assigned PC saw the patient, the goals and interventions documented were not consistent with the patient's identified treatment goals. Additionally, the assigned PC failed to recognize the patient's decision to stop taking all medications, including MAT medications despite the significance of substance use issues in the patient's mental health and functioning.

The patient began refusing Suboxone and urine toxicology screenings in late March 2024, and refusing all medication by late April 2024. Psychotropic medications were discontinued in early May 2024. The patient reported suicidal ideation on May 14, 2024, and he was referred to the MHCB. Despite the patient recanting his statements and undergoing a suicide risk assessment which determined that both his chronic and acute suicide risks were low with adequate rationale, the patient was admitted to the MHCB. He was discharged back to the EOP on May 22, 2024 after the MHCB IDTT noted that the MHCB placement appeared unnecessary. Five-day follow-up contacts were completed, but the documentation was minimal. A few days after discharge, a consult was placed for a psychiatrist to see the patient due to increased anxiety. The patient was seen and started on fluoxetine.

Within the On-Demand system, it was noted that the patient was offered 6.87 hours of treatment while in the EOP and attended 5.01 hours, on average. He was offered at least 10 hours of weekly structured treatment twice while at CIM. Of note, there was not a single group note entered into the patient's healthcare record during the reporting period. According to On-Demand, the patient's structured treatment hours reflected participation in "Assignment" and ISUDT.

**Findings**

The care and treatment provided to this patient were inadequate.

Diagnoses were unclear resulting in discrepancies in the patient's identified needs and determination of necessary interventions to address those needs. Despite the IDTT identifying substance use as playing a major role in the patient's mental health; there was no coordination or collaboration with substance use treatment staff, and no recognition of the patient's decision to discontinue MAT. Further, there were major concerns with continuity of care with several PCs and psychiatrists seeing the patient and providing discrepant interventions and assessments.

**Patient J**

This 45-year-old EOP patient's healthcare record was reviewed to assess the quality of care provided at CIM. The patient was provided diagnoses of unspecified schizophrenia spectrum and other psychotic disorder and amphetamine-type substance use disorder, severe. The patient was prescribed paliperidone as a long-acting injectable and was fully adherent under a PC 2602 order. He was also prescribed diphenhydramine and benztropine. The patient arrived at CIM at the EOP level of care on April 3, 2024 after being discharged from the ICF level of care.

When received by CDCR in 2021, the patient was placed at the 3CMS level of care for 10 months prior to being placed at the MHCB level of care in July 2022. He was placed at the ICF level of care for 314 days, was discharged to the EOP level of care where he remained for only five days before returning to the inpatient setting. The patient had been placed at the inpatient levels of care (MHCB, APP, and then ICF) for 219 days secondary to severe psychosis, paranoid and somatic delusions, and disorganized thoughts.

Upon arrival, the patient was seen for an initial suicide risk assessment which was adequate. The documentation noted that due to medical issues, the patient was unable to sit for long periods of time, so he did not attend programming. Five-day follow up contacts were completed and were adequate, albeit sparsely documented. An initial psychiatric assessment was completed on April 17, 2024 which was adequate. He was seen by his PC on April 19, 2024, but a comprehensive initial assessment was not completed until April 29, 2024, over three weeks after his arrival at the CIM EOP. The assessment was simplistic with no review of the patient's treatment or progress while in the inpatient setting, nor of his current treatment needs. The clinical summary section included only copied text from several inpatient IDTT meetings with no "summary" at all.

An initial IDTT meeting occurred later than required on April 30, 2024. The required staff and the patient were present, along with a psychiatric technician. Documentation noted that the patient was already enrolled in the Suicide Risk Management Program (SRMP) which was confusing, as there was no evidence that the patient met criteria for enrollment in the program. One treatment goal was created: to address distress related to delusions by talking to staff and stopping to think before acting. There was no mention of psychotropic medications or group programming in the interventions section, yet the discharge section noted that the patient could be discharged to a lower level of care if he was able to maintain medication adherence. Of note, the patient was fully adherent with medication due to the PC 2602 order.

On May 9, 2024, the patient submitted a healthcare request to have his medication changed from an injection to oral form. He was seen in response to this request on May 15, 2024, and the requested change was not made due to the patient's history of nonadherence and subsequent severe decompensation. This was the only documented psychiatric contact during the reporting period following the initial IDTT meeting.

The patient was not seen weekly by his PC, but instead was seen three times in ten weeks. Documentation of those contacts was inadequate and revealed brief check-ins and use of deep breathing. The patient was only offered structured treatment during two weeks of his stay; one week, he was offered 1.88 hours, and the other week, he was offered two hours. The patient refused most of the offered structured treatment. The patient was not offered any treatment at any other time while at the EOP level of care at CIM.

**Findings**

The care and treatment provided to this patient were inadequate.

The initial PC assessment and IDTT did not occur timely and did not address the patient's needs; nor was an adequate treatment plan provided, despite the patient's lengthy history of serious psychiatric needs and persistent mental illness. Neither individual nor group treatment were offered to this patient, and no rationale was provided as to why the patient was not offered adequate treatment.

**Patient K**

This 45-year-old EOP patient's healthcare record was reviewed to assess the quality of care provided at CIM. The patient was provided diagnoses of unspecified schizophrenia and other psychotic disorder; adjustment disorder with mixed anxiety and depressed mood; and amphetamine-type substance use disorder, moderate, in early remission. The patient was prescribed buspirone, quetiapine, and venlafaxine and was fully adherent. He was also prescribed buprenorphine-naloxone. The patient transferred to CIM on April 4, 2024.

The patient was incarcerated on January 10, 2024, and was immediately placed at the MHCB level of care. He was discharged to the 3CMS level of care on January 19, 2024, but was elevated to the EOP level of care on February 1, 2024. During his two prior periods of incarceration, the patient was treated at the 3CMS level of care or was not enrolled in the MHSDS.

The patient was not seen for an initial PC assessment until April 24, 2024; the initial assessment was marginally adequate. An initial psychiatric assessment was also completed later than required on April 30, 2014. It was adequate and included provisional diagnoses of schizoaffective disorder, bipolar type versus bipolar and related disorders based on the patient's reported history of psychotic symptoms and mood symptoms.

An initial IDTT meeting occurred nearly one month after the patient's arrival. The patient, the assigned PC, and assigned psychiatrist were present; however, no correctional counselor was in attendance. The safety plan, which was created in February 2024, was reviewed and appeared adequate. One goal was created to address depression with a measurable goal, yet no baseline information was presented. The planned interventions were adequate. There was no mention of diagnostic impressions by the psychiatrist.

The patient was only seen for routine PC contacts two times during the eight weeks that he was in the program. Contacts included adequate treatment interventions consistent with the treatment plan, when they occurred. Two routine psychiatric contacts occurred with the patient; however, further mention of diagnostic considerations was omitted.

This patient, on average, was offered 2.26 hours of structured treatment weekly. He attended all offered treatment but was not offered more than 3.5 hours any given week.

**Findings**

The care and treatment provided to this patient were inadequate.

Initial assessments and the initial IDTT meeting did not occur within required timeframes. The patient was not offered individual or group treatment consistent with requirements. There was a need for diagnostic clarification, and there was no continuity regarding follow up on diagnostic impressions.

**Patient L**

This 64-year-old EOP patient's healthcare record was reviewed to assess the quality of care provided at CIM. The patient was provided a diagnosis of schizoaffective disorder, depressive type. The patient was fully adherent with his prescribed mirtazapine and olanzapine. He arrived at the CIM EOP on March 6, 2024.

The patient was incarcerated since 1987 and had received mental health services at all levels of care, including not being enrolled in the MHSDS for periods of time. He continuously received mental health services since 1994, and he primarily received treatment at the EOP level of care.

The initial PC and psychiatric assessments were completed timely and adequately; however, the initial psychiatric assessment was not completed by the patient's assigned psychiatrist. An initial IDTT meeting occurred on March 19, 2024 with the patient and his assigned PC in attendance. An alternate psychiatrist participated in the IDTT meeting, but not the individual who completed the initial assessment. It was not indicated whether the correctional counselor in attendance was assigned to the patient. The chief psychologist and a psychiatric technician were also present. The IDTT noted that the patient refused more than 50 percent of offered treatment. The patient explained that he could not get up for early groups, and the IDTT agreed to offer the patient groups later in the day. Due to that accommodation, the patient was not referred to a higher level of care. While IPOCs were initiated during the IDTT to address depressed mood, there were no treatment goals documented for the patient, nor objectives or interventions. This was especially

concerning given the higher level of care trigger which the team indicated would be met with support for group attendance and interventions to address the patient's thinking about treatment. In a progress note later that same day, the PC noted a treatment goal of decreasing the patient's self-rated depression. Despite a focus on increasing patient programming, he was offered 1.57 hours and attended 0.67 hours of structured treatment on average weekly while at CIM. The most treatment offered to the patient any given week was three hours.

The patient was not seen weekly for PC contacts. No sessions were offered between April 16, 2024 and May 1, 2024. Additionally, the patient had a parole board hearing on May 14, 2024, missed his PC contact that day, did not show for a group contact with his clinician on May 15, 2024, and was not seen again until May 28, 2024. During that contact, there was no mention of the patient's parole board hearing. Most sessions with the PC included some evidence of interventions being provided to the patient. Routine psychiatric contacts occurred timely and appeared adequate.

**Findings**

The care and treatment provided to this patient were inadequate given that he was not offered more than three hours of treatment any given week while in the EOP.

This was concerning given that the patient was flagged as having a high treatment refusal rate. Additionally, there was no follow-up with the patient following a parole board hearing.

**Patient M**

This 48-year-old EOP patient's healthcare record was reviewed to assess the quality of care provided at CIM. The patient was provided a diagnosis of major depressive disorder, recurrent episode, with psychotic features; however, elsewhere in the healthcare record, diagnoses of unspecified schizophrenia spectrum and other psychotic disorder and adjustment disorder with anxiety were present. The patient was adherent to his medication regimen which included hydroxyzine, mirtazapine, risperidone, and venlafaxine. He was also prescribed buprenorphine-naloxone. The patient transferred to CIM at the EOP level of care on February 27, 2024.

This patient was incarcerated in CDCR for the first time on December 6, 2023. He was placed at the MHCB level of care on December 27, 2023 while at the reception center and was discharged to the EOP level of care on January 4, 2024.

An initial psychiatric assessment was completed on February 29, 2024 which was adequate and included diagnoses of schizophrenia, unspecified depressive disorder, unspecified anxiety disorder, and a provisional diagnosis of schizoaffective disorder, depressed type. An initial PC assessment was completed on March 4, 2024. There was mention of review of the psychiatric assessment, but no acknowledgement of the psychiatrist's diagnostic impressions as the PC provided a diagnosis of major depressive disorder, recurrent episode, with psychotic features.

An initial IDTT meeting occurred on March 8, 2024 with the patient and his assigned PC present, but an alternate psychiatrist covered the meeting and had not met the patient previously.

It was unclear whether the correctional counselor who was present was assigned to the patient. A psychiatric technician was also in attendance. In the section related to higher level of care indicators, patient participation in EOP programming was not addressed, so it was unclear if the patient had been consistently participating in EOP programming prior to his transfer to CIM. Diagnostic discrepancies were not acknowledged nor addressed during the IDTT meeting. The patient indicated that he hoped to work on his anxiety, which was not identified in his diagnoses of record. The treatment plan included a goal to decrease anxiety that was measurable but without a baseline assessment. The treatment interventions were appropriate.

An IDTT meeting occurred on April 2, 2024. The patient's assigned psychiatrist was present, but an alternate PC conducted the meeting. A correctional counselor and psychiatric technician were present as well. The patient was not present for the meeting, as he was noted as "being out to medical." The IDTT was held to discuss referring the patient to the MCRP, and the patient was aware and in agreement with referral to the program. The IDTT determined that there were no mental health barriers to placement in the MCRP. The patient was informed of the decision the following day, and a classification committee meeting was held with the patient on April 11, 2024 to discuss the process of transfer.

The patient was seen as required for routine PC and psychiatric contacts. The PC contacts evidenced interventions consistent with the treatment plan, and the psychiatric contacts were adequate in addressing the patient's treatment needs.

On average, the patient was offered 10.46 hours of treatment weekly and attended 6.99 hours. The patient was offered at least 10 hours of treatment five weeks while at CIM. Groups were offered by a variety of staff including clinicians, recreational therapists, and nurses.

**Findings**

The care and treatment provided to this patient were adequate; however, diagnostic clarification was needed.

**Patient N**

This 61-year-old EOP patient's healthcare record was reviewed to assess the quality of care provided at CIM. The patient was provided a diagnosis of persistent depressive disorder. The patient was fully adherent to his prescribed fluoxetine. He transferred to CIM on March 6, 2024.

The patient was incarcerated since 1992 and was treated at the 3CMS level of care or not enrolled in MHSDS for most of his incarceration. However, during January 2019, he was placed at the MHCB level of care and subsequently at both the APP and ICF levels of care through November 2019. There was one attempt to move the patient to the EOP level of care on January 29, 2019, but the patient was placed at the MHCB level of care on January 30, 2019, and returned to the acute level of care on February 11, 2019. The patient was ultimately discharged from inpatient care to the EOP level of care on March 16, 2022.

An initial psychiatric assessment was completed on March 19, 2024 which noted that in addition to his psychiatric concerns, the patient also had a diagnosis of Dandy-Walker syndrome which resulted in headaches for the patient. The assessment was comprehensive.

An initial PC assessment was completed on March 20, 2024, the day after the patient attended his classification committee meeting. The patient's assigned PC did not attend the classification committee meeting. The initial assessment was mostly adequate; however, the clinical summary was unchanged from 2023. During the assessment, the patient expressed passive suicidal ideation and had a history of suicide attempts, yet no suicide risk assessment was conducted.

An initial IDTT meeting occurred later than required on March 22, 2024. The patient was present along with his assigned PC, an alternate psychiatrist who had not met the patient previously, a psychiatric technician, and a correctional counselor. It was noted that the patient had refused over half of offered programming prior to his transfer but had been engaged in treatment since arriving at CIM; and as such, a referral to higher level of care was not indicated. In the patient's verbalized treatment goal section, it referenced meetings with the PC every 90 days and an annual IDTT meeting. This was reflective of treatment at the 3CMS, not EOP level of care. The treatment plan included measurable goals to address anxiety and depression, with vague interventions. The rationale for retention at the EOP level of care was generic.

Routine contacts with a PC occurred weekly, except between May 7, 2024 and May 24, 2024. The contacts included documentation of appropriate interventions to address the patient's depression and anxiety; however, the patient struggled with thoughts of suicide, and no formal assessment of risk was completed at any time during the reporting period. However, the PC reviewed risk and protective factors and provided an informal assessment of risk during most contacts.

The patient was not seen for a routine psychiatric appointment during May 2024, but he was seen in March and April 2024. The contacts were adequate and appeared to address the patient's treatment needs.

This patient was offered 5.22 hours and attended 2.15 hours of weekly structured treatment, on average. The most treatment the patient was offered was 9.5 hours in a single week.

**Findings**

The care and treatment provided to this patient were inadequate.

A formal suicide risk assessment appeared indicated given the patient's self-reported passive suicidal ideation and history of serious suicide attempts. Also, the initial PC assessment and initial IDTT were completed later than required, and the patient was not seen as required by his PC or psychiatrist, nor was he offered structured treatment hours consistent with the Program Guide. Overall, when the patient was seen, the interventions met his needs.

**Patient O**

This 52-year-old transgender female EOP patient's healthcare record was reviewed to assess the quality of care provided at CIM. The patient was provided a diagnosis of major depressive disorder, recurrent episode, moderate. The patient was not prescribed psychotropic medications daily, but instead had a prn prescription for mirtazapine. She transferred to CIM on March 27, 2024.

This patient was incarcerated in 2005 and was placed at the 3CMS level of care or not enrolled in MHSDS until December 2021, when she was placed at the MHCB level of care. She was discharged to the EOP level of care in January 2022, where she remained.

The patient was seen for a timely initial PC assessment. The assessment included no chief complaint and provided the patient with a diagnosis of major depressive disorder, recurrent with psychotic features, but no rationale for the diagnosis was provided. Of note, the previous PC assessment which was completed in January 2024 noted that the patient identified as female and female pronouns were used. This was also noted in the banner bar of the patient's healthcare record, yet there was no mention of the patient's gender identity in the current assessment or in any documentation entered into the healthcare record once the patient arrived at CIM.

The patient had a cardiovascular incident shortly after arriving at CIM which required an angiogram, placement of a stent, and treatment in the ICU. Upon return, the patient was referred to the psychiatrist for follow up and was seen on April 17, 2024. This contact occurred later than required, but was acceptable given the patient's placement in the hospital.

An initial IDTT meeting occurred on April 19, 2024 with required staff and the patient present. A psychologist and psychiatric technician were also present. No treatment goals were created, yet IDTT documentation referenced addressing the patient's depression with cognitive behavioral therapy. The rationale for retaining the patient at the EOP level of care was adequate.

On average, the patient was offered 2.04 hours of structured treatment and attended 1.21 hours. The most treatment the patient was offered in a single week was 4.7 hours. The patient was not offered weekly PC contacts. The contacts that occurred evidenced a review of symptoms and the use of interventions to address the patient's depression and anxiety. Routine psychiatric appointments were consistent with expectations.

**Findings**

The care and treatment provided to this patient were inadequate.

The treatment plan included no treatment goals, the patient was not offered treatment consistent with requirements, and diagnostic clarification was needed. Additionally, the patient arrived at CIM with clinical documentation that she identified as transgender and preferred female pronouns, yet this was not acknowledged at any point during the reporting period at CIM.

**Patient P**

This 60-year-old EOP patient's healthcare record was randomly selected and reviewed to assess the quality of mental health care provided at CIM. At the time of review, the patient was provided diagnoses of major depressive disorder, recurrent, with psychotic features, and antisocial personality disorder. He was prescribed sertraline and buspirone for symptoms of depressed mood and anxiety and appeared to have been generally medication adherent during the review period.

Prior to his arrival to the CIM EOP at the end of February 2024, the patient had a lengthy history of mental health treatment in the CDCR. The patient received mental health services at all levels of care, including treatment at DSH in 2007. He had received mental health services at the EOP level of care continuously since October 3, 2019. He reported a history of suicidal ideation and two suicide attempts by hanging in 2009. In mid-February 2024 before arriving at CIM, the patient engaged in a hunger strike to protest what he perceived as lack of medical care at his previous institution.

In addition to his mental health treatment, the patient had medical conditions that included type II diabetes, obstructive sleep apnea, hyperlipidemia, hypertension, gastroesophageal reflux disease, stage III chronic kidney disease, a benign cyst on his right kidney, a lipoma on his scalp, hematuria, and prostate cancer. His cancer reportedly responded well to treatment, while his hypertension was described as difficult to stabilize. While at CIM, the patient was evaluated offsite for chest pain with findings of diastolic dysfunction and asymptomatic bradycardia.

The patient transferred to CIM on February 29, 2024, and he was immediately placed at the EOP level of care. The initial mental health assessment was completed on the following day and was thorough. The patient was evaluated by psychiatry on March 11, 2024. Trileptal was discontinued, as the patient complained about side effects, and the medication was not detected in his laboratory results. Additionally, sertraline was restarted for depression and anxiety, and buspirone was restarted for anxiety. The psychiatrist indicated that the patient's symptoms had improved. Of note, the EHRS indicated that the pharmacist flagged the potential for a medication interaction between sertraline and buspirone that could result in serotonin syndrome. This concern was communicated to the prescribing psychiatrist on the same day that the medications were restarted. Both assessments were completed in person and in a confidential setting.

The initial IDTT meeting occurred timely and in person on March 12, 2024, and the assigned primary clinician, an alternate psychiatrist, a nurse, and the patient attended. A reasonable and measurable treatment goal was developed to address the patient's depression, and the treatment plan was consistent with both the psychiatric and the initial mental health assessment. As the patient was newly placed at the EOP level of care at CIM, the treatment plan appropriately retained him at that level of care for stabilization of his depressive symptoms.

Following the initial IDTT meeting, the patient was seen on two occasions by psychiatry, on March 28, 2024 and on May 9, 2024. Both visits occurred in person in confidential settings. During the May 9, 2024 visit, the psychiatrist noted that some of the patient's apparent psychotropic medication nonadherence at CIM may have been due to offsite medical care. The

psychiatric care provided was consistent and in accordance with the treatment plan; however, 42 days lapsed between the March 28 and the May 9, 2024 psychiatric encounters, and as of June 13, 2024, the pending psychiatric encounter was overdue.

The patient was seen regularly by his assigned primary clinician who consistently tracked his level of depression, identified contributing factors and cognitive-behavioral interventions to address his depression, and assigned concrete homework to address symptoms. The PC contacts occurred in person and in a confidential setting, and the content of those contacts was clear and consistent with the treatment plan.

During the review period, the patient was offered an average of only 2.92 hours of structured group activities weekly; of those, he attended an average of 2.08 hours. At no time was he offered 10 hours of groups for any given week. The documentation of group participation was minimally adequate. Notably, a May 29, 2024 mood management group note indicated both that the patient was a no show and that he contributed in a manner that was very beneficial to the group.

**Findings**

The care and treatment provided to this patient were marginally adequate.

The assessment and treatment planning process occurred appropriately, and both psychiatric and primary clinician individual interventions consistently addressed the patient's symptoms. Additionally, his treatment engagement and progress were closely monitored. The patient was, however, not seen timely by the psychiatrist. However, insufficient group activities were offered; this was especially problematic because the patient informed the treatment team that lack of activity contributed to his depressive symptoms. As documented, the patient appeared to enjoy and to benefit from group activities when offered.

**Patient Q**

This 61-year-old EOP patient's healthcare record was randomly selected and reviewed to assess the quality of mental health treatment provided at CIM. The patient was provided diagnoses of schizoaffective disorder, depressed type; amphetamine use disorder by history; opioid use disorder by history; PTSD by history; and antisocial personality disorder by history. At CIM, he was initially prescribed olanzapine, lithium, and fluoxetine to address symptoms of auditory hallucinations, depression, and potential suicidal ideation, as well as hydroxyzine PRN for anxiety. His medications were subsequently adjusted as later described.

The patient had a lengthy history of CDCR incarceration; and during the period between 1984 to 2001, he did not receive mental health treatment. Since 2001, the patient had multiple changes in his level of care, and he received treatment at the 3CMS, EOP, MHCB, and ICF levels of care. The documentation indicated a history of three suicide attempts (the most recent in 2005), violence, and impulsivity, as well as recent concerns for safety in the context of perceived peer threats/conflicts. He suffered both physical and sexual abuse as a child and violent and/or traumatic losses within his family.

The patient had multiple medical conditions, including cholelithiasis, cirrhosis of the liver, coronary artery disease with a history of coronary angioplasty, hyperlipidemia, hypertension, type II diabetes, a seizure disorder, history of exposure to tuberculosis, history of late syphilis, HIV disease, allergic rhinitis, asthma, macular scarring, and cataracts.

The patient transferred to CIM on February 22, 2024, when he was placed at the EOP level of care on the date of arrival. The initial mental health assessment occurred on February 29, 2024, and it included a thorough review of the patient's psychiatric history, current presentation, and treatment needs. The initial psychiatric assessment occurred on March 4, 2024 and was thorough despite the patient's desire to keep the appointment brief. Both the initial mental health and the psychiatric assessments were completed in person and in a confidential setting.

The IDTT meeting occurred on March 5, 2024 and was attended in person by the primary clinician, an alternate psychiatrist, a correctional counselor, and a psychiatric technician. The patient declined to attend the IDTT meeting, stating that he was feeling physically unwell; this was a pattern that appeared to characterize much of his subsequent treatment engagement. The treatment plan goals were not measurable and addressed only the patient's depression rather than psychotic symptoms. A subsequent IDTT meeting for a treatment plan review that was due on June 5, 2024 had not occurred as of June 13, 2024.

After the initial March 4, 2024 psychiatric assessment, a psychiatrist saw the patient on three occasions, on April 2, May 2, and May 23, 2024. The latter two contacts occurred at cell front because the patient declined to leave his cell for a confidential clinic appointment. He was also scheduled to see his assigned psychiatrist on May 16, May 30, June 7, and June 13, 2024; however, he refused each of those appointments and was rescheduled.

During the course of treatment, haloperidol was prescribed, and the dosage was increased; concurrently, olanzapine was reduced and then discontinued. Those changes occurred to address ongoing auditory hallucinations and other psychotic symptoms while limiting sedation and side effects that could exacerbate the patient's diabetes and hyperlipidemia. Lithium was also increased to address mood symptoms, and Cogentin was added to address nighttime agitation that the psychiatrist determined might be a side effect of haloperidol. On May 2, 2024, hydroxyzine, which had been prescribed PRN was discontinued, as it was noted that the patient had last requested the medication on December 8, 2023. The patient agreed with those changes and was adherent to his psychotropic medications. The psychiatric documentation included the rationale for medication changes and the patient's response to those changes.

The assigned mental health clinician met with the patient weekly, with one exception between May 23, 2024 and June 6, 2024. Those encounters addressed the patient's depressive symptoms, coping skills, and limited engagement in mental health treatment. The mental status documentation consistently omitted assessment for auditory hallucinations. The primary clinician provided the patient with concrete homework and followed the treatment plan. The documentation indicated that both custody and the primary clinician asked the patient to leave his cell for a confidential contact on those occasions. However, several of those encounters occurred cell front when the patient declined to leave his cell.

During the review period, the patient was offered an average of 5.64 hours of structured group activity. On average, he attended only 2.18 hours of group each week. He was not offered 10 or more hours of group activity during any of the weeks reviewed.

**Findings**

The care and treatment provided to this patient were inadequate.

The treatment plan did not address ongoing psychotic symptoms, and a review of the treatment plan did not occur within the required timeframe. Had that review occurred, it was likely that the treatment team would have concluded that the patient had not shown sustained or consistent improvement. He declined to participate in most groups and some medical care, and he declined to leave his cell. Psychotic symptoms were noted during psychiatric encounters but not during primary clinician encounters. In fact, the PC documentation did not include assessment of possible auditory hallucinations. While the patient's psychotic symptoms may have prevented him from tolerating more than five hours of group activity weekly, this was not clearly documented in the healthcare record. The patient was never offered 10 hours of group activity in any week, and exploration of the potential role that serious mental illness played in his declining out-of-cell treatment was insufficient.

**Patient R**

This 50-year-old EOP patient's healthcare record was randomly selected and reviewed to assess the quality of mental health care provided at CIM. The patient was provided a diagnosis of mood disorder, unspecified and a provisional diagnosis of major depressive disorder, recurrent, severe with psychotic features. Additional diagnoses of opioid and methamphetamine use disorders were also present in the healthcare record. The patient was prescribed mirtazapine, olanzapine, and buspirone to treat symptoms of depression and anxiety. The patient was involved in the ISUDT where he was prescribed Suboxone to address his opioid use disorder.

The patient's history included extensive juvenile detention involvement, chronic homelessness, depression with recurrent suicidal ideation without documented suicide attempts, and illicit substance use including intravenous methamphetamine and opioid use. He was incarcerated in CDCR from 1997 to 2009; however, he did not receive mental health services at that time. In 2009 he was first admitted to an MHCB after becoming incoherent and paranoid due to illicit drug use. After that placement, the patient received mental health services at the 3CMS, EOP and MHCB levels of care. After release from CDCR and spending some years in the community, the patient was returned to the CDCR on November 9, 2023 and placed at the EOP level of care at the time of reception. During his prior and current CDCR incarcerations, the patient received RVRs due to the use of illicit substances.

The patient tested positive for hepatitis C with a high viral load but refused treatment. A May 17, 2024 MAT progress note documented the patient's report that he intended to use intravenous substances upon his release from incarceration and therefore refused hepatitis C treatment. No other relevant medical conditions were listed in the healthcare record.

The patient transferred to CIM on February 20, 2024, and he was placed in the EOP on the day of arrival. The initial psychiatric assessment was completed in person and in a confidential

setting two days later. The documentation reflected a detailed review of the patient's history and treatment, and a lengthy history of illicit substance use while incarcerated was noted. Mirtazapine, olanzapine, and buspirone were continued unchanged from the dosages prescribed at the prior facility. The initial mental health assessment was completed on February 27, 2024; it included a careful review of risk factors and adequate case conceptualization.

The IDTT met on March 1, 2024 to formulate an initial treatment plan. The patient, assigned primary clinician, alternate psychiatrist, correctional counselor, and psychiatric technician attended the meeting in person. A realistic and measurable treatment goal to reduce anxiety was established and was arguably consistent with the patient's confirmed diagnosis of mood disorder. Given the patient's recent arrival to the CIM EOP, it was determined to retain him in the EOP to stabilize his symptoms.

Following the initial psychiatric assessment on February 22, 2024, the patient was seen by a psychiatrist on March 21, 2024 and again on May 1, 2024 by another psychiatrist. The patient declined to attend his April 24, 2024 psychiatric appointment. Both encounters occurred in person; and in both encounters, the patient complained of fatigue and requested treatment with bupropion. Both psychiatrists declined his request, noting that the patient did not meet criteria for treatment with a nonformulary medication, and that the patient had tested positive for amphetamine on March 12, 2024. A reduction in the dosage of his existing psychotropic medications was offered to help with feelings of fatigue, but the patient declined any medication changes. The documentation indicated that the patient remained psychiatrically stable during this period. As of June 13, 2024, he had not been seen by psychiatry since May 1, 2024.

The patient was regularly seen by a mental health clinician from March 5, 2024 to May 15, 2024. Thereafter, he was seen only once on May 31, 2024. All encounters occurred in person; encounters during March 2024 occurred in a confidential setting. On March 20, 2024, the primary clinician noted an update of the treatment goal to decrease depression rather than anxiety. Beginning in early April 2024, the patient began refusing clinic appointments; subsequently, several primary clinician encounters occurred cell front. Primary clinician encounters focused on engaging the patient in active treatment but were essentially supportive in nature.

The patient was offered an average of 6.79 hours of group activity weekly during the review period. During two of those weeks, he was offered at least 10 hours of group programming; and during the third week, he was offered 9.25 hours of groups. The patient, however, did not attend most groups; he attended an average of 1.61 hours of group programming weekly. He complained that he was unable to wake up before 11:00 am and therefore missed his groups. At least five group progress notes indicated that the patient attended the full group session and simultaneously stated that he did not attend. Group notes also indicated that the patient's mood was expansive and that he had difficulty attending to the discussion at hand.

During this time period, the patient tested positive for amphetamine and methamphetamine on March 12, April 11, and May 29, 2024; he also tested positive for fentanyl on April 11, 2024. On April 22, 2024, he received an RVR for possession of drug paraphernalia, and the subsequent mental health assessments recommended that the patient not be deprived of access to packages

and canteen. During May 2024, the patient's MAT provider began tapering his Suboxone due to treatment nonadherence.

On May 31, 2024, the IDTT met in person with the patient to review his treatment plan. The treatment plan was revised to focus on depression rather than anxiety but was otherwise unchanged in content. No discussion of the patient's recent use of illicit substances was documented. The treatment team determined to retain the patient in the EOP to continue to address his depression.

**Findings**

The care and treatment provided to this patient were inadequate.

There was a lack of consideration of the role of current and historical substance use on the patient's psychiatric symptoms. Neither his provisional diagnosis of major depressive disorder, severe, with psychotic features nor his mood disorder were resolved during nearly four months of EOP treatment. The challenges interfering with his engagement in structured group and individual treatment were not adequately explored or addressed. Coordinated treatment involving mental health, medical and the ISUDT staff was needed to provide appropriate treatment planning and to address the full scope of this patient's mental health challenges.

**Patient S**

This 55-year-old EOP patient's healthcare record was randomly selected and reviewed to assess the quality of mental health care provided at CIM. The patient was provided diagnoses of social anxiety disorder; panic disorder without agoraphobia; ADHD, predominantly inattentive type; antisocial personality disorder by history; and generalized anxiety disorder by history. He was initially prescribed prazosin for nightmares, sertraline for depression and anxiety, and hydroxyzine PRN for anxiety. Those medications were continued from his treatment at the previous institution.

The patient had a history of childhood verbal, physical, and sexual abuse, childhood head-banging, and convictions for sex offenses as an adult. The patient was incarcerated in CDCR from 1994 to 2004; during that time, he did not receive mental health services. Subsequently, he received treatment at the 3CMS, EOP, acute, and intermediate levels of care following three suicide attempts in 2005, 2021, and 2022; the 2021 overdose attempt was documented as potentially fatal absent the medical intervention that was provided. He received mental health services at the EOP level of care continuously since 2003.

The patient's medical conditions included a history of right kidney donation to his sister, immunosuppression, chronic kidney disease, hypertension, osteopenia, left knee pain, sarcoid myositis, and vitamin D deficiency.

The patient arrived at CIM on February 26, 2024 and was placed in the EOP on the day of arrival. The initial mental health assessment was completed in person on March 1, 2024 and included a thorough evaluation of the patient's social and mental health history as well as current presentation. He reported daily passive suicidal ideation with no plan or intent, with instead a desire to live. The licensed clinical social worker who completed the assessment concluded that

the patient met the criteria for a diagnosis of PTSD and thoroughly documented the rationale for that diagnosis on a symptom-by-symptom basis.

The patient was next seen by the assigned mental health clinician on March 7, 2024, and the patient and PC determined that the focus of treatment would be on reducing anxiety. However, when the treatment team met with the patient to complete the treatment plan on March 8, 2024, it was determined that the focus of treatment would be on reducing depression. Attending the IDTT meeting in person were the assigned mental health primary clinician, an alternate psychiatrist, a correctional counselor, a licensed psychiatric technician, and the patient. As documented, the treatment goal of reducing depression was not measurable; although, it was broadly consistent with the patient's reported symptomatology and desired focus of care.

The patient was not seen for a psychiatric assessment until March 11, 2024, three days after the IDTT meeting. The assessment was thorough and individualized, and resulted in continuation of prazosin, sertraline, and hydroxyzine at the same doses with which the patient arrived at CIM. He was not seen by a psychiatrist again until May 17, 2024, or 67 days later. At that time, the prazosin dose was decreased to reduce a potential side effect, and it was noted that the patient was not experiencing nightmares. Sertraline was continued unchanged, and Strattera was initiated to address symptoms of ADHD. The patient had subsequent psychiatric encounters on May 22, 2024 when no medication changes occurred; and on June 6, 2024, the prazosin dosage was again decreased, and the Strattera dose was increased. All psychiatric encounters occurred in person and in a confidential setting. The psychiatric documentation, including the rationale for dosage changes and the patient's response to medications, was thorough.

The patient's assigned primary clinician consistently saw him in person weekly during the review period, and almost always in a confidential setting. On one occasion, the patient declined to leave his cell and at that time he was seen cell-front. The content of the sessions was focused on understanding, monitoring, and reducing the patient's depression. The treatment interventions were consistent with the treatment plan and were clinically appropriate for depression; however, the interventions may not have addressed the full scope of symptoms including anxiety, inattention, and possible post-traumatic symptoms.

Between February 26, 2024 and June 10, 2024, the patient was offered an average of 3.99 hours of group activity weekly, and he reportedly attended an average of 2.49 hours of groups weekly. When documented, the patient's group participation indicated active engagement; group progress notes on May 10, May 15, May 24, May 29, June 5, and June 12, 2024 all indicated both that the patient was in "full session attendance" and that he did not attend the group session.

**Findings**

The care and treatment provided to this patient were inadequate.

The initial treatment plan was developed before the psychiatric provider evaluated the patient and therefore could not benefit from that assessment. An extensively detailed, symptom-focused mental health assessment by a licensed clinical social worker concluded that the patient had symptoms consistent with a diagnosis of PTSD, but that assessment did not appear to have been considered by other members of the treatment team. A follow-up psychiatric appointment was

late by more than one month, and group programming was not offered as required. The documentation of the patient's participation, or lack of participation in groups was often unclear and contradictory within the same group progress note.

**Patient T**

This 45-year-old EOP patient's healthcare record was randomly selected and reviewed to assess the quality of mental health care provided at CIM. The patient was provided a diagnosis of schizoaffective disorder, bipolar type, and he was prescribed olanzapine and oxcarbazepine to address symptoms of psychosis, depression, and anxiety.

The patient began receiving outpatient mental health care in the CDCR in 2003, and he was placed at the EOP level of care between 2007 and 2009, and again between 2014 and 2015. He variously reported either two or ten suicide attempts with the most recent occurring in January 2023, and five community psychiatric hospitalizations. The patient had an extensive history of cannabis, alcohol, hallucinogen, opioid, and methamphetamine use dating to age 16, when he also reported the onset of mental health symptoms. Methamphetamine appeared to be his preferred substance, and he reported his last use approximately six months before transfer to CIM. He was physically healthy with no medical conditions documented.

The patient transferred to CIM on February 15, 2024, when he was continued in the EOP. On the afternoon of arrival, nursing staff placed an urgent referral to mental health because the patient complained of depression. He was seen timely by a licensed mental health clinician on the following day, when the patient reported that he had begun adjusting to the EOP, including participating in programming and recreation, and was no longer experiencing depression or acute distress.

The initial mental health assessment was completed in person on February 22, 2024 in a confidential setting; it included a thorough review of the patient's mental health treatment. The IDTT met in person on March 1, 2024 to develop an initial treatment plan; the assigned primary clinician, alternate psychiatrist, correctional counselor, psychiatric technician, and patient all attended. The treatment plan goals were reasonable, measurable, and addressed both hallucinations and depression. However, the treatment plan was developed before the initial psychiatric evaluation was completed.

The patient was seen for the initial psychiatric evaluation on March 6, five days after the initial IDTT meeting and 20 days after his arrival to the CIM EOP. The evaluation was confidential and conducted in person. The documentation of that evaluation was thorough and detailed, specifying the type and content of reported hallucinations. No medication changes were made, but additional psychiatric diagnoses of substance-induced psychosis, unspecified anxiety disorder, and stimulant (methamphetamine) use disorder, in early remission, were documented.

Appropriately, following the initial psychiatric evaluation, the IDTT met again to review the treatment plan with consideration of the psychiatric evaluation. The plan was expanded to include a treatment goal addressing suicidal ideation, from which the patient had previously experienced. This meeting was attended in person by the patient and an alternate primary clinician, alternate psychiatrist, correctional counselor, and a nurse.

The patient was next seen by a psychiatrist on March 29, 2024, when he was described as stable, and no changes in treatment were made. A third psychiatric encounter occurred on April 26, 2024, when the patient reported that he had experienced a stress-induced period of three to four days during which he experienced auditory and visual hallucinations. The episode was appropriately explored, and possible medication changes were offered which the patient declined. The psychiatrist assessed the patient as stable. Both the March 29 and the April 26, 2024 encounters occurred in person and in confidential settings. As of June 13, 2024, no psychiatrist had seen the patient since April 26, 2024, and a treatment plan review had not occurred.

The patient was seen by his primary clinician on alternate weeks in February and March, 2024. All but one of those contacts was confidential; the exception was a cell-front encounter when the patient declined to come to the clinic because he was sleeping. During that time, he was seen by a total of three mental health clinicians, and multiple progress notes did not track the patient's progress toward discharge in a meaningful manner. The documentation was of variable quality across the clinicians. After a March 28, 2024 encounter, the patient was not seen again by a mental health clinician until May 9, 2024; subsequently he was not seen again until May 29, 2024. This was the last clinician encounter documented in the healthcare record as of June 13, 2024.

The patient was offered an average of 9.5 hours of group programming weekly during the review period. During six of the 13 weeks reviewed, he was offered at least 10 hours of group programming weekly. According to quality management data available through the OnDemand portal, the patient attended most of those offerings, averaging 8.81 hours of group programming each week. Available documentation in the healthcare record indicated much less, as progress notes were only located to support an average of one hour a week of group participation during April 2024.

**Findings**

The care and treatment provided to this patient were inadequate.

The initial psychiatric evaluation was completed late, and routine psychiatric and primary clinician encounters did not occur at required frequencies. There was a 42-day gap between primary clinician contacts between March 28 and May 8, 2024, and as of June 13, 2024; 48 days had lapsed since the patient last saw a psychiatrist. While psychiatric interventions and documentation otherwise appeared appropriate to the patient's presentation, individual treatment often was not consistent with the treatment plan in a verifiable manner. Additionally, recreational therapy progress notes included identical wording under "individual comments" across multiple encounters.

**Patient U**

This 46-year-old EOP patient's healthcare record was reviewed to assess the adequacy of care provided. He was provided a diagnosis of major depressive disorder and was prescribed Abilify and Prozac. The patient transferred to the CIM C yard on April 11, 2024.

He primarily received mental health services at the EOP level of care, but he previously received treatment at the MHCB, acute and intermediate levels of care.

The initial PC assessment was completed on the "yard", and the documentation did not allow determination whether the assessment occurred in a confidential setting. The majority of documentation was outdated, as it was copied from previous evaluators; the documentation indicated that the patient had a history of depression, auditory hallucinations, paranoia, and a long history of substance abuse. Copied documentation in the history of present illness section from five years prior stated that the patient was suicidal. Due to the copy and pasting of outdated information without clear indication that the information was not original or current, the information misrepresented the patient's current treatment needs. As the patient denied any treatment needs, documentation regarding the patient's recent symptoms, functioning, or treatment engagement and response was critical in treatment planning. Of concern was the failure to address previous provider documentation noting that the patient routinely presented with delusional thinking.

The initial psychiatric assessment documentation clearly conveyed the patient's current symptoms and functioning. The patient presented as slightly disheveled, disorganized, delusional, and with reported auditory hallucinations. The patient reported decreased appetite with weight loss. He agreed to an increase in his antipsychotic medication dosage that was increased again during a subsequent psychiatric contact due to ongoing disorganized thinking.

Of note, the patient had a "man down" event the day prior to the psychiatric assessment. The patient was observed mumbling and laughing inappropriately and did not know why he was on the ground; he initially cried and then became agitated. He reported smoking what he believed to be marijuana prior to the incident. There was no documentation in the initial psychiatric assessment regarding the incident, and it was unclear whether the psychiatrist was aware that it occurred.

All required staff and the patient attended the initial IDTT meeting which did not occur timely. No higher level of care referral indicators were noted; however, the patient's clinical presentation during the "man down" incident warranted consideration of referral to a higher level of care. EOP level of care was continued due to delusional thoughts, paranoia and depression. Delusions were targeted as a treatment goal, with a short-term goal to reduce feelings of "dysfunction/interference" to a certain level, and there was an unrealistic goal of remission of delusions in three months. The sole intervention was reality testing.

Primary clinician weekly contacts, conducted by two different clinicians, did not occur timely. It was noted that the clinician documentation did appropriately document consultation with custody staff. Of concern, the documentation of the patient's mental status by primary clinicians indicated that the patient's mental status was generally unremarkable; however, that description was in stark contrast to psychiatric documentation that described the patient as disorganized and delusional.

At the time of this review on June 21, 2024, the documentation indicated that the patient attended one coping group. There was an order for a group on June 6, 2024 which was noted as

completed, but there was not accompanying clinical documentation to confirm that the patient attended the group.

**Findings**

The care and treatment provided to this patient were inadequate.

Initial assessments were delayed, and the primary clinician assessment was of insufficient quality. Treatment interventions were not multidisciplinary. Weekly primary clinician contacts did not occur timely, and reality testing as indicated as a treatment intervention was not utilized. The sole diagnosis of major depression was inconsistent with the presence of psychotic symptoms and warranted clarification. Documentation of the patient's mental status, symptoms and function varied significantly between providers. There was no documentation to support communication between providers regarding that discrepancy, and there was no discussion documented during the IDTT meeting. The patient's clinical presentation with the psychiatrist warranted consideration of referral to a higher level of care. Lastly, the provision of group treatment was deficient.

**Patient V**

This 47-year-old patient's EOP healthcare record was reviewed to assess the adequacy of care provided. He was provided diagnoses of major depressive disorder and PTSD and was prescribed Cymbalta. The patient transferred to CIM on April 12, 2024.

He had a twenty-year history of 3CMS placement and began receiving mental health services at the EOP level of care in 2021.

The initial provider assessments included relevant historical information and documentation regarding the patient's current clinical presentation. Both evaluators included symptoms to support the diagnosis of major depressive disorder, but the rationale for providing the diagnosis of PTSD was not documented.

The patient attended the initial IDTT meeting; also, in attendance were the assigned primary clinician and covering psychiatrist. It was unknown if the correctional counselor was assigned to the patient. The patient did not meet criteria for any higher level of care referral indicators. The established treatment goal appropriately targeted depression by challenging negative thoughts, thought stopping and affirmations. Psychiatric medication was not identified as a treatment intervention.

Routine psychiatric contact documentation was thorough. Stressors, symptoms and medication benefit were assessed. Primary clinician routine contacts, provided by two different clinicians, were not timely but was representative of meaningful therapeutic contacts.

At the time of this review on June 24, 2024, the patient attended and was actively engaged in the one treatment group that was documented on June 13, 2024. An order was present for a group on June 5, 2024 that was indicated as completed, but there was not accompanying clinical documentation regarding that group. Of note, there was documentation that the patient requested more groups.

**Findings**

The care and treatment provided to this patient were marginally adequate.

The initial assessments were completed appropriately, and psychiatric routine care occurred timely. Although routine primary clinician contacts were meaningful, the contacts did not occur timely. Further, the provision of structured therapeutic activities was well below the ten hours of weekly treatment required. The clinical rationale for the provision of a diagnosis of PTSD and multidisciplinary treatment planning were needed.

**Patient W**

This 46-year-old EOP patient's healthcare record was reviewed to assess the adequacy of care provided. He was provided diagnoses of unspecified depressive disorder, cannabis use disorder, cocaine use disorder, opioid use disorder, and antisocial personality disorder. He was prescribed Prozac, Vistaril and melatonin and was a participant in the MAT/ISUDT program. The patient transferred to CIM on February 22, 2024.

He had a long history of anxiety, depression, and substance abuse. He had received mental health services at the 3CMS, EOP and MHCB levels of care. At the time of the review, the patient was housed on C yard at CIM.

The documentation from provider initial assessments included relevant historical and current information. The initial psychiatric assessment was completed at cell front, after the patient left the clinic before the visit occurred. The documentation of routine psychiatric contacts was clinically useful.

The patient and assigned primary clinician attended the initial IDTT meeting. A goal to reduce anger was added to existing goals that targeted reduction in anxiety, depression and substance abuse. Interventions that targeted anger included psychoeducation and the development of coping skills. No changes were made to the goals and interventions, nor was the patient's progress in treatment updated in the routine IDTT documentation. The rationale provided for continued treatment at the EOP level of care was reasonable.

The patient was seen by three different psychiatric providers. The psychiatrist who completed the initial assessment only saw the patient for the assessment, despite being the assigned provider. Two different psychiatrists, neither of whom had evaluated the patient previously, attended the initial and routine IDTT meetings.

While less than five hours weekly, the patient was enrolled in groups as of February 28, 2024. At the time of this review on June 24, 2024, there was no documentation of group treatment since May 2, 2024. Of note, the patient requested and submitted a grievance requesting more groups.

While the majority of primary clinician contacts occurred timely with the assigned primary clinician, he was seen by a total of five different clinicians. Overall, contacts with clinicians were representative of therapeutic contacts with evidence-based interventions.

**Findings**

The care and treatment provided to this patient were marginally adequate.

Overall, the patient received appropriate treatment by the primary clinician and appropriate psychiatric monitoring; however, the provision of group treatment was chronically inadequate. Continuity of provider care was an area of concern, and the treatment planning documentation required update.

**Patient X**

This 45-year-old EOP patient's healthcare record was reviewed to assess the adequacy of care provided. He was provided diagnoses of major depressive disorder, and alcohol, amphetamine and cannabis use disorders. He was prescribed Effexor, prazosin, Abilify, and Vistaril. The patient transferred to CIM on April 12, 2024.

The patient had a long history of mental illness and substance abuse, and he received mental health services at the 3CMS, EOP and MHCB levels of care.

The initial provider assessments included appropriate clinical information. Both providers identified depression and a history of auditory hallucinations as treatment needs. Additionally, the initial psychiatric assessment identified anxiety and nightmares. Of note, most of the historical information utilized in the initial primary clinician assessment was provided from past clinical contacts that were not identified, so it was unclear when that information was generated.

Assigned providers and the patient attended the initial IDTT meeting. The patient did not meet the criteria for consideration of referral to a higher level of care. IPOCs that targeted depression and substance use were initiated. It should be noted that the use of IPOCs was discontinued with the implementation of the updated treatment plan, and the treatment goals using the recently implemented SMART goals were not established.

The provider contacts occurred timely. The patient was stable during the one required psychiatric contact that focused on substance abuse. The primary clinician contacts also occurred timely and routinely utilized cognitive-behavior therapy, an evidence-based intervention for depression.

Between May 14, 2024 and June 21, 2024, the patient was offered a total of eight groups.

**Findings**

The care and treatment provided to this patient were marginally adequate.

The individual provider care was appropriate; however, group programming was inadequate and was not offered as required. Additionally, the treatment planning documentation was not completed appropriately.

**Patient Y**

This 42-year-old patient's healthcare record was randomly selected from the EOP roster to assess the adequacy of care provided. He was provided diagnoses of major depressive disorder, schizophrenia, and generalized anxiety disorder. The patient was prescribed Risperdal and lithium. The patient transferred to CIM on April 4, 2024 from a reception center, after he returned to CDCR for a new term.

The patient had received mental health services at the EOP, MHCB and ICF levels of care during previous incarcerations.

The initial provider assessments included historical and current clinical information. The patient's primary treatment needs included anxiety, depression, substance abuse, and psychotic symptoms. Much of the primary clinician assessment was copied from previous providers, some was from an unknown author and timeframe. The patient was assessed as under the influence of methamphetamine or spice during the psychiatric contact, due to clinical and physical observations. He was assessed as able to function at his current level of care.

The patient and assigned providers attended the initial IDTT meeting. The IDTT determined that the patient did not meet the criteria for consideration of referral to a higher level of care. The documentation did not indicate multidisciplinary discussion of the patient's treatment needs or recent functioning. Despite identification of psychosis and depression, treatment planning only targeted anxiety, with a goal to "maintain anxiety of 5." The therapeutic alliance was the identified intervention. The rationale for continuation at the current level of care was not documented, but it appeared that the patient remained in the EOP.

At the time of this review on June 25, 2024, the patient was seen for one routine primary clinician contact on June 18, 2024, since his placement at CIM in early April 2024. The mental status documented by the PC was insufficient and was discrepant from the psychiatric assessments on May 22, 2024 and June 20, 2024. Specifically, during routine psychiatric contacts, the patient presented with disorganization, disheveled appearance, and was malodorous. It was unclear if his presentation was determined to be due to psychiatric symptoms and/or substance use. Regardless, the patient's medications were increased, and his recent medication nonadherence and substance use were addressed.

Since the patient's placement at CIM on April 4, 2024, he was scheduled for five groups between May 13, 2024 and June 17, 2024.

**Findings**

The care and treatment provided to this patient were inadequate.

The frequency of primary clinician contacts and group therapy was significantly inadequate. Treatment planning was insufficient and did not fully target the patient's identified treatment needs. Admission to the MHCB should have been considered to assist in determining if the patient was psychiatrically decompensating or if his altered mental status was due to substance use. Relatedly, there was no indication that a toxicology screen was considered. The discrepancy between the psychiatric and PC assessments of the patient's mental status was an

area of concern. Lastly, documentation of symptoms and functional impairments was needed to support the diagnoses.

**Patient Z**

This 43-year-old EOP patient's healthcare record was reviewed to assess the adequacy of care provided. He was provided diagnoses of schizoaffective disorder and antisocial personality disorder. He was prescribed olanzapine and Remeron. The patient was classified as DDI, and he transferred to CIM on April 16, 2024.

The patient had previously received mental health services at the 3CMS and MHCB levels of care.

The initial provider assessments were comprehensive and included relevant psychiatric history and current treatment needs. The patient had a long history of psychiatric treatment including numerous inpatient hospitalizations and several suicide attempts. The patient was medication adherent and presented as stable. He was not seen for a required routine primary clinician contact before he transferred to the RHU for safety reasons.

While in the RHU, a comprehensive initial primary clinician assessment occurred timely. Rather than the provision of an initial psychiatric assessment, a routine psychiatric contact occurred via telemedicine. The assigned providers and the patient attended the initial IDTT meeting that occurred on the same day. The treatment goals, continued from March 2024, targeted suicidal ideation and hallucinations and included evidence-based interventions. The IDTT continued the patient at the EOP level of care, but the rationale addressed discharge rather than the continued need for EOP care. The primary clinician contacts were representative of a therapeutic contact.

The patient was seen for another initial primary clinician assessment after his transfer from the RHU to the mainline EOP. The patient disclosed symptoms of depression and hallucinations. Much of the information was copied from other sources, which were not identified by timeframe or author and was not clearly identified as copied, making it difficult to distinguish between current and past documentation. The patient was again seen by telepsychiatry for what should have been an initial psychiatric assessment, but was instead a routine contact. The patient presented with stability and good response to medication treatment.

The patient was offered two groups at CIM, and both occurred during his placement in the RHU.

One routine primary clinician contact occurred on May 31, 2024, which was representative of a meaningful therapeutic contact. However, at the time of this review on June 28, 2024, no subsequent routine primary clinician contacts had occurred.

**Findings**

The care and treatment provided to this patient were inadequate.

This patient did not receive structured group treatment in the RHU or the mainline EOP as required. Additionally, the patient did not receive an initial IDTT as required following placement at the mainline CIM EOP; nor did he receive a timely primary clinician routine

contact prior to RHU placement or after return to the mainline EOP. Initial psychiatric assessments did not occur as required in the RHU and upon the patient's return to mainline EOP.

**Patient AA**

This 48-year-old EOP patient's healthcare record was reviewed to assess the adequacy of care provided. The patient was provided diagnoses of schizoaffective disorder, major depression, major depression with psychotic features, and antisocial personality disorder. At the time of the review, he had discontinued his psychotropic medications. The patient transferred to CIM from an MHCB on April 19, 2024.

The patient previously received mental health services at the 3CMS and acute levels of care.

The initial provider assessments were thorough and included relevant historical and current symptoms that included depressed mood and auditory hallucinations. The patient had multiple psychiatric hospitalizations and several suicide attempts. His psychotropic medications were adjusted to address symptoms, and education regarding medication adherence was provided.

On May 6, 2024, a psychiatric contact occurred in response to medication nonadherence and a 7362. The patient was appropriately counseled, and a medication change was agreed upon. Overall, he presented with stability. Two days later, another psychiatric contact occurred due to medication nonadherence. At that time, the patient denied medication side effects, but reported that he didn't feel well while taking the medications. He planned to discontinue the medication, as he did not believe he needed them. He presented with stability and denied any symptoms, including depression and auditory hallucinations, which he previously reported. The documentation of primary clinician contact on May 16, 2024 was representative of a meaningful therapeutic contact, and the patient continued to deny symptoms with a stable presentation.

On May 20, 2024, the patient was admitted to the institution's MHCB due to command auditory hallucinations and suicidal ideation with a plan to hang himself. He reported increased depression and hopelessness. He was assessed with high acute and chronic suicide risk. On May 30, 2024, he was discharged to the mainline EOP on Thorazine and Cogentin.

Excluding five-day-follow-up contacts, the patient was not seen by the primary clinician or psychiatrist until June 19, 2024, when he was seen for an initial primary clinician assessment. The assessment did not include updated, individualized clinical information for treatment planning.

No initial psychiatric assessment was documented. There was psychiatric technician documentation that the patient attended a medication nonadherence appointment with the psychiatrist on June 6, 2024 and that all psychiatric medications were discontinued. However, documentation of the contact was not located in the healthcare record.

The initial IDTT meeting occurred on June 21, 2024, and the patient did not attend the meeting. The assigned clinician and a covering psychiatrist were present. The patient was identified for a higher level of care referral due to four MHCB admissions in the past four months. The treatment modification addressed psychiatric follow-up to address medication adherence but did not appropriately consider his recent pattern of nonadherence and eventual termination of

psychotropic medications. The documentation did not reflect discussion of precipitants to recent MHCB placements and relevant patterns, nor was his recent discharge documented in sufficient detail; all of which were clinically indicated. A treatment goal to reduce distress from auditory hallucinations with distress tolerance skills to reduce suicidal ideation was developed.

The patient was scheduled for three groups between May 14, 2024 and May 16, 2024 prior to the MHCB admission. At the time of this review on June 25, 2024, there was no group treatment documentation.

**Findings**

The care and treatment provided to this patient were inadequate.

Psychiatric documentation regarding psychotropic medication discontinuation after MHCB discharge was not located in the healthcare record, and this was an area of concern given the patient's recent decompensation after he discontinued his psychotropic medications. After the MHCB discharge, the patient was not timely or appropriately assessed by providers or during the IDTT meeting.

The patient was not appropriately considered for a higher level of care. Treatment modifications for nonreferral and treatment planning were insufficient and did not fully address the patient's treatment needs. The patient was not provided sufficient group treatment in accordance with the EOP level of care.

**Patient BB**

This 53-year-old patient's healthcare record was randomly selected from the EOP roster to assess the adequacy of care provided. The patient was provided a diagnosis of bipolar I disorder, and he was prescribed Prozac and Vistaril. The patient transferred to CIM on April 12, 2024 after an MHCB admission due to suicidal ideation precipitated by ongoing medical concerns.

The initial provider assessments documented a comprehensive review of the patient's extensive history of mental illness that included multiple psychiatric hospitalizations, a history of psychosis, and several suicide attempts. The recent MHCB discharge was referenced, but there was no indication that providers were aware of the context of the inpatient treatment. The patient reported a plan to kill himself if the outcome of his parole board hearing on October 2024 was unfavorable for him. His current symptoms included depression and anxiety.

The providers and the patient attended the initial IDTT meeting. The treatment goals appropriately targeted depression, anxiety and suicidal ideation. Clinician interventions for depression were reasonable. Overall, the interventions were not multidisciplinary, and no interventions were established for anxiety. The intervention for suicidal ideation narrowly focused on follow-up after parole. The patient was continued at the EOP level of care, although the rationale for continuation was unclear.

Routine primary clinician contacts were representative of meaningful therapeutic contact. Treatment focused on management of depressive symptoms and passive suicidal ideation with cognitive-behavioral treatment interventions. Regarding suicidal ideation, the patient's safety

plan was not reviewed or updated, and a suicide risk assessment was clinically indicated but not completed.

Psychiatric contacts occurred in response to medication nonadherence. Medication changes occurred to address side effects by the assigned psychiatrist and two different covering psychiatrists. While documentation varied by provider, the overall documentation was sufficient for continuity of care. The most recent medication change by a covering psychiatrist included the initiation of Prozac, which could result in decompensation for patients with bipolar disorder. It was unclear whether the psychiatrist was aware of the providers' diagnosis of bipolar disorder, as it was not updated in EHRS.

Between May 14, 2024 and June 20, 2024, the patient was scheduled for nine groups.

**Findings**

The care and treatment provided to this patient were inadequate.

The provision of group treatment was below requirements. The treatment interventions were not multidisciplinary, and the interventions were lacking for anxiety and were insufficient for suicidal ideation. While suicidal ideation was assessed and targeted in routine primary clinician contacts; the safety plan was not reviewed or updated, and a suicide risk assessment was clinically indicated but not completed. It was unclear whether the psychiatrist was aware of the patient's suicidal ideation. The provider diagnosis of bipolar I disorder differed from the EHRS diagnoses of major depressive disorder, unspecified depressive disorder and antisocial personality disorder; that discrepancy warranted clarification.

**Patient CC**

This 39-year-old EOP patient's healthcare record was reviewed to assess the adequacy of care provided. He was provided diagnoses of amphetamine-type/other substance induced psychotic disorder and unspecified anxiety disorder. He was prescribed Vistaril and Zyprexa prn. The patient transferred to CIM on March 6, 2024.

The patient had received mental health services at the 3CMS and MHCB levels of care.

Shortly after admission, the patient requested to speak with mental health. He presented with paranoia and fear for his safety, as he believed people were trying to break through his cell ceiling to attack him. He was admitted to the MHCB. His symptoms were later attributed to substance use, and he was discharged on March 19, 2024. Five-day follow-up contacts occurred as required, and the patient was seen timely for an initial primary clinician assessment. The documentation included relevant clinical information. Without sufficient rationale provided, the patient was provided a diagnosis of unspecified anxiety disorder with a treatment goal to reduce anxiety from four to zero on a ten-point scale.

Shortly after the initial primary clinician assessment, custody appropriately submitted a referral to mental health and indicated that the patient appeared paranoid and confused on March 29, 2024. Specifically, he did not want to leave his cell, and he perceived that his lights were "dimming"; however, custody staff confirmed that they were operating appropriately. When

mental health saw the patient, he maintained that he wanted to "decompress" in his cell, and he reportedly did not present with psychosis, confusion or paranoia.

The following day, the patient was referred to mental health from medical due to paranoia and talking to himself that included gesturing to the ceiling, and he was referred to the MHCB. His symptoms were attributed to substance use, and the patient was also nonadherent with his prescribed Zyprexa in the days prior to the MHCB admission. Although the MAR indicated that the patient had not taken Zyprexa between March 24, 2024 to March 26, 2024; it was unclear why he was not seen for a medication nonadherence assessment. The patient stabilized and was discharged from the MHCB to return to the mainline EOP on April 4, 2024.

Five-day-follow-up contacts occurred as required. On April 15, 2024, another initial primary clinician assessment was completed. The initial psychiatric assessment was comprehensive and appropriately addressed recent medication nonadherence. The documentation of that contact summarized the patient's chronic methamphetamine use and its impact on his mental health.

The IDTT meeting was attended by the patient, the assigned clinician, and a covering psychiatrist. The patient was identified for consideration of referral to a higher level of care due to multiple MHCB admissions in three months. The nonreferral rationale and treatment modifications were appropriate. Established treatment goals targeted distress from hallucinations and depression. A long-term goal for distress and depression to be in remission in six months was unrealistic. Interventions were identified as cognitive behavioral techniques but were not multidisciplinary. A goal that targeted relapse prevention and substance abuse was clinically indicated but was not included. The EOP level of care was continued, but the rationale for continuation was unclear.

The patient was seen by another provider for medication nonadherence. He reported continued auditory hallucinations that were not bothersome to him. He did not like the sedative effect of Zyprexa and did not want to continue taking the medication, and he was unwilling to take another medication. The patient was agreeable to having the medication available to him as needed, and the order was changed to prn.

On June 13, 2024, an alarm was activated due to the patient's bizarre and agitated behavior on the yard. Medical evaluated him, and he was sent to an outside emergency room for further evaluation. The patient was seen upon return to the facility by mental health. He had stabilized and presented with calm behavior. He did not recall the incident or the behavior that led to the emergency room admission. Despite earlier denials of substance use, he reported that he had used drugs prior to the incident.

Most of the primary clinician contacts occurred timely and included treatment interventions for depression and relapse prevention.

At the time of this review on June 27, 2024, the patient had not been seen for psychiatric contact since May 8, 2024.

During April 2024, the patient was scheduled for one group. The group offerings increased during May, and by mid-May to June 2024, the patient was scheduled for four groups weekly.

**Findings**

The care and treatment provided to this patient were inadequate.

The patient was not monitored appropriately by the psychiatrist, and group offering was well below Program Guide requirements. Treatment planning also needed improvement.

**Patient DD**

This 40-year-old EOP patient's healthcare record was reviewed to assess the adequacy of care provided. He was provided diagnoses of adjustment disorder with mixed anxiety and depressed mood, amphetamine-type substance use disorder, antisocial and borderline personality disorders, generalized anxiety disorder, PTSD, and major depression with psychotic features. The patient was prescribed Abilify, Strattera, prazosin and Zyprexa. The patient transferred to CIM on April 4, 2024.

The initial primary clinician assessment included an appropriate summary of the patient's psychosocial and psychiatric history. It was documented that he had a long history of mood and psychotic disorders with a history of diagnoses of PTSD, schizophrenia, depression, and anxiety, with recent treatment for schizoaffective disorder. The patient also had a long history of heroin and methamphetamine use. Current symptoms were not clearly documented. The initial psychiatric assessment occurred almost one month after CIM placement and after the initial IDTT meeting, but the assessment included relevant clinical information.

Assigned providers and the patient attended the initial IDTT meeting. There were no indications for consideration of referral to a higher level of care. The psychiatric treatment plan review documentation indicated goals to reduce auditory hallucinations and paranoia and to stabilize mood, but those goals were not included in the IDTT documentation. The IDTT treatment goal was to reduce depression. Interventions were identified as "CBT, meds, groups," but they lacked specificity and were not clearly aligned with case conceptualization. There was also indication of a recent MHCB admission that was not included in the treatment planning.

Although there were gaps in primary clinician contacts during June 2024, the documentation of PC contacts was representative of a meaningful therapeutic contact. Evidence-based cognitive-behavioral treatment interventions were used to assist in managing depression and paranoia.

The patient was not offered any groups in April 2024. Provided groups in May and mid-June 2024 averaged three to four hours weekly.

**Findings**

The care and treatment provided to this patient were inadequate.

The consistent deficiency in care was the lack of group treatment. Further, there was delay in the initial psychiatric assessment and gaps in routine primary clinician contacts. There was a lack of coordination between the psychiatric treatment goals and those identified by the IDTT which indicated poor multidisciplinary treatment coordination. Lastly, multiple diagnoses were present in EHRS for the patient that warranted clarification with clinical rationale provided.

**California Rehabilitation Center (CRC)**
**October 22, 2024 – October 24, 2024**

**Patient A**

This 47-year-old patient's healthcare record was reviewed to assess the quality of EOP care at CRC. The patient had documented psychiatric diagnoses of bipolar I disorder, current or most recent episode depressed, unspecified; adjustment disorder with mixed anxiety and depressed mood; other or unspecified stimulant use disorder, moderate; opioid use disorder, moderate; and major depressive disorder, recurrent episode, severe.

The patient served multiple prison terms in CDCR beginning in 1999. The patient returned to CDCR for his current term on July 2, 2024, and he had an expected release date of March 4, 2025. During incarceration the patient received treatment in all levels of care except for acute.

Documented symptoms included depression, anxiety, auditory hallucinations, and paranoia. Other documented concerns included engagement in self-injurious behavior (cutting) and chronic passive suicidal ideation. The healthcare record referenced four to five suicide attempts, the most recent of which occurred two to three years ago when the patient attempted to use a zip tie around his neck.

On August 13, 2024, a psychiatrist who was not the patient's assigned psychiatrist completed an initial assessment in a timely manner and in a confidential setting. The psychiatrist noted that, while at NKSP, the patient had reported significant depressive and anxiety symptoms, as well as nightmares and "other trauma-related symptoms." The patient had active prescriptions for aripiprazole (for psychosis), fluoxetine (for depression), and prazosin (for nightmares), and he was described as medication adherent. The patient also participated in ISUDT and was prescribed buprenorphine-naloxone.

On August 21, 2024, the primary clinician completed a timely initial assessment in a confidential setting. During this assessment, the patient reported symptoms of depression, anxiety, and "mania," along with hearing himself argue with another voice in his head. The primary clinician diagnosed the patient with major depression, recurrent; chronic PTSD; a history of chronic bipolar disorder; and symptoms of psychosis. The clinician also documented amphetamine and psychostimulant dependence, as well as substance use and dependence involving alcohol, opioids, and methamphetamines, with remission in a controlled environment.

The initial IDTT did not occur timely. However, on August 22, 2024, the meeting was conducted with all required participants present, including the assigned PC, assigned psychiatrist, a CCI, the patient, and a senior psychologist. The clinical summary was comprehensive and the team noted that the patient was in agreement with the plan to focus on depression, anxiety, and auditory hallucinations. Measurable short and long-term goals were included, and the plan outlined individual and group interventions to explore the patient's emotions, identify triggers, and teach relaxation techniques.

However, several deficiencies were identified in the treatment plan. The case formulation was generic, diagnostic changes were made without listing specific symptoms exhibited by the patient to support each diagnosis, prior documentation of PTSD and related symptoms were not referenced, and goals for a less restrictive level of care were vague -- developing independent coping strategies and managing mental health symptoms. There was also no reference to psychiatric medications, group assignments, or recommendations for jobs, substance use treatment, or length of stay. On this date, the IDTT provided diagnoses of bipolar I disorder, current or most recent episode depressed, unspecified, and adjustment disorder with mixed depressed mood and anxiety.

Routine PC contacts occurred timely with appropriate use of intermittent individual contacts and caseload groups. The PC contacts suggested provided care was adequate, as documentation consistently addressed the patient’s current functioning, progress toward treatment goals, implemented interventions, and the patient’s response to treatment interventions. According to the PC, the patient had been functioning at his baseline, and he was working as a porter in his housing unit. The patient denied substance use, consistently attended groups, and adhered to his prescribed medications.

Routine psychiatry contacts were also timely, with the psychiatrist meeting the patient on September 10, 2024, and again on October 9, 2024. These contacts were generally adequate. The psychiatrist documented psychiatric history, response to medications, status of symptoms, and current functioning. Medication adjustments were made during these visits to address the patient’s reported concerns. The psychiatrist added a working diagnosis of PTSD, unspecified schizophrenic spectrum and other psychotic disorders, polysubstance use disorder, and alcohol use disorder.

A review of records suggested the patient had access to sufficient structured treatment hours, which he regularly attended. His was assigned to both core and supplemental groups such as stress management, mood management, coping skills, and recreation groups.

**Findings**

The EOP care provided to this patient was adequate.

Despite unresolved and unexplained diagnostic discrepancies and other documentation issues suggesting the need for additional training and supervisory oversight, the patient had access to and appeared to benefit from timely and adequate individual and group mental health services in the EOP at CRC. Clinical progress notes provided relevant information, including compliance with offered treatment services, medication adherence, status of symptoms and functioning, implemented interventions and patient response, and evidence of progress and stabilization. Additionally, the patient had access to core groups that aligned with treatment goals as well as supplemental recreation therapy activities.

**Patient B**

This 39-year-old patient's healthcare record was reviewed to assess the quality of EOP care at CRC. The patient was provided diagnoses of mild neurocognitive disorder due to multiple etiologies and unspecified mood disorder. The patient also had a DD2 designation. He was not prescribed psychiatric medications and had not participated in mental health treatment prior to incarceration. The patient was transferred to CRC on July 30, 2024.

The patient entered CDCR on December 30, 2004, and began participating in MHSDS at the 3CMS LOC on November 7, 2005. Healthcare records referenced prior care in 3CMS, EOP and MHCB. The patient re-entered CDCR on January 26, 2023 at the 3CMS level of care and transitioned to EOP on June 20, 2024.

Upon arrival, the patient was initially placed on quarantine status. CRC mental health providers completed their initial assessments via telephone while the patient was on quarantine status. The PC completed an initial assessment on August 2, 2024, in a timely manner. During this assessment, the patient stated his chief complaint as feeling "a little anxious." The assessment also documented the patient's history of substance use, self-injurious behavior (cutting), and two suicide attempts. The first attempt occurred in youth authority following sexual abuse, and the second attempt was prompted by distress when he was moved to a different yard and could not return. Overall, the initial PC assessment was adequate.

The patient's initial psychiatric assessment at CRC EOP occurred on August 13, 2024. However, this assessment was completed by a covering psychiatrist, not the assigned psychiatrist. An earlier initial psychiatric evaluation had been completed at WSP's reception center on July 28, 2024. According to the August 13 psychiatric assessment, the patient was diagnosed with mild neurocognitive disorder due to multiple etiologies. He was noted to be relatively stable, with mild anxiety related to being separated from his family and occasional sadness about being incarcerated. The patient was also diagnosed with opioid use disorder but refused Suboxone, citing side effects of rash and constipation.

The IDTT meeting did not occur timely but was convened on August 15, 2024. The patient attended the meeting along with his assigned PC, a chief psychologist, and a CCI. However, the patient's assigned psychiatrist was not present, and an alternate psychiatrist attended instead. During the meeting, the patient expressed goals to work on his substance use and anger issues, as well as to earn credits for early release. The targeted symptoms of depression, anger management, and substance use were identified, and measurable short and long-term goals were included. While the treatment plan outlined appropriate interventions, it did not reference group assignments or job/education assignments. The treatment team agreed that the patient was receiving treatment at an appropriate level of care; however, the goals for a less restrictive level of care were vague. Specifically, the IDTT wrote that the patient would be considered for discharge once he developed "appropriate coping skills to manage their mental health symptoms independently."

Routine PC contacts occurred weekly as required, either through individual or caseload group sessions, until September 18, 2024. This date marked the last documented contact with the

assigned PC. After that, the patient did not receive another individual contact until October 10, 2024, when a covering clinician met with him. While some clinical documentation appropriately referenced implemented interventions aligned with the patient's treatment plan, the plan/disposition section of each PC progress note carried forward the same generic statement across multiple contacts.

Although the initial psychiatric assessment was conducted by a covering psychiatrist and the patient was not prescribed psychiatric medications, the patient was seen by the psychiatrist in a timely manner. Monthly psychiatric contacts occurred on September 9, 2024, and again on October 7, 2024. Despite the absence of prescribed medications, these psychiatric contacts suggested the appointments were useful for assessing the patient's current status and medication preferences.

A review of group progress notes suggested the patient was generally offered the required minimum hours of weekly structured therapeutic activities. The patient was assigned to groups for stress management, coping, and recreational activities. PC progress notes indicated that the patient consistently attended the groups, but at times was disengaged, left early, or did not pay attention. However, the PC and IDTT did not document whether they had considered providing accommodations or alternative activities during group hours based on the patient's DD2 designation and inability to read and write.

**Findings**

The EOP care provided to this patient was adequate.

While clinical documentation suggested the patient remained relatively stable without prominent psychiatric symptoms or psychiatric medication, the patient did have a prominent neurocognitive disorder and appeared to benefit from participation in EOP services based on his attendance. Further, the IDTT identified offered services that aligned with the patient's goals for depressed mood and anger management. This patient, however, may have benefitted from attention to discharge planning and exploration of accommodations or alternative activities during treatment groups.

**Patient C**

This 29-year-old patient's healthcare record was reviewed to assess the quality of EOP care at CRC. At CRC, the patient was diagnosed with unspecified anxiety disorder, unspecified schizophrenia spectrum and other psychotic disorders, and polysubstance use disorder. The psychiatrist prescribed olanzapine, mirtazapine, and sertraline. The patient also participated in the MAT program and was prescribed buprenorphine-naloxone. The patient was transferred to CRC EOP on or around July 16, 2024.

The patient entered CDCR on November 3, 2014, and was housed in the general population during his first four terms. He returned to CDCR for the current term on May 2, 2024. On May 12, 2024, the patient was admitted to the MHCB level of care after a suicide attempt where he jumped from an upper tier. The patient reported that he had been experiencing suicidal ideation

and auditory hallucinations at that time. During the MHCB admission, the patient engaged in a suicidal gesture and was referred for acute care. The patient then discharged from acute care to EOP, and after spending some time at another prison, transferred to CRC.

A CRC clinician completed a SRASHE (Suicide Risk Assessment and Self-Harm Evaluation) on July 24, 2024 due to the patient's recent acute care admission for danger to self. The patient denied current suicidal ideation or intent during the assessment interview. While his acute suicide risk was determined to be low, his chronic suicide risk was assessed as high.

The initial PC assessment and psychiatric assessment were completed timely. While the PC's assessment was appropriate and contained relevant information, diagnostic impressions were not documented. The psychiatrist's initial assessment referenced the patient's reported symptoms, current functioning, and continued medications.

The treatment team convened timely on July 25, 2024, with the minimum required participants present. The treatment plan targeted danger to self and auditory hallucinations and included short and long term goals that were measurable. Planned interventions were evidence-based and included cognitive behavioral therapy techniques to address the two documented treatment targets. The plan, however, did not address the patient's symptoms of anxiety and depression, provide a clear current level of care rationale, or specify criteria for considering a less restrictive level of care.

The patient met weekly with the assigned PC either individually or in caseloads groups every other week. After meeting the new assigned PC on August 28, 2024, the patient received confidential individual contacts on September 6, 13, and 16, 2024. On September 27, 2024, the patient declined to leave his housing unit. The PC emphasized the importance of attending all mental health treatment sessions, including groups, an intervention that effectively resulted in greater treatment participation overall. While the PC's progress notes routinely referenced appropriate interventions, the patient's responses to those interventions were not consistently documented.

Routine psychiatry contacts occurred timely. Initially, no changes were made to the patient's medication regimen, but after concerns about the patient's sleep were raised, Remeron was prescribed, resulting in noticeable improvements in sleep.

The patient's group assignments were appropriate for his presenting problems. Assigned groups included CBT, anger management, transitions, process groups, and EOP caseload groups. The patient's group attendance was initially low but improved in response to the PC's intervention during October 2024. While EOP group content was not consistently documented, the patient was noted to engage and participate when present.

**Findings**

The EOP care provided to this patient was adequate.

PC and psychiatric assessment and routine contacts were timely and adequate. Although improvements were indicated for treatment planning and progress note documentation, the treatment plan included measurable goals and evidence-based interventions for some of the patient's problem areas, and group assignments and individual contact interventions appeared to be effective for meeting his treatment needs based on outcomes. Additionally, referrals were timely submitted when requested or indicated, including when the patient endorsed difficulty sleeping.

**Patient D**

This 48-year-old patient's healthcare record was reviewed to assess the quality of EOP care at CRC. The patient's psychiatric diagnoses included schizoaffective disorder, bipolar type, and histrionic personality disorder. He was initially prescribed Seroquel and Vistaril, which then changed to Zyprexa and Vistaril; however, records indicated these psychiatric medications were ultimately discontinued in response to the patient's medication non-adherence. On or around July 9, 2024, the patient discharged from acute care and transferred to CRC at the EOP level of care.

The patient entered CDCR for his current and second term on June 5, 2024. He had received care in the 3CMS, EOP, and MHCB levels of care during incarceration.

Before arriving at CRC, the patient was admitted to an MHCB from June 29, 2024, to July 8, 2024, for being a danger to himself. Records indicated that the patient endorsed command auditory hallucinations and suicidal thoughts with a plan to jump from the second tier. During his MHCB admission, the patient also reported visual hallucinations, depression, anxiety, and decreased sleep and appetite. Staff conducting the discharge suicide risk assessment rated his acute risk as moderate and his chronic risk as high.

On July 10, 2024, the PC conducted the first of the five-day follow-up contacts and responded to an urgent referral. During the follow-up assessment, the patient reported that he had requested to speak with a psychiatrist regarding side effects from his medications. The PC referred him to psychiatry on the same date. The patient identified anxiety, auditory hallucinations, and self-injurious behaviors as his main symptoms, which staff prioritized for intervention.

The psychiatrist performed an initial assessment on July 10, 2024. During the evaluation, the psychiatrist noted the patient's intermittent refusal to take Seroquel as prescribed and documented his history of refusing other psychotropic medications. When asked about refusing Seroquel, the patient explained that he no longer wanted to take it regularly because it caused problems, particularly now that he was no longer prescribed Gabapentin. The patient denied recent drug use but claimed he was sent to a crisis bed after initiating a hunger strike and banging his head following the discontinuation of Gabapentin. Based on this evaluation, the psychiatrist discontinued Seroquel and prescribed Vistaril on an as-needed basis for anxiety. The psychiatrist assigned a working diagnosis of unspecified bipolar disorder and noted a history of unspecified schizophrenia spectrum and other psychotic disorders.

On July 18, 2024, the IDTT convened with all required participants. The IDTT documentation included a comprehensive clinical summary and measurable treatment goals. The team targeted depression, self-injurious behaviors, command auditory hallucinations, visual hallucinations, and distress related to perceptual disturbances as areas for treatment. However, the initial treatment plan failed to address anxiety, which had been identified as a problem area. An IPOC for anxiety was added later.

The treatment team documented vague EOP discharge criteria and rationale for the patient's retention at the current level of care. Additionally, despite the psychiatrist's documentation of the patient's medication non-adherence and recent discontinuation of antipsychotic medications prior to the IDTT, the treatment plan set a goal for the patient to maintain 90% medication adherence for 60-days to address hallucinations, reflecting insufficient collaborative discussion and care planning among team members.

The PC provided routine contacts in a timely manner and documented interventions that aligned with the treatment plan. However, clinical notes failed to include updates on the patient's progress toward treatment goals, making it difficult to determine the effectiveness of those interventions.

Psychiatric contacts also occurred on schedule, and the psychiatrist followed up promptly in response to referrals. Progress notes provided clear justifications for medication changes. However, as noted earlier, the psychiatrist did not communicate these medication changes to the primary clinician. This miscommunication was evident in the treatment plan for hallucinations, which relied on antipsychotic adherence despite the recent discontinuation of antipsychotics.

For structured therapeutic activities, the treatment team assigned the patient to groups that were generally aligned with his presenting problems, including anger and stress management, process groups, coping skills, special mental health topics, cognitive behavioral therapy (CBT) groups, and an EOP caseload group. However, the patient was offered fewer than the required weekly minimum hours of structured therapeutic activities. This was particularly concerning given his attendance rates suggested a willingness to engage fully with EOP programming. The clinician completed the 90-day post-discharge SRASHE timely at CRC. The patient's acute risk was rated as low and his chronic risk was rated as high.

**Findings**

The EOP care provided to this patient was inadequate.

While compliance was noted for routine assessments and individual encounters, identified deficiencies rendered the overall care inadequate. The treatment team failed to share critical information for developing an effective and collaborative care plan. While the psychiatrist justified medication changes in their documentation prior to the initial IDTT, these changes were not communicated to the primary clinician, leading to a misaligned treatment plan that relied on discontinued medications. The treatment team did not document expectations or criteria for determining readiness for less restrictive level of care. The individual providers failed to document whether the patient demonstrated progress toward established treatment goals to assess

the effectiveness of treatment interventions and justify level of care decisions. Further, despite the patient's treatment engagement efforts, CRC failed to offer the required *minimum* hours of structured therapeutic activities, which may have delayed treatment progress and readiness for advancement to a less restrictive level of care.

**Patient E**

This 32-year-old patient's healthcare record was reviewed to assess the quality of EOP care at CRC. The patient was provided with a diagnosis of unspecified schizophrenia spectrum and other psychotic disorders; amphetamine-type substance use disorder, severe, in sustained remission; and opioid use disorder, severe, in sustained remission. During the review period the patient was prescribed olanzapine and was medication adherent. The patient was also a participant in a substance use program and was prescribed buprenorphine-naloxone.

The patient transferred to CRC on or around December 21, 2023 at the 3CMS level of care. On July 23, 2024, he was referred for EOP placement due to "mild insight into his mental illness, paranoia, and ongoing auditory and visual hallucinations," which clinicians assessed as putting him at risk of isolating, reacting violently to protect himself, and disengaging from treatment and programming.

The patient began experiencing psychotic symptoms in his early 20s, following methamphetamine use. He had one psychiatric hospitalization in the community for danger to others in 2018 and one MHCB admission during his current prison term in August 2021. The patient's record also indicated a history of command auditory hallucinations with violent behavior. There were no suicide attempts or self-injurious behavior incidents noted in the record.

Upon EOP placement, the PC and psychiatrist conducted their initial assessments on time. The psychiatrist completed the initial assessment on July 31, 2024, and documented the patient's chief complaint as auditory hallucinations, at times with commands. On this date, the patient reported hearing voices telling him that someone was out to get him, others could read his thoughts, or that he was an FBI agent or the Archangel of Death. He also expressed fear of someone wanting to kill him. The patient denied using substances since starting his incarceration. The psychiatrist assessment resulted in a working diagnosis of unspecified schizophrenic spectrum and other psychotic disorders, likely schizophrenia, along with a history of polysubstance use disorder and alcohol use disorder. The psychiatrist continued the patient on Zyprexa to manage his psychosis.

The PC assessment was timely completed on August 5, 2024. During the interview with the PC, the patient denied experiencing command auditory hallucinations since EOP placement, but did report chronic auditory hallucinations without commands.

The initial IDTT did not occur timely for this patient. IDTT ultimately convened on August 8, 2024 with all required attendees present. The team determined that the patient did not require a higher level of care (HLOC), a safety plan, or SRMP placement on this date. IPOCs were added to the treatment plan for hallucinations with measurable goals, which included identifying three

triggers for auditory hallucinations, three coping skills that reduce hallucinations, and practicing the new coping skills. The planned interventions were appropriate and included implementing cognitive behavioral therapy (CBT) and distress tolerance techniques. However, the IDTT did not document appropriate criteria for considering of a less restrictive level of care for this patient. The IDTT instead indicated that the patient would be considered for a lower level of care after exhibiting stability in mood and functioning without psychotropic medication for a period of at least six months, which is a generic statement more commonly used to justify the removal of a patient from MHSDS entirely.

The treatment team convened again on October 17, 2024 to update the patient's treatment plan. All required participants, including a chief psychologist, attended the meeting. The IDTT noted that the patient continued to endorse auditory hallucinations and had recently experienced a medication change. The team determined that further retention in EOP for at least 60 days was most appropriate for his needs. On this date, the IDTT initiated IPOCs for mental health substance use and hallucinations, both of which included appropriate interventions.

Routine primary clinician contacts were timely. During August 2024, the patient was reassigned to an unlicensed psychologist as his primary PC. The PC progress notes suggested implemented interventions aligned with the patient's treatment goals. Routine psychiatry contacts were also timely, with contacts completed on August 26, September 19, and October 17, 2024. Progress notes suggested psychiatric care was generally adequate.

The patient's assigned EOP groups included recreation therapy, coping skills, anger management, stress management, EOP caseload groups, and leisure activities. The patient attended the groups regularly and they were generally appropriate for his targeted symptoms.

**Findings**

The EOP care provided to this patient was adequate.

The treatment team referred the patient to the EOP level of care in a timely manner and appropriately retained him in EOP during the second IDTT. Aside from delays with the initial IDTT, required EOP contacts, including assessments and routine follow-ups, occurred on time. Psychiatry provided adequate care, and PC progress notes indicated the regular implementation of evidence-based interventions during individual sessions, which appeared to be therapeutically beneficial for the patient. Additionally, group assignments were generally appropriate for addressing the patient's targeted treatment goals.

**Patient F**

This 40-year-old patient's healthcare record was reviewed to assess the quality of EOP care at CRC. The patient was provided a diagnosis of unspecified schizophrenia spectrum and other psychotic disorder. Psychiatric medications were not prescribed during the review period. The patient transferred to CRC at the EOP level of care on August 14, 2024.

The patient returned to CDCR for his current term on June 25, 2024, and had an expected parole date of May 16, 2025.

An unlicensed psychologist completed a deficient initial PC assessment on August 26, 2024. The violence risk assessment was incomplete, and the patient's chief complaint was not included in the assessment. Historical information was pulled forward from an assessment completed at the sending facility on July 1, 2024. The record indicated that psychiatric medications prescribed in the county jail were discontinued upon arrival in CDCR. Although during the initial PC assessment the patient denied auditory and visual hallucinations and reported that he would experience AH/VH when heavily using drugs on the streets, the patient's own stated treatment goals were to improve his "thinking," "the voices inside my head," and his substance use issues. Of note, despite the patient transferring to CRC in the EOP level of care, the PC noted their assessment that the patient's level of care would be determined at the initial IDTT.

An initial psychiatric assessment was completed timely on August 27, 2024. The patient refused psychiatric medications but stated he would consider medication if symptoms were to emerge. Although the patient was not clear on why he was placed in EOP, he expressed a desire to remain in EOP and participate in services. The patient was provided with a working diagnosis of unspecified schizophrenic spectrum and other psychotic disorder, as well as a historical diagnosis of amphetamine use disorder.

The initial IDTT did not occur timely. The treatment team eventually convened on August 29, 2024, with a different primary clinician and a covering psychiatrist, neither of whom had met the patient prior to the meeting. A correctional counselor and a chief psychologist also attended. The primary clinician and psychiatrist appeared unfamiliar with the patient and seemingly failed to review recent assessments which provided critical information for care planning.

The initial PC assessment at CRC noted the patient's desire to address substance use and manage the "thoughts" or "voices inside his head." Additionally, the clinical summary from the previous institution described the patient as "engaged and insightful," aware of his diagnosis and the impact of substance use on his decision-making. The summary also noted ongoing struggles with symptom management and medication adherence. Despite having access to this information and the opportunity to explore the patient's treatment goals during the IDTT, the team created a treatment plan that focused solely on "anxiety" and "insight" without explanation. They did not document a revised case formulation, any change in diagnosis, or confirmation that collateral information had been reviewed and considered. Furthermore, the rationale for retaining the patient at the current level of care was generic and lacked patient-specific details.

Routine psychiatric appointments occurred timely. These appointments were generally adequate. The patient was not prescribed psychiatric medications, and he denied experiencing any mood or psychotic symptoms during these contacts.

The PC met with the patient on September 3, 2024. During the session, the patient denied hearing voices and stated that the last time he had heard a voice calling his name was approximately two months prior. He also denied experiencing paranoid thoughts or delusions, including previous recurring beliefs that he was rich. He reported using self-reminders to ground

himself, recognizing that he was not at risk and was experiencing delusions. The PC conducted a brief risk assessment and implemented interventions, including "providing a supportive holding environment and engaging the patient in discussion to establish rapport."

Routine PC contacts occurred weekly, except during the week of September 24, 2024, when the patient attended an EOP caseload group facilitated by another clinician instead of his assigned PC. The next day, an unlicensed psychologist covering for the PC met with the patient, but it was unclear if the session occurred in a confidential setting, as the patient reported feeling unwell. On October 2, 2024, another primary clinician conducted a PC clinical contact and documented that the patient showed no overt signs of perceptual disturbances. However, the patient was described as guarded with "limited coping and a poor understanding of anxiety and the need for treatment." The patient met with his assigned PC again on October 10, 2024.

Despite the patient regularly attended offered structured therapeutic activity groups, he did not have access to the required minimum hours of weekly structured programming during EOP placement at CRC. The patient was assigned to groups for mood management, leisure activities, substance use, and a caseload group that was not consistently facilitated by his assigned PC.

During the review period, three different PCs worked with the patient, one of whom was an unlicensed psychologist. When the assigned PC met with the patient, the sessions were generally adequate and with corresponding progress notes referencing appropriate interventions.

**Findings**

The EOP care provided to this patient was inadequate.

Care continuity was a major concern, leading to ineffective treatment planning and inconsistent implementation of treatment interventions during the required weekly PC contacts. The patient was seen by at least three different clinicians, and interventions were only adequate when his assigned PC conducted follow-ups. Despite the patient's apparent willingness to fully engage in EOP services, he was not offered the required minimum hours of structured therapeutic activities during the review period. Additionally, the patient's PC caseload group was not consistently facilitated by his assigned PC. Lastly, the initial PC assessment was incomplete and both the initial PC assessment the IDTT's documentation contained copied and pasted information with conclusions suggesting they had not sufficiently reviewed or considered the information in their diagnostic and care planning decisions for this patient.

**Patient G**

This 41-year-old patient's healthcare record was reviewed to assess the quality of EOP care at CRC. The patient transferred to CRC's EOP on July 16, 2024.

The patient served multiple terms, and received MHSDS services at the EOP and MHCB LOC. The patient returned to CDCR for the current term on May 6, 2024 at the EOP LOC. Healthcare records indicated a history of depression and PTSD upon arrival at CDCR in May 2024. In addition to depressed mood, the patient also reportedly experienced sleep disturbances,

nightmares, and auditory hallucinations when under the influence. The patient was noted to have a history of two prior suicide attempts (by hanging) and a history of methamphetamine and heroin use.

The initial psychiatric assessment occurred timely on July 22, 2024. The patient, at the time, was also seen for medication non-adherence. The patient's chief complaint was noted to be anxiety. The patient attributed medication noncompliance to not wanting to get up in the morning and or walk to the pill line that was far from the patient's cell. The patient was provided a working diagnosis of generalized anxiety disorder (GAD) characterized by restlessness, worry, and a sensation of being on edge; PTSD with symptoms of hypervigilance, avoidance, and an elevated startle response; amphetamine use disorder; mood disorder not otherwise specified (NOS); and delayed sleep phase disorder. The patient was prescribed Prozac, Vistaril, Clonidine, and melatonin. The patient was also a participant in the ISUDT program and had a prescription for buprenorphine-naloxone.

The initial PC assessment occurred timely on July 24, 2024. The patient's chief complaint was noted to be anxiety and nightmares. The assessment was meaningful and adequate.

On July 25, 2024, the treatment team convened with the required participants present. The IDTT clinical summary provided a useful summary of the patient's history and current functioning. The patient's current concerns were noted to be violent nightmares and adjusting to the dormitory housing. The treatment plan specifically targeted the patient's sleep disturbance, anxiety, and attendance in groups. The goals were measurable, and interventions were adequate for addressing identified targets. However, the discharge plan and level of care rationale were vague. The IDTT did, however, acknowledge and provide an appropriate plan in response to the positive higher level of care referral indicator as the patient was flagged for participating in less than 50 percent of EOP services while at Wasco State Prison's Reception Center. The IDTT noted that the patient's medical issues had served as a barrier to treatment participation at that time and that those medical issues had since been resolved. During IDTT, it was noted that the patient was willing to continue taking Prozac.

Routine PC contacts occurred timely and alternated each week between individual and group contacts. PC contacts specifically measured targeted symptoms and behaviors on July 30, August 13, and August 27, 2024. After this date, the patient's anxiety, sleep, and motivation for treatment were not consistently measured during each PC contact. However, the patient's needs were addressed, and appropriate interventions were implemented during PC contacts.

The psychiatrist also met timely with the patient. The psychiatrist's contacts were meaningful and addressed patients' symptoms, functioning, and the patient's medication needs.

The patient was offered the requisite number of structured treatment activities per week and attended groups that were generally aligned with their treatment goals.

**Findings**

The EOP care provided to this patient was adequate.

Required EOP contacts were timely, and progress notes suggested the patient benefitted from interventions implemented during individual sessions. The treatment plan addressed the patient's presenting problems with measurable goals and relevant interventions. The IDTT appropriately reviewed and responded to the higher level of care referral indicator. The higher level of care nonreferral rationale was sufficient, suggesting that the patient's group attendance would likely improve based on resolution of medical concerns that served as a barrier to participation. While some PC progress notes required improvement for quality and tracking of progress, documentation suggested the patient benefitted from EOP care and remained stable during the review period.

**Patient H**

This 64-year-old patient's healthcare record was reviewed to assess the quality of EOP care at CRC. The patient arrived at CRC with diagnoses of unspecified depressive disorder and unspecified schizophrenia spectrum, and other psychotic disorder and was prescribed fluoxetine. On August 14, 2024, the patient transferred to CRC's EOP.

The patient returned to CDCR for the second and current term on July 16, 2024. During incarceration the patient received services in the 3CMS, EOP, and MHCB levels of care.

The initial psychiatric assessment occurred timely on August 20, 2024. This contact also occurred in response to medication non-adherence. During the assessment the patient reported symptoms of depression, auditory hallucinations, and a history of substance use issues. The psychiatrist provided a diagnosis of unspecified depressive disorder and a history of polysubstance use disorder. However, the diagnosis did not account for the patient's reported psychotic symptoms or recent psychotic diagnosis during reception center placement. Further, the provider did not document a rationale for the change in diagnosis or an opinion regarding the patient's endorsed psychotic symptoms. Regarding medication non-adherence, the patient explained that he would stop taking the medication during warmer weather as he was less able to regulate his temperature which affected his sleep and resulted in feeling faint while standing outside in the pill line.

The initial PC assessment occurred timely on August 20, 2024. The patient's chief complaint was noted to be paranoia and auditory and visual hallucinations (AH/VH). The information from the assessment conducted in July 2024 at the reception center was pulled forward into this document.

The initial IDTT occurred timely on August 22, 2024. All required attendees attended along with the patient. The assigned PC was present but this provider did not complete the initial assessment. The treatment included IPOCs for anxiety which included measurable goals and relevant interventions; however, the treatment plan failed to address the patient's prominent depressive symptoms, medication non-adherence, reported auditory hallucinations and paranoia, or substance use concerns. The treatment plan also did not align with the psychiatrist's diagnosis or include prescribed antidepressant medication as an intervention in the interdisciplinary treatment plan. Further, the IDTT did not comment on group assignments or indicate whether

the patient's level of functioning prevented a job assignment or participation in education. Lastly, the IDTTs level of care rationale and expectations for discharge to a less restrictive level of care were vague. The discharge criteria indicated that the patient would demonstrate mood stability for a minimum of six-months without psychotropic medication, a statement that justified removal from MHSDS entirely but likely was not applicable to this patient.

Routine PC contacts occurred weekly as required with caseload groups occurring every other week. Individual PC contacts were generally completed in confidential settings based on documentation. While PC progress notes referenced implementation of relevant interventions, the notes were brief and did not provide information about the patient's response to those interventions or indicate whether they resulted in progress toward treatment objectives over time.

Routine psychiatry contacts occurred timely. Progress notes for these contacts suggested the provider spent sufficient time with the patient to update their mental status, assess for medication side effects, and respond to questions and concerns. Although the patient did not perceive improvements in their depressive symptoms, the psychiatrist noted that they observed slow improvement over time.

At CRC, the patient did not have access to the required weekly minimum of ten hours for structured therapeutic activities. During a five-week period, the patient had been offered an average of only 3.2 hours per week, of which she attended an average of 2.8 hours.

**Findings**

The EOP care provided to this patient was inadequate.

Overall, the patient did not have access to treatment commensurate with their level of care, collaborative care planning was lacking, treatment plans were deficient, and PC documentation did not allow for tracking progress or response to interventions over time. The treatment plan did not align with the patient's presenting problems, diagnosis, or the psychiatrist's treatment focus. While individual contacts occurred timely and progress notes suggested implementation of appropriate interventions, the primary clinician failed to document the patient's response to determine whether the interventions were effective or required modification for goal achievement and advancement to a less restrictive level of care. Further, the hours of structured programming available to this patient were a significant departure from the required weekly minimum of ten hours. The PC documentation issues identified during this review suggested the need for additional training and supervisory oversight.

**Patient I**

This 33-year-old patient's healthcare record was reviewed to assess the quality of EOP care at CRC. CRC diagnosed the patient with unspecified depressive disorder and unspecified schizophrenia spectrum and other psychotic disorder. Psychiatry prescribed olanzapine, buspirone, and mirtazapine to address his psychosis, anxiety, sleep disturbances, and depression. The patient also participated in the ISUDT program and received buprenorphine-naloxone as part of his substance use treatment. On January 24, 2024, the patient transferred to CRC at the 3CMS

LOC. However, due to concerns about his poor coping skills, worsening depression, and a decreased ability to care for himself or function in GP housing at the 3CMS LOC, the treatment team elevated his care level to EOP on August 20, 2024.

The patient had prior CDCR incarcerations and received MHSDS services at the 3CMS and EOP LOC. The patient returned to CDCR for the current prison term on November 9, 2023.

The psychiatrist conducted the initial psychiatric assessment timely on August 28, 2024. During the assessment, the patient reported depression, anxiety, and intermittent auditory hallucinations. In response, the psychiatrist increased the patient's antipsychotic medication while continuing his other medications for anxiety, sleep, and depression.

The initial PC assessment also occurred timely on August 28, 2024. However, similar to other cases reviewed at CRC, the clinician who completed the initial assessment was neither the assigned provider nor present during the initial IDTT. The PC initial assessment was incomplete, missing key information such as a chief complaint. Nonetheless, the clinical summary was updated to document the patient's endorsement of depression, hopelessness, negative schema, anxiety, chronic ruminative thoughts, and insomnia.

The IDTT convened timely on September 5, 2024, with all required participants, including the patient, assigned PC and psychiatrist, correctional counselor, and a chief psychologist. The team continued existing IPOCs (initiated on February 13, 2024) to target the patient's hallucinations and depressed mood. The treatment plan included measurable goals and appropriate interventions, but did not provide necessary progress updates. Additionally, the rationale for retaining the patient at the current level of care was generic, stating only that a lower level of care could be considered once the patient demonstrated "appropriate coping strategies to manage his mental health symptoms independently."

The PC conducted timely routine contacts, either individually or through caseload groups. PC interventions generally aligned with the patient's treatment plan. The patient's response to treatment interventions and evidence of progress toward treatment objectives were absent in progress notes.

Progress notes for routine psychiatry contacts revealed timely follow-up encounters that were used to monitor changes in mental status and response to medications.

During the review period, the patient received one RVR on October 1, 2024, for fighting. The evaluating clinician determined that the patient's mental health symptoms did not influence his behavior resulting in the RVR.

Despite the patient's group attendance rate demonstrating a desire to fully engage in EOP services, CRC failed to offer the patient the required ten hours of weekly structured therapeutic activities.

**Findings**

The EOP care provided to this patient was inadequate.

While routine PC and psychiatry contacts were timely completed timely and progress notes referenced relevant interventions, deficiencies in care planning, treatment access, and clinical documentation rendered the overall care inadequate. The patient did not have access to the required minimum hours of structured treatment despite his apparent willingness to engage fully in available EOP services. Treatment plans did not address all of the patient's presenting problems, and they were not updated to address the behavior resulting in an RVR during the review period. Further, it was unclear how the IDTT would monitor the effectiveness of treatment plans and justify level of care decisions in the absence of documented responses to treatment interventions during clinical encounters, progress toward treatment goals over time, and clear expectations for a less restrictive level of care.

**Patient J**

This 56-year-old patient's healthcare record was reviewed to assess the quality of EOP care at CRC. The patient transferred to CRC's EOP on July 30, 2024.

The patient returned to CDCR for his current second term on May 23, 2024. Healthcare records indicated the patient received services in the 3CMS, EOP, and MHCB levels of care.

He was seen timely for the initial IDTT, initial psychiatric assessment, and initial PC assessment.

Psychiatry diagnosed the patient with adjustment disorder, with mixed anxiety and depressed mood, and alcohol use disorder, moderate. Psychiatry did not prescribed psychotropic medication during the review period. The PC's assessments referenced evidence of auditory and visual hallucinations, paranoia, and delusions. The PC noted the patient's eye contact was avoidant, and that he appeared to be responding to internal stimuli; however, the patient denied so when questioned. The patient denied current suicidal ideation and a history of suicide attempts, which was supported by healthcare records. The PC also noted impaired insight, poor judgment, and a tendency to minimize his symptoms. The patient's self-identified treatment targets during assessment included anger and a desire to work on interactive skills, including talking to others in a calmer, lower voice.

The IDTT convened on August 15, 2024. Although the assigned PC, correctional counselor, and patient were present, a covering psychiatrist attended and this provider had not met the patient previously. Psychiatry did not prescribed medication and it did not appear that psychiatry had been informed of the psychotic symptoms observed during the PC's assessment, which suggested a lack of sufficient collaboration and sharing of critical information during treatment planning. The treatment plan developed during this IDTT did not address psychotic symptoms and sections of the document were left blank, including diagnostic impressions, predisposing factors, perpetuation factors, and protective factors. Further, the case formulation was inadequate.

The treatment plan targeted only impulsivity and insight. The corresponding goals were not measurable and the interventions were vague. For example, one short-term goal was "providing insight into mental illness." Although psychoeducation was referenced as an intervention, the educational content to be provided was not documented and it was not assigned to a specific discipline (e.g., psychology, psychiatry, nursing). Despite the patient self-identifying anger as a focus of treatment, it was not included in the treatment plan. Additionally, the progress section of the treatment plan noted "progress" but did not specifically indicate how progress was measured and what symptom, behavior, or functional deficit had improved. Lastly, the IDTT's rationale for retaining the patient in the current level of care and considering a less restrictive level of care were vague. For example, the IDTT indicated that a less restrictive level of care would be considered after the patient "developed appropriate coping strategies to manage mental health symptoms independently."

Routine PC contacts occurred timely with alternating weeks of individual and caseload group treatment. When the patient did not attend the caseload group due to scheduling conflicts, the PC appropriately and timely followed up for an individual encounter. PC progress notes continued to indicate a lack of insight into mental illness. The PC did not address the patient's impulsivity issues during these contacts, despite treatment plans identifying this as one of two targets. On October 9, 2024, the PC noted concerns that the patient was responding to internal stimuli. The patient claimed he had been singing along to music when questioned, but also mentioned that his cellmate had made comments to him about it the night before. The patient was described as defensive when discussing mental health symptoms. He was not prescribed psychotropic medication, and the PC did not document a psychiatric consult or referral in response to documented concerns about ongoing psychotic symptoms.

The patient was seen by psychiatry timely for required follow up contacts despite the lack of prescribed medication. The psychiatrist met with the patient twice in September and in October; however, the absence of information about ongoing psychotic symptoms suggested the PC had not consulted with the provider and that the provider had not reviewed the PC's progress notes. Instead, the psychiatrist indicated that patient was managing well and reporting no psychosis or crisis. Another psychiatric progress note indicated that medical had been monitoring the patient for unintended weight loss during the review period.

On average, the patient was offered the required minimum hours of structured treatment activities and attended most. Although group notes described the patient's participation as minimal, the PC documented that he was able to recall new techniques learned during the group sessions.

The patient was assigned to a job but received two RVRs during the review period for showing up late. The patient also had a history of not showing for ducated appointments. The PC, however, did not address or discuss the thoughts and behaviors resulting in the RVRs during clinical encounters.

**Findings**

The EOP care for this patient was inadequate.

While compliance was noted for timely contacts and structured therapeutic activity hours, the patient's primary mental health issues were not addressed by the EOP treatment team. The treatment plan remained deficient for multiple reasons, including as a result of incompleteness, inattention to primary mental health issues and reason for EOP placement, and insufficient attention to collaborative care planning. The EOP care failed to address the patient's psychotic symptoms, behaviors resulting in RVRs, diagnostic clarification needs, and self-identified goals. The lack of collaboration between the PC and psychiatrist continued throughout the review period, and psychiatry did not appear aware of the PC's ongoing concerns about active psychotic symptoms as a result. Further, the PC did not sufficiently explore or address the patient's psychotic symptoms, medication referral needs, concerning interpersonal interaction in his housing unit, job related issue resulting in two RVRs, or unintended weight loss that warranted monitoring by medical staff.

**Patient K**

This 41-year-old EOP patient's healthcare record was randomly selected to assess the adequacy of care provided at CRC. He was provided a diagnosis of unspecified depressive disorder and was prescribed Zoloft and Remeron. The patient transferred to CRC on June 26, 2024 from the reception center for his third CDCR prison term.

The initial provider assessments were appropriate and comprehensive. The documentation noted childhood onset of lifetime depression for which the patient first received treatment in 2012 at the 3CMS level of care during his first prison term. During his second term, he received treatment at the MCHB, acute, and EOP levels of care.

Monthly routine psychiatric documentation assessed the patient's symptoms that primarily included depression and disturbed sleep. The patient's response to medication, the rationale for medication treatment, and education were also documented.

The primary clinician contacts occurred with the same clinician, and the patient was seen for individual and group contacts with the PC. The individual contact documentation was indicative of a meaningful therapeutic contact with the utilization of treatment interventions to address disturbed sleep and interpersonal stressors.

The initial and routine IDTT documentation included the patient's treatment goals that aligned with his treatment needs of depression, disturbed sleep and substance use, and those interventions were utilized during the primary clinician contacts. The IDTT documentation indicated that the patient did not meet any criteria for consideration of referral to a higher level of care. The rationale provided for continuation at the EOP level of care was generic at the initial IDTT meeting, but was more individualized at the routine IDTT meeting.

While it was unclear how groups were assigned, the patient was assigned various recreational and clinical groups. In addition to the primary clinician caseload group, the patient was offered coping, CBT, and anger management groups.

**Findings**

The care provided to this patient was adequate.

The initial assessments, treatment planning and routine provider documentation reflected the utilization of evidence-based clinical interventions to address identified treatment needs. Minor improvements were needed in the IDTT documentation, including integration of psychiatric care in treatment planning, and individualized group assignment.

**Patient L**

This 38-year-old EOP patient's healthcare record was randomly selected to assess the adequacy of care provided at CRC. He was provided a diagnosis of unspecified schizophrenia spectrum and other psychotic disorder. He was prescribed Vistaril prn, Zyprexa, Cogentin and Remeron. The patient transferred to the D yard at CRC on July 12, 2024 after discharge from an MHCB.

The MHCB placement occurred due to suicidal ideation with a plan to hang himself. The patient recanted the suicidal ideation the following day and indicated that he made the statement to prevent transfer to another institution. The five-day follow-up contacts were completed at CRC as required, and the safety plan was reviewed.

The initial primary clinician assessment indicated that the patient's primary treatment need was anxiety related to anticipation of homelessness upon parole in four months. The psychosocial information was limited, with reference to history of childhood trauma, placement in group homes, and juvenile detention.

In contrast to the initial PC assessment, the initial psychiatric assessment noted symptoms of depression, auditory hallucinations and sleep disturbance. The documentation included recent and remote psychosocial history. The routine psychiatric documentation addressed the patient's symptoms of auditory hallucinations and anxiety, medication response, and included a rationale for medication adjustments.

The routine primary clinician contacts were primarily individual, although caseload groups also occurred. During September 2024, the patient's PC changed without explanation. The PC documentation appropriately included the use of clinical interventions and pre-release planning, as the patient's EPRD was December 31, 2024.

The assigned providers attended the initial IDTT meeting. A goal to target auditory hallucinations was developed, and a danger to self goal developed while the patient was in the MHCB was continued. Identified treatment needs of anxiety, depression, and sleep disturbance, however, were not targeted. Group assignment was not documented by the IDTT; however, the patient was offered clinical caseload, process and stress management groups as well as recreational-based groups. No higher level of care criteria were identified by the IDTT. The patient was maintained at the EOP level of care; however, the rationale for maintaining that level of care was generic and required individualization.

**Findings**

The care provided to this patient was adequate.

The care provided appeared to meet the patient's treatment needs. Improved collaboration was needed in treatment plan development and the rationale for group assignment.

**Patient M**

This 29-year-old EOP patient's healthcare record was randomly selected to assess the adequacy of care provided at CRC. He was provided a diagnosis of unspecified schizophrenia spectrum and other psychotic disorder. He was prescribed Remeron and Vistaril. This DD1 patient transferred to CRC on July 16, 2024 after his second MHCB admission where he was treated for psychotic symptoms. Five-day follow-up contacts were completed as required at CRC.

The initial psychiatric assessment was thorough and included a review of the circumstances that precipitated the recent MHCB admission, current mental health status, and relevant psychosocial information. The psychiatrist provided diagnoses of unspecified anxiety, unspecified depression, and history of unspecified schizophrenia spectrum and other psychotic disorder and polysubstance use disorder. At the patient's request, scheduled Remeron was changed to prn administration, and Vistaril was continued. The routine psychiatric documentation noted monitoring of the patient's symptoms and functioning which remained stable.

The initial primary clinician assessment documented the patient's substance abuse and history of auditory hallucinations, which the patient appeared to minimize. Limited historical information including mental health history was included, and copied documentation did not include identifying information, such as the date, author, and the patient's level of care. The assessment did not provide a sufficient summary of the patient or his treatment needs.

The assigned providers and the patient attended the initial IDTT meeting. The patient met the criteria for consideration of referral to a higher level of care due to poor group attendance, and the rationale provided for nonreferral was appropriate. Treatment planning targeted auditory hallucinations which the patient consistently denied in subsequent treatment sessions. The rationale for continued treatment at the EOP level of care was generic and virtually the same as that noted in another patient's healthcare record.

Weekly primary clinician contacts occurred with two different clinicians and primarily consisted of individual contacts. It appeared that there was a PC change in September 2024, and there was no documentation indicating that the change was explained to the patient. The documentation focused on the patient's symptoms and functioning. Clinical interventions were utilized during the PC sessions; however, prior to the clinician change, the interventions remained unchanged without clear individualization for the patient's specific treatment needs.

The patient was offered various recreational therapy and clinical groups; although, the rationale for group assignment was unclear, as no rationale was documented by the IDTT. In addition to caseload groups, clinical groups topics included anger management, stress management, mood management and CBT.

The patient's EPRD was December 4, 2024, and pre-release planning was documented.

**Findings**

The care provided to this patient was adequate.

The patient was appropriately monitored by his providers, and his treatment needs were appropriately addressed. Treatment planning would have been improved with an adequate initial primary clinician assessment and treatment goals to target substance abuse and discharge planning. Diagnostic clarification and a rationale for the provided diagnosis was needed.

**Patient N**

This 29-year-old EOP patient's healthcare record was randomly selected to assess the adequacy of care provided at CRC. He was provided diagnoses of unspecified schizophrenia spectrum and other psychotic disorder and unspecified anxiety disorder. He was prescribed Zyprexa. The patient transferred to CRC on July 30, 2024 from the reception center.

During previous CDCR prison terms, the patient received mental health services at the 3CMS, EOP, and intermediate levels of care. He also had multiple MHCB placements with the most recent in 2019. An MHCB referral was rescinded prior to the transfer to CRC, when he recanted earlier suicidal statements that were made due to safety concerns.

The initial provider assessments included relevant clinical information. Subsequent routine psychiatric documentation was clinically useful and focused on the patient's auditory hallucinations and concerns regarding his upcoming release. He was reportedly stable, and his medications were not changed.

The initial IDTT meeting was attended by the patient, the primary clinician, and the assigned psychiatric provider. Without clear rationale, the treatment targeted suicidal ideation, impulsivity and substance abuse. Auditory hallucinations identified by the psychiatrist and psychiatric medications were not included in treatment planning. The patient met the criteria for consideration of referral to a higher level of care due to poor group attendance prior to CRC transfer, and the rationale provided for nonreferral was appropriate. The rationale for continued treatment at the EOP level of care was generic and virtually the same as that noted in another patient's healthcare record.

The patient was seen in individual sessions for his primary clinician contacts, and CBT was utilized. The documentation focused on the patient's concerns regarding anticipated release during November 2024.

The patient had an EPRD of November 29, 2024. He was enrolled in the pre-release group and various clinical and recreational groups.

**Findings**

The care provided to this patient was adequate.

His treatment needs were addressed during routine contacts with the PC and psychiatrist.

**Patient O**

This 33-year-old EOP patient's healthcare record was randomly selected to assess the adequacy of care provided at CRC. He was provided a diagnosis of unspecified schizophrenic spectrum and other psychotic disorder. He was prescribed Zyprexa. The patient transferred to CRC on July 23, 2024 from the reception center.

The patient had previously received mental health services at the 3CMS, EOP and MHCB levels of care.

The initial psychiatric assessment described the patient as delusional with active response to internal stimuli. The documentation adequately conveyed psychiatric clinical impressions and relevant clinical information. The patient had not been prescribed psychotropic medication and continued to decline the need for medication treatment. During routine psychiatric contacts, the patient continued to minimize his psychotic symptoms; however, after ongoing psychoeducation and encouragement, he agreed to treatment with an antipsychotic medication with subsequent medication adherence.

The initial primary clinician assessment included relevant clinical information. As with the initial psychiatric assessment, the patient denied mental health symptoms. The routine primary clinician contacts primarily occurred individually and appropriately monitored the patient's mental status; however, he remained with poor insight and continued to minimize or deny mental health symptoms. The routine provider documentation indicated communication and input at the EOP daily huddles.

The assigned providers and the patient attended the initial IDTT meeting. No higher level of care indicators were identified by the IDTT. The treatment goals appropriately targeted auditory hallucinations and medication nonadherence with utilization of CBT and distress tolerance during primary clinician contacts as indicated. The rationale for continuation at the EOP level of care was generic and virtually the same as another patient's documented rationale.

Recreational and clinical groups were offered; although, the rationale for group assignment was unclear. In addition to caseload groups, clinical group topics included process, anger management, and stress management.

**Findings**

The care provided to this patient was adequate.

The patient was appropriately monitored, assessed and provided appropriate treatment by the treatment team. Treatment planning, however, should have included psychiatric input, including the use of psychotropic medications.

**Patient P**

This 37-year-old EOP patient's healthcare record was randomly selected to assess the adequacy of care provided at CRC. Various diagnoses were documented in the healthcare record. The psychiatrist provided diagnoses of unspecified anxiety and depressive disorders, and history of unspecified schizophrenic spectrum and other psychotic disorder; however, elsewhere in EHRS, diagnoses of adjustment disorders with mixed anxiety and depressed mood, antisocial personality disorder, and major depressive disorder were documented. Vistaril, Remeron, Zyprexa were prescribed; however, the medications were inappropriately, other than Vistaril, ordered prn. The patient transferred to CRC on July 24, 2024.

The patient was not included in the MHSDS between 2011 and 2021; however, after three MHCB placements between July 2021 and May 2022, he was placed at the EOP level of care.

The initial psychiatric assessment and routine psychiatric documentation included relevant clinical information. The patient had a history of auditory hallucinations and self-harm. He was described as generally stable with some mild anxiety and depression in response to various institutional and familial stressors. The patient was nonadherent with his psychotropic medications, and no medication changes occurred.

The initial primary clinician assessment was overly brief and did not provide sufficient psychosocial information and clinical rationale for the statement that the patient "may be maximizing" symptoms. As was noted by the psychiatrist, the patient was reportedly stable. Clinical interventions were occasionally utilized. The primary clinician was changed without adequate documentation of transition planning.

The assigned providers and the patient attended the IDTT meeting. No higher level of care indicators were identified by the IDTT. A goal for substance use was developed which was reasonable given the patient's history of substance abuse. No other goals were developed, despite documentation that the patient requested improved sleep as a treatment goal. The rationale for continuation at the EOP level of care was generic and virtually the same as another patient's documented rationale. The patient was offered various recreational therapy and clinical groups; although, the group assignment rationale was unclear. In addition to caseload groups, clinical groups included anger and stress management.

**Findings**

The care provided to this patient was adequate.

This patient demonstrated stability, and transition planning to the 3CMS level of care was appropriate. A rationale for group assignment was needed in the IDTT documentation.

**Patient Q**

This 32-year-old EOP patient's healthcare record was randomly selected to assess the adequacy of care provided at CRC. He was provided diagnoses of major depressive disorder, PTSD, and unspecified anxiety disorder. He was prescribed Prozac, BuSpar and Vistaril. The patient transferred to CRC on July 25, 2024 after a four-month ASH hospitalization.

The documentation indicated that the patient was referred to the MHCB on January 31, 2024 due to suicidal ideation with a plan. For reasons that were unclear, he remained in the MHCB until late February 2024 when he was referred to ASH due to continued suicidal ideation, two incidents of superficial self-harm, and auditory hallucinations. The ASH discharge documentation indicated that the patient consistently denied auditory hallucinations while hospitalized, and antipsychotic medication was discontinued. He was discharged with a diagnosis of major depressive disorder.

Five-day follow-up contacts were completed as required at CRC and included safety planning. A comprehensive suicide risk assessment which included individualized and useful clinical information was completed after placement at CRC. He was assessed with moderate chronic risk and low acute suicide risk. A lack of integration of previous risk assessments likely contributed to an underestimation of moderate chronic risk in the current risk assessment.

The initial psychiatric assessment documentation focused on the patient's self-report regarding MHCB and DSH placements with no indication that collateral record review occurred other than outdated documentation copied from the MHCB placement from four months ago. There was no indication that the psychiatrist was aware of the ASH discharge documentation that stated that the patient may have exaggerated his symptoms of psychosis and did not appear to have a primary thought disorder.

The initial primary clinician assessment documented symptoms of anxiety, depression and history of self-harm behavior. Lack of psychosocial and mental health treatment history in the assessment were noted and were of significant concern. Copied documentation from the March 2024 MHCB admission was outdated, and there was no indication that the ASH hospitalization information was reviewed.

The patient and assigned treatment providers attended the initial IDTT meeting. Limited information from the initial primary clinician assessment was continued in the IDTT documentation. The treatment goals targeted self-harm behavior, depression, and anxiety with evidence-based interventions. The rationale for continuation at the EOP level of care was generic and not individualized to the patient's treatment needs.

The documentation of routine psychiatric contacts indicated assessment of the patient's symptoms and provided rationale for medication adjustments. His depression improved, but his anxiety and nightmares worsened.

Without explanation or transition planning, the assigned primary clinician changed in late August 2024. During routine contacts that primarily were individual sessions, the assigned primary clinician was attentive to the patient's stressors and used cognitive-behavioral interventions as indicated in the treatment plan to address his treatment needs. The documentation also noted that no significant concerns regarding the patient were discussed during the EOP huddles.

The patient was offered recreational and clinical groups that included stress and anger management, coping, and caseload groups. It was unclear how groups were assigned to address

the patient's treatment needs of depression, anxiety, trauma, self-harm and adjustment to a new facility.

**Findings**

The care provided to this patient was adequate.

Despite the lack of integration of collateral information and overreliance on the patient's report, the patient's treatment needs were met during routine provider contacts. However, the lack of evidence that the inpatient documentation was reviewed was an area of great concern for continuity of care. An additional area of needed improvement was the provision of a rationale for group assignment in treatment planning and diagnosis.

**Patient R**

This 40-year-old EOP patient's healthcare record was randomly selected to assess the adequacy of care provided at CRC. He was provided diagnoses of unspecified schizophrenia spectrum and other psychotic disorder and unspecified anxiety disorder. He was not prescribed psychotropic medication. The patient transferred to CRC on August 14, 2021.

The initial primary clinician assessment included a summary of the patient's psychosocial and mental health treatment history and current mental health symptoms of depression and auditory hallucinations. The patient had received mental health services at the 3CMS, EOP and MHCB levels of care. His most recent MHCB placement occurred two months prior to CRC transfer due to cutting and a hanging attempt.

The assigned providers and the patient attended the initial IDTT meeting. No higher level of care indicators were identified by the IDTT. Measurable treatment goals with appropriate clinical interventions targeted anxiety and depression, but there was no goal to target auditory hallucinations or medication nonadherence. The patient was continued at the EOP level of care; however, the rationale for continuation was generic and lacked individualization, and conflicting and confusing documentation was present regarding 3CMS removal.

The initial psychiatric assessment included minimal original documentation; most of the documentation was copied from the initial primary clinician assessment and routine psychiatric documentation from July 2024. As with the primary clinician documentation, the PC noted that the patient did not want to take psychotropic medication and preferred to address his symptoms with coping skills. It was documented that he reported severe auditory hallucinations but did not appear to be responding internal stimuli. The PC stated that the patient appeared to exaggerate his symptoms; however, no clear rationale was provided for that assessment. That perspective was not continued in subsequent PC documentation, despite continued report of auditory hallucinations. The rationale for the patient's medication refusal was not clearly assessed. The patient signed a refusal form regarding medication refusal. Subsequent contacts monitored the patient's symptoms and functioning, but the quality of his auditory hallucinations was not assessed. The patient continued to decline treatment with psychotropic medication for anxiety, auditory hallucinations and disturbed sleep. Attempts were made to further understand the patient's resistance which he attributed to side effects.

The patient was seen for individual routine primary clinician contacts and one caseload group with his assigned clinician. Although insufficient in quantity, the quality of the PC contacts was appropriate, and clinical interventions were utilized to assist the patient in managing stressors.

The patient regularly attended his assigned recreational therapy and clinical groups. Clinical groups included anger and stress management and process groups. The rationale for group assignment was unclear.

**Findings**

The care provided to this patient was inadequate.

The patient's intent to manage symptoms with coping skills was not sufficiently addressed due to infrequent primary clinician contacts. While the patient's psychosis was appropriately monitored by the psychiatrist, neither provider sought collateral documentation to better understand the recent suicide attempt and symptom history, including conceptualization of auditory hallucinations and medication refusal to assist with treatment and to minimize future decompensation. Treatment planning needed improvement in goal development and rationale for group assignment.

**Patient S**

This 45-year-old EOP patient's healthcare record was randomly selected to assess the adequacy of care provided at CRC. He was provided diagnoses of unspecified schizophrenic spectrum and other psychotic disorder, polysubstance use disorder, and alcohol use disorder. He was not prescribed psychotropic medication. The patient transferred to CRC from the reception center on August 27, 2024; he was initially placed at the 3CMS level of care but elevated to the EOP level of care at the reception center

The initial primary clinician assessment included relevant clinical and psychosocial information. The patient had an extensive history of treatment for his mental illness, including various community and state hospitalizations. Of note, he was hospitalized at Patton State Hospital from 2005 to 2015 and again more recently for competency restoration.

The initial psychiatric assessment documentation indicated that the patient was not prescribed psychotropic medication at the time of CRC placement. The patient stated that he felt better without medication and was not bothered by his symptoms. It was unclear if the psychiatrist was aware of recent psychiatric documentation on August 3, 2024, when the patient requested discontinuation of his psychotropic medication. The documentation stated "while the recent long-acting injectable [antipsychotic] may help delay IPs decompensation, abruptly coming off a high dose of Zyprexa will likely hasten things."

The assigned providers attended the initial IDTT meeting. The patient was identified for consideration of referral to a higher level of care due to poor group attendance while at the reception center. The nonreferral rationale and treatment modifications were appropriate. Treatment goals with reasonable interventions appropriately targeted group attendance and auditory hallucinations but did not address medication adherence. The patient was continued at the EOP level of care, but the rationale for continuation was unclear.

During the reviewed dates, the patient was seen for two individual primary clinician contacts on September 17, 2024 and October 2, 2024. The patient presented with psychotic symptoms at both contacts. During the September contact, despite presenting with overt and bizarre grandiose delusional thinking, disorganization, and inappropriate laughter; the PC stated that there was "no evidence of psychotic thought content". It was concerning that the PC did not recognize that the patient was psychotic, and no collateral input was sought.

On October 7, 2024, the patient presented with an inability to function or communicate clearly due to psychotic symptoms and paranoia. He was appropriately referred to the MHCB.

**Findings**

The care provided to this patient was inadequate.

This actively psychotic, medication nonadherent patient who had an extensive psychiatric history was not appropriately monitored by his providers. The psychiatric documentation did not indicate review of collateral documentation; that was concerning, as recent psychiatric documentation noted anticipated decompensation after medication discontinuation. Further, education regarding the risk of decompensation was not documented by the psychiatrist. Similarly, the primary clinician failed to seek collateral information regarding the patient's functioning given his ongoing psychosis, and failed to assess, monitor, and to intervene timely as was clinically indicated.

**Patient T**

This 41-year-old EOP patient's healthcare record was randomly selected to assess the adequacy of care provided at CRC. He was provided diagnoses of unspecified schizophrenic spectrum and other psychotic disorder; however, other diagnoses were documented, including unspecified mood disorder, polysubstance use disorder, and PTSD. He was prescribed Topamax, Zyprexa and BuSpar. The patient transferred to CRC from the reception center on August 27, 2024.

During a prior CDCR prison term, the patient was treated at the 3CMS level of care. He had a history of outpatient treatment since childhood but no community inpatient treatment. He had a history of paranoia. His current symptoms included anxiety and chronic, ego-syntonic hallucinations.

The initial provider assessments included relevant clinical information to direct treatment planning. Of note, the initial primary clinician assessment was well written and organized. The initial IDTT meeting was attended by the patient and assigned providers. No higher level of care indicators were identified by the IDTT. Objective and measurable treatment goals included appropriate clinical interventions for targeted symptoms of hallucinations, anxiety and paranoia. The patient was appropriately continued at the EOP level of care, but sufficient clinical rationale for continuation was not provided.

The routine provider documentation indicated that appropriate assessment and response to the patient's treatment needs occurred. CBT techniques were used during individual primary clinician contacts, and medication adjustments were made by the psychiatrist.

The patient was offered recreational therapy and clinical groups. Clinical groups included the caseload and stress management groups.

**Findings**

The care provided to this patient was adequate.

The initial assessments and IDTT documentation included sufficient information for treatment planning and continuity of care. Areas of needed improvement included providing the rationale for group treatment, integration of psychiatric care into the IDTT documentation, and diagnostic clarification.

**Patient U**

This 49-year-old EOP patient's healthcare record was reviewed to assess the adequacy of care provided at CRC. The patient was provided diagnoses of unspecified anxiety disorder, unspecified depressive disorder, and unspecified schizophrenic spectrum and other psychotic disorder; a provisional diagnosis of PTSD was also documented. He had a history of methamphetamine use. At the time of the review, he was prescribed Prozac, BuSpar, and Vistaril. The patient transferred to CRC on July 30, 2024 from an MHCB.

The documentation noted childhood onset of depression and anxiety, exacerbated by his mother's death, for which he first received treatment during the previous year in CDCR. He also had a history of intermittent suicidal ideation since childhood and no history of suicide attempts.

The patient was reportedly stable when assessed at the required five-day follow-up contacts that were completed by three different clinicians. The initial provider assessments were adequate. The psychiatric documentation noted that the recent MHCB admission was due to auditory hallucinations and suicidal ideation, while there was no mention of auditory hallucinations in the primary clinician documentation. Treatment planning was not updated to target those treatment areas and had not been updated since January 2024 when a goal to address anxiety was established. Treatment needs of depression, auditory hallucinations, risk of harm to self, and grief were not addressed during the initial IDTT meeting; although, depression was targeted during the routine IDTT meeting.

Routine monthly psychiatric documentation included assessment of the patient's symptoms and medication response, the rationale for the medications prescribed, education and alternative medications considered. Overall, the patient presented as stable. He discontinued Zyprexa due to side effects in September 2024, and reported that he was able to manage intermittent auditory hallucinations without the medication during the October 2024 psychiatric contact.

Primary clinician contacts that were conducted individually and in caseload groups occurred with the same clinician. The documentation indicated that meaningful individual therapeutic contacts occurred with the utilization of evidence-based treatment interventions for anxiety and depression.

Group assignment was not clearly documented; therefore, the rationale for recreational and clinical groups placement was unclear. In addition to the primary clinician caseload group, the

patient was offered coping, CBT, chronic illness support/pain management and stress management groups.

**Findings**

The care and treatment provided to this patient were adequate.

Despite shortcomings in treatment planning, routine provider documentation reflected utilization of evidence-based clinical interventions to address treatment needs. Minor improvements were needed in assessment documentation, the rationale for group assignment, and treatment planning.

**Patient V**

This 27-year-old EOP patient's healthcare record was reviewed to assess the adequacy of care provided at CRC. He was provided a diagnosis of unspecified schizophrenia spectrum and other psychotic disorder, and he was prescribed Abilify at the time of the review. The patient was placed at the 3CMS level of care at CRC on June 25, 2024 after his second MHCB placement in less than one month due to grave disability. Shortly thereafter, his level of care was appropriately increased to the EOP level of care.

Although five-day follow-up contacts were completed as required, and the safety plan was reviewed; the documentation did not fully address the reasons for the MHCB placement and the risk of decompensation upon discharge. The provider initial assessments included minimal psychiatric treatment history for this patient who presented with guardedness, poor insight regarding his mental illness, and ongoing psychosis.

The routine individual PC contacts included the use of clinical interventions, and the documentation indicated that the contacts were therapeutic. The routine psychiatric documentation was clinically useful and consistently assessed the patient's symptoms, medication response, and the rationale for medication changes.

The assigned providers attended the initial and routine IDTT meetings. Goals to target auditory hallucinations, treatment participation and ADLs were developed and continued at the routine IDTT meeting. Group assignment and the quality of participation were not included in the IDTT documentation. The patient was offered recreational and clinical groups consisting of caseload, coping, CBT, and stress management groups. The patient did not meet the criteria for consideration of referral to a higher level of care and was maintained in the EOP, and the provided rationale was reasonable.

**Findings**

The care and treatment provided to this patient were adequate.

The care provided met the patient's treatment needs with treatment planning and routine provider contacts. A summary of the patient's psychiatric treatment history was needed in the initial assessment documentation.

**Patient W**

This 30-year-old EOP patient's healthcare record was reviewed to assess the adequacy of care provided at CRC. He was provided diagnoses of unspecified schizophrenic spectrum and other psychotic disorder, and unspecified bipolar and related disorder; those diagnoses conflicted with the primary clinician diagnosis of adjustment disorder with mixed anxiety and depressed mood. A diagnosis of amphetamine induced psychotic disorder was also present in EHRS. The patient was not prescribed psychotropic medication. He transferred to CRC on July 30, 2024 from the reception center.

Symptoms that were documented in the initial primary clinician assessment were mood lability, depression, and a history of auditory and visual hallucinations that occurred during chronic methamphetamine use. The PC noted that the patient "appears to be maximizing" symptoms. The history of present illness section was outdated, as the information was from his first prison term in 2019 for which he was released four years prior. In contrast, the initial psychiatric assessment documented ongoing, intermittent auditory hallucinations, anxiety and depression, as well as multiple inpatient community hospitalizations with the most recent occurring in March 2024 for ten days.

The assigned providers and the patient attended the initial and routine IDTT meetings. Discrepancies in the initial provider assessments were not addressed. The sole treatment goal during the initial IDTT meeting targeted substance abuse; depression and anxiety were added as treatment goals during the routine IDTT meeting. The patient did not meet the criteria for consideration of referral to a higher level of care. The rationale for continued EOP level of care was generic.

The routine psychiatric contact documentation addressed the patient's symptoms and medication nonadherence. Upon arrival to CRC, the patient was prescribed an Invega injection and high doses of Zyprexa and Depakote. During early September 2024, he discontinued psychotropic medications due to sedative side effects. Alternative medication options were appropriately reviewed, which the patient declined. He denied the presence of psychotic symptoms and reported feeling more alert and energetic. He attributed previous symptoms to drug use. During a subsequent contact, he continued to present without mood or psychotic symptoms.

Individual primary clinician contacts focused on substance use with the utilization of cognitive behavioral treatment interventions. The patient was offered various recreational therapy and clinical groups; although, the rationale for group assignment was unclear. In addition to caseload groups, clinical group topics included stress management and CBT.

**Findings**

The care and treatment provided to this patient were adequate.

Improvements were needed in documentation, initial provider coordination, and treatment planning. Despite those shortcomings, the providers appropriately addressed the patient's treatment needs during routine contacts. Diagnostic clarification and a rationale for the provided diagnoses was needed.

**Patient Y**

This 39-year-old EOP patient's healthcare record was reviewed to assess the adequacy of care provided at CRC. He was provided diagnoses of PTSD, unspecified anxiety disorder, unspecified depressive disorder, and was noted with a history of psychosis. He was prescribed Zoloft, prazosin, Remeron and Vistaril prn. The patient entered CDCR for his first prison term in May 2024 and was transferred to an MHCB due to suicidal ideation at the reception center; he was discharged to the EOP level of care. He transferred to CRC on July 9, 2024.

The initial primary clinician assessment included a thorough review of the patient's traumatic childhood, but the mental health history was limited, and current symptoms were not clearly documented. In contrast, the initial psychiatric assessment detailed the patient's current symptoms of severe anxiety and depression, frequent nightmares and flashbacks and included a relevant psychosocial history.

The initial and routine IDTT meetings were attended by the patient, the assigned primary clinician, and assigned psychiatric provider. The patient did not meet the criteria for consideration of referral to a higher level of care. Treatment at the EOP level of care was continued with an appropriate and individualized rationale provided at the initial IDTT meeting. However, no rationale for continuation was provided in the routine IDTT documentation. Objective and measurable treatment goals targeted anxiety, depression and insomnia. Primary clinician treatment interventions were developed during the initial IDTT meeting, and those relevant goals and interventions were continued at the routine IDTT meeting. Missing from treatment planning were psychiatric interventions for established treatment goals and a treatment goal for trauma symptoms identified by the psychiatrist. The routine IDTT documentation was minimally updated and did not include a summary of the patient's course of treatment.

Documentation in the routine psychiatric contacts indicated regular assessment of symptoms, functioning, and medication response, and the rationale for medication adjustment was provided. Over time, the patient's nightmares lessened, and there was a slight decrease in his anxiety and depression.

Primary clinician contacts primarily occurred by individual contacts. Evidence based cognitive-behavioral treatment interventions were regularly utilized to assist the patient in managing his symptoms.

The patient was assigned various clinical and recreational groups that included stress management, CBT, caseload, and mood management groups; however, the rationale for group assignment was unclear.

**Findings**

The care and treatment provided to this patient were adequate.

Despite the lack of provider coordination in treatment planning documentation, the patient's treatment needs were met during routine contacts. Improvements were needed in provider coordination and the rationale for group assignment.

**Patient Z**

This 40-year-old EOP patient's healthcare record was reviewed to assess the adequacy of care provided at CRC. He was provided diagnoses of unspecified schizophrenic spectrum and other psychotic disorder, polysubstance use disorder, and alcohol use disorder, with a provisional diagnosis of schizophrenia; those diagnoses were discrepant from the EHRS diagnosis of unspecified personality disorder. He was prescribed Zyprexa and BuSpar. The patient transferred to CRC on August 27, 2024 from the reception center.

The initial provider assessments included relevant psychosocial history including a history of inpatient mental health treatment in the community and during prior incarcerations. The patient's primary treatment need of intermittent auditory hallucinations was managed with psychotropic medication treatment. During the subsequent psychiatric contact, his symptoms and functioning were assessed, and he remained psychiatrically stable.

The assigned providers and the patient attended the initial IDTT meeting. Treatment goals appropriately targeted auditory hallucinations and substance use with utilization of psychoeducation and the development of a relapse prevention plan that was utilized as indicated during primary clinician contacts. The patient did not meet the criteria for consideration of referral to a higher level of care and was continued at the EOP level of care. The rationale for continuation at the EOP level of care was generic and lacked individualization.

The patient was offered clinical groups, including process and caseload groups. Recreational therapy was not offered. The rationale for group assignment was unclear.

**Findings**

The care and treatment provided to this patient were adequate.

The initial assessments, treatment planning, and routine care were appropriate.

**Patient AA**

This 29-year-old patient's healthcare record was reviewed to assess the adequacy of care provided at CRC. He was provided diagnoses of depressive disorder, unspecified anxiety, and a history of polysubstance and alcohol use disorder. He was prescribed Vistaril prn.

The patient entered CDCR for his first incarceration in May 2024. He transferred to CRC on August 1, 2024 after discharge from an MHCB where he was treated for suicidal ideation, anxiety, and depression.

The initial provider assessments included relevant clinical information. The initial and routine IDTT meetings were attended by the required providers and the patient. The patient met the criteria for consideration of referral to a higher level of care due to multiple MHCB referrals; however, the nonreferral rationale to treat anxiety, depression, mood lability, and substance abuse at the EOP level of care, and the treatment modifications were appropriate. Despite the individualized rationale for nonreferral, the rationale to continue treatment at the EOP level of care was generic. Further, the treatment goals did not target anxiety, depression, or mood lability

but instead addressed anger; suicidal ideation and substance abuse were appropriately addressed. The treatment goals were not updated during the routine IDTT meeting, and a summary of the patient's clinical presentation was not included.

Routine psychiatric contact documentation indicated that the patient remained depressed and anxious, with mild improvement noted in October 2024. The patient attended routine primary clinician contacts when cognitive behavioral interventions and psychoeducation were utilized to address his symptoms.

The patient was offered recreational therapy and clinical groups; although, the rationale for group assignment was unclear. In addition to caseload groups, the patient was offered stress management groups.

**Findings**

The care and treatment provided to this patient were adequate.

Despite needed improvement in treatment planning documentation; primary clinician contacts were representative of a therapeutic contact, and the patient was timely monitored by psychiatry.

**Patient BB**

This 40-year-old patient's healthcare record was reviewed to assess the adequacy of care provided at CRC. He was provided a diagnosis of unspecified schizophrenic spectrum and other psychotic disorder, likely schizophrenia. He was prescribed Abilify Maintena.

The patient transferred to CRC on July 30, 2024 from the reception center. He had a long history of psychosis with inpatient and outpatient treatment in the community.

Most of the initial primary clinician assessment was copied from an unknown author and timeframe, and the mental status examination content was incomplete. Thus, the documentation did not convey the patient's current treatment needs or clinical presentation. The initial psychiatric assessment documentation included relevant clinical information and documented current symptoms of daily auditory hallucinations.

The patient, a covering psychiatrist, and the assigned primary clinician attended the initial IDTT meeting. The patient did not meet the criteria for consideration of referral to a higher level of care. The rationale for continued EOP treatment was generic and was not individualized to the patient's treatment needs. The treatment goals targeted auditory hallucinations and substance use. Psychotropic medication treatment was not included as an intervention, and a goal to eliminate auditory hallucinations in ninety days was unrealistic for this patient with chronic psychotic symptoms.

Routine psychiatric contacts documented an assessment of the patient's symptoms and their impact on functioning, as well as medication side effects and response. The patient reported that his auditory hallucinations continued daily, but were not bothersome, and were not accompanied by delusions or paranoia.

During routine primary clinician contacts that primarily consisted of individual sessions, the assigned primary clinician was supportive and assessed the patient's mood and functioning. Distraction techniques, established as an intervention during the IDTT meeting, were reviewed to assist in decreasing the auditory hallucinations.

The patient was offered recreational and clinical groups that included stress management, specific mental health issues, and cognitive behavioral therapy. It was unclear how the groups were assigned, or if they addressed the patient's treatment needs.

**Findings**

The care and treatment provided to this patient were adequate.

Despite insufficient initial primary clinician assessment documentation, appropriate treatment goals were developed to address the patient's treatment needs during individual PC contacts. Improvements were needed in the IDTT documentation.

**Patient CC**

This 29-year-old patient's healthcare record was reviewed to assess the adequacy of care provided at CRC. He was provided diagnoses of unspecified anxiety disorder, and a history of unspecified schizophrenia spectrum and other psychotic disorder and cannabis disorder. The patient did not want to take psychotropic medications, and he was not prescribed those medications. The patient transferred to CRC on August 14, 2024, after his level of care was changed from 3CMS to the EOP level of care.

Psychosocial history and prior mental health treatment from April 2024 was copied into the initial primary clinician assessment from a previous provider. The patient had a history of two inpatient psychiatric hospitalizations due to psychosis and suicidal ideation. The documentation indicated that the patient's level of care was changed from 3CMS to EOP in July 2024 to better manage poor impulse control, violence, insecurity, passive suicidal ideation, victimization concerns, and difficulty with peer relationships and programming. The initial provider assessments failed to discuss that relevant clinical information. The initial psychiatric assessment stated that the patient denied auditory hallucinations but indicated that he might be minimizing his symptoms and that he appeared paranoid and guarded. The patient presented similarly at the next routine psychiatric contact and continued to refuse treatment with psychotropic medication.

While the assigned primary clinician attended the initial IDTT meeting, a different clinician completed the initial assessment. A covering psychiatrist attended the initial IDTT meeting, as did the patient. The IDTT continued the patient at the EOP level of care; however, the provided rationale was generic. Objective and measurable treatment goals targeted suicidal ideation, insight, paranoia, and depressed mood. The interventions were individualized.

In alignment with treatment planning, the primary clinician routine contacts focused on rapport building and monitoring of the patient's symptoms and functioning. Due to poor group treatment attendance, the patient was referred to the IDTT and was placed on EOP modified programming.

The patient transferred to another institution for RHU placement on October 9, 2024 due to an RVR for threatening behavior.

**Findings**

The care and treatment provided to this patient were adequate.

The patient was appropriately monitored by his providers, and reasonable attempts were made to build rapport and to engage the patient in treatment. Despite the insufficient initial primary clinician assessment and lack of provider continuity, the patient's treatment needs were addressed during the initial IDTT meeting, and treatment planning aligned with the provided treatment. The IDTT documentation would have been improved with a treatment goal that targeted medication resistance.

**Patient DD**

This 35-year-old patient's healthcare record was randomly selected to assess the adequacy of care provided at CRC. The patient was provided diagnoses of unspecified depressive disorder, unspecified schizophrenic spectrum and other psychotic disorder, and polysubstance use disorder; those diagnoses conflicted with the EHRS diagnoses of adjustment disorder with mixed anxiety and depressed mood, amphetamine type substance use disorder, anxiety and depression, mood disorder, and opioid use disorder. He was prescribed Wellbutrin daily and Vistaril prn. He had an EPRD of February 26, 2025. The patient was discharged from an MHCB to CRC on August 15, 2024.

The patient first received mental treatment as an adolescent. He did not have a history of inpatient psychiatric hospitalization. His recent MHCB placement was due to suicidal ideation, anxiety, and depression.

Five-day follow-up contacts occurred timely, and the safety plan was reviewed. The patient's current symptoms included anxiety, depression, paranoia, and auditory hallucinations.

The initial primary clinician assessment was comprehensive and included detailed clinical information. The initial psychiatric assessment included relevant clinical and psychosocial information.

The assigned PC, a covering psychiatrist, and the patient attended the initial IDTT meeting. The patient did not meet the criteria for consideration of referral to a higher level of care, and he was appropriately continued at the EOP level of care; however, the rationale was not individualized. Objective and measurable treatment goals targeted suicidal ideation, depression, anxiety, and auditory hallucinations. The interventions were evidence-based and individualized.

During subsequent provider contacts, the patient reported that his depression and auditory hallucinations had improved. The psychiatric documentation noted discussion of symptoms, functioning, and medication response. The patient continued to refuse treatment with antipsychotic medications. During routine primary clinician contacts, cognitive behavior therapy skills were utilized to assist the patient in managing his symptoms.

The rationale for the assignment of recreational and clinical groups was unclear. In addition to caseload groups, the patient was scheduled for a clinical pre-release group.

**Findings**

The care and treatment provided to this patient were adequate.

Treatment planning and routine care was aligned with the initial provider assessments and the patient's identified treatment needs. Diagnostic clarification was needed.

**Patient EE**

This 51-year-old patient's healthcare record was reviewed to assess the adequacy of care provided at CRC. The patient was provided diagnoses of unspecified schizophrenic spectrum and other psychotic disorder, unspecified depressive disorder, and polysubstance use disorder; those diagnoses conflicted with the EHRS diagnoses of adjustment disorders unspecified, major depressive disorder, and PTSD. He was prescribed Zoloft, Zyprexa, and Vistaril. The patient transferred to CRC from the reception center on August 20, 2024.

The initial psychiatric assessment included relevant historical and current symptoms including depression, anxiety, and intermittent auditory hallucinations. The routine psychiatric contact documentation indicated assessment of the patient's symptoms, functioning, medication side effects, and included the rationale for treatment. The patient presented as stable with good medication response.

Historical information in the initial primary clinician assessment was copied from an initial psychiatric assessment from 2021 that was completed during a prior term; an update of the patient's functioning in the prior three years was not included. Current symptoms were documented as depression, auditory hallucinations, and recent suicidal ideation.

The initial IDTT meeting was attended by the patient and his assigned providers. The patient did not meet the criteria for consideration of referral to a higher level of care, and he was continued at the EOP level of care; the provided rationale for retaining the patient at the current level of care was generic. Objective and measurable treatment goals targeted hallucinations, anxiety, depression, and suicidal ideation. The clinical interventions included the development of a therapeutic relationship, psychoeducation, and the utilization of relaxation skills.

The routine provider documentation indicated that appropriate assessment and response to the patient's treatment needs occurred. Cognitive behavior therapy techniques were used during individual primary clinician contacts, and the psychiatrist made medication adjustments as indicated.

The patient was not offered recreational therapy. Clinical groups included the caseload group and a chronic illness support/pain management group. The rationale for group assignment was not documented.

**Findings**

The care and treatment provided to this patient were adequate.

Despite the insufficient initial primary clinician assessment, the patient's treatment needs were addressed in treatment planning and during routine provider care. Areas of needed improvement included a rationale for group treatment assignment, the integration of psychiatric care into IDTT documentation, and diagnostic clarification.

**High Desert State Prison (HDSP)**
**July 9, 2024 – July 11, 2024**

**Patient A**

This 29-year-old patient's healthcare record was reviewed to assess the care provided at the HDSP EOP. The patient was provided diagnoses of unspecified mood disorder and multiple substance use disorders. The patient was not prescribed psychotropic medications until one day prior to the end of the reporting period. He was prescribed buprenorphine-naloxone for his substance use disorder. The patient transferred to HDSP on March 27, 2024.

The patient had two previous periods of incarceration when he was not included in the MHSDS. His current period of incarceration began in August 2022, and he was placed at the 3CMS level of care six days after being received within CDCR. He was elevated to the EOP level of care on January 17, 2023, where he remained except for a rescinded MHCB referral on January 15, 2024.

The patient was seen for an initial psychiatric assessment on April 11, 2024 via telepsychiatry, and the documentation of the contact was adequate. On April 19, 2024, a PC documented a "MH Brief Records Review", and a full MHPC initial assessment was completed later than required on April 22, 2024 by a different PC. Given the patient's diagnosed mood disorder, it was concerning that the mood and affect section of the mental status examination was not completed. Otherwise, the content of the assessment was basic but adequate. A SRASHE was also completed by the same PC on that date which was adequate.

An initial IDTT meeting occurred later than required on April 23, 2024. The required staff and the patient were present, along with a registered nurse and a recreational therapist. The IDTT documentation noted that the patient had refused more than 50 percent of offered programing, but they also noted that the refusals were due to "behavioral factors versus SMI", so the patient was not referred to a higher level of care. No treatment modifications were included to support the patient's participation in treatment. There were no patient strengths and no verbalized treatment goals provided by the patient. An IPOC addressing "anger" without goals or inventions was included in the documentation, and no treatment plan was created. In the discharge plan section, a narrative indicated that the patient would work on reducing his depressive symptoms and strengthen his problem-solving skills, but no measurable goals and no interventions were listed beyond generic EOP programming.

An urgent referral was placed by a correctional officer noting "depression" without any further description on April 25, 2024. There was no evidence that the patient was seen by a clinician within 24 hours as required to address that referral; however, the patient was seen for an RVR mental health assessment the following day, but the referral issue was not addressed. Mental illness was found to be a contributing factor to the incident which involved willfully resisting a peace officer. The patient was seen by two different PCs on May 2, 2024, within two minutes of each other. One was a consult by the patient's assigned PC to address an urgent referral due to the patient reporting frequent chest pain. The session did not adequately address the patient's needs. The second was a routine PC contact completed by an unlicensed clinician who had not

seen the patient previously. The content of the contact focused on “knowledge of bodily functions such as body temperature, bowel movements, reaction times, coordination efforts, alertness, and cognitive efficiency” without any rationale provided or connection to the patient’s needs or IPOC. There was no evidence of a supervisory review of the content of the unlicensed clinician’s note. The patient was again seen by the same unlicensed psychologist on May 3, 2024, and the content of that session focused on psychoeducation regarding cognitive processes without linking it to the patient’s needs.

On May 4, 2024, the patient was placed in the RHU after threatening staff. An initial PC assessment was completed on May 7, 2024; however, the patient refused to participate. The assessment was completed via healthcare record review; however, the assessment did not address the patient’s functioning since his arrival at HDSP and included no mention of other RVRs and frequent emergency medical contacts due to reported chest pain.

The patient was seen for a SRASHE on May 14, 2024 after referral by nursing during an episode of reported chest pain. His risk levels were unchanged from prior assessments and were adequately justified. The patient was seen for another SRASHE and another initial PC assessment on May 16, 2024. The SRASHE noted that the assessment was due to suicidal threats made to custody during rounds in RHU. The patient reported to the PC that suicidal statements were made to report a PREA incident in a private location. The SRASHE documentation was adequate and noted an appropriate response to the PREA allegation. The PC assessment was completed by a different PC, and it was noted to have been completed in response to a housing change; although, the housing change was not apparent. The patient refused to participate, so the assessment was completed via healthcare record review. The content was mostly unchanged from the assessment completed on May 7, 2024.

The patient was next seen cellfront for a wellness check, as his PC was not at the facility on May 21, 2024. The patient was then seen by the CIT on May 22, 2024, after reporting suicidal ideation; however, he quickly recanted and reported concerns with his property which were addressed by the lieutenant. A SRASHE was completed adequately. That pattern continued over many days, with the patient reporting suicidal ideation only to recant and report other concerns related to housing and custody status. On May 24, 2024, the patient fashioned a noose around his neck but upon assessment reported property and safety concerns. A SRASHE was completed; however, the content was unchanged from the one completed earlier the same day, and there was no mention of the noose, or the increased risk associated with creation of a lethal means for suicide.

The patient’s first and only contact with a psychiatrist since placement in the RHU occurred on May 30, 2024, which was 26 days after his RHU arrival. While the assessment included a comprehensive review of the patient’s history and an adequate review of previous documentation, the psychiatrist provided a diagnosis of unspecified schizophrenia without adequate rationale and prescribed the patient mirtazapine and perphenazine.

No IDTT was completed with the patient following his placement in the RHU.

This patient was offered minimal group treatment, and only by recreational therapists. No structured treatment hours were recorded after the patient's placement in the RHU on May 4, 2024.

Of note, upon arrival at HDSP, the patient's healthcare record noted an upcoming parole date of June 1, 2024. The first pre-release contact made with the patient occurred on May 28, 2024, which noted the patient's recent RVRs and a likely change in release dates. The assessment content was adequate. A pre-release contact with the patient was also completed on May 30, 2024. The patient's release date was subsequently changed to October 19, 2024.

**Findings**

The care and treatment provided to this patient were inadequate.

The patient's needs were not addressed at any point. In fact, no treatment plan was ever created for the patient, and there was no IDTT meeting following his placement in the RHU. Additionally, there were rarely any routine PC contacts offered to the patient; and when they were offered, they were provided by a clinician other than the patient's assigned PC, were not linked to the patient's needs, and reflected poor continuity of care. Despite the patient's escalation in reported medical and mental health crises; no treatment planning or treatment was provided to address the patient's distress and escalation of self-harm gestures.

**Patient B**

This 39-year-old patient's healthcare record was selected to review the quality of care provided at the HDSP EOP. He was provided diagnoses of borderline personality disorder and several substance use disorders including cocaine, hallucinogens, cannabis, alcohol, amphetamine, and opioid use disorders. The patient was not prescribed psychotropic medication during the reporting period. He arrived at HDSP on March 15, 2024.

This patient was incarcerated for his eighth CDCR prison term in September 2013. He was placed at the 3CMS level of care during his three most recent previous periods of incarceration. At the time of reception in 2013, he received mental health services at the 3CMS level of care until he was admitted to the MHCB during May 2017. Since then, the patient had numerous MHCB placements and was treated at the 3CMS and EOP levels of care across multiple facilities. The patient was most recently admitted to the MHCB level of care in April 2023. Since his discharge on April 11, 2023, the patient received treatment at the EOP level of care and was transferred to HDSP on March 15, 2024. He was immediately placed in the RHU upon arrival at HDSP due to enemy concerns.

The patient reported having received bad news and was referred to a mental health clinician on March 16, 2024. He was seen by a PC on March 17, 2024, and the documentation of that contact was more than adequate. An initial PC assessment was completed adequately on March 20, 2024, despite the patient's refusal to engage in the assessment. An initial psychiatric assessment was completed on April 22, 2024 via telepsychiatry. The assessment was adequate and included information that the patient was not pleased with being transferred to HDSP and expected to be

transferred back to his previous facility soon. An initial IDTT meeting occurred on March 27, 2024 with the required staff present along with a senior psychologist supervisor and psychiatric technician. The patient refused to attend. While information contained within the IDTT documentation noted that the patient had refused more than 50 percent of treatment offered; there was no discussion of that fact, and no treatment enhancements were documented to support improvement in treatment participation. The section related to treatment participation was blank. The patient was noted as wanting to focus on his substance use, and an IPOC to address substance use was initiated; however, it included no goals or interventions. Also, no treatment plan was documented for the patient. The rationale for the patient's continued placement at the EOP level of care was vague and generic.

Twice in April 2024, referrals were submitted by a custody officer who was seeing the patient to address grievances, which noted that the patient complained of worsening mental health symptoms. The patient was seen within the required timeframes, and the responses were adequate. The patient was seen weekly by his PC while in the RHU, and the contacts were adequate.

On April 5, 2024, the patient was seen for an RVR mental health assessment that was wholly inadequate. It included a statement that the patient "appears to be suffering crisis mental health states on a recurring basis" and recommended "Patient should be afforded all therapeutic and programming opportunities at the CCCMS level of care" after noting that the patient was currently enrolled in the EOP program. The patient was released from the RHU on April 16, 2024. An initial PC assessment was completed on April 22, 2024, which was largely unchanged from the previous assessment. No initial psychiatric assessment was completed, no IDTT meeting occurred, and the patient was not seen for a routine PC contact through the end of the reporting period. There was a refusal form documented on May 14, 2024 for a psychiatric appointment, but no other documentation was entered into the healthcare record about that session.

The patient was not offered group treatment consistent with Program Guide requirements. While in the RHU, the patient was not offered any group treatment.

**Findings**

The care and treatment provided to this patient were grossly inadequate.

No treatment plan was developed for this patient at any time during his placement in the EOP at HDSP. The one IDTT meeting that was held was poorly documented and failed to include enhancements to address the patient's treatment refusal. The patient was not seen as required by the PC, psychiatrist, or by individuals offering group treatment. An RVR mental health assessment included clearly inaccurate information.

**Patient C**

This 41-year-old patient's healthcare record was selected to review the quality of EOP services being provided at HDSP. The patient was provided a diagnosis of major depressive disorder,

single episode with psychotic features. He was moderately adherent to his prescribed bupropion. He was also prescribed olanzapine prn and buprenorphine-naloxone. He transferred to the HDSP EOP on March 7, 2024.

This patient did not receive mental health services during his five previous periods of CDCR incarceration. Upon his most recent arrival into CDCR in July 2013, the patient was not placed in the MHSDS until August 2019, when he received treatment at the 3CMS level of care for 70 days. He was again placed at the 3CMS level of care in February 2021. Since then, he received mental health services at the 3CMS, MHCB, acute, ICF, and EOP levels of care. The patient's most recent MHCB placement occurred in 2022. Since October 1, 2022, the patient received mental health services at the EOP level of care.

Prior to transfer, the patient engaged in self-injury that was described as superficial wounds to his left forearm with active bleeding, as well as an altered mental status. A SRASHE completed upon the patient's return from the emergency department noted that he tested positive for amphetamines and did not want to transfer to HDSP. The patient had a history of instrumental self-injury as well as a prior suicide attempt.

An initial psychiatric assessment was completed via telepsychiatry on March 19, 2024, which was adequate. An initial PC assessment was completed later than required on March 29, 2024. During the assessment, the patient asked to be enrolled in groups to help with his mental health. While the assessment was generally adequate, it relied heavily on the patient's self-report and made no mention of the instrumental self-injury that occurred prior to his transfer.

The initial IDTT meeting occurred later than required on April 2, 2024. The PC who attended the meeting was not the patient's assigned PC and had not met the patient previously. There was also no correctional counselor at the meeting, and the patient refused to attend. Despite the patient's history and a safety plan that was included in the healthcare record; the IDTT documentation noted that the patient did not have or need a safety plan. The patient was also noted as being removed from the SRMP, as they stated that he no longer met inclusion criteria; however, there was no discussion of patient progress or the clinical rationale for removal. There were no documented patient strengths or goals provided by the patient. An IPOC for depressed mood was initiated without measurable goals or interventions, no treatment plan was created, and there was no rationale provided for retaining the patient at the EOP level of care.

During the subsequent eight weeks, the patient was offered one primary clinician session on April 30, 2023 with an unlicensed psychologist who was not the patient's assigned PC. The documentation indicated that psychoeducation on anger was provided; however, that content was not related to the patient's identified needs. Further, the patient was provided with homework, but no follow-up contact occurred, as the patient was not seen again by any PC for the remainder of the reporting period.

The psychiatrist offered the patient two sessions; one on April 5, 2024 which the patient refused, and another later than required on May 10, 2024. The patient was largely medication nonadherent, reported feeling down, and was isolative; however, the telepsychiatrist took no

action to address the patient's nonadherence nor address his isolation which was documented as a known risk factor.

All groups documented in the healthcare record were offered by recreational therapists, and the patient was not offered structured treatment consistent with Program Guide requirements.

**Findings**

The care and treatment provided to this patient were inadequate.

The initial PC assessment and IDTT meetings were late. No treatment plan was created for the patient, and there was no attention to the fact that the patient had engaged in superficial self-injury prior to his transfer to HDSP. The patient was removed from the SRMP without any clinical rationale provided. The patient's medication nonadherence went unaddressed for five weeks. The patient was not seen for a single session by his assigned PC during the reporting period. The patient was not offered the required number of hours of structured treatment, and his only clinically therapeutic contact was with an unlicensed psychologist who provided treatment unrelated to the patient's needs.

**Patient D**

This 66-year-old patient's healthcare record was reviewed to assess the quality of care provided in the HDSP EOP during the review period. The patient was provided diagnoses of PTSD, delusional disorder, ADHD predominantly hyperactive/impulsive presentation, antisocial personality disorder, and mood disorder due to a general medical condition. The patient was prescribed several medications during the reporting period including duloxetine and lorazepam, as well as buspirone, hydroxyzine, and risperidone ordered prn, and melatonin. During the reporting period, the patient was fully adherent to his prescribed lorazepam and mostly adherent to his prescribed duloxetine. The patient transferred to HDSP on March 18, 2024.

This patient was incarcerated in July 2017 and began receiving mental health services at the 3CMS level of care at that time. He was primarily treated at the 3CMS level of care, and there were two MHCB placements until September 13, 2023 when the patient was placed in an MHCB and discharged to the EOP level of care. Subsequently, the patient had five additional MHCB placements, with the most recent placement occurring in February 2024. Since his discharge on February 10, 2024, the patient received mental health services at the EOP level of care.

On March 19, 2024, the patient was seen in response to a referral, as he broke a window after being frustrated about not receiving his medications upon arrival to HDSP. The PC talked with the patient and deescalated the situation. The clinician later provided the patient with psychoeducational worksheets. On March 21, 2024, the patient submitted a request to see psychiatry, and the following day submitted a request to see a PC. An initial psychiatric assessment was completed on March 27, 2024 via telepsychiatry which was adequate. A PC consult occurred on the same date that adequately addressed the patient's needs. A routine referral was submitted on March 29, 2024, as the patient reported severe anxiety and emotional distress. An urgent referral was submitted the following day, as the patient was accused of

engaging in a PREA incident involving exposure of his genitals to a peer. The patient also received RVRs for breaking the window and willfully resisting a peace officer. The patient was placed in the RHU on March 29, 2024.

An initial PC assessment was completed on April 3, 2024 in the RHU which noted that the RHU placement was due to safety concerns. The assessment was adequate. The patient submitted a request to see the psychiatrist and his PC on the same date. An initial psychiatric assessment was completed on April 5, 2024 via telepsychiatry which was adequate. An initial IDTT meeting occurred on April 10, 2024 with required staff and the patient present. A senior psychologist supervisor, psychiatric technician, and correctional counselor II were also present at the meeting. Despite the patient being positive for two indicators which required consideration of referral to a higher level of care (three or more RVR mental health assessments in the past three months and treatment refusals), the IDTT did not document a review of the patient's needs for a higher level of care. The patient reported wanting to work on anger management, and an IPOC for anger was initiated; however, no treatment goals or interventions to address this were documented. There was no treatment plan for the patient. The rationale for retaining the patient at the EOP level of care was generic and vague. On April 11, 2024, the patient declared that he was on a hunger strike during meal pass but ended the hunger strike the following day. He refused a contact offered by a PC on April 16, 2024 in response to the hunger strike referral. The patient was placed in the CTC on that date due to medical issues unrelated to his hunger strike.

The patient was seen by a psychiatrist on April 23, 2024, and medication adjustments occurred at the patient's request. The patient returned to the RHU on April 25, 2024. There were no PC contacts for the remainder of the month, and the patient initiated another hunger strike on May 5, 2024 due to concerns about his property. He was seen by his PC on May 7, 2024, secondary to the hunger strike. A status note was documented without evidence of interventions beyond education regarding health consequences of a hunger strike. The hunger strike ended the following day. A wellness check was completed cell front on May 14, 2024 by a covering clinician. The patient submitted a request to be seen "ASAP" by his PC and was seen by a covering clinician on May 21, 2024 but refused to be seen in a confidential setting. A status note was documented. The patient was seen by a covering psychiatrist on May 20, 2024, and adequate documentation of the contact was completed.

The patient was not offered any structured treatment while in the mainline EOP. While in the RHU, the patient was not offered adequate hours of structured treatment.

**Findings**

The care and treatment provided to this patient were inadequate.

The patient's healthcare record included no treatment plan. Additionally, the IDTT failed to recognize that the patient had received several RVRs and had refused treatment; those two issues required a review of his need for a higher level of care. There were no routine therapeutic contacts with the patient except for a single session on April 9, 2024, despite numerous RVRs and two declared hunger strikes. At no time was the patient offered treatment hours consistent with requirements.

**Patient E**

This 29-year-old patient's healthcare record was selected to review the quality of care provided at the HDSP EOP during the review period. The patient was not provided psychiatric diagnoses during the review period. He was prescribed lithium, mirtazapine, and olanzapine with poor adherence to all medications. The patient transferred to the HDSP EOP on April 3, 2024.

The patient was received in CDCR in November 2013. He was first placed in the MHSDS on January 18, 2023 at the 3CMS level of care. The patient was placed at the MHCB level of care twice before placement at the EOP level of care in September 2023. He had two additional MHCB placements since that time, and he most recently discharged from the MHCB on December 21, 2023 to the EOP level of care.

On April 5, 2024, a psychiatrist was informed that the patient was not taking his prescribed medications and noted in the healthcare record that the patient would be scheduled for an appointment to address the nonadherence. On April 19, 2024, a refusal form was filed in the healthcare record indicating that the patient refused a psychiatry appointment without corresponding documentation by a psychiatrist. That response was not timely.

On April 10, 2024, the patient was seen by the CIT. He denied any suicidal ideation but instead initiated a crisis contact to deal with property issues. A SRASHE was completed that was adequate. On April 23, 2024, a psychiatrist entered a note that the patient had refused his initial psychiatric assessment. On May 2, 2024, a PC documented a healthcare record review but no contact with the patient. A clinician-to-clinician contact was entered into the record on the same date, but there was no evidence of a response from the patient's previous clinician. On May 8, 2024, a PC other than the one who completed the healthcare record review attempted to complete an initial PC assessment, but the patient refused. The assessment was to be completed via telemental health; however, the medical assistant was unable to bring the telehealth equipment to the cell, so the patient was not seen in response to the refusal. As a result, there was no mental status examination performed, and no additional information was provided about the patient. The PC noted that no diagnoses were currently entered into the healthcare record for the patient, and no diagnostic impressions were provided.

On May 12, 2024, the patient was seen for a mental health assessment for two RVRs due to failure to present for count and delaying a peace officer. The patient reported having no prior knowledge of the RVRs but admitted to covering the window of his cell. On May 22, 2024, the patient was seen for a pre-release contact, as he had an upcoming release date of June 28, 2024. The content of the documentation was adequate. Of note, the date was changed secondary to the RVRs previously mentioned. On May 30, 2024, the patient was seen briefly for an initial psychiatric assessment before leaving the session early. This was the patient's first contact with a psychiatrist since his arrival at HDSP on April 3, 2024, despite frequent medication refusals. Minor medication adjustments occurred, and no diagnosis was provided. No IDTT meeting occurred for this patient during the review period. In fact, the patient's initial IDTT meeting did not occur until July 2, 2024, three months after his arrival.

All groups offered to the patient were facilitated by recreational therapists, and he refused all groups.

**Findings**

The care and treatment provided to this patient were inadequate.

The patient had been at HDSP for over one month without any face-to-face contact with a psychiatrist, and only a CIT contact with a PC regarding property issues during his first week at the institution. His initial psychiatric assessment was not attempted until the patient had been at the institution for three weeks, and his initial PC assessment was not completed until the patient had been at the institution for one month.

No IDTT meeting occurred for the patient during the reporting period. The patient consistently refused all group treatment offered to him, and no interventions were initiated to address that concern. Similarly, the patient's medication nonadherence was not adequately addressed. Finally, neither the psychiatrist nor the PC provided diagnoses for the patient.

**Patient F**

This 33-year-old EOP patient's healthcare record was reviewed to assess the quality of care provided at HDSP. The patient was provided diagnoses of schizophrenia and antisocial personality disorder. He was prescribed Zyprexa, and he received his psychotropic medications by a PC 2602 order. He arrived at HDSP on March 7, 2024.

The patient was also a participant in the ISUDT program. He entered the MHSDS at the EOP level of care on December 15, 2010, and he also received mental health services at the acute and intermediate levels of care.

The patient was seen timely for the initial PC assessment on March 18, 2024. and he participated in the assessment. The PC described the patient as a poor historian, and thus information about the patient's psychosocial history prior to CDCR incarceration was limited. The PC noted that the patient denied any mental health concerns, lacked insight into his mental illness and that the patient historically demonstrated a lack of connection to reality regarding his behaviors and actions. His symptoms historically consisted of possible auditory and visual hallucinations, as well as persecutory and paranoid thinking. The assessment noted that the PC 2602 order was granted during December 2011 due to grave disability. The patient had a history of medication nonadherence and a history of treatment with Thorazine, Zyprexa, Risperdal, Depakote, and Zoloft. He had no known history of suicidal ideation or suicide attempts. The EOP functional evaluation was completed and indicated no impairments or functional difficulties related to the patient's symptoms. The treatment focus was to "continue to clarify impact of anxiety, impulsivity, and prepare for parole."

A timely initial psychiatric assessment was completed on March 20, 2024. The patient was seen via telepsychiatry and participated in the assessment. The psychiatrist noted diagnoses of

schizophrenia and antisocial personality disorder. The patient stated that he was provided a diagnosis of paranoid schizophrenia, and he began hearing voices in 2009. The psychiatrist also indicated that the patient was a poor historian, did not understand why he was prescribed antipsychotic medication, and often spit out the medication upon administration. The psychiatrist also noted that the patient's judgement and insight regarding the need for mental health treatment appeared chronically impaired. The psychiatrist continued Zyprexa and noted that the PC 2602 order would expire on August 23, 2024.

The initial IDTT meeting occurred late on March 26, 2024; the meeting included the patient, the assigned PC and the psychiatrist. It was unclear if they attended in-person or remotely. An RN, CC1, and recreational therapist also attended the IDTT meeting. The IDTT did not identify higher level of care indicators, and the patient was not identified as a high treatment refuser. The clinical summary, case formulation, and EOP functional evaluations were retained from the initial PC assessment. No specific patient strengths or verbalized treatment goals from the patient were identified. The treatment plan contained one IPOC for impulsive behavior; however, no treatment goals or interventions were documented. The patient was retained at the EOP level of care. The discharge criteria were appropriate and noted that a lower level of care would be considered after the patient increased his insight and awareness regarding his mental illness; however, the treatment plan lacked any identifiable or specific goals and interventions to support the patient in managing or improving his symptoms.

A psychiatry consult note on May 21, 2024 stated that the psychiatrist had received a consultation request from an EOP PC regarding the patient; however, the reason for the consult request was not provided in the consult note. This was the first psychiatry contact for the patient since the initial psychiatric assessment on March 20, 2024, and it occurred by telepsychiatry. The psychiatric documentation indicated that the assessment was thorough and included significantly more clinical information than was provided in the initial psychiatric assessment. The psychiatrist increased the Zyprexa dose and ordered follow-up in 30 days. The patient had not been seen for another psychiatry contact at the time of this review on June 10, 2024.

The patient was also not seen timely for clinically appropriate PC contacts during the review period. Four individual in-person PC contacts were provided. An unlicensed psychologist provided three of the four contacts, and three of four contacts did not occur timely. The PC progress notes indicated that the PC and patient addressed coping skills, symptom management and management of depression. The progress notes suggested that the content of the PC contacts did not align with the treatment plan or goals. Depression was not previously identified as a significant clinical concern for the patient, as the IPOC was for impulsive behavior. Impulsive behavior was not mentioned anywhere in the PC progress notes. The mental status assessment provided by that PC indicated the patient's mood and behavior were consistently "within normal limits", and that the patient "can control negative thoughts." The final PC contact of the review period was provided by the PC who performed the initial PC assessment. At that contact, the PC noted that the patient's thinking was disorganized and tangential, and the PC was unable to address the IPOC goals due to thought process impairment. The patient's symptom severity prompted the PC to send a message to the psychiatrist that the patient "may be under-medicated." The psychiatry consult/contact previously discussed occurred in response to that

request. Continuity of care, the timeliness of PC contacts, and treatment plan implementation were inadequate.

The patient was provided recreational therapy groups during the review period. The frequency of those groups varied between one and four times weekly. The patient attended all but one offered recreational therapy group, and his participation was frequently noted as good. The patient was also provided with in-cell packets and activities. Group topics included coping, current events, and recreation therapy which appeared appropriate.

**Findings**

The care and treatment provided to this patient were inadequate.

Treatment planning and clinical documentation were inadequate, and clinical contacts did not occur timely and did not align with the treatment plan. Continuity of care was poor, and group scheduling was inconsistent.

The treatment plan did not contain specific or identifiable goals or interventions to address the patient's lack of insight, historical medication nonadherence, or psychotic symptoms. Although the initial provider assessments were timely and appropriate; subsequent PC and psychiatric contacts were not. The frequency of psychiatric contacts was particularly problematic, as the patient was not seen for routine psychiatric follow-up for approximately 60 days. When seen, he was seen by a different psychiatrist, and the patient was only seen in response to a request from the PC due to an increase in the patient's symptomatology. The PC documentation also indicated that the content of the contacts was not consistent with the treatment plan and did not address the treatment goals. Continuity of care was inadequate. The patient was seen by different PCs and psychiatrists during the review period. Further, despite an increase in symptoms, the patient had not been seen for follow-up by the PC as of June 10, 2024, three weeks after he was seen by the psychiatrist when his medication was increased.

**Patient G**

This 34-year-old EOP patient's healthcare record was reviewed to evaluate the quality of care provided at HDSP. He was provided diagnoses of amphetamine-type substance use disorder, severe, in early remission; unspecified depressive disorder; and panic disorder. He was prescribed Lexapro. He arrived at HDSP on March 7, 2024.

The patient had received mental health services at the 3CMS, EOP, and MHCB levels of care. The most recent MHCB placement occurred on January 17, 2024, and he was discharged to the EOP level of care. His history was significant for five previous suicide attempts; one serious attempt occurred in CDCR during 2019. The patient was a participant in the ISUDT program.

The patient was seen timely for the initial PC assessment on March 21, 2024. The PC indicated that the patient described his primary symptoms as severe anxiety and panic that were exacerbated by illicit substance use. His suicide history was pulled forward from previous assessments, and the most recent SRASHE occurred on February 24, 2022. The PC noted

several relevant protective factors for the patient, including an upcoming release date in 2025 and a supportive family. His demeanor was described as pleasant, and he was noted to demonstrate partial insight and fair judgment. The EOP functional evaluation indicated that the patient did not require any additional support or accommodations. The treatment focus was appropriate for the patient's presentation and clinical needs, and the case conceptualization was appropriate. The diagnosis list did not include any anxiety or panic disorders and was limited to a diagnosis of opioid use, unspecified, uncomplicated, and also included several minor physical ailments/episodes.

The initial psychiatric assessment was completed by telepsychiatry one day late on March 22, 2024. The psychiatrist provided diagnoses of major depressive disorder and generalized anxiety disorder with panic, and Lexapro was prescribed as the patient reported symptom improvement with the medication. The psychiatrist also noted that the patient had abstained from the use of illicit substances for the past six months. His mental status was described as normal with fair insight and judgment. His acute suicide risk was assessed as low, and his chronic risk was assessed as high. Psychiatric follow-up was scheduled for 30 days.

The initial IDTT meeting occurred late on March 26, 2024. The meeting was attended by the patient, the assigned PC, psychiatrist via telepsychiatry, CC1, RN, and a recreational therapist. Diagnoses of amphetamine-type substance use disorder, severe, in early remission; unspecified depressive disorder; and panic disorder were documented. The IDTT did not identify any higher level of care indicators. The treatment plan included an IPOC for anxiety, and interventions were specified for the patient's symptoms or triggers. The level of care justification and discharge criteria were appropriate and focused on addressing panic symptoms and improving coping skills to maintain sobriety; however, there were no specific interventions to assist the patient in achieving those treatment goals.

Psychiatry contacts were provided by telepsychiatry in a confidential setting; however, the psychiatric contacts did not occur timely. The initial psychiatric assessment was completed on March 22, 2024, and a routine follow-up contact occurred on April 11, 2024; however, the patient was not seen for a subsequent psychiatric contact for the remainder of the review period. At the April 11, 2024 contact, the patient was described as stable with no complaints. His acute suicide risk was assessed as low, and his medication regimen was unchanged. The documentation of the contact was thorough and clinically appropriate.

The patient was not seen for a routine PC contact until April 4, 2024. An unlicensed psychologist provided most of the offered PC contacts; this was a different PC than the PC who conducted the initial PC assessment. The PC contacts did not occur timely or consistently. There were periods of up to 34 days between PC contacts. A progress note on April 17, 2024 indicated that the patient was angry in response to being asked to sign a refusal form for his last missed appointment, and the patient reported that he was not provided a ducat and custody did not let him leave his cell. No note or refusal form was located in the healthcare record referencing the missed appointment.

The patient refused to participate in a SRASHE on May 6, 2024, and the refusal note indicated that the SRASHE would not be completed without seeing the patient. The patient was placed in

the RHU on or about May 14, 2024, and he was provided an initial PC assessment on May 16, 2024. The assessment indicated that the patient declined to participate in the interview, and the assessment was completed by healthcare record review. The patient remained in the RHU for one week before return to his mainline EOP housing unit. He was not seen by a psychiatrist while in the RHU. He was seen for one cell front PC wellness check-in by a covering PC while in the RHU when he was described as stable and cooperative. The next PC contact was provided by a LCSW eight days after the patient was released from the RHU. The contact was well documented, and the PC provided appropriate interventions to address the treatment goals. The PC noted that the patient demonstrated stable mood and was scheduled to begin ISUDT treatment the following day. Although the timeliness of PC contacts was inadequate; the clinicians provided appropriate interventions and support which aligned with the treatment plan and treatment goals when he was seen.

The healthcare record contained three poorly completed and/or incomplete treatment refusal forms. None of the refusal forms indicated the specific reason for the patient's refusal. On two of the three forms in the section where the clinician was to describe the treatment refused and the risks and benefit of intervention; the clinician wrote "refusal may result in LOC change from EOP to 3CMS." That statement was inappropriate and suggested that treatment refusals might form the basis for a reduction in level of care, and no additional information was documented. The third refusal form indicated that the patient refused to attend a scheduled therapy appointment.

The patient was generally offered two recreational therapy groups weekly during the review period; however, he was not offered any groups from April 12 to April 22, 2024, from May 9 to May 20, 2024, and from May 22, 2024 to June 10, 2024. The patient attended all offered groups, and his participation was described as moderate. The group topics were appropriate and included coping, social skills, communication, and recreation therapy.

**Findings**

The care and treatment provided to this patient were inadequate.

The initial PC assessment occurred timely; however, the initial psychiatric assessment and initial IDTT were not timely. The patient was seen for only one psychiatric contact after the initial psychiatric assessment, despite being prescribed psychotropic medications and spending approximately one week in the RHU. Subsequent PC contacts were not always timely, and the time between PC contacts during the review period ranged between two and 34 days. The documentation indicated that the patient refused to participate in treatment on three occasions; however, the treatment refusal forms were poorly completed and the notations on the refusal forms suggested that treatment refusal was considered a basis for reducing the patient's level of care from EOP to 3CMS. The refusal forms lacked detailed or specific information about the refusal or efforts to address or mitigate any patient concerns that may have precipitated the refusals.

**Patient H**

This 38-year-old EOP patient's healthcare record was reviewed to evaluate the quality of care provided at HDSP. The healthcare record included several diagnoses including unspecified schizophrenia spectrum and other psychotic disorder, unspecified depressive disorder, antisocial personality disorder, opioid use disorder, and polysubstance use disorder. He was prescribed Effexor and Vistaril and was not consistently adherent to his prescribed medications. The patient arrived at HDSP on March 27, 2024.

The patient had been a participant in the MHSDS since 2017 and received mental health services at the 3CMS, EOP, and MHCB levels of care. His most recent MHCB placements occurred in February 2024 and May 2024; after each placement, he discharged to the EOP level of care. The patient's history was significant for one suicide attempt via cutting/stabbing in 2020 which he aborted during the act. The documentation indicated that the patient did not receive any mental health assessment or treatment following that suicide attempt. His chronic suicide risk was assessed as high, and his acute risk was assessed as low.

Although the patient arrived at HDSP on March 27, 2024 at the EOP level of care, there was no documentation of an EOP initial PC assessment, and no initial PC assessment was completed until the patient was admitted to the HDSP MHCB on May 16, 2024. The MHCB PC completed a timely initial MHCB PC assessment on May 16, 2024; however, almost all of the information in that assessment was pulled forward from previous assessments and did not include updated clinical information that reflected the patient's current mental status except that he had reported suicidal ideation without a plan or intent in response to worsening depression.

The initial psychiatric assessment occurred late on April 10, 2024. The patient was seen by telepsychiatry with the assistance of a tele-presenter, and the patient was cooperative with the assessment. The psychiatrist described the patient as stable. The psychiatrist also noted the patient's report of auditory hallucinations and mood swings. The patient requested a decrease in his Effexor dose due to side effects, and the psychiatrist decreased Effexor and increased Vistaril. The psychiatrist updated the patient's diagnoses to schizoaffective disorder, antisocial personality disorder, and substance use disorder. He assessed the patient with low acute suicide risk and high chronic risk. The patient declined to participate in an initial psychiatric assessment on June 13, 2024 after discharge from the MHCB and return to the EOP unit. That initial assessment attempt also did not occur timely and was over three weeks late. The assessment had not been provided or rescheduled at the time of this review.

No IDTT meeting or treatment plan were documented from the patient's arrival at HDSP to June 15, 2024, the date of this review. An initial IDTT meeting in the MHCB was completed on May 20, 2024, the same day that the patient was discharged from the MHCB. That IDTT meeting did not occur timely, as it was not provided within 72 hours of MHCB admission on May 16, 2024. The IDTT noted that the patient denied suicidal ideation, had met his MHCB treatment goals, and would be discharged to the EOP level of care. The patient was not provided an initial PC assessment or an initial IDTT meeting upon his return to the EOP level of care.

After the initial psychiatric assessment on April 10, 2024, the patient was not seen for psychiatric follow-up or routine psychiatric contact prior to his MHCB admission on May 20, 2024, despite a recent medication adjustment and a history of medication nonadherence. He was not seen for routine psychiatric contact after discharge from the MHCB.

The patient was seen for only one EOP PC contact between March 27, 2024 and June 15, 2024. A PC progress note dated April 5, 2024 was documented, but that note did not contain any current or relevant information and only included information directly pulled forward from a PC contact provided at CSP/Corcoran on February 1, 2024. It was unclear whether the mental status was current or pulled forward, and the documented plan was limited to building rapport so that the patient would feel comfortable attending his sessions. A PC progress note of May 23, 2024 indicated that the patient had refused a telehealth PC contact. It was unclear whether the patient was only scheduled for telehealth PC contacts.

The patient was offered two recreational therapy groups weekly between his arrival at HDSP on March 27, 2024 and his placement in the MHCB on May 16, 2024. He attended only one of the offered groups, a life skills group on April 30, 2024. The patient was not offered any EOP groups after his discharge from the MHCB on May 20, 2024.

**Findings**

The care and treatment provided to this patient were significantly inadequate.

Clinical contacts and assessments were absent or not timely, treatment planning was severely inadequate, and the lack of treatment resulted in MHCB placement two months after arrival at HDSP.

The patient was not seen for timely initial assessments and was never provided an EOP treatment plan or IDTT meeting. Routine and follow-up PC and psychiatric contacts did not occur except when the patient was housed in the MHCB. The ongoing lack of assessment and treatment significantly increased the patient's risk and culminated in an MHCB admission due to suicidal ideation on May 16, 2024. The MHCB IDTT meeting did not occur timely and only occurred upon the patient's MHCB discharge. The patient was seen for timely five-day follow-up contacts, but he was not seen timely for initial PC or psychiatric assessments upon his return to the EOP; additionally, no EOP initial IDTT meeting or treatment plan were documented.

The lack of required assessments, treatment, and monitoring posed significant and increased risk for the patient, particularly given his history of medication nonadherence and two recent MHCB admissions due to suicidal ideation. Despite his frequent treatment refusals, there was no documentation that he was considered for EOP modified programming or that his lack of participation was ever discussed by his treatment providers.

**Patient I**

This 35-year-old EOP patient's healthcare record was reviewed to evaluation the quality of care provided at HDSP. Upon arrival at HDSP, he was provided diagnoses of major depressive

disorder, recurrent episode, with psychotic features; opioid use disorder, severe, in sustained remission; alcohol use disorder; and altered mental status, unspecified. The patient was prescribed Trazodone, hydroxyzine, Depakote, and Abilify. The patient arrived at HDSP on April 16, 2024 from the CMF PIP where he was treated for grave disability. A PC 2602 order was granted during that PIP admission.

He had a history of receiving mental health services at the MHCB, 3CMS, EOP, and acute levels of care. He was assessed with low acute and moderate chronic suicide risk.

An initial PC assessment was attempted on April 18, 2024 by telehealth; however, the documentation indicated that custody reported that the patient refused, and no medical assistant was available to facilitate cell front telehealth contact to obtain the documented refusal. The PC indicated the initial assessment was completed by healthcare record review due to the refusal. The initial assessment occurred timely, and the assessment forms were completed appropriately and provided relevant and current clinical information about the patient's functioning. The EOP functional evaluation was completed appropriately and indicated that the patient could not work in the heat due to taking heat sensitive medications. The clinical summary included an appropriate case formulation and identified specific areas for initial treatment focus.

The patient was not seen for five-day follow-up contacts upon arrival to HDSP. He was seen for three follow-up contacts on April 19, 2024, April 20, 2024, and April 21, 2024; however, there was no documentation of contacts on April 17, 2024 or April 18, 2024. The contact on April 19, 2024 was inadequately documented and incorrectly identified April 19, 2024 as day four of the required five-day follow-up rather than day three.

The patient participated in an initial psychiatric assessment by telepsychiatry on May 7, 2024 that occurred four days late. The psychiatrist documented the patient's psychosocial and clinical histories, current symptoms and concerns, and current mental status. He also provided the patient with psychoeducation and an extensive orientation to the EOP, and medication adherence was discussed. The psychiatrist provided diagnoses of major depressive disorder with psychotic features and catatonia, with provisional diagnoses of schizophrenia spectrum disorder and bipolar disorder also documented. The psychiatrist further indicated that the patient continued to meet the criteria for the PC 2602 order due to grave disability. The psychiatrist assessed the patient's chronic suicide risk as moderate and his acute risk as low.

The initial EOP IDTT meeting on May 28, 2024 was extremely delayed, and the patient refused to attend. The IDTT was attended by the required staff including the assigned PC, psychiatrist, CC1, and a recreational therapist. The IDTT documentation did not indicate whether the PC and psychiatrist attended the IDTT meeting in person or virtually; the initial assessments were attempted or provided by telehealth and telepsychiatry, and it was reasonable to assume that the providers attended the IDTT meeting virtually as well. The treatment team provided diagnoses of major depressive disorder, recurrent, with psychotic features, and alcohol abuse. No higher level of care indicators were identified, and the patient did not require a safety plan. No specific patient strengths were identified. The treatment plan included an IPOC for depressed mood but did not include any specific interventions to address the depressive symptoms or to improve functioning other than medication management and encouraging the patient to participate in

treatment. No IPOCs or specific treatment planning was documented to address the patient's psychotic symptoms. The level of care and discharge criteria indicated that the patient would work to reduce paranoid symptoms but did not specify how those symptoms would be addressed. The EOP functional evaluation was carried forward from the initial PC assessment and remained appropriate.

The patient was seen for a routine psychiatric contact on June 4, 2024. The contact occurred timely and was provided by telepsychiatry. The psychiatrist reported that the patient requested discontinuation of his heat sensitive medications and stated that he did not need medications to remain stable. The psychiatrist noted that the patient became dismissive and defensive regarding discussion of alternatives to discontinuing the heat medications. The patient reportedly denied any psychotic symptoms or suicidal ideation and denied any significant clinical concerns. The psychiatrist reported that the patient became frustrated and eventually left the session during the discussion of concern regarding medication discontinuation.

The patient was not seen for routine or follow-up PC contacts since his arrival at HDSP.

The patient was offered recreational therapy groups at HDSP. The offered group topics were appropriate; however, group scheduling was inconsistent, and the patient only attended one of seven offered recreational therapy groups since his arrival.

**Findings**

The care and treatment provided to this patient were inadequate.

The initial psychiatric assessment did not occur timely and was one week late, despite the patient's recent discharge from acute care and being prescribed several psychotropic medications. The initial PC assessment occurred timely, but the patient refused to participate, and no subsequent PC contacts were documented. The five-day follow-up contacts were not completed as required. The IDTT meeting was significantly late by one month, and treatment planning was inadequate and did not include IPOCs or treatment interventions to target the patient's psychotic symptoms, ambivalence toward treatment, or address his paranoia and anxiety. The treatment plan included an IPOC for depressed mood which was not identified as a primary concern, and no interventions were documented to address that concern. The patient was offered recreational therapy groups; however, the frequency of offered groups was inadequate. The lack of PC contacts provided to the patient was very concerning, particularly given the patient's recent discharge from acute care, the presence of chronic psychotic symptoms, and the patient's poor insight regarding the need for mental health care.

**Patient J**

This 28-year-old EOP patient's healthcare record was reviewed to evaluate the quality of care and treatment provided at HDSP. At the time of arrival at HDSP, he was provided diagnoses of unspecified depressive disorder, opioid use disorder, and stimulant use disorder. He was prescribed Remeron and melatonin, and he was a participant in the ISUDT program. The patient arrived at HDSP on April 12, 2024 after discharge from the CMC MHCB.

The patient had a history of receiving mental health services at the 3CMS, EOP, and MHCB levels of care, and he had two previous suicide attempts in 2013 and 2019. He had been placed in the MHCB in March 2024 after cutting himself to prevent transfer to HDSP, and the documentation indicated that the patient denied intent to die. Upon arrival at HDSP, the patient was seen timely for appropriately documented five-day follow-up contacts.

A PC progress note of April 16, 2024 indicated that the patient's primary concern was depression that quickly led to suicidal ideation. A different PC conducted a healthcare record review on the same day and provided a brief summary of the patient's CDCR clinical history. He was seen for a timely initial PC assessment on April 17, 2024 when his chief complaints were anger and substance abuse problems. He also reported a history of depression, anxiety, sleep problems, ADHD, and PTSD, as well as polysubstance use and dependence, particularly methamphetamine and opioids. The EOP functional evaluation was completed and indicated the patient did not have any restrictions or limitations or require accommodations. The clinical summary and case formulation were also completed appropriately and included updated and recent information regarding the patient's clinical status. The patient was not seen for another routine PC contact during the period reviewed.

The first and only psychiatric contact since his arrival at HDSP was provided on April 23, 2024, and the documentation indicated that the patient was seen by the psychiatrist during a UCC meeting. The note was very brief and indicated that the patient requested that his medications be ordered for regular administration rather than prn. The psychiatrist ordered Remeron as requested, and indicated that the patient would be seen for the initial psychiatric assessment on May 1, 2024. The initial psychiatric assessment was not documented, and the patient had not been seen for subsequent psychiatric contact as of June 15, 2024, the date of this review.

There was no documentation of the completion of an IDTT meeting or treatment plan for the patient during the review period.

The patient was not consistently offered recreational therapy groups at HDSP. He was offered two groups in April 2024, one group in May 2024, and two groups in June 2024 at the time of review. The patient attended three of the five offered groups and reportedly demonstrated good participation and engagement.

A SRASHE which was one of four 90-day follow-up evaluations following inpatient discharge was completed on April 15, 2024. The SRASHE was completed appropriately and identified the patient's triggers and protective factors. His chronic risk was assessed as high, and acute risk was assessed as low; appropriate clinical justifications were provided for the risk ratings and protective factors.

**Findings**

The care and treatment provided to this patient were severely inadequate.

There was a lack of documentation of the completion of an IDTT meeting or treatment planning despite the patient's arrival from an MHCB. He was not seen for an initial psychiatric assessment despite being prescribed psychotropic medication and was not seen at all other than during a UCC meeting. The patient was also not seen for follow-up or routine PC contacts after the initial assessment.

**Patient K**

This 37-year-old EOP patient's healthcare record was reviewed to assess the quality of care provided at HDSP. Upon arrival at HDSP, he was provided diagnoses of major depressive disorder, recurrent episode, mild, and opioid use disorder. He was prescribed Abilify, Vistaril, and Remeron, and he was also a participant in the ISUDT program. The patient arrived at HDSP on April 16, 2024 after discharge from the CMF MHCB where he received treatment since March 14, 2024 due to suicidal ideation.

The patient was initially placed in the MHSDS in July 2010 after placement in the MHCB after his daughter's death from cancer; he received mental health services at the 3CMS, EOP, and MHCB levels of care. The patient had several instances of suicidal ideation and/or self-harm that resulted in MHCB placements.

The patient refused to participate in the initial PC assessment by telehealth on May 8, 2024, and it was completed by a healthcare record review due to the patient's refusal. The initial PC assessment was completed eight days late. The patient's presenting problems were ongoing substance abuse contributing to poor sleep patterns and increased sadness in response to losses in his family. The assessment provided the patient's clinical and psychosocial histories and was completed appropriately. The EOP functional evaluation was completed and noted no impairments or required accommodations. The clinical summary and case formulation were updated appropriately and were useful in informing treatment. The identified treatment focus was to increase awareness of the negative impacts of substance abuse on mental health symptoms and to provide acceptance and therapy to help with development of coping skills and insight into thoughts, feelings, and behaviors.

The patient was offered a second initial PC assessment on June 10, 2024 after his return to the EOP from the MHCB. The patient again refused to participate in the assessment. Review of the assessment indicated that the entire document was pulled forward from the previous initial PC assessment of May 8, 2024 and did not include more recent, updated information.

Although he arrived at HDSP on April 16, 2024, the patient was not seen for an initial psychiatric assessment until May 16, 2024, two weeks late. The patient refused to attend the initial psychiatric assessment, and the documentation indicated that the patient was not medication adherent. An initial psychiatric assessment eventually occurred on May 29, 2024 after placement in the MHCB on May 28, 2024, when the patient reported suicidal ideation and stated that he ingested cleaning chemicals but did not intend to die. The MHCB initial psychiatric assessment that was provided by telehealth was adequate, and included the reason for MHCB admission, mental status, relevant clinical history, and medication plan. The patient was reportedly upset because he had been removed from the EOP level of care. The psychiatrist noted that the patient had refused all initial assessments and had missed many doses of Abilify.

The patient reported benefit from Abilify but noted drowsiness, and the psychiatrist agreed to reduce the dose to address the side effects. The psychiatrist also decreased Remeron and discontinued Vistaril. The patient was discharged from the MHCB on June 3, 2024; and he had not been seen for an EOP initial psychiatric assessment at the time of review.

The initial IDTT meeting occurred three weeks late on May 21, 2024, and the patient refused to attend; however, the required staff were in attendance. It was unclear whether the PC and psychiatrist attended the IDTT virtually or in-person. No higher level of care indicators were identified for consideration of higher level of care referral. Although not a participant in the SRMP, a safety plan was documented that was adequate and individualized. The clinical summary, including treatment goals, was pulled from the initial PC assessment and remained appropriate. The treatment plan included one IPOC for substance use/abuse, but no specific interventions were included. Although the patient had chronic depression with severe depressive episodes, no IPOC for that condition was developed. Despite the patient's lack of treatment participation, refusal to complete initial assessments, and medication nonadherence; he was discharged from the EOP and placed at the 3CMS level of care. That reduction in treatment was particularly concerning given the providers were unable to properly assess the patient's functioning or investigate possible reasons for his lack of participation and engagement in treatment. The patient was placed in the MHCB for suicidal ideation only one week after he was removed from the EOP. He stated that he experienced suicidal ideation, as he had increasing depression after learning of removal from the EOP.

The patient was seen timely for appropriately documented five-day follow-up contacts after his arrival on April 16, 2024 from the CMF MHCB and after discharge from the HDSP MHCB on June 3, 2024.

At the time of review, the patient was seen for only one individual PC contact since his arrival at HDSP. The contact was provided by an unlicensed psychologist, and the progress note indicated that the patient denied suicidal ideation and discussed his family. The PC provided the patient with psychoeducation and handouts on grief.

At the time of review, the patient had not been seen for any routine psychiatric contacts and had not met with or been evaluated by a psychiatrist other than when housed in the MHCB.

The patient was offered four recreational therapy groups and did not attend any of the offered groups.

**Findings**

The care and treatment offered to this patient were severely inadequate.

Clinical contacts, assessments, level of care considerations, and treatment planning were significantly problematic. The lack of assessment, treatment planning, and clinical contacts exacerbated the patient's mental health symptoms. The patient was not seen for routine or follow-up psychiatric contacts since his arrival at HDSP and only received one PC contact. He refused to participate in any initial assessments and refused to attend the initial IDTT meeting.

The initial IDTT meeting occurred three weeks late and occurred without a completed initial psychiatric assessment. The treatment team's decision to discharge the patient from the EOP to the 3CMS level of care after the patient refused to participate in the initial assessments and after demonstrating consistent medication nonadherence was inappropriate and concerning. That decision was made without any input or feedback from the patient, and the patient was not present at the IDTT meeting when the decision occurred. He was admitted to the MHCB only one week later due to suicidal ideation, and he stated that his suicidal ideation and increase in symptoms was triggered by his sudden removal from the EOP. Additionally, there was no documentation that the MHCB treatment team attempted to investigate the patient's reasons for refusing to engage with his EOP treatment team.

**Patient L**

This 34-year-old EOP patient's healthcare record was reviewed to assess the quality of care provided at HDSP. He was provided diagnoses of adjustment disorder, unspecified, and schizoid personality disorder, and he was not prescribed psychotropic medication while in the MHCB. The patient arrived at HDSP on April 18, 2024 after he was discharged from the CIM MHCB where he was placed on April 11, 2024 after reporting suicidal ideation at KVSP.

The patient was not included in the MHSDS for most of his prison term except for three very brief MHCB admissions in 2023. He was discharged to the EOP level of care at HDSP after the most recent MHCB placement. At each MHCB admission, the patient had reported suicidal ideation due to lack of sleep caused by noisy neighbors.

An urgent PC consult contact occurred on April 19, 2024, only one day after the patient's HDSP arrival. The progress note indicated that the referral was made due to his recent MHCB discharge. The PC noted that the patient was not interested in taking medications due to religious reasons. The patient reported very little sleep disturbance since arriving at HDSP, and the PC noted that the patient appeared stable with normal mood and behavior. He denied suicidal ideation.

Five-day follow-up contacts were completed appropriately upon arrival at HDSP; during those contacts, the patient was consistently described as stable.

The patient was placed in the HDSP RHU on April 25, 2024 due to safety concerns. No initial assessments or an initial IDTT meeting were completed prior to the RHU placement. The patient was not seen by mental health staff in the RHU until May 8, 2024, when the initial PC assessment was completed more than two weeks after the RHU placement. The presenting problem noted that the patient was retained in the RHU pending a safety investigation. The patient participated in the assessment and provided his psychosocial and clinical history. The PC noted that the patient had bizarre delusional thinking and partial insight, but his mental status was otherwise normal. The EOP functional evaluation did not identify any impairments or the need for accommodations. The clinical summary and the case formulation were completed appropriately.

The patient declined to consider taking psychotropic medications for religious reasons and was not seen by the psychiatrist for an initial assessment or routine contacts during the review period.

The initial RHU IDTT meeting occurred late on June 12, 2024, over one month after RHU placement. The patient participated in the IDTT meeting that included the necessary participants except for an alternate psychiatrist. No higher level of care indicators were identified. The patient was assessed with low chronic and acute suicide risk. The patient did not verbalize any treatment goals, and the treatment team noted treatment adherence as the primary treatment goal. The treatment plan contained an IPOC for treatment nonadherence but did not provide specific interventions. The discharge criteria indicated that the EOP level of care remained appropriate, his functional impairments did not indicate the need for a higher level of care, and his symptoms and functioning did not suggest that a lower level of care was appropriate.

The patient received timely, weekly PC contacts while housed in the RHU. The contacts were documented appropriately and indicated that the patient generally demonstrated stable mood and no signs or symptoms of distress or decompensation. Although he continued to present with delusional thinking, he consistently denied depressive symptoms and was reportedly anxious to learn the results of the safety investigation.

SRASHEs were conducted on May 31, 2024 and June 5, 2024. Both SRASHEs occurred in response to the patient expressing suicidal ideation. The SRASHE on May 31, 2024 noted that the patient had submitted a form 5602 that indicated possible suicidal thinking. After discussion with the PC, the patient stated he “just said that. I am not feeling that way.” The PC provided an appropriate brief assessment and determined the patient was not at risk of self-harm. The June 5, 2024 SRASHE occurred after the patient reported suicidal ideation to custody to have his property concerns addressed. The PC provided the assessment, and the patient denied suicidal ideation and said he would wait to hear from custody about his property which was later addressed. That assessment also indicated low acute and chronic suicide risk.

The patient was offered six recreational therapy groups during the review period. The groups were not offered consistently, no groups were offered for one week. The patient attended five of the six offered groups and was described as an active group participant.

**Findings**

The care and treatment provided to this patient were inadequate.

The patient should have been seen for an initial psychiatric assessment upon placement in the EOP and provided counseling and psychoeducation regarding the potential risks and benefits of medications that might have alleviated his symptoms. The initial PC assessment did not occur timely after arrival at HDSP and after placement in the RHU. The initial IDTT meeting did not occur until approximately six weeks after his arrival to HDSP and one month after RHU placement. The treatment plan was inadequate and did not provide appropriate treatment goals or interventions to support the patient’s clinical needs. An IPOC and treatment interventions to address the patient’s delusional thinking and poor coping skills should have been developed.

Additionally, the treatment plan was delayed and did not target the patient's symptoms appropriately.

**Patient M**

This 42-year-old EOP patient's healthcare record was reviewed to assess the care provided at HDSP. The patient was provided diagnoses of unspecified bipolar and related disorder and substance-induced psychotic disorder, moderate or severe use. He was prescribed Remeron, Cymbalta, and Cogentin and was a participant in the ISUDT program. The patient arrived at HDSP on April 6, 2024 after discharge from the CHCF PIP intermediate care where he was treated from November 9, 2023 to April 6, 2024 due to suicidal ideation and depression.

The patient initially entered the MHSDS in 2007 during a previous term and had received mental health services at the 3CMS, EOP, MHCB, and intermediate levels of care. His history was significant for one documented suicide attempt in CDCR, but the patient reported at least two previous suicide attempts in CDCR.

The patient was seen timely for appropriately documented five-day follow-up contacts after his arrival at HDSP. At each contact, he was described as stable and denied suicidal ideation or any related concerns.

The initial PC assessment occurred timely on April 9, 2024, and the patient participated in the assessment. It was unclear whether the assessment occurred in-person or by telehealth. The patient's chief complaint was that he was only able to remain sober while in prison and wanted to learn coping skills and to maintain his sobriety upon prison release. The patient reported a very long history of polysubstance use beginning in childhood and discussed his trauma history and previous suicide attempts. His mental status was normal with partial insight and fair judgment. The EOP functional evaluation was completed and indicated no accommodations or restrictions. The clinical summary and case formulation were updated appropriately. The patient reportedly responded well to treatment; his treatment focus was to continue sobriety, increase awareness of his mental illness, and to prepare for parole in 2025.

The initial psychiatric assessment occurred five days late on April 25, 2024 by telepsychiatry with the assistance of a tele-presenter. The psychiatrist provided diagnoses of anxiety and schizoaffective disorder, with a provisional diagnosis of major depressive disorder with psychotic features. The psychiatrist continued Cymbalta, Remeron, and Cogentin unchanged. The patient reported stable mood with normal sleep and appetite. He reported auditory hallucinations that were improved with medication treatment. The patient was also on MAT to assist in maintain sobriety. The psychiatrist reported that the patient's mental status was normal, he denied suicidal ideation, and the patient was assessed with low acute and high chronic suicide risk. Psychiatric follow-up was scheduled for 30 days.

The initial IDTT meeting was completed three weeks late on May 14, 2024. The patient participated in the IDTT meeting that was attended by the assigned PC and psychiatrist, a CC1, and an recreational therapist; it was unclear whether the PC and psychiatrist participated in-person or virtually. The patient was identified for his lack of treatment participation regarding

indicators for consideration of referral to a higher level of care, as he had not attended his assigned groups and was nonadherent with Remeron. The treatment plan indicated that the patient remained stable despite his lack of participation and medication adherence, and he was reminded of the importance of attending his groups and individual sessions. The PC was to use motivational interviewing techniques to explore the patient's resistance and to help increase his engagement. A safety plan was documented that was developed upon discharge from intermediate care, and the safety plan was appropriate and well documented. The treatment plan included an IPOC for substance use/abuse but did not include IPOCs or specific treatment goals or interventions to target depression or psychotic symptoms despite the patient's chronically depressed mood and auditory hallucinations.

The patient was seen for a 30-day routine psychiatric follow-up contact by telepsychiatry on May 28, 2024, and the contact occurred in a confidential setting; however, the contact occurred three days late. A contemporaneous psychiatry progress note for medication nonadherence indicated that the patient had missed three or more consecutive doses of Remeron, and the medication was discontinued. The patient reported that he was adherent with Cymbalta and wanted to continue that medication. The patient was described as stable with normal mental status. He reported good mood, sleep, and appetite and denied the presence of auditory hallucinations or suicidal ideation and identified several protective factors. The psychiatrist provided a diagnosis of schizoaffective disorder, continued Cymbalta, and planned to follow-up in 30 days.

The patient was not seen for individual or group PC contact since his arrival at HDSP. The PC attempted to administer a SRASHE by telehealth on May 9, 2024; however, the patient refused to participate, and there was no documentation that the SRASHE was completed.

The patient was offered between one and four recreational therapy groups weekly since his arrival at HDSP. The group topics appeared appropriate. The patient attended only one offered group between his arrival at HDSP on April 6, 2024 and the initial IDTT meeting on May 14, 2024. The patient responded very well to the counseling and encouragement provided during his IDTT meeting, and his group attendance increased significantly for the remainder of the review period.

**Findings**

The care and treatment provided to this patient were grossly inadequate.

The patient was not seen timely for assessments or clinical contacts, the initial IDTT meeting did not occur timely, and the treatment plan was inadequate for the patient's clinical needs and presentation, and it lacked focus or interventions for the patient's depression and auditory hallucinations. Only one PC progress note was located in the healthcare record since the patient arrived at HDSP, and it merely noted that the patient refused to participate in a SRASHE. The patient's clinical needs and presentation indicated the need for frequent and consistent contacts with his providers, and the lack of PC contacts and support likely negatively impacted his engagement in treatment. The patient was previously described as amenable to treatment and willing to work with his providers, and he responded very quickly when he was encouraged to increase his group attendance. Once the patient began to attend his groups, he demonstrated

good engagement and participation and appeared to benefit. Although the initial psychiatric assessment did not occur timely; the overall psychiatric care and contacts were adequate, and the patient's medications were adjusted appropriately.

**Patient N**

This 25-year-old EOP patient's healthcare record was reviewed to assess the quality of care provided at HDSP. He was provided diagnoses of unspecified insomnia disorder; cocaine use disorder, moderate, in sustained remission; alcohol use disorder, severe, in sustained remission; other substance use disorder, severe, in sustained remission; and opioid use disorder, severe, in sustained remission. He was prescribed Remeron and prazosin. The patient arrived at the HDSP EOP on March 30, 2024 after discharge from the CSP/Sac MHCB.

The patient recently entered the MHSDS at the 3CMS level of care, was admitted to the CSP/Sac MHCB in March 2024, and discharged to EOP at HDSP. He was a participant in the ISUDT program.

The patient was seen for only four of the five required days of five-day follow-up contacts after his arrival at HDSP. Review of the notes indicated that the patient was provided a safety plan, and the plan was reviewed at each contact. The patient remained stable and consistently denied suicidal ideation or any significant concerns.

The patient was offered an initial psychiatric assessment by telepsychiatry on April 4, 2024, but he refused to attend the appointment. The psychiatrist noted that the patient's medications would be continued unchanged, and his initial assessment would be provided "as scheduled." The initial psychiatric assessment had not occurred at the time of review, and the patient refused a scheduled psychiatric contact on May 9, 2024. He was not offered or provided any other psychiatric contacts during the review period.

The initial PC assessment occurred two days late on April 15, 2024. The patient participated in the assessment, but it is unclear whether the assessment was provided by telehealth. The patient's chief complaint was depression, and the PC noted that the patient reported low mood and motivation, as well as appetite and sleep disturbances. The patient also reported a history of anger problems. The patient denied any history of suicide attempts but stated that he engaged in head-banging behaviors to get attention and to have his concerns addressed. The patient reported one prior accidental overdose on heroin when he was housed at CSP/Solano. The PC indicated that the patient demonstrated pleasant mood, normal mental status, and full insight into his problems and mental illness. The EOP functional evaluation was completed appropriately and indicated that no impairments were present, and no accommodations were required. The clinical summary was updated appropriately which identified the patient's treatment focus as supporting his recovery and developing insight into his traumas and underlying reasons for substance abuse.

No initial EOP IDTT meeting or treatment plan was documented for the patient since his arrival at HDSP. At the time of review, the patient had been housed at HDSP for over 10 weeks without a treatment plan.

One PC contact was documented since the patient's HDSP arrival on April 16, 2024, the day after the initial PC assessment. The PC indicated that the patient asked to speak with the psychiatrist, and the PC noted the date of the patient's psychiatric appointment; however, there was no documentation that the identified psychiatric contact occurred. The PC reported that the patient's mental status was normal, and he denied significant concerns. The patient was not offered another routine PC contact during the review period.

The patient was offered recreational therapy groups during the review period. The group topics were not clinically focused, and the patient was not offered groups consistently; he was only offered groups during two weeks in April 2024 and one week in May 2024. His group attendance was inconsistent; but when he did attend, his participation and engagement were assessed as good.

**Findings**

The care and treatment offered to this patient were grossly inadequate.

The patient was not seen for an initial psychiatric assessment or routine psychiatric contacts during the review period despite being prescribed psychotropic medications. The initial PC assessment was late, and the patient was seen for only one subsequent PC contact during the review period. No IDTT meetings or treatment plans were documented at HDSP; and at the time of this review, the patient had been at the EOP level of care for approximately 10 weeks without a treatment plan. The patient was offered groups sporadically and was not offered weekly groups as required.

**Patient O**

This 23-year-old EOP patient's healthcare record was reviewed to evaluate the quality of care provided at HDSP. He was provided diagnoses of opioid use disorder, severe, in sustained remission; unspecified schizophrenia spectrum disorder; and unspecified depressive disorder. He was not prescribed psychotropic medications but was a participant in the ISUDT program and received MAT. The patient transferred to HDSP from SVSP on March 7, 2024.

The patient had received mental health services at the EOP and MHCB levels of care. His history was significant for three previous suicide attempts in CDCR.

The PC provided a cell front contact on March 8, 2024 soon after the patient's arrival to the institution. The PC noted that the patient refused to come to the mental health office to participate in the initial assessment, and the PC went to the patient's cell to provide a check-in. The patient reportedly denied any mental health symptoms and stated that he did not need to be seen for the mental health consult. He was described as alert and fully oriented, and the PC consulted with the housing officers who agreed that the patient had not demonstrated any difficulties.

A timely initial PC assessment occurred on March 21, 2024. The PC assessment form incorrectly stated that the purpose of the assessment was admission to MHCB rather than

performed as the patient was a new arrival to the institution. The assessment form did not specify whether the assessment was provided by telehealth. The patient participated in the assessment and stated that his chief complaints were depression, excessive worrying, and suicidal ideation. He also reported a history of polysubstance use, including methamphetamine and heroin. He reported taking Remeron in the past, and that he started MAT while in a county jail after an accidental overdose. The suicide and self-harm summary noted one suicide attempt in CDCR on July 18, 2023, which the patient reported was not an actual suicide attempt but rather an attempt to be moved as he was fearful that he would be killed on his current yard. The EOP functional evaluation was completed appropriately and indicated no significant impairments or required accommodations. The clinical summary was updated and indicated that the patient's treatment focus would be to improve his internalized self-concept with positive social experiences through therapy sessions. The PC updated the case formulation appropriately.

The initial psychiatric assessment occurred by telepsychiatry on April 10, 2024, over one month after his arrival at HDSP and significantly beyond timeline requirements. The patient denied suicidal ideation and denied the presence of psychotic symptoms, but he reported nightmares and hypervigilance. The psychiatrist opined that the patient's previous diagnosis of schizophrenia was possibly incorrect given his absence of psychotic symptoms. The patient stated that he did not want to take medications because they made his symptoms worse in the past. The psychiatrist indicated that the patient's mental status was normal and provided an assessment of low acute suicide risk and high chronic risk. The psychiatrist provided diagnoses of adjustment disorder and probable PTSD, and opined that prazosin would likely be helpful if the patient agreed to medication treatment. The plan was to follow up with the patient in 30 days.

The initial IDTT meeting occurred on April 16, 2024, and the patient refused to participate. The IDTT meeting was attended by the assigned PC and psychiatrist, an RN, a CC1, and a recreational therapist. No higher level of care indicators were identified; however, the patient had reportedly attended less than 50 percent of offered treatment. The treatment team indicated that the patient had not yet been offered groups, but that he was not at risk for decompensation that would warrant a higher level of care. It was notable that the patient had been housed at the HDSP EOP for almost one month and had not been offered groups, and the patient stated during the initial PC assessment that he anticipated attending groups as part of his treatment. The treatment plan included a safety plan. The initial PC assessment and initial psychiatric assessment contained conflicting information regarding the patient's suicide attempt history. The treatment plan included one IPOC for depressed mood but did not list any specific interventions. The level of care justification and discharge criteria were appropriate.

The patient was offered one follow-up psychiatric contact on May 17, 2024 which he refused. The psychiatrist noted that the patient was not prescribed psychotropic medications, and he was encouraged to attend future appointments.

The patient was seen for two routine PC contacts during the review period. He was provided in-person PC contacts on April 24, 2024 and May 6, 2024 in a confidential setting. The progress notes indicated that the patient demonstrated appropriate mood and behavior at each contact, and he was provided clinically appropriate interventions including worksheets and homework.

Unfortunately, the patient was not seen for another individual PC contact for the remainder of the review period.

The patient was usually offered two recreational therapy groups weekly. He was described as an active participant in three of the four offered groups prior to the initial IDTT meeting; that contradicted information in the treatment plan which stated that the patient had not yet been offered groups. The patient was not offered groups between April 2, 2024 to April 18, 2024, but he was offered two groups per week and attended most of his groups for the remainder of the review period. The group topics were not clinical in content.

**Findings**

The care and treatment provided to this patient were inadequate.

The initial IDTT meeting occurred two weeks late. The treatment plan included information about the patient's group attendance that directly contradicted other documentation. The treatment plan contained an IPOC to target the patient's depressed mood but did not provide specific and trackable treatment goals or interventions to target his frequent suicidal ideation and trauma symptoms. The initial psychiatric assessment occurred two weeks late, and the 30-day follow-up psychiatric appointment was offered one week late. The patient was only seen for two routine follow up PC appointments, and neither occurred timely. The documentation indicated that the PC provided clinically appropriate interventions, and it was likely that the patient would have benefitted from more consistent and timely PC contacts. The patient was not offered groups for two consecutive weeks.

**Patient P**

This 52-year-old EOP patient's healthcare record was reviewed to assess the quality of care provided at HDSP. The patient was provided diagnoses of major depressive disorder, recurrent episode, severe and PTSD. The patient was not prescribed psychotropic medications, as they were discontinued during the reporting period. The patient arrived at the HDSP EOP on March 7, 2024.

The patient received services at the 3CMS and MHCB levels of care in the past, with his last MHCB discharge in July 2022 resulting in placement at the EOP level of care where he remained since.

Within the first week at HDSP, the patient had refused his psychotropic medications. Nursing staff notified psychiatry; however, the patient was not seen by a telepsychiatrist until March 22, 2024. The patient was seen for an initial psychiatric assessment on that date, and the documentation made no mention of the patient's medication nonadherence. The telepsychiatrist noted an additional diagnosis of PTSD and made medication adjustments. An initial MHPC assessment was not completed until April 8, 2024, over one month after the patient's arrival at HDSP at the EOP level of care. The assessment was wholly inadequate, as almost all of the documentation was pulled forward from previous assessments completed in November and December 2023.

An initial IDTT meeting occurred on May 7, 2024, despite the requirement for completion no later than March 21, 2024. The required staff and the patient were present. A measurable goal was included to address grief and adequate interventions; however, the goal was initiated in November 2023 at another facility with no updates or documentation of progress. The discharge criteria section listed depression and resiliency as targets of treatment. Patient strengths and the patient's verbalized goals were omitted from documentation. There was also no mention of the patient's PTSD diagnosis. Of note, both the psychiatrist and the PC attended the IDTT meeting virtually.

There were no routine PC contacts following the initial assessment. Routine psychiatric contacts were completed via telepsychiatry on April 11, 2024 and May 7, 2024. Medication nonadherence was addressed, and ultimately the psychotropic medications were discontinued. The contacts and documentation appeared adequate.

The patient was offered an average of 5.61 hours of structured treatment during the reporting period, and he attended 5.05 hours on average weekly. The most treatment the patient was offered was 6.22 hours per week. Of note, on March 22 and March 29, 2024, a recreational therapy note was entered into the patient's healthcare record noting that a cell front visit was completed with the patient, and handouts were provided. The patient's record reflected a full 60-minute session based on that contact.

**Findings**

The care and treatment provided to this patient were inadequate.

Initial assessments did not occur timely, and the initial PC assessment was wholly inadequate and included no recent or updated information. The initial IDTT meeting occurred 60 days after the patient's arrival at the institution, and the treatment plan was pulled forward and not updated. Additionally, there was inconsistent information about the targets for treatment in the IDTT documentation. There were no weekly PC contacts documented. Further, it appeared that the cell-front contacts by a recreational therapist were being counted as full hour-long structured treatment sessions.

**Patient Q**

This 30-year-old EOP patient's healthcare record was reviewed to assess the quality of care provided at HDSP. The patient was provided diagnoses of schizoaffective disorder, bipolar type and unspecified personality disorder. The patient was prescribed quetiapine and venlafaxine. He was fully adherent to the quetiapine as prescribed but rarely accepted the venlafaxine. The patient arrived at the HDSP EOP on February 23, 2024 and transferred out on May 17, 2024

The patient received services primarily at the EOP level of care during his incarceration but was placed at the MHCB and ICF levels of care in the past. Most recently, he was placed in the SVSP PIP for restoration to competency treatment and was discharged on February 9, 2024 after

being found competent on February 7, 2024. Records indicated that the patient remained at the EOP level of care despite placement within the PIP during that period of time.

Soon after his arrival, the patient submitted a healthcare request to see a mental health clinician and continued to submit several requests during his stay including multiple requests on the same date, and some that were submitted in languages other than English. Some of those "requests" were not requests, but complaints about staff and staff's misperceptions of the patient, inquiries about buildings, and requests for access to property and photographs of staff. Additionally, there were a number of staff referrals for the patient who often claimed his mental health was being adversely affected by numerous concerns including his environment, lack of property, boredom, etc. Requests and referrals were responded to adequately and timely, including referrals for a number of PREA allegations. However, only one of the PREA referrals on March 4, 2024 included completion of a SRASHE which was adequate. Of note, the patient submitted requests for a "live" clinician, as he indicated that his assigned primary clinician was "on video", yet the one contact he had with his primary clinician in mainline made no reference to the contact being made virtually.

An initial PC assessment was completed on February 28, 2024, which was adequate. An initial psychiatric assessment was completed on March 1, 2024 by a telepsychiatrist. The psychiatrist noted that the patient had an active PC 2602 order for antipsychotic medications, yet antipsychotic medications had been discontinued prior to the patient's transfer to HDSP. The assessment was adequate, and the psychiatrist did not make any medication changes.

An RVR mental health assessment was completed on March 3, 2024 which contained inaccurate information reflecting an inadequate record review.

An initial IDTT meeting occurred on March 5, 2024 with staff and the patient present. Of note, documentation indicated that the patient's assigned PC was not present; however, the PC who was present completed the patient's initial assessment, SRASHE, and responded to most healthcare requests and referrals for this patient. The patient received five RVRs in the previous three months but was not referred to a higher level of care with adequate rationale provided. IPOCs and treatment goals were pulled forward from prior treatment plans. The treatment goals were no longer relevant, such as competency and depression, and did not reflect the patient's current presentation or needs. There were no relevant treatment goals or interventions documented to address the patient's current needs.

The patient was placed in the RHU on March 8, 2024 for safety concerns. He was seen by his assigned telepsychiatrist on that date, and quetiapine was initiated under the PC 2602 order. An initial PC assessment was completed by a newly assigned PC. The content was adequate, given that the patient refused to respond to a number of questions. The patient refused to engage in an initial psychiatric assessment with his assigned telepsychiatrist on March 15, 2024, who noted that the patient was known to him from contacts in the mainline EOP.

An initial IDTT meeting occurred on March 19, 2024 with required staff and the patient present. The IDTT documentation included contradictory information, as the patient was flagged for consideration of referral to a higher level of care based on RVRs and treatment refusal; yet those

items were marked "no" within the treatment plan, and no rationale was provided nor treatment enhancements provided to address those issues. There were no treatment goals or interventions included, only a newly initiated IPOC for "irritability" with no further information provided. Further, there was no mention of the fact that the psychiatrist had noted concerns about the patient's mood lability and possible decompensation due to schizoaffective disorder.

The patient engaged in weekly sessions with his PC which appeared to be appropriate to the patient's needs and included incentives for the patient not going "man down" during the week, as he frequently claimed emergent medical needs to elicit more immediate responses from staff. The patient refused subsequent contacts with the psychiatrist after quetiapine was prescribed. The patient filed a grievance, asking for his medications to be discontinued, but was informed that it was not possible with an active PC 2602 order.

While in the RHU, the patient was offered 2.01 hours of structured treatment weekly on average and attended 1.76 hours on average. The most structured treatment he was offered in any week was three hours. Of note, a recreational therapist noted a cell-front contact as a 30-minute group.

**Findings**

The care and treatment provided to this patient were inadequate.

There was no treatment plan for the patient, despite having two initial IDTT meetings since his arrival at HDSP. There was a lack of collaboration among the treatment team regarding the needs of the patient, especially regarding diagnostic impressions and assessment of functional deficits. RVR mental health assessments were also inadequate and contained inaccurate information. On the positive side, the PC treating the patient in the RHU attempted to set limits and used reinforcement to encourage adaptive coping.

**Patient R**

This 63-year-old EOP patient's healthcare record was reviewed to assess the quality of care provided at HDSP. The patient was provided diagnoses of major depressive disorder, recurrent episode with psychotic features and antisocial personality disorder. The patient was prescribed aripiprazole, buspirone, fluoxetine, and mirtazapine. The patient arrived at the HDSP EOP on February 21, 2024.

The patient received services at the APP and ICF levels of care in 2018, but remained at the EOP level of care throughout most of his incarceration. He was partially adherent to most of his medications but refused his mirtazapine frequently.

An initial PC assessment was completed timely on February 23, 2024 and was marginally adequate. The history of the patient's illness had not been updated since 2018 after he engaged in a suicide attempt. Also, the suicide history section included a narrative that indicated that the patient presented with a number of high-risk stable and dynamic factors for suicide, yet no SRASHE was completed. The patient was transferred to HDSP after being at the same facility for over five years, and he was distressed about a lack of family visits. The patient asked to end

the interview early, as he was not feeling well. The clinical summary was adequate, and an initial, vague goal for treatment was included that focused on increasing social connection with others. An initial psychiatric assessment was completed by a telepsychiatrist on the same date which was adequate.

An initial IDTT meeting occurred on February 27, 2024. The staff and the patient were present, yet the psychiatrist who attended the meeting was not the patient's assigned psychiatrist. Fortunately, it was the telepsychiatrist who completed the initial assessment. No treatment plan was created for the patient, and the sections related to patient strengths and patient's verbalized goals were blank. There was narrative language in the discharge plan section noting that the patient would reduce depressive symptoms and strengthen interconnectedness skills, but no interventions were listed beyond psychotropic medications. The discharge plan noted that the patient would be considered for the 3CMS level of care when "able to complete his tx plan"; however, there was no treatment plan.

The patient was not seen again by his PC up to the date of this review on June 6, 2024. The patient's assigned telepsychiatrist met with the patient for the first time on May 10, 2024, which was beyond the required timeframe by over 60 days. The telepsychiatrist addressed the patient's nonadherence to mirtazapine by adjusting the time of administration, and documentation of that encounter was adequate.

The patient was offered 5.67 hours of structured treatment on average during the reporting period and attended 4.78 hours on average. The most hours the patient was offered in any given week was seven hours.

**Findings**

The care and treatment provided to this patient were inadequate.

The initial PC assessment identified potential increased risk factors for suicide, yet no formal assessment of suicide risk was completed. The patient had no treatment plan and was not seen by a PC for over 90 days. There was one routine contact with a psychiatrist which was at least 60 days overdue. The patient was not offered 10 hours of structured treatment in any given week.

**Patient S**

This 54-year-old EOP patient's healthcare record was reviewed to assess the quality of care provided at HDSP. The patient was provided diagnoses of paranoid personality disorder, narcissistic personality disorder, and delusional disorder. The patient was prescribed olanzapine, venlafaxine, prazosin, vortioxetine, and trazodone and was mostly adherent during the reporting period; however, he started refusing medications frequently in May 2024. He was discharged to the EOP level of care and arrived at the HDSP EOP on February 9, 2024.

The patient was incarcerated in 2001 and was either placed at the 3CMS level of care or not included in the MHSDS until 2023, when he was placed at the MHCB level of care from May

22, 2023 to June 27, 2023. He returned to the MHCB the following day and was placed at the ICF level of care from July 14, 2023 to February 7, 2024. His inpatient placement was due to suicidal ideation with a plan to die by hanging, as well as dangerousness toward others. The patient met his inpatient treatment goals and was adherent to his medication upon discharge. The discharge SRASHE rated his chronic suicide risk as moderate and his acute risk as low. A safety plan was developed at the time of discharge from the inpatient setting to address his ongoing risks. Of note, the patient was not in agreement with his discharge, as he did not receive his property during the entirety of his inpatient stay and wanted it before he was transferred to another facility.

The patient was seen for a suicide risk evaluation upon transfer to HDSP on February 9, 2024. His risk levels remained unchanged with adequate rationale provided; however, the safety plan that was created at the time of discharge from the inpatient setting was not reviewed nor included in the updated assessment. This resulted in the safety plan section of all subsequent five-day follow-up contacts being blank. Two of the five-day follow-up contacts included documentation that the safety plan was reviewed with the patient, despite its omission from the documentation. Five-day follow-up contacts were otherwise adequate.

An initial PC assessment was completed on February 13, 2024 which was adequate. An initial psychiatric assessment was completed on February 15, 2024 by a telepsychiatrist. The content was adequate, and the psychiatrist indicated that a diagnosis of schizoaffective disorder was being considered with minimal justification provided beyond "mood swings." The psychiatrist also noted that there was no justification for the delusional disorder diagnosis, despite the PC having documented the presence of delusions that were paranoid in content.

An initial IDTT meeting occurred on February 20, 2024 with staff and the patient present; however, the psychiatrist who attended was not assigned to the patient and had not met the patient previously. A treatment plan was initiated with three problems listed, but no long or short-term goals. Interventions of medications, psychoeducation, cognitive behavioral therapy, and reality testing were listed despite the absence of goals. In the discharge section of the plan, there was an indication that treatment was to increase awareness and understanding of mental health symptoms. There was no discussion of the diagnostic changes suggested by the psychiatrist in the initial psychiatric assessment. The patient was identified as not needing placement in the SRMP during the IDTT meeting, despite having been discharged from an inpatient setting where he was placed due to suicidality. No rationale was provided for that decision.

The patient was only seen twice by his PC between the initial IDTT meeting and April 16, 2024, then he was seen weekly during April 2024 by an unlicensed psychologist, but not again during the reporting period. Of note, the PC contact offered to the patient on March 7, 2024 was refused because the patient's assigned PC attempted to see him via telehealth equipment, and the patient expressed concerns about confidentiality with another person in the room. The patient expressed similar concerns with the telepsychiatrist on March 21, 2024, but the psychiatrist told the patient that the telepresenters was required to be in the room. The patient refused subsequent psychiatric contacts; however, they were not even offered monthly as required.

A routine IDTT meeting occurred on May 28, 2024 with the required staff present. There were minimal changes to documentation including a few sentences provided by the members in attendance at the meeting noting medication nonadherence, the quality of group participation, and comments by the patient that he had not received enough groups and could not attend AA/NA because he had a job in the kitchen. There were still no treatment goals listed nor discussion of patient progress in treatment. No mention was made of the patient's refusal of telepsychiatry contacts nor discussion about providing treatment through an alternate modality. No new goals were discussed to address medication nonadherence.

During the reporting period, the patient was offered 5.25 hours of structured treatment weekly on average and attended 3.7 hours on average. The most treatment the patient was offered in any given week was seven hours. The patient consistently complained that he did not have enough programming.

**Findings**

The care and treatment provided to this patient were inadequate.

There was no treatment plan created for the patient, diagnostic clarification was required but not discussed, there was poor communication among members of the IDTT, poor continuity of care, the patient was not seen as required by his PC or his psychiatrist, and he was not offered sufficient structured treatment. Additionally, given the patient's paranoia, he expressed concerns about being seen for telepsychiatry and telemental health contacts with a telepresenter in the room, but no accommodations were considered.

**Patient T**

This 39-year-old EOP patient's healthcare record was reviewed to assess the quality of care provided at HDSP. The patient was provided diagnoses of depressive disorder due to another medical condition, with mixed features and opioid use disorder, moderate. The patient was prescribed bupropion, mirtazapine, oxcarbazepine, and duloxetine; he was generally adherent. He arrived at the HDSP EOP on February 17, 2024.

The patient had received mental health services at all levels of care. He was discharged from the ICF level of care on February 15, 2024 after being in the inpatient setting (MHCB, APP, and ICF) since July 2023 following a suicide attempt.

Upon arrival at HDSP, the patient reported to the nursing staff that he had swallowed four razors prior to his arrival and was experiencing pain in his abdomen. He was sent to a community hospital for x-rays which revealed metallic objects in his abdomen. The patient remained at the hospital until the metal objects which were prongs from a electrical plug passed, and he returned to HDSP on February 22, 2024. A SRASHE was completed upon his return which was adequate; however, the patient's acute risk ratings appeared to rely heavily on the patient's self-report. Prior to his discharge and subsequent self-injury, the inpatient psychologist rated his acute risk as moderate and developed a safety plan; however, the HDSP psychologist rated his acute risk as low and noted no reason for a safety plan. A safety plan appeared clinically

indicated given the patient's history and recent self-injurious behavior. Five-day follow-up contacts were completed adequately. The patient had two more SRASHEs completed, one on February 23, 2024 in conjunction with his initial assessment, and one on February 25, 2024 following a referral from nursing due to expressed suicidal ideation. None were completed by the same clinician. Both subsequent SRASHEs were mostly adequate and resulted in the same assessment of risk levels, yet no safety plan was developed.

An initial PC assessment was completed on February 23, 2024. The content was inadequate, as the history of the patient's illness section was pulled forward from December 2022 with no updated information, including no reference to the patient's recent inpatient stay due to a suicide attempt. Diagnoses were difficult to discern, as a number were listed that included depressive disorder due to another medical condition, with mixed features; bipolar and related disorder due to another medical condition, with mixed features; depression; anxiety; cannabis use disorder, moderate; and opioid use disorder, moderate. Of note, the "medical condition" referenced in diagnoses was not identified. An initial psychiatric assessment was completed via telepsychiatry on March 1, 2024. The assessment was adequate, and the psychiatrist assessed the patient's acute suicide risk as moderate and included diagnoses of PTSD, major depressive disorder, and borderline traits. No formal SRASHE was completed, however.

An initial IDTT meeting occurred on March 5, 2024 without the required staff present. The PC was not assigned to the patient but had completed one of the SRASHEs, and no correctional counselor was present. The patient was present for the meeting. The patient was not placed in the SRMP despite meeting criteria given his recent discharge from an inpatient setting following a suicide attempt and subsequent self-injurious behavior since arriving at HDSP. There was also no treatment plan developed for the patient, and no justification provided for his current level of care.

Later that day, the patient reported that he learned his uncle died; however, there was no evidence that he had contact with anyone via phone or his tablet. He was seen for a contact by a clinician who had never met the patient previously, provided with grief handouts, and returned to his cell. He was then seen two days later by another clinician in response to the same referral it appeared. A number of patient requests and referrals were submitted during the reporting period, due to the patient expressing distress related to deaths or illnesses in his family. Responses were timely, yet completed by varied clinicians who noted skepticism about the veracity of the patient's reports. On occasion, there was evidence of interventions being provided to the patient to address his distress. Beyond those responses to referrals and requests, there was no evidence that routine PC contacts were offered to the patient during the reporting period. Of note, contacts provided to the patient by his assigned PC, including the IDTT meeting, were delivered via telehealth but were not documented as such in the progress notes.

The patient was seen for a routine psychiatric appointment on April 4, 2024 by his assigned telepsychiatrist, and the documentation was adequate.

A routine IDTT meeting occurred on May 21, 2024 with required staff and the patient present. The IDTT noted that the patient had refused more than 50 percent of his offered programming. The patient reported that he was spending time in his cell communicating with his family on his

tablet regarding his mother's declining health. Documentation noted that the patient's refusal of treatment was a choice versus related to serious mental illness, and encouragement was provided to the patient to attend more groups. There was no treatment plan developed for the patient, and the only updates provided included brief comments made by IDTT participants which made no mention of the patient's mental health symptoms, his treatment needs, or treatment progress.

The patient was offered 2.12 hours of structured treatment weekly on average and attended 0.62 hours. The most structured treatment the patient was offered in any given week was four hours. For one week, from May 6 to May 12, 2024, the patient was not offered any structured treatment.

**Findings**

The care and treatment provided to this patient were inadequate.

The patient's history and behavior warranted development of a safety plan, enrollment in the SRMP, and treatment goals to address his history of suicidal and self-injurious behavior; yet there was no documentation in the healthcare record that those issues were addressed. Further, the patient was never offered a routine PC contact, but instead appeared to only be seen when he expressed distress over family concerns. Continuity of care was poor, as the patient was seen by a number of different clinicians during the reporting period. The patient was not offered 10 hours of structured treatment at any point.

**Patient U**

This 55-year-old patient's healthcare record was reviewed to assess the quality of EOP care provided at HDSP. The patient had diagnoses of major depressive disorder, recurrent episodes, and opioid use disorder, and documented concerns included depressed and anxious mood; auditory hallucinations; and "rumination, absolutist thought process; self-harm to alleviate root emotions when he feels like he is not in control of his situation/environment." Notably, he had a history of engaging in self-injurious behaviors (e.g. insertion/ingestion of foreign objects, overdose, cutting) and two reported suicide attempts. The patient was identified as DNH, required hearing aids, and relied on a wheelchair to ambulate. The patient transferred from SVSP's EOP to HDSP's EOP on March 7, 2024.

The patient served multiple prior prison terms and reentered CDCR for his current term on March 5, 2001, with an EPRD of March 21, 2032. The patient received mental health treatment in all levels of care, including outpatient and inpatient. The most recent inpatient admission occurred at SVSP-PIP's acute program from May 11 through May 18, 2023, due to self-harming behaviors including ingesting metal objects.

Upon arrival at HDSP, the patient informed nursing staff of a foreign body ingestion (FBI) one day prior, and he was transported to the local hospital where X-rays confirmed that parts of some items were identified. On March 8, 2024, the patient returned to HDSP and was seen for an emergent mental health consult due to the recent FBI. A SRASHE was completed, attributing the patient's behaviors to emotions surrounding a family member's passing and a property-related concern. Records indicated that historically the patient's self-harming behaviors were for

secondary gain. The clinician rated chronic suicide risk as high based on the patient's extensive history of self-harm incidents, some of which were deemed suicide attempts. The patient's acute risk was assessed as low despite the impulsive FBI incident two days prior and several positive acute risk factors suggesting moderate risk.

The initial PC assessment was completed timely on March 13, 2024. It was unclear whether the PC assessed the patient onsite, via telehealth and or in a confidential setting. Recommended goals focused on the patient's adoption and maintenance of pro-social behaviors and extinguishing maladaptive and self-sabotaging behaviors, including self-harm/ingestion.

An initial psychiatry assessment was completed timely on March 15, 2024, via telepsychiatry. The patient reported a history of auditory hallucinations and stated that Abilify had helped with the voices and depression. Abilify was then prescribed, and the Effexor was discontinued at patient's request and due to non-adherence. Both providers diagnosed the patient with major depressive disorder with recurrent episodes.

The IDTT convened with all required members on March 19, 2023. The assigned PC and psychiatrist were present as well; however, documentation did not clearly indicate whether they attended via telehealth or in person. While the patient's diagnoses were documented, diagnostic criteria or symptoms and functional impairments to support the diagnosis were not. The IPOCs for depressed mood were initiated, however, there were no measurable treatment goals or specific interventions associated with the IPOCs. Additionally, although it was noted that the patient participated in less than 50 percent of his treatment, the justification for maintaining the patient at the current LOC was limited to the patient understanding the importance of programming, not being at risk of decompensation, maintaining appropriate self-care, and denying thoughts of self-harm. The barriers to treatment participation were not explored, documented, or addressed in the treatment plan with appropriate interventions. The discharge criteria were also vague, indicating that the patient would remain on EOP LOC to reduce depressive symptoms, strengthen resiliency skills, and learn new strategies to improve his social-emotional function. In addition, it was reasoned that the level of care would "promote ongoing progress forward" and that a lower level of care would be considered when the patient was able to complete his treatment plan and increase his awareness of his symptoms of self-harm and depression. Furthermore, there was no mention of assigned groups or potential for jobs and education.

The patient was not seen by his PC for weekly contacts as required by the Program Guide. Rather, following the March 19, 2024 IDTT, the assigned PC met with the patient only once more during the review period on March 21, 2024, and this contact occurred in response to an urgent referral for bad news and focused on the completion of a SRASHE. Subsequently, the patient met with an unlicensed psychologist on April 5, 17, and 24, 2024, and none of the progress notes for these contacts referenced interventions, response to treatment, or progress.

Routine psychiatry contacts were also not completed timely during the review period. After the March 19, 2024 IDTT, the psychiatrist did not offer a routine contact until May 10, 2024, and this contact was prompted by medication non-adherence. On this date, the patient met with a telepsychiatrist and reported that the Abilify resulted in drowsiness. The psychiatrist responded

by lowering Abilify to 5mg as needed for auditory hallucinations/ agitation and documented a plan to follow-up in 30-days.

During the review period, the patient was seen by an emergency responder for illicit substance withdrawal and was subsequently referred to ISUDT. On May 15, 2024, an urgent referral was initiated after the patient reportedly initiated a hunger strike; however, during or after mental health assessment he was observed eating and consuming liquids. Additionally, Mental health clinicians evaluated the patient twice on March 21, 2024 in response to emergent referrals for suicidal ideation due to bad news and multiple stressors including housing unit issues, although neither evaluation resulted in an MHCB referral. The first evaluating clinician noted that the patient had a history of poor frustration tolerance and responded to feelings of overwhelm by swallowing objects or reporting suicidal thoughts. The second evaluation for endorsement of suicidal thoughts on this date resulted in resolving the housing unit issue.

The patient also received two RVRs during the review period, one of which was for battery on a prisoner on May 15, 2024 and the other for refusing housing on May 21, 2024. The two RVR mental health assessments concluded that mental illness was not contributing factor to the behaviors.

Regarding structured therapeutic activities, on average the patient was offered 5.6 hours per week instead of the required minimum of ten hours during the review period.

**Findings**

The EOP care provided to this patient was inadequate.

The patient did not have access to treatment commensurate with his level of care, and when services were offered they did not address the established treatment targets or reasons for EOP placement. Noncompliance was identified for routine PC contacts, routine psychiatric contacts, and structured therapeutic activities, with significant departures from Program Guide requirements for psychiatric contact frequencies and treatment hours. During a 12-week period, aside from the initial assessment and the IDTT, the assigned PC met with the patient only once in response to an urgent referral that was used to complete a SRASHE. There were no routine PC contacts for therapy with the assigned PC during this timeframe. In the absence of timely mental health contacts, the patient seemingly relied on the urgent and emergent referrals process for more frequent mental health encounters. Additionally, several concerning behaviors documented during the review period should have resulted in an IDTT and treatment plan modification to address substance use concerns, behaviors resulting in RVRs, medication nonadherence, and concerns about poor frustration tolerance and risk of FBI during periods of distress. Insufficient attention was given to the patient's self-harming behavior/foreign body ingestion during suicide risk assessments, treatment planning, and routine PC contacts.

**Patient V**

This 47-year-old patient's healthcare record was reviewed to assess the quality of EOP care provided at HDSP.

The patient served multiple previous CDCR prison terms beginning March 3, 1998. His current term began on May 24, 2004, at the EOP LOC with an EPRD of 2061. While in CDCR, the patient received mental health services in all outpatient and inpatient levels of care. The patient was provided diagnoses of antisocial personality disorder, unspecified bipolar disorder, and opioid use disorder. Documented symptoms included depressed mood, isolation, low motivation, self-injurious behavior, and chronic thoughts of not wanting to feel emotional pain. He also had a history of four suicide attempts, foreign body ingestion, auditory hallucinations, violence, and substance use. The patient was prescribed Abilify for mood stabilization and auditory hallucinations, Vistaril for anxiety, Keppra for seizures, Benadryl and Zyprexa as needed for agitation. An active PC 2602 involuntary medication order of Abilify, Zyprexa, and Vistaril was in place for danger to self and danger to others. The patient was generally adherent to the PC2602-ordered medications, and the order was renewed timely until April 18, 2025. The patient arrived at HDSP on February 2, 2024.

Upon arrival, the patient was seen timely for the required five-day follow-up at HDSP from February 3, 2024 through February 7, 2024. His chronic risk was assessed as high, and his acute risk was assessed as low on this date. The rationale for the risk levels was adequate.

The initial psychiatric assessment was completed via telehealth on February 06, 2024. The content of the assessment was adequate, and the psychiatrist noted that the patient had a long history of trauma, character pathology that complicated his post-traumatic stress disorder, as well as symptoms consistent with schizoaffective disorder. The psychiatrist diagnosed the patient with schizoaffective disorder, PTSD, antisocial personality disorder, and borderline personality disorder traits without further documentation of the patient's clinical symptom presentation. The patient was prescribed Abilify for mood stabilization and voices, Zyprexa as needed for agitation, Topamax for mood, and Vistaril as needed for anxiety. The plan consisted of pursuing a renewal of PC2602, which was due to expire in April 2024.

The initial PC assessment occurred timely on February 8, 2024. Although the patient reported a history of auditory hallucinations, the PC assessed the symptom to be connected to the loss of family members. Still, the PC provided diagnoses of schizoaffective disorder, depressive type, and bipolar disorder, unspecified, in addition to antisocial personality disorder and opioid use disorder. The patient was also noted to have a history of cutting, foreign body ingestion, and chronic pain.

An initial IDTT meeting was held timely on February 13, 2024. The required participants were present, including the assigned PC and psychiatrist. It was unclear whether the assigned PC and psychiatrist attended onsite or remotely. The IDTT changed the patient's diagnosis on this date to opioid use disorder, antisocial personality disorder, and unspecified bipolar disorder. However, symptoms justifying the patient's new diagnoses were not documented and the IDTT did not justify the change in diagnoses which were different from assessments completed at HDSP and prior to arrival. Further, the despite HDSP psychiatric assessment indicating a long history of trauma, character pathology that complicated his post-traumatic stress disorder, and symptoms consistent with schizoaffective disorder, PTSD and trauma were not included in the diagnoses or addressed in the treatment plan developed on this date.

The treatment plan focused on increasing the patient's coping skills to achieve stability in this EOP level of care and to cease self-injurious behavior such as cutting as a coping mechanism. Although there were several previously initiated IPOCs included (e.g., "grave disability" and psychotropic medication use), the treatment plan section was left blank and failed to include interventions and measurable goals for tracking progress. Additionally, assigned structured treatment groups and potential job placement and educational opportunities were not documented during IDTT. Further, the discharge criteria were not measurable or patient specific, indicating that the patient would be considered for a lower level of care when he increased his insight into the root causes of his mental health symptoms and reduced his depression.

Routine PC contacts were not completed timely. During a 14-week period, the patient was offered approximately seven PC encounters, four of which were completed by the assigned PC. A covering psychologist met with the patient on Feb. 28, 2024, an unlicensed psychologist met with him on April 23 and April 30, 2024. Routine PC progress notes did not reference meaningful therapeutic interventions or indicate whether progress was observed. However, during a follow-up SRASHE appointment on May 1, 2024, the patient reported worsening depression due to limitations in programming at HDSP.

Over a 14-week period the patient was offered an average of 6.26 hours of structured treatment per week, of which he attended an average of 5.55 hours or 76 percent.

On May 7, 2024, a routine follow-up IDTT meeting was held with the required participants present. During the meeting, medication changes were discussed due to the patient's non-adherence. Limited information was provided regarding the patient's group participation and progress toward goals. However, it was documented that the patient was working on the PIE project via "correspondence." The treatment plan was not modified to encourage the patient's medication adherence or to improve the measurability of treatment goals.

**Findings**

The EOP care provided to this patient was inadequate.

The patient did not have access to treatment commensurate with his level of care and treatment needs. On average the patient was offered only 6.26 hours of weekly structured therapeutic activities. PC contacts were generally offered twice per month instead of weekly. During completed PC encounters, interventions were not implemented, response to treatment was not documented, and care continuity was lacking. Care continuity was also compromised by the IDTT's failure to address diagnostic discrepancies and use the results of initial assessments in their development of treatment plans during IDTTs. Further, despite the clinician noting worsening depression as a result of insufficient EOP programming during a SRASHE, the clinician did not take the time to offer therapeutic interventions and this information was not discussed during a subsequent IDTT.

**Patient W**

This 27-year-old patient's healthcare record was reviewed to assess the quality of EOP care provided at HDSP. The patient transferred from LAC's EOP RHU to HDSP's RHU EOP on February 13, 2024. The documented reason for RHU placement was the patient's involvement in a fight on or around January 1, 2024.

The patient served prior terms in CDCR. He returned to CDCR for the current prison term in 2016 with an EPRD of September 28, 2024. The patient received mental health services in 3CMS, EOP, MHCB, and Acute levels of care. The patient had three suicide attempts documented in CDCR, with the most serious being an attempted hanging on November 27, 2021.

The initial PC assessment occurred timely on February 15, 2024. The provider did not document whether the session occurred via telehealth or in a confidential setting. The assessment included relevant historical information that was pulled forward from prior assessments. During the initial PC assessment, the patient indicated that he was managing his depression and PTSD. The PC discussed prior diagnoses with the patient and ultimately documented in their assessment antisocial personality disorder, borderline personality disorder, anxiety, and depression, and a rule out diagnosis of PTSD.

The psychiatric initial assessment also occurred on timely via telepsychiatry on February 15, 2024. The psychiatrist diagnosed the patient with unspecified depressive disorder, borderline personality disorder, antisocial personality disorder, and substance abuse. Although the psychiatrist noted the patient remained stable and had not requested his as-needed Zyprexa in two months, the prescription for Zyprexa 5mg daily as needed for agitation was continued on this date.

The patient's initial IDTT occurred timely on February 20, 2024. The patient attended with his assigned PC and a covering tele-psychiatrist. Documentation did not indicate whether the PC attended onsite or remotely. IPOCs for depressed mood were initiated; however, the goals and interventions were not specific and measurable. The treatment plan also retained the goals and interventions without modification from the prior institution, which targeted anxiety and distorted thinking; however, baseline ratings were needed for tracking progress or worsening symptom severity. According to the IDTT documentation, the patient was also on the Suicide Risk Management Program (SRMP) due to having three or more MHCB admissions during the prior four-month period. The goals of the SRMP were not measurable or clear. For example, the goals included "parole planning to build sense of efficacy" and addressing relational impacts through helping him manage his feelings through changing his interpersonal relationships. The level of care rationale and discharge criteria for a less restrictive level of care were appropriate, but measurability was lacking. Although the IDTT documented that he had no EOP functional impairments, there was no mention of potential job or education assignments. The IDTT also stated that the patient did not require a safety plan since it was completed on January 29, 2024, but each section of that safety plan contained the same statement, "nothing documented in original."

Required routine PC contacts did not occur timely. The implementation of planned treatment

interventions and progress toward established treatment goals were not documented in progress notes. Regarding the frequency of PC contacts, the patient met with the PC weekly from February 15, 2024 through March 7, 2024, but was not seen again until over one month later on April 18, 2024, and this contact was used to complete the required post discharge quarterly SRASHE. Subsequently, a covering unlicensed psychologist met with the patient on April 23, 2024 and April 29, 2024, and the next PC interaction occurred during a quarterly IDTT review held nearly one month later on May 21, 2024.

Routine psychiatric appointments also were not completed timely. Aside from the initial psychiatric assessment, the patient was only seen by his assigned psychiatrist via tele-psychiatry on March 21, 2024. On that date, the patient reported not needing to use the Zyprexa, but the prescription was continued on an as needed basis. The patient was not offered a monthly routine psychiatric contact in April 2024, and he refused an attempted contact on May 21, 2024. At the time of the May 21, 2024 review, a different psychiatrist had been assigned.

The quarterly IDTT occurred timely with all required members on May 21, 2024. The assigned PC and the newly assigned tele-psychiatrist who had not met the patient prior to the IDTT attended. IDTT documentation did not indicate whether the PC and psychiatrist attended onsite or remotely. Although it was noted that the patient was attending approximately 50% of his groups and left early at times, the IDTT failed to explore the underlying reason for the refusals, and they did not document a higher level of care nonreferral rationale or interventions for addressing barriers to group treatment participation in lieu of a higher level of care referral on this date. Further, the IDTT failed to indicate the total number of hours offered and attended, which appeared to be well below the minimum requirement of ten hours. Of note, the patient was encouraged to attend a pre-release planning group that was expected to start the following week.

On May 29, 2024, the patient requested to meet with his assigned PC, but was instead seen cell side by a senior psychologist. The patient reported that he had not been seen by his PC and had not refused any appointments. Although the senior psychologist submitted a referral to the PC on this date, on June 5, 2024, the patient was seen in response to an emergent referral after he reported suicidal ideation. Documentation indicated that the patient's neighbor had convinced him that MHCB would be a better housing placement than RHU EOP.

**Findings**

The EOP care provided to this patient was inadequate.

The patient did not have access to treatment commensurate with his EOP level of care while at HDSP. PC and psychiatry contacts were not completed timely and the frequency of PC contacts were a significant departure from Program Guide requirements. Treatment goals were not stated in measurable terms, and when PC contacts were completed, treatment interventions and progress toward treatment goals were not mentioned. Further, in response to the patient's worsening symptoms and lack of group treatment participation, the IDTT failed to explore and address the underlying reason for the refusals or document the required higher level of care nonreferral rationale and updated treatment plan in lieu of a referral.

**Patient X**

This 37-year-old EOP patient's healthcare record was reviewed to assess the quality of care provided at HDSP. The patient was provided diagnoses of unspecified depressive disorder and antisocial personality disorder. He was prescribed venlafaxine, bupropion, diphenhydramine, and olanzapine. The patient transferred to HDSP from CSP/Sac on April 29, 2024.

The patient had placements at the 3CMS, EOP, MHCB, and acute levels of care, as well as periods that he was not included in the MHSDS. The most recent MHCB placement occurred on January 29, 2024 due to an incident in which he refused to leave his cell. He had one incident of self-injury in 2018 that involved foreign body ingestion. Regarding relevant physical health issues, the patient had diabetes, seizure disorder, and chronic pain, along with multiple additional medical diagnoses. He underwent right knee ACL repair on January 18, 2024.

An IDTT meeting occurred on April 17, 2024 before transfer to HDSP. The patient did not attend the meeting. His treatment plan included goals related to depressed mood and impulsive behavior, primarily in the form of indecent exposure.

PC visits were conducted onsite and indicated that the patient engaged in some poor coping strategies and received RVRs. Overall, he reportedly had a stable mood and logical thought content, and it was recommended that he remain at the EOP level of care. The patient was seen by the PC three times in March and April and twice in May 2024 for individual sessions. The content of the documentation indicated meaningful interactions. However, it was not specified whether those encounters occurred in a confidential setting.

An initial psychiatric assessment was completed on May 30, 2024, 31 days after arrival at HDSP. That assessment was conducted via telepsychiatry and was thorough and complete. The patient was uncooperative and left the session when asked about medication nonadherence. He frequently did not take venlafaxine and requested quetiapine to improve sleep. Psychiatric contacts were completed monthly, but the documentation did not specify if they were conducted in a confidential setting.

Group notes were present for only eight groups during the review period, all of which were recreational. The notes indicated that the patient attended fully but was often uncooperative. The patient received three RVRs, two for indecent exposure and one for obstructing a peace officer.

**Findings**

The care and treatment provided to this patient were inadequate.

The existing progress and treatment notes contained appropriate and relevant content, indicating significant and meaningful interactions when they occurred. However, the patient was not seen weekly as required by the PC, and groups were not offered as required. There was no evidence of psychotherapeutic groups or individual interventions directed at the treatment plan goals.

**Patient Y**

This 60-year-old EOP patient's healthcare record was reviewed to assess the quality of care provided at HDSP. The patient was provided diagnoses of unspecified schizophrenia, major depressive disorder, adjustment disorder with anxiety, antisocial personality disorder, alcohol use disorder, and opioid use disorder. He was prescribed Haldol. The patient arrived at the HDSP EOP on April 10, 2024.

The patient had received mental health services at the EOP level of care since January 9, 2019, with multiple MHCB admissions since that time. Pertinent medical conditions included bilateral sacroiliitis, effusion of the right knee joint, and fibrosis of the liver. The patient was prescribed buprenorphine by the ISUDT provider.

An IDTT meeting did not occur at HDSP during the review period. The most recent IDTT meeting, prior to this review period, was dated December 27, 2023.

While the patient experienced persecutory delusions, his mood and behavior remained stable at the EOP level of care. One psychiatric progress note was documented, indicating that the patient refused the evaluation and was not seen.

The PC's first contact with the patient occurred on May 1, 2024, and the next contact occurred on May 23, 2024 at the cell front due to the patient's refusal to leave his cell for a confidential contact. There was no documentation of treatment planning at HDSP during the review period. Group notes indicated that the patient did not show for groups approximately once per week.

The patient was provided a single cell due to flashbacks from a reported past sexual assault. No RVRs or SRASHEs were conducted during the review period while the patient was housed at HDSP.

**Findings**

The care and treatment provided to this patient were inadequate.

He was seen only twice by the PC from April 10, 2024, to May 31, 2024, and was not seen by a psychiatrist during the same timeframe. While recreational groups were offered, the patient did not attend any of them.

**Patient Z**

This 32-year-old EOP patient's healthcare record was reviewed to assess the quality of care provided at HDSP. He was provided diagnoses of panic disorder, opioid use disorder, amphetamine use disorder, generalized anxiety disorder, and claustrophobia. He was prescribed Trileptal, Abilify, Vistaril, and clonidine. He arrived at HDSP on March 12, 2024.

The patient was first placed at the 3CMS level of care in 2011 and was admitted to the MHCB on seven occasions; this was his second EOP placement.

An IDTT meeting occurred on April 16, 2024, with the nurse, MHPC, psychiatrist, correctional counselor, and recreational therapist in attendance. Indicators for referral to a higher level of care were reviewed, and it was determined that the patient did not require a referral and should remain in the EOP to continue working on symptoms of anxiety and night terrors. A clinician-to-clinician contact occurred timely.

The first assessment by the psychiatrist occurred on March 28, 2024 via telepsychiatry. The documentation did not indicate whether the session occurred in a confidential setting. Although documentation indicated that the patient refused to take Trileptal, that issue was not addressed in the psychiatric documentation. In the psychiatric progress note dated May 16, 2024, medication nonadherence in general was discussed, and the patient reported difficulty attending the pill line. The psychiatrist noted the symptoms targeted by the prescribed medications.

An MHPC urgent note was entered on March 13, 2024, noting the patient's mental health history and that the patient was interviewed briefly and oriented to the EOP. The initial PC assessment occurred on April 9, 2024.

The patient attended only three recreational therapy groups at HDSP during the review period, with two of the offered groups conducted at cell front. No other therapeutic groups were documented in the healthcare record. A SRASHE was completed on May 2, 2024 as part of the required follow-up post-inpatient placement.

**Findings**

The care and treatment provided to this patient were inadequate.

The patient did not receive the required amount of treatment hours, and his medication nonadherence appeared to have only minimally been addressed.

**Patient AA**

This 42-year-old EOP patient's healthcare record was reviewed to assess the quality of care provided at HDSP. The patient was provided diagnoses of schizophrenia, antisocial personality disorder, exhibitionistic disorder, and pedophilic disorder. He arrived at the HDSP EOP on March 8, 2024.
The patient had multiple higher levels of care placements, including MHCB, EOP, intermediate, and acute care placements.

The initial psychiatric assessment occurred on March 29, 2024 via tele-psychiatry. The psychiatrist discussed medications with the patient, but he refused to take antipsychotic medication and did not meet the criteria for a PC 2602 order. He was prescribed Vistaril for anxiety. The patient was not seen every 30 days by the psychiatrist.

The master treatment plan was dated April 10, 2024. It addressed multiple goals that partially aligned with the patient's symptoms; however, his presentation of delusional beliefs and verbalization of suicidal threats were not addressed. The initial PC assessment was conducted in person on March 13, 2024, but it was not noted whether that contact occurred in a confidential setting. The assessment was complete and thoroughly addressed all mental health issues.

Some PC notes indicated that the patient declined to be seen in a confidential setting, while others did not note whether the session occurred in a confidential setting. The patient was seen by the assigned PC weekly. The PC noted the patient's symptom presentation of delusions, but there was little mention of his treatment plan goal addressing anger. The recreational therapy groups were offered approximately twice weekly, but the patient frequently did not attend. There were no clinical groups documented.

A SRASHE was completed on March 8, 2024 due to the patient verbalizing suicidal thoughts upon arrival at HDSP, and again on March 26, 2024 due to a positive screening for RHU pre-placement. On April 12, 2024, the patient received RVRs for battery of a peace officer and damage to state property. The PC determined that the incident was not related to his mental illness.

**Findings**

The care and treatment provided to this patient were inadequate.

The patient was not offered sufficient group therapy as required. While the PC and other mental health staff were clearly familiar with the patient and monitored his care, the lack of sufficient treatment hours contributed to the determination of inadequacy in care.

**Patient BB**

This 31-year-old EOP patient's healthcare record was reviewed to assess the quality of care and treatment at HDSP. The patient was provided diagnoses of major depression, PTSD, opioid use disorder, and alcohol use disorder. He arrived at HDSP on March 8, 2024.

The patient received mental health services at the MHCB, intermediate, and EOP levels of care since 2015, and he had one suicide attempt in 2019 by cutting his wrists. The patient had a history of several RVRs, but none occurred during the review period.

The treatment plan included goals for managing depressed mood and strengthening the patient's sense of purpose. The treatment team determined that the patient was appropriately placed at the EOP level of care, and higher level of care indicators were not identified.

The initial psychiatric assessment occurred on March 14, 2024 via telepsychiatry, and the psychiatrist continued prescriptions of vortioxetine, prazosin, Vistaril, and BuSpar. The patient was seen every 30 days by the psychiatrist. The patient frequently did not take the medications as prescribed citing side effects; he discussed this issue with the psychiatrist who adjusted dosing amounts and times accordingly.

The initial PC assessment occurred on March 12, 2024, but the patient refused to attend. The PC followed up the same day by seeing him for a SRASHE that was required as a 90-day follow-up. He was seen by the PC the day prior for a five-day follow-up contact post PIP discharge. The patient was also seen by the PC on April 5, 2024, and he requested another visit on May 2, 2024 as he "hadn't seen her/him in a while." Another PC contact occurred on May 8, 2024. The confidentiality of the contacts was not documented. The patient discussed his concerns with the PC during the contacts and was receptive to interventions.

The patient was offered several recreation therapy groups weekly, and he attended sporadically but participated when present. No clinician led groups were documented. The patient was also seen by the ISUDT provider once during the review period.

**Findings**

The care and treatment provided to this patient were inadequate.

The primary clinician did not see the patient at the required frequency; however, the PC was responsive to the patient's requests and was aware of his symptoms.

**Patient CC**

This 41-year-old patient's healthcare record was reviewed to assess the care provided at the HDSP EOP. The patient was provided diagnoses of schizoaffective disorder, manic type; major depressive disorder; and schizophrenia prior to transfer to HDSP. Upon arrival at HDSP, he was prescribed Zyprexa and hydroxyzine prn for anxiety. The patient arrived at HDSP on March 18, 2024 at the EOP level of care from the CHCF PIP acute care unit.

The patient was referred to acute inpatient treatment due to a serious suicide attempt and significant impairment due to a severe mental illness. While at the PIP, the patient refused vital sign assessments, treatment groups, and was reportedly isolative. The PIP discharge summary noted that the patient was discharged from the CHCF PIP acute care to an EOP modified program.

The patient was seen by a clinician following an urgent referral due to intake screening at HDSP. He was seen on March 19, 2024, and the reason for referral was noted as a suicide attempt within the last year and discharge from acute care. No suicide risk was completed at that time, but one was completed the following day. The patient was described as difficult to engage and that he reported experiencing "voices in his brain" since he was six years old. The patient further reported that a precipitant for suicidality was stress due to peers, staff, and the general prison environment. Medical records documentation noted precursors to decompensation of isolation and medication nonadherence, with even one missed medication dosage triggering a decline in the patient's mental status. The patient's chronic risk of suicide was assessed as high due to three documented attempts with intent to die, the most recent in February 2024 which resulted in inpatient treatment. His acute suicide risk was assessed as low; however, the accuracy of that was unclear, as the patient was described as guarded and difficult to engage. That determination appeared to have been based primarily on the patient's reported denial of suicidality.

The patient was seen on April 3, 2024 by a telepsychiatrist for an initial contact. The telepsychiatrist provided diagnoses of schizoaffective disorder, depressive type, unspecified depressive disorder, and unspecified schizophrenia spectrum and other psychotic disorder. The patient was maintained on the same medications with the addition of Zyprexa prn for agitation. The patient presented with guardedness and would not respond to questions regarding his psychiatric symptoms and history of illness. He was described by the psychiatrist as alternating between withdrawn and agitated behavior.

The patient was not seen by his PC for an initial assessment until April 8, 2024. The PC provided diagnoses of schizoaffective disorder, depressive type and antisocial personality disorder. The assessment reviewed the patient's extensive history of psychiatric symptoms and multiple inpatient placements, primarily due to danger to self. The patient had a history of self-injurious behavior, and he was described as a poor historian. The PC assessment identified no evidence of the presence of a thought disorder; however, the healthcare record documentation clearly included descriptions of ongoing somatic and paranoid delusions that included distress over "creatures" in his brain and belief that mental health staff were sharing his private information with peers and custody staff. Additionally, the initial PC assessment focused on depressive symptoms; however, that assessment was internally inconsistent. For example, while noting that the patient was depressed in the narrative; the mental status exam indicated that his mood was "fine," his affect unremarkable, and provided no information regarding the presence or absence of other depressive symptoms. The PC found no evidence of the presence of a thought disorder or delusional thinking; but they did note that the patient reported that his medication was working, which implied that the medication may have mitigated his impaired thought processes. The PC provided a diagnosis of schizoaffective disorder, depressive type.

The initial IDTT meeting occurred on April 9, 2024. The telepsychiatrist who completed the intake assessment was present as was the assigned PC. It should be noted that this was not the psychiatrist who completed subsequent documentation and was not the psychiatrist identified as the assigned psychiatrist. A CCI was present, but the IDTT did not document if that was the assigned CCI. There was also documentation that a CDCR headquarters audit team and senior supervising psychologist were present at the IDTT meeting. The treatment team did not identify any indicators for consideration of referral to a higher level of care, despite the patient's lack of treatment participation while in the PIP. No safety plan was completed for the patient despite a serious suicide attempt in February 2024 that precipitated his inpatient treatment. The treatment targets included limited insight, depression and anxiety, psychotic symptoms, and intermittent suicidality secondary to psychosis. Some of the treatment goals were inappropriate; for example, the patient was to report a consistent decrease in psychotic symptoms as a function of medication adherence. This was inappropriate, as the patient had limited insight regarding his illness and had documented periods of selective mutism when questioned about his psychotic symptoms; therefore, a decrease in reporting of psychotic symptoms would not be considered treatment progress. The treatment interventions for those two areas were to continually reassess the patient's suicidality and insight, but there was no plan or intervention to develop a therapeutic relationship with the patient and to reinforce accurate self-report. The treatment goals and interventions for depression, anxiety, and insight were adequate and included using motivational interviewing and cognitive behavioral therapy.

The patient was seen on April 12, 2024 by a different PC, and interventions identified in the treatment plan for depression, anxiety, and insight were implemented during the session. There was no documentation that the patient was seen again by a PC by the time of this review on June 2, 2024.

The healthcare record did not include medication refusal forms for each incident of refused Zyprexa; however, documentation in the healthcare record clearly described his intermittent medication refusal. There were ten incidents of medication refusal documented in the healthcare record, but some were for morning administrations despite the medication administration record that documented that the Zyprexa order only required one administration daily at bedtime. A prn order allowed administration of Zyprexa on an as needed basis for hallucinations; however, the medication administration record did not document any administrations of the prn medication. There were at least six incidents of refused Zyprexa doses at bedtime. There were at least three referrals to psychiatry for medication nonadherence, and three psychiatric notes throughout May 2024 noted the patient's nonadherence, but indicated that the patient would be seen at the next scheduled appointment. This was concerning, as healthcare record documentation clearly noted that the patient quickly decompensated due to brief medication nonadherence. The patient had not been seen by psychiatry by the time of this review on June 2, 2024.

The healthcare record documentation indicated that the patient had only two groups scheduled weekly with sporadic attendance. All treatment groups were facilitated by a recreational therapist, and the groups were not clearly linked to treatment goals in the treatment plan. The patient only attended two current events groups during May 2024; those groups involved reviewing news articles and discussing current events in the dayroom.

**Findings**

The care and treatment provided to this patient were inadequate.

The patient was not seen timely for his initial assessments at HDSP nor by his treatment team despite arriving from an acute inpatient program. The patient was admitted to acute inpatient level of care due to a serious suicide attempt and grave disability believed to be secondary to medication nonadherence. It was very concerning that this seriously ill patient was discharged to a program that appeared to be struggling with maintaining sufficient staff to provide adequate treatment at the EOP level of care, particularly when the patient was discharged without meeting all his treatment outcome expectations at the PIP. The treatment plan did not address the patient's primary precursors to decompensation that included isolation (including refusal of treatment) and medication nonadherence. The treatment plan also failed to identify if the patient was in modified EOP, yet did not schedule him for more than a two recreational therapy groups weekly. The treatment team also failed to develop a safety plan as indicated or to target treatment nonadherence.

After the initial IDTT meeting, the patient was only seen once by a PC and not at all by psychiatry, despite documentation and referral due to medication nonadherence. While the healthcare record included documentation regarding the importance of medication adherence for this patient, the assigned psychiatrist's response to multiple referrals for medication nonadherence was to merely document that the patient would be seen at his next scheduled

appointment. There appeared to be no sense of urgency or recognition regarding the importance of promptly addressing this patient's medication nonadherence. At the time of review on June 2, 2024, the patient had not yet been seen by the psychiatrist.

**Patient DD**

This 44-year-old patient's healthcare record was reviewed to assess the care provided at the HDSP EOP. The patient provided a diagnosis of schizophrenia, unspecified, and was prescribed Haldol, Zyprexa, Vistaril, and Prozac, as well as Zyprexa and Vistaril ordered prn. The patient arrived at HDSP on March 11, 2024 from WSP at the 3CMS level of care. He was placed at the EOP level of care on March 21, 2024, and was subsequently transferred to CSATF on May 1, 2024.

The patient had a history of treatment at the EOP and MHCB levels of care. He had also received mental health treatment in the state hospital system.

The patient was a poor historian with very limited recall of historical events. While he could not recall specifics, the patient did acknowledge a history of suicidality and at least one suicide attempt substantiated by the healthcare record. The patient reported command auditory hallucinations; specifically, voices that told him to eat his feces. The patient was seen on March 12, 2024 due to an urgent referral following the intake screening process. The patient was seen urgently due to continuing to consume his fecal matter (last occurrence two days prior), command hallucinations, problems with hygiene, single cell status, and reports of screaming in his cell at night that was disruptive to his peers. The patient was not referred to the MHCB at that time, although the clinician noted that he should be considered for a higher level of care. The patient was referred to psychiatry and for his PC intake assessment, but he was not moved from his regular housing.

The patient was seen on March 14, 2024 by a telepsychiatrist who was not his assigned psychiatrist. A diagnosis of unspecified schizophrenia spectrum and other psychotic disorder was provided. The psychiatrist continued Zyprexa, Haldol, and Prozac but discontinued Vistaril noting that it was ineffective. Remeron was added for sleep and depression that was reported by the patient. The psychiatric assessment was comprehensive and detailed, noting that the patient had reported mental health symptoms dating back to childhood. The assessment provided information that the patient had a chaotic childhood marked by repeated trauma, foster care placement, and eventual homelessness as an adult. He reported that he had trouble with cellmates due to frequently talking to himself and waking up screaming, and his current cellmate had threatened him. The psychiatrist did not note the memory impairment documented in the urgent referral contact. The psychiatrist also noted that there was no evidence of delusions or thought disorder, describing the patient's thought process as linear and logical but with continued reports of command hallucinations instructing him to engage in bizarre behavior. The patient was described as anxious and fearful with blunted affect, poor insight and judgement. The patient was seen by the same telepsychiatrist on April 4, 2024, with a medical assistant. The patient was described as poorly groomed with a foul body odor. His psychotropic medications were continued. The patient was not seen again in an individual contact by psychiatry prior to his transfer.

The assigned PC completed an intake evaluation by telehealth on March 18, 2024. A large amount of information was pulled forward from the prior urgent referral contact. In the current assessment, the PC noted that the patient was depressed, disorganized, anxious, and reported auditory hallucinations. The PC documented a history of multiple diagnoses, past substance abuse, and past suicide attempts with little detail provided. The patient was described as not oriented to time with poor recall. The patient reported visual hallucinations of seeing spirits and seeing objects coming from the walls. He was described with below average intelligence with poor insight and judgement. While the patient had been in prison before, he denied recall of prior incarceration. The patient continued to report eating his feces; however, the mental health staff did not document any efforts to verify this behavior with custody or the patient's cellmate. The patient did repeatedly report that he was fearful of others in the dorm and that he had been threatened with assault for his bizarre behaviors. That evaluation was updated once the patient was placed at the EOP level of care.

The treatment team saw the patient on March 21, 2024 for a level of care change. The treatment team documentation did not indicate if the assigned PC and alternate psychiatrist were present via telehealth, but both were telehealth providers. A CCI was also present, but there was no indication whether they were the assigned CCI. The patient met the higher level of care criterion one (patient unable to function at current level of care due to mental illness), and the IDTT increased his level of care to EOP to allow for more intensive treatment. The patient continued to report his fear of peers in general and of his cellmate specifically. The treatment team referred the patient for an evaluation for possible developmental disorder. The treatment targets included delusions and hallucinations. One overly vague treatment goal was developed, and the only intervention listed was to increase the patient's level of care. The patient was assigned to single cell placement pending transfer to another EOP due to his custody level. He was also designated DD2 on April 8, 2024, which would allow him to receive supportive services and accommodations from the developmental disability program.

The patient was seen weekly by his PC, but those clinical contacts did not include therapeutic interventions beyond supportive therapy and were primarily check-ins with the patient. The patient was also not assigned to any treatment groups. Additional clinical information was obtained during those contacts, including ongoing hygiene issues such as lack of bathing and brushing his teeth. The patient continued to report command hallucinations and reportedly failed to flush his toilet regularly. He continued to report fears of hurting himself or being hurt by peers. He was not placed into any therapeutic groups pending his transfer. He continued to report frequent auditory hallucinations that were extremely distressing to him. The patient continued to report night awakenings due to screaming and hallucinations, using toilet water to brush his teeth and wash his face, and intermittent vomiting due to using toilet water. He also continued to report eating feces from his toilet. The patient's self-report was never verified through consultation with custody, nursing, or other facility staff despite the health risks of those behaviors. The patient was not referred to medical for assessment of his physical well-being considering the behaviors described.

**Findings**

The care and treatment provided to this patient were inadequate.

While the patient was appropriately reviewed for a level of care increase, he was only placed at the EOP level of care after exhibiting behaviors more consistent with grave disability. The healthcare record indicated that a referral to the MHCB should have occurred upon his arrival at HDSP as a result of the urgent mental health contact. Instead, the patient was returned to regular housing to await his psychiatric and PC assessments.

The patient was described and perceived differently by the telepsychiatrist and telehealth PC; his thinking was alternately described as logical and linear versus disorganized, he had no memory impairment compared with significant impairment. Those differing presentations were not resolved during the IDTT meeting or through consultation between telehealth providers. The treatment plan developed by the treatment team was wholly inadequate, relying on EOP placement without any evidence-based interventions despite the patient's behavior posing a significant health risk. Placement into a structured environment with 24-hour nursing would have allowed mental health staff to monitor the patient's behaviors and to develop a behavior plan to eliminate dangerous behavior that threatened his health. While the patient was at times described as a poor historian, his reports regarding use of toilet water and eating feces were never confirmed with facility staff. In addition, the patient consistently reported significant safety concerns and being threatened by others, but the clinical staff did not follow-up or address this with facility custody staff. The patient received no therapeutic groups, and individual contacts were primarily check-in meetings.

Lastly, there were no significant therapeutic interventions provided despite the patient reporting that medications were only minimally effective, as he continued to be extremely distressed by the hallucinations. The patient should have been referred to an inpatient setting to address his grave disability.

**Patient EE**

This 54-year-old patient's healthcare record was reviewed to assess the care provided at the HDSP EOP. He was provided diagnoses of schizoaffective disorder, opioid use disorder, and PTSD based on self-report of a qualifying event and related symptoms; he was also classified as DD2. At the time of arrival at HDSP, the patient was prescribed Zyprexa, Buspar, Effexor, prazosin, and Vistaril prn for anxiety. The patient arrived at HDSP on March 7, 2024 from SVSP at the EOP level of care.

The patient was seen on March 8, 2024 in response to an urgent referral that was made following his initial health screening due to his responses, recent bad news, and prior treatment. The patient was tearful during the contact, because he had hoped to go to another prison that was close to his family. No suicide risk assessment was completed or documentation provided that a suicide risk assessment was not clinically indicated. No clinical interventions occurred during that contact, but the patient was encouraged to give his current placement a chance before requesting transfer.

The patient was seen on March 14, 2024 by another clinician reportedly due to the same initial urgent referral. That contact was completed by a senior psychologist and was more comprehensive in assessing the patient's concerns, current status, and risk of harm. The patient reported that he was coping well with stressors and was stable.

The patient was not seen until March 28, 2024 for an initial PC assessment. The provider pulled a large amount of historical information forward and did not complete multiple sections of the assessment, including problem/diagnosis, mental status, and psychosocial history. The only symptoms listed included difficulty with recent disciplinary infractions for fighting/violence and frustration tolerance. No symptomatology was provided to support the diagnoses beyond opioid use disorder or maintenance at the EOP level of care. Alarmingly, following the assessment, the patient was not seen again for an individual PC contact until May 15, 2024, and he had not been seen at the time of the review on June 3, 2024.

The psychiatrist saw the patient for an initial assessment via telepsychiatry on March 20, 2024, with a medical assistant present. The patient had multiple physical disorders including cauliflower ear, right club foot, pectus excavatum, and polygenic hereditary disorder. While the patient had previously undergone various procedures related to those ailments, they were not noted as impacting his mental health. The patient reported hearing voices beginning at age 15 and experiencing a great deal of abuse and trauma. His son died of an overdose in November 2023, and he stated that he had been "going through it"; however, he expressed hopefulness that he would eventually recover. The patient had a strong relationship with his children, had been sober, and was engaged in mental health treatment. The mental status exam was within normal limits, and he was assessed with fair insight and judgement. The telepsychiatrist concluded that the patient's acute suicide risk was low but with high chronic risk due in part to prior suicide attempts and incarceration. His psychotropic medications were continued, but the Zyprexa dosage was increased to help with auditory hallucinations and mood. The patient intermittently refused his psychotropic medications. A refusal form was completed on April 18, 2024; however, the medication administration record for that date did not show administrations or refusals of those medications. The form did not indicate what medications were allegedly refused, but noted that refusal "may result in level of care change from EOP to CCCMS." The patient was not seen again by psychiatry until a telepsychiatry appointment occurred on May 8, 2024. He was seen by the same telepsychiatrist who completed the initial assessment, but they were not the assigned telepsychiatrist. Medication nonadherence was reportedly discussed, but the patient's rationale for nonadherence was not provided. The psychiatrist did inform the patient that refusal of psychotropic medication could result in discontinuation of the medication. The patient reported that the medication was helpful but that he was frustrated with too few therapeutic groups and frequent yard closures due to fights.

The initial IDTT meeting occurred on April 2, 2024, nearly a month after his arrival to HDSP. The assigned psychiatrist was present, presumably via telehealth, but an alternative clinician was present. Nursing and a CCI were present; although the IDTT did not indicate if the CCI was the assigned counselor. The patient met no higher level of care referral criteria, and his safety plan was pulled forward from November 2023 and was not updated. The patient's primary coping strategy was to be in a cell by himself, as he reported that current stressful situations would trigger his traumatic memories and responses and overwhelm him. The treatment plan included primarily historical information but did identify depressed mood as a target of treatment. Unfortunately, no actual treatment plan was developed. No treatment goals or interventions were identified, and that section of the form was blank. There was no information regarding indicated treatment groups.

Group progress notes were extremely problematic. Facilitators completed two notes for the same time period on March 29, 2024 at 1030-1130, and there was conflicting information that the patient was both present and absent for the same group and documentation that the patient was present for full sessions when that was impossible as the sessions overlapped. From March 21, 2024 when his treatment groups began until June 1, 2024, the patient was only offered a total of 19 hours of recreational therapy groups. The total minimum number of hours that should have been offered during that time frame of 10 weeks was 100 hours.

**Findings**

The care and treatment provided to this patient were inadequate.

The patient was not seen timely for his initial assessments; and while the psychiatric assessment was comprehensive, the PC assessment was incomplete and inadequate. The assessments did not support the diagnoses provided. The treatment plan was also incomplete and inadequate, with no treatment goals or interventions provided. The patient was not seen at the necessary frequency by the psychiatrist and PC, negating the ability to quickly identify the patient's needs and to provide ongoing treatment. It was quite concerning that the patient was only seen for an initial assessment by his PC and on one other occasion during an almost three-month period. There were inadequate treatment groups offered to assist the patient in managing his grief, depression, and ongoing stress due to incarceration. The patient complained to providers about the lack of treatment; however, nothing changed, and he continued to be offered extremely minimal treatment that was inconsistent with his diagnosis, functioning, and level of care needs. It was also quite concerning that the patient was told that refusing medications could result in a decrease in his level of care, when he was not on an involuntary medication order and had the right to refuse medication treatment.

**Patient FF**

This 33-year-old patient's healthcare record was reviewed to assess the care provided at the HDSP EOP. He was provided a diagnosis of schizoaffective disorder, bipolar type, and was prescribed Abilify prn, nortriptyline, and Remeron. He was also receiving medication-assisted therapy with Suboxone. The patient was placed at HDSP on March 5, 2024.

The patient was housed at HDSP and was sent to the CSP/Sac MHCB due to suicidality. The inpatient notes indicated that the patient was upset about being at HDSP which was located far away from his family. The patient had one prior MHCB placement from February 21 to February 24, 2024 at CSATF. The patient returned to HDSP on February 24, 2024, but he attempted self-harm during transport. Custody reported that he was hitting his head in the transport vehicle and was attempting to rub the seatbelt as if to sharpen it. While the patient reportedly agreed to be removed from the EOP level of care prior to discharge from CSATF, he reported a plan to hang himself to HDSP nursing staff once he was placed in the EOP yard. The patient was transferred to the CSP/Sac MHCB on February 25, 2024, and returned to HDSP on March 5, 2024. While in the CSP/Sac MHCB, he frequently refused to engage in treatment efforts and was intermittently adherent with medication.

The patient was seen for five-day follow-up contacts upon his return to HDSP; however, the safety plan was not updated. He had refused to participate in safety planning while in the CSP/Sac MHCB, and HDSP mental health staff did not update that safety plan despite his family being identified as a significant protective factor and he complained about being isolated from them. The patient was next seen on March 21, 2024 in response to a 602 where he stated that he was experiencing difficulty living at HDSP. When seen by his PC, he reported no difficulties. While it was unclear if the contact occurred in a confidential setting, the PC documented exploring problem-solving and skill practice with the patient, and the patient was not perceived to have been in crisis. The patient submitted another referral on April 1, 2024, reporting that his psychotropic medications were not working and that he was feeling depressed and experiencing difficulty sleeping.

The patient refused his psychiatric appointment on April 3, 2024, and he began refusing Abilify on April 7, 2024. He continued to refuse Abilify nearly daily throughout April. He was seen by his telepsychiatrist on April 24, 2024. The patient told his psychiatrist that the Abilify was not helping his auditory hallucinations, and he continued to report being very unhappy at HDSP. The patient did not understand why he was sent to HDSP which was far away from his family, and he was worried about the safety of his family. He reported that he heard spirits telling him that his family was in danger and that he needed to kill himself to help them because they were stuck in hell. The patient further reported that he did not find his treatment groups helpful and was unsure that EOP services would benefit him. The psychiatrist noted the presence of religious delusional thinking with little insight into his illness. His medications were continued including Abilify, despite the patient's complaints that the medication was ineffective, and no other medication changes occurred. On May 28, 2024, the patient refused his psychiatric appointment with a different telepsychiatrist. He had not been seen again by psychiatry at the time of the review on June 1, 2024.

The patient was seen at cell front after refusal for an initial PC assessment by a senior psychologist who was not the assigned PC on April 3, 2024. The assessment pulled forward historical information without any clinical conceptualization of the case based on the healthcare record review. The patient was not seen by any PC for individual contact after that date, and no individual PC contacts were attempted.

The treatment team finally convened on April 30, 2024, almost two months after the patient's return to HDSP. The patient refused to attend the IDTT meeting, but the assigned PC and telepsychiatrist were present. The safety plan portion of the treatment plan was not completed, despite two recent MHCB placements and the patient's continued report of difficulty being away from family where his children could not visit. The clinical summary in the treatment plan was pulled from the psychiatric progress note and was not developed in conjunction with the IDTT. The treatment plan was not completed; there were no targets of treatment, treatment goals or interventions identified. The treatment team did not discuss the patient's significant stressor of being away from his family, nor did they identify treatment adherence and establishing a therapeutic rapport as treatment goals.

Treatment groups did not begin for this patient until March 20, 2024. Few groups were offered, and they were all recreational therapy groups. During the first week of group treatment, the patient was offered three hours of group and then offered one to two hours for a total of 18 hours

of group offered during the 12 weeks of placement at HDSP EOP that ended on June 1, 2024. There were also problems with group documentation. On March 27, 2024, the patient was identified by the same recreational therapist as present and absent in two different group notes for the same date and time. Again, on March 29, 2024, the patient was both noted as present and absent in two different group notes by the same facilitator. The patient was incorrectly noted to have been present for the entire group of another facilitator that overlapped with an earlier group that he was allegedly present for on March 29, 2024.

**Findings**

The care and treatment provided to this patient were inadequate.

The patient had two recent MHCB placements precipitated by transfer away from his family whose support was his primary protective factor. The patient was not seen by his psychiatrist and PC with sufficient frequency to address his concerns and to quickly identify decompensation. The patient complained about his medication's ineffectiveness, but the psychiatrist made no changes despite medication nonadherence. The treatment plan was wholly inadequate and incomplete; it did not include an updated treatment plan, despite the patient's repeated self-report of risk factors and prior hospitalization for suicidality. The patient was not properly evaluated for consideration of referral to a higher level of care despite his treatment nonadherence. Lastly, the patient was not provided with sufficient group treatment options to assist him in adjusting to being away from his family and developing coping skills.

**Patient GG**

This 25-year-old patient's healthcare record was reviewed to assess the care provided at the HDSP EOP. The patient was provided diagnoses of major depressive disorder, recurrent, mild; "anxiety;" PTSD; cannabis use disorder severe; and "psychosis" prior to his arrival at HDSP. He was prescribed Zoloft, Vistaril, Zyprexa, Remeron prn for sleep, Zyprexa prn for agitation and/or psychosis, and Vistaril prn for anxiety. The patient arrived at the HDSP EOP on March 22, 2024 from the CSATF MHCB where he was treated from March 9 to March 22, 2024.

This was the patient's first CDCR incarceration. The patient repeatedly complained of chest pain in the weeks prior to transfer, causing multiple emergency responses that were ultimately resolved without referral to an outside hospital. The documentation indicated that those incidents were typically accompanied by agitation and complaints regarding custody. The patient was eventually admitted to the CSATF MHCB due to suicidality. Prior to the MHCB placement, the patient received mental health services at the 3CMS level of care.

The patient was seen by a clinician on March 23, 2024 due to an urgent referral from nursing following the intake screening. He was cleared to return to housing. The five-day follow-up contacts were completed, and the safety plan was updated and applicable to his current housing at HDSP. During that time, the patient also sporadically refused his psychotropic medication necessitating a referral to psychiatry. The patient declined the contact with the telepsychiatrist, and he continued to refuse medication. The patient was not seen by psychiatry for an individual contact while in the mainline EOP at HDSP, despite remaining medication nonadherent while housed in the mainline HDSP EOP.

The initial PC assessment occurred on April 11, 2024, and it was primarily based on prior assessment information that was pulled forward with little updated information provided. The patient reported that control of his anger was his primary concern. The PC noted that the patient had difficulty self-soothing with low frustration tolerance. This was exemplified by the patient repeatedly reporting chest pain at his prior facility, when he often yelled and cursed at responding staff and reported anger toward custody because he felt disrespected or had not received something he expected, such as canteen. The patient had previously reported that he engaged in cutting as a coping tool and stated that he would rather feel physical pain than emotional pain.

The patient was seen by an alternate PC on April 17, 2024, following an emergent referral because he had requested immediate clinical contact. He declined a confidential contact with mental health, instead "demanding" that he be seen in his housing unit. Upon arrival, the clinician noted that the patient was playfully interacting with peers and did not seem to be experiencing any distress. The patient reported to the clinician that he was upset about a consequence due to a recent disciplinary action and wanted to assault custody staff. When the clinician discussed the patient's needs and appearance, the patient told the clinician that he wanted to kill himself, refused to answer additional questions, and walked toward his cell. The clinician informed custody, and the patient was ordered to go to the EOP building for a confidential interview and possible referral to alternate housing. The patient ultimately calmed down and participated in the clinical interview, stating that he had hoped that mental health would help him access the correctional counselor and get answers to his questions regarding the disciplinary action. The concern was resolved, and the referral to the MHCB was rescinded according to the clinician. The patient was not seen again prior to his transfer from the mainline EOP on April 24, 2024.

The initial IDTT meeting occurred on April 23, 2024, one month following the patient's arrival to HDSP. The assigned PC and telepsychiatrist were present at the meeting; however, the patient did not attend. His absence was not documented in the master treatment plan, but the psychiatrist did note the patient's absence in his notes. A representative from nursing and the recreational therapist were present as was a CCI, but the IDTT did not indicate if the CCI was the assigned counselor. The master treatment plan did not update any information beyond noting an individual plan of care for anger. The treatment plan itself was merely copied from the MHCB placement at CSATF, which was no longer relevant. The IDTT did not address the patient's treatment nonadherence, as he frequently refused medication and treatment groups. The patient was offered five one-hour recreational therapy groups over a 32-day period that he was housed in the mainline EOP, and he refused to attend all. The psychiatrist did note in his IDTT medication review that the patient should be evaluated regarding his level of care given his functional level and refusal to engage with mental health. The safety plan portion of the treatment plan was not completed, despite the patient's recent suicidality and the use of self-harm as a coping tool.

The patient was placed in the RHU on April 24, 2024. The initial PC assessment in the RHU noted that the patient was moved to the RHU due to safety concerns. The patient remained in the RHU throughout May 2024.

**Findings**

The care and treatment provided to this patient were inadequate.

The patient was discharged from an MHCB to the EOP level of care at HDSP, but he was not seen timely to assess his mental status and to develop an appropriate treatment plan given his recent crisis placement. The patient was seen daily for the five-day post-MHCB follow-up, and his safety plan was reviewed; however, that did not expedite his intake assessment. The patient was not seen by psychiatry at all during his time in the mainline EOP after refusing his initial assessment. His psychotropic medications were continued despite repeated nonadherence.

The patient was seen for a PC evaluation three weeks after arrival, and that evaluation relied solely on historical information that was not updated for his current situation. That evaluation provided little helpful information, did not address the patient's medication nonadherence, and did not support the diagnoses provided. Prior documentation suggested that the patient may have been having trouble adjusting to incarceration, and his coping involved relying on emergent medical and psychiatric complaints. The HDSP psychiatrist appeared to consider the same and indicated that the patient's level of care should be evaluated for appropriateness. Despite that, the IDTT did not indicate as a focus of treatment diagnostic clarification, review of appropriate level of care, or address the need for coping skills. Instead, the treatment team simply continued the treatment goals and interventions developed at the CSATF MHCB which were outdated. The patient was only offered five hours of recreational therapy while housed in the mainline EOP. He refused to attend all treatment groups and frequently refused his psychotropic medication; however, treatment nonadherence was inappropriately not a focus of treatment.

**Kern Valley State Prison (KVSP)**
**July 15, 2024 – July 17, 2024**

**Patient A**

This 43-year-old EOP patient's healthcare record was reviewed to assess the quality of care provided at KVSP. The patient was provided a diagnosis of unspecified psychotic disorder; however, the problem list indicated a diagnosis of delusional disorder. No current psychotropic medications were listed in the psychiatric progress notes or review; the patient was offered Zyprexa while in the MHCB in January 2024, but he declined to take the medication. He transferred from an MHCB to the EOP level of care on January 11, 2024.

The patient was provided multiple previous psychiatric diagnoses, and he had several higher level of care placements as well as past involuntary psychiatric treatment. His symptoms primarily included delusional and disorganized thinking and difficult to understand speech. He attempted to hang himself in 2013. Pertinent recent history included an MHCB admission for 16 days due to thoughts of self-harm.

The initial IDTT meeting occurred before his initial primary clinician and initial psychiatric assessments. On January 24, 2024, the psychiatrist, MHPC, supervisor and other staff were present at the initial IDTT, but the patient declined to attend the meeting. The goals and interventions documented were appropriate for the patient's care and addressed his presenting symptoms. The treatment team determined that the patient did not require transfer to a higher level of care; however, no documented rationale was provided except that the decision was a unanimous one.

The patient was seen for the initial psychiatric assessment on February 15, 2024, with a subsequent visit on June 7, 2024. The latter visit occurred in a confidential setting in the psychiatric office. The psychiatrist determined that the patient demonstrated no patterns of instability or psychosis that required psychotropic medication treatment at that time.

The initial PC assessment was completed on January 18, 2024. The patient was seen by the PC at cell-front on a near weekly basis, with a noted gap in PC contacts from March 11 to April 8, 2024. There was minimal variation in the content of the PC progress notes. The PC stated plans to work further with the patient when he was willing to leave his cell for a confidential session.

The patient was offered just over an average of three hours of group therapy weekly; he attended .07 hours on average weekly, and he had not attended any groups since early April 2024. The groups that the patient attended in April 2024 were recreation therapy groups.

**Findings**

The care and treatment provided to this patient were adequate.

He experienced severe paranoid and grandiose delusional thinking; he often spoke in unintelligible language and refused most treatment offered to him which made it difficult to

determine his treatment needs. His behavior and hygiene, however, remained stable. Although he minimally engaged with staff, it appeared that the patient had treatment-resistant symptoms, and the EOP level of care and staff monitoring assisted in maintaining his stability.

**Patient B**

This 34-year-old EOP patient's healthcare record was reviewed to assess the quality of care provided at KVSP. He was provided diagnoses of bipolar 1 disorder, adjustment disorder, and opioid use disorder. He was prescribed Zyprexa. He received his psychotropic medication by a PC 2602 order that was initiated on February 6, 2024. The patient arrived to the KVSP EOP on March 20, 2024. The patient had several MHCB and one DSH admission since 2014, and he had been prescribed various psychotropic medications.

The initial IDTT meeting occurred on March 27, 2024, and the assigned MHPC and psychiatrist were present as well as correctional counselors and the patient. The identified goals in the treatment plan included depressed mood and anxiety, and appropriate outcomes and clinical interventions were listed. Higher level of care considerations were documented and were relevant.

The initial psychiatric contact occurred after the initial IDTT meeting on April 4, 2024, when the patient declined to leave his cell for the visit. The initial psychiatric assessment was completed on April 11, 2024, and the patient was seen again by the psychiatrist on June 13, 2024 in a confidential setting. The psychiatrist thoroughly reviewed the patient's presentation and status and determined that no treatment changes were indicated at that time.

The initial PC assessment occurred on March 26, 2024; the patient was subsequently seen by the PC on April 2, 2024. No other PC contacts were documented until May 7, 2024. Subsequent PC contacts occurred weekly in a confidential setting, but some contacts occurred at cell front or in the yard. The content of the therapy sessions was adequate and was consistent with the treatment goals.

On average, the patient attended over 10 hours of groups weekly. He often attended recreation therapy groups; a recreation therapy summary on May 29, 2024 described his attendance and participation as inconsistent and noted that the patient at times pushed the boundaries of speaking and acting respectfully. He attended groups facilitated by several different recreation therapists.

At the most recent PC contact, the patient was angry and yelled, demanding to have a different PC who was female. The unit staff noted that the patient had a recent court date with a possible bad outcome that may have contributed to his bad mood.

**Findings**

The care and treatment provided to this EOP patient were adequate.

The patient had consistent and meaningful contacts from his psychiatrist, PC, and recreation therapists, and the treatment plan was clinically relevant. Overall, his behavior and mood remained stable, and the therapeutic interventions were appropriately considered.

**Patient C**

This 41-year-old patient's healthcare record was reviewed to assess the quality of care provided at KVSP. He was provided diagnoses of schizoaffective disorder, depressive type; opioid use disorder; and antisocial personality disorder. Additionally, he had medical diagnoses of myasthenia gravis, hepatitis C, and asthma. The patient had received mental health services at the MHCB, EOP, and ICF levels of care. The patient was prescribed mirtazapine, olanzapine, bupropion, and oxcarbazepine. He transferred to the KVSP EOP on April 2, 2024.

The initial IDTT meeting occurred on April 17, 2024, and the assigned PC, psychiatrist and other unit staff were present; however, the patient refused to attend. The initial treatment plan included goals to address hallucinations, depression and substance use. Although it was noted that the patient met the criteria for higher level of care referral consideration, an adequate rationale for nonreferral was provided.

The initial psychiatric contact occurred in person on April 11, 2024; however, the patient was seen by different psychiatrists for each subsequent visit that occurred on April 25 and June 3, 2024. The documentation indicated that the patient's psychotropic medications were adjusted due to nonadherence. The psychiatric visits occurred in confidential settings and at the cell front; the April 25 visit occurred in a confidential setting in the psychiatric office. At that visit, the psychiatrist addressed the patient's current and past concerns and noted a request for an increase in the oxcarbazepine dosage.

The initial contact occurred on April 25, 2024 after the initial IDTT meeting, and other PC contacts occurred on May 9, May 23, June 3, and June 12, 2024. The April 25 visit occurred in a confidential setting, but the remainder of the contacts occurred at cell front. Although the documentation of PC contacts provided details regarding the patient's discussions; they minimally addressed the treatment plan goals and interventions. Additionally, the notes often stated that the patient was informed that he would be seen weekly by his PC; however, that did not occur.

The patient attended groups on April 18 and May 16, 2024, and he attended recreation groups on May 23 and May 24, 2024. The documentation indicated that he did not show for seven other groups, and he attended an average of four and one-half groups weekly.

The patient received an RVR for fighting on May 29, 2024.

**Findings**

The care and treatment provided to this patient were inadequate.

The patient was not seen weekly for PC contacts, and the continuity of care by the psychiatrists was poor, as he was seen by several different providers.

**Patient D**

This 44-year-old patient's healthcare record was reviewed to assess the quality of care provided at KVSP EOP. The patient was provided diagnoses of unspecified schizophrenia and PTSD. He also had chronic pain, gastroesophageal reflux disease and asthma. He was prescribed Thorazine PRN, Zyprexa and Zoloft; however, the psychiatrist discontinued Zoloft due to nonadherence on May 12, 2024.

The patient arrived at the KVSP EOP on February 7, 2024, and the initial psychiatric contact occurred on the following day when he reported feeling highly anxious and suicidal due to the transfer from the MHCB.

The initial IDTT meeting occurred on February 21, 2024, and the assigned psychiatrist and PC were present. The initial treatment plan addressed the patient's danger to self and depressed mood. The treatment plan was reviewed on May 22, 2024.

The patient was subsequently seen by the psychiatrist on March 1, 2024, then on April 26, May 9, May 11, and May 21, 2024; the patient refused the May 9, 2024 visit, but he was seen by the psychiatrist for a check-in. All visits occurred in a nonconfidential setting at cell-front. The psychiatric progress notes indicated frequent medication nonadherence. Of note, the psychiatrist indicated that the patient denied symptoms; however, in the same paragraph stated that he endorsed auditory hallucinations, including command voices telling him to harm himself.

A PC contact occurred on February 12, 2024 when a SRASHE was completed, and the initial PC assessment was completed on February 20, 2024. The PC attempted to see the patient onsite weekly; however, he frequently refused to attend a confidential session, and thus all PC contacts occurred at cell-front. The PC notes were sparse in content with little if any original content provided. The PC notes indicated consideration of lowering the patient's level of care to 3CMS due to nonparticipation and lack of noted mental health symptoms other than his self-reported anxiety.

The patient was offered 9.81 hours of group therapy weekly; he attended 3.58 hours weekly, and the treatment plan indicated that he only attended 15 percent of groups offered. The most recent group attended occurred on May 13, 2024 for recreation therapy.

SRASHEs were completed on February 12, 2024 and May 11, 2024 due to suicidal thinking related to the patient's upcoming prison release date. He was evaluated in the emergency department on February 20, 2024 due to altered mental status when the patient stated that he had "smoked something."

**Findings**

The care and treatment provided to this patient were inadequate.

The patient was not engaged in therapy, and the clinical notes included minimal and at times contradictory information. While the patient's symptoms appeared to possibly be at his baseline, there was little documentation to indicate that adequate attempts were utilized to engage him in treatment.

**Patient E**

This 32-year-old patient's healthcare record was reviewed to assess the quality of care provided at KVSP where he arrived on July 3, 2023. He was provided diagnoses of major depressive disorder, recurrent episode, with psychotic features; ADHD, inattentive type; alcohol/stimulant/cannabis/opioid use disorder; antisocial personality disorder; and borderline personality disorder.

Prior to EOP placement, the patient displayed significant instability and was referred to the MHCB on June 29, September 3, and September 12, 2022.

After placement at the KVSP EOP, the patient was seen initially by the PC on July 4, 2023 when thorough documentation was provided regarding the events that precipitated the MHCB placement including relationship difficulties and suicidal thinking. He was subsequently seen by the PC on July 7, 2023. The PC did not note whether the contacts occurred in a confidential setting. The PC notes were detailed and relevant to the patient's concerns, needs and were consistent with the treatment plan.

The initial psychiatric contact occurred on July 7, 2023, when the patient was noted with continued mild anxiety and depression. The patient was prescribed Abilify, and he requested discontinuation of the medications which the psychiatrist agreed to. He was subsequently seen for psychiatric contacts on October 4, 2023, November 2, 2023, February 2, 2024, April 30, 2024, May 2, 2024, June 5, 2024 and June 12, 2024. At the June 12, 2024 visit, the psychiatrist tapered Lithium at the patient's request. He was also prescribed Vistaril for sleep and anxiety, as well as Suboxone. The content of the psychiatric notes was thorough, and the rationale for medication changes was documented. The patient was seen by his assigned psychiatrist during most visits, with few visits conducted by another clinician when the assigned clinician was unavailable. The content of the notes was adequate.

SRASHEs were completed on September 22, 2023, December 1, 2023, January 4, 2024, March 26, 2024, and April 21, 2024 due to ongoing thoughts of self-harm.

The most recent IDTT meeting was attended by the assigned PC and psychiatrist. The IPOCs considered relevant factors in the patient's behavior, emotional state, thoughts, and past behaviors; and there was documentation regarding consideration of referral to a higher level of care with appropriate justification for continuation at the current level of care.

The patient attended recreational groups and PC-led groups where he participated appropriately, but the documentation indicated that he sometimes did not show for groups or only attended a

portion of the group. He was offered PC-led groups approximately every two weeks and recreation therapy groups two to four times weekly on average.

The patient reported chest pain twice in the past 30 days and was evaluated by an RN. He had a CIT intervention due to thoughts of self-harm within the past 60 days, but there were no incidents of self-directed injury during the review period while in the EOP.

**Findings**

The care provided to this patient was adequate.

The patient received care in the KVSP EOP during the prior year, and he exhibited significant improvement in his symptomatology as compared to his previous instability with multiple referrals to the MHCB.

**Patient F**

This 41-year-old EOP patient's healthcare record was reviewed to assess the adequacy of care provided at KVSP. The patient was provided diagnoses of other specified schizophrenia spectrum and other psychotic disorder, antisocial personality disorder, substance induced psychotic disorder with delusions, and unspecified bipolar disorder, as well as various substance related disorders. He was prescribed Abilify, Depakote and BuSpar. The patient transferred to KVSP on March 11, 2024 after MHCB discharge.

He was treated at the EOP level of care until his transfer to CSP/SAC at the end of June 2024. During that incarceration that began in January 2024, he was treated at the EOP and the MHCB levels of care; during prior incarcerations, he received mental health services at the 3CMS, EOP, MHCB, acute and intermediate levels of care.

Provider initial assessments included pertinent recent and historical clinical information. The patient had history of problematic methamphetamine use which was not concerning to him. Of note, he was treated in the MHCB in March 2024 due to psychosis and disruptive behavior that were attributed to methamphetamine use.

Routine monthly psychiatric contacts generally occurred with the assigned provider. It was unclear if that provider was a telepsychiatrist, but the use of a medical assistant in the initial assessment suggested the use of telepsychiatry. One contact occurred at cell front, but the rationale for the nonconfidential contact was not documented.

The patient had a pattern of medication nonadherence that was not timely or appropriately addressed by his providers. Specifically, medication nonadherence was evident from the beginning of April 2024 to late June 2024, and no clinical contacts were documented that addressed the medication nonadherence. The patient had a psychiatric contact on May 14, 2024 when medication nonadherence was attributed to safety concerns with no further follow-up provided. The lack of contact in June 2024 was particularly concerning given documented psychotic symptoms during the previous contact. The psychiatric documentation included multiple typographical errors, and there were inconsistencies in the narrative description,

assessment, and the mental status examination of the patient. For example, on May 14, 2024 the patient was assessed with tangential speech, delusional thinking and with ongoing auditory hallucinations; however, the mental status section did not include that information, nor was it clearly documented in prior psychiatric documentation.

The assigned treatment providers and the patient attended the initial IDTT meeting. The documentation identified the patient's treatment needs as anger and depression with a plan to monitor and to provide psychoeducation; however, measurable treatment goals for those treatment needs were not developed. Further, relapse prevention/substance use and bipolar symptoms that were identified by the psychiatrist were not considered. Documentation stating that the "clinician plans on continuing to monitor anger and depressed mood, in addition to providing psychoeducation and coping strategies" indicated a lack of provider collaboration. Additionally, the lack of measurable goals made it difficult to monitor treatment progress. The IDTT did not identify criteria that indicated that the patient met criteria for higher level of care consideration. The rationale for continued EOP level of care was reasonable.

Overall, the primary clinician documentation was overly brief and indicative of a check-in rather than a meaningful therapeutic contact. The documentation provided a rating of the patient's symptoms of depression and auditory hallucinations on a zero to 10 scale, but a formal mental status examination that included attention to the patient's ADLs was not included. When his symptoms were rated higher than seven, there was no clinical assessment of the need for a higher level of care or consultation with peers, including psychiatry. Nor was psychiatric consultation documented when the patient reported hallucinations between April 2024 and June 2024. There was no utilization of clinical interventions, instead a plan to provide "psychoeducation and coping strategies to IP when willing to meet in a confidential setting" was consistently documented across routine contacts. Most primary clinician contacts occurred in nonconfidential settings without clear assessment of the patient's rationale for refusing a confidential session or provider reasons for not conducting the session confidentially. Lastly, significant events such as a suspected overdose that required outside hospitalization on April 6, 2024, a hospital admission for chest pain between April 1 2024 and April 3, 2024, a broken right hand, and RVRs for fighting were not sufficiently addressed.

No group sessions were documented for May or June 2024. During April 2924, groups were primarily recreational in content.

**Findings**

The care provided to this patient was inadequate.

Treatment planning lacked collaboration and did not sufficiently address the patient's treatment needs. Relatedly, it was unclear how recreational therapy would solely address the patient's treatment needs. The patient was not appropriately monitored by the psychiatrist, and the psychiatric documentation was not clinically useful. The primary clinician contacts did not address the patient's pattern of treatment refusals, significant events, or utilize clinical interventions.

Of note, there was no consultation with medical staff regarding a toxicology assessment to determine if methamphetamine use as a contributing factor to the patient's clinical presentation given his recent MHCB admission and long history of methamphetamine use. A toxicology screen was ordered on May 28, 2024, but results were not located in the healthcare record, and it was unclear if the treatment team was aware of the testing.

**Patient G**

This 49-year-old EOP patient's healthcare record was reviewed to assess the adequacy of care provided at KVSP. The diagnoses provided in EHRS included major depressive disorder, PTSD, and other substance induced psychotic disorder; those diagnoses differed from the assigned psychiatric provider diagnosis of unspecified psychotic disorder. The patient was prescribed Abilify, Remeron, Prozac and prazosin. The patient transferred to KVSP on February 28, 2024 following his only MHCB placement where he was treated for suicidal ideation precipitated by custodial factors and familial stressors.

Between his incarceration in 2006 and EOP placement in 2022, the patient was either not included in the MHSDS or received mental health services at the 3CMS level of care

There was a lack of continuity of care regarding the patient's treatment needs following transfer to KVSP. Specifically, during the MHCB discharge risk assessment, the patient expressed hopelessness regarding transfer to KVSP and made conditional statements of self-harm regarding the transfer. There was no clear documentation regarding discussion of those issues during the five-day follow-up contacts or during provider initial assessments. Relatedly, consultation with the sending institution was not located in the healthcare documentation.

The initial primary clinician assessment included a succinct but useful summary of the patient's mental health history in CDCR; however recent and pre-CDCR mental health history and psychosocial information was not documented. Current symptoms were noted as depression without further details other than rating the depression on a ten-point scale as five of ten.

The documentation was overly brief and relatively unchanged for the two cell front psychiatric contacts that occurred due to institutional factors such as orientation status and institutional lockdown that occurred prior to the initial psychiatric assessment. While not timely, the initial psychiatric assessment included most of the necessary clinical information. In addition to primary clinician identification of depression; anxiety and auditory hallucinations were also targeted as treatment needs. Routine contact documentation included the patient's mental status and medication adjustment in response to symptoms. The patient had intermittent medication nonadherence that began shortly after KVSP transfer and persisted through mid-July 2024. While there was documentation that "risks and expected benefits" were discussed, it was unclear that the patient's prolonged intermittent medication nonadherence was clearly addressed. Of note, no psychiatric contacts were documented during April and June 2024.

Neither provider assessment sufficiently documented the factors that led to the MHCB admission. Other than the safety plan, the patient's recent suicidal ideation was not sufficiently addressed in treatment. Specifically, the patient reported suicidal ideation with intent due to his custody points increasing and worrying about his son. At the time of MHCB discharge, the

patient's outlook regarding his future in CDCR remained negative, and he remained distressed about his son. The underlying factors that led to his MHCB admission remained unchanged, placing him at continued elevated risk of self-harm; however, those treatment needs were not appropriately targeted in treatment. Further, during a follow-up suicide risk assessment, the patient endorsed passive suicidal ideation during the previous month which was not targeted in clinician contacts or communicated to the treating psychiatrist. The patient was assessed with moderate chronic risk which was likely an underestimation of his long-term risk.

The assigned treatment providers attended the initial and routine IDTT meetings. The patient also attended his initial IDTT meeting, but there was no documentation regarding the patient's stated treatment goals despite a documentation prompt for patient input. The documentation indicated a plan to address depression; however, treatment goals for anxiety and depression developed during the MHCB admission in mid-February 2024 were not updated. The patient was continued at the EOP level of care without documented rationale. The patient did not meet the criteria for consideration of referral to a higher level of care.

Most primary clinician contacts occurred at cell front due to refusals which were not sufficiently assessed or addressed. During cell front contacts, the patient's mental status examination and current functioning were documented, but treatment interventions were not documented. During confidential contacts, clinical interventions to assist the patient in managing familial stressors and symptoms were utilized. In contrast to psychiatric documentation of auditory hallucinations, the patient consistently denied auditory hallucinations during the PC contact, and the discrepancy was not addressed.

Recreational therapy was the primary group treatment modality. There was no rationale for group assignment provided in the IDTT documentation.

**Findings**

The care provided to this patient was inadequate.

The patient's elevated risk of self-harm upon placement at KVSP and ongoing risk were not appropriately monitored or targeted in treatment. The initial primary clinician assessment was insufficient, and overall provider care was inadequate. Treatment planning was not updated, and individualized, measurable treatment goals with corresponding treatment interventions were not developed by the KVSP IDTT. Relatedly, the delayed psychiatric assessment impacted treatment planning, as the patient's psychotic symptoms were not considered. The lack of psychiatric and patient input in treatment planning and discrepant mental status assessments by providers was indicative of a poor provider collaboration. Diagnostic clarification with clinical rationale was needed. Lastly, it was unclear how the provision of only recreational therapy groups addressed the patient's treatment needs.

**Patient H**

This 37-year-old EOP patient's healthcare record was reviewed to assess the adequacy of care provided at KVSP. He was provided a diagnosis of schizoaffective disorder; EHRS additionally included a diagnosis of antisocial personality disorder. He was prescribed Abilify, Vistaril and

Invega, and he received his psychotropic medications by a PC 2602 order. The patient transferred to KVSP on December 27, 2023.

In addition to the EOP level of care, the patient had also received mental health services at the MHCB and acute levels of care.

The initial psychiatric assessment did not occur timely and was completed after the initial IDTT meeting; however, the content of the assessment was adequate. The documentation indicated a long history of mental illness including numerous psychiatric hospitalizations and history of a PC 2602 order since 2012. The patient reported a history of depression, paranoia, and ongoing auditory hallucinations. In contrast to the patient's stated goal during the IDTT meeting to decrease delusions, there was no indication of delusional thinking documented in the initial psychiatric assessment.

For reasons that were unclear, the patient was approached at cell front to complete the initial primary clinician assessment. Routine primary clinician documentation was not individualized and was generally unchanged.

The patient and assigned providers attended the initial IDTT meeting. No summary of pertinent clinical information regarding the patient's current or historical treatment needs was documented. The treatment goals included in the clinical summary sections were to increase coping skills to manage mental health distress, to increase interpersonal conflict resolution skills and to reduce delusions and auditory hallucinations; however, there were no measurable treatment goals with clinical interventions developed to support those treatment goals in the designated treatment plan section. Of note, a corresponding clinician note on the same day indicated no evidence of delusions. The IDTT did not identify any higher level of care indicators, and a rationale for continuation at the EOP level of care was not documented. A rationale for recreational group therapy was not included in treatment planning.

Inpatient referral documentation indicated that the patient decompensated and was admitted to the MHCB in mid-February 2024 due to suicidal and homicidal ideation and active manic/psychotic symptoms including threatening others. Consistent with primary clinician documentation, it was noted that the patient had been nonadherent with prescribed Trileptal. It was unclear if the psychiatrist was aware of the patient's medication nonadherence.

**Findings**

The care provided to this patient was inadequate.

The nonconfidential nature and quality of the initial primary clinician assessment and IDTT were insufficient. The delayed initial psychiatric assessment negatively impacted treatment planning which was not collaborative. It was unclear how recreational therapy group assignment addressed the patient's treatment needs. Routine primary clinician documentation needed individualization to assist with provider collaboration and continuity of care. It was unclear if the psychiatrist was aware of the patient's medication nonadherence that occurred prior to decompensation that warranted MHCB admission.

**Patient I**

This 40-year-old EOP patient's healthcare record was reviewed to assess the adequacy of care provided at KVSP. He was provided diagnoses of bipolar I disorder, generalized anxiety disorder, and other or unspecified stimulant use disorder. He was prescribed Trileptal, Vistaril and Risperdal. The patient transferred to the KVSP EOP from an MHCB where he was treated due to suicidal ideation, bizarre behavior, thoughts to harm others and paranoia which he later attributed to substance use

The patient had received mental health services at the 3CMS, EOP and MHCB levels of care.

The initial primary clinician assessment included relevant clinical and psychosocial information. The patient had a long history of mental health treatment that began in childhood, as well as a history of anxiety and depression exacerbated by substance abuse.

The initial psychiatric assessment documentation was insufficient. The provided mental health history was limited, and there were grammatical errors present that impacted documentation review ("…anxious 2/2 family conflict" or "smokes spicy for the last 3 weeks)." Further, assessment/plan for medication was unclear: "change meds to qpm for drowsiness. Pt refuses to change his meds." The documentation in the initial psychiatric assessment attributed the MHCB admission to the patient cutting his wrist; that determination was not located in primary clinician or MHCB discharge documentation. Treatment symptoms included depression, irritability, anxiety, decreased memory and concentration, mood lability and racing thoughts, paranoia and intermittent auditory and visual hallucinations. Routine psychiatric contacts occurred with various providers. Overall, the documentation was brief and focused on the patient's symptoms and functioning which improved since MHCB discharge.

The initial and routine IDTT documentation included a relevant and updated clinical summary. The assigned treatment providers and the patient attended the initial IDTT meeting. The patient's stated goals of reducing anxiety, depression and working on medication adherence were documented. Interventions included CBT, distress tolerance and psychoeducation, and those interventions were utilized during routine primary clinician contacts. No higher level of care indicators were identified by the IDTT. Discharge criteria and barriers to treatment were documented. Of note, documentation of the rationale to continue EOP level of care, which was appropriate, was not included in the designated section but in the clinical summary sections which might not be easily located with clinician changes. The rationale for group assignment that was primarily recreational was not included in IDTT documentation.

**Findings**

The care provided to this patient was adequate.

The patient's mental status improved with psychotropic medication treatment and targeted psychotherapy. The poor quality of the initial psychiatric assessment was outweighed by the sufficient routine care. The documentation of routine primary clinician contacts indicated the provision of meaningful therapeutic contacts and was aligned with treatment planning. It was unclear how recreational therapy groups targeted the patient's treatment needs.

**Patient J**

This 41-year-old EOP patient's healthcare record was reviewed to assess the adequacy of care provided at KVSP. He was provided diagnoses of major depression with psychosis, generalized anxiety disorder and antisocial personality disorder. He was prescribed Prozac, Zyprexa and Vistaril. The patient transferred to KVSP on February 7, 2024 from intermediate care where he was treated for an exacerbation of depressive symptoms and psychosis.

The initial primary clinician assessment included an appropriate review of relevant historical clinical information including psychosocial and mental health history comprised of treatment for anxiety, depression, anger and substance use. The patient's current treatment needs were not clearly documented.

The documentation of the initial psychiatric assessment was of lesser quality. While psychosocial information was included, information regarding the patient's mental health history was limited. The documentation included a narrative of the patient's current clinical presentation that included increased depression and intermittent auditory hallucinations. The documentation of the mental status examination was discrepant, as it was copied from a previous psychiatric contact two weeks prior and was not identified as not current.

The initial IDTT meeting was attended by the assigned treatment providers. The routine IDTT documentation did not include a sufficient summary of the patient's treatment progress since the previous IDTT meeting. The stated treatment goals were to reduce anxiety and depression. Measurable treatment goals that targeted depression and distress tolerance were implemented. Clinical interventions included cognitive-behavior therapy, distress tolerance skills and psychoeducation. The rationale for recreational therapy assignments was not documented. The IDTT did not identify indicators for consideration of higher level of care referral. The rationale for continuation at the EOP level of care was for "monitoring and evaluation" and lacked individualized details.

The psychiatric care was provided by three different providers. The quality of the contacts and continuity of care were areas of concern. During February and March 2024 contacts, the patient made a statement that he believed "people were giants;" however, further information was not documented. That belief was not reflected in the mental status section; and for reasons that were unclear, the patient was assessed with paranoia. The documentation in February 2024 was also .spoke in an angry tone; however, the mental status section described his speech, mood and affect as within normal limits. For reasons that were unclear, safety precautions were reviewed during both contacts, and during the March 5, 2024 contact; a plan for the patient to be seen in seven days was documented, but no psychiatric contact was documented until two months later. A different provider saw the patient in May and June 2024. The documentation provided no reference to paranoia, and the patient's perception of people as giants was not assessed. During both contacts, the patient again reported elevated anxiety and depression; medications changes occurred during May but not in June 2024, and no rationale was provided for the medication changes. During the June 20, 2024 contact, the follow-up plan was unclear, as the psychiatrist agreed to see the patient the following week, but the documentation also noted a plan for follow-up in three to four weeks. Of note, during May 2024, a different provider made medication

changes without seeing the patient that included discontinuation of prazosin and increasing the Zyprexa dosage and changing it to prn administration due to nonadherence.

Across psychiatric providers, the documentation was overly brief, and some of the documentation was unclear. For example, on March 5, 2024, the last psychiatric contact was documented as "213/2023;" although EHRS indicated that the date was February 15, 2024. On June 20, 2024, a different provider documented the following: "He states his appetite is OK, but he's having some trouble sleeping due to this."

The patient was engaged in treatment with the primary clinician who consistently utilized clinical interventions through April 2024. After a new primary clinician was assigned, the contacts consistently occurred at cell front due to refusals and were indicative of wellness checks despite an opportunity for the utilization of clinical interventions. The rationale for refusals and the clinician change were not clearly documented.

**Findings**

The care provided to this patient was inadequate.

The initial assessment documentation did not fully capture relevant clinical information to guide treatment planning that was not individualized. The psychiatric care was insufficient, and the documentation of those contact was of poor quality. The primary clinician contact documentation was variable, ranging from indicative of a therapeutic contact to a brief wellness check in which the patient's clinical needs were not fully addressed. It was unclear how recreational therapy met the patient's treatment needs.

**Patient K**

This 45-year-old EOP patient's healthcare record was reviewed to evaluate the care provided at KVSP. Various psychiatric diagnoses were identified in prior healthcare records including PTSD; major depressive disorder, recurrent episodes, unspecified; antisocial personality disorder; narcissistic personality disorder; borderline personality disorder; and opioid use disorder, severe. The patient was transferred to KVSP EOP on September 1, 2022.

The patient served multiple prior CDCR prison terms, first entering CDCR in March 1998. The patient returned to CDCR for the current term on January 12, 2010 to serve a sentence of life without parole. The healthcare record referenced treatment at various levels of care beginning in 2015, including 3CMS, EOP, MHCB, and intermediate care. His most recent intermediate care hospitalization occurred in July 2022 due to mood instability and danger to self concerns. The documentation also noted a history of violence, five suicide attempts, self-injurious behaviors, and multiple hunger strikes.

At KVSP mental health providers changed the patient's primary diagnosis to major depressive disorder, removed the personality disorder diagnoses, and adjusted his psychotropic medications due to complaints of sedation. The KVSP psychiatrist prescribed bupropion for depression, and the patient was described as generally medication adherent. The patient was also a participant in the ISUDT program and was prescribed buprenorphine-naloxone.

The PC and psychiatrist at KVSP completed the initial assessments timely; although, the initial psychiatric assessment occurred at cell front, as the patient refused a confidential session. The routine psychiatric follow-up appointments did not occur timely. Routine PC contacts and IDTT meetings generally occurred timely; however, documentation issues were identified for both. The case formulation in the initial PC assessment was copied and pasted without indication that it was appropriately reviewed and adopted without the need for change. The patient's chief complaint at that time included depression, suicidal thoughts, and severe mood instability. The suicide and self-harm summary indicated that the patient did not endorse suicidal or homicidal ideation and had no indication of recent self-injurious behavior.

The PC at KVSP had worked with this patient for approximately two and a half years in the EOP which facilitated continuity of care. It was clear that the patient had a good rapport with the PC, and he consistently attended their routine individual sessions. The PC progress notes, however, were generally problematic, as they repeatedly relied on copied and pasted information pulled forward from prior notes which did not allow for the tracking of meaningful progress and response to treatment interventions. Further, the PC progress notes contained inconsistent and inaccurate information. For example, the primary clinician indicated that the patient attended most treatment groups; whereas the IDTT accurately noted that his EOP treatment participation was below 50 percent.

The treatment plans remained insufficient throughout the review period, as they also relied on copied and pasted or pulled forward information, including the clinical summary section which should have provided updates on progress and response to interventions. Unlike the PC documentation, the IDTT documentation did accurately note that the patient was identified on the sustainable process report for participating in less than 50 percent of EOP treatment. The required higher level of care nonreferral rationale indicated that the treatment plan was modified to address the attendance issues. The IDTT documentation further indicated that the patient was included in the SRMP in December 2023.

The KVSP EOP IPOCs targeted anhedonia and depressed mood, but progress was measured solely by the absence of self-injurious behavior and RVRs over an extended period rather than the development of adaptive behaviors and healthy coping strategies. Further, planned interventions were vague, referring very generally to psychodynamic talk therapy during individual encounters. As previously indicated, the PC progress notes also did not allow for determining specific interventions or their effectiveness. Additionally, the treatment plans lacked clear, measurable treatment and discharge objectives, baseline measures, estimated timeframes for goal attainment, and less restrictive levels of care. Also missing was the patient's own input in treatment planning and goal setting.

Regarding group treatment, the patient was not offered the required amount of structured therapeutic activity hours commensurate with the EOP level of care. When groups were offered, the patient generally did not attend, and he remained on the sustainable process list for five consecutive IDTT meetings due his level of participation remaining below 50 percent. It was concerning that, despite providers referencing anxiety as a barrier to group treatment participation; that known obstacle was not directly addressed in treatment planning or individual

sessions to improve the patient's attendance. Further, the IDTT documentation repeatedly acknowledged attendance concerns without appropriately modifying the enhanced care plan sections associated with the positive higher level of care referral indicator for treatment participation; modification was clearly indicated based on the plan's apparent ineffectiveness and the patient's lack of progress.

Of note, during March 2024, the PC did document their interventions to address the patient's hunger strike which he initiated due to frustration regarding property issues. The patient indicated that he planned to remain on the hunger strike until his need was met, and the PC's intervention involved educating the patient about the dangers of a hunger strike. The PC also documented a plan to assess the patient at each clinical contact for safety. The hunger strike lasted from March 13 to March 28, 2024. During a subsequent IDTT meeting on March 20, 2024, no reference was made to the hunger strike, the property related stressor, or the need for treatment plan modifications.

The March 20, 2024 IDTT meeting included all required disciplines; however, a different psychiatrist than the assigned provider was present at the meeting. For the fifth consecutive IDTT meeting, the patient remained on the sustainable process list for participating in less than 50 percent of EOP treatment hours; however, while the team documented their justification for retaining the patient at the EOP level of care, they failed to address the ineffective enhanced care plan which again remained unchanged despite the lack of progress and appropriate focus on the previously identified barrier. Additionally, the IDTT failed to appropriately document progress toward previously established treatment goals, and the patient's own goals remained absent from the care plan.

**Findings**

The care provided to this patient was inadequate.

The patient's treatment needs were not sufficiently addressed, and his own treatment goals were not considered in treatment planning. While the IDTT and primary clinician sessions occurred timely, psychiatric contacts did not. The patient was also not offered the required minimum hours of structured therapeutic activities during the review period. There were also problems with PC and IDTT treatment planning and documentation practices. Clinical documentation contained inconsistencies, an overreliance on copied and pasted information pulled forward from historical notes, and an overall absence of necessary information for determining progress and response to treatment. The treatment goals remained focused on the absence of specific behaviors such as RVRs, and vague interventions were provided rather than enhancing coping skills, socialization, and adaptive/healthy behaviors with relevant interventions. The higher level of care sections of treatment plans suggested that there was an ongoing lack of progress toward addressing the positive higher level of care referral indicator of group treatment attendance below 50 percent for five consecutive IDTT meetings; however, while the level of care decision was justified, the required enhanced care plan lacked necessary modifications to effectively target the patient's anxiety which was a known barrier to group treatment participation.

**Patient L**

This 39-year-old patient's healthcare record was reviewed to assess the quality of care provided at the KVSP EOP. This patient had remained in the KVSP EOP since April 2022.

The patient entered CDCR for his current term in May 2018 and received mental health treatment at all levels of care, including EOP, MHCB, intermediate, and acute care programs. Notably, the patient was also hospitalized at DSH after being deemed incompetent to stand trial in 2017. The healthcare record referenced multiple suicide attempts in the community, as well as at least four suicide attempts and/or self-harm incidents involving hanging, cutting, and overdosing during his time in CDCR.

Prior psychiatric diagnoses included unspecified schizophrenia spectrum and other psychotic disorders, as well as antisocial personality disorder, alcohol abuse, and opioid abuse. Psychotropic medications included olanzapine and haloperidol for psychosis, bupropion for depression, hydroxyzine for anxiety, trazodone for insomnia, and benztropine to address potential medication side effects. While the patient had a seizure disorder and a documented traumatic brain injury, he was assessed as having no developmental delay and was not in need of adaptive support for cognitive deficits.

At KVSP, the initial PC and psychiatric assessments were completed timely. He was provided a diagnosis of schizoaffective disorder, bipolar type, and was prescribed bupropion, olanzapine, and trazodone. The patient was described as generally medication adherent. Concerns noted by the KVSP psychiatrist included anxiety, significant substance use concerns, auditory hallucinations, communication deficits, as well as violence and self-harm risk.

A suicide risk assessment was completed on January 14, 2024, followed by an urgent referral. At that time, the patient was found unresponsive due to a suspected drug overdose. Later, during interview, the patient denied intent to end his life, instead he stated that he was attempting to have fun. That incident was not deemed a suicide attempt, and the evaluating clinician assessed his chronic suicide risk as high based upon his history, and his current suicide acute risk was assessed as low. On May 30, 2024, another SRASHE was completed in response to the patient endorsing suicidal ideation. However, the patient declined to complete the assessment with the crisis clinician, stating that he was not suicidal but desired to speak with his assigned PC urgently regarding command auditory hallucinations. The patient's acute risk was assessed as low, and his chronic risk was assessed as high at that time.

During the review period, the patient's substance abuse issues and other behavioral concerns worsened. He lost his job as a porter, had a serious drug overdose, and received four RVRs between January and April 2024. Three RVRs occurred in March and April 2024; one was for obstructing a peace officer, one for refusing to provide a urine sample, and one for battery on a prisoner. During the RVR mental health assessment, the patient stated that he had been experiencing auditory hallucinations; however, the evaluators determined that the patient's mental illness did not significantly influence the behaviors resulting in the RVRs, and other provider notes suggested that the hallucinations might have been attributable to substance use.

The IDTT convened on three occasions during the review period. While IDTT meetings between February 2024 and August 2024 included all required disciplines, at least two included a covering clinician instead of the assigned PC. Notably, the May 2024 IDTT occurred two weeks late, and the patient did not attend. The September 2022 treatment plan IPOCs targeted auditory hallucinations and anxiety and were last updated in February 2023. The treatment plan included measurable goals and appropriate interventions for the identified targets; however, the plan failed to target critical concerns, including the patient's violence, propensity for self-harm, and potentially lethal substance use. Patient specific groups and medication interventions also were not referenced in the interdisciplinary plan.

Despite documentation suggesting doubts about the accuracy of the psychotic diagnosis, the IDTT continued to retain the provisional diagnosis of unspecified schizophrenia disorder, and there was no documentation that the appropriate diagnostic discussions or other efforts occurred to clarify the diagnosis. Further, despite new presenting problems that included loss of his job, drug overdose, and three recent RVRs that resulted in the patient meeting a criterion for consideration of referral to a higher level of care; the IDTT failed to modify the treatment plan targets and goals accordingly. The IDTT did update the clinical summary, noting medication adherence and treatment participation; however, they did not document whether functional impairments were identified. Regarding the level of care consideration, there was a vague statement indicating that the IDTT would consider lowering the patient's level of care after he demonstrated significant symptom stability for at least six months; and in another section, it was noted that the patient would be considered for discharge after a significant reduction in auditory hallucinations and maintenance of sobriety.

While the patient was eventually screened for inclusion in the ISUDT program on or around June 3, 2024, the IDTT did not refer or coordinate substance abuse services timely.

Routine PC contacts did not occur timely, and the patient was often seen by covering providers, which compromised continuity and quality of care. The documentation indicated that the patient met with his assigned primary clinician on April 4, 2024; subsequently, he was seen intermittently by covering providers who documented inconsistent patient information, interventions, and opinions. Fortunately, a new PC was assigned in August 2024; however, the documentation of therapeutic interventions during individual provider contacts was inadequate.

Psychiatric contacts also did not occur timely. In January 2024, a psychiatrist met with the patient at the cell front in response to a refusal. Although a psychiatric contact occurred in February 2024, the patient was not seen for psychiatric contact during March or May 2024. The sole psychiatric contact in April 2024 was completed by a covering provider at cell front. The psychiatrist met with the patient in June 2024, when the patient's medications were increased. The psychiatrist also noted that the patient received MAT, had ongoing substance use, and recent medication refusals.

The patient was not consistently offered the required EOP structured therapeutic activities. During the review period, the patient attended an average of only five of eight and a half hours of offered structured therapeutic activities weekly. Groups that were attended included leisure activities, coping skills, and stress management.

**Findings**

The care provided to this patient was inadequate.

During the monitoring period, the IDTT meetings, PC contacts, and psychiatric contacts did not occur timely. Offered group treatment hours were inadequate. Continuity of care issues affected consistency and treatment quality; as both the assigned psychiatric and PC providers did not consistently follow up with the patient, and the patient did not have a consistent PC for at least four consecutive months. Treatment plans remained deficient and were not modified in response to worsening substance use and other behavioral concerns, including behaviors that resulted in RVRs and job loss. The provision of therapeutic interventions was not documented during PC contacts. There was a lack of timely coordination of substance use services, and care collaboration was lacking overall due to inconsistent provider coverage. Lastly, diagnostic uncertainties and medication issues were identified but not sufficiently addressed.

**Patient M**

This 49-year-old patient's healthcare record was reviewed to assess the quality of care provided at the KVSP EOP. The patient was provided a diagnosis of major depressive disorder, recurrent episodes, moderate. His symptoms included depressed and anxious mood; he also had a history of multiple suicide attempts with a desire to die, a history of methamphetamine use, and violence. His medical conditions included chronic pain, diabetes, and seizures. He was prescribed fluoxetine and hydroxyzine and was reportedly medication adherent. In addition, the patient was prescribed Keppra for seizures and was prescribed buprenorphine-naloxone to address his substance use. The patient utilized a wheelchair. Following his MHCB discharge, the patient was transferred to the KVSP SNY EOP on April 15, 2022, and subsequently to general population EOP on December 15, 2022.

The patient served multiple CDCR prison terms, first entering CDCR in January 1994. The patient returned to CDCR for his current term on November 20, 2006. He received mental health services at various levels of care beginning in 1997, including 3CMS, EOP, MHCB, and acute levels of care; he also was placed on modified programming in the EOP. The patient's most recent MHCB placement occurred on April 7, 2022, due to feeling distraught, depressed, and suicidal after learning that his daughter was shot in the head during a carjacking while her two-year-old child was in the backseat.

The treatment team met twice during the review period. The quarterly IDTT meeting occurred on February 28, 2024 as scheduled. However, the next quarterly meeting was delayed by almost four weeks and occurred on June 26, 2024. All required disciplines were present at the June IDTT meeting; however, in February 2024, a covering psychiatrist attended instead of the assigned provider, and the patient refused to attend. The treatment plan's clinical summary was carried over from the prior treatment team meeting except for noting that the patient received an RVR for fighting. IPOCs targeting depressed mood were again included; however, progress in treatment was last updated in October 2023. The treatment plan targets lacked measurable goals and appropriate interventions to target additional concerns that included anger, grief, anxiety, and

substance use. The June 26, 2024 treatment summary indicated that the patient was involved in a fight on June 25, 2025; however, that information was not documented at the time of the IDTT meeting. The patient denied involvement in the fight; however, given his RVR on April 9, 2024 for participation in a riot, the IDTT failed to modify the treatment plan targets and goals accordingly. In addition, patient-specific groups and medication interventions also were not referenced in the interdisciplinary plan. Furthermore, barriers to the patient's treatment were not documented, and the criteria for the discharge plan and justification for retaining the patient in the EOP were omitted. Moreover, the treatment plan omitted information pertaining to the patient's DDP designation, preferred learning style, and strengths.

As noted previously, the patient received an RVR for participation in a riot in April 2024. The patient had a suspected overdose after the June 26, 2024 IDTT meeting, and he was seen on June 28, 2024 for a SRASHE. Although the patient refused to participate in the SRASHE, he denied suicidal ideation related to the suspected overdose. His chronic suicide risk was assessed as high, and his acute risk level was assessed as low.

Routine PC contacts did not occur weekly as required; and at times, they occurred at cell front in a nonconfidential setting due to the patient's refusal. In addition, the PC documentation was inadequate; as there were minimal updates to progress notes, including the mental status examination. The documentation also did not consistently address treatment goals, interventions utilized, the patient's response to treatment interventions, and barriers to treatment. Continuity of care was also disrupted, as the patient was seen by three different PCs during the review period.

Routine psychiatric contacts also did not occur timely, as the patient was not seen monthly in February or April 2024. When seen, it was unclear if the sessions occurred in a confidential setting; however, the documentation contained adequate mental status updates, and the patient was continued on his medications without changes.

Notably, the patient consistently missed structured activities that included nursing-led substance use treatment groups, coping skills groups, and stress management groups. Physical therapy was ordered due to recent shoulder surgery; however, he missed multiple physical therapy appointments as well. Although the patient was offered the required number of structured therapeutic activities on average weekly, he only attended an average of six hours weekly.

**Findings**

The care and treatment provided to this patient were inadequate.

During the monitoring period, the IDTT meetings, PC contacts, and psychiatric contacts did not occur timely. Continuity of care issues affected consistency of treatment. Treatment plans remained deficient and were not modified in response to substance use and other behavioral concerns, including behaviors that resulted in an RVR. Clinical documentation consistently omitted the patient's progress toward individualized treatment goals, interventions implemented, the patient's response to treatment, and any barriers to treatment.

**Patient N**

This 49-year-old patient's healthcare record was reviewed to assess the quality of care provided at the KVSP EOP. The patient was provided a diagnosis of schizoaffective disorder, and he received his psychotropic medications by a PC 2602 order after engaging in serious self-injurious behavior in July 2020. Various psychiatric diagnoses were identified in prior healthcare records, including schizoaffective disorder, bipolar disorder, persistent depressive disorder, antisocial disorder, and opioid use disorder, moderate. Psychotropic medications included olanzapine, sertraline, venlafaxine, atomoxetine, finasteride, hydroxyzine, and buspirone. The patient was included in the ISUDT program and was prescribed buprenorphine-naloxone. The patient was medication adherent. The patient transferred to KVSP on July 13, 2021.

The patient first entered CDCR on April 24, 2003. He received mental health services at various levels of care beginning in 2003, including 3CMS, EOP, MHCB, and acute levels of care. The patient's second term began on March 20, 2012, and he was placed in the EOP in May 2012.

The patient had a long history of psychiatric treatment beginning at age 16, including multiple psychiatric hospitalizations in the community and in CDCR for depression and self-injurious behaviors. He also had a history of substance use. His symptoms included paranoia, command auditory hallucinations, and engaging in self-injurious behavior and violence.

During the review period, SRASHEs were conducted on January 16, 2024, and again on April 18, 2024 due to the patient expressing suicidal ideation. The SRASHE referenced the patient's history of 11 instances of self-injurious behaviors without the intent to die while incarcerated. The most recent serious self-injurious behavior occurred on July 22, 2020, after the patient severely cut himself requiring sutures. On January 16, 2024, the patient was seen cell front after refusing to leave his cell for an assessment after expressing suicidal ideation when his power was turned off. When assessed, the patient no longer reported that he was suicidal, as the power was resumed. On April 18, 2024, the patient was also seen by the crisis intervention team after expressing suicidal ideation. During the risk assessment, the patient recanted his statements, stated that he was in severe pain, wanted medical attention, and that he did not know who his assigned PC was, and he wanted to speak to someone. The patient was referred to medical where his concerns were addressed. Notably, the patient's chronic suicide risk was assessed as high, and his acute risk level was assessed as low. A mental health assessment was completed, as the patient received an RVR on February 24, 2024 for battery on a prisoner, but his behavior was deemed not due to mental health illness or developmental disability. In addition, during the PC contact on June 12, 2024, the patient was noted to have a superficial cut on his forearm; however, that incident was not mentioned in the IDTT documentation.

Although an updated IDTT meeting occurred timely on February 14, 2024, the subsequent treatment team meeting did not occur until June 19, 2024. During the February 14, 2024 IDTT meeting, the required participants were present; however, in June 2024, neither of the assigned providers were in attendance. The patient was provided a diagnosis of bipolar I disorder, with consideration of a diagnosis of schizoaffective disorder, bipolar type. No rationale for the

diagnosis was provided, nor was there discussion of symptoms, or resolution of the diagnostic uncertainty.

The treatment plan documented the patient's current level of functioning, participation in groups and individual sessions, and participation in yard and exercise. However, the case formulations were carried forward from prior assessments. IPOCs targeting the patient's depressed mood and self-harming behaviors that were initiated in 2022 were also included but had not been updated since November 7, 2023. Although the treatment plan contained targeted areas of focus that included depression and anxiety with short and long-term measurable goals; the progress towards goals was based primarily on the patient's subjective experience of anxiety and depression. Although the patient's progress was documented, the progress note remained unchanged for each IDTT meeting. Although the patient was present at the June 2024 treatment team meeting, he did not want to make any changes to his treatment plan. Progress toward the patient's targeted symptoms was left unchanged, and the discharge plan and reason for retention at the current level of care were not documented.

The PC contacts occurred timely each week until the end of March 2024; subsequently, the patient did not meet with the assigned PC from March 12, 2024 until April 2, 2024. On April 2, 2024, the patient attended the PC-led group but did not meet with the PC again until April 15, 2024. On that date, the patient was informed that he would be assigned a new PC, as his assigned PC was transferring. The patient was referred to a supervisor for follow-up and was informed on April 23, 2024 that he would be seen bi-weekly. The patient then was seen approximately every other week by a clinician. The patient was seen twice in May 2024 for an urgent PC contact and again on May 29, 2024 when he was seen cell front.

On January 25, 2024, the patient refused to attend his PC 2602 reassessment with the psychiatrist. Although the psychiatrist was present at the February 2024 IDTT meeting, the psychiatrist did not meet again with the patient until April 11, 2024. Again, the patient was seen cell front in a nonconfidential setting, because he refused to attend a confidential session. The patient was provided diagnoses of persistent depressive disorder, ADHD, opioid use disorder, and antisocial personality disorder. The patient was reportedly medication adherent. He was seen again on April 15, 2024 via telepsychiatry by a different psychiatrist, and he was not seen again until June 14, 2024.

During the review period, the patient attended a nursing-led group focused on pain, substance use, and impulse control. He also attended groups facilitated by recreational therapists and his primary clinician that focused on developing coping skills and recreational therapy.

**Findings**

The care provided to this patient was adequate.

Although the PC, psychiatric, and IDTT meetings did not occur timely; the PC 2602 order was timely renewed as was clinically indicated. In addition, although the IDTT carried over information from prior assessments; an updated case summary was included. In addition, measurable goals to target the patient's depression, anxiety, and self-injurious behavior were

included. Continuity of care needed improvement, as the patient saw three different clinicians for individual contacts during the review period. The PC contact documentation tracked the patient's progress toward goals and included meaningful interventions. Although the patient was initially seen weekly by the PC who documented the patient's progress toward goals and utilizing appropriate interventions; the PC was transferred, and the patient was not seen timely. In addition, the assigned PC and psychiatrist were not present for the IDTT meeting in June 2024.

**Patient O**

This 65-year-old healthcare record was reviewed to assess the quality of care provided at the KVSP EOP. Prior psychiatric diagnoses included depressive disorder due to another medical condition with depressive features; depressive disorder due to another medical condition with major depressive-like episodes; intermittent explosive disorder; unspecified anxiety disorder; borderline personality disorder; and antisocial personality disorder. The patient also had dementia with a provisional diagnosis of Parkinson's disease, hyperparathyroidism, and hyperparathyroidism delirium due to another medical condition. The patient was prescribed duloxetine, olanzapine, and hydroxyzine; additionally, he was prescribed carbidopa-levodopa for his Parkinson's disease. The patient was medication adherent. The patient was transferred to KVSP on July 18, 2023.

The patient first entered CDCR in 1982 and served multiple prison terms. He began his current CDCR term in May 2018 and had received mental health treatment at all levels of care. Since October 2019, the patient received mental health services at the EOP level of care due to anxiety, multiple medical concerns, and auditory hallucinations.

The patient arrived at the KVSP CTC medical unit on July 18, 2023; although he could walk with assistance, he utilized a wheelchair. His providers were considering diagnoses of Parkinson's disease versus tremors due to tardive dyskinesia resulting from antipsychotic medication treatment. The patient reported tremors of his hands and weakness in his lower extremities, and he was at risk of falling. The documentation indicated that the patient would be seen in two months for a neurology consultation.

The quarterly IDTT convened timely twice during the review period on December 27, 2023 and March 20, 2024. All required disciplines were in attendance except for a covering psychiatrist. The IDTT noted the patient's medical concerns and intermittent anxiety and depression. IPOCs targeted medical concerns, ADLs, adherence to psychotropic medications, and risk of injuries from falls. The patient's progress was also updated and included observation of the patient walking around the nurse's stations, attending yard, attending to his ADLs with assistance, and remaining medication adherent. During the March 2024 IDTT meeting, targeted areas of anxiety and depression were added with measurable short and long-term goals based on the patient's self-report of anxiety and depression assessed as zero on ten-point scale, but no baseline measures were documented. The interventions were appropriate and included medication management, attending groups, engaging in the treatment, walking around the nursing station, and challenging thoughts. The last safety planning was developed at KVSP on February 10, 2023 when his chronic and acute suicide risk were assessed as low. Notably, the treatment plan case summary was minimally updated, and the case formulation had not been updated since

September 4, 2019, with the last documented review in July 2023. In addition, the discharge planning was vague.

The PC contacts generally occurred timely; however, the PC did not consistently document whether the patient was seen in a confidential setting. This was important, as the documentation stated that the patient was often seen walking around the nursing station, in the yard, or at bedside in the medical unit. The PC documentation also lacked specific discussion regarding the patient's progress toward treatment goals, interventions used, and the patient's response to interventions.

Psychiatric appointments did not occur timely, as the patient was not seen for an individual psychiatric contact in March 2024. In addition, the patient met with an alternate psychiatrist in January, February, and April 2024 and did not meet with his assigned psychiatrist until May 2024. The psychiatric contacts were otherwise adequate.

Notably, on April 19, 2024 and May 26, 2024, the patient was sent to an outside hospital for urgent care after falling. Given his medical conditions and placement in the CTC, he was offered approximately two groups weekly. He generally attended recreational therapy groups related to leisure, positive social interactions, mindfulness, exercise, and yard activities but was not offered the required 10 hours of structured therapeutic activities weekly.

**Findings**

The care and treatment provided to this patient were adequate.

During the review period, the patient's mental health symptoms appeared to have stabilized, and the primary areas of concern were medical. However, the patient was not seen timely, and there was continuity of care concerns, as the patient did not meet with his assigned psychiatrist for most of the contacts. The patient's progress, appropriate targeted areas, measurable goals, and appropriate interventions were noted in the IDTT documentation. Despite adequate care, the documentation needed improvement, specifically regarding the daily progress notes, updated progress toward treatment goals, and discharge planning.

**Patient P**

This 31-year-old EOP patient's healthcare record was reviewed to assess the quality of care provided at KVSP. The patient was provided diagnoses of persistent depressive disorder; adjustment disorder, mixed anxiety and depressed mood; and substance abuse. His symptoms included depression, anxiety, insomnia, agitation, mood instability, and psychosis. The patient had a history of suicide attempts and was identified as a high treatment refuser. He was prescribed olanzapine, mirtazapine, and melatonin, and he was generally medication adherent. The patient arrived at the KVSP EOP on November 28, 2023.

The patient entered CDCR for a second prison term on February 15, 2022. He was not included in the MHSDS until May 4, 2023 when he cut his right forearm with a razor requiring sutures.

He assaulted correctional officers and was referred for MHCB admission. He subsequently was discharged from the MHCB to the EOP level of care, where he remained at the time of review.

Although the initial PC assessment occurred timely on December 5, 2023, the contact occurred in a nonconfidential setting at cell front due to restricted cell movement. Most information included in the assessment was pulled forward from prior assessments and was minimally updated, including information from the May 2023 assessment. On December 5, 2023, the initial psychiatric assessment was completed based on record review; the patient was not present for the assessment due to custody-restricted movement. The psychiatrist provided a diagnosis of persistent depressive disorder. The medications olanzapine, mirtazapine, and melatonin were continued to target symptoms of depression, anxiety, insomnia, agitation, mood instability, and psychosis. However, further diagnostic clarification was needed to discern between diagnoses of substance-induced psychosis and psychotic disorder and to better understand the patient's symptoms given his reported history of substance use.

The assigned psychiatrist's first contact with the patient occurred on December 14, 2023. The patient expressed feelings of anxiety, irritability, and depression. He was provided a diagnosis of persistent depressive disorder; olanzapine and melatonin were continued, but mirtazapine was increased to further target mood symptoms. On January 10, 2024, the psychiatrist saw the patient for a consult and increased the olanzapine dosage.

The initial IDTT meeting occurred on December 6, 2023 without the patient in attendance due to custody reasons. An updated treatment team meeting occurred on January 17, 2024 with the assigned PC, psychiatrist, correctional counselor, senior psychologists, and the patient in attendance. Notably, information was pulled forward directly from the initial treatment team meeting on December 6, 2023 without updates. The failure to update the treatment plan on that date was concerning, as the initial treatment plan was based on a cell front initial PC assessment and was limited to IPOCs pulled forward from a treatment plan developed at another institution during May 2023 that included vague goals for depression and recognized anxiety as a target but offered no measurable goals, interventions, baseline measures, or progress response. In addition, diagnostic clarification was needed. Furthermore, the patient's history of high treatment refusal was not addressed, nor were structured treatment hours included in treatment planning. A safety plan was developed, and the updated justification for maintaining the patient at the EOP level of care was adequate.

Following the IDTT meeting, the psychiatrist met with the patient on January 18, 2024 in a nonconfidential setting at cell front due to the patient's refusal; subsequently, the psychiatrist met with the patient on March 5, 2024. At that visit, the psychiatrist noted that the patient was medication adherent but with continued anxiety, depression and insomnia. Prozac was prescribed, and olanzapine, mirtazapine, and melatonin were continued.

A quarterly treatment team meeting occurred timely on April 10, 2024. The assigned PC, CCI, and the patient were present, but an alternate psychiatrist attended. The patient had been identified as a high treatment refuser since January 22, 2024, but the patient explained that his nonadherence was due to having issues with his cell door not opening for groups. The correctional counselor provided suggestions, and the patient was receptive. Barriers to treatment

were explored, and appropriate interventions to address those barriers were documented. The level of care rationale was adequately justified. An IPOC for anxiety was also included, and the goals included reducing anxiety to a rating of four or below on a ten-point scale as measured by self-report by the next treatment team meeting, tolerating uncomfortable social situations such as groups three times weekly, and learning three positive coping skills. The patient's progress toward the goal of reducing anxiety was updated on December 19, 2023 and January 8, 2024; however, no progress updates were identified in subsequent treatment plans. Despite the patient being identified as a high refuser for groups and individual provider contacts; barriers were not explored, and modified EOP was not considered as a temporary intervention while the IDTT worked with the patient on improving their adherence.

The PC contacts occurred timely each week; however, the contacts typically occurred cell front due to refusal. In addition, the documentation of the contacts was limited. The PC contacts typically were documented via a free text note and included an update of the patient's subjective rating of his depression and anxiety on a ten-point scale and a general description of the topic of discussion. The same generic information was generally included in each note with the plan that included, "This clinician plans on continuing to monitor anxiety, in addition to providing psychoeducation and coping strategies to IP when willing to meet with this clinician in a confidential setting." There were minimal updates to the patient's progress in treatment, the interventions used, and the patient's response to the intervention.

The next contact with the assigned psychiatrist occurred on March 5, 2024, when the Prozac dosage was increased. The patient was not seen monthly by the assigned psychiatrist as required. He was seen by an alternate psychiatrist at the IDTT meeting on April 10, 2024, by telepsychiatry on April 22, 2024, and after three incidents of medication nonadherence on May 8, 2024; he was seen by an alternate psychiatrist.

During the review period, the patient received four RVR mental health assessments beginning March 27, 2024 due to refusing to accept housing and delaying a peace officer. For each assessment, the evaluating clinicians opined that there was no evidence that mental health played a role in the patient's RVRs. Despite the multiple RVRs, the patient was not considered for referral to a higher level of care.

The treatment plan remained unchanged despite an apparent lack of effectiveness, the patient's ongoing lack of treatment participation, and four RVRs within a short period of time. Further, neither the PC nor the psychiatrist considered conducting a clinically indicated IDTT meeting sooner than the required timeframe to discuss consideration of referral to a higher level of care or treatment plan modification to address the patient's ongoing treatment refusals or increased number of RVRs.

**Findings**

The care and treatment provided to this patient were inadequate.

The psychiatric contacts did not occur timely, and there was a lack of psychiatric continuity of care. PC contacts were generally offered timely, but the patient refused to attend confidential

sessions. The PC documentation was generally limited and did not indicate whether planned or clinically indicated interventions were used or reference a response to any implemented interventions. Indicators noting that the patient should be considered for referral to a higher level of care were either not identified timely or not addressed at all. For example, the patient's high treatment refusal rates were not acknowledged in treatment plans until four months after his arrival date. Further, the treatment plan remained unchanged, despite an apparent lack of effectiveness, the patient's ongoing lack of treatment participation, and the patient's four RVRs within a short period. Further, neither the PC nor the psychiatrist considered conducting an IDTT early to discuss treatment participation barriers, higher level of care considerations based on two positive indicators, and necessary treatment plan modification to address the patient's ongoing treatment refusals and increase in RVRs.

**Patient Q**

This 25-year-old patient's healthcare record was reviewed to assess the care provided at the KVSP EOP. He was provided diagnoses of schizophrenia and unspecified anxiety disorder. His primary symptoms included anxiety and depressed mood, as well as auditory hallucinations and nightmares. The patient also had a speech impediment resulting from a gunshot wound to the head. The problem list in EHRS included insertion of foreign objects in his rectum, obesity, as well as opioid, alcohol, methamphetamine, and cannabis abuse. He was prescribed olanzapine and sertraline; although the patient was reportedly adherent with olanzapine, there were intermittent refusals of sertraline beginning in April 2024. He also participated in the ISUDT program. The patient arrived at the KVSP EOP on December 29, 2023

The patient first entered CDCR on May 21, 2018. On June 7, 2018, he was placed in the MHSDS at the 3CMS level of care. His second term began on April 27, 2022, and he received treatment at the 3CMS, EOP, and MHCB levels of care. He was last placed in the MHCB on February 23, 2023 after placement in the ASU where he presented with disorganized speech, and passive suicidal statements; he also had inserted a nine-inch blade into his rectum. When questioned during the RVR assessment, the patient was unable to comprehend why he was being charged as he reasoned, "The weapon is in me and not on me." Upon discharge from the MHCB on March 1, 2023, his chronic and acute suicide risk were assessed as low. Subsequently, the patient was again placed briefly in the MHCB from June 10, 2023 to June 11, 2023, after he made passive suicidal statements that were reportedly motivated by a desire for a cell change.

The assigned PC met with the patient on January 8, 2024 for the initial PC assessment when the patient presented with a history of depression and reported mild to moderate anxiety. The clinical summary and case formulation were primarily pulled forward from previous assessments. The patient was provided diagnoses of schizophrenia and unspecified anxiety disorder; however, there was no documentation of the patient's symptoms to justify the provided diagnoses. The assigned psychiatrist did not meet with the patient timely before the initial IDTT meeting on January 10, 2024; however, they noted that the goals of treatment were to improve the patient's anxiety, depressive symptoms, and psychosis.

The initial IDTT meeting occurred on January 10, 2024; the required participants were in attendance, but the patient refused to attend. IPOCs that were initiated on June 28, 2023 targeted

anxiety with a goal of decreasing the intensity of his symptoms as measured by the patient's self-report by the next IDTT meeting. In addition, the patient was expected to tolerate uncomfortable social situations, such as a group three times weekly, and to maintain his anxiety in remission for three months. The treatment team, however, did not provide baseline measurements for anxiety to track progress or increased severity, and the goal of eventually lowering the level of care was unclear and not measurable. Treatment interventions were generic or unrelated to the target. For example, one intervention focused on "fostering a therapeutic alliance by empathizing with the patient's feelings of distress," and another anxiety intervention indicated that the patient's anxiety reduction would be measured by not receiving an RVR within the next six months. While a goal of not engaging in self-injurious behavior related to mood was present, the IDTT did not focus the interventions on replacement or more adaptive behaviors. The treatment plan also did not include the patient's symptoms to support the provided diagnoses or to target psychosis, impulsivity, violence, or medication adherence. The clinical summary did indicate that anxiety treatment for the next 90 days would focus on increasing insight, distress tolerance, and healthy coping skills. The rationale for maintaining the patient at the EOP level of care was the patient's benefit from EOP-focused counseling and support groups that the patient previously stated helped him to manage his anxiety and other symptoms.

The psychiatrist did not meet timely with the patient, and the psychiatrist only saw the patient on three occasions during a five-month period, except at the IDTT meetings. The patient was not seen for psychiatric contacts during April or May 2024. The assigned psychiatrist first met with the patient after the IDTT meeting on January 12, 2024 for a routine visit and to discuss medication nonadherence. According to the documentation, the patient evidenced no significant depressive, manic, or psychotic symptoms, or danger to self or others. Vistaril was prescribed for insomnia and anxiety, and Zyprexa and Zoloft were continued. The patient was next seen on February 29, 2024 for routine psychiatric follow-up and to address his medication nonadherence. The patient reported hearing voices and requested a prescription for Seroquel; however, no medication changes were made. On April 26, 2024, the patient stated that he had not heard voices for the past several months, and he denied problems with his mood symptoms, psychotic symptoms or anxiety.

The patient was generally seen timely for PC contacts during the review period. Most of the weekly contacts with the primary clinician occurred in a nonconfidential setting; and it appeared that the cell-front contacts occurred due to lockdowns, the patient not receiving a ducat or refusing for various reasons. The documentation included in PC progress notes was often information copied from the prior note, making it difficult to determine whether progress toward the goals had occurred. The treatment notes were minimally updated during each session; the plan and disposition section of each note included a statement that the patient would "remain in EOP LOC and would be assessed each clinical contact for safety, mood changes, danger to self and danger to others, and signs of mental health decompensation." The PC wrote a long explanation of planned interventions and goals for addressing numerous symptoms and behaviors; however, the list was too long for one contact, and the list was copied and pasted in every note without specifying the focus of each session and the patient's response to one or more of the interventions used, if used at all.

The PC documented that the patient was eventually enrolled in GED education groups and was on the wait list for a porter job. He reportedly socialized with other incarcerated persons in the day room and had a good relationship with his cellmate. Despite the patient reporting to the PC that he often missed groups due to not receiving ducats, the documentation did not indicate that communications occurred with custody to verify or to address that reported barrier to treatment that was also reported by other patients.

On February 28, 2024, a SRASHE was completed as one of the 90-day post inpatient discharge required SRASHEs. The patient participated in the assessment and denied suicidal and self-injurious thoughts, intent, or plan. His chronic risk was assessed as moderate, and his acute risk level was assessed as low. The rationale for the low acute risk rating was based on the patient not endorsing suicidal or homicidal ideation. A subsequent 90-day follow-up SRASHE occurred on May 22, 2024, when the patient denied suicidal ideation and had no indication of recent self-injurious behavior. He was again assessed with moderate chronic and low acute suicide risk.

At the next IDTT meeting on April 3, 2024, all required participants attended including the patient. The treatment plan was copied unchanged from the initial treatment plan. The treatment plan included anxiety as the target symptom, but the goals remained generalized and not individualized, and the interventions were inadequate. Progress towards goals and adjustments were not included or addressed. Barriers to patient participation in structured treatment activities were also not documented.

The patient received several RVRs for battery on a peace officer and fighting. On March 13, 2024, he also received an RVR for obstructing a peace officer; and according to a PC note dated May 1, 2024, he received an RVR for refusing to leave an area when directed to do so.

During the review period, the patient attended approximately 38 percent of his therapeutic structured activities weekly. The patient primarily attributed his nonattendance to not receiving ducats; however, collateral information indicated that patient refused to attend. At the April 2024 IDTT meeting, it was noted that the patient met the criteria for consideration of referral to a higher level of care. The rationale for not referring the patient to a higher level of care was adequate and reasoned that 60 days would be appropriate to monitor the patient’s progress. In addition, the patient's refusal of scheduled EOP activities was addressed with appropriate interventions. It was noted that the patient had not attended scheduled group sessions. The patient attributed his lack of group attendance to his depression related to unexpected deaths in his family but stated that he was feeling better, and appropriate interventions were added.

**Findings**

The care and treatment provided to this patient were inadequate.

While the IDTT meetings occurred timely with the necessary staff in attendance, and the patient did not appear to require a higher level of care; several concerns were identified. Symptoms justifying the patient’s diagnosis of schizophrenia were not documented, nor were related interventions included in treatment plans. There was a need for diagnostic clarification to determine whether the patient had a psychotic disorder; however, there was not documentation

indicating that the issue was discussed during IDTT meetings. Treatment targets that were documented in treatment plans had corresponding goals that lacked specific individualized interventions, and the PC did not document specific interventions implemented or the patient's responses during their routine encounters. Although the PC and psychiatric contacts generally occurred timely, several PC sessions occurred at cell front, at times due to reported custody issues such as not receiving a ducat or not being released from the cell for scheduled appointments and medication. Although custody indicated that the patient refused appointments, and the patient's treatment attendance was addressed at the IDTT meetings with appropriate interventions; the patient continued to meet the criteria for consideration of referral to a higher level of care, and he did not receive the required number of structured treatment activities.

**Patient R**

This 57-year-old patient's healthcare record was reviewed to assess the quality of care provided at the KVSP EOP. He was provided diagnoses of bipolar I disorder, most recent or current episode depressed, moderate, and opioid use disorder. His primary symptoms included depression, anxiety, anger, self-injurious behaviors, racing thoughts, rapid speech, and sleep disturbances. He was prescribed lithium and mirtazapine with medication adherence. He was previously included in the ISUDT, but he left the program in December 2023. The patient transferred to the KVSP EOP on October 20, 2021; due to medical concerns, his housing alternated between the KVSP EOP, outside hospitals, and placement in the KVSP CTC. His last KVSP CTC placement occurred on September 4, 2023.

The patient served multiple CDCR prison terms and entered CDCR for his current term on December 29, 2005. He had received mental health services at all levels of care.

The patient's mental health history included physical, emotional, and sexual abuse; substance use; violence; and suicidal and self-injurious behaviors. His history was also significant for medical concerns and multiple falls due to ataxia. He had an endovascular coil embolization basilar artery aneurysm in May 2017.

As a result of his numerous transfers, the patient had 14 initial PC assessments, of which four occurred at KVSP. The most recent initial PC assessment occurred on September 8, 2023. At the time, the patient had returned from an outside hospital due to falls and injuries; the patient had recently broke nine ribs requiring surgery. At the initial PC assessment on September 8, 2023, the patient refused to leave his cell, but he was seen cell front and participated in the assessment. At the time, he reported having medical issues and feeling depressed most of the time. He also reported having anger problems and insomnia.

The EOP PC routine contacts in the CTC generally occurred weekly and were timely. It appeared that the patient was also seen by alternate clinicians on several occasions, and then met with a newly assigned PC beginning on April 23, 2024. At times, he was seen at cell front due to unavailable custody escorts. Although the progress notes suggested that some therapeutic contacts focused on the patient's depression, guilt, and shame regarding his crime with appropriate interventions provided; stressors related to his CTC confinement, physical pain, and functional limitations remained unaddressed.

The patient was reportedly medication adherent during the review period. The psychiatrist reviewed the treatment plan on January 10, 2024 and again on April 10, 2024, during the treatment team meetings. The psychiatric contacts occurred timely during the review period. The psychiatric notes indicated that the patient was engaged during the sessions and actively participated. Several contacts occurred at the patient's bedside in a confidential setting due to the patient's placement in the CTC. On March 7, 2024, the patient requested to modify his Remeron dose to prn administration, and the dosing was changed by the psychiatrist. Subsequently on March 11, 2024, he was seen by his assigned PC when he exhibited signs and symptoms of mania. The following day, the patient was seen by a psychiatrist, and the psychotropic medications were adjusted. On March 23, 2024, the psychiatric provider discontinued escitalopram.

On January 4, 2024, the patient was seen by the PC when he presented with fatigue and low energy but reported feeling okay. His cell was described as messy and cluttered. The documentation indicated that the patient's legs were bleeding, and he complained of itchiness; the nurse consulted with a medical doctor regarding the medical concern.

An initial IDTT meeting did not occur timely on January 10, 2024. All required attendees were present, except an alternate psychiatrist attended. The treatment plan did not contain mental health targets or goals. Instead, IPOCs were pulled forward from September 2023 and were limited to nursing targets of physical pain, remaining free from injury, nutrition, and discharge planning. Significant barriers to EOP treatment participation included the patient's CTC placement, frequent reliance on a wheelchair for ambulation, and significant medical issues that resulted in functional impairments in multiple areas; however, the treatment plan was not individualized for the patient's current stressors and barriers to full EOP treatment access. This was especially concerning, as the patient stated that he wanted more treatment and perceived that his providers were failing to meet his needs.

During the January 10, 2024 IDTT meeting, the patient reportedly aggressively questioned why his annual examination had not been completed. He also discussed his level of care and reported that he had issues of anger, depression, and impulsiveness. The patient's verbalized treatment goal was documented as "I don't feel like I am getting the same support that I was getting in the yard." During the IDTT meeting, the patient reportedly interrupted the PC, referring to the provider as a liar. Due to the patient's behavior, the meeting ended prematurely. The IDTT then determined that based on the patient's statements about the inadequacy of care, he may have reached maximum therapeutic benefit. Further, despite the patient's concerning presentation, the IDTT documentation indicated that there were "No signs or sxs of distress noted at this time." The discharge plan was also vague and stated that the patient would be retained at the EOP level of care; however, they would begin working toward placement at the 3CMS level of care. Despite the patient's barriers to structured treatment hours such as his medical issues requiring outside hospitalization or being confined to the infirmary, the patient was not placed on EOP modified programming.

Further, during PC contacts there was no evidence of implementation of treatment interventions, which further suggested that they were pulled forward without intention to continue the intervention of DBT.

The follow-up IDTT meeting occurred timely on April 10, 2024, and all required participants except for the assigned PC were present. During the meeting, the patient stated that he felt neglected as he felt that he was unable to express himself at the prior IDTT meeting. The patient also continued to report depression, loneliness, and increased medical concerns that impacted his functioning.

Mental health providers appropriately updated the IPOCs and targeted depression with a short-term goal of reducing the patient's rating of depression. The intervention plan included increasing talk therapy, processing negative emotions, and enhancing the patient's perceived support. In addition, the goals of treatment included continuing to increase the patient's self-expression of negative emotions and positive self-talk, as well as helping the patient to process loneliness and the drivers of his depression. The rationale for continuation at the EOP level of care, however, was vague; the rationale merely stated that the patient would remain in the EOP, as it appeared appropriate.

The patient was only offered an average of 1.66 hours of weekly structured treatment activities in the CTC.

**Findings**

The care provided to this patient was inadequate**.**

The initial EOP treatment plan contained only nursing IPOCs pulled forward from September 2023. Mental health IPOCs were not added to the treatment plan until several months later in April 2024. While PC and psychiatric progress notes suggested some meaningful interventions were offered during individual encounters; the PC continuity of care was poor, and mental health interventions ignored the patient's pain and other medical conditions that were prominent and served as barriers to full EOP treatment access which the patient desired. The IDTT clinical documentation contained vague statements about the level of care as well as inconsistent information regarding the patient's presentation. Further, providers did not document enhanced interventions in lieu of EOP treatment hours that were not offered in the CTC, and the patient was not considered for modified EOP programming.

**Patient S**

This 40-year-old EOP patient's healthcare record was reviewed to assess the quality of care provided at KVSP. The patient was provided diagnoses of PTSD, factitious disorder, histrionic personality disorder, narcissistic personality disorder, and antisocial personality disorder. He also reportedly had a history of conversion disorder and feigning symptoms, such as reporting multiple neurological deficits that were inconsistent and in contrast with staff observation and medical evidence. The patient was prescribed Abilify, Vistaril, Lexapro, melatonin, Prazosin,

and Remeron, with medication adherence. The patient utilized hearing aids and a wheelchair for ambulation. The patient arrived at the KVSP EOP on August 24, 2023.

The patient arrived at CDCR on June 15, 2017 to serve his first CDCR prison term of life without parole. Shortly thereafter on July 27, 2017, he was placed in the MHSDS at the 3CMS level of care. He had since received mental health services at all levels of care. Notably, he had multiple MHCB placements due to danger to self, gravely disability, and suicidal ideation. The most recent PIP hospitalization occurred due to grave disability on April 2, 2019. The patient remained at the EOP level of care since the PIP discharge.

Notably on May 8, 2024, the patient was placed in the CTC at the EOP level of care after an outside hospitalization for a reported seizure and fall that he claimed resulted in paraplegia.

At the time of the November 2023 IDTT meeting, the IDTT indicated that the patient met the criteria for consideration of referral to a higher level of care due to participating in less than 50 percent of treatment hours. The nonreferral rationale, however, was vague, and interventions in lieu of treatment hours offered or to address barriers were not provided.

Subsequent routine psychiatric contacts did not occur timely, and the assigned psychiatrist had not met with the patient for a routine contact in more than four months. Further, the documentation for each contact was minimally updated. On February 23, 2024, the patient reported hearing voices with poor sleep, and his medications were adjusted.

The patient met with his assigned PC initially on January 3, 2024, and it was noted that he was seen in a nonconfidential setting due to custody issues. The subsequent PC contacts generally occurred timely but were intermittently nonconfidential, occurring at cell front. The PC contacts generally addressed current issues and provided appropriate interventions to address the patient's mental health concerns. The patient was described as cooperative but agitated. He continued to report concerns with medical staff; however, according to the PC, the patient did not want to address his mental health issues or concerns.

Of note, all PC documentation of cell front contacts contained the same copied and pasted statement indicating, "This writer was unable to address treatment goals/progress or provide specific MH treatment interventions as outlined in the MH treatment plan due to the Pt. declining/or being unable to attend his weekly PC appointment. However, data sources indicate overall positive adaptive functioning and no worsening in mental health symptoms." That generalized statement was clearly inadequate, and it was unclear from the documentation if the patient refused or was unable to attend a confidential session. Further, no interventions or plans for addressing either barrier were documented.

Regarding the initial treatment plan, the disposition plan section of the treatment plan contained more information; however, that plan was also vague. For example, the section indicated that the patient would maintain a low level of anxiety and continue to attend groups and routine weekly contacts and improve coping skills by continuing to address treatment plan goals.

The quarterly IDTT meeting occurred on February 21, 2024; all required participants were present as well as a senior psychologist, psychology technician, and a recreational therapist. A diagnostic clarification discussion was indicated but did not occur at the meeting. The treatment plan remained nonspecific and was not individualized; for example, it referenced weekly contacts to provide the patient "with coping tools and continued support to manage unstable mood." The patient reported that anxiety remained problematic, as he experienced continued agitation and irritability with nightmares. The clinical summary was pulled forward from July 2023. IPOCs for irritability initiated on September 6, 2023 were included with the goal of the patient participating in group activity without irritability four times weekly for one month and participation in group activities without acting out with irritability three times weekly. The duration and baseline measurements for those goals were not included, and progress toward goals was not updated. Notably, the patient began attending groups more frequently and was no longer identified as a high treatment refuser.

The patient occasionally participated in groups, including two nursing-led groups regarding wellness; however, he attended only an average of 3.66 hours of offered structured weekly treatment activities. Notably, the patient was enrolled in a veterans group, which he typically attended.

On April 28, 2024, the patient had a seizure and was taken to an outside hospital twice. He ultimately returned on May 8, 2024 and was placed in the KVSP CTC at the EOP level of care. In the CTC, the patient was seen for an initial assessment by a newly assigned PC on May 16, 2024. The PC noted that the patient reported no sensation in his extremities, and he had undergone an extensive medical workup; however, none of the studies revealed any abnormalities. There was also documentation of inconsistencies in the patient's report of inability to use his extremities.

The patient was also seen by psychiatry for emergent consults following his return from the hospital after reportedly having a seizure and falling on April 28, 2024. He was seen by his inpatient psychiatrist on May 9, 2024, who provided a diagnosis of major depressive disorder with psychotic features.

On May 16, 2024, an initial CTC EOP IDTT meeting occurred at bedside. Although the assigned PC attended the meeting, an alternate psychiatrist was present. A CCI, supervising psychologist, and RN were also present at the meeting as well as the patient. Regarding the treatment plan, the chief complaint was omitted from the assessment, but the clinical summary section indicated that the patient wanted to participate in mental health treatment and rehabilitation with the occupational therapist. The patient's history of mental illness was well documented. The clinical formulation, however, was carried forward from 2022 and was not updated. The treatment plan omitted the patient's strengths, IPOCs, treatment goals, and interventions. The patient did not have access to required EOP treatment, and treatment plans in the CTC did not consider alternative structured activities in lieu of the lack of offered group hours.

**Findings**

The care provided to this patient was inadequate.

Psychiatric follow-up contacts did not occur timely, with four months between contacts in the outpatient setting. Further, diagnostic clarification did not occur timely, and treatment plans were not clinically useful. Treatment interventions were not included in the initial treatment plans, and the CTC EOP treatment plan completely omitted information regarding strengths, IPOCs, treatment goals, and interventions. While some progress notes suggested meaningful interventions, several PC progress notes contained inappropriate copied and pasted language that did not clarify the reason for the cell front encounter or the intervention to address the treatment barrier. The patient was not provided the required structured therapeutic activities, and the CTC IDTT failed to document alternative activities in lieu of the provision of ten hours of treatment.

**Patient T**

This 55-year-old patient's healthcare record was reviewed to assess the quality of care provided at the KVSP EOP. The patient was provided diagnoses of bipolar II disorder, PTSD, schizoaffective disorder, and antisocial personality disorder. His primary symptoms included irritability, anger, depression, anxiety, insomnia, suicidal ideation, paranoia, and auditory hallucinations. The patient also had a documented history of sexual abuse, substance abuse, self-injurious behavior, suicide attempts, and violence toward others. An active PC 2602 order was in place that was renewed on June 18, 2024 due to psychosis with danger to self and others. He was prescribed Invega, bupropion, and diphenhydramine, and he was reportedly medication adherent.

The most recent SRASHE on September 20, 2023 assessed the patient with moderate chronic and low acute suicide risk. The patient had four prior suicide attempts, one of which was documented as a serious attempt in 2016 by hanging. Multiple incidents of self-injurious behavior without intent to die were also documented.

The initial PC assessment occurred timely but was conducted in a nonconfidential setting at the cell front, and the documentation for that contact was brief. The PC noted the patient's history of mood instability, psychosis, PTSD, and the current involuntary medication order. Notably, the patient was identified as a high treatment refuser. The patient informed the PC that his depression and medication issues were barriers to out-of-cell treatment participation. A psychiatrist attempted to meet with the patient on December 28, 2023 for the initial psychiatric assessment but documented that custodial issues prevented completion of the in-person assessment. The psychiatric assessment was ultimately completed after the initial IDTT meeting on January 5, 2024.

Regarding routine individual encounters, PC contacts were not completed timely. A new PC was assigned during January 2024, and that provider offered individual patient contacts only twice monthly. While the patient was assigned to a PC caseload group every other week, he did not attend, requiring weekly PC contacts that did not occur. The PC progress notes did not reference

progress toward treatment goals, and the notes suggested lack of continuity of care, as the patient met with several PCs during the course of five months.

The psychiatrist provided the patient with a diagnosis of schizoaffective disorder while suggesting diagnostic uncertainty and noting that further consideration was indicated. The psychiatrist adjusted the patient's medications to address symptoms of depression, including insomnia and depressed mood. The psychiatrist continued to prescribe Invega to target the patient's psychosis and mood stabilization. Several psychiatric contacts occurred at the cell front, and the patient reportedly refused psychiatric contacts during March and April 2024.

The initial IDTT meeting occurred timely on December 27, 2023, and all required disciplines were present, but the patient reportedly could not attend due to custody restrictions. The treatment plan included targets carried forward from August 2023 which focused on depressed mood. Within the clinical summary, there were measurable treatment goals and interventions for depression, irritability, suicidal ideation, self-injurious behavior, delusions, agitation, anger, and activities of daily living. The listed interventions included CBT, coping skills, DBT, and interpersonal skills. However, the patient's high treatment refusal was not addressed in the treatment plan, a higher level of care nonreferral rationale was not documented, and the level of care rationale section did not include realistic goals for considering a lower level of care. For example, it required the patient to participate in 100 percent of treatment activities for an unspecified period.

Due to a scheduling error, a subsequent IDTT meeting occurred on January 3, 2024. All required attendees were present, including the patient. The patient actively participated in the treatment planning process, and the IDTT noted that he was working on a distress tolerance workbook. The SRMP note indicated that custodial barriers prevented the patient from participating in groups and individual clinical contacts; however, those barriers were not specified. The IDTT also indicated that the patient was unable to attend individual PC contacts due to custodial issues. Progress toward goals was not discussed on that date, goals and interventions were not modified, and the case formulation remained generic having been copied and pasted from a prior assessment. Additionally, the IDTT again did not acknowledge that the patient met the criteria for consideration of referral to a higher level of care due to low treatment participation, did not document a rationale for retaining the patient at the current level of care, and failed to develop a plan for addressing ongoing barriers to treatment participation.

On April 3, 2024, the treatment team convened and updated the treatment plan. All required attendees were present. The IDTT acknowledged that the patient participated in fewer than the required minimum hours of structured therapeutic activities and demonstrated minimal progress overall. The treatment team attributed the patient's lack of progress to a recent injury rather than to custodial barriers. It was also noted that the patient had requested more indoor groups and fewer gym groups due to a physical injury for which he was receiving physical therapy. The treatment plan was modified in response to his physical injury. Although the patient made statements suggesting increased depression and an overall lack of progress, the IDTT did not modify their interventions but instead focused on the patient's need to increase their treatment participation and engagement in out-of-cell activities. Unfortunately, it remained unclear whether more recent barriers to treatment participation were related to custodial issues, physical

limitations, depression, or other factors. The IDTT should have explored those barriers with the patient and revised their interventions accordingly.

**Findings**

The care provided to this patient was inadequate.

Notably, a consistent issue identified in the EOP reviews at KVSP was the presence of custodial barriers to treatment; however, providers did not document the specific custodial barrier or indicate whether they communicated the issue to mental health and custody leadership for intervention and guidance. Despite the patient's lack of attendance in PC EOP caseload groups every other week, the PC failed to follow up individually with the patient as required, resulting in only two PC contacts offered monthly. The patient also was not offered the required minimum hours for EOP structured therapeutic activities during the review period. Additionally, PC care continuity and documentation concerns were identified.

Regarding treatment planning, the treatment team did not sufficiently address the patient's high refusal rate or barriers to attendance, higher level of care nonreferral rationales were not documented, enhanced plans in lieu of higher level of care referrals were not developed when indicated, level of care retention rationales remained insufficient, and goals for lowering the patient's level of care were unrealistic and incomplete. Further, the psychiatrist's diagnostic uncertainty remained unresolved without IDTT discussion or referral for evaluation and psychological testing for diagnostic clarification. At the time of the April 2024 IDTT meeting, instead of modifying treatment goals in response to lack of effectiveness and recent barriers; the IDTT placed the responsibility on the patient to attend more activities without exploring the underlying factors contributing to treatment nonadherence and worsening symptom severity.

**Patient U**

This 32-year-old male patient's case was reviewed to asses the quality of care being provided within the EOP at KVSP. The patient was diagnosed with schizoaffective disorder, bipolar type. During the review period, the patient was not consistently adherent to his prescribed lithium and olanzapine. He was also prescribed buprenorphine-naloxone. Following release from the EOP RHU at CSP/Corcoran on March 25, 2024, the patient was transferred to KVSP's EOP.

This patient was incarcerated since April 2000, was placed at the 3CMS level of care from October 2015 to November 2016, but otherwise was not provided treatment within the MHSDS until October of 2022. Since that time, the patient received treatment at the 3CMS, EOP, and MHCB levels of care. He was last discharged from an MHCB on July 31, 2023 to the EOP level of care. Other than a rescinded MHCB referral on December 9, 2023, the patient remained at the EOP level of care since that time.

On April 2, 2024, a telepsychiatrist documented that the patient could not be seen for initial assessment due to a yard lockdown and instead completed a cell front wellness check.

The initial IDTT took place on April 3, 2024, with all required attendees, including the patient despite the psychiatrist and PC not completing any initial assessments and the PC having no prior encounters with the patient. The IDTT documentation confirmed the presence of all required attendees, along with a supervising psychiatric technician, a licensed psychologist, an unlicensed psychologist, a licensed clinical social worker, and a medical assistant who supported the patient's assigned telepsychiatrist.

The clinical summary indicated that the patient experienced no self-harm incidents, MHCB admissions, or RVRs within the previous 90 days and that he complied with his medications. The documentation noted that the IDTT agreed to retain the patient at the EOP level of care but failed to provide any clinical rationale for this decision. The staff assessed the patient for suitability for KOP medications and found no contraindications. Although the documentation reflected the patient's interest in decreasing depressive symptoms, it lacked any treatment plans, goals, or interventions. Furthermore, the documentation did not include any information on the patient's strengths, functional impairments or criteria for discharge to a less restrictive level of care.

An initial PC assessment was completed the following day at cell front by the patient's assigned PC. However, the entire document was blank, except for the clinical summary section. No mental status examination or review of the patient's history was completed. The clinical summary section noted that the patient was not comfortable completing the assessment at cell front, yet no rationale was provided for failing to offer the patient a confidential contact. All information was pulled forward from previous assessments without any updates. An initial psychiatric assessment was completed via telepsychiatry on April 5, 2024. The assessment was basic and marginally adequate, comprised mostly of documentation from individual contacts with the patient over the course of the previous eight months without synthesis or a comprehensive formulation of the case. The patient had no other psychiatric contacts during the review period.

The patient was offered required weekly routine PC contacts through individual encounters, except for one week when the patient was offered a group session instead. Documentation of individual contacts appeared to rely on a template with similar, if not exact, language being used across all notes. Critical information was absent in PC progress notes, including the patient's treatment goals, the use of clinical interventions, the patient's response to treatment, and the patient's level of functioning. On May 23, 2024, the patient was seen by his PC for an urgent consult after an uncle, who was prominent in the patient's life, had died by suicide. The patient was seen again the following day and documentation referenced use of appropriate interventions for addressing grief.

A sufficient number of recreational therapy groups and nursing led treatment groups (NLTGs) were noted as having been offered to the patient during the review period. He appeared to attend occasionally. He was also offered PC caseload groups on two occasions but attended only one during the review period.

The patient was transferred to another facility on May 31, 2024.

**Findings**

The EOP care provided to this patient was inadequate.

No initial assessments were completed with the patient prior to his initial IDTT, and the IDTT documentation failed to reference treatment plans, interventions, and an adequate summary or formulation of the patient's case. The initial assessments completed after the IDTT were also inadequate. While the patient was offered weekly PC contacts, the clinical documentation was missing critical information, including identified mental health needs, the patient's response to treatment, and references to implemented interventions during clinical encounters except for one completed contact which occurred in response to a specific referral request following a family member's death by suicide. Routine psychiatric contacts did not occur as required despite records indicating the patient had been medication nonadherent. While the patient was offered a sufficient number of groups, they were mostly recreational groups and NLTGs which did not meet the patient's needs. For example, he was assigned to a diabetes group despite not being diagnosed with diabetes.

**Patient V**

This 48-year-old patient's case was reviewed to assess of the quality of care provided in the EOP at KVSP. The patient was provided with diagnoses of schizoaffective disorder, bipolar type; antisocial personality disorder; and attention deficit hyperactivity disorder, combined presentation. He was prescribed intramuscular paliperidone to which he was fully adherent. He was also prescribed buspirone during the reporting period but was not adherent and it was ultimately discontinued. Hydroxyzine and olanzapine were prescribed as needed and the patient had an active prescription for buprenorphine-naloxone to address his substance use. After being released from the EOP RHU at CSP/Corcoran on March 18, 2024, the patient was transferred to KVSP's EOP.

This patient was incarcerated within CDCR on a number of occasions, with his most recent period of incarceration beginning in December 2016. Since that time, the patient has been treated at the EOP, MHCB, ICF, and APP levels of care, including placement at Atascadero State Hospital. The patient was briefly placed at the 3CMS level of care on two occasions in the past eight years, with neither episode lasting more than two weeks. He was most recently placed at the APP level of care from July 2022 to February 2023 and discharged to the EOP level of care. He returned to the MHCB in May 2023 and was discharged to the EOP level of care on June 5, 2023 where he has remained since.

On March 26, 2024 the patient was seen at cell front by a psychiatrist after refusing his appointment. A progress note was entered into the chart, but an initial assessment was not completed. The patient was seen for his initial IDTT the following day, without having had an initial PC or psychiatric assessment. There was also no psychiatry medication review completed for the IDTT. The patient and all required staff attended the IDTT

The IDTT referenced the patient's high treatment refusal rates at the prior institution, and documented an adequate plan for addressing this issue. While the clinical summary was generally adequate, there was no documentation of patient strengths, patient goals, or complete treatment planning. Instead, the IDTT adopted a vague statement that the patient's self-harm and anxiety would be "monitored" and coping skills would be offered. The rationale for retaining the patient at the EOP level of care was adequate; however, there was no documentation of discharge criteria.

The patient was seen for a routine PC contact and completion of a follow-up SRASHE on April 4, 2024. The contact was held in the yard with no documented rationale for the lack of confidentiality. The PC progress note evidenced no interventions during the encounter. A psychiatric contact was completed the same day, and documentation was adequate, with medications being adjusted to address the patient's reported symptoms. On April 11, 2024, an initial psychiatric assessment was completed by a psychiatrist who was not assigned to the patient; however, the documentation was adequate. Another initial psychiatric assessment was completed by a different psychiatrist on April 25, 2024 who added medication to address the patient's anxiety. There was no rationale provided for the use of the initial assessment form, but the documentation was adequate. On May 9, 2024, a psychiatrist who had never seen the patient discontinued the newly ordered medication secondary to the patient's non-adherence and documented that the patient would be seen again in seven days. The patient was not seen by a psychiatrist again during the remainder of the review period, including for the required routine monthly EOP contact.

On May 6, 2024, nursing documentation noted that there was a use of force against the patient following an altercation with another patient. This incident was not noted by the patient's PC who saw the patient on May 9, 2024. The PC noted that the patient was agitated and made veiled statement of suicidal ideation, yet no interventions were documented beyond instructing the patient to submit a request to be seen if these thoughts were overwhelming. The PC noted that the patient had an upcoming court date on May 10, 2024, yet on May 13, 2024 when the patient was seen again by the PC, documentation was largely unchanged, noting that the patient was still anxious about his upcoming court hearing. On May 20, 2024, the patient admitted to engaging in self-injurious behavior to manage his anxiety about his pending court date; however, no interventions were documented, no self-harm PowerForm was completed, and the patient was inappropriately asked to complete a request slip if his thoughts of suicide worsened. On May 30, 2024, PC documentation again reference self-harm; however, it was unclear whether the note referenced a new incident of self-harm or copied information from a prior note. During this encounter, the patient reported feeling abandoned by his family which provided further evidence of increased suicide risk, yet no formal suicide risk assessment was completed, no interventions were provided to the patient, and no PowerForm for the self-harm incident was documented. Further, the documented rationale for not considering a referral to a higher level of care was inadequate, as it only indicated that the patient had not been discussed in recent huddles.

The patient was offered recreational therapy groups and NLTGs for the required hours of structured therapeutic activities. The groups occasionally addressed the patient's identified needs, and the patient's attendance was variable.

**Findings**

The EOP care provided to this patient was inadequate.

The PC did not complete an initial assessment, the initial psychiatric assessment was late, and routine psychiatric contacts were not completed in accordance with Program Guide required timeframes or as documented by the provider for clinical indications. The IDTT failed to develop a treatment plan for this patient as required by Program Guide and in accordance with the standard of care. Further, during the review period, the patient expressed increased anxiety, passive suicidal ideation, and reported engagement in self-harm; however, the provider failed to implement critical interventions in response to increased suicide risk factors, symptom severity, and reported self-harm incident(s).

**Patient W**

This 40-year-old male patient's record was reviewed to assess the quality of treatment being provided at the EOP level of care at KVSP. The patient had been incarcerated several times before his most recent return to CDCR on November 25, 2019. However, he did not participate in the MHSDS until January 2024, when he was admitted to the MHCB level of care. Records showed that he attempted to remove his left eye, which likely resulted in permanent blindness in that eye. Inconsistent information appeared throughout his medical chart regarding the injury; he later recanted his intent and described the injury as a "stupid accident." However, documentation from the emergency department indicated that the injury was not accidental, given its severity and the patient's self-report at that time.

Upon discharge on February 9, 2024, he was placed at the EOP level of care and transferred to KVSP on February 29, 2024. Psychiatry did not prescribe any psychotropic medications, but did diagnose the patient with autism spectrum disorder.

The patient participated in an initial PC assessment on March 12, 2024. However, the assessment was inadequate; it included minimal updated content and noted the need for further evaluation to identify his goals and monitor his functioning. The assessment did not provide a rationale for why a comprehensive assessment was not completed during this encounter. On the same date, a psychiatrist noted that the patient was unavailable for evaluation due to being in "orientation" and indicated that he would be rescheduled "ASAP." The psychiatrist recorded diagnoses of unspecified bipolar and related disorder, opioid use disorder, and antisocial personality disorder, without mentioning the patient's existing diagnosis of record. Further, there was no rationale for these diagnoses, nor was there any evidence that the patient had received any of these diagnoses previously or met the diagnostic criteria. The psychiatrist documented the patient's targeted symptoms as depression, anxiety, insomnia, agitation, mood instability, and psychosis, but failed to provide a rationale or evidence.

An initial IDTT meeting took place on March 13, 2024, with the required staff and the patient present. Several other individuals attended the meeting, including a senior psychologist supervisor, a nurse, a medical assistant, a recreational therapist, and two licensed psychologists. The clinical summary section indicated that the patient wanted to improve himself and focus on

"identifying and adjusting problems with his attitude, anger, and behaviors." However, the summary included an opinion regarding the patient's appropriateness for KOP medications that failed to acknowledge the patient's serious self-harm incident, even though the incident was mentioned in the case formulation section below.

The meeting lacked documentation of patient strengths, goals, IPOCs, and a treatment plan. Furthermore, there was no rationale for retaining the patient at the EOP level of care, nor were there any documented discharge criteria.

An initial IDTT meeting was held on March 13, 2024 with required staff and the patient present. A number of other individuals were present at the meeting including a senior psychologist supervisor, nurse, medical assistant, recreational therapist, and two licensed psychologists. The clinical summary section noted that the patient would like to better himself and work on "identifying and adjusting problems with his attitude, anger, and behaviors." There was also an opinion regarding the patient's appropriateness for KOP medications which failed to recognize the patient's serious self-harm incident despite the incident being carried over into the case formulation section below. There were no patient strengths, no patient goals, no IPOCs, and no treatment plans developed. There was also no rationale for retaining the patient at the EOP level of care and no discharge criteria documented.

The initial psychiatric assessment was completed later than required and after the initial IDTT meeting. Although a psychiatrist who had previously documented inaccurate information about the patient conducted the assessment, there was no acknowledgment of this prior mistake, aside from the copying of earlier content into the current assessment. The assessment included accurate information about the patient but failed to recognize the patient's attempted self-enucleation. The psychiatrist identified mood instability, decreased social communication, and interaction skills as treatment targets, but did not provide any rationale.

The patient was offered individual sessions with his PC bi-weekly, with group sessions scheduled every other week. Beginning on April 11, 2024, evidence showed that individual sessions included goal development and clinical interventions tailored to the patient. However, the documentation for the PC group lacked specific details regarding the group's content and the patient's responses to it. On May 9, 2024, a routine follow-up SRASHE was conducted cell front, as the patient refused a confidential meeting. The content of the SRASHE was inadequate, primarily consisting of information copied from previous assessments and failing to mention the patient's engagement in self-enucleation.

The patient was seen for only one routine psychiatry contact on May 30, 2024, and a covering provider completed this required encounter with adequate documentation.

The patient was offered an adequate amount of structured treatment hours. Most documented structured activities were recreation therapy groups with some documented evidence of NLTGs. Most group documentation was non-specific, however, on March 21, 2024, while a recreational therapist noted that the patient was disruptive and hyperverbal during a group session, this incident was not referenced in the PC or IDTT documentation.

**Findings**

The EOP care provided to this patient was inadequate.

While the patient was offered a sufficient number of groups, and the PC ultimately engaged the patient in goal development during individual encounters, there were several deficiencies in care identified during this review. There were serious concerns with IDTT documentation, a lack of treatment planning during IDTT, significant diagnostic discrepancies in the clinical documentation that were not addressed, and noncompliant routine psychiatry contacts. Additionally, the IDTT made no mention of the patient's near loss of his left eye, which according to documentation at the time of the incident, was a self-inflicted injury. There was also no rationale provided as to why the patient required placement at the EOP level of care and no discharge criteria for a less restrictive level of care.

**Patient X**

This 50-year-old transgender patient's healthcare record was reviewed to assess the quality of care provided within the EOP at KVSP. The patient was provided with diagnoses of gender dysphoria; antisocial personality disorder; major depressive disorder, recurrent; PTSD; and malingering. The malingering diagnosis was entered into the record in 2019 and remained active. The patient was adherent to her prescribed venlafaxine. She was transferred to KVSP at the EOP level of care after being discharged from the MHCB on March 11, 2024. The MHCB placement was precipitated by the patient expressing an intention to cut her wrists while at the 3CMS level of care.

This patient was incarcerated within CDCR since December of 1995 and serving a sentence of life without the possibility of parole. She was primarily treated at the 3CMS level of care or not enrolled in MHSDS until May 2013, when she was first placed at the MHCB level of care. Since that time, she has been treated at all levels of care (i.e., 3CMS, EOP, MHCB, ICF and APP).

Five-day follow-up contacts were completed with the patient upon arrival at KVSP for a total of seven days, as the fifth and sixth contacts occurred on a Saturday and were completed by nursing staff. All contacts occurred at cell front with only nursing staff noting it was due to patient refusal. PCs documented that the safety plan was reviewed with the patient and was not modified, yet the content included activities that were specific to her previous facility and warranted modification.

An initial PC assessment was completed on March 18, 2024. The clinician noted that the patient had two pending serious RVRs. The content of the assessment was mostly adequate despite much of the content being copied from previous assessments. An initial psychiatric assessment was not completed timely as the patient was in "orientation" when the psychiatrist attempted a contact; however, the psychiatrist documented that the patient was seen at cell front making that reasoning unclear.

An initial IDTT meeting was held on March 20, 2024 despite the lack of assessment by a psychiatrist. The patient's assigned psychiatrist did not attend the meeting. A covering

psychiatrist along with the patient's assigned PC, a senior psychologist supervisor, and a correctional counselor attended. IDTT documentation noted that the patient did not attend but also that the patient did not refuse to attend. The rationale for the patient's absence was not documented. A treatment plan was created to address the patient's negative thoughts and irritability. It included an adequate goal and objective, as well as appropriate interventions. However, the IDTT documentation noted that the patient did not require a safety plan, yet the content from the patient's safety plan that had been reviewed during five-day follow-up contacts was included without necessary modifications for the current setting. Additionally, the case formulation appeared to have been copied incompletely from a previous document as it started mid-sentence. A rationale for retaining the patient in EOP was not documented.

An initial psychiatric assessment was completed on March 28, 2024. It was not completed by the patient's assigned psychiatrist nor the psychiatrist who had been present at the patient's initial IDTT. The content was adequate. The patient was not seen again by a psychiatrist during the review period, despite the requirement for monthly contacts.

The patient was seen weekly by her assigned PC; however, most of the contacts appeared to be status check-ins and included no reference to the patient's treatment needs or evidence of interventions being provided. Most notes included what appeared to be copied and templated language, as the pronoun "he" was often used in these sections whereas the pronoun "she" was used elsewhere in the notes. On the three occasions where the PC documented interventions being used in the session, they were appropriate to the patient's identified needs.

The patient was offered groups in keeping with expectations; however, most groups were recreational in nature, with some NLTGs being offered.

On the last day of the reporting period, the patient engaged in self-harm by drinking cleaning fluid. She was admitted to the MHCB.

**Findings**

The EOP care provided to this patient was inadequate.

IDTT documentation contained inconsistent and inaccurate information. The patient's safety plan was not modified as indicated for the current setting. While there was an adequate treatment plan developed for the patient, the interventions documented in the plan were not implemented during encounters. PC contacts rarely provided evidence of any clinical interventions. Groups offered to the patient were primarily recreational in nature. Psychiatric encounters were not completed timely.

**Patient Y**

This 23-year-old patient's record was reviewed to assess the quality of care at KVSP's EOP. The patient was provided with diagnoses of major depressive disorder, single episode, unspecified and opioid use disorder, moderate. The patient was adherent to his prescribed lithium, and olanzapine and moderately adherent to his prescribed prazosin, hydroxyzine, and

fluoxetine. After being released from the EOP RHU at CMC on February 22, 2024, the patient transferred to KVSP at the EOP level of care.

The patient was incarcerated for the first time in February 2022 and was not enrolled in MHSDS during reception. He was admitted to the MHCB level of care in September 2023 where he remained for 39 days before being discharged to the EOP level of care on November 3, 2023.

The patient was seen for an initial PC assessment on February 29, 2024. The assessment appeared to be adequate; however, it was difficult to determine how much of the information was current versus pulled forward from previous assessments. There were a number of concerning factors which indicated an elevated risk for suicide within the documentation, yet no SRASHE was completed. An initial IDTT was held without the patient having been seen by a psychiatrist prior to the meeting on March 6, 2024. Required staff were present but the patient refused to attend. Documentation incorrectly noted that the patient had not been placed at the MHCB level of care within the past year. Additionally, the treatment plan, goals, objectives, and interventions appeared to have been developed while the patient was in the RHU and were unchanged to address his needs in the current environment.

The following day, March 7, 2024, the patient was seen by the CIT and expressed a desire to be placed at the MHCB level of care secondary to concerns about his safety given the nature of his crime (i.e., sexual assault). The patient expressed no specific fears, just reported overwhelming anxiety and recent substance use. The PC completing the assessment documented that the patient had not had any negative interactions with peers and assessed his acute risk of suicide to be low despite significant risk factors. The SRASHE also incorrectly documented that the patient did not have a sexual offense history. The patient was returned to his cell. Later that day, the patient refused to attend his initial psychiatric assessment which was marginally adequate given the refusal.

The patient refused all group and individual contacts through March 16, 2024 when the patient was seen by a nurse to assess for recent injuries after reporting safety concerns. The patient was placed within the RHU later that day. An initial PC contact was completed on March 20, 2024 and documentation was inadequate, including only historical information with no reference to his current RHU placement or its precipitants. Later that same day, the patient reported suicidal ideation and was placed at the MHCB level of care. The patient returned to the EOP level of care on March 29, 2024 after reporting a decrease in suicidal thoughts; however, the discharge plan did not provide guidance on supporting the patient's ongoing needs. He was placed in the RHU.

Five-day follow-up contacts were completed, but the first three contacts were completed at cell-front by nursing staff. The first mental health contact occurred on day four at the patient's cell front and while the PC noted that the safety plan had been reviewed, it needed updating, but was not modified in any way. Specifically, the plan did not address the patient's safety concerns or statement of suicide to affect changes in housing. The last contact was completed in a confidential setting, but the safety plan was not updated. The initial PC assessment was completed in concert with the final five-day follow-up on April 3, 2024. The content was

adequate. An initial psychiatric assessment was completed the day prior and was marginally adequate, with limited evidence of a comprehensive assessment.

An initial IDTT meeting was held on April 10, 2024. The patient, his assigned PC, a correctional counselor, and a psychiatric technician were present. A covering psychiatrist who had not met the patient previously attended instead of the patient's assigned psychiatrist. Despite the fact that the patient had refused all EOP treatment offered to him prior to his transfer to MHCB and had not attended any groups since returning to the EOP, the IDTT did not document that attendance was an issue for the patient. The safety plan was documented as having been reviewed but was still not appropriately updated. The treatment plan was not modified to address new problem areas and remove outdated setting specific goals. The treatment plan was not modified in response to the patient self-identifying anxiety as a target when asked for input by providers. A goal for depression was carried forward from his previous facility and was adequate. The patient's MHCB treatment goal was not removed from this plan. The rationale for EOP placement was adequate.

The patient returned to mainline on April 11, 2024 and was seen by the CIT on April 15, 2024 related to safety concerns. The patient was relocated to another yard but then later returned to RHU for safety reasons. An adequate initial assessment was completed on April 19, 2024. Despite having had no contact with a psychiatrist, an initial IDTT was held on April 24, 2024 with required staff present. The patient refused to attend. Again, the IDTT failed to recognize the patient's lack of attendance in treatment. The IDTT noted that the safety plan was reviewed, however the document was blank. The treatment plan was adequately updated to address the patient's depression and substance use as he requested. The patient was seen for a routine PC contact on April 23, 2024 and the documentation reflected adequate intervention. The patient was seen by a covering psychiatrist who had not met the patient previously on April 30, 2024 for an initial assessment. The assessment was adequate.

During his treatment at the EOP level of care in both mainline and RHU settings, the patient was rarely offered adequate opportunities for structured treatment. Additionally, the patient did not attend any of the treatment offered to him in a group setting and this fact was never addressed in any treatment plan nor treatment contact.

The patient transferred to another facility on May 6, 2024.

**Findings**

The EOP care provided to this patient was inadequate.

The patient's mental health needs were not adequately assessed or treated while he was at KVSP. Treatment planning was largely inadequate and psychiatric continuity of care was absent. Only during the patient's placement within the RHU during his final three weeks at KVSP did a PC conduct an adequate assessment and the IDTT create an adequate treatment plan. The patient never received an adequate safety plan nor interventions to target his reported suicidality and safety concerns.

**Patient Z**

This 40-year-old EOP patient's healthcare record was reviewed to assess the adequacy of care provided at KVSP. He was provided diagnoses of unspecified depressive disorder, unspecified anxiety disorder, opioid use disorder, and antisocial personality disorder. He was prescribed Trileptal, nortriptyline, and Suboxone. The patient arrived at KVSP from MCSP on January 23, 2024,

The patient had received mental health services at the EOP level of care since August 2022. The patient had a history of refusing to attend treatment groups and individual clinical encounters, and he attended less than 50 percent of offered treatment.

The patient was scheduled with telepsychiatry for an initial assessment on February 6, 2024, but he refused the confidential appointment. He was seen briefly at the cell door by the telepsychiatrist who noted that the patient stated that he was okay and agreed to attend his next psychiatric appointment. The patient reportedly was only partially adherent with his psychotropic medications. He was next seen by the on-site psychiatrist on February 8, 2024 in a confidential setting when the patient reported that the medications were effective, and he requested an increase in the Trileptal dosage. The psychiatrist noted that the patient had missed multiple doses of Trileptal and indicated that prior to consideration of an increased medication dosage, the patient needed to show medication adherence for two weeks. That initial psychiatric assessment was documented in the format of a progress note and contained minimal historical information. The patient's mental status was generally described as within normal limits. The patient was noted to be overweight and had trouble ambulating, as he required a cane. He had numerous medical conditions including a fracture of the sixth vertebrae and chronic pain.

On February 13, 2024, the patient was seen for the initial PC assessment that occurred approximately one week late. The documentation of that assessment showed that the history of present illness merely included multiple cut and pasted entries from prior entries that were completed at other facilities. Those entries that were dated to 2021 were brought forward unchanged, even when they were contradicted by subsequent information. Most of the information in the assessment was from other assessments conducted as long ago as 2018. The patient acknowledged a significant substance use history that included alcohol, marijuana, methamphetamine, prescription medications, and daily opioid use. The patient reported that he had depression due to family issues, including missing his family, and guilt that he was not present in his family members' lives. The patient indicated that the depression did not impact his sleep or appetite. He did acknowledge that he had significant anxiety, that his children made him joyful and hopeful, and he enjoyed visits with them.

The initial IDTT meeting occurred on February 14, 2024. While the treatment plan indicated that this was a quarterly treatment team meeting, it was actually an initial IDTT meeting at KVSP. The assigned PC and psychiatrist, psychologist supervisor, and CCI were present; however, it was unclear if the CCI was the assigned CCI. The clinical summary was minimally adequate, while the comprehensive case formulation required improvement. The treatment plan was also incomplete and did not include actual treatment interventions; although, the clinical summary did note a treatment goal to reduce anxiety, provided a baseline measurement of symptoms, and included an achievable goal; however, there were no behaviorally-based

objective goals which limited the appropriateness of the goals. The listed intervention also did not appear to be individualized or adequate to maximize efficacy in treatment. The only intervention was to assist the patient in the development of relaxation skills.

A routine IDTT meeting occurred on May 8, 2024. The assigned PC and psychiatrist, a psychiatric technician and a correctional counselor attended, but it was unclear if that was the assigned CCI. The patient was included on the sustainability report for consideration of higher level of care referral due to poor treatment attendance. Interestingly, the patient was only offered 7.88 hours of treatment weekly during the prior three months, which did not meet requirements for offered treatment. The treatment plan noted that the patient was medication adherent, but he was not prescribed psychotropic medications. He reported that his poor treatment attendance was due to pain in his legs and feet. A nursing review of the healthcare record indicated that there was no documentation regarding the pain located in the healthcare record. The treatment plan was updated to reflect this obstacle to care and included working with the patient to identify if there were any environmental deterrents, likely due to his mobility impairment and chronic pain, and to encourage the patient to speak to his medical provider about his pain. The treatment plan was updated further to include a treatment target of depression with a goal to add three coping strategies through CBT and motivational interviewing. Those strategies were inadequate to address the negative self-talk and the underlying beliefs that maintained the depression, and no other reinforcers were identified. The IDTT indicated that the patient functioned reasonably well and was relatively stable; therefore, referral to a higher level of care was not indicated. The treatment modifications on the higher level of care tab of the treatment plan were appropriate and included using motivational interviewing to work with the patient to improve insight and to identify his treatment goals, and then to choose treatment groups together that would further those goals. The treatment team did document that they would monitor the patient for possible reduction in his level of care due to his lack of engagement and apparent stability.

The patient was provided multiple treatment groups including nursing-led treatment groups for substance use, and he received MAT for his opioid use disorder. The patient was not offered the minimum amount of structured therapeutic activity required; additionally, all offered mental health groups were recreational, and no clinical groups were provided. Most of the structured therapeutic activity was provided by the nursing-led treatment groups.

The patient was not seen monthly as required by the treating psychiatrist. No appointments were scheduled during April and July 2024; the patient refused two May 2024 appointments, and he refused two June 2024 appointments and was subsequently seen in a nonconfidential setting. The patient continued to refuse to discuss psychotropic medication treatment, and he remained resistant despite repeated education about the potential benefits of medication treatment. At a June 6, 2024 psychiatric appointment, the patient stated that he was doing great. Despite that, progress notes from the PC and psychiatrist did not clearly indicate implementation of the discharge plan to continually assess for sufficient functional stability for placement at a lower level of care.

The PC did not see the patient in a confidential setting weekly as required and clinically indicated. Instead, the patient was seen for more than half of his contacts in a nonconfidential setting. On at least three occasions, it was documented that the nonconfidential contacts occurred due to program modification, but more often no explanation was provided.

Consequently, there was no evidence that the treatment plan was ever implemented. The patient refused two confidential appointments and was seen cell front. His engagement with his treatment providers was poor, but it was unclear how much the nonconfidential nature of the PC appointments contributed to his poor treatment engagement.

In June 2024, the patient was transferred to the RHU while awaiting transfer to an EOP RHU.

**Findings**

The care and treatment provided to this patient were inadequate.

The IDTT maintained the patient at the EOP level of care at KVSP; however, the patient was not provided treatment consistent with the EOP level of care, including monthly psychiatric contacts and implementation of a treatment goal to address medication resistance with appropriate treatment group assignments and individual interventions. The patient was rarely seen by his PC in a confidential setting, making it difficult to discuss sensitive topics and to implement clinical interventions. The treatment plan was inadequate, and unrealistic, given the frequency of nonconfidential visits, lack of critical targets of treatment such as medication refusal, lack of treatment engagement, and lack of interventions. While there were some hopeful clinical activities described in the narrative and higher level of care sections of the plan, none appeared to have been implemented, except possibly encouraging the patient to communicate with his primary medical provider. Despite those omissions in care, the patient appeared to be functioning reasonably well. This brought into question whether the treatment team adequately evaluated the patient's need for treatment at the EOP level of care, or if placement at a lower level of care was indicated. The patient would benefit from a comprehensive assessment that included assessment of the appropriate level of care, development of an adequate treatment plan, and transition to a lower level of care.

**Patient AA**

This 51-year-old EOP patient's healthcare record was reviewed to assess the adequacy of care provided at KVSP. The patient was provided diagnoses of exhibitionistic disorder, major depressive disorder, recurrent with psychotic features, schizoaffective disorder, and antisocial personality disorder. He had a history of receiving his psychotropic medications by PC 2602 orders due to danger to self and others; however, at the time of his arrival to KVSP, there was no active PC 2602 order. At the time of KVSP arrival, he was prescribed olanzapine and Effexor. The patient arrived at KVSP on April 24, 2024 from CCI.

The patient was chosen for review after he reported concerns during a group that after an attempted hanging during late May 2024, he was seen at an outside hospital and returned to his cell after return to KVSP rather than referred to the MHCB. He had been incarcerated since 1995 and had a history of receiving RVRs for infractions such as repeated sexually disordered conduct and indecent exposure.

An emergent psychiatric consult occurred at the time of the arrival to KVSP, because the patient stated that he felt like harming himself and was suicidal. Custody reportedly observed the patient attempting to make a noose with his clothing. The psychiatrist did not see the patient but

consulted with nursing staff. He was placed into alternative housing on a suicide watch pending further evaluation and an MHCB referral. He was seen the following day by a primary clinician who evaluated the patient at cell front due to custody and confidential space limitations. The patient was admitted to the MHCB on April 25, 2024, and was discharged back to the EOP level of care on May 6, 2024. On May 7, 2024, the patient was observed in a holding cell attempting to make a noose. A mental health assessment was completed at cell front that assessed the patient with high chronic and acute suicide risk. The patient was re-admitted to the MHCB on May 8, 2024, and discharged on May 17, 2024. During his time in the MHCB, the patient was uncooperative with treatment. For example, he refused individual therapy, typically refused to attend IDTT meetings, and refused clothing when removed from suicide watch instead remaining in a safety smock. He however did participate in outdoor yard, dayroom, and telephone activities. It was noted that a correctional counselor had indicated that the patient was frustrated with his transfer to KVSP, and it appeared that his treatment team indicated that this was due to his commitment offenses that contributed to his repeated crises and MHCB placements.

The patient had received six disciplinary reports in the prior three months, three for indecent exposure, two for refusing to accept assigned housing, and one for delaying a peace officer. The patient was also identified as a high treatment refuser. Following MHCB discharge, the patient again reported suicidal ideation and was placed into alternative housing on May 17, 2024. He exposed his genitals to the suicide watch observer and was ultimately discharged to the EOP level of care later that day. The following day, he reported chest pain and was seen by medical. An EKG was normal, and the patient was returned to housing. The following day, the patient reported taking 40 unidentified pills. He was assessed at the TTA, was asymptomatic, but was sent to an outside emergency room. He remained asymptomatic, and all test results were normal, so he was returned to KVSP. Similar behavior continued until the third week of May 2024; however, the patient was not placed into the MHCB or alternative housing after those incidents.

Due to the patient's frequent crises and placements into alternative housing and the MHCB, the initial PC assessment did not occur until May 28, 2024. It was noted that the patient preferred placement at the inpatient level of care and was quite frustrated when last discharged from intermediate care during November 2023. During the initial PC assessment, the patient was described as calm with a full range of affect. His thoughts and speech were linear and goal directed. Much of the information in that document was from prior assessments. The prior documentation was present, even though it appeared outdated or may have contradicted subsequent information. The PC did not indicate if all the information that was provided by prior assessments dating back to 2018 remained current and applicable, and the initial PC assessment was more accurately classified as an assessment update. Some information was provided regarding the patient's suicidality, noting that he denied current suicidal ideation and recent self-injury. Based on other documentation, the patient reported frustration with his imprisonment of 32 years. The assessment noted that least 20 suicide risk assessments had been completed from January to May 2024, and the patient was described as a sex offender who used suicidal ideation and self-injury as maladaptive coping skills, not to kill himself, but as an act of self-preservation to protect himself. That information was consistently documented throughout much of the recent mental health history.

The initial psychiatric assessment did not occur until June 4, 2024. The psychiatrist noted that the patient had spent six years in CDCR receiving no mental health services, and in 2001 he was

placed at the 3CMS level of care. In 2002, the patient was first admitted to the MHCB; since that time, his level of care fluctuated between 3CMS, EOP, MHCB, acute, and intermediate levels of care. It was noted in a MHCB progress note that the patient had trouble functioning in general population and preferred placement at the inpatient level of care. During the initial psychiatric assessment, the patient denied suicidal ideation, requested a medication dosing change, and reported no side effects and minimal symptoms. The patient reported auditory hallucinations but stated that he had not experienced any in several weeks. The psychiatrist noted that the patient was calm and cooperative with no evidence of thought disorder and was fully oriented. The patient demonstrated full affect with euthymic mood, linear thoughts, no evidence of delusions, and no evidence of significant depressive symptoms. The diagnosis of schizoaffective disorder by history was maintained. The patient's medications were changed during the MHCB placements, and they were maintained following this assessment to include Zyprexa, Effexor, and Lamictal.

The patient was seen for the initial EOP IDTT meeting on May 29, 2024, and the patient had not been seen by the treating psychiatrist prior to the initial IDTT meeting as required. The IDTT meeting included the assigned PC and an alternative psychiatrist; however, the documentation did not accurately document that the treating psychiatrist was absent. A mental health supervisor and a correctional counselor were also present, but it was unclear if the CCI was the assigned CCI. The IDTT noted that the patient met the criteria for consideration of referral to a higher level of care due to multiple RVRs and poor treatment participation. The clinical rationale for not referring the patient was adequate as were the treatment modifications included to address the underlying the reasons for the RVRs and poor participation. The clinical summary appeared to have been from a MHCB stay, as it noted that the patient was sufficiently stable to be discharged to a lower level of care and specifically indicated that he would be released to the EOP. The case formulation was adequate, but the actual treatment plan was incomplete. It noted only depressed mood as a treatment target, despite the patient's safety concerns and inability to address them appropriately which were the most significant factors in the patient's recent difficulty functioning at KVSP. Prior mental health documentation including from the MHCB suggested that the patient's self-report of severe depression was inconsistent with observations or objective data such as good program participation in non-mental activities; that further undermined the importance of depression as a sole treatment target. The patient appeared extremely anxious and reportedly had developed his presentation in an attempt to influence his housing.

The patient was provided with treatment groups that were all recreationally based, and no clinical groups were documented. The patient was generally seen weekly through June 2024, but those individual contacts appeared to be check-ins based on the documentation. The documentation also indicated that the patient continued to engage in indecent exposure; however, the treatment plan was not modified to address those behaviors.

**Findings**

The care and treatment provided to this patient were inadequate.

When the patient had legitimate concerns regarding his housing and safety, and he was willing to utilize medical and mental health resources excessively to influence housing; EOP and MHCB

staff at KVSP should have collaborated regarding an intervention plan. Although a formal behavioral plan was indicated, mental health staff could have developed and implemented DBT or other behavior treatment interventions without need for additional resources.

Initial assessments did not occur timely and did not integrate recent assessments. The treatment plan was incomplete and did not properly target the patient's most significant functional deficits, including the need to develop appropriate ways to feel safe and to notify staff if feeling unsafe. Instead, the treatment plan targeted depression which the IDTT thought was not present, or if present was part of the maladaptive coping skill process. While the HLOC form did include additional treatment modifications that addressed recent RVRs, the interventions remained unclear and likely ineffective, such as individual stress management. The treatment plan was unclear regarding what issues would be addressed short-term, and there was no documentation that the treatment plan was implemented, other than general relaxation type groups. Individual sessions were inadequate to implement therapeutic interventions, and treatment was not modified based on the patient's continued poor functioning, including continued sexual misconduct.

**Patient BB**

This 25-year-old EOP patient's healthcare record was reviewed to evaluate the care provided at KVSP. He was provided diagnoses of unspecified mood disorder, antisocial personality disorder, and opioid use disorder. The patient was prescribed bupropion, buspirone, hydroxyzine, mirtazapine, and prazosin and was described as generally medication adherent. The patient was prescribed buprenorphine-naloxone to address his substance use disorder. He arrived at KVSP on January 10, 2024.

The patient entered CDCR for his first term on July 12, 2018. He had received mental health services at all levels of care beginning in 2020. The patient also had a history of poor coping skills, substance use, impulsivity, violence, suicide attempts, and self-injury.

The patient's most recent intermediate hospitalization occurred from August 1, 2023 to January 10, 2024. He transferred to ICF after endorsing suicidal ideation with a plan to hang himself after he learned that he was identified as one of the incarcerated individuals who incited a riot and would be sent to segregated housing. In addition, while in the MHCB, the patient continued to endorse suicidal ideation, tore his shirt, made a noose, and was transferred for intermediate care. While in the ICF, the patient was engaged in treatment and was medication adherent. There were no signs of suicidal ideation or self-harming behaviors. However, the patient struggled with adhering to unit rules, such as covering cell windows, and accepting boundaries set by providers. On January 9, 2024 prior to discharge to KVSP, the patient reported suicidal ideation and was found hoarding medication; however, after assessment, he was discharged and transferred to the KVSP EOP on January 10, 2024.

Five-day follow-up contacts at KVSP were completed timely; however, they occurred in a nonconfidential setting due to the patient's refusal. In addition, the safety plan indicated that it was reviewed with the patient on January 12, 2024, despite the patient reportedly refusing the confidential appointment, and the mental health provider stating that the patient informed them that they were on the phone, that they were doing well and did not want to talk.

A SRASHE on January 11, 2024 was completed that referenced three prior suicide attempts, the most recent in January 2023 by hanging; he had three incidents of self-harm behavior by laceration, asphyxiation, and overdose with the most recent occurring on March 3, 2023. The documentation indicated that the self-harm incidents occurred without intent to die and without the use of a lethal method. The patient was assessed with high chronic and low acute suicide risk. Although the January 11, 2024 SRASHE stated that the January 9, 2024 ICF discharge SRASHE indicated that there was no documentation of suicidal or homicidal ideation or self-injurious behavior and the patient denied the current plan, intent, means, or access to weapons, that information conflicted with information documented in the January 10, 2024 ICF discharge IDTT when the patient reportedly had accepted his discharge to the EOP but voiced passive suicidal ideation. Further, details regarding the patient's hoarding of medications located in his cell on January 9, 2024 were omitted from the narrative.

The initial PC assessment at KVSP occurred timely on January 18, 2024. The patient, however, refused the scheduled appointment; so the evaluation was conducted cell front in a nonconfidential setting. The initial PC assessment was adequate, utilized collateral resources, and identified depression, anxiety, anger problems, and poor impulse control as current concerns. Although the clinical summary was useful, the history of present illness section was poorly documented and only included a note from September 27, 2022.

Although the initial psychiatric assessment was scheduled with a telepsychiatrist on January 18, 2024, the patient refused. A healthcare record review was then conducted, and his psychotropic medications were continued.

The initial IDTT meeting occurred timely on January 24, 2024; however, subsequent IDTT meetings did not occur as required. The treatment team did not reconvene until July 10, 2024, almost six months later and three months later than required. During the January 24, 2024 IDTT meeting, all required disciplines were present including the assigned PC and psychiatrist, CCI, and the patient. In addition, a senior psychologist, two licensed clinical psychologists, a master's level clinician, and a recreational therapist were present. The treatment plan IPOCs were pulled forward but were not updated from previous assessments. The IPOCs included danger to self initiated on October 3, 2023, self-harm initiated on August 10, 2023, and chronic pain initiated on August 3, 2023. The treatment plan targeted anxiety, depression, and poor impulse control. The goals for treatment were measurable and specific. The interventions were also appropriately tailored to the treatment targets and involved cognitive behavioral therapy, dialectical behavioral therapy and psychoeducation. The discharge plan and reason for retention were adequate and indicated that discharge would be considered when the patient demonstrated four coping skills to manage depression and anxiety and had no RVRs for at least six months as a measure of improvement in impulse control. While the treatment plan was adequate, it failed to reference substance use issues, individualized groups, and medication interventions.

The routine psychiatric contacts did not occur timely. The patient often refused appointments. After he refused the initial psychiatric assessment by telepsychiatry, he was seen by the psychiatrist on January 31, 2024. On that date, the psychiatrist noted targeted symptoms of depression, anxiety, insomnia, agitation, and mood instability. The patient was reportedly medication adherent and denied substance use. BuSpar and prazosin were adjusted to address

anxiety and nightmares. The patient subsequently refused the psychiatric appointments on April 22, 2024 and April 23, 2024, but he was seen cell front and noted to be in no acute distress. The patient was rescheduled; however, he also did not attend the rescheduled appointment on April 26, 2024. The patient did not meet with his newly assigned psychiatrist until June 20, 2024, when he was approached in the yard and reported to the psychiatrist that he was never told that he had an individual psychiatric appointment.

Routine PC contacts initially occurred timely; however, the contacts typically occurred cell front due to the patient's refusal. Although the PC initially met with the patient weekly until March 7, 2024; the patient was not seen for nearly four weeks and did not meet with the assigned PC until April 4, 2024. The patient was then seen cell front after refusing the confidential individual contact with his PC and reported that he was not feeling well. Subsequently, the patient was assigned a new PC and was seen on April 29, 2024.

In addition to the lack of weekly contacts, the documentation of the PC contacts was inconsistent and was problematic. Although the PC contacts typically included an update of the patient's subjective rating of his feelings of depression and anxiety on a scale of one to ten and a general description of the topic of discussion, there were minimal updates to the patient's progress in treatment, the interventions used, and the patient's response to the interventions utilized. Further, the providers did not consistently document the reasons for refusals or interventions used to increase out-of-cell participation. A PC consult was ordered for April 29, 2024, as the patient told custody staff that he had not been seen in two weeks. He reportedly stated that he was not doing well and reported intravenous heroin use, but he reportedly rated his depression as minimal. Despite that, the progress note plan and discussion were generic and remained unchanged for each subsequent progress note.

During the review period, the patient met with three different primary clinicians. From April to June 30, 2024, he was seen by his newly assigned PC, and he saw a covering PC on two occasions which impacted continuity of care. In addition, the covering PC documented that there were no clear signs of mood or thought disturbances with plans to monitor for potential hallucinations and depressed mood; however, the concern regarding hallucinations did not apply specifically to the patient, as hallucinations were not identified as a symptom in the treatment plan.

The patient received an RVR on June 14, 2024 for fighting. The evaluating clinician opined that there was no evidence to suggest that mental health played a role in the RVR. The patient also had a history of other serious RVRs, including for serious disruption of facility operation, willfully resisting a peace officer, unauthorized possession of drug paraphernalia, behavior that could lead to violence, battery on a peace officer, possession of a controlled substance, threatening staff, assault on a peace officer by means not likely to cause GBI, possession of dangerous contraband, disobeying an order, continued failed to perform assigned work, and disrespect for the potential for violence/disruption.

The patient was scheduled to attend therapeutic groups focused on coping skills, stress management, mental health education, nursing-led groups for substance use, wellness, mental health education, and art therapy. Although the patient was typically scheduled for the required

10 hours of structured treatment activities weekly; due to cancellations and patient refusal, the patient on average attended less than fifty percent of the offered structured treatment during the review period. When groups were offered, the patient's attendance was sporadic, and he was identified as a high treatment refuser on July 10, 2024 after refusing eight of twelve weeks of EOP treatment and an average of 5.7 hours of structured therapeutic activities weekly. Although motivational interviewing occurred at times during PC contacts, known obstacles to patient participation were not directly addressed to improve the patient's treatment adherence.

**Findings**

The care and treatment provided to this patient were inadequate.

During the review period, the patient was seen by three different PCs, resulting in inconsistency and disruption of continuity of care. Additionally, the patient often refused to attend appointments in a confidential setting or declined participation in structured treatment activities; however, barriers to his treatment participation were not addressed adequately or timely. PC and psychiatric contacts did not occur timely. In addition, the PC documentation was poor and failed to consistently note whether the planned or clinically indicated interventions were implemented and failed to consistently note the patient's responses to those interventions. Despite the apparent ineffectiveness of the treatment plan, ongoing treatment nonadherence, and a recent RVR; the routine IDTT meeting was significantly delayed. A clinically indicated IDTT meeting should have occurred sooner to address treatment participation barriers, to assess higher level of care considerations based on positive indicators, or to modify the treatment plan to address treatment nonadherence.

**Patient CC**

This 57-year-old EOP patient's healthcare record was reviewed to assess the adequacy of care provided at KVSP. He was provided diagnoses of schizoaffective disorder, depressive type; unspecified bipolar and related disorder; unspecified neurocognitive disorder; PTSD; specific learning disorder, with impairment in mathematics; and antisocial personality disorder. The patient was prescribed aripiprazole, levetiracetam, mirtazapine, oxcarbazepine, prazosin, and hydroxyzine prn. He also was prescribed buprenorphine-naloxone to address his opioid use. The patient transferred from MHCB to the KVSP EOP on January 3, 2024.

The patient first entered CDCR on December 11, 2001, and he served multiple prison terms, the most recent term beginning on May 3, 2006. He first entered the MHSDS in 2004, and he received mental health services at all levels of care.

The most recent MHCB placement occurred from December 23, 2023 to January 9, 2024 due to depression and suicidal ideation. The patient also had a history of multiple suicide attempts that included swallowing and overdose.

Five-day follow-up contacts occurred timely; however, the assessments typically occurred in a nonconfidential setting for various reasons. On day two, the mental health officer noted that the patient was on orientation status, so he was seen at cell front; and the patient refused to

participate due to the nonconfidential setting. On day three, the patient was again seen at the cell front due to a lockdown; he was seen also in a nonconfidential setting on day five, but no reason was documented.

On January 4, 2024, an initial SRASHE was conducted after the patient's discharge from the MHCB. At that time, he was assessed with moderate chronic and a low acute suicide risk. On February 28, 2024, another SRASHE was completed after the patient overdosed on illicit substances the day prior. His acute risk was increased to moderate at that assessment due to the recent dangerous behavior. On March 12, 2024, a SRASHE was completed after the patient reported an increase in auditory hallucinations, stress related to his mother's health, and had refused his morning medications. He also reported suicidal ideation without a specific plan but did not want access to harmful objects and reported a plan to hit his head the night prior. His chronic risk was assessed as moderate, and his acute risk was assessed as moderate to high. Due to the patient's recent overdose, suicidal ideation, and family stressors; he was admitted to the MHCB where he remained from March 12 to March 18, 2024. A SRASHE completed on June 19, 2024 for routine follow up assessed moderate chronic and low acute suicide risk.

The initial PC and psychiatric assessments were completed timely. During the initial PC assessment on January 12, 2024, the patient's chief complaints were identified as stress, lack of sleep, and concerns about his mental health. The history of present illness was carried forward from previous documentation, and it had not been updated since August 1, 2019. The assessment included minimal clinical summary updates, noting that the patient would work on anger management, coping skills, negative thoughts, and goals. The case formulation was also retained from previous assessments, and the sections identifying the patient's preferred learning style and the rationale for the recommended level of care were not completed.

The initial psychiatric assessment was completed on January 18, 2024 when the patient was provided diagnoses of schizoaffective disorder, PTSD, unspecified neurocognitive disorder, and antisocial personality disorder; he was reportedly medication adherent. The patient reported depression, anxiety, irritability, racing thoughts, sleep disturbances, intermittent auditory hallucinations, and the belief that others were talking about him. The psychiatrist prescribed aripiprazole, oxcarbazepine, prazosin, atomoxetine, and hydroxyzine.

Three IDTT meetings occurred timely during the review period. The January 17, 2024 IDTT meeting included the required participants, but the March 27, 2024 IDTT meeting included a covering clinician instead of the assigned PC. The June 19, 2024 IDTT meeting included a covering psychiatrist rather than the assigned psychiatrist. The initial treatment plan retained clinical summaries and prior case formulations with minimal updates. In addition, sections of the treatment plan were not completed, including the patient's learning style and strengths. The patient's verbalized treatment goals were not documented; however, the patient was present at the meeting and had previously stated that he wanted to work on anger management, coping skills, negative thoughts, and goals during the initial assessment. IPOCs from September 2023 were included that targeted depressed mood, hallucinations, and substance use, but they were not updated with the patient's progress. In addition, the treatment plan targeted sleep disturbance but did not include any short or long-term measurable goals, baseline measures, interventions to be

utilized, or treatment response and progress. In addition, no rationale was provided to retain the patient at the current level of care, and no discharge criteria were documented.

A second initial IDTT meeting occurred on March 27, 2024, after the patient was discharged from the MHCB on March 18, 2024. At the meeting, he was identified as a high treatment refuser, as he had refused 3.5 hours of structured therapeutic activities weekly for four of seven weeks. Adequate justification and treatment modifications were documented to address barriers to treatment. The treatment plan documentation included an updated clinical summary, and decrease in depression was added as a target for treatment with adequate long and short-term measurable goals that were initiated on March 13, 2024. On June 19, 2024, the patient was seen again for a routine IDTT meeting when it was noted that the patient was working on his sleep hygiene, communication skills, and problem-solving skills to manage his symptoms to transfer to a lower level of care. Relevant sections of the treatment plan were not completed, including the DDP designation, verbalized treatment goals, IPOC updates, discharge planning, and the justification for retention at the EOP level of care. In addition, the plan failed to target critical concerns including the patient's substance use and potentially lethal overdoses. Individualized groups and medication interventions also were not referenced in the treatment plan, nor were the disciplines responsible for the intervention identified.

Routine contacts with the primary clinician occurred timely. The patient met with the assigned clinician weekly, either individually or during alternating EOP coping skills groups facilitated by the assigned clinician. The documentation for the PC-led groups did not detail the patient's individual participation or the specific coping skills topics that were discussed. Additionally, the PC individual contact notes did not adequately assess the patient's progress toward goals and often failed to record the interventions used or the patient's responses to those interventions. The routine monthly psychiatric contact did not occur timely in February 2024, and the patient transferred to the MHCB from March 12, 2024 to March 18, 2024. The assigned psychiatrist met with the patient for an initial psychiatric contact on March 26, 2024, and his medications were adjusted to increase mirtazapine, to begin treatment with Cogentin, and to continue aripiprazole, oxcarbazepine, prazosin, and hydroxyzine prn. The patient was seen by a newly assigned psychiatrist on May 14, 2024 when he requested discontinuation of aripiprazole and benztropine, as they were heat risk medications that prevented him from going to the yard. He otherwise reported that he was doing well without auditory hallucinations, but with disrupted sleep. His medications were discontinued as requested. Subsequently on May 30, 2024, the psychiatrist also discontinued the evening dose of oxcarbazepine and prazosin due to nonadherence; however, after a routine psychiatric contact on June 25, 2024, the patient requested and was restarted on prazosin, and oxcarbazepine was increased. The documentation of routine psychiatric contacts indicated that the patient's concerns and symptoms were addressed, and a rationale for medication adjustments was provided.

The documentation indicated that due to cancellations, the patient was not offered the required minimum treatment hours. In addition, the patient refused structured therapeutic activities, and on average attended six of eight and a half hours of offered structured therapeutic activities weekly. Groups that were assigned were relevant and included recreational, leisure activities, coping skills, mental health education, stress management, and nursing-led groups.

**Findings**

The care and treatment provided to this patient were inadequate.

Although the IDTT meetings and PC contacts generally occurred timely, significant deficiencies in the documentation were noted. The treatment goals did not include baseline measures, appropriate interventions, or documentation of the patient's progress. Important sections of the treatment plan were omitted, and while the level of care decision was justified; the treatment plan did not include the necessary modifications to effectively address the patient's substance use which was a known barrier to participation in group treatment. Overall, the treatment plans were inadequate and were not updated in response to the patient's worsening substance use and overdoses.

Additionally, the PC documentation frequently lacked individualized progress notes and did not sufficiently document the patient's progress toward treatment goals. That documentation often failed to include the interventions utilized or the patient's responses to those interventions. The clinical documentation included inconsistencies, relied too heavily on copied and pasted information from historical notes, and lacked essential details needed to assess progress and response to treatment.

**Patient DD**

This 42-year-old EOP patient's healthcare record was reviewed to assess the adequacy of care provided at KVSP. He was provided diagnoses of schizophrenia; major depressive disorder, recurrent episodes; amphetamine-type substance use disorder, severe; and antisocial personality disorder. His symptoms included depressed mood, auditory hallucinations, and a history of self-injurious and suicidal behavior. He was prescribed fluoxetine, melatonin, mirtazapine, and olanzapine with medication adherence. He transferred to the KVSP EOP on January 9, 2024.

The patient began his current CDCR term on May 30, 2006, and he had received mental health services at all levels of care.

The patient was most recently placed in an MHCB on December 31, 2023 when he was treated for suicidal ideation and auditory hallucinations. Before discharge on January 9, 2024, he was observed with a tied undershirt around his neck attached to furniture in the room. His chronic suicide risk was assessed as high, and his acute risk was assessed as low.

Upon arrival at KVSP, five-day follow-up contacts occurred in a nonconfidential setting due to a lack of available treatment space or the patient's refusal to meet in a private area.

Initial PC and psychiatric assessments occurred timely on January 12, 2024. The initial PC assessment contained limited updates, and most of the information was carried over from previous evaluations; the history of present illness was copied and was last updated in 2021. At the initial psychiatric assessment, the psychiatrist reported that the patient endorsed depressed mood, anxiety, and auditory hallucinations, and the previously mentioned medications were prescribed.

Two IDTT meetings occurred during the review period on January 16, 2024 and April 24, 2024 which occurred one week late. A covering psychiatrist attended the January IDTT meeting, and the patient declined to attend both treatment team meetings. The reason for the patient's refusal was not included in the documentation, and there was limited updated information regarding the patient's progress in treatment. The initial treatment plan, however, targeted safety and danger to self and depressive symptoms through skill building and focused grief processing. The treatment plan included specific, measurable short and long-term goals with appropriate interventions. The treatment plan documentation, however, omitted pertinent information about the patients' strengths, verbalized goals, the rationale for continuation at the EOP level of care, and the criteria for discharge. At the April IDTT meeting, a newly assigned PC was in attendance. Although the treatment was noted to target the patient's depression and included short and long-term goals, the treatment plan interventions and the patient's progress toward goals were vague and included the absence of behaviors such as RVRs and self-injurious behaviors as measures of the patient's progress rather than goals, such as developing coping skills. In addition, individualized groups, medication interventions, and patient's barriers to treatment were also not documented in the treatment plan. Specific criteria for the discharge plan and justification for retaining the patient in the EOP were vague.

Routine PC contacts occurred timely, however, at times they occurred cell front in a nonconfidential setting due to the patient's refusal. In addition, a newly assigned PC began meeting with the patient in April 2024. The adequacy of the PC documentation was inconsistent. The newly assigned PC documented identical information for each contact and re-dated the progress note adding minimal updates. The poor documentation made it difficult to determine the patient's status, if progress toward the patient's goals occurred, and whether the information was accurate. Overall, the documentation did not consistently address the patient's progress toward treatment goals, the interventions utilized, the patient's response to treatment interventions, or barriers to treatment.

Routine psychiatric contacts did not occur timely. In addition, the patient refused a psychiatric contact on April 25, 2024, and he was not in his cell for a cell front follow-up contact. Although the patient had chronic auditory hallucinations; there were no significant mood, psychotic, or anxiety symptoms noted during the psychiatric contacts. Medication adjustments occurred, and the patient was partially adherent with his psychotropic medications.

The patient received an RVR on March 6, 2024 for indecent exposure; the mental health assessment determined that the patient's mental health did not contribute to the RVR behavior. Additionally, a May 29, 2024 recreational therapist progress note indicated that the patient displayed inappropriate behavior during a group session.

Although the patient was scheduled for the required minimum number of structured therapeutic activities, he only attended 78 percent of offered treatment. The groups offered appeared relevant and included coping skills, stress management, processing, coping, mental health education, current events, nursing-led life skills, and stress management groups.

**Findings**

The care and treatment provided to this patient were inadequate.

The IDTT meetings and psychiatric contacts did not occur timely, and the necessary participants did not attend the IDTT meeting. Treatment targets documented in treatment plans had corresponding goals that lacked specific individualized interventions. Treatment plans remained deficient and were not modified in response to the patient's behavioral concerns, including behaviors that resulted in an RVR. Clinical documentation consistently omitted the patient's progress toward individualized treatment goals, the interventions implemented, his response to treatment, and any treatment barriers.

**Patient EE**

This 50-year-old EOP patient's healthcare record was reviewed to assess the adequacy of care provided at KVSP. He was provided a diagnosis of major depressive disorder and a provisional diagnosis of PTSD. The patient transferred to KVSP on January 5, 2023.

The patient began serving his most recent CDCR term on June 5, 1997, and he had received mental health services at all levels of care. He was previously provided diagnoses of bipolar I disorder, antisocial personality disorder, borderline personality disorder, and exhibitionistic disorder. His symptoms included depression, anxiety, agitation, and auditory hallucinations. He had a history of substance use, violence, suicide attempts, and suicidal ideation, as well as comorbid medical conditions including prostatic hypertrophy, hypertension, and dermatitis.

During the review period, a routine IDTT meeting occurred timely on March 20, 2024, and the required staff were in attendance with the exception of a covering psychiatrist. The clinical summary of the treatment plan indicated that the patient was medication adherent and was engaged during individual sessions with assigned providers. The treatment plan targeted the patient's depressed mood and included an IPOC initiated on January 19, 2023; however, it had not been updated since September 2023 and lacked specific measurable goals, relying only on self-reports without indicating the patient's baseline level of depression. In addition, the treatment plan did not include interventions to be utilized for depression, also omitting the responsible discipline, psychiatric interventions, and specific group assignments. Furthermore, the documentation failed to address the patient's strengths, goals, or discharge plan, including the rationale for retaining the patient at the current level of care, anticipated discharge date, and criteria for discharge. The IDTT also omitted documentation of the patient's DDP status and learning style. A provisional diagnosis of PTSD was referenced in the psychiatric assessment, but there was no further documentation of diagnostic clarification. Overall, the IDTT documentation was insufficient and incomplete.

Routine PC contacts generally occurred timely in a confidential setting. The patient's clinical needs appeared to have been addressed timely with adequate interventions implemented. There also appeared to be adequate collaboration between the assigned providers; as the PC noted that the patient was not medication adherent on January 25, 2024, and a referral was made to the psychiatrist. Although progress notes documented interventions utilized; the interventions were not informed by the treatment plan, and the patient's response was not consistently documented. Additionally, progress notes were minimally updated and contained an identical mental status examination and plan for each progress note.

Routine psychiatric appointments did not occur timely. Although the patient met with the psychiatrist on January 29, 2023, he was not seen in February and did not meet again with the psychiatrist until March 14, 2024. Although the psychiatrist was not able to see the patient in a confidential setting on that date due to a building lockdown, the patient was seen cell front for a wellness check. The patient reported doing well and wanted to resume fluoxetine, and he agreed to meet in a confidential setting at the next appointment. On March 21, 2024, the patient was seen for a confidential session in the psychiatric office when he reported continued depression and requested change from Vistaril to Prozac which was beneficial in the past. Remeron was prescribed to address sleep difficulties, and the psychiatrist described the patient as somewhat depressed with some anxiety but noted that the patient denied auditory or visual hallucinations. The patient was not seen again by the psychiatrist until May 8, 2024, after requesting a psychiatric contact to discuss his medications. Subsequently, he was not seen again until June 25, 2024, when he was seen for routine psychiatric follow-up and medication nonadherence. The patient was reported doing well on his current medications with no evidence of significant mood, psychotic, or anxiety symptoms noted.

The patient attended groups that included coping skills, stress management, and nursing-led groups that addressed assertiveness, substance use, and medication management; he also attended leisure and recreational groups. The patient attended an average of 70 percent of offered structured therapeutic activities; however, due to cancellations, he was only offered on average 8.67 hours of structured therapeutic activities weekly.

**Findings**

The care and treatment provided to this patient were inadequate.

Although the patient was relatively stable during the review period, and routine PC and treatment team meetings generally occurred timely; routine psychiatric contacts were not timely. Treatment planning was incomplete and deficient; and although the PC progress notes identified the interventions utilized, they did not appear to be driven by the treatment plan as measures of the patient's progress along stated measurable self-report goals were not documented, and his response to interventions was not consistently noted.

**Patient FF**

This 47-year-old EOP patient's healthcare record was reviewed to assess the adequacy of care provided at KVSP. He previously was provided diagnoses of schizoaffective disorder, bipolar type, factitious disorder with psychotic features and substance-induced psychotic disorder; his symptoms included auditory and visual hallucinations, paranoia, and bizarre delusions, as well as a history of substance use, violence, suicide attempts and self-injurious behavior while in the community. The patient transferred to KVSP on January 2, 2024.

The patient first entered CDCR on May 4, 2000, and was placed in the MHSDS soon thereafter. He had received mental health services at all levels of care.

The patient was seen timely by both the assigned PC and the assigned psychiatrist for the initial assessments. The assessments were appropriate, and the patient was then provided a diagnosis of

schizophrenia, paranoid type. He was prescribed benztropine, buspirone, olanzapine, and valproic acid, and he received his psychotropic medications by a PC 2602 order due to grave disability that was renewed timely on February 6, 2024.

Three routine IDTT meetings occurred timely during the review period on January 10, 2024, April 3, 2024, and June 26, 2024. All required disciplines were in attendance; however, the patient refused to attend the January 10, 2024 IDTT meeting. His history of treatment refusal was noted in treatment planning, as the patient was included in the sustainable process report. The treatment team's justification for retaining the patient at the EOP level of care was adequate, as his nonadherence was attributed to poor insight regarding his mental health symptoms, his participation in other programming, stable mood symptoms and coping skills, and that he was attentive to his ADLs. In addition, adequate treatment plan modifications were included to address the patient's participation.

The clinical summary indicated that although the patient denied experiencing mental health symptoms, he exhibited delusional thinking believing that he was falsely incarcerated because his criminal record was sealed. Despite that, the patient reported no distress and wanted to focus on adjusting to the new environment. The treatment plan targeted his treatment nonadherence, and IPOCs focused on treatment nonadherence and delusions. Although the IPOCs were included, they were initiated on October 3, 2023 and had not been updated. In addition, although the treatment plan included measurable goals for treatment nonadherence, the delusion IPOC failed to include measurable goals or interventions to be utilized. Adequate discharge criteria and justifications for retaining the patient at the current level of care were documented.

During the April and June 2024 IDTT meetings, it was noted that the patient had refused group treatment. In April, he only attended approximately five percent of his structured treatment activities; and in June, he had 16 percent treatment participation. The June 2024 treatment plan lacked specific treatment modifications and interventions to be utilized such as the specific treatment modalities, specific groups, the disciplines responsible, and progress toward specific goals. Additionally, there was no documentation of the patient's strengths, verbalized goals, preferred learning style, or discharge planning criteria.

Routine PC contacts generally occurred timely but often occurred cell front in a nonconfidential setting due to the patient's refusal. The documentation of those brief contacts was limited and typically stated that, "This writer was unable to address treatment goals/progress or provide specific MH treatment interventions as outlined in the MH treatment plan due to the pt declining/or being unable to attend his weekly PC appointment. However, data sources indicate overall positive adaptive functioning and no worsening in mental health symptoms…" Overall, the patient was generally stable during the review period, and the PC contacts appeared adequate and included documentation of the patient's current mental status and his treatment adherence; however, the interventions used and the patient's response were not consistently documented.

Routine psychiatric contacts did not occur timely. When seen in January, April, and June 2024, the patient was reportedly stable without evidence of significant mood or psychotic symptoms. His concerns appeared to have been adequately addressed, and medication adjustments were justified.

Although the patient often refused structured activities, he was assigned to appropriate groups related to coping skills, stress management, mental health education, nursing-led groups, and recreational groups.

**Findings**

The care and treatment provided to this patient were adequate.

During the review period, the patient's symptoms appeared to have stabilized, and the primary areas of concern were treatment nonadherence, chronic delusional thinking, and occasional mood symptoms. He was seen consistently by his assigned PC and psychiatrist, despite refusing appointments in nonconfidential settings. Although barriers to treatment needed further exploration, and documentation needed improvement; the patient's treatment needs appeared to have been addressed by treatment providers. In addition, the IDTT meetings occurred timely and targeted the patient's symptoms and included some measurable goals. Adequate rationale was also provided to justify retention at the EOP level of care despite the patient's high treatment refusal.

**Patient GG**

This 55-year-old EOP patient's healthcare record was reviewed to assess the adequacy of care provided at KVSP. The patient was provided diagnoses of schizoaffective disorder, depressive type, unspecified anxiety disorder, and opioid use disorder. He was prescribed olanzapine, buspirone, venlafaxine, and atomoxetine, and he had intermittent nonadherence. The patient was also prescribed buprenorphine-naloxone for opioid use disorder. He transferred to the KVSP EOP on January 17, 2024.

The patient initially entered CDCR on July 21, 1992 to serve a life term with the possibility of parole. He had received mental health services at the 3CMS, EOP, and MHCB levels of care. The patient also had a history of receiving his psychotropic medications by a PC 2602 order due to danger to self in 2019. He had a history of self-injurious behavior and a suicide attempt by hanging in 2013.

The patient was last placed in the MHCB from January 10, 2024 to January 17, 2024 due to paranoia, depression and cutting.

Five follow-up contacts occurred timely after transfer to KVSP. A safety plan was developed while the patient was housed in the MHCB, and the documentation indicated that it was reviewed with the patient on only one of the days of contact. The patient declined out-of-cell contacts in a confidential setting on all but the final day of follow up. The primary clinician addressed the patient's concerns and implemented cognitive restructuring interventions.

The initial PC and psychiatric assessments occurred timely and were appropriate. The initial PC assessment occurred cell front on January 22, 2024 and included some incomplete sections and relied heavily on historical information from prior evaluations. The patient reported significant

paranoia, anxiety, and mistrust of others due to an unauthorized withdrawal from his trust account and the theft of some property. He expressed concerns about not feeling safe related to his offense. As a result of his safety concerns, the PC referred those concerns to the appropriate custody staff.

On January 30, 2024, the patient was seen by the psychiatrist, but it was unclear if the contact occurred in person and in a confidential setting. During the assessment, the patient displayed symptoms of depression, anger, anxiety, irritability, agitation, and paranoia, but denied experiencing hallucinations or thoughts of self-harm. The psychiatrist provided the previously mentioned diagnoses and noted that the patient had intermittent medication nonadherence.

The IDTT meetings did not occur timely, and only two meetings occurred during the review period on January 31, 2024 and May 15, 2024**.** During the January 31, 2024 meeting, all required participants were present, but the patient refused to attend. The IDTT noted that the patient had missed five of ten weeks of treatment, resulting in continued monitoring due to his treatment refusal. The IDTT determined that referral to a higher level of care was not warranted, and adequate justifications and treatment plan modifications to address the treatment refusal were documented. Although the clinical summary was useful, the case formulation was generic. IPOCs targeting anxiety that were initiated on August 8, 2023 were continued; however, they were not updated with the patient's progress. The goals set for the patient were measurable, and sufficient interventions were provided. The discharge plan criteria and reason for retaining the patient at the EOP level of care were well documented, and appropriate justification was provided.

Routine PC contacts occurred timely during February 2024; however, the patient was seen by the assigned PC only twice in March and April 2024, and then was seen by a covering PC for three consecutive weeks. Notably, the patient frequently refused confidential contacts and was primarily seen cell front. The contacts appeared brief, and the interventions were limited and primarily focused on psychoeducation and encouraging the patient to participate in EOP programming. The patient generally appeared to be doing well during the contacts with only minimal symptoms reported. The PC noted that the sustainable process report indicated that the patient received two RVRs, one for sexual disorderly conduct on February 24, 2024, and another for indecent exposure on February 28, 2024. The patient was also assessed by the CIT on February 28, 2024; after receiving the IEX RVR, he expressed suicidal ideation which he later denied. The PC noted that on March 6, 2024, the patient had shown some improvement, as he reportedly attended some groups and reported feeling better.

The patient was seen for the RVR mental health assessments on March 6, 2024 and March 12, 2024, and the clinician determined that the patient's RVR related behaviors were not due to mental illness. On April 18, 2024, the patient was involved in an altercation and was evaluated by medical staff; however, he refused any further treatment.

The May 15, 2024 IDTT meeting did not occur timely. Although the patient was identified as a high treatment refuser, progress toward the specific treatment goals was not included in the treatment plan. The patient attended an average of only 2.45 hours of group sessions weekly with poor medication adherence. The IDTT lowered the patient's level of care to 3CMS due to treatment nonadherence at that meeting. There was no documentation that there was discussion

of the recent RVRs and an altercation during the May 15, 2024 IDTT meeting, but the PC notes documented the incidents.

Routine psychiatric contacts did not occur monthly as required in February and March 2024. On April 15, 2024, the patient met with a covering psychiatrist when he requested adjustment in his medications due to low motivation, and his medication was adjusted. A newly assigned psychiatrist attempted to see the patient on May 7, 2024 in response to a consultation request; however, the patient angrily refused to talk with the psychiatrist.

**Findings**

The care and treatment provided this patient were inadequate.

The routine psychiatric contacts and IDTT meetings did not occur timely. Additionally, continuity of care was poor, as the patient was seen by multiple providers.

The barriers to the treatment and an increase in RVRs were not adequately addressed timely by the IDTT. EOP modified programming could have been considered as a temporary measure while the IDTT worked with the patient to improve his treatment adherence. Ultimately, he was placed at a lower level of care after treatment modifications occurred; however, those modifications did not result in significant improvement.

**Pelican Bay State Prison (PBSP)**
**May 29, 2024 – May 31, 2024**

**Patient A**

This 27-year-old patient's healthcare record was reviewed to assess the care provided in the PBSP EOP. The patient was provided diagnoses of unspecified depressive disorder, PTSD, and opioid use disorder. He was on MAT for opioid abuse and was prescribed Remeron at bedtime for depression. He arrived at PBSP on April 10, 2024, and he was admitted to the MHCB following his arrival to PBSP.

He had served multiple CDCR prison terms with his current term beginning in 2016. He received mental health services at the EOP level of care since 2019. He was housed at CSP/Sac until he transferred to RJD on March 7, 2024.

At the time of intake at PBSP, the patient reported his high levels of depression and anxiety which he rated on a ten-point scale as 10. He reported having been an active gang member in the past, and he was a recent dropout who feared being recognized at PBSP.

The patient had refused confidential contacts at CSP/Sac and RJD with psychiatry, his PC, and medical staff. He was seen at cell front on occasion. The patient had not attended group treatment consistently and refused to attend his initial IDTT meeting at RJD. Prior to arrival at RJD, a pre-placement screening was completed for placement in the RHU; however, no specific reason for RHU placement was provided. The patient then transferred to PBSP; however, during a layover at CSP/Sac, he was emergently referred to mental health. The reason for referral was unclear except that custody was concerned about the patient's mental status. The patient was cleared for transport without the completion of a suicide risk assessment, despite suicide risk indicated as the focus of the documentation.

Upon arrival at PBSP, an urgent referral to mental health was submitted based on the patient's intake screening. The following morning, nursing contacted psychiatry by telephone regarding the urgent consult. The psychiatrist directed nursing to submit the urgent referral. Despite this, the patient was not seen by mental health until his initial PC assessment on April 17, 2024. That assessment did not reference the urgent referral.

The patient was seen by a covering telepsychiatrist for his initial psychiatric assessment on April 25, 2024, which occurred 15 days after arrival to PBSP. The patient reported that everything was "good" except for sleep but also reported that he was stabbed 30 days prior and had been "jumped" several times in the last month. The patient appeared to have safety concerns that were not directly addressed by his providers. He continued to refuse to attend group and refused a disciplinary-related mental health assessment interview once he learned of the purpose for the visit. The patient's mental status was not found to be a factor in the behavior underlying the RVRs.

The initial IDTT meeting occurred on May 1, 2024; however, the patient did not attend. The assigned PC and a covering psychiatrist were present at the meeting. In addition, the mental health supervisor, nursing representative, and a CCII were present. The treatment plan did not

indicate whether the correctional counselor was assigned to the patient. While the SOMS data provided on the HLOC tab of the treatment plan noted that the patient was a treatment refuser, the treatment team did not indicate criterion 7 (i.e., on average over last three months, the patient participated in less than five hours of treatment) as positive, nor document consideration of referral to a higher level of care, rationale for non-referral, or treatment modifications. The clinical summary did note that the patient met that criterion and indicated that he would be encouraged to attend treatment. Areas of focus for treatment included depressed mood, lack of engagement with mental health treatment, and substance use cravings. The treatment objectives were limited; for example, it noted that the patient would identify and challenge at least three cognitive distortions daily. Additionally, the treatment interventions did not include a means to quantify them (e.g., patient will maintain a thought log). However, long term treatment objectives for treatment participation were objective and measurable. Evidence-based interventions were identified in the treatment plan.

On the following day on May 2, 2024, the patient was admitted to the MHCB due to active suicidality, reports that he had swallowed a razor, and having removed his shoelaces while talking to the PC. The patient initially presented at the TTA with complaints of severe atypical chest pain that he rated as a 10 of 10, or the highest level of pain. The documentation did not indicate that the patient was sent to an outside hospital. When seen by an RN in a holding cell, the patient reported suicidality with a plan and the recent death of a family member. The patient refused to allow x-rays that were clinically indicated due to the report of a swallowed razor, stating that he wanted to kill himself and not to receive treatment.

The course of treatment at the PBSP MHCB was characterized by inconsistent self-report regarding suicidality, emotional lability, disruptive behaviors (e.g., throwing tooth powder), and engaging in self-harm (e.g., hitting head against holding cell or cell door). The patient continued to only minimally engage in treatment. He was sent to an outside emergency department on May 13, 2024, due to self-reported poisoning that included taking 10 hoarded Remeron tablets, tying a piece of cloth around his neck, and consuming spice. A self-harm progress note indicated that the patient was found unconscious by custody with a ligature around his neck. Staff, including the responding nurse, believed that the patient had feigned his unconscious presentation; it was noted that there was no visible evidence of injuries, and the emergency department found no evidence of drugs. His vitals and EKG results indicated no anomalies. The patient was discharged back to the PBSP MHCB.

At the next IDTT meeting on May 15, 2024, the MHCB treatment team failed to recognize that the patient had been in the MHCB for more than 10 days and his treatment refusal. The patient was not referred to a HLOC at that time, because he was perceived as engaging in impression management for secondary gain due to safety concerns.

**Findings**

The care and treatment provided to this patient were inadequate.

The patient had transferred to several institutions multiple times and experienced a lack of continuity of care that continued at PBSP. He was seen by a covering psychiatrist rather than his assigned psychiatrist. He was not appropriately seen by a clinician in response to an urgent

referral upon arrival. The patient had significant safety concerns that he indicated resulted in intense feelings of depression and anxiety. He repeatedly expressed those safety concerns to the PBSP staff; however, there was no documentation that the concerns were addressed, and they were not a focus of treatment. The mental health staff believed that the patient was feigning symptoms for secondary gain related to his safety concerns, but no psychological assessment was performed to clarify the diagnostic presentation. The patient repeatedly reported high levels of fear; but this was not a focus of treatment, even as it was characterized as the primary driver of his psychiatric symptoms.

Additionally, the treatment team failed to identify criteria for consideration of referral to a higher level of care. Consequently, a HLOC referral was not considered, and no treatment modifications were included in the treatment plan. The treatment plan indicated that the patient would be "encouraged" to participate in treatment, and broad treatment interventions were listed such as cognitive behavioral therapy; however, it was unclear how this would actually positively impact the patient's treatment participation. The patient would benefit by having his safety concerns addressed by custody and made a focus of treatment if there are no specific concerns identified.

**Patient B**

This 27-year-old patient's healthcare record was reviewed to assess the care provided in the PBSP EOP. The patient was provided diagnoses of major depressive disorder, recurrent, moderate; unspecified bipolar or related disorder; unspecified trauma and stressor-related disorder; antisocial personality disorder; severe opioid use disorder in a controlled environment; and alcohol use disorder. He was prescribed Remeron. The patient arrived at PBSP on April 10, 2024, and he had been placed at the EOP level of care at a prior facility on November 11, 2023. He had a history of MHCB placement at CHCF.

The patient screened positive for an urgent referral to mental health during the nursing health screen upon arrival at PBSP. The psychiatrist was notified and confirmed that an urgent referral was needed due to the patient receiving unspecified bad news and feelings of depression. However, the patient was only seen at cell front for what the PC described as a wellness check. No suicide risk assessment was completed, and the patient was not seen in a confidential setting.

The initial PC assessment completed on April 16, 2024 was based on a record review, as the patient refused to attend the confidential clinical session. The assessment noted that the patient previously reported that his November 2023 hospitalization was due to receiving bad news, specifically the death of his seven-year-old child from COVID-19; however, that information was not confirmed by CDCR. According to the PC, the patient had multiple recent institutional moves, including moving from CSP/Sac to CSP/LAC before transferring to CHCF for admission to the MHCB, and subsequent discharge to RJD before transfer to PBSP. The patient was on RHU status following a disciplinary action for assaulting a peace officer. Documentation in EHRS indicated that the patient was an inconsistent historian.

The patient refused the initial psychiatric assessment on the same date. The psychiatrist saw the patient at cell front for a wellness visit where the risks of not attending confidential visits was reviewed. The documentation of the initial psychiatric assessment was minimal with limited

record review and primarily included areas of the assessment that were pulled forward. The patient was maintained on Remeron, and the diagnosis of major depressive disorder was continued. Later that day, the patient was determined to officially be on a hunger strike, as he had refused his ninth meal, and a routine referral to mental health was made. Nursing notes documented that the patient reported that he began a hunger strike at the beginning of April 2024 because his request for his girlfriend to visit was denied.

It was concerning that neither initial assessments included information regarding the patient's refusal of multiple meals. The psychiatric assessment specifically addressed the patient's mental status despite the difficulties in conducting a mental status exam at cell front. The psychiatrist also concluded that there was no evidence of suicidality and did not address the missed meals or hunger strike at all.

The patient was seen by the IDTT on May 1, 2024. All disciplines were present at the meeting, but the psychiatrist was not the assigned psychiatrist. The IDTT documentation did not indicate if the CCII was the patient's assigned CCII. Sustainability data imprinted on the HLOC tab in the treatment plan identified the patient as a treatment refuser. Despite that, the PBSP treatment team did not endorse the related criterion and did not document consideration of referral to a HLOC or note treatment modifications. Despite refusing other mental health contacts including group treatment, the patient attended the IDTT meeting. He reported increased irritability during the meeting and requested an appointment with the psychiatrist to discuss possible medication changes to assist in managing his irritability. As of April 15, 2024, the patient had not been seen by the psychiatrist. According to the treatment plan, the treatment team identified anger and impulsivity as targets for treatment. The treatment goals were vague and subjective rather than objective and observable. No baseline was established for any of the treatment goals. While some of the interventions identified were overly broad, they were generally adequate and evidence based. No treatment target was initiated for the patient's poor treatment adherence, despite the sustainability report clearly documenting that this was an issue that existed before arrival to PBSP.

No specific treatment groups were identified in the treatment plan. In fact, review of EHRS demonstrated that the patient was not scheduled for a treatment group until he failed to show for a caseload group on April 24, 2024. On April 30, 2024, the patient was seen by his assigned PC in a confidential setting when he reported that much of his prior behavioral issues that included disciplinary infractions, hunger strike, going "man down" with chest pain, and reporting suicidal ideation, had all occurred in an effort to avoid transfer to PBSP. The patient further reported that he no longer wanted to leave PBSP and was instead focused on making the best of his time there. The clinician reported using effective and empathic listening skills but did not implement actual interventions outlined in the treatment plan. The PC did not address the patient's treatment refusals. Subsequently, the patient attended most scheduled leisure groups.

**Findings**

The care and treatment provided to this patient were inadequate.

The initial assessments were limited in that the patient refused the initial psychiatric and PC appointments. Those refusals may have contributed to the poor treatment planning in which the

patient's lack of engagement with mental health treatment was not properly identified on the HLOC tab and was not addressed as a focus of treatment. The treatment targets of anger and impulsivity were overly broad and vague. Clarity was not provided by the treatment goals, and the treatment was not individualized. No specific treatment groups were identified; and other than one PC/case management group, all groups consisted of leisure activities. While difficult to conclude, the medical record documentation indicated that the patient struggled with feelings of depression, adjustment to incarceration, and coping; however, those issues were not properly identified by PBSP staff nor addressed in the treatment plan.

**Patient C**

This 31-year-old patient's healthcare record was reviewed to assess the care provided in the PBSP EOP. He was provided the diagnosis of schizophrenia and was prescribed Abilify, risperidone, Cogentin, Zoloft, and risperidone prn. The patient arrived at PBSP on April 10, 2024 from CSP/LAC.

This was his first prison term, and his reason for commitment included sexual offenses. An urgent referral was made to mental health following the initial health screening. The Spanish-speaking patient was seen at cell front by an English-speaking PC for a wellness visit apparently in lieu of an actual confidential clinical contact in response to the urgent referral. No interpreter was utilized, as the PC stated that the patient declined to wait for one. As the patient was seen at cell front, the rationale for not utilizing an interpreter following an urgent referral was inadequate. The PC documented that they communicated using simple words and that the patient gave a "thumbs up". The PC provided no documentation to indicate that the patient had adequate functioning and insufficient rationale for assuming that further intervention was not indicated.

The same clinician completed the initial PC assessment on April 18, 2024; however, the healthcare documentation indicated that they were not the assigned PC. An interpreter was used for the evaluation; although, the PC documented difficulties, as they could not always hear each other since the interpreter was on the phone. The suicide risk assessment completed at the same time indicated that the patient had continued active suicidal thoughts and a recent attempt. The patient was noted with many risk factors and had few protective factors. His chronic risk was determined to be high, and his acute risk was assessed as low; however, those determinations appeared to be primarily based on the patient's denial of current suicidality and his lack of overt depressive symptoms. The determination of low acute risk was not supported by the healthcare record documentation, including a recent suicide attempt within the prior three months. The PC assessment indicated that the patient had a history of delusional beliefs and auditory hallucinations with a history of bizarre behavior.

Another urgent referral was made on April 21, 2024, after custody staff discovered the patient naked in his cell, urinating through the grate of the housing door, and pushing feces under the door. After being brought to the holding cell, the psychiatric technician documented that the patient reported to the interpreter that he was in fear for his life and removed his pants again. When seen in a confidential setting with the PC and an interpreter, the patient reported that he had intentionally engaged in the bizarre behavior because he had been "acting like a woman." When asked by the PC to elaborate, the patient simply responded that was all, that he had been

acting like a woman. The patient reported significant safety concerns and reported that he had been spat on by a peer, but he could/would not identify that person. Despite the seemingly delusional statement ("acting like a woman"), the PC concluded that the patient could return to his cell after agreeing that he would not engage in the behavior again.

On April 26, 2024, the patient refused to see the covering telepsychiatrist. The patient was seen at cell front using telehealth equipment assisted by the certified nursing assistant. The telepsychiatrist noted that the patient reported that he was doing well, denied suicidality, and was rescheduled to be seen in seven days. It did not appear that the covering psychiatrist had reviewed the healthcare record, or the patient's unusual behavior would have been addressed in the documentation of that encounter.

The patient was next seen on April 30, 2024 by his assigned PC for the first time. A custody officer assisted in translation. The patient denied suicidality and hallucinations, but continued to report intense safety concerns. The PC reported that they and the officer present reassured the patient regarding his safety and reviewed the process to seek assistance if needed. The patient reported that he was hit in the nose two days prior, had already reported it, and wanted to see medical due to continued pain.

An IDTT meeting occurred on May 1, 2024. An interpreter was present along with all required disciplines; however, the attending psychiatrist was not the assigned psychiatrist. There was no information in the treatment plan to identify if the CCII was the assigned CCII. The sustainability report imprinted on the HLOC tab of the treatment plan noted that the patient frequently refused treatment, and that criterion was flagged. The treatment team appropriately identified that positive criterion but did not refer the patient to a HLOC. The rationale for non-referral was adequate for an initial IDTT and included safety concerns and being uncertain if groups were provided in Spanish. The treatment modifications were included in the HLOC tab and were appropriate. A safety plan was indicated considering the patient's recent suicide attempt, but the form was not completed. The treatment team also failed to complete the actual treatment plan tab fully. There were no targets for treatment, no treatment goals or interventions, and no individualized plans of care. It was unclear what groups the patient would be assigned to and if PBSP had sufficient Spanish treatment opportunities.

The healthcare record did not include group therapy documentation from PBSP until May 2, 2024. Subsequently, the patient was scheduled intermittently for leisure groups. Those groups were all scheduled for two hours; however, there was not documentation of any significant interactions with the patient or recognition of the need for interpretive services.

On May 9, 2024, the patient submitted a healthcare services request requesting testing for colon cancer. On May 14, 2024, the patient refused a medical visit for his nose. The request for colon cancer screening was not addressed in the medical progress note.

**Findings**

The care and treatment provided to this patient were inadequate.

The patient was seen by different mental health providers during his brief time at PBSP. He frequently refused mental health and medical appointments beginning prior to his arrival at

PBSP. The patient repeatedly expressed fears for his safety primarily due to his commitment offense, and he subsequently reported incidents such as being hit in the nose or spat on. It was unclear from the mental health documentation if those incidents were reality-based or part of his delusional thinking. The patient may have had somatic delusions as demonstrated by the complaints regarding his nose and request for colon cancer testing. No safety plan was documented despite treatment planning documentation indicating that one was necessary considering the patient's recent attempt. His acute risk was assessed as low which was not consistent with documented risk factors. The treatment plan form did not include an actual treatment plan; that form, and the safety plan were not completed. Urgent referrals were not assessed with the urgency required, and the patient instead either received a wellness cell front visit or the content of the behavior underlying the referral was not properly conceptualized considering the patient's diagnosis and symptoms.

**Patient D**

This 39-year-old EOP patient's healthcare record was reviewed to assess the quality of care provided at PBSP. The patient was provided diagnoses of bipolar I disorder and unspecified schizophrenia spectrum and other psychotic disorder. He was prescribed Abilify, Prozac, and Vistaril prn. He transferred to the facility on April 10, 2024.

He had received mental health services at various higher levels of care including the acute and MHCB levels of care. His most recent MHCB admission occurred in February 2024. His EPRD was September 15, 2024. His healthcare record was randomly selected from the PBSP EOP roster to assess the adequacy of mental health care provided.

The primary clinician initial assessment included useful information regarding the patient's treatment history and current symptoms of chronic depression, anxiety, anger, impulsivity, and auditory hallucinations. The sole primary clinician contact occurred on May 3, 2024, when the patient's treatment needs were addressed.

The patient refused the initial psychiatric assessment by telepsychiatry on April 25, 2024. A cell front wellness check was subsequently conducted, and the brief documentation of that encounter indicated that patient was "okay and denied concerns" including thoughts of self-harm or harm to others and "did not appear in distress." The documentation lacked indication that custody staff was consulted, nor did it include a description of the cell, or the patient's mental status. The documentation indicated a plan to reschedule the patient to be seen in seven days; however, at the time of the review on May 8, 2024, the patient had not been seen.

The patient refused to attend his IDTT meeting which did not occur until May 1, 2024. The IDTT meeting was attended by a covering psychiatrist and the assigned primary clinician. The IDTT documentation indicated that the patient did not meet the criteria for consideration of referral to a higher level of care; however, treatment attendance was documented as "not applicable" without further explanation. The rationale for continued treatment at the EOP level of care was generic and would have been improved with greater specificity. Treatment goals were not established.

The patient refused four of the five two-hour groups that were offered between May 2, 2024 and May 7, 2024. Groups focused on leisure activities, and most were facilitated by a nurse.

**Findings**

The care and treatment provided to this patient were inadequate.

The patient did not receive treatment consistent with Program Guide requirements including weekly primary clinician contacts, an initial psychiatric assessment, or a timely IDTT meeting. The documentation of the cell front telepsychiatrist contact did not provide sufficient mental status information. Treatment goals were not established, and group treatment was not individualized to the patient's treatment needs. A rationale for provided diagnoses was needed.

**Patient E**

This 31-year-old EOP patient's healthcare record was reviewed to assess the quality of care provided at PBSP The patient was provided diagnoses that varied by provider that included antisocial personality disorder, unspecified depressive disorder, and schizoaffective disorder versus major depression with psychosis. He was prescribed Zoloft and Vistaril. He transferred to the facility on April 10, 2024.

The patient previously received mental health services at the 3CMS, EOP, MHCB and ICF levels of care; his most recent discharge from the MHCB occurred in April 2023 after his only suicide attempt by hanging while housed in restricted housing.

The initial provider assessments were clinically appropriate and identified the patient's treatment needs as anxiety, depression, and chronic passive suicidal ideation. The initial psychiatric assessment was completed by telepsychiatry. The IDTT meeting was attended by the assigned primary clinician and a covering psychiatrist. Poor treatment attendance was identified as a criterion for consideration of referral to a higher level of care, and a reasonable plan and rationale for non-referral was documented to address the patient's treatment refusals. Additionally, treatment attendance and depression were appropriately implemented as treatment goals. The treatment interventions required multidisciplinary input, as the interventions were solely developed by the primary clinician. Anxiety and suicidal ideation were not targeted, although identified as treatment needs. The rationale for continued treatment at the EOP level of care was not documented.

The patient refused his only primary clinician contact with a covering clinician on April 29, 2024. He was seen for a non-confidential wellness check when he presented without distress.

The patient was scheduled for groups after his initial IDTT meeting. He refused most groups which were focused on leisure activities. During the two weeks of scheduled groups; one was facilitated by a recreational therapist, and the remainder were facilitated by a nurse.

**Findings**

The care and treatment provided to this patient were marginally adequate.

Provider continuity of care and treatment planning required improvement. While depression and treatment attendance were targeted for treatment, additional identified treatment needs of anxiety and suicidal ideation were not considered as treatment goals. Further, group treatment was not individualized to this patient's treatment needs. Clinical rationale for the provided diagnoses was needed.

**Patient F**

This 65-year-old patient's healthcare record was reviewed to assess the adequacy of care provided. The patient transferred to the PBSP EOP on April 19, 2024. He was provided diagnoses of major depressive disorder and unspecified anxiety disorder. The patient was generally adherent with prescribed Buspar, Remeron, and Zyprexa.

The patient had previously received mental health services at the 3CMS, EOP, and MHCB levels of care.

The patient transferred to the EOP after discharge from an MHCB which occurred due to suicidal ideation. He was not seen for four of the required five-days of follow-up after discharge, and the documentation of the contact was minimal and lacked individualization. Relatedly, a suicide risk assessment was not completed as required.

The patient refused provider initial assessments. The primary clinician initial assessment was conducted by record review and included relevant clinical information. The patient refused a subsequent primary clinician contact; and when seen in the dayroom, he was assessed as managing appropriately.

After the initial psychiatric assessment refusal, the patient was seen by a covering telepsychiatrist for a cell front contact when it was documented that he did not "appear in any distress" and denied thoughts of harm to self or others. No additional mental status documentation was provided. The telepsychiatrist indicated that the patient would be rescheduled within seven days (by May 2, 2024) for an initial psychiatric assessment; however, at the time of this review on May 8, 2024, that assessment had not occurred.

The patient did not attend his initial IDTT meeting which was attended by the assigned primary clinician and a covering psychiatrist. No higher level of care indicators were identified. There was no IDTT documentation indicating that there was discussion that the initial psychiatric assessment had not been completed. Treatment goals were not implemented for this patient. The rationale for continuation at the EOP level of care would have been improved if greater specificity was provided.

The patient attended one of three offered leisure groups since his placement at PBSP. Two of three groups were nursing-led, and one group was facilitated by a recreational therapist.

**Findings**

The care and treatment provided to this patient were inadequate.

This patient had been recently discharged from an MHCB, and he was not appropriately monitored after his transfer to a lower level of care. The patient was not appropriately followed for the required five-days of follow-up, and a suicide risk assessment and an initial psychiatric assessment were not completed. The cell front contact by the telepsychiatrist did not provide sufficient mental status information. Treatment goals were not established during the IDTT meeting, and group treatment was not individualized to the patient's treatment needs. Considering his recent MHCB discharge and continued treatment refusals, it was clinically indicated for providers to consult with unit custody staff regarding the patient's functioning and adjustment to the EOP.

**Patient G**

This 58-year-old patient's healthcare record was reviewed to assess the care provided at the PBSP EOP. The patient was provided diagnoses of persistent depressive disorder, PTSD, and antisocial personality disorder. He was adherent with prescribed Celexa and Remeron.

The patient transferred to the facility on April 3, 2024.

He previously received mental health services at the 3CMS, EOP, MHCB, acute and ICF levels of care; and he was treated at the EOP level of care since ICF discharge in 2019.

The patient refused the initial telepsychiatric assessment on April 10, 2024; consequently, he was seen for a cell front contact. The documentation of that contact included a mental status assessment and brief review of psychiatric history which was reasonable given the non-confidential nature of the contact. The documentation included a plan to follow-up with the patient in two weeks which had not been completed at the time of this review on May 9, 2024.

The extent and confidentiality of the primary clinician initial assessment was unclear given the following documentation: "Complete [sic] refused remainder of appointment." Regardless, the documentation provided a succinct summary of the patient's mental health treatment and current depressive symptoms, specifically, chronic suicidal ideation, fatigue, and decreased appetite. The patient's most recent suicide attempt occurred in 2018 by cutting, and he last experienced suicidal ideation three days prior to the primary clinician initial assessment.

The initial IDTT meeting was conducted in absentia and was attended by the assigned primary clinician and a covering psychiatrist. The planned treatment appropriately targeted depression and risk of self-harm with objective and measurable short and long-term goals and clinically appropriate interventions. No indicators for consideration of a higher level of care were identified, and the rationale for continuation at the EOP level of care was individualized and appropriate.

Excluding the initial assessment, three primary clinician routine contacts were completed by two different covering clinicians, one of which was reassigned as the primary clinician. Thus, in the brief time that the patient was housed at PBSP, he was seen by three different clinicians. The first contact was for an urgent referral due to his cellmate's suicide. This wellness check was conducted with a custodial escort at cell front due to modified programming. The patient reportedly was managing appropriately. The patient refused a scheduled contact several days later and was seen at cell front. The third contact occurred in a confidential setting with his

newly assigned clinician. The documentation indicated that the patient was engaged and that a meaningful therapeutic contact occurred.

After the initial IDTT meeting, two-hour groups were offered primarily by a nurse and at times by a recreational therapist with a focus on leisure activities. The patient attended one of seventeen offered groups.

**Findings**

The care and treatment provided to this patient were marginally adequate.

Except for group treatment, the limited initial treatment provided was individualized to the patient's treatment needs. In general, the patient was appropriately monitored by providers; however, provider continuity and timely psychiatric follow-up required improvement.

**Patient H**

This 34-year-old patient's healthcare record was reviewed to assess the care provided at the PBSP EOP. The patient was provided diagnoses of unspecified depressive disorder and antisocial personality disorder. He was prescribed Zoloft and Remeron.

The patient transferred to the facility on April 10, 2024.

He previously received mental health services at the 3CMS, EOP and MHCB levels of care.

The patient was referred for an urgent consult from R&R due to having received bad news, and he was seen by a mental health clinician the following day. The documentation of that encounter indicated that the patient was uncomfortable with the non-confidential nature of the contact that occurred in the dayroom, and he indicated that he would wait until his next appointment. One week later, the patient refused the initial primary clinician assessment due to not feeling well. A brief wellness check was conducted, and the patient requested a confidential contact to discuss a death in the family. Two weeks later, the patient attended a confidential primary clinician contact with a newly assigned clinician. During that contact, he stated that he wanted to address his mood swings, impulsivity, his future, and family issues. The documentation was indicative of a meaningful therapeutic contact and included review of relaxation techniques.

During the comprehensive initial psychiatric assessment that was completed by a covering telepsychiatrist, the patient reported the onset of trauma-related symptoms, and psychiatric medication was resumed. In contrast, the initial primary clinician assessment, which was based on record review, noted symptoms of depression and anxiety.

The patient attended the initial IDTT meeting which was also attended by his assigned primary clinician and a covering psychiatrist. Of note, the psychiatrist that attended the IDTT meeting was a different provider than the one who completed the initial assessment. Treatment goals were not established, and the rationale for continuation at the EOP level of care needed individualization.

On May 4, 2024, the patient was placed in alternative housing after hours due to a suicidal statement that he recanted soon after; he indicated that he made the statement to change housing due to safety concerns. Upon clinical evaluation the next day, the patient continued to deny suicidal ideation and maintained his safety concerns. A SRASHE was completed that assessed the patient with high acute and chronic suicide risk. Pending resolution of his safety concerns, the patient was admitted to the MHCB on May 5, 2024.

The patient was offered nine two-hour groups between April 22, 2024 and May 2, 2024, and the content of the groups was focused on leisure activities. Most groups were facilitated by nursing; two groups were facilitated by recreational therapists.

**Findings**

The care and treatment provided to this patient were inadequate.

The non-confidential contact for the urgent referral, which ultimately delayed care was an area of concern. There was a lack of provider continuity, timely primary clinician contacts, treatment planning, and individualized group treatment.

**Patient I**

This 37-year-old EOP patient's healthcare record was reviewed to assess the quality of care provided at PBSP. The patient was provided diagnoses of major depressive disorder, recurrent episode, moderate; PTSD; unspecified anxiety disorder; opioid use disorder, moderate; amphetamine-type substance use disorder, moderate; and alcohol use disorder, moderate. The patient was prescribed aripiprazole, buspirone, fluoxetine, and olanzapine and was fully medication adherent. The patient arrived at the PBSP EOP on January 26, 2024. He had received services at the 3CMS, EOP and MHCB levels of care, and the most recent MHCB placement occurred in October 2023.

Upon his arrival at PBSP, the patient reported having trouble adjusting to the facility's remote location and was referred to mental health. The patient also submitted a request to be seen by a clinician. He was seen for an initial psychiatric assessment on January 30, 2024, and the assessment was adequate; however, the assessment did not reference the referral or healthcare request.

The initial primary clinician assessment occurred on February 1, 2024, and the assessment was adequate. The patient's adjustment concern that resulted in the referral and health care request was noted during the MHPC initial assessment. The clinician recommended that the patient be considered for transfer to the 3CMS level of care at the initial IDTT meeting; however, the rationale for that decision was not well documented.

The initial IDTT meeting occurred on February 7, 2024. The assigned MHPC, a correctional counselor, a psychiatric technician, and the patient were present; however, the psychiatrist was not assigned to the patient and had not met him previously. Even though transfer to the 3CMS level of care was discussed with the patient during the initial MHPC assessment, there was no documentation of the criteria that would be used to determine when the patient would be eligible

for that transition; the documentation only indicated what would be required to discharge the patient from the MHSDS entirely. The rationale documented for retaining the patient at the EOP level of care was the patient's desire to earn milestone credits. No clinical rationale was provided, and no functional impairments were documented. An IPOC was included to address the patient's depressed mood through challenging dysfunctional thoughts, improving decision making skills, and learning positive coping skills; yet the treatment plan section of the IDTT documentation was blank, and no interventions were listed, including no reference to treatment groups. There was no documentation of input from the psychiatrist or other members of the treatment team.

Psychiatric contacts were documented monthly, but the content of those contacts was superficial. MHPC individual contacts were offered weekly; the patient attended most contacts, and the documentation indicated that treatment interventions were provided to support the goals noted in the treatment plan. Of concern was the fact that neither the psychiatrist nor the primary clinician noted that the patient was not attending his group programming. The patient was consistently offered between ten and 20 hours of structured treatment weekly, including clinical and recreational groups. The patient attended most of his groups during the first week in the EOP; but subsequently, he did not attend more than 25 percent of groups for the remainder of the review period.

**Findings**

The treatment provided to this patient was inadequate.

Of concern was the lack of a specific treatment plan, poor rationale to support the patient's current level of care, no criteria for movement to the 3CMS level of care when this was specified as a goal for the patient, and no acknowledgment by members of the IDTT that the patient was not attending his groups. Conversely, the patient was consistently offered structured treatment hours consistent with requirements, and the individual MHPC sessions evidenced the use of treatment interventions which supported the patient's goals.

**Patient J**

This 55-year-old EOP patient's healthcare record was reviewed to assess the quality of care provided at PBSP. The patient was provided diagnoses of schizoaffective disorder, depressive type; PTSD; borderline personality disorder; antisocial personality disorder; and opioid use disorder, moderate. The patient was prescribed bupropion, buspirone, and long-acting injectable risperidone and was fully medication adherent. The patient received his psychotropic medications by a PC 2602 order. He had a lengthy incarceration history with placements at all levels of care including 3CMS, EOP, ICF, APP, and MHCB. The patient was placed at the EOP level of care in December 2022 after his latest discharge from the ICF level of care.

The patient arrived at the PBSP EOP on February 21, 2024 after transfer from another institution. During the initial health screening, the patient reported depressive symptoms, and after phone consultation with a psychiatrist; an urgent referral was made to mental health, yet the patient was not seen in response to that referral. Instead, the patient was seen for a routine initial

psychiatric assessment on February 26, 2024, when the PC 2602 order was acknowledged. The content of the assessment was adequate, and the AIMS was completed. While his depressive symptoms were discussed, the referral was not directly addressed.

The patient refused to participate in the initial MHPC assessment. The content of the assessment was adequately derived from a healthcare record review, yet the urgent referral was also not mentioned in the documentation.

An initial IDTT meeting occurred on March 6, 2024 with required staff and the patient present. An IPOC was initiated to address depressed mood with goals of verbalizing realistic hopes and improvement in mood symptoms. The only intervention listed was vague, and it indicated that goal setting would be used with the patient. An IPOC addressing substance use was also initiated and included goals of identifying triggers and maintaining sobriety. The same intervention of goal setting was listed. The treatment plan section was blank, and no functional deficits were noted. No rationale was provided for retaining the patient at the EOP level of care, nor were criteria for reducing his level of care documented. Only criteria for removal from the MHSDS were documented.

The patient was offered between 14 and 18 hours of structured treatment weekly, yet he refused almost all offered programming. He attended an EOP orientation group on March 18, 2024. He was offered weekly MHPC appointments and a monthly psychiatric appointment but refused all sessions. He also refused the laboratory work necessary for the monitoring of his PC 2602 medications. The patient reported feeling unsafe leaving his cell given the proximity of the EOP to the general population housing. There was no evidence that collateral information was obtained from custody staff, and no efforts were documented to engage the patient in treatment beyond brief contacts at cell front following refusals.

**Findings**

The treatment provided to this patient was inadequate.

While the patient was consistently offered structured treatment hours consistent with requirements; the patient refused almost all contacts, and no efforts were made to address the repeated refusals. Of concern was the lack of a specific treatment plan, poor rationale to support the patient's current level of care, and no acknowledgment by members of the IDTT that the patient was not attending his groups.

**Patient K**

This 59-year-old EOP patient's healthcare record was reviewed to assess the quality of care provided at PBSP. The patient was provided a diagnosis of unspecified bipolar and related disorder. He was prescribed sertraline and duloxetine and was medication adherent. The patient arrived at the PBSP EOP on January 23, 2024. The patient had a history of treatment at the 3CMS, EOP, and MHCB levels of care, and he had received treatment at the EOP level of care since 2021.

The initial MHPC assessment was completed by the assigned clinician on January 25, 2024. The content was adequate; however, the assessment noted an extensive substance use history, paranoia, odd presentation, and problems with anger management, yet no consideration of those signs and symptoms were included in the diagnostic formulation.

An initial psychiatric assessment was completed on the same date which noted diagnoses of adjustment disorder with depression and alcohol use disorder without rationale provided for those diagnoses. The documentation of that assessment made no mention of the patient's documented diagnosis of unspecified bipolar disorder and history of schizoaffective disorder. The assessment was otherwise adequate. The patient's medications were increased at his request to address depressive symptoms.

An IDTT meeting occurred on January 31, 2024; the patient and several staff were present including the assigned MHPC, assigned psychiatrist, two correctional counselors, custody officer, sergeant, lieutenant, unlicensed psychologist, educational provider, senior psychologist supervisor, senior psychologist specialist, and licensed psychiatric technician. The documentation indicated that members of the treatment team contributed to the discussion during the IDTT meeting. An IPOC for depressed mood was carried forward from 2022. The treatment plan included two goals; one to address mood swings, and the other to address "insight/personal responsibility." The objectives were clear, and the interventions were specific and appropriate. The rationale for retaining the patient at the EOP level of care was adequate.

The patient was offered weekly sessions with his MHPC and was noted to be paranoid with limited cognitive functioning and anxiety. The sessions included appropriate interventions to address those concerns, despite those symptoms not being listed in the treatment plan. A formal assessment instrument was attempted to help understand the patient's diagnosis; however, no results of the assessment or changes to the diagnosis were documented.

The patient was offered between 12 and 18 hours of programming weekly, and his attendance was variable. Some group facilitators noted the patient's odd presentation and inability to remain on topic, while others included only generic comments about the patient's level of engagement which was unchanged at each session.

The psychiatrist met with the patient three times during the review period. There was no evidence that the psychiatrist reviewed the patient's healthcare record, as the psychiatrist continued to list the patient's diagnosis as adjustment disorder without mention of the patient's paranoid and tangential thinking, or his inability to remain on topic that was documented by other staff. As an example, the MHPC noted that the patient was observed with inappropriate smiling, while the psychiatrist noted that the patient appeared to be joking when smiling during the session.

**Findings**

The treatment provided to this patient was inadequate.

While treatment planning appeared initially adequate, it failed to address the patient's needs over time. There was poor continuity and coordination of care, with the psychiatrist failing to review the patient's healthcare record to understand how he presented in other contexts. It appeared that there were some concerns about the patient's cognitive abilities, yet no referrals were made for assessment of his intellectual ability. Structured treatment was offered consistent with requirements, and individual MHPC contacts included comprehensive discussion of patient functioning and evidenced interventions to address the patient's needs during clinical sessions.

**Patient L**

This 60-year-old EOP patient's healthcare record was reviewed to assess the quality of care provided at PBSP. The patient was provided diagnoses of schizoaffective disorder, depressive type; alcohol use disorder, moderate; and amphetamine-type substance use disorder, moderate. He was prescribed buspirone, risperidone, and valproic acid and was medication adherent. The patient received his psychotropic medications by a PC 2602 order. He was primarily treated at the EOP level of care throughout his nearly 10-year incarceration, but he also received treatment at the ICF, APP, and MHCB levels of care; his most recent MHCB stay occurred during December 2023. The patient arrived at the PBSP EOP on January 23, 2024, when it was acknowledged that he was designated as DD2 requiring adaptive supports for reading/writing, slow simple language, extra time, and documentation indicating that he was vulnerable to victimization.

The initial MHPC assessment was completed on January 29, 2024 as well as a SRASHE; the SRASHE was reportedly completed as one of the 90-day follow up evaluations after an inpatient discharge, yet the patient was only discharged from the MHCB one month prior. Both assessments were completed adequately; however, the clinical summary and clinical formulation sections of the initial assessment were not updated from the last assessment which was completed at another institution on January 15, 2024. An initial psychiatric assessment was completed on the same day which was adequately completed.

An initial IDTT meeting occurred on January 31, 2024 that included the required staff and the patient. Additionally, a senior psychologist supervisor, additional correctional counselor, licensed psychiatric technician, lieutenant, sergeant, and education provider were present. The patient's case was identified for review of consideration of referral to a higher level of care given his participation in less than 50 percent of programming. Adequate treatment modifications were documented to support an increase in participation. His DDP status and adaptive supports were reviewed. The treatment plan identified goals of attending at least five hours of structured treatment weekly and decreasing hostile behaviors. The goals were objective and measurable; however, there was no intervention listed to support the patient's increased treatment participation. It was unclear why the treatment modifications noted in the higher level of care section were not simply pulled into the treatment plan. There was evidence of input from members of the treatment team other than the MHPC. An Interdisciplinary Support Team (IDST) meeting occurred on February 6, 2024; however, the patient refused to attend. No updates were made to the patient's adaptive supports.

The patient was offered between 12 and 19 hours of structured treatment hours weekly; however, he attended no more than 20 percent of offered treatment weekly. He also refused to attend routine MHPC and psychiatric contacts. The MHPC contacts rarely included documentation that the patient was not attending groups, and no interventions were documented to support increased participation in treatment. On March 6, 2024, a referral was submitted by a sergeant regarding the patient's refusal to attend treatment groups. The sergeant noted that the patient believed he would be lowered to the 3CMS level of care if he continued to refuse to attend EOP groups. The patient refused to be seen by the MHPC in response to the referral. The MHPC documented that it was explained to the patient that group attendance was required to determine his level of functioning before a transfer to the 3CMS program could occur, but this explanation did not increase the patient's treatment participation.

**Findings**

The treatment provided to this patient was inadequate.

While the patient was offered the required structured treatment and timely contacts, there was no documentation of treatment planning or interventions to increase the patient's participation in programming. Further, it was unclear why the patient was not placed in the modified EOP, given that his treatment plan specified five, not ten hours of weekly treatment.

**Patient M**

This 41-year-old EOP patient's healthcare record was reviewed to assess the quality of care provided at PBSP. The patient was provided diagnoses of antisocial personality disorder, opioid use disorder, and other (or unknown) substance-induced psychotic disorder, with moderate or severe use disorder. The patient was not prescribed psychotropic medications but was prescribed buprenorphine-naloxone for his substance use disorder. The patient had not been enrolled in the MHSDS for many years but was placed at the MHCB level of care in November 2022 while in the RHU and then transferred to an acute inpatient setting. He was subsequently discharged to the 3CMS level of care in the RHU until increased to the EOP level of care on February 20, 2024 while housed in the PBSP RHU. He transferred to the PBSP mainline EOP on February 29, 2024.

An initial psychiatric assessment was attempted on March 6, 2024, but the patient refused to attend the session. The content of that assessment was marginally adequate with minimal evidence that a healthcare record review occurred, including no mention of the patient's inpatient placements. The assessment appeared to rely substantially on the patient's self-reported history and self-reported current psychiatric needs; thus, it contained inaccuracies.

An initial MHPC assessment was completed on March 8, 2024, but the patient refused to participate. The content of the assessment was adequate. On March 9, 2024, the patient was involved in an altercation with a peer resulting in lacerations to the patient's head and hand, as well as a nosebleed.

An initial IDTT meeting occurred on March 13, 2024 with the required staff present, as well as a senior psychologist supervisor, additional correctional counselor, licensed psychiatric technician, sergeant, unlicensed psychologist, and educational provider. The patient did not attend. The IDTT noted that the patient had received seven RVRs in the past 30 days but was not being referred to a higher level of care as he was recently placed at the EOP level of care. The plan was to engage the patient using motivational interviewing, DBT, CBT techniques, and progressive muscle relaxation; however, it was unclear how those interventions could be utilized when the patient refused to engage with staff. The treatment plan included a single goal to address treatment nonadherence with a plan for the patient to attend 50 percent of scheduled appointments over the next 90 days. The interventions were vague (e.g., "MI, rapport building"). There was evidence of input in treatment planning from various IDTT members.

The patient was offered between 16 and 18 hours of treatment weekly during the review period; however, he refused all groups and individual contacts. The patient was seen weekly at his cell door by MHPCs; however, neither of the two clinicians were the patient's assigned primary clinician. There was no evidence that interventions outlined in the treatment plan were utilized with the patient.

Three mental health assessments were completed after the patient received RVRs during the review period. Although completed by the same clinician, the assessments were contradictory and confusing. The first two assessments indicated no nexus between the patient's mental health condition and the RVR behavior, while the third made no clear statement about any nexus. Additionally, the third assessment was unclear regarding what was recommended and included the statement, "There are no known penalties might have an adverse impact on his MH stability" which was confusing as to its intent.

**Findings**

The treatment provided to this patient was inadequate.

As was noted in other cases reviewed; the patient consistently refused to engage in any treatment, yet there were no interventions provided to address his refusals despite a treatment goal developed to address that issue. The patient was seen by two MHPCs who were not assigned to his care, likely increasing the likelihood of refusals due to not being familiar with the individual staff members. Further, RVR mental health assessments were contradictory and confusing. The treatment planning was, however, adequate, and the patient was offered the required structured treatment hours.

**Patient N**

This 43-year-old EOP patient's healthcare record was reviewed to assess the quality of care provided at PBSP. The patient was provided a diagnosis of schizoaffective disorder, bipolar type. The patient arrived at the PBSP EOP on January 26, 2024. He had primarily received treatment at the EOP level of care, but he received care at the ICF, APP and MHCB levels of care in the past. The patient was prescribed a paliperidone injection by a PC 2602 order and was medication adherent.

Upon arrival at PBSP, a note in the healthcare record indicated that the order for the long-acting injectable antipsychotic medication paliperidone had expired. The patient was scheduled for a psychiatric appointment on January 30, 2024, but he refused. The psychiatrist noted the patient's PC 2602 order due to danger to himself and noted the intent to continue the medication in the initial psychiatric assessment. The remainder of the assessment was minimally adequate. An MHPC also attempted to complete an initial assessment on the same date, which was adequate despite the patient's refusal to engage.

An initial IDTT meeting occurred on February 7, 2024 with the required staff and the patient present, as well as an additional psychologist, additional psychiatrist, additional correctional counselor, nurse, senior licensed psychiatric technician, sergeant, lieutenant, custody officer, and unlicensed psychologist. It was noted that the patient consistently failed to attend at least 50 percent of scheduled programming but was not referred to a higher level of care given his recent transfer to a new treatment team and current stability. Treatment modifications to increase his participation included psychoeducation, motivational interviewing, humanistic interventions, CBT, and DBT. The treatment plan included relevant goals of medication adherence and increased treatment participation. There was evidence of input in treatment planning from the various IDTT members.

The patient was offered between 10 and 20 hours of treatment weekly; however, he refused most groups. He attended over 50 percent of treatment offered for only one week during the review period. The patient routinely attended individual MHPC appointments during February 2024, but then refused all remaining contacts through the remainder of the review period. The assigned MHPC was able to engage with the patient during sessions and noted delusional thought content, anxiety, and agitation. The MHPC referred the patient to the psychiatrist who moved the patient's injection to an earlier date but did not attempt to meet with the patient. When seen by covering MHPCs in March 2024, the patient was described as agitated, delusional, and had recently quit his job in the kitchen due to delusional thoughts. Of note, when the patient attended groups; the group therapy documentation was generic and did include clear descriptions of the patient's presentation in groups, making it difficult to assess how the patient functioned during group interactions.

**Findings**

The treatment provided to this patient was marginally adequate.

The patient was offered adequate treatment groups and individual sessions which evidenced engagement with the patient. The treatment planning was adequate. Of concern, the psychiatrist did not reassess the patient at any point during the review period after his refusal on February 13, 2024, despite reports of increased delusional thinking and agitation. Improvement in group therapy documentation was needed.

**Patient O**

This 29-year-old EOP patient's healthcare record was reviewed to assess the quality of care provided at PBSP. The patient was provided diagnoses of unspecified mood disorder; amphetamine-type substance use disorder, severe; and ADHD, combined presentation. The patient was prescribed atomoxetine and was medication adherent. The patient arrived at the PBSP EOP on March 13, 2024. He was not included in the MHSDS for most of his incarceration (since January 2017) but was placed in the MHCB in November 2022, and he remained in the MHSDS since. He received treatment at the 3CMS, EOP and MHCB levels of care. His most recent placement at the MHCB level of care was during June 2023.

The patient was seen for an initial MHPC assessment on March 19, 2024; the assessment was comprehensive but failed to note the patient's ADHD diagnosis which was the target of his psychotropic medication treatment. A SRASHE was completed on the same date as a routine 90-day follow-up evaluation after an inpatient discharge. The content was adequate, and the risk levels were appropriately justified.

An initial psychiatric assessment was attempted on March 21, 2024, but the patient refused to attend the session. The content of the assessment documentation was adequate given the patient's refusal. One additional MHPC session was attempted during the review period, but the patient refused to attend. The patient was offered six hours of treatment during his first full week in the EOP and attended two hours of ISUDT treatment.

Given the patient's arrival date, an initial IDTT meeting should have occurred during the review period, but it occurred one week later than required on April 3, 2024.

**Findings**

The treatment provided to this patient was adequate given his short length of stay; however, his initial IDTT meeting did not occur timely.

**Patient P**

This 33-year-old EOP patient's healthcare record was reviewed to assess the quality of care provided at PBSP. The patient was provided diagnoses of antisocial personality disorder; methamphetamine use disorder, severe; unspecified depressive disorder; and amphetamine-type substance-induced psychotic disorder. The patient was prescribed haloperidol decanoate and valproic acid and was medication adherent. This patient was primarily treated at the 3CMS level of care until October 2023, when he was placed at the MHCB and then the acute levels of care. He was placed at the EOP level of care in February 2024, and he arrived at the PBSP EOP on March 13, 2024.

An initial MHPC assessment was completed on March 19, 2024 which was adequate. The patient refused to engage in the initial psychiatric assessment on March 21, 2024; the content of that assessment was adequate given the patient's refusal to attend the session. This patient was offered six hours of treatment during his first full week in the EOP and only attended two hours

of ISUDT treatment. The patient was also seen for an individual MHPC session on March 26, 2024.

Given the patient's arrival date, an initial IDTT meeting should have occurred during the review period, but it occurred one week later than required on April 3, 2024.

**Findings**

The treatment provided to this patient was adequate given his short length of stay; however, his initial IDTT meeting did not occur timely.

**Patient Q**

This 40-year-old EOP patient's healthcare record was reviewed to assess the quality of care provided at PBSP. The patient was provided diagnoses of schizoaffective disorder, bipolar type; delusional disorder; and antisocial personality disorder. The patient was prescribed buspirone, olanzapine, and venlafaxine and was medication adherent. He received mental health treatment at all levels of care, primarily alternating between the 3CMS and EOP levels of care. His most recent inpatient placement occurred in late 2020 into early 2021, when he was at the ICF level of care and discharged to the 3CMS level. He was placed at the EOP level of care in July 2023 and arrived at the PBSP EOP on March 13, 2024.

The patient's first contact with a mental health clinician occurred on March 22, 2024, when he had an RVR mental health assessment which appeared to adequately consider his mental health needs and the role his symptoms played in the charge of battery on another incarcerated individual. An initial psychiatric assessment was completed on March 25, 2024 which was adequate; however, the psychiatrist noted diagnoses of unspecified schizophrenia spectrum and other related psychotic disorder, methamphetamine use disorder (severe) with likely methamphetamine-induced psychotic disorder, cannabis use disorder (severe), and alcohol use disorder (mild to moderate). There was no rationale provided for those diagnoses nor discussion of the diagnoses previously provided. An MHPC initial assessment was completed the following day which was minimally adequate. Much of the documentation was pulled forward from previous assessments, and there was no mention of the psychiatric assessment completed the day prior with discrepant diagnoses.

An initial IDTT meeting occurred on March 27, 2024 with the required staff and the patient present. A senior psychologist supervisor, additional correctional counselor, psychiatric technician, custody officer, sergeant, lieutenant, senior psychiatric technician, additional psychologist, and unlicensed psychologist were also in attendance. The patient was identified for consideration of referral to a higher level of care due to frequent treatment refusal. He was not referred, because he had just arrived at the institution and would be working with a new treatment team. It was noted that the MHPC would work with the patient to assess the reason for treatment refusal and use CBT, DBT, and motivational interviewing to increase participation in treatment. As the patient was present at the meeting, it was unclear why reasons for refusals were not explored at that time. A treatment goal was created to address the patient's violence toward others, and a long list of interventions were provided. The patient was to be considered

for transfer to the 3CMS level of care at his next IDTT if he refrained from violence, took his medications, and attended "sufficient" structured treatment; however, sufficiency was not objectively defined.

The patient was offered six hours of structured treatment during the week following his IDTT meeting and refused all contacts.

**Findings**

The treatment provided to this patient was marginally adequate.

While assessments were completed adequately and timely, and treatment planning was sufficient; the required number of structured treatment hours were not offered to the patient, diagnostic discrepancies were not acknowledged nor addressed, and the necessary attendance requirements for the patient to be considered for transfer were not specified.

**Patient R**

This 38-year-old EOP patient's healthcare record was reviewed to assess the quality of care provided at PBSP. The patient was provided diagnoses of generalized anxiety disorder; major depressive disorder, recurrent episode, unspecified; and antisocial personality disorder. The patient was prescribed hydroxyzine and was medication adherent. The patient arrived at the PBSP EOP on March 13, 2024. He was primarily treated at the 3CMS level of care but was most recently placed at the EOP level of care after discharge from the MHCB in November 2023. The patient also received treatment at the ICF and APP levels of care in 2017 and 2018.

The patient was seen for an initial MHPC assessment on March 20, 2024, and the assessment was adequate. A SRASHE was also completed on that date as a routine follow-up after discharge from an inpatient setting. The patient was assessed with moderate acute risk for suicide and high chronic risk, and adequate rationale was provided. As he was assessed with high risk; a safety plan was created, yet it was documented that the patient did not participate in the development of the safety plan. Although the patient participated in the SRASHE, no rationale was provided for why he did not assist in the development of the safety plan. Consequently, all entries in the safety plan were the opinion of the MHPC who had met the patient for the first time that day.

An initial psychiatric assessment was completed with the patient on March 25, 2024, which was adequate.

The initial IDTT meeting occurred on March 27, 2024 with the required staff present. A senior psychologist supervisor, additional correctional counselor, senior psychiatric technician, custody officer, sergeant, lieutenant, and psychiatric technician were also in attendance. The safety plan created without the patient on March 20, 2024 was pulled forward and noted as having been reviewed with the patient; however, no input from the patient was included in the safety plan. The treatment plan included two goals; one goal to address passive suicidal ideation, and the other goal to address his depressed mood. The interventions to address the patient's suicidal

ideation were marginally sufficient, and the interventions to address his depressed mood appeared adequate. There was evidence of input from members of the treatment team in treatment planning.

This patient attended 52 percent of the 4.23 treatment hours offered during his first full week in the EOP, including two hours of group therapy and one clinician contact. The MHPC contact reflected interventions consistent with the treatment plan.

**Findings**

The treatment provided to this patient was marginally adequate.

The patient was seen timely for assessments, and treatment planning was adequate. The development of a collaborative safety plan required improvement, and the patient should have been offered more structured treatment hours.

**Patient S**

This 55-year-old EOP patient was randomly selected for healthcare record review to assess the quality of care provided at PBSP. The patient was provided diagnoses of major depressive disorder, PTSD, and opioid use disorder. The patient was not prescribed psychotropic medications by a psychiatrist; however, he was prescribed amitriptyline, an antidepressant medication frequently used for chronic pain. The patient transferred to PBSP on January 26, 2024.

The patient had a history of multiple MHCB placements, most recently in 2019; he had no history of treatment at the intermediate or acute levels of care. Relevant medical conditions included foot injury requiring surgery, with resultant need for medical CTC placement from approximately March 20, 2024 to April 8, 2024.

The suicide risk assessment on August 8, 2023 assessed the patient with moderate chronic and low acute risk of suicide. The patient had two prior suicide attempts by driving off a cliff, and one instance of self-injury by headbanging.

The initial psychiatric and PC evaluations occurred timely prior to the initial IDTT meeting. The psychiatric evaluation was concise and contained clinically useful information. The initial treatment team meeting also occurred timely, and all required participants including the patient were in attendance. While the telepsychiatrist noted that they were covering for the assigned psychiatrist, they did not state that they were in attendance remotely. The treatment goals and interventions remained largely unchanged from the prior institution. Routine PC contacts generally occurred timely. Two visits occurred at cell-front due to patient refusal.

The patient required medical placement in the CTC due to his surgical concerns. The patient remained at the EOP level of care, but he was seen by an MHCB psychiatrist and PC. The initial psychiatric and PC assessments, as well as the initial IDTT meeting occurred timely. All required members of the treatment team were present. The treatment plan noted that the patient

was placed on modified EOP programming and would be offered out of cell activities by the recreational therapist; however, it was also noted that such activities were based on staff availability and scheduling.

Upon discharge from the CTC, the patient returned to EOP mainline programming. The initial psychiatric and PC evaluations both occurred timely. With one exception, the patient was seen weekly by his PC. The PC notes reflected generic and nonspecific interventions, such as effective listening and coping skills. The patient was seen cell front by telepsychiatry on May 13, 2024. While the progress note stated that the session was conducted at cell front due to staff assault and security concerns, it did not state that it was conducted by telepsychiatry.

The patient was seen by three PCs and four psychiatrists, including the one who attended the initial IDTT meeting. During his course of treatment at PBSP, the patient was offered less than ten hours weekly for six of ten weeks. While CTC documentation reflected the patient was placed on EOP modified status during his stay, weekly treatment hours provided by CDCR did not reflect this. Group treatment after March 30, 2023 was overwhelmingly recreational and leisure in nature. Multiple groups started late due to custody issues. On May 21, 2024, the patient was involved in an altercation during group.

The patient remained at PBSP at the EOP level of care at the time of this review.

**Findings**

The care and treatment provided to this patient were inadequate.

The initial IDTT carried over goals from the prior IDTT at another institution, despite the significant stressors of transfer to a new institution, especially to a new EOP. While telepsychiatry provided the psychiatric care outside the CTC, it was not routinely noted that the patient was not seen in person, including the instance in which the session occurred at cell front. Additionally, the presence of a telepresenter was also not noted. Given the patient's history of suicide attempts, transfer between institutions, as well as his medical issues requiring CTC placement; an updated suicide risk assessment appeared warranted.

Positive aspects of care included overall timely initial evaluations, IDTT meetings, psychiatric sessions, and PC visits. Although the psychiatrists recommended medication treatment, progress notes reflected a clear rationale for why the patient declined.

**Patient T**

This 27-year-old EOP patient was randomly selected for healthcare record review to assess the quality of care provided at PBSP. The patient was provided diagnoses of schizoaffective disorder, opioid use disorder, cannabis use disorder, and methamphetamine use disorder. He was prescribed quetiapine for psychosis, venlafaxine for depression, and atomoxetine for anxiety and restlessness. Relevant other prescribed medications included buprenorphine/naloxone as MAT for opioid use disorder. The patient arrived at PBSP on March 13, 2024 from SVSP.

The patient had a history of treatment at the 3CMS, EOP, and MHCB levels of care, with the most recent MHCB placement in August 2023. There was no history of treatment at the intermediate or acute levels of care. The patient had an extensive history of over 20 suicide attempts. Suicide risk assessments completed on August 10, 2023 and March 18, 2024 assessed the patient with high chronic and low acute risk of suicide.

On his first night at PBSP, the patient reported that if he did not get his electronics soon, he would go into mental health crisis. The patient reportedly did not voice any suicidal ideation. The telepsychiatrist discussed the case with nursing and conducted a healthcare record review. The psychiatrist cleared the patient to return to his housing unit. While the psychiatrist noted that they would place an urgent PC consult for the patient to be seen the following day, documentation of such follow-up was not located in EHRS.

The patient was evaluated by the PC approximately four days after arrival. The initial psychiatric and PC evaluations and the initial IDTT all occurred timely. The initial psychiatric evaluation noted the patient had anxiety and that this was one indication to increase the dose of atomoxetine; however, there was no anxiety disorder diagnosis provided.

Routine PC contacts occurred timely. Most were conducted at cell front, due to patient refusal. A psychiatric visit was due on May 4, 2024; however, the patient was seen for a nonconfidential cell front telepsychiatry appointment on May 13, 2024. The reason provided in the documentation reflected staff assault and security concerns in the yard and that the patient was not released to attend the appointment. While the documentation indicated that the contact occurred at cell front, it did not state that it was conducted by telepsychiatry.

Progress notes reflected that the patient had a high degree of group refusals. The patient attended on average 1.45 hours of structured treatment weekly. The treatment plan reflected this issue of concern; however, the treatment plan was not altered, and specific interventions were limited.

The patient remained at PBSP at the EOP level of care at the time of this review.

**Findings**

The care and treatment provided to this patient were inadequate.

Despite the patient requiring the telepsychiatrist to be contacted on the night of arrival, and despite the telepsychiatrist documenting an urgent consult would be placed to have the patient evaluated the following day; there was no documented PC contact until four days later. This patient had a documented high chronic risk of suicide and had recently changed institutions. Given both risk factors, the telepsychiatrist's determination that the patient should have been seen the following day was clinically appropriate and should have been implemented.

Although appropriate for a psychiatrist to prescribe medications consistent with appropriate clinical judgement, insufficient documentation was provided for the rationale for treatment with

the medication atomoxetine, which is a medication traditionally used to treat ADHD. The documentation indicated that the medication was prescribed for anxiety; however, there was no diagnosis of anxiety provided. Telepsychiatry visits were frequently not labeled as such, nor did the documentation include whether a telepresenter was present.

There was appropriate repeat provision of the suicide risk assessment for this patient at high chronic suicide risk, and timely initial assessments and IDTT meetings.

**Patient U**

This 46-year-old EOP patient was randomly selected for healthcare record review to assess the quality of care provided at PBSP. The patient was provided diagnoses of schizophrenia, amphetamine-type substance use disorder, cannabis use disorder, and antisocial personality disorder. He was prescribed risperidone for psychosis and diphenhydramine for side effects to antipsychotic medication. On August 15, 2023, the patient was placed at the EOP level of care, arriving at PBSP on January 23, 2024.

The patient had a history of receiving mental health services at all levels of care. The suicide risk assessment on May 1, 2024 assessed the patient with low chronic and acute risk for suicide, with no history of suicidal thoughts, suicide attempts, or self-injurious behaviors.

The patient had a history of receiving PC 2602 involuntary medications for danger to self and others. The initial psychiatric evaluation noted that the patient met with a psychiatrist at the prior institution on August 22, 2023 to evaluate possible renewal, but the patient was not under a PC 2602 order at the time of this review.

The initial evaluations occurred timely prior to the initial IDTT meeting and provided useful clinical information. The telepsychiatrist noted that the patient's thought processes were tangential, and that the patient appeared to minimize his symptoms. The evaluation was cogent, and provided clear information to formulate a clinical picture of the patient. The PC evaluation noted seven RVRs during the prior 24 months, including for fighting and battery on a prisoner. The patient was disheveled and malodorous. The PC who conducted the initial assessment was not present for IDTT meeting, but an alternate PC attended.

The patient had frequent refusals of confidential sessions; as such, some PC and telepsychiatry sessions were conducted at cell front. The PC saw the patient twice weekly due to his clinical status and frequent refusals. The treatment plan reflected the patient's degree of group refusals, and listed several appropriate interventions, such as motivational interviewing, cognitive behavioral therapy, and dialectical behavioral therapy. The patient continued to express grandiose delusions such as having built UCLA and being a fashion model.

The patient remained at PBSP at the EOP level of care at the time of this review.

**Findings**

The care and treatment provided to this patient were adequate, with concern noted.

The patient had comprehensive initial PC and psychiatric evaluations. The treatment plan reflected the patient's clinical presentation. The PC saw the patient twice weekly due to clinical need.

Stronger consideration for referral to a higher level of care appeared, however, merited. Despite the patient having clear psychotic symptoms such as disrupted thought processes and delusional thinking, portions of the treatment plan reflected consideration of lowering the patient's level of care to 3CMS. Instead, the patient should be carefully monitored for the need for a higher level of care.

**Patient V**

This 35-year-old EOP patient was randomly selected for healthcare record review to assess the quality of care provided at PBSP. The patient was provided diagnoses of major depressive disorder, amphetamine-type substance use disorder, opioid use disorder, and a history of traumatic brain injury. The patient was prescribed venlafaxine for depression and buprenorphine/naloxone as medication-assisted treatment for opioid use disorder. On November 9, 2023, the patient was placed at the EOP level of care, arriving at PBSP on March 27, 2024.

The patient was quickly placed into the RHU on April 2, 2024, due to assault on a prisoner. The patient received another RVR on April 5, 2024 for battery on a peace officer. The patient had a history of receiving mental health services at all levels of care. The treatment plan from April 16, 2024 indicated that the patient had ten MHCB placements in the prior six months; however, due to extensive carryover information, it was unclear if this information was current or not. The suicide risk assessment on April 15, 2024 assessed the patient with high chronic and low acute risk of suicide.

The initial telepsychiatric and PC evaluations occurred timely prior to the initial IDTT meeting. The PC evaluation was completed by healthcare record review, due to patient's refusal to attend a confidential session. The patient also refused an interview for the RVR mental health assessment. The refusal form noted that the patient refused to submit to a strip search, which was required to attend the sessions. On April 25, 2024, the patient was seen cell front by the PC due to modified programming. The patient frequently refused to attend groups.

The treatment plan contained inconsistent and outdated information. The problems and symptoms grid listed interventions from his MHCB stay. The treatment plan stated that the patient would see the PC once weekly in one portion, and twice weekly in another. Routine psychiatric and PC contacts occurred timely. Some PC notes indicated that the session occurred at cell front; while some notes indicated that the cell front contact occurred due to modified programming, others did not state a reason. Some notes inaccurately also listed the patient as receiving mental health services at the 3CMS level of care.

The patient remained in the RHU until May 1, 2024, when he transferred to the CSP/Sac EOP RHU. On May 15, 2024, the patient was admitted to the MHCB; subsequently, he was referred to the intermediate level of care where he remained at the time of this review.

**Findings**

The care and treatment provided to this patient were inadequate.

The patient had extensive refusals of both individual and group contacts. The treatment plan listed interventions carried over from a prior MHCB stay. The treatment plan listed multiple MHCB and RVR stays; however, documentation of those considerations for higher level of care referral was scant. Multiple PC notes incorrectly stated that patient was at the 3CMS level of care. Notes did not consistently reflect how the intervention used would likely improve the patient's treatment attendance.

**Patient W**

This 34-year-old EOP patient was randomly selected for healthcare record review to assess the quality of care provided at PBSP. The patient was provided diagnoses of bipolar I disorder with psychotic features, chronic PTSD, amphetamine-type substance use disorder, opioid use disorder, and antisocial personality disorder. Beginning in 2017, the patient received involuntary PC 2602 medications due to dangerousness to others. He was prescribed aripiprazole a long-acting injectable antipsychotic medication, oral olanzapine for psychosis, and bupropion, an antidepressant medication. Additional medications included buprenorphine-naloxone for opioid use disorder, and testosterone injections due to low hormone levels. On January 23, 2024, the patient was placed at the EOP level of care, arriving at PBSP on April 10, 2024. The patient had a history of receiving mental health services at all levels of care.

The suicide risk assessment on April 18, 2024 assessed the patient with low chronic and acute risks of suicide, and no history of suicide attempts. The patient voiced suicidal thoughts in the context of agitation on April 22, 2024, when a repeat suicide risk assessment was completed that also assessed low chronic and acute suicide risk.

On April 11, 2024, the day after arrival, the patient was seen for an urgent consult that was conducted at cell front. The patient stated that he was very anxious about being housed next to general population incarcerated individuals.

The initial PC and telepsychiatric evaluations were completed timely prior to the initial IDTT meeting. The telepsychiatrist who conducted the initial evaluation was not present at the initial IDTT meeting; however, a covering telepsychiatrist was present. The IDTT meeting did not occur timely. No treatment goals were documented.

On April 30, 2024, the patient was placed in the RHU due to safety/enemy concerns. The required RHU psychiatric and PC evaluations occurred timely prior to the initial IDTT meeting. The initial RHU telepsychiatric evaluation was comprehensive, focused, and allowed for the construction of a clear clinical picture of the patient.

The patient was seen by PCs for multiple consults, due to patient and staff requests. The consult note from May 27, 2024 noted that the session was conducted at cell front due to modified

programming. The treatment plan noted that the patient was nonadherent with his oral antipsychotic medication. He was observed biting it and taking approximately half of the dose. Psychiatric progress notes did not reflect how that issue was addressed.

On May 30, 2024, the patient transferred to the KVSP mainline EOP where he remained at the time of this review.

**Findings**

The care and treatment provided to this patient were inadequate.

Multiple PC sessions occurred in a nonconfidential setting at cell front due to modified programming. Considering the patient's long history of violence against others, including an active PC 2602 involuntary medication order; the patient's degree of impulsivity, irritability, and agitation merited closer consideration. Despite having the oral antipsychotic ordered as directly observed therapy, it was unclear how the psychiatrist addressed the patient's medication nonadherence. The patient was prescribed the antidepressant medication bupropion, which can be associated with increased agitation. Stronger justification for treatment with that antidepressant medication was required. Additionally, the patient received injections of testosterone, due to low levels. Given the risk of testosterone increasing anger, aggression, and impulsivity; close consultation between mental health and medical providers was merited, but not reflected in healthcare documentation.

**Pleasant Valley State Prison (PVSP)**
**October 29, 2024 – October 31, 2024**

**Patient A**

This 35-year-old EOP patient's healthcare record was reviewed to assess the quality of mental health care provided at PVSP. The patient was provided a diagnosis of unspecified bipolar and related disorder. He was initially prescribed hydroxyzine and quetiapine, but shortly after the patient's arrival at PVSP, quetiapine was discontinued at the patient's request because he did not want to take heat medications. Hydroxyzine was stopped soon after due to nonadherence. His medical conditions included hyperlipidemia, human papilloma virus, and sciatica. The assessing psychiatrist also noted the presence of pre-diabetes. The patient transferred to PVSP at the EOP level of care on August 8, 2024.

The patient had a history of childhood physical abuse, adolescent behavioral problems with school expulsion, chronic homelessness as an adult, and alcohol, cannabis, cocaine, ecstasy, hallucinogen, methamphetamine, and opioid use. He was diagnosed with ADHD and bipolar disorder in the community but reported that those diagnoses were incorrect. Within the CDCR, the patient received mental health services at the 3CMS, MHCB, and EOP levels of care. No history of suicide attempts or self-injurious behavior was listed in his healthcare record.

The initial psychiatric assessment was completed by a non-assigned psychiatrist, and the primary clinician's clinical summary and case formulation update were completed timely and in confidential settings. During the initial psychiatric assessment, the patient denied that he had bipolar disorder, reported that he had previously fabricated reports of auditory hallucinations, and insisted that quetiapine be discontinued without tapering. Using the outdated multiaxial diagnostic system, the psychiatrist provided diagnoses of unspecified bipolar and related disorder, ADHD by self-report, and several substance use disorders. The patient was assigned a GAF score of 45, indicating the presence of serious symptoms and/or serious functional impairment. The primary clinician clinical summary update was adequate, but the case formulation was formulaic, did not address the symptoms for which the patient was receiving EOP level of care, and used language that was nearly identical to that used for other patients by this primary clinician.

The initial IDTT meeting occurred timely and was attended by the assigned primary clinician, an alternate psychiatrist, and a correctional counselor; the IDTT documentation did not indicate whether the correctional counselor was assigned to the patient. The patient refused to attend. Although the IDTT documentation indicated that the patient did not need or have a safety plan, a June 19, 2024 safety plan was pulled forward that identified the patient's warning signs and a protective factor. Signs of decompensation included anger and isolation. The IDTT clinical summary and case formulation were imported from the primary clinician's earlier assessment and did not reflect any discussion of what occurred in the IDTT meeting. Patient strengths were documented; however, because the patient was not present, his verbalized treatment goals were not documented. The treatment plan was imported without modification or updates from a June 27, 2024 treatment plan developed at WSP, and it identified lack of distress tolerance skills, depression, and anxiety as treatment goals. Short and long-term goals were measurable, but

baseline measurements were not obtained at PVSP. No discharge plan, discharge criteria, or reason(s) for retention were documented.

A non-assigned psychiatrist saw the patient timely for follow-up appointments, although the patient declined his psychiatric encounter in October 2024. No attempt to see the patient at cell front for this refusal was documented, and the psychiatric progress note included language copied from a prior note stating that the patient was educated. The assigned psychiatrist did not see the patient between his arrival and October 15, 2024, and the diagnosis of unspecified bipolar disorder was not explored or resolved.

The primary clinician offered the patient confidential individual sessions during August and September 2024; two of those encounters occurred at cell front, as the patient refused a confidential setting. A SRASHE was completed in a confidential setting as a follow-up from the prior MHCB stay; the patient was assessed with low acute and moderate chronic risk for suicide. In a confidential session, the patient reported that he lacked control over his behaviors, suffered from mood instability and behavioral impulsivity, and was willing to reconsider medication treatment. The primary clinician documented that she would convey that information to the psychiatrist, but there was no documentation confirming that this occurred. When the patient next saw the psychiatrist, he continued to refuse medication, and there was no documented discussion regarding the patient's prior report that he lacked control over his behaviors and suffered from mood instability. No individual primary clinician encounters were documented during the first 15 days of October 2024.

Three clinician-led groups were documented during the period reviewed; none occurred in September 2024. Recreational therapy groups began to be offered 12 days after his arrival, and he attended those groups intermittently. On September 23, 2024, he was removed from a recreational group after making several challenging and oppositional remarks; the patient processed that incident on the same day with his primary clinician. He began participating in NLTG groups in mid-October 2024. Several progress notes, including those for his UCC meeting, a caseload group, and recreational groups, documented the patient's presentation as angry, and he received an RVR in September 2024 for fighting. The RVR mental health assessment found no contribution of mental illness to the incident.

**Findings**

The care and treatment provided to this EOP patient were inadequate.

The treatment plan was borrowed from another institution and was not used to guide treatment, the case formulation was formulaic and did not address the symptoms for which the patient was referred for the EOP level of care, and no discharge plan or criteria were documented. The diagnosis of unspecified bipolar disorder was not resolved, and the assigned psychiatrist did not see the patient during the period reviewed. Several progress notes indicated that the patient was angry and aggressive, and anger and isolation were identified in the safety plan as warning signs. The record was devoid of alternative explanations for this anger and aggression other than untreated bipolar disorder. Too few individual primary clinician encounters and clinical-led

groups were documented to constitute regular care. The patient's intermittent disengagement from treatment was not addressed.

**Patient B**

This 47-year-old EOP patient's healthcare record was reviewed to assess the quality of mental health care provided at PVSP. The patient was provided diagnoses of unspecified depressive disorder and PTSD. He was prescribed mirtazapine and was adherent with the medication. The patient transferred to the PVSP EOP on August 5, 2024.

In addition to psychiatric diagnoses, his medical conditions included asthma, hyperlipidemia, a seizure disorder secondary to traumatic brain injury, chronic lower back pain, chronic kidney disease, and a history of endocrine disorder.

The patient had a history of violent loss of loved ones, including witnessing his best friend's murder, along with being the victim of stabbing, and being hit with a gun in the head himself, homelessness, cannabis and cocaine use, and time-limited outpatient psychiatric care in the community. Four episodes of self-injury or suicide attempts were listed in his healthcare record, all by hanging. Within the CDCR, he had received mental health services at the 3CMS, MHCB, and EOP levels of care.

The initial psychiatric assessment and primary clinician clinical summary and case formulation update were completed timely and in a confidential manner. A non-assigned psychiatrist completed the psychiatric assessment. The assessment was adequate and included diagnostic impressions of schizophrenia as the working diagnosis, PTSD, antisocial personality disorder by history, and cannabis and stimulant use disorders, with a provisional diagnosis of substance-induced psychotic disorder. Using the outdated multiaxial diagnostic system, a GAF score of 39 was assigned to the patient, indicating some impairment in reality testing, communication or major functional impairment. The patient was offered but declined prazosin or an SSRI antidepressant medication for PTSD related symptoms; consideration of treatment with antipsychotic medications was not documented. The primary clinician's clinical summary reviewed historical events but did not include current diagnoses; similarly, the case formulation was adequate with respect to distal factors contributing to his current clinical presentation, but did not address current symptoms other than unresolved grief.

The initial IDTT meeting occurred timely and was attended by the patient, assigned primary clinician and psychiatrist, and a correctional counselor; the documentation did not indicate whether the correctional counselor was assigned to the patient. The IDTT clinical summary and case formulation were imported from the primary clinician's earlier assessment and did not reflect any discussion of what occurred in the IDTT meeting. Patient strengths and verbalized treatment goals were documented. The treatment plan was imported without modification or updates from a November 21, 2023 treatment plan developed at VSP, and it listed only CBT and DBT under interventions. Short and long-term goals were measurable, but baseline measurements were not obtained. No discharge plan, discharge criteria, or reason(s) for retention at the EOP level of care were documented.

The patient was seen timely for follow-up psychiatric contacts by two different non-assigned psychiatrists. Both sessions were confidential and adequately documented. With the patient's persistent refusal of antipsychotic medications, continued reports of auditory and visual hallucinations of his dead friend, and expressed concern that he would be discharged from EOP care; the psychiatrist who provided the most recent encounter noted that the patient might be exaggerating his symptoms and that his reported symptoms were inconsistent with his clinical presentation. No changes or resolution of diagnoses were made; however, and the patient was continued on mirtazapine.

Recreational therapy groups began to be offered to the patient 15 days after his arrival, and he attended some but far from all of those groups. A total of five clinician-led groups were documented between the patient's arrival on August 5, 2024 and October 15, 2024; four of those group sessions occurred on or before September 1, 2024, and the fifth occurred in early October 2024 when the patient declined to attend. All five progress notes for the groups included a narrative description of the patient's participation or non-attendance. Four individual encounters with the primary clinician were documented between August 5, 2024 and October 15, 2024. Each session occurred in a confidential setting and focused on coping skills for depression and grief and loss, but not on symptoms of posttraumatic stress or auditory hallucinations.

**Findings**

The care and treatment provided to this EOP patient were inadequate.

Diagnoses were not reconciled with the patient's clinical presentation. His treatment was inconsistent with and inadequate for schizophrenia and PTSD, yet those remained the diagnoses documented by the psychiatrists. The assigned psychiatrist only saw the patient once in the initial IDTT meeting, and the psychiatrist had not evaluated the patient prior to the IDTT meeting. The primary clinician interventions for grief may have been clinically appropriate but raised questions regarding the nature of the patient's mental health needs and diagnoses. The treatment plan was borrowed from another facility and was not used to guide treatment. The case formulation did not adequately address the patient's current symptoms, and EOP discharge criteria were not formulated. Except for one group session, clinician-led groups were not documented from September 1, 2024 to October 15, 2024.

**Patient C**

This 54-year-old EOP patient's healthcare record was randomly selected and reviewed to assess the quality of mental health care provided at PVSP. The patient was provided diagnoses of major depressive disorder, recurrent, moderate, and PTSD. He was prescribed aripiprazole, atomoxetine, and lithium, and he was consistently adherent with those medications. The patient transferred to the PVSP EOP on August 15, 2024.

In addition to his psychiatric diagnoses, his medical conditions included pre-diabetes, hyperlipidemia, and a history of hepatitis C.

The patient had an early and extended history of substance use, including alcohol, cannabis, methamphetamine, and opioids, as well as a history of being sexually abused. Two suicide attempts were documented in his healthcare record. Within the CDCR, the patient was either not included in the MHSDS or received mental health services at the 3CMS level of care from 1990 to 2010. After re-incarceration in 2020, he was placed at the EOP level of care at reception and remained at that level of care during the review period.

The initial psychiatric assessment and primary clinician clinical summary and case formulation update were completed timely and in a confidential manner. A non-assigned psychiatrist completed the initial psychiatric assessment and documented symptoms of depression, nightmares, flashbacks, chronic middle insomnia, auditory hallucinations, severe anxiety, racing thoughts, paranoia, preoccupation with cleanliness, and chronic passive suicidal ideation without intent or plan. Diagnoses of major depressive disorders, recurrent, severe with psychotic features; PTSD; unspecified anxiety disorder; ADHD; and several substance use disorders were provided. Using the outdated multiaxial diagnostic system, a GAF score of 49 was assigned to the patient indicating serious symptoms and/or serious impairment. The patient's aripiprazole dose was increased to address insomnia, depression, and psychosis.

The primary clinician's clinical summary update was brief but consistent with available information. Command auditory hallucinations were documented, and diagnoses of adult ADHD, PTSD, and major depressive disorder, recurrent, moderate were provided. The case formulation update was formulaic, did not address symptoms of the patient's current symptoms, and instead focused on the patient's need for substance use treatment, anger management and domestic violence interventions. It was nearly identical to other case formulations developed by the primary clinician for other patients.

The initial IDTT meeting occurred timely and was attended by the assigned primary clinician and psychiatrist, and a correctional counselor; the documentation did not indicate whether the correctional counselor was assigned to the patient. The patient declined to attend. The IDTT clinical summary and case formulation were imported from the primary clinician's earlier assessment and did not reflect discussion of what occurred in the IDTT meeting. Patient strengths and verbalized treatment goals were documented; although, the source of the latter was unclear, as the patient was not present. The treatment plan identified depression and lack of motivation as primary treatment targets but did not address symptoms of PTSD or ADHD. Interventions focused on adaptive coping skills, trigger identification, medication adherence, and participation in scheduled individual and group sessions. The short and long-term goals were not measurable, and no discharge plan, discharge criteria, or reason(s) for retention were documented.

As documented, one clinician-led group was offered to the patient 16 days after the patient's arrival, and recreational groups began to be offered to the patient two days after that. A primary clinician progress note for an individual encounter referred to the patient not attending a caseload group on September 22, 2024, but no corresponding group progress note was provided for the patient suggesting that the primary clinician may have provided caseload group sessions but did not document the patient's non-attendance. Only one clinician-led group was documented between August 15, 2024 and October 15, 2024. Individual primary clinician encounters

occurred timely in a confidential manner and were consistent with the treatment plan's focus on coping skills. A 30-day psychiatric follow-up encounter occurred timely and in a confidential setting; however, it was provided by a second non-assigned psychiatrist. Aripiprazole was again increased to address ongoing depression, insomnia, and auditory hallucinations.

**Findings**

The care and treatment provided to this EOP patient were inadequate.

The patient's refusal to attend the initial IDTT meeting was not addressed, and the case formulation was generic, weak, and did not adequately address the patient's psychotic, attention deficit, anxiety, or posttraumatic symptoms. While the documentation facilitated continuity of psychiatric care across three different psychiatrists; the assigned psychiatrist never met the patient, and divergent diagnoses and clinical impressions were not resolved. As documented, there was only one clinician-led group during the two months of EOP care reviewed. Measurable treatment goals and discharge criteria were missing. On the positive side, the primary clinician's individual sessions were consistent with the treatment plan and appeared to follow the patient's current needs, and psychiatrists tried to optimize medication management to address the patient's ongoing symptoms.

**Patient D**

This 62-year-old EOP patient's healthcare record was reviewed to assess the quality of mental health care provided at PVSP. The patient was provided diagnoses of unspecified mood disorder, unspecified schizophrenia spectrum and other psychotic disorder, and amphetamine-type substance use disorder, moderate, in sustained remission. He was prescribed mirtazapine for mood symptoms and was consistently adherent with the medication. Hydroxyzine was prescribed prn for anxiety, but the patient never requested the medication. The patient transferred to the PVSP EOP on August 8, 2024.

His medical conditions included hepatitis C, cirrhosis of the liver, and benign prostatic hyperplasia.

The patient reported a history of emergency community psychiatric hospitalizations. He had an early and long history of substance use, including PCP and methamphetamine, along with childhood abuse, exposure to domestic violence, and adult homelessness. No history of suicide attempts was documented in his healthcare record. The patient reported one self-interrupted suicide attempt by initially attempting to overdose on chlorpromazine. Within the CDCR he had not required mental health services between 2003 and 2010 apart from two months of treatment at the 3CMS level of care from 2007 to 2008. Since 2010, he received mental health services at the 3CMS and EOP levels of care, as well as one five-hour MHCB placement.

The initial psychiatric assessment and an abbreviated primary clinician clinical summary and case formulation update occurred timely. A non-assigned psychiatrist completed the initial psychiatric assessment; the patient declined to meet in a confidential setting. The psychiatrist provided diagnoses of schizophrenia; unspecified mood disorder; amphetamine-type substance

use disorder, moderate, in remission in a controlled environment; and a provisional diagnosis of schizoaffective disorder, depressed type. Using the outdated multiaxial diagnostic system, the patient was assigned a GAF score of 50, reflecting serious symptoms or impairments in functioning. The psychiatrist educated the patient regarding the benefit of antipsychotic medication treatment, but the patient declined medication treatment.

The primary clinician's case formulation accounted for the patient's history and addressed current symptoms. The clinical summary was adequate, detailed and included documentation of the patient's report that he experienced auditory hallucinations, flashbacks of childhood abuse, and difficulty remaining asleep due to dreams. The primary clinician documented diagnoses of unspecified schizophrenia spectrum and other psychotic disorder and unspecified mood disorder. Diagnostic impressions offered by the non-assigned psychiatrist and primary clinician were not subsequently reconciled.

The initial IDTT meeting occurred timely and was attended by the patient, assigned primary clinician, and an alternate psychiatrist. No other treatment team members were documented in attendance. The IDTT documentation included a safety plan that was pulled forward from July 2024, but not well-integrated into a current treatment plan; the IDTT documentation instead indicated that a safety plan was not needed. The IDTT clinical summary and case formulation were imported from the primary clinician's earlier assessment and did not reflect any discussion of what occurred in the IDTT meeting. Patient strengths and verbalized treatment goals were documented, but no treatment plan, discharge plan, discharge criteria, or reason(s) for retention were documented.

Recreational groups began to be offered 12 days after the patient's arrival; the patient attended most groups. Between his arrival on August 8, 2024 and October 15, 2024, a total of four clinician-led groups were documented, all occurred on or before September 1, 2024. Each group progress note included a narrative description of the patient's participation. Individual primary clinician encounters occurred timely in September 2024 but were absent in August 2024 and the first two weeks of October 2024. Two different non-assigned psychiatrists provided follow-up encounters; both occurred timely and were confidential, but the documentation for both contacts included content that was copied from prior progress notes and was presented as if current. No medication changes were made, and no diagnostic clarification occurred. Use of the GAF scale appeared inconsistent. The patient's GAF score was 50 during the initial assessment, 40 at the first psychiatric follow-up, and 45 at the second contact, while the patient's mental status and report of symptoms appeared largely unchanged.

**Findings**

The care and treatment provided to this EOP patient were inadequate.

There was no treatment plan to guide treatment and no discharge plan to guide preparation for a lower level of care. The patient was simultaneously diagnosed with schizophrenia by the treating psychiatrists and prescribed only an antidepressant medication; psychiatric diagnoses did not appear consistent with the patient's clinical presentation as documented in primary clinician and psychiatric encounters, and differing diagnoses were not reconciled. The reasons for the patient

declining to accept an antipsychotic medication were not documented and/or discussed with the patient. The assigned psychiatrist did not see the patient during the period reviewed. Lastly, too few clinician-led groups and too few individual primary clinician encounters were documented to constitute ongoing consistent care.

**Patient E**

This 26-year-old EOP patient's healthcare record was reviewed to assess the quality of mental health care provided at PVSP. The patient was provided diagnoses of unspecified depressive disorder, unspecified trauma and stressor-related disorder, and unspecified anxiety disorder. He was initially prescribed mirtazapine for depression and anxiety, and he was prescribed clonidine prn for agitation and impulsivity. Those medications were discontinued shortly after his arrival at PVSP due to nonadherence. In addition to his mental health diagnoses, his medical conditions included hepatitis C and obesity.

The patient had a history of early and extensive substance use including alcohol, benzodiazepine, cannabis, cocaine, ecstasy, and methamphetamine. One suicide attempt by cutting his wrist and neck in January 2023 was documented; the patient also reported a history of attempting to drink himself to death at age 18. Within the CDCR, he had received mental health treatment at the 3CMS, MHCB, and EOP levels of care prior to arriving at PVSP.

The patient transferred to the PVSP EOP on August 19, 2024 and remained there until paroled on October 15, 2024. Both the initial psychiatric assessment and a primary clinician clinical summary and case formulation update were completed timely. The patient refused a confidential psychiatric assessment and was uncooperative when interviewed at cell front. The non-assigned psychiatrist who completed the assessment documented that the patient was medication adherent based on review of the medication administration record; however, the medication administration record showed nonadherence, and the medications were discontinued by the assigned psychiatrist on the same day that the psychiatric assessment was completed. The assessing psychiatrist provided a diagnosis of unspecified anxiety disorder and a provisional diagnosis of major depressive disorder with anxious distress. The diagnoses were not subsequently resolved.

The MHPC clinical summary was concise but adequate, and the assessment occurred in a confidential setting. The case formulation was formulaic, did not address symptoms of the patient's psychiatric diagnoses, and instead focused on the patient's need for substance use treatment, anger management and domestic violence interventions. The language used was nearly identical to that used by the primary clinician for other patients' case formulations.

The initial IDTT meeting occurred one day late. The patient, assigned primary clinician and psychiatrist, and a correctional counselor attended; the documentation did not indicate whether the correctional counselor was assigned to the patient. The IDTT documentation included a June 2024 safety plan that was not well-integrated into the treatment plan; the IDTT documentation instead indicated that a safety plan was not needed. The clinical summary and case formulation were imported from the primary clinician's earlier assessment and did not reflect discussion of what occurred in the IDTT meeting. The treatment plan was partially copied from one developed at WSP; those elements did not include long-term goals and were not updated. The

PVSP IDTT added a treatment goal focused on abstinence from illicit substances, but the associated long-term goal was not measurable. No treatment plan, discharge plan, discharge criteria, or reason(s) for retention were documented.

Recreational groups began being offered 15 days after the patient's PVSP arrival. The patient frequently declined to attend those groups. Only one clinician-led group was documented between the patient's arrival and parole, and the patient declined to attend. Only two individual primary clinician encounters were documented, both occurred in September 2024. The patient refused the second of the encounters; the first encounter occurred in a confidential setting but was ended early, as the patient did not want to miss canteen. The patient was seen timely for a 30-day psychiatric follow-up appointment. That encounter occurred in a confidential setting but was conducted by a non-assigned psychiatrist. A pre-release planning assessment was completed on September 23, 2024, but the documentation of patient participation in pre-release planning was absent except for one individual primary clinician session.

**Findings**

The care and treatment provided to this EOP patient were inadequate.

The assigned psychiatrist saw the patient only once during the period reviewed during the initial IDTT meeting, while a non-assigned psychiatrist conducted the initial assessment and follow-up appointment. The non-assigned psychiatrist did not appear aware of the patient's medication nonadherence at the time of the initial assessment. Diagnostic impressions were not reconciled or resolved. The treatment plan was largely borrowed from another institution and did not drive treatment. Insufficient clinician-led groups, primary clinician individual encounters, and pre-release planning were provided; and the patient's disengagement from treatment was not adequately addressed.

**Patient F**

This 38-year-old EOP patient's healthcare record was reviewed to assess the quality of mental health care provided at PVSP. The patient was provided diagnoses of unspecified schizophrenia spectrum and other psychotic disorder, alcohol use disorder, and opioid use disorder; he was also provided with the diagnostic code for condition of imprisonment or other incarceration. He was prescribed olanzapine for psychiatric symptoms and was adherent with the medication. Through the ISUDT, he was prescribed buprenorphine-naloxone for opioid use disorder. In addition to his psychiatric diagnoses, an allergy to bee venom was noted in his medical problems, and psychiatric documentation recorded elevated HgA1C levels, and a history of a lower left extremity fracture due to a motor vehicle accident in which the patient reported that he lost consciousness. On August 13, 2024, the patient transferred from ASP to PVSP; he remained at the EOP level of care.

During his first three incarcerations in CDCR, the patient required no mental health services. The patient reported two brief psychiatric admissions in the community for observation due to apparent psychosis. He had no history of suicide attempts or self-injurious behavior and no

history of being the victim of abuse. Since returning to CDCR in January 2024, he had received mental health services at the 3CMS and EOP levels of care.

The initial psychiatric and primary clinician assessments were completed timely in a thorough manner and in a confidential setting. Of note, the psychiatrist used the outdated multiaxial diagnostic system, including the GAF scale to record diagnostic impressions. The psychiatrist assigned a GAF score of 40 to the patient, indicating impairment in reality testing or communication and/or major functional impairment. The psychiatrist described the patient as guarded with complex persecutory delusions that included medical and mental health clinicians who were cooperating with a county policy officer using the intercom system and Bluetooth technology to spread rumors that the patient was a child molester. After discussing the risks of metabolic syndrome with olanzapine treatment, the psychiatrist and patient agreed to continue that medication; the psychiatrist noted a plan to attempt to persuade the patient to increase the dosage because his psychosis was not controlled at the dose prescribed. The primary clinician noted much the same symptomatology, identified the patient's coping skills, and indicated that increasing the patient's stress management skills might be helpful in preventing relapse of substance use.

The initial IDTT meeting occurred on August 20, 2024 and was attended by the patient, assigned primary clinician and psychiatrist, and a correctional counselor; the documentation did not indicate whether the correctional counselor was assigned to the patient. The IDTT clinical summary and case formulation were identical in wording to those developed in the primary clinician assessment, and the case formulation did not address the factors that worsened or improved the patient's paranoia and delusional thinking. While patient coping behaviors were listed, patient strengths were not. The patient's verbalized treatment goal was documented together with a note that he had poor insight into his mental illness. The treatment plan identified hallucinations and anxiety as the primary targets of treatment, provided short-term objectives and long-term goals that were variable with respect to being measurable, and listed CBT, motivational interviewing, and DBT as the interventions. The role of psychotropic medication in treating psychosis and the desirability of increasing the patient's insight into the need for treatment were not documented. In addition, the treatment plan did not appear to be developed by the PVSP EOP treatment team. The date the treatment goal was started was documented as July 23, 2024 when the patient was receiving EOP care at ASP, and the wording in each column of the treatment plan was identical to that contained in the July 23, 2024 treatment plan developed at ASP. No discharge plan, discharge criteria, or reason for retention were documented. However, the psychiatry review of the master treatment plan indicated that the patient needed to be retained at the EOP level of care to optimize his psychotropic medication regimen, to reduce psychotic symptoms, and to enhance insight.

Following the initial psychiatric assessment on August 16, 2024, the patient was not seen by psychiatry again as of October 4, 2024.

The patient was offered therapeutic encounters with the primary clinician weekly, either through caseload groups or individual therapeutic encounters. As noted below, he declined the former and asserted that he did not belong in the EOP. He participated in two individual encounters with the primary clinician during the period reviewed. On September 3, 2024, he showed no insight

into the possibility that he might be suffering from psychotic symptoms but nevertheless told the primary clinician that he wanted to increase the dosage of olanzapine to help him with sleep. The patient was instructed to submit a request to see the psychiatrist. In the same note, the primary clinician also noted that other EOP patients were afraid of the patient, because he was seen muttering aggressively under his breath and responding to unseen stimuli. On September 16, 2024, he continued to show no insight into his mental illness. The primary clinician documented that the patient had complained that the EOP sergeant had allowed sheriff officers to use the loudspeaker to antagonize the patient, and that everyone was pretending that they did not hear the officers.

An initial recreational therapy assessment was attempted on August 15, 2024, but the patient refused to complete the assessment and asserted "this is a scam." He was first offered group programming on August 20, 2024. However, he did not begin attending until September 10, 2024, and then only attended recreational groups sporadically refusing most. He declined to attend any clinician-led groups.

**Findings**

The care provided to this EOP patient was inadequate.

The treatment plan was borrowed from another institution and was not updated. Although the primary clinician made good efforts to connect with the patient and to develop a therapeutic alliance, the patient's psychotic symptoms worsened during EOP treatment, the psychiatrist documented that the patient's antipsychotic medication was not dosed sufficiently to bring his symptoms under control, and the patient was not seen by the psychiatrist after the initial psychiatric assessment. The patient's stated willingness to increase his dosage of olanzapine to improve his sleep represented an excellent opportunity to improve his treatment; however, instead of collaborating with the psychiatrist to support that medication increase, the primary clinician directed the patient to submit a request to see the psychiatrist. Given the patient's level of impairment and lack of insight, that was a missed opportunity. The patient failed to improve at the EOP level of care, attending few of his recreational groups and none of his clinician-led groups; however, there was no evidence that the treatment team was aware of the patient's flat or downward clinical trajectory. He required better multidisciplinary communication and collaboration as well as intensified efforts to strengthen his psychiatric treatment, including more frequent psychiatric contacts than were offered.

**Patient G**

This 42-year-old EOP patient's healthcare record was reviewed to assess the quality of mental health care provided at PVSP. The patient was provided a diagnosis of unspecified adjustment disorder and was prescribed hydroxyzine prn for anxiety; however, he did not take the prn medication. His medical conditions included chronic low back pain, chronic pain of left arm, knee pain, chest wall pain, transformed migraine, and talipes planus; in addition, the psychiatrist diagnosed obesity and noted a history of encephalitis.

The patient had a reported history of being bullied at school as well as childhood sexual abuse, childhood diagnoses of autism, oppositional-defiant disorder, and ADHD with methylphenidate and dextroamphetamine treatment, enrollment in special education classes, one community psychiatric hospitalization as an adult triggered by suicidal ideation and a suspected overdose with Motrin following his mother's death, and subsequent homelessness. Within the CDCR, he received mental health services at the 3CMS and EOP levels of care. No history of suicide attempts or self-injurious behavior was documented. He had an extensive history of substance use starting at age 13 including alcohol, cannabis, cocaine, ecstasy, hallucinations, and opioids, and he was serving a sentence for sexual abuse of a child.

On August 13, 2024, the patient transferred from the ASP EOP to the PVSP EOP. The initial psychiatric assessment was completed in a timely and thorough manner. The patient was described as fidgety, pressured, and requiring redirection, but he did not exhibit evidence of a thought disorder or perceptual disturbances. Diagnostic impressions included adjustment disorder with anxiety; alcohol use disorder, in remission in a controlled environment; cannabis use disorder, in remission in a controlled environment; and likely cluster B personality disorder(s) or traits. Additionally, provisional diagnoses of generalized anxiety disorder and unspecified bipolar and other related disorder were considered. Of note, the psychiatrist used the outdated multiaxial diagnostic system to record diagnostic impressions and assigned a GAF score of 52 to the patient, which was at the low end of the range for moderate symptoms and/or moderate functional impairment. The patient declined to accept psychotropic medications, but the patient's reasoning for that decision was not documented.

The initial primary clinician assessment was also completed timely and included an adequate psychosocial and psychiatric history but a weak case formulation that simply repeated his history and noted that he used video games as a coping skill. That assessment documented that the patient was refusing psychotropic medications because he did not want to be sedated.

The initial IDTT meeting occurred timely and was attended by the patient, assigned primary clinician and psychiatrist, and a correctional counselor; the IDTT documentation did not indicate whether the correctional counselor was assigned to the patient. This was the first documented encounter between the assigned psychiatrist and the patient. The IDTT clinical summary and case formulation were identical to each other word for word, and lifted directly from the initial primary clinician assessment. Those documents did not reflect any content of what occurred during the IDTT meeting. There was no documentation of patient strengths, a discharge plan, discharge criteria, or reason(s) for retention, and the treatment plan was not completed. However, the patient's verbalized treatment goals were well-documented and appeared relevant and appropriate given his documented clinical presentation.

During the period reviewed, the patient was provided weekly contacts with his primary clinician through caseload group and individual sessions. The patient also had a timely psychiatric follow-up encounter by a psychiatrist who was not assigned to the patient. Although not always documented as such, those primary clinician and psychiatric encounters appeared to occur in confidential settings. During the follow-up encounter, the psychiatrist opined that the patient might benefit from a mood stabilizing medication but documented the patient's continuing resistance to accepting psychotropic medications.

The primary clinician's documentation of the patient's participation in caseload groups included narratives describing patient-specific details that were helpful. Primary clinician and psychiatric progress notes for individual encounters were adequately documented, and the primary clinician documented clinically appropriate interventions that addressed the patient's symptoms and behaviors. Primary clinician progress notes recorded the patient's ambivalence regarding taking medication for anxiety, the patient's sensory discomfort at wearing a disability vest, and reports from the patient's peers that the patient lacked social skills and appeared to have an attitude of entitlement. The primary clinician opined that the patient was high functioning and that a lower level of care could be considered. Recreational groups were offered beginning August 20, 2024, and the patient attended both recreational and clinical groups regularly.

**Findings**

The care provided to this EOP patient was inadequate.

Although the primary clinician demonstrated consistently good interventions and documentation, there did not appear to be any efforts to resolve the patient's multiple provisional diagnoses or to investigate the patient's self-reported diagnosis of autism. The assigned psychiatrist saw the patient only once in the initial IDTT meeting. At the PVSP EOP, the patient was viewed as high functioning; however, the clinical documentation suggestive of autism spectrum symptoms, social impairment, mood symptoms, and/or cluster B personality disorder traits did not reconcile with that view. No treatment plan, discharge criteria, or case formulation were available to guide the treatment team's care of the patient.

**Patient H**

This 39-year-old EOP patient's healthcare record was reviewed to assess the quality of mental health care provided at PVSP. The patient was provided diagnoses of major depressive disorder, single episode, severe with psychotic features; unspecified depressive disorder; unspecified anxiety disorder; and opioid use disorder. He was prescribed olanzapine, sertraline, and prazosin for symptoms of depression, psychosis, anxiety, and nightmares and was adherent with those medications. Through the ISUDT, he was prescribed buprenorphine-naloxone for opioid use disorder but was frequently nonadherent with that medication. In addition to his psychiatric diagnoses, his medical conditions included hypertriglyceridemia and hand pain. A history of loss of consciousness due to a motor vehicle accident was documented by the psychiatrist. The patient transferred from the WSP EOP to the PVSP EOP on August 8, 2024.

The patient had a reported history of involuntary hospitalization and court-mandated outpatient treatment in the community following suicide attempts. Within the CDCR, he had received mental health care at the 3CMS and EOP levels of care. No history of suicide attempts or self-injurious behavior was listed in his suicide risk overview, but a history of two suicide attempts in the community, one by hanging, was documented in the psychiatric assessment. A recent history of suicidal ideation along with sadness, social withdrawal, anergia, hopelessness, amotivation, paranoia with auditory hallucinations, and decreased sleep and appetite triggered his placement

at the EOP level of care. The patient had a self-reported history of cannabis, alcohol, and methamphetamine use. The patient had an EPRD of December 20, 2024

The initial psychiatric assessment was completed four days later in a confidential and thorough manner. The psychiatrist used the outdated multiaxial diagnostic system to record diagnostic impressions and provided the patient with a GAF score of 40, reflecting the presence of psychosis. The patient was assessed as stable, and he declined any medication changes; the psychiatrist provided diagnoses of major depressive disorder, single episode, severe with psychotic symptoms, PTSD, and stimulant use disorder.

The initial primary clinician assessment was completed on August 13, 2024 in a confidential setting. The assessment provided adequate psychosocial and psychiatric history but focused more on the patient's history of substance use and violence than on his depression and PTSD symptoms. The case formulation included recommendations for CBT and motivational interviewing to address substance use issues along with anger management and domestic violence groups. The language used was nearly identical to that used by the primary clinician for other patients' case formulations. The patient's recent psychotic symptoms were noted in the primary clinician's clinical summary but were not integrated into the case formulation.

The initial IDTT meeting occurred on August 21, 2024 and was attended by the patient, assigned primary clinician, a non-assigned psychiatrist, and a correctional counselor. The documentation did not clarify whether the correctional counselor was assigned to the patient. The IDTT clinical summary and case formulation were copied over unchanged from the primary clinician's August 13, 2024 assessment; therefore, they did not reflect content discussed in the IDTT meeting or include multidisciplinary input. The case formulation did not address the primary problem of depression listed in the treatment plan, and it did not address what factors improved or worsened the patient's symptoms. The patient's strengths and verbalized treatment goal were documented, and the treatment plan provided a measurable short-term objective and long-term goal but failed to document a baseline measurement against which the patient's improvement in depression could be measured. CBT, therapy, psychiatry, and groups were listed as interventions without providing any detail or specifics regarding the type of therapy or type of groups that the patient required. The PVSP EOP treatment team did not develop or update the treatment plan. The date the goal was started was documented as August 1, 2024 when the patient was housed at WSP in the EOP, and the wording in each column of the treatment plan was identical to that contained in the WSP EOP treatment plan of August 1, 2024. A discharge plan, discharge criteria, and rationale for retaining the patient at the EOP level of care were not included in the IDTT documentation; although, the psychiatry review of the master treatment plan indicated that the overall treatment goals for the patient's EOP care were to increase his coping skills and reality testing.

After the August 12, 2024 initial psychiatric assessment, the patient was seen for a 30-day psychiatric follow-up appointment on September 11, 2024 by a non-assigned psychiatrist. That encounter occurred at the cell front due to the patient's refusal of the encounter in a confidential setting. The psychiatrist documented continued non-intrusive auditory hallucinations but stable mood and sleep. No medication changes were made, and the psychiatric plan for treatment remained unchanged from that documented on August 12, 2024.

The primary clinician saw the patient individually every other week. Those encounters occurred in a confidential setting and included documentation of the interventions provided along with effective efforts to develop a therapeutic alliance. However, the patient was never asked to rate his depression on a scale of 0 to 10, so progress towards the treatment plan short and long-term goals was not determined. As described immediately below, too few clinician-led groups were offered to support at least weekly encounters between the patient and primary clinician.

Recreational groups were offered beginning August 20, 2024, and groups led by clinicians were briefly offered beginning August 25, 2024. The patient attended and participated in both recreational and clinical groups; although, he occasionally declined to attend the recreational groups. Only three groups led by a primary clinician were documented in the patient's healthcare record, occurring on August 25, August 27, and September 1, 2024 but not thereafter. The three clinical group progress notes included narrative descriptions of the patient's participation. The reasons for the lack of additional clinician-led groups were not documented in the patient's healthcare record.

**Findings**

The care provided to this EOP patient was inadequate.

The patient's GAF score of 40 indicated clinically significant impairment in reality testing, impairment in communication, and/or major impairment in functioning, thinking, or mood. That level of impairment ought to have been associated with intensified psychiatric efforts at treatment, including more frequent contacts or stronger efforts to encourage higher doses of medication for symptom control. Such efforts were not in evidence, and the patient continued to report psychotic symptoms at the most recent psychiatric encounter. Nearly simultaneously, the primary clinician documented an absence of psychotic symptomatology. There was no documentation that those divergent findings were reconciled. The case conceptualization and treatment plan were inadequately formulated and did not guide treatment. The treatment plan was borrowed from another institution and was not updated. The treatment provided was not consistent with the goals of the treatment plan, and the team did not measure treatment progress as required by the treatment plan. Just as important, the patient's recent history of suicidal ideation and distal history of suicide attempts were inadequately explored; a full suicide risk evaluation was not completed but appeared to have been clinically indicated, particularly considering the patient's pending release to the community. Multidisciplinary communication was lacking, and an insufficient number of clinical group sessions were offered.

**Patient I**

This 39-year-old EOP patient's healthcare record was reviewed to assess the quality of mental health care provided at PVSP. The patient was provided a diagnosis of unspecified schizophrenia spectrum and other psychotic disorder, but he was not prescribed psychotropic medication. His medical conditions included hyperlipidemia, hypertensive disorder, degenerative joint disease in the knee with chronic pain, and non-cardiac chest pain. He had a permanent knee brace and was

monolingual in Spanish. The patient transferred from the ASP EOP to the PVSP EOP on August 6, 2024.

The patient had a history of reporting auditory and visual hallucinations and treatment with aripiprazole, olanzapine, risperidone, mirtazapine, and hydroxyzine; however, the patient stopped taking those medications in early 2022. He had not met the criteria for involuntary medication treatment under PC 2602 since his medication discontinuation. No history of childhood sexual abuse, suicide attempts, or self-harm was noted in the healthcare record, and he reported no history of mental health treatment in the community. He reported a history of methamphetamine use starting at age 15, with last use in 2014. Within the CDCR, he received mental health services at the 3CMS and EOP levels of care.

On August 11, 2024, the primary clinician completed a clinical summary and case formulation update as the initial primary clinician assessment. The assessment was conducted in a confidential setting with the assistance of a Spanish interpreter, and it documented multiple psychotic symptoms including auditory, visual, and tactile hallucinations as well as paranoid thought processes and sleep disturbance. The case formulation was formulaic, did not address the patient's psychotic symptoms, and instead centered on the patient's need for substance use treatment, anger management and domestic violence interventions. The language used was nearly identical to that used by the primary clinician for other patients' case formulations.

The patient's initial psychiatric assessment was completed on August 12, 2024 through a certified Spanish interpreter and was thorough; although, the psychiatrist relied on the outdated multiaxial diagnostic system to record diagnostic impressions, including the GAF scale. The patient was found without signs of thought disorganization, bizarre mentation, or internal preoccupation, but he reported a chronic history of auditory hallucinations. Differential diagnostic impressions included schizophrenia spectrum disorder and substance-induced psychotic disorder, among others. Suicide risk was assessed as low based on history and current mental status.

The initial IDTT meeting occurred on August 13, 2024 and was attended by the patient, assigned primary clinician, a non-assigned psychiatrist, and a correctional counselor; the documentation did not indicate if the correctional counselor was assigned to the patient. In the IDTT clinical summary, a Spanish interpreter reportedly assisted with the meeting but was not included in the information listing those present. With minor additions, the IDTT clinical summary and case formulation were copied unchanged from the August 11, 2024 primary clinician documentation. The case formulation did not address the factors that improved or worsened the patient's symptoms, and it did not address the primary problem of hallucinations identified in the treatment plan. However, patient strengths and the patient's verbalized treatment goal were documented. The treatment plan failed to formulate a measurable long-term goal, and it identified CBT, reality testing, and coping skills as the primary interventions to address the patient's hallucinations. No discharge plan, discharge criteria, or reason for retention were indicated in the IDTT documentation. However, the master treatment plan psychiatry review documented that reducing depression, anxiety, and auditory hallucinations, developing coping skills to address mood and psychotic symptoms, and abstaining from substance use were the overall treatment goals.

An initial recreational therapy assessment was completed on August 14, 2024 that was patient-specific and clinically appropriate. The patient first began receiving individual and group programming on August 20, 2024. During the first individual session with his primary clinician on that date, he reported that he was experiencing tactile hallucinations on his back and genitals. He described the sensation as feeling as if someone was touching him all over, and he requested assistance in seeing his psychiatrist regarding medication options. The patient also expressed concern that he was assigned to groups that were not conducted in Spanish and did not have a Spanish interpreter. On August 25, 2024, the primary clinician documented that she had emailed EOP clinical staff, recreational therapy staff, and supervisors regarding the patient's need for a Spanish interpreter, and that she had emailed the psychiatrist regarding the patient's request to explore medication options for his symptoms.

Following the initial psychiatric assessment and August 25, 2024 email from the primary clinician, the patient was seen by a non-assigned psychiatrist on September 11, 2024. The session was conducted in Spanish, apparently without the aid of an interpreter. The patient was found to be experiencing continuing auditory hallucinations, insomnia, and paranoia but had no suicidal and homicidal ideation. There was no reference to tactile hallucinations. The patient continued to decline medications for his symptoms, and the psychiatrist noted that the patient did not meet the criteria for involuntary treatment. Most of the note's content was copied from prior record entries. The psychiatric progress note did not document inquiry into the patient's reasons for declining psychotropic medications or the patient's capacity to make informed healthcare decisions; it also did not document any efforts to encourage the patient to consider medications other than a reference to discussing the risk of psychotic decompensation. The plan was simply to monitor the patient. The assigned psychiatrist did not see the patient between the time of his PVSP arrival and October 4, 2024.

The primary clinician saw the patient weekly either in caseload group or individually. Individual encounters occurred in a confidential setting except when the patient refused. In those notes, the primary clinician documented that the patient reported worsening of his tactile hallucinations and paranoia, and sleeplessness due to the hallucinations. There was no indication in those progress notes that the primary clinician conveyed concerns about the worsening symptoms to the assigned psychiatrist. On September 9, 2024, the patient refused his individual session, and there was inadequate probing of the patient's reasons for refusal documented in the accompanying note. In the September 16, 2024 individual primary clinician encounter, the PC documented that the patient reported that approximately one month earlier, he awoke after experiencing tactile hallucinations and found blood "in his rectum area." There was no indication that the primary clinician referred the patient to any other staff in response to the patient's report.

Most group therapy notes were developed by recreational therapists; the patient was also offered and participated in an anger management and a life skills/caseload clinical group. Progress notes for both recreational and clinical groups were minimal in recording his participation, and did not indicate whether a Spanish interpreter was utilized.

**Findings**

The care provided to this EOP patient was inadequate.

The patient did not receive care that adequately addressed his psychotic symptoms or his refusal of psychotropic medications. Primary clinician notes indicated that the patient was ambivalent rather than adamant about refusing medications, and efforts to explore his reasons for refusing efforts to encourage him to reconsider taking psychotropic medications, and efforts to explore whether he had the capacity to make informed decisions about his own care were not documented. The tactile hallucinations reported at length to the primary clinician did not appear to have been considered by the psychiatrists who saw the patient. The atypical nature and worsening course of the patient's symptoms, along with the primary clinician's effort to have the patient re-evaluated for medications, should have resulted in increased urgency for timely psychiatric follow-up as well as underscored the need for reconciling or verifying psychiatric diagnoses. Neither such urgency nor diagnostic clarification were apparent in the healthcare documentation. The assigned psychiatrist did not see the patient. When the patient reported that he discovered blood in his rectal area, that report should have raised concerns about a potential health problem requiring medical follow-up (e.g., hemorrhoids or other internal bleeding), an incident of sexual victimization requiring PREA follow-up, or an exacerbation of psychotic symptomatology. Regardless of the underlying process(es), the patient's report of bleeding required an integrated team approach and that did not occur. The case formulation did not address the patient's psychotic symptoms.

**Patient J**

This 64-year-old EOP patient's healthcare record was reviewed to assess the quality of mental health care provided at PVSP. The patient was provided diagnoses of schizoaffective disorder, bipolar type, and bipolar I disorder, current or most recent episode manic, severe. He was prescribed quetiapine for psychosis and mood instability and was medication adherent. In addition to his mental illness, his medical conditions included obesity, pre-diabetes, dyslipidemia, hypertension, and bilateral pes planus.

The patient had a reported history of childhood physical abuse in which his older brother allegedly beat and tortured him, and a stepfather beat him. He received no medical or mental health care for that abuse and had no history of outpatient mental health treatment in the community. However, his healthcare record indicated that he was a patient at Patton State Hospital for the 34 years prior to CDCR incarceration, having been committed there after killing his sister and his wife. That hospitalization ended when he was convicted of assault, leading to his transfer to the CDCR. No history of suicide attempts or self-injurious behavior was documented. The patient had a history of alcohol, cannabis, cocaine, hallucinogen, and methamphetamine use. His EPRD was listed as March 24, 2025.

The patient was placed at the EOP level of care at the WSP reception center in April 2024 and transferred from the WSP EOP to the PVSP EOP on August 12, 2024. The initial primary clinician assessment was completed timely in a confidential setting and prior to the initial IDTT

meeting, but the initial psychiatric assessment did not occur until after the initial IDTT meeting and was not conducted by the assigned psychiatrist.

At the initial primary clinician assessment, the patient presented as pressured, tangential, and difficult to redirect but was cooperative. Most of the assessment consisted of content excerpted from prior entries in the healthcare record with scant evidence of current assessment efforts and a very limited case formulation that recounted history, noted the patient's coping strategies, and concluded that the patient appeared to be stable but prone to talk at length about religious ideas. Confusingly, the assessment indicated both that the patient had no history of psychiatric hospitalization and that the patient was hospitalized at Patton State Hospital for 34 years. Further, it included additional contradictory statements that the patient was serving a three-year sentence for assault and that the patient was serving a life sentence for murdering his sister and wife.

The initial IDTT meeting occurred on August 20, 2024 and was attended by the patient, assigned primary clinician and psychiatrist, and a correctional counselor. The documentation did not indicate whether the correctional counselor was assigned to the patient, and the IDTT meeting was the first and only time the assigned psychiatrist saw the patient between the patient's arrival and October 4, 2024. The IDTT clinical summary and case formulation were copied unchanged from the primary clinician's initial assessment; therefore, they did not reflect either what occurred in the IDTT meeting or a multidisciplinary approach. The patient's verbalized treatment goals, treatment plan, discharge plan, discharge criteria, and reason(s) for retention at the EOP level of care were not documented.

Later in the day on August 20, 2024, a non-assigned psychiatrist completed the initial psychiatric assessment when the patient was described as logorrheic, circumstantial, in need of frequent redirection, and religiously preoccupied, but he did not exhibit evidence of psychosis or suicidal and homicidal thinking. Given the metabolic side effects of quetiapine, the psychiatrist appropriately suggested alternative antipsychotic medications, but the patient declined any medication changes. The psychiatrist noted that the patient's risk for serious violence when not taking medications was significant. The psychiatrist used the outdated multiaxial diagnostic system to record diagnostic impressions and assigned the patient a GAF score of 45, indicating the presence of serious symptoms and/or serious functional impairment. A primary diagnosis of schizoaffective disorder, bipolar type was provided, but there was no documented discussion of the diagnosis of bipolar I disorder that was listed in the patient's healthcare record.

Following the initial psychiatric assessment, the non-assigned psychiatrist saw the patient on September 19, 2024. The content of that progress note was largely identical to that of the August 20, 2024 assessment, and no changes in medication were made. The patient was offered weekly contact with his primary clinician through caseload group and individual encounters that occurred in a confidential setting. Progress notes for the caseload group sessions consistently included narrative descriptions of the patient's participation; progress notes for the individual encounters were brief, did not track the patient's treatment progress, and did not identify the interventions provided.

Recreational therapy groups began being offered on August 20, 2024, and the patient began attending them the following day. He declined to attend a number of those groups and declined to attend one of his primary clinician's groups, reporting that he preferred to spend his time in the yard instead.

**Findings**

The care provided to this EOP patient was inadequate.

No treatment plan was developed to guide the patient's care, the IDTT's goals for the patient were not documented, and the individual therapeutic encounters failed to indicate what interventions were provided or how the patient had responded. There was inadequate clarification regarding the patient's alternative psychiatric diagnoses (schizoaffective disorder versus bipolar I disorder), the case formulation did not reflect the grave nature of the patient's past history of violence or the time he spent at Patton State Hospital, and healthcare documentation for the patient's PVSP EOP care did not reference any summary of or recommendations from the patient's reported 34 years of inpatient treatment at Patton State Hospital. Given that historical context and the patient's quickly approaching EPRD, the EOP treatment team needed to develop a thorough and accurate understanding of the patient's risks and treatment needs. Achieving such an understanding would have been facilitated by review of his inpatient treatment at Patton State Hospital. However, a discharge summary or other records from Patton State Hospital were not located in the patient's healthcare record, and there was no indication that the treatment team felt it was important to obtain that information.

**Patient K**

This 47-year-old EOP patient's healthcare record was reviewed to assess the quality of mental health care provided at PVSP. The patient was provided diagnoses of PTSD and adjustment disorder, with mixed anxiety and depressed mood. He was prescribed sertraline and hydroxyzine and was consistently adherent with those medications. Through the ISUDT, he was prescribed buprenorphine-naloxone for opioid use disorder. In addition to his mental health diagnoses, he had medical conditions including obesity, hyperlipidemia, hypertension, and a history of abdominal pain, umbilical hernia repair, and successfully treated hepatitis C. The patient transferred from the CMF EOP to the PVSP EOP on August 15, 2024

The psychiatrist noted that the patient had a history of concussions after being assaulted and that the patient was stabbed in 2008; the primary clinician documented that the patient was stabbed eight times in 2015.

The patient had a history of childhood abuse, parental heroin use, early gang membership, juvenile justice involvement, and foster care placement. He denied any psychiatric hospitalizations or other mental health treatment in the community. During repeated periods of CDCR incarceration spanning 2000 to 2021, he did not require mental health services apart from seven days of 3CMS placement in 2003. Since October 21, 2021, the patient had required either treatment at the MHCB or EOP levels of care. The patient had no history of suicide attempts or self-injurious behavior documented, but his MHCB admission in October 2021 was triggered in

part by suicidal ideation. He reported a history of a deliberate heroin overdose with intent to die when his mother died in 2003, as well as an incident in 2022 when he prepared to hang himself but did not do so. A history of alcohol, cannabis, inhalant, methamphetamine, and opioid use was noted, and his family history was positive for suicide (maternal cousin) and fatal heroin overdose (brother).

The initial psychiatric assessment was completed timely and in a thorough manner. The patient was described as depressed but free of psychotic symptoms; the patient reported chronic insomnia, dysphoria, hypervigilance, and nightmares/flashbacks. The psychiatrist used the outdated multiaxial diagnostic system to record diagnostic impressions and assigned a GAF score of 48 to the patient, indicating moderately serious symptoms or impairment. The psychiatrist provided diagnoses of major depressive disorder, recurrent, severe with psychotic features; PTSD; opioid use disorder; stimulant use disorder; cannabis use disorder; and alcohol use disorder. His medication dosing was adjusted slightly to simplify the regimen and to reduce the likelihood that sertraline interfered with sleep.

The primary clinician completed an abbreviated clinical summary and case formulation update rather than a full initial assessment. Although not a full assessment, the clinical summary adequately captured the patient's clinical presentation and psychosocial history. The case formulation was generic, formulaic, did not address the patient's current symptoms, and instead focused on substance use and violence. The content of the case formulation was nearly identical to the content provided by the primary clinician in other patient's case formulations.

The initial IDTT meeting occurred timely and was attended by the patient, assigned primary clinician and psychiatrist, and a correctional counselor. The documentation did not indicate whether the correctional counselor was assigned to the patient, and this was the first and only time that the assigned psychiatrist met with the patient during the period between the patient's arrival and October 4, 2024. The IDTT clinical summary and case formulation were copied unchanged from the primary clinician's earlier encounter with the patient; therefore, they did not document what occurred during the IDTT or reflect multidisciplinary input. The patient's strengths and verbalized treatment goals were well documented, and a treatment plan was documented. Although the treatment plan may have been clinically appropriate; it was limited, as it did not reflect psychiatric care as an intervention and did not appear to have been developed by the PVSP EOP treatment team. The measurable short-term objective and long-term goal were noted to have been started on February 15, 2024 well before the patient arrived at PVSP, and the language contained in each column of the treatment plan was identical to the language formulated in the treatment plan of February 15, 2024 that was developed by the CSATF treatment team. No baseline measurement of the patient's subjective reports of symptoms was obtained against which progress toward the long-term treatment goal could be measured. No discharge plan, discharge criteria, or reason(s) for retention at the EOP level of care were included in the IDTT documentation.

Following the initial psychiatric assessment, the patient was seen again by the non-assigned psychiatrist on September 19, 2024. The patient was reportedly stable with no signs or symptoms of psychosis with normal sleep and appetite; there was an absence of hopelessness,

suicidal or homicidal ideation, acute stressors, or illicit substance use. The patient reported that he was doing well on his current medications and declined additional medication changes.

Following the clinical summary and case formulation update completed on August 19, 2024, the primary clinician saw the patient individually every other week and documented providing the patient with active listening, psychoeducation, skills building, and encouragement to journal. Over the course of those encounters, the patient appeared to be improving. However, the patient tested positive for methamphetamine on September 23, 2024, on the same day as one of the individual encounters. According to the documentation, the patient was offered only one caseload group on September 1, 2024, as none were documented before or after that date. That was the only clinician-led group documented in the healthcare record between his arrival at PVSP and October 4, 2024.

A recreational therapy group was offered to the patient on August 21, 2024, but he declined to attend. No additional groups were offered until August 27, 2024, when the patient attended a recreational therapy group. Beginning September 3, 2024, recreational groups were offered regularly, and the patient attended most offered groups.

**Findings**

The care provided to this EOP patient was inadequate.

The PVSP EOP team's treatment plan was borrowed from another facility, was not updated, and was not used to guide treatment in a meaningful manner. The patient was never asked about replacing negative self-talk with positive statements and never asked to rate his symptom severity on a scale of 0 to 10, so progress towards the treatment plan short and long-term goals was not determined. Even if the treatment plan was developed by the PVSP EOP team, no baseline level of depression was obtained against which progress toward the long-term goal could be measured. The case formulation did not address the patient's primary diagnosis or symptoms. During the first two weeks of treatment, the patient was offered only two groups; both were recreational therapy groups. Only one clinician-led group was offered between his PVSP arrival and October 4, 2024. The assigned psychiatrist saw the patient only once during the review period at the initial IDTT meeting, and that provider had not assessed the patient prior to that meeting. The inadequate amounts of structured treatment may have contributed to the patient's relapse on methamphetamine.

**Patient L**

This 34-year-old EOP patient's healthcare record was reviewed to assess the quality of mental health care provided at PVSP. The patient was provided diagnoses of bipolar I disorder, current or most recent episode depressed, with psychotic features, and schizoaffective disorder, depressive type. Due to his persistent refusals of medication, he was not prescribed any scheduled psychotropic medications after his arrival at PVSP, and he had no history of involuntary treatment under a PC 2602 order. His medical conditions included dyslipidemia and hepatitis C. The patient transferred from the CIM EOP RHU to the PVSP EOP on August 22, 2024.

The patient had a history of outpatient treatment in the community, A history of five suicide attempts or self-injurious episodes was noted, including two incidents of hanging, one of cutting his wrist, and one incident in which he hit his head with his hand in response to auditory hallucinations. A suicide attempt by overdose with pills on June 30, 2024 was listed under "suicide history information," but no such event was documented in the healthcare record on or about that date. Within the CDCR, he had received mental health services at the 3CMS, EOP, MHCB, and ICF levels of care, and he was previously treated with aripiprazole, risperidone, mirtazapine, hydroxyzine, and zolpidem. The patient had a lengthy history of substance use, including alcohol, cannabis, cocaine, and an unspecified prescription medication in the community. Within the CDCR he had a history of using cannabis and spice, and on July 17, 2024 required hospitalization in the community for seizure-like activity after smoking spice. He had declined inclusion in the ISUDT program prior to his arrival at PVSP, and he continued to decline that treatment at PVSP.

At CIM, he had been placed in the RHU after being found guilty of an RVR for refusing to provide a urine sample for a toxicology screen. Following his arrival at PVSP, the initial psychiatric assessment and a limited initial primary clinician assessment were completed timely and in a confidential setting. The psychiatrist described the patient as guarded but cooperative and without signs of psychotic processes; although, he reported chronic auditory and visual hallucinations. The psychiatrist used the outdated multiaxial diagnostic system to record diagnostic impressions and assigned a GAF score of 48 to the patient, indicating moderately serious symptoms or impairment. The plan of care included monitoring the patient and clarifying his psychiatric diagnoses.

The primary clinician completed an abbreviated clinical summary and case formulation update. The case formulation was generic, focused first on the patient's distal history and then on interventions for substance use, anger, and domestic violence. In wording, the case formulation was nearly identical to case formulations provided for other EOP patients by the primary clinician, and it did not address the serious mental illness for which the patient was receiving EOP care. The clinical summary was adequate.

A SRASHE was completed four days later as one of the four required following a MHCB placement. Confusingly, it referred to the July 17, 2024 episode in which the patient used spice, experienced seizure-like activity, and required outside hospitalization as a suicide attempt "by overdose due to depression, anxiety, [and] panic attack." No health records contemporaneous with or immediately following the July 17, 2024 incident referenced the patient's use of spice as a suicide attempt. The SRASHE also indicated that the patient had an MHCB placement in July 2024, which was not the case; instead, the patient was returned to the EOP level of care following his offsite hospitalization in July 2024, and his most recent MHCB placement occurred in February 2024 due to suicidal ideation. The SRASHE concluded that the patient was at high chronic and moderate acute risk for suicide, and it was noted that he continued to experience symptoms of depression, psychosis, and fleeting thoughts of suicide. In conflict with CDCR policy, the SRASHE concluded that a safety plan was not needed or clinically indicated.

The initial IDTT meeting occurred timely and was attended by the patient, assigned primary clinician and psychiatrist, a certified nursing assistant, and a correctional counselor. The documentation did not indicate whether the correctional counselor was assigned to the patient, and this was the first and only time the assigned psychiatrist met with the patient during the period between the patient's arrival and October 4, 2024. The IDTT clinical summary and case formulation were copied unchanged from the primary clinician's earlier encounter with the patient; therefore, they did not document what occurred during the IDTT meeting or reflect multidisciplinary input. The patient's strengths and verbalized treatment goals were documented. The treatment plan was identical to the one developed on May 14, 2024 at CIM and was not updated; it did not address the patient's refusal of psychotropic medication, suicide risk, or refusal of substance use treatment. No discharge plan, discharge criteria, or reason(s) for retention at the EOP level of care were included in the IDTT documentation.

Following the initial psychiatric assessment, the patient was seen by a non-assigned psychiatrist for a 30-day follow-up. That encounter occurred timely and may have occurred in a confidential setting, although that was not documented. The documentation was nearly identical to that provided for the initial psychiatric assessment, and no changes in treatment occurred. The plan of care was continued to monitor the patient, to clarify diagnoses, and to attempt to improve insight.

The primary clinician saw the patient once every two weeks for individual encounters. Those sessions occurred in a confidential setting and were primarily supportive and psycho-educational in nature. No caseload or other clinician-led groups were documented, and all documented groups were offered by recreational therapists.

**Findings**

The care provided to this EOP patient was inadequate.

The treatment plan was inadequate, was borrowed from another institution, and did not address the patient's refusal of psychotropic medications, his depression or suicidal ideation. The case formulation was generic and was nearly identical in content to case formulations developed for other patients; concerningly, it did not address the patient's serious mental illness. Efforts to clarify the patient's diagnosis, to explore his resistance to psychotropic medication, and to explore his refusal of substance use treatment were not documented. The assigned psychiatrist saw the patient only once in the initial IDTT meeting without the benefit of previously assessing the patient. The SRASHE relied upon an inaccurate account of the patient's history of suicide attempts and substance use which increased the risk that an inaccurate history and understanding of the patient's suicide risks would be carried forward. A safety plan was not developed, and the primary clinician erred in concluding that one was not required by policy or indicated by clinical need. Caseload and other clinical groups were not offered by clinicians, and the only documented group programming was provided by recreational therapists.

**Patient M**

This 39-year-old EOP patient's healthcare record was reviewed to assess the quality of mental health care provided at PVSP. The patient was provided diagnoses of unspecified depressive disorder and recurrent major depressive disorder with atypical features. Trials of aripiprazole, hydroxyzine, olanzapine, and risperidone were prescribed, but he was frequently nonadherent with those medications. The patient had no history of receiving involuntary treatment under a PC 2602 order. Through the ISUDT, he was prescribed buprenorphine-naloxone for opioid use disorder.

The patient had medical conditions including latent tuberculosis, headache, non-specific pain in neck, and arthralgia of temporomandibular joint. He underwent laparoscopic surgery for cholelithiasis in July 2024. A history of latent syphilis and successful treatment for hepatitis C were noted by the psychiatrist. The patient received treatment for both latent tuberculosis and latent syphilis while at PVSP. The patient transferred from the HDSP EOP to the PVSP EOP on August 22, 2024.

The patient had a history of childhood physical abuse and psychiatric care following a suicide attempt by hanging at age eight, foster care, behavioral difficulties in school, and gang affiliation. He had multiple psychiatric admissions between the ages of eight and 18. Past diagnoses included bipolar disorder, PTSD, and ADHD. He was previously prescribed buspirone, fluoxetine, hydroxyzine, lithium, methylphenidate, olanzapine, paroxetine, sertraline, trifluoperazine, valproic acid, and other psychotropic medications. Six suicide attempts were documented for dates ranging from 1992 to 2016. Within the CDCR, he had received mental health services at the 3CMS, EOP, and MHCB levels of care. He had a history of cannabis, methamphetamine, and opioid use.

He was placed in the PBSP MHCB on August 8, 2024 due to suicidal ideation, possible visual hallucinations that the patient described as "visions," and paranoia. He transferred from PBSP to the HDSP MHCB on August 10, 2024, discharged from the HDSP MHCB to the EOP care on August 21, 2024, and transferred to the PVSP EOP on the following day. After arrival at PVSP, five-day primary clinician follow-up contacts occurred daily between August 23 and August 26, 2024 in confidential settings. During each follow-up encounter, the patient's safety plan was reviewed with the patient. The patient remained behaviorally and psychiatrically stable during that time.

The initial psychiatric evaluation and an abbreviated primary clinician assessment occurred on August 27, 2024. The psychiatric assessment was adequate, relied on the outdated multiaxial diagnostic system to record diagnostic impressions, and resulted in a determination that the patient suffered from chronic psychotic illness. The patient was described as delusional, paranoid, and desirous of discontinuing risperidone due to concern for the development of gynecomastia. Diagnoses of schizophrenia, cannabis use disorder, and opioid use disorder were provided, with a provisional diagnosis of schizoaffective disorder, depressed type considered. The patient was assigned a GAF score of 49, indicating moderately serious symptoms or impairment. He was prescribed aripiprazole.

The primary clinician completed a clinical summary and case formulation update instead of a full assessment. The patient did not participate in the update, and the clinical summary portion was sparse, inadequate, and based on record review only. The update included a case formulation that was generic, formulaic, and nearly identical in wording to case formulations developed for other patients by this primary clinician. It focused on substance use, anger management, and domestic violence but did not address the patient's serious mental illness. Diagnoses of major depressive disorder, recurrent with atypical features, and bipolar disorder were provided.

The initial IDTT meeting occurred timely and was attended by the patient, assigned primary clinician and psychiatrist, a certified nursing assistant, and a correctional counselor. The documentation did not indicate whether the correctional counselor was assigned to the patient, and this was the first and only time the assigned psychiatrist met with the patient during the period between the patient's arrival and October 4, 2024. The IDTT documentation mistakenly indicated that the patient did not have or need a safety plan and then included the most recent safety plan. The IDTT clinical summary and case formulation were copied unchanged from the primary clinician's earlier encounter with the patient; therefore, they did not document what occurred during the IDTT meeting or reflect multidisciplinary input. The patient's strengths and verbalized treatment goals were documented. A current treatment plan was developed that focused exclusively on substance use as the identified treatment target; it did not address the patient's chronic mental illness or the challenges that required EOP level of care. No discharge plan, discharge criteria, or reason(s) for retention at the EOP level of care were included in the IDTT documentation.

Following the initial psychiatric assessment, the patient was seen twice due to medication non-adherence by two different non-assigned psychiatrists. Medication adjustments to address the patient's lack of adherence included changing the timing of the dose of aripiprazole from evening to morning, adding hydroxyzine to address symptoms of insomnia, and then switching from aripiprazole to olanzapine. Aripiprazole and hydroxyzine were discontinued on September 24, 2024 due to the patient's medication nonadherence, but the patient was not seen by psychiatry between September 9, 2024 and October 1, 2024 when olanzapine was started. Consequently, the patient did not have active psychotropic medications for the six days between September 24, 2024 and October 1, 2024. The patient reported ongoing auditory hallucinations on October 1, 2024.

After the clinical summary and case formulation update, the primary clinician saw the patient individually every other week. Those encounters occurred in a confidential setting but were brief and limited to check-ins. The patient was first offered group programming on September 3, 2024. Almost all documented groups were offered by recreational therapists, and the patient did not attend many of them. Only one caseload group was documented on September 15, 2024, and the patient declined to attend.

**Findings**

The care provided to this EOP patient was inadequate.

The treatment plan did not address the patient's serious mental illness and instead focused on substance use that appeared to be in remission and was not in any case the primary reason for placement at the EOP level of care. Any efforts that may have been made to reconcile the divergent diagnoses offered by the psychiatrist and primary clinician were not documented. The patient was seen by three different psychiatrists within less than 40 days which may have contributed to multiple changes in antipsychotic medication. The assigned psychiatrist saw the patient only once at the initial IDTT meeting. An antipsychotic medication was discontinued, and a period of nearly one week lapsed before a different antipsychotic was prescribed; during that time, the patient reported ongoing auditory hallucinations. The number of clinician-led groups was inadequate, and the individual contacts with the primary clinician did not constitute meaningful therapy. The patient's chronic psychosis and high chronic suicide risk required more intensive interventions and greater integration of multidisciplinary care than were provided.

**Patient N**

This 31-year-old EOP patient's healthcare record was reviewed to assess the quality of mental health care provided at PVSP. The patient was provided a diagnosis of unspecified mood disorder and was prescribed aripiprazole, mirtazapine, and ziprasidone. He was adherent with aripiprazole and mirtazapine over 80 percent of the time but was adherent with ziprasidone only 57 percent of the time. The patient transferred from the WSP EOP to the PVSP EOP on August 7, 2024 and was released from CDCR custody on September 29, 2024.

Through the ISUDT, he was prescribed buprenorphine-naloxone for opioid use disorder. His medical conditions included obesity, tinea capitis, hypothyroidism, and dyslipidemia.

The patient reported a history of chronic homelessness both as a child and as an adult, but he provided inconsistent reports that he either had no history of mental health treatment in the community or had multiple brief hospitalizations when he reported that he was suicidal to gain admission for shelter from cold weather. Within the CDCR, he had received mental health services primarily at the EOP and MHCB levels of care. He had one documented incident of self-injury by cutting his wrist in 2017. A history of opioid, cannabis, methamphetamine, and spice use were documented.

At WSP, he had two recent MHCB placements for suicidal ideation. Shortly after his arrival at PVSP from August 9 to August 13, 2024, the patient submitted a total of six health care services requests indicating that he wanted to stop taking heat medications. On August 13, 2024, the patient was seen by a non-assigned psychiatrist for the initial psychiatric assessment. The psychiatric assessment was adequate and addressed the patient's desire for aripiprazole to be discontinued as it limited his ability to go to the yard due to high temperatures. The psychiatrist used the outdated multiaxial diagnostic system to record diagnostic impressions of unspecified schizophrenia spectrum and other psychotic disorder; stimulant use disorder, severe; and opioid use disorder; and provisional diagnoses of schizoaffective disorder, depressed; methamphetamine-induced psychotic disorder; and borderline personality traits were also documented. A GAF score of 50 was assigned, indicating the presence of serious symptoms or serious functional impairment. At the patient's insistence, aripiprazole was discontinued, and no

other antipsychotic medications were prescribed. Mirtazapine was continued for depression and insomnia.

The primary clinician completed a clinical summary and case formulation update rather than a full initial primary clinician assessment. The update occurred timely in a confidential setting. The clinical summary did not adequately resolve conflicting reports from the patient or provide a clear assessment of the patient's clinical presentation. The case formulation was generic, very similar in content to case formulations developed for other EOP patients by this clinician, and focused on substance use, anger management, and domestic violence rather than the poorly specified symptoms of mental illness that were the focus of the patient's EOP treatment. A diagnosis of unspecified mood disorder was offered; although, the patient reported auditory hallucinations, mood swings, and a pattern of responding to internal stimuli. He presented with a combination of pressured speech and mumbling that was difficult to understand. Subsequent documentation clarified that the patient had a significant speech impediment.

The initial IDTT meeting occurred timely and was attended by the patient, assigned primary clinician, an alternate psychiatrist, and a correctional officer; the IDTT documentation did not clarify whether the correctional officer was assigned to the patient. The IDTT documentation indicated that the patient did not have or need a safety plan, but then included the most recent safety plan that was pulled from a five-day follow-up encounter of July 29, 2024. The IDTT clinical summary and case formulation were copied unchanged from the primary clinician's earlier encounter with the patient; therefore, they did not document what occurred during the IDTT or reflect multidisciplinary input. The patient's strengths and verbalized treatment goals were documented. The treatment plan was borrowed unchanged from the treatment plan developed on July 7, 2024 at WSP. It was not updated, its long-term goal was not measurable, and it did not address the patient's recent MHCB placements for suicidal ideation, his refusal of antipsychotic medications, or any psychiatric interventions. Interventions included "weekly contact," presumably by the primary clinician, and as described below, that did not occur. No discharge plan, discharge criteria, or reason(s) for retention at the EOP level of care were included in the IDTT documentation.

Following the initial psychiatric assessment, the same non-assigned psychiatrist saw the patient timely for a 30-day follow-up contact. Although not documented, it appeared that the encounter occurred in a confidential setting. The documentation was adequate but largely identical to the content in the initial psychiatric assessment. The patient presented with paranoia and insomnia; and after discussion and in anticipation of pending community release, he agreed to restarting an antipsychotic medication. Ziprasidone was selected based on the patient's poor metabolic status with target symptoms of psychosis, depression, and insomnia. The patient was not adherent with the medication, and the assigned psychiatrist was notified. The assigned psychiatrist indicated on September 24 and September 26, 2024 that the patient's pattern of intermittent nonadherence would be addressed at the next scheduled visit. It appeared that the assigned psychiatrist was unaware of the patient's pending release from prison.

After the clinical summary and case formulation update were completed on August 11, 2024, the primary clinician saw the patient for individual treatment on August 20, 2024, and then not until September 15 and September 16, 2024. The three encounters occurred in confidential settings.

On August 20, 2024, the encounter focused on building therapeutic rapport and cognitive skills to manage anxiety by identifying triggers to anxiety. On September 15, 2024, the primary clinician completed a mental health pre-release planning assessment that indicated the patient planned to live in a tent in Anaheim, California following his release. The September 16, 2024 encounter focused largely on attempting to answer the patient's questions about his upcoming release. Documentation of those encounters was adequate. A second mental health pre-release planning assessment was completed by another social worker on September 23, 2024 that apparently was based on record review rather than contact with the patient, and it contained more information regarding the probation office and community contacts.

The patient was initially offered group programming on August 20, 2024, and he attended some groups. Recreational therapists offered most groups. During the period between August 7, 2024 and September 29, 2024, only three clinician-led groups were documented, and the patient did not attend any of those groups. Progress notes for the two clinician-led group sessions he did attend included narrative descriptions of the patient's participation in the group.

**Findings**

The care provided to this EOP patient was inadequate.

There were inadequate efforts to clarify the patient's psychiatric diagnoses and treatment needs. The discrepant diagnostic impressions developed by the psychiatrist and the primary clinician were not reconciled. The case formulation was inadequate and did not address the potential presence of a serious mental illness. The treatment plan was borrowed from another institution, it did not guide treatment, and it did not address the patient's near-term release to the community. The patient was provided with inadequate levels of individual and group treatment. The reasons for his intermittent nonadherence with antipsychotic medication were not adequately explored; and in the context of ongoing climate change, the patient's requests to stop antipsychotic medication as they prevented him from going to yard during heat alerts raised concerns that the conditions of confinement significantly and adversely impacted the patient's treatment and welfare. It may not have been possible to prevent the patient from being released to live as he chose in a tent, but efforts to explore alternatives and to develop a more robust release plan were not well documented. For a patient serving a sentence for arson with a history of substance use disorders and apparent serious mental illness; discharge planning was inadequate and only occurred in the final two weeks of his stay at PVSP.

**Patient O**

This 34-year-old EOP patient's healthcare record was reviewed to assess the quality of mental health care provided at PVSP. The patient was provided diagnoses of unspecified anxiety disorder, unspecified depressive disorder, and unspecified schizophrenia spectrum and other psychotic disorder. He was prescribed haloperidol, olanzapine, intramuscular paliperidone, sertraline, and benztropine for symptoms of psychosis and depression, and he was adherent with those medications. His medical conditions included hyperlipidemia, hypothyroidism, and low vitamin D levels.

The patient had a history of emergency psychiatric admissions in the community due to danger to self, self-injurious behavior in the form of head-banging, and a reported history of holding a gun to his head in 2008; in the 2008 incident, a family member prevented him from completing the suicide attempt. He had a history of alcohol, cannabis, and methamphetamine use as well as homelessness. His earliest release date was listed as November 3, 2024.

The patient was placed at the EOP level of care at WSP during reception in mid-July 2024 due to reporting suicidal ideation but being assessed with low acute risk for suicide. He transferred to the PVSP EOP on August 12, 2024. An initial primary clinician assessment was completed on August 19, 2024 that was thorough; for example, the clinician documented that the patient had considered suicide in 2008 because he did not want to argue with his mother and did not want to use illicit substances anymore, and that the patient preferred long-acting injectable medications because they were easier to manage. However, the case formulation did not provide a formulation of the patient's clinical presentation and instead listed a series of historical facts along with conclusions that the patient had flat affect, was cooperative and potentially guarded, and denied any need for mental health treatment.

The initial IDTT meeting occurred on August 20, 2024 and was attended by the assigned primary clinician and psychiatrist, and a correctional counselor; the documentation did not indicate whether the correctional counselor was assigned to the patient. The patient declined to attend, and the assigned psychiatrist had not met with the patient prior to the IDTT meeting and had not met with the patient after the IDTT as of October 4, 2024. Confusingly, the IDTT documentation indicated that the patient did not have or need a safety plan and then included a safety plan in which every element consisted of the statement, "Nothing documented in original." The IDTT documentation inaccurately indicated that this safety plan was developed at PVSP on July 14, 2024. The patient was housed at WSP on that date, and a SRASHE but not a safety plan was completed on that date. The IDTT clinical summary and case formulation were copied unchanged from the initial primary clinician assessment; therefore, they did not reflect what occurred at the IDTT meeting or multidisciplinary input. Instead of documenting the patient's strengths, the IDTT documentation referred readers to the primary clinician assessment. The treatment plan was borrowed unchanged from the treatment plan developed on August 1, 2024 at WSP and was not updated. Depression was identified as the primary treatment target, and both the short-term and long-term goals were measurable. However, no baseline measurement of depression severity was obtained against which progress toward treatment goals could be measured. Psychotic symptoms were not addressed. A discharge plan, discharge criteria, and reason(s) for retention at the EOP level of care were not documented.

Almost immediately following the IDTT meeting, a non-assigned psychiatrist completed an initial psychiatric assessment. Because the patient declined to leave his cell for a confidential setting, the psychiatrist saw the patient at cell front. The assessment was nevertheless thorough. The psychiatrist relied on the outdated multiaxial diagnostic system to record diagnostic impressions and provided diagnoses of schizophrenia, alcohol use disorder, cannabis use disorder, and stimulant use disorder; a provisional diagnosis of schizoaffective disorder, depressive type was also considered. A GAF score of 45 was assigned to the patient, indicating serious symptoms or serious impairment, and haloperidol, intramuscular paliperidone, sertraline, and benztropine were continued.

Following the initial psychiatric assessment, the patient was seen by a second non-assigned psychiatrist on September 18, 2024 for a 30-day follow-up encounter. The patient again declined a confidential encounter and was seen at cell front. It was noted that the patient was sleeping and did not wake up for the encounter. The documentation of that encounter was sparse and resulted in no changes in treatment. Although the patient was documented as asleep, the progress note that included material copied from the prior encounter indicated that the patient was educated regarding the risks and benefits of his current medications; and he was aware of the need to notify staff if his symptoms worsened, if he experienced suicidal ideation, or if he experienced medication side effects. The note went on to state that the patient was advised to maintain a healthy weight, lifestyle, and exercise, as well as to abstain from alcohol and illicit substances.

Following the initial primary clinician assessment, the patient was offered individual encounters with the primary clinician on September 3 and September 16, 2024. He could not be awakened for the first encounter and declined the second. Primary clinician groups were offered weekly through September 22, 2024, but the patient declined to attend all but one of those sessions. The primary clinician documented attempts to encourage the patient to participate and noted that he consistently presented with flat affect, was withdrawn, participated only minimally, and on one occasion appeared to be responding to internal stimuli while denying symptoms. Recreational group programming was first offered to the patient on August 20, 2024, but the patient declined to attend almost all group programming.

A pre-release needs assessment was initiated on August 15, 2024 and completed on September 24, 2024; however, there was no documentation that mental health staff discussed planning for the pending release with the patient.

**Findings**

The care provided to this EOP patient was inadequate.

The initial psychiatric assessment occurred late after the initial IDTT meeting, and the treatment plan was borrowed from another institution and was not updated. There was inadequate effort documented regarding clarification of the patient's multiple diagnoses. The case formulation did not adequately address the patient's clinical presentation and treatment needs. Although continuing to identify the patient's depression as a primary target in the treatment plan may have been clinically appropriate, depression was only part of the clinical picture. Progress notes indicated that psychotic symptoms were likely present that interfered with functioning; given the psychiatrist's primary diagnosis of schizophrenia, the treatment plan should have been updated to address psychotic as well as depressive symptoms. The patient's disengagement from individual and group treatment was not adequately explored or addressed; combined with his flat affect and social withdrawal, his disengagement may have been evidence that he was suffering from negative symptoms of schizophrenia or severe depression. Non-assigned psychiatrists did not document any consideration of those possibilities and their implications for treatment, and the assigned psychiatrist saw the patient only once in the IDTT meeting. No other psychiatric encounters occurred in a confidential setting, and the evident practice of pasting in content from prior psychiatric encounters resulted in documentation that psychiatrist educated a patient who

was asleep. As of October 4, 2024, with less than one month before his pending release to the community, the patient was only minimally engaged in treatment and not improving. Greater efforts at treatment engagement and pre-release planning were indicated.

**Patient P**

This 57-year-old EOP patient's healthcare record was reviewed to assess the care provided at PVSP. He was provided a diagnosis of schizoaffective disorder, bipolar type. He was prescribed fluoxetine and lurasidone during his first period of EOP placement at PVSP, and olanzapine during his second period of EOP placement at PVSP. He was generally adherent with his psychotropic medications. His medical conditions included chronic ureteropelvic junction obstruction with acquired hydronephrosis, chronic low back pain, hyperlipidemia, obesity, and hepatitis C.

The patient had a lengthy history of childhood trauma, adult substance use, and psychiatric care. He received his psychotropic medications by a PC 2602 order from August 2017 to April 2023, was treated as a mentally disordered parolee at Atascadero State Hospital during 2013 and 2014 and in 2021, and he had received mental health services at the 3CMS, EOP, and MHCB levels of care.

The patient was first placed at the EOP level of care at PVSP between September 3 and September 17, 2024. The initial primary clinician assessment at PVSP occurred timely but contained an inadequate case formulation. The initial psychiatric assessment was completed late after the initial IDTT meeting and not by the assigned psychiatrist. Neither assessment indicated whether they were conducted in a confidential setting, and neither referenced the patient's lengthy history of involuntary treatment. Both assessments documented active psychosis and a history of treatment for mental illness. Lurasidone was increased to address active psychotic symptoms, and fluoxetine was moved from evening to morning to reduce the risk of insomnia with a plan to discontinue it and consider adding a mood stabilizing medication. The psychiatrist planned to see the patient for follow up in 30 days.

The IDTT meeting occurred timely and was attended by the patient and the required staff. The assigned psychiatrist had not previously met the patient and did not have a current psychiatric assessment available to review. The IDTT clinical summary and case formulation were copied and pasted from the primary clinician assessment and did not reflect discussion in the IDTT meeting. The patient's verbalized treatment goals, EOP discharge criteria, and reasons for retention were not documented, the long-term goal for the treatment plan was not measurable, the treatment plan did not reference mood symptoms, and the treatment plan did not include psychiatric interventions or refer to mood symptoms. After the IDTT meeting, the assigned PC did not see the patient again until day 13 when he was seen in response to an urgent referral, and there was no documentation of clinical contact with other mental health staff until that date.

On September 15, 2024, custody sent an urgent referral to mental health because the patient was yelling, responding to internal stimuli, unable to be redirected, and exhibiting bizarre behavior. A mental health clinician not assigned to the patient conducted a timely and confidential assessment. The patient was found to be malodorous with soiled clothing, agitated, angry,

yelling, cursing, and religiously preoccupied, and he appeared to be responding to auditory hallucinations. The clinician erroneously documented that there was no indication in the healthcare record that he had a history of involuntary hospitalization in the community or MHCB placement in the CDCR. The patient was de-escalated and agreed to avoid responding to auditory hallucinations except in his cell. The clinician met with the patient's assigned primary clinician the following day and discussed the patient's behavior and potential need for a higher level of care referral.

Following that meeting, the assigned primary clinician met with the patient and documented that the patient had yelled and cursed at invisible stimuli, reported ongoing auditory hallucinations, and had grandiose, religiously themed delusional thinking. In the mental status portion of the note, the clinician documented that there were no "forms of psychoses" and no concerns with the patient's cognition during the encounter. The clinician documented that the patient was attending recreational groups; although no such attendance had been documented. The progress note failed to reconcile the patient's agitated and psychotic behaviors prior to the encounter with their apparent absence during that encounter, did not include an assessment, and provided no plan for the patient's treatment. Later that afternoon, the patient was documented as a no show for a recreational group, the first such group to be documented. Custody then submitted a second urgent referral to mental health, because the patient was yelling bible verses and cursing at staff.

On the morning of September 17, 2024, the patient was nonadherent with fluoxetine and lurasidone. He continued to be psychotic, bizarre, pressured, incoherent, disruptive, threatening, and combative, and he assaulted custody staff causing visible bodily injury. The patient was placed in handcuffs and brought to the TTA. A covering psychiatrist who responded to the urgent consult from the previous day and the current incident assessed the patient as a danger to others and in need of MHCB placement for stabilization. The psychiatrist ordered an emergency intramuscular injection of olanzapine and diphenhydramine which was given, and discontinued fluoxetine because it may have exacerbated the patient's symptoms. The assigned psychiatrist documented the need to transfer the patient to a higher level of care. Due to the MHCB referral, the assigned primary clinician completed a SRASHE and assessed the patient with low suicide risk. While in the CTC awaiting transportation to the MHCB, the patient again began to shout inappropriately. A second emergency intramuscular injection, this time of ziprasidone and diphenhydramine, was administered in the afternoon. Shortly thereafter, he was transferred to the CSP/Corcoran MHCB where he remained for ten days.

On September 27, 2024, the patient returned to PVSP. He was prescribed olanzapine at the MHCB. Five-day follow-up contacts and a SRASHE occurred timely and documented the patient's continued religious preoccupation with bizarre behavior. He was largely nonadherent with olanzapine between September 27 and October 4, 2024. On October 1, 2024, he was placed in the RHU at PVSP after he received an RVR for assault on a peace officer with grave bodily injury. In the RHU, he began to escalate by kicking and banging on the door. On October 4 and October 11, 2024, RVR mental health assessments of the September 17, 2024 RVRs for battery on an officer found that mental illness contributed to his behavior and recommended avoidance of RHU placement.

The initial primary clinician and initial psychiatric assessments occurred timely, were adequate, referenced the patient's history of involuntary treatment, and demonstrated a clear appreciation of the patient's need for medication treatment. Both assessments concluded that the patient required a higher level of care. The initial IDTT meeting occurred timely and was attended by the assigned primary clinician, a covering psychiatrist, and the assigned correctional counselor. The clinical summary and case formulation were copied and pasted from the primary clinician assessment and did not reflect what occurred in the IDTT meeting. Patient strengths, verbalized treatment goals, and a treatment plan were documented; the treatment plan lacked a measurable long-term goal and did not address the patient's mood symptoms or medication nonadherence. The IDTT documentation noted that ICF care was recommended to stabilize the patient's symptoms; this was discussed with the patient who agreed with the plan. The patient began taking oral olanzapine consistently following that encounter and agreed to intramuscular paliperidone. His primary clinician saw him once for a weekly encounter that occurred at cell front in the RHU. On October 17, 2024, the patient was transferred to the SVSP PIP for intermediate care.

**Findings**

The care and treatment provided to this EOP patient were inadequate.

The documentation indicated that there were several lapses in care that impeded proactive and adequate treatment of the patient's poorly controlled psychosis. The patient's symptoms appeared to have a significant mood component that may have been worsened by recently initiated treatment with fluoxetine. During the patient's first placement at the PVSP EOP, neither the primary clinician assessment nor the psychiatric assessment reflected awareness of the patient's historical need for involuntary treatment. While the psychiatrist who completed the initial assessment documented awareness that the patient's antidepressant medication may have been contraindicated given his bipolar features, only the timing of the dose was changed and fluoxetine was continued. As the patient presented with significant psychotic symptoms that required an increase in antipsychotic medication dosage, consideration that antidepressant medication might have contributed to symptom activation, and the patient's inability to function in his current setting; the patient should have been seen by the psychiatrist more frequently than every 30 days. Given the patient's acuity, more frequent contact by the primary clinician was also clinically indicated.

No structured therapeutic activity was documented for the first 13 days of care. Failure to recognize the patient's history of involuntary treatment and/or appreciation of the patient's acuity continued when he was assessed in response to the first urgent referral from custody for bizarre and agitated behavior. While the de-escalation of the patient's agitation during that encounter was positive, it is unclear from the documentation whether the psychiatrist was consulted in response to the first urgent referral. The assigned primary clinician's documented follow-up to that incident was inadequate. It failed to reconcile the presence and absence of psychotic symptoms and agitated behaviors recorded in the progress note, lacked an assessment of the patient's clinical condition, and offered no plan to address those significant psychotic symptoms. The patient's alleged assault on a correctional officer might have been avoided had emergency medication been provided earlier.

Treatment planning was deficient during both stays, and the treatment team failed to address medication nonadherence adequately. As documented, only three recreational groups were offered to the patient during both EOP stays; and in two instances, the documentation was unclear whether the patient attended. Conversely, the referrals to MHCB and ICF were clinically appropriate and timely.

**Patient Q**

This 58-year-old EOP patient's healthcare record was selected for review to assess the care provided to the patient at PVSP. The patient was provided diagnoses of schizoaffective disorder, bipolar type and antisocial personality disorder. He was not prescribed psychotropic medication during the review period. His medical conditions included a history of successful treatment of hepatitis C, hepatic fibrosis, vertigo due to traumatic brain injury, benign prostatic hyperplasia with urinary incontinence, and bilateral hearing loss following surgery.

The patient had a childhood history of physical abuse and a history of mental illness since age 15. He had one documented medically severe suicide attempt, and he reported several suicide attempts. He had a history of alcohol, cannabis, hallucinogen, and methamphetamine use beginning at age nine. He reported hospitalization at Patton State Hospital. He had received mental health services at the 3CMS and EOP levels of care, and he had a history of medication nonadherence.

The patient transferred from the CMF EOP to the PVSP EOP on August 27, 2024. The initial primary clinician assessment and initial psychiatric assessment occurred timely and were generally adequate; although the PC's case formulation was poor, and neither assessment indicated whether they occurred in a confidential setting. The psychiatric assessment was completed by a psychiatrist not assigned to the patient. The patient was described as delusional, grandiose, paranoid, irritable, and illogical; he had poor insight regarding his mental illness and adamantly refused antipsychotic medication treatment.

The initial IDTT meeting occurred timely and was attended by an alternate primary clinician, the assigned psychiatrist, who had not previously met the patient, and the correctional counselor. The patient refused to attend. The IDTT determined that the patient did not meet the criteria for consideration of referral to a higher level of care. The clinical summary and case formulation were copied and pasted from the initial primary clinician assessment and did not reflect discussion in the IDTT meeting. The treatment plan identified anxiety as the primary target of treatment, included a measurable long-term goal, but failed to reflect a baseline measurement against which progress toward the goal could be measured. The treatment plan did not address the patient's psychotic or mood symptoms, lack of insight, refusal of psychotropic medication, or placement on EOP modified programming. Discharge criteria were not documented.

Following the initial IDTT meeting until the end of October 2024, the assigned primary clinician met with the patient once in a caseload group and twice in a confidential setting for individual encounters. An alternate clinician also saw the patient once at cell front for a wellness check when the assigned clinician was unavailable. Those encounters resulted in the patient being seen

by a PC an average of once every two weeks. If the patient was scheduled for but did not attend additional caseload group sessions, those missed encounters were not documented. The assigned primary clinician's progress notes were thorough. One note indicated that the patient refused to meet with the psychiatrist, because the patient asserted that he was Muslim and was therefore unwilling to accept psychotropic medication. A variety of grandiose and paranoid delusional statements were documented, and the patient was reportedly anxiously fixated on retaining his single cell status.

The patient saw the assigned psychiatrist for one follow-up appointment during the review period when he continued to refuse treatment with psychotropic medications. Although his thought processes were illogical and grandiose, he was not found to meet the criteria for involuntary medication treatment. One month later, the psychiatrist completed a non-contact master treatment plan review in which the patient's continued refusal of psychotropic medication, and the team's goal of preventing psychotic decompensation were noted. The patient's refusal of psychiatric appointments was not documented in the healthcare record except in one primary clinician progress note.

Recreational therapy groups were first documented two weeks after the patient's arrival at PVSP, and the patient attended inconsistently. Only one caseload group was documented.

**Findings**

The care and treatment provided to this patient were inadequate.

At the time of transfer to PVSP, the patient was placed in the EOP and was receiving modified programming, and the need for continuation of modified programming at PVSP was not documented. The treatment plan was inadequate, because it failed to address the patient's long-standing pattern of medication nonadherence, failed to address his psychotic and mood symptoms, failed to establish a baseline measurement for the treatment goal, and failed to guide treatment. Primary clinician contacts were well-documented and demonstrated clinically appropriate efforts; however, the interventions did not follow the treatment plan, and the contacts did not occur at the required frequency nor were they sufficient to meet the patient's treatment needs. Psychiatric encounters did not occur with sufficient frequency to build rapport. Despite continued delusional statements and ongoing medication and treatment refusal with lack of insight, the patient's capacity to make informed healthcare decisions was not assessed. Results from such an assessment could have been an important step in identifying therapeutic strategies and targets.

**Patient R**

This 37-year-old male patient's healthcare record was reviewed to assess the quality of EOP care provided at PVSP. The patient was diagnosed with attention-deficit hyperactivity disorder, combined type and antisocial personality disorder. The patient was prescribed mirtazapine and hydroxyzine. On September 4, 2024, while housed in PVSP's RHU, the patient's level of care was elevated from 3CMS to EOP.

The patient was incarcerated for his third term on June 8, 2015. During prior incarcerations, he was either not enrolled in MHSDS or receiving care at the 3CMS level of care. During the current prison term, he received treatment in the 3CMS, EOP, and MHCB levels of care.

Prior to the level of care change, the patient had been refusing his psychiatric medications, covering his cell window, and not maintaining proper cleanliness of his cell. According to the 3CMS IDTT documentation, the patient was elevated to the EOP level of care due to increased symptoms of anxiety, depression, auditory hallucinations, paranoid thoughts, and medication nonadherence.

There was no initial psychiatric assessment or initial IDTT documented in the patient's record. An initial PC assessment was completed timely on September 4, 2024; however, it was inadequate. The assessment was documented in a progress note format, lacked relevant historical information about the patient, and included contradictory information about the patient's functioning.

The patient refused to attend any clinical contacts offered, including weekly PC contacts, monthly psychiatric appointments, and the 90-minutes of weekly group sessions with clinicians.

On October 1, 2024, the patient declined to meet with his PC to complete an updated SRASHE. The clinician subsequently completed a shortened version of the SRASHE, indicating no change in risk; however, the rationale provided was inadequate, considering the patient's recent decline in functioning which necessitated an increase in level of care.

There was, however, evidence of at least daily rounding by psychiatric technicians in the RHU.

**Findings**

The EOP care provided to this patient was inadequate as there was no initial psychiatric assessment or IDTT conducted after the increase in level of care from 3CMS to EOP, and the initial PC assessment was inadequate. Furthermore, there was inadequate justification for not completing a full SRASHE. The patient's refusal of the limited services offered in the 3CMS RHU remained an obstacle to care that should have been addressed in the treatment plan; however, an EOP treatment plan was not developed at PVSP. The patient also required transfer to an institution with a designated RHU EOP within 30-days of EOP placement; however, he remained housed in PVSP's 3CMS RHU for more than 50-days, and during this period, he did not have access to mental health services commensurate with his level of care.

**Patient S**

This 31-year-old male patient's record was reviewed to assess the quality of EOP care provided at PVSP. He was admitted to the MHCB on August 22, 2024, and discharged to the EOP level of care at PVSP on August 29, 2024.

The patient was incarcerated in CDCR for the first time on April 30, 2024, and initially placed in the 3CMS level of care.

Upon arrival at PVSP, the patient was seen for five-day follow-up contacts. Four of the five contacts indicated that the patient's safety plan had been reviewed, despite the document being blank. Otherwise, the contacts were adequately documented and conducted in confidential settings. The patient was removed from the required custody checks after 24-hours.

An initial psychiatric assessment was completed timely on September 3, 2024, and deemed adequate. The assigned PC completed their initial assessment of the patient timely on September 1, 2024; however, several deficiencies were identified rendering the assessment only minimally adequate. The patient was diagnosed with schizophrenia and adjustment disorder, unspecified, and prescribed divalproex sodium, haloperidol, and hydroxyzine, to which he was minimally adherent. He was also prescribed benztropine as needed.

The initial IDTT occurred on September 3, 2024 with all required staff present, including the patient. Similar to the five-day follow-up documentation, the IDTT notes indicated that the patient's safety plan was reviewed, despite the document being blank. The treatment plan had not been updated since the patient's admission to the MHCB, and no new treatment goals for the outpatient setting were established. Additionally, there was no rationale provided for his placement at the EOP level of care or mention of the patient's impending release date in January 2025.

The patient was offered weekly contacts with his assigned PC; however, for three consecutive weeks, he was offered group sessions instead of individual contacts, of which he refused two out of the three. The last individual contact with his assigned PC occurred on October 7, 2024. Except for a cell front wellness completed by a covering clinician on October 28, 2024, there were no weekly PC contacts offered after October 7, 2024.

There were no routine psychiatric contacts documented in the patient's record, despite multiple notices sent to the patient's assigned psychiatrist regarding medication non-adherence.
The patient was generally offered five-hours of weekly structured activities, which included recreational therapy and nursing-led treatment groups. Additionally, records suggested some pre-release planning services had been initiated for the patient.

**Findings**

The EOP care provided to this patient was inadequate.

No treatment plan was created, and the patient did not have access to the required minimum hours of structured treatment commensurate with his level of care. There was no evidence that the issue of medication non-adherence was adequately addressed. Routine psychiatry contacts were not completed timely, and the patient had not met with a psychiatrist in two-months. Further, noncompliance was identified for routine PC contacts. Collectively, the patient did not have access to required minimum group or individual mental health services while in the EOP at PVSP.

**Patient T**

This 44-year-old male patient's record was reviewed to assess the quality of EOP care provided at PVSP. The patient was diagnosed with unspecified schizophrenia spectrum and other psychotic disorder. He was fully adherent to his prescribed olanzapine and lurasidone. He transferred from the reception center to PVSP on September 18, 2024.

The patient was incarcerated within CDCR on August 8, 2024 and was initially placed at the 3CMS level of care but was elevated to the EOP level of care on August 14, 2026 while still at the reception center.

At PVSP, the patient received an adequate recreational therapy initial assessment on September 24, 2024. The initial PC assessment occurred on September 30, 2024, but was conducted using a case summary and case formulation update form instead of the appropriate initial assessment form. Despite this, the overall assessment was adequate; however, it did not mention the patient's DD2 designation or adaptive support needs.

There was no initial psychiatric assessment prior to the patient's IDTT meeting on October 1, 2024. Although the patient, assigned PC, and psychiatrist attended the meeting, a correctional counselor was absent. The patient's developmental disability code of DD2 and adaptive support needs were discussed during the IDTT meeting. While the developed treatment plan addressed the patient's hallucinations, the plan was inconsistent with the needs and treatment modalities outlined in the IDTT's clinical summary and case formulation, and substance use was not addressed.

After the meeting, a psychiatrist—not the assigned psychiatrist—completed an initial assessment. The psychiatric provider documented diagnoses of schizophrenia, stimulant use disorder, and amphetamine-type disorder. During this encounter, the patient reported distressing "shakes" and requested the discontinuation of lurasidone. Despite no overt signs of involuntary movements, the psychiatrist began tapering the patient off the medication.

Following the October 1, 2024 IDTT meeting, there were no routine PC contacts documented in the patient's record until October 21, 2024. When the PC did finally conduct an individual contact on October 21, the progress note indicated that the interventions provided were adequate. Additionally, a caseload group completed on October 26, 2024, was adequate based on its content, which included interventions aligned with the patient's treatment plan.

The patient was generally offered the required minimum hours of structured therapeutic activities through recreation therapy leisure groups and NLTGs.

**Findings**

The EOP care provided to this patient was inadequate. Several deficiencies in care were identified during this review, including the IDTT's failure to integrate the patient's adaptive needs into the treatment plan based on his DD2 designation, ensure consistency between the treatment plan and identified treatment needs based on assessment findings, address diagnostic

discrepancies for effective and collaborative care planning, and offer weekly PC contacts in accordance with the minimum EOP care requirements.

**Patient U**

This 23-year-old male patient's record was reviewed to assess the quality of EOP care provided at PVSP. The patient was provided with a diagnosis of unspecified depressive disorder, substance use disorder, and opioid use disorder. He was moderately adherent to his prescribed medication regimen which included buspirone, mirtazapine, risperidone, and hydroxyzine. He was also prescribed buprenorphine-naloxone. The patient was placed at PVSP EOP on August 29, 2024.

The patient was placed at the MHCB level of care on the day of his arrival into CDCR on June 26, 2024. He was discharged to the EOP level of care on July 5, 2024 but returned to the MHCB level of care the following day. He returned to the reception center at the EOP level of care on July 16, 2024 and transferred to PVSP on August 29, 2024. The patient's listed release date was December 9, 2024.

On the day of his transfer, a licensed clinical social worker from the reception center emailed the pre-release coordinator at PVSP regarding a statement made by the patient, indicating a conditional intent to die by suicide upon release if certain property was not returned to him by CDCR. However, a pre-release planning note entered into the record on October 10, 2024, did not mention the conditional suicidal statement.

Upon arrival at PVSP, the patient participated in a recreational therapy initial assessment on September 4, 2024, which was adequately conducted. An initial MHPC assessment was completed timely and was also adequate.

An initial IDTT meeting was held on September 10, 2024; however, the patient's assigned MHPC and a correctional counselor were absent. The patient attended the meeting with an alternate PC and his assigned psychiatrist. A treatment plan was developed to address the patient's depression, including adequate goals and interventions, though the discharge criteria were generic. The patient's functional deficits were appropriately documented. Later that day, a psychiatrist not in attendance at the IDTT completed an initial psychiatric assessment, resulting in medication changes to address the patient's reported fatigue.

The patient was seen for routine PC appointments both in groups and individual sessions; however, the sessions were not consistently offered on a weekly basis. The patient did not receive any contact for three consecutive weeks in October 2024. Documentation of PC contacts was limited in terms of treatment interventions and progress toward the patient's goals, primarily describing the patient's current status. The patient received a follow-up consultation with the psychiatrist in response to medication non-adherence and was offered a routine contact as well. Despite the patient's reluctance to engage with the psychiatrist, documentation of the encounters was adequate.

The patient was offered between six and ten-hours of weekly group services, including recreational therapy and NLTGs. While he occasionally attended recreational groups, he did not participate in NLTGs.

**Findings**

The EOP care provided to this patient was inadequate.

The patient was not offered minimum treatment commensurate with his level of care or therapeutic interventions in alignment with his treatment plan and assessed treatment needs. Continuity of care was poor. It was also concerning that the communicated conditional suicidal statements were not appropriately documented in the records or addressed in treatment, especially given the patient's history of self-harm and suicidal behavior.

**Patient V**

This 61-year-old male patient's record was reviewed to assess the quality of EOP care provided at PVSP. He was diagnosed with adjustment disorder with depressed mood, a diagnosis that had been active in his record since September 2022. His prescribed medication regimen included aripiprazole, bupropion, and buspirone, to which he was fully adherent. He was also prescribed buprenorphine-naloxone. The patient transferred to the EOP at PVSP on September 18, 2024.

The patient returned to CDCR for his fourth prison term on September 21, 2022, and was immediately placed at the EOP level of care as this was his level of care at the time of his prior release in April 2019. During his prior periods of incarceration, from January 2010 to April 2019, the patient was placed at both the 3CMS and EOP levels of care, with three admissions to the MHCB. In contrast, during his earlier incarcerations from 1995 to 2003, he was not enrolled in the MHSDS.

The initial psychiatric and recreational therapy assessments were completed with the patient on September 24, 2024, and both assessments were adequate. On this date, the psychiatrist noted diagnoses of bipolar I disorder (most recent episode depressed) and opioid use disorder. A routine psychiatric contact took place on October 22, 2024, which was also adequately documented.

The patient did not receive an initial PC assessment or an initial IDTT. Consequently, the patient had no treatment plan developed. Despite the patient arriving on September 18, 2024, the first PC contact did not occur until October 7, 2024, which was both clinically concerning and a significant departure from the Program Guide requirement for EOP patients. The patient refused this session, and there was no PC documentation of a record review or consultation with other staff to obtain necessary information about the patient's history, risk, and current functioning in the housing unit. The PC did document an individual contact on October 21, 2024; however, this contact only served as a check-in with no evidence of treatment interventions or discussion of treatment goals.

Regarding offered structured therapeutic activities, the patient was offered recreational therapy groups and NLTGs totaling between eight and ten hours per week. Documentation indicated the patient's participation in two weekly EOP orientation group sessions beginning on October 18, 2024; however, the documentation was limited to a single line noting that the patient had engaged and participated in the sessions.

**Findings**

The EOP care provided to this patient was inadequate.

The patient did not receive the required initial PC assessment or initial IDTT, and he did not have a treatment plan developed despite being retained in the EOP level of care at PVSP for over a month. Noncompliance was noted for routine PC contacts as well, and when the PC offered a session, it was limited to a brief check in without meaningful therapeutic interventions or discussion of treatment goals. Additionally, diagnostic clarification was indicated but not addressed.

**Patient W**

This 31-year-old non-binary patient's record was reviewed to assess the quality of EOP care provided at PVSP. The patient reported being non-binary as the patient was a "spiritual being" and was comfortable with he/him/his pronouns. The patient entered CDCR on August 8, 2024, for the current and first prison term. Initially placed at the 3CMS level of care at the reception center, the patient was elevated to the MHCB level of care on September 10, 2024. During this time, the patient received diagnoses of unspecified schizophrenia spectrum and other psychotic disorder, PTSD, and unspecified depressive disorder. The patient demonstrated partial adherence to prescribed medications, including mirtazapine and olanzapine, and was also prescribed buprenorphine-naloxone.

On September 19, 2024, the patient discharged to the EOP level of care and subsequently transferred to PVSP later that same day. Upon arrival at PVSP, the patient was seen for five-day follow-ups, which were adequately documented and reflected a review of the patient's safety plans as well as adjustment to the EOP setting.

The initial PC contact occurred on September 22, 2024; however, it was documented on the clinical summary update form rather than the appropriate initial assessment form. Although the documentation was generally adequate, a rationale was not provided for the diagnosis of unspecified schizophrenia, and the case formulation mirrored those seen in other patient records. The initial recreational therapy assessment completed on September 26, 2024 was also adequate. On September 27, 2024, the initial psychiatric assessment was conducted, addressing the patient's recent medication non-adherence. On this date, the psychiatrist documented diagnoses of schizoaffective disorder, bipolar type; posttraumatic stress disorder; opioid use disorder; and stimulant use disorder amphetamine type and also noted borderline personality traits.

An initial IDTT meeting was held on October 1, 2024, with the patient's assigned clinician and psychiatrist present; however, no correctional counselor was in attendance, and the patient

refused to participate. During this meeting, a treatment plan was developed to address the patient's substance use and medication non-adherence with adequate goals and interventions. A functional assessment was completed as well. However, there was no level of care rationale provided for continued EOP placement, and the criteria for discharging the patient to a less restrictive level of care were generic. Further, the IDTT failed to address the diagnostic discrepancies noted in the initial PC and psychiatry assessments.

On the evening of October 2, 2024, the patient was placed on suicide watch after reporting suicidal and homicidal ideation. A SRASHE was completed the next morning, on October 3, 2024, which noted that the patient had engaged in self-harm. The patient expressed that they no longer wanted to live and exhibited incoherence and hallucinations. The patient was assessed as being at high risk for suicide and was subsequently admitted to the MHCB. Notably, a self-harm PowerForm was not completed as required, despite the documented self-harm incident.

The patient discharged from the MHCB and returned to PVSP's EOP on October 14, 2024. Five-day follow-up contacts were conducted adequately. The patient's assigned PC documented an update to the patient's clinical summary and case formulation; however, despite the documentation indicating it was written on October 15, 2024, much of the text remained unchanged from the notes of September 22, 2024. There was no documentation regarding the treatment provided to the patient while in the MHCB, nor was there any indication of the patient's response to that treatment or reference to the MHCB staff's aftercare recommendations for care continuity. The patient's treatment goals were not modified to address the precipitants to the MHCB admission, including self-harm and suicidal thoughts. Instead, the treatment plan primarily focused on substance use.

The initial psychiatric assessment was completed on October 18, 2024, which included information about medication changes initiated during the MHCB stay; however, the psychiatrist did not address the patient's medication non-adherence since returning from the MHCB.

A routine PC contact occurred on October 21, 2024, which was adequately conducted. During this contact, the patient expressed a desire to have a cellmate to alleviate distress, and the PC noted that they would follow up with correctional staff. However, there was no documentation in the record confirming that the follow-up occurred. Additionally, the PC documented that the patient had been offered and attended 12.8 hours of structured therapeutic activities; however, the record lacked evidence to support this claim.

The IDTT convened on October 22, 2024, with all required staff present, including the patient. The clinical summary was pulled forward from the contact with the PC on October 15, 2024, and there was no evidence that the patient's diagnoses were discussed, leaving existing discrepancies unresolved. Additionally, there was no mention of the patient's request for a cellmate. The issue of the patient's non-adherence to medication was also not addressed. The treatment plan was updated to address the patient's delusions, hallucinations, and homicidal ideation, featuring appropriate goals and interventions. However, there was no rationale provided for the patient's EOP placement, and discharge criteria for a less restrictive level of care remained generic.

**Findings**

The EOP care provided to this patient was inadequate.

This inadequacy was largely attributed to poor continuity of care; inaccurate and discrepant documentation; failure to adequately address medication non-adherence, precipitants to the recent MHCB admission, and unresolved diagnostic discrepancies; and lack of documentation confirming implementation of treatment plans during clinical encounters.

**Patient X**

This 57-year-old male patient's record was reviewed to assess the quality of EOP care provided at PVSP. The patient transferred to PVSP's EOP on August 22, 2024.

The patient was incarcerated for the first and only time in October 1987. Within the first six months of incarceration, he was transferred to ASH, where he remained for nearly two years. Following discharge and return to CDCR, the patient received treatment in the 3CMS level of care and had extended periods without MHSDS services. During 2014, the patient was admitted to the MHCB for the first time and subsequently remained in the MHSDS program, with placements in 3CMS, EOP, MHCB, APP, and ICF. Most recently, the patient was discharged from the ICF level of care in February 2019 and has remained at the EOP level of care since that time.

On August 27, 2024, the initial assessments with the psychiatrist, PC, and recreational therapist were completed. The initial psychiatric assessment also referenced the diagnosis of schizoaffective disorder, depressive type, but changed the diagnosis to unspecified depressive disorder with a rule-out for major depressive disorder. The psychiatrist also noted stimulant use disorder (amphetamine type), cannabis use disorder, opioid use disorder, and a rule-out for substance-induced psychotic disorder. The psychiatrist noted that during assessment the patient reported that psychotic symptoms had only emerged in conjunction with drug use and that he had not experienced psychosis in over 20-years. Although the psychiatrist prescribed bupropion, the patient's medication adherence was variable.

The PC assessment included a diagnosis of schizoaffective disorder, depressed type, without sufficient justification or explanation. Notably, the PC did not complete an initial assessment form but, instead, updated the patient's clinical summary and case formulation. This case formulation was strikingly similar to those written for other patients and disproportionately focused on substance use issues, despite the patient's chronic depression, trauma history, and history of suicidality. Of note, the initial recreational therapy assessment was adequate.

The initial IDTT meeting occurred timely with the required staff and patient present on September 3, 2024. During the meeting, it was noted that the patient participated in less than 50 percent of EOP programming over the previous three-month period. The IDTT documentation included an appropriate higher level of care non-referral rationale on this date. Modifications to support treatment participation were also documented, which included prompting, simple directions, and offering breaks. However, the IDTT documentation appeared to consist entirely

of prior entries by the PC, with no input or acknowledgment from the psychiatrist regarding the diagnostic discrepancies. The diagnosis of schizoaffective disorder, depressed type, was continued in the IDTT documentation without sufficient rationale or support. Notably, while the clinical summary focused on the treatment of the patient's substance use, the treatment plan from January 2024 was carried forward, centering on the patient's depression and family connections. Although the interventions were appropriate, the goals set in the treatment plan were vague and not measurable. A significant concern was the failure to update the treatment plan to reflect the specific treatments available at PVSP. Additionally, there was no rationale provided for maintaining the patient at the EOP level of care, and the discharge criteria were similarly vague.

Over the next three weeks, the patient refused all offered groups but did attend two individual sessions with his PC. Despite the absence of documentation to confirm group attendance in the record, on September 23, 2024, the PC inaccurately noted that the patient was attending groups "most of the time," relying on input from custody staff instead of a review of the record.

The psychiatrist met with the patient on September 24, 2024, in response to medication nonadherence. Psychiatry noted that the medication had been discontinued due to nonadherence on September 10, 2024, and the patient's request to restart the medication was not granted. The patient continued to refuse all groups through early October and was subsequently reported to have stopped taking his medications for hypertension as well.

The PC completed an individual contact on October 7, 2024 and appropriately addressed the patient's symptoms but failed to mention his lack of group attendance or medication nonadherence issues. On this date, the PC again claimed that the patient was attending groups based on custody staff input rather than relying on a review of the patient's record.

The patient attended recreational therapy groups on October 9 and 10, 2024, and participated in two NLTGs the following week.

A PC progress note for the contact on October 21, 2024, reflected a status check rather than a treatment session with meaningful interventions. The PC again failed to review and address the patient's limited participation in groups during this contact. While the PC documented that the patient reported mild depression, the patient's own rating of his depression that day indicated a moderate severity. The following day, the patient was seen by the psychiatrist, where he reported the need to restart his antidepressant medication and indicated that his depression had worsened over the past week. This report contrasted with what had been documented by the PC the day prior. Despite expressing his need for medication, the patient continued to refuse participation in most groups. Additionally, a physician's assistant noted that the patient had been refusing all medical care for more than a year.

**Findings**

The EOP care provided to this patient was inadequate.

The IDTT members failed to work collaboratively in the treatment of this patient, with the PC and psychiatric documenting discrepancies in diagnoses and patient presentation. Further, the

patient was refusing all groups as well as medications, yet this fact went unnoticed by his PC despite the patient's IDTT documentation reflecting an intention to monitor his participation and engage in prompting in lieu of a higher level of care referral. The fact that the patient was isolating himself, refusing most mental health treatment, and all medical care was not being monitored or addressed.

**Patient Y**

This 43-year-old male patient's record was reviewed to assess the quality of EOP care provided at PVSP. The patient was diagnosed with unspecified schizophrenia spectrum and other psychotic disorder, while an additional diagnosis of schizoaffective disorder, bipolar type, was noted elsewhere in the record. The patient was prescribed long-acting injectable paliperidone and divalproex sodium, and he was fully adherent to this medication regimen.
The patient was transferred to PVSP on July 30, 2024, and his level of care was elevated to EOP on August 13, 2024.

The patient returned to CDCR for the current second term in May 2024. Prior to his release in January 2024, he had been receiving treatment at the 3CMS level of care, which was continued upon his return.

An IDTT was held on August 13, 2024, while the patient was receiving services at the 3CMS level of care. The IDTT documentation indicated that the patient wanted an elevation in his level of care to facilitate more frequent contact with his PC. It was documented that EOP placement was indicated, given the severity of the patient's symptoms, his history of prior involuntary hospitalizations, current presentation, and the patient's concerns about relapse. However, since his arrival at PVSP, providers failed to update information about symptom severity and current mental status, making the rationale for EOP placement difficult to validate. A treatment plan was subsequently developed to address the patient's substance use and hallucinations, which included adequately documented goals and interventions.

The initial recreational therapy assessment conducted on August 21, 2024 was adequate. However, there were no initial PC or psychiatric assessments found in the record following the patient's level of care change to EOP. Furthermore, there was no IDTT meeting completed during the review period, which resulted in a lack of EOP care planning for this patient.

PC contacts were offered to the patient in both group and individual settings, but these contacts were not provided weekly as required. The documentation of these sessions primarily reflected the patient's status, lacking evidence of treatment interventions or discussions regarding the patient's treatment goals or progress. There was also no review of the patient's overall participation in the program.

Routine psychiatric contacts were conducted at least monthly, but concerns arose on September 13, 2024, when the patient was noted as being non-adherent with his prescribed paliperidone. In reality, the medication was unavailable to the patient. Although the psychiatrist documented plans to administer the medication later that day, this did not occur. The patient ultimately did not receive his medication until it was ordered to be given by the chief psychiatrist on September

17, 2024. The medication was supposed to have been administered on September 10, 2024, resulting in a seven-day delay and a serious lapse in continuity of care.

Recreational therapy groups were offered to the patient in accordance with minimum requirements. However, while the patient generally participated in the available groups, documentation indicated that these sessions primarily consisted of unstructured leisure time and lacked a therapeutic focus that aligned with the patient's treatment needs.

**Findings**

The EOP care provided to this patient was inadequate.

The patient did not receive initial assessments with either his PC or psychiatrist, and there was no IDTTs documented in the record. Furthermore, there was no EOP treatment plan developed or evidence of treatment being provided beyond medications and unstructured leisure groups. Although there were documented contacts with the PC, they lacked evidence of meaningful treatment interventions or efforts to identify treatment goals. Additionally, there was a significant lapse in the continuity of medication administration without any explanation, further compromising the patient's care.

**Patient Z**

This 53-year-old male patient's record was reviewed to assess the quality of EOP care provided at PVSP. The patient transferred to PVSP on July 24, 2024.

This patient was incarcerated for the first time within CDCR on May 15, 2024, and was placed at the 3CMS level of care within a week of his incarceration. After transferring to PVSP on July 24, 2024, the IDTT convened on August 6, 2024 and elevated his level of care to EOP. At that time, the patient presented with poor hygiene, flat affect, limited speech, and responses to internal stimuli. The patient was provided with a diagnosis of schizophrenia and was mostly adherent to his prescribed medications, which included haloperidol, escitalopram, and benztropine, as well as buprenorphine-naloxone.

The initial PC assessment was inadequate. The assessment was documented on a clinical summary and case formulation update form; however, it contained limited updated clinical information and only some additions to the patient's history. The case formulation was similar in content to those seen for other patients and lacked the necessary individualization. The assessment omitted any mention of the patient's transfer to the EOP level of care, and it failed to reference relevant information from psychiatry including the provider's rationale for initiating haloperidol and escitalopram.

Prior to the initial IDTT on August 13, 2024, there was no initial psychiatric assessment completed. A psychiatrist did, however, complete an initial assessment on August 6, 2024, prior to the IDTT that resulted in the level of care change to EOP. The IDTT meeting included the required staff and the patient.

Despite the presence of the psychiatrist who had completed the assessment on August 6, 2024, the IDTT documentation included outdated information from a psychiatric contact that occurred on July 16, 2024. The treatment plan was pulled forward from the previous plan and included a generic goal of compliance with mental health treatment. However, the interventions were not updated to reflect the services available at the EOP level of care. Moreover, the discharge criteria were confusing, as they appeared to reflect criteria for discharge from the MHSDS rather than for a decrease to the 3CMS level of care, further complicating the patient's treatment course.

The frequency of PC contacts failed to meet Program Guide requirements. Although both individual and group sessions were offered, they did not occur weekly, and there were lapses in PC contacts between September 2 and 15, 2024; between September 15 and October 14, 2024; and between October 14 and October 25, 2024. When PC contacts were completed, except for a single session where substance use was explored, progress notes failed to reference meaningful interventions. Instead, the PC contacts were generally used for check-ins or status updates. There was also no reference to progress toward established treatment goals or a less restrictive level of care.

Monthly psychiatric contacts involved different psychiatrists, contributing to a lack of continuity in care. A covering psychiatrist who saw the patient in September provided minimal documentation, merely noting that medications would be continued. In contrast, when the patient was seen by his assigned psychiatrist in October, the documentation was comprehensive, addressing the patient's overall functioning and noting recent methamphetamine use indicated by urine toxicology results from September 25, 2024. This assessment also acknowledged recent medication nonadherence and resulted in a decision to taper the patient off escitalopram due to the methamphetamine use.

The patient was offered group treatment, which he generally attended. However, the recreation therapy groups were primarily limited to unstructured leisure activities, lacking a therapeutic focus. While the patient did participate in two anger management sessions led by a psychologist, it was unclear whether he had specific problems with anger management as this was not referenced in prior clinical notes. Additionally, he was offered nursing-led treatment groups, which he attended occasionally.

**Findings**

The EOP care provided to this patient was inadequate.

There was poor collaboration among the IDTT and little evidence that the patient's PC was reviewing the patient's record when indicated. The PC failed to acknowledge changes in the patient's prescribed medications, recent drug use, or participation in group treatment, despite treatment engagement being on the patient's treatment plan. Routine PC contacts also failed to meet the Program Guide minimum requirement for EOP patients. Further, the patient's treatment plan and PC interventions during completed encounters did not appear to address his needs.

**Patient AA**

This 49-year-old male patient's record was reviewed to assess the quality of EOP care provided at PVSP. During incarceration, the patient received diagnoses of bipolar I disorder, current or most recent episode depressed, mild; adjustment disorder with depressed mood; and unspecified anxiety disorder. He was initially prescribed valproic acid, lithium, and hydroxyzine, though he demonstrated variable adherence to this regimen. Additionally, he was prescribed buprenorphine-naloxone.

The patient transferred to PVSP on August 19, 2024, and subsequently released to parole on October 21, 2024.

This patient entered CDCR for his first and only term on December 22, 2023. He was initially placed at the 3CMS level of care but was elevated to the EOP level of care on July 24, 2024.

An adequate recreational therapy assessment was completed on August 22, 2024. An initial contact with the MHPC was conducted on August 26, 2024, accompanied by a clinical summary and case formulation update. While the clinical summary was marginally adequate, the case formulation closely resembled those found in other patients' records and included elements that did not align with this patient's history, such as the need for anger management and domestic violence groups. Notably, the clinical summary only included the bipolar I diagnosis and omitted the other diagnoses referenced in the patient's records. The initial psychiatric assessment completed on August 27, 2024, was comprehensive.

The initial IDTT meeting occurred on September 3, 2024 with all required staff and the patient present; however, the psychiatrist who completed the initial assessment was not in attendance. The IDTT documentation primarily consisted of content from the PC instead of reflecting input from all members. A treatment plan was developed to address the patient's depressed mood, with adequate goals and interventions. However, the plan failed to address pre-release planning, despite the patient's impending release in just over six-weeks. Additionally, the discharge criteria for a less restrictive level of care were generic and did not adequately consider the patient's upcoming release.

The patient had been refusing all treatment offered during his first week of incarceration; however, he submitted a healthcare request to see the psychiatrist on September 11, 2024. He was seen by the psychiatrist on September 17, 2024, during which he requested medication to help with depression stemming from his wife placing a restraining order against him. The psychiatrist provided support and education and ultimately referred this issue for discussion with his PC in therapy.

During the PC encounter on September 23, 2024, the clinician engaged the patient in discussions about his living arrangements upon release but failed to acknowledge the patient's report of the restraining order. Instead, the PC encouraged the patient to communicate with his wife, which was inappropriate given the circumstances surrounding the restraining order. Following this session, the PC did not see the patient again until October 7, 2024. The documentation for this session reflected an adequate and supportive meeting, with a focus on release planning and

coordination of services. On this date, the patient was referred to the psychiatrist to discuss medications after release.

The psychiatrist saw the patient on October 14, 2024, and the documentation was adequate. The following day, the patient submitted a request to see his PC to address concerns related to his upcoming release. When the patient was seen on October 20, 2024—just one day before his release—documentation did not include any evidence of what was discussed during the session.

During his stay at the EOP, the patient was offered recreational therapy and nursing-led treatment groups; however, he appeared to refuse participation in most of these sessions.

Ultimately, the patient was paroled on October 21, 2024, with parole medications ordered appropriately. There was adequate evidence of both formal and informal release planning.

**Findings**

The EOP care provided to this patient was adequate.

While there were documentation issues identified during this review, the PC and psychiatric contacts generally included interventions aimed at supporting the patient and addressing his pre-release planning needs. Referrals were appropriately used across disciplines. The patient had access to treatment groups, although he refused most. Medications were coordinated at discharge. The PC, however, would likely benefit from pre-release planning training to ensure they review necessary documentation and ask relevant questions to avoid recommending inappropriate or unrealistic plans for housing, including those that might lead to reincarceration based on violating restraining orders.

**San Quentin State Prison (SQ)**
**October 29, 2024 – October 31, 2024**

**Patient A**

This 35-year-old patient's healthcare record was randomly selected to assess the adequacy of care provided. The diagnoses provided to the patient varied by clinician and by location in EHRS. The psychiatric diagnosis of schizophrenia by history differed from the IDTT documentation of a diagnosis of unspecified schizophrenia. Neither diagnosis was included as part of the diagnoses of record in EHRS which noted diagnoses of bipolar II disorder, generalized anxiety disorder, other specified schizophrenia spectrum and other psychotic disorder, and psychosis. The patient was prescribed BuSpar, guanfacine, Vistaril, loxapine, lithium, Cogentin and Zoloft. The patient had received mental health services at all levels of care, although he was primarily treated at the EOP level of care. His most recent inpatient treatment occurred at a PIP between October 2023 and February 2024.

The patient transferred to the SQ EOP on March 5, 2024. The initial provider assessments documentation included relevant and useful information regarding the patient's long history of mental health treatment. The patient had a history of hypomania, suicidal ideation, and suicide attempts. However, information regarding current symptoms and functioning was limited. Current symptoms included command auditory hallucinations and anxiety. The onset of hallucinations coincided with methamphetamine use ten years prior.

The assigned providers and the patient attended the initial IDTT meeting. The patient was identified for consideration of referral to a higher level of care due to less than fifty percent treatment attendance. The nonreferral rationale and treatment modifications were appropriate. The documentation in the clinical summary section focused on current and recent functioning. There was a statement regarding treatment focus to reduce distress, symptom intensity and to increase distress tolerance; however, individualized, measurable treatment goals and corresponding interventions were not documented. The rationale for continuation at the current level of care was not clearly documented in the identified section of the document. A routine IDTT meeting was required but was not documented.

Monthly psychiatric contacts occurred in nonconfidential settings such as the dayroom or yard, reportedly due to the patient's preference. The documentation of those contacts focused on symptom response to medication treatment. Medication adjustments occurred collaboratively with ongoing informed consent regarding risks and benefits.

The primary clinician contacts also occurred in nonconfidential settings due to the lack of treatment space. Sufficient documentation addressed the patient's current symptoms and mental status, and the documentation was generally unchanged across primary clinician contacts. Similarly, the treatment interventions remained unchanged and required more detail for continuity of care.

The patient presented with stability during the review period; however, on May 30, 2024, he was placed in alternative housing due to auditory hallucinations and passive suicidal ideation precipitated by feeling overwhelmed and anxious. A suicide risk assessment was conducted the

following day, and the patient was appropriately discharged to mainline EOP with five-day follow-up contacts ordered that occurred timely. Despite the severity of the incident, subsequent PC contact documentation minimally addressed this significant issue.

Most of the patient's groups were recreational in content. The rationale for group assignment was unclear.

**Findings**

The care and treatment provided to this patient were marginally adequate.

The documentation indicated that the patient was appropriately monitored by providers. However, the pattern of nonconfidential contacts was a significant area of concern. Also of concern were the lack of individualized treatment goals with appropriate treatment interventions in the initial IDTT meeting and routine primary clinician documentation, and the lack of a routine IDTT meeting. Routine primary clinician documentation required more detail for continuity of care. The rationale for and provision of recreational group treatment was unclear. Diagnostic clarification with clinical rationale was needed.

**Patient B**

This 39-year-old patient's healthcare record was randomly selected to assess the adequacy of care provided. He was placed in the RHU due to his level four custody status. He was provided diagnoses of ADHD, anxiety, and bipolar disorder; however, the documentation lacked clinical rationale for the provision of those diagnoses. He was prescribed Zyprexa, lithium, Vistaril, and melatonin.

The patient transferred to SQ on April 23, 2024 for a local court appearance.

Much of the initial primary clinician assessment documentation was copied from other providers. The documentation did not convey an organized clinical summary or case conceptualization of the patient. His current symptoms were simply noted as disturbed sleep and an increase in auditory hallucinations. Of note, there was indication of an MHCB admission two months prior, but relevant clinical information was not documented. Further, copied documentation indicated that the previous treatment team determined that the patient's RVRs resulted from delusional thinking. However, there was no conceptualization of that information by the new primary clinician.

An initial psychiatric assessment was not completed. The patient refused his first psychiatric contact on May 10, 2024, and there was no documentation of a plan for follow-up; however, he was seen by a psychiatrist on May 31, 2024. The documentation of that contact focused on his current symptoms of poor sleep, auditory hallucinations, and depression, and his medication was adjusted. The patient was assessed with stability and was provided a primary diagnosis of bipolar disorder. His auditory hallucinations were assessed as "treatment resistant."

The initial IDTT meeting was attended by the assigned providers. The patient was identified for consideration of referral to a higher level of care due to less than fifty percent treatment attendance. The nonreferral rationale and treatment modifications were appropriate. The

documentation in the treatment goals, interventions and progress section was poor. As was noted in the initial primary clinician assessment, most of the documentation was copied from previous providers and lacked a comprehensive clinical summary that would guide treatment planning. Further, the treatment goals that were indicated as completed during the February 2024 MHCB stay were copied, and there were no updated treatment goals or treatment interventions. The rationale for continued EOP level of care was not documented.

The routine primary clinician contacts occurred at cell front due to patient refusals. The documentation was overly brief and was barely representative of a wellness check. A mental status examination and an assessment of the patient's functioning were not documented.

The rationale for solely providing recreational treatment groups as the primary group modality was not documented.

**Findings**

The care and treatment provided to this patient were inadequate.

Psychiatric care was delayed, and the patient was not monitored appropriately by either assigned provider. Copied documentation in the initial primary clinician assessment and treatment planning documentation did not convey an organized clinical summary or case conceptualization regarding the patient or identify his treatment needs. Of note, the patient transferred to another institution, and the insufficient assessment documentation was not useful for continuity of care. The treatment goals and interventions were not updated, and the provision of recreational therapy and the patient's treatment needs were unclear. Diagnostic rationale was needed.

**Patient C**

This 55-year-old patient's healthcare record was randomly selected to assess the adequacy of care provided. He was provided a diagnosis of unspecified schizophrenia spectrum and other psychotic disorder; however, an additional diagnosis of unspecified depressive disorder was included in EHRS and provided by the primary clinician. He was prescribed Zyprexa, Thorazine, and Remeron. The patient had a long history of mental illness and EOP treatment during previous incarcerations. His only MHCB admission occurred in February 2024.

The patient transferred to SQ on March 7, 2024, following an MHCB admission due to psychosis.

The initial psychiatric assessment provided a thorough and useful summary of the patient's current and recent clinical functioning as well as indication of review of the clinical documentation. The documentation indicated ongoing but nonacute psychotic symptoms, and an appropriate rationale was provided regarding the patient's reluctance to medication changes and his ability to make treatment decisions. Routine psychiatric contacts generally occurred timely and conveyed clear discussion and assessment of symptoms, side effects, and medication response.

The initial primary clinician assessment was insufficient. Most of the documentation was copied and did not provide an updated or organized summary of the patient's treatment history or

current treatment needs. The presenting problem was noted as depression, and there was no indication of the psychotic symptoms that precipitated his recent MHCB placement.

The initial and routine IDTT documentation included the patient's history of psychotic symptoms but lacked a useful clinical summary to guide treatment planning. Neither initial nor routine IDTT documentation included a description of the current psychotic symptoms that were regularly documented by the psychiatrist. The treatment planning was unclear. IPOCs, which were discontinued for treatment planning, were utilized and targeted depression, delusions, and hallucinations. Unrealistic goals were established, indicating the goal for each symptom to be in remission by the next IDTT meeting and to remain in remission for the subsequent year. Further, a treatment goal in the IDTT treatment plan section from January 2024 that targeted auditory hallucinations, was indicated as met. There were no updates to treatment planning during the routine IDTT meeting; nor was anxiety targeted, which was identified as a treatment need. The patient did not meet criteria for consideration of referral to a higher level of care at the initial and routine IDTT meetings. The patient was continued at the EOP level of care without documented rationale provided at both the initial and routine IDTT meetings.

The patient's primary clinician changed in June 2024, and he was appropriately prepared for the change. Prior to the primary clinician change, routine contacts occurred in the dorm due to the patient's preference. Whether the clinical encounters with the new PC occurred in a confidential setting was unclear for most of the documentation; when nonconfidential contacts were clearly documented, the rationale for not providing the contact in a confidential setting was unclear. The PCs documented routine monitoring of the patient's mental status; however, their documentation was discrepant from the psychiatrist's clear documentation of the presence of psychotic symptoms. The documentation of treatment interventions was vague, and there was minimal documentation of the patient's overall functioning and program involvement.

Group treatment was recreational in content, and the documentation indicated insufficient access to groups. Specifically, group documentation was only evident three to four times monthly between May and July 2024.

**Findings**

The care and treatment provided to this patient were inadequate.

The benefit of clinically useful psychiatric documentation was overshadowed by multiple shortcomings in overall routine care, including a lack of provider coordination. Relatedly, treatment planning which was unclear and did not meet the patient's treatment needs, lacked provider coordination. There was variable primary clinician documentation regarding confidentiality, and the documentation needed specificity regarding the patient's regular functioning and treatment interventions for continuity of care. It was unclear how the provision of limited recreational therapy met the patient's treatment needs, as no rationale for group assignment was provided in the treatment plan. Diagnostic clarification and provided rationale were needed.

**Patient D**

This 42-year-old patient's healthcare record was randomly selected to assess the adequacy of care provided. He was provided a diagnosis of unspecified schizophrenia spectrum and other psychotic disorder. He was prescribed Haldol and Vraylar.

The patient transferred to SQ on April 17, 2024, following MHCB discharge.

The initial primary clinician assessment included original and useful documentation of the patient's current functioning and documentation of recent functioning during his MHCB placement; however, an organized and comprehensive clinical summary of the patient's history of mental health treatment needs and relevant psychosocial information was lacking. Similarly, the psychiatric assessment included a brief summary of the patient's current and recent mental health status but lacked comprehensive historical information. Of note, provider documentation of the MCHB placement varied. The psychiatric documentation indicated that the MHCB admission occurred due to suicidal ideation related to methamphetamine use. The primary clinician documentation attributed the MHCB placement to auditory and visual hallucinations to cut his wrists and throat without clear connection to substance use.

The assigned providers and the patient attended the initial IDTT meeting. Regarding treatment planning, a goal that targeted suicidal ideation and command auditory hallucinations established during the MHCB admission and marked as completed was not updated. The patient did not meet any higher level of care referral criteria, and the rationale for continued treatment at the EOP level of care was not documented. The rationale for group assignment, which was recreational in content, was also not documented.

The psychiatric documentation was clinically relevant and addressed the patient's symptoms, functioning, and medication response. The patient's auditory hallucinations increased when he discontinued psychotropic medication and improved when he resumed medication treatment. Treatment options were documented as discussed with the patient, and medication adjustment decisions occurred collaboratively. Contacts that occurred in the dayroom generally occurred due to patient preference, but on one occasion he was seen in the dayroom due to limited treatment space.

The rationale for nonconfidential routine primary clinician contacts was not consistently documented. Overall, while the patient was routinely monitored; the PC contacts were not consistently indicative of meaningful therapeutic interactions. The documentation was often overly brief, and clinical interventions to assist the patient in managing symptoms were not documented. However, when the patient discontinued his psychotropic medications, the clinician appropriately referred the patient to see the psychiatrist and medical staff and worked with the patient to alert staff as needed.

**Findings**

The care and treatment provided to this patient were marginally adequate.

The initial assessments and treatment planning were insufficient. It was unclear how recreational group therapy targeted this patient's treatment needs. The primary clinician documentation was

generally representative of brief check-ins, and the rationale for nonconfidential contacts was unclear. The deficits in care overshadowed the responsive psychiatric care and clinically useful psychiatric documentation.

**Patient E**

This 42-year-old patient's healthcare record was randomly selected to assess the adequacy of care provided. He was provided a diagnosis of unspecified schizophrenia spectrum and other psychotic disorder. He was prescribed Abilify, Cogentin, Vistaril, Lithium, and Haldol.

The patient transferred to SQ on April 30, 2024.

The initial provider assessment documentation included a sufficient summary of the patient's current treatment needs. However, while the primary clinician included documentation of recent and historical treatment needs and relevant psychosocial information, sufficient information was not present in the psychiatric assessment. The patient had a history of schizophrenia and reported manageable auditory hallucinations as well as elevated anxiety. He had a long history of inpatient treatment in the community and an MHCB admission in January 2024 due to psychiatric decompensation.

The assigned providers and the patient attended the initial IDTT meeting. Despite patient attendance, there was no documentation to indicate that the patient verbalized treatment goals, nor were treatment goals established in the IDTT documentation. The patient did not meet the criteria for consideration of referral to a higher level of care. The rationale for continued treatment at the EOP level of care was not documented.

Monthly psychiatric contact documentation included an assessment of psychiatric symptoms, medication response, and appropriate discussion of medication adjustments in response to increased symptoms. The psychiatric contacts occurred as clinically indicated, which appropriately resulted in two contacts during July 2024 due to an increase in agitation and disorganization.

The rationale for frequent nonconfidential primary clinician contacts was unclear. Overall, the documentation was not indicative of meaningful therapeutic contact. The documentation, which indicated routine monitoring of the patient, was overly brief with a focus on the patient's report of current symptoms and mental status with rare use of clinical interventions.

The patient was placed in alternative housing on August 1, 2024, and subsequently was admitted to the MHCB due to increased distress and disorganized behavior.

**Findings**

The care and treatment provided to this patient were marginally adequate.

The patient was regularly monitored by his assigned treatment providers, the psychiatrist was responsive to the patient's treatment needs, and the patient was timely and appropriately referred to a higher level of care. However, insufficient treatment planning, deficits in the psychiatric assessment, and an overall lack of meaningful primary clinician contacts were areas of concern.

**Patient F**

This 45-year-old patient's healthcare record was reviewed to assess the quality of care provided in the EOP at SQ. The patient was provided diagnoses of major depressive disorder, recurrent episode, moderate; claustrophobia; and opioid use disorder. He was not prescribed psychotropic medication but was prescribed gabapentin for pain and buprenorphine-naloxone for opioid use disorder. The patient arrived at SQ on December 11, 2023 on modified EOP status.

This patient was incarcerated since 2011. He received mental health services at the 3CMS level of care for nine years until placement at the MHCB level of care in October 2023, and then discharged to the EOP where he was immediately placed on modified EOP status.

An initial PC assessment was completed on December 14, 2023, and it occurred in a nonconfidential setting. The assessment was inadequate, as no updated information was included, and there was no mention of the patient's modified EOP status. The rationale for the nonconfidential contact was not documented. The patient was provided diagnoses of major depressive disorder and ADHD without rationale. He was provided with a group schedule and was oriented to programming.

An initial IDTT meeting occurred on December 19, 2023 prior to the completion of an initial psychiatric assessment. The patient refused to attend, and there was no correctional counselor present; however, the patient's assigned PC and psychiatrist were present. No treatment goals were included in the treatment plan. The documentation noted that the patient wanted to work on his substance use, depression, and anxiety. An IPOC addressing danger to self was pulled forward from his MHCB admission in October 2023. No rationale was provided for placement of the patient on modified EOP status, and no discharge criteria were documented.

An initial psychiatric assessment was completed by the assigned psychiatrist on December 21, 2023. The psychiatrist noted diagnoses of major depressive disorder, anxiety and ADHD as reported by the patient, and documented the two former diagnoses as diagnostic impressions "by history." Overall, the assessment was adequate.

The patient was seen weekly by the assigned primary clinician primarily for individual contacts, but on occasion in a group setting. There was a lack of continuity across sessions, as each note appeared to reflect the patient's current status and to address immediate concerns rather than providing cohesive treatment for the patient's symptoms of depression over time. There were some contacts where clear and appropriate interventions were documented to meet the patient's identified needs. Psychiatric contacts occurred monthly and were documented adequately. The patient consistently denied interest in taking psychotropic medications despite his depression and anxiety.

According to the healthcare record documentation, the patient was immediately placed in group treatment and attended his first group session the day after his arrival at SQ. He was offered an average of 10.96 hours of structured treatment weekly while in the EOP, and attended an average of 8.4 hours weekly. Across the 22 weeks the patient was in the EOP, there were four weeks when he was offered fewer than 10 hours weekly.

No routine IDTT meeting occurred during the reporting period. In fact, the patient's first routine IDTT meeting occurred in July 2024, despite being due for a 90-day IDTT meeting several months prior.

**Findings**

The care and treatment provided to this patient were inadequate.

The initial psychiatric assessment was not completed prior to the initial IDTT meeting, the IDTT included no treatment goals and no rationale for the patient's level of care, the patient's healthcare record reflected modified EOP status without explanation despite the patient being assigned to a full schedule of structured treatment, and no routine IDTT meetings occurred as required for over seven months. While individual PC sessions occurred and addressed the patient's immediate needs, the lack of a treatment plan was evident in the lack of continuity of care across sessions.

**Patient G**

This 55-year-old patient's healthcare record was reviewed to assess the quality of care provided in the EOP at SQ. The patient was provided diagnoses of adjustment disorder with mixed anxiety and depressed mood. He was prescribed fluoxetine daily and hydroxyzine prn and was adherent. He was transferred to SQ EOP on February 16, 2024.

The patient was incarcerated previously and received treatment at the 3CMS level of care and at times was not included in the MHSDS. He was most recently incarcerated in March 2022 and was not included in the MHSDS until May 2023, when he was placed at the 3CMS level of care. He was admitted to the MHCB in January 2024 for the first time and remained there for 21 days before being discharged to the SQ EOP on February 16, 2024.

Five-day follow-up contacts were completed and documented adequately; however, the patient was seen in the dayroom by a PC on February 19, 2024 for a "wellness check" without further explanation why the contact occurred in a nonconfidential setting or the reason for the visit. The patient reported increased symptoms, problems with his medications, and requested not to be referred to the MHCB. The PC noted that custody staff corroborated the patient's reports and noted that the patient was not sleeping, was anxious, and was observed crying. The only plan documented was that the patient "will be seen by his MHPC moving forward." None of those concerns were documented during the five-day follow-up contacts.

An initial PC assessment was completed on February 21, 2024 that was inadequate, as the majority of the information was pulled forward without update, despite the patient's recent discharge from the MHCB. A SRASHE was completed as part of an initial assessment. A mental status examination from an unknown date and unknown author was included in the SRASHE without further explanation. Of note, the prior mental status examination differed significantly from the one completed during the initial assessment. The patient was assessed with moderate chronic risk and low acute suicide risk with adequate documentation provided.

An initial psychiatric assessment completed on February 22, 2024 noted that the patient had a significant stutter which the patient reported as having a recent onset. The assessment was adequate, and the psychiatrist provided diagnoses of adjustment disorder with mixed anxiety and depressed mood, and provisional diagnoses of PTSD and psychotic disorder. The psychiatrist discontinued all medications prescribed during the MHCB stay and prescribed melatonin to assist with sleep.

An initial IDTT meeting occurred on February 27, 2024 that included all required staff and the patient present. The clinical summary was brief, inadequate, and identical to the patient's verbalized treatment goals, noting that the patient had safety concerns and difficulty sleeping which increased his anxiety and that the patient was working on medication changes with the psychiatrist. No treatment plan was documented, no rationale was provided for retaining the patient at the EOP level of care, and no discharge criteria were developed.

No routine IDTT meeting occurred during the reporting period; a routine IDTT meeting was due in May 2024. Review of the healthcare record revealed that no routine IDTT meeting occurred as of July 22, 2024.

The patient was seen more frequently than minimally required by his PC for weekly sessions. The sessions were not consistently conducted in confidential settings, which was a preference of the patient. The content of the sessions appeared to address the patient's needs, despite the absence of a treatment plan. Psychiatric contacts also occurred more frequently than minimally required and included several medication changes to address the patient's anxiety and lack of sleep.

The patient was placed in an Introduction to EOP group within five days of arrival at SQ. He was offered 10.01 hours of structured treatment and attended an average of 8.73 hours weekly. Three of twelve weeks, the patient was not offered at least 10 hours of structured treatment.

**Findings**

The care and treatment provided to this patient were inadequate.

Although the overall adequacy of care provided was consistent with the patient's needs; no treatment plan was developed, and no routine IDTT meeting was conducted to review the patient's treatment progress or ongoing treatment needs.

**Patient P**

This 34-year-old patient's healthcare record was reviewed to assess the quality of care provided in the EOP at SQ. The patient was provided a diagnosis of schizophrenia. He was prescribed Invega Sustenna and hydroxyzine prn, and he was medication adherent. He was transferred to SQ on March 27, 2024.
During a previous period of incarceration from 2016 to 2021, the patient received mental health services at the EOP and MHCB levels of care. He returned to CDCR in August 2023, was

placed at EOP level of care in reception, then transferred to the MHCB the same day. The patient was subsequently placed at the ICF level of care from August 31, 2023 to February 28, 2024, when he was discharged to the EOP level of care.

The patient was seen for an initial PC assessment on March 29, 2024, and it was adequately documented. An initial psychiatric assessment was completed on April 2, 2024. The psychiatrist provided a diagnosis of unspecified psychotic disorder with a provisional diagnosis of substance induced psychotic disorder; the only rationale for providing the diagnoses was that the patient had received those diagnoses previously. No medication changes were made.

An initial IDTT meeting occurred on April 9, 2024 with required staff and the patient present. The patient provided input into the treatment plan and noted a desire to maintain his current stability and to cope with his auditory hallucinations. A treatment goal to target impulsivity was documented on the treatment plan; however, the goal appeared to be created at an earlier time, as the progress section noted that the goal had been achieved. The narrative section of the plan included a plan to monitor the patient's symptoms, to develop insight, and to encourage treatment compliance. Interventions were not documented for those goals. There was no rationale documented for retaining the patient in EOP beyond copied statements about the focus of treatment.

The patient was seen for weekly sessions with his PC which evidenced assessments and interventions consistent with the narrative in the treatment plan. The interventions addressed the patient's needs, and patient progress was clearly documented. Of concern, sections of the progress notes were copied each week unchanged, including the mental status examination and portions of the assessment section. Monthly psychiatric contacts occurred consistently and appeared adequate.

The patient was offered 4.96 hours of structured treatment on average weekly, and attended 4.3 hours. During the six weeks, he was not offered 10 hours in any given week.

**Findings**

The care and treatment provided to this patient was adequate.

Some areas of needed improvement were however identified. The patient was not offered the required number of structured treatment hours weekly, and there was no mention of the lack of treatment offered in the PC documentation. There were also concerns about the PC copying important sections of progress notes each week, making it difficult to assess the patient's current clinical presentation.

**Patient I**

This 40-year-old condemned patient's healthcare record was selected to review the care provided at the EOP level of care at SQ. The patient was provided diagnoses of unspecified schizophrenia and other psychotic disorder, major depressive disorder, adjustment disorder, and stimulant use

disorder. He was adherent to his prescribed olanzapine. He was transferred to the EOP level of care on March 4, 2024.

The patient was incarcerated at SQ since 2008 and was not involved in the MHSDS until February 11, 2024, when he was placed at the MHCB level of care due to presenting with paranoia and persecutory ideation. He was discharged to the EOP level of care on March 4, 2024.

Five-day follow-up contacts were completed as required. A SRASHE was completed on March 7, 2024, despite the patient refusing to leave his cell for the assessment. The patient reported, at cell front, that he had a "bad moment" prior to his discharge from the MHCB but was no longer suicidal. His chronic risk was assessed as low, but his acute risk was assessed as moderate with adequate justification. The SRASHE was adequate, given the patient's refusal to engage in the assessment.

An initial psychiatric assessment was completed on March 8, 2024 which was adequate; however, it was not completed by the assigned psychiatrist. The psychiatrist noted that the patient likely had diagnoses of schizophrenia, stimulant use disorder, cannabis use disorder, in sustained remission in a controlled environment, and alcohol use disorder in sustained remission in a controlled environment.

An initial IDTT meeting occurred on March 12, 2024, despite no initial PC assessment being completed prior to the meeting. All required staff were present, but the patient refused to attend. The patient was placed in the SRMP, and his safety plan was reviewed. The placement was due to the patient having a high acute suicide risk rating prior to his placement in an inpatient setting. The treatment plan noted that the patient met criteria for anxiety disorder and stimulant use disorder without any reference to a psychotic disorder, despite symptoms of paranoia and persecutory delusions as well as the psychiatrist's assessment of a psychotic disorder. The documentation included no discussion of the patient's strengths or his own treatment goals. The treatment goals documented were dated February 14, 2024, and were created while the patient was in the MHCB; thus, they were not applicable to the EOP setting or had already been achieved. There was no rationale provided for retaining the patient at the EOP level of care, and no discharge criteria were provided.

The patient was seen weekly by his PC who noted that the patient had an adjustment disorder with disturbance of conduct and amphetamine-type induced psychotic disorder, with mild use. The content of documentation evidenced only status notes with no interventions documented. The plan section of the notes was unchanged from week to week and noted only that the patient was to remain at SQ until transfer due to the condemned inmate transfer program and would be monitored in the interim. Psychiatric contacts occurred more frequently than minimally required and noted improvements in the patient's mental status. The psychiatrist indicated that it was unclear if the improvements were due to the antipsychotic medications or the patient's abstinence from substance use.

Over the seven weeks the patient was in the EOP, he was offered 10.26 hours on average weekly and attended only 1.51 on average weekly. There was no mention in PC documentation of the

patient failing to attend offered programming. The patient transferred to another institution on May 14, 2024.

**Findings**

The care and treatment provided to this patient were inadequate.

No treatment plan was developed, no treatment was provided except medications and recreational groups, there were clear diagnostic discrepancies without acknowledgment or attempts at reconciliation, and the patient's refusal to attend his treatment groups was not addressed.

**Patient J**

This 30-year-old patient's healthcare record was selected to review the quality of care provided at the EOP at SQ. The patient was provided diagnoses of major depressive disorder, recurrent, with psychotic features; alcohol use disorder, severe, in sustained remission; and cannabis use disorder, severe, in sustained remission. He was adherent to his prescribed mirtazapine and hydroxyzine. This patient was incarcerated in July 2022 and was treated at the 3CMS level of care until January 2024, when he was placed at the MHCB level of care and discharged to the EOP level of care at SQ on February 2, 2024.

The patient was seen for five-day follow-up contacts as required; however, all contacts were conducted in the day room in a nonconfidential setting. No concerns were noted during the contacts, and each clinician documented having reviewed the safety plan with the patient; this was concerning given the nonconfidential setting where the contacts occurred.

An initial psychiatric assessment was completed on February 5, 2024 which was adequate. The psychiatrist concurred with the diagnoses of record. An initial PC assessment was completed on February 7, 2024 that included little new information beyond a mental status examination. Almost the entirety of the document was prepopulated from previous assessments and included no updated information about the patient's current status following his recent discharge from the MHCB. A SRASHE was completed at the time of the initial assessment that similarly included little updated information and was inadequate. Justification for the assessment of low acute suicide risk was marginally sufficient. Of concern was the fact that the patient's safety plan was updated without the patient's participation, and the update was poorly completed. The patient's prior safety plan, which was created collaboratively with the patient upon discharge from MHCB, was comprehensive and useful.

The initial IDTT meeting occurred on February 13, 2024 with required staff and the patient present. Despite the patient having recently been discharged from the MHCB due to danger to self, the IDTT documentation noted no reason to review the patient's safety plan during the IDTT meeting. This was especially concerning; as the contents of the safety plan were changed since his discharge from the MHCB, and the patient had not collaborated with regarding the development of the changed plan and was presumably not aware of its contents. There was no treatment plan contained within the IDTT documentation. An IPOC for depression and a

treatment goal to address suicidal ideation, which was created during the patient's MHCB stay and was noted as "achieved," were carried over into the current document without any updates. There was no rationale provided for the patient's level of care, and no discharge criteria were noted. Although this was the patient's first EOP placement, the documentation incorrectly stated that this was not the patient's initial EOP placement.

The patient was seen for weekly PC contacts in the two weeks following his initial IDTT meeting. Both contacts occurred in nonconfidential settings, with the rationale provided for not having a confidential session that the patient preferred to meet outside of an office. This was concerning, as similar documentation by this PC for other patients appeared to address sensitive topics, including the patient's crime and feelings about his crime. Further, the documentation noted that one of the reasons for the MHCB admission only a few weeks prior was due to feelings of guilt and concerns that peers might learn of his crime. At the very least, the PC should have redirected the conversation with the patient, given its sensitive nature and the nonconfidential setting; however, that did not appear to have occurred.

On February 22, 2024, the patient reportedly used an illicit substance, possibly "spice", and he made vague statements of intent to harm himself. Upon assessment, the patient was intoxicated and incoherent, yet he clearly indicated that he was experiencing suicidal ideation. For that reason, the patient was admitted to the MHCB. He was discharged back to the EOP on March 5, 2024. While in the MHCB, the patient denied suicidal ideation but admitted to feelings of not being enough, not belonging, and a sense of foreshortened future. After discharge, five-day follow-up contacts were completed in nonconfidential locations and included a review of the patient's safety plan. Of note, the safety plan was inadequate, but was not updated during any of those contacts.

An initial psychiatric assessment was completed on March 7, 2024. The psychiatrist did not believe that the patient met the criteria for a major depressive disorder with psychotic features, but instead suspected a trauma-related diagnosis and substance use disorder. The assessment was adequate. An initial PC assessment was completed on March 15, 2024 which was comprehensive; however, no updated SRASHE was completed. The unlicensed psychologist who completed the initial assessment continued the patient's diagnoses of record with adequate rationale provided but did not indicate that the diagnostic impression of the psychiatrist was reviewed.

The initial IDTT meeting did not occur until March 26, 2024, one week later than required. The assigned PC was present, as was a covering psychiatrist, the patient, and a correctional counselor. The safety plan was reviewed but not updated; this despite the plan requiring adequate update after the MHCB discharge. Further, no treatment plan was documented, no rationale was provided for placement at the EOP level of care, and no discharge criteria were provided. There was no mention of diagnostic discrepancies. Of note, there was no evidence of supervisory signatures on any of the documentation entered by the unlicensed psychologist.

The patient was seen as required for weekly PC sessions. Contacts were adequate and evidenced the use of interventions to address the patient's needs and continuity across sessions. The only concern noted was the lack of attention paid to the patient's substance use and related RVR in

May 2024. Previous substance use was related to the patient's crime and episodes of suicidal ideation, yet those issues were not addressed in treatment sessions. On May 31, 2024, a 90-day SRASHE was completed that was adequate. This was a positive finding, despite the fact that the assessment was triggered by a requirement and not as clinically indicated. Monthly psychiatric contacts were adequate; however, there continued to be discrepant views of the patient by psychiatry and his PC which were not reconciled in documentation.

The patient was offered an average of 16.48 hours of structured treatment weekly, and attended 15.06 hours. Over nine weeks, the patient was consistently offered over 10 hours of structured treatment weekly.

**Findings**

The care and treatment provided to this patient were inadequate despite improvements in individual therapy over time.

Assessments, treatment planning, and safety planning were inadequate. It appeared that clinicians and providers had not reviewed the patient's healthcare record thoroughly, and thus continuity of care across clinicians and over time was poor. There were clear indicators of risk that were not adequately addressed early in the patient's treatment which likely impacted his return to the MHCB shortly after his arrival in the EOP. Diagnostic clarification was also needed.

**Patient K**

This 30-year-old patient's healthcare record was selected to review the quality of care provided at the EOP level of care at SQ. The patient was provided diagnoses of unspecified bipolar and related disorder and adjustment disorder with anxiety. He was fully adherent to his prescribed olanzapine during the reporting period. He was also prescribed hydroxyzine and olanzapine prn, as well as buprenorphine-naloxone to address his opioid use disorder. He ultimately discharged from the SQ MHCB on March 13, 2024.

The patient received mental health services at the 3CMS level of care during previous incarcerations, and at times he was not included in the MHSDS. During his current period of incarceration which began in November 2023, the patient was not included in the MHSDS until placement in an MHCB on February 15, 2024. Upon discharge on February 27, 2024, the patient was placed at the EOP level of care but returned to the MHCB within two days.

Five-day follow-up contacts were completed as required upon the patient's placement at the EOP level of care. As the MHCB admission was due to significant impairment due to mental illness, and not a danger to self, no safety plan was created or reviewed. No initial PC or initial psychiatric assessment were completed prior to the initial IDTT meeting on March 26, 2024. In fact, the only contact with the PC occurred the day prior to the IDTT meeting in a nonconfidential location with no rationale provided. The required staff were present at the IDTT meeting, but the patient refused to attend. The clinical summary was not updated but instead included a single line of text noting that the patient refused to attend the meeting. There were

two goals included in the treatment plan. The first goal was created while the patient was in the MHCB with a target to “stabilize psychosis”, and it was noted to have been achieved. The second goal was noted as having been initiated on March 13, 2024 to target substance abuse. The objectives and interventions were vague. There was no rationale for the patient’s placement at the EOP level of care, and no discharge criteria were documented. The IDTT documentation was wholly inadequate.

An initial psychiatric assessment was completed the following day that was generally adequate; however, no clear diagnosis was provided other than what was already documented in the patient's healthcare record. The patient was seen monthly by the psychiatrists, and contacts were mostly adequate. Weekly PC contacts were documented; however, most were conducted in a nonconfidential setting, and the documentation of the sessions was largely unchanged from session to session with no evidence of interventions or discussion of the patient’s substance use issues, which was his only treatment goal.

On March 16, 2024, the patient was seen at his request by the MAT provider for an increase in his MAT medications due to increased cravings. The provider noted that the patient appeared more comfortable communicating in Spanish during the contact. Of note, substance use cravings and the patient’s preferred language were not documented by the patient’s psychiatrist or PC, and that was of concern as those were essential components in treatment provision.

The patient was offered 4.48 hours and attended an average of 2.54 hours of structured treatment weekly. During the eight weeks reviewed, the patient was not offered 10 hours any given week.

**Findings**

The care and treatment provided to this patient were inadequate.

Neither the psychiatrist nor the PC completed an initial assessment of the patient prior to the initial IDTT meeting, and an initial PC assessment was never completed. The IDTT documentation and the treatment plan were inadequate. The PC contact documentation did not indicate that the treatment provided was consistent with the patient’s treatment goal, the contacts generally occurred in nonconfidential settings, and the documentation was largely unchanged week to week. The patient was not offered sufficient treatment hours. Lastly, there was no evidence that the psychiatrist or the PC were aware of the patient’s substance use treatment changes, despite substance use as his only treatment goal.

**Patient L**

This 32-year-old patient’s healthcare record was reviewed to assess the quality of care provided at the EOP level of care at SQ. This patient was provided diagnoses of unspecified anxiety disorder and unspecified personality disorder. He was prescribed buspirone and escitalopram, and he did not take those medications consistently during the reporting period. He was transferred to the EOP on March 14, 2024.

The patient was incarcerated in June of 2022. He was treated at the 3CMS level of care until November 2022, when he was placed at the EOP level of care. The patient was placed at the MHCB level of care on March 6, 2024, was discharged to the SQ EOP on March 14, 2024, and was released from custody on June 10, 2024.

The patient was placed at the MHCB level of care due to suicidal ideation after a reported suicide in his family, as well as his father's death; those incidents were unverified. The patient was also noted with a sexual offense, and he reported safety concerns. Upon discharge, he was assessed with high chronic and low acute suicide risk. Five-day follow-up contacts were completed as required. Of concern was the fact that for the first two days of follow-up contacts, clinicians documented that the medication administration record was reviewed, and the patient was adherent to his prescribed medications; however, he was not adherent.

The patient was seen for initial PC and psychiatric assessments which were adequate and occurred timely. An initial IDTT meeting occurred on March 26, 2024 with required staff present, but the patient refused to attend. No treatment plan was documented; however, in the clinical summary, there was mention of working on rapport building, diagnostic clarification, coping strategies, and distress tolerance. The patient's upcoming release date was acknowledged; however, no goal to address discharge planning was documented. There was no rationale for the patient's placement at the EOP level of care other than documenting that it was "still appropriate."

An urgent referral was generated by an investigative services officer on April 2, 2024, after the patient called the PREA hotline reporting that he was told to do it by voices in his head. The patient was seen later that day but refused to engage with the clinician, stating that he would rather talk to his assigned clinician. The patient was seen by his assigned clinician on April 4, 2024. During that contact, the patient reported symptoms resulting from previous trauma and admitted to experiencing auditory hallucinations but not reporting them to his psychiatrist for fear of being committed to a hospital rather than being released to the community. The patient was seen the following day by the psychiatrist. The contact was adequately documented, and there was evidence of communication between the psychiatrist and the PC about the patient. Of note, both the psychiatrist and the PC noted that the patient was likely experiencing symptoms of PTSD, but the patient's diagnosis was not changed.

Weekly contacts were documented with the PC with little evidence of interventions provided to the patient. A number of progress notes documented a plan to collaborate with medical staff regarding the patient's active Crohn's disease management, but there was no evidence that collaboration occurred. Many progress notes contained the same wording, copied from session to session. PC contacts did not adequately address the patient's refusal to participate in his EOP groups. Psychiatric contacts were offered monthly; however, the patient rarely agreed to meet with the psychiatrist in a confidential setting. Of note, the patient requested a change in psychiatrists, noting that he was not comfortable with a female provider. The psychiatrist attempted to address the patient's medication nonadherence by changing the time of dosing, but that did not appear to be effective.

The patient refused to attend a discharge planning meeting on March 29, 2024. The meeting was rescheduled for April 3, 2024. The patient participated, signed releases of information, completed forms, and was given information about scheduled appointments in the community. The patient was seen for a pre-release planning assessment on May 15, 2024, and he was provided with psychotropic medications upon prison release.

Over the reporting period, the patient was offered an average of 9.23 hours weekly, and attended 1.67 hours. His lack of participation in programming was not addressed.

**Findings**

The care and treatment provided to this patient were inadequate.

PC contacts, while conducted weekly, did not document the implementation of therapeutic interventions and contained the same entries week after week with little change. Despite IDTT documentation noting a plan to address diagnostic clarification and documentation from both the PC and psychiatrist that the patient met the criteria for a diagnosis of PTSD; no changes were made to the patient's diagnoses of record, and the PC documented until the patient's release contradictory information that diagnostic clarification was needed, and the patient met criteria for PTSD. The patient's lack of attendance at programming and nonadherence to medications were not adequately addressed. Additionally, there was clear evidence that the patient was experiencing significant psychiatric symptomatology, including paranoia, hallucinations, and passive suicidal ideation; yet those concerning symptoms were not addressed adequately during any clinical contacts.

**Patient M**

This 22-year-old patient's healthcare record was selected for review of the quality of care provided in the EOP at SQ. This patient was provided diagnoses of bipolar I disorder, severe recurrent major depression without psychotic features, PTSD, unspecified depressive disorder, and insomnia. The patient was prescribed buspirone, fluoxetine, melatonin, and olanzapine during the reporting period. He was marginally adherent to his medication regimen. The patient was discharged to the EOP level of care at SQ on March 8, 2024

This patient was incarcerated for the first time in December 2022 and was placed at the 3CMS level of care in January 2023. The patient was admitted to the MHCB level of care while in the RHU on August 11, 2023, and was subsequently transferred to an acute, and then intermediate inpatient setting. Of note, while the patient was admitted to the inpatient setting due to suicidal thoughts and behaviors; no safety plan was created prior to the patient's discharge.

The patient was seen for five-day follow-up contacts. On the first day, a safety plan was documented; however, the patient did not participate in the process, and it appeared to be based solely on a healthcare record review. It was unclear why the process was not collaborative. The documentation also incorrectly indicated that the patient had no safety concerns and was medication adherent. Later that same day, the patient was placed in alternative housing due to

enemy concerns, depression, and suicidal thoughts. The patient was placed at the MHCB level of care and returned to SQ on March 20, 2024 with an adequate safety plan.

The documentation indicated that the patient was placed in the RHU upon arrival at SQ while his safety concerns were investigated. Five-day follow-up contacts were completed as required. An initial PC assessment was completed on March 25, 2024. Of concern was the fact that the patient's history was pulled forward from August of 2022 without update, despite a subsequent lengthy inpatient stay and recent MHPC placement. Similarly, the suicide and self-harm summary included a description dated October 11, 2023 without any updated information, despite self-harm behavior documented during his inpatient stay. The clinical summary and case formulation were not updated and were inadequate. An initial psychiatric assessment was completed on March 28, 2024 which was adequate.

An initial IDTT meeting occurred on April 10, 2024; the meeting occurred later than required and after the patient had already attended his ICC meeting. The assigned PC was present; however, a covering psychiatrist who had not met the patient previously attended the meeting. A correctional counselor, psychiatric technician, and the patient were also present. The documentation indicated that the safety plan was not reviewed during the IDTT meeting without adequate rationale provided for the omission. A goal to decrease anxiety was included in the treatment plan with interventions including, "relaxation skills; DBT." Short- and long-term objectives were not measurable. The rationale provided for EOP placement was the fact that the patient was recently discharged from inpatient settings. The provided discharge criterion was an absence of MHCB placements.

The patient was seen for routine PC contacts on April 8 and April 22, 2024. Both contacts resulted in status notes with no evidence of interventions provided to the patient. There was no contact documented for the week of April 15, 2024. The patient refused a PC contact offered on April 29, 2024. A PC contact on May 6, 2024 noted "processing" the patient's anxiety about an upcoming transfer without further detail. The psychiatrist saw the patient as required and attempted to address his medication nonadherence.

The patient was placed in the RHU for four weeks and was offered an average of 5.93 hours of structured treatment weekly. He attended all offered treatment. The most treatment he was offered in any week was 6.55 hours.

**Findings**

The care and treatment provided to this patient were inadequate.

The initial PC assessment and IDTT documentation were inadequate and did not address the patient's documented symptoms and treatment needs as evidenced by his history including suicidal ideation, self-harming behavior, impulsivity, and substance use. Weekly PC contacts were not provided as required, and the patient was not offered adequate structured treatment during the review period.

**Patient N**

This 41-year-old patient's healthcare record was reviewed to assess the quality of care provided at the SQ EOP. He was provided a diagnosis of schizophrenia. The patient was adherent to his haloperidol, which was prescribed under an active PC 2602 order. He transferred to SQ EOP on March 25, 2024.

This patient was incarcerated for the first time in September 2023 and was placed at the 3CMS level of care. Within two days, he was admitted to an MHCB and then transferred to an acute inpatient setting for 165 days. The patient was discharged to the SQ EOP on March 25, 2024, and he paroled on June 18, 2024.

Inpatient psychiatry noted that the patient was actively psychotic and denied any mental health needs at the time of admission but improved after treatment with long-acting haloperidol injections. The treating psychiatrist noted that the patient was unlikely to be medication adherent; and as such, a PC 2602 order was granted on December 5, 2023 to address the patient's grave disability at that time.

Five-day follow-up contacts were completed. Of concern, two of the days, PCs documented having reviewed the patient's safety plan with the patient despite there being no safety plan in the healthcare record. Similarly, on three of the days, PCs documented that the patient was medication adherent and that the medication administration record was reviewed, yet the patient was only prescribed a long-acting injection which had not been administered since his arrival at SQ. Of note, the patient lost consciousness on March 27, 2024, possibly due to dehydration. A psychiatrist met with the patient on March 29, 2024 to address a concern that the patient's symptoms were related to haloperidol. The psychiatrist ordered that a haloperidol serum level be obtained prior to the patient's next scheduled injection. That serum level obtained on April 15, 2024 did not reveal an elevated serum level of the medication.

An initial PC assessment was completed on April 2, 2024 which was adequate. There was no documentation that an initial psychiatric assessment was completed prior to the initial IDTT meeting on April 9, 2024. The required staff and the patient were present for the meeting. There were no treatment goals documented, and no rationale for the patient's placement at the EOP level of care was provided. The fact that the patient was scheduled for parole in June 2024 was noted, but no plans were initiated regarding pre-release planning.

The patient was seen weekly for PC contacts; however, some contacts occurred in nonconfidential settings due to a lack of space. The psychiatrist saw the patient monthly with one exception, when the contact was one week overdue. The PC and psychiatric contacts were appropriate to the patient's needs.

The patient was seen for a pre-release contact on May 29, 2024, when it was noted that there was an urgent need for housing, medication management, food, clothing, mental health services, life skills, and pro-social support. There was evidence that an email was sent to an outpatient provider on June 11, 2024, and a response was received with dates for social worker and telepsychiatrist appointments; however, the psychiatric appointment was after the patient's next

injection was due. The pre-release planner was successful in having the telepsychiatrist appointment scheduled sooner. The patient's housing was also secured, and the patient received a final medication injection prior to his prison release.

The patient was offered an average of 3.93 hours of structured treatment weekly while in the EOP and attended an average of 0.51 hours weekly. The PC attempted to provide intervention for the patient to attend more treatment, but he refused.

**Findings**

The care and treatment provided to this patient were marginally adequate.

Documentation of five-day follow-up contacts contained inaccurate information, no initial psychiatric assessment was completed, treatment planning documentation was poor, one psychiatric contact occurred later than required, and the patient was not offered an adequate number of structured treatment hours. Despite that, the care provided to the patient by the PC, psychiatrist, and pre-release planner met his needs. For this patient, placement on modified programming status appeared appropriate.

**Patient O**

This 57-year-old patient's healthcare record was selected for review to assess the quality of care provided at the EOP level of care at SQ. The patient was provided a diagnosis of schizoaffective disorder, bipolar type and was prescribed injectable paliperidone under a PC 2602 order due to danger to others and grave disability. The patient was fully medication adherent. He was also prescribed olanzapine and hydroxyzine prn. He was transferred to SQ on March 26, 2024.

The patient had numerous incarcerations since 1989 and was usually not included in the MHSDS; however, during some periods of incarceration, he received mental health services at all levels of care. When the patient was included in the MHSDS, he was most often placed at the EOP or modified EOP levels of care. At the time of reception for his current period of incarceration which began in April 2022, the patient was placed at the EOP level of care. Since then, the patient primarily received treatment in inpatient settings including MHCB, ICF, and APP levels of care. He was discharged from the ICF level of care after nearly one year of inpatient treatment to the EOP level of care at SQ on March 26, 2024. Prior to his discharge, the patient verbalized serious concerns about returning to SQ due to paranoia around custody officers and stated an intention to refuse housing to be sent to another institution. As reported, the patient refused housing immediately upon arrival and was placed in the RHU.

Five-day follow-up contacts were completed and were adequately documented. A clinician attempted to engage the patient in safety planning on the first day of monitoring, but the patient refused. The patient was offered an initial psychiatric contact on April 9, 2024, but he refused to attend. He was seen at cell front by the psychiatrist and a PC to address the refusal. The patient reported that he would attend a rescheduled appointment. The patient attended an individual session with the psychiatrist on April 12, 2024; although, the documentation did not reveal a full initial assessment but included an adequate healthcare record review. An initial PC assessment

was documented on April 12, 2024; however, minimal information was added to what was documented previously. It appeared that the patient may have refused the contact, but that was unclear based on the documentation. The documentation indicated that the patient refused all clinical contacts due to safety concerns about custody staff at SQ.

An initial IDTT meeting occurred on April 17, 2024, which occurred later than required. The required staff were present, but the patient refused to attend. No treatment goals were established for the patient. The patient reported to the PC that he would not engage in programming until his transfer to another facility, which was reportedly pending. The patient was offered weekly PC contacts and psychiatric contacts more often than minimally required, but he declined almost all sessions and was seen at cell front. The patient complained of sleep difficulties but was not amenable to any interventions offered other than wanting to transfer to another facility and to stop his medication injections. On June 5, 2024, the patient reported suicidal ideation due to his sleep difficulties and problems adjusting to SQ. He was placed at the MHCB level of care.

During his time in the EOP RHU, the patient was offered an average of 6.06 hours of weekly structured treatment, and attended only an average of 0.65 hours weekly over six weeks.

**Findings**

The care and treatment provided to this patient were marginally adequate, given his refusal to engage in any treatment.

Unrelated to his treatment refusal, the IDTT meeting occurred later than required, and the IDTT did not develop a treatment plan.

**Patient P**

This 47-year-old EOP patient's healthcare record was reviewed to assess the quality of care provided at SQ. The patient was provided a diagnosis of persistent depressive disorder and was prescribed Remeron and melatonin prn. The patient transferred to the SQ EOP on February 27, 2023

Remeron and melatonin were ultimately tapered and discontinued during January 2024. The patient was classified as medium custody level 2 and was housed in the H unit. The patient self-referred and entered the MHSDS at the EOP level of care on July 27, 2023 due to increased depressive and anxiety symptoms as well as difficulty managing his emotions and behaviors. A SRASHE on January 9, 2023 assessed low acute and chronic suicide risk. That assessment aligned with the patient's history; he had no prior suicide attempts, and he had adequate protective factors. The patient had a history of long-term methamphetamine dependence. He had no history of MHCB or psychiatric hospitalizations.

The annual IDTT meeting occurred timely on February 27, 2024, and a quarterly IDTT meeting occurred on June 4, 2024. The quarterly IDTT meeting occurred one week late. The patient refused to attend the annual IDTT meeting but was present for the quarterly IDTT meeting. The

meetings were attended by the assigned clinicians, although the CCI was not present for both meetings. Regarding treatment planning, the patient stated that he wanted to better manage his symptoms of anxiety and depression that worsened after a recent divorce. The treatment team did not provide any specific goals, interventions, or objectives, nor was justification provided for the level of care or discharge criteria provided. The clinical summary had not been updated since the IDTT meeting on November 28, 2023. No IPOCs were included in the annual IDTT documentation in February 2023, but IPOCs were documented for the June 2024 quarterly IDTT meeting. No higher level of care indicators were identified, and the patient had attended more than 50 percent of offered treatment. The EOP functional evaluation did not identify the need for accommodations. There was no documentation that a clinically indicated ISUDT referral was submitted, and the IDTT did not adequately address the patient's substance use issues and associated RVR during the review period. All clinicians were onsite for the IDTT meetings.

During the review period, psychiatric contacts were offered at least monthly and often more frequently, particularly when there were medication concerns or worsening symptoms. Those contacts were conducted in a confidential setting, and there was no indication that the patient refused confidential clinical contacts. The content of the contacts was well-documented, and the patient and psychiatrist collaborated regarding medication management. The psychiatrist documented the provision of clinical interventions including motivational interviewing, psychoeducation, and behavioral activation to address the patient's substance abuse concerns. Initially, the patient was prescribed Remeron and melatonin for sleep; however, after titration to the maximum dose without significant positive effects, Remeron was discontinued by early February 2024. The patient was not prescribed psychotropic medications until May 9, 2024, when Lexapro was prescribed after reported increase in symptoms after the patient was placed on C-status. Continuity of care was maintained through joint meetings with the psychiatrist and PC, although the patient expressed disappointment when assigned a new psychiatrist in June 2024. The new psychiatrist conducted a comprehensive assessment and updated the patient's diagnosis to unspecified depressive disorder and stimulant use disorder (methamphetamine). The psychiatric contacts were documented appropriately. All psychiatric contacts were provided on-site, and there was no indication of the use of telepsychiatry.

The assigned PC was an unlicensed psychology intern, and there was appropriate documentation of supervision by a licensed psychologist. The PC contacts generally occurred timely with occasional missed weekly sessions. The confidential sessions occurred at the Correctional Health Services Building. The patient frequently reported depressed mood, frustration regarding a pending court case, and complex family dynamics in the community. The PC provided diagnoses of adjustment disorders with mixed anxiety and depressed mood and persistent depressive disorder. While the PC consistently documented the patient's subjective reports, mental status, and assessments; he struggled with illicit substance use throughout the review period. The PC noted improvement in the patient's affect following the initiation of Lexapro treatment in May 2024. The treatment plan lacked IPOCs, measurable goals, or specific interventions; however, the progress notes reported interventions such as motivational interviewing, validating patient concerns, and empathetic listening. Continuity of care was maintained with appropriate collaboration with the psychiatrist. The patient reported anger and frustration when his psychiatrist was changed in June 2024; this concern was compounded by the upcoming change of his PC, as well as reassignment of his treatment team. Subsequent sessions

focused on processing those difficult emotions. No referrals were deemed necessary by the PC; although, an ISUDT referral would have been appropriate to address the patient's illicit substance use. All PC contacts occurred in person, and telehealth was not utilized.

During the review period, the patient was typically offered two to three group sessions weekly; although, there were several weeks when no groups were offered. Group sessions were facilitated by PCs and recreational therapists, with some clinical groups co-facilitated by two psychology interns. Notably, PC-led groups outnumbered recreation-based groups. The groups appeared appropriate for the patient's needs and level of care.

Several clinically relevant events occurred during the review period. The patient received an RVR for fighting on March 1, 2024. On March 30, 20204, an urgent PC consultation note by the covering PC indicated that the patient was found with multiple bundles of methamphetamine, some of which he had recently used; and he potentially faced additional prison time for that offense. On May 7, 2024, the patient was placed on C-status for 30 days and acquired another RVR in early June 2024 for failing to present for count.

**Findings**

The care and treatment provided to this patient were inadequate.

Deficiencies were noted in treatment planning, documentation, and IDTT meeting timeliness. The documentation indicated that although PC and psychiatric contacts were generally adequate and timely, there were significant shortcomings in treatment planning. The PC progress notes lacked detailed interventions beyond motivational interviewing and occasional reality testing or psychoeducation. Although both the PC and psychiatrist established good rapport and collaborated with the patient with appropriate medication management; the IDTT and treatment planning were deficient in several areas. No IPOCs or specific, measurable treatment goals and interventions were documented until March 2024. Although IPOCs were eventually developed that were not timely; the treatment plan lacked clear justification for the level of care and lacked clear discharge criteria. Additionally, the treatment plan was not significantly updated to address the patient's increased symptoms and maladaptive behaviors including frequent methamphetamine use and acquiring several RVRs during the review period. The patient was not referred, as was clinically indicated, to the ISUDT program; the quarterly IDTT meeting did not occur timely, and the CCI failed to attend both IDTT meetings. Additionally, the patient was not offered sufficient group hours.

**Patient Q**

This 45-year-old EOP patient's healthcare record was reviewed to assess the quality of care provided at SQ. The patient was provided diagnoses of unspecified depression and unspecified psychotic disorder. Upon arrival at the SQ EOP, the patient was prescribed Haldol, Effexor, and BuSpar. The patient arrived at SQ EOP from NKSP-RC on February 27, 2024.

The patient reported chronic auditory hallucinations and severe depression which significantly affected his functioning, social interactions, and sleep. He reported three previous suicide

attempts by overdose at ages 25, 27, and 43; none of the attempts required hospitalization. The patient was placed in the EOP upon arrival at CDCR in January 2024, and a January 25, 2024 SRASHE assessed high chronic risk and low acute suicide risk.

The initial psychiatric assessment occurred timely. The initial psychiatric assessment was completed on February 29, 2024, and the patient actively participated in the assessment. The psychiatrist provided a diagnosis of unspecified psychotic disorder. The patient reported ongoing auditory hallucinations which were not of a command nature. The patient indicated that his medication regimen was effective and was beneficial in improving his mood and sleep. The patient reported feeling safe in the SQ EOP environment but voiced anxiety concerning his upcoming release and the challenges of securing housing in the community.

The initial PC assessment also occurred timely, and the patient actively participated in the assessment. The clinical summary and case formulation were adequate and were updated appropriately. The PC assessment included appropriate clinical background and psychosocial information and was adequate to inform treatment.

The initial IDTT meeting did not occur until March 19, 2024. The meeting was attended by the assigned providers and CCI, and the patient was present. Notably, the treatment plan lacked specific problems, goals, objectives, or interventions, and no IPOCs were included. Despite identification as a high treatment refuser, the treatment team clarified that this was due to the patient’s limited treatment participation at the reception center; they noted that the patient’s group attendance rate at SQ was 92 percent. The level of care justification was adequate, and discharge criteria were generic but appropriate for the patient. The EOP functional evaluation indicated that no special accommodations were necessary. Both the PC and psychiatrist were present onsite for the IDTT meeting.

Throughout the review period, psychiatric contacts consistently occurred timely, and the patient was offered confidential clinical contacts. The patient maintained stability and did not request psychotropic medication adjustments. In late May 2024, the patient began taking Suboxone, which he reported as beneficial. The psychiatric progress notes indicated good collaboration between the patient and psychiatrist, and the patient remained psychiatrically stable throughout the review period.

The PC contacts occurred timely and were provided a confidential setting; although the patient occasionally declined to attend confidential sessions and was seen at cell front. The PC contacts were thoroughly and meticulously documented. The PC actively engaged in several interventions with the patient which focused on helping the patient improve his coping skills despite the absence of IPOCs and interventions in the treatment plan. The interventions noted in the progress notes included motivational interviewing, psychoeducation, cognitive reframing, validation, coping skills development, and relapse prevention. Specific efforts were made to address the patient’s auditory hallucinations, depressed mood, and history of alcohol use problems. Self-esteem building exercises were also incorporated. The PC supplied the patient with clinically relevant handouts and worksheets. The patient implemented several interventions such as listening to music to mitigate the impact and intensity of his auditory hallucinations, beginning a regular meditation practice, and maintaining a thought journal. In mid-May 2024,

the patient was found with another patient's Suboxone and received a RVR. He was subsequently referred to the MAT program to be prescribed Suboxone prior to his prison release. The patient was also provided an adequate prerelease assessment six weeks prior to his release from prison.

The documentation indicated that the patient was offered between two to five group sessions weekly during the review period. The topics covered in those groups were clinically appropriate. While most of the sessions were facilitated by recreational therapists, the patient also participated in groups led by psychology interns and residents. The patient reported to his PC that the group sessions were effective and beneficial. His group attendance was generally good, and the patient attended more than 50 percent of the offered group sessions. He attended all his offered groups for several weeks during the review period.

**Findings**

The care and treatment provided to this patient were adequate.

Deficiencies, however, were noted in the treatment planning documentation, and the initial IDTT meeting was slightly delayed.

The patient's stay at the SQ EOP was brief. Individual clinical contacts occurred timely and were well-documented, and the prescribed medications were effective with no changes made during the review period. Despite the absence of an adequate treatment plan and a delayed initial IDTT meeting, the PC otherwise provided excellent care to the patient. Appropriate interventions were developed, documented, and modified as the patient responded to treatment, and supplementary materials were provided to work on between PC sessions. Each contact was meticulously documented with documentation of the interventions provided as well as the patient's response to treatment. Additionally, appropriate referrals and prerelease planning were offered to ensure continuity of care upon prison release.

**Patient R**

This 41-year-old EOP patient's healthcare record was reviewed to assess the quality of care provided at SQ. Upon arrival at the SQ EOP, the patient was provided diagnoses of antisocial personality disorder; chronic schizoaffective disorder; schizophrenia, paranoid type; and substance-induced mood disorder. He was prescribed Invega Sustenna and Vistaril and was housed in the H unit. The patient arrived at SQ EOP on February 22, 2024, after he transferred from NKSP-RC.

The patient had a history of five prior CDCR terms, and he had received mental health services at the 3CMS, EOP, and MHCB levels of care. Additionally, the patient had type 2 diabetes. A SRASHE on February 27, 2024 assessed high chronic risk due to two documented suicide attempts between 1998 and 2000. His acute risk was assessed as moderate, and the assessment noted good protective factors and adequate ADLs but also noted ongoing command auditory and visual hallucinations.

The initial psychiatric assessment occurred on the same day as the initial IDTT meeting on March 5, 2024, and it was unclear if the assessment was conducted during the initial IDTT meeting. The assessment included a comprehensive review of the patient's clinical and psychosocial history. The patient reported a long history of treatment for psychosis, auditory hallucinations, and visual hallucinations. The patient and psychiatrist collaboratively reviewed the patient's medication history.

The initial PC assessment occurred timely on February 27, 2024 with active participation from the patient. The patient reported that his chief complaints were auditory and visual hallucinations which were often accompanied by suicidal and homicidal ideation. The patient reported that medications had been effective in alleviating those symptoms. An EOP functional evaluation was completed that indicated that the patient was unable to work in hot weather or conditions due to heat sensitive medications. Much of the clinical summary was pulled forward from the previous IDTT at NKSP-RC, and several sections of the clinical summary and case formulation were incomplete and/or not updated to reflect the patient's current status.

The initial IDTT meeting was the only treatment team meeting that occurred during the review period, and the required quarterly IDTT meeting in June 2024 did not occur. The initial IDTT meeting occurred timely on March 5, 2024, and the patient, his assigned clinicians, and CCI were in attendance. The clinical summary and case formulation were inappropriately carried forward unchanged from the reception center, and the Safety Planning section was incomplete and inadequately documented. That section initially indicated that the patient did not require a safety plan; however, subsequently detailed a specific safety plan provided on February 27, 2024 which was adequate and tailored to the patient. The patient was not a participant in the SRMP, and no indicators for consideration of referral to a higher level of care were identified. The treatment plan included one IPOC for negative symptoms which was initiated on November 30, 2022 during a prior incarceration and had not been updated since. Furthermore, the treatment plan lacked defined problems, objectives, goals, and interventions. Additionally, the treatment plan did not include a justification for the level of care or discharge criteria.

During the review period, psychiatric contacts occurred timely and were consistently offered monthly. Despite being offered a confidential clinical contact, the patient preferred to meet with the psychiatrist in the day room. Medication adjustments were made collaboratively; those adjustments included an increase in Vistaril for anxiety and the addition of Trilafon prn to augment Invega Sustenna. Progress notes were appropriately updated at each contact and indicated that the patient remained stable. The patient responded well to the medication regimen with no adverse or negative side effects reported.

During the review period, the PC provided timely weekly contacts. The patient was offered confidential contacts, but he chose to meet with the PC in the dormitory. The PC provided diagnoses of schizophrenia, paranoid type; antisocial personality disorder; and substance-induced mood disorder. The PC progress notes were inadequate, and the PC frequently carried forward the subjective section, interventions, and response to interventions for consecutive weeks without updates. A progress note indicated that an IPOC for hallucinations was added on March 5, 2024 with goals that included complete remission of the patient's chronic auditory hallucinations. The patient reported continuous auditory and visual hallucinations since age 13, despite numerous

medication trials, and he reported that the hallucinations were manageable with medication. The patient was enrolled and waitlisted for GED, ISUDT, and RAC classes. He was at times described as delusional and paranoid during PC contacts, but he was easily redirected. The patient appeared engaged and motivated towards treatment. The PC provided a three-week notice regarding a change in clinicians and processed termination and transfer issues appropriately. The new PC conducted a thorough initial assessment, obtained appropriate information, and established rapport with the patient. Continuity of care and treatment interventions were appropriately provided, and the interventions were appropriate despite the lack of specific interventions and goals in the treatment plan.

The patient was consistently offered between four to seven group sessions weekly, and he demonstrated consistent attendance. The group topics were clinically relevant and included introduction to EOP, DBT, and recreational therapy. Two groups were facilitated by recreational therapists, and one group was facilitated by a PC.

It appeared that the patient remained at his clinical baseline during the review period, was engaged and motivated towards treatment, and he consistently met for individual sessions with his treatment providers.

**Findings**

The care and treatment provided to this patient were inadequate.

There were significant documentation deficiencies in treatment planning and PC progress notes.

The documentation indicated that the patient maintained stability, established good rapport with his clinicians, and actively participated in mental health treatment and other programs. The PC and psychiatrist provided appropriate care and effectively addressed the patient's concerns during individual contacts. However, there were significant documentation deficiencies that adversely affected the overall quality and continuity of care. Specifically, the inadequacies in treatment planning documentation, the lack of timely quarterly IDTT meetings, and severely inadequate PC progress notes resulted in overall inadequate treatment.

**Patient S**

This 54-year-old EOP patient's healthcare record was reviewed to assess the quality of care provided at SQ. The patient was provided a diagnosis of adjustment disorder with mixed anxiety and depressed mood. He was prescribed Prozac and Abilify while at SQ. The patient transferred to the SQ EOP from NKSP-RC on February 15, 2024.

He had received mental health services at the MHCB and EOP levels of care. Additionally, the patient experienced significant medical concerns, particularly related to his left eye, left leg, and back pain. It was noted that he was scheduled for release from prison in November 2024.

The patient arrived at CDCR for his first prison term in December 2023. He was housed in the H unit at SQ. The initial psychiatric assessment occurred timely with active participation from the

patient. The patient reported no significant history of mental health concerns or treatment prior to incarceration. He had no self-harm history prior to the incident in December 2023 that led to his MHCB admission shortly after his arrival to CDCR. During that incident, the patient superficially cut his neck and wrists and expressed fear for his safety due to gang members in his housing unit. It was noted that the patient was not medication adherent, and he reported that Zyprexa worsened his sciatic pain. Consequently, he agreed to switch to Abilify while continuing Prozac, which he found beneficial. The patient denied suicidal or homicidal ideation. The psychiatrist noted that the most recent SRASHE on January 17, 2024 assessed low chronic and acute suicide risk. The patient reported symptoms of depression, auditory and visual hallucinations.

The initial PC assessment also occurred timely on February 16, 2024, and the patient participated in the assessment. Although the assessment was thoroughly completed by hand and scanned into the patient's healthcare record; the electronic form was not completed, and it was unclear which PC completed the initial assessment. Nonetheless, the assessment was informative and comprehensive.

The initial IDTT meeting occurred one month after the patient's transfer to SQ. The assigned clinicians and the patient were present at the meeting. The clinical summary and case formulation were updated appropriately, and the case formulation included an adequate level of care justification. The overall treatment plan was inadequate, as there were no IPOCs included, and the problems, objectives, goals, and interventions appeared to be inappropriately carried forward from the MHCB treatment plan rather than updated to reflect the current EOP level of care. The discharge criteria were generalized and not individualized. No higher level of care indicators were identified. An individualized and appropriate safety plan was reviewed during the IDTT meeting. An EOP functional evaluation was completed which indicated that the patient did not require mental health accommodations. Both the PC and psychiatrist were present onsite for the IDTT meeting. There was no documentation that a quarterly IDTT meeting occurred as required in June 2024.

Throughout the review period, psychiatric contacts generally occurred timely and were consistently offered monthly. Although offered confidential sessions, the patient frequently declined and chose to meet in the day room. His medication regimen remained unchanged from the initial psychiatric assessment. The patient reported a reduction in auditory hallucinations and the elimination of visual hallucinations. The psychiatric progress notes indicated that the patient maintained a stable and euthymic mood during the review period.

PC contacts were provided every seven to ten days, and the patient attended all sessions in a confidential setting. The PC appropriately documented the patient's subjective reports, treatment progress, mental status, interventions, and plans with minimal information carried forward. The patient's mood was primarily affected by his physical health symptoms and concerns about providing for his family upon release from prison. The PC noted that despite experiencing periods of increased anxiety, depression, and auditory hallucinations when stressed, the patient remained generally euthymic and stable. He was actively engaged in treatment, socialized with peers, and formed friendships within the unit. The patient reported several coping skills which

he utilized effectively and consistently. During the review period, he did not require any additional support or referrals.

The patient was offered a variety of groups including a DBT group facilitated by a psychology extern, an art group, an introduction to EOP group, and recreational therapy leisure groups. The documentation indicated that the patient consistently attended and was engaged during group therapy. The assigned groups were not individualized for the patient's treatment needs.

A 90-day MHCB discharge SRASHE was completed on April 14, 2024 which assessed the patient with low chronic and acute suicide risk.

**Findings**

The care and treatment provided to this patient were inadequate.

Although the patient presented with stability and had a positive response to medications and treatment interventions; the overall treatment was inadequate due to several factors. The initial IDTT meeting was delayed by two weeks, the treatment plan failed to include any IPOCs or indicators to track treatment progress appropriately, and the specified problems, objectives, goals, or interventions were carried over from a previous MHCB IDTT and were not updated to reflect the patient's EOP goals and functioning. Furthermore, the treatment goals outlined in the discharge criteria were generalized and not tailored to the patient, and a quarterly IDTT meeting did not occur in June 2024 as required. Despite those deficiencies, the patient received appropriate and attentive care during individual contacts with providers. The routine contacts were both timely and well-documented, and the patient actively collaborated with his providers. The patient effectively processed stressors and developed coping skills with the PC and worked with his psychiatrist regarding medication management. Additionally, the patient participated in most offered group sessions, which appeared to aid in coping skills development.

**Patient T**

This 24-year-old EOP patient's healthcare record was reviewed to assess the quality of care provided at SQ. The patient was provided diagnoses of adjustment disorder, antisocial personality disorder, mild alcohol use disorder, and moderate cannabis use disorder. He was prescribed Depakote and Zyprexa. The patient transferred to the SQ EOP from the 3CMS level of care on March 21, 2024.

The patient arrived at SQ on January 28, 2024, and was placed at the EOP level of care on March 21, 2024. He was admitted to the SQ MHCB from April 9 to April 19, 2024 due to suicidal ideation linked to grief over his brother's death. He previously received mental health services at the 3CMS and MHCB levels of care before his current EOP placement.

The initial psychiatric assessment was delayed until April 30, 2024 after the patient's return from the SQ MHCB. The assessment provided a comprehensive review of the patient's clinical history from both CDCR and the community. The psychiatrist noted that the patient's recent MHCB admission was due to significant stressors, including the recent deaths of his mother from

an overdose and his younger brother from a shooting. The patient's Zyprexa and Depakote were continued without changes. The overall assessment was thorough and well-documented.

The initial PC assessment was provided timely on April 3, 2024, and the patient actively participated. During that assessment, the patient reported auditory and visual hallucinations since 2023, but he denied mood symptoms or substance use difficulties. The assessment indicated that the patient had a history of reporting suicidal ideation when acutely stressed, which he quickly recanted. He had no history of self-injurious behavior. The EOP functional evaluation highlighted the patient's challenges in appropriately responding to coworkers and supervisors and recommended redirection to deescalate when agitated. The clinical summary was updated accordingly and noted the patient's labile mood and impulsivity.

The patient was placed at the EOP level of care at his March 21, 2024 IDTT meeting. The meeting was attended by the assigned clinicians, CCI, and the patient. The patient refused to attend the initial EOP IDTT meeting on April 30, 2024 after discharge from the MHCB. The IDTT was appropriately staffed, and the assigned providers and CCI were present. The patient's strengths and verbalized treatment goals were not documented, and no IPOCs were included in the treatment plan. The problem list, objectives, long-term goals, and interventions were documented and were individualized. The identified problems included grief, difficulty in managing crisis-provoking situations, hallucinations, and substance abuse. Interventions including grief counseling, DBT coaching and groups, psychoeducation on managing maladaptive auditory hallucination content, and strategies to cope with impulsive behavior were provided. The level of care justification was adequate, and the discharge criteria were generalized but appropriate. An adequate safety plan was developed.

The patient was seen timely for individual psychiatric contacts in a confidential setting. His diagnosis was updated to unspecified mood disorder. He was described as generally stable and demonstrated appropriate benefit from the prescribed medications. Depakote was, however, discontinued on June 18, 2024 after the patient reported nausea as a side effect. The patient was provided another initial assessment when he was assigned a new psychiatrist on May 31, 2024, when treatment teams were reassigned. The updated initial psychiatric assessment was well documented by the new psychiatrist.

Individual PC contacts occurred timely and were offered in a confidential setting; although, the patient preferred to meet in the day room. The PC progress notes were well documented and included both subjective and objective reports, assessments, and plans; all of which were consistently updated at each contact. The PC noted therapeutically appropriate interventions that aligned with the treatment plan, and the interventions carried forward from the MHCB and the patient's progress were documented appropriately. The PC also documented effective collaboration with the psychiatrist. A strong rapport was developed between the PC and the patient, and the session content included discussion of sensitive and challenging topics.

The patient's group attendance was poor. The patient was typically offered between one to three group sessions weekly, and two of the three sessions were recreational therapy groups. The group assignments, however, did not consistently align with the patient's treatment plan. Notably, the patient was not provided with opportunities to participate in DBT groups or coping

skills groups. Instead, he primarily was assigned to recreational therapy leisure groups which mainly involved watching movies.

There were several notable events during the review period. The patient received appropriate five-day follow-up contacts after he was discharged from the MHCB on April 19, 2024. On May 26, 2024, the patient was placed into alternative housing when he reported suicidal thoughts after the death of his godmother. The patient was assessed by a psychiatrist; he declined MHCB care and requested to return to his dormitory on May 27, 2024. A SRASHE was completed that assessed low to moderate chronic and low acute suicide risk.

**Findings**

The care and treatment provided to this patient were adequate.

The clinical contacts with both the PC and the psychiatrist were adequate and well-documented. The patient showed a positive response to his prescribed psychotropic medications, and there was good collaboration between the psychiatrist and the patient. The PC provided the interventions outlined in the treatment plan, such as grief counseling and the development of coping skills. The patient remained generally stable throughout the review period, despite several significant consecutive stressors.

Although the overall treatment was adequate; deficiencies were noted. Several sections of the treatment plan were not completed, and the initial psychiatric assessment was delayed. Additionally, the offered group therapy sessions were not individualized for the patient and were inadequate in frequency. It is likely that the patient's group attendance was negatively impacted by those deficiencies.

**Patient U**

This 23-year-old EOP patient's healthcare record was reviewed to assess the quality of care provided at SQ. The patient was provided a diagnosis of adjustment disorder with depressed mood; however, previous diagnoses included unspecified schizophrenia and other psychotic disorders. The patient received his psychotropic medications by a PC 2602 order that was granted on February 29, 2024. He was prescribed clonidine, Vistaril, risperidone, Remeron and Zyprexa prn. The patient arrived at SQ EOP on April 25, 2024.

The patient had received mental health services at the 3CMS, EOP, MHCB, and APP levels of care, and he was hospitalized at the CMF PIP at the acute level of care immediately prior to EOP placement at SQ. The most recent SRASHE assessed the patient with low acute and chronic suicide risk. He also had significant medical conditions including hyperlipidemia and syphilis.

The patient received timely and appropriately documented five-day follow-up contacts after his arrival. The initial PC and psychiatric assessments were documented, but the initial psychiatric assessment did not occur timely. The initial psychiatric assessment occurred on May 23, 2024, approximately one month after his arrival to the SQ EOP and nine days after the initial IDTT meeting. The assessment occurred in the dayroom after the patient declined a confidential

session, and the patient participated in the assessment. The patient reported stable mood and uncertainty about the effectiveness of his medications on symptoms. The assessment was thorough and well-documented, and no changes were made to the patient's medications. He was reportedly medication adherent.

The initial PC assessment occurred timely on May 9, 2024, and the patient again declined to attend a confidential session. This assessment was comprehensive and appropriately documented, and updates were made to the clinical summary and case formulation. The PC provided diagnoses of schizophrenia and major depressive disorder, recurrent, moderate episode, with identification of a primary treatment goal to clarify the diagnosis between schizophrenia and major depressive disorder with psychotic features. The PC planned to use CBT to address the patient's depressive symptoms. The patient denied psychotic symptoms but acknowledged a long history of depression.

The initial IDTT meeting was delayed and occurred on May 14, 2024. The meeting included the patient and assigned clinicians; although, the CCI was absent. The patient was described as engaged and receptive to treatment. No IPOCs were provided in the treatment plan. The patient reported a treatment goal of addressing depressive symptoms, but the treatment plan lacked specific problems, objectives, and interventions in the designated section. Those elements were included in the Discharge Plan/Reason for Retention section of the treatment plan, and the treatment goals and interventions were appropriate and individualized to the patient's needs. No higher level of care indicators were identified, and the patient expressed enthusiasm to participate in programming. The level of care justification was appropriately documented, and the overall treatment planning process was adequate despite the absence of IPOCs.

The monthly psychiatric contacts following the initial assessment occurred timely and were offered in a confidential setting; however, the patient declined to attend sessions in a confidential setting. The patient reported concerns about weight gain and oversedation related to his psychotropic medications. In response, the psychiatrist decided to taper and discontinue clonidine, and Remeron was also discontinued due to nonadherence. Risperdal was maintained at the current dosage. The psychiatrist also noted that the patient might be suitable for the 3CMS level of care after his medications were stabilized, as it was noted that the patient had limited engagement in EOP groups and lack of commitment to therapeutic goal setting.

The patient was consistently seen weekly for PC contacts during the review period. The PC contacts were offered in a confidential setting except one session that occurred in the dayroom after the patient missed the scheduled appointment. The PC established good rapport with the patient, and the patient was described as stable without significant depressive symptoms. The patient demonstrated a future-oriented mindset and expressed interest in opportunities such as fire camp and vocational training. The patient was noted to consistently exhibit a flat affect and showed little interest in socializing, and the PC considered schizoid personality disorder as a primary diagnosis. By the end of the review period, the treatment team was considering discharging the patient to the 3CMS level of care at the next IDTT meeting scheduled in August 2024. The patient agreed with that plan.

The patient maintained regular contacts with his PC and psychiatrist but did not participate in group sessions. Initially, the patient attended the first two group sessions when he arrived at SQ EOP, but he did not attend subsequent groups during the review period. Although the patient was typically offered one to three group sessions weekly, there were several weeks during the review period when no group sessions were offered. The patient was not offered any core clinical groups and was only offered recreational therapy groups.

**Findings**

The care and treatment provided to this patient were adequate.

Overall, the care and treatment provided was adequate despite some deficiencies in the timeliness of the initial IDTT meeting and psychiatric assessment, and a lack of core clinical group offerings. The psychiatrist worked collaboratively with the patient regarding medication management and demonstrated a patient-centered and individualized approach to treatment planning. The PC worked with the patient to set relevant goals and implemented appropriate interventions tailored to the patient's presentation. The providers actively sought diagnostic clarification to support the treatment process and therapeutic interventions. Throughout the review period, the patient remained stable and future-oriented, and the treatment team appropriately considered discharge to the 3CMS level of care at the next IDTT meeting.

**Patient V**

This 33-year-old EOP patient's healthcare record was reviewed to assess the quality of care provided at SQ. His primary diagnosis was unspecified psychotic disorder, which had since been resolved according to the psychiatric progress notes. Additional diagnoses noted in the PC progress notes included adjustment disorder with anxiety; schizophrenia; and major depressive disorder, severe with psychotic features. The patient was not prescribed psychotropic medication since 2020. The patient arrived at the SQ EOP in June 2019.

The patient received mental health services at the EOP and MHCB levels of care.

During the review period, one IDTT meeting occurred that was identified as an "update" IDTT. Although the assigned clinicians and CCI attended the IDTT meeting, the patient declined to participate. Review of the treatment plan revealed several deficiencies. It was unclear if the clinical summary had been updated since the previous treatment plan, and the IPOCs for depressed mood and hallucinations that were initiated in 2020 had not been revised since 2023. The treatment plan was notably lacking in several key areas, including problems, objectives, goals, interventions, level of care justification, and discharge criteria. A quarterly IDTT meeting that was due in April 2024 was not documented.

Psychiatric contacts consistently occurred monthly as required. The contacts were offered in a confidential setting; although, the patient frequently declined to attend a session in a confidential setting. During each contact, the patient was described as stable and consistently denied experiencing any significant or intrusive symptoms. The patient also reported benefitting from participating in EOP groups and his PC contacts.

The PC contacts generally occurred timely; however, there were some weeks where the patient was not offered a PC contact. The PC progress notes were poorly documented and were severely inadequate. Specifically, the content of the progress notes was carried forward previous entries that were supplemented by only a brief, one-sentence subjective update from the patient. The progress notes lacked any information or updates regarding the provision of interventions or treatment goals for the patient. It was unclear whether the contacts were provided in a confidential setting.

The patient actively participated in NLTG groups during January and February 2024; however, his attendance at EOP groups was inconsistent. Throughout the review period, the patient was offered between one to five group sessions weekly, but for one week in May 2024; no groups were offered. The documentation of those groups was also inadequate, as the specific topics or focus of the sessions were frequently not clearly identified in the group progress notes.

**Findings**

The care and treatment provided to this patient were inadequate.

Treatment planning was severely inadequate and incomplete, and did not include essential elements such as treatment goals, interventions, level of care justification, and discharge criteria. Additionally, the IPOCs were outdated, and most of the treatment plan content was carried forward from previous documents. The required quarterly IDTT meeting did not occur in March 2024. The PC progress notes were severely inadequate, and most of the content was repetitively carried forward without substantive or clinically meaningful updates. Those progress notes did not provide sufficient information regarding the patient's clinical status or the clinical interventions and support provided to address his symptoms. Lastly, the group offerings were insufficient in both frequency and the range of topics covered.

**Patient W**

This 68-year-old EOP patient's healthcare record was reviewed to assess the quality of care provided at SQ. He was provided diagnoses of major depressive disorder and alcohol use disorder. He was prescribed Lexapro and Vistaril. The patient arrived at the SQ EOP on June 1, 2021, and was housed in the H unit during the review period. The patient remained at the EOP level of care since placement in the MHSDS on March 9, 2021.

A quarterly IDTT meeting occurred on January 23, 2024, but the subsequent quarterly IDTT meeting scheduled for April 2024 was not documented. The next IDTT meeting did not occur until July 23, 2024. The quarterly IDTT meeting on January 23, 2024 was attended by the assigned clinicians, but the patient did not attend. During the IDTT meeting, the PC and psychiatrist collaborated to address the patient's increased depressive symptoms. The treatment plan included 10 hours weekly group therapy, in addition to weekly contacts with the PC, and medication management with the psychiatrist. While the treatment goals and interventions were appropriately detailed in the clinical summary, they were not included in the "Treatment Plan" section. An IPOC for depressed mood was appropriately developed but lacked specific

interventions and progress indicators. No higher level of care indicators were identified, and the EOP functional evaluation suggested no accommodations were required. The level of care justification was brief but appropriate, but specific discharge criteria were not provided.

During the review period, psychiatric contacts initially occurred timely, but there was a lack of documentation of psychiatric contact from May 6, 2024 to the end of the review period on June 30, 2024. The psychiatric contacts occurred in a confidential setting unless the patient declined. The documentation of those contacts was thorough, and the patient's psychotropic medications remained unchanged during the review period. The documentation indicated that the patient remained generally stable.

PC contacts were not offered consistently, and there were several weeks during the review period when the patient was not offered a PC contact. PC contacts were offered in a confidential setting; although, the patient occasionally chose to meet in the dayroom instead. The documentation of those contacts was consistently adequate and provided appropriate updates on the patient's progress and functioning. The PC demonstrated effective collaboration with the psychiatrist and encouraged the patient to consult with the psychiatrist when his symptoms increased. The PC documented specific interventions including psychoeducation, interpersonal conflict resolution skills, techniques to challenge negative mindset, and strategies for building self-esteem. In mid-May 2024, the PC appropriately assessed an increase in depressive symptoms. The patient's mood fluctuated between euthymia and dysthymia, and the PC adjusted the treatment interventions accordingly.

The patient was offered a limited number of weekly group sessions, ranging from one to three weekly, and there were some weeks when no groups were offered. The documentation of group progress notes was inadequate, as the topics and focus of the groups were not clearly specified. Recreational therapists and psychology trainees facilitated the group sessions. The frequency and variety of topics covered in those groups were inadequate for the patient's clinical presentation and was inconsistent with the treatment plan which prescribed 10 hours of group sessions weekly.

**Findings**

The care and treatment provided to this patient were inadequate.

Clinical contacts did not occur timely. Specifically, the patient was not seen for a quarterly IDTT meeting between January 23, 2024, and July 23, 2024. The PC contacts did not consistently occur timely, and the patient was not offered PC contact for several non-consecutive weeks during the review period. Additionally, there was a lapse in psychiatric contact, as the patient was not seen for a psychiatric contact from May 6, 2024, until the end of the review period on June 30, 2024. The patient was not offered sufficient group therapy hours, and the group progress notes were inadequate and failed to clearly identify the topics discussed in the sessions.

**Patient X**

This 55-year-old EOP patient's healthcare record was reviewed to assess the quality of care provided at SQ. The patient was prescribed Seroquel, Zoloft, and melatonin. The patient was placed at the EOP level of care on April 12, 2023 due to an increase in depressed mood, racing thoughts, anger, and auditory hallucinations.

The patient was placed at SQ on March 24, 2022 at the 3CMS level of care with diagnoses of PTSD and major depressive disorder. His level of care increased to EOP on April 12, 2023. The patient had a history of treatment at the 3CMS and EOP levels of care.

On February 13, 2024, the patient participated in an IDTT meeting attended by an alternate PC and his assigned psychiatrist, but the CCI was not in attendance. Most of the treatment plan was carried forward unchanged from previous treatment plans. The patient was described as actively engaged in programming and effectively collaborated with both his PC and psychiatrist. The treatment plan included an IPOC addressing the patient's depressed mood, but it lacked updates or progress indicators. Additionally, the treatment plan section did not include any problems, objectives, goals, interventions, or progress update indicators. No higher level of care indicators were identified, and the EOP functional evaluation was completed appropriately. The required quarterly IDTT meeting in May 2024 did not occur, and the documentation indicated that the next IDTT did not occur until August 6, 2024.

Psychiatric contacts were offered in a confidential setting; however, there were notable lapses in contacts as the February 2024 contact occurred three weeks late, no contact occurred in March, and the May 2024 contact occurred two weeks late. Consequently, the patient was not seen for psychiatric contact for a six-week period. Despite those scheduling issues, the psychiatric contacts were generally well-documented and noted effective collaboration between the patient and psychiatrist. As the patient prepared for upcoming release, there was good continuity of care, and the psychiatrist noted the importance of the continuation of the patient's medications upon enrollment in a community program.

PC contacts occurred timely and were generally offered in a confidential setting. The PC established good rapport with the patient; however, the documentation of PC contacts was severely inadequate. The progress notes primarily consisted of repeated and carried forward subjective observations and lacked substantive updates regarding the treatment plan, interventions provided, and responses to treatment.

The patient was offered three to five group sessions weekly. Although the specific topics of those groups were not explicitly detailed in the progress notes, the comments section provided some limited insight into the themes discussed during each session. The group sessions were facilitated by PCs and recreational therapists. The themes of the groups were appropriate, and the patient consistently showed good attendance and active engagement.

**Findings**

The care and treatment provided to this patient were inadequate.

Concerns were noted regarding treatment planning and documentation. The IDTT meetings were notably inadequate, as they did not include the necessary participants, and a significant portion of the treatment plans were carried forward from previous IDTT meetings without updates to reflect the patient's current clinical status or needs. Additionally, IPOCs were not updated appropriately which compromised the quality of patient care. It was also noted that the required quarterly IDTT meeting in May 2024 did not occur, and the next IDTT meeting did not occur until August 6, 2024. Individual PC contacts were also very poorly documented, and most of the PC progress notes were inappropriately pulled forward without substantive updates and did not indicate whether the session content aligned with the treatment plan or treatment goals.

**Patient Y**

This 47-year-old EOP patient's healthcare record was reviewed to assess the quality of care provided at SQ. The patient was provided a diagnosis of schizoaffective disorder, depressed type, and he demonstrated both positive and negative symptoms including isolation, hypersomnia, poor insight, auditory hallucinations, and delusional thinking. The patient was prescribed Thorazine, Haldol, Cogentin, Remeron, and prazosin. The patient arrived at SQ EOP from NKSP-RC on January 25, 2024.

He had no history of substance abuse or self-injurious behavior, and he was assessed with moderate chronic suicide risk and low acute risk. The patient had a history of receiving mental health services at the 3CMS, EOP, and MHCB levels of care. During his stay at the SQ EOP, the patient was housed in the H unit.

On January 30, 2024, the patient was seen for a routine psychiatric contact rather than a comprehensive initial psychiatric assessment. During that contact, the patient was described as stable, and no medication changes occurred. The patient reported that his prescribed medications were effective, and he denied any side effects. He acknowledged ongoing command auditory hallucinations, but he reported that they were manageable and nonintrusive. Additionally, the patient denied any suicidal or homicidal ideation.

The initial PC assessment occurred timely on February 1, 2024, and the patient actively participated in the assessment; however, the assessment was incomplete, inadequate, and critical sections such as the presenting problem, clinical summary, and factors affecting treatment were not provided. Much of the assessment content was carried forward from previous records; this lack of current clinical information highlighted the need for a more thorough evaluation to indicate the patient's current presentation and treatment needs.

The patient was seen for a timely initial IDTT meeting on February 6, 2024. He was seen for a "special" IDTT on March 19, 2024; however, the quarterly IDTT that was due on or before May 6, 2024 was not documented. The March 19, 2024 IDTT meeting was specifically noted as being "strictly held in regard to the MCRP program." Both IDTT meetings included the assigned clinicians, but neither included a CCI. The patient attended the initial IDTT meeting on February 6, 2024 but did not attend the March 19, 2024 IDTT meeting. The initial treatment plan was inadequate, as it lacked essential components such as treatment goals, interventions,

recent IPOCs, level of care justification, discharge criteria, and an updated clinical summary. The patient was identified as a high treatment refuser; although, it was noted that he was medication adherent, psychiatrically stable, and willing to engage in individual sessions with his PC and psychiatrist.

The psychiatric contacts occurred timely, were offered in a confidential setting, and were appropriately documented. The mental status and subjective reports were consistently updated, and the patient was described as stable during the review period without medication changes. Additionally, the patient seemed to respond positively to the transition to a new psychiatrist in June 2024, when treatment teams were reassigned.

The patient was seen for generally timely PC sessions with limited instances of missed weekly contacts. Most interactions occurred in a confidential setting, and the PC had good rapport with the patient. Progress notes were very well documented and provided relevant and current information which helped to inform and guide treatment. The PC implemented clinically appropriate interventions, and the PC sessions focused on skills development and coping strategies. The PC noted the patient's fluctuating group attendance that ranged from 21 to 87 percent during the review period. The patient attributed his inconsistent attendance to confusion regarding group scheduling. The topics discussed in the groups were not clearly identified in the documentation which may have contributed to the patient's inconsistent attendance. Recreational therapists and psychology trainees facilitated the groups.

**Findings**

The care and treatment provided to this patient were inadequate.

Deficiencies were noted in treatment planning documentation and the timeliness of IDTT meetings. Although the patient maintained stability and showed signs of benefitting from contacts with his PC and psychiatrist, the overall treatment was inadequate due to severely inadequate treatment planning documentation and a failure to update the treatment plan to reflect the patient's current functioning and clinical needs. The treatment plans were markedly deficient due to a lack of specific and current treatment goals, interventions, IPOCs, level of care justification, discharge criteria, and updated clinical summaries. Additionally, the patient was not seen for a required quarterly IDTT meeting on or before May 6, 2024.