**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF CALIFORNIA**

**RALPH COLEMAN, et al.,**

**Plaintiffs.**

**v.** **No. 2:90-cv-0520 KJM-SCR**

**GAVIN NEWSOM, et al.,**

**Defendants.**

# THIRTY-FIRST ROUND MONITORING REPORT – PART A: SPECIAL MASTER'S MONITORING REPORT ON THE INPATIENT MENTAL HEALTH CARE PROGRAMS AT THE CALIFORNIA DEPARTMENT OF STATE HOSPITALS AND CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION PSYCHIATRIC INPATIENT PROGRAMS

Matthew A. Lopes, Jr., Esq.
Special Master
PANNONE LOPES DEVEREAUX & O'GARA LLC
Northwoods Office Park, Suite 215-N
1301 Atwood Avenue
Johnston, RI 02908
(401) 824-5100
Fax: (401) 824-5123
July 30, 2025

# TABLE OF CONTENTS

THIRTY-FIRST ROUND MONITORING REPORT PART A: SPECIAL MASTER'S REPORT ON THE INPATIENT MENTAL HEALTH PROGRAMS FOR *COLEMAN* PATIENTS ..... 1

INTRODUCTION ..... 1

Defendants' Response to the Draft Report ..... 4

CDCR Objections ..... 11

DSH Objections ..... 17

PART I ..... 29

A. UPDATE ON THE STATE OF ACCESS TO MENTAL HEALTH INPATIENT CARE FOR *COLEMAN* CLASS MEMBERS ..... 29

1. Least Restrictive Housing and the DSH Trial Processes ..... 30

2. PIP Staffing Plan ..... 31

3. PIP Minimum Treatment Standards ..... 32

4. CDCR's Plan to Close More Than 300 PIP and MHCB Beds ..... 33

B. AREAS OF FOCUS: ISSUES DEFENDANTS NEED TO ADDRESS REGARDING INPATIENT CARE ..... 38

1. Staffing Vacancies ..... 38

2. Referrals and Transfers ..... 44

3. Least Restrictive Housing (LRH) Placements ..... 49

4. Access to DSH Hospitals ..... 56

5. Clinical Services and Treatment in Inpatient Programs ..... 62

PART II. THE SPECIAL MASTER'S FINDINGS AT THE DEPARTMENT OF STATE HOSPITALS ..... 66

A. CENSUS ..... 66

B. STAFFING ..... 67

C. TREATMENT AND CLINICAL SERVICES ..... 70

1. Interdisciplinary Treatment Teams (IDTTs) ........ 70

2. Group Therapy ........ 71

3. Individual Treatment ........ 72

4. Psychiatric Services ........ 73

5. Medication Management ........ 75

a. Clozapine ........ 78

b. PC 2602 Involuntary Medications ........ 78

c. Prescriptions and Verbal Orders ........ 80

d. Non-Formulary Medications ........ 80

e. Polypharmacy Reviews ........ 81

g. Concerns Surrounding Patient Discharge and Collaboration between DSH and CDCR ........ 82

6. Other Treatment Issues ........ 83

a. Behavioral Management ........ 83

b. Pre-release Planning ........ 83

c. Access to Meaningful Jobs and Educational Opportunities ........ 83

D. QUALITY OF CARE IN DEPARTMENT OF STATE HOSPITALS ........ 84

1. Overall Quality of Care ........ 84

2. Treatment Planning ........ 85

3. Treatment Delivery ........ 88

4. Diagnostic Concerns ........ 89

5. Clinical Documentation Issues ........ 90

6. Suicide Risk Assessment ........ 91

7. Discharge Concerns ........ 92

8. Additional Concerns ........ 93

E. SUICIDE PREVENTION ........ 94

F. PATIENT ACCESS TO TREATMENT ........ 95

G. REFERRALS ........ 96

H. TRANSFERS, ADMISSIONS, AND DISCHARGES ........ 96

I. PATIENT DISCIPLINARY PROCESS AND THE USE OF FORCE ........ 97

1. Patient Disciplinary Process ........ 97

2. Use of Force ........ 98

J. UNUSUAL OCCURRENCES/SERIOUS INCIDENTS/ NEAR MISSES/ SENTINEL EVENTS ........ 99

K. USE OF OBSERVATION CELLS/ROOMS, SECLUSION, AND RESTRAINT ........ 100

L. EMERGENCY RESPONSE AND THE DEATH REVIEW PROCESS ........ 101

M. QUALITY MANAGEMENT AND UTILIZATION REVIEW ........ 101

N. PATIENT COMPLAINTS/PATIENT SATISFACTION ........ 103

O. *COLEMAN* POSTINGS ........ 103

P. LAUNDRY AND SUPPLIES ISSUES ........ 104

Q. VISITATION ........ 104

R. LAW LIBRARY ACCESS ........ 105

S. MILESTONE CREDITS ........ 106

PART III. THE SPECIAL MASTER'S FINDINGS AT THE PSYCHIATRIC INPATIENT PROGRAMS ........ 106

A. STAFFING ........ 106

B. TREATMENT AND CLINICAL SERVICES ........ 111

1. IDTTs ........ 111

2. Group Treatment ........ 113

3. Individual Treatment ........ 116

4. Behavioral Management ........ 119

5. Solo Programming ........ 121

C. Quality of Care ..... 121

1. Interdisciplinary Treatment Team (IDTT) Processes and Treatment Planning ..... 123

2. Treatment Delivery ..... 127

3. Diagnostic Concerns ..... 129

4. Clinical Documentation ..... 130

5. Suicide Risk Evaluations and Safety Planning ..... 132

6. Concerns Regarding Suicide Watch and Suicide Precautions ..... 132

7. Medication Concerns at CMF-PIP and CHCF-PIP ..... 133

D. MEDICATION MANAGEMENT ..... 134

E. PATIENT ACCESS TO TREATMENT ..... 142

F. REFERRALS AND TRANSFERS ..... 144

G. ADMISSIONS AND DISCHARGES ..... 146

H. LEAST RESTRICTIVE HOUSING ..... 147

I. PATIENT DISCIPLINARY PROCESS AND THE USE OF FORCE ..... 148

J. USE OF OBSERVATION CELLS/ROOMS, SECLUSION, AND RESTRAINTS ..... 154

K. EMERGENCY RESPONSE AND THE DEATH REVIEW PROCESS ..... 155

L. QUALITY MANAGEMENT AND UTILIZATION REVIEW ..... 157

M. PATIENT COMPLAINTS/PATIENT SATISFACTION ..... 161

N. CUSTODY AND MENTAL HEALTH PARTNERSHIP PLAN ..... 162

O. *COLEMAN* POSTINGS ..... 165

P. LAUNDRY AND SUPPLY ISSUES ..... 166

Q. PROPERTY/VISITATION/PRIVILEGES/TELEPHONE ACCESS ..... 167

R. LAW LIBRARY ACCESS ..... 169

S. PRE-RELEASE PLANNING ..... 171

T. PROGRAM ACCESS ..... 174

U. EDUCATION ........ 175

CONCLUSION ........ 176

RECOMMENDATION ........ 180

APPENDIX A1 Atascadero State Hospital (DSH – Atascadero) ........ 182

APPENDIX A2 Coalinga State Hospital (DSH – Coalinga) ........ 206

APPENDIX A3 Patton State Hospitals (DSH – Patton) ........ 232

APPENDIX B1 California Medical Facility (CMF-PIP) ........ 249

APPENDIX B2 Salinas Valley State Prison (SVSP-PIP) ........ 294

APPENDIX B3 California Health Care Facility (CHCF – PIP) ........ 334

APPENDIX B4 California Institution For Women (CIW-PIP) ........ 387

APPENDIX B5 San Quentin Rehabilitation Center (SQ-PIP) ........ 412

APPENDIX C1 Atascadero State Hospital (DSH – Atascadero) ........ 433

APPENDIX C2 Coalinga State Hospital (DSH – Coalinga) ........ 503

APPENDIX C3 Patton State Hospital (DSH – Patton) ........ 550

APPENDIX D1 California Medical Facility (CMF-PIP) ........ 584

APPENDIX D2 Salinas Valley State Prison (SVSP-PIP) ........ 639

APPENDIX D3 California Health Care Facility (CHCF – PIP) ........ 669

APPENDIX D4 California Institution For Women (CIW-PIP) ........ 720

APPENDIX D5 San Quentin Rehabilitation Center (SQ-PIP) ........ 745

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF CALIFORNIA**

**RALPH COLEMAN, et al.,**

**Plaintiffs,**

**v.** **No. 2:90-cv-0520 KJM-SCR**

**GAVIN NEWSOM, et al.,**

**Defendants.**

# THIRTY-FIRST ROUND MONITORING REPORT PART A: SPECIAL MASTER'S REPORT ON THE INPATIENT MENTAL HEALTH PROGRAMS FOR *COLEMAN* PATIENTS

## INTRODUCTION

This Report encompasses the Special Master's review of the inpatient mental health care programs at three California Department of State Hospitals facilities with *Coleman*-designated beds (Atascadero State Hospital (DSH-Atascadero); Coalinga State Hospital (DSH-Coalinga); and Patton State Hospital (DSH-Patton)) as well as the five Psychiatric Inpatient Programs (PIPs) housed within California Department of Corrections and Rehabilitation (CDCR) prisons: California Medical Facility Psychiatric Inpatient Program (CMF-PIP); California Health Care Facility Psychiatric Inpatient Program (CHCF-PIP); Salinas Valley State Prison Psychiatric Inpatient Program (SVSP-PIP); California Institution for Women Psychiatric Inpatient Program (CIW-PIP); and San Quentin Rehabilitation Center Psychiatric Inpatient Program (SQ-PIP).

The Special Master conducted full scale on-site monitoring tours of CMF-PIP, CHCF-PIP, and SVSP-PIP, referred to in prior reports as the three "Lift and Shift" PIPs,[1] and conducted paper reviews of CIW-PIP, SQ-PIP and the three DSH hospitals with *Coleman*-designated beds.

For these inpatient programs, the monitoring focus areas were:

- Mental Health Staffing
- Treatment and Clinical Services
- Quality of Care
- Medication Management
- Patient Access to Treatment
- Referrals and Transfers
- Admissions and Discharges
- Least Restrictive Housing
- Patient Disciplinary Process and Use of Force
- Use of Observation Cells/Rooms, Seclusion, and Restraints
- Emergency Response and the Death Review Process
- Quality Management
- Patient Satisfaction
- Custody and Mental Health Partnership Plan
- *Coleman* Postings

[1] Similar to the two preceding reviews of the PIPs, this report distinguishes between the Lift-and-Shift PIPs (CMF-PIP, CHCF-PIP, and SVSP-PIP) and the CDCR-developed PIPs (CIW-PIP and SQ-PIP). Prior to 2017, DSH operated CMF-PIP, CHCF-PIP, and SVSP-PIP within the confines of these prisons; management of these inpatient programs transferred to CDCR in July 2017. *See generally* Special Master's 2018 Inpatient Report, ECF No. 5894 at 13-16. In contrast, CDCR developed and operated CIW-PIP and SQ-PIP, hence they are referred to as the CDCR-developed PIPs.

- Laundry and Supply Issues
- Property/Visitation/Privileges/Telephone Access
- Law Library Access
- Pre-Release Planning
- Program Access
- Education

Following the format of the preceding inpatient report, this Report is comprised of three major sections. Part I provides an update on the state of access to inpatient mental health care for *Coleman* class members, including brief updates on the five "previously identified core areas – staffing vacancies, referrals and transfers, least restrictive housing (LRH) placements, access to DSH facilities, and clinical services and treatment in inpatient programs – which defendants must address to sustain any progress that has been achieved related" to improving *Coleman* patient access to inpatient mental health care.[2] *See* ECF No. 7555 at 17 (citing ECF No. 5894 at 17). Parts II and III of this Report contain summaries organized by monitoring focus area of the Special Master's findings at the DSH hospitals and CDCR PIPs, respectively.

In addition, the individual summaries of the Special Master's findings at each of the DSH hospitals are provided in Appendices A1-A3. Individual summaries of the Special Master's findings at each of the CDCR PIPs are provided in Appendices B1-B5. The Special Master's expert's clinical case reviews, assessing the adequacy of care provided to *Coleman* class members at DSH hospitals are found in Appendices C1-C3. Finally, the Special Master's

---

[2] In his 2018 Inpatient Care Report, the Special Master identified five areas of focus requiring defendants' attention in order to develop and sustain an adequate inpatient mental health system. *See* ECF No. 7555 at 50 (citing ECF No. 5894 at 17-27).

expert's clinical case reviews, assessing the adequacy of care provided to *Coleman* class members at CDCR PIPs, are found in Appendices D1-D5.

**Defendants' Response to the Draft Report**

On May 14, 2025, the Special Master provided the *Coleman* parties with a draft version of the Thirty-First Round Monitoring Report – Part A, covering the DSH facilities with *Coleman*-designated beds and the CDCR PIPs (hereinafter "Draft Report"). As required by the Order of Reference, the parties were provided 30 days to provide any preliminary comments or objections to the Draft Report.

On June 13, 2025, defendants sent the Special Master their responses and objections to the Draft Report. *See* Letter from Elise Thorn, Esq., Deputy Attorney General, California Department of Justice, to Special Master Lopes (June 13, 2025), attached hereto as Exhibit A. Plaintiffs did not submit preliminary comments or objections to the Draft Report.

The Special Master carefully reviewed defendants' comments and objections and, where warranted, revised the final version of the Report as delineated below.

**General Objections**

*DSH Bed Utilization*

First, defendants objected to the Draft Report's discussion of the patient census at DSH hospitals with *Coleman*-designated beds. Exhibit A at 1-2. Defendants take particular issue with the Special Master's description of these beds as "underutilized," arguing this phrasing is "misleading and inaccurate" in light of the findings of the UNA study and defendants' recent record of timely transferring patients to inpatient settings. Exhibit A at 2. Similarly, defendants object to the Special Master's description of the recent increase in the *Coleman* patient census at DSH hospitals as having "plateaued." *Id.* Defendants argue that the Special Master's Draft Report "impl[ies] there is a problem with the DSH patient census or referral process" and that it

"implies that DSH's Coleman beds are not being used as effectively as they could be for those patients who can appropriately be treated in them…." *Id.*

Remarkably, defendants also contend data demonstrating "that Defendants have for years met mandated timelines for admission" to inpatient settings was "*surprisingly absent* from the Report's findings." Exhibit A at 2. A mere cursory review of the very pages[3] containing the findings to which defendants objected demonstrates the misguided nature of this objection. Indeed, as he did in the preceding monitoring round, the Special Master highlighted defendants' performance in timely admitting patients referred to acute and intermediate care settings as a "commendable trend."

The section of the Draft Report subject to this objection provides an overview of recent data with respect to referrals and admissions to the DSH hospitals. These pages noted several facts, which defendants do not and cannot dispute. First, as of the time of the Draft Report's distribution, "approximately half of all *Coleman* designated DSH beds were still vacant" despite concerted efforts by both CDCR and DSH to increase utilization of these critically important inpatient beds.[4] *Infra* p. 45. Moreover, the Special Master highlighted significant increases in referrals to DSH hospitals following the onset of the first two DSH trial processes, describing this as "a fruitful start" to these initiatives. *Infra* p. 45. As noted and notwithstanding defendants' suggestion otherwise,[5] the Draft Report highlighted defendants recent, "commendable" performance in meeting transfer timeframes. *Infra* p. 49 ("While referrals to

---

[3] Defendants objected to specific language appearing on pages 5, 15, 16, and 19 of the Draft Report (now pages 29-30, 44, 45, and 49). The Special Master's characterization of defendants' "commendable" performance with respect to inpatient transfer timeframes likewise appeared on page 19 of the Draft Report (now page 49).

[4] See *infra* p. 33-37 for discussion of CDCR's plan to close more than 300 inpatient beds.

[5] *See supra* note 3 and accompanying text.

inpatient care have not returned to pre-COVID-19 levels, patients who were referred to and accepted into a CDCR PIP have, by and large transferred to those programs within the timeframes prescribed in the Program Guide. *This commendable trend continued into the Thirty-First Round as all patients that were admitted to acute and intermediate care programs transferred timely upon acceptance within Program Guide requirements*.") (emphasis added).

Against this backdrop, the Draft Report, in one instance, described the DSH beds as "underutilized," as follows: "Since the preceding monitoring round, it has been apparent that the underutilization of *Coleman* designated beds at DSH is in part attributable to the fact that many patients referred to inpatient care require a higher LRH than unlocked dorm." *Infra* p. 49. Here, the Special Master provided his assessment that: (1) these beds are underutilized, i.e., not being used to their fullest potential as reflected by the 49 percent census at DSH-Atascadero as of February 2025, reported in defendants' own data reproduced in the Draft Report, *infra* p. 56, and (2) that part of the reason for this suboptimal bed utilization is the mismatch between the security level of the DSH beds and that of some patients requiring inpatient care. In the sentences that follow, the Draft Report described the importance of the LRH process to ensuring "sufficient, timely access to" the DSH beds. *Infra* p. 57-61. These are hardly objectionable observations, and the Special Master need not subject his monitoring reports to this level of wordsmithing.

Finally, the Special Master notes that defendants' recent improvements in complying with Program Guide transfer timeframe requirements do not render this portion of the remedy "resolved." Exhibit A at 2 ("DSH objects to the Report's reference to this past historical issue, without an explanation that the issue is currently resolved."). Of course, neither defense counsel nor the Special Master have authority to make that determination. Defendants' efforts should remain focused on maintaining these improvements, particularly with respect to this remedial

subject, which has long been plagued by a repeated pattern of court intervention leading to temporary surges in compliance only to be followed by backsliding. *E.g.*, September 3, 2020 Order, ECF No. 6846 at 11 (noting that "new' gains in timely and adequate access to inpatient care" observed after defendants' 2013 termination motion "did not in fact hold," leading to the Court's 2017 "enforcement order to address slippage in the timeliness of transfer to inpatient care").

As noted, the Draft Report referred to some historical events with respect to access to inpatient care in order to properly contextualize current data and trends. While defendants distorted the Draft Report's discussion of defendants' recent record with respect to transfer timeframes, in one respect, defendants correctly identify a gap in the Draft Report's historical timeline, and that is with respect to the UNA study. The Special Master agrees that this contextual discussion should include reference to the UNA study and has so revised the Draft Report.[6] *See infra* p. 46-47.

*DSH Trial Review Process*

Defendants objected to the Draft Report's discussion of the five "trial processes" defendants initiated beginning in October 2023, aimed at "increase[ing] admissions to DSH" facilities. See October 6, 2023 Email from Kristopher Kent to Plaintiffs and Special Master, attached hereto as Exhibit B at 1. Defendants take issue with statements in the Draft Report which "assert[ed] that the Review Processes must be formalized." Exhibit A at 3. Further, defendants express their "reasonable concern[] that a 'formalized LRH policy detailing the

---

[6] Relatedly, the Special Master added a section to the final version of the report regarding CDCR's recent announcement that they intend to "deactivate" or "close" more than 300 male inpatient beds at CMF-PIP and CHCF-PIP. *See infra* pp. 33-37.

framework of the five trial processes' would be inappropriately converted into a further expansion of the *Coleman* remedy." *Id.*

This objection is misguided and, accordingly, the Special Master did not revise the Draft Report's discussion of the trial processes. First, as defendants know, these recent "trial processes" are squarely within the existing scope of the *Coleman* remedy, as is the Special Master's report squarely within his court-ordered responsibilities under both the Order of Reference and specific orders and directives relating to these very policies. *See infra* notes 8 and 9. Moreover, notwithstanding defendants' protestations, the Draft Report provides exactly the context defendants appear to seek where they requested that the "explanation"[7] that some *Coleman* patients may be inappropriate for DSH's low-security beds. *See infra* p. 49 ("Since the preceding monitoring round, it has been apparent that the underutilization of *Coleman* designated beds at DSH is in part attributable to the fact that many patients referred to inpatient care require a higher LRH than unlocked dorms."); *see also infra* p. 176 ("With respect to the DSH trial processes, it must be recognized that defendants' ability to timely transfer *Coleman* patients to inpatient beds is inextricably linked to the match (or mismatch, as the case may be) between the patient's security level and the security level of the inpatient beds available to that patient.").

Defendants' assertion that the Draft Report inaccurately described the level of "transparency" defendants exhibited similarly falls flat. Exhibit A at 3. Defendants acknowledged the Draft Report's account "is factually accurate" but took issue with the purported lack of explanation "that instead of having meetings to go over the out-of-LRH

[7] Defendants contented, "It is unlikely that DSH beds will ever be completely filled because these beds are located in unlocked dorms and correspond to the lowest security levels. Accordingly, they are not safe for most Coleman patients requiring inpatient care. This explanation should be included in the Report and statements criticizing Defendants for not filling all DSH Coleman beds should be removed." Exhibit A at 3.

reviews, starting after May 2023, DSH conducted twice monthly LRH reviews and sent copies of every review" to the Special Master. *Id*. While defendants have wide latitude to manage their referral and LRH review process, defendants' unilateral decisions to (i) cease in-person meetings to review cases and (ii) instead provide the Special Master with an after-the-fact paper review is hardly a demonstration of *increased* transparency. Because defendants identified no error in the Draft Report (and acknowledged its factual accuracy, *see* Exhibit A at 3), the Special Master did not revise the report in response to this objection but has appended defendants' letter to this report consistent with his regular practice.

Finally, in response to defendants' assertion that "formalization of the [trial processes] is not a proper subject of the Report," the Special Master directs defendants, at minimum, to the Court's July 11, 2013 Order (ECF No. 4688)[8], November 15, 2023 Order (ECF No. 8066)[9] as

---

[8] ECF No. 4688 at 11-12:

> After hearing and considering all of the evidence tendered by both parties at the evidentiary hearing, the court finds there is a significant evidentiary basis for questioning the adequacy of critical aspects of inpatient care currently provided to members of the plaintiff class. Even if the Special Master did not already have the authority, and the duty, to monitor the adequacy of inpatient care provided to class members, the evidence tendered by plaintiffs would suggest the necessity that he do so.
>
> For these reasons, the court will, by this order, make express what should have been clear from the prior orders discussed above. First, the Special Master has the authority and the duty to monitor all programs for the provision of inpatient mental health care to the plaintiff class. Second, given the urgency of the issues tendered by plaintiffs, the Special Master will be directed to forthwith commence monitoring all such programs, and to report to the court on their adequacy and whether any modifications to defendants' remedial plan are required to ensure that members of the plaintiff class are receiving adequate inpatient mental health care.

[9] ECF No. 8066 at 5 (directing the Special Master to supervise discussions between the parties regarding, *inter alia*, "possible revisions to the Least Restrictive Housing policy and other steps to enhance class members' access to Department of State Hospital (DSH) programs, including but not limited to the new two-step plan developed by CDCR and DSH to enhance review of

well as the transcript from the Court's June 27, 2024 status conference (ECF No. 8315 at 5)[10] and otherwise will not engage in such a hyper-technical remedial boundary drawing exercise. The Special Master is obligated by the Order of Reference and specific court orders relating to defendants' LRH policies to report to the Court, if and as necessary, on these matters. In the Special Master's view and based upon his experience monitoring the provision of mental health care in defendants' institutions, formalizing some or all of these trial processes will aid the existing remedy, promote durability of the remedy, and permit defendants to measure and demonstrate progress in this critical remedial area going forward.

*Quality of Care*

Here, defendants revive an oft-repeated objection to the Special Master's clinical experts' assessments of the adequacy of care delivered to individual patients during their inpatient stays at the DSH hospitals and CDCR PIPs. Exhibit A at 4. Specifically, "[d]efendants request that the Special Master provide detailed examples of inpatient records that represent inadequate care in the PIPs and identify any objective standards or guidelines that the Special Master's experts use to determine the adequacy of care…." *Id.* Defendants make similar arguments and requests as to the Special Master's experts' review of individual cases at the DSH hospitals with *Coleman* designated beds. *Id.*

As noted, for instance, in the Court's May 16, 2024 Order adopting in full the Special Master's Thirtieth Round Monitoring Report – Part C, "the court has already rejected" a similar

---

referrals of inmate-patients who are eligible for placement in unlocked dormitory inpatient settings to determine their eligibility for admission to DSH").

[10] ECF No. 8315 at 5 (Court clarifying its "expectation that defendants will meet with the Special Master and meet with the plaintiffs as well, or at least provide plaintiffs a chance to respond to what's being proposed, which appears constructive, and the Special Master would let me know if I need to set the matter for a special hearing or set any dates to move things along").

objection to the terms the Special Master's uses to assess adequacy of care in his clinical experts' detailed individual case reviews. ECF No. 8239 at 5 (citing April 12, 2023 Order, ECF No. 7808 at 9-10). There, the Court summarily overruled defendants' most recent attempt to levy this objection. *Id.* at 5.

This iteration of defendants' objection is particularly perplexing because, by and large, the case reviews defendants object to provide precisely the "detailed examples of inpatient records that represent inadequate care in the PIPs" and DSH hospitals. Moreover, each case review provides detailed examples of any deficiencies identified in the patient record leading to the expert's determination of adequacy or inadequacy. For these reasons, together with the court's prior rejection of substantively similar objections, *e.g.,* ECF No. 8239 at 5 (citing April 12, 2023 Order, ECF No. 7808 at 9-10), the Special Master did not revise the Draft Report in response to defendants' objections.

**<u>CDCR Objections</u>**

*"The Report improperly criticizes Defendants for not achieving a greater number of inpatient referrals."*

Similar to defendants' general objections, here CDCR objects to "the inclusion of a discussion about a decrease in referral rates that excludes any discussion of the results of the UNA." For the reasons explained above, the Special Master agrees and has included appropriate references to the results of the UNA study in the final version of the report.

*"The Reporting on Minimum Treatment Standards Requires Clarification."*

CDCR requested clarification regarding "which programming was included in calculating structured treatment hours at each PIP" and "whether patients who were clinically determined to be unsuitable for receiving minimum programming were excluded from the average-hours-offered calculation." See Exhibit A at 5. The data and statistics regarding treatment offered in

the PIPs were derived from defendants' data using defendants' calculation for "structured treatment hours at each PIP." In addition, to the best of the Special Master's knowledge, the documentation provided by defendants for this monitoring round did not distinguish patients "who were clinically determined to be unsuitable for receiving minimum programming." Accordingly, the Special Master did not revise the final report based on this objection beyond the clarifications noted in this paragraph.

*"The Report Contains Misleading Statements Concerning PIP Staffing."*

The Special Master did not revise the Draft Report in response to defendants request to "also include the staff-to-patient ratio in the PIPs during the relevant period," because this information was contained in the Draft Report in the first instance. *Infra* pp. 256 (CMF-PIP); 300-301 (SVSP-PIP); 340 (CHCF-PIP); 390 (CIW-PIP); and 415 (SQ-PIP). Moreover, the Special Master notes, in contrast to CDCR's suggestion otherwise, the PIP Staffing Plan is based on a staff-to-bed ratio, not a staff-to-patient ratio. *See* Exhibit A at 5. As such, the Special Master reports vacancy rates on this basis and, as indicated, supplements this reporting with information on staff-to-patient ratios observed at the time of the review.

*"The PIPs Were Audited for Compliance with the Structured Treatment Policy Before It Even Issued."*

Defendants contend that the Special Master improperly audited all five PIPs for compliance with the structured treatment hour requirements contained in the "Treatment Minimums for Patients Receiving Treatment within CDCR Psychiatric Inpatient Programs and IFLEX Locations" policy before it was issued on September 3, 2024. Specifically, defendants argue that the Draft Report "describes the policy that requires CDCR to offer patients 20 hours of group treatment each week[]" and that "[t]he Report…improperly audited all five PIPS for compliance from February 1 to July 31, 2024 – prior to when the policy came into effect." *See*

Exhibit A at 5-6. As a result, the defendant's requested either a clarification of this issue or to remove the discussion of the "Structured Treatment Policy" all together. *See id*.

However, the defendant's contentions are misplaced. As specifically stated in the Draft Report, *see infra* pp. 113, 261, 305, 346, 392, and 417, at each of the five PIP institutions, the Special Master monitored defendant's compliance with the requirements of the Court's August 23, 2023 Order, ECF No. 7924 at 10, which required that "[d]efendants shall immediately adopt and implement in the CDCR PIPs the minimum treatment standards set out in the DSH CQI process approved by the court." The DSH CQI process "provide[d] that patients will be offered 20 hours of treatment per week, at least ten hours of which are to be 'core treatment'." *See* ECF No. 7812-1 at 15. As each PIP institution was required to have implemented the August 23, 2023 court order at the time of each respective site visit, the Special Master did not amend the Draft Report but added a footnote reflecting the effective date of CDCR's policy implementing this court-ordered requirement (September 3, 2024). *See infra* p. 113.

*"The Positive Behavior Support Teams Program Is Not Part of the Coleman Remedy."*

Here, defendants revive a previously levied objection that the Draft Report's discussion of Positive Behavior Support Teams (PBST) "falls outside of the Special Master's monitoring duties." Exhibit A at 6. Defendants alternatively request that either the discussion of PBSTs be removed altogether or that the report "clarify that these PBSTs are not required under the remedial plan or other court orders." *Id.* at 6. As observed in the Special Master's response to defendants' prior similar objection, defendants overstate the extent to which the use of PBSTs "falls outside of the Special Master's monitoring duties." As the parties know, one of the Special Master's "principal responsibilities" under the Order of Reference (ECF No. 640) is to "provide expert advice to defendants to ensure that their decisions regarding the provision of mental health

care to class members conforms to the requirements of the federal constitution and to advise the court regarding assessment of defendants' compliance with their constitutional obligations." December 11, 1995 Order of Reference, ECF No. 640 at 2. While the Special Master is without authority to direct defendants to utilize PBSTs in their inpatient programs, *see id.* at 7-8, he can, consistent with his authority under the Order of Reference, *advise* defendants and the Court that said implementation (or more efficacious implementation as the case may be) would be an efficient, effective, and proven way to improve the quality of care delivered in these inpatient settings.

As previously reported, PBST intervention "is clinically indicated for many *Coleman* class members," Thirtieth Round Monitoring Report – Part A, ECF No. 7833 at 52 n. 23, and "defendants have recognized the need to provide positive behavior support services to *Coleman* class members for many years." *Id.* at 18-19.[11]. As such, the Special Master has monitored utilization of PBSTs in each of his inpatient monitoring reports.[12] Accordingly, the Special Master did not revise the final version of the report in response to this objection.

---

[11] *See also* Defendants' November 24, 2010 Plan to Reduce or Eliminate Intermediate Care Facility and Acute Inpatient Waitlist in Response to the Court's March 31, 2010 and August 4, 2010 Orders, ECF No. 3962-1 at 5, 8, 11, 25; Stipulation and Order Approving Defendants' Plan to Treat Maximum Custody Patients in Psychiatric Inpatient Programs, ECF No. 7392 at 3.

[12] *See* Special Master's 2014 Inpatient Report, ECF No. 5156 at 11 ("When patients failed to improve after all the treatment team had exhausted its clinical resources, staff did not avail themselves of the Positive Behavioral Support Team (PBST) to develop any behaviorally-based treatment interventions"); Special Master's 2016 Inpatient Report, ECF No. 5448 at 55 ("The Positive Behavioral Support Team (PBST) at DSH-Vacaville was a valuable treatment service that helped development of behavioral treatment plans for acute and intermediate care patients. The PBST consulting team included a psychologist, plus another psychologist who specialized in Indecent Exposure (IEX) treatment, and a Medical Technical Assistant (MTA). The PBST interviewed patients, attended IDTT meetings, and developed treatment plans to assist patients. Its caseload consisted primarily of acute care patients and some intermediate care patients."); *id.* at 56 (discussing inadequate quality of behavior plans as reported by DSH-Vacaville (now CMF-PIP) staff and confirmed through record review); *id.* at 215-216 (PBST section of DSH-Vacaville summary); *id.* at 221; *id.* at 326, 327, 328, 329, 347, 349 (case review discussions of PBST);

*"The Language Describing the Least Restrictive Housing Policy Is Inaccurate."*

First, defendants identify an editing error in the Draft Report resulting in lack of clarity, which the Special Master has corrected. *See infra* p. 147-148.

Defendants also request the Special Master to revise the Report's description of patients who "require" unlocked dorm settings. The Special Master concurs and has made the requested revisions to the final version of the report. *See infra* pp. 54, 147, 252, 280, and 372.

*"The Death Review Process Is Outside of the Scope of the Special Master's Monitoring."*

The Special Master did not revise the Draft Report's discussion of the death review process at the CDCR PIPs. The review of completed suicides that is documented in CDCR's suicide case reviews is a subcomponent of the Death Review Process. Components of the Death Review Process, including medical history and assessment and nursing care, are included in the suicide case reviews and are developed during the Death Review Process. The Special Master's monitoring of the Death Review process is appropriate because it is integral to the review of completed suicides.

*"The Report Inappropriately Suggests that EOP Patients Should be Transferred to DSH Beds."*

CDCR objects to the following footnote in the Draft Report:

> It is no secret that CDCR has struggled to find appropriate housing for class members at the EOP level of care in recent years. *See* DRAFT Thirty-First Round Focused EOP Report at 11 ("Despite opening 1,010 new EOP beds across nine housing units at eight institutions, during the focused review (and up until the time of this writing), defendants struggled to find appropriate, designated EOP housing for some class members resulting in a significant number of EOP patients being placed in non-EOP beds."). With so many DSH beds available even after the DSH trial processes were implemented, it may be time for defendants to consider more innovative uses for these DSH beds, including potentially housing of members of

---

Special Master's 2018 Inpatient Report, ECF No. 5894 at 46-47, 212, 222-23; 311, 317-21 (case reviews); 2021 Inpatient Report, ECF No. 7039 at 68-69, 188, 203, 218-19, 257-58, 278, 286, 288; *id.* at 366-68 (case reviews); 29th Round Monitoring Report Part A, ECF No. 7555 at 84, 96-97, 104, 174, 175, 178, 186-88, 222, 253-55, 259, 304, 366; *id.* at 433, 459 (case reviews).

> the growing EOP population in those beds, an idea the Court considered at an earlier point in time. *See* March 31, 2009, ECF No. 3556 at 2 (noting the court's directive to defendants to "consider other emergency measures, such as transferring inmates at the Enhanced Outpatient Program (EOP) level of care to Atascadero State Hospital (ASH) and Coalinga State Hospital (CSH).").

While the Special Master appreciates CDCR's perspective, the underlying point is one that is fundamentally sound: the DSH beds are a vital part of defendants' MHSDS system and should be utilized to the maximum extent feasible, which, from time to time, may require outside-the-box thinking. *See* December 17, 2019 Order, ECF No. 6427 at 48 (noting "nothing prevents the defendants coming forward with a more transformational option" to remedy systemic deficiencies in its MHSDS). Accordingly, the Special Master maintained this footnote.

*"SVSP, CIW, and SQ Request that Certain Clarifications be Included in the Report."*

CDCR requested the Draft Report be revised to remove reference to a "triage plan" at SVSP-PIP, which defendants explain did not impact the PIP programs during the review period. The Special Master has corrected the final version of the report accordingly.

CDCR made three requests regarding CIW-PIP, one of which resulted in modification to the Draft Report. The Special Master revised the final version of the report to remove reference to separate programming schedules for acute and ICF programs based on the department's explanation that "[a]cute and ICF patients program together." Exhibit A at 7. The Special Master maintained the Draft Report's discussion of the STEP program and use of crisis plans at CIW-PIP as the report accurately reports the state of affairs during the review period based on the documents CDCR provided to the monitoring team.

Finally, the Special Master corrected data regarding biweekly post reviews at SQ-PIP as requested.

**<u>DSH Objections</u>**

*Provision of the Draft Monitoring Report*

First, DSH notes their objection to "the delay in the provision of the [draft] report and request[ed] that the Special Master endeavor to timely provide DSH with monitoring reports" going forward. While the Special Master always endeavors to provide draft monitoring reports in as timely a manner as practicable, he acknowledges the delay in producing this Draft Report. However, the DSH paper reviews were conducted close in time to the Special Master's focused tours on heat plan compliance and those tours of newly opened EOP units. These focused reviews were both driven by developments in the field, including urgent patient safety issues. Because of the nature of these focused reviews, the flow of the Special Master's regular monitoring was disrupted.

The Special Master notes that since his reviews of the DSH hospitals concluded, he has filed four status reports with the court and disseminated two other reports to the parties for their review and comment: The Thirty-First Round Focused Heat Plan Monitoring Report was filed on February 28, 2025 (ECF No. 8558); the Special Master's Data Remediation Report Status Report was filed on May 1, 2025 (ECF No. 8624); the Thirty-First Round Focused Monitoring Report on Newly Activated EOP Programs was filed on May 29, 2025 (ECF No. 8654); the draft Special Master's Thirty-First Round Monitoring Report – Part A – Inpatient Programs was sent to the parties on May 14, 2025; the draft Second Re-Audit of Suicide Prevention Practices in the PIPs was sent to the parties on June 30, 2025; and a further Data remediation status report was filed on July 11, 2025 (ECF No. 8697).[13]

[13] Since his appointment, the Special Master has filed 149 substantive reports concerning the status of defendants' compliance with court-ordered remedial requirements.

*The Interdisciplinary Treatment Team Process*

DSH further objects to the Draft Report's discussion of team member attendance at interdisciplinary treatment team (IDTT) meetings in the DSH hospitals. Citing to a DSH Policy Directive, defendants argue "[t]he Report incorrectly holds DSH to an IDTT-attendance requirement that is not applicable to DSH or supported by the Program Guide or DSH policies under the 2017 Memorandum of Understanding (MOU)." Exhibit A at 8. Specifically, DSH objects to the Draft Report's use of the phrase "required staff" when discussing DSH IDTT members.

In their objections, DSH acknowledged that their policy "provides that the interdisciplinary treatment teams be composed of certain team members and that there will be IDTT meetings." Exhibit A at 9. Defendants are correct. DSH Policy Directive 3607, entitled "DSH Treatment Planning Policy – CDCR Patients in DSH Inpatient Programs," provides:

> The IDTT is comprised of the patient and those persons who work directly with each patient in the following service areas: psychiatry, psychology, social work, rehabilitation therapy, and nursing as well as any other person who is directly involved in the treatment of the patient.

DSH Policy Directive 3607 (dated July 1, 2017), attached hereto as Exhibit C at 1. The policy also provides minimum frequencies for IDTT meetings and notes the importance of each IDTT member's contribution to the treatment planning process. Exhibit C at 3 ("The IDTT identifies the overall impression and needs of the patient after discussion of the information obtained from each member's assessment of the patient and the reason(s) provided by CDCR clinicians for the patient's admission to DSH."); *see also id.* ("Implementation of the treatment plan is interdisciplinary, and patients are active participants in implementation. All members of the IDTT are involved in assisting each patient in reaching his documented goals through the delivery of treatment and activities that will best serve his needs.").

Here, DSH's objection is hyper-technical and requires no revision to the Draft Report. It is clear from the plain language and spirit of the policy DSH relies on that the contributions of each IDTT member – representing, at minimum, psychiatry, psychology, social work, rehabilitation therapy, and nursing – are integral to effective treatment planning. In order to meaningfully contribute to treatment planning discussions with the patient that occur in these meetings, at minimum, team members must attend them. Accordingly, there is nothing "improper" with the Special Master's reporting on IDTT attendance at the DSH facilities and, the Special Master did not revise the Draft Report in response to this objection.

*Treatment Planning and Treatment Goals*

DSH levied both general and specific objections[14] to the Draft Report's discussion of treatment planning and treatment goals. These objections raise similar issues to the defendants' general objection regarding "Quality of Care" discussed above, as DSH objects to the Draft Report's reference to "significant concerns with treatment planning" at the DSH hospitals because the Draft Report "failed to provide any nationally recognized objective measures or standards that the experts used to determine whether a treatment plan was 'effective' for the purposes of the Report." *Compare* Exhibit A at 9, *with* Exhibit A at 4 (requesting that the

---

[14] With respect to DSH's objection to the discussion of treatment outcome expectations, it appears defendants misinterpreted the critique contained in the Draft Report. DSH objected to the Draft Report's identification of eleven cases "where the monitor's expert noted that the treatment outcome expectations developed while the patient was in CDCR were not updated upon arrival at DSH, despite indications that the goals were not appropriate for the hospital location (e.g., references to the patient's cell or to custody officers.)." DSH argued that "the Special Master's experts failed to recognize that in the Program Guide, there is no mention of treatment outcome expectations that must be met at hospital prior to discharge" and that these treatment outcome expectations are not a prerequisite to discharge. Exhibit A at 10. For clarity, the Special Master's expert was noting the need to update these goals to align with the patient's new setting (i.e. hospital vs. prison) so that the goals are meaningful and achievable. Accordingly, the Special Master did not revise the Draft Report in response to this objection.

Special Master "identify any objective standards or guidelines that the Special Master's experts use to determine the adequacy of care").

Notably, the Court summarily overruled defendants' prior attempts to import "national standards" other than those adopted by this court in its order adopting the Special Master's Thirtieth Round Monitoring Report – Part C. May 16, 2024 Order, ECF No. 8239 at 2-3 (summarily overruling defendants' objection to the Special Master monitoring to Program Guide requirements rather than National Commission on Correctional Health Care (NCCHC) standards: "In making their first objection, defendants disregard these and other longstanding orders and fail to comply with the specific court order setting out the proper procedure for seeking relief from prior court orders."). Moreover, the Special Master notes that the individual case reviews underlying the Treatment Planning and Treatment Goals discussion includes detailed explanation of the factors weighing for and against a determination of adequacy or efficacy. As with the quality of care determinations, evaluations of effective treatment planning are included in the Special Master's expert's review of an individual case during a specific review period and are based on the experts' knowledge of the remedial requirements in this case as well as their collective hundreds of years of experience providing, supervising, and/or monitoring delivery of mental health services to incarcerated persons as they move across various levels of care including inpatient. In each case, the experts provide detailed explanation of their rationale. For these reasons, the Special Master did not revise the Draft Report in response to this objection.

*Group Treatment*

DSH identified a typographical error in the Draft Report's discussion of weekly average treatment hours offered to *Coleman* patients at DSH-Coalinga which has been corrected in the final version of the report.

*Individual Therapy*

Here, DSH objects to what it describes as the Draft Report's discussion of a "frequent unfounded critique by the Special Master's experts" with respect to the relatively low amount of individual treatment offered to class members. DSH argued that the Draft Report "d[id] not recognize that the DSH model of treatment is primarily group therapy and use of psychiatric medications." Exhibit A at 10. Specifically, defendants requested that the separate sections of the report summarizing findings regarding individual treatment be removed from the report because individual treatment is not required by the remedial plan. *Id.* at 11.

The Draft Report's discussion of individual treatment in the context and as a component of remedial requirements to provide core and supplemental treatment to class members in inpatient settings is clear and accurate. *E.g., infra* p. 189 (As patients were offered an average of 7.1 hours per patient per week of core group treatment, and only 18 of those patients received an average of 0.42 hours of individual treatment, DSH-Atascadero was not compliant with its requirements to offer at least ten hours of core treatment per week.); *infra* p. 213 ("As patients were offered an average of 6.5 hours of core group treatment and 3.1 hours per week of core individual treatment, DSH-Coalinga was close but ultimately not compliant with its requirements to offer at least ten hours of core treatment per week."). Indeed, these passages include the Special Master's assessment of the extent to which the DSH hospitals were offering treatment hours (i.e. *combined group and individual treatment hours offered*) consistent with the requirement of DSH's court-ordered CQI plan. *See infra* note 15 and accompanying text.

In at least one instance, defendants' contentions appear at odds with the record. Defendants argue, "In fact, the core treatment guidelines (10 hours per week) approved by the Court, as well as the DSH Governing Body Reports, confirm that individual therapy is not part of

the DSH remedial plan. There is no requirement to track individual treatment, nor is it a metric that is included in the remedial plan." Exhibit A at 11. To the contrary, DSH's court-ordered CQI process[15], and related Governing Body Reports explicitly include "individual therapy" in its treatment hours offered calculus: "Although DSH-[Atascadero] utilizes group settings as the primary source of delivering treatment, *when appropriate, individual therapy is utilized to meet patient needs more effectively and offer treatment that is difficult to delivery in a group environment*." ECF No. 7625-1 at 28 (DSH-Atascadero Governing Body Report, appended to Special Master's Twenty-Ninth Round Monitoring Report – Part B) (emphasis added). These Governing Body Reports make clear that both individual and group therapy hours are included in the summary of treatment hours, *see id.*, and provides separate definitions for "Individual Therapy" and "Scheduled Individual Therapy." *Id.* at 29. The Draft Report's accounting for both group and individual treatment hours offered is, therefore, entirely appropriate and consistent with the DSH remedial plan. Accordingly, the Special Master did not revise the final version of the report in response to this repeat, baseless objection.

*Documentation*

DSH objected to the Draft Report's finding that, "[a]cross all DSH facilities, the number of treatment hours provided to patients was not consistently documented and in a number of cases, documentation related to the provision of treatment was missing entirely from clinical

---

[15] *See* March 8, 2017 Order, ECF No. 5573 at 3 (directing DSH to "develop a plan…for the creation of a continuous quality improvement (CQI) process to be utilized in the DSH inpatient programs that treat Coleman class members" under the "guidance and supervision of the Special Master, and with input from the plaintiffs as appropriate"); *see also* Special Master's Twenty-Ninth Round Monitoring Report – Part B, ECF No. 7625 at 27-30 (describing development of DSH's CQI process); id. at 79 (noting the Special Master's "determination that DSH's CQI process was adequate" and his "final approval to defendants to implement" DSH's CQI process); *see also* December 20, 2022 Order, ECF No. 7688 at 9-10 (adopting Twenty-Ninth Round Monitoring Report – Part B in full).

records." *Infra* p. 90. DSH explains that “DSH IDTTs use a database system called the Forms Repository to input all clinical information, including treatment plans, group notes, individual clinical notes, and incident reports.” Exhibit A at 11. DSH also objected to the Draft Report’s observation that incomplete medical records “significantly compromise continuity of care.” *Id.*

Importantly, the findings contained in the Draft Report are based on what was available in the patient’s record at the time of the experts’ reviews. While it may be true that certain information exists outside of the patient’s “paper chart” is “readily available to every member of the patient’s treatment team through the Forms Repository system,” at least some of these documents were not readily available to the Special Master’s experts, and the Draft Report reflected the same. Upon review, the Special Master modified this sentence as follows, but otherwise left the Draft Report’s discussion intact: “In some cases, missing documentation was located and provided during the on-site review; yet none of this documentation was in the patients’ records and available to other clinicians, which could significantly compromise ~~ing~~ continuity of care.”

The Special Master maintained the Draft Report’s discussion of the use of monthly summary notes for weekly psychology notes in one case review (DSH-Patton Patient H), which found: “While on-site, the expert raised multiple concerns with weekly [psychology] sessions being summarized in monthly notes, as this allowed delay in clinically relevant information to be accessible when needed in the healthcare record.” *Infra* p. 565. Defendants contend that this finding is inappropriate because the Draft Report speaks favorably of the use of monthly notes at DSH-Atascadero. The distinction here is the monthly notes at DSH-Atascadero were summarizing psychiatry contacts, which are required to occur at less frequent intervals than

psychology contacts. Accordingly, the Special Master did not revise the Draft Report in response to this objection.

*Involuntary Medication Non-Renewals*

The Special Master did not revise the Draft Report's discussion of involuntary medication renewals. DSH explained that the Draft Report's critique of the "lack of a thorough rationale for non-renewal of involuntary medication (PC 2602)" was inappropriate because "there is no statutory authority or DSH policy requiring that a clinical rationale be documented for non-renewal of a PC 2602." Exhibit A at 12. Moreover, "it has been DSH's practice for years not to document the rationale for non-renewals of PC 2602s without criticism from the Special Master," alleging inconsistent monitoring practices. *Id.*

The Special Master disagrees with DSH and did not revise the Draft Report in response to this objection. In brief, the Special Master has monitored PC 2602 non-renewals and has, for instance, highlighted DSH clinicians in the past for *properly* documenting non-renewals. *E.g.*, Thirtieth Round Monitoring Report – Part B, ECF No. 8085 at 184 (DSH-Coalinga: "Clinical notes included sufficient rationales for observation levels, diagnostic changes, involuntary mediation non-renewal, and lower level of care discharge."). DSH's explanation that its clinicians, as a matter of established practice, do not document their rationale for non-renewal of involuntary medication is noted. However, this is not an example of the Special Master inappropriately or inconsistently monitoring.

*Pharmacology*

Here, DSH acknowledges the Draft Report's "feedback related to psychopharmacology and referred these cases to its expert internal consultation team…for review." Exhibit A at 12. No revisions to the Draft Report were requested.

*Suicide Risk Assessment*

Based on DSH's representation that "DSH hospitals do not use the [6 question] screening version" of the C-SSRS but rather than "full assessment version," the Special Master has substituted the Draft Report's references to the shorter "screening" version of the tool to refer to the full-assessment version as appropriate.

*Referrals and Rescissions*

Regarding referrals and rescissions, the Special Master revised the Draft Report to note that of the transfers to DSH-Atascadero that exceeded the 30-day requirement, two were noted as "delayed due to unit quarantine" consistent with the documentation defendants provided in advance of the reviews of the DSH hospitals.

With respect to the Draft Report's observation that "neither CDCR nor DSH provided reasons for rescission of patient referrals to DSH," defendants stated they were "unaware of any requests for an explanation or data concerning the *reasons for increases* in rescission rates." Exhibit A at 13. Here, no revision to the Draft Report is necessary because defendants misread the Draft Report's finding and the report's language is accurate. The Special Master, in his document request for the monitoring tours of the PIPs, explicitly requests explanations (i.e. "reasons") for rescinded referrals to inpatient settings:

VI. Referrals, Admissions, and Transfers

1. Provide a list of all *Coleman* class patients referred to only your facility during the review period, separate by level of care. Include as applicable:

    […]

    - Any notes/comments, *including reasons for recission*/rejection/delays in referral and transfer timeframes.

Special Master's 31st Round PIP Document Request, attached hereto as Exhibit D. A similar request was included in the 31st Round DSH Document Request, though the request language omitted reference to "rescinded" referrals, instead asking for "the reason why" referrals were "rejected." Special Master's 31st Round DSH Document Request, attached hereto as Exhibit E.

The Draft Report's statement that "neither CDCR nor DSH provided reasons for rescission of patient referrals to DSH" is a reflection of the state of the documents provided to the Special Master in advance of the DSH reviews, i.e., documentation did not reflect "any notes/comments, including reasons for recission/rejection/delays in referral and transfer timeframes." While not specifically requested in advance of the respective monitoring tours, the Special Master appreciates the explanation defendants provided in their June 13, 2025 letter and reproduces here:

> …[B]efore the [DSH Trial] Review Processes, DSH received only about 22% of all ICF referrals generated by CDCR because CDCR clinical housing recommendations for most referrals did not allow the referred patients to be considered for admission to DSH. The Review Processes, however, eliminated the need for a CDCR clinical-housing recommendation in a referral, and thus DSH started to receive every ICF referral with an LRH of unlocked dorms. This led to DSH receiving approximately 50% of all ICF referrals generated by CDCR. Consequently, an increase in rescission rates was expected upon the implementation of the Review Processes because over half of all referrals sent to DSH were comprised of patients who had housing recommendations for single-cell, multi-person cell, and locked dorms, which are all part of the CDCR PIP system. Around 70% of these referrals were determined not to be clinically appropriate for admission to DSH, and they were rescinded. Approximately 30% of these referrals, however, were determined to be appropriate for admission to DSH despite a more restrictive housing recommendation from CDCR.

Exhibit A at 13.

*DSH-Defendants' Objections to Case Reviews*[16]

In addition to the above-referenced comments and objections, DSH separately provided extensive objections to 15 of the Special Master's clinical experts' case reviews (DSH-Atascadero patients C, E, I, L, M, P, AA; DSH-Coalinga patients A, D, E, K, S, W; DSH-Patton patients A and J). The Special Master and his experts carefully reviewed DSH-defendants' objections and found no basis to change any of the overall findings regarding adequacy of care objected to by DSH.[17]

Upon careful review, in some cases, DSH-defendants largely restate objections (in the context of an individual case review) addressed above.[18] In addition, the lack of electronic

---

[16] DSH's comments and objections to the case reviews were contained in a separate letter appended to defendants' June 13, 2025 letter (Exhibit A). For purposes of this Report, this separate letter is referred to as "DSH Letter," and citations to the DSH Letter refer to the pagination noted at the bottom of the DSH Letter.

[17] As noted above, the Special Master's expert clarified references to the C-SSRS screening tool as warranted. *See* DSH-Coalinga Patient K.

[18] *Compare* DSH Letter at 1-2 [DSH-Atascadero patient C] (objecting to lack of "objective measure, nationally recognized standard, or the use of the C-SSRS risk level criteria), *and* DSH Letter at 3 [DSH-Atascadero patient I] (arguing the expert's finding regarding suicide risk underestimation was "not supported by any nationally recognized measures or standards, or C-SSRS manual/trainings."), *with* Exhibit A at 4 ("The Report does not identify the objective measures or standards of care that DSH hospitals were measured against…"); *Compare* DSH Letter at 4 [DSH-Atascadero patient M] (objecting to expert's critique of lack of individual treatment), *and* DSH Letter at 6-7 [DSH-Coalinga patient D] (objecting to "the concern by the Special Master's experts as individual therapy alone was not warranted to address the patient's concerns given his response to group treatment and self-reported improvement in symptoms."), *and* DSH Letter at 7 [DSH-Coalinga patient E] (objecting to "finding that the patient's treatment was inadequate and that individual therapy was initially recommended, but not provided," arguing "there was no need for individual therapy given his attendance and participation in treatment groups"), *with* Exhibit A at 10-11 ("A frequent unfounded critique by the Special Master's experts is what they perceive as a lack of individual treatment interventions."); *Compare* DSH Letter at 5-6 [DSH-Atascadero patient AA] ("…[A]s stated before there is no recognized national standard for all 'required' treatment team members to be present at the meeting and it is not in line with DSH policy."), *and* DSH Letter at 8 [DSH-Coalinga Patient S] ("…[T]here is a lack of empirical research, nationally recognized standards, objective measures, and policy (Program Guide and MOU) stating all disciplines must be present an a [sic] IDTT

health records in the DSH facilities prohibits the Special Master's expert's ability to re-review the cases in question. Further, in some instances, DSH appears to be relying on information not contained in the patients' medical record – even relying on CDCR records that postdated the review period for the respective cases to bolster their objection. *See* DSH Letter at 5 [DSH-Atascadero Patient P] ("It should be noted by the Special Master experts that the patient did not report any safety concerns *when at the MHCB for six days after his discharge from [DSH-Atascadero]*") (emphasis added); DSH Letter at 8 [DSH-Coalinga patient K] (referencing patient's discharge to CDCR, which occurred after the Special Master's expert's review); *see also* Exhibit A at 11 (expressing concern with Special Master's observation that information was missing from the medical record and noting "that DSH IDTTs use a database system called the Forms Repository to input all clinical information, including treatment plans, groups notes, individual clinician notes, and incident reports."), and *supra* p. 26-27(Special Master's response to this objection). The Special Master's experts do not routinely rely on extraneous information outside of the patient's medical record (and not otherwise provided to the expert) in conducting these clinical case reviews. Finally, the Special Master's experts are court appointed. When assessing the adequacy of the treatment provided to these individual patients, these experts bring to bear hundreds of years of collective experience providing, supervising, and/or monitoring patient mental health care in correctional settings.

After consulting with his experts and in consideration of the factors delineated above, the Special Master did not revise his expert's adequacy determinations in the DSH case reviews in response to DSH-defendants' objections. *But see supra* note 8 (regarding C-SSRS).

---

meeting."), *with* Exhibit A at 8-9 ("The Report incorrectly holds DSH to an IDTT-attendance requirement that is not applicable to DSH or supported by the Program Guide or DSH policies under the 2017 Memorandum of Understanding (MOU).").

Because the Special Master has not always received complete and comprehensive documents in advance of these paper reviews, the Special Master intends to return to full scale monitoring tours for the DSH hospitals during the next monitoring round. This return to full-scale monitoring tours should provide an opportunity for DSH to express some of the concerns outlined in their preliminary objections to the Draft Report and provide any relevant supplemental information to the Special Master's experts in real time.

**PART I.**

**A. <u>UPDATE ON THE STATE OF ACCESS TO MENTAL HEALTH INPATIENT CARE FOR *COLEMAN* CLASS MEMBERS</u>**

This report comes at a pivotal time in this long-running case, with a number of important developments occurring during the Special Master's review of inpatient care and continuing up until the time of this writing. Most importantly, in the preceding months, the Court has identified its Receiver-nominee, who has begun the process of developing the court-ordered Receivership Action Plan "to effectuate full and durable compliance with the court-approved and court-ordered remedies in this action.". *See* ECF No. 8589 at 2.

Moreover, since the Special Master's prior monitoring reports on the CDCR PIPs (Thirtieth Monitoring Round Report – Part A, ECF No. 7833) and DSH programs (Thirtieth Monitoring Round Report – Part B, ECF No. 8085) were filed, several case developments have impacted the provision of inpatient mental health care to *Coleman* patients. These developments, which will be discussed in greater detail in the sections that follow, include:

1. Developments related to defendants' efforts regarding Least Restrictive Housing, including the initiation of five "trial processes" designed to improve access to less restrictive *Coleman* patient-designated beds at DSH hospitals.

2. The full implementation of defendants' 2021 PIP Staffing Plan and application of a maximum staffing vacancy rate of ten percent for PIP mental health staff positions.
3. The full implementation of minimum treatment standards which had been already set out in the DSH CQI process and required the minimum offering of 20 hours of structured therapeutic activities, ten of which must be core treatment absent a modified treatment plan.

**1. <u>Least Restrictive Housing and the DSH Trial Processes</u>**

Appropriate placement of patients in their clinically and custodially appropriate Least Restrictive Housing setting is a critical component of mental health care delivery in a correctional setting, both from a clinical and operational perspective. From a patient care perspective, less restrictive housing settings facilitates improved access to out of cell time, programming, and treatment. *See, e.g.*, Special Master's 2016 Inpatient Care Report, ECF No. 5448 at 9 (noting that "access to [patients'] clinically and custodially appropriate least restrictive housing (LRH)" is "a very important concern from a therapeutic standpoint."). From a systemic perspective, working to ensure patients are appropriately housed in their least restrictive setting can optimize utilization of the low-custody state hospital beds, freeing up higher security inpatient beds in CDCRs PIPs, which have been in high demand throughout the life of this case. The combined effect of a limited supply of high security PIP beds and suboptimal utilization of the DSH beds have contributed, in the past, to long waitlists for and untimely access to inpatient beds.[19] Moreover, these factors also put additional pressure on mental health staff working in the PIPs, which are already struggling to provide adequate care due to understaffing.

[19] *See* Special Master's 2016 Inpatient Report, ECF No. 5448 at 9 ("Further, when DSH-Atascadero beds are not open to CDCR patients, there is a resounding ripple effect throughout all of the …inpatient programs which treat these patients, creating almost instantly a re-shuffling for

Perhaps the most significant development since the preceding inpatient monitoring reports, from the perspective of improving access to inpatient care, is defendants' initiation of five separate "trial processes" designed to facilitate movement of patients to the least restrictive housing, including the low-custody inpatient beds at the DSH hospitals that have proven so critical to defendants' overall inpatient mental health care system. While defendants' efforts here are indeed "encouraging steps," ECF No. 8066 at 2, they have demonstrated a lack of urgency in finalizing these processes into formal policy. The Special Master notes his growing frustration with the slow pace defendants are proceeding on these promising initiatives and urges them to promptly correct course. A more detailed update on the development of these trial processes is included below. *See infra* pp. 49-56.

**2. PIP Staffing Plan**

With respect to mental health staffing, the Court has proceeded with enforcing a maximum staffing vacancy rate in the PIPs. In an August 23, 2023 Order, the Court noted that "[t]he record is clear that defendants are not providing adequate inpatient care with the current high vacancy rates across all PIP staffing allocations" and signaled its intent to grant plaintiffs' request to "set a deadline for full implementation of defendants' 2021 PIP Staffing Plan." *See* ECF No. 7923 at 13-15. In the same Order, the Court directed the parties to meet and confer and, thereafter, file a joint statement addressing "whether the court should confirm a maximum vacancy rate for the PIPs that is different from the ten percent rate established by the June 2002 order and used by DSH." *Id.* at 13. After hearing from the parties,[20] the Court issued its October

---

other beds at other [inpatient] programs, and at CDCR a back-up of patients awaiting [inpatient] placement.").

[20] Notably, in their response to the Court's August 23, 2023 Order, defendants stated: "It is the State's position that there is no quantifiable staffing threshold that is required by the Constitution, and that any arbitrary maximum vacancy rate is not an appropriate proxy for

11, 2023 Order, requiring defendants to "maintain a maximum mental health staffing vacancy rate of ten percent in the CDCR PIPs," and further requiring defendants to "take all steps necessary to come into compliance with the staffing ratios in their 2021 CDCR PIP Staffing Plan and the maximum ten percent vacancy rate" within six months. ECF No. 8009 at 3. This report is the Special Master's first review of the inpatient programs since the Court's October 11, 2023 Order. Though some improvements were noted in the defendant's February 2025 monthly vacancy report, all three Lift and Shift PIPs exceeded the maximum vacancy rate of ten percent. *See* ECF No. 8585. The two CDCR-developed PIPs however, approached or achieved compliance for most of the four key mental health staffing classifications.

### 3. PIP Minimum Treatment Standards

In addition, after many months of discussion and litigation, defendants moved forward with implementing the Court's August 23, 2023 Order requiring defendants to "immediately adopt and implement in the CDCR PIPs the minimum treatment standards set out in the DSH [Continuous Quality Improvement] process approved by the Court." ECF No. 7924. In making this Order, the Court noted:

> Defendants have presented [an] inadequate [PIP minimum treatment standard] plan two years after defendants promised, and failed, to develop a plan for minimum treatment standards for the CDCR PIPs. The time has passed for additional planning. Now is the time for action that leads, expeditiously, to compliance with the Eighth Amendment in the delivery of adequate care to California's most seriously mentally ill inmates. The court previously has found the minimum standards for treatment of inpatient class members adopted by DSH are adequate. For the reasons explained above, defendants will be directed to forthwith adopt and

---

measuring Defendants' constitutional compliance. Rather, the appropriate measure is the standard of care that is actually provided to patients." ECF No. 7937 at 2. The Court noted that "it is settled that employment of sufficient numbers of mental health staff is one component of a constitutionally adequate prison mental health care system," and, further, that defendants' response to its August 23, 2023 Order "disregard[ed] the law and the facts of this case." October 11, 2023 Order, ECF No. 8009 at 2.

> implement in the CDCR PIPs the minimum treatment standards set out in the DSH CQI process, which the court previously has approved.

ECF No. 7924 at 10.

Following the defendants' appeal, *see* ECF No. 7953, the Ninth Circuit upheld the Court's August 23, 2023 Order, *see* ECF No. 8385, and defendants subsequently distributed and implemented PIP Minimum Treatment Standards, which aligned with the DSH CQI process, specifically delineating the amount and types of treatment offered as well as frequency of clinical contacts and IDTTs. This report is the Special Master's first review of the PIPs since implementation of the PIP Minimum Treatment Standards. In summary, while all the PIPs offered fewer than the 20 hours of required treatment, some programs made progress in increasing the number of weekly hours offered to PIP patients, which was a promising sign considering the understaffing with which these programs continue to grapple. A detailed review of the minimum treatment standards offered to PIP patients is discussed below.

**4. <u>CDCR's Plan to Close More Than 300 PIP and MHCB Beds</u>**

In two letters dated July 1, 2025, and July 2, 2025 (collectively referred to as "Mission Change Letter"),[21] CDCR announced several updates to mission changes and the "closure" of more than 300 inpatient beds, as reflected in the table below (reproduced from CDCR's Mission Change Letter):

| Institution | Deactivation | Cells | Reason | Reactivation Date |
|---|---|---|---|---|
| CMF PIP P1 | August 1, 2025 | 32 | Deactivation | N/A |
| CMF PIP P2 | August 1, 2025 | 36 | Deactivation | N/A |
| CMF PIP S1 | August 1, 2025 | 30 | Deactivation | N/A |
| CMF PIP S2 | August 1, 2025 | 30 | Deactivation | N/A |

---

[21] CDCR sent a revised version of the July 1, 2025 letter on July 2, 2025, which added the closure of 32 beds at CMF-PIP's P1 unit, for a net reduction of 305 inpatient beds. As reflected in the table, CDCR also announced the reactivation of 32 beds in CMF-PIP's High Custody Intermediate Treatment Center (HCITC), effective July 1, 2025.

| | | | | |
|---|---|---|---|---|
| CMF ICF A3 | August 1, 2025 | 40 | Deactivation | N/A |
| CMF PIP 64 ICF Bed Pods C & D | October 27, 2022 | 32 | Quarantine & Isolation | July 1, 2025 |
| CHCF PIP A2A | August 1, 2025 | 39 | Deactivation | N/A |
| CHCF MHCB A2B | August 1, 2025 | 38 | Deactivation | N/A |
| CHCF PIP B3A | August 1, 2025 | 30 | Deactivation | N/A |
| CHCF PIP B5B | August 1, 2025 | 30 | Deactivation | N/A |
| *Net Reduction* | | *305* | | |

Letter from Nicholas Weber, Esq., CDCR Office of Legal Affairs, to Special Master Lopes (July 2, 2025), attached hereto as Exhibit F; *see also infra* note 21. With the department's plan to close these beds effective August 1, 2025, CDCR was poised to violate, at minimum, the Court's March 8, 2017 Order, which requires a meet and confer with the Special Master "at least thirty days before making any changes, additions, or reductions in the number and/or use of any inpatient beds or mental health crisis beds." ECF No. 5573 at 3-4.

In their Mission Change Letter, CDCR variously refers to the "closure" and "deactivation" of the above-listed PIP and MHCB units at CMF-PIP and CHCF-PIP: "On August 1, 2025, the California Department of Corrections and Rehabilitation (CDCR) will *deactivate* PIP and MHCBs at CMF and CHCF. The *closure* of the PIP and MHCBs at CMF and CHCF PIP is an effort to right size the number of CDCR's inpatient beds considering decreased demand over the past several years." Exhibit F at 2 (emphasis added). Elsewhere, CDCR referred to the California Department of Public Health (CDPH) licenses for these units being "suspended." *See id.* ("The licenses for [CMF-PIP units] P2, S1, S2, and A3 will be suspended on August 1, 2025."). CDCR noted that most of these "units slated for deactivation have been empty for months, if not years." *Id.*

On July 10, 2025, plaintiffs' counsel replied to CDCR's Mission Change Letter, objecting to the "planned…permanent closure" of these 305 inpatient beds. Letter from Thomas Nolan, Esq., Rosen Bien Galvan & Grunfeld to Nicholas Weber, Esq., CDCR Office of Legal

Affairs (July 10, 2025), attached hereto as Exhibit G. In their letter, plaintiffs' counsel correctly noted that these bed closures are in addition to the previously noticed closure of 116 ICF beds in the SVSP's C5 and C6 units. Exhibit G at 1. Juxtaposed to the "many years and many hundreds of millions of dollars to plan, build, develop, license, and staff" these inpatient units, plaintiffs' argued "Defendants' decision to give the Special Master and Plaintiffs less than one month's notice [was] plainly insufficient," and "failed to comply" with the requirements of the Court's March 8, 2017 Order. Exhibit G at 2; *see also* ECF No. 5573 at 3-4 ("Until further order of the court, defendants shall meet and confer with the Special Master at least thirty days before making any changes, additions, or reductions in the number and/or use of any inpatient beds or mental health crisis beds."). Plaintiffs further questioned CDCR's "rush" to close these beds so close in time to the filing of Receiver-Nominee's forthcoming Receivership Action Plan. Exhibit G at 1-2 (referring to CDCR's "rushed decision," and characterizing this decision to "close these beds just before the Receiver has a chance to evaluate whether they may be needed to remedy the longstanding constitutional violations in this case" as "dangerous and unjustified"). Finally, plaintiffs "demand[ed] that Defendants keep these units open pending appointment of a *Coleman* Receiver and the opportunity for the Receiver to evaluate the issue and make a decision concerning these closures." Exhibit G at 2.

Following additional correspondence among the parties, the Special Master supervised a meet and confer regarding CDCR's planned bed closures on July 23, 2025. CDCR agreed to postpone the effective date of the bed closures until 30 days after the meet and confer (August 22, 2025), but otherwise, the parties reached an impasse. Since that time, plaintiffs have filed a request for leave to file a motion regarding defendants' plan to close these 305 beds. ECF No.

8710. Defendants filed their opposition to plaintiffs' request for leave to file a motion regarding CDCR's plan to close these beds on July 29, 2025. ECF No. 8711.

At minimum, there is significant uncertainty as to CDCR's ability re-open these now-licensed beds in the future if the department voluntarily "suspends" these licenses. In a July 11, 2025 email in advance of the July 23, 2025 meet and confer, defense counsel represented: "CDCR is planning to *suspend the licenses* for these beds *as opposed to surrendering them entirely*. Suspension is the option that makes it *easiest to quickly reactivate these beds*." Email from Nicholas Weber, Esq., CDCR Office of Legal Affairs, to Thomas Nolan, Esq., Rosen Bien Galvan & Grunfeld (July 11, 2025), attached hereto as Exhibit H (emphasis added).

Indeed, it remains unclear how these CMF-PIP and CHCF-PIP beds can be put back in service (easily or otherwise) if CDCR's pursues voluntary license suspension. While the rules for several CDPH facility license categories feature explicit provisions allowing a licensed facility to "voluntarily suspend" their license, the Correctional Treatment Center (CTC) regulations appear to feature no such provision.[22] Even assuming CDPH would permit CDCR to pursue a "voluntary suspension" absent explicit enabling authority, a plain reading of those CDPH's rules and regulations that allow for voluntary suspension suggests that CDCR may not be able to "reinstate" these beds to active status *unless they opt to do so within twelve months of the voluntary suspension* of these licenses. The following appears in CDPH's rules and regulations for "Acute Psychiatric Hospitals" and is representative of similar Title 22 provisions:

[22] The CTC rules permit CDHP to "suspend or revoke any license" for violation of CHPH rules, "aiding, abetting, or permitting" violation of CHPH rules, or "conduct inimical to the public health, morals, welfare or safety of the people of the State of California…." 22 CCR § 79595.

**§ 71129. Voluntary Suspension of License or Licensed Beds**

> (a) Upon written request, a licensee may request that his license or licensed beds be put in suspense. The Department may approve the request for a period not to exceed 12 months.
>
> (b) Any license or portion thereof which has been temporarily suspended by the Department pursuant to this section shall remain subject to all renewal requirements of an active license, including the payment of license renewal fees, during the period of temporary suspension.
>
> (c) Any license suspended pursuant to this section *may be reinstated by the Department within 12 months of the date of suspension* upon receipt of an application and evidence showing compliance with licensing operational requirements in effect at the time of reinstatement. *If the license is not reinstated within the 12-month period, the license shall expire automatically and shall not be subject to reinstatement*.

22 CCR § 71129 (emphasis added); see also 22 CCR § 73229 (similar provision for "Intermediate Care Facilities"); 22 CCR § 77051 (similar provision for "Psychiatric Health Facilities"). This time limiting provision was not brought to light during the meet and confer nor did defendants refer to it in their recently filed opposition to plaintiffs' request for leave to file a motion.

As noted, during the meet and confer process, defense counsel pointed to no authority supporting their contention that there was an easy path to reopening these "suspended" beds. Indeed, the long record of court oversight of defendants' various inpatient bed planning initiatives suggests otherwise. Moreover, in light of the recent growth in the MHSDS population – and the significant growth in the EOP population specifically – the Special Master urges caution in pursuing such dramatic shifts in defendants' inpatient bed capacity.

## B. AREAS OF FOCUS: ISSUES DEFENDANTS NEED TO ADDRESS REGARDING INPATIENT CARE

### 1. Staffing Vacancies

As noted, on October 11, 2023, the Court set a deadline for defendants to establish and maintain a ten percent maximum staff vacancy rate in the CDCR PIPs and come into complete compliance with the staffing ratios in the CDCR PIP Staffing Plan, within six months. *See* ECF No. 8009 at 3. On June 12, 2024, the Court set a status conference to discuss defendants' compliance with the CDCR PIP staffing plan. *See* ECF No. 8270.

During the June 27, 2024 status conference, the Court noted its "tentative plan…to proceed with enforcement of the October 11, 2023 order" using the same enforcement and fines structure established for the outpatient programs. *See* June 27, 2024 Transcript of Proceedings, ECF No. 8315 at 7. The Court confirmed this approach to enforcing the CDCR PIP maximum vacancy rate order in an order following the June 27, 2024 status conference. *See generally* June 28, 2024 Order, ECF 8301. As discussed, this is the Special Master's first report on the CDCR PIPs since the Court's October 11, 2023 order establishing the ten percent maximum vacancy rate in the CDCR PIPs and its subsequent steps toward enforcing that order.

#### a. Staffing Vacancies at Lift and Shift PIPs (CMF-PIP, CHCF-PIP, and SVSP-PIP)

In the two preceding monitoring reports, the Special Master noted "dangerously high" staffing vacancies in the Lift and Shift PIPs and noted that the "Lift and Shift PIPs [were] in a crisis, primarily driven by deficiencies that have plagued defendants' mental health care system throughout the long history of this case, including dangerously high staffing vacancies at some programs." *See* ECF No. 7555 at 37 and 7833 at 37. As of February 2025, staffing vacancies at CMF-PIP, CHCF-PIP, and SVSP-PIP remained significantly above the maximum vacancy rate of

ten percent, though vacancies at two Lift and Shift PIPs (CMF-PIP and CHCF-PIP) had improved since the preceding round.

In addition, during the review period, the three Lift and Shift inpatient programs heavily relied on registry staff to fill significant vacancies in psychiatry and primary clinician positions. However, contracts for these registry positions were temporary; most of which did not exceed six months and did not include any obligations for the staff member to renew or return on a full-time basis. *See infra* p. 256. Of the 72.8 allocated psychiatry positions at the three Lift and Shift inpatient programs on the date of each site visit, only 20 were filled by full-time state service psychiatrists, resulting in a vacancy rate of 73 percent. CDCR employed 39.3 contracted registry psychiatrists to help fill these vacancies and reduce the overall functional vacancy rate to 19 percent.

Similar reliance on registry staff was noted for primary clinician positions at these three institutions during each site visit as well.[23] Of the 140.45 allocated primary clinician positions across the three Lift and Shift inpatient programs, only 34 were full time state service employees, which created a vacancy rate of 76 percent. Reliance on 48.88 registry staff to fill these primary clinician positions reduced the functional vacancy rate to a still critically high 41 percent.

The charts below compare the functional vacancy rated observed during the Thirith and Thirty-First Round Monitoring Reports in the four key mental health staff disciplines at the Lift and Shift PIPs.[24]

---

[23] Primary clinician positions are comprised of both psychologists and clinical social workers.

[24] For Thirtieth Round staffing vacancy data, see ECF No. 7744, reflecting PIP Staffing Data that is reported as part of the *Coleman* Monthly Report reflective of January 2023. *See* ECF No. 7833 at 50 n.1. For the Thirty-First Round staffing vacancy data, see ECF No. 8585.

**Figure 1: Functional Vacancy Rates at CMF-PIP in the 30th and 31st Monitoring Reports**




**Figure 2: Functional Vacancy Rates at CHCF-PIP in the 30th and 31st Monitoring Reports**



**Figure 3: Functional Vacancy Rates at CHCF-PIP in the 30th and 31st Monitoring Reports**




As shown above, CMF-PIP and CHCF-PIP demonstrated some improvement in mental health staffing vacancies compared to the preceding monitoring period but still have critically high vacancy rates across mental health classifications that exceed the court-ordered maximum ten percent vacancy rate. For both PIPs, staffing vacancies in the Thirty-First Round exceeded 20 percent for each of the four key mental health staff disciplines. Unfortunately, at CMF-PIP, psychiatry and psychology functional vacancy rates increased since the prior review period, reaching dangerous levels of 37 percent and 65 percent respectively. Although the social worker functional vacancy rate reduced at CMF-PIP from the preceding monitoring report, the program still operates with a 60 percent functional vacancy rate.

CHCF-PIP has shown improvement in all relevant disciplines reflecting decreased functional vacancy rates from the preceding review period, however, no discipline maintained a functional vacancy rate less than 23 percent in the current review period.

In contrast to the preceding review period where SVSP-PIP was the only Lift and Shift PIP to approach compliance, see ECF No. 7833 at 50 n. 1, SVSP-PIP experienced a significant

loss of staff, reflecting an increase in the psychiatrist functional vacancy rate from one percent to 25 percent, psychology functional vacancy rate from 19 percent to 41 percent, and rehabilitation therapists from two percent to ten percent.

**b. <u>Staffing Vacancies at CDCR-Developed PIPs (CIW-PIP and SQ-PIP)</u>**

The CDCR- developed PIPs demonstrated improved staffing levels during this review period, approaching or achieving compliance for most of the four key mental health staffing classifications. The charts below compare the functional vacancy rates observed during the Thirith and Thirty-First Round Monitoring Reports in the four key mental health staff disciplines at the CDCR developed PIPs.[25]

**<u>Figure 4: Functional Vacancy Rates at SQ-PIP in the 30th and 31st Monitoring Reports</u>**




[25] For Thirtieth Round staffing vacancy data, see ECF No. 7744, reflecting PIP Staffing Data that is reported as part of the *Coleman* Monthly Report reflective of January 2023. *See* ECF No. 7833 at 50 n.1. For the Thirty-First Round staffing vacancy data, see ECF No. 8585.

**Figure 5: Functional Vacancy Rates at CIW-PIP in the 30th and 31st Monitoring Reports**




At the conclusion of February 2025, SQ-PIP was each compliant for each of the four key staffing areas. CIW-PIP was compliant for only rehabilitation therapist positions while maintaining a 17 percent functional vacancy rate for psychiatrists, psychologists, and social workers, respectively.

**c. Staffing Vacancies at DSH**

With the exception of one social worker position at DSH-Patton, all four disciplines of psychiatry, psychology, clinical social workers, and rehabilitation therapists at DSH-Coalinga and DSH-Patton were filled by state service and registry staff during the Thirty-First Monitoring Round. Notably, all four disciplines were also filled by state service and registry staff at DSH-Coalinga and DSH-Patton during the Thirtieth Round.

There continued to be staffing concerns at DSH-Atascadero during this review period. Notably, none of the three disciplines of psychiatry, psychology, and clinical social workers achieved less than 20 percent functional vacancy while rehabilitation therapists were still not compliant with an 11 percent functional vacancy rate.

Below is a chart comparing the functional vacancy rate for mental health disciplines at DSH-Atascadero in the Thirtieth and Thirty-First Monitoring Round.[26]

**Figure 6: Functional Vacancy Rates at DSH-Atascadero in the 30th and 31st Monitoring Reports**




As noted, for staff psychiatry and staff psychology positions, there was no change in the functional vacancy rate from the preceding monitoring round. While the social worker and rehabilitation therapist functional vacancy rates decreased slightly but remained non-compliant during the review period.

**2. Referrals and Transfers**

**a. Referrals and Transfers to DSH**

As discussed in greater detail elsewhere in this report, during the review period, defendants activated several "trial processes" in an effort to increase referrals of low-custody

[26] For Thirtieth Monitoring Round data contained in these charts, see ECF No. 8085 at 34-38.

patients to DSH facilities.[27] Although defendants' pursuit of these initiatives was encouraging on some level, as of the time of these writing approximately half of all *Coleman* designated DSH beds were still vacant, and progress to increasing utilization of these critical inpatient mental health beds plateaued over the course of the review period.

In the Thirtieth Round Monitoring Report on DSH hospitals, the Special Master observed that the number of referrals to DSH decreased slightly from 123 in the Twenty-Nineth monitoring round to 120 in the Thirtieth monitoring round, representing a two percent decrease in total referrals to DSH. *See* ECF No. 8085 at 62-63 and ECF No. 8085 at 31. However, following implementation of the first two LRH trial processes in October 2023, as identified below, the number of referrals to DSH increased to 332, an increase of 176 percent.

Of the 332 patients referred to DSH during the Thirty-First Round, 150 or 45 percent of patient referrals were rescinded by the referring institution while one was rejected. While neither CDCR nor DSH provided reasons for rescission of patient referrals to DSH, rescission rates from the two preceding monitoring rounds reflect a noteworthy increase in rescissions of referrals to inpatient care at DSH facilities over the last three reviews. *See* ECF No. 7625 at 104, 125, and 146 (reporting no rescissions of referrals to DSH during the Twenty-Ninth Monitoring Round),; s*ee also* ECF No. 8085 at 92, 110, and 127 (reporting 50 rescissions or 41 percent of the 120 referrals to DSH during the Thirtieth Round).

Nonetheless, the increase in patient admissions to DSH facilities proved to be a fruitful start to the first two DSH trial processes. As compared to the 62 admissions to DSH facilities

---

[27] The first two DSH Trial Processes began in October 2023 while the three additional trial processes began in September 2024, after the review periods for both DSH and PIP institutions in the Special Master's Thirty-First Monitoring Round. Therefore, an assessment of the effects of the five trial processes was not feasible during the review period.

during the Thirtieth Monitoring Round, there were 176 total admissions during the current review period.

As for transfer timelines, patient transfers were compliant with required timeframes at DSH-Coalinga and DSH-Patton. DSH-Atascadero approached compliance with transfer timeframe requirements, with 101 of 116 or 87 percent of patients transferring within 30 days as required.

Although the number of *Coleman* patients admitted to DSH facilities increased significantly from the historic lows observed in the prior review period, many of these critically important inpatient beds remained vacant during the review period. *See* ECF No. 8085 at 92, 110, and 127; *see also infra* pp. 56-61.

**b. Referrals and Transfers to PIPs**

While efforts to increase access to required inpatient mental health care is deeply rooted in the *Coleman* remedy, in recent years, both the Special Master and the defendants have observed and reported on the significant decrease in referrals to acute and intermediate care. As previously reported, the recent significant drop in referrals to inpatient care was first observed at the start of the COVID-19 pandemic, a trend that has continued through the present, which includes the time of defendants' most recent Unmet Needs Assessment (UNA).[28] *See* ECF No.

[28] On September 13, 2021, the Court found that "the absence of a robust sustainable process for identification and referral of inmates to inpatient care has inevitably led to large numbers of inmates in need of inpatient care remaining unidentified and unreferred to such care." ECF No. 7305 at 14. Given these findings, the Court ordered the defendants, under the supervision of the Special Master, to "undertake an unmet bed needs study to assess whether there are class members in need of inpatient or crisis bed care who have not been identified or referred to necessary care." *See id*. at 14-15. The defendants, working under the Special Master's supervision, conducted the UNA reviews between April 2022 and March 2023. Defendants filed their report on the UNA study with the court on June 30, 2023, concluding there was "no such unmet need as the number of referrals during the UNA were not substantially or consistently higher than referral numbers in previous years using CDCR's baseline referral process." *See* ECF

7833 at 43 (citing ECF No. 7555 at 122). While the Court found defendants' report on its UNA study "persuasive in its finding that CDCR has enough inpatient beds and mental health crisis beds (MHCBs) to meet class member need for these levels of care," it also "identified some questions not intended to be answered by the UNA or the Report but nonetheless best addressed promptly in aid of a sustainable remedy." November 15, 2023 Order, ECF No. 8066 at 3. These "questions" included "why referrals to inpatient mental health care have not returned to the referral levels that preceded the onset of the COVID-19 pandemic," and "what lessons were learned during the UNA study about the impact of staffing shortages on access to care and interdisciplinary treatment team (IDTT) referral decisions." *Id.* at 3-4.

In the Thirtieth Round Monitoring Report – Part A, the Special Master reported that based upon defendants' monthly inpatient census and waitlist filings, "referrals to CDCR's PIPs remain significantly below pre-COVID-19 levels…" *See* ECF No. 7833 at 44. Prior to the COVID-19 pandemic, "the number of referrals to CDCR's PIPs, inclusive of both referrals to acute and intermediate care was consistently near to or well in excess of 300 referrals per month between August 2017 – March 2020." *Id.* at 43. (Internal quotations omitted). However, in the Thirtieth Round Report, the Special Master noted that there were 964 acute and intermediate care patient referrals to CDCR PIPs during the six month review period covered in that report (June 1, 2022 to November 30, 2022).

During the review period covered in this report, this trend continued, as there were 872 total acute and intermediate care referrals to the Lift and Shift inpatient programs and an

---

No. 7865-3 at 9. In its November 15, 2023 Order, ECF No. 8066 at 3, the Court indicated that the UNA was "persuasive in its finding that CDCR has enough inpatient beds and mental health crisis beds (MHCBs) to meet class member need for these levels of care."

additional 100 acute and intermediate referrals to the SQ-PIP and CIW-PIP, for a total of 972 total referrals to PIP institutions, similar to the 964 referrals observed in the preceding round. Compared to the preceding monitoring round by PIP, total referrals decreased by 27 percent to CMF-PIP, increased by 79 percent to CHCF-PIP, decreased by 52 percent to SVSP-PIP, increased by 58 percent to CIW-PIP, and decreased by 54 percent to SQ-PIP.

A review of defendant's monthly inpatient census and waitlist filings from January 2023 through December 2024 continue to indicate that referrals to CDCR's PIPs remain below pre-COVID-19 levels and have been for two years.[29]

**Figure 7: Patient Referrals to CDCR PIPs from January 1, 2023 through December 31, 2023**




[29] *See* ECF Nos. 7730 at 21 (January 2023), 7762 at 21( February 2023), 7811 at 21 (March 2023), 7836 at 21 (April 2023), 7859 at 23 (May 2023), 7874 at 22 (June 2023), 7921 at 22 (July 2023), 7949 at 22 (August 2023), 8014 at 22 (September 2023), 8067 at 22 (October 2023), 8086 at 19 (November 2023), 8109 at 22 (December 2023), 8132 at 22 (January 2024), 8158 at 23 (February 2024), 8199 at 23 (March 2024), 8237 at 23 (April 2024), 8280 at 23 (May 2024), 8333 at 23 (June 2024), 8357 at 23 (July 2024), 8402 at 23 (August 2024), 8432 at 23 (September 2024), 8464 at 23 (October 2024), 8495 at 23 (November 2024), and 8516 at 23 (December 2023).

**Figure 8: Patient Referrals to CDCR PIPs from January 1, 2024 through December 31, 2024**




While referrals to inpatient care have not returned to pre-COVID 19 levels, patients who were referred to and accepted into a CDCR PIP have, by and large, transferred to those programs within the timeframes prescribed in the Program Guide. See ECF No. 7833 at 45 (reporting, in the Thirtieth Round, "[o]n a positive note, CDCR timely transferred patients referred to the PIPs during the review period." This commendable trend continued into the Thirty-First Round as all patients that were admitted to acute and intermediate care programs transferred timely upon acceptance within Program Guide requirements. *See infra* p. 143-145.

3. **Least Restrictive Housing (LRH) Placements**

"Providing timely access to DSH beds for all CDCR [patients] who meet clinical and custodial requirements for placement at [the three hospitals] is essential to the remedial process in the *Coleman* case." *See* ECF No. 5894 at 22. Since the preceding monitoring round, it has been apparent that the underutilization of *Coleman* designated beds at DSH is in part attributable to the fact that many patients referred to inpatient care have a custodial LRH of unlocked

dorms.[30] *See* ECF No. 7833 at 49. To ensure sufficient, timely access to the low-custody inpatient beds at DSH, defendants have been required to develop a least restrictive housing policy that ensures that all patients who are possibly suitable for DSH admission are considered. Although defendants have developed five trial processes since October 2023, as of the time of this writing, defendants' have not formalized any of the trial processes into policy. The sections that follow provide brief updates regarding LRH since the preceding inpatient report.

**d. <u>PIP Policy – Housing Review/Least Restrictive Housing</u>**

By way of review, revisions to CDCR's proposed Policy and Procedure regarding Housing Review and related efforts to address concerns regarding patient access to Least Restrictive Housing were considered in 2021 through the small workgroup process. *See* Special Master's Thirtieth Round Monitoring Report Part A, ECF No. 7833 at 36-37 (discussing revisions to CDCR's Policy and Procedure regarding Housing Review/Least Restrictive Housing). These discussions stalled for more than a year and were renewed when defendants distributed a further revision to the Housing Review/Least Restrictive Housing policy on November 8, 2022. At the time the Special Master filed the Thirtieth Round review of the PIPs in May 2023, defendants had not yet finalized this policy.

[30] According to the September 26, 2023 Housing Review/Least Restrictive Housing Policy (12.11.2111), "patients shall receive treatment in the least restrictive housing based on their Least Restrictive Housing (LRH) designation. Patients shall only be treated in a more restrictive housing when specific clinical factors…prevent a patient from being safely treated within their LRH designation or if there are no vacant beds within a housing program consistent within the LRH and/or Clinical Housing Recommendation (CHR)." In this policy, "Least Restrictive Housing (LRH)" is defined as "the lowest custody setting in which a patient may be housed within a PIP, Flex Bed location, or DSH Hospital as determined by California Correctional Health Care Services Health Care Placement Oversight Program (HCPOP)." "Clinical Housing Review (CHR)" is defined as "[a] recommendation for housing in the PIP that is based on the patient's current clinical functioning."

**e. Developments Related to Transfers to Inpatient Programs**

On August 11, 2023, the Court ordered the parties to submit a joint status report addressing sustained compliance with Program Guide requirements to timely transfer patients to inpatient programs, which the parties responded to on September 26, 2023. *See* ECF No. 7916; *see also* ECF No. 7969. Among the steps defendants outlined to facilitate sustained compliance with inpatient transfer timeframe requirements was a "two-step plan anticipated to increase the number of patients accepted into DSH" and later described as "trial processes." *See* ECF No. 7969 at 5-7.

In their response, Plaintiffs argued that in order to sustain compliance with inpatient transfer requirements, defendants must utilize the empty DSH beds that were reserved for *Coleman* class members. *See id*. at 11. They also believed that the LRH policy was the biggest barrier placing patients in DSH beds. *Id*. at 12. Plaintiffs also reported their concern about the number of inpatient beds offline due to staffing. *Id*. Lastly, plaintiffs believed that the defendants needed to fully implement the program for patients with personality disorders so that acute and intermediate care beds can be utilized for "patients that need traditional inpatient psychiatric hospital care." *Id*. at 12.

On September 29, 2023 and November 7, 2023, the Court held status conferences to discuss timely transfers to inpatient mental health care. *See* ECF Nos. 7916 and 8066. Between the two status conferences, the defendants provided the Special Master and the Plaintiffs with information regarding two initial trial processes to transfer patients from CDCR to DSH. *See* October 6, 2023, Email from Kristopher Kent to Plaintiffs and Special Master, attached hereto as Exhibit B.

**f. <u>Initial (October 2023) Trial Processes</u>**

In its October 6, 2023, email referenced above, DSH sent the Special Master and plaintiffs' counsel a document outlining defendants' new "Trial Process for DSH Review of *Coleman* Patients." *Id.* While this was a new process, DSH and CDCR indicated that the changes were consistent with the MOU and that they would monitor the changes for six months to assess whether they increased admissions to DSH. *Id.* This "trial process" had two components. *See* Trial Process for DSH Review of Coleman Patients at 1, attached hereto as Exhibit I. The two components were:

<u>New Referrals from Different Level of Care (CCCMS, EOP, MHCB, and APP)</u>

- Review every referral with an LRH of Unlocked Dorms regardless of clinical housing recommendation. This will increase the pool of referrals DSH reviews and may lead to increase in admissions to DSH.

<u>CDCR and DSH Utilization Review: Out of LRH Referrals From an ICF Setting</u>

- Every 30-45 days, CDCR IRU will select and review in collaboration with DSH a set number of patients out of LRH (for Unlocked Dorms) to determine if certain patients are indicated for an unlocked dorm setting.
- The number of patients, in a PIP-ICF program, being reviewed would be approximately 40-50 for each 30-45 day review period to help ensure a continued and sustained review of patients out of LRH.
- This process may lead to shorter stays in the PIPs for those clinically indicated patients with an LRH of Unlocked Dorm and an increase in admissions to the state hospital. Consequently, this may also improve bed availability at CDCR ICF PIPs.

- Additionally, this joint review could include patients with a single-cell chrono that was given due to their fragility from a severe mental illness and determine if they could be housed and treated in a state hospital (if the single-cell chrono was not due to severe in-cell violence and custody and the treatment team agrees with its removal)
- DSH reviews should not replace treatment team decision making to refer a patient to their LRH.

*Id*. at 1-2.

Defendants represented that after implementing the review process, they would monitor the process to determine whether it increased the identification of individuals who were "initially admitted to a DSH bed or who step down from a PIP." *Id.* at 4. If there was an increase, the trial processed would be made permanent. *Id*.

Thereafter, the parties met and conferred under the Special Master's supervision to discuss defendants' proposed trial processes for DSH admissions. The Special Master's experts were also afforded an opportunity to observe five rounds of the out of LRH reviews between November 2023 and May 2024.

On April 15, 2024, the parties filed a joint proposal requesting that the court defer further discussion about the LRH policy and other steps to enhance class members' access to DSH until 30 days after the court terminated mediation.[31] ECF No. 8200 at 1. On that same day, the parties met under the direction of the Special Master. On April 18, 2024, the court granted the parties'

[31] On March 8, 2024, the Court referred the contempt findings regarding staffing to a Ninth Circuit Mediator for 60 days. ECF No. 8147. After the April 12, 2024 mediation, the parties requested that conversations regarding LRH be deferred as discussions were happening in the context of mediation, and the court ordered that the parties submit a joint proposal on the matter. ECF No. 8197.

request to defer discussion about the LRH policy and related steps to enhance members' access to DSH. ECF No. 8205 at 1. The matter was reset for hearing on June 27, 2024. *See* ECF No. 8270.

**g. <u>Additional (June 2024) Trial Processes</u>**

On June 18, 2024, just over a week prior to a status conference planned for June 27, 2024, CDCR and DSH provided notice that they intended to implement three *additional* trial processes to increase the number of *Coleman* patients admitted to DSH. *See* June 18, 2024 Letter from E. Thorn to Special Master Lopes and M. Bien, attached hereto as Exhibit J. The three additional trial processes included:

1. Review of Custodially Ineligible Patients: "The objective of this trial process is to review Coleman patients who are currently ineligible for placement at DSH because they are designated as close custody and who (1) have a sentence of life without the possibility of parole, (2) are at least 62 years old; and (3) are designated single cell suffix (only as a result of mental health reasons or victimization concerns)."
2. DSH-Atascadero Select Coleman Admissions: "The objective of this trial process is to use a small number of beds on the DSH-Atascadero admissions unit as part of the 256 DSH-Atascadero Coleman Beds to provide focused clinical support for Coleman patients at the intermediate level of care to help them stabilize so that they can transition to unlocked dorm intermediate care units in DSH-Atascadero."
3. Long Term Intermediate Hospitalization: The objective of this trial process is to identify patients from DSH's intermediate care setting who have demonstrated difficulty maintaining clinical stability upon their return to CDCR's Enhanced

> Outpatient Program and to provide them with treatment in DSH's long-term intermediate hospitalization program for an extended period, but not to exceed the patients' maximum CDCR sentences.

During the June 27, 2024 hearing, the court acknowledged defendants' June 18, 2024 letter to the Special Master. *See* ECF No. 8315 at 4. The court announced its expectation that the parties would continue to meet and confer under the Special Master's supervision and directed the Special Master to inform the court if there was a need for further proceedings. *Id.* at 5. On July 29, 2024, the parties met and conferred under the Special Master's supervision to discuss the additional trial processes outlined in the June 18, 2024 letter. After the meet and confer, the Defendants, on August 9, 2024, stated that they intended to begin "DSH-Atascadero Select *Coleman* Admissions" and "Long Term Intermediate Hospitalization" on August 9, 2024. *See* Email from D. McClain to M. Bien and Special Master Lopes, attached hereto as Exhibit K. "Review[s] of Custodially Ineligible Patients" would begin on September 16, 2024. *Id.*

On December 10, 2024, plaintiffs requested a status update on the new trial processes and expressed concern that all trial processes were not fully implemented or have not had their intended effect as progress towards increasing bed utilization at DSH had plateaued. *See* December 10, 2024 Email from Luma Khabbaz to Damon McClain, attached hereto as Exhibit L. Plaintiffs followed up on their request, on January 9, 2025, and the defendants provided a response. *See* January 9, 2025 Emails from Luma Khabbaz to Damon McClain and Kristopher Kent to Luma Khabbaz, attached hereto as Exhibit M. Defendants responded that they had decided to make the trial process permanent and that they would draft a policy document and share it with the parties regarding the trial process. *See also* June 26, 2024 Email from Elise Thorn, Esq. to Luma Khabbaz and Special Master, attached hereto as Exhibit N.

On February 21, 2025, plaintiffs acknowledged Defendants' response to their January 9, 2025 letter and asked questions about each of the five trial processes and requested monthly reports on the outcome and progress of these trial processes. *See* February 21, 2025 Letter from A. Harrold to K. Kent, attached hereto as Exhibit O. The parties met on February 26, 2025 under the supervision of the Special Master. On February 27, 2025, CDCR provided documentation that IRU staff was provided regarding the process and plaintiffs acknowledged receipt. *See* February 27, 2025 Emails between N. Weber and A. Harrold, attached hereto as Exhibit P.

While the Special Master remains generally supportive of the various trial processes defendants' have pursued over the last year to increase utilization of the low-custody beds at the DSH programs, the lack of clarity and finality to these "trial processes" is a concern. While defendants have indicated their intent to finalize most of the new processes, they have offered no timeframe in which they plan to finalize them, leaving the permanency of these well-intentioned developments in limbo. In an April 21, 2025 email, the Special Master again urged defendants to clarify its timeline for finalizing these processes and incorporate them into the memorandum of understanding between CDCR and DSH. *See* April 21, 2025 Email from Deputy Special Master Kerry Walsh, Esq. to Nick Weber, Esq., Office of Legal Affairs, attached hereto as Exhibit Q. As of the time of this writing, defendants had not responded to the Special Master's April 21, 2025 correspondence.

**4. <u>Access to DSH Hospitals</u>**

**a. <u>Current Status of DSH Census and Waitlist</u>**

As of February 24, 2025, DSH-Atascadero reported a bed capacity of 256 and a census of 125 patients which represented a 49 percent fill rate. DSH-Coalinga reported a bed capacity of 50 and a census of 42 patients, representing an 84 percent fill rate. While DSH-Patton reported a

bed capacity of 30 and a census of 15. The February 24, 2025 Census, Waitlist, and Transfer Timelines Compliance report indicated that there were no acute care patients at DSH-Patton. See ECF 8571 at 7.

The waitlist as of February 24, 2025 at DSH-Atascadero and DSH-Coalinga included a total of 28 patients awaiting admission including referrals pending review, referrals accepted from CDCR prisons, and accepted referrals from CDCR PIPs. The waitlist as of February 24, 2025 at DSH – Patton consists of one patient's referral pending review.

**b. DSH Bed Utilization**

The DSH trial processes identified above were designed to facilitate movement of patients to the low-custody inpatient beds at DSH hospitals and fill the number of allocated DSH beds that were not being utilized. During this timeframe, bed capacity for *Coleman* patients requiring inpatient mental health care at the three DSH institutions remained at 256 beds at DSH-Atascadero, 50 beds at DSH-Coalinga, 30 beds at DSH-Patton for female incarcerated persons requiring inpatient mental health care.[32] However, data from September 2023 through February 2025 revealed that although the number of utilized beds slightly increased following the implementation of each trial process in October 2023 and September 2024, respectively, the *Coleman*-patient census at two of the three hospitals continued to be *significantly* lower than the patient bed capacity. *See infra* p. 57 n. 32.

---

[32] *See* Defendant's Census, Waitlists, and Transfer Timelines Compliance Reports for Inpatient Mental Health Care, ECF No. 8014 at 6, ECF No. 8067 at 6, ECF No. 8086 at 6, ECF No. 8109 at 6, ECF No. 8132 at 8, ECF No. 8158 at 9, ECF No. 8159 at 11, ECF No. 8199 at 9, ECF No. 8237 at 9, ECF No. 8280 at 9, ECF No. 8333 at 9, ECF No. 8358 at 9, ECF No. 8402 at 9, ECF No. 8432 at 9, ECF No. 8464 at 9, ECF No. 8495 at 9, ECF No. 8516 at 9, ECF No. 8547 at 9, and ECF No. 8571 at 9.

In September of 2023, one month prior to the implementation of the first two trial processes, DSH-Atascadero's *Coleman* patient population reflected 61 filled beds, which accounted for 24 percent of the total beds available for *Coleman* patients. *See* ECF No. 8014 at 6. In October 2023, the number of utilized beds decreased to 59, accounting for 23 percent of the total beds available for *Coleman* patients. *See* ECF No. 8067 at 6. Following the implementation of the first two trial processes, in October 2023, the number of utilized beds increased to 64 or 25 percent and 76 or 30 percent in November and December of 2023, respectively. *See* ECF Nos. 8086 at 6 and 8109 at 6. As reflected in *Figure 9* below, the total number of unfilled beds at DSH-Atascadero remained higher than the total *Coleman* patient census from January 2024 through February 2025 despite the two trial processes in place since October 2023 and an additional three DSH trial processes implemented in September 2024.

**<u>Figure 9: DSH-Atascadero bed capacity and census from January 2024 through February 2025.</u>**




DSH-Coalinga, however, maintained a significantly higher bed utilization rate from September 2023 through February 2025. In September 2023, *Coleman* patient bed population

reflected 40 of the 50 beds filled, which accounted for 80 percent of the total beds available for *Coleman* patients. *See* ECF No. 8014 at 6. In October 2023, the number of beds utilized increased to 42, accounting for 84 percent of the total beds available for Coleman patients. *See* ECF No. 8067 at 6. Following the implementation of the first two trial processes, in October 2023, the number of beds that were utilized was 42 or 84 percent and 34 or 68 percent in November and December of 2023, respectively. *See* ECF Nos. 8086 at 6 and 8109 at 6. In *Figure 10* below, DSH-Coalinga's monthly census fluctuated between 39 and 46 patients from January 2024 through August 2024. Following the implementation of the three additional trial processes in September 2024, the monthly census increased to 49 in November 2024 then decreased to monthly census levels consistent with those reported prior to the three new trial processes.

**<u>Figure 10: DSH-Coalinga bed capacity and census from January 2024 through February 2025</u>**




DSH-Patton reported a significantly low census from September 2023 through February 2025. Prior to the implementation of the first two trial processes, the defendants reported that the

monthly census for DSH-Patton in September 2023 was three patients which represented ten percent of the 30 allocated *Coleman* patient beds. *See* ECF No. 8014 at 6. After implementation of the first two trial processes, the monthly census rose to eight in October, nine in November, and fell to four patients in December, representing 27 percent, 30 percent, and 13 percent of the 30 allocated *Coleman* patient beds, respectively. *See* ECF Nos. 8067 at 6, 8086 at 6, and 8109 at 6. As depicted in *Figure 11* below, the patient census at DSH-Patton did not exceed 17 percent of its bed capacity from January 2024 until November 2024, two months after the implementation of the three other trial processes. In December 2024, the Coleman patient census nearly doubled and had tripled by February 2025.

**<u>Figure 11: DSH-Patton bed capacity and census from January 2024 through February 2025</u>**




The number of beds utilized at the three hospitals was also effected by the number of patients awaiting transfer from either CDCR institutions or CDCR PIPs to DSH for inpatient

treatment (i.e. placed on a waitlist) from January 2024 through February 2025.[33] The number of patients who were placed on a waitlist for transfer to DSH-Atascadero and DSH-Coalinga for inpatient care fluctuated significantly in the 13 examined months. *See supra* p. 57 n. 32. As depicted in *Figure 12* below, the number of patients who were placed on a waitlist for transfer to DSH-Atascadero or DSH-Coalinga varied by month from 11 to 28. While the number of patients who were placed on a waitlist for transfer to DSH-Patton varied from zero to seven and only exceeded five total patients in January 2025. Unfortunately, while these patients awaited DSH admission, most received inpatient treatment at a custody level that was higher than that provided in the unlocked dorm setting at DSH. Patient transfer timelines for those on waitlists, including the number of patients who were referred to DSH and were pending admission, are discussed below. *See infra* pp. 96-97.

**<u>Figure 12: Number of patients on DSH waitlists from January 2024 through February 2025</u>**




[33] Defendant's Monthly Vacancy Reports indicate that patients considered to be placed on a "waitlist" include those who have been referred to DSH for placement but are pending review and accepted referrals from either CDCR Prisons or CDCR PIPs. *See* ECF No. 8571 at 7.

These three DSH hospitals are the highest performing programs in the State providing inpatient treatment to *Coleman* patients. Although the overall increase in census numbers for these three programs following the DSH trial process implementation is encouraging the number of unfilled beds remains high. A formalized LRH policy detailing the framework of the five trial processes identified above is necessary to effectively operationalize these well-intentioned efforts to optimize DSH bed utilization for those members of the patient class who require inpatient mental health care.

**5. <u>Clinical Services and Treatment in Inpatient Programs</u>**

Since the preceding monitoring report, there have been significant developments related to minimum treatment standards for *Coleman* patients receiving inpatient mental health care in CDCR's PIPs. In addressing CDCR PIP underperformance in providing adequate mental health care to *Coleman* class members, the Special Master discovered, through multiple rounds of monitoring, that patients uniformly received less structured therapeutic activities, unstructured out-of-cell time, and individual treatment than would be expected in a functioning inpatient program. *See* ECF No. 7039 at 116. In certain instances, class members were found to receive more mental health care (i.e. group therapy and individual treatment) in an EOP program in the prisons than in a CDCR PIP setting. *Id.*

As a result, in his January 28, 2021 inpatient monitoring report, the Special Master made the following recommendation:

> To the extent necessary to remedy any deficiencies identified in the foregoing report, the CDCR and DSH defendants, under the guidance and supervision of the Special Master, and with input from the plaintiffs as appropriate, shall develop plans within 90 days to provide structured therapeutic activities, unstructured out-of-cell activities, treatment planning, and individual treatment, including for maximum custody patients consistent with a psychiatric inpatient level of care, as well as implement a system for tracking and reporting adherence to the standards developed.

ECF No. 7039 at 118. The court adopted the Special Master's findings in full in its August 17, 2022 order. However, at that time, the Court declined to adopt the Special Master's recommendation regarding minimum treatment standards in part based on defendants' representation that, subject to requests for clarification, "they expected 'to develop and submit plans to the Special Master within 90 days' and that 'implementation of a system for tracking and reporting adherence to the standards developed will require additional time." *See* ECF No. 7605 at 9-10.

While the defendants represented to the court that they planned to develop and submit the recommended plans for minimum treatment standards in the PIPs, they ultimately did not do so. *See* ECF No. 7608 at 5 (August 29, 2022 Order adopting Special Master's Twenty-Ninth Round Monitoring Report – Part A (ECF No. 7555) regarding CDCR's PIPs). Thereafter, in his May 17, 2022 Report, the Special Master repeated his recommendation:

> Consistent with the recommendations contained in the Special Master's 2021 Inpatient Care Report, to the extent necessary to remedy any deficiencies identified in this report, within 90 days CDCR under the guidance and supervision of the Special Master, and with input from the plaintiffs as appropriate, shall develop minimum standards for the provision of structured therapeutic activities, unstructured out-of-cell activities, treatment planning, and individual treatment, consistent with a psychiatric inpatient level of care, and shall develop plans to provide such structured therapeutic activities, unstructured out-of-cell activities, treatment planning, and individual treatment consistent with he established minimum standards. CDCR shall also develop and implement a system for tracking and reporting adherence to the standards developed.

ECF No. 7555 at 164-165.

While the court adopted the Special Master's findings in his May 17, 2022 report in full, the court did not adopt the Special Master's recommendations regarding development of remedial plans and minimum treatment standards but rather referred this topic to discussions between the Special Master and CDCR Secretary. The court "signaled it would accept a declaration" from the CDCR Secretary "setting out any agreed-upon" CDCR PIP minimum

treatment standards.[34] These discussions stalled and thereafter the Court directed the parties to meet and confer under the Special Master's supervision to discuss and, if possible, stipulate to a plan for minimum treatment standards in the CDCR PIPs. *See* ECF No. 7697 at 3-4.

On March 28, 2023, the defendants' filed their proposed plan, which included no requirement for a minimum number of structured treatment hours, leaving the amount of structured programming offered to patients to "individualized clinical assessment and treatment planning by the [IDTT], updated based on clinical progress per the standard of care." *See* ECF No. 7787 at 6. On April 17, 2023, plaintiffs filed a motion asking the court to reject the plan. ECF No. 7812. Following additional motion practice, on August 23, 2023, the court concluded that defendant's plan for minimum treatment standards in the CDCR PIPs was inadequate. *See* ECF No. 7924 at 10. The court stated that it had previously found the minimum standards for treatment of inpatient class members adopted by DSH as adequate and directed defendants to adopt the minimum treatment standards set out in the DSH CQI process. *See id*. Defendants subsequently appealed this order. ECF No. 7953.

---

[34] In its August 29, 2022 Order, the Court noted the following:

> In response to the virtually identical recommendations in the Special Master's 2021 Inpatient Report, defendants had committed to development and submission of plans to the Special Master within ninety days and 'to working with the Special Master to clarify the required components requested in this recommendation.' Defendants have not followed through on the commitment they made to the Special Master and to this court, and they provided no cogent explanation for this failure. In the interests of maintaining a proper focus on the work that remans to be done, while expressing its disappointment, the court will refer this issue as well to the Special Master and [CDCR Secretary] for discussions aimed at remediating the deficiencies identified in the Report by a date certain.

ECF No. 7608 at 5.

Following defendants' appeal, on August 30, 2024 the Ninth Circuit affirmed the District Court's order and on September 3, 2024, CDCR released the PIP Minimum Treatment Policy. *See* September 4, 2024 Email from N. Weber to A. Gourse. The policy stated that:

To comply with this policy, the following requirements must be met:

- Each patient will have a minimum of 20 hours of programming offered each week. This will include at least ten (10) hours of core treatment hours, with the remainder being supplemental treatment, unless clinically contraindicated pursuant to a properly documented Modified Treatment Plan. A review of each patient's Master Treatment Plan is required to ensure a rationale is documented for any patients offered fewer than 20 hours of treatment. The treatment plan shall include plans for improving patient participation.
- Data about treatment services will be used to evaluate the core and supplemental treatment hours offered.

The instant Thirty-First Round Inpatient Report is the first review of the inpatient programs since the minimum treatment standards were set on August 23, 2023. *Figure 13* below reflects the average weekly number of structured treatment hours offered to PIP patients during the respective review periods covered in this report for all five CDCR PIPs.

**Figure 13: Average Number of Structured Treatment Hours Offered to PIP Patients Per Week During Respective PIP Review Periods**

| PIP | Average Weekly Number of Structured Treatment Hours Offered to Acute Care Patients | Average Weekly Number of Structured Treatment Hours Offered to Intermediate Care Patients |
|---|---|---|
| **CMF-PIP** | 8.41 hours per week | 7.83 hours per week |
| **CHCF-PIP** | 14.5 hours per week | 15.83 hours per week |
| **SVSP-PIP** | N/A | 10.84 hours per week |
| **CIW-PIP** | 7.68 hours per week | 9.93 hours per week |
| **SQ-PIP** | 4.8 hours per week | 14.8 hours per week |

*See infra* pp. 113-116.

While none of the CDCR PIPs have yet to meet the minimum treatment standards, these data indicate the standards are having some initial success in pushing the average number of hours upward at some programs compared to the preceding round, a promising development in an otherwise mixed review of these vitally important programs.

## PART II.
## THE SPECIAL MASTER'S FINDINGS AT THE DEPARTMENT OF STATE HOSPITALS

### A. CENSUS

As of May 9, 2024, DSH-Atascadero's Program V housed 113 intermediate care *Coleman* patients, accounting for 44 percent of the hospital's 256 designated *Coleman* beds. The hospital did not report an average *Coleman* patient monthly census for the review period. Patients were housed in four housing units in Program V, including 35 patients in Unit 30, 22 in Unit 32, 32 in Unit 33, and 24 in Unit 34. The *Coleman* patient population had increased by 46 percent since the Thirtieth Round, when DSH-Atascadero housed 67 *Coleman* patients. *See* ECF No. 8085 at 82.

As of May 15, 2024, DSH-Coalinga's Unit 21 maintained a 50-bed intermediate care facility that housed 44 intermediate level of care *Coleman* patients. The hospital's *Coleman* census was 63 percent higher than its 27-patient census during the prior review in December 2022. During this review period, the monthly *Coleman* census averaged 41 patients, while it averaged 22 patients during the previous reporting period. *Id.* at 102.

DSH-Patton operated a 30-bed intermediate care facility that treated female *Coleman* patients during the review period. As of May 1, 2024, DSH-Patton housed two *Coleman* patients; both were intermediate level of care. Average monthly census data for the review period was not provided.

**B. STAFFING**

Similar to the previous round, DSH-Atascadero continued to report significant staffing vacancies in its Program V facility while staffing remained strong at both DSH-Coalinga and DSH-Patton. During the review period, DSH-Atascadero was unable to indicate whether the executive/management/leadership positions were filled and reported functional vacancy rates that exceeded ten percent for psychiatrists, psychologists, social workers, and rehabilitation therapists. Notably, no discipline at DSH-Atascadero achieved less than a 22 percent functional vacancy rate at the time of reporting. On the other hand, DSH-Coalinga and DSH-Patton reported filling all executive/management/leadership positions, while each institution reported filling almost all psychiatry, psychology, social work, and rehabilitation therapy positions with only one of two clinical social worker positions vacant at DSH-Patton. All three institutions satisfied the 1:30 staff-to-patient ratio as required.

As compared to the other two hospitals, DSH-Atascadero demonstrated concerning staffing vacancies during the Thirty-First Round. Specifically, DSH-Atascadero did not indicate whether the executive director, clinical administrator, or hospital administrator were filled during the review period. However, the medical director and chief psychologist positions were filled.

For psychiatry positions as DSH-Atascadero, all three senior supervising psychiatrist positions were vacant as they were in the Thirtieth Round. *See* ECF No. 8085 at 34. Seven of nine psychiatrist positions were filled for a 22 percent vacancy rate, representing a drastic improvement from the Thirtieth Round's psychiatry vacancy rate of 77 percent (though, notably, contractors reduced the functional vacancy rate in the Thirtieth Round to 22 percent). *See id.*

As for psychology, there were 12.3 allocated senior supervising psychology positions of which 9.97 were filled for a 19 percent vacancy rate. Like the prior reporting period, six of nine psychologist positions were filled for a 33 percent vacancy rate. *See id*. at 35.

For social workers, DSH-Atascadero reported that five of six supervising psychiatric social worker positions were filled for a 17 percent vacancy rate. Additionally, like the prior reporting period, there were six of nine social worker positions were filled for a 33 percent vacancy rate. However, one social worker was on extended leave, increasing the functional vacancy rate to 44 percent.

For rehabilitation therapists, like the Thirtieth Round, eight of nine allocated positions were filled, for an 11 percent vacancy rate. One rehabilitation therapist was on long-term leave resulting in a functional vacancy rate of 22 percent. *See id*.

Compared to the prior round, registered nurse vacancies increased from a 26 percent to 29 percent vacancy rate. *See id*. While senior psych tech vacancy rates decreased from 33 percent in the previous round to 11 percent and psych tech vacancy rates decreased from 21 percent to 18 percent. *See id*.

Similar to the previous review period, DSH-Coalinga filled all leadership positions, including those for the executive director, clinical and hospital administrators, program director, chief psychiatrist, and medical director. *Id.* at 36.

As for psychiatry, both allocated psychiatrist positions were filled. DSH-Coalinga also utilized all available psychiatrists, telepsychiatrists, and psychiatric nurse practitioners that were not otherwise assigned to the program, to conduct initial assessments on *Coleman* patients. The two allocated psychiatrists would then conduct all routine psychiatric contacts. Additionally, like the prior review period, both positions for psychologists, social workers, and rehabilitation therapists were also filled. *See id*.

For nursing positions, the nursing coordinator position was filled as were all seven registered nurse positions. Two of three senior psych tech positions were filled for a 33 percent vacancy rate while 19 of 32 psych tech positions were filled for a 41 percent vacancy rate.

DSH-Patton reported that, like the previous reporting period, all four executive positions, including executive director, medical director, clinical, and hospital administrator, were filled, as were all three management positions, which included program director and both nursing coordinators. *See id*. One of the nurse coordinator positions was filled by an out-of-class staff member.

Consistent with the previous round, the supervising psychiatrist position was filled, as were the two psychiatry positions using contractors. *See id*. at 37. Both psychologist and both rehabilitation therapist positions were filled, as they were in the prior review period, however only one of two clinical social worker positions were filled. *Id*. The social worker was unlicensed during the review period.

As for nursing, all ten registered nursing positions were filled, an improvement from the 22 percent vacancy rate for registered nursing positions in the previous round. *See id*. All three senior psych tech positions were filled, as were 26 of 28 psych tech positions for a seven percent vacancy rate, also an improvement from a 24 percent functional vacancy for psych tech positions rate in the Thirtieth Round. *See id*.

<u>Telepsychiatry</u>

DSH-Atascadero and DSH-Patton did not use telepsychiatry during the review period. DSH-Coalinga utilized telepsychiatry for initial psychiatric assessments only and had on-site staff complete all routine psychiatric contacts.

## C. <u>TREATMENT AND CLINICAL SERVICES</u>

### 1. <u>Interdisciplinary Treatment Teams (IDTTs)</u>

The quality of IDTT meetings at the three state hospitals was assessed based on documentation and individual case reviews for patients treated there during the reporting period. Like the previous monitoring round, almost all IDTTs were completed timely, however required staff were present for 62 of 78 or 79 percent of reviewed IDTTs. *See* ECF No. 8085 at 38. There continued to be significant concerns with treatment planning at all three hospitals, including treatment plans only periodically including goals that targeted patient needs, lack of adequate interventions to address patients' treatment goals, and insufficient supporting rationales for those interventions. *See id*. Similarly, treatment plans continued to lack updates when clinically indicated to do so. *See id.* Further detailed discussion of the quality of care delivered to *Coleman* class patients in IDTTs and treatment planning, is reviewed in Part II(D) below. *See infra* pp. 83-93.

The quality of IDTT meetings at DSH-Atascadero was based on a review of cases for 34 patients treated during the review period. Overall, IDTTs were generally completed timely with only two cases receiving untimely IDTTs. However, only 26 of 34 reviewed IDTTs included the required staff. Reviewed treatment plans were not compliant during the review period as the number of plans reviewed did not achieve 90 percent compliance with targeted and individualized treatment goals, specific interventions to achieve those treatment goals, adequate rationales for chosen interventions, and updated treatment plans when clinically indicated.

At DSH-Coalinga, the quality of IDTT meetings was assessed based on a review of 28 patients treated during the review period. IDTTs were completed in a timely manner in all 28 cases, however required staff were present in 21 of 28 or 75 percent of the time. Like DSH-Atascadero, reviewed treatment plans were not compliant during the review period as the number

of plans reviewed fell below the 90 percent threshold in areas of targeted and individualized treatment goals, specific interventions to achieve those treatment goals, adequate rationales for chosen interventions, and updated treatment plans when clinically indicated.

IDTT meetings at DSH-Patton were assessed based on documentation and individual case reviews for 16 patients treated during the review period. At DSH-Patton, IDTTs were compliant with both timeliness and the required staff presence as 15 of 16 or 94 percent of cases included required staff. Unfortunately, consistent with the other hospitals, treatment planning was not compliant as some treatment plans included boilerplate or vague treatment goals and the treatment team otherwise did not update treatment plans despite clinical indications to do so. On a positive note, the treatment plans did include adequate interventions to treat the identified goals, however because the goals were not targeted or individualized, it was difficult to discern if the patients experienced positive treatment outcomes.

**2. <u>Group Therapy</u>**

The DSH CQI process requires that patients be offered at least twenty hours of treatment per patient per week, ten hours of which must be core treatment. See ECF No. 7924 at 4 (citing ECF No. 7625 at 29-30 stating that "[b]y 2020, DSH had developed a fully adequate CQI process…which it still uses" and ECF No. 7812-1 at 15 stating "that [the DSH CQI] process includes definitions of 'core groups,' 'supplemental groups,' and 'individual therapy' and provides that patients will be offered 20 hours of treatment per week, at least ten hours of which are to be 'core treatment'.). Because core treatment hour requirements can include individual treatment, compliance is assessed as a totality of treatment offered to the patient on average per week.

The three hospitals reported offering between 20 and 43.2 hours of group treatment per patient per week during the review period. At DSH-Atascadero, patients were offered a weekly average of 7.1 hours of core groups and 36.1 hours of supplemental groups, while patients attended 4.7 hours of core group and 5.3 hours of supplemental groups. At DSH-Coalinga, patients were offered a weekly average of 9.541 hours of core groups and 27 hours of supplemental group while attending 4.7 hours of core group and 5.71 hours of supplemental group. DSH-Patton was the only institution that achieved compliance through group treatment with offering at least ten hours of core groups. During the review period, the hospital offered 10.4 hours per patient per week of core group treatment while offering 9.69 hours of supplemental group treatment. Patients at DSH-Patton attended 9.38 hours of core group and 7.76 hours of supplemental group treatment during the review period.

Cancellations were reported to only have affected group treatment at DSH-Atascadero. While group cancellation was reported for only ten total groups during the review period at DSH-Coalinga and was not reported as an issue at DSH-Patton, it was reported that 4.3 percent of groups were cancelled at DSH-Atascadero due to provider availability, not enough patients showing up for group, or missing patient rosters.

**3. <u>Individual Treatment</u>**

The three hospitals can satisfy CQI core treatment requirements through the offering of individual treatment in addition to core group treatment during the review period. Patients are required to receive at least ten hours of core treatment per week, which can include, *inter alia*, core groups and individual treatment. *See* ECF No. 7924 at 4 (citing ECF No. 7625 at 29-30 and ECF No. 7812-1 at 15).

Unfortunately, the lack of individual treatment offered to *Coleman* class patients at DSH-Atascadero continued from the previous monitoring round as the hospital offered only 18 patients 0.42 hours of individual treatment. ECF No. 8085 at 85. As DSH-Atascadero only offered patients an average of 7.1 hours per patient per week of core group treatment, the institution did not comply with the CQI process core treatment requirements.

At DSH-Coalinga, the hospital indicated that during the review period, *Coleman* class patients were offered an average of 3.1 hours per patient per week of individual treatment. As patients were offered an average of 6.5 hours of core group treatment and 3.1 hours of individual treatment, DSH-Coalinga was nearly compliant with its CQI process core treatment requirements.

In addition to the already compliant offering of 10.4 hours per patient per week of core group treatment, DSH-Patton offered 0.42 hours of individual treatment per patient per week to *Coleman* class patients.

**4. <u>Psychiatric Services</u>**

Overall, psychiatric services provided to *Coleman* class patients varied across the three hospitals. Although all three hospitals timely offered initial psychiatric evaluations during the review period, only DSH-Atascadero maintained an internal policy for conducting minimum monthly psychiatric contacts, which proved to be fruitful during the review period as all contacts were timely. DSH-Coalinga and DSH-Patton did not maintain a policy for frequency of routine psychiatric contacts and relied on the patient's assigned psychiatrist to determine contact frequency based on clinical need. This led to concerns with continuity of psychiatric care and frequency of psychiatric contacts when clinically indicated.

On a positive note, for the 34 reviewed cases, psychiatric services at DSH-Atascadero were compliant during the review period. The hospital completed timely initial and routine psychiatric contacts and demonstrated adequate psychiatric care related to complex non-medication related treatment objectives. Specifically, psychiatrists at DSH-Atascadero used evidence-based treatments that were logical, rational, and met clear treatment targets, which lead to clinical effectiveness for most patients. It was clear from the cases reviewed that psychiatrists at the hospital were focused on reducing medication doses when possible while maintaining control of the patients' symptoms.

At DSH-Coalinga, for the 28 reviewed cases, initial psychiatric assessments were completed timely during the review period as the institution utilized all available psychiatrists at the hospital, including telepsychiatrists and psychiatric nurse practitioners, to complete initial assessments for *Coleman* patients. The hospital then assigned one of two allocated psychiatrists to the patient for routine care. Although this led to the hospital meeting all required timeframes for completing initial psychiatric assessments, the patient-assigned psychiatrist needed to rely on information from the initial evaluation in treatment planning and decisions about the frequency of follow-up. While in most reviewed cases the frequency of routine contacts was clinically adequate, some patients required more frequent contacts than what were provided to meet their treatment goals, particularly when medication changes were made.

Concerns with the use of telepsychiatry in an inpatient setting were also noted at DSH-Coalinga. In one case, the telepsychiatrist expressed difficulty in determining whether the patient was having trouble hearing the telepsychiatrist or whether the patient was experiencing an underlying psychiatric disorder. In another case, it was noted that the patient was not participating meaningfully, which hindered the evaluation process.

Consistent with other DSH facilities, for the 16 reviewed patients, DSH-Patton completed all reviewed initial psychiatric evaluations within 24 hours of admission. DSH-Patton did not have a local policy governing minimum frequency of psychiatric contacts, which proved to be concerning in several reviewed cases during the review period. While in most cases, the frequency of routine psychiatric contact was clinically appropriate, at least one reviewed case revealed that a patient waited 51 days for a follow-up psychiatric care. This case was particularly concerning giving the patient's prescription for the antipsychotic clozapine and a seclusion and restrain incident during her stay. There were two other instances of lack of documented follow-up following clinical indications to do so.

**5. <u>Medication Management</u>**

Twenty-six charts were reviewed across the three hospitals, including ten charts each from DSH-Atascadero and DSH-Coalinga, and six charts from DSH-Patton. Of the cases, 12, or 46 percent, were adequate. There was substantial inter-hospital variation, with adequate cases comprising 70 percent of cases at DSH-Atascadero, but only ten percent at DSH-Coalinga. As explained herein, several of the charts deemed adequate nonetheless had deficiencies, but these shortcomings did not rise to the level of rendering the medication management inadequate.

Positive aspects of medication management across the three institutions generally included timely initial psychiatric evaluations; adept management of complex conditions; frequent use of evidence-based medications; and appropriate review of patients on multiple medications. However, the monitor's expert found multiple examples of concerning medication issues, generally related to dosing, the number of or speed of medication changes, and the length of time between psychiatric contacts. Additionally, concerns discussed in preceding monitoring rounds continued, including PC 2602 involuntary medication issues, inaccurate information

about the commitment statute under which the patient was receiving treatment at DSH, and barriers to treatment due to the lack of an electronic healthcare record and limited documented coordination between CDCR and DSH.

The three hospitals reviewed demonstrated many strengths in medication management. Psychiatric evaluations were timely, occurring within 24 hours of admission. Psychiatrists managed complex, difficult to treat, and co-occurring conditions. In large part, the symptoms and listed diagnoses supported the medications used. Psychiatrists appropriately used medications including lithium, clozapine, and long-acting injectable antipsychotics, of which evidence-based treatments frequently underutilized across other healthcare systems.

In many cases, the medication management was logical, evidence-based, and clearly contributed to the clinical improvement of the patients under review. The monitor's expert saw multiple examples in which the psychiatrist appropriately attempted to minimize the number of medications, in order to reduce the risk of side effects and medication interactions.

Despite these positive aspects, the monitor's expert discovered multiple deficiencies in the charts reviewed, including several continuing concerns from preceding monitoring reports. Specifically, the monitor's expert had serious concerns about the medication management in several cases. In one case at DSH-Atascadero psychiatry started an antidepressant medication at two-to-four times the standard starting dose and ordered the medication crushed which releases the medication more quickly, with no documented rationale for doing so. Given that this increased the risk of side effects including worsened mood, anxiety, and possibly even suicidal thoughts or behaviors, a documented rationale for using this aggressive approach was required.

In another case at DSH-Atascadero, the admitting psychiatrist made multiple medication changes for a patient taking the antipsychotic clozapine, with no clearly documented urgency to do so.

The monitor's expert also saw multiple concerns with the medication management at DSH-Coalinga. An illustrative case demonstrated multiple concerns. The patient was appropriately started on the antipsychotic olanzapine. The dosing was unusually aggressive, ramping up to 40 mg per day, twice the FDA-approved maximum dose, in less than one month, without a clearly documented rationale for doing so. The patient was not seen by the psychiatrist until 28 days later, after the patient was already taking the 40 mg per day dose.

This same patient had a long-standing prescription for nortriptyline, an antidepressant often used for chronic pain, yet this was changed to an antidepressant without such properties. The psychiatrist documented this was due to reported concerns about overdose risk with nortriptyline. While the patient had one prior suicide attempt, the psychiatrist noted on the initial assessment that the patient's suicide risk was "absent." Stronger justification for such a change to the patient's long-standing medication was required.

In another example from DSH-Coalinga, the psychiatrist started two antipsychotics (clozapine and haloperidol), while tapering off of another (olanzapine). Several days later, the psychiatrist reversed course and raised the olanzapine dose. The patient subsequently had concerning side effects, including bedwetting. There was insufficient documentation as to the number of medication changes.

In one additional concerning DSH-Coalinga case, the medication changes and the rationales listed in psychiatric progress notes were inadequate or absent, including changing an antipsychotic medication without a progress note indicating the patient was seen.

**a. <u>Clozapine</u>**

Clozapine is an antipsychotic medication which is often effective even when other medications have failed and is vastly underutilized in many healthcare settings. Despite its clear clinical benefit, the medication requires close monitoring for potentially life-threatening side effects. As seen in preceding monitoring rounds, DSH demonstrated an admirable willingness to prescribe this medication, when indicated.

The three hospitals had a total of 29 patients who were prescribed clozapine during the review period. Of these, there were 11 initiations of the medication, and 18 medication continuations.

Of these, the monitor's expert reviewed nine clozapine cases. When examining just the issue of the use of clozapine, all cases were adequate. Continuing from the preceding monitoring round, DSH documented clear clinical rationales for the use of use of this medication and followed informative protocols governing the use of this medication. DSH complied with the mandated laboratory monitoring in all cases. DSH-Atascadero demonstrated best practices with their interdisciplinary "clozapine clinic" that assisted with the monitoring of patients who were prescribed clozapine.

**b. <u>PC 2602 Involuntary Medications</u>**

The three hospitals treated 50 patients under a PC 2602 order, including four initiated by DSH, and five renewals. There were 38 PC 2602 cases at DSH-Atascadero, eight at DSH-Coalinga, and four at DSH-Patton.

As seen in preceding monitoring rounds, the three hospitals had clear policies and procedures in place surrounding the PC 2602 involuntary medication process. All three hospitals had staff who acted as medication court administer, who was responsible for tracking PC 2602-

related matters. There were no uses of force to administer involuntary medications during the reporting period.

The monitor's expert's review of 14 PC 2602 cases revealed multiple concerns. Importantly, all three hospitals demonstrated confusing and inconsistent documentation as to whether a patient was under a PC 2602 involuntary medication order. This was exceptionally prevalent at DSH-Coalinga where documentation indicated confusion about multiple patients' PC 2602 status.

DSH-Coalinga had one case in which the psychiatrist did not provide an adequate rationale for not filing an initial PC 2602 petition. The patient had a history of prior PC 2602 treatment, and an extensive history of self-injury. The patient was markedly delusional at the time of admission. Despite CDCR records documenting clear improvement on a certain antipsychotic, for unclear reasons, the patient subsequently refused it. Clear documentation of the rationale for not filing an initial PC 2602 petition was warranted.

Additionally, when reviewing a PC 2602 order, the treating psychiatrist must seek court permission on at least an annual basis. The medical record should reflect a clear rationale as to why the psychiatrist seeks renewal or not. Based on medical record reviews and other documentation, it was difficult to determine the number of non-renewals of patients under PC 2602 orders at all three hospitals. During case reviews, the monitor's expert found several non-renewals with limited documentation and rationale for non-renewal.

A review of the records revealed that CDCR and DSH lacked close collaboration on PC 2602-related matters. There did not appear to be an adequate process that clearly identifies patients under PC 2602 orders at the time of intake, or when a PC 2602 petition is not renewed prior to admission or discharge. For example, CDCR had a clear process that includes the

completion of a specific non-renewal form. It was unclear during the review period if that information was given to DSH or if DSH had a similar process.

**c. Prescriptions and Verbal Orders**

All three hospitals had clear policies permitting psychiatrist to order prescriptions for a maximum of 45 days. The hospitals did not utilize bridge prescription orders.

Verbal and telephone orders were allowed but limited to urgent situations or when the physician was off-site. Psychiatrists had to sign the telephone order within 24 hours at DSH-Coalinga, or 48 hours at DSH-Atascadero and DSH-Patton. Only DSH-Patton utilized a tracking log for telephone orders, which indicated if the physician had signed the order within the mandated timeframe.

In one case at DSH-Patton, two psychiatric medications lapsed. The paper chart rendered determining the number of missed doses difficult.

For patients paroling from DSH, the hospitals continued to follow program directives from 2017, which provided a 30-day supply of medication. Since March 1, 2022, CDCR has provided a 60-day supply of most medications, with the goal of providing additional time for patients to establish care in the community and reducing the chance of interruption of medications. The monitor's expert recommended that DSH align its policy with CDCR, to ensure equal access to prescription medications.

**d. Non-Formulary Medications**

DSH had clear and clinically appropriate policies governing the use of non-formulary medications, including exemptions to the approval process. Importantly, this allowed patients taking non-formulary medications at the time of DSH admission to continue their medication for up to 30 days, prior to approval through the non-formulary process. Despite this, a case at DSH-Patton documented the psychiatrist changing the medication from a non-formulary to a

formulary antidepressant. While the medications were closely related, this change risked clinical worsening when the patient's symptoms were of sufficient severity to merit treatment at DSH.

**e. Polypharmacy Reviews**

While often necessary, the use of multiple psychiatric medications carries increased risk of side effects and adverse outcomes. Similar to preceding monitoring rounds, DSH followed clear guidelines for reviewing patients prescribed multiple psychiatric medications.

**f. Medical Records/Documentation Issues**

The DSH institutions remained on a paper healthcare record, which posed a multitude of challenges both in patient care and for the monitor's expert's review. DSH reported that they will award the contract to an electronic healthcare vendor in the summer of 2025, with an anticipated pilot at DSH-Coalinga in 2026.

The lack of access to healthcare records was particularly impairing for initial psychiatric assessments. In one example from DSH-Atascadero, the psychiatrist noted that a very impaired patient, who could not provide a coherent history, had to order the records from headquarters in order to have them available for review. In an additional case at DSH-Coalinga, the psychiatrist noted that they were unable to verify the patient's medications.

As noted in the preceding monitoring round, several healthcare records stated the wrong commitment statute, such as restoration of competency for trial, or in one case at DSH-Coalinga, for sex offender treatment. The commitment statute determined many aspects of treatment, including groups, the key modality of treatment in DSH. Several psychiatric evaluations noted the patient would attend court-readiness groups, which would be inappropriate for most CDCR patients.

Timely access to legible healthcare records was a significant concern. While at DSH-Coalinga and DSH-Patton, most psychology notes were absent from the chart. The health records contained multiple handwritten notes, frequently with limited legibility.

It is well-established in healthcare that patient transfers from one facility to another pose patient safety issues. Two of the most important documents upon transfer are a discharge medication list and the discharge summary. At DSH-Atascadero, one patient's transfer medication list differed from the psychiatrist's discharge summary. An effective electronic healthcare record could reduce such crucial errors in relaying clinical information.

#### g. **Concerns Surrounding Patient Discharge and Collaboration between DSH and CDCR**

The monitor's expert had concerns about the discharge of some patients back to CDCR. In one case, the DSH-Atascadero treatment team discharged a patient with profound psychosis and five prior suicide attempts after only a brief stay. The reason for discharge was for possible diversion of the medication buprenorphine/naloxone, used to treat Opioid Use Disorder. The chart did not adequately reflect additional interventions that DSH-Atascadero undertook prior to discharging the patient. Furthermore, documented clinical coordination with CDCR was scant.

Additionally, some discharged cases demonstrated limited documented contact and collaboration between DSH and CDCR. In one DSH-Atascadero case, a patient under a PC 2602 involuntary medication order was prescribed clozapine, yet returned to CDCR with neither. There was no notice of non-renewal or rationale for non-renewal of the PC 2602 seen in the chart. In both of these cases, there was no documented clinician-to-clinician contact or Coordinated Clinical Assessment Team to discuss a transition of care.

**6. <u>Other Treatment Issues</u>**

**a. <u>Behavioral Management</u>**

There were no behavioral plans at any of the three hospitals during the review period.

**b. <u>Pre-release Planning</u>**

All three hospitals provided pre-release planning services to *Coleman* class patients during the review period.

At DSH-Atascadero, thirteen patients received pre-release planning services, including Transitional Case Management Program (TCMP) services prior to their discharge. Nine patients were released to the Division of Adult Parole Operations, three patients were released to a post-release community supervision program, and one patient was discharged to DSH as an Offender with a Mental Health Disorder (OMD).

At DSH-Coalinga, four patients received pre-release planning services prior to their scheduled discharge. All four patients received TCMP services for SSI application assistance.

At DSH-Patton, thirteen patients received pre-release planning services. The institution was unable to indicate the number of patients who received TCMP services or the type of services provided.

**c. <u>Access to Meaningful Jobs and Educational Opportunities</u>**

Patients at two of the three hospitals had meaningful employment positions during the review period; DSH-Patton was unable to provide documentation to indicate whether patients received access to meaningful employment or educational opportunities during the review period. Additionally, only DSH-Coalinga was able to indicate the number of patients who attended more than five hours of educational classes or activities during any month of the review period.

DSH-Atascadero reported that of the eight patients who held meaningful employment positions, seven or 88 percent of patients held positions greater than five hours per week. Actual monthly employment ranged from five to ten patients. Of the 415 educational activities scheduled, twenty patients attended 199 or 48 percent of activities. DSH-Atascadero was otherwise unable to indicate if patients were provided with meaningful educational opportunities for five or more hours per week.

DSH-Coalinga reported that on average, 13 of 40 or 33 percent of Coleman patients held meaningful monthly employment positions. Actual monthly employment ranged from ten to 17 patients. There were no patients who attended more than five hours of educational classes or activities during any month of the review period.

## D. QUALITY OF CARE IN DEPARTMENT OF STATE HOSPITALS

### 1. Overall Quality of Care

Seventy-eight patient healthcare records were reviewed in detail to determine the quality of care provided during the reporting period across the DSH facilities providing care to individuals in the custody of CDCR. This included 34 records at DSH-Atascadero, 28 records at DSH-Coalinga, and 16 records at DSH-Patton. In addition to analyses of treatment planning, delivery of treatment, diagnostic issues, documentation, suicide risk assessment, and discharge planning, an overall assessment of the adequacy of treatment was provided for each case. Of the 78 individual cases reviewed, 31 cases (40 percent) received adequate care. The remaining 47 cases, or 60 percent, were assessed to have received care of inadequate quality.




**2. Treatment Planning**

Treatment planning requires specific elements to ensure an effective, collaborative process supporting adequate patient care, including timely meetings, having the necessary members of the patient's treatment team present during treatment discussion (including the patient), relevant and specific goals and interventions, reviewing treatment progress since prior IDTT meetings, updating the treatment plan when clinically indicated, and addressing any significant changes in the patient's presentation since the previous IDTT meeting.

Across all DSH facilities, IDTTs were generally conducted in a timely manner. There were two cases, both at DSH-Atascadero, in which IDTT meetings were late or not held as required (DSH-Atascadero Patients DD and EE). In four cases at DSH-Atascadero, it was noted that IDTT documentation was absent from the patients' records (DSH-Atascadero Patients M,

BB, CC, and GG). There were concerns noted about required and/or expected staff members being absent from IDTT meetings at DSH-Atascadero and DSH-Coalinga. Specifically, at DSH-Atascadero eight of the 34 cases reviewed, or 21 percent, were noted to have critical staff missing from IDTT meetings. At DSH-Coalinga, this was found to be true in seven of the 28 cases reviewed, or 25 percent of the time. At DSH-Patton, only one of the 16 cases reviewed was missing required/expected staff. Missing staff included psychiatrists, psychologists, recreational therapists, nurses and social workers. While the Administrative Directive governing treatment planning at DSH-Atascadero allowed for only a psychiatrist and a nurse to form the treatment team, and also that the only required signature was the psychiatrist, this differed from Policy Directive 3607, "DSH Treatment Planning Policy- CDCR Patients in DSH Inpatient Programs" with an effective date of July 1, 2017, which stated that "The IDTT is comprised of the patient and those persons who work directly with each patient in the following service areas: psychiatry, psychology, social work, rehabilitation therapy, and nursing as well as any other person who is directly involved in the treatment of the patient."

Treatment plans included vague treatment goals or goals which did not appear appropriate to address the patients' needs in 21 percent of the cases reviewed (16 of 78 cases) and across all sites. Specifically, this issue was identified as a concern in 25 percent of the cases reviewed at both DSH-Coalinga (seven of 28 cases, DSH-Coalinga Patients F, G, K, L, P, R, and S) and DSH-Patton (four of 16 cases, DSH-Patton Patients A, E, M, and N) and 15 percent of the cases at DSH-Atascadero (five of 34 cases). These included DSH-Atascadero Patients C, E, F, G, and Q. As an example of an inappropriate goal, DSH-Atascadero Patient C's treatment plan included a goal that the patient would not endorse suicidal ideation or hopelessness prior to discharge, yet a patient with suicidal ideation should be encouraged, not discouraged, to talk

about his suicidal ideation in order to develop appropriate means for the patient to cope with and address those thoughts when they arise. Instead, the treatment plan encourage the patient not to endorse his high-risk thoughts in order to be discharged.

At DSH-Coalinga, the monitor's expert also noted inadequate rationale for the treatment interventions listed on treatment plans in 32 percent of the cases reviewed at DSH-Coalinga (nine of 28 cases; DSH-Coalinga Patients F, K, L, M, N, O, P, Q, and R). This was primarily noted as patients being enrolled in groups unrelated to their treatment needs. This issue was only noted in a minority of cases at DSH-Atascadero (DSH-Atascadero Patients A, H and GG) and DSH-Patton (DSH-Patton Patient A).

One of the most pervasive concerns noted by the monitor's expert was the failure to update patients' treatment plans when clinically indicated. This issue was noted as a concern in 23 of the 78 cases reviewed (29 percent) including 41 percent of cases at DHS-Atascadero (14 of 34 cases; DSH-Atascadero Patients A, D, F, H, I, P, Q, S, T, X, Z, AA, BB, and FF), 31 percent of cases at DSH-Patton (five of 16; DSH-Patton Patients B, D, G, J, and L), and 14 percent of cases at DSH-Coalinga (four of 28; DSH-Atascadero Patients E, F, G, and U). This concern did not include an additional 11 cases (eight at DSH-Atascadero – Patients K, L, N, Q, S, X, BB, and CC; two at DSH-Coaling – Patients A and K; and one at DSH-Patton – Patient L) where the monitor's expert noted that the treatment outcome expectations developed while the patient was in CDCR were not updated upon arrival at DSH, despite indications that the goals were not appropriate for the hospital location (e.g., references to the patient's cell or to custody officers).

During the previous round, the monitor's expert noted concerns regarding the absence of individual therapeutic interventions as part of the treatment plans for patients when clinically indicated. In the current round, this issue was identified in 17 percent of cases overall (13 of 78

cases). This included six cases at DSH-Atascadero (DSH-Atascadero Patients G, H, I, K, S, and X) and seven cases at DSH-Coalinga (DSH-Coalinga Patients D, F, L, M, O, P, and Y). This concern was not identified at DSH-Patton although lack of documentation from psychologists being filed in records at DSH-Patton is discussed later in this report.

Clinical case summaries and case formulations developed during the IDTT process were adequate in the cases reviewed. Additionally, treatment teams routinely assessed the patient's response to treatment as well as relevant changes in functioning and symptom presentation.

**3. Treatment Delivery**

Quality care requires the provision of adequate and coordinated treatment interventions in keeping with the goals of the patient's treatment plan. In 28 percent of cases reviewed, 22 of 78 cases, the services provided to patients was not in keeping with the interventions outlined in the patient's treatment plan. There were 11cases at DSH-Atascadero (DSH-Atascadero Patients A, B, E, F, H, J, K, O, P, FF, and GG), eight cases at DSH-Coalinga (DSH-Coalinga Patients A, E, F, G, H, K, S and V), and three cases at DSH-Patton (DSH-Patton Patients A, H, and P.) in which there was little evidence in the record of the provision of treatment interventions outlined in the patients' treatment plans. Of note, the majority of interventions provided to patients across facilities were group therapy and psychotropic medications. Individual treatment interventions were rarely listed as a planned intervention and rarely provided to patients. Case reviews revealed concerns not only with the lack of individual interventions being offered to patients, but also an indication that the content of treatment contacts and/or the timing of treatment contacts were not in keeping with the patient's identified needs. This included a lack of behavioral interventions when indicated, contacts occurring less frequently than indicated by the patient's needs or treatment plan, generic groups not specifically addressing the patient's needs, as well as

the provision of psychiatric and psychological services occurring during treatment team meetings and not during individual clinical contacts with the patient. Concerns of this type were identified across all facility in 27 of the 78 cases reviewed (35 percent). Specifically, there were 11 cases at DSH-Atascadero (DSH-Atascadero Patients A, E, G, H, I, L, M, X, Z, CC, and FF), nine cases at DSH-Coalinga (DSH-Coalinga Patients D, H, K, L, S, U, V, Y, and Z), and seven cases at DSH-Patton (DSH-Patton Patients C, D, G, L, M, O, and P) in which this concern was identified.

One significant concern, which appeared to be localized to DSH-Atascadero, was a lack of sufficient group treatment being provided to patients including an insufficient number of hours as well as groups of insufficient clinical quality to address the patients' treatment needs. This concern was identified in 15 of the 34 cases reviewed, or 44 percent. As an example, DSH-Atascadero Patient K was admitted for active psychosis and delusions. The patient's treatment plan noted that the patient was to be enrolled in a number of clinical groups, yet the record revealed only recreational therapy groups were offered. Similar concerns were found in DSH-Atascadero Patient A's record, where a patient who had been admitted for suicidal ideation was provided primarily supplemental leisure activities, such as watching television and playing bingo, yet these contacts appeared to be counted as treatment hours.

**4. <u>Diagnostic Concerns</u>**

In 15 of the 78 cases reviewed, diagnostic issues were identified including a lack of diagnostic agreement across team members that was not reconciled during the patient's admission and/or a lack of rationale for the diagnoses provided. These concerns, while present across institutions, were most prevalent at DSH-Coalinga where the concern was identified in eight of the 28 cases reviewed (DSH-Coalinga Patients B, C, D, E, K, L, P, and Q).

**5. Clinical Documentation Issues**

Across all DSH facilities, the number of treatment hours provided to patients was not consistently documented and in a number of cases, documentation related to the provision of treatment was missing entirely from clinical records. Across facilities, the monitor's expert had to ask leadership for missing documentation. In some cases, missing documentation was located and provided during the on-site review; yet none of this documentation was in the patients' records and available to other clinicians, which could significantly compromise continuity of care. Specifically, lack of documentation was noted in 29 of the 78 cases reviewed (37 percent) including 12 cases at DSH-Atascadero (DSH-Atascadero Patients B, C, D, E, F, H, K, L, O, Q, BB and CC), five cases at DSH-Coalinga (DSH-Coalinga Patients F, H, X, Z, and AA) and 12 cases at DSH-Patton (DSH-Patton Patients A, B, C, D, E, F, G, I, J, M, N, and O).

At DSH-Patton, the monitor's expert noted an absence of documentation by psychologists within the healthcare records. When leadership was asked about missing documentation, a number of notes were provided to the experts without explanation as to why they were not filed in the patients' records. Most psychology notes were monthly summaries which lacked mental status examinations, amount of time spent with patients, and whether or not contacts were held in confidential settings.

In addition to the absence of documentation within the record, in half of the cases reviewed (39 or 78 cases), clinical documentation did not provide adequate information regarding the interventions being provided to address treatment goals including individual interventions as well as the type of groups and/or the number of groups being offered to patients. This made it difficult to determine whether the patient was receiving adequate care in keeping with identified treatment needs. This concern was noted in 15 cases at DSH-Atascadero (DSH-

Atascadero Patients A, B, E, F, H, J, K, L, N, O, Q, S, CC, FF, and GG), 11 cases at DSH-Coalinga (DSH-Coalinga Patients A, B, C, D, E, F, G, H, I, J, and K), and 13 cases at DSH-Patton (DSH-Patton Patients A, B, C, E, F, G, H, I, L, M, N, O, and P).

In 40 of the 78 cases reviewed, or 51 percent, inconsistencies were noted in patient documentation. These inconsistencies included internal contradictions within the same note as well as discrepancies across clinical staff working with the same patient. None of these inconsistencies were acknowledged or addressed. Specifically, inconsistencies within and between documentation was found in 19 of the cases reviewed at DSH-Atascadero (DSH-Atascadero Patients A, B, C, D, E, F, G, H, I, J, K, N, O, R, V, Y, AA, BB and CC), 12 of the cases reviewed at DSH-Coalinga (DSH-Coalinga Patients A, D, E, F, H, S, T, V, W, Z, AA, and BB), and nine of the cases reviewed at DSH-Patton (DSH-Patton Patients A, B, C, D, F, H, K, O, and P). Inconsistencies included differences in patients' engagement in treatment activities (e.g., DSH-Atascadero Patients A and B), various discussions of the patient's symptom presentation without efforts to address or resolve difference (e.g., DSH-Atascadero Patients E, R, and BB), discrepancies about whether the patient had achieved treatment goals (e.g., DSH-Atascadero Patients N and CC) and inconsistent information about prescribed medications (DSH-Atascadero Patient V), among other concerns.

**6. Suicide Risk Assessment**

The monitor's expert noted that suicide risk assessments were completed timely and when clinically indicated in most of the records reviewed. Of concern with regard to suicide risk assessment was the lack of adequate rationale for risk levels often accompanied by a failure to identify risk factors documented elsewhere in the record or within the patient's history. These concerns were noted in the documentation of formal risk assessment, most often completed by

psychologists as well as informal assessments of risk completed by psychiatrists. Specifically, concerns with adequate rationale for risk determination and/or the failure to recognize previous identified risks were noted in 36 percent of cases reviewed (28 of 78 cases). The concern was identified in nine of the 34 cases reviewed at DSH-Atascadero (DSH-Atascadero Patients A, C, I, N, O, P, W, AA and CC); 13 of the 28 cases reviewed at DSH-Coalinga (DSH-Coalinga Patients A, C, D, G, K, O, P, Q, R, T, W, AA, and BB); and six of the 16 cases reviewed at DSH-Patton (DSH-Patton Patients B, H, K, L, M, and O).

At DSH-Coalinga, experts noted that suicide risk assessments were completed relying on the Columbia-Suicide Severity Rating Scale (C-SSRS) which is a screening tool and not designed or validated as a comprehensive suicide risk assessment. The difference in the comprehensive nature of suicide risk assessment between DSH and CDCR was noteworthy. Also, when identified, self-harm was not targeted in treatment at DSH-Coalinga.

**7. Discharge Concerns**

The monitor's expert noted two primary concerns related to discharge. The first was the fact that patients appeared to be discharged from the DSH inpatient setting prematurely as evidenced by either a failure to achieve their identified treatment goals and/or ongoing serious clinical needs which appeared to warrant further treatment. Of the 78 cases reviewed, this concern was identified in 27 cases, or 35 percent of the time with the majority of cases, 18, being found at DSH-Atascadero (DSH-Atascadero Patients A, C, D, E, F, H, J, K, M, N, O, P, Q, R, V, W, Z, and FF). Additionally, there were five cases at DSH-Coalinga (DSH-Coalinga Patients A, C, D, E, and F), and four cases at DSH-Patton (DSH-Patton Patients A, B, D, and P) where premature discharge was noted as a concern.

The second concern was identified primarily at DSH-Coalinga and was related to inadequate discharge planning. This concern was identified as a failure to document an adequate discharge plan (including release plans). The eight cases where this was noted at DSH-Coalinga included DSH-Coalinga Patients A, G, H, N, O, P, T and W. Of note, these eight cases comprised 29 percent of the 28 cases reviewed at DSH-Coalinga.

**8. <u>Additional Concerns</u>**

The monitor's expert had serious concerns about the one case of restraints at DSH-Patton. Based on the documentation provided, there was inadequate justification for placing the patient into restraints. After the patient was released from restraints, the patient was placed in locked seclusion. Despite almost seven hours of sleeping or being "quiet," the patient remained in seclusion. Also, the monitoring for seclusion was done via audiovisual monitoring, not direct observation. While this is a serious concern for the Special Master and his team, remote observation is allowed per DSH-Patton policy.

A number of patients at DSH-Patton were incorrectly noted to have been admitted as PC1370 patients (Incompetent to Stand Trial) by admitting psychiatrists.

At DSH-Coalinga, documentation by psychiatrists often failed to assess for patient weight gain, which can be a serious side effect of some psychotropic medications, with documentation from the psychiatrist noting that weight gain could not be assessed because the patient's height was absent from the record, not allowing for calculation of the patient's Body Mass Index. This was found even when at least one of the records reviewed included the patient's height. What was unclear was why the psychiatrist could not order the patient's height to be measured and/or measure it during the clinical contact.

## E. SUICIDE PREVENTION

There were no deaths by suicide reported at any of the three hospitals during the review period. However, there were three incidents involving self-injurious behavior, suicidal behavior, and/or suicide attempts; two occurred at DSH-Coalinga and one occurred at DSH-Patton.

During the review period, DSH-Atascadero continued to implement its ligature risk identification and heat map project with the purpose of identifying and eliminating all ligature attachment points throughout the hospital. There were no revisions to the suicide prevention or death review policy process during the review period. Suicide risk assessments were performed by psychology, psychiatry, and nursing disciplines. Monthly audits of psychology and nursing suicide risk assessments were performed, and suicide prevention training was provided to all new employees with an annual review training provided to direct and support patient care staff. Meeting minutes of monthly suicide prevention committee meetings reflected adequate attendance and reflected a comprehensive suicide prevention program.

At DSH-Coalinga, there were two patients who engaged in self-injurious behavior, suicidal behavior, and/or suicide attempts during the review period; one who engaged in self-injurious and suicidal behaviors required hospital treatment. As was reported during the previous round, DSH-Coalinga replaced all patient furniture with anti-ligature furniture for the reduction of suicide risk, including patient beds, end tables, chairs, and shelves. The hospital provided documentation regarding training on suicide risk assessments. The Columbia-Suicide Severity Rating Scale (C-SSRS) was used for the completion of full suicide risk assessments at DSH-Coalinga as well. Mandatory training regarding suicide awareness was also provided to new employees in addition to the annual training provided to direct and support staff.

At DSH-Patton, one patient engaged in a suicide attempt but did not require hospital treatment. The patient was assessed for suicide risk which was determined to be moderate and

was placed on one-to-one observation. During the review period, DSH-Patton completed suicide risk assessments on all admissions, annual psychological assessments, and at times of increased suicide risk. The hospital continued to conduct monthly audits of suicide risk assessments. Mandatory suicide risk reduction training was provided to new employees in addition to the annual recertification training provided to direct and support staff.

**F. PATIENT ACCESS TO TREATMENT**

Like the prior reporting period, DSH-Atascadero and DSH-Coalinga continued to use the Hospital Access System (HAS) policy to promote positive patient behavior and treatment participation, and to access programming and privileges. *See* ECF No. 8085 at 62. DSH-Patton did not track the HAS program during the reporting period.

DSH-Atascadero's HAS was unchanged from the prior review period and consisted of five levels with each step allowing additional access and privileges, as determined by the treatment team. During the review period, *Coleman* patients spend an average of 19.41 days at Level One, 15.25 days at Level Two, 42 days at Level Three, and 115.85 days at Level Four. The institution did not provide any information for the average number of days spent on Level Five.

The DSH-Coalinga policy regarding HAS was updated on September 20, 2022 and remained in effect without change from the Thirtieth Round. Like the prior reporting period, the hospital did not provide the number of patients or individual patient lengths of time at each level during the reporting period. *See id*.

DSH-Patton did not track the HAS policy during the review period. Instead, the hospital reported that *Coleman* patients had access to inter-compound privileges (ICP), known as "grounds." After a seven day observation period, ICPs were granted, and the treatment team

evaluated the approval or delay of privileges. The patients that were not granted privileges were escorted to various treatments and activities.

### G. REFERRALS

There were referrals to all three hospitals during the reporting period.

There were 234 patients referred to DSH-Atascadero during the review period; 116 were accepted while CDCR rescinded 117 referrals, and one referral was rejected due to danger-to-others concerns.

At DSH-Coalinga, there were 85 referrals of 83 patients; 51 were accepted, 33 were rescinded, and one was initially accepted but rescinded prior to admission. Nine of 52 or 17 percent of referral packets were timely completed.

At DSH-Patton, there were 13 referrals of 12 CIW patients during the review period. All 13 referrals were accepted, however one referral appeared to have been rescinded on an unspecified date.

### H. TRANSFERS, ADMISSIONS, AND DISCHARGES

Of the three hospitals, DSH-Coalinga and DSH-Patton were compliant with timely transfers and admissions to inpatient care during the review period, while DSH-Atascadero and DSH-Patton were compliant with timely discharge of patients from inpatient care.

There were 116 intermediate care patients admitted to DSH-Atascadero during the reporting period as compared to the 34 admissions in the Thirtieth Round. *See* ECF No. 8085 at 63. One hundred and one patients transferred timely while two others were noted as "delayed due to unit quarantine," a court-approved exception to the transfer timeline requirements. *See* ECF No. 5744 at 5 (Addendum to 12.11.2101 (A) PIP Policy and Procedure Referral and Admission, providing for "medical condition" exception to inpatient transfer timeframe); see also December 15, 2017 Order, ECF No. 5750 at 4 (approving Addendum 12.11.2101(A)).

Therefore, DSH-Atascadero was 89 percent compliant with required transfer timelines. The average time from receipt of the completed referral to admission was 28 days with a range of eight to 421 days. For discharges, DSH-Atascadero discharged 73 patients during the reporting period and 54 required clinical discharges back to CDCR. Of the 54 patients who required clinical discharge, 49 or 91 percent were physically discharged within 72 hours of clinical discharge.

Including patients who were referred to DSH-Coalinga prior to the review period but were admitted during the reporting period, there were 54 admissions to DSH-Coalinga as compared to the prior review period's 22 admissions. *See id*. at 64. There was one acute care patient who was not transferred within 72 hours of bed assignment, while 51 of 53 or 96 percent of intermediate care patients timely transferred within 30 days of referral. The two untimely transfers were 54 and 75 days late. Fifty patients were discharged during the review period, as compared to the 12 patients discharged during the prior reporting period. Of the 50 patients that were discharged, 44 were discharged back to CDCR. Of those 44, 23 or 52 percent were physically discharged within 72 hours of clinical discharge.

At DSH-Patton, all 13 referrals for 12 patients were timely admitted, as compared to the prior review period's six admissions. For discharges, the hospital reported discharge information for all 12 patients admitted during the review period, though only once for the patient who was admitted twice. Each patient was physically discharged the same day as their clinical discharge.

## I. PATIENT DISCIPLINARY PROCESS AND THE USE OF FORCE

### 1. Patient Disciplinary Process

Similar to the previous round, only DSH-Atascadero and DSH-Coalinga issued rules violation reports (RVRs) during the review period. Of the documentation that was produced

regarding the RVRs that occurred during the review period, mental health assessments (MHA) were completed in most but not all cases due to patient discharge to CDCR prior to completion.

During the review period, DSH-Atascadero issued 16 RVRs to *Coleman* class patients. Documentation reflected that of the 16 RVRs issued, 11 patients received an MHA while at the hospital while five did not have an MHA completed before discharge. Unfortunately, DSH-Atascadero only provided two MHAs for review; both were completed in a confidential setting. In one case, the clinician who completed the MHA reported that the patient's ongoing symptomology likely contributed to the behaviors that lead to the RVR, including not understanding the consequences of those behaviors.

DSH-Coalinga issued 13 RVRs to *Coleman* class members during the reporting period; ten of which were still pending disposition. Produced documentation for ten cases indicated that custody staff timely referred patients for completion of an MHA in three or 30 percent of reviewed cases, while mental health staff timely completed and returned the assessment to custody staff in eight or 80 percent of reviewed cases. All ten reviewed assessments were conducted confidentially. Of the ten reviewed cases, two opined that mental health factors contributed to the patient's behavior. Documentation about penalty mitigation was provided in all ten cases.

DSH-Patton did not issue any RVRs to *Coleman* patients.

**2. <u>Use of Force</u>**

There were no use of force incidents involving *Coleman* class patients at any of the DSH facilities during the review period.

## J. UNUSUAL OCCURRENCES/SERIOUS INCIDENTS/ NEAR MISSES/ SENTINEL EVENTS

All three hospitals reported unusual occurrences and serious incident reports (SIRs) during the review period.

DSH-Atascadero reported 26 unusual occurrences involving 23 patients during the review period. Of the 26 incidents, 21 were assaults, two were for alleged neglect/abuse, two were for alleged sexual assault, and one involved a fall. Only five of the 26 unusual occurrences remained open and pending review. DSH-Atascadero also indicated that there were 127 SIRs involving 93 patients during the review period. Of the 127 SIRs reported, there were 22 incidents of self-harm, 53 incidents of aggression, and 39 medical incidents reported. There were no reported sentinel events. The hospital appropriately kept track of and documented all unusual occurrences and SIRs during the review period.

DSH-Coalinga reported five unusual occurrences involving three patients during the review period. Of the five unusual occurrences, two were for reported suicide attempts, one involved a patient swallowing several pieces of metal, one involved an alleged assault on a staff member and one involved a deficiency in the five-point restraint process stemming from the alleged staff assault. DSH-Coalinga also reported 94 SIRs involving 54 patients, as compared to the three serious incident reports involving two patients during the prior round. *See* ECF No. 8085 at 67. Incidents included aggressive acts towards other patients, staff, and themselves, as well as falls, medical episodes, and suicidal ideation, threats, and attempts. An SIR was completed in each instance. There were no reported sentinel events. DSH-Coalinga reported keeping track of and documenting unusual occurrences and SIRs during the review period.

DSH-Patton reported two unusual occurrences for which both also had SIRs; neither incident was investigated. One incident involved a patient who attempted suicide while the other

involved a patient who required medical intervention due to shortness of breath and chest tightening. There were no reported sentinel events. The hospital appropriately tracked and documented all unusual occurrences and SIRs during the report period.

**K. <u>USE OF OBSERVATION CELLS/ROOMS, SECLUSION, AND RESTRAINT</u>**

Similar to the prior reporting period, none of the three hospitals used observation cells. There were nine seclusion incidents across three hospitals during the review period; DSH-Atascadero reported seven seclusion incidents while DSH-Coalinga and DSH-Patton each reported one. There were also 18 restraint incidents during the review period; 15 of which occurred at DSH-Atascadero, two occurred at DSH-Coalinga, and one occurred at DSH-Patton.

There were seven seclusion incidents at DSH-Atascadero during the monitoring round as compared to only three incidents during the Thirtieth Round. See ECF No. 8085 at 95. The average time in seclusion was 33.4 hours, which was a significant increase from 9.23 hours during the preceding monitoring round. The range of time spent in seclusion during the current review period was 6.25 hours to 104 hours.

DSH-Atascadero's restraint incidents increased from seven incidents in the preceding monitoring round to 15 during the review period. *See id*. at 67. There were 12 incidents involving patients placed in full restraints and three incidents involving patients placed in non-ambulatory restraints. The average time in restraints during this review period was 11.3 hours, with a range from 0.75 hours to 53.8 hours.

There was one seclusion episode at DSH-Coalinga during the reporting period; a decrease from five seclusion episodes during the Thirtieth Round. *See id*. at 68. The incident lasted for two hours and 43 minutes and the patient was released when the dangerous behavior concluded.

There were also two restraint incidents at DSH-Coalinga. One of the restraint incidents revealed that three of the nine qualitative indicators were not met, and areas of needed

improvement were identified. Corrective training was implemented to address the issues. The average restraint time was three hours and 45 minutes.

At DSH-Patton, there was one seclusion and restraint episode stemming from the same incident during the review period. The incident stemmed from a patient scratching another patient's hand and then threatening staff and the other patient. This patient was placed in five point restraints and was treated with intramuscular Haldol, Ativan, and Benadryl. The five-point restraints were discontinued after five hours and the patient was placed in seclusion for 12 hours.

## L. EMERGENCY RESPONSE AND THE DEATH REVIEW PROCESS

All three hospitals had emergency response processes. There were no deaths reported during the review period.

At DSH-Atascadero, the emergency care committee met monthly with required participants. The hospital provided medical emergency response evaluation audits for drills conducted in Program V which reflected compliance with emergency drills.

DSH-Coalinga conducted multiple emergency response drills in March 2024 on various units within the hospital including where *Coleman* class patients are housed. Further information regarding emergency response mock drills was unavailable.

DSH-Patton also conducted emergency response drills during the review period including those regarding choking events, dehydration, and hypovolemic shock.

## M. QUALITY MANAGEMENT AND UTILIZATION REVIEW

All three hospitals continued to operate robust quality improvement programs. Like the Thirtieth Round, the Joint Commission accredited DSH-Atascadero but not DSH-Coalinga.

DSH-Atascadero continued to sustain comprehensive quality improvement, risk management programs and utilization review with various committees that conducted multiple audits throughout the year. The quality council functioned as the oversight and monitoring

committee to which other committees reported. The quality council identified action items and monitored the status of implementation and completion of the items. Additionally, DSH-Atascadero continued to work with the Clinical Operations Advisory Council (COAC) which assisted the hospital with quality assurance improvements, assessment of current clinical treatment, and collaboration to conduct various audits to assist in quality improvement efforts.

DSH-Coalinga also continued to operate a comprehensive quality improvement program as well. The quality council met monthly and served as a hub for all quality improvement activities. Active quality assurance committees included the program review committee, utilization review committee, and utilization management committee. Audits and performance improvement measures during the review period included special incident reports, admission assessment audits, emergency response audits, nursing weekly progress note audits, rehabilitation therapy documentation audits, and social worker social history assessment audits. The data management unit (DMU) was developed at DSH-Coalinga to assist in producing, collecting, and tracking facility data for management and committee use. No corrective action or improvement plans were initiated during the review period.

DSH-Patton continued to maintain a stable quality improvement program as well. The continuous quality improvement process utilized a chart audit tool that evaluated a range of criteria from randomly selecting patient charts and involved audits of all hospital departments, with review of hospital-wide data that was organized by program and by hospital unit. The information was then utilized to identify deficiencies, to initiate a root cause analysis, and to develop corrective action or improvement plans. The hospital also conducted audits related to psychiatry, psychology, social work, rehabilitation, and nutrition.

## N. PATIENT COMPLAINTS/PATIENT SATISFACTION

During the review period, patients filed 52 complaints at DSH-Atascadero and one complaint at DSH-Coalinga. Patient satisfaction surveys conducted at DSH-Atascadero and DSH-Coalinga typically reported satisfaction with provided treatment. No patients filed complaints or participated in patient satisfaction surveys at DSH-Patton during the review period.

At DSH-Atascadero, 25 patients filed 52 complaints about medical and mental health treatment, medication side effects, access to and use of personal possessions, advocacy services, free-from-harm concerns, grounds passes, the ability to keep and spend reasonable sums of money, out-of-doors recreation, religious freedom, and various daily living issues. The hospital did not provide additional information regarding the complaints' outcomes. The hospital also reported that 58 percent of the patients discharged from care completed the patient satisfaction survey. Reviewed data revealed positive responses greater than 90 percent in 11 of 14 inquiries.

One patient filed a complaint at DSH-Coalinga related to medication administration concerns and a staff member disclosing personal health information in front of other patients. The medication administration complaint was resolved within one month while the allegation of privacy rights violations was not substantiated. Twenty-seven patients took the patient satisfaction survey upon discharge from the program. Patients reported an overall positive experience within the program.

## O. *COLEMAN* POSTINGS

It was reported that *Coleman* posters in English and Spanish were posted in all living areas that house Coleman class patients during the review period.

## P. LAUNDRY AND SUPPLIES ISSUES

Like the prior reporting period, none of the hospitals reported problems with laundry or supply issues.

Patients at DSH-Atascadero were provided with clean clothing two times a week and their bed linens were exchanged weekly. Reviewed logs revealed that laundry items were cleaned off-site and were counted and sorted before being returned to the institution.

At DSH-Coalinga, the institution maintained up-to-date policies and procedures for ordering clothing and linens, soiled laundry pick-up, laundry order deliveries, special needs laundry processing, stock shelf-rotation, and stock clerk coverage. Reviewed laundry logs were adequate during the review period.

At DSH-Patton, patient clothing and linens were laundered by the prison industries authority linen service. The hospital provided up-to-date policies for inspection, sorting, storage, and transportation of patient laundry. Like the previous round, unit supervisors were responsible for ensuring that their units had an adequate supply of clean clothing and linens.

## Q. VISITATION

Similar to the prior round, all three hospitals had visitation policies in place. DSH-Patton was the only institution with COVID-19 mitigation policies in effect during the review period.

DSH-Atascadero's visitation LOP allowed in-person visitation four days per week for 45 minutes during each visit and tele-visits were provided on the remaining three days. Patient phones were available on each unit, provided that they were not involved in mandatory treatment activities, and accessible for 16 hours per day.

At DSH-Coalinga, patient visitation was allowed five hours daily, seven days per week, including on holidays. Tele-visits were also permitted. An updated visitation administrative directive described protocols for visitor registration and security processing, group visitation,

visitation restrictions, terminations, revocations of visitations, and protocols for approved items for visitation.

DSH-Patton's visitation policy included department procedures that limit the number of visits per patient, limit the number of visitors in the facility, and masking protocols. In-person visits at the hospital were permitted for adults Sunday through Friday for a six hour period and Saturdays for a two hour period. Tele-visits for adults were permitted Monday through Friday as well.

**R. <u>LAW LIBRARY ACCESS</u>**

Similar to the prior reporting period, patients at all three hospitals had access to the law library.

At DSH-Atascadero, the law library had had a capacity of 15 patients at a time and patients were allowed first come first serve access to the library during regularly scheduled hours. Additionally, if specific relevant legal materials were not available then library staff could request photocopies from the California State Law Library.

The law library at DSH-Coalinga was open seven days weekly for ten hours per day. Patients had access to legal materials which included both hard copy materials and kiosks for legal research as well as computers and copy machines. Like the prior reporting period, library kiosks were available for daily use for up to two hours for pro per patients and those with upcoming court dates given priority scheduling. Unit supervisors were responsible for scheduling patient-requested appointment times with the program assistant.

Patients at DSH-Patton were allowed access to the law library which included virtual legal research kiosks, legal forms related to their commitment code, knowledge-based information, and leisure reading materials. Patients who could not physically go to the law library were allowed to contact the librarian on the days the west library was open to receive

materials on their unit. The east/central library operated on Tuesdays for two hours and on Wednesdays and Fridays for four hours per day. The west library operated on Mondays for 1.5 hours and Thursdays for two hours per day.

### S. MILESTONE CREDITS

All three hospitals provided Coleman patients with the opportunity to earn milestone credits. The hospitals then provided the milestone credit information to CDCR, which would then calculate and award patients' milestone credits.

## PART III.
## THE SPECIAL MASTER'S FINDINGS AT THE PSYCHIATRIC INPATIENT PROGRAMS

### A. STAFFING[35]

Since the unacceptably high vacancy rates reported in the Thirtieth Monitoring Report, the five PIP institutions have made little progress, and in some cases regressed, in coming into compliance with the court-approved PIP staffing plan and maintaining vacancy rates below the court-ordered maximum of ten percent. *See* ECF No. 7833 at 52; *see also* ECF No. 8009 at 3.

As discussed in previous rounds and noted in the foundational court orders of this case, federal court oversight of CDCR's mental health program will not end until there is full implementation of defendants' court-approved staffing plan. *See* ECF No. 5711 at 1. In the Thirtieth Round Monitoring Report, the Special Master noted that the five psychiatric inpatient programs (PIPs) "continued to report unacceptably high vacancy rates for many positions." *See* ECF No. 7833 at 52. Prior to that, in the Twenty-Ninth Round Monitoring Report, the Special Master reported similar concerns that "[d]espite the court-approved PIP Staffing Plan being in

[35] The source for this data is the Psychiatric Inpatient Program (PIP) Staffing Data that is part of the *Coleman* Monthly Report reflective of February 2025 data that was reported on March 28, 2025. *See* ECF No. 8585 at 13-16.

place, alarming staffing shortages for many disciplines continued to plague the PIPs." *See* ECF No. 7555 at 69.

In what has proven to be a continuous pattern of drastic understaffing in the programs housing and treating the most acutely mentally ill members of the plaintiff class, four of the five PIP programs have again reported concerningly high functional vacancy rates in both supervisory positions and line staff for the four critical disciplines of psychiatry, psychology, clinical social work, and recreation therapy.

From the Thirtieth to the Thirty-First Round, the overall staff psychiatry functional vacancy rate increased from 27 to 28 percent and the overall staff psychology functional vacancy rate increased from 46 to 48 percent. While these were incremental increases from one round to the next, the institutions' inability to fill these positions over the course of almost two years is troubling. Similar staffing deficiencies were noted with social worker positions, as the overall functional vacancy rate decreased from 49 percent in the Thirtieth Round to only 41 percent in the Thirty-First Round. These continued staffing vacancies in the most critical disciplines have had a cascading impact on the provision of mental health treatment provided to the highest level of care patients within CDCR.

As highlighted in more detail below, the lack of adequate staffing has led to CMF-PIP relying on a triage plan that de-prioritized initial assessments or routine primary clinician contacts. *See infra* pp. 256-257. The prioritization of certain treatment areas has led to an insufficient offering of structured treatment across all five PIPs. *See infra* pp. 112-115. The lack of supervisory staff has also led to dysfunctional quality management programs, lack of positive behavioral support teams (PBST) or system to encourage progress (STEP) programs, and discontinuation of required training in the areas of safety plans, suicide risk evaluation

mentoring, and custody and mental health partnership plan. *See infra* pp. 118-120, 141-143, 154-157, 162-165.

Chief Psychiatrists

All five PIPs maintained one allocated chief psychiatrist position; all positions were filled.

Senior Psychiatrist Supervisors

There were five total allocated senior psychiatrist positions across three institutions (CHCF-PIP, CMF-PIP, and SVSP-PIP); three positions were filled for a 40 percent vacancy rate. Of the two allocated positions at CHCF-PIP, one was filled for a 50 percent vacancy rate. Both senior psychiatrist supervisor positions at CMF-PIP were filled while the senior psychiatrist supervisor position at SVSP-PIP was vacant.

Staff Psychiatrists

Overall at the five PIPs, 24 of 78.6 staff psychiatry positions were filled, reflecting a 69 percent vacancy rate. The use of 32.5 registry staff positions reduced the functional vacancy rate to 28 percent.

Four of the five PIPs individually reported functional vacancy rates that exceeded the court-ordered maximum vacancy rate of ten percent. ECF No. 8009 at 3. SQ-PIP was the only institution in compliance with a nine percent functional vacancy rate. CMF-PIP reported the highest functional vacancy rate for staff psychiatrists at 37 percent, while SVSP-PIP and CHCF-PIP each reported 25 percent and 23 percent functional vacancy rates respectively. CIW-PIP reported a lower but still noncompliant functional vacancy rate of 17 percent for staff psychiatrists.

Chief Psychologists

Each of the five PIPs had an allocated chief psychologist position for a total of five positions. However, only chief psychologist position was filled at CHCF-PIP, CIW-PIP, and CMF-PIP respectively. SQ-PIP and SVSP-PIP did not have a chief psychologist on staff.

Senior Psychologist Supervisors

Of the 10.4 senior psychologist supervisor positions, seven were filled for an overall 33 percent vacancy rate. Notably, the 0.3 senior psychologist supervisor position at SQ-PIP was not filled while only one of 3.75 senior psychologist supervisor positions were filled at CMF-PIP for a 73 percent vacancy rate. Only one of 1.5 senior psychologist supervisor positions at SVSP-PIP were filled for a 33 percent vacancy rate. However, compliance was noted at CHCF-PIP, which reported an eight percent vacancy rate, and at CIW-PIP which reported that its 0.5 allocated position was filled by one full time equivalent (FTE) position.

Senior Psychologist Specialists

There were 28.9 allocated senior psychologists specialist positions across the five PIPs, of which 19 were filled for a 34 percent vacancy rate. No individual PIP vacancy rate for senior psychologists specialist positions fell below 20 percent. Of the 2.3 positions at SQ-PIP, one was filled for a 57 percent vacancy rate. Of the 6.6 positions at SVSP-PIP, four were filled for a 39 percent vacancy rate. At CHCF-PIP, there were 9.1 senior psychologists specialist positions of which six were filled for a 34 percent vacancy rate. CMF-PIP allocated 8.4 positions of which six were filled for a 29 percent vacancy rate and CIW-PIP allocated 2.5 positions of which two were filled for a 20 percent vacancy rate.

Staff Psychologists

The five PIPs had a total of 81.1 allocated staff psychologist positions, of which 19 were filled for a alarming 77 percent vacancy rate. The use of 23.27 registry staff reduced the functional vacancy rate for staff psychologists to a still troubling 48 percent. The only PIP to comply with the court-ordered maximum vacancy rate of ten percent for staff psychologists was SQ-PIP, which exceeded its 0.3 allocated position with three FTE line staff. The remaining institutions reported noncompliant staff psychologist functional vacancy rates of 65 percent at CMF-PIP, 44 percent at CHCF-PIP, 41 percent at SVSP-PIP, and 17 percent at CIW-PIP.

Social Workers

There was a total of 71 social worker positions at the five PIPs, of which 29 were filled for a 59 percent vacancy rate. The use of registry staff covered an additional 13.18 positions which decreased the functional vacancy rate to a still noncompliant and excessively high 41 percent. Once again, SQ-PIP was the only PIP that filled more than 90 percent of social worker positions, with a 9 percent functional vacancy rate. Functional vacancy rates at the four remaining institutions included a 60 percent functional vacancy rate at CMF-PIP, a 40 percent functional vacancy rate at CHCF-PIP, a 17 percent functional vacancy rate at CIW-PIP, and a close but still not compliance functional vacancy rate of 13 percent at SVSP-PIP.

Recreation Therapists

Of the 76.3 allocated recreation therapist positions throughout the five PIPs, 51 were filled for a 33 percent vacancy rate. The use of 11.08 registry recreation therapists reduced the functional vacancy rate to 19 percent. Only two institutions were not compliant with court-approved staffing requirements for recreation therapists, as CHCF-PIP reported a 28 percent

functional vacancy rate and CMF-PIP reported a 20 percent functional vacancy rate. CIW-PIP and SQ-PIP each reported that the number of recreation therapists exceeded the number of allocated positions while SVSP-PIP maintained a ten percent functional vacancy rate for recreation therapist positions.

## B. TREATMENT AND CLINICAL SERVICES

Similar to the preceding monitoring round, the treatment offered to PIP patients was generally inadequate. IDTT quality was mostly deficient at CMF-PIP, CHCF-PIP, and SVSP-PIP; IDTT documentation from CIW-PIP and SQ-PIP, on the other hand, revealed minimal to no concerns. Structured therapeutic treatment hours offered were largely insufficient and staffing shortages forced institutions to rely heavily on recreation therapy groups. PBST implementation was also negatively impacted by staffing shortages.

### 1. IDTTs

#### CMF-PIP, CHCF-PIP, and SVSP-PIP

At CMF-PIP, observed acute care IDTTs were problematic as all meetings demonstrated a need for improvement in staff collaboration and meeting content. During most IDTTs, treatment team members waited to be prompted by the primary clinician before participating, and when they did participate, input was minimal. This lack of spontaneous participation led to limited collaborative discussion of the patients' symptoms, functioning and treatment planning. There was also a lack of discussion regarding each patient's comprehensive psycho-social history and lack of case conceptualization. Additionally, least restrictive housing, progress toward treatment goals, interventions to achieve goals and group assignment, including NLTG groups were not discussed.

Intermediate care IDTTs at CMF-PIP varied in adequacy with only housing unit A3 demonstrating very good treatment team meetings. In the remaining housing units, the degree of

collaboration among the team members and quality of treatment planning discussed during the IDTTs varied. Although diagnoses were discussed with patients and there appeared to be team agreement regarding diagnoses, there was little discussion of measurable treatment goals to address the diagnoses. Discussion regarding treatment targets and interventions to achieve treatment goals was also minimal.

At CHCF-PIP, acute care IDTTs were generally adequate despite some identified problems. There was adequate staff attendance which generally included the patients. In all meetings there was a brief discussion of the patient's mental health history, focusing primarily on the factors precipitating the patient's admission to the acute unit, however none of the meetings included case conceptualizations. Treatment plans were discussed with goals clearly articulated; however, treatment goals were not always discussed in measurable terms. Discussion of interventions was often vague or generic, referring to medication, groups, and individual treatment without the specific content that would be provided during therapeutic sessions. Group participation was reviewed; however, discussions did not include a review of what types of groups the patient was attending and how those groups impacted the patient's treatment goals.

Observed intermediate care IDTTs at CHCF-PIP were generally inadequate and needed improvement. Required staff were in attendance for all observed IDTTs and demonstrated a collaborative and interactive approach to each patients' treatment planning. However, measurable treatment goals and expected outcomes for discharge were not uniformly discussed during each IDTT. Functional impairments and patient strengths were also not consistently discussed. Discussion regarding the degree of progress toward measurable treatment goals varied widely in observed IDTTs as did the patient's engagement and level of participation in treatment groups.

The quality of IDTTs at SVSP-PIP were not compliant during the review period. Although there were positive aspects for each treatment team, including the treatment planning processes being collaborative, patient-centered, and addressing each patient's unique clinical needs and presentation, there continued to be consistent concerns with patient attendance, lack of case conceptualizations, failing to identify patient diagnoses, and discussion of specific treatment. Additionally, clinical interventions to achieve treatment goals were not always clearly stated or identified, which led to inappropriate treatment groups for some patients.

**CIW-PIP and SQ-PIP**

As CIW-PIP and SQ-PIP were completed as paper reviews without on-site monitoring of services, IDTTs were not observed during this round. However, reviewed documentation for each institution revealed minimal or no concerns with various aspects of treatment planning during the review period.

**2. Group Treatment**

The PIPs are required to offer patients at least 20 hours of structured therapeutic activities per patient per week, ten hours of which must be core treatment.[36] *See* ECF No. 7924 at 10 (citing "[d]efendants shall immediately adopt and implement in the CDCR PIPs the minimum treatment standards set out in the DSH CQI process approved by the court.*"); see also* ECF No. 7812-1 at 15 (stating "that [the DSH CQI] process…provides that patients will be offered 20 hours of treatment per week, at least ten hours of which are to be 'core treatment'."). Because core treatment hour requirements can include individual treatment, compliance with this

[36] Since the August 23, 2023 Order, ECF No. 7924, CDCR has formalized these requirements into a policy that took effect on September 3, 2024.

requirement is assessed as a totality of treatment offered to the patient on average per week. *See* ECF No. 7812-1 at 15.

Similar to the preceding monitoring round, PIP patients were offered insufficient structured therapeutic treatment hours. Institutions continued to rely heavily on recreation therapy groups to satisfy their provision of structured treatment due to staffing shortages of primary clinicians. Overall, the quality of observed groups was adequate at CMF-PIP and SVSP-PIP. The quality of groups offered to patients at CHCF-PIP varied by level of care.

As CIW-PIP and SQ-PIP were completed as paper reviews without on-site monitoring, the quality of group treatment provided to patients was unable to be assessed. However, PIP patients at these institutions were offered an insufficient number of structured treatment hours during the review period.

**<u>CMF-PIP, CHCF-PIP, and SVSP-PIP</u>**

CMF-PIP institution reported offering acute care patients an average of 8.41 hours of structured treatment per week while offering intermediate care patients an average of 7.83 hours of structured treatment per week. Quality of group treatment for both acute and intermediate care patients was adequate for both core and supplemental groups. However, patients and staff confirmed that groups generally started late which affected patient treatment schedules and had significant attendance concerns due to group treatment and yard occurring at the same time. Observed groups included appropriate content for the titles of the group and staff were skilled at facilitating group discussions. Patients expressed that the quality of core groups were beneficial, however a majority of groups were led by recreation therapists during the review period.

CHCF-PIP offered acute care patients an average of 14.5 hours of structured treatment while offering intermediate care patients an average of 15.83 hours of structured treatment. As a

result, the institution was not compliant with the required offering of 20 hours of structured treatment. The quality of groups offered to patients at CHCF-PIP varied by level of care. Observed acute groups included discussion topics that did not address the title of the assigned group. The content of some groups appeared to be challenging for patients to understand and the facilitator did not appear to be familiar with the topics discussed. The quality of intermediate care groups, including maximum custody groups, was better. The biggest limitations to intermediate care groups, particularly for maximum custody patients, during the review period was physical plant space and staffing limitations.

At SVSP-PIP, patients were offered an average of 10.84 hours of structured treatment per week. Although this was an increase in the average weekly offering of 5.6 hours of group treatment during the previous round, the amount of structured treatment hours offered was insufficient for an inpatient setting. Notwithstanding the insufficient amount of treatment offered, the quality of group treatment was overall positive, but group participation was generally low and there were concerns with custody staff interruption. Observed clinician-led and recreation therapy groups were well-facilitated and organized. The topics and curriculums of the observed groups were appropriate for the intermediate care population. The clinicians leading the groups were engaging, knew their patients, kept the groups on task, and actively engaged in the group discussions and activities. The NLTG topics appeared appropriate for the intermediate care population as well.

**CIW-PIP and SQ-PIP**

As CIW-PIP and SQ-PIP were completed as paper reviews without on-site monitoring, group therapy services were not observed during this round. However, data regarding structured treatment hours offered to patients were produced for each institution.

At CIW-PIP, two separate and conflicting data sets regarding group treatment hours were produced with no explanation for the discrepancies; one data set suggested compliance whereas the other did not. Neither data set provided separate treatment hours for maximum custody patients. One report cited a combined cumulative average of 29.39 offered hours for structured and unstructured treatment with a range of 26.2 to 31.1 hours while the other treatment report indicated that acute care patients were offered a weekly average of 7.68 hours of structured treatment and intermediate care patients offered a weekly average of 9.93 hours of structured treatment.

SQ-PIP offered acute care patients an average of 4.8 hours of structured treatment per week and intermediate care patients an average of 14.8 hours. Of those intermediate care patients, flex bed patients were offered an average of 15.4 hours per week. Though no group treatment was observed, the institution reported that core groups were offered to patients five days per week while supplemental groups were offered seven days per week. There were no waitlists for group activities during the review period.

### 3. **Individual Treatment**[37]

The PIP Minimum Treatment Standards requires that acute care patients receive an initial psychiatric evaluation within 24 hours of arrival, every three days thereafter for the first thirty days, and then every seven days during their stay. Acute care patients are also required to receive an initial primary clinician evaluation within ten days of arrival and thereafter twice per

[37] Record reviews to assess compliance with minimum frequency of clinical contacts and IDTTs for both acute and intermediate care patients solely focused on the occurrence of a primary clinician or a psychiatric contact and did not assess the quality of the contact. The indication of an initial assessment did not verify that a comprehensive initial assessment was completed during the first contact with the primary clinician or psychiatrist. Additionally, the review of routine primary clinician or psychiatric contacts did not distinguish between a brief check-in or a meaningful therapeutic contact.

calendar week. For IDTTs, acute care patients are required to receive an initial IDTT within 72 hours of arrival and every seven calendar days thereafter during the patient's stay.

The PIP Minimum Treatment Standards requires that intermediate care patients also receive an initial psychiatric evaluation within 24 hours of arrival, every three days thereafter for the first thirty days, and then every seven days during their stay. Intermediate care patients are also required to receive an initial primary clinician evaluation within ten days of arrival and thereafter once per calendar week. For IDTTs, intermediate care patients are required to receive an initial IDTT within 72 hours of arrival and every 30 calendar days thereafter during the patient's stay.

Compliance reviews for timely initial and routine mental health appointments and required IDTT attendance were conducted and varied across all PIP institutions.

**CMF-PIP, CHCF-PIP, and SVSP-PIP**

At CMF-PIP, compliance with timely initial psychiatric evaluations varied by level of care as acute care patients reached 100 percent compliance and intermediate care patients were 50 percent compliant. Routine psychiatric contacts were both noncompliant as acute care patients received timely routine psychiatric contacts in 72 percent of cases as opposed to 82 percent of cases for intermediate care patients. Timely initial primary clinician evaluations occurred in 87 percent of reviewed acute care cases and 71 percent of intermediate care cases while timely routine primary clinician evaluations occurred in 49 percent of acute care cases and 42 percent of intermediate care cases. CMF-PIP was compliant for both initial and routine IDTTs during the review period.

At CHCF-PIP, compliance with timely initial psychiatric evaluations was reached for both acute and intermediate care patients with 100 percent and 97 percent compliance

respectively. Routine psychiatric contacts occurred timely in 81 percent of acute care cases and 65 percent of intermediate care cases. For initial primary clinician evaluations, a mere 33 percent of acute care patients and 27 percent of intermediate care patients received timely evaluations. Compared to routine primary clinician contacts, only 72 percent of acute care patients and 64 percent of intermediate care patients received timely contacts. Both initial and routine IDTTs were compliant for both acute and intermediate care patients.

At SVSP-PIP, initial psychiatry contacts, initial and routine primary clinician contacts, and initial and routine IDTTs complied with timeliness requirements; routine psychiatry contacts neared compliance at 82 percent.

**CIW-PIP and SQ-PIP**

At CIW-PIP, the institution was compliant with acute and intermediate care initial and routine psychiatric contacts, initial primary clinician contacts, and initial and routine IDTTs during the review period. However, only 60 percent compliance was noted for routine primary clinician contacts provided to acute care patients and 87 percent compliance for routine primary clinician contacts provided to intermediate care patients.

SQ-PIP was compliant with reviewed acute and intermediate care initial psychiatric and initial primary clinician evaluations as well as acute routine psychiatric contacts. Acute and intermediate care routine primary clinician contacts neared compliance at 87 and 88 percent respectively. Intermediate care routine psychiatry contacts were 75 percent compliant. SQ-PIP was also compliant with timely initial IDTTs for acute patients but achieved but achieved 88 percent compliance with intermediate care initial IDTTs. For routine IDTTs, both acute and intermediate care patients were compliant.

4. **Behavioral Management**

Overall, Positive Behavior Support Teams (PBST) were implemented at CMF-PIP, CHCF-PIP, CIW-PIP, and SQ-PIP, however staffing shortages had a significant impact on the availability and quality of PBSTs during the review period. SVSP-PIP did not have a PBST due to staffing shortages.

**CMF-PIP, CHCF-PIP, and SVSP-PIP**

At CMF-PIP, there was a small increase in access to behavioral planning during the review period, however, patient need continued to outweigh access. The CMF-PIP assigned two psychologists to the institution's PBST who provided consultation, complete behavioral plans, and staff training on ways to work with patients with challenging behaviors. During the review period, the PBST received two referrals for PIP patients. Behavior plans for these patients were developed according to documentation in the healthcare record and each targeted behavior changes but lacked sufficient rationales. There was no evidence of continuity of behavior plans for patients after discharge from PIP.

CHCF-PIP reported having a PBST that comprised of a single psychologist who provided support and consultation to patients with challenging behaviors while the IDTTs were responsible for creating behavioral plans. Staff indicated that the PBST provided consultation on not only those patients amenable to behavioral plans but also "complex" patients who suffered from serious psychiatric symptoms or who were determined to be "difficult to discharge." It was noted that unit psychologists and/or primary clinicians were responsible for monitoring behavior plans during patient treatment. This was concerning as not all primary clinicians were likely to have the training or expertise needed to complete functional behavioral analyses and develop or modify effective and evidence-based behavioral plans. Reviewed cases of patients who were

clinically indicated for behavioral support revealed little evidence that the planned behavioral interventions were developed despite indications either in the patient's record or on tracking forms that interventions were to be implemented.

SVSP-PIP indicated that it did not have any staff assigned to a PBST and that consequently, there were no behavioral treatment consultations during the review period. However, observation of IDTTs, group treatment, and a review of patient records, revealed several patients for which PBST intervention was indicated.

**CIW-PIP and SQ-PIP**

At CIW-PIP, PBST documentation suggested attention to policy development, process improvement, and staff training during the review period. CIW-PIP implemented two behavior plans during the review period. Tracking forms confirmed that, while the completion of the Positive Behavior Support Plans were generally delayed by process improvement efforts, one plan was completed on May 24, 2024 and the other was finalized on July 10, 2024. While these improvements were promising, the low number of referrals for Positive Behavior Support Plans were concerning given the nature of the population and relatively high utilization of highly restrictive and intrusive methods for behavior management, like restraints.

SQ-PIP reported that two patients had active positive behavioral support plans. The institution reported that implementation of the behaviorally-based STEP program reduced referrals for formal positive behavioral support plans. When patients were being treated under formal behavior plans, they were not included in the unit-wide STEP program so that they could receive immediate reinforcement for positive behavior. Health records were reviewed for the two patients who had formal positive behavioral support plans; while reference to the behavioral

plans and patient behavior was referenced in progress notes and treatment plans, documentation was similar across notes and did not reflect tracking of the efficacy of the plans.

### 5. Solo Programming

#### CMF-PIP, CHCF-PIP, and SVSP-PIP

Neither CMF-PIP or SVSP-PIP utilized solo programming during the review period.

At CHCF-PIP, staff reported that at any given time during the review period and on any given intermediate care unit, up to five patients were on solo programming. In general, most newly admitted patients, as well as patients who presented as a danger to others and those who were too psychotically disorganized to participate in group activities, were placed on solo programming for one to two weeks.

#### CIW-PIP and SQ-PIP

No explanation was provided regarding how solo programming was utilized at CIW-PIP during the review period. The institution could not indicate the number of patients on solo programming during the review period.

SQ-PIP did not identify patients on solo programming or their average length of time on solo programming status. However, patients who were not max custody status often had to program alone as no other non-max custody patients were housed on the units at the same time during the reporting period.

## C. Quality of Care

The delivery of adequate mental health care within the PIPs was assessed through detailed healthcare record reviews. The findings reflected the continuation of concerns identified during previous rounds as well as some areas of improvement. Of concern was the ongoing challenges found in the provision and documentation of treatment at the three “Lift and Shift” facilities (CHCF-PIP, CMF-PIP, and SVSP-PIP) in contrast to the programs at CIW-PIP and SQ-

PIP which evidenced far fewer concerns. Significantly and as reflected in the table below, at least 90 percent of reviewed cases at CIW-PIP (90%) and SQ-PIP (100%) were determined to have received adequate care.

In addition to evaluation of treatment planning through the IDTT process, treatment delivery, diagnostic clarification, documentation, suicide prevention, and medication management, an overall assessment of the adequacy of mental health treatment was provided for each case reviewed. A total of 122 patient records were reviewed. Of those records, 66 cases, or 54 percent, were determined to have received adequate care. The remaining 56 cases, or 46 percent, were determined to have received care that was inadequate in meeting their mental health needs at the inpatient level of care in keeping with the expectations set forth in the Program Guide and standards of care. The graph and table to follow illustrate the adequacy of care within the PIPs.

| | **CHCF-PIP** | **CIW-PIP** | **CMF-PIP** | **SQ-PIP** | **SVSP-PIP** | **ALL** |
|---|---|---|---|---|---|---|
| **Adequate** | 29% | 90% | 20% | 100% | 74% | 54% |
| **Inadequate** | 71% | 10% | 80% | 0% | 26% | 46% |




Of the records reviewed, 95 patients were receiving care at the intermediate care level and 26 were receiving services at the acute care level. Specifically, of those receiving services at the intermediate care level of care, 57 patients, or 60 percent, were determined to have received adequate care, while six patients at the acute care level of care, or 35 percent, were determined to have received adequate care.

**1. <u>Interdisciplinary Treatment Team (IDTT) Processes and Treatment Planning</u>**

There was variability identified across institutions with regard to meeting the expectations of the IDTT process and treatment planning. While there were a number of concerns noted with high frequency at CHCF-PIP and CMF-PIP and few common issues identified at SVSP-PIP, both CIW-PIP and SQ-PIP were free of any pattern of concerns such that no identified concerns appeared to be present beyond a few cases at each institution.

Most sites were noted to be holding IDTTs timely with required staff being present during the meetings along with patients. SVSP-PIP was noted as not having the required staff present consistently. Six of the 19 cases reviewed at SVSP-PIP, or 32 percent, did not have the

required staff present during the meetings (SVSP-PIP Patients A, B, C, G, I, and R). Most often, nurses and correctional counselors were noted as being absent. During the previous monitoring period, this was noted to have been an issue at CMF-PIP but was identified in only 20 percent of cases this round (6 of 30 including CMF Patients O, X, Y, X, AA, and CC).

With regard to the content of treatment planning documentation there was a failure of the IDTT to adequately update the treatment plan when indicated. This occurred in 45 of the total cases reviewed, or 37 percent. Specifically, this concern was identified in 63 percent of cases at CMF-PIP (19 of 30 including CMF-PIP Patient E, F, G, H, I, M, P, Q, R, T, U, V, W, X, Y, Z, AA, BB, and CC), 47 percent of cases at SVSP-PIP (9 of 19 including SVSP Patients B, C, D, E, F, J, K, R, and S), 46 percent of cases at CHCF-PIP (16 of 35 including CHCF-PIP Patients F, G, K, M, N, P, R, S, T, U, V, Y, Z, AA, DD, and EE) and one case at CIW-PIP (CIW Patient K).

There was a failure to identify specific treatment interventions which would be provided to support the patients' attainment of identified treatment goals. This concern was most prevalent at CMF-PIP where it was identified in 60 percent of cases (18 of 30) and CHCF-PIP where it was identified in 40 percent of cases (14 of 35) including CMF-PIP Patients A, B, C, D, F, L, M, N, O, P, R, S, W, Y, AA, CC, and DD and CHCF-PIP Patients K, L, M, N, P, R, S, T, X, Z, AA, DD, EE and FF. In many cases which identified this issue, it was noted that interventions listed on the treatment plan failed to include psychiatric interventions, incorporate group interventions, or provide any interventions at all within the treatment plan. As examples, CHCF-PIP Patient K was admitted to the inpatient setting after engaging in self-harm including cutting himself and swallowing foreign objects. During the initial IDTT, these events were not documented and there were no interventions listed to address the patient's self-harm. The treatment plan for CHCF-PIP Patient R included no interventions on the treatment plan. CMF-

PIP Patient A's treatment plan made no mention of the patient being enrolled in groups as interventions to meet identified treatment goals, despite groups being the primary therapeutic intervention being provided for the patient.

There was also a failure to document the patient's response to treatment or progress toward treatment goals during IDTT meetings in 60 percent of cases at CMF-PIP (18 of 30 including CMF-PIP Patients B, C, D, E, F, G, H, I, K, L, M, P, Q, R, U, V, X, and Z) and 37 percent of cases at CHCF-PIP (13 of 35 including CHCF Patients G, K, L, M, N, O, P, S, T, U, V, X, and Y).

The IDTT process at CMF-PIP evidenced a number of additional concerns with high frequency including a failure to adequately update or provide a clinical summary or clinical formulation (63 percent, 19 of 30 cases including CMF-PIP Patients C, E, F, G, I, K, O, P, R, s, U, V, W, X, Z, AA, BB, CC, and DD), treatment goals which did not match the identified needs of the patient (50 percent, or 15 of 30 cases including CMF-PIP Patients A, B, E, F, H, K, O, P, S, X, Z, AA, BB, CC, and DD ), vague, inappropriate, or missing treatment goals (43 percent, or 13 of 30 cases including CMF-PIP Patients C, G, I, K, M, N, O, P, R, S, W, Y, and DD), no discussion of changes in the patient's symptoms or behaviors in IDTT documentation (40 percent, or 12 of 30 cases including CMF-PIP Patients B, D, F, G, H, L, M, P, Q, R, X, and Z), a failure of the IDTT to identify significant events that occurred since the previous IDTT meeting such as self-injurious behavior or receipt of an RVR (37 percent, or 11 of 30 cases including CMF-PIP Patients F, H, I, K, M, P, S, T, Z, AA, and CC), and a lack of documentation regarding the patient's level of functioning (33 percent, or 10 of 30 cases including CMF-PIP Patients B, D, F, G, H, I, K, M, Q, and Z). These same concerns were identified as problematic at CMF during the previous round. On a positive note, these concerns had been identified as problematic at

SVSP-PIP during the previous round but were not identified in more than four of the 19 cases (21 percent) reviewed at SVSP-PIP during the current round (see specific patients below).

In addition to CMF-PIP, some of these issues were also identified at other PIPs. A lack of updated or adequate clinical summaries and/or case formulations was noted in CHCF-PIP Patients J, K, L, M, N, V, W, X, CC, and GG; CIW Patients J, K, and S; and SVSP-PIP Patients D and E. Treatment plan goals which did not appear to match the needs of the patient or reported symptoms were present for CHCF-PIP Patients K, L, M, N, R, S, X, Y, and AA; SQ-PIP Patient A; and SVSP-PIP Patients C, F, G, and R. Vague, inappropriate, or missing treatment goals were noted in CHCF-PIP Patients K, L, M, P, W, AA, DD, and FF; CIW-PIP Patients J and K; SQ-PIP Patient G; and SVSP-PIP Patients B, C, E, and G. There was no discussion of changes in the patient's symptoms or behaviors in IDTT documentation for CHCF-PIP Patients G, S, and T and CIW-PIP Patients J and K There was a failure to identify and address significant events that occurred with the patient since the prior IDTT for CHCF-PIP Patients N,T, X, and Y. IDTT documentation lacked evidence of a description of patient's functioning in the records of CHCF-PIP Patients M, S, and T.

Examples of the above issues included CMF-PIP Patient I who required emergency intramuscular medication and was placed on suicide precautions, yet neither of these incidents were mentioned in documentation during the patient's next IDTT meeting. CMF-PIP Patient E's treatment plan failed to review the patient's progress toward treatment goals in IDTT documentation. SVSP-PIP Patient C's treatment plan included a single goal to address social withdrawal yet failed to mention the patient's needs related to self-injurious behavior, suicidal ideations, psychosis, and disorganized thinking and speech.

The Program Guide requires that initial assessments be completed prior to a patient's initial IDTT meeting in order to ensure that treatment plans adequately address a patient's needs. During the previous monitoring round, concerns with the timeliness and adequacy of initial psychiatric and primary clinician assessments were noted at CMF-PIP, SQ, and SVSP-PIP. During the current round, this issue was identified at CMF-PIP in 20 of the 30 cases reviewed (67 percent) with regard to the completion of timely and adequate initial assessments by primary clinicians. These included CMF-PIP Patients A, B, C, D, E, F, G, I, J, N, U, V, W, X, Y, Z, AA, BB, CC, and DD. This issue was identified with less frequency (29 percent or 10 of 35 cases) at CHCF-PIP including CHCF-PIP Patients K, L, N, O, T, U, CC, EE, FF, and HH. Initial psychiatric assessments were problematic at CMF-PIP in 27 percent, or eight of 30 cases reviewed including CMF-PIP Patients B, C, D, E, F, G, J, and R. This issue was also identified in five cases at CHCF-PIP, or 14 percent, including CHCF-PIP Patients K, M, N, U and W as well as two cases (11 percent) at SVSP-PIP (SVSP-PIP Patients I and J).

**2. <u>Treatment Delivery</u>**

The most prevalent and overwhelming concern with the delivery of treatment within the PIPs at CHCF-PIP, CMF-PIP, and SVSP-PIP was a lack of required primary clinician contacts. This concern was identified in 44 percent of all cases reviewed (54 of 122) and was identified as significant problem at CMF-PIP (73 percent, 22 of 30 cases including CMF-PIP Patients A, B, F, G, H, L, M, N, O, P, Q, R, T, U, Q, X, Y, Z, AA, BB, CC, and DD), CHCF-PIP (69 percent, 24 of 35 cases including CHCF-PIP Patients A, B, C, E, F, G, H, I, K, L, O, Q, R, T, U, V, X, Y, Z, AA, BB, CC, EE, and II) and SVSP-PIP (37 percent, seven of 19 cases including SVSP-PIP Patients B, C, D, E, F, G, and J). This issue was not a concern at CIW-PIP (only CIW-PIP Patient K) or SQ-PIP (no cases).

There was also a lack of evidence that the treatment provided to patients in terms of frequency, timing, and/or content was meeting the needs of the patient as identified in clinical documentation. This concern was identified in 25 percent of all cases reviewed (30 of 122) and found specifically problematic at CHCF-PIP where it was noted in 49 percent of cases reviewed (17 of 35 including CHCF-PIP Patients C, G, K, N, O, P, Q, R, S, T, U, W, Y, AA, EE, GG, and HH) and at CMF-PIP where it was noted in 33 percent of cases (10 of 30 including CMF-PIP Patients B, D, G, I, J, M, Q, R, S, and DD). It was identified to a lesser extent at SVSP-PIP (two cases SVSP Patients C and E) and SQ-PIP (one case, SQ-PIP Patient H) and not identified in any cases reviewed at CIW-PIP. For example, CHCF-PIP Patient EE's treatment was noted to be inadequate secondary to not receiving adequate primary clinician contacts to address the needs identified in the treatment plan. CHCF-PIP Patient GG exhibited significant behavioral problems including self-injury, threats towards staff, and indecent exposure and yet there were not documented interventions to address these behaviors nor was an adequate treatment plan developed to address these issues. Finally, CMF-PIP Patient DD exhibited psychotic symptoms and yet there was no treatment plan developed for the patient who was treated by at least nine different psychiatrists and was not seen by a primary clinician until he had been in the inpatient setting for 21 days.

Additionally, there was a notable absence of clinical or core groups being provided to patients. This was identified as an issue in 20 percent of all cases reviewed (24 of 122 cases) but was especially concerning at CHCF-PIP where it was noted in 49 percent of cases (17 of 35 including CHCF-PIP Patients C, D, E, H, I, J, K, L, M, O, Q, R, T, BB, FF, HH, and II) and at SQ-PIP where it was noted in 28 percent of cases reviewed (five of 18 cases including SQ Patients D, E, F, H, and I). There was one case identified at CIW-PIP (CIW-PIP Patient F) and

SVSP-PIP (SVSP-PIP Patient B). The monitor's expert noted that most groups offered to patients at these PIPs were facilitated by recreational therapists and/or nursing staff and did not address the specific mental health needs of the patients reviewed and were not specified in patients' treatment plans.

Lastly, there was a lack of evidence that the interventions outlined in patients' treatment plans were being provided to patients in 16 percent of all cases reviewed (19 of 122) yet was significantly problematic at CMF-PIP where this issues was identified in 33 percent of cases (ten of 30 including CMF-PIP Patients E, J, M, O, R, S, U, V, W, and DD). This issue was identified to a lesser extent at all other institutions.

### 3. Diagnostic Concerns

Concerns related to poor rationale for documented diagnoses, unclear diagnostic formulations, and/or diagnostic discrepancies among clinicians and providers that were not rectified in the documentation have been a perennial concern. This round, concerns about clarity of diagnoses were identified in 14 percent of all cases reviewed (17 of 122 cases) with a specific concern noted at CMF-PIP where this issue was identified in 40 percent of the reviewed records (12 of 30 including CMF-PIP Patients B, D, H, I, L, P, S, U, V, Y, BB, and DD). At SVSP-PIP, diagnostic concerns were noted in 16 percent of cases (3 of 19 including SVSP-PIP Patients A, D and I) and in two of 35 cases (six percent) at CHCF-PIP including CHCF-PIP Patients L and U. For example, CMF-PIP Patient P's psychiatrist documented that the patient's diagnoses were under review and yet there was no mention of this in IDTT documentation nor was it acknowledged by the primary clinician. CHCF-PIP Patient U's psychiatrist omitted rationale for diagnostic impressions and CMF-PIP Patient B's record included conflicting and confusing diagnostic entries from psychiatric providers and within IDTT documentation.

No diagnostic concerns were identified at CIW-PIP or SQ-PIP.

**4. Clinical Documentation**

Accurate and adequate clinical documentation is essential for the delivery of quality healthcare services. As has been true in previous years, healthcare record reviews revealed a number of instances where clinicians and psychiatric providers were using templated, formulaic, or exact copies of notes from session to session making it impossible to determine the needs of the patient and/or the patient's current level of functioning. During this round, this concern was identified in 21 percent of all cases reviewed (26 of 122) but was most problematic at SVSP-PIP where it was noted in 37 percent of cases reviewed (seven of 19 including SVSP-PIP Patients A, B, C, D, E, G, and L). It was also identified in 31 percent of cases (11 of 35) at CHCF-PIP including CHCF-PIP Patients D, H, K, L, N, S, U, V, BB, FF, and GG; 23 percent of cases (seven of 30) at CMF-PIP including CMF-PIP Patients K, Q, U, V, Y, Z, and AA; and six percent of cases (one of 18) at SQ-PIP (SQ-PIP Patient H).

There was also a prevalence of inconsistencies in documentation across clinicians and providers, or on occasion, within the same note written by a clinician or psychiatrist. For example, psychiatric progress notes for CHCF-PIP Patient U noted that the patient was free of psychotic symptoms yet documented persistent auditory hallucinations in the same note. The monitor's expert noted these inconsistencies to be problematic when they were not addressed or resolved within the documentation. While clinicians and psychiatrists can disagree about a patient's clinical picture or observe different aspects of a patient's condition, standards of care dictate that the IDTT should identify these discrepancies and work to resolve or at least understand them. For example, CMF-PIP Patient P was noted in IDTT documentation as

experiencing passive suicidal ideation, yet psychiatric progress notes reflected more active thoughts of suicide. This discrepancy was neither noted nor addressed.

In 27 percent of cases reviews (33 of 122) inconsistencies were noted but not addressed in documentation. Specifically, this concern was identified in 43 percent of cases as CMF-PIP (13 of 30 including CMF-PIP Patients A, C, D, K, O, R, S, U, Q, Y, Z, AA, and BB), 42 percent of cases at SVSP-PIP (eight of 19 including SVSP-PIP Patients A, B, C, D, E, F, H, and J), 31 percent of cases at CHCF-PIP (11 of 35 including CHCF-PIP Patients D, G, H, L, M, P, S, U, V, BB, and GG) and one case at CIW-PIP (CIW-PIP Patient B). This concern was not identified at SQ-PIP.

It was noted across a number of institutions that individual primary clinician contacts were not occurring, but instead, primary clinicians were conducting clinical groups for patients. While group treatment can be effective, the documentation of groups was assessed to be inadequate in 27 percent of cases reviewed at CMF-PIP (eight of 30 cases) and eleven percent at CHCF-PIP (four of 35 cases). In many cases, such as CMF-PIP Patients R, T and CC, the failure of the primary clinician to document how the patient's treatment needs were addressed in the group and the patient's response to the group made it challenging to assess the patient's treatment progress or for other providers to understand the complete picture of the patient's functioning. There was no mention of how these groups applied to the patient's needs or the impact on the patient's mental health and functioning. One especially concerning example was CMF-PIP Patient CC who was referred to the psychiatrist for follow-up after making suicidal statements in group, yet there was no mention of this in the group documentation.

### 5. Suicide Risk Evaluations and Safety Planning

Concerns with adequate completion of Suicide Risk Evaluations (SREs) were noted in 11 of the 122 cases reviewed (nine percent). Specifically, there were ten cases where an SRE was not completed at the time of admission or when clinically indicated due to the nature of the patient's presentation (CHCF-PIP Patient AA; CIW-PIP Patients G, I, and J; CMF-PIP F, M, N, S, BB, and DD) and two cases where the SRE appeared to underestimate the patient's risk due to a lack of inclusion of previously identified risk factors (CMF-PIP Patient C and M).[38]

Additionally, there were 19 cases (16 percent out of 122 cases) where there was a failure to engage in the patient in safety planning when clinically indicated. This concern was most prevalent at CMF-PIP where it was identified in 11 cases (37 percent of the 30 cases reviewed including CMF-PIP Patients D, E, F, G, I, M, U, W, Y, Z, and DD), CHCF-PIP where it was identified in 14 percent of cases (five of 35 including CHCF-PIP Patients O, U, V, Q, and X) and SVSP-PIP where it was identified in 16 percent of cases (three of 19 including SVSP-PIP Patients L, M, and Q). As examples, CMF-PIP Patient M expressed suicidal ideation and required on-call psychiatric interventions, yet no safety plan was initiated. CHCF-PIP Patient X limited insight and recent suicide attempt warranted development of a safety plan prior to the patient's discharge and yet none was developed. SVSP-PIP Patients L and M were both noted as being chronically suicidal yet neither patients' treatment team engaged in safety planning with these patients.

### 6. Concerns Regarding Suicide Watch and Suicide Precautions

The Special Master's expert identified ten cases (seven at CMF-PIP and three at CHCF-PIP) where there was improper suicide watch or suicide precautions practices or documentation.

[38] CMF Patient M was identified as having both concerns in his record.

Concerns included documentation of staff not monitoring a patient as required (CHCF-PIP Patient P), delayed implementation of suicide watch or precautions orders (CHCF-PIP Patient U), orders not being followed appropriately (CHCF-PIP Patient U), changes to suicide watch or suicide precautions practices without written orders (CMF-PIP Patient S), no orders in the record (CMF-PIP Patient V) and changes to suicide watch or suicide precautions orders without an assessment of the patient (CHCF-PIP Patient Y) or with poor rationale being provided in the record (CMF-PIP Patients D, E, F, and I). For CMF-PIP Patient U, suicide precautions were discontinued through an expiration of the order rather than a face-to-face evaluation of the appropriateness of discontinuing precautions.

**7. Medication Concerns at CMF-PIP and CHCF-PIP[39]**

There were ten cases (eight at CMF-PIP and two at CHCF-PIP) where medication management concerns were identified, including CMF-PIP Patients F, P, R, U, V, W, AA and BB and CHCF-PIP Patients U and Y. These included inconsistent orders (CHCF-PIP Patient U received a lower dose than had been provided prior to admission without justification), dosing of medications not followed or incorrectly administered (CHCF-PIP Patient U had multiple changes to a medication by different psychiatrists resulting in nursing staff documenting an excessive dose on the patient's medication administration record which was fortunately identified and rectified prior to administration and CMF-PIP Patient AA was noted as having received an extra 16mg of suboxone prescribed to another patient), changes to medication orders without an assessment of the patient (CHCF-PIP Patient Y), failure to adequately address patient non-

[39] Medication concerns identified in this section only pertain to the identified patients at CMF-PIP and CHCF-PIP who were among the 122 patient records reviewed to assess the adequacy of mental health treatment across all five PIPs. Additional focused review of medication management for a separate sample of patients is discussed in Section IIID of this report. *See infra* p. 103-111.

adherence (CMF-PIP Patient P), failure to recognize medication side effect risks (CMF-PIP Patient F), medications allowed to expire (CMF-PIP Patients R, U, V, and W) leaving the patient unmedicated for a period of time, failure to address the fact that a patient was taking medications other than what was prescribed (CMF-PIP Patients P and CC) and less than adequate justification for the use of intramuscular medications following an incident of self-harm (CMF-PIP Patient F).

## D. MEDICATION MANAGEMENT

The monitor's expert reviewed 50 healthcare records, ten from each of the five PIPs, in order to evaluate the adequacy of medication management provided. Of these, 34, or 68 percent, were adequate. This represented interval improvement from the preceding monitoring round in which 28, or 56 percent, were adequate. Substantial variation remained among facilities, from a high of ten adequate cases at SQ-PIP, to a low of four adequate cases at SVSP-PIP. While aspects of medication management demonstrated interval improvement since the preceding monitoring round, other domains continued to display concerning areas, risking delayed or limited clinical improvement, or, in some cases, patient safety.

One of the most important decisions in medication management is determining if medications are warranted; the PIPs generally demonstrated well-founded decisions. CHCF-PIP and SQ-PIP documented clearly whether a medication was initiated or not, and whether there was collaboration with relevant disciplines and involvement of the patient in shared decision-making process. Long-acting injectable antipsychotic medications are a useful option when patient struggle with non-adherence to medication. In general, the PIPs appropriately considered and used these medications.

Several cases displayed concerns with the number of medication changes. At CIW-PIP, one case had approximately nine medication changes, all done at the time of admission. In a case at CHCF-PIP, the psychiatrist stopped three medications and started three medications at the

same time. Some cases at CIW-PIP and SVSP-PIP displayed concerns for using multiple medications from the same class, without a clear justification for doing so. Cases at SVSP-PIP also displayed limited documentation for medication choices and doses, and, in other cases, displayed delays in making substantive medication changes.

Clozapine is an antipsychotic medication which frequently improves patients' symptoms, even when other medications have failed. Given its potentially fatal side effects, close monitoring is required to initiate and monitor patients on this medication. In general, the PIPs evaluated patients appropriately for the use of clozapine, and monitored for medication side effects, with exceptions of not initiating the medication seen at CHCF-PIP and SVSP-PIP.

CIW-PIP and SQ-PIP demonstrated appropriate use of the PC 2602 process. In multiple examples reviewed, treatment with involuntary medications was a key factor in the patient's clinical improvement. Challenges in the PC 2602 process were seen at the remaining three PIPs. At CHCF-PIP, the psychiatrist was unclear if the patient was under a PC 2602 order or not. The presence or absence of a judge's involuntary medication order should be immediately evident. In another case at CHCF-PIP, a patient under a PC 2602 order had not received their medication many hours after it was due, with the psychiatrist determining that an alarm-triggered custody response was required. In a case at CHCF-PIP, the psychiatrist discontinued the injectable back-up form of the medication (should the patient refuse an oral one) after the initial evaluation, instead of allowing for a period of observation of stability on the unit. This raised concerns, as the patient had cut his wrist requiring sutures three weeks prior to admission.

In one CMF-PIP case reviewed, there were substantial delays in the PC 2602 process. The patient, for whom danger to others was one factor necessitating PIP placement, did not receive recommended antipsychotic medication for 207 days after the psychiatrist prescribed the

medication. Once the PC 2602 order was obtained, the patient promptly received the medication, improved, and was discharged approximately 30 days later. The delays resulted in the patient suffering longer than necessary and posed an increased risk of violence to both staff and fellow patients. While some of these delays were not in CDCR's control, the delayed filing of the initial petition, the failure to change the petition from a non-emergent to an emergent one after several concerning incidences on the unit and not providing the patient access to his medical records to contest the petition with resultant delays were within CDCR's control.

SVSP-PIP reported concerning barriers to implementation of PC 2602 orders. Staff reported that custodial staff were reluctant to administer medication without the psychiatrist present, or, in some cases, without seeing the actual court order. Neither of these were required by policy. Furthermore, no judicial order is required to administer involuntary medications for the first 72-hours of emergency initial petitions. The monitor's expert urges CDCR to rectify these issues immediately.

All institutions had a Medication Court Administrator (MCA) who facilitated the PC 2602 process. All MCAs reported no barriers interfacing with the Office of Legal Affairs, the Office of Administrative Hearings, or Administrative Law Judges.

CIW-PIP and SQ-PIP had good continuity of care. Of note, CIW-PIP documented a clear medication plan for the covering psychiatrist to follow.

In other PIPs, lack of psychiatric continuity of care resulted in multiple changes to the medication plans. Other notes documented custodial staffing limitations leading to a direct impact of the inability to see the patient in a confidential setting.

Except for SQ-PIP, the PIPs demonstrated concerns with the documentation in the medical record. CIW-PIP documented interval improvement in the amount of carry over

information from prior notes compared with the preceding monitoring round. Notes contained conflicting information. Other notes for cases at CHCF-PIP and SVSP-PIP had duplicative medication lists, rendering it difficult to determine which medications the patient was taking. Lack of information on medication changes also occurred.

**CMF-PIP, CHCF-PIP, SVSP-PIP**

Of the ten healthcare records reviewed for the quality of medication management at CMF-PIP, six were adequate. This was an interval improvement since the preceding monitoring round, in which four cases were adequate, and six inadequate.

In some cases, CMF-PIP made rapid medication changes, without clearly defined rationales. Poor continuity of psychiatric care, with different psychiatrists having differing medication plans contributed to this. In one case, psychiatry prescribed a total of seven different antipsychotics in less than two months' time. Antipsychotic medications often require weeks of treatment, and optimization of the dose in order to demonstrate efficacy. Furthermore, multiple antipsychotic medications were administered at the same time, clouding the clinical picture of which medication was leading to clinical benefit. Other cases listed a plan for medications in the progress notes, which differed from what the psychiatrist actually performed.

CMF-PIP did not report the number of patients prescribed clozapine. None of the patients the monitor's expert reviewed were prescribed clozapine.

A total of 130 patients received involuntary medications under the PC 2602 process, for which CMF-PIP displayed variability. In one example, the institution promptly filed an initial emergent petition after a patient reportedly attacked multiple other patients. Yet, in another case, CMF-PIP had delays echoing the preceding monitoring round. These multiple deficiencies included: delayed filing of the initial non-emergent petition (82 days after prescription of

medication); failure to convert the petition to an emergent one despite multiple threats and intimidation to staff; and failure to provide the patient with his medical records, causing delays in the PC 2602 hearing. The PC 2602 petition was granted 207 days after the initial prescription of the antipsychotic medication. After one month of treatment with the medication, the patient had improved to the point of discharge to a lower level of care.

The monitor's expert reviewed the healthcare records for ten patients, in order to assess the quality of medication management provided at CHCF-PIP; six were adequate. This is compared to five adequate cases in the preceding monitoring round.

Positive aspects of medication management included: timely initial psychiatric evaluations; using long-acting injectable antipsychotics in appropriate cases; and careful consideration of whether medications and involuntary treatment were indicated.

Other cases displayed concerns with both the number and speed of medication changes. In a case at CHCF-PIP, the psychiatrist stopped three medications and started another three medications at the same time. Given those number of changes, it would be essentially impossible to determine whether a clinical benefit or side effect was due to stopping a medication, starting a medication, or an interaction between medications.

At the time of the site visit, CHCF-PIP had 24 patients on clozapine. In one case, one reason for referral to PIP was to initiate the medication clozapine; however, the patient made minimal progress, remained psychotic, and was discharged on the same antipsychotic medications.

During the reporting period, 196 patients received involuntary medications under the PC 2602 process. The healthcare records reviewed revealed multiple concerns with the PC 2602 process, from: the psychiatrist not knowing if the patient was under a judge's PC 2602

involuntary medication order; not administering ordered involuntary medications until the psychiatrist activated an alarm for custody to respond; and finally, to stopping an injectable back-up medication at the time of admission, despite the patient's extensive history of self-injury.

As seen in the preceding monitoring round, healthcare and custody staffing limitations led to direct impacts on the patient. This included lack of continuity with the psychiatrists, leading to conflicting plans with medications, and multiple examples of inability to see the patient confidentially due to limited custody staff.

Mirroring the preceding monitoring round, SVSP-PIP had the lowest number of adequate medication management cases at four, with six being inadequate. This was a slight interval improvement since the preceding monitoring round in which three cases were adequate, and seven were inadequate.

Positive aspects included timely psychiatric evaluations, in all but one case. SVSP-PIP used long-acting injectable medications appropriately, although one case may have benefitted from consideration of this form of medication, due to medication non-adherence.

Concerns with medication management at SVSP-PIP included the use of multiple antipsychotic medications at the same time and starting a medication at two-to-four times the usual starting dose, despite the medication having interactions with other medications the patient was prescribed.

During the site visit, 17 SVSP-PIP patients were prescribed clozapine. One patient not initiated on clozapine was of particular concern. CDCR's own expert medication consultation service stated that, "There is no other antipsychotic except for clozapine which can offer any benefit at this juncture." Despite this, the patient was not started on the medication; he was

discharged on multiple other antipsychotics, which was of particular concern given concern for a medical diagnosis frequently leading to severe side effects to antipsychotic medications.

During the monitoring period, 81 patients received PC 2602 involuntary medications. While SVSP-PIP reported improvements in the process to obtain PC 2602 orders, the institutional staff reported custodial barriers to the administration of the medications. Custody staff reportedly declined to administer medications without the psychiatrist present, or in some cases, without seeing the actual court order, neither of which were required by policy. The monitor's expert urges CDCR to rectify these issues immediately.

**CIW-PIP and SQ-PIP**

Of the ten healthcare records reviewed at CIW-PIP, the monitor's expert determined that eight demonstrated adequate medication management. This was interval improvement since the time of the preceding monitoring round in which six were adequate, and four inadequate.

Initial psychiatric evaluations were timely and contained germane information to paint a clear clinical picture of the patient. Psychiatric follow-ups were timely, and the cases displayed good continuity of care. As one example, the treating psychiatrist communicated the plan for the covering psychiatrist; this prevented contradictory medication plans as seen in other PIPs.

CIW-PIP generally implemented long-acting injectable medications, when indicated; however, in one example, the healthcare record required stronger justification for the use of two long-acting injectable medications.

While the cases displayed many positive aspects, several concerns merit highlighting. The psychiatrist for one case made approximately nine medication changes at the time of admission. It would be impossible to know if clinical benefit or side effects were due to a particular medication change. In another case, mentioned above, the patient was prescribed three

antipsychotic medications, although the monitor's expert did note a plan to taper off one medication. Stronger documented justification for these medication decisions was required. In another case, the patient's diagnosis did not comport with the medications prescribed. And, finally, in a different case, the healthcare record repeatedly reflected "no significant mental health concerns," and the patient was not prescribed medications. While caution was merited as the patient was pregnant, stronger justification for the several month-long hospitalized was merited.

While CIW-PIP did not report the number of patients prescribed clozapine, in the cases reviewed, the monitor's expert observed no concerns with the use of this medication.

CIW-PIP once again demonstrated appropriate evaluation for and filing PC 2602 involuntary medication petitions. CIW-PIP reported that 44 patients received involuntary medications under the PC 2602 process.

CIW-PIP notes contained information carried over from prior notes, which sometimes resulted in the Plan section containing incorrect and outdated information; however, there was interval improvement since the preceding monitoring round.

The monitor's expert reviewed ten cases from SQ-PIP; as seen in the preceding monitoring round, all were adequate. Positive aspects included: management of complex cases with co-morbid psychiatric and medical conditions; logical rationales for evidence-based medication decisions; collaboration with the patient regarding medication options, when appropriate; and the use of long-acting injectable medications. One positive aspect deserved emphasis. SQ-PIP worked with DSH-Napa to provide electroconvulsive therapy (ECT) in patients with severe and refractory conditions. The cases reviewed were appropriate, with the patients having resultant marked clinical improvement. While limitations in medication

management were found, these did not rise to the level of rendering the medication management inadequate and were fewer than seen in the preceding monitoring round.

While SQ-PIP did not report the number of patients prescribed clozapine, the monitor's expert saw no concerns in the cases reviewed regarding the management of this medication.

SQ-PIP reported that 23 patients received involuntary PC 2602 medications. Echoing the preceding monitoring round, SQ-PIP considered, evaluated, and filed PC 2602 petitions when indicated.

SQ-PIP demonstrated good continuity of psychiatric care. Additionally, healthcare records reviewed were clear and succinct, with limited information carried over from prior notes. The monitor's expert recommends SQ-PIP documentation as a model for other PIPs.

### E. PATIENT ACCESS TO TREATMENT

The System to Encourage Progress (STEP) program was created to encourage treatment participation and positive patient behavior within the PIP setting. The STEP program policy was distributed on March 15, 2022. During the monitoring period, CHCF-PIP and SVSP-PIP were the only institutions to clearly indicate the full or partial implementation of statewide policy. CIW-PIP and SQ-PIP both provided general descriptions but did not indicate whether the program was implemented during the review period. CMF-PIP did not implement the program due to supervising staff deficiencies.

Like the prior review period, implementation and use of the policy at CHCF-PIP and SVSP-PIP were met with challenges. Common barriers included insufficient staffing, lack of funding, inadequate systems to track and utilize patients' earned incentives, inconsistent application of the system, and limited discussion of the STEP program and its requirements during IDTTs.

**CMF-PIP, CHCF-PIP, and SVSP-PIP**

At CMF-PIP, the STEP program was not implemented during the review period due to staffing shortages, particularly with supervisory staff. There was discussion during observed IDTTs and documentation in healthcare records that treatment teams sporadically placed patients in STEP levels, despite no available incentives at the institution.

At CHCF-PIP, the STEP program's statewide policy was not fully implemented due to the lack of funding for implementation of the second phase of the program which involved providing concrete incentives to patients who meet their goals. Interviewed patients were aware of the three steps that had been implemented in the first phase of the program.

Although the STEP program's local operating procedures at SVSP-PIP were aligned with statewide policy, mental health leadership reported continuing issues with the STEP incentive program as it was unclear how the program implemented the incentives once the desired behaviors were achieved. Staff indicated that patients did not receive their incentives immediately when demonstrating the desired behaviors. Incentive points were instead tracked by staff and were discussed during IDTT. To "spend" those points, patients had to submit a written request to the Program Department. As compared with other PIPs where patients were provided points at the time of engaging in the targeted behavior and visited the "incentive store" weekly to spend their points, SVSP-PIP's STEP program did not utilize its potential to more closely adhere to evidence-based behavioral principles to achieve a durable targeted behavior. Additionally, it was confirmed through the IDTT process that incentives and movement through the STEP program varied by recreation therapist and was not individualized or appropriately valued, rendering the program of limited clinical utility.

**CIW-PIP and SQ-PIP**

CIW-PIP only provided a general description of the STEP program without confirming its implementation during the review period. Requested data regarding the STEP program was not otherwise provided.

SQ-PIP provided very little documentation regarding the STEP program's implementation during the review period. The institution reported that the STEP program reduced referrals for formal positive behavioral support plans. When patients were being treated under formal behavior plans, they were not included in the unit-wide STEP program so that they could receive immediate reinforcement for positive behavior.

**F. REFERRALS AND TRANSFERS**

Compared to the prior monitoring round, total referrals decreased by 27 percent to CMF-PIP, increased by 79 percent to CHCF-PIP, decreased by 52 percent to SVSP-PIP, increased by 58 percent to CIW-PIP, and decreased by 54 percent to SQ-PIP. No patients who were endorsed to a PIP or pending admission exceeded transfer timelines at the time of reporting.

**CMF-PIP, CHCF-PIP, and SVSP-PIP**

There were 303 referrals–consisting of 206 acute and 97 intermediate care referrals–to CMF-PIP during the review period. The 206 acute care referrals resulted in 193 admissions, four rescissions, and nine rejections; the 97 intermediate care referrals resulted in 80 admissions, seven rescissions, and ten rejections. All rescissions and rejections occurred timely.

Five acute and four intermediate care patients were awaiting transfer to CMF-PIP; all were within transfer timelines.

Sixteen patients with complex medical needs were referred to CMF-PIP, resulting in eight acceptances and eight rescissions.

For CHCF-PIP, there were 462 referrals–consisting of 293 acute and 169 intermediate care referrals–during the review period. The 293 acute care referrals resulted in 272 admissions, seven rescissions, and 14 rejections; the 169 intermediate care referrals resulted in 156 admissions, three rescissions, and ten rejections.

Three acute and three intermediate care patients with complex medical needs were referred to CHCF-PIP; all resulted in admissions.

For SVSP-PIP, there were 107 intermediate care referrals during the review period which resulted in 96 acceptances, six rescissions, and five rejections. At the time of the site visit, three patients were endorsed to SVSP-PIP and an additional four patients' referrals were accepted and pending admission.

**CIW-PIP and SQ-PIP**

There were 84 referrals for 49 patients–consisting of 41 acute and 43 intermediate care referrals–to CIW-PIP during the review period**.** The 41 acute care referrals resulted in 40 admissions and one rescission; the 43 intermediate care referrals resulted in 41 admissions and two rescissions. No referrals were for patients with complex medical needs and no patients were awaiting an acceptance or rejection decision or placement at the CIW-PIP at the time of reporting.

For SQ-PIP, there were four acute and 12 intermediate care referrals during the review period. Two of the acute referrals and all 12 intermediate care referrals resulted in admissions; whether the other two acute referrals were rescinded or rejected was not discernable. One acute and two intermediate care referrals were for patients with complex medical needs and no patients were endorsed and pending acceptance or accepted and awaiting admission at the time of reporting.

**G. <u>ADMISSIONS AND DISCHARGES</u>**

On a positive note, all five institutions complied with admissions timelines. Discharges, on the other hand, were delayed at four of five institutions. Thirty-two percent of acute and 28 percent of patients physically discharged more than 72 hours after clinical discharge from CMF-PIP; 46 percent of acute and 17 percent of intermediate care patients from CHCF-PIP; 30 percent from SVSP-PIP; and 37 percent from CIW-PIP. All physical discharges from SQ-PIP, except for one intermediate care patient, timely occurred within 72 hours of clinical discharge.

**<u>CMF-PIP, CHCF-PIP, and SVSP-PIP</u>**

For CMF-PIP, 99 percent of acute care and 92 percent of intermediate care admissions were timely. The average lengths of stay for acute and intermediate care patients were 72 and 82 days, respectively, with ranges of 15 to 203 days and five to 204 days, respectively.

There were 238 acute and 97 intermediate care patients discharged from CMF-PIP during the review period; 77 of 238 or 32 percent of acute care patients and 27 of 97 or 28 percent of intermediate care patients took longer than 72 hours to physically discharge after clinical discharge.

For CHCF-PIP, 99 percent of acute care and all intermediate care admissions were timely. The average lengths of stay for acute and intermediate care patients were 48 and 141 days, respectively, with ranges of nine to 156 days and eight to 1,779 days, respectively.

There were 283 acute and 291 intermediate care patients discharged from CHCF-PIP during the review period; 130 of 283 or 46 percent of acute care patients and 49 of 291 or 17 percent of intermediate care patients took longer than 72 hours to physically discharge after clinical discharge.

For SVSP-PIP, 95 of 96 or 99 percent of admissions timely occurred within 30 days of referral, but 84 of 96 or 88 percent of admissions took longer than three days following acceptance.

SVSP-PIP discharged 141 patients during the review period; 42 or 30 percent took longer than 72 hours to physically discharge following clinical discharge.

**CIW-PIP and SQ-PIP**

For CIW-PIP, 38 of 40 or 95 percent of acute care and all 41 intermediate care admissions were timely. The average lengths of stay for acute and intermediate care patients were 20 and 84 days, respectively, with ranges of two to 65 days and 18 to 211 days, respectively.

There were 63 patients discharged from CIW-PIP during the review period; 23 or 37 percent took longer than 72 hours to physically discharge after clinical discharge.

All SQ-PIP admissions were timely. The two acute patients had lengths of stay of 100 and 120 days; intermediate care patients' average length of stay was 116 days and ranged from 39 to 197 days.

Three acute and 18 intermediate care patients were discharged from the SQ-PIP during the review period; all three acute and 17 of 18 or 94 percent of intermediate care patients physically discharged within 72 hours of clinical discharge.

## H. LEAST RESTRICTIVE HOUSING

During the Thirty-First Round, each institution reported a decrease in the number of patients housed above their LRH from the prior review period (except for SQ-PIP which housed no patients above their LRH during the prior or current review periods). Notably, CMF-PIP reported an 18 percent decrease from the prior review period, while CHCF-PIP reported a 44 percent decrease, SVSP-PIP reported a 17 percent decrease, and CIW reported a 30 percent decrease. See ECF No. 7833 at 93-94. .

**CMF-PIP, CHCF-PIP, and SVSP-PIP**

CMF-PIP reported 32 intermediate care patients in out of level housing; eight required locked dorms, two required multi-person cells, and 22 have a custodial LRH of unlocked dorms.

CHCF-PIP reported 76 intermediate care patients in out of level housing; 13 required locked dorms, 16 required multi-person cells, and 47 have a custodial LRH of unlocked dorms unlocked dorms.

SVSP-PIP reported 78 intermediate care patients in out of level housing; 55 were in single-cells and 23 were in multi-person cells.

**CIW-PIP and SQ-PIP**

At the time of reporting, CIW-PIP had seven patients housed above their least restrictive housing but provided no other relevant data. SQ-PIP reported that no patients were housed above their least restrictive housing either during the review period or at the time of reporting.

## I. PATIENT DISCIPLINARY PROCESS AND THE USE OF FORCE

**Patient Disciplinary Process**

During the review period, there were 771 RVRs issued to patients in the five CDCR PIPs during the review period. Three institutions, including CMF-PIP, CHCF-PIP, and SVSP-PIP, provided detailed information regarding the patient disciplinary process. CIW-PIP and SQ-PIP provided minimal information. At the three institutions that provided information regarding the timely referral of the mental health assessment to mental health staff, no institution was compliant. However, CMF-PIP and CHCF-PIP were compliant with timely completion and return of the mental health assessment to custody staff. SVSP-PIP was not compliant with this requirement. None of the three institutions were compliant with the completion of the mental health assessment in a confidential setting. The mental health clinicians reported recommending

penalty mitigation in almost all cases reviewed across the three institutions and the senior hearing officer (SHO) mitigated penalties in 58 out of 60 or 97 percent of recommended cases.

As for training, no institution provided mental health assessment training information for mental health staff during the review period. For custody mental health assessment training, CMF-PIP, CHCF-PIP, and CIW-PIP were the only institutions in compliance.

**CMF-PIP, CHCF-PIP, and SVSP-PIP**

CMF-PIP issued 66 RVRs to 55 acute care patients and 11 intermediate care patients during the review period. The monitor reviewed a random sample of 20 RVRs. Custody staff timely referred the mental health assessment to mental health staff in nine of 20 or 45 percent of cases. Mental health staff timely completed and returned the assessment to custody in 19 of 20 or 95 percent of cases. Of the reviewed sample, 16 or 80 percent of mental health assessments were completed confidentially. The mental health assessment recommended penalty mitigation in all 20 reviewed cases, which the senior hearing officer always documented consideration. The senior hearing officer mitigated penalties in all 20 cases.

CMF-PIP did not provide data for mental health staff members who completed the training. For custody staff, the chief deputy administrator, three of four correctional administrators, all captains, all correctional counselors and 30 of 31 lieutenants completed the training, as did 74 of 78 sergeants, and 543 of 589 or 92 percent of custody officers.

CHCF-PIP issued 575 RVRs to 169 acute care patients and 406 intermediate care patients during the review period. The monitor reviewed a random sample of 20 RVRs. Custody staff timely referred the mental health assessment to mental health staff in 16 of 20 or 80 percent of cases. Mental health staff timely completed and returned the assessment to custody in 19 of 20 or 95 percent of cases. Of the reviewed sample, six or 30 percent of mental health

assessments were completed confidentially. The mental health assessment recommended penalty mitigation in 18 or 90 percent of reviewed cases, which the senior hearing officer always documented consideration. The senior hearing officer mitigated penalties in 16 of 18 or 89 percent of the cases.

CHCF-PIP did not provide data regarding mental health staff members who completed mental health assessment training. For custody staff, all correctional administrators, captains, and lieutenants completed the training, as did 40 of 42 or 95 percent of sergeants, and 426 of 484 or 88 percent of custody officers.

SVSP-PIP issued 120 RVRs to PIP patients during the review period. Twenty-nine RVRs were randomly selected to assess compliance with policy requirements. Of the sample reviewed, the mental health assessment was timely requested in 21 of 29 or 72 percent of cases and timely completed and returned to custody in ten of 29, or 34 percent of cases. Of the 29 mental health assessments reviewed, 13 or 45 percent were completed confidentially. The primary clinician recommended penalty mitigation in 22 cases. The SHO mitigated penalties in all 22 cases and mitigated penalties in an additional three cases.

As for attendance at the annual mental health assessment training, 385 of 485, or 79 percent of custody staff and no mental health staff attended.

**<u>CIW-PIP and SQ-PIP</u>**

CIW-PIP provided limited information regarding the patient disciplinary process during the review period. During the review period, CIW-PIP issued and adjudicated seven RVRs to two acute care, four intermediate care, and one MHCB patient during the review period. The institution reported that 450 of 477 or 94 percent of institution-wide custody staff completed the RVR mental health assessment training; no data was provided for mental health staff.

At SQ-PIP, three RVRs were issued to intermediate care patients during the review period. Mental health assessments were completed for all three patients. No data regarding penalty mitigation was provided. RVR training data was not provided for mental health staff. However, 559 of 900 or 62 percent of custody staff attended the training.

**Use of Force**

The PIPs reported a total of 329 use of force incidents during the review period, an increase of 16 percent since the Thirtieth Monitoring Round. Of the 329 use of force incidents, ten were controlled and 319 were immediate. [40] There were no controlled and 62 immediate use of force incidents at CMF-PIP, ten controlled and 191 immediate use of force incidents at CHCF-PIP, no controlled and 55 immediate use of force incidents at SVSP-PIP, no controlled and 11

---

[40] CDCR defines Immediate Use of Force in its Department Operations Manual as:

> Immediate use of force is the force used to respond without delay to a situation or circumstance that constitutes an imminent threat to institution/facility security or the safety of persons. Employees may use immediate force without prior authorization from a higher official. Immediate force may be necessary to subdue an attacker, overcome resistance or effect custody. If it is necessary to use force solely to gain compliance with a lawful order, controlled force shall be used.

CDCR defined controlled Use of Force in its Department Operations Manual as:

> A controlled use of force is the force used in an institution/facility setting, when an inmate's presence or conduct poses a threat to safety and security and the inmate is located in an area that can be controlled or isolated. These situations do not normally involve the imminent threat to loss of life or imminent threat to institution security. All controlled use of force situations requires the authorization and the presence of a First or Second Level Manager during business hours. During non-business hours, the on-site manager shall be the Administrative Officer of the Day (AOD) who is responsible for the authorization of any controlled use of force and whose presence is required during any controlled use of force. Staff shall make every effort to identify disabilities, to include mental health issues, and note any accommodations that may need to be considered.

CDCR Operations Manual §51020.4, attached hereto as Exhibit R.

immediate use of force incidents at CIW-PIP, and no controlled or immediate use of force incidents at SQ-PIP during the review period.

Review of four controlled and 32 immediate use of force incidents across CMF-PIP, CHCF-PIP, and SVSP-PIP revealed compliance with required policy in all four controlled and 31 of 32 immediate use of force incidents.

As for use of force policy training, all five PIPs reported compliance with custody training on the use of force process while four of five PIPs reported 100 percent compliance with mental health staff training on the use of force process. SQ-PIP did not produce training information for its mental health staff.

**CMF-PIP, CHCF-PIP, and SVSP-PIP**

At CMF-PIP, there were no controlled and 62 immediate use of force incidents during the review period. The monitor's video review of 12 immediate use of force incidents revealed compliance with relevant policy.

CMF-PIP reported that 97 percent of custody staff and 100 percent of mental staff completed required use of force training.

At CHCF-PIP, there were 201 use of force incidents, including 191 immediate and ten controlled uses of force. Ten immediate and four controlled use of force incidents were reviewed. Custody staff in the ten immediate use of force incidents used a reasonable and appropriate amount of force and revealed compliance with relevant policy. The four controlled use of force incidents included three refusals to submit to PC 2602 administration and a patient's non-compliance with one-to-one observation orders. All policy requirements for each controlled use of force incident were met.

Although CHCF-PIP was not able to provide PIP specific data, CHCF indicated that 961 of 1,059 or 91 percent of institution-wide custody staff and all 43 mental health staff completed the use of force training for the last full calendar year.

SVSP-PIP reported no controlled and 55 immediate use of force incidents during the review period. Nine of ten reviewed immediate use of force incidents reflected that custody staff used a reasonable and appropriate amount of force that complied with relevant policy. The one examined immediate use of force incident that did not reflect compliance with policy guidelines involved an in-cell entry to administer a PC 2602 medication to a patient. Upon review, both the psychiatrist and custody staff requested that the patient submit to a PC 2602 medication order, however the patient sat in the corner of his cell and did not comply. As a result, an officer called for an emergency cell entry and utilized physical force to subdue the patient and administer the medication. It was determined that the responding officer’s actions to call for an emergency cell entry rather than conduct a controlled use of force was inappropriate given the circumstances and inconsistent with CDCR Operations Manual regarding the use of immediate and controlled use of force.

SVSP-PIP indicated that all 22 mental health staff and 793 of 825 or 96 percent of custody staff completed the annual use of force training.

**CIW-PIP and SQ-PIP**

CIW-PIP reported 11 immediate and no controlled use of force incidents. The use of force policy underwent no changes from the previous review period. The use of force training was completed by 535 of 589 or 91 percent of institution-wide custody staff and all eight mental health staff.

There were no use of force incidents at SQ-PIP during the review period. All five required mental health staff received the use of force training. Custody staff training data appeared to have been provided for the entire institution; this data reflected that 984 of 1,043 or 94 percent of custody staff received the training.

## J. USE OF OBSERVATION CELLS/ROOMS, SECLUSION, AND RESTRAINTS

There were 240 incidents of placing patients in observation cells at CMF-PIP during the reporting period. However, other than CIW-PIP who did not track this information, no other institution reported using observation cells.

Other than CIW-PIP who reported conflicting data regarding the number of restraint incidents, which varied from 25 to 38 restraint incidents, only CHCF-PIP reported one restraint incident during the review period.

**CMF-PIP, CHCF-PIP, and SVSP-PIP**

At CMF-PIP, leadership staff reported that there was no use of restraints, timeout cells, and/or seclusion rooms during the review period. However, during the monitoring period there were in fact 240 incidents of placing patients on observation status.

At CHCF-PIP, only one patient was restrained during the monitoring period. Seclusion was not used during the reporting period.

At SVSP-PIP, there were no patients held in observation cells, seclusions, or restraints reported during the monitoring period.

**CIW-PIP and SQ-PIP**

At CIW-PIP, provided documentation yielded conflicting data regarding the number of restraint incidents during this review period. One data set indicated 25 restraint incidents involving 16 patients, while the other indicated 38 restraint incidents for 21 patients; no

explanation was provided to reconcile these discrepancies. Furthermore, during the review period, logs for patients placed in observation cells were not maintained.

SQ-PIP reported no seclusion or restraints incidents during the review period. The observation cell was not used and SQ-PIP reported no use of "time-out" for any patient during the reporting period.

## K. EMERGENCY RESPONSE AND THE DEATH REVIEW PROCESS

Four of five institutions, including CMF-PIP, CHCF-PIP, SVSP-PIP, and SQ-PIP demonstrated having emergency response and review processes in place during the review period. CIW-PIP did not produce any minutes from the institution's emergency medical response review committee (EMRRC).

Both SVSP-PIP and SQ-PIP reported one death each during the review period. SVSP-PIP demonstrated an adequate death review process. SQ-PIP did not conduct a death review process as the patient died of a known medical condition.

### CMF-PIP, CHCF-PIP, SVSP-PIP

At CMF-PIP, there were four incidents, involving mental health patients that required emergency medical response. All four incidents were reviewed by the EMRRC. The incidents included an incident of multiple superficial cuts and significant bleeding, two incidents of hunger strike, and a neck laceration. The EMRRC noted inconsistent nursing and medical documentation regarding the neck laceration incident. There were no comments or other analysis regarding the three other incidents. EMRRC meeting attendance requirements were suspended due to critical staffing vacancies although the chief psychiatrist continued to attend these meetings. There were no deaths that occurred at CMF-PIP during the review period.

At CHCF-PIP, EMRRC meetings took place each month during the review period. Reviewed meeting minutes were comprehensive. The Patient Safety Subcommittee (PSS)

meeting minutes for the same time period were reviewed and were determined to be comprehensive. Standing agenda items included the status of current improvement projects, system surveillance, root cause analysis, morbidity and mortality reviews, health care grievances, program administration, and open forum. Additionally, responses to emergencies were appropriate. There were no deaths reported in the PIP during the review period.

At SVSP-PIP, The EMRRC met twice per month which was an increase from the prior reporting period. Reviewed documentation revealed that all EMRRC meetings attained required quorums. Substantive topics included sentinel events, including a death of a PIP patient during the review period, patient abuse allegations, staff assault and battery concerns, unusual occurrences, and self-injurious behaviors.

The individualized approach that the committee took in the Thirtieth Round continued into the current review period. Each patient incident was described in detail and at times included interventions to assist the patient in abstaining from the behavior that led to the incident. In the minutes, there were varying levels of assessment of underlying causes or factors that contributed to the patient's behavior or the incident.

There was one death of a PIP patient at SVSP during the review period. The institution indicated that the death was not by suicide. The death was identified in EMRRC meeting minutes as an overdose. The committee reviewed the death report and noted a concern that despite the patient being on direct observation treatment (DOT) medications, the patient was able to hoard medications. EMRRC meeting minutes reflected adequate discussion of ways to prevent future occurrences.

**CIW-PIP and SQ-PIP**

At CIW-PIP, EMRRC minutes were not provided for the current review period and their omission from the document production was not explained. There were no deaths reported at CIW-PIP during the review period.

SQ-PIP submitted meeting minutes for the institution's EMRRC for the reporting period. Each set of minutes included a list of all emergency medical responses and all unscheduled transports for the previous month, yet for the minutes from February through May 2024, there was no indication as to whether individual cases needed to be opened for review. The information contained in the minutes did not allow for a review of the timeliness or appropriateness of responses to emergencies.

There was one SQ-PIP patient death during the review period. The death was a natural death and occurred at a community hospital secondary to a known medical condition. No review of the death was provided; however, it was reported that no corrective actions were needed in response to the death.

## L. QUALITY MANAGEMENT AND UTILIZATION REVIEW

Like during the prior monitoring round, staffing shortages negatively impacted quality management and utilization review activities at CMF-PIP, CHCF-PIP, and SVSP-PIP. Quality management activities at those three institutions frequently consisted of program monitoring and data review as opposed to quality improvement studies or action items; to that end, no CAPs were initiated at any of those three institutions. CIW-PIP had various document production issues which negatively impacted their findings. On a positive note, like during prior monitoring rounds, SQ-PIP maintained an active and robust quality management program; however, utilization management was inactive during the review period.

**CMF-PIP, CHCF-PIP, and SVSP-PIP**

CMF-PIP did not have a functioning quality management program due to staffing shortages. No CAPs were initiated from utilization review audits, committee recommendations, or patient complaints. Peer reviews were not conducted. Mental health program subcommittee, patient safety subcommittee, specialized bed subcommittee, and utilization review meetings were held with quorums in attendance; mental health program subcommittee documentation, however, was largely formulaic and did not specify action plans. Patient subcommittee, specialized bed subcommittee, and utilization review meeting minutes discussed safety topics including self-harm and outside hospitalization but did not separate incidents by level of care; utilization review subcommittee meeting minutes did not document PIP bed utilization review. SRE compliance ranged from 81 to 87 percent.

CHCF-PIP's quality management program focused on routine monitoring of quality assurance activities rather than functioning as a full quality improvement program and was largely impacted by staffing vacancies. While monthly meetings were held with quorums in attendance, mental health program subcommittee meeting minutes, for example, reflected routine tracking and monitoring of data but evidenced no formal quality improvement studies or actions. Relatedly, several action items showed little to no progress over time and no related CAPs were initiated during the review period.

SVSP-PIP did not have dedicated quality management staff either during the review period or at the time of the site visit–the chief of mental health operated the program while simultaneously addressing his other duties–which impeded progress on the development of the quality management program. To that end, there were no patient improvement programs, CAPs, QITs, or FITs during the review period or at the time of the site visit. While SPRFIT, the Quality

and Performance Improvement Program (QPIP), Utilization Management Committee, and Risk Management Committee all were involved in quality management utilization review, the SPRFIT and QPIP committees contributed most of the performance metrics. QPIP met for all but one month of the review period with quorums achieved at each meeting. Their ongoing performance improvement priorities included increasing treatment hours offered to consistently achieve 20 hours per week–including 10 hours of core treatment–and to improve the quality of IDTTs and treatment planning, suicide risk evaluations, and safety plans. The utilization management committee met four times during the review period with quorums achieved at each meeting and typically discussed complex patients in a case review and planning format. The risk management committee met biweekly throughout the review period with quorums in attendance at each meeting and frequently examined data related to staff and patient safety.

**CIW-PIP and SQ-PIP**

CIW-PIP failed to produce the following documentation: meeting minutes and other relevant proof of practice information related to the local governing body (LGB), EMRRC, and patient safety committee; the requested information on unusual occurrences, serious incidents, near misses, and sentinel events; and follow-up documentation for a CDPH-required CAP specific to mental health staff training in the PIP. Meeting materials that were produced indicated that strengths in their healthcare quality assurance program with a commitment to compliance monitoring, process improvement, staffing, interdisciplinary collaboration, information technology, inpatient bed utilization, physical plant, and tracking and analyzing trends. Healthcare quality management committee, mental health program subcommittee, and utilization management meeting minutes confirmed that the monthly meetings occurred with quorums in attendance. Mental health program subcommittee documents referenced a charter

developed to review the efficacy of structured groups as well as three PIWPs focused on reducing the number of RVRs issued to MHSDS patients by 25 percent; increasing staff retention by addressing burnout and increasing employee wellness and job satisfaction; and implementing at least two of four California model pillars such as peer support and normalization. No further documentation was provided for mental health-specific CAPs or PIWPs. Regrettably, a March 2024 CDPH survey identified several concerns in the PIP including a finding that six custody officers, one social worker, and various nursing staff violated the PIP policy training requirement.

SQ-PIP's quality management process remained active and robust from the prior review period, including routine participation in the SPRFIT, mental health quality management subcommittee, patient safety committee, emergency medical response and review committee, and the specialized beds subcommittees; all meetings occurred monthly with quorums in attendance. Utilization management was inactive during the review period. Quality management committee, mental health subcommittee, and specialized beds subcommittee minutes reflected monitoring of routine services in the PIP including timely suicide risk evaluations, timely IDTT meetings, IDTT staffing, delivery of structured therapeutic activities, and adherence with expectations of the Joint Commission. During the review period, a workgroup was developed to maximize clinical resources and increase group treatment hours. Further improvement projects included a charter, failure modes and effects analysis, fishbone diagrams that help identify potential causes of problems, tracking mechanisms, updating local policies, noise reduction, and improving treatment planning; however, these projects started and stopped when competing priorities were elevated.

## M. PATIENT COMPLAINTS/PATIENT SATISFACTION

Patient complaints were noted at all five PIPs during the review period. Like the preceding review period, it was unclear if the patient complaint log included incarcerated persons from the entire institution or just the PIP.

Patient satisfaction surveys were distributed at CHCF-PIP, SVSP-PIP, CIW-PIP, and SQ-PIP during the review period. CMF-PIP did not distribute patient satisfaction surveys to patients due to reported clinical supervisor vacancies. CHCF-PIP reported providing surveys to discharged patients as well as acute care patients on a monthly basis and intermediate care patients on a quarterly basis.

**CMF-PIP, CHCF-PIP, and SVSP-PIP**

CMF-PIP provided a log of patient complaints from Facility A; however, it could not be discerned from the log whether the patients referenced were PIP patients. Patient satisfaction surveys were not completed during the reporting period due to the clinical supervisor vacancies.

At CHCF-PIP, there were 136 patient complaints reported during the review period. Of the 136 patient complaints, 124 were closed, five were awaiting approval, four were awaiting a response, and three were under mental health review. Beginning in August 2024, the patient satisfaction survey was distributed to all acute patients monthly and all intermediate care patients quarterly as well as at the time of discharge. Leadership indicated receiving 120 patient responses from the first quarter of implementation. The data collected was reviewed during the monthly meeting with PIP leaders to identify areas of needed safety and quality improvement.

SVSP reported 85 complaints during the reporting period or a 27 percent increase since last reporting round. No SVSP-PIP patients completed patient satisfaction surveys during the review period.

**CIW-PIP and SQ-PIP**

CIW-PIP patients filed six complaints; five required no intervention and one was rejected. All six were closed by the time of reporting. Sixteen patients completed patient satisfaction surveys during the review period. Patients generally expressed their appreciation and satisfaction with the care provided in the PIP; some patients expressed their desire for more interesting group topics and more opportunities for peer interaction and socializing.

At SQ-PIP, three patient complaints were filed against mental health staff during the review period. All three were closed by the time of reporting and no intervention was needed.

One patient satisfaction survey was conducted during the review period. This survey was related to noise complaints and indicated sleep was impacted which negatively affected the therapeutic milieu of the unit.

## N. CUSTODY AND MENTAL HEALTH PARTNERSHIP PLAN

Compliance with the components of the custody and mental health partnership plan varied by institution; regrettably, CIW-PIP produced no CMHPP data. CMHPP LOPs were outdated at CMF-PIP and CHCF-PIP and current at SVSP-PIP and SQ-PIP; all four aligned with headquarters' directive. Executive joint rounding did not occur in the CMF-PIP or CHCF-PIP during the review period; while the rounding occurred at the SVSP-PIP and SQ-PIP, only the SQ-PIP adequately discussed the rounding in the executive staff meeting, quality management committee, and mental health program subcommittee meeting minutes.

Reviewed huddle forms reflected variable attendance by required staff across the four institutions, with required staff in full attendance at CHCF-PIP and SQ-PIP and at 27 and 61 percent attendance, respectively, at the CMF-PIP and SVSP-PIP. Observed huddles across the generally reflected attendance by required staff and collaborative, meaningful discussion amongst staff.

No staff were reassigned to new positions due to patients filing staff misconduct complaints; however, one misconduct complaint from CHCF-PIP revealed concerning behavior by staff wherein the staff member assaulted a patient and permanently damaged that patient's shoulder.

Annual off-post training was attended by all required staff at CMF-PIP and SVSP-PIP; 97 percent of custody staff and 76 percent of mental health staff at CHCF-PIP; and 98 percent of custody staff and 72 percent of non-custody staff at SQ-PIP, though SQ-PIP's provided data was institution-wide and not separated exclusively to PIP staff.

Regrettably, quarterly round table training was not held during the review period at CMF-PIP while compliance regarding the same could not be ascertained at CHCF-PIP, SVSP-PIP, or SQ-PIP.

**CMF-PIP, CHCF-PIP, and SVSP-PIP**

CMF-PIP's CMHPP LOP was last revised in March 2022 and, thus, outdated, but otherwise aligned with headquarters' directive.

Executive joint rounding did not occur in the PIP during the review period.

Only 27 percent of reviewed huddle forms reflected attendance by required staff; custody staff was generally absent. Of the eight observed huddles, required staff attended seven and discussions were generally thorough and collaborative.

CMF-PIP patients filed 69 staff misconduct complaints; no CMF-PIP staff were reassigned due to the complaints.

All required custody and non-custody staff attended the annual off-post training. Regrettably, quarterly round table training was not held during the review period.

CHCF-PIP's LOP was last revised in January 2022 and, thus, outdated, but otherwise aligned with headquarters' directive.

Executive leadership joint rounding did not occur in the CHCF-PIP during the review period.

Reviewed huddle forms reflected attendance by required staff. The two observed huddles also reflected attendance by required staff and discussions at both were collaborative and informative.

CHCF-PIP patients filed 100 staff misconduct complaints, one of which reflected concerning staff behavior wherein the staff member assaulted a patient resulting in permanent damage to the patient's shoulder. No staff were reassigned due to misconduct complaints.

Annual off-post training was attended by 97 percent of custody staff and 76 percent of mental health staff. Compliance with attendance at the quarterly round table training could not be ascertained from the data provided.

SVSP-PIP's CMHPP LOP was up to date and aligned with headquarters' directive.

Executive joint rounding occurred once in the PIP during the review period with all required staff in attendance. The rounding was not discussed in any of the warden's executive meeting minutes from the review period, for all six months in the mental health subcommittee minutes, and for two of six months in the quality management committee meeting minutes.

Reviewed huddle forms reflected 61 percent compliance for required staff attendance. Four observed huddles were all attended by required staff, though lacked collaborative discussion.

Annual off-post training was attended by all custody and mental health staff. Compliance with attendance at the quarterly round table training could not be ascertained from the data provided.

**CIW-PIP and SQ-PIP**

Regrettably, CIW-PIP provided no CMHPP data.

SQ-PIP's CMHPP LOP was up to date and aligned with headquarters' directive.

Executive leadership joint rounding occurred once in the PIP during the review period with all required staff in attendance and was adequately discussed in the executive staff meeting, quality management committee, and mental health program subcommittee meeting minutes.

Huddles occurred daily on second and third watch with required custody, mental health, and medical staff in attendance. SQ-PIP additionally held weekday morning meetings between custody, mental health, and nursing staff as well as a monthly all-staff meeting.

While no data regarding staff misconduct complaints filed against PIP staff was provided, documentation indicated that no staff members were moved to other posts due to misconduct complaints.

Annual off-post training data was not separated by PIP staff but, rather, was provided for the full institution; this data revealed attendance by 98 percent of custody staff and 72 percent of non-custody staff. Compliance with attendance at the quarterly round table training could not be ascertained from the data provided.

**O. *COLEMAN* POSTINGS**

All PIPs were compliant with placing *Coleman* posters in observed housing units.

**CMF-PIP, CHCF-PIP, and SVSP-PIP**

Coleman postings were displayed in both English and Spanish in all toured housing units at CMF-PIP, CHCF-PIP, and SVSP-PIP.

**CIW-PIP and SQ-PIP**

Provided documentation for CIW-PIP indicated that updated English and Spanish *Coleman* posters were posted in all patient-accessible locations.

At SQ-PIP, *Coleman* posters were posted in English and Spanish; visual audits were also conducted during the monthly Environment of Care MH Risk Assessment.

**P. LAUNDRY AND SUPPLY ISSUES**

There were notable laundry concerns at CHCF-PIP and SVSP-PIP during the review period. Patients reported going weeks without clean clothing and linens which forced patients to wash the clothing themselves or reuse linens for extended periods of time. There were no issues with laundry or linen services at CMF-PIP, CIW-PIP, or SQ-PIP during the review period.

**CMF-PIP, CHCF-PIP, and SVSP-PIP**

There were no reports of laundry issues at CMF-PIP during the review period.

At CHCF-PIP, there were significant laundry concerns during the review period. Although document production indicated that no laundry or supply issues were identified during the review period, interviewed custody staff reported routinely experiencing shortages of clothing and safety blankets. Staff indicated completing their own informal audits when there was not enough clothing in their housing unit and borrowing clothing and safety blankets from other facilities who had excess clothing to spare. Due to the shortage, staff indicated that patients would either wear the wrong size clothing or wash their own clothing in their cell. Like the preceding monitoring period, PIP patients were supposed to received clothing and laundry on a one for one laundry exchange when patients were offered showers. Soiled clothing and linens were removed at least three times weekly.

SVSP-PIP maintained the same laundry and supply distribution schedule since the preceding monitoring round which required a one-for-one exchange for clothing and linens as the

patients were released for shower. Similar to the preceding review period, the institution did not provide any audits, reports, or logs pertaining to laundry services during the reporting period. Patient interviews reflected continuing laundry issues during the review period. One patient particularly indicated that he was not receiving clean towels and was not receiving new clothing on a one-for-one exchange following a shower as required. This patient reported using the same towel for nine consecutive weeks. Patients were repeatedly told that they were short on clothing issue.

**CIW-PIP and SQ-PIP**

CIW-PIP provided limited information on the institution's laundry process during the review period. The institution's LOP documented the provision and collection of clothing and linens during the reporting period. Laundry was no longer washed off-site which ensured same-day laundry pick-up and drop-off.

SQ-PIP reported that their clean laundry supply adequately met patient needs. NCAT data regarding linen exchanges was provided which reflected compliance with timely linen exchanges throughout the review period.

## Q. PROPERTY/VISITATION/PRIVILEGES/TELEPHONE ACCESS

SVSP-PIP continued to have delays in patients' receipt of property during the review period. The institution did not indicate a reason for delays but did indicate that custody staff had made phone calls for patients when appropriate.

Patients reported no issues with visitation at CMF-PIP, CHCF-PIP, SVSP-PIP, or SQ-PIP. CIW-PIP did not provide documentation related to visitation during the review period.

For privileges, patients reported adequate offering of yard at all five PIPs, however the amount of yard offered would vary by housing unit at SVSP-PIP. Additionally, patients reported concerns with canteen at SVSP-PIP as the canteen would travel from cell-to-cell. This forced

patients to remain in their cell on canteen day which led to skipped programming and out-of-cell time.

The offering of telephone calls was adequate at most institutions. An reasonable number of phone calls were offered at CMF-PIP, CHCF-PIP, CIW-PIP, and SQ-PIP. However, telephone calls varied by housing unit at SVSP-PIP with some patients being offered one or two phone calls within a three-week period.

**<u>CMF-PIP, CHCF-PIP, and SVSP-PIP</u>**

At CMF-PIP, reviewed NCAT data for twenty randomly selected acute, intermediate, and maximum custody patients revealed that patients in the PIP were offered 110 minutes a day of out-of-cell time and 17 of the 20 patients were offered multiple phone calls. Visitation for patients in the PIP was non-contact and occurred in the main visiting area. Visitation was limited to Saturday and Sundays. Patients reported limited recreational supplies available to them during their unstructured out-of-cell time and described poor access to hair clippers and razors for grooming purposes. Since the COVID-19 pandemic, all meals for patients in intermediate housing units have been served in cell.

At CHCF-PIP, twenty-four weeks of reviewed NCAT data revealed that PIP patients were receiving two to three hours of yard or day room daily, three showers weekly, two or more phone calls weekly, and a weekly linen exchange. CHCF-PIP allowed visitation on Friday, Saturday, and Sunday for seven hours each day and on holidays. PIP patients during non-contact visits were allowed three visitors, including children and each visit was limited to one hour.

At SVSP-PIP, issues with obtaining patient property from the prior institution continued into the Thirty-First Round. This was specifically a concern when patients were transferred from an outside institution. Each of the four PIP units applied different rules concerning yard and

telephone time. Out-of-cell time averaged 10.6 hours per week in units C5 and C6. Out of cell time for patients in TC1 and TC2 averaged 13.3 hours per the same period. Access to telephone calls varied by housing unit as well. Documentation reflected that unit C5 provided the opportunity for patient phone calls one or two times in a three week period while in TC1, telephone was offered every other day during third watch during unstructured activity time.

**CIW-PIP and SQ-PIP**

At CIW-PIP, no documentation regarding visitation was provided. PIP patients were granted one phone call per week unless restricted by their IDTT. NCAT data tracking phone calls and yard offerings throughout the review period was provided as well.

At SQ-PIP, non-contact visits, phone calls, and out-of-cell activities were to be offered unless specifically restricted by the IDTT. NCAT data reflected that patients were offered one phone call per week.

## R. LAW LIBRARY ACCESS

Access to the law library at CMF-PIP, CHCF-PIP and SVSP-PIP were similar to the preceding review round. CMF-PIP, CHCF-PIP, and SVSP-PIP were allowed access to the law library when filling out a form and giving it to appropriate staff. All three institutions maintained computer access kiosks for patient use.

CIW-PIP did not provide any information related to law library access while SQ-PIP only provided patient rosters reflecting the number of patients who were granted law library privileges.

**CMF-PIP, CHCF-PIP, and SVSP-PIP**

Similar to the prior review period, CMF-PIP patients' access to the law library was limited to the paging system in which patients filled out a form and submitted it to library staff. Additionally, some PIP units used a paging system in which patients could fill out a request form

indicating which books or documents they needed and the librarian would deliver the requested legal documents to the appropriate unit. Patients housed in units A2, A3, P1, and HCITC had access to law library kiosks in their unit.

CHCF-PIP patients were allowed access to the law library when they filled out a Priority Library User (PLU) Request and Declination form and submitted it to custody staff. The officers would then submit the requests to the library staff who determined the patient's priority status depending on if the patient had a pending legal care. Priority library users (PLU) were allowed up to four hours of computer access per week while general legal users (GLU) were allowed two hours of computer access per week.

Each housing unit at the CHCF-PIP was equipped with a law library computer kiosk in the center of the housing unit. Custody staff also indicated that some units had a portable law library kiosk as well.

SVSP-PIP patient access to law library was solely through kiosks and written requests during offered dayroom hours. Observed kiosks were working properly. Patients reported that scheduled day room negatively affected their access to the kiosks as evening day room access created long lines to use the kiosk. The head librarian reported that within two days of patient-requests, photocopied material was sent to the patient.

**CIW-PIP and SQ-PIP**

CIW-PIP did not produce documentation related to law library access privileges during the review period.

At SQ-PIP, the institution provided NCAT data that reported patient appointments for law library access. During the review period, 40 patients utilized the law library.

## S. PRE-RELEASE PLANNING

CMF-PIP, CHCF-PIP, and SVSP-PIP's pre-release programs included at least one pre-release coordinator that completed institution-wide pre-release services during the review period. Neither CIW-PIP or SQ-PIP indicated whether each institution had a designated pre-release coordinator.

All pre-release programs offered some type of pre-release planning to eligible patients including TCMP services and PReP meetings prior to release. Pre-release groups were offered at CHCF-PIP, SVSP-PIP, and CIW-PIP during the review period.

**CMF-PIP, CHCF-PIP, and SVSP-PIP**

CMF-PIP's pre-release coordinator was a clinical social worker and did not carry a caseload. She provided institution-wide pre-release services and ensured that all PIP patients had a pre-release planning (PReP) meeting prior to release. There were no pre-release groups during the reporting period due to staff shortages.

There were 30 patients released from the PIP during the review period. Of these, 16 were released to the community, ten were released to DSH as OMHD, and the remaining four patients were released back to an EOP program prior community release. The C&PR assisted patients who required housing upon release. Transitional case management program (TCMP) caseworkers assisted 25 of the 30 patients with applications for medical, social security, and veteran benefits. Seven of the ten patients released to the community were discharged to probation and therefore required a signed ROI.

CHCF-PIP staffed a pre-release unit during the review period, with one social worker supervisor, two social workers who were institutional mental health pre-release coordinators, and three medical social workers. The unit provided pre-release services throughout the institution

for the MHSDS population, including those in CHCF-PIP. Transition plans for releasing patients from the PIP were developed in PReP meetings attended by all appropriate stakeholders.

CHCF-PIP reported there were 54 patients scheduled for release during the reporting period. Of the 54, ten were acute care and 44 were intermediate care patients; 42 patients were released during the reporting period. Fifty-two patients were scheduled for release to parole or were offenders with mental health disorders (OMHD) to be released to DSH, while two patients were scheduled to be released to probation. Correctional counselors were responsible for assisting PIP patients with obtaining a Cal ID prior to their release from CDCR while TCMP case workers assisted 26 patients with applications for SSI, nine patients with applications for medical benefits and four patients with applications for veteran benefits.

Like the prior review period, SVSP's pre-release coordinator was not assigned specifically to the PIP. The pre-release coordinator reported accessing patients who were 60 days from release. The coordinator then located statewide benefits including TCMP and Cal ID, for each patient. That information was relayed to the primary clinician and to the statewide Mental Health Pre-Release Coordinating Team at monthly meetings. The state-wide team then made further necessary referrals for the PIP patients who were releasing.

The coordinator reported that every patient who released from the PIP had been offered TCMP services. The institution reported that weekly pre-release groups were on-going with primary clinicians determining eligibility. Groups were reportedly run by a social worker and followed the state-wide pre-release curriculum

**CIW-PIP and SQ-PIP**

The monitor was unable to determine whether the pre-release coordinator position at CIW-PIP was filled during the review period. Eight patients were released directly from the PIP

to parole or probation during the reporting period. Of the eight patients discharged, four were released to probation with a release of information (ROI) signed by each. Further, CIW-PIP had seven patients within 90 days of discharge from CDCR with an additional two patients within 120 days of release. Of these releases, seven were scheduled for release to parole and two for release to probation. Pre-release groups were held once per week from January through September.

The pre-release narrative supported compliance with required responsibilities such as completion of the PReP and submission of a signed ROIs for patients discharged to probation; however, no proof of practice or records of these activities was provided. TCMP case managers who assist PIP patients within 60 days of release on applications for medical insurance, veteran and social security benefits, were not able to separate CIW-PIP patients from institutional mental health patients in provided reports.

From the information available, it was also unclear whether SQ-PIP appointed a pre-release coordinator during the review period. The pre-release LOP stated that for patients discharging from a PIP, CDCR required a PReP meeting to be scheduled ten to 30 days prior to discharge. The pre-release coordinator and a representative from the admissions and discharge unit (ADU) were required to attend.

The institution reported that patients in the PIP within six months of release were interviewed by the community transition program (CTP), which educates a patient about the programs available to them upon release to the community. CTP was able to assist patients with referrals to substance abuse programs and transitional housing programs, including the STOP program. SQ-PIP indicated there were no PIP patients who received parole or probation targeted pre-release planning or pre-release groups during the review period. Like CIW-PIP, TCMP case

managers were not able to separate SQ-PIP patients from institutional mental health patients in provided reports.

**T. PROGRAM ACCESS**

No patients at any of the five PIPs held employment positions during the review period. The reporting of milestone credits varied by institution. CMF-PIP, SVSP-PIP, and SQ-PIP were unable to provide data regarding milestone credits while CHCF-PIP and CIW-PIP were able to report the number of credits awarded but not the number of patients eligible.

**CMF-PIP, CHCF-PIP, and SVSP-PIP**

CMF-PIP did not report whether patients held job assignments or whether patients were offered employment opportunities during the review period. Additionally, data for milestone credits was not provided by the institution, but PIP patients were reportedly eligible to earn milestone credits for every 60 hours of group treatment.

At CHCF-PIP, patients were not assigned jobs. CHCF-PIP reported that acute and intermediate care patients were eligible to earn milestone credits. However the total amount of patients who were eligible for and/or earned milestone credits was not provided. The institution indicated that there were a total of 121 credits awarded to acute care patients and 294 credits awarded to intermediate care patients.

SVSP-PIP reported that no PIP patients were offered job or work assignments during the review period. Additionally, like CMF-PIP, SVSP-PIP could not provide data on the number of PIP patients who earned milestone credits during the review period.

**CIW-PIP and SQ-PIP**

CIW-PIP did not provide any information regarding job assignments. However, two milestone credits were awarded to acute care patients and 66 milestone credits were awarded to

intermediate care patients. CIW-PIP did not indicate the number of patients who were eligible for or earned milestone credits during the review period.

No patients at SQ-PIP had job assignments during the review period. Data regarding how many PIP patients were eligible for, and earned, milestone credits was not provided.

## U. EDUCATION

During the review period, only CMF-PIP reported enrolling patients in educational programs. No patients were enrolled in educational programs at SVSP-PIP, CIW-PIP, or SQ-PIP. CHCF-PIP did not report information regarding educational programming.

### CMF-PIP, CHCF-PIP, and SVSP-PIP

One patient at CMF-PIP was enrolled in educational programming while no patients were enrolled at SVSP during the review period. CHCF-PIP did not report information regarding educational programming.

### CIW-PIP and SQ-PIP

No patients were enrolled in educational programming at CIW-PIP or SQ-PIP.

**CONCLUSION**

As the Court's Receiver-nominee begins the process of building her action plan, *see generally* April 2, 2025 Order, ECF No. 8589, there continues to be disparity in the adequacy of inpatient mental health care provided in CDCR's PIPs, with the CDCR-developed PIPs (CIW-PIP, SQ-PIP) outperforming the Lift and Shift PIPs (CMF-PIP, CHCF-PIP, SVSP-PIP) in several critical areas. Moreover, during the review period, defendants continued to work to address the longstanding, unnecessary barriers to admission to high performing, low-custody inpatient beds reserved for *Coleman* class members at DSH that some class members still face. Since the preceding monitoring round, there have been some positive developments, including the previously discussed DSH admissions trial processes and improved compliance with inpatient transfer timeline requirements. *See supra* 5-6 and 29-30.

With respect to the DSH trial processes, it must be recognized that defendants' ability to timely transfer *Coleman* patients to inpatient beds is inextricably linked to the match (or mismatch, as the case may be) between the patient's security level and the security level of the inpatient beds available to that patient. *See, e.g.*, Thirtieth Round Monitoring Report – Part B, ECF No. 8085 at 31 ("As the Special Master has previously observed, there appears to be a mismatch between the security levels of defendants' inpatient mental health bed supply and the Coleman patients who require inpatient mental health services."). Historically, the low-custody beds at DSH-Atascadero, for instance, have been among defendants' highest performing inpatient programs. However, at various times throughout the history of this case, many patients have faced barriers to accessing these high-performing beds due to their security level being incompatible with that of the DSH beds. This dynamic can result in population pressures that other parts of the system for inpatient care are ill-equipped to absorb and may negatively impact

individual patients for whom lower security hospital based settings could be advantageous for their treatment; the LRH process was designed to minimize these potential ill-effects. As the Court has explained:

> Defendants implemented the LRH policy in 2015. The policy enhances use of low custody inpatient beds at Atascadero State Hospital (ASH) to treat class members custodially eligible for those beds and keeps high custody inpatient beds available in the California Department of Corrections and Rehabilitation (CDCR) Psychiatric Inpatient Programs (PIPs), as part of an overall effort to reduce or eliminate historically long waitlists for access to high custody inpatient beds. The LRH policy is a key component of defendants' comprehensive remedial structure, developed over the past decade in an effort to ensure class members have timely access to necessary inpatient mental health care.

November 15, 2023 Order, ECF No. 8066 at 1-2.

During the past two years, as the Court turned its attention to, *inter alia*, assessing durability of compliance with inpatient transfer timeline requirements (which, as noted, has always been inextricably linked to removing barriers to admission like LRH), defendants announced five new "trial processes" for DSH admissions. *See supra* p. 30. The Special Master supervised and actively participated in the meet and confer process regarding these trial processes and is encouraged by the collaboration demonstrated by the two defendant-state agencies. The modifications to the admission criteria to allow for greater access to DSH for *Coleman* class members may well prove to have significant benefits for members of the patient class, though as of March 24, 2025, 118 of the 256 *Coleman*-designated beds at DSH-Atascadero remained vacant. Defendants' March 2025 Inpatient Census, Waitlists, and Transfer Timelines Compliance Report, ECF No. 8603 at 7.[41]

[41] It is no secret that CDCR has struggled to find appropriate housing for class members at the EOP level of care in recent years. *See* DRAFT Thirty-First Round Focused EOP Report at 11 ("Despite opening 1,010 new EOP beds across nine housing units at eight institutions, during the focused review (and up until the time of this writing), defendants struggled to find appropriate, designated EOP housing for some class members resulting in a significant number of EOP patients being placed in non-EOP beds."). With so many DSH beds available even after the DSH

However, to ensure these initial "trial processes" are deployed to maximum benefit, CDCR and DSH must work together to make these programs permanent. This may include issuing policies, memoranda, and procedures or updating the existing Memorandum of Understanding (MOU) between CDCR and DSH regarding transfer of *Coleman* class members to DSH programs. Unfortunately, while defendants have indicated their intent to make some of these processes permanent, they have not provided a timeline as to when any policies incorporating these revised LRH processes will be drafted or when negotiations for a new MOU will commence, leaving the permanency of these developments (and any gains that have resulted from them) hanging in the balance. As the Court's Receiver-nominee works to create the Receivership Action Plan in a compressed timeframe, now is the time for defendants to take the steps necessary to bring finality to this important initiative. Too much time has already passed, and the potential benefits are too significant to do otherwise.

During the review period, it was clear that significant work remains in most of CDCR's PIPs to provide adequate care to those most acutely mentally ill members of the plaintiff class. Four of the five PIPs, including all three Lift and Shift inpatient programs, have again reported concerningly high staffing vacancies, which have created seemingly insurmountable barriers to providing inpatient mental health care consistent with defendants' remedial obligations. Among the most concerning developments in recent years, understaffing has led to CMF-PIP relying on a "triage plan" that has deprioritized a number of clinical tasks required by the Program Guide

---

trial processes were implemented, it may be time for defendants to consider more innovative uses for these DSH beds, including potentially housing of members of the growing EOP population in those beds, an idea the Court considered at an earlier point in time. *See* March 31, 2009, ECF No. 3556 at 2 (noting the court's directive to defendants to "consider other emergency measures, such as transferring inmates at the Enhanced Outpatient Program (EOP) level of care to Atascadero State Hospital (ASH) and Coalinga State Hospital (CSH).").

(including initial assessments and routine primary clinician contacts), caused insufficient structured treatment offerings for inpatient settings, and minimized availability for important support programs like PBST and the STEP program.

The two CDCR-developed PIPs deserve recognition for their performance during this review period, as the quality of care was found to be adequate in 90 percent of reviewed cases at CIW-PIP and 100 percent of reviewed cases at SQ-PIP, a significant achievement for both programs.[42] There were no identified patterns of concern with IDTT processes and treatment planning, treatment delivery, diagnostic concerns, or clinical documentation concerns at these two inpatient programs.[43]

However, of the three Lift and Shift inpatient programs, only SVSP-PIP came close to providing adequate care with 74 percent of cases reviewed being found adequate.[44] Unfortunately, at CHCF-PIP and CMF-PIP, adequate care was found to have been provided in only 29 percent and 20 percent of cases respectively.

From this report, it is abundantly clear that in the coming months defendants focus should be directed at eliminating understaffing in the PIPs, increasing treatment offered to align with the

[42] Notwithstanding this achievement, in some areas, the Special Master was unable to assess compliance due to deficient document production at both CDCR-developed PIPs (CIW-PIP, SQ-PIP). Accordingly, the Special Master will conduct full scale, on-site monitoring tours of these programs during the next monitoring round.

[43] The Special Master notes that CIW-PIP provided incomplete document production in anticipation of the paper review. Incomplete document production was noted for a majority of the supplemental programs and areas of review including custody and mental health partnership, patient disciplinary process, law library access, and program access.

[44] On April 1, 2025, defendants provided notice to the Special Master that as of March 14, 2025 CDCR had stopped intake to SVSP's PIP buildings C5 and C5 in preparation for the units' closure in the summer of 2025. Defendants indicated that "[t]he closure of C5 and C6 is an effort to right the size [of] the number of CDCR's inpatient beds considering decreased demand." See April 1, 2025 Letter from Sundeep Thind, Esq., Office of Legal Affairs, to Special Master Matthew Lopes, Esq., attached hereto as Exhibit S.

requirements of the PIP minimum treatment standards, and moving away from "triage plans" which authorize programs to provide less than the minimum level of services required by the Program Guide.

While the three DSH hospitals continued to provide a more beneficial treatment milieu compared to the Lift-and-Shift PIPs, lingering issues identified in the preceding monitoring report still acted as barriers to adequate care in the Thirty-First Round. Though staffing vacancies exceeded ten percent at DSH-Atascadero (the largest of the three hospitals' *Coleman* programs) DSH-Coalinga and DSH-Patton were compliant with staffing requirements throughout the review period. Unfortunately, the Special Master's expert's focused review of quality of care across the three hospitals was only 40 percent adequate among the 78 individual cases reviewed. Additionally, of the three hospitals, only DSH-Patton was compliant with the required minimum treatment standards as required by the DSH CQI process. Surely the successful aspects of the DSH programs are at least partially attributable to the robust quality improvement programs at the three hospitals, however sustained compliance with requirements remains a critical aspect of ending federal court oversight. In order to achieve the same, the three hospitals must continue to maintain adequate staffing, meet their minimum treatment offering requirements, and continue to work to remove barriers to *Coleman* patients' access to DSH beds in the next monitoring round.

## RECOMMENDATION

In view of the findings contained herein, the Special Master recommends that the Court enter an order directing the following:

1. That defendants, working under the Special Master's supervision and consulting with the Receiver-nominee in a manner consistent with their existing obligations, shall finalize and issue any and all policies, memoranda, and procedures, including as necessary

amendments to the existing Memorandum of Understanding (MOU) between CDCR and DSH regarding admission of *Coleman* class members to DSH programs, within 30 days of any order adopting this report.

Respectfully submitted,

*/s/ Matthew A. Lopes, Jr.*
Matthew A. Lopes, Jr., Esq.
Special Master

Date: July 30, 2025

**APPENDIX A1**
**Atascadero State Hospital (DSH – Atascadero)**
Review Period: October 1, 2023 – March 31, 2024
(Paper Review)

## I. SUMMARY OF THE FINDINGS

- As of May 9, 2024, DSH-Atascadero's Program V housed 113 intermediate care *Coleman* patients, accounting for 44 percent of the hospital's 256 designated *Coleman* beds. The Coleman patient population had increased by 46 percent since the Thirtieth Round, when DSH-Atascadero housed 67 *Coleman* patients.

- The medical director and chief psychologist positions were filled. DSH-Atascadero did not indicate whether the following executive positions were filled during the review period – executive director, clinical administrator, or hospital administrator.

- Seven of nine psychiatrist positions were filled, for a 22 percent vacancy rate. Six of nine psychology positions were filled, for a 33 percent vacancy rate. Six of nine social worker positions were filled, for a 33 percent vacancy rate. Eight of nine rehabilitation therapist positions were filled, for an 11 percent vacancy rate.

- DSH-Atascadero did not use telepsychiatry or telehealth for *Coleman* class members during the reporting period.

- The institution satisfied the 1:30 clinician-to-patient staffing ratio for psychiatry, psychology, social work, and rehabilitation therapist.

- Overall, IDTTs were generally completed in a timely manner, however, only 26 of 34 or 76 percent of IDTTs included required staff.

- Reviewed treatment plans were not compliant during the review period as the plans did not achieve 90 percent compliance with targeted and individualized treatment goals, specific interventions to achieve those treatment goals, adequate rationales for chosen interventions, and updated treatment plans when clinically indicated.

- Patients were offered a weekly average of 7.1 hours of core groups and attended a weekly average of 4.7 hours of core group. Patients were offered a weekly average of 36.1 hours of supplemental group and attended a weekly average of 5.3 hours of supplemental group.

- Eighteen patients were offered less than a half hour of individual treatment per week, while the remaining patients were not offered any individual treatment. These treatment hours offered were insufficient for an inpatient program.
- Initial psychiatric evaluations were timely, occurring within 24 hours of admission. DSH-Atascadero had an internal policy requiring minimum monthly psychiatric contacts;

these were compliant across all reviewed patients. Psychiatrists demonstrated adequate psychiatric care related to complex non-medication related treatment objectives.

- The monitor's expert reviewed ten cases at DSH-Atascadero to assess the adequacy of medication management; seven, or 70 percent, were adequate.

- The hospital's comprehensive management of patients on clozapine, including the use of an interdisciplinary clozapine clinic, demonstrated best practices. When solely examining the issue of the use of clozapine, all cases were adequate.

- Reviewed charts revealed multiple deficiencies as to medication management, including inadequate documentation of the rationale for medication changes, and the lack of documented coordination between DSH and other agencies.

- As noted in the preceding monitoring round, DSH's lack of electronic healthcare records proved to be a substantial barrier in the review of cases. The lack of access to healthcare records was particularly concerning for initial psychiatric assessments.

- There were no uses of force to administer PC 2602 involuntary medication orders.

- No *Coleman* patients had behavioral plans during the reporting period.

- There were neither deaths by suicides nor suicide attempts or self-injurious behaviors resulting in serious injury during the review period.

- DSH-Atascadero continued to utilize the HAS program to promote positive patient behavior and treatment participation.

- The hospital admitted 116 intermediate care patients during the reporting period. One hundred and one or 87 percent of patients transferred timely. The average time from receipt of the completed referral to admission was 28 days with a range of eight to 421 days.

- DSH-Atascadero discharged 73 patients during the review period and 54 required clinical discharges back to CDCR. Of the 54 patients who required clinical discharge, 49 or 91 percent were physically discharged within 72 hours of clinical discharge.

- DSH-Atascadero issued 16 RVRs to Coleman class members during the review period.

- There were no use of force incidents reported during the review period.
- During the review period, DSH-Atascadero reported 26 unusual occurrences involving 23 patients. The hospital indicated that there were 127 SIRs involving 93 patients during the review period. There were no reported sentinel events.

- During the review period, there were seven seclusion incidents, 15 restraint incidents, including 12 incidents involving full restraints and three incidents involving non-ambulatory restraints, and no use of observation cells.

- The hospital continued to sustain comprehensive quality improvement, risk management programs and utilization review with various committees that conducted multiple audits throughout the year.

- Reviewed patient satisfaction survey data revealed positive responses greater than 90 percent in 11 of 14 queries.

## II. CENSUS

As of May 9, 2024, DSH-Atascadero's Program V housed 113 intermediate care *Coleman* patients, accounting for 44 percent of the hospital's 256 designated *Coleman* beds. The hospital did not report a *Coleman* patient average monthly census. Patients were housed in four housing units in Program V, including 35 patients in Unit 30, 22 in Unit 32, 32 in Unit 33, and 24 in Unit 34. The *Coleman* patient population had increased by 46 percent since the Thirtieth Round, when DSH-Atascadero housed 67 *Coleman* patients.

## III. STAFFING

### 1. Administrative and Clinical Staffing

DSH-Atascadero did not indicate whether the following executive positions were filled during the review period – executive director, clinical administrator, or hospital administrator. The medical director and chief psychologist positions were filled.

Senior Supervising Psychiatrist: All three positions were vacant.

Supervising Psychiatric Social Worker: Five of six positions were filled for a 17 percent vacancy rate.

Psychiatrists: Seven of nine psychiatrist positions were reported filled, for a 22 percent vacancy rate.

Senior Supervising Psychologists: Of the 12.3 allocated positions, 9.97 were filled for a 19 percent vacancy rate.

Psychologists: Six of nine psychology positions were filled, for a 33 percent vacancy rate.

Social Workers: Six of nine social worker positions were filled, for a 33 percent vacancy rate. One social worker was on extended leave, increasing the functional vacancy rate to 44 percent.

Rehabilitation Therapists: Eight of nine rehabilitation therapist positions were filled, for an 11 percent vacancy rate. One rehabilitation therapist was on extended leave, increasing the functional vacancy rate to 22 percent.

Registered Nurses (RNs): Twenty-four of 34 RN positions were filled, for a vacancy rate of 29 percent.

Senior Psych Techs: Sixteen of eighteen senior psych tech positions were filled, for an 11 percent vacancy rate.

Psych Techs: Eighty-six of 105 psych tech positions were filled, for a vacancy rate of 18 percent.

Pre-Licensed Psych Techs (PLPTs): Both PLPT positions were filled.

Health Service Specialists (HSS): Both HSS positions were vacant.

DSH-Atascadero's Program V administrative staff also included two staff service analyst positions, one of which is vacant, an STP coordinator which was filled, and two vacant office technician positions.

**2. Tele-Mental health**

DSH-Atascadero did not use tele-mental health for *Coleman* class members during the reporting period.

**3. Staff-to-Patient Ratios and the Adequacy of Clinical Staffing**

The institution satisfied the 1:30 clinician-to-patient staffing ratio for psychiatry, psychology, social work, and rehabilitation therapist. DSH-Atascadero reported several fluctuations in level of care positions due to new hires, attrition, and routine changes in personnel. DSH-Atascadero indicated that the Program V units were staffed based on the intermediate care facility minimum staffing requirements.

The institution was compliant with staff-to-patient caseload ratios during the review period.

## IV. TREATMENT AND CLINICAL SERVICES

**1. Interdisciplinary Treatment Teams (IDTTs)**

The quality of IDTT meetings at DSH-Atascadero was assessed based on documentation and individual case reviews for 34 patients treated during the review period, however in four cases, IDTT documentation was absent from the patients' records. Overall, IDTTs were generally completed in a timely manner with only two cases, Patients DD and EE, receiving untimely IDTTs. Only 26 of 34 or 76 percent of IDTTs included the required staff.

Although all reviewed cases had an initial evaluation and contained a treatment plan as required, the monitor's expert found that five of 34 or 15 percent of treatment plans – Patients C, E, F, G, and Q - included vague treatment goals or goals which did not appear appropriate to address the patients' needs. For example, Patient C's treatment plan included a goal that the patient would not endorse suicidal ideation prior to discharge; however, to appropriately address

suicidal ideation, the patient should be encouraged, not discouraged to talk about those ideations. Instead, the treatment plan encouraged the patient not to endorse his high risk thoughts if he wanted to be discharged from care.

In the treatment plan, individual therapeutic interventions should be tailored to achieve each patients' individualized goals. However, during the review period, the monitor's expert noted concerns regarding either the absence of individual therapeutic interventions as part of the treatment plan (Patients G, H, I, K, S, and X) or inadequate rationales for the treatment interventions listed in the treatment plan (Patients A, H, and GG).

Similar to the prior round, treatment plans were not updated despite clinical indications to do so. Of the 34 reviewed cases, 14 or 41 percent of treatment plans, including Patients A, D, F, H, I, P, Q, S, T, X, Z, AA, BB, and FF, were not updated when clinically indicated. Not included were the eight cases, including Patients K, L, N, Q, S, X, BB, and CC, whereby the monitor's expert noted that the treatment outcome expectations, developed while the patient was in CDCR, were not updated upon arrival to DSH-Atascadero despite indications that the goals were not appropriate for the hospital setting.

Although IDTTs timely occurred during the review period, required staff were not compliant with attendance. Additionally, reviewed treatment plans were not compliant during the review period as the plans did not achieve 90 percent compliance with targeted and individualized treatment goals, specific interventions to achieve those treatment goals, adequate rationales for chosen interventions, and updated treatment plans when clinically indicated.

**2. <u>Group Therapy</u>**

Core group treatment offered to *Coleman* patients at DSH-Atascadero was similar to the previous monitoring round, however the amount of offered supplemental group treatment

increased significantly. During the current review period, core groups accounted for 16 percent of treatment delivered to *Coleman* patients. DSH-Atascadero offered 100 core scheduled groups and 32 core unscheduled groups during the review period and offered an average of 7.1 hours per patient per week of core group treatment, compared to 7.5 hours in the Thirtieth Round. *See* ECF No. 8085 at 85. Patients attended an average of 4.7 hours per patient per week of core group treatment during the current review period.

Supplemental groups accounted for 84 percent of treatment delivered to Coleman class patients during the current review period. DSH-Atascadero offered 97 supplemental groups, including four Spanish language groups. Patients were offered an average of 36.1 hours per patient per week of supplemental treatment compared to an offered average of 5.9 hours per patient per week during the Thirtieth Monitoring Round. *See id*. Patients attended an average of 5.3 hours per patient per week of supplemental group treatment during the current review period.

The hospital cancelled 4.3 percent of groups during the review period with primary reasons being provider availability. Other reasons for cancellations included no patients showing up for group and missing patient rosters.

*Coleman* patients at DSH-Atascadero were offered an average of 43.2 hours per patient per week of group therapy. As the DSH CQI process requires an offering of at least twenty hours treatment per week, ten hours of which must be core treatment, the hospital, with its offering of 36.1 hours per patient per week, was compliant with its offering of supplemental groups. However compliance with core treatment requirements are dependent upon the amount of individual therapy offered in addition to the 7.1 hours per patient per week of core group treatment that has been offered. *See* ECF No. 7924 at 4 (citing ECF No. 7625 at 29-30 stating that "[b]y 2020, DSH had developed a fully adequate CQI process…which it still uses" and ECF

No. 7812-1 at 15 stating "that [the DSH CQI] process includes definitions of 'core groups,' 'supplemental groups,' and 'individual therapy' and provides that patients will be offered 20 hours of treatment per week, at least ten hours of which are to be 'core' treatment".).

### 3. Individual Treatment

In the Thirtieth Round Monitoring Report, the Special Master noted that DSH-Atascadero offered only 0.9 weekly hours of individual treatment to *Coleman* class members. *See* ECF No. 8085 at 85. During the current review period, this amount of treatment offered declined to less than a half hour per week. DSH-Atascadero reported that individual treatment was offered to only 18 patients and averaged 0.42 hours per patient per week of offered individual treatment. All the patients attended offered individual treatment.

Unfortunately, the lack of individual treatment continued from the previous monitoring period. As patients were offered an average of 7.1 hours per patient per week of core group treatment, and only 18 of those patients received an average of 0.42 hours of individual treatment, DSH-Atascadero was not compliant with its requirements to offer at least ten hours of core treatment per week. *See* ECF No. 7924 at 4 (citing ECF No. 7625 at 29-30 and ECF No. 7812-1 at 15).

### 4. Psychiatric Services

On-site psychiatrists performed all psychiatric care at DSH-Atascadero during the review period. Psychiatric care was assessed based on case reviews and other documentation.

Initial psychiatric evaluations were timely, occurring within 24 hours of admission. DSH-Atascadero had an internal policy requiring minimum monthly psychiatric contacts; these were compliant across all reviewed patients.

In general terms, DSH-Atascadero psychiatrists managed complex, refractory, and often co-occurring conditions with ease. The hospital's psychiatrists were quite facile with the use of evidence-based treatments, including the use of clozapine and long-acting injectable antipsychotics, and used an internal process for consultation with experts in psychiatric medication management.

Psychiatrists used logical, rational, and clear treatment targets leading to clinical effectiveness for most patients. It was clear in the cases reviewed that psychiatrists were focused on reducing medications and doses, when possible, while maintaining control of the patient's symptoms. In the case of Patient Y, although there was a lack of substantive medication changes, the treating psychiatrist allowed additional time for non-medication treatments (e.g. milieu and group treatments) to take hold.

Because the hospital completed timely initial and routine psychiatric contacts and demonstrated adequate psychiatric care related to complex non-medication related treatment objectives, the psychiatric services provided to *Coleman* patients were compliant during the review period.

**5. <u>Medication Management</u>**

The monitor's expert reviewed ten cases at DSH-Atascadero to assess the adequacy of medication management provided to *Coleman* patients during the review period. The cases were chosen randomly from three lists, including patients under a PC 2602 involuntary medication order, patients on clozapine, and all admissions during the reporting period. Of these cases, seven, or 70 percent, were adequate. Therefore, as indicated below, DSH-Atascadero was not compliant with medication management during the review period.

The monitor's expert had serious concerns about medication management in two particular cases, including Patients S and AA. In Patient S's case, the psychiatrist prescribed the antidepressant medication, venlafaxine. While the standard starting dose of this medication was 37.5 mg daily or occasionally 75 mg, the psychiatrist started the patient with 150 mg daily, a dosage two-to-four times the standard dose, without a documented rationale for doing so. The psychiatrist also ordered this extended-release medication crushed, due to general (not patient specific) concerns about the possible diversion of this medication in carceral settings. This converted the slow-release form of the medication, which would release the medication into the bloodstream over a period of hours, into an immediate release form which released the medication into the bloodstream in short order. Psychiatry leadership indicated that although the dosage was higher than was traditionally started, they did not see this as a deviation from standard practice. Unfortunately, the approach risked increased side effects including worsened mood, anxiety, and suicidal thoughts or behaviors, without a documented rationale for why this unusually aggressive approach was required. Although psychiatrists are free to prescribe medications as they deem appropriate, deviations from standard practice required justification in the mental health record.

In Patient AA's case, the psychiatrist conducted an initial psychiatric evaluation for a patient on clozapine and made multiple medication changes, without supporting documentation that reflected the urgency behind making multiple contemporaneous interventions. These changes included: changing the antidepressant fluoxetine to sertraline; replacing the long-acting injectable antipsychotic haloperidol with oral risperidone; and discontinuing the buprenorphine/naloxone that was used for treating opiate use disorder (with this last change requested by the patient). While treating psychiatrists can prescribe and remove patients from

medications when they deem appropriate, with so many changes at once, it would be impossible to determine the reasons that the patient improved or what side effects resulted from which medication. The record reflected that the patient subsequently became confused, with the treating psychiatrist considering whether these medication changes were involved.

**A. Clozapine**

While clozapine can be a potentially lifesaving medication for patients with difficult to treat psychiatric conditions, its use requires close monitoring due to potentially fatal side effects. The hospital's comprehensive management of patients on clozapine, including the use of an interdisciplinary clozapine clinic, demonstrated best practices. When solely examining the issue of the use of clozapine, all cases were adequate. DSH-Atascadero initiated clozapine in nine cases and continued the medication in 15 cases. Of the cases reviewed, six or 60 percent, were prescribed clozapine during their hospitalization. The monitor's expert wanted to underscore that in Patient W's case, the persistence and dedication of the treatment team allowed the patient to start this appropriate mediation.

**B. PC 2602 Medication Orders**

The right to refuse medication, or whether medications may be given involuntary under court order, strike at core clinical and legal issues in psychiatric treatment. In alignment with these important principles, the monitor's expert urges DSH-Atascadero to reexamine its processes for documenting if a PC 2602 order was not renewed due to clinical improvement and coordinating with CDCR regarding their processes for non-renewal of PC 2602 cases.

DSH-Atascadero had clear policies and procedures governing the PC 2602 process and had a dedicated PC 2602 coordinator. There were no uses of force required to administer involuntary medications. DSH-Atascadero had a total of 38 individuals who received PC 2602

involuntary medications; these included four initial and one renewal. DSH-Atascadero had one case, Patient V, in which a patient's PC 2602 order for danger to self or others was not renewed, with no clear reasoning documented in the chart. It was unclear if the patient's experienced clinical improvement so that he no longer met criteria for PC 2602, or if the non-renewal was an oversight by DSH. This was a serious error that required further inquiry, especially considering that this patient's psychiatric progress notes had extensive carry over information, which resulted in the incorrect recordation of medications in the chart.

### C. Prescriptions and Verbal Orders

While verbal and telephone orders were allowed, they were limited to urgent situations or when the physician was off-site. Psychiatrists had to sign the telephone orders within 48 hours. DSH-Atascadero did not employ a tracking system to ensure the physician had signed the order within the mandated timeframe.

### D. Non-Formulary Medications

DSH-Atascadero had clear and clinically appropriate policies governing the use of non-formulary medications. The exemptions were logical, including the continuance of non-formulary medications at the time of admission, prior to review through the non-formulary process.

### E. Polypharmacy Reviews

DSH-Atascadero displayed clear guidelines for reviewing patients on multiple psychiatric medications. No concerns were seen with this process.

**F. HS Medications**

There were no concerns reported or observed with the administration of Hora Somni/Hour of Sleep (HS) medications, such as giving potentially sedating medications too early in the day.

**G. Medical Records/Documentation Issues**

As noted in the preceding monitoring round, DSH's lack of electronic healthcare records proved to be a substantial barrier in the review of cases. The lack of access to healthcare records was particularly concerning for initial psychiatric assessments. In one example, the psychiatrist noted that a very impaired patient, who was unable to provide a coherent treatment history, had multiple prior treatment episodes for restoration of competency at DSH-Atascadero. Due to the lack of an electronic medical record system, the psychiatrist had to order the records from headquarters—an unnecessary delay to review critically important information for this extremely ill patient who was profoundly psychotic and a poor historian.

The monitor's expert also had concerns about the quality of the documented contact and continuity of care from DSH to CDCR. It is well-recognized that logistics surrounding patient transfer are a period of increased risk, particularly with medication errors. To treat patients safely and mitigate these risks, medical and mental health information regarding the transferring patient must be conveyed to the receiving institution. The discharge summary from the sending institution must also include the patient's list of medications. At DSH-Atascadero, one patient's transfer medication list contained an as-needed antipsychotic medication which was not listed in the patient's discharge summary. An effective electronic healthcare record could reduce such crucial errors in relaying clinical information.

In another case, the DSH-Atascadero treatment team discharged a patient with profound psychosis and five prior suicide attempts after only a brief stay. The reason for discharge was for possible diversion of the medication buprenorphine/naloxone, used to treat Opioid Use Disorder. However, the chart did not adequately reflect additional interventions that DSH-Atascadero undertook prior to discharging the patient. Given this and how extensively impaired the patient was prior to arrival at the hospital, the monitor's expert was not only concerned with the decision to discharge the patient but concerned with the lack of necessary documentation sent to the receiving institution.

Another patient who entered DSH-Atascadero on clozapine and under a PC 2602 involuntary medication order returned to CDCR without either of these. There was no notice of non-renewal or rationale for non-renewal seen in the chart. In both of these latter cases, there was no documented clinician-to-clinician contact or Coordinated Clinical Assessment Team (i.e. a multidisciplinary team for complex cases) to discuss a transition of care.

**6. <u>Other Treatment Issues</u>**

**A. <u>Behavioral Management</u>**

DSH-Atascadero provided their Behavior Plan Policy which had an effective date of June 28, 2023. The policy provided instruction regarding the development of behavior plans. There were no behavior plans for *Coleman* class patients during the review period. *Coleman* class patients with disruptive behavior were routinely transferred to a CDCR PIP if continued inpatient care was required.

**B. <u>Pre-Release Planning</u>**

Thirteen patients received pre-release planning services during the review period and prior to their scheduled discharge. All patients received TCMP services prior to their discharge

date; it was unclear which services were provided due to lack of documentation. Nine patients were released to the Division of Adult Parole Operations, three patients were released to a Post-Release Community Supervision program, and one patient was discharged to DSH as an Offender with a Mental Health Disorder (OMD).

### C. Access to Meaningful Jobs and Educational Opportunities

On average, seven of eight or 88 percent of patients held meaningful employment positions greater than five hours per week; actual monthly employment ranged from five to ten patients. Of the 415 educational activities scheduled, twenty patients attended 199 or 48 percent of activities.

## V. SUICIDE PREVENTION

There were no deaths by suicides of *Coleman* class patients during the review period. Additionally, there were no suicide attempts or self-injurious behaviors that resulted in major injury for *Coleman* patients during the review period.

DSH-Atascadero continued to implement its ligature risk identification and heat map project with the purpose of identifying all possible ligature attachment points throughout the hospital and to eliminate those points when possible. As of February 16, 2023, ASH replaced 25.7 percent of all identified ligature risks within the hospital with an anticipated completion date of July 2027. Effective February 2024, The Joint Commission (TJC) and the Centers for Medicare and Medicaid Services (CMS) ended TJC's Ligature Risk Extension Request Program. TJC and CMS met and decided that it would be more feasible to end the Ligature Risk Extension Request Program and instead continue to cite ligature risks during their Full Triennial Surveys as Requirements for Improvement (RFI) requiring Evidence of Standards Compliance (ESC). DSH-Atascadero was notified that they would receive a virtual validation survey from TJC

sometime in July 2024 and would be provided with a list of pertinent documents that they would like to review in order to validate progress and time in the program.

There were no revisions to the suicide prevention or death review policy processes during the review period.

Suicide risk assessments were performed by psychology, psychiatry and nursing disciplines. Monthly audits of psychology and nursing suicide risk assessments were performed. Suicide prevention training was provided to all new employees by a DSH-Atascadero psychologist, and annual review training was provided to direct patient care and support patient care staff.

DSH-Atascadero conducted monthly suicide prevention committee meetings throughout the review period with required participants in attendance. The meeting minutes continued to contain information that revealed a comprehensive suicide prevention program at DSH-Atascadero.

## VI. PATIENT ACCESS TO TREATMENT

DSH-Atascadero provided its administrative directive regarding the Hospital Access System (HAS). The hospital continued to use the HAS to promote positive patient behavior and treatment participation, as well as to access programming and privileges. The HAS consisted of five levels from Level One to Level Five, with each step allowing additional access and privileges. Patients were admitted at Level One and could progress to Level Five as determined by the treatment team.

During the review period, *Coleman* patients spent an average of 19.41 days at Level One, a decrease of 20.59 days since the preceding monitoring period. *See* ECF No. 8085 at 92. *Coleman* patients spent an average of 15.25 days at Level 2, a decrease of 5.75 days since the

preceding monitoring period. *See id.* For Level 3, *Coleman* patients spent an average of 42 days, which was a decrease of 16.5 days since the last monitoring period. *See id.* For Level 4, *Coleman* patients spent an average of 115.85 days, a decrease of 71.15 days from the last monitoring period. *See id.* No information was provided regarding the average time spent at Level 5 for *Coleman* patients.

## VII. REFERRALS

There were 234 patients referred to DSH-Atascadero during the review period. These referrals were from the following CDCR institutions:

| Institution | Number of Referrals to DSH-Atascadero |
|---|---|
| CHCF | 79 |
| CIM | 12 |
| CMC | 10 |
| CMF | 33 |
| CSP/Corcoran | 5 |
| CSP/LAC | 4 |
| CSP/Sac | 11 |
| CSATF | 13 |
| CSP/Solano | 1 |
| KVSP | 1 |
| PBSP | 1 |
| MCSP | 3 |
| RJD | 19 |
| SQ | 19 |
| SVSP | 17 |
| VSP | 4 |
| WSP | 2 |
| **Total** | **234** |

However, CDCR rescinded 117 patients, and one other patient was rejected due to danger to others concerns.

## VIII. TRANSFERS, ADMISSIONS, and DISCHARGES

### 1. Admissions

The hospital admitted 116 intermediate care patients during the reporting period. Of these admissions, 101, or 87 percent of patients transferred timely. The average time from receipt of the completed referral to admission was 28 days with a range of eight to 421 days.

DSH-Atascadero was not compliant with timely transfers and admissions during the review period.

### 2. Discharges

DSH-Atascadero discharged 73 patients during the review period and 54 required clinical discharges back to CDCR. Of the 54 patients who required clinical discharge, 49 or 91 percent were physically discharged within 72 hours of clinical discharge. The average physical length of stay was 154 days and ranged from two to 770 days. The average clinical length of stay was 147 days and ranged from two to 577 days. Notably, of the 19 patients who did not require clinical discharge, 11 patients were discharged due to parole and eight were discharged to DSH-Atascadero's OMHD.

DSH-Atascadero was compliant with physical discharges within 72 hours of clinical discharge during the review period.

## IX. PATIENT DISCIPLINARY PROCESS

During the review period, DSH-Atascadero issued 16 RVRs to Coleman class members. Reasons included indecent exposure, battery on peers, criminal threats, use/possession of controlled substances, possession of contraband, and misuse of medication. Documentation

reflected that of the 16 RVRs issued, 11 patients received an MHA while at the hospital and five did not have the MHA completed before discharge to CDCR. DSH-Atascadero only provided two MHAs for review; both were completed in a confidential setting. In one case, the clinician who completed the MHA reported that the patient's mental health likely contributed to the behaviors that led to the RVR due to the patient's ongoing symptomatology which impaired his judgment and ability to accurately perceive his environment, including the consequences of his behaviors.

Additionally, two patients received counseling chronos, one patient was found not guilty, four patients were found guilty, and the remaining nine patients lost time constraints though the respective dispositions were unclear.

Although the DSH-Atascadero provided information to support that MHAs were conducted for patients who were not discharged to CDCR during the pendency of the RVR, compliance with required RVR policies could not be discerned.

## X. USE OF FORCE

There were no revisions to the use of force policy since the prior review period. The last update to the policy was December 2021.

There were no use of force incidents reported during the review period, therefore compliance with required policy could not be discerned.

## XI. UNUSUAL OCCURENCES/SERIOUS INCIDENTS/NEAR MISSES/SENTINEL EVENTS

During the review period, DSH-Atascadero reported 26 unusual occurrences involving 23 patients. Of the 26 incidents, 21 were assaults, two were for alleged neglect/abuse, two were for alleged sexual assault, and one involved a fall. Only five of the 26 remained open and pending review. The first allegation of neglect was not mental health related but involved a nurse who

did not immediately respond to a patient who alerted staff to falling in the bathroom overnight and suffering a laceration to the back of his head. The laceration resulted in the need for at least seven staples in his head. The second allegation of neglect involved a patient being identified as needing line-of-sight seclusion for danger to others. The patient was identified as meeting the criteria for seclusion at 11:55 A.M., however it was identified at 8:30 P.M. that the enhanced observation was not being followed. The patient was assessed and there was no harm identified to the patient.

The hospital indicated that there were 127 SIRs involving 93 patients during the review period. Of the 127 SIRs reported, there were 22 incidents of self-harm, 53 incidents of aggression, and 39 medical incidents reported.

There were no reported sentinel events.

The hospital appropriately kept track of and documented all unusual occurrences and SIRs during the review period. Reviewed documentation reflected detailed information in each unusual occurrence and SIR report. For these reasons, DSH-Atascadero was compliant with required procedures regarding unusual occurrences, serious incidents, near misses, and sentinel events.

## XII. USE OF OBSERVATION CELLS/ROOMS, SECLUSION, and RESTRAINT

DSH-Atascadero reported that the use of observation cells, namely administrative isolation, was not utilized.

There were seven seclusion incidents during the monitoring round as compared to only three incidents during the Thirtieth Round. See ECF No. 8085 at 95. There was also a significant increase in the time *Coleman* patients spent in seclusion. The average time in

seclusion was 33.4 hours, which was a significant increase from 9.23 hours during the preceding monitoring period, with a range from 6.25 hours to 104 hours. *See id*.

The number of restraint incidents also increased from seven incidents during the preceding monitoring period to 15 during this review period. *See id*. There were 12 incidents involving patients placed in full restraints and three incidents involving patients placed in non-ambulatory restraints. The average time in restraints during this review period was 11.3 hours, with a range from 0.75 hours to 53.8 hours.

DSH-Atascadero was compliant with policies and procedures for the use of observation cells, seclusion, and restraints.

## XIII. EMERGENCY RESPONSE AND THE DEATH REVIEW PROCESS

### I. Emergency Response

The Emergency Care Committee met monthly with the necessary participants.

DSH-Atascadero provided medical emergency response evaluation audits for drills conducted in Program V. The second quarter October 2023 drill involved an anaphylaxis scenario. The audits indicated compliance with emergency drills. No medical emergencies occurred in Program V during the reporting period.

### II. Death Review Process

There were no deaths of *Coleman* class patients during the review period.

The minutes of the Patient Safety Evaluation System Subcommittee indicated that the Mortality Interdisciplinary Review Committee meeting remained involved in the interdisciplinary review of institutional deaths.

## XIV. QUALITY MANAGEMENT AND UTILIZATION REVIEW

DSH-Atascadero was accredited by the Joint Commission. The hospital continued to sustain comprehensive quality improvement, risk management programs and utilization review with various committees that conducted multiple audits throughout the year. The quality council functioned as the oversight and monitoring committee to which other committees reported. The quality council identified action items and monitored the status of implementation and completion of the items. Additional quality improvement committees included the following: patient safety evaluation system subcommittee, mortality and incident review committee, emergency care committee, hospital advisory council, medical risk management committee, risk/utilization management committee, suicide prevention committee, utilization management, and violence prevention committee.

DSH-Atascadero continued to work with the Clinical Operations Advisory Council (COAC). The COAC assisted DSH-Atascadero regarding quality assurance improvements, assessment of current clinical treatment, and collaboration to develop objectives for clinical practice throughout the review period. Additionally, COAC collaborated with the hospital to conduct various audits to assist in quality improvement efforts.

As a result of the detailed quality management and utilization review process as described, DSH-Atascadero was compliant with quality management requirements.

## XV. PATIENT COMPLAINTS/PATIENT SATISFACTION

During the review period, 25 patients made 52 complaints about medical and mental health treatment, medication side effects, access to and use of personal possessions, advocacy services, free-from-harm concerns, grounds passes, the ability to keep and spend reasonable sums of money, out-of-doors recreation, religious freedom and practice concerns, and various

daily living issues. The hospital did not provide additional information regarding the complaints' outcomes.

DSH-Atascadero reported that 58 percent of the patients discharged completed the patient satisfaction survey. Reviewed patient satisfaction survey data revealed positive responses greater than 90 percent in 11 of 14 queries. The queries that failed to achieve 90 percent patient satisfaction addressed whether the environment was clean and neat, whether someone had explained patients' rights during their hospital stay, and whether staff educated patients about their medications.

While the institution did not provide information regarding patient compliant outcomes, the hospital demonstrated a system to keep track of patient complaints and used the patient satisfaction survey effectively, therefore the DSH-Atascadero was compliant with patient complaints and patient satisfaction during the review period.

## XVI. ***COLEMAN* POSTINGS**

Current *Coleman* posters were reportedly posted in both English and Spanish in all Program V housing units.

## XVII. **LAUNDRY AND SUPPLY ISSUES**

DSH-Atascadero revised their bed linen and patient clothing LOP in March 2022. According to the policy, patients were provided with clean clothing two times a week, and their bed linens were exchanged weekly. Reviewed logs revealed the above items were routinely laundered off-site and were bundled, counted, and sorted before being returned to the institution.

DSH-Atascadero was compliant with laundry and supply requirements.

## XVIII. VISITATION

Administrative Directive 713 regarding visitation was updated in March 2024. The LOP allowed in-person visitation four days a week for 45 minutes during each visit and tele-visits were provided on the remaining three days.

Patient phones were available on each unit and accessible between 7:00 AM and 11:00 PM each day. Telephone use was available to patients at any time provided they were not involved in mandatory treatment activities.

DSH-Atascadero was compliant with visitation requirements during the review period.

## XIX. LAW LIBRARY ACCESS

The hospital provided Administrative Directive 602.2 which explained that the Logan Library contained a legal collection in the patient's section of the library. The library also had a capacity of 15 patients at a time and patients were allowed first come first serve access to the library during regularly scheduled hours. Additionally, if specific relevant legal materials were not available then library staff could request photocopies from the California State Law Library.

DSH-Atascadero was compliant with law library requirements during the review period.

## XX. MILESTONE CREDITS

During the review period, DSH-Atascadero provided daily treatment attendance data to CDCR, which was then used to calculate milestone credits for each patient.

**APPENDIX A2**
**Coalinga State Hospital (DSH – Coalinga)**
Review Period: October 1, 2023 – March 31, 2024
(Paper Review)

## I. SUMMARY OF THE FINDINGS

- As of May 15, 2024, DSH-Coalinga's Unit 21 maintained a 50-bed intermediate care facility that housed 44 intermediate level of care *Coleman* patients. The hospital's *Coleman* census was 63 percent higher than its 27-patient census during the prior review in December 2022.
- Like the previous review period, DSH-Coalinga filled all leadership positions, including those for the executive director, clinical and hospital administrators, program director, chief psychiatrist, and medical director.
- All of the hospital's positions for the four disciplines of psychiatry, psychology, social work, and rehabilitation therapy were filled with civil service staff.
- Staff indicated that due to the significant number of admissions to Unit 21 compared to other units, initial psychiatric evaluations were assigned to all psychiatrists and psychiatric nurse practitioners available in the institution, including telepsychiatrists. No telepsychiatrist or psychiatric nurse practitioners completed routine psychiatric contacts with class members.
- Like the prior review period, DSH-Coalinga maintained a 1:30 clinical staffing ratio for psychiatry, psychology, social work, and rehabilitation therapy.
- Though fully staffed to treat *Coleman* class patients, the institution reported difficulty retaining and recruiting clinical staff prior to and continuing through the review period. In addition to its remote location, competition with other public and private entities has made it difficult to recruit and retain qualified mental health professionals.
- Although required staff were not compliant with attendance at IDTTs, the meetings occurred timely during the review period. Reviewed treatment plans were not compliant during the review period as the plans fell below the 90 percent threshold in the areas of targeted and individualized treatment goals, specific interventions to achieve those treatment goals, adequate rationales for chosen interventions, and updated treatment plans when clinically indicated.
- The Hospital offered an average of 6.54 hours of core groups per week, compared to a weekly offering of 19.9 hours in the Thirtieth Monitoring Round. The Hospital offered 27 hours per week of supplemental groups as compared to offering 4.9 hours per week in the Thirtieth Monitoring Round.

- From October 1, 2023 through March 31, 2024, DSH-Coalinga offered 3.1 hours per patient per week of individual treatment to the *Coleman* population.

- Initial psychiatric evaluations at DSH-Coalinga were assigned to all available psychiatrists, telepsychiatrists, and nurse practitioners at the institution. Although completed within the appropriate timeframes, concerns with initial evaluations during the review period stemmed from the use of telepsychiatry in an inpatient setting resulting in inadequacies in the evaluations directly related to the modality.

- There was no policy requiring a set frequency of follow-up psychiatric contacts after the initial assessment. Leadership indicated that the patient's assigned psychiatrist determined the contact frequency based on clinical need, yet in a number of cases the patient's assigned psychiatrist had not completed the initial evaluation. In most cases, the frequency of routine contacts was clinically adequate, yet some patients required more frequent contacts than what they received to meet their treatment goals.

- DSH-Coalinga displayed significant struggles providing adequate medication management for *Coleman* class members. The monitor's expert randomly selected ten cases to assess the adequacy of medication management provided. Of these cases, only one, or ten percent, was adequate.

- On average, 13 of 40 or 33 percent of *Coleman* patients held meaningful monthly employment positions; actual monthly employment ranged from ten to 17 patients.

- There were no deaths by suicides during the review period. There were two patients who demonstrated self-injurious behavior, suicidal behavior, and/or a suicide attempt during the review period.

- DSH-Coalinga continued to use the HAS to promote positive patient behavior and treatment participation, as well as to access programming and privileges.

- The one acute care patient was not transferred within 72 hours of bed placement, while 51 of 53, or 96 percent of intermediate care patients timely transferred within 30 days of referral; the two untimely transfers were 54 and 75 days late.

- DSH-Coalinga issued 13 RVRs to *Coleman* class members and there were no use of force incidents during the reporting period.

- DSH-Coalinga reported five unusual occurrences involving three patients and 94 serious incidents involving 54 patients during the reporting period. This was a significant increase over the three incidents involving only two patients during the previous round.

- There was one seclusion episode and two restraint incidents during the reporting period; areas of needed improvement were identified and training was implemented as required.

- DSH-Coalinga was not accredited by the Joint Commission, and there were no ICF licensing surveys during the review period.
- The hospital continued to operate a comprehensive quality improvement program, with the quality council servicing as the hub for quality improvement activities.
- DSH-Coalinga developed and implemented audits and performance improvement measures during the review period.
- The hospital tracked and resolved patient complaints adequately and used the patient satisfaction survey effectively during the review period.

## II. CENSUS

As of May 15, 2024, DSH-Coalinga's Unit 21 maintained a 50-bed intermediate care facility that housed 44 intermediate level of care *Coleman* patients. The hospital's *Coleman* census was 63 percent higher than its 27-patient census during the prior review in December 2022. During this review period, the monthly *Coleman* census averaged 41 patients, while it averaged 22 patients during the previous reporting period.

## III. STAFFING

### 1. Administrative and Clinical Staffing

Like the previous review period, DSH-Coalinga filled all leadership positions, including those for the executive director, clinical and hospital administrators, program director, chief psychiatrist, and medical director.

Psychiatrists: Both positions were filled.

Psychologists: Both positions were filled.

Social Workers: Both positions were filled.

Rehabilitation Therapists (RT): Both positions were filled.

Nursing coordinator: The position was filled.

Registered Nurses: All seven positions were filled.

Senior Psych Techs: Two of three positions were filled.

Psych Techs: Nineteen of 32 or 59 percent of positions were filled.

**2. Tele-Mental Health**

DSH-Coalinga reported that the institution utilized telepsychiatry only for initial assessments when necessary. Staff indicated that due to the significant number of admissions to Unit 21 compared to other units, initial psychiatric evaluations were assigned to all psychiatrists, telepsychiatrists, and nurse practitioners available in the institution. Staff reported that no telepsychiatrist or psychiatric nurse practitioner completed routine psychiatric contacts for class members during the review period.

Otherwise, DSH-Coalinga did not use tele-mental health to treat *Coleman* class members during the reporting period.

**3. Staff-to-Patient Ratios and the Adequacy of Clinical Staffing**

Like the prior review period, DSH-Coalinga maintained a 1:30 clinical staffing ratio for psychiatry, psychology, social work, and rehabilitation therapy. The institution indicated using two full clinical treatment teams to address the patient population. However, given the number of admissions to DSH-Coalinga, the institution utilized all psychiatry staff, including telepsychiatrists and psychiatric nurse practitioners to complete initial assessments within required timeframes. Routine psychiatric contacts were completed by two assigned psychiatrists.

The institution was compliant with staff-to-patient caseload ratios during the review period.

**4. Retention and Recruitment Efforts**

Although DSH-Coalinga indicated being fully staffed to treat *Coleman* class patients, the hospital reported difficulty retaining and recruiting clinical staff prior to and continuing through

the review period. In addition to its remote location, competition with other public and private entities has made it difficult to recruit and retain qualified mental health professionals. Local recruitment efforts included attending CDCR recruitment events, initiating connections with local schools and the Coalinga Chamber of Commerce, and presenting to psychiatric technicians and registered nurses. In 2024, DSH-Coalinga had 19 staff departures and 28 hires for a net gain of nine employees.

## IV. TREATMENT AND CLINICAL SERVICES

### 1. Interdisciplinary Treatment Teams (IDTTs)

The quality of IDTT meetings at DSH-Coalinga was assessed based on documentation and individual case reviews for 28 patients treated during the review period. Overall, IDTTs were completed in a timely manner in all 28 cases, however critical staff were present in 21 of 28 or 75 percent of the time.

Unlike the previous round, treatment plans included vague treatment goals or goals which did not appear appropriate to address patient needs in seven or 25 percent of cases reviewed, including for Patients F, G, K, L, P, R, and S. *See* ECF No. 8085 at 103 (comparing the Special Master's Thirtieth Round Monitoring Report – Part B, "[w]ith the exception of [one patient], treatment plans included goals appropriate to the patients' needs, and interventions to achieve the identified goals.").

In the treatment plans at DSH-Coalinga, the monitor's expert noted concerns regarding the absence of individual therapeutic interventions to address patient treatment goals when clinically indicated. This occurred in seven cases at DSH-Coalinga, including Patients D, F, L, M, O, P, and Y. Additionally, the expert also noted inadequate rationale for the treatment interventions listed on the treatment plans and patients were enrolled in groups unrelated to their

treatment needs. This occurred in nine or 32 percent of cases reviewed, including Patients F, K, L, M, N, O, P, Q, and R.

During the review period, 14 percent of treatment plans were not updated despite clinical indications to do so. This included Patients E, F, G, and U. Not included were the two cases, Patients A and K, where the monitor's expert noted that the treatment outcome expectations, developed while the patient was in CDCR, were not updated upon arrival to DSH despite indications that the goals were not appropriate for a hospital setting.

Although the IDTT meetings timely occurred during the review period, required staff were not compliant with attendance. Additionally, reviewed treatment plans were not compliant during the review period as the plans fell below the 90 percent threshold in the areas of targeted and individualized treatment goals, specific interventions to achieve those treatment goals, adequate rationales for chosen interventions, and updated treatment plans when clinically indicated.

**2. <u>Group Therapy</u>**

Core group treatment offered to *Coleman* patients was significantly lower than the previous monitoring round. During the current review period, core groups accounted for 68.6 percent of treatment delivered to *Coleman* patients, an 11.4 percent reduction from the Thirtieth Round. DSH-Coalinga offered 42 core scheduled groups with an average offering of 6.54 hours per week, compared to a weekly offering of 19.9 hours of core groups in the Thirtieth Monitoring Round. Patients attended an average of 4.7 hours of group per week during the current review period.

The proportion of supplemental groups increased compared to the prior round, accounting for 31.2 percent of treatment delivered to *Coleman* class patients, as compared to

19.6 percent of offered treatment in the previous monitoring round. DSH-Coalinga offered 50 supplemental groups with an average offering of 27 hours per week as compared to the offering of only 4.9 weekly hours of supplemental groups in the Thirtieth Round. During the current review period, patients attended an average of 5.71 hours per week. Similar to the previous round, supplemental group hours offered reflected the practice of offering all patients every available supplemental activity.

Cancellations did not negatively affect the provision of group therapy during the review period. DSH-Coalinga reported that only 10 groups were cancelled during the review period, and cancellations occurred due to lack of coverage and staffing, group schedule changes, quarantines, displacement due to COVID-19, and staff training.

Overall, due to the lack of core groups offered during the review period, supplemental group treatment was increased significantly from the previous monitoring round. As the DSH CQI process requires that patients be offered at least twenty hours of structured therapeutic activities, including at least ten hours of core treatment, the total number of offered supplemental groups was compliant, however compliance with the core treatment requirements are dependent upon the amount of individual therapy and clinical contacts offered. *See* ECF No. 7924 at 4 (citing ECF No. 7625 at 29-30 stating that "[b]y 2020, DSH had developed a fully adequate CQI process…which it still uses" and ECF No. 7812-1 at 15 stating "that [the DSH CQI] process includes definitions of 'core groups,' 'supplemental groups,' and 'individual therapy' and provides that patients will be offered 20 hours of treatment per week, at least ten hours of which are to be 'core' treatment".).

### 3. Individual Treatment

DSH-Coalinga did not provide clear information to determine the number of *Coleman patients* who were offered or attended individual treatment and therefore compliance could not be assessed. However, the documentation produced reflected that from October 1, 2023 through March 31, 2024, DSH-Coalinga offered 3.1 hours per patient per week of individual treatment to the *Coleman* population.

As patients were offered an average of 6.5 hours of core group treatment and 3.1 hours per week of core individual treatment, DSH-Coalinga was close but ultimately not compliant with its requirements to offer at least ten hours of core treatment per week. *See id*.

### 4. Psychiatric Services

Quality of psychiatric care during the review period was assessed based on case reviews and other clinical documentation.

Initial psychiatric evaluations at DSH-Coalinga were assigned to all available psychiatrists, telepsychiatrists, and nurse practitioners at the institution, which facilitated compliance with their policy of completing all initial psychiatric assessments within 24 hours. The use of covering psychiatrists to complete initial evaluations requires comprehensive and accurate documentation as the patient's assigned psychiatrist must rely on information from the initial evaluation in treatment planning and decisions about the frequency of follow-up.

Concerns with initial evaluations during the review period primarily stemmed from the use of telepsychiatry in an inpatient setting. Four cases that utilized telepsychiatry for an initial psychiatric evaluation were selected for review: these included Patients V, W, AA, and BB. There were two cases in which the telepsychiatrist noted challenges with the patient hearing the provider. In Patient BB's case, the telepsychiatrist had difficulty ascertaining whether the patient

was having trouble hearing the telepsychiatrist or whether the patient was experiencing an underlying psychiatric disorder that prevented him from treatment. This challenge had diagnostic implications.

In Patient V's case, the telepsychiatrist documented that the patient did not participate meaningfully in the interview, and that the psychiatrist did not know the patient's suicide or self-injurious behavior history. Despite this, the telepsychiatrist marked the patient to be at "absent" risk for both. Additional concerns were noted when the telepsychiatrist did not note that the patient was under a PC 2602 order and stated that he had a right to refuse medications. These inaccuracies had serious implications for the patient's treatment and treatment planning.

There was no policy requiring a set frequency of follow-up psychiatric contacts after the initial assessment. Leadership indicated that the patient's assigned psychiatrist determined the contact frequency based on clinical need. The institution did not use telepsychiatry or nurse practitioners for routine psychiatry contacts during the review period and instead used two designated psychiatrists to perform all routine psychiatric care after the initial evaluation. This compromised the continuity of care from the initial evaluation, especially when the frequency of follow-up contacts was within the treating psychiatrists' own discretion, yet that individual had not completed the initial evaluation.

While in most cases the frequency of routine contacts was clinically adequate, some patients required more frequent contacts than what were provided to meet their treatment goals. In one case, Patient V had a gap of 48 days between psychiatric contacts and subsequently had a gap of 22 days after substantial medication changes. Closer psychiatric follow-up appeared warranted given the clinical presentation of the patient, and the degree of medication changes that were made.

One additional issue at DSH-Coalinga was the psychiatrist using the treatment team as the psychiatric contact for Patient Y. While holding a joint session with the treatment team might prove fruitful at times, psychiatric sessions should generally be held confidentially between the patient and the psychiatrist.

Although the hospital completed timely initial psychiatric evaluations, there were concerns with the use of telepsychiatry and psychiatric nurse practitioners for initial evaluations, frequency of routine contacts, and using the treatment team as an opportunity to conduct a psychiatric contact. Therefore, DSH-Coalinga's psychiatric services were not compliant during the review period.

**5. <u>Medication Management</u>**

DSH-Coalinga displayed significant struggles providing adequate medication management for *Coleman* class members. The monitor's expert randomly selected ten cases to assess the adequacy of medication management provided. Of these cases, only one, or ten percent, was adequate. Therefore, and as indicated below, DSH-Coalinga was not compliant with medication management during the review period.

The monitor's expert saw concerning medication management issues at DSH-Coalinga. One case, Patient U, displayed multiple medication management concerns. The patient was appropriately started on the antipsychotic olanzapine. The dosing was unusually aggressive, ramping up to 40 mg per day, twice the FDA-approved maximum dose, in approximately one month's time. The patient was not seen by the psychiatrist until 28 days later during his treatment team meeting, after the patient was still taking 40 mg per day. While a psychiatrist may prescribe medications as they deemed clinically necessary, including prescribing higher than FDA-approved doses, the psychiatrist should have documented a clear rationale for doing so, and

the psychiatrist should have reassessed the patient sooner to monitor for response and side effects. Neither were done.

While in CDCR, this same patient had a long-standing prescription for nortriptyline, an antidepressant often used for chronic pain, yet the psychiatrist at DSH-Coalinga changed this to sertraline, an antidepressant without such pain benefits. The psychiatrist noted the reason for this change was potential lethality in overdose with nortriptyline. While the patient had one prior suicide attempt, the psychiatrist noted on the initial assessment that the patient's suicide risk was "absent." Stronger justification for such a change in medication was required. The monitor's expert appreciated the consideration of the risks of nortriptyline yet also noted that chronic pain itself was also a suicide risk factor.

For Patient AA, the psychiatrist started two antipsychotics (clozapine and haloperidol), while tapering off another (olanzapine). Several days later, the plan changed to increase olanzapine and the as-needed haloperidol dose. The patient subsequently experienced concerning side effects, including bedwetting. While the decision to start the antipsychotic medication clozapine appeared well-justified, the rationale for making this number of concurrent medication changes was inadequately documented in the record.

For Patient BB, the medication changes and the rationales listed in psychiatric progress notes were absent or difficult to discern. This necessitated the monitor's expert to review the medication orders themselves to see which changes were made. The psychiatrist changed antipsychotic medications without a progress note documenting that the patient was seen, or a clear rationale for the change. Additionally, the diagnosis listed in the medication orders was incorrect. Standard of care dictates that patients should be seen and evaluated prior to making medication changes and that rationale for changes should be clearly documented.

**A. Clozapine**

Clozapine is a potentially life-saving medication that requires close monitoring due to potentially fatal side effects. DSH-Coalinga initiated clozapine in two cases and continued the medication in two additional cases. Of the ten cases the monitor's expert reviewed, two, or 20-percent, were prescribed clozapine. When examining solely the issue of the use of clozapine, both cases were adequate. Notably, in Patient AA's case, the psychiatrist used DSH's expert psychiatric consultation service to ask a nuanced question, with the valuable information obtained helping to ensure the safe use of this medication in a patient with medical issues.

**B. PC 2602 Medication Orders**

The right to refuse medication, or whether medications may be given involuntarily under court order, strike at core clinical and legal issues in psychiatric treatment. Despite this importance, the administration of PC 2602 medications at DSH-Coalinga raised significant concerns, including non-renewal of petitions without adequate justifications and inconsistent and confusing documentation. For the following reasons, the monitor's expert recommends review of the PC 2602 process at DSH-Coalinga and to establish closer communication with CDCR on these cases.

Importantly, DSH-Coalinga had clear policies and procedures governing the PC 2602 process and had a dedicated PC 2602 coordinator. The hospital had a total of eight patients under a PC 2602, all of which were continued from CDCR. There were no uses of force required to administer involuntary medications.

DSH-Coalinga did not initiate any PC 2602 petitions and renewed four PC 2602 petitions during the review period, however documented reasons for not initiating PC 2602 petitions and non-renewals were unclear. In Patient W's case, the rationale for not filing an initial PC 2602

petition was particularly confusing. Markedly delusional at the time of admission, the patient had a history of PC 2602 orders, and an extensive history of self-injury. Despite CDCR records documenting clear improvement on a certain antipsychotic, for unclear reasons, the patient subsequently refused the medication. Clear documentation of the rationale for not filing an initial PC 2602 petition was warranted in this case.

Additionally, based on information provided, it was difficult to determine the number of non-renewals of patients under PC 2602 orders. During review of patient mental health records, the monitor's expert found two cases, Patients S and T, in which the rationale for non-renewal was unclear. In Patient T's case, the patient had two separate instances of aggression, including breaking a mirror then having a physical altercation with a peer. Due to the aggression, the patient was returned to CDCR and no longer under a PC 2602 order.

Unfortunately, the mental health records reviewed demonstrated confusing and inconsistent documentation regarding whether a patient was under a PC 2602 involuntary medication order at all. In Patient S's case, the psychiatrist incorrectly stated in the initial psychiatric evaluation that the patient was not under a PC 2602 involuntary medication order, yet later in the evaluation the psychiatrist wrote orders for injectable medications in case the patient refused oral ones. In Patient V's case, the psychiatrist incorrectly wrote that the patient was not under a PC 2602 order and may refuse medications. In Patient BB's case, psychiatry notes were confusing as to whether the patient was under a PC 2602 order, when in fact he was.

The monitor's expert strongly recommends that DSH-Coalinga reevaluate its processes for tracking these cases, clearly documenting if a PC 2602 is not being renewed due to clinical improvement and coordinating with CDCR regarding their processes for non-renewal of PC 2602 cases. Additionally, the findings may support the need for training psychiatrists and nurse

practitioners completing initial evaluations for *Coleman* patients, as providers assigned to other units in the hospital may be unfamiliar with the penal code dictating involuntary treatment for incarcerated individuals.

**C. <u>Prescriptions and Verbal Orders</u>**

Verbal and telephone orders were permitted only in urgent situations or when the physician was off-site. Psychiatrists had to sign the telephone orders within 48 hours. DSH-Coalinga had no tracking system to ensure the physician had signed the order within the mandated timeframe. This appears to warrant correction through policy development or at minimum, quality assurance tracking.

**D. <u>Non-Formulary Medications</u>**

DSH-Coalinga employed clinically appropriate policies surrounding the use of non-formulary medications. Exemptions allowed were logical, such as continuing non-formulary medications which a patient was taking at the time of admission, prior to review through the non-formulary process.

**E. <u>Polypharmacy Reviews</u>**

DSH-Coalinga had clear guidelines for reviewing patients on multiple psychiatric medications. No concerns were noted with this process.

**F. <u>HS Medications</u>**

DSH-Coalinga reported no concerns regarding the administration of *Hora Somni*/Hour of Sleep (HS) medications, such as giving potentially sedating medications too early in the day.

### G. Medical Records/Documentation Issues

As noted in the preceding monitoring round, the lack of electronic healthcare records proved to be a substantial barrier in the review of cases. DSH-Coalinga will reportedly be the test site for an electronic medical record system, which is anticipated in 2026.

In one case, the psychiatrist noted that they were unable to verify the patient's medications, and thus ordered a one-time dose of a medication, pending confirmation. A psychiatrist having access to a correct list of the patient's medications at time of admission is essential. An electronic medical record system could have obviated this issue.

In another case, a psychiatrist's note was not in the chart, despite being seen 14 days earlier. The medical record is the lynchpin of clinical communication in the hospital setting. Timely access to clinical information is critical for patient safety requiring timely documentation and filing of that documentation in the patient's record.

Monitoring for side effects with psychiatric medications is critical. One of the most common side effects is weight gain. The body mass index (BMI) is a ratio between a patient's height and weight and is commonly used in healthcare settings to monitor weight gain. In five of the ten cases reviewed at DSH-Coalinga, the psychiatrist stated they were unable to monitor the body mass index, as the patient's height was missing. In many cases, the monitor's expert was able to find the height in the healthcare record. An effective electronic healthcare record could have calculated the BMI automatically. Further, psychiatric providers may need training on where to locate a patient's height in the record in order to properly calculate BMI.

During the monitoring period, DSH-Coalinga treated patients under a variety of commitment statutes. Clear documentation of the relevant statute for which the patient is admitted, is essential. Specifically, in one case, the initial psychiatric evaluation noted that the

patient was at DSH-Coalinga for sex-offender treatment, rather than for treatment of patients from CDCR. As noted above, as the initial psychiatric evaluations were not routinely being completed by the patient's assigned psychiatrist, accurate documentation is essential for proper continuity of care.

**6. Other Treatment Issues**

**A. Behavioral Management**

There were no behavioral plans created or in effect during the review period.

**B. Pre-Release Planning**

DSH-Coalinga reported that during the review period, four patients received pre-release planning services prior to their scheduled discharge. All four patients received TCMP services for SSI application assistance.

**C. Access to Meaningful Jobs and Educational Opportunities**

On average, 13 of 40 or 33 percent of *Coleman* patients held meaningful monthly employment positions; actual monthly employment ranged from ten to 17 patients. There were no patients who attended more than five hours of educational classes or activities during any month of the review period.

## V. SUICIDE PREVENTION

There were no changes to the suicide prevention policy since an administrative directive update on July 11, 2023.

There were no deaths by suicides during the review period.

There were two patients who demonstrated self-injurious behavior, suicidal behavior, and/or a suicide attempt during the review period. One serious incident involving self-injurious and suicidal behavior occurred on December 5, 2023 and required hospital treatment. An

additional patient demonstrated suicidal behavior on two occasions in November and December 2023 which did not require medical treatment.

DSH-Coalinga provided documentation regarding training on suicide risk assessments. A tracking tool for the completion of suicide risk assessments was utilized by DSH-Coalinga, and training was provided by the psychology department regarding the use of the tool. Mandatory training regarding suicide awareness was also provided during new employee orientation and a mandatory training was also provided during annual review training.

As was reported during the previous monitoring round, DSH-Coalinga replaced all patient furniture with anti-ligature furniture for the reduction of suicide risk, including patient beds, end tables, chairs, and shelves.

## VI. <u>PATIENT ACCESS TO TREATMENT</u>

The DSH-Coalinga policy regarding the Hospital Access System (HAS), which was updated on September 20, 2022, remained in effect without changes. DSH-Coalinga continued to use the HAS to promote positive patient behavior and treatment participation, as well as to access programming and privileges. However, DSH-Coalinga could not provide the number of patients or individual patient length of time at each stage during the review period. Instead, they provided a list of patients that included the date that the HAS level was placed on hold and returned.

## VII. <u>REFERRALS</u>

During the review period, there were 85 referrals of 83 patients to DSH-Coalinga; 51 referrals were accepted, 33 were rescinded, and one was accepted but rescinded prior to admission. Nine of 52 or 17 percent of referral packets were timely reviewed. DSH-Coalinga was not compliant with timely review of referral packets during the review period.

The 85 referrals were from the following institutions:

| Institution | Number of Referrals to DSH-Coalinga |
|---|---|
| CHCF | 25 |
| CMF | 13 |
| CHCF-PIP | 7 |
| SVSP | 7 |
| CMF-PIP | 6 |
| CSP/Sac | 5 |
| SATF | 5 |
| CSP/Corcoran | 4 |
| SQ | 4 |
| RJD | 3 |
| PBSP | 2 |
| CSP/LAC | 2 |
| CMC | 1 |
| CSP/Solano | 1 |
| **Total** | **85** |

## VIII. TRANSFERS, ADMISSIONS, and DISCHARGES

### 1. Admissions

Including patients who were referred to DSH-Coalinga prior to the review period but were admitted during the reporting period, there were 54 admissions as compared to the prior review period's 22 admissions. Of the 54 admissions, the average time from acceptance to

physical admission was 7.24 days with a range of one to 19 days. The one acute care patient was not transferred within 72 hours of bed assignment, while 51 of 53, or 96 percent of intermediate care patients timely transferred within 30 days of referral; the two untimely transfers were 54 and 75 days late.

Although the one acute care patient was not transferred timely, there were only two untimely intermediate care transfers, therefore DSH-Coalinga was compliant with transfers and admissions during the review period.

### 2. **Discharges**

Fifty patients were discharged during the review period, as compared to the 12 patients discharged during the prior reporting period. The average physical length of stay was 152.6 days with a range of eight to 285 days. Of the 50 patients discharged during the review period, four were physically discharged directly to parole, while two patients were Offenders with a Mental Health Disorder (OMD) and were transferred to DSH-Atascadero. Of the 44 remaining patients, 23 or 52 percent were physically discharged within 72 hours of clinical discharge. Delays ranged from one to 16 days; reasons for delays were not provided.

DSH-Coalinga was not compliant with physical discharges within 72 hours of clinical discharge during the review period.

## IX. **PATIENT DISCIPLINARY PROCESS**

DSH-Coalinga issued 13 RVRs to *Coleman* class members during the reporting period; ten were still pending disposition. Produced documentation for ten cases indicated that custody staff timely referred the patient for completion of a mental health assessment in three or 30 percent of reviewed cases, while mental health staff timely completed and returned the assessment to custody staff in eight or 80 percent of reviewed cases. All ten reviewed

assessments were conducted confidentially. Of the ten reviewed cases, two opined that mental health factors contributed to the patient's behavior. Documentation about penalty mitigation was provided in all ten cases.

One patient was discharged from DSH-Coalinga due to disciplinary issues during the review period. The patient remained on line-of-sight enhanced observation for 20 days before he was transferred to a mental health crisis bed in January 2024.

As a result of these concerns, DSH-Coalinga was not compliant with the patient disciplinary process during the review period.

## X. USE OF FORCE

DSH-Coalinga's use of force policies were updated and reflected no changes since the prior reporting round. Produced policies adequately identified appropriate and excessive uses of force, different use of force classifications, and best practices for documenting and reporting use of force incidents.

DSH-Coalinga had no use of force incidents during the reporting period, therefore compliance with required policy could not be discerned.

## XI. UNUSUAL OCCURENCES/SERIOUS INCIDENTS/NEAR MISSES/SENTINEL EVENTS

DSH-Coalinga reported five unusual occurrences involving three patients during the reporting period. In November and December 2023, a patient indicated to his primary clinician that he made two suicide attempts. The institution did not indicate any deficiencies in treatment and the patient was referred for medical and psychiatric intervention, including 1:1 observation following the second attempt. Each attempt was reported as a separate occurrence. Another patient reported swallowing several pieces of metal and was referred to medical staff; the institution did not report any deficiencies in treatment. The third patient committed an alleged

assault on a staff member and was restrained in five-point restraints in January 2023. Video review of the incident revealed that the criteria for the use of restraints were not met. The institution noted a deficiency in the restraint process, and training was implemented for the staff involved. This was recorded as two separate occurrences.

During the review period, DSH-Coalinga reported 94 serious incident reports involving 54 patients, as compared to three serious incident reports involving two patients during the prior monitoring period. Of the 94 incidents, 17 resulted in minor first aid, 14 resulted in medical treatment, and three resulted in hospitalization. Incidents included aggressive acts towards other patients, staff, and themselves, as well as falls, medical episodes, and suicidal ideation, threats, and attempts. A Serious Incident Report (SIR) was completed in each instance.

Although there was an identified deficiency with the use of restraints, the institution addressed the concern and implemented training as necessary. Additionally, an SIR was created for all reported serious incidents as required. As a result, DSH-Coalinga was compliant with required procedures regarding unusual occurrences, serious incidents, near misses, and sentinel events.

## XII. USE OF OBSERVATION CELLS/ROOMS, SECLUSION, and RESTRAINT

There were no reported changes to the seclusion or restraint policies or procedures since the previous monitoring round. DSH- Coalinga did not use observation cells during the reporting period.

There was one seclusion episode during the reporting period. The patient was found to be imminently dangerous to self/others which necessitated the use of seclusion. The incident lasted for two hours and 43 minutes and the patient was released when the dangerous behavior concluded.

There were also two restraint incidents. During the first restraint incident, the qualitative audit report noted successful implementation of all aspects of psychiatric care. However, during the second incident, three of the nine qualitative indicators were not met, including that the hospitalization was not focused on the behavior that resulted in the patient being restrained, there was not a linked objective to the patient's treatment and the restraint, and the patient was not released as soon as the violent or dangerous behavior that created the emergency was no longer displayed and the patient met the release criteria on the restraints order. The average restraint time was 3 hours and 45 minutes.

No treatment was required or provided during any of the restraint and seclusion incidents.

DSH-Coalinga performed audits for each incident; areas of needed improvement were identified.

As areas of needed improvement were identified and training was implemented as required, DSH-Coalinga was compliant with the use of observation cells, seclusion, and restraints.

## XIII. EMERGENCY RESPONSE AND THE DEATH REVIEW PROCESS

### 1. Emergency Response

DSH-Coalinga provided information regarding multiple emergency response drills that were conducted during March 2024 on various units in the hospital, including Unit 21 that housed *Coleman* class patients. Further information regarding the emergency response mock drills was inaccessible and therefore compliance could not be discerned.

### 2. Death Review Process

There were no deaths of *Coleman* class patients during the review period.

## XIV. QUALITY MANAGEMENT AND UTILIZATION REVIEW

DSH-Coalinga was not accredited by the Joint Commission, and there were no CDPH licensing surveys during the review period. There was one plan of correction that was developed for an incident that occurred on January 31, 2024 when the California Department of Public Health found that the facility failed to ensure a patient's rights when a psychiatric technician failed to appropriately deescalate the patient, leading to placement in five-point restraints.

DSH-Coalinga continued to operate a comprehensive quality improvement program (QIP). The quality council met monthly and served as a hub for all quality improvement activities. Active quality assurance committees included the program review committee, utilization review committee, and utilization management committee.

DSH-Coalinga developed and implemented audits and performance improvement measures during the review period that included special incident reports, admission assessment audit, emergency response audit, nursing weekly progress note audit, rehabilitation therapy documentation audit, registered nurse progress note audit, and social worker social history assessment audit.

The Data Management Unit (DMU) was developed at DSH-Coalinga to assist in producing, collecting and tracking facility data for management and committee use.

No corrective action or improvement plans were initiated during the review period, and no audits or reports were generated by the mortality and incident review committee for *Coleman* patients. The institution noted that their focus instead was the goal of offering ten or more core hours for patients by the first thirty days of their hospitalization.

Regarding the procurement of an electronic health record (EHR) solution, DSH was awaiting approval to release their Request for Proposal (RFP). DSH anticipated that a contract

decision would occur sometime in the summer of 2025, with EHR implementation at DSH-Coalinga as a pilot site in the first half of 2026.

As a result of the detailed quality management and utilization review as described, DSH-Coalinga was compliant with quality management requirements.

## XV. PATIENT COMPLAINTS/PATIENT SATISFACTION

During the review period, one patient at DSH-Coalinga filed a complaint related to medication administration and a staff member disclosing personal health information in front of other patients. The medication administration complaint was resolved within one month and included a further explanation to the patient regarding the medications being prescribed. The allegation of a privacy rights violation was not substantiated.

DSH-Coalinga produced survey results reflecting patient satisfaction of care on Unit 21 within Program 7 from July 1, 2023 through March 31, 2024. Twenty-seven patients took the 26-question survey upon discharge from the program and were asked about topics ranging from admissions, medications, treatment planning, staffing, treatment environment, treatment program, and discharge. Patients reported an overall positive experience, with no more than two of the 27 patients reporting a negative experience with any of the 26 questions.

As the institution demonstrated keeping track of and resolving patient complaints by using effective communication with the complainant, and used the patient satisfaction survey effectively, the institution was compliant with patient complaints and patient satisfaction during the review period.

## XVI. *COLEMAN* POSTINGS

DSH-Coalinga reported that although they don’t keep a log of *Coleman* postings, *Coleman* posters in English and Spanish were continuously posted on Unit 21.

## XVII. LAUNDRY AND SUPPLY ISSUES

DSH-Coalinga maintained up-to-date policies and procedures for ordering clothing and linen, soiled laundry pick-up, laundry order deliveries, special needs laundry processing, stock shelf-rotation, and stock clerk coverage. Reviewed laundry logs were adequate.

As a result, DSH-Coalinga was compliant with laundry and supply requirements.

## XVIII. VISITATION

An updated version of the administrative directive governing patient visitation at DSH-Coalinga was provided and allowed visitation for a minimum of five hours daily, seven days per week, including holidays. It described protocols for visitor registration and security processing, group visitation, visitation restrictions, terminations, revocations of visitations, and protocols for approved items for visitation among other matters.

## XIX. LAW LIBRARY ACCESS

The law library at DSH-Coalinga was open seven days weekly for ten hours per day. Patients had access to legal materials which included both hard copy materials and kiosks for legal research as well as computers and copy machines. The patient's treatment team was required to send notice to the program assistant supervising the library when enhanced library access was needed for pro per patients.

Like the prior reporting period, library kiosks were available for daily use for up to two hours for pro per patients and those with upcoming court dates given priority scheduling. Unit supervisors were responsible for scheduling patient-requested appointment times with the program assistant. If the kiosk was unavailable, staff were required to document the request and reason for denial on the kiosk tracking log. Patients were also able to request copies of law

materials with a "Legal Request Form." If granted, the documents were required to be available within 72 hours of the request.

DSH-Coalinga was compliant with law library access requirements during the review period.

## XX. MILESTONE CREDITS

Milestone credits were offered but not awarded at DSH-Coalinga. Milestone credit-related data was shared with CDCR which then determined the award of milestone credits.

**APPENDIX A3**
**Patton State Hospitals (DSH – Patton)**
Review Period: October 1, 2023 – March 31, 2024
(Paper Review)

## I. SUMMARY OF THE FINDINGS

- DSH-Patton operated a 30-bed intermediate care facility that treated female Coleman patients during the review period. As of May 1, 2024, DSH-Patton housed two *Coleman* patients; both were intermediate level of care.

- DSH-Patton reported that all four executive positions – executive director, medical director, clinical, and hospital administrator–were filled, as were all three management positions, which included program director and both nursing coordinators.

- All of the hospital's positions for psychiatrists, psychologists, and rehabilitation therapists were filled. One of the two social worker positions were filled. The social worker was unlicensed.

- DSH-Patton did not utilize telepsychiatry or telehealth during the review period.

- The institution maintained a 1:30 clinician-to-patient ratio for psychiatrists, psychologists, social workers, and rehabilitation therapists and a 1:8 staffing ratio for senior psych techs, psych techs, RNs, and PLPTs.

- IDTTs were completed in a timely manner in all 16 cases with required participants in attendance for 15 or 94 percent of cases. As required, all patients received a timely initial assessment prior to the patient's initial treatment plan.

- Treatment plans at DSH-Patton were not compliant during the review period as 25 percent of reviewed patient treatment plans included boilerplate or vague goals, and the treatment teams otherwise did not update treatment plans in 31 percent of reviewed cases, despite clinical indications to so.

- DSH-Patton offered an average of 10.4 hours per patient per week of core group treatment and 9.69 hours per patient per week of supplemental treatment. Patients attended 9.38 hours of core group and 7.76 hours of supplemental group per week. This amount of group treatment was compliant.

- DSH-Patton offered 0.42 hours of individual treatment per patient per week and delivered 0.29 hours of individual treatment weekly to *Coleman* class patients.

- Consistent with other DSH facilities reviewed, DSH-Patton completed all reviewed initial psychiatric evaluations within 24 hours of admission. DSH-Patton did not have an internal policy requiring minimum monthly psychiatric contacts.

- Four of six or 67 percent of cases were found to have adequate medication management, therefore, DSH-Patton was not compliant with medication management during the review period.

- DSH-Patton did not initiate clozapine for class members and continued the medication in one case in which the clozapine management was adequate.

- DSH-Patton treated four Coleman class members receiving involuntary medications under PC 2602. The institution did not initiate any PC 2602 petitions, nor have any renewals petitions. However, there were significant concerns in two cases in which documentation of whether the patient was under a PC 2602 order was either incorrect or inconsistent.

- In addition to the two patient charts with incorrect PC 2602 information, three reviewed patient charts revealed the wrong patient commitment type, and being treated relative to the wrong commitment type.

- There were no deaths by suicide during the review period. No changes were made to policy and procedures regarding suicide prevention and death review process.

- DSH-Patton did not track Hospital Access System (HAS) during the review period.

- DSH-Patton reported that Coleman patients had access to inter-compound privileges (ICPs), otherwise called “grounds.” After an observation period of seven days, ICPs were granted, and the treatment team evaluated the approval or delay of privileges.

- During the review period, there were 13 referrals of 12 patients to DSH-Patton; all patients were referred from CIW. All 13 referrals were accepted.

- All 13 referrals were timely admitted to DSH-Patton and therefore compliant with transfers and admissions.

- DSH-Patton reported discharge data for all 12 patients admitted during the review period, though only once for the patient who was admitted twice. Each patient was physically discharged on the same day as their clinical discharge and therefore compliant with the 72-hour physical discharge requirements.

- No RVRs were issued to Coleman class members during the review period. There were no use of force incidents or policy changes during the review period.

- During the review period, DSH-Patton reported two unusual occurrences for which both had Special Incident Reports (SIRs); neither incident was investigated.

- There was one seclusion and restraint incident during the review period. The five-point restraints were discontinued after 5.05 hours; the patient was then placed in locked door seclusion for 12 hours.
- DSH-Patton continued to have a robust quality improvement program, overseen by the quality council, while the hospital also conducted numerous audits related to quality management.
- No patients submitted complaints or participated in patient satisfaction surveys.

## II. CENSUS

DSH-Patton operated a 30-bed intermediate care facility that treated female *Coleman* patients during the review period. As of May 1, 2024, DSH-Patton housed two *Coleman* patients; both were intermediate level of care. Average monthly census data for the review period was not provided.

## III. STAFFING

### 1. Administrative and Clinical Staffing

DSH-Patton reported that all four executive positions – executive director, medical director, clinical, and hospital administrator–were filled, as were all three management positions, which included program director and both nursing coordinators. One of the nurse coordinator positions was filled by an out-of-class staff member.

Senior Supervising Psychiatrist: The senior supervising psychiatrist position was filled.

Psychiatrists: Both psychiatry positions were filled by contractors.

Psychologists: Both psychology positions were filled.

Social Workers: One of the two social worker positions were filled. The social worker was unlicensed.

Rehabilitation Therapists: Both rehabilitation therapist positions were filled.

Registered Nurses (RNs): All ten RN positions were filled.

Senior Psych Techs: All three senior psych tech positions were filled.

Psych Techs: Twenty-six of 28 psych tech positions were filled for a seven percent vacancy rate.

Pre-Licensed Psychiatric Technicians (PLPTs): Both PLPT positions were filled.

Health Services Specialist (HSS): All three HSS positions were filled.

### 2. Tele-Mental Health

DSH-Patton did not utilize tele-mental health to treat *Coleman* patients during the review period.

### 3. Staff-to-Patient Ratios and the Adequacy of Clinical Staffing

The institution maintained a 1:30 clinician-to-patient ratio for psychiatrists, psychologists, social workers, and rehabilitation therapists and a 1:8 staffing ratio for senior psych techs, psych techs, RNs, and PLPTs.

## IV. TREATMENT AND CLINICAL SERVICES

### 1. Interdisciplinary Treatment Teams (IDTTs)

The quality of IDTT meetings at DSH-Patton was assessed based on documentation and individual case reviews for 16 patients treated during the review period. Overall, IDTTs were completed in a timely manner in all 16 cases with required participants in attendance for 15 or 94 percent of cases. As required, all patients received a timely initial assessment prior to the patient's initial treatment plan.

Like the previous round, treatment planning documentation periodically included goals that targeted patients' needs and included adequate interventions and supporting rationales for those interventions. However, there were concerns noted in four cases, as follows. For Patients A, E, M, and N, treatment plans included boilerplate or vague goals that did not always align

with objective findings in the patient's health record or the patients' subjective complaints. There were no concerns with individual therapeutic interventions when clinically indicated, however, in Patient A's treatment plan, the monitor's expert noted inadequate rationales for the patient's treatment interventions.

Of the 16 reviewed cases, there were five patients, Patient B, D, G, J, and L, that did not have their treatment plans updated despite clinical indications to do so. Additionally, the monitor's expert noted that the treatment outcome expectations for Patient L that were developed while the patient was in CDCR, were not updated upon arrival to DSH despite indications that the goals were not appropriate for a hospital setting.

The hospital's IDTTs were both timely and regularly included required staff during the reporting period and were therefore compliant. However, treatment plans at DSH-Patton were not compliant during the review period as 25 percent of reviewed patient treatment plans included boilerplate or vague goals, and the treatment teams otherwise did not update treatment plans in 31 percent of reviewed cases, despite clinical indications to so.

**2. <u>Group Therapy</u>**

The hospital achieved compliance with DSH CQI process requirements for the offering of ten hours of core treatment to *Coleman* patients during the review period. At DSH-Patton, core groups accounted for 47.4 percent of treatment delivered to *Coleman* patients. There were 19 core scheduled groups and seven core unscheduled groups with an average offering of 10.4 hours per patient per week of core group treatment as compared to 9.6 hours of offered core group treatment in the preceding round. *See* ECF No. 8085 at 121. Patients attended an average of 9.38 hours per week.

The hospital was compliant with the offering of supplemental treatment as well. During the review period, supplemental treatment accounted for 50.9 percent of all treatment delivered to *Coleman* patients. DSH-Patton offered 27 supplemental groups to patients with an offering of 9.69 hours per patient per week, as compared to 1.79 hours of supplemental group treatment during the Thirtieth Round. *See id*. During the current review period, patients attended an average of 7.76 hours of supplemental treatment per week.

Based upon the information provided, it did not appear that treatment cancellations were a significant issue of concern.

**3. Individual Treatment**

During the review period, DSH-Patton offered 0.42 hours of individual treatment per patient per week and delivered 0.29 hours of individual treatment weekly to *Coleman* class patients.

The DSH CQI process requires that patients be offered at least twenty hours of treatment per week that includes at least ten hours of core treatment. *See* ECF No. 7924 at 4 (citing ECF No. 7625 at 29-30 stating that "[b]y 2020, DSH had developed a fully adequate CQI process…which it still uses" and ECF No. 7812-1 at 15 stating "that [the DSH CQI] process includes definitions of 'core groups,' 'supplemental groups,' and 'individual therapy' and provides that patients will be offered 20 hours of treatment per week, at least ten hours of which are to be 'core' treatment".) Overall, DSH-Patton was compliant with these requirements through the offering of group and individual treatment to *Coleman* class patients during the review period.

**4. Psychiatric Services**

Quality of psychiatric care during the review period was assessed based on case reviews and other clinical documentation.

Consistent with other DSH facilities reviewed, DSH-Patton completed all reviewed initial psychiatric evaluations within 24 hours of admission. DSH-Patton did not have a local policy governing minimum frequency of psychiatric contacts. While in most cases the frequency of routine psychiatric contact was clinically appropriate, in one case, Patient J experienced a 51 day gap in treatment. Given the severity of the patient's presentation, including requiring seclusion and restraints during her stay, as well as being on the antipsychotic clozapine, the monitor's expert opined the patient merited closer psychiatric follow-up.

Additionally, two cases displayed concerns for lack of documented follow-up on medical issues, both of which can be caused or worsened by psychiatric medications. In Patient F's case, multiple notes mentioned that the patient was referred to neurology for restless leg syndrome; however, no follow-up for this was seen in the psychiatric progress notes. In another case, involving Patient I, the psychiatrist repeatedly noted an increase in the hormone prolactin, which can occur due to medical conditions, or treatment with some psychiatric medications. Despite this, there was no documentation as to whether this required further intervention.

DSH-Patton's psychiatric services were found to be compliant during the review period. Despite the lack of documented follow-up for two patients and the extensive gap in treatment for one patient, the hospital completed all initial and most routine psychiatric contacts in a timely manner.

### 5. Medication Management

Due to the small number of *Coleman* class members admitted to the hospital during the monitoring period, the monitor's expert reviewed six medical records at DSH-Patton to assess the quality of medication management provided. Of these cases, four or 67 percent, were found to have adequate medication management, therefore, and as indicated below, DSH-Patton was not compliant with medication management during the review period.

At times, DSH-Patton displayed appropriate, rational medication management, with clear treatment goals. It was apparent that when possible, psychiatrists attempted to reduce side effects by minimizing the number of medications. In one instance involving Patient G, DSH-Patton displayed adept medication management for a patient with medical issues. However, this was not always the case. In two other cases, Patients F and I, the monitor's expert found medical concerns and concerns related to medication side effects. Additional challenges observed at DSH-Patton included medication orders lapsing for Patient H, documentation of incorrect information surrounding the commitment type for Patients F, H, and I, and whether the patient was under an involuntary medication order.

In one case involving Patient H, two psychiatric medications lapsed, without clearly documented rationale. Unfortunately, the hospital's utilization of a paper medical record made determining the number of missed doses difficult.

#### A. Clozapine

Clozapine, an antipsychotic medication which is often effective even when other medications have failed, must be closely monitored due to potentially life-threatening side effects. DSH-Patton did not initiate clozapine for class members and continued the medication in one case involving Patient J, in which the clozapine management was adequate.

### B. PC 2602 Medication Orders

The right to refuse medication, or whether medications may be given involuntarily under court order, strike at core clinical and legal issues in psychiatric treatment. DSH-Patton maintained clear policies and procedures governing the PC 2602 involuntary medication process. The facility also had designated staff to oversee these cases.

During the review period, DSH-Patton treated four *Coleman* class members receiving involuntary medications under PC 2602. The institution did not initiate any PC 2602 petitions, nor have any renewal petitions. However, there were significant concerns in two cases at DSH-Patton, involving Patients F and H, in which documentation of whether the patient was under a PC 2602 order was either incorrect or inconsistent.

There was no use of force required to administer PC 2602 medications.

### C. Prescriptions and Verbal Orders

Verbal and telephone orders were permitted only in urgent situations or when the physician was off-site. Psychiatrists had to sign the telephone order within 48 hours; DSH-Patton was the sole facility of the three reviewed that utilized a tracking log to verify signature compliance.

### D. Non-Formulary Medications

DSH-Patton had clinically appropriate policies governing the use of non-formulary medications. The process required input from the pharmacy, and approval by a physician reviewer. DSH-Patton had appropriate exemptions to this process, outlined in the Pharmacy and Therapeutics Manual, Policy 5.11, which stated that non-formulary medications were allowed “if a patient is admitted or returns from an outside facility on a non-formulary medication.” Despite this, in Patient H’s case, the psychiatrist changed the medication from a non-formulary

medication that was prescribed at CDCR to a formulary antidepressant. While the medications were closely related, this change risked clinical worsening at a point when the patient's symptoms were of sufficient severity to merit inpatient care.

### E. **Polypharmacy Reviews**

DSH-Patton had a clear policy surrounding the review of cases of patients on multiple psychiatric medications. The policy was reasonable and appeared to be adequately implemented.

### F. **HS Medications**

DSH-Patton did not report, and the monitor's expert did not find challenges relating to administration of prescriptions written at *Hora Somni*/Hour of Sleep (HS), such as administering potentially sedating medications too early in the day.

### G. **Medical Records/Documentation Issues**

An accurate medical record is an essential element of patient treatment, serving a critical role in the communication of clinical information. In addition to the two charts with incorrect PC 2602 information, three charts for Patients F, H, and I, or 50 percent of charts reviewed indicated the wrong patient commitment type. For Patient F, this occurred in the initial psychiatric evaluation. The evaluation noted the patient was treated at DSH-Patton under PC 1370 (relating to trial competency), instead of PC 2684 (allowing the treatment of CDCR patients at DSH). In Patient H's case, both the psychiatric evaluation and multiple social worker notes stated that the patient was under PC 1370, and with one goal being to "increase trial competency." Clarity on the commitment type is essential, as this interfaces with psychiatric and psychological treatment, as well as legal issues. An effective electronic medical records system would have likely obviated these errors.

### 6. Other Treatment Issues

#### A. Behavioral Management

DSH-Patton had no behavioral plans that were developed or implemented during the review period.

#### B. Pre-Release Planning

Thirteen patients received pre-release planning services during the review period and prior to their scheduled discharge. The institution was unable to report the number of patients who received TCMP services, or the type of services provided.

#### C. Access to Meaningful Jobs and Educational Opportunities

DSH-Patton did not provide documentation to indicate whether patients received access to meaningful jobs or educational opportunities during the review period.

## V. SUICIDE PREVENTION

No changes were made to policy and procedures regarding suicide prevention and death review process.

There were no deaths by suicide during the review period. One serious attempt occurred on November 15, 2023, when a patient tied a bra strap around their neck while in the bathroom. The bra strap was removed, and the patient was examined by staff without observed or reported injuries noted. The patient was assessed for suicide risk which was determined to be moderate, and was placed on one-to-one observation.

DSH-Patton completed suicide risk assessments on all admissions, annual psychological assessments, and at times of increased suicide risk. The Columbia-Suicide Severity Rating Scale (C-SSRS) was utilized for the assessment of suicide risk. DSH-Patton continued to conduct monthly audits of suicide risk assessments.

Regarding training on suicide risk assessment, all staff were required to participate in a two-hour suicide prevention and risk reduction training during their new employee orientation. Additionally, all staff were required to participate in an Annual Recertification training. Newly hired psychologists were trained on the C-SSRS during their first month of work. All psychologists received training on the C-SSRS on November 12, 2019, with a 90-minute refresher course during April 2023.

## VI. PATIENT ACCESS TO TREATMENT

DSH-Patton did not track Hospital Access System (HAS) during the review period. DSH-Patton reported that *Coleman* patients had access to inter-compound privileges (ICPs), otherwise called "grounds." After an observation period of seven days, ICPs were granted, and the treatment team evaluated the approval or delay of privileges. The patients that were not granted privileges were escorted to various treatments and activities.

DSH-Patton provided information regarding patients who were denied ICP status. Between October 10, 2023 and December 23, 2003, there were 11 instances in which ICP status was denied and subsequently restored which involved five patients. The reasons for denial included behaviors such as sharing food, noncompliance with staff, cheeking medications, entering a peer's room, bartering and trading, and refusal to get up for morning routine. The ICP denial usually lasted for one day, with the longest lasting for six days. DSH-Patton reported that there were no denials of ICP from January to March 2024.

## VII. REFERRALS

During the review period, there were 13 referrals of 12 patients to DSH-Patton; all patients were referred from CIW. All 13 referrals were accepted, however one referral appeared to have also been rescinded on an unspecified date. All referrals were received timely and

therefore compliant.

## VIII. TRANSFERS, ADMISSIONS, and DISCHARGES

### 1. Admissions

All 13 referrals were timely admitted to DSH-Patton and therefore compliant with transfers and admissions.

### 2. Discharges

DSH-Patton reported discharge data for all 12 patients admitted during the review period, though only once for the patient who was admitted twice. For those 12 instances, the average clinical and physical lengths of stay were 77 days and ranged from 24 to 238 days. Each patient was physically discharged on the same day as their clinical discharge and therefore compliant with the 72-hour physical discharge requirements.

## IX. PATIENT DISCIPLINARY PROCESS

No RVRs were issued to *Coleman* class members during the review period.

## X. USE OF FORCE

There were no use of force incidents or policy changes during the review period.

## XI. UNUSUAL OCCURENCES/SERIOUS INCIDENTS/NEAR MISSES/SENTINEL EVENTS

During the review period, DSH-Patton reported two unusual occurrences for which both had Special Incident Reports (SIRs); neither incident was investigated. Documentation was provided for each occurrence, and both involved intermediate level of care patients. One incident involved a patient who attempted suicide. This patient was escorted to a side room for assessment and observation where they explained that they had a history of hearing voices, and that the voices were getting too loud. This patient received medication and was placed on 1:1

observation due to high risk of suicide. The second unusual occurrence involved a patient who required medical intervention due to shortness of breath and chest tightening. This patient was admitted to the ICU for observation and treatment.

The hospital appropriately tracked and documented all unusual occurrences and SIRs during the review period. Reviewed documentation reflected detailed information in each unusual occurrence and SIR report. For these reasons, DSH-Patton was compliant with required procedures regarding unusual occurrences, serious incidents, near misses, and sentinel events.

## XII. USE OF OBSERVATION CELLS/ROOMS, SECLUSION, and RESTRAINT

DSH-Patton did not have observation cells.

There were no changes to the policies and procedures regarding seclusion and restraints during the review period. There was one seclusion and restraint incident during the review period; it occurred on October 15, 2023 and lasted for 12 hours. This incident stemmed from a patient scratching another patient's hand and then threatening staff and the other patient. This patient was placed in five-point restraints and was treated with intramuscular Haldol, Ativan and Benadryl. The five-point restraints were discontinued after 5.05 hours; the patient was then placed in locked door seclusion for 12 hours.

No policy changes were noted during the review period.

DSH-Patton was compliant with policies and procedures for the use of observation cells, seclusion, and restraints.

## XIII. EMERGENCY RESPONSE AND THE DEATH REVIEW PROCESS

### 1. Emergency Response

DSH-Patton completed emergency response drills during the review period. During the fourth quarter of 2023, DSH-Patton conducted three emergency response drills regarding a

choking event. During the first quarter of 2024, three drills targeted dehydration and hypovolemic shock.

### 2. Death Review Process

DSH-Patton did not report any deaths during the review period.

## XIV. QUALITY MANAGEMENT AND UTILIZATION REVIEW

DSH-Patton continued to have a robust quality improvement program. The continuous quality improvement process utilized a chart audit tool that evaluated a range of criteria from randomly selected patient charts in the hospital and involved audits of all hospital departments, with review of hospital-wide data that was organized by program and by hospital unit. The information was then utilized to identify deficiencies, to initiate a root cause analysis, and to develop corrective action or improvement plans.

DSH-Patton conducted audits related to the various disciplines, including psychiatry, nursing, psychology, social work, rehabilitation, and nutrition. In addition, performance improvement audits were conducted in topics including group observations, treatment planning, and safety checklists.

DSH-Patton anticipated the implementation of the electronic health records following initial testing at other DSH institutions.

As a result of the detailed quality management and utilization review process as described, DSH-Patton was compliant with quality management requirements.

## XV. PATIENT COMPLAINTS/PATIENT SATISFACTION

The hospital reported that no patients submitted complaints or participated in patient satisfaction surveys, therefore compliance with these requirements could not be assessed.

## XVI. *COLEMAN* POSTINGS

Current *Coleman* posters were reportedly posted in both English and Spanish on all units that housed the *Coleman* patient population.

## XVII. LAUNDRY AND SUPPLY ISSUES

DSH-Patton provided Administrative Directive 7.02 which noted that patients' clothing and linen were laundered by Prison Industries Authority linen service. The hospital provided up-to-date policies for inspection, sorting, storage, and transportation of patient laundry. Additionally, like the previous review period, unit supervisors were responsible for ensuring that their units had an adequate supply of clean clothing and linens.

## XVIII. VISITATION

The visitation procedures LOP was last updated on January 18, 2024. In-person visits were permitted for adults Sunday through Friday for a six hour period and Saturdays for a two hour period. Tele-visits for adults were permitted Monday through Friday as well; weekend tele-visits were not permitted.

DSH-Patton produced the COVID-19 Transmission-Based Precautions and Testing protocols which included department procedures when visiting patients including limiting the number of visits per patient, limiting the number of visitors in the facility at one time, explaining the risk associated with visiting to visitors and patients, and masking protocols.

DSH-Patton's telephone use guidelines were outlined in a document labeled Administrative Directive 7.08; a copy of the same was provided.

## XIX. LAW LIBRARY ACCESS

Patients were allowed access to the law library which included virtual legal research kiosks, legal forms related to their commitment code, knowledge-based information, and leisure

reading materials. Patients who could not physically go to the law library were allowed to contact the librarian on the days the west library was open to receive materials on their unit. The east/central library operated on Tuesdays for two hours and on Wednesdays and Fridays for four hours per day. The west library operated on Mondays for 1.5 hours and Thursdays for two hours per day.

## XX. MILESTONE CREDITS

Like during the previous review period, DSH-Patton offered patients milestone credits and then provided that data to CDCR; CDCR then calculated and awarded patients' milestone credits.

**APPENDIX B1**
**California Medical Facility (CMF-PIP)**
Review Period: February 1, 2024 – July 31, 2024
Site Visit: September 17, 2024 – September 19, 2024

As identified in the Thirtieth Monitoring Round, the lack of both supervisory and line staff continued to persist and had significant effects on CMF's inpatient program. With vacancy rates that exceeded ten percent for supervisory staff and all four disciplines of psychiatry, psychology, social worker, and recreation therapists, treatment for both acute and intermediate care patients at CMF-PIP continued to be noncompliant with Program Guide requirements in the Thirty-First Round.

Observed IDTTs for both acute and intermediate care patients demonstrated continuing variability in addressing relevant issues, treatment goals, interventions, and were overall inadequate. All PIP patients were also offered less than the required 20 hours of structured treatment, including core treatment. Most concerningly, however, is that due to staffing shortages, PIP patients did not receive initial primary clinician assessments upon admission and did not receive routine primary clinician contacts during the review period. Patients were only provided routine primary clinician contacts when clinically indicated at IDTT; however no observed IDTTs discussed assignment of individual therapy.

There continued to be a lack of treatment space, lack of resources for provided treatment, and lack of documentation of required treatment offerings, including individual treatment provided to patients during the review period. Staffing shortages continued to prevent the implementation of the STEP program at CMF-PIP and had a significant impact on the use of behavioral planning as staff needed to prioritize patient caseloads. Although this report notes some positive aspects to treatment provided at CMF-PIP during the Thirty-First Round where

appropriate, mental health services provided to *Coleman* patients continued to be noncompliant with Program Guide requirements.

## I. SUMMARY OF THE FINDINGS

- On September 13, 2024, CMF-PIP operated 396 beds. Of 218 acute care beds, 116 or 53 percent were filled, as were 90 of 178 or 51 percent of intermediate care beds, for a total of 206 total PIP patients. The acute care population included 16 maximum custody patients and the intermediate care population included 20 maximum custody patients.

- The institution continued to experience severe staffing shortages that had not improved since the prior site visit. Among other vacancies, there was a 16 percent functional vacancy rate for psychiatrists, 46 percent functional vacancy rate for psychologists, 56 percent functional vacancy rate for social workers, and 26 percent functional vacancy rate for recreation therapists.

- CMF-PIP did not utilize any tele-mental health during the review period.

- Caseload ratios for all disciplines in acute care facilities were all within established ratios except for primary clinicians in maximum custody unit, Q-3. Caseload ratios for psychiatrists, primary clinicians, and recreation therapists were within established limits in all intermediate care facilities.

- There were only five permanent full-time psychiatrists positions filled while registry staff maintained an additional 25.4 positions. There were only six total full-time permanent primary clinician positions at CMF-PIP, including both psychologists and social workers.

- Due to the significant staffing vacancies that continued from the prior round, CMF-PIP adopted a group-based triage plan model that involved each primary clinician providing five 1-hour groups per week, which included one group for their assigned caseloads patients. Regularly scheduled individual clinical contacts with their caseload patients only occurred when determined by the IDTT to be clinically indicated.

- Leadership reported that patients were typically seen by their primary clinician during weekly caseload groups. It was reported that these groups were stand-alone groups, meaning that group content was not contingent on previous groups.

- All acute IDTTs were held in confidential space with required staff in attendance. Observed IDTTs varied in adequacy, however across all IDTTs there was much need for improvement, particularly around collaboration and content.

- Like the observed IDTTs for acute care patients, adequacy for intermediate care IDTTs varied by housing unit but all required staff were in attendance. The IDTTs observed on A2 and P3 were problematic as they did not discuss relevant aspects of the treatment planning processes including goals, interventions, and treatment outcomes. The IDTTs observed on unit A3 were generally very good.

- During the review period, acute care patients were only offered an average of 8.41 hours per week of structured treatment. Acute care patients reportedly attended an average of 4.6 hours per week and refused an average of 3.81 hours of structured treatment per week. Quality of observed acute care groups was very good.

- Intermediate care patients were only offered an average of 7.83 hours of structured treatment per week. Intermediate patients attended an average of 4.31 hours per week. Quality of intermediate care groups was adequate.

- During the review period there were a total of 20 NLTG groups offered to PIP patients with 11 groups offered to acute care patients and nine groups offered to intermediate care patients.

- Consistent with case review findings and contact compliance, mental health leadership confirmed that primary clinicians were not completing initial assessments for acute or intermediate care patients during the review period.

- Leadership reported that individual therapy was assigned as clinically indicated during IDTT, however no observed IDTTs discussed assignment of individual therapy.

- Patients reported that individual clinical contacts with their primary clinicians were available on an as-needed basis. Acute and intermediate care patients reported receiving at least a weekly clinical contact with their psychiatrists.

- The monitor's expert randomly selected five cases each from the acute and intermediate levels of care; within intermediate, a mix of cases were taken from dormitory, multi-person cells, and single-celled patients. Of these cases, six were adequate, and four were inadequate.

- Unfortunately, the monitor's expert observed a multitude of inadequacies in the medication management of these selected cases. Several cases displayed problems, but did not rise to the level of rendering the medication management inadequate.

Examples of inadequacies related to medication management included lack of rationales for medication changes, hesitancy in providing PC 2602 orders when clinically indicated, documentation concerns, and lack of continuity of care with psychiatry.

- The institution did not have a Positive Behavioral Support Team (PBST) LOP during the review period. Since the previous monitoring round, there was a small increase in access to behavioral planning, however, patient need continued to outweigh access.

- The mental health program subcommittee meeting minutes consistently documented that the STEPS program was not implemented due to staffing shortages, particularly supervisory staff.

- Of the 303 referrals to CMF-PIP during the reporting period, 206 were for acute care and 97 were for intermediate care. For acute care referrals, 99 percent were timely transferred within ten days. For intermediate care referrals, 92 percent transferred timely within 30 days.

- Of the 206 acute patient referrals 193 were admitted, four were rescinded, and nine were rejected. Regarding the 97 intermediate care referrals, 80 were admitted, seven were rescinded and ten were rejected.

- Three hundred and thirty-five patients discharged from CMF-PIP during the reporting period, of this number 238 were acute care and 97 were intermediate care.

- Thirty-two intermediate care patients were in out of level housing, eight of whom required locked dorms, two required multi-person cells and 22 have a custodial LRH of unlocked dorms.

- There were 240 incidents of placing patients on observation status but no uses of restraints, timeout cells, or seclusion rooms.

- Four incidents involving mental health patients required emergency medical response during the review period. There were no deaths.

- Similar to the prior review period, CMF-PIP did not have a functioning QM program which was attributed to staffing shortages. There were several areas of concern identified during the site visit where quality management projects would be helpful. There were no corrective action plans initiated.

- Due to staffing shortages, no pre-release groups were offered.

- CMF-PIP patients were not provided with jobs, but one person was enrolled in educational classes.

## II. CENSUS

On September 13, 2024, CMF-PIP operated 396 beds. Of 218 acute care beds, 116 or 53 percent were filled, as were 90 of 178 or 51 percent of intermediate care beds, for a total of 206 total PIP patients. The acute care population included 16 maximum custody patients and the intermediate care population included 20 maximum custody patients.

Of the 178 intermediate care beds, 94 were single cells, 20 were multi-person cells, and 64 were locked dorms. Of the 94 single cell beds, 30 were on the intermediate care unit that is clustered with maximum custody patients and 64 beds were in the High Custody Intermediate Treatment Center (HCITC) unit. Thirty-two of the 64 HCITC beds were single-celled while 16 were used to quarantine newly admitted patients, and the remaining 16 were classified as COVID-19 isolation beds.

For the 218 acute care beds, there were six housing units, each with 30 beds.

Beds identified as flex beds were consistently assigned to intermediate care patients and not designated for use by patients at the acute care level.

## III. STAFFING

### 1. Administrative, Clinical, and Correctional Staffing

On November 25, 2024, the institution produced staffing data which indicated that all four program director positions were filled, as were one of two program assistant positions.

Chief Psychiatrist: This position was filled.

Senior Psychiatrist Supervisors: One of two positions were filled.

Psychiatrists: Six of 28.7 allocated psychiatrist positions were filled, resulting in a vacancy rate of 79 percent. Registry staff filled 18.15 psychiatry positions which reduced the functional vacancy rate to 16 percent.

Chief Psychologist: This position was filled.

Senior Psychologist Supervisors: One of four allocated senior psychologist supervisor positions were filled resulting in a 75 percent vacancy rate.

Senior Psychologist Specialists: Six of eight allocated senior psychologist specialist positions were filled resulting in a 25 percent vacancy rate.

Psychologists: There were 29.9 allocated psychologists positions of which three were filled, reflecting a 90 percent vacancy rate. An additional 13.25 registry staff reduced the functional vacancy rate to 46 percent.

Supervising Psychiatric Social Workers: One of two positions were filled.

Social Workers: Of 24.9 allocated social worker positions, four were filled for an 84 percent vacancy rate. Registry staff filled an additional 7.88 positions and one permanent social worker was on long term leave, resulting in functional vacancy rate of 56 percent. One social worker was unlicensed.

Recreation Therapists: Six of 27.5 recreation therapist positions were filled for a 78 percent vacancy rate. Registry staff filled an additional 14.25 positions, reflecting a functional vacancy rate of 26 percent.

Supervising Registered Nurses (SRN): 39 of 45.6 allocated supervising registered nurse II positions were filled for a vacancy rate of 14.5 percent.

Registered Nurses (RN): 168 of 176 allocated registered nurse positions were filled resulting in a five percent vacancy rate. An additional four positions were filled using registry

staff and one permanent registered nurse position was on extended leave, reducing the functional vacancy rate to three percent.

Senior Psych Techs: Four of six allocated senior psych tech positions were filled for a vacancy rate of 33 percent. Staff acting out of class filled the two remaining positions which eliminated the functional vacancy rate.

OSS II: One of two allocated positions were filled.

AGPA: Eleven allocated AGPA positions were filled.

HPS I: This position was filled.

HPS II: This position was filled.

Clerical Positions: Thirteen of 25.9 allocated clerical positions were filled for a 50 percent vacancy rate. Two positions were on long term leave which increased the functional vacancy rate to 57.5 percent.

Correctional Staff: The warden, chief deputy warden, and all five associate warden's positions were filled. For captains, five of six positions were filled for a 17 percent vacancy rate. For lieutenants, 29 of 30.2 positions were filled for a four percent vacancy rate. For sergeants, 85 of 87 positions were filled resulting in a two percent vacancy rate. There were five of six allocated CC II Supervisor positions filled, seven of eight CC II specialist positions filled, 22 of 24 CC I positions filled, and 727 of 731.4 correctional officer staff positions filled. There were 28 correctional officer staff on long term leave resulting in a four percent functional vacancy rate for correctional officers.

**2. Tele-Mental Health**

CMF-PIP did not utilize any tele-mental health during the review period.

### 3. Staff-to-Patient Ratios and the Adequacy of Clinical Staffing

As of September 13, 2024, caseload ratios for psychiatrists, primary clinicians, and recreation therapists in acute care housing units P-1, Q-2, S-1, and S-2 were all within established ratios. Caseload ratios for the acute care maximum custody unit, Q-3, slightly exceeded the 1:15 acute care patient ratio for primary clinicians. Caseload ratios for psychiatrists, primary clinicians, and recreation therapists were within established limits in all intermediate care facilities.

CMF-PIP maintained significant reliance on registry staff for psychiatric and primary clinician positions during the review period but reported that contracts for these positions did not exceed six months and did not obligate the staff to renew the contract or return on a full-time basis. Notably, there were only five permanent full-time psychiatrists positions filled while registry staff maintained an additional 25.4 positions. There were only six total full-time permanent primary clinician positions at CMF-PIP, including both psychologists and social workers.

The institution did not specifically address steps taken to alleviate this staffing concern during the review period.

## IV. TREATMENT, CLINICAL SERVICES, AND PROGRAMING:

Due to the significant understaffing that persisted from at least the two prior rounds, CMF-PIP adopted a group-based triage plan model for treatment beginning in October 2023, which included unit-based assignments of psychiatrists and primary clinicians. During the site visit, it was reported that this model involved each primary clinician providing five 1-hour groups per week, which included one group for their assigned caseloads patients. Regularly scheduled individual clinical contacts with their caseload patients only occurred when

determined by the IDTT to be clinically indicated. It was uncommon for patients to be regularly scheduled for individual primary clinician contacts.

Leadership reported that patients were typically seen by their primary clinician during weekly caseload groups. If patients missed their caseload group, they were seen individually. Primary clinicians also facilitated skills based clinical groups. It was reported that these groups were stand-alone groups, meaning that group content was not contingent on previous groups. This allowed patients to gain skills regardless of consistent group attendance or recent unit admission.

Observed treatment space on acute units included a confidential day room available for IDTTs, groups, and individual contacts; a confidential interview room with a therapeutic cubicle; and access to off-unit group rooms. Ceiling-mounted fixed security cameras were present in each of the acute day rooms visited; the special master's expert confirmed with custody and mental health leadership that no microphone or audio-surveillance system were installed in these day rooms. Adjacent to unit Q-3, where maximum security acute care patients were housed, there were several confidential group rooms, each with six to eight therapeutic cubicles and good visibility into them from the central hallway. Additionally, there were multiple group rooms available for PIP recreational groups in the O-wing centralized treatment center.

**1. <u>Interdisciplinary Treatment Team Meetings (IDTTs)</u>**

<u>Acute Care</u>

Fourteen IDTTs held for acute care patients were observed on Q1, Q2, Q3, and S1. All IDTTs were held in confidential space with required staff in attendance. However, in one IDTT on Q2, a correctional counselor was replaced with a custody officer in which leadership indicated

was acting as the "custody representative." This officer did not participate but stayed in the room during the ensuing IDTTs.

Observed IDTTs varied in adequacy, however across all IDTTs there was much need for improvement, particularly around collaboration and content. During most IDTTs, treatment team members waited to be prompted by the primary clinician before participating, and when they did participate, input was nominal. This lack of spontaneous participation led to minimal collaborative discussion of the patient's symptoms, functioning and treatment planning. The primary clinician provided a brief review of mental health treatment history and reason for admission, but comprehensive psycho-social history and case conceptualization was needed. Psychiatric medications were reviewed by the psychiatrist and the patient was given an opportunity to ask questions. Treatment team members were responsive to the patient's mental status. Patient understanding of diagnosis was discussed, however discussion of functional impairment varied. Treatment goals were identified but varied in measurability. Discussion of patient group participation also varied but when discussed it was not clearly or consistently tied to treatment goals.

Additionally, least restrictive housing, progress toward treatment goals, interventions to achieve goals and group assignment, including NLTG groups were not discussed. When clinically indicated, safety planning was not discussed. For maximum custody patients, treatment goals that clearly targeted contributing factors to the patient's maximum custody status were not discussed.

During the review period, acute care patients were required to receive an initial IDTT within 72 hours of arrival and every seven calendar days thereafter during the patient's stay.

Thirty acute care patients who required initial IDTTs during the review period were selected to review compliance with required timeframes.

Of the 30 acute care patients, 29 or 97 percent occurred within 72 hours of arrival. Patients were in attendance for 28 or 93 percent of initial IDTTs while the required staff were in attendance for 26 or 87 percent of initial IDTTs. The registered nurse was absent in three of these four initial IDTTs.

Thirty additional acute care patients who required routine IDTTs during the review period were also selected to review compliance with required timeframes. Of the 87 expected timeframes, 84 or 97 percent occurred timely. Of the 116 IDTTs reviewed, patients were present in 94 or 81 percent while required staff were present in 85 or 73 percent. Notably, the registered nurse was absent in 26 of 31 or 84 percent of routine IDTTs where the required staff was not present.

Although initial and routine IDTTs were timely, adequacy varied across the fourteen observed IDTTs for acute care patients, the IDTTs failed to discuss required topics and needed improvement particularly with collaboration and content. As a result, IDTTs provided to acute care patients during the review period were not complaint.

Intermediate Care

Twelve intermediate care IDTTs were observed on units A2, A3, and P3 during the site visit. Like the observed IDTTs for acute care patients, adequacy varied by housing unit. The IDTTs observed on A2 and P3 were problematic as they did not discuss relevant aspects of the treatment planning processes including goals, interventions, and treatment outcomes. The IDTTs observed on unit A3 were generally very good.

In all housing units, patients were in attendance and were sufficiently engaged throughout the meeting. The treatment space was confidential and of sufficient size for the intended purpose. In units A2 and P3, the degree of collaboration among the team members and quality of treatment planning discussed during the IDTTs varied depending on the particular treatment team. Although diagnoses were discussed with patients during the IDTTs and there appeared to be team agreement regarding diagnoses, there was little discussion of measurable treatment goals to address the diagnoses. Discussion regarding treatment targets and interventions to achieve treatment goals was also minimal in these two housing units. Effective communication was notably underutilized, which was concerning given that effective communication ensures that patients understood the IDTT discussion and meeting outcomes. Additionally, interventions initiated or adjusted to address ongoing or newly identified obstacles to treatment progress generally did not occur.

Level of care transition planning took place in multiple IDTTs on unit P3 during the site visit. For one patient who was returning to EOP level of care, the primary clinician presented the patient's continuing symptoms and safety plan to the treatment team and indicated that the safety plan would continue to his lower level of care. The specific goals of the safety plan and interventions to achieve those goals were not discussed or changed based on the reduction in level of care. Similarly, a different patient was transitioning to EOP level of care, however the clinician did not identify what goals that the patient met that qualified him for a reduction in level of care. The clinicians did not discuss his previous EOP group attendance or any expectations for the patient to manage once discharged.

During the review period, intermediate care patients were required to receive an initial IDTT within 72 hours of arrival and every 30 calendar days thereafter during the patient's stay.

Thirty intermediate care patients who required initial IDTTs during the review period were selected to review compliance with required timeframes. Of the 30 reviewed patients who received an initial IDTT, only two or seven percent were timely and required staff were present for 27 of 30 or 90 percent.

Thirty patients required routine IDTTs. There were 100 expected timeframes, of which 99 were timely while 96 had the patient present and 93 included the required staff.

Although the treatment teams were clearly knowledgeable and had demonstrated rapport with the patients, most meetings lacked case conceptualizations, discussion of measurable treatment goals, group participation, and least restrictive housing. Because IDTTs were inadequate in most observed housing units during the site visit and only seven percent of initial IDTTs were timely, intermediate care IDTTs were not compliant during the review period.

**2. <u>Group Therapy</u>**

The institution was required to offer PIP patients at least 20 hours of structured therapeutic activities per patient per week, ten hours of which must be core treatment. *See* ECF No. 7924 at 10 (citing "[d]efendants shall immediately adopt and implement in the CDCR PIPs the minimum treatment standards set out in the DSH CQI process approved by the court.*"); see also* ECF No. 7812-1 at 15 (stating "that [the DSH CQI] process…provides that patients will be offered 20 hours of treatment per week, at least ten hours of which are to be 'core treatment'."). The remaining ten hours offered to patients must consist of supplemental treatment and cannot include offered yard or day room activity. Because core treatment hour requirements can include individual treatment, compliance is assessed as a totality of treatment offered to the patient on average per week. *See* ECF No. 7812-1 at 15.

Acute Care

During the review period, acute care patients were scheduled for an average of 12.98 hours per week of structured therapeutic activities but were only offered an average of 8.41 hours per week of structured treatment. Acute care patients reportedly attended an average of 4.6 hours per week and refused an average of 3.81 hours of structured treatment per week. Although the offering of 8.41 hours per patient per week of structured treatment was an increase from the weekly offering of 4.48 hours in the Thirtieth Round, the amount of treatment offered was insufficient for an acute care program. Group cancellations were not common during the review period and generally occurred due to staff illness or custody issues.

Although the quantity of structured treatment offered to acute care patients was deficient, the quality of acute care groups was positive overall. However, both staff and patients confirmed that groups generally started late which affected patient treatment schedules if they were assigned to back to back groups or individual contacts. Patients and staff also reported that there were significant attendance concerns during the review period. This was due to group and yard occurring at the same time which required patients to choose between structured and unstructured activities. There were no groups offered in foreign languages.

Two clinician led treatment groups were observed on units S2 and Q1 during the site visit. The groups were held in confidential treatment spaces and the rooms were of adequate size for the intended purpose. Attendance was moderate with six patients in unit S2's group and five patients in unit Q1's group. The group on S2 focused on the topic of forgiveness. Patients observed a video during the group and received a handout to guide the discussion throughout different points of the video. The group on Q1 began with a meditation exercise which was followed by discussion and education on the mind-body connection. This was followed by a Ted

Talk on self-care which was paused at opportune times to discuss various points. Both groups were excellent in content and clinician relatability and competency. Group members were actively engaged and participated with ease during the groups.

Three recreation therapy groups were also observed on units P1, Q1, and Q3 during the site visit. All three groups were facilitated by a different recreation therapist. Group leaders were prepared with appropriate content and were skilled in facilitating group discussion. Group leaders knew the patients well and created a comfortable semi-structured environment for group participants who were engaged and participated with ease. The group on P1 opened with an activity in which each patient selected a song and while the song was playing patients drew what they thought of during the song which was then discussed before moving on to the next song selection. This was followed by a Ted Talk on vulnerability that was processed with patients. The group on Q1 focused on teaching stress management techniques through guided viewing and discussion of videos instructing viewers in behavioral relaxation skills, including yoga. The group on Q3 began with a check-in and was followed by an educational discussion and skill application of a handout on a "growth mindset." All three groups were excellent and could be considered core groups.

Acute care patient interviews reflected that patients were satisfied with their group treatment but consistently reported across multiple housing units that they wanted more out-of-cell time. Acute care patients reported that due to space constraints, there was no day room because the space was used for group treatment. This forced patients to stay in their cells for most of the day. Patients indicated that groups felt forced because the only time that they could use the day room was to have groups and not have unstructured recreational time to interact with others.

Though the quality of groups was adequate, the amount of group treatment offered to acute care patients at CMF-PIP during the review period was insufficient for an inpatient program and fell short of the requirements of the court-approved PIP Minimum Treatment Standards.

Intermediate Care

Intermediate care patients were scheduled for an average of 12.14 hours per patient per week of structured treatment but were only offered an average of 7.83 hours of structured treatment per week. Intermediate patients attended an average of 4.31 hours per week. Of note, the institution reported that 4.17 hours of intermediate care group treatment was cancelled per patient per week during the review period.

Both core and recreation therapy groups were observed on unit P3 across three days during the site visit. All observed groups were held for approximately one hour and were held in confidential settings.

One observed core group, attended by three patients, was titled “Gratitude.” The group topic was relevant to all three patients. The group was run by a clinical social worker who asked open-ended questions about the definition of gratitude, positivity and focus. A clip from a motivational speaker was played, quotes were discussed and relevant handouts were distributed to the patients. The clinician had good rapport with each patient and made the group activity specific to their treatment plans, strengths, and behaviors while incarcerated. The patients stated they had attended the clinician’s group in the past, benefitted from the content, and would continue to attend in the future.

An additional core group was facilitated by a psychologist and had seven patients in attendance. The title of the group was “Change and Growth.” The clinician asked patient about

current events or news in their life and then discussed individual situations where the patient was either treading water or swimming toward a specific goal. The group was interactive with patients providing support and advice to each other and identifying areas in their own lives requiring more discipline or acceptance. The clinician established rapport with the patients, was able to firmly but appropriately state when a patient was being less than honest or when the patient was minimizing risk or their strengths. These patients reported the group made positive impacts on their lives and helped tolerate their incarceration.

A recreation therapy group was also observed. The recreation therapist had a calm demeanor, ensured engagement, explained the purpose of the games and allowed the patients to verbalize how their choices impacted their future. The recreation therapists group was relevant and life skilled based. Patients reported the recreation therapist groups were more beneficial than other recreation groups where the patients were left to play games or watch movies of questionable relevance to their treatment goals.

Interviewed patients reported that a vast majority of group treatment in the intermediate care program was completed by recreation therapists, however the quality of clinician-led treatment groups was reported to be good and beneficial. Patients expressed interest in group topics that more aligned with their diagnosis.

Although patients reported that they were offered ten hours per week of out-of-cell unstructured time in either the day-room or yard, they also expressed concern that it was common for this time to be scheduled at the same time as group therapy, which affected their attendance at groups.

Though the quality of groups was adequate, the amount of group treatment offered to intermediate care patients at CMF-PIP during the review period was insufficient for an inpatient

program. CMF-PIP should work to remedy unnecessary – and easily corrected – barriers to treatment participation, like scheduling conflicts between group treatment and other out of cell activities reported above.

Nursing Led Therapeutic Groups (NLTG)

NLTGs began at the CMF-PIP in 2022. During the review period there were a total of 20 NLTG groups offered to PIP patients with 11 groups offered to acute care patients and nine groups offered to intermediate care patients. However, during the review period NLTG groups were not offered to maximum custody patients on unit Q3 due to identified safety concerns. Additionally, due to the timing of groups and treatment space concerns, average attendance at NLTGs were reported to be very low.

One NLTG group was observed for acute care patients on unit S1 during the site visit. There were two RNs facilitating the group. The group was session two of a nine-week series of Mental Health and Wellness: Grief and Loss. The group included a series of questions related to the group topic, which was relatable for each patient as they had each experienced the loss of a family member. Nurses were empathetic, listened to each patient, and validated each patients feelings and concerns. Several other questions were asked of the patients which prompted discussion for the hour-long session.

Following the group, the CNE stated that typical NLTGs were not facilitated by multiple nurses. The CNE also reported efforts to create more discussion between the patients' primary clinicians and nursing staff to help integrate NLTGs into the treatment program on a consistent basis. She planned to reach out the Chief of Mental Health and other Chiefs of Mental Health to determine the best way to collaborate between clinical and nursing staff.

**3. Individual Treatment**

Acute Care

The Program Guide requires that acute care patients receive an initial psychiatric evaluation within 24 hours of arrival, every three days thereafter for the first thirty days, and then every seven days during their stay. Acute care patients are also required to receive an initial primary clinician evaluation within ten days of arrival and thereafter twice per calendar week.

Sixty acute care patients were reviewed to assess compliance with Program Guide timeframes during their stays.[45]

Thirty acute care patients who required initial psychiatry evaluations during the reporting period were randomly selected for review. All 30 patients received a timely initial psychiatry evaluation within 24 hours of arrival while 27 or 90 percent occurred in a confidential setting. Reasons for non-confidentiality included one patient refusal and two instances of nursing and custody staff present in the room for the evaluation.

A random sample of 30 acute care patients who required routine psychiatry contacts during the review period was also selected. There were 145 expected timeframes, 104 or 72 percent of routine psychiatry contacts occurred every three days for the first thirty days of inpatient care and then every seven days thereafter. Of the 145 reviewed contacts, 113 or 78 percent occurred in a confidential setting. Reasons for non-confidentiality included patient refusal and modified programming.

[45] These measures of compliance solely focused on the occurrence of a primary clinician or a psychiatric contact within the required timeframes and did not assess the quality of the contact. The indication of an initial assessment did not verify that a comprehensive initial assessment was completed during the first contact with the primary clinician or psychiatrist. Additionally, the review of routine primary clinician or psychiatric contacts did not distinguish between a brief check-in or a meaningful therapeutic contact.

The 30 randomly selected acute care patients who required initial psychiatry evaluations also required initial primary clinician evaluations during the reporting period. As alluded to below, no patients received initial primary clinician evaluations during the reporting period. *See infra* p. 269. However, of the 30 acute care patients reviewed, 26 or 87 percent received at least a contact with a primary clinician within ten days of arrival.[46] Lengths of time before a patient received a primary clinician contact upon arrival ranged from 24 hours to 42 days late. Fifty percent of these primary clinician contacts were conducted in a confidential setting. Reasons for non-confidentiality included patient refusal, lack of available treatment space, modified programming, custody concerns, enrollment in a discharge planning group, and two instances of provider initiated unplanned contacts.

Of the random sample of 30 acute care patients who required routine psychiatry contacts, 28 required routine primary clinician contacts. Therefore, two additional patients who required routine primary clinician contacts were randomly selected and added to the pool of patients. Across this sample of 30 patients, there were 117 expected timeframes, of which 57 or 49 percent timely occurred. Of the 109 primary clinician contacts reviewed, 41 or 38 percent occurred in a confidential setting. Reasons for non-confidentiality included patient refusals, modified programming, and custody presence in the treatment space due to the patient's maximum custody status.

---

[46] As noted below, the institution did not provide initial primary clinician evaluations during the reporting period and was therefore not compliant. However, to evaluate whether the patient received any contact with a primary clinician upon admission to the PIP, the monitor identified the first contact that was documented by the primary clinician following arrival. *See supra* p. 267 n. 45; *see also infra* p. 269.

Intermediate Care

The Program Guide requires that intermediate care patients also receive an initial psychiatric evaluation within 24 hours of arrival, every three days thereafter for the first thirty days, and then every seven days during their stay. Intermediate care patients are also required to receive an initial primary clinician evaluation within ten days of arrival and thereafter once per calendar week.

Sixty intermediate care patients were reviewed to assess compliance with Program Guide timeframes during their stays.[47]

Thirty patients required initial psychiatry evaluations during the review period. Fifteen or 50 percent were timely and 29 or 97 percent were conducted in a confidential setting. Reasons for nonconfidential evaluations were not stated.

Thirty patients required routine psychiatry contacts during the review period. One hundred and forty-three timeframes were expected and 117 or 82 percent occurred timely. Of the 143 routine psychiatry contacts reviewed, 113 or 79 percent were conducted in a confidential setting. Routine psychiatry contacts were nonconfidential due to patient refusals and modified programming.

Thirty patients required initial primary clinician evaluation during the review period. However, as alluded to below, no patients received initial primary clinician evaluations during the reporting period. *See infra* p. 269. Of the 30 patients who required an initial primary clinician evaluation, 13 did not receive any primary clinician contact upon arrival to the PIP until their first routine primary clinician contact. Of the 17 patients who did receive primary clinician

[47] *See supra* p. 267 n. 45.

contact upon arrival, 12 or 71 percent occurred within ten days of arrival[48] and 13 or 76 percent were conducted in a confidential setting. Contacts were nonconfidential due to patient refusals.

Thirty patients required routine primary clinician contacts during the review period. Seventy-nine timeframes were expected and 33 or 42 percent were timely. Seventeen routine primary clinician contacts were overdue. Of the 62 primary clinician contacts reviewed, 35 or 56 percent were conducted in a confidential setting. Routine primary clinician contacts were nonconfidential due to patient refusals.

Consistent with findings derived from the monitor's expert's clinical case reviews and review of patient records to evaluate timeliness of clinical contacts, mental health leadership confirmed that primary clinicians were not completing initial assessments for acute or intermediate care patients during the review period.

Leadership reported that individual therapy was assigned as clinically indicated during IDTT, however no observed IDTTs discussed assignment of individual therapy. Concerningly, staff reported that frequency of individual therapy was not tracked during the review period. Staff estimated that less than twenty percent of the PIP population, including both acute and intermediate care, were seen by a primary clinician individually during the review period.

Acute and intermediate care patients reported receiving at least a weekly clinical contact with their psychiatrists in a confidential setting; though some patients reported that confidentiality was at times an issue for individual contacts.

[48] As noted below, the institution did not provide initial primary clinician evaluations during the reporting period and was therefore not compliant. However, to evaluate whether the patient received any contact with a primary clinician upon admission to the PIP, the monitor identified the first contact that was documented by the primary clinician following arrival. *See supra* p. 267 n. 45.

CMF-PIP could not indicate the number of individual treatment hours offered to acute or intermediate care patients during the review period as the institution did not track this information. Of concern, primary clinician contacts were provided on an as-needed basis with clinical "check-ins" occurring during group therapy. As the institution only offered acute patients an average of 8.41 hours of structured treatment, intermediate patients an average of 7.83 hours of structured treatment and did not measure the offering of individual structured treatment, CMF-PIP was not compliant with its requirements to offer patients at least 20 hours of structured therapeutic activities per week during the review period. At a minimum, the lack of initial assessments and offering of primary clinician contacts on an as-needed basis is woefully inadequate in an inpatient setting.

**4. Solo Programming**

Solo programming did not occur during the monitoring round.

**5. Medication Management**

The monitor's expert reviewed the healthcare records for ten patients in order to assess the quality of medication management at CMF-PIP. The monitor's expert randomly selected five cases each from the acute and intermediate levels of care; within intermediate, a mix of cases were taken from dormitory, multi-person cells, and single-celled patients. Of these cases, six were adequate, and four were inadequate. This represented an incremental improvement from the preceding monitoring round in which four were adequate and six were inadequate, but did not rise to the level of compliance with medication management requirements.

CMF-PIP had positive aspects regarding the medication management of patients. Initial psychiatric evaluations were completed timely, with most being comprehensive and painting a clear clinical picture of the patient, with exceptions discussed below. Additionally, in contrast

with the preceding monitoring round, none of the records reviewed reported that the psychiatrist conducted their follow-up visits within the IDTT. Psychiatrist screened for and, when indicated, addressed medication side effects. As observed in the preceding monitoring round, CMF-PIP often considered the use of long-acting injectable antipsychotics, and initiated them when appropriate. Despite demonstrated benefits, including increased medication adherence and reduced rates of hospitalization, these medications are frequently under-utilized in many healthcare systems.

Unfortunately, the monitor's expert observed a multitude of inadequacies in the medication management of these selected cases. Several cases displayed problems, but did not rise to the level of rendering the medication management inadequate.

In one case, a crucial antipsychotic medication for the patient simply disappeared from one psychiatry note on April 10, 2024 to the next on April 19, 2024. In searching the nursing records, the medication was listed on April 12, 2024, but then subsequently disappeared. The documentation did not mention a change to this medication; it is unclear if the order for this medication unknowingly expired.

In some instances, CMF-PIP made rapid medication changes, used multiple antipsychotic medications at the same time, with the medication plan differing based on the psychiatrist seeing the patient that day. In one case, a patient was prescribed a total of seven different antipsychotics in less than two months' time. Multiple antipsychotic medications were administered at the same time, with inadequate time for many of the trials to gauge efficacy. A psychiatry note mentions an eighth antipsychotic given by injection, but the monitor's expert believed this was in error, as the medication is not routinely available in this formulation in the United States. In one concerning example, a psychiatrist started an antipsychotic, yet a different psychiatrist changed

to another antipsychotic the subsequent day. The justification for doing so was inadequate as the first antipsychotic required food for absorption, however the second psychiatrist noted that the patient wasn't eating enough so they changed the medication. This case exemplified the importance of continuity of care with psychiatry, and the need for a clear medication plan for covering psychiatrists to follow, barring clinical urgency to deviate from the plan.

In other cases, the medication plan in the patient's medical record did not comport with what was done. An intermediate care patient was admitted on a low-dose antidepressant. The admitting psychiatrist mentioned a plan to wean off the medication; however, the medication continued for 153 days from the time of admission through the end of the review period. On July 23, 2024, another psychiatrist added on a second antidepressant, continuing the other antidepressant at a low dose. Standard practice would be to optimize the dose of one antidepressant, prior to the addition of another. While there could be clinical situations in which starting a second medication would be indicated, the psychiatrist should have documented this rationale clearly in the chart.

In this same case, the diagnosis of the patient was unclear despite being in the hospital for approximately five months. Diagnosis is central to guiding treatment. If the diagnosis was still unclear after a five-month stay, the treatment team should have considered how to clarify the diagnosis (e.g. through psychological testing).

**a. <u>Clozapine</u>**

Clozapine is a potentially life-saving medication whose use requires close monitoring due to potentially fatal side effects. CMF-PIP did not report the number of patients taking clozapine. None of the patients reviewed below were prescribed clozapine during the monitoring period.

**b. PC 2602 Medication Orders**

The right to refuse medication, or whether medications may be given involuntarily under court order, strike at core clinical and legal issues in psychiatric treatment. CMF-PIP reported 130 patients received involuntary medication under the PC 2602 process during the reporting period. The institution filed 33 initial emergency, 21 initial non-emergency, and 76 renewal petitions; all petitions were granted. There were no cases of planned non-renewal, nor any cases that expired due to administrative error.

The Medication Court Administrator (MCA) role was filled by a Staff Services Analyst (SSA) who had been serving in that full-time position for approximately three years. They reported no barriers in interfacing with the Office of Legal Affairs, Office of Administrative Hearings, or the Administrative Law Judges. Hearings were conducted virtually, with the MCA and the plaintiff's counsel present on-site. While some PC 2602 were handled appropriately, the monitor's expert observed serious concerns in one PC 2602 case.

On a positive note, following an acute care patient attacking multiple other patients, the institution promptly filed an initial emergent petition. However, another raised multiple concerns. The patient was admitted for acute care at CMF-PIP on March 4, 2024, in part due to concern for violence towards others. On March 8, 2024, psychiatry prescribed an antipsychotic medication, which the patient began to refuse. On March 19, 2024, notes indicated that the psychiatrist was considering an initial non-emergent PC 2602 petition. A note from April 24, 2024 stated that psychiatry would file a PC 2602 for grave disability, while a note from April 30, 2024 stated that the patient was still being evaluated for involuntary medications. On May 7, 2024, notes reflected threats and intimidation to staff. The note once again documented a plan to file a PC 2602 petition. On May 29, 2024, 82 days after the prescription of the antipsychotic, the

psychiatrist's note stated that the petition was filed for grave disability and danger to others, with a hearing scheduled in mid-June 2024. The hearing on June 19, 2024 was postponed until July 2, 2024, due to the patient's attorney's request. On July 2, 2024, the hearing started, yet was postponed until August 6, 2024 so that the patient would have time to obtain and review his medical records. On August 6, 2024, the hearing was postponed until September 3, 2024, as the patient did not receive his records. At the time of that hearing, the patient had still not received his records, and the hearing was postponed to October 1, 2024. During that time, the patient threatened a group leader on September 6, 2024, yet the petition was not changed from a non-emergent to an initial emergent. On October 1, 2024, the petition was granted, 207 days after the psychiatrist prescribed the antipsychotic. Psychiatry promptly started the antipsychotic. The patient was discharged on October 31, 2024, due to clinical improvement with medications.

This case displayed multiple problems, which resulted in direct clinical impacts to the patient, and increased level of risk to patients and staff. The psychiatrist's delay in filing the initial non-emergent PC 2602 hearing was deeply concerning. Even after repeatedly intimidating a staff member, the petition was not filed until 22 days later. This echoes findings from the preceding monitoring round, in which two cases reviewed had delays in filing PC 2602 petitions. The delays in the patient obtaining his records was also troublesome. While some notes documented that this was due to the patient not submitting required paperwork, there was scant documentation regarding the treatment team working with health information services, regional staff, or legal affairs. The monitor's expert was cognizant that CDCR was not responsible for the patient's attorney's request for delay, nor the Administrative Law Judge's decision to postpone hearings. However, the patient remained in the PIP for 207 days prior to receiving the needed

medication. After a mere 30 days of treatment with the medication, the patient improved and was able to discharge to a lower level of care.

#### c. Documentation Concerns

Documentation concerns remained, similar to the prior monitoring round. The initial psychiatric evaluations in multiple cases had excessive information carried forward, rendering it difficult to discern which information was current.

### 6. Positive Behavioral Support Team

The institution did not have a Positive Behavioral Support Team (PBST) LOP during the review period. Since the previous monitoring round, there was a small increase in access to behavioral planning, however, patient need continued to outweigh access. The CMF-PIP assigned two psychologists to the institution's Positive Behavior Support Team (PBST) who accepted referrals from all levels of care at CMF. PBST staff described their role as providing consultation, complete behavioral plans, and train staff on ways to work with patients with challenging behaviors. This was not a clearly dedicated position as the same staff also assisted in the MHCB, with the completion of RVRs and discharge planning.

Behavioral plans are an individualized treatment intervention that target a pattern of self-harm or other frequent dangerous behavior which often precipitates inpatient treatment. During the review period, the PBST received two referrals for PIP patients, suggesting that the PBST team was underutilized in the PIP.

Written referrals to PBST for two acute care patients were reviewed. Both were appropriately referred by the same psychologist. While there was an indication of the referral in the patient's healthcare record documentation, a copy of the written referral was not located in the healthcare record. This referral was obtained on site. Although staff reported that behavior

plans for these patients were not developed, documentation in the healthcare record indicated otherwise. One behavior plan was located within primary clinician documentation, while the other was not located but there was reference to a behavior plan within provider documentation. Both plans targeted behavior change; however, rationale was not documented.

In addition to the lack of a policy and procedure for utilization of the PBST, another shortcoming was the lack of continuity of behavior plans. Specifically, when a plan was developed for a patient at the acute level of care, there was no mechanism to continue the plan when the patient's level of care changed.

**7. Maximum Custody**

As of the date of the site visit there were 16 acute and 20 intermediate care patients on maximum custody status. Acute care maximum custody patients were housed on unit Q3 while intermediate care maximum custody patients were housed on unit P3.

CMF-PIP provided a sample of 52 patients who were placed on maximum custody during the review period. These patients had lengths of stay ranging from three to 655 days and averaged 103 days. Forty-five of the 52 patients were retained on maximum custody due to their SHU offense; four patients had their custody level reduced upon transfer, two patients had their custody level reduced due to their enemy concerns being isolated to other institutions, and one patient was reduced to allow for access to programs.

Interviewed maximum custody patients reported less frequent provider contacts and consistent with IDTT observations, noted that treatment goals identified in patient treatment plans did not target clinical factors that resulted in maximum custody placement. Staff reported that treatment hours offered to patients were often dependent upon the patient's maximum custody status during the review period.

Treatment space for maximum custody patients included several confidential group rooms, each with six to eight therapeutic cubicles and good visibility into them from the central hallway.

## V. PATIENT ACCESS TO TREATMENT

### 1. System to Encourage Progress (STEP) Program

The mental health program subcommittee meeting minutes consistently documented that the STEPS program was not implemented due to staffing shortages, particularly supervisory staff. It was also noted that the policy was being rewritten and was due in March 2024, however no update or status of the policy was documented through July's meeting documentation.

Notably, there was discussion during observed IDTTs and documentation in healthcare records that treatment teams sporadically placed patients in STEP levels, despite no available incentives.

## VI. REFERRALS AND TRANSFERS

To prevent "significant and unacceptable delays" in inpatient care, patients referred to a PIP must be transferred within required transfer timelines. The Program Guide governs all inpatient transfer timelines after a patient's interdisciplinary treatment team refers a patient to inpatient care and the inpatient program accepts the referral. See ECF No. 7333-1 at 19. The required timelines for the transfer are dependent on the patient's level of care. For acute patient placement, the transfer must occur within 10 days of the IDTT referral, regardless of the inpatient program's acceptance date, and within 72 hours of bed assignment. *See Id*. For intermediate care placement, the transfer must occur within 30 days of referral, regardless of the acceptance date, and within 72 hours of bed assignment. *See Id.*

There were 303 referrals to CMF-PIP during the reporting period. Of the 303 referrals, 206 were for acute care and 97 were for intermediate care. There were 111 fewer referrals and 74 fewer admissions to the CMF-PIP than reported in the previous monitoring round. The institution was unable to provide dates on which the referral was received to determine compliance with policy requirements.

Of the 206 acute patient referrals 193 were admitted, four were rescinded, and nine were rejected. Regarding the 97 intermediate care referrals, 80 were admitted, seven were rescinded and ten were rejected.

There were five acute care patients and four intermediate care patients on the waiting list, all were within transfer timelines.

Sixteen patients with complex medical needs were referred to CMF-PIP; eight were accepted when their medical issues were resolved; the remaining eight patient referrals were rescinded.

There were no referrals to the PIP from a SHU term in EOP.

The institution was compliant with timely referrals and transfers to CMF-PIP during the review period.

## VII. ADMISSIONS AND DISCHARGES

### 1. Admissions

For acute care referrals, 99 percent were timely transferred within ten days, or from completed referral at IRU to admission. The average transfer time from CMF-PIP acceptance to admission was 1.4 days. The average length of stay for acute patients during the reporting period was 71.8 days, with a range of 15 to 203 days.

For intermediate care referrals, 92 percent transferred timely within 30 days, or from the date that mental health IRU referral was completed. The average time for transfer from CMF-PIP acceptance to admission was 1.4 days with 94 percent of the transfers timely. The average length of stay for intermediate care patients was 82.2 days with a range of five to 204 days.

All acute and intermediate care rejections and rescissions were timely.

The institution was compliant with timely admissions to CMF-PIP during the review period.

**2. Discharges**

There were 335 patients discharged from CMF-PIP during the reporting period, of this number 238 were acute care and 97 were intermediate care. The average length of stay for acute care patients was 122 days with a range of 15 to 1,574 days. The average length of stay for intermediate care patients was 209 days with a range of five to 1,177 days. Seventy-seven or 32 percent of acute care patients took longer than 72 hours to physically discharge after clinical discharge while 27 or 28 percent of intermediate care patients took longer than 72 hours.

Staff attributed extended PIP stays to wanting to provide additional treatment or prolonged investigations related to safety concerns.

Because 32 percent of acute care patients and 28 percent of intermediate care patients took longer than 72 hours to physically discharge after clinical discharge, CMF-PIP was not compliant with program guide discharge requirements during the review period.

## VIII. LEAST RESTRICTIVE HOUSING

There were 32 intermediate care patients in out of level housing, eight of whom required locked dorms, two required multi-person cells and 22 have a custodial LRH of unlocked dorms.

Concerningly, LRH was not discussed during any of the IDTTs observed.

## IX. PATIENT DISCIPLINARY PROCESS

The CMF-PIP issued 66 RVRs to 55 acute care patients and 11 intermediate care patients during the review period. The monitor reviewed a random sample of 20 RVRs. Custody staff timely referred the mental health assessment to mental health staff in nine of 20 or 45 percent of cases. Mental health staff timely completed and returned the assessment to custody in 19 of 20 or 95 percent of cases.

Of the reviewed sample, 16 or 80 percent of mental health assessments were completed confidentially. Patients agreed to cell-front interviews in two cases and refused the interview in the remaining two cases. Nineteen of 20 or 95 percent of reviewed RVRs indicated the assignment of a staff assistant.

The mental health assessment recommended penalty mitigation in all 20 reviewed cases, which the senior hearing officer always documented consideration. The senior hearing officer mitigated penalties in all 20 cases.

Eighteen cases were reviewed where the patients' RVRs were reportedly recommended to be documented in an alternative manner but the senior hearing officer proceeded with the hearing. In three cases, the hearing was postponed pending DA referral and in one case the senior hearing officer did not document the outcome. For the remaining cases that were heard, the senior hearing officer documented consideration of the MHA, and the SHO found each patient guilty. However, the SHO did not take away any privileges that the clinician recommended for mitigation.

The institution did not provide data for mental health staff members who completed the RVR MHA training. For custody staff, the chief deputy administrator, three of four correctional

administrators, all captains, all correctional counselor's and 30 of 31 lieutenants completed the training, as did 74 of 78 sergeants, and 543 of 589 or 92 percent of custody officers.

Although the institution was compliant with patient disciplinary training during the review period, it was not compliant with patient disciplinary process requirements.

## X. USE OF FORCE

There were no controlled and 62 immediate use of force incidents during the review period. The monitor's video review of 12 immediate use of force incidents revealed compliance with relevant policy.

CMF-PIP reported that 97 percent of custody staff and 100 percent of mental staff completed required use of force training.

The institution was compliant with use of force policy and staff training requirements during the review period.

## XI. PIP MAXIMUM CUSTODY REDUCTION ICC REVIEWS

CMF-PIP could not indicate the number of patients who received a 128G Chrono that was completed following IDTT recommendations to reduce a patient's maximum custody designation.

A sample of 20 maximum custody patients ICC Chronos were reviewed to assess whether the patient received an initial ICC meeting within the 10-day time period. All twenty reviewed patients received a timely initial ICC. Also, these patients had follow-up ICCs within 30 to 60 days. The CC II explained that patients are either seen within 30 days, 60 days, or 90 days depending on their individual projected MERD or regarding their disciplinary history. The CC II further explained that patients with the more severe cases such as attempted murder are seen prior to 90 days and patients with no disciplinary history are likely seen within 30 days.

Compliance with PIP maximum custody reduction review requirements was not discernable during the review period.

## XII. USE OF OBSERVATION CELLS/ROOMS, SECLUSION, AND RESTRAINT

Leadership staff reported that there was no use of restraints, timeout cells, and/or seclusion rooms during the review period. However, during the monitoring period there were 240 uses of placing patients on observation status (usually during nonbusiness hours), which involved the patient being confined to his cell and constantly observed by a staff person as well as the on-call psychiatrist assessing the patient within four hours of such a placement. The institution did not have a local operating procedure, which would guide staff in delineating between the use of observation cells and seclusion.

In addition, during the monitoring period there were 141 patients placed on suicide precaution and another 147 uses of suicide watch.

Of note, during the review period, there were three incidents revealed through both patient interviews and in two different case reviews of the use of "cuff status," akin to the now discontinued Discretionary Program Status (DPS). A patient described the use of "cuff status" as punitive in nature as it occurred after he flooded his cell. This status lasted for several weeks during which time he was restricted to his cell and unable to attend yard or treatment groups. The interviewed patient indicated that he was unaware of criteria he had to engage in to be released from cuff status.

## XIII. EMERGENCY RESPONSE AND THE DEATH REVIEW PROCESS

### 1. Emergency Response

There were four incidents, involving mental health patients that required emergency medical response. All four incidents were reviewed by the emergency medical response review

committee (EMRRC). The incidents included an incident of multiple superficial cuts and significant bleeding, two incidents of hunger strike, and a neck laceration. The EMRRC noted inconsistent nursing and medical documentation regarding the neck laceration incident. There were no comments or other analysis regarding the three other incidents. EMRRC meeting attendance requirements were suspended due to critical staffing vacancies although the chief psychiatrist continued to attend these meetings.

SPRFIT meeting minutes for the monitoring period were reviewed. Of note, two PIP-related topics were placed on hold due to limited staffing in the institution, including ensuring that a safety plan was being completed and reviewed by supervisor and ensuring that suicide risk evaluation mentoring was being provided in the PIPS. Staff reported that a modified mentoring program has been implemented in recent months. Additionally, SRE timeline plan measurements were problematic due to errors in reporting.

Due to the critical staffing vacancies that prevented attendance at EMRRC meetings and PIP related topics placed on hold in SPRFIT meetings due to limited staffing, compliance with emergency response processes during the review period could not be discerned.

### 2. Death Review Process

There were no deaths that occurred at CMF-PIP during the review period.

## XIV. QUALITY MANAGEMENT AND UTILIZATION REVIEW

Similar to the prior review period, the PIP did not have a functioning QM program which was attributed to staffing shortages. There were several areas of concern identified during the site visit where quality management projects would be helpful, such as groups starting late and lengthy stays in inpatient care.

There were no corrective action plans initiated as a result of Utilization Review audits, committee recommendations, or patient complaints during the review period.

Monthly CMF mental health subcommittee (MHSC) meeting minutes, patient safety subcommittee, specialized bed sub-committee and utilization review meeting minutes were reviewed with a focus on the PIP. Quorums were achieved monthly.

Overall, MHSC documentation was succinct, and information was conveyed with a summary statement which remained unchanged across monthly meeting minutes and did not specify action plans. During the review period, suicide risk evaluation compliance ranged from 81 percent to 87 percent. Across monthly documentation, it was indicated that the institution was working with CDCR Headquarter to “get PIP numbers included on the dashboard;” specific information was not included.

Monthly patient safety subcommittee, specialized bed subcommittee and utilization review meetings included institutional trends for various safety topics, including self-harm and outside hospitalization, but did not separate incidents by level of care. While the Chief of Mental Health was in attendance at the specialized bed subcommittee meetings, there was minimal content related to PIP patient care; an indication of need for mental health integration.

Utilization review subcommittee meeting minutes were primarily focused on medically related incidents. There was no documentation of PIP bed utilization review. Of note, there was repeated documentation regarding the need for Dialectical Behavior Therapy given incidents of self-injury.

Leaderships staff reported that peer review was not occurring at CMF PIP.

Ultimately, the institution was not compliant with its quality management program during the review period.

## XV. PATIENT COMPLAINTS/PATIENT SATISFACTION

Patient satisfaction surveys were not completed during the reporting period due to the clinical supervisor vacancies. CMF-PIP provided a log of patient complaints from Facility A; however, it could not be discerned from the log whether the patients referenced were PIP patients.

## XVI. CUSTODY AND MENTAL HEALTH PARTNERSHIP PLAN

CMF's custody and mental health partnership plan LOP was last revised in March of 2022 but was aligned with headquarters directive.

Executive joint rounding in the PIP programs should occur at least twice yearly. However, CMF-PIP reported there were no executive joint rounding visits to the PIP during the reporting period. The last executive joint rounding in the PIP occurred in January 2024 with the next executive joint rounding for the PIP scheduled in October 2024.

Twelve days of huddle sheets were selected for review across each PIP housing unit to determine compliance with custody and mental health program requirements. CMF-PIP utilized the Specialized Bed Huddle Reports during the review period. Of the 264 huddles reviewed 72, or 27 percent were compliant with the required staff presence, 113, or 43 percent were non-compliant, and 79 or thirty percent were either not provided or incomplete. In several instances, the institution provided the huddle sheets for second watch but did not provide huddle sheets for third watch. Additionally, huddles were often not compliant due to staff attendance. Custody staff were routinely absent from huddles.

Second and third watch huddles on units P3, HCITC, and A2 were observed during the site visit. Huddles in P3 were led by the psychiatrist and primary clinician who asked questions

to the recreation therapists, nursing, and custody staff. The huddles were interactive and collaborative as all disciplines participated with relevant input without prompting.

Required staff were in attendance for the third watch huddle in HCITC. A useful review of the patients and various activities occurred during the huddle, which was led by a nurse with some input from the psychiatrist and sergeant.

Only nursing and one custody staff member attended the third watch huddle on A2. The psychiatrist and PC were not in attendance. The custody officer did not speak and the patient census was read and noted as "fine" or "not a problem". The A2 huddle was not interactive, and pertinent information about medication compliance and ADLs were not discussed. A second huddle on A2 was observed that did not include correctional officers. A nurse reviewed all the patients housed in the unit. A recreation therapist reported being stalked by a patient, who was described by his psychiatrist as being psychotic. The recreation therapist was appropriately distressed by the stalking but did not appear to have an appreciation of the psychotic driven behavior. There was inadequate discussion regarding management of this patient during the huddle. Additionally, during the discussion of another patient, a psychiatrist attempted to provide relevant information to the group but was somewhat cut off by the presenting nurse.

Huddles, led by nursing staff, were also observed on Q3 (3rd watch) and P1 (2nd watch). Psychiatric providers and primary clinicians were in attendance. The Q3 huddle provided a high level overview of each patient including as applicable: out of cell attendance, flu vaccine refusal, IDTT attendance prn requests, labs, hospital transfer and specific to Q3, max cuff status with minimal participation from other staff. The P1 huddle expanded the basic discussion as above to include information regarding patient functioning, such as whether a patient was "doing better," "more alert," lack of IEX for seven days or had experienced suicidal ideation. The P1 huddle

had more staff input and while custody staff were variably present, input was useful. Overall, the huddles met the criteria of multi-disciplinary communication between disciplines but given patient acuity on the PIP, huddles in the PIP level of care would be much improved with specific mental status or symptom information.

There were 69 grievances filed by PIP patients alleging staff misconduct during the reporting period, 49 were filed by acute patients and 20 by ICF patients. However, CMF-PIP reported no custody staff were reassigned from their post due to a staff misconduct complaint.

There were complaints from patients about third watch custody staff not allowing patients to contact mental health staff, being rude and disrespectful to patients, especially DD patients including name calling and racial slurs. There were no complaints about second watch staff.

All custody staff received OJT Partnership training as did all required non-custody staff including mental health psychiatrists, psychologists, social workers and recreation therapists.

Mental health leadership at the institution reported they were not holding quarterly partnership training during the reporting period. This was specifically due to the lack of mental health supervisors available to facilitate the training.

Because the institution went approximately ten months without conducting executive joint rounding, lacked required staff at second and third watch huddles, and did not hold quarterly partnership training during the reporting period, the institution was not compliant with the custody and mental health partnership plan during the review period.

## XVII. ***COLEMAN* POSTINGS**

The monitor observed *Coleman* posters in English and Spanish in all observed housing units.

## XVIII. LAUNDRY AND SUPPLY ISSUES

CMF-PIP's LOP required that every PIP patient would be assessed by nursing staff for clothing needs. Nursing staff were required to complete a clothing memo request form and submit it to the material & stores supervisor or laundry supervisor within 24 hours of the patient's arrival on the unit. Additionally, patients would receive clothing within one business day after receipt of the clothing memo.

Nursing staff were also responsible for contacting laundry services to arrange for clothing exchanges, needs such as mattresses and pillows, and to resolve any issues related to laundry or other items. Furthermore, clean linen reportedly was distributed three times weekly and soiled laundry was also picked up and transported to the laundry warehouse three times weekly. Lastly, PIP EVS staff were reportedly responsible for the transport of clean and soiled clothing and linen to and from the facility laundry warehouse.

## XIX. PROPERTY/VISITATION/PRIVILEGES/TELEPHONE ACCESS

The LOP regarding policy and procedures for the CMF-PIP was current as of June 2024. The LOP included instructions regarding the entry of data into the non-clinical activity tracker, where the offering, acceptance and refusal of yard were entered for each PIP patient. In addition, CDCR provided a memo dated December 23, 2024, authored by the Director of the Division of Adult Institution which indicated all PIP patients, excluding maximum custody, were allowed to make one phone call a week unless restricted by their IDTT. According to the PIPs LOP, maximum custody patients were authorized phone calls, in accordance with their assigned privilege group.

Twenty randomly selected acute, intermediate, and maximum custody patients were reviewed regarding the offering of out-of-cell time, showers, telephone calls and visitation across

a two week period. On average patients in the PIP were offered 110 minutes a day of out-of-cell time and accepted on average 42 minutes of out-of-cell time. Upon review of the NCAT data for the selected patients, slightly more than 90 minutes of yard was consistently offered to all patients reviewed, while on average 42 minutes of yard were accepted daily by patients. Of the 20 patients reviewed, six patients refused all offered out of cell time during the two-week period reviewed. Regarding telephone calls offered, 17 of the 20 patients reviewed were offered and either accepted or refused multiple offers of phone calls.

Visitation for patients in the PIP was non-contact and occurred in the main visiting area. Visitation was limited to Saturday and Sundays. In the monitors review of NCAT data for the 20 selected acute, ICF and maximum custody patients over a two-week period, visits were recorded on three occasions for two patients.

Interviewed patients stated that they received limited access to the patio which was only available to patients during weekend days. Patients reported limited recreational supplies available to them during their unstructured out-of-cell time. Patients on A2 and A3 described poor access to hair clippers and razors for grooming purposes. Patients also reported concerns with tablets and the inability to charge the tablet inside of their assigned cell.

Since the COVID-19 pandemic, all meals for patients in intermediate housing units have been served in cell. The dining room previously used for intermediate patients has subsequently been under the correctional officers control and not available to intermediate patients. The dining area has been used for meals for the general population incarcerated persons. This was particularly concerning given the psychosocial rehabilitative benefits related to intermediate care patients eating in a dining hall. The need to use the dining hall during non-meal hours for

intermediate care patients for programming purposes was also apparent due to physical plant limitations.

## XX. LAW LIBRARY ACCESS

CMF's LOP explained that patients could request law library access by filling out a law library request form. Patients needed to be admitted to the PIP for a minimum of seven days prior to gaining access to the law library. Additionally, some PIP units used a paging system in which patients could fill out a request form indicating which books or documents that they needed, and the librarian would deliver the requested legal documents to the appropriate unit. Patients were allowed to utilize the requested legal documents for a limit of three days, and they could request a three-day extension as long as no other patient requested the same documents. Lastly, patients housed in A2, A3, P1, and HCITC, had access to the law library kiosk in their housing unit.

## XXI. PRE-RELEASE PLANNING

The institution's pre-release LOP was current, dated and signed in February 2024. While the LOP was current, there was no reference to the pre-release planning assessment (PRPA) that should be completed for mental health patients who were released from the institution. In addition, there was no reference to the PReP meeting, organized by headquarters director of pre-releases services with stakeholders, and specifically required for patients discharged from the PIP. The pre-release LOP requires revision to address consistency with headquarters' pre-release LOP.

The institutional mental health pre-release coordinator was a clinical social worker who provided services to all mental health patients throughout the institution, including the PIP. It was the IMHPCs primary role as she did not carry a caseload during the review period. Despite

the omissions in the institution's LOP, the pre-release coordinator reported that all PIP patients had a PReP meeting prior to release. The meetings were organized by the headquarters mental health pre-release director and included all stakeholders necessary for the patients' transition back into the community. PReP meetings, like CCAT meetings, were held in the PIP and generally replaced the completion of PRPA. In addition to this meeting, the IMHPC participated in the weekly ISUDT pre-release meeting and the monthly pre-release meeting facilitated by the headquarters pre-release director.

Pre-release groups had not occurred in the PIP during the reporting period due to staffing shortages; however, it was reported that groups would re-start in October 2024. The institution utilized headquarters curriculum for pre-release groups.

There were 30 patients released from the PIP during the reporting period. Of the 30 patients released, 16 were released to the community, ten were released to DSH as OMHD and the remaining four patients were ultimately discharged to an EOP program.

TCMP assisted 25 of the 30 PIP patients released with applications for medical, social security and veteran benefits. Four of the patients refused TCMP services and one patient was transferred to DSH prior to TCMP having the ability to meet with them. Though TCMP met with PIP patients, they were not able to extrapolate date exclusively for the patients in the PIP.

Seven of the patients released from the PIP were discharged to probation and therefore required that a signed release of information (ROI) that allowed the sharing of necessary information. The required ROI was signed by all but one patient who refused. In instances when the patient refused to sign the IMHPC reported they reached out to the community providers as well as the probation officer.

Regarding California IDs, the IMHPC reported that applications were submitted for all 30 patients. The pre-release coordinator reported applications for 15 patients were pending or being held in trust for their release, five patients refused to cooperate in the application process and most of the remaining ten patients were ineligible to apply. However, the IMHPC reported that for patients who did not have Cal Id's, the institution often provided them with their CDCR ID for identification upon release.

The IMHPC indicated the C&PR assisted patients who required housing upon release for those patients who required housing upon release. However, records of referrals to housing programs were maintained by the C&PR and not available to the IMHPC.

For the above stated reasons, the institution was compliant with its pre-release program during the review period.

## XXII. PROGRAM ACCESS

CMF-PIP did not report whether any patients had job assignments. Additionally, data for milestone credits was not provided by the institution, but PIP patients were reportedly eligible to earn milestone credits for every 60 hours of group treatment.

## XXIII. EDUCATION

One patient was enrolled in an educational program.

**APPENDIX B2**
**Salinas Valley State Prison (SVSP-PIP)**
Review Period: February 1, 2024 – July 31, 2024
Site Visit: September 17, 2024 – September 20, 2024

The significant deficiencies in provided treatment and care identified in the Thirtieth Round Monitoring Report unfortunately continued at SVSP-PIP in the Thirty-First Round. *See* ECF No. 7833 at 216. Unfortunately, in the current review period, functional vacancy rates for psychiatrist and psychologist positions increased to 22 percent and 37 percent respectively which had cascading effects on treatment across the inpatient program. *See id*. Observed IDTTs continued to be inadequate with numerous shortcomings identified. PIP patients were only offered an average of 10.84 hours per patient per week of structured therapeutic activities, which is just more than half of the amount of treatment that is required to be offered to PIP patients. See ECF No. 7924 at 10. Groups continued to begin late, end early, and were disrupted by custody staff.

Similarly, a review of the patients' health care records as to medication management also continued to reveal multiple deficiencies, including documentation concerns, rapidly changing medications, dosing issues, and continuing barriers to the administration of PC 2602 medications. Although this report notes positive aspects of treatment provided to patients during the review period where appropriate, treatment at SVSP-PIP continued to be noncompliant with Program Guide requirements in the Thirty-First Round.

## I. SUMMARY OF THE FINDINGS

- As of September 17, 2024, SVSP-PIP operated a 242-bed ICF across four housing units; 198 beds were single-celled and 44 were multi-person cells consisting of 20 two-patient cells and 24 four-patient cells. Of the 242 total beds, 176 or 73 percent were occupied, three were redlined, and 57 were available.

- Although SVSP-PIP took steps to address the staffing issues identified in the Thirtieth Monitoring Round, functional vacancies for psychiatrists and psychologists that were otherwise compliant in the Thirtieth Round, were not compliant in the Thirty-First Round.

- There was a 22 percent functional vacancy rate among psychiatrists, 37 percent among psychologists, and ten percent among social workers and recreation therapists, respectively.

- Registered nursing positions had a 20 percent functional vacancy rate while psych techs had a 44 percent functional vacancy rate.

- SVSP-PIP did not utilize tele-mental health or telework during the review period.

- All primary clinicians had caseloads within established ratios ranging from one to 19 patients. All but one psychiatrist also had caseloads within established ratios.

- Generally, quality of IDTTs at SVSP-PIP were inadequate during the monitoring tour. Although there were positive aspects including collaborative and patient-centered treatment planning and addressing each patient's unique clinical needs and presentation, there continued to be consistent concerns with patient attendance, lack of case conceptualizations and treatment interventions, failure to identify patient diagnoses, and lack of discussion of specific treatment.

- SVSP-PIP patients were scheduled for an average of 14.35 hours of structured therapeutic activities per week but were only offered an average of 10.84 hours per week. Patients reportedly attended only 4.05 hours of structured treatment on average per week. This was insufficient for an inpatient setting.

- The quality of observed group treatment was overall adequate during the monitoring tour. However, there continued to be frequent disruption by custody staff and the creation of treatment schedules that did not account for patient movement, resulting in missed or early exit from groups and appointments.

- SVSP-PIP was unable to indicate the number of individual treatment hours offered to patients during the review period. However, interviews with staff and patients indicated that patients were generally offered at least one individual contact per week with their primary clinician and psychiatrist.

- Clinical staff reported that mental health understaffing and lack of adequate and confidential treatment space often affected treatment offerings and consistency.

- Of these ten cases reviewed to assess the adequacy of medication management, four were adequate, reflecting a slight improvement since the preceding monitoring round, but ultimately not compliant.

- The monitor's expert's review of medication management at SVSP-PIP revealed similar concerns from the prior monitoring round, including rapidly changing medications, dosing issues, medication administration challenges, discontinuity in psychiatric care, and continuing barriers to the administration of PC 2602 medications.

- The institution indicated that it did not have any staff assigned to a positive behavioral support team (PBST) and that consequently, there were no behavioral treatment consultations during the review period.

- Maximum custody patients were placed into treatment groups based on expediency and availability rather than to address treatment goals.

- There were 107 referrals endorsed to SVSP-PIP during the review period; 96 were accepted, six were rescinded, and five were rejected. Ninety-five of 96 or 99 percent of accepted referrals were admitted to the SVSP-PIP within 30 days.

- The timeframe between acceptance and admission averaged 1.85 days and ranged from zero to 14 days. Twelve or 13 percent of admissions took longer than three days following acceptance.

- SVSP-PIP discharged 141 patients during the review period. Forty-two or 30 percent of patients took longer than 72 hours to move following clinical discharge.

- On September 13, 2024, 78 patients were housed out of their LRH.

- SVSP-PIP issued 120 RVRs to PIP patients during the review period; five of which were documented in an alternative manner.

- SVSP-PIP reported no controlled and 55 immediate use of force incidents during the review period.

- SVSP-PIP quality management activities were part of SVSP's institutional quality management program. Staffing vacancies continued to impede the PIP's quality management activities. There were no CAPs, QITs or FITs during the review period or at the time of the site visit.

- A Utilization Management Committee (UMC) was initiated in February 2024 to review complex and difficult-to-treat patients and identify any deficiencies or shortcomings in

their admission, course of treatment, or discharge process. At the time of the monitoring tour, the UMC was exploring how to address and utilize the data sets to determine which areas to focus on and to develop policies and/or procedures to address any deficiencies.

- Reviewed CMHPP huddle reports revealed that, similar to the prior reporting period, there were issues with required mental health and custody staff's huddle attendance.

- There were continued delays with patients receiving property and adequate laundry.

- Like the prior reporting period, SVSP-PIP did not have a designated pre-release planning coordinator but followed the institution-wide pre-release planning program.

## II. CENSUS

As of September 17, 2024, SVSP-PIP operated a 242-bed ICF across housing units C5 and C6, and stand-alone units TC1 and TC2; 198 beds were single-celled and 44 were multi-person cells consisting of 20 two-patient cells and 24 four-patient cells. Of the 242 total beds, 176 or 73 percent were occupied, three were redlined, and 57 were available; six multi-person beds were assigned but remained unoccupied.

Of the 198 single-cell beds, 143 were occupied, three were redlined, and 52 were available. Of the 44 multi-person cells, 33 were occupied, six were assigned, and five were available; this included 24 beds in the four-patient cells of which 20 were occupied, two were assigned, and two were available, and 20 beds in the two-patient cells of which 13 were occupied, four were assigned, and three were available.

There were 13 PC 1370 patients.

## III. STAFFING

### 1. Administrative, Clinical, and Correctional Staffing

Unfortunately, functional vacancies for psychiatrists and psychologists that were otherwise compliant in the Thirtieth Round fell out of compliance in the Thirty-First Round.

As of September 14, 2024, staffing was as follows:

Chief of Mental Health: This position was filled.

Program Assistant: This position was filled.

Chief Psychiatrist: This position was filled.

Senior Psychiatrist: This position was vacant.

Psychiatrists: One of 11.1 positions were filled for a 91 percent vacancy rate; 7.65 contractors reduced the functional vacancy rate to 22 percent.

Chief Psychologist: The chief psychologist position was filled, though this individual was on long-term leave. The position was filled by an individual acting out of class who was expected to leave the position in the weeks after the site visit to take the permanent outpatient chief psychologist position.

Senior Supervising Psychologist: Both positions were filled, though one of these individuals was also on long-term leave. This position was filled by an individual acting out of class who was also expected to leave the role in the weeks after the site visit.

Psychologists: Two of 11.1 positions were filled for an 82 percent vacancy rate; five contractors reduced the functional vacancy rate to 37 percent. One post-doc psychologist was unlicensed.

Supervising Social Worker: This position was filled.

Social Workers: Nine of 11.1 positions were filled for a 19 percent vacancy rate; one contractor reduced the functional vacancy rate to 10 percent. Two social workers were unlicensed.

Recreation Therapists: Ten of 11.1 positions were filled for a 10 percent vacancy rate.

Supervising RN IIs: 22 of 24.3 positions were filled for a nine percent vacancy rate. Two supervising RN IIs were on long-term leave, increasing the functional vacancy rate to 18 percent.

Registered Nurses: 46.6 of 78.6 positions were filled for a 41 percent vacancy rate. The two RNs on long-term leave and utilization of 18 contractors resulted in a 20 percent functional vacancy rate.

Licensed Vocational Nurse: 11 of 24.8 positions were filled for a 56 percent vacancy rate. The two licensed vocational nurses on long-term leave and utilization of nine contractors resulted in a 27 percent functional vacancy rate.

Psychiatric Technician: 11.8 of 24.8 positions were filled for a 52 percent vacancy rate. Three psych techs were on long-term leave and the use of five contractors resulted in a 44 percent functional vacancy rate.

Certified Nursing Assistant: 15 of 93.8 positions were filled for an 84 percent vacancy rate. Two CNAs were on long-term leave and 47 contractors were utilized, resulting in a 36 percent functional vacancy rate.

Senior Psychiatric Technician: Both positions were filled.

OSS II: Both positions were filled.

Associated Government Program Analyst: Five of seven positions were filled for a 29 percent vacancy rate.

HPS I: Both positions were vacant.

CHSA: Two of three positions were filled for a 33 percent vacancy rate.

Office Technicians: 14.9 of 21 positions were filled for a 29 percent vacancy rate. One office technician was on long term leave resulting in a functional vacancy rate of 34 percent.

Custody staff were redirected to fill the allocated custody positions in the PIP as necessary resulting in no functional vacancies for any position at any time. However, specific

individual custody staff members were not assigned to the PIP, resulting in a lack of continuity of custody staff with a demonstrated ability to work with higher level of care patients.

The warden, chief deputy warden, and associate warden positions were filled during the site visit. In TC1 and TC2, there was one captain, one lieutenant, five sergeants, two CC Is, one CC II, and 35 correctional officers; all positions were filled. In C5 and C6, there was one captain, one lieutenant, four sergeants, four CC Is, and 37 correctional officer positions filled.

**2. Tele-Mental Health**

SVSP-PIP did not utilize tele-mental health or telework during the review period.

**3. Staff-to-Patient Ratios and the Adequacy of Clinical Staffing**

All primary clinicians had caseloads within established ratios ranging from one to 19 patients. All but one psychiatrist also had caseloads within established ratios. The one psychiatrist had a caseload of 32 patients and, thus, exceeded established ratios by two patients. Mental health leadership reported (but could not confirm) that this one psychiatrist likely worked a 50-hour week and, thus, covered 1.2 positions which would result in a caseload above 30 patients.

While the institution did not track recreation therapists' individual caseloads, each of the four PIP units had either two or three assigned recreation therapists and no unit had more than 58 patients.

Staff reported that they had lost three clinicians to the outpatient program at SVSP as these individuals did not want to facilitate a high numbers of treatment groups that were now required. Staff repeatedly referenced their workload and indicated that they felt this treatment expectation without additional staff overburdened existing staff members, was not clinically necessary, and contributed to increased refusal rates.

SVSP-PIP took various measures over the review period to improve the staffing issues identified in the previous monitoring round; the results of these efforts proved to be insufficient. These included utilizing the regional hiring unit, increased marketing for vacant positions, hiring above minimum for mid-step hires, pay differentials for staff that provide direct patient care in person for more than 50 percent of the pay period, recruitment and retention bonuses for mental health staff, additional payment for providing on-site psychiatry, and additional payment for psychiatrists and psychologists who worked additional caseloads.

## IV. TREATMENT, CLINICAL SERVICES, AND PROGRAMING:

### 1. Interdisciplinary Treatment Team Meetings (IDTTs)

Generally, quality of IDTTs at SVSP-PIP were not compliant during the review period. Although there were positive aspects for each treatment team including the treatment planning processes being collaborative, patient-centered, and addressing each patient's unique clinical needs and presentation, there continued to be consistent concerns with patient attendance, lack of case conceptualizations, failing to identify patient diagnoses, and discussion of specific treatment. Additionally, clinical interventions to achieve treatment goals were not always clearly stated or identified, which led to inappropriate treatment groups for some patients.

Seven routine IDTTs were observed on unit C5. Six of the IDTTs were held in absentia due to patient's refusal to attend. The IDTTs were conducted in a confidential room with adequate space for the patient and the treatment team. The IDTTs were appropriately staffed and included the primary clinician, psychiatrist, registered nurse, CC I, and rehabilitation therapist. The treatment team demonstrated a collaborative and patient-centered approach and it was clear that each staff member knew the patient and was able to substantively contribute to the IDTT. The CC I was appropriately engaged in the treatment planning, knew the patients well, and

provided unsolicited and appropriate input for each patient. Treatment goals were clinically appropriate, relevant, and reflected the patient's presentation and clinical concerns. The treatment team reviewed each patient's group attendance and participation in individual primary clinician and psychiatry contacts.

There were several deficiencies noted throughout the observed IDTTs[49] that caused only two of seven IDTTs to meet audit criteria. The patient's diagnosis was not clearly stated in several IDTTs although symptoms and symptom severity were discussed. The patient's medications were also not explicitly stated in several IDTTs. None of the observed IDTTs included a formal case conceptualization. Clinical interventions to address treatment goals were not always clearly stated or identified aside from medication management and the STEP program incentives. Least restrictive housing was not discussed in three of seven IDTTs.

Five routine IDTTs were observed on unit TC1. The IDTT room was large, adequately lit, set to an adequate room temperature, and appropriate for the stated purpose. Observed IDTTs were patient-centered, confidential, and contained all required participants, with good interdisciplinary collaboration between the primary clinician and the psychiatrist. Of note, there was good nursing input in relevant cases. Additionally, the treatment team routinely reviewed LRH, and in one case changed the patient's LRH from single to a multi-person cell. In another case the treatment team appropriately modified the 20 hours treatment requirement to ten hours. Overall, patients reported being pleased with their treatment including saying that there were "good people working here" and that they "like the groups." Negative aspects of TC1's IDTTs

[49] All six IDTTs that occurred in unit C6 were completed within 32 minutes of the scheduled start time, therefore the monitor's expert was unable to attend to assess adequacy.

included a high rate of patient refusals, lack of case conceptualizations or consistently stating the diagnosis, and limited custody participation.

Six IDTTs were observed on unit TC2 during the site visit. All required participants were present; however the treating psychiatrist was present in six of the eight cases scheduled. Discussion of actual treatment varied by primary clinician and various elements of treatment planning had to be prompted by the supervisor that was present. Other team members typically only spoke when prompted and would only ask the patients if they had any questions for that staff member. However, the correctional counselor was extremely interactive, did not need to be prompted to participate, knew the patients' cases very well, and was knowledgeable about the referral and admission process. Elements of effective communication were not used in any of the IDTTs and notably, one observed primary clinician was difficult to understand as they spoke rapidly when addressing the patient's chart.

Treatment discussions were very high-level with broad goals (e.g., managing thoughts of suicide) rather than specific, objective, behaviorally based treatment goals. Specific treatment was generally not discussed. However, one primary clinician did talk with one patient about specific therapeutic techniques that they would use during individual contacts and group to address treatment goals. There were no team discussions regarding appropriate treatment groups for the patients and one treatment team even told a patient that he did not have to attend all of his treatment groups. This was particularly concerning given that treatment group assignments should be based on individualized needs assessments and directly connected to treatment targets and goals. By telling a patient that he does not need to attend all his treatment groups, it disrupts the clinician's ability to determine if an alternative treatment plan should be considered. During

IDTTs, patients consistently requested that the treatment team increase the opportunity for specific groups related to their symptoms/diagnosis and their stressors or personal goals.

Additionally, in TC2, there were no group discussions regarding any patient's behavioral goals as part of the incentive-based STEP program as this was primarily monitored and addressed by the recreation therapist. It was clear in the six IDTTs observed in TC2 that STEP program goals varied by recreation therapist rather than by patient. For example, one recreation therapist informed multiple patients that they would earn incentive points at STEP One by attending two of twenty groups, attend all clinical contacts, and act appropriately when out of their cell. A different RT told multiple patients that they would receive their incentive points by attending 50 percent of treatment groups, all clinical contacts, and act appropriately out of their cell. Additionally, these different standards did not incorporate the patient's attendance rates when addressing patient treatment goals, as some patients had already exceeded their attendance goals, yet those goals were not updated nor was a STEP increase discussed.

During the review period, intermediate care patients were required to receive an initial IDTT within 72 hours of arrival and every 30 calendar days thereafter during the patient's stay. Thirty intermediate care patients who required initial IDTTs during the review period were selected to review compliance with required timeframes. Of the 30 patients reviewed, 28 or 93 percent occurred timely. The required staff attended 19 or 63 percent of the initial IDTTs reviewed. The staff members generally missing from the IDTTs were the correctional counselor or registered nurse, while alternate staff often replaced the psychiatrist. Patients attended 21 or 70 percent of initial IDTTs, and patient refusals accounted for non-attendance.

Thirty intermediate care patients who required routine IDTTs during the review period were selected to review compliance with required timeframes. There were 51 expected

timeframes; 49 or 96 percent occurred timely. Of the 71 reviewed routine IDTTs, patients were present for 43 or 61 percent of IDTTs and required staff were present for 63 or 89 percent of IDTTs.

Overall, there was a high rate of patient refusal to participate in IDTTs at SVSP-PIP. Observed IDTTs were not compliant during the review period as they consistently did not address case conceptualizations, identify patient diagnoses, and lacked discussion of specific treatment. Additionally, clinical interventions to address treatment goals were not always clearly stated or identified.

**2. Group Therapy**

The institution was required to offer PIP patients at least 20 hours of structured therapeutic activities per patient per week, ten hours of which must be core treatment. *See* ECF No. 7924 at 10 (citing "[d]efendants shall immediately adopt and implement in the CDCR PIPs the minimum treatment standards set out in the DSH CQI process approved by the court.*"); see also* ECF No. 7812-1 at 15 (stating "that [the DSH CQI] process…provides that patients will be offered 20 hours of treatment per week, at least ten hours of which are to be 'core treatment'."). The remaining ten hours offered to patients must consist of supplemental treatment and cannot include offered yard or day room activity. Because core treatment hour requirements can include individual treatment, compliance is assessed as a totality of treatment offered to the patient on average per week. *See* ECF No. 7812-1 at 15.

During the review period, the institution indicated that SVSP-PIP patients were scheduled for an average of 14.35 hours of structured therapeutic activities per week but were only offered an average of 10.84 hours per week. Patients reportedly attended only 4.05 hours of structured treatment on average per week. Although this represented an improvement in the average

weekly offering of treatment compared to the preceding review period (where an average of 5.6 weekly hours of group treatment as provided) the amount of structured treatment hours offered was nonetheless insufficient for an inpatient setting and noncompliant with the court-approved PIP Minimum Treatment Standards. Notably, during the review period, patients refused an average of 6.8 hours of structured treatment per week and 3.34 hours were cancelled per week.

The quality of group treatment was overall positive during the review period. Staff indicated that groups that were facilitated by clinicians were categorized as core groups while groups facilitated by recreation therapists were categorized as supplemental groups. Groups were offered primarily in English but there were several clinically relevant and appropriate groups facilitated in Spanish, however they were not core treatment groups.

Staff indicated that group participation was generally low during the review period, which was consistent with the average rate of refusal identified noted above. Primary Clinicians reported a significant decrease in group attendance when patients were assigned to 20 hours per week and that in their opinion many patients were "grouped out" after the increase.

In units C5 and C6, four primary clinician-led clinical groups and one recreation therapy supplemental group were observed during the site visit. All observed groups were well-facilitated and organized. The topics and curriculums of the observed groups were appropriate for the ICF population and included topics such as CBT for depression, social skills development, stress management, and affirmation through art. The clinicians leading the groups were engaging, knew their patients, kept the groups on task, and actively engaged in the group discussions and activities. The observed groups included an appropriate combination of psychoeducation, interactive discussion, and worksheets/handouts when appropriate. The materials utilized during the groups were consistent with the themes and focus of the groups and

the patients appeared to maintain interest and benefit from the content within the materials. The patients often provided positive feedback to the facilitators, expressed that the groups were helpful, and appeared to benefit from the groups.

Two Nursing Led Therapeutic Groups (NLTGs) were provided to patients on C5/C6. Both groups were scheduled for Mondays and were provided by the same psychiatric technician due to understaffing. The NLTG topics appeared appropriate for the ICF population. The NLTG schedule also indicated NLTG groups were provided to patients within the treatment center on Tuesdays, Thursdays, and on weekends to both general ICF patients and Max Custody patients.

Two groups were observed in TC1 during the review period. Both groups had substitute facilitators which altered the scheduled topics. While the first group topic on the schedule was "Anxiety/PTSD," the group facilitator stated that the group was titled "Mental Health Topics." Positive aspects included a caring and empathic psychologist who attempted to engage the three participants. The facilitator made appropriate use of showing a video, pausing it, and asking questions of the group. One patient appeared inappropriate for the group, due to the severity of his psychosis. The group was terminated early, due to custody issuing a "recall" which required all patients to leave.

A covering social worker facilitated the second group. The social worker was empathic and welcoming yet set appropriate limits and boundaries with the patients. The topics were appropriate to the patients, including skills such as acceptance and finding meaning even in difficult circumstances.

Two clinical groups and multiple supplemental groups were observed in TC2 during the site visit. While there was little standardization across treatment groups and many group titles

were inconsistent with what was addressed during the group, observed clinicians appeared to adhere more closely to the topics addressed in the titles of their groups.

Interviewed patients across all housing units indicated that they enjoyed most of their treatment groups but wanted more meaningful groups. Patients consistently stated that they were assigned to groups to "make the numbers" rather than due to clinical indications and that they believed that they were in treatment groups that were not relevant to them. Examples included substance-related groups for those who reported a lack of substance abuse history and parenting groups for patients without children.

Other concerns that patients consistently expressed about groups during the site visit, which were also observed on several occasions, included frequent disruption of treatment groups by custody staff and the creation of treatment schedules that did not account for patient movement, resulting in missed or early exit from groups and appointments. During the site visit, several observed treatment groups that were discussing highly sensitive topics (e.g., family alienation, victimization, sexual abuse) were interrupted by custody staff opening the treatment room door without warning and keeping it open. On occasion, the custody officers would disrupt the group and call for a patient to be removed. This had a significant negative effect on the continuity of the group since at times these patients had been speaking or listening to sensitive discussions.

Overall, there appeared to be a culture within custody staff that failed to understand the sanctity of treatment and the critical nature of confidentiality for patients at the inpatient level of care. Additionally, because core and supplemental groups did not always begin on time, the compressed treatment schedule did not allow patients to take full advantage of the group and still have time to make it to the next group.

### 3. Individual Treatment

The Program Guide requires that intermediate care patients receive an initial psychiatric evaluation within 24 hours of arrival, every three days thereafter for the first thirty days, and then every seven days during their stay. Intermediate care patients are also required to receive an initial primary clinician evaluation within ten days of arrival and thereafter once per calendar week.

Sixty intermediate care patients were reviewed to assess compliance with Program Guide timeframes during their stays.[50]

Thirty intermediate care patients who required initial psychiatry evaluations during the reporting period were randomly selected for review. All thirty reviewed initial psychiatry assessments occurred timely. Twenty or 67 percent of initial psychiatry assessments took place in a confidential setting; four assessments, or 13 percent, were non-confidential due to patient refusals, and the remaining non-confidential assessments were due to modified programming, lack of custody escorts, or unknown reasons.

A random sample of 30 intermediate care patients who required routine psychiatry contacts during the review period was also selected. Of the 77 timeframes, 63 or 82 percent timely occurred every three days for the first thirty days of inpatient care and then every seven days thereafter. Of the 96 contacts reviewed, 39 or 40 percent occurred in confidential settings.

[50] These measures of compliance solely focused on the occurrence of a primary clinician or a psychiatric contact within the required timeframes and did not assess the quality of the contact. The indication of an initial assessment did not verify that a comprehensive initial assessment was completed during the first contact with the primary clinician or psychiatrist. Additionally, the review of routine primary clinician or psychiatric contacts did not distinguish between a brief check-in or a meaningful therapeutic contact.

Reasons for non-confidentiality included patient refusals, modified programming restricting movement, and lack of available custody escorts.

The 30 randomly selected intermediate care patients who required initial psychiatry evaluations also required initial primary clinician evaluations during the reporting period. Of the 30 patients reviewed, 27 or 90 percent occurred timely. Nineteen or 63 percent took place in a confidential setting. Reasons for nonconfidential evaluations included patient refusals and other unknown reasons.

The random sample of 30 intermediate care patients who required routine psychiatry contacts also required routine primary clinician contacts during the review period. There were 72 expected timeframes; 65 or 90 percent timely occurred every seven calendar days. Of the 92 reviewed contacts, 44 or 48 percent occurred in confidential settings. Reasons for non-confidentiality included patient refusals and modified programming.

SVSP-PIP was unable to indicate the number of individual treatment hours offered to patients during the review period. Interviews with staff and patients indicated that patients were generally offered at least one individual contact per week with their primary clinician and psychiatrist. Three patients who were interviewed on Units C5 and C6 reported that they received weekly primary clinician contacts and are seen more often when they request it. In addition, patients reported satisfaction with the quality of the individual clinical contacts.

Staff reported several factors that negatively impacted individual patient care. Staff indicated that the clinical care schedule was compressed due to the number of groups offered per day. Staff specifically stated that the quality and frequency of individual treatment decreased significantly when the PIP minimum treatment requirements were established. Even when they could get a patient on a clinical schedule, staff indicated that it was difficult to see patients for

clinical contacts in the afternoon due to custody's rolling shift changes which restricted patient movement. Clinical staff reported that mental health staff shortages and lack of adequate and confidential treatment space often affected treatment offerings and consistency.

Although SVSP-PIP could not indicate the exact number of individual core treatment hours offered to patients per week, interviewed patients indicated receiving weekly primary clinician and psychiatry contacts. Coupled with the average weekly offering of only 10.84 hours of structured activity per week, the institution was not compliant with the required offering of 20 hours of structured therapeutic activities or the requirement that ten of the 20 hours be core treatment.

**4. Solo Programming**

No patient was on solo programming status throughout the site visit. The institution could not produce information regarding the number of patients placed on solo programming during the reporting period as the institution did not have a system of tracking this information.

**5. Medication Management**

Healthcare records of ten patients were reviewed to assess the adequacy of medication management provided at SVSP-PIP during the review period. Of the patients selected, nine were randomly chosen from a list of patients receiving treatment during the monitoring period, with one case selected due to clinical concerns raised at the time of the site visit. For patients admitted prior to the start of the review period, documents were sometimes reviewed before the review period began in order to understand the clinical presentation and course; however, only the medication management provided during the review period was evaluated for adequacy. Of these ten cases, four were adequate, reflecting a slight improvement since the preceding monitoring round, but ultimately not compliant.

While medication management at SVSP-PIP raised several clinical concerns, the magnitude of concern was less than that observed during the preceding monitoring round. Positive aspects of treatment included timely initial psychiatric evaluations in all but one case. The management of patients prescribed clozapine, was generally appropriate, with one exception discussed below. SVSP-PIP considered and employed long-acting antipsychotic medications where indicated, with one exception discussed below. Finally, in one case, the psychiatrist recognized a medical condition which may have impacted the patient's psychiatric symptoms and referred the patient for primary care evaluation.

Cases that were found to have adequate medication management nevertheless displayed multiple concerns that were notable despite not rendering the care inadequate. In one example of a patient with a psychotic disorder, documentation was unclear about the patient's diagnosis, whether psychiatry prescribed an antipsychotic during a portion of the hospitalization, and whether medication non-adherence was addressed in a systematic manner.

Comparatively, the cases with inadequate medication management displayed concerns across several domains. One of the most pressing concerns was the use of multiple medications from the same class, with insufficient rationale documentation. While complex cases frequently require the use of multiple medications, these cases failed to provide a clear rationale for incurring the increased risk of medication interactions and side effects. In one case, the patient was prescribed standing doses of two antipsychotics, and an as-needed dose of a third antipsychotic. Additionally, the patient experienced tardive dyskinesia (a movement disorder often caused by treatment with antipsychotic medications) of sufficient severity to affect his speech. Despite the degree of severity, this side effect was inadequately addressed, although some notes did reflect interval improvement. In another case, the patient was prescribed multiple

antipsychotics, including four at the same time with insufficient rationale documentation. In a third case, the patient was admitted on two antipsychotics, with the SVSP-PIP psychiatrist starting a third one. Further documentation concerns with this case are discussed below.

Other cases lacked clear rationales surrounding medication initiation or discontinuation. In one case, the medical record lacked a clear rationale for starting one medication, and a high initial dose of another medication. The patient was started on the medication atomoxetine, a medication traditionally used to treat attention deficit hyperactivity disorder (ADHD), without a rationale for this medication. Furthermore, the psychiatrist started paroxetine, a medication often used to treat depression or anxiety. While traditionally started at 10 or 20mg per day, the medication was started at a dose of 40 mg daily, without a clear rationale for this robust dose. Notably, paroxetine interacts with multiple medications, including two antipsychotics (namely aripiprazole and chlorpromazine) whose levels would increase with the use of paroxetine. In another case, the patient wished to stay on clozapine, but the psychiatrist discontinued this due to weight gain. While the monitor's expert realizes that weight gain must be addressed, there was no documentation of a systematic plan to address the weight gain prior to discontinuation of this medication which is typically a medication of last resort.

In contrast, some cases had delays in making medication changes or not starting certain medications at all. In one case, there were no substantive changes for nearly one month into the hospitalization. In another example, it was unclear why the psychiatrist did not consider a long-acting injection, when there were documented concerns with medication compliance. In an additional case, the patient was referred to the intermediate level of care, with a goal of stabilizing the patient on the antipsychotic medication clozapine. Despite CDCR's expert medication consultation service going so far as to document that "[t]here is no other

antipsychotic, except for clozapine which can offer any benefit at this juncture," the patient was not started on this medication. Instead, the patient was discharged on multiple antipsychotics, which was of particular concern given that the patient's treatment team was considering a diagnosis of frontotemporal dementia. While the decision to make medication changes rests with the treating psychiatrist, patients with a diagnosis of frontotemporal dementia can be extremely sensitive to and have severe side effects to many antipsychotic medications.

**a. Clozapine**

At the time of the site visit, SVSP-PIP had 17 patients prescribed clozapine. The institution was unable to indicate the number of patients who were prescribed clozapine during the monitoring period.

**b. PC 2602 Medication Orders**

SVSP-PIP filed eight emergency PC 2602 involuntary medication petitions, with six granted, one withdrawn, and one denied. Seven non-emergency initial petitions, and 34 renewal petitions were filed, with all being granted. Five additional patients were deemed appropriate for PC 2602 non-renewal, with all cases reviewed by the chief psychiatrist. No cases expired due to being lost to follow-up, or administrative tracking errors.

Since the preceding monitoring round, the Medication Court Administrator (MCA) position shifted from custody to a mental health staff services analyst (SSA); this change occurred in approximately June 2024. The SSA divided their time between PC 2602-related matters and the STEP program; however the percentage of time that the SSA spent on PC 2602-related matters was unclear. There was also a backup MCA to assist when necessary. The MCA reported working with stakeholders to streamline and standardize procedures. Recent improvements included requiring psychiatry to submit renewal petitions further in advance,

creating an expanded shared email to prevent missing important PC 2602 information, and running a weekly report of PC 2602 patients in case a patient on a PC 2602 arrived at SVSP without the MCA being informed. The regional chief psychiatrist had worked closely with the institution to assist with these improvements.

The MCA denied any barriers in interfacing with the Office of Legal Affairs, the Office of Administrative Hearings, or the administrative law judge, and reported collegial and collaborative working relationships with psychiatrists. Hearings were conducted remotely by computer twice per month, with the number of cases ranging from four to 14 per month.

While SVSP-PIP displayed improvements in the logistics of obtaining and renewing PC 2602 orders compared to the preceding monitoring round, staff reported sizeable barriers to the administration of PC 2602 medications. Nursing reported that custody, in more cases than not, were reluctant to facilitate administration of the PC 2602 medications. Staff reported that custody declined to facilitate administration of the medication without the psychiatrist present, or, in some cases, without seeing the actual court order; neither were required by policy. Additionally, no judicial order is required to administer medications for the first 72-hours of emergency initial petitions.

**c. <u>Documentation Concerns</u>**

Documentation within the medical record system also displayed important medication management concerns. In one example, the initial psychiatric evaluation contained a medication list so duplicative that it rendered the document nearly unintelligible. In another case, the documentation for the use of adding on a third antipsychotic was unclear. A note from March 26, 2024 said to consider the addition of cariprazine. The IDTT that occurred the following day did not document this medication, however the patient was on the medication on March 29, 2024.

The medication subsequently disappeared from medication lists. It was unclear if this was a planned discontinuation of medication, or an unintended expiration of a medication prescription. Additionally, one psychiatrist also put in a generic medication consent template in each note stating that the patient had been apprised of side effects for multiple medication classes, and that the patient may refuse medications if not under a PC 2602 involuntary medication order. A discussion of side effects and the right to refuse medications should be individualized for the patient.

**6. <u>Positive Behavioral Support Team</u>**

Behavior therapy is a long-standing, evidence based treatment that is frequently indicated for certain populations with chronic severe mental illnesses. The monitor's expert's observation of IDTTs, group treatment, and review of patient records revealed several SVSP-PIP patients for which PBST intervention was clinically indicated. However, the institution indicated that it did not have any staff assigned to a positive behavioral support team (PBST) and that consequently, there were no behavioral treatment consultations during the review period.

**7. <u>Maximum Custody</u>**

There were 56 PIP patients on maximum custody status at SVSP-PIP during the review period; 11 of whom remained on maximum custody status as of September 17, 2024. For these 11 patients, the length of stay ranged from 84 to 229 days. Maximum custody patients were housed in TC1 and TC2 during the review period.

For treatment space, TC1 had two group rooms with six TTMs installed in each room, for a total of 12 modules. TC2 has one group room with nine TTMs installed.

Continuity of care concerns for maximum custody patients from the prior review period continued into the Thirty-First Round. See ECF No. 7833 at 237-238. Institutional leadership indicated that there was no treatment policy or LOP for patients who experienced a change to

maximum custody status during their inpatient stay. Staff indicated that patients typically would not be seen until their next regularly scheduled IDTT and reported that the patient's primary clinician and recreation therapist would meet with each new maximum custody patient to develop the patient's group schedule. It was unclear if the groups that were selected by the clinician were supported by the full treatment team. However, it was clear that maximum custody patients were placed into treatment groups based on expediency and availability rather than to address treatment goals.

The institution indicated that there were a total of 32 treatment groups available to maximum custody patients in TC1 during the review period, 14 of which were core groups that were facilitated by the clinician. There were also 16 groups available to maximum custody patients in TC2 during the review period, eight of which were core groups facilitated by a clinician.

## V. PATIENT ACCESS TO TREATMENT

### 1. System to Encourage Progress (STEP) Program

SVSP PIP had an LOP for their STEP program that was mostly consistent with the statewide STEP policy. However, one distinction from the statewide policy was the references to the exclusion of individuals who had been found incompetent to stand trial, otherwise known as PC 1370 patients.

During the reporting period, mental health leadership reported continuing issues with the STEP incentive program as it was unclear how the program implemented the incentives once the desired behaviors were achieved. For example, staff indicated that patients did not receive their incentives immediately when demonstrating the desired behaviors. Incentive points were instead tracked by staff and were discussed during IDTT. To "spend" those points, patients had to

submit a written request to the Program Department. As compared with other PIPs where patients were provided points at the time of engaging in the targeted behavior and visited the "incentive store" weekly to spend their points, SVSP-PIP's STEP program did not utilize its potential to more closely adhere to evidence-based behavioral principles to achieve a durable targeted behavior.

A review of institutional documentation revealed that during the review period, an overwhelming majority of patients were held on STEP One while 26 patients achieved STEP Two, and 23 patients achieved STEP Three. It was confirmed through the IDTT process that incentives and movement through the STEP program varied by recreation therapist and was not individualized or appropriately valued, rendering the program of limited clinical utility. *See supra* p. 304 (citing "STEP program goals varied by recreation therapist rather than by patient. For example, one recreation therapist informed patients that they would earn incentive points at STEP One by attending two of twenty groups, attend all clinical contacts, and act appropriately when out of their cell. A different RT told patients that they would receive their incentive points by attending 50 percent of treatment groups, all clinical contacts, and act appropriately out of their cell.").

Due to concerns with the incentive-based program and STEP requirements varying by recreation therapist rather than the individual patient, the institution was not compliant with the STEP Program during the review period.

## VI. <u>REFERRALS AND TRANSFERS</u>

To prevent "significant and unacceptable delays" in inpatient care, patients referred to a PIP must be transferred within required transfer timelines. The Program Guide governs all inpatient transfer timelines after a patient's interdisciplinary treatment team refers a patient to

inpatient care and the inpatient program accepts the referral. See ECF No. 7333-1 at 19. The required timelines for the transfer are dependent on the patient's level of care. For acute patient placement, the transfer must occur within 10 days of the IDTT referral, regardless of the inpatient program's acceptance date, and within 72 hours of bed assignment. *See Id*. For intermediate care placement, the transfer must occur within 30 days of referral, regardless of the acceptance date, and within 72 hours of bed assignment. *See Id*.

There were 107 referrals endorsed to SVSP-PIP during the review period; 96 were accepted, six were rescinded, and five were rejected. 95 of 96 or 99 percent of accepted referrals were admitted to the SVSP-PIP within 30 days, however according to the produced documentation, one admission did not occur until 1,111 days after the referral.[51] Institutional staff reported that reasons for delays included patients refusing to transfer, lack of transportation, and, most notably, a local agreement not to perform internal admissions or discharges on Fridays, weekends, or Monday holidays due to mental health staffing shortages. There was otherwise no provided documentation regarding referral or transfer delays.

At the time of the site visit, three patients were endorsed to the SVSP-PIP but no decision had been made regarding those referrals. An additional four patients' referrals had been accepted but were awaiting admission to the SVSP-PIP. Thirteen patients with complex medical needs were referred to the SVSP-PIP during the review period.

[51] Referral, transfer, admission, and discharge data was provided by defendants' counsel and not locally by the institution. Despite repeated attempts, defendants' counsel were unable to provide accurate and reliable data and, instead, produced data containing glaring errors and omissions. Additionally, this data often differed from the data maintained locally by the institution, which was generally more accurate and detailed. Regardless, this report relies upon defendants' counsel's data in accordance with defendants' counsel's request to do the same.

Staff reported ongoing barriers in having patients transferred to DSH facilities, due to DSH declining referrals.

Although there were concerns with the local agreement not to perform internal admissions or discharges on Fridays, weekends, or Monday holidays, the institution was compliant with referrals and transfers during the review period.

## VII. ADMISSIONS AND DISCHARGES

### 1. Admissions

The timeframe between acceptance and admission averaged 1.85 days and ranged from zero to 14 days. Twelve or 13 percent of admissions took longer than three days following acceptance; of those 12, five took four days to admit, four took five days to admit, and one patient each took six, seven, and 14 days, respectively. Again, no documentation was provided regarding admission delays, but institutional staff attributed delays to the same reasons stated above.

Because 13 percent of admissions took longer than three days following acceptance, the institution was close but ultimately not compliant with program guide requirements for admissions to inpatient programs.

### 2. Discharges

SVSP-PIP discharged 141 patients during the review period. Clinical lengths of stay averaged 262 days and ranged from one to 1,798 days. Physical lengths of stay averaged 268 days and ranged from four to 1,798 days. Forty-two or 30 percent of patients took longer than 72 hours to move following clinical discharge; delays ranged from one to 93 days beyond the clinical discharge date. Again, while no documentation was provided regarding discharge delays, institutional staff attributed these delays to the same reasons stated above.

Because 30 percent of patients took longer than 72 hours to move following clinical discharge, the institution was not compliant with program guide requirements to discharge patients following inpatient stays.

## VIII. LEAST RESTRICTIVE HOUSING

Like the prior reporting period, SVSP-PIP did not provide historical data on LRH for the review period. On September 13, 2024, 78 patients were housed out of their LRH; 55 were housed in single-cells and 23 in multi-person cells. ICC documentation for eight of ten reviewed maximum custody patients reflecting appropriate review and documentation of LRH in coordination with HCPOP.

## IX. PATIENT DISCIPLINARY PROCESS

SVSP-PIP issued 120 RVRs to PIP patients during the review period; five of which were documented in an alternative manner. Twenty-nine RVRs were randomly selected to assess compliance with policy guidelines. Of the sample reviewed, the mental health assessment (MHA) was timely requested in 21 of 29 or 72 percent of cases and timely completed and returned to custody in ten of 29, or 34 percent of cases. Of the 29 MHAs reviewed, 13 or 45 percent were completed confidentially.

No reviewed MHAs recommended that the RVR be documented in an alternative manner, nor or did any MHAs indicate that a patient's mental illness "strongly influenced" the behavior documented in the RVR. However, 22 or 76 percent of MHAs indicated that patients' mental health contributed to the behavior which led to the RVR. Based upon these findings, the primary clinician recommended penalty mitigation in 22 cases. The SHO mitigated penalties in all 22 cases and mitigated penalties in an additional three cases.

Of the reviewed RVRs, staff assistants were appointed in every case and 28 of 29 or 97 percent of patients timely received the required RVR documentation prior to the hearing.

As for attendance at the annual mental health assessment training, 385 of 485, or 79 percent of custody staff and no mental health staff attended.

Although the SHO mitigated penalties in all requested cases and mitigated penalties in an additional three cases without recommendation from the reviewing clinician, the institution was not compliant with patient disciplinary process timelines during the review period.

## X. USE OF FORCE

SVSP-PIP reported no controlled and 55 immediate use of force incidents during the review period. Ten immediate use of force incident packages and body worn camera footage package were selected to assess compliance with policy guidelines. The reviewed incidents included three instances of battery on a peace officer, three instances of resisting a peace officer, two instances of attempted suicide, one instance of self-mutilation, and one instance of fighting. Nine of ten incidents reflected that custody staff used a reasonable and appropriate amount of force, including physical force and OC spray. Appropriate decontamination was afforded to all patients as required.

The one examined immediate use of force incident that did not reflect compliance with policy guidelines involved an in-cell entry to administer a PC 2602 medication to a patient. Upon review, both the psychiatrist and custody staff requested that the patient submit to a PC 2602 medication order, however the patient sat in the corner of his cell and did not comply. As a result, an officer called for an emergency cell entry and utilized physical force to subdue the patient and administer the medication. According to 2024-DOM-51020.12, when force is necessary but does not involve an imminent threat to subdue an attacker, effect custody, or to

overcome resistance, the force *shall* be controlled. As 2024-DOM-51020.12.1 authorizes controlled use of force to administer PC 2602 medications, even if the patient was decompensating, the responding officer's actions to call for an emergency cell entry rather than conduct a controlled use of force was inappropriate given the circumstances and inconsistent with policy guidelines.

SVSP-PIP indicated that all 22 mental health staff and 793 of 825 or 96 percent of custody staff completed the annual use of force training.

The institution was compliant with use of force policy and staff training requirements during the review period.

## XI. PIP MAXIMUM CUSTODY REDUCTION ICC REVIEWS

Reviewed ICC chronos for ten maximum custody patients housed in TC1 and TC2 during the review period reflected minimal input from mental health during each session. Of the ten reviewed ICC chronos, eight included a detailed maximum custody reduction review that provided adequate justifications to either retain or remove maximum custody status. The ICC considered the least restrictive housing designation for all four patients who were removed from maximum custody status as required.

According to the Maximum Custody Reduction Reviews for Psychiatric Inpatient Program Participants Memorandum, the headquarters Mental Health Compliance Team (MHCT) is required to conduct bi-weekly "post-reviews" of maximum custody patients housed in the SVSP-PIP to identify cases in which the institution should consider suspending maximum custody or an RHU term to improve access to treatment. *See* March 9, 2022 Memorandum regarding Maximum Custody Reduction Reviews for Psychiatric Inpatient Program Participants. Reviewed reports reflected that 211 post-reviews of SVSP-PIP maximum custody patients

occurred from February 5, 2024 to July 22, 2024. During these post-reviews, the MHCT recommended suspending 30 patients' maximum custody status. As a result of these reviews, the ICC suspended maximum custody status for a total of 14 patients. One additional patient had his maximum custody status suspended but was charged with a new RHU term prior to being released. Although the deputy director considered two cases, there were no additional maximum custody suspensions following the deputy director video conference.

For maximum custody training, seven captains, five administrators, 23 CC I's, ten CC II's, two CC III's, three sergeants, and two correctional officers completed the training during the review period. As for non-custody staff, four administrators, 12 senior psychologists, ten psychiatrists, 17 psychologists, 11 clinical social workers, and 11 recreation therapists completed the training. For both custody and non-custody staff, the institution could not provide the number of staff that were required to complete the training, therefore compliance could not be assessed.

For the above stated reasons, the institution was compliant with PIP maximum custody reviews during the review period.

## XII. USE OF OBSERVATION CELLS/ROOMS, SECLUSION, AND RESTRAINT

There were no patients held in observation cells at the time of the site visit. There were no seclusions or restraints reported during the monitoring period. Toured seclusion and restraint rooms were in good working order, and staff were knowledgeable of procedures surrounding the use of seclusion and restraints.

## XIII. EMERGENCY RESPONSE AND THE DEATH REVIEW PROCESS

### 1. Emergency Response

Similar to the prior reporting round, the RMC continued to provid a forum that reviewed patient risk incidents. The RMC met twice per month which was an increase from the prior reporting period. Reviewed documentation revealed that all RMC meetings attained required quorums.

Substantive topics that the RMC addressed included sentinel events, including a death of a PIP patient during the review period, patient abuse allegations, staff assault and battery concerns, unusual occurrences, and self-injurious behaviors.

The individualized approach that the committee took in the Thirtieth Round continued into the current review period. Each patient incident was described in detail and at times included interventions to assist the patient in abstaining from the behavior that led to the incident. In the minutes, there were varying levels of assessment of underlying causes or factors that contributed to the patient's behavior or the incident.

For the above stated reasons, the institution was compliant with emergency response during the review period.

### 2. Death Review Process

There was one death of a PIP patients at SVSP during the review period. The institution indicated that the death was not by suicide. The death was identified in RMC meeting minutes as an overdose. The committee reviewed the death report and noted a concern that despite the patient being on direct observation treatment (DOT) medications, the patient was able to hoard medications. RMC meeting minutes reflected adequate discussion of ways to prevent future occurrences of hoarding medications and overdose, including using a means-restriction plan for patients that includes enhanced searches of the cell as determined by IDTT. The chief of mental

health indicated that when implementing the cell search plan, it should only be targeted to high-risk patients.

Because staff discussed ways to deter possible overdoses in the future and addressed concerns related to the patient death, the institution's death review process was compliant during the review period.

## XIV. QUALITY MANAGEMENT AND UTILIZATION REVIEW

SVSP-PIP did not have dedicated quality management staff at the time of the site visit or during the review period. The chief of mental health (CMH) had been managing the quality management and utilization review process for the PIP and reported that it was continuing to improve, but the lack of dedicated, data-driven quality management and utilization review staff impeded progress and development of the program. The CMH elaborated that rather than quality management and utilization review ideas and insights being brought to him from staff immersed in the process, he is forced to evaluate that program while simultaneously addressing his other duties. The committees involved in quality management and utilization review at SVSP-PIP are SPRFIT, the Quality and Performance Improvement Program (QPIP), the Utilization Management Committee (UMC), and the Risk Management Committee (RMC). Most performance metrics at SVSP-PIP are from the SPRFIT and QPIP committees. The CMH reported SPRFIT was operating very well at the time of the site visit, but QPIP was still a "work in progress" and consistently improving.

Reviews of the records showed the QPIP committee met monthly during the review period, except in April 2024. Minutes reflected a quorum was achieved at each meeting with discussion of various aspects of patient care and PIP operations. The QPIP committee identified five ongoing performance improvement priorities for the 2024-25 fiscal year. The QPIP priority

items were to increase treatment hours offered to consistently achieve 20 hours per week, including 10 hours of core treatment; improve the quality of IDTTs and treatment planning; improve the quality of suicide risk evaluations; and to improve the quality of safety plans.

A Utilization Management Committee (UMC) was initiated in February 2024. A psychiatrist, RN, and supervisory psychologist specialist lead the committee. The purpose of the committee is to review complex and difficult-to-treat patients and identify any deficiencies or shortcomings in their admission, course of treatment, or discharge process. The committee met four times during the review period and a quorum was met at each meeting. The committee discussed two complex patients per meeting in a case review and planning format. The CMH reported the UMC was exploring how to address and utilize the data sets to determine which areas to focus on and to develop policies and/or procedures to address any deficiencies.

The Risk Management Committee (RMC) met bi-weekly throughout the review period. A quorum was met at each meeting. At these meetings, the RMC discussed and examined data related to staff and patient safety. Committee topics included: sentinel events, allegations of patient abuse, and incidents of violence against patient to patient or patient to staff, any incidents of seclusion or use of clinical restraints, any incidents of continuous observation, any self-injurious behaviors (SIB) rated “moderate” or above, and two incidents of SIB within a 7-day period.

Although the institution clearly lacked required staff to fully implement a robust and comprehensive quality management and utilization review process, the institution took all steps necessary to achieve sustainable success in the inpatient program, therefore the institution was compliant with the quality management and utilization review process during the review period.

## XV. PATIENT COMPLAINTS/PATIENT SATISFACTION

SVSP reported 85 complaints during the reporting period, a 27 percent increase since last reporting round. Complaints included patient disagreements with diagnoses or prescribed medications, patients being assigned to groups that did not run, requests for changes in mental health care personnel, and patient complaints of custody mistreatment. No staff were moved to another post due to patient complaints.

No SVSP-PIP patients completed patient satisfaction surveys during the review period. CDCR reported that LOP 509, which created a patient council that meets monthly, was initiated in March 2024. Its goal was to promote communication and a therapeutic alliance among facility patients and staff.

## XVI. CUSTODY AND MENTAL HEALTH PARTNERSHIP PLAN

SVSP-PIP's custody and mental health partnership plan LOP was revised in April 2023 and was aligned with statewide policy.

Executive leadership joint rounding of the PIP occurred in once in the six month review period, with the institution using the required form. All required staff were present. SVSP reported one staff and one patient interview during rounding. Staff were interviewed and expressed concerns about getting patients to shower and adding a break room for custody officers in TC1. Patients interviews reflected that staff treated them well but there was a problem with issuing tablets in a timely fashion and a concern about the lack of 1:1 time with clinicians.

Joint executive rounding was not addressed in the warden's executive meeting during the review period. The Joint Executive Rounding form was attached to the Quality Management meeting minutes but was not referenced in the meeting minutes for the months of February, March, April, and June. It was described in the months of May and July. Joint Executive

Rounding was referenced in each month's mental health subcommittee meeting minutes. The minutes addressed problems created due to lack of staffing and issues regarding patient transport to appointments.

Similar to preceding monitoring round, daily huddles occurred in all units on second and third watch but were not compliant with attendance of required staff on either watch. Out of 14 huddle forms reviewed, nine or 64 percent were compliant with required staff attendance for second watch and eight or 57 percent were compliant with required staff attendance for third watch. Notably, the required custody staff signature was missing from over 50 percent of the attendance forms in unit C5. Observed huddles on Units C5 and C6 primarily consisted of nursing leading the huddle and reporting details to the other participants with little to no collaboration. Huddles in TC1 and TC2 were also led by nursing staff but were interactive with most members discussing patients.

Regional staff reported that Quarterly Partnership Roundtable Training figures could not be discerned as prison staff were not distinguished from for the PIP.

The institution reported 100 percent compliance for custody staff and mental health staff with Annual Partnership Off-Post Training.

Although the inpatient program lacked sufficient staff during huddles, all other elements of the custody and mental health partnership plan were compliant during the review period, therefore the SVSP-PIP was compliant.

## XVII. ***COLEMAN* POSTINGS**

All four PIP units had up-to-date English and Spanish *Coleman* postings.

## XVIII. LAUNDRY AND SUPPLY ISSUES

SVSP-PIP maintained the same laundry and supply distribution schedule since the preceding monitoring round which required a one-for-one exchange for clothing and linens as the patients were released for shower. Like the prior review period, the institution did not provide any audits, reports, or logs pertaining to laundry services during the reporting period. In the event of low inventory or supplies during business hours, each facility coordinated with the SVSP Warehouse and would coordinate with other housing units during holidays and non-business hours.

Patient interviews reflected continuing laundry issues during the review period. One patient reported that he was not receiving clean towels and was not receiving new clothing on a one-for-one exchange following a shower as required. This patient reported using the same towel for nine consecutive weeks. Patients were repeatedly told that they were short on clothing issue.

SVSP-PIP indicated consistently ordering new inventory and state clothing during the review period due to the shortages created by the current laundry service contract at Avenal State Prison (ASP). Given the ongoing laundry concerns, the institution also inquired about a new laundry service contract with California Training Facility (CTF) for just SVSP-PIP patient clothing and inventory needs.

## XIX. PROPERTY/VISITATION/PRIVILEGES/TELEPHONE ACCESS

Issues with obtaining patient property from the prior institution continued into the Thirty-First Round. This was specifically a concern when patients were transferred from an outside institution. Officers reported calling institutions on behalf of patients to find and forward the property.

Each of the four PIP units applied different rules concerning yard and telephone time. Out-of-cell time averaged 10.6 hours per week in units C5 and C6. Out of cell time for patients in TC1 and TC2 averaged 13.3 hours per the same period.

Officers in TC 1 and TC 2 reported that second watch groups and yard time overlapped. If patients wanted to attend both in one day, they would have yard for approximately 20 minutes. Further, some patients would skip their groups if they wanted to participate in yard. Second watch yard time typically lasted one hour on weekdays and 2 hours each weekend day.

Reviewed documents revealed that unit C5 provided the opportunity for patient phone calls one or two times in the last 21 days of the review period. Specifically, unit C5 had an average of 1.6 phone calls per patient for a three-week period. In unit C6, there was an average of 18 phone calls per patient in a three-week period. In TC1, telephone was offered every other day during third watch from 6:00 PM to 7:00 PM during unstructured activity time. This time also included shower and dayroom.

Officers reported that once patients were issued tablets, telephone time became somewhat obsolete as they could make calls from their tablets at any time patients were in their cell. However, officers also reported concerns with broken tablets repairs taking over a week due to one person assigned to fix all tablets for two institutions.

As canteen travels from cell to cell, patients must remain in their cells on canteen day which has led to skipped groups and other privileges to wait in their cells for canteen, which was typically conducted in the morning.

## XX. LAW LIBRARY ACCESS

PIP patient access to law library was solely through kiosks and written requests during offered dayroom hours. Viewed kiosks were working properly. Patients reported that scheduled

day room negatively affected their access to the kiosks as evening day room access created long lines to use the kiosk. The head librarian reported that within two days of patient-requests, photocopied material was sent to the patient.

## XXI. PRE-RELEASE PLANNING

Similar to the preceding monitoring round, SVSP's pre-release coordinator was not assigned specifically to the PIP. She served the role as the institution's pre-release coordinator for the past five years and her role in the PIP had not changed. The pre-release coordinator reported actively accessing patients who were 60 days from release. The coordinator then located statewide benefits including TCMP, Cal ID, for each patient. That information was relayed to the primary clinician and to the statewide Mental Health Pre-Release Coordinating Team at monthly meetings. The state-wide team then made further necessary referrals for the PIP patients who were releasing.

The institution reported that weekly pre-release groups were on-going with primary clinicians determining eligibility. Groups were reportedly run by a social worker and followed the state-wide pre-release curriculum.

The coordinator reported that every patient who released from the PIP had been offered TCMP services as that was the coordinator's norm. However, that was not documented in any formal manner for review. The coordinator reported that there was no way to document previous pre-release contacts or efforts in EHRS. She documented contacts which she made through the pre-release assessment and through monthly meetings with the Statewide Mental Health Pre-Release Coordination Team.

For the above stated reasons, the institution was compliant with pre-release planning during the review period.

## XXII. PROGRAM ACCESS

The institution reported that no PIP patients were offered education, job assignments, or work assignments during the reported period. Additionally, SVSP-PIP could not provide data on the number of PIP patients who earned milestone credits during the reporting period.

## XXIII. EDUCATION

No SVSP-PIP patients were enrolled in education programs during the review period.

**APPENDIX B3**
**California Health Care Facility (CHCF – PIP)**
Review period: February 1 – July 31, 2024
Site visit: October 15 – October 17, 2024

The CHCF-PIP site visit revealed more positive findings regarding medication management when compared to the previous review period. CHCF-PIP's staffing vacancy rates had improved since the prior review period, specifically functional vacancy rates for psychiatry and rehabilitation/recreation therapy were 13 and 16 percent, respectively. Whereas the previous functional vacancy rates for the same disciplines were 32 percent for psychiatry and 37 percent for rehabilitation/recreation therapy. However, like the previous reporting period, functional vacancy rates for psychology and social work remained high even with the use of contactors at 47 percent for each discipline. Functional vacancy rates from the prior review period were 52 percent for psychology and 37 percent for rehabilitation/recreation therapy.

Although the CHCF-PIP had improved in multiple areas acute care patients continued to receive less than 20 offered hours of out-of-cell structured and unstructured treatment hours which was consistent the previous reporting period. Additionally, intermediate care patients during the review period also received insufficient offerings out-of-cell structured and unstructured treatment hours which differed from the previous review.

## I. SUMMARY OF THE FINDINGS

- Similar to the previous reporting period, CHCF-PIP continued to have closed PIP beds including 39 acute care and 60 intermediate care beds and 15 PIP beds were redlined.
- During the site visit, 98 or 53 percent of the CHCF-PIP's 184 acute care beds were filled. During the prior site visit in January 2023, 78 of 184 or 42 percent of acute care beds were filled.
- During the site visit, 207 or 63 percent of the CHCF-PIP's 330 intermediate care beds were filled. During the previous site visit, 254 of 330 or 77 percent of intermediate care beds were filled.

- CHCF-PIP's staffing vacancy rates had improved since the prior review period, specifically functional vacancy rates for psychiatry and rehabilitation/recreation therapy were 13 and 16 percent, respectively. However, functional vacancy rates for psychology and social work remained high at 47 percent for each discipline.

- The CHCF-PIP did not use telepsychiatry, tele-psychology, nor tele-social work during the review period or at the time of the site visit.

- CHCF-PIP met the staff-to-patient ratios of 1:15 for acute care, and 1:30 for intermediate care, for psychiatry, psychology, social work, and rehabilitation/recreation therapy.

- Observed acute care IDTTs were collaborative; observed intermediate care IDTTs ranged from adequate to inadequate as it appeared that training in treatment planning and conducting IDTTs was warranted.

- The positive behavioral support team process was inadequate.

- Group treatment on the maximum custody units was somewhat limited due to the TTMs not being able to be placed in a semicircle which limited patient interaction with other patients in the group setting.

- Mental health staff and patients reported that it was not uncommon for group treatments to be canceled related to various incidents requiring an emergency custodial response and mental health staffing absences related to vacations and illness.

- Multiple observed groups lacked confidentiality due to the door being left wide open during the entirety of the group offerings.

- Both RTs and PTs reported that they did not have access to group treatment curricula or materials and had to search for materials on their own which was evident during group observations.

- Similar to the previous reporting period, the number of out-of-cell structured and unstructured treatment hours offered to acute care patients remained insufficient for an acute care program. However, during the review period the number of out-of-cell structured and unstructured treatment hours offered to intermediate care patients was also insufficient for an intermediate care program.

- Review of the healthcare records for ten CHCF-PIP patients to assess the quality of medication management revealed adequate medication management for six of ten reviewed cases.

- There were no reported barriers in the PC 2602 process which differed from the previous reporting period.

- Reviewed immediate use of force incidents exhibited reasonable and appropriate use of force and all policy requirements for each controlled use of force incident were met.

- Reviewed NCAT data indicated that patients were receiving weekly calls, linen exchanges, yard, and showers. However, interviewed patients alleged that they were not receiving all their privileges.

- Patients reported significant laundry issues and custody staff reported doing individual audits due to issues with laundry and clothing.

- Observed CMHPP huddles revealed that staff were engaged, and that custody staff appropriately participated.

- Union issues reportedly continued to result in custody staff not attending maximum custody huddles which was consistent with the previous review period.

- Patients typically had access to contact and virtual visitation.

- The institution reported that PIP patients were not assigned jobs.

## II. CENSUS

On October 11, 2024, the population at CHCF-PIP was 305 patients, of which 98 were acute care patients and 207 were intermediate care patients. Of those 305 patients, there were 23 acute maximum custody patients and 40 intermediate care maximum custody patients; 15 intermediate care maximum custody patients were housed in an overflow unit. The total capacity for CHCF-PIP was 415 patients, with 145 available acute care beds and 270 available

intermediate care beds. CHCF-PIP reported there were 39 acute care, and 60 intermediate care beds closed, with 15 PIP beds redlined. There were no flex beds at the time of the site visit.

CHCF-PIP reported that B1A, B1B, B2A, B2B and B4A were acute care housing units, and B4A was the acute care maximum custody acute unit. The intermediate care housing units were B3B, B4B, B5A, B6A, B6B, B7A, B7B, B8A, B8B, and B4B was the intermediate care maximum custody unit and B3B was used for intermediate care maximum custody overflow. The following housing units were closed A2A, B3A, and B5B.

## III. STAFFING

CHCF-PIP provided staffing numbers for PIP specific allocations and other allocations for the entire institution.

### 1. Administrative, Clinical, and Correctional Staffing

Program Directors: Four of 4.4 allocated program director positions were filled for a nine percent vacancy rate.

Program Assistants: Both program assistant positions were filled.

Chief Psychiatrists: The chief psychiatrist position was filled.

Senior Supervising Psychiatrists: One of two senior psychiatrist positions was filled.

Psychiatrists: Thirteen of 33 psychiatrist positions were filled for a vacancy rate of 61 percent. The use of 13.5 contractors reduced the psychiatry functional vacancy rate to 20 percent. Additionally, 2.25 positions were filled by dual appointments, which further reduced the psychiatry vacancy rate to 13 percent.

Chief Psychologists: Both chief psychologist positions were filled.

Senior Supervising Psychologists: All 4.35 senior psychologist supervisor positions were filled.

Senior Psychologist Specialist: Eleven of 14 senior psychologist specialist positions were filled by permanent staff, while three positions or 21 percent vacancy rate.

Psychologists: Eight of 34.25 psychologist positions were filled for a 77 percent vacancy rate; one psychologist was out on long term leave and another psychologist was acting out of class in another position, an additional 12.25 positions were filled with registry staff for a functional vacancy rate of 47 percent. Two psychologists were unlicensed.

Supervising Social Workers: The two supervising social worker positions were filled.

Social Workers: Eight of 29.2 social worker positions were filled, for a 73 percent vacancy rate. Two social workers were out on long term leave and contractors filled an additional 9.5 positions leaving a functional vacancy rate of 47 percent. Three social workers were unlicensed.

Rehabilitation/Recreation Therapists: Eleven of 23.9 rehabilitation therapist positions were filled, for a vacancy rate of 54 percent; an additional nine positions were filled by contracts reducing the functional vacancy rate to 16 percent.

Supervising Registered Nurses (SRNs): There were 147.7 supervising registered nurse positions of which 119 positions were filled, for a vacancy rate of 19 percent. There were five SRNs on long-term leave and eight SRNs were working out of class, increasing the functional vacancy rate of 28 percent.

Registered Nurses (RNs): Of the 711.57 allocated registered nurse positions, 468 positions were filled resulting in a vacancy rate of 34 percent. Contractors filled an additional 42 positions, and 11 RNs were out on extended leave resulting in a functional vacancy rate of 30 percent.

Senior Psych Techs: All 24 senior psych tech positions were filled. However, three senior psych techs were out on long term leave, resulting in a functional vacancy rate of 12 percent.

Psych Techs: Of the 256.65 psych tech positions, 215 positions were filled, for a vacancy rate of 16 percent. The use of contractors filled an additional four positions while 17 psych techs were acting out of class in other positions resulting in a functional vacancy rate of 21 percent.

Unit Supervisors: There were no allocated unit supervisor positions, though four positions were filled.

Health Program Specialist I (HPSI): One of 1.5 HPSI positions were filled, resulting in a 33 percent vacancy rate.

Health Program Specialist II (HPSII): The HPSII position was filled.

Associated Government Program Analyst (AGPA): All 12.5 permanent positions were filled.

Correctional Health Care Administrator I (CHSA I): Two of 2.4 CHSA I positions were filled for a 17 percent.

Correctional Health Care Administrator II (CHSA II): All three CHSA II positions were vacant.

Correctional Staff: The warden position was filled. The associate warden and captain positions were filled by staff acting out of class, all 2.8 lieutenant positions were filled, as were all 9.8 sergeants' positions. All five CC I positions were filled as were all three CC II positions. Furthermore, all 169 correctional officer positions were filled.

**2. Telepsychiatry**

CHCF-PIP did not utilize telepsychiatry during the reporting period.

### 3. Telework

Tele-psychology and tele-social work were not utilized in the CHCF-PIP during the reporting period.

### 4. Staff-to-Patient Ratios and the Adequacy of Clinical Staffing

All psychiatry and primary clinician caseloads were within caseload ratios for acute and intermediate care.

Acute care caseload ratios averaged nine patients for psychiatry, 7.5 patients for primary clinicians, and 9.8 patients for recreational therapy. Intermediate care caseload ratios averaged 14.5 patients for psychiatry, and 11.5 patients for primary clinicians and recreation therapists.

## IV. TREATMENT CLINICAL SERVICES, AND PROGRAMMING

### 1. Interdisciplinary Treatment Team Meetings (IDTTs)

Acute Care

Four acute care IDTTs were observed. All were routine weekly IDTT meetings. The space was adequate with regard to size and confidentiality. Required staff were present and each had access to computers as needed. The patient was present for three of the four meetings. In all meetings there was a brief discussion of the patient's history, focusing primarily on the factors precipitating the patient's admission to the acute unit. None of the meetings included case conceptualizations. Psychotropic medications were identified and discussed with regard to efficacy and side effects. Diagnoses were clearly presented in all cases; however, there was no discussion regarding the team's consensus regarding the diagnoses or symptoms which supported the diagnoses. The patient's functional impairments were identified along with patient strengths in all meetings. Treatment plans were discussed with goals clearly articulated; however, treatment goals were not always discussed in measurable terms. Discussion of interventions was

often vague and/or generic referring to medication, groups, and individual treatment without the specific content that would be provided during therapeutic sessions. Group participation was reviewed; however, discussions did not include a review of what types of groups the patient was attending and how those groups impacted the patient's treatment goals. LRH was not discussed in all meetings nor was justification for the patient's level of care. Overall, meetings were collaborative.

During the review period, acute care patients were required to receive an initial IDTT within 72 hours of arrival and every seven calendar days thereafter during the patient's stay. Thirty acute care patients who required initial IDTTs during the review period were selected to review compliance with required timeframes. All 30 acute care patients received timely initial IDTTs within 72 hours of arrival. Patients were in attendance for 25 or 83 percent of initial IDTTs while the required staff were in attendance for 29 or 97 percent of initial IDTTs.

Thirty additional acute care patients who required routine IDTTs during the review period were also selected to review compliance with required timeframes. Of the 90 expected timeframes, 77 or 86 percent occurred every seven calendar days. Patients were present in 88 of the 120 or 73 percent of reviewed routine IDTTs while required staff were present in 112 or 93 percent of routine IDTTs.

Intermediate Care

Multiple intermediate care IDTTs were observed during the site visit. An observed IDTT on unit B8A was held in absentia due to the patient declining to attend his IDTT. This was a discharge IDTT as the patient was informed one week earlier that he was going to be discharged back to North Kern State Prison to complete the reception center process which was stopped due to a suicide attempt. The patient had consistently refused to participate in programming and only

sporadically participated in individual counseling. All the appropriate IDTT members were present although the attending psychiatrist was covering for the patient's treating psychiatrist. The treatment team was planning to schedule a discharge CCAT with the NKSP RC EOP staff. The monitor's expert raised the issue of whether the completion of the reception center process could be accomplished remotely since, from a clinical perspective, another transfer from NKSP following the completion of such a process would likely be clinically destabilizing.

Two IDTTs were observed on unit B8B which were attended by the required clinical staff. The first IDTT was an initial IDTT for a patient who was initially admitted to maximum security acute care and was later transferred to a non-maximum security acute care prior to his current intermediate care admission. The second IDTT involved a patient with a likely schizoaffective disorder, who reported he was locked in his cell about 20 hours per day. However, staff explained that this patient frequently declined to attend group or activity therapies on a daily basis. This patient received individual counseling on a weekly basis. Both IDTTs were attended by the required staff.

A maximum security IDTT was observed on unit B4B. The patient reviewed clearly was psychotic but was improving with the use of involuntary ordered psychotropic medications.

Another six IDTTs were observed including three on unit B3B, two on unit B6B, and one on unit B8B. The conference room space for all the observed IDTTs was adequate. Staff also had access to computers. During the one initial IDTT the primary clinician and psychiatrist appeared to have completed their initial evaluations prior to the IDTT. Treatment planning was discussed with the patients during the meeting. Measurable treatment goals and expected outcomes for discharge were not uniformly discussed during each IDTT. Diagnoses were generally discussed during the IDTT. Discussion regarding treatment targets/interventions/goals,

level of care, clinically indicated contact frequencies, and level of observation/allowable items determined collaboratively significantly varied among the observed IDTTs. Discussion regarding the degree of treatment progress or lack of progress toward goals discussed ranged widely in the IDTTs observed.

Review by primary clinicians and/or the IDTT regarding patients' engagement in groups or levels of participation significantly varied in the IDTT's observed. The IDTT meetings were generally collaborative and interactive among the individual team members. Notably, the IDTT process observed on unit B8B was excellent, which was related, in part, to the primary clinician using the QI IDTT audit as a guide in structuring the IDTT process.

Additional IDTTs were observed on unit B5A. There were four IDTTs scheduled on B8A, however, none were conducted due to either patient movement, transfers, or parole. Two IDTTs were observed on unit B5A and conducted by one clinician who was introduced as the patients' clinician and not Dr. or Ms. so it was unclear if the clinician was a psychologist or social worker. All required participants were in attendance. The clinician conducting the IDTTs was difficult to understand and follow. There was no case conceptualization, accomplished or partially accomplished goals and interventions were not discussed, and LRH was not discussed. The patients were discharging in two weeks without the discussion of the successful completion of goals and there was no mention regarding the steps patients could take to be successful at the next level of care. Psychiatry and CC I interactions were appropriate.

Five more IDTTs were observed, including one initial, one discharge, and three routine IDTTs. The space was adequate with regard to size and confidentiality. Required staff were present with the exception of psychiatry. In two of the meetings, a covering psychiatrist was in attendance. All staff had access to computers as needed. Patients attended all meetings. At the

beginning of every meeting, primary clinicians reviewed each patient's criminal case factors including the patient's crime, sentencing, and RVR history. In a number of the cases, the patient was clearly troubled by discussion of these factors and in one case the patient stated that a review of his crimes made him "look like a scumbag" and visibly impacted his emotional state. It was not clear why clinicians chose to review these factors. Psychiatric histories were discussed as well; however, there were no case conceptualizations presented. Patient diagnoses were stated but not discussed so consensus could not be determined except in one case where the psychiatrist noted that one of the diagnoses had been removed. There was no further discussion or review of this fact during the meeting. Functional impairments and patient strengths were not consistently discussed.

Further, while either treatment goals or Treatment Outcome Expectations (TOEs) were presented, it was not always clear that they met the needs of the patient. For example, in one case, a patient was experiencing psychotic symptoms, paranoia, and challenges engaging in programming, yet his treatment goal was identified as "anger management" without clarification. Treatment interventions, other than medications and groups, were vague and occasionally inappropriate. In addition to the anger management focus for the patient experiencing psychosis as mentioned above, another patient who was clearly experiencing anxiety was told to leave groups early if he was anxious, rather than developing a plan to address the patient's anxiety through evidence-based interventions.

Groups were discussed generically, without indication of which groups patients would be attending or how these groups met the patient's needs or facilitated achievement of treatment goals. In two cases, the recreational therapists mentioned specific groups the patient would be assigned but not how these addressed the patient's goals. Generally, treatment planning was not

individualized. Three of the five meetings were not collaborative as they were dominated by the primary clinician, who often interrupted the patient, and simply inquired if any of the other members had input. There was no discussion of safety planning when it was clinically indicated, no transition planning, and none of the cases included discussion of the rationale for continued placement at the intermediate level of care; however, treatment progress and/or barriers to treatment were vaguely mentioned. In the one case where the meeting was a discharge IDTT, rationale for transitioning the patient to the EOP level of care was discussed and appeared appropriate.

Overall, it appeared that training in treatment planning and conducting IDTT meetings was warranted.

During the review period, intermediate care patients were required to receive an initial IDTT within 72 hours of arrival and every 30 calendar days thereafter during the patient's stay. Thirty intermediate care patients who required initial IDTTs during the review period were selected to review compliance with required timeframes. Of the 30 intermediate care patients, 28 or 93 percent occurred within 72 hours of arrival. Patients were in attendance for 26 or 87 percent of initial IDTTs while the required staff were in attendance for 25 or 83 percent of initial IDTTs. In two instances, the initial IDTT took place without any psychiatrist or primary clinician.

Thirty intermediate care patients who required routine IDTTs during the review period were selected to review compliance with required timeframes. Of the 83 expected timeframes, 82 or 99 percent were timely. Patients were present in 87 of the 113 or 77 percent of reviewed routine IDTTs while required staff were present in 107 of 113 or 95 percent of reviewed routine IDTTs.

**2. Group Therapy**

The institution was required to offer PIP patients at least 20 hours of structured therapeutic activities per patient per week, ten hours of which must be core treatment. *See* ECF No. 7924 at 10 (citing "[d]efendants shall immediately adopt and implement in the CDCR PIPs the minimum treatment standards set out in the DSH CQI process approved by the court.*"); see also* ECF No. 7812-1 at 15 (stating "that [the DSH CQI] process…provides that patients will be offered 20 hours of treatment per week, at least ten hours of which are to be 'core treatment'."). The remaining ten hours offered to patients must consist of supplemental treatment and cannot include offered yard or day room activity. Because core treatment hour requirements can include individual treatment, compliance is assessed as a totality of treatment offered to the patient on average per week. *See* ECF No. 7812-1 at 15.

Acute Care

CHCF-PIP reported that an average of 14.5 hours of weekly structured therapeutic activities were offered to patients and ranged from 11.71 hours to 16.24 hours. Patients attended 8.27 hours and refused 6.23 hours on average each week. It was reported that an average of 3.4 hours of weekly structured treatment was cancelled.

The institution reported there were no waitlists for any groups in response to the data request, yet when on-site, it was reported that patients were often delayed in being able to enroll in groups due to the groups being full. The lack of a waitlist thus reflected a lack of formal tracking rather than an absence of patients waiting to be engaged in groups. Individual patients reported that when groups were filled, they would go to the yard and if a patient in the group chose to leave the group session early, they would be allowed to join the group. While it was positive to hear that efforts were being made to increase patient access to groups, it was

concerning to learn that entering a group late and participating in a group to which the patient was not routinely assigned was not problematic from a therapeutic standpoint. This likely evidenced that groups were not treatment focused and were likely recreational or leisure in nature, where the content was not relevant to the patient's treatment.

There were no groups offered in any language other than English.

CHCF-PIP was unable to report the range and average size of groups within the PIP; however, they reported that the maximum group size for acute care was eight patients. In their narrative, CHCF staff reported that patients were assigned to groups specifically by the IDTT so that the patients could receive treatment that was consistent with their treatment plans. However, there was no evidence that this was the case as observed IDTTs, and groups were not reflecting this initiative and interviews with patients confirmed that this practice was not occurring.

The vast majority of groups offered to acute care patients were facilitated by recreational therapists (RT) or psychiatric technicians (PTs). Both RTs and PTs reported that they did not have access to group treatment curricula or materials and had to search for materials on their own. This was evident during observed PT-facilitated groups as the PTs read from printed sheets and did not appear to understand the concepts being presented.

Four acute care groups were observed. All were conducted in rooms that were adequate with regard to size and confidentiality. Of concern was the fact that loud noises from televisions could occasionally be heard through the walls and some facilitators left the doors open, compromising confidentiality. One group was facilitated by a psychologist; however, the Special Master's expert was only able to observe the group for a short time as the schedule provided on the day of the site visit was inaccurate regarding the start time and an alarm on the unit required that the group be suspended for approximately 10 minutes. There were six

participants in the group. The part of the group that was observed did not evidence that it was a Cognitive Behavioral Therapy group as titled, but instead was an open group where patients were discussing various topics.

Two of the observed groups were facilitated by PTs, one was a stress management group, and the other was a life skills group. The PT facilitating the stress management group noted that four patients were assigned to the group, but other patients were "pulled in" as available. There were five patients present during the group session, which was conducted with the door open, limiting confidentiality. The PT reviewed a pre-printed handout; however, there were not enough copies for all the patients. The content of the group was challenging for the patients to understand, and the PT did not appear to be familiar with what was being presented.

The second PT-facilitated group included five patients and was a life skills group which was intended to focus on interpersonal boundaries yet covered various topics that were unrelated to each other, and each was covered only superficially. The PT did not appear to be familiar with the content being discussed, struggled to explain the concepts, and mispronounced terms. The group was disorganized and did not allow for, nor encourage, patient interaction. The structured part of the group, despite covering a vast number of topics, lasted only 30 minutes before two televisions in the room were turned on for the patients to watch. The patients were allowed to select the television shows and opted for police-related reality shows.

The fourth group observed was a relaxation group facilitated by an RT. The door remained closed during the group session. The group included three participants. It was structured and included formal breathing and progressive relaxation exercises. The RT discussed how these exercises could be used by the patients during times of anxiety and agitation. This group was adequate and appeared to meet the needs of the patients.

Intermediate Care

The average number of structured out-of-cell therapeutic therapy offered and received on average per week per patient during the monitoring period was reportedly 15.83 hours and ranged from 14 to 17.75 hours. Patients attended a weekly average of 7.07 hours and ranged from 5.98 to 8.48 hours.

Interviewed intermediate care patients reported a wide range regarding the number of unstructured out-of-cell hours offered on a weekly basis which ranged from less than 10 hours to about 21 hours depending on the specific intermediate care unit. Reviewed NCAT data revealed that PIP patients were receiving two to three hours of yard or day room daily, three showers weekly, two or more phone calls, and a weekly linen exchange. However, this was not consistent with information obtained from most patients who reported receiving less of each.

Mental health staff and patients reported that it was not uncommon for group therapies to be canceled related to various incidents requiring an emergency custodial response and mental health staffing absences related to vacations and illness.

An observed anger management/conflict resolution group was conducted by a primary clinician. Six maximum security intermediate care patients attended the group in B4B. The group leader was well prepared, and the patients were generally actively involved. Due to the size of the multipurpose room, the configuration of the six therapeutic modules was not in a semi-circle, which limited the social interaction among the patients involved. Custody restraints were not used in the TTMs.

Three recreational therapy groups were observed. The first recreational therapy group was observed on B7A. Only two patients attended the group. However, both patients were actively involved with the recreational therapist during this structured therapy session. The

second RT group was observed on B8B. This group was a painting group which three patients attended. The patients were actively involved in the painting lesson. The third RT group was a playing cards and/or watching a movie group and involved three patients and two RTs.

Additionally, compared to the previous site visit, the average number of hours for out-of-cell structured therapeutic activities offered for each patient had significantly improved, especially in the maximum-security units. The increase in the maximum security units was directly related to the use of the therapeutic modules. Also, there was a significant increase in the number of core structured therapeutic activities that had recently been implemented.

Line staff reported one barrier to increasing the number of structured therapeutic activities per patient which was physical plant limitations. This barrier appeared, in part, to be related to scheduling issues that needed to be addressed. Staff also described soundproofing issues in the two rooms on each unit used for structured therapeutic activities. This issue also needed to be adequately addressed.

The use of therapeutic modules in the maximum security units is somewhat limited due to the physical plant space, which does not allow the modules to be placed in a semicircular manner for the purposes of facilitating interaction among the patients in the group setting. The designated day room in the maximum security units continued to be unused by patients due to security concerns. It is recommended that the furniture be removed from the day room space and replaced by therapeutic modules placing them in a semicircular fashion for specific recreational therapy or for activities that do not require confidentiality.

<u>Nursing Lead Therapeutic Groups (NLTG)</u>

The Nursing Led Therapeutic Groups (NLTG) began in the PIP in 2021. There was a total of 20 groups offered in the PIP. All groups were offered in the intermediate care units B5A,

B6A, B7A and B8A. The NLTG schedule for October 15, 2024, showed NLTGs on all four units for one hour time blocks. There were no NLTGs scheduled on second watch.

Due to the timing of the groups which conflicted with the offering of day room and yard time, the NLTG attendance rates in the PIP averaged around 44 percent.

The SRN III was interviewed. There were 14 RN positions allocated for PIP mental health groups and ten were filled. Of those ten positions filled four were NLTG RNs who conducted groups in buildings B5A, B6A, B7A and B8A. The term PIP Mental Health Group RNs was misleading as headquarters nursing staff stated that all RNs who conducted groups statewide were NLTG. According to CHCF-PIP nursing staff, since the NLTGs have reached their capacity of 120 groups including 20 in PIPs and 100 in EOP, the mental health PIP RN nurses were all trained to conduct NLTGs but were currently teaching non-NLTG groups that were not standardized. Of the PIP groups beginning between the hours of 1000 AM and 1900 PM, an average of seven of those groups per day were conducted by nursing staff, which these groups were not standardized and did not follow an NLTG curriculum. The patients, however, would still receive credit for the groups through milestone credits instead of rehabilitative achievement credits (RAC).

According to nursing staff, Mental Health & Wellness NLTGs were taught on Mondays, Physical Health & Wellness NLTGs were taught on Tuesdays, Substance Abuse NLTGs were taught on Wednesdays, Expressive NLTGs were taught on Thursdays, and Life Skills NLTGs were taught on Friday.

An NLTG on B5A was observed with a start time of 1500 PM. The group was on Physical Wellness and the topic was focused on Hepatitis C. Eight patients were on the roster and eight patients attended. One scheduled patient did not attend, and a patient was added. A

RN facilitated the group and the group was interactive. The formal meeting lasted about 20 minutes. The remaining 40 minutes, patients interacted with each other on topics other than Hepatitis C. The entire curriculum was followed. The RN had a good rapport with patients and the patients interacted well with each other. The NLTG was not confidential as the door was open wide the entire time and at times the hallway was very noisy. This was problematic as patients were asked about protected information about their Hepatitis C status.

RT Groups

Two RT groups were observed. The first RT group was attended by six patients. Two patients were playing Axis and Allies, another played cards with the RT, two other patients were playing a board game, and one patient sat alone listening to music. The RT group went on for an hour and patients were engaged and the RT interacted with each patient. The second RT group was attended by seven patients. The RT had paint and drawing supplies for the patients and they painted along with the patients. The group was interactive while listening to music. The participants were familiar with each other as some patients helped others to create colors by mixing paints. The group lasted the full hour, and the patients were engaged the entire time.

### 3. **Individual Treatment**

Acute Care

The Program Guide requires that acute care patients receive an initial psychiatric evaluation within 24 hours of arrival, every three days thereafter for the first thirty days, and then every seven days during their stay. Acute care patients are also required to receive an initial primary clinician evaluation within ten days of arrival and thereafter twice per calendar week.

Sixty acute care patients were reviewed to assess compliance with Program Guide timeframes during their stays.[52]

Thirty acute care patients who required initial psychiatry evaluations during the reporting period were randomly selected for review. All 30 patients received a timely initial psychiatry evaluation within 72 hours of arrival. Twenty-five or 83 percent of initial psychiatry evaluations occurred in a confidential setting; reasons for non-confidentiality included patient refusals, modified programming, and provider initiated unplanned contacts.

A random sample of 30 acute care patients who required routine psychiatry contacts during the review period was also selected. There were 150 expected timeframes, 122 or 81 percent occurred every three days for the first thirty days of inpatient care and then every seven days thereafter. Of the 150 reviewed contacts, 45 or 30 percent occurred in a confidential setting. Reasons for non-confidentiality included patient refusals, modified programming, and provider initiated unplanned contacts.

The 30 randomly selected acute care patients who required initial psychiatry evaluations also required initial primary clinician evaluations during the reporting period. Of the 30 acute care patients, only ten or 33 percent timely occurred within 72 hours of arrival. Lengths of time before a patient received an initial primary clinician evaluation ranged from 24 hours late to 27 days late. Twenty of 30 or 67 percent of primary clinician evaluations were held in a

[52] These measures of compliance solely focused on the occurrence of a primary clinician or a psychiatric contact within the required timeframes and did not assess the quality of the contact. The indication of an initial assessment did not verify that a comprehensive initial assessment was completed during the first contact with the primary clinician or psychiatrist. Additionally, the review of routine primary clinician or psychiatric contacts did not distinguish between a brief check-in or a meaningful therapeutic contact.

confidential setting. Reasons for non-confidentiality included patient refusals and modified programming.

The random sample of 30 acute care patients who required routine psychiatry contacts also required routine primary clinician contacts during the review period. Across the 30 acute care patients reviewed, there were 146 expected timeframes, of which 105 or 72 percent were timely. Of the 146 reviewed contacts, 81 or 55 percent occurred in a confidential setting. Reasons for non-confidentiality included patient placement on maximum custody status which required the officer to be in the treatment room, patient refusals, and modified programming.

Sixteen patients who were receiving treatment at the acute level of care were interviewed during the site visit. Patients reported having been on the units ranging from two weeks to three months. Patients reported overall satisfaction with the services being provided on the acute care units. Individual and IDTTs were reported to occur as required, with additional cell-front check-ins being completed multiple times per week by both the psychiatrists and primary clinicians. Of the sixteen patients, two patients reported that they did not routinely see their assigned clinicians and one patient reported that despite being on the unit for over three weeks, he had not yet been seen by his assigned psychiatrist. Patients reported being offered between three and six groups per day, as well as having open access to the yard. Patients reported that they had to choose between yard time and group time during the day. All patients reported that the dayrooms were not in use.

Most patients reported being aware of their diagnoses as well as the content of their treatment plans. Patients reported that they felt respected by staff, felt safe on the units, felt cared for by the staff, were confident that they could access support during a crisis, and had access to the phone and/or a tablet. The patients expressed concerns about laundry, having

limited time for visitation with family members, delays in receiving property, and wanted access to more food.

One patient reported that he had a catheter that occasionally leaked and he was denied access to the shower when this occurred. He reported that showers were only available every other day. The patient appeared to be extremely anxious and upset. The patient reported that he had not raised the issue with his treatment team and was encouraged to do so yet appeared reluctant. The Special Master's expert followed up with a nurse on the unit who indicated that the patient should have access to a shower upon request given his medical needs. The patient's reported challenges were expressed to the nurse who indicated follow-up would occur; however, in the documentation on the day of this contact and the following day did not evidence that any follow-up was conducted.

Intermediate Care

The Program Guide requires that intermediate care patients also receive an initial psychiatric evaluation within 24 hours of arrival, every three days thereafter for the first thirty days, and then every seven days during their stay. Intermediate care patients are also required to receive an initial primary clinician evaluation within ten days of arrival and thereafter once per calendar week.

Sixty intermediate care patients were reviewed to assess compliance with Program Guide timeframes during their stays.[53]

[53] These measures of compliance solely focused on the occurrence of a primary clinician or a psychiatric contact within the required timeframes and did not assess the quality of the contact. The indication of an initial assessment did not verify that a comprehensive initial assessment was completed during the first contact with the primary clinician or psychiatrist. Additionally, the review of routine primary clinician or psychiatric contacts did not distinguish between a brief check-in or a meaningful therapeutic contact.

Thirty intermediate care patients who required initial psychiatry evaluations during the reporting period were randomly selected for review. Of the 30 patients, 29 or 97 percent received an initial psychiatry evaluation timely within 72 hours of arrival. Twenty-five or 83 percent of these initial psychiatry evaluations occurred in a confidential setting; reasons for non-confidentiality included patient refusal and a patient's maximum custody status which resulted in custody being in the treatment room with the patient and psychiatrist.

A random sample of 30 intermediate care patients who required routine psychiatry contacts during the review period was also selected. There were 150 expected timeframes, 97 or 65 percent timely occurred every three days for the first thirty days of inpatient care and then every seven days thereafter. Of the 150 reviewed contacts, 72 or 48 percent occurred in a confidential setting. Reasons for non-confidentiality included patient refusal, custody movement restrictions, weather concerns, and "provider initiated unplanned non-confidential" contacts.

The 30 randomly selected intermediate care patients who required initial psychiatry evaluations also required initial primary clinician evaluations during the reporting period. Of the 30 intermediate care patients, eight or 27 percent timely occurred within 72 hours of arrival. Lengths of time before a patient received an initial primary clinician contact ranged from 24 hours late to 39 days late. Twenty-one of 30 or 70 percent of primary clinician evaluations were held in a confidential setting. Reasons for non-confidentiality included patient refusals and one instance of modified programming.

The random sample of 30 intermediate care patients who required routine psychiatry contacts also required routine primary clinician contacts during the review period. Across the 30 reviewed intermediate care patients, there were 149 expected timeframes, of which 95 or 64 percent timely occurred every seven days. Of the 149 reviewed contacts, 74 or 50 percent

occurred in a confidential setting. Reasons for non-confidentiality included patient refusals, unspecified custody factors, modified programming, unavailable treatment space, and "provider initiated unplanned non-confidential" contacts.

Patients interviewed generally reported that they received weekly individual counseling from their mental health primary clinician. Treatment sessions were generally in a confidential setting although staff acknowledged that about twenty percent of such sessions were not confidential related to either patient refusal or some custody staff related issues. Patients reported that the duration of such individual contacts ranged from 30 minutes to one hour. Continuity of care did not appear to be a significant issue.

Telepsychiatry and telemental health were not used for intermediate care.

**4. Solo Programming**

Intermediate Care

Staff reported that at any given time on any given intermediate care unit, zero to five patients were on solo programming. In general, newly admitted patients were placed on solo programming that would last for about one to two weeks. The other criteria for solo programming were being a danger to others or too psychotically disorganized to participate in group activities. Patients meeting such criteria could be on solo programming for several days to several weeks.

**5. Medication Management**

**a. Clozapine**

At the time of the site visit, CHCF-PIP had 24 patients on clozapine.

**b. PC 2602**

At the time of the site visit, the institution had 104 patients receiving involuntary PC 2602 medications. CHCF-PIP reported 196 patients received PC 2602 involuntary medication during the reporting period. The institution filed 35 initial emergent, 31 initial non-emergent, and 130 renewals; all petitions were granted. There were no cases in which the PC 2602 was planned non-renewal, nor any cases lost to follow up.

CHCF had a dedicated, full-time PC 2602 medication court administrator who had been in the position for approximately ten months at the time of the site visit. All hearings were held virtually. There were no reported barriers in the PC 2602 process, such as interfacing with the Office of Legal Affairs, Office of Administrative Hearings, or with the Administrative Law Judge.

**c. Non-Formulary Medications**

CHCF-PIP reported that 422 patients were prescribed a total of 613 non-formulary medications. A review of the non-formulary medications appeared appropriate, and raised no concerns.

**d. Medication Management Case Reviews**

The monitor's expert reviewed the healthcare records for ten patients, including five each from the acute and intermediate programs, in order to assess the quality of medication management provided at CHCF-PIP. Cases were randomly selected from a list of admissions during the monitoring period. Of these ten total cases, six were adequate and four were inadequate. This compared to five adequate and five inadequate cases found in the preceding monitoring round. Some cases deemed adequate had inadequacies and concerns; however, these did not rise to the level of rendering the overall medication management inadequate. For those

patients admitted prior to the monitoring round, relevant documents were reviewed to help understand the clinical picture; however, only the medication management of the patients during the review period was included in assessments of adequacy.

Echoing the preceding monitoring round, CHCF-PIP displayed positive aspects including timely initial psychiatric evaluations, and using long-acting injectable antipsychotics in appropriate cases. Long-acting injectable antipsychotics are a useful tool to address medication adherence, yet are frequently under-utilized in health care systems. As an example, in one case, there was concern for the patient's compliance with medication, which the psychiatrist addressed by changing the medication to one with a long-acting injectable form.

One of the most important decisions in medication management is deciding whether to start a medication. Several cases displayed careful and nuanced consideration of whether medications and involuntary treatment were indicated. Additionally, the cases documented the rapport between the patient and the psychiatrist. In one case, psychiatry collaborated with other disciplines regarding whether the patient's symptoms and clinical presentation required treatment with medication. Ultimately, the psychiatrist decided against medications, with the health record documenting a clear rationale for this decision. In one case, the patient made clear clinical improvement with medications, and his rapport with his psychiatrist assisted with managing challenging behaviors. In another case, the rapport between the patient and the psychiatrist prevented a potential use of force to administer involuntary PC 2602 medications. In another case, psychiatry documented working with other disciplines regarding the patient's medical care and whether an involuntary treatment order was required. While the order under consideration, namely involuntary medical treatment under PC 2604, was in the domain of the medical service,

the collaboration seen between psychiatry and medical in this patient in a psychiatric hospital was admirable, and helped medical providers with their decision making.

Despite these positive aspects, most cases displayed significant limitations in medication management. Cases displayed barriers to starting medications. In one case, the patient was referred to the intermediate level of care, with one goal being to start the patient on clozapine. The patient made minimal progress, remained psychotic, but was discharged on the same antipsychotics. Additionally, the patient had tardive dyskinesia, a movement disorder frequently caused by treatment with antipsychotics. Clozapine does not cause or worsen tardive dyskinesia, and has been shown to improve it. The monitor's expert realized that the decision to start particular medications remained with the treating psychiatrist; however, given that one goal of referring the patient to the inpatient level of care was to start clozapine, a clear rationale for not doing so was required. In an additional case, the patient reported depression and requested a particular antidepressant. The psychiatrist documented that this was not an option, as it was not on CDCR's list of formulary medications. There are many reasons to not start a medication, but the decision should be driven primarily by clinical factors (and, in certain cases, supplemented by custodial concerns), and not simply whether a medication is on the formulary or not.

Cases also displayed concerns with the number and speed of medication changes. In one illustrative case, the psychiatrist stopped three medications, and started three medications at the same time. Medications included antipsychotics and antidepressants. Barring urgent situations, the rationale for making this number of changes at one time is elusive. The psychiatrist would have no way of knowing if the subsequent clinical benefits or side effects were due to stopping a particular medication, or starting a new one.

As seen in the preceding monitoring round, there were multiple concerns with the PC 2602 involuntary medication process. In one case, the psychiatrist documented that they would contact the PC 2602 coordinator to see if a patient was under involuntary medications or not. The ability of a patient to consent or refuse medications strikes at the core of fundamental psychiatric care. The presence of absence of a judge's involuntary medication order should have been immediately evident. In another case, the psychiatrist noted that the medications they ordered for a patient receiving medications under the PC 2602 involuntary medication process had not been administered many hours later. The psychiatrist documented discussing the urgency of intervening and told nursing to activate an alarm for custody to respond. Additionally in this case, the psychiatrist noted the patient had an extensive history of non-compliance, yet they started an antipsychotic with no injectable form should the patient refuse. In a case of a patient with an extensive history of self-injury (Case J), psychiatry discontinued the patient's injectable backup medication after the initial evaluation. This was concerning as the patient had cut his wrist requiring sutures just 24 days prior to admission. The rationale for discontinuing the injectable form of the medication so soon after admission, instead of after a longer period of evaluation and monitoring the patient, was lacking.

Documentation in the electronic medical record revealed challenges. In one case, the psychiatry notes failed to address medication non-adherence, and contained conflicting information, such as the patient stopping a medication due to side effects, but then documenting no side effects later in the note. Finding out why a medication was stopped required review of nursing records. In another case, the patients admission evaluation had duplicative medications in the medication list, which rendered the document difficult to discern. Additionally, a medication listed in the list was not mentioned in the psychiatrist's medication plan.

Staffing limitations also directly affected the provision of care within CHCF-PIP. Cases displayed limited continuity of psychiatric care. In one case, this resulted in a covering psychiatrist changing the primary psychiatrist's treatment plan and discontinuing an antidepressant, with limited documented urgency to do so. In another case, the psychiatrist documented on multiple occasions that they were unable to see the patient in a confidential setting, due to "custody limitations" and "custody factors." Furthermore, the psychiatrist noted that no one-to-one sitter was present to monitor the patient, despite the order for this level of observation. While this was not a direct medication issue *per se*, this represented a serious deviation from standard of care and posed a risk to patient safety.

Notably, many intermediate care patients, especially those on involuntarily administered medications, were displeased with the medications they were prescribed. Also, continuity of medications for intermediate care patients were not an issue.

**6. <u>Positive Behavioral Support Team</u>**

CHCF reported having a Positive Behavioral Support Team (PBST). On site, the expert's monitor learned that the PBST was comprised of a single psychologist. According to local policy, the PBST provided support and consultation while the IDTTs were responsible for creating behavioral plans. This is not keeping up with standards of care in the development of behavioral plans, as such development requires specialized expertise in functional behavioral assessment and the development of such plans. Additionally, there were contradictions within the local policy. Specifically, the local policy stated that unit psychologists were responsible for creating and monitoring behavior plans yet elsewhere it was noted that primary clinicians were responsible. This was concerning as not all primary clinicians are likely to have the training or expertise needed to complete functional behavioral analyses and develop effective and evidence-

based behavioral plans. The LOP noted that primary clinicians were to use a template created by the PBST to create Behavioral Intervention Plans (BIPs). The Special Master's expert reviewed the template and determined that it was overly simplistic and focused on antecedent-driven behaviors and did not adequately account for consequence-driven behaviors. Additionally, the template included behaviors that were likely to be driven by psychosis or other serious mental illness such as polydipsia and purging after meals which are more appropriately treated through traditional psychiatric and evidence-based treatments for specific disorders which often underlie these behaviors (e.g., schizophrenia, bulimia nervosa). This finding was confirmed during interviews on site which revealed that the PBST was providing consultation on not only those patients amenable to behavioral plans (e.g., those who engage in disruptive, destructive, and/or dangerous behavior) but also "complex" patients who suffered from serious psychiatric symptoms or who were determined to be "difficult to discharge."

Unit Behavioral Guidelines (UBGs) were also developed for patients to address the environment to support behavior change. Review of a template for these guidelines revealed best practices for engaging with all patients, not necessarily targeted interventions to address dangerous behaviors. The template also called for minimizing staff interactions with the patient which may be clinically indicated for some patients but not all. This again raised concerns about the use of this template by staff without the expertise or training to fully assess behavior and implement clinically appropriate interventions. In addition to these behavioral plans, the PBST psychologist offered individual behavioral sessions to specific patients.

CDCR's PBST program was designed to receive referrals from IDTTs to address disruptive, destructive, and/or dangerous behavior. At CHCF, it was reported that rather than having IDTT make referrals to the PBST for formal behavior analysis and the development of

behavior plans, the PBST psychologist with support from support staff reviewed SPRFIT documentation for self-harm behavior, unusual occurrence reports, RVRs for violence and indecent exposure, hunger strike documentation, utilization management minutes, and pre-admission reviews to identify patients who may be amenable to behavioral supports. It was not clear that IDTTs were making referrals for PBST support. A rudimentary tracking system maintained a list of these patients with limited information about whether or not the patient had been assessed or had any behavior-specific treatments implemented.

Since June, 2024, the PBST was tracking patients at high risk for dangerous behavior toward themselves or others and coordinating consultation team meetings. The consultation team included PIP psychology and psychiatry chiefs and supervisors, and the unit mental health supervisors, as well as SPRFIT, DDP and PBST psychology specialists. This team met with the IDTTs for identified patients who engaged in more than two incidents of violence toward themselves or others in a given week. It was reported that on occasion, the consultation team engaged in a full review of the patient's history and arrived to complete a consultation with the IDTT, only to find that that patient's behavior has improved secondary to the use of psychotropic medication. This may be indicative of the fact that the patient's behavioral concerns were secondary to psychiatric illness and not appropriate for behavioral interventions.

Two excel spreadsheets were provided for tracking related to the PBST. One appeared to be a list of patients reviewed by the consultation team and included 14 patients. A second spreadsheet was used to track complex cases and referrals, yet not all the patients reviewed by the consultation team were in this spreadsheet. This spreadsheet included a list of 51 patients. In the cases where BIPs or UBGs were noted as having been implemented, record reviews revealed

limited to no follow up documentation regarding the effectiveness of interventions, which is an integral part of behavioral treatment.

Records for patients who were noted as having BIPs, UBGs, and/or were being seen for individual sessions by the PBST psychologist were reviewed. In some cases, there was no evidence that the planned behavioral interventions were developed despite indications either in the patient's record or on the tracking form that they were to be implemented. Some UBGs were found to be incomplete, referencing rewards that were not explained nor provided to the patient as incentives for behavior change. Further, there was no evidence that behavioral interventions were integrated into the patient's master treatment plan or reviewed by the IDTT either during formal IDTT meetings or during individual sessions. There was no evidence in the record that the effectiveness of these interventions was being tracked or assessed. For the patients being seen for weekly sessions with the PBST psychologist, these contacts were not acknowledged by the patient's assigned primary clinician nor mentioned in IDTT documentation. The individual PBST contact revealed evidence-based interventions to address the patients' behavioral needs; however, the plans noted in the progress notes were not consistently implemented and there was no tracking of behavioral incidents which are considered a standard of care in behavioral interventions.

Overall, the PBST program was inadequate. Recommendations for improvement are as follows, the need for additional PBST staff members; appropriate training for all PIP staff on behavioral support and consistency; specialized training for primary clinicians who are expected to conduct functional behavioral analyses and develop behavioral plans; consistent implementation of behavioral plans that have been developed; improved tracking of referrals, consultations, and implemented behavioral plans; and a reduction in the scope of patients

targeted for behavioral interventions to include only those for whom such interventions are clinically indicated. It was reported that training for clinical staff was being developed and expected to be implemented over time.

**7. Maximum Custody**

The institution reported that there was no report available that identified all maximum custody patients during the review period, including all staff who attended the IDTT. Similarly, no report was available regarding IDTT 128-Bs where the IDTT recommended that patients maximum custody designation be reduced. Furthermore, CHCF-PIP could not provide copies of all the ICC 128G Chronos which were completed following the recommendation by the patient's IDTT to reduce the patient's maximum custody designation with the ICC's action explaining why the patient's custody level was not reduced.

CHCF-PIP reported a sample of 52 intermediate care patients who were placed on maximum custody and who required weekly pre-reviews during the review period. These patients had lengths of stay ranging from three to 655 days and averaged 109 days. Forty-one of the 52 patients were retained on maximum custody due to their SHU offense; two patients were retained on maximum custody due to their patient investigations; two patients had their custody level reduced upon transfer; one patient was retained on maximum custody pending transfer to an appropriate EOP institution due to their LOC change; another patient was released on administrative review; one patient was recommended reduction at their pre-MERD review for greater access to programs; one patient had their investigation expedited; one patient was transferred to CIW-PIP; and the remaining two patients were recommended reduction if enemy concerns were isolated to KVSP and RJD respectively.

A reviewed sample of 25 maximum custody patients regarding initial ICCs and all patients had their initials within the 10-day time period. Also, these patients had follow-up ICCs within 30 to 60 days.

Additionally, a sample of 20 Chronos indicated that patients who were on maximum custody were often released from maximum custody within two to three days of being placed on maximum custody. Notably there were patients who were on maximum custody for an extended period of time which were often patients who were previously placed on maximum custody by other referring institutions or by CHCF for serious offenses.

Required staff attended all observed ICCs. One Initial ICC took place on unit B1A and the patient attended; sixteen ICCs including seven initials and nine subsequent ICCs took place on unit B1B and only one patient attended the remaining 15 were held in absentia. All observed ICCs were collaborative and mental health's recommendations were considered when deciding the outcome for each case. Notably, the ICC released 14 of 17 or 82 percent of patients from maximum custody.

**8. <u>Patient Interviews</u>**

<u>Acute Care</u>

Most acute care patients reported being offered confidential individual weekly sessions with both their assigned primary clinicians and psychiatrists. Patients also reported that their primary clinicians and psychiatrists often conducted cell-front check-ins throughout the week. Most patients reported that individual contacts were helpful, of sufficient length, and clinical in nature. Observations of interactions with patients during IDTT meetings confirmed that the primary clinicians and psychiatrists were familiar with patients and had positive therapeutic relationships. Custody and environmental factors were reported to have an effect on the ability

for staff to conduct individual sessions with patients. These included frequent alarms and crisis interventions which required custody staff to be redirected. There were no telepsychiatry or telemental health services being provided in the acute care units.

Intermediate Care

Ten patients interviewed in a group setting within unit B6B reported being offered four groups per day seven days per week. They stated they attended the majority of offered groups and found many of the groups to be helpful. These patients stated that they were generally offered dayroom or yard time for about three hours per weekday. They met with their primary clinician in a confidential setting on a weekly basis and briefly with their psychiatrist on a weekly basis. They reported that IDTTs occurred on a monthly basis.

The patients described significant laundry issues such as a lack of clean towels and limited access to blankets as well as proper fitting clothing.

Four of the patients interviewed were maximum custody patients but, in general, had their custody status reduced in a very timely manner. One of the patients was clinically discharged approximately 90 days earlier but remained in CHCF due to suitable housing not being available. Staff confirmed the accuracy of this situation. However, it is not appropriate to use an intermediate care setting for housing purposes only.

Twelve patients interviewed in a group setting within unit B8A provided very different information than the previous referenced group of patients in the context of access to treatment. These patients stated that they were only offered five group therapies per week and only intermittently were offered out-of-cell unstructured time. They described very poor access to both their psychiatrist and their primary clinician. These patients had many complaints about the medications they were prescribed in the context of not wanting to take medications but reported

that once medications were prescribed, they did not have difficulties receiving the medications. Most of these patients described treatment offered in the maximum security acute care units and/or EOP to be much more preferable than treatment in their current in the intermediate care setting. They stated that they were generally locked down at least 20 hours per day in their cell.

The information obtained from the above group was not considered to be credible after discussion with staff on their treatment team. During the month of September, patients, on average, were offered 14 hours of group therapy per week. The charts of four patients were randomly reviewed by the chief of mental health who reported that each patient received weekly primary clinician and psychiatrists' sessions during the month of September 2024.

Ten additional patients were interviewed in a group setting within unit B7B. These patients reported being offered generally two to three groups per day on a seven day per week basis, which were predominantly recreational therapy groups. They confirmed meeting with their primary clinician on a weekly basis and with their psychiatrist on a weekly basis. They also reported that IDTTs occurred on a monthly basis. Most of these patients indicated that they could describe their treatment plan. They also reported being offered up to three hours per day of either yard or day room time on a daily basis.

Fourteen more patients were interviewed, and the average length of stay amongst these patients was 3 months. Each patient knew their clinicians and psychiatrist and were seen often for an average of 15 to 45 minutes. All were offered between four to six groups per day except Saturday and Sunday.

Patients had concerns regarding the fact that add on's to groups were no longer allowed and patients wanted the ability to attend groups if others refused which this was previously allowed. Other concerns were with only one person showing up for group, discharging patients

without patient's input, 1:1 sessions not being individualized, custody letting patients out late and returning them back to their cells early, and having to choose between NLTG, dayroom or yard in the evening. There were no specific issues with custody. When asked about what would improve the mental health services the response was more clinical groups that are consistent with their diagnosis.

## V. PATIENT ACCESS TO TREATMENT

### 1. System to Encourage Progress (STEP) Program

The statewide policy has not been fully implemented due to the lack of funding for the implementation of the second phase of this program, which involves providing concrete incentives. Patients were reportedly familiar with the three steps that have been implemented.

All the patients interviewed reported having access to tablets, which they found to be very helpful. In addition, patients on Step three had access to television sets provided by CDCR. Patients who could afford to buy a television did not have to achieve Step 3 in order to have a television.

## VI. REFERRALS AND TRANSFERS

To prevent "significant and unacceptable delays" in inpatient care, patients referred to a PIP must be transferred within required transfer timelines. The Program Guide governs all inpatient transfer timelines after a patient's interdisciplinary treatment team refers a patient to inpatient care and the inpatient program accepts the referral. See ECF No. 7333-1 at 19. The required timelines for the transfer are dependent on the patient's level of care. For acute patient placement, the transfer must occur within 10 days of the IDTT referral, regardless of the inpatient program's acceptance date, and within 72 hours of bed assignment. *See Id*. For

intermediate care placement, the transfer must occur within 30 days of referral, regardless of the acceptance date, and within 72 hours of bed assignment. *See Id*.

There were 462 referrals to CHCF-PIP during the reporting period. There were 293 referrals to acute care, of which 272 were admitted, seven were rescinded, and 14 were rejected.

There were 169 intermediate care referrals, of which 156 were admitted, three were rescinded, and ten were rejected.

There were 65 CHCF-PIP patients who were endorsed to DSH during the reporting period, 18 were admitted; ten were admitted to Atascadero and eight were admitted to Coalinga. Three intermediate care referrals were rescinded, and the remaining 44 patients were transferred to other PIPs.

## VII. ADMISSIONS AND DISCHARGES

Based on the observation IDTT's, admissions and discharges were clinically appropriate.

### Admissions

For acute care patients the average time from the completion of the referral at mental health IRU to the patient's admission was four days with a range of zero to 21 days and 99 percent of the acute care admissions were timely. The average length of stay for acute care patients during the reporting period was 48 days, with a range of nine to 156 days.

The average time from the completion of the referral to the patient's admission was seven days with a range of zero to 27 days. All admissions were timely. For intermediate care patients who were currently in the PIP, the average length of stay was 141 days with a range of eight to 1,779 days.

There were six patients with complex medical needs, of which three were acute and three were intermediate care patients. All patients were admitted once their issues were resolved.

At the time of the site visit CHCF-PIP reported that there were no patients on the waitlist.

Ten intermediate care patients were referred to and accepted by CHCF-PIP who had a SHU term in EOP. The average length of stay for these ten patients was 87 days. Four of these patients remained in the PIP at the time of the site visit.

**Discharges**

The CHCF-PIP discharged 574 patients during the reporting period, including 283 acute care patients and 291 intermediate care patients. The length of stay for physical discharged acute care patients averaged 64 days, with a range of 11 to 239 days. The average between clinical and physical discharge for acute care patients was six days, with a range of zero to 119 days.

The lengths of stay for physical discharged intermediate care patients was 210 days, with a range of zero to 2,126 patients. The average length of stay between clinical and physical discharged patients was three days with a range of zero to 211 days.

## VIII. LEAST RESTRICTIVE HOUSING

On October 11, 2024, CHCF-PIP reported 76 intermediate care patients were in out of level housing, 13 of whom required an LRH of locked dorms, 16 with an LRH of multi-purpose cells, and 47 have a custodial LRH of unlocked dorms.

LRH was not discussed during the observed IDTTs.

## IX. PATIENT DISCIPLINARY PROCESS

The CHCF-PIP issued 575 RVRs to 169 acute care patients and 406 intermediate care patients during the review period.

Clinicians recommended documenting the RVR in an alternative manner for 30 cases. The RVR was reduced to counseling in 24 cases and patients were found not guilty in two cases. The remaining four cases proceeded with the hearing where two cases were mitigated due to the

clinicians' recommendations and the other two cases involved the same inpatient which were not mitigated due to the patient's repeated disciplinary history of committing the same acts.

The monitor reviewed a random sample of 20 RVRs. Custody staff timely referred the mental health assessment to mental health staff in 16 of 20 or 80 percent of cases. Mental health staff timely completed and returned the assessment to custody in 19 of 20 or 95 percent of cases. Four of the assessments recommended alternative discipline and in all four cases the SHO decided to proceed with the hearing where each patient was found guilty.

Of the reviewed sample, six or 30 percent of mental health assessments were completed confidentially. All reviewed RVRs indicated the assignment of a staff assistant.

The mental health assessment recommended penalty mitigation in 18 or 90 percent of reviewed cases, which the senior hearing officer always documented consideration. The senior hearing officer mitigated penalties in 16 of 18 or 89 percent of the cases.

The institution did not provide data regarding mental health staff members who completed mental health assessment training. For custody staff, all correctional administrators, captains, and lieutenants completed the training, as did 40 of 42 or 95 percent of sergeants, and 426 of 484 or 88 percent of custody officers.

## X. USE OF FORCE

CHCF-PIP followed established department policy and procedure for all use of force issues and did not maintain a local operating procedure.

During the review period, there were 201 use of force incidents, including 191 immediate and ten controlled uses of force. The institution was unable to indicate the level of care for each patient who was involved in immediate use of force incidents. However, of the ten controlled use of force incidents, five involved intermediate care patients and five involved acute patients.

The monitor reviewed ten immediate uses of force. Of the ten reviewed incidents, six involved a battery on a peace officer, there were three instances of fighting, and one instance of resisting a peace officer. Custody staff used a reasonable and appropriate amount of force in all ten incidents, including physical force and OC spray. Appropriate decontamination was afforded to all patients as required. Officers completed MH-5 mental health referrals in all ten incidents as well.

Four controlled use of force incidents were selected for video and record review. The incidents included three refusals to submit to PC 2602 administration and a patient's non-compliance with one-to-one observation orders. All policy requirements for each controlled use of force incident were met, including a mental health clinician being present, video surveillance footage of the incident, appropriate cool down period, multiple attempts by custody and mental health staff to gain the patients compliance with vocal orders, and nursing's review to confirm that the patient was not a high risk for exposure to chemical agents. Physical force was used in all four incidents and OC vapor spray was used in three of the four incidents. Appropriate decontamination was afforded to all patients and although two patients refused decontamination, officers still brought the patients outside for fresh air following the incident.

Although the institution was not able to provide PIP specific data, CHCF indicated that 961 of 1,059 or 91 percent of institution-wide custody staff and all 43 mental health staff completed the use of force training for the last full calendar year.

## XI. PIP MAXIMUM CUSTODY REDUCTION ICC REVIEWS

A sample of 25 maximum custody initial ICCs were reviewed, and all 25 patients had their initials within the 10-day time period and they had follow-up ICCs within 30 to 60 days.

Additionally, a sample of 20 Chronos indicated that patients who were on maximum custody were often released from maximum custody within two to three days of being placed on maximum custody. Notably there were patients who were on maximum custody for an extended period of time which was routinely due to the fact that they were previously placed on maximum custody by other referring institutions or by CHCF for serious offenses.

Required staff attended all observed ICCs. One Initial ICC took place on unit B1A and the patient attended; sixteen ICCs including seven initials and nine subsequent ICCs took place on unit B1B and only one patient attended the remaining 15 were held in absentia. All observed ICCs were collaborative and mental health's recommendations were considered when deciding the outcome for each case. Notably, the ICC released 14 of 17 or 82 percent of patients from maximum custody.

## XII. USE OF OBSERVATION CELLS/ROOMS, SECLUSION, AND RESTRAINT

Only one patient was restrained during the monitoring Period. Seclusion was not used during the reporting period, although it was not uncommon for special observation to occur such as 1:1 observation. Patients on special observation status continued to participate in out-of-cell activities unless clinically not indicated.

## XIII. EMERGENCY RESPONSE AND THE DEATH REVIEW PROCESS

### Emergency Response

Emergency Medical Response Review Committee (EMRRC) meetings took place each month during the review period. Reviewed meeting minutes were comprehensive. The Patient Safety Subcommittee (PSS) meeting minutes for the same time period were reviewed and were also comprehensive. Standing agenda items included the status of current improvement projects, system surveillance, root cause analysis, morbidity and mortality reviews, health care grievances,

program administration, and open forum. Additionally, responses to emergencies were appropriate.

Specialized Beds Subcommittee meeting minutes were also reviewed. Standing agenda items included prior meeting action items, system surveillance, improvement work, SBCCM huddles, and program administration.

**Death Review Process**

There were no deaths reported in the PIP during the review period. There were no unresolved QIPs resulting from suicide reports since the previous Coleman review of the PIPs. Morbidity and Mortality Reviews were reviewed by the PSS. The death review process was sufficient.

## XIV. QUALITY MANAGEMENT AND UTILIZATION REVIEW

Overall, it appeared that the QM process at the CHCF-PIP was focused on routine monitoring of quality assurance activities rather than functioning as a full quality improvement program with formal studies and root cause analyses being completed. Minutes from Quality Management meetings completed during the reporting period were reviewed. Meetings were held monthly and quorums were achieved. A number of the initiatives related to mental health were impacted by high staffing vacancies. Additionally, several action items showed little to no progress over time, including improvements in the hiring process. There was evidence that actions were being taken to address the lack of progress across some areas, but not all.

CHCF-PIP's Quality Management Mental Health Unit (QMMHU) was comprised of 12 members including four Staff Services Analysts/Associate Government Program Analysts, one Health Program Specialist I, one Health Program Specialist II, one Senior Psychologist Supervisor, one Program Director, one Program Assistant, one Senior Psychologist Specialist, a

Chief Psychologist, and the Chief of Mental Health. Similar to last year, the Health Program Specialists, who previously were dedicated solely to mental health quality management activities, could be pulled into medical auditing for the Office of Inspector General (OIG) audits among other more medically oriented quality management tasks. This made focusing on mental health quality management activities challenging.

Mental Health Subcommittee meeting minutes were reviewed for the reporting period. All meetings included a quorum. The minutes reflected routine tracking and monitoring of data but evidenced no formal quality improvement studies. Across the reporting period, several items were noted to be out of compliance for the PIPs including groups being held in confidential settings, timely discharges, and appointments being cancelled due to custody issues. Additionally, it was noted that SRE mentoring training and use of force training was not in compliance. Of concern, most items that were recognized as being out of compliance did not result in any actions to be taken other than monitoring.

It was reported that the QMMHU identified issues that required improvement and created action plans and/or workgroups to address these issues. The issues targeted for corrective action were reportedly identified through a few avenues including Coleman audits, the Joint Commission findings, and routine monitoring of the dashboard. Prior to the reporting period, the QMMHU identified seven primary areas for improvement including local operating procedures, timely mental health consults, timely completion of suicide risk evaluations (SREs), IDTT audits, SRE mentoring, clinician led groups, and coordination of care between disciplines. It was reported that no new corrective action plans for specifically addressing issues within the PIPs were initiated during the reporting period.

Process improvement workgroups were formed to address timely mental health consults and the completion of timely admission and discharge SREs. During the reporting period, the completion of timely PC contacts showed improvement but remained non-compliant. Specifically, completion of timely PC contacts was documented as 26 percent compliant in February 2024, 27 percent compliant in March 2024, 35 percent compliant in April 2024, 36 percent compliant in May 2024, and 40 percent compliant in June 2024. Timely completion of SREs were noted to be compliant as follows: 87 percent in February 2024, 86 percent in March 2024, 88 percent in April 2024, 88 percent in May 2024, and 87 percent in June 2024.

Completion of timely IDTTs within the PIP were noted as 94 percent compliant in February 2024, 96 percent compliant in March 2024, 96 percent compliant in April 2024, 93 percent compliant in May 2024, 93 percent compliant in June 2024, and 94 percent compliant in July 2024. As compliance had been sustained, routine tracking to timely IDTTs within the PIPs was no longer being monitored by the QMMHU. What remained an ongoing challenge was required staff attendance at IDTTs. The findings of percentage compliance was as follows: February zero percent, March 22 percent, April zero percent, May 67 percent, June 13 percent, and July 32 percent. It was reported that the deficiencies were due to staff vacancies, vacations, and absences.

Treatment offered showed improvements over the reporting period, ranging from 33 percent compliant in February 2024 to 75 percent compliant in May 2024. However, compliance dropped slightly to 67 percent in June 2024.

Formal auditing of master treatment plans was completed during the reporting period. An audit tool was developed as part of a Corrective Action Plan (CAP) to address deficiencies noted by The Joint Commission and headquarters surveys. The tool was initially adequate but

was not updated to reflect changes in the treatment plan template, despite these changes occurring in February 2024. The results of these audits did not reflect overall nor sustained improvement in the few areas where improvements were noted in the past.

QM findings were disseminated to staff through a number of avenues including town hall meetings, staff meetings, a newsletter disseminated every three weeks, and leadership meetings.

In response to the Special Master's request regarding continued stay reviews, CHCF responded that the continued stay review process was "discontinued in favor of greater focus on LRH review." This response conflicted with other responses provided to the Special Master, as well as what was observed and reported on site. There was clear evidence that continued stay reviews were being completed routinely through the UM process. Additionally, CHCF provided a list of 76 patients who were out of their LRH during the reporting period yet responded that the institution was unable to produce any information on the rationale as to why these patients were housed out of their LRH or demonstrate any systematic review of LRH during the reporting period. When asked, the CHCF clinical leadership reported that LRH reviews were completed at the headquarters level and any need to review specific patients was triggered by these headquarters' reviews. There were no LRH reviews being completed at CHCF.

Utilization Management (UM) meetings were conducted weekly during the reporting period, with the exception of two weeks in May, because they were unable to reach a quorum. A review of the minutes revealed a list of attendees, without reference to the individuals' roles or disciplines. Also, the boxes indicating the number of staff required for a quorum and whether a quorum had been met were noted as "N/A" on all minutes reviewed. Each set of minutes included narrative descriptions of individual patients along with a brief description of what was discussed during the UM meeting; however, reasons why the patient was being reviewed, final

dispositions, and the decisions of the UM committee were not consistently documented. Most discussions centered around discharge with some discussion of treatment recommendations. For a number of patients, the UM committee indicated a plan to discuss the patient at some future point, yet these future discussions did not consistently occur as planned. Further, none of the minutes included any action items or tracking of issues over time. CHCF clinical leadership was asked about the criteria for inclusion in the UM process. It was reported that there was no set criteria for inclusion in UM reviews, but that a preliminary meeting was held with the Chief Psychiatrist, Chief Psychologist, Admission Discharge Unit Program Director, PBST Psychologist and Senior Psychologist Supervisor to determine which patients were to be reviewed at each meeting. Factors included length of stay and incident reports. It was reported that a tracking system was implemented on a shared drive that allowed IDTT members to track information about patients' planned discharges to assist the UM committee in making recommendations.

There was no evidence that staff were being pressured to discharge patients prematurely.

## XV. PATIENT COMPLAINTS/PATIENT SATISFACTION

There were 136 patient complaints reported to CHCF-PIP during the review period. Of the 136 patient complaints, 124 were closed, five were awaiting approval, four were awaiting a response, and three were under mental health review.

In June 2024, CHCF-PIP established a patient survey process in efforts to receive direct feedback from all PIP patients, including patient perceptions and experiences with the care, treatment, and services delivered at CHCF-PIP. Beginning in August 2024, the patient satisfaction survey was distributed to all acute patients monthly and all intermediate care patients quarterly as well as at the time of discharge. Leadership indicated receiving 120 patient

responses from the first quarter of implementation. The collected data was reviewed during the monthly meeting with PIP leaders to identify areas of needed safety and quality improvement.

## XVI. CUSTODY AND MENTAL HEALTH PARTNERSHIP PLAN

The CMHPP LOP was dated January 2022 and complied with statewide policy.

Executive leadership joint rounding was not conducted in the CHCF-PIP during the review period. The chief of mental health and the warden had last conducted this rounding on March 8 and 18, 2022. However, documentation indicated that executive leadership joint rounding occurred in other housing units during five months of the review period, during which correctional officers and patients were interviewed. However, meeting minutes from the quality management committee and the mental health program subcommittee did not address this rounding.

Reviewed second and third watch huddle forms from November 2022 typically indicated attendance by required mental health and custody staff. Clinical staff separately reported that, due to union issues, custody staff did not attend maximum custody huddles. The monitor's expert also observed two CMHPP huddles attended by numerous mental health staff and a custody officer. At each huddle, a clinician with computer access provided a clinical and functional update for each patient on the unit. Mental health staff were engaged, and the custody officer appropriately participated.

There were 100 staff misconduct complaints during the review period. Filed complaints alleged staff using disrespectful language, inappropriate uses of force, threatening and retaliatory behavior, and falsifying documents, among other allegations. One reviewed complaint revealed concerning staff behavior. In that instance, the patient ran toward an electric fence in a suicide attempt but ultimately stopped running and laid down on the concrete. Nonetheless, a staff

member assaulted the patient, resulting in permanent damage to the patient's shoulder. No staff were reassigned due to misconduct complaints.

The institution offered quarterly round table training during all months of the reporting period, but staff training attendance documentation did not indicate staff who did not attend the training. As such, training compliance could not be determined.

The institution reported that 1,272 of 1,419 or 90 percent of required staff attended the annual off-post training. Specifically, 97 percent of custody staff, and 76 percent of mental health staff, attended this training.

## XVII. COLEMAN POSTINGS

All visited housing units contained updated Coleman posters in English and Spanish.

## XVIII. LAUNDRY AND SUPPLY ISSUES

CHCF maintained a LOP for laundry and linen collection, cleaning, and distribution. Like the preceding monitoring period, PIP patients received clothing and laundry on a one for one laundry exchange when patients were offered showers. Soiled clothing and linens were removed at least three times weekly. The institution indicated that the laundry Material and Stores Supervisor II maintained a lot of laundry needs for the PIP units. The Correctional Business Manager I conducted informal inspections and informal audits of the area to ensure compliance. If issues were identified, then they were relayed to the Material and Stores Supervisor II managing the laundry and were corrected.

Although document production indicated that no laundry or supply issues were identified during the review period, interviewed custody staff reported routinely experiencing shortages of clothing and safety blankets. Staff indicated completing their own informal audits when there was not enough clothing in their housing unit and borrowing clothing and safety blankets from

other facilities who had excess clothing to spare. Due to the shortage, staff indicated that patients would either wear the wrong size clothing or wash their own clothing in their cell.

CHCF-PIP produced a laundry and exchange log for 723 patients during the review period. Ten patients were randomly selected to examine the timelines for linen exchange during the review period. During the 170 examined weeks, the average time between clothing and linen exchanges was 2.9 days with a range of 1.7 to 6.6 days.

## XIX. PROPERTY/VISITATION/PRIVILEGES/TELEPHONE ACCESS

Twenty-four weeks of reviewed NCAT data revealed that PIP patients were receiving two to three hours of yard or day room daily, three showers weekly, two or more phone calls weekly, and a weekly linen exchange.

CHCF-PIP provided DOM Article 42, Section 54020 which addressed visiting. The institution allowed visitation on Friday, Saturday, and Sunday for seven hours each day. Also, patients were allowed visiting hours on holidays including New Years Day, Independence Day, Thanksgiving Day, and Christmas Day. PIP patients during non-contact visits were allowed three visitors, including children and each visit was limited to one hour. However, visiting timeframes could be extended depending on scheduling and availability of space.

## XX. LAW LIBRARY ACCESS

CHCF-PIP's general LOP included patient-specific law library access information in addition to CHCF's general law library LOP and was updated within the past year.

Each housing unit at the CHCF-PIP was equipped with a law library computer kiosk in the center of the housing unit. Custody staff also indicated that some units had a portable law library kiosk as well. The institution's LOPs indicated that PIP patients were allowed access to the law library when they filled out a Priority Library User (PLU) Request and Declination form

and submitted it to custody staff. The officers would then submit the requests to the library staff to confirm if the patient had an active legal case. If so, then the law library would determine if the patient were a PLU or a General Legal User (GLU). PLU patients were given priority and up to four hours of computer access per week. GLU patients were allowed two hours of computer access per week. Interviewed custody staff indicated allowing patients to use the law library without completing the PLU request if the kiosk was not being used at the time of the request.

According to the PIP LOP, staff were specifically assigned to be present and directly monitor the patient using the law library computer during the review period. Staff indicated being present in the vicinity of the patient using the kiosk but did not directly monitor the patient.

## XXI. <u>PRE-RELEASE PLANNING</u>

CHCF-PIP's pre-release program LOP was current and consistent with headquarters policy.

Unlike many other CDCR institutions and to their credit, CHCF-PIP staffed a pre-release unit, with one social worker supervisor, two social workers who were institutional mental health pre-release coordinators (IMHPC), and three medical social workers. The unit provided pre-release services throughout the institution for the MHSDS population, including those in the memory care unit, the palliative care unit, and patients scheduled for compassionate release.

Transition plans for patients releasing from the PIP were developed in PReP meetings attended by all appropriate stakeholders, including probation, parole, the C&PR officer, admission and discharge unit (ADU) staff, the patient's clinical team members, the IMHPCs, and the statewide pre-release staff who scheduled the meetings. The PReP meetings replaced the completion of the pre-release planning assessment (PRPA) in the PIPs. The IMHPCs and the

pre-release unit supervisor attended the monthly headquarters pre-release meeting and the weekly ISUDT pre-release meetings.

CHCF-PIP reported there were 54 patients scheduled for release during the reporting period. Of the 54, ten were acute care and 44 were intermediate care patients; 42 patients were released during the reporting period. Fifty-two patients were scheduled for release to parole or were offenders with mental health disorders (OMHD) to be released to DSH, while two patients were scheduled to be released to probation. Releases of information (ROIs) were signed by both patients scheduled for release to probation.

Correctional counselors were responsible for assisting PIP patients with obtaining a Cal Id prior to their release from CDCR, and the IMHPCs recorded the same. IMHPCs documented that 12 patients who discharged from the PIP had obtained their Cal Ids. Similarly, although TCMP case workers did not keep separate records for PIP patients, the IMHPCs kept PIP patients' pre-release data and were able to provide the following information: TCMP assisted 27 PIP patients with applications for benefits, an additional 14 patients refused TCMP services. TCMP case workers assisted 26 patients with applications for SSI, nine patients with applications for medical benefits and four patients with applications for veteran benefits.

The IMHPCs reported there were 20 patients scheduled for release who were referred to the STOP housing program and 23 OMHD referrals were made to DSH from the CHCF-PIP.

## XXII. <u>PROGRAM ACCESS</u>

The institution reported that PIP patients were not assigned jobs.

CHCF-PIP reported that acute and intermediate care patients were eligible to earn milestone credits for 13,818 and 40,333 days, respectively, during the reporting period. The total amount of patients who were eligible to earn milestone credits was not provided. The total

amount of patients who earned milestone credits was not provided. However, 121 credits were awarded to acute care patients, and 294 credits were awarded to intermediate care; 29 and 28 credits were reportedly pending respectively.

**APPENDIX B4**
**California Institution For Women (CIW-PIP)**
Review Period: February 1, 2024 – July 31, 2024
(Paper Review)

The CIW-PIP paper review revealed variable compliance with applicable policies and protocols and, regrettably, extensive document production deficiencies. Despite moderate staffing vacancies, staff-to-patient ratios were met given the census. Initial and routine IDTTs, initial and routine psychiatry contacts, and initial PC contacts occurred timely for acute and intermediate care patients; routine PC contacts for acute and intermediate care patients neared compliance. Maximum custody patients in both acute and intermediate levels of care had access to treatment groups. PIP admissions for acute and intermediate care patients were timely as well.

Patients' health care records related to medication management found that most cases were adequate, though some deficiencies were found. In addition, of the patient records the monitor's expert reviewed to assess overall adequacy of mental health treatment provided to CIW-PIP patients, 90 percent were determined to have received adequate care. *See supra* Part II.C.

Regrettably, document production was often unclear or missing entirely for various sections. This was particularly problematic with respect to missing and conflicting documentation regarding CIW-PIP's restraint practices given their issues from previous monitoring rounds and local governing body meeting minutes which were not provided.

## I. SUMMARY OF THE FINDINGS

- At the time of reporting, 33 of 45 or 73 percent of CIW-PIP's beds were filled.
- Staffing improved from the preceding monitoring round though vacancies still persisted; psychiatry had a 44 percent vacancy rate, the senior supervising psychologist position was vacant, psychologists had a 17 percent vacancy rate, and social workers had a 44 percent vacancy rate.

- CIW-PIP met the applicable staffing ratios of 1:15 for acute care and 1:30 for intermediate care for the four disciplines of psychiatry, psychology, social work, and recreation therapy.

- Tele-mental health was not utilized during the review period.

- Initial and routine IDTTs, initial and routine psychiatry contacts, and initial PC contacts complied with required timelines for acute and intermediate care patients; routine PC contacts for acute and intermediate care patients neared compliance.

- Separate and conflicting data sets were produced regarding structured treatment hours offered and attended.

- Of the five acute and five intermediate care patient healthcare records reviewed for quality of medication management, eight were found adequate and two inadequate.

- Of the patient records the monitor's expert reviewed to assess overall adequacy of mental health treatment provided to CIW-PIP patients, 90 percent were determined to have received adequate care. *See supra* Part II.C.

- While the number of patients receiving clozapine was not reported, the medication was utilized appropriately and patients were appropriately evaluated for the use of this medication when initiated.

- For PC 2602 medication orders, all 15 emergent initial petitions, four non-emergent initial petitions, and 25 renewal petitions were granted.

- Conflicting information was provided regarding the System To Encourage Progress (STEP) program and Positive Behavior Support Plans.

- All transfer timeframe requirements for acute and intermediate care patients admitted during the review period were met.

- The CIW-PIP discharged 63 patients during the review period; 40 or 63 percent physically discharged timely.

- Restraint practices at CIW-PIP were identified as an area of serious concern from the previous two monitoring rounds and a required CAP from a 2022 Joint Commission survey, particularly due to the use of standing orders for restraints. Despite these concerns, restraint incidents remained relatively high during the current review period, and evidence of standing orders for restraints was again identified.

- Quality management document production was missing various materials including minutes/proof of practice documents for local governing body (LGB), Emergency Medical Response and Review Committee (EMRRC), patient safety committee, a response to the request for logs of unusual occurrences, serious incidents, near misses, and sentinel events.

- Many other documents were unclear or missing entirely from production including for the following sections: group programming, treatment hours, solo programming, the System To Encourage Progress (STEP) program, Positive Behavior Support Plans, use of observation cells/rooms, seclusion and restraint, custody and mental health partnership plan, visitation, law library, job assignments, and milestone credits.

## II. CENSUS

On October 6, 2024, the CIW-PIP operated 45 beds; 33 or 73 percent were filled by three acute and 30 intermediate care patients and the remaining 12 beds were available. No beds were redlined.

## III. STAFFING

### 1. Administrative, Clinical, and Correctional Staffing (as of October 2, 2024)

Chief of Mental Health: This position was filled.

Program Assistant: This position was filled.

Chief Psychiatrist: This position was filled.

Psychiatrists: Two of 3.6 psychiatry positions were filled for a 44 percent vacancy rate.

Chief Psychologist: This position was filled.

Senior Supervising Psychologist: This 0.2 position was vacant.

Psychologists: Three of 3.6 psychologist positions were filled for a 17 percent vacancy rate.

Social Workers: Two of 3.6 social workers were filled for a 44 percent vacancy rate.

Rehabilitation/Recreation Therapists: All four positions were filled.

Unit Supervisor: The unit supervisor position was filled.

Senior Psych Tech: This position was filled.

Psych Techs: Five of six psych tech positions were filled for a 17 percent vacancy rate.

Supervising Registered Nurses: All 5.5 positions were filled.

Registered Nurses: 18.9 of 19.9 positions were filled for a five percent vacancy rate.

Certified Nursing Assistants (CNAs): All 23 positions were filled.

Correctional Health Care Administrator (CHSA): This position was filled.

Warden: This position was filled by an individual acting out of class.

Chief Deputy Warden: This position was also filled by an individual acting out of class.

Associate Wardens: All four positions were filled.

Captains: Three of four positions were filled.

Lieutenants: 20 of 21 positions were filled for a five percent vacancy rate.

Sergeants: 55 of 58 positions were filled for a five percent vacancy rate.

CCIs: All ten positions were filled.

CCIIs: All eight positions were filled.

Correctional Officers: 397 correctional officers filled 389 positions; however, 39 individuals were on long term leave reflecting a 12 percent functional vacancy rate.

**2. Tele-Mental Health**

Tele-mental health was not utilized during the review period.

**3. Staff-to-Patient Ratios and the Adequacy of Clinical Staffing**

The staff-to-patient ratios for psychiatry, psychology, and social work were met due to the institution's census.

**4. Staff Recruitment Efforts**

Staff recruitment and retention efforts included increased marketing, expedited hiring for *Coleman* classifications, hiring above minimum, a pay differential of 15 percent of base salary for providing direct patient care for more than 50 percent of the pay period, incremental

percentage retention bonuses, recruitment and retention bonuses for on-site psychiatry, and extra payment for psychiatrists and psychologists who worked additional caseloads.

## IV. TREATMENT, CLINICAL SERVICES, AND PROGRAMMING

### 1. Interdisciplinary Treatment Teams (IDTTs)

The Special Master requested information regarding local quality assurance audits of IDTTs during the review period, including audits and any corrective actions for timeliness, required staff attendance, and adequacy. Defendants reported that there were "no internal audits conducted on IDTTs" and also that information pertaining to IDTT involvement in MAX custody designation recommendations in the PIP was not available.

As the CIW-PIP was monitored via paper review, there were no on-site expert audits of IDTTs to assess compliance and quality. However, reviewed documentation revealed minimal or no concerns with the various aspects of treatment planning documentation.

The PIP Minimum Treatment Standards require that acute care patients receive an initial IDTT within 72 hours of arrival and every seven calendar days thereafter during the patient's stay. The Program Guide also requires that intermediate care patients receive an initial IDTT within 72 hours of arrival and every 30 calendar days thereafter during the patient's stay.

One acute care and 25 intermediate care patients required initial IDTTs during the review period. All timely occurred within 72 hours of patient arrival and were attended by required staff; patients attended the one acute initial IDTT and 21 or 84 percent of the intermediate care initial IDTTs.

The acute care patient also required routine IDTTs during the reporting period. All four expected timeframes timely occurred every 14 calendar days. The patient was present for two of four routine IDTTs while required staff was present for all four.

Twenty-nine intermediate care patients required routine IDTTs during the review period. There were 80 expected timeframes; 79 or 99 percent were timely. Patients attended 70 or 76 percent of routine IDTTs while required staff attended 91 or 99 percent.

**2. Core & Supplemental Treatment Hours**

The PIP was required to offer patients at least 20 hours of structured therapeutic activities per patient per week, ten hours of which must be core treatment. *See* ECF No. 7924 at 10 (citing "[d]efendants shall immediately adopt and implement in the CDCR PIPs the minimum treatment standards set out in the DSH CQI process approved by the court."); *see also* ECF No. 7812-1 at 15 (stating "that [the DSH CQI] process…provides that patients will be offered 20 hours of treatment per week, at least ten hours of which are to be 'core treatment'."). The remaining ten hours offered to patients must consist of supplemental treatment and cannot include offered yard or day room activity. Because core treatment hour requirements can include individual treatment, compliance is assessed as a totality of treatment offered to the patient on average per week. *See* ECF No. 7812-1 at 15.

While group programming schedules for acute and intermediate care patients were provided for each month of the review period, it was unclear whether the schedules were implemented as written due to separate documentation indicating that provided group schedules were implemented on the final day of the review period (July 31, 2024). The provided intermediate care group schedules included group title, scheduled day and time, a description of each group activity, assigned staff facilitator, and assigned number of patients; absent from the schedules, however, were planned group durations. While the group schedules suggested maximum custody patients were scheduled for group treatment during the review period, separate treatment hour data for maximum custody patients was not provided for either the acute or intermediate care programs to determine hours offered.

While there was no reference to internal audits of group treatment during the review period, the quality management meeting materials referenced a developed charter for group treatment curriculum. The CIW-PIP did not have a group waitlist or provide non-English speaking groups during the review period.

Treatment Hours: Acute & Intermediate Care

Two separate and conflicting data sets regarding group treatment hours were produced with no explanation for the discrepancies; one data set suggested compliance whereas the other did not. Neither data set provided separate treatment hours for maximum custody patients.

One report indicated a combined cumulative average of 29.39 offered hours for structured and unstructured treatment with a range of 26.2 to 31.1 hours; 12.3 offered hours were attended on average. Notably, this report's treatment hours were not separated for acute or intermediate programs.

The other treatment hour report for the period of January 29, 2024 through July 31, 2024 suggested neither the acute nor intermediate care program achieved compliance with the weekly minimum requirement. For the acute care program, this report's data revealed a weekly average of 7.68 hours offered, with 9.8 hours scheduled and 1.74 hours cancelled; on average, acute care patients attended 4.47 weekly hours and refused 3.2 hours. For the intermediate care program, this report's data revealed a weekly average of 9.93 treatment hours were offered, with patients attending an average of 5.83 hours and refusing an average of 4.1 hours. Intermediate care patients were scheduled for an average of 12 weekly hours of structured programming, of which an average of 1.7 were cancelled.

Acute Psychiatric Program (APP)

For the acute program, except for one of the reports referenced above, defendants did not submit site-specific mental health service information. CIW-PIP's narrative mainly referenced general PIP requirements rather than describing acute program offerings, related quality assurance audits, or self-identified strengths and areas for improvement. Due to the paper review of the CIW-PIP, patient interviews were not conducted.[54]

Intermediate Care Facility (ICF)

Despite documentation stating that provided group schedules were implemented on the last day of the current review period, conflicting documentation was provided with intermediate program group schedules for February through July 2024, including for MAX custody patients. Groups were assigned based on patients' treatment needs, scheduled Monday through Friday, and included a focus on relevant core topics. Group topics included Seeking Safety, Anger Management, Health Management, Understanding Mental Illness, Dialectical Behavior Therapy, Start Now, House of Healing, and Healthy Relationships and Attachment. The program schedule also referenced Pre-Release Planning groups.

Maximum Custody PIP Patient Access to Treatment

Maximum custody patients in both the acute and intermediate levels of care had access to treatment groups where they were housed. Group schedules for intermediate care maximum custody patients indicated that supplemental and core groups were scheduled four and five days per week with two groups offered on Wednesdays, respectively. Core group topics covered

[54] Before each of the Special Master's monitoring tours, plaintiffs' counsel sends a letter outlining issues and concerns with the institution/program being reviewed. For the CIW-PIP paper review, plaintiffs' letter included concerns derived from interviews with patients at the intermediate level of care but indicated patients at the acute level of care refused counsel's requests to interview.

anger management, emotion regulation, stress management, and understanding mental illness. Approximately three to four patients were assigned to each group. The group schedules did not include planned durations. As previously indicated, group schedules were not provided for the acute program max or non-max patients, nor was treatment hour data specific to this subpopulation of class members.

**3. <u>Individual Mental Health Treatment</u>**

<u>Acute Care</u>

The PIP Minimum Treatment Standards require that acute care patients receive an initial psychiatric evaluation within 24 hours of arrival, every three days thereafter for the first thirty days, and then every seven days during their stay. Acute care patients are also required to receive an initial primary clinician evaluation within ten days of arrival and thereafter twice per calendar week.

One acute care patient required an initial psychiatry evaluation during the review period. The patient received a timely initial psychiatry evaluation within 72 hours of arrival. The initial psychiatry evaluation occurred in a confidential setting. This patient also required routine psychiatry contacts during the review period. There were five expected timeframes; all five occurred every three days for the first thirty days of inpatient care. Of the five reviewed contacts, two or 40 percent occurred in a confidential setting. Reasons for non-confidentiality included patient refusals.

This acute care patient also required an initial primary clinician evaluation during the review period. The evaluation timely occurred within 72 hours of arrival and was held in a confidential setting. This patient required routine psychiatry contacts during the review period as well. There were five expected timeframes; three or 60 percent timely occurred every seven

days. Of the five reviewed contacts, two or 40 percent occurred in a confidential setting. Reasons for non-confidentiality included patient refusals and cell front contacts.

Intermediate Care

The Program Guide requires that intermediate care patients also receive an initial psychiatric evaluation within 24 hours of arrival, every three days thereafter for the first thirty days, and then every seven days during their stay. Intermediate care patients are also required to receive an initial primary clinician evaluation within ten days of arrival and thereafter once per calendar week.

Twenty-five intermediate care patients who required initial psychiatry evaluations during the reporting period were randomly selected for review. All 25 patients received a timely initial psychiatry evaluation within 72 hours of arrival. Eighteen or 72 percent of these initial psychiatry evaluations occurred in a confidential setting; reasons for non-confidentiality included modified programming and cell front contacts.

Twenty-nine intermediate care patients who required routine psychiatry contacts during the review period were also selected. Of 133 expected timeframes, 124 or 93 percent occurred every three days for the first thirty days of inpatient care and then every seven days thereafter. Of the 145 reviewed contacts, 81 or 56 percent occurred in a confidential setting. Reasons for non-confidentiality included patient refusals, modified programming, unavailable custody escorts, day room contacts, and cell front contacts.

The 25 randomly selected intermediate care patients who required initial psychiatry evaluations also required initial primary clinician evaluations during the reporting period; all 25 timely occurred within 72 hours of arrival and 15 or 60 percent were held in a confidential

setting. Reasons for non-confidentiality included patient refusals, unavailable custody escorts, and cell front contacts.

Twenty-nine intermediate care patients also required routine primary clinician contacts during the review period. Of 132 expected timeframes, 115 or 87 percent timely occurred every seven days. Of the 144 reviewed contacts, 86 or 60 percent occurred in a confidential setting. Reasons for non-confidentiality included patient refusals, modified programming, unavailable custody escorts, yard contacts, and cell front contacts.

**4. Solo Programming**

No explanation was provided regarding how solo programming was utilized during the review period; provided documentation stated, "There is no report or list available that identifies the length of time per patient spent on solo program status during the review period as well as the range and reasons for solo program status." Additionally, a list of all patients on solo programming within 72-hours of the reporting date, including the housing unit for each patient was requested; a list containing six CDCR numbers in one column and "PIP" in the second column was provided in response with no further narrative or explanation. Consequently, the number of patients solo programming within 72 hours of the reporting date could not be determined.

**5. Medication Management**

Healthcare records for ten patients were reviewed to assess the quality of medication management provided at CIW-PIP, including five each from the acute and intermediate levels of care. Of these ten cases, eight were adequate and two were inadequate. This was an improvement from the preceding monitoring round which found six adequate and four

inadequate cases. There were medication concerns–even in cases deemed adequate–but they did not rise to the level of rendering the medication management inadequate.

CIW-PIP continued to demonstrate several positive aspects regarding medication management of psychiatrically-complex patients. Initial psychiatric evaluations were timely, frequently were comprehensive, and painted clear clinical pictures of the patients. Psychiatric follow-up visits were also timely. Overall, there was good continuity of care, and when another psychiatrist was covering, the psychiatrists had communicated about the medication plan; this prevented contradictory medication plans as seen in other PIPs. The institution also continued to use long-acting injectable antipsychotics where appropriate. Often under-utilized in health care systems, long-acting antipsychotics are an important tool in addressing medication non-adherence, with demonstrated benefits including reduced rates of repeat hospitalizations. Additionally, the institution routinely evaluated patients for the use of clozapine and, where indicated, initiated the medication.

Despite these positive aspects, medication management at CIW-PIP also demonstrated multiple concerns.

In one case, there were approximately nine medication changes at the time of admission; these included important medications such as antipsychotics, mood stabilizers, and an antidepressant. This raised concerns, as it would be impossible to know if clinical benefits or side effects were due to a particular medication change.

Cases displayed the use of multiple medications in the same class. In one case, a patient was prescribed three antipsychotic medications. While there was a clear plan to taper off the one oral medication, the rationale for using two long-acting injectables required stronger justification.

In one case, the patient's diagnosis did not comport with the medications prescribed. This patient had diagnoses of Major Depressive Disorder and Borderline Personality Disorder. She had recently attempted suicide prior to admission, requiring treatment at an outside hospital. Despite this, the patient was not on an antidepressant, but instead a mood stabilizer and an antipsychotic. The monitor's expert of course recognizes that medication decisions rest with the treating psychiatrist; however, the chart should reflect the rationale for the use of these agents in lieu of an antidepressant.

In another case, the reason for the patient's continued hospitalization was unclear. Notes reflected "no significant mental health concerns," and the patient was noted to not require medications. Despite this, the patient was treated at the acute and intermediate levels of care for several months. The monitor's expert noted that the patient was pregnant, and thus caution with her mental health treatment, including the use of medications, was warranted. Nevertheless, clearer justification for requiring PIP treatment was required.

The institution had a case in which a patient not under a PC 2602 involuntary medication order had an injectable, as-needed antipsychotic medication ordered. The monitor's concerns included deferring to nursing judgment as to whether an injectable medication is required. Should a patient not under a PC 2602 involuntary medication order reach the point of requiring an injectable antipsychotic, the psychiatrist should be advised of the situation to determine the next clinical interventions.

Several cases raised concerned about non-confidential sessions, due to "modified programming" which was not explained further. This included initial psychiatric evaluations in two cases. Other non-confidential sessions raised fewer concerns, as the notes clearly documented that these were due to patient refusal.

**a. Clozapine**

Clozapine is a critically important medication for the treatment of refractory psychotic disorders, and other psychiatric conditions. The medication has potentially fatal side effects and, thus, requires close monitoring to employ safely. The institution did not report the number of patients receiving the antipsychotic medication clozapine; however, as outlined further below, in the cases reviewed, patients were appropriately evaluated for the use of this medication, and, when initiated, it was utilized appropriately.

**b. PC 2602 Medication Orders**

As demonstrated in the preceding monitoring round, CIW-PIP continued to evaluate patients for, and file PC 2602 involuntary medication petitions, when indicated. Forty-four patients received medications under the PC 2602 process. CIW-PIP filed 15 emergent initial petitions, four non-emergent initial petitions, and 25 renewal petitions; all were granted. The institution had no planned non-renewals, nor any cases that lapsed due to administrative errors.

**c. Documentation Concerns**

While some notes continued to have information carried over from prior notes, this appeared to be less than in the preceding monitoring round. This sometimes resulted in the Plan section of the note containing incorrect, out-of-date information, such as medication doses. In some cases, the patient's diagnosis was not clearly listed in the psychiatric notes. Medication lists also sometimes contained duplicated medications which rendered discerning the medications the patient was taking challenging.

**1. Behavioral Management**

Documentation contained conflicting information regarding implementation of the System To Encourage Progress (STEP) program and Positive Behavior Support Plans for behavioral management during the current review period.

The monitor's expert reviewed several documents referencing the CIW-PIP's STEP program to determine whether it had been active during the review period. The institutional narrative suggested that the program was active during that time; however, consistent with other responses in the narrative and accompanying documentation, it only provided a general description of the STEP program without confirming its implementation. Requested data regarding the STEP program was not otherwise provided. Lastly, although plaintiffs' letter indicated that the STEP program was active when they interviewed patients in preparation of this audit, the monitor found a response in a separate file stating that there "were no patients on the STEP program during this review period."

Regarding CIW-PIP's behavior plans and interventions, in the last two monitoring reports, experts raised concerns about CIW-PIPs use of what they referred to as "Crisis Plans," which were standing orders for restraints as a first level response to specific behavioral concerns. The 30th Round Monitoring Report noted that this practice was both a violation of policy and a deviation from the standard of care. For the current round, a "crisis plan" was referenced for one of several patients on CIW-PIP's restraint log, suggesting the PIP continued to write standing orders for restraints.

Specific to Positive Behavior Support Plans, most of the reviewed documents suggested attention to policy development, process improvement, and staff training during the review period. CIW-PIP implemented two behavior plans during the review period which matched the

number of plans referenced in the prior monitoring round. Tracking forms confirmed that, while the completion of the Positive Behavior Support Plans was generally delayed by process improvement efforts, one plan was completed on May 24, 2024 and the other was finalized on July 10, 2024. While these improvements were promising, the low number of referrals for Positive Behavior Support Plans and the inactive STEP program were concerning given the nature of the population and relatively high utilization of highly restrictive and intrusive methods for behavior management (e.g., physical restraints).

## V. <u>REFERRALS AND TRANSFERS</u>

To prevent "significant and unacceptable delays" in inpatient care, patients referred to a PIP must be transferred within required transfer timelines. The Program Guide governs all inpatient transfer timelines after a patient's interdisciplinary treatment team refers a patient to inpatient care and the inpatient program accepts the referral. *See* ECF No. 7333-1 at 19. The required timelines for the transfer are dependent on the patient's level of care. For acute patient placement, the transfer must occur within 10 days of the IDTT referral, regardless of the inpatient program's acceptance date, and within 72 hours of bed assignment. *See id.* For intermediate care placement, the transfer must occur within 30 days of referral, regardless of the acceptance date, and within 72 hours of bed assignment. *See id.*

The CIW-PIP received 84 referrals for 49 patients during the review period, consisting of 41 acute and 43 intermediate care referrals. One acute referral was rescinded, and two intermediate care referrals were rejected, resulting in 40 acute and 41 intermediate care admissions. No referrals were for patients with complex medical needs.

## VI. ADMISSIONS AND DISCHARGES

### Admissions

Forty acute and 41 intermediate care patients were admitted during the review period. Thirty-eight of 40 or 95 percent of acute care patients and all 41 intermediate care patients transferred timely; the two delayed acute care transfers were one and two days late, respectively, and both transfers occurred within five days of HCPOP endorsement. No patients were awaiting an acceptance or rejection decision or awaiting CIW-PIP placement at the time of reporting.

During the review period, the average length of stay in acute care was 20 days and ranged from two to 65 days. For intermediate care, the average length of stay was 84 days and ranged from 18 to 211 days.

### Discharges

CIW-PIP discharged 63 patients during the review period; 40 or 63 percent physically discharged timely within 72 hours of clinical discharge. No patients were clinically discharged but pending physical discharge at the time of reporting.

## VII. LEAST RESTRICTIVE HOUSING

At the time of reporting, seven patients were housed above their least restrictive housing.

## VIII. PATIENT DISCIPLINARY PROCESS

CIW-PIP issued and adjudicated seven RVRs to two acute care, four intermediate care, and one MHCB patient during the review period. Four RVRs for intermediate care patients were documented in an alternative manner.

The institution reported that 450 of 477 or 94 percent of institution-wide custody staff completed the RVR mental health assessment training; no data was provided for mental health staff.

## IX. USE OF FORCE

The CIW-PIP reported 11 immediate and no controlled use of force incidents. Uses of force stemmed from patients resisting or battering officers, battering nurses, and one patient removing their restraints. There were no special incident reports.

The use of force policy underwent no changes from the previous review period.

The use of force training was completed by 535 of 589 or 91 percent of institution-wide custody staff and all eight mental health staff.

## X. PIP MAXIMUM CUSTODY REDUCTION ICC REVIEWS

CIW-PIP admitted 11 maximum custody patients during the review period, consisting of six acute and five intermediate care patients. The institution could not provide data regarding the number of maximum custody patient IDTTs held during the review period.

Bi-weekly post reviews were held for 44 patients throughout the review period as well (though two reviews were at three-week intervals instead of two). The reviews found against suspending the maximum custody terms in 37 or 84 percent of cases; the patients' maximum custody status was recommended for reduction in the other seven or 16 percent of cases.

Fifty-nine of 65 or 91 percent of mental health staff and 30 of 33 or 91 percent of custody staff completed the maximum custody reduction review process training.

## XI. USE OF OBSERVATION CELLS/ROOMS, SECLUSION AND RESTRAINT

In the last two monitoring reports, concerns were raised regarding the institution's restraint practices; restraint data discrepancies were also identified as a concern in the prior monitoring report. The Joint Commission also required a CAP related to the CIW-PIP's restraint practices during their survey in 2022. However, the institution failed to clearly report a plan for addressing ongoing restraint practice concerns including reviewing and internally auditing

restraint incidents to determine whether less restrictive means should have been implemented and whether their practices adhered to policy requirements and the standard of care.

Provided documentation yielded conflicting data regarding the number of restraint incidents during this review period. One data set indicated 25 restraint incidents involving 16 patients, while the other indicated 38 restraint incidents for 21 patients; no explanation was provided to reconcile these discrepancies. CIW-PIP's restraint log for the current review period referenced one "crisis plan" that resulted in four point restraints for one patient designated DD2, suggesting the PIP continued the standing restraint order practice.

Additionally, without providing a reason, the CIW-PIP reported that no audits of restraints were conducted during the review period. Furthermore, during the review period, logs for patients placed in observation cells were not maintained, that there were no SIRs related to the placement of patients in seclusion or restraints, and that cells were not used for seclusion or time out.

## XII. EMERGENCY RESPONSE AND THE DEATH REVIEW PROCESS

CIW-PIP reported no unresolved QIPs resulting from suicide reports since the preceding monitoring tour and "no deaths reported in the PIP during the review period of 2/1/24 thru 7/31/24." EMRRC minutes were not provided for the current review period and their omission from the document production was not explained.

## XIV. QUALITY MANAGEMENT AND UTILIZATION REVIEW

Numerous critical quality management materials were not produced, including the following: meeting minutes and other relevant proof of practice information related to the local governing body (LGB), EMRRC, and patient safety committee; the requested information on

unusual occurrences, serious incidents, near misses, and sentinel events; and follow-up documentation for a CDPH-required CAP specific to mental health staff training in the PIP.

The quality management meeting materials that were provided suggested that the institution maintained strengths in their healthcare quality assurance program with a commitment to compliance monitoring, process improvement, staffing, interdisciplinary collaboration, information technology, inpatient bed utilization, physical plant, and tracking and analyzing trends. Meeting minutes for the various committees confirmed relevant information was shared and elevated as appropriate. Unfortunately, follow-up information was not identified for mental health specific CAPs/PIWPs, in part due to the absence of some requested materials. Of note, the various quality management committee meeting minutes indicated that a quorum required only 50 percent attendance by required members/voters.

LGB meeting minutes were not provided. Defendants' response to the Special Master's request for information from inpatient surveys and accreditations indicated that, while there were no Joint Commission surveys during this timeframe, CDPH conducted their relicensing survey on or around March 27, 2024. Notably, the March 2024 CDPH survey identified several concerns in the PIP, including a finding that, in addition to nursing staff, six custody officers and one social worker were "confirmed" to be in violation of the PIP policy training requirement.

According to the CDPH report, this social worker had been working in the PIP without the required training, which included "suicide prevention techniques," from December 26, 2023 through at least the date of the survey on March 27, 2024. Regarding the action item for the PIP social worker, OLA responded that the corrective actions would be reported in the local governing body committee meeting. However, since LGB minutes were not provided, the status

of whether that social worker continued to work in the PIP or had received the required training could not be determined.

The Healthcare Quality Management Committee was responsible for maintaining oversight of the various healthcare subcommittees. Reviewed meeting minutes confirmed monthly meetings occurred with a quorum and with mental health leadership in attendance. The QMC minutes routinely referenced information from various subcommittee minutes, including the Mental Health Program Subcommittee, Utilization Management Committee, and other patient safety subcommittees. ISUDT updates and quarterly Medication Management Committee updates were also referenced.

The Mental Health Program Subcommittee also met monthly with a quorum during the review period. The MHPS minutes suggested the institution maintained a sufficient mental health quality management program with oversight of mental health services and appropriate collaboration with other relevant QM committees for quality assurance purposes. PIP-specific action items were routinely covered in meeting minutes. The MHPS routinely reviewed timely mental health referrals, timely RVR mental health assessments, confidentiality of RVR assessments, inpatient readmission rates, HLOC referrals and audits, safety concerns, SPRFIT items, and IT issues that required inefficient manual tracking for certain metrics including policy adherence. Continuous action items were generally assigned to program supervisors for monitoring and reporting. Of note, meeting minutes indicated that headquarters had placed the CAT audits on hold.

MHPS documents referenced a charter developed to review the efficacy of structured groups offered to the MHSDS population. This charter remained under review one month after the end of the monitoring period. MHPS also developed three PIWPs which were ongoing

during the current review period. The three PIWPs focused on reducing the number of RVRs issued to MHSDS patients by 25 percent; increasing staff retention by addressing burnout and increasing employee wellness and job satisfaction; and implementing at least two of four California model pillars such as peer support and normalization. However, no further information was provided to determine implementation or effectiveness for these three PIWPs. The monitor's expert was unable to find progress updates on PIWPs in the meeting minutes or confirmation that the goal for one PIWP had been achieved by June 2024 as planned.

The Utilization Management (UM) meeting met monthly throughout the review period with a quorum consistently achieved. This meeting was co-chaired by the chief medical executive and Chief Psychiatrist. While meeting minutes primarily focused on matters specific to medical such as timely specialty appointments, mental health data was routinely reported and minutes confirmed that relevant mental health incidents such as self-harm and suicide attempts were routinely reviewed. The utilization management minutes also suggested relevant information was shared with the higher-level healthcare quality management committee. Length of stay and average daily census data were consistently provided for MHCB but not for the PIP.

Meeting minutes were not found for the patient safety subcommittee. Logs of unusual occurrences, serious incidents, near misses, and sentinel events were also not provided.

While some patient safety information was reported in the UM meeting minutes, the monitor did not find proof of practice demonstrating that the patient safety committee met or reviewed relevant incidents during the review period.

## XV. PATIENT COMPLAINTS/PATIENT SATISFACTION

CIW-PIP patients filed six complaints; five required no intervention and one was rejected. All six were closed by the time of reporting.

Sixteen patients completed patient satisfaction surveys during the review period. Patients generally expressed their appreciation and satisfaction with the care provided in the PIP; some patients expressed their desire for more interesting group topics and more opportunities for peer interaction and socializing.

## XVI. CUSTODY AND MENTAL HEALTH PARTNERSHIP PLAN

CIW-PIP did not produce documentation regarding its implementation of the CMHPP.

## XVII. *COLEMAN* POSTINGS

Provided documentation indicated that updated English and Spanish *Coleman* posters were posted in all patient-accessible locations.

## XVIII. LAUNDRY AND SUPPLY ISSUES

The CIW-PIP's LOP, last updated in September 2023, detailed the provision and collection of clothing and linens.

Effective August 2024, clothing and laundry were no longer washed off-site and instead washed on-site in CIW's main laundry facility. This facilitated same-day laundry pick-up and drop off.

## XIX. VISITATION/PRIVILEGES/TELEPHONE ACCESS

No documentation regarding visitation was provided. A memorandum regarding non-clinical out-of-cell time tracking was provided, which indicated that the NCAT was used to track all scheduled and non-scheduled activities. PIP patients were granted one phone call per week unless restricted by their IDTT. NCAT data tracking phone calls and yard offerings throughout the review period was provided as well.

## XX. LAW LIBRARY ACCESS

No documentation was produced.

## XXII. PRE-RELEASE PLANNING

The CIW-PIP pre-release LOP was current and appropriately signed in September 2023 by the Warden, CEO and chief of mental health and consistent with the headquarters pre-release policy, noting–among other activities–that a pre-release (PReP) meeting was required between ten and 30 days prior to the patient's release. PReP meetings were to be scheduled by headquarters between the county stakeholders and the required clinical staff from CDCR.

Though the documentation provided appeared to have been authored by the institutional mental health pre-release coordinator (IMHPC), the institution did not specifically report that the position was filled. Relatedly, whether a licensed clinical social worker held the position in accordance with headquarters policy could not be determined.

Eight patients were released directly from the PIP to parole or probation during the review period. Of the eight patients discharged, four were released to probation with a release of information (ROI) signed by each. Further, a headquarters report generated on October 8, 2024 revealed that CIW-PIP had seven patients within 90 days of discharge from CDCR with an additional two patients within 120 days of release. Of these releases, seven were scheduled for release to parole and two for release to probation. The institution documented that the ROI was signed by one of the two probation releases.

The pre-release narrative provided by the institution regarding pre-release activities support compliance with required responsibilities such as completion of the pre-release planning assessment (PRPA) and submission of a signed release of information for patients discharged to probation; however, no proof of practice or records of these activities with patients was provided. Additionally, headquarters and the institution was unable to provide information specific to the PIP regarding referrals for community housing programs, such as STOP. Further, the

transitional case management program (TCMP) case managers who assist PIP patients within 60 days of release on applications for medical insurance, veteran and social security benefits, were not able to separate CIW-PIP patients from institutional mental health patients. Finally, headquarters and the institution indicated there was no report to determine a patient's application for or receipt of a California Identification (CAL-ID).

Continued review of the pre-release narrative indicated that the pre-release coordinator was to attend the bi-weekly ISUDT pre-release meeting to discuss the PIPs patients on the agenda, the monthly statewide headquarters pre-release meeting, coordinated clinical assessment team (CCAT) meetings as needed, discharge IDTTs when available, and the bi-monthly prison to community meeting held at parole headquarters.

Pre-release groups were scheduled every Wednesday for an hour from January to September 2024, or during cycle 53, 54, and 55. The institution's narrative additionally reported that the IMHPC provided pre-release instruction to mental health staff at CIW upon hire and then as needed.

## XXIII. PROGRAM ACCESS

No data regarding job assignments was provided. Two milestone credits were awarded to acute care patients and 66 to intermediate care patients; no data was provided on how many patients were eligible for or earned the credits.

## XIII. EDUCATION

No CIW-PIP patients were assigned to educational or vocational classes.

**APPENDIX B5**
**San Quentin Rehabilitation Center (SQ-PIP)**
Review Period: February 1, 2024 – July 31, 2024
(Paper Review)

SQ-PIP continues to stand out as a high performer among its peer programs, with this paper review revealing mostly positive findings. Most mental health, nursing, and custody staffing positions were filled. Reviewed documentation for IDTTs found that they occurred timely and with required staff in attendance. Acute and intermediate care patients attended weekly averages of 1.9 and 7.3 hours, respectively.

Review of health care records for ten patients all revealed adequate medication management. Relatedly, clozapine administration was managed appropriately as were reviewed PC 2602 cases.

There were few document production concerns though, notably, an accurate census could not be ascertained.

## I. SUMMARY OF THE FINDINGS

- SQ-PIP provided care to acute and intermediate care patients, though an accurate census at the time of reporting could not be ascertained.
- Nearly all staffing positions were filled, though the functional vacancy rate for registered nurses was 22 percent, among other vacancies. All applicable staff-to-patient ratios were met.
- Tele-mental health was not utilized during the review period.
- Acute care patients received timely initial and routine IDTTs during the review period. Intermediate care patients received timely initial IDTTs in 88 percent of reviewed cases, while routine IDTTs were 98 percent timely.
- SQ-PIP acute and intermediate care patients were offered weekly averages of 4.8 and 14.8 hours of out-of-cell structured therapeutic activities, respectively, and attended weekly averages of 1.9 and 7.3 hours.
- SQ-PIP was compliant with reviewed acute and intermediate care initial psychiatric and initial primary clinician evaluations as well as acute routine psychiatric contacts.

- Acute and intermediate care routine primary clinician contacts neared compliance at 87 and 88 percent respectively. Intermediate care routine psychiatry contacts were 75 percent compliant.
- Review of the healthcare records of ten SQ-PIP patents all revealed adequate medication management.
- Both acute and all 12 intermediate care patients admitted to the SQ-PIP transferred timely.
- All three acute and 17 of 18 or 94 percent of intermediate care patients who discharged from SQ-PIP physically discharged within 72 hours of clinical discharge.
- SQ-PIP's quality management process remained active and robust.

## II. CENSUS

At the time of reporting, SQ-PIP was a 28-bed unit. Conflicting data was produced regarding the number occupied, available, and redlined beds; consequently, an accurate census could not be ascertained.

## III. STAFFING

### 1. Administrative, Clinical, and Correctional Staffing

Chief of Mental Health: This position was filled.

Program Assistant: This position was filled.

Chief Psychiatrist: This position was filled.

Psychiatrists: 2.5 psychiatrists filled the 2.2 allocated positions.

Chief Psychologist: Whether this position was filled was unclear; produced documentation indicated that the position was functionally vacant but also that there was a full-time equivalent acting out of class.

Senior Psychologist Supervisor: A senior psychologist supervisor filled the 0.3 position.

Psychologists: Three psychologists filled the 2.2 allocated positions.

Social Worker Supervisor: The 0.1 position was vacant.

Social Workers: Two of 2.2 social worker positions were filled for a nine percent vacancy rate.

Recreation Therapists: Three recreation therapists filled the 2.2 positions.

Supervising Registered Nurses (SRNs): Twenty of 21.4 positions were filled for a seven percent vacancy rate. One SRN was on long-term leave reflecting an 11 percent functional vacancy rate.

Registered Nurses (RNs): Sixty-three of 83 positions were filled for a 24 percent vacancy rate. Four RNs on long-term leave and the use of six contractors reduced the functional vacancy rate to 22 percent.

Licensed Vocational Nurses (LVNs): Forty-seven of 67 positions were filled for a 30 percent vacancy rate. The seven individuals on long-term leave and 19 contractors reduced the functional vacancy rate to 12 percent.

Certified Nursing Assistants (CNAs): Eight CNAs filled the nine allocated positions for an 11 percent vacancy rate. The use of one contractor reduced the functional vacancy rate to zero.

Senior Psych Techs: All three positions were filled.

Psych Techs: Forty-two of 43 positions were filled for a two percent vacancy rate. The five individuals on long-term leave and one contractor increased the functional vacancy rate to 12 percent.

Office Services II (OSSII): The 0.6 position was vacant.

Associated Government Program Analyst (AGPA): One AGPA filled the 1.6 positions for a 37 percent vacancy rate.

Health Program Specialist I (HPSI): Two HPSIs filled the 2.02 positions for a one percent vacancy rate.

Correctional Health Care Administrator (CHCA): The one CHCA position was filled.

Clerical Positions: Two of five positions were filled for a 60 percent vacancy rate.

Warden: The warden position was filled by an individual acting out of class.

Chief Deputy Warden: This position was filled.

Associate Warden: This position was filled.

Captain: This position was filled by an individual acting out of class.

Lieutenants: All three positions were filled.

Sergeants: All three positions were filled.

CCI: This position was filled.

CCII: This position was filled.

Correctional Officers: All 27 positions were filled.

**2. Tele-Mental Health**

SQ-PIP did not utilize tele-mental health during the reporting period.

**3. Staff-to-Patient Ratios and the Adequacy of Clinical Staffing**

The caseloads of all psychiatrists, psychologists, social workers, and recreation therapists were within established ratios.

## IV. TREATMENT, CLINICAL SERVICES, AND PROGRAMMING

**Interdisciplinary Treatment Teams (IDTTs)**

During the reporting period there were no formal audits of IDTTs. Compliance with Program Guide requirements for timeliness and required staffing were monitored monthly via the Specialized Bed Subcommittee. Review of minutes from these meeting revealed overall compliance with these two metrics; however, the data was reportedly inaccurate secondary to

issues related to the use of flex beds. Specifically, the system assessed required staffing according to MHCB requirements for patients placed at the intermediate or acute levels of care, resulting in false non-compliant reports.

A clinical supervisor audited five IDTT meetings twice during the year to evaluate the quality and consistency of observation levels and property issues based on current suicide risk levels for report to the SPRFIT. One of these audits occurred within the reporting period; of the five observed IDTTs, four adequately discussed observation and property issues, while one team required prompting by the supervisor.

The PIP Minimum Treatment Standards require that acute care patients receive an initial IDTT within 72 hours of arrival and every seven calendar days thereafter during the patient's stay. The Program Guide also requires intermediate care patients receive an initial IDTT within 72 hours of arrival and every 30 calendar days thereafter during the patient's stay.

Three acute care and 24 intermediate care patients' healthcare records were reviewed for compliance with required timeframes. Of the three acute care patients reviewed, all required and received timely initial IDTTs. Required staff were present for one of three or 33 percent of acute care IDTTs. Patients were present in two of three or 67 percent of cases.

All three acute care patients also required routine IDTTs during the reporting period. All ten expected timeframes were timely. The patient was present for eight of 11 or 73 percent of routine IDTTs while required staff was also present for eight of 11 or 73 percent of routine IDTTs.

Of the 24 intermediate care patients, 16 required initial IDTTs, of which 14 or 88 percent occurred timely. Required staff were present for 13 of 16 or 81 percent of intermediate care

initial IDTTs. Patients were present for 11 of 16 or 69 percent of intermediate care initial IDTTs.

All 24 intermediate care patients required routine IDTTs during the review period. There were 82 expected timeframes; 80 or 98 percent were timely. Patients attended 73 of 87 or 84 percent of routine IDTTs while required staff attended 59 or 68 percent.

**Group Therapy**

The institution was required to offer PIP patients at least 20 hours of structured therapeutic activities per patient per week, ten hours of which must be core treatment. *See* ECF No. 7924 at 10 (citing "[d]efendants shall immediately adopt and implement in the CDCR PIPs the minimum treatment standards set out in the DSH CQI process approved by the court."); *see also* ECF No. 7812-1 at 15 (stating "that [the DSH CQI] process…provides that patients will be offered 20 hours of treatment per week, at least ten hours of which are to be 'core treatment'."). The remaining ten hours offered to patients must consist of supplemental treatment and cannot include offered yard or day room activity. Because core treatment hour requirements can include individual treatment, compliance is assessed as a totality of treatment offered to the patient on average per week. *See* ECF No. 7812-1 at 15.

SQ-PIP offered core groups facilitated by psychologists, social workers, and psychology interns Monday through Friday as well as supplemental groups seven days per week facilitated by recreational therapists and psychiatric technicians. Group capacity varied from four to nine patients. SQ-PIP only offered English language groups, but interpreters were provided when needed. There were no group waitlists during the review period and all groups were available to maximum custody patients. No audits related to the delivery of group treatment were completed during the review period.

Acute Care

Acute care patients, on average, were scheduled for 6.2 hours of out-of-cell structured therapeutic activities weekly, offered a weekly average of 4.8 hours, and attended a weekly average of 1.9 hours; patients refused an average of 2.9 weekly hours and an average of 1.3 weekly hours were cancelled. Reasons for cancellations were not provided.

Intermediate Care

SQ-PIP provided two sets of data for ICF patients. One set included ICF patients housed in ICF beds, and the other included ICF patients in flex beds. Patients in ICF designated beds were scheduled a weekly average of 18.5 hours of out-of-cell structured therapeutic activities, of which patients were offered a weekly average of 14.7 hours and attended a weekly average of 7.1 hours; patients refused an average of 7.6 weekly hours of structured therapeutic activities and an average of 3.5 weekly hours were cancelled. On average, the patients in flex beds were scheduled for 18.2 hours of structured therapeutic activities weekly, offered 15.4 hours, attended 8.5 hours, and refused 6.9 hours; on average, 2.5 hours were cancelled. When the data for all ICF patients were combined, the results revealed that, on average, ICF patients were scheduled for 18.5 hours of structured therapeutic activities, offered 14.8 hours, attended 7.3 hours, refused 7.5 hours, and had 3.3 hours of structured therapeutic activities cancelled. No information about the reasons for cancellations was provided.

Non-Max Patients

During the review period, SQ-PIP never had more than one non-max patient on the unit at a time allowed to attend programming without mechanical restraints. Therefore, these patients were not able to participate in core or supplemental group treatment with other patients. They were provided individualized services in lieu of groups as well as "check-ins" related to

recreation and healthy leisure. No information was provided regarding the number of weekly structured therapeutic activities provided to non-max patients.

**Individual Treatment**

Acute Care

The PIP Minimum Treatment Standards require that acute care patients receive an initial psychiatric evaluation within 24 hours of arrival, every three days thereafter for the first thirty days, and then every seven days during their stay. Acute care patients are also required to receive an initial primary clinician evaluation within ten days of arrival and thereafter twice per calendar week.

Three acute care and 24 intermediate care patients' healthcare records were reviewed for compliance with the required timeframes.

Three acute care patients required initial psychiatry evaluations; all three timely occurred within 72 hours of arrival and two of three occurred in confidential settings. All three patients also required routine psychiatry contacts during the review period. Of the 15 expected timeframes, 14 or 93 percent occurred timely. Of the 15 reviewed confidential contacts, six or 40 percent occurred in confidential settings; nonconfidential contacts stemmed from patient refusals.

All three acute care patients also required initial primary clinician evaluations. All three timely occurred within 72 hours of arrival and two of three were held in confidential settings; the one nonconfidential contact was held cell front due to a patient refusal. All three patients required routine psychiatry contacts during the review period as well. Of the 15 expected timeframes, 13 or 87 percent timely occurred every seven days. Of the 15 reviewed routine contacts, 12 or 80 percent occurred in confidential settings; reasons for nonconfidential contacts included patient refusals.

Intermediate Care

The PIP Minimum Treatment Standards require that intermediate care patients also receive an initial psychiatric evaluation within 24 hours of arrival, every three days thereafter for the first thirty days, and then every seven days during their stay. Intermediate care patients are also required to receive an initial primary clinician evaluation within ten days of arrival and thereafter once per calendar week.

Of the 24 intermediate care patients, 16 required initial psychiatry evaluations; of which 15 or 94 percent were timely. Twelve of 16 or 75 percent of reviewed evaluations were conducted in confidential settings. Reasons for nonconfidentiality were not discerned. Twenty-four intermediate care patients required routine psychiatry contacts during the review period. Of 114 expected timeframes, 85 or 75 percent timely occurred every three days for the first thirty days of inpatient care and then every seven days thereafter. Of the 120 reviewed contacts, 79 or 66 percent occurred in confidential settings. Reasons for non-confidentiality included patient refusals and cell front contacts.

Of the 24 intermediate care patients, 16 intermediate care patients required initial primary clinician evaluations; of which 15 or 94 percent were timely. Twelve of 16 or 75 percent of reviewed initial primary clinician evaluations were conducted in confidential settings. Reasons for nonconfidentiality were not discerned. Twenty-four intermediate care patients required routine primary clinician contacts during the review period. Of 112 expected timeframes, 98 or 88 percent timely occurred every seven days. Of the 118 reviewed contacts, 82 or 69 percent occurred in confidential settings. Reasons for non-confidentiality included patient refusals and cell front contacts.

**Solo Programming**

SQ-PIP did not identify patients on solo programming or their average length of time on solo programming status. However, patients who were not max custody status often had to program alone as no other non-max custody patients were housed on the units at the same time during the reporting period, but this was not IDTT-prescribed solo programming.

**Medication Management**

Healthcare records for ten patients were reviewed to assess the quality of medication management provided at SQ-PIP. Of the cases, two were acute and eight were immediate which reflected the greater number of patients treated at the intermediate level of care. Mirroring the preceding monitoring round, all cases were adequate.

As observed in the preceding monitoring period, SQ-PIP displayed myriad positive aspects regarding the psychiatric management of patients. Psychiatrists managed complex cases, often involving co-occurring personality disorders, substance use, and medical problems. The rationales for choosing a given medication were logical, clearly explained, and comported with evidence-based practices and standard of psychiatric care. Psychiatrists adjusted medications appropriately, such as in one case when the patient arrived on an inappropriate as-needed medication. Additionally, psychiatrists actively collaborated with the patients using shared decision making on medication decisions. SQ-PIP also used long-acting injectable medications appropriately, such as in another case where the patient had a history of medication non-adherence.

SQ-PIP was once again adept with navigating the complex interplay of both medical and psychiatric conditions. SQ-PIP displayed multiple examples of this, including monitoring for cognitive impairments such as dementia, treating patients with psychotic conditions causing them to drink excessive water, leading to low sodium levels, and recommending a referral to

neurology for a patient treated with an anti-seizure medication that has well-documented possible side effects of worsened mood and irritability.

SQ-PIP worked admirably with DSH-Napa to have patients obtain access to electroconvulsive therapy, an evidence-based treatment for severe mood and psychotic disorders refractory to other treatments. The cases reviewed were appropriate, with the patients demonstrating marked clinical improvement.

Fewer deficiencies with SQ-PIPs medication management were found than in the preceding monitoring round. In one example, a patient with a seizure disorder was prescribed bupropion—a medication that can worsen seizures. While this patient arrived on this medication, stronger justification for its continuation by the SQ-PIP psychiatrist was warranted.

**a. <u>Clozapine</u>**

Clozapine is used to treat psychotic disorders and other conditions which have not responded to other treatments. Despite its clear utility in treating refractory patients, the medication is frequently underutilized in health care settings, partially due to required close monitoring to reduce the risk of potentially fatal side effects. SQ-PIP did not report the number of patients receiving the antipsychotic medication clozapine; however, in the cases reviewed with patients prescribed clozapine, the medication was managed appropriately.

**b. <u>PC 2602 Medication Orders</u>**

Like the preceding monitoring round, SQ-PIP continued to evaluate patients for, and file, PC 2602 involuntary medication petitions when clinically indicated. Of the cases selected, three received medications under the PC 2602 process. All cases were managed appropriately. Two cases showed documented consideration of a PC 2602 petition; however, the patients did not meet criteria. Twenty-three patients received medications under the PC 2602 process. SQ-PIP

filed five emergent initial petitions, four non-emergent initial petitions, and 14 renewal petitions; all were granted. There were no planned non-renewals, nor any cases that lapsed due to administrative errors.

**c. <u>Documentation</u>**

SQ-PIP's documentation was succinct and easy to follow, with limited information carried forward from other notes. The psychiatrists' notes allowed for clear conceptualizations of the patients' clinical status and there was good continuity of care, as patients worked with the same psychiatrists for most or all of their stay.

**<u>Behavioral Management</u>**

SQ-PIP reported that two patients had active positive behavioral support plans since the preceding review period. One was still active during the review period and the other was discontinued prior to the patient discharging to a lower level of care in July 2024. The institution reported that implementation of the behaviorally-based STEP program reduced referrals for formal positive behavioral support plans. When patients were being treated under formal behavior plans, they were not included in the unit-wide STEP program so that they could receive immediate reinforcement for positive behavior. Health records were reviewed for the two patients who had formal positive behavioral support plans; while reference to the behavioral plans and patient behavior was referenced in progress notes and treatment plans, documentation was similar across notes and did not reflect tracking of the efficacy of the plans. Additionally, the behavioral plans could not be located within the patient's records, nor documentation from the assessments or consultations which were needed to develop the plans. Consequently, the quality or adequacy of the plans could not be assessed, and their efficacy could not be tracked.

In addition to providing individual plans, SQ-PIP used consultation to assist with "unit management plans" to address problematic behavior. These consultations addressed issues

within the therapeutic milieu and provided staff on the unit with education and guidance to help promote positive social behaviors. This consultative model was used to address the behavior of four specific patients since the previous monitoring period. A review of the records for patients for whom unit management plans were provided revealed reference to the plans; however, like with the individual plans, the content of the plans could not be located.

Overall, while the description of behavioral management appeared clinically sound and the implementation of the plans was referenced in patient records, the content and efficacy of these plans could not be assessed given that the plans themselves and data-based tracking could not be located for review.

## VI. <u>REFERRALS AND TRANSFERS</u>

To prevent "significant and unacceptable delays" in inpatient care, patients referred to a PIP must be transferred within required transfer timelines. The Program Guide governs all inpatient transfer timelines after a patient's interdisciplinary treatment team refers a patient to inpatient care and the inpatient program accepts the referral. *See* ECF No. 7333-1 at 19. The required timelines for the transfer are dependent on the patient's level of care. For acute patient placement, the transfer must occur within 10 days of the IDTT referral, regardless of the inpatient program's acceptance date, and within 72 hours of bed assignment. *See id.* For intermediate care placement, the transfer must occur within 30 days of referral, regardless of the acceptance date, and within 72 hours of bed assignment. *See id.*

SQ-PIP received four acute and 12 intermediate care referrals during the review period. Two of the acute referrals and all 12 intermediate care referrals resulted in admissions; whether the other two acute care referrals resulted in rescissions or rejections was not documented.

## VII. ADMISSIONS AND DISCHARGES

### Admissions

Both acute and all 12 intermediate care admissions to the SQ-PIP occurred timely. One acute and two intermediate care patients had complex medical needs.

At the time of reporting, no patients were endorsed and pending acceptance or accepted and awaiting admission to the SQ-PIP.

The two acute care patients had lengths of stay of 100 and 120 days, respectively. For the 12 intermediate care patients, the average length of stay was 116 days and ranged from 39 to 197 days.

### Discharges

Three acute and 18 intermediate care patients were discharged during the review period. All three acute care patients and 17 of 18 or 94 percent of intermediate care patients physically discharged within 72 hours of clinical discharge. One intermediate care patient physically discharged four hours late; reasons for the same were not provided.

## VIII. LEAST RESTRICTIVE HOUSING

No patients were housed above their LRH during the review period or at the time of reporting.

## IX. PATIENT DISCIPLINARY PROCESS

Three RVRs were issued to intermediate care patients during the review period. Mental health assessments were completed for all three patients. None of the three cases reported that mental illness contributed to the behavior that led to the RVR. No data regarding penalty mitigation was provided. None of these three cases recommended documentation in an alternative manner, nor were any of these three patients issued SHU terms.

One additional acute care patient had an RVR documented in an alternative manner.

RVR training data was not provided for mental health staff. The data provided for custody staff seemingly reflected the entire institution and not just the PIP; that data indicated that 559 of 900 or 62 percent of custody staff attended the training.

## X. USE OF FORCE

There were no use of force incidents and no changes to the use of force policy during the review period.

All five required mental health staff received the use of force training. Custody staff training data was once again seemingly provided for the entire institution; this data reflected that 984 of 1,043 or 94 percent of custody staff received the training.

## XI. PIP MAXIMUM CUSTODY REDUCTION ICC REVIEWS

SQ-PIP admitted one acute and five intermediate care maximum custody patients during the review period. Data regarding the number of maximum custody patient IDTTs held during the review period was not provided.

The maximum custody reduction review process training data for mental health staff appeared to include the entire institution; this data indicated that 70 of 85 or 82 percent of mental health staff completed the training. The custody staff training data appeared to be PIP specific and reflected that 51 of 53 or 96 percent of custody staff completed the training.

## XII. USE OF OBSERVATION CELLS/ROOMS, SECLUSION AND RESTRAINT

SQ-PIP reported no seclusion or restraints incidents during the review period. The observation cell was not used and no use of “time-out” for any patient was reported.

## XIII. EMERGENCY RESPONSE AND THE DEATH REVIEW PROCESS

Meeting minutes were submitted for the institution’s Emergency Medical Response Review Committee (EMRRC) for the reporting period. Each set of minutes included a list of all

emergency medical responses and all unscheduled transports for the previous month; however, for the minutes from February through May 2024, there was no indication as to whether or not individual cases needed to be opened for review. This limited the ability to track cases which required follow-up. Minutes from June and July 2024 identified which cases required further review and evidence of review was evident in the minutes; however, the minutes did not consistently indicate whether the case was submitted to the electronic health incident reporting system.

The information contained in the minutes did not allow for a review of the timeliness or appropriateness of responses to emergencies.

There was one SQ-PIP patient death during the review period. The death was a natural death and occurred at a community hospital secondary to known medical conditions. No review of the death was provided; however, no corrective actions were needed in response to the death.

There were no unresolved QIPs resulting from previous deaths by suicide at SQ-PIP.

## XIV. QUALITY MANAGEMENT AND UTILIZATION REVIEW

SQ-PIP's quality management process has remained active and robust since the previous review. The PIP participated routinely in quality management subcommittees including SPRFIT, mental health quality management subcommittee, patient safety committee, emergency medical response and review committee, and the specialized beds subcommittee. Minutes from all subcommittee and quality management committee meetings held during the reporting period were provided for review; minutes reflected that quorums were achieved for meetings.

Quality management committee, mental health subcommittee, and specialized beds subcommittee minutes reflected monitoring of routine services in the PIP including timely suicide risk evaluations, timely IDTT meetings, IDTT staffing, delivery of structured therapeutic

activities, and adherence with expectations of the Joint Commission. The quality management process demonstrated review of issues, investigating causes, and taking steps to address causes of deficiencies when possible. Notably, minutes reflected that automated tracking systems were often inaccurate due to errors in entry or other tracking issues unrelated to services deficiencies. This resulted in issues being flagged as non-compliant in the system when they actually were compliant. The inaccuracies were related to both human error and problems with how the system tracked data.

During the reporting period, a workgroup was developed to maximize clinical resources (e.g., staffing and locations) and increase group treatment hours. The documentation provided demonstrated a robust process including a charter, failure modes and effects analysis, fishbone diagrams, and tracking mechanisms. Additional improvement projects identified during the reporting period included updating local policies, noise reduction, and improving treatment planning; however, these projects evidenced starts and stops when competing priorities, such as Joint Commission compliance, were elevated.

The Patient Safety Committee met monthly during the review period and routinely monitored the status of overall system surveillance, incident reports, individual cases of concern, Joint Commission findings, and follow-up on previously identified action items. Of note, the committee identified a robust reporting system and were proud of the staff's willingness to report concerns for follow-up, evincing a culture focused on patient safety.

SQ-PIP Utilization Management (UM) was inactive during the reporting period.

The Joint Commission visited the facility in May 2024 and SQ-PIP provided documentation of follow-up and self-evaluation of identified deficiencies which were timely and adequate.

## XV. PATIENT COMPLAINTS/PATIENT SATISFACTION

Three patient complaints were filed against mental health staff during the review period. All three were closed by the time of reporting and no interventions were needed.

One patient satisfaction survey was conducted during the review period. This survey was related to noise complaints and indicated sleep was impacted which negatively affected the therapeutic milieu of the unit.

## XVI. CUSTODY AND MENTAL HEALTH PARTNERSHIP PLAN

The custody and mental health partnership plan LOP aligned with headquarters' directive and was dated April 2024 and, thus, up to date.

Executive leadership joint rounding occurred in the PIP during the review period with required staff in attendance. The required form was utilized and noted improved staff morale, individual patient concerns, physical plant issues, and a desire for better food for patients. Reviewed executive staff meeting, quality management committee, and mental health program subcommittee meeting minutes all revealed adequate discussion of the PIP rounding.

Documentation revealed that unit huddles occurred daily on second and third watch with custody, mental health, and medical staff all in attendance.

Data regarding staff misconduct complaints filed against PIP staff during the review period was not provided, though provided documentation indicated that no staff were moved to other posts due to misconduct complaints.

Documentation was provided regarding further collaborative efforts between custody and mental health staff. This included daily huddles, and additional weekday morning meeting between custody, mental health, and nursing, and an additional monthly all-staff meeting.

Quarterly round table training sign-in sheets were provided but staff that did not attend the training were not provided; accordingly, compliance could not be ascertained.

The annual partnership off-post training data was not exclusive to the PIP but, rather, reflected the entire institution; that data indicated that 901 of 922 or 98 percent of custody staff and 68 of 94 or 72 percent of non-custody staff attended the training.

## XVII. *COLEMAN* POSTINGS

*Coleman* posters were posted in English and Spanish. Visual audits were also conducted during the monthly Environment of Care MH Risk Assessment.

## XVIII. LAUNDRY AND SUPPLY ISSUES

SQ-PIP's laundry services LOP was last updated in October 2024 and, thus, up to date. Their dirty laundry was sent out to CSP/Solano's PIA program on Mondays, Wednesdays, and Fridays; clean laundry was returned on Wednesdays and Fridays. SQ-PIP reported that their clean laundry supply adequately met patient needs. NCAT data regarding linen exchanges was provided which reflected compliance with timely linen exchanges throughout the review period.

## XIX. VISITATION/PRIVILEGES/TELEPHONE ACCESS

SQ-PIP's visitation, privileges, and telephone access LOP was last updated in May 2024 and, thus, up to date. The LOP indicated that non-contact visits, phone calls, and out-of-cell activities were to be offered unless specifically restricted by the IDTT. Telephone calls were permitted in further accordance with the December 2023 *Expansion of Telephone Calls* memorandum which granted patients access to one phone call per week. NCAT data regarding offerings of telephone calls and yard was also provided.

## XX. LAW LIBRARY ACCESS

Like during the prior review period, NCAT data was provided regarding law library access and patient appointments. This data revealed that, during the review period, 40 patients had law library appointments.

## XXI. PRE-RELEASE PLANNING

SQ-PIP provided a pre-release LOP specific to inpatient care, which was consistent with headquarters policy, current, and approved by the warden and the CEO. The PIP executive director and health care access associate warden were responsible for implementation of the policy. Specifically, for patients discharging from a PIP, CDCR required a pre-release planning (PReP) meeting to be scheduled ten to 30 days prior to discharge. The institutional mental health pre-release coordinator (IMHPC) and a representative from the admissions and discharge unit (ADU) attended the PReP meetings. PReP meetings were scheduled by the statewide pre-release coordinator to include stakeholders in the community as well as staff from the institution.

At the time of reporting, SQ-PIP reported one patient with less than 120 days prior to release and one patient with less than 60 days prior to release from CDCR.

Appointment of an IMHPC could not be ascertained from the data provided; accordingly, compliance with headquarters' policy could not be determined.

The institution reported that patients in the PIP within six months of release were interviewed by the community transition program (CTP), which educates patients about available programs upon release to the community. CTP was able to assist patients with referrals to substance abuse programs and transitional housing programs, including the STOP program. Unfortunately, the PIP did not provide any information regarding whether the two patients reportedly within six months of release were referred to or assessed by the CTP.

No PIP patients received parole or probation targeted pre-release planning or were offered pre-release groups during the review period. Defendants reported there was no data source available that could provide information regarding whether a patient was assisted by the institution with obtaining their CAL-ID. And, while the transitional case management program (TCMP) assists mental health patients who will be released from the PIP with applications for benefits, such as medical insurance or veteran and social security benefits, the information specific to PIP patients could not be separated from the institution's global data provided by TCMP. Similarly, headquarters reported that there was no report that would accurately provide data on the number of patients released or scheduled for release who were referred to transitional housing programs, such as the STOP program.

## XXII. PROGRAM ACCESS

No SQ-PIP patients had job assignments during the review period. Data regarding the number of PIP patients eligible for and those who earned milestone credits was not provided.

## XXIII. EDUCATION

No patients were assigned to educational or vocational classes during the review period.

**APPENDIX C1**
**Atascadero State Hospital (DSH – Atascadero)**
Dates Visited: June 24, 2024 – June 27, 2024
Review Period: October 1, 2023 – March 31, 2024

**Patient A**

This 57-year-old patient's healthcare record was reviewed to assess the quality of care provided at DSH-Atascadero. The patient was provided diagnoses of major depressive disorder, single episode, severe; antisocial personality disorder; and opioid use disorder, severe. Other relevant diagnoses included vitamin D deficiency, B12 deficiency anemia, iron deficiency anemia, and coccidiomycosis. He was prescribed duloxetine for depression, for depression and paranoia, and hydroxyzine prn for sleep. The patient arrived at DSH-Atascadero from the CMF-PIP acute care program on September 14, 2023, and discharged two months later, on or around November 14, 2023.

The patient had a prior psychiatric hospitalization in the community following a suicide attempt, a significant substance use history, and was serving a 73-year prison term that was extended for a serious crime that occurred during incarceration. Referral reasons included suicidal ideation, aggression, recent manufacturing of a noose, depression, and history of antisocial personality disorder.

The initial suicide risk assessment was completed on September 22, 2023, the patient's risk was assessed as moderate. That risk rating, however, appeared to underestimate the patient's suicide risk considering the total number of risk factors, the absence and recent loss of protective factors, a documented suicide attempt three to four weeks prior, and two to three hanging attempts within the prior three months. The patient also made concerning statements during the initial assessments, such as, "I tried to hang myself. I got tired of everything," "…when I got that write up, it destroyed everything for me and I decided to end my life because I got tired of going through this over and over," as well as mentioning how the recent RVR resulted in a loss of contact with his support system. The documentation confirmed that during late August 2023, staff found a manufactured noose hidden in a glove in preparation for a hanging attempt. Further, upon admission to DSH-Atascadero, the patient was placed on every 15-minute checks with a special incident report for danger to self, current suicidal ideation, and a reported suicide attempt two days prior to arrival, when he tried to hang himself after covering his windows.

Regarding treatment planning, the psychologist responsible for completing the suicide risk assessment recommended DBT and noted that the patient was motivated to engage in treatment. The DSH-Atascadero treatment team adopted treatment goals that included avoiding self-harm for one month, attending 90 percent of weekly group offerings, and practicing two distress tolerance skills for two-months.

This reviewer noted concerns with the lack of structured treatment hours offered and with the use of attendance data for television watching to support their claim that the patient's group treatment participation goal was met. The treatment plan indicated that several supplemental

leisure activities were offered on unit 32 including movie and popcorn, bowling, bingo, and sticky ball.

The treatment plan indicated that the patient participated in 80.2 percent of only two hours of weekly structured groups offered, and 0.4 of 0.4 hours of weekly individual therapy offered. Further, the healthcare record provided seemingly inaccurate attendance data by stating that the patient attended 95.5 percent of 50.4 hours of weekly treatment offered, while also stating that he attended only 8.3 of 47.3 hours of supplemental activities.

Additionally, the discharge documentation indicated that “to structure his leisure time on the unit, Mr. Carmona was observed watching television in the dayroom and socializing with select peers.” Further, in the overall functioning on the unit section of the discharge summary, it was stated that from September 7 to October 1, 2023, the patient was observed spending his time watching television most of the time.

Thus, despite claims that the patient met his goal of attending 90 percent or more of offered groups, the documentation suggested that his actual attendance appeared to be less than 25 percent that was primarily limited to television related leisure activities.

Not surprisingly, during a treatment conference held on October 17, 2023, the patient stated to the treatment team, “I feel like I’m not getting my treatment. I came here because I have issues with shame. I’m depressed most of the time. I don’t sleep. I wake up in middle of night and have thoughts of hurting myself sometimes. I’m tired of the life I’m living.” The patient also asked the treatment team how the game groups benefitted him. While the team did not document a response to the patient’s group concerns or his statement about waking up with thoughts of harming himself, they noted that Zyprexa was prescribed for sleep on that date.

During early November 2023, the patient earned the highest hall pass available to him at DSH-Atascadero. However, on November 7, 2023, the patient received a green card for an inappropriate verbal comment to a staff member, which he later attributed to feeling disappointed about the removal of his individual therapy sessions, as he perceived that he had made progress in that therapy modality. The patient further indicated that the way in which DSH-Atascadero structured their groups was not as helpful as he had hoped. Although he initially requested to be returned to CDCR, he then threatened a hunger strike if not returned soon to CDCR.

Without other interventions documented to address the patient’s threat of a hunger strike to have his need met, the treatment team granted his demand for discharge to CDCR. Notably, distress tolerance was one of his goals, and he stated that the removal of individual therapy triggered the change in his emotional response.

While the documentation suggested that the patient’s demand for discharge and threat of a hunger strike was the primary reason for discharge, the psychiatric discharge summary stated that the patient had met all treatment goals and had received maximum benefit from the program. The patient was discharged to the EOP level of care on November 14, 2023.

**Findings**

The care and treatment provided to this patient were inadequate.

The patient's suicide risk was underestimated at the time of admission, and the documentation did not confirm that the clinician's recommendation for DBT was implemented. The sole protective factor included in the suicide risk assessment was the patient's desire to engage in treatment; however, the patient was not offered sufficient structured therapy hours, and the disorganized manner in which the group hour data was reported resulted in unclear and seemingly misleading determinations regarding attendance and group treatment goal attainment.

While the patient found individual therapy to be a more effective modality which was demonstrated by his behaviors on the unit prior to removal, the individual sessions were discontinued without a documented explanation. Additionally, the patient did not appear to have been sufficiently prepared for the removal of individual therapy by the use of effective termination interventions with a focus on distress tolerance, which was one of his goals. Further, the treatment team failed to intervene appropriately in response to the patient's exhibited poor frustration tolerance and instead reinforced his maladaptive and impulsive threatening behavior that he utilized to have his needs met.

**Patient B**

This 39-year-old patient's healthcare record was reviewed to assess the quality of care provided at DSH-Atascadero. The patient was provided diagnoses of schizoaffective disorder, depressive type; major depressive disorder, single episode unspecified; antisocial and borderline personality disorders; opioid use disorder; alcohol use disorder; and cannabis use disorder. The patient also had type 2 diabetes mellitus. He was prescribed Wellbutrin, olanzapine, Cogentin, and Trileptal, as well as hydroxyzine and olanzapine prn. The patient arrived at DSH-Atascadero from CHCF-PIP's acute program on August 23, 2023 and was discharged on or around November 6, 2023.

The patient's history was significant for sexual and emotional abuse, multiple suicide attempts, and at least ten inpatient admissions for danger to self while in CDCR. The referring institution noted some improvement during the acute care stay but recommended further treatment in an intermediate care program for consideration of medication adjustments, stabilization, as well as other interventions for depression, anxiety, hallucinations, and paranoia. Other concerns noted by the referring PIP included poor sleep, mood swings, paranoia, visions on the wall, delusions of reference, a recent history of foreign body ingestion, and substance use to self-medicate his psychiatric symptoms.

The initial psychiatric assessment was completed timely. Except for reported paranoia, the mental status examination results were unremarkable. The patient's medications were adjusted several times during the course of his hospitalization.

On August 28, 2023, a psychologist assessed the patient's suicide risk as moderate. That evaluator noted five prior suicide attempts, the most recent occurred during 2022 and involved swallowing razor blades with the intent to die. Additionally, four self-harm incidents occurred

during 2022, including an incident of head banging. Documented protective factors included identified reasons for living, responsibility to family, a supportive social network, and engagement in work and school.

Regarding treatment planning, the treatment team convened timely on three occasions. The adopted treatment outcome expectations included reducing the severity or intensity of hallucinations, depression, and self-harm incidents, as well as improving medication adherence to 100 percent for 12 weeks, and developing three coping skills for managing depression. The treatment team also adopted the recommendation for participation in 12 weeks of weekly individual therapy when the patient was expected to work on reality testing, relapse prevention, and emotion regulation.

While there was no documentation of weekly individual therapy at DSH-Atascadero; during an October 11, 2023 suicide risk assessment, a psychologist noted that while the patient did not participate in treatment groups, he did attend a brief check-in contact. That suggested there may have been at least one brief check-in contact with a psychologist, but the content for the only psychologist progress note found in the healthcare record was limited to checkboxes for mood, danger to self, danger to others, and willingness to inform staff of suicidal ideation, intent, and plan. No therapeutic interventions were documented.

The patient was reportedly enrolled in ten hours of treatment groups and ten hours of leisure and recreation supplemental activities. Enrolled treatment groups included staying safe, sponsor group twice weekly, healthy living five times weekly, and aggression reduction. From September 10, 2023 to October 7, 2023, the patient reportedly attended 45.8 percent of the 6.6 weekly hours offered for structured treatment, 5.1 of 51.5 hours of weekly supplemental activities, as well as six unscheduled groups and one drop-in preparing for discharge group during the four-week period. On October 27, 2023, the assigned social worker wrote that the patient attended groups sporadically with an overall attendance rate of 57 percent. However, while discharge documentation stated that the patient attended 71.1 percent of the total treatment of 58.7 hours per week offered, the timeframe for that data was unclear.

On August 31, 2023, the patient met with a psychiatrist and reported that his prior hallucinations were related to amphetamine use, and he requested discontinuation of antipsychotic medication. During that contact, the psychiatrist noted ongoing mood swings, anxiety, pressured speech, hypervigilance, and irritability; medication adjustments included discontinuation of Remeron, a decrease in the Zyprexa dosage, and change in the administration time of valproic acid.

On September 1, 2023, the patient reported feeling much better with improved sleep after the medication adjustment, and no psychotic or manic symptoms. During a subsequent psychiatric contact on September 21, 2023, the patient was irritable and annoyed, but was noted to be psychiatrically stable with fair medication adherence, good attention to daily activities, and no high-risk behaviors during the hospitalization.

During late September 2023, the treatment team noted a reduction in anxiety and depression, adding that the patient used coping strategies, engaged appropriately with peers and staff, and was no longer considered high risk for aggression, suicide, self-harm, or victimization. His

group treatment participation reportedly increased to 75 percent. The social worker also coordinated discharge planning and a communication between the patient and his mother, indicating that the patient was expected to parole around November 6, 2023.

The discharge summary indicated that the patient was evaluated for an offender with a mental health disorder (OMHD) commitment during the hospitalization, and he did not meet the criteria for commitment. The discharge documentation referenced evidence of the patient's stabilization, including progress toward or completion of treatment outcome expectations, an increase in HAS level to five, and verbalized readiness for discharge to the outpatient setting with a parole plan that included maintaining sobriety. The discharge summary and recent clinical notes sufficiently justified the plan to discharge the patient to the EOP level of care on November 6, 2023.

**Findings**

The care and treatment provided to this patient were adequate.

The patient appeared to benefit from the hospitalization, including medication interventions, the social worker's attention to parole planning, the therapeutic milieu, and at least some offered groups. However, insufficient structured treatment hours were offered, and there was failure to follow through with plans for individual therapy. There were also problems with documentation and inconsistent group attendance data, which should be addressed by the institution. Lastly, despite the patient and providers attributing the patient's psychotic symptoms to substance use, the diagnosis of schizoaffective disorder was retained at discharge without justification.

**Patient C**

This 38-year-old patient's healthcare record was reviewed to assess the quality of care provided at DSH-Atascadero. Upon arrival to the hospital, the patient was provided diagnoses of bipolar disorder, opioid use disorder, and PTSD. The DSH-Atascadero treatment team changed those diagnoses during hospitalization to schizoaffective disorder, bipolar type, and opioid use disorder, moderate. He was prescribed Lexapro, Latuda, and Zyprexa, and he was medication adherent. The patient transferred to DSH-Atascadero on November 29, 2023.

The patient had an EPRD of April 1, 2025. Prior to transfer from the CMF-PIP acute care program to DSH-Atascadero, the patient was discovered removing plastic bags from garbage cans on November 2, 2023; that behavior was concerning given he had tied a plastic bag around his head in an apparent suicide attempt prior to the acute admission. The CMF-PIP staff further indicated that despite several medication trials, the patient had not stabilized, and he continued to have toxicology results that were positive for Suboxone that was not prescribed for him.

The patient had a significant history of suicidal behaviors, suicide attempts, and self-harm incidents. In April 2022, the patient cut sheets into strips to make a rope to kill himself. On September 7, 2023, he was found with a bag tied around his head; he initially denied suicidality while stating to an officer that he was stretching the bag, and reporting to a nurse that he just wanted to feel something. During a subsequent MHCB placement, he was tearful, depressed, and not eating, and he acknowledged that he felt like giving up. Notably, around the time of the

September 7, 2023 suicide attempt, the CDCR MHCB treatment team indicated that the patient was more likely to minimize his symptoms and risk than to exaggerate symptoms or to engage in self-harm for secondary gain. On September 13, 2023, the staff found a manufactured rope in the patient's cell, and he later admitted to suicidal thoughts. Subsequently, the patient was referred to the CMF-PIP acute care program where on November 2, 2023, he was found removing plastic bags from garbage cans presumably for suicide or self-harm, but he claimed plans to use them as waterbags during exercise.

The suicide risk assessment completed at DSH-Atascadero on December 5, 2023 appeared to underestimate the patient's suicide risk, as the clinician provided a moderate risk rating. The patient, however, had numerous risk factors for suicide, including his EPRD in 2025 and fear of deportation. He explained to staff that he would have no support system or help if deported to Mexico. The evaluating psychologist recommended a structured environment and DBT to address the patient's suicide risk factors that included depressed mood, suicidal ideation, loneliness, and hopelessness.

The psychiatrist completed the initial assessment timely on November 29, 2023. Symptoms documented upon admission included depressed mood, affective instability, auditory hallucinations, and paranoid delusions. The psychiatric assessment quoted the patient as saying, "Paranoia … cameras looking at me, it irritates me. I'm up and down depression crying noises bother me." The psychiatrist indicated that since that issue was not reported prior to admission, they questioned whether the patient was exaggerating his symptoms. Despite that uncertainty, the psychiatrist changed the patient's diagnosis from bipolar disorder to schizoaffective disorder, bipolar type. Latuda was discontinued on that date, and Lexapro was prescribed for depression.

The patient initially expressed reluctance to agree to MAT due to fear of being pressured to sell or share Suboxone with others; however, he ultimately agreed to Suboxone treatment on November 16, 2023.

The DSH-Atascadero treatment team adopted the referring institution's treatment outcome expectations without modifications. The objectives stated that the patient would not endorse suicidal ideation or hopelessness for at least three weeks prior to discharge, he would have 95 percent medication adherence with appropriate laboratory studies for at least three weeks prior to discharge, the patient would not engage in homicidal or suicidal behavior for at least three weeks prior to discharge, and he would demonstrate the use of at least three self-directed coping skills once daily as documented by the clinical team for three weeks prior to discharge.

The information regarding group treatment in the healthcare record did not allow for determination of the group hours offered or attended by type; however, the patient was reportedly enrolled in DBT groups, including groups titled DBT basics and DBT study hall. The December 27, 2023 treatment plan did reference seven hours of assigned groups, but the team documented that they did not have access to treatment attendance data due to the recentness of the patient's admission. However, the patient was admitted one month prior on November 29, 2023.

Of note, the treatment team discharged the patient to the EOP level of care on January 18, 2024 due to behavioral issues prior to demonstration of sufficient progress and readiness for the outpatient level of care.

Regarding the course of hospitalization leading up to the discharge, the patient was seen on December 5, 2023 for psychiatric sick call, when olanzapine was increased at night due to reported auditory hallucinations. The patient presented with affective dysregulation on that date, and the psychiatrist raised concern about medication diversion, as the patient frequently requested various medications. On December 6, 2023, the psychiatrist met with the patient again and stated that the patient was needy, somewhat entitled, and that he required a lot of unnecessary things. The provider further stated that the patient was bargaining for medication changes for no reason, and was requesting Seroquel, Latuda, and Zyprexa, as well as an increase in the Suboxone dosage. On that date, it was also documented that the patient continued to exhibit affective instability and paranoia; although he rated his depression at six of ten on a ten-point scale, he admitted to having passive death wishes twice weekly.

During three additional contacts between December 15 and December 29, 2023, the patient continued to report or exhibit mood dysregulation, guarded and paranoid presentation, suicidal thoughts, sleep issues, increased depression and opiate cravings, and a decrease in the frequency of auditory hallucinations. The psychiatrist continued to document requests for medication changes or adjustments, which were generally met with new orders. For example, on December 27, 2023, the patient was started on lithium; however, that medication was discontinued on December 29, 2023.

On January 17, 2024 at 1830, a peer reported to staff that the patient gave him Suboxone in exchange for a radio. Subsequently, the patient’s room was searched, and the radio was found; at 2000 hours, the patient reportedly escalated and assaulted his peer by hitting him in the face and knocking him to the ground. The patient received orders for full restraints on January 17, 2024, and subsequent orders for seclusion were provided on January 18, 2024.

A psychiatrist interviewed the patient while in seclusion on January 18, 2024 at 0800 hours; the documentation indicated that the patient apologized and presented with anxiety and a dysphoric appearance. However, the treatment team determined that the patient required discharge to CDCR at the EOP level of care on that date.

At the time of discharge, the diagnosis of schizoaffective disorder was retained with a list of symptoms supporting the diagnosis, and olanzapine was continued for psychosis and mood symptoms; however, there were discrepant statements regarding whether treatment objectives were met, as some discharge documentation indicated that treatment outcome expectations were not met prior to discharge, that the patient was discharged for behavior problems, and there was a statement that the patient required a structured environment. Other discharge documentation stated that the patient met his treatment objectives and would benefit from the EOP level of care.

Treatment providers documented that the patient would be discharged to the EOP level of care at SATF with strong recommendations for cognitive behavior therapy in a structured environment,

but they failed to provide sufficient justification for referring the patient to the outpatient setting rather than continued inpatient treatment at a PIP.

**Findings**

The care and treatment provided to this patient were inadequate.

The suicide risk assessment underestimated the patient's risk and did not sufficiently justify the moderate risk rating. During assessment, the psychiatrist questioned the presence of psychotic symptoms but changed the diagnosis from bipolar disorder to schizoaffective disorder, bipolar type, while noting that olanzapine was prescribed for the patient's psychotic symptoms. Despite evidence of diagnostic uncertainty, the treatment team did not document consideration of a diagnostic clarification evaluation.

The documentation did not include treatment hours, including one month after admission, making it difficult to determine whether any treatment beyond medications and leisure activities were offered. Treatment plans were inappropriate, as they expected the patient to stop disclosing suicidal ideation and hopelessness rather than learning to manage those thoughts and feelings when they occurred. That expectation was particularly inappropriate considering the referring treatment team's documentation of the patient's tendency to minimize his suicide risk and plans for self-harm.

Despite discrepant statements regarding whether treatment goals were met prior to discharge, it was clear that the patient had not met treatment objectives related to danger to self, danger to others, or self-directed coping strategies for a three-week period prior to discharge; yet the treatment team discharged the patient to the outpatient setting without sufficient justification while continuing to state that they strongly recommend CBT, and emphasizing that the patient, required placement in a structured environment.

**Patient D**

This 41-year-old patient's healthcare record was reviewed to assess the quality of care provided at DSH-Atascadero. The patient was provided diagnoses of unspecified neurocognitive disorder, schizophrenia, cannabis use disorder, and cocaine use disorder. Upon admission, he was prescribed risperidone, Abilify, BuSpar, and sertraline.

The patient had an extensive psychiatric history with prior DSH admissions. Records indicated that during a 2012 DSH hospitalization, the patient was placed in five-point restraints on four separate occasions. There was also reference to a DSH admission for an offender with a mental health disorder commitment from 2014 to 2017.

The inpatient referral indicated that the patient's symptoms were unmanageable and interfered with his ability to function and program in the prison setting. The referring institution's treatment outcome expectations included increasing participation in treatment to 50 percent, improving attention to ADLs for 90 days, remaining medication adherent, and reducing

persecutory command auditory hallucinations by demonstrating the ability to reality test during mental health clinician contacts. A medication evaluation was also recommended.

On August 1, 2023, the patient transferred from the SVSP-PIP to DSH-Atascadero for continued intermediate care at his LRH and to address ongoing auditory hallucinations, paranoia, disorganized thinking, anxiety, and depression. The DSH-Atascadero psychiatrist initially continued the above-mentioned medications with the additions of olanzapine and hydroxyzine prn.

During the initial psychiatric assessment, the patient was described as a poor historian with fidgeting, anxiousness, and with ongoing command auditory hallucinations involving self-harm content. Consistent with the referring institution's opinion, the psychiatrist documented that the patient's paranoia resulted in avoidance of various treatment activities. On August 2, 2023, the patient's risperidone dosage was briefly increased to address auditory hallucinations and paranoia but subsequently required reduction due to the presence of extrapyramidal side effects. The assigned psychiatrist attempted treatment with several other medications, including amantadine, mirtazapine, and BuSpar; however, the patient's symptoms did not significantly improve. The patient was unwilling to take clozapine that was recommended by the psychiatrist due to the required frequency of blood draws for laboratory monitoring.

A psychologist completed a suicide risk assessment on August 4, 2023, assessing the patient's suicide risk as low and referencing a history absent of suicide attempts, self-harm, and suicidal ideations.

The treatment team convened for a second time on October 2, 2023. On that date, the documentation referenced vague strengths, including "some stated insight into his symptoms and clearly communicating his thoughts and needs without prompting." The team further indicated that as of September 3, 2023, the patient had no contact with anyone in the community, no releases of information, and no effective coping skills. Despite providers indicating that the severity of the patient's cognitive impairment was unclear and that he exhibited below average intelligence with impairment in social and other important areas of functioning; the treatment team did not document consideration of referral for neuropsychological testing during the hospitalization.

The group treatment data at DSH-Atascadero was very difficult to interpret due to poor documentation and a lack of group treatment notes available in healthcare records. However, from August 27, 2023 to September 23, 2023, the patient was reportedly offered an average of 4.3 weekly treatment hours of which he attended 50 percent.

It was concerning that by October 24, 2023, the treatment team recommended discharge to the EOP level of care despite strong evidence of the need for additional inpatient care. Further, documentation regarding the patient's hospital course was inconsistent.

On August 4, 2023, a provider described the patient as exhibiting paranoia and command auditory hallucinations with voices stating that others intended to harm him, and the patient

prematurely terminated the interview on that date. On September 1, 2023, the patient continued to report paranoid thoughts about others, stating, “I think everybody is out to get me and stuff.”

On October 2, 2023, the treatment team documented ongoing auditory hallucinations and paranoia with voices stating that they would harm him. The patient also stated to the treatment team, “I don’t really like it here…too many people coming at me wanting to fight me and I don’t want to get in trouble.” The provider documented that the patient requested return to prison, as he perceived that both peers and DSH-Atascadero staff were challenging him.

Subsequently, the patient reportedly cursed at a peer rather than coming to the staff to report being the target of his peers, and a provider increased the patient’s violence risk to moderate due to paranoia and the negative peer interaction.

On October 23, 2023, the staff documented that the patient was involved in an altercation with a peer that resulted in injury to the patient causing a bloody lip. The patient stated that he was targeted and “shoulder checked” by several peers on the unit, and the incident resulted in the patient being “pummeled” by another patient. While the first incident was not observed by staff, a staff member observed a different peer “shoulder checking” the patient on the same day. Also, on that date, the patient reported auditory hallucinations, and his olanzapine was increased.

On October 24, 2023, DSH-Atascadero clinically discharged the patient to the EOP level of care, indicating in their rationale that the patient was pummeled by a peer and remained at risk for further victimization on the unit. However, the decision to reduce the patient’s level of care to outpatient and to return him to the prison setting was not justified in the documentation.

While the patient awaited transfer to the EOP level of care, providers continued to document paranoia with peers and staff on October 30, 2023, and the nursing discharge summary on the following day indicated that the patient was often isolative, but medication adherent. The summary additionally reported that the patient continued to exhibit auditory hallucinations, delusions, and paranoia through late October 2023. In contrast to other provider notes, the nurse documentation stated that the patient verbally provoked another peer resulting in mutual aggression, and that the patient was informed about his discharge due to his recent aggression. It appeared that the nurse and clinical staff clearly had not discussed the reason for discharge based on the conflicting documentation, as some providers indicated that the patient remained at risk for victimization due to being targeted by multiple peers, and the nurse describing the reason for discharge as due to provocative and aggressive behavior. Notably, neither reason justified discharge to a lower level of care.

At the time of discharge, the assigned psychiatrist documented that throughout the current hospitalization, the patient continued to exhibit persistent feelings of aggression, auditory hallucinations, a persecutory delusion that his peers were after him, as well as statements suggesting more bizarre delusional beliefs, such as his brain was stolen and that he had not used the bathroom in ten years. The psychiatrist noted that the patient’s symptoms remained resistant to medications despite medication adherence, and the patient remained resistant to a trial of clozapine.

The DSH-Atascadero discharge summary stated that the reason for discharge was that the patient was currently being targeted by his peers, and his physical safety could not be assured with the level of security present on his current treatment unit. The summary further stated that the patient appeared cognitively impaired and was unable to program fully while having to deal with ongoing concerns about his physical safety, which they were unable to guarantee in the open dorm setting of his current treatment unit. The summary further stated that there were no single cells available at DSH-Atascadero for his commitment code, and that the patient had endorsed persistent baseline aggressive impulses. The summary did not provide a rationale for discharge to outpatient care rather than transfer to an inpatient CDCR PIP.

**Findings**

The care and treatment provided to this patient were inadequate.

The patient suffered from persistent psychotic symptoms, including delusions and command auditory hallucinations, that did not respond well to his current medication regimen. The patient also reported during intake that his paranoia at times prevented him from engaging in treatment activities. Providers acknowledged the ongoing severity of the patient's mental illness, the presence of a cognitive impairment that impacted his social and other areas of functioning, and his ongoing risk for victimization in the unit. According to the discharge summary, the patient was promptly discharged, as he was targeted by multiple peers on the unit, and due to DSH-Atascadero's inability to ensure his safety with current staffing. The discharge was not based on achieving treatment objectives or stabilization of symptoms that resulted in his current admission. The discharge summary failed to provide a rationale for discharging to the outpatient setting in EOP rather than a CDCR PIP for further intermediate care until an outpatient level of care was clinically justified.

Further, there was clearly a lack of communication among treatment team members, as the nurse misinformed the patient that his aggressive behavior was the reason for the discharge.

**Patient E**

This 45-year-old patient's healthcare record was reviewed to assess the quality of care provided at DSH-Atascadero. The patient was provided diagnoses of schizoaffective disorder, bipolar type, cocaine use disorder, antisocial personality disorder, and cannabis use disorder. Differential diagnoses documented at the time of discharge included bipolar disorder, schizoaffective disorder, depressive type, major depressive disorder, with psychotic features, substance induced psychotic disorder and malingering. Of note, there was an absence of documentation to support a diagnosis of malingering for this patient. The patient had an active PC 2602 order in place due to danger to others; he was prescribed Aristada and lithium. The patient transferred to DSH-Atascadero on April 27, 2023

This patient had a long history of severe chronic psychotic mental illness with paranoia, auditory hallucinations, severe affective instability, dangerous behavior to self and others, medication nonadherence due to lack of insight, multiple inpatient psychiatric hospitalizations, and prior involuntary medication orders for danger to self and others. Further, the patient had five

documented suicide attempts by possibly lethal methods including overdose, hanging, and wrist cutting.

NKSP initially referred the patient to the CMF-PIP due to delusions, paranoia, isolative behavior, and verbal abuse and threats toward staff and other incarcerated persons. The CMF-PIP retained the patient for seven months, documenting that he had partially stabilized on involuntary medication prior to transfer to DSH-Atascadero.

The initial psychiatric assessment occurred timely. During the assessment, the patient presented with bizarre paranoia including maintaining a delusional belief that someone was using "radiation force" on him. The patient was further described as pleasant and cooperative, while also reporting normal mood and difficulty thinking clearly. The psychiatrist changed the patient's psychotropic medications during the hospitalization, and the patient ultimately discharged with a renewed PC 2602 order and active prescriptions for Abilify, lithium carbonate, and atorvastatin.

The initial and only suicide risk assessment completed at DSH-Atascadero occurred on May 4, 2023. The evaluating clinician rated the patient's suicide risk as low, noting that while the patient had five prior suicide attempts, he denied thoughts of suicide after his last documented attempt in 2018.

The treatment team adopted the CDCR recommended treatment outcome expectations for discharge without modification which required participating in at least 75 percent of individual therapy sessions and treatment groups, meeting with psychiatry to review and update medications every 30 days, maintaining 90 percent compliance with showers and meals, and decreasing the severity of delusions to a four or below on a ten-point scale within 30 days.

During his hospital course, some improvements were documented prior to discharge; but not all treatment interventions were offered, and not all treatment outcome expectations were met. Approximately one month after admission, on May 31, 2023 the patient reported to staff that he was "stale" and requested to return to prison as he preferred to be in a room alone talking to himself. The patient added that he was not motivated to socialize with others or to attend groups.

On or around June 27, 2023, the patient reportedly denied and minimized his symptoms while still requesting return to the prison setting. The provider indicated on that date that with prompting, the patient acknowledged that he was not thinking clearly. The provider also noted that the patient remained quiet and isolative on the unit but participated in aggression reduction groups, attended to his activities of daily living, remained medication adherent, engaged appropriately but minimally with staff and peers, and used pacing as his primary coping skill.

By August 28, 2023, the patient was described as stable, and his hospital course was described as uneventful; however, the patient reported poor sleep, paranoia, experiencing brain fog, and having concern that he might experience another manic episode. At that time, his group attendance was described as low at only 43.3 percent; although, the provider did not reference group type, hours offered, or hours attended. While group treatment participation barriers were not queried or documented during that time; the patient reported on September 26, 2023 that he

had significant anxiety during groups. Despite that report, individual psychotherapy was not offered as planned, nor were interventions implemented to address the patient's anxiety to increase his group participation.

On October 2, 2023 during a PC 2602 renewal interview, the patient initially responded vaguely to questions. However, he eventually was less guarded and reported that he sometimes spoke with people who were not there, experienced delusions, sometimes preferred not to do anything, and he exhibited an overall lack of insight regarding what might occur in the absence of medication treatment. The interview resulted in the submission of a renewal petition for involuntary medication that was granted due to danger to self and others on or around November 8, 2023.

From October 15, 2023 to October 25, 2023, the patient required isolation in another unit after testing positive for COVID-19. Approximately one month later on November 20, 2023, the psychiatrist documented that for one month, the patient remained stable and attended 85.7 percent of groups. However, the provider failed to indicate the group type and total groups hours offered to clinically justify the determination that the treatment outcome expectation was met. Further, the provider documented on that date that the patient continued to present with anxiety and guardedness while exhibiting poverty of speech and thought content. While the patient denied psychotic symptoms, other providers had already documented concerns that the patient minimized his report of psychotic symptoms for return to prison.

According to the most recent and final treatment plan, as of October 25, 2023, the patient was enrolled in nine hours of weekly treatment groups. According to the final treatment plan, from July 23, 2023 to October 21, 2023, the patient attended 69 percent of 56.1 hours of weekly groups offered. For the reporting period of September 24, 2023 to October 21, 2023, the patient was offered 4.8 hours of weekly structured treatment, of which he attended 55 percent. He reportedly was offered 51.2 hours of weekly supplemental activities, of which he attended only 1.9 hours. Individual therapy was not offered during the hospitalization as was indicated in the treatment plan, and the patient did not attend drop-in group sessions during that period.

The patient ultimately discharged to the EOP level of care on January 11, 2024. The discharge summary described the patient's hospital stay as uneventful based on no required use of prn medication or seclusion or restraint incidents, no engagement in high-risk behavior requiring enhanced monitoring, improvement in group attendance and personal hygiene, and improvement in symptoms and functioning due the involuntary medication order.

Of note, the discharge summary continued to list malingering as a differential diagnosis while adding that the patient might need a malingering assessment. That statement was surprising and confusing, as there was no documentation suggesting signs of malingering during the nine-month hospitalization, the treatment team retained the diagnosis of schizoaffective disorder, bipolar type, the prescriber continued to order antipsychotic and mood stabilizing medications, and providers frequently documented concern about the patient's poor insight and judgment due to suspected minimization of psychotic symptoms in an attempt to return to the prison setting. Further, the treatment team never documented discussion regarding malingering, and the patient was never referred for an evaluation while hospitalized to resolve any diagnostic uncertainties.

**Findings**

The care and treatment provided to this patient were inadequate.

While the patient demonstrated some improvement in symptoms and functioning during the nine-month hospitalization at DSH-Atascadero, the overall care was inadequate. The treatment team meetings were not utilized appropriately; the meetings did not ensure that treatment plans were appropriate for the patient and setting; there was no documentation of discussion of discrepant opinions or observations regarding the patient's stability, diagnosis, and discharge readiness; and there was no resolution of data discrepancies to allow consistent and accurate tracking of progress toward treatment objectives.

Providers documented diagnostic uncertainties upon admission and discharge but did not attempt to justify or resolve those diagnostic uncertainties. The treatment team adopted the CDCR recommended treatment outcome expectations within their treatment plan, including provision of individual therapy; however, they did not implement that intervention, even when it was clinically indicated in response to the patient's worsening group treatment participation due to increased paranoia.

Further, the healthcare documentation did not offer clear and consistent treatment data to accurately determine treatment hours offered or attended, which was also necessary for demonstrating that treatment objectives were met. The group data that was provided in treatment plans did not allow providers or reviewers to determine whether the group type and content offered and attended was relevant to the patient's presenting problems or goals. Thus, it was unclear whether the patient actually met the treatment outcome expectation for treatment participation as indicated in the discharge summary.

Other discrepancies were noted in provider progress notes during September and October 2023; psychiatry began documenting that the patient had stabilized based on self-report, while other providers documented concerns that the patient exercised poor judgment by minimizing psychotic symptoms in an attempt to return to the prison setting.

**Patient F**

This 30-year-old patient's healthcare record was reviewed to assess the quality of care provided at DSH-Atascadero. The patient was provided a diagnosis of schizophrenia. He was prescribed fluphenazine, clonidine, and lamotrigine. The patient's PC 2602 involuntary medication order was renewed one day prior to his arrival to DSH-Atascadero on February 13, 2024.

The patient had an extensive mental health treatment history with multiple inpatient admissions due to serious mental illness and periodic decompensation to the point of grave disability. Prior to the referral for inpatient care, the patient psychiatrically decompensated in the EOP level of care with active psychotic symptoms and evidence of grave disability despite an active involuntary medication order.

The patient transferred from the RJD EOP to DSH-Atascadero for intermediate care. RJD clinicians documented that the patient was not attending to his ADLs, presented as disheveled and malodorous, isolated in a cell that was in disarray and filled with trash, exhibited grandiose and bizarre delusions, demonstrated no insight regarding his mental illness, and did not participate in structured therapeutic activities.

Upon arrival to DSH-Atascadero, the patient's self-report did not match the assessing psychiatrist's observations. The patient stated that he had no problems, was doing okay, and was seemingly unaware of the reason for inpatient admission. In contrast, assessing providers documented disorganized thought processes and delusions that were grandiose, bizarre, and sexual in nature. The admitting psychiatrist, social worker, and psychologist noted in their assessment recommendations that the patient would likely benefit from medication adjustments, group treatment, and a structured inpatient care setting.

Several progress notes and assessments completed prior to and during the current inpatient admission referenced grandiose and bizarre delusional statements that were sexual in nature, which raised concern for victimization or RVRs in the prison setting. For example, the patient reportedly referred to his sexy body, having power and authority over the devil, and gangsters allowing him to "butt rape" and make others perform sexual activities; additionally, he stated that he had trillions of dollars and that he could do anything he wanted, including killing half of mankind. Further, the patient reported that he was responsible for the appointments of the former and current president. During a meeting with an DSH-Atascadero social worker for the initial assessment, the patient made similar delusional and sexually inappropriate statements.

The initial psychiatric assessment described the patient as guarded, resistant in responding to questions, lacking insight into his mental illness and the need for medication, and verbalizing bizarre delusions. The psychology initial suicide risk assessment completed on February 16, 2024, assessed low suicide risk, as the clinician noted an absence of documented and reported suicide attempts and self-harm incidents.

It appeared that the DSH-Atascadero treatment team inappropriately adopted the treatment outcome expectations from RJD into their sole treatment plan at the seven-day treatment conference dated February 20, 2024; the treatment outcome expectations were clearly designed for the prison setting and the EOP level of care. For example, there were treatment outcome expectations that required two minutes of attendance in a PC check-in group that occurred in a CDCR EOP. Other treatment outcome expectations focused on increasing insight through gentle reality testing, increasing group participation, and improving medication adherence.

Despite group treatment participation as one of the patient's treatment goals and referral reasons, the healthcare record did not provide the total group hours offered and attended. According to the sole treatment conference/treatment plan document dated February 20, 2024, the patient was enrolled in five hours of group treatment, but data regarding his attendance was unavailable. While group attendance data was vaguely referenced in the psychiatric and social worker discharge summaries, the social worker noted sporadic group attendance at 40 percent, and the psychiatrist reported zero percent group attendance on the clinical discharge date of February 29, 2024.

Regarding the patient's brief hospital course, on February 13, 2024, DSH-Atascadero acknowledged that the patient required inpatient care to address hallucinations, delusions, ADLs, disorganization, and isolation. On that date, the social work assessment appropriately acknowledged that none of the patient's treatment goals were met. On February 25, 2024, the provider documented that the patient was new to the unit, spending most of the shift in bed, and requiring prompts for medication and groups. On February 27, 2024, the psychiatrist prescribed Benadryl prn for sleep. Clinical documentation on that date suggested that the patient remained acutely psychotic with poor insight and judgment, but with no behavioral concerns. On that date, the patient reportedly requested return to prison, refused to comply with required laboratory testing, EKGs, and treatment groups. While the patient stated that he did not have a mental illness and did not require psychiatric hospitalization, the provider documented that he required further inpatient care and treatment at DSH-Atascadero. The patient was abruptly discharged two days later to the EOP level of care without sufficient justification or evidence of discharge readiness. The February 29, 2024 discharge summary stated that the patient "will not benefit from further care and treatment at DSH-A," that he had requested return to prison and continued to deny having a mental illness, and that his group treatment participation was zero percent. The mental status section noted fair attention to his ADLs with poor insight and judgment.

The discharge summary did not reference any behavioral concerns or significant events during the brief hospitalization, nor did it suggest that the treatment team sufficiently addressed barriers to treatment adherence or implemented interventions relevant to the adopted treatment outcome expectations from the referring institution, including those for increasing group treatment adherence, use of motivational interviewing to engage the patient in treatment, and use of gentle reality testing to increase insight.

As the patient was clinically discharged from DSH-Atascadero to the EOP level of care on February 29, 2024, the total duration of his inpatient admission was only 16 days. DSH-Atascadero noted that the patient physically transferred to CDCR on March 14, 2024.

**Findings**

The care and treatment provided to this patient were inadequate.

The DSH-Atascadero clinicians failed to develop realistic treatment outcome expectations that were patient and setting specific; however, considering that the patient was discharged without sufficient evidence of progress toward stabilization, it was questionable whether appropriate treatment outcome expectations would have been met within that short duration. The DSH-Atascadero clinical assessments and progress notes confirmed the presence of active psychosis with poor insight and judgment, ADL concerns, and verbalized delusional statements that were grandiose, violent, and sexual in nature; those factors increased his risk for victimization and incurring RVRs in the prison setting. After only 16 days, the patient was abruptly discharged to the EOP level of care without an adequate clinical rationale, evidence of stabilization and discharge readiness, or proof of sufficient progress toward the adopted treatment outcome expectations. While medications were adjusted, the patient remained nonadherent with laboratory studies, EKGs, and treatment groups. Individual psychotherapy was not discussed or

recommended to address insight, reality testing, and other potential barriers to group treatment participation.

It appeared that DSH-Atascadero staff allowed the patient to direct his own discharge and level of care, despite providers documenting ongoing clinical concerns, including lack of insight, lack of progress and appropriateness for inpatient care only two days prior to his abrupt discharge. Further, the patient was not offered clinically indicated or court ordered minimum care during the hospital stay, and the inconsistent clinical documentation did not allow the reviewer or receiving institution to determine his level of participation, despite that being a reason for admission and recommended focus of treatment.

**Patient G**

This 40-year-old patient's healthcare record was reviewed to assess the quality of care provided at DSH-Atascadero. The patient was provided diagnoses of autism spectrum disorder; major depressive disorder, recurrent, moderate; amphetamine type substance use disorder; cannabis use disorder; cocaine use disorder; and adult antisocial behavior. He was prescribed lithium, buspirone, and vortioxetine; however, buspirone and vortioxetine were discontinued during the initial psychiatric contact. The patient arrived at DSH-Atascadero from CMF on October 4, 2023, and discharged on or around January 16, 2024.

Prior to arrival at DSH-Atascadero, the patient had three MHCB placements and received care in an acute program; however, the acute program determined that he required intermediate care to address ongoing danger-to-self concerns, PTSD, persistent depressive mood, hopelessness, decreased energy/motivation, low self-esteem, suicidal ideation, and social anxiety.

The initial psychiatric assessment on October 3, 2023 provided a thorough biopsychosocial assessment with relevant historical mental health information prior to and during incarceration, as well as a well-developed case formulation to support diagnostic considerations. On that date, the psychiatrist opined that prior reports of auditory hallucinations may have been related to substance use based on the patient's responses during the interview. Psychiatric progress notes were updated weekly or within 30 days and included relevant updates on mental status and response to medication changes. Medications were further modified or discontinued during hospitalization. While the psychiatrist documented improvement in depression, auditory hallucinations, and suicidality following initiation of lithium prior to arrival; lithium was discontinued on December 18, 2023.

The only individual contact with a psychologist occurred for an assessment on October 10, 2023. On that date, the psychologist completed a suicide risk assessment with a detailed narrative of the patient's mental health history and assessed the patient's suicide risk as moderate, which appeared consistent with his history and presentation. The patient had a history of suicide attempts and self-harm incidents, the most recent occurred during 2022 when he cut his wrists with a broken light bulb. The assessment also referenced a significant childhood trauma history with poor adaptive coping skills. Based on the assessment, the psychologist recommended group treatment including mental health and wellness, staying safe, and healthy living to address coping skills, emotional regulation, and psychiatric symptoms. Individual psychotherapy was

not considered, despite the referring institution suggesting that social anxiety was a barrier to group treatment participation.

The treatment plans targeted symptoms of anxiety and depression with a goal of reducing symptom severity to a five-of-ten or lower based on self-rating for at least 30 days, identifying two reasons for living, and learning and implementing three new coping skills twice per week for a minimum of four weeks. Like other treatment plans reviewed at DSH-Atascadero, this patient's treatment plan contained a section of relevant treatment objectives and interventions that remained listed as not met with expected target dates for achievement after planned discharge dates; thus, it appeared that none were resolved. The objectives for this patient included increasing group attendance, engaging in the therapeutic community, identifying three healthy leisure activities, and understanding assigned diagnoses. The patient was discharged in January 2024, but the target dates for those specific objectives were during April 2024.

Social work progress notes suggested that those contacts were generally used for case management check-ins and coordinating pre-release services in preparation for the patient's upcoming probation release. The social worker also documented that while they offered weekly pre-release planning groups, the patient generally did not attend. The social work discharge note referenced specific pre-release plans, including the name and address of the transitional housing program coordinated with county probation.

Treatment plans referenced group hour data for a review period that began prior to admission and during COVID-19 isolation. Specifically, the patient was admitted on October 4, 2023 and required placement in the COVID-19 isolation unit from October 31, 2023 to November 9, 2023; however, the treatment plan stated that from September 17, 2023 to December 16, 2023, the patient was offered an average of 43.6 hours of weekly treatment, with 39 hours of supplemental activities and 4.5 hours of weekly structured treatment groups. The patient reportedly attended only 2.8 of the 4.5 hours of weekly structured treatment groups offered during that period, and his overall attendance was described as poor. Of note, providers did not consider offering individual psychotherapy to address known barriers to group attendance, such as social anxiety and a tendency toward isolation.

The final treatment conference occurred 14 days prior to discharge on January 2, 2024. The treatment team documented on that date that from November 19, 2023 to December 16, 2023, the patient attended 88.3 percent of the 48.1 weekly treatment hours offered. The nursing discharge documentation, however, described the patient's treatment participation during hospitalization as poor, adding that the patient preferred independent leisure activities, such as reading, watching movies, and pacing.

Positive aspects of the DSH-Atascadero hospitalization included maintaining medication adherence and ADLs, a HAS level of three for longer than 70 days, adherence with unit rules and routines, and appropriate interactions with staff and other patients. The patient also had no behavioral incidents during the hospitalization. The treatment team documented that the patient had expressed interest in vocational service eligibility, but his release date in January 2024 prevented his participation.

The patient discharged to the EOP level of care on January 16, 2024, the discharging provider appropriately included recommendations for the outpatient team to consider. The discharge summary further indicated that all treatment outcome expectations were met, and that the patient voiced readiness for discharge while denying thoughts of self-harm, perceptual disturbances, and mood related concerns. A provider also noted that the patient's protective factors and use of healthy coping skills for managing risk increased prior to discharge.

**Findings**

The care and treatment provided to this patient were adequate.

While several concerns were identified during this review, the overall care was adequate. The patient demonstrated further improvements during the hospitalization. The treatment team provided a therapeutic milieu with sufficient attention to psychopharmacological and pre-release planning interventions. However, it did not appear that the patient was offered the required minimum hours of structured therapeutic activities, and his group attendance issues were not addressed.

The patient was not offered clinically indicated interventions to address documented PTSD and trauma, isolation, and social anxiety with the need for skills building that were identified as barriers to group treatment participation during initial assessments and throughout the hospital course. The treatment team should have modified their treatment modality based on the patient's psychiatric needs and limitations. Additionally, significant improvement was needed to correct documentation deficiencies, most notably the absence of group notes, group data, and uninterpretable treatment team documentation.

**Patient H**

This 31-year-old patient's healthcare record was reviewed to assess the quality of care provided at DSH-Atascadero. The patient was provided diagnoses of schizoaffective disorder, depressive type; other unspecified stimulant use disorder, severe, in early remission; cocaine use disorder, severe, in early remission; and alcohol use disorder, severe, in early remission. Upon arrival, the patient was prescribed chlorpromazine, lithium, mirtazapine, and paliperidone palmitate, as well as chlorpromazine and hydroxyzine prn. The patient transferred from the CHCF-PIP to DSH-Atascadero on January 25, 2024.

Prior to the current admission, the patient was referred to the CHCF-PIP acute care program during an October 2023 MHCB placement due to delusions, paranoia, limited insight into his mental illness, poor hygiene and grooming, flat affect, objective signs of auditory hallucinations, and self-harm ideation.

The initial psychiatric assessment completed on January 25, 2024 provided a thorough biopsychosocial assessment with relevant historical mental health information. The psychiatrist noted restricted range of affect, apparent underlying anger, ongoing report of non-distressing auditory hallucinations of females conversing for a few minutes each day, a lack of awareness regarding the current intermediate care admission, and the patient's focus on returning to CDCR. The patient also reported that he did not have a mental illness, did not require psychotropic

medication treatment, and did not need further treatment in an inpatient care facility. The psychiatrist opined on that date that the patient's persistent psychotic symptoms may have been due to long-term amphetamine use.

The psychology initial assessment for suicide risk and violence risk completed on February 1, 2024 resulted in moderate risk ratings for both. The psychologist, however, documented that due to the patient's minimal engagement and guarded presentation during assessment, his risk factors could not be fully assessed. The suicide risk assessment referenced a history of self-injurious behavior as well as a reported plan to kill himself while in CDCR on September 19, 2023, regardless of where he was housed. At that time, the patient reportedly stated, "Regardless of where I go…I want to be with the lord." The risk assessments resulted in the psychologist recommended further monitoring of risk during hospitalization, adding that the patient's risk of violence and self-harm might increase in response to medication nonadherence and signs of poor impulse control, limited coping skills, depression, paranoia, delusions, and anxiety. Additionally, the psychologist recommended DBT on February 1, 2024 and February 29, 2024, an updated risk assessment if the patient exhibited aggressive behavior, and diagnostic clarification based on discrepancies between the acute program's ongoing clinical concerns and the patient's denial of symptoms upon admission to DSH-Atascadero.

While the patient was seen for follow up by the psychiatrist frequently, and the social worker attended to case management needs with check-in contacts and reminders of treatment outcome expectations; the psychologist met with the patient only for assessments. The treatment team did not consider individual psychotherapy with the psychologist in response to group treatment nonadherence and recommendations for DBT.

Psychiatric progress notes offered useful updates regarding mental status and response to medications, as well as justifications for medication changes during the hospitalization. The social work progress notes referenced treatment participation information, and they contacted the patient's mother during the current admission. The progress note for the family contact indicated that the patient's brother was also diagnosed with schizophrenia, that the patient himself presented with mania and severely cut his arm in his mother's presence at age 18, and that the patient's substance use and gang activity further complicated his symptomatology.

Treatment group information was uninterpretable due to inconsistent or unavailable information in the healthcare record. While the treatment plan referenced a list of assigned groups, there was no indication that the groups were offered as planned. Further, total group hours offered and attended by type could not be determined for supplemental and structured activities, and there was no reference to DBT groups despite the referring institution and the DSH-Atascadero psychologist's recommendations. The patient's group list included drug education, aggression reduction, healthy living, mental health wellness, exercise physical wellness, sponsor group, and staying safe.

The psychiatrist noted that while the patient complained of not being assigned to treatment groups, the provider noted that the patient attended 37.5 hours of group during his hospitalization. That provider, however, did not indicate whether they were referencing structured group or supplemental activity hours. While most providers and nursing consistently

described the patient's group treatment participation as poor, one treatment plan described the patient's group attendance as adequate. Unfortunately, group notes were unavailable in the healthcare record for review to confirm the group type and hours offered and attended.

On January 26, 2024, the patient reported lethargy, feelings of hopelessness and helplessness, and auditory hallucinations during evening hours. However, when the psychiatrist asked the patient again whether he suffered from a mental illness, the patient responded, "Not really…well, maybe a little bit." The psychiatrist further noted that the patient exhibited poverty of speech with monosyllabic responses to interview questions. On January 31, 2024, the psychiatrist discontinued lithium and chlorpromazine, and continued orders for paliperidone palmitate and mirtazapine.

Nursing documentation indicated that the patient's group attendance was poor, and that he preferred sleep and isolation. Shift notes during February 2024 also referenced behavioral concerns, including encouraging another patient to stop taking their medication and taking extra milk containers.

Throughout the hospitalization, the clinical documentation described the patient's group treatment attendance as poor. However, at the time of the February 2024 treatment conference, the team documented that group attendance data was unavailable. Still, despite provider documentation raising concerns about poor group treatment adherence; the treatment team did not document specific barriers to group treatment participation or update interventions to address those barriers. Further, individual psychotherapy was not considered as an alternative to group treatment where barriers to group treatment participation could be addressed and recommended DBT interventions could be implemented. If psychotherapy was offered, there were no psychology progress notes located in the healthcare record other than one refused contact when the patient was placed in a seclusion room due to being agitated one day prior to discharge.

On February 14, 2024, the patient refused his scheduled dose of intramuscular paliperidone palmitate for psychotic symptoms but reportedly remained adherent with mirtazapine. On February 28, 2024, two weeks after the antipsychotic medication injection refusal, the patient reportedly threatened the psychiatrist during a treatment team meeting and was placed in seclusion for six hours due to danger to others.

On February 28, 2024, the psychiatrist documented that the patient presented with agitation, denied ever experiencing auditory hallucinations, and stated that he previously reported auditory hallucinations to procure his desired housing. Additionally, nursing documented on that date that the patient yelled and cursed at the treatment team, stating that he had done nothing wrong and that the team had mental illnesses. Nursing described the patient as unpredictable on that date. Seclusion related progress notes indicated that the patient briefly resisted by pulling away from staff before allowing seclusion placement. A psychologist attempted to meet with the patient; however, they noted that he was selectively mute and was unwilling to engage in the interview.

On February 29, 2024, one month after admission and one day after seclusion placement due to danger to others; the patient was clinically discharged to the EOP level of care. The discharging

provider did not provide a rationale for discharging the patient to the outpatient level of care instead of a PIP. The discharge documentation indicated that the patient was unable to achieve his treatment outcome expectations and had "essentially reached optimal level of improvement" at the current level of care. The psychiatric discharge justification further indicated that the patient had insisted on returning to CDCR, was unwilling to participate in group treatment, and refused his antipsychotic medication injection. Of note, the discharging psychiatrist retained the diagnosis of schizoaffective disorder with a detailed justification to support the diagnosis and stated that antipsychotic medications remained indicated in the outpatient level of care. However, despite the patient's refusal of injectable antipsychotic medication and subsequent order for seclusion due to danger to others; the provider opined that the patient did not meet the criteria for involuntary medication administration.

**Findings**

The care and treatment provided to this patient were inadequate.

During the 35-day hospitalization, the patient exhibited the very symptoms and behaviors that the psychologist indicated in their initial assessment should be monitored and addressed due to their expected impact on self-harm and violence risk. However, the treatment team failed to adhere to the psychologist's recommendations for DBT and diagnostic clarification, and the team did not modify their treatment approach as clinically indicated to address worsening insight, medication nonadherence, poor impulse control, reported hopelessness and helplessness, and decreased functioning. Further, the treatment team did not refer the patient for individual psychotherapy to address barriers to group treatment, to implement DBT interventions, and to address his worsening presentation prior to the incident resulting in seclusion.

Additionally, the patient's worsening presentation and placement in seclusion due to danger to others one day prior to clinical discharge suggested that a PIP inpatient transfer and involuntary medication order might have been indicated; however, the discharging provider did not document sufficient justification for discharging the patient to the EOP level of care in the prison setting, stating that the patient "essentially reached optimal level of improvement" despite being "unable to meet his treatment outcome expectations." Those statements were further evidence that the patient should have been considered for involuntary medication treatment and transfer to a PIP for continued inpatient care.

The group treatment documentation required significant improvement, as group notes were unavailable, and providers documented discrepant and/or unclear information about the group type and group hours offered and attended. This was of concern, as DSH-Atascadero providers repeatedly indicated that group treatment was their primary or preferred treatment modality for PC 2684 (Coleman) patients.

**Patient I**

This 57-year-old patient's healthcare record was reviewed to assess the quality of care provided at DSH-Atascadero. The patient was provided a diagnosis of unspecified depressive disorder

with a differential diagnosis of adjustment disorder. He was prescribed mirtazapine and hydroxyzine prn. The patient arrived at DSH-Atascadero from CMC on February 21, 2024.

The patient had a prior DSH hospitalization due to danger to self during 2014. CMC referred the patient for inpatient care during February 2024, noting in their referral that the patient had significant mood symptoms, depression, anxiety, hopelessness, and suicidal ideation with a recent interrupted suicide attempt. Precipitants to the recent crisis included denial of parole and a change in institutions that resulted in being far away from his support system in the community.

The initial psychiatric assessment occurred within 24 hours of arrival. While CMC provided a diagnosis of adjustment disorder, the psychiatrist changed the above-mentioned diagnosis. The psychiatric assessment provided a thorough biopsychosocial history, including a recent timeline of significant events leading up to the current admission. During hospitalization, mirtazapine was reduced, and the patient reported an overall positive response.

The DSH-Atascadero psychologist completed their initial suicide risk assessment on February 26, 2024, and assessed the patient's risk as moderate. The document referenced three prior interrupted suicide attempts by hanging, the most recent occurred on January 2, 2024 at the CMC MHCB. The risk assessment did not include several positive risk factors that were clearly present based on the documentation, including recent suicidal thoughts with a specific plan and method, feeling alone, evidence of a major depressive episode, and perceived burden on his family. Further, the clinician documented that the most severe lifetime suicidal ideation occurred just one month prior when the patient was denied parole and subsequently created a noose with a reported plan to end his life. The evaluating clinician's recommendations to address risk included copied and pasted, generic statements observed in other patients' healthcare records, including enrollment in treatments to enhance coping skills for distress and psychiatric symptoms, talking to staff when experiencing thoughts of self-harm, and regular monitoring by staff until suicide risk was deemed low.

The treatment team convened on February 28, 2024 and March 20, 2024. During the February 28, 2024 treatment conference, the patient made a statement that he would rather kill himself than ruin more lives. The treatment team did not document a plan for follow up despite the patient's statement, and there was no individual progress note located in the healthcare record on that date to indicate further clinical assessment. There was also no group attendance data available during the February 2024 conference. The team did, however, document that the patient was enrolled in six hours of treatment groups, and that they would discuss group assignments aligned with the patient's interests.

The March 20, 2024 treatment plan document included several patient specific objectives/goals that remained unmet with target dates well after the date of discharge. While the treatment team documented that the patient was enrolled in ten hours of leisure/recreational supplemental activities and eight hours of treatment groups; they indicated that the patient attended 75 percent of only 2.9 hours of weekly structured treatment offered and 0.4 of 0.4 hours of weekly individual contacts offered. For supplemental groups, the patient attended only 3.7 of the 22.5 weekly hours offered. The treatment team further indicated that during a four-week period, the

patient attended a total of nine drop-in groups. However, the team inaccurately reported that the patient attended 91.1 percent of the 27.5 weekly treatment hours offered during that period. Further, clinical documentation indicated that when the patient attended groups, he did not actively participate.

During March 2024, some clinical notes referenced signs of agitated depression. On March 20, 2024, the patient presented with psychomotor agitation, a cooperative but resentful attitude, forceful speech, anxious mood, a marked mood lability, and frustration with his incarceration. During March 2024, the patient was also described as disrespectful to nurses on at least two occasions in response to their offered medical assistance. On March 21, 2024, the patient reported chest pain but then retracted his statement and refused medical attention and prn medication for anxiety. Also on March 21, 2024, the patient was accused of coercing a peer to engage in inappropriate sexual relations in his room; while the patient adamantly denied the allegation and agreed not to retaliate, he was described as very upset. The following day, a nurse documented that the patient presented with anxiety and anger.

Of note, prior documentation indicated that during June 2023, the patient required MHCB placement due to danger to self and mental exhaustion. The current DSH-Atascadero documentation noted that the patient repeatedly stated that he would end his life if transferred to CSP-Lancaster, as the transfer would result in loss of support due to distance from his wife's residence. The patient reported that he had no other support. During March 2023, the patient requested discharge to a CDCR facility that was closer to his wife's residence, such as CHCF. While the patient's request for discharge was granted on March 27, 2024, the treatment team did not provide information regarding the receiving facility or indicate whether they contacted CDCR to discuss the patient's transfer options. Notably, the patient was discharged to CCI which was a significant distance from his wife's residence.

The DSH-Atascadero discharge summary stated that the patient was more motivated to discharge and transfer to a northern prison where he would receive visits with his wife rather than to participate in programming at DSH-Atascadero, and that the patient felt that he had achieved maximum benefit from the intermediate care setting. The summary further stated that the patient had an overall positive response to the inpatient setting, prescribed medication, and other interventions. The summary also stated that the patient's group attendance was at 100 percent; however, that information could not be verified, as the group data reported in the healthcare record was unreliable, and there were no group notes in the patient's healthcare record. While the discharge summary referenced treatment outcome expectations, the provider stated that his depression was "less of an issue than the logistical aspects of his confinement – meaning distance from support system." The protective factors referenced were also tied to the patient's hope that he would transfer to an institution closer to his wife.

**Findings**

The care and treatment provided to this patient were inadequate.

There were several omissions in care noted. The psychiatric diagnosis did not consider the patient's history, symptoms, and functioning, which suggested that he met the criteria for major

depressive disorder, recurrent. The suicide risk assessment did not include several positive risk factors resulting in underestimation of risk, and suggesting that the clinician did not review collateral records. The treatment team allowed the patient to determine readiness for discharge; however, his readiness and protective factors were based on a specific outcome that did not occur. Further, prior to discharge, the treatment team failed to consider recent events on the unit and to prepare the patient for the possibility that he might not transfer to an institution closer to his wife. The treatment team also did not document attempts to communicate with CDCR to determine the patient's transfer options or to advocate for a transfer to a northern location. The discharge justification failed to focus on suicide prevention planning, despite a suicide attempt prior to admission, and the potential for increased risk if the patient did not transfer to a northern prison, which he did not.

**Patient J**

This 27-year-old patient's healthcare record was reviewed to assess the quality of care provided at DSH-Atascadero. The patient was provided diagnoses of schizophrenia and cannabis use disorder. He was prescribed olanzapine and hydroxyzine. The patient arrived at DSH-Atascadero from San Quentin on September 14, 2023 for intermediate care treatment to address symptoms of schizophrenia that included auditory and visual hallucinations, as well as probable thought broadcasting. His EPRD was December 14, 2023.

The initial DSH-Atascadero psychiatric assessment noted a history of medication nonadherence and a statement from the patient that prior psychotropic medications were ineffective in addressing his auditory hallucinations. The psychiatrist further indicated that while the patient exhibited insight into his mental illness, he also presented with objective signs of psychosis, including response to auditory hallucinations.

A psychologist completed the initial suicide risk assessment on September 25, 2023, and indicated that the patient presented with guardedness during interview. The psychologist noted that the patient had 20 psychiatric hospitalizations in the community, no current social support, and no history of suicide attempts, self-harm behaviors, or suicidal thoughts. The patient was assessed with low suicide and violence risk.

On September 29, 2023, a social worker assessed the patient and recommended DBT, individual psychotherapy, and substance abuse, but there was no indication that any of those interventions were offered. The social worker did, however, contact the patient's mother informing her of her son's pending release and indicating that the patient would parole to a specialized treatment facility for optimized programming through the parole outpatient clinic.

Regarding treatment outcome expectations, the referring institution recommended an assessment for grave disability and determination whether the patient met the criteria for a PC 2602 involuntary medication order, stabilization of disorganized thinking and internal preoccupation, interventions to improve hygiene and to challenge paranoid delusions, participation in five groups per week, and medication adherence for 30 days. The DSH-Atascadero treatment plan included several of the referring institution's treatment outcome expectations and some additional treatment objectives. Included in the list of additional objectives was verbalizing two

specific coping strategies for effectively managing symptoms of a mental illness and identifying three skills for managing aggressive violent impulses. However, none of the additional objectives developed at DSH-Atascadero were met prior to discharge, and all had expected completion dates after the date of discharge. Of note, the treatment team documented that the patient was not eligible for a job despite expressing interest, but no reason was provided why he was ineligible.

The October 12, 2023 treatment plan stated that the patient was enrolled in five groups including mental health wellness, aggression reduction, healthy living, and sponsor groups. However, despite the patient's group participation objective, treatment plans did not provide sufficient group data for effectively tracking progress. Further, the clinical documentation contained inconsistent and unclear information about group treatment participation. For example, the discharge documentation stated that the patient spent most of his time in his room with some time watching television in the dayroom, while also stating that the patient participated in 71.4 percent of the ten-hours of weekly supplemental recreation and leisure activities offered since September 2023. Notably, there was no group data provided for structured or core groups.

Regarding the patient's hospital course, during September 2023, assessments were completed, multiple prompts were necessary to encourage adherence, grandiose delusions were exhibited during the treatment conference, and disorganization and delusions involving religious content were noted during interactions with staff. From October 16 to October 27, 2023, the patient required placement in COVID isolation. The October 2023 clinical notes described the patient as quiet and isolative with minimal peer interactions. While providers documented that the patient's quarterly group attendance was at 69.2 percent, they did not document the amount of group hours offered at that time. Further, there were no group notes in the patient's healthcare record to determine group type or hours during the hospitalization. The clinical notes continued to suggest that the patient did not engage with other patients and tended to isolate or watch television in the dayroom. There was no documentation that he was offered the recommended individual psychotherapy or demonstrated sufficient progress toward treatment objectives prior to his discharge two weeks after release from COVID isolation.

On November 10, 2023, the patient was discharged to the EOP level of care. The discharge documentation stated that all treatment outcome expectations were met, and that the patient was appropriate for the EOP level of care in the prison setting. The rationale for discharge stated that during hospitalization, the patient maintained his hygiene, denied psychotic symptoms, "contracted for safety," and remained medication adherent. The discharge documentation also indicated that the patient denied psychiatric symptoms, including auditory hallucinations since arrival from San Quentin. There was, however, no discussion regarding the previously observed and documented objective signs of psychosis or the status of the patient's delusions, his need for prompts for medication adherence, or of his isolative behaviors. It also remained unclear whether the patient's isolative behaviors were attributed to his diagnosis, and whether improvement occurred after medication treatment. Additionally, the documentation did not provide information regarding the referenced use of a contract for safety that was clinically inappropriate.

According to the discharge summary, the patient discharged to the EOP level of care and transferred to CMC for discharge to parole.

**Findings**

The care and treatment provided to this patient were inadequate.

While attention to pre-release planning was appropriate, assessments and treatment plans resulted in several treatment recommendations that were not implemented, including individual psychotherapy and DBT. The patient's brief hospitalization, time in COVID isolation, and time spent isolating in his room, also suggested that he might not have been offered or participated in recommended treatments prior to discharge. However, the documentation did not allow for tracking of the group treatment that was offered, and the clinical notes provided inconsistent information regarding attendance. Further, providers did not focus the discharge rationale on the patient's treatment outcome expectations, symptoms and behaviors observed during hospitalization, or progress toward the additional objectives developed by the DSH-Atascadero treatment team.

Overall, it was unclear what treatment was offered at DSH-Atascadero beyond medication management, unstructured leisure time, and discharge planning; and statements suggesting that the patient met his treatment outcome expectations were not supported by the documentation.

**Patient K**

This 42-year-old patient's healthcare record was reviewed to assess the quality of care provided at DSH-Atascadero. The patient was provided diagnoses of unspecified schizophrenia spectrum and other psychotic disorder, unspecified depressive disorder, and amphetamine-type substance use disorder, moderate. He was prescribed cariprazine, fluoxetine, and hydroxyzine prn. The patient was admitted to DSH-Atascadero on November 29, 2023.

The patient had been incarcerated for approximately 22 years, and he had a history of receiving mental health services at the EOP level of care for several years. He was referred to DSH-Atascadero from the SVSP-PIP where he was reportedly admitted in July 2023. There was documentation that the patient had Capgras Syndrome, believing that his family members had been replaced by custody officers.

The patient was seen by the psychiatrist on the day of admission to DSH-Atascadero when a comprehensive psychiatric evaluation was completed. Assessment of his suicide risk indicated low risk, as the patient had not acted upon any suicidal ideation during the prior year; despite the treatment outcome expectations established by SVSP-PIP that focused on self-injury and suicide. Although the patient reported a history of cutting to relieve stress, he also reported multiple coping strategies to avoid harming himself.

The history and physical assessments were also completed upon admission to DSH-Atascadero. The social work psychosocial assessment was not completed until December 29, 2024, 30 days after admission, and 25 days after the first discharge summary was completed. The patient was not interviewed for that assessment; instead, only a healthcare record review was conducted.

The psychology suicide and security risk assessments and admission psychological evaluation were completed on November 30, 2024, that assessed the patient at low risk for self-harm and escape. The suicide risk assessment noted that the patient's self-report was inconsistent with the EHRS documentation, and that the patient was viewed as inappropriately utilizing mental health services as a means to address custodial concerns. Treatment recommendations included cognitive therapy for psychotic symptoms, DBT, and staying safe groups.

The treatment outcome expectations listed in the treatment plan and recommended continuing care plan included improving insight and reality testing to accurately identify delusions and paranoia 50 percent of the time, decreasing delusions and paranoia by 50 percent by discharge, increasing contact with family by increased calls or written contact with them twice monthly, decreasing suicidal ideation and self-injurious behavior to no occurrences, decreasing aggressive behavior toward officers to no occurrences by discharge, and increasing future orientation to identify three or more goals for life after release. Those CDCR treatment objectives were not adjusted at DSH-Atascadero to reflect the current hospital environment.

The patient was seen for the 30-day treatment team meeting on December 26, 2023, and the treatment plan noted that he had attended just over half of assigned prescheduled treatment groups. He had attended three hours of 30.3 hours offered of supplemental activity weekly and had attended 10 unscheduled or drop-in sessions. At that time, the patient was reportedly scheduled for 11 hours of treatment groups weekly, but there was no distinction between core or clinical groups and supplemental or leisure groups. It appeared that the patient was only offered one hour weekly of prescheduled structured treatment groups.

Interdisciplinary nursing notes indicated that the patient remained delusional during his brief hospitalization. He continued to believe that people were impersonating his family. The documentation further indicated that the patient had refused to move to another dorm when instructed to do so; the move was due to a peer and unrelated to this patient. The patient was described as inciting peers against staff by telling peers that the staff wanted to replace him with another patient who was a thief. The patient reportedly was not responsive to staff instruction regarding directives and was dismissive of staff direction. It was unclear if the patient ultimately moved, or how the matter was resolved. Shortly thereafter, the recommended continuing care plan was updated, and the patient was discharged.

An addendum to the discharge summary was completed on January 4, 2024, because the patient was not discharged as initially recommended.

The patient ultimately discharged from DSH-Atascadero on January 10, 2024, for a length of stay of 42 days. It should be noted that a psychiatrist concluded on December 4, 2024, that the patient would not benefit from continued care at DSH-Atascadero, and a recommended continuing care plan and discharge summary was completed at that time. Despite this, the patient remained at DSH-Atascadero for an additional month; however, the documentation did not indicate whether the treatment team members were aware of the discharge, or why the patient was not actually discharged at that time. Clinical supervisors could not explain this premature discharge conclusion, or why the patient was not physically discharged at that time.

**Findings**

The care and treatment provided to this patient were inadequate.

Soon after the patient transferred to DSH-Atascadero from the SVSP-PIP, a psychiatrist who had not previously met with the patient concluded that the patient would not benefit from treatment at DSH-Atascadero; although that conclusion was not supported by the documentation. The patient was repeatedly described in progress notes as delusional, and it did not appear that his treatment outcome expectations were met at the time of discharge.

The patient received minimal treatment according to the documentation. It appeared that the patient was primarily offered recreational supplemental activities, such as yard. Considering his ongoing psychiatric symptoms which continued to cause him significant distress and isolated him from his support system; individual and group treatment was indicated to assist in reality testing, coping with the anxiety that resulted from his delusional belief and isolation, and addressing underlying precipitants to self-injury. While it was noted that the patient had coping strategies regarding his urges to cut himself, the clinical staff did not explore that area or assess his ability to use specific coping skills to resist those urges.

The minimal treatment offerings suggested that the treatment team was not aware of the discharge documentation from day five of the hospitalization. Assessments appeared to include cut-and-pasted information from the original referral that did not inform treatment and discharge planning. Treatment planning was minimal and inconsistent with the patient's mental status and needs. In addition, the psychologist noted the patient's need for specific groups, but he was never assigned to those treatment groups. There appeared to be little clinical service delivery and inadequate documentation to document the treatment provided and the patient's progress in treatment.

**Patient L**

This 47-year-old patient's healthcare record was reviewed to assess the quality of care provided at DSH-Atascadero. Upon admission to DSH-Atascadero, the patient was provided diagnoses of schizoaffective disorder, bipolar type, and amphetamine-type substance uses disorder, severe, in early remission Upon discharge, additional diagnoses of antisocial personality disorder and cannabis use disorder, moderate were provided. He was prescribed quetiapine, paroxetine, and buspirone. The patient was admitted to DSH-Atascadero on February 28, 2024 from CHCF.

The patient was seen by the psychiatrist for the initial evaluation on the day of admission. It was noted that he had six prior admissions to the DSH, four of which occurred at DSH-Atascadero and two at the CMF-PIP, formerly known as DSH Vacaville. Of those six admissions, one in 2009 was due to being found incompetent to stand trial (PC1370), and the remaining five were for inpatient treatment as an incarcerated person (PC2684). The initial evaluation was comprehensive and integrated the patient's significant psychiatric history into a sound clinical case conceptualization.

The initial social work contact was completed on March 1, 2024, and noted that social work would assist the patient in a better understanding of his psychiatric symptoms and coping strategies while developing an effective discharge plan. The psychologist and the recreation

therapist did not see the patient until March 6, 2024, one day after the initial seven-day treatment team meeting. The suicide risk assessment noted multiple prior suicide attempts but none within the last three months, and assessed his risk of suicide as moderate. He was also considered a low security risk.

The patient was seen by his treatment team on March 5, 2024 according to interdisciplinary notes; however, the treatment plan showed the patient's date of arrival as the meeting date. The treatment outcome expectations included complete medication adherence prior to parole, attending two therapy groups weekly that focused on reducing suicidal ideation, increasing coping skills and management of mood and affect, and identifying one coping skill per mental health contact to address his delusions and depressed mood. It should be noted that the treatment outcome expectation for two therapy groups per week noted "out of cell" and appeared carried over from CDCR. It also appeared that the patient had limited insight into his persecutory delusions, since he repeatedly requested to talk to hospital officers to report concerns regarding his family's safety. The patient was enrolled in five hours of treatment groups at the time of his initial treatment team meeting including drug education, aggression reduction, mental health wellness, sponsor group and staying safe. Staying safe and aggression reduction were facilitated by social work or psychology, while the remainder were facilitated by nursing primarily and a student-assistant recreation therapist.

The patient was seen for his 30-day treatment team meeting on March 29, 2024. According to the treatment plan, the patient was manic and demonstrated word salad while denying the need for treatment at DSH-Atascadero. He remained in the treatment team meeting for only a few minutes before asking to leave.

The patient reportedly required prompting to attend groups, but he was able to adequately attend to his ADLs. From February 18 to March 16, 2024, he was scheduled for only 3.2 hours weekly of prescheduled structured treatment and attended less than half at 47.6 percent. He was offered 16.8 hours of supplemental activity per week and attended only 2.9 hours. The patient also reportedly attended one drop-in session of staying safe. There were no group treatment progress notes or attendance documents in the healthcare record.

The patient was seen weekly by psychiatry except for two missed weeks during his six-week hospitalization. The patient was not seen individually by psychology or social work beyond the initial assessment, despite indicated treatment needs for discharge planning, cognitive therapy for delusions, coping skill training, and reality testing as noted in the psychology and social work initial assessments. There was no documentation that contact was made with CDCR to discuss the patient's condition and needs for release. While the psychiatrist documented discussion regarding the benefits of treatment with other antipsychotic medications such as Clozaril due to the distress that the patient experienced from his delusional beliefs that included fear that his family would be harmed; such medication changes did not occur due to the patient's limited length of stay.

The patient was released directly to parole on April 13, 2024. It appeared that the treatment team had initially been unaware of the impending parole date, as it was not in the initial documentation; however, subsequent documentation referenced a "mandate" to discharge the patient quickly, suggesting that they were not timely apprised of the impending parole date upon

admission. According to DSH-Atascadero supervisory staff, similar circumstances had previously occurred when milestone credits were calculated and applied by CDCR; they reported that DSH-Atascadero did not receive regular weekly updates to be informed of changes in parole dates.

**Findings**

The care and treatment provided to this patient were inadequate.

The patient was acutely psychotic upon arrival to DSH-Atascadero and remained psychotic at the time of discharge. While one psychiatrist noted that medication changes were indicated to address the patient's psychosis and distress due to his delusional thinking; no changes were made due to his imminent release. It was unclear if the staff were unaware of the patient's impending release date initially because they failed to review all documentation, or if the parole information was unavailable to all team members. Regardless, this issue appeared to negatively impact the patient's treatment at DSH-Atascadero; treatment should have been implemented upon arrival and provided in a focused and intense manner to allow sufficient time for improvement prior to release. Given the imminent release date, the patient required rapid stabilization so he could participate adequately in his treatment and in discharge planning.

The patient was not seen individually by psychology or social work despite his significant treatment and release planning needs that were articulated in the initial assessments. The patient was discharged to parole while still struggling greatly with delusions, impaired thoughts, difficulty communicating due to acute psychosis, and great distress and agitation toward perceived threats to him and his family. There was no documentation that there was direct contact made with parole staff, and the recommended continuing care plan did not address how to best help the patient stabilize in the community with the help of CDCR parole and community resources.

**Patient M**

This 61-year-old patient's healthcare record was reviewed to assess the quality of care provided at DSH-Atascadero. The patient was provided diagnoses of bipolar I disorder, most recent episode depressed, with psychotic features, and PTSD. He was prescribed olanzapine and Depakote ER. The patient was admitted to DSH-Atascadero on February 6, 2024 from CHCF.

He patient was seen for his initial psychiatric evaluation on the day of admission. The psychiatric evaluation was comprehensive and provided valuable information for treatment planning. It was noted that the patient reported having been raped in CDCR by several peers, and that he began receiving mental health services at that time. The patient denied ever having experienced hallucinations; although, CDCR records indicated that he was possibly responding to internal stimuli. The patient also insisted that his only mental health diagnosis was PTSD characterized by flashbacks and nightmares regarding the rape. The patient acknowledged that he had irritable outbursts towards others, describing himself as mad at the world. He reported that he isolated, as he did not trust anyone in CDCR. DSH-Atascadero progress notes indicated that the patient was typically guarded in interactions and limited his disclosures, which suggested that the patient was generally paranoid and distrustful of all others.

The patient was seen for the initial psychological assessment on February 9, 2024, and he was assessed with low suicide and self-harm risk and with low risk for institutional violence. Identified treatment needs included gaining insight into his psychiatric symptoms, identifying triggers, and learning techniques to manage triggers and symptoms. The patient was also seen by a social worker on that date to complete an admission note. This social work contact was primarily for the patient to sign necessary admission documentation but was not an initial assessment. The social work psychosocial assessment was not completed until March 6, 2024, following the patient's move from the admissions unit. The assessment was completed by healthcare record review, and no explanation was provided for the completion of the assessment without interviewing the patient. A recreation therapist assessment was completed on February 20, 2024. The patient was seen three times by the admission unit recreation therapist, but there were no progress notes from the Coleman unit recreation therapist. Those assessments were clinically adequate.

The patient was seen by the treatment team on February 14, 2024, eight days after admission. His treatment outcome expectations included completion of ADLs without prompting for 30 days, psychotropic medication adherence 95 percent of the time, attending groups and yard 90 percent of the time, engaging rather than avoiding participation, no acting out behaviors for 30 days prior to discharge, demonstrating increased insight into his mental illness by discussing three benefits of medication adherence, and continued engagement with mental health prior to discharge. At the time of the initial treatment plan, the patient was only assigned to a sponsor group. It was unclear if all team members attended the treatment team meeting, as the treatment plan was only signed by the psychiatrist. The treatment plan did note that the patient was administered the Wide Range Achievement Test-4 (WRAT4) and was found to be below the first percentile and in the impaired range for his ability to read and recognize words. The patient's documented cognitive limitations and very limited reading ability were not addressed in treatment planning, despite the significant impact this limitation had on the patient's ability to engage in treatment and his need for adaptive support and/or accommodation.

The patient was seen for the 30-day treatment team meeting on March 6, 2024, and this treatment plan was signed by the psychiatrist, recreation therapist student assistant, and psychiatric technician. At that time, the treatment plan noted that the patient would be enrolled in two mental health wellness groups, two aggression reduction groups, and one staying safe group, in addition to his two sponsor groups. Prior to that, the patient was reportedly scheduled for just one hour of treatment groups per week.

The second 30-day treatment team meeting should have occurred prior to the patient's DSH-Atascadero discharge; however, there was no documentation of the meeting. The social worker did note in the discharge summary that the patient had met all his treatment outcome expectations, except for his ability to demonstrate increased insight into his mental illness, as he continued to deny his mental illness. While the social worker noted that the patient had full group attendance, he was scheduled for less treatment groups than were offered at the CDCR EOP level of care, making it unclear if the patient had made sufficient progress in that area.

The documentation indicated that the patient was not seen weekly by the psychiatrist after he moved from the admission unit to the PC2684 unit. The patient was only seen twice for what appeared to be monthly contacts. He was also not seen by psychology or social work disciplines

for individual treatment interventions, despite a clearly documented need. Given the patient's documented paranoia and fear regarding peers, individual therapy was of particular importance in addressing the patient's mental health needs and behavioral deficits.

Overall, the patient spent 24 days on the admission unit and 41 days in the PC2684 unit at DSH-Atascadero for a total length of stay of 65 days. He was discharged on April 11, 2024.

**Findings**

The care and treatment provided to this patient were inadequate.

This patient was extremely ill and had experienced difficulty functioning in a prison environment due to mental illness. The patient experienced a very traumatic event while in CDCR that was not properly addressed through treatment and negatively impacted his mental status and functional ability. His paranoia was well documented and reinforced by his specific fears regarding peers. Due to his general paranoia and fear of peers, individual therapy was clinically indicated and necessary to build the required skills to participate meaningfully in group treatment. In addition, the patient's impaired cognitive ability and inability to read or recognize words was not addressed in the treatment plan. The treatment plan should have been modified to address this patient's unique mental health symptoms, to address his history that sustained those symptoms, and to address his impaired ability to benefit from treatment.

It was concerning that DSH-Atascadero discharged the patient without adequately addressing the most significant impairments in insight regarding acceptance of his mental illness and paranoia. While the patient was provided with minimal group treatment opportunities, the more clinically significant deficit in care was in not utilizing individual therapy to reinforce his attendance and participation in groups and to focus on skill development. His discharge from DSH-Atascadero was premature, as the patient had made only very limited improvement; and the most important treatment outcome expectation was not addressed, thus increasing the likelihood that the patient would decompensate and require re-referral for inpatient treatment.

**Patient N**

This 65-year-old patient's healthcare record was reviewed to assess the quality of care provided at DSH-Atascadero. The patient was provided diagnoses of major depressive disorder, recurrent episode, with psychotic features and borderline personality disorder. The patient had a complicated medication history with multiple medication and dosage changes; at the time of discharge from DSH-Atascadero, he was not prescribed psychotropic medications. The patient was admitted to DSH-Atascadero on November 30, 2024 from CHCF.

The patient had four prior DSH admissions, all under the PC2684 treatment category. The most recent DSH hospitalization occurred in 2013. The patient had multiple medical ailments including difficulty ambulating with the use of a wheelchair, recent stroke, and difficulty breathing.

The patient was seen for the initial psychiatric evaluation upon admission. The evaluation was comprehensive and noted that the patient's first self-reported suicide attempt occurred at age 8

and resulted in a multiyear hospital admission. He reported 17 suicide attempts in the community and four while in prison.

On December 6, 2024, the patient was seen by psychology for an initial intake assessment, and he was assessed with moderate risk of suicide. The social work psychosocial assessment was not completed until January 2, 2024, and the recreation therapist assessment was not completed until December 19, 2023. The psychosocial assessment did not include a patient interview and was based completely on a healthcare record review with no rationale provided. That document merely reiterated existing information and was consequently redundant and did not add value to the understanding of the patient's functional level and current mental health symptoms. In contrast, the recreation therapist assessment did include a patient interview, and it was comprehensive and informative for treatment planning.

There were multiple medication changes during the patient's hospitalization at DSH-Atascadero. The patient was prescribed valproic acid, buprenorphine, paliperidone ER, quetiapine, prazosin, chlorpromazine, lithium, and hydroxyzine while at DSH-Atascadero; all psychotropic medications were discontinued at the time of discharge due to medication nonadherence, side effects or ineffectiveness. Additionally, the patient had frequent refusals of nursing assessments, laboratory studies, and medical equipment, for example refusal of a prescribed CPAP machine.

The patient reportedly responded positively to treatment groups, and he formed therapeutic alliances with his psychiatrist and psychologist according to the recommended continuing care plan. However, it should be noted that he refused most groups, and his attendance did not exceed 40 percent of scheduled groups over the course of treatment, and there were periods of less attendance. The patient repeatedly stated to team members that he hated groups and did not need to attend them.

The patient's treatment outcome expectations appeared carried over from CDCR and were not individualized for DSH-Atascadero. The treatment outcome expectations included language regarding out-of-cell activities; DSH-Atascadero did not have celled housing. They also included custody monitoring; however, DSH-Atascadero did not have custody staff but hospital peace officers who did not regularly monitor unit behavior. The treatment outcome expectations included the following: no self-injurious behaviors for 90 days or more, engaging in at least three out-of-cell activities per week for 90 days or more, the primary clinician would provide weekly individual therapy to assist in acquisition of coping skills and to reduce subjective feelings of depression and anxiety, depression and anxiety would be rated at four or less for 60 days on a ten-point scale, the patient would report subjective decrease in urges to self-harm, and would identify at least three positive coping skills to use in place of self-harm, anger, and agitation.

Autonomy and control were seen as important to the patient, and he continued to voice his desire to return to CDCR and complained of too much unstructured free time at DSH-Atascadero. The patient ultimately reported that he felt stable and wanted to return to CDCR; he had some objective improvement with improved but still minimal group participation, generally euthymic presentation, and reduction in symptom report. The treatment team did not query to learn if the reduction in symptom report was due to actual symptom reduction, or because he simply was not asked; for example, the patient was not specifically asked about his auditory hallucinations in a pre-discharge contact with his psychiatrist. The patient reported that his recent stroke and

disruptions in placement were the precipitants for his decompensation. The treatment team believed that the patient had shown sufficient improvement and discharge him to CDCR.

Of note, documentation completed throughout the patient's hospitalization contradicted aspects of the discharge summary. For example, a social work note during a quarterly treatment team meeting on February 28, 2024 documented that the patient reported that his depression had been "bad lately," that the patient acknowledged becoming more isolative, reported auditory hallucinations that told him he was unworthy, experienced anergia, did not want to be around others, refused all medical and psychiatric medications despite the risk, refused most treatment groups, and reported feeling lost. That documentation occurred only three weeks before discharge. The documentation also indicated that the patient had extreme guilt regarding his crime, was admitted for inpatient care due to increased depression, and that he had poor treatment engagement, self-injury and repeated thoughts of death and dying. DSH-Atascadero staff reported that the patient was not future-oriented and refused to develop goals or plans for his future including possible release. While at DSH-Atascadero, he continued to refuse much of his treatment, and this expanded to medical assessments and treatment, despite the associated significant risks. He became more isolative, complained about the lack of treatment and too much unstructured time at DSH-Atascadero, and appeared to make no progress with actual further deterioration in his mental stability.

**Findings**

The care and treatment provided to this patient were inadequate.

Contrary to his recommended continuing care plan, the healthcare record indicated that the patient's course of treatment was characterized by deterioration in his mental status and an increase in dysfunctional behaviors that would only exacerbate his decompensation. The patient's acute symptomatology was not properly recognized or addressed beyond unit nursing staff who documented continued concerns and referrals to providers to address his treatment refusals, particularly his complete medication refusal. That decompensation was quite alarming in light of his multiple risk factors for suicide. He had no future orientation, and he was consumed by guilt, and accepted his misfortune of suffering a stroke as punishment that he deserved due to his crime. This patient was engaged in self-harm by refusing all medical and mental health care in view of his treatment team, yet they failed to recognize and respond with appropriate evidence-based interventions. A behavior plan was also indicated for this patient to improve his adherence and to engage him in treatment.

The discharge decision was not supported by the healthcare record documentation, as there was no evidence of stability. While the patient wanted to return to CDCR because there was not enough to do at DSH-Atascadero; the treatment team did not increase his scheduled treatment activities and recreational opportunities as indicated. The patient's behavior indicated an increased risk for suicide. The treatment team failed to recognize this patient's risk, and instead, discharged him prematurely.

**Patient O**

This 31-year-old patient's healthcare record was reviewed to assess the quality of care provided at DSH-Atascadero. The patient was provided diagnoses of schizoaffective disorder, depressive type, and amphetamine-type substance use disorder, severe. He was prescribed Zyprexa and Zoloft. The patient was admitted to DSH-Atascadero on March 6, 2024 from the SATF.

The patient was previously hospitalized at DSH-Atascadero after being classified as a mentally disordered offender. He was referred to inpatient treatment on that occasion, because he had been unable to function in the prison setting without extensive support including two MHCB stays in January 2024. Those stays were characterized by paranoia with associated agitation.

He was seen by the psychiatrist for an initial evaluation on the date of arrival. The documentation indicated that the patient based their assessment of the patient's suicidality on the patient's denial of self-injurious behavior while not properly weighting CDCR documentation indicating that the two MHCB admissions were due to suicidal ideation combined with the paranoia and agitation, and that the patient required repeated crisis interventions; consequently, the patient was assessed with low risk for suicide and self-injury. The assessment was otherwise adequate.

The patient was seen by a social worker on the following day, but the contact was brief and primarily occurred to complete admission paperwork. During that contact, the patient reported that when he did not take his medications, he became paranoid and experienced delusions. The social work psychosocial assessment was not completed until March 28, 2024; while within the DSH 30-day timeline, the assessment not completed within a time period to inform treatment planning and discharge decisions. The patient was not interviewed for the assessment, and it merely repeated information found in other assessment documents, making it redundant and of no clinical utility.

While the patient was described as having fair insight regarding his mental illness because he acknowledged that he had a psychiatric disorder; he did not report or recognize his recent decompensation, denied all symptoms, and appeared to actually have limited insight into his illness.

The nursing assessment indicated that the patient had a recent suicide attempt on February 15, 2024, which was not addressed in the initial psychiatric assessment or the new arrival social work progress note. That assessment also documented that the patient had wished he was dead within the past few weeks, and that he had thoughts that he and/or his family would be better off if he was dead. Again, that information was not identified in other subsequent documentation by the psychologist or psychiatrist in assessing risk or stability.

During the initial psychological assessment on March 13, 2024, the patient reported that he was surprised by his admission to DSH-Atascadero, as he felt that he was doing well, was medication adherent prior to transfer, and had attended treatment groups. His need for repeated crisis intervention and MHCB placements as well as the previously disclosed suicide attempt noted by nursing were not addressed at this assessment. There appeared to be some confusion whether the patient had actually attempted suicide on February 15, 2024, as a risk assessment at that time

indicated that he did not have an attempt history. Although the patient denied suicidal ideation to DSH-Atascadero staff, he had reported it to CDCR staff at the time of referral and had a documented history of such. The initial psychological assessment was comprehensive regarding aspects of the patient's history and risk factors for suicide, self-harm, and violence. It did not address the contradictory information in the record regarding his possible recent attempt.

The patient was seen on March 14, 2024 for a seven-day treatment team meeting that was attended by all treating staff except the recreation therapist. The treatment outcome expectations included that the patient would attend at least 60 percent of treatment and engage in discussions with facilitators and peers, would remain medication adherent and demonstrate a reduction in symptoms such as decreased yelling and decreased paranoia, would verbalize three benefits of remaining medication adherent, would verbalize at least three triggers that caused worsening of mental health symptoms and three coping strategies that reduced symptom severity, and that there would be reduction in suicidal ideation to no more than two times per week for at least 30 days. The patient requested return to CDCR and stated that he did not want to be at DSH-Atascadero. The patient was to be assigned to the sponsor, mental health wellness, aggression reduction, healthy living, recreation therapy, and preparing for discharge therapy groups. Due to the lack of group treatment notes or attendance records in the healthcare record, it could not be confirmed whether the patient was scheduled for all those groups and attended them. The recommended continuing care plan dated March 26, 2024 noted that the patient had attended 100 percent of treatment groups, except between February 18 to March 16, 2024. Information was not documented regarding how many hours of core and supplementary group treatment was included; of concern was the time period reported that preceded the patient's arrival to DSH-Atascadero on March 6, 2024. The reason provided for discharge noted by the psychiatrist in the recommended continuing care plan was that the patient would not benefit from further care and treatment.

The patient was discharged from DSH-Atascadero on April 3, 2024, with a total length of stay of only 28 days.

**Findings**

The care and treatment provided to this patient were inadequate.

The clinical documentation contained contradictory information regarding critical information, including the patient's symptoms, history, and suicide risk factors. Information from the CDCR referral documentation suggested that the nursing assessment was most consistent with the patient's documented history, while the psychiatrist and psychologist did not review that information or failed to reconcile the contradictions. As a result, the patient's primary symptoms and impairment were not addressed adequately during his brief admission to DSH-Atascadero.

The patient was referred to DSH-Atascadero because his symptoms required extensive resources and the need for closer monitoring while his medications were adjusted to support improved functioning and decreased symptoms. The contradictions in his self-report to his DSH-Atascadero treatment team, when viewed in the context of the CDCR documentation, suggested that the patient was trying to minimize his symptoms to present himself in a positive light to return to CDCR. The conclusion by the psychiatrist in the recommended continuing care plan

that the patient would not benefit from DSH-Atascadero hospitalization did not include justification for the determination and was not supported by the healthcare record.

**Patient P**

This 30-year-old patient's healthcare record was reviewed to assess the quality of care provided at DSH-Atascadero. The patient was provided diagnoses of adjustment disorder with mixed anxiety and depressed mood, and opioid use disorder, severe. Upon admission, he was prescribed paroxetine, and hydroxyzine, and he received MAT for his opioid use disorder.

The patient was admitted to DSH-Atascadero on September 28, 2023 from PBSP. He was serving his first prison term which began in June 2023. He was referred to inpatient treatment due to danger to self after experiencing difficulty adjusting to prison life and having safety concerns, as he was a gang dropout. The referral indicated that the patient had engaged in self-injurious behavior to avoid placement in general population where he believed he was in danger. He had reportedly been told by a correctional counselor during a CDCR MHCB stay that his safety concerns were unsubstantiated, and his negative coping behaviors escalated at that time.

The patient was seen on the day of admission for the initial psychiatric evaluation. The evaluation was comprehensive and noted a positive history for group home placements, special education ADHD, intravenous drug use, multiple juvenile hall placements, and school suspensions for fighting. Initially the patient reported his mood as depressed and anxious but after being reassured that he was safe and that his family would be contacted by phone; the mental status noted that he became euthymic. There was otherwise no evidence of a thought disorder, delusions, altered perceptions, and the patient denied any suicidal or homicidal ideation. Although there was documentation of the patient's self-harm behaviors that included stabbing, hitting his head, and suicidal statements while at CDCR; the admitting psychiatrist concluded that the patient's risk for suicide was low. Risk for self-injury was also assessed as low, as he was in the protected setting of a hospital; the psychiatrist noted that the patient's risk would be high if transferred to general population housing. The patient was reportedly informed that he would be maintained on Suboxone until he was referred to the Sublocade clinic.

The patient was seen by the psychologist on October 11, 2023 for the initial evaluation that included a risk assessment. He was assessed with moderate suicide risk and low risk for violence. It was unclear why the patient was then referred to the aggression reduction group. He was also referred to the staying-safe, DBT, drug education, and mental health wellness groups. The evaluation also noted a significant trauma history and recommended placement into a trauma treatment group. The psychosocial assessment was completed without a patient interview, as it was deemed unnecessary; only a healthcare record review was completed. The document was also unsigned. The information provided in that healthcare record was already available elsewhere; therefore, it was redundant and did not assist in treatment or discharge planning. The recreation therapist assessment was completed on October 27, 2023, which was comprehensive.

On December 5, 2023, the patient was reportedly assaulted by another patient. Later, additional witnesses discussed their observations with the unit staff, and the psychologist documented that it appeared that the patient had caused the conflict. The staff ultimately did not act on the

incident, as the assault was not observed by staff, both patients had talked and resolved the conflict, and each stated that they did not plan to seek retribution.

The patient was not seen weekly by the psychiatrist. There was no documentation of psychiatric contacts for three of four weeks in October, once in November, and not at all in December 2024. There were no 30-day treatment plans located in the healthcare record; only the seven-day treatment plan was completed on October 5, 2023. The treatment outcome expectations documented in the treatment plan included that the patient not engage in self-injurious behavior for a period of 30 consecutive days, that he would stabilize on a medication program that would reduce anxiety and depression to a subjective rating of four out of 10 or lower, and that the patient would learn coping skills to improve distress tolerance and reduce subjective reported distress by 50 percent. At that time, the patient was to be enrolled in two nursing sponsor groups weekly, one mental health wellness group facilitated by psychology, one aggression reduction group facilitated by social work, a suicide reduction/safety planning group called staying safe facilitated by social work, and a drug education group. The recommended continuing care plan was completed one week before the patient was discharged.

The patient had experienced some difficulty and frustration with unit rules, often feeling as though he was being treated unfairly; for example, his level was dropped for bartering by accepting half of a peer's meal. He also became upset with unit staff when his lotion was disposed of as it violated rules. He also became upset and disrespectful to staff with cursing after a bag containing his food was inadvertently thrown away.

By the end of November 2024, the patient appeared to have adjusted to the unit routine and rules and was ultimately elected to ward government. According to the recommended continuing care plan, after the patient was struck in the bathroom reportedly by a different patient; the hospital public safety officer investigated, and the patient repeatedly refused to speak to them. The staff concluded that both patients had engaged in inappropriate behavior. Although there were no injuries to the patient, the patient and peer were determined inappropriate to remain at DSH-Atascadero, as their behavior was too disruptive to the unit milieu. The psychologist's documentation did not note ongoing disruption or that the patient would be discharged due to the incident. The patient was active in his treatment planning and engaged in treatment according to the recommended continuing care plan, participating in 96 percent of treatment during the month prior to discharge. The recommended continuing care plan noted 19 hours of group therapy but did not indicate if that was an aggregate for the entire four-week period or an average per week. An addendum to the discharge summary was completed the day prior to discharge by a different psychiatrist, changing the recommendation for placement at discharge to specifically recommending discharge to an MHCB due to concern regarding the patient's clear statements that he would harm himself if forced to transfer to a general population yard due to his safety concerns, and the DSH-Atascadero treatment team perceived his statements as valid. The patient was discharged on December 21, 2023, with a length of stay of 84 days.

**Findings**

The care and treatment provided to this patient were inadequate.

This patient had an environmental stressor that exacerbated his serious mental illness. He was fearful for his safety, and those fears were not misplaced. Despite this, the DSH-Atascadero treatment team did not communicate directly with CDCR to address those concerns. Information regarding the patient's options for housing would have informed the treatment team's efforts to improve the patient's functional level and ability to cope with stress. Instead, the patient was placed into treatment groups that did not directly address his specific symptoms and impairment. This environmental stressor was considered so significant by DSH-Atascadero clinical staff that an addendum to the discharge summary was completed to recommend placement in an MHCB upon return to CDCR. The patient appeared to benefit from treatment based upon the documentation, but due to one incident, the team determined that he was too disruptive and had to be discharged. That reason for discharge was not supported by other documentation in the healthcare record, and it was unclear how the patient's presence was disruptive in an ongoing way, especially given that staff allowed him to be on the ward/patient government council.

The treatment team did not regularly review the patient's progress and modify the treatment plan accordingly. The patient's intense fear and belief that it would be more beneficial to kill himself than to live with the anxiety and anticipation of someone else harming him, was not properly addressed through consultation with CDCR and evidence-based treatment. Because he was returned to CDCR without improvement in that area, it was highly probable that he would cycle repeatedly through the MHCB and be referred again for inpatient treatment.

**Patient Q**

This 32-year-old patient's healthcare record was reviewed to assess the quality of care provided at DSH-Atascadero. The patient was provided diagnoses of schizoaffective disorder, bipolar type, and opioid use disorder, severe. He was prescribed Abilify Maintena, lorazepam, olanzapine, hydroxyzine prn, and Suboxone, and he received his psychotropic medications by a PC 2602 order. The patient was admitted to DSH-Atascadero on December 12, 2023 from CSP/Sac.

The patient experienced psychiatric decompensation while in CDCR beginning November 2023 that ultimately resulted in MHCB placement and referral for inpatient treatment. That decompensation included catatonia according to the intake documentation.

The patient was seen by the psychiatrist on the day of arrival for an admission psychiatric evaluation. During that contact, the patient reported that he needed his psychotropic medication discontinued but did not explain why. The patient was described as quite somnolent, and it was noted that he had difficulty speaking and articulating. The psychiatrist stated that the patient was so impaired that portions of the evaluation had to be abbreviated. The patient reported auditory and visual hallucinations of angels and demons that two weeks prior included command hallucinations to fight others, though he was able to resist acting on them. He believed that he could hear people from around the world communicating with him, experienced thought broadcasting, and religious, persecutory, and grandiose delusions. His thought processes were characterized by intermittent derailment, and the content was hyperreligious. His judgment and insight were poor. His suicide risk was assessed as moderate, and his risk of violence was assessed as low despite recent command hallucinations to fight. The patient was initially maintained on Abilify Maintena. Suboxone and lorazepam were discontinued due to concern

that those medications were responsible for the patient's significant somnolence during the interview. He was continued on hydroxyzine and olanzapine prn.

The initial psychological evaluation occurred on December 14, 2023, it was conducted by an off-unit psychologist who noted that the patient was unable to complete the WRAT4; although he had reportedly obtained his GED after dropping out of high school in the tenth grade. Despite poor response to the WRAT4 administration with blank staring at the page until the testing was terminated, and inability to abstract; the psychologist concluded that no treatment modifications were needed due to cognitive impairment. The psychologist assessed low suicide risk despite documenting that the patient could not coherently respond to questions about suicidal ideation or prior self-aborted attempts. The psychologist did note the CDCR documented self-injurious acts that included foreign body insertion into his penis that required outside hospital treatment and possession of a noose accompanied by suicidal ideation. The patient was actively responding to and preoccupied by internal stimuli during the interview with perseveration regarding religious delusional thinking. He also exhibited periods of immobility and blank staring.

An initial social work progress note was completed on December 15, 2023 that documented a brief contact to review paperwork and to obtain patient signatures. The social worker documented that the patient had a similar presentation as was noted by the psychologist with very limited interaction. The social work psychosocial assessment was completed on January 4, 2024, and it included a patient interview. Despite the patient interview, most of the information was copied verbatim from prior assessments. The patient was able to talk to his mother and sister during that contact.

The nursing assessment was completed on the day of arrival; the assessment was beneficial, as it identified the patient's belief that his medication injections were causing him to have mental illness. The recreation therapist assessment was not completed until January 9, 2024; healthy living groups were recommended to assist the patient in developing healthy leisure activities that could be used as coping skills.

The patient was first seen by his treatment team on December 22, 2023, eight days after arrival. The treatment outcome expectations stated that the patient would have a "SIMI" rating decrease to two as rated by the clinician on the subjective units of distress scale (SUDS); although that scale was a self-report scale of subjective distress, not one completed by the clinician. In addition, the acronym SIMI was not defined. According to DSH-Atascadero supervisory staff, this was a typographical error meant to be serious mental illness or SMI. However, an SMI rating was not what the SUDS provided, it was solely a rating of distress by the patient. A second treatment outcome expectation was that the patient would maintain reality based on topic discussion for two minutes at weekly treatment team meetings for four consecutive intervals; this was concerning, as intermediate inpatient treatment required monthly, not weekly treatment team meetings. The final treatment outcome expectation was for the patient to report one new coping skill per treatment team interval to improve reality testing and to decrease disturbance from hallucinations. In the treatment plan, the patient was assigned to two sponsor groups, one mental health wellness group, one staying safe group, one aggression reduction group, and give healthy living groups.

The patient was next seen on January 12, 2024 by the treatment team. That treatment plan indicated that the patient was enrolled in 10 hours of treatment groups but did not specify how much of that was core treatment. The treatment plan did indicate that he was offered 1.6 hours per week of prescheduled structured treatment during the prior month and had attended 41.9 percent or 0.67 hours of prescheduled treatment. He attended three hours per week of supplemental activity of 46.2 offered hours. The patient also attended six sessions of various drop-in groups. Two academic achievement (math and reading skills) groups were added to the treatment plan at that time.

The patient was next seen on February 7, 2024 by the full treatment team. This treatment plan referenced mall group attendance, but no documentation of that attendance was located in the healthcare record. From the end of December 2023 to January 2024, the patient attended 4.6 hours per week of 8.1 hours of prescheduled treatment groups, and 4.3 hours per week of 24.6 hours of offered supplemental activity per week.

On January 25, 2024, the patient was prescribed Suboxone after reporting drug craving. On January 31, 2024, he was observed giving the medication to another patient.  the recommended continuing care plan treatment section, the incident with Suboxone was summarized and followed immediately by a statement that the patient would no longer benefit from treatment at DSH-Atascadero. The decision to discharge the patient appeared directly related to the Suboxone incident, as the recommended continuing care plan further documented that the patient continued to experience hallucinations with paranoid, grandiose, and religious delusions. Nursing notes during that time consistently reported that the patient had hyperreligiousity and was consistently observed responding to internal stimuli as he paced the hallways. The recommended continuing care plan indicated that symptoms of mania and catatonia had responded to psychotropic medication with improvement.

The patient was discharged on February 14, 2024, for a 64-day length of stay at DSH-Atascadero.

**Findings**

The care and treatment provided to this patient were inadequate.

The patient was acutely psychotic and so impaired in functioning that he appeared to be more appropriate for the acute inpatient level of care rather than intermediate care. His cognition was significantly impaired due to his mental illness, he was experiencing severe symptoms of psychosis and had difficulty interacting with others. All DSH-Atascadero staff documented observations that supported the significant impairment of the patient. Despite those concerns, the treatment team did not recognize the high probability that the patient could be victimized and pressured by higher functioning patients. The incident with the diverted Suboxone was presented as an intentionally planned act, while the record suggested that the patient was incapable of such complex planning and was more likely to have been manipulated. For that incident to seemingly be the reason to discharge this patient was egregious if accurate. Even if unconnected, the decision to discharge the patient was not supported by the documentation, and the patient remained acutely ill.

Because the patient's treatment was not modified due to his impairment, it appeared that he was not able to fully benefit from the groups in which he was enrolled. The treatment outcome expectations were not updated to the DSH-Atascadero setting and intermediate treatment.

The psychological assessment was problematic particularly in its assessment of suicide risk for this patient. Treatment plans did not include adequate treatment interventions and did not indicate that the team considered referring the patient to a higher level of care to stabilize him so he could participate in his treatment. There was a high likelihood that upon the patient's return to CDCR, he would be re-referred for inpatient care, especially because the patient had not met any of his treatment goals.

**Patient R**

This 43-year-old intermediate level of care patient's healthcare record was reviewed to assess the quality of care provided at DSH–Atascadero. The patient was provided diagnoses of bipolar disorder type I, PTSD, amphetamine use disorder, and alcohol use disorder. The patient was prescribed the antipsychotic medications fluphenazine, haloperidol, olanzapine, loxapine, and aripiprazole; fluoxetine, duloxetine, and mirtazapine which may be used for depression, anxiety, and PTSD; the mood stabilizing medications lithium and oxcarbazepine; buspirone for anxiety; and naltrexone for self-injurious behavior. Additionally, diphenhydramine was ordered prn for medication side effects and anxiety, and the antipsychotic medication chlorpromazine was also ordered prn.

The patient was admitted from the CIM MHCB where he was placed due to delusions and paranoia that others wanted to harm him, agitation, and suicidal thoughts. He received treatment at DSH–Atascadero from January 6, 2023 to February 22, 2024. At admission, the patient displayed disorganized thought processes, religious delusions, insomnia, and racing thoughts. The patient had a history of victimization and assault with resultant nightmares.

The treatment team determined the patient to be at moderate risk for suicide and self-harm. The patient had one prior suicide attempt by overdosing on medications in 2016. Treatment outcome expectations focused on not reporting suicidal thoughts or engaging in self-harm for 90 days, participating in 100 percent of treatment for 90 days, and reporting that his depression and anxiety were under a specific designated level.

On January 21, 2023, the patient was angry and hit himself causing a black eye. He was also noted drinking copious amounts of water. On January 22 ,2023, the patient reported ongoing suicidal thoughts with a plan to make a noose from his sheet. The documentation indicated that appropriate clinical interventions occurred. The patient asked for and was briefly placed into restraints. He was promptly released and then placed on one-to-one monitoring status. There were no concerns noted with the use of or documentation of restraints or one-to-one monitoring. The patient struggled with thoughts of hitting himself, with the last known incident on December 9, 2023. He made significant progress during his treatment. Of note, the patient received specialized trauma treatment, including both groups and evidence-based individual therapy for trauma and self-injury. The documentation indicated that the patient was frequently offered under 10 hours of prescheduled treatment groups; however, the total treatment offered was over

20 hours. The patient attended over 80 percent of groups and attended all individual sessions with the trauma-trained psychologist.

On January 29, 2024, the patient used non-prescribed buprenorphine/naloxone, a medication used for the treatment of opioid use disorder. The treatment team documented that the decision to return the patient to CDCR for this incident was a difficult one, as the patient actively participated in the needed treatment. The writer of the document stated that patients admitted from CDCR were ineligible to remain at DSH–Atascadero after diverting medications. The nursing discharge summary noted that prior to discharge, the patient rarely attended groups or "even gets out of bed." The recommendations for continued care included watching the patient closely for head banging.

**Findings**

The care and treatment provided to this patient were adequate.

Significant concerns, however, were noted regarding the discharge process and the healthcare record documentation.

The patient received specialized individual therapy to focus on his trauma. Group topics appeared appropriate. While the patient was frequently not scheduled for the required ten hours of structured treatment activities, the patient was offered additional drop-in and leisure groups. The patient made clear progress. There was also clear documentation supporting the use of restraints.

Prior to the time of discharge, nursing noted that the patient was isolative, confused, not sleeping, and rarely getting out of bed. That constellation of symptoms suggested the need to delay the discharge from the intermediate level of care; or if DSH was insistent on transferring back to CDCR, a lateral transfer to a PIP should have been considered.

The documentation stated that patients from CDCR who divert medications were ineligible to remain at DSH–Atascadero. The expert was unable to confirm that policy. If such a blanket policy did exist, DSH should reevaluate that policy and instead consider an individualized and patient-based approach.

Also concerning was the recommendation from DSH–Atascadero for CDCR to monitor the patient closely for head banging. That level of monitoring was unable to be implemented at the EOP level of care to which the patient was discharged. Despite such an important recommendation, there was no documentation in the DSH–Atascadero healthcare record that a clinician-to-clinician contact occurred with CDCR EOP staff. As CDCR clinicians also were frequently not fully aware of the services provided at DSH, the expert recommends that clinicians from both CDCR and DSH be trained regarding what services were available within both systems. Those documentation issues also emphasized the challenges with the continued use of a paper healthcare record at DSH. The transfer medication list included prn medications, including an antipsychotic medication that were not included in the psychiatrist's discharge summary.

**Patient S**

This 38-year-old intermediate level of care patient's healthcare record was reviewed to assess the quality of care provided at DSH–Atascadero. The patient was provided diagnoses of schizoaffective disorder, depressed type and amphetamine use disorder. Relevant medical conditions were diabetes mellitus, obesity, high cholesterol, and hypertension. The patient was prescribed the antipsychotic medications clozapine and fluphenazine, the mood stabilizing medication divalproex that was later discontinued at DSH–Atascadero, the antidepressant medication venlafaxine that was started at DSH–Atascadero, and atropine drops for clozapine side effects. While venlafaxine was traditionally started at a dosage of 37.5 mg, the starting dose for this patient was 150 mg. Psychiatric progress notes included extensive carry-over information and contained scant information from the current clinical interviews.

The patient was treated at DSH–Atascadero from March 30, 2023 to March 14, 2024. He was admitted to DSH–Atascadero after receiving treatment at an MHCB, followed by the PIP acute and intermediate levels of care. At time of admission to the MHCB, the patient had suicidal thoughts, was defecating in his pants, and was threatened by a peer. The patient had prior treatment at DSH for both restoration of competency and for treatment after placement in CDCR.

The patient had a history of three suicide attempts by cutting his wrists, jumping from a window, and hanging. The most recent attempt occurred in 2017. The assessing psychologist determined that the patient was at moderate acute risk for suicide. The patient had a history of aggression during a prior DSH stay. His violence risk assessment was assessed as moderate.

Treatment outcome expectations included reduction of suicidal thoughts, reducing distress from auditory hallucinations, and developing coping skills to deal with both. One additional goal from CDCR was for the patient to attend a weekly individual session for 12 weeks prior to discharge.

The patient did not have ongoing individual therapy while at DSH. The patient was frequently offered under ten hours weekly of structured treatment, and he had 34 percent attendance during his treatment stay. The patient made gradual progress in treatment. On March 14, 2024, the patient discharged to RJD at the EOP level of care.

**Findings**

The care provided to this patient at DSH–Atascadero was inadequate.

The expert raised significant concerns onsite with how psychiatry initiated treatment with venlafaxine. The usual starting dose is 37.5 mg daily, whereas the patient was started at 150 mg daily. The documentation failed to include a rationale for starting such a high dose. That problem was amplified in that venlafaxine is usually given in an extended-release formulation, yet this was administered as crush and float, converting the medication into an immediate release formulation which risked increased side effects without a clear rationale. Psychiatric progress notes frequently contained information carried over from prior notes, with scant information from the current clinical interview present.

As group treatment was the mainstay of treatment at DSH–Atascadero, the patient's overall attendance rate of 34 percent was of particular concern. The treatment plan was not sufficiently updated to address this serious impediment to treatment. One of the goals from CDCR was for the patient to attend weekly sessions consistently prior to discharge.

The patient did not receive ongoing individual therapy. DSH was able to alter treatment outcome expectations, yet those were unchanged; if DSH wanted to alter those treatment outcome expectations, justification was required.

The patient received treatment at DSH–Atascadero for nearly one year. It was unclear if the patient would have made more rapid clinical improvement if he had received additional treatment.

**Patient T**

This 38-year-old intermediate level of care patient's healthcare record was reviewed to assess the quality of care provided at DSH–Atascadero. At the time of admission, the patient was provided a diagnosis of unspecified schizophrenia spectrum and other psychotic disorder, which was subsequently revised to schizoaffective disorder, bipolar type. Additional diagnoses included ADHD, opioid use disorder, and amphetamine use disorder. Relevant medical diagnoses included orthostasis treated with fludrocortisone, and excessive salivation due to clozapine treated with atropine drops and botulinum toxin injections. While receiving treatment at DSH–Atascadero, the patient fell and hit his head on January 29, 2024.

Medications at time of admission included olanzapine for psychosis, mirtazapine for depression, atomoxetine and clonidine for ADHD, with prn medications of hydroxyzine for anxiety, and olanzapine for agitation. During treatment at DSH–Atascadero, psychiatry transitioned the patient from olanzapine to clozapine. Due to ongoing psychosis, psychiatry added the antipsychotic medication asenapine, and atomoxetine was discontinued.

The patient received treatment at DSH–Atascadero from April 14, 2023 to February 17, 2024. The patient was admitted from the CMF MHCB where he was referred for bizarre behaviors such as digging in the trash and multiple delusions. The patient had a history of treatment at the EOP and MHCB levels of care.

The suicide risk assessment from April 19, 2023 assessed the patient with low suicide risk. He had no prior suicide attempts.

Interdisciplinary treatment team meetings occurred timely. Psychiatry was the only discipline who consistently signed the treatment plans. Treatment outcome expectations focused on reducing auditory hallucinations and delusions, learning coping skills, and medication adherence. The patient was frequently not offered the required ten hours of structured treatment activities. With supplemental and drop-in activities added, the patient was offered more than 20 hours of treatment weekly. On July 13, 2023, the patient struck a peer after the peer reportedly called him a name. DSH–Atascadero was able to address this incident internally and did not return the patient to CDCR. With continued treatment, the patient's psychosis improved as did his group

attendance. On February 17, 2024, the patient paroled to Sacramento County with an appointment scheduled with his parole officer on the day of discharge.

**Findings**

The care and treatment provided to this patient were adequate.

The medication management provided was logical, evidence-based, and likely contributed to the patient's clinical improvement during his treatment at DSH–Atascadero. Psychiatry documentation of the rationale for a change in the patient's diagnosis was clear. While the patient had an episode of aggression, DSH–Atascadero was able to continue to treat the patient rather than returning him to CDCR. The hospital also closely coordinated with CDCR and parole services with documentation of the patient seeing the parole officer on the day of discharge.

While the overall care was adequate, the case displayed limitations. The patient was not offered the required ten hours of structured treatment activities. After the patient struck a peer, the treatment team raised the patient's risk of violence from low to moderate, but did not revise the treatment plan to address this issue of concern.

**Patient U**

This 40-year-old intermediate level of care patient's healthcare record was reviewed to assess the quality of care provided at DSH–Atascadero. The patient's diagnoses included unspecified schizophrenia spectrum and other psychotic disorder, amphetamine use disorder, and antisocial personality disorder. Relevant medical conditions included a head injury, obesity, and vitamin B-12 deficient anemia. He was prescribed the antipsychotic medication olanzapine, the mood stabilizing medication divalproex, the antidepressant medication sertraline, as well as benztropine for side effects to antipsychotic medication.

The patient was treated at DSH–Atascadero from May 11, 2023 to January 11, 2024. The patient was admitted from the CHCF-PIP acute care, where he was admitted for suicidal thoughts. The patient had no history of suicide attempts, and his suicide risk level was assessed as low.

As the patient scored low on cognitive screens performed at the time of admission and also given his history of head injury; psychology performed neuropsychological testing to screen for a neurocognitive disorder. That diagnosis was not provided.

The treatment outcome expectations focused on performing activities of daily living such as showering regularly, utilizing coping skills to address thought dysregulation, medication adherence, and attending over 75 percent of treatment. The patient reportedly met those goals. The only goal the patient did not meet focused on increased insight into the symptoms of schizophrenia. The patient had good engagement in treatment, with an overall group attendance rate of 86.5 percent. The patient had no behavior problems and had a job in the laundry. The patient made gradual progress and discharged on January 11, 2024 to RJD at the EOP level of care.

**Findings**

The care provided to this patient was adequate.

This case displayed several positive aspects. Psychology performed psychological testing to clarify the nature of the patient's cognitive challenges. Medication management focused on reducing the number of medications and dosages, when possible, while maintaining control of the patient's symptoms. Additionally, the patient wanted and obtained a job while at DSH–Atascadero which benefitted his mental health.

**Patient V**

This 34-year-old intermediate level of care patient's healthcare record was reviewed to assess the quality of care provided at DSH–Atascadero. He was provided diagnoses of schizoaffective disorder, bipolar type, opioid use disorder, and alcohol use disorder. Medications at the time of admission included the antipsychotic medications clozapine and haloperidol long-acting injectable, the antidepressant medication fluoxetine, and benztropine to address antipsychotic medication side effects. The patient also had hydroxyzine ordered prn for anxiety. The patient received treatment at DSH–Atascadero from May 19, 2023 to February 8, 2024.

While at the CHCF-PIP in December 2022, the patient punched a wall with such force that his fractures required surgical repair and pins. During his treatment at DSH–Atascadero, the patient contracted COVID-19. The psychiatrist and internist closely coordinated and monitored the patient closely, given concerns for medication interactions with the antiviral treatment.

The patient received his psychotropic medications by a PC 2602 involuntary medication order due to danger to self and others which expired December 15, 2023. There was no non-renewal notice or rationale for non-renewal located in the healthcare record. During treatment, the long-acting haloperidol was discontinued with subsequent trials of risperidone and olanzapine. Psychiatry stopped fluoxetine, but the medication was resumed due to clinical worsening. Psychiatric progress notes included extensive carry-over information which resulted in incorrect information documented in the healthcare record. As an example, the note from December 19, 2023 stated that the patient was taking risperidone, but the patient was prescribed olanzapine.

The patient had a history of mental health treatment at all levels of care. In August 2022, the patient was referred to the MHCB level of care after cutting himself. He had auditory and visual hallucinations, labile mood, agitation, unpredictable behavior, as well as hypersexual behaviors such as being naked in his cell and frequent masturbation. The patient was subsequently transferred to the CHCF-PIP acute level of care, where he remained until transferring to DSH–Atascadero.

The patient had multiple prior suicide attempts. The assessing psychologist determined that the patient was at moderate suicide risk. Treatment outcome expectations and goals included increasing socialization with peers, attending treatment and leisure groups, increasing insight into illness, and reducing the risk of victimization by learning problem solving strategies to

manage safety. The patient made clear progress in treatment. As one example, he attended between 96 to 100 percent of his offered structured treatment.

The patient had an incident on January 25, 2024 in which he lost privileges. He subsequently refused clozapine and requested discharge back to CDCR. On February 5, 2024, the patient was awake most of the night and was responding to internal stimuli. On February 6, 2024, the patient was placed on in-room seclusion where he was noted to have auditory hallucinations to which he was responding and shadow boxing. A nursing note from February 7, 2024 noted that the patient was "notably manic." The treatment team noted that the patient partially met his treatment goal of increased insight and did not meet his other goals. The team reported that the patient had reached maximum benefit from DSH–Atascadero, and he was requesting return to CDCR. On February 8, 2024, the patient discharged to MCSP at the EOP level of care.

**Findings**

The care provided to this patient was inadequate.

Several concerns were noted regarding the care provided that were discussed with DSH–Atascadero and DSH leadership while onsite. The patient arrived at DSH–Atascadero on clozapine and under a PC 2602 involuntary medication order due to danger to self and others; however, he was returned to CDCR with neither. The PC 2602 order was allowed to lapse with no rationale documented in the psychiatry notes or treatment plan about the rationale for non-renewal. There was a lack of close coordination between CDCR and DSH, as evidenced by the lack of a clinician-to-clinician contact documented in the DSH or CDCR healthcare record. Additionally, prior to returning to CDCR, the case should have been considered for a coordinated clinical assessment team meeting, so that all parties were aware of those relevant details. The expert strongly recommended closer coordination between CDCR and DSH for patients with PC 2602 involuntary medication orders. Additionally, the rationale for the use of two closely related antipsychotic medications, clozapine and olanzapine, required stronger justification.

Positive aspects of care included having multiple clinicians, alone and together, try to encourage the patient to engage in the recommended treatment and to take his medications. Additionally, there was close coordination between the medical and psychiatric physicians when the patient contracted COVID-19.

**Patient W**

This 57-year-old intermediate level of care patient's healthcare record was reviewed to assess the quality of care provided at DSH–Atascadero. At the time of admission to DSH–Atascadero, the patient was provided diagnoses of schizophrenia, alcohol use disorder, and amphetamine use disorder. Relevant medical diagnoses included hepatic C, hypothyroidism, and atrial fibrillation. Medications at the time of admission included the antipsychotic medication haloperidol in both the long-acting and oral forms, as well as benztropine for side effects. During the course of treatment, clozapine replaced haloperidol. The patient received his psychotropic medications by a PC 2602 involuntary medication order.

The patient was treated at DSH–Atascadero from September 6, 2023 to March 26, 2024, and he had a history of multiple prior placements at DSH. The patient was admitted to DSH–Atascadero from the CSP/Sac MHCB due to religious delusions that he was a prophet and the son of God, poor insight and judgment, and suspected auditory hallucinations. While the patient had suicidal ideation in the MHCB, the ideation resolved prior to DSH–Atascadero admission.

The initial psychiatric evaluation occurred within the required 24 hours of admission. The treatment team assessed the patient with low risk for suicide. The patient denied suicide attempts, but the documentation noted that the CDCR records showed one attempt in 2009. The patient was assessed at moderate risk of aggression.

The patient had a challenging initial phase of treatment, including the need for restraints on September 10, 2023 and October 22, 2023 due to dangerousness to others. The provided documentation supported the use of restraints. Treatment team meetings occurred timely but were not consistently signed by all disciplines. The treatment outcome expectations centered on engaging in conversations with others without distraction by the psychotic symptoms, and improvement in the activities of daily living. Treatment plans documented that the patient was often offered less than the requisite ten hours per week of structured treatment activity. The patient had 61 percent treatment attendance from February to March 2024. With non-structured treatment, the patient attended approximately 74 percent of the 43.8 hours offered. While the patient made gradual progress, at the last treatment team meeting, the treatment team reported that the patient had not yet met his treatment outcome expectations. On March 26, 2024, the patient discharged to CMF at the EOP level of care.

**Findings**

The care and treatment provided to this patient were adequate.

Due to the treatment team's perseverance, the patient was able to start the medication clozapine, an antipsychotic medication that is often effective when other medications have failed. The institution was able to manage the patient's risk of aggression to others, despite the patient requiring two episodes of restraints. The medication management was logical and clinically effective. The psychiatrist successfully minimized the number of prescribed medications, thus reducing the risk of side effects and medication interactions.

Although some concerns were noted regarding the care provided, those concerns did not rise to the level of rendering the care inadequate. The patient had not met his treatment outcome expectations by the time of the last treatment team meeting. Stronger justification for discharge in the absence of meeting those goals was merited. The patient was not offered the ten hours of structured treatment activity required. Despite those omissions in care, the patient made clear progress.

Lastly, the treatment plans did not contain signatures from all disciplines. While only the psychiatrist's signature was required per DSH–Atascadero policy, that policy did not appear aligned with the governing MOU between CDCR and DSH regarding treatment planning, nor did it reflect best clinical practice.

**Patient X**

This 35-year-old intermediate level of care patient's healthcare record was reviewed to assess the quality of care provided at DSH–Atascadero. The patient was provided diagnoses of schizophrenia and obesity. He received his psychotropic medications by a PC 2602 involuntary medication order due to grave disability. Medications at time of admission included the long-acting injectable antipsychotic medication fluphenazine administered monthly, diphenhydramine injection given with the fluphenazine for side effects, hydroxyzine daily and prn for anxiety, and melatonin prn for insomnia. During treatment at DSH–Atascadero, fluphenazine was changed to olanzapine, and diphenhydramine was changed to benztropine. The patient had a brief trial of treatment with the mood stabilizing medication divalproex in January 2024; however, the medication was discontinued due to sedation. The patient transferred from the CHCF-PIP acute level of care on October 11, 2024, and was treated at DSH–Atascadero through February 23, 2024.

The patient's symptoms included delusions, agitation, and impaired ability to care for activities of daily living. The patient had multiple prior admissions to DSH for restoration of competency. The psychiatrist noted that those prior records were unavailable, and they were subsequently requested.

The patient's suicide risk was assessed as moderate. He had no prior suicide attempts but had reported suicidal thoughts requiring prior MHCB placement. The patient's violence risk was assessed as moderate. The patient had a history of cursing at custodial staff, and he threw objects at custody staff during his prior involuntary medication hearing.

The initial psychiatric evaluation occurred timely within 24 hours of admission. Overall, the evaluation was comprehensive and painted a clear clinical picture of the patient. Medication management was logical and appropriate based on the clinical presentation of the patient.

Treatment team meetings occurred timely. The treatment outcome expectations centered on no self-harm for 90 days, managing depression and anxiety, and medication adherence for 12 months. Those treatment outcome expectations were not updated during the patient's treatment at DSH–Atascadero.

The patient remained delusional with limited insight. He stated that he did not have a mental illness and requested discharge back to CDCR. Notes from February 7, 2024 stated that the patient did not believe he required medications, and he was argumentative with the psychiatrist. While the patient was medication adherent, he repeatedly refused vital signs, medical, dental, laboratory studies, and ECGs. He attended few groups and was repeatedly noted to be isolative. The patient requested return to CDCR and was determined to "not benefit from further care and treatment" at DSH–Atascadero. On February 23, 2024, the patient discharged to CSATF at the EOP level of care.

**Findings**

The care and treatment provided to this patient were inadequate.

The treatment outcome expectations did not clearly address the patient's primary psychiatric disorder of psychosis. While CDCR initiated the treatment outcome expectations, it was incumbent on DSH to revise them. Despite the patient struggling to engage in treatment, the treatment outcome expectations and interventions were not meaningfully adjusted. The patient displayed limited engagement in groups, yet there was no documented consideration of supplementing his care with other interventions, such as individual therapy or a behavioral plan.

An additional concern was the lack of access to healthcare records. The patient had multiple prior stays at DSH; however, those records were unavailable to the treatment team. This was exceptionally important in this case, as the psychiatrist noted that the patient was a poor historian, was very psychotic, and was unable to provide much information.

Positive aspects of treatment included medication management, which was appropriate and rational with clear treatment targets.

**Patient Y**

This 33-year-old intermediate level of care patient's healthcare record was reviewed to assess the quality of care provided at DSH–Atascadero. The patient was provided diagnoses of schizoaffective disorder, depressed type; amphetamine use disorder; cannabis use disorder; and tobacco use disorder. Relevant medical issues included a severe facial and head injury requiring surgical repair at age 17. He was prescribed the antipsychotic medication risperidone on a scheduled and prn basis, paroxetine for depression, and prn hydroxyzine for anxiety. During his hospital course, the vitamin methyl folate was added due to a genetic condition, and metformin was prescribed to assist with medication-induced weight gain.

The patient was admitted to DSH–Atascadero on November 16, 2023 from the SQ EOP, and was treated until February 28, 2024.

The patient's symptoms included psychosis which had worsened since April 2023, including bizarre beliefs, disruptive behaviors, threats to others, auditory and visual hallucinations, grandiose delusions, and disrupted and disorganized thought processes. The patient had prior treatment at the EOP, MHCB, and PIP levels of care.

The patient was assessed with low risk for suicide. The patient had two prior suicide attempts by overdose in 2016 and 2022, and a history of self-injurious behavior by cutting from 2015 to 2022, with no reported self-injury since incarceration.

The initial treatment team meeting occurred timely. The treatment outcome expectations centered on attending group, completing hygiene tasks, and being able to test the reality of his delusions. The patient was attending approximately 69 percent of groups and was completing hygiene tasks independently. The final goal was unmet, as the patient denied that he had any delusions.

On February 11, 2024, the patient had an altercation with a peer that was triggered by bartering on the unit. During the altercation, the patient reportedly threatened to kill staff. He was placed

into restraints. The documentation justifying the use of restraints was sound. A psychologist conducting the RVR mental health assessment determined that mental health factors did not contribute to the incident. As a result of the altercation, the patient was discharged to CDCR.

Due to the degree of the patient's psychosis, the psychiatrist stated that they would have considered the antipsychotic medication clozapine should the patient have remained at DSH–Atascadero longer.

The patient discharged to SQ at the EOP level of care on February 28, 2024.

**Findings**

The care and treatment provided to this patient were adequate.

Positive aspects of care included clear documentation supporting the need for clinical restraints, close monitoring of the patient in restraints, and prompt release when deemed safe to do so.

One concern in the care of this patient included the lack of significant medication changes; however, it appeared that the psychiatrist allowed additional time for non-medication treatments including milieu and group treatments to be implemented. Additionally, the psychiatric discharge summary noted that the patient had reached maximal benefit from hospitalization, yet subsequently stated that additional medications would have been considered should the patient have remained longer.

**Patient Z**

This 27-year-old intermediate level of care patient's healthcare record was reviewed to assess the quality of care provided at DSH–Atascadero. The patient was provided a diagnosis of schizophrenia, and he had relevant medical conditions of weight gain and sleep apnea. Medications at time of admission included the antipsychotic medications clozapine and aripiprazole, the antidepressant medications bupropion and venlafaxine, and the antianxiety medication hydroxyzine.

The patient was referred by the CSP/Sac MHCB, and was treated at DSH–Atascadero from November 28, 2023 to April 5, 2024. The patient had previously received mental health services at the 3CMS, EOP, MHCB, and intermediate levels of care.

The patient received his psychotropic medications by a PC 2602 involuntary medication order due to danger to self and grave disability. During his treatment at DSH–Atascadero, the clozapine dose was optimized. Aripiprazole, venlafaxine, and hydroxyzine were discontinued. The psychiatrist discontinued bupropion; however, the medication was resumed due to worsening depressive symptoms. The psychiatrist well documented their consideration of the risks and benefits of using bupropion and clozapine together, as both medications could increase the risk of seizures. Trials of the antidepressant medication sertraline and the mood stabilizing medication valproic acid were discontinued due to side effects, and in the case of valproic acid, due to an unclear indication for the medication.

The patient had a history of three prior suicide attempts, by firearms and opiate overdose. The suicide risk assessment dated November 29, 2023 assessed low risk. The risk assessment noted the review of prior suicide risk assessment from CDCR.

At the time of admission, the patient had persecutory auditory hallucinations and low energy. On December 24, 2023, the staff believed that the patient was diverting his medication to a peer. This resulted in a reduction of the patient’s hospital access system (HAS) level. The patient had poor group attendance at 20 to 30 percent; the patient was unable to explain why he had poor group attendance.

The treatment teams meetings occurred timely. The initial treatment team meeting included the psychiatrist, psychologist, and unit supervisor, but did not document the presence of social worker, recreation therapist, or nursing. Treatment outcome expectations included reducing hallucinations and resultant distress, and improving coping skills. Treatment plans repeatedly documented the patient’s poor group attendance; however, other than encouraging the patient to attend, it was unclear how the treatment team modified the treatment plan to address this barrier to treatment. The treatment team held a treatment conference on February 21, 2024, when the patient was not on the unit.

The initial psychiatric evaluation occurred on the day of admission and was thus timely. Psychiatric visits occurred at a clinically appropriate frequency, with medication management decisions clearly justified. There were few documented instances of individual therapy. The notes indicated that the patient was encouraged to attend groups. The documentation of individual sessions indicated that the treatment that was provided was consistent with the treatment plan goals.

The discharge documentation included a recommended continuing care plan which noted that the patient had not met his treatment outcome expectations; however, as the patient “could not be encouraged” to participate more fully in the treatment program at DSH–Atascadero, and also given the patient’s focus on resentencing, he was deemed to have made “maximum benefit” from treatment at DSH–Atascadero. On April 5, 2024, the patient discharged to CSP/Sacramento at the EOP level of care.

**Findings**

The care provided to this patient was inadequate.

The patient failed to meet any of his treatment outcome expectations, yet the goals and interventions were not revised. While group treatment was the predominant modality of treatment employed by DSH–Atascadero, the patient had limited attendance which should have prompted consideration of additional interventions such as more frequent individual sessions, or a behavioral plan to address group attendance. Treatment planning conferences lacked several key participants, including in one case the patient. Although in accordance with DSH–Atascadero policy, a robust interdisciplinary meeting regarding such complex patients was clinically important.

Positive aspects of care included the quality of medication management, and the suicide risk assessment documenting review of relevant CDCR records.

**Patient AA**

This 42-year-old intermediate level of care patient's healthcare record was reviewed to assess the quality of care provided at DSH–Atascadero. He was provided diagnoses of schizoaffective disorder, bipolar type, opioid use disorder, and constipation. Medications at time of admission included the antipsychotic medication clozapine and long-acting injectable haloperidol, the antidepressant medication fluoxetine, melatonin for sleep, and buprenorphine/naloxone as medication-assisted treatment for opioid use disorder. The patient was admitted to DSH–Atascadero on March 7, 2024 as a transfer from the CMF-PIP

The patient had a significant prior treatment history, including two prior DSH commitments in 2017 and 2019 to restore competency for trial. More recently, the patient had been treated at the CMF-PIP since May 22, 2023. At that time, the patient was admitted to the acute level of care due to delusions of being controlled and poisoned, tactile hallucinations, and poking at his eyes with the intent to remove them. The patient had episodes of placing his pants around his neck stating that he wanted to kill himself, as well as aggression to others and property. While the antipsychotic medication clozapine was recommended, the patient refused. On August 9, 2023, the patient transitioned to the CMF-PIP intermediate level of care. Due to the severity of his clinical status, the patient returned to the acute level of care on January 10, 2024. The patient was started on clozapine with resulting clinical improvement. Prior to transitioning to DSH–Atascadero, the patient was attending 70 percent of his treatment.

The patient had several rapid medication changes while at DSH–Atascadero, including multiple changes at the time of admission. The dose of clozapine was increased. Fluoxetine was changed to sertraline due to concerns for medication interactions. Sertraline was subsequently discontinued due to concerns of overly activating the patient. The haloperidol long-acting injectable was discontinued and replaced by oral risperidone. The patient requested discontinuation of buprenorphine/naloxone. At the time of discharge, the patient was prescribed clozapine, risperidone, with prn haloperidol for psychosis and hydroxyzine for anxiety. The patient had an episode of confusion which the assessing psychiatrist felt to be due to the rapid medication changes at time of admission, or excessive water ingestion.

Psychology completed suicide risk assessments on March 15, 2024, which assessed the patient at low acute risk. A different psychologist evaluated the patient on April 2, 2024; that evaluation referenced the prior suicide risk assessment but assessed the patient at moderate risk.

The patient displayed concerning behaviors since the time of admission. Nursing documentation showed the patient required redirection for digging in the trash and taking food from the dining hall. The patient hit himself with resultant eye bruising that was driven by paranoia that others would harm him. Psychiatry noted that the patient had significant behavioral problems, including difficulty following the rules and interacting appropriately with peers.

The initial treatment planning conference occurred timely with the psychiatrist and psychologist present; however, the patient, social worker, recreation therapist, and nursing were not present. Treatment outcome expectations included reducing distress from psychosis, anxiety, and depression as evidenced by attending 60 to 70 percent of programming, being independent with activities of daily living for 60 to 90 days prior to discharge, and learning three coping skills to deal with distress and overstimulation from psychosis, depression, anxiety. Additional goals included improving his insight into his mental health by identifying two to three symptoms he experienced, and to be 100 percent medication adherent. The plan noted that a behavioral plan was not required at that time.

On March 31, 2024, the patient required in-room seclusion after reportedly kicking his roommate in the head due to delusional thinking. Comprehensive nursing documentation clearly stated that this was the least restrictive intervention. Due to the patient's clinical status, the treatment team determined that the patient required a more restrictive setting. On April 3, 2024, the patient returned to the CMF-PIP for ongoing treatment.

**Findings**

The care and treatment provided to this patient were inadequate.

Despite the patient already attending 70 percent of treatment at the CMF-PIP prior to DSH–Atascadero arrival, the treatment goal for DSH–Atascadero was to attend 60 to 70 percent of treatment. Additionally, the treatment plan was not substantially modified despite the patient's limited progress. Given the importance of the initial treatment team meeting, all disciplines should have attended. The patient displayed concerning behaviors such as digging in the trash from the time of admission. Despite this, there was no behavior plan created. A behavior plan would have been instrumental in determining the reasons for his behaviors, which would guide subsequent interventions.

The patient had multiple medication changes at the time of admission with no documented concern regarding making multiple medication changes at the same time. The patient subsequently became confused, and the treating psychiatrist considered whether the medication changes were the culprit for his confusion. The documentation regarding assessment of the patient's suicide risk was inconsistent, with some assessments reflecting low and others assessing moderate risk.

Positive aspects of care included the frequency of psychiatric contacts, and strong documentation surrounding the need for in-room seclusion.

**Patient BB**

This 41-year-old patient's healthcare record was reviewed to assess the quality of care provided at DSH–Atascadero. The patient was provided diagnoses of schizophrenia and amphetamine-type substance use disorder, severe. He was initially prescribed Zyprexa and Vraylar, and his medications were adjusted during the hospitalization to Zyprexa and Zoloft. The patient arrived

at DSH–Atascadero on May 18, 2023, and was ultimately discharged on or around February 28, 2024.

Th patient was referred to DSH–Atascadero from the SQ EOP to address difficulties in functioning. He reportedly arrived at CDCR for his current term in December 2023, when he was not taking medications and quickly decompensated. He stopped eating meals, threw away his food, ate from the trash, and repeatedly threw away his CDCR issued ID and clothing. The patient also refused to take medications, did not attend groups, and engaged in bizarre behaviors that irritated his dorm mates. The treatment outcome expectations included medication adherence for 30 days and no medication refusals for at least one week prior to discharge. Additionally, within the next 90 days, the patient would verbalize understanding of his mental health diagnosis and related symptoms, and in the next 30 days the patient would increase adherence to programming by not disposing of his clothing, food, bedding, and other items.

The psychiatric admission evaluation occurred on May 18, 2023, the date of arrival at DSH–Atascadero. A psychosocial assessment was completed on May 31, 2023. The initial seven-day treatment team meeting occurred on May 25, 2023, when the initial suicide and violence risk assessments were completed that assessed his risk as low due to his lack of a history of violence.

The treatment team meetings occurred timely and were attended by some but not the entire treatment team; the DSH–Atascadero leadership reported that the signatures of a psychiatrist and RN were the only ones required to complete a treatment plan. The treatment plan maintained the treatment outcome expectations provided by CDCR. The patient was assigned to several treatment groups including aggression reduction, drug education, healthy living, mental health wellness, and sponsor group. The treatment plan remained essentially unchanged throughout the hospitalization, except a Buddhist meditation group was added on November 14, 2023. The patient's insight was consistently noted as limited, and there was conflicting documentation regarding the patient's insight and whether he acknowledged his mental illness. The treatment outcome expectations for verbalizing understanding of mental health diagnosis and associated symptoms were noted as completed at the treatment team meeting on August 17, 2023; however, in subsequent progress notes by several different clinicians, the patient vacillated between acceptance and denial of his mental illness.

Psychiatric progress notes indicated that psychiatric contacts generally occurred monthly; however, there were no psychiatric progress notes documented between the initial psychiatric assessment on May 18, 2023 and August 27, 2023. Monthly psychiatric progress notes were generally well written and provided appropriate updates to the patient's care and status. The patient was consistently described as stable with fair insight. His Zyprexa was increased, and Vraylar was discontinued in December 2023. The psychiatric progress note on January 11, 2024 indicated that the patient remained stable and medication adherent, and he acknowledged his mental illness and ongoing need for medication treatment. The final psychiatric progress note on February 18, 2024 indicated that the patient continued to acknowledge his mental illness and the need for medication treatment, and his symptoms were well controlled.

There was no documentation that an initial psychology assessment was completed. The healthcare record included monthly psychology progress notes, but there were several months

when a progress note was not documented. Progress notes were documented on June 20, 2023, September 14, 2023, December 14, 2023, January 11, 2024, and February 13, 2024. Review of the psychology progress notes indicated that the patient was engaged in treatment, did not demonstrate behavioral difficulties, and his group attendance increased during his hospitalization. His group attendance increased from 25 percent in June 2023 to 89 percent in February 2024. The notes also indicated that the patient remained psychiatrically stable, had developed insight regarding his mental illness, and reported that his medications were helpful.

The patient was seen for four social work contacts during the DSH–Atascadero hospitalization. A five-day admission note contained only generalized information about the patient's reason for admission and status at that time. The psychosocial assessment on May 31, 2023 indicated that the patient had prior treatment and placements at the EOP, MHCB, and PIP levels of care. His therapeutic plan included medication management, group therapy, and substance abuse treatment. On August 31, 2023, the patient reportedly attended three of his provider's groups when he demonstrated limited insight regarding his mental illness but was medication adherent.

The patient was assigned to treatment groups including aggression reduction, drug education, healthy living, mental health wellness, Buddhist meditation, and sponsor group. His group attendance improved, and he was an active participant in his groups. An August 21, 2023 recreational therapist note indicated that the patient had attended 18 percent of scheduled treatment from May 7 to August 5, 2023, but a recreational therapist note on February 13, 2024 indicated that the patient attended 89 percent of scheduled treatment from November 12 to December 3, 2023. That note also indicated that the patient did not consistently acknowledge his mental illness, but he was medication adherent.

According to the discharge summary, the patient met his treatment goals and treatment outcome expectations prior to discharge. According to the discharge summary, the patient was medication adherent and stable since at least December 2023; additionally, he was described as respectful towards staff and peers, and he had attended 87 percent of his scheduled groups between January 14 and February 10, 2024. There was no documentation of behavioral concerns or the use of seclusion, restraint, or increased observation.

The patient was discharged to the EOP level of care at SQ.

**Findings**

The care and treatment provided to this patient were adequate.

The treatment team meetings occurred timely and included the necessary team members. The treatment plans were clinically appropriate, and the patient made significant progress during the hospitalization. There were conflicting reports regarding his level of insight, but he remained stable during his stay at DSH–Atascadero. At the time of his discharge, the patient had improvement in his mood, was attending to his ADLs, was participating in treatment, and was adherent to his prescribed medications.

**Patient CC**

This 48-year-old patient's healthcare record was reviewed to assess the quality of care provided at DSH–Atascadero. He was provided diagnoses of major depressive disorder, single episode, with psychotic features; antisocial personality disorder; tobacco use disorder; and cannabis use disorder. Although initially prescribed gabapentin, Remeron and Vistaril; at the time of DSH–Atascadero discharge, the patient was not prescribed psychotropic medications. The patient arrived at DSH–Atascadero on September 20, 2023 from the CHCF PIP where he was receiving acute care.

The patient previously transferred from the CIM MHCB to the CHCF PIP due to paranoia, anxiety, delusional thinking, depression, and suicidal ideation with a plan to overdose or hang himself. His psychotic symptoms resulted in poor medication adherence, limited engagement in treatment, isolation in his cell, and poor hygiene and grooming while in CDCR. Although he was resistant to consider treatment with antipsychotic medications, he agreed to take a mood stabilizing medication, which resulted in reduced suicidal ideation, paranoia, and increased group attendance. He transferred to DSH–Atascadero for placement in an unlocked dorm setting prior to discharge to the EOP level of care.

The treatment plan included several treatment outcome expectations that included learning to use reality testing to manage anxiety related to others targeting him, learning to use effective communication skills to improve relationships with others; managing his suicidal ideation, improving his mood management, and providing diagnostic clarification. The treatment outcome expectations also included specific and appropriate interventions to use with the patient during weekly sessions with his PC.

The initial psychiatric and psychology assessments, and initial treatment team meeting all occurred timely. The initial suicide and violence risk assessments were completed on September 23, 2023 when the patient first met with the psychologist; at that time, his suicide risk was assessed as moderate, and his risk for self-injurious behaviors or violence was assessed as low.

The treatment team meetings occurred monthly during the DSH–Atascadero hospitalization; the attendance at the meetings varied, and none of the treatment team meetings included all members of the treatment team. For example, the assigned psychologist and RN were absent from the initial and discharge treatment team meetings. The treatment outcome expectations remained unchanged during the hospitalization, and the treatment plan included appropriate group assignments and individual therapy. The patient was often scheduled for far fewer group hours than was documented in the treatment plan. At the time of discharge, the patient was enrolled in 14 hours of treatment groups weekly; however, only a fraction of those group hours was actually offered to the patient, and his attendance was consistently poor. Throughout his stay at DSH–Atascadero, the patient reportedly engaged in disruptive but nonviolent behaviors on the unit, such as bartering goods and being discovered with contraband in his room. At the discharge treatment team meeting, the team noted no abnormal clinical events in the previous quarter, and the patient was described as stable.

The psychiatric admission assessment on September 20, 2023 occurred timely and indicated that the patient demonstrated depression, hypersomnia, anxiety, paranoia, hypervigilance, and suicidal ideation due to safety concerns. Although the suicide risk assessment assessed moderate risk, the psychiatrist documented that the patient had no risk for self-injurious behaviors or violence. The psychiatrist discontinued Suboxone at the initial assessment and updated the patient's diagnosis to major depressive disorder, moderate, without psychotic features. Review of subsequent monthly psychiatric progress notes indicated that the patient discontinued Remeron due to concerns about weight gain. In September 2023, he was described as stable and adjusting appropriately to the unit; however, in October 2023 and November 2023, he reported depression, suicidal ideation, and paranoia due to stress and perceived threats in CDCR. At the final psychiatric contact on December 19, 2023, the patient reported mild dysthymia and anxiety, but he was not prescribed psychotropic medications and remained generally stable.

An admission psychology progress note on September 23, 2023 included the same initial diagnoses of major depressive disorder, single episode, with psychotic features, antisocial personality disorder, tobacco use disorder, and cannabis use disorder as were provided prior to DSH–Atascadero arrival. The admission note identified the treatment outcome expectations and included specific therapeutic interventions to address the patient's clinical needs and concerns. The specific interventions included specialized groups including yoga and DBT, individual DBT sessions with the primary clinician, and diagnostic clarification. There were only two subsequent psychology progress notes documented. A progress note on September 27, 2023 referenced a Serious Incident Report (SIR) where latex gloves and lotion were found in the patient's room. The incident was resolved promptly, and the patient was receptive to counseling regarding unit rules. A psychology note on December 11, 2023 was related to an incident when the patient had an altercation with another patient. Notably, there was no documentation that indicated that the patient was offered or participated in individual DBT sessions as was prescribed in the treatment plan.

The discharge summary indicated that the patient attended 55.9 percent of the 5.1 hours offered hours weekly. The discharge summary noted "good engagement in individual therapy", however, documentation of that individual therapy was not located in the healthcare record. The discharge summary also noted that despite good engagement with his individual therapist, the patient continued to demonstrate frequent antisocial and minor rule-breaking behaviors and was reluctant to discuss and process those behaviors openly with his therapist and other providers. The treatment team decided to discharge the patient to the EOP level of care after concluding that he had reached maximum benefit from hospitalization, and that he demonstrated a lack of psychiatric symptoms. It noted that the focus of his treatment shifted specifically to prosocial rehabilitation addressing his criminal thinking attitudes and behaviors. At the time of discharge, the patient was provided diagnoses of adjustment disorder with disturbance of mood and behavior, antisocial personality disorder, tobacco use disorder, and cannabis use disorder. Follow-up recommendations noted that the patient was not appropriate for psychotropic medication treatment, but he required ongoing support for coping with stress, anger management, and prosocial rehabilitation.

The patient was discharged from DSH–Atascadero on December 29, 2023 to the RJD EOP.

**Findings**

The care and treatment provided to this patient were adequate.

The patient stabilized and was appropriately discharged despite poor or absent treatment documentation. He remained psychiatrically stable during the hospitalization and appeared to gain insight regarding his symptomatology and developed coping skills. The patient did not demonstrate or report any behaviors that required increased observation or the use of seclusion or restraints. His psychotropic medications were discontinued, and he remained stable, as his symptoms appeared primarily related to characterological issues. Although he was not offered and did not attend adequate hours of group treatment, the patient was described as socially active on the unit and often demonstrated a euthymic mood.

**Patient DD**

The 58-year-old patient's healthcare record was reviewed to evaluate the quality of care provided at DSH–Atascadero. At the time of admission to DSH–Atascadero, he was provided diagnoses of schizoaffective disorder, bipolar type; amphetamine-type substance use disorder, severe; opioid use disorder, severe; stimulant use disorder (cocaine type), moderate; cannabis use disorder, moderate; and PCP use disorder, moderate. The patient historically reported and demonstrated delusions, hallucinations, and psychosis. At the time of arrival, he was prescribed Suboxone, Lexapro, lithium, Vistaril, Remeron, Zyprexa, risperidone, and venlafaxine. At the time of discharge, he was prescribed lithium, quetiapine, and bupropion.

The patient arrived at DSH–Atascadero on May 13, 2022 from VSP. He was referred to DSH–Atascadero due to significant depressive and psychotic symptoms including command auditory hallucinations. Treatment outcome expectations included a decrease in reported depressive mood symptoms such as hopelessness, avolition, and negative thoughts for a period of 60 days; demonstrated ability to perform ADLs for 60 days; reduction of suicidal ideation from daily to no more than three times weekly for 60 days; and attendance in at least 70 percent of individual and group sessions to decrease avolition.

The initial psychiatric and psychology assessments occurred timely. The initial psychiatric assessment was completed on May 13, 2022, and it noted that the patient arrived with prescriptions for multiple medications and that diagnostic clarity and medication adjustment were the primary focus. The patient's mood was described as depressed, and he endorsed suicidal ideation without a plan. At the initial psychology assessment on May 17, 2022, the patient reported persistent depression and demonstrated dysthymic mood and blunted affect. His suicide risk was assessed as moderate, and his violence risk was assessed as low. The patient reported command auditory hallucinations that he described as violent and loud. The psychologist listed the staying safe group as a primary intervention.

The initial seven-day treatment team meeting on May 25, 2022 was late by approximately five days. The treatment team scheduled the patient for four hours of groups weekly during that meeting. The 60-day treatment team meeting occurred on July 13, 2022, when the patient described his depression as eight of ten on a ten-point scale in which ten was the most severe; he

also reported suicidal ideation without a plan. The quarterly treatment team meetings occurred timely for the remainder of the DSH–Atascadero hospitalization, and a timely annual treatment team meeting occurred on May 10, 2023. The patient consistently demonstrated depressed and reported depressed mood, auditory hallucinations, and suicidal ideation without a plan. His rating of depression vacillated between low to moderate and high, and the patient was consistently medication adherent. He attended to his ADLs appropriately soon after his DSH–Atascadero admission, and the treatment team noted that the treatment outcome expectation for ADLs had been met at the November 9, 2023 treatment team meeting.

The patient was seen timely for monthly psychiatric contacts. The psychiatric progress notes included thorough and appropriate justifications for medication adjustments, and the patient's symptoms appeared to improve during the course of hospitalization. He reportedly demonstrated no behavioral difficulties during his hospitalization.

The patient was offered between six and 10.2 hours of groups and scheduled treatment weekly. He attended his groups consistently, and he met the treatment outcome expectation for attending at least 70 percent of scheduled treatment by the quarterly treatment team meeting on November 22, 2022. His group attendance remained consistent and above 70 percent for the remainder of his DSH–Atascadero stay.

The initial discharge summary was dated August 16, 2023; however, the patient was retained and did not actually discharge until December 1, 2023 due to worsening depressive symptoms. He was described as increasingly withdrawn and isolative. In a discharge summary addendum on October 19, 2023, the patient reported suicidal ideation without intent or plan, denied auditory hallucinations, and did not exhibit delusional thinking. The psychiatrist had recently begun treatment with bupropion, which appeared effective. The final discharge summary addendum of November 16, 2023 noted no significant changes and that the patient had contracted COVID but made a full recovery. The discharge summary addendum described the patient as "fragile, difficulties with resilience, distress management and easily falls into dysphoric states when under stress and will need ongoing trauma work and work to help him ground and cope with distress." The final summary indicated that the patient had met most of his treatment outcome expectations and was prepared for discharge. He remained depressed but less so, he attended to his ADLs without prompting, he reported suicidal ideation approximately once every few days, and his group attendance was above 70 percent during most of his hospitalization. At the time of discharge, the patient was provided a primary diagnosis of bipolar I disorder in addition to the substance abuse disorders previously mentioned. He did not exhibit behavioral concerns during his DSH–Atascadero hospitalization.

**Findings**

The care and treatment provided to this patient were adequate.

The patient had significant improvement during his DSH–Atascadero hospitalization. At the time of admission, the patient was prescribed a large number of psychotropic medications, and the psychiatrist worked closely with the patient to determine an appropriate medication regimen. At the time of discharge, the number of prescribed medications was reduced from six to three.

The severity of the patient's primary symptoms was significantly reduced, including decreased depressed mood and suicidal ideation. He was medication adherent and attended his group and individual sessions. The patient also appeared to benefit from the skills learned to minimize his symptoms and to meet his treatment outcome expectations prior to discharge to the RJD EOP.

**Patient EE**

This 37-year-old patient's healthcare record was reviewed to assess the quality of care provided at DSH–Atascadero. Upon arrival at DSH–Atascadero, the patient was provided diagnoses of bipolar I disorder, current or most recent episode manic, severe; amphetamine use disorder, severe; antisocial personality disorder; and narcissistic personality disorder. He arrived at DSH–Atascadero with active prescriptions for lithium, Remeron, and Zyprexa prn. The patient arrived at DSH–Atascadero on September 20, 2023 from the CHCF PIP, where he was receiving acute care.

The patient arrived at DSH–Atascadero with an active PC 2602 order, and he had a history of several involuntary medication orders. His history was significant for multiple self-harm incidents, several of which were considered as serious suicide attempts. He also had multiple acute and intermediate placements and had received mental health services at the 3CMS, EOP, and MHCB levels of care. Upon his admission to DSH–Atascadero, the patient was described as floridly manic, psychotic, and extremely argumentative.

The treatment outcome expectations included elimination of suicidal ideation and self-injurious behaviors per self-report for at least 60 days, medication adherence for at least 60 days, identifying three coping skills to reduce suicidal ideation for 30 days prior to discharge; and identifying two triggers for agitation/irritability by the discharge treatment team meeting.

The patient was seen timely for the initial psychiatric assessment; however, the initial psychology assessment did not occur until eight days after arrival, and the seven-day initial IDTT meeting occurred two days late on September 29, 2023. The psychiatrist opined that the patient's presentation was more consistent with a diagnosis of borderline personality disorder rather than a mood or psychotic disorder, and he required highly structured inpatient psychiatric care and 24-hour nursing supervision due to his significant functional impairment. The psychiatrist also indicated that stabilization or elimination of the patient's chronic self-injurious behaviors was most appropriately treated at the intermediate level of care. The psychiatrist assessed the patient's suicide risk as moderate, and his risk for self-injurious behavior was high. The psychiatrist adjusted the patient's medications to clinically appropriate levels, and the patient agreed to take his medications.

The psychology admission note stated that the patient was too drowsy to complete the assessment, as he was falling asleep. The psychologist assessed the patient's suicide risk as moderate and indicated that individual and group DBT would be used to address the patient's symptoms and presentation. At the initial treatment team meeting on September 29, 2023, the patient reported that he did not agree with his diagnosis and did not want to take his prescribed medications, but that he would take the medications and comply with the PC 2602 order. The

patient was enrolled in 10 hours of treatment groups that included aggression reduction, healthy living, mental health wellness, preparing for discharge, sponsor group, staying safe, and tai chi.

The 30-day treatment team meeting occurred on October 20, 2023; at that time, the patient reportedly had no issues with peers and attended 85 percent of offered treatment, although he was only offered 1.5 hours weekly during the prior month. At the 60-day treatment team meeting, the patient was described as actively participating in treatment and attending groups. He reportedly socialized well on the unit and actively engaged with peers. He had no self-injurious behaviors or any behavioral incidents since his DSH–Atascadero admission and had attended 73.3 percent of 5.7 hours of offered treatment weekly. He also had met his treatment outcome expectations, as he had not engaged in any self-injurious behaviors since admission, was medication adherent, had not experienced suicidal ideation, and was able to identify at least two triggers for irritability or anger.

The patient was seen timely for psychiatric contacts. Review of the psychiatric progress notes indicated that the patient's symptoms responded well to the prescribed medications and medication adjustments. The patient remained medication adherent and did not require any prn or involuntary medication administrations. At a psychiatric contact on October 20, 2023, the patient was described as increasingly stable; and although still symptomatic, he was calmer and with more appropriate behavior than when he arrived. The psychiatrist noted increased speech, better organized thoughts, inflated self-esteem, poor insight, and fair judgment.

The patient attended weekly treatment groups, including a staying safe group facilitated by a psychologist. The patient attended the staying safe group for four sessions where he reportedly demonstrated euthymic mood and full participation at each session.

The discharge summary on November 9, 2023 indicated that the patient was medication adherent since his DSH–Atascadero admission, and he became increasingly engaged and appropriate with peers and staff after medication treatment. He was described as pleasant and cooperative with labile affect, slightly pressured speech, improved insight and judgment, no suicidal ideation or self-injurious behaviors, and inflated self-esteem that had reduced somewhat since admission. He maintained his ADLs without assistance and attended 85 percent of his offered groups. The treatment team recommended that the patient remain on medications, continue individual and group therapy, and continue substance use disorder treatment upon his return to CDCR.

The provided diagnoses at the time of DSH–Atascadero discharge were bipolar I disorder, current or most recent episode manic, severe; borderline personality disorder; antisocial personality disorder; and amphetamine use disorder, moderate. The patient's medications were adjusted during the course of his hospitalization, and he was discharged with prescriptions for lithium, Zyprexa, Vistaril prn, melatonin prn, as well as back up medications in the event of medication refusal.

The patient discharged to the EOP level of care at CMC on or about December 5, 2023.

**Findings**

The care and treatment provided to this patient were adequate.

The patient appeared to respond well to the treatment provided at DSH–Atascadero. His medications were adjusted with optimal response and adherence, despite his lack of insight regarding the need for medication treatment. The patient was provided group treatment; and although he was not consistently offered 10 hours weekly, he appeared to benefit from the clinical groups he attended. The patient met the treatment outcome expectations prior to discharge.

**Patient FF**

This 31-year-old patient's healthcare record was reviewed to assess the quality of care provided at DSH–Atascadero. Prior to the patient transfer to DSH–Atascadero, the patient was provided diagnoses of schizophrenia, major depressive disorder, cocaine use disorder, mild, and substance induced anxiety disorder; however, upon admission his diagnoses were changed to schizophrenia and cocaine use disorder. He was prescribed Risperdal Consta and oral risperidone, and he received his psychotropic medications by a PC 2602 order since January 10, 2024. His primary symptoms included bizarre behavior, weight loss, poor attention to ADLs, response to internal stimuli, social withdrawal, delusional thinking, and compulsive masturbation. The patient arrived at DSH–Atascadero on January 18, 2024 from the CMC MHCB.

Prior to the MHCB placement, he presented with poor ADLs, treatment refusal, disorganization, poor insight, and open masturbation. The treatment outcome expectations included no inappropriate masturbation for 30 consecutive days; improved ADLs by showering at least three times weekly for at least 30 days, wearing non-malodorous clothing, and maintaining his living space appropriately; attending at least 75 percent of offered treatment for at least 30 days; no incidents of group disruption due to response to internal stimulation or sharing delusional material; and maintaining medication adherence for 30 days.

The initial assessments and initial treatment team meeting occurred timely and were completed appropriately. The patient's mental status upon admission was described as very guarded with poor insight and fair judgment. His risk for suicide, self-injurious behaviors, and violence were assessed as low. The social worker, psychologist, and psychiatrist noted that the patient had delusional thinking, and he appeared to frequently respond to internal stimuli. At the seven-day initial treatment team meeting on January 23, 2024, the patient denied any history of mental illness or current symptoms. He reportedly made delusional statements regarding an officer at CMC and appeared to be responding to internal stimuli. The treatment team noted the patient's psychiatric goals had yet to be determined, but he was enrolled in nine hours of treatment groups weekly. The treatment team also addressed complaints from other patients that the patient was masturbating excessively at night, but the patient denied the behavior and refused to discuss any aspects of treatment with his treatment team. An interdisciplinary note on January 23, 2024 noted that the patient was moved to a different room on the unit in response to the complaints.

A January 29, 2024 weekly psychiatric note indicated that the patient had continued excessive masturbation behavior after he was moved to the second dorm location and did not want to discuss the behavior with his clinicians. During the patient's second week at DSH–Atascadero, his dormmates reported that the patient's excessive masturbation had become more aggressive and now occurred while he was staring at them. A psychology note on January 30, 2024 stated that the treatment team convened a special meeting to address the patient's behavior. The patient continued to deny the behavior despite numerous complaints and refused to acknowledge any aspects of mental health treatment with his providers aside from taking his medication under the PC 2602 order.

In response to the patient's behaviors, lack of insight, and treatment refusal; the treatment team documented plans to return the patient to CDCR. The social worker discharge summary stated that the treatment team was unable to assess the patient's progress towards his treatment outcome expectations, as the patient was a new admission. At the time of discharge, the patient's attitude and behavior were described as guarded and supercilious; he refused to discuss his thought content with his providers, and his attention was easily distracted by internal stimuli. He denied auditory and visual hallucinations, paranoia, suicidal or homicidal ideation. The treatment team recommended treatment at the EOP level of care and to continue the patient's medications under the PC 2602 order.

The patient discharged to the EOP level of care at CMC on February 7, 2024.

**Findings**

The care and treatment provided to this patient were inadequate.

The patient arrived at DSH–Atascadero clearly demonstrating acute psychosis, lack of insight, and treatment resistance. He was noted by clinicians across disciplines to be responding to internal stimuli and engaged in sexually problematic and aggressive behaviors in his dorm units which resulted in numerous complaints from his dormmates. Despite his lack of insight and sexually problematic behaviors, the treatment team decided that the patient had reached maximum benefit after only two weeks of hospitalization, and they did not attempt any further interventions. Although the patient had an active PC 2602 order; the psychiatrist did not make any medication adjustments, and the psychologist and social worker did not attempt to provide any behavioral interventions or alternative strategies to address the patient's behaviors and lack of insight regarding his mental illness. He was discharged prematurely and returned to CDCR without adequate treatment or the opportunity to meet his treatment outcome expectations.

**Patient GG**

This 41-year-old patient's healthcare record was reviewed to assess the quality of mental healthcare at DSH–Atascadero. At the time of admission, the patient was provided a diagnosis of unspecified schizophrenia spectrum or other psychotic disorder that was later updated to bipolar I disorder, current or most recent episode manic, with psychotic features.

The patient arrived at DSH–Atascadero on July 11, 2023 from the SVSP PIP where he was receiving care at the intermediate level of care, and he was referred to DSH–Atascadero for placement at his LRH and after he disengaged from his treatment team, demonstrated a decrease in his ADLs, became hyper-religious, and after he was observed talking to himself while walking around his cell naked for prolonged periods of time.

The patient was expected to meet the following treatment outcome expectations prior to discharge from DSH–Atascadero: increased medication adherence and group participation, development of three coping skills to manage distress, remaining physically and sexually appropriate, and attending to his ADLs appropriately. The DSH–Atascadero treatment team slightly modified the CDCR treatment outcome expectations.

The initial clinical assessments and initial seven-day treatment team meeting occurred timely. The initial psychiatric assessment was thorough and was completed appropriately. The psychology admission note documented an assessment of the patient's risk for suicide and violence as low. The patient's insight and judgment were described as poor to fair with no overtly irrational beliefs or delusional thought content noted. He had poor insight regarding his mental illness. The treatment team obtained collateral information from the patient's former partner in the community which confirmed a history of mood episodes that clarified the patient's diagnosis as bipolar I disorder. The initial seven-day treatment plan was completed timely on July 11, 2023, and it documented that the patient's primary initial treatment interventions were medication adherence and groups; however, the patient was only assigned to mental health wellness and sponsor groups.

The monthly treatment team meeting occurred two weeks late, but subsequent quarterly treatment team meetings occurred timely. The October 10, 2023 quarterly treatment team meeting was attended by the psychiatrist and RN, but the assigned psychologist and psychiatric technicians were not in attendance. The documentation of that meeting indicated that the patient was only offered three hours weekly of scheduled treatment. At his final quarterly treatment team meeting on January 7, 2024, the patient reportedly spent most of his time pacing the hallways reading his bible, there were no acute or apparent symptoms observed by staff, and there had been no significant behavioral incidents since his admission.

The patient was generally seen timely for monthly psychiatry contacts. Although he was not seen for psychiatry contact in September or October 2023, subsequent monthly psychiatric contacts were well documented and clinically beneficial. For example, the psychiatrist personally escorted the patient to Spanish-speaking groups to improve his attendance in January and February 2024, just prior to his discharge. The psychiatrist noted that the patient had remained psychiatrically stable since his admission and opined that the patient's hyper-religiosity, insomnia, and hypersexuality were indicative of mania.

There were only two documented psychology contacts for the patient during his DSH–Atascadero hospitalization. A January 9, 2024 psychology note indicated that the patient continued to deny mental health symptoms with little to no insight regarding his mental illness.

The patient's group attendance was generally poor. His attendance improved significantly after the psychiatrist began to personally escort him to his assigned groups; however, the group facilitators reported that the patient obtained little from the groups where he presented with hyper-religiosity.

The February 26, 2024 discharge summary noted that the patient had met most of his treatment outcome expectations when he was discharged to SVSP EOP on February 26, 2024. He participated in 75 percent of his groups in the month prior to discharge, the patient readily identified three coping skills he could use in times of distress or boredom, he generally remained sexually and physically appropriate, and he attended to his ADLs appropriately and without prompting. As a result, the DSH–Atascadero treatment team opined that the patient had achieved maximum benefit from treatment, as he remained stable despite his poor insight.

**Findings**

The care and treatment provided to this patient were adequate.

The patient appeared to benefit from the DSH–Atascadero hospitalization. The treatment team provided generally timely clinical contacts and appeared to build strong rapport with the patient, despite his lack of insight and reluctance to consistently engage in treatment or to adhere to his medication treatment. The patient remained psychiatrically stable and did not require any periods of enhanced observation, prn medications, or seclusion. The treatment team provided diagnostic clarity, and they worked to improve the patient's group attendance, despite his lack of insight and resistance to treatment. The patient was appropriately recommended for discharge to the EOP level of care.

**Patient HH**

This 33-year-old patient's healthcare record was reviewed to assess the quality of care provided at DSH–Atascadero. He was provided diagnoses of schizoaffective disorder, depressive type; opioid use disorder, severe; and amphetamine-type substance use disorder, severe. At the time of admission, he was prescribed chlorpromazine and Remeron. The patient arrived at DSH–Atascadero on March 3, 2023 from MCSP.

He was referred to DSH–Atascadero for intermediate care for stabilization of acute psychotic symptoms, to improve his coping skills, and to reduce suicidal ideation. He had a recent history of command auditory hallucinations, poor hygiene, insomnia, depression and poor food intake. Upon admission to DSH–Atascadero, the patient reported that he was sleeping only one hour each night, had no appetite, and he endorsed command auditory hallucinations telling him to hurt himself and his cellmate and to "go ballistic" in the dayroom. He was placed on 15-minute enhanced observation at that time due to his history of multiple suicide attempts.

The treatment outcome expectations included consultation with psychiatry within 90 days regarding the appropriate medication regimen; adherence with all medications for 90 days; increased engagement and participation in treatment activities to at least 50 percent in 90 days;

development of insight and improved coping; and identification and application of three new coping skills in the next 90 days.

The psychiatric and psychology admission assessments occurred timely. The psychiatric admission assessment on March 3, 2023 noted that the patient reported a suicide attempt by heroin overdose two days prior to his admission to DSH–Atascadero. The patient stated that his cellmate revived him with salt water, and he did not report the incident to any staff. The psychiatrist provided appropriate diagnostic rationale and adjusted the patient's medications. The patient told the psychiatrist he had been hospitalized more than 100 times due to auditory hallucinations, suicide attempts by overdose, or cutting himself; he also reported a history of hospitalization due to violence toward others. The psychiatrist described the patient's mood as depressed and angry with fair insight and sociopathic judgment. The admission psychology progress note on March 8, 2024 described the patient as superficially cooperative with minimal insight. The psychologist prescribed CBT for psychosis and DBT specialized groups to address the patient's clinical needs. The patient participated in a social work psychosocial assessment on March 13, 2023, and the social worker recommended medication, DBT groups, psychoeducation, and SUD treatment as primary interventions.

There was no initial seven-day treatment plan or 30-day monthly treatment plan located in the healthcare record. Quarterly treatment team meetings occurred on June 6, 2023, September 5, 2023, and December 5, 2023 which were attended by the required staff. At the June 6, 2023 meeting, the patient continued to report command auditory hallucinations. He was enrolled in 11 hours of core treatment groups weekly and participated in 0.4 hours per week of individual treatment. During the treatment team meeting on September 5, 2023, the patient reported significant command auditory hallucinations, depression, and paranoia, but reported that his suicidal ideation was significantly reduced. The treatment team noted that the patient had met or partially met his CDCR treatment outcome expectations at that time. At the final quarterly treatment team meeting on December 5, 2023 prior to discharge, the patient was described as generally stable, medication adherent, and he had participated in individual treatment consistently despite poor group attendance.

No psychiatric progress notes were located in the healthcare record between the psychiatric admission assessment on March 3, 2023 and the monthly progress note on August 7, 2023. The patient was seen timely for monthly psychiatric contacts after August 7, 2023. The documentation indicated that the patient and psychiatrist worked collaboratively to determine the most effective combination of medications. The patient remained motivated and medication adherent and was ultimately stabilized on clozapine, buspirone, lithium, loxapine, and Vistaril.

No psychology progress notes were located in the healthcare record between the psychology admission assessment on March 8, 2023 and July 5, 2023; it appeared that the patient was seen weekly or biweekly for psychology contacts for the remainder of his hospitalization. The individual sessions were well documented, and the interventions provided during sessions aligned with the treatment plan and goals.

The patient was offered core treatment groups during his DSH–Atascadero hospitalization. He was offered between seven and nine hours of core treatment groups weekly. His group

assignments included healthy living, mental health wellness, preparing for discharge, staying safe, and DBT groups. The documentation indicated that the patient's group attendance was often poor, and he attended between 47 to 51percent of his offered groups; he achieved 82 percent attendance for one month.

The December 5, 2023 discharge summary stated that the patient met most of his treatment outcome expectations when he discharged on December 14, 2023. His symptoms improved with medication treatment, and he was medication adherent. Although his group treatment participation was at approximately 50 percent, the patient attended all of his scheduled individual treatment sessions and received appropriate and effective interventions and support. The patient was also able to improve his insight regarding his mental illness and to develop adequate coping skills. At the time of discharge, the patient was generally stable and requested return to CDCR.

**Findings**

The care and treatment provided to this patient were adequate.

Although the documentation of some of the clinical contacts was not located in the healthcare record, the patient was generally seen timely for assessments and treatment team meetings. The interventions provided were appropriate and consistent with the treatment plan and goals. Additionally, he met his treatment outcome expectations with improvement in the symptoms that led to his hospitalization.

**APPENDIX C2**
**Coalinga State Hospital (DSH – Coalinga)**
**Dates Visited: June 10, 2024 – June 13, 2024**
**Review Period: October 1, 2023 – March 31, 2024**

**Patient A**

This 52-year-old patient's healthcare record was reviewed to assess the quality of care provided at DSH-Coalinga. In CDCR, the patient was diagnosed with schizoaffective disorder with symptoms that included thought distortion, ideas of reference, paranoid delusions, auditory hallucinations, depressed mood, social isolation, and anhedonia. Prior records also referenced a history of three prior suicide attempts, including one in 2016 involving razor swallowing, and two attempts in 1998—one by overdose and another by attempted hanging. The patient had been maintained on involuntary medication orders since 2019. CSP/Sac referred the patient for intermediate care to address significant impairment due to mental illness, ongoing paranoia, poor attention to ADLs, and intermittent suicidal ideation.

The patient was admitted at DSH-Coalinga on July 19, 2023. The patient's diagnoses were changed upon admission to schizoaffective disorder, unspecified; major depressive disorder, recurrent episode, unspecified; type two diabetes; and hypertension. The patient arrived at DSH-Coalinga with an active involuntary medication order (PC 2602) for danger to others, which was set to expire on January 11, 2024. During the hospital stay, the patient was prescribed Zyprexa, Cogentin, long-acting injectable haloperidol decanoate, and Vistaril for agitation, verbal and physical aggression, and sleep.

The psychiatrist's initial assessment was timely and indicated that the use of involuntary medication might have masked some of the symptoms documented in CDCR's referral. The psychologist completed their initial assessment on July 26, 2023, documenting several positive suicide risk factors as well as several protective factors they believed were sufficient to mitigate the patient's risk and provide a low-risk rating. This reviewer observed in the records that the patient had three documented suicide attempts, was divorced, had minimal contact with his adult children, had prominent psychotic and depressive symptoms, intermittent suicidal ideation, and had been homeless prior to incarceration, suggesting minimal protective factors.

DSH-Coalinga adopted the referring institution's treatment outcome expectations without modifications. The treatment goals indicated that within 90-180 days, the patient would regain insight into his mental illness, evidenced by a reduction in psychotic features to a rating of four or below on a ten-point scale; rate his distress from paranoia at a four out of ten or lower; participate in a combination of individual and group therapy at a level of at least 75%; and demonstrate an increased level of functioning by promptly and independently attending to activities of daily living, including showering and maintaining a clean cell.

The patient's DSH-Coalinga healthcare record did not demonstrate that the treatment plan had been implemented as written. Despite the plan indicating that the patient would participate in individual psychotherapy, there was no evidence in the healthcare record that such therapy had been offered. Regarding group treatment, the healthcare record did not allow for determining

whether the hospital offered the court-ordered minimum required hours for weekly treatment. Further, despite goals for group attendance, the clinical documentation did not provide hours offered and attended by type (structured versus unstructured) or topic. The treatment plan did reference the groups in which the patient was “enrolled,” including leisure activity groups for socialization, dialectical behavior therapy groups for emotion regulation, managing mental illness, medication education, and trauma, but there was no way of knowing whether these groups were consistently offered or attended based on record review. The social worker met with the patient at least monthly for case management, but these contacts were generally limited to brief check-ins and a review of the patient’s progress. In one instance, the patient expressed interest in obtaining a job; however, the social worker noted that they were unable to validate the patient’s Social Security number, further documenting that there was “no process in place” to obtain the patient's Social Security card at the time. Thus, the patient was deemed ineligible for a job during admission. A positive finding was the psychiatrist generally met with the patient weekly during admission for mediation monitoring, intermittent adjustments, assessment of side effects, and education.

During August and September 2023, records suggested the patient was generally compliant with treatment recommendations. The patient was attending some groups and was described as medication adherent with all medications, while still presenting with psychotic symptoms, mood symptoms, and intermittent passive suicidal ideation. Clinical notes, dated September 11, 2023, suggested the patient had not yet met any of his treatment outcome expectations. A provider did document that the patient had been communicating with his mother via telephone.

During September 2023, it was documented that the patient “missed” his monthly Court ordered IM dose of antipsychotic medication. Two experts reviewed the record to determine whether the missed dose resulted from patient refusal or a failure to administer as prescribed. However, neither expert could find a document clarifying the reason for the missed dose. There was some indication that a psychiatrist might have attempted to change the patient's medication from Haldol to lithium and Zoloft during September 2023, as there was reference to a statement from the patient that he believed only Haldol was effective and that lithium and Zoloft were "not good for his body." Still, it remained unclear whether this was the reason for the missed dose of involuntary antipsychotic medication that month.

During October 2023, the patient had reported to staff that he felt overcrowded in the state hospital and preferred the ability to walk away from others. He rated his depression as moderate and indicated that he continued to experience intermittent suicidal thoughts. On October 6, 2023, the patient refused his Court-ordered Haldol injection, prompting an officer to assist medical staff in administering the medication involuntarily. Although the patient ultimately received the IM medication, he became physically aggressive toward the officer upon leaving the exam room and verbally threatened the psychiatrist, saying he would "put them down." As a result, the psychiatrist ordered five-point restraints for danger to others. The psychiatrist documented that the patient exhibited paranoid persecutory delusions in acute exacerbation due to Haldol levels fluctuating lower, suggesting the change in behavior was attributed to the missed dose of antipsychotic medication during September 2023.

During the final treatment team meeting on October 6, 2023, providers noted that the patient did not attend as he had been escorted to R&R for transfer to another institution. While the team noted that some of the sending institution's treatment outcome expectations had been "partially met," the reviewer noted that the team's documentation found that none of the hospital's own individualized goals for this patient were met and all had expected dates of completion set for one to two months after his discharge. The treatment team further documented that the patient's group attendance was at 67%. However, they still did not specify the group hours offered, the group type (structured versus unstructured), or the group topic, making it difficult to determine whether the referenced attended groups were relevant to the patient's presenting problems or limited to unstructured leisure activities. Either way, the goal for treatment participation had not been met prior to discharge.

The discharge summary indicated that the patient required discharge to an MHCB due to psychotic decompensation with aggression and thoughts/plans to harm others. At the time of discharge, the diagnostic section described the patient as exhibiting chronic paranoid schizophrenia with chronic paranoid delusions of persecution, recent physically aggressive behavior, and medication non-adherence, including refusal of both court-ordered and voluntary medication. The patient transferred to an MHCB at CSP/Corcoran.

**Findings**

The care and treatment provided to this patient were inadequate. The treatment plan was not implemented as planned, including offering individual psychotherapy. Records did not allow the reviewer to determine group hours offered and attended despite the patient's group treatment participation goals. Documentation related to the missed dose of Court-ordered antipsychotic medication in September 2023 did not clearly indicate whether the missed dose occurred due to patient refusal or due to failure to administer. By early October 2023, records suggested the patient had rapidly decompensated, became physically aggressive, presented as a danger to others, and required five-point restraints. The patient was then discharged to the CSP/Corcoran MHCB instead of an acute care program.

**Patient B**

This 48-year-old patient's healthcare record was reviewed to evaluate the quality of care provided at DSH-Coalinga. Prior to the current admission the patient was in the EOP level of care and had one recent MHCB admission. SQ referred the patient for intermediate care for significant impairment due to mental illness and ongoing suicidal ideation. The patient arrived at DSH-Coalinga on October 12, 2023.

The psychologist conducted their initial suicide-risk assessment using the C-SSRS and provided a sufficiently justified low-risk rating. Individual psychotherapy was not recommended or offered during admission. Social worker contacts were generally used for brief checks-ins with a review of progress toward discharge objectives. Social worker progress notes did not reference implemented therapeutic interventions.

This psychiatrist completed their initial assessment timely. Upon admission, the patient was diagnosed with both schizophrenia and schizoaffective disorder, as well as amphetamine-type substance use disorder. The provider initially prescribed Zyprexa. The psychiatrist's monthly progress notes suggested that the contacts occurred during treatment team meetings, as the provider mentioned the presence of other team members. However, there were also progress notes written in the interim suggesting that one-on-one contacts occurred weekly or biweekly during admission, though several of the corresponding notes for those sessions were handwritten and illegible. On November 8, 2023, the psychiatrist documented that the patient may have been responding to internal stimuli, leading to medication adjustments. Oral Prolixin was discontinued, and the patient was started on long-acting injectable Prolixin Decanoate for psychosis. However, the patient accepted only one dose before refusing the medication and requesting discontinuation.

Regarding the treatment plan, DSH-Coalinga adopted the referring institution's treatment outcome expectations, including objectives for maintaining 90% medication adherence over a two-month period; increasing coping skills for managing auditory hallucinations; learning and applying dialectical behavior therapy (DBT) skills such as mindfulness; and implementing reality testing skills for managing auditory hallucinations. The plan indicated also that the patient would increase his treatment compliance and engagement by attending 50% of scheduled groups without prompting for at least one month prior to discharge.

The healthcare record did not indicate whether the hospital provided the Court-ordered minimum hours for weekly treatment. Additionally, treatment plans were inconsistent in how they reported on group data, including attendance, group type (structured versus unstructured), and topic, preventing the reviewer from drawing meaningful conclusions about the appropriateness of offered group treatment and progress toward related goals. Notably, this patient consistently expressed a lack of interest in attending group treatment during admission and participated in only 12% of unspecified group types.

Regarding the patient's hospital course, at the time of the seven-day treatment team conference, the patient continued to endorse paranoia and auditory hallucinations while denying depressive symptoms and suicidal thoughts. At the 30-day treatment team meeting, the patient denied all psychiatric symptoms. In late November 2023, the patient met with the psychiatrist and reported that he had been feigning symptoms since his initial incarceration in the county jail. The patient explained that other incarcerated individuals had informed him that a serious mental illness might result in a reduced sentence. In response to the patient's report, all psychiatric medications were discontinued.

Despite the patient's report that he had been feigning symptoms, the hospital retained him for an additional two-months to monitor for potential changes in mental status in the absence of psychotropic medication. During the December 2023, January 2024, and February 2024 treatment team conferences, the patient denied all symptoms of a serious mental illness and continued to report that he had never experienced genuine symptoms of a serious psychological disorder during his lifetime.

The discharge documentation stated that the patient had achieved maximum benefit from hospitalization. The treatment team acknowledged that the patient had not met his treatment outcome expectations but provided a sufficient rationale for discharge. The discharge summary referenced the patient's report of feigning symptoms in hopes of an early release, adding that the patient continued to refuse treatment and medication while denying psychiatric symptoms during the remainder of his inpatient admission. The discharging provider further indicated that the patient remained symptom-free without psychiatric medication for eight weeks prior to discharge. The patient was discharged on February 14, 2024.

**Findings**

The care and treatment provided to this patient were adequate. The patient admitted to feigning psychiatric symptoms during November 2023, explaining that he believed it would result in an early release. The hospital providers appropriately discontinued psychiatric medication and monitored the patient for signs of decompensation for an additional eight-weeks, instead of discharging him abruptly based solely on his self-report. However, it was concerning that the hospital retained the patient's diagnosis of schizophrenia at discharge, despite consistently documenting the absence of psychiatric symptoms without medication over an eight-week period. Additional concerns highlighted in this review included problems with documenting group treatment data and illegible psychiatry notes that were handwritten.

**Patient C**

This 24-year-old patient's healthcare record was reviewed to assess the quality of care provided at DSH-Coalinga.

The patient was diagnosed with Major Depressive Disorder, severe, recurrent; Opioid Use Disorder, mild on maintenance therapy in controlled environment; Cannabis Use Disorder, Mild; Alcohol Use Disorder, Mild; and Pedophilic Disorder, Non-Exclusive Type, Sexually Attracted to Females. Notably, while one psychiatric provider maintained these diagnoses throughout the current admission and in their discharge summary, another psychiatric provider changed the diagnoses to Adjustment Disorder with mixed disturbance of emotion borderline personality disorder in progress notes for their contacts. The final treatment plan diagnoses also differed from the diagnosis in the discharge summary.

Psychiatric medications were changed during the current admission. During February 2024, the patient was prescribed aripiprazole for depression; buprenorphine/naloxone HCL for opioid use disorder; escitalopram oxalate for Major Depressive Disorder; lithium carbonate melatonin; and prazosin HCL for nightmares. While the patient refused medications intermittently during the first two months of admission, adherence subsequently improved.

CMF referred the patient for intermediate care to address danger to self concerns, including ongoing suicidal ideation, and a significant impairment due to mental illness. The DSH inpatient admission occurred from December 20, 2023 through March 25, 2024.

On December 20, 2023, both the psychiatrist and psychologist completed their initial assessments, including a detailed review of the patient's history and presenting problems. The psychologist completed a suicide risk evaluation using the CSSRS and rated the patient's suicide risk as moderate. The patient had a documented history of suicide attempts and continued to endorse thoughts of suicide. The suicide risk assessments were updated on January 18, 2024 and March 14, 2024. Despite reporting ongoing suicidal ideation with increased stressors and safety concerns on the unit during March 2024, the evaluating psychologist lowered the suicide risk rating from moderate to low without sufficient justification.

This patient's treatment outcome expectations (TOEs) included 90-days of low acute suicide risk, demonstrating increased insight into his mental illness, and developing coping skills for effective mood management.

Psychiatric providers generally offered weekly contacts, but there were several weeks when two contacts were completed. Of note, the LCSW and psychiatric provider did reference therapeutic interventions during their sessions, including counseling with a review of healthy coping strategies for stress management and interpersonal issues. This psychiatric provider also documented that the patient responded well to medications, redirection, and other interventions during admission. The clinical documentation confirmed that DBT interventions were implemented as planned. Additionally, the social worker completed social security paperwork, and a community resource needs assessment. Psychology contacts were limited to assessments without treatment interventions.

The healthcare record did not allow for determining whether DSH-Coalinga offered the Court-ordered required minimum hours for weekly treatment or for interpreting total hours of structured ("core") and unstructured groups offered and attended. According to treatment plans, this patient was "enrolled" in core treatment groups, including for social skills, trauma, "hope and spirituality," substance use, and two or three different Dialectical Behavior Therapy (DBT) groups. During February 2024, the patient was also "enrolled" in at least ten-hours of weekly *supplemental activities*, of which he attended 96% during the preceding 30-day period. Total hours offered were not provided for this period. During March 2024, the patient's group attendance was described as "sporadic" at 75%, which he attributed to safety concerns and an alleged assault by a peer on the unit. After alleging the assault and ongoing safety concerns, the patient did not attend group activities.

Upon admission, the patient was placed on enhanced observation due to "acute danger to himself." The observation order was removed on December 22, 2024, and diagnoses were briefly changed to a combination of Major Depression and Borderline Personality Disorder. On January 17, 2024, the patient was placed on direct one-to-one observation after reporting suicidal ideation with an undisclosed plan.

During late February 2024, the patient began reporting safety concerns and harassment from peers due to the nature of his charges, and it was documented that he presented with ongoing depressive symptoms, "passive suicidal ideation," and moderate risk for suicide. Additionally, the patient reported stress related to a CDCR-115 for ordering pornographic material; nightmares about being assaulted; and triggering of trauma symptoms during a group which required staff

intervention. On February 26, 2024, a psychiatrist indicated that the patient had threatened a hunger strike to expedite a reimbursement but returned to eating that same day after redirection.

On March 9, 2024, the patient yelled at a peer and subsequently informed staff that he was in danger on the unit. On March 12, 2024 he reported an assault by another patient. Although staff documented that they were unable to confirm the assault occurred based on camera footage, the patient was placed on "enhanced observation and clinical status review" (15-min checks) for "danger from others," which was discontinued on March 14, 2024 after the patient reported feeling safer in the unit and "committing to safety."

The patient was discharged to the EOP level of care and transferred to CSP/LAC on March 25, 2024. The discharge rationale indicated, the treatment team "feels that [patient] has achieved the maximum benefit of hospitalization and his clinical needs can be met in an enhanced outpatient program (EOP) setting."

The psychiatrist's discharge rationale was not clearly linked to achieving or exhibiting sufficient progress toward the treatment outcome expectations. For example, one TOE required 90-days of low acute suicide risk, which arguably had not been met based on clinical notes which referenced ongoing suicidal thoughts, new stressors, and safety concerns. Regarding the goal for demonstrating effective mood management coping skills, the discharging provider stated that the patient had been observed playing with a handheld gaming device (referred to as a "game-boy"), talking to peers and family, pacing, and going to groups; however, the gaming device had been taken away during late February 2024 and was not available in CDCR and the patient stopped interacting with peers and attending groups due to safety concerns in early March 2024. Lastly, regarding demonstration of increased insight related to mental illness, the discharge documentation referenced only that the patient "paces to manage feelings of depression." Additionally, the discharge summary provided a diagnosis of Major Depressive Disorder without a personality disorder, whereas the final treatment plan diagnosed the patient with Adjustment Disorder and Borderline Personality Disorder. There was no discussion regarding the ongoing diagnostic discrepancies.

**Findings**

The care and treatment provided to this patient were adequate. Positive aspects included attention to medication management, frequency of psychiatric provider contacts for monitoring and therapeutic interventions, and implementation of dialectical behavior therapy which was clinically indicated for this patient. The social worker also attended to pre-release planning needs during admission and offered interventions during their encounters. However, several concerns were identified during this review, including diagnostic inconsistencies throughout the admission without reference to discussions among providers for resolution/agreement; underestimation of risk during March 2024; offered group hours were not clearly documented; and the content of several handwritten psychiatry progress notes could not be interpreted. While clinical documentation leading up to February 2024 suggested the patient may have been appropriate for the EOP level of care, the discharge in March 2024 appeared abrupt and seemingly related to his interpersonal problems and expressed safety concerns on the unit as opposed to evidence of goal achievement.

**Patient D**

This 45-year-old patient's healthcare record was reviewed to assess the quality of care provided at DSH-Coalinga.

The patient was initially diagnosed with Schizophrenia, and the psychologist continued to document this diagnosis through the end of admission; however, the psychiatrist had changed this diagnosis within 30-days of admission to Major Depressive Disorder, recurrent; amphetamine-type substance use disorder; unspecified opioid related disorder; and unspecified trauma related disorder. While the psychiatrist's and psychologist's diagnoses remained discrepant during admission, suggesting a lack of communication, the psychiatrist provided a useful diagnostic clarification in their discharge summary. The psychiatrist explained that based on one month of observation and a detailed records review, they concluded that the patient's auditory hallucinations were trauma related and not the result of a psychotic disorder and that historical auditory hallucinations with bizarre content likely occurred during amphetamine intoxication or a severe Major Depressive Episode.

The patient was initially prescribed olanzapine and long-acting injectable Abilify Aristida for psychosis; trazadone (for sleep; and Cogentin for Parkinsonian side effects of antipsychotic medication.

The DSH inpatient admission occurred from October 5, 2023 through February 28, 2024. CSP/LAC referred the patient for intermediate care to address a significant impairment due to mental illness.

The initial psychiatric admission assessment was thorough and occurred timely on October 5, 2023. On this date, the patient was placed on line of site orders due to command auditory hallucinations instructing him to cut off his genitalia. During the initial assessment interviews, the patient reported increased anxiety, shame, and guilt due to a belief that God was punishing him for being a "homosexual." The patient's statements during assessment suggested diminished strength or absence of prior protective factors for mitigating risk, including his relationship with his wife and his religious beliefs and practices.

On October 12, 2023, the psychologist completed the initial assessment which revealed that the patient experienced mood disturbances after recently disclosing his sexuality leading to daily internal conflicts. The psychologist noted that the patient, raised in a Christian family, feared losing support due to his "sexuality," "lifestyle," and "choices." Explaining the event that resulted in observation on October 5, 2023, the patient reported hearing the voice of his deceased friend commanding him to dismember his genitalia and confirmed that he thought about following through with the self-harm act. The psychologist attributed these hallucinations to religious guilt and shame related to the patient's sexuality.

The psychologist assessed the patient's suicide/self-harm risk as low on October 12, 2023, despite the patient's history of multiple suicide attempts and prior self-injurious behavior incidents, the most recent of which occurred during July 2023, expressed daily thoughts of

dismemberment, and his recent placement on observation status due to voices commanding him to remove his penis. The psychologist also noted, "death wishes, wish to be dead, but denies any kind of suicidality." The patient also disclosed that he had a family member die by suicide and that his most recent suicide attempt occurred early that year during March 2023, at which time he attempted to die by heroin overdose. Further, the psychologist's documented protective factors on this date (religion, family responsibility, social network, belief that suicide is immoral) were likely ineffective for risk mitigation, as the patient perceived himself as a burden, feared family rejection for being gay, and exhibited significant feelings of shame and guilt. The suicide risk evaluation was updated on February 27, 2024, and also resulted in a low-risk rating.

The patient's treatment plan included several goals, including to think before acting and refrain from self-injurious behavior for 30 days; avoid self-harm during hospital admission; identify two to three distracting behaviors to replace suicidal thoughts; recognize one to two triggers for depressed mood within four weeks; attend 70 to 80% of treatment programming over the next 60-day period; and learn assertive communication skills to openly express his needs and opinions. Treatment plans did not address the underlying issues driving the patient's current crisis, such as recommending and implementing interventions for addressing shame, guilt, fear of losing prior support systems, self-acceptance, and exploring options for communicating with family/spouse. The patient's significant substance use history and voices with self-harm content also were not included in the treatment plan.

This reviewer noted that psychotherapy was indicated for this patient to address the driving factors to his current crisis and hospital admission; however, this was not offered or considered in the assessments or treatment plans. Psychiatric monthly indicated that the patient had been seen "with the treatment team," suggesting nearly all monthly psychiatric encounters occurred during treatment team meetings instead of as separate individual provider contacts. The healthcare record did not allow for determining whether DSH-Coalinga offered the Court-ordered required minimum hours for weekly treatment. Clinical documentation indicated that during February 2024 the patient's group participation was at 58% and perhaps at 76% overall during the entirety of the admission; however, this data was not meaningful without including group hours offered. Additionally, providers noted that the patient missed most of the groups he did attend due to arriving late and leaving early; however, there was no indication that this issue was explored or addressed with the patient.

Regarding the hospital course, clinical documentation suggested that the patient began reporting some improvements in symptom severity during November and December 2023, with more significant improvements noted in January and February 2024. During this period, the patient rated his depressed mood at a severity of four out of ten on a ten-point scale. On February 6, 2024, the patient had one behavioral incident when staff searched his cell and found altered wires and springs in a white envelope which the patient claimed he was holding for a peer. Medications were adjusted during admission, and the patient responded well, remaining medication-adherent. The patient did not further endorse suicidal ideation after the initial assessment. The patient's group treatment participation varied between 58% and 76%, although specific hours offered and attended were not recorded. The February 2024 suicide risk evaluation remained largely unchanged with a low rating and similar protective factors which should have been explored further to assess their effectiveness in mitigating his risk. The

clinician continued to note that the patient's Christian belief deterred him from attempting suicide but did not seem to consider his prior suicide attempts, including the most recent one by intentional drug overdose one year prior. The clinician also documented that the patient decided not to come out to his family or other members of his support system, and there was no evidence of related supportive interventions during admission.

The patient was clinically discharged to the EOP level of care on February 28, 2024. Although the discharge summary claimed that the patient had met all of his treatment outcome expectations, the statements used to support this claim were vague and there was conflicting documentation elsewhere in the record. For example, the discharge summary indicated that the patient used coping strategies such as pacing, listening to radio, and talking to peers; identified that hearing voices (mother's and friend's) triggered his thoughts of self-harm; and that he met his goal for assertive communication by doing "a good job expressing how he feels in a team setting." However, specific coping skills for managing voices and thoughts of self-harm were not referenced, and the final treatment plan indicated that goals for identifying and managing triggers for depression and for treatment participation had not been met.

**Findings**

The care and treatment provided to this patient were inadequate. Inadequacies included assessments, treatment plans, and overall care. While the patient demonstrated some progress during admission and the discharging psychiatrist ultimately justified the diagnosis at discharge, there were several concerns identified during this review. Suicide risk assessments underestimated the patient's risk and overestimated the strength of documented protective factors. Protective factors required further exploration, as there was evidence that they may have served as risk factors for self-harm and may have motivated a prior suicide attempt one year prior. Diagnostic discrepancies between the psychiatrist and psychologist were not discussed or resolved prior to discharge, despite the psychiatrist changing the diagnosis 30 days after admission. Treatment plans failed to address the precipitating factors to the patient's recent crisis and interventions were missing for managing voices with self-harm content regardless of their etiology. Individual psychotherapy was clinically indicated to address this patient's significant guilt, shame, and fear of losing support systems which at times resulted in thoughts of self-mutilation; however, this was not considered or implemented. Further, the evaluating psychologist used terms that were inappropriate such as "lifestyle" "choices" and "sexuality" when referencing the patient's self-identification as a gay male, which suggested the need for training on serving LGBTQ+ populations. Additionally, there was conflicting information regarding whether the patient met all treatment objectives prior to discharge, and providers did not explore or address barriers to group treatment participation or consider offering individual psychotherapy as an alternative while addressing identified barriers.

**Patient E**

This 40-year-old patient's healthcare record was reviewed to assess the quality of care provided at DSH-Coalinga. The patient was diagnosed with Schizoaffective Disorder Depressive Type; Unspecified Alcohol Related Disorder; Unspecified Cannabis Related Disorder; and Unspecified Amphetamine-Type Substance Related Disorder. While some providers also diagnosed the

patient with Post Traumatic Stress Disorder (PTSD) with a sufficient diagnostic rationale, the diagnosis was absent in the discharge summary without justification for removal. Psychiatry indicated the patient refused a recommended trial of clozapine for treatment-resistant symptoms and that the patient did not meet criteria for involuntary medication. The patient, however, remained medication adherent with his prescribed Prozac; olanzapine; and Remeron.

The DSH inpatient admission occurred from August 10, 2023 through February 14, 2024. Salinas Valley State Prison (SVSP) referred the patient for intermediate care to address paranoid ideation, auditory hallucinations, limited insight, and inadequate coping skills. Delusions that impacted the patient's sleep were also referenced in the record.

The initial psychiatric assessment was completed timely on August 10, 2024. The assessment discussed the reason for inpatient referral and provided a thorough biopsychosocial history, including relevant mental health history, symptoms, suicide/self-harm risk, and response to treatment during the preceding year. During assessment, the patient presented with depressed mood, anxiety and panic attacks, auditory and visual hallucinations, limited insight into his mental illness, and a trauma history with symptoms supporting a PTSD diagnosis. Assessment documentation also referenced four documented suicide attempts between 1997 and 2020, which involved two incidents of attempted hanging and two incidents of wrist cutting. The patient also endorsed a history of self-injurious behavior and suicidal thoughts as recent as a few months prior to admission. The social worker's initial assessment emphasized that the patient maintained a delusion or fixed belief that others would attempt to pull out his teeth while he slept, which at times resulted in sleep avoidance and becoming "stressed out" for several days.

A psychologist completed two suicide risk assessments during admission. The initial CSSR-S completed at intake rated the patient's suicide risk as moderate; however, a low-risk rating was provided in the narrative section of the same document without sufficient justification for the discrepant rating. A treatment plan completed around this time appropriately rated the patient's suicide risk as moderate. The psychologist also completed a follow up suicide risk assessment using the CSSR-S prior to the February 2024 discharge, which resulted in a low-risk rating.

The treatment plan outlined goals for the patient to participate in 80% of mental health treatment to learn skills for managing psychosis and delusional thinking, identify three coping skills for managing his mental health, demonstrate improved insight about his mental illness by verbalizing reasons for medication adherence, and identify at least three negative effects of substance use on his mental health. The plan also included goals for the patient to communicate prosocially and manage negative emotions and impulsivity. Notably, some of the individualized treatment goals developed at the hospital were not met before discharge and had expected completion dates after the discharge date.

Provided treatment included medication management, structured and unstructured group treatment. A social worker met with the patient to review progress towards treatment outcome expectations, but the note primarily referenced case management activities rather than specific therapeutic interventions. Records suggested the psychologist met with the patient to update assessments, but not to provide individual psychotherapy despite the documented recommendation for this modality.

The healthcare record did not allow for determining whether DSH-Coalinga offered the Court-ordered required minimum hours for weekly treatment. The treatment plans did, however, indicate that the patient was "enrolled" in groups for dialectical behavior therapy (DBT), anger management, managing mental illness, changing thinking, medication education, and a 12-step program. The patient reportedly attended 75% of offered groups, but this information was not meaningful without data for weekly group hours offered.

The patient had one behavioral incident on December 13, 2023, wherein he became verbally aggressive toward two staff members after they instructed him to step away from the exit doors. Clinical notes indicated that the patient had identified three coping skills for managing psychosis and delusional thinking, including listening to music, walking, and watching television. The patient also identified that substance use led to neglecting his activities of daily living (ADLs), such as showering, eating, and taking medication. Still, despite medication adherence, through the date of discharge, this patient continued to endorse depressive symptoms, auditory hallucinations, and a delusional belief that others would attempt to pull out his teeth while he slept. The delusion continued to cause distress and sleeplessness.

The patient was discharged to the EOP level of care on or around February 14, 2024. The treatment team further indicated that while progress was observed during admission, the patient only *partially met* most of the referring institution's treatment outcome expectations and did not meet the majority of the treatment objectives developed during hospital admission. Still, the treatment team opined that the patient had "achieved maximum benefit" from hospitalization and that further hospitalization would not lead to further reduction in symptoms.

**Findings**

The care and treatment provided to this patient were inadequate. Although the patient appeared to present with symptoms resistant to prescribed medications and he declined a trial of clozapine, the treatment plan did not effectively address several problems noted during initial assessment which persisted during hospitalization, including anxiety, panic attacks, depressed mood, trauma, and symptoms suggestive of PTSD. The discharge decision was not linked to the treatment objectives from the referring institution or individualized goals developed by the DSH-Coalinga treatment team. Instead of considering modifications to the treatment plan for effectiveness, the discharging team/provider documented a vague and unsupported claim that the patient "achieved maximum benefit" from hospitalization and that further hospitalization would not lead to a further reduction in symptoms. Further, individual psychotherapy was recommended for this patient but there were no progress notes or reference to this modality in other documentation confirming it was offered as planned. Lastly, there was a lack of documented interdisciplinary discussion regarding the PTSD diagnosis and perceived barriers to treatment/discharge objectives which was necessary for determining whether interventions required modification for effectiveness.

**Patient F**

This 37-year-old patient's healthcare record was reviewed to assess the quality of care provided at DSH-Coalinga. At DSH-Coalinga, the patient was diagnosed with Major Depressive Disorder, Recurrent, with Psychotic Features; Autism Spectrum Disorder; Alcohol Use Disorder; Opioid Use Disorder; Cannabis Use Disorder; Sedative Hypnotic or Anxiolytic Use Disorder, Severe; Cocaine Use Disorder; Amphetamine Type Substance use Disorder, Severe; and Antisocial Personality Disorder. The current inpatient admission occurred from June 1, 2023 through December 22, 2023.

The psychiatric provider completed their initial assessment timely. Admission medications included Cymbalta, diphenhydramine, lurasidone, and propranolol. Cymbalta and lurasidone were discontinued during June 2023, and he was started on lithium and Seroquel. Lithium had to be discontinued one week later due to impaired kidney function; the patient was subsequently started on Depakote. Seroquel and Depakote doses were optimized. Seroquel was discontinued due to the patient's level of sedation, and Prolixin was started. Celexa was added for depressive symptoms. Multiple medication changes occurred during admission due to side effects. For example, Depakote was decreased due to tremors and drooling. Remeron was added. Suboxone was ultimately prescribed during December 2023. The patient's prescribed medications at discharge included Divalproex sodium; duloxetine hydrochloride, haloperidol; mirtazapine, naltrexone hydrochloride, and diphenhydramine hydrochloride.

RJD referred the patient for intermediate care explaining that the patient had decompensated in the EOP level of care. In the outpatient setting, the patient had spent most of his time isolating in his cell, lying in his bed, neglecting activities of daily living, and avoiding treatment groups and social interactions. The referring institution further indicated that the patient had been medication nonadherent and exhibited increased depressive symptoms, vegetative symptoms, and paranoia which contributed to further isolation.

A psychologist completed their initial assessment with a suicide risk evaluation on August 24, 2023 and rated the patient suicide risk as moderate risk. According to the assessment documentation, the patient was serving a life sentence, struggled with depression since adolescence, and had nine documented suicide attempts starting at age 14. His most recent suicide attempt occurred in 2019 when he cut his wrists with an eyeglass lens. In 2010 the patient attempted suicide by hanging, and in 1999, he attempted suicide by overdosing on opiates and alcohol. The patient also had a significant substance abuse history. A subsequent suicide risk evaluation was completed on December 19, 2023 resulting in a low-risk rating. Despite the presence of several risk factors, the psychologist opined that the identified protective factors effectively mitigated his risk for suicide/self-harm. On this date, the psychologist indicated the patient denied suicidal ideation intent and plan, had remained medication adherent during admission, and requested discharge to CDCR for a scheduled board of prison hearing (BPH).

The treatment plan indicated that within the next 90-days interventions would result in reducing anxiety in social settings by attending an average of five-hours of weekly activities; increasing ability to manage vegetative symptoms as evidenced by 80% attendance in group psychotherapy; increasing social skills by learning three new social skills; increasing future-oriented thinking as

evidenced by the patient identifying at least two goals to work toward; and managing paranoid ideation by describing at least two effective coping skills learned during admission. Of note, some goals were vague and not clearly relevant for the presenting problem, and the two goals for group attendance differed.

Implemented treatment consisted of medication interventions and monitoring, social worker case management contacts, and groups which the patient attended minimally. Individual psychotherapy was indicated for this patient to address barriers to group attendance but not discussed or offered during admission.

The healthcare record did not allow for determining whether DSH-Coalinga offered the Court-ordered required minimum hours for weekly treatment. The treatment team indicated that the patient was enrolled in groups for managing mental illness, dialectical behavior therapy, mindfulness, social skills, and interpersonal effectiveness skills. Whether these groups were offered to the patient was unclear; however, the treatment team did indicate on December 14, 2023 that the patient attended some supplemental groups but did not attend any structured groups during the reporting period. Some documentation suggested the patient may have attended some of the structured groups during prior review periods, and a psychologist described the patient's overall group attendance as “average.”

Around September 2023, clinical documentation began suggesting some minimal evidence of progress in social interactions. The patient remained medication adherent and at times participated in smaller group activities on the unit, but clinical notes suggested he presented as overtly anxious during group activities. However, during November 2023, a social worker noted that the patient had been isolating in his cell and attended only 55% of offered groups, which appeared to be only supplemental groups described as “unit activities.” The social worker did, however, indicate that the patient had maintained contacts with family via telephone at an unknown frequency. On November 14, 2023, the social worker documented that the patient expressed frustration after learning that his board of parole hearing had been postponed for a second time. On December 21, 2023, staff observed the patient interacting and laughing with a peer and opined that the patient had benefitted from the therapeutic milieu.

According to the final treatment plan, dated December 21, 2023, one day prior to discharge, none of the hospital’s own treatment objectives for this patient had been met and all had expected completion dates set more than one month after the discharge date. Regarding the referring institution’s treatment outcome expectations, the treatment team documented that three of five had been met. However, the patient's inability to meet his goal for social skills by participating in 80% of groups suggested individual psychotherapy should have been considered to address the patient's anxiety and paranoia as these served as a barrier to attendance prior to and during admission. Unfortunately, there was no indication that individual psychotherapy was considered for this patient.

Psychiatry documented in their discharge summary that the patient had achieved “maximum benefit of hospitalization,” adding that the patient’s needs could be better met in EOP level of care. The provider did not provide further detail to support their opinion that the patient’s needs could be better met in the outpatient versus inpatient setting, which was especially necessary

considering the patient's compromised mental status in the outpatient setting prior to the current admission.

**Findings**

The care and treatment provided to this patient was inadequate. The discharge summary argued that the patient had achieved the maximum benefit of hospitalization and that his needs could be better met in the outpatient setting but offered insufficient evidence to support this opinion. The patient met only two of five of the referring institution's treatment outcome expectations and none of the hospital's own treatment plan goals prior to discharge. Notably, lack of group treatment participation was a one of many reasons for the inpatient referral and two of the patient's treatment targets relied on group treatment participation, yet the patient's anxiety and paranoia continued to serve as barriers to group treatment attendance. Despite this, the treatment team neither documented discussion of nor implemented individual psychotherapy to address the known barriers during admission. Similar to other records reviewed at this hospital, group treatment offerings were not clearly documented in clinical notes, including those from treatment conferences. Further, there were no group notes found in the patient's record.

**Patient G**

This 50-year-old patient's healthcare record was reviewed to assess the quality of care provided at DSH-Coalinga. At DSH-Coalinga, the patient was diagnosed with Schizoaffective Disorder Depressive Type. The provider also noted a history of traumatic brain injury with unspecified intracranial injury and loss of consciousness. CHCF referred the patient for intermediate care, and the patient arrived at DSH-Coalinga on July 19, 2023.

Regarding the patient's history, he was involved in a motorcycle accident at the age of 15 or 16, during which he sustained a head injury and lost consciousness for nine hours. Following the accident, the patient experienced seizures, coordination issues, and cognitive delays, including difficulty with simple calculations. The healthcare record suggested that the patient had committed his crime of murder during a state of psychotic paranoia, believing that a man wanted to kill his family. The patient also had two very serious suicide attempts during 2017 and an active involuntary medication order for danger to others.

The psychiatric assessment occurred timely. The patient arrived with an active involuntary medication order for danger to others, with an expiration date of April 5, 2024. Upon admission, the psychiatrist prescribed lithium carbonate; long-acting injectable paliperidone palmitate; quetiapine fumarate, with injectable olanzapine as back-up for refusal or oral Seroquel, as well as risperidone as needed.

The psychiatric provider referenced in their assessment emotional and neurological deficits due to head injury and noted that the patient did not want to change his current medication regimen.

Regarding the psychologist's assessments, this reviewer noted that the evaluating psychologist may not have reviewed relevant collateral information based on inaccurate statements in their assessment documentation. For example, the psychologist documented "no" history of a head

injury despite historical records and the hospital psychiatrist noting otherwise. Further, the psychologist's suicide risk assessments resulted in "low risk" ratings but failed to reference several positive risk factors that were also discussed in recent records. Missing from the positive risk factors were high impulsivity, agitation, aggressive behavior toward others, and treatment nonadherence. The evaluating clinician also did not consider in their assessment of risk the patient's recent placement on observation after initially reporting thoughts of self-harm and then changing his report to thoughts of harming others, or recently documented unpredictable behaviors triggered by perceptual disturbances. The psychologist's recommendations for risk reduction were limited to medication adherence and group treatment participation at 80%. The psychologist did not consider individual psychotherapy, consider the patient's appropriateness for group treatment, or recommend specific groups based on the patient's current mental status and cognitive limitations.

Fortunately, the treatment team appropriately ordered a cognitive assessment during admission. While the assessment resulted in the patient scoring in the range of "no cognitive impairment," the evaluator noted suboptimal scores on subtests for visual-spatial executive functioning, abstraction, and delayed recall.

The treatment plan indicated that the patient would decrease suicide risk by sustaining a low-risk rating, maintain sobriety, learn to manage distress by identifying and describing two coping skills during admission, and demonstrate an increased ability to engage in reality testing by identifying and describing at least two methods of reality testing. Notably, the above treatment goals were insufficient, especially for suicide risk as it failed to focus on ensuring the patient learned appropriate methods for managing and responding to thoughts of suicide/self-harm. Danger to others was not addressed in the treatment plan, nor was impulsivity. Further, while individual psychotherapy was recommended in the treatment plan, there were no progress notes found in the record to confirm that these sessions were offered as planned.

Implemented treatment consisted of psychiatric contacts for medication management, monitoring, and safety, and social worker contacts for brief check-ins and a review of progress without documented interventions. The healthcare record did not allow for determining whether DSH-Coalinga offered the Court-ordered required minimum hours for weekly treatment; however, at one point during admission his group attendance was described as "high." While weekly individual psychotherapy was recommended for reality testing in the treatment plan, this reviewer found no evidence of implementation during admission. Psychology contacts were only used for assessment purposes.

Regarding hospital course, the patient arrived during July 2023 and began demonstrating that a higher level of care may have been warranted during August 2023; however, the psychiatrist attempted to manage the patient in the current setting with several medication adjustments through December 3, 2023 at which time the patient assaulted a peer and was recommended for a higher level of care.

On August 7, 2023, the patient reported believing that others were controlling his mind and he requested placement in seclusion to ensure he did not harm others on the unit. On this date, the

psychiatrist placed the patient in seclusion with enhanced observation and stat orders Benadryl, Ativan, and Cogentin.

On August 8, 2023, enhanced observation status and the long-acting injectable Invega Sustenna were discontinued. Prolixin was prescribed as an alternative medication for psychosis. On August 16, the patient met with his psychiatrist and reported that he heard on the hospital intercom that a biker gang was planning to kill his family members. The psychiatrist increased Prolixin, and although clozapine was discussed on this date, the patient refused due to the frequent blood draws required for this medication. On August 29, 2023, the patient called 911 to report that his family was in danger, and Prolixin was increased. Records indicated that the patient frequently called 911 during this admission to report that his family was in danger.

On September 7, 2023, the psychiatrist started long-acting injectable Prolixin Decanoate. On November 4, 2023, a nurse documented that the patient appeared agitated, felt unsafe, and reported that another patient had repeatedly tackled him and threatened to stab him. The patient was moved across the hallway and noted to be a "danger from others." On November 20, 2023, the patient reported another assault by a peer, though the peer claimed they were only "horseplaying." The psychiatrist started the patient on Zyprexa, which was subsequently increased. The patient continued to call 911 and report that his family was in danger, at times adding that they were being terrorized, beaten, and raped.

On December 3, 2023, the patient assaulted a peer using a mop handle as a weapon, striking the peer three times, and causing injury. During a follow-up assessment in the seclusion room, the patient was described as delusional with poor insight and unpredictable behavior. The provider recommended the patient for a higher level of care due to danger to others.

The patient was discharged the following day on December 4, 2023. The discharge summary indicated that a higher level of care was warranted to address violent thoughts toward others, delusions, depression, and withdrawn and isolative behaviors. The diagnosis of Schizoaffective Disorder was retained at discharge.

Of note, despite the patient's concerning presentation, including unpredictable behavior, paranoia, and delusional statements voiced during group sessions, from August 2023 through December 3, 2023, treatment plans were not modified, and group treatment continued to be encouraged without implementing the recommended weekly individual psychotherapy as an alternative.

**Findings**

The overall care and treatment were inadequate. While the psychiatrist's efforts to manage this patient in the intermediate care setting were significant, records suggested that the patient should have been referred to an acute care program well before December 2023. Treatment plans remained inadequate from admission to discharge without modifications in response to the patient's decompensated state and clear signs that he may not have been appropriate for the group treatment modality. Weekly individual treatment had been recommended throughout the current admission, but it was not implemented as planned or clinically indicated. Further, the

psychologist's assessments suggested they failed to review collateral documentation which resulted in underestimating risk and likely contributed to the inadequate treatment recommendations within their assessment summaries.

**Patient H**

This 32-year-old patient's healthcare record was reviewed to assess the quality of care provided at DSH-Coalinga. At DSH-Coalinga, the patient was diagnosed with Schizoaffective Disorder, Bipolar Type; Amphetamine Type Substance Use Disorder; and Antisocial Personality Disorder. A history of head injury was also noted in the record. The patient was initially prescribed Haldol; Suboxone; Depakote; and hydroxyzine as needed for anxiety. During admission, Haldol was decreased and Depakote ER was maintained reportedly with "good mood stabilization" and blood levels. The healthcare record indicated that clozapine had been discontinued during July 2023.

The patient arrived at DSH on August 15, 2023 and ultimately discharged to the EOP level of care on or around October 2, 2023.

The patient was referred by SVSP for intermediate care to address symptoms and behaviors resulting from a psychotic disorder, including problems with attention to activities of daily living, auditory hallucinations, hopelessness, irritability, lack of motivation, excessive sleeping, isolation, and negative interactions with peers. The patient also experienced paranoid beliefs that others were watching him in the shower, which led to avoidance of showering. The referring institution noted that the patient was expected to parole around November 2024, suggesting the need for pre-release planning services.

The psychiatrist completed the assessment on August 15, 2023. The assessment noted that the patient presented with minimal insight into his delusions, which included beliefs of being watched in the shower and being able to be in two places at once.

The psychologist completed their initial assessment on August 21, 2023. The psychologist's suicide risk evaluation referenced four prior suicide attempts, two of which occurred during episodes of psychosis where the patient described experiencing auditory hallucinations and feelings of being overwhelmed and worthless.

The treatment plan indicated that the patient would address his fixed beliefs or delusions during individual therapy sessions, engage in reality testing once per week, shower at least twice per week for the next six months, develop at least three healthy coping skills to decrease distress from auditory hallucinations for six-months, and interact with other patients at least three-times per week to develop communication skills over the next six-month period. DSH-Coalinga developed their own individualized treatment goals, which focused on group attendance, completing all assignments, enhancing social skills, and developing effective communication and problem-solving skills. Consistent with the referring institution's recommendations, the DSH-Coalinga treatment team also recommended individual psychotherapy; however, the lack of progress notes in the patient's record suggested these sessions were not offered as indicated and planned.

Despite group treatment attendance being a focus of the patient's treatment plan, the healthcare record did not provide clear information on weekly group treatment hours offered and attended throughout the current admission. Both were necessary for tracking progress toward these objectives as well as determining participation in core groups that were relevant to other treatment outcome expectations. During September 12, 2023, a treatment provider indicated that the recommended level of group participation was "independent," and that the patient participated in ten hours of *unstructured* activities per week but attendance for structured treatment was not documented. On October 2, 2023, the treatment team indicated that the patient had been "enrolled" in community integration for parolees since August 28, 2023; however, they did not have progress to report on during the conference.

The social worker documented throughout the current admission that the patient required pre-release planning services, including assistance with securing housing before discharge to the community and potential transportation to a program or housing upon release. The social worker noted that the patient could not live with his mother due to parole conditions. This reviewer was unable to find evidence that the social worker provided the pre-release planning services during admission. Instead, there were several recommendations for CDCR to implement pre-release planning prior to the patient's upcoming parole date on November 24, 2023.

During admission, the patient maintained medication adherence at 100%; increased his shower frequency to twice per week; communicated benefits and side effects of medication adherence; interacted appropriately with staff and peers; and attended 77% of therapeutic groups; however, group type and hours offered were still not provided.

The discharge treatment plan indicated that the patient met only two of the four treatment outcome expectations recommended by the referring institution, including goals for showering and decreasing distress related to ongoing auditory hallucinations and delusions. None of the individualized treatment goals developed at DSH-Coalinga were met, and the expected date of completion for these unmet goals was November 30, 2023, which was more than one month after the discharge date. The treatment team discharged this patient to the EOP level of care on October 2, 2023, with recommendations for pre-release planning prior to his expected release date the following month. The treatment team also indicated that the patient voiced readiness for discharge and return to CDCR.

In contrast to the final treatment plan, the psychiatrist's discharge summary offered conflicting information regarding overall progress. The discharge summary claimed the patient had a global assessment of functioning score of 80 (higher than expected for a 3CMS patient in CDCR) and met *all* treatment outcome expectations. Further, this provider indicated that the patient benefitted from his "one-to-one sessions done once a week," but there was no evidence that these sessions occurred.

**Findings**

The care and treatment for this patient were adequate, albeit with sizeable limitations, Significant documentation issues, including inconsistent information regarding implemented interventions

and the degree of goal achievement, made it difficult to determine whether the patient's progress was directly related to the overall care beyond medication interventions. The treatment team recommended individual psychotherapy, and the discharging provider claimed that the patient benefited from it. However, no progress notes were found to confirm that individual psychotherapy was offered or that it included interventions recommended in the treatment plan. Furthermore, the reviewer could not determine the total number of groups offered, including by type (structured versus unstructured) or topic, to assess whether they met minimum requirements and were relevant to the patient's treatment targets. Additionally, although the discharge treatment plan and discharge summary suggested some progress during admission, the extent of that progress differed significantly. The social worker also seemingly deferred to CDCR to provide pre-release planning services, despite the patient focusing on his discharge date throughout the admission, and the social worker documenting that the patient had not secured a housing plan prior to discharge from the hospital, which was very close to his parole date.

**Patient I**

This 30-year-old patient's healthcare record was reviewed to evaluate the quality of care provided at DSH-Coalinga. He was diagnosed with Schizoaffective Disorder, Depressive Type; Cannabis Use Disorder, Moderate; and Alcohol Use Disorder Moderate. Psychiatric medications prescribed at DSH included Depakote ERand olanzapine. During admission, the treating psychiatrist increased olanzapine and tapered the patient off of Depakote. Consistent with the referring institution's treatment recommendations, the psychiatrist encouraged and educated the patient on the risks and benefits of clozapine at least monthly; however, the patient repeatedly declined due to the frequency of blood draws associated with this medication. Psychiatry also documented that the patient did not meet PC 2602 criteria. The patient transferred to DSH-Coalinga on June 1, 2023.

CSATF had referred the patient for intermediate care pursuant to address significant impairment due to mental illness with distressing auditory hallucinations involving commands to "get into fights" as well as visual hallucinations of shadows.

DSH-Coalinga adopted the referring institution's treatment outcome expectations without modifications. The objectives included increasing socialization by having the patient attend and actively engage in at least 80% of treatment groups; remaining compliant with daily medication during admission to address auditory and visual hallucinations, depressed mood, anxiety, motivation, and overall functioning; decreasing distress caused by command auditory hallucinations to a self-rating of four out of ten; verbalizing and demonstrate the use of three to five coping skills for managing depression; and participating in a medication evaluation, including an evaluation for clozapine appropriateness.

The initial assessments were completed timely. The psychiatrist conducted a thorough assessment, which included detailed rationale for decisions regarding diagnoses and medications. The psychologist completed suicide risk assessments on June 6, 2023 and again on November 6, 2023, rating the patient's suicide risk as low and providing sufficient justification on both occasions.

Regarding treatment provided during admission, the psychiatrist generally met with the patient more often than every 30 days, the social worker used contacts for case management without offering therapeutic interventions and the psychology contacts were limited to assessments during admission. Regarding group therapy, the healthcare record neither allowed the reviewer to determine whether DSH-Coalinga offered the court-ordered minimum hours for weekly group treatment nor determine the total number group hours offered or attended, including by type (structured versus unstructured) and topic. However, the documentation suggested that at least some of the assigned or "enrolled" groups were specific to the patient's treatment needs (e.g., medication education), and all group activities promoted socialization within the therapeutic milieu.

Regarding the patient's hospital course, providers documented that the patient did not receive any special incident reports (SIRs) during admission or engage in behaviors requiring seclusion or restraints. Additionally, providers noted that no emergency or stat medications were ordered, and the patient did not request as-needed medications. The patient was described as medication-adherent, with excellent group attendance during admission. Providers documented that the severity of the patient's symptoms improved during the course of admission, noting that while the patient continued to experience moderate symptoms, the severity of these symptoms could likely be further addressed in the outpatient setting. The treatment team documented that the patient maintained a job assignment, suggesting that the functional impairments present at the time of admission had improved. The psychiatrist noted that the patient was at the maximum dosage of his current medication and had refused clozapine medication due to the frequency of required blood draws. Although there was a period when the patient's treatment attendance declined, providers intervened with behavioral interventions to increase group treatment participation, and the intervention was effective.

The patient was discharged to the EOP level of care on November 28, 2023. Around the time of discharge, providers indicated that the patient had met all of the referring institution's treatment outcome expectations. Regarding expectations for group treatment attendance and engagement, the hospital reported that the patient's group treatment participation was at 90%. For medication adherence, the hospital confirmed that the patient remained compliant with prescribed psychotropic medication throughout the admission. Concerning coping skills for managing depression, the hospital stated that the patient used deep breathing, improved sleep hygiene, and entertainment, such as television, to cope with current symptoms. Regarding the goal for managing auditory hallucinations and the evaluation for clozapine, the psychiatrist noted that they discussed the risks and benefits of the medication during a medication evaluation, but the patient refused clozapine. The discharge documentation further indicated that the patient's auditory hallucinations no longer involved commands and that the patient found them more manageable during the preceding three-month period.

**Findings**

The care and treatment provided to this patient were adequate. Mental health providers documented sufficient diagnostic and level of care rationales; implemented interventions consistent with the patient's presenting problems; documented evidence of progress toward discharge objectives over time; and appropriately justified the discharge decision while linking

the determination to achieving the referring institution's treatment outcome expectations. Further, the treatment team appropriately used behavioral interventions to motivate group attendance.

**Patient J**

This 43-year-old patient's healthcare record was reviewed to assess the quality of care provided at DSH-Coalinga. The psychiatrist completed the psychiatric assessment timely, diagnosed the patient with major depressive disorder, recurrent episode, severe, and appropriately documented medication indications as well as a sufficient diagnostic rationale. The psychiatrist referenced an active involuntary medication order set to expire on September 18, 2024. Upon admission, the psychiatrist prescribed olanzapine, lithium carbonate ER for mood stability; sertraline and hydroxyzine as needed for anxiety. Lithium was discontinued at the patient's request but was restarted during November 2023 after the patient reported an attempt to strangle himself. At the time of discharge to a higher level of care on December 14, 2023, the patient was prescribed lithium carbonate; melatonin); olanzapine; sertraline; and olanzapine injection for refusal of oral medication. Additionally, the patient was prescribed chlorpromazine as needed for anxiety. The patient arrived at DSH-Coalinga for the current admission on October 20, 2023.

According to the healthcare record, the patient had one prior DSH hospital admission from November 8, 2022 through February 22, 2023. CMF referred the patient for intermediate care to address ongoing danger to self concerns and significant impairments due to a mental illness.

The psychologist completed suicide risk assessments, initially during October 2023, and again on December 11, 2023. While the October assessment indicated a moderate risk rating for suicide and self-harm, the risk rating was increased in December 2023 after the patient reported four suicide attempts during the current admission, as well as ongoing auditory hallucinations with voices telling him to take his own life.

The patient's treatment outcome expectations included demonstrating decreased depression through objective assessment of socialization with others, eating and sleeping, participating in 75% of group treatment, engaging adequately in treatment overall, avoiding isolation in his cell and self-harm behaviors/gestures with or without intent to die for a period of 90 days. The patient, however, did not meet these treatment objectives as his statements disclosures on December 11, 2023, resulted in the treatment team referring the patient to a higher level of care.

The healthcare record did not allow for determining whether DSH-Coalinga offered the Court-ordered required minimum hours for weekly treatment. Documentation indicated that the patient had attended between 94% and 100% of offered groups; however, the hospital failed to provide total group hours offered during this timeframe, including by type (structured versus unstructured) and by topic to determine relevance.

During the patient's hospital course, he reported depressive symptoms and guilt almost daily, along with intermittent thoughts of suicide. The patient also reported attempting to strangle himself on November 7, 2023, December 8, 2023, and December 11, 2023, and he referenced two other suicide attempts during admission. On December 11, 2023, the patient stated that he would absolutely kill himself if he could find an effective method. On this date, the patient rated

his depression at a 10 out of 10 on a 10-point scale, and he was placed on enhanced observation until his eventual discharge to a higher level of care on December 14, 2023.

**Findings**

The care and treatment provided to this patient were adequate. Provider documentation appropriately justified diagnostic decisions, treatment recommendations, risk ratings, and treatment and level of care determinations. Treatment plans were appropriate for the patient's presenting problems, even though staff were unable to fully implement those plans prior to the patient's discharge to a higher level of care. Notably, the hospital's documentation of group treatment data in inpatient records did not allow outside reviewers to determine whether the patient had sufficiently met group treatment-related goals during admission or whether the hospital had offered court-ordered required minimum group hours.

**Patient K**

This 38-year-old patient's healthcare record was reviewed to assess the adequacy of care provided at DSH-Coalinga. The patient was provided diagnoses of major depressive disorder with psychotic features and amphetamine-type use disorder. He was prescribed Haldol, Vistaril, Abilify, Vistaril and trazodone.

The patient was admitted to DSH-Coalinga from an acute care unit on December 20, 2023 for intermediate care and further stabilization of auditory hallucinations that caused mood disturbance, paranoia and suicidal ideation.

The patient was admitted to acute care after a serious suicide attempt in which he hit his head on a wall and fractured two vertebrates, resulting in paraparesis, difficulty swallowing, and incontinence. Surgery and a nine-day hospitalization followed. The suicide attempt was attributed to depression and paranoia.

The initial assessments from multidisciplinary treatment team members were thorough. The initial treatment plan and subsequent monthly treatment plans included CDCR treatment outcome expectations and DSH individual plans of care (IPOCs). The treatment outcome expectations, which were specific to the patient's presenting problem, were not aligned with the IPOCs. Specifically, the treatment outcome expectations included identification of coping skills to manage auditory hallucinations and anxiety; improvement in mood management, and addressing risk of self-harm. The first IPOC was generic and was not individualized to the patient's treatment needs, and the same generic IPOC was also noted in another patient's healthcare record. Risk of self-harm and contributing factors were not specifically targeted.

Specifically, the IPOC was intended for the patient to learn to manage symptoms through group treatment and to identify and utilize two coping skills. To achieve that IPOC, the patient was assigned various groups; however, the rationale for the assignment of groups to address the patient's treatment needs was unclear. For example, the patient was assigned to trauma, drama, and grief and loss groups which were not clearly indicated in the identified treatment needs.

Additional groups included various DBT topics, but the rationale was not provided for placement in those groups. The second IPOC was related to the patient's long-term substance use history, and substance-related groups were assigned.

Group treatment and psychotropic medication were the primary treatment modalities. The documentation indicated regular group treatment attendance; however, application or utilization of group content to convey progress in treatment was not clearly and consistently documented. Most of the monthly psychiatric contacts occurred during monthly treatment team meetings.

Monthly social work contacts documented an assessment of the patient's treatment outcome expectations and progress toward discharge; however, treatment interventions were not utilized. Individual therapy with the psychologist did not occur.

The documentation indicated that psychotropic medication changes occurred in accordance with reported symptoms. During the first three months of the review, the psychiatric documentation indicated that the patient continued to report anxiety, depression, and daily command auditory hallucinations. His depression was variable and at times impacted his sleep, energy, and resulted in hopelessness. His psychiatric diagnosis was major depressive disorder; however, the rationale for removal of the diagnosis of major depressive disorder with psychotic features despite persistent auditory hallucinations was not documented.

In November 2023 while in acute care, the patient was assessed with high chronic and moderate acute suicide risk. One month later in December 2023, the patient was assessed with low current risk for self-harm via the Columbia assessment. The rationale for the change from moderate acute risk to low current risk was not documented. In May 2024, the patient's current suicide risk was increased to moderate, despite minimal change in symptoms or response to the assessment.

**Findings**

The care and treatment provided to this patient were inadequate.

The documentation of care was inadequate. Alignment between specific CDCR treatment outcome expectations and the DSH IPOCs, which were not individualized the patient's needs was unclear. Additionally, the rationale for group assignment which was the primary treatment rationale aside from psychotropic medications, was not documented. The patient was not provided individual treatment consistently by any provider; nor did the documentation indicate that individual therapy was not clinically indicated. Most psychiatric contacts occurred during the multidisciplinary treatment team meetings, and the diagnostic change lacked a provided clinical rationale.

Suicide risk was not appropriately addressed in treatment, including the development of a safety plan.

**Patient L**

This 49-year-old patient's healthcare record was reviewed to assess the adequacy of care provided at DSH-Coalinga. The patient was provided diagnoses of generalized anxiety disorder. He was prescribed Vistaril, Paxil, and clonidine.

The patient was admitted to DSH-Coalinga on January 11, 2024. He was referred for intermediate care due to suicidal ideation with intent from the Corcoran MHCB, after he failed to stabilize during a ten-day stay. Additional symptoms at the time of referral were depression, anxiety, and unresolved grief.

The initial assessments from treatment team members were comprehensive. The patient's distress was attributed to the death of his 15-year-old son approximately one and a half years prior due to an accidental overdose. In addition to grief, the patient blamed himself for the death.

The treatment team meetings occurred monthly. The CDCR treatment outcome expectations targeted mood stability, socialization, group attendance, and the ability to challenge irrational thoughts and to identify coping skills for anxiety and depression. In contrast, DSH-Coalinga treatment goals were generic and lacked clear alignment with the patient's treatment needs and treatment outcome expectations. For example, DSH-Coalinga goals were to increase treatment engagement to manage symptoms with group attendance and utilization of coping skills, to enhance social skills via group treatment, and to verbalize skills for improved communication and problem solving. Group therapy was the primary treatment modality; although, the rationale for group assignment to DBT, coping skills, drama, trauma, anger, medication education, and social skills groups was unclear. Further, for reasons that were unclear, the patient was not assigned to the grief and loss group.

The initial psychiatric evaluation that was completed by the nurse practitioner was comprehensive. Psychiatric contacts occurred at least monthly; although, they were completed at the treatment team meetings. The patient was seen by three different providers. One routine contact occurred via telepsychiatry. Overall, the documentation focused on the patient's symptoms, and medication changes occurred that were consistent with the patient's treatment needs. Early during his hospitalization, the patient requested treatment with a benzodiazepine medication but was appropriately not prescribed the medication and was educated accordingly. The patient reported improved depression and consistently denied suicidal ideation following admission. He continued to report elevated levels of anxiety.

Throughout the hospitalization, several psychiatric diagnostic changes or additions occurred, including the provision of diagnoses of major depressive disorder, antisocial personality disorder and PTSD. While the rationale was insufficient in the provider documentation, an appropriate rationale was provided in the psychiatric discharge summary for all three diagnoses. In contrast, the social worker discharge summary included a diagnosis of generalized anxiety disorder but did not include antisocial personality disorder.

During February 2024 as the patient's depression improved, he exhibited increased agitation that included oppositional, rude, and argumentative behavior with staff. During April 2024, he was involved in two different peer assaults. He was discharged shortly thereafter and was recommended for the intermediate level of care in a locked dorm setting for continued group

treatment for PTSD, as he continued to process the death of his son. The psychiatric discharge summary was comprehensive and was useful for continuity of care.

Shortly after DSH-Coalinga admission, the patient was assessed with low suicide risk. Prior to discharge on April 10, 2024, he was assessed with moderate to high risk, as he noted daily thoughts of suicide. A safety plan was not developed, and there was no documentation of targeted treatment. It was also documented that the patient did not want to live in a cell with a peer, and he threatened to kill the cellmate. It was unclear whether that information was communicated to CDCR prior to his discharge and transfer, as there was no documentation in the healthcare record that indicated that such communication occurred.

**Findings**

The care and treatment provided to this patient were marginally adequate.

The patient's acute distress resolved following DSH-Coalinga admission. In addition to the benefit of the therapeutic milieu, this high-functioning patient needed individual psychotherapy to assist him in managing grief and anxiety. The lack of individual contacts with the psychiatrist and lack of a safety plan were additional areas of concern. Treatment planning would have been improved with alignment between the treatment outcome expectations and the DSH-Coalinga treatment goals.

The patient was appropriately discharged from DSH-Coalinga; however, it was unclear why his treatment needs could not have been addressed at the EOP level of care.

Some handwritten documentation made the review difficult, which was an area of concern for continuity of care.

**Patient M**

This 31-year-old patient's healthcare record was reviewed to assess the adequacy of care provided at DSH-Coalinga. The patient was provided a diagnosis of schizoaffective disorder, bipolar type. He was prescribed Zyprexa; Vistaril and Haldol were ordered prn. The patient was admitted to the hospital on October 23, 2023.

The patient had a long history of mental illness including delusions, paranoia, and auditory hallucinations. At the time of his admission, he was acutely psychotic and had poor insight regarding his mental illness. He had previously discontinued psychotropic medication, and his symptoms impacted his ability to care for himself.

The initial assessments completed by the psychiatrist, social worker, and rehabilitation therapist were appropriate. There was no initial assessment completed by the psychologist. The patient was assessed with low suicide risk during initial and quarterly risk assessments utilizing the Columbia suicide rating scale. The risk assessment from CDCR indicated that the patient had moderate chronic and low acute suicide risk.

The patient continued to present with disorganization and auditory hallucinations after admission. During the first month of hospitalization, he reported that he was not bothered by the

hallucinations and refused psychotropic medication. He was observed pacing and talking to himself but was generally attentive to his ADLs. By mid-December 2023, he further decompensated with debilitating hallucinations and delusions that impacted his ability to communicate and to attend to his ADLs. He agreed to taking antipsychotic medication, and he was later noted to be medication adherent. His symptoms and functioning improved; however, in early May 2024, his mental status significantly worsened which resulted in an emergency PC 2602 order due to grave disability that was granted on May 31, 2024.

The psychiatric contacts occurred both individually and during the monthly treatment team meetings. The patient's symptoms and functioning were monitored appropriately, and in general, the documentation was brief but useful. Individual therapy was not provided; while not documented as not clinically indicated, individual therapy would not have been indicated for this patient due to psychotic symptoms.

Monthly rehabilitation therapy notes were descriptive; although, it was unclear whether those useful observations were communicated during the monthly treatment team meetings or in another forum. During the first month of hospitalization, the documentation indicated that the patient required redirection to wear his clothing appropriately, as he had altered his clothes to be used as headwear. He also paced in the hallways and talked to himself for most of the night. During January 2024, there was indication that the patient experienced anxiety which impacted his ability to remain in groups.

Monthly social work documentation provided a brief summary of the patient's functioning and symptoms as well as an update on the status of his treatment outcome expectations. The April and May 2024 monthly documentation prior to his decompensation indicated that the patient had met two of his treatment outcome expectations, including medication adherence and 100 percent group attendance. He had partially met the third treatment outcome expectation of gaining insight into his mental illness.

The initial and monthly treatment plan documentation included the treatment outcome expectations and assessment of violence toward self and others that were assessed as low. Overall, the CDCR treatment outcome expectations and treatment objectives developed at DSH-Coalinga aligned. During the first monthly treatment plan meeting, there was documentation that the patient was enrolled in social skills and exploring leisure skills groups. He later attended various unit leisure activities and was assigned to changing your thinking, cognitive therapy for psychotic symptoms, coping skills, DBT mindfulness, drama, grief and loss, managing mental illness, houses of healing, and transition back to CDCR groups. The rationale for group assignment was not clearly documented.

**Findings**

The care and treatment provided to this patient were adequate.

The patient's primary treatment needs during most of the review period were medication management and a therapeutic milieu where he responded positively as his mental status and ability to function improved. In addition, his group attendance improved, and he made progress toward his treatment goals.

The clinical documentation would have been improved with communication between treatment team providers, and with a provided rationale for group assignment.

**Patient N**

This 43-year-old patient's healthcare record was reviewed to assess the adequacy of care provided at DSH-Coalinga. The patient was provided a diagnosis of major depressive disorder. He was prescribed Zyprexa, Trileptal, and Vistaril prn. The patient was admitted to DSH-Coalinga for intermediate care from the CMF-PIP acute care unit on December 1, 2023.

After more than twenty years of incarceration, the patient was recently placed in the MHSDS. He had an onset of depressive symptoms after he discontinued gang involvement and focused on achieving parole. However, he received an RVR for contraband, which he anticipated would prevent any chance of parole and a future in the community. Subsequently, the patient had two serious suicide attempts by opioid overdose during May and August 2023. On both occasions, the patient was found unresponsive, required the use of an automated external defibrillator, CPR, and treatment with Narcan and subsequent hospitalization.

The initial psychiatric assessment was thorough. Psychiatric contacts occurred one to two times monthly on an individual basis, and supportive therapy was offered in addition to medication management. Medication changes occurred to target depression and anxiety.

Monthly social work contacts occurred until February 2024. The documentation indicated that assistance was provided in communicating with the correctional counselor regarding the patient's parole hearing and in obtaining a domestic partnership.

The psychology assessment was comprehensive but failed to recommend individual treatment; instead, the patient was recommended for group treatment. None of the recommended groups specifically targeted depression or self-harm.

Monthly treatment plans indicated that the CDCR treatment outcome expectations and the DSH treatment objectives aligned with a focus on the risk of self-harm, coping skills for depression, and 80 percent group treatment attendance. The rationale for group assignment was not documented. The patient's assigned groups included 12-step self-study group, substance abuse recovery, changing your thinking, drama, houses of healing, managing mental illness, and several DBT focused groups. At the time of the quarterly review in May 2024, the patient had met his treatment outcome expectations, and it was documented that he might be approaching maximum treatment benefit.

Prior to transfer to DSH-Coalinga, the patient was assessed with high chronic and moderate acute suicide risk by CDCR. Following admission to DSH-Coalinga. His current risk level between December 2023 and May 2024 varied between low, moderate and high, as determined by a suicide screening tool.

**Findings**

The care and treatment provided to this patient were marginally adequate.

This high-functioning patient required individual counseling to assist him in managing identified anxiety and depression. Further, there was no clear documentation regarding safety planning or managing potential bad news, such as a parole denial which was the event that precipitated his hospitalization.

The risk assessments needed improvement. The assessment of current risk within the inpatient setting was reasonable; however, given the discharge plan of return to CDCR, the assessment should have included evaluation of acute and chronic suicide risk.

**Patient O**

This 36-year-old patient's healthcare record was reviewed to assess the adequacy of care provided at DSH-Coalinga. The patient was provided diagnoses of bipolar I disorder with psychotic features and amphetamine type substance use disorder. He was prescribed Depakote, Zyprexa and Remeron.

The patient was admitted to DSH-Coalinga for intermediate care on June 7, 2023 from the CHCF-PIP acute care unit. The acute care hospitalization was precipitated by a serious suicide attempt in which the patient lacerated his neck and forearms requiring outside medical care. At the time, he was distressed by command auditory hallucinations and paranoia and was medication nonadherent. The initial psychology assessment referred the patient to group psychotherapy and recreational groups, but not individual therapy despite the absence of clinical contraindications. Monthly social work documentation was generally supportive in content

The initial psychiatric assessment occurred via telepsychiatry. Subsequent psychiatric contacts occurred in-person one to two times monthly. The rationale for medication adjustments was documented.

The CDCR treatment outcome expectations and DHS treatment objectives were generally aligned and targeted psychosis, depression and suicidal ideation. The interventions included DBT groups, grief and loss, anger management groups, substance related groups, and a trauma group. The rationale for group assignment was unclear, and the assignment did not clearly align with the identified treatment needs. Quarterly treatment plans noted the patient's group attendance and general participation, but treatment engagement and the application of group content as related to his treatment needs was unclear.

The suicide risk assessments were variable. In May 2023, the patient was assessed with high chronic and moderate acute suicide risk. Shortly after DSH-Coalinga admission and during subsequent assessments completed by the psychologist, his risk varied between low and moderate risk, without clear explanation for changes. Some evaluators clearly documented the timeframe as current. Consideration of the patient's suicide risk and protective factors varied, with the rationale often focusing on current denial of suicidal ideation at the time of the assessment. The psychiatric documentation during July, September, and October 2023 assessed the patient with high chronic suicide risk. The treatment plan documentation prior to his discharge indicated that he had moderate chronic and low acute suicide risk.

The patient experienced a reduction in depression and psychosis during the course of his hospitalization. He was discharged on January 24, 2024. There was no documentation regarding

discussion of discharge and the patient's ability to manage return to CDCR. The psychiatric discharge summary provided a thorough overview of medication adjustments and the patient's response.

**Findings**

The care and treatment provided to this patient were marginally adequate.

A review of documentation indicated that the patient's mental status improved over time, and his symptoms responded well to psychotropic medication treatment; however, the patient's treatment lacked consideration of individual psychotherapy, the variation in suicide risk assessment was considerable, and individualized treatment and safety planning were needed.

Some handwritten documentation made the review difficult, which was an area of concern for continuity of care.

**Patient P**

This 63-year-old patient's healthcare record was reviewed to assess the adequacy of care provided at DSH-Coalinga. The patient was provided a diagnosis of major depressive disorder, and he was prescribed Vistaril, Prozac and Latuda. The patient was admitted to DSH-Coalinga on November 14, 2023.

On October 31, 2023, he was assessed with high chronic and moderate acute suicide risk at CDCR. Risk assessments at DSH assessed his current risk as low or moderate. The provided rationale for that assessment did not fully consider endorsement of items or variation across assessments. The risk assessments indicated that his daughters were protective factors but failed to consider that his relationship with them was variable; thus, their relationship could pose a risk factor during times of discord.

He was referred for intermediate care from the EOP level of care after a steady increase in depressive symptoms, including increased auditory hallucinations and suicidal ideation despite treatment engagement. His symptoms were attributed to a board denial.

The initial psychiatric assessment completed by a nurse practitioner was thorough. The psychiatrist met with the patient one to two times monthly, either in treatment team meetings or individually and primarily addressed medication management. The psychiatric diagnosis of major depressive disorder varied from the treatment plan diagnosis of major depressive disorder with psychosis.

Monthly social work contacts were supportive in nature and indicated progress toward treatment outcome expectations. The treatment outcome expectations targeted coping skills for depression and auditory hallucinations, hopefulness, thoughts of self-harm, impulsivity, and mindfulness. The DSH treatment objectives, as was noted in other DSH-Coalinga reviewed patients, were generic. An example was the following: "increase in treatment engagement to manage symptoms of his diagnosis as evidenced by maintaining at least 80% group attendance and articulating at least two applicable effective coping skills…" The treatment objectives were to be established by changing your thinking, cognitive therapy for psychotic symptoms, DBT,

medication education, three substance related groups and several recreational groups. The rationale for group assignment was unclear, and suicidal ideation was not specifically targeted. The patient was not provided individual psychotherapy, nor did the documentation indicate that individual therapy was not clinically indicated.

The patient indicated that he was ready to return to the EOP to attend a board hearing. He was discharged to CDCR on May 10, 2024, after he partially met two treatment outcome expectations and fully met the remaining three. He did not receive treatment to learn interventions to deal with possible denial of parole.

**Findings**

The care and treatment provided to this patient were marginally adequate.

His symptoms and ability to function improved, and he was hopeful and ready to face the board of parole. However, individual therapy was clinically indicated but not provided, risk assessments needed improvement, and safety planning and relapse prevention were needed.

**Patient Q**

This 54-year-old transgender patient's healthcare record was reviewed to assess the adequacy of care provided at DSH-Coalinga. The patient was provided diagnoses of borderline personality disorder and major depressive disorder. She was prescribed Abilify, lithium, and Prozac. The patient had a history of suicide attempts with a recent attempt by overdose on metformin. Current symptoms included chronic suicidal ideation, mood lability, and impulsivity.

The patient was admitted to DSH-Coalinga on September 6, 2023 from acute care, where she was treated since July 17, 2023.

Diagnostic clarification for this patient was needed. A diagnosis of borderline personality disorder was consistently documented; however, the initial psychiatric assessment provided rationale for a diagnosis of bipolar II disorder which was maintained in the treatment planning documentation. In contrast, the routine psychiatric documentation included a diagnosis of major depressive disorder. Further, despite inpatient consultation documentation that the patient had a significant trauma history, PTSD was not appropriately considered.

In addition to medication management, group psychotherapy was the primary treatment intervention. In addition to three DBT groups, the patient was assigned to drama, anger, managing mental illness, trauma, grief, and transgender support groups. While the rationale for group assignment was not clearly specified; except for the grief, anger, and drama groups, the group assignment targeted her treatment needs.

Prior to DSH-Coalinga admission, the patient was assessed with high chronic and moderate acute suicide risk by CDCR. The DSH-Coalinga risk assessments assessed her with moderate and low suicide risk. Of note, an assessment of moderate risk on November 6, 2023 was likely an underestimation. Specifically, between November 2, 2023 and November 4, 2023, the patient had several incidents of purposeful self-harm by manipulating her glucose level. Further, on

November 7, 2023, she ingested two batteries which she partially opened, requiring transfer to the emergency department by ambulance.

A psychiatric discharge summary dated November 6, 2023 indicated that the treatment team had determined that the patient required a higher level of care in a more secure setting given her increased incidents of self-harm, impulsivity, and multiple unremitting interpersonal stressors which increased her risk of self-harm. EHRS documentation indicated that she was admitted to the CMF-PIP for acute care on November 8, 2023.

**Findings**

The care and treatment provided to this patient were adequate.

In the absence of an intense and comprehensive DBT program that included coaching and individual psychotherapy for chronic suicidal ideation and mood lability, this patient's treatment was adequate. The patient was appropriately discharged to a more secure treatment setting. This case highlighted the need for comprehensive risk assessments at DSH for Coleman MHSDS patients.

**Patient R**

This 34-year-old patient's healthcare record was reviewed to assess the adequacy of care provided at DSH-Coalinga. The patient was provided a diagnosis of schizoaffective disorder. He was prescribed Prozac and Risperdal, and he received his psychotropic medications by a PC 2602 order. The patient was admitted to DSH-Coalinga on July 27, 2023 due to grave disability.

This patient had an extensive history of serious mental illness with chronic psychosis and suicidal ideation. He had multiple inpatient psychiatric hospitalizations and had previously been committed as a mentally disordered offender. Given his long history of substance use, he was prescribed Suboxone and was referred to substance use groups.

He was referred from the RJD MHCB due to suicidal ideation with a plan to cut his wrist. Additional symptoms included delusions, command auditory hallucinations, paranoia, and isolation. There was unexplained variation in the patient's suicide risk assessments. Prior to DSH-Coalinga admission, he was assessed with low acute and moderate chronic suicide risk. The initial psychiatric assessment determined that he had low to moderate acute risk. Shortly thereafter, he was assessed with low risk by the psychologist, which was maintained in subsequent psychology assessments.

The CDCR treatment outcome expectations targeted ADLs, medication adherence, and group attendance. The patient's treatment needs and symptoms that included chronic suicidal ideation, mood instability and psychosis were identified in his treatment plan, although not clearly targeted. One treatment objective focused on maintaining ADLs by placement in the managing mental illness group. Additional treatment objectives of medication adherence were to be achieved by the managing mental illness, medication education,12-step study group, social skills group, managing anger, and drama groups. Except for the medication education and managing mental illness groups, it was unclear how the other groups would assist with medication adherence. Chronic suicidal ideation was not specifically targeted in treatment.

Individual psychiatric contacts occurred one to two times monthly. A provider change occurred, and the patient was seen by his new psychiatrist on November 20, 2023. On December 12, 2023, the patient presented with improved reality testing and insight regarding his mental illness. He indicated that he would maintain medication adherent. The psychiatrist indicated that the patient did not meet the criteria for renewal of a PC 2602 order, and on January 10, 2024, the patient was informed that the PC 2602 order continuation would not be sought. A month later, the patient refused his biweekly Risperdal injection due to side effects and refused treatment with alternative antipsychotic medications.

In early February 2024, the patient presented as future-oriented and indicated that he wanted to return to CDCR to gain milestone credits for an earlier release. He maintained stability without psychotropic medication treatment, and he was discharged to the EOP level of care on March 19, 2024.

**Findings**

The care and treatment provided to this patient were adequate.

This patient's care was adequate with recommendations for consideration. The patient's symptoms, functioning, and ADLs stabilized and improved following admission to the therapeutic milieu at DSH-Coalinga. While group assignment did not clearly target his symptoms, the patient's primary treatment needs were medication related. He presented with insight regarding his mental illness, and his PC 2602 order was not renewed. He was stable at the time of discharge; however, given his extensive history of psychosis and impact on functioning, and his recent discontinuation of antipsychotic medication; a longer period of observation was worth consideration prior to transfer to a correctional setting that provided less clinical observation. The presenting problem of suicidal ideation indicated the need for a safety plan; however, no safety plan was developed. The variation in the initial provider risk assessments warranted clarification.

Some handwritten documentation made the review difficult, which was an area of concern for continuity of care.

**Patient S**

This 60-year-old patient's healthcare record was reviewed to assess the quality of care provided at DSH-Coalinga. The patient was provided diagnoses of schizophrenia, obsessive-compulsive disorder, and antisocial personality disorder. He was prescribed ziprasidone, with an injection of olanzapine if refused, and benztropine for side effects to antipsychotic medications. The patient was admitted from CHCF on June 2, 2023, and he discharged to an unknown institution on December 18, 2023.

The patient had auditory hallucinations that said derogatory things about him, as well as paranoid ideation. He had a history of washing his hands and items for up to 13 hours daily; at time of admission, that behavior had decreased to two to three hours daily, and he washed his hands an estimated 50 times per day.

The patient had a history of multiple prior hospitalizations at DSH.

The treatment outcome expectations focused on participation, coping skills, self-care, and treatment adherence. The goals appeared appropriate, except for the one centered on obsessive compulsive disorder treatment which stated that the patient would decrease his obsessive compulsive thoughts and behaviors as evidenced by articulating at least three triggers leading to his episodes.

The initial psychiatric evaluation occurred timely, but contained confusing, inaccurate, and internally inconsistent information. The reason for admission was listed as sex offender treatment. The evaluation stated that the patient did not have an active PC 2602 involuntary medication order, but then listed injectable medications should the patient refuse oral medications. The initial psychiatric evaluation stated that the treatment plan would include individual, group, and milieu therapy; however, the documentation did not reflect ongoing individual sessions. The patient reported that he would take his medication after the expiration of his involuntary medication order in September 2023, and the psychiatrist did not apply for a PC 2602 order renewal. Several sessions with the psychiatrist were conducted during the treatment team meeting, and the patient was not seen for an individual session. The psychiatrist recommended sertraline; however, the patient refused. Psychiatric notes reported that the patient's height was not listed, so the psychiatrist could not calculate the patient's body mass index to monitor for weight gain.

The patient was assessed with low suicide risk. The patient had not had suicidal thoughts for 28 years, and he had no prior attempts or self-injury.

The patient intermittently refused psychiatric and treatment planning sessions. During the course of treatment, his group attendance substantially improved approaching 100 percent in October 2023. His handwashing decreased to five times daily. The patient reported that groups were "boring", but that he attended groups to obtain points to use at the canteen. On December 4, 2023, the patient contracted COVID-19 and was moved to the quarantine unit. The patient discharged to an unknown institution on December 18, 2023.

The patient was interested in obtaining a job while at DSH-Coalinga; however, as was seen in other cases, the patient was unable to do so without a copy of his social security card.

**Findings**

The care and treatment provided to this patient were inadequate.

The initial psychiatric evaluation contained multiple fundamental errors and conflicting information, including essential details such as the statute under which the patient was sent to DSH, and whether there was a PC 2602 order in place. As was seen in other cases, the justification for the non-renewal of the patient's PC 2602 order was inadequate. Closer coordination between CDCR and DSH was indicated for closer collaboration regarding PC 2602 related matters.

Multiple treatment team meetings lacked the essential disciplines, such as psychiatry, psychology, social work, and rehabilitation therapy. The patient strongly wanted to obtain employment while at DSH-Coalinga; however, as was seen in other cases, a barrier was not being able to validate the patient's social security card.

Positive aspects of treatment included treatment planning addressing psychosis. The treatment planning regarding obsessive compulsive disorder was inadequate and did not conform to evidence-based standards; however, the patient nevertheless made progress in the severity of his obsessive compulsive symptoms.

**Patient T**

This 37-year-old patient's healthcare record was reviewed to assess the quality of care provided at DSH-Coalinga. The patient was provided diagnoses of schizophrenia and amphetamine use disorder. He was prescribed the antipsychotic medications olanzapine, lurasidone, aripiprazole as well as hydroxyzine prn for anxiety. The patient was admitted to DSH-Coalinga after discharge from an MHCB; subsequently he was treated at the CMF-PIP for acute care in April 2023, then admitted to DSH-Coalinga on August 10, 2023.

The patient received his psychotropic medications by a PC 2602 involuntary medication order due to danger to self and others, with an expiration of November 23, 2023. The documentation stated that the order would not be renewed, but the rationale for that decision was unclear. Relevant medical issues included low white blood cell count, which was thought to either be a normal variant or possibly a medication side effect.

The patient was admitted to address suicidal ideation, grief, irrational thinking, and limited distress tolerance. The patient had prior treatment at DSH for restoration of competency.

The initial psychiatric evaluation occurred timely. While the frequency of psychiatric sessions appeared appropriate, several notes were handwritten and illegible.

The patient had a history of multiple suicide attempts, including three to five attempts within the six months prior to DSH-Coalinga admission. The psychiatrist noted that the patient's current acute suicide risk was low, and his chronic risk was assessed as high. Despite the history of self-injury including within the prior six months, the psychiatrist stated that the risk of self-injury was absent. The patient had an extensive history of violence, including multiple staff assaults, but his acute violence risk was also stated as absent.

The psychologist completed a suicide risk assessment and assessed the patient with low suicide risk, noting suicidal ideation within the last three months but none in the prior month. The patient was assessed with moderate violence risk; however, no interventions were clearly stated other than the focus of treatment was planned around critical contributors and key items.

The psychiatrist and psychologist were not present at the multiple treatment teams. The treatment outcome expectations were revised to identify new coping skills and reality-testing skills. The patient was seen for two individual psychology therapy sessions focusing on grief and loss and privacy issues.

The patient struggled with aggression while at DSH-Coalinga. On October 18, 2023, the patient broke a mirror after reportedly being accused of something he did not do. On October 29, 2023, the patient had a physical altercation with a peer but would not state the reason for the altercation; the psychiatrist indicated belief that it might have resulted from paranoid thoughts, noting that the patient was delusional, paranoid, and was not at his baseline. The documentation

stated that, as the patient refused to sign a compatibility chrono regarding the peer, he was recommended for discharge. The documentation indicated that the patient would return to CDCR, but did not state to which level of care. The patient requested discharge from the EOP due to reported concerns of gangs and violence. The patient returned to CDCR on November 3, 2023.

**Findings**

The care and treatment provided to this patient were inadequate.

There were fundamental concerns regarding the patient's level of dangerousness to self and to others. Despite the patient having a history of suicide attempts and a history of violence, the psychiatrist assessed the acute risk of both as "absent." There was also inadequate justification for not renewing the PC 2602 order, and the documentation did not contain clear justification for nonrenewal. The documentation was also unclear what level of care the patient would be discharged to and did not document clinician-to-clinician contact.

This case underscored the difficulties with the current DSH paper healthcare record system. The admitting psychiatrist did not have access to the patient's current medications. Several psychiatric progress notes were illegible. DSH was in the process of transitioning to an electronic healthcare record; however, that transition was not anticipated to occur in the immediate future.

Positive aspects of care included frequent psychiatric contacts.

**Patient U**

This 48-year-old patient's healthcare record was reviewed to assess the quality of care provided at DSH-Coalinga. The patient was provided a diagnosis of schizophrenia; additionally, he had a history of low white blood cell counts, and he developed low platelet counts during treatment at DSH-Coalinga.

The patient was prescribed the antipsychotic medications lurasidone and olanzapine, the mood stabilizing medication lithium, and the antidepressant medication nortriptyline which was also being used to treat chronic pain. He was also prescribed olanzapine prn, but he did not utilize the prn medication. The patient received his psychotropic medications by a PC 2602 order.

The patient transferred from the CSP/Sacramento EOP on October 27, 2023, due to increasing confusion and incoherence. He remained hospitalized at the time of review. The patient had a history of treatment at the 3CMS, EOP, and MHCB levels of care.

The psychiatric evaluation occurred timely on the day of admission. The psychiatrist noted that the patient's answers were difficult to follow due to psychosis. The psychiatrist decided to change the patient's antipsychotic medication from lurasidone to olanzapine, and they documented a plan to increase the dose over the next month up to 40 mg daily. Despite the aggressive dosing which exceeded FDA limits, the psychiatrist did not see the patient until 28 days later; that follow-up visit occurred during a treatment team meeting and not in an individual confidential session. As was noted in the healthcare records of other DSH-Coalinga patients, the

psychiatrist stated that they were unable to calculate body mass index, as the patient's height was unavailable. The psychiatrist then changed the antidepressant medication from nortriptyline to sertraline. The reason provided for the change was the risk of nortriptyline in overdose.

The patient's suicide risk was assessed as absent. He had one prior attempt in 2008 after the death of his mother.

The treatment outcome expectations included increasing insight into hallucinations and developing coping skills for them, identifying and coping with his feelings, bathing regularly, keeping his cell clean, and being medication adherent. The initial treatment team meeting occurred timely. The initial rehabilitation therapy assessment was not complete, and the plan stated that the patient could not be assigned to core groups yet. The treatment team meetings often did not include key disciplines. In other cases, several disciplines were present by telehealth.

Several psychiatric sessions occurred during the treatment team meetings. The patient had difficulty attending groups and had episodes of aggression. The last psychiatric note in the healthcare record on May 7, 2024 noted that the patient was markedly delusional; however, no psychiatric follow-up visits had occurred at the time of review on June 12, 2024.

**Findings**

The care and treatment provided to this patient were inadequate.

Multiple concerns were noted regarding the medication management for this patient. The patient was appropriately started on the antipsychotic medication olanzapine. The dosing was unusually high and was rapidly increased, with an increase in dosage to 40 mg per day within one month; that dosage was twice the FDA-approved maximum. The patient was then not seen by the psychiatrist until after already receiving the 40 mg dose. The patient should have been seen and reassessed sooner to monitor for treatment response and possible medication side effects.

Additionally, the patient had no depressive disorder diagnosis despite treatment with antidepressant medications. The psychiatrist discontinued the antidepressant medication nortriptyline, reportedly due to concern of overdose, as the medication did pose significant risk in overdose. However, the initial psychiatric evaluation noted "absent" suicide risk, while the psychologist assessed low risk. The medication was also prescribed for pain control. The choice of sertraline was perplexing, as that medication had no concomitant pain reducing properties. Thus, stronger justification for such a change was required.

As was seen in multiple other cases, the psychiatrist documented that they could not calculate body mass index, as there was no patient height documented. This was concerning, as several of the psychotropic medications prescribed were associated with significant weight gain.

Group treatment was the main treatment modality at DSH-Coalinga. Despite the patient's poor group attendance, his treatment plan was not significantly altered to address that treatment barrier. Given his poor group attendance and how profoundly impaired he was; consideration of individual therapy or a behavioral plan appeared warranted.

**Patient V**

This 27-year-old patient's healthcare record was reviewed to assess the quality of care provided at DSH-Coalinga. The patient was provided diagnoses of schizoaffective disorder, bipolar type and autism spectrum disorder. The patient received his psychotropic medications by a PC 2602 involuntary medication order that was renewed at DSH-Coalinga. He was prescribed the antipsychotic medications paliperidone, olanzapine, aripiprazole, and haloperidol, and the mood stabilizing medication lithium.

On February 23, 2023, the patient was admitted to CMF-PIP for acute care due to isolation, rarely leaving his cell, and acting in response to hallucinations. The CMF-PIP clinicians noted that in the 60 days prior to transfer to DSH-Coalinga; the patient rarely left his cell, did not attend his individual sessions, and he failed to wash his hair. The patient was admitted to DSH-Coalinga on November 1, 2023, and he remained hospitalized there at the time of review.

The initial psychiatric evaluation was completed by telepsychiatry. The psychiatrist noted that the patient did not participate meaningfully in the interview, and the psychiatrist did not know the patient's suicide or self-injurious behavior history. Despite that, the psychiatrist documented the patient to be at "absent" risk for both violence and suicide risk. The psychiatrist also did not note that the patient had an active PC 2602 order, stating that the patient had a right to refuse medications. It was not until November 7, 2023 that medication orders were revised noting the involuntary medication order.

Within the first month of admission, the patient was seen by three psychiatrists. The psychiatric contacts occurred infrequently thereafter. Examples included a gap from December 7, 2023 to January 24, 2024, and from February 27, 2024 when the psychiatrist made significant medication changes to March 20, 2024.

The treatment outcome expectations included increasing insight, coping skills, showering, and attending treatment. Treatment team meetings generally occurred timely, but frequently key disciplines were not in attendance. The patient had poor group attendance. While one note stated that group attendance would be incentivized to provide rewards of off unit activities, further details of that intervention or the development of a behavioral plan were not documented.

**Findings**

The care and treatment provided to this patient were inadequate.

The psychiatric care provided to this patient displayed several fundamental concerns. Most importantly, and as was seen in other cases; there was a lack of clarity whether the patient had an active PC 2602 order to receive involuntary psychotropic medications. That was an issue that DSH should quickly remedy, as the question of whether a patient could refuse medication was a fundamental aspect of treatment.

While the patient attended limited structured groups, the treatment plan was not substantially modified to address that treatment barrier other than providing the patient with self-directed activities. The patient had long-standing isolation and treatment refusal. While there was mention of incentivizing his group attendance, a behavioral plan should have been considered.

As group therapy was DSH's main treatment modality; the patient required additional treatment modifications, such as individual therapy and a behavioral plan.

**Patient W**

This 31-year-old patient's healthcare record was reviewed to assess the quality of care provided at DSH-Coalinga. The patient was provided diagnoses of schizophrenia, autism spectrum disorder, and ADHD, combined type. The patient had a history of PC 2602 involuntary medication orders, but there was no active order at the time of arrival at DSH-Coalinga. At the time of admission, he was prescribed olanzapine for psychosis and hydroxyzine for anxiety; he was also prescribed the antipsychotic medication quetiapine prn for agitation. The patient transferred from the CMF-PIP intermediate care unit to DSH-Coalinga on January 3, 2024.

The discharge summary also noted a diagnosis of PTSD. He was classified as DD2, which indicated the need for prompts for self-care and/or activities of daily living, and possible victimization concerns. Documentation from CDCR indicated that the patient's cognitive challenges contributed to his dysregulated mood.

He was admitted to the CMF-PIP due to delusions, paranoia, not eating, having trash and clothing on the floor, isolation, and fear that others would kill him. The patient had a history of multiple MHCB placements and prior treatment at DSH and the PIP. The patient returned to CDCR on January 23, 2024.

The initial psychiatric assessment occurred timely on the day of admission and was conducted by telepsychiatry. At the initial psychiatric evaluation, the patient presented with grandiose and paranoid delusions, believing he had cured cancer and had written a new gospel. While the documentation indicated that the patient benefitted from treatment with olanzapine, the patient only consented to taking quetiapine, as it helped his sleep. The psychiatrist did note that a PC 2602 order might be required should the patient refuse medications and subsequently decompensate clinically. The quetiapine was titrated up to a robust dose. The patient was seen by the psychiatrist at clinically appropriate frequency, at least weekly.

The treatment outcome expectations included reducing distress from psychosis, interacting with peers appropriately, attending programming, remaining independent with his activities of daily living, learning coping skills, and being medication adherent; those goals were not met. The initial treatment team meeting occurred timely and included all necessary disciplines; however, rehabilitation therapy had not completed their assessment prior to the treatment team meeting.

The initial psychiatric evaluation noted absent suicide and violence risks. The patient had a history of over 30 episodes of cutting that required minor intervention including skin glue for repair. The subsequent suicide risk assessment completed by the psychologist assessed the patient with low risk.

The patient had difficulty at DSH-Coalinga, and he made statements about harming peers. On January 19, 2024, the patient required seclusion due to threats to peers and staff. The patient wrote a letter to female staff that included concerning content. The patient was subsequently placed on enhanced observation status. The documentation indicated that the patient had paranoia, perceptual disturbances, irritability, and episodes of masturbation. The documentation

also indicated that the patient might require a higher level of care but then stated that an example of higher level of care placement would be transfer to an MHCB.

The clinical notes contained no documentation of clinician-to-clinician contact, or which institution the patient transferred. The patient transferred to the CSATF MHCB, where he was subsequently transferred to intermediate then to the acute level of care. The patient transferred to the CMF-PIP for acute care on February 1, 2024, where he remained at the time of review.

**Findings**

The care and treatment provided to this patient were inadequate.

The patient had a clearly documented history of refusing medications with resultant need for PC 2602 involuntary medication orders. Despite CDCR documentation clearly stating that the patient benefitted from olanzapine, the patient subsequently refused that medication upon arrival to DSH-Coalinga. It was unclear why a PC 2602 application was not submitted when the patient began to refuse an effective medication.

The treatment plan goals appeared appropriate. The initial rehabilitation therapy evaluation was not completed prior to the initial treatment team meeting. The decision to return the patient to a more restrictive setting in CDCR was clearly justified. There was, however, a lack of any documentation that a clinician-to-clinician contact occurred, which was warranted in this complex case. The DSH-Coalinga documentation listed MHCB as a higher level of care, when in fact it was a lower level of care than inpatient treatment at DSH.

**Patient X**

This 39-year-old patient's healthcare record was reviewed to assess the quality of care provided at DSH-Coalinga. The patient was provided diagnoses of schizophrenia and unspecified alcohol related disorder. At the time of admission, the patient received his psychotropic medications by a PC 2602 involuntary medication order expiring on October 26, 2024. He was prescribed the antipsychotic medication olanzapine, with an injection administered if the patient refused the oral form, as well as prn orders for the antipsychotic medication haloperidol for agitation and hydroxyzine for anxiety. The patient transferred to DSH-Coalinga on January 4, 2024, where he remained at the time of review.

The patient had a history of treatment at all levels of care. In March 2023, the patient was referred to the CHCF-PIP for intermediate care due to poor activities of daily living, minimal eating, poor hygiene, paranoia, auditory hallucinations, and catatonia.

The initial psychiatric evaluation occurred timely. The patient reported auditory and visual hallucinations. The psychiatric visits occurred approximately every two weeks initially, then the interval increased to every four weeks. The last psychiatric progress note was dated April 25, 2024. On June 10, 2024, the expert inquired about the lack of subsequent notes. The DSH-Coalinga leadership investigated this and discovered that the patient was seen on May 28, 2024, and a dictated note was subsequently provided.

As noted in the healthcare records of other reviewed DSH-Coalinga patients, the initial psychological assessment was delayed. The assessment was completed on March 4, 2024, 60 days after admission.

The treatment team assessed the patient with low suicide risk. The patient had a history of approximately five to six suicide attempts in the community, and one in CDCR. In 2012, the patient was found hanging, requiring cut down. His acute risk of violence was assessed as absent.

The treatment outcome expectations focused on the patient showering, keeping his room clean, and not harming himself. Group treatment was to commence with smaller groups, then to advance to regular-sized groups. Treatment team meetings occurred timely and were updated at least monthly. The treatment plans documented clear interval progress in the patient's clinical status, including but not limited to the treatment plan goals. As an example, the patient's group attendance improved from 56 to 86 percent within a few weeks. The psychiatric notes documented clinical improvement, as evidenced by improved activities of daily living and group attendance.

**Findings**

The care and treatment provided to this patient were adequate.

The patient made progress toward his clinically reasonable and realistic treatment goals. The patient had improved group attendance and hygiene. The treatment team realized that the patient might have difficulty in larger groups and thus started the patient with smaller groups initially.

Areas of needed improvement included the lack of timely access to healthcare records, the lack of documentation of an initial psychological evaluation for 60 days after admission and not having access to a psychiatric progress note in the healthcare record 14 days after the encounter.

**Patient Y**

This 41-year-old patient's healthcare record was reviewed to assess the quality of care provided at DSH-Coalinga. The patient was provided a diagnosis of bipolar disorder, type I, most recent episode manic with psychotic features; that diagnosis was subsequently revised to schizoaffective disorder. The patient received his psychotropic medications by a PC 2602 involuntary medication order, and he was prescribed the antipsychotic medications fluphenazine, haloperidol, and olanzapine, the mood stabilizing medication divalproex, as well as benztropine and diphenhydramine prn for side effects to antipsychotic medications. Relevant medical conditions included hypothyroidism that was treated with levothyroxine.

The patient's relevant treatment history included an attempted hanging at KVSP, after which he was admitted to the CMF-PIP for acute care. The patient transferred to DSH-Coalinga on January 10, 2024, and he remained there at the time of review.

The initial psychiatric evaluation occurred timely and contained a comprehensive mental status examination. The initial social worker evaluation was dated February 16, 2024, 37 days after

admission. The patient denied suicidal thoughts at the time of admission. He was assessed with low suicide risk and absent risk of self-injury.

The initial treatment team meeting occurred timely; however, the psychiatrist was not present. The treatment team meetings often did not include participants such as a psychologist or social work. The treatment outcome expectations included reducing auditory hallucinations, attending programming, performing activities of daily living independently, improving insight and coping, and adhering to prescribed medications.

Most psychiatric contacts occurred during the treatment team meeting and not in individual confidential psychiatric session. Although there was documentation of the patient's height in the healthcare record; the psychiatrist repeatedly stated that the patient's height was unavailable, and thus they could not calculate the patient's body mass index. That was concerning, as the patient was prescribed several medications that posed a risk of weight gain.

Except for the suicide risk assessments and the initial evaluation, no individual psychology sessions were documented in the healthcare record.

On April 12, 2024, a peer attempted to strike at the patient. The patient was subsequently placed on constant observation due to danger to others. Follow-up visits on April 13, 2024 and April 14, 2024 were conducted by a telepsychiatrist.

The patient's participation in treatment showed gradual improvement. The treatment plans noted when the patient met his treatment goals. Group topics appeared appropriate and included topics such as DBT, interpersonal effectiveness, managing mental illness, medication education, and coping skills. The patient remained hospitalized at DSH-Coalinga at the time of review on June 11, 2024.

**Findings**

The care and treatment provided to this patient were inadequate.

Most of the psychiatric visits occurred during the treatment team meetings and not in individual, confidential settings. As the patient had documented paranoia, the lack of confidential individual sessions was particularly concerning. The rationale for some medication choices was lacking, given the patient's medication side effects. As one example, the psychiatrist prescribed haloperidol which was a medication that was more likely than others to cause movement side effects, and that medication required treatment with additional medication to address tremors. The psychiatrist repeatedly documented that they were unable to assess the patient's body mass index, as the patient's height was unavailable. Weight gain is one of the most common side effects of psychotropic medications treatment, with resulting increased risk of medical complications and increased risk for medication discontinuation. While the height was documented in the healthcare record; even if it was not, it was unclear why the psychiatrist did not obtain and document the patient's height for such an important consideration. That issue underscored the importance of DSH utilizing an electronic healthcare record soon.

The treatment team meetings did not include the necessary participants including the psychiatrist, psychologist, and social worker.

Positive aspects of treatment included appropriate group topics and the patient's engagement in treatment.

**Patient Z**

This 52-year-old patient's healthcare record was reviewed to assess the quality of care provided at DSH-Coalinga. The patient was provided diagnoses of schizoaffective disorder, depressive type, hallucinogen use disorder, stimulant use disorder, cannabis use disorder, and antisocial personality disorder.

The patient was prescribed the antipsychotic medication clozapine, and diphenhydramine and benztropine for side effects, as well as hydroxyzine prn for anxiety or agitation and haloperidol prn for agitation. He was also prescribed levetiracetam for seizures; as this medication could cause psychiatric side effects, the psychiatrist worked with the internal medicine provider to transition the patient to divalproex, which was used to treat both seizures and for mood stabilization.

The patient was admitted to DSH-Coalinga on January 17, 2024 from the CMF-PIP acute care unit where he was treated due to danger to self, grave disability, poor activities of daily living, hallucinations, depression, and anxiety. The patient had a history of prior DSH treatment from June 2022 to March 2023. Medical issues included seizure disorder requiring a helmet, urinary tract obstruction, chronic kidney disease, and a history of hepatitis C. While at DSH-Coalinga, the patient contracted respiratory syncytial virus (RSV) and COVID-19.

The initial psychiatric evaluation occurred timely on the day of admission. The assessment was cogent, comprehensive, and contained clinically useful information. The initial psychiatric evaluation noted concerns for malingering and a low score on a cognitive screening test. The psychiatrist noted that they would consider referral for a neuropsychological evaluation to evaluate both; however, no such testing or rationale for reconsidering such a referral was located in the healthcare record. The subsequent progress note was dated February 14, 2024, 28 days after the initial assessment. Several psychiatric sessions occurred during treatment team meetings rather than in individual confidential settings. Progress notes from psychiatry and internal medicine were often handwritten and difficult to discern. The last note in the healthcare record was dated April 15, 2024. The expert asked DSH-Coalinga leadership about this, and a dictated psychiatric progress note for a session was completed on June 6, 2024 and was signed on June 11, 2024.

The patient had several suicide risk assessments that were completed during his hospitalization at DSH-Coalinga, with acute risk ranging from low to moderate. The patient reported a history of ten to twelve suicide attempts, by overdose, use of a gun, or by hanging. The last attempt occurred in 2015 by hanging; there was no apparent injury. The psychiatrist assessed low acute and high chronic suicide risk, and protective factors were clearly documented. A May 3, 2024 evaluation instead stated that the patient had only one prior suicide attempt.

The treatment outcome expectations included attending 60 to 70 percent of programming, improving insight, coping skills, and ADLs, and medication adherence. Of the six treatment team meetings documented in the healthcare record; three included all disciplines, two did not

include the rehabilitation therapist, one did not include a social worker, and one did not include the psychologist. The group topics appeared appropriate and included DBT and substance use. There were several incidents in which the patient was placed on either line-of-sight observation or one-to-one monitoring due to suicidal thoughts or out of concern that a peer might harm the patient. The most recent documentation indicated ongoing auditory, visual, tactile, and olfactory hallucinations, as well as continued suicidal ideation. On June 8, 2024, the patient tested positive for COVID-19 and was transferred to the quarantine unit where he was housed at the time of review.

**Findings**

The care and treatment provided to this patient were inadequate.

The treatment team meetings frequently did not include key disciplines. The number of documented suicide attempts varied in the healthcare record from one to 12 attempts reported. This was a critical factor in accurately assessing the patient's level of risk.

Also, of concern was the patient's medication management, considering his multiple medical conditions. The patient was prescribed several medications that could cause confusion, sedation, falls, and worsening of the patient's pre-existing constipation and urinary retention. The combination of medications prescribed by the psychiatrist required stronger justification, considering the patient's significant medical concerns.

As was seen in other healthcare records, the psychiatrist stated that the patient's height was unavailable, so they could not follow the body mass index for the patient. Treatment with clozapine resulted in a high risk for significant weight gain, and that risk was only amplified by some of the patient's other medications.

The initial psychiatric evaluation noted consideration for neuropsychological testing to evaluate for cognitive issues and possible malingering. There was no clear rationale why that testing was not performed. Additionally, the patient had atypical psychotic symptoms, such as tactile and olfactory hallucinations which merited consideration of a medical work-up and evaluation.

While outside the scope of this review, the patient was prescribed clozapine which is a medication that requires intensive monitoring of the white blood cell count, and the patient contracted two respiratory illnesses while at DSH-Coalinga which could be reflective of decreased immunity.

Positive aspects of care included a comprehensive initial psychiatric evaluation, and close collaboration between psychiatry and medical regarding the use of medications with lower risk for psychiatric side effects.

**Patient AA**

This 42-year-old patient's healthcare record was reviewed to assess the quality of care provided at DSH-Coalinga. The patient was provided diagnoses of schizoaffective disorder, bipolar type, alcohol use disorder, and stimulant use disorder; he had symptoms of paranoia, hallucinations, delusions, disorganized thoughts and behaviors, as well as a prior history of mania. He also had

intermittent medication adherence. Relevant medical issues included low sodium and high potassium blood levels. The patient was prescribed the antipsychotic medications paliperidone, olanzapine, risperidone, clozapine, haloperidol, and the antidepressant medication mirtazapine. He was also prescribed hydroxyzine prn for anxiety and olanzapine prn for psychosis.

The patient had a history of treatment at the EOP and MHCB levels of care, as well as prior treatment at DSH for evaluation of competency to stand trial.

The initial psychiatric evaluation occurred timely, and was completed by telepsychiatry. The psychiatrist did consult with the advanced pharmacology consult service to discuss treatment with clozapine for this patient with electrolyte disturbances. As was seen in other DSH-Coalinga cases, the psychiatrist stated that they could not calculate the body mass index, as there was no height documented in the healthcare record.

Subsequent psychiatric visits often included multiple rapid medication changes. As one example, on March 26, 2024, the plan stated to start clozapine and haloperidol, with a plan to increase the dosages of both medications and to taper and discontinue olanzapine. On April 5, 2024, the patient was prescribed the combination of clozapine, olanzapine, and haloperidol, with a plan to increase olanzapine and the haloperidol prn dose. On May 2, 2024, the patient had concerning side effects, including bedwetting. In some instances, medication changes occurred without clinical documentation. Medication plans were often confusing, with multiple medication changes occurring contemporaneously or in rapid succession.

The assessing psychiatrist reported the patient to have “absent” acute suicide risk, while also noting an overdose of acetaminophen in 2009. A subsequent suicide risk assessment indicated that the patient had low acute and chronic risk, despite documenting an additional suicide attempt in 2005 by walking into traffic.

The treatment outcome expectations included medication adherence, group attendance, and improved psychotic symptoms and social interactions. Treatment team meetings frequently lacked key disciplines. For example, the initial treatment team meeting did not include social work and rehabilitation therapy. Additionally, the rehabilitation therapy assessment was not completed prior to the initial treatment team meeting. Subsequent treatment team meetings lacked psychiatry or psychology presence.

Social worker notes indicated clear review of the treatment outcome expectations. The social worker actively assisted the patient in parole planning and coordinated with the TCMP program. SSI and Medi-Cal applications were submitted, and Medi-Cal was subsequently approved.

The patient was actively involved in a 12-Step program and was in contact with his sponsor.

**Findings**

The care and treatment provided to this patient were inadequate.

The medication management for this patient was concerning. While the decision to start treatment with clozapine appeared well-justified, making several medication changes at the same

time appeared questionable; as it would be extremely difficult to evaluate the response to medications and to monitor for side effects with multiple changes occurring simultaneously.

The treatment planning meetings often did not include key disciplines. The rehabilitation therapy assessment was not completed prior to the initial treatment team.

Positive aspects of the care provided included clear documentation of progress toward goals, good parole planning, and consultation with the advanced psychiatric medication consultation service that was available to DSH psychiatrists.

**Patient BB**

This 32-year-old patient's healthcare record was reviewed to assess the quality of care provided at DSH-Coalinga. The patient was provided diagnoses of schizoaffective disorder, bipolar type; cognitive processing deficits after brain surgery; and alcohol use disorder. The patient was admitted to DSH-Coalinga on February 14, 2024 from the CHCF-PIP.

The patient had a remote history of anorexia nervosa. The patient was classified as DD2, indicating the need for prompts for self-care and/or activities of daily living, and possible victimization concerns. His symptoms included auditory hallucinations, depression, and suicidal thoughts. Relevant medical medications included levetiracetam for seizures, and the patient had a history of drinking excessive amounts of water with resultant seizures. On September 22, 2023, the patient had a seizure and resultant aspiration pneumonia; he denied that he was drinking an excessive amount of water.

The patient was prescribed the antipsychotic medications haloperidol, paliperidone, and olanzapine, the mood stabilizing medication lithium, the antidepressant medication venlafaxine, the antianxiety medications buspirone and hydroxyzine, and benztropine for side effects to antipsychotic medications.

It was unclear from the documentation what level of care the patient received at the PIP prior to the DSH-Coalinga admission. The patient had a history of treatment at the acute level of care, most recently for approximately two- and one-half months in 2022.

The patient had an extensive history of suicidality, including hanging, jumping requiring brain surgery, overdosing, and ingestion of corrosive chemicals. The initial suicide risk assessment assessed the patient with low acute and moderate overall risk for suicide, with an "absent" risk of self-injury. On May 8, 2024, the psychologist repeated the suicide risk assessment, as the patient reported worsened depression and suicidal ideation; he was then assessed with moderate suicide risk. The patient reportedly had an absent acute risk of violence, but he did have a history of assaulting a sleeping peer during prior DSH treatment, and his index crime was murder.

The treatment team meetings occurred timely and included the required disciplines. The treatment outcome expectations focused on reducing depression and auditory hallucinations, while increasing coping skills. The DSH treatment team subsequently revised the goals from CDCR, including reducing group attendance from 100 to 80 percent. At the initial treatment team meeting on February 21, 2024, the team noted that the patient had not yet met with the rehabilitation therapist, and thus was not enrolled in groups yet.

The initial psychiatric evaluation occurred timely by telepsychiatry within 24 hours of admission. The initial mental status examination completed by the psychiatrist noted challenges with the patient hearing the psychiatrist; it was unclear if that difficulty was due the patient having hearing deficits, or it was due to computer connection issues. The psychiatrist documented the need to monitor weights and water intake, but indicated that the patient did not require the formal polydipsia protocol at that time. While excessive water consumption is typically associated with psychotic disorders, the psychiatrist insightfully noted the possibility that the behavior could be due to the patient's history of an eating disorder. While the patient had an active PC 2602 involuntary medication order, that information was not explicitly documented in the psychiatric documentation.

The rationale in the psychiatric progress notes for medication changes was often difficult to discern. The documentation indicated that on two occasions, the psychiatrist made significant medication order changes without a corresponding progress note. As one example, on February 27, 2024, the psychiatrist changed the antipsychotic medication from haloperidol to paliperidone; however, there was no progress note documenting that the patient was seen, or a clear rationale provided for such change. Additionally, the diagnosis listed in those medication change orders was schizophrenia, which was incorrect. Psychiatric notes in May 2024 indicated that the patient had an active PC 2602 involuntary medication order that expired February 8, 2025; however, that information was not documented at the time of intake. A note from May 22, 2024 indicated that the antianxiety medication buspirone was prescribed but failed to list the medication dosage. In June 2024, there were orders, but no note indicating clinical contact, to discontinue haloperidol and to start olanzapine with an injectable backup if the patient refused oral medication.

The psychologist completed an initial evaluation on April 2, 2024, which was 42 days after admission. The only psychology notes located in the healthcare record were for the initial assessment and suicide risk evaluations.

The patient remained hospitalized at DSH-Coalinga at the time of review.

**Findings**

The care and treatment provided to this patient were inadequate.

The healthcare record documentation was unclear regarding the critical issue of whether the patient had an active court-ordered involuntary medication order or not; an order was in place. Medications changes occurred in physician orders, but there was no documentation that the patient was actually evaluated in person, and there was no clinical information documented that supported the medication changes.

The psychiatric evaluation was conducted by telepsychiatry, and there were noted difficulties with communication. Those challenges were posited to be due to either the patient's hearing deficits or connectivity concerns. That crucial distinction merited fuller exploration. The initial psychiatric evaluation, however, contained clinically useful information.

**APPENDIX C3**
**Patton State Hospital (DSH – Patton)**
**Dates Visited: May 6 – 9, 2024**
**Review Period: October 1, 2023 – March 31, 2024**

**Patient A**

This patient's healthcare record was reviewed to assess the care provided at DSH-Patton. At the time of admission, she was provided a diagnosis of unspecified schizophrenia spectrum and other psychotic disorder; however, at the time of discharge, her diagnosis was changed to schizophrenia. She received her psychotropic medications by a PC 2602 order; she was prescribed Haldol and Cogentin, and PRN orders for those medications was provided. The patient arrived at DSH-Patton on October 17, 2023 from CIW-PIP and was discharged on December 15, 2023.

The patient reported a history of methamphetamine use but denied use during the previous three years. The treatment expectations from the CIW-PIP included medication adherence, development of coping skills, and increased ability to tolerate reality testing.

While housed at Folsom State Prison in 2022, the patient programmed with a job and school attendance, and she received mental health services at the 3CMS level of care. At that time, she was not prescribed psychotropic medications. The patient ultimately transferred to a womens' community transitional release program; however, she was returned to CDCR approximately eight months later due to mental health concerns that included bizarre behavior, poor appetite and attention span, and difficulty following directions. The patient stopped eating, was observed talking to herself, had poor hygiene and was observed "playing" in the toilet. She was ultimately admitted to the MHCB due to grave disability. While in the MHCB, she did not stabilize and refused psychotropic medication treatment.

An initial psychiatric evaluation was completed on the day of her arrival at DSH-Patton on October 17, 2023. The psychiatrist noted the patient's poor insight regarding her mental illness and denial of past mental health concerns. She presented with guardedness, did not engage in spontaneous speech, and was described as a poor historian. Additionally, the patient demonstrated concrete thinking and poor judgment. She denied hallucinations; although historically, she was observed responding to internal stimuli.

The rehabilitation therapy assessment, psychosocial assessment, suicide and violence risk assessments were completed timely. The assessments were all completed adequately, and the rehabilitative therapy and psychosocial assessments contained comprehensive clinical information.

The seven-day IDTT met, and a treatment plan was developed; however, the treatment plan was not individualized and included only vague interventions, such as the patient would be assigned to unit-based treatment and activities including coping with incarceration, exercise group, mind body healing, and medication education groups. Only the medication group appeared clinically relevant to the patient's reason for referral. Of note, the DSH-Patton document request production indicated that the patient received individual therapy focused on reducing stress and

anxiety in her interactions with others, assertiveness training, and increasing her insight regarding her mental illness; the treatment plan did not include all of those additional treatment goals.

Although the healthcare record did not include psychology notes, DSH-Patton was able to produce one monthly progress report for the patient that had not been placed in the healthcare record. This monthly summary note stated that the patient was seen weekly by the psychologist. The note did not document the provision of specific interventions but instead stated that the psychologist had "spoken" with the patient "to work toward treatment goals." While that note indicated some original treatment expectations, no clinical documentation regarding specific interventions utilized or patient response was provided. The psychology summary note was very vague and did not include the detail expected in a weekly progress note. There were no weekly psychology progress notes to document whether the clinical contacts occurred in a confidential setting as opposed to a brief interaction in a nonconfidential setting.

The patient was also seen weekly by a social work intern who documented the provision of case management services.

The psychiatrist met with the patient weekly and documented confidential clinical contacts; however, the documentation indicated that the sessions were brief check-ins with the patient. The notes included reference to group attendance; however, no group treatment summary notes were documented in the healthcare record.

Although the patient appeared to demonstrate some initial stabilization, little progress was made regarding increased tolerance and insight. In contrast to the seeming stability documented in psychiatric notes, the nursing progress notes described the patient with agitation, paranoia, and possible disorganized behavior. The psychiatrist increased the patient's Haldol during late November 2023 to address her psychotic symptoms; however, she experienced medication side effects, and the medication dosage was reduced approximately one week before her discharge. The final psychiatric note did not indicate whether the patient had met her treatment objectives.

No weekly group treatment or monthly summary progress notes were located in the healthcare record. An examination of the documentation indicated that for the randomly selected week of October 30, 2023, the patient was provided 17.4 hours of group therapy.

The discharge summary was detailed and provided information regarding the patient's presentation at the time of DSH-Patton admission and her treatment; however, the summary did not include some of the concerning incidents documented in nursing notes. The discharge summary included a recommendation that the patient be transitioned to a long-acting injectable form of Haldol. It was unclear why that medication change did not occur during her DSH-Patton hospitalization; this was especially concerning as an involuntary medication order was in place. The discharge summary indicated that at the time of discharge, the patient's negative symptoms had improved with medication treatment. The summary did not indicate whether all of the treatment outcome expectations were met; in fact, recent notes by the social work intern and psychiatric provider documented that the patient had not fully met those goals.

**Findings**

The care and treatment provided to this patient were inadequate.

While the patient was seen weekly by the psychiatrist, the documentation indicated that those contacts were brief periods of assessment. During the hospitalization, the psychiatrist modified the patient's medications, with an increase in the Haldol dosage and subsequent reduction just one week prior to discharge due to side effects. Additionally, the psychiatric discharge summary recommended that the patient receive a long-acting injectable antipsychotic medication but did not pursue that change despite the patient's PC 2602 order and the enhanced ability to monitor the patient within the structured inpatient setting.

The patient did receive case management services from a social work intern, but the specific services delivered were more consistent with supportive contacts, such as providing the patient with a treatment schedule, and providing reinforcement and support for unit activities.

No group participation was documented to allow for assessment of treatment progress in the group setting. The last progress notes completed by social work and psychiatry within the week of discharge indicated that the patient continued to work to meet the treatment outcome expectations. The discharge summary did not provide the documentation necessary for clinical discharge, as the treatment outcome expectations were not met, there had been recent psychotropic medication changes, and specific psychiatric recommendations to place the patient on a long-acting injectable antipsychotic medication had not occurred. Although the patient had received treatment in the PIP prior to transfer to DSH-Patton, the documentation did not support clinical discharge after only two months of DSH-Patton hospitalization.

**Patient B**

This patient's healthcare record was reviewed to assess the care provided at DSH-Patton. The patient was admitted with diagnoses of unspecified schizophrenia spectrum and other psychotic disorder and cannabis use disorder. At the time of admission to DSH-Patton, the patient was prescribed olanzapine, and valproic acid, as well as benztropine and fluphenazine PRN. The patient received her psychotropic medications by a PC 2602 order. She was referred to DSH-Patton from the CIW-PIP, as she had stabilized sufficiently for placement at her LRH of unlocked dorms and was admitted on March 13, 2024.

Prior to admission at the CIW-PIP, the patient was removed from the MHSDS and the 3CMS level of care in March 2023. From October 2023 to December 2023, 12 mental health referrals were made, two from education and 10 from custody due to concerns regarding the patient's decompensation. She had engaged in disruptive behavior, had trouble with peers and following simple commands, was described at times as disoriented, unpredictable, had engaged in bizarre behavior, and exhibited poor self-control.

The psychiatric assessment was completed on the day of arrival to DSH-Patton. That assessment noted that the patient was provided diagnoses of bipolar I disorder, alcohol use disorder, and cannabis use disorder while at CDCR. The psychiatric assessment was comprehensive and noted that the patient had no insight regarding her mental illness, denied current symptoms, and

reported that her placement at DSH-Patton was due to retaliation. Despite the patient denying the need for psychotropic medication treatment, she agreed to continue treatment with valproic acid and olanzapine. While indicating to the psychiatrist that she did not want to discuss what occurred prior to the CIW-PIP admission, she acknowledged difficulties beginning in September 2023 which she attributed to the death of her fiancé. The patient was described as guarded and mildly irritable with occasional disorganization and rambling speech. Her focus and attention were also slightly impaired.

The risk assessments, nursing assessment, and rehabilitation therapy assessment were completed timely, but no psychosocial or psychological assessments were located in the healthcare record. The patient was assessed with low suicide risk despite a history of self-harm and being found with a noose around her neck in 2016. She minimized her self-harm history, and she reported that she had placed a noose around her neck to be moved because she did not like her roommate.

A signature page in the healthcare record designated for a forensic treatment plan (form DSH-Patton 7546) was reportedly utilized for the seven-day/initial treatment plan on March 19, 2024; however, the only attendees at the treatment team meeting were the psychiatrist and three rehabilitation therapists in addition to the patient. The initial treatment plan was minimal in content and contained little information regarding actual interventions that would be implemented. Discharge criteria were all established for 30 days and included improved insight regarding her mental illness by being able to identify two symptoms, no incidents of aggressive or threatening behavior toward self or others, attendance in at least 75 percent of treatment activities including group and individual sessions, and 100 percent medication adherence. This was the only treatment plan developed at DSH-Patton as the patient was discharged within 35 days of admission, and there was no documentation of a discharge treatment team meeting located in the healthcare record. The abbreviated hospital stay may have been the reason why group treatment documentation indicated that most of the scheduled treatment was supplemental rather than core group treatment.

While document production information indicated that the patient received individual psychotherapy sessions; the patient was seen by the clinical social worker on only one occasion on April 2, 2024, and the social worker progress note indicated that she provided only temporary case management services, and that the treatment team had not requested any social work interventions. No psychology notes were located in the healthcare record; however, a copy of a monthly summary psychology note was provided by DSH-Patton. The summary note indicated that the psychologist "…spoke with patient weekly to work toward treatment goals…" The summary note did not fully document that confidential individual therapeutic sessions occurred; the information in the summary was vague and inadequately detailed the provision of clinical interventions.

The patient was seen weekly by a psychiatrist, but the notes were duplicative with the only change in documentation occurring for the mental status examination despite documentation by multiple disciplines that the patient requested a medication reduction. At the time of discharge, risperidone was added PRN for agitation.

An April 11, 2024 monthly nursing assessment described the patient with hyperactivity, pressured speech, mood swings, disorganized thinking, irritability, and probable response to

internal stimuli. She was discharged from DSH-Patton six days later, and the discharge summary provided the generic statement that the patient had "adequately met treatment outcome expectations"; however, the healthcare record documentation did not support that conclusion. While the discharge summary was detailed; the content was inconsistent with nursing documentation and suggested that the psychiatrist had not reviewed the entirety of the healthcare record. Additionally, the psychiatrist documented that although the patient complained of morning tiredness as a medication side effect during April 2024 for the first time; that issue was not addressed by the DSH-Patton psychiatrist who referred the issue to the subsequent psychiatric provider after discharge. As the patient had made repeated requests for a medication reduction during the DSH-Patton hospitalization despite reporting beneficial effect from the medications; no rationale was provided for not addressing this medication management issue prior to discharge.

No weekly group psychotherapy notes or monthly summaries were located in the healthcare record to assess the patient's functional and participation levels. The attendance report data did not summarize the number of hours attended. The expert reviewed the second week of treatment, the week of March 20, 2024, which indicated that 14 hours of group treatment were provided. Little insight-oriented treatment was provided. Treatment groups included music, movies, and leisure; only two core treatment groups were provided, and all group offerings were primarily rehabilitation services. The patient's attendance was generally above 75 percent as outlined in the treatment outcome expectations, with the lowest attendance at 67 percent.

The patient was discharged on April 17, 2024, for a total of 35 days hospitalized at the intermediate level of care at DSH-Patton.

**Findings**

The care and treatment provided to this patient were inadequate.

The initial seven-day treatment plan was inadequate and vague regarding clinical interventions and specific treatment groups. The treatment plan established multiple treatment outcome expectations but did not adequately address improved insight and functioning. The psychiatrist was made aware of the patient's complaint regarding medication side effects and her ongoing request for psychotropic medication reduction; however, this issue was not addressed prior to discharge and was referred to the receiving provider.

Weekly psychotherapy was recommended; however, the documentation did not indicate that clinically meaningful, confidential individual sessions occurred. The treatment groups that were offered were predominately leisure or social activities which did not address the need for increased insight through education and ability to identify two symptoms that was included in the treatment plan. The nursing staff described the patient with continued functional impairments that were not addressed in the psychiatric discharge summary.

The clinical rationale for discharge was not provided in documentation beyond the generic discharge statement that the patient had adequately met treatment outcome expectations. It did not appear that the patient met those treatment goals, as the documentation did not indicate that the goals were met. Further, an adequate rationale for clinical discharge was not provided.

**Patient C**

This patient's healthcare record was reviewed to assess the care provided at DSH-Patton. She was provided diagnoses of schizophrenia; cannabis use disorder, moderate; amphetamine-type use disorder, moderate; and cocaine use disorder, moderate. At the time of DSH-Patton admission, she was prescribed olanzapine, fluphenazine, sertraline, lithium, and benztropine. The patient was referred from the CIW-PIP and admitted to DSH-Patton on October 17, 2023.

The risk assessments, nursing assessment, psychiatric assessment, and rehabilitative therapy assessment were all completed timely. The psychological assessment was completed after the seven-day IDTT meeting occurred on October 26, 2023; the psychosocial assessment was completed within seven days on October 24, 2023, but it was also completed after the initial treatment team meeting on October 19, 2023. The psychiatric evaluation was comprehensive and noted that the patient had seven previous DSH-Patton hospitalizations.

The DSH patient management unit (PMU) provided significant information regarding suspected malingering for secondary gain, because the patient had previously stated that she wanted to remain at DSH-Patton long-term. In mid-August 2023 while housed at the CIW-PIP, the patient was informed that she would be discharged to the EOP level of care. The patient then began reporting increased depression and thoughts of suicide with a plan. When the PIP staff discussed the possibility of transfer to DSH-Patton, the patient reportedly stated, "that's what I want." This was viewed by at least some of the CIW-PIP staff as due to the patient's desire to be close to her parents who lived near DSH-Patton and would visit the patient. Shortly thereafter, however, custody staff was notified by a family friend that the patient's stepfather and mother had recently died within one day of each other. This was seen as a clinically significant event, as her parents formed the patient's support system. The patient initially denied suicidality but eventually reported poor sleep, anergia, suicidal ideation, and depression. Due to the loss of her primary support system and history of symptoms, the patient was accepted at DSH-Patton. During the initial psychiatric exam, the patient's mental status was described primarily as within normal limits except for impaired memory, attention, concentration, and a blunted affect.

The psychological evaluation, beyond repeating the same historical information included in the PMU review, was relatively brief in content. The psychologist recommended individual and group therapy to address the patient's coping skills deficit and to help her learn how to function in the CDCR environment and to rely less on the hospital setting. CBT was also recommended. The social worker completing the psychosocial assessment noted that the patient would not answer some of her questions and exhibited thought blocking when answering others. The mental status examination documented in the psychosocial assessment contained conflicting information; for example, the social worker was unable address some areas of the assessment as the patient would not answer and simply stared at the provider, but elsewhere described the patient as cooperative.

The initial treatment plan on October 19, 2023 indicated that the patient would be assigned to unit-based activities and several treatment groups such as coping with incarceration, medication education, mind body healing, and exercise group. At the next treatment team meeting on November 16, 2023, the plan included more detail regarding actual treatment groups. The patient was enrolled in approximately 14 groups; however, approximately half of the groups

were rehabilitation therapy or nursing facilitated activities. The treatment plan indicated that the patient had 100 percent attendance at her treatment groups, but it was unclear how many groups she was enrolled in during that period. A calculation based on attendance data provided by DSH-Patton indicated that the patient was provided almost 20 hours of treatment during the randomly selected week of November 4, 2023.

The treatment team documented at the last treatment team meeting on November 16, 2023 that the patient had met all treatment outcome expectations of not endorsing active suicidal or self-harm ideations for 45 days, attending 75 percent of treatment groups, 100 percent medication adherence, and developing two coping skills to manage symptoms of emotional distress Although there was no documentation of an actual discharge treatment team meeting; it was noted at that meeting that all discharge criteria were met except for the duration of the outcomes. The patient remained at DSH-Patton for 18 additional days, and she was discharged just three days short of the duration goal on December 4, 2023, after approximately 42 days of hospitalization at DSH-Patton.

The pre-site document production included a summary of the patient indicating that her "individual psychotherapy sessions focused on a cognitive behavioral therapy approach." The single psychology monthly summary note, however, indicated that the patient was not cooperative with meeting for individual sessions with the provider. The social worker only met with the patient on two occasions to provide social work assistance, which included providing the patient with her treatment schedule and providing "validation" and "praise." Based upon the documentation, the patient did not receive individual treatment consistent with the document production data. No group treatment documentation was located in the healthcare record to support progress in treatment groups.

The psychiatrist met with the patient weekly, and at the last contact on November 27, 2023; the psychiatrist determined that the patient had met all treatment outcome expectations which was documented in the discharge summary. The discharge summary was detailed and contained necessary information; however, it did not document the clinical rationale for discharge.

**Findings**

The care and treatment provided to this patient were inadequate.

The patient had a clearly documented history of decompensation when not in inpatient care; however, that observation was characterized as an exaggerated symptom presentation to remain at the inpatient level of care. The only evidence of possible exaggeration of symptoms was the patient affirming that she wanted to go to DSH-Patton and that when told of impending discharge at the CIW-PIP, she reported increased suicidality and depression. During that time, the patient also lost the primary support system of her parents, which also could reasonably result in increased depression and possible suicidality. Despite suspecting malingering, no psychological assessment was completed that could have provided more objective data regarding that hypothesis.

Additionally, the patient did not receive individual clinical contacts to focus on cognitive behavioral therapy interventions and increased coping skills to maintain her in the outpatient

setting; this made it more likely that she would return for inpatient care. There was no documentation of behavioral treatment focused on the patient's alleged dependence on inpatient care. Further, there was no documentation that the patient had developed two additional coping skills to cope with emotional distress, one of her treatment outcome expectations. At the time of discharge, it remained unclear whether the patient had exaggerated symptoms or had simply experienced decompensation. That diagnostic uncertainty should have been resolved, as it was presented as a hypothesis prior to admission.

**Patient D**

This patient's healthcare record was reviewed to assess the care provided at DSH-Patton. This pregnant patient was admitted to DSH-Patton on November 21, 2023 from the CIW-PIP acute care where she was hospitalized since November 1, 2023. At the time of admission, she was provided a diagnosis of borderline personality disorder, and she was prescribed Abilify and Lexapro, as well as Benadryl PRN; those medications were continued at DSH-Patton.

The referral documents from the CIW-PIP suggested that the patient exhibited rapidly fluctuating moods, irritability, ambivalence regarding wanting her baby, intermittent medication adherence due to concerns that they would injure her baby, and frustration with the lack of activity at the acute level of care. The available documentation suggested that the patient was not sufficiently stabilized for transfer to the intermediate level of care.

The patient's suicide risk was assessed as low nine days after DSH-Patton arrival. No violence risk assessment was located in the healthcare record; although, the psychologist provided a date for the assessment in the psychological intake evaluation. The nursing assessment was completed timely. The rehabilitation therapy assessment occurred within seven days; however, the psychological evaluation was not completed until eight days after her arrival. No psychosocial assessment was located in the healthcare record. The psychiatric evaluation was completed timely on the day of admission, and the assessment was comprehensive and included relevant clinical information. The psychiatrist provided a diagnosis of unspecified bipolar and related disorder based on the patient's report of symptoms and presentation. The medical provider also completed the medical history and physical timely.

No treatment plan was located in the healthcare record. The patient summary provided as part of the document request indicated that during individual psychotherapy sessions, the patient was taught breathing exercises as a coping technique; however, there was no documentation in the healthcare record that the intervention was utilized nor were any psychology monthly summary reports provided for that patient. As was noted in other healthcare records, the social worker documented seeing the patient approximately weekly for check-ins and to provide the patient with their weekly group schedule. No progress notes or monthly summaries were located in the healthcare record.

Psychiatric progress notes documented the following treatment outcome expectations all to be completed within 30 days: maintaining 80 to 90 percent medication adherence, attending at least 75 percent of treatment groups, not engaging in aggressive behaviors, and demonstrating the use of three positive coping skills to manage emotional distress and impairment. The last progress note and discharge summary indicated that those goals were met. The patient was seen weekly

by the psychiatrist. Documentation of those contacts included significant amounts of cut and pasted information with updated mental status exams and updates on patient's pregnancy status.

Interdisciplinary and nursing notes indicated that the patient remained emotionally labile during her DSH-Patton hospitalization and suggested that the patient had not stabilized sufficiently for discharge.

No treatment group weekly or monthly summary progress notes were present in the healthcare record. Attendance data indicated that the patient did not attend an average of 75 percent of treatment groups, and her attendance ranged from zero to 100 percent, with most attendance around 50 percent.

The discharge summary was completed prior to discharge. It was detailed and included relevant information including the course of treatment but did not provide adequate support for the patient's readiness for discharge. She was provided discharge diagnoses of unspecified bipolar or other related disorder and borderline personality disorder. The patient was discharged from DSH-Patton on December 15, 2023 after a three-and-one-half week hospitalization.

**Findings**

The care and treatment provided to this patient were inadequate.

This was a complicated case of a pregnant woman who was ambivalent regarding her pregnancy with significant mental health symptoms and functional deficits that were not stabilized at the time of discharge from DSH-Patton. The patient was sent to DSH-Patton from the CIW-PIP acute care, yet she was hospitalized at DSH-Patton for less than 30 days. The patient was not seen individually as reported and as clinically indicated based on the documentation. It did not appear that the patient had progressed or stabilized in group treatment, since her attendance remained sporadic; and it appeared that she had not met the treatment goals including those outlined in the psychiatric progress notes. While there was a comprehensive discharge summary, it did not provide a relevant and adequate clinical rationale for discharge.

**Patient E**

This patient's healthcare record was reviewed to assess the care provided at DSH-Patton. She was provided a diagnosis of schizoaffective disorder, bipolar type. The patient was prescribed Haldol Decanoate every two weeks, Risperdal Consta every two weeks, Depakene, Cogentin, and propranolol, as well as Benadryl and Zyprexa PRN. She was admitted to DSH-Patton on October 13, 2023.

The patient was referred to inpatient treatment due to grave disability and was referred to DSH-Patton from the CIW-PIP intermediate level of care because it was believed that she would benefit from continued treatment and was appropriate for housing in the unlocked dorms.

The psychiatric assessment, medical history and physical, rehabilitative therapy assessment, psychosocial assessment, and nursing assessments were completed timely. The initial psychiatric assessment was comprehensive and detailed; the psychiatric assessment documented that the patient was generally medication adherent and indicated that she had stabilized significantly

prior to arrival at DSH-Patton. The patient was assessed with low suicide risk on October 19, 2023. No new arrival psychological evaluation was located in the healthcare record. Most of the intake assessments utilized much of the PMU historical information regarding the patient, and little new information beyond a mental status examination was documented. The patient was described as delusional, disorganized and paranoid at the time of intake assessment by the psychiatrist and other evaluators.

The patient was seen by the treatment team within seven days on October 19, 2023 and within 30 days on November 16, 2023. The initial treatment plan was minimal in content; it contained the same generic treatment recommendations for group treatment that were observed for other patients reviewed and did not include detailed information regarding the number of groups or the number of hours of structured therapy for which the patient would be scheduled. The treatment outcome expectations identified in the treatment plan all had 90-day timelines and included remaining 100 percent medication adherent, attending at least 75 percent of treatment groups, developing three coping skills to manage symptoms, and tolerating reality testing of her delusional beliefs.

At the next treatment team meeting, the patient reportedly had adhered to the unit routine with medication adherence and no evidence of delusional thinking; her psychotic symptoms appeared very well controlled with medication treatment. The patient articulated that she was ready for discharge and that the medications had fully resolved her hallucinations. All treatment outcome expectations were considered met at the treatment team meeting, except for the duration of timelines for completion. The discharge summary was completed and provided detailed information, including relevant information regarding the course of treatment and medication management. The discharge summary noted that all treatment goals were met.

The psychiatrist discontinued Haldol Decanoate and reduced the Depakene dosage early in the patient's hospitalization; subsequently, further adjustments were made to the Depakene dosage. The patient appeared to function well on the unit, and she reportedly had no behavioral concerns. She reportedly had occasional difficulty with eye contact, explaining to staff that she felt that she was being judged when people talked to her. This was likely due in part to her delusional thinking which resulted in negative self-perception. The DSH-Patton staff, however, indicated that the patient managed her delusional thinking well, and the patient eventually reported that the medication helped to eliminate auditory hallucinations; however, earlier in her hospitalization, she reported that she continued to hear voices, but far less frequently.

One monthly psychology summary note suggested that the patient was seen on one occasion to review her progress and treatment outcome expectations. The information documented in that note was general and vague, suggesting that the psychologist did not meet with the patient weekly for individual treatment. The social work notes indicated that the patient only received supportive services that included check-ins and providing the patient with a group schedule, as well as reinforcement through positive validation of patient's efforts to comply with her treatment regimen.

No group therapy weekly or monthly summary notes were present in the healthcare record. Based on provided attendance data, the patient's group attendance ranged from attending no groups to 100 percent attendance. The data indicated that for the seven-day period between

November 13 and November 19, 2023; the patient was offered 20 hours of group therapy. While the patient's average treatment attendance was not provided, it did not appear to meet the 75 percent minimum.

The patient was discharged from DSH-Patton on December 1, 2023, for a total length of stay of 49 days.

**Findings**

The care and treatment provided to this patient were minimally adequate.

The patient arrived at DSH-Patton with significantly improved mental status and reduced symptomatology; however, as she had long-standing mental health issues and functional impairment, her prior treatment team believed that she would benefit from continued treatment. This made her treatment outcome expectations even more important in determining readiness for discharge.

The patient was hospitalized for 49 days at DSH-Patton; however, the quality of the clinical contacts was unclear based upon the documentation, with the exception of the psychiatric contacts. The progress notes prior to discharge indicated that the patient was determined to achieve her treatment goals; although, there was no documentation regarding specific coping skills provided or her ability to tolerate reality testing.

Additionally, the lack of sufficient group treatment attendance was not addressed. Due to the lack of group therapy documentation, the patient's possible progress could not be properly assessed. The patient was offered appropriate group therapy opportunities, and the psychiatrist worked closely with the patient to facilitate continued stability and medication adherence. Despite the limitations in documentation, it appeared that the patient remained stable throughout her hospitalization.

**Patient F**

This 31-year-old intermediate level of care patient's healthcare record was reviewed to assess the quality of care provided at DSH-Patton. Diagnoses at the time of DSH-Patton admission included schizophrenia, bipolar I disorder, borderline personality disorder, and substance use disorders (opiates and amphetamines). Medications at the time of DSH-Patton admission included the antipsychotic medications fluphenazine long-acting injectable and oral olanzapine, and the antidepressant medication sertraline. The patient was admitted to DSH-Patton on March 5, 2024 from the CIW-PIP acute level of care.

The patient's symptoms upon admission included paranoia, auditory and visual hallucinations, suicidal thoughts, and a history of self-injury by cutting. Upon admission, the psychiatrist at DSH-Patton revised the diagnoses to unspecified schizophrenia spectrum disorder and substance use disorders (cannabis, stimulant, and opiates).

The patient had a history of inconsistent medication adherence, and a PC 2602 involuntary medication order was obtained at the CIW-PIP. During treatment at DSH-Patton, the patient was

also prescribed quetiapine for psychosis, clonazepam for restless leg syndrome and anxiety, trazodone for insomnia, and hydroxyzine PRN for anxiety.

The treatment team meetings occurred timely and included the required disciplines. The treatment outcome expectations centered on self-injurious behavior, reduction of psychotic symptoms, and medication adherence. Of note, although the patient had one prior suicide attempt as a teenager; self-injury was not noted to be an area of current clinical concern in the initial psychiatric evaluation. Her acute suicide risk was assessed as low.

The initial psychiatric evaluation occurred timely within 24 hours of admission. Overall, the evaluation was comprehensive and painted a clear clinical picture of the patient; however, the note contained incorrect information regarding the patient's treatment received under PC 1370, judgment of mental incompetence and order for commitment. The psychiatric follow up sessions generally occurred on a weekly basis. Multiple notes mentioned that the patient was referred to neurology for restless leg syndrome; however, no follow up information was located in the psychiatric progress notes. Laboratory monitoring was appropriate, and side effects of medications were monitored. A nursing note dated May 1, 2024 incorrectly reported that the patient was not under a PC 2602 involuntary medication order.

The healthcare record displayed inconsistent clinical information regarding suicide and self-injurious behaviors. The initial psychiatric evaluation mentioned that the patient had thoughts of self-injury in January 2024 but did not act on those thoughts. While the suicide risk assessment completed on March 12, 2024 documented no history of self-injury, the treatment outcome expectations listed self-injurious behaviors as a central area of treatment. This conflicted with a psychiatric note dated March 27, 2024 which stated that the patient's last episode of self-injury was approximately two years prior. The end of the suicide assessment plan stated that the patient would be referred for specific therapies, including CBT, DBT, and cognitive processing therapy; however, there was no documentation to reflect such referrals.

DSH reported that *Coleman* patients were seen weekly for individual counseling with a psychologist. Individual psychology progress notes were missing from the healthcare record at the time of the review and were provided near the end of the monitoring tour; DSH-Patton did not provide a reason for their absence in the healthcare record. The institution provided one such note for this patient dated April 24, 2024. While the note stated that the patient had "oblique suicidal thoughts" prior to admission, she reportedly was "still working towards her prison treatment goals." The note mentioned the patient's anxiety about possibly returning to DSH-Patton at the time of parole. The note failed to state the interventions employed during the treatment session. The patient discharged to CCWF on May 9, 2024.

**Findings**

The care and treatment provided to this patient were inadequate.

The healthcare record documentation was inconsistent regarding risk of self-injury; some notes stated that there was no history of self-injury, while others stated that it occurred two years prior. Despite no current self-injurious behavior, several of the treatment outcome expectations focused on this goal.

Documentation of individual therapy was lacking in the healthcare record. DSH-Patton supplied one therapy note. The suicide risk assessment stated that a referral to specific therapeutic interventions would be made; however, the healthcare record review did not indicate that those interventions occurred.

There were multiple limitations regarding the provision of psychotherapy. The healthcare record lacked documentation of the provision of individual psychotherapy sessions, with only one note provided by DSH-Patton at the end of the monitoring tour. That note contained insufficient information regarding specific therapeutic interventions provided.

Overall, the medication management appeared appropriate and rational with clear treatment targets. Medication side effects were appropriately addressed. Concerns included a referral to neurology listed in multiple psychiatry notes without documented follow-up.

**Patient G**

This 47-year-old intermediate level of care patient's healthcare record was reviewed to assess the quality of care provided at DSH-Patton. Diagnoses at the time of DSH-Patton admission were schizophrenia, major depressive disorder, and substance use disorders (opiates and amphetamines). At the time of admission, the patient was prescribed risperidone and fluphenazine for psychosis, divalproex for mood stabilization, fluoxetine for depression, and prazosin for trauma-induced nightmares. The patient arrived at DSH-Patton on January 26, 2024 from CIW-PIP acute level of care.

At the time of discharge, the diagnoses were revised to borderline personality disorder, PTSD, major depressive disorder, and substance use disorders. Relevant medical medications included levetiracetam for seizures and buprenorphine/naloxone for MAT to address opiate use disorder.

Medication management was logical with clear targets of treatment. Medication side effects were managed effectively. From February 26 to February 29, 2024, the patient was at an outside medical hospital due to low heart rate. The prazosin was discontinued, and the fluoxetine dose was lowered.

The initial and routine treatment team meetings occurred timely and included all required participants. The treatment plan goals included medication adherence, group attendance, absence of suicidal thoughts or self-injury, and the use of coping skills to address emotional distress and anxiety; the duration of all goals was 30 days. The patient met all goals prior to return to CDCR. The initial treatment plan from February 1, 2024 listed the principal diagnosis of borderline personality disorder, while the March 14, 2024 monthly conference listed a diagnosis of schizophrenia.

The patient had a history of four suicide attempts and one instance of razor blade ingestion in August 2023. The initial psychiatric evaluation occurred timely and noted that the patient was at high acute risk for suicide with a risk for self-injurious behavior; the psychiatrist subsequently placed the patient on one-to-one monitoring from January 26 to January 30, 2024. A subsequent suicide risk assessment assessed the patient with moderate acute and moderate-to-high chronic suicide risk.

The initial psychiatric evaluation occurred timely and included sufficient information to construct a clear clinical picture of the patient. Follow-up visits also occurred timely on approximately a weekly basis. Overall, there was good continuity of psychiatric care. Psychiatric visits occurred onsite.

The March 5, 2024 psychosocial assessment indicated that due to COVID-19 precautions, the patient received modified group treatment and received court competency handouts to complete.

Included in a list of activities offered to the patient, the patient had two documented individual therapy sessions on March 7, 2024 and March 14, 2024, of which she attended 50 percent and 100 percent respectively. While therapy notes were absent from the healthcare record, the notes were provided at the end of the monitoring tour. Offsite review revealed that one note, dated February 2024 without a specific date, stated that the psychologist met with the patient weekly. The note reflected that the patient consistently denied any thoughts of self-harm. The notes lacked formal mental status examinations. Other than "weekly", it was not possible to determine the actual number of therapy sessions that occurred during the month. The second note, dated March 2024, did not list the number of sessions or if they occurred weekly. This note also documented the absence of suicidality. The notes contained limited details regarding the interventions used in session, and how such interventions addressed treatment plan goals.

The patient also met with a social worker for case management services. The patient attended both core and supplemental groups with a high degree of attendance. Group topics were generally germane to the patient's clinical presentation. On March 18, 2024, the patient discharged to CCWF at an unclear level of care.

**Findings**

The care and treatment provided to this patient were inadequate.

The healthcare record review revealed multiple concerns. The psychiatrist changed the patient's diagnosis from schizophrenia to borderline personality disorder without a clearly documented rationale. The diagnostic change should have been accompanied by thorough documentation in support of the change. If there was a concern about the diagnosis, consideration could have been given to psychological testing for the purpose of diagnostic clarification.

The initial psychosocial assessment indicated that the patient received seemingly inappropriate treatment packets, more consistent with DSH placement under other commitment statutes. This was concerning given the low number of CDCR patients at DSH-Patton; as it appeared that the DSH-Patton treatment team was more familiar with patients who had other commitment statutes and may not have provided care specifically tailored for CDCR patients treated under the PC 2684 statute. The treatment goals should have been revised and updated, as she had already met the identified goals.

Positive aspects of the care provided included comprehensive assessment of suicide risk and appropriate placement of the patient on enhanced observation due to risk. Medication management also appeared appropriate, including the interaction between medical concerns and psychotropic medication management.

**Patient H**

This 68-year-old intermediate level of care patient's healthcare record was reviewed to assess the quality of care provided at DSH-Patton. At the time of DSH-Patton admission, the patient was provided a diagnosis of major depressive disorder; schizoaffective disorder, depressed type and stimulant use disorder by history were also included in the documentation. The patient was prescribed lithium for mood stabilization, lurasidone for psychosis and depression, and desvenlafaxine for depression. The patient was admitted from the CIW-PIP acute level of care on December 13, 2023.

The reasons for her admission to acute care included worsening depression, not eating or drinking, and urinating and defecating in bed. The patient was not taking medications, and psychiatry requested and was granted a PC 2602 involuntary medication order. The healthcare record documentation was unclear if the patient's not eating and drinking was a suicide attempt, or due to grave disability. The patient had prior suicide attempts by not eating, most recently on October 4, 2023.

At the time of DSH-Patton admission, medical conditions included a pacemaker for heart block, pancreatitis, hypertension, high cholesterol, urinary incontinence, and constipation. During her treatment course, the patient transitioned from lurasidone to aripiprazole. The patient's intake nutritional assessment contained useful information; however, it failed to mention the patient's history of not eating or drinking.

The initial and routine treatment team meetings occurred timely. The treatment goals included medication adherence, completing activities of daily living, and communicating and engaging with the treatment team staff, all for a minimum of 30 days. The treatment team subsequently added a goal of practicing mindfulness skills ten minutes daily for the next 30 days.

The initial psychiatric evaluation, initial suicide risk assessment, and progress notes from psychiatry and social workers were inconsistent regarding whether the patient had prior suicide attempts. As an example, the formal suicide risk assessment did not note prior suicide attempts and assessed low suicide risk. In contrast, the December 26, 2023 psychiatric note stated that the patient had between four to six attempts, most recently in October 2023.

The initial psychiatric evaluation stated that the patient would be enrolled in court education groups as required under PC 1370; however, the patient was not committed to DSH-Patton under that statute. Multiple social worker notes stated that one goal was "increasing trial competency", which was a goal for PC 1370 patients. Several social worker notes also reflected discrepant information about the patient being under a PC 2602 involuntary medication order.

The initial psychiatric evaluation was completed timely within 24 hours of arrival. Psychiatric notes were comprehensive and contained clinically useful information. There was good continuity of psychiatric care. Psychiatric services were provided onsite with no use of telepsychiatry.

The psychiatrist changed the patient's antidepressant medication from the nonformulary medication desvenlafaxine to venlafaxine pending approval of the medication. The DSH-Patton nonformulary policy stated that nonformulary medications may be continued if the patient was

taking them prior to arrival at DSH-Patton. Subsequent notes reflected that the patient missed psychotropic medication doses for an unclear "unavoidable reason."

The psychologists documented monthly summary notes from December 2023 to March 2024. The notes mentioned that the psychologist "spoke" with the patient weekly. Notes reflected clinical progress, but contained scant information regarding interventions provided and how they related to the patient's treatment goals.

Social worker notes focused on case management services. As seen in other cases, the notes reflected that the social worker was providing "temporary case management" services.

The patient discharged to CDCR on April 30, 2024. The healthcare record reflected discrepant information regarding whether the patient discharged to CCWF or CIW.

**Findings**

The care and treatment provided to this patient were inadequate.

The healthcare record reflected discrepant information regarding the patient's history of suicide attempts. The question of suicide attempt history was of the utmost importance, as this determined risk level and treatment interventions. Regarding medications, several concerns were noted. At the time of admission, a medication was replaced with another pending approval of a nonformulary medication. This deviated from DSH-Patton policy 5.11 from the Pharmacy and Therapeutics Manual which stated that nonformulary medications were allowed "if a patient is admitted or returns from an outside facility on a non-formulary medication." While venlafaxine and desvenlafaxine were closely related medications, a change in the patient's medication risked clinical decompensation.

An additional medication concern was the lapse in two of the patient's psychotropic medications. The reason for this lapse was not specified in the healthcare record. The paper healthcare record used by DSH-Patton made determining the number of doses of missed medications difficult to determine.

Additionally, as seen in other cases, healthcare record notes mentioned that the patient was placed at DSH-Patton for PC 1370 incompetence to stand trial, rather than treatment of a CDCR incarcerated person under PC 2684.

There was limited continuity of social worker services, and notes frequently indicated that they were providing "temporary" services. The psychologist provided monthly summary notes of weekly meetings. While the notes reflected clinical progress, they contained inadequate information regarding the interventions used in session and how they related to treatment plan goals.

While on-site, the expert raised multiple concerns with weekly sessions being summarized in monthly notes, as this allowed delay in clinically relevant information to be accessible when needed in the healthcare record.

**Patient I**

This 57-year-old intermediate level of care patient's healthcare record was reviewed to assess the quality of care provided at DSH-Patton. The patient's diagnoses included schizoaffective disorder, bipolar type; alcohol use disorder; and stimulant use disorder. At the time of admission, the patient was prescribed risperidone long-acting injectable for psychosis and benztropine for medication side effects. The patient was admitted on September 20 2023 from CIW-PIP intermediate level of care.

During her DSH-Patton stay, schizoaffective disorder was changed to unspecified schizophrenia spectrum disorder. Relevant medical conditions included migraines, for which the patient took topiramate, and a possible history of seizures.

The patient was admitted to the MHCB level of care on June 16, 2023 due to grave disability, confusion, disorientation, delusional thinking that she was dead and that her body was being consumed, delusional behaviors of trying to leave the institution, and wanting to speak with the FBI. The patient arrived at the CIW-PIP on July 13, 2023. Due to limited medication adherence, a PC 2602 involuntary medication order was obtained. The patient had subsequent medication adherence and attended individual and group counseling. Due to her progress, she was subsequently determined to be appropriate for transfer to the unlocked dorms at DSH-Patton for continued treatment.

The initial and follow-up treatment team meetings occurred timely and included all required participants. The treatment outcome expectations included reduced intensity of distress related to delusional thought content, medication adherence, and participation and attendance at 100 percent of groups, all for 90 days. The patient was assessed with low acute and chronic suicide risk.

The initial psychiatric evaluation occurred timely on the day of admission. As seen in other healthcare records, the psychiatrist reported that the patient would be enrolled in court education groups, which was required under PC 1370; however, the patient was not hospitalized under that statute. Notes reflected six sessions with the psychiatrist between October 2, 2023 and November 6, 2023; all notes documented the same plan verbatim. Of note, the plan contained historical information regarding medication treatment, but did not specify a plan for ongoing medication treatment. All psychiatric sessions occurred on-site, with no use of telepsychiatry. Laboratory studies on September 26, 2023 showed elevated prolactin, which was a probable side effect of antipsychotic medication treatment. Subsequent notes mentioned this concern but did not include a clear plan for follow-up. The psychiatrist began a taper of the benztropine, due to an unclear rationale for its use and reported limited efficacy.

The initial psychological assessment recommended individual and group therapy to focus on coping skills to reduce reliance on the hospital setting. During on-site review of the healthcare records; the healthcare record contained one psychology progress note dated October 19, 2023. At the end of the monitoring tour, DSH-Patton supplied two additional psychology notes dated September 2023 and November 2023. The note from September 2023 (no specific date) noted that the patient attended groups and engaged in the unit milieu. While the note mentioned coping skills, it did not contain any specific coping skills nor how they related back to treatment plan

goals. The note from October 19, 2023 included identifying information about another patient and how the patient bothered peers "and is trying to manipulate them." One additional note was dated November 2023 in one location, and December 2023 (no specific dates) in another. The notes documented the patient's progress but did not contain specific interventions and how they linked back to treatment plan goals. There was, however, good continuity of care with the psychologist.

Social work notes largely focused on case management and group attendance.

At the time of discharge, the patient reportedly had chronic psychotic symptoms, but she had made clinical process with no further bizarre or paranoid delusions. The psychiatric discharge summary noted that the patient met her treatment outcome expectations and was thus discharged back to CDCR on November 14, 2023.

**Findings**

The care and treatment provided to this patient were inadequate.

As observed in other healthcare records, the initial psychiatric evaluation mentioned treatment with court groups under the PC 1370 statute. Additionally, despite screening for and documenting in multiple notes that the patient had an elevated prolactin level, the psychiatrist did not document a plan to address this. The psychiatrist wrote an apparently verbatim plan carried over for the six psychiatry notes from October 2, 2023 to November 6, 2023; the plan was a summary of medication history and interventions at the time of the initial psychiatric evaluation and not actually a plan for next steps in psychiatric treatment. Other than the tapering of a medication due to side effects, there were no substantive medication changes made. While it was the psychiatrist's discretion to change medications or not, the rationale for continuing the medications unchanged merited stronger justification in the healthcare record.

For unclear reasons, two of the three psychology notes were initially missing from the healthcare record at the time of the monitoring visit. Two of the notes were labeled with the month only, and did not include a specific date of service. The notes did not reflect specific interventions performed, and how these interventions linked back to treatment goals.

Positive aspects of the care provided included timely treatment team meetings and psychiatric contacts, as well as good continuity with the psychiatrist and psychologist.

**Patient J**

This 37-year-old intermediate level of care patient's healthcare record was reviewed to assess the quality of care provided at DSH-Patton. The patient's diagnoses were schizoaffective disorder and amphetamine use disorder. At time of admission, the patient was prescribed the antipsychotic medication clozapine and naltrexone to treat substance use disorder. The patient was admitted on September 29, 2023 from the CIW-PIP. While at the CIW-PIP, the patient was noted with significant improvement in hallucinations, delusions, paranoia, bizarre behavior, and negative symptoms. Also while there, psychiatry obtained a PC 2602 involuntary medication order.

Psychiatry at DSH-Patton added the antipsychotic medication haloperidol to target the patient's impulsivity, aggression, and psychosis. The patient was also prescribed hydroxyzine PRN for anxiety, and atropine drops for side effects to clozapine.

The initial and routine treatment team meetings occurred timely and included all required participants. The treatment outcome expectations were medication adherence, no aggressive behaviors, attending and participating in 75 percent of groups, identifying techniques to use daily to manage her symptoms, and attending to her ADLs; the duration of those expectations was 90 days.

After admission to DSH-Patton, the patient had multiple instances in which she took food and drinks from peers and was found digging in the trash for food. An incident on October 11, 2023 resulted in the need for a reported "show of force" and administration of a PRN medication. The patient had two such instances on October 15, 2023. The patient reportedly took a cup of tea from a peer, with the peer running after the patient. Staff intervention was required, but the patient was redirectable and did not require PRN medication. Approximately five hours later, the patient had an incident of reportedly taking a candy bar from a peer and scratching the peer when they tried to retrieve it. She threatened the peer and staff and was subsequently placed into five-point restraints. The documentation indicated that there was no time to attempt to de-escalate the situation, but did not clearly state why five-point restraints was the least restrictive intervention. The physician notification and required evaluation were both within mandated timeframes. The patient received injectable PRN medications. The total time in restraints was approximately five hours. As nursing staff stated that the patient was "cooperative and able to follow directions," the patient was released from restraints and transitioned to locked-door seclusion. Despite nursing notes documenting that the patient was either resting or quiet for almost a seven-hour span of time, the patient remained in seclusion for an additional five hours. During the approximately 12 hours of seclusion, the patient was monitored by audiovisual monitoring, not by direct observation.

The patient had multiple similar instances of taking food from peers, including approximately three hours after release from seclusion; additional instances occurred on October 17, 2023, November 18, 2023, and December 19, 2023. The patient required locked seclusion on October 17, 2023 due to being "unpredictable" and concern that she might harm others.

Psychiatric progress notes documented reasonable medication management, such as adding haloperidol after the patient's incident of restraint placement, and hydroxyzine PRN for anxiety. The last psychiatric progress note seen in the healthcare record was dated November 13, 2023. The patient discharged from DSH-Patton and returned to CDCR on January 2, 2024.

**Findings**

The care and treatment provided to this patient were inadequate.

Due to the magnitude of the concerns noted, the issues of concern were conveyed to DSH-Patton staff during the onsite visit.

Shortly after admission, the patient displayed challenging behaviors, including multiple instances of taking food from peers, frequently asking for food in groups, and digging in the trash for food.

A deeper exploration of that behavior was warranted, with strong consideration for a behaviorally based plan. While increased appetite could be a side effect of clozapine, it was unclear if this contributed to the behaviors, or whether they were driven by other psychological factors.

The expert expressed concern onsite about the use of seclusion and restraints for this patient. Given the physical and mental health risks inherent from using restraints, they should only be utilized as the least-restrictive option to keep the patient or others safe. The documentation in the healthcare record did not clearly support that five-point restraints were required; while the patient scratched a peer and threatened a peer and staff; there was insufficient documentation that those behaviors rose to the level of requiring restraints. Although it was a nursing decision for restraint placement; it was the decision of the psychiatrist to continue placement. Furthermore, when the patient was removed from restraints and was placed into seclusion, the patient had a period of almost seven hours in which she was reportedly quiet or asleep. It was unclear why seclusion was not discontinued sooner. While audiovisual monitoring of patients in seclusion was permitted per DSH-Patton policy, the expert expressed concern about that means of monitoring replacing one-on-one in-person observation.

Despite the patient's continued display of challenging behaviors surrounding food, no behavioral plan was proposed or implemented.

The expert also expressed concern about the lack of documented psychiatric contacts from November 13, 2023 to the time of discharge on January 2, 2024.

Positive aspects of this case included a logical approach to medication management.

**Patient K**

This 31-year-old intermediate level of care patient's healthcare record was reviewed to assess the quality of care provided at DSH-Patton. Her diagnoses at time of admission included schizoaffective disorder, bipolar type; unspecified mood disorder; unspecified anxiety disorder; and substance use disorders (alcohol, amphetamine, and cannabis). Medications at the time of admission included fluphenazine, olanzapine, and risperidone for psychosis, valproic acid and lithium for mood stabilization, escitalopram for depression and anxiety, and benztropine to address side effects from antipsychotic medications. The patient transferred from the CIW-PIP acute level of care to DSH-Patton on August 17, 2023.

Medication changes during hospitalization at DSH-Patton included discontinuation of lithium, risperidone, and benztropine, and the addition of amantadine to address side effects to antipsychotic medications. Relevant medical medications included bromocriptine, which was traditionally used to address high levels of the hormone prolactin which sometimes occurred with antipsychotic medication treatment.

The initial and routine treatment team meetings occurred timely and included all required participants. The treatment plan goals included medication adherence, lack of suicidal thoughts or self-harm, learning techniques to address distress from auditory hallucinations, and attendance at individual and group therapy sessions.

The patient had a history of hitting her head and ingesting ibuprofen, although the validity of those reports was unclear. The patient was placed on suicide watch three times in September 2023, due to suicidal thoughts related to auditory hallucinations. The initial psychiatric evaluation assessed the patient to be at moderate suicide risk. The suicide risk assessment completed by psychology on August 23, 2023 was internally inconsistent; one portion documented moderate suicide risk, but the summary indicated that the suicide risk was low. Concerningly, the assessment did not address multiple overdoses that contributed to MHCB, PIP, and subsequent DSH admission.

The initial and follow-up psychiatric sessions occurred timely. The psychiatrist saw the patient daily when she was on one-to-one monitoring. Medication management was logical and attempted to minimize the number of prescribed psychotropic medications. The psychiatric discharge summary was comprehensive and provided a clear clinical picture of the patient's presentation and progress during treatment. During her treatment, the patient had significant weight gain.

The treatment plans reflected progress toward treatment goals and group attendance. The patient returned to CIW at the EOP level of care on February 23, 2024.

**Findings**

The care and treatment provided to this patient were adequate.

When the patient reported suicidal thoughts; the DSH-Patton clinicians appropriately reviewed and addressed those symptoms with increased monitoring and close psychiatric follow-up. The psychiatric notes were comprehensive and clinically useful. Complex medication management decisions were logical, and the justification was clearly delineated. The treatment plans showed progress toward treatment outcome expectations. While at DSH-Patton, the patient demonstrated substantial weight gain which may have been a side effect of prescribed medications. While the patient did see a nutritionist who provided interventions to address that concern, a closer emphasis on preemptively addressing that side effect appeared warranted.

An issue of concern was the inconsistent information provided in the suicide risk assessments.

**Patient L**

This 32-year-old patient's healthcare record was reviewed to evaluate the quality of care provided in the intermediate care program at DSH-Patton. At DSH-Patton, the patient was provided diagnoses of unspecified schizophrenia spectrum and other psychotic disorder, unspecified anxiety disorder, opioid use disorder, amphetamine use disorder, and cannabis use disorder. A diagnosis of borderline personality disorder was added to the list of diagnoses at the time of discharge. She was prescribed Prolixin decanoate, Prozac, BuSpar, Remeron, prazosin, and melatonin.

The patient had nine MHCB level of care referrals between May 2022 and December 2023, as well as three incidents of foreign body ingestion that occurred between October and December 2023. The patient received acute care at the CIW-PIP from December 15, 2023 to January 11,

2024. Subsequently, the patient discharged to the CIW-PIP intermediate care program and transferred to DSH-Patton on or around March 5, 2024 for further intermediate care pursuant to PC 2684.

Prior to arriving at DSH-Patton, the CIW-PIP treatment team documented significant improvement at 78 percent toward goals of decreasing self-harm, and improving self-care and treatment participation. A CIW-PIP progress note on March 4, 2024 also referenced significant improvements, including “unremarkable” mental status examinations, participation in unit activities, medication adherence, and an absence of overt psychosis or recent harm to self or others.

The revised CIW-PIP treatment outcome expectations included further demonstration of stable behavior and further work on coping strategies to prevent self-harm, to manage cravings for illicit substances, and to manage irritability.

All DSH-Patton providers completed their initial assessments as required. A psychologist completed a suicide risk assessment on March 15, 2024 which assessed the patient with low suicide risk. The psychologist noted two suicide attempts and three self-harm incidents since 2022, three of which occurred prior to the patient’s recent acute admission in September, October, and November 2023. The suicide risk assessment narrative vaguely referenced social support as a protective factor; however, no further information was provided, and social support was not marked positive on the CSSRS tool itself. Additionally, the psychologist stated that the patient’s awareness of feelings and requests for help served as protective factors; despite, the CIW-PIP referral indicating a lack of emotional self-awareness and regulation, and the assigned DSH-Patton psychiatric assessment noting chronic problems with emotion dysregulation, poor frustration tolerance, and marked reactivity of mood during stress.

The treatment plan was developed timely. Clinical notes indicated that the patient was assigned to treatment groups within two days of DSH-Patton arrival on March 7, 2024, including ten clinician-led structured therapeutic activities and four rehabilitative therapy groups. While the treatment plan indicated individual psychotherapy with a psychologist would be provided, no progress notes were located in the healthcare record.

At the request of the expert, DSH leadership provided one progress note not included in the healthcare record for the patient. The progress note included the month and year, but no specific contact dates were provided. The note’s content suggested that it referenced only one contact to “discuss her treatment” and to “provide education.” The psychologist’s note failed to demonstrate that psychotherapy was provided as planned. Further, there was no reference to current mental status, type of education provided, or goals addressed. The note instead provided a brief summary of the current admission, which was information already provided in greater detail in the treatment plans, nursing notes, and social worker case management notes.

The DSH-Patton treatment team convened timely but did not develop their own treatment goals or adopt the new goals recommended by CIW-PIP which included addressing emotion dysregulation and frustration tolerance. Instead, the treatment team adopted the treatment

outcome expectations from the original CIW-PIP referral, many of which were already met prior to the patient's arrival at DSH-Patton.

The treatment team's 30-day conference documentation indicated that the patient attended all assigned groups, behaved appropriately on the unit, did not engage in self-harm or harm to others, utilized coping skills to deal with emotional stress and anxiety during hospitalization, and remained fully medication adherent with symptoms that were described as well controlled. Psychiatric, social worker, and nursing progress notes also suggested that the patient achieved their goals and was prepared for discharge. Further, the treatment team indicated that the patient perceived that their treatment goals were met and that they were prepared to return to the outpatient care setting.

The patient was discharged to the EOP level of care on or around April 23, 2024.

**Findings**

The care provided to this patient was adequate.

The treatment provided met the patient's level of care needs during the very brief hospitalization. The CIW-PIP documentation suggested the patient may have been ready for discharge to the EOP prior to the DSH-Patton admission. However, as DSH-Patton accepted the patient; they should have either developed their own treatment goals or adopted the new goals proposed by the CIW-PIP, as the original treatment outcome expectations had been met or nearly met prior to DSH-Patton arrival. Despite this, the patient appeared to benefit from the DSH-Patton treatment groups, socialization activities, and medication management during the hospitalization.

Similar to other DSH-Patton healthcare records reviewed, problems were identified with the psychologist's suicide risk assessments, implementation of individual treatment as recommended, and documentation practices that fail to meet the minimum standard of care.

**Patient M**

This 41-year-old transgender patient's healthcare record was reviewed to evaluate the quality of intermediate care provided at DSH-Patton pursuant to PC 2684. At DSH-Patton, the patient was provided diagnoses of gender dysphoria and schizoaffective disorder, bipolar type. The diagnoses were appropriately justified in the healthcare record. The treating psychiatrist prescribed haloperidol and lithium. The patient arrived at DSH-Patton on or around November 14, 2023.

The healthcare record documentation indicated that the patient had a serious mental illness, an index offense that occurred in the context of psychiatric decompensation, and participation in several competency evaluations prior to sentencing. During April 2023, CDCR reduced the patient's level of care from EOP to 3CMS shortly after an MHCB admission. The patient had psychiatric decompensation in the general population setting and four MHCB admissions before referral to the CIW-PIP for psychosis and danger-to-self concerns.

Concerning symptoms and behaviors noted in the healthcare record included headbanging, suicide attempts, cutting, pseudo-seizures, auditory and visual hallucinations, impulsivity, paranoia, mood lability, and intermittent reliance on a wheelchair for ambulation due to a knee injury that required surgical intervention.

The initial DSH-Patton provider assessments and initial treatment team meeting occurred timely. The psychiatrist completed a thorough initial assessment and met with the patient on at least five occasions during the brief hospitalization. The psychiatrist also increased the lithium dosage and noted ongoing medication adherence and an overall positive response to the medication change. Nursing and social worker assessments and progress notes provided useful observations, as well as updates regarding treatment adherence and progress. Additionally, progress toward treatment outcome expectations was appropriately documented at the time of the 30-day treatment team meeting on December 5, 2023.

Treatment plan targets included medication adherence, psychotic and manic symptoms, self-harm, suicidal ideation, distress related to hallucinations and delusions, implementing coping skills, sobriety, and insight into mental illness and the benefits of medication treatment. Interventions included structured and unstructured group treatment with various disciplines, individual psychotherapy, and medication management.

While most treatment outcome expectations were appropriate; of concern was the goal for suicidal ideation, as the expected outcome focused on not reporting thoughts of suicide. Specifically, the treatment plan stated, "not endorse any [suicidal ideation]," which discouraged the patient from reporting suicidal thoughts instead of learning triggers for suicidal thoughts, coping skills for managing those thoughts, and developing a plan that encouraged seeking supportive interventions when the thoughts were unmanageable. Notably, the discharge summary also noted the patient's lack of suicidal ideation endorsement as a rationale to support discharge.

A social worker assessment on December 7, 2023 included a recommendation for individual psychotherapy. DSH leadership confirmed that psychologists, not social workers, were expected to provide psychotherapy. The documentation, however, did not confirm that individual psychotherapy was provided to the patient as recommended.

Review of the November 15, 2023 psychologist's suicide risk assessment indicated that the provider relied on the patient's self-report to evaluate suicide risk instead of appropriately reviewing collateral records, including PIP records and other DSH-Patton provider assessments. For example, despite other DSH-Patton providers and the PIP referral packet referencing six suicide attempts; the psychologist documented only a history of headbanging and provided no information about prior suicide attempts. While the psychologist appropriately stated that the patient's headbanging remained a current concern and recommended addressing the behavior during individual therapy contacts; there were no interventions for this target behavior, or any other goal documented in the psychology progress notes that were eventually provided by the DSH leadership.

At the request of the expert, the DSH leadership provided psychology progress notes that were not present in the healthcare record. A psychologist completed one progress note for the patient that briefly focused on treatment adherence during the DSH-Patton hospitalization. The note stated that the provider spoke with the patient weekly to work toward treatment goals, but the provider did not include contact dates, reference any interventions or specific goals addressed during the weekly sessions, describe the patient's response to any interventions, or provide relevant mental status updates.

Regarding group treatment, the treatment plan referenced 12 assigned groups; six of which were clinician-led groups, one nursing group, and five rehabilitative therapist groups. The social worker's progress note referenced 17 hours of treatment groups with topics that included seeking safety, self-help/self-maintenance, dual recovery anonymous, coping skills, and morning focus.

The discharge summary indicated that the patient met all treatment outcome expectations and voiced readiness for discharge. The discharging provider also indicated that the patient was future oriented and anticipated accruing milestone credits for treatment participation in CDCR. Social worker and nursing notes also suggested that the patient maintained positive interactions with peers and staff, exhibited appropriate boundaries, did not engage in fights or altercations, articulated needs appropriately, did not engage in self-harm, responded well to medication changes, remained medication adherent, worked with the dietician on a weight plan in preparation for knee surgery, attended all assigned groups, and practiced deep breathing and positive self-talk.

The patient discharged to the EOP level of care on or around December 15, 2023.

**Findings**

The care and treatment provided to this patient were minimally adequate.

Although the patient appeared to benefit from some services provided at DSH-Patton, several concerns were noted. As previously indicated, the treatment team developed an inappropriate goal for suicidal ideation. The documented expected outcome used language that discouraged voicing thoughts of suicide, instead of encouraging discussion of suicidal thoughts to better understand their function, to learn and implement techniques for managing them, and to develop plans for involving others when indicated to prevent harm.

Despite three recommendations for individual psychotherapy, there was no proof of implementation. Further, psychologists failed to provide minimally adequate information in their progress note, including contact dates, reference to interventions, response to interventions, and mental status updates.

**Patient N**

This patient's healthcare record was reviewed to assess the quality of intermediate care provided at DSH-Patton. The patient was provided diagnoses of bipolar I disorder, most recent episode depressed; borderline personality disorder; and opioid use disorder. Medications prescribed at

DSH-Patton included olanzapine, prazosin, propranolol, lithium, and duloxetine. The patient also received MAT and was prescribed Sublocade and naloxone. On June 7, 2023, the patient transferred from CIW-PIP to DSH-Patton for continued intermediate care at her LRH.

The problem list included depression, anxiety, suicidal ideation, prior suicide attempts, paranoid ideations, insomnia/decreased need for sleep, decreased/increased energy, nightmares, increased activity, guilt, shame, cravings for illicit substances, history of hoarding medication for overdose, mania, and a history of seizures. The healthcare record referenced a history of five manic episodes, the most recent occurred during May 2022.

Upon arrival at DSH-Patton, the patient was immediately placed on one-to-one suicide watch in an admission suite due to her significant history of suicide attempts and self-harm. The admission note described the patient as "insightful regarding mental illness, non-delusional, non-manic, and cooperative." Suicide watch orders were discontinued on June 12, 2023.

The initial assessments and initial treatment team meeting occurred timely. The psychiatric assessment referenced a history of sexual abuse, self-harm by cutting beginning at age 13, multiple suicide attempts and self-injurious behavior incidents, and an extensive substance abuse history with intentional and accidental overdoses. The patient had at least five serious suicide attempts since 2022, with the most recent occurring during April 2023 when she attempted to overdose on Suboxone. Personal strengths referenced in assessments included honorable discharge from the military and not receiving RVRs during her incarceration.

The DSH-Patton treatment plan targeted depression, anxiety, suicidal thoughts, self-harm, substance abuse, and grief. While suicidal thoughts were an appropriate focus, the corresponding goal or expected outcome involved the absence of suicidal thoughts for a period of 90 days which was likely unrealistic for this patient. More appropriate short- and long-term goals should have involved tracking and monitoring thoughts of suicide to better understand their function, learning and implementing techniques for managing and replacing suicidal thoughts, and developing plans to seek out specific individuals for as needed interventions to prevent harm.

The patient was seen timely by psychiatry, was assigned to a relatively high number of groups, and was expected to receive psychotherapy during weekly psychologist contacts. The clinical notes indicated that the patient participated in all assigned groups and individual therapy contacts, remained medication adherent, developed and led her own smart recovery group beginning October 2023, received permission to attend off unit meetings, maintained positive communications with staff and peers, did not react when assaulted by others on the unit which involved two unprovoked assaults during July 2023, and held the title and responsibilities of ward government president.

Despite documentation that suggested that the patient met her treatment outcome expectations and was psychiatrically stable; by October or November 2023, the patient's request for extended hospitalization was granted through January 31, 2024, and the total length of stay at DSH-Patton was seven months. The treatment team noted that the patient's request for an extended stay was

approved for continued substance abuse treatment and individual therapy focused on grief counseling.

A review of individual therapy notes indicated that, while there were six monthly progress notes; the notes failed to include minimally adequate information, including specific contact dates, the focus of each contact, specific interventions implemented during contacts, and mental status updates. Instead, the psychologist's progress notes included only the month and year, and the content was generally limited to summarizing the patient's progress during the hospitalization.

Progress notes from psychiatry, social workers, and nurses provided useful information. The psychiatric discharge summary also offered a thorough description regarding the course of hospitalization.

The patient discharged to CDCR at the EOP level of care on January 31, 2024. The discharge summary indicated that all treatment outcome expectations were met.

**Findings**

The care and treatment provided to this patient were adequate.

The patient adhered to all treatment recommendations and unit rules, and the staff rewarded those behaviors by extending her hospital stay, approving off unit meetings, allowing the patient to start her own recovery group, and assigning the patient as the ward government president. While trauma was not specifically targeted in the treatment plan, the patient was assigned to a treatment group with a trauma focus.

It was noted that this was one of several cases that highlighted the need for additional training on developing appropriate suicide prevention related treatment goals, as well as correcting extremely deficient documentation practices among psychologists. The progress notes that were provided by the DSH leadership failed to demonstrate evidence of psychotherapy as was recommended by the treatment team.

**Patient O**

This 32-year-old patient's healthcare record was reviewed to evaluate the quality of intermediate care provided at DSH-Patton. At DSH-Patton, the patient was provided diagnoses of borderline personality disorder; major depression, recurrent, severe; PTSD, and amphetamine-type substance use disorder. She reportedly remained medication adherent during the DSH-Patton hospitalization and was prescribed benztropine, fluoxetine, fluphenazine decanoate, hydroxyzine pamoate, and propranolol. The patient arrived at DSH-Patton on April 22, 2024.

The patient had a prior intermediate care hospitalization during November 2023 that lasted 64 days; however, she was readmitted for inpatient care after several MHCB referrals and demonstrating an inability to function in the outpatient setting. The initial CIW-PIP admission during January 2024 was also prompted by the patient tying a noose around her neck, engaging

in two self-harm incidents involving headbanging, requiring restraints in the MHCB, and receiving an RVR for fighting.

Significant events during the recent CIW-PIP hospitalization included being discovered hoarding her medications with a reported plan to overdose, engaging in self-harm by headbanging, and requiring physical restraints to prevent self-harm. On April 22, 2024, the patient transferred from the CIW-PIP to DSH-Patton pursuant to PC 2684.

The referring institution's treatment outcome expectations included no suicidal ideation for 30 days, refraining from self-harm for 30 days, and identifying triggers for suicidal ideation, self-harm, and suicide attempts. The treatment outcome expectations also included learning and practicing three alternative coping strategies to replace self-harming behaviors and drug use, remaining 100 percent medication adherent, increasing insight regarding medication benefits, and identifying five personal strengths in the context of weekly individual therapy.

During the early phase of hospitalization, the patient was reportedly resistant to engage with staff and to participate in treatment activities which presented obstacles to completing mental status examinations at that time. Initially, the patient was often observed sleeping most of the day, while still interacting with peers, using the telephone, attending to ADLs, and taking medication as prescribed. An April 30, 2024 psychiatric note indicated that the patient refused to speak with the provider, did not attend her seven-day treatment conference, "made a scene" and demands on the unit, and later apologized for her behaviors.

The initial assessments and treatment team meeting occurred timely. The assessments referenced five prior suicide attempts and frequent self-injurious behavior incidents, two of which recently resulted in orders for five-point restraints to prevent harm.

The psychiatrist completed a brief admission note within 24 hours of admission on April 22, 2024, and a more comprehensive initial assessment on April 30, 2024. The April 30, 2024 psychiatric assessment and subsequent psychiatric progress notes were sufficiently detailed with pertinent information about the course of hospitalization, medication changes, the status of current symptoms, and response to medication and other treatment interventions during admission.

The treatment plans and social worker progress notes referenced eight to ten assigned groups. The groups included a rehabilitation therapist-led coping skills group and social skills activity group, as well as a psychologist-led healthy choices group and three weekly morning focus groups. Other listed groups included exercise groups and community meetings. The treatment goals were consistent with the referring institution's treatment outcome expectations. While the expected date of completion for most goals was August 2024, the social worker noted that the patient would parole during June 2024; parole planning was appropriately added to the treatment plan.

Social workers' progress notes indicated that they generally provided temporary case management services at DSH-Patton. On April 30, 2024, a social worker documented a plan to collaborate with the discharge department and forensic services to develop a thorough discharge

plan, adding that the patient's expected parole date was June 3, 2024. The social worker also confirmed that a TCMP interview occurred for completion of SSI and medical insurance forms. During that contact, the patient was encouraged and agreed to focus on treatment goals and to participate in unit activities.

The DSH-Patton psychologist also recommended several therapeutic interventions in their April 24, 2024 suicide risk assessment narrative, including weekly psychotherapy, DBT, cognitive processing therapy, and CBT. The referring institution's treatment goals also included identifying five personal strengths during weekly PC sessions. Unfortunately, there was no indication that psychotherapy or any other treatments recommended by the psychologist were implemented during the DSH-Patton hospitalization. The expert requested psychotherapy notes for this patient and was informed by the DSH leadership that the assigned primary clinician was away but planned to start individual therapy upon return on the following week.

Mental health providers at DSH documented discrepant opinions regarding suicide risk in four documents completed over a three-day period; those opinions were documented without the occurrence of new suicide or self-harm related incidents. While the discrepancies were not explained, a review of those documents suggested a lack of collaborative discussion and one provider's failure to review and/or consider recent collateral documentation in their determination of risk. The psychiatrist noted in their initial assessment dated April 22, 2024, that the patient's acute suicide risk was moderate, and chronic risk was moderate to high; the treatment plan completed the following day indicated low suicide risk. The psychologist's April 24, 2024 suicide risk assessment included a moderate risk rating. Further, the social worker's assessment indicated moderate to high chronic suicide risk and high risk for self-harm. The social worker's assessment referenced multiple incidents of self-injurious behavior, including recent head banging, razor cutting, and razor ingestion.

At the time of this May 6, 2024 review, the patient remained housed at DSH-Patton. As previously noted, the patient was expected to parole in early June 2024, and parole planning services were in process. To date, the patient had not been offered any of the planned psychotherapy contacts. The DSH leadership reported that they contacted the assigned psychologist, and they indicated that psychotherapy would commence the following week.

**Findings**

The care and treatment provided to this patient were adequate.

The assessments occurred timely, psychiatry closely monitored the patient and appropriately ordered medications as crush and float, groups were assigned timely, and parole planning services were quickly implemented in preparation for the patient's upcoming parole date.

Psychotherapy, however, was recommended by both the referring institution and the evaluating psychologist, including to address suicide and self-harm risk; however, DSH had not offered psychotherapy despite documenting that the patient was expected to parole within the next four weeks. In addition to DSH-Patton's failure to follow through with plans for psychotherapy to

date, concerns were noted with inadequate suicide risk assessments and unresolved discrepant opinions regarding current suicide risk.

**Patient P**

This 42-year-old transgender patient's healthcare record was reviewed to evaluate the quality of care provided in the intermediate care program at DSH-Patton. The patient was admitted to DSH-Patton with a psychiatric diagnosis of schizoaffective disorder, bipolar type. At DSH-Patton, the patient was prescribed divalproex sodium, Cymbalta, fluphenazine, prazosin PRN, Zyprexa, and Benadryl. The patient was also prescribed testosterone, weekly Trulicity injections, tiotropium bromide, a CPAP machine, a helmet, and walker. The patient was retained at DSH-Patton for only a brief period from January 12, 2024 to February 16, 2024.

The CIW-PIP referred the patient to DSH-Patton pursuant to PC 2684 for further care to address ongoing agitation, auditory hallucinations, anxiety, medication nonadherence, argumentativeness, and suicidal ideation.

During the initial psychiatric assessment at DSH-Patton on January 12, 2024, the patient was described as tangential and circumstantial. The patient reported ongoing auditory hallucinations, adding that they were able to manage them at their current severity rating of four of ten. The psychiatrist noted that the patient had been maintained on clozapine treatment for several years. The documentation indicated that despite the patient's report that clozapine was effective for symptom management; on or around November 11, 2023, the CIW-PIP psychiatrist discontinued clozapine based on "doubt" about the presence of a formal thought disorder, the patient's behavior problems, inconsistent reports of auditory hallucinations, and intermittent anxiety, depression, and sleep disturbance. Notably, the DSH-Patton psychiatrist denied the patient's request to restart clozapine during the current DSH-Patton hospitalization, as they indicated the belief that the patient requested the medication in an attempt to extend their hospital stay.

During the follow up treatment team meeting on February 12, 2024, borderline personality disorder; opioid use disorder, severe; and amphetamine-type substance use disorder, severe were added to the list of diagnoses. The patient also had type 2 diabetes, asthma, urinary incontinence, hypertension, and dyslipidemia. Further the patient had a significant seizure disorder for which they were required to wear a helmet while in CDCR facilities, considered a fall risk, and was provided a walker for ambulation. Although no formal substance use diagnosis was documented, the documentation referenced a significant history of methamphetamine, heroin, and alcohol use.

The DSH-Patton assessments referenced an extensive history of self-harm and suicide attempts. The patient's history was significant for incidents involving wrist cutting, multiple overdoses, and other self-harming behaviors while in CDCR. Records also referenced a history of command auditory hallucinations with suicidal content.

The DSH-Patton treatment team documented that prior to transferring the patient back to CDCR, they were expected to meet the following treatment outcome expectations: participation in 80 to 90 percent of groups and individual sessions for a minimum of 30 days; decrease in intensity of

anxiety and agitation to a four of ten or lower within 30 days; identification of two grounding techniques to manage agitation and anxiety; achieving medication adherence at 80 to 90 percent without verbal prompting for 30 days; and refraining from self-harm and danger to others for 30 days.

During the first week of hospitalization, the patient reported to staff that their rights were violated in several ways. The patient indicated that DSH-Patton failed to accommodate their requests for gender affirming clothing, including boxer shorts, providing access to male canteen items, resumption of clozapine, providing property after 19 days, and offering an assistive telephone device to accommodate their hearing impairment. Of note, DSH-Patton documented that the patient's requests for gender affirming clothing were met on or around January 16, 2024. Regarding the assistive telephone device, the staff documented that the request was not accommodated due to doubts about the patient's inability to hear based on their continued telephone use without the device.

By the third week of hospitalization, on February 1, 2024, a staff member informed the patient that all of their treatment outcome expectations would be met within the next 11 days. However, the patient was only assigned to groups for two weeks, and those groups were reportedly disrupted by a COVID outbreak. Further, there were no individual therapy sessions documented in the healthcare record at that time, and there was no documentation that any of the providers attempted to prepare the patient for discharge to a lower level of care.

The most recent suicidal behavior that was documented occurred during the current DSH-Patton hospitalization on February 2, 2024, when the patient wrote a suicide letter to another patient prior discovery by staff with a bra strap around his neck in a reported strangulation attempt. The February 2, 2024 suicide letter written to another patient stated:

> *"You are the closest thing to a grandma I've ever had and I luv you for it. But the voices are getting too loud I can't let them win so I'm gonna take them out first I just wanted to say goodbye Luv, Tony."*

A subsequent clinical note indicated that the other patient provided the note to staff who responded by cutting the strap from around the patient's neck and placing the patient on one-to-one suicide watch for at least two days before switching to "rover observation" until the patient's discharge date.

Regarding group treatment, social worker notes indicated that the patient was assigned to 17 hours of structured groups in addition to other supplemental groups, most of which were exercise groups such as yoga. Of note, a COVID outbreak occurred around January 13, 2024, resulting in suspension of groups for an unspecified period. The patient was also unable to attend groups after a suspected seizure on February 12, 2024 which resulted in orders for bedrest until the date of discharge. The providers documented that the patient had attended 86 percent of groups when briefly offered, but also documented that the patient was unwilling to wear their helmet as required during that period.

The treatment team reconvened on February 12, 2024. Despite the patient's recent suicidal behavior, medical obstacles to treatment participation, ongoing rover observation for self-harm concerns, and lack of success toward meeting the treatment outcome expectation for self-harm; the treatment team decided to discharge the patient to a lower level of care. The treatment team noted that the patient had requested to remain at DSH-Patton until after Ramadan, based on concern that they would be unable to receive a Ramadan meal in CDCR due to insufficient time for submitting a request. However, there was no indication that any treatment team member advocated on behalf of the patient by contacting CDCR to coordinate the religious meal. Instead, the request was seemingly dismissed as an attempt to extend their DSH stay.

Nursing notes indicated that the patient remained medication adherent and requested PRN Vistaril when auditory hallucinations became unmanageable, adding that they were usually able to manage the voices without the PRN medication. The patient's most recent endorsement of auditory hallucinations occurred on February 14, 2024. Further, nursing documented on February 16, 2024 that, while the patient attended to their ADLs; he remained medication adherent and attended groups. The patient continued to present with labile mood, emotion dysregulation, depressed and manic episodes, as well as high anxiety.

The patient was seen by the psychiatrist for follow up at least weekly. However, in contrast to other clinical notes, and despite the patient being retained on rover observation for self-harm concerns through the date of discharge; the psychiatrist documented that the patient socialized with others and had not exhibited or reported overt signs of depression or suicidal thoughts. The psychiatrist further stated that the patient was maintained on rover observation since February 11, 2024 "purely to ensure that he will not engage in any dangerous behaviors to influence any decision to keep him in Patton longer."

The treatment team recommended individual therapy with a psychologist and included the contacts in the treatment outcome expectations; however, no individual provider progress notes or appointment dates were located in the healthcare record. The expert requested progress notes from DSH leadership and identified several concerns after reviewing the sole psychologist progress note completed for the patient. The progress note had a typed date of February 14, 2024 which was unsigned; the provider stated that they attempted several contacts before that date, but there were no corresponding notes for those contacts or specific dates referenced in the sole progress note. Further, the psychologist's note suggested that they had not reviewed the patient's recent records or communicated with other treatment team members; as they failed to reference the patient's recent suicidal behavior or ongoing orders for rover rounds due to self-harm concerns. Instead, they wrote conflicting information indicating that risk for danger to self was low, that risk factors had not changed recently, and noted concern about the patient's continued placement "within Patton" due to "NOT [participating] in mental health care and treatment planning." The individual provider's progress note also suggested they were unaware that the treatment team had planned to discharge the patient, and their statement regarding appropriateness for Patton due to lack of treatment participation was inconsistent with other providers' statements which were used to justify the discharge; for example, that the patient's group treatment attendance was at 86 percent.

Despite DSH-Patton staff repeatedly dismissing the patient's requests as attempts to remain at their facility; the patient remained medication adherent, rarely utilized the prescribed PRN medication due to reporting that they were generally able to manage the intensity of auditory hallucinations, attended group activities when able, and reported during a February 6, 2024 psychiatric contact that while they felt "fine," adding "I just want to make sure that when I leave next week, I will have all of my property…make sure that I am able to sign up for Ramadan in CDCR."

As previously indicated, clinical documentation confirmed the patient had not met their discharge goals and was not sufficiently prepared for discharge. The staff also did not focus on discharge readiness, including ensuring the patient had realistic expectations about the length of stay. One provider stated that the patient expressed happiness to learn that it was not difficult to sign up for Ramadan meals at DSH-Patton, but the provider did not inform the patient that they would not be retained through Ramadan. Another provider documented that the patient was under the impression that they would remain at DSH-Patton through Ramadan, adding, "even though he was not promised anything specific." Additionally, a psychiatrist documented that the patient was under the impression that they would remain at Patton until the end of Ramadan, and the provider noted that they "did not state otherwise, except to say that he is under CDCR custody and will be returned anytime". That was another missed opportunity for a much-needed therapeutic intervention. There were also no documented attempts to assist the patient with their religious meal request by contacting CDCR, an intervention that seemed reasonable and would have eased the patient's anxiety regarding discharge.

DSH-Patton discharged the patient to the EOP level of care on February 16, 2024. The psychiatric discharge summary stated that the patient adequately met treatment outcome expectations. That statement was surprising, considering one of the treatment outcome expectations indicated that the patient would not engage in self-harm for 30 days; however, the patient had written a suicide letter, attempted self-strangulation two weeks prior, and was maintained on rover watch to prevent further harm until discharge. Further, the patient was unable to attend groups for 30 days duration after the date of group assignment due to a COVID outbreak and subsequent orders for bedrest following a suspected seizure.

**Findings**

The care and treatment provided to this patient during the brief intermediate care stay at DSH-Patton were inadequate.

The patient was discharged from the DSH-Patton intermediate care program to the EOP level of care as the providers indicated that the patient adequately met treatment outcome expectations; however, the patient was not retained long enough to achieve their treatment goals, engaged in self-harm requiring a higher level of observation up to the date of discharge, did not participate in individual therapy as indicated in their discharge goals, and was not offered interventions focused on discharge preparation to ensure a smooth transition from one level of care to another. Further, the care was not collaborative, and the individual provider clearly had not consulted with other team members or reviewed the patient's recent records; and their failure to write

progress notes for and reference specific dates of refused contacts was a deviation from the standard of care.

Despite clear evidence of diagnostic uncertainty, the patient was not referred for a diagnostic clarification evaluation or behavioral plan. Instead of considering that the patient may have both a major mental disorder and personality disorder or pursuing assessment to clarify the diagnosis; some providers documented the presence of psychotic symptoms that the patient often managed without requesting their PRN medication, while others dismissed the patient's demands and behaviors and attributed them to a personality diagnosis without offering behavioral interventions.

Several of the patient's requests during the brief hospitalization were dismissed as attempts to remain at DSH-Patton; however, the clinical documentation did not consistently support that perception. Certainly, some of the patient's requests seemed reasonable, but staff were unwilling to accommodate or advocate on behalf of the patient, including when they denied the patient's request for an assistive telephone device and to coordinate a Ramadan meal in preparation for discharge to CDCR. The patient also requested to restart clozapine, a medication that was prescribed for several years until their recent CIW-PIP admission; however, that request was also dismissed as an attempt to extend their DSH stay without sufficient justification or follow through to clarify diagnostic uncertainties.

Lastly, despite other providers continuing to document a diagnosis of schizoaffective disorder, bipolar type, as well as symptoms to support the diagnosis throughout the current hospitalization; the discharging psychiatrist changed the patient's diagnosis to borderline personality disorder, and stated that the diagnosis of schizoaffective disorder, bipolar type was "currently in question."

**APPENDIX D1**
**California Medical Facility (CMF-PIP)**
Dates Visited: September 17, 2024 – September 20, 2024
Review Period: February 1, 2024 – July 31, 2024

**Patient A**

This 25-year old patient's healthcare record was reviewed to assess the quality of acute care at CMF-PIP. Diagnoses in the official place of record (schizophrenia, adjustment disorder, unspecified stimulant related disorder and unspecified amphetamine-type substance related disorder) differed between the psychiatric providers working with the patient. Working diagnosis in psychiatric documentation at the time of the review was unspecified schizophrenia spectrum and other psychotic disorder. He was prescribed Zyprexa, injectable Haldol and Invega, as well as Cogentin and Vistaril as needed. The patient was admitted to the acute level of care at the CMF-PIP on August 7, 2024.

Since the patient's incarceration within CDCR in April 2024, he had seven MHCB admissions with the most recent due to disorganized and bizarre behavior and an inability to care for himself. During that admission he had been observed smearing and eating his feces. Previous MHCB admissions were precipitated by medication non-adherence, suicidal ideation and psychosis. The patient is scheduled to release on parole in January 2025.

The initial psychiatric assessment was thorough and included historical and recent clinical information, a review of psychiatric medication and relevant psychosocial information. The patient continued to present as psychotic and reported suicidal ideation without plan or intent. He had no history of suicide attempts and was assessed as low acute and moderate chronic risk. The patient was placed on suicide precautions, which were discontinued the following day with clear rationale documented.

Routine psychiatric documentation was generally thorough and clinically useful with a descriptive summary of the patient's behavior, symptoms and functioning. Medication adjustments incorporated patient input, where appropriate. Across reviewed documentation, the patient made slow and stepwise progress. Overall, smearing and eating feces improved and were followed by bouts of flooding his cell or putting his belongings in the toilet and variable ADLs. At times he made suicidal statements to get his needs met and recanted once evaluated by the psychiatrist.

Between the time of admission and September 10, 2024, the patient had not been seen for a primary clinician initial assessment. The only individual primary clinician contact occurred on September 6, 2024 and was a wellness check. IDTT documentation was completed by the same social worker and consistently indicated that a primary clinician had not been assigned.

IDTT documentation provided a brief overview of the patient's recent and current functioning and was consistent with psychiatric documentation. An initial goal that targeted discontinuation of eating and smearing feces was appropriate and later expanded to improve ADLs and social skills and increase group attendance. Treatment goals were realistic, objective and measurable, although interventions to attain goals were not documented. Additionally, the discrepancy with

treatment outcome expectations identified at the time of APP referral were not explained. Goals were updated during subsequent IDTTs, although sufficient rationale was not documented. Of note, goals were included in the body of the clinical summary section instead of the treatment plan section which included an outdated treatment goal from the MHCB. He was initially recommended for locked dorms which was subsequently changed to single cell-- a more appropriate housing given hygienic concerns.

Group assignment and rationale were not included in IDTT documentation. There was variable documented group attendance in psychiatric documentation during the month of August 2024, with such documentation only located between September 6, 2024 and September 9, 2024. Groups targeted trauma, anxiety and depression which were not clearly identified as treatment needs.

**Findings**

The mental health treatment provided to this patient was adequate.

This patient's primary treatment need was medication management and thus his care was assessed as adequate. While psychiatric case was appropriate, the patient was not appropriately assigned, evaluated, monitored, or treated by a primary clinician nor was group assignment individualized or sufficient. Treatment planning was reasonable but needed improvement in documentation of any change in treatment outcome expectations, group assignment rationale and utilization of the designated treatment plan section for continuity of care.

**Patient B**

This 27-year-old patient's healthcare record was reviewed to assess the quality of acute care provided at CMF-PIP. Diagnosis was unclear as there were multiple diagnoses documented in various areas in the chart. At the time of the review, he was prescribed Zyprexa, Zoloft, and Haldol. The patient was admitted to the S1 unit on August 5, 2024.

The patient was admitted from an MHCB after an ibuprofen overdose in the context of persecutory delusions--his fourth admission in six months. Psychotic symptoms including paranoia and auditory hallucinations were assessed as secondary to heavy spice use during the previous year. Treatment outcome expectations targeted a reduction in distress, increased socialization with peers as evidenced by 80% treatment attendance and reality testing. At the time of admission, he was assessed as low acute and moderate chronic risk with sufficient clinical rationale.

The initial psychiatric assessment focused on the patient's current functioning. Recent psychiatric history included copied documentation from MHCB admission documentation; however, information regarding additional psychiatric history including the multiple MHCB admissions, substance abuse history and reason for referral were not included. During the monitoring period, the patient was seen by four different psychiatrists with the majority of documentation by two psychiatrists, one of which was assigned. Overall, documentation was sufficient as to not impair continuity of care and included symptom assessment, medication response and rationale for medication changes. Documentation of functioning was limited.

Targeted symptoms of psychosis (auditory hallucinations and paranoia), depression, and anxiety improved across documentation.

Documentation of diagnosis was an area of concern. Diagnosis for the primary psychiatric providers varied greatly with one indicating psychosis not otherwise specified/schizoaffective disorder while another provided indicated unspecified depressive disorder and substance induced psychotic disorder. In contrast, documentation pulled forward in both providers' notes consistently indicated diagnoses of adjustment disorders, with anxiety, unspecified anxiety disorder, and unspecified other substance related disorder. Further confusing the diagnostic picture, documentation from the 72-hour treatment plan authored by a primary clinician and carried forward in subsequent IDTTs indicated a diagnosis of unspecified schizophrenia spectrum and other psychotic disorder, and methamphetamine use disorder.

A primary clinician initial assessment was not completed. Between the time of admission and September 10, 2024, the patient had one contact with his assigned primary clinician. Documentation was representative of a wellness check with no clinical interventions to address reported anxiety and depression.

Group treatment (recreational and clinical) was documented beginning in late August 2024. Clinical topics included anger management and coping skills which were not clearly in alignment with treatment goals. Group assignment was not included in IDTT documentation.

The patient was treatment engaged, medication adherent, and attended the five reviewed IDTTs that occurred during reviewed dates. Covering providers attending the 72-hour IDTT and a covering primary clinician was in attendance for four of the five reviewed IDTTs. Documentation focused on the patient's current status as opposed to a clear summary of his symptoms, functioning and treatment response and progress toward treatment goals since the previous IDTT. Treatment goals established at the 72-hour IDTT were continued during subsequent IDTTs and targeted depression/anxiety, psychosis and substance use. Danger to self was not targeted. Goals were measurable and treatment interventions were established although lacked specificity and were not clearly utilized.

The patient was recommended for a multi-person cell during the 72-hour IDTT which was continued for the duration of the review. However, as documentation indicated that the patient stabilized, his housing could have been reconsidered.

**Findings**

The mental health treatment provided to this patient was adequate.

The patient's acute distress stabilized with psychiatric care, and assessment of care based solely on the need for acute stabilization is assessed as adequate.

However, the patient's treatment needs persisted after the acute psychosis resolved. This treatment-engaged patient needed individual therapy to address underlying factors that led to prolonged substance use and eventual decompensation. Additionally, group treatment was not specific to his treatment needs. A comprehensive assessment and case conceptualization were

not completed by either provider. Lastly, the diagnostic discrepancy across and within documentation and across providers was an area of concern.

**Patient C**

This 43-year-old patient's healthcare record was reviewed to assess the quality of acute care provided at CMF-PIP. Upon admission to CMF-PIP, the patient was diagnosed with schizoaffective disorder, bipolar type as symptoms of mania and psychosis had not stabilized. An emergency PC 2602 order was granted on July 25, 2024 due to violent behavior. He was prescribed Zyprexa, propranolol, and injectable Abilify. After two months within CDCR, the patient required MHCB admission, with resultant CMF-PIP acute care admission to the P1 unit on July 29, 2024.

Treatment outcome expectations targeted ADLs, medication adherence, reality testing, increased programming, threats to others, and improved insight.

The initial psychiatric assessment included a descriptive summary of his current presentation, however psychiatric history was limited to the psychiatric MHCB discharge summary which was not marked as unoriginal. Overall, psychiatric documentation was thorough, clinically useful and provided specific information regarding the patient's level of agitation, paranoia, delusions, disorganized speech and ADLs which improved over time. Medication response and rationale for medication use was documented.

A primary clinician initial assessment was not completed. Primary clinician contacts occurred individually or during clinical groups with designated topics of discharge planning or coping. Overall, documentation for this treatment-engaged patient was clinically relevant and included utilization of reality testing, Socratic questioning, review of appropriate behavior and supportive therapy with a focus on symptom management.

Documentation indicated that the patient was offered leisure activity groups beginning on August 1, 2024. During subsequent weeks, group activity increased to include various recreational therapy groups and clinical groups (mood management and specific mental health issues).

IDTTs were generally attended by assigned providers and intermittently by the patient. Clinical summary documentation focused on the patient's current status but did not provide a summary of the patient's functioning since the previous IDTT or progress toward treatment goals. Treatment planning was unclear. Measurable treatment outcome expectations established at the time of referral were continued but were not expanded upon to include interventions. Further, in the designated 'treatment plan' section, goals established during the MHCB admission were copied but it was unclear if this was an oversight, or were in addition to the stated treatment outcome expectations. The patient was consistently recommended for unlocked dorms which was not appropriate during the first few weeks of admission given his aggressive and impulsive behavior at the time of admission.

Of note, some IDTT content (72-hour IDTT and two subsequent IDTTs) regarding the presence of suicidal and homicidal ideation was inconsistent with provider documentation during these timeframes and inconsistent with documentation within the same IDTT documentation.

Additionally, it was also documented that the patient would be assessed for suicide watch but no documentation was located.

Shortly after PIP admission, the patient was assessed as low acute and chronic risk which were continued from the MHCB admission and likely an underestimate of his risk. This assessment was overly reliant on his denial of suicide attempts and failed to consider his variable but previous report of two overdoses as suicide attempts and accidental overdoses, history of suicidal ideation and various risk factors.

**Findings**

The mental health treatment provided to this patient was adequate.

Of note, there were deficiencies in important aspects of his care. The patient stabilized with psychiatric care, medication adherence under PC 2602, group treatment, and limited individual treatment. However, comprehensive initial assessments, case conceptualization, clear treatment goals and IDTT documentation and more frequent individual primary clinician contacts were needed.

**Patient D**

This 24-year-old patient's healthcare record was reviewed to assess the quality of acute care provided at CMF-PIP. Diagnosis varied across provider and within provider documentation, and included unspecified mood disorder, antisocial and borderline personality disorders, adjustment disorder, unspecified anxiety disorders, and rule-out bipolar disorder versus major depressive disorder versus personality pathology. He was prescribed Abilify, Zoloft and Depakote and as needed Zyprexa and Vistaril.

The patient was admitted to APP Q3 unit on July 25, 2024 from the MHCB after persistent and unrelenting suicidal ideation and two suicide attempts via overdose on Depakote. Notably, one of these occurred while on suicide watch in the MHCB and required outside hospital medical treatment. Treatment outcome expectations targeted self-harm behavior, depression and anxiety.

A primary clinician initial assessment was not completed. The initial psychiatric assessment noted no prior community mental health history and a long history of juvenile detention. Narrative documentation focused on the patient's current mental status and suicide attempt that warranted the MHCB admission. In contrast to persistent suicidal ideation in the MHCB, at the time of admission to CMF-PIP, the patient denied suicidal ideation and reported that he was future-oriented. The overdose in the MHCB was not included in initial documentation, and it was unclear if the psychiatrist was aware of the suicide attempt. Regardless, the 1:1 suicide watch with limited issue that the patient had was on for the majority of the MHCB admission was discontinued and the patient was given full issue without sufficient clinical rationale. Several hours later, the patient ingested a battery.

The patient had a long history of self-harm behaviors, with 50 known instances within CDCR. Between July 25, 2024 and August 19, 2024, the patient engaged in five self-harm incidents (laceration or ingestion) none of which was assessed as more than minor injury. He was appropriately assessed as high chronic and acute risk on July 26, 2024. However, no safety plan

was completed even though it was clinically indicated. On July 27 and 28, 2024 while agitated, he superficially cut himself and reported continued suicidal ideation. Emergency injectable medications were given without sufficient rationale on both days. Clinical interventions other than medication were not utilized. Rationale for initiation, continuation, or discharge of suicide watch/precautions and access to property was not consistently documented.

Weekly primary clinician contacts frequently occurred at cell front, generally with the assigned clinician. Documentation was overly brief and not representative of a meaningful therapeutic contact.

Treatment planning documentation was minimal. Across IDTTs a summary of the patient's current symptoms, functioning and treatment engagement/response were not documented. Documentation from March 2024 was copied regarding current risk and was inconsistent with the risk assessment completed in July 2024. Treatment goals were copied from the initial MHCB IDTT on July 17, 2024. Targeted areas included depression, impulsive behavior, suicidal ideation and treatment refusals which were appropriate for the patient's needs; however, established interventions were not utilized. The housing recommendation for the majority of IDTT documentation was unlocked dorms; however, documentation from August 29, 2024 indicated both unlocked dorms and multi-person cell.

Group treatment began on August 1, 2024 and was primarily offered by the recreational therapist with the exception of two discharge planning groups offered by the assigned primary clinician. It was unclear how groups were assigned given the lack of documentation in IDTTs.

IDTT documentation indicated that the patient needed continued inpatient care. The discharge IDTT was held on August 29, 2024 and he was transferred to CMF-ICF on September 9, 2024.

**Findings**

The overall mental health treatment provided to this patient was inadequate.

While the patient received medication management, necessary distress tolerance interventions were not utilized and a behavior plan was not considered for the patient's extensive history of self-harm behaviors. Comprehensive provider assessment, diagnostic clarification and case conceptualization were needed to develop an individualized treatment plan for the patient's chronic suicidal ideation. Clear documentation of rationale for initiation, continuation or discharge of suicide watch/precautions and access to property was needed.

**Patient E**

This 36-year-old patient's healthcare record was reviewed to assess the quality of acute care provided at CMF-PIP. Diagnosis varied by provider and location and included bipolar disorder and unspecified mood disorder, antisocial personality disorder and borderline personality disorder. He was prescribed Zyprexa and lithium, as well as needed Zyprexa and Vistaril. He was admitted to the Q3 max unit at the acute level of care on June 11, 2024 following a MHCB stay where he continued to engage in self-harm behavior.

The MHCB admission was precipitated by a self-inflicted laceration which required sutures that he repeatedly removed. Additionally, he was a participant in the Developmental Disability Program at the level of DD2, generally reflecting the need for prompts for activities of daily living.

A primary clinician initial assessment was not completed. The psychiatric initial assessment included relevant clinical information although excluded a narrative summary of pertinent information to assist with conceptualization. In addition to self-harm, identified treatment areas included depression, anger, impulse control and intermittent auditory hallucinations. An initial risk assessment assessed him as high chronic risk and moderate acute risk with appropriate clinical rationale. A safety plan was clinically indicated but not completed.

The day after admission the patient attempted to strangle himself by attaching a noose to the sink. His intent was to die, and he was placed on 1:1 suicide watch which was downgraded the next day and discontinued after six days on June 18, 2024. Clear rationale for continuation or termination were not located and access to property was planned in advance as opposed to contingent on daily assessments. The day after the suicide attempt, he was seen jointly by the psychiatrist and primary clinician. Coping skills were reviewed and medication adjustments with rationale to target mood, suicidal ideation and occasional auditory hallucinations were documented.

The patient had another incident of self-injurious behavior by swallowing a pen filler several days later. Similar to his self-harm behavior in the MHCB, he attributed this to boredom and frustration. Following this incident, his primary clinician submitted a referral to the Positive Behavior Support Team (PBST) to assist in managing the pattern of self-harm and disruptive behaviors (e.g. banging, multiple requests to see staff). The referral was not located in EHRS. A review of the referral provided during the site visit indicated that interventions the team had utilized (emotional regulation/impulse control, boundaries, behavioral modification, incentives and consequences) were not clearly documented in EHRS. Documentation of PBST assessment was not located. However, documentation entitled, “Initiation of Behavioral Plan” from June 18, 2024, a “behavior plan,” was documented although rationale was not provided. The plan included daily scheduled primary clinician contacts, daily review of ability to be safe with full property, medication compliance, and coping skill development. Of concern, it was indicated a PC 2602 would be filed if the patient did not maintain 100% medication compliance. It was also documented that a referral to PBST would be completed to assist with behavioral interventions. It was unclear if daily primary contacts occurred as they were not consistently documented. Regardless, the patient stabilized with the structure of the plan, noted by the primary clinician on June 21, 2024.

IDTT documentation needed improvement. The clinical summary for the 72-hour IDTT was insufficient and focused on the patient’s recent functioning. The patient’s course and progress in treatment were not clearly documented. Treatment goals from the MHCB admission were not updated to address treatment needs at the acute level of care. Treatment goals targeted self-harm and for reasons that were unclear, targeted homicidal ideation. Goals also targeted anxiety and depression. Interventions were evidence-based. At the time of admission, the patient’s LRH was unlocked dorm which was inconsistent with his clinical presentation.

An inpatient consult for ICF was completed on June 25, 2024 and the patient was discharged on June 28, 2024 to ICF. There was no documentation regarding continuation of the behavioral plan that the primary clinician developed.

**Findings**

The overall mental health treatment provided to this patient was adequate.

While he stabilized in acute level of care, there were multiple areas of concern. Overall, the care that was provided was responsive to his immediate treatment needs but not reflected in treatment planning documentation, which was insufficient and not updated. A comprehensive initial assessment was not completed by either provider which impacted case conceptualization.

Of concern, a safety plan was not developed despite clinical indication. Patient access to property on suicide watch/precaution warrants should be contingent on a daily assessment of the patient's mental status. Decisions regarding initiation, continued, or terminated suicide watch/precaution need documentation of clear clinical rationale.

Documentation regarding referral, assessment and rationale for behavior plan interventions were missing or limited. Further, while the patient's behavior improved after the behavior plan was implemented, the plan did not clearly target the factors (boredom, frustration) that contributed to his maladaptive behaviors and the threat of a PC 2602 was inappropriate. Further, the lack of documentation of the use and status of the plan in the ICF referral was disruptive for continuity of care and maintaining treatment gains.

**Patient F**

This 40-year-old patient acute level of care patient's healthcare record was reviewed to assess the quality of acute care and the behavioral plan provided at CMF-PIP Psychiatric diagnoses were borderline personality disorder in addition to a long history of documented schizoaffective disorder. At the time of discharge, he was prescribed Haldol (injection), Prozac, lithium, Remeron, Cogentin, propranolol and as needed chlorpromazine, Benadryl, and Vistaril. The patient was admitted on February 1, 2024.

The patient was a participant in the Developmental Disability Program (DDP) at the level of DD2, reflecting the need for prompts and supports for ADLs. This patient had multiple self-injurious incidents in the months preceding his PIP admission. Self-harm behaviors included ingestion of prescription shampoo and mismanagement of type 1 diabetes, including refusal of insulin. He subsequently had three episodes of diabetic ketoacidosis, a life-threating condition. An emergency PC 2602 petition was initiated on January 15, 2024, and granted on January 25, 2024, for grave disability.

During the first two weeks of admission, self-harm behaviors persisted, including diabetes mismanagement and self-strangulation with clothing. During this timeframe, he was given injectable medication after incidents of self-harm although clinical rationale was not sufficiently clear in documentation. Suicide watch/precautions were initiated, continued and discontinued with varying access to property. Clinical rationale for observation and property restrictions was not documented. Further, there was an incident of feces smearing that was referenced but not

sufficiently assessed or addressed in treatment. Despite a pattern of continued self-injurious behavior, a risk assessment was not completed until mid-March 2024, well over a month after his last self-harm behavior. A safety plan was not completed despite clinical indication.

There was no primary clinician initial assessment, nor did he receive individual therapy. The patient intermittently attended groups offered by his primary clinician and recreational therapists.

IDTT documentation needed improvement. The clinical summary section generally provided a brief synopsis of the patient's current functioning but a summary of symptoms, use of the behavior plan, medication management and treatment engagement, progress toward treatment goals was not included. Treatment goals did not target the patient's symptoms (impulsivity, self-harm, anxiety, depression, poor ADLs and auditory hallucinations) and had not been sufficiently updated since the MHCB admission. Discharge criteria was not documented. Early documentation attributed the pattern of self-harm behavior to deficits in problem-solving and verbal skills but was not subsequently addressed.

Identification of a need for a PBST referral was first documented on February 14, 2024. Specifically, the psychiatrist appropriately referred to the patient's self-harm behavior as maladaptive ways to express the patient's needs. The PBST referral, dated February 20, 2024, provided during the site visit was not located in the healthcare record.

In contrast with EHRS and psychiatric diagnosis, the PBST referral indicated a diagnosis of major depression with psychotic features. There was no indication of the patient's DD2 status, which had been hypothesized as a factor in his self-harm. Targeted areas of concern were selective mutism, lack of treatment engagement, and self-harm behavior. A behavioral plan was not located in the healthcare record, however, psychiatric documentation indicated the development of a behavior plan which made access to property contingent on abstaining from self-harm behavior.

The initial psychiatric assessment included copied documentation that was not clearly indicated as unoriginal and did not include a comprehensive psychiatric history. Psychiatric documentation during the initial weeks of his admission was overly brief, and at times lacked a mental status exam, but improved with a provider change.

Regarding psychiatric care, the patient had an abnormal heart rhythm, namely atrial fibrillation. He was on multiple medications during the review period which have cardiac effects, most concerningly chlorpromazine and lithium. The dose of chlorpromazine he was given was high. The situation was worse as he was also taking fluoxetine, which raises chlorpromazine levels. Separately, he was on multiple anticholinergic medications (i.e. benztropine, mirtazapine, chlorpromazine, diphenhydramine, and hydroxyzine) which can lead to confusion/cognitive issues (especially given he was DD2), falls, cardiovascular and gastrointestinal side effects, among others.

In part, the patient attributed self-injurious behavior to wanting to return to EOP, which in addition to property access, motivated him to abstain from self-harm. He was discharged to EOP on April 15, 2024, and while he had stabilized, continued inpatient care at ICF was worth consideration to assist with a prolonged period of stability and to gain additional skills. Further

inpatient treatment merited discussion as in the month before discharge, documentation indicated that the patient identified as transgender. This new disclosure was a substantial change for this patient who had limited resources to manage stressors.

**Findings**

The overall mental health treatment provided to this patient was inadequate.

This case displayed multiple shortcomings in assessment, treatment, discharge, and consideration for continued inpatient care. Comprehensive initial assessment and conceptualization to guide treatment was not completed. Relatedly, risk assessment and safety planning were not completed at the time of admission or following multiple incidents of self-harm behavior. Further, suicide watch/precaution and access to property decisions were made without sufficient clinical rationale. Psychiatric medication posed potential risks without sufficient documentation of clinical rationale for risks/benefits.

Treatment planning documentation was not sufficiently updated and did not target this patient's treatment needs. Coordination with the DDP team was needed. The referral to PBST was appropriate, however there was a delay between identification and referral. There was insufficient documentation of the referral and behavior plan in the healthcare record. Further, the plan for the provision of property for abstaining from self-harm, assisted the patient in maintaining safe behavior in the short-term but did not target underlying factors for longer-term behavior change. Given this patient's lengthy history of self-harm behaviors with varying rationale, a functional behavioral analysis was needed to fully assess and develop a targeted plan to address underlying factors and effect long-term behavior change.

**Patient G**

This 34-year-old patient's healthcare record was reviewed to assess the quality of acute care provided at CMF-PIP. Psychiatric diagnoses were schizoaffective disorder and attention deficit hyperactivity disorder. He was prescribed Invega (injection), trazadone and Strattera, and as needed Zyprexa and Vistaril. The patient admitted to the S2 acute care unit on July 1, 2024.

Prior to arrival at CMF-PIP, the patient was admitted to the MHCB after he decompensated. After a period of medication refusal, he became paranoid, isolated, had poor ADLs and reported suicidal ideation with a plan to hang himself. He was assessed as high acute and chronic risk in the MHCB. The PIP admission risk assessment rated him as moderate acute risk and high chronic risk, which indicated the need for a safety plan, although one was not completed. The change in acute risk was reasonable but rationale was not documented.

Initial psychiatric documentation on the day of admission included a succinct but useful summary of the patient's current and recent psychiatric needs but lacked comprehensive psychiatric history. Symptoms included auditory visual hallucinations, paranoia, depression, anxiety, and passive suicidal ideation. Documentation indicated that a non-emergent PC 2602 had been filed. A PC 2602 for danger to self was granted on August 6, 2024 and Invega long-acting injectable was given following cell extraction.

Following the initial psychiatric assessment, the patient was selective with whom he engaged and consistently refused attempts to engage with psychiatry. Documentation was descriptive of the patient's behavior at the time of the contact but did not indicate consultation with nursing or custodial staff regarding overall functioning. He was assessed at cell front until late August 2024 when be became receptive to confidential contacts and was more engaged in treatment. He continued to report elevated anxiety and depression, as well as command auditory and visual hallucinations.

There was no primary clinician initial assessment. The first primary clinician individual contact did not occur until August 15, 2024 after the patient refused a case management group.

This patient was seen on the day of admission for his 72-hour IDTT. The majority of documentation was blank or outdated. IDTT documentation reflected an introductory meeting but there was no documented input from other disciplines and no real treatment planning was documented. In contrast to identified treatment needs of self-harm and clinical presentation of paranoia, treatment goals, one of which was from April 2024 targeted auditory hallucinations and substance abuse. There was no documentation to support clinical utility of these treatment goals.

Insufficient documentation from the 72-hour IDTT continued in subsequent weekly IDTTs. It was documented that he refused to speak with his treatment team. Documentation indicated that he did not appear acutely distressed; documentation of symptoms and functioning was insufficient. Program participation, treatment progress, and quality of group attendance were not documented. Of note, he was recommended for unlocked dorms without any clinical rationale. The discharge section of IDTT was not completed for the duration of reviewed documentation.

**Findings**

The overall mental health treatment provided to this patient was inadequate. There were no targeted attempts to engage this patient outside of psychiatric contacts or group. Further, there was a dearth of historical clinical information for this patient due to the lack of provider initial assessments and insufficient IDTT documentation. Relatedly, there was an over-reliance on the patient's disclosure and a lack of review of the substantial records available to the treatment team during his time in CDCR; since his incarceration began in 2016, the patient had multiple MHCB admissions, as well as an acute admission in 2023, and an ICF admission in 2023. Further, for the month that he did not engage with the treatment team, there was no documentation i of the patient's mental status or attention to ADLs. During this time, collateral information from psychiatric or unit staff, or from outside sources was not documented, indicating a lack of collaborative care.

**Patient H**

This 32-year-old patient's healthcare record was chosen for review for the quality of acute care provided at CMF-PIP after observing the patient's IDTT on Q1 during the site visit. He was admitted to acute level of care on August 23, 2024 from the MHCB after psychotic symptoms failed to stabilize and he reported suicidal ideation. He was diagnosed with schizophrenia and

various substance use disorders. At the time of the review, he was prescribed Invega long-acting injectable and prazosin, as well as needed Vistaril and Zyprexa.

While in the MHCB, he was assessed as high acute risk due to thoughts of self-harm with a plan, although disorganized and unrealistic. The risk assessment that occurred at the time of the acute admission was based on healthcare record review due to patient refusal. Documentation included the patient's denial of suicidal ideation during the psychiatric initial assessment that occurred on the same day. In contrast to the MHCB assessment, he was assessed as low acute and high chronic risk with an indication that this was based on a January 2024 risk assessment. While the finding of acute risk at the MHCB was likely an overestimate, the recency of the suicidal ideation and plan was not considered in the current rationale and there was no explanation for the exclusion.

A primary clinician initial assessment was not completed. The initial psychiatric assessment included recent and current clinical information; additional psychiatric information was added across contacts. At the time of admission, the patient presented with disorganized thoughts, auditory hallucinations, paranoid delusions, and anxiety. Across contacts, his mental status improved somewhat but diagnosis remained unclear and complicated by the question of substance use. The team considered a diagnosis of schizotypal personality disorder; however, the rationale was not clearly documented.

IDTT documentation included a useful summary of relevant clinical factors as observed during the IDTT. Across documented IDTTs, documentation also provided a thorough summary of the patient's current clinical presentation but did not convey overall functioning between IDTTs, treatment progress, frequency of programming, quality of group participation or relevant input from other treatment team members. Noteworthy exclusions from psychiatric documentation included the use of an injectable medication on August 27, 2024 due to feeling overwhelmed and anxious, as well as previous psychological testing which indicated exaggeration of psychotic symptoms. Relatedly, a toxicology screen was documented as ordered but results were not discussed. Treatment goals that targeted psychosis had not been updated since his MHCB admission and it was not clear if these goals were continued by the acute care team. Further, identified treatment needs of self-harm, substance use and those identified by the patient (sleep, anxiety, depression) were not targeted.

Lastly, risk, LRH and discharge planning documentation were not updated since admission.

**Findings**

The overall mental health treatment provided to this patient was inadequate.

The patient's mental status minimally improved during the first month of his admission despite medication adherence and there was not clear conceptualization for the lack of improvement. Diagnostic clarification was needed and could have included psychological testing, comprehensive record review, and routine toxicology testing. Further, treatment planning documentation lacked provider coordination. The primary clinician initial assessment was not completed which hampered conceptualization and treatment planning. Additionally, it was not clear why individual treatment was not considered to this patient.

**Patient I**

This 48-year-old patient's healthcare record was reviewed to assess the quality of acute care provided at CMF-PIP. Psychiatric diagnosis varied by provider but overall recognized the presence of psychosis and mood symptoms. He was prescribed Zyprexa, Haldol, Depakote and Remeron. The patient was admitted to the S2 acute care unit on June 21, from the MHCB after psychosis and suicidal ideation persisted. An emergent PC 2602 was filed on June 27, 2024, due to continued psychosis, in addition to agitated and threatening behavior. His mental status and behavior improved with antipsychotic medication under a PC 2602, granted on July 16, 2024.

A primary clinician initial assessment was not completed. The initial psychiatric assessment represented a thoughtful review of his healthcare record and routine psychiatric documentation while on S2 continued to provide rationale for diagnostic impressions (schizoaffective disorder versus bipolar disorder versus disruptive mood dysregulation disorder) and medication adjustments. However, when the patient changed units which resulted in a different psychiatrist, documentation was generally brief and minimally descriptive regarding mental status and clinical presentation, which made it difficult to determine mental status improvement/decline. Similarly, diagnosis was changed to schizoaffective disorder, bipolar type, antisocial personality disorder and methamphetamine use disorder, without clear clinical rationale.

At the time of admission, the patient was assessed as moderate chronic risk and high acute risk. A safety plan was not completed despite clinical indication. Between July 16, 2024 and August 7, 2024, there were three incidents of suicidal ideation and agitation, two of which warranted injectable medications. Two incidents resulted in the use of suicide precaution, however, rationales for initiation, continued use, and termination of suicide precaution were not documented. During one incident (July 19, 2024) the patient was evaluated by the psychiatrist for suicidal ideation with a plan to hang himself. The patient indicated he could resist the urge to self-harm while waiting for medication to take effect. There was no plan to further assess or monitor the patient and documentation from three days later (July 22, 2024) indicated the use of injectable medication. Documentation was not timely and there was no indication of behavior that would warrant this invasive intervention.

The patient was placed on cuff status several times on S2 between admission and transfer to the max unit on August 9, 2024. Cuff status prohibited him from attending programming. Per psychiatric documentation, the first incident of 'cuff status' occurred on June 27, 2024 due to threats toward custody staff. The status was reviewed in psychiatric documentation every few days and was discontinued without rationale on July 12, 2024. During another incident, psychiatric documentation from August 3, 2024 indicated that the patient was frustrated that he had been placed on cuff status and had been unable to program for three days; however, the documentation did not list the clinical rationale for the status. Psychiatric documentation from five days later indicated that the cuff status was initiated on July 30, 2024 due to "homicidal" ideation. It was documented that the psychiatrist recommended termination of the cuff status, later that same day. However, none of this was documented in the July 30, 2024 psychiatric progress note. Regardless, custody continued the cuff status through August 5, 2024. In another incident of unclear documentation, psychiatric documentation from August 8, 2024, suggested that cuff status was resumed on August 7, 2024 after aggressive behavior toward an officer.

Regardless of housing unit, IDTT documentation did not provide an accurate or sufficient summary of his course of treatment, progress toward treatment goals symptoms, and functioning between treatment team meetings, including the use of injectable medications and suicide precautions. Further, treatment planning was unclear. For the duration of reviewed IDTTs, treatment goals were outdated (two of three treatment goals in the 'treatment plan' section were continued since December 2023 and one was from the MHCB admission). Treatment goals that targeted depression, suicidal ideation, and auditory hallucinations were documented from the time of admission and continued for the duration of the review in the section for 'patient's verbalized treatment goals' but it was unclear that these were realistic for the patient at the time of admission. Additionally, housing was inappropriately recommended as unlocked dorms and discharge documentation remained insufficient. Specifically, IDTT documentation (September 19, 2024) indicated that the patient would be discharged at the next IDTT to EOP without clear rationale.

The majority of weekly primary clinician contacts occurred at cell front. Overall, documentation was brief without the use of clinical interventions.

**Finding**

The overall mental health treatment provided to this patient was inadequate.

Multiple deficiencies in this patient's care render it inadequate. Cuff status was poorly documented. Risk of self-harm was not appropriately managed. At no time, despite various opportunities to do so, was a safety plan developed with the patient. Of utmost concern, was the overreliance on the patient's indication that he could manage the impulse to self-harm and resultant failure to monitor him appropriately. This concern is exacerbated by lack of timely documentation for injectable medication without sufficient clinical rationale or the use of less restrictive interventions. Relatedly, changes to suicide watch/precaution including termination needed clinical rationale. Overall, treatment planning was insufficient. It was unclear why individual treatment was not provided and the lack of a primary clinician initial assessment hampered case conceptualization which could have assisted with needed diagnostic clarification. Lastly, despite no clearly documented change in symptoms, functioning, or treatment progress, documentation indicated a plan to discharge to EOP.

**Patient J**

This 50-year-old patient's healthcare record was reviewed in order to assess the quality of acute care provided at CMF-PIP. Psychiatric diagnosis was bipolar I disorder and major neurocognitive disorder due to multiple etiologies, with behavior disturbance. He was prescribed Depakote, a mood stabilizer. He had a long history of substance use. On June 19, 2024, the patient was admitted to unit S2 at acute level of care from the MHCB, due to psychosis and medication adherence failed to improve in the MHCB.

Primary clinician documentation indicated that the patient was seen for a joint initial assessment with the psychiatrist. Documentation from both providers was overly brief and did not include sufficient mental health history or represent a comprehensive assessment to conceptualize patient treatment needs, including substance use. Psychiatric documentation indicated that the patient

was "superficially coherent," with a likely need for PC 2602 due to grave disability. However, the following day, after taking prescribed Depakote, he presented with "significant improvement" as his thoughts were more organized. He continued to evidence improvement with medication adjustments though July 8, 2024 when symptoms worsened, and included mood lability. During subsequent weeks, the patient continued to have difficulty stabilizing and evidenced agitation which eventually responded to an increase in Depakote.

Over the course of hospitalization memory difficulties were noted. The patient performed poorly on a cognitive assessment and dementia with agitation was added but later changed to Major Neurocognitive disorder due to multiple etiologies with behavioral disturbance without sufficient rationale/clinical support. IDTT documentation indicted a plan for neuropsychological evaluation, although the status of the referral was not located.

Overall, psychiatric documentation was brief. Documentation regarding status of symptoms, functioning, mental status, and response to treatment was brief.

Overall, primary clinician individual documentation occurred weekly. Documentation reflected stabilization and improvement of mental status with continued pressured speech and impairments in attention and concentration. Clinical interventions of supportive therapy, cognitive behavior therapy and positive psychology were utilized, although clinical utility with dementia was not considered.

The patient's discharge plan was unclear. Although IDTT documentation on August 12, 2024 indicated that the patient was referred to the memory care unit, subsequent IDTT documentation did not indicate the status of the referral. Subsequent IDTT documentation indicated a DDP referral which resulted in a DD1 designation. The patient was ultimately discharged to EOP. There was insufficient documentation that the patient was assessed as able to manage EOP or was appropriately prepared for the transition. Further, there was insufficient clinical transition planning for this patient with a parole date on November 30, 2024.

Of concern, documentation from June 28, 2024 indicated that the patient was on cuff status. However, no documentation regarding initiation, continuation or termination of cuff status was located.

**Findings**

The overall mental health treatment provided to this patient was inadequate.

While the patient's mental stabilized, the overall care he needed was not provided. New onset cognitive decline at the age of 50 was identified but the origin and extent of decline was not sufficiently assessed. There was documentation of appropriate plans to refer the patient for a neuropsychological evaluation and the memory care unit but the status of this was not updated. Additionally, consultation with medical was needed. Relatedly, a comprehensive initial assessment was not completed by either provider and routine contact and IDTT documentation was overly brief. More thorough documentation would have assisted with case conceptualization, diagnostic clarification, and treatment planning. The use of cuff status itself was of significant concern and further exacerbated by the lack of accompanying documentation.

Lastly, the patient was discharged to EOP without sufficient clinical rationale or adequate preparation to transition to EOP, followed by a fast-approaching parole date.

**Patient K**

This 46-year-old patient's record was reviewed to assess the quality of intermediate care provided at CMF. The patient was provided with a diagnosis of schizophrenia. He was fully adherent to his prescribed psychotropic medications which included olanzapine, risperidone, and paliperidone, and as needed benztropine which were prescribed under a PC2602 order. The patient had a history of treatment at the 3CMS, MHCB, and acute levels of care. He was discharged from the APP level of care to the ICF level of care on February 28, 2024 and transferred to CMF on May 7, 2024.

An initial psychiatric assessment was completed on the day of arrival at CMF. The patient engaged briefly with the psychiatrist and reported that he was not interested in participating in groups, but found his medications to be helpful even though he could not express how so. The assessment was adequate given the patient's reluctance to engage in the interview. An admission SRASHE was completed on May 7, 2024 by a different psychiatrist and was noted as having been completed in the dayroom without explanation as to why. There was no history of suicidal thoughts or behaviors, and the patient's suicidal risks were rated as low. The assessment was adequate.

A 72-hour IDTT was completed the following day with the patient's assigned psychiatrist present; however, a covering PC was present. A correctional counselor, registered nurse, and the patient were also present. The IDTT documentation incorrectly noted that the patient had no history of assaultive behavior (his criminal history included assault), no history of sexual misconduct (the patient was recommitted to CDCR for failure to register as a sex offender) and that the patient was not prescribed involuntary medications (he was under an active PC 2602 order). Elsewhere, IDTT documentation correctly identified these issues; however. IDTT documentation also noted that the patient's last SRASHE was completed on April 29, 2024 when it was completed May 7, 2024. The clinical summary noted that the patient's treatment goals included "education about disorder, medication compliance, and insight" yet the only treatment goal on the treatment plan was related to the patient's ADLs. There was no rationale for placement at the ICF level of care and no discharge criteria documented. The IDTT recommended placement in a single cell due to the patient's poor hygiene and risk of victimization. IDTT documentation noted that the patient's security level had not yet been determined, which was confusing given the patient had been incarcerated for the past four months.

Over the following week, the patient was seen at his cell by his assigned PC and assigned psychiatrist. Neither documented why the patient was not seen confidentially, and clinical documentation was sparse and superficial. The patient also did not show for the two recreational groups offered to him during the week.

On May 15, 2024, a 10-day IDTT meeting was held with a covering PC, the patient's assigned psychiatrist, a registered nurse, and a correctional counselor. The patient refused to attend. The

same incorrect information regarding risk factors and the most recent SRASHE was carried over into the IDTT documentation unchanged. The clinical summary section included a single phrase noting that the patient refused the meeting and made no reference to the patient's functioning since his admission to ICF. There were no strengths listed nor patient's verbalized treatment goals. There was no reference to the earlier goals other than an unchanged goal on the treatment plan related to the patient's ADLs. There was no information about the patient's progress toward this goal despite both the psychiatrist and PC who saw the patient at cell front during the previous week noted that his cell was clean, and his hygiene appeared adequate. The rationale for single cell placement was unchanged.

The patient was not seen out of his cell by his PC or psychiatrist over the following month. The patient was offered 10-12 hours per week of recreational therapy groups, as well as PC-led groups; however, the patient refused all groups. Group notes by the PC often included seeing the patient at cell front and determining that there was no clinical indication to see the patient for an individual session. The PC consistently documented that the patient's cell was "clean and organized" and that the patient evidenced no symptoms of psychosis.

An IDTT was held on June 12, 2024 with the patient's assigned PC and psychiatrist present, although the assigned psychiatrist had changed, with no indication that the psychiatrist had met the patient previously. A correctional counselor and nurse were present. The inaccurate section describing risk factors remained unchanged. The treatment planning section noted that the patient was both present and absent from the meeting; however, other documentation stated he did not attend. Despite the PC and psychiatrist documenting no problems with the patient's hygiene or cell cleanliness during cell-front contact, the IDTT noted that the patient was not showering, and odor was "still present." The treatment plan was not updated, despite the patient not leaving his cell. There was no rationale for the patient's level of care nor discharge criteria. Similarly, there was no update to his housing recommendation, or his security level. The psychiatrist later saw the patient at cell front and documented guardedness, disorganized thinking, and was reacting to stimuli not observable by others; however, the psychiatrist did not change the patient's medication or plan to address his obvious psychosis and isolation.

The patient continued to refuse all clinical contacts with the psychiatrist, which were offered three times per week, and medication changes were initiated on June 20, 2024 which appeared to address the patient's negative symptoms. Subsequently, the patient's hygiene was noted to improve, and he was more talkative with staff, although still refused to leave his cell for clinical contacts or groups. Of note, the patient was rarely offered individual sessions with his PC and PC documentation was canned and often contradicted documentation found elsewhere in the record. On July 3, 2024, the PC noted that the patient's hygiene had improved following the medication change; however, the PC had not mentioned hygiene concerns in previous progress notes.

The patient attended his IDTT meeting on July 8, 2024 and was noted to be showering more frequently and attended day room on one occasion. The patient's treatment plan remained unchanged. IDTT documentation did not include any reference to the STEP program.

**Findings**

The overall mental health treatment provided to this patient was inadequate.

The patient was isolating himself, refusing all treatment, and by most accounts was maintaining inadequate hygiene for over six weeks before any changes to his treatment were made. The treatment offered by the PC was inadequate, with copied and canned documentation that often contradicted that of other clinicians. Treatment planning was limited and IDTT documentation included copied information that was both inadequate and inaccurate across all meetings. Fortunately, changes to the patient's medications in June 2024 resulted in improvement of the patient's negative symptoms. There was no evidence that treatment interventions were provided to the patient to support his one treatment goal of improving his hygiene.

**Patient L**

This 43-year-old patient's record was reviewed to assess the quality of intermediate care provided at CMF. He was provided with a diagnosis of major depressive disorder, recurrent episode with psychotic features. The patient was adherent to his regimen of prescribed psychotropic medications including aripiprazole, buspirone, fluoxetine, risperidone, and hydroxyzine. The patient had a history of treatment at the 3CMS level of care, and was admitted to the MHCB from which he transferred to CMF-ICF on October 26, 2023, due to danger to himself.

The patient was seen monthly by the IDTT during the reporting period. All required staff and the patient were present for meetings, although an alternate psychiatrist covered the meeting on two occasions. Much of the documentation included minimal changes from month to month. Rather than using the treatment plan section of the form, the clinical summary section included a list of Treatment Outcome Expectations (TOEs) which were indicated as having been "met" or "partially met" during the reporting period. It was unclear what issues remained for the "partially met" outcome expectations. The patient reported high levels of depression and anxiety with unremitting auditory hallucinations. There was no discussion of how these were being addressed in treatment other than noting the psychiatrist was making medication changes as needed. Patient participation in programming and therapeutic activities was not documented, nor was a discharge plan or rationale for continued placement at the ICF level of care. During the first five months of the reporting period, it appeared that the patient was placed in a locked dorm, not his LRH which was a multi-person cell, secondary to his history of violence. The only treatment goal that appeared related to this was that the patient would be enrolled in groups to address conflict resolution. In July 2024, the housing recommendation was changed to a multi-person cell, with no rationale or explanation.

The psychiatrist saw the patient weekly during the reporting period with a few exceptions. Most contacts were provided by the patient's assigned psychiatrist. Documentation was mostly adequate with frequent medication changes with adequate rationale to address the patient's non-remitting symptoms of depression, auditory hallucinations, paranoia, and sleep disturbance, as well as side effects. Psychiatrists, who saw the patient, documented diagnoses of schizophrenia and/or schizoaffective disorder which were not the official diagnoses on record. Further, the

patient self-reported that he was not attending groups secondary to his symptoms, but a review of the record revealed this was incorrect, and the patient regularly attended about two-thirds of the offered groups.

The patient was offered groups approximately seven hours each week, with five of those hours being offered by recreational therapists. The patient's assigned PC offered two groups per week to the patient, with attendance improving during the review period. Topics were generic, but occasionally relevant to the patient's documented needs and treatment goals. There was no documentation of the patient's response to group treatment relative to his needs and goals. Many of the groups involved watching movies and engaging in leisure activities. There were no individual sessions with the PC offered to the patient during the reporting period.

**Findings**

The mental health treatment provided to this patient was adequate.

Despite this, the case demonstrated significant shortcomings. On the positive side, the patient was mostly seen weekly by psychiatrists who attempted to address the patient's needs through frequent medication changes. The patient was not offered therapeutic individual contacts with his PC and groups offered by the PC were occasionally relevant to the patient's needs, but documentation did not clearly indicate whether the patient was benefiting from these groups. Similarly, recreational therapy groups were tangentially related to the patient's needs and goals, with limited evidence in the record of the patient's response. Diagnostic clarification was clearly indicated. Treatment planning was limited and included sparse documentation regarding the patient's progress toward goals, treatment engagement, and discharge planning. It was not clear why the patient's recommended housing was changed from locked dorm to multi-person cell in July 2024 and whether treatment was provided to target the patient's violence risk beyond medications.

**Patient M**

This 46-year-old patient's record was reviewed to assess the quality of intermediate care provided at CMF. He was provided with a diagnosis of major depressive disorder, recurrent episode, moderate. He was mostly adherent to his prescribed sertraline. Relevant medical conditions included chronic pain. Additionally, he was prescribed buprenorphine-naloxone. The patient had a history of treatment at the 3CMS, EOP, MHCB, and ICF levels of care. In January 2024, he was placed at the ICF level of care for 17 days, was admitted to the MHCB level of care, and returned to the ICF level of care at CMF on February 7, 2024.

An initial psychiatric assessment was completed on the day of the patient's arrival, was adequate, and included a review of the patient's recent placement in the MHCB. His 72-hour IDTT was held the following day and included required staff and the patient. A number of items within the risk factors section of IDTT documentation were blank, including whether the patient had a history of self-injurious behavior, suicide attempts, assaultive behavior, or involuntary medications. There was also no narrative provided to describe the risk factor of "history or current suicidal ideation" which was marked as "yes" for the patient. The patient's STEP status

was entered as Step 1. There was no treatment plan developed for the patient, yet there were IPOCs to address anxiety and depressed mood that were initiated in March 2023 while the patient was at the EOP level of care. There was no rationale for the patient's current level of care, nor discharge criteria. An admission SRASHE was completed on February 9, 2024 which included self-reported prior suicide attempts and daily suicidal ideation within the past month with thoughts about how he might kill himself. Despite these findings and a number of risk factors identified, the patient was given an acute suicide risk rating of low. No rationale was provided for this rating; however, rationale for a low acute risk rating from September 2023 was included in the documentation. The acute risk rating appeared to be an underestimation of the patient's risk. The patient's chronic risk rating of moderate appeared appropriate but was also not justified.

Monthly IDTT meetings were held with all required staff and the patient present. Sections of the form remained blank until May 2024, when some of the sections were filled (e.g., risk factors, patient strengths, patient's stated goals). In June 2024, the patient had a change in both his assigned PC and assigned psychiatrist. IDTT documentation was generic, relied almost exclusively on the patient's self-report, and rarely discussed the patient's progress in treatment beyond his self-report. None of the IDTT documentation incorporated the five instances during the reporting period when nursing staff consulted with on-call psychiatry about the patient, regarding depression, suicidal thoughts, and anxiety including some instances of sufficient severity to merit injectable medications. In May 2024, IDTT documentation included generic goals and interventions, but they did not reappear in subsequent treatment planning documentation indicating that progress toward goals and the delivery of the interventions listed were not reviewed or discussed during the meeting. Also, psychiatry medication review forms for the IDTT were not completed until the May 2024 IDTT and were consistently completed thereafter.

Psychiatric contacts were offered to the patient at least weekly and reflected adequate interventions targeted to address depression, and transient, passive suicidal ideation. Despite the patient's request, PC individual contacts were not offered to the patient as required. Groups facilitated by the PC were offered two to three times per week, most weeks; however, there were at least three weeks when the patient was not offered any PC contacts. PC documentation included little evidence of interventions being provided to the patient to assist with depressive symptoms or suicidal ideation. Further, despite the PC being aware of the patient's suicidal ideation and multiple occasions of requiring on-call psychiatric intervention for the same, no SRASHE or safety plan was completed with the patient, other than his admission SRASHE.

During two weeks in June 2024, the patient was offered nine and 12 hours of groups per week. All but four of those hours were recreational therapy groups. The patient attended a little over half of the offered groups.

**Findings**

The overall mental health treatment provided to this patient was inadequate.

The patient continued to struggle with depression, hopelessness, chronic pain, and suicidal ideation, yet no treatment to target these issues was provided to the patient beyond psychotropic medication. Both the patient and the PC appeared to recognize the need for individual therapy, yet these services were not provided consistently. The patient's treatment plan was inadequate and significant events in the patient's behavior and thinking were neither acknowledged nor addressed during IDTT meetings.

**Patient N**

This 33-year-old patient's healthcare record was reviewed to assess the quality of intermediate care provided at CMF. He was provided with diagnoses of unspecified bipolar and related disorder; major depressive disorder, single episode, severe; unspecified schizophrenia spectrum and other psychotic disorder; and opioid use disorder, severe. The patient was fully adherent to his prescribed citalopram, mirtazapine, and olanzapine but only moderately adherent to his prescribed prazosin. He was also prescribed buprenorphine-naloxone for a substance use disorder. The patient had a history of treatment at the 3CMS and MHCB levels of care, prior to being admitted to the acute level of care on April 3, 2024. On July 10, 2024, he was transferred to the ICF level of care and arrived at CMF on July 15, 2024.

An initial psychiatric assessment was completed on July 15, 2024 and was comprehensive. The psychiatrist noted that the patient likely suffered from a major depressive disorder and that psychotic symptoms were likely due to substance use. The psychiatrist documented the patient's significant history of suicidality and noted him to be at moderate acute risk for suicide. The patient was seen for a routine psychiatric contact on July 24, 2024 and discussed being bored, experiencing nightmares, and feeling depressed and anxious. He had a flat affect. Medication adjustments were made to address the patient's reported symptoms.

His initial IDTT meeting was not held within 72 hours as required, but instead was held on July 31, 2024, sixteen days after his admission. Additionally, the PC had not met with the patient to complete an initial assessment within 10 days of his admission and in fact had not met with the patient privately at any point since his admission. No initial SRASHE was completed despite the fact that the patient was assessed as being moderate acute risk for suicide by the psychiatrist, had a history of suicide attempts, and was recently hospitalized at the APP level of care secondary to a suicide attempt by fentanyl overdose. Required staff and the patient were present at the meeting. Narrative sections of the IDTT documentation mentioned goals of building an internal sense of control, distress tolerance, insight, and medication management without discussion of how these goals would be measured. Interventions were also vague, referencing psychoeducation and distress tolerance groups. The patient's treatment plan included a goal for the patient to be free from suicidal ideation and acute distress over the next seven days. The only intervention was assessment by the psychiatrist for the need for a PC 2602 order should the patient refuse medications. Given the totality of IDTT documentation, it appeared that this goal and related objectives and interventions were carried over from a previous treatment plan. The team recommended that the patient be placed in a single cell as he reportedly murdered his cellmate in 2017.

During the two weeks of the review period the patient was at CMF's ICF; he was offered thirteen groups, six of which were core clinical groups. The remainder were facilitated by recreational therapists, with several being structured groups focused on skill building.

**Findings**

The overall mental health care and treatment of this patient was inadequate.

Reasons for inadequacy included not being assessed by his PC nor given a formal suicide risk assessment despite significant risk factors and a recent discharge from acute inpatient placement secondary to a suicide attempt. His treatment plan was vague. Psychiatric assessment and interventions were adequate. Additionally, while not sufficient in terms of number of hours, groups offered to the patient were mostly clinically focused.

**Patient O**

This 27-year-old patient's healthcare record was reviewed to assess the quality of intermediate care provided at CMF. He was fully adherent to the medications prescribed under a PC 2602 order for danger to others, including olanzapine, paliperidone, and valproic acid. The patient had a history of treatment at the EOP, MHCB, ICF, and acute levels of care. He was admitted to the APP level of care on March 20, 2024 and discharged to the ICF level of care and arrived at CMF on July 2, 2024.

APP discharge documentation noted that the patient continued to be delusional and disorganized, struggled to maintain adequate hygiene, was isolative and disruptive, and should be placed in a single cell. The APP IDTT recommended "intensive, long-term treatment" to address these symptoms.

A comprehensive initial psychiatric assessment was completed with the patient on the day of his arrival. It included a thorough review of the patient's history and prior course of treatment along with diagnostic justification. An initial, 72-hour IDTT was held on July 3, 2024 with required staff and the patient in attendance. Risks included a history of self-injury (e.g., the patient ripped his fingernails in 2020 while psychotic) and 14 assaults on peace officers while incarcerated. The patient was noted to be maximum custody status; however, the IDTT documented that mental health symptoms were not contributing to specific behavior leading to this status. It is unclear how this was determined as documentation indicated his assaults were delusion-based. The clinical summary included a single sentence about the patient's reason for admission and the clinical formulation included a statement, "updated at 30 day." No patient strengths or patient-identified goals were listed. There was an IPOC initiated for delusions, without any goals or interventions. The treatment plan included a single goal to program without behavior that is dangerous to others for one week. Interventions listed included DBT skills and learning adaptive coping responses. Discharge criteria was unrelated to this goal and noted that the patient needs to maintain ADLs and medication compliance. The IDTT recommended a single cell for the patient.

A routine psychiatric contact was held on July 9, 2024 but the patient refused to leave his cell. The contact was adequate given the non-confidential nature. A second IDTT meeting was also held on July 10, 2024. The patient's assigned PC, a registered nurse and the patient were present. A covering psychiatrist who had not met the patient previously was present, and there was no correctional counselor at the meeting. Documentation noted that the patient was following unit rules but was not attending groups. This was confusing as there was no evidence that the patient had been offered groups. The case formulation was not completed and there were no updates to the patient's treatment goal, yet narrative information indicated that motivation interviewing was going to be used to help the patient change his behavior. Patient strengths and patient-identified goals remained blank.

A recreational therapy assessment was completed with the patient on July 11, 2024 and appeared adequate. The patient was offered weekly psychiatric contacts which included adequate documentation and reviewed the patient's progress toward achieving his treatment goals. The patient showed improvement in delusional thinking, impulse control, and maintaining his ADLs. The patient was not seen for individual sessions with his PC at any time during the reporting period. The PC offered two groups to the patient, one of which the patient attended. The documentation from the group was inadequate and noted only that the patient was an active participant with no other details. The patient was offered a total of 13 hours of groups between July 10 and July 22, 2024, with four of those groups being core groups. No groups were offered for the remainder of the reporting period.

The patient was released from maximum custody status on July 23, 2024 following an ICC meeting that was attended by a PC who was not the patient's assigned PC.

**Findings**

The overall mental health treatment provided to this patient was inadequate.

Despite the patient's improvement in symptoms and functioning and receiving adequate psychiatric care, his overall treatment within the ICF at CMF was inadequate. Treatment planning documentation was minimal, with a number of sections left blank, and unresolved inconsistencies. The treatment provided to the patient was not in keeping with his treatment plan. The patient was not provided with adequate individual treatment and group offerings were insufficient, including no groups being offered to the patient from July 3-9 and from July 23-31, 2024.

**Patient P**

This 56-year-old non-binary patient's healthcare record was reviewed to assess the quality of intermediate care provided at CMF. The patient's preferred pronouns were noted to be "they/them." This patient was provided with diagnoses of bipolar disorder, unspecified; paranoid schizophrenia; gender dysphoria in adolescents and adults; major depressive disorder, recurrent episode, severe; and substance use disorders. The patient was receiving medications under a PC2602 order since January 2023, based on danger to self, including bupropion, olanzapine, sertraline, lurasidone, and hydroxyzine. The patient was fully adherent. The patient

was also prescribed buprenorphine-naloxone. The patient had been treated at all levels of care. The patient was transferred from the APP to the ICF level of care and arrived at CMF on September 20, 2023.

During the reporting period, the patient was seen monthly by the IDTT. The patient was present for all meetings, as were required staff, except on one occasion when an alternate psychiatrist was present. IDTT documentation included no treatment plan, goals, or planned interventions. Updates to IDTT documentation were brief, reflecting the patient's self-report but included no information about the patient's treatment, symptom presentation, suicide risk, group attendance, or daily functioning, other than the information provided by the patient. The patient's diagnoses were under review by the psychiatrist, yet diagnostic clarification was not included in IDTT documentation. The patient reporting ongoing struggles with passive suicidal ideation which were mitigated by distraction yet, at times, psychiatric documentation reflected more active suicidal ideation. These episodes were not mentioned in IDTT documentation. The patient reported finding prescribed medications helpful. Of note, there was no reference to the patient's gender dysphoria diagnosis in IDTT documentation despite the fact that the psychiatrist and the patient had been discussing hormone treatment and gender affirming surgery since June 2024 and the patient had a history of hormone therapy.

Psychiatric contacts were held weekly with the patient, with a few missed weeks during the reporting period. Documentation was comprehensive and thoughtful, reflecting consideration of the patient's needs, symptom presentation, medication effectiveness, and diagnostic clarification. A number of progress notes written by the patient's psychiatrist who started working with the patient in June 2024 reflected therapeutic contacts and discussions. Of concern was the fact that in June 2024, the psychiatrist documented that the patient's laboratory tests revealed medications that the patient was not prescribed and low serum levels of prescribed medications. There was no evidence that this issue was discussed in the subsequent IDTT meeting nor was the issue of noncompliance documented as being raised with nursing staff despite the patient's PC 2602 order.

The patient was assigned two PCs during the reporting period. The first worked with the patient through May 2024 and offered only groups and no individual treatment. The patient often refused to attend groups and was occasionally seen cell front when this occurred. Documentation from the groups the patient attended was minimal and included no patient-specific information. Beginning in mid-June 2024, the patient's new PC offered groups and some individual sessions, typically two contacts per week. On the rare occasions when individual sessions were held, documentation reflected engagement with the patient and use of therapeutic interventions. The patient did not attend groups often, and documentation of groups was limited.

Review of groups offered during a two-week span in June 2024 revealed that the patient was offered approximately seven hours of groups weekly, with the majority of groups being offered by recreational therapists including both structured and unstructured groups.

**Findings**

The overall mental health treatment of this patient was inadequate.

Records included no treatment goals, symptoms being targeted by treatment, or discharge criteria, making it difficult to determine why the patient was in an ICF setting and how the IDTT would know when the patient demonstrated improvement. Psychiatric care appeared appropriate and both psychiatrists assigned to the patient documented challenges in diagnosing the patient yet no referral for psychological testing was mentioned nor generated. The PCs assigned to the patient during the reporting period appeared unaware of the diagnostic challenges reflecting poor record review. Also, PC documentation was sparse and reflected little about the patient's functioning, symptom presentation, treatment engagement, or treatment progress.

**Patient Q**

This 51-year-old patient's healthcare record was reviewed to assess the quality of intermediate care provided at CMF. He was provided with diagnoses of schizoaffective disorder, depressive type and major depressive disorder, recurrent episode, with psychotic features. The patient was fully adherent to his prescribed paroxetine and quetiapine. The patient had a history of treatment at the EOP, MHCB, and transferred to CMF-ICF from APP on February 12, 2024.

IDTT meetings were held monthly with the patient and required staff present for the meetings with the exception of one meeting where no nurse or correctional counselor were present. The patient's treatment plan included two goals, one to reduce suicidal ideation and the other to reduce auditory hallucinations. Both included numerical ratings to be used, yet no baseline was provided and there was no indication of the patient's ratings of these symptoms during any of the IDTT meetings. Further, it appeared that the goals may have preceded his ICF placement as the intervention listed to reduce suicidal ideation was "DSH referral." Updates to the IDTT documentation were limited to short entries in the clinical summary section which included only patient self-report and no input from staff or objective information about patient functioning, treatment participation, or treatment progress. Some elements of a current mental status were included in the narrative. On July 3, 2024, the patient reported to the IDTT that he did not feel like he had made much progress since his admission to the ICF and requested more individual therapy. This request was not revisited or mentioned in the documentation of the subsequent IDTT meeting. The record revealed a single individual therapeutic session with the patient on July 17, 2024 during which therapeutic interventions were referenced and a handout was provided to the patient. Otherwise, the patient was offered one group per week with his PC during the reporting period.

Psychiatric contacts were held at least weekly, with documentation mostly unchanged from week-to-week. Documentation included a brief mental status, a copy of the patient's laboratory test results as monitored by the substance disorders treatment program, and a canned assessment and plan section that was noticeably unchanged.

The patient was offered 14 hours of groups across two weeks in June, with the majority of groups (12 hours) being offered by recreational therapists including both structured and

unstructured groups. There were two groups offered by the patient's PC, one per week, with limited individualized documentation about the patient.

**Findings**

The overall mental health treatment provided to this patient was inadequate.

Treatment planning was inadequate and included numerical ratings for symptoms that went unmeasured and vague interventions. In fact, there was little evidence of any interventions being provided to the patient beyond recreational groups and medications. Documentation by the PC, psychiatrist, and recreational therapists was void of specificity and other than self-reported status information provided by the patient during IDTT meetings, there was no tracking of patient's progress or readiness for discharge.

**Patient R**

This 50-year-old patient's healthcare record was reviewed to assess the quality of intermediate care provided at CMF. The patient was diagnosed with major depressive disorder, recurrent, severe, with psychotic features, PTSD, and anxiety. He was mostly adherent to his prescribed sertraline and partially adherent to his prescribed prazosin. He was also prescribed hydroxyzine as needed. The patient had a history of treatment at the 3CMS, EOP, MHCB levels of care, and one placement at the acute level of care, from which he transferred to CMF ICF on April 10, 2024.

The patient was seen for an initial psychiatric assessment on the day of his arrival. The content of the note was inadequate as it included mostly information pulled forward from prior psychiatric contacts. The only new information was a mental status examination and a plan to keep the patient's medications the same. An initial IDTT was held the following day with all required staff and the patient present, except the PC was not assigned to the patient. IDTT documentation included a number of blank sections including the case formulation and patient strengths. There was no treatment plan. There was reference to the patient wanting to work on "depression and trauma" without any goals or interventions listed. The discharge criteria was noted as decreasing suicidal ideation to a manageable level. In the risk section of the documentation, the fact that the patient had a history of self-injury was omitted and the patient's maximum custody status was noted as not being related to mental health, yet later in the documentation the IDTT justified a recommendation for a single cell based on the fact that when the patient is feeling suicidal, he lashes out and assaults others.

The next IDTTs were held on April 17, 2024 and then monthly thereafter. Required staff and the patient were present for meetings, except on one occasion a covering psychiatrist attended the meeting. The April 17, 2024 IDTT documentation included a well-written case formulation but lacked a treatment plan, specific goals, or interventions. Vague goals about increasing insight and coping mechanisms, and medication compliance were documented without providing baseline information. In May 2024, an IPOC was added to address the patient's maximum custody status, yet the risk section failed to acknowledge mental health factors related to his status. In June 2024, after the patient's custody status was reduced to medium, the IDTT

continued to recommend a single cell with no change in rationale regarding the patient's violence secondary to suicidal ideation and lack of insight. The June 2024 IDTT documentation noted that the patient's mother died two weeks prior, yet no change to the treatment plan was indicated. Of note, there was still no formal treatment plan in the documentation. IDTT documentation in July was largely unchanged, with no specific goals, interventions, or discussion of patient progress beyond a vague statement that he was making progress in treatment and his depression was "easing."

Routine psychiatric contacts were offered to the patient at least weekly. From admission to mid-June 2024, the patient's psychiatrist provided superficial documentation with limited information about the patient beyond mental status notes and immediate functioning. On May 10, 2024, the patient was agitated and the psychiatrist added olanzapine, noting that a PC 2602 would be pursued if the patient did not take the medication or engaged in violence. Other than a note on May 30, 2024 regarding the fact that the patient had not refused medications since May 23, 2024, there was no other reference to olanzapine or its effectiveness. It appears that the medication was allowed to expire on July 15, 2024 with no mention of this in the record. The patient was assigned a new psychiatrist in June 2024 and documentation increased in adequacy with the exception of omission regarding the patient's olanzapine.

There was no evidence that the patient was seen by a PC for any individual contacts during the reporting period. Instead, the patient's PC offered three to five groups per week to the patient, which he mostly attended. Documentation of these groups was limited to the patient's level of participation and an occasional mention of emotionality during groups. On May 20, 2024, the patient was seen at his cell door after refusing group and it was noted that the patient's mother had died. The PC documented that the patient would be seen daily for monitoring, but there was no evidence that this occurred. The patient was next seen by the PC nine days later in a group during which he became emotional and asked to return to his cell. There was no follow up with the patient.

Group offerings were assessed during two weeks in July 2024 during which the patient was offered 18 hours of groups, six of which were offered by his PC. The patient attended most groups, however there was no mention of how these groups applied to the patient's needs or the impact on the patient's mental health and functioning.

**Findings**

The overall mental health treatment provided to this patient was inadequate.

Treatment planning was poor, and continuity of care was inadequate as evidenced by failure to follow up on prescribed medications and to complete contacts after the patient's mother's death and emotionality in groups. There was no evidence of an assessment of how the patient's treatment was impacting his mental health or functioning.

**Patient S**

This 28-year-old patient's healthcare record was reviewed to assess the quality of intermediate care provided at CMF. He was provided with a diagnosis of paranoid schizophrenia. The patient's PC 2602 medications included divalproex sodium, haloperidol injections, mirtazapine, olanzapine, paliperidone, and as needed diphenhydramine. Documentation indicated that the patient refused medications on July 10, 2024 despite the PC2602 order. There was no information in EHRS regarding this refusal.

This patient had a history of treatment at the EOP, MHCB, ICF, and acute levels of care, and transferred to CMF on March 1, 2024.

The patient's psychiatrist completed a comprehensive initial assessment and SRASHE on the day of arrival. An initial IDTT meeting was also held on March 1, 2024 and was attended by required staff and the patient. A number of sections were blank including the case formulation, patient strengths, patient's treatment goals, and the treatment plan section. In the IPOC section of the documentation, the patient's previous TOEs were pulled forward with a number of them noted as having been met. At the next IDTT meeting held four days later, all sections remained unchanged except for a brief summary of the patient's self-reported current status.

The patient assaulted another patient in his dorm on March 7, 2024 and later assaulted officers when his cell door was opened after covering his window and failing to respond. He was agitated, given emergency medications, and placed on 1:1 status "mostly for behavioral reasons" according to the psychiatrist who evaluated him. He was seen later that day by his PC who documented no plan for the patient other than to keep him under observation. He was removed from 1:1 observation the following day by the psychiatrist. It was noted that the IDTT would meet to discuss his disposition "early next week", but the patient would remain in a single cell. The PC attempted to see the patient later that day, but he refused. There was no IDTT meeting the following week. The patient was seen mostly at cell front secondary to refusal, by his psychiatrist and PC over the next two and a half weeks. The patient expressed a desire to transfer and reported that he did not like being in a single cell. He also reported that he was attempting to "hyperventilate" himself. The psychiatrist noted that the patient did not evidence signs of psychosis or other symptoms he had reported in the past. On March 23, 2024 the patient reported an intent to engage in self-harm by biting or headbanging and was placed on 1:1 suicide watch status and given emergency medications. No suicide risk evaluation was completed, and no treatment plan was created to address the patient's reported intent to engage in self-harm. On March 27, 2024 the patient arrived for his IDTT meeting in a suicide-resistant smock accompanied by a custody officer, yet there was no explanation as to why in the documentation. There was no treatment plan documented for the patient. When the patient was seen by his psychiatrist the following day, he was no longer in a suicide smock and appeared to have been discharged from 1:1 suicide watch but there was no documentation in the record regarding this decision.

In the following weeks, the patient was offered a number of contacts with the psychiatrist and his PC, all of which he refused to attend. He also refused to attend the groups offered to him. A "CMF Suicide Risk Evaluation" was completed on April 11, 2024; however, the patient refused

to participate. There was no indication as to why the evaluation was being completed. The patient's chronic and acute risk were rated as high and the disposition indicated "no change" but did not specify what that meant. A safety plan was also created on that date which was adequate despite the patient's refusal to engage. The patient did attend an individual contact with his PC on April 12, 2024 and the PC documented that the patient was to remain at the ICF level of care. Despite this, another SRASHE was completed on April 18, 2024 with the reason indicating ICF discharge. The patient had not been seen by the PC or a psychiatrist in the interim. The patient refused to participate and continued to be assessed as having high chronic and acute risk for suicide, but the disposition was to discharge the patient. No rationale was provided. The safety plan was unchanged.

A social worker completed a discharge summary on April 18, 2024 but it was not clear where the patient was being discharged from or being sent to. The summary was adequate and included recommendations for treatment goals. It is unclear why these goals were not incorporated into the patient's treatment plan. A discharge IDTT was also held on April 18, 2024 which the patient attended while cuffed behind his back. There was no treatment or discharge plan. The patient was recommended to be placed in a single cell. The IDTT documentation was wholly inadequate as it was unclear what was occurring with the patient or what the plan was. A discharge psychiatry noted dated the same day noted that the patient was being discharged to a "single cell ICF."

The patient was seen for an initial IDTT on April 22, 2024 despite not having been seen for any initial assessments. The patient refused to attend the meeting. Documentation included a number of blank sections other than noting the patient had refused to attend. There was no treatment plan. The patient was noted to be maximum custody status and the IDTT documented that mental health factors did not contribute to this status and treatment interventions were not required to address his maximum-security status. Subsequent IDTT meetings were held monthly, with the patient refusing to attend two meetings. In May 2024, the patient was noted as being medium custody status. The case formulation indicated that the PC questioned the patient's diagnosis of schizophrenia, did not observe any symptoms, and believed the patient did not meet criteria for continued placement in ICF. The PC documented that "treatment goals are meaningless" given the patient's refusal to engage with staff. Further, the discharge plan noted, "discharge will occur when MHMD is comfortable with the stability of his medication." The patient was not discharged however and remained at the ICF level of care at the time of this review (September 12, 2024). Subsequent IDTTs included information that the patient began to attend programming, and vague treatment goals were created along with an intervention to "continue motivational interviewing" yet the case formulation was not updated.

Weekly psychiatric contacts were offered to the patient, but he refused to attend most of them. He was observed in a "frog" position on the floor, his room was unkempt, and he was occasionally observed making grunting noises. No individual contacts with the PC were offered to the patient after his transfer to a single cell ICF. The patient was seen by his PC and psychiatrist together on June 11, 2024 and it was documented that the patient evidenced delusional thinking, flat affect, poor hygiene and reported auditory hallucinations. The patient was offered a number of groups but rarely attended.

**Findings**

The overall mental health treatment provided to this patient was inadequate.

Documentation of the care provided to this patient was often confusing and it was difficult to determine what was being done to treat the patient other than providing him with medication. Treatment planning was non-existent and diagnostic clarification was needed.

**Patient T**

This 22-year-old patient's healthcare record was reviewed to assess the quality of intermediate care provided at CMF. The patient had no diagnosis on record. He was prescribed buspirone, nortriptyline, and venlafaxine and was mostly adherent. The patient had a history of treatment at the 3CMS, EOP, and MHCB levels of care. He arrived at CMF ICF on July 5, 2024.

The patient was seen for an initial psychiatric assessment on the day of his arrival. The assessment included a review of the patient's history while incarcerated and indicated a diagnosis of major depressive disorder and ADHD. He was admitted to ICF secondary to suicidal thoughts and dangerousness to others. His history included self-harm, suicidal ideation, poor impulse control, poor anger management, poor social skills, and no social support. An initial SRASHE was completed by a psychiatrist on this date and the patient was largely uncooperative. Risk levels were determined to be moderate with rationale being pulled from previous assessments. No safety plan was completed as the patient was placed in an inpatient setting.

An initial IDTT was held on July 5, 2024 with the patient and required staff present, except an alternate PC was present. The patient was noted to be maximum security status and required treatment to address his risk factors. The patient's treatment plan included six treatment goals addressing suicidal ideation, depression/anxiety, self-injurious behavior, excessive MHCB admissions, poor impulse control/anger management, and discomfort being in groups. Objectives and interventions were appropriate.

The patient engaged in superficial self-harm on July 9, 2024 by picking at an old wound and causing bleeding on his arm. The patient was offered medication and an assessment by a psychiatrist was attempted but refused the following day. The patient was seen at cell front and appeared stable.

When seen for a 10-day IDTT on July 11, 2024, the treatment goals were unchanged or updated, yet a narrative indicated that motivational interviewing would be used to "entice group participation" and psychoeducation would be used to increase insight. It was also documented that the patient would be placed in an anger management group. The case formulation was completed adequately. The patient reported to the treatment team that he had been diagnosed with autism spectrum disorder in the past and provided an assessment report which reportedly did not provide a diagnosis, as it was not the intent of the report. There was no mention of the patient's self-harm two days prior.

The patient was seen by the psychiatrist for at least weekly sessions. When the patient agreed to attend, the psychiatrist engaged the patient in treatment for anger management and provided medication consultation. There were two group sessions offered to the patient by the PC during the reporting period. The patient attended one session and the documentation was generic. In the two weeks following the patient's 10-day IDTT, he was offered 12 hours of groups, one of which was offered by the PC and two of which were anger management groups and indicated in the patient's treatment plan.

**Findings**

The mental health treatment provided to this patient was adequate.

However, PC contacts were not in keeping with expectations for inpatient treatment. Further, the IDTT failed to acknowledge the patient's self-harm.

**Patient U**

This 29-year-old patient's healthcare record was reviewed to assess the quality of acute care provided at CMF-PIP. He was provided diagnoses of schizoaffective disorder, depressed type, borderline personality disorder, unspecified schizophrenia spectrum and other psychotic disorders, major depressive disorder, recurrent, unspecified severity, amphetamine-type substance use disorder, severe, in sustained remission, and opioid use disorder, severe, in sustained remission. PIP psychiatrists noted a diagnosis of posttraumatic stress disorder in progress notes but did not record this in the list of mental health problems. The patient was adherent with prescribed aripiprazole, lamotrigine, lithium, melatonin, prazosin, and sertraline. Hydroxyzine and olanzapine were prescribed PRN for anxiety and agitation, and he made frequent of these medications. He was admitted to the CMF-PIP at the acute level of care on March 21, 2024.

Through the ISUDT, he was prescribed buprenorphine-naloxone. In addition to his psychiatric diagnoses, medical conditions included morbid obesity, sleep apnea, hypothyroidism, hypertension, type 2 diabetes, and a history of hepatitis C.

The patient had a lengthy history of psychiatric treatment in CDCR, at all levels of care. Seven suicide attempts were noted, including a hanging attempt at age 15 and subsequent attempts by asphyxiation and cutting his wrist, along with additional instances of non-suicidal self-harm.

The patient was admitted one day following a suicide attempt by self-strangulation at the CIM-MHCB while on suicide watch. At the time of this incident, he had reported symptoms of depression, anxiety, flashbacks and nightmares of his abuse, and derogatory command auditory hallucinations telling him to kill himself. On March 21, 2024, a CMF-PIP psychiatrist conducted a SRASHE. The SRASHE, although it mistakenly referred to patient with female pronouns, was thorough and determined that the patient was at high chronic and high acute risk for suicide. A different psychiatrist completed the initial psychiatric evaluation on the same day and placed the patient on 1:1 suicide watch with a safety smock, blanket, and mattress. The psychiatric assessment inaccurately indicated the patient had most recently attempted suicide on March 13,

2024, while records from CIM-MHCB confirm that the patient's two most recent attempt occurred on March 15, 2024 and March 20, 2024. The erroneous March 13, 2024 date was carried forward in subsequent psychiatric progress notes.

Suicide watch was continued through March 24, 2024, with increasing levels of access to items in his cell. On March 24, 2024, the patient was placed on suicide precautions. No subsequent order renewing suicide precautions was entered; the March 24, 2024 order was permitted to expire on March 25, 2024 without a face-to-face evaluation addressing the appropriateness of discontinuing precautions. On March 25, 2024 he was permitted to wear pants and shirt rather than use a safety smock, but with continued property restrictions and continued use of a safety mattress and safety blanket. On March 26, 2024, a nursing note indicated the patient was on every 15-minute watch, but there we no corresponding observation rounds, and a psychiatrist, noting the patient's continued suicidal ideation, wrote that the patient should be continued on safety issue as a result. No order for suicide precautions was written. Instead, on March 26 and 27, 2024 he was permitted access to an electronic tablet and reading material, with continued use of a safety mattress and safety blanket, until March 28, 2024, when he was given full issue.

The patient's IDTT meetings occurred timely for the first month of treatment and were attended by the patient and all required disciplines however, the correctional counselor was not always the one assigned to the patient. After the first month of treatment, IDTT meetings occurred once every nine to 15 days, with attendance as described. Appropriate short-term objectives and long-term goals were established in the initial treatment plan but were not accompanied by any baseline measurement of target symptoms. The Collaborative Assessment and Management of Suicidality (CAMS) framework was included as one of the interventions to be used, but there was no subsequent documentation of its subsequent use. Similarly, there was no documentation that the intervention of "grief work" was delivered. Neither the patient's verbalized treatment goals nor any elements of the treatment plan were updated from one IDTT meeting to the next.

Treatment progress was not measured. However, successive IDTT clinical summaries consistently indicated that the patient was free from signs of disorganized or delusional thinking, participated in unstructured and structured activities, maintained personal hygiene, was adherent to prescribed medications, and reported an absence of active suicidal ideation. IDTT documentation also consistently indicated that there would be no change in the patient's level of care and that the patient had a pending investigation for safety concerns. Beginning on June 21, 2024, the IDTT clinical summary indicated that the patient would be discharged to EOP once the investigation was completed. On August 8, 2024, the IDTT clinical summary indicated that the patient had been stable for several months, that the custody investigation had been completed, and that the patient would be discharged to EOP level of care. At the next IDTT meetings, on August 19 and August 30, 2024, the clinical summary indicated that the custody investigation was still ongoing, and that the patient would be discharged to EOP following its completion. None of the IDTT documentation referred to the patient's progress in the STEP program or the development of a safety plan. The case formulation remained unaltered over time and consisted of historical, rather than current, information, and did not state what improved or worsened these challenges.

During the first six days of PIP treatment the patient was seen by five different psychiatrists. While the patient was seen frequently by psychiatry throughout the review period, successive progress notes frequently included identical wording regarding the patient's weight, metabolic syndrome, failure to use his CPAP machine, and medication management. Between April 11, 2024 and May 28, 2024, seven successive psychiatric progress notes indicated that the patient "remains with the same enemy concerns that may extend his time on the unit." The role of enemy concerns was communicated to custody on March 28, 2024 and noted in his IDTT meeting documentation on March 29, 2024. However, the possible impact of enemy concerns on his symptoms and treatment needs was not otherwise addressed in clinical documentation. On June 3, 2024, the patient was the victim of an unprovoked peer assault and was then placed on non-disciplinary max custody status through June 11, 2024 to separate him from the peer.

An order for lithium expired on August 5, 2024 and was not restarted until August 27, 2024. A PRN order for olanzapine also expired on August 5, 2024 but was restarted on August 14, 2024, after the patient reported he needed the medication, which he took regularly an order for aripiprazole expired on August 6, 2024 and was restarted on August 8, 2024. Additionally, sertraline was discontinued, and lamotrigine was initiated to address depressive symptoms; lamotrigine was soon appropriately discontinued after the patient broke out in a rash.

An initial primary clinician evaluation was not completed during this admission, and the primary clinician saw the patient individually in a confidential setting only twice between March 25 and September 4, 2024. The primary clinician saw the patient up to three times a week in therapeutic groups and occasionally, in response to the patient not attending a group session or a group cancellation, in non-confidential or cell-front locations for brief check-ins.

**Findings**

The overall mental health treatment provided to this acute care patient was inadequate.

The patient's initial suicide precautions and limited issue orders were inconsistent with policy and reflected poor communication among providers and/or poor understanding of what was required. Suicide precautions were discontinued through an expiration of the order rather than a face-to-face evaluation of the appropriateness of discontinuing precautions.

Although the patient was seen frequently by both psychiatry and psychology, the interventions listed in the treatment plan were not documented in the healthcare record, and vice versa. IDTT documentation did not reference the development of a safety plan. Baseline levels of symptoms and subsequent progress were not measured, the STEP program did not appear to be utilized, three medication orders expired and had to be restarted after gaps ranging from two to 22 days, and the recent chronology of suicide attempts was not accurately reflected in psychiatric documentation. Documentation of the discontinuation of suicide precautions was not clear, and an initial primary clinician evaluation was not completed.

There did not appear to be any effort to clarify the welter of psychiatric diagnoses in the patient's record. The patient did not receive meaningful individual therapy. Despite these challenges, the patient's symptoms and behavior stabilized, and his retention on the PIP acute level of care for

several months appeared unwarranted from a clinical perspective. The long pendency of a custody investigation into safety concerns, which appeared to be the primary obstacle to discharge, was a concern.

**Patient V**

This 34-year-old patient's healthcare record was reviewed to assess the quality of acute care provided at the CMF-PIP. In psychiatric and psychology progress notes he was provided diagnoses of schizophrenia, schizoaffective disorder, bipolar type, bipolar disorder, cannabis use disorder, severe, cocaine use disorder, moderate, other stimulant use disorder, moderate, in early remission, and noncompliance with treatment; in contrast, the master mental health problem list was blank. The patient was prescribed olanzapine and divalproex sodium under a PC 2602 court order, with chlorpromazine and olanzapine injections as back-ups for non-adherence with oral divalproex sodium and olanzapine, respectively. He was adherent with oral medications. In addition to his psychiatric diagnoses, medical problems included subclinical hypothyroidism and high cholesterol. The patient was re-admitted to the CMF-PIP at the acute level of care on April 18, 2024.

The patient had a well-established history of psychiatric illness and treatment, beginning at age 13, along with a history of using alcohol, cannabis, cocaine, and ecstasy. He had a history of treatment at all levels of care, and periods of treatment under PC 2602 orders since 2019. The patient had no known suicide attempts, although he placed a towel around his neck and hit the cell door with his fists while psychotic and manic in the MHCB in early April 2024.

The patient was placed in MHCB at CMF with psychosis. He required extraction from the MHCB to be moved to the acute level of care and was incoherent, agitated, kicking, and behaved as if reacting to things that were not really there. The initial psychiatric evaluation, a SRASHE, and initial treatment plan were completed within one day of arrival. A preliminary diagnosis of schizoaffective disorder, bipolar type, was made, with a plan to treat disturbed mood, psychosis, and agitation with injectable olanzapine. Although the patient was admitted from the MHCB with a safety smock, once in the PIP the patient was placed on partial issue with access to pants and shirt, ordered a safety blanket and safety mattress, and ordered a paper tray with no plastics for meals. There were no orders for suicide watch or suicide precautions entered at that time, and the April 18, 2024 order for clothing restriction and limited issue was not renewed the following day. In the SRASHE, chronic and acute suicide risks were judged to be low. The initial treatment plan addressed programming and adherence with medication. Discharge goals were measurable and clinically appropriate.

Following the initial IDTT meeting on April 19, 2024, IDTT meetings were held once a week for the first month and then once every two weeks thereafter. The assigned psychiatrist, assigned primary clinician, and a nurse consistently attended, with the assigned correctional counselor present at most meetings. The patient attended eight out of 13 IDTT meetings, refusing the rest. The patient's strengths and verbalized treatment goals were poorly documented and never updated after the initial IDTT meeting. The treatment plan itself was not updated until August 1, 2024, when CBT, DBT, and positive reinforcement were added as interventions to address agitated behavior and psychotic symptoms. None of the IDTT documentation referred to the

patient's progress or lack of progress in the STEP program or to the development of a safety plan. The case formulation remained unaltered over time and consisted of historical information, but did not formulate answers to why the patient was suffering from the specific problems with which he was presenting in the PIP, or what made these challenges better or worse.

The patient continued to be highly agitated and psychotic following admission, and on April 22, 2024, the patient attacked four peers in the dayroom. He was placed on suicide precautions with a safety smock and limited issue, and it was determined that he required emergency medication. He refused to accept oral olanzapine, and the psychiatrist filed an initial emergent PC 2602 petition. On April 23, 2024, the psychiatrist discontinued suicide precautions but continued orders for limited issue. Orders regarding patient issue were not entered on April 24, 2024. On April 25, 2024, an order permitted the patient to have partial clothing and regular eating utensils, but restricted him from canteen, groups, day room, and yard activities and required a safety blanket and safety mattress. However, on April 29, 2024 the primary clinician documented that the patient was still in a safety smock; the clinician encouraged the patient to start wearing clothing. On April 30, 2024, he was permitted full clothing, regular bedding, loose paper and a pen, but no yard, day room or canteen. By April 30, 2024, the patient was documented as wearing clothing in a bizarre manner. On the same date a PC 2602 court order was granted due to grave disability and danger to others.

Following the April 22, 2024 incident, the patient was followed closely and frequently by psychiatry. Roughly two-thirds of the psychiatric encounters occurred in a non-confidential or cell-front setting, driven in part by the patient's refusal to come out of his cell. Medications were adjusted and eventually simplified as the patient began to respond to treatment, and psychiatrists monitored the patient's mental status, suicide risk, response to medications, and potential for medication side effects with care. Portions of progress note content were frequently identical or nearly identical from one encounter to the next. On May 15, 2024, an order was issued to give the patient full issue; no orders regarding patient issue had been provided after April 30 and before May 15, 2024. An order for quetiapine, which was used temporarily to supplement the aripiprazole, expired on May 15, 2024 and was not renewed until May 20, 2024; and an order for chlorpromazine, used as a PRN injectable back-up for refusal of oral medication, expired on May 17 and was not renewed until May 21, 2024. Fortunately, these gaps in medication orders did not appear to negatively impact the patient, and over time the patient's functioning and mental status improved because of the medications.

No initial primary clinician evaluation was completed during the review period. While the primary clinician saw the patient regularly, more than half of these encounters occurred cell-front and often appeared brief. Documented interventions included encouragement to program, praise for treatment adherence, and supportive therapy to reinforce coping strategies. There was no clear documentation of the provision of DBT and CBT following the treatment plan update on August 1, 2024. As was the case with psychiatric progress notes, much of the content in primary clinician progress notes was identical or nearly identical from one encounter to another.

Additionally, the patient did not have the benefit of therapeutic groups during the review time. As a result of the April 22, 2024 altercation, the patient was placed on cuff status by custody, a status that prevented him from attending groups. The treatment team advocated with custody

staff more than once for discontinuation of the patient's cuff status as the patient's functioning improved. The patient was apparently assigned to groups beginning July 1, 2024, when group progress notes begin to document him as a no-show. Regrettably, cuff status was not discontinued until August 20, 2024, after the patient signed a compatibility chrono. Even after discontinuation of the cuff status, the patient declined to attend any groups. While several treatment team members documented this status change, the assigned psychiatrist wrote on August 27, 2024 and September 4, 2024 that the patient was still on cuff status. This documentation may have been part of the larger pattern of copying language from earlier notes into the progress note being developed.

**Findings**

The overall mental health treatment provided to this acute care patient was inadequate.

At the beginning of the patient's inpatient hospitalization, he was placed on limited issue without any accompanying orders for suicide precautions or suicide watch. Limited issue orders were also entered for the patient after suicide precautions had been discontinued in April. No initial primary clinician evaluation was conducted, and documentation regarding the decision to discontinue suicide precautions could not be located in the record. Orders regarding patient issue were sporadic and not renewed timely if at all. The treatment planning process did not adequately identify the specific challenges to the patient's lack of engagement with non-pharmacological treatment, and listed interventions including DBT and CBT that do not appear to have been provided. IDTT documentation did not reference development of a safety plan, and did not refer to the STEP program, which did not appear to be used. The patient's treatment goals were never updated in IDTT, Psychiatric and primary clinician progress notes showed frequent copying and pasting prior content, which resulted in out-of-date information in progress notes.

Reasons for the patient's repeated refusals to meet psychiatry and psychology in a confidential setting were not adequately explored, with the sole documented intervention of encouraging him to attend groups. Although outside of the mental health team's control, the clinical challenges resulting from the patient's prolonged placement on cuff status in an acute setting need to be emphasized. The patient's cuff status lasted more than 20 consecutive weeks, long after his behavior had stabilized and his assault risk diminished. This negatively impacted the treatment team's ability to bring the patient into group programming.

Aspects of psychiatric care was reasonable, but insufficient to bring the patient's care into adequacy. Positive aspects included monitoring the patient's symptoms, quickly filing an essential involuntary medication petition, adjusting medication doses, and monitoring for side effects. While the first assigned psychiatrist clarified the patient's diagnosis, this was not reflected in the master treatment plan. Despite these positive aspects, sizeable concerns included inadvertent expiration of two medication orders. While the patient's pharmacological treatment was partially successful during the review period, his social functioning remained impaired and had not yet been adequately addressed.

**Patient W**

This 53-year-old patient's healthcare record was reviewed to assess the quality of acute care provided at CMF-PIP. He was provided diagnoses of schizophrenia, opioid use disorder, severe, methamphetamine use disorder, severe, antisocial personality disorder, and unspecified schizophrenia spectrum and other psychotic disorder. He was treated with buspirone, melatonin, mirtazapine, olanzapine, quetiapine, and risperidone to address symptoms of anxiety, insomnia, and psychosis. He was adherent with these medications. Hydroxyzine and injectable olanzapine were also prescribed on a PRN basis to address anxiety and agitation. Through the ISUDT, he was prescribed buprenorphine-naloxone for opioid use disorder. Medical conditions included subclinical hypothyroidism, elevated cholesterol, hepatitis C, gastritis, constipation, obesity, and chronic back pain. and an abdominal hernia. The patient was admitted to the CMF-PIP on April 17, 2024 and paroled on September 2, 2024.

The patient had a history of suicide attempts in 1997 (hanging), 2021 (jumping off a prison tier), and 2024 (overdose). He had prior treatment at the 3CMS, EOP, MHCB, and acute levels of care. Progress notes indicated the patient's functioning and symptoms had gradually grown worse over recent years, perhaps due to substance use.

He was admitted to the PIP from MHCB, where he had been placed on March 11, 2024, the same day as his return to the CDCR. At that time he reported intense suicidal ideation with a plan to cut or hang himself and exhibited multiple risk factors for suicide. He also voiced long-standing delusions surrounding HIV, including that he had harmed others, and others would harm him

On the day of admission, a SRASHE, initial psychiatric assessment, and initial IDTT meeting were completed. The patient was found to be at high chronic and acute suicide risk, with few protective factors; psychotic, s hopeless, with recent but not current suicidal ideation; and reported side effects to medications. The initial treatment plan targeted suicidal ideation and depressed mood, and included reasonable discharge goals.

Following the initial IDTT meeting, IDTT meetings were held weekly for the first month, then every two weeks thereafter. The assigned psychiatrist, assigned primary clinician, a nurse, and a correctional counselor were consistently present at these meetings; the IDTT documentation did not indicate whether the correctional counselor was the one assigned to the patient, reference the STEP program, or the development of a safety plan. The patient attended most meetings. The majority of IDTTs did not include a case formulation or patient strengths.

When the case formulation was included, it identified historical, not current problems, and lacked ameliorating factors. The patient's verbalized treatment goals were not documented. The treatment plan template itself was not updated. An intervention to assist the patient in developing a safety plan appropriate for EOP discharge was present just a few days prior to discharge; when the treatment team was well aware that discharge to parole, not EOP, was imminent.

The patient was seen frequently by psychiatrists with good continuity of care. Multiple medication changes were made over the course of treatment, and documentation regarding the

rationale for these changes and collaboration with the patient was good. Psychiatry recommended a medication for depression and anxiety; however, the patient declined. One order for melatonin inadvertently expired briefly, and was restarted two days later. The patient's depression, anxiety, and irritability improved over time, and the frequency and intensity of his psychosis improved, but did not fully resolve.

An initial primary clinician assessment was not completed, with few individual sessions documented. The patient began attending groups regularly. There was no documented intervention to assist the patient with developing a safety plan appropriate for a lower level of care.

Due in large part to the patient's continuing symptoms and his limited engagement in the process, discharge planning was challenging. His treatment team did not opine he met criteria for evaluation for involuntary treatment after paroling, such as 72-hour psychiatric detainment. On August 30, 2024, the master treatment plan psychiatry review indicated that the patient continued to voice concerns that he would be killed once he was released. In contrast, the IDTT documentation of that date indicated that the patient did not report any concern that there may be a potential threat from others to his life or safety when he was discharged. There was inconsistency between the psychiatrist's portion of the master treatment plan, and the remaining portion regarding core symptoms such as safety issues upon parole.

**Findings**

The overall mental health treatment provided to this acute care patient was inadequate.

The treatment plan focused on historical, rather than current factors. Additionally, the treatment plan was never updated and failed to address the STEP program; it was unclear if this program was used during the patient's inpatient treatment. While psychiatric treatment was adequate and clearly helped to improve the patient's symptoms, the primary clinician did not provide sufficient individual treatment, which was required given his degree of delusions and paranoia.

**Patient X**

This 39-year-old patient's healthcare record was reviewed to assess the quality of acute care provided at CMF-PIP. He was provided diagnoses of schizophrenia, unspecified, adjustment disorder with anxious mood, and methamphetamine use disorder. In the PIP he was prescribed haloperidol, olanzapine, quetiapine, valproic acid, and hydroxyzine. The patient displayed multiple symptoms of psychosis and agitation, resulting in MHCB admission, with subsequent CMF-PIP admission on March 3, 2024.

The patient was initially adherent with quetiapine and non-adherent with other scheduled psychotropic medications, and on several occasions accepted hydroxyzine when it was prescribed PRN. He subsequently became non-adherent with all psychotropic medications.

The patient had a history of abuse, incarceration from a young age, extensive substance abuse, and competency restoration treatment. The patient had a history of treatment at the 3CMS, EOP, MHCB, and acute levels of care.

The initial psychiatric assessment was completed on March 3, 2024 in a confidential setting. The psychiatrist found the patient to be depressed, anxious, defensive, delusional, and paranoid, but without hallucinations or suicidal ideation. Quetiapine dosage was decreased due to side effects, apparent, and hydroxyzine was increased for anxiety Psychiatry planned to monitor the patient's symptoms, and to possibly consider an alternative antipsychotic medication.

On March 6, 2024, a SRASHE was completed by a non-assigned psychiatrist based on record review, with a listed reason as the patient was attending group. This evaluation concluded that the patient was at low acute risk and moderate chronic risk for suicide. Also on March 6, 2024, the 72-hour IDTT meeting occurred and was attended by the patient, the assigned psychiatrist, and assigned primary clinician, it was unclear if the correctional counselor in attendance was the assigned one. The team placed the patient into STEP 2. The patient's goals and the team's treatment outcome expectations were documented, and included measurable goals, yet lacked a baseline measurement which was required to monitor degree of improvement. Delusional thinking was addressed by medications and reality testing. The team recommended single-cell placement, and planned to monitor Patient strengths were not documented, and the case formulation was noted as pending.

Following the initial IDTT meeting, IDTT meetings were held weekly for the first month of the patient's treatment and every two weeks thereafter. With rare exceptions, the assigned primary clinician, psychiatrist, and correctional counselor attended. While documentation reflected nursing input, the IDTTs did not reflect nursing staff attendance—a Program Guide requirement in PIPs. STEP program documentation was lacking after the March 26, 2024 IDTT. The patient attended all IDTT meetings through April 23, 2024, but subsequently refused as the treatment team was pursuing a PC 2602 petition. The treatment plan itself was not updated after March 6, 2024, and continued to document that the patient's delusional thinking had decreased, when this was not the case.

After completion of the initial psychiatric assessment on March 4, 2024, the patient was seen by psychiatry in individual encounters a total of just six times through the first month of acute treatment, and on average about once a week thereafter. Well-documented psychiatric treatment was generally provided by the patient's assigned psychiatrist. The patient refused recommended antipsychotic and mood stabilizing medications, and consistently indicated he would only accept quetiapine and venlafaxine. Because the patient appeared to be taking his quetiapine, psychiatry increased his dosage, and planned to monitor him involuntary medication treatment under PC 2602; venlafaxine was not prescribed, with a clear rationale. Despite increasing doses of quetiapine, the patient had recurrent periods of psychosis, including, but not limited to paranoia, disorganized thinking, agitation, and threatening others (including the use of racial slurs).

On May 3, 2024, he became agitated and threatening, required custodial escort out of group, and received one-time doses of chlorpromazine and hydroxyzine to address his acute agitation. Due to his continued psychosis and reactivity, the team suspected he was not taking his medications

as prescribed, which was confirmed by a subsequent cell search finding hoarded quetiapine. Additionally, other patients on the unit had tested positive for this medication although they were not prescribed it. As such, psychiatry ordered the medication crushed and floated, to reduce risk of diversion, and decided to file for involuntary medication treatment under PC 2602, due to grave disability and danger to others. On May 23, 2024, psychiatry filed a non-emergency petition for involuntary medication treatment due to grave disability and danger to others. The hearing was scheduled for June 18, 2024, but postponed to July 2, 2024 at the request of the patient's attorney. On July 2, 2024, the court authorized an additional postponement to August 6, 2024 at the patient's request; the patient had requested the postponement so that he could obtain and review his health care records. On August 6, 2024, the hearing was postponed again to September 3, 2024, and on September 3, 2024, it was postponed to October 1, 2024, in both instances because the patient had not received his health care records. Progress notes indicated that the team had repeatedly educated and attempted to assist the patient in completing the forms to request his medical records; the notes indicated that the patient was not cooperative.

In response to these decisions, the patient refused individual and group treatment, IDTTs, and medications Due to concern for the patient's hostility, the treatment team requested that he be placed on cuff status, which custody followed. On July 3, 2024, the treatment team determined it was clinically appropriate to recommend a trial off of cuff status; custody removed the patient from cuff status on July 9, 2024.

On August 5, 2024, the patient was assaulted by a peer who subsequently reported he struck the patient because the patient was making hostile gestures. The patient signed a compatibility chrono and was not placed back on cuff status.

Documented treatment by the primary clinician was lacking, including no initial assessment, and inadequate number of individual contacts. Additionally, after the decision to file the PC 2602 petition, the patient only attended groups sporadically.

**Findings**

The overall mental health treatment provided to this acute care patient was inadequate.

No primary clinician assessment was completed, and the frequency of visits was not compliant with Program Guide requirements. Treatment planning did not adequately address the patient's lack of insight, or need for involuntary treatment. The treatment plan was not updated to reflect medication non-adherence and inaccurately stated that the patient's delusional thinking had decreased. Nursing staff and progress in the STEP program were not documented.

As a result of the patient's symptoms and non-compliance with treatment recommendations, the patient received little to no actual treatment for over four months. The treatment team took inadequate efforts to remedy the delays in the PC 2602 process.

**Patient Y**

This 62-year-old patient's healthcare record was reviewed to assess the quality of acute care provided at t CMF-PIP. He was provided with diagnoses of adjustment disorder with depression and anxiety, rule out major depressive disorder, rule out posttraumatic stress disorder, stimulant use disorder, cannabis use disorder, and hallucinogen use disorder. He was adherent with prescribed escitalopram, melatonin, mirtazapine, olanzapine, and diphenhydramine for depression, anxiety, and insomnia, and intermittently used PRN diphenhydramine and hydroxyzine for anxiety. The patient was admitted to CMF-PIP on March 6, 2024 from CHCF-MHCB, due to suicidal ideation.

The patient reported a history of childhood abuse, substance abuse, and a prior diagnosis of borderline intellectual functioning. He had a history of treatment at the 3CMS, MHCB, ICF, and acute levels of care, and reported a history of one overdose at age 11.

An initial psychiatric assessment on the day of admission found the patient depressed, with passive suicidal ideation and evidence of posttraumatic symptoms. He was placed on full issue and regular observation, and escitalopram with hydroxyzine PRN were continued. A different psychiatrist completed a SRASHE on the same day. This psychiatrist found that the patient's was depressed, with suicidal ideation conditional on return to VSP, with moderate chronic and acute risks for suicide.

The initial IDTT was timely, and attended by the assigned psychiatrist and primary clinician, and the patient. Various correctional counselors were present at this and subsequent IDTTs; however, documentation was unclear as to which was the one assigned to the patient.

On March 7, 2024, the patient was placed in STEP 2, and this placement was noted again during the subsequent two IDTT meetings but not thereafter. Subsequent IDTT meetings occurred weekly for the first month of treatment and once every two weeks thereafter. The patient's advanced preferences for safety interventions were not documented until September 4, 2024. The treatment plan template was not used in any IDTT meetings. During the June 26, 2024 IDTT meeting, the patient reported discharge safety concerns, and these were reported to custody on the same date. The treatment team determined that the safety concerns increased the patient's risk of self-harm or suicide and that the patient would not be discharged until the chief psychiatrist or designee assessed the patient as appropriate for discharge. These safety concerns were not documented as present during subsequent IDTT meetings until August 21, 2024. Development of a safety plan was not documented.

Following the initial psychiatric assessment, the assigned psychiatrist saw the patient once every two to four days for the first month of treatment, and four to seven times a month thereafter. All these encounters occurred in a confidential setting. The psychiatrist adjusted medications to target anxiety and depression. The patient gradually responded to these medications, and by June 2024 he began to report that he was not experiencing significant anxiety or depression.

Psychiatric progress notes frequently contained formulaic content that was copied over from one encounter to the next, and on occasion this resulted in internally contradictory documentation.

For example, on August 13, 2024, the psychiatrist documented the patient as exhibiting "cheerful prosody" with euthymic mood and full affect, as well as neutral mood with constricted affect. Psychiatric reviews of master treatment plans appeared to utilize generic rather than patient-specific language. These documents repeatedly indicated that treatment was focused on reducing psychotic symptoms, self-injurious behavior, aggression, and homicidal ideation; these symptoms and behaviors were not part of the patient's presentation at any time during the review period. On May 14, 2024, the psychiatrist tested the patient with the Montreal Cognitive Assessment; the patient's results indicated mild cognitive impairment.

An initial primary clinician assessment was not completed. The primary clinician first saw the patient individually on March 8, 2024, consisting mostly of content pulled forward from earlier assessments by other clinicians. On March 12, 2024, a primary clinician progress note did not indicate whether the patient was seen and instead only included content carried forward. After March 12, 2024, the primary clinician saw the patient for a total of six individual encounters, with the last occurring on May 23, 2024. On May 23, 2024 the primary clinician completed a "CMF suicide risk evaluation" and found the patient to be at low chronic and low acute risk for suicide. During most of the review period, the primary clinician saw the patient approximately three times a week in group programming. Many of these group sessions consisted of showing participants a video followed by discussion. The primary clinician developed no progress notes of any kind after August 7, 2024 but remained assigned to the patient a month later. While the patient continued to participate in other group programming, he received no documented individual encounters with a clinician after May 23, 2024.

**Findings**

The overall mental health treatment provided to this acute care patient was inadequate.

There was a significant delay in the treatment team actively addressing the triggering events and safety concerns surrounding peers and housing that led to the current admission. The patient's safety concerns at VSP were identified by the treatment team during the first several days of treatment but not reported to custody for investigation for over three months. There was no resolution of the patient's rule out diagnoses of major depressive disorder and posttraumatic stress disorder after more than six months of inpatient treatment.

No primary clinician assessment was completed, and no individual primary clinician contacts were documented after May 23, 2024. Primary clinician interventions beyond active listening were not documented. The treatment plan template was never completed and as a result the treatment planning process failed to adequately identify either the interventions to be provided or the patient's response to treatment. IDTT documentation did not reference the development of a safety plan. The patient's suicidal ideation rapidly resolved following admission, and by June 2024 his self-reported depression and anxiety appeared to be largely resolved as documented in frequent psychiatric contacts. Clinical reasons for retaining the patient at the acute level of care despite such clinical improvement were not documented, and it appeared the patient's stay was protracted due to an ongoing custody investigation into the patient's safety concerns.

**Patient Z**

This 52-year-old male-to-female transgender patient's healthcare record was reviewed to assess the quality of intermediate care provided at CMF-PIP. She was provided diagnoses of unspecified bipolar disorder, gender dysphoria, posttraumatic stress disorder, borderline personality disorder, and antisocial personality disorder. She was prescribed fluvoxamine, lamotrigine, and mirtazapine. She was generally adherent with mirtazapine and fluvoxamine, but not with lamotrigine. Diphenhydramine, hydroxyzine, and olanzapine were prescribed PRN for anxiety and agitation. The patient was admitted to the CMF-PIP intermediate level of care on March 25, 2024.

The patient's medical conditions included heart disease, high cholesterol, high blood pressure, kidney disease, cysts in the pancreas and liver, enlarged prostate, hepatitis C, and a history of head trauma with resultant seizures. She had a mobility disability and used a walker. She was prescribed gender affirming hormones during the review period.

The patient had a history of alcohol, cannabis, and cocaine use. Three prior suicide attempts were listed in her record, by hanging (in 2018), self-starvation (in 1990), and jumping (in 1979, when she would have been seven or eight years old). She had a history of head banging. Prior mental health treatment within the CDCR included extensive care at all levels of care.

The patient was admitted from RJD EOP to the CMF-PIP intermediate level of care on March 25, 2024, for worsening suicidal ideation following an alleged sexual assault at RJD and denial of her request to be transferred to a women's prison. An initial psychiatric assessment was completed the same day and was thorough. She was found to be depressed, with passive suicidal ideation, and free from psychotic signs and symptoms. An accompanying SRASHE found her at high chronic risk and moderate acute risk for suicide. She was admitted to intermediate care on full issue and no restrictions.

During her initial psychiatric assessment, she was adamant that she could not cell with others. Later that evening she reported that she would become suicidal if forced to stay in locked dorm housing, citing fears for her safety and intolerance of peers to her transgender identity. She was placed on 1:1 observation with clothing, a safety mattress and blanket, no property in her cell, and no other restrictions. On March 26, 2024, the team consulted with custody and custody determined that the patient needed single cell housing, and she was promptly moved, with 1:1observation and limited issue subsequently removed.

Also on March 26, 2024, the 72-hour IDTT meeting occurred and was attended by the patient, assigned primary clinician, assigned psychiatrist, a nurse, a recreational therapist, and a correctional counselor. The IDTT incorrectly documented that the patient had no history of self-injury or suicide attempts. This error was carried forward in all subsequent IDTT documentation. Patient strengths and verbalized treatment goals were documented; the patient reported that she wanted to work on "core issues" related to early childhood sexual abuse and needed to remain in a single cell. The treatment plan identified depression and trauma as the targets of treatment, provided measurable short-term objectives and long-term goals, and indicated that the team would challenge cognitive distortions, teach distress tolerance skills, and

assist the patient in processing trauma. The role of the patient's transgender identity in the context of incarceration in a men's prison was not addressed. No case formulation, discharge plan, discharge criteria, or reasons for retention were included in the IDTT documentation. The psychiatric review of the master treatment plan indicated that the patient needed to be retained at the ICF level of care to establish an effective medication regimen. In contrast to the patient's desire for a single cell for safety reasons, the treatment team determined her least restrictive housing was a locked dorm.

After consultation with custody, the patient was transferred to single-cell ICF housing on March 27, 2024, transferred from single-cell ICF housing back to locked dorm housing on March 28, 2024 and, at the recommendation of the assigned psychiatrist, transferred temporarily and unendorsed to single-cell housing on March 29, 2024. The IDTT determination of the patient's least restrictive housing was formally changed on April 2, 2024, during a cell-front IDTT "discharge" meeting with the patient. The clinical summary from this IDTT meeting addressed the patient's housing and safety concerns arising from her transgender identity and recent alleged sexual victimization at RJD. A PREA investigation was ongoing, and custody was informed of the patient's safety concerns at RJD. The team indicated that she should be placed in a single cell as her least restrictive housing. The accompanying master treatment plan psychiatry review note provided rationale for the patient's retention at the intermediate level of care, including but not limited to the need for diagnostic clarification and further stabilization. On April 5, 2024, an IRU housing review endorsed the patient to single cell housing.

On April 11, 2024, she was formally transferred to single-cell housing, and a new 72-hour IDTT meeting occurred the following day. During this meeting the patient expressed passive suicidal ideation. The treatment plan was not updated, and no case formulation was provided. Her 10-day IDTT occurred timely and documented the patient would kill herself if ICF care was not helpful. A case formulation was documented, but it was generic, formulaic, did not link assessment data to treatment planning, did not address the patient's gender identity, nor the patient's need for trauma-informed care, and did not identify factors that improved or worsened her symptoms.

Subsequent IDTT meetings beginning on May 8, 2024 occurred timely and were attended by the patient, assigned primary clinician and psychiatrist. A correctional counselor was present, but documentation did not indicate whether they were assigned to the patient. Documentation did not indicate whether nursing was present. On May 8, 2024, a long historical clinical summary was developed, and it was carried forward unchanged in subsequent IDTT meeting documentation. The case formulation described above, the patient's strengths, and the patient's verbalized treatment goals, and the treatment plan were brought forward unchanged during each IDTT meeting. Documentation of what occurred during the IDTT meetings was missing from multiple IDTTs, containing nearly identical information. Only on August 21, 2024 did the IDTT documentation briefly note what had occurred during the meeting, including the treatment team's observation that the patient had improved and that discharge consideration would take place over the next month. The patient's placement in the STEP program, the development of a safety plan, and the patient's progress with respect to the safety plan were not indicated in any IDTT documentation. Master treatment plan from psychiatry provided more germane clinical information.

The psychiatry sessions were frequent, with almost all occurring in a confidential setting. Although she was seen by four different psychiatrists during the first month of treatment, continuity of treatment and concordance in diagnostic impressions were good. The patient's diagnosis was clarified, and changed from bipolar disorder to posttraumatic stress disorder and a history of major depressive disorder. Due to the change in diagnosis and patient preference, lamotrigine was discontinued.

Psychiatrists actively collaborated with the patient, medical providers, and experts in transgender care to integrate the patient's treatment, including resumption of gender-affirming hormones. The psychiatrist found the patient's preference for psychotherapy over medications to address trauma reasonable. Multiple psychiatric encounters documented appropriate individual therapy interventions.

On May 24, 2024, an unlicensed psychologist completed a suicide risk evaluation, as part of a PREA referral from custody. The evaluation found the patient to be at high chronic risk for suicide but low acute risk, with no plan, intent or desire to end her life.

The patient refused pat downs by male custody officers, and female officers were typically unavailable on the patient's unit. As such, on June 5, 2024, the treatment team determined that the patient should be transferred to another single-cell ICF unit, where female custody officers were present. The patient declined, stating that transfer to a unit where maximum custody patients were present was punitive, and she would not be safe. She demanded to be discharged, declared a hunger strike, refused medications, and stated that she would kill herself after discharge She received an RVR for refusal of housing.

The assigned psychiatrist and the chief psychiatrist worked collaboratively with the patient, persuading her to stop her hunger strike on June 10, 2024. On June 13, 2024, the patient made suicidal statements during the mental health RVR assessment and was placed on suicide watch. The patient gave up her property and male CDCR clothing but refused to give up her female clothing. Psychiatry re-evaluated the patient and determined that a cell extraction to remove her female clothing was not indicated and that she could be watched in this clothing. Suicide precautions were discontinued the following day, and she was placed back on full patient issue. The mental health assessment for her RVR found that her mental illness contributed to her housing refusal and recommended that she retain access to yard and gender-affirming products through canteen. The patient was not transferred and continued to refuse groups out of fear of harassment, or obtaining another RVR.

The patient agreed to start and optimize the dose of fluvoxamine to treat posttraumatic stress disorder symptoms, with resultant improved behavior and engagement in programming.
No initial primary clinician assessment was completed, and the first documented individual primary clinician encounter did not take place until May 21, 2024, nearly two months after the patient's arrival in the PIP. A second individual encounter occurred on June 4, 2024, documenting a plan to create a safety plan the following week. Both encounters occurred in a confidential setting. Aside from three limited cell-front encounters, no additional individual primary clinician sessions were documented. Based on psychiatric progress notes, it appeared

that the primary clinician provided the patient with handouts and other counseling without documenting these encounters. Although the patient was offered multiple groups with the primary clinician, she did not begin attending groups consistently until late August 2024, when it appeared a female custody officer was made available on the unit to conduct the patient's required pat downs.

**Findings**

The overall mental health treatment provided to this intermediate care patient was inadequate.

The patient's initial endorsement to a locked dorm as her least restrictive housing level was not clinically appropriate, given her recent alleged sexual victimization and well-articulated concerns about her own safety in the context of her transgender identity. While the housing level was eventually changed to single cell, the decision to transfer her to a unit with more female custody officers was made without her input, and resulted in an unnecessary RVR, along with ruptured therapeutic treatment. Documented treatment planning was inaccurate, inadequate, did not refer to the STEP program or the development of a safety plan, did not demonstrate an appreciation of her need for a trauma-informed environment and support for, the patient's transgender identity. No initial primary clinician assessment was completed, only two confidential individual primary clinician encounters occurred, and for much of the review period the patient refused groups because of her perceptions of a hostile and unsafe milieu.

Although most care was inadequate, the excellent care provided by psychiatrists fulfilled some of the patient's treatment needs. Psychiatric care was well-documented, integrative, collaborative, therapeutic, trauma-informed, and effective. The assigned psychiatrist provided supportive psychotherapy; individual psychotherapy was not made available through other treatment team members. Psychiatrists supported the patient's access to gender-affirming treatment, clothing, and articles, and demonstrated a consistent appreciation of her transgender identity and overall treatment needs.

**Patient AA**

This 42-year-old patient's healthcare record was reviewed to assess the quality of intermediate care provided at CMF-PIP. He was provided diagnoses of schizoaffective disorder, depressed type, opioid use disorder, severe, stimulant use disorder, severe, cannabis use disorder, severe, and alcohol use disorder, severe. He was prescribed buspirone, haloperidol, mirtazapine, and olanzapine, and was generally adherent with these medications. Diphenhydramine, hydroxyzine, and olanzapine were prescribed on a PRN basis. The patient was treated for suicidal ideation and psychosis at the CMF-MHCB prior to transfer to CMF-PIP intermediate level of care on March 13, 2024.

Through the ISUDT, he was prescribed buprenorphine-naloxone for opioid use disorder. In addition to his mental illness, relevant medical conditions included a history of traumatic brain injury, seizures, low sodium blood levels, and hepatitis C.

The patient had an extensive history of substance use and psychiatric hospitalizations in the community, severe enough to result in a two-year long conservatorship. Three suicide attempts/self-injurious episodes were listed in his record, each involving asphyxiation and occurring in 2014, but additional suicide attempts by jumping, overdosing, and cutting his neck were also identified in progress notes. Within the CDCR he had been treated extensively at all levels of care.

In the PIP, an initial psychiatric assessment was completed on the day of admission in a confidential setting and was thorough. An accompanying SRASHE found the patient at high chronic risk and moderate acute risk for suicide, with multiple protective factors. He was admitted to intermediate care on full issue.

The 72-hour IDTT meeting occurred the next day and contained all required participants; however, it was unclear if the correctional counselor was assigned to the patient. The IDTT documentation inaccurately indicated that the patient had no history of suicide attempts. This error was not corrected in subsequent IDTT meeting documentation. The IDTT documentation did not include a case formulation, the patient's strengths, or the patient's verbalized treatment goals. However, the clinical summary did indicate the patient wanted to increase his coping skills. The treatment plan was imported from the MHCB treatment team and contained errors such as stating that a psychologist completed the interventions, while the PIP primary clinician was a social worker. The treatment plan targeted depressed mood, suicidal ideation, safety concerns, and grief, with no reference to recent psychotic symptoms. The patient was placed at STEP 1.

Subsequent IDTT meetings occurred timely, were consistently attended by the patient, and were generally attended by the assigned primary clinician and psychiatrist, a nurse, and a correctional counselor. Only some of the time was the assigned correctional counselor in attendance. IDTT documentation did not identify the patient's strengths or verbalized treatment goals until July 31, 2024, and did not include a case formulation until August 20, 2024, which was one sentence long and of limited utility. Justification for this level of care and discharge goals were not documented. However, the clinical summaries made clear that the patient was improving, and on June 4, 2024, he was moved to STEP 3 with a recommendation for unlocked dorm as his least restrictive housing.

Following the initial psychiatric assessment, the patient was followed weekly by his assigned psychiatrist. Most encounters occurred in a confidential setting; the exceptions occurred when the patient declined to meet in a confidential setting, when the psychiatrist saw the patient at cell front. Progress notes were formulaic and nearly identical in wording, but they were updated sufficiently to reflect the patient's status. Treatment was interrupted on March 23, 2024, when the patient suffered a seizure thought to be induced by low blood sodium levels, due to drinking excessive amounts of water. The patient's treatment at a community hospital from March 23 to March 31, 2024 was marked by prolonged seizures, low blood electrolytes, confusion, respiratory failure requiring intubation, and aspiration pneumonia.

Upon his return to the PIP, the patient was placed on medical 1:1 observation with water restriction but full issue for one day to ensure he maintained his sodium levels. The chief

psychiatrist conducted a new initial psychiatric assessment, which was thorough, and the patient continued to be followed by his assigned psychiatrist. The patient's recovery was slow; he was not oriented to location or circumstance as of April 3, 2024. He remained under medical observation until mid-April 2024. The patient improved and began engaging in groups. Doses of mirtazapine and buspirone were optimized, and PRN hydroxyzine were used to address increased anxiety. The patient otherwise remained psychiatrically and behaviorally stable, with documentation repeatedly indicating the lack of psychosis, depression, or suicidal ideation.

On August 3, 2024, the patient inadvertently received an extra 16 mg of Suboxone, in addition to his prescribed 12 mg dose. The error was appropriately reported to a medical provider and chief psychiatrist. The patient was observed by nursing for three hours; no adverse sequelae were documented.

The patient did not receive an initial primary clinician assessment, and no individual primary clinician encounters were documented during the review period. The patient inconsistently attended groups with the primary clinician or other team members.

**Findings**

The overall mental health provided to this intermediate care patient was inadequate.

The treatment plan was carried over from the MHCB did not identify current treatment interventions and goals (including for the serious concerns of psychosis and excessive water intake), or discharge criteria. No initial primary clinician assessment and no individual primary clinician encounters were documented. Although psychiatric care was adequate, it was unclear what the discharge criteria were or why the patient continued to remain at the ICF level of care following stabilization. While continued retention in the ICF level of care may have been clinically appropriate, the rationale for this determination was unclear.

**Patient BB**

This 39-year-old patient's healthcare record was reviewed to assess the quality of intermediate care provided at CMF-PIP. He was provided diagnoses of schizoaffective disorder, possible complex posttraumatic stress disorder, borderline personality disorder, antisocial personality disorder, opioid use disorder, and stimulant use disorder. The patient was under a PC 2602 involuntary medication order, and was compliant with prescribed benztropine, diphenhydramine, fluphenazine decanoate, lithium, melatonin, mirtazapine, propranolol, and venlafaxine. Olanzapine and hydroxyzine were prescribed PRN for agitation. The patient was transferred from the CMF-PIP acute level of care to the CMF-PIP intermediate level of care on February 28, 2024, after multiple instances of self-injury had continued while he was in the acute level of care.

Through the ISUDT, he was prescribed buprenorphine-naloxone for opioid use disorder. In addition to his mental illness, he had medical conditions including iron deficiency anemia that the medical provider thought was caused by self-inflicted cutting and blood loss. Other medical conditions included an injury to the kidney with a history of requiring dialysis, sleep apnea,

hypothyroidism, high cholesterol, obesity, pre-diabetes, and a history of infections on his heart valves, and hepatitis C. He had disability status for hearing impairment.

The patient had prior mental health treatment in the community from age of seven, with multiple psychiatric hospitalizations. Within CDCR he had been treated at the 3CMS, EOP, MHCB, and acute levels of care, with continuous involuntary treatment under PC 2602 since 2015 due to danger to self. An extensive history of self-injurious behavior was noted, including self-laceration, insertion or ingestion of foreign objects, head banging, biting, and injuries resulting from punching walls or a locker. Two prior suicide attempts, one by biting the inside of his arm and one by jumping, were listed. His most recent admission for acute inpatient care followed a self-inflicted laceration that required 32 sutures, was not accompanied by suicidal ideation or intent, but raised significant concern that he was at risk for severe injury or accidental death.

Upon admission to the intermediate level of care, the patient was found to be distracted by internal stimuli and reported visual and auditory hallucinations. He was admitted on full issue and no restrictions, with minor adjustments to his medications.

The 72-hour IDTT meeting occurred timely and was attended by the patient, assigned primary clinician and psychiatrist, aa correctional counselor not assigned to the patient, a nurse, and a clinical intern. Documentation lacked a case formulation, and the patient's strengths and verbalized treatment goals were not documented. The treatment plan identified self-injurious behavior as the target of treatment, set the short-term objective as being free of self-injury for one week, set the long-term goal as being free of self-injury for two weeks, and listed DBT and CBT as the interventions. Although the patient reported command auditory hallucinations during the meeting and had a long history of involuntary treatment with antipsychotic medication, the treatment plan did not identify or address the patient's self-reported psychotic symptoms or the provision of involuntary medication. An interdisciplinary plan of care for depressed mood was initiated. The patient was placed in STEP 1 without documented rationale; it was noted he had most recently been in STEP 2 in the acute level of care.

The ten-day IDTT meeting occurred on March 13, 2024 and was attended by the patient and treatment team members. A very brief case formulation was added but identified historical information, with no discussion of factors which ameliorated or worsened symptoms. One patient strength and the patient's verbalized treatment goals were added. Because the short-term objective listed in the treatment plan was to remain free from self-injurious behavior for one week, the patient had already met this objective.

Subsequent IDTT meetings were held timely and generally attended by the patient and required treatment team members. The patient was moved to STEP 2 on March 26, 2024 and retained at this level throughout the rest of the review period; IDTT documentation was careful to document the patient's STEP level in each meeting and the rationale for not progressing him to STEP 3. By the time of his March 26, 2024 IDTT meeting, the patient had met what was identified as a long-term treatment goal, that of remaining free of self-injury for two weeks. The patient's discharge plan, criteria for discharge, and reason for retention in the ICF were collectively indicated as "to be determined" through all but one IDTT meeting. On August 6, 2024, IDTT documentation noted that the patient had partially met his treatment goals and that the plan was

to discharge him to EOP. IDTT documentation the following month reverted to stating that the discharge plan, criteria for discharge, and reason for retention were to be determined. The patient's strengths, verbalized treatment goals, and treatment plan were not revised in any of the IDTT meetings after March 13, 2024. The only psychiatric review of the master treatment plan available during the review period, for the July 9, 2024 IDTT meeting, contained a well-reasoned rationale and plan for retaining the patient in the ICF.

Following the initial psychiatric assessment, the patient was seen weekly or more frequently thereafter, with an increase in frequency following self-injurious or aggressive behavior beginning in July 2024. Through mid-June 2024, psychiatric progress notes repeatedly indicated that there was a plan to discontinue venlafaxine because it was contraindicated given the patient's bipolar features. Discontinuation was not undertaken; when a new psychiatrist was assigned to the patient at the end of June 2024, he noted that while the antidepressants may have contributed to the patient's decompensation in the past, the low dose of venlafaxine could be beneficial considering the patient's tendency to become anxious and obsessive. No substantive medication changes were made until July 9, 2024, when the patient's fluphenazine decanoate dose was decreased due to concern about the risk of side effects at the dose the patient had been receiving, and propranolol was started to address anxiety and possible antipsychotic-induced side effects.

On July 25, 2024 he cut his arm, required sutures in an outside hospital, and was placed on suicide watch with a safety smock, blanket and mattress and limited issue. Suicide watch was discontinued the following day, and the patient was placed on suicide precautions for 24 hours with full issue; suicide precautions were discontinued thereafter. The self-inflicted injury occurred in the context of the patient taking non-prescribed bupropion and repeatedly insisting that he be prescribed bupropion. Multiple psychiatrists confirmed that this medication was not indicated, and it was not prescribed. In August and September 2024, the patient repeatedly demanded to be sent to a state hospital so that he could obtain bupropion. At the patient's insistence and following repeated threats of self-injury, the patient's venlafaxine dosage was increased in early September 2024.

Although psychiatric progress notes discussed risk and protective factors for suicide or documented brief suicide risk assessments, a full SRASHE was not completed during the review period despite the patient's history of recurrent self-injury and ongoing impulsivity. In addition to the July 25, 2024 episode of self-injury, the patient punched a door on May 13, 2024 and punched a locker or wall on July 7, 2024. These episodes were associated with the patient expressing frustration that he was not receiving bupropion. During this time, he received an RVR for refusing to provide a urine sample for toxicology screening; the mental health assessment found no contribution of mental illness to this refusal. The patient also tested positive several times for antidepressants that he was not prescribed, including bupropion.

No initial primary clinician assessment was completed, and no confidential sessions were provided. The very few individual encounters the primary clinician documented were brief and occurred at cell front. The patient's discussions with his primary clinician about his demand for a state hospital referral, which were referred to in psychiatric progress notes, were not reflected

in any primary clinician notes. He was scheduled for multiple groups with his primary clinician but frequently did not attend these or other therapeutic groups.

**Findings**

The overall mental health treatment provided to this intermediate care patient was inadequate.

As documented, the treatment planning process was inadequate. Although a treatment plan was created, it was clear from its content and other documentation that it did not guide treatment. The short-term objective and long-term goal were too easily met, and the treatment plan itself did not address involuntary treatment as one of the patient's core interventions. There was poor resolution of the patient's psychiatric diagnoses, with IDTT documentation indicating solely borderline and antisocial personality disorders, and psychiatric documentation indicating schizoaffective disorder and/or bipolar disorder. Psychiatric documentation was variable, depending on the psychiatrist involved. Many progress notes contained excellent detail, reflected thoughtful consideration, and took time to provide rationale for treatment decisions. Other psychiatric progress notes were overly brief, did not indicate whether the encounter occurred in a confidential setting, and provided little evidence of a focused effort to optimize the patient's treatment for the first three months of ICF care.

An initial primary clinician assessment and a full SRASHE were not completed. These were important evaluations to complete, given the patient's behavioral history. Additionally, the patient did not receive meaningful individual therapy from his primary clinician. Primary clinician progress notes reflecting contacts either cell-front or in group provided minimal to no information regarding the patient and his response to treatment. Based on psychiatric documentation, it appeared that the primary clinician may have had clinically relevant discussions with the patient without documenting them.

**Patient CC**

This 52-year-old patient's healthcare record was reviewed to assess the quality of intermediate care provided at CMF-PIP. He was provided diagnoses of major depressive disorder, recurrent, severe, unspecified depressive disorder, antisocial and borderline personality disorder features, adjustment disorder, posttraumatic stress disorder, and opioid use disorder, mild. He was prescribed guanfacine, nortriptyline, prazosin, and venlafaxine to treat symptoms of depression and posttraumatic stress disorder, and he was largely adherent with these medications. Diphenhydramine and olanzapine were ordered on a PRN basis for anxiety. The patient was admitted from CSP/Sac EOP to the CMF-PIP intermediate level of care on March 12, 2024.

Through the ISUDT, he was prescribed buprenorphine-naloxone for opioid use disorder. Medical conditions included chronic nerve and back pain, enlarged prostate, and a history of gunshot wounds and successfully treated hepatitis C.

The patient had no history of mental health treatment prior to 2021, when the patient began receiving 3CMS care. Although no suicide attempts were recorded in his health record, the patient reported that he had made "about" three attempts by overdosing, hanging, and, in

November 2023, overdosing on heroin. He had no history of other self-injurious behaviors. Prior to the current ICF admission, he was previously treated at the 3CMS, EOP, and MHCB levels of care.

The patient's admission was triggered by depression and suicidal ideation and a lack of clinical improvement at the EOP level of care. The initial psychiatric assessment was timely and thorough. An accompanying SRASHE found the patient to be at high chronic risk and moderate acute risk for suicide. He was admitted to the ICF on full issue and no restrictions, with no changes to his scheduled psychiatric medications.

The 72-hour IDTT meeting occurred on March 13, 2024 and was attended by the patient, assigned primary clinician and psychiatrist, a correctional counselor, and a nurse. IDTT documentation did not include any risk factors or behavioral alerts, case formulation, patient strengths, or the patient's verbalized goals. The treatment plan identified substance use, feelings of worthlessness, and depressed mood as treatment targets, and identified harm reduction and CBT as interventions. He was noted to have made moderate progress towards the goals of reducing feelings of worthlessness and depression. Multiple short-term treatment objectives were listed either in the treatment plan or the clinical summary. He was placed on level 1 of the STEP program.

Subsequent IDTT meetings occurred timely and were consistently attended by the patient and usually attended by the assigned primary clinician and assigned psychiatrist; alternate team members were present for three of eight IDTT meetings. A nurse was present at all IDTT meetings, and a correctional counselor was present at all but one IDTT meeting. Documentation did not indicate whether the correctional counselor was assigned to the patient. Beginning in the April 9, 2024 IDTT meeting, the patient reported he would kill himself if an upcoming parole board hearing was not successful. As of the August 27, 2024 IDTT meeting, no case formulation, no discharge plan, discharge criteria, or reasons for retention had been documented, and the treatment plan had not been updated. In contrast, psychiatric reviews of the master treatment plan on multiple occasions provided clear rational for retention at the ICF level of care.

Following the initial psychiatric assessment, no psychiatric contacts were documented between March 13 and March 29, 2024. After his first 30 days of ICF care, psychiatrists generally saw the patient weekly. These contacts occurred in a confidential setting except on one occasion, when the patient refused to come to the office and was seen at cell front. Psychiatric documentation was variable depending on provider but generally demonstrated close attention to the patient's symptoms, treatment needs, and medication-related issues. The patient tested positive for non-prescribed bupropion on three occasions and oxcarbazepine on one occasion; these findings were not adequately addressed in psychiatric progress notes.

A primary clinician assessment was not completed, and no individual primary clinician encounters were documented during the review period. While the primary clinician and other mental health professionals saw the patient frequently in group programming, there was little individualized documentation in group notes indicating how the patient responded to interventions. On one occasion, this was particularly concerning. An April 8, 2024 psychiatric progress note indicated that the patient had been referred to the psychiatrist by the primary

clinician after the patient voiced suicidal ideation with a plan in the primary clinician's group. There was no documentation of this statement in the PC's documentation.

**Findings**

The overall mental health treatment provided to this intermediate care patient was inadequate.

The documented treatment planning process was incomplete and inadequate in multiple ways, including but not limited to lacking case formulation and discharge criteria, and failing to address the patient's PTSD symptoms despite these being active targets of psychiatric treatment. The primary intervention listed on the treatment plan, listed as "CBT," was generic. The treatment plan was never updated, a critical omission after the patient reported that he would kill himself if denied parole. The patient repeatedly indicated that he would "give up" and die by suicide if denied parole at his parole board hearing scheduled for September 25, 2024, and psychiatric notes identified the pending board hearing as a risk factor for suicide. Except for ongoing psychotropic medication adjustments, no preventive or proactive interventions addressing the patient's specific suicide risk could be located in the record. The patient did not receive an initial primary clinician assessment or any individual primary clinician treatment encounters.

**Patient DD**

This 48-year-old patient's healthcare record was reviewed to assess the quality of intermediate care provided at CMF-PIP. He was provided diagnoses of schizoaffective disorder, bipolar type, and borderline personality disorder; additional psychiatric diagnoses listed in his record include major depressive disorder, recurrent, severe with psychotic features, unspecified psychotic disorder, unspecified bipolar disorder, bipolar spectrum condition, and attention-deficit hyperactivity disorder. He was treated with aripiprazole, cariprazine, oxcarbazepine, bupropion, and prazosin. While he was adherent with most of these scheduled medications, he declined recommended dosing of antipsychotic medications. Olanzapine was prescribed PRN for agitation. Medical conditions included vitamin D deficiency, enlarged prostate, chronic pain, and a history of hepatitis C.

He arrived in CDCR in 1995 with no history of mental health care prior to incarceration. The patient had a history of methamphetamine and heroin use, with his last use in 2018. He had four suicide attempts including one by hanging, one by overdose, and two by cutting. He received mental health services continuously within the CDCR since 2008 across all levels of care. During a prior attempt to reduce his level of care from acute to intermediate on September 6, 2023, the patient became angry, lacerated his radial artery, and required treatment at an outside hospital. The patient transitioned from the CMF acute to CMF intermediate level on March 28, 2024, without incident. On March 19, 2024, his acute suicide risk was assessed as moderate, and his chronic suicide risk was assessed as high.

He was admitted to the ICF on full issue and no restrictions. The initial psychiatric assessment was completed on the same date, was through, included findings of poor reality testing, delusions, with a diagnosis of schizoaffective disorder, bipolar type, and rule out diagnoses of a

severe anxiety disorder and posttraumatic stress disorder. Bupropion, oxcarbazepine, and prazosin were continued pending further assessment.

The 72-hour IDTT meeting occurred on March 29, 2024 and was attended by the patient, assigned primary clinician, psychiatrist, and correctional counselor, as well as nursing. IDTT documentation did not provide a case formulation, identify the patient's strengths, verbalize treatment goals, reference the STEP program, or provide a treatment plan. The IDTT clinical summary reflected both the patient's desire to receive treatment for borderline personality disorder and the patient's reports of suicidal ideation, but nothing in the IDTT documentation addressed the presence of a psychotic disorder. An interdisciplinary plan of care for self-harm was initiated.

The 10-day and first 30-day IDTT meetings occurred timely and were attended by the required team members, but left the case formulation, patient strengths, patient verbalized treatment goals, and treatment plan blank. No master treatment plan psychiatric reviews were completed for the first three IDTT meetings but then were documented. Subsequent IDTT meeting documentation began to reflect the patient's psychotic symptoms, patient strengths, and the attendance of recreational therapists in the meetings on May 29, 2024. A minimal and inadequate case formulation was first documented on June 27, 2024. The patient's verbalized treatment goals and the treatment plan itself were never completed. Only the August 21, 2024 IDTT meeting documentation referred to the STEP program.

Following the initial psychiatric assessment, the patient had frequent psychiatric sessions, which were confidential except when the patient refused. The patient was treated by a total of at least nine different ICF psychiatrists, including three different assigned psychiatrists, during the review period. Diagnostic impressions varied and were not addressed in progress notes or resolved during the review period. During an April 15, 2024 encounter, the psychiatrist documented that the patient had contracted for safety, an intervention that has no evidence base. Despite ongoing evidence of psychotic symptoms and continued suicidal ideation, no medication changes were made until June 20, 2024, when the patient was placed on cariprazine to address psychosis and mood stabilization.

From that point forward, a clear effort to treat the patient's psychotic symptoms was well-documented. The patient was resistant to taking therapeutic doses of cariprazine and was therefore switched to aripiprazole. Medications were switched from pill to syrup form after suspicion of diversion emerged. With the patient's resistance to adequate and therapeutic doses of antipsychotic medication, psychiatrists began to document consideration of involuntary treatment under PC 2602 due to danger to self. Psychiatric documentation made clear the link between the patient's psychotic thinking and the patient's suicide risk, as the patient had delusional religious beliefs, including ones requiring him to remain in Vacaville, CA. Consideration of a PC 2602 petition was obviated, as the patient was willing to take aripiprazole including the long-acting injectable formulation, and consideration of a PC 2602 petition was paused.

No initial primary clinician assessment was completed, and the first individual primary clinician encounter occurred on April 18, 2024, 21 days after the patient's arrival. Subsequent individual

sessions with the primary clinician were documented on May 21, 2024, May 28, 2024, June 6, 2024, and June 14, 2024, but not thereafter. Each of these encounters occurred in a confidential setting. The quality of primary clinician progress notes was variable but often did not indicate any specific interventions that may have been provided during the encounter. The patient was engaged in multiple groups including groups with the primary clinician.

**Findings**

The overall mental health treatment provided to this intermediate care patient was inadequate.

Treatment planning documentation was inadequate as detailed above, with no treatment plan formulated. For most of the review period, the treatment team appeared to struggle to address the patient's psychotic symptoms. The patient was seen by at least nine different psychiatrists, including four during the first month of treatment, and this appeared to result in a lack of consistent and focused treatment until mid-June 2024. Despite a finding of psychosis in the initial psychiatric assessment, the patient was not placed on a scheduled antipsychotic medication for nearly three months. Concerns about the clinical appropriateness and effectiveness of the patient's other psychotropic medications, well documented by the psychiatrists who reviewed them, did not result in changing these medications. No psychiatric encounters addressed the concern identified in the initial psychiatric assessment that an antidepressant medication may be contraindicated because of the patient's possible bipolar symptoms. Efforts to clarify the patient's diagnoses were not documented until September 11, 2024.

Despite a history of suicide attempts, a March 19, 2024 finding that his chronic suicide risk was high, ongoing passive suicidal ideation, and a plan to die by suicide if discharged away from Vacaville, CA or if he was unable to successfully complete the sequel to the Bible that God commanded him to write, a SRASHE was not completed during the review period, and safety planning was not referenced in IDTT documentation. A psychiatrist's use of safety contracting, especially with a patient with psychosis and poor insight, was not clinically appropriate. No initial primary clinician assessment was completed, the first primary clinician individual encounter occurred 21 days after the patient's ICF arrival, and the patient received a total of only six individual primary clinician sessions, with no individual contacts after mid-June, 2024.

**APPENDIX D2**
**Salinas Valley State Prison (SVSP-PIP)**
Dates Visited: September 17, 2024 – September 20, 2024
Review Period: February 1, 2024 – July 31, 2024

**Patient A**

This 44-year-old patient's healthcare record was reviewed to assess the quality of intermediate care at SVSP-PIP. Upon admission, the patient was diagnosed with PTSD, substance-induced psychotic disorder, unspecified anxiety/depression, severe opioid use disorder, and severe alcohol use disorder. Prior to admission, the patient was prescribed Remeron, Vistaril, and Buspar, but his medications were later changed to Seroquel, Depakote, lithium, Vistaril, and Invega.

On July 5, 2023, the patient was admitted from CMC acute level of care due to a need for further stabilization of self-harm, suicidal ideation and behavior, hallucinations telling him to do things, depression, anxiety, and substance abuse.

The patient had a history of treatment at all levels of care. He also had a history of delusions, auditory hallucinations, and paranoia. The diagnosis was later updated to unspecified schizophrenia spectrum and other psychotic disorders. Relevant medical concerns included gastrointestinal issues. The patient had three documented suicide attempts, one in 2000 and two in 2004. Due to interpersonal difficulties, the patient was placed in a single cell setting, which was maintained throughout his admission.

The patient's IDTTs were provided monthly and in a timely manner throughout the review period. The setting was confidential, with all required assigned staff present except for the CC1, who was absent from three IDTTs. Two IDTTs were held *in absentia*, one due to refusal and the other because of a conflicting medical appointment. The treatment goals and patient's progress were appropriately updated over time, reflecting the patient's fluctuations in progress and presentation. The patient had met all listed treatment goals in the May IDTT. However, not all IPOC items were tracked beyond certain dates months prior, with all the IPOC goals listed as "Met." The patient did not meet the discharge criteria throughout the review period. In the IDTT on February 12, 2024, the patient's safety risk was noted as chronic high and acute low risk, with strong protective factors and a scheduled release in October 2024. The patient was engaged in treatment, attended groups, advocated for his needs, and interacted well with staff "when in the right mood." The IPOCs did not align with the patient's diagnosis and needs, but interventions and goals were appropriate. The main problem identified was increased anxiety, with appropriate and measurable goals and interventions in place. LRH was clinically justified.

Despite occasional inaccuracies in progress note documentation, the psychiatry contacts were generally timely, and the care provided was responsive and collaborative. The majority of contacts were provided in a confidential setting. There were instances where progress note documentation was not always current, with some information being pulled forward. The patient was adherent to medication throughout the review period. The prescribed medications included Seroquel, Suboxone, Vistaril, Depakote ER, and lithium. The patient experienced breakthrough

auditory hallucinations in February 2024, leading to adjustments in medication. By May 2024, after several medication adjustments, the patient reported manageable symptoms and expressed optimism towards parole in October 2024. In June 2024, there was an increase in prazosin for nightmares and a decrease in Vistaril due to side effects. The patient remained stable with some ongoing symptoms in July 2024 and actively participated in groups to advance his release date.

During the course of treatment, the PC contacts were provided weekly and were timely. There were discrepancies noted between the patient's symptoms as reported by other clinicians and his presentation as recorded in the PC progress notes. For example, the PC noted the patient denied experiencing psychotic symptoms, while the contemporaneous psychiatrist notes indicated severe psychotic symptoms that required medication changes. The adaptive functioning section highlighted progress in going to yard, and the objective mental status was consistently pulled forward in March-April 2024. The focus of the PC sessions revolved around social skill development, coping skills, and anxiety management regarding upcoming parole; there were instances where interventions did not align with the stated concerns. The PC seemed to doubt the veracity of the patient's psychotic symptoms at times, leading to disagreement with the psychiatrist regarding the diagnosis and treatment. The treatment provided by the PC consistently focused on anxiety management and social skills in preparation for the patient's upcoming parole. The patient appeared to benefit from the sessions and interventions, showing a decrease in anxiety over time in response to coping skills training.

During the review period, the patient was offered groups almost daily, totaling between 6.98 and 21.33 hours per week. The patient's attendance generally exceeded 80-percent. The groups were led by PCs and RTs. The patient was not offered NLTGs during the review period. The topics of the groups appeared to be appropriate for the patient and addressed his concerns effectively. There were no RVRs, significant events, or housing moves during the review period.

**Findings**

The mental health treatment provided to this patient was adequate.

However, there were significant concerns with documentation and coordination of care between the PC and psychiatrist. During the review period, it was found that the patient showed improvement, indicating that the medication management and therapy provided were effective. There were discrepancies in the notes and observations of symptoms, with PC notes pulling forward important information but lacking appreciation for the severity of psychotic symptoms. Psychiatrist notes were generally adequate, although some information was also pulled forward inappropriately. Despite this, all contacts including PC, psychiatrist, IDTT, and groups were offered in a timely and in-person manner. The treatment plan and goals were deemed appropriate for the patient's clinical needs, and there was noticeable improvement in the patient's condition. The patient had a good rapport with clinicians and seemed to work well within their specialties. Overall, it was observed that PC did not fully grasp the severity of the patient's symptoms, such as nightmares, but did provide psychoeducation and coping skills training that could be beneficial post-release.

**Patient B**

This 42-year-old patient's healthcare record was reviewed to evaluate the quality of intermediate care provided at SVSP-PIP. Upon arrival at SVSP-PIP ICF on September 27, 2023 from CMC MHCB, the patient was diagnosed with bipolar I disorder with manic symptoms. His diagnoses was updated in February 2024 to borderline personality disorder, antisocial personality disorder, and bipolar I disorder with manic symptoms. The patient received treatment under an involuntary medication PC 2602 order, which expired in August 2024.

The patient had a complex history, including multiple MHCB admissions due to danger to self and a significant impairment in functioning related to mental illness, multiple RVRs, and treatment at ASH. For several years, the patient endorsed a fixed delusion regarding the Mexican Mafia and insisted on remaining on MAX custody status for perceived safety. After his last PIP discharge in 2023, the patient had engaged in repeated nonlethal self-injurious behavior, including ingesting excessive medication and superficial cutting to avoid being placed in the general population or an EOP yard. The TOEs for this patient were focused on reducing self-injurious behavior, improving emotional regulation, and decreasing distress related to delusional beliefs. His treatment course prior to the period under review included aggression towards staff and property. The patient remained on max custody during his treatment at SVSP-PIP.

The most recent SRASHE was conducted on September 28, 2023. The patient was considered a safety risk, with chronic high risk and acute moderate risk due to a history of suicide attempts, self-injurious behavior, substance use, impulsivity, anxiety, agitation, and acting out.

Initial assessments and IDTTs were completed in a timely manner. In February 2024, the IDTT was attended by a substitute psychiatrist and CC1 and the patient refused to attend. The IPOCs in the patient's treatment plan for MAX Custody, Impulsive Behavior, Mood State, and Psychotropic Medication Use were inadequate and had not been updated since November 23, 2023. The treatment goals indicated that the patient had expressed a desire to work on depression, yet during his IDTT he claimed to have been "malingering the whole time" and did not believe he had any mental health issues despite his symptoms and behaviors. The primary problem identified was impulsivity, with measurable but generic short and long-term objectives. The interventions were generalized, and the patient was noted as not making progress, having broken several windows on his unit in the previous month. The discharge criteria were generic, and TOEs were carried forward at each IDTT. Numerous risk factors were flagged, including self-injurious behavior, suicidal ideation, suicide attempts, sexual misconduct, assaultive behaviors, and requiring treatment under PC 2602. The discharge section incorrectly stated that the patient did not report any concerns about potential threats to his life or safety from others when discharged from PIP, yet his delusions centering on safety influenced much of his behavior in an attempt to remain on Max custody status and thus avoid other patients.

Subsequently, the patient attended the majority of his IDTTs. The assigned PC was usually present, but there usually a substitute psychiatrist. The CC1 was absent in three out of seven IDTTs. The RT was absent in almost all IDTTs, which was concerning because RTs played a significant role in STEP progress tracking during observed IDTTs during the monitoring visit. The identification of the patient's STEP level was inconsistent, making it unclear what STEP the

patient was at in the IDTT documentation. The IPOCs were not updated appropriately, were inadequate, and were poorly or inconsistently documented. Over time, the patient's mental health status appeared to improve, with a reduction in assaultive behaviors towards staff and increased participation in treatment despite the noted shortcomings. In May 2024, the ICC and treatment team approved the patient to remain in Max programming status even when removed from Max custody status. Most treatment plans were carried forward month to month with little substantive updates or tracking progress.

The psychiatrist had timely individual contacts, providing diagnoses of bipolar I disorder, schizoaffective disorder, antisocial personality disorder, and malingering. Initially, the patient was placed on long-acting injectable Prolixin due to concerns about medication adherence due to cheeking. Despite the patient's protests, the medication regimen remained unchanged. The patient frequently expressed paranoia towards staff, and dissatisfaction with his treatment and medications. The psychiatrist counseled the patient effectively, to which the patient was generally receptive. The patient harbored delusions about the providers being corrupt and associated with the Mexican mafia, which warranted maintaining the injectable medication to ensure adherence. When the patient was changed to oral Prolixin, he displayed increased symptoms. The patient often refused confidential settings, opting instead for cell front meetings. Despite repeatedly requesting to discontinue medications, the patient was maintained on the regimen. During the review period, the patient also reported suicidal ideation and engaged in superficial self-injurious behavior, expressing fear of being removed from maximum custody. In July 2024, the patient ingested another inmate's Suboxone, experienced heightened paranoia, and believed correctional officers and inmates intended to harm him. Consequently, the patient's medication was cross-tapered from Prolixin to Geodon, which gradually reduced the paranoia. Given the patient's ongoing psychiatric challenges and medication ambivalence, the patient's PC2602 was renewed.

Review of PC progress notes indicated that he did not exhibit psychotic symptoms or significant mood instability. There was frequent repetition and pulling forward of the Assessment and Plan sections in the PC progress noted, which indicated a lack of individualized updates in documentation. During sessions, the PC noted focusing on anxiety-reducing skills, such as breathing techniques, to help the patient manage his symptoms. Notably, there was a two-week period in March without any contact or check-in from the PC, which impacted the continuity of care. The patient expressed vacillating opinions towards staff, with a general sense of distrust and paranoia towards various personnel. Throughout the review period, the patient consistently rated his depression and anxiety at low levels, between 0-4 out of 10. The patient exhibited challenging behaviors, including frequent acting out and requests for transfer to a different unit, which were effectively managed. A change in PC occurred at the end of June 2024 due to the previous PC moving off the unit, but deficiencies in progress notes persisted. The new PC's documentation continued to be limited, often containing only one or two statements from the patient, with the remainder pulled forward.

There were no group sessions offered to the patient in February 2024 and the first three weeks of March 2024. Following this period, the patient began to attend group sessions consistently. Most of the recreational therapy groups, regardless of their specific topics, were observed to involve activities such as listening to music, socializing with peers, and watching documentaries.

These groups did not seem to follow a structured curriculum. There were no PC-led core groups offered to the patient until April 23, 2024, when an Anger Management group was facilitated. The patient attended the majority of the groups offered and was noted to be respectful towards peers.

During the review period, there were consistent daily psych tech (PT) notes documenting the patient's mental status, relevant observations, and addressed or pertinent elements of the IPOCs.

During the review period, the patient acquired several Rule Violation Reports (RVRs) with the reported intention of maintaining maximum custody status.

**Findings**

The overall mental health treatment provided to this patient was inadequate.

While psychiatry care was generally adequate, there were significant shortcomings in treatment planning. Notably, the patient's IPOCs had not been updated since November 2023, and substitute providers were present at almost all IDTT meetings. Additionally, RT was absent for all IDTTs and the CC1 missed three out of seven IDTTs. The majority of treatment plans were simply carried forward each month without any substantial updates or changes. Furthermore, PC care was inadequate due to untimely contacts and poor documentation, with the same information being repeated across progress notes even when the patient changed clinicians. Additionally, the patient was not offered PC-led groups for nearly three months following admission to the PIP.

**Patient C**

This 40-year-old transgender female patient's healthcare record was reviewed to evaluate the quality of intermediate care provided at SVSP-PIP. The patient was diagnosed with schizoaffective disorder and schizophrenia and her primary symptoms include paranoia and auditory hallucinations. The patient was admitted to SVSP-PIP on October 16, 2023, following admission from SVSP MHCB.

Previously, this patient had been in the SVSP-PIP ICF from November 8, 2021, to April 23, 2023, but her medications were not continued after discharge to EOP, leading to a significant deterioration in her mental status. During the review period, her medications included Prozac, Invega Sustenna (long-acting injectable), lithium, Zyprexa prn, and eventually Clozaril. She is single-celled and was under a PC 2602 involuntary medication order since 2012, for danger to others.

The patient's history includes treatment at the 3CMS, EOP, MHCB, and ICF levels of care. She has a background of fetal alcohol syndrome (FAS), polysubstance abuse, and psychosis. A referral to PIP included a trial of Clozaril, which was not initiated until March 2024. Her history also includes self-injurious behavior (SIB) through cutting, but no documented or reported suicide attempts.

On April 11, 2024, the patient reported suicidal ideation (SI) and was released from suicide watch the following day. Her risk was assessed as moderate chronic due to self-injurious behavior, with acute risk being low. On July 29, 2024, she again reported suicidal thoughts, took prn Zyprexa without complaint, and was placed on suicide watch. In the documentation for this incident, there was a discrepancy in risk level with acute risk indicated as moderate, but a summary from a previous SRASHE incorrectly pulled forward as "Low" risk.

IDTT meetings were timely throughout the review period, however, several issues were identified concerning attendance and treatment planning. A substitute clinician or CC1 attended the meetings on several occasions and there were two instances where no registered nurse was present. The IPOCs initially addressed hallucinations and mood state, with the latter being closed and removed from the treatment plan after the February 2024 IDTT. In that IDTT, the primary concern was social withdrawal, with a goal of participation in sessions with the PC and the psychiatrist. This goal was inadequate as the patient's only treatment goal, given the scope was too narrow and failed to address significant issues such as dangerousness to self, psychosis, and disorganized speech and thoughts. The interventions were also inadequate, focusing only on observation for improvements and encouraging participation in sessions and groups. In subsequent IDTTs, the main problem area was appropriately updated to psychosis. The patient was noted to be psychotic, isolative, and not engaging in ADLs or treatment, yet interventions were not revised. Documentation was poor, as evidenced by the March 27, 2024 IDTT, which inconsistently indicated the patient as "present" via a checkbox, while the summary noted patient refusal and a cell front meeting. The patient had not met any treatment goals and presented as disheveled with poor ADLs. No LRH rationale was provided and the patient's strengths and stated treatment goals were never updated. In the May 2024 IDTT, the patient was completely disengaged from treatment and had limited insight into her mental illness. Although self-injurious behavior was not listed as a behavioral concern in the goals or summary sections, it was indicated in the Risk Factors section. Overall, treatment planning was inadequate and severely lacking, as it did not include specific interventions or strategies to improve the patient's symptoms. Much of the information in the treatment plans and progress notes was carried forward without appropriate updates, and the STEP level or goals were never modified to address the lack of treatment participation and improvement.

The patient did not have a documented psychiatry contact in the first three weeks in February 2024. However, following this period, weekly psychiatrist contacts were provided consistently. Most psychiatry contacts were conducted cell front due to the patient's refusal to come out of cell for a confidential setting. The psychiatrist observed that the patient exhibited chronic psychosis, but there were notable improvements in response to medication including decreased paranoia, auditory hallucinations, and bizarre delusions. Nevertheless, the patient's baseline condition remained marked by psychosis, tangential and delusional thinking, auditory hallucinations, hyper-religiosity, grandiosity, and disorganized speech. In March 2024, the patient reported drowsiness as a side effect of her medication and her speech was often incoherent. Clozaril was began in late March 2024.. By May 2024, the psychiatrist noted that while the reported medication adherence, review of labs refuted this. A subsequent lab test, however, confirmed medication adherence. The patient regularly refused timely blood draws, which complicated the titration of Clozaril, which required close lab monitoring.

The PC faced several challenges in managing the patient's care effectively. Contacts were inconsistent, with some weeks lacking timely contacts. The patient was reluctant to leave her cell, which hindered progress. The PC observed minimal improvement in symptoms and engagement during the review period, with much of the progress notes being pulled forward from week to week. The treatment plan was not updated, despite the patient meeting two of four treatment objectives in April 2024, followed by a swift regression and increase in symptoms. By early May 2024, the patient was noted to rarely leave her cell for any reason and did not engage with her providers. The PC did not alter strategies to address this, nor was there any documented coordination with the psychiatrist regarding the patient's medication, mental status, or lack of improvement. Overall, the documentation and treatment planning were inadequate.

During the review period, the patient was regularly offered group sessions but only attended one to two groups throughout the review period. On the rare occasions in which she did attend, she was not engaged and left early. Her presence in communal areas such as the dayroom and yard was also limited. Participation in one-on-one sessions outside of her cell was minimal, and she attended only about half of her IDTT meetings. Notably, there were no incidents of self-injurious behavior or RVRs.

**Findings**

The mental health treatment provided to this patient was inadequate.

With the exception of Clozaril initiation, the overall approach to treatment was inadequate, with no significant adjustments made to address the patient's lack of response. Additionally, while PC contacts were not always timely throughout the review period, there was a noted improvement in the timeliness of psychiatrist contacts after the significant gap early in the review period. It is also important to note that the patient did not actively participate in the treatment process. The PC progress notes were inadequate, and failed to accurately reflect treatment plan-driven interventions. The only noted action in the records is "encouragement," which is insufficient for comprehensive patient care and this patient's clinical needs. Despite some engagement in activities such as yard and dayroom visits, the individual did not consistently attend 1:1 contacts with providers or participate in group sessions. This lack of participation highlighted a critical barrier to effective treatment and underscored the need for more proactive measures to encourage involvement in therapeutic activities.

**Patient D**

This 30-year-old patient's healthcare record was reviewed to evaluate the quality of intermediate care provided at SVSP-PIP. The patient was diagnosed with unspecified bipolar and related disorder, antisocial personality disorder, borderline personality disorder, opioid use disorder, and post-traumatic stress disorder. He was prescribed Effexor, Trazodone, Zyprexa, and Suboxone for medication-assisted treatment of opioid use disorder. The patient arrived at SVSP-PIP on February 22, 2024, from CHCF Acute Max.

The patient received treatment at all levels of care, with a history of threatening staff, self-harm, and fecal smearing. He also endorsed four self-reported suicide attempts, although he was

considered a poor historian, and there were three documented instances of self-injury by cutting. Treatment objectives focused on reducing self-injurious behavior and suicidal ideation, stabilizing mood, ensuring treatment adherence, developing insight, fostering positive coping strategies, and creating meaningful safety plans.

The initial psychiatrist assessment on February 22, 2024, was conducted in person within a confidential setting, clearly identifying the diagnosis, medications, and treatment plan. The patient was assessed to have a low acute risk. The PC conducted a timely initial assessment on February 22, 2024, in which the PC opined that the patient's presentation was more likely attributable to a personality or characterological disorder rather than a psychotic or mood disorder.

The patient was provided timely IDTTs throughout the review period. The patient's acute and moderate risk levels for self-harm were rated as moderate. Although a case formulation was absent in the initial 72-hour IDTT, it was later updated with a brief formulation. The Initial IPOCs highlighted issues such as anger, anxiety, and depressed mood, with goals that were appropriate and measurable. Problems and interventions were individualized, particularly concerning depression and anger, and were justified with a focus on ensuring safety due to concerns about victimization, PTSD, and the safety of both the individual and potential cellmates. Subsequent IDTTs were generally attended by appropriate staff. The patient's anxiety levels had decreased by the March 2024 IDTT. The patient participated in all IDTTs except for June and July 2024, where he refused to attend. The June 2024 IDTT, conducted *in absentia*, failed to provide any substantive updates to the patient's treatment plan. The July 2024 IDTT was also held *in absentia*, although documentation incorrectly indicated the patient was present. During that time, the patient was on a hunger strike and seeking a liquid diet due to medical grievances related to back pain. The IDTT noted that the hunger strike was not linked to any psychotic or mental health process. He also expressed conditional suicidal ideation concerning his discharge and mental health treatment, though no acute or immediate risk was identified. The patient's treatment participation increased in May 2024 following his release from maximum custody. A PC 2602 was also implemented in May 2024 which the patient contested, alleging it was based on false information, and he expressed a desire not to work with his assigned psychiatrist who initiated the petition. Legal action threats against CDCR and providers were frequent. An RT intervention was provided in May 2024, which was well-received. Overall, progress was observed, with significantly fewer episodes of anger and a largely stabilized presentation over the course of the review period despite poor treatment planning documentation.

The patient was consistently seen by his psychiatrist several times a week when he was admitted to SVSP-PIP, which was later reduced to weekly as the patient stabilized. While most medications remained unchanged on admission, melatonin was introduced to aid sleep. Due to worsening depressive symptoms, including writing suicide letters and experiencing delusions, the psychiatrist applied for an emergent PC 2602. The psychiatrist also provided an updated diagnosis in April 2024, identifying bipolar I, depressed, with mixed and psychotic features, while ruling out borderline personality disorder and antisocial personality disorder. The patient's medications were adjusted to include risperidone and Depakene, but the patient refused them, leading to a switch to Abilify, which was also refused. The psychiatrist opted against forced

injection, in order to encourage voluntary compliance. Following the implementation of the PC 2602, the patient's psychiatrist was changed due to aggression and anger towards his former psychiatrist. A case consultation on May 15, 2024 resulted in the decision to administer long-acting injectable Abilify to enhance medication adherence and minimize staff risk. The medication was given despite the patient's refusals. By late May 2024, a new psychiatrist developed good rapport. The medication regimen was altered to include Effexor and Tenex for PTSD, along with melatonin and the injectable Abilify. The patient appeared to benefit from the treatment and engaged more frequently in confidential sessions and responded well during cell front checks Wellbutrin was initiated in late July 2024 but was discontinued due to the patient's history of substance use disorder and the potential for abuse.

Although the initial PC assessment was timely, routine contacts were not consistently timely, occurring sometimes on a bi-weekly basis. Initially, the PC assessed that the patient's presentation was more characterological rather than driven by psychotic or mood disorders. The PC appropriately documented events related to the patient's repeated hunger strikes. Relevant clinical updates were often buried within repeated content from previous notes. By the end of May 2024, the patient displayed a generally good mood, was actively participating in group sessions and one-on-one meetings, and maintained good peer relationships. The PC made references to cognitive-behavioral therapy interventions but lacked specificity in describing the interventions, progress, or tracking of IPOC measurements and goals. Several contacts in June and July 2024 were conducted cell front due to "time constraints," with notes stating this would likely occur with future contacts as well. Despite this, the patient remained engaged during these interactions. Overall, while the actual care provided was adequate, the documentation was severely lacking in detail and thoroughness.

The patient actively participated in various group sessions. He regularly attended the Anger Management Group led by his assigned PC. Additionally, the patient was involved in both RT and other PC groups, which included topics relevant to symptom management and coping skills. The patient's group attendance rates varied significantly during the review period, ranging from approximately five percent to 86 percent of the offered sessions. Notably, lower attendance was observed when the patient was involved in protesting a grievance or placed in maximum custody, which impacted his ability to participate fully in the group activities.

**Findings**

The mental health treatment provided to this patient was adequate.

Despite this, there were significant shortcomings in documented IDTT treatment plans and PC progress notes. The excessive amounts of carried-over information failed to inform meaningfully on interventions used, or progress toward treatment goals. Psychiatrist progress notes were consistently thorough and updated with each contact, demonstrating a level of care and attention that was appropriate for the patient's needs. This discrepancy highlights the need for improved documentation practices in IDTT and PC notes to ensure that they accurately reflect the patient's current status and the effectiveness or lack thereof of the treatment strategies being employed.

**Patient E**

This 41-year-old patient's healthcare record was reviewed to evaluate the quality of intermediate care provided at SVSP-PIP. The patient was provided diagnoses of schizoaffective disorder, bipolar type, moderate opioid use disorder, unspecified bipolar and related disorder, and had a history of hepatitis C infection. The patient was under PC 2602 for Grave Disability and was prescribed Buspar, Depakote, Haldol, lithium, Effexor, and Vistaril. The patient arrived at the SVSP-PIP on February 1, 2022 from the SVSP MHCB and EOP.

The patient had a long history of treatment in the MHCB and ICF levels of care. The patient was identified as Mentally Disordered Offender (now entitled Offenders with a Mental Health Disorder) positive and was scheduled for transfer to the DSH upon release later in 2024. In the month prior to ICF admission, the patient acquired four RVRs. The patient's history was also significant for suicide attempts and self-injurious behavior, with 13 recorded suicide attempts. The patient had a history of ingesting urine, feces, and foreign objects such as deodorant, soap, lotions, and dirt.

On February 1, 2024, an initial, well-documented psychiatric assessment provided a comprehensive overview of the patient's diagnoses, medications, history, and subjective report. The assessment identified a chronic high risk and an acute low risk for self-harm or suicide. The psychiatrist also noted the presence of bizarre delusions and odd beliefs, and adjusted medications. The following day, on February 2, 2024, an initial PC assessment was provided. This assessment was timely, and the patient actively participated. The initial PC assessment included relevant clinical history and provided mental status information. The clinical summary and case formulation sections were pulled forward and were not updated throughout the review period.

The patient was provided timely IDTTs throughout the review period. At his initial IDTT, the patient was noted as motivated towards treatment and capable of articulating his needs. The initial problem, short-term objective, long-term goal, intervention, and treatment progress were deemed appropriate, however, specific treatment goals, level of care criteria, and discharge criteria were not provided. The LRH justification was adequate. The patient's STEP progress was not updated in several consecutive IDTTs. Further, the level of care justification and discharge criteria were inadequate or absent. Treatment planning was insufficient, with no IPOCs or substantial treatment goals except improving ADLs by May 2024. Excessive amounts of unedited information from previous IDTTs was carried forward. The IDTTs indicated that initially the patient was at baseline, and declined confidential one-on-one appointments, attended minimal groups, and exhibited poor ADLs. By May 2024, the patient was responding well to treatment and had reached STEP 2, and by July 2024, he was noted to be attending groups, maintaining a clean cell, and attending to his ADLs. Despite this progress, there were still no IPOCs or treatment goals developed beyond TOEs.

The patient was consistently documented as medication adherent on PC2602, with exceptions to lithium in June and July 2024. Initially during the review period, the patient was noted as stable and responded well to programming although he frequently declined confidential contacts. On March 10, 2024, the patient was placed on suicide watch, which was stopped the following day

after reporting no suicidal ideation and expressing a desire to change cells. Medication adjustments were made collaboratively in response to the patient's symptoms, and a renewal of the PC2602 was granted on May 8, 2024. Throughout the PIP stay, the patient was generally stable, responded well to medications, and exhibited no significant behavioral problems, though occasional delusions were noted.

PC contact documentation showed inconsistencies and areas for improvement. Initially, the PC contacts were not provided on a weekly basis, with some weeks being missed entirely. The patient often refused a confidential setting, resulting in frequent cell front meetings. The quality of progress notes was inadequate, without clear treatment goals beyond TOEs, or specified interventions—problems which were mirrored in IDTTs and treatment plans. There was no specific mention of ADLs, despite this being a primary area of concern. Further, the patient's STEP status was not updated to align with IDTT or other provider notes. There was a noticeable improvement in progress note quality when a new PC took over in mid-June 2024, who provided detailed interventions and documented the patient's responses. Despite this improvement, deficiencies remained, such as progress notes not aligning with the treatment plan; for example, the PC indicated that the patient refused Remeron in July 2024, although the individual was not prescribed Remeron and was actually refusing lithium. Until the change in PCs, the documentation inadequately stated interventions, progress, or significant details.

The individual's attendance and participation in group activities was notably inconsistent, with the patient frequently leaving early without providing a reason. Despite being offered more than ten hours of groups per week, with a range of suitable groups and topics, the patient frequently declined treatment and programming opportunities, opting instead to spend a considerable amount of time at yard. From June 2024 onward, his attendance ranged from two percent to 14 percent of the offered group sessions

**Findings**

The mental health treatment provided to this patient was inadequate.

Concerns included lack of documented individualized treatment plan, with no real treatment goals beyond improving ADLs. Additionally, there was an over-reliance on pulling forward information from previous IDTT meetings and PC individual contacts, resulting in important information not being updated; however, there was a notable improvement in the quality of PC progress notes when a new PC took over in mid-June 2024. Furthermore, PC contacts were not always timely, and some weekly contacts were missed.

**Patient F**

This 35-year-old patient's healthcare record was reviewed to evaluate the quality of intermediate care provided at SVSP-PIP. The patient was provided diagnoses of unspecified bipolar disorder, with a history of bipolar I disorder, unspecified schizophrenia spectrum and other psychotic disorders, and substance use disorder. The patient was prescribed Latuda and valproic acid. The patient was admitted from SATF MHCB on March 22, 2024.

The patient's primary symptoms included delusions, auditory and visual hallucinations, poor insight, manic symptoms and behaviors, disorganized speech, agitation, irritability, and significant interpersonal issues with both peers and staff. Notably, the patient physically assaulted a member of the treatment team at the MHCB during an IDTT when he learned he was referred to ICF. The patient had a history of treatment at the 3CMS, EOP, and MHCB levels of care. The patient was determined to be a Mentally Disordered Offender (now termed Offenders with a Mental Health Disorder) and was scheduled for discharge to ASH in October 2024 after parole. The SRASHE on March 24, 2024 noted acute and chronic low risk, with no documented self-injurious behavior or suicide attempts in the patient's record.

The initial psychiatry assessment was timely and revealed a complex clinical picture. The patient exhibited paranoia towards both staff and fellow patients and was diagnosed with unspecified bipolar disorder with psychotic features. The patient was initially resistant to adjustments of his lurasidone and valproic acid, with the psychiatrist thus considering a PC 2602.

The patient's IDTTs were timely and contained required members, including the patient. While lacking IPOCs, the identified problems to be addressed were individualized, with appropriate short and long-term goals and interventions. Unfortunately, the problem list was never adjusted in response to the patient's refusal to participate in treatment. In the April 2024 IDTT, an IPOC for danger to others In May and June 2024, the patient was still on Max custody status and was not attending groups or engaging in treatment. At the July 2024 IDTT, the patient had made no progress towards his goals, continued to refuse group participation, and remained on Max custody status; however, following this the patient began participating in programming and attended up to four hours per week (albeit always less than 25-percent) of his assigned groups. Overall, the patient's IDTTs were poorly documented and lacked discharge criteria or justification for the level of care, and none included the patient's TOEs as provided by the MHCB. The patient refused to participate in the initial PC assessment, and it was completed via record review. The review was conducted thoroughly and was as complete as possible given the lack of direct participation from the patient.

Psychiatry contacts with the patient were provided in both confidential settings and cell front as some scheduled appointments were declined by the patient and some were cancelled due to custody-related issues. There were several documentation issues noted, including incomplete sentences and sections, which resulted in incomplete clinical updates. The patient's mental status exam data was frequently pulled forward from previous notes. In early April 2024, the psychiatrist observed reduced mood lability, although irritability persisted. A diagnosis of antisocial personality disorder was considered. The patient reported that the medications were effective and had no side effects. Despite the patient's paranoia towards mental health, he expressed satisfaction and was adherent with his medications. However, once the patient was no longer on maximum custody status, concerns about medication adherence and potential diversion were noted. Although there was no direct evidence of diversion, lower-than-expected valproic acid levels and manic symptoms were observed. Zyprexa was added. The patient was reportedly focused on remaining in the PIP and exhibited inconsistent symptom reporting and medication-seeking behavior. There was also a noted preoccupation with religious themes. By July 2024, the patient denied experiencing symptoms, including auditory hallucinations, and had

responded well to Zyprexa; however, the patient switched psychiatrists, resulting in a three-week gap in care.

PC weekly contacts were timely, with the notable exceptions of a three-week gap after the initial assessment, and two instances without documented weekly contacts. On May 9, 2024, the clinician transitioned from free-text to a structured note, which included TOEs and provided a more detailed clinical picture. Additionally, IPOCs became integrated into the treatment plan. The patient frequently requested an evaluation for the Developmental Disability Program (DDP); the patient received this on June 4, 2024, and did not meet criteria. Despite encouragement from the PC, the patient consistently refused to leave his cell for one-on-one PC contact. The patient had episodic pressured speech and focused on religious themes and the DDP.

The review of group attendance records revealed a discrepancy between the psychiatrist, the PC, and the provided data. While the clinicians' progress notes suggested that the patient was attending most of his groups, a detailed examination of the group attendance data showed that his participation was significantly lower, attending no more than 25%, or four hours, of the groups offered. This inconsistency highlights potential inaccuracies and poor communication between the parties involved which warrants further investigation to ensure that the records accurately reflect the patient's participation in the program.

**Findings**

The mental health treatment provided to this patient was inadequate.

The findings from the review period highlight several critical deficiencies in the management and documentation of the patient's care. The treatment team should have documented stronger consideration of a PC2602 given concerns for medication adherence and limited response, with ongoing symptoms. Additionally, PC notes and IDTT documentation were poorly executed and incomplete, further impacting the continuity of care. IDTTs frequently lacked IPOCs and contained inadequate or missing level of care justifications and discharge criteria. Furthermore, the goals and interventions were not updated during the review period despite the patient's lack of response. Documentation suggests the patient was in a manic or hypomanic state, with minimal improvement. This was confounded by possible impression management to achieve goals for level of care, amplifying the importance of These findings further improved documentation practices and adjusting treatment plans to better address the patient's needs.

**Patient G**

This 49-year-old patient's healthcare record was reviewed to evaluate the quality of intermediate care provided at SVSP-PIP. The patient was provided a diagnosis of schizophrenia. Relevant additional issues included possible polydipsia (the excessive consumption of water) and recent enrollment in the Developmental Disability Program at the level of DD2. Medications included Zyprexa, Cogentin, and PRN Haldol. The patient received medications under PC 2602, obtained during treatment at MHCB at CSP/Corcoran which preceded his admission to SVSP-PIP on April 25, 2024.

The referral to PIP was made to facilitate psychiatric stabilization, medication management, and skill-building activities. An admission SRASHE indicated a chronic moderate risk level and an acute low risk level for self-harm and suicide. The patient's history included one suicide attempt in 2000 and two instances of self-injurious behavior in 2018 and 2020 which were seemingly triggered by psychotic episodes. Despite the patient denying any mental illness or the necessity for a safety plan, a safety plan was appropriately completed by the PC. The individual had a history of treatment at all levels of care. The patient had limited insight, delusions and hallucinations, and a history of indecent exposure, and substance use issues. Due to his degree of functional impairment the patient was housed in a single cell.

The initial psychiatry assessment was conducted in a timely and thorough manner, although the patient did not participate in the assessment process. The clinical history provided was as comprehensive as possible given the limitations of a record review. The initial PC assessment was also provided timely, the patient participated, and the documentation was completed appropriately. During the first week of the PIP, it was noted that the patient had attended at least one group session.

The patient's IDTTs were timely and contained required participants, except the initial IDTT and May 2024 IDTT did not have a CC1. Furthermore, the patient refused to attend all but one IDTT. IPOCs were never provided in the patient's treatment plan. The patient's verbalized goals and strengths were not updated throughout the review period and there was limited intervention and treatment planning to address the patient's lack of adherence to treatment and attendance at group sessions.

During his course of treatment, the patient was noted to show progress by participating in one-on-one sessions, taking medication more consistently, and displaying a euthymic mood, even smiling during conversations with his PC.

The patient received timely psychiatry contacts throughout the review period. The patient exhibited very poor insight, consistently denied any mental illness, and repeatedly requested the discontinuation of prescribed medications. Despite this, the patient was largely adherent to his oral medications, requiring only one backup injectable medication under PC 2602. Four consecutive notes from May to June 2024 were pulled forward in their entirety with no updates or changes to reflect the patient's changes in functioning. With an increased dose of Zyprexa, the patient had reduced auditory hallucinations, better hygiene and eye contact; however paranoid delusions remained.

Although PC contacts were generally scheduled on a weekly basis, the patient rarely left his cell for one-on-one sessions. In June 2024, the PC noted that the patient was attending yard, as well as intermittent groups. While he continued to deny any mental illness, he was benefiting from the ICF treatment and medication adherence. PC progress notes throughout the review period were generally adequate, yet later notes increasingly relied upon pulled forward information.

Despite being offered near or more than ten hours of suitable clinical and recreational groups per week, the patient attended between 0.33 and 4.93 hours per week.

**Findings**

The mental health treatment provided to this patient was adequate.

While the patient's poor insight led to frequent refusals of confidential sessions, the patient maintained good rapport with clinicians and displayed clinical improvement. Despite his lack of insight, the patient remained largely adherent to his prescribed PC 2602 medications. The psychiatrist worked collaboratively with the patient and considered side effects and the patient's preferences. The PC made diligent efforts to meet with the patient, although these attempts were frequently met with refusals. The PC appropriately monitored the patient's progress and provided appropriate therapeutic interventions. Documentation issues included the absence of IPOCs in the treatment plan and progress note information carried forward.

**Patient H**

This 40-year-old transgender female patient's healthcare record was reviewed to evaluate the quality of intermediate care at SVSP-PIP. She was provided diagnoses of schizoaffective disorder, bipolar type, and antisocial personality disorder. The patient had limited medication adherence and was under a PC 2602 order. Medications prescribed during PIP treatment included Haldol, Zyprexa, Abilify, Seroquel, Wellbutrin, Effexor, trazodone, and BuSpar. She was admitted to SVSP-PIP TC2 with single-cell status on April 2, 2024 following a transfer from the RJD MHCB.

The patient's primary mental health symptoms included mood symptoms, suicidal ideation, self-injurious behaviors, social and emotional withdrawal, auditory hallucinations, and she was often observed responding to things not observable by others.

The patient's level of care history included EOP, MHCB, ICF, and DSH placements. The admission SRASHE on April 5, 2024 assessed the patient at high chronic and acute risk of self-harm. The patient endorsed 30 previous suicide attempts but was noted as a poor historian. Documented instances of self-injurious behavior include swallowing objects, head banging, and cutting.

The initial assessments were provided timely. The initial psychiatric evaluation was completed cell front due to the patient's refusal of a confidential setting. The primary reason for ICF admission was identified as suicidal ideation and danger to self. The initial PC assessment was completed appropriately, including all relevant history sections.

The patient's IDTTs were timely throughout the review period and contained all required participants. Continuity of care was good, with a substitute PC on one occasion. The patient attended and participated in four of six IDTTs. Although IPOCs were not provided, the treatment plan included relevant problems with well-defined appropriate short and long-term goals and interventions. TOEs were aligned with the patient's treatment plan goals and were consistently updated until July 2024. Justifications for LRH and single-cell status were thorough and appropriate. In May 2024, the patient displayed psychotic symptoms on the rare occasions in which she left her cell. The patient had significant difficulties in verbal communication and

responding to questions. By June 2024, the patient attended individual and group treatment more frequently; however, she showed no substantial improvement in symptoms and remained highly disorganized. The July 2024 IDTT documentation was inadequate, including the misgendering of the patient and the absence of discharge criteria, level of care justification, and updated TOEs.

The patient did not participate in a confidential 1:1 contact with her psychiatrist until April 11, 2024, and was initially selectively mute. There were frequent instances of misgendering in progress notes. During early interactions with the psychiatrist, the patient was selectively mute but was medication adherent. While she was medication-adherent, side effects prompted changes in her antipsychotic medications.

Psychiatric contacts were generally timely, occurring no more than eight days apart with attempts often made twice a week. As the patient began to verbalize more, the psychiatrist made additional medication changes targeting manic and psychotic symptoms. Despite the patient's lack of progress, documentation of changes to the medication plan were inconsistently documented, with most of the plan section carried forward from prior notes.

The initial PC diligently tracked the patient's TOEs, with accordance with the psychiatrist's clinical observations. When the patient's PC changed on June 6, 2024, documentation of progress towards TOEs did not continue, and was replaced by vague treatment goals aimed at reducing suicidal ideation and psychosis. The patient did not engage in any out of cell PC contacts until June 19, 2024. Notes through July 2024 reflected the patient remained unkempt, malodorous, with limited speech; however, by the end of the review period, the patient's attention to personal hygiene, specifically in attending to showers had noted improvement

The patient seldom participated in group activities until the month of July 2024, when she attended approximately 5.75 to 8.22 hours per week. The patient attended clinically appropriate groups including Rational Behavior and Decisions, Anger Management, DBT, Stress Management, and Social Skills/Communication groups. These groups were primarily facilitated by PCs with a few groups led by RTs.

**Findings**

The mental health treatment provided to this patient was adequate.

This patient with challenging psychotic symptoms generally received timely and consistent sessions with her PC and psychiatrist. IDTTs were timely and contained required staff. The patient's progress towards TOEs were updated appropriately, except for the final IDTT of the review period which lacked discharge criteria, level of care justification, or TOEs updates. Medication changes appeared appropriate in response to the patient's evolving condition, adequately addressed side effects, and resulted in clinical improvements. Some psychiatry progress notes had poorly documented medication changes, partially due to information carried forward from prior notes. PC contacts and documentation were generally adequate yet the second PC did not document TOEs progress effectively. The patient had improved individual and group attendance during the review period. Group topics were appropriate to the patient's clinical status.

**Patient I**

This 41-year-old patient's healthcare record was reviewed to evaluate the quality of intermediate care provided at SVSP-PIP. The patient was provided a diagnosis of schizophrenia, marked by hallucinations including ones telling him to hurt himself and others. The patient was prescribed Zyprexa, Risperdal, and Haldol. On June 6, 2024, he was transferred from CIM MHCB to SVSP-PIP, to thoughts of harming himself and others.

The patient also suffered from mood disturbances, sleep disturbances, excessive worry, trouble concentrating, isolation, and a lack of attention to his ADLs. This patient had a long history of receiving mental health services in the community. The patient's level of care history also included EOP and MHCB levels of care, with four MHCB admissions in the three months prior to his ICF admission. The patient was noted to have low chronic and acute risk for self-harm. The patient reported six suicide attempts in the community, though these claims were not verifiable. There was no documented self-injurious behavior or suicide attempts in his CDCR history.

The initial IDTT was not attended by a CC1 or the assigned PC. While CDCR policy required the completion of initial assessments prior to the IDTT, the psychiatry assessment was conducted during the initial IDTT. The patient displayed bizarre behaviors including not responding to the treatment team, prompting the early termination of the IDTT. The psychiatrist also considered malingering due to the patient's presentation and the symptoms observed during the IDTT. The assigned PC completed a timely initial assessment, which was comprehensive and contributed valuable data for the IDTT.

The patient's IDTTs were timely. The patient was single-celled and the LRH justification was appropriate. There were no IPOCs present, with the primary identified problems were mood dysregulation and psychosis. The patient's short-term and long-term objectives were appropriate and measurable. The patient refused to participate in the seven-day IDTT, at which his assigned clinicians were not present. At the 30-day IDTT, appropriate interventions for psychosis were documented; however, mood dysregulation was no longer considered a problem. All of the patient's TOEs were marked as "Met." The patient denied mental health symptoms, asked to discontinue all medications, and requested transfer to unlocked dorms. The psychiatrist explained the possibility of reducing medications but emphasized the need for medication adherence to remain eligible for unlocked dorm placement, to which the patient reportedly agreed. The patient reported attending three-to-four groups per day, and the treatment team agreed to make an unlocked dorm referral, which was either rescinded or rejected.

In the final IDTT of the review period, the patient denied mental health symptoms and refused all medications, groups, and scheduled medical appointments. Without a PC2602, the team could not enforce medication treatment, and they appropriately decided to retain the patient for approximately six weeks to monitor for decompensation. Despite these significant changes, the patient's strengths and verbalized treatment goals were never updated in the relevant sections.

Throughout the review period, psychiatry contacts were timely, often confidential, yet treatment by three different psychiatrists led to poor continuity of care. The psychiatrists adjusted medications and appropriately addressed side effects. The patient persistently advocated for admission to the state hospital and the psychiatrist noted he may have been exaggerating symptoms; the patient subsequently reported feigning symptoms to avoid the general population and expressed a desire to discontinue treatment. He refused all medications and group activities. Consequently, Risperdal was discontinued, and a trial of medications was initiated at the patient's request and despite the psychiatrist's recommendation for a low-dose medication regimen, which the patient refused.

The timely PC contacts displayed good continuity of care and were often confidential. Almost all PC contacts were provided by the assigned PC.

The patient participated in nearly all of his group sessions until the week of July 24, 2024. During this period, he attended various groups focused on Mood Management, Coping, Anger Management, and Stress Management. The topics covered in these groups were well-suited to the patient's presentation and symptoms and he was provided relevant support and strategies for managing his condition.

**Findings**

The mental health treatment provided to this patient was adequate.

Initial assessments were conducted thoroughly and in a timely manner, although the psychiatrist assessment appeared to be conducted during the IDTT, in deviation from CDCR policy. The IDTTs were both timely and appropriate, with treatment planning effectively addressing symptoms and presentations as identified in the TOEs. Contacts with both PC and psychiatrist were timely and documented appropriately. Most one-on-one contacts were conducted in a confidential setting. The treatment team's decision to retain the patient after he began refusing mental health treatment was appropriate. Group topics were appropriate.

**Patient J**

This 54-year-old patient's healthcare record was reviewed to evaluate the quality of intermediate care provided at SVSP-PIP. The patient was provided diagnoses of schizoaffective disorder, borderline personality disorder, antisocial personality disorder, and opioid use disorder. Medications prescribed included Invega, Latuda, Seroquel, clozapine, Remeron, Cogentin, and BuSpar. This medium custody patient readmitted to the SVSP-PIP on May 1, 2024, after having been out to court since November 24, 2023.

The patient's relevant medical conditions included seizures treated with Keppra, type 2 diabetes, high lipids, asthma versus emphysema, and a breast mass. The patient had a history of PC 2602 orders; however, he was not under one upon admission to SVSP-PIP. The patient had an extensive history of treatment in the EOP, MHCB, ICF, and acute levels of care. The patient reported three suicide attempts, a history of self-injurious behavior, and safety concerns.

The patient's IDTTs were timely and appropriately staffed. Documentation displayed multiple limitations and was internally inconsistent containing contradictory documentation regarding self-injurious behavior and suicide attempts. This deficit was noted in the initial IDTT and was never corrected or updated. The level of care justification and discharge criteria were limited and generalized, without update since a prior IDTT in October 2023. There were no IPOCs, identified problems, or objectives and interventions documented. The patient was assigned to a multi-person cell. Reducing depression was added to the patient's treatment plan and included appropriate short and long-term goals, as well as appropriate interventions. The patient consistently reported an 8 out of 10 on the depression scale. By the end of June 2024, the patient was adherent and engaged in treatment, was promoted to STEP 2, and expressed a desire to work on stress management. Subsequent IDTTs contained mostly carried-forward information, except for adding a problem for self-harm (with appropriate e goals), updating the patient's goal of dorm housing, and promotion to STEP 3. Overall, the patient's treatment planning was adequate despite initially poor documentation and some information being carried forward. Adequate updates were included where appropriate, but the IDTT and treatment plan required more substantive updates and details about the patient's treatment, such as specific group assignments. Nonetheless, the overall process was adequate considering the timeliness, staff attendance, identified problems, and the patient's response to treatment.

The initial psychiatric assessment was timely, yet occurred at cell front due to the absence of a custody escort. During the assessment, the patient reported demeaning auditory hallucinations but denied having any suicidal or homicidal ideations. The patient resumed the medications he had discontinued when he left for court in November 2023, namely Invega, Latuda, Remeron, and Buspar. Throughout the assessment, the patient was noted as stable and he engaged appropriately with the psychiatrist. The majority of the content was pulled forward from the patient's original initial psychiatric assessment provided prior to his court transfer.

Throughout the review period, the patient participated in timely psychiatry contacts. The patient consistently reported chronic passive suicidal ideation without any specific plan or intent, as well as a persistently depressed mood and auditory hallucinations that did not significantly hinder his daily functioning. Some psychiatry contacts coincided with IDTT meetings. On June 7, 2024, the patient disclosed cravings for heroin and ongoing methamphetamine use while in the PIP, indicating a need for continued substance use treatment and support. At the end of June 2024, the patient had worsened anxiety due to discussion of upcoming parole plans. Documentation reflected an ongoing effort to optimize his psychiatric care.

The patient did not have documented contact with a PC from May 2-May 21, 2024, and was then seen by his non-assigned PC for his first contact. On June 13th, 2024, the patient exhibited aggressive behavior towards a non-assigned PC after a group, but later appropriately apologized. By the end of June 2024, the patient demonstrated high levels of engagement and motivation for treatment. In July 2024, the patient was only offered two of four weekly contacts. Additionally, the PC progress notes lacked detailed interventions, with repetitive information carried forward from previous weeks.

During the review period, the patient actively participated in various group sessions, including NLTGs. Group topics covered a range of relevant areas including Anger Management, DBT, Stress Management, and Coping Strategies.

On July 8, 2024, the patient had difficulties with his cellmate, reported suicidal and homicidal thoughts, and required placement on suicide watch. The patient was resistant to efforts by both the treating and Chief psychiatrists to encourage medication adherence. Consequently, an emergency PC2602 petition was initiated due to the patient’s danger to self, danger to others, and grave disability. The patient was noted to be actively responding to internal stimuli and displaying paranoid behavior. The patient eventually assented to receive injectable medication, and the PC 2602 petition was subsequently granted. Plans were in place to begin a clozapine trial shortly after the review period ended.

**Findings**

The mental health treatment provided to this patient was adequate.

Despite the documentation displayed significant shortcomings. Clinical contacts were timely, and the patient’s clinicians maintained a good rapport which contributed positively to the patient’s care. Initial IDTTs lacked clearly defined problems, goals, and interventions, significant improvements were later noted. The patient became highly engaged in treatment and remained generally stable except for a brief period of instability triggered by issues with a cellmate, which were later resolved. An emergency PC 2602 was initiated appropriately and granted, demonstrating a responsive approach to the patient’s needs. The patient responded well to medications, which were adjusted appropriately with patient collaboration. Overall, the patient’s condition improved, and he was looking forward to the possibility of parole in the near future.

**Patient K**

This 33-year-old patient's healthcare record was reviewed to assess the quality of care provided at the SVSP-PIP. The patient was provided diagnoses of schizophrenia, anxiety, and methamphetamine abuse. He was prescribed Depakote, paliperidone injection, Haldol, and Vistaril. The patient arrived at the SVSP-PIP on May 2, 2024, and since his arrival to CDCR in February 2024, he had three MHCB placements due to psychotic symptoms and statements regarding self-harm.

The patient did not attend the initial assessment or IDTT meeting on May 3, 2024, and the documentation indicated that he refused to participate. The required staff were present at the IDTT meeting, including the psychiatrist and PC. The patient attended the next IDTT meeting on May 8, 2024. The treatment plan goals were to reduce self-harm, to adhere to medications, to engage in social activities, to recognize his symptoms, and to use DBT coping skills to manage his symptoms.

The psychiatric contacts occurred in person, and the patient frequently declined out-of-cell confidential interviews. The progress notes indicated that the patient was intermittently adherent to his medication regimen and often reported feeling paranoid and anxious.

The PC contacts occurred almost exclusively at cell front or on the yard, and the notes indicated that the patient usually declined being seen in a confidential setting. The PC documented observing the patient attending the yard and socializing with other patients. He was frequently observed mumbling and appeared to be responding to internal stimuli by looking at the wall and laughing.

The patient did not engage in discussions with his PC or psychiatrist beyond briefly answering questions, and he declined most of his sessions for individual and group therapy. An admission SRASHE was completed on May 3, 2024.

**Findings**

The mental health treatment provided to this patient was adequate.

The patient was offered appropriate treatment consistently which he often declined, although he engaged in some social activity on the yard. He appeared withdrawn and difficult to engage in therapeutic activity. He displayed symptoms of psychosis and difficulty with adaptive functioning skills. Although treatment plan goals and interventions were relevant to his needs, there was little evidence that he utilized interventions to further improve his functioning and to decrease his symptoms beyond the medication regimen.

**Patient L**

This 39-year-old patient's healthcare record was reviewed to evaluate the quality of care provided at the SVSP-PIP. The patient was provided diagnoses of major depressive disorder, recurrent with psychosis and ADHD. He was prescribed buspirone, olanzapine, atomoxetine, and valproic acid. He arrived at the SVSP-PIP on May 2, 2024 for stabilization of his suicidality.

The patient transferred to an MHCB on February 5, 2024 due to self-harm with suicidal thoughts. He had three MHCB placements within three months and 14 MHCB placements during his incarceration.

The initial IDTT meeting occurred within an hour of the patient's arrival to the SVSP-PIP; subsequently, a 10-day IDTT meeting occurred. The PC, psychiatrist, counselor, and nurse were present at both meetings; additionally, the psychologist, recreation therapist, and an additional unit social worker were also present at the second meeting. The patient attended all of the IDTT meetings. Treatment targets included not engaging in self-harm, decreasing depressive symptoms, medication adherence, maintaining ADLs, and learning coping skills for anxiety and depression; those targets were appropriate and linked to his diagnoses and symptoms.

The patient was seen weekly by the psychiatrist, and those visits often occurred in the group room. The psychiatric notes indicated meaningful interactions with the patient, and that the patient was encouraged to attend all offered therapy. The PC contact documentation often stated that the patient was seen at cell front due to time constraints; the content of that documentation changed little and stated that the PC had informed the patient to expect cell front visits due to poor staff coverage. The patient was provided mental health materials to work on in his cell. He was offered several groups daily facilitated by the social worker, psychologist, and recreation therapist which he attended and participated in appropriately, but he frequently did not show for groups or left early.

An admission SRASHE was completed on May 2, 2024, and the patient was assessed with high chronic and low acute suicide risk. The patient had multiple past self-harm incidents and suicide attempts. It was concerning that the documentation stated that a safety plan was not needed, because it was thought not clinically indicated for this chronically suicidal patient.

**Findings**

The mental health treatment provided to this patient was inadequate.

Individual contacts with the PC and psychiatrist were conducted at cell front or in a nonconfidential setting. While those visits were conducted weekly, progress notes did not indicate efforts toward, or progress on treatment goals and often contained the exact same wording for each visit with little change. The patient often did not attend therapy groups, which was not addressed in individual contact documentation or the treatment plan.

**Patient M**

This 52-year-old patient's healthcare record was reviewed to evaluate the quality of care provided at the SVSP-PIP. The patient was provided diagnoses of bipolar I disorder and amphetamine abuse. He was prescribed divalproex, olanzapine, amlodipine, and Vistaril.

The patient transferred from the EOP level of care to the PIP on May 2, 2024, due to an increase in extreme depression and suicidal ideation. He reported feeling hopeless, believing he might never leave prison, and expressing concern about his ability to survive if released. The patient previously received treatment in a PIP in 2018 and had a history of seven or more suicide attempts.

An initial IDTT meeting occurred on the day of arrival to the SVSP-PIP that included the patient, PC, psychiatrist, correctional counselor, and nurse. The treatment plan addressed goals for managing suicidal thoughts and depression, as well as the housing review and rationale for the transfer to a higher level of care.

The patient was seen weekly by the psychiatrist, often in the group room but occasionally at cell front when he declined to leave his cell for his appointment. The psychiatrist made medication adjustments based on the patient's reported symptoms. The patient was medication adherent.

The initial PC assessment was completed timely, and the patient was seen for weekly contacts by the assigned PC or a substitute. The PC documented sessions that were confidential, partially confidential, or nonconfidential. The patient engaged with the therapist and was often described as in good spirits with polite behavior. His anxiety and suicidal thoughts were directly addressed in therapy sessions.

Several groups, including cognitive, recreation, medication, and symptom management were offered daily. The patient often attended fully or partially, and displayed appropriate behavior.

An admission suicide risk assessment was completed on May 2, 2024; the patient was assessed with high chronic and moderate acute suicide risk. A safety plan, however, was not completed; the documentation stated that a safety plan was not clinically indicated.

**Findings**

The mental health treatment provided to this patient was adequate.

The PC, psychiatrist, and treatment team provided therapeutic activities on a regular and consistent basis that were appropriate for the patient's identified needs and goals. His medication adherence was excellent, and his anxiety and suicidal thoughts were directly addressed in therapy sessions. Concerning, however, was the lack of a safety plan for this chronically suicidal patient.

**Patient N**

This 38-year-old patient's healthcare record was reviewed to assess the quality of care provided at the SVSP-PIP. The patient was provided diagnoses of schizoaffective disorder, bipolar type and amphetamine-induced mild neurocognitive disorder. At the time of admission to the SVSP-PIP on April 29, 2024, the patient was not prescribed psychotropic medications; however, he was prescribed Zyprexa on May 27, 2024.

The patient was remanded under a PC 1370 order for restoration of competency. He had a history of 27 prior MHCB placements.

IDTT meetings occurred timely and included the PC, psychiatrist, nurse, rehabilitation therapist, and CC1 in attendance. The treatment plan included goals related to competency restoration, as well as medication and treatment adherence.

The rationale for continuation at the intermediate level of care was appropriately documented. The psychiatrist saw the patient for individual contacts when appropriate assessments occurred, and psychotropic medication treatment was implemented according to the PC 1370 requirements. Some of the psychiatric contacts occurred in confidential settings, while others did not; as the patient refused to attend confidential sessions, and he was seen at cell front.

The PC consistently saw the patient for individual sessions when the clinician assisted the patient with reality testing and addressed treatment goals. Some of the sessions occurred in a

confidential setting except when the patient refused to leave his cell when he was seen at cell front.

Daily groups were offered to the patient, and he frequently attended the full sessions. Group topics included anger management, cognitive behavioral therapy, and recreation therapy.

An admission SRASHE assessed the patient with moderate chronic and low acute suicide risk. He received an RVR for destruction of property on May 19, 2024, and the RVR mental health assessment recommended that if sanctions were imposed, the patient should be allowed to attend yard and day room due to his tendency to isolate.

**Findings**

The mental health treatment provided to this patient was adequate.

The patient was seen consistently for therapeutic contacts and medication management that targeted his symptoms, and he was regularly monitored with documentation regarding his progress in care.

**Patient O**

This 29-year-old patient's healthcare record was reviewed to assess the quality of care provided at the SVSP-PIP. The patient was provided diagnoses of schizophrenia and amphetamine-type substance-induced psychotic disorder. He was prescribed olanzapine and Remeron; Haldol decanoate was added on June 28, 2024. The patient was admitted on May 9, 2024.

At the time of admission, the patient displayed psychotic symptoms including unintelligible speech, constant nudity in his cell, disorganization, and unkempt appearance. His mental health history included placement at the 3CMS level of care with subsequent referral to the EOP on February 27, 2024, and one MHCB placement on April 16, 2024. An emergency PC 2602 order was obtained from April 30, 2024 to May 23, 2024 due to grave disability; the order was subsequently provided for one year on May 22, 2024.

The initial IDTT meeting occurred within 24 hours of admission and included the PC, psychiatrist, and nurse. The treatment plan goals were appropriate for the patient’s symptoms. Subsequent IDTT meetings occurred timely as required and included goals relevant to the patient’s diagnosis and symptoms.

The psychiatrist met with the patient weekly, frequently in a confidential setting; although some sessions occurred at cell front due to patient refusal. The psychiatrist noted the patient's symptoms and progress, and treatment adjustments occurred as indicated.

The PC conducted a suicide risk assessment upon arrival to the SVSP-PIP; the PC noted that the patient exhibited significant response to auditory hallucinations and was unable to engage in conversation. The PC noted that the patient had no history of suicide or self-harm. Weekly

therapy sessions were provided in a confidential setting, with occasional cell front contacts when the patient declined to leave his cell.

The documentation noted the patient's stabilization and progress, including discharge planning to a lower level of care, and focus on treatment plan goals. The PC observed improved mood and organized thinking over time.

Several weekly groups were offered that were primarily recreational or leisure-focused, and some cognitive groups were offered. The patient frequently did not attend, and some notes inconsistently stated both full attendance and no-show for the same group.

The patient received RVRs for fighting on June 6, 2024 and on July 23, 2024.

**Findings**

The mental health treatment provided to this patient was adequate.

The PC and psychiatrist were attentive to the patient’s symptoms and treatment needs. The patient showed progress in his symptoms of psychosis and mood after involuntary medication administration.

**Patient P**

This 32-year-old patient's healthcare record was reviewed to assess the adequacy of care at the SVSP-PIP. The patient was provided a diagnosis of delusional disorder. At the time of admission, he was remanded to the PIP on a PC 1370 order and was not prescribed psychotropic medication. He was admitted to the SVSP-PIP on May 10, 2024.

The patient had seven MHCB placements due to psychosis and disorganization. He had poor insight regarding his mental illness.

The initial IDTT meeting occurred on May 13, 2024 with the psychiatrist, PC, correctional counselor, nurse, and rehabilitation therapist in attendance. Treatment goals of adherence to treatment sessions and medications were documented. Subsequent IDTT meetings occurred timely as required.

An admission SRASHE assessed the patient with low acute and chronic suicide risk. The patient was not prescribed psychotropic medications until June 28, 2024, when the psychiatrist prescribed Haldol and aripiprazole.

The patient attended weekly sessions in confidential settings with the psychiatrist and PC, and the documentation indicated that he was focused on his legal situation, including the specifics of his charges. He frequently stated that his charges were dropped and denied the need for treatment. In the groups that he attended, he participated actively and appropriately but did not show for approximately half of the offered groups. His assigned groups included rational thinking, symptom management, anger management, recreation and leisure activities.

**Findings**

The mental health treatment provided to this patient was adequate.

The required therapeutic interventions were offered, and appropriate ongoing assessment and treatment were provided. The treatment team intervened appropriately with the patient; although, his delusions regarding his illness and court findings were resistant to change.

**Patient Q**

This 35-year-old patient's healthcare record was reviewed to determine the adequacy of care provided at the SVSP-PIP. The patient was provided diagnoses of schizophrenia, unspecified type; amphetamine-type substance use disorder; and opioid use disorder. He was prescribed Zyprexa, Prozac, and Suboxone. The patient was admitted on May 14, 2024.

The patient was placed at an MHCB on April 23, 2024 due to verbalized suicidal thoughts and self-harm. He had several positive urine drug screens for amphetamines, marijuana, and opiates. He had a history of MHCB and EOP placement.

An IDTT meeting occurred on May 16, 2024 that included the patient, PC, psychiatrist, social worker, supervising psychologist, nurse, and correctional counselor. Relevant treatment goals were developed to improve coping skills and treatment attendance; additionally, the patient’s correctional and mental health history was documented and reviewed.

Most of the psychiatric notes indicated that the patient was seen confidentially in one of the group rooms. If he did not come to his appointment, the psychiatrist saw the patient at cell front. The psychiatrist monitored the patient's progress and response to medication thoroughly on a weekly basis.

The patient was seen for PC contacts weekly when there was documentation of discussion of the patient’s auditory hallucinations, substance use, mood, and coping skills. The sessions usually occurred in a confidential setting; although, some notes indicated that the patient was seen at cell front due to time constraints.

Groups were regularly offered to the patient, but he frequently refused or did not show. Although the PC notes indicated that the patient was encouraged to attend groups, there was no other documentation that his treatment nonadherence was addressed. Offered groups included cognitive, didactic, recreation, and leisure.

An admission SRASHE assessed the patient with moderate acute and chronic suicide risk. A safety plan was appropriately developed.

**Findings**

The mental health treatment provided to this patient was adequate.

The psychiatric and PC contacts occurred timely, there was appropriate medication management, and therapeutic interventions were consistently documented. While the patient's engagement in treatment was limited, particularly regarding group attendance, the treatment team made ongoing efforts to encourage participation and to address his mental health needs.

**Patient R**

This 56-year-old patient's healthcare record was reviewed to assess the quality of care provided at the SVSP-PIP. He was provided diagnoses of schizophrenia and anxiety. He was prescribed divalproex, hydroxyzine, paliperidone, and venlafaxine at the time of admission, and olanzapine was added to this regimen during his hospitalization. He received his psychotropic medications by a PC 2602 order. The patient was admitted to the SVSP-PIP on May 14, 2024.

The patient’s first acute CDCR psychiatric hospitalization occurred in 1996, and he had several subsequent acute and intermediate hospitalizations for extended periods of time. He also had medical conditions including chronic constipation, GERD, hemorrhoids, and obesity.

The initial IDTT meeting occurred on May 15, 2024; only the patient, the PC, psychiatrist, and nurse attended. Subsequent IDTT meetings included all required staff members. The treatment plan problem included the patient’s gastrointestinal reflux disease and delusional thinking, but did not mention anxiety with which he was diagnosed or his disorganized thinking and behavior. The admission SRASHE provided an assessment of low acute and chronic suicide risk.

Psychiatric contacts occurred weekly; some sessions occurred in a confidential setting, while others did not note whether the session occurred in a confidential setting. The patient presented with grandiose, religious and persecutory delusional thinking. The psychiatrist documented medication adjustments to address the patient’s psychotic symptoms and mood dysregulation. Effexor was mixed with applesauce to ensure that the medication was not diverted by the patient. The initial PC assessment occurred on May 16, 2024, but it occurred at cell front and relied heavily on a healthcare record review. The PC contacts occurred weekly, but the documentation often did not note whether the sessions occurred in confidential settings; occasionally, the patient declined to leave his cell and was seen at cell front. The patient consistently presented with delusional thinking and was somewhat redirectable; however, he sometimes argued with staff and was verbally hostile. The treatment goals were to reduce psychotic symptoms, to gain insight, and to meaningfully participate in treatment. The PC worked with the patient regarding reality testing, anxiety and psychosis management, and self-care.

The patient frequently did not attend his scheduled groups; however, he adequately participated in those groups that he attended.

**Findings**

The mental health treatment provided to this patient was marginally adequate.

There were areas of concern noted. The treatment plan did not address all of the patient's diagnosed conditions, specifically his anxiety. Confidentiality of sessions was inconsistently

documented. A recommendation for a Clozaril trial from the referring facility was not addressed in the treatment plan or in the psychiatric documentation after the initial visit. Group attendance was poor, and there were no documented interventions to improve the patient's treatment engagement. Positive aspects of care included appropriate medication management, consistent PC contacts, and efforts to address the patient's delusional thinking.

**Patient S**

This 60-year-old patient's healthcare record was reviewed to assess the quality of care provided at the SVSP-PIP. The patient was provided a diagnosis of schizophrenia. He was prescribed paliperidone and venlafaxine at the time of admission, and Remeron was prescribed on July 17, 2024. The patient received his psychotropic medications by a PC 2602 order due to grave disability and danger to others; the order was in place since at least 2020. The patient was admitted to the SVSP-PIP on May 17, 2024.

The patient had multiple inpatient placements, including MHCB, acute, and intermediate levels of care. He was recently unable to remain at the EOP level of care due to increased psychosis, not attending to his ADLs, and lack of treatment participation.

A 72-hour IDTT meeting occurred on May 20, 2024, and the 10-day IDTT meeting occurred on May 22, 2024. The required staff were present at the meetings, except the correctional counselor who was not present at the 72-hour IDTT meeting. The problem areas identified in the treatment plan were psychosis and gastrointestinal concerns, with goals to gain insight regarding his psychosis, to demonstrate coping skills, and to decrease negative social interactions. IDTT meetings occurred monthly.

The psychiatrist met with the patient weekly to address medication issues. The patient requested treatment with Cogentin or Wellbutrin at each session, and he was provided the reasons why those medications were not prescribed. Most sessions occurred in a confidential setting, but the patient sometimes refused to attend a confidential session and was seen at cell front.

The PC individual sessions occurred weekly and addressed the patient's progress and objectives; the documentation noted the content of the clinical interactions, the patient's activity on the unit and yard, and therapeutic interventions utilized. The sessions usually occurred in a confidential setting, but some occurred on the yard or at cell front when the patient declined to leave his cell.

The patient was consistently seen by his assigned care providers. While the patient attended some assigned groups with improved attendance over time; he often did not show for the groups. For the groups that he attended, it was documented that he often stared without participating, or the note contained a general statement that the patient participated in the group.

**Findings**

The mental health treatment provided to this patient was adequate.

The patient was seen for regular weekly psychiatric and PC contacts, and there was appropriate medication management. Areas of needed improvement included documentation of interventions to address the patient's inconsistent group attendance and participation.

**Patient T**

This 50-year-old patient's healthcare record was reviewed to assess the quality of care provided at the SVSP-PIP. He was provided diagnoses of anxiety and neurocognitive disorder due to brain injury and other specified mental disorder. The patient was prescribed aripiprazole, olanzapine, oxcarbazepine, and chlorpromazine. His medical conditions including GERD, hyperlipidemia, and asthma. The patient was admitted to the SVSP-PIP on May 20, 2024 due to confusion, persecutory delusions, inability to trust others, and impulsivity. He was transferred to the PIP for restoration of competency under a PC 1370 order.

An IDTT meeting occurred on May 21, 2024 that included the PC, psychiatrist, correctional counselor, and nurse. The treatment goal was to improve treatment adherence by attending at least one group and the psychiatric weekly contacts, and to restore his competence under the PC 1370 order. An admission SRASHE was completed on May 21, 2024 that noted six suicide attempts; the patient was assessed with high chronic and low acute suicide risk. The assessment was thorough and appeared to accurately assess the patient’s suicide risk.

Psychiatric contacts occurred weekly, but whether the meetings occurred in a confidential setting was not noted. The psychiatric notes described the patient's interactions that were tangential, frequently off-topic, and at times coy or gamey. The patient engaged with staff and was reportedly medication adherent. As the patient did not appear to make significant progress during the reporting period, the psychiatrist added Haldol on July 30, 2024.

The patient was seen for weekly PC contacts by the onsite psychologist; those sessions occurred in a confidential setting with the purpose of PC 1370 restoration. The notes described the patient and provider interactions in detail, yet they did not note progress or mention treatment plan goals except encouragement to attend groups. The notes did not provide a summary or analysis of the treatment provided; rather they detailed description of only what the patient and psychologist said, followed by a statement that there would be no change in the treatment plan.

The patient attended some groups initially; however, he later stopped attending any groups. This was noted by the PC, and the patient was verbally encouraged to attend groups.

**Findings**

The mental health treatment provided to this patient was inadequate.

For several weeks, although the patient was seen for individual sessions by the PC and psychiatrist; treatment planning was not altered, despite the patient's lack of improvement. The patient's interactions with the therapist were characterized by idiosyncratic and odd statements and tangential thinking, and he continually refused to attend group treatment sessions which was not adequately addressed in treatment planning. The lack of progress toward treatment goals and

competency restoration, coupled with insufficient adjustments to the treatment approach, indicated the need for more responsive and individualized treatment interventions.

**APPENDIX D3**
**California Health Care Facility (CHCF – PIP)**
Review period: February 1 – July 31, 2024
Site visit: October 15 – October 17, 2024

**Patient A**

This 57-year-old patient's healthcare record was reviewed to assess the quality of care provided at the CHCF-PIP. He was provided diagnoses of schizophrenia, unspecified type, adjustment disorder with depressed mood, pedophilic disorder, PTSD, and anxiety disorder. He was prescribed chlorpromazine, Vistaril, and Zoloft. His medical conditions included asthma and diabetes. The patient transferred to the CHCF-PIP on May 23, 2024.

The patient had received mental health services at the 3CMS and MHCB levels of care, and he had a history of eight suicide attempts. The most recent MHCB placement occurred on May 7, 2024, when the patient expressed suicidal intent, gave away his belongings, and stated that he was afraid and thought that he would be killed.

The initial IDTT meeting occurred on May 24, 2024; the patient, MHMD, MHPC, correctional counselor, psychiatric technician, and nurse were present. The seven-day and subsequent 30-day IDTT meetings occurred timely. The patient's problems, goals, and discharge planning were included in the treatment plan which addressed the patient's delusional thinking, concerns about medication adherence, and progress required to lower his level of care.

The MHMD met with the patient at least weekly in a confidential setting; although, at times the patient declined to leave his cell for the interview and was seen at cell front. The psychiatrist tapered and discontinued the patient's Thorazine due to low blood pressure and replaced it with Haldol. On July 25, 2024, the psychiatrist noted that the patient appeared to have returned to his baseline level of functioning, and discharge to the EOP was recommended.

The MHPC contacts primarily occurred at the cell front, and those contacts did not occur weekly. The patient interacted well with the PC, and the PC documented the patient's comments regarding his thoughts, feelings, and symptoms. The treatment plan goals, however, were discussed superficially according to the PC documentation.

Several groups were offered each week by clinical, recreation therapy, and nursing staff. The patient attended and participated appropriately in the groups, except during a period when he contracted conjunctivitis and was isolated from others.

No RVRs were recorded, and there were no additional suicide risk assessments completed after the required initial admission assessment.

**Findings**

The mental health treatment provided to this patient was adequate.

The patient attended groups and was monitored closely by the psychiatrist with effective medication management, and he made progress in treatment. It was unclear, however, why the PC sessions primarily occurred at cell front.

**Patient B**

This 65-year-old patient's healthcare record was reviewed to assess the quality of care provided at the CHCF-PIP. The patient was transgender, and she preferred female pronouns. She was provided diagnoses of major depression with psychotic features and opioid use disorder. She was prescribed Suboxone, Cymbalta, Remeron and Zyprexa. The patient had medical diagnoses of cellulitis, peripheral artery disease, diabetes, and right leg above knee amputation. The patient arrived at the CHCF-PIP for acute care on March 29, 2024 due to danger to self and self-harm.

The patient had received mental health services at all levels of care, and she had multiple higher level of care placements due to self-harm since her arrival to CDCR in 2023. Her suicide risk was assessed at high chronic and moderate acute suicide risk. She frequently refused to allow her vital signs to be checked. The documentation indicated that the patient believed that her testicles were dead, and that the Bible instructed her to remove them.

The initial IDTT meeting occurred on April 2, 2024; the MHPC, MHMD, RN, correctional counselor, psychiatric technician and psychologist attended the meeting as well as the patient. Relevant problems and goals were discussed with the patient, including elimination of self-harming behavior and the use of prosocial coping skills. Reducing depression and participating in therapeutic activities were discussed as well. Subsequent IDTT meetings occurred timely. On May 24, the patient transferred from acute to intermediate care.

The psychiatrist met with the patient timely in confidential settings, and medication adjustments were documented with a rationale provided.

The patient was seen by the MHPC weekly, and at times more frequently in a confidential office until June 26, 2024, which was the last documented PC contact during the review period. There were no PC notes recorded during July 2024. On July 2, 2024, the patient was found unresponsive in her cell, was treated with Narcan, and was taken to an outside hospital.

The patient had greater than 50 percent group attendance, and the group topics included life skills, social skills, and medication education; the groups were facilitated by recreation therapists, rehabilitation therapists, or psychiatric technicians. No cognitive or psychotherapeutic groups were documented.

On April 14, 2024, the patient made further cuts to her scrotum, apparently in another attempt to remove her testicles.

**Findings**

The overall mental health treatment provided to this patient was inadequate.

This patient presented with significant behavioral, psychiatric and physical difficulties, which were responded to appropriately by the staff. There were, however, areas of needed improvement in care, evidenced by the lack of documented contacts by the assigned PC during July 2024, and no therapeutic groups offered by a licensed mental health clinician.

**Patient C**

This 43-year-old patient's healthcare record was reviewed to assess the quality of care provided at the CHCF-PIP. The patient was provided a diagnosis of bipolar disorder; he was prescribed olanzapine, Vistaril, Lamictal, and risperidone. On July 5, 2024, he was prescribed lithium, and the risperidone was tapered. The patient arrived at the CHCF-PIP for intermediate care on May 24, 2024.

He received his psychotropic medications by a PC 2602 order that was initiated at an MHCB on May 20, 2024. The patient was placed at the 3CMS level of care upon arrival to CDCR in 2016, and he had two MHCB placements due to symptoms of mania that included delusions of grandeur, hallucinations, decreased sleep, and hyperverbal speech, as well as agitation and threatening behavior.

The initial IDTT meeting occurred on May 28, 2024, and the PC, MHMD, correctional counselor, psychiatric technician, and psychologist were present at the meeting as well as the patient. Goals were identified to improve the patient's psychotic symptoms and mania. He was recommended for a single cell and was on max custody status. On June 26, 2024, a progress note by an RN indicated that the patient had declined to attend his IDTT meeting, but no treatment plan was documented. Another IDTT meeting was reported by the MHMD and RN on July 25, 2024; but again, no treatment plan was documented.

The initial psychiatric assessment occurred on May 24, 2024, and the MHMD saw the patient at least weekly and often more frequently. The contacts occurred in confidential settings, but the patient occasionally declined to leave his cell for an appointment.

The initial PC assessment occurred on May 30, 2024, and the documentation of that contact very minimally described the interaction. Two more weekly confidential contacts occurred; however, after June 13, 2024, there were no further MHPC contacts documented during the report period.

The patient was offered groups including daily living skills, coping skills, nursing-led therapeutic groups, and recreation groups. Some of the entries indicated that the patient was on solo status and could not attend, while most of the notes indicated that the patient refused to attend.

On June 24, 2024, the patient was involved in an altercation with another patient, and one of his teeth was broken. A suicide risk assessment was completed on May 27, 2024, and the patient was assessed with moderate chronic and low acute suicide risk.

**Findings**

The overall mental health treatment provided to this patient was inadequate.

There were no treatment plans documented other than the initial and three-day plans, and there were no PC contacts for a period of about six weeks. The patient also typically refused to attend groups, and there was documentation of interventions to address his treatment refusal other than encouragement by the recreation therapists and the MHMD.

**Patient D**

This 32-year-old patient's healthcare record was reviewed to assess the quality of care provided at the CHCF-PIP. The patient was provided diagnoses of bipolar disorder, depressed with psychotic features; intermittent explosive disorder; opioid use disorder; and antisocial personality disorder. He was prescribed olanzapine, Suboxone, fluphenazine, hydroxyzine pamoate, and lithium. The patient arrived at the CHCF-PIP on May 28, 2024.

The patient was admitted due to a plan for suicide that included harming himself by hanging or cutting. He also experienced command hallucinations, delusional thinking, and poor impulse control. The patient was placed on a PC 2602 order on December 20, 2023. In the prior six months, he received mental health services at the EOP level of care as well as six MHCB referrals for depression, psychosis, and self-harm with suicidal thoughts. He acknowledged crushing and snorting Wellbutrin and taking methamphetamine.

The initial IDTT meeting was a 72-hour IDTT meeting that occurred on May 31, 2024. The 10-day IDTT meeting occurred on June 4, 2024. Subsequent IDTT meetings occurred timely. On July 2, 2024, the IDTT meeting occurred without the patient, as he was out of the facility for a specialty medical appointment. Goals related to suicidal plans and substance use were included in the treatment plan. A suicide risk assessment was completed on May 30, 2024 that noted two past suicide attempts. His acute risk was assessed as low, and his chronic suicide risk was assessed as moderate.

The MHMD met with the patient consistently; however, the notes often did not indicate whether the sessions occurred in a confidential setting. Two notes during the reporting period indicated that the visit occurred at the cell front, as the patient refused to leave his cell. The MHMD documented evaluation of the patient’s progress, medication side effects, and the patient’s mental status. No medication changes occurred in the reporting period.

The initial MHPC assessment was conducted on June 4, 2024, and the subsequent PC visits occurred timely. The patient occasionally declined to leave his cell, and cell front check-in contacts were completed. The PC progress notes addressed the treatment plan goals and the patient's current statements and status; however, nearly identical language was documented for each note regarding treatment interventions. The patient’s progress or lack of progress was not clearly summarized in the PC notes.

The patient was offered groups that included life skills, social skills, recreation therapy, stress management, nursing-led therapeutic groups, and coping skills; he refused to attend some groups. There was no documentation of the provision of therapy groups by licensed mental

health clinicians. Of note, some group notes contained information about the patient's participation while also indicating that the group was canceled.

No RVRs or additional suicide risk assessments were documented during the reporting period.

**Findings**

The overall mental health treatment provided to this patient was inadequate.

There were discrepancies in suicide risk assessments that contradicted more recent assessments, the documentation often failed to indicate whether the sessions were confidential, progress notes lacked individualization and clear summaries of progress, there were no documented therapy group notes from licensed mental health clinicians, and group attendance documentation contained conflicting information regarding participation.

**Patient E**

This 25-year-old patient's healthcare record was reviewed to assess the quality of care provided at the CHCF-PIP. The patient was provided diagnoses of alcohol use disorder, amphetamine-type use disorder, opiate use disorder, antisocial personality disorder, cannabis use disorder, bipolar disorder, and major depressive disorder. He was prescribed olanzapine, buprenorphine, and mirtazapine. The patient was admitted to the CHCF-PIP on May 29, 2024.

The patient had received mental health services at the 3CMS, EOP, and intermediate levels of care. He also had six MHCB referrals primarily due to self-harm that included cutting and tying a sheet around his neck.

A 72-hour IDTT meeting occurred on May 30, 2024 that included the MHMD, an alternate PC, correctional counselor, nurse, psychologist, rehabilitation therapist, psychiatric technician, and the patient. The identified problem areas were multiple RVRs, substance abuse, and suicidal ideation. Treatment plan objectives to reduce suicidal ideation, to engage in positive coping strategies, and to attend therapeutic activities were included. IDTT meetings occurred monthly as required, and the treatment team identified goals that were appropriate to the patient's presentation.

The initial psychiatric assessment was completed on May 31, 2024, and the patient was seen by the MHMD or a covering psychiatrist at least every three days for the first month, and subsequently he was seen at least weekly. The patient’s medication response and side effects were monitored closely, and mirtazapine was increased to address depressive symptoms. The patient was medication adherent.

The initial MHPC assessment occurred on June 4, 2024, and the documentation noted discussion regarding the patient’s concerns about his mother, improving coping and social skills, and reducing urges to self-harm. Subsequent MHPC contacts occurred approximately every two weeks and were not timely.

The patient refused to participate in a suicide risk assessment on May 31, 2024; the clinician completed a thorough healthcare record review and assessed the patient's chronic risk as moderate, and his acute suicide risk as low.

The patient attended groups that included life skills, coping skills, nursing-led therapeutic groups, and daily living. No cognitive or therapy groups offered by licensed mental health clinicians were documented.

No RVRs or additional suicide risk assessments were documented. A substance use treatment evaluation was completed on July 8, 2024.

**Findings**

The overall mental health treatment provided to this patient was inadequate.

Although the patient's behavior appeared stable, as evidenced by a lack of significant behavioral incidents; the PC contacts did not occur as required, and no therapeutic groups were provided other than recreation, rehabilitation, and psychiatric technician or nursing-led groups.

**Patient F**

This 32-year-old patient's healthcare record was reviewed to assess the quality of care provided at the CHCF-PIP. The patient was provided a diagnosis of schizoaffective disorder, depressive type. He was prescribed paroxetine, lithium, perphenazine, and mirtazapine. At the time of admission, he presented with mumbling speech and flat affect, and the documentation indicated that he was often difficult to understand, as he mumbled or expressed nonsensical language.

The patient had a history of suicide attempts, self-harm and paranoid ideation, and he had received mental health services at the 3CMS, EOP, MHCB, and intermediate levels of care.

The initial IDTT meeting occurred on May 30, 2024; the patient, MHPC, correctional counselor, nurse, psychiatric technician, social worker and rehabilitation therapist were present, and an alternate MHMD attended the meeting. Identified concerns to target in treatment included paranoid ideation, danger to others, and suicidal ideation. The treatment goals were to identify and to utilize coping skills, and to reduce suicidal thoughts. His acute and chronic suicide risk were assessed as high. The patient declined to attend subsequent monthly IDTT meetings, and they were conducted in absentia.

The initial MHMD contact occurred on May 29, 2024, and the patient was seen weekly or more frequently for subsequent psychiatric contacts. On June 10, 2024, the patient was seen at cell front when he was observed crawling on the floor, mumbling unintelligibly, and refusing to answer questions. No additional interventions were mentioned at that time. Additional psychiatric progress notes did not reveal meaningful interactions with the patient who often refused to talk or spoke in gibberish. No medication changes occurred until late July 2024, and documentation indicated that the patient was medication adherent. On July 28, 2024, the psychiatrist saw the patient in response to a nursing referral, as the patient had covered his

window; the psychiatrist ordered a Haldol injection at that time. The July 31, 2024 IDTT documentation noted that the psychiatrist decided to pursue a PC 2602 order.

The MHPC saw the patient at cell front; those contacts usually occurred weekly, but for two weeks the patient was not seen. Several notes indicated that the patient had been placed in a safety smock. The staff noted difficulty communicating with the patient, and they attempted to use an interpreter on several occasions. The documentation indicated a plan to discuss the patient's symptoms and behavior with the psychiatrist and the treatment team. The patient did not attend any groups.

**Findings**

The overall mental health treatment provided to this patient was inadequate.

During the two months of hospitalization at the CHCF-PIP, the patient did not make progress and continued to present with probable psychosis, bizarre behavior, and treatment nonadherence; however, the therapeutic interventions were not modified to address the significant symptomatology exhibited by the patient.

**Patient G**

This 45-year-old patient's healthcare record was reviewed to assess the quality of care provided at the CHCF-PIP. The patient was provided diagnoses of antisocial personality disorder, bipolar disorder, borderline personality disorder, and opioid use disorder. He was prescribed Wellbutrin, quetiapine, clozapine, and atomoxetine. The patient arrived on May 29, 2024.

The patient had a lengthy history of self-harm and suicide attempts, and he had received mental health treatment at the EOP and MHCB levels of care due to symptoms of racing thoughts, psychosis, and disorganized behavior. The referral to ICF included a recommendation for treatment with Clozaril to address mood and psychotic symptoms. The patient transferred from an MHCB where he was placed due to a plan for suicide; a PC2602 order was obtained at that time. He was placed on one-to-one observation for suicidal ideation at the time of CHCF-PIP admission, which continued until June 4, 2024.

The initial IDTT meeting occurred on May 30, 2024 that included the patient, MHPC, MHMD, counselor, psychologist, supervisor, psychiatric technician, nurse, and recreational therapist. The goals to be achieved prior to discharge included stabilization of psychotic, manic, disorganized, and depressive symptoms. The subsequent IDTT meetings occurred timely and included the required staff and the patient; however, progress toward goals was not clearly identified in the treatment plans.

The initial MHMD contact occurred on May 29, 2024, and the patient was seen weekly or more frequently by the psychiatrist. The progress notes stated that the psychiatrist spoke with the patient about minimizing psychotropic medications and utilizing effective doses, and Clozaril was discontinued on June 10, 2024. The patient appeared to respond positively to the medication management and reported less depression, anxiety and suicidal thoughts.

The MHPC met with the patient on the day of arrival to the CHCF-PIP on May 29, 2024, the initial assessment was completed on June 7, 2024. The patient was seen weekly for PC contacts, but the patient was not seen for two weeks. All contacts occurred in confidential setting except two contacts; at one contact the patient refused to leave his cell, and the documentation of another contact did not identify a reason for the cell front visit. The PC notes included details regarding the patient's participation in therapeutic activities, as well as his absence of behavioral problems.

Few groups were offered to the patient in June 2024, and he largely refused groups in July 2024. Although the psychiatric technician notes reflected his treatment nonadherence, the MHMD and MHPC notes indicated that the patient fully participated in groups and unit activities. Offered groups included recreation, rehabilitation, and nursing-led groups; on two occasions, core CBT groups were offered.

**Findings**

The overall mental health treatment provided to this patient was inadequate.

Although the patient made progress behaviorally and appeared to respond positively to medication treatment; he did not participate in the unit therapy offered which was not accurately reflected in the IDTT or progress note documentation. Additionally, interventions to improve participation were not documented by the PC. Core groups were only offered on two occasions.

**Patient H**

This 30-year-old patient's healthcare record was reviewed to assess the quality of care provided at the CHCF-PIP. The patient was provided diagnoses of schizoaffective disorder, depressive type and alcohol use disorder. He was prescribed Invega, mirtazapine, risperidone, and valproic acid.

A suicide risk assessment completed at the time of admission assessed the patient with moderate chronic and low to moderate acute suicide risk. The initial IDTT meeting occurred on May 30, 2024, and it included the required staff and the patient. Problems to address in treatment were identified as hallucinations, delusions, depression, suicidal ideation, and pre-release planning. The next IDTT meeting on June 4, 2024 was attended and documented by an alternate PC. A June 2, 2024 nursing progress note mentioned an IDTT meeting on that date; but no treatment plan was documented by the PC, and the next IDTT meeting on July 30, 2024 was held in absentia due to movement restrictions.

The initial psychiatric assessment was completed on May 29, 2024. The patient was seen by the MHMD or a covering psychiatrist every seven days. The psychiatric notes were written with little variation, often simply containing information brought forward from past examinations including mental status examinations in which the patient was repeatedly described as wearing hospital clothes. No medication changes occurred during the report period.

In June and July 2024, the patient was seen for three confidential contacts by the MHPC. The documentation was exceptionally brief and described topics of discussion such as "post-release planning issues at depth."

Group progress notes described the provision of recreation therapy, nursing-led groups, and rehabilitation groups with full participation by the patient. Other notes stated that the patient was on solo programming status and could not attend groups. No core therapeutic groups were provided.

**Findings**

The overall mental health treatment provided to this patient was inadequate.

The patient was not seen timely for PC contact, and no core therapy groups were offered. It should, however, be noted that the patient's behavior on the unit was appropriate, and he requested to not program with other incarcerated persons due to his upcoming parole. The documentation lacked mention of the patient's progress toward treatment goals; although, it did indicate that he was provided with pre-release planning. The absence of required PC contacts and core therapy groups represented significant omissions in the implementation of the treatment plan.

**Patient I**

This 30-year-old patient's healthcare record was reviewed to assess the quality of care provided at the CHCF-PIP. The patient was provided diagnoses of amphetamine use disorder, antisocial personality disorder, unspecified schizophrenia, opioid use disorder, borderline personality disorder, narcissistic personality disorder, and major depressive disorder. Malingering and polysubstance abuse were also listed in the problems list in EHRS. The patient was prescribed Suboxone, Benadryl, mirtazapine, and prazosin. Clozaril was started on June 10, 2024. He was admitted on May 30, 2024.

Since transfer to CDCR in 2015, the patient had 22 MHCB, five acute, and three intermediate care admissions due to self-harm and aggressive behaviors. The patient had several physical health disorders, including GERD, asthma, and low body mass index.

The initial IDTT meeting occurred on May 30, 2024; alternate MHMD and MHPC were present with all other required staff and the patient. The treatment team identified symptoms to address in treatment that included self-harm, lack of coping skills, and poor treatment adherence. The rationale for maintaining the patient at the current level of care was provided, and a single cell was recommended.

The initial psychiatric assessment was completed on May 31, 2024. The patient was seen in confidential settings by the MHMD, but the patient occasionally declined and was seen at the cell front. The assigned MHMD changed on June 27, 2024, and MHMD contacts were provided by six different psychiatrists during the reporting period. The patient's medication adherence was inconsistent which was addressed by the psychiatrists.

The initial PC assessment occurred on May 31, 2024, when the PC addressed the patient's documented treatment targets and history. The next PC contact occurred on June 14, 2024, and weekly contacts continued thereafter. The patient was offered confidential contacts, but he refused on three occasions, and he was seen for covering his window on two dates in July 2024. The PC documented on July 31, 2024 that the patient appeared more withdrawn and had become less engaged over time.

DBT and anger management groups were provided to the patient within the first week of his hospitalization, and he participated in those and other recreational groups. No core groups led by licensed mental health staff were documented from mid-June to July 2024.

The patient was on a hunger strike on June 19 and June 20, 2024, which was documented in nursing notes but not by mental health staff clinicians. A suicide risk assessment was completed on May 31, 2024, which noted the patient's frequent self-harm incidents and suicide attempts. Most of the incidents involved low or nonlethal behaviors, and the documentation indicated that they appeared to be used as coping strategies when the patient felt that his needs were unmet, or when he was upset with housing. Those behaviors included cutting, foreign body ingestion, hanging, and banging his head. His chronic suicide risk was assessed as high, and he was assessed with low to moderate acute risk.

**Findings**

The mental health treatment provided to this patient was adequate.

While timely MHMD and PC contacts occurred, and initial DBT and anger management groups were offered; there were areas of needed improvement. The lack of core groups led by licensed mental health staff from mid-June to July 2024 was a notable deficiency. The frequent changes in psychiatrists may have impacted continuity of care.

**Patient J**

This 40-year-old patient’s record was randomly selected to assess the quality of care provided within the ICF level of care at CHCF. The patient was provided with diagnoses of schizoaffective disorder, bipolar type; opioid use disorder, severe; antisocial personality disorder; and borderline personality disorder. He was fully adherent to his prescribed bupropion and clozapine. This patient arrived at CHCF-ICF on March 22, 2024.

The patient had an extensive history of inpatient treatment, most recently treated at the MHCB, acute, intermediate but requiring a return to acute, prior to his admission to CHCF-ICF.

Upon arrival at ICF on March 22, 2024 an initial psychiatric assessment was completed. There were a number of sections of the assessment which appeared to have been copied from other psychiatrists at various points in time, making it difficult to ascertain the precipitant for the current admission to ICF. A review of the record revealed that the patient had just returned from a community hospital after cutting himself and swallowing four pieces of metal which could not

be retrieved. The patient's self-injury was reportedly in response to his transfer from the acute to ICF setting. None of this was noted by the psychiatrist and the balance of the initial assessment was minimal and inadequate.

An initial IDTT was held on March 25, 2024 with only the patient, PC, and psychiatrist present. The risk factors and STEP sections were not updated. This was concerning as the patient had reported engaging in self-harm the day prior to the IDTT meeting, yet it was not acknowledged in assessing his risk. The clinical summary was not updated in any meaningful way and the reason for admission to the ICF level of care was not documented. There were no patient strengths nor patient identified goals documented. A single IPOC for danger to self was pulled forward from a previous treatment plan. There was a single treatment goal, dated December 4, 2023 to address self-harm which was relevant for an outpatient setting and was not updated. There was no rationale for retaining the patient at the ICF level of care and no discharge criteria. The treatment plan was inadequate. The first time a treatment plan appeared in the record was on May 1, 2023. That IDTT meeting included required staff, documented meaningfully updated information, vague goals for treatment and updates to the IPOC. Subsequently, monthly IDTT documentation was superficially updated, with no references to the patient's progress toward treatment goals and no discussion of what treatment interventions were being provided to the patient. On July 23, 2024, there was an entry into the section related to reason for retention, but the rationale was vague. Despite the patient refusing to attend most groups offered to him, there was no mention of this, nor interventions identified to increase his participation in groups in IDTT documentation.

The initial PC assessment completed on March 25, 2024 was inadequate in that almost all the information, except the patient's mental status examination, was pulled forward from previous assessments. Subsequent PC contacts were offered most weeks, but documentation consisted of short phrases with little to no information about treatment offered or the patient's response to treatment. Self-harm and treatment participation were not addressed despite the patient continuing to engage in self-injurious behavior throughout the reporting period. The primary interventions provided to the patient appeared to be routine medications or stat medications provided in response to the patient's reported agitation or thoughts of self-harm. Routine psychiatric contacts were inadequately documented and consisted almost entirely of the same information, pulled forward from months prior and written by other providers, such that much of the information was outdated and inaccurate.

Early in the reporting period, the patient was seen by a psychologist who offered groups, which were largely refused by the patient, as well as individual contacts. These contacts did not include evidence-based or effective interventions and ceased after the first month without any plan to address the patient's needs. While a behavioral plan or at least some evidence-based intervention to address distress tolerance and self-injury were clearly indicated, neither were offered to the patient or addressed in the treatment plan. Most groups offered to the patient were facilitated by psychiatric technicians yet were typically refused by the patient.

**Findings**

The overall mental health treatment provided to this patient was inadequate. There was no evidence-based treatment plan and no interventions offered to the patient to address his needs beyond medications. Routine PC and psychiatric contacts were poorly documented and demonstrated no coordinated effort to provide the patient with thoughtful, planned care. Interventions appeared to be reactive and treatment planning was wholly inadequate.

**Patient K**

This 30-year-old patient's record was randomly selected to assess the adequacy of care provided at the ICF level of care at CHCF. The patient was provided with diagnoses of major depressive disorder, recurrent episode, with psychotic features; unspecified anxiety disorder; unspecified schizophrenia spectrum and other psychotic disorder; antisocial personality disorder; and alcohol use disorder, severe, in early remission. The patient was fully adherent to his prescribed quetiapine. This patient had a history of treatment at the 3CMS, MHCB, and, preceding this ICF admission, the acute levels of care.

The patient was seen by a psychiatrist on May 7, 2024. Despite not using the initial assessment form in EHRS, the patient's history and current status were documented. The psychiatrist provided diagnoses of major depressive disorder, antisocial personality disorder, and substance use disorders; however, they noted that the patient's previous psychotic symptoms were attributable to substance use. A formal initial psychiatric assessment was documented on May 14, 2024 but the patient refused to engage in the assessment. This psychiatrist documented a diagnosis of unspecified schizophrenia and noted a justification for his continued placement at the ICF level of care.

An initial IDTT meeting was held on May 7, 2024 with the patient and required disciplines present; however, neither the patient's assigned PC nor the assigned psychiatrist who had completed the initial contact with the patient were present. The reason for the patient's admission to the ICF level of care was not documented. The patient's custody status was unclear, as he was documented as maximum custody yet the clinical summary noted that the patient had been moved to non-maximum PIP status on March 21, 2024. A review of other documentation in the record revealed that the patient returned to maximum security PIP status in April 2024, yet there was no mention of this in the documentation. Regardless, the treatment team recommended a single cell and there were no goals or interventions documented to address the patient's aggression toward others. Treatment outcome expectations (TOEs) were listed, but no treatment plan was created. The patient was seen two days later for a second IDTT and then at least monthly thereafter. There was a 7-day IDTT documented in the record on June 18, 2024, the rationale for which was not clear; however, it appeared to be related to the patient's transfer to non-maximum status. None of the IDTT documentation included a treatment plan other than listing the TOEs without information about progress. There was no information provided as to the interventions being offered to the patient to target his needs or to assist in achieving TOEs.

There was no evidence that an initial PC assessment was completed with the patient; however, an initial SRE was completed on May 10, 2024 although the patient refused to participate in the

evaluation. On May 15, 2024, the patient was seen by a psychologist who listed interventions to be provided to the patient, yet these were not incorporated into the patient's treatment plan. Routine individual PC contacts were not consistently offered weekly while the patient was maximum security status but improved in timeliness, evidence of interventions, and patient response once he transferred to non-max status.

While psychiatric contacts were provided routinely, early documentation was inadequate as it mostly consisted of the same content being copied from note to note with only minimal updates and no documentation of patient's progress or lack thereof. Once the patient was transferred to non-maximum custody status, psychiatric documentation improved and was adequate.

Documentation varied in terms of what diagnoses were provided for the patient. Most mental health professionals noted the patient's diagnosis of a major depressive disorder, but acknowledgement of a psychotic disorder and anxiety disorder varied throughout the record. Diagnostic clarification was needed in this case.

Most groups offered to the patient were facilitated by psychiatric technicians and nurses and were only peripherally related to the patient's identified needs (e.g., life skills). Documentation did not include descriptions of the groups nor the patient's response to the content. There were psychologist and social worker-facilitated groups offered as well; however, documentation did not provide descriptions of what these groups covered in terms of content other than a DBT group which was offered to the patient on May 29, 2024. Unfortunately, the DBT group was only offered to the patient once.

**Findings**

The overall mental health treatment provided to this patient was inadequate. While there was evidence of quality individual treatment sessions being provided by the patient's PC and psychiatrists once he transferred to the non-max unit in June 2024, the other services provided to the patient were not adequate. There was no treatment plan created for the patient and there was no information about the patient's treatment progress over time. The patient's treatment plan on June 6, 2024 noted that the treatment team was continuing to recommend single status and no change in the patient's max status, yet on June 14, 2024, he was transferred off of max status without rationale in any clinical documentation. Despite the patient's identified needs of depression, anxiety, history of suicide attempts, hallucinations, aggressive behavior, poor coping, paranoia, and psychosis, groups to address these issues were not provided to the patient other than a single session of DBT in May 2024. Diagnostic clarification was needed.

**Patient L**

This 29-year-old male patient's record was randomly selected to assess the quality of care provided at the ICF level of care at CHCF. This patient was provided with multiple diagnoses, including unspecified schizophrenia spectrum and other disorder; major depressive disorder, recurrent episode, with psychotic features; trichotillomania; borderline personality disorder; antisocial personality disorder; and adjustment disorder, with mixed disturbance of emotions and conduct. The patient was receiving medications under a PC2602 and was fully adherent to his

prescribed regimen which included aripiprazole, buspirone, fluoxetine, olanzapine, and valproic acid. This patient had a history of treatment in the 3CMS, EOP, ICF, and just preceding this ICF admission, the acute levels of care.

On the day of arrival, the patient was seen by a psychiatrist who documented a brief transfer note with little information beyond noting a brief mental status and no changes in the patient's medications. A superficial initial psychiatric assessment was completed on February 14, 2024. An initial IDTT was held on February 14, 2024 with the patient present; however, neither the PC nor psychiatrist were assigned to the patient and neither had met the patient since he arrived on the unit. The patient's risk for suicide were noted to be high for chronic risk and moderate for acute risk based on an assessment that had not been updated since November 9, 2023. There was contradictory information in the risk section of IDTT documentation. The reason for admission to the ICF level of care was noted as "to continue working on his mental health" and there were TOEs listed, most of which had been met by the patient and not updated. There was an IPOC related to danger to others initiated in November 2023 yet no treatment plan. The following week, another IDTT meeting was held with an alternate PC and psychiatrist present, along with the patient. New TOEs were noted in the clinical summary section without any interventions nor a treatment plan included in the documentation. Subsequent IDTT meeting were held monthly; however, the assigned PC and psychiatrist changed frequently. In April 2024, IDTT documentation noted that the patient had returned to APP level of care without explanation. IDTT documentation showed poor continuity across meetings, with no reference to patient progress, fluctuating treatment targets, and an absence of evidence of interventions having been provided to the patient beyond medications. In May 2024, a pre-release planning IPOC was initiated but no plan was put in place to address the patient's upcoming release in August 2024. On July 31, 2024, the IDTT noted that the patient was placed on solo dayroom and yard given inappropriate touching of another patient, yet no goals or interventions were listed to address this concern. No treatment plan was developed for the patient during the review period, his suicide risk assessment was not updated, and contradictions in documentation were not acknowledged or resolved. Strangely, IDTT documentation noted that the patient was not fully adherent to his medication regimen and made no mention of his PC2602 order. A review of EHRS noted that the patient's adherence to his prescribed medications ranged from 98.2 percent to 100 percent during the reporting period making it unclear how the IDTT determined the patient had poor medication compliance.

Individual PC sessions were documented most weeks during the reporting period and evidenced interventions being provided to target the patient's needs. Weekly psychiatric contacts were completed by a number of different psychiatrists, with documentation noted as being mostly adequate and focused on medication effectiveness and side effects. The patient was seen by a pre-release planner for the first time on June 11, 2024. Housing placement was confirmed for the patient yet there was no information about mental health appointments being arranged. The patient reported an intention to stop taking his medications and discontinue his mental health care upon release.

The patient attended most groups offered to him which were primarily facilitated by nurses, rehabilitation therapists, and psychiatric technicians. The patient was offered an acceptable amount of structured therapeutic activity.

**Findings**

The overall mental health treatment provided to this patient was inadequate. Reasons for inadequacy included: an absence of adequately documented treatment planning; frequent changes in primary clinicians and psychiatrists; inadequate pre-release planning; and generic group offerings. That being said, individual PC and psychiatric contacts focused on the patient's needs and symptoms with the use of evidence-based interventions and adequate documentation of the patient's response to treatment.

**Patient M**

This 22-year-old male patient's record was selected for review of the quality of care provided within the ICF at CHCF. The patient was provided with a diagnosis of bipolar I disorder, current or most recent episode manic, mild. He was not prescribed any psychotropic medication. This patient had a history of multiple MHCB admissions, from which the most recent was transferred to CHCF-ICF on June 13, 2024.

An initial psychiatric assessment was completed on the day of his arrival and was adequate despite the fact that the patient refused to exit his cell for a confidential interview. The psychiatrist incorrectly documented that the patient was admitted to the APP level of care. An initial IDTT was held the following day with required staff and the patient present; however, the psychiatrist who completed the initial assessment was not in attendance. IDTT documentation was adequate and included treatment goals and evidence-based interventions; however, there was no mention of groups or medications in the treatment plan despite these interventions being mentioned as part of the treatment goals. The patient was not housed in his LRH and one of the treatment goals appeared to address his behavior affecting this status but was not explicitly stated. Subsequent IDTT documentation was inadequate. The clinical summary completed in July 2024 was copied from the June 2024 clinical summary and retained exact quotes from the patient. There was passing reference to the fact that the patient had been naked in his cell without any change in a plan of care or specifics about further assessment needed. There was no mention of patient's progress toward treatment goals nor level of engagement in treatment despite the fact that the patient was refusing to attend almost all groups and was rarely seen out of his cell secondary to environmental and custody concerns on the unit.

An admission SRASHE was completed but the patient refused to engage; thus, the content was taken entirely from a record review. Individual PC sessions were documented weekly and the content was marginally adequate in that interventions were vaguely mentioned yet there was no mention of treatment goals or treatment progress. The content of documentation was markedly similar week to week. On June 27, 2024, the PC "cleared" the patient for full programming. It was not clear why this was not done during an IDTT meeting. The patient was offered groups beginning on June 29, 2024 facilitated by nursing staff and psychiatric technicians. The patient refused most groups offered to him. Of note, a number of groups and individual sessions were not held secondary to environmental and custody issues on the unit.

An initial PC assessment was completed by a social worker who was not the patient's assigned PC on July 9, 2024 and was wholly inadequate. It was copied almost entirely from previous assessments and included no updated clinical information beyond a mental status examination.

Routine psychiatric contact were completed primarily by the patient's assigned psychiatrist, but occasionally by others. Documentation did not routinely indicate whether or not the patient was seen cell front or in confidential space yet upon review of data in EHRS, it was noted that most contacts were completed at cell front. The content of documentation was poor and appeared to rely mostly on the patient's self-reported lack of symptoms with little evidence of collateral information or observations beyond brief interactions with the patient. No psychiatric contacts were documented between July 16 and July 23, 2024 other than the patient being seen in IDTT. This was concerning as the patient had been observed naked in his cell for days, throwing water under his door, and noticeably agitated beginning on July 14, 2024. The covering psychiatrist who saw the patient on July 16th made no mention of the fact that he had been naked in his cell for two days. When the patient was seen by his assigned psychiatrist on July 23, 2024, there was mention of the fact that the patient had been observed to be exhibiting manic like symptoms by "floor staff" but noted that the patient presented well with "professionals" and no plan was enacted other than ongoing monitoring.

**Findings**

The overall mental health treatment provided to this patient was inadequate. The patient was admitted for manic symptoms with goals to address socialization skills and management of his symptoms. There was no evidence of any interventions being provided to address these needs beyond groups being offered which the patient refused. The IDTT did not mention nor address the patient's refusals, nor the manifestation of manic symptoms which emerged in mid-July. Psychiatric contacts were inadequate due to the fact that they were held at cell front and relied almost entirely on the patient's self-report. IDTT documentation was limited and inadequate.

**Patient N**

This 32-year-old male patient's record was randomly selected to assess the adequacy of treatment at the ICF level of care at CHCF. The patient was provided with diagnoses of schizoaffective disorder, bipolar type; borderline personality disorder; antisocial personality disorder; and opioid use disorder. He was fully adherent to his prescribed clozapine and partially adherent to his prescribed desvenlafaxine. He transferred from the MHCB to the APP level of care on May 2, 2024 and was transferred to the ICF level of care at CHCF on June 11, 2024.

This patient has been incarcerated since 2014 and has been treated at all levels of care within CDCR (i.e., 3CMS, EOP, MHCB, APP and ICF). He spent most of his incarceration in an inpatient setting, having spent over six years at either the APP or ICF levels of care. Most recently, he was discharged from the ICF level of care to EOP in April 2024, only to be admitted to the MHCB after nine days.

An initial psychiatric assessment was completed on June 11, 2024 at cell front due to patient refusal. The assessment was adequate given the non-confidential nature of the contact. A

SRASHE was completed the following day and was adequate, providing high ratings for both chronic and acute risk for suicide which were justified by the patient's history and current presentation. Of concern, a safety plan was not initiated despite a clear clinical indication to begin the process. An initial IDTT meeting was held with required staff on June 13, 2024. The patient refused to attend; however, the content of the IDTT documentation was adequate. There were relevant and specific treatment goals as well as evidence-based interventions to achieve those goals. An initial social worker assessment was completed on June 20, 2024 yet was comprised mostly of information from previous documentation. Similarly, an initial recreational therapy assessment was completed on June 24, 2024 with no evidence of updated information.

Over the following month, the patient was offered weekly routine sessions with a psychiatrist and nursing-led groups a few times a week. There was no evidence of any contact with his PC nor of therapeutic interventions being provided in keeping with the treatment plan. The monthly IDTT meeting on July 18, 2024 included no information about the patient's progress toward treatment goals, engagement in groups, or medication compliance. Only a description of the patient's presentation during the meeting was documented. The only PC contact was held with the patient on July 31, 2024 and was adequate.

**Findings**

The overall mental health treatment provided to this patient was inadequate. There was no evidence that treatment was provided to the patient beyond weekly psychiatric medication monitoring and a few nursing groups per week. Initial social work and recreational therapy assessments were not adequately updated and no safety plan was initiated despite the patient's long history of suicidal behaviors and high risk for suicide.

**Patient O**

This 51-year-old male patient's record was randomly selected for review of the quality of care provided at the ICF level of care at CHCF. This patient was provided with diagnoses of borderline personality disorder, antisocial personality disorder, and schizoaffective disorder, bipolar type. He was prescribed haloperidol decanoate, lithium, mirtazapine, quetiapine, and benztropine and was receiving medications under a PC2602 order. He was fully adherent to most of his medications, but occasionally refused his lithium and mirtazapine. As there was no back-up medication for lithium, the patient received verbal prompting, but not involuntary injectable medication. The patient was most recently admitted to the ICF at CHCF on June 27, 2024 following discharge from the acute inpatient setting. The patient transferred to CHCF on maximum security status and under enhanced observation status following a recent medication adjustment.

This patient was incarcerated a number of times beginning in 1992 and was first enrolled in the MHSDS in 1996. During previous periods of incarceration, he was primarily treated at the 3CMS level of care with brief placement at the EOP and MHCB levels of care; however in 2003 the patient was admitted to Atascadero State Hospital (ASH) where he remained for two and a half years and then returned after only two months and remained there until his sentence was completed over seven months later. The patient's current period of incarceration began in 2014

and since that time he has been treated at the EOP, MHCB, APP and ICF levels of care but has primarily remained in an inpatient setting. His current inpatient placement began in 2019 and has included treatment at the APP and ICF levels of care.

An initial psychiatric assessment was completed on the day of his admission and was adequate, reflecting a comprehensive record review. It was noted that the patient was under enhanced observation and was being assigned to solo programming due to his risk of assaulting others. The patient was also noted as having an extensive history of self-harm. A social worker interviewed the patient at cell-front and engaged in a clinician-to-clinician contact with the patient's former psychologist. An initial IDTT was held on June 28, 2024 with the patient and required staff in attendance. While the documentation included TOEs and an IPOC for danger to self, the treatment plan was not updated and included a goal initiated in February 2024 that had already been achieved. There was a vague statement about stability being necessary for the patient to discharge to a lower level of care and the need for treatment regarding danger to himself and others. The IPOC included a number of evidence-based interventions including DBT skills and individual therapy but appeared to have been carried forward from previous treatment plans. A nursing progress note mentioned that the patient was no longer on 1:1 status and was enrolled in solo programming, but there was no mention of this in the IDTT documentation. Additionally, the IDTT documentation noted that the patient was being maintained on single cell status due to his risk of victimization, yet all other documentation indicated that it was due to the fact that he was at risk of harming himself and others. Subsequent IDTTs included minimal updates, no discussion of the patient's progress toward goals or level of engagement with treatment, nor a discussion of the interventions provided to the patient beyond noting his level of medication compliance. Fortunately, psychiatric and nursing progress notes included discussion of the patient's progress with regard to treatment levels and attendance in groups.

An initial SRASHE was completed on June 29,2024 by a covering psychologist. The SRASHE was completed at cell front secondary to issues on the unit (i.e., breakfast being served and "closed custody") and was adequate given the limited ability to interview the patient. On July 2, 2024 there was a note from the PC noting that the patient's previous treatment team met with the PC to discuss the patient's care. The PC then noted she met with the patient and introduced herself, despite documentation indicating that they had met during the patient's IDTT meeting a few days earlier. On July 9, 2024 there was documentation in the record that that patient had been kicking his door and possibly engaged in head-banging. Emergency medications were ordered but the patient refused to leave his cell for medication administration and an alarm was activated. It was unclear from the record if force was used, but the patient received his medications and was placed on 1:1 status. On July 11, 2024, the patient again engaged in self-injury and force was used to extract the patient from his cell in order to stop him from banging his head on the door. He later lunged at his treating psychiatrist but was restrained by officers. Emergency medications were given to the patient. A consult with the Positive Behavior Support Team (PBST) was held on July 12, 2024 with a plan for a full PBST assessment of the patient to be conducted the following week. On July 16, 2024, the psychiatrist documented that there was no one sitting outside the patient's cell observing him, despite the patient remaining on 1:1 status. A meeting occurred on July 17, 2024 in a confidential setting and included only a brief description of a discussion with the patient about his history and his self-injury as well as an

assessment of executive functioning. A plan was put in place to see the patient monthly for skill building (e.g., distress tolerance and emotional regulation). The patient again engaged in head-banging on July 22, 2024

Routine psychiatric and PC contacts were held weekly and evidence adequate intervention. PC contacts were sporadic and mostly held at cell front secondary to safety concerns or the patient not wanting to leave his cell. There was minimal evidence of treatment interventions being provided by the PC. Groups were offered a few times per week by the nursing staff and the patient attended on occasion when he was not on 1:1 status. It was not clear from the group documentation whether the patient attended with other patients or by himself.

**Findings**

The overall mental health treatment provided to this patient was inadequate. While there were documented efforts of attempting to address the patient's danger to himself through consultation with the PBST, there was no evidence that the patient's IDTT was attempting to provide treatment to reduce his self-injury other than through the use of medication. Treatment planning was inadequate and IDTT documentation made no mention of the patient's status, functioning or a plan for treatment. It was also concerning that the patient was not being directly observed despite being on 1:1 status on July 16, 2024.

**Patient P**

This 62-year-old male patient's healthcare record was reviewed to assess the quality of ICF care provided at CHCF. The patient was provided with a diagnosis of schizophrenia and was prescribed clozapine, haloperidol, and benztropine and was fully adherent. During the reporting period, the patient was being treated at the ICF level of care at CHCF where he had been since August of 2023.

This patient has been incarcerated since 1979 and has been treated at the EOP and inpatient levels of care including APP, ICF, and DSH placements. Most of his inpatient placements have lasted for years.

Monthly IDTT meetings were held with required staff in attendance. The patient occasionally attended. Documentation included relevant updates regarding patient functioning, progress toward treatment goals, and ongoing treatment needs; however, starting in April 2024, documentation no longer reviewed each treatment goal specifically with relevant progress being noted. It appeared that the patient's assigned PC changed at that time. In April 2024, the IDTT noted that a referral to DSH may be indicated as the patient's level of functioning remained unchanged with ongoing disorganized thinking, delusions, paranoia, and inability to communicate effectively. A referral was made in May 2024 and the patient was removed from single cell status in an effort to move him to functioning at his LRH status. IDTT documentation noted that the treatment team was not aware of why the patient had not yet been transferred to DSH. Of note, the patient was transferred to DSH on September 26, 2024, nearly five months after being referred.

Early in the reporting period, weekly PC documentation included clinical interventions, the use of music during sessions to assist with brightening the patient's affect, and weekly review of his progress toward treatment goals. When his assigned PC changed in April 2024, documentation decreased in specificity and evidenced only status notes with limited review of patient functioning and no discussion of treatment goals. There were no PC contacts documented between June 13, 2024 and August 8, 2024 without explanation.

Weekly contacts were held with the patient's assigned psychiatrist with only a few occasions where the patient was seen by a covering psychiatrist. Documentation was adequate and evidenced review of the patient's symptoms, mental status, medication compliance, and functioning. There was no rationale provided in psychiatric notes as to why the patient's transfer to DSH was delayed.

The patient was offered groups in excess of ten hours per week, all of which were facilitated by nursing staff. The patient occasionally refused to attend groups but often did and evidenced engagement.

**Findings**

The mental health treatment provided to this patient was adequate; however, there were concerns that when the patient's PC was changed in April 2024, documentation and contact frequency greatly decreased to the point of non-compliance with required timeframes. It was also concerning that the patient did not transfer in a timely fashion to DSH.

**Patient Q**

This 29-year-old male patient's record was to reviewed to assess the quality of care provided at CHCF-ICF. The patient was provided with diagnoses of schizoaffective disorder, bipolar type and unspecified personality disorder. He was prescribed haloperidol, olanzapine, divalproex sodium, and citalopram and was fully adherent under a PC2602 order. He transferred to CHCF on March 6, 2024 after a brief placement at the MHCB level of care.

This patient had a history of treatment at all levels of care.

An initial SRASHE was completed upon admission and was comprehensive, resulting in ratings of moderate chronic risk and low acute risk with adequate rationale. An initial psychiatric assessment was completed on the same day and was adequate; however, it was not completed by the patient's assigned psychiatrist. The following day, an initial IDTT meeting was held with required staff present but the patient refused to attend. IDTT documentation acknowledged that the patient was assigned maximum security status but would be released from that status as he had no recent RVRs. The TOEs created when the patient was placed at the ICF level of care in February 2024 were included in the documentation but no updates were documented and no interventions were listed. The patient's LRH was noted to be multi-person dorm. Subsequent IDTT meetings were held monthly and discussed how the patient began attending individual sessions with his assigned clinicians but refused to attend groups with other patients. Despite identifying a need for socialization, no treatment plan was developed for the patient to address

this nor was there any reference to the TOEs. There was no discussion of any interventions being provided to the patient other than medications.

The patient was not seen weekly by his PC and contacts did not evidence the use of any treatment interventions with the patient or made reference to any treatment goals, other than a single cell-front contact where the PC mentioned that automatic negative thoughts were discussed with the patient. Routine psychiatric contacts were offered at least once per week but typically more often and many were held at cell front due to patient refusal. Psychiatric contacts were adequate. The patient was offered ten hours or more of groups weekly but refused most of what was offered by nursing and recreational therapy staff.

**Findings**

The overall mental health treatment provided to this patient was inadequate. There was no treatment plan created for the patient to address his functioning or his lack of program engagement. The only interventions offered to the patient were medications and non-specific groups targeting coping and leisure skills. PC contacts did not occur as required and evidenced little to no treatment interventions.

**Patient R**

This 60-year-old male patient's record was selected to assess the quality of ICF care provided at CHCF. He was provided with a diagnoses of schizophrenia and schizoaffective disorder, bipolar type. The patient was prescribed haloperidol decanoate, olanzapine, venlafaxine, bupropion, and gabapentin under a PC2602 order and was fully adherent. He arrived at the ICF at CHCF on April 21, 2021.

The PC2602 order had been in place since 2019 and was initiated secondary to grave disability and the patient's dangerousness toward others. The patient had a history of treatment at the 3CMS, EOP, and ICF levels of care.

Monthly IDTT meetings were held during the reporting period. Required staff were present but the patient refused to attend every meeting. IDTT documentation was inadequate as it included a list of TOEs without any interventions. From March through July, 2024 there were no changes to the content of the IDTT documentation other than the date and the list of participants. IDTT documentation noted that the patient was not participating in any programming and was not attending to his ADLs, yet no interventions were listed to address these issues other than medications, which were noted to be ineffective in assisting the patient.

Psychiatric contacts were offered to the patient weekly during the reporting period, but he refused to leave his cell for the sessions. His assigned psychiatrist attempted to assess and engage the patient at cell front. Documentation was adequate given the nature of the contacts and there was evidence of medication adjustments to address the patient's psychiatric needs and side effects.

While contacts with the MHPC were offered to the patient most weeks during the reporting period, the patient refused to exit his cell and all contacts were completed at cell front. The content of documentation was mostly identical week after week and noted no concerns with functioning or hygiene, which conflicted with IDTT documentation and psychiatric documentation which noted impaired ADLs, active psychosis, paranoia, delusions, depression, and a resting tremor. There was no evidence of interventions being attempted to engage the patient in treatment other than encouragement.

The patient was offered 10 hours of solo programming groups most weeks during the reporting period but refused to attend. Groups were offered by psychiatric technicians and recreational therapists.

Of note, utilization management (UM) minutes revealed that this patient's case had not been reviewed by the UM committee during the reporting period. Further, the patient's case was identified by the Positive Behavioral Support Team (PBST) psychologist as possibly requiring consultation in 2023, yet no consultation was provided to assist in the treatment of this patient.

**Findings**

The overall mental health treatment of this patient was inadequate. There was no treatment plan developed to address the fact that the patient was not leaving his cell, was not engaging in treatment, had seriously poor hygiene, and was actively psychotic. There was no evidence of consultations being requested to assist in the treatment of this patient. Further, MHPC documentation was deficient, including information that was unchanged from week to week and included findings that were inconsistent with other providers' documentation as well as documentation by the IDTT.

**Patient S**

This 31-year-old male patient's healthcare record was reviewed to assess the ICF care at CHCF. The patient was provided with diagnoses of borderline personality disorder; schizoaffective disorder, depressive type; posttraumatic stress disorder (PTSD); and compulsive exhibitionism. He was fully adherent to his prescribed haloperidol, olanzapine, and benztropine and was mostly adherent to his prescribed sertraline and valproic acid. He was also prescribed diphenhydramine as needed. The patient was prescribed medications under a PC2602 order due to his dangerous toward others and grave disability. He was admitted to the APP level of care on March 6, 2024 and transferred to the ICF level of care at CHCF on May 30, 2024.

This patient had a history of treatment at all levels of care.

On the day of arrival, the patient was seen for an initial psychiatric assessment which was adequate. The following day, an initial IDTT meeting was held with required staff and the patient present. Unfortunately, rather than pulling information from the SRASHE completed prior to the patient's discharge from APP on May 21, 2024, the IDTT pulled in a SRASHE dated July 27, 2023 which included out of date information and failed to adequately incorporate the patient's most recent levels of assessed risk. TOEs, IPOCs, and a written treatment plan were

documented, the latter of which appeared to have been developed while the patient was at the MHCB level of care three months prior with no updates. Goals were related to decreasing self-injurious behaviors, suicidal ideation, ratings of depression, and indecent exposure with appropriate interventions. The patient's IDTT noted that his LRH was unlocked dorm, yet the discharge summary from his APP team noted a recommendation of single cell given the patient's history. This was not recognized by the IDTT.

An admission SRASHE was completed on June 1, 2024. The content was adequate despite the patient refusing to engage in the evaluation. There was no evidence that an initial MHPC assessment was completed with the patient. An IDTT meeting held on June 6, 2024 included required staff, other than an alternate MHPC, and the patient. Documentation reviewed the patient's status and current level of participation in treatment.

The patient engaged in self-injurious behavior on June 8, 18, and 27, 2024as well as on July 3, 2024. During an IDTT meeting on July 3, 2024, a new set of treatment goals were included in the clinical summary narrative, without interventions being listed to support the goals. The IPOCs and treatment plan were not updated to reflect the changes. While the documentation mentioned the patient's self-injurious behavior on July 3, 2024, there was no mention of the three prior incidents. The routine IDTT meeting on July 31, 2024 was held without the patient in attendance due to "custody related factors." Documentation did not include any discussion of patient functioning, progress toward goals, participation in treatment, nor the three incidents of self-injurious behavior that occurred between the last IDTT meeting and the current meeting. None of the patient's IDTT documentation included updated SRASHE or LRH information.

While adequate routine psychiatric contacts were documented at least weekly, there was no evidence of MHPC contacts with the patient until June 10, 2024 when he was seen at cell front after the patient engaged in self-injury. His first individual session with his MHPC was June 12, 2024 and while it included a review of the patient's functioning and mental status, there was no evidence of interventions being provided other than encouragement to use coping skills. Subsequent weekly contacts revealed similar documentation. There was evidence of a CBT group being provided to the patient on July 1, 2024 by a psychologist. Otherwise, the patient was offered approximately 15 to 16 hours of group each week, facilitated by psychiatric technicians, recreational therapists, and nurses. Documentation of groups was largely void of information regarding the content of the group or how the group was related to the patient's treatment goals.

**Findings**

The overall mental health treatment provided to this patient was inadequate. There was no explicit identification of the interventions that were to be provided to the patient to address his treatment goals other than his medications. Treatment offered to the patient, whether in groups or individually, did not demonstrate the use of evidence-based interventions to address the patient's needs, including multiple incidents of self-harm. Despite updated suicide risk assessments being documented in the patient's record, none were recognized by the treatment team. The patient's LRH was not discussed nor were differences in recommendations acknowledged by the current IDTT.

**Patient T**

This 52-year-old PIP patient's healthcare record was reviewed to assess the quality of acute care provided at the CHCF-PIP. The patient was provided a diagnosis of major depressive disorder, recurrent, severe with psychotic features. He was prescribed duloxetine, fluoxetine, hydroxyzine, melatonin, olanzapine, sertraline, and venlafaxine, with variable adherence. The patient had a history of treatment at all levels of care. He was treated at CHCF-APP from May 3, 2024 to July 11, 2024, at which time he transferred to the intermediate level of care at CSH.

The patient's medical conditions included hypertension, hyperlipidemia, diabetes, diabetic neuropathy, asthma, left shoulder pain, and a history of hepatitis C with successful treatment.

The initial psychiatric assessment was timely and confidential but did not reflect awareness that the patient had just arrived from CSH with a primary diagnosis of schizoaffective disorder, recent treatment refusal, and suicidal intent. The patient was found at high suicide risk and placed on suicide precautions with partial clothing, regular mattress, and treatment materials. Nursing staff missed the suicide precautions order for more than six hours but implemented staggered observations thereafter. Orders for suicide precautions were renewed over the next two days, and the patient was seen daily by psychiatry. Concerningly, a psychiatric progress note documented that the patient was on 1:1 watch with a safety smock and safety mattress, when none of these precautions were ordered.

An admission SRASHE was completed timely and found the patient to be at high chronic and moderate acute risk for suicide. The initial primary clinician assessment was timely, confidential, and adequate except for an incomplete mental status exam. The initial and weekly IDTT meetings occurred timely, and in most instances the assigned staff, rather than alternates, attended. The patient attended all but two IDTT meetings. Patient risk factors, behavioral alerts, advanced preferences for safety interventions, clinical summary, strengths, needs, verbalized treatment goals, readiness for discharge, and rationale for retention were documented adequately. The treatment plan was clinically appropriate with measurable goals but failed to document the date the goals were started. IDTT documentation did not track the patient's progress with respect to specific treatment plan goals or refer to the patient's participation in the STEP program. A large portion of IDTT documentation was cut-and-pasted from prior IDTT documentation. The treatment plan was not updated to reflect the patient's progress or lack thereof. Beginning with the fourth IDTT meeting, documentation referred to the need to develop a safety plan, and this comment continued through the ninth IDTT meeting. The safety plan was developed on July 10, 2024, one day prior to clinical discharge, and was minimally adequate.

The patient was followed frequently by psychiatry. Many documented psychiatric encounters occurred in the context of IDTT meetings rather than individual sessions. The assigned psychiatrist's progress notes contained minimal information, omitted rationales for diagnostic impressions and clinical decisions, and tended to find the patient free of psychotic symptoms while contemporaneous documentation reflected the presence of persistent auditory hallucinations. The patient was followed irregularly by his primary clinician, who first saw the

patient for an individual encounter 24 days after admission and did not document individual encounters for 22 days later in treatment. Primary clinician notes did not document interventions provided but recorded persistent depression, auditory hallucinations, and passive suicidal ideation. The primary clinician indicated that additional weekly sessions would be added to address these challenges. If they occurred, these sessions were not documented. The primary clinician's discharge summary noted a lack of measurable treatment progress.

Multiple changes and apparent lack of clarity accompanied the psychopharmacological interventions targeting the patient's psychotic symptoms. Without documented rationale, the patient was initially placed on a much lower dose of olanzapine than he received at CSH. The dose was then increased by a second psychiatrist, changed in timing by a third psychiatrist, and apparently misunderstood by nursing staff, who documented that the patient would receive 80 mg of olanzapine each day. Fortunately, physician orders and the medication administration record confirmed that this did not occur; instead, following an EKG showing concern, the olanzapine dose was reduced. On two subsequent occasions, a covering psychiatrist noted the patient's auditory hallucinations had not responded to this dose and indicated she was raising the dose. On the first occasion, the order was not written. The patient began receiving the higher dose just prior to transferring back to CSH. Consideration of the EKG issue was not documented by any psychiatrist after May 13, 2024.

**Findings**

The overall mental health treatment provided to this patient was inadequate.

Treatment was characterized by discontinuity of care between the discharge from CSH and admission to the CHCF-PIP, multiple changes in psychotropic medication – including an initial reduction of antipsychotic medication dosage by 87.5% – that did not result in clinical improvement, inadequate primary clinician contacts, failure to recognize and reconcile different findings on contemporaneous mental status exams, limited documentation regarding clinical and diagnostic rationales, and lack of patient ability to apply new coping skills. The patient's progress toward achieving specific treatment plan goals was not tracked, and the patient's placement in the STEP program was not documented. Consideration of an alternative antipsychotic medication in light of the patient's diabetes and EKG concerns was not documented. Nursing's failure to notice the initial order for suicide precautions for six hours and confusion about olanzapine orders were near misses. The patient's symptomatology did not appear to improve.

**Patient U**

This 55-year-old PIP patient's healthcare record was randomly selected and reviewed to assess the quality of acute care provided at the CHCF-PIP. The patient was provided diagnoses of unspecified depressive disorder, generalized anxiety disorder, bereavement, borderline personality disorder, amphetamine-type substance use disorder, and cannabis use disorder. He was prescribed buspirone and duloxetine for anxiety and depression and was adherent with these medications. Hydroxyzine was prescribed as needed for agitation. Medical conditions included enlarged prostate, and nerve and shoulder pain. He was admitted to CHCF-PIP acute care on

March 11, 2024 due to suicidal ideation and a recent deliberate overdose on spice, a synthetic drug related to marijuana.

The patient had a history of multiple suicide attempts and extensive substance use, including alcohol, cannabis, cocaine, methamphetamine, opioids, and spice. The patient had a history of treatment at all levels of care.

Initial psychiatric and initial primary clinician assessments were completed timely, in a confidential manner, and were adequate despite relying extensively on content from prior assessments. The initial primary clinician assessment was accompanied by a standardized questionnaire for depression severity, which was helpful. Admission and discharge SRASHEs were completed timely, as was a third urgent SRASHE, discussed below. SRASHEs consistently found the patient to be at high chronic suicide risk and moderate acute suicide risk. No safety plan was developed despite these findings.

Initial and follow-up IDTT meetings occurred timely and were generally attended by the patient, and all required members of the treatment team. Risk factors, preferences for safety interventions, clinical summary, patient participation in the IDTT meeting, patient strengths and needs, and a treatment plan with a measurable goal were all adequately documented. The case formulation was inadequate and did not address factors contributing to improvement. References to the STEP program ceased after the second IDTT meeting, and the treatment plan was not updated to document progress.

The assigned psychiatrist followed the patient regularly with confidential encounters. Psychiatric progress notes were largely cut-and-pasted and failed to provide a substantive rationale for retaining the patient in acute care beyond a pat phrase that the patient "was not ready yet" for discharge. Progress notes repeatedly indicated that the patient was receiving mirtazapine for sleep problems, although this medication was never ordered. Despite documentation challenges, psychiatric care appeared adequate. The assigned primary clinician followed the patient at irregular intervals, yet the first individual encounter documented was 23 days after admission and took place at cell front. During documented contacts, the primary clinician paid close attention to the patient's clinical presentation and suicidal risk, offered appropriate interventions, and established an effective rapport. The patient participated actively in groups and remained free of behavioral problems, suicide attempts, and illicit substance use.

The patient made good progress in treatment and was initially discharged to EOP care on April 24, 2024. His discharge was paused after he reported a plan to die by suicide if returned to EOP care at RJD. He subsequently told his primary clinician that he had safety concerns at RJD, but subsequently denied these. After two additional SRASHEs, a formal clinical case conference among CDCR stakeholders, CCAT, and additional individual therapy, the patient was determined to be safe for discharge. He was discharged to EOP care at RJD on June 4, 2024.

**Findings**

The mental health treatment provided to this patient was adequate.

The patient received appropriate psychiatric care that adequately addressed his anxiety and mood symptoms, as evidenced by the patient declining to increase dosages despite ongoing stress. Groups provided by recreational and rehabilitation therapists were a significant strength, as were the interventions provided by the primary clinician and the care the IDTT took to support a safe discharge, including completion of additional SRASHEs and a clinical case conference. The patient's symptoms and behavior improved. Concerns included inaccurate psychiatric documentation, gaps in the frequency with which the primary clinician saw the patient for individual encounters, and most importantly the absence of safety plan development.

**Patient V**

This 57-year-old PIP patient's healthcare record was randomly selected and reviewed to assess the quality of acute care provided at the CHCF-PIP. The patient was provided diagnoses of unspecified anxiety disorder and unspecified schizophrenia spectrum and other psychotic disorder. Under a PC 2602 order for involuntary medication treatment due to grave disability, he was prescribed amantadine, lorazepam, mirtazapine, and olanzapine, with back-up intramuscular injections of lorazepam and olanzapine for refusal of oral medications. The patient was transferred from MHCB care at SQRC to CHCF-PIP acute care on February 21, 2024, and discharged to intermediate care on April 18, 2024.

The patient was generally adherent with oral olanzapine but required injections twice due to medication non-adherence, consistently adherent with mirtazapine, and intermittently adherent with amantadine and lorazepam. Medical conditions included unintended weight loss and dyslipidemia.

The patient had a history of multiple psychiatric hospitalizations and severe psychosis with catatonia, but no history of suicide attempts, self-injurious behavior, or illicit substance use. He had been treated at all levels of care. His primary language was Spanish, and this may have been his only language; documentation was unclear.

The initial psychiatric assessment was completed timely but was inadequate, amounting to little more than a progress note and failing to provide a thorough assessment of the patient's clinical presentation and treatment needs, a diagnosis, or a patient-specific plan of care. The initial primary clinician assessment was completed timely and adequately but without patient input, as the patient was unable or unwilling to participate.

The initial and weekly IDTT meetings occurred timely but were frequently attended by alternates for assigned staff. One third of the IDTT meetings were held without the patient. Advanced preferences for safety interventions, the clinical summary, patient's participation in IDTT meetings and the STEP program, strengths, and verbalized treatment goals were adequately documented. Risk factors and behavioral alerts were inadequately documented, and the case formulation was limited, failing to address potential language or cultural barriers. The treatment plan focused on catatonia and psychosis and was clinically appropriate, but long-term goals were not measurable. The treatment plan was updated to document the patient's progress. Discharge criteria and rationale for retention at the acute level of care were poorly documented.

While psychiatry saw the patient regularly, during the first three weeks of acute care, six psychiatrists either saw the patient or provided orders for the patient's care; the assigned psychiatrist did not see the patient until day 20 of the acute care stay. Lorazepam was carefully titrated to discontinuation while monitoring for the reemergence of catatonia. The unspecified psychotic disorder diagnosis was resolved, and at discharge the patient was diagnosed with schizoaffective disorder, bipolar type. The patient frequently refused confidential settings for his primary clinician encounters and was seen at cell front; he also refused several psychiatric contacts. Primary clinician progress notes were thorough and thoughtful, but it appeared that team members were not communicating their findings to each other and that the team did not have a clear understanding of the patient's symptoms beyond catatonia. The patient provided inconsistent reports regarding his symptoms. Depression was first documented by a psychiatrist on March 5, 2024. On April 4, 2024, the primary clinician documented the presence of significant depression that was interfering with group attendance and group participation, along with command auditory hallucinations that included voices that told him to punch himself. The patient also reported significant depression during an IDTT meeting on that date, which was attended by an alternate to the assigned psychiatrist. However, on April 16, 2024, two days prior to discharge, the assigned psychiatrist indicated that the patient's report of depression was new, and for the first time an antidepressant medication was added to the patient's regimen.

The patient declined to attend most groups, and this pattern did not improve during his stay. Admission and discharge SRASHEs indicated that the patient's acute risk of suicide rose during acute care, from low at admission to moderate at discharge. A safety plan was not developed.

**Findings**

The overall mental health treatment provided to this patient was inadequate.

While the patient's catatonia was adequately addressed, additional symptoms including psychosis and depression were not Psychiatric documentation did not address medication non-adherence. The patient's depression worsened by discharge, as evidenced by command auditory hallucinations telling him to kill himself and an increased acute risk for suicide. The patient was discharged two days after an antidepressant was started, allowing inadequate time for stabilization, and a safety plan was not developed.

**Patient W**

This 28-year-old maximum custody PIP patient's healthcare record was randomly selected for review in order to assess the quality of acute care provided at CHCF-PIP. The patient was provided diagnoses of unspecified schizophrenia spectrum and other psychotic disorder, unspecified anxiety disorder, unspecified depressive disorder, amphetamine-type substance use disorder, and opioid use disorder. After a PC 2602 order for involuntary medication treatment was issued, he was prescribed clonidine, divalproex sodium/valproic acid, haloperidol, and olanzapine. The patient was adherent with these medications except scheduled olanzapine. Additional dosages of clonidine, haloperidol, hydroxyzine, and olanzapine were prescribed on an as-needed basis for severe agitation and anxiety, and he used as needed hydroxyzine and

olanzapine frequently. Through the ISUDT he was prescribed buprenorphine-naloxone for opioid use disorder. Medical conditions included asthma and chronic back and shoulder pain.

The patient was admitted from MHCB care at COR to CHCF-PIP acute care on February 12, 2024, and clinically discharged to CHCF-PIP intermediate care on May 7, 2024. Upon admission to acute care, he was placed on suicide precautions with partial issue. He remained on suicide precautions for eight days and was seen daily by psychiatry during this time.

The patient had a history of two suicide attempts, the most recent of which occurred on January 23, 2024, requiring treatment in the ICU setting. After discharge, he was placed in MHCB care at COR prior to admission to CHCF-PIP. He had a history of treatment at the 3CMS, EOP, and MHCB levels of care.

The initial psychiatric and initial primary clinician assessments were completed timely in confidential settings. Both were adequate, although transcription or typing errors characterized the psychiatrist's documentation in this assessment and subsequent progress notes. The initial and weekly IDTT meetings also occurred timely and were usually attended by the assigned staff, with the patient frequently declining to attend. Risk factors, warning signs, advanced preferences for safety interventions, a clinical summary, and the patient's participation in the STEP program, in IDTT meetings, and in treatment generally were adequately documented. The treatment plan failed to document the date goals were established, focused exclusively on interventions that would be provided by the primary clinician and omitted reference to psychiatric care, and was not updated to document the patient's progress or to adjust treatment after clinically significant events. The case formulation failed to address psychotic symptoms or suicidal risk. IDTT documentation included the team's determination not to recommend a referral of the patient to the ICC for consideration of removal of MAX custody status, and the patient remained on MAX status for duration of his acute care at CHCF-PIP.

The patient was followed closely by psychiatry throughout his acute care stay. Almost all contacts took place at cell front, with documentation that the patient was refusing to leave his cell. Psychiatric progress notes on February 18 and February 28, 2024 contained difficult to understand language and grammar. The patient exhibited significant levels of violence towards staff and property destruction while psychotic, with subsequent emergency PC 2602 orders obtained. Because the patient demonstrated a propensity to sleep through the day and to request higher doses of medications to help him sleep, the assigned psychiatrist carefully limited dosages, successfully stabilized the patient, and encouraged the patient to participate in other forms of treatment.

The primary clinician first offered an individual session 24 days after the patient's arrival on the unit. Thereafter, the patient refused most individual contacts with the primary clinician. Primary clinician progress notes were thorough and helpful. The patient also refused all but a few group sessions; documentation made clear that recreational, rehabilitation, and nursing staff were coming to his cell to invite him to group on a frequent basis. Admission and discharge SRASHEs found the patient to be at high chronic risk and medium acute risk for suicide. The patient was issued several RVRs for property destruction and gassing staff; mental health assessments for these RVRs repeatedly found that the patient's mental illness contributed to his

behavior and recommended that he not be isolated and instead be placed at the ICF level of care. At transfer to intermediate level of care, the patient was diagnosed with schizoaffective disorder, bipolar type. The patient's insight into his mental illness and recent suicide attempt remained limited, and a safety plan was not developed.

**Findings**

The overall mental health treatment provided to this patient was inadequate.

The treatment plan did not adequately address the patient's treatment needs or the key interventions that were used to treat them and was not adjusted following his violent behavior. Concerns included the incoherence of some psychiatric documentation, a significant delay in starting individual treatment with the primary clinician, and the patient's suicide risk being undiminished at discharge. No safety plan was developed, and the reasons why the patient failed to engage in most programming were inadequately investigated and addressed. Strengths in this patient's treatment included the caution the team used in ensuring the patient's safety when he first arrived on the unit, the pursuit involuntary medication, and the care exercised in avoiding over-sedation.

**Patient X**

This 39-year-old PIP patient's healthcare record was reviewed to assess the quality of acute care provided at the CHCF-PIP. The patient was provided diagnoses of major depressive disorder, recurrent, severe, unspecified depressive disorder, and antisocial personality disorder. He was prescribed fluoxetine and mirtazapine and was medication-adherent. Hydroxyzine and olanzapine were ordered as needed for anxiety and agitation, but he did not ask for them during his acute care stay. Through the ISUDT, he was prescribed buprenorphine-naloxone for opioid use disorder. Medical conditions included hypertension, asthma, chronic left leg pain with resultant use of a cane, and seizure disorder.

Seven suicide attempts were listed in his health record. He previously received 3CMS, EOP, MHCB, and ICF level of care.

The patient was admitted to CHCF-PIP acute care on April 15, 2024 and discharged to EOP care at CHCF on June 22, 2024. The initial psychiatric assessment was timely and adequate, although it relied heavily on prior documentation and did not indicate whether it was conducted in a confidential setting. According to the assessment, the patient was placed on every 15-minute nursing safety checks with full issue of clothing and bedding, but the psychiatrist's contemporaneous order placed the patient on 1:1 suicide watch due to risk of self-harm and suicidal statements. The following day, a different psychiatrist ordered suicide watch to be changed to suicide precautions; this change was made without a documented psychiatric encounter. Suicide precautions were discontinued on the third day and were accompanied by a psychiatric note documenting face-to-face assessment.

The initial primary clinician assessment was timely, adequate, but conducted at cell-front due to the patient's refusal of a confidential setting. The assessment was completed by a clinician who

was not assigned to the patient and, like the initial psychiatric assessment, relied extensively on excerpting prior documentation. The initial and weekly IDTT meetings occurred timely and were usually attended by assigned mental health professionals; however, the patient declined to attend six of ten IDTT meetings. While some IDTT elements were documented adequately, the documentation had several limitations, including treatment plan was incomplete, inadequate, and not updated; the STEP program was not referenced; and the patient's treatment progress and participation in IDTT meetings were often inadequately documented.

The patient was followed closely by psychiatry during his acute care stay. However, almost all psychiatric contacts took place at cell front and consisted of brief mental status check-ins. The patient was guarded and minimally communicative in these encounters, but more forthcoming about his concerns and symptoms in confidential encounters with his primary clinician. In early May 2024, he requested additional medication for depression, and fluoxetine was added. The dosage was subsequently increased, once in connection with a patient encounter, and once without any documentation of patient contact or rationale for the increase. The primary clinician or an alternate saw the patient less frequently than required, and most encounters were at cell front because the patient declined a confidential setting. Primary clinician progress notes varied in quality, and neither the psychiatrists nor the clinicians who saw the patient adequately addressed the patient's disengagement from treatment other than medication. While groups were offered to the patient, and multiple disciplines encouraged the patient to attend, he refused almost all groups throughout his stay. Several progress notes documenting his failure to attend a group noted that he was out on the yard, suggesting that he needed to choose between yard and groups.

The patient had three episodes of hostility, all related to staff performing policy-required mouth checks to ensure proper administration of his buprenorphine-naloxone. One of these altercations resulted in an RVR. The patient declined to participate in the mental health assessment for the RVR, but the assessment was thorough, competent, and concluded that mental illness did into contribute to the patient's behavior. His admission and discharge SRASHEs found him at high chronic risk and low-to-moderate acute risk for suicide, suggesting his acute risk may not have been adequately addressed. The primary clinician discharge summary inaccurately stated that the patient had attended approximately 60% of his treatment; the patient's engagement in non-pharmacological treatment was minimal.

**Findings**

The overall mental health treatment provided to this patient was inadequate.

The discordant information from the initial psychiatric assessment the orders entered was of the utmost concern. Additionally, the patient was transitioned from suicide watch to suicide precautions without a face-to-face evaluation being documented. The patient's treatment plan was incomplete, not used to guide treatment, and not updated to address the patient's behavior on the acute unit. The primary clinician repeatedly documented that the patient was offered "all manner of treatment and programming," yet did not assess or address his lack of engagement in these treatments. Beyond medication management, little patient-specific programming and interventions were delivered. The patient repeatedly reported fearfulness of others stemming

from past traumatic experiences and refused almost all out-of-cell programming and therapeutic encounters. These symptoms and behaviors were not adequately investigated or addressed.

**Patient Y**

This 68-year-old patient's healthcare record was reviewed to assess the quality of intermediate care provided at CHCF-PIP. The patient was provided a diagnosis of schizoaffective disorder, bipolar type. He was under PC 2602 order and received a long-acting injectable form of Abilify due to refusal of oral medications. The patient was admitted to CHCF-PIP on July 2, 2019 at the ICF level of care due to grave disability.

Upon admission, the patient exhibited isolative behavior, delusional and disorganized thinking, grandiose paranoia, medication nonadherence, and a lack of insight as he denied any mental illness and was not participating in programming. The patient had a history of treatment at the EOP and ICF levels of care. The patient had several significant medical conditions, including Parkinson disease, blindness in the left eye, and hypertension. The Parkinson disease had resulted in severe speech problems and significant tremors. Despite these medical issues, the patient refused most, if not all, medical appointments.

The patient was housed on unit B7B and was provided IDTT meetings at least once every 30 days totaling eight IDTTs during the review period. The IDTTs all included the patient's assigned PC and psychiatrist, but four IDTTs lacked nursing and two IDTTs lacked a CC1. The treatment team included a senior psychologist specialist for additional support but the patient continued to refuse to participate in treatment or programming. The treatment plan included IPOCs for grave disability and psychosocial wellbeing; while the group topics and interventions were largely appropriate, the IPOCs were not updated in a timely manner, and some of the interventions in the treatment plan were not even available at CHCF-PIP. The clinical summary was appropriate and included relevant updates of the patient's functioning and lack of overall progress. The patient's single-cell justification was appropriate, and discharge criteria and level of care justification were brief but appropriate. The patient was referred for transfer to unlocked dorms at his April 18, 2024 IDTT without clinical rationale or justification, however, the referral to unlocked dorms was rescinded by IRU due to the patient's lack of progress and inability to be housed with other patients. Notably, the patient's treatment plans did not include any IPOCs or treatment goals after the April 18, 2024 IDTT. The patient was referred to ASH in May 2024, but that referral was also rejected. Throughout the review period, the patient remained disheveled, malodorous, and isolated, with chronic grandiose delusions and no insight into his condition. The patient refused to attend any of his IDTTs and did not participate in any clinical contacts, programming, or out-of-cell activities.

Psychiatry contacts were offered weekly in a confidential setting throughout the review period; however, all psychiatry contacts were conducted cell front due to the patient's refusal to leave his cell. The psychiatrist referred the patient to the Positive Behavior Support Team for assessment and program encouragement. The patient's severe tremor limited antipsychotic medication options. The patient's highly treatment-resistant mental illness and severe functional limitations were discussed in utilization management meetings. A discharge summary was prepared on April 18, 2024, but he remained at CHCF-PIP in single-cell status after an unlocked dorm

referral was rescinded. By June 2024, the psychiatrist had observed no improvement over the past year. A consultation with experts in psychiatric medication management on June 20, 2024 considered the potential use of clozapine and electroconvulsive therapy. Throughout the review period, the patient's mental status remained unchanged; he was severely psychotic, delusional, and paranoid, with no interaction with clinicians or other patients and he required several cell extractions for PC 2602 medication administration.

During the review period, PC contacts were provided to the patient approximately every one to two weeks, though not consistently on a weekly basis. All PC contacts occurred cell front as the patient refused to leave his cell for any reason. The patient was usually described as cooperative and described as talkative and friendly; however, at points he was agitated and delusional akin to the hostility he displayed towards the psychiatrist. The patient consistently denied any suicidal ideation or self-injurious behavior, and his eating and sleeping patterns were normal.

The patient did not participate in any groups and he remained in his cell throughout the review period.

The patient received an RVR and was placed on maximum custody following an incident involving battery on a peace officer during a cell extraction for PC 2602 medication on February 7, 2024.

**Findings**

The mental health treatment provided to this patient was adequate.

The care provided to the patient at CHCF-PIP was adequate considering the complexity of his mental health and medical needs, which significantly complicated his treatment. The treatment team faced considerable challenges and appeared uncertain about how best to assist the patient. The treatment team sought guidance from senior staff and the IRU and attempted referrals to DSH and unlocked dorms, both of which were rescinded or rejected. Prescribing antipsychotic medications was particularly difficult due to his medical conditions, and nonadherence to oral medications. Despite timely IDTTs, weekly psychiatry contacts, and PC contacts every seven-to-14 days, the patient remained hostile towards the psychiatrist and only engaged with PC at cell front. He continued to exhibit florid psychosis, delusions, and grave disability throughout the review period with no significant changes or improvement observed between clinical contacts. The patient's mental status and presentation remained unchanged even after increased doses of injectable Abilify.

**Patient Z**

This 49-year-old patient's healthcare record was reviewed to evaluate the quality of intermediate care at CHCF-PIP. The patient was provided diagnoses of schizoaffective disorder, antisocial personality disorder, malingering, other specified bipolar and related disorders, moderate amphetamine-type substance use disorder, and severe opioid use disorder. The patient was prescribed Clozaril, Risperdal, Depakote, Remeron, BuSpar, Vistaril, and atropine. The patient was transitioned from CHCF-PIP acute level of care to ICF on November 16, 2023.

The patient had a history of treatment at all levels of care. On his most recent SRASHE dated December 2, 2023 the patient's risk of chronic and acute self-harm were assessed as moderate.

During the review period, IDTTs were not timely. The patient did not attend any of his IDTTs but he was described as respectful, polite, cooperative, and insightful into his mental illness. In February and March 2024, IDTTs were provided by different PCs, and the patient was not assigned a consistent PC until August 2024 after the conclusion of the review period. The patient was not offered a 30-day routine IDTT in April or May 2024. Treatment Outcome Expectations (TOEs) included the patient having no suicidal ideation or self-injurious behavior due to hallucinations, reduced anxiety and depression, identifying and utilizing coping skills, attending program, and medication adherence. The IPOCs included several interventions carried over from the patient's APP admission that were not applicable to the ICF setting. IPOC updates were not made until the patient's March 2024 IDTT when the treatment team added an IPOC for Hallucinations which included appropriate interventions. Discharge criteria, level of care justifications, and least restrictive housing justification were limited or absent until added in the March 2024 IDTT. In June 2024, the patient reported struggling with lack of consistent providers, but the treatment team indicated the patient had met most of his treatment goals. In July 2024, the patient reported a significant increase in symptoms, including hallucinations telling him to do things, nightmares, and anxiety, which resulted in continued hospitalization at the ICF level of care.

The patient was offered confidential weekly psychiatry contacts throughout the review period; however, he often declined, and most contacts were provided cell front. The psychiatrist evaluated the patient's chronic and acute risk of self-harm as "Low." In June 2024, the patient expressed reluctance to discharge and reported his desire to remain in ICF for continued treatment. Towards the end of the review period, the patient began refusing Clozaril and his medication adherence became increasingly poor. Clozaril was discontinued and Risperdal was prescribed for psychosis. On July 31, 2024, the patient reported self-injurious behavior, increased auditory hallucinations, and passive suicidal ideation. Overall, the psychiatrist's progress notes were comprehensive and informed treatment decisions. Continuity of care was adequate with covering psychiatrists providing contacts when the assigned psychiatrist was unavailable. The patient and psychiatrist appeared to collaborate effectively on the patient's medication regimen.

The patient did not receive a 1:1 PC contact between February 1, 2024, and April 9, 2024. A session was documented on April 9, 2024, which resembled an intake session and detailed the patient's clinical history without specifying interventions. On June 6, 2024, a covering PC offered another contact, but the patient declined a confidential setting and asked to consult with his assigned psychiatrist about medication. The patient was not assigned a PC until July 2024. During a confidential session on July 19, 2024, the patient reported self-injurious behavior and that his medications were ineffective. The injury was described as superficial and the PC informed custody, nursing, and supervisors of the event but did not provide an updated SRASHE. Despite the patient's worsening symptoms and medication non-adherence, the PC progress note indicated the treatment team still considered discharging the patient the following week, which was improper given the patient's medication nonadherence and increase in

symptoms. The patient received weekly PC contacts in July 2024 and the PC noted providing appropriate interventions to address the patient's symptoms.

The patient had inconsistent attendance of the two-to-five groups offered most days. The group topics were primarily focused on Life Skills, Stress Management, and Leisure. The groups were facilitated by psychiatric technicians and recreational therapists. In July 2024, the patient was offered two clinical groups led by a psychologist, but he declined to attend both sessions.

**Findings**

The overall mental health treatment provided to this patient was inadequate.

The patient did not receive timely IDTTs and was not offered the required monthly IDTTs in April and May 2024. Treatment planning was inadequate. Many of the interventions proposed were neither appropriate nor applicable to ICF level of care and there were inconsistencies between the group assignments in the treatment plan and the groups offered to the patient during the review period. Additionally, IPOCs were not updated appropriately, with some goals marked as "met" despite conflicting reports and observations in the IDTT and progress notes. The patient also lacked an assigned PC for the majority of the review period and did not receive timely or adequate PC contacts.

**Patient AA**

This 46-year-old patient's healthcare record was reviewed to evaluate the quality of intermediate care provided at CHCF-PIP. The patient was provided diagnoses of major depressive disorder, recurrent and severe, antisocial personality disorder, borderline personality disorder, exhibitionistic disorder, insomnia disorder, and opioid use disorder. The patient was prescribed BuSpar, Remeron, Trileptal, and Zyprexa. The patient arrived at CHCF-PIP ICF on January 5, 2024, after receiving treatment at the APP level of care.

The patient had 51 incidents of self-injurious behavior or suicide attempts, with five of these attempts indicated as with intent to die. The most recent suicide attempt occurred on October 13, 2023. The patient had a history of treatment at all levels of care. The latest SRASHE assessment on December 5, 2023 indicated a high chronic risk and a moderate acute risk. The patient had multiple RVRs, with a history of IEX.

This patient was housed on unit B8A during the review period, had mobility impairments, and relied on a walker.

IDTTs were provided timely with required staff including the PC, a psychiatrist, CC1, and nursing always in attendance. A covering psychiatrist participated in two of the IDTTs. The patient attended three out of seven IDTTs during the review period. In the February 2024 IDTT, the patient requested a referral to ASH, which the treatment team reportedly considered although there was no indication that the referral was made. The patient was frequently placed on 1:1 suicide watch and occasionally engaged in brief hunger strikes to have his needs addressed. The patient was medication adherent and attended most group sessions, but he often refused 1:1

contacts. The treatment plan included IPOCs for danger to self, Ineffective Coping, and Behavioral Symptoms. Goals and interventions from the Acute treatment plan were carried forward and remained appropriate, and progress updates were noted in the treatment plans. Updates to the IPOCs noted by the RN in IDTT were not always accurate or consistent with other reports in the patient's chart. Treatment goals focused on reducing danger to self and objectives included maintaining no suicidal ideation or self-harm incidents and learning coping methods. Interventions included CBT for suicidal ideation and danger to self, medication management, and addressing poor distress tolerance and impulse control through DBT skills. Single-cell justification was appropriate due to the patient's long history of boundary violations and over 40 RVRs for indecent exposure. The patient also struggled with ADLs and was often malodorous. The level of care justification and discharge criteria were adequate.

The patient was offered timely psychiatry contacts throughout the review period except for one 10-day gap in May when he did not see a psychiatrist. The patient received daily psychiatry contacts during periods when he was on suicide watch. The patient often declined a confidential setting and the majority of psychiatry contacts were provided cell front. The documentation of psychiatry contacts was inconsistent. The patient's assigned psychiatrist consistently provided thorough documentation that reflected support and encouragement offered to the patient, but covering psychiatrist progress notes were often carried forward entirely. The patient consistently reported both passive and active thoughts of suicide and self-harm, including cutting and inserting metal objects into his skin. Collaborative efforts between the psychiatrist and PC were noted, particularly during periods when the patient was on suicide watch. The patient experienced several significant family stressors during the review period which exacerbated the patient's depression and suicidal ideation, leading to increased episodes of self-injury and suicide watch. In June and July 2024, the patient actively expressed suicidal ideation and engaged in frequent self-harm, primarily in response to familial stressors. The patient remained medication adherent throughout the review period and his medications were not changed.

The patient was provided with PC contacts generally every seven-10 days until June 25, 2024, with increased frequency during times of crisis or when the patient was on suicide watch. From June 25, 2024, to July 31, 2024 the patient did not receive any one-on-one PC contacts. The patient often declined a confidential setting and contacts were provided cell front. The PC and psychiatrist met with the patient together several times. These interactions were thoroughly documented and aligned with the goals and interventions provided in the treatment plan. Despite consistent efforts by the PC, the patient demonstrated resistance to the interventions for the majority of the review period. On May 16, 2024, the patient began receiving support through the Positive Behavioral Support Team (PBST). The PBST intake notes highlighted the patient's chronic suicidal ideation, and his reluctance to engage in grief counseling or develop alternative coping mechanisms to self-injurious behavior and suicidal ideation. Initially, the patient responded positively to the plan and actively participated in programming and requested homework. However, this progress was brief, as increased stressors worsened symptoms, resulting in patient disengagement from treatment, and a return to suicide watch just two weeks later. The patient did not re-engage with the treatment team before the end of the review period and was not offered a 1:1 PC contact from June 25 through July 31, 2024.

The patient was offered various NLTG groups, attended them sporadically, and reported them to be beneficial. The patient's frequent placement on suicide watch often restricted group attendance. Group topics included Stress Management, Life Skills, Medication Education, and leisure activities, but the patient was not assigned DBT and Anger Management groups, which were identified in the problem/intervention list in the treatment plan. Additionally, some group sessions were inadequately documented, without a clear indication of the group topic or focus. The groups were facilitated by psychiatric technicians and recreational therapists.

In early March 2024, the patient was placed on a 1:1 suicide watch following the sudden death of his son. The patient remained on suicide watch until early April 2024. In April 2024, the patient reported safety concerns, which led to placement in a maximum custody unit to ensure his safety. Additionally, on July 2, 2024, the patient received an RVR for an IEX incident.

**Findings**

The overall mental health treatment provided to this patient was inadequate.

The care provided to the patient was marked by a combination of strengths and significant deficiencies. The treatment team appropriately referred the patient for Positive Behavioral Support, and they considered a referral to ASH. Additionally, most one-on-one clinical interactions were well documented and reported the patient's clinical status and response to treatment effectively.

There were significant shortcomings that compromised the overall quality of care. The timeliness of the patient's PC contacts was inconsistent and he was not offered any 1:1 PC contacts from June 25, 2024, to July 31, 2024. Further, some psychiatric contacts, particularly those provided by a covering psychiatrist, were inadequately documented, often being carried forward verbatim from previous notes without updates. While the treatment goals and interventions outlined in the treatment plan were appropriate, the patient was not provided with suitable group assignments that aligned with these goals, indicating a gap in the implementation of the treatment plan.

**Patient BB**

This 36-year-old patient's healthcare record was reviewed to assess the quality of intermediate care provided at CHCF-PIP. The patient was provided diagnoses of schizophrenia with catatonia, PTSD, and antisocial personality disorder. The patient's medications included Abilify, Wellbutrin, and lorazepam, which were provided under a PC 2602 order. Relevant medical issues intertwined with the patient's psychiatric issues included requiring a 1:1 for reminders to eat and drink. The patient was admitted to CHCF-PIP ICF B7B unit on February 16, 2024, as a transfer from the APP level of care.

The patient had a history of treatment at all levels of care. A SRASHE on February 19, 2024 indicated a moderate chronic risk and a low acute risk of self-harm.

The APP team referred the patient to ICF for continued stabilization and focus on improving ADLs, eating and showering, and adherence to recommended treatment. An IPOC addressing grave disability was comprehensive and appropriate. The patient was single-celled due to his catatonia, inability to navigate social interactions, and risk of victimization. Additionally, a few days prior to arrival at ICF, the patient had unprovokedly attacked another patient, reportedly because his auditory hallucinations instructed him to do so.

During the review period, the patient received eight IDTTs. The initial 72-hour IDTT was delayed by a day but the remaining IDTTs were timely. The IDTTs were attended by the patient's PC, psychiatrist, and CC1, though some IDTTs lacked nursing staff. The patient attended five of the eight IDTTs. He required reminders for basic needs such as eating and drinking and spent most of the day in the same position for hours at a time. The patient showed significant improvement over time with medication and was managing his ADLs independently by April 2024. Although he showed minimal responses to staff, the patient remained medication adherent. Risk factors and behavioral alerts were identified appropriately and the treatment goals from the APP IDTTs were carried forward. Clinical summaries were largely carried forward after the initial and 7-day IDTTs and the level of care justification remained appropriate. Towards the end of the review period, the patient's symptoms began to lessen in severity. Although treatment plans and goals were largely unchanged from those in the acute level of care, the overall treatment plan remained appropriate for the patient's clinical needs.

Psychiatry contacts were timely, and were largely confidential, except as limited by the patient's catatonia. The patient struggled to maintain medication adherence with oral medications, but he was receptive to injectable lorazepam to address his catatonia. The catatonia symptoms responded positively to the lorazepam regimen, while psychotic symptoms improved in response to Abilify. Given the patient's partial response to medication, the psychiatrist considered ECT and consulted with the primary care physician regarding a potential neurology referral. In June 2024, efforts were made to taper the patient off lorazepam and introduce Klonopin, but a supply shortage prevented its initiation. Psychiatry noted the patient made steady, albeit slow, improvement in catatonia, psychosis, and depressive symptoms throughout the review period.

The PC noted the patient was reported auditory hallucinations to harm others at the time of admission to ICF. The Initial PC Assessment on February 26, 2024 was provided 10 days after the patient arrived.

While the patient did not participate in the initial assessment and it was completed via record review, the assessment was comprehensive. ICF PC routine contacts were generally offered weekly, but there were instances where 12-14 days elapsed between offered contacts. The patient often declined a confidential setting and opted for cell front interactions, and the PC. noted gradual improvement in the patient's catatonia. Progress notes lacked references to the treatment plans or specific interventions and instead resembled cell front "check-ins". The patient's mental status and subjective observations were documented and updated at each contact, however, the assessment and plan remained largely unchanged. Throughout the review period, the patient continued to exhibit moderate to severe catatonia, auditory hallucinations, and depression. The PC's interventions were primarily limited to encouraging the patient to attend to his ADLs and advising the patient to reach out to the treatment team if he was feeling unsafe.

The patient was offered several groups while at CHCF-PIP. Group topics included Symptom Management, Social Skills, NLTG groups, Life Skills, Leisure, and Medication Education. The groups were facilitated by RTs, PTs, RNs, and a psychologist.

During the review period, the patient was involved in three unusual incidents, each resulting in an RVR. These incidents included fighting, battery on a prisoner, and battery on a peace officer. It was later determined that two of the three RVRs were attributable to the patient's mental illness. Consequently, in late July 2024, the patient was transferred to the Max unit.

**Findings**

The mental health treatment provided to this patient was adequate.

The patient demonstrated slow but steady improvement in response to treatment. IDTTs meetings were provided timely and were well-staffed, and treatment goals and interventions were appropriate. The interventions primarily focused on medication management to address the patient's psychotic symptoms and severe catatonia. The psychiatrist worked collaboratively with the patient to enhance medication adherence and noted the patient's preference for injectable medications. The psychiatrist appropriately consulted with the patient's primary care physician and neurology specialists and considered ECT as a potential option. Psychiatry and PC contacts were generally timely and offered in a confidential setting. Although PC contacts were not always well documented, relevant updates regarding the patient's presentation were consistently provided and the PC noted ongoing efforts to engage and support the patient. The patient was offered appropriate groups, but the severity of his symptoms hindered his ability to attend consistently or safely.

**Patient CC**

This 42-year-old patient's healthcare record was reviewed to evaluate the quality of care at CHCF-PIP APP and ICF levels of care. The patient was provided diagnoses of major depressive disorder, recurrent, severe, unspecified psychotic disorder, and several personality disorders including antisocial, borderline, narcissistic, and paranoid. The patient's symptoms included auditory hallucinations, paranoid delusions, impulsivity, and frequent reports of suicidal ideation. The patient was under a PC 2602 for danger to self and his prescribed medications were Cymbalta, Seroquel, Cogentin, and prazosin. The patient also had medical conditions that required the use of a hearing aid and a wheelchair. The patient was admitted to the APP program on January 12, 2024 for suicidal ideation and significant impairment due to mental illness.

The patient's level of care history included EOP, MHCB, and multiple prior PIP admissions. Notably, the patient did not engage in treatment or programming during any previous PIP admissions and his behavior did not improve as a result of previous PIP treatment. Records suggested that despite the patient having reported suicidal ideation in order to get his needs met, he was willing to escalate his impulsive behaviors. During the review period, the patient received five SRASHEs. While in the APP, the patient's chronic risk was rated moderate and

acute risk was rated high. While in ICF, the patient's chronic risk was assessed as moderate, and his acute risk was rated as low.

The patient was placed on the Max unit upon admission but was transferred to a non-Max unit after one week. The patient was provided six APP IDTTs during the review period. The IDTTs were attended by his PC, psychiatrist, and CC1. Weekly APP IDTTs were generally timely. The patient was categorized as STEP 2 and was assigned to groups. The treatment team set objectives for the patient to attend five groups per week without significant prompting, and to employ coping skills for distress tolerance and impulsivity. Diagnostic clarification testing was recommended. The patient did not articulate any personal treatment goals, but the treatment team created goals to address his mood, psychosis, and suicidal ideation. Initiated in November 2023, the patient's IPOCs for danger to others remained unchanged, and lacked appropriate goals or interventions. The Problems/Goals/Interventions list included depression and paranoia, but it was carried forward from a prior MHCB admission, without appropriate updates. No level of care justification or discharge criteria were provided except that the patient had reached the maximum benefit of the APP program. The treatment team noted that the patient would continue treatment for suicidal ideation at the ICF level and was referred for placement in unlocked dorms.

The patient transitioned to the ICF level of care on March 12, 2024, but was placed in locked dorms instead of unlocked dorms. The patient received eight ICF IDTTs, all of which were provided timely. The IDTTs generally contained required staff including the assigned PC and psychiatrist, nursing, and with one exception, the CC1. The patient's risk factors, signs of decompensation, interventions, and signs of stability were appropriately provided. Upon admission to ICF, the patient reported high levels of depression, anxiety, and persecutory delusions. The patient was at STEP 3 and his TOEs were updated, comprehensive, and suitable for the patient's condition. The IDTT included IPOCs for danger to self and Maximum Custody, although the Maximum Custody IPOC was no longer applicable. The Problems/Goals/Interventions list was carried forward unchanged from the APP IDTTs. The patient repeatedly expressed his belief that mental health and medical staff were colluding against him, and he frequently requested copies of his medical records while also filing grievances. On May 2, 2024, the patient was referred to unlocked dorms at ASH, but the referral was rejected, leading to a redirection by IRU to a multiperson cell at CMF, which was also rejected. The patient insisted on transfer to ASH, even though a single cell was not an option at that facility. In June and July 2024, the patient became increasingly hostile and verbally combative with the treatment team. On July 3, 2024, the IDTT determined the patient's functioning was unsuitable for the PIP level of care, and he was discharged to the EOP level of care. The discharge justification was appropriate, indicating the patient's condition was more related to personality traits than psychotic symptoms, making an outpatient setting more suitable. On July 8, 2024, upon learning of his upcoming transfer to SVSP EOP, the patient reported suicidal thoughts. The patient refused transfer, was placed on 1:1 watch, leading to the rescission of the EOP referral. The patient filed grievances against the treatment team, refused engagement, and was retained at ICF. He changed treatment teams and was transferred to a different ICF unit in late July 2024 near the end of the review period.

Psychiatry contacts were consistently timely in APP, and offered in a confidential setting, which the patient frequently declined. The patient's mental status and presentation remained largely unchanged throughout the review period, characterized by high levels of depression, anxiety, and passive suicidal ideation without a specific plan. The patient was medication adherent and engaged in sessions with the psychiatrist, who, at the patient's request, introduced Seroquel which resulted in a more stable mood. A PTSD assessment indicated that the patient likely met the criteria for PTSD and it was appropriately added to the patient's diagnoses. The APP psychiatrist provided a comprehensive and appropriate discharge summary. ICF psychiatry contacts were also timely and offered in a confidential setting. During the initial assessment, the patient expressed paranoid delusions regarding dental staff implanting a tracking chip in his tooth and plotting against him. By May 2024, the patient was actively participating in groups but continued to exhibit paranoia towards mental health and custody staff, which persisted into June. The patient remained medication adherent and engaged in group activities despite his paranoia towards staff. The decision was made not to pursue a PC 2602 renewal as the patient no longer met the criteria, having missed only one medication dose in the past year and with no violent RVRs recorded in the past year. The psychiatrist noted the patient was doing relatively well and cooperating with his providers until the referral to ASH was rejected, which led to increased hostility and confrontational behavior towards his providers. The patient began refusing medications towards the end of July 2024, which coincided with the expiration of the PC 2602. Despite encouragement from the psychiatrist to taper off his medications rather than stop them abruptly, the patient remained hostile and unreceptive.

The patient was offered weekly APP and ICF PC contacts in a confidential setting, which the patient intermittently declined. The patient consistently reported high levels of depression and anxiety, however, the PC noted that the patient's presentation did not align with the reported symptoms or their severity. His initial ICF PC assessment occurred 10 days post-admission on March 22, 2024, and after the patient's 72-hour and 7-day IDTTs. The patient refused to participate and the assessment was completed via chart review with information sourced from the ICF IDTTs. The patient showed interest in attending RT groups, yet he was often noted as disruptive and failed to interact positively with his peers while in group. He regularly expressed grievances about his treatment team and perceived deficiencies in his care, fixated on the ASH referral rejection, and frequently argued with his PC about CDCR policies and standards of care. IPOC indicators were absent from progress notes until May 24, 2024. During periods of suicide watch and enhanced observation, the PC met with the patient daily and consistently noted his anger, combativeness, and paranoia following the ASH referral rejection. Psychology leadership, including the Chief of Mental Health, Chief of Psychology, and Senior Psychologist Supervisor were actively involved in treatment and intervention efforts.

The patient was offered core clinical groups, RT groups, and NLTGs. It was noted that the patient attended most of his assigned groups and group topics were appropriate for the patient's clinical needs. Group topics included Life Skills, Social Skills/Communication, CBT, Stress Management, and Leisure.

**Findings**

The mental health treatment provided to this patient was adequate.

The overall treatment provided to the patient was adequate, even though some documentation was carried forward in the treatment plans. The patient's condition remained generally unchanged, but there was noted deterioration following the rejection of the ASH referral. The treatment team demonstrated consistent and diligent efforts in managing and supporting this clinically challenging patient. Clinical contacts were mostly timely, except for the initial PC ICF assessment. The psychiatrist maintained a generally collaborative relationship with the patient, despite the patient's argumentativeness and paranoia. Attempts by the treatment team to refer the patient to DSH and EOP levels of care were unsuccessful, as these referrals were rejected by the IRU and CCAT processes. Due to the patient's extreme hostility and mistrust towards his treatment team, he was ultimately transferred to a different ICF unit.

**Patient DD**

This 55-year-old patient's healthcare record was reviewed to assess the quality of intermediate care at CHCF-PIP. The patient was diagnosed with schizoaffective disorder, bipolar type, and was prescribed Abilify, Depakote, sertraline, benztropine, Vistaril, Remeron, propranolol, and melatonin. The patient arrived at CHCF-PIP ICF on April 2, 2024.

The patient's relevant medical issues included Type 1 diabetes, and mobility issues requiring use of a cane. The patient had a history of treatment at the 3CMS, EOP, and MHCB levels of care.

During the review period, the patient received six IDTTs that were provided timely. Although all IDTTs were appropriately staffed, the PCs and psychiatrists in attendance were often not the patient's assigned clinicians; four different PCs attended the IDTTs. The patient's clinical summary and case formulation were updated appropriately. An IPOC for danger to self was initiated during the 10-day IDTT. While no progress indicators were provided initially, these were added in the IDTT on June 5, 2024, which indicated that treatment goals had been met. Problems, goals, and interventions from the MHCB treatment plan were carried forward, but remained generally appropriate, although they should have been updated to reflect the ICF level of care treatment modalities. Risk factors, behavioral alerts, and interventions were specified appropriately, but the level of care justification and discharge criteria were either absent or were inadequate when provided. The patient was noted to be medication adherent, and he actively participated in treatment. He consistently reported depressive symptoms in the mild to moderate range and consistently denied suicidal ideation or psychotic symptoms.

The initial psychiatric assessment was conducted promptly and in a confidential setting. The patient was offered weekly confidential psychiatry contacts although there were instances when the patient declined or refused the contacts. The patient reported that his medications were beneficial in improving his mood, increasing frustration tolerance, and managing hallucinations. The psychiatrist and patient worked collaboratively to adjust the medication regimen and carefully considered the potential impact on the patient's blood sugar levels. Throughout the review period, the psychiatrist noted the patient remained stable without worsened psychiatric symptoms or decompensation.

The patient's first documented PC contact outside of IDTT was offered on April 12, 2024, ten days post-admission and following both the 72-hour and 7-day IDTTs. The patient refused to participate and the initial PC assessment was conducted via record review by a covering PC. The patient did not receive consistent individual PC contacts and it appeared that he was never assigned a dedicated PC during the review period. Individual PC contacts, labeled as "Brief Individual Sessions," were provided on May 10, June 4, and June 18, 2024. During these brief sessions, the patient reported he was feeling well, was benefiting from treatment groups, and he generally remained at baseline status. The overall PC care was notably inadequate, as the patient did not receive any meaningful clinical contacts, services or support from the ICF PCs.

The patient was assigned to appropriate groups and demonstrated good attendance, participation, and engagement. The groups included clinical, RT, and NLTG groups. The group topics were appropriate and included Life Skills, Daily Living Skills, Social Skills/Communication, Symptom Management, Medication Education, CBT Group, and Coping Skills. The patient was also placed in a specialized treatment group to address challenging personality and behavioral issues.

On April 5, 2024, the patient refused to participate in a SRASHE. The evaluation indicated moderate chronic risk and acute risk was assessed as low.

**Findings**

The overall mental health treatment provided to this patient was inadequate.

Care was inadequate primarily due to insufficient 1:1 PC contacts, and the lack of a dedicated PC assignment. It is likely that the patient may have benefitted significantly from additional therapeutic support from a PC, which could have addressed coping skills to manage his persistent moderate depressive symptoms and mental health challenges associated with managing his medical conditions. Such support would have potentially enhanced his overall engagement in the treatment process.

**Patient EE**

This 39-year-old patient's healthcare record was reviewed to assess the quality of intermediate care provided at CHCF-PIP. The patient was provided diagnoses of schizoaffective disorder, bipolar type, unspecified anxiety disorder, gender dysphoria, and severe alcohol use disorder. The patient's symptoms included severe depression, generalized anxiety, auditory and tactile hallucinations, intermittent suicidal ideation, and frequent self-injury, primarily through head banging. The patient's medications included Thorazine, BuSpar, Prozac, Cogentin, Vistaril, and melatonin. The patient was medication-adherent, but he reported limited benefit. Relevant medical medications included hormone therapy. The patient had a history of treatment at the EOP, MHCB, and ICF levels of care.

The patient was transferred to CHCF-PIP from MCSP on March 29, 2024 for danger to self. IDTTs were provided timely during the review period and were well staffed by the required disciplines, although there were several IDTTs where the patient's assigned PC and/or

psychiatrist were absent and substitutes provided coverage. The patient attended and actively participated in his IDTTs. The patient reported longstanding frustration with his unrelenting psychotic symptoms, and the primary treatment objectives included elimination of auditory and tactile hallucinations, increased understanding of his mental illness, and eventual discharge to EOP. The treatment plans included IPOCs for hallucinations and danger to self. The IPOC for hallucinations lacked specific interventions or measurements; however, the IPOC for danger to self, introduced in the June 2024 IDTT, was comprehensive, with appropriate interventions and progress indicators. The treatment team goals focused on developing coping strategies for managing hallucinations, but these goals were somewhat limited and generalized.

While the patient was endorsed for a multiperson cell, the clinical rationale was inappropriate. The level of care justification was appropriate at each IDTT. By May 2024, the patient was actively engaged in treatment, motivated to improve, expressed a desire for a less restrictive program, and discussed potential discharge with the treatment team. Discharge criteria were not provided until the June 2024 IDTT and were adequate and specific to the patient's needs. The patient requested discharge to EOP, citing a lack of symptom improvement. The treatment team acknowledged the patient's effective use of coping skills and absence of self-harm since the previous IDTT, however,

The patient actively participated in the initial psychiatry assessment, which was timely and comprehensive. Confidential psychiatry contacts were offered at least weekly throughout the review period. Psychiatry contacts were not always well documented in the progress notes and some information was carried forward repeatedly. The psychiatrist noted making consistent efforts to provide psychoeducation regarding medications and set clear expectations with the patient. In May 2024, the patient's medication adherence began to decline, leading to increased irritability and agitation. By July 2024 the patient had refused medication for three weeks and exhibited increased delusional, agitated, and disorganized behavior, including breaking his tablet and yelling at mental health staff. The psychiatrist considered and discussed with the patient the possibility of initiating a PC 2602 for continued medication refusal.

The patient responded positively to these efforts and agreed to medication changes. Initially, these changes led to an improvement in the patient's symptoms and presentation; however, the patient later decompensated, experienced delusions, and broke his tablet in response to auditory hallucinations. Consequently, the psychiatrist initiated an emergency PC 2602 petition on July 24, 2024. Due to continued instability and worsening symptoms, a Haldol injection was ordered on July 30, 2024, with good response.

The initial PC Assessment was provided on April 5, 2024, one week following the patient's admission and after his first two IDTTs. The assessment was thoroughly completed but it was not provided by the patient's assigned PC. The patient was offered weekly PC contacts in a confidential setting throughout the review period; however, the patient occasionally opted for cell-front contacts. The PC provided several contacts with the psychiatrist present and developed a strong rapport with the patient. During 1:1 PC contacts, the PC discussed the patient's trauma and assisted the patient in processing difficult emotions. The PC provided psychoeducation, coping skills training, and supportive therapy. The PC progress notes were comprehensive and provided appropriate updates on the patient's subjective reports, objective status, assessments,

and plans, though the progress notes lacked clear metrics of progress. The PC maintained a positive relationship with the patient and delivered timely and appropriate treatment and support.

During the review period the patient was offered between four-to-ten groups per week. Group topics included Daily Living Skills, Life Skills, NLTG groups, Medication Education, and Mood Management. The groups were facilitated by nursing staff and RTs. Prior to being placed on solo programming, the patient frequently attended his groups.

**Findings**

The mental health treatment provided to this patient was adequate.

The treatment provided to the patient was comprehensive and effectively addressed his clinical needs. The patient received timely and well-documented IDTTs and clinical contacts from both the PC and the psychiatrist. The collaboration between the PC and psychiatrist was evident in their joint efforts to engage the patient in treatment planning and encourage the patient to participate in programming. The patient was offered, attended, and reported significant benefit from the groups. The psychiatrist appropriately initiated an emergency PC 2602 petition when the patient demonstrated a decline in medication adherence and an increase in symptoms, including delusional and disorganized thoughts and heightened agitation.

**Patient FF**

This 27-year-old patient's healthcare record was reviewed to assess the quality of care at CHCF-PIP APP and ICF. The patient was provided diagnoses of antisocial personality disorder, opioid use disorder, and unspecified depressive disorder. He was prescribed Effexor, trazodone, Risperdal, Seroquel, and Remeron. The patient was admitted to CHCF APP on March 12, 2024, from CSP/Corcoran MHCB, due to suicidal ideation, self-harm, and danger to others.

Medically, the patient had a history of Hepatitis C. A SRASHE conducted on March 13, 2024, indicated a moderate chronic risk and high acute risk, while a subsequent SRASHE on April 23, 2024, showed a high chronic risk and moderate acute risk. His level of care history included 3CMS, EOP, and MHCB.

The patient's history was significant for self-harm behaviors, poor distress tolerance, and deficits in emotional regulation. Over the six months preceding his admission to CHCF-PIP, the patient was admitted to the MHCB 22 times and had incurred nine RVRs. The most recent MHCB admission was triggered by the deaths of his brother and sister. During the majority of the review period, the patient was on Maximum Custody status due to problematic behaviors including incidents of IEX, threats towards custody staff, and boarding up in his cell. Upon admission, the patient was immediately placed on one-to-one suicide watch after he reported active suicidal ideation and possession of a razor. He made threats of self-injurious behavior if the watch was discontinued.

The patient received six Acute IDTTs before discharge to ICF after approximately five weeks in the Acute program. The IDTTs were timely and attended by appropriate staff, including the PC,

psychiatrist, CC1, and nursing staff. A covering PC facilitated the first three IDTTs, and the patient attended four out of six IDTTs. Initial treatment goals focused on developing coping skills to stabilize mood, achieving 24-hours without suicidal ideation, and 72-hours without self-injurious behavior. During the first routine IDTT, IPOCs for danger to self and Maximum PIP custody were added. Specific and individualized Discharge criteria were general, rather than specific and individualized. The justification for single-cell housing was appropriate. The clinical summary contained a significant error, incorrectly identifying the patient's race and the case conceptualization was inadequate. Despite these issues, the patient made substantial progress and was appropriately discharged to the ICF level of care on April 17, 2024.

During the review period, the patient received five ICF IDTTs, all of which were timely. While the majority of the IDTTs were adequately staffed, there was one instance where the IDTT was facilitated by a covering PC and a covering psychiatrist, rather than the assigned clinicians, as required by policy. The patient's IPOCs were not updated following the Acute IDTTs and no new interventions were provided. There was no level of care justification or discharge criteria provided. Risk factors and safety interventions were appropriately updated, and the case conceptualization was adequate. Despite this maximum custody patient's consistent presentation of perseverative, aggressive, and inappropriate behavior towards staff, as well as frequent incidents requiring one-on-one suicide watch, there were no updates to his treatment goals, clinical interventions, or strategies to address these significant barriers to treatment.

Timely and confidential psychiatry contacts were offered. The patient was intermittently seen at cell front when he declined to exit his cell. The patient's Acute Initial Psychiatry Assessment was timely and noted the patient's reported severe depression, intermittent auditory hallucinations during depressive episodes, moderate paranoia, and persistent suicidal ideation. He denied homicidal ideation. The patient was noted as being medication adherent, but medication adjustments were made due to side effects. Risperdal was discontinued as the psychiatrist determined the patient did not have psychosis. By late March 2024, the psychiatrist concluded that the patient did not have significant organic psychiatric issues and was using suicide threats in order to meet his perceived needs. Clinical rationale and treatment team observations appropriately supported this opinion. The Acute Psychiatric Discharge note was completed appropriately, and the patient was reportedly looking forward to transfer to ICF. During the ICF admission, the patient refused to participate in his initial psychiatric assessment and his medications remained unchanged. The patient spent most of the review period on maximum custody and 1:1 suicide watch. The patient repeatedly engaged in a pattern of threatened self-harm, reportedly to influence his custody status; suicide watch was eventually discontinued without incident when the patient no longer reported suicidal thoughts. Overall, psychiatry contacts were timely and well-documented and reflected the team's consistent efforts to meet the patient's clinical needs and ensure safety without reinforcing maladaptive behaviors.

An Acute Initial PC Assessment was provided on March 14, 2024 in a confidential setting and the patient actively participated. The assessment was comprehensive and significantly informed the IDTT and treatment planning. PC contacts were consistently offered at least once a week, with increased frequency during periods when the patient was on suicide watch. The progress notes from these contacts were inconsistent and often inadequate, with a significant amount of information being carried forward from one note to the next. IPOC measures were either absent

or not appropriately updated. The patient was not offered an initial PC assessment when he transitioned to the ICF level of care and did not receive a one-on-one PC contact until May 2, 2024, two weeks after arriving on the unit and despite being on a one-on-one suicide watch. This initial contact was a "wellness check" conducted cell front due to custody-modified programming. Following May 2, 2024, confidential weekly PC contacts were offered, though the patient declined a confidential setting for nearly all contacts, opting instead to meet cell front. The patient frequently declined to engage with the PC. The PC documented the patient's unpredictable and labile mood, as well as his challenging behaviors including gassing custody staff and insisting on female one-on-one staff. An Acceptance and Commitment Therapy (ACT) approach was recorded in some progress notes, with interventions and strategies included when the patient chose to engage with the PC. Despite these efforts, rapport between the PC and the patient was not established, and the patient never fully engaged in treatment or sessions with his PC.

In the Acute setting, the patient was offered RT groups with topics such as Stress Management, Leisure, and Life Skills. A spot check of several group progress notes revealed a discrepancy that on at least one occasion, the patient was incorrectly marked as having attended a full group session despite the comments section of the group progress note indicating he refused to participate. Nevertheless, overall group attendance in APP was consistent. In contrast, at ICF the patient was not offered group sessions until the final week of the review period, from July 22 to July 31, 2024. During this time, the patient was on Max custody status, but attended all five offered groups. Groups were facilitated by a psychologist, nursing staff, and RTs and included topics such as Specific Mental Health Issues, Coping, Social Skills, and Life Skills.

There was a series of unusual incidents for this patient that necessitated continuous monitoring and observation. Upon admission, the patient was placed on 1:1 suicide watch from March 12 to March 15, 2024. Suicide watch was reinstated from March 25 to April 9, 2024, following the patient's report of swallowing a razor and expressing suicidal thoughts. During the period from April 29 to June 8, 2024, while on suicide watch, the patient reported active SI and engaged in destructive behavior by breaking all the windows in his cell, which required a cell extraction and subsequent relocation. The patient required further suicide watch from June 17 to July 2, 2024, and again from July 8 to July 23, 2024. Additionally, the patient was noted to have engaged in IEX behaviors in both Acute and ICF.

**Findings**

The overall mental health treatment provided to this patient was inadequate.

The care provided to the patient was notably inadequate, primarily due to insufficient treatment planning and the absence of specific interventions and strategies designed to address the patient's severe characterological symptoms and problematic behaviors. At ICF, the treatment planning was particularly lacking, as the treatment team failed to develop or implement any targeted clinical interventions or strategies to manage the patient's ongoing and persistent symptoms and behaviors. Appropriate discharge and level of care criteria were not provided, which were crucial for guiding the treatment process and determining the appropriate care trajectory for the patient. Although the timeliness and documentation of clinical contacts were adequate, and the

patient's providers appeared to make diligent efforts to engage with the patient, the absence of a clear, collaborative treatment plan hindered their ability to effectively respond to the patient's symptoms and guide treatment. The lack of a structured plan ultimately compromised the overall quality of care.

**Patient GG**

This 44-year-old patient's healthcare record was reviewed to assess the quality of care at CHCF-PIP APP and ICF. The patient was provided diagnoses of antisocial personality disorder, borderline personality disorder, unspecified psychosis not attributable to substances or known physiological conditions, opioid abuse, substance-induced depressive disorder, and post-traumatic stress disorder. The patient was prescribed Zyprexa, clozapine, Trileptal, Effexor, Keppra, Wellbutrin, prazosin, and PRN Vistaril and Remeron. Additionally, the patient was prescribed Suboxone for opioid use disorder. The patient was admitted to CHCF-PIP APP on March 1, 2024, for danger to self and was initially placed in unit B4A under suicide precautions due to ongoing suicidal ideation.

The patient had a history of treatment at all levels of care, including 14 MHCB admissions since his last ICF discharge on December 6, 2023.

The patient received six Acute IDTTs, all of which were timely and were appropriately staffed by the patient's assigned clinicians and CC1. The patient attended his IDTTs and reported depression, ongoing auditory hallucinations, and suicidal ideation. He identified cutting himself as his primary coping mechanism. The treatment team focused on addressing the patient's extensive history of self-injurious behavior (SIB) and active suicidal ideation, with a plan to use any means available to harm himself. The primary treatment goals were to abstain from SIB for 30 days, eliminate intent from the patient's suicidal ideation before discharge, and learn three strategies to manage distressing hallucinations. The patient expressed a desire to reduce his cutting behaviors. An IPOC for Self-harm was provided and included appropriate goals and measures of reducing suicidal ideation and improving coping skills. The patient's Problems/Goals/Interventions section, risk factors, safety interventions, and justification for single-cell placement were all appropriate. The patient's depressive symptoms and SI showed improvement during his APP stay, and he was appropriately discharged to ICF on April 3, 2024 to continue developing coping skills for managing depression, PTSD, and self-harm thoughts and behaviors.

The patient received four ICF IDTTs during the review period. IDTTs were timely with the exception of June 2024, when no IDTT was provided. These IDTTs were appropriately staffed by the patient's assigned clinicians and CC1. The patient's chronic risk was rated as high and his acute risk rated as low-moderate. The patient expressed a primary goal of improving impulse control and reducing self-harming behaviors. The patient actively participated in both individual and group therapy sessions and showed high levels of motivation and engagement towards treatment. The treatment plan included IPOCs for Substance Abuse and danger to self with appropriate interventions and indicators provided; progress was regularly updated. Single-cell housing justification was appropriate. Overall, the IDTTs were generally adequate and included appropriate treatment planning and identified specific goals and interventions to support the

patient's treatment and recovery. During the IDTTs, the patient reported positive progress and that his symptoms steadily improved.

The patient received an Acute initial psychiatric assessment on the day of admission. The patient declined a confidential setting but he actively participated in the evaluation. The patient endorsed severe depression, auditory hallucinations, and self-harm urges without suicidal intent, and was placed under enhanced safety observation for safety. The clinical rationales for medication changes were not documented in the progress notes. The patient showed a positive response to treatment, and he was removed from enhanced observation by March 12, 2024. Routine psychiatric contacts were offered twice weekly and the patient continued to decline a confidential setting. The patient's medications were adjusted based on symptom response and the patient's overall mental status improved. The patient discharged to ICF on April 3, 2024.

The patient received an ICF initial psychiatry assessment one week after admission. The assessment was appropriately documented and the patient's medications were continued unchanged. Routine psychiatry contacts were consistently timely, and the patient received daily contacts while under 1:1 suicide watch and enhanced observation. Weekly contacts were provided when the patient was not under enhanced observation. The patient generally opted for a confidential setting when not on enhanced observation and opted for cell front contacts when he was on enhanced observation. The psychiatrist worked collaboratively with the patient to adjust the medication regimen, and ensuring adherence. The patient was under enhanced observation or suicide watch from April 12-23, April 25-30, May 8-20, June 21-26, and July 11-13, 2024. Toward the end of the review period, the patient reported nightmares and sleep disturbances and was prescribed prazosin. Throughout the review period, psychiatry contacts in ICF were timely and thoroughly documented and the psychiatrist documented psychoeducation and medication adjustments appropriately.

The initial Acute PC assessment was provided one week after the patient's admission and after his initial IDTT. The assessment was incomplete and severely inadequate, as it only included the clinical summary and case formulation which were pulled directly from the patient's previous IDTTs. Routine Acute PC contacts were generally timely and were provided weekly in a confidential setting. The PC and the patient developed a strong rapport and the PC documented supportive therapy, psychoeducation, and CBT interventions. After the patient arrived at ICF, the initial PC assessment was delayed until May 23, 2024, over six weeks after the patient's arrival. The assessment was completed thoroughly. The patient changed PCs twice while in the ICF, and there was a gap in offered 1:1 PC contacts from admission on April 3, 2024 until April 22, 2024. During this period, the only PC contact was a check-in while the patient was on 1:1 suicide watch. After April 22, 2024, PC contacts were offered weekly and were generally well-documented, including the status of treatment goals, interventions provided, and the patient's response. The patient appeared to respond well to the PC and maintained good rapport. In mid-July 2024, the patient reported a severe increase in nightmares and lack of sleep and the PC provided supportive counseling and processing therapy.

The patient was offered and actively participated in several groups upon his admission to the Acute level of care; however, the patient's attendance was impacted by periods of enhanced observation and suicide watch. Group topics included Life Skills, Medication Education, and

psych tech groups. The patient's groups assignments were not well-aligned with the patient's specific needs and it is likely that the patient would have gained more from participating in DBT groups and other groups focused on safety and coping skills. During the patient's stay in ICF, he was offered several groups including Life Skills, Coping Skills, Stress Management, Social Skills, and Art groups. The patient was offered multiple groups each day and groups were facilitated by psychiatric technicians and RTs. The patient's ability to attend these groups was again significantly and frequently affected by his 1:1 suicide watch and enhanced observation status. Despite these challenges, the patient showed a high level of attendance and engagement in the groups when not on suicide watch. Facilitators noted the patient was consistently respectful of group rules and demonstrated consideration towards other group members.

**Findings**

The mental health treatment provided to this patient was adequate.

The patient demonstrated notable improvements in mental status and symptoms during the review period. Treatment at the Acute level was adequate and the patient met treatment expectations. Although there were initial delays in PC contacts when the patient was placed in ICF, the PC established a strong rapport and provided timely contacts and appropriate clinical interventions. The patient actively engaged with the psychiatrist and collaborated effectively on medication management. The patient's attendance and participation in groups sessions was consistent except when the patient was on suicide watch. Despite the challenges posed by the patient's longstanding and severe impulses to self-harm, compounded by a history of poor coping skills and chronic adjustment issues, the treatment team prioritized the patient's safety, and the patient responded well to the provided interventions.

**Patient HH**

This 21-year-old patient's healthcare record was reviewed to assess the quality of intermediate care at CHCF-PIP. The patient was diagnosed with schizoaffective disorder, depressed type, and was prescribed Abilify, Lexapro, Cogentin, Vistaril, and Invega Sustenna. The patient arrived at CHCF-PIP ICF on June 17, 2024 from the CHCF MHCB.

The patient had a history of treatment at the 3CMS, EOP, and MHCB levels of care. Upon admission, a SRASHE conducted on June 19, 2024 indicated that the patient's chronic risk was moderate and his acute risk was low.

The patient was initially referred to the CHCF-PIP APP on May 14, 2024, from the CHCF MHCB; however, this referral was rejected, and the patient was ultimately admitted to CHCF-PIP ICF on June 17, 2024 under maximum custody status. The patient was admitted to ICF level of care for significant impairment due to mental illness and danger to self. During the review period, the patient was provided three IDTTs. The 7-day IDTT was provided two days late, but the subsequent IDTTs were timely. The IDTTs were attended by appropriate staff, including a PC, psychiatrist, CC1, and nursing staff. The patient's assigned PC was present for only one of the IDTTs. The patient attended his initial IDTT but refused to participate in the following two IDTTs. The patient did not endorse depression symptoms but he reported experiencing anxiety

and auditory hallucinations. The patient denied any suicidal or homicidal ideation. The patient's goals were to achieve stability, adhere to his prescribed medications, and avoid RVRs. The treatment objectives focused on improving ADLs, reducing psychosis, engaging in out-of-cell treatment, achieving 100% medication adherence, gaining insight into his mental illness, verbalizing three coping skills, managing suicidal ideation, and reporting a 50% decrease in self-harm thoughts. IPOCs for hallucinations and self-harm were provided and included appropriate goals, interventions, and measures which were updated appropriately. The Problems/ Goals/ Interventions list was carried forward from the MHCB treatment plan without updates. The clinical rationale for the patient's housing placement was appropriate. Notably, the Risk Factors and Behavioral Alerts section were incomplete throughout the review period. In June 2024, the patient was noted as medication adherent and he was participating in programming, but in July 2024 there was a marked decline in treatment participation and medication adherence. Despite this, the patient reportedly maintained stability.

During the review period, psychiatry contacts were consistently timely and offered in a confidential setting. The initial psychiatry assessment was timely, and the psychiatrist noted the patient came out of his cell for a confidential setting but then refused to participate in the actual assessment. The psychiatrist noted the patient consistently denied experiencing suicidal ideation, homicidal ideation, auditory hallucinations, visual hallucinations, or any adverse side effects from his medications. Throughout the review period, the patient demonstrated a positive response to both medication and programming and consistently denied any significant mental health symptoms. There was a noted decline in medication adherence in mid-July, but the patient remained stable and there was no observed increase in symptoms.

The initial PC assessment was provided in a timely manner and was provided simultaneously with the initial psychiatric assessment. This assessment was completed appropriately and informed the IDTT. The patient was not offered a 1:1 PC contact until July 2, 2024; however, subsequent contacts were provided weekly. The PC noted the patient chose not to engage in any 1:1 interactions with the PC, either confidentially or at cell front. Throughout the review period, the PC reported that the patient consistently denied experiencing any mental health symptoms and remained stable.

The patient was promptly assigned to a Social Skills/Communication group led by an RT when he arrived at ICF. The patient was provided with only one group session per week during the review period.

**Findings**

The mental health treatment provided to this patient was adequate.

The patient was offered timely clinical contacts including initial assessments, SRASHEs, IDTTs, and routine contacts. Treatment planning was comprehensive, incorporated appropriate treatment goals and interventions, and was appropriately documented. The patient remained stable since his arrival and did not report or demonstrate any mental health decompensation.

**APPENDIX D4**
**California Institution For Women (CIW-PIP)**
Review Period: February 1, 2024 – July 31, 2024

**Patient A**

This 35-year-old patient's healthcare record was reviewed to assess the quality of care provided at the CIW-PIP.

The patient was provided diagnoses of bipolar disorder and amphetamine-type substance induced mood disorder. She was prescribed Zyprexa, Depakene, lithium and Prolixin, and she received her psychotropic medications by a PC 2602 order since June 24, 2024. The patient was admitted to the CIW-PIP for intermediate care on July 8, 2024.

The patient's behavioral health history included a possible suicide attempt at age 11; other documentation indicated that this was a non-suicidal self-harm incident. Additionally, she had a history of alcohol and drug use beginning at age 18. When she arrived at CDCR on June 11, 2024 from a county jail, she was psychotic and unable to provide additional history.

A 72-hour IDTT meeting occurred on July 10, 2024 without the patient, as she had disrobed and was agitated. The treatment team recommended addressing the patient's maniac and psychosis, and she was recommended for a single cell. Her acute and chronic suicide risk was assessed as moderate.

The MHMD met with the patient two to three times weekly and made medications adjustments with explanation provided for those changes. The patient refused to leave her cell for approximately half of the visits, but she appeared to be making progress as evidenced by decreased irritability and more cooperation with staff over time.

The MHPC met with the patient every other day from July 8 to July 14, 2024, due to her status on suicide watch, and then she was seen weekly. The patient declined to meet in a confidential setting on two occasions but met in a private dining area with the PC on July 31, 2024. She was frequently irritable and dismissive with the staff, and the PC focused on building rapport with the patient.

The patient was cleared to attend yard and one group daily, and she began attending groups after the suicide precautions were discontinued. She participated appropriately in process and substance abuse group.

**Findings**

The mental health treatment provided to this patient was adequate.

The patient was provided with regular MHMD and MHPC contacts, appropriate treatment planning, and medication management. The treatment team was responsive to the patient's needs, and she had gradual improvement in her symptoms. Additionally, the patient was offered

clinically appropriate group therapy offerings, and there were consistent efforts to engage the patient despite her initial resistance.

**Patient B**

This 74-year-old patient's healthcare record was reviewed to assess the quality of care provided at the CIW PIP.

The patient was provided diagnoses of delusional disorder and unspecified schizophrenia. She also had physical health diagnoses of hypertension and narcolepsy. She was prescribed risperidone. On July 11, 2024, a petition for a PC 2602 order was filed to treat the patient involuntarily due to nonadherence with treatment. The patient was admitted to the CIW-PIP for intermediate care on July 1, 2024.

The patient received mental health services at the EOP level of care for three months prior to admission to the CIW-PIP; however, she had many persecutory delusional beliefs that interfered with her ability to function appropriately, and she refused to take her prescribed medications. A suicide risk evaluation was completed at the time of admission that assessed the patient with low chronic and acute suicide risk.

An IDTT meeting occurred on July 3, 2024, and the patient was present at the meeting with the required staff. Medication adherence and delusional thoughts were identified as primary problems. A seven-day IDTT meeting occurred on July 9, 2024.

The MHMD met three times per week with the patient, and long-acting injectable medication was administered to target psychosis after the PC 2602 order was obtained. The patient refused to meet in a confidential setting; as a result, all interactions occurred cell front.

The MHPC met with the patient weekly, and most of those contacts occurred in the non-contact room due to the patient's max custody status. Some inconsistencies were noted in the healthcare record, including a note on July 19, 2024 that stated the patient would be removed from max custody status; however, subsequent notes did not address that issue. Additionally, in some documentation, the patient was alternately referred to as she or he, sometimes within the same note. It was unclear from the healthcare record whether the patient preferred male pronouns, or if there were any gender-related concerns.

The patient was offered groups and was encouraged to attend them, but she declined to attend all groups. Leisure materials were brought to her cell. On July 31, 2024, the patient came to the cell door when offered group and said that she would attend the next group; this was a marked improvement for the patient. On July 8, 2024, the patient received an RVR for battery on a peace officer.

**Findings**

The mental health treatment provided to this patient was adequate.

The treatment team engaged appropriately with the patient considering her condition and status, and they made effective interventions to aid in her progress. The patient appeared to have improvement in her mental status and behavior over time.

**Patient C**

This 29-year-old patient's healthcare record was reviewed to assess the quality of care provided at the CIW-PIP.

She was provided diagnoses of major depression and unspecified mood disorder on the problem list; however, the treatment plan and MHMD notes included nonspecific mention of anxiety and psychosis as problems and diagnoses. She was prescribed Haldol, Lexapro, and hydroxyzine. The patient was admitted to the CIW-PIP on May 29, 2024.

The patient had a history of hallucinations, depression, suicidal ideation, and anxiety. The patient also had a history of MHCB and PIP placements. She reported first receiving mental health treatment at age 15 for an eating disorder, and she received involuntary mental health treatment at age 21. The patient had physical health problems including chronic GERD, pre-diabetes, and constipation, but she reported no current complaints at her admission physical examination.

The initial 72-hour IDTT meeting occurred on May 31, 2024, and all required staff were present with the patient. IPOCs were developed for depressed mood, self-harm, and substance abuse. Subsequent IDTT meetings occurred at the required intervals.

The MHMD met three times weekly with the patient in the first month of hospitalization, and then weekly. The psychiatrist added Lamictal and clonidine to address mood and anxiety symptoms. Most of the contacts occurred in a confidential setting, but some occurred in the yard.

The MHPC saw the patient weekly for individual sessions when they reviewed progress on IPOCs, the use of coping skills, response to treatment, and program participation. Most of the sessions occurred in a confidential setting, and only one session occurred at cell front due to the patient's refusal to leave her room.

The patient was offered several core and recreational groups daily, and she attended and participated frequently. Her substance use issues were addressed in routine IPOC reviews.

A SRASHE was completed on May 30, 2024 at the time of admission, and the patient was assessed with high chronic and acute suicide risk. She received no RVRs during the reporting period. Self-harm was reviewed in routine IPOC documentation, but the patient did not have any incidents of self-harm or suicidal behavior during the reporting period.

**Findings**

The mental health treatment provided to this patient was adequate.

She was seen for regular clinical contacts, therapeutic adjustments to medications occurred, and the treatment team was attentive to the patient's behavioral and emotional progress in treatment. As she progressed during the hospitalization, the treatment team appropriately considered reduction in her level of care.

**Patient D**

This 48-year-old patient's healthcare record was reviewed to assess the quality of care provided at the CIW-PIP.

The patient was provided diagnoses of antisocial personality disorder, anxiety disorder, unspecified mood disorder, opioid use disorder, and methamphetamine use disorder. She was prescribed Invega, Zyprexa, hydroxyzine, and benztropine. She received her psychotropic medications by a PC 2602 order since April 3, 2024. The patient was admitted to the CIW-PIP on May 6, 2024.

The patient had received mental health services at all levels of care during her 20 years in prison, and this was her third PIP placement in 2024. She had recently been discharged from the PIP to the EOP on April 24, 2024, but she had severe difficulty adjusting, continued to experience hallucinations, acted impulsively, and did not engage in treatment. She was then referred to the MHCB on April 29, 2024.

The initial IDTT meeting occurred on May 10, 2024. The treatment team identified goals of reducing anxiety, improving impulse control, and addressing substance use issues. Staff present at the initial IDTT meeting included the MHMD, MHPC, psychiatric technician, and correctional counselor. Subsequent IDTT meetings occurred monthly. It was determined that the patient required a single cell. The patient was assessed with low acute and high chronic suicide risk.

The MHMD met with the patient weekly to review progress and response to medications, and her medications were adjusted to address her mood instability, impulsivity, and agitation. Most of the sessions occurred in a confidential setting with some refusals by the patient to leave her cell when she was seen at the cell front.

The MHPC met with the patient weekly, and the PC notes did not indicate whether the sessions occurred in a confidential setting. The documentation of one session indicated that it occurred at the cell front.

Several groups were offered to the patient daily, including DBT, substance abuse, and other core groups; additionally, she was offered recreation and psychiatric technician-led groups. She attended the groups regularly and participated actively and appropriately.

On July 30, 2024, the patient was involved in a fight with another patient; subsequently, she was returned to step 1 solo programming. A SRASHE assessed the patient with low acute and high chronic suicide risk.

**Findings**

The mental health treatment provided to this patient was adequate.

The patient was seen consistently as required, and her treatment was appropriately modified to address her symptoms. The treatment team demonstrated responsiveness to the patient's complex needs, including her multiple diagnoses and history of treatment at various levels of care.

**Patient E**

This 36-year-old patient's healthcare record was reviewed to assess the quality of care provided at the CIW- PIP.

The patient was provided diagnoses of cannabis use disorder, PTSD, and schizoaffective disorder, bipolar type. She received her psychotropic medications by a PC 2602 order; she was prescribed fluphenazine, olanzapine, Invega, clonazepam, and clonidine. At the time of admission, the MHMD documentation indicated that ECT was being considered for the patient. The patient was admitted to the CIW-PIP on April 24, 2024.

The patient had multiple MHCB and PIP admissions due to self-directed violence, danger to others, non-engagement in treatment, and assaults on staff. She had mental health hospitalizations in the community.

The initial IDTT meeting occurred on April 24, 2024, and the patient refused to attend. The MHPC and psychologist met separately with the patient at her cell. Other staff in attendance included the MHMD, correctional counselor, nurse, psychiatric technician, social worker, and recreation therapist. An IPOC was developed with goals to decrease verbal aggression, to improve medication adherence, and to eliminate violent behavior. The patient was provided a positive behavior support plan, and it was determined that she could be moved from max custody to solo program. IDTT meetings occurred monthly and included review of treatment plan goals and updates regarding progress. On July 12, 2024, the patient refused to leave her cell for the IDTT meeting, stating that she was afraid she might harm others if she left her cell.

The MHMD met weekly with the patient in a confidential setting for approximately half of the contacts; she was seen at cell front when she refused to meet in a confidential setting. The only medication change that occurred during the reporting period was on May 1, 2024, when the MHMD restarted valproic acid for mood stabilization. The MHMD documentation indicated that a request for ECT had been submitted and was awaiting approval.

The MHPC met with the patient approximately twice weekly, and most of the sessions occurred at the cell front. The reasons provided for the nonconfidential sessions included determination that the patient was unstable and aggressive, that she was sleeping, or that she declined to leave her cell. The PC made efforts to see with the patient regularly when the positive behavior support plan was discussed, as well as goals and general progress.

Group therapy, including anger management, coping skills, symptom management and recreation therapy were offered several times weekly, and the patient usually did not show for group therapy. Staff brought worksheets to her cell and invited her to group; however, in July 2024, all the group sessions were marked no show without further elaboration.

The patient received an RVR on May 3, 2024 for threatening staff, and the psychologist determined that mental health factors likely played a role in her behavior.

**Findings**

The mental health treatment provided to this patient was adequate.

Although the patient made minimal progress; appropriate interventions were implemented, such as the positive behavior support plan, and therapeutic contacts occurred at the required intervals.

**Patient F**

This 36-year-old patient's healthcare record was reviewed to assess the quality of care provided at the CIW-PIP. The patient was provided diagnoses of borderline personality disorder, PTSD, schizophrenia, and major depression with psychotic features. She was prescribed fluphenazine, olanzapine, sertraline, lithium, divalproex, benztropine, and hydroxyzine.

A PC 2602 order was granted on January 11, 2024. The patient had multiple MHCB placements within the past year related to severe agitation, assaultive behavior, and head banging. At the time of her admission to the CIW-PIP, she was on max custody status, suicide precautions, and manual flushing of her toilet was in place. The patient was designated DDP and had adaptive supports documented in her treatment plan. She had been transferred from the acute to the intermediate level of care.

An IDTT meeting occurred on April 17, 2024, and the required staff were in attendance including the patient. The treatment team documented patient-identified goals to address head-banging, improved medication adherence and coping skills; additionally, the treatment team added danger to others to her IPOC. She was assessed with high acute and chronic suicide risk. The IDTT meetings occurred monthly when the patient's response to treatment interventions was documented. The treatment indicated that the patient was generally medication adherent, and they documented interventions to address her head banging behavior as well as adaptations in communication programming necessary as a result of her developmental disabilities. The patient was provided with a soft helmet due to the head banging behavior.

The MHMD met with the patient weekly in a confidential setting; some exceptions occurred when modified custody status was in effect or when the patient declined to leave her cell. There was documentation regarding the patient’s response to medications, medication adherence, and progress in therapy. Medication adjustments were documented with written justification.

The MHPC met twice weekly with the patient, as she was on solo programming and had a positive behavior support plan in place. The visits occurred in a confidential setting and

addressed coping skills and treatment plan goals. The assigned PC met with the patient regularly for appropriate continuity of care.

The patient was on solo programming for most of the reporting period and was offered at least two groups weekly, including recreational, stress management, anger management, and coping groups. Most of the groups offered were not core groups, and her group offerings were limited due to her solo programming status.

The patient received an RVR for battery on a peace officer on April 23, 2024. On May 28, 2024, the patient was restrained and administered Haldol and Benadryl injections due to head banging.

**Findings**

The mental health treatment provided to this patient was adequate.

The treatment team demonstrated responsiveness to the patient's complex needs, including her multiple diagnoses, developmental disability status, and high-risk behaviors. Regular IDTT meetings, frequent MHMD and MHPC contacts, and appropriate medication management were evident.

**Patient G**

This 31-year-old patient's healthcare record was reviewed to assess the quality of care provided at the CIW-PIP.

The patient was provided diagnoses of alcohol use disorder, amphetamine induced psychotic disorder, opioid use disorder, and schizoaffective disorder, depressive type. She was prescribed BuSpar, olanzapine, haloperidol, Vistaril, Remeron, and Depakene. The patient was admitted to the CIW-PIP on March 25, 2024 due to paranoia, delusions, and assaultive behavior.

The patient returned to CDCR for a second prison term on February 14, 2024. She had a history of severe behavioral and mental health symptoms including hallucinations, assaults on other incarcerated persons, suicidal thoughts, and depression. She reported receiving mental health treatment since age 13.

The initial IDTT meeting occurred on March 27, 2024; the MHMD, counselor, nurse, psychiatric technician, correctional counselor, psychologist, and recreation therapist attended. The treatment plan stated that an alternate MHPC attended, because a PC had not yet been assigned.

The treatment plan goals were to address hallucinations, violent behavior, and depression. The patient was on max custody status with a single cell recommendation, and she was reduced to medium custody within a few days.

The assigned MHMD met with the patient weekly in a confidential setting, and medication adjustments occurred according to the patient's response and behavior. Occasionally the patient declined to leave her cell, when the psychiatrist then saw her at cell front. On July 30, 2024, the

MHMD requested medical clearance and laboratory studies to initiate treatment with Clozaril due to continued psychosis, illogical thinking, fighting, and suicidal thoughts.

The MHPC saw the patient weekly when the identified treatment plan goals were addressed; those sessions usually occurred in a confidential setting, although some occurred at cell front when the patient declined to leave her cell. She was also seen daily as required while on suicide precautions, either by the MHPC or a social worker.

The patient was provided group therapy that included several core and recreational groups. The patient usually attended groups with appropriate participation, but she occasionally refused to attend.

The patient was placed on suicide precautions from May 6 to May 14, 2024, from May 20 to June 3, 2024, and from July 9 to July 16, 2024 due to perceptual disturbances and suicidal ideation. She believed that there was a cat behind her eye, and she reported hearing voices telling her to kill herself. On July 29, 2024, the patient was involved in a fight with another patient. Observations and decisions regarding the patient’s suicide watch status were documented in the progress notes, but no SRASHEs were documented.

**Findings**

The mental health treatment provided to this patient was adequate.

The clinicians provided therapy according to requirements and responded to the patient's lack of progress with increased contacts and medication changes. Of significant concern was the lack of documentation of adequate suicide risk assessment, particularly as the patient was placed on suicide precautions on three occasions during the reporting period.

**Patient H**

This 31-year-old patient's healthcare record was reviewed to assess the quality of care provided at the CIW-PIP. The patient was provided diagnoses of alcohol abuse, amphetamine abuse, and unspecified schizophrenia. She was prescribed fluoxetine, olanzapine, buspirone, propranolol, risperidone, and oxcarbazepine. The patient was admitted to the CIW-PIP on February 2, 2024.

The patient had seven MHCB referrals since placement at the reception center due to suicidal threats, banging her head, hallucinations, and emotional dysregulation.

The initial IDTT meeting occurred on February 5, 2024, and it included the MHPC, MHMD, correctional counselor, nurse, psychiatric technician, custody staff, recreation therapist and social worker. The treatment plan identified hallucinations as the primary issue of concern, and IPOCs were developed for negative symptoms and depressed mood. IPOC goals and objectives for danger to self were added on February 20, 2024. Progress through the step program system was noted in the MHPC and the IDTT notes, as the patient had improvement in emotional regulation and hallucinations.

The MHMD met with the patient weekly and tracked response to medications, adherence, and medication changes. Whether the sessions occurred in a confidential setting was not always documented, but the documentation indicated that most sessions were confidential, with a few occurring at cell front due to program restrictions or lack of escort availability.

The MHPC completed the initial assessment on February 5, 2024 and met with the patient at least weekly. Treatment goals were reviewed with the patient, as well as treatment progress and case management issues. An additional psychologist saw the patient for rounds while on suicide precautions, but otherwise the assigned MHPC routinely saw the patient.

The patient was offered and attended core groups as well as recreational and nursing-led groups, and she participated appropriately. She declined to attend several groups, sometimes stating that she was too nervous to attend.

On June 18, 2024, the patient reported suicidal ideation and thoughts of cutting her wrist after she was considered for referral to PSH and ultimate discharge to the EOP. She was placed on suicide precautions for one day, but was returned to programming, and the transfer was not initiated.

**Findings**

The mental health treatment provided to this patient was adequate.

The patient made progress during treatment to allow for transfer to a lower level of care. The therapeutic contacts were timely and adequate.

**Patient I**

This 34-year-old patient's healthcare record was reviewed to assess the quality of care provided at the CIW-PIP. The patient was provided diagnoses of antisocial personality disorder, bipolar disorder, borderline personality disorder, and opioid use disorder. She was prescribed Prolixin, Risperdal, lithium, chlorpromazine, Cymbalta, clonidine, and propranolol. She arrived at the CIW-PIP on December 8, 2023 from an MHCB.

The patient had multiple higher level of care placements for severe behavioral concerns including foreign body ingestion, suicidal ideation, kicking, yelling, and severely dysregulated emotions. She was placed on a PC 2602 order on February 8, 2024.

The IDTT meetings occurred monthly when goals for addressing anger, danger to self, and substance abuse were addressed. The MHPC was present at most of the meetings with an alternative present in their absence; the MHMD attended regularly. The correctional counselor, nurse, psychiatric technician, social worker and recreation therapist also attended the IDTT meetings.

The MHMD saw the patient weekly for clinical contacts, at times in a confidential setting, and also at cell front due to custody determination that the patient was unstable and unsafe to be

removed from her cell. On February 5, 2024, the MHMD discontinued Risperdal, Prolixin, metformin, clonidine, and Thorazine, indicating that the medications were ineffective. Zyprexa was initiated on February 22, 2024, and Abilify was started on February 29, 2024.

The MHPC met with the patient regularly, often two to three times weekly; at that time, the patient's mood, thoughts, goals, and plan of care were addressed. Most sessions occurred in a confidential setting; although, the patient was deemed too unstable to leave her cell at times. Core and recreational groups were offered to the patient several times weekly, and she frequently attended and participated appropriately.

The patient received RVRs for threatening staff on May 4, June 17, and July 13, 2024, and she received another RVR for potential for violence/disruption on June 25, 2024. The patient was placed on suicide watch on February 1, 2024 due to verbalizing thoughts of wanting to die.

**Findings**

The overall mental health treatment provided to this patient was inadequate.

Although the patient was seen timely, and the treatment team was responsive to the patient's symptomatology; the patient had severe regression and lack of treatment progress that was not addressed. Despite several incidents of suicidal thoughts and behavior, no suicide risk assessment was documented.

**Patient J**

This 33-year-old patient's healthcare record was reviewed to assess the quality of care provided at the CIW-PIP. The patient was provided diagnoses of antisocial personality disorder, bipolar I disorder with psychotic features, depressive disorder, gender dysphoria, impulse control disorder, opioid use disorder, PTSD, and obsessive compulsive disorder. She was prescribed oxcarbazepine, Suboxone, fluphenazine, and hydroxyzine.

The patient was admitted to the CIW-PIP on December 12, 2023, and was placed on a PC 2602 order on January 25, 2024. She was referred to the PIP due to poor functioning in the EOP, with refusal to attend treatment, medication nonadherence, persecutory delusional thinking, increase in verbal aggression, lability, paranoia, and poor hygiene.

The same mental health assessment dating back to 2023 was entered into each treatment plan and MHMD note; that made it difficult to discern the patient's previous history and placements. She had received mental health services at all levels of care during the prior year.

IDTT meetings occurred monthly with the patient present. Alternate MHPC and MHMDs were often in attendance; other attendees included the correctional counselor, nurse, psychiatric technician, and social worker. The treatment plan goals were not always clearly documented, but they included goals to reduce depressed mood and to address distorted thoughts. Treatment plan updates discussed the patient's progress in the step program, her max custody status, and placement on suicide watch, with little description of the patient's symptoms. The treatment

team clearly recommended that the patient remain in the PIP due to assaultive behavior, poor program participation, and lack of treatment engagement.

The patient was seen by the MHMD weekly for confidential contacts to review medication effectiveness and progress. The MHMD clearly documented medication changes and the reasons for those changes.

The MHPC met with the patient weekly and offered confidential sessions which the patient sometimes declined. Goals and progress were regularly reviewed and clearly identified in the notes.

The patient was on solo programming during much of the reporting period due her max custody status, but she was afforded core and recreation treatment groups. She declined to attend many, but participated appropriately in therapy when she attended.

The patient was placed on suicide watch on several occasions during the reporting period due to suicidal ideation that she later retracted; she stated that she was overly anxious and needed time alone as the reason for making the statements. She received an RVR for aggravated battery on May 17, 2024. Significantly, there were no SRASHEs documented in the healthcare record.

**Findings**

The mental health treatment provided to this patient was adequate.

The patient was provided with consistent treatment opportunities and contacts, as well as medications prescribed according to her needs. Her treatment was individualized and was adjusted according to her progress. The lack of clearly documented suicide risk assessment was concerning, given the frequency of suicide watch for this patient.

**Patient K**

This 46-year-old patient's healthcare record was reviewed to assess the quality of acute and intermediate care provided at CIW-PIP. The patient was provided a diagnosis of schizoaffective disorder. The patient was prescribed Zyprexa, Haldol, Cogentin, and Depakene and was under emergent PC 2602 for grave disability, danger to others, and danger to self. The patient was admitted to CIW-PIP at the Acute level of care on June 26, 2024 from the CIW MHCB.

The patient had a history of poor medication adherence which resulted in highly volatile and aggressive behaviors driven by paranoid delusions and persecutory auditory hallucinations that staff and peers were plotting against her. The patient had a history of treatment at the 3CMS, EOP, and MHCB levels of care. A SRASHE provided on admission to the PIP indicated high chronic and acute risk of self-harm.

She was admitted to the MHCB for danger to self and danger to others after she reported she swallowed a razor and had plans to hang herself. The patient was admitted to CIW-PIP on

suicide watch, as well as at Max custody status, which she remained on throughout the review period.

The patient received two IDTTs during the review period, an initial 72-hour IDTT and a routine weekly IDTT. Both IDTTs were attended by appropriate staff including a PC, psychiatrist, CC1, psych tech, and an RT. All providers were onsite for IDTTs. A covering psychiatrist attended the initial IDTT, but all other staff were the patient's assigned clinicians. The patient attended her initial IDTT but did not attend her routine IDTT, due to custody modified programming. The patient denied thoughts of harming herself or others. The patient was single-celled, and the least restrictive housing justification was appropriate, indicating that the patient's assaultive behaviors were driven by acute paranoia and delusions, making her unsuitable for a cellmate or dorm housing. The patient's treatment outcome expectations were appropriate and targeted medication and treatment adherence, attending to ADLs appropriately, reducing suicidal and homicidal thoughts, and reducing the intensity and frequency of paranoid thoughts and beliefs. The patient was to remain RVR free for 90 days. Her treatment plan included IPOCs for Max Custody status and Danger to Others, but the IPOCs lacked interventions or treatment goals. The remainder of the treatment plan, including Problems/Objectives/Goals/Interventions/Progress were pulled forward from the MHCB IDTT. Discharge criteria were not provided. The patient reportedly wanted to work on anger, grief, and obtaining her GED. At her weekly IDTT, the treatment team noted the patient had attended two of the three offered groups and her level of care was lowered to ICF. The rest of the treatment plan was carried forward unchanged from the initial IDTT and still did not include discharge criteria, IPOC goals, progress indicators, or interventions other than medication management.

The patient was offered confidential psychiatry contacts every two to three days; however, the patient occasionally declined, and those contacts were provided cell front. The psychiatrist provided an adequate initial assessment the day of admission and noted the patient denied any significant symptoms except depression, rated seven out of ten, and her mental status was within normal limits except for poor insight and judgment. Psychiatry contacts were documented appropriately, and progress notes indicated the patient stabilized quickly with medications. The psychiatrist consistently reported the patient did not demonstrate any overt psychosis or mood dysregulation, her insight improved significantly, her ADLs improved, and her paranoia was "reduced/eliminated." The psychiatrist had good rapport with the patient. Mid-July 2024 progress notes indicated the patient denied mental health symptoms and was consistently attending Max custody groups and participating in programming.

The patient received initial PC assessments from a social worker and a psychologist. Both initial assessments were provided after the patient's 72-hour initial IDTT. The initial SW assessment was completed in full, however, all information was pulled forward directly from other documents in the patient's chart. It did not provide any additional information that was not presented in the initial IDTT. The initial psychology assessment was thorough and provided the reason for the patient's admission and content from the clinical interview. The PC described the patient as cooperative, moderately engaging, with improving insight about the need for medications, and without any erratic, bizarre, or volatile behaviors. The patient received at least one daily PC contact throughout her time on suicide watch/suicide precautions. PC contacts were no longer consistent once the patient was removed from suicide precautions, but her limited

PC contacts were documented appropriately and the PC had good rapport with the patient. The PC progress notes indicated the patient was increasingly stable and engaged in treatment throughout the review period.

The patient was assigned Max custody groups facilitated by psychologists and RTs. She demonstrated consistent group attendance and a high degree of participation. The patient's group assignments included Symptom Management, Coping, Understanding Your Mental Illness, and Recreation Therapy.

**Findings**

The overall mental health treatment provided to this patient was inadequate.

Overall care and treatment were inadequate despite the patient's positive response to medications and improvements in stability. The patient's treatment plan was inadequate, and PC contacts were inconsistent after the patient was removed from suicide precautions; PC progress notes lacked any references to the patient's treatment plan or IPOCs. The treatment plan documentation was inadequate and did little to inform the patient's care except to maintain medication management. The patient's treatment goals, objectives, and interventions were not updated at either PIP IDTT during the review period and not since the patient's MHCB admission.

**Patient L**

This 52-year-old patient's healthcare record was reviewed to assess the quality of intermediate care provided at CIW-PIP. She was provided diagnoses of schizoaffective disorder, opioid use disorder, methamphetamine use disorder, eating disorder, and antisocial personality disorder. The patient was under PC2602 order for danger to self (DTS) and was prescribed fluphenazine, Risperidone, lithium, Effexor, Remeron, Vistaril, Cogentin, and Zyprexa prn. The patient arrived at the CIW-PIP on November 21, 2023 from the CIW MHCB.

The patient's level of care history included EOP, MHCB, APP, and ICF, including multiple MHCB admissions and five prior PIP admissions. The patient had an extensive history of self-harm, including ingestion of objects requiring medical interventions. The patient's chronic and acute risk of self-harm were rated as high.

The patient was in the MHCB after a suicide attempt by swallowing Tylenol. She was on Max custody status from her admission until April 24, 2024. The patient was provided nine IDTTs during the review period and attended seven. IDTTs were provided at least monthly and contained all required staff, with the majority of the IDTTs led by the patient's assigned clinicians. The treatment team noted the patient's extensive history of self-harming behaviors, suicide attempts, and violent behaviors. Given her history of ingesting non-food items, she was on a Foreign Body Ingestion (FBI) plan for the majority of the review period. On March 20, 2024, the patient ingested objects and required treatment at an outside hospital, including two colonoscopies to remove the foreign bodies. The patient's treatment goals, objectives, and interventions were appropriate and individualized. The treatment plan included IPOCs for

Swallowing, Danger to Self, Impulsive Behavior, and Max Custody. The IPOC for swallowing included appropriate interventions and progress indicators. Treatment interventions were appropriate and specific. The patient reported several appropriate treatment goals and coping strategies. The level of care justification and discharge criteria were absent or inadequate. The patient's single-cell housing justification indicated the patient's history of swallowing objects as the reason for single-cell housing. A Positive Behavior Support Plan (PBSP) was initiated in April 2024. The patient was medication and treatment adherent and frequently attended her assigned groups. Each IDTT was well-documented, included relevant updates, and prioritized the patient's safety by limiting access to objects she might swallow.

The psychiatrist offered consistent confidential weekly contacts throughout the review period. The psychiatrist noted the patient repeatedly requested to be discharged to EOP, that her mental status was generally within normal limits, and she consistently denied mental health symptoms during 1:1 contacts. There were no changes to the patient's medications during the review period and she remained adherent to her prescribed medications.

The patient received PC contacts from a psychologist, social worker, and predoctoral psychology intern. PC contacts were offered at least once per week in a confidential setting. She received daily PC contacts while on suicide watch or suicide precautions. PC progress notes were very thorough and included robust descriptions of session content and the patient's responses to interventions. The PC included other providers in sessions when appropriate and the patient appeared to benefit from the therapy and support provided by the PC.

The patient attended over 90-percent of offered groups during the review period. The patient attended Max custody and regular unit groups. Group topics were appropriate and included Learning About Trauma, DBT, Positive Psychology, Process Group, Happiness Meaning and Purpose, Anger Management, Substance Abuse/Addiction, and Rec Therapy. Groups were facilitated by psychologists, psychology interns, and RTs.

**Findings**

The mental health treatment provided to this patient was adequate.

The patient's treatment team provided consistent and well-documented contacts and treatment planning. The patient's treatment plan, IPOCS, goals and interventions, and measures of progress were individualized and appropriate. The patient was provided appropriate interventions to address challenging self-injurious behaviors, which were adjusted as clinically appropriate. Clinical progress notes were thorough, very well documented, and indicated appropriate interventions from the PCs and psychiatrists. The patient's group assignments were appropriate, and she attended the majority of her assigned groups during the review period.

**Patient M**

This 51-year-old patient's healthcare record was reviewed to assess the quality of care provided at CIW-PIP. She was provided diagnoses of schizoaffective disorder, amphetamine-type substance use disorder, with a relevant medical history of a prior traumatic brain injury. She was

under PC2602 order and was prescribed several medications and had several medication changes during the review period. The patient's medications included Zyprexa, fluphenazine, lorazepam, Benadryl, lithium, Depakene, propranolol, Risperdal, and Remeron. The patient arrived at CIW-PIP on July 23, 2019.

This patient's level of care history included EOP, MHCB, ICF, and APP. Her primary symptoms included mood instability and extremely poor impulse control that historically resulted in the patient assaulting peers or staff.

The patient reportedly felt safe in the PIP environment, spent the last five years in the PIP, and made significant efforts to remain in the PIP when discharge was discussed. She received 12 IDTTs during the review period, including routine and "special" IDTTs. All IDTTs were well-staffed and included at least one PC, a psychiatrist, CC1, RN, psych tech, and RT. Most IDTTs were provided by the patient's assigned clinicians, although several had a covering psychiatrist, and one had a covering PC. The patient attended the majority of her IDTTs and was only absent due to a lack of custody escort. The patient's primary clinical needs included reducing self-injury including headbanging and the use of suicide watch/precaution as a primary coping mechanism and improving mood stability and impulse control; the treatment team noted the patient's prior brain injury likely impacted her impulsivity and overall presentation. Her treatment plan included IPOCs for danger to others and Max Custody, with appropriate interventions and indicators that were updated at each IDTT. Additionally, the patient had a positive behavior support plan, which included appropriate incentives and consequences to address the plan's target behaviors. Singe-cell housing rationale was appropriate, noting the patient's history of unpredictable assault and violence. The discharge criteria were appropriate. Review of the IDTTs indicated the patient's overall response to treatment was positive and her insight improved, but she continued to experience sporadic instances where she "blacked out" and physically attacked a CO or engaged in headbanging. She continued to use suicide watch or precaution as a primary coping method and her overall mental status declined at the end of the review period to where she rarely left her cell to shower, or to attend individual or group treatment.

Psychiatry contacts were offered consistently in a confidential setting. Progress notes indicated the patient and psychiatrist maintained good rapport and collaborated on the patient's medication regimen to maximize efficacy and minimize side effects. The patient was medication adherent. While medication adjustments were partially effective, she reported ongoing auditory hallucinations but was able to cope with these.

The patient was offered consistent PC contacts, often twice per week for routine and PBSP contacts. PC contacts were well-documented. The PC had very good rapport with the patient and provided appropriate interventions, including coping skills training, insight development, and processing emotions. The PC and patient frequently discussed the patient's triggers and maladaptive responses to stressful situations and her intrusive thoughts. The patient was receptive to the PC interventions and worked to use the coping strategies, although she was not always successful. The PC interventions aligned with the patient's treatment plan and treatment goals and the IPOC indicators were tracked and updated appropriately in the PC progress notes.

While the patient was assigned appropriate groups, she rarely attended, and often left after five to ten minutes when she did attend. The patient's groups were facilitated by psychologists, psychology interns, and RTs.

The patient acquired two RVRs during the review period, both for battery on a peace officer. The patient reported she did not remember either incident but asked to apologize to the COs after the incidents.

**Findings**

The mental health treatment provided to this patient was adequate.

The patient's clinical contacts were timely, consistent, and well-documented. The patient had very good rapport with her providers and actively participated in her treatment planning. Although the patient's traumatic brain injury likely impacted her impulse control and coping skills development, her insight improved over the course of the review period and her maladaptive behaviors overall reduced in frequency and severity. Her medications were adjusted appropriately and the PC noted appropriate interventions and skill development. Although her group attendance was impacted by anxiety and she rarely remained for an entire group, the group assignments were appropriate.

**Patient N**

This 28-year-old patient's healthcare record was reviewed to assess the quality of acute and intermediate care provided at CIW-PIP. Her diagnosis was schizoaffective disorder, bipolar type. The patient received Zyprexa, fluphenazine, and Cogentin under a PC 2602 order for danger to self and others. The patient was admitted to CIW-PIP APP on July 5, 2024.

The patient was placed in the CCWF MHCB after suffering an acutely manic and psychotic episode in which she allegedly battered her roommate in an unprovoked attack, and broke the roommate's nose. While on 1:1 suicide watch later that night, the patient removed both her eyes. Despite treatment at an outside hospital, the patient had resultant permanent blindness. She was placed on suicide watch upon admission to CIW-PIP APP. The patient's chronic and acute risk of self-harm was rated as high.

The patient received two IDTTs during the review period. Her initial and weekly routine APP IDTT was attended by the patient's assigned PC, psychiatrist, CC1, RN, psych tech, and RT. The patient was present at both IDTTs and actively participated. Her level of care was reduced to ICF at the routine IDTT. The patient reported auditory hallucination responding well to medications, mild-to-moderate depression, anxiety, irritability, and anger at herself for pulling out her eyes. She reported her primary treatment goals were to understand her mental illness and symptoms, work on her coping skills to not hurt herself or anyone else, take her medications, accept her blindness, and program with other patients. The treatment plan included an IPOC for Hallucinations and included appropriate goals, interventions, and progress indicators. The primary goals in the treatment plan included reducing psychosis, medication adherence, and reducing the patient's risk of danger to herself and others.

The patient received an initial psychiatry assessment on the day of admission. She was offered confidential psychiatry contacts, which were performed at cell front when the patient declined. The patient reported ongoing auditory hallucinations that told her to do things, but did not include hurting herself or others. The patient was adherent to her medications, with resultant reduction in her hallucinations.

The patient participated in initial PC assessments from a social worker and psychologist, both of which were completed appropriately. Routine PC contacts were timely, consistent, and offered in a confidential setting which the patient sometimes declined. The patient received daily PC contacts while on suicide watch and frequent PC contacts on her unit. The PC and patient developed good rapport, and the patient demonstrated a positive adjustment to the PIP. PC progress notes were well-documented and noted appropriate clinical discussions. The PC consulted with the Americans with Disabilities Act Coordinator for the patient to get training in life skills without vision. The PC also noted the patient's symptoms showed consistent improvement during the review period.

The patient attended and actively participated in the assigned groups, which were clinically appropriate. Psychology interns, psychologists, and RTs facilitated the groups.

**Findings**

The mental health treatment provided to this patient was adequate.

The patient received timely and well-documented clinical contacts. The treatment plan was individualized, addressed the patient's specific needs and concerns, and included appropriate IPOCS, goals, and interventions. The patient's auditory hallucinations responded well to medications. The PCs provided appropriate coping skills training and strategies to help the patient adjust to the PIP and to being newly blind. The patient's group assignments were appropriate, and she attended most of her groups.

**Patient O**

This 43-year-old patient's healthcare record was reviewed to assess the quality of intermediate care provided at CIW-PIP. The patient was provided diagnoses of unspecified anxiety disorder, antisocial personality disorder, and anxiolytic use disorder, severe, in sustained remission. She was prescribed Cymbalta, lorazepam, Lexapro, Benadryl, Cogentin, lithium, Latuda, and propranolol. While she was under a PC2602 order initially, a renewal petition during the review period was denied. Due to the nature of her committing offense, she patient had extreme anxiety, and refused to. She was noted to engage in highly reckless and dangerous behaviors, including self-harm (including swallowing razors, cutting herself, and attempting suicide), to avoid being around her peers. The patient would often threaten to harm a cellmate, should she be double-celled. The patient had a history of treatment at the EOP and MHCB levels of care, as well as PIP hospitalizations. Her record was significant for many community psychiatric hospitalizations prior to her incarceration. She was admitted to CIW-PIP on March 15, 2023.

The patient attended all seven IDTTs during the review period. All required IDTT members were present, including her assigned PCs and psychiatrist, as well as nursing and a CC1. The patient was Step 3 and assigned to groups. The treatment plan included IPOCs for Anxiety and Danger to Self, which had appropriate interventions and progress indicators. The treatment team discussed discharge to EOP with unlocked dormitory housing but appropriately retained the patient after her PC 2602 expired to monitor her medication adherence and stability. The patient was medication adherent, and she came out of cell for 1:1 clinical contacts and some groups, but she refused dayroom and yard. The treatment team appropriately adjusted the patient's goals and interventions to encourage out of cell time and treatment adherence. The level of care justification and discharge criteria were appropriate.

The patient was offered a confidential psychiatry contact every seven-10 days during the review period. The patient and psychiatrist collaborated to optimize medications and minimize side effects. The patient frequently reported ongoing high levels of anxiety about coming out of cell for yard or dayroom and she frequently reported feeling overwhelmed by the thought of being around her peers.

PC contacts were offered every seven-10 days in a confidential setting. The patient's PC noted the patient had not engaged in any self-injurious behavior SIB since her PIP arrival. The PC progress notes were well-documented, noting interventions consistent with the treatment plan. The PC performed targeted interventions to reduce the patient's anxiety around going to the dining room and yard. The PC appropriately adjusted the patient's treatment goals and discharge criteria to better align with the patient's functioning and EOP level of care expectations. The PC also demonstrated very good coordination and continuation of care by collaborating with the EOP PC and even included them in individual sessions with the patient.

While the patient was assigned appropriate groups, attendance was poor due to anxiety about being around peers. The groups were facilitated by psychology interns and RTs.

**Findings**

The mental health treatment provided to this patient was adequate.

The patient received consistently timely and well-documented clinical contacts and IDTTs. The providers collaborated well with the patient and with one another to encourage the patient's program adherence and participation. The treatment team appropriately modified the patient's treatment goals and discharge criteria to more closely align with EOP programming requirements and to address her anxiety. While the patient remained highly anxious regarding leaving her cell, her participation in treatment improved over the course of the review period. The psychiatrist collaborated with the patient regarding her medications and the patient remained medication adherent after her PC 2602 expired. The PC collaborated closely with the EOP clinician who would treat the patient after discharge from PIP.

**Patient P**

This 62-year-old patient's healthcare record was reviewed to assess the quality of intermediate care provided at CIW-PIP. The patient was provided diagnoses of alcohol use disorder, moderate in a controlled environment, and schizoaffective disorder, bipolar type. The patient was prescribed Haldol, Zyprexa, Cogentin, Depakote, perphenazine, Benadryl, and fluphenazine under a PC 2602 order. The patient arrived at CIW-PIP ICF on October 21, 2015.

Additionally, the patient was a participant in the Developmental Disability Program at the level of DD2, reflecting the need for prompts for ADLs, and risk of victimization. Her primary symptoms included grandiose delusions, and auditory hallucinations telling her to hurt herself and others. Relevant medical conditions included Type 2 Diabetes, with resultant chronic kidney disease. The patient had an extensive history of state hospital admissions and had received treatment in a PIP since 2012.

The patient received ten IDTTs during the review period. All IDTTs were well-staffed and attended by a PC, psychiatrist, CC1, RN, and psych tech. IDTTs were occasionally staffed by a covering PC or psychiatrist. The patient's primary treatment interventions were medication management and supportive behavioral therapy with positive reinforcement. This treatment plan was appropriate given the patients DD2 status, acute psychosis, and impulsivity. The treatment plan incorporated the patient's DD2 status, and included appropriate IPOCs, interventions, measures of progress, and treatment goals. The patient's treatment plan also included a safety plan in case of headbanging behaviors. Treatment planning was appropriate and individualized for this patient and her presentation.

The patient was offered consistent psychiatry contacts every five to 10 days throughout the review period; contacts were offered in a confidential setting unless custody modified program was in place. The patient's medications were not changed during the review period, and the patient's overall mental status appeared to remain consistent. The patient remained psychotic, impulsive, and was frequently observed responding to things that others could not perceive. The psychiatry progress notes were updated appropriately at each contact. The patient remained medication adherent throughout the review period and reported no problems or side effects from her medications.

The patient received PC contacts from her primary PC and a Positive Behavioral Support Plan PC, with notes reflecting close coordination and alignment of treatment goals. Contacts were offered in a confidential setting, but some were held cell front due to custody modified programming, or the patient being deemed unsafe for escort due to her unpredictable assaultive behaviors. The PCs documented behavioral interventions at each contact.

The patient received one-to-one RT contacts to work on PBSP goals, which were well-documented and aligned with the patient's treatment plan.

There were several episodes where the patient's safety plan was activated, and she was briefly placed in four-point restraints and on one-to-one suicide watch after headbanging episodes and

required prn fluphenazine to deescalate. The patient was provided with a special IDTT after each episode and behavioral interventions and treatment plans were updated appropriately.

**Findings**

The mental health treatment provided to this patient was adequate.

The patient received timely and well-documented IDTTs and clinical contacts. Treatment planning was appropriate and aligned with the patient's treatment needs and clinical presentation. The patient's mental illness was very longstanding and treatment/medication resistant. The patient was medication adherent, received two PC contacts per week, and contacts were well documented. PC progress notes included appropriate behavioral interventions and IPOC progress indicators were updated appropriately in most PC progress notes. The patient's safety plan was utilized several times during the review period and outcomes were appropriate. The patient also received 1:1 RT contacts to further support her behavioral plan.

**Patient Q**

This 43-year-old patient's healthcare record was reviewed to assess the quality of intermediate care provided at CIW-PIP. The patient was provided diagnoses of schizoaffective disorder, bipolar type, antisocial personality disorder, borderline personality disorder, and methamphetamine dependence. Relevant medical conditions included a seizure disorder. Additionally, the patient had a history of drinking excessive amounts of water to the point of lowering the electrolyte levels in her blood, a potentially life-threatening condition. The patient was prescribed Invega long-acting injectable, clozapine, fluphenazine, lurasidone, Zyprexa, Haldol, Lexapro, Cogentin. The patient had a history of treatment at the EOP, MHCB, and ICF levels of care. The patient was admitted to CIW-PIP ICF on October 28, 2022 from CIW MHCB.

The patient received timely routine IDTTs and several special IDTTs during the review period. All IDTTs were staffed with required members, except for one that indicated an RN substituted for the psychiatrist. The patient attended approximately half of her IDTTs. The patient's primary symptoms were bizarre and delusional thought content, ongoing auditory hallucinations, and unpredictable behaviors. The primary treatment focus was to develop coping skills, improve reality testing, improve mood regulation, decrease impulsivity, and better manage psychosis and risk of danger to others. The patient's self-reported primary goals were to attend groups, take her medications, and transfer to Patton State Hospital. The patient frequently refused oral Zyprexa, and accepted injections instead. The treatment plans included appropriate IPOCS, interventions, case formulation, clinical summary, justification for single-cell status and level of care, and discharge criteria. The patient's progress was tracked and updated appropriately during PC contacts. The patient was also on a water restriction care plan due to her excessive water consumption. The patient was paranoid, verbally aggressive to staff and peers, and had thoughts of harming others, which resulted in poor group attendance. The treatment team discussed ECT with the patient, but the patient refused, at least partially due to paranoid delusions regarding the treatment team and stated she would be suicidal if she received the treatment.

The patient was offered weekly psychiatry contacts in a confidential setting although some contacts were provided cell front due to the patient's refusal. The patient remained acutely psychotic despite frequent medication adjustments. Given her treatment-resistant psychosis, she was started on clozapine. The patient was mostly medication adherent until June 16th, 2024, then she started to refuse all her medications, decompensated, and became acutely psychotic and delusional. Due to nonadherence, clozapine was discontinued and replaced with Zyprexa and Haldol. The psychiatrist also noted possibly exploring court-ordered ECT if the patient's symptoms continued.

The patient received consistent PC contacts one to two times per week depending on the severity of her symptoms. The patient was usually seen cell front after refusing a confidential setting due to not feeling safe to leave her cell. The patient was appropriately placed on solo programming when she endorsed thoughts to harm or attack others. PC progress notes were robust, and included appropriate mental status updates, updated IPOC progress indicators, and frequent consultations with psychiatry and nursing. The PC and patient had good rapport and the PC documented appropriate behavioral interventions when they were able to engage with the patient. The PC continued to attempt to meet with the patient after the patient's decompensation in July 2024, but most of those sessions appeared unproductive due to the severity of the patient's symptoms.

The patient attended several appropriate treatment groups in February 2024. The patient went on solo programming from mid-February through early July 2024 then slowly started attending symptom management group twice per week.

**Findings**

The mental health treatment provided to this patient was adequate.

The patient received timely and consistent clinical contacts including IDTT, PC contacts, psychiatric contacts, and RT one-to-ones when she was placed on solo programming. Treatment planning was appropriate and individualized. Her treatment was made more difficult by medication resistant psychotic symptoms and paranoid delusions. The psychiatrist attempted several medication trials and overall medication management appeared appropriate. The psychiatrist appropriately noted considering ECT if the patient's symptoms continued to be non-responsive to medications. The PCs provided appropriate interventions which were consistent with the patient's treatment plan. The patient's providers documented collaboration of care. The patient was offered and attended appropriate groups when her mental status allowed.

**Patient R**

This 39-year-old patient's healthcare record was reviewed to assess the quality of intermediate care provided at CIW-PIP. She was provided a diagnosis of chronic paranoid schizophrenia and she was prescribed Seroquel, Invega, Cymbalta, lithium, Depakote, Vistaril, perphenazine, Ativan, propranolol, and Cogentin. Additionally, the patient had a history of potentially life-threatening excessive water consumption. She was admitted to CIW-PIP ICF on February 16th, 2018 due to suicidal thoughts and danger to others.

The patient received seven IDTTs in the review period, all of which were timely with required staff present, with occasional substitutes for her assigned PC and psychiatrist. The patient attended approximately half of her IDTTs. While the patient was on Step 3, she was lowered to Step 1 and placed on Max custody, after hitting her PC in the face. She came off Max custody on April 24th, 2024 and was placed on Solo programming status due to her impulsive and unpredictable behaviors. The patient reported her treatment goals were to be medication adherent and to not assault anyone. While the IPOC areas were appropriate, the goals and interventions were general and limited. Progress indicators were updated appropriately at each IDTT. At the April 30, 2024 IDTT the treatment team added an appropriate IPOC for positive behavioral support that targeted the patient's impulsive behaviors. The discharge criteria were general but appropriate. The patient had persecutory delusions, with resultant refusal of groups and out of cell one-to-one contacts when feeling unsafe.

The patient was offered confidential routine psychiatry contacts approximately every five to 10 days; however, patient refusals and modified programming due to the patient's assaultive or aggressive behaviors resulted in frequent cell front sessions. Psychiatry contacts were documented appropriately and included rationales for medication adjustments. The psychiatrist documented frequent consultations with the patient's PC and other providers regarding the patient's symptoms and presentation.

PC contacts were also offered in a confidential setting, but the patient frequently declined and spoke with her PC at cell front. The patient was on solo programming for the majority of the review period due to striking her PC in the face. The patient received two PC contacts per week while on Solo programming and the PCs documented routine contacts and positive behavioral support plan contacts appropriately, with interventions aligned with treatment plan goals. The PC documented appropriate coping skills training, and review of IPOCs and treatment goals. Coordination of care was appropriate and the PC documented frequent consultations with other PCs and the patient's psychiatrist.

The patient was offered Max custody groups and was provided one-to-one contacts with a RT when on solo programming status. While group topics were appropriate, her attendance was inconsistent.

**Findings**

The mental health treatment provided to this patient was adequate.

The patient received consistent and timely clinical contacts and IDTTs. The patient's treatment plan was adequate and included appropriate and individualized goals and IPOCS. The PC appropriately provided incentive-based interventions from the patient's behavior plan. The psychiatrist adjusted the patient's medications appropriately. The patient's providers collaborated well on her treatment and overall care.

**Patient S**

This 71-year-old patient's healthcare record was reviewed to assess the quality of intermediate care provided at CIW-PIP. She was provided a diagnosis of schizoaffective disorder, bipolar type. She was prescribed Zyprexa, fluphenazine, and Depakote under a PC 2602 order for danger to others. The patient arrived at CIW-PIP ICF on June 28, 2023.

The patient's treatment history included intermediate care at PIP and DSH. The most recent SRASHE on June 28th, 2023 indicated moderate acute and high chronic risk of self-harm.

The patient received six routine IDTTs during the review period, all of which included required staff. The patient attended five of six IDTTs. The patient's primary symptom was aggression to herself, and others driven by delusional thinking which was worsened during periods of medication nonadherence. The patient was Step 3 and was assigned to two groups per day, walk alone yard, and no day room. The patient required redirection and prompts to take medications, and to come out and return to her cell. The patient's treatment plan included appropriate IPOCs, interventions, measures of progress, and justifications for least restrictive housing, level of care, and discharge criteria. The clinical summary was not updated and contained a significant amount of information that was pulled forward. The treatment plan also included a behavioral support plan to encourage better ADLs and decrease the patient's hostile verbal responses towards staff. While the patient denied auditory hallucinations, staff observed her responding to things that others did not experience.

The patient was offered confidential psychiatry contacts every seven to 10 days, but she often declined and opted for cell front contacts. The psychiatrist noted the patient had no insight, denying any mental health symptoms. The psychiatrist documented consultations with nursing staff and the patient's PC regarding the patient's behaviors. Over the review period the patient attended and stayed in groups more appropriately, was less disruptive, and was more easily redirectable.

The patient was offered weekly PC contacts, which were documented appropriately and aligned with the patient's IPOCs and treatment plan. The patient was engaged in sessions, but she fixated on medications for sleep, discharge to PSH, or release to go home. The patient and PC frequently discussed coping skills and behavioral plan interventions. PC progress notes were well written and reflected overall improvement in the patient's symptoms and behaviors over the review period.

The patient attended core clinical groups, NLTG groups, and recreational therapy groups. Clinical group topics were appropriate. The patient's inconsistent group attendance was appropriately addressed with behavioral interventions.

**Findings**

The mental health treatment provided to this patient was adequate.

The patient was provided timely and well-documented PC and psychiatry contacts throughout the review period. The patient's treatment plan included appropriate treatment goals, interventions, justifications for level of care, and discharge criteria. The IPOCs and interventions/indicators were appropriate, tracked, and updated in the PC progress notes and at IDTTs. The PC provided clinical interventions and support that was consistent with the treatment plan. The patient's providers demonstrated good continuity of care and frequently consulted with each other. The patient's overall mental status improved in response to treatment.

**Patient T**

This 35-year-old patient's healthcare record was reviewed to assess the quality of intermediate care provided at CIW-PIP. The patient was provided diagnoses of bipolar one disorder; schizoaffective disorder, bipolar type; methamphetamine use disorder; and antisocial personality disorder. Medication included Seroquel, and PRN Cogentin.

The patient had a history of treatment at the 3CMS, EOP, MHCB, and ICF levels of care. The patient endorsed grandiose, paranoid, and bizarre delusions and usually presented as very guarded.

The patient arrived at the CIW-PIP ICF program on March 8, 2023. The patient was admitted with psychosis, and resultant. Serious Impairment Due to Mental Illness. She received seven IDTTs during the review period. All IDTTs were staffed by the patient's assigned providers and CC1, but the patient refused to attend. Her treatment goals were to stay sober "do her time her way," and eventually parole. The patient's treatment plan included IPOCs for Delusions and Treatment Nonadherence. The IPOCs included interventions and progress indicators which were appropriate for the patient's presentation and treatment goals. In the February IDTT, the treatment team noted the patient was stable, had met most of her treatment goals, and had not been prescribed medications for several months. The treatment team recommended discharge to CIW's outpatient unit which provides additional support and services. The patient programmed well, with increased group attendance.

The patient was offered weekly confidential psychiatry contacts, which she occasionally declined. The patient refused labs and medical workups ordered by the psychiatrist; however, with staff encouragement, she eventually completed them.

PC contacts were offered weekly in a confidential setting, although the patient occasionally declined. The patient's presentation remained stable, and she was responsive to PC inquiries and questions. The PC reviewed and appropriately updated the patient's IPOCs, and documented progress towards treatment goals. The patient was generally ambivalent about participating in treatment but responded to the PC's encouragement to attend groups and was looking forward to discharge to EOP.

The patient was assigned appropriate group topics but rarely attended. As she approached discharge, attendance increased to just over 50 percent in response to encouragement from the treatment team. The groups were facilitated by psychology interns and RT's.

**Findings**

The mental health treatment provided to this patient was adequate.

The patient was provided timely and well-documented clinical contacts which were offered in a confidential setting, although the patient occasionally refused and participated in cell front contacts. The patient's treatment planning was appropriate for her needs, and she met her treatment goals prior to consideration for discharge. She reportedly agreed with the plan to discharge to EOP instead of a state hospital level of care. The PC and psychiatrist maintained consistent weekly contacts, and the patient maintained good rapport with her providers. She was not prescribed medications for several months prior to the review period and remained stable. The treatment team appropriately retained the patient for several months after discontinuation of medications. The PIP treatment team appropriately prepared the patient for discharge to EOP and coordinated closely with the EOP clinicians treating her after discharge.

**APPENDIX D5**
**San Quentin Rehabilitation Center (SQ-PIP)**
Review Period: February 1, 2024 – July 31, 2024

**Patient A**

This 40-year-old patient's healthcare record was reviewed to assess the quality of care provided at the SQ-PIP acute level of care. The patient was provided diagnoses of schizophrenia and antisocial personality disorder. He was prescribed clozapine and hydroxyzine. The patient was admitted the SQ-PIP on June 5, 2024.

The patient entered CDCR in 2003, and he had multiple higher level of care placements as well as chronic treatment nonadherence. His symptoms included reclusiveness, suicide attempts, and poor hygiene. The patient was additionally diagnosed with psoriasis and anemia. Early in 2024, the patient was treated at an outside hospital for rhabdomyolysis due to treatment with Haldol.

An initial IDTT meeting occurred on June 5, 2024 that included an alternate MHPC and MHMD and a correctional counselor. The patient was receiving treatment at an outside hospital and did not attend. While the treatment plan documented the patient's history and concerns, the only documented goal was for him to take a walk twice daily. Subsequent IDTT meetings occurred timely.

The initial psychiatric assessment occurred on June 5, 2024, and the patient was seen by a psychiatrist at least three times weekly. The patient was seen by three different psychiatrists who met with the patient regularly.

The initial PC assessment occurred on June 6, 2024, and the MHPC met with the patient at least three times weekly. The documentation indicated that the PC sessions occurred at the patient's cell in a nonconfidential setting, while some occurred at the observation cell where the patient was housed for suicide watch.

The patient spent much of his time in his cell, and he was placed on suicide watch observation for several days. A SRASHE was completed at the time of admission on June 5, 2024, and the patient was assessed with high chronic and acute suicide risk.

No documentation of group therapy sessions was located in the healthcare record.

**Findings**

The mental health treatment provided to this patient was adequate.

The patient's symptoms were severe and difficult to treat, and his clinical progress was closely monitored throughout his hospitalization. Due to the requirements of his one-to-one suicide observation status, group therapy was not offered.

**Patient B**

This 64-year-old patient's healthcare record was reviewed to assess the quality of care provided at the SQ-PIP at the intermediate level of care. The patient was provided diagnoses of schizophrenia, antisocial personality, and neurocognitive disorder. He was prescribed aripiprazole, fluoxetine, and clozapine.

The patient was hospitalized at the SQ-PIP since August 19, 2019 for treatment of delusional thinking, poor self-care, and inability to appropriately function at lower levels of care or in general population. He believed that he was someone other than himself, and that a computer in his neck prevented him from walking. His first psychiatric inpatient referral occurred in 1993. He utilized a wheelchair and had multiple medical health concerns.

An IDTT meeting occurred monthly with the assigned MHPC and MHMD present at the meetings; the RN, correctional counselor, psychiatric technician, and social worker were also present regularly. The treatment team documented that the patient attended most of the offered groups and described his clinical status, with justification provided for retaining the patient at the intermediate level of care. Problems identified in the treatment plan were psychosis, cognitive impairment, and social skills deficit.

The patient was seen by the MHMD in a confidential setting weekly or sometimes more often, and the MHMD documented the patient's mental status, program participation, and response to medication treatment.

The patient was also seen for MHPC contacts weekly in a confidential setting. During those sessions, the patient's mental status, participation in therapeutic activities, and treatment plan goals were reviewed. The patient required frequent reminders to use coping skills and to adhere to the treatment programming. The patient had severe communication deficits, and he reportedly presented with active delusional thinking during encounters with his clinicians.

The patient attended group therapy that included mental health education groups and recreation therapy approximately three to four times weekly, but no process therapy groups were documented.

**Findings**

The mental health treatment provided to this patient was adequate.

The patient was severely limited in his capability to engage in therapeutic activities due to his physical and mental health conditions. He was followed consistently by his clinicians, and was provided the therapy appropriate for his condition.

**Patient C**

This 59-year-old patient's healthcare record was reviewed to assess the quality of care provided at the SQ-PIP at the intermediate level of care. The patient was a transgender woman who

preferred the use of female pronouns. She was provided a diagnoses of depressive disorder and unspecified anxiety disorder. She was prescribed Lexapro and mirtazapine. The patient was admitted to the SQ-PIP on December 16, 2024 after a suicide attempt by overdose.

The patient initially entered the MHSDS in 2020 after a suicide attempt by overdose. She had multiple medical problems, including atrial fibrillation, migraine headaches, hypertension, and GERD. She was sentenced to death for a crime committed in 1988.

An admission SRASHE assessed the patient with moderate acute suicide due to her ongoing concern regarding transfer to a different male facility where she would feel unsafe.
The first IDTT meeting in the review period occurred on February 13, 2024, and the assigned MHPC, an alternate MHMD, the correctional counselor, and psychiatric technician were present. The treatment plan documented relevant goals, including reduction of depressive symptoms and thoughts of self-harm, medication adherence, and treatment adherence.

The MHMD met with the patient at least weekly and often more frequently, and the psychiatric documentation indicated that a thorough review of the patient's symptoms and progress occurred. The patient's response to medication treatment was also closely monitored.

The patient was seen weekly by the MHPC in a confidential setting. The treatment plan goals and status were reviewed regularly, as well as the patient's suicide risk. The patient was anticipating transfer to a women's facility, and that was a frequent source of discussion during the sessions. The PC also encouraged participation in social and program activities.

Therapeutic groups including recreation, mental health education, health, and transgender support were offered daily, and the patient regularly attended and participated. No process psychotherapy groups were documented.

**Findings**

The mental health treatment provided to this patient was adequate.

The patient was seen timely for therapeutic, confidential sessions with the psychiatrist and PC. Treatment planning was appropriate. Although offered group treatment daily, the lack of clinician-led groups was concerning.

**Patient D**

This 24-year-old patient's healthcare record was reviewed to assess the quality of care provided at the SQ-PIP at the intermediate level of care. The patient was provided diagnoses of schizophrenia and antisocial personality disorder. He was prescribed clozapine, Haldol, Prozac, and lithium. The patient was admitted to the SQ-PIP on February 21, 2023

The patient had multiple MHCB placements in the prior several years due to severe psychosis, suicidal thoughts, and panic attacks.

An admission SRASHE assessed the patient with high chronic and low acute suicide risk, and the clinicians provided ongoing monitoring of the patient's suicide risk.

IDTT meetings occurred monthly and were attended by the assigned MHPC, MHMD, correctional counselor, and psychiatric technician, as well as the patient. The treatment plan goals addressed group attendance, individual session participation, reality testing, and personal hygiene. The patient participated in goal setting and acknowledged his strengths with some assistance.

The MHMD documented weekly notes about the patient's status and progress; however, the notes often stated that the healthcare record was partially reviewed with no indication whether the patient was seen in person. Occasional notes stated that the patient was seen in the office. The patient's response to medications, symptoms, and adherence were noted appropriately.

The MHPC saw the patient weekly and sometimes more frequently in a confidential setting when they discussed the patient's current symptoms and concerns, participation in programming, and coping skills. Information from other treatment team members was integrated by the MHPC into their assessments, such as relevant group, nursing, and custody staff information.
Recreation therapy, health, and mental health education groups were offered daily, and the patient attended and participated; however, no core groups were documented.

**Findings**

The mental health treatment provided to this patient was adequate.

The MHPC and MHMD sessions were clinically appropriate, although the lack of documentation regarding confidentiality in the MHMD documentation was noted. While the patient attended recreation groups daily, no core groups were offered.

**Patient E**

This 45-year-old patient's healthcare record was reviewed to assess the quality of care provided at the SQ-PIP at the ICF level of care. The patient was provided diagnoses of borderline personality disorder, gender dysphoria, major depressive disorder, and schizoaffective disorder. She was prescribed clozapine, clonazepam, Abilify, Zoloft, and olanzapine prn. A PC 2602 order was in place since 2019. The patient was admitted to the SQ-PIP for intermediate care on May 5, 2023.

The patient had a history of self-directed injury as a teenager and was provided a diagnosis of gender dysphoria at age 13. She had multiple MHCB placements and five inpatient admissions during her incarceration due to suicide attempts and severe self-injury; that included one inpatient stay that lasted almost three years from April 2015 to January 2018.

The IDTT meetings occurred monthly with the patient, MHPC, MHMD, correctional counselor, psychiatric technician, and recreation therapist regularly in attendance. Her treatment plan goals

included decreasing anxiety and self-harm, improved regulation of her emotions and behavior, and decreasing depressive symptoms.

The MHMD met with the patient with medication adjustments in response to laboratory studies and symptoms. On June 24, 2024, the psychiatrist added Zoloft to address the patient's ongoing depression and suicidal thoughts. Many of the notes indicated that the patient was seen in a confidential office setting, and occasionally the patient was seen at cell front without explanation. Some psychiatric notes did not address whether the session occurred in a confidential setting. The patient had occasional medication nonadherence that was promptly addressed with discussion and education.

The MHPC and social worker met with the patient several times weekly in a confidential office setting, and her status and progress in treatment were regularly reviewed. The documentation indicated that the patient would remain at the current level of care due to her lack of progress in treatment. Assessment of the patient's depressive symptoms indicated moderately severe depression.

Group therapy, including health issues, recreation therapy, and mental health education, were offered daily, and the patient attended most offered groups. No core groups were documented.

**Findings**

The mental health treatment provided to this patient was adequate.

The patient was seen timely for appropriate clinical sessions with the PC and psychiatrist with appropriate symptom management. Treatment planning was clinically appropriate. There was a lack of offered core groups. It was unclear if some psychiatric sessions occurred in confidential settings. Due to the patient's ongoing severe symptoms and difficulty progressing, the treatment team should reevaluate treatment planning to better address the patient’s complex needs.

**Patient F**

This 65-year-old patient's healthcare record was reviewed to assess the quality of care provided at the SQ-PIP at the intermediate level of care. The patient was provided diagnoses of schizophrenia, neurocognitive disorder, and impaired intellectual functioning. He was prescribed Haldol, Cogentin, and Lamictal. The patient was admitted to the SQ-PIP on October 26, 2023.

The patient had a significant mental health history that included three PIP admissions, and a PC 2602 order that was in place since April 9, 2024.

A SRASHE assessed the patient with low acute and chronic suicide risk, and his suicide risk was monitored during the hospitalization.

The IDTT meetings occurred monthly and were attended by the MHMD, assigned MHPC, correctional counselor, recreation therapist and social worker. The treatment plan included goals

related to poor hygiene, medication nonadherence, and psychosis. The rationale for continuation at the intermediate level of care was reviewed and documented, as the patient's continued symptoms and lack of progress resulted in an inability to function adequately at a lower level of care.

Three psychiatrists met with the patient in a confidential setting several times weekly. The assigned MHMD met with the patient regularly and closely monitored the patient's response to medications and programming.

The PC and a social worker met with the patient in a confidential setting weekly. The patient's responsiveness to treatment and progress toward treatment plan goals were reviewed as well as plans for further assessment. In July 2024, the PC indicated that the treatment team determined that additional intellectual functioning testing was necessary which was scheduled accordingly.

Health issues, recreation, leisure activities, and mental health education groups were offered daily, but no core therapeutic groups were documented. The patient attended most of the groups that were offered and participated appropriately.

**Findings**

The mental health treatment provided to this patient was adequate.

The treatment team meetings occurred timely with frequent and clinically appropriate MHMD and MHPC contacts, and appropriate medication management. There was a lack of core therapeutic groups offered.

**Patient G**

This 71-year-old patient's healthcare record was reviewed to assess the quality of care provided at the SQ-PIP at the intermediate level of care. The patient was provided diagnoses of schizoaffective disorder, bipolar type, and unspecified anxiety disorder. He was prescribed clonazepam, Remeron, and quetiapine. The patient was admitted to the SQ-PIP on March 21, 2024.

The patient had a lengthy history of mood instability, psychosis, grandiose and persecutory delusional thinking. His significant impairment prevented adequate functioning in general population. He utilized a wheelchair due to neuropathy, and he had several additional medical concerns.

The IDTT meetings occurred monthly and included the MHPC, MHMD and correctional counselor consistently; the nurse and psychiatric technician did not consistently attend. The patient refused to attend some of the meetings due to paranoid beliefs. Goals were developed to address medication nonadherence, to improve therapy attendance, and to learn coping skills to manage distress. The goals section of some of the treatment plans was not completed.

The MHMD met with the patient weekly and reviewed the patient's symptoms, behavior and thought content, suicide risk, and response to medications. The patient was encouraged to participate in programming. He was rarely seen in a confidential setting for those sessions, as he declined, or unit activities prevented a confidential meeting. The rationale for continuation at the intermediate level of care was provided, as the patient did not exhibit a change in symptoms or willingness and ability to engage significantly in treatment.

The assigned PC and social worker met at least twice weekly with the patient; however, he declined to leave his cell, stating that he preferred to continue reviewing his legal paperwork. His mental status and treatment progress were assessed, and the patient typically was focused on persecutory delusions regarding his legal status. The documentation indicated that the patient appeared to be at his baseline level of functioning with limited insight regarding his mental illness and chronic delusional thinking, but he had no episodes of acute psychosis.

The patient would not attend group therapy, and the documentation regarding groups were supply contacts for bringing the patient therapeutic materials. He refused to accept any supplies offered.

**Findings**

The mental health treatment provided to this patient was adequate.

Although the patient declined confidential therapeutic contacts and did not attend groups, the staff consistently attempted to engage the patient in treatment and closely monitored his clinical status.

**Patient H**

This 68-year-old patient's healthcare record was reviewed to assess the quality of care provided at the SQ-PIP at the intermediate level of care. He was provided diagnoses of schizophrenia, antisocial personality disorder, and multiple substance use disorders. He was prescribed Haldol and olanzapine. The patient also had medical conditions that included dyslipidemia, constipation, psoriasis, and hypertension. The patient was admitted to the SQ-PIP for intermediate care on April 22, 2024.

The patient was serving a death penalty sentence, and he had a lengthy history of psychosis and suicidal behavior, frequently reacting to paranoid beliefs about others intending to harm him. He received ECT during a recent SQ-PIP placement.

IDTT meetings occurred monthly and were attended by the MHPC, MHMD, correctional counselor, social worker, recreation therapist, psychiatric technician, and the patient. The treatment plan goals addressed obesity, hallucinations, substance use, discussing thoughts, medication adherence, and attending psychoeducation groups.

The MHMD completed a thorough initial assessment on April 23, 2024, which integrated the patient's past and current response to various treatments including hospitalizations, ECT in 2021,

and past medication trials. The patient was seen by two psychiatrists at least twice weekly, and although the sessions occurred in person, he was often seen at cell front without explanation for the lack of a confidential meeting. There was a lapse in psychiatric contacts from June 18 until July 2, 2024.

The MHPC and social worker each met with the patient weekly in a confidential office setting. Although the documentation reflected the patient's verbalizations and behavior, treatment plan goals and progress were not well documented. In each note, the same phrase was written each week regarding an observation that the patient did not appear to be behaviorally driven by his beliefs at this time and continued to take his meals. Yard and group attendance was recorded but without specific frequency documented.

The patient usually refused to attend groups but was offered recreation therapy, health issues, and mental health education groups. He attended health issues groups occasionally and participated appropriately.

The patient did not have any incidents of suicidal behavior or RVRs during the reporting period and showed some gradual signs of improvement in normalized thinking with less evidence of delusions or agitation.

**Findings**

The mental health treatment provided to this patient was adequate.

The patient showed some improvement in his chronic symptoms during his hospitalization. The treatment team demonstrated responsiveness to the patient's complex needs; however, areas of needed improvement included the lack of confidentiality of many MHMD sessions without documented justification, the limited documentation of progress towards treatment plan goals in MHPC notes, and the absence of core therapeutic groups.

**Patient I**

This 56-year-old patient's healthcare record was reviewed to assess the quality of care provided at the SQ-PIP at the intermediate level of care. He was provided diagnoses of schizophrenia, alcohol dependence, antisocial personality disorder, and borderline personality disorder. He was prescribed buspirone, clozapine, and Haldol. He had previously been admitted to the MHCB due to danger to self and severe functional impairment. He also had recently begun receiving ECT twice weekly under a court order since June 6, 2024; the treatments were reduced to monthly at the time of his admission to the SQ-PIP. The patient was admitted to the SQ-PIP on May 7, 2024.

The patient had a history of substance use beginning in early adolescence with heavy drug and alcohol use. As he entered early adulthood, he developed significant mental health symptoms including psychosis, severe anxiety, and depression. In 1996, the patient was hospitalized involuntarily. In 2005, he received a death sentence for convictions related to murder and rape.

A SRASHE was completed upon admission that assessed high chronic and moderate acute suicide risk. The initial IDTT meeting occurred on May 9, 2024, and included the MHPC, MHMD, correctional counselor, nurse, physician, social worker, and recreation therapist. The patient helped develop goals to address intrusive thoughts, paranoid beliefs, and depressive symptoms such as lethargy and anhedonia. The IDTT meetings occurred monthly.

The MHMD saw the patient weekly in a confidential setting to assess his cognition, emotional well-being, adherence to treatment programming, and medication response. The psychiatrist addressed the patient's concerns, and they appeared to have a good rapport.

The MHPC completed an initial assessment on May 8, 2024, and the patient's history and current functioning were reviewed. Notably, the patient stated that he was lazy and not depressed in response to a question regarding his lack of progress in step goals. The PC and social worker saw the patient twice weekly when his mental status was monitored, and he was encouraged to engage in treatment activities.

Recreation, health issues, and mental health education groups were offered daily, and the patient attended about half of those groups. No core therapeutic groups were documented.

**Findings**

The mental health treatment provided to this patient was marginally adequate.

The patient was appropriately engaged with the treatment team and monitored closely while receiving significant pharmaceutical interventions and ECT regularly. Although he received recreation groups, no core therapeutic groups were offered.

**Patient J**

This 44-year-old intermediate care patient's healthcare record was reviewed to assess the quality of care provided at the SQ-PIP. The patient was provided diagnoses of schizophrenia and neurocognitive impairment. He received his psychotropic medications by a PC 2602 order due to grave disability. He was prescribed clozapine, aripiprazole, fluoxetine, Zyprexa, and memantine. The patient arrived at the SQ-PIP in October 2014.

This patient's level of care history included treatment at the 3CMS, EOP, and intermediate levels of care. The patient also had type 2 diabetes. He did not have any history of self-harming behaviors, and his chronic and acute suicide risk were assessed as low.

The patient was a condemned incarcerated person who was housed at SQ since 1986, and had been hospitalized at the SQ-PIP for intermediate care since October 2014. He had a long history of auditory hallucinations and residual negative symptoms of schizophrenia, including avolition and anhedonia. He reportedly had no insight regarding his mental illness, and did not know why he was placed in the PIP. The patient reportedly presented with a good sense of humor and had good rapport with his treatment team despite frequent refusals to leave his cell for treatment activities.

Routine monthly IDTT meetings occurred during the review period. Most IDTT meetings were attended by the assigned providers with occasional psychiatric or MHPC alternative coverage. The patient attended four of six IDTT meetings. He was described with having extreme difficulty with time orientation, short term memory, and recall. The treatment team noted that most of the patient's positive psychotic symptoms had reduced or were eliminated, but he continued to demonstrate negative symptoms such as isolation, apathy, and treatment refusal; additionally, he required frequent reminders to attend to his ADLs. The treatment goals were clearly identified, individualized, and measurable and focused on improving verbal communication, increasing attention to ADLs, and helping the patient to leave his cell for yard and groups. The patient also had a positive behavior support plan focused on improving his ADLs and decreasing treatment refusals. The treatment plan included an IPOC for grave disability that lacked specific goals and interventions; however, goals and interventions were provided in the clinical summary section. The patient's treatment progress was updated appropriately at each IDTT meeting, and his condition remained stable throughout the review period. The level of care retention rationale and discharge criteria were specific and appropriately updated at each IDTT meeting. The treatment providers were onsite for each IDTT meeting. Overall, treatment planning and the IDTT documentation were adequate.

The patient was offered weekly psychiatric contacts in a confidential setting. He received a positive behavior support plan reward when he attended confidential sessions with his psychiatrist. The patient's medications were not changed during the review period, and he remained stable. The psychiatric progress notes documented appropriate continuity of care and specifically referenced aspects of the patient's positive behavior support plan as well as consultations with other providers including the patient's primary care provider. The psychiatrist also coordinated with other providers to ensure that the PC 2602 renewal petition was filed appropriately.

PC contacts were provided weekly by a licensed psychologist and a LCSW. The contacts were offered in a confidential setting, and the providers noted the use of incentives consistent with the positive behavior support plan. The PC contacts were well documented. The clinicians noted the patient's difficulty with speech and conversation, as he utilized one-to-two-word sentences. His psychologist regularly administered cognitive and dementia screening tools to assess the patient's functioning. The PCs both noted implementation of the treatment plan interventions and the patient's response, and the patient successfully engaged in out of cell activities with the custody resource team. The PC progress notes indicated that the patient remained stable and was responsive to positive behavior support plan incentives.

The patient was offered groups and attended between four and six groups weekly during the review period. He was assigned to recreation therapy and mental health education groups, and his participation was good. A psychologist, psychology intern, and recreation therapist facilitated the groups.

**Findings**

The mental health treatment provided to this patient was adequate.

The routine IDTT meetings were well documented, and treatment planning was individualized for the patient's clinical needs. The treatment plans included appropriate goals, interventions, level of care rationale, and updates about the patient's functioning and response to treatment. The patient responded well to the positive behavior support plan; he routinely left his cell for routine contacts, groups, yard, and showers in response to behavioral incentives. His medication regimen was appropriate and effective in addressing his symptoms. His primary clinicians met with him consistently in a confidential setting and documented the contacts appropriately including positive behavior support plan interventions and responses, and routine utilized cognitive assessment tools. The patient responded well to treatment and remained stable throughout the review period.

**Patient K**

This 51-year-old patient's healthcare record was reviewed to assess the quality of mental healthcare provided at the SQ-PIP. The patient was provided a diagnosis of schizoaffective disorder, bipolar type. He had a history of paranoid ideation, severe anxiety, isolative behavior, depression, and lack of self-care. The patient reported a history of auditory hallucinations since childhood, and he had prevalent periods of depression that included chronic paranoid psychosis and significant anxiety. He was prescribed Abilify, clozapine, and Cogentin. His level of care history included 3CMS, EOP, MHCB, and intermediate levels of care, as well as treatment at DSH. His chronic suicide risk was assessed as high with low acute risk. The patient did not have any chronic or significant medical conditions.

The patient was admitted to the SQ-PIP for intermediate care on October 22, 2022 from the SQ EOP to begin a trial of Clozaril. He was on max custody status while in the PIP, and he was single-celled due to victimization concerns.

Seven routine IDTT meetings occurred during the review period; all included the required staff, and most included the assigned clinicians as well as the patient who was an active participant. The treatment plan was appropriate. The PIP treatment outcome expectations were appropriate and tailored towards effective functioning upon the patient's return to the EOP. The treatment goals focused on preparation for condemned transfer, completing ECT, and increasing socialization and out of cell treatment participation. The treatment plan included appropriate interventions including ECT, use of a CBT journal, meditation training, medication adherence, and life skills workbooks. The interventions were specific and well documented and were adjusted over time to meet the patient's presentation and needs. The treatment plan included IPOCs to address decreased functioning and anxiety with appropriate goals and indicators provided. Discharge and level of care criteria were appropriate and individualized. The patient participated in the resource officer day room, the dog program, and group meditation with his PC, and he had met all but one of his treatment outcome expectations by May 28, 2024.

Psychiatric contacts were offered weekly, and most were provided in a confidential setting. The progress notes were thoroughly detailed, and the contacts were well documented. The patient and psychiatrist had good rapport and collaborated regarding medication changes as the patient's symptoms improved in response to ECT. Although the patient responded well to ECT, his

symptoms reemerged after the first round, and ECT was renewed for a second round of treatment. The assigned psychiatrist provided most of the psychiatric contacts. The SQ-PIP psychiatrist also documented consultation with the ECT psychiatrist regarding the patient's treatment and response. By the end of the review period, the patient told his psychiatrist that he felt stable with no significant mental health symptoms.

The patient was offered one to two PC contacts weekly from an LCSW and a psychologist. Most of the PC contacts were provided in a confidential setting unless the patient declined. The patient was placed in a therapeutic treatment module during confidential sessions. The LCSW progress notes documented diagnoses of paranoid schizophrenia and major depressive disorder. The PC progress notes included IPOC indicator updates which appeared consistent with the patient's presentation and symptoms. The patient reported anxiety regarding the upcoming condemned unit transfers from SQ, and the primary clinicians addressed his concerns appropriately and documented teaching CBT and mindfulness coping skills. The PC progress notes indicated good collaboration between providers, and the treatment plan interventions were well documented. The patient reported that the combination of Clozaril and ECT was "awesome", and he reported significant improvement in paranoia, anxiety, social isolation, and coping skills.

The patient was consistently offered groups, and group attendance was an integral part of his treatment plan and treatment goals. Group topics included recreation therapy, life skills, coping skills, and mental health education. Primary clinicians, recreation therapists, and psychiatric technicians facilitated the groups. The patient's attendance varied according to the severity of his paranoia, but his attendance increased significantly after he began ECT, and he attended most of his assigned groups at the end of the review period.

**Findings**

The mental health treatment provided to this patient was adequate.

The clinical contacts occurred consistently and were well documented; most were provided in a confidential setting. The IDTT meetings included the necessary participants, and the patient attended and actively participated in his treatment planning. Treatment planning was appropriate and included specific goals, interventions, and progress indicators. The level of care retention justification and discharge criteria were also appropriate and individualized. The PC progress notes documented consistent implementation of treatment plan interventions and continuity of care between providers. The patient responded very well to the combination of ECT and medications, and he was appropriately referred for a second round of ECT after the first round was completed and his symptoms returned. The patient was assigned appropriate groups, and the treatment team successfully collaborated with the custody resource team to encourage socialization and to increase the patient's out of cell time.

**Patient L**

This 57-year-old intermediate care patient's healthcare record was reviewed to assess the quality of care provided at the SQ-PIP. He was provided diagnoses of schizophrenia and delusional

disorder, and he had a history of catatonia, paranoia, and mutism. He received his psychotropic medications by a PC 2602 order due to grave disability; he was prescribed Zyprexa, Zoloft, and Benadryl, and he was medication adherent. The patient's controlling offense and history of sex offense convictions contributed to his paranoia as well as his history of assaults on five occasions by other detainees at the county jail. His level of care history included treatment at the 3CMS, EOP, and intermediate levels of care. His chronic and acute suicide risk were assessed as low, and he had no history of suicide attempts or self-injurious behavior.

The patient was admitted to the SQ-PIP at the ICF level of care on January 18, 2023 due to serious impairment due to mental illness. At that time, he was described as generally uncooperative with staff, acutely psychotic, unwilling to engage in any mental health assessments, and he demonstrated mutism, episodic hostility, poor ADLs, and periods of delusional thinking and hallucinations.

Seven routine IDTT meetings occurred during the review period; all meetings were attended by a PC, psychiatrist, and CCI with sporadic attendance from recreation therapists, psychiatric technicians, and nurses. The patient refused to attend all IDTT meetings.

At the beginning of the review period, the patient had not participated in any out of cell programming or treatment, including IDTT meetings and routine contacts. He had refused to speak at all with any members of his treatment team since his admission in January 2023. He was noted to respond appropriately to custody and nursing using yes and no responses and only refused to speak with mental health staff. The treatment plan included an IPOC for grave disability which included limited goals that were appropriate given the patient's presentation. The treatment goals primarily focused on engaging with his providers, and the treatment team was persistent and diligent in their efforts to interact with him. The patient's presentation improved significantly in May 2024, and he began to engage with his providers at cell front. He continued to refuse to leave his cell for individual contacts or groups, but he did go to the dayroom to call his family. The patient also advocated for himself regarding STEP incentives, receiving more food, asking for medical appointments, and he attended to his ADLs appropriately. He declined in-cell therapeutic activities. Overall, treatment planning and the IDTT meetings were adequate.

The assigned psychiatrist attempted weekly contacts in a confidential setting; however, all routine psychiatric contacts occurred at cell front due to patient refusals. The patient began to engage at cell front with the psychiatrist in May 2024, and was increasingly more conversant as the review period progressed. The psychiatrist noted that the patient was medication adherent, was eating meals, sleeping well, maintained basic hygiene, and was active in his cell without any distress or agitation. He also noted that the patient showed ongoing improvement from May to July 2024 and consistently denied any symptoms or distress. At the end of the review period, the patient told his psychiatrist that he planned to start attending groups and was glad to be leaving his cell more frequently.

The assigned PCs (psychologist and LCSW) attempted weekly contacts, but the patient consistently refused most offered contacts between February and April 2024. The PCs noted that the patient was highly motivated by the STEP incentives, and he began to engage in brief cell

front conversations in April 2024. The PC progress notes were well written, and the PCs initiated discharge planning in early May 2024, as the patient became more stable and his engagement improved. Although the patient initially agreed to discharge in July 2024; the day prior to discharge, he requested a confidential individual PC contact to discuss treatment planning and wanting to practice leaving his cell before transferring to another institution. The patient agreed to attend two individual sessions and one group per week for four to six weeks, and the treatment team appropriately postponed his discharge. The PC contacts were generally well documented, included relevant updates to the patient's clinical presentation and response to treatment, and the interventions aligned with the treatment plan.

The patient did not attend or participate in any groups during the review period.

**Findings**

The mental health treatment provided to this patient was adequate.

Despite the patient's consistent refusals to speak with or acknowledge mental health staff for the initial months of the review period; his providers remained diligent and consistent in their efforts to engage with him and were eventually successful. The patient had a very long history of treatment resistance, and the treatment team utilized appropriate and consistent interventions to encourage him to participate in treatment. He responded well to STEP program incentives, and eventually became more invested in his treatment and programming. The treatment team appropriately delayed the patient's discharge in response to his increased engagement and expressed desire to spend more time preparing for discharge prior to transferring to a mainline facility.

**Patient M**

This 45-year-old intermediate care patient's healthcare record was reviewed to assess the quality of care provided at the SQ-PIP. He was provided diagnoses of unspecified schizophrenia spectrum and other psychotic disorder and antisocial personality disorder. His primary symptoms included disorganized thinking with paranoia, grandiosity, anxiety, irritability, depressed mood, intermittent suicidal ideation, isolation, and impulsivity. During the review period, the patient was prescribed clozapine, prazosin, Abilify, bupropion, Prolixin, Cogentin, Wellbutrin, Vistaril, modafinil, gabapentin, atropine, and glycopyrrolate. He was also prescribed Suboxone for MAT. The patient was admitted to the SQ-PIP on April 21, 2023 from the SQ MHCB.

His level of care history included treatment at the 3CMS, EOP (modified programming), MHCB, and intermediate levels of care, and he was hospitalized at the intermediate level of care for all but two months of his incarceration. His chronic suicide risk was assessed as high with moderate acute risk. His medical concerns included gluten sensitivity and neurogenic bladder which required self-catheterization several times daily.

The routine IDTT meetings occurred timely during the review period and included the required staff and the patient who actively participated in his treatment planning. The treatment team

noted that the patient had a long history of chronic depression, psychosis that included auditory hallucinations, delusions, and ideas of reference, extensive suicidality and violence, and stimulant and opioid abuse. The team also noted that the patient was paranoid regarding leaving his cell, expressed safety concerns, and endorsed PTSD symptoms. The treatment plan included one IPOC for self-harm and noted that the patient had a history of frequent self-injurious behaviors and suicidal ideation within the past 18 months. The IPOC included appropriate goals and interventions, but it had not been updated since November 2023. The treatment plan accurately and comprehensively described the patient's presentation and treatment goals. The progress and response to treatment were appropriately updated at each IDTT meeting. The level of care retention and discharge criteria were appropriate, and single-cell justification was provided. The treatment team indicated that the patient would be retained for ongoing medication adjustments and monitoring for stability. The patient remained clinically stable, and he denied any suicidal ideation and had no self-injurious behavior during the review period. His participation in out of cell programming and groups increased over the review period, and the treatment team documented support and encouragement as the patient's discharge date approached. Overall, the IDTT meetings and treatment planning for this patient were adequate.

The patient was offered weekly psychiatric contacts in a confidential setting except for a very limited number of cell front check-in contacts. The psychiatric progress notes were well documented and indicated that the patient and psychiatrist collaborated regarding the patient's medication regimen, and the medications were adjusted frequently to minimize negative side effects. The patient was prescribed Clozaril, Abilify, Wellbutrin, Cogentin, and Vistaril for most of the review period and was medication adherent. He reported that Clozaril was effective in reducing his psychotic symptoms but caused significant drowsiness that sometime interfered with his programming attendance. The psychiatrist adjusted the medications, and the patient was able to attend programming. Near the end of the review period, the patient's medication regimen was Clozaril, Abilify, modafinil, glycopyrrolate, and Vistaril, and he reported that his psychotic symptoms were manageable, and his drowsiness was significantly reduced.

The patient was offered two PC contacts weekly from a LCSW and psychologist. The PCs consistently offered a confidential setting, but the patient often refused due to drowsiness. The PC progress notes indicated good rapport with the patient, and the contacts were generally well documented. The PC progress notes included IPOC indicator updates, clinical interventions to address the patient's anxiety such as coping skills development, and psychoeducation. The patient discussed improvements in symptoms, ongoing drowsiness in response to Clozaril, and preparation for his upcoming transfer to MCSP when he discharged from the PIP. The patient openly discussed his concerns with his PCs, and he remained clinically stable throughout the review period.

The patient was assigned groups during the review period, and his attendance was adequate. Group topics included art therapy, recreation therapy, leisure, mental health education, coping skills, and life skills. A psychologist, recreation therapists and psychiatric technicians facilitated the groups, and the group topics were appropriate for the patient's needs and level of care.

**Findings**

The mental health treatment provided to this patient was adequate.

The patient received timely and consistently well documented routine clinical contacts and IDTT meetings, and most clinical contacts were provided in a confidential setting. The patient collaborated with his providers regarding his treatment planning and medications and remained clinically stable throughout the review period. His treatment plan was individualized and included appropriate interventions which were documented in PC and psychiatric progress notes. The psychiatrist adjusted the patient's medications appropriately to reduce side effects and to maximize efficacy. The PCs had good rapport with the patient and documented appropriate interventions and support in the progress notes. The patient was offered appropriate groups and attended most of his offered groups.

**Patient N**

This 63-year-old intermediate care patient's healthcare record was reviewed to assess the quality of care provided at the SQ-PIP. His diagnoses included bipolar II disorder, major depressive disorder, recurrent, schizoaffective disorder, and antisocial personality disorder. His symptoms included manic episodes, grandiosity, racing thoughts, insomnia, and possible psychosis. He was prescribed lithium, Depakote, Latuda, and Prozac. The patient was admitted to the SQ-PIP on August 21, 2023.

His level of care history included treatment at the 3CMS, EOP, and intermediate levels of care. The patient had hearing aids but often declined to use them in quiet settings, and mobility impairment that required a bathtub for bathing.

The patient reportedly demonstrated isolative behavior, limited self-care, poor ADLs, depressed mood, treatment refusal, and suicidal ideation with a plan contingent upon the pending unit closure and transfer of condemned incarcerated persons from SQ.

Seven routine IDTT meetings occurred during the review period; all were attended by the required staff and the assigned clinicians were usually present. For most of the review period, the patient was reportedly treatment adherent, except he did not attend groups. He participated in all of his individual contacts and was medication adherent. The primary treatment focus was to increase the patient's out-of-cell time, to participate in groups, showers, and yard. The treatment plan included an IPOC for danger to self which had limited but appropriate goals. The treatment goals were very specific and individualized, but it was unclear whether the patient's progress and response to treatment were updated at each IDTT meeting. The patient was engaged in his treatment planning and advocated for himself. He responded well to gradual medication adjustments and was described as much improved at the May 2024 IDTT meeting when it was noted that he had attended four groups, was requesting baths, and his depressed mood had significantly decreased. At the July 2024 IDTT meeting, the treatment team noted that the patient was preparing for discharge; as his primary symptoms had largely resolved, and he denied suicidal ideation related to transfer from SQ. The patient participated in activities with

the custody resource team, the patient council, and his mental health pre-transfer committee meeting.

The patient was offered weekly psychiatric contacts in a confidential setting; although, a very limited number of contacts occurred cell front due to clinician time constraints or modified programming. The psychiatrist adjusted the patient's medications at the beginning of the review period, and he discontinued Depakote and initiated treatment with lithium. The patient responded well to lithium, and the psychiatrist added Prozac to address the patient's depressed mood. Medication dosages were adjusted and titrated to minimize side effects. The patient reported a negative side effect in May 2024 from lithium; subsequently lithium was discontinued, and Latuda was initiated. The patient responded well to Latuda and Prozac and reported significant improvement in mood, energy, and outlook. The psychiatric contacts were consistently well documented, and the overall psychiatry care was adequate.

The patient was seen for weekly PC contacts by a psychologist and LCSW. The PC contacts were offered in a confidential setting; although, the patient occasionally declined and participated in cell front contacts. The PC contacts were very well documented and provided thorough descriptions and narratives of the session content and the patient's response to interventions. The PCs noted that supportive therapy, motivational interviewing, DBT skills training, mindfulness, and encouragement of self-care and ADLs were provided. The progress notes also indicated that the patient discussed and processed difficult and traumatic events and topics with the PCs. The patient had very good rapport with his PCs, attended almost all his confidential sessions, and had improvement in functioning and coping skills.

The patient was offered appropriate groups, but he did not attend any groups during most of the review period. He began to attend groups sporadically in May 2024. The group offerings included mental health education, recreation therapy, health issues, and life skills that were facilitated by recreation therapists and psychiatric technicians.

**Findings**

The mental health treatment provided to this patient was adequate.

The patient was seen for timely, well documented contacts in a confidential setting throughout the review period. He had good rapport with his treatment team and providers which increased his treatment adherence and efficacy. The patient and his psychiatrist frequently collaborated regarding medication management, and his depressive, psychotic, and mood symptoms were greatly reduced with improved ADLs. The PCs had very good rapport with the patient and provided appropriate therapeutic support despite his frequent refusal to attend groups. The patient's mental status and clinical presentation improved, and he had met most of his treatment goals by the end of the review period.

**Patient O**

This 62-year-old intermediate care patient's healthcare record was reviewed to assess the quality of care provided at the SQ-PIP. The patient was provided a diagnosis of schizophrenia, paranoid

type, with primary symptoms of delusions, paranoia, disorganized and bizarre behaviors, and past hallucinations. He received his psychotropic medications by a PC 2602 order due to danger to others since 2011, and was prescribed Risperdal Consta. The patient was admitted to the SQ-PIP for intermediate care on January 29, 2024, after he demonstrated severe decompensation of mental health symptoms and significant anxiety and distress regarding the upcoming condemned transfers. The patient reportedly agreed to the PIP admission and stated that his medications and the treatment were extremely helpful.

His level of care history included 3CMS, EOP, MHCB, and intermediate levels of care; additionally, he had a history of DSH treatment. Although the patient denied any significant medical concerns, his healthcare record noted hepatitis C, gallstones, Crohn's disease, cirrhosis of the liver, and coronary artery disease.

Eight IDTT meetings occurred during the review period; all were attended by the required staff and the patient who actively participated. The patient was single-celled due to a history of in-cell homicide and violence towards a peer when he was at DSH. The treatment team noted that the patient had been on EOP modified programming since 2016 and had only attended MHPC appointments and sporadic medical appointments. The primary treatment goals were to increase socialization by attending groups, yard, and dayroom, to address residual psychosis by CBT and/or supportive therapy, and to increase the patient's insight regarding his diagnosis and how medications affected his mental health. The treatment plan included IPOCs for negative symptoms, distractibility, and delusions. All the IPOCs were initiated prior to the PIP admission and were generalized. Fortunately, the treatment planning section of the treatment plan included very specific and individualized goals and interventions to address the patient's delusions, paranoia, disorganized behaviors, and residual psychosis. The patient was referred to the custody resource team to increase his out of cell time, and he agreed to attend his assigned groups in accordance with the STEP program. Over the review period, the patient was generally consistent with attending individual contacts and one specific group, which was a marked improvement compared to his attendance while in the EOP.

The patient was seen timely for the initial psychiatric assessment and weekly psychiatry contacts in a confidential setting. He was offered several contacts weekly when initially admitted to the PIP. The patient occasionally declined to attend a confidential session, but most of the psychiatric contacts occurred in a confidential setting. He was prescribed Risperdal Consta and declined any changes in medication. The psychiatric contacts were well documented, and progress notes included comprehensive updates to the patient's clinical status. The patient consistently endorsed a somatic delusion that he had cancer in his gums that had spread to his brain. The psychiatrist noted that most of the patient's residual psychotic symptoms were negative symptoms; and his delusions, social isolation, and avoidance remained prevalent, despite the patient's denial of significant mental health symptoms.

The patient was seen for timely initial PC assessments by his psychologist and LCSW. The psychologist assessment was comprehensive and informed treatment appropriately. The LCSW assessment was inadequate, and many sections of the assessment were incomplete. The routine PC contacts were offered in a confidential setting and were well documented. The progress notes included updates regarding the patient's functioning, and some progress notes included

IPOC progress indicators. The PC notes indicated that the patient remained generally stable with brief episodes of situational distress. The PCs used appropriate interventions that aligned with the treatment plan that included DBT techniques, mindfulness, and solution-focused talk therapy. The PCs maintained positive rapport even during periods when the patient demonstrated increased paranoia or agitation. The patient engaged with his PCs appropriately despite his limited insight.

The patient was offered several groups during the review period. He initially attended an art group and coffee club group, but eventually only attended the coffee club. The treatment team noted that the patient's attendance at that group was an improvement compared with his treatment engagement while in the EOP.

**Findings**

The mental health treatment provided to this patient was adequate.

The patient received timely, consistent, and usually confidential contacts with his mental health providers. The IDTT meetings and routine contacts were well documented and included appropriate clinical updates. Treatment planning was appropriate, and the treatment team utilized the STEP program to incentivize the patient to increase his out of cell time. Although he had not fully met his treatment goals of increased socialization and insight development during the review period, he remained clinically stable and treatment adherent.

**Patient P**

This 54-year-old intermediate care patient's healthcare record was reviewed to assess the care provided at the SQ-PIP. He was provided a diagnosis of schizophrenia, paranoid type, and his symptoms included psychogenic polydipsia, erotomanic delusions focused on a specific music artist, and severe negative schizophrenia symptoms. He was prescribed Invega and Seroquel. The patient was admitted to the SQ-PIP on April 4, 2024, due to the risk of significant impairment secondary to psychogenic polydipsia.

His level of care history included treatment at the 3CMS, EOP, and intermediate levels of care. His acute suicide risk was assessed as low, and his chronic risk was assessed as low-moderate.

The patient did not agree with his ICF placement, and this was his third PIP placement for similar concerns of psychogenic polydipsia. The water in his cell was shut off for the first two months of his hospitalization, and was turned on as he began to self-regulate his fluid intake appropriately.

Five IDTT meetings occurred during the review period, including the 72-hour, 10-day, and 30-day routine IDTT meetings. The IDTT meetings were attended by the required disciplines, but the patient's assigned clinicians were not always present. The treatment goals were individualized and appropriate for the patient's needs. The treatment goals focused on increasing treatment and medication adherence and reducing the impact of the patient's paranoid and somatic delusions on his treatment and behaviors. The treatment team utilized STEP incentives

to encourage treatment adherence and participation in medical and mental health assessments and appointments. There were no IPOCs in the treatment plan. The patient consistently endorsed paranoid delusions regarding his water intake and medical blood draws to monitor his sodium levels. The treatment team appropriately ordered one-to-one watch to monitor the patient's water intake when his water was turned on. The discharge and level of care retention justifications were appropriate. A PC 2602 petition was granted on April 30, 2024 for grave disability and danger to self, and the patient's psychotic symptoms responded well to medication treatment. His treatment participation increased in May 2024, and he started to attend groups, yard, and confidential individual sessions with his PCs and psychiatrist. Overall, the treatment planning was adequate and focused on monitoring of the patient's fluid intake, improving his insight, reducing the impact of his delusions, and increasing his treatment adherence, all of which improved during the review period.

The patient was offered frequent psychiatric contacts throughout the review period and was often seen two to three times weekly by a psychiatrist. Two psychiatrists provided most contacts. The patient often declined a confidential setting, and most contacts occurred at cell front. A PC 2602 petition was sought after the patient refused to consider increasing his Invega to address his delusions and psychotic symptoms. The PC 2602 order was ultimately granted on April 30, 2024, Invega was increased, and the psychiatrist added Seroquel and Vistaril prn. The patient denied the need for medication or to be remain hospitalized, but he was medication adherent. The Invega was changed from oral to a long-acting injectable form in early May 2024, and the patient's symptoms improved. His water intake stabilized to a safe level, and his auditory hallucinations reduced in intensity and frequency. Although he remained generally guarded and paranoid; by the end of the review period, the patient had regulated his water intake appropriately, and many of his previously held delusional beliefs had reduced in severity.

The PC contacts were offered at least weekly by a psychologist and an LCSW in a confidential setting, and the patient frequently declined and opted for cell front contacts. The PC progress notes were well documented and indicated that the patient consistently denied any increase in mental health symptoms or distress, and he was often delusional and annoyed by medical blood draws. The PCs eventually developed rapport with the patient, and he participated in several confidential individual sessions. His delusional beliefs persisted, but lessened over time in response to treatment, and he was often described as polite and engaged during clinical contacts. The patient responded well to the PC interventions and support, and in June 2024, he was reportedly optimistic and looking forward to discharge and transfer.

The patient was offered several groups during the review period; PC and psychiatric progress notes indicated that his attendance was adequate. Group topics included recreation therapy and health issues, and the groups were facilitated by psychiatric technicians and recreation therapists. The documentation indicated that his attendance was inconsistent but generally improved over time.

**Findings**

The mental health treatment provided to this patient was adequate.

The patient was offered timely clinical contacts, including initial assessments, IDTT meetings, and routine contacts. Although the patient did not agree with his ICF placement and demonstrated little to no insight regarding his mental illness or need for treatment; his treatment team was diligent and consistent in their efforts to build rapport and to encourage him towards his treatment goals. The psychiatrist appropriately pursued a PC 2602 order when the patient was reluctant to consider medication changes to address his psychotic symptoms, and the patient responded well to the prescribed medications. PC contacts were well documented, and the progress notes included appropriate interventions and clinical updates. The patient's participation and treatment adherence increased over time; and, by the end of the review period, his symptoms had generally resolved, and he was anticipating discharge and transfer.

**Patient Q**

This 66-year-old intermediate care patient's healthcare record was reviewed to assess the quality of care provided at the SQ-PIP. The patient was provided a diagnosis of delusional disorder with a differential diagnosis of schizophrenia. The patient was not prescribed psychotropic medications when he was admitted to the PIP, but the psychiatrist initiated a PC 2602 petition upon admission. The PC 2602 order was eventually granted on May 21, 2024, and he was prescribed Haldol. The patient was admitted to the SQ-PIP for intermediate care on April 29, 2024.

The patient's level of care history included treatment at the 3CMS, EOP, and MHCB levels of care; for most of his incarceration he was not included in the MHSDS or was included in the 3CMS program. The patient had a history of hepatitis C.

Immediately prior to admission he was in the SQ EOP where he received modified programming. The patient reportedly refused to participate in the condemned transfer process, and he decompensated in response to the transfers. He also had no insight and denied that he had a mental illness or need for mental health treatment. He demonstrated paranoia, grandiose delusions, as well as religious preoccupation; and his delusions resulted in multiple programming issues and RVRs. He was described as uncooperative, isolative, hostile, and aggressive. The patient refused to leave his cell for any health appointments or programming, and he received RVRs for attempting to bribe officers with unrealistic and exorbitant sums of money and fake self-written checks. He attended to his ADLs and maintained his cell appropriately but was unable to navigate social dynamics.

The patient was provided timely and well documented initial PC and psychiatric assessments. He was described as hostile and angry towards the providers, and they indicated that he acted out his resistance due to his disagreement with the ICF placement. Although he refused to participate in the initial assessments, both assessments were completely adequately by healthcare record review and observation and included the patient's clinical history and behavioral observations to inform the IDTT and treatment planning.

Five IDTT meetings occurred during the review period. The 72-hour, 10-day, and routine IDTT meetings occurred timely and were attended by required staff, but the patient refused to attend all but the July IDTT meeting. The patient did not participate in treatment or attend yard for most

of the review period. The treatment team noted that he had fixed delusions of being a millionaire and was often grandiose and disorganized in his thinking. The treatment goals were individualized and appropriate, and his progress toward his goals was updated at each IDTT meeting.

A PC 2602 petition was granted on May 21, 2024, and the patient responded well to long-acting injectable Haldol. The patient remained hostile and disengaged from his mental health and medical providers until July 2024, when he began to respond to medication treatment. In July 2024, the patient left his cell for individual contacts with his providers, and he was described as less delusional and irritable, but he continued to refuse to attend groups due to fear of other patients. As his symptoms improved, the treatment team began to prepare the patient for discharge and encouraged more out of cell time in preparation for a mainline EOP setting.

The psychiatrist documented repeated attempts to encourage the patient to leave his cell for a confidential contact. He consistently denied the need for treatment and also refused medical appointments and laboratory studies. He did not participate in a confidential psychiatric contact until July 2024. The psychiatrist appropriately pursued a PC 2602 order and titrated the patient's medications appropriately to maximize adherence and effectiveness. The patient responded well to Haldol and was increasingly engaged with his psychiatrist. The psychiatrist noted reduced irritability and delusional thinking. The psychiatric progress notes were comprehensive and were updated appropriately at each contact.

PC contacts were offered several times weekly, and the PCs documented several cell front attempts daily when the patient was scheduled for a mental health appointment. The patient left his cell for his first confidential contact on June 11, 2024, but he did not attend another PC contact until July 10, 2024, when there was discussion of discharge from the PIP. The psychiatrist was also present for that contact. Although he left his cell consistently for PC contacts after July 10, 2024, the patient remained delusional and guarded and was described as "literally avoiding all contact with others." He repeatedly demanded to be discharged from the PIP and refused to attend groups during the review period. The assigned PCs documented consistent efforts in working with this highly guarded and delusional patient.

The patient was assigned to recreation therapist and psychiatric technician groups but did not attend any groups during the review period.

**Findings**

The mental health treatment provided to this patient was adequate.

The patient was offered timely and consistent mental health contacts, and his providers documented substantial efforts to get the patient out of his cell and to participate in treatment. The PCs and psychiatrist often documented several cell front contact attempts daily when he was scheduled for an appointment. The psychiatrist appropriately initiated a PC 2602 order when the patient was reluctant to consider medications. The psychiatrist adjusted the medications appropriately, and the patient responded well to the long-acting injectable Haldol. His delusions and irritability reduced, he left his cell for contacts, and he was medication adherent after the PC

2602 order was obtained. Treatment planning was individualized and appropriate for the patient's presentation and clinical needs, and he appeared to be responding well to treatment and his providers at the end of the review period.

**Patient R**

This 52-year-old intermediate care patient's healthcare record was reviewed to assess the quality of care provided at the SQ-PIP. The patient was provided diagnoses of schizophrenia, paranoid type, cognitive disorder, and traumatic brain injury by history. He was classified as a DDI. The patient received his psychotropic medications by a PC 2602 order and was prescribed clozapine, risperidone, Cymbalta and Suboxone. The patient was admitted to the SQ-PIP on February 18, 2023, after he reported ongoing panic episodes with physiological symptoms.

His level of care history included treatment at the 3CMS, EOP, MHCB, and intermediate levels of care; additionally, he was also hospitalized at DSH. His chronic and acute suicide risk was assessed as low.

The patient was transferred to an outside hospital on January 16, 2024, after he suffered a stroke and was treated for right side hemiparesis, right side neglect, and dysphagia. He was housed in the CTC upon his return on January 31, 2024, until he was returned to the PIP on May 23, 2024. The treatment team noted that when he was discharged from the CTC, the patient was attending to his ADLs, was using a walker to ambulate, was adherent with medical and mental health treatment, and his mood symptoms were significantly reduced compared to prior to the outside hospitalization and CTC stay. The patient was retained at the SQ-PIP for intermediate care to monitor his stability and to prepare for discharge to the EOP.

The patient received timely and well documented initial psychiatric and PC assessments when he returned to the PIP from the CTC. There were four IDTT meetings during the review period, including the 72-hour and 10-day IDTT meetings. All IDTT meetings included the necessary participants, and the patient attended all but one meeting which he missed to attend a rehabilitation therapy appointment. The primary treatment goals were to reduce distress from auditory hallucinations and paranoid ideation, to attend to ADLs appropriately, to learn three coping skills to manage distress from auditory hallucinations, and to verbalize triggers for substance abuse and to learn the impact substance abuse had on his mental health symptoms. There were no IPOCs, but the treatment plan included appropriate and individualized goals, treatment objectives, interventions, and progress updates. The discharge criteria and level of care retention justification were appropriate. The patient's group attendance and routine individual contact attendance increased after his return to the PIP, and he was removed from the high refuser list on June 20, 2024. He had achieved almost all his treatment goals by his June 2024 IDTT meeting; he was generally treatment adherent, and the treatment team was preparing the patient for discharge in July 2024.

The patient was seen at least weekly for a psychiatric contact during the review period, and most psychiatric contacts were provided in a confidential setting. The patient was seen by two psychiatrists, and the contacts were well documented. The patient reported a very positive response to medication treatment; he was medication adherent and reported that his mood and

auditory hallucinations were "the best they've ever been." Overall, the psychiatric care was adequate and appropriate for the patient's needs.

The MHPC contacts were provided by a LCSW and psychologist. The contacts were provided at least once per week, and the progress notes were thorough and well documented. Most of the session content focused on the patient's adjustment post-stroke and his functional concerns. He consistently denied acute mental health symptoms or distress. The PC progress notes described the patient as appropriate and engaged with his providers. The PCs also noted consultation with medical staff, as was appropriate. The patient reported that he was comfortable in the PIP, was enjoying the programming there, and he had grown very attached to his PIP providers. The PC appropriately noted the need to carefully prepare the patient for discharge due to his DD1 status and treatment with Clozaril. The PC documented encouraging the patient toward discharge and incorporating therapy termination techniques into the individual contacts.

The patient was offered recreation therapy, health issues, and mental health education groups. PCs, recreation therapists, and psychiatric technicians facilitated the groups. The documentation indicated inconsistent attendance, but the patient attended the recreation therapy groups most often.

**Findings**

The mental health treatment provided to this patient was adequate.

The patient was highly motivated and engaged in treatment when he returned to the PIP from the CTC. He had good rapport with his providers, and his symptoms responded well to medication treatment. The routine clinical contacts and IDTT meetings occurred timely and were well documented, and they were offered in a confidential setting for most of the contacts. The patient was offered appropriate groups, and his attendance increased compared with prior to his stroke and CTC stay. Most of the patient's difficulties were functional and not mental health related, and he made progress there as well. The PC was sensitive to the patient's DD1 status and appropriately initiated termination and discharge techniques to ease the patient's adjustment.