# EXHIBIT A

*ROB BONTA*
*Attorney General*

*State of California*
*DEPARTMENT OF JUSTICE*

1300 I STREET, SUITE 125
P.O. BOX 944255
SACRAMENTO, CA 94244-2550

Public: (916) 445-9555
Telephone: (916) 210-7318
Facsimile: (916) 324-5205
E-Mail: Elise.Thorn@doj.ca.gov

June 13, 2025

VIA ELECTRONIC MAIL

(Via Email)
Matthew A. Lopes, Jr.
Special Master
Pannone Lopes Devereaux and O'Gara LLC
Northwoods Office Park, Suite 215N
1301 Atwood Avenue
Johnston, RI 02919

RE: *COLEMAN, et al. v. NEWSOM, et al.*
Defendants' Objections to the Special Master's Draft Thirty-first Round Monitoring Report on the Inpatient Programs

Dear Special Master Lopes:

Defendants have received and respond below to your May 14, 2025 draft report (Report) on the Psychiatric Inpatient Programs (PIPs) in the California Department of Corrections and Rehabilitation (CDCR) and the inpatient programs in the Department of State Hospitals (DSH.)

Defendants set forth some general objections as well as separate objections specific to the Report's criticisms of the CDCR and DSH programs, including responses and objections to the Report's treatment of institution specific data and findings and a response to patient reviews.

## General Objections

### 1. DSH Bed Utilization

Defendants note that much of the report is based on the premise that Defendants are obligated to fill a certain percentage of the inpatient DSH beds designated for use by *Coleman* patients. No such requirement is part of the remedy in this case. Defendants' reports and this draft Report confirm that the constitutional issue of timely access to the appropriate level of care has been resolved. No class member has waited beyond Program Guide timelines since 2017, except during the COVID pandemic or under an approved exception. The Report should highlight that patients received timely and adequate access to inpatient care, which was confirmed by the 2022-2023 Unmet Needs Assessment (UNA) Report, and continues to be confirmed every month by CDCR's reports concerning inpatient transfers.

The Report notes that there has been a "significant decrease in referrals to acute and intermediate care" as compared to the period before the pandemic. (*See* Report at 16.) But the

UNA project in 2022-2023 thoroughly documented that there was no unmet need for patients at the Acute and Intermediate Care Facility (ICF) levels of care in the Mental Health Services Delivery System. This further demonstrates that some number of unfilled DSH beds does not mean that DSH beds are "underutilized." The results of the UNA demonstrate appropriate utilization of DSH and PIP beds, and the Report should note this fact instead of implying there is a problem with the DSH patient census or referral process. Additionally, even though the Court agreed with the UNA's conclusion that there was no unmet need for inpatient care, Defendants voluntarily developed a number of enhanced trial review processes to ensure that they identify patients who can safely and appropriately be treated in DSH.

The Report critically notes an "underutilization" of DSH beds for *Coleman* class members and "plateaued" utilization of DSH beds, as though this is reason for concern or indicates noncompliance or poor performance. (Report at 19, 15.) Defendants object to this critique because it is misleading and inaccurate. The term "underutilization" is misleading because it implies that DSH's *Coleman* beds are not being used as effectively as they could be for those patients who can appropriately be treated in them, leading to wasted resources or missed opportunities. The experts' basis for using the term "underutilization" is simply that not all DSH *Coleman* beds are filled. But that oversimplified logic only holds if there are enough patients referred to inpatient care who can safely and appropriately be treated in DSH hospitals and fill all of DSH's *Coleman* beds. There are not, and the use of the term "underutilization" and the Report's stated concerns regarding the fill rate of DSH beds are improper, unfounded, and misleading.

If the reason DSH *Coleman* beds are not filled is that many "patients referred to inpatient care require a higher LRH" than is available in DSH hospitals—as the Special Master's Report points out—then the beds are not being "underutilized." (*See* Report at 19.) To the contrary, the beds are being fully utilized for the patients who can be appropriately and safely treated in DSH hospitals. DSH is not a correctional system and cannot house many of the individuals within the custody of CDCR due to security concerns. Consequently, the fact that not all DSH *Coleman* beds are filled does not demonstrate that they are "underutilized," nor does it indicate any insufficiency related to referrals and admissions to DSH. The use of the term "underutilization" in the Report is therefore inappropriate and misleading, as are any criticisms based on less-than-completely-filled beds.

Finally, the Special Master's experts noted that movement of *Coleman* class members to their least restrictive housing setting can allow for higher security inpatient beds in CDCR PIPs, "which have been in high demand throughout the life of this case." (Report at 5.) "The combined effect of a limited supply of high security PIP beds and suboptimal utilization of the DSH beds have contributed, in the past, to long waitlists for an untimely access to inpatient beds." (*Id.*) While historically this may have been accurate (the Report references a 2016 finding), the current data, which is surprisingly absent from the Report's findings, demonstrates that Defendants have for years met mandated timelines for admission, taking into account permitted exceptions. In fact, waitlists for ICF beds (the level of care where a majority of least restrictive housing is available) have been significantly low for all housing types with no backlog and no late admissions. DSH objects to the Report's reference to this *past* historical issue, without an explanation that the issue is currently resolved. It is misleading and should be clarified or removed.

**2. DSH Trial Review Processes**

The Report provides an overview and description of the development and implementation of five trial processes (Review Processes) designed to address the Special Master and Plaintiffs' concerns about class members' access to DSH care. (Report at 19-26.) DSH Policy Directive 3601 of the Inpatient MOU provides the framework for the enhanced review process. The Review Processes are not court-ordered and are not designed to achieve or increase compliance with any court order or the constitutional remedy in this case. Defendants voluntarily adopted the Review Processes and they are reasonably concerned that a "formalized LRH policy detailing the framework of the five trial processes" would be inappropriately converted into a further expansion of the *Coleman* remedy. Defendants object to statements in the Report asserting that the Review Processes must be formalized.

There is no obligation under the Eighth Amendment to fill all DSH beds or to fill all CDCR PIP beds—rather the focus must be on ensuring patients are receiving constitutionally adequate mental healthcare. The three DSH units are 58% filled (196/336) as of May 15, 2025, versus a 60% fill rate for the PIPs (665/1,111). As the Special Master is aware, CDCR has timely admitted patients to intermediate and acute care nearly 100% of the time, except during the COVID emergency. It is unlikely that DSH beds will ever be completely filled because these beds are located in unlocked dorms and correspond to the lowest security levels. Accordingly, they are not safe for most *Coleman* patients requiring inpatient care. This explanation should be included in the Report and statements criticizing Defendants for not filling all DSH Coleman beds should be removed.

The first Review Process was started in October 2023 and was further expanded to include other custody factors, use of an admissions unit at DSH-ASH, and a long-term Intermediate treatment program. The Review Processes were designed to be fully transparent and Defendants request that the Report accurately describe this transparency. The Report acknowledges that the Special Master's experts were "afforded an opportunity to observe five rounds of the Out of LRH reviews between November 2023 and May 2024." (*See* Report at 23.) This is factually accurate but fails to explain that instead of having meetings to go over the out-of-LRH reviews, starting after May 2023, DSH conducted twice monthly LRH reviews and sent copies of every review to CDCR and the Special Master electronically for their review and input. DSH invited the Special Master's experts to raise any questions or concerns, but they never raised comments or questions regarding any of the 255 reviews sent from June 2024 through June 2025. Although absent from the Report, in some cases, when the PIP treatment team members questioned if a *Coleman* class member was suitable for the DSH unlocked dorm setting, they would, per policy, request a Coordinated Clinical Assessment Team (CCAT) meeting. The Special Master's experts were invited to attend all such CCAT meetings.

The Report describes the Review Processes as "encouraging" and acknowledges Defendants' plan to make the Review Processes permanent, but further noted a "growing frustration" with lack of a formalized policy for the Review Processes. (Report at 6.) Defendants object to this criticism. The Special Master should be monitoring compliance with the remedy. The remedy does not include the Review Processes, nor does it mandate their inclusion or formalization. Accordingly, the formalization of the Review Processes is not a proper subject of the Report. Moreover, there is no basis for the experts' frustration here.

Defendants have not stated that they plan to stop the Review Processes, nor is there any evidence that they intend to do so. The Report should not criticize Defendants based on speculation that Defendants might stop the Review Processes at some point in the future, particularly where, as here, the remedy does not require the implementation of the Review Processes.

**3. Quality of Care**

Defendants raise a point of contention that has been repeatedly dismissed in past reports. Defendants do so in a good faith attempt to understand how the Special Master's experts define "adequacy." The Report found that 54% of CDCR PIP patient records demonstrate "adequate care" and 46% of the records demonstrate "inadequate" care. (*See* Report at 91.) Defendants request that the Special Master provide detailed examples of inpatient records that represent inadequate care in the PIPs and identify any objective standards or guidelines that the Special Master's experts use to determine the adequacy of care so that clinicians can understand how to improve documentation and the provision of care in a targeted manner. Without an understanding of the standards or metrics against which they are being judged, Defendants are unable to identify problems and make improvements.

The reporting on the quality of care at DSH is similarly unclear. The Special Master's experts noted that all three state hospitals achieved "adequate" care at a rate of 40% based on 78 chart reviews. (*See* Report at 149.) The Special Master's experts do not provide explicit parameters that correspond to an "adequate" level of care. The Report does not identify the objective measures or standards of care that DSH hospitals were measured against, other than the requirements for 10 hours of Core Treatment per week, 10 hours of Supplemental treatment per week, and specific staffing ratios. Without reference to objective defined measures or standards that correspond to "adequate" mental health care, clinicians are unable to determine how the Special Master's experts reached their conclusions. DSH seeks to better understand this so it can implement targeted responsive corrective measures.

It would also be helpful if the Special Master's experts could provide references to Program Guide requirements related to their determination of "inadequate" care. To the extent that the Special Master's experts have referenced national standards applicable to correctional settings, such as those articulated by the American Psychiatric Association (APA), the Joint Commission, or the National Commission on Correctional Health Care (NCCHC) in making his findings, Defendants request that the Report specify those standards. Otherwise, the Special Master's experts' finding that "quality of care across the three [DSH] hospitals was only 40 percent adequate among the 78 individual cases reviewed" is not intelligible, helpful, or actionable. (*See* Report at 149; *see also* Metzner, J., *Systems Monitoring and Quality Improvement,* in *Oxford Textbook of Correctional Psychiatry* 377-381 (Trestman, Appelbaum, Metzner eds., 2015) (noting that "the monitor should obtain feedback from both parties; review national standards of correctional mental health care, such as APA task force guidelines and NCCHC standards.").) Without reference to specific monitoring standards, the reporting across rounds is likely to be inconsistent, depending on which of the Special Master's experts are performing the evaluation. (*See id.*) Again, Defendants seeks to better understand so they can implement targeted responsive corrective measures.

**CDCR Objections**

**1. The Report improperly criticizes Defendants for not achieving a greater number of inpatient referrals.**

As stated above, Defendants have achieved sustainable compliance with timely referrals and transfers to inpatient care and the Report acknowledges this achievement. (*See* Report at 19 ("all patients that were admitted to acute and intermediate care programs transferred timely upon acceptance within Program Guide requirements.").) The Report, however, contends that "referrals to inpatient care have not returned to pre-COVID levels" and "in recent years, the Special Master has observed and reported on the significant decrease in referrals to acute and intermediate care." (*Id*. at 19, 16.) The reduction of referrals to inpatient care should not be adjudged against Defendants, particularly in light of the results of the UNA, a comprehensive evaluation of Defendants' system that assessed 32,545 patients and determined that there is "no unmet need for inpatient referrals within CDCR." (ECF No. 7865-3 at 8.) Indeed, the goal of a properly functioning healthcare system is to ensure that patients in the system are improving and that unnecessary hospitalizations are avoided. CDCR objects to the inclusion of a discussion about a decrease in referral rates that excludes any discussion of the results of the UNA.

**2. The Reporting on Minimum Treatment Standards Requires Clarification.**

The Report provides a tabulation of the average structured treatment hours offered to patients at each CDCR PIP. (Report at 35.) But the Report does not indicate which programming was included in calculating structured treatment hours at each PIP. This information should be added to the Report and the Report should also clarify whether patients who were clinically determined to be unsuitable for receiving minimum programming were excluded from the average-hours-offered calculation.

**3. The Report Contains Misleading Statements Concerning PIP staffing.**

The Report notes that PIP staffing vacancy rates were "below the court ordered maximum of ten percent." (*See* Report at 75.) This vacancy-rate calculation, however, is based on a staff-to-bed ratio, not a staff-to-patient ratio. CDCR requests that the Report also include the staff-to-patient ratio in the PIPs during the relevant period, which will provide a more comprehensive picture of PIP staffing. The Eighth Amendment does not require staff to care for empty beds—it requires staff to provide constitutionally adequate care to *patients*.

CDCR also requests that fill rates reported for all PIP classifications include registry staff to avoid imparting the false impression that the use of registry staff is somehow not compliant with staffing obligations.

**4. The PIPs Were Audited for Compliance with the Structured Treatment Policy Before It Even Issued.**

The Report describes the policy that requires CDCR to offer patients 20 hours of group treatment each week. (*See* Report at 82-85.) This policy memorandum was issued on September 2, 2024, and institutions were allowed 30 additional days to achieve compliance (by October 2,

2024). The Report, however, improperly audited all five PIPs for compliance from February 1 to July 31, 2024—prior to when the policy came into effect. CDCR requests that the Special Master revise the Report to make clear that the audit period preceded the date of the new requirement or remove that discussion altogether.

**5. The Positive Behavior Support Teams Program Is Not Part of the *Coleman* Remedy.**

The Report discusses the use of positive behavioral support teams (PBSTs) in CDCR's PIPs but fails to make clear that this program is not mandated by the remedy in this case. (*See* Report at 87-89.) CDCR requests that the Special Master amend the Report to clarify that these PBSTs are not required under the remedial plan or other court orders, and provide the source for the standards applied to evaluate PBST programs in this Report. Alternatively, because the use of PBSTs falls outside of the Special Master's monitoring duties, the discussion of PBSTs in the Report could be removed altogether and future monitoring of this issue could be discontinued.

**6. The Language Describing the Least Restrictive Housing Policy Is Inaccurate.**

First, Defendants note that the following sentence is unclear and needs to be revised: "Each institution fewer less patients above their least restrictive housing than during the prior review period (except for SQ-PIP which housed no patients above their LRH during the prior or current review periods)." (Report at 116.)

Second, the Report characterizes certain patients as "requiring" unlocked dorms. The use of the word "required" suggests that these patients *must* be housed in unlocked dorms, when findings in the same section do not demonstrate that these patients were clinically cleared for housing in that setting. (*Id.*) Accordingly, CDCR requests that the Report be revised to identify the number of patients with a custodial LRH of unlocked dorms instead of the number of patients who "required an unlocked dorm."

**7. The Death Review Process Is Outside of the Scope of the Special Master's Monitoring.**

The Report states that SVSP-PIP and SQ-PIP reported one death each during the review period and concludes that SVSP-PIP demonstrated an adequate death-review process, but that SQ-PIP did not conduct a death review process as the patient died of a known medical condition that did not require a responsive corrective action. (*See* Report at 124; 126.) CDCR objects to the Special Master's monitoring of the death review process (CCHCS mortality review). (*See* Report at 124-26.) This is outside the scope of the Special Master's monitoring and falls squarely within the jurisdiction of the U.S. District Court for the Northern District of California in *Plata v. Newsom*. CDCR requests that the Report strike any language auditing the CCHCS mortality review.

**8. The Report Inappropriately Suggests that EOP Patients Should be Transferred to DSH Beds.**

The Report suggests that CDCR should consider placement of EOP patients in DSH for mental health care. (*See* Report at 146-47, n. 21.) This suggestion is not viable as patients at the EOP level of care do not meet Program Guide criteria for referral and admission to any inpatient program. There are also dangerous clinical implications in placing patients in an inpatient settingwhen their mental health status does not warrant hospitalization. CDCR requests that the footnote be deleted from the final report as it is completely unrelated to monitoring compliance with the mandated remedy in this case, and is unsupported by authority.

**9. SVSP, CIW, and SQ Request that Certain Clarifications be Included in the Report.**

SVSP-PIP

The Report states that "the lack of adequate staffing has led to multiple institutions relying on triage plans that de-prioritized initial assessments or routine primary clinician contacts at . . . SVSP-PIP." (Report at 76.) SVSP's triage plan has not applied to patients in the MHCB or PIP. SVSP did not provide the Special Master with any triage plan applicable to the PIP during the 31st round monitoring tour. As explained subsequently in the Report, space and time constraints may have limited individual treatment time or quality but this is not attributable to a triage plan. (*See id.* at 2226-27; 278-79.)

CIW-PIP

The Report states that "requested group programming descriptions or schedules for CIW-PIP's acute program were not provided." (Report at 361.) CDCR notes that CIW does not have a separate acute and ICF unit. Acute and ICF patients program together. In addition, the Report states that planned group durations were absent from the schedules. CIW previously provided the current group schedule to the Special Master, which notes the duration on the far-left side of the provided spreadsheet. (*Id.*) Please let Defendants know if the Special Master's experts need assistance locating the relevant information.

The Report states that documentation "contained conflicting information regarding implementation of the System To Encourage Progress (STEP) program and Positive Behavior Support Plans." (*Id.* at 370.) The STEP program has been implemented at the CIW-PIP since its inception.

The Report notes that "CIW-PIP's restraint log for the current review period referenced one "crisis plan" that resulted in four-point restraints for one patient designated DD2, suggesting the PIP continued the standing restraint order practice." (*Id.* at 374.) CDCR notes that CIW discontinued the use of crisis plans on April 1, 2024. Finally, the Report states that "the CIW-PIP reported that no audits of restraints were conducted during the review period." (*Id.*) CIW has been reviewing the use of seclusion or restraints on a monthly basis to determine whether

they were appropriately used or if other interventions could have been used. This information is reported to the Patient Safety Committee.

SQ-PIP

The Report states that there were 6 PIP patients admitted during the review period and that there were no biweekly post reviews conducted. (Report at 395.) These findings are not accurate. Based on the confidential patient list provided with the draft report, the patients listed under SQ were not in a PIP, not on MAX custody status, or had not undergone condemned processing during the review period. The SQ ICC could not recommend reduction for PIP patients who had not been processed through the condemned inmate transfer program (CITP— a process that SQ condemned patients have to go through before they can be removed from condemned) because SQ does not have an electrified fence, which is a requirement for housing assignments. Defendants request that the Report be revised to correct these findings.

## DSH Objections

The Report covers the treatment of *Coleman* patients in the DSH system at Atascadero State Hospital (ASH), Coalinga State Hospital (CSH), and Patton State Hospital (PSH), and discusses the Trial Review Processes related to utilization of DSH beds for *Coleman* patients. The Report also provides individual patient reviews, the objections to which are attached as Exhibit A to this letter. The Report raises some legitimate issues that DSH is currently examining. But DSH is concerned that the monitoring of the hospitals was conducted in a manner outside of established norms and best practices, as described by the Special Master's own expert. (Metzner, J., *Systems Monitoring and Quality Improvement,* in *Oxford Textbook of Correctional Psychiatry* 377-381 (Trestman, Appelbaum, Metzner eds., 2015).) Additionally, other peer reviewed and established standards show how some of the criticisms from the Special Master's experts are not supported by evidence-based treatment or by a review of the scientific literature.

### 1. Provision of the Draft Monitoring Report

The Report was sent to DSH on May 14, 2025. This is over one year from the Special Master's experts' monitoring tour at PSH and approximately eleven months from the tours at CSH and ASH. DSH objects to the delay in the provision of the report and requests that the Special Master endeavor to timely provide DSH with monitoring reports to "facilitate a more effective response . . . because the report should serve as a blue-print for achieving compliance." (Metzner, Jeffrey, *Systems Monitoring and Quality Improvement,* in *Oxford Textbook of Correctional Psychiatry* 381 (Trestman, Appelbaum, Metzner eds., 2015).)

### 2. The DSH Interdisciplinary Treatment Team Process

The Report incorrectly holds DSH to an IDTT-attendance requirement that is not applicable to DSH or supported by the Program Guide or DSH policies under the 2017 Memorandum of Understanding (MOU). The inpatient MOU and its associated policy directives are not part of the Program Guide. (*See* Special Master's 2018 report on the updated Program

Guide, ECF No. 5844 at 8, and the 2018 supplemental filing on the Program Guide updates, ECF No. 5564 and ECF No. 5564-1 at 598-600.) The sections of the Program Guide that reference required members of an IDTT do not apply to the DSH programs. Only Chapter 6 of the Program Guide governs DSH. (*See* 2021 Program Guide at 12-3-9, 12-4-6, and 12-5-11.) DSH objects to the Report to the extent it imposes Program Guide requirements for EOP and crisis-bed patients on the DSH programs. (*See* Report at 39, 55.)

For example, the Report raises concerns that not all members of the IDTT—the Report refers to them as "required staff"—are present at each DSH IDTT meeting. (*See* Report at 39, 55.) But DSH Policy Directive 3607 only provides that the interdisciplinary treatment teams be composed of certain team members and that there will be IDTT meetings. It does not require that every team member attend every IDTT meeting. The Report discusses the IDTTs and IDTT meetings interchangeably, which is inconsistent with the MOU and Policy Directive 3607, and is also misleading and confusing. Thus, the experts' criticism about required DSH staff not attending IDTT meetings is improper and should be removed from the Report.

Moreover, the Report seems to imply that IDTT meetings are the only time communication and collaboration between a patient's treatment team members occurs. (Report at 55-56.) This is inaccurate and ignores that DSH IDTT members regularly talk, collaborate, and adjust a patient's treatment plan and interventions outside of the IDTT meetings, which is justified and clinically sound given that IDTT meetings occur, at a minimum, once every 30 days. Policy Directive 3607 and Chapter 6 of the Program Guide only require that IDTT members collaborate and communicate effectively to treat the patient, and this need not occur at an IDTT meeting. Because there is no attendance requirement for DSH IDTT meetings, these criticisms should be removed from the Report.

**3. Treatment Planning and Treatment Goals**

The Report expressed "significant concerns with treatment planning at all three hospitals," but failed to provide any nationally recognized objective measures or standards that the experts used to determine whether a treatment plan was "effective" for the purposes of the Report. (*See* Report at 39 and 55.) The Report notes the standard applied to audit the treatment plans was 90 percent ("[r]eviewed treatment plans were not compliant during the review period as the number of plans reviewed did not achieve 90 percent compliance with targeted and individualized treatment goals, specific interventions to achieve those treatment goals, adequate rationales for chosen interventions and updated treatment plans when clinically indicated"). (Report at 40.) Other than the "90 percent" reference, the Report did not indicate through any documentation, metric, or nationally recognized or empirically sound standards, how the experts judged what constituted a targeted and individualized goal, what a specific intervention should have been, how often treatment plans should be updated, or how "clinically indicated" is defined or evaluated. Without clear definitions and standards for these areas of treatment planning, DSH is unable to tell what objective standard it is being held to. Instead, DSH is seemingly held to an undefined standard based on the Special Master's experts' subjective views. Objective and fully defined standards and guidelines should be required for any monitoring process concerning the provision of mental healthcare in a correctional setting. (Metzner, J., *Systems Monitoring and Quality Improvement,* in *Oxford Textbook of Correctional Psychiatry* 377-381 (Trestman, Appelbaum, Metzner eds., 2015); Bellass, S., Canvin, K., McLintock, K., Wright, N., Farragher,

T., Foy, R., & Sheard, L. (2022), *Quality Indicators and Performance Measures for Prison Healthcare; a Scoping Review*, Health and Justice, 10 (13).) Ad hoc observations untethered to any validated standards cannot be the test for effectiveness or adequacy. Accordingly, DSH objects to the Report's findings concerning Treatment Planning and Treatment Goals.

The Report expressed a concern that a treatment goal for a particular patient—Patient C—was documented as a goal for the patient to "not endorse suicidal ideation or hopelessness prior to discharge." *See* Report at 56. The Report asserts that this treatment goal was concerning because it could discourage the patient from discussing their suicidal ideation in order to get discharged instead of actually discussing their suicidal ideation and learning appropriate coping skills. While the Special Master had one interpretation of this treatment goal, there was no evidence that the documented goal discouraged the patient from speaking frankly about suicidal ideation or learning effective coping skills. Another reasonable interpretation of this common treatment goal is that the patient's suicidal ideation and hopelessness should be significantly decreased or resolved by the time of discharge because that is a goal for every patient who is admitted to DSH for danger to self. The Special Master's experts failed to document other interpretations and approaches to the patient's treatment goal. In addition, DSH provided the experts with specific information regarding review of Patient C at ASH with empirical evidence supporting the appropriateness of the documented treatment goal. DSH requests that the criticisms concerning this treatment goal be removed from the Report because there is sufficient evidence to support it based on empirical and national guidelines.

The Report also asserted failures to update treatment plans when clinically indicated, specifically singling out the treatment outcome expectations. (Report at 56.) But treatment outcomes and expectations for the *Coleman* DSH patients are provided by the CDCR IDTT, which documents desired outcomes for the patients to achieve at the time of discharge. Regardless, the Special Master's experts failed to recognize that in the Program Guide (12-6-12 and 12-6-13), there is no mention of treatment outcome expectations that must be met at the hospital prior to discharge. Treatment outcome expectations are listed by DSH in the treatment plan as a courtesy to CDCR clinical teams, but that is not a requisite for treatment or determination for when a patient must be discharged. DSH objects to these findings because they do not align with Program Guide requirements.

**4. Group Treatment**

The Report incorrectly states that CSH provided a weekly average of 6.54 hours of core group treatment. (Report at 41.) In fact, as demonstrated in DSH's Governing Body Reports, which were provided to the Special Master, the weekly average hours were 11.259 hours (October), 8.563 hours (November), 6.699 hours (December), 9.671 hours (January), 9.94 hours (February), and 11.112 hours (March). Thus, the average hours of core group treatment across all of these months was 9.541 hours. DSH requests that this be corrected in the Report.

**5. Individual Therapy**

A frequent unfounded critique by the Special Master's experts is what they perceive as a lack of individual treatment interventions. (Report at 42, 57.) The Report does not recognize that the DSH model of treatment is primarily group therapy and use of psychiatric medications.

*Id.* The Report states critically, "[u]nfortunately, the lack of individual treatment offered to Coleman class patients at DSH-Atascadero continued from previous monitoring rounds." (*Id.* at 42.) However, individual treatment is not mandated in the Program Guide, the MOU and related policies, or in court orders. In fact, the core treatment guidelines (10 hours per week) approved by the Court, as well as the DSH Governing Body Reports, confirm that individual therapy is not part of the DSH remedial plan. There is no requirement to track individual treatment, nor is it a metric that is included in the remedial plan. Indeed, the Federal Bureau of Prisons (BOP) outlined their "Treatment and Care of Inmates with a Mental Illness" in 2025 and only included evidence-based treatment, namely group treatment. There is no mention of individual treatment as part of their curriculum. The BOP stated "group treatment has proven to be both clinically effective and an efficient use of resources in treatment of mental illness…mental health clinicians are encouraged to provide treatment using a therapeutic group format."

The Special Master's Report does not take into account empirical and nationally recognized norms regarding group treatment for patients. The focus on individual treatment and use of the words "unfortunately" and "offered only" unfairly and improperly criticizes DSH for having a group-treatment model when such a model is an appropriate and adequate form of treatment. In addition, the Special Master's experts did not proffer facts evidencing a need for individual treatment during the monitoring period, and instead only implied there was not enough individual treatment (specifically at ASH) without any justification. DSH objects to these findings. The remedial plan requires core treatment and supplemental treatment, but the Special Master has included a separate section on individual treatment in the Report as though individual treatment is a required component of the remedial plan. The Report should be amended to remove any indication that individual treatment is a requirement under the remedial plan.

**6. Documentation**

The Special Master's experts expressed concerns with missing documentation. (*See* Report at 59.) The Report explains that the missing documentation was not directly in the paper record and could compromise continuity of care. (*Id.*) But the Report does not include the explanation provided to the Special Master's experts, *i.e.*, that DSH IDTTs use a database system called the Forms Repository to input all clinical information, including treatment plans, groups notes, individual clinician notes, and incident reports. This means that treatment documentation may not always be in the paper chart but is readily available to every member of the patient's treatment team through the Forms Repository system. Accordingly, DSH objects to the Report's incorrect finding that the documentation was missing and that this compromised continuity of care. Contrary to the Report's findings, no documentation was missing, and the patients' continuity of care was not compromised.

Another issue raised in the Report concerning missing documentation and inconsistency in reporting has to do with an internal policy at ASH regarding monthly psychiatric contacts "which proved to be fruitful during the review period as all contacts were timely." *See* Report at 43. But on page 534, the Special Master experts, when reviewing clinical documentation at PSH, "raised multiple concerns with weekly sessions being summarized in monthly notes, as this allowed delay in clinically relevant information to be accessible when needed in the healthcare record." The Special Master experts did not criticize monthly notes being utilized with the

psychiatrists at ASH, but there is criticism here because the monthly notes summarize weekly individual therapy sessions. Monthly psychiatry contacts at ASH also summarized other areas of the patient's treatment, incidents, and progress within the month as well. While the breadth of the documentation in the monthly notes at PSH was noted to be lacking, the criticism of the monthly notes is not justified and, especially given that the experts approved monthly notes at another hospital.

**7. Involuntary Medication Non-Renewals**

The Report notes several examples of a lack of a thorough rationale for non-renewal of involuntary medication (PC 2602). (Report at 49.) But the Report does not take into account that there is no statutory authority or DSH policy requiring that a clinical rationale be documented for non-renewal of a PC 2602. (*Id.*) In fact, it has been DSH's practice for years not to document the rationale for non-renewals of PC 2602s without criticism from the Special Master. The experts' use and documentation of this new "metric" is inconsistent with appropriate monitoring of correctional mental healthcare systems. (Metzner, Jeffrey, *Systems Monitoring and Quality Improvement,* in *Oxford Textbook of Correctional Psychiatry* 379 (Trestman, Appelbaum, Metzner eds., 2015) ("Thoughtful selection of a monitor and clear delineation of his or her duties will help avoid dissatisfaction with the monitoring process which often focused on unclear or changing outcome measures.") The use of new and changing Special Master experts and a lack of clear, consistent, and objective criteria and standards leads to unfair and inconsistent monitoring practices, and DSH therefore objects to these findings.

**8. Pharmacology**

DSH has noted the feedback related to psychopharmacology and referred these cases to its expert internal consultation team of psychopharmacology experts for review. See, specifically, individual reviews for patients U, Y, Z, AA, and BB at CSH. Given the 11-month lag between this round of monitoring and the resulting report, records were difficult to obtain for further review in time to include a response to this issue in this letter.

**9. Suicide Risk Assessment**

The Report raises concerns of inadequate risk ratings and rationales for suicidality (*see* Report at 61), but the Report provides no objective basis for this criticism, such as a nationally recognized suicide assessment standard or measure. Accordingly, DSH objects to these criticisms in the Report. The Columbia-Suicide Severity Rating Scale (C-SSRS) comes with a manual and training that is nationally recognized as the "gold standard" for suicide-risk assessment. Because the Report fails to cite the C-SSRS protocol, its critique is not based on empirically sound measures, and not helpful to identify or address issues with remedial-plan compliance.

The Report also mentions that CSH relied on the C-SSRS as a suicide risk assessment and labeled it as a mere "screening tool." (*See* Report at 61.) This is not accurate information as the C-SSRS is considered the gold standard, as stated previously, and (1) has been endorsed by the Food and Drug Administration since 2011 for assessing suicide risk in new antidepressant trials, (2) is used by the Joint Commission since 2016, and (3) is used by the Department of

Defense (e.g. Navy Suicide Prevention Branch). (Interian, A., Chesin, M., Kline, A., Miller, R., St. Hill, L., Latorre, M., Shcherbakow, A., King, A., & Stanley, B. (2018), *Use of Columbia-Suicide Severity Rating Scale (C-SSRS) to Classify Suicidal Behaviors*, Archives of Suicide Research. 22 (2).) The C-SSRS is a widely recognized evidence-based suicide-risk assessment with a high sensitivity for suicidal behavior. Using it to assess for suicide risk is clinically appropriate at CSH and other state hospital settings. DSH therefore objects to the Report's characterization of the C-SSRS as an unsuitable screening tool.[1]

**10. Referrals and Rescissions**

The Report misleadingly cites a finding that 87% of *Coleman* class patients transferred in a timely manner to ASH (timely is defined as within 30 days as mandated by the court). (*See* Report at 65.) This statement mischaracterizes the timeliness of transfers within court-approved policy and allowed exceptions. The Report fails to note that those *Coleman* patients who were not transferred within 30 days were not counted as non-compliant because Court-approved exceptions applied to each of them, and consequently, there were no objections raised concerning the timeliness of their transfers by the Plaintiffs, the Special Master, or the Court. Therefore, given that all transfers were compliant (either with deadlines or within policy and allowed exceptions), the Report should state that 100% of transfers occurred timely.

The Report discusses the observation of increased recission rates for referrals to DSH and states, "neither CDCR nor DSH provided reasons for rescission of patient referrals to DSH." (Report at 15-16.) This is not a fair criticism. Defendants are unaware of any requests for an explanation or data concerning the reasons for increases in recission rates. But had such a request been made, DSH would have explained that before the Review Processes, DSH received only about 22% of all ICF referrals generated by CDCR because the CDCR clinical housing recommendations for most referrals did not allow the referred patients to be considered for admission to DSH. The Review Processes, however, eliminated the need for a CDCR clinical-housing recommendation in a referral, and thus DSH started to receive every ICF referral with a LRH of unlocked dorms. This led to DSH receiving approximately 50% of all ICF referrals generated by CDCR. Consequently, an increase in recission rates was expected upon the implementation of the Review Processes because over half of all referrals sent to DSH were comprised of patients who had housing recommendations for single cell, multi-person cell, and locked dorms, which are all part of the CDCR PIP system. Around 70% of these referrals were determined not to be clinically appropriate for admission to DSH, and they were rescinded. Approximately 30% of these referrals, however, were determined to be appropriate for admission to DSH despite a more restrictive clinical housing recommendation from CDCR.

[1] For reference the screening version of the C-SSRS (which the Special Master experts did not mention specifically) is only six questions. DSH hospitals do not use the screening version, they use the full-assessment version of the C-SSRS.

**Conclusion**

Defendants appreciate the opportunity to provide the foregoing responses and objections to the draft inpatient report. Defendants are prepared and request the opportunity to provide further clarification or elucidation to the foregoing responses and objections.

Sincerely,

*/s/ Elise Owens Thorn*

ELISE OWENS THORN
Deputy Attorney General

For ROB BONTA
Attorney General

cc: *Coleman* Plaintiffs' Counsel

# Exhibit A

State of California – Department of State Hospitals Gavin Newsom, Governor

Legal Division
1215 O Street, MS-5
Sacramento, California 95814
www.dsh.ca.gov

June 13, 2025

Damon McClain, Esq.
Elise Owens Thorn, Esq.
California Department of Justice
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-5500

Re: RESPONSE TO THE DRAFT THIRTY-FIRST ROUND MONITORING REPORT – PART A: SPECIAL MASTER'S MONITORING REPORT ON THE INPATIENT MENTAL HEALTH CARE PROGRAMS AT THE CALIFORNIA DEPARTMENT OF STATE HOSPITALS AND CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION PSYCHIATRIC INPATIENT PROGRAMS

Dear Mr. McClain and Ms. Thorn:

The California Department of State Hospitals (DSH) submits its response to the Special Master's expert's clinical case reviews, assessing the adequacy of care provided to *Coleman* class members at DSH hospitals set forth in Appendices C1-C3 of the draft inpatient report.

Sincerely,

*/s/ Kristopher Kent*
KRISTOPER KENT
Attorney IV
Department of State Hospitals
Legal Division

***"Caring Today for a Safe and Healthy Tomorrow"***

*Objections to the Special Master's Individual Patient Reviews*

*A. Atascadero*

1. Patient C: The Special Master experts noted an underestimate of the patient's suicide risk due to total number of risk factors and history of suicidal ideation. In addition, they noted the patient had two protective factors that were not mentioned and the lethality of his last two suicide attempts either caused minor damage or no damage (no damage with the recent attempt in September 2023). The patient stated his last suicidal ideation was the day he arrived at DSH-A and has not since. Given the lack of lethality, protective factors, and treatment at Acute level of care a moderate risk level was appropriate and in accordance with C-SSRS training and empirical evidence on risk ratings. DSH objects to the statement this patient's suicide risk was underestimated as there was no objective measure, nationally recognized standard, or use of the C-SSRS risk level criteria used to come to this conclusion.

   The Special Master experts documented diagnostic concerns because the psychiatrist initially doubted the presence of psychotic symptoms, but acknowledged the psychiatrist diagnosed the patient with Schizoaffective Disorder Bipolar Type and prescribed Olanzapine for psychotic symptoms. The Special Master experts interpreted this as diagnostic uncertainty, but in fact the psychiatrist clearly expressed doubts of psychotic symptoms for the patient, but then confirmed the presence of psychotic symptoms which is why the patient was prescribed Olanzapine and given a psychotic disorder. Expressing doubts of certain symptoms is not diagnostic uncertainty as it is more intellectual and diagnostic curiosity, especially early in a patient's treatment, thus DSH objects to the statement by the Special Master experts this was concerning.

   Treatment planning was mentioned as "inappropriate" because it contained a goal of "expecting the patient to stop disclosing suicidal ideation and hopelessness." DSH objects to this treatment goal as "inappropriate" since this was not an accurate statement as the goal was clearly written as "Pt (Patient) will not endorse any statements of hopelessness or loneliness of [sic] four consecutive weeks and Pt will reduce incidents of passive SI or SI with plan/urges and SIB (self-injurious behavior) to zero incidents for 4 consecutive weeks." This type of treatment goal is not uncommon and should be interpreted as the patient's suicidal ideation, depression, and hopelessness will improve to where he no longer considers suicide as an option and feels more hopeful about his future. For patient's referred as danger to self, this is a primary and common goal, but the Special Master interpreted this in an uncommon way that is not based on any nationally recognized standardized goals or measures. Nurcombe (1989) documented appropriate treatment goals during psychiatric hospitalizations where an example of such goal was "At the time of discharge the patient will express no suicidal ideation or risk taking impulses to milieu staff or peers (Nurcombe, B. (1989). *Goal-Directed Treatment Planning and the Principles of Brief Hospitalization*. American Academy of Child and Adolescent Psychiatry)."

   McLean Hospital provided an online resource in 2022 for focused assessment and treatment of suicide that detailed most up to date research, risk factors, assessment, treatments, and other key clinical areas (Jacobs, D.G. & Klein-Benheim, M. (2022). *Current Status of Suicide – Focused Assessment and Treatment 2022*. McLean Hospital). While "no suicidal ideation" is recognized

and a desirable treatment outcome, it is not a universally defined or nationally mandated treatment outcome. A patient not endorsing suicidal ideation is considered a key indicator of positive progress in their treatment. Utilizing empirical research and currently nationally recognized standards for treatment goals with patients at risk of suicide, it is evident the treatment goal for this patient was appropriately written and DSH objects to the goal being considered "inappropriate" by the Special Master experts.

The Special Master experts also expressed concern with the discharge of the patient as not meeting treatment goals. The Special Master experts acknowledged the patient was sufficiently aggressive towards a peer requiring restraints and was also appearing to take advantage of lower functioning peers through improper bartering of substance (e.g. Suboxone). The Special Master experts provided no evidence the patient did not meet treatment goals, but Program Guide 12-6-12 and 12-6-13 allows for discharges when "further hospitalization is unnecessary," as it was clearly in this case. The patient was not actively psychotic, did not endorse significant depression symptoms, and was void of genuine suicidal ideation/behavior. The Special Master experts should take into account Program Guide language regarding discharges from DSH as the Program Guide clearly states discharge in this case was appropriate. In addition, Program Guide 12-6-11 clearly stated "a patient who has been found to pose and unusual and severe security risk to the DMH program in which he/she is housed shall be transferred by CDCR to a CDCR institution within 24 hours." This Program Guide language allows for such a discharge from the state hospital. DSH objects to the finding that this was an inappropriate discharge as the discharge was in line with the Program Guide.

2. Patient E: The Special Master experts documented this patient's care as inadequate despite their statement that he "demonstrated some improvement in symptoms and functioning." DSH objects to the finding that this patient's care was inadequate. One issue they noted was the treatment objective from CDCR being adopted, but again referencing Program Guide 12-6-12 and 12-6-13, this is not the sole criteria to determine when a patient is ready for discharge back to CDCR EOP as the treatment objectives from CDCR are recommendations from the sending team. In addition, the Special Master experts noted there was a focus of individual therapy in the treatment objectives, but this is inaccurate as the treatment objective clearly states on page 1 of the treatment plan "Pt [sic] will participate in mental health treatment activities by coming out of his cell, attending 1:1 sessions and groups as least 75% of the time." The treatment objective groups 1:1 sessions, groups, and activities all together help to meet the 75% as requested by the sending team. Individual therapy and a 1:1 session are not synonymous as the Special Master experts would ascertain. A 1:1 check-in, which is usually a brief encounter and may or may not be in a confidential session, would suffice as a "1:1 session" and not be individual therapy, which are for longer durations of around 45-50 minutes and always in a confidential setting. And a 1:1 session can be with any provider, while individual therapy is typically completed by psychology. "1:1 sessions" as recommended in the treatment outcome expectations from CDCR, can include 1:1 check-ins with members of the treatment team and not solely individual therapy, therefore this treatment outcome expectation was met.

The Special Master experts also noted discrepancies among treatment team members regarding the patient's presentation. Discussion and recognition of such discrepancies should be discussed and documented as the experts wrote, but it does not take into account how the patient improved significantly by programming in core/structured treatment over 50% of the time from where he was wanting to be primarily isolative and stay in his room (or cell when at CDCR). This should be seen as great improvement for the patient and objective data that his treatment was effective. DSH objects to the finding that this is evidence of inadequate care for the patient as he was referred to DSH after mostly isolating in his cell and coming out of his cell rarely, but at DSH he was programming in core treatment over 50% of the time, evidence of significant success.

3. Patient I: DSH objects to the finding of this patient's care as inadequate. Special Master experts documented the patient's behavior of resentful attitude, forceful speech, anxious mood, marked mood lability, frustration with incarceration, disrespectful to staff, and being upset/anxious/angry when accused of coercing a peer to engage in inappropriate sexual relations. They noted these were signs of agitated depression or major depressive disorder, but they could also be signs of personality disorders/traits such as BPD and ASPD, situational stressors as he was focused on being near his wife, which the experts did not consider. And it is possible the patient met diagnoses for Major Depression and a characterological disorder or traits of a disorder, as it is common in the forensic psychiatric inpatient population for a patient to carry multiple psychiatric diagnoses. At the very least alternative diagnoses should be considered. Without face-to-face interaction, careful and thorough evaluation and rule-outs/provisional alternative diagnoses at least have to be considered. In addition, the patient was not diagnosed with a Major Depressive Disorder as he did not demonstrate symptoms associated with it in accordance with the DSM-5 TR (experts did not provide qualifying diagnostic criteria in their rationale for MDD either), and the patient even had a reduction in his antidepressant dosage without significant change in presentation noted suggestive that he was not suffering from objective signs of a Major Depressive Disorder (i.e. neurovegetative symptoms).

   DSH objects to the finding that the treatment team did not communicate with CDCR regarding housing location at the time of discharge. .The discharge summary on page 7 (of 9), documented that the patient spoke with a Correctional Counselor (a CDCR custody staff member) about options of placement when he returns to CDCR. It even stated after speaking to the correctional counselor, the patient wanted to return to CDCR. This demonstrates CDCR was contacted to discuss placement options for when he was discharged to EOP, and it was documented in the discharge summary.

   In regards to the suicide risk assessment, DSH objects to the finding that the risk was underestimated. The finding is not supported by any nationally recognized measures or standards, or C-SSRS manual/trainings.. Without such support, it would be impossible to determine objectivity and accuracy of the statement that the patient's suicide risk was underestimated. The patient did not engage in a suicide attempt prior to admission to DSH-A as documentation notes he voiced "suicidal thoughts," not attempted suicide. The Special Master experts did not acknowledge the suicide risk assessment from CDCR also noted a moderate risk for the patient, same as DSH's risk assessment.

4. Patient L: The Special Master experts critiqued treatment for this patient because it was not targeted more aggressively due to the patient's impending parole to the community within two months of admission, but DSH objects as this is not congruent with the Program Guide and clinical factors present at the time. The Program Guide describes ICF level of care as providing "longer-term mental health intermediate and non-acute inpatient treatment…" This type of explanation of ICF level of care is more suggestive of long-term treatment that is slower paced and allows for more steady treatment. Intense and rapid treatment would likely be more indicated for Acute level of care and this should have been considered by the Special Master experts.

   The Special Master experts accurately note the patient was suffering from prominent and fixed paranoid delusions throughout his hospitalization and at the time of discharge. For this reason, the Special Master experts implied more aggressive treatment should have been considered to help reduce the patient's delusions and give him an increased chance for successful parole. While this logic appears somewhat sound, it actually ignores the difficulty in treating patients with strong fixed paranoid delusions and that most literature states that rapport building is necessary (Williams, S & Walkdrop, J. (2024). *The effects of shared decision – making on patient participation in discharge meetings in a behavioral health unit.* Journal of the American Psychiatric Nurses Association. 30 (1); Combs, D.R. and Tiegreen, J,. (2007) *The use of behavioral experiments to modify delusions and paranoia: Clinical guidelines and recommendations*. International Journal of Behavioral Consultation and Therapy. 3(1) 30-37.). Literature accurately states rapport building and treatment of paranoid delusions takes time and patience, so aggressive treatment in this case would likely worsen the patient's paranoia. The Special Master experts should have consulted with literature and standardized treatment protocols for managing severe paranoia as that would have provided objective rationalization for the treatment team approach by DSH.

5. Patient M: The Report states that the clinical team should have used individual therapy to address the patient's lack of insight and paranoia. , But this finding ignores that the patient atientdemonstrated no paranoia living in a housing unit with 49 other peers and attended group sessions without significant difficulty. It would appear the limited number of groups offered, and the unlocked dorm environment itself, was effective for the patient as it reduced his outward paranoia. As an outcome measure the patient and his CDCR psychiatrist (when he arrived after discharge from ASH) had this interaction days after discharge "IP tells me he was at ASH recently. He enjoyed his 'groups and they check up on you a lot.' He is feeling improved as compared to previous treatment with writer 10 months ago."

   Just having paranoia alone does not necessarily warrant individual therapy treatment. If the patient was not attending groups, isolating significantly, and other concerning behaviors where group therapy would be insufficient then an argument could be made for individual therapy to address the paranoia, but that clearly did not occur with this patient, and he thrived with the DSH group modality.

6. Patient P: The Special Master experts noted the patient was diagnosed with Adjustment Disorder with Mixed Anxiety/Depressed Mood, and Opioid Use Disorder and did not object to these diagnoses.

DSH objects to the finding that these diagnoses were "serious mental illness," which is not in agreement with the Program Guide because Adjustment Disorder and Opioid Use Disorder are not listed under "Serious Mental Disorder" on page 12-1-6.

The Special Master experts stated the patient had an "environmental stressor" which were his safety concerns and the experts were not clear if CDCR was informed of those concerns. DSH objects to this finding and the conclusions as CDCR policy requires clinician to clinician contact for MHCB referrals (before admission) where the custody concerns were addressed to CDCR. It should be noted by the Special Master experts that the patient did not report any safety concerns when at the MHCB for six days after his discharge from ASH. The transfer to the MHCB was to help him readjust to a prison setting as further inpatient psychiatric treatment at ICF would only reinforce the maladaptive behavior (he was referred to ICF because he would engage in self-harm due to safety concerns from his past gang status). The Special Master experts made a prediction of high probability that the patient would cycle in the MHCB and be referred in the inpatient setting again, but for the last 1.5 years the patient has only been to the MHCB once and not referred to Acute or ICF. There is no documentation or use of objective rationale, measures, or standards supporting the Special Master experts "highly probable" prediction, which was largely inaccurate.

The Special Master experts also reported concerns that the patient's treatment groups were not addressing his core concerns and symptoms. However, the patient was enrolled in aggression reduction, DBT, sponsor groups, healthy living, staying safe, and mental health wellness. DSH objects to this concern by the Special Master experts as these groups address anxiety, depression, living in a prison environment, coping, and sobriety issues.

7. <u>Patient AA:</u> The Special Master experts noted the patient's care was inadequate. The patient was only at DSH-A for 27 days before being discharged back to CDCR at Acute level of care. The Special Master experts first noted a behavioral plan should have been utilized to address the patient's concerning behavior, but provided no objective measure or nationally recognized standard for when a behavioral plan should be initiated. DSH objects to the conclusion that a behavioral plan should have been implemented as it does not align with empirical research and nationally recognized standards. The Academy of Consultation-Liaison Psychiatry and Tolsiano et al (2017) note data collection is an "integral part" of a behavioral plan which includes tracking, severity, circumstances, triggers, etc (Academy of Consultation – Liaison Psychiatry. (2022). *How to create a behavioral plan in a medical setting;* Tolisano, P., Sondik, T.M., & Dike, C.C. (2017). *A Positive Behavior Approach for Aggression in Forensic Psychiatric Settings.* Journal of American Academy of Psychiatry and Law 45:31-39). In addition, behavioral plans are utilized when the concerning behavior remains despite conventional/typical treatment adjustments. According to national standards and objective measures because this patient only lasted 27 days in the state hospital before being sent to Acute level of care, there was not enough time to determine if typical/conventional treatment options were not effective and to do the appropriate data collection. In addition, the Special Master experts also did not note that after the patient was sent to Acute level of care, he was therefor approximately three months

suggesting that he was not ready for ICF level of care yet, so the decision to send him back to Acute was clinically indicated.

There was a concern documented by the Special Master experts that not all treatment team members were in the IDTT meeting, but as stated before there is no recognized national standard for all "required" treatment team members to be present at the meeting and it is not in line with DSH policy (AD 414). *See* Policy Directive 3607; Program Guide. Joint Commission, a nationally recognized organization that accredits over 22,000 healthcare agencies/programs, does not have a standard or measure requiring all members of a treatment be present at an IDTT meeting. The Special Master experts provided no evidence the IDTT members as a whole were not communicative and collaborating together for the care of the patient outside of an IDTT meeting. DSH objects to this concern as there is no nationally recognized standard and the Program Guide does not require all treatment team members be present at every DSH IDTT meeting.The patient's suicide risk at admission was rated as low given factors that he was in a controlled setting, compliant with psychiatric medications, not endorsing suicidal ideation, and his last suicide attempt was two years ago where he suffered no injury. The Special Master experts found that the suicide risk assessments were inconsistent, but the patient's suicide risk changed during hospitalization as suicide risk is a dynamic and not static risk factor, so this should have been considered and not necessarily deemed inconsistent. The patient's suicide risk assessment was initially rated as "low" on 3/15/24 after participating in the C-SSRS interview, but on 3/27/24, the patient engaged in an "aggressive act to self," and endorsed significant suicidal ideation related to paranoia. Then on 4/2/24, the patient's suicide risk was increased to moderate given the increase in psychotic symptoms and risk for further "aggressive acts to self." DSH objects to the criticism of the variable suicide risk levels by treatment team members as the patient's clinical presentation changed from admission necessitating a change in his suicide risk level.

*B. Coalinga*

1. Patient A: The Special Master experts documented concern with the discharge of the patient to the MHCB after he became significantly aggressive due to decompensation. DSH objects to this concern as not in line with the Program Guide, which requires such discharges. According to Program Guide 12-6-11, when a patient becomes significantly aggressive and is a "severe security risk," they "shall" be transferred to a CDCR institution within 24 hours. CDCR has informed DSH, that a 24 hour transfer is not possible from DSH to Acute or ICF, so CDCR opted to use the MHCBs for the discharge for continuity of care at a high acuity level and to keep others safe in a timely manner.

2. Patient D: The Special Master experts expressed concern the patient did not receive individual psychotherapy to address his guilt and shame regarding his sexuality as the patient recently discovered himself to be gay. The patient did not express any concerns talking about his guilt, shame, or potential loss of support system in the group treatment setting and in fact steadily during his hospitalization the patient remarked on decreases in depression, anxiety, auditory hallucinations, and paranoia. The Special Master experts provided no objective measure or nationally recognized standard to support their assertion that individual therapy should have been

provided rather than group therapy and did not acknowledge the improvement in symptoms and presentation with the provided treatment. And despite attending approximately 58% of treatment groups, there is no indication that other alternatives to treatment were required as the patient himself noted improvement in functioning and demonstrated objective signs of improvement. DSH objects to the concern by the Special Master experts as individual therapy alone was not warranted to address the patient's concerns given his response to group treatment and self-reported improvement in symptoms.

In addition, the Special Master experts noted an underestimation of the patient's suicide risk, but did not provide nationally recognized standards and objective measures to rationalize this conclusion. DSH objects to the finding that the patient's suicide risk was underestimated as there were no objective measures utilized and they did not incorporate the C-SSRS manual or training on risk levels to justify this conclusion.

Lastly, the Special Master experts noted the treatment plan did not include precedent factors to his self-harm risk and hallucinations, but DSH objects to this conclusion as the preceding factors were his discovery about his sexual orientation, his uncertainty about how to tell his family, and his concern that others in prison may want to harm him. He regularly discussed these issues and the symptoms they caused such as depression, fear, and hallucinations (all improved). He even stated prior to discharge that he was ready to tell his family/wife that he was gay.

3. Patient E: The Report includes a finding that the patient's treatment was inadequate and that individual therapy was initially recommended, but not provided.

   However, the Special Master experts omitted the fact that the patient attended over 80% of his treatment groups and thus there was no need for individual therapy given his attendance and participation in treatment groups. The Special Master experts also noted the patient did not meet all of his treatment outcome expectations, referencing Program Guide 12-6-12 and 12-6-13. However, that is not the sole criteria to determine when a patient is ready for discharge back to CDCR EOP as the treatment objectives from CDCR are recommendations from the sending team. The Special Master experts did not document whether the patient's functional impairment was so severe as to require inpatient hospitalization. Nor did the experts document his attendance in treatment and ability to advocate for himself, which evidenced the resolution of much of his severe impairment to a point where he could program at EOP. Program Guide 12-1-7 and 12-1-8 indicate that EOP is appropriate for patients with "acute onset or significant decompensation…inability to function in general population…presence of dysfunctional or disruptive social interaction…impairment in activities of daily living." The Special Master experts did not document how this patient's treatment progress and presentation would be a match for EOP as defined in the Program Guide. For these reasons, DSH objects to the conclusion the patient's care was inadequate as it did not account for the patient's treatment attendance, his reduced functional impairment, and did not cite Program Guide criteria for discharge to an EOP setting.

4. Patient K: The Special Master Experts documented that the care for this patient was inadequate, which is wrong. The experts noted there was a lack of rationalization for group treatment and

none for why individual treatment was not indicated. The patient attended 91% of treatment groups suggesting he had no difficulty or barriers attending treatment in the milieu and eventually expressed a decrease in symptoms and was able to be discharged. Additionally, documentation by DSH provided significant evidence of feigning/exaggerating and malingering symptoms as a means to avoid going back to CDCR. Documentation of objective signs showed the patient smiling, laughing, joking with peers, with no difficulty in socializing, and spending an inordinate amount of time on the phone talking to a female friend. The treatment team noted the patient's signs are atypical for someone experiencing daily auditory hallucinations and he even scored high on a malingering screening assessment suggestive of feigning psychopathology symptoms. Lastly the patient met all treatment outcome expectations and met criteria for discharge in accordance with Program Guide 12-6-12 and 12-6-13. DSH objects that the treatment for this patient was inadequate as he was discharged in accordance with the Program Guide, met all treatment outcome objectives, and there was clear and convincing evidence of feigning symptoms, indicating further inpatient psychiatric hospitalization was not indicated.

The Special Master expert also wrote the patient did not receive the full suicide risk assessment, but DSH objects to this conclusion as the documentation clearly shows he was assessed with the C-SSRS which is a comprehensive and full risk assessment (the C-SSRS screening version was not utilized as implied by the Special Master expert).

5. <u>Patient S:</u> The Special Master experts documented concerns with a lack of a rationale for a non-renewal of PC 2602, but failed to acknowledge that there is no requirement to provide a rationale for a non-renewal in the PC 2602 statute or in DSH policy.

   Although CDCR has a PC 2602 policy and forms to be filled out only by CDCR personnel, there is no such policy at DSH and not providing a rationale for PC 2602 non-renewal has been a long-standing practice in DSH based on community standards. In addition, there was no indication the patient stopped taking his medications voluntarily as he agreed to do so before the expiration of his PC 2602. DSH objects to this critique by the Special Master experts as it is not in statute, Program Guide, or policy, and thus should not be considered a requirement for "adequate" care of a patient.

   Another critique of the patient's care by the Special Master experts was that not all "essential" disciplines were present in IDTT meetings. As stated before there is a lack of empirical research, nationally recognized standards, objective measures, and policy (Program Guide and MOU) stating all disciplines must be present at a IDTT meeting. In addition, there was no evidence the IDTT were not communicating and collaborating as a team as is required in 3607 and Program Guide.

   The Special Master experts stated the patient did not receive evidence-based treatment for obsessive compulsive disorder, although they did not provide any evidence-based treatment modalities or standards in their rationale so it is unclear how the treatment was not evidence based. The experts even noted a significant decrease in his obsessive-compulsive behaviors as well. DSH objects to this conclusion by the Special Master experts as there was no empirical or

objective rationale for such a conclusion, and it ignored the patient significantly improved while at DSH.

6. Patient W: The patient was only at CSH for 20 days before being urgently discharged to a MHCB and then Acute level of care. The Special Master experts documented the patient should have been placed on a PC 2602 order due to refusing Olanzapine on arrival, but DSH objects to this hind-sight conclusion because they left out of their review that the patient actually started to refuse his Olanzapine prior to arrival at CSH. A PC 2602 was not yet indicated as the patient agreed to take an increased dose of Seroquel (something he was already prescribed) and is a similar atypical antipsychotic medication. Partial compliance was appropriate in some cases and the psychiatrist wanted a chance to build rapport with the patient to get voluntary agreement with medications before resorting to involuntary medication order as many patients view that as a breach of trust, which the psychiatrist did consider if the patient decompensates. Unfortunately, the patient decompensated very quickly when he made threats to harm others and discharge was decided on an emergent basis rather than try to stabilize him on psychiatric medications with a PC 2602 in the unlocked dorm setting, which the Special Master agreed with the discharge in their review.

   The Special Master experts expressed concern with the discharge to MHCB, but DSH objects to this concern as it was in line with the Program Guide regarding such discharges. According to Program Guide 12-6-11, when a patient becomes significantly aggressive and is a "severe security risk," they "shall" be transferred to a CDCR institution within 24 hours. CDCR has informed DSH, a 24 hour transfer is not possible from DSH to Acute or ICF PIP, so CDCR opted to use the MHCBs for such discharge for continuity of care at a high acuity level and to keep others safe in a timely manner. This should be cited as the rationale instead of the implied criticism of DSH. Fortunately, the Special Master agreed with the urgent discharge. And it should be added clinician to clinician contact occurred as required with all MHCB admissions in accordance with CDCR policy.

*C. Patton*

1. Patient A: The Special Master experts expressed concern that the treating psychiatrist recommended a long-acting injectable of Haldol, but did not convert the patient at the state hospital. This is in error as the psychiatrist stated:

   > Given her past history of frequent exacerbation of psychotic symptoms while not on psychotropic medication, Ms. Ross needs to be monitored for compliance and treatment and if possible, transition to a long-acting injectable form of her Haldol.

   The psychiatrist only recommended possible transition to a long-acting injectable if the patient's compliance stops in the future. At the state hospital she was compliant with her medication regimen. DSH objects to this conclusion by the Special Master experts as they erroneously read the discharge summary and assumed the psychiatrist recommended a long-acting injectable form of Haldol, but in fact only recommended it if the patient starts to decline her oral medications, which again she did not do at the state hospital setting.

The Report states that he patient did not appear to meet treatment outcome expectations. That finding is wrong as the patient attended 100% of her treatment groups, reported significant decrease in distress, was 100% compliant with medications, and developed appropriate coping skills. The improvement stated in the documentation was significant and evidence of adequate treatment. DSH objects to this conclusion as evidence of inadequate care, as Program Guide 12-6-12 and 12-6-13, provides criteria for discharge, that the Special Master experts did not cite, In addition, the patient's significant improvement at the state hospital noted further inpatient psychiatric treatment was not indicated, thus discharge to EOP was initiated as clinically indicated.

2. Patient J: The Special Master experts noted significant concerns with the use of restraints for a behavior that likely could have been redirected in an alternative manner and a prolonged stay in seclusion when not indicated.

   The Special Master experts requested a behavioral plan, but DSH objects as this was not indicated. When the first incident occurred in October, the patient had only been on the unit for 18 days. There was not enough time to adjust conventional treatment before a behavioral plan would be considered as suggested by The Academy of Consultation-Liaison Psychiatry and Tolsiano et al (2017) as cited earlier in this attachment. Two other targeted behaviors were considered less severe and did not require restrictive measures of restraints or seclusion, more suggestive that conventional/typical treatment in the state hospital was effective. This would be part of data collection mandated in a behavioral plan initial stages to determine if a behavioral plan is necessary. The Special Master experts did not provide nationally recognized standards or objective measures to warrant the opinion that a behavioral plan was necessary.

# EXHIBIT B

# Trial Processes for DSH Review of Coleman Patients

From: Kent, Kristopher@DSH-S
To: ColemanTeam-RBGOnly@rbgg.com, colemanspecialmaster@pldo.com, Matt Lopes
Cc: Reden, Brent@DSH-S, Caballero, Michael@DSH-S, Elise.Thorn@doj.ca.gov, Damon McClain, Namrata Kotwani, Paul B. Mello, Samantha Wol
Jennifer@CDCR, Bentz, Melissa@CDCR, Laurel E. O'Connor
Sent: 10/6/2023 12:34:49 PM
Attachments: Trial Processes for DSH Review of Coleman Patients.10.4.23.pdf

Hello All,
Over the past several years, DSH and CDCR have worked together to provide extra reviews of Coleman patients beyond the reviews done under the current inpatient referral process to ensure that all patients who are suitable for DSH admission are reviewed and that none are overlooked. Based on these reviews, DSH and CDCR have developed two trial process changes outlined in the attached document. DSH and CDCR plan to implement these process changes immediately. The attached document provides the details on these plans. DSH and CDCR think these changes are consistent with the MOU and will monitor these changes for at least six months to see if they result in increased admissions to DSH. Thanks, Kris

Kristopher Kent
Attorney IV
Department of State Hospitals
Legal Division
1215 O street, MS5 ***Please note new address***
Sacramento, CA 95814
Work Mobile: (916) 584-2248 **Please Note: I am working remotely. Please direct calls to this number**
Fax: (916) 651-3852
Email: Kristopher.Kent@dsh.ca.gov
Web: http://www.dsh.ca.gov
CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. DO NOT DISCLOSE THIS EMAIL TO OTHERS. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

# Trial Processes for DSH Review of Coleman Patients

New Referrals from Different Level of Care (CCCMS, EOP, MHCB, and APP)

- Review every referral with an LRH of Unlocked Dorms regardless of clinical housing recommendation. This will increase the pool of referrals DSH reviews and may lead to increase in admissions to DSH.

    - Process for all new ICF referrals:
        - CDCR will send ALL referrals that HCPOP identifies as having an LRH for unlocked dorms to DSH as endorsements.
        - All referrals sent to DSH will have an outcome (accept/rescind/reject)

CDCR and DSH Utilization Review: Out of LRH Referrals From an ICF Setting

- Every 30-45 days, CDCR IRU will select and review in collaboration with DSH a set number of patients out of LRH (for Unlocked Dorms) to determine if certain patients are indicated for an unlocked dorm setting
- The number of patients, in a PIP-ICF program, being reviewed would be approximately 40-50 for each 30-45 day review period to help ensure a continued and sustained review of patients out of LRH
- CDCR IRU will provide a regular list of out-of-LRH patients weekly to DSH PMU
- DSH PMU will conduct and provide case reviews to CDCR IRU at least two business days before the scheduled joint LRH review meeting.
- This process may lead to shorter stays in the PIPs for those clinically indicated patients with an LRH of Unlocked Dorm and an increase in admissions to the state hospital. Consequently, this may also improve bed availability at CDCR ICF PIPs.
- Additionally, this joint review could include patients with a single-cell chrono that was given due to their fragility from a severe mental illness and determine if they could be housed and treated in a state hospital (if the single-cell chrono was not due to severe in-cell violence and custody and the treatment team agrees with its removal)

- DSH reviews should not replace treatment team decision-making to refer a patient to their LRH
- If there is a disagreement between DSH and IRU to refer, a referral can still be made if IRU and the treatment team think the patient is ready for LRH step-down
- IRU will communicate with the PIPs when DSH reviews a patient and determines the patient is appropriate for ULD. IRU will request that the team refer the patient through the regular referral process.
- Prior review by DSH to determine appropriateness for ULD, will not preclude a patient from future reviews for appropriateness for movement to ULD or referral by the treatment team to ULD.

After CDCR and DSH implement the review process, they will monitor the process to determine its effectiveness. If the reviews assist in identifying increased numbers of individuals who are initially admitted to a DSH bed or who step down from a PIP, then these processes will be made permanent.

# EXHIBIT C

# POLICY DIRECTIVE

| | |
|---|---|
| NUMBER | 3607 |
| TITLE | **DSH Treatment Planning Policy – CDCR Patients in DSH Inpatient Programs** |
| EFFECTIVE DATE | July 1, 2017 |
| SUPERSEDES | AL2015-24 |

**References/ Authority**

- By Order of the Director, Department of State Hospitals
- Mental Health Services Delivery System Program Guide – 2009 Revision
- Memorandum of Understanding Between California Department of Corrections and Department of State Hospitals for Management and Oversight of Intermediate Care and Acute Inpatient Programs Treating Patients

**Policy**

Patient treatment planning is to discuss and develop patient-centered assessment, treatment, care, and services based on identified patient needs. The Interdisciplinary Treatment Team (IDTT) shall develop treatment plans that may include crisis intervention, individual counseling, group therapy, medication review and monitoring, social skills training, behavioral planning, and recreational and leisure activities.

The IDTT is comprised of the patient and those persons who work directly with each patient in the following service areas: psychiatry, psychology, social work, rehabilitation therapy, and nursing as well as any other person who is directly involved in the treatment of the patient.

Every patient shall have an individualized treatment plan. The patient has a right to request an internal review of the treatment plan, care, treatment, and services. If requested, the Senior Psychiatrist Supervisor will meet with the patient and the IDTT members to review the plan and discuss any concerns.

The patient's progress shall be reviewed by the IDTT on a basis consistent with California Code of Regulations Title 22 requirements for the license type of the DSH state hospital. Adjustments shall be made to the patient's treatment plan as necessary.

Treatment plans for patients who have recently transitioned to their Least Restrictive Housing (LRH) shall include clinical goals and objectives related to retention in their LRH.

# POLICY DIRECTIVE

**Responsibility**

Responsibility for policy review and implementation:

Department of State Hospitals (DSH) Director, or designee.

The Executive Director, or designee, is responsible for the compliance with this policy by all staff providing services to CDCR patients at DSH-Coalinga, DSH-Atascadero and DSH-Patton.

Responsibility for implementation:

The Program Director or designee is responsible for training and appropriate implementation of this policy. All Interdisciplinary Treatment Team (IDTT) members shall comply with this policy.

**Purpose**

To formalize and standardize the DSH treatment and planning policies and procedures in order to provide patient-centered care, treatment, and services for California Department of Corrections & Rehabilitation (CDCR) patients receiving inpatient treatment in their LRH custody setting within DSH.

**Procedure**

The patient's treating psychiatrist or psychologist shall be identified as the facilitator of the IDTT. The facilitator works with the other members of the IDTT in the development and review of the treatment plan.

Upon admission, each patient shall be assessed by the IDTT within 72 hours and the information obtained will be used to identify a patient's treatment needs as they relate to the patient's reason for admission and presentation at DSH. This synthesis of information will be documented in the initial treatment plan developed by the IDTT. The purpose of this conference is to guide a patient's care until the full treatment plan is developed. This preliminary plan will focus on the patient's safety and will address interventions in response to emergency needs.

The treatment plan serves as a reference document to guide the patient's care and should be reviewed frequently while the patient remains at DSH.

Following the 72-hour IDTT meeting, the IDTT shall begin to develop a full treatment plan and shall hold a treatment planning conference within 10 calendar days of the patient's admission to the program. During that conference, the IDTT shall review the treatment plan with the patient, and thereafter shall finalize the patient's treatment plan. Planning for maintenance of the patient's LRH and discharge planning shall begin at this time.

IDTT meetings shall be held for treatment planning as often as necessary to meet the patient's needs, but no less frequently than every 30 calendar days for intermediate and seven (7) business days

(excluding weekends and holidays) for acute. In addition, an emergency IDTT may occur when an emergent or urgent situation requires the updating of treatment plans between scheduled IDTT intervals (e.g., use of restraints/seclusion).

Assessment – The IDTT identifies the overall impression and needs of the patient after discussion of the information obtained from each member's assessment of the patient and the reason(s) provided by CDCR clinicians for the patient's admission to DSH. Information is also obtained from various sources including the patient, prior medical and psychiatric records, the unit health record, and, as appropriate, the correctional counselor & the patient's family/significant others. The clinical impressions, diagnoses, and prognoses for treatment are identified by the members of the IDTT. The assessment process includes the patient's perceptions of needs, preferences, and goals, as well as their perceptions of quality of life, functional skills, services desired, and how his spiritual and emotional needs can be met while receiving services. The IDTT uses this information as a basis for identifying and prioritizing treatment needs.

Individual Treatment Planning – Using the above identified assessment information the IDTT, in conjunction with the patient, develops the individualized treatment plan. The plan identifies behavioral goals and objectives to address both problems and strengths; the interventions and services that will be made or provided; a review of the patient's ability to maintain the LRH designation provided by CDCR; and the criteria for discharge. The plan also identifies behavioral goals that lead to observable, measureable objectives to meet the discharge criteria. The plan also includes how the patient's identified spiritual needs will be met.

Treatment Plan Implementation – Implementation of the treatment plan is interdisciplinary, and patients are active participants in implementation. All members of the IDTT are involved in assisting each patient in reaching his documented goals through the delivery of treatment and activities that will best serve his needs. Implementation includes ongoing feedback concerning each patient's response to interventions and ongoing assessment of each patient's level of understanding and readiness to learn.

The IDTT shall seek ongoing feedback from the patient throughout implementation of the treatment plan to assure that maximum treatment benefits are received. This feedback includes input and discussion regarding preferences for groups and activities, and periodic evaluation of current treatment activities in relation to expected outcomes. The IDTT monitors progress in achieving treatment goals and modifies the

# POLICY DIRECTIVE

treatment plan as needed. The IDTT also monitors and reassesses progress toward maintaining the patient's LRH designation as well as discharge criteria.

The IDTT is responsible for communicating its decisions with all staff that will be involved in treatment plan implementation through individual consultation, unit staff meetings, IDTT meeting documentation, and through various committees and processes established by DSH policy. The IDTT is also responsible for communicating with other staff that may be involved with providing other aspects of patient services. All IDTT members shall communicate to all other team members any information that is necessary for the completion of their individual duties.

The treatment plan serves as a record of IDTT communication and planned interventions toward assisting the patient's stabilization and recovery, skill and goal development, maintenance of the LRH designation, and the successful discharge from inpatient care. The concepts and terms used in the plan – including objectives and interventions – shall be stated in clear, concise, and measurable terms. The patient's written consent to treatment and written acknowledgment of the limits of confidentiality in the IDTT process shall be documented in the plan. The IDTT process also serves as the method to provide the patient or surrogate decision maker with information about the current and anticipated outcomes of care, the current treatment interventions, and the services that the patient requires in order to participate in current and future behavioral health care decisions.

**Signature**

PAMELA AHLIN
Director
Department of State Hospitals

KATHERINE TEBROCK, ESQ.
Deputy Director
Statewide Mental Health Program
Division of Health Care Services
Department of Corrections and Rehabilitation

# EXHIBIT D

# TABLE OF CONTENTS


Section I Narrative Summary ....................................................................................3

Section II Population/Census ....................................................................................3

Section III Staffing ....................................................................................4

Section IV Treatment, Clinical Services, Programming ....................................................................................8

Section V Patient Access to Treatment ....................................................................................10

Section VI Referrals, Admissions, Transfers ....................................................................................11

Section VII Patient Disciplinary Process ....................................................................................13

Section VIII Use of Force ....................................................................................15

Section IX Use of Observation Cells, Seclusion, Restraint ....................................................................................16

Section X Prevention, Emergency Response & Death Review Process ....................................................................................17

Section XI Utilization Review & Quality Management ....................................................................................17

Section XII Unusual Occurrences, Serious Incidents, Near Misses, Sentinel Events ....................................................................................18

Section XIII Patient Complaints/Patient Satisfaction ....................................................................................18

Section XIV *Coleman* Postings ....................................................................................18

Section XV Laundry & Supply Issues ....................................................................................19

Section XVI Privileges, Visiting, Telephone Access ....................................................................................19

Section XVII Law Library Access ....................................................................................19

Section XVIII Custody and Mental Health Partnership Plan ....................................................................................20

Section XIX Heat Plan ....................................................................................21

Section XX Pre-Release Planning ....................................................................................21

# *Coleman* Special Master's 31st Round Monitoring Tours of CDCR Psychiatric Inpatient Programs (PIPs)

*Updated August 2024*

The *Coleman* Special Master's Thirty-First Round onsite reviews of CDCR Psychiatric Inpatient Programs (PIPs) will cover **February 1, 2024 through July 31, 2024,** and will focus on areas outlined in this document request.

NOTE: *There are times when to present accurate information, the institution must go outside of the review period dates for calculations. For example, when reporting a patient's total length of stay in the PIP, it would not begin calculating his/her length of stay on June 1, 2023, just because that was when the review period began when his/her actual stay/admission began on May 2, 2023.*

## Request for Documents

All requested documents that can be provided in electronic format should be provided in separate electronic files, properly labeled, with the file title indicating the section content. Large volumes of files may be grouped into one folder that is clearly titled by section name/class/category. Each file and folder should be clearly labeled. For example, do not label files or folders as "Section 01" or "4.2"; instead, label files and folders as "Population/Census" or "Sec 12 Patient Complaints." Any requested documents and/or information that *cannot* be provided in electronic format should be produced in printed form that is legible (font size no smaller than 10 point), organized, labeled, and tabbed where indicated.

Documents should be produced in their original format as much as possible. ***It is essential that logs be provided in their original Excel format and not as PDF files or in any other converted format***. Whenever possible, **these logs should not contain merged or modified cells**. If a log was developed as a Word table, it should be provided in that format and not in a PDF or other converted format.

*********In accordance with the Order of Reference, monitors and experts may review and obtain copies of any documents related to the provision of mental health services to *Coleman* class patients, including services required by the Program Guide or other court-ordered care or treatment of CDCR patients. This includes, but is not limited to, those documents specifically requested in this Document Request, as well as any other documents related to the care or treatment of *Coleman* class patients but not otherwise specifically requested in this document request.** The "documents requested" here or "subject to review" mean any written or printed material of any kind, whether stored in hard copy or electronic format.

If a document is provided in response to one request and is requested again in another section of this document request, please refer to the document already provided identifying its specific location. Example: II Population/Census Data, No.3.

If a specific document request is not applicable to your facility, please indicate that it is not.

Any questions concerning this document request may be addressed to *Coleman* Deputy Special Master Kerry Walsh, Esq (kwalsh@pldolaw.com) or Deputy Special Master Patricia Williams, Esq. (harconwil@gmail.com).

Provide a complete schedule of activities that will occur during the days of the site visit by the Friday prior to the start of the visit. Include structured and unstructured therapeutic activities, Institutional Classification Committee (ICC)/Unit Classification Committee (UCC) meetings, Interdisciplinary Treatment Team (IDTT) meetings, Max Custody IDTTs and ICCs, committee and subcommittee meetings, huddles, psych tech rounds, CMHPP meetings, Use of Force review meetings, and any schedules of training that will be occurring. Please do not cancel any clinical activities such as treatment team meetings, treatment, structured and unstructured therapeutic activities, and/or quality management meetings or training solely because of the scheduled site tour.

***REVIEW PERIOD: PLEASE PROVIDE THE DATA AND INFORMATION REQUESTED BELOW FOR THE PERIOD FROM February 1, 2024 through July 31, 2024.**

## I. Narrative Description of the Program

A narrative description of the PIP's current status, including but not limited to any changes or developments since the preceding monitoring period and any efforts and results of addressing issues identified during the Special Master's preceding monitoring tour. Include any new or revised policies or procedures, any new and/or revised administrative directives (ADs) (with changes red-lined, if possible), any new licensing surveys and plans of correction, and any new Joint Commission reports and requirements of improvement, since the preceding tour/document production. If no actions were taken on previously identified issues, provide reasons why they were not taken. **Include any current issues or obstacles to the delivery of care and any plans to address those obstacles**.

Please include a description of current COVID-19 quarantine and isolation space for patients.

## II. Population/Census Data

Within 72 hours of the start of the site visit, provide the current census **by housing unit and separated by level of care,** including:

- patient name;
- CDCR number;
- date of admission;
- Housing unit bed capacity;
- number of beds reserved;
- number of beds assigned for admission;
- redlined/off-line beds;

- number of isolation rooms;
- number of flex beds; and,
- number of available beds.

**Please clearly indicate which patients are PC 1370 patients, if any.**

## III. Staffing

1. Please provide a narrative summarizing the facility's current status with respect to staffing allocation issues and treatment programming, with particular attention to changes since the preceding review.

2. If staffing issues were identified in the preceding monitoring report, explain any efforts to address concerns and whether there were improvements.

3. Staffing Report: Please provide your current (within 1-2 working days of the first day of the site visit) staffing, indicating the number of licensed and unlicensed staff and those in "acting" capacity using the following formats:

### 3A. Facility Administration, Supervisory, and Clinical Staff Report

| Position | Positions Established | Positions Filled | Vacancies | FTE Positions on Long Term Leave | FTE Positions Acting Out of Class | Full-time Equivalent Contractor s, Dual Appts. (i.e., in terms of FTEs) | Functional Vacancies |
|---|---|---|---|---|---|---|---|
| Program Director | | | | | | | |
| Program Assistant | | | | | | | |
| Unit Supervisor | | | | | | | |
| Chief Psychiatrist | | | | | | | |
| Senior Psychiatrist | | | | | | | |
| Psychiatrists | | | | | | | |
| Chief Psychologist | | | | | | | |
| Senior Supervising Psychologist | | | | | | | |
| Psychologists | | | | | | | |
| Supervising Social Worker | | | | | | | |
| Social Workers | | | | | | | |

| Position | Positions Established | Positions Filled | Vacancies | FTE Positions on Long Term Leave | FTE Positions Acting Out of Class | Full-time Equivalent Contractor s, Dual Appts. (i.e., in terms of FTEs) | Functional Vacancies |
|---|---|---|---|---|---|---|---|
| Rehabilitation/ Recreation Therapists | | | | | | | |
| Psychiatric Nurse Practitioner | | | | | | | |
| Supervising Registered Nurse | | | | | | | |
| Health Services Specialist | | | | | | | |
| Registered Nurses | | | | | | | |

| Position | Positions Established | Positions Filled | Vacancies | FTE Positions on Long Term Leave | FTE Positions Acting Out of Class | Full-time Equivalent Contractors, Dual Appts. (i.e., in terms of FTEs) | Functional Vacancies |
|---|---|---|---|---|---|---|---|
| Licensed Vocational Nurses (LVNs) | | | | | | | |
| Certified Nursing Assistants (CNA) | | | | | | | |
| Senior Psych Techs | | | | | | | |
| Psych Techs | | | | | | | |
| Office Services I (OSSI) | | | | | | | |
| Office Services II (OSSII) | | | | | | | |

| Position | Positions Established | Positions Filled | Vacancies | FTE Positions on Long Term Leave | FTE Positions Acting Out of Class | Full-time Equivalent Contractor s, Dual Appts. (i.e., in terms of FTEs) | Functional Vacancies |
|---|---|---|---|---|---|---|---|
| Associated Government Program Analyst (AGPA) | | | | | | | |
| Health Program Specialist I (HPSI) | | | | | | | |
| Health Program Specialist II (HPS II) | | | | | | | |
| Correctional Health Care Administrator (CHCA) | | | | | | | |
| Clerical Positions | | | | | | | |

### 3B. Custody Staff Report

| Custody Staff Position | Positions Allocated | Positions Filled | Vacancies | FTE Positions on Long Term Leave | FTE Positions Acting Out of Class | Functional Vacancies |
|---|---|---|---|---|---|---|
| Warden | | | | | | |
| Chief Deputy Warden | | | | | | |
| Associate Warden(s) | | | | | | |
| Captain(s) | | | | | | |

| **Custody Staff Position** | **Positions Allocated** | **Positions Filled** | **Vacancies** | **FTE Positions on Long Term Leave** | **FTE Positions Acting Out of Class** | **Functional Vacancies** |
|---|---|---|---|---|---|---|
| Lieutenant(s) | | | | | | |
| Sergeant(s) | | | | | | |
| CC I(s) | | | | | | |
| CC II(s) | | | | | | |
| Correctional Officer(s) | | | | | | |

4. Describe the facility's standards/requirements for staff-to-patient ratios by discipline and by unit.

5. Provide a list of all clinicians and their caseloads within (72 hours of the start of the site visit).

6. Provide the actual current (within 72 hours of the start of the site visit) treating staff-to-patient ratios for each program unit in the facility.

| | | | | |
|---|---|---|---|---|
| Unit# _<br>Patients # | Unit# _<br>Patients # | Unit# _<br>Patients # | Unit# _<br>Patients # | Unit# _<br>Patients # |
| Psychiatrists* # | Psychiatrists*# | Psychiatrists*# | Psychiatrists*# | Psychiatrists*# |
| Psychologists # | Psychologists # | Psychologists # | Psychologists # | Psychologists # |
| Clinical Social Workers# | Clinical Social Workers# | Clinical Social Workers# | Clinical Social Workers# | Clinical Social Workers# |
| Recreation Therapists# | Recreation Therapists# | Recreation Therapists# | Recreation Therapists# | Recreation Therapists# |

***Indicate telepsychiatry where appropriate**.

7. If telepsychiatry was used during the reporting period, please provide the following information:

   a. the number of days and locations that telepsychiatry was used during each month;

b. the programs that used telepsychiatry during each month;
c. the purposes for which telepsychiatry was used during each month;
d. the total number of encounters using telepsychiatry during each month; and,
e. any notice provided to the Special Master if telepsychiatry was used for more than 30 consecutive days and any plan to address the staffing issue.

8. For any mental health staff that provided treatment via telehealth during the review period or at the time of the site visit, provide the following:

   a. the program unit and level of care where the services were provided, and
   b. the percentage of time spent teleworking.

## IV. Treatment, Clinical Services, and Programming

1. Provide any policies governing the frequency of clinical contacts for patients at the acute and intermediate levels of care, including, as applicable, any relevant approvals of program flexibility from state licensing agencies.

2. Provide a list of all patients admitted to acute and intermediate levels of care (separated by level of care) during the review period. Include patient name, CDCR number, date of admission, date of initial mental health primary clinician assessment, date of initial psychiatric assessment, date of initial rehabilitation/recreation therapist assessment, date of initial Interdisciplinary Treatment Team (IDTT) meeting, and date of initial Institutional Classification Committee (ICC) meeting.

3. Provide results/reports of audits of IDTTs regarding meeting Program Guide timelines, required staff attendance, and adequacy of IDTT discussion and action. When local processes are used, please indicate the methodology and include corrective action plans.

4. Provide a list separated by core (clinician-led) groups and supplemental groups, including a description of all types of structured therapies offered. Examples of supplemental groups include recreation therapy groups, music therapy groups, and educational groups. For the review period, provide a list of groups offered, including:

   a. the number of patients assigned to each group and manner of assignment of patients
   b. any waitlist(s);
   c. the range and average number of patients participating in each group on a weekly basis; and,
   d. the number of groups offered in a language other than English.

5. Provide separate lists of core (clinician-led) and supplemental groups offered to MAX custody patients in intermediate and acute care programs. Indicate whether MAX custody patients have access to treatment groups in all areas where they are housed and, if not, why?

6. Provide results/reports of audits of group therapy offerings. When local processes are used, please indicate the methodology and include corrective action plans.

7. Provide the number of hours of treatment **offered** weekly (raw number per patient and average across patients) over the review period for each of the following:

   a. core (clinician-led) treatment groups;
   b. recreation therapy groups;
   c. nursing-led therapy groups; and,
   d. individual treatment broken down by discipline (psychiatry, primary clinician, RT).

**For individual treatment contacts, indicate whether they were offered confidential versus non-confidential contacts.

8. Provide the number of hours of treatment **attended** weekly (raw number per patient and average across patients) over the review period for each of the following:

   a. clinician-led (core) treatment groups;
   b. recreation therapy groups;
   c. nursing-led therapy groups; and,
   d. individual treatment broken down by discipline (psychiatry, primary clinician, RT).

9. Provide the number and percentage of treatment hours that were attended by individual patients weekly over the review period.

10. Provide the number and percentage of treatment groups that were canceled weekly during the review period and the reason(s) why. Include a list of canceled groups in order from most to least.

11. Provide the number and percentage of treatment groups that were refused weekly during the review period. Include a list of refused groups in order from most to least.

12. Provide the number and percentage of patients with job assignments (more than five hours weekly) during the review period.

13. Provide the number and percentage of patients assigned to educational or vocational classes (more than five hours weekly) during the review period.

14. Provide the number and percentage of patients eligible to earn milestone credits and who have earned milestone credits by level of care using the format below.

| MHSDS Type | Population | MCC Eligible | MCC Earned |
|---|---|---|---|
| ACUTE | | | |
| INTERMEDIATE | | | |

15. Provide reports of IDTTs, canceled, and/or refused and reasons for cancellation or refusal during the review period.

16. Provide behavior management/consultation data, including all patients referred for positive behavioral support.

a. Provide the number of behavioral plans completed since the preceding monitoring round.
b. Provide any logs of behavioral plans, including but not limited to the names of patients who had behavioral plans.

17. Provide a list of all *Coleman* class patients (CDCR # and Name) within 72 hours of the start of the site visit prescribed **non-formulary psychotropic medications**.

18. Provide a list of all *Coleman* class patients (CDCR # and Name) within 72 hours of the start of the site visit receiving **involuntary medications (PC2602**) and indicate renewal dates.

19. Provide a report or list of all Max custody patients admitted to the PIP during the review period. Include the patient's name, CDCR number, level of care (MHI), date of arrival at the PIP, custody designation at the time of arrival to the PIP, date of initial ICC, and custody designation after initial ICC.

20. Provide a report or list of all Max custody patient IDTTs held during the review period, including all staff attending the IDTT (including custody staff).

21. Provide a copy of all IDTT 128-Bs where the IDTT recommended the patient's Max custody designation be reduced.

22. Provide a copy of all ICCs 128G chronos completed following the recommendation by the patient's IDTT to reduce the patient's Max custody designation, including ICC action where the patient was not removed from Max custody.

23. Provide a copy of the Division of Adult Institutions (DAI) Mental Health Compliance Team (MHCT) weekly pre-review report of all patients referred to a PIP at the intermediate level of care and the result of this review.

24. Provide a copy of the DAI MHCT bi-weekly report of Max custody patients housed in the PIP and the result of this review.

25. Provide a report or copy of the results of the bi-weekly Deputy Director videoconference of Max custody PIP patients.

26. Provide a report by job classification of all correctional counselors and ICC chairpersons, who attended the required OJT, BET code 11063222 since March 1, 2022, regarding ICC Max custody reduction.

27. Provide a report by job classification of all mental health staff who attended the required OJT, BET code 11063222 since March 2021 regarding ICC and IDTT Max custody reduction.

V. <u>**Patient Access to Treatment**</u> (If you have not implemented STEP at your facility, provide the following for your STAGE or other incentive program)

1. Provide the local operating procedure (LOP) for the STEP program. If the LOP has not been implemented, please indicate and provide any local practices.

2. Provide the list of all patients treated at your facility during the review period by name and CDCR number at each STEP level (including Assessment & Orientation) by unit
   - Include the log in its original format with **no merged or modified cells**.

3. Provide the durations of patients' STEP statuses and the reasons for the durations.
   - Include the average length of time spent at each STEP level during the monitoring period, as well as the range for each unit and each program (e.g., acute, intermediate).

4. Provide a list of all patients by STEP level and program unit within 72 hours of the start of the site visit.

5. Provide a list of all patients on solo programming within 72 hours of the start of the site visit. Include the housing unit for each patient.

6. Provide the average length of time per patient spent on solo program status during the review period, as well as the range and reasons for solo program status.

7. Provide a report of any changes or modifications to practices, policies, and procedures with the use of the STEP program.

8. Provide copies of the monthly Health Care Access report issued during the monitoring period.

## VI. <u>Referrals, Admissions, and Transfers</u>

1. Provide a list of all *Coleman* class patients referred to **only your** facility during the review period, separated by level of care. Include as applicable:
   - CDCR number;
   - Name;
   - Referral type;
   - Referring Institution;
   - IDTT referral date;
   - Referral received date (IRU);
   - Referral endorsement date (by HCPOP);
   - Referral acceptance date (by PIP);
   - Referral recission date;
   - Referral rejection date;
   - Admission date;
   - Least Restrictive Housing;
   - Date of initial ICC;
   - Length of stay; and,
   - Any notes/comments, including reasons for recission/rejection/delays in referral and transfer timeframes.

2. Provide a list of all *Coleman* patients currently in the facility separated by Level of Care (MHI) and Program Unit showing:
   - CDCR number;
   - Name;
   - Current bed unit;
   - Referral type;
   - Referring institution;
   - IDTT referral date;
   - Referral received date (IRU);
   - Referral endorsement date (by HCPOP);
   - Referral acceptance date (by PIP);
   - Admission date;
   - Least Restrictive Housing;
   - Date of initial ICC;
   - Length of stay; and,
   - Any notes/comments, including reasons for delays in referral and transfer timeframes.

3. Provide the current (within 72 hours of the start of the site visit) waitlist of CDCR referrals endorsed to your institutional PIP where the PIP did not decide by the first day of the site visit and separate by level of care, including:
   - CDCR number;
   - Name;
   - Referring institution;
   - IDTT referral date;
   - IRU referral received date;
   - Endorsement to PIP date;
   - Scheduled admission date
   - Previous level of care;
   - Least restrictive housing; and,
   - Any comments/notes specifically **identifying reasons for delays for each patient.**

4. Provide the current (within 72 hours of the start of the site visit) waitlist of CDCR referrals accepted at your institutional PIP who have not yet been admitted by the first day of the site visit, reporting by level of care, including:
   - CDCR number;
   - Name;
   - Referring institution;
   - Previous level of care;
   - IDTT referral date;
   - IRU referral received date;
   - Endorsement to PIP date;
   - Scheduled admission date;
   - Least restrictive housing; and,

- Any comments/notes specifically identifying reasons for delays.

5. Provide a list of all *Coleman* class patients with CDCR number and name referred to your institutional PIP with complex medical needs during the review period. Include:
   - Outcome of referral;
   - Accepted and admitted dates; and,
   - Rejection date, and if so, provide reason.

6. Provide a list of all *Coleman* class patients (CDCR number and name) currently in the PIP who are **currently clinically placed in a higher custody setting than their least restrictive housing (LRH) designation.** Please indicate the dates of the last ICC and IDTT.

7. Provide a list of all *Coleman* class patients (CDCR number and name) during the review period who were **admitted to your PIP from a Security Housing Unit/Restricted Housing Unit-EOP**, identifying those within 21 days of discharge from the facility on any date during the site visit.

8. Provide a report of patients physically discharged from the PIP during the review period. Separate by acute and intermediate levels of care. Include for each patient:

   a. Name;
   b. CDCR number;
   c. Date of admission;
   d. Date of clinical discharge;
   e. Date of physical discharge/transfer;
   f. Date of clinician-to-clinician contact; and,
   g. Specific reasons for delays in physical discharge for each patient, where applicable.

9. Provide a list of all *Coleman* class patients currently (within 24 hours of the start of the site visit) in the PIP, separated by Level of Care, who have been **clinically discharged but remain in a bed in the facility** on the first day of the site visit, including:

   a. CDCR number;
   b. Name;
   c. Clinical Discharge Date
   d. Scheduled Discharge Date;
   e. Discharge Level of Care;
   f. Length of Stay;
   g. Administrative Days; and,
   h. Specific reasons that the patient remained in the bed after clinical discharge for each patient.

## VII. Patient Disciplinary Process

1. Provide a copy of the institutional Disciplinary Process LOP.

2. Provide a list of all **adjudicated** RVRs issued to PIP patients during the review period, including the patient's name, CDCR number, patient's level of care at the time of RVR, date of violation, RVR date, RVR violation, RVR adjudication date, and results of adjudication. (While on site, the monitor will request from the list provided a complete copy of selected RVRs, including a copy of the MHA.)

3. Provide a report including the patient's name, CDCR number, patient's level of care, date of RVR, and violation for all mental health assessments completed that recommended the behavior be documented in an alternative manner ("yes" response to question number two of the MHA).

4. Complete the spreadsheet below identifying **all PIP** correctional staff receiving the Inmate Disciplinary Process Mental Health Assessment training (BET code 11055507) within the last 12 months, excluding employees on long-term sick leaves. Demonstrate compliance with the policy by identifying the job class, total number, each class (filled), number of staff trained by job class, and the number of staff NOT trained by job class.

| Report of Training - Inmate Disciplinary Process Mental Health Assessment. BET Code 11055507 | | | |
|---|---|---|---|
| Reporting Period | | | |
| Institution | | | |
| Job Class: | Total Number of Staff in Class (Filled) | Number of Staff Trained per Class | Number of Staff NOT Trained per Class |
| Correctional Administrator | | | |
| Captain | | | |
| Lieutenant | | | |
| Sergeant | | | |
| Correctional Officer | | | |

5. Complete the spreadsheet below identifying **all PIP** mental health staff who received the Inmate Disciplinary Process Mental Health Assessment training for the last 12 months, excluding employees on long-term sick leaves. Demonstrate compliance with the policy by identifying the job class, total number, each class (filled), number of staff trained by job class, and number of staff NOT trained by job class.

| Report of Training - Inmate Disciplinary Process Mental Health Assessment. | | | |
|---|---|---|---|
| Reporting Period | | | |
| Institution | | | |
| Job Class: | Total Number of Staff in Class (Filled) | Number of Staff Trained per Class | Number of Staff NOT Trained per Class |
| Chief Psychologist/Chief of Mental Health/Chief Psychiatrist | | | |
| Senior Psychologists/Senior Psychiatrists/Senior Social Work Supervisor | | | |
| Psychologists | | | |
| Psychiatrists | | | |
| Other: | | | |

## VIII. <u>Use of Force</u>

Provide the following:

1. A copy of the institutional LOP regarding Use of Force.

2. A summary of any changes to the facility's use of force policy and procedures since the last review period.

3. Cell extraction logs and reports for the review period.

4. A list of ALL use of force incidents occurring within the PIP during the review period. The list shall include the patient's name, CDCR number, the patient's level of care, date of incident, the physical location of the incident, if the force used was immediate or controlled, and the status of review of the incident. While on site, the monitor may request a complete copy of closed incidents, including all levels of review.

5. Any Special Incident Reports which were issued for cases of use of force.

6. Upon request, provide any use of force video available.

7. Complete the spreadsheet below identifying **all PIP** correctional staff receiving Use of Force Policy training (using BET training code 11053412) during the last 12 months excluding employees on long-term sick leaves. Demonstrate compliance with policy by identifying the job class, total number of staff in each class (filled), number of staff trained by job class, and number of staff NOT trained by job class.

| Job Class: | Total Number of Staff in Job Class (Filled) | Number of Staff Trained per Job Class | Number of Staff not trained per Job Class |
|---|---|---|---|
| Warden | | | |
| Chief Deputy Warden | | | |
| Correctional Administrator | | | |
| Captain | | | |
| Lieutenant | | | |
| Sergeant | | | |
| Correctional Officer | | | |

8. Complete the spreadsheet below identifying **all PIP** required health care staff, those receiving Use of Force Policy training (using clinical training code 11055482) during the last twelve months, excluding employees on long-term sick leaves. Demonstrate compliance with policy by identifying the job class, the total number of staff in each class (filled), number of staff trained by job class, and number of staff NOT trained by job class.

| Job Class: | Total Number of Staff in Job Class (Filled) | Number of Staff Trained per Job Class | Number of staff not Trained per Job class |
|---|---|---|---|
| Chiefs of Psychology, Mental Health, and Psychology | | | |
| Supervisor Psychologists/Supervisor Psychiatrists/Supervisor Social Workers | | | |
| Psychologists | | | |
| Psychiatrists | | | |
| Psychiatric Nurse Practitioners | | | |
| Social Workers | | | |
| Nurses | | | |
| Other: | | | |

## IX. <u>Use of Observation Cells, Seclusion, and Restraint</u>

Provide the following:

1. Logs and reports concerning use of timeout cells/seclusion rooms during the review period.

2. Restraint logs and reports during the review period.

3. Observation cell logs and reports during the review period.

4. Any Special Incident Reports (SIRs) that were related to the placement of patients in seclusion/restraint during the review period.

5. Names and CDCR numbers of current patients who have been placed in seclusion/restraint during this admission. Include dates of the seclusion/restraint incidents.

6. Results of any audits of seclusion and restraint occurrences during the review period.

## X. Emergency Response and the Death Review Process

Provide the following:

1. Please provide the name and CDCR number of any patient who died during the review period while in a PIP housing unit.

2. Minutes of any risk management committee meetings.

3. Provide a list of unresolved QIPs resulting from suicide autopsy reports since the preceding monitoring review.

## XI. Utilization Review and Quality Management

Provide the following:

1. A narrative overview of any quality management and/or performance improvement activities, special projects, ongoing corrective action, studies, pilots, etc. that took place during the review period.

2. Minutes of meetings of any risk management committee(s) and the Clinical Management Team (CMT) completed during the review period.

3. Electronic Health Record (EHR), utilization management (UM), or other patient reports and findings from audits completed during the review period.

4. All audits and reports generated by any mortality and incident review committee and all morbidity and mortality reviews involving PIP patients completed during the review period.

5. All corrective action plans initiated as a result of audit results, or committee recommendations, completed during the review period.

6. Minutes of meetings of any utilization management committee completed during the review period.

7. Audits and reports by the Patient Improvement Program completed during the review period.

8. Copies of all Prospective Reviews, Concurrent Reviews, Continued Stay Reviews, Retrospective/Quality Management Reviews and Minutes of the Utilization Management Committee (UM Committee) completed during the review period.

9. All reports of the HCPOP/IRU/ADU Management Units regarding housing reviews and movement completed during the review period. This includes:

    a. The report maintained at headquarters;
    b. The report maintained at the institution;
    c. The out-of-LRH (least restrictive housing) report used by the institution; and
    d. The LRH justification report.

## XII. Unusual Occurrences/Serious Incidents/Near Misses/Sentinel Event

Provide the following:

1. Logs of unusual occurrences, near misses, and sentinel events during the review period.

2. Reports of unusual occurrences, near misses, and sentinel events during the review period.

3. Logs of serious incidents/Special Incident Reports (SIRs) during the review period.

## XIII. Patient Complaints/Patient Satisfaction

Provide the following:

1. List or log of all patient complaints, summaries of the complaints, and outcomes during the review period. The list or log should include the patient's name, CDCR number, date of the complaint, complaint reason, and date resolved/closed.

2. Summary of all patient satisfaction surveys administered to patients during the review period.

## XIV. *Coleman* Postings

Provide the following:

1. Any policies and/or procedures regarding posting *Coleman* notices.

2. Any audits, reports, or compliance logs with posting *Coleman* notices according to policies and/or procedures during the review period.

## XV. <u>Laundry and Supply Issues</u>

Provide the following:

1. A narrative overview of what has been done to address laundry and supply issues since the preceding review and any results thereof. Include a description of laundry and supplies distribution and any changes during holidays and non-business hours.

2. A copy of the LOP regarding laundry and supplies for PIP patients and any policies and/or procedures regarding the handling of laundry and ordering of supplies since the last monitoring round.

3. Any audits, reports, or logs of compliance with the handling of laundry and supplies policies and/or procedures.

4. Any audits, reports, or logs of compliance with shower policies and/or procedures.

## XVI. <u>Privileges/Visiting/Yard/Telephone Access</u>

1. Provide patient visitation, privileges, and telephone access policies and/or procedures (e.g., LOPs).

2. Provide telephone logs for patients in the PIP upon request.

3. Describe any changes to the telephone policy since the last monitoring round.

4. Describe any changes to visitation policies since the last monitoring round. Indicate if visitation was in-person or virtual during the review period.

5. Identify how records are kept for yard offered to PIP patients, including maximum custody patients; provide any logs related to the same. Also describe or provide local policies/procedures related to the use of clothed and unclothed body searches.

## XVII. <u>Law Library Access</u>

1. Provide policies and/or procedures regarding patient access to the law library. Include Max custody patient access to the law library.

2. Provide any logs of PIP patient law library access use during the review period.

## XVIII. Custody and Mental Health Partnership Plan

Please provide information on the following:

1. Provide a copy of the institutional LOP for Custody and Mental Health Partnership Plan.

2. Provide documentation on Joint Executive Rounding by Institution Leadership (dates, attendees' names and titles, programs visited, topics identified, and staff response).

3. For Joint Executive Rounding, provide a summary of programs rounded, topics identified and identification of staff who completed the rounds, and any meeting minutes reflecting that the rounding results were discussed/presented.

4. For Joint Executive Rounding, provide monthly Executive Staff meeting agendas that include Joint Executive Rounding topics, programs rounded, and identification of staff that completed rounds.

5. For Joint Executive Rounding, provide documentation of programs rounded, identification of staff that completed rounds, and topics in Quality Management Committee minutes. Please upload specific pages that address Joint Executive Rounding.

6. For Joint Executive Rounding, provide documentation of programs rounded, identification of staff that completed rounds, and topics in Mental Health Subcommittee minutes. Please upload specific pages that address Joint Executive Rounding.

7. Provide access to documentation (dates, attendees' names and discipline/title, topics discussed) of mental health, medical, nursing, and custody huddles that occurred during second and third watch on regular business days during the review period.

    a. Please indicate if your institution is piloting Specialized Bed Complete Care Model Huddles on second watch and, if applicable, provide effective dates and proof of practice.

8. Provide training sign-in sheets and FLSAs for the dates of the quarterly round table training identified in the 2019 CMHPP regarding the completion of quarterly round table training during second and third watch. Include the date and time of training, attendees' names, training class title, and lesson plan. Provide documentation by program unit or housing unit (acute and intermediate as applicable).

9. Provide a list in a spreadsheet of staff (names and title) by program unit or housing unit that did not attend the quarterly round training as scheduled; identify the date/lesson plan missed and plan to make-up the training.
10. Provide documentation of custody and mental health staff attendance at the annual partnership off-post training. The BET training code is 11060827. To demonstrate compliance, provide the total number of custody and mental health staff at the facility by job classification minus staff out on long-term sick and the total number of staff that attended the training by job classification.

11. Provide documentation of any additional collaborative efforts between custody and mental health staff.

12. Please provide a list in a spreadsheet by patient name, CDCR number, housing location, summary of staff misconduct allegation, date complaint filed, and finding or current status of the staff misconduct complaint. Monitors may identify and request a hard copy of specific staff misconduct complaints, excluding staff names, while on site.

13. How many staff were moved to another post as a result of a staff misconduct complaint? Please do not include any staff identifying information.

    a. Where were they moved to?

## XIX. <u>Heat Plan</u>

Please provide the following:

1. Provide a copy of the memorandum issued at the beginning of the heat season.

2. Provide the list of all PIP patients taking heat-sensitive medications during the review period.

3. Provide a copy of the Institutional LOP Heat Plan.

4. Provide any and all documentation, including Daily Activity Reports, reflecting heat plan activation during the review period.

5. Provide any documentation reflecting accommodations provided to PIP patients for canceled yard due to activation of a heat alert during the review period.

6. Provide summarized data reflecting the percentage of staff who attended/did not attend heat alert training, as well as all supporting documentation, including sign-in sheets. The data should be broken down by job classification, with the total number of staff in each classification, excluding those on extended leaves or workers' compensation, and the total number of staff in each class who attended/did not attend the training.

7. Provide documentation identifying all PIP patients who experienced a heat-related illness during the review period; documentation should include the patient's name, patient's MHI and the nature of the heat-related illness.

8. Provide a copy of the monthly heat reports submitted to CDCR headquarters during the review period.

## XX. <u>Pre-Release Planning</u>

Please provide the following:

1. Provide a narrative that describes all pre-release planning activities at the institution.

2. Provide a copy of the LOP for pre-release planning.

3. Provide group schedules showing pre-release activities during the reporting period.

4. Provide the total number, names, and CDCR numbers of PIP patients who had 90 days or fewer until parole during the review period. Indicate which patients paroled directly from the PIP.

5. Provide the total number, names, and CDCR numbers of PIP patients who received pre-release planning targeted toward parole during the review period.

    a. Include specific services provided, whether referral to transitional case management program (TCMP) was made, and whether clinician-to-clinician contact was made.

6. Provide logs/spreadsheets, reports, or other documentation indicating the amount of pre-release programming received by PIP patients scheduled to release during the review period.

7. Provide documentation reflecting communications and other contacts by the pre-release coordinator with PIP patients who received pre-release planning.

8. Provide the number of patients released from the PIP whose CAL-Id documentation was completed by the CCII. For those not completed, please provide the reason.

9. Provide documentation, including spreadsheets, reflecting all contacts by the Transitional Case Management Program (TCMP) with PIP patients (as available), including patient refusal of TCMP services where applicable.

10. Provide a list of patients released to Probation from the PIP, including patient name and CDCR number. Include whether a signed Release of Information was obtained and forwarded to Probation during the review period.

11. Provide a list of patients, including patient name and CDCR number, released from the PIP who were referred by the C&PR to housing programs, such as the STOP Program, during the review period.

12. Provide a list of all *Coleman* class patients (CDCR number and Name) that are within **120 days of their institutional release as of** the first day of the site visit.

13. Provide a list of all *Coleman* class patients (CDCR number and Name) that are within **60 days of their institutional release as of** the first day of the site visit.

# EXHIBIT E

# *Coleman* Special Master's Monitoring Tours of Department of State Hospital's Inpatient Mental Health Programs for CDCR Patients

## DSH-ATASCADERO, DSH-COALINGA and DSH-PATTON

The 2023 *Coleman* Special Master's paper reviews of the Department of State Hospital's (DSH's) Inpatient Mental Health Programs for CDCR patients will cover **October 1, 2023 through March 31, 2024** and will focus on areas outlined in this document request.

NOTE: *There are times when, to present accurate information, the hospital must go outside of the review period dates for calculations. For example, when reporting a patient's length of stay in the hospital, it would not begin calculating their length of stay on August 1, 2023 just because that was when the review period began when their actual stay/admission began on May 2, 2023.*

## Request for Documents

All requested documents that can be provided in electronic format should be provided in separate electronic files, properly labeled, and with the file title indicating the section content. Large volumes of files may be grouped into one folder that is clearly titled by section name/class/category. Each file and folder should be clearly labeled. For example, do not label files or folders as "Section 01" or "4.2"; instead, label files and folders as "Population/Census" or "Sec 12 Patient Complaints." Any requested documents and/or information that *cannot* be provided in electronic format should be produced in printed format that is legible (font no smaller than ten point), organized, labeled, and tabbed where indicated.

Documents should be produced in their original format as much as possible. ***It is essential that logs be provided in their original Excel format and not as PDF files or in any other converted format when placed on the Department of State Hospital SharePoint.*** If a document was developed as a Word table, it should be provided in that format and not in a PDF or other converted format. ***Appropriate access credentials should be provided to Coleman Deputy Special Master Kerry F. Walsh, Esq. at kwalsh@pldolaw.com and Patricia M. Williams, Esq. at harconwil@gmail.com and Rachel Gribbin at RGribbin@pldolaw.com.***

If a document is provided in response to one request and is requested again in another section of this document request, please refer to the document already provided identifying its specific location. Example: II Population/Census Data, No. 3.

If a specific document request is not applicable to your hospital, please indicate that it is not.

**Please make the documents accessible on or before May 3, 2024.**

Any questions concerning this document request may be addressed to *Coleman* Deputy Special Master Kerry F. Walsh, Esq. at kwalsh@pldolaw.com or Deputy Special Master Patricia M. Williams, Esq. at harconwil@gmail.com.

***REVIEW PERIOD: PLEASE PROVIDE THE DATA AND INFORMATION REQUESTED BELOW FOR THE PERIOD FROM OCTOBER 1, 2023, THROUGH MARCH 31, 2024.**

## I. Narrative Description of the Program

A narrative description of the program's current status, including but not limited to any changes or developments since the preceding monitoring period and any efforts and results of addressing issues identified during the Special Master's preceding monitoring tour/document production. Please include:

- any new or revised policies or procedures,
- any new and/or revised administrative directives (ADs) (with changes red-lined, if possible),
- any new licensing surveys and plans of correction, and
- any new Joint Commission reports and requirements of improvement since the preceding tour/document production.

If no actions were taken on previously identified issues, provide the reasons why they were not taken. Include any current issues or obstacles to the delivery of care and any plans to address those obstacles.

Separately, provide a narrative description of the acute and intermediate care programs provided at the hospital to *Coleman* class members.

Provide all policies and procedures governing the acute and intermediate care programs provided at the hospital to *Coleman* class members.

Provide training policies and procedures for treatment staff.

## II. Population/Census Data

Please provide a breakdown of the current census by Level of Care and Unit.

## III. Staffing

Provide a narrative summarizing the hospital's current status concerning staffing allocation issues and treatment programming for *Coleman* class members, with particular attention to changes since the preceding review. Specifically, identify any efforts and results of addressing issues identified within the preceding review. Additionally, please describe how your current staffing impacts the provision of treatment to *Coleman* class members. Please include any local recruitment and retention efforts since the preceding review period.

Provide the hospital standards/requirements for staff-to-patient ratios by discipline, unit, and LOC and the actual current staff-to-patient ratios by discipline and unit, including LOC at the time of the site visit.

Provide staffing position allocations, numbers of positions filled/covered (all in terms of full-time equivalents), and vacancies for the listed disciplines. Include any positions that cover *Coleman* class members and non-*Coleman* class members, and indicate the percentage of position used for each. Include a break out of supervisory and line staff within disciplines. Indicate whether staff are contractors, in "acting" capacity, serving in a double capacity, or on loan from other programs or facilities.

| **Position** | **Positions Established** | **Licensed or Unlicensed (L or UL)** | **Positions Filled** | **Vacancies** | **FTE Positions on Long Term Leave** | **FTE Positions Acting Out of Class** | **Full-time Equivalent Contractors, Dual Appts. (i.e., in terms of FTEs)** | **Functional Vacancies** |
|---|---|---|---|---|---|---|---|---|
| Executive Director | | | | | | | | |
| Clinical Administrator | | | | | | | | |
| Hospital Administrator | | | | | | | | |
| Medical Director | | | | | | | | |
| Senior Supervising Psychiatrist | | | | | | | | |
| Program Director | | | | | | | | |
| Nurse Coordinator | | | | | | | | |
| Psychiatrists | | | | | | | | |
| Psychologists | | | | | | | | |
| Social Workers | | | | | | | | |
| Rehabilitation Therapists | | | | | | | | |
| Supervising Registered Nurses | | | | | | | | |
| Health Service Specialists | | | | | | | | |
| Nurse Practitioners | | | | | | | | |

| Position | Positions Established | Licensed or Unlicensed (L or UL) | Positions Filled | Vacancies | FTE Positions on Long Term Leave | FTE Positions Acting Out of Class | Full-time Equivalent Contractors, Dual Appts. (i.e., in terms of FTEs) | Functional Vacancies |
|---|---|---|---|---|---|---|---|---|
| Registered Nurses | | | | | | | | |
| Senior MTAs | | | | | | | | |
| MTAs | | | | | | | | |
| Senior Psych Techs | | | | | | | | |
| Psych Techs | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

**Please fill in any additional treatment staff not listed above.

1. If telepsychiatry was used during the reporting period, please provide the following information:

   - any local operating procedures regarding telepsychiatry;
   - the number of days and locations that telepsychiatry was used during each month;
   - the programs that used telepsychiatry during each month;
   - the purposes for which telepsychiatry was used during each month;
   - the total number of encounters using telepsychiatry during each month; and
   - if you were using telepsychiatry during the preceding monitoring period, describe any staffing changes.

2. For any mental health staff other than psychiatry that provided treatment via telehealth during the review period and at the time of the site visit, provide the following:

   - any local operating procedures regarding telehealth;
   - the number of days and locations that telehealth was used during each month;
   - the percentage of treatment provided per provider via telehealth;
   - the percentage of time spent teleworking (two days per week, three days per week) per provider;
   - the programs that used telehealth during each month;
   - the purposes for which telehealth was used during each month;
   - the total number of encounters using telehealth during each month; and
   - if you were using telehealth during the preceding monitoring period, describe any staffing changes.

## IV. <u>Treatment, Clinical Services, and Programming</u>

Provide separately the following for the acute and intermediate programs:

1. Patients' names and numbers, dates of admissions, date of initial and most recent Treatment Team meetings.

2. Nature and description of all types of structured therapies offered (please include groups and individual therapies). *Please do not provide raw patient attendance reports.*

   a. Where provided.

   b. Number of patients assigned to each therapy per week and manner of assignment of patients.

   c. Average number of patients participating in each therapy per week.

   d. Number of hours of all types of structured therapy, which are core groups, centralized groups (i.e., treatment mall groups), and supplemental therapies, per week.

   e. My Activity Participation and Planning (MAPP) roster count report for patients in the PC 2684 program.

3. Numbers of hours of treatment ***offered (i.e., not simply scheduled)*** weekly (raw number of hours per patient per week and average number of hours across patients per week). This would include the number of hours offered to each patient each week during the review period and then a weekly average (across all patients) of treatment hours offered weekly during the review period.

   a. Group treatment.

   b. Recreational therapy.

c. Individual treatment.

4. Numbers of hours of treatment ***delivered*** weekly (raw number of hours per patient per week and average number of hours across patients per week). This would include the number of hours delivered to each patient each week during the review period and then a weekly average (across all patients) of treatment hours delivered weekly during the review period.

   a. Group treatment.

   b. Recreational therapy.

   c. Individual treatment.

5. Percentage of treatment hours that were delivered by group therapy.

   - Please provide the total percentage for the review period and
   - Weekly data for the review period.

6. Percentage of treatment hours that were delivered by recreational therapy.

   - Please provide the total percentage for the review period and
   - Weekly data for the review period.

7. Percentage of treatment hours that were delivered by individual treatment.

   - Please provide the total percentage for the review period and
   - Weekly data for the review period.

8. Number of treatment groups that were canceled during the monitoring visit/period and reason(s) why.

9. Number and percentage of patients with jobs that are treatment plan driven (more than five hours weekly).

10. Number and percentage of patients who attend educational classes or activities (more than five hours weekly).

11. Number, names, and hospital numbers of *Coleman* patients who were treated at this hospital and had 90 days or less until parole date.

12. Number, names, and hospital numbers of patients who received pre-release planning targeted toward parole.

    a. Include specific services provided, whether referral to transitional case management program (TCMP) was made, and whether clinician-to-clinician contact was made.

b. MAPP schedule cancellation report.

c. Incident management report.

13. Report of treatment planning conferences held, canceled, and/or refused.

14. Number of behavioral plans completed during the monitoring period.

15. Log of behavioral plans including, but not limited to, the names and hospital number of patients who had behavioral plans, proposed actions, expectations, and, as applicable, modifications.

16. Reports from WARMSS or other database regarding any of the above.

## V. <u>Medication Management</u>

1. Provide written procedures and/or other documentation (e.g., a narrative summary) regulating psychiatrist prescribing practices, maximum length of medications ordered by psychiatrist, maximum length of bridge ordered medications, and how telephone orders and verbal orders are tracked.

2. Provide written procedures and/or other documentation (e.g., a narrative summary) regarding the processes used for the approval of non-formulary drugs and the utilization of non-formulary medications.

   i. Please provide a list of non-formulary psychiatric medications.

3. Provide written procedures and/or other documentation (e.g., a narrative summary) regarding polypharmacy reviews.

4. Provide written procedures and/or other documentation (e.g., a narrative summary) regulating the prescribing and monitoring of patients on clozapine. Provide the total number of and the names and numbers of patients on clozapine during the review period, including which patients were on clozapine prior to arrival and which patients were initiated on clozapine while at DSH.

5. Provide the number of patients on HS medications, the total number of medications prescribed at HS, and whether HS medications were administered after 2000 hours.

6. PC 2602.

   i. Provide the total number and the names and numbers of all patients receiving medications under the PC2602 process during any portion of the monitoring period. Provide a list of current patients receiving medications under the PC 2602 process and list the report date (should be within seven calendar days of document production).

ii. Provide the number of petitions initiated and the number of petitions renewed, including the status of any pending petitions (report the numbers for emergency petitions separately from non-emergent petitions, identifying both, and provide a total number); include whether any petitions were withdrawn for clinical reasons; and include any petitions denied or withdrawn for non-clinical reasons such as poor tracking or mishandling and provide the number of cases in each category (e.g., six were denied due to procedural error, three were withdrawn due to failure to meet deadline).

iii. Provide the total number of patients and the names and numbers of patients who have been non-compliant with the PC 2602 process and any use of force associated with medication administration.

iv. Provide the policy/procedure for institutional tracking and reporting of the PC 2602 process within DSH and how this information is conveyed to CDCR.

v. Provide written procedures and/or documentation (e.g., a narrative summary) regarding parole medications.

1. Include a list of patients who paroled during the review period and indicate whether parole medications were administered and what amount (e.g., 30 days, 60 days).

## VI. <u>Patient Access to Treatment</u>

1. Please provide the policy/procedure for the Hospital Access System (HAS) and highlight any changes or modifications to practices, policies, and procedures with the use of the HAS system since the preceding monitoring period.

2. A list of all patients on HAS status, collectively and by HAS level.

3. Duration of patients at each HAS level, current status, and the reasons for the durations. For each patient, please provide specific dates of change in level.

4. A list of all patients who are not/did not get full HAS privileges and the reasons why (e.g., a patient at Level 4 only received Level 3 due to COVID-19, staffing shortage, etc.).

## VII. <u>Referrals, Admissions, and Transfers</u>

1. Please provide a narrative description of the review process for patients out of LRH, as well as a list of all patients reviewed, including:

   a. Name

   b. CDCR and Hospital numbers

c. Outcome (acceptance, rejection) including explanation.

2. A list of all patients referred to your institution during the review period, including for each patient:

    a. Name

    b. CDCR and Hospital number

    c. Referring facility.

    d. Dates of:

        i. Referral.
        ii. Acceptance or rejection, and if rejected, the reason why.
        iii. Admission (include reasons for any delays).

3. A list of current patients, by units, and level of care, including for each patient:

    a. Name.

    b. CDR and Hospital number.

    c. Referring facility.

    d. PC 2602 order (yes or no).

    e. Dates of:

        i. Referral.
        ii. Acceptance.
        iii. Admission.

4. A census log of discharged patients, including for each patient:

    a. Name.

    b. CDCR and Hospital number.

    c. Date of admission.

    d. Date of clinical discharge.

    e. Date of physical discharge/transfer.

5. Any dates of administrative discharge where the patient has been discharged but not transferred out of the program within the designated timelines.

6. Provide data for the monitoring period regarding the DSH-CDCR Memorandum of Understanding (MOU), admissions, discharges, least restricted housing (LRH) movement, level-of-care (LOC) changes, etc.

   a. Accepted referrals received by month.

   b. Rejected referrals by month (including reasons for rejection).

   c. Monthly snapshot of waitlist (including CDCR direct pending and accepted referrals).

   d. Monthly snapshot of net available beds indicating census, beds on hold, and redlined beds.

   e. List of beds by unit (if the unit is shared with patients under other statutes (e.g., PC 1370).

   f. Monthly snapshot of census by LOC.

   g. Direct admissions from CDCR by month.

   h. Direct discharges to CDCR by month.

   i. Direct admissions from other DSH facilities by month for PC 2684 patients.

   j. Direct discharges to other DSH facilities by month for PC 2684 patients.

   k. Level of care changes: acute to intermediate.

   l. Level of care changes: intermediate to acute.

   m. List of LRH designations by LOC and custody levels for patients at the hospital for each month of the monitoring period and at the time of the site visit.

   n. List of intermediate patients not in their LRH designation by month during the monitoring period and at the time of the site visit.

   o. Average days in bed of current patient census.

   p. The average length of stay of patients discharged by month.

## VIII. <u>Quality Improvement/Quality Management/Utilization Management</u>

Provide the following for the monitoring period and for during the site visit:

1. A narrative overview of quality improvement/quality management/utilization management/performance indicator activities carried out during the review period.

2. All policies and procedures related to the quality improvement systems at the hospital.

3. All minutes of meetings regarding the Performance Improvement Program at the hospital including, but not limited to, Treatment Planning (TxPP); Mall Planning; Clinical Operations Advisory Council (COAC); Quality Council; Standards Compliance Department; Incident Management System; Incident Management Review Committee (IMRC); Risk Management System; Quality Action Team; Hospital Advisory Council (HAC); MAPP Reports; Mall Reports; Utilization Management Committee (UM); Utilization Review, Committee, Clinical Management Team; Treatment Outcome Expectations; Treatment Plan Audits; and Chapter Champion Committee.

4. All Performance Improvement Program reports, whether or not generated within the Program Improvement structure, regarding and/or related, but not limited to Treatment Planning (TxPP); Mall Planning; Clinical Operations Advisory Council (COAC); Quality Council; Standards Compliance Department; Incident Management System; Incident Management Review Committee (IMRC); Risk Management System; Quality Action Team; Hospital Advisory Council (HAC); MAPP Reports; Mall Reports; Utilization Management Committee (UM); Utilization Review, Committee, Clinical Management Team; Treatment Outcome Expectations; Treatment Plan Audits; and Chapter Champion Committee.

5. Any and all chart audits covering the monitoring period and for current patients, including treatment plan audits, psychiatry chart audits, peer reviews, etc.

6. All audits conducted under the Performance Improvement Program including, but not limited to, audits reported to or regarding Treatment Planning (TxPP); Mall Planning; Clinical Operations Advisory Council (COAC); Quality Council; Standards Compliance Department; Incident Management System; Incident Management Review Committee (IMRC); Risk Management System; Quality Action Team; Hospital Advisory Council (HAC); MAPP Reports; Mall Reports; Utilization Management Committee (UM); Utilization Review, Committee, Clinical Management Team; Treatment Outcome Expectations; Treatment Plan Audits; and Chapter Champion Committee.

7. All corrective action plans or improvement plans implemented as a result of audits or through actions related to or regarding Treatment Planning (TxPP); Mall Planning; Clinical Operations Advisory Council (COAC); Quality Council; Standards Compliance Department; Incident Management System; Incident Management Review Committee (IMRC); Risk Management System; Quality Action Team; Hospital Advisory Council (HAC); MAPP Reports; Mall Reports; Utilization Management Committee (UM); Utilization Review, Committee, Clinical Management Team; Treatment Outcome Expectations; Treatment Plan Audits; and Chapter Champion Committee.

8. For items No. 2, 3, 4, 5, 6, and 7 above, as necessary, please have staff available to assist in identifying specific applications to *Coleman* class patients.

9. All audits and reports generated by the Mortality and Incident Review Committee (MIRC) and all morbidity and mortality reviews involving PC 2684 patients.

10. All CQI reports for the hospital completed during the reporting period.

11. An update (in narrative form) on the medical records system.

## IX. Use of Observation Cells, Seclusion, and Restraint

1. Any changes to policy and procedures regarding Seclusion and Restraint since the preceding monitoring period.

2. Logs and reports concerning the use of observation cells.

3. Seclusion logs and reports, including patient names and hospital numbers.

4. Restraint logs and reports, including patient names and hospital numbers.

5. Any Special Incident Reports (SIRs) related to the placement of patients in restraints/seclusion.

## X. Suicide Prevention and Death Review Process

1. Any changes to policy and procedures regarding the Suicide Prevention and Death Review Process since the preceding monitoring period.

2. Provide the tracking tool/log of suicide risk assessments performed during the review period.

3. Please provide copies of all suicide risk assessments performed during the review period.

4. Documentation of training on suicide risk assessments.

5. Suicide prevention processes, including reports, audits, morbidity and mortality reviews, corrective action plans, and any quality improvement teams chartered or action taken for the purpose of suicide prevention.

    - For Atascadero State Hospital, please provide any policies and procedures relative to the increased monitoring Heat Map plan and

    - Any proof of practice of increased monitoring pursuant to the plan.

6. Logs of suicides.

7. Reports of serious incidents related to self-injurious behavior and suicide attempts.

## XI. Emergency Response

The emergency response process, including reports, audits, corrective action plans, and any quality improvement teams chartered or actions taken regarding emergency review.

a. Provide a list of all emergency response drills, including both tabletop and live drills, during the review period.

## XII. Unusual Occurrences/Serious Incidents

1. Logs of unusual occurrences.

2. Reports of unusual occurrences.

3. Logs of serious incidents/Special Incident Reports (SIRs).

## XIII. Patient Disciplinary Process

All logs, audits, and/or reports concerning patient aggressive behaviors, noncompliance with institutional rules, and institutional responses thereto. Include and indicate cases in which disciplinary citations were issued and those which were adjudicated and the outcomes of adjudicated cases.

Provide information regarding the completion of mental health assessments for PC 2684 patients (name and hospital numbers) who received formal rule violation reports during the reporting period. Include patient's name, hospital number, date of violation, and violation. The Special Master reserves the right to request a sample after review.

Please provide any policies and procedures regarding early return to CDCR due to disciplinary reasons. Please also provide,

a. A list of patients returned to CDCR early due to disciplinary issues during the review period, including each patient's name, CDCR number, and Hospital number.

## XIV. Use of Force

1. Logs and reports on institutional response to cases of patient aggression and/or failure to comply with institutional rules and whether institutional response complied with policy.

2. Logs and reports of any use of force for the administration of PC 2602 medications.

3. Any changes to the policy and procedures.

4. Any Special Incident Reports which were issued for cases of use of force.

## XV. Laundry and Supplies Issues

1. Any policies and/or procedures regarding the handling of laundry and provision of supplies.

2. Any audits, reports, or logs of compliance with laundry handling and supply procurement and distribution policies and/or procedures.

## XVI. Visitation

1. All patient visitation policies and procedures.

2. Any modifications to the patient visitation policies and procedures within the last six months.

## XVII. Telephone Access

Any policies and/or procedures regarding access to telephones.

## XVIII. Law Library Access

Any policies and/or procedures regarding patient access to the law library.

## XIX. Patient Complaints/Patient Satisfaction

1. List or log of all patient complaints, summaries of the complaints, and outcomes.

2. Summary of all patient satisfaction surveys administered to patients.

## XX. *Coleman* Postings

1. Any policies and/or procedures regarding posting of *Coleman* notices.

2. Any audits, reports, or logs of compliance with posting of *Coleman* notices according to policies and procedures.

## XXI. Milestone Credits

1. Describe how *Coleman* class patients receive milestone credits at your facility.