# EXHIBIT F

STATE OF CALIFORNIA —DEPARTMENT OF CORRECTIONS AND REHABILITATION GAVIN NEWSOM, GOVERNOR

**OFFICE OF LEGAL AFFAIRS**
Jennifer Neill
General Counsel
P.O. Box 942883
Sacramento, CA 94283-0001

July 2, 2025

Special Master Lopes
Pannone Lopes Devereaux and O'Gara LLC
Northwoods Office Park, Suite 215N
1301 Atwood Avenue
Johnston, RI 02919

VIA EMAIL

Special Master Lopes:

I write regarding recent updates to mission changes and impatient bed closures.

1. Mission Changes

On August 1, 2025 CDCR will close one Enhanced Outpatient Program (EOP) unit (D2) at High Desert State Prison. EOP patients will still be housed at D1.

2. Inpatient and Crisis Bed Closures

| Institution | Deactivation | Cells | Reason | Reactivation Date |
|---|---|---|---|---|
| **SAC MHCB** | October 30, 2024 | 13 | Flooring, HVAC and ADA modifications | October 2025 |
| **CMF PIP P1** | August 1, 2025 | 32 | Deactivation | N/A |
| **CMF PIP P2**[1] | August 1, 2025 | 36 | Deactivation | N/A |
| **CMF PIP S1**[2] | August 1, 2025 | 30 | Deactivation | N/A |
| **CMF PIP S2**[2] | August 1, 2025 | 30 | Deactivation | N/A |
| **CMF ICF A3** | August 1, 2025 | 40 | Deactivation | N/A |
| **CMF PIP 64 ICF Bed Pods C & D** | October 27, 2022 | 32 | Quarantine & Isolation | July 1, 2025 |
| **CHCF PIP A2A** | August 1, 2025 | 39 | Deactivation | N/A |
| **CHCF MHCB A2B** | August 1, 2025 | 38 | Deactivation | N/A |
| **CHCF PIP B3A** | August 1, 2025 | 30 | Deactivation | N/A |
| **CHCF PIP B5B** | August 1, 2025 | 30 | Deactivation | N/A |

[1] Closed and empty since July 2024.
[2] Closed and empty since April 2025.

a. California State Prison, Sacramento (SAC) Crisis Beds

Thirteen Mental Health Crisis Beds (MHCB) were closed in SAC's Correctional Treatment Center on October 30, 2024 for ADA modifications, heating, ventilation, and air conditioning work, and flooring repair. This project is estimated to be completed by the end of October 2025.

b. Reactivation of California Medical Facility (CMF) – Psychiatric Inpatient Program (PIP) Sixty-Four Bed Unit

CMF reactivated 32 Intermediate Care Facility (ICF) beds in the sixty-four-bed unit (Pods C and D) on July 1, 2025. All sixty-four beds are now operating.

c. Closure of PIP and MHCB Beds at CMF PIP and California Health Care Facility (CHCF) PIP

On August 1, 2025, the California Department of Corrections and Rehabilitation (CDCR) will deactivate PIP and MHCBs at CMF and CHCF. The closure of the PIP and MHCBs at CMF and CHCF PIP is an effort to right size the number of CDCR's inpatient beds considering decreased demand over the past several years. CDCR operates nearly 1,400 male PIP beds (Acute and ICF), yet projections routinely indicate that available beds far exceed demand. For years, CDCR's court-ordered population projection expert has reported a steady decrease in demand. The Spring 2022 Mental Health bed need study showed a demand for 1,481 male PIP beds. (ECF No. 7553 at 8, 15-19.) Today, the Spring 2025 projection indicates a need for only 949 male PIP beds by Fiscal Year 2026, down from 1,017 beds in the Fall 2024 projections. (ECF No. 8652 at 8, 15-17, see also ECF No. 8521 at 8, 15-18.)

With the exception of CMF A3 and P1, the units slated for deactivation have been empty for months, if not years. After these bed closures, CDCR will still have sufficient bed capacity to ensure patients are timely admitted to inpatient care.

i. CMF PIP Bed Closures

CMF closed P2 in July 2024 and S1 and S2 in April 2025 for outlet retrofits. These three units remain empty and will be deactivated on August 1, 2025. Additionally, CMF will deactivate locked dorm ICF unit A3 on August 1, 2025. A3 patients will be moved to locked dorm ICF unit A2 if eligible. CMF will also deactivate acute unit P1 on August 1, 2025. The licenses for P2, S1, S2, A3, and P1 will be suspended on August 1, 2025.

ii. CHCF PIP and MHCB Closures

On August 1, 2025, CHCF PIP will close Acute unit A2A (39 beds), MHCB unit A2B (38 beds), ICF units B3A and B5B (60 beds total). No patients are currently housed in these beds as CHCF PIP has consolidated their patients and care teams in response to reduced bed demand. Their licenses will be suspended on August 1, 2025.

Sincerely,

*/s/ Nick Weber*

NICK WEBER
Assistant Chief Counsel
Office of Legal Affairs

# EXHIBIT G

ROSEN BIEN
GALVAN & GRUNFELD LLP

101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
T: (415) 433-6830 ▪ F: (415) 433-7104
www.rbgg.com

Thomas Nolan
Email: tnolan@rbgg.com

July 10, 2025

VIA ELECTRONIC MAIL ONLY
Nicholas Weber
Assistant Chief Counsel
CDCR Office of Legal Affairs
Nicholas.Weber@cdcr.ca.gov

Re: *Coleman v. Newsom* --Plaintiffs' Objection to Planned August 1, 2025 Closure of 305 PIP and MHCB Beds
Our File No. 0489-03

Dear Nick:

We are writing to object to the planned August 1, 2025 permanent closures of 267 male inpatient PIP beds -- including 168 inpatient beds at the PIP at CMF (including beds on P1, P2, S1, S2 and A3), and 99 inpatient PIP beds at CHCF (including beds on A2A, B3A and B5B) -- and of 38 MHCB beds at CHCF (on A2B[1]). Defendants announced the planned closures of these 305 licensed beds for the first time in two Mission Change Letters dated July 1, 2025 and July 2, 2025.

Notably, the closure of these 305 beds comes just days after the June 30, 2025 closure of an additional 116 ICF beds at SVSP in the C5/C6 units – for a total loss of 383 male inpatient beds in the span of a month (not counting the purported CHCF MHCB closure).

## I. Defendants' Notice of Inpatient Beds Closures is Insufficient, and Untimely

Given that Defendants are planning to close 305 additional inpatient beds -- the largest reduction of inpatient resources in the history of this case -- and given the fact that these resources took many years and many hundreds of millions of dollars to plan, build, develop, license and staff – Defendants' decision to give the Special Master and Plaintiffs less than one month's notice is plainly insufficient. This rushed decision is particularly ill

[1] Although the July 2 Mission Change letter lists A2B at CHCF as an MHCB unit, it is listed in the bed audit as having 20 flex beds and 18 acute beds. Please clarify the current use and licensing status of the A2B unit at CHCF.

advised, as the announced date for the bed closures coincides precisely with the timeframe in which the Court will be evaluating the Receiver Candidate's plan of action and determining whether a permanent appointment is warranted. Unilaterally closing these beds just before the Receiver has a chance to evaluate whether they may be needed to remedy the longstanding constitutional violations in this case is dangerous and unjustified. Defendants must give the new Receiver the chance to evaluate whether permanently closing these units is justified and consistent with a durable remedy.

Defendants are required by court order to "meet and confer with the Special Master at least thirty days before making any changes, additions, or reductions in the number and/or use of any inpatient beds or mental health crisis beds." March 8, 2017 Order, ECF No. 5573, at ¶ 5. While the Court's order permits a shorter timeline in exigent circumstances, we are not aware of any emergency justifying less than a full month between the meet and confer and the closure, nor have Defendants identified one in their letters.

Defendants have unquestionably failed to comply with this requirement. Defendants' decision to not even provide notice until 30 days before the planned closures rendered compliance with the Court's requirement impossible. Indeed, no meet and confer has taken place or even been scheduled. Defendants did not even respond to the Special Master's repeated requests to set up a meet and confer to discuss planned mission changes until July 8, when they notified the parties that they would not be available to meet until July 16 – just two weeks before the planned closures.

Defendants have provided no basis justifying their rushed decision to close these beds. **We demand that Defendants keep these units open pending appointment of a *Coleman* Receiver and the opportunity for the Receiver to evaluate the issue and make a decision concerning these closures**.

## II. Defendants Must Seek Permission from The Court, the Special Master, and the *Coleman* Receiver Before Closing These Units.

Careful oversight of inpatient resources to ensure they are sufficient to meet class member demand has been a central, long-running concern in this case. It is critical that the MHSDS not return to the period of severe inpatient shortages that plagued the first decades of this case. As the Court found in 2006, in a proceeding to challenge defendants' inadequate plans regarding inpatient resources:

> The special master reports, the record reflects, and defendants admit, that the plan presented to the court in no way adequately responds to the severe shortage of intermediate care facility beds and mental health

> crisis beds that currently exists in the CDCR. It is undisputed that the shortage is leaving critically mentally ill inmates languishing in horrific conditions without access to immediately necessary mental health care. In his testimony, Dr. Peter Farber-Szekrenyi, who was appointed to the position of CDCR's Director of Health Care Services on December 1, 2005, repeatedly referred to the shortage as a "crisis," a description entirely supported by the record before this court. Dr. Farber-Szekrenyi testified that at present there is a shortage of 75 mental health crisis beds and 125 intermediate inpatient beds.

May 2, 2006 Order, ECF No. 1800, at 2:14-22; *see also* October 5, 2010 Order, ECF No. 3929.

Given the size of the proposed closures announced in the July 2, 2025 Mission Change Letter, the requirements of prior Court orders regarding inpatient care resources, and Defendants' knowledge that the Court is in the process of appointing a Receiver, Defendants must seek permission from the Court for these extensive closures. Indeed, the Court has expressly forbidden Defendants from deactivating at least one unit slated for closure – the P-2 Inpatient Unit at CMF -- without the Court's permission. *See* 5/2/06 Court Order, ECF No. 1800, at ¶ 6 ("Defendants shall maintain thirty-six (36) intermediate inpatient beds at the California Medical Facility (CMF) P-2 unit until further order of the court.").

While Plaintiffs chose not to object to Defendants' closure of the troubled C5/C6 units at SVSP PIP, which all parties agreed were never meant to be permanent inpatient units in the first place, the loss of those 116 beds amplifies the magnitude and risk of the Defendants' plan to permanently deactivate an additional 305 beds on top of the C5/C6 closure just weeks ago. The reductions in inpatient capacity undertaken by CDCR in the last month are very dramatic and require acting with caution and careful Court oversight, not unilateral action on the extremely truncated schedule Defendants have announced.

## III. Defendants' Population Projections Routinely Underestimate True Demand for Inpatient Resources

Defendants' assertion that none of the closed PIP beds are needed is erroneous. While inpatient bed utilization has declined in the past 5 years, starting with the pandemic and continuing through a period of severe clinical staffing shortages throughout the MHSDS, that decline is clearly related to the pandemic restrictions on referrals and the subsequent severe, unabated clinical staffing crisis.

Historically, reductions in the number of patients utilizing CDCR and DSH inpatient beds have not generally reflected a lack of need for such beds. Rather, as clearly established in each of the unmet need studies of inpatient bed need conducted over the years, reductions in inpatient beds utilization have instead persistently reflected the failure of CDCR clinicians to refer all appropriate cases for inpatient care. *See, e.g.,* 6/30/2023 Unmet Need Assessment Report, ECF No. 7865-3, at 14 (PDF pagination) (acknowledging 2005 UNA report found that "[s]ome staff showed signs of institutionalization, with higher tolerance for pathology and decompensation" than appropriate). Defendants contended that their 2022-2023 UNA report showed no unmet need for inpatient beds, but even Defendants have to acknowledge that the UNA study generated a significant increase in referrals to inpatient units. See 6/30/23 Unmet Needs Study Report, ECF No. 7865-3, at 38-39 (discussing 343 patients referred to higher levels of care as a result of the study).

It is also important to underscore that as recently as February 2023, CDCR was facing possible contempt fines for its failure to timely transfer patients needing inpatient care into such programs – transfer delays that were definitely related to inadequate bed space. *See* 2/28/23 Order Re: Contempt Hearings on Inpatient Transfer Timelines, ECF No. 7741 and ECF No. 7555 at 54 (discussing closure of CHCF PIP units to new admissions from September 2021 to January 2022 due to "the staffing crisis and resulting poor quality of care."). Moreover, the *Coleman* Court has found that this kind of inadequate or delayed access to inpatient care "create[s] backlogs at every layer of the MHSDS." ECF 5529 at 3. The Court has also found that "periodic substantial decline in clinical referrals to necessary hospital care" is "one of the most tragic failures in the delivery of mental health care." *Coleman v. Brown,* 938 F. Supp. 2d 955, 982 (E.D. Cal. 2013). We are currently in a period marked by an unexplained decline in inpatient referrals.

At the end of the most recent UNA study in 2023, Plaintiffs disputed the study's finding that CDCR had adequate inpatient beds on hand due to the concern that the widespread shortage of clinical staff at the time of the study likely interfered with the ability of CDCR clinical staff at each institution to properly identify and refer patients potentially in need of inpatient care into the study cohort for screening and possible referral. *See* Plaintiffs' Objections to UNA Inpatient Bed Need Report, ECF No. 7900 at 4-5 (noting "the staffing crisis has undermined the ability of CDCR to identify and refer all cases of need for inpatient care both in the context of the UNA study, and in CDCR's routine reviews of patients for higher levels of care in IDTTs. As the Special Master noted, 'throughout the UNA process, UNA review teams, including CDCR clinicians, consistently expressed concern about the woeful mental health staffing levels in the institutions and the resultant lack of follow-up care and required IDTTs.' ECF No. 7865-2 at 30.").

Defendants themselves admit they found evidence that staffing shortages interfered with the 2022/23 UNA Study results, writing in the final 2022/23 UNA Study Report that inpatient "referral recommendations may have been influenced by staffing deficiencies, according to discussions among UNA reviewers." 6/30/2023 Unmet Need Assessment Report, ECF No. 7865-3, at 67.

Even assuming for the sake of argument that the most recent 2022/23 UNA Study fully captured the need for inpatient care at the time, that study does not support current plans to eliminate an additional 305 inpatient beds, especially given the significant increase in the overall size of the mental health caseload since the UNA study concluded.

In June of 2023, at the end of the 2022/23 UNA Study process – when presumably the census of CDCR's inpatient beds was at least somewhat closer to true need given the impact of the many study-driven referrals – the total usage of inpatient beds was 1,048, with 105 patients awaiting placement, for a total bed need established through use of **1,154 male inpatient beds**. *See* June 2023 Monthly Statistics, 7/23/23 MIS Report.

Defendants assert in their July 2, 2025 Letter that recent population projections show declining demand for inpatient beds since the 2022/23 UNA period:

> For years, CDCR's court-ordered population projection expert has reported a steady decrease in demand. The Spring 2022 Mental Health bed need study showed a demand for 1,481 male PIP beds. (ECF No. 7553 at 8, 15-19.) Today, the Spring 2025 projection indicates a need for only 949 male PIP beds by Fiscal Year 2026, down from 1,017 beds in the Fall 2024 projections. (ECF No. 8652 at 8, 15-17, see also ECF No. 8521 at 8, 15-18.)

July 2, 2025 Weber Mission Change Letter at 2. But these CDCR population projections shift constantly and have not proven reliable during the course of this case. For example, the Fall 2024 Bed Need Study, filed on January 21, 2025, shows that the Fall 2023 projections for all higher levels of care (i.e., excluding CCCMS) underestimated the 2025 bed need by almost 11% and had to be adjusted upwards. *See* 1/21/25 Notice of Submission of January 2025 Bed Study (attaching the Fall 2024 Population Projections Bed Study), ECF No. 8521 (1/21/25) at 27 (showing the Fall 2023 need estimate for 2025 as 8,490 beds, and the Fall 2024 estimate for 2025 as 9,401 beds, a difference in estimates of 10.7 percent). These projections are also inconsistent with the UNA study results, as discussed below.

These projections also fail to take into account recent changes in law, including the 2024 passage of Proposition 36 (Homelessness, Drug Addiction, and Theft Reduction

Act), which is expected to dramatically increase the overall CDCR population and the population of class members. *See* 10/17/24 Article, *California May Take a Big Step Backwards Towards More Incarceration with Proposition 36*, Prison Policy Initiative (predicting growth of 35% in the state prison population in the next five years following passage of the law.)

Indeed, it is hard to credit or justify *any* projected decline in the need for inpatient beds given the dramatic increase in MHSDS population, and in particular in the EOP population, in the last few years.

Below we adjusted the 2022/23 UNA results for the growth in the overall population that has taken place since the end of the UNA Study in June 2023. This calculation shows that the Defendants' planned 305 bed elimination will cut into needed inpatient resources. Prior to the closures announced in the July Mission change letters, and prior to the closure of C5/C6 at SVSP, CDCR had the following inpatient beds for men[2] (based on the 4/28/25 MIS Report):

**Pre-Closure ICF Beds –** 1024 Beds (370 Low Custody ICF and 654 High Custody ICF beds).

**Pre-Closure Acute Beds (Flex)** – 480 Beds

**Pre-Closure Total Inpatient Beds for Men – 1504 beds**

After the closures of C5/C6 and the additional planned closures announced in the July Mission Change Letters, CDCR would have the following male inpatient beds:

**Post-Closure ICF Beds[3] –** 808 ICF beds (a reduction of 20 percent from pre-closure levels)

**Post-Closure Acute Beds (Flex)[4] –** 313 Acute beds (a reduction of 35 percent

[2] All of the planned bed closures are in units for men.

[33] There were 1,024 male ICF beds prior to the closure/deactivation of C5/C6 at SVSP (116 ICF beds) and the planned closures of A3 at CMF (40 ICF beds), B3A at CHCF (30 ICF beds) and B5B at CHCF (30 ICF beds), so the post-closure total male ICF beds will be 1,024 minus 216, or 808 beds -- a reduction of 20 percent.

[4] There were 480 male Acute beds prior to the closures/deactivations of P1 at CMF (32 acute beds), P2 at CMF (36 acute beds), S1 at CMF (30 acute beds), S2 at CMF (30 acute beds), and A2B at CHCF (39 acute beds), so the post-closure total of male Acute beds will be 480 minus 167, or 313 remaining beds -- a reduction of 35 percent.

from pre-closure levels).

**Defendants' Post-Closure Total Inpatient Beds – 1,121**

Notably, the post-closure total for male inpatient beds is lower than **the total need implied by the combined census of occupied beds and waiting list of 1,154** near the end of the 2022/23 UNA Study in April 2023. That fact alone should cause Defendants to reconsider the planned closures, particularly in light of the longstanding practice of inpatient bed planning using a 90 percent occupancy standard. *See* 3/24/17 Order at 10:15-16 ("All of the projected need is based on a 90 percent occupancy standard and therefore includes more beds that the projected average daily census for all of the inpatient programs.").

But the shortfall is greater than the amount by which CDCR beds will fall below usage levels at the end of the 2022/23 UNA study. Since the 2022/23 UNA Study Report was released in June of 2023, the population of the MHSDS has grown by 9 percent, while the EOP population has grown at more than double that rate (by 18.5 percent), as shown in the following chart. *Compare* June 2023 Monthly Statistics, 7/25/23 MIS Report (total MHSDS census of 32,680 and EOP census of 6,662), *and* April 2025 Monthly Statistics, 4/28/25 MIS Report (most recent report showing total MHSDS census of 35,663 and EOP census of 7,892). The following table adjusts the usage at the end of the 2022/23 UNA Study to account for this population growth:

| Date | Usage at End of 2022/23 UNA | Caseload Overall | EOP Caseload |
|---|---|---|---|
| July 30, 2023 | **1,154** | 32,680 | 6,662 |
| April 28, 2025 | | 35,663 | 7,892 |
| Percent Growth | | 9 percent | 18.5 percent |
| Adjusted Need Based on Increase | | **1,257 beds** | **1,367 beds** |

The chart shows that if inpatient bed need expanded by the same amount that the overall MHSDS population has expanded since the end of the UNA study, the new bed need would be 1,257 inpatient beds. Similarly, if the inpatient bed need expanded by the same amount that the more seriously ill EOP population expanded, the new need would be 1,367 beds.

Defendants plan is to cut the total number of male inpatient beds to 1,121, which is 33 beds less than the demonstrated inpatient demand at the end of the UNA study. It is also far below the potential need implied by recent population growth in the MHSDS overall by 136 beds, and below the need implied by recent EOP population growth by 236 beds. These shortages are even worse if we use the 90-percent rule required by the Court for bed planning.

It simply does not make sense for the inpatient bed need to be dropping dramatically while EOP bed need and the overall caseload are dramatically growing, and it makes even less sense to permanently take over 400 inpatient beds offline on the assumption that growth will continue to drop despite continuing increases in the *Coleman* population and the persistent unreliability of Defendants' projections over the history of this case.

## IV. Questions About Reversing the Closures and the Impact of Closures

Finally, we request more information about the exact nature of the planned bed closures, and what it would take to reverse these closures in the event that defendants are wrong about future demand and of referrals to inpatient care revert to a higher level than exists currently.

Past experience in this case with licensing inpatient psychiatric units proves that it can take significant time, and often requires waivers of various licensing requirements -- waivers that have frequently required *Coleman* court intervention in the past. *See* 5/2/06 Order, ECF No. 1800, at 2:14-3:2 and ¶¶ 4, 6-11, 14 (discussing various barriers to opening inpatient units at SVSP and CMF and inviting and requiring Defendants to seek *Coleman* Court intervention when licensing requirements prevented opening any inpatient units or required closing any inpatient units), *see also*, 3/24/17 Order, ECF No. 5583, at 26-27 (discussing re-emergence of waitlists for inpatient care in 2015) and at 12:24-13:19 (discussing Defendants' 2017 plans to respond to serious 2015-2017 shortage of ICF beds by expanding ICF beds on an emergency temporary basis by opening L-1 unit at CMF as ICF unit, converting isolation rooms at CHCF to ICF beds, and building inpatient units with flex beds at CIM and RJD). Moreover, these past experiences show that in times of crisis in inpatient bed capacity, Defendants end up employing emergency conversions of less-than-ideal ordinary housing units to provide inpatient care. *Id.* (discussing L-1 unit use at CMF).

In addition, in the past Fire Marshall issues have also created barriers to licensing inpatient units. *See generally,* October 5, 2010 Order, ECF 3929 (discussing need to address State Fire Marshall concerns about the use of C5 and C6 at SVSP for inpatient treatment).

We have the following questions:

1. Are Defendants proposing to suspend the licenses for the closed units, or give up the licenses? Is there a suspension status that makes it easier to re-start the units?

2. In the event Defendants want to re-open the closed units, how long would it take to re-license the units if the licenses are given up, and what are the steps involved?

3. Is it possible CDCR would not be able in the future to re-license some of the inpatient units at CMF, including the units on A-Wing, P-Wing, and Q-Wing, given their physical plant and any special waivers obtained in the past for those units?

4. Would additional upgrades or renovations be required to re-license the CMF units or the CHCF units?

5. Are there other steps like Fire Marshall review that would be required to re-open these units if they are fully closed by CDCR?

6. Will there be adequate numbers of locked dorms at CMF in A-2 once A-3 is closed?

The CMF locked dorms serve as an important step-down for some higher LRH individuals who want to program at DSH hospitals including ASH and CSH. Historically, class members have often had to prove that they can program safely in the locked dorms at CMF before being sent to ASH. Once more than half of those beds are closed, we are very concerned that referrals of class members needing treatment at ASH will fall below even the current inadequate levels.

We look forward to the required meet and confer on these issues. Additionally, please inform us **within 5 calendar days** if Defendants do not agree to delay the planned August 1, 2025 deactivation date until at least 30 days after that meet and confer so that we can seek court intervention to enforce the Court's prior orders.

Sincerely,

ROSEN BIEN
GALVAN & GRUNFELD LLP

*/s/ Thomas Nolan*

By: Thomas Nolan
Of Counsel

TN:TN

Encl.

cc: Co-Counsel
Coleman Special Master
Coleman Receiver and Staff
Elise Thorn
Sundeep Thind
Namrata Kotwani
Diana Toche
Amar Mehta
Steven Cartwright
Paul Mello
Samantha Wolff
Damon McClain

# EXHIBIT H

**Young, Mitchell J.**

| | |
|---|---|
| **From:** | Weber, Nicholas@CDCR <Nicholas.Weber@cdcr.ca.gov> |
| **Sent:** | Friday, July 11, 2025 2:54 PM |
| **To:** | AJ Alany; Thomas Nolan |
| **Cc:** | Steve Fama; Coleman Special Master; Damon McClain; Samantha Wolff; Paul B. Mello; Namrata Kotwani; Toche, Diana@CDCR; Mehta, Amar@CDCR; Cartwright, Steven@CDCR; Colette S. Peters; CDCR OLA Coleman CAT Mailbox; Elise Thorn |
| **Subject:** | RE: Coleman: Plaintiffs' Objection to Planned August 1, 2025 Closure of 305 PIP and MHCB Beds [IMAN-DMS.FID12440] |

Tom,

CDCR is available to meet and confer. We are available on July 16 or 23rd, as previously noted, but we can also be available on July 15 at 3:00 PM or July 17 at 2:00 PM.

CDCR disagrees with Plaintiffs' interpretation of the March 8, 2017, order, but have always been willing to meet and confer to discuss these planned closures and deactivation dates. CDCR further disagrees that waiting for the Receiver Nominee's report or potential appointment is necessary to manage its statewide bed need. Furthermore, CDCR disagrees that permission from the court, the Special Master, or the Receiver Nominee is required in this case and your citation to a nearly 20-year-old order regarding a purported bed shortage is not persuasive.

CDCR also disagrees with Plaintiffs' attempt to cast their own population projections. As you know, for nearly 25 years, CDCR has been court ordered to work with John Misner to conduct its twice annual bed needs study. It is these court-ordered projections that CDCR relies on in making these bed changes.

Plaintiffs' suggestion that "reductions in the number of patients utilizing CDCR and DSH inpatient beds have not generally reflected a lack of need for such beds" is particularly baseless given that the UNA demonstrated that there was no unmet need for inpatient care. Plaintiffs' reliance on population numbers during the 2022 UNA is equally unpersuasive. Bed demand has only decreased in the last three years. Tellingly, the units identified for closure at CHCF have sat unused since December 2021 and January 2022. And outside of COVID, CDCR has been fully compliant with timely transfers to inpatient beds.

Regarding your questions outlined at page 9 of your letter, CDCR is planning to suspend the licenses for these beds as opposed to surrendering them entirely. Suspension is the option that makes it easiest to quickly reactivate the beds. Reactivating suspended beds takes 30-60 days. The process requires an application to the Department of Public Health and State Fire Marshal (SFM) clearance, including an onsite inspection. The application and onsite inspection is much more limited than standard inpatient bed activations since this only authorizes a lift in suspension. The focus is on whether the unit has staff, per Title 22, whether the units are stocked with supplies, and whether requisite trainings are in place.

There is not a concern that lifting a suspended license would be hindered by physical plant design. Nor does CDCR anticipate the need for physical plant retrofits to lift a suspension. Such physical plant issues only come into play when a facility attempts to initially license a unit.

CDCR does not concede that locked dorms are necessary components of its inpatient system or that the 8th Amendment requires that a correctional system maintain "locked dorm" ICF units. Nonetheless, CDCR believes there are adequate locked dorms with the closure of A-3. Locked dorm usage has trended down over the past four years. While the four-year average is 55% capacity, that figure has dropped significantly since 2022. Additionally, in that same timeframe, DSH bed usage has increased from 32% in 2023 to 58% in the first half of 2025.

Please let me know when Plaintiffs are able to meet and confer.

Nick Weber
Assistant Chief Counsel
Complex Litigation Unit B
Office of Legal Affairs
Department of Corrections & Rehabilitation
(916) 217-1949

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

---

**From:** AJ Alany <aalany@rbgg.com>
**Sent:** Thursday, July 10, 2025 6:18 PM
**To:** Weber, Nicholas@CDCR <Nicholas.Weber@cdcr.ca.gov>
**Cc:** Steve Fama <sfama@prisonlaw.com>; Coleman Special Master <colemanspecialmaster@pldolaw.com>; Damon McClain <damon.mcclain@doj.ca.gov>; Samantha Wolff <swolff@hansonbridgett.com>; Paul B. Mello <pmello@hansonbridgett.com>; Namrata Kotwani <namrata.kotwani@doj.ca.gov>; Toche, Diana@CDCR <Diana.Toche@cdcr.ca.gov>; Mehta, Amar@CDCR <Amar.Mehta@cdcr.ca.gov>; Cartwright, Steven@CDCR <Steven.Cartwright@cdcr.ca.gov>; Colette S. Peters <csp.colemanreceiver@icloud.com>; CDCR OLA Coleman CAT Mailbox <OLAColemanCAT@cdcr.ca.gov>
**Subject:** Coleman: Plaintiffs' Objection to Planned August 1, 2025 Closure of 305 PIP and MHCB Beds [IMAN-DMS.FID12440]

**CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Dear Nick,

Please see the attached letter from attorney Thomas Nolan regarding the Planned August 1, 2025 Closure of 305 Inpatient Beds.

Best,

**AJ Alany [he/him]**
**Paralegal**
ROSEN BIEN GALVAN & GRUNFELD
101 Mission Street 6th Floor
San Francisco, CA 94105
(415) 433-6830 (telephone)
(415) 433-7104 (fax)
aalany@rbgg.com

CONFIDENTIALITY NOTICE: The information contained in this e-mail message may be privileged, confidential and protected from disclosure. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this e-mail message in error, please e-mail the sender at aalany@rbgg.com.

This message was sent from outside the company. Please do not click links or open attachments unless you recognize the source of this email and know the content is safe.

# EXHIBIT I

# Trial Processes for DSH Review of Coleman Patients

New Referrals from Different Level of Care (CCCMS, EOP, MHCB, and APP)

- Review every referral with an LRH of Unlocked Dorms regardless of clinical housing recommendation. This will increase the pool of referrals DSH reviews and may lead to increase in admissions to DSH.

    - Process for all new ICF referrals:
        - CDCR will send ALL referrals that HCPOP identifies as having an LRH for unlocked dorms to DSH as endorsements.
        - All referrals sent to DSH will have an outcome (accept/rescind/reject)

CDCR and DSH Utilization Review: Out of LRH Referrals From an ICF Setting

- Every 30-45 days, CDCR IRU will select and review in collaboration with DSH a set number of patients out of LRH (for Unlocked Dorms) to determine if certain patients are indicated for an unlocked dorm setting
- The number of patients, in a PIP-ICF program, being reviewed would be approximately 40-50 for each 30-45 day review period to help ensure a continued and sustained review of patients out of LRH
- CDCR IRU will provide a regular list of out-of-LRH patients weekly to DSH PMU
- DSH PMU will conduct and provide case reviews to CDCR IRU at least two business days before the scheduled joint LRH review meeting.
- This process may lead to shorter stays in the PIPs for those clinically indicated patients with an LRH of Unlocked Dorm and an increase in admissions to the state hospital. Consequently, this may also improve bed availability at CDCR ICF PIPs.
- Additionally, this joint review could include patients with a single-cell chrono that was given due to their fragility from a severe mental illness and determine if they could be housed and treated in a state hospital (if the single-cell chrono was not due to severe in-cell violence and custody and the treatment team agrees with its removal)

- DSH reviews should not replace treatment team decision-making to refer a patient to their LRH
- If there is a disagreement between DSH and IRU to refer, a referral can still be made if IRU and the treatment team think the patient is ready for LRH step-down
- IRU will communicate with the PIPs when DSH reviews a patient and determines the patient is appropriate for ULD. IRU will request that the team refer the patient through the regular referral process.
- Prior review by DSH to determine appropriateness for ULD, will not preclude a patient from future reviews for appropriateness for movement to ULD or referral by the treatment team to ULD.

After CDCR and DSH implement the review process, they will monitor the process to determine its effectiveness. If the reviews assist in identifying increased numbers of individuals who are initially admitted to a DSH bed or who step down from a PIP, then these processes will be made permanent.

# EXHIBIT J

*ROB BONTA*
*Attorney General*

*State of California*
*DEPARTMENT OF JUSTICE*

1300 I STREET, SUITE 125
P.O. BOX 944255
SACRAMENTO, CA 94244-2550

Public: (916) 445-9555
Telephone: (916) 210-7318
Facsimile: (916) 324-5205
E-Mail: Elise.Thorn@doj.ca.gov

June 18, 2024

VIA ELECTRONIC MAIL

Matthew A. Lopes, Jr.
Special Master
Pannone Lopes Devereaux and O'Gara LLC
Northwoods Office Park, Suite 215N
1301 Atwood Avenue
Johnston, RI 02919

Michael Bien
Lisa Ells
Ernest Galvan
Rosen, Bien, Galvan & Grunfeld, LLP
101 Mission Street, Sixth Floor
San Francisco, CA 94105

RE: *Coleman v. Newsom, et al.*
Trial Processes for DSH Admissions

Dear Plaintiffs' Counsel and Special Master Lopes:

As you know, the Department of State Hospitals (DSH) and the California Department of Corrections and Rehabilitation (CDCR) implemented a trial process for DSH review of *Coleman* patients for possible admission to DSH, which has increased the number of *Coleman* patients admitted to state hospitals since October 9, 2023, when the trial process was implemented. This letter is to provide notice that DSH and CDCR intend to implement three additional trial processes that should further increase the number of *Coleman* patients admitted to DSH and utilization of DSH beds for *Coleman* patients. The three additional processes are briefly discussed below and in the attached documents. Please provide us with any comments you have regarding these three additional processes by June 26, 2024, and please also let us know if you would like to meet to discuss these processes.

**1. Review of Custodially Ineligible Patients**

The objective of this trial process is to review *Coleman* patients who are currently ineligible for placement at DSH because they are designated as close custody and who (1) have a sentence of life without the possibility of parole, (2) are at least 62 years old; and (3) are designated single cell suffix (only as a result of mental health reasons or victimization concerns). DSH will review patients who fit these criteria in accordance with the MOU on referral, admission, and movement. Based on 2023 data, this may result in a substantial number of additional referrals to DSH for possible admission. For more detail, see Attachment 1.

**2. DSH-Atascadero Select Coleman Admissions**

The objective of this trial process is to use a small number of beds on the DSH-Atascadero admissions unit as part of the 256 DSH-Atascadero Coleman Beds to provide focused clinical support for Coleman patients at the intermediate level of care to help them stabilize so that they can transition to unlocked dorm intermediate care units in DSH-Atascadero. This may increase admissions of patients to DSH-Atascadero who previously would have been deemed inappropriate for admission to DSH because they were unstable and in need of more restrictive housing. For additional detail, see Attachment 2.

**3. Long Term Intermediate Hospitalization**

The objective of this trial process is to identify patients from DSH's intermediate care setting who have demonstrated difficulty maintaining clinical stability upon their return to CDCR's Enhanced Outpatient Program and to provide them with treatment in DSH's long-term intermediate hospitalization program for an extended period, but not to exceed the patients' maximum CDCR sentences. This may help patients who are prone to cycle frequently through the acute and intermediate levels of care due to the seriousness of their mental disorders. In addition, this may increase utilization of DSH beds for *Coleman* patients. For additional detail, see Attachment 3.

Sincerely,

*/s/ Damon McClain*

DAMON MCCLAIN
Supervising Deputy Attorney General

For ROB BONTA
Attorney General

# ATTACHMENT 1

**PROPOSAL - Close Custody, LWOP (at least 62 years of age), and Single Cell Coleman Reviews**

The objective of this proposal is to review Coleman patients currently custodially ineligible for placement at the DSH state hospital (unlocked dorms) in a manner that is clinically the most effective.

Initial Referrals to ICF:

All Close custody, LWOP at least 62 years of age, and Single Cell Suffix (single cell initiated as a result of mental health reasons or victimization concerns only) patient referrals to ICF level of care are not automatically excluded for DSH consideration. The patient referrals will be sent to DSH for clinical review to determine if the individual is clinically indicated for treatment in an unlocked dorm. Notification of the patient referral to DSH will start the 30-calendar day Program Guide timeline for admission.

DSH will conduct clinical reviews of the referrals consistent with Joint Policy Directive 3601: Referral, Admission and Movement in the joint DSH and CDCR MOU and notify CDCR IRU and HCPOP if a patient referral is recommended for admission or not recommended for admission to the DSH unlocked dorms.

HCPOP will begin necessary and indicated custody review processes with the institutions (e.g. committee, DRB, etc...) to allow for the patient referral to be endorsed to DSH. Once the necessary and indicated custody review processes have completed, HCPOP can endorse as outlined in Joint Policy Directive 3601: Referral, Admission and Movement.

Out of LRH reviews for Close Custody, LWOP (at least 62 years of age), and Single Cell:

- For individuals who were not clinically indicated for treatment in an unlocked dorm at the time of initial referral. DSH PMU will include reviews of these individuals within its existing LRH reviews defined in the "Trial Process."
- DSH will send a list and reviews of these patients preliminary recommended for admission to the state hospital to HCPOP and IRU.
- For those patients out of LRH recommended for admission to the state hospital, CDCR will begin necessary and indicated custody review processes with the institutions (e.g. committee, DRB, etc...) to allow for the patient referral to be endorsed to DSH. Once the necessary and indicated custody review processes have completed, the treatment teams can refer the patient and HCPOP can endorse as outlined in Joint Policy Directive 3601: Referral, Admission and Movement.

# ATTACHMENT 2

# DSH-Atascadero Select Coleman Admissions Trial Process

**Proposal: Utilize a small number of beds on the admission unit (unlocked single room) as part of the 256 DSH-Atascadero Coleman Beds to provide focused clinical support for ICF patients to stabilize in a DSH environment so that they can transition to the unlocked dorm ICF units.**

## Criteria for Short Term Utilization of Admissions Unit

1. All patient referrals shall be to ICF level of care and shall follow Policy Directive 3601: Referral, Admission and Movement in the joint DSH and CDCR MOU.
2. PMU shall clinically review all referrals and make a recommendation if a patient should be considered for temporary admission to the admissions unit (unlocked single room).
3. All patient referrals shall meet criteria for placement in the unlocked dorms, but upon clinical review by the Medical Director, or designee, a patient shall be admitted for temporary placement on the admissions unit (unlocked single room) if they meet additional criteria, including but not limited to:
    a. The severity of the patient's psychiatric symptoms makes it unsafe for them to be initially placed in the unlocked dorm and there is reasonable certainty that symptoms will improve with medication changes and/or therapeutic milieu within a 60-day time period and it would be safe for them to be housed in the admission unit.
    b. The patient has moderate aggression/ideations to harm others due to their severe mental illness, which may improve with medication changes and/or therapeutic milieu within a 60 day time period and it would be safe for them to be housed in the admission unit.
    c. The patient has been housed in a single cell for a significant period of time and there is concern that placement immediately into an unlocked dorm environment will be unsuccessful without a transition period in an unlocked single room.
4. Upon transport to the hospital, the patient will be admitted through the admission suite. The intake process in the suite takes approximately 2-3 hours. Patients shall receive a comprehensive medical assessment, a body check for any contraband, a shower and clean hospital clothing. Once this intake process has been completed and the patient is cleared, they shall be admitted to their admission housing unit.
5. Transitional periods in the admissions unit are meant for intensive modification of treatment (i.e. medication adjustments) in a more controlled environment so the patient can successfully transition to the unlocked dorm units.
6. A transition period residing on an admission unit will provide increased observation due to the lower census (28-32) and a higher staff to patient ratio.
7. All patients will have the ability to obtain a hospital access badge once assessed to be stable enough to independently move about the hospital safely.
8. All patients will be offered a variety of core treatment (individual and group) and supplemental activities, both on the admission unit and in centralized locations.

9. The admission unit Clinical Treatment Team shall consider transferring a patient to a dorm unit when clinically indicated and after completion of admission assessments.
10. If the patient's time on the admissions unit exceeds 30 days, then the unit Clinical Treatment Team shall report to the Utilization Management Committee (UM) patient progress towards transitioning to a dorm setting.
11. Patients will be referred back to CDCR in accordance with PD 3601 Joint Policy Referral, Admission and Patient Movement after 60 days if behavioral or psychiatric symptoms are unable to improve and dorm living at DSH cannot be achieved, but still require inpatient hospitalization at Acute or Intermediate.
12. If DSH assesses that the patient no longer requires inpatient treatment after stabilization in the admissions unit and is indicated for EOP level of care, DSH shall follow PD 3609 Joint Policy: Discharges.

DRAFT

# ATTACHMENT 3

# POLICY DIRECTIVE

| | |
|---|---|
| **NUMBER** | 3612 |
| **TITLE** | JOINT POLICY RE: Long-Term Intermediate Hospitalization |
| **EFFECTIVE DATE** | TBD |
| **SUPERSEDES** | NEW |

## STATEMENT

Policy Directives (PD) of the Department of State Hospitals (DSH) provide guidance, as appropriate, to comply with laws, regulations, codes, etc. PDs are issued and signed by the Director.

The California Department of Corrections and Rehabilitation (CDCR) and Department of State Hospitals (DSH) may identify patients from DSH's intermediate care setting to receive treatment in DSH's long-term intermediate hospitalization program for an extended period of time, but not to exceed the individual's maximum CDCR sentence. Typically, long-term hospitalization is for individuals who have demonstrated difficulty maintaining clinical stability in the Enhanced Outpatient Program (EOP) due to treatment-refractory symptoms of a serious mental illness (SMI). DSH and CDCR shall collaboratively manage all DSH inpatient program patient movement.

## PURPOSE

To provide a long-term inpatient psychiatric setting at the ICF level of care for patients who, as a result of their treatment-refractory symptoms of a SMI, have difficulty independently functioning in the EOP setting. Patients may be considered for placement for an extended period of time for inpatient psychiatric treatment and observation.

## RESPONSIBILITY

**Responsibility for policy review and implementation:**

DSH Director or designee.
CDCR Deputy Director, Statewide Mental Health Program or designee.

**Responsibility for compliance with the policy:**

The Executive Directors or designees of the DSH state hospitals treating CDCR patients.

**Responsibility for compliance with policy by Patient Management Unit staff at**

# POLICY DIRECTIVE

**DSH-Sacramento:**
DSH Deputy Director of Patient Care Coordination Division, or designee.

## AUTHORITY

1. By Order of the Director, Department of State Hospitals
2. Mental Health Services Delivery System Program Guide - 2021 Edition
3. Memorandum of Understanding Between California Department of Corrections and Rehabilitation and Department of State Hospitals for Management and Oversight of Intermediate Care and Acute Inpatient Programs (MOU)

## DEFINITIONS

**Intermediate (ICF):** Inpatient program within a DSH hospitals or CDCR Psychiatric Inpatient Programs (PIPs) providing long-term intermediate and sub-acute mental health treatment for CDCR patients with SMI. See also MHSDS Program Guide (2021 Edition) at 12-6-6.

**Long-Term Intermediate (LTI):** Subprogram of ICF that provides long-term psychiatric care for specific patients who demonstrate a pattern of significant psychiatric regression in the CDCR outpatient setting and therefore require multiple inpatient hospitalizations at DSH or a PIP due to the severity of their treatment-refractory symptoms of a SMI.

## PROCESS

### I. Process

DSH may retain specific ICF patients who require LTI hospitalization for longer than is expected for CDCR patients in a standard ICF setting. These patients typically decompensate or present with such severe psychiatric symptoms that they are unable to be maintained at the EOP level of care despite multiple admissions to an Acute/ICF setting. An initial maximum of 50 patients may be considered as part of the existing designated beds for Coleman class patients. Any increase or decrease to the maximum number of patients can be requested by DSH or CDCR, but DSH shall have sole authority to increase or decrease the maximum number of patient beds for the long-term hospitalization program from the existing designated beds for Coleman class patients.

Patients who have already been referred, accepted, and admitted, in accordance with the ICF admission process outlined in the MOU and Joint Policy Referral, Admission, and Movement may be considered for LTI hospitalization needs. CDCR can document in the referral to DSH's ICF program for individual patients it would like to be considered for LTI by DSH.

DRAFT

Continued Stay Review (CSR) forms shall be reduced to once a year for patients designated as LTI by DSH.

A. Process for DSH to review and designate ICF patients to be in the LTI program:

1. If the DSH ICF treatment team determines an ICF patient meets criteria for LTI hospitalization, Utilization Management and the DSH medical director shall be informed. Criteria may include, but not be exclusive or limited to:

   a. Patient has evidence of at least two failed EOP discharges, from ICF level of care, in the last two years due to treatment-refractory symptoms of SMI.
   b. Patient has severe treatment-refractory symptoms that would make it unlikely the patient could independently program at the EOP level of care.
   c. Patient requires or is currently prescribed a complex psychiatric medication regimen that may be difficult to maintain in the EOP level of care.

2. The medical director may request a review by PMU of the patient's clinical history while in CDCR to help determine if the patient has an inability to successfully program at EOP level of care due to their treatment-refractory symptoms of a SMI.

3. PMU shall provide the review and recommendation to the medical director for approval within thirty (30) calendar days.

4. If the patient is approved for LTI hospitalization, they shall be designated as such.

5. PMU and IRU shall be notified of the patient's change in designation to LTI hospitalization.

6. If the patient is not approved for LTI hospitalization, the patient shall continue with their current ICF treatment and plan of care.

## II. <u>Return to CDCR</u>

A. For continuity of care, all discharges from the LTI hospitalization program to CDCR shall have a CCAT at least seven (7) calendar days before physical discharge; attendees shall include, but not be limited to, IRU, the treatment team likely to receive the patient, and clinical leadership at the CDCR institution. All discharges back to CDCR shall follow the MOU and Joint Policy, Discharge process.

B. If a patient is determined not to be clinically indicated for LTI, but still requires ICF level of care, the patient can be converted to a standard ICF program at DSH or can

be discharged to a CDCR PIP program, if indicated.

## ROLES

**CDCR Inpatient Referral Unit (IRU):** The CDCR Headquarters Mental Health unit responsible for review and oversight of all CDCR referrals to DSH.

**DSH Patient Management Unit (PMU):** The DSH Headquarters mental health unit responsible for management and oversight of all CDCR referrals to DSH.

## APPROVAL

______________________________ Date: __________________
STEPHANIE CLENDENIN
Director
Department of State Hospitals

______________________________ Date: __________________
Amar Mehta, M.D.
Deputy Director
Statewide Mental Health Program
Division of Health Care Services
California Department of
Corrections and Rehabilitation

## ATTACHMENT

None

DRAFT

# EXHIBIT K

**Young, Mitchell J.**

| | |
|---|---|
| **From:** | Lopes Matthew |
| **Sent:** | Friday, August 9, 2024 7:23 PM |
| **To:** | Coleman Special Master |
| **Subject:** | Fwd: Coleman -- DSH Trial Processes |

*[I'm sending this email quickly from my handheld device. Please excuse the brevity and/or typos made in my desire to communicate promptly with my thunder thumbs.]*

**Matthew A. Lopes Jr., PARTNER**
mlopes@pldolaw.com
P 401.824.5156 • F 401.824.5123

---

**Pannone Lopes Devereaux & O'Gara LLC**
Northwoods Office Park Suite 215 N
1301 Atwood Avenue, Johnston, RI 02919
www.pldolaw.com • Legal Disclaimer

Begin forwarded message:

> **From:** Damon McClain <damon.mcclain@doj.ca.gov>
> **Date:** August 9, 2024 at 5:24:22 PM EDT
> **To:** "Michael W. Bien" <mbien@rbgg.com>, Jenny Yelin <JYelin@rbgg.com>, Lisa Ells <LElls@rbgg.com>, Ernest Galvan <EGalvan@rbgg.com>, dspecter@prisonlaw.com, Lopes Matthew <mlopes@pldolaw.com>, "Walsh Kerry F." <kwalsh@pldolaw.com>, kristopher.kent@dsh.ca.gov, "Reden, Brent@DSH-S" <Brent.Reden@dsh.ca.gov>, "Neill, Jennifer@CDCR" <Jennifer.Neill@cdcr.ca.gov>, "Bentz, Melissa@CDCR" <Melissa.Bentz@cdcr.ca.gov>, "Weber, Nicholas@CDCR (Nicholas.Weber@cdcr.ca.gov)" <Nicholas.Weber@cdcr.ca.gov>, "Thind, Sundeep@CDCR" <Sundeep.Thind@cdcr.ca.gov>
> **Cc:** Pmello@hansonbridgett.com, Samantha Wolff <SWolff@hansonbridgett.com>, "Lawrence M. Cirelli" <lcirelli@hansonbridgett.com>, Elise Thorn <elise.thorn@doj.ca.gov>
> **Subject: Coleman -- DSH Trial Processes**
>
> Dear Plaintiffs' Counsel and Special Master Lopes,
>
> Following up on our last discussion regarding the three new DSH proposals, DSH intends to implement the new trial processes on the dates set forth below.
>
> 1. The admissions-unit process -- August 19, 2024.
> 2. The long-term-admissions process -- August 19, 2024.
> 3. The process for review of custodially ineligible patients for possible admission to DSH -- September 16, 2024.
>
> -Damon

**Damon G. McClain**
**Supervising Deputy Attorney General**
**455 Golden Gate Avenue, Suite 11000**
**San Francisco, CA 94102-7004**
tel.: (415) 510-3596
fax: (415) 703-5843
damon.mcclain@doj.ca.gov

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

This message was sent from outside the company. Please do not click links or open attachments unless you recognize the source of this email and know the content is safe.

# EXHIBIT L

**Young, Mitchell J.**

| | |
|---|---|
| **From:** | Luma Khabbaz <LKhabbaz@rbgg.com> |
| **Sent:** | Tuesday, December 10, 2024 11:50 AM |
| **To:** | Damon McClain; Nick Weber; Kris Kent; Thind, Sundeep (Sundeep.Thind@cdcr.ca.gov); Elise Thorn; Paul B. Mello; Samantha Wolff (swolff@hansonbridgett.com); Reden, Brent@DSH-S |
| **Cc:** | Coleman Team - RBG Only; Coleman Special Master; Steve Fama |
| **Subject:** | Coleman: Requesting Info on Status of DSH Processes [IMAN-DMS.FID12440] |
| **Attachments:** | DAG-Pls+SM_Resp to Pls Ltr re DSH Trial Processes_recd 06.26.24_0489.03.pdf; DAG-SM+Pls_Ltr re DSH Admissions_06.18.24_recd 06.18.24_0489.03.pdf; LK-DAG, Ltr re DSH Trial Processes, 06-25-2024, 489-3.pdf |

Damon:

We write to follow up on the status of the new trial processes designed to increase admissions to DSH, when appropriate. Because Defendants' monthly inpatient transfer reports seem to show that the fill rates of DSH *Coleman* beds have plateaued in recent months, we are concerned that not all five of the trial processes may be fully implemented and/or may not be having their intended effect.

**The two processes announced in October 2023** (new referrals from different levels of care; DSH-CDCR joint review of out-of-LRH PIP patients): In Defendants' letter from June 26, 2024 (reattached) and at the subsequent July 29, 2024 meet and confer, Defendants represented that these initial trial processes had been made permanent and that they would share this final policy in writing for Plaintiffs and the Special Master to review. What is the status of that written policy? When do Defendants estimate Plaintiffs will have the opportunity to review it? Also, please let us know if the permanent policy has differed from the trial process in any other way (for example, we understand that an adjustment was made that there will be no more conference calls to discuss out-of-LRH reviews. 6-26-24 Ltr from Damon McClain at 1.).

**Three processes announced June 2024** (review of custodial ineligible patients who are LWOP, at least 62 years old, and are single cell; select ASH admissions to stabilize patients to transition them to ULD; long-term ICF hospitalization): In Defendants' June 18, 2024 letter, they previewed three new trial processes for DSH admission, to which Plaintiffs provided preliminary comments in their June 25, 2024 letter (attached). At the July 29 meet and confer, Plaintiffs and the Special Master had questions about the timeline for implementation of these processes. Defendants represented that they would implement them after considering comments from Plaintiffs and the Special Master, complying with any required union notices, and training staff. 6-26-24 Ltr from Damon McClain at 2-3. Has there been any update to the implementation of these three trial processes? To the extent they have not yet been rolled out, when can we expect Defendants to do so? To the extent they are already in place, please report on their efficacy to date and any initial impressions.

For all trial processes being utilized, please provide us with updated data on the results—similar to the initial trial process data provided to Plaintiffs on 6/26/2024 that breaks down referrals and admissions per month.

We also request another meeting to discuss the progress of these trial processes.

Thank you,

**Luma Khabbaz** ***(she/her)***
**Associate**
ROSEN BIEN GALVAN & GRUNFELD LLP

101 Mission Street 6th Floor
San Francisco, CA 94105
(415) 433-6830 (telephone)
(415) 433-7104 (fax)
lkhabbaz@rbgg.com

The information contained in this e-mail message may be privileged, confidential and protected from disclosure. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this e-mail message in error, please e-mail the sender at lkhabbaz@rbgg.com

This message was sent from outside the company. Please do not click links or open attachments unless you recognize the source of this email and know the content is safe.

# EXHIBIT M

**Young, Mitchell J.**

| | |
|---|---|
| **From:** | Luma Khabbaz <LKhabbaz@rbgg.com> |
| **Sent:** | Thursday, January 9, 2025 2:02 PM |
| **To:** | Damon McClain; Nick Weber; Kris Kent; Thind, Sundeep (Sundeep.Thind@cdcr.ca.gov); Elise Thorn; Paul B. Mello; Samantha Wolff (swolff@hansonbridgett.com); Reden, Brent@DSH-S |
| **Cc:** | Coleman Team - RBG Only; Coleman Special Master; Steve Fama |
| **Subject:** | RE: Coleman: Requesting Info on Status of DSH Processes [IMAN-DMS.FID12440] |

All:

I am writing to follow up on the status of the DSH trial processes and requested updates in my email below from December 10, 2024. We received an email from Kris Kent on December 10 acknowledging receipt, but we have yet to receive any other response. Could Defendants provide an estimated date we should expect a response?

Thank you.
Luma

---

**From:** Luma Khabbaz
**Sent:** Tuesday, December 10, 2024 8:50 AM
**To:** Damon McClain <Damon.McClain@doj.ca.gov>; Nick Weber <Nicholas.Weber@cdcr.ca.gov>; Kris Kent <Kristopher.Kent@dsh.ca.gov>; Thind, Sundeep (Sundeep.Thind@cdcr.ca.gov) <Sundeep.Thind@cdcr.ca.gov>; Elise Thorn <Elise.Thorn@doj.ca.gov>; Paul B. Mello <Pmello@hansonbridgett.com>; Samantha Wolff (swolff@hansonbridgett.com) <SWolff@hansonbridgett.com>; Reden, Brent@DSH-S <Brent.Reden@dsh.ca.gov>
**Cc:** Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>; Coleman Special Master <colemanspecialmaster@pldolaw.com>; Steve Fama <sfama@prisonlaw.com>
**Subject:** Coleman: Requesting Info on Status of DSH Processes [IMAN-DMS.FID12440]

Damon:

We write to follow up on the status of the new trial processes designed to increase admissions to DSH, when appropriate. Because Defendants' monthly inpatient transfer reports seem to show that the fill rates of DSH *Coleman* beds have plateaued in recent months, we are concerned that not all five of the trial processes may be fully implemented and/or may not be having their intended effect.

**The two processes announced in October 2023** (new referrals from different levels of care; DSH-CDCR joint review of out-of-LRH PIP patients): In Defendants' letter from June 26, 2024 (reattached) and at the subsequent July 29, 2024 meet and confer, Defendants represented that these initial trial processes had been made permanent and that they would share this final policy in writing for Plaintiffs and the Special Master to review. What is the status of that written policy? When do Defendants estimate Plaintiffs will have the opportunity to review it? Also, please let us know if the permanent policy has differed from the trial process in any other way (for example, we understand that an adjustment was made that there will be no more conference calls to discuss out-of-LRH reviews. 6-26-24 Ltr from Damon McClain at 1.).

**Three processes announced June 2024** (review of custodial ineligible patients who are LWOP, at least 62 years old, and are single cell; select ASH admissions to stabilize patients to transition them to ULD; long-term ICF hospitalization): In Defendants' June 18, 2024 letter, they previewed three new trial processes for DSH admission, to which Plaintiffs provided preliminary comments in their June 25, 2024 letter (attached). At the July 29 meet and confer, Plaintiffs and the Special Master had questions about the timeline for implementation of these processes. Defendants represented

that they would implement them after considering comments from Plaintiffs and the Special Master, complying with any required union notices, and training staff. 6-26-24 Ltr from Damon McClain at 2-3. Has there been any update to the implementation of these three trial processes? To the extent they have not yet been rolled out, when can we expect Defendants to do so? To the extent they are already in place, please report on their efficacy to date and any initial impressions.

For all trial processes being utilized, please provide us with updated data on the results—similar to the initial trial process data provided to Plaintiffs on 6/26/2024 that breaks down referrals and admissions per month.

We also request another meeting to discuss the progress of these trial processes.

Thank you,

**Luma Khabbaz** ***(she/her)***
**Associate**
ROSEN BIEN GALVAN & GRUNFELD LLP
101 Mission Street 6th Floor
San Francisco, CA 94105
(415) 433-6830 (telephone)
(415) 433-7104 (fax)
lkhabbaz@rbgg.com

The information contained in this e-mail message may be privileged, confidential and protected from disclosure. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this e-mail message in error, please e-mail the sender at lkhabbaz@rbgg.com

This message was sent from outside the company. Please do not click links or open attachments unless you recognize the source of this email and know the content is safe.

# UPDATE ON THE STATUS OF THE TRIAL REVIEW PROCESSES AND PROPOSALS FOR COLEMAN PATIENTS

In 2023, The Department of State Hospitals (DSH) introduced two trial processes to review *Coleman* patients for admission to DSH: (1) DSH will review every patient referred for inpatient care with an LRH of Unlocked Dorms regardless of CDCR's clinical housing recommendation; and (2) DSH and CDCR will review all patients at the ICF LOC who do not have an Unlocked Dorm LRH to determine whether there are any clinical reasons the patient could be assigned an Unlocked Dorm LRH. The trial processes were fully implemented in October 2023. DSH is currently considering formalizing the 2023 trial processes and will share any proposed policies with Plaintiffs and the Office of the Special Master for input when available.

In 2024, DSH circulated three additional proposals to increase the referral and admission of *Coleman* patients to DSH: (1) the use of the Admissions Unit at DSH-Atascadero, (2) the designation of *Coleman* patients as Long-Term Intermediate (LTI), and (3) the expansion of custody criteria for placement in DSH. Those three proposals have been fully implemented since September 2024.

The trial review processes and the three additional proposals have increased the utilization of DSH beds for *Coleman* patients.[1] Since October 9, 2023, the *Coleman* census within DSH state hospitals has increased by approximately 68.6% – from 102 *Coleman* patients to the current census of 175 (see Table 1), with approximately 25 additional patients pending admission and 4 patients pending DSH review. Since the three additional proposals were implemented in September 2024, the census increased from 153 to 175.

<u>Table 1</u>




Within the same time period, the trial review processes and additional proposals have also helped contribute to an approximate 19.4% decreased census in the more restrictive ICF settings at the CDCR PIPs. Based on the progress to date, DSH and CDCR believe that continued use of the trial review processes and the additional proposals will continue to increase utilization of DSH beds for the *Coleman* class population.

[11] This update is based on data available through November 2024.

The data Plaintiffs requested regarding the trial review processes and added proposals is summarized below in the following tables.

## A. DSH REVIEW OF COLEMAN PATIENTS REFERRED TO ICF LEVEL OF CARE WITH A LEAST RESTRICTIVE HOUSING (LRH) DETERMINATION OF UNLOCKED DORMS

- Implemented on October 9, 2023
- Table A shows the total number of ICF referrals sent to DSH each month since the Trial Process started on October 9, 2023, with the additional proposals (Single Cell suffix, Close Custody, LWOP over age 62). The table provides the outcome of those referrals, including whether the patient was Admitted to DSH, Re-directed to a PIP for placement, whether the treatment team chose to rescind the ICF referral, and whether the patient paroled before a decision or placement could be determined.

**TABLE A**

| Month/Year | Total ICF Referrals Sent to DSH for Review | # of Patients Accepted/Admitted to DSH | # of Patient Referrals Rescinded by the Treatment Team | # of Patients Redirected to PIP for ICF | # of Patients Paroled Before Decision |
|---|---|---|---|---|---|
| **2023** | | | | | |
| October | 41 | 25 | 3 | 13 | |
| November | 70 | 36 | 10 | 24 | |
| December | 67 | 38 | 9 | 20 | |
| **2024** | | | | | |
| January | 71 | 30 | 11 | 30 | |
| February | 51 | 27 | 9 | 15 | |
| March | 50 | 24 | 3 | 23 | |
| April | 60 | 35 | 6 | 19 | |
| May | 63 | 26 | 5 | 31 | 1 |
| June | 63 | 27 | 11 | 25 | |
| July | 56 | 22 | 9 | 25 | |
| August | 46 | 20 | 2 | 24 | |
| September | 54 | 24 | 7 | 23 | |
| October | 79 | 26 | 9 | 43 | 1 |
| November | 58 | 27 | 5 | 26 | |
| **Total** | **829** | **388** | **99** | **340** | **2** |

### B. DSH REVIEW OF PATIENTS IN PIP ICF PROGRAMS WITH AN LRH OF UNLOCKED DORMS

- Implemented October 9, 2023
- Table B below provides data from each of the rounds of reviews conducted by DSH and the outcomes. The patients reviewed were in an ICF PIP program at the time of review with an LRH of Unlocked Dorms[2]

**TABLE B**

| Review Round | # of Patients Reviewed | # of Patients Recommended for Referral to DSH |
|---|---|---|
| **1 (11/4/23)** | 46 | 21 |
| **2 (12/12/23)** | 44 | 20 |
| **3 (1/29/24)** | 41 | 6 |
| **4 (3/15/24)** | 40 | 24 |
| **5 (5/17/24)** | 39 | 19 |
| **6 (8/19/24)** | 15 | 6 |
| **7 (8/29/24)** | 18 | 4 |
| **8 (10/2/24)** | 10 | 4 |
| **9 (10/18/24)** | 10 | 3 |
| **10 (11/6/24)** | 11 | 8 |
| **11 (11/20/24)** | 12 | 6 |
| **12 (12/4/24)** | 13 | 6 |
| **13 (12/19/24)** | 12 | 4 |
| **Total** | **311** | **125** |

*Patients that were referred to DSH through this process are reflected in the total number of referrals in Table A.

[2] For Rounds 6-13 DSH and CDCR changed the process to increase the frequency of rounds and to decrease the number of patients being reviewed from approximately 40-50 patients for each 30-45 day review period to approximately 13-15 patients for each 14 day review period.

## C. Expanded Custody Criteria Reviews for ICF Referrals sent to DSH

- Implemented September 2024
- HCPOP sent referrals to DSH for review that met the expanded custody criteria for unlocked dorm placement. If DSH responded that the patient was clinically appropriate, HCPOP would contact the institution to hold a committee to review the custody factors.

**TABLE C**

| Total (Since 9/2024) | Proposal No. 3 | Proposal No. 3 | Proposal No. 3 |
|---|---|---|---|
| | Close Custody | Single Cell (due to MH and Victimization reasons) | LWOP (at least 62 years of age) |
| Referrals | 12 | 8 | 1 |
| Pending Admission | 0 | 1 | 0 |
| Admitted/Designated | 4 | 2 | 0 |
| Currently Under Review by DSH and/or CDCR | 0 | 0 | 0 |
| DSH Recommended against admission/ Rescinded by CDCR | 7* | 2 | 1 |
| Rescinded by CDCR after DSH acceptance | 1 | 3 | 0 |

*There was one patient who was both Close custody and had a single cell suffix, but who was counted as Close custody to simplify the data.

**D. Expanded Custody Criteria Reviews for Patients in the PIP**

- Implemented October 2024
- Review completed by IRU and HCPOP
- HCPOP conducted a review of all patients in a PIP ICF program that may be eligible for DSH based on the expanded custody criteria: CLOSE custody, LWOP, S-Suffix for clinical reasons. The summary below shows the status of those reviews:

**TABLE D**

| PIP Location | # of Patients Reviewed | # of Patient Referred | # of Patients Pending Clinical Stabilization | # of Patients DC'd to EOP or Parole | PC1370 |
|---|---|---|---|---|---|
| CHCF | 17 | 1 | 11 | 5 | 0 |
| CIW | 2 | 1 | 1 | 0 | 0 |
| CMF | 3 | 2 | 0 | 1 | 0 |
| SVSP | 31 | 5 | 13 | 6 | 7 |
| **Total** | **53** | **9** | **25** | **12** | **7** |

**E. Long-Term Intermediate Program and use of Admissions Unit**

- Implemented September 2024
- Three patients have been accepted as Long-Term Intermediate patients and are currently receiving treatment at DSH
    - Two patients are under review for LTI consideration
- Twelve patients have been admitted directly to the admissions unit

**TABLE E**

| Total (Since 9/2024) | Proposal No. 1 | Proposal No. 2 |
|---|---|---|
| | **Long Term Intermediate Hospitalization** | **Admissions Unit** |
| **Referrals** | N/A | N/A |
| **Pending Admission** | N/A | N/A |
| **Admitted/Designated** | 3* | 12* |
| **Currently Under Review** | 2* | 0 |
| **Recommended against admission/designation by DSH (Rescinded by CDCR)** | 0 | 0 |

*All patients for LTI and Admissions unit have been admitted and thus are not counted as a separate referral number in Table A.

**Defendants' Responses to Questions Posed in Plaintiffs' June 25, 2024 Letter Re: Trial Processes to Increase Admissions and Utilization of DSH Beds for Coleman Patients**

Current Trial Process

1. ***What is the status of the trial? Have Defendants decided to make it permanent? If so, were any adjustments made to the initially proposed process as a result of lessons learned during the trial period? Are Defendants planning to formalize the process in a policy or other formal document?***

   Answer: The Trial Process is continuing and defendants have decided to make it permanent. One adjustment that was made is there will be no more conference calls to discuss the out of LRH reviews between DSH PMU and CDCR IRU Instead the out of LRH reviews will continue to be sent to CDCR IRU electronically and if there are questions/concerns then a conference call will be utilized to discuss. The Special Master experts will continue to be provided with the out of LRH reviews as is current practice.

   A policy document will be drafted and shared with the parties memorializing the Trial Process.

2. ***Additionally, please provide us with updated data on the results of the trial process. The last data we received was on April 5, 2024, which contained the March referrals to DSH. We would also appreciate some form of roll-up report that summarizes the results of the entire trial period, and/or through today if the process has extended or become permanent.***

   Answer: An update was shared with Plaintiffs on 6/26/24.

Review of Certain Custodially Ineligible Patients

3. ***Please provide more information on how the selection criteria were formulated. For instance, why is the age cut-off set at 62 years old, and why is the sentence requirement LWOP? Are CDCR and DSH considering expanding this process to other custodially ineligible patients, depending on the results of this initial trial? Your letter states that this trial process may result in a "substantial number" of referrals to DSH, based on 2023 information. Could you please provide us with an estimate of how much of the existing PIP population and new referrals will be reviewed for DSH admission based on this process? Please also provide some information on when you expect this trial process will begin and how long it will last.***

   Answer:
   To increase the number of patients for consideration by DSH for eligibility, patients who are 62 years old with a sentence of LWOP will be considered. The age of 62 was determined to be most appropriate while balancing security, access to treatment, current policy regarding housing incarcerated persons who are LWOP within an electrified fence, staff safety, public safety, and escape risk.

   At this time, CDCR and DSH are not considering expanding this process to other custodially ineligible patients.

# EXHIBIT N

In 2023, there were approximately 325 patient referrals to ICF that had a Close custody status, LWOP of at least 62 years of age, and/or Single Cell suffix due to mental health and/or victimization concerns. These patient referrals were both "new" referrals and "out of LRH" referrals. Based on last year's data, Defendants estimate a similar number of patient referrals to ICF may meet this criteria in 2024 and 2025.

The review process will start after defendants receive and consider comments from plaintiffs and the Special Master, and any required union notice and staff training occurs. There is currently no end date projected for this proposal, but like the October Trial Process it should extend for a minimum of least six months to ensure collection of enough data to assess its effectiveness.

<u>DSH-Atascadero Select Coleman Admissions</u>

4. ***Could you please also provide more detailed selection criteria for this initiative? We recall that Defendants for a short period provided treatment to Coleman patients in the ASH admissions unit that was akin to the APP level of care. Will this be different? What type of programming will be available to patients while they are in the admissions unit? Will the patients in question come from the group that has already been reviewed each month as part of the existing trial process, or will more patients be reviewed as part of this new process? The process references that this will be for a "small" number of DSH-Atascadero beds. Can you provide more specificity on what that number is projected to be? Like the trial process above, please also provide information on the timeline of when this trial process is set to begin and how long it will last.***

Answer: Yes this will be different as the patients admitted to the admissions unit would be provided ICF level of care consistent with their referrals, , not APP level of care.

Patients on the admissions unit will be reviewed and have the same access to programming on the unit and hospital access to the treatment mall as those patients admitted directly to the unlocked dorm treatment unit, as clinically indicated by the treatment team. The differences from the unlocked dorm treatment unit is that patients will be in a single room and there will be a higher staff to patient ratio. The goal is to help the patients better adjust to the hospital before moving to the unlocked dorm treatment unit

This process will be open to patients reviewed who are out of LRH and new referrals, as clinically indicated.

The number of patients that would be indicated for temporary placement on the admissions unit would ebb and flow based on clinical presentation, clinical history, and patient needs. We are not able to provide a projected number of admissions unit beds utilized since it will vary based on the referrals received and patients' clinical needs.

The process will start after defendants receive and consider comments from plaintiffs and the Special Master any required union notice, and staff training occurs. There is currently no end date projected for this proposal, but like the October Trial Process it should extend for a minimum of least six months to ensure collection of enough data to assess its effectiveness.

<u>Long-term Intermediate</u>

5. ***Like the other proposed processes, could you please provide us with a timeline of when this trial process will begin and how long you anticipate it will last? Further, Attachment 3 to your letter states that "initial maximum of 50 patients may be considered" and that DSH has the sole discretion to decrease the maximum number of beds for this trial process. Please clarify whether this means DSH will be reviewing all referrals, as well as existing PIP patients, to see if they would be appropriate for this trial process. Please also clarify whether and how DSH and CDCR clinicians will be trained to identify patients who may be eligible for this program. Lastly, who is eligible for this trial process? Will patients who are custodially ineligible for DSH admission but similarly cycle through levels of care and fail EOP discharges be reviewed?***

Answer: The process will start after defendants receive and consider comments from plaintiffs and the Special Master, any required union notice, and staff training. This is anticipated to be a permanent policy proposal with no end date.

Only patients admitted to DSH-Atascadero will be reviewed for the Long-Term Intermediate program. The treatment team in consultation with the UM committee and medical director, or designee will review patients to determine appropriateness for the Long-Term Intermediate program. CDCR treatment teams can request a patient be considered for the Long-Term Intermediate Program when referred to ICF unlocked dorms, and DSH mayreview this request when making a final determination.

DSH-Atascadero treatment teams will receive training on the policy, criteria, and process so that they are aware of this program, the process for admission, utilization review, discharges, and the patients clinically indicated for such a program.

The training needs for CDCR staff will be minimal. From a referral standpoint, the process of referring a patient to ICF level of care will not differ since the assessment and consideration for long-term intermediate will occur after the patient is already receiving treatment at DSH. A memorandum to CDCR staff will be released outlining the Long-Term Intermediate program and how patients may be selected for the program. Additionally, the Inpatient Referral Unit team members will have training regarding the Long-Term Intermediate program and can assist the field with questions as they arise. Announcements regarding the program will also occur during regular scheduled meetings with PIP Leadership and Inpatient Coordinators.

Any patient who is clinically indicated for ICF and unlocked dorms and demonstrate a clinical need for such a program is eligible.

Patients previously custodially ineligible, but who meet the criteria for Close custody, LWOP aged 62 or older, and have a single cell suffix due to mental health or victimization concerns, could be eligible. Other custodial ineligible patients not outlined in these trial proposed processes would not be eligible at this time.

<u>Other Questions</u>

6. ***Plaintiffs would appreciate more information on what type of outcome and/or progress reporting will be utilized to assess the viability and impact of the proposed processes, and request monthly updates. Additionally, in terms of process, do DSH and CDCR anticipate conducting joint discussions regarding the potential patients falling into these categories to determine eligibility and admissions decisions? How will any disagreements be resolved?***

   Answer: Outcome and process reporting measures for these trial processes could include, but not be limited to:

   - Increased successful admissions to the state hospital
   - Increased census at the state hospital
   - Majority of successful transitions from admissions unit to the unlocked dorm treatment unit
   - Decrease in frequency of cycling through inpatient settings by patients

   DSH and CDCR will continue to follow the MOU for informal discussions, CCATs, and appeals when necessary to discuss and resolve disagreements.

# EXHIBIT O

ROSEN BIEN
GALVAN & GRUNFELD LLP

101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
T: (415) 433-6830 ▪ F: (415) 433-7104
www.rbgg.com

Adrienne Pon Harrold
Email: AHarrold@rbgg.com

February 21, 2025

VIA ELECTRONIC MAIL ONLY

Kristopher Kent
Attorney IV, Legal Division
Department of State Hospitals
1215 O Street, MS5
Sacramento, CA 95814
Kristopher.Kent@dsh.ca.gov

Matthew A. Lopes, Jr.
*Coleman* Special Master
Pannone Lopes Devereaux & O'Gara
1301 Atwood Avenue, Suite 215N
Johnson, RI 02919
mlopes@pldolaw.com

Re: *Coleman v. Newsom*
DSH Trial Processes: Questions for February 2025 Meeting
Our File No. 0489-03

Dear Mr. Kent:

Plaintiffs appreciate Defendants' January 9, 2025, response to our request for more information concerning the status of the various trial processes aimed at improving *Coleman* patients' access to DSH facilities, and Defendants' willingness to meet with Plaintiffs and the Special Master to further discuss. *See* Kent Email to Khabbaz & Attachment "DSH Trial Process Summary 2024 Final" (attached hereto as **Exhibit A**).

Based on Defendants' response, we write to share a preliminary list of questions in advance of our next scheduled meet and confer on February 26, 2025.

## I. Overall Questions

Plaintiffs remain supportive of CDCR and DSH's collaboration over the last two years to design what are now five distinct trial processes to provide additional reviews of *Coleman* patients needing ICF care beyond the reviews already done under the current inpatient referral process, to ensure that all patients possibly suitable for DSH admission are considered and that none are overlooked.

Defendants report that, "[b]ased on the progress to date, DSH and CDCR believe that continued use of the trial review processes and the additional proposals will continue

to increase utilization of DSH beds for the *Coleman* class population." Exhibit A at 2. We hope this means that Defendants will continue to use all of the trial processes. We also appreciate Defendants' report of the increased utilization of DSH beds for *Coleman* patients, including that—since the first two trial processes began in October 2023—the *Coleman* census in DSH has increased by approximately 68.6%, contributing to a 19.4% decrease in the census in the more restrictive PIP-ICF beds. *Id.*

Although the initial progress is encouraging, **Plaintiffs remain concerned that approximately half of all DSH beds designated for *Coleman* class members are still unused, and progress in increasing utilization seems to have plateaued in recent months**. Defendants' most recent monthly report concerning inpatient patient census, waitlists, and compliance with transfer timelines shows that there are a total of 171 of *Coleman* patients in DSH, and **165 available beds are still not being used (137 Atascadero, 8 Coalinga, and 20 Patton beds), or a 51% fill rate**. *See* January 2025 Report, ECF No. 8547 at ECF 7 (attached hereto as **Exhibit B**). This is essentially the same as the prior month's report. *See* December 2024 Report, ECF No. 8516 at ECF 7 (172 total *Coleman* patients in DSH with 164 beds available, also a 51% fill rate).

Defendants' graph seems to confirm this. *See* Exhibit A at 2. It shows an initial bump in admissions after the first two trial processes began in October 2023, but utilization has not significantly increased since April 2024, despite implementation of three additional trial processes in September 2024.[1] Defendants report an increase of 22 *Coleman* class members in DSH since implementing the three processes in September 2024. *Id*. But the increase in admissions since implementing the three new proposals is less than Plaintiffs had expected based on Defendants' representations. For example, Defendants previously explained that one of these proposals—review of certain custodially ineligible patients (discussed more below under "Trial Process #3")—was expected to alone result in a "substantial number of additional referrals." *See* June 18, 2024 McClain Letter, at 1 (attached hereto as **Exhibit C**). In response to Plaintiffs' request to be more specific, Defendants stated "there were approximately 325 patient referrals" in 2023 that had at least one of the three criteria to be eligible for review, and that Defendants "estimate[d] a similar number" for 2024 and 2025. *See* June 26, 2024 Response (attached hereto as **Exhibit D**). However, Defendants' recent response shows

[1] Our initial impression is that the graph appears to be generally consistent with the data in Defendants' monthly report concerning inpatient patient census, waitlists, and compliance with transfer timelines from the same time period. *See* ECF Nos. 8067, 8086, 8109, 8132, 8159, 8199, 8237, 8280, 8333, 8357, 8402, 8432, 8464, 8495, 8516, 8547.

that only 6, or at most 15, patients have been admitted under this process (Tables C and D are confusing to Plaintiffs, as described more below). *See* Exhibit A at 5-6.

In addition, Plaintiffs are concerned by the Special Master team's statements in the February 4, 2025 CMF exit call that CMF treatment teams report problems with getting patients accepted by DSH, including frequent rejections due to custodial factors, RVRs, or substance use. It appears that, to CMF staff, the changes to the LRH process have not resulted in a meaningful change in acceptance to DSH. This is concerning for many reasons, including that custodial factors continue to be a significant barrier to DSH admission. Plaintiffs continue to believe that DSH is able to safety and effectively treat class members with higher LRH designations than unlocked dorms ("ULD").

All of the above leads Plaintiffs to ask:

- **What is Defendants' understanding of why approximately half of DSH beds available to *Coleman* patients remain unused despite having five trial processes currently in place?**
- **How is CDCR addressing the concerns and confusion raised in the CMF exit call regarding difficulty in getting patients accepted by DSH?**
- **Are DSH and CDCR considering further expanding the custody criteria for referrals (beyond the narrow exception for certain close-custody patients, described below under "Trial Process #3")?**

## II. Questions for Each of the Five Trial Processes

On October 6, 2023, Defendants announced two trial process changes. *See* Kent Email to Coleman Team & Attachment "Trial Processes for DSH Review of Coleman Patients" (attached hereto as **Exhibit E**).

**Trial Process #1: Review of New ICF Referrals From Different Levels of Care.**[2] CDCR will endorse and send to DSH *all* new referrals for ICF (i.e., coming from a CCCMS, EOP, MHCB, or APP level of care) who have an LRH of ULD, regardless of their clinical housing recommendation.

[2] If Defendants refer to the various trial processes differently, please let us know, so we can all use the same terminology to keep them straight.

- This trial process is one of the most important reforms, as it ensures that a clinical housing recommendation of a higher LRH than ULD does not bar DSH from considering an ICF referral. Defendants represented in their June 26, 2024 letter, *see* Exhibit D, and in the July 29, 2024 meet and confer that the two 2023 trial process had been made permanent and that Defendants would share the final policy in writing for Plaintiffs and the Special Master to review. However, Defendants' recent response seems to walk this commitment back: "DSH is currently considering formalizing the 2023 trial processes and will share any proposed policies with Plaintiffs and the Office of the Special Master for input when available." Exhibit A at 2. Plaintiffs are concerned that there is no written policy, and urge Defendants to formalize this trial process and make it permanent. **Will this trial process be made permanent? Do Defendants have any update on whether and when a policy will be ready to share?**

- For Table A (*see* Exhibit A at 3): **Does this table include (1) all ICF referrals, or (2) it is just the ICF referrals generated by this trial process (i.e., the additional patients DSH considered despite them having a clinical housing recommendations of a more restrictive LRH)?** Plaintiffs are trying to understand the increase in admissions that occurred due to the trial processes, so are interested in the information described in category (2) above.

- In the same table: **What exactly does "Rescinded by the Treatment Team" mean? What are some reasons for these rescissions?**

**Trial Process #2: Joint Review of Out-of-LRH PIP ICF Patients.** Every 30-45 days, CDCR IRU selects a set number of patients already in a CDCR ICF setting who are housed outside their LRH of ULD, and provides the list to the DSH PMU for DSH to make a recommendation for whether the patient is appropriate for ULD and transfer to DSH. This process also includes patients with a single-cell chrono that was given due to their fragility from a severe mental illness.

- Again, Defendants previously represented this trial process would be made permanent. **Will this trial process be made permanent? Do Defendants have any update on whether and when a policy will be ready to share?**

- It is our understanding that patients whom DSH *recommends* for admission are not necessarily always admitted. Rather, CDCR IRU communicates the recommendation to the CDCR treatment teams, who decide whether to

follow the recommendation and make the referral. Table B shows only the number *recommended*. *See* Exhibit A at 4. **How many patients were actually subsequently referred, and how many were admitted?**

- Plaintiffs continue to believe that the step of going back to the CDCR treatment team is unnecessary and likely impedes and delays transfers to DSH. **Will CDCR and DSH consider removing the interim step to get CDCR treatment team referral? What is the expectation and training provided to the treatment team regarding how quickly they should review the recommendation and whether they should approve it?**

- Plaintiffs see in Table B that the number of patients reviewed dropped from a high of 46 when the trial began (to get through the initial backlog) to around 10-13 patients per review since October 2024. **Please explain Defendants' understanding of what portion of PIP ICF patients with LRH of ULD are being considered during these reviews (i.e., are all patients being reviewed now, or is there still a backlog).**

- Relatedly, Plaintiffs would appreciate Defendants' insight into these ~10 patients per review who are in a PIP but who have an LRH of ULD. For example, ICF referrals that have an LRH of ULD are already sent to DSH under Trial Process #1, which has been in place for over a year now, so most patients who would meet this criteria should have already been considered by DSH for admission relatively recently. **What is the profile of the patients who most benefit from this trial process (e.g., patients whose LRH changed to ULD since PIP-ICF admission, or patients who had an LRH of ULD but DSH initially denied admission)?**

In addition to these two initial trial processes, on June 18, 2024, Defendants notified Plaintiffs and the Special Master of three more categories of trials for DSH admissions. *See* Exhibit C.

**Trial Process #3: Expansion of Custody Criteria.** Close custody patients are usually ineligible for DSH placement. Under this process, however, all close custody, LWOP at least 62 years of age, and single cell (as a result of mental health reasons or victimization concerns only) patient referrals will be sent to DSH for review to determine if the patient is clinically indicated for treatment in an unlocked dorm.

- Defendants' initial overview of this process suggested that is covered patients were close custody, LWOP at least 62 years of age, *and* single

celled. But Table C suggests that a patient could have any of these three factors (i.e., CC, LWOP at least 62 years of age, *or* single celled). *See* Exhibit A at 5-6. **Please clarify if a patient must have one or all three criteria to be eligible.**

- Defendants' response also suggests that, like Trial Process #2 (periodic joint review of PIP-ICF patients), DSH reviews the patient and *recommends* admission, and CDCR decides whether make the referral. Our understanding from the July 29, 2024 meet and confer is that, that for LWOP patients, CDCR must conduct a custody review to ensure they are permitted to leave the institution. **Please clarify what CDCR review is required for patients under this trial process. On what basis has CDCR denied transfers that DSH recommends under this process? How many patients were actually subsequently referred, and how many were admitted?**

- Relatedly, in Table C: **What does it mean to be "Rescinded by CDCR after DSH acceptance"? Why would that occur?**

- As described above, Defendants expected a "substantial number" of referrals to be generated from this trial process, possibly as high as 325. *See* Exhibit C at 1; Exhibit D at 2. If Table C shows admissions under this process to date, then this is only six patients. **What explains the discrepancy between the number of potentially eligible patients and the number actually admitted thus far?**

- Plaintiffs are confused by Part D and Table D in the response. Exhibit A at 6. **Was this a one-time review of current PIP ICF patients? Please explain what this review process is.**

- Relatedly, for Table D: **Were the "Referred" patients admitted? What does "Pending Clinical Stabilization" mean?**

- **Do Defendants have any plans to make this process permanent?**

**Trial Process #4: Utilization of DSH-ASH Admissions Unit for Patients Requiring Stabilization.** As DSH considers all new ICF referrals who have a LRH of ULD (*see* Trial Process #1), DSH may utilize a small number of beds in the ASH admission unit (unlocked single room) to provide focused clinical support for ICF patients to stabilize in a DSH environment so that they can transition to the unlocked dorm ICF units.

> These includes but is not limited to circumstances where the severity of the patient's psychiatric symptoms makes it unsafe for them to be initially placed in the ULD, the patient has moderate aggression/ideations to harm others due to their severe mental illness, or the patient has been housed in a single cell for a significant period of time..

- In Table E, *see* Exhibit A at 6: **Why does "Referrals" read N/A?**
- **What has happened to the 12 people admitted to the Admission Unit? For example, how long did they stay in the Admission Unit and have they successfully been placed in the main DSH ULD setting?**
- **Do Defendants have any plans to make this process permanent?**

> **Trial Process #5: Review for Long-Term Intermediate DSH Placement.** For *Coleman* class members already in DSH, DSH will identify patients who have demonstrated difficulty maintaining clinical stability upon their return to CDCR's Enhanced Outpatient Program (i.e., prone to cycle in and out of ICF) and to provide them with treatment in DSH's long-term intermediate hospitalization program for an extended period, but not exceeding the patients' CDCR sentences.

- **We are unclear on the status of this process. Is this process already permanent, per Policy Directive No. 3612 shared by Defendants in their June 18, 2024 letter (*see* Exhibit C at 8-12)? If not, do Defendants have any plans to make this process permanent?**
- **What training have DSH-ASH clinicians received on this process so they are aware of this option for existing patients?**
- **Do CDCR treatment teams have any input in this review?**
- In Table E, *see* Exhibit A at 6: **What happened to the 2 currently under review?**

**Finally, Plaintiffs again respectfully request that Defendants provide regular monthly reports on the outcomes and progress of these trial processes. It is very hard to evaluate the efficacy of these trial processes without such data.**

/ / /

/ / /

Thank you again for the information in Defendants' response to our request for updates and for your consideration of this preliminary list of follow-up questions in advance of our February 26 meeting.

Sincerely,

ROSEN BIEN
GALVAN & GRUNFELD LLP

*/s/ Adrienne Pon Harrold*

By: Adrienne Pon Harrold

AH:LK

# Exhibit A

California Department of State Hospitals

**RE: Coleman: Requesting Info on Status of DSH Processes [IMAN-DMS.FID12440]**

From: Kent, Kristopher@DSH-S
To: Luma Khabbaz, Damon McClain, Weber, Nicholas@CDCR, Thind, Sundeep@CDCR, Elise.Thorn@doj.ca.gov, Paul B. Mello, Samantha Wolff (swolff@hansonbridgett.com), Reden, Brent@DSH-S, Caballero, Michael@DSH-S
Cc: , ,
Sent: 1/9/2025 1:25:54 PM
Attachments: DSH Trial Process Summary 2024 Final.pdf

Hi Luma,
Please find attached a summary in response to your inquires below. In regards to your request to meet, if you still would like to meet after reviewing the document please send over some dates that would work for your team. Thanks, Kris

Kristopher Kent
Attorney IV
Department of State Hospitals
Legal Division
1215 O street, MS5 ***Please note new address***
Sacramento, CA 95814
Work Mobile: (916) 584-2248 **Please Note: I am working remotely. Please direct calls to this number**
Fax: (916) 651-3852
Email: Kristopher.Kent@dsh.ca.gov
Web: http://www.dsh.ca.gov
CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. DO NOT DISCLOSE THIS EMAIL TO OTHERS. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

**From:** Luma Khabbaz <LKhabbaz@rbgg.com>
**Sent:** Thursday, January 9, 2025 11:02 AM
**To:** Damon McClain <Damon.McClain@doj.ca.gov>; Weber, Nicholas@CDCR <Nicholas.Weber@cdcr.ca.gcv>; Kent, Kristopher@DSH-S <Kristopher.Kent@dsh.ca.gov>; Thind, Sundeep@CDCR <Sundeep.Thind@cdcr.ca.gov>; Elise.Thorn@doj.ca.gov; Paul B. Mello <Pmello@hansonbridgett.com>; Samantha Wolff (swolff@hansonbridgett.com) <SWolff@hansonbridgett.com>; Reden, Brent@DSH-S <Brent.Reden@dsh.ca.gov>
**Cc:** Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>; Coleman Special Master <colemanspecialmaster@pldolaw.com>; Steve Fama <sfama@prisonlaw.com>
**Subject:** RE: Coleman: Requesting Info on Status of DSH Processes [IMAN-DMS.FID12440]

All:

I am writing to follow up on the status of the DSH trial processes and requested updates in my email below from December 10, 2024. We received an email from Kris Kent on December 10 acknowledging receipt, but we have yet to receive any other response. Could Defendants provide an estimated date we should expect a response?

Thank you.
Luma

**From:** Luma Khabbaz
**Sent:** Tuesday, December 10, 2024 8:50 AM
**To:** Damon McClain <Damon.McClain@doj.ca.gov>; Nick Weber <Nicholas.Weber@cdcr.ca.gov>; Kris Kent <Kristopher.Kent@dsh.ca.gov>; Thind, Sundeep (Sundeep.Thind@cdcr.ca.gov) <Sundeep.Thind@cdcr.ca.gov>; Elise Thorn <Elise.Thorn@doj.ca.gov>; Paul B. Mello <Pmello@hansonbridgett.com>; Samantha Wolff (swolff@hansonbridgett.com) <SWolff@hansonbridgett.com>; Reden, Brent@DSH-S <Brent.Reden@dsh.ca.gov>
**Cc:** Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>; Coleman Special Master <colemanspecialmaster@pldolaw.com>; Steve Fama <sfama@prisonlaw.com>
**Subject:** Coleman: Requesting Info on Status of DSH Processes [IMAN-DMS.FID12440]

Damon:

We write to follow up on the status of the new trial processes designed to increase admissions to DSH, when appropriate. Because Defendants' monthly inpatient transfer reports seem to show that the fill rates of DSH *Coleman* beds have plateaued in recent months, we are concerned that not all five of the trial processes may be fully implemented and/or may not be having their intended effect.

**The two processes announced in October 2023** (new referrals from different levels of care; DSH-CDCR joint review of out-of-LRH PIP patients): In Defendants' letter from June 26, 2024 (reattached) and at the subsequent July 29, 2024 meet and confer, Defendants represented that these initial trial processes had been made permanent and that they would share this final policy in writing for Plaintiffs and the Special Master to review. What is the status of that written policy? When do Defendants estimate Plaintiffs will have the opportunity to review it? Also, please let us know if the permanent policy has differed from the trial process in any other way (for example, we understand that an adjustment was made that there will be no more conference calls to discuss out-of-LRH reviews. 6-26-24 Ltr from Damon McClain at 1.).

**Three processes announced June 2024** (review of custodial ineligible patients who are LWOP, at least 62 years old, and are single cell; select ASH admissions to stabilize patients to transition them to ULD; long-term ICF hospitalization): In Defendants' June 18, 2024 letter, they previewed three new trial processes for DSH admission, to which Plaintiffs provided preliminary comments in their June 25, 2024 letter (attached). At the July 29 meet and confer, Plaintiffs and the Special Master had questions about the timeline for implementation of these processes. Defendants represented that they would implement them after considering comments from Plaintiffs and the Special Master, complying with any required union notices, and training staff. 6-26-24 Ltr from Damon McClain at 2-3. Has there been any update to the implementation of these three trial processes? To the extent they have not yet been rolled out, when can we expect Defendants to do so? To the extent they are already in place, please report on their efficacy to date and any initial impressions.

For all trial processes being utilized, please provide us with updated data on the results—similar to the initial trial process data provided to Plaintiffs on 6/26/2024 that breaks down referrals and admissions per month.

We also request another meeting to discuss the progress of these trial processes.

Thank you,

**Luma Khabbaz** *(she/her)*
**Associate**
ROSEN BIEN GALVAN & GRUNFELD LLP
101 Mission Street 6th Floor
San Francisco, CA 94105
(415) 433-6830 (telephone)
(415) 433-7104 (fax)
lkhabbaz@rbgg.com

The information contained in this e-mail message may be privileged, confidential and protected from disclosure. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this e-mail message in error, please e-mail the sender at lkhabbaz@rbgg.com

In 2023, The Department of State Hospitals (DSH) introduced two trial processes to review *Coleman* patients for admission to DSH: (1) DSH will review every patient referred for inpatient care with an LRH of Unlocked Dorms regardless of CDCR's clinical housing recommendation; and (2) DSH and CDCR will review all patients at the ICF LOC who do not have an Unlocked Dorm LRH to determine whether there are any clinical reasons the patient could be assigned an Unlocked Dorm LRH. The trial processes were fully implemented in October 2023. DSH is currently considering formalizing the 2023 trial processes and will share any proposed policies with Plaintiffs and the Office of the Special Master for input when available.

In 2024, DSH circulated three additional proposals to increase the referral and admission of *Coleman* patients to DSH: (1) the use of the Admissions Unit at DSH-Atascadero, (2) the designation of *Coleman* patients as Long-Term Intermediate (LTI), and (3) the expansion of custody criteria for placement in DSH. Those three proposals have been fully implemented since September 2024.

The trial review processes and the three additional proposals have increased the utilization of DSH beds for *Coleman* patients.[1] Since October 9, 2023, the *Coleman* census within DSH state hospitals has increased by approximately 68.6% – from 102 *Coleman* patients to the current census of 175 (see Table 1), with approximately 25 additional patients pending admission and 4 patients pending DSH review. Since the three additional proposals were implemented in September 2024, the census increased from 153 to 175.

<u>Table 1</u>




Within the same time period, the trial review processes and additional proposals have also helped contribute to an approximate 19.4% decreased census in the more restrictive ICF settings at the CDCR PIPs. Based on the progress to date, DSH and CDCR believe that continued use of the trial review processes and the additional proposals will continue to increase utilization of DSH beds for the *Coleman* class population.

[11] This update is based on data available through November 2024.

The data Plaintiffs requested regarding the trial review processes and added proposals is summarized below in the following tables.

### A. DSH REVIEW OF COLEMAN PATIENTS REFERRED TO ICF LEVEL OF CARE WITH A LEAST RESTRICTIVE HOUSING (LRH) DETERMINATION OF UNLOCKED DORMS

- Implemented on October 9, 2023
- Table A shows the total number of ICF referrals sent to DSH each month since the Trial Process started on October 9, 2023, with the additional proposals (Single Cell suffix, Close Custody, LWOP over age 62). The table provides the outcome of those referrals, including whether the patient was Admitted to DSH, Re-directed to a PIP for placement, whether the treatment team chose to rescind the ICF referral, and whether the patient paroled before a decision or placement could be determined.

**TABLE A**

| Month/Year | Total ICF Referrals Sent to DSH for Review | # of Patients Accepted/Admitted to DSH | # of Patient Referrals Rescinded by the Treatment Team | # of Patients Redirected to PIP for ICF | # of Patients Paroled Before Decision |
|---|---|---|---|---|---|
| **2023** | | | | | |
| October | 41 | 25 | 3 | 13 | |
| November | 70 | 36 | 10 | 24 | |
| December | 67 | 38 | 9 | 20 | |
| **2024** | | | | | |
| January | 71 | 30 | 11 | 30 | |
| February | 51 | 27 | 9 | 15 | |
| March | 50 | 24 | 3 | 23 | |
| April | 60 | 35 | 6 | 19 | |
| May | 63 | 26 | 5 | 31 | 1 |
| June | 63 | 27 | 11 | 25 | |
| July | 56 | 22 | 9 | 25 | |
| August | 46 | 20 | 2 | 24 | |
| September | 54 | 24 | 7 | 23 | |
| October | 79 | 26 | 9 | 43 | 1 |
| November | 58 | 27 | 5 | 26 | |
| **Total** | **829** | **388** | **99** | **340** | **2** |

**B. DSH REVIEW OF PATIENTS IN PIP ICF PROGRAMS WITH AN LRH OF UNLOCKED DORMS**

- Implemented October 9, 2023
- Table B below provides data from each of the rounds of reviews conducted by DSH and the outcomes. The patients reviewed were in an ICF PIP program at the time of review with an LRH of Unlocked Dorms[2]

**TABLE B**

| Review Round | # of Patients Reviewed | # of Patients Recommended for Referral to DSH |
|---|---|---|
| **1 (11/4/23)** | 46 | 21 |
| **2 (12/12/23)** | 44 | 20 |
| **3 (1/29/24)** | 41 | 6 |
| **4 (3/15/24)** | 40 | 24 |
| **5 (5/17/24)** | 39 | 19 |
| **6 (8/19/24)** | 15 | 6 |
| **7 (8/29/24)** | 18 | 4 |
| **8 (10/2/24)** | 10 | 4 |
| **9 (10/18/24)** | 10 | 3 |
| **10 (11/6/24)** | 11 | 8 |
| **11 (11/20/24)** | 12 | 6 |
| **12 (12/4/24)** | 13 | 6 |
| **13 (12/19/24)** | 12 | 4 |
| **Total** | **311** | **125** |

*Patients that were referred to DSH through this process are reflected in the total number of referrals in Table A.

[2] For Rounds 6-13 DSH and CDCR changed the process to increase the frequency of rounds and to decrease the number of patients being reviewed from approximately 40-50 patients for each 30-45 day review period to approximately 13-15 patients for each 14 day review period.

### C. Expanded Custody Criteria Reviews for ICF Referrals sent to DSH

- Implemented September 2024
- HCPOP sent referrals to DSH for review that met the expanded custody criteria for unlocked dorm placement. If DSH responded that the patient was clinically appropriate, HCPOP would contact the institution to hold a committee to review the custody factors.

**TABLE C**

| Total (Since 9/2024) | Proposal No. 3 | Proposal No. 3 | Proposal No. 3 |
|---|---|---|---|
| | Close Custody | Single Cell (due to MH and Victimization reasons) | LWOP (at least 62 years of age) |
| Referrals | 12 | 8 | 1 |
| Pending Admission | 0 | 1 | 0 |
| Admitted/Designated | 4 | 2 | 0 |
| Currently Under Review by DSH and/or CDCR | 0 | 0 | 0 |
| DSH Recommended against admission/ Rescinded by CDCR | 7* | 2 | 1 |
| Rescinded by CDCR after DSH acceptance | 1 | 3 | 0 |

*There was one patient who was both Close custody and had a single cell suffix, but who was counted as Close custody to simplify the data.

### D. Expanded Custody Criteria Reviews for Patients in the PIP

- Implemented October 2024
- Review completed by IRU and HCPOP
- HCPOP conducted a review of all patients in a PIP ICF program that may be eligible for DSH based on the expanded custody criteria: CLOSE custody, LWOP, S-Suffix for clinical reasons. The summary below shows the status of those reviews:

**TABLE D**

| PIP Location | # of Patients Reviewed | # of Patient Referred | # of Patients Pending Clinical Stabilization | # of Patients DC'd to EOP or Parole | PC1370 |
|---|---|---|---|---|---|
| CHCF | 17 | 1 | 11 | 5 | 0 |
| CIW | 2 | 1 | 1 | 0 | 0 |
| CMF | 3 | 2 | 0 | 1 | 0 |
| SVSP | 31 | 5 | 13 | 6 | 7 |
| **Total** | **53** | **9** | **25** | **12** | **7** |

### E. Long-Term Intermediate Program and use of Admissions Unit

- Implemented September 2024
- Three patients have been accepted as Long-Term Intermediate patients and are currently receiving treatment at DSH
    - Two patients are under review for LTI consideration
- Twelve patients have been admitted directly to the admissions unit

**TABLE E**

| Total (Since 9/2024) | Proposal No. 1 | Proposal No. 2 |
|---|---|---|
| | Long Term Intermediate Hospitalization | Admissions Unit |
| **Referrals** | N/A | N/A |
| **Pending Admission** | N/A | N/A |
| **Admitted/Designated** | 3* | 12* |
| **Currently Under Review** | 2* | 0 |
| **Recommended against admission/designation by DSH (Rescinded by CDCR)** | 0 | 0 |

*All patients for LTI and Admissions unit have been admitted and thus are not counted as a separate referral number in Table A.

# Exhibit B

ROB BONTA, State Bar No. 202668
Attorney General of California
MONICA N. ANDERSON, State Bar No. 182970
Senior Assistant Attorney General
DAMON MCCLAIN, State Bar No. 209508
Supervising Deputy Attorney General
ELISE OWENS THORN, State Bar No. 145931
NAMRATA KOTWANI, State Bar No. 308741
CHRISTIAN M. GEORGELY, State Bar No. 322952
Deputy Attorneys General
1300 I Street, Suite 125
P.O. Box 944255
Sacramento, CA 94244-2550
Telephone: (916) 210-7317
Fax: (916) 324-5205
E-mail: Christian.Georgely@doj.ca.gov
*Attorneys for Defendants*

HANSON BRIDGETT LLP
LAWRENCE M. CIRELLI, SBN 114710
PAUL B. MELLO, SBN 179755
SAMANTHA D. WOLFF, SBN 240280
KAYLEN KADOTANI, SBN 294114
DAVID C. CASARRUBIAS-GONZALES, SBN 321994
MOLLIE LEVY, SBN 333744
SAMANTHA M. BACON, SBN 351561
425 Market Street, 26th Floor
San Francisco, CA 94105
Telephone: (415) 777-3200
E-mail: PMello@hansonbridgett.com
*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **RALPH COLEMAN, et al.,**<br>Plaintiffs,<br>**v.**<br>**GAVIN NEWSOM, et al.,**<br>Defendants. | Case No. 2:90-cv-00520 KJM-SCR<br><br>**DEFENDANTS' CENSUS, WAITLISTS, AND TRANSFER TIMELINES COMPLIANCE REPORTS FOR INPATIENT MENTAL HEALTH CARE** |

Defendants California Department of Corrections and Rehabilitation (CDCR) and Department of State Hospitals (DSH) file the attached reports capturing data concerning patient census, waitlists, and compliance with transfer timelines for inpatient mental health care in compliance with the Court's October 13, 2015 order. (ECF No. 5367.) Attached are letters from CDCR and DSH enclosing the following census and inpatient reports, as modified by the Court's May 19, 2017 Order (ECF No. 5610): (1) DSH CDCR Patient Census and Waitlist Report (Exhibit A); (2) DSH Psychiatric Inpatient Timelines Compliance Report, Patients Admitted January 1, 2025 through January 31, 2025 Who Waited Beyond Program Guide Timelines

(Exhibit B); (3) CDCR Psychiatric Inpatient Programs (PIP) *Coleman* Patient Census and Waitlist Report as of January 27, 2025 (Exhibit C); (4) CDCR Mental Health Crisis Bed *Coleman* Patient Census and Waitlist Report as of January 27, 2025 (Exhibit D); (5) Psychiatric Inpatient Programs Census Report as of 01/27/2025 (Exhibit E); (6) CDCR Inpatient Program Referrals: Compliance with Program Guide Timeframes for Acute and Intermediate Referrals Admitted or Closed in January 2025 (Exhibit F); and (7) CDCR Inpatient Program Referrals: Compliance with Program Guide Timeframes for Acute and Intermediate Referrals Rescinded, Rejected or Paroled/Discharged in January 2025 (Exhibit G).

The current compliance report at Exhibit F shows that of the 202 patients referred to inpatient programs in January 2025, 184 were admitted to an inpatient program within Program Guide transfer timelines, two patients were admitted outside Program Guide transfer timelines but under transfer timeline exceptions, and the remaining 16 patient referrals were rescinded or rejected, or the patients were discharged or paroled. As reflected in the attached letter from CDCR and the attached reports, there is currently sufficient capacity to meet the needs of patients at all levels of inpatient care. CDCR continues to monitor the inpatient transfer timelines and exceptions and will continue to review this information with the Special Master and with other stakeholders in various settings.

/ / /

/ / /

/ / /

## CERTIFICATION OF ORDERS

Defendants' counsel certifies that they reviewed the following orders relevant to this filing: ECF No. 5367 and ECF No. 5610.

Dated: February 18, 2025

Respectfully submitted,

ROB BONTA
Attorney General of California
DAMON MCCLAIN
Supervising Deputy Attorney General

***/s/ Christian M. Georgely***
CHRISTIAN M. GEORGELY
Deputy Attorney General
*Attorneys for Defendants*

*HANSON BRIDGETT LLP*

***/s/ Paul B. Mello***
*PAUL B. MELLO*
*SAMANTHA D. WOLFF*
*DAVID C. CASARRUBIAS*
*Attorneys for Defendants*

CF1997CS0003
38798218.docx

Office of the Director
1600 9th Street, Room 151
Sacramento, California 95814
www.dsh.ca.gov

February 18, 2025

Damon McClain, Esq.
Christian Georgely, Esq.
California Department of Justice
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-5500

Re: DEFENDANTS' CENSUS, WAITLISTS AND TRANSFER TIMELINES COMPLIANCE REPORTS FOR INPATIENT MENTAL HEALTH CARE

Dear Mr. McClain and Mr. Georgely:

The California Department of State Hospitals (DSH) submits its monthly information on patient census, referrals, waitlists, and transfer timeline compliance for inpatient mental health care.

The DSH CDCR Patient Census and Waitlist Report—as of January 27, 2025—is attached as Exhibit A, and the DSH Psychiatric Inpatient Timelines Compliance Report, Patients Admitted January 1, 2025 through January 31, 2025 Who Waited Beyond Program Guide Timelines, is attached as Exhibit B. These reports are based on data from the DSH Bed Utilization Management Report.[1]

The report attached as Exhibit A reflects data collected at a single point in time and, as a result, should not be used for purposes outside of that report. The report attached as Exhibit B is the compliance report from DSH, which includes requested compliance data for all DSH level-of-care referrals admitted to inpatient care in January 2025, for any inmate-patient who waited beyond the timelines specified in the Mental Health Services Delivery System Program Guide (2009 Revision) at 12-1-16.

[1] These reports are based on data collected as of the last business Monday of the month.

DSH records show that, as of January 27, 2025, there were no patients waiting beyond Program Guide transfer timelines for admission to DSH. Exhibit B shows that no patients were admitted to DSH Intermediate Care in January 2025 beyond Program Guide transfer timelines. The supplemental report on DSH's pending waitlist, which was provided to the Special Master and Plaintiffs via e-mail, also shows that no patients were admitted to DSH in January 2025 beyond Program Guide transfer timelines.

Sincerely,

*/s/ Stephanie Clendenin*
STEPHANIE CLENDENIN
Director
Department of State Hospitals

***"Caring Today for a Safe and Healthy Tomorrow"***

# Exhibit A

State of California
GAVIN NEWSOM, Governor
RESEARCH EVALUATION & DATA INSIGHTS
1215 O Street
Sacramento, CA 95814

DSH

## DSH CDCR Patient Census and Waitlist Report

Data as of: 1/27/2025

***Acute Care Patients***

| DSH Facility - Acute - Female | Bed Capacity | Census | Beds on Hold[1] | Beds Redlined[2] | Medical Isolation Rooms[3] | Available Beds | Waitlist | | | Total Patients Awaiting Admission |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Referrals Pending Review | Accepted Referrals | | |
| | | | | | | | | CDCR Prison[4] | CDCR PIP[5] | |
| Patton[6] | - | 0 | 0 | 0 | 0 | 0 | | | | 0 |
| Total | - | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (Includes 0 Waiting >10 Days) |

***Intermediate Care Low Custody - Unlocked Dorms***

| DSH Facility - Unlocked Dorms | Bed Capacity | Census | Beds on Hold[1] | Beds Redlined[2] | Medical Isolation Rooms[3] | Available Beds | Waitlist | | | Total Patients Awaiting Admission |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Referrals Pending Review | Accepted Referrals | | |
| | | | | | | | | CDCR Prison[4] | CDCR PIP[5] | |
| Atascadero | 256 | 119 | 0 | 0 | 0 | 137 | | | | |
| Coalinga | 50 | 42 | 0 | 0 | 0 | 8 | | | | 14 |
| Total | 306 | 161 | 0 | 0 | 0 | 145 | 3 | 9 | 2 | (Includes 0 Waiting >30 Days) |

***Intermediate Care Low Custody - Unlocked Dorms - Female***

| DSH Facility - Unlocked Dorms - Female | Bed Capacity | Census | Beds on Hold[1] | Beds Redlined[2] | Medical Isolation Rooms[3] | Available Beds | Waitlist | | | Total Patients Awaiting Admission |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Referrals Pending Review | Accepted Referrals | | |
| | | | | | | | | CDCR Prison[4] | CDCR PIP[5] | |
| Patton[6] | 30 | 10 | 0 | 0 | 0 | 20 | | | | 7 |
| Total | 30 | 10 | 0 | 0 | 0 | 20 | 1 | 6 | 0 | (Includes 0 Waiting >30 Days) |

[1]Beds on hold are assigned for internal patient movement and patients waiting to transfer to DSH. When allocated *Coleman* beds are at maximum capacity within the facility, beds with patients pending discharge may be placed on hold for accepted patients to maximize bed utilization. This may result in negative totals for available beds, but does not necessarily imply exceeding capacity.

[2]Redlined beds are temporarily unavailable due to repairs.

[3]Medical isolation rooms are required for licensing and physically differ from the other housing in the program, i.e., have showers or restricted sightlines into the cell, and are deemed inappropriate for everyday use.

[4]Direct referrals from a CDCR prison for patients awaiting transfer to DSH for inpatient treatment.

[5]Referrals for patients currently receiving inpatient treatment within a CDCR PIP referred to DSH for stepdown of LRH or Level of Care change.

[6]Beds at DSH-P are for female patients only.

# Exhibit B

State of California
**RESEARCH EVALUATION & DATA INSIGHTS**
1215 O Street
Sacramento, CA 95814



DSH

## DSH Psychiatric Inpatient Timelines Compliance Report

Patients Admitted January 1 through January 31, 2025 Who Waited Beyond Program Guide Timelines

| Level of Care | Patients Waiting Outside Program Guide Timelines[3] | Days Waited Outside Program Guide Timelines[4] |
|---|---|---|
| Intermediate Care Admissions | 0 | 0 |
| **Subtotal** | **0** | **0** |
| Exceptions to Program Guide Timelines - OTC, OTH, and Medical Holds[1] | 0 | 0 |
| Exceptions to Program Guide Timelines - Internal Referrals[2] | 0 | 0 |
| **Total Excluding Exceptions to Program Guide Timelines** | **0** | **0** |

[1]Includes exceptions to the Program Guide timelines for referrals on hold for patients with out-to-court status, out-to-hospital status, and medical holds.
[2]Includes exceptions to the Program Guide timelines for CDCR patients currently receiving inpatient treatment within a DSH program and have been referred for internal movement within DSH.
[3]Including patients admitted who waited greater than 30 days from the referral received date to DSH for a change in level of care.
[4]Includes the total number of days admitted patients waited beyond 30 days from the referral received date to DSH for a change in level of care.

State of California
GAVIN NEWSOM, Governor
RESEARCH EVALUATION & DATA INSIGHTS
1215 O Street
Sacramento, CA 95814

## DSH Psychiatric Inpatient Timelines Compliance Report

Patients Admitted January 1 through January 31, 2025 Who Waited Beyond Program Guide Timelines

***Patients Admitted to Intermediate Care***

| Name | CDCR # | CDCR Direct/ DSH Internal | Total Days on Waitlist | Number of Days Waited Beyond Program Guide Timelines | Total Days on Hold | Exclusion Days | Total Days Waited Excluding Exceptions | Exception Reason(s) |
|---|---|---|---|---|---|---|---|---|
| No patients admitted with wait times exceeding 30 days | | | | | | | | |
| Total Number of Patients Waiting Over 30 Days | 0 | Total Number of Days All Patients | 0 | 0 | 0 | 0 | 0 | - |

# Exhibit C

June 18, 2024

VIA ELECTRONIC MAIL

Matthew A. Lopes, Jr.
Special Master
Pannone Lopes Devereaux and O'Gara LLC
Northwoods Office Park, Suite 215N
1301 Atwood Avenue
Johnston, RI 02919

Michael Bien
Lisa Ells
Ernest Galvan
Rosen, Bien, Galvan & Grunfeld, LLP
101 Mission Street, Sixth Floor
San Francisco, CA 94105

RE: *Coleman v. Newsom, et al.*
Trial Processes for DSH Admissions

Dear Plaintiffs' Counsel and Special Master Lopes:

As you know, the Department of State Hospitals (DSH) and the California Department of Corrections and Rehabilitation (CDCR) implemented a trial process for DSH review of *Coleman* patients for possible admission to DSH, which has increased the number of *Coleman* patients admitted to state hospitals since October 9, 2023, when the trial process was implemented. This letter is to provide notice that DSH and CDCR intend to implement three additional trial processes that should further increase the number of *Coleman* patients admitted to DSH and utilization of DSH beds for *Coleman* patients. The three additional processes are briefly discussed below and in the attached documents. Please provide us with any comments you have regarding these three additional processes by June 26, 2024, and please also let us know if you would like to meet to discuss these processes.

**1. Review of Custodially Ineligible Patients**

The objective of this trial process is to review *Coleman* patients who are currently ineligible for placement at DSH because they are designated as close custody and who (1) have a sentence of life without the possibility of parole, (2) are at least 62 years old; and (3) are designated single cell suffix (only as a result of mental health reasons or victimization concerns). DSH will review patients who fit these criteria in accordance with the MOU on referral, admission, and movement. Based on 2023 data, this may result in a substantial number of additional referrals to DSH for possible admission. For more detail, see Attachment 1.

**2. DSH-Atascadero Select Coleman Admissions**

The objective of this trial process is to use a small number of beds on the DSH-Atascadero admissions unit as part of the 256 DSH-Atascadero Coleman Beds to provide focused clinical support for Coleman patients at the intermediate level of care to help them stabilize so that they can transition to unlocked dorm intermediate care units in DSH-Atascadero. This may increase admissions of patients to DSH-Atascadero who previously would have been deemed inappropriate for admission to DSH because they were unstable and in need of more restrictive housing. For additional detail, see Attachment 2.

**3. Long Term Intermediate Hospitalization**

The objective of this trial process is to identify patients from DSH's intermediate care setting who have demonstrated difficulty maintaining clinical stability upon their return to CDCR's Enhanced Outpatient Program and to provide them with treatment in DSH's long-term intermediate hospitalization program for an extended period, but not to exceed the patients' maximum CDCR sentences. This may help patients who are prone to cycle frequently through the acute and intermediate levels of care due to the seriousness of their mental disorders. In addition, this may increase utilization of DSH beds for *Coleman* patients. For additional detail, see Attachment 3.

Sincerely,

*/s/ Damon McClain*

DAMON MCCLAIN
Supervising Deputy Attorney General

For ROB BONTA
Attorney General

# ATTACHMENT 1

**PROPOSAL - Close Custody, LWOP (at least 62 years of age), and Single Cell Coleman Reviews**

The objective of this proposal is to review Coleman patients currently custodially ineligible for placement at the DSH state hospital (unlocked dorms) in a manner that is clinically the most effective.

Initial Referrals to ICF:

All Close custody, LWOP at least 62 years of age, and Single Cell Suffix (single cell initiated as a result of mental health reasons or victimization concerns only) patient referrals to ICF level of care are not automatically excluded for DSH consideration. The patient referrals will be sent to DSH for clinical review to determine if the individual is clinically indicated for treatment in an unlocked dorm. Notification of the patient referral to DSH will start the 30-calendar day Program Guide timeline for admission.

DSH will conduct clinical reviews of the referrals consistent with Joint Policy Directive 3601: Referral, Admission and Movement in the joint DSH and CDCR MOU and notify CDCR IRU and HCPOP if a patient referral is recommended for admission or not recommended for admission to the DSH unlocked dorms.

HCPOP will begin necessary and indicated custody review processes with the institutions (e.g. committee, DRB, etc...) to allow for the patient referral to be endorsed to DSH. Once the necessary and indicated custody review processes have completed, HCPOP can endorse as outlined in Joint Policy Directive 3601: Referral, Admission and Movement.

Out of LRH reviews for Close Custody, LWOP (at least 62 years of age), and Single Cell:

- For individuals who were not clinically indicated for treatment in an unlocked dorm at the time of initial referral. DSH PMU will include reviews of these individuals within its existing LRH reviews defined in the "Trial Process."
- DSH will send a list and reviews of these patients preliminary recommended for admission to the state hospital to HCPOP and IRU.
- For those patients out of LRH recommended for admission to the state hospital, CDCR will begin necessary and indicated custody review processes with the institutions (e.g. committee, DRB, etc...) to allow for the patient referral to be endorsed to DSH. Once the necessary and indicated custody review processes have completed, the treatment teams can refer the patient and HCPOP can endorse as outlined in Joint Policy Directive 3601: Referral, Admission and Movement.

# ATTACHMENT 2

# DSH-Atascadero Select Coleman Admissions Trial Process

**Proposal: Utilize a small number of beds on the admission unit (unlocked single room) as part of the 256 DSH-Atascadero Coleman Beds to provide focused clinical support for ICF patients to stabilize in a DSH environment so that they can transition to the unlocked dorm ICF units.**

## Criteria for Short Term Utilization of Admissions Unit

1. All patient referrals shall be to ICF level of care and shall follow Policy Directive 3601: Referral, Admission and Movement in the joint DSH and CDCR MOU.
2. PMU shall clinically review all referrals and make a recommendation if a patient should be considered for temporary admission to the admissions unit (unlocked single room).
3. All patient referrals shall meet criteria for placement in the unlocked dorms, but upon clinical review by the Medical Director, or designee, a patient shall be admitted for temporary placement on the admissions unit (unlocked single room) if they meet additional criteria, including but not limited to:
    a. The severity of the patient's psychiatric symptoms makes it unsafe for them to be initially placed in the unlocked dorm and there is reasonable certainty that symptoms will improve with medication changes and/or therapeutic milieu within a 60-day time period and it would be safe for them to be housed in the admission unit.
    b. The patient has moderate aggression/ideations to harm others due to their severe mental illness, which may improve with medication changes and/or therapeutic milieu within a 60 day time period and it would be safe for them to be housed in the admission unit.
    c. The patient has been housed in a single cell for a significant period of time and there is concern that placement immediately into an unlocked dorm environment will be unsuccessful without a transition period in an unlocked single room.
4. Upon transport to the hospital, the patient will be admitted through the admission suite. The intake process in the suite takes approximately 2-3 hours. Patients shall receive a comprehensive medical assessment, a body check for any contraband, a shower and clean hospital clothing. Once this intake process has been completed and the patient is cleared, they shall be admitted to their admission housing unit.
5. Transitional periods in the admissions unit are meant for intensive modification of treatment (i.e. medication adjustments) in a more controlled environment so the patient can successfully transition to the unlocked dorm units.
6. A transition period residing on an admission unit will provide increased observation due to the lower census (28-32) and a higher staff to patient ratio.
7. All patients will have the ability to obtain a hospital access badge once assessed to be stable enough to independently move about the hospital safely.
8. All patients will be offered a variety of core treatment (individual and group) and supplemental activities, both on the admission unit and in centralized locations.

DRAFT

9. The admission unit Clinical Treatment Team shall consider transferring a patient to a dorm unit when clinically indicated and after completion of admission assessments.
10. If the patient's time on the admissions unit exceeds 30 days, then the unit Clinical Treatment Team shall report to the Utilization Management Committee (UM) patient progress towards transitioning to a dorm setting.
11. Patients will be referred back to CDCR in accordance with PD 3601 Joint Policy Referral, Admission and Patient Movement after 60 days if behavioral or psychiatric symptoms are unable to improve and dorm living at DSH cannot be achieved, but still require inpatient hospitalization at Acute or Intermediate.
12. If DSH assesses that the patient no longer requires inpatient treatment after stabilization in the admissions unit and is indicated for EOP level of care, DSH shall follow PD 3609 Joint Policy: Discharges.

DRAFT

# ATTACHMENT 3

| | |
|---|---|
| **NUMBER** | 3612 |
| **TITLE** | JOINT POLICY RE: Long-Term Intermediate Hospitalization |
| **EFFECTIVE DATE** | TBD |
| **SUPERSEDES** | NEW |

## STATEMENT

Policy Directives (PD) of the Department of State Hospitals (DSH) provide guidance, as appropriate, to comply with laws, regulations, codes, etc. PDs are issued and signed by the Director.

The California Department of Corrections and Rehabilitation (CDCR) and Department of State Hospitals (DSH) may identify patients from DSH's intermediate care setting to receive treatment in DSH's long-term intermediate hospitalization program for an extended period of time, but not to exceed the individual's maximum CDCR sentence. Typically, long-term hospitalization is for individuals who have demonstrated difficulty maintaining clinical stability in the Enhanced Outpatient Program (EOP) due to treatment-refractory symptoms of a serious mental illness (SMI). DSH and CDCR shall collaboratively manage all DSH inpatient program patient movement.

## PURPOSE

To provide a long-term inpatient psychiatric setting at the ICF level of care for patients who, as a result of their treatment-refractory symptoms of a SMI, have difficulty independently functioning in the EOP setting. Patients may be considered for placement for an extended period of time for inpatient psychiatric treatment and observation.

## RESPONSIBILITY

**Responsibility for policy review and implementation:**

DSH Director or designee.
CDCR Deputy Director, Statewide Mental Health Program or designee.

**Responsibility for compliance with the policy:**

The Executive Directors or designees of the DSH state hospitals treating CDCR patients.

**Responsibility for compliance with policy by Patient Management Unit staff at**

**DSH-Sacramento:**
DSH Deputy Director of Patient Care Coordination Division, or designee.

## AUTHORITY

1. By Order of the Director, Department of State Hospitals
2. Mental Health Services Delivery System Program Guide - 2021 Edition
3. Memorandum of Understanding Between California Department of Corrections and Rehabilitation and Department of State Hospitals for Management and Oversight of Intermediate Care and Acute Inpatient Programs (MOU)

## DEFINITIONS

**Intermediate (ICF):** Inpatient program within a DSH hospitals or CDCR Psychiatric Inpatient Programs (PIPs) providing long-term intermediate and sub-acute mental health treatment for CDCR patients with SMI. See also MHSDS Program Guide (2021 Edition) at 12-6-6.

**Long-Term Intermediate (LTI):** Subprogram of ICF that provides long-term psychiatric care for specific patients who demonstrate a pattern of significant psychiatric regression in the CDCR outpatient setting and therefore require multiple inpatient hospitalizations at DSH or a PIP due to the severity of their treatment-refractory symptoms of a SMI.

## PROCESS

### I. Process

DSH may retain specific ICF patients who require LTI hospitalization for longer than is expected for CDCR patients in a standard ICF setting. These patients typically decompensate or present with such severe psychiatric symptoms that they are unable to be maintained at the EOP level of care despite multiple admissions to an Acute/ICF setting. An initial maximum of 50 patients may be considered as part of the existing designated beds for Coleman class patients. Any increase or decrease to the maximum number of patients can be requested by DSH or CDCR, but DSH shall have sole authority to increase or decrease the maximum number of patient beds for the long-term hospitalization program from the existing designated beds for Coleman class patients.

Patients who have already been referred, accepted, and admitted, in accordance with the ICF admission process outlined in the MOU and Joint Policy Referral, Admission, and Movement may be considered for LTI hospitalization needs. CDCR can document in the referral to DSH's ICF program for individual patients it would like to be considered for LTI by DSH.

Continued Stay Review (CSR) forms shall be reduced to once a year for patients designated as LTI by DSH.

A. Process for DSH to review and designate ICF patients to be in the LTI program:

1. If the DSH ICF treatment team determines an ICF patient meets criteria for LTI hospitalization, Utilization Management and the DSH medical director shall be informed. Criteria may include, but not be exclusive or limited to:

   a. Patient has evidence of at least two failed EOP discharges, from ICF level of care, in the last two years due to treatment-refractory symptoms of SMI.
   b. Patient has severe treatment-refractory symptoms that would make it unlikely the patient could independently program at the EOP level of care.
   c. Patient requires or is currently prescribed a complex psychiatric medication regimen that may be difficult to maintain in the EOP level of care.

2. The medical director may request a review by PMU of the patient's clinical history while in CDCR to help determine if the patient has an inability to successfully program at EOP level of care due to their treatment-refractory symptoms of a SMI.

3. PMU shall provide the review and recommendation to the medical director for approval within thirty (30) calendar days.

4. If the patient is approved for LTI hospitalization, they shall be designated as such.

5. PMU and IRU shall be notified of the patient's change in designation to LTI hospitalization.

6. If the patient is not approved for LTI hospitalization, the patient shall continue with their current ICF treatment and plan of care.

## II. <u>Return to CDCR</u>

A. For continuity of care, all discharges from the LTI hospitalization program to CDCR shall have a CCAT at least seven (7) calendar days before physical discharge; attendees shall include, but not be limited to, IRU, the treatment team likely to receive the patient, and clinical leadership at the CDCR institution. All discharges back to CDCR shall follow the MOU and Joint Policy, Discharge process.

B. If a patient is determined not to be clinically indicated for LTI, but still requires ICF level of care, the patient can be converted to a standard ICF program at DSH or can

be discharged to a CDCR PIP program, if indicated.

## ROLES

**CDCR Inpatient Referral Unit (IRU):** The CDCR Headquarters Mental Health unit responsible for review and oversight of all CDCR referrals to DSH.

**DSH Patient Management Unit (PMU):** The DSH Headquarters mental health unit responsible for management and oversight of all CDCR referrals to DSH.

## APPROVAL

________________________________ Date: __________________

STEPHANIE CLENDENIN
Director
Department of State Hospitals

________________________________ Date: __________________

Amar Mehta, M.D.
Deputy Director
Statewide Mental Health Program
Division of Health Care Services
California Department of
Corrections and Rehabilitation

## ATTACHMENT

None

DRAFT

# Exhibit D

**Defendants' Responses to Questions Posed in Plaintiffs' June 25, 2024 Letter Re: Trial Processes to Increase Admissions and Utilization of DSH Beds for Coleman Patients**

Current Trial Process

1. ***What is the status of the trial? Have Defendants decided to make it permanent? If so, were any adjustments made to the initially proposed process as a result of lessons learned during the trial period? Are Defendants planning to formalize the process in a policy or other formal document?***

   Answer: The Trial Process is continuing and defendants have decided to make it permanent. One adjustment that was made is there will be no more conference calls to discuss the out of LRH reviews between DSH PMU and CDCR IRU Instead the out of LRH reviews will continue to be sent to CDCR IRU electronically and if there are questions/concerns then a conference call will be utilized to discuss. The Special Master experts will continue to be provided with the out of LRH reviews as is current practice.

   A policy document will be drafted and shared with the parties memorializing the Trial Process.

2. ***Additionally, please provide us with updated data on the results of the trial process. The last data we received was on April 5, 2024, which contained the March referrals to DSH. We would also appreciate some form of roll-up report that summarizes the results of the entire trial period, and/or through today if the process has extended or become permanent.***

   Answer: An update was shared with Plaintiffs on 6/26/24.

Review of Certain Custodially Ineligible Patients

3. ***Please provide more information on how the selection criteria were formulated. For instance, why is the age cut-off set at 62 years old, and why is the sentence requirement LWOP? Are CDCR and DSH considering expanding this process to other custodially ineligible patients, depending on the results of this initial trial? Your letter states that this trial process may result in a "substantial number" of referrals to DSH, based on 2023 information. Could you please provide us with an estimate of how much of the existing PIP population and new referrals will be reviewed for DSH admission based on this process? Please also provide some information on when you expect this trial process will begin and how long it will last.***

   Answer:
   To increase the number of patients for consideration by DSH for eligibility, patients who are 62 years old with a sentence of LWOP will be considered. The age of 62 was determined to be most appropriate while balancing security, access to treatment, current policy regarding housing incarcerated persons who are LWOP within an electrified fence, staff safety, public safety, and escape risk.

   At this time, CDCR and DSH are not considering expanding this process to other custodially ineligible patients.

In 2023, there were approximately 325 patient referrals to ICF that had a Close custody status, LWOP of at least 62 years of age, and/or Single Cell suffix due to mental health and/or victimization concerns. These patient referrals were both "new" referrals and "out of LRH" referrals. Based on last year's data, Defendants estimate a similar number of patient referrals to ICF may meet this criteria in 2024 and 2025.

The review process will start after defendants receive and consider comments from plaintiffs and the Special Master, and any required union notice and staff training occurs. There is currently no end date projected for this proposal, but like the October Trial Process it should extend for a minimum of  least six months to ensure collection of enough data to assess its effectiveness.

DSH-Atascadero Select Coleman Admissions

4. ***Could you please also provide more detailed selection criteria for this initiative? We recall that Defendants for a short period provided treatment to Coleman patients in the ASH admissions unit that was akin to the APP level of care. Will this be different? What type of programming will be available to patients while they are in the admissions unit? Will the patients in question come from the group that has already been reviewed each month as part of the existing trial process, or will more patients be reviewed as part of this new process? The process references that this will be for a "small" number of DSH-Atascadero beds. Can you provide more specificity on what that number is projected to be? Like the trial process above, please also provide information on the timeline of when this trial process is set to begin and how long it will last.***

Answer: Yes this will be different as the patients admitted to the admissions unit would be provided ICF level of care consistent with their referrals, , not APP level of care.

Patients on the admissions unit will be reviewed and have the same access to programming on the unit and hospital access to the treatment mall as those patients admitted directly to the unlocked dorm treatment unit, as clinically indicated by the treatment team. The differences from the unlocked dorm treatment unit is that patients will be in a single room and there will be a higher staff to patient ratio. The goal is to help the patients better adjust to the hospital before moving to the unlocked dorm treatment unit

This process will be open to patients reviewed who are out of LRH and new referrals, as clinically indicated.

The number of patients that would be indicated for temporary placement on the admissions unit would ebb and flow based on clinical presentation, clinical history, and patient needs. We are not able to provide a projected number of admissions unit beds utilized since it will vary based on the referrals received and patients' clinical needs.

The process will start after defendants receive and consider comments from plaintiffs and the Special Master any required union notice, and staff training occurs. There is currently no end date projected for this proposal, but like the October Trial Process it should extend for a minimum of  least six months to ensure collection of enough data to assess its effectiveness.

<u>Long-term Intermediate</u>

5. ***Like the other proposed processes, could you please provide us with a timeline of when this trial process will begin and how long you anticipate it will last? Further, Attachment 3 to your letter states that "initial maximum of 50 patients may be considered" and that DSH has the sole discretion to decrease the maximum number of beds for this trial process. Please clarify whether this means DSH will be reviewing all referrals, as well as existing PIP patients, to see if they would be appropriate for this trial process. Please also clarify whether and how DSH and CDCR clinicians will be trained to identify patients who may be eligible for this program. Lastly, who is eligible for this trial process? Will patients who are custodially ineligible for DSH admission but similarly cycle through levels of care and fail EOP discharges be reviewed?***

Answer: The process will start after defendants receive and consider comments from plaintiffs and the Special Master, any required union notice, and staff training. This is anticipated to be a permanent policy proposal with no end date.

Only patients admitted to DSH-Atascadero will be reviewed for the Long-Term Intermediate program. The treatment team in consultation with the UM committee and medical director, or designee will review patients to determine appropriateness for the Long-Term Intermediate program. CDCR treatment teams can request a patient be considered for the Long-Term Intermediate Program when referred to ICF unlocked dorms, and DSH mayreview this request when making a final determination.

DSH-Atascadero treatment teams will receive training on the policy, criteria, and process so that they are aware of this program, the process for admission, utilization review, discharges, and the patients clinically indicated for such a program.

The training needs for CDCR staff will be minimal. From a referral standpoint, the process of referring a patient to ICF level of care will not differ since the assessment and consideration for long-term intermediate will occur after the patient is already receiving treatment at DSH. A memorandum to CDCR staff will be released outlining the Long-Term Intermediate program and how patients may be selected for the program. Additionally, the Inpatient Referral Unit team members will have training regarding the Long-Term Intermediate program and can assist the field with questions as they arise. Announcements regarding the program will also occur during regular scheduled meetings with PIP Leadership and Inpatient Coordinators.

Any patient who is clinically indicated for ICF and unlocked dorms and demonstrate a clinical need for such a program is eligible.

Patients previously custodially ineligible, but who meet the criteria for Close custody, LWOP aged 62 or older, and have a single cell suffix due to mental health or victimization concerns, could be eligible. Other custodial ineligible patients not outlined in these trial proposed processes would not be eligible at this time.

## Other Questions

6. ***Plaintiffs would appreciate more information on what type of outcome and/or progress reporting will be utilized to assess the viability and impact of the proposed processes, and request monthly updates. Additionally, in terms of process, do DSH and CDCR anticipate conducting joint discussions regarding the potential patients falling into these categories to determine eligibility and admissions decisions? How will any disagreements be resolved?***

Answer: Outcome and process reporting measures for these trial processes could include, but not be limited to:

- Increased successful admissions to the state hospital
- Increased census at the state hospital
- Majority of successful transitions from admissions unit to the unlocked dorm treatment unit
- Decrease in frequency of cycling through inpatient settings by patients

DSH and CDCR will continue to follow the MOU for informal discussions, CCATs, and appeals when necessary to discuss and resolve disagreements.

# Exhibit E

**Trial Processes for DSH Review of Coleman Patients**

From: Kent, Kristopher@DSH-S
To: ColemanTeam-RBGOnly@rbgg.com, colemanspecialmaster@pldo.com, Matt Lopes
Cc: Reden, Brent@DSH-S, Caballero, Michael@DSH-S, Elise.Thorn@doj.ca.gov, Damon McClain, Namrata Kotwani, Paul B. Mello, Samantha Wolff (SWolff@hansonbridgett.com), Weber, Nicholas@Cl
Sent: 10/6/2023 9:34:49 AM
Attachments: Trial Processes for DSH Review of Coleman Patients.10.4.23.pdf

---

Hello All,
Over the past several years, DSH and CDCR have worked together to provide extra reviews of Coleman patients beyond the reviews done under the current inpatient referral process to ensure that all patients who are suitable for DSH admission are reviewed and that none are overlooked. Based on these reviews, DSH and CDCR have developed two trial process changes outlined in the attached document. DSH and CDCR plan to implement these process changes immediately. The attached document provides the details on these plans. DSH and CDCR think these changes are consistent with the MOU and will monitor these changes for at least six months to see if they result in increased admissions to DSH. Thanks, Kris

Kristopher Kent
Attorney IV
Department of State Hospitals
Legal Division
1215 O street, MS5 ***Please note new address***
Sacramento, CA 95814
Work Mobile: (916) 584-2248 **Please Note: I am working remotely. Please direct calls to this number**
Fax: (916) 651-3852
Email: Kristopher.Kent@dsh.ca.gov
Web: http://www.dsh.ca.gov
CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. DO NOT DISCLOSE THIS EMAIL TO OTHERS. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

# Trial Processes for DSH Review of Coleman Patients

New Referrals from Different Level of Care (CCCMS, EOP, MHCB, and APP)

- Review every referral with an LRH of Unlocked Dorms regardless of clinical housing recommendation. This will increase the pool of referrals DSH reviews and may lead to increase in admissions to DSH.

  - Process for all new ICF referrals:
    - CDCR will send ALL referrals that HCPOP identifies as having an LRH for unlocked dorms to DSH as endorsements.
    - All referrals sent to DSH will have an outcome (accept/rescind/reject)

CDCR and DSH Utilization Review: Out of LRH Referrals From an ICF Setting

- Every 30-45 days, CDCR IRU will select and review in collaboration with DSH a set number of patients out of LRH (for Unlocked Dorms) to determine if certain patients are indicated for an unlocked dorm setting
- The number of patients, in a PIP-ICF program, being reviewed would be approximately 40-50 for each 30-45 day review period to help ensure a continued and sustained review of patients out of LRH
- CDCR IRU will provide a regular list of out-of-LRH patients weekly to DSH PMU
- DSH PMU will conduct and provide case reviews to CDCR IRU at least two business days before the scheduled joint LRH review meeting.
- This process may lead to shorter stays in the PIPs for those clinically indicated patients with an LRH of Unlocked Dorm and an increase in admissions to the state hospital. Consequently, this may also improve bed availability at CDCR ICF PIPs.
- Additionally, this joint review could include patients with a single-cell chrono that was given due to their fragility from a severe mental illness and determine if they could be housed and treated in a state hospital (if the single-cell chrono was not due to severe in-cell violence and custody and the treatment team agrees with its removal)

- DSH reviews should not replace treatment team decision-making to refer a patient to their LRH
- If there is a disagreement between DSH and IRU to refer, a referral can still be made if IRU and the treatment team think the patient is ready for LRH step-down
- IRU will communicate with the PIPs when DSH reviews a patient and determines the patient is appropriate for ULD. IRU will request that the team refer the patient through the regular referral process.
- Prior review by DSH to determine appropriateness for ULD, will not preclude a patient from future reviews for appropriateness for movement to ULD or referral by the treatment team to ULD.

After CDCR and DSH implement the review process, they will monitor the process to determine its effectiveness. If the reviews assist in identifying increased numbers of individuals who are initially admitted to a DSH bed or who step down from a PIP, then these processes will be made permanent.

# EXHIBIT P

**Young, Mitchell J.**

| | |
|---|---|
| **From:** | Weber, Nicholas@CDCR <Nicholas.Weber@cdcr.ca.gov> |
| **Sent:** | Thursday, February 27, 2025 6:31 PM |
| **To:** | Adrienne Harrold; Coleman Special Master; Coleman Team - RBG Only; Steve Fama |
| **Cc:** | Elise Thorn; Namrata Kotwani; Damon McClain; Kent, Kristopher@DSH-S; Reden, Brent@DSH-S; Zollweg, Brian@DSH-S; Thind, Sundeep@CDCR |
| **Subject:** | RE: Coleman - DSH Referral Processes [IMAN-DMS.FID12440] |
| **Follow Up Flag:** | Flag for follow up |
| **Flag Status:** | Completed |

Good afternoon,

CDCR does not have any other documents for the field on the trial process. CDCR does not expect much impact on the field with these processes since they are mainly aimed at headquarters' workflows, which our IRU team is well versed in.

As to your other two requests, Defendants are preparing a written response to your February 21 letter. We will also consider your request for the Q&A material, but that is still being designed at this time.

Nick Weber
Assistant Chief Counsel
Complex Litigation Unit B
Office of Legal Affairs
Department of Corrections & Rehabilitation
(916) 217-1949

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

---

**From:** Adrienne Harrold <aharrold@rbgg.com>
**Sent:** Thursday, February 27, 2025 11:16 AM
**To:** Weber, Nicholas@CDCR <Nicholas.Weber@cdcr.ca.gov>; Coleman Special Master <colemanspecialmaster@pldolaw.com>; Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>; Steve Fama <sfama@prisonlaw.com>
**Cc:** Elise Thorn <elise.thorn@doj.ca.gov>; Namrata Kotwani <Namrata.Kotwani@doj.ca.gov>; Damon McClain <Damon.McClain@doj.ca.gov>; Kent, Kristopher@DSH-S <Kristopher.Kent@dsh.ca.gov>; Reden, Brent@DSH-S <Brent.Reden@dsh.ca.gov>; Zollweg, Brian@DSH-S <Brian.Zollweg@dsh.ca.gov>; Thind, Sundeep@CDCR <Sundeep.Thind@cdcr.ca.gov>
**Subject:** RE: Coleman - DSH Referral Processes [IMAN-DMS.FID12440]

CAUTION: This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Dear Nick,

Thank you for quickly following up with this document. I believe it is the same two-pager we received on October 9, 2023, when Defendants announced the trial processes (and was Exhibit E to my recent February 21st letter). My understanding is that there was a more detailed document that was provided to CDCR clinicians to help them understand when and how to make referrals under the trial, but I may have misunderstood. Please let me know.

If helpful to make sure we are all on the same page, here are two additional follow-ups we have in our notes from the meet and confer yesterday:

1. A written response to the questions in Plaintiffs' February 21st letter (at least the questions we did not get to)
2. After the new Q&A-style training to CDCR clinicians about these trial processes occurs, a copy of the recording of the training and the material provided (e.g., the powerpoint).

Thank you again to Defendants and the Special Master's team for the helpful meeting yesterday.

Sincerely,
Adrienne

---

**From:** Weber, Nicholas@CDCR <Nicholas.Weber@cdcr.ca.gov>
**Sent:** Thursday, February 27, 2025 10:41 AM
**To:** Adrienne Harrold <aharrold@rbgg.com>; Coleman Special Master <colemanspecialmaster@pldolaw.com>; Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>; Steve Fama <sfama@prisonlaw.com>
**Cc:** Elise Thorn <Elise.Thorn@doj.ca.gov>; Namrata Kotwani <Namrata.Kotwani@doj.ca.gov>; Damon McClain <Damon.McClain@doj.ca.gov>; Kent, Kristopher@DSH-S <Kristopher.Kent@dsh.ca.gov>; Reden, Brent@DSH-S <Brent.Reden@dsh.ca.gov>; Zollweg, Brian@DSH-S <Brian.Zollweg@dsh.ca.gov>; Thind, Sundeep@CDCR <Sundeep.Thind@cdcr.ca.gov>
**Subject:** Coleman - DSH Referral Processes

[EXTERNAL MESSAGE NOTICE]

All,

During yesterday's meet and confer, Plaintiffs requested the document provided to CDCR HQ IRU staff outlining the 2023 process. That document is attached.

Nick Weber
Assistant Chief Counsel
Complex Litigation Unit B
Office of Legal Affairs
Department of Corrections & Rehabilitation
(916) 217-1949

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

This message was sent from outside the company. Please do not click links or open attachments unless you recognize the source of this email and know the content is safe.

# EXHIBIT Q

**Young, Mitchell J.**

| | |
|---|---|
| **From:** | Lopes Matthew |
| **Sent:** | Monday, April 21, 2025 6:56 PM |
| **To:** | Coleman Special Master |
| **Subject:** | Fwd: LRH Indicators |
| **Attachments:** | image001.jpg; Exhibit A.pdf; Exhibit B.pdf; Exhibit C.pdf |
| **Follow Up Flag:** | Flag for follow up |
| **Flag Status:** | Flagged |

*[I'm sending this email quickly from my handheld device. Please excuse the brevity and/or typos made in my desire to communicate promptly with my thunder thumbs.]*

**Matthew A. Lopes Jr., PARTNER**
mlopes@pldolaw.com
P 401.824.5156 • F 401.824.5123

---

**Pannone Lopes Devereaux & O'Gara LLC**
Northwoods Office Park Suite 215 N
1301 Atwood Avenue, Johnston, RI 02919
www.pldolaw.com • Legal Disclaimer

Begin forwarded message:

> **From:** "Walsh Kerry F." <kwalsh@pldolaw.com>
> **Date:** April 21, 2025 at 5:59:53 PM EDT
> **To:** Nick Weber <Nicholas.Weber@cdcr.ca.gov>, CKelso@pacific.edu, "Selby, Michael@CDCR" <Michael.Selby@cdcr.ca.gov>
> **Cc:** Lopes Matthew <mlopes@pldolaw.com>, "Walsh Kerry F." <kwalsh@pldolaw.com>, hdlugacz@blhny.com, "Ryan, Jr., Michael F." <mryan@pldolaw.com>, "Simard, Alexa M." <asimard@pldolaw.com>
> **Subject: LRH Indicators**
>
> Good afternoon Nick – I am writing to provide an update on the status of the LRH indicators in the data remediation process and the Special Master's thoughts on how the development of the LRH indicators should proceed through the remediation process given the implementation of the new DSH trial processes.
>
> On October 6, 2023, DSH Defendants sent to the Plaintiffs and the Special Master a document entitled "Trial Processes for DSH review of Coleman Patients". (See Exhibit A attached). The intent behind the creation and implementation of these new processes was to increase admissions to DSH facilities by adjusting the admissions criteria to allow for an expanded pool of eligible *Coleman* patients who would otherwise not be considered for placement in a DSH facility due to

existing prohibitive clinical or custodial factors. A collateral benefit of increased admissions to DHS hospitals would be improved ICF bed availability at the CDCR's PIPs. There were two processes outlined in Defendants' plan designed to increase referrals to be reviewed by DSH.

1. New Referrals from Different Level of Care (CCCMS, EOP, MHCB and APP)

   Under this process, DSH would review *every* referral from CDCR with an LRH of unlocked dorms regardless of clinical housing recommendation and all referrals would have an outcome – acceptance, rejection or rescission.

2. CDCR and DSH Utilization Review: Out of LRH Referrals From an ICF Setting

   Utilizing this process, patients already in a CDCR PIP who were out of LRH for unlocked dorms, would be reviewed jointly by CDCR and DSH to determine appropriateness for unlocked dorms at DSH. These reviews would not replace treatment team decisions to refer a patient to their LRH.

Defendants concluded that after implementation, they would determine the effectiveness of the process and if it identified an increased number of patients for DSH unlocked dorms, the processes would be made permanent.

Following the dissemination of these two initial trial processes, and also after the introduction of the three additional processes in June of 2024, a series of meet and confers were held between 12/6 2023 and 2/25/2025, to allow the Special Master and Plaintiffs to ask questions and provide their input regarding these new processes. During the course of the meet and confers, it was stated that defendants' intention was to make these trial processes permanent, but formal policies would need to be drafted, and the processes would need to be incorporated into a new Memorandum of Understanding (MOU) between CDCR and DSH which currently was not being negotiated.

On June 18, 2024, Defendants notified the Special Master and the Plaintiffs that DSH and CDCR intended to implement three additional processes to increase the number of admissions of Coleman patients to DSH facilities. (See Exhibit B attached).

3. Review of Custodially Ineligible Patients
   This process would expand the review process to Coleman patients who are ineligible for DSH admission because they are designated as close custody and who (1) have a sentence of life without the possibility of parole, (2) are at least 62 years old, and (3) are designated single cell suffix (only as a result of mental health reasons or victimization concerns).

4. DSH-Atascadero Select Coleman Admissions
   This process would use a small number of beds on the DSH-Atascadero admission unit to stabilize Coleman patients in order to transfer these previously inappropriate patients to unlocked dorms at the facility.

5. Long Term Intermediate Hospitalization
   This trial process would identify those Coleman patients who are unable to maintain clinical stability upon their return to CDCR from DSH-Atascadero. These patients who cycle back and forth between CDCR and DSH-Atascadero would be put into a long-term intermediate program at DSH for extended periods to reduce these frequent returns and in turn would make use of DSH beds.

On August 9, 2024, Damon McClain indicated that all three new DSH proposals contained in his June 18, 2024 correspondence would be implemented by September 16, 2024. (See Exhibit C).

This expansion of the admission criteria to allow greater access to DSH for Coleman class members is a tremendous benefit for the patients. Increases in admissions to DSH were noted at the initial implementation of these processes and it is hoped that those trends will continue in the future. Unfortunately, what is lacking are formal policies to memorialize these forward-moving efforts by the defendants and a new MOU between CDCR and DSH into which these new policies would be incorporated.

At present, defendants have been unable to provide a date as to when any policies incorporating these revised processes will be drafted and circulated to the parties for review and when negotiations for a new MOU will commence, leaving the permanency of these well-intentioned developments in limbo.

Least Restrictive Housing (LRH) policies and reviews have transformed over the years to allow Coleman patients to be treated in the least restrictive environment based on their clinical needs and custodial factors. The unlocked dorms at DSH constitute the least restrictive environment for many Coleman patients and these new processes are designed to increase accessibility to that environment. In the data remediation process, the indicators for LRH have been stalled due to the uncertainty of the formalization of the new trial processes outlined above. At present there are four indicators created, but not developed, to monitor the LRH process which did not, and do not at present, contemplate the utilization of the five new processes implemented by defendants.

| | |
|---|---|
| AC26.1 | Timely Review of LRH Housing During the IDTT |
| AC26.2 | Clinical Barriers to the Patient's Performance Out of LRH |
| AC26.3 | Correctional Counselor Review of LRH During IDTT with an Appropriate Response |
| AC26.4 | PIP ICF Patients Housed Outside of Their LRH |

There is no question that the criteria for admission to a DSH program has been significantly expanded to allow for greater access to those programs for Coleman patients. Development of LRH indicators without incorporating these new processes would lead to indicators that would be outdated and incomplete from their inception. The Special Master believes that it would be a waste of resources to develop and remediate indicators that do not reflect the processes currently in effect. Therefore, he has de-prioritized these four indicators until such time as formal policies have been drafted and vetted by the parties, or all other presently unremedied indicators have been completed.

On more than one occasion, we have requested a timeline for the completion of the policies for these new processes and when these final policies will be incorporated into an updated MOU between CDCR and DSH. We are again reiterating that request by way of this email and offer our assistance in any way to accelerate that process. Thank you Nick.

**Kerry F. Walsh, Partner**
kwalsh@pldolaw.com

P 401.824.5118 • F 401.824.5123

**Pannone Lopes Devereaux & O'Gara LLC**
Northwoods Office Park Suite 215 N
1301 Atwood Avenue, Johnston, RI 02919
www.pldolaw.com • Legal Disclaimer

# EXHIBIT R

**State of California**

## California Department of Corrections and Rehabilitation
**Adult Institutions, Programs, and Parole**

# Operations Manual

*"Public Safety, Public Service"*©

**Updated Through**
**January 1, 2022**

# CHAPTER 5 — ADULT CUSTODY AND SECURITY OPERATIONS

## ARTICLE 1 — PEACE OFFICER AUTHORITY

*Revised February 29, 2009*

**51010.1 Policy**

It is the policy of the California Department of Corrections and Rehabilitation (CDCR) to ensure that CDCR peace officer authority comports with applicable State statutes, regulation and mutual aid agreements.

**51010.2 Purpose**

The purpose of this Article is to clarify CDCR peace officer authority as it relates to inmates, parolees, and California law enforcement requests for assistance.

**51010.3 Peace Officer Authority**

CDCR peace officer authority is outlined in Penal Code (PC) Sections 830.2(d)(1) & (2) and PC 830.5. While normal CDCR peace officer authority applies generally to custody of inmates either inside or outside of a CDCR facility (e.g. escape pursuit and transportation/hospital custody, etc.) and parolees, appropriately trained and equipped CDCR peace officers can be authorized to act outside of normal duties during emergency and non-emergency situations as specified by law.

A CDCR peace officer has authority that extends to any place in the State while engaged in the performance of the duties of his/her respective employment and for the purposes of carrying out the primary function of his/her employment or as required under Sections 8597, 8598, and 8617 of the Government Code (GC).

**51010.4 Emergency Assistance**

When a government agency (city, county, state, federal) makes an emergency mutual aid request that meets the criteria contained in the State Mutual Aid Plan or the Law Enforcement Mutual Aid Plan, response protocol provided in these plans shall be followed.

GC Section 8597 authorizes that when the appropriate state official proclaims a state of emergency or when a state of war emergency exists, PC Section 830.5 CDCR peace officers have full powers and authority as outlined in PC Section 830.1. Criteria for activation of these plans include, but are not limited to, disasters which may result from flood, fire, earthquake, war, sabotage, or riots.

GC Section 8598 authorizes that when a local emergency exists, PC Section 830.5 peace officers have full powers and authority as outlined in PC Section 830.1.

When acting as peace officers under PC Section 830.1, CDCR peace officers are authorized to exercise any powers which are appropriate or which may be directed by their superior officers.

**51010.5 Non-Emergency Assistance (General Law Enforcement Assistance)**

GC Section 8617 provides that the CDCR may exercise non-emergency mutual aid powers in accordance with the Master Mutual Aid Agreement and local ordinances, resolutions, agreements, or plans.

**51010.6 Provision of Assistance in Emergency and Non-Emergency Situations**

CDCR hiring authorities (e.g. Wardens, Regional Parole Administrators) are authorized to provide CDCR peace officer assistance to law enforcement agencies in emergency and non-emergency situations as consistent with the authority discussed herein. Hiring authorities will notify their supervisors of provision of assistance (e.g. Wardens will notify their Associate Directors). Specially trained and equipped peace officers include, but are not limited to, Crisis Response Team members and Emergency Operations Unit personnel conducting tactical and negotiation operations, and Investigative Services Unit members conducting investigative operations, and should be deployed as appropriate for the particular circumstances.

When CDCR peace officers are assigned to provide emergency or non-emergency law enforcement assistance, these tasks become the primary function of their employment for the duration of the assignment. Unless other agreements have been made, all costs associated with this assistance are the responsibility of the CDCR.

**51010.7 Revisions**

The Assistant Secretary, Office of Correctional Safety, shall ensure that the content of this Article is current and accurate.

**51010.8 References**

PC §§ 830.1, 830.2(d)(1) & (2).

GC §§ 8597, 8598, & 8617.

## ARTICLE 2 — USE OF FORCE

*Revised January 12, 2016*

**51020.1 Policy**

It is the policy of the California Department of Corrections and Rehabilitation's (CDCR), Division of Adult Institutions (DAI), to accomplish custodial and correctional functions with minimal reliance on the use of force. Employees may use reasonable force as required in the performance of their duties, but shall not use unnecessary or excessive force. Staff may, at any point, determine the situation can be resolved without the use of force and terminate the use of force process.

This policy, in conjunction with related procedures and training, defines staff responsibilities and requirements concerning the use of force.

This policy will assist staff in identifying when and how much force is appropriate under different circumstances, ensure that supervision, monitoring, and evaluation of the use of force is consistent with procedures and training, and ensure the investigation of possible unnecessary or excessive use of force. Staff found culpable of violations of the Use of Force Policy will be subject to disciplinary (preventive, corrective, or adverse action) procedures.

**51020.2 Purpose**

The purpose of this Article is to outline DAI's procedures pertaining to the use of force, as set forth in CCR, Title 15, Section 3268.

**51020.3 Responsibility**

It is the responsibility of all employees to understand and comply with the Use of Force policy, related procedures, ongoing training, and applicable law.

It is the responsibility of each Institution Head:

- To ensure that all employees receive appropriate training annually and understand the Use of Force policy and procedures, including both the application of force and subsequent reporting and documentation requirements.
- To record and track all training and discipline related to the use of force.

**51020.4 Definitions**

*Revised March 7, 2017*

The following shall define language usage in this Article:

**Reasonable Force**

Reasonable force is the force that an objective, trained, and competent correctional employee faced with similar facts and circumstances, would consider necessary and reasonable to subdue an attacker, overcome resistance, effect custody, or gain compliance with a lawful order.

**Unnecessary Force**

Unnecessary force is the use of force when none is required or appropriate.

**Excessive Force**

Excessive force is the use of more force than is objectively reasonable to accomplish a lawful purpose.

**Immediate Use of Force**

Immediate use of force is the force used to respond without delay to a situation or circumstance that constitutes an imminent threat to institution/facility security or the safety of persons. Employees may use immediate force without prior authorization from a higher official.

Immediate force may be necessary to subdue an attacker, overcome resistance or effect custody.

If it is necessary to use force solely to gain compliance with a lawful order, controlled force shall be used.

**Imminent Threat**

An imminent threat is any situation or circumstance that jeopardizes the safety of persons or compromises the security of the institution, requiring immediate action to stop the threat. Some examples include, but are not limited to: an attempt to escape, on-going physical harm or active physical resistance.

**Controlled Use of Force**

A controlled use of force is the force used in an institution/facility setting, when an inmate's presence or conduct poses a threat to safety or security and the inmate is located in an area that can be controlled or isolated. These situations do not normally involve the imminent threat to loss of life or imminent threat to institution security. All controlled use of force situations requires the authorization and the presence of a First or Second Level Manager during business hours. During non-business hours, the on-site manager shall be the Administrative Officer of the Day (AOD) who is

responsible for the authorization of any controlled use of force and whose presence is required during any controlled use of force. Staff shall make every effort to identify disabilities, to include mental health issues, and note any accommodations that may need to be considered.

**Non-conventional Force**

Non-conventional Force is force that utilizes techniques or instruments that are not specifically authorized in policy, procedures, or training. Depending on the circumstances, non-conventional force can be necessary and reasonable; it can also be unnecessary or excessive.

**Non-deadly Force**

Non-deadly force is any use of force that is not likely to result in death.

**Deadly Force**

Deadly force is any use of force that is likely to result in death. Any discharge of a firearm other than the lawful discharge during weapons qualifications, firearms training, or other legal recreational use of a firearm, is deadly force.

**Great Bodily Injury (GBI)**

Great bodily injury is any bodily injury that creates a substantial risk of death.

**Serious Bodily Injury**

Serious bodily injury means a serious impairment of physical condition, including, but not limited to the following:

- Loss of consciousness;
- Concussion;
- Bone fracture;
- Protracted loss or impairment of function of any bodily member or organ;
- A wound requiring extensive suturing; and
- Serious disfigurement.

**Response Supervisor**

The Response Supervisor is the first line supervisor in an institution/facility responsible for the area where an incident occurs. When responding to or observing an incident involving the use of force, the response supervisor shall assume control of the responders and direct the tactics used to stop the threat. Additionally, the response supervisor shall assess the appropriateness/effectiveness of the force options being deployed, ensuring compliance with policy and training.

**Responding Supervisor**

The Responding Supervisor is the first line supervisor responsible for the employee involved in an incident.

**Incident Commander**

The Incident Commander is the second line supervisor in an institution/facility responsible for the area where an incident occurs or an allegation of excessive or unnecessary force is received.

**First Level Manager**

A First Level Manager in an institution/facility is a Captain, or the AOD.

**First Line Manager**

A First Line Manager is a Parole Administrator, District Administrator, Special Agent-In-Charge, or a Senior Special Agent.

**Second Level Manager**

A Second Level Manager in an institution/facility is an Associate Warden.

**Second Line Manager**

A Second Line Manager is a Deputy Regional Parole Administrator or Chief.

**Institution Head**

The Institution Head is a Warden or designee.

**Institutional Executive Review Committee (IERC)**

The IERC is a committee of institution staff chaired by the respective Institution Head tasked with reviewing all uses of force and every allegation of excessive or unnecessary force. The IERC is the final institutional level of review.

**Department Executive Review Committee (DERC)**

The DERC is a committee of staff selected by, and including, the Associate Director who oversees the respective institution/facility Mission-based group. The DERC has oversight responsibility and final review authority over the IERC. The DERC shall review every use of deadly force and every serious bodily injury, great bodily injury or death that could have been caused by a staff use of force. The DERC shall also review those incidents referred to the DERC by the IERC Chairperson or otherwise requested by the DERC. The DERC shall conduct all reviews within sixty (60) days of completion by the IERC.

**Deadly Force Investigation Teams (DFIT)**

DFIT is a team of trained department investigators that shall conduct criminal and administrative investigations into every use of deadly force and every death or great bodily injury that could have been caused by a staff use of force, except the lawful discharge of a firearm during weapons qualifications or firearms training, or other legal recreational uses of a firearm. Based on certain local Memoranda of Understanding, criminal investigations may instead be conducted by an outside police department or sheriff's office. Although defined as deadly force DFIT need not investigate the discharge of a warning shot inside an institution/facility if an Investigative Services Unit Sergeant or above, or an uninvolved Correctional Lieutenant, confirms that the discharge of deadly force was a warning shot and that no injuries were caused by the shot. All warning shots shall be reported to the Office of Internal Affairs/DFIT and the Office of the Inspector General (OIG).

**Deadly Force Review Board (DFRB)**

The DFRB conducts a full and complete review of all incidents involving a use of deadly force (except warning shots) and every death or great bodily injury that could have been caused by a staff use of force, regardless of whether the incident occurs in an institutional or community setting.

**Joint Use Committee (JUC)**

The JUC is a committee of field staff from the DAI tasked with reviewing and evaluating recommended revisions to the Division's Use of Force Policy and Procedures.

**Holding Cells**

All holding cells shall be located within buildings or sheltered areas. A holding cell shall not be used as a means of punishment, housing or long-term placement. If clothing is taken from an inmate when they are placed in a holding cell, alternate clothing shall immediately be provided unless security concerns preclude issuance.

**51020.5 Use of Force Options**

It is the expectation that staff evaluate the totality of circumstances involved in any given situation, to include consideration of an inmate's demeanor, bizarre behavior, mental health status if known, medical concerns, as well as ability to understand and/or comply with orders, in an effort to determine the best course of action and tactics to resolve the situation. Whenever possible, verbal persuasion should be attempted in an effort to mitigate the need for force. The type of verbal persuasion will vary dependent upon the inmate's ability to understand. If time permits, verbal orders should be issued prior to resorting to force and are required to be provided before controlled force is used. The unresisted searching or escorting of an inmate/parolee and the unresisted application of authorized restraint equipment is not a use of force. Use of Force options do not have to be utilized in any particular sequence, but should be the force option staff reasonably believes is sufficient. Each force option has specific qualities that should be considered when choosing which option to deploy, including but not limited to: range of effectiveness, level of potential injury, staff safety, deployment methodology, level of threat presented, distance between staff and inmate, number of staff and inmates involved and the inmate's ability to understand. When responding to or observing an incident involving the use of force, the response supervisor shall assume control of the responders and direct the tactics used to stop the threat. Additionally, the response supervisor shall assess the appropriateness/effectiveness of the force options being deployed ensuring compliance with policy and training. Use of force options include but are not limited to:

- Chemical agents: Provides staff the ability to use force while maintaining distance.
- Hand-held batons: The baton is normally issued to custodial staff assigned to positions with direct inmate contact. The baton should not be carried in the extended position unless it is being utilized for the protection of the inmate and/or staff. In controlled use of force, the baton is intended for the defense of staff and to assist in gaining control of the inmate.
- Physical strength and holds: Any deliberate physical contact, using any part of the body to overcome conscious resistance, is considered physical force. A choke hold or any other physical restraint which prevents the person from swallowing or breathing shall not be used unless the use of deadly force would be authorized.
- Less-lethal weapons: A less lethal weapon is any weapon that is not likely to cause death. A 37mm or 40mm launcher and any other weapon used to fire less-lethal projectiles is a less lethal weapon.
- Lethal weapons: A firearm is a lethal weapon because it is used to fire lethal projectiles. A lethal weapon is any weapon that is likely to result in death.

**51020.6 Use of Restraints**

The unresisted application of authorized restraint equipment is not a use of force. When mechanical restraint is required, handcuffs, alone or attached to a waist chain,

# EXHIBIT S

STATE OF CALIFORNIA —DEPARTMENT OF CORRECTIONS AND REHABILITATION GAVIN NEWSOM, GOVERNOR

**OFFICE OF LEGAL AFFAIRS**
Jennifer Neill
General Counsel
P.O. Box 942883
Sacramento, CA 94283-0001

April 1, 2025

Special Master Lopes
Pannone Lopes Devereaux and O'Gara LLC
Northwoods Office Park, Suite 215N
1301 Atwood Avenue
Johnston, RI 02919

VIA EMAIL

Special Master Lopes:

I write regarding recent updates to mission changes and impatient bed closures.

1. Mission Changes

On May 5, 2025, CDCR plans to close Pelican Bay State Prison's (PBSP) Facility B, Building 2 (B2) to convert it from a Level IV Enhanced Outpatient Program (EOP) to a Level IV General Population (GP). All level IV EOP patients will be housed in B1, which has more space than B2 to accompany mental health programming. Please note that once B2 is deactivated, B1 will be the sole EOP building at PBSP.

2. Inpatient Beds Closures

Updates to inpatient closure projects since the last mission change letter, dated October 30, 2024, are noted in red in the table below.

| Institution | Deactivation | Cells | Reason | Reactivation Date |
|---|---|---|---|---|
| **SAC MHCB** | October 30, 2024 | 13 | Flooring, HVAC and ADA modifications | October 2025 |
| **CMF PIP P2** | July 1, 2024 | 36 | Outlets/Fire Alarm | September 2025 |
| **CMF PIP Q2** | November 2024 | 31 | Outlets | March 18, 2025 |
| **CMF PIP Q1** | December 2024 | 29 | Mobility Retrofits and Outlets | March 18, 2025 |
| **CMF APP S1 & S2** | April 1, 2025 | 60 | Electrical Updates | August 2025 |
| **CMF PIP C & D pods** | October 27, 2022 | 32 | Quarantine & Isolation | TBD |
| **PVSP MHCB** | February 19, 2019 | 6 | CTC Repair | TBD |
| **SVSP C5 & C6** | March 14, 2025 | 116 | Operational | N/A |

a. California State Prison, Sacramento (SAC) Crisis Beds

Thirteen (13) mental health crisis beds (MHCB) will be closed in SAC's correctional treatment center (CTC) unit on or around October 30, 2024 for ADA modifications, heating, ventilation, and air conditioning work, and flooring repair. This project is estimated to be completed by the end of October 2025.

b. California Medical Facility (CMF) – Psychiatric Inpatient Program (PIP)

CMF plans to install outlets in all PIP cells. Installation of outlets in thirty-six (36) beds in CMF's P2 Acute Psychiatric Program (APP) unit are now complete. However, an issue was identified with the maintenance of the fire alarm panel, impacting P2 from reopening, so the anticipated reopening date is sometime in September 2025.

Q2, a second APP unit with thirty-one (31) beds went offline in November 2024 for the outlet retrofit project. This project is now complete and Q2 was reactivated on March 18, 2025.

In June 2023, *Armstrong* Plaintiffs informed CDCR of beds four inches above ground in CMF PIP that *Armstrong* patients have difficulty getting in and out from. As a result, CMF took twenty-nine (29) beds offline from Q1 to do outlet retrofits. Of those twenty-nine (29) beds, 27 beds also underwent mobility retrofits. This project was completed and Q1 was reactivated on March 18, 2025.

On April 1, 2025, CMF deactivated 60 acute beds in S-1 and S-2 for electrical updates. The project is estimated to take about four months, and the beds are anticipated to be reactivated sometime in August 2025.

Additional beds offline at CMF include 16 beds in C-Pod and 16 beds in D-Pod, which are being used for quarantine and isolation purposes.

c. Pleasant Valley State Prison Crisis Bed

Pleasant Valley State Prison's (PVSP) Correctional Treatment Center and crisis bed closed on February 19, 2019 due to roof damage as a result of rain storms. Two outstanding projects remain, which are the fire alarm system and the nursing call station. Additionally, the smoke exhaust system needs to be repaired. The completion date for both projects has been pushed to the end of 2025; a more specific completion date is not available at this time.

d. Salinas Valley State Prison (SVSP) PIP

On March 14, 2025, CDCR stopped intake to SVSP's PIP buildings C5 and C6 in preparation for the units' closure in summer 2025. The closure of C5 and C6 is an effort to right size the number of CDCR's inpatient beds considering decreased demand.

Sincerely,

*/s/ Sundeep Thind*

SUNDEEP THIND
Attorney III
Office of Legal Affairs