1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                     FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    RALPH COLEMAN, et al.,                    No. 2:90-cv- 0520 KJM SCR P

12                        Plaintiffs,           ORDER APPOINTING RECEIVER

13          v.

14    GAVIN NEWSOM, et al.,

15                        Defendants.

16

17          For three decades, this court has overseen defendants' efforts to fully and durably

18    implement the court-ordered remedies necessary to deliver constitutionally adequate mental

19    health care to the plaintiff class, now numbering approximately 35,000 adults in custody in

20    California state prisons.  In doing so, the court has exercised substantial deference to defendants,

21    and has been exceedingly patient, if not too patient.  It has issued more than 250 substantive

22    orders, at times providing direction, at others prodding or cajoling, sometimes memorializing

23    progress, sometimes reprimanding or threatening contempt, all with the goal and the hope that

24    defendants would achieve compliance with the remedies on their own, without further court

25    oversight.  Since 2007, the court's current Special Master and his team of experts have provided

26    guidance and conducted monitoring of defendants' levels of compliance, while defendants have

27    remained in the driver's seat with the freedom to manage the prison mental health care system,

28    holding the keys to termination of court oversight.  Defendants have made some progress, but

1

1    they also have resisted much of the way, reflexively appealing eighteen times in the last eight

2    years alone, achieving delays but no material change in the remedy.  *See* Attachment A.

3    Recently, the court formally found defendants in contempt with respect to the critically central

4    mental health staffing component of the remedy, and imposed civil sanctions now amounting to

5    more than $100 million in fines to date in order to advance compliance.  Defendants appealed this

6    order too, which the circuit court affirmed in all material respects.  But the appeal bought at least

7    another five months of delay and only in the last few months have funds generated by the

8    sanctions begun to be expended to address persistent staffing shortfalls.

9         All of the court's experience with the case demonstrates that defendants are not able to or

10    are not going to fully and finally correct the constitutional violations underlying the court-ordered

11    remedies, without more than the kind of close supervision the court has provided for so long.

12    Therefore, more than a year ago, the court put the parties on notice in an order to show cause of

13    its tentative plan to appoint a receiver, for as long as needed, to ensure the long-deferred remedies

14    are final implemented, durably so.  A receivership, with authority as a fully-empowered arm of

15    the court to effect the remedy directly, is a well-recognized tool available to this court, drawing

16    on its equitable powers, to fully address "otherwise uncorrectable" constitutional violations.

17         The court has now given all the parties a chance to respond to its order to show cause, and

18    has entertained a deliberate and extended process to consider the parties' responses and to

19    identify possible candidates to serve as receiver.  The court has carefully considered the parties'

20    positions, and identified a highly qualified candidate to serve as receiver, who has submitted a

21    viable Receiver's Action Plan.  The court now confirms its tentative conclusions set forth in the

22    order to show cause and issues this order to appoint Colette S. Peters as the receiver in this case.

23    In doing so, as explained more fully below, the court makes the required findings, including that

24    there is "a grave and immediate threat" and "actuality of harm" to the plaintiff class that a

25    receivership will address, and the use of "less extreme measures of remediation ha[s] been

26    exhausted."

27         As the court also explains below, this is the first of four orders the court issues to effect

28    the appointment and the fully effective functioning of the receivership.

1    **I.    BACKGROUND**

2         While the court has many times before reviewed the background of this case, it provides

3    an essential summary here as factual support for confirming the tentative conclusions it reached

4    in the order to show cause why a receiver should not be considered, and through formal

5    proceedings, appointed.  *See* July 12, 2024 Order and Order to Show Cause, ECF No. 8330.

6         In 1995, the court found defendants in violation of their Eighth Amendment obligation to

7    provide seriously mentally ill inmates confined in the California Department of Corrections and

8    Rehabilitation (CDCR) (then the California Department of Corrections (CDC)) with access to

9    constitutionally adequate mental health care.  *Coleman v. Wilson*, 912 F. Supp. 1282 (E.D. Cal.

10   1995).  Specifically, "[t]he plaintiff class consists of all inmates with serious mental disorders

11   who are now, or who will in the future be, confined within the [CDCR]."  Jul. 23, 1999 Stip. &

12   Order at 3, ECF No. 1054.  Early on, the court appointed a Special Master to "provide expert

13   advice to defendants" in their development of a plan to remedy the constitutional violations and,

14   thereafter, "[t]o monitor defendants' implementation of and compliance with" any court-ordered

15   remedial plan.  Dec. 11, 1995 Order of Reference at 3-4, ECF No. 640.  The core remedial plans

16   that emerged from this process are the CDCR Mental Health Services Delivery System (MHSDS)

17   Program Guide (Program Guide), ECF No. 7333-1, and the Compendium of Custody Related

18   Remedial Measures (Compendium), ECF No. 7333-1.  The court has ordered development and

19   implementation of several other remedial measures in aid of implementation of these core

20   remedial plans, as well as specific suicide prevention measures.  *See* Sept. 3, 2020 Order at 4-6,

21   ECF No. 6846.

22        In the 2024 order to show cause, the court reviewed the history of the work performed by

23   the Special Master as an arm of the court, without the powers accorded a receiver:

24            [T]he remedial phase of this action has proceeded under a "carefully
25            constructed process supervised by a Special Master that was
26            designed to moderate court intrusion in defendants' own remedial
27            efforts and is arguably more respectful of defendants' knowledge of
28            their operations and their management prerogatives than a process
29            whereby oversight is transferred to a receivership; it is also more
30            hopeful that defendants can best determine how to meet their
31            constitutional obligations to the seriously mentally ill inmates in their

1    custody." *Coleman v. Newsom*, 424 F. Supp. 3d 925, 929 (E.D. Cal.
2    2019). The [current] Special Master has served the court since his
3    appointment in February 1996, and he and his team of experts have
4    extensive knowledge of this action and the many obstacles to
5    compliance that have plagued the remedial process for almost three
6    decades. Notwithstanding the deference and respect afforded
7    defendants by the process the court and the Special Master have
8    relied on to date, in at least three [critical] areas [] defendants have
9    not achieved the required remediation.

10    ECF No. 8330 at 3. More than a year later, defendants still have not achieved the required

11    remediation in the areas addressed in the July 12, 2024 order and order to show cause, as

12    reviewed below.

13          A.      **Mental Health Staffing in Institutional Programs**

14          The first critical area relates to persistent staffing shortfalls in the prisons' mental health

15    care programs. These programs are found at three of the four levels of CDCR's MHSDS:

16    Correctional Clinical Case Management System (CCCMS), Enhanced Outpatient Programs

17    (EOPs) and Mental Health Crisis Beds (MHCBs). In March 2024, following evidentiary

18    proceedings held in late 2023 developing the record with respect to staffing, the court issued a

19    tentative ruling finding defendants in contempt of the court's prior orders. Mar. 8, 2024 Bench

20    Order, ECF No. 8147. The court deferred its tentative ruling pending ultimately unsuccessful

21    mediation efforts supervised by a Ninth Circuit Mediator. Mar. 8, 2024 Minutes, ECF No. 8146.

22    Then in June 2024, the court confirmed its tentative ruling, formally finding three defendants in

23    contempt of court for failing to comply with the court's orders to come into full compliance with

24    defendants' 2009 institutional mental health staffing plan and the court-ordered ten percent

25    vacancy rate. *See generally* June 25, 2024 Order, ECF No. 8291. The court ordered defendants

26    to pay substantial civil fines. *See generally id.* On July 12, 2024, the court ordered the parties to

27    meet and confer under the supervision of the Special Master and to submit a proposed plan for

28    expenditure of those fines "to remedy ongoing mental health understaffing" in CDCR's

29    institutional programs. *See* ECF No. 8330 at 15. The parties timely submitted that plan, and on

30    August 29, 2024, the court approved the plan and ordered defendants to implement it. Aug. 29,

31    2024 Joint Submission & Order, ECF No. 8381. The defendants then obtained a stay from the

4

1   court of appeals, Nov. 12, 2024 Order, ECF No. 8462, during their pursuit of a largely

2   unsuccessful appeal, *see generally Coleman v. Newsom*, 131 F.4th 948 (9th Cir. 2025), which

3   delayed expenditure of funds generated by the fines.  In the meantime, as reflected in defendants'

4   regular reports to the court institutional mental health staffing fill rates improved incrementally

5   but neither fully nor durably, and defendants remain out of compliance with the required

6   institutional staffing remedy.  *See* Attachment B, Chart 1.

7           Shortly after the court of appeals issued its decision affirming the court in material part

8   but before the mandate issued, the court approved on April 1, 2025, a stipulation of the parties

9   designed to address understaffing issues by authorizing the use of Marriage and Family

10  Therapists (MFTs) and Professional Clinical Counselors (PCCs) as primary clinicians at the

11  CCCMS, EOP and MHCB levels of care.  Apr. 1, 2025 Stip. & Order, ECF Nos. 8587, 8587-1.

12  Subsequently, after the court of appeals issued its mandate, the court approved a further

13  stipulation of the parties to address continuing staffing shortfalls by amending the categories

14  defendants assign to the various mental health classifications in the staffing vacancy reports they

15  file monthly, adding categories for Chief and Senior Psychologists and for Supervising Social

16  Workers, and grouping the remaining psychologist and social worker positions into a new

17  category identified as Primary Clinicians, which also includes the MFT and PCC positions.[1]  Jun.

18  30, 2025 Stip. & Order, ECF No. 8688.  The most recent reporting shows the addition of new

19  classifications to serve as primary clinicians has provided a boost to the previous staffing deficits,

20  but full and durable compliance still remains a goal rather than a reality.  *See* Attachment B,

21  Chart 2.

22          Defendants have also now implemented, on a temporary basis, payment of bonuses

23  provided for in the Staffing Expenditure Plan, ECF No. 8381.  The court will order those bonuses

24  be made permanent.

25  /////

---

[1] The court ordered defendants to begin filing monthly vacancy reports in February 2018. Feb. 15, 2018 Order at 4, ECF No. 5786.  Though styled as "vacancy" reports, the percentages contained in the reports represent the percentage of authorized positions filled in each of the categories.

In sum, while the court's contempt findings and imposition of civil fines may have

focused minds and motivated some improvements, defendants' inability to achieve compliance

with the court-ordered staffing ratios persists with no solution identified to effect the remedy

sooner rather than later, other than appointment of a receiver.

### B.    Mental Health Staffing in CDCR PIPs

The second critical area the court identified in the order to show cause relates to staffing

and other matters in CDCR PIPs.  The court summarized the recent history of its actions on this

front as follows:

> [O]n October 11, 2023, the court ordered defendants to come into
> complete compliance with the CDCR PIP Staffing Plan, subject to a
> maximum ten percent vacancy rate, within six months. ECF No.
> 8009. On June 24, 2024, the court issued an order finding defendants
> out of compliance with the October 11, 2023 order and setting a fine
> schedule enforceable through civil contempt if compliance is not
> achieved within four months. ECF No. 8301. The four-month period
> started on July 1, 2024. *Id.* at 2.

ECF No. 8330 at 4.  As defendants' monthly vacancy reports show, defendants have not met the

thresholds required to avoid the accrual of fines as provided by the June 24, 2024 order.  *See*

Attachment B, Chart 3.

Also related to the PIPs, on July 28, 2025, plaintiffs requested leave to file a motion

regarding defendants' plan to deactivate numerous licensed PIP beds, ECF No. 8710, for which

defendants had provided notice on July 2, 2025, Second Am. Mehta Decl. at 2, ECF 8728-1.  On

July 29, 2025, defendants filed an opposition to the request, although the court had not granted

plaintiffs' leave to file the motion.  ECF No. 8711.[2]  On August 4, 2025, the court directed the

parties to "provide information comparing the current fill rates" in the PIPs "with the fill rates

that would exist upon defendants' proposed" deactivation of inpatient beds and directed

defendants to include that information in their monthly staffing vacancy reports going forward.

Aug. 4, 2025 Order at 2-3, ECF No. 8721.  The information defendants have now provided

suggests, on its face, that if the planned deactivations went forward defendants would remain out

---

[2] Defendants have amended their opposition twice.  ECF Nos. 8719, 8728.

1    of PIP staffing compliance only with respect to psychology positions.  Muhammad Decl. ¶ 4 &

2    Exs. A-B, ECF No. 8739-2.  On August 21, 2025, the court stayed the planned deactivation for a

3    period of fourteen days, given the unanswered questions it raises.  Aug. 21, 2025 Order, ECF No.

4    8747.  Those unanswered questions include whether the deactivation of the beds can be reversed

5    promptly if they are needed again, and whether the lack of need for the beds reflects problems

6    with patient referrals.  ECF No. 8710 at 4-5.  Even if the planned deactivations are appropriate,

7    taking account of all the relevant considerations, defendants would still not be in full compliance

8    with the court-ordered PIP staffing requirements, although they might be closer to compliance.

9    The noncompliance here as well supports the appointment of a receiver, subject to analyzing the

10   applicable factors as the court does below.

11        At the special status hearing on August 22, 2025, the court advised the parties of its

12   intention to refer the issues raised by the planned deactivation to the Receiver for consideration

13   upon the effective date of her appointment.  *See generally* RT 8/22/2025.

14        **C.    Suicide Prevention**

15        The third critical area of noncompliance called out by the court in the order to show cause

16   relates to suicide prevention.  It is established in this action "[w]here, as here, defendants know

17   that they house prison inmates at risk for suicide, they are required to take all reasonable steps to

18   prevent the harm of suicide." *Coleman v. Brown*, 938 F.Supp.2d 955, 975 (E. D. Cal. 2013).  The

19   court has clearly identified the reasonable steps defendants must take; those steps still are not

20   fully implemented despite the passage of many deadlines and the extreme seriousness of the

21   problem of high suicide rates among the plaintiff class.

22        In early 2015, without objection from either party, the court ordered defendants to adopt

23   thirty-two suicide prevention measures in CDCR's institutional mental health programs;[3] the

24   measures were recommended by the Special Master's suicide prevention expert, Lindsay M.

25   Hayes, and defendants were ordered to work with Mr. Hayes and the Special Master to implement

26   them.  *See generally* Feb. 3, 2015 Order, ECF No. 5271.  In 2018, at Mr. Hayes' recommendation

---

[3] Initially referred to as "recommendations," the court now refers to these as measures.
*See* ECF No. 8330 at 4 n.3.

1    the court withdrew three of the previously ordered measures, leaving twenty-nine measures to be

2    implemented.  Jan. 25, 2018 Order at 3, ECF No. 5762.  Since then, Mr. Hayes has conducted

3    four additional compliance re-audits, for a total of seven audits including the original audit and

4    six re-audits.  *See* Jan. 6, 2023 Order at 3-5, ECF No. 7696 (discussing original audit report and

5    reports on first through fifth re-audits); *see also* ECF No. 8143-1 (sixth re-audit report).  He

6    currently is completing his seventh re-audit.

7         In January 2020, the court set the first deadline for defendants to fully implement the then-

8    outstanding suicide prevention measures, requiring completion by the end of Mr. Hayes' fourth

9    re-audit.  Jan. 7, 2020 Order, ECF No. 6441.  In September 2020, the court set a second deadline,

10   requiring defendants to complete outstanding work before the start of Mr. Hayes' fifth re-audit.

11   ECF No. 6846 at 21-22.  In February 2023, the court set a third deadline.  ECF No. 7743.  In that

12   order, the court signaled that ongoing violations of its orders to fully implement these measures

13   would be enforceable through civil contempt proceedings and payment of coercive fines.  *Id*. at 4-

14   5.  Defendants have not met any of the court's deadlines.  *See id*.; *see also* ECF Nos. 8414, 8433

15   (ruling on defendants' objections to Special Master's Expert's Sixth Re-Audit Report).

16        The threat of contempt proceedings and the court's order to show cause why a receiver

17   should not be appointed have not spurred defendants to full compliance.  Prior to Mr. Hayes'

18   current re-audit, defendants were still out of compliance with thirteen suicide prevention

19   measures.  *See* RT 9/30/24, ECF No. 8433; Nov. 27, 2024 Order, ECF No. 8478; June 24, 2025

20   Order at 13, ECF No. 8682.  The court understands the pending re-audit report will show

21   defendants still remain out of full compliance. [4]  This track record with respect to a critical aspect

22   of the *Coleman* remedy bolsters the court's conclusion that it has "no option but to entertain a

23   receivership."  ECF No. 8330 at 10.  While the court could initiate the contempt proceedings that

---

[4]  Relatedly, on January 6, 2023, the court ordered defendants to implement sixteen
recommendations for the development of corrective action plans in the CDCR PIPs on a
schedule to be proposed by the parties jointly.  ECF No. 7696 at 2; Mar. 7, 2023 Order,
ECF No. 7754.  The court is currently awaiting a further report from the Special Master and
Mr. Hayes on the status of these corrective action plans, *see* Jul. 1, 2025 Minute Order, ECF
No. 8692, and anticipates referring this report to the Receiver.

1   are now ripe, that approach to enforcement has in the past led to an escalation in litigation and

2   inevitable appeals, in the vicious adversarial cycle that has plagued this case to date.

3   Appointment of a receiver promises to be a more efficient and effective mechanism for finally

4   achieving compliance with respect to the suicide component of the remedy as well.

5               **D. Other Aspects of Remedy As Yet Unfulfilled**

6          In addition to the three critical areas discussed above, the court has issued several orders

7   related to data and quality, as the July 12, 2024 order to show cause also noted.  These issues bear

8   on the court's decision to appoint a receiver in this action, too.  In the order to show cause, the

9   court noted that "finalization of defendants' quality assurance process and the Continuous Quality

10  Improvement Tool (CQIT), and completion of data remediation required by defendants' knowing

11  presentation of misleading evidence to the court and the Special Master, *see generally*, *Coleman*

12  *v. Newsom*, 424 F. Supp. 3d 925, *supra*, are unduly delayed without reasonable justification."

13  ECF No. 8330.  As the court has explained in several orders,

14                  CQIT . . . is the comprehensive tool defendants will ultimately use
15                  when they assume the monitoring responsibilities the Special Master
16                  has borne to date. *See generally*, July 1, 2021 Order, ECF No. 7216;
17                  *see also* January 4, 2023 Order, ECF No. 7695, at 2. "The 'key
18                  indicators' in CQIT 'signify the material provisions of the Program
19                  Guide and the Compendium that must be durably implemented' in
20                  order to satisfy the Eighth 17 Amendment." ECF No. 7216 at 4
21                  (additional citations omitted).

22  May 24, 2023 Order at 3, ECF No. 7847.  Full data remediation is critical to finalization and

23  implementation of CQIT and, more broadly, defendants' quality assurance process.  *See*

24  *generally*, *e.g.*, ECF No. 7847.  While the court now, just earlier this month, has been able to find

25  the provisionally approved key indicators for CQIT have been remediated, Aug. 4, 2025 Order,

26  ECF No. 8724, much work remains to finalize the CQIT tool and, more broadly, the required

27  quality assurance and quality improvement processes essential to full remediation.  As the court

28  previously has explained,

29                  [a]n adequate quality management system is a required part of the
30                  remedy in this action. *See id.* at 2 (citing *Coleman v. Wilson*, 912 F.
31                  Supp. 1282, 1308 14 (E. D. Cal. 1995)). "Quality assurance and
32                  quality improvement are components of an adequate quality

1    management system: quality assurance focuses on quantification of
2    system performance, while quality improvement focuses on the
3    quality of that same system's performance." ECF No. 6996 at 2
4    (citing ECF No. 4205 at 74-75); *see also* May 24, 2023 Order, ECF
5    No. 7847, at 2 (quoting August 30, 2012 Order, ECF No. 4232, at 5,
6    for proposition improved quality improvement process will enable
7    defendants to "address issues with the quality of care that is
8    delivered").

9    Nov. 16, 2023 Order at 2, ECF No. 8069.  Completion of this remedial work is essential for

10   defendants to "'achieve and maintain compliance' with constitutional requirements [and]

11   'transition . . . into self-monitoring and . . . *eventual removal of federal court oversight*.'"  ECF

12   No. 7847 at 5 (emphasis in original) (quoting Aug. 30, 2012 Order at 4-5, ECF No. 4232) (other

13   citations omitted).

14        The protracted delays in finalizing the key indicators to get to this stage of the essential

15   quality assurance assessment also support appointment of a receiver, to bring a laser focus to

16   ensuring this aspect of the remedy moves forward now expeditiously.

17   **II.    PROCEDURAL HISTORY**

18        This order is the culmination of more than a year during which the court has followed a

19   careful, deliberative and transparent process.  At each step of the way, the parties have had

20   extensive opportunities to be heard.  As noted, on July 12, 2024, the court first issued the order

21   and order to show cause requiring the parties to show cause in writing "why the court should not

22   initiate formal proceedings to appoint a receiver to assume responsibility, with this court's

23   oversight, for completion of all tasks necessary to implementation of the remedy in this action."

24   ECF No. 8330 at 15.  The court set the order to show cause on for hearing on August 20, 2024.

25   *Id*.  On August 2, 2024, the parties filed a response to the order to show cause, jointly proposing

26   appointment of the Receiver in *Plata v. Newsom*, Case No. 01-1351 JST (N.D. Cal.) as the

27   temporary Receiver in this action.  ECF No. 8347.  The court held show cause hearings on

28   August 20, 2024 and August 21, 2024.  ECF Nos. 8360, 8364.  At the latter hearing, the court

29   discussed with the parties its intention to "appoint an outside technical advisor to advise and help

30   the court with specific questions arising from the parties' joint proposal" to appoint the *Plata*

31   Receiver as temporary receiver in this action.  Aug. 22, 2024 Order at 1, ECF No. 8368.  The

1   court identified its candidate to serve as technical advisor and gave the parties an opportunity to

2   file objections to the appointment.  *Id.*  Neither party filed objections, and on August 27, 2024,

3   the court appointed Eric Douglas of Leading Resources, Inc. as an outside technical advisor.

4   Aug. 27, 2024 Order, ECF No. 8377.

5           In September 2024, the *Plata* Receiver withdrew his name from consideration as

6   temporary receiver in this action.  Sept. 24, 2024 Order at 1, ECF No. 8406.  The court informed

7   the parties it would "continue to move forward with identifying and hiring a receiver for this

8   action . . . ," *id.*, and, to that end, held a further status conference on September 30, 2024, *id.* at 2;

9   *see also* Sept. 30, 2024 ECF No. 8414.  As the court authorized, ECF No. 8433 at 8-10, on

10  October 14, 2024, the parties filed a second joint statement concerning appointment of a

11  temporary receiver.  ECF No. 8430.  The parties reported they had identified two possible

12  candidates and would provide a further update to the court by October 25, 2024.  *Id.* at 1-2.  On

13  October 25, 2024, the parties filed a joint statement nominating a second candidate while

14  agreeing to keep the individual's identity confidential.  ECF No. 8442.  The court reviewed the

15  resume of the proposed candidate, ECF No. 8443, sought input from its technical advisor, ECF

16  No. 8444, and met with the proposed candidate, subsequently identified as Martin Hoshino, Nov.

17  15, 2024 Minute Order, ECF No. 8463.  Mr. Hoshino advised the court he was unavailable to

18  serve as temporary receiver but offered his assistance to the court in finding another candidate.

19  *Id.*  The court authorized Mr. Hoshino to confer with counsel for plaintiffs and defendants "in an

20  effort to identify additional candidates and if possible a new candidate or candidates the parties

21  agree upon."  *Id.*; *see also* Nov. 22, 2024 Minute Order, ECF No. 8471.

22          On December 5, 2024, the court held a further status conference with the parties, ECF No.

23  8482, and thereafter scheduled an *in camera* meeting with proposed candidate Michael Wilkening

24  "subject to the presentation of a plan for a Receivership prior to appointment."  Dec. 6, 2024

25  Minute Order, ECF No. 8483.  On December 23, 2024, the court informed the parties Mr.

26  Wilkening was "not prepared to be considered as a candidate for Receiver in this action."  Dec.

27  23, 2024 Minute Order, ECF No. 8501.  The court further informed the parties it was "consulting

28  with its technical advisor and will further advise the parties soon on the next steps it will take to

1    move forward with appointment of a Receiver." *Id*.  On January 15, 2025, the court notified the

2    parties "it is having its technical advisor make initial, confidential inquires to a short list of

3    possible" receiver candidates.  Jan. 15, 2025 Courtesy Notification, ECF No. 8515.

4         On February 25, 2025, the court held an *in camera* hearing with the parties on the status of

5    appointment of a receiver, ECF No. 8551, and on March 18, 2025, the court held a further *in*

6    *camera* hearing with the parties followed by a public hearing at which it identified a new

7    candidate it had identified as the proposed receiver, Colette S. Peters.  ECF No. 8572.  At the *in*

8    *camera* portion of the latter hearing, as the court confirmed in a subsequent order, "the parties

9    agreed Ms. Peters is qualified and did not identify any other reason counseling against her

10   appointment, while the defendants preserved their objection to appointment of a receiver in the

11   first instance."  Mar. 19, 2025 Order and Order to Show Cause at 2, ECF No. 8574.  Thereafter,

12   the court "confirmed its intent to move forward toward appointment of a receiver by providing for

13   a next phase during which Ms. Peters will serve as Receiver-nominee and work collaboratively

14   with the parties, while also coordinating with the Special Master, to develop a detailed

15   Receivership Action Plan" to be presented to the court within a four month period.  *Id*.  The court

16   set out the proposed powers and duties of the Receiver-nominee and directed the parties to

17   respond with a joint statement.  *Id*. at 3-8.

18        The parties filed the required joint statement on March 28, 2025.  ECF No. 8583.  On

19   April 2, 2025, after considering the joint statement, the court issued an order appointing Colette S.

20   Peters as Receiver-nominee with the powers and duties set out in that order.  Apr. 2, 2025 Order

21   and Order Appointing Receiver-Nominee, ECF No. 8589.  The court directed the Receiver-

22   nominee to develop and present to the court a "detailed Receivership Action Plan" (hereafter

23   Plan) within four months, *id*. at 2, as a prerequisite to the court's consideration of her appointment

24   as Receiver in this action.  The court also authorized the Receiver-nominee to appoint two Deputy

25   Receiver-nominees, William W. Lothrop and Kathleen T. Toomey, and Mr. Hoshino as a Senior

26   Advisor.  ECF No. 8589 at 3; May 1, 2025 Order, ECF No. 8625.  The Receiver-nominee timely

27   submitted the proposed Plan.  *See* Aug. 4, 2025 Order, ECF No. 8721; *see also* Plan, ECF No.

28   8722.  As directed by the court, ECF No. 8721 at 1, the parties have filed responses to the Plan

1   and supplemental briefs on their current positions regarding appointment of a Receiver.  ECF

2   Nos. 8735, 8737 (plaintiffs' response and supplemental response), 8736, 8739 (defendants'

3   responses).  The court held a special status conference on August 22, 2025 to clarify certain

4   matters and hear from the parties concerning their respective positions.  Aug. 19, 2025 Minute

5   Order, ECF No. 8744; *see also* ECF No. 8748 (Minutes).

6   ## III.  LEGAL STANDARDS

7       The court set out the relevant legal standards in the July 12, 2024 order and order to Show

8   Cause, and confirms those here:

> "[I]f [the] (sic) government fails to fulfill [its] obligation to [provide
> adequate mental health care], the courts have the responsibility to
> remedy the resulting Eighth Amendment violation. . . .  Courts faced
> with the sensitive task of remedying unconstitutional prison
> conditions must consider a range of available options. . . ."  *Brown v.
> Plata*, 563 U.S. 493, 511 (2011).  As this court explained in its June
> 25, 2024 order:
>
> > State officials have "primary responsibility for curing"
> > constitutional violations in the scope of their jurisdiction.
> > *Hutto v. Finney*, 437 U.S. 678, 687 n.9 (1978) (citing
> > *Milliken v. Bradley*, 433 U.S. 267, 281 (1977)), *abrogated
> > on other grounds by Dep't of Agric. Rural Dev. Rural Hous.
> > Serv. v. Kirtz*, 601 U.S. 42 (2024).  Where those officials
> > "fail in their affirmative obligations . . . judicial authority
> > may be invoked."  *Id.* (quoting *Swann v. Charlotte-
> > Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15 (1971)).  Where a
> > court has issued orders to remedy identified constitutional
> > violations and those orders remain disobeyed, the court has
> > "ample authority to go beyond earlier orders" and enter an
> > order necessary to "bring an ongoing violation to an
> > immediate halt."  *Id.* at 687 & n.9.
>
> > ECF No. 8291 at 29.  Indeed, the court is required to take further
> > action where unconstitutional conditions remain.  *Brown*, 563 U.S.
> > at 511.  Several equitable tools are available to a court to obtain
> > obedience to its orders and bring continuing constitutional violations
> > "to an immediate halt."  *Hutto*, 437 U.S. at 687 & n.9.  These tools
> > include contempt proceedings, *see, e.g.*, *Shillitani v. United States*,
> > 384 U.S. 364, 370 (1966), appointment of a special master or
> > appointment of a receiver, *see, e.g.*, *Brown v. Plata*, 563 U.S. 493,
> > 511 (2011).  Each of these is a distinct remedy to which different
> > standards apply.  *Cf., e.g.*, *Morgan v. McDonough*, 540 F.2d 527, 533
> > (1st Cir. 1976) (affirming appointment of receiver where "more usual

1            remedies contempt proceedings and further injunctions were plainly
2            not very promising, as they invited further confrontation and delay").

3   ECF No. 8330 at 8-9.

4       "[R]eceiverships are recognized equitable tools available to the courts to remedy

5   otherwise uncorrectable violations of the Constitution or laws." *Plata v. Schwarzenegger*, 603

6   F.3d 1088, 1093-94 (9th Cir. 2010) (collecting cases). In assessing whether to ultimately appoint

7   a receiver in this action, the court has applied the "multi-pronged test" set out by the trial court in

8   *Plata v. Schwarzenegger*, 2005 WL 2932253, slip op. at *23 (N.D. Cal. 2005). The test has seven

9   elements, the first two of which are given predominant weight, as follows:

10            (1) Whether there is a grave and immediate threat or actuality of harm
11            to plaintiffs;

12            (2) Whether the use of less extreme measures of remediation have
13            been exhausted or prove futile;

14            (3) Whether continued insistence that compliance with the Court's
15            orders would lead only to confrontation and delay;

16            (4) Whether there is a lack of leadership to turn the tide within a
17            reasonable period of time;

18            (5) Whether there is bad faith;

19            (6) Whether resources are being wasted; and

20            (7) Whether a receiver is likely to provide a relatively quick and
21            efficient remedy.

22   *Id.* (quoted in ECF No. 8330 at 11).

23   **IV.**    **DISCUSSION**

24       **A.**      **Defendants' Remaining Opposition**

25       As noted, on August 4, 2025, the court ordered the parties to file a short statement "of

26   whether their positions on appointment of a Receiver have changed since briefing on that

27   question was completed and, if so, how their positions have changed." ECF No. 8721 at 1. In

28   their response, defendants represent they "continue to maintain that they do not believe the legal

29   standards governing the appointment of a receiver have been and can be met"; they also state,

30   however, they are encouraged by "several parts of the Receiver-Nominee's Receiver's Action

1   Plan" but "[w]ithout further direction from the Court on the scope and authority of a receiver, the

2   reporting structure, the legal status of the Special Master if a receiver is appointed, and the status

3   of contempt fines if a receiver is appointed [their] position remains unchanged." ECF No. 8736

4   at 1, 2.

5         The court has carefully considered the parties' positions and in particular the four issues

6   raised by defendants, which it reviewed with the parties at the special status on August 22, 2025.

7   *See* RT 8/22/2025 at 24-42, ECF No. 8751. For the reasons explained below, the court finds the

8   legal standards for appointment of a receiver are met. Concurrently with this order, the court

9   issues a separate order on the Receiver's authority. To the extent defendants have specific issues

10  about the reporting structure within the receivership, they recognize that flexibility will be

11  required as the Plan is actualized, *see* ECF No. 8739 at 5; the court directs them to address any

12  concerns to the Receiver in the first instance, once her appointment is effective September 1. As

13  discussed with the parties at the August 22, 2025 status conference, the court is directing

14  preparation of a focused plan to clarify the role of the Special Mastership going forward; the

15  court's directive in this respect is included in the court's concurrent order approving the

16  Receiver's Action Plan. Below, the court makes certain orders clarifying the status of contempt

17  fines and prospective contempt proceedings.

18        **B.    Factors Informing Appointment of Receiver**

19        Each of the relevant factors supports the court's appointment of the Receiver.

20              **1.    Grave and Immediate Threat or Actuality of Harm to Plaintiffs**

21        This court already has found the record "replete with evidence of both threatened and

22  actual harm to members of the plaintiff class as a result of the defendants' ongoing non-

23  compliance with" key remedial measures. ECF No. 8330 at 12. As discussed in Section I above,

24  necessary remedial work remains unfinished and the harm to the plaintiff class, both threatened

25  and actual, continues.

26  /////

15

1    2.    **Exhaustion/Futility of Other Tools Used by the Court to Obtain**
2          **Remediation**

3    The court also previously has surveyed its remedial efforts to date:

4    The court's appointment of a Special Master thirty years ago
5    deployed one of the available tools. The Special Master's role has
6    been to supervise development and implementation of plans required
7    to remedy the extensive constitutional violations identified at the trial
8    of this matter and in the court's September 13, 1995 order, *Coleman*
9    *v. Wilson*, 912 F.Supp. 1282 (E.D. Cal. 1995). *See* Dec. 11, 1995
10   Orders, ECF Nos. 639, 640. The first Special Master was J. Michael
11   Keating, Jr.; his successor, Matthew A. Lopes, Jr., was appointed to
12   the Special Master's team in early 1996 and succeeded Mr. Keating
13   as Special Master in November 2007, *see* Apr. 24, 2024 Order at 8-
14   9. Both successfully supervised defendants in the development of
15   the remedial framework for this action, which consists of primary
16   remedial plans developed by defendants and approved by the court,
17   as well as other additional remedial measures in aid of
18   implementation of defendants' primary remedial plan for the
19   delivery of mental health care, the Program Guide. *See* Sept. 3, 2020
20   Order at 2-6. The Special Master has continued to supervise
21   implementation through now thirty rounds of monitoring.

22   ECF No. 8330 at 8-9 (footnote omitted). The record shows this court's predecessor issued more

23   than one hundred substantive orders approving the remedies developed by defendants, both in aid

24   of and requiring implementation of those remedies. *See Coleman*, 938 F.Supp.2d at 972-73 (over

25   seventeen years court had "issued over one hundred . . . substantive orders to defendants . . .

26   focused on core issues including but not limited to staffing, bed planning, suicide prevention, and

27   access to inpatient care."). Since this court assumed responsibility for supervision of this action

28   in August 2014, *see* Aug. 29, 2014 Order, ECF No. 5213, it has issued over one hundred twenty-

29   five substantive orders related to implementation and enforcement of the remedy.[5] Some of those

30   orders were issued more than five years ago, and they contain details and great specificity about

31   the required remedies and implementation tasks that then remained. *See, e.g.*, Jul. 9, 2019 Order,

32   ECF No. 6214; *see also* ECF No. 6846. These prior orders are incorporated here by reference.

33   /////

---

[5] This number does not include numerous procedural and other orders the court has issued over the past decade in managing this complex action.

1    Notwithstanding the court's substantial effort, as reviewed in Section I above, the work is

2    unfinished, the progress too slow and no end in sight if the current framework remains in place.

3            3.    **Efficacy of Continued Insistence on Compliance with the Court's**
4                 **Orders**

5    Despite the court's issuance of over 250 orders in thirty years, this case remains rife with

6    conflict and delay.  Among those orders was the order in 2023, initiating proceedings to

7    determine whether to hold defendants in contempt to finally remedy chronic mental health care

8    understaffing, one of the most critical and longstanding parts of the ongoing Eighth Amendment

9    violation in this action.  Defendants strenuously resisted a finding of contempt, had a full

10   opportunity to present evidence to demonstrate a contempt finding was not justified, and were not

11   able to identify a mediated resolution using the services of the Ninth Circuit Mediator made

12   available by the court to avoid final findings of contempt after the court previewed its tentative

13   findings.  Defendants then appealed, unsuccessfully, but in appealing delayed implementation of

14   many of the remedial steps required by the court's contempt order for almost a year.

15   Even if there are finally a few signs of progress with respect to staffing, defendants do not

16   appear close to achieving completion of the staffing remedy, let alone durably.  *See* Section IA

17   above; *see also* Attachment B.  And staffing is but one aspect of the remedy long unfulfilled.

18   Particularly if the court must continue to rely on contempt proceedings to obtain compliance with

19   its orders, there is no indication defendants' reflexive practice of appealing the court's orders will

20   cease.

21           4.    **Bad Faith**

22   Whether there is bad faith is a factor to consider in determining whether a receiver is

23   warranted.  At the same time, "[a] finding of bad faith is not required to institute a receivership."

24   *Nunez v. N.Y.C. Dep't of Correction*, No. 11-5845, 2025 WL 1374584, at *13 (S.D.N.Y. May 13,

25   2025) (quoting *United States v. Hinds County*, No. 16-489, 2023 WL 1186925, at *12 (S.D. Miss.

26   Jan. 30, 2023)), *appeal filed*, No. 25-1723 (July 15, 2025).  "And, as observed by the *Plata* Court,

27   the question of motive is complicated."  *Id*. (alteration omitted) (quoting *Hinds County*, 2023 WL

28   /////

1186925, at *12, in turn quoting *Plata v. Schwarzenegger*, No. 01-1351, 2005 WL 2932253, at

*29 (N.D. Cal. Oct. 3, 2005)).

The record in this action over the past twelve years supports a finding of bad faith by at

least some defendants and some counsel at various junctures. As the court set out in the July

2024 order to show cause,

> Over the past dozen years defendants or their counsel have
> (1) violated ethical rules meant to constrain counsel, *see Coleman v.
> Brown*, 938 F. Supp. 2d 955, 962-69 (E.D. Cal. 2013) and, more
> recently, (2) knowingly presented misleading information to the
> court and the Special Master, *see generally Coleman v. Newsom*, 424
> F. Supp. 3d 925. This deeply disappointing conduct itself has caused
> unnecessary delays. Most recently, the court has had to signal it will
> impose monetary sanctions on defense counsel if the "recurring
> pattern of defendants' disregard for this court's orders, which
> appears to be either willful or a significant derogation of duty on the
> part of counsel" continues. May 16, 2024 Order at 6, ECF No. 8239.
> *See also* ECF No. 8212 at 5-7 (noting "at least one serious
> inconsistency" between position taken by defendants on paper versus
> position on same issue taken in open court and observing that
> "defendants' strategy for ending [judicial] oversight appears focused
> primarily on litigation rather than expedited compliance with . . .
> longstanding remedies in this action," which "inevitably delay[s]
> progress toward the end of judicial oversight"; ECF No. 8069, *supra*;
> Apr. 13, 2023 Order at 7, ECF No. 7808 (noting defendants' false
> contention that Special Master failed to identify source of data relied
> on and defendants' failure to acknowledge Special Master's
> response to their objection); Apr. 12, 2023 Order at 10, ECF No.
> 7807 (defendants cannot ignore existing court orders and must,
> instead, seek relief if warranted); Feb. 20, 2019 Order at 4-7, ECF
> No. 6096 (reminding defense counsel of ethical obligations under
> Rule 11 given their "selective quoting" of hearing transcript,
> disregard of prior court orders, and "treatment of potentially
> privileged information during . . . . independent investigation"; Nov.
> 16, 2017 Order, at 7, 9-10, ECF No. 5726 (discussing defendants'
> disregard for law of the case and prior relevant court orders).

ECF No. 8330 at 13-14. Even the foregoing findings by the court did not bring an end to

defendants' non-compliance with its orders. *See, e.g.,* May 15, 2025 Minute Order, ECF No.

8638 (ordering defendants to show cause why the court should not impose monetary sanctions for

non-compliance with April 22, 2025 order); Jun. 6, 2025 Order at 3, ECF No. 8668 (discharging

order to show cause "with a cautionary reminder that the court expects all its orders to be

1  complied with promptly, absent a stay"); Jun. 24, 2025 Order at 9, ECF No. 8682 (again

2  cautioning defendants court expects full compliance with its orders).

3       While the court finds this factor satisfied, it also notes that even if it were not, a receiver

4  would be warranted given that the court need not "make a finding as to whether Defendants have

5  acted in bad faith." *Nunez*, 2025 WL 1374584, at *13.

6                   5.    **Absence of Leadership**

7       In the Plan, the Receiver-nominee identifies multiple failures of leadership as a root cause

8  of defendants' failure to achieve compliance. *See* ECF No. 8722 at, *e.g.*, 3, 8-9. These include a

9  "complex leadership structure" that does not clearly identify "who is ultimately responsible for

10  delivery of constitutionally adequate mental health services"; "poor communication and lack of

11  information" about what is required by the established remedies in this action; and "no

12  uniform . . . mechanism for sharing best practices and lessons learned across institutions." *Id*.

13  at 9.

14       The Plan cogently describes the leadership required to turn the tide and includes steps for

15  the Receiver to take immediately to bring that leadership to bear. Ms. Peters' resume, attached as

16  Attachment C, shows the depth and breadth of her experience in correctional settings. The parties

17  acknowledge her qualifications, ECF No. 8574 at 2, and the court is persuaded she has the

18  credentials and the vision to fill the leadership void promptly. Ms. Peters proposes to appoint Mr.

19  Lothrop and Ms. Toomey as Deputy Receivers and Mr. Hoshino as Senior Advisor, and the court

20  hereby approves her proposal, given the work Ms. Peters and this team have performed to date,

21  demonstrating their qualifications, commitment to clear communication and collaboration, work

22  ethic, solid understanding of the task at hand and proven leadership capabilities. The resumes of

23  Mr. Lothrop, Ms. Toomey and Mr. Hoshino also are attached to this order. *See* Attachments D-F.

24       Fundamentally, Ms. Receiver's Action Plan not only describes how and why an absence

25  of leadership supports the appointment of a receiver, but also offers the best chance to fill the

26  leadership vacuum strategically and constructively assuming the defendants – and all parties –

27  give the Receiver and the Plan a chance. *See* ECF No. 8722 at 16.

19

1

6.     **Waste of Resources**

2      It cannot reasonably be disputed that the amount of money being spent on the contentious

3 litigation that has plagued remediation in this action for more than a decade is a significant waste

4 of public resources, given that the litigation has not effected any material change in the court-

5 ordered remedy but rather only served to delay implementation and the end of federal court

6 oversight.  In fiscal year 2022/2023, publicly available documents indicated defendants paid more

7 than $2.5 million dollars for their lawyers alone.  *See* Cal. Dep't of Corrections & Rehab., Class

8 Action Capital Outlay Annual Legis. Rep. at 10 (FY 22/23).[6]  This amount, spent three years ago

9 now, is more than the combined annual compensation Ms. Peters seeks for herself and two

10 Deputy Receivers today.  *See* Receiver's Action Plan, Appendix D, ECF No. 8722-4

11 ($812,784.00 for Receiver; $700,552.00 for Deputy Receiver Lothrop, $687,883.00 for Deputy

12 Receiver Toomey); *see also* Order Re Compensation of Receiver and Deputy Receivers

13 (equalizing compensation for Deputy Receivers at $700,552.00 each) (filed concurrently).

14      This factor, like all the rest reviewed above, supports appointment of the Receiver.

15
16

7.     **Whether a Receiver is Likely to Provide a Relatively Quick and
       Efficient Remedy**

17      The Receiver-nominee estimates it will take five to seven years to bring this action to a

18 conclusion, and notes this assumes the Receiver can move forward immediately to implement the

19 Plan.  ECF No. 8722 at 15.  The Receiver-nominee notes continuing litigation would prolong that

20 timeline.  *Id*. at 8.  Assuming no further litigation, with adequate resources and cooperation of the

21 parties, the court is persuaded the Plan contains an "aggressive, flexible, and realistic" timeline

22 that will ensure as timely completion of the remedy in this action as reasonably possible.  In

23 reaching this conclusion the court notes the five to seven years must be evaluated against the

24 backdrop of the long-running remedial phase of this case, which has taken thirty years so far, with

25 some progress as noted above but no durable end otherwise in sight.

26 /////

---

[6] https://www.cdcr.ca.gov/wp-content/uploads/2024/02/FY-22-23_Class-Action-Budgetary-Report_SB154_01-31-24_FINAL.pdf at 5 (last visited Aug. 26, 2025).

1    This factor, in light of the details of the Plan the court approves concurrently, weighs in

2    favor of appointment of a Receiver to implement the Plan.

3            8.    **Conclusion**

4    Taken together, all of the relevant factors, weighed in light of the totality of the record

5    before the court, favor appointment of a Receiver.  Plaintiffs continue to suffer actual and

6    threatened harm while necessary and durable remediation of ongoing Eighth Amendment

7    violations elude defendants.  The Receiver's Action Plan's clear-eyed assessment of the current

8    leadership vacuum describes persuasively defendants' inability, on their own, to complete the full

9    and durable remediation required in this action.  Ms. Peters as Receiver is the best person to carry

10    out the Action Plan now.  The court finds the remaining option available to it—practically

11    speaking the only remaining viable option—is to appoint a receiver to ensure defendants meet all

12    of their constitutional obligations to the plaintiff class in a reasonable time.

13          **C.**    **Prison Litigation Reform Act Requirements**

14    To order prospective relief, the court must find "that such relief is narrowly drawn,

15    extends no further than necessary to correct the violation of the Federal right, and is the least

16    intrusive means necessary to correct the violation of the Federal Right."  18 U.S.C. § 3626(a)(1).

17    This test requires that prospective relief "must be proportional to the scope of the violation,

18    and . . . must extend no further than necessary to remedy the violation."  *Brown v. Plata*, 563 U.S.

19    493, 531 (2011).  Appointment of a receiver in this action also meets these requirements.  The

20    scope of the constitutional violation is substantial:  defendants' ongoing failure to fully implement

21    the remedies for more than thirty years harms, actually and in addition potentially, all of the

22    nearly 35,000 seriously mentally ill individuals in California's prisons.  As set out in this order,

23    the court has issued hundreds of orders, appointed the Special Master and a team of experts to

24    provide guidance and monitoring, and overseen contempt proceedings, among many, many other

25    efforts to manage this case to conclusion.  All the court's less intrusive measures have not

26    effected the requisite constitutional compliance in a timely way.  The record fully supports the

27    court's conclusion that a receivership is the only remedial tool left to the court, practically

28    speaking.

## V.  STATUS OF FURTHER PROCEEDINGS

### A.  Contempt

As discussed with the parties at the August 22, 2025 status conference, effective immediately the court on its own motion stays further use of the contempt remedy.  The stay will remain in effect so long as defendants cooperate fully and in good faith with the Receiver, and ensure she is provided with adequate resources to implement the Plan, as approved in a separate order.  Should defendants take an appeal from this order, this stay will be lifted immediately upon the filing of a notice of appeal and the court will initiate the contempt proceedings it has previously identified and others as appropriate to ensure there is no delay in the court's efforts to enforce the remedy in this case.

### B.  Fines

Defendants seek clarification of the status of contempt fines if a receiver is appointed. ECF No. 8739.  The court first provides a brief summary of the current state of those fines.  In its order affirming this court's June 25, 2024 contempt findings and the base amount of civil sanctions this court imposed as fines, the United States Court of Appeals remanded the matter for further factfinding and analysis on the court's decision to "increase the fines to double the amount of the State's monthly salary 'savings'. . . ."  *Coleman v. Newsom*, 131 F.3d at 965.  On April 17, 2025, the court deferred consideration of this issue presented by the remand and, instead, held that under the monthly savings calculations for the base sanctions amount before doubling:

- $95,691,570.50 in fines had accrued through March 28, 2025;
- Defendants had deposited a total of $155,177,434.00 in accumulated fines into the Special Deposit Fund for such fines as of April 10, 2025;
- The difference between total deposits to the fund and the amount of funds then available to fund the Staffing Spending Plan equaled $59,485,863.50 and that amount would not be "available to fund the Staffing Spending Plan unless and until the court issues a clarifying order on remand to support the doubling";
- Fines would continue to accumulate at the non-doubled rate until further order of the court; and

- The excess amount of $59,485,863.00 would remain in the fund and be credited toward newly accumulated fines.

Apr. 17, 2025 Order at 2-5.  As of defendants' last monthly mental health staffing vacancy report, a total of $114,696,759 has accumulated in non-doubled fines, ECF No. 8715 at 28, leaving $40,480,675.00 in excess fines to be credited against newly accumulating fines,[7] even while expenditures are now being made from the Special Deposit Fund.  On August 11, 2025, defendants reported expenditures from the Special Deposit Fund to date of $19,807,762.00, most of which was spent on the temporary bonuses, and a total balance in the fund of $135,369,672.00.  ECF No. 8729 at 5-6.  Defendants also represented that expenditures made in July 2025 from the state's general fund would "be reimbursed from the Special Deposit Fund and reflected in future reports."  *Id*. at 4.  The amount of those expenditures is not included in the August 11, 2025 report.  Monthly fines averaged approximately $3,578,000.00 for the months of March, April, and May 2025, and declined to $2,391,448.00 in June 2025.  *See* ECF Nos. 8621 at 24, 8656 at 24, 8690 at 27, 8715 at 28.  At the current rate, without further order of court and assuming some fines continue to accrue, defendants would be likely to continue to credit fines in lieu of deposits for some period of time, unless and until expenditures deplete the Special Deposit Fund.

Moreover, the court has not yet held contempt proceedings or ordered payment of fines accumulating for understaffing in the PIPs, *see* ECF No. 8301, or for non-compliance with its orders requiring implementation of outstanding suicide prevention measures, *see* ECF No. 7743.

The court also on its own motion stays further accumulation of fines effective September 1, 2025.  As of September 1, 2025, authority to direct expenditure of the remaining fines is transferred to the Receiver, with the Receiver's full authority conferred by an order issued concurrently with this order.  The stay and transfer of authority will remain in effect so long as defendants cooperate fully and in good faith with the Receiver, and ensure she is provided with adequate resources to implement her Action Plan, as approved in a separate order.  Should defendants take an appeal from this order, this stay will be lifted immediately upon the filing of a notice of appeal, fines will restart, and initiate the contempt proceedings it has previously

---

[7] $155,177,434.00 - $114,696,759.00 = $40,480,675.00.

1   identified and others as appropriate to ensure there is no delay in the court's efforts to enforce the

2   remedy in this case.

3         Should defendants choose to appeal this order, the suspension of fines and transfer of

4   authority to the Receiver for expenditure of those fines will be suspended immediately upon the

5   filing of a notice of appeal and the court's prior orders governing fines and administration of

6   expenditures from the Fund to implement the Staffing Expenditure Plan will go back into effect.

7       **C. Deactivation of Inpatient Beds**

8         The court's appointment of a receiver will be effective September 1, 2025.  On that date,

9   the Receiver will assume responsibility, among other matters, for all matters related to operation

10  of inpatient beds in the CDCR PIPs.  All questions presented by defendants' proposed

11  deactivation of certain inpatient bed licenses are referred to the Receiver effective September 1,

12  2025.  Plaintiffs' July 28, 2025 request is therefore moot.

13  **VI.  CONCLUSION**

14        Good cause appearing, IT IS HEREBY ORDERED that:

15      1.    Colette S. Peters is appointed as Receiver in this action, effective
16           September 1, 2025;

17      2.    Receiver Peters is authorized to appoint in this action William W. Lothrop
18           and Kathleen T. Toomey as Deputy Receivers and Martin Hoshino as
19           Senior Advisor, also effective September 1, 2025;

20      3.    All further use of the contempt remedy is stayed until further order of the
21           court;

22      4.    As of September 1, 2025, authority to direct expenditure of the amounts in
23           the Special Deposit Fund is transferred to the Receiver;

24      5.    All questions presented by defendants' proposed deactivation of certain
25           inpatient bed licenses are referred to the Receiver effective September 1,
26           2025; and

27      6.    Plaintiffs' July 28, 2025 request is denied as MOOT.

28  DATED:  August 27, 2025.

                                       SENIOR UNITED STATES DISTRICT JUDGE

# Attachment A

| Appeal Number | Court of Appeals Docket Number | Date Docketed | Date of Judgment/ Dismissal | Date of Mandate | Disposition |
|---|---|---|---|---|---|
| 1 | 95-17039 | 10/30/95 | 11/14/96 | 12/06/96 | Dismissed |
| 2 | 97-15667 | 04/18/97 | 05/22/97 | 06/13/97 | Dismissed |
| 3 | 97-16622 | 09/02/97 | 12/17/98 | 12/17/98 | Stipulated dismissal |
| 4 | 97-17014 | 10/23/97 | 12/17/98 | 12/17/98 | Stipulated dismissal |
| 5 | 00-17107 | 11/01/00 | 02/16/01 | 03/12/01 | Dismissed |
| 6 | 06-16077 | 06/15/06 | 07/26/06 | | Voluntary dismissal |
| 7 | 07-16361 | 08/02/07 | 09/11/07 | 10/09/07 | Dismissed |
| 8 | 10-17546 | 11/08/10 | 04/22/11 | 05/16/11 | Affirmed |
| 9 | 13-15931 | 05/07/13 | 05/21/15 | 05/21/15 | Stipulated voluntary dismissal |
| 10 | 13-16637 | 08/14/13 | 01/14/15 | 01/14/15 | Stipulated voluntary dismissal |
| 11 | 14-16691 | 09/04/14 | 01/14/15 | 01/14/15 | Stipulated voluntary dismissal |
| 12 | 17-16080 | 05/24/17 | 11/28/18 | 12/20/18 | Dismissed |
| 13 | 17-17328 | 11/16/17 | 11/28/18 | 02/14/19 | Affirmed |
| 14 | 18-16445 | 08/02/18 | 12/14/19 | 01/15/20 | Dismissed |
| 15 | 19-15006 | 01/02/19 | 01/14/20 | | Voluntary dismissal |
| 16 | 20-16062 | 06/01/20 | 10/09/20 | 10/09/20 | Voluntary dismissal |
| 17 | 20-16734 | 09/09/20 | 01/05/22 | 10/27/22 | Dismissed |
| 18 | 21-15039 | 01/07/21 | 05/17/21 | 05/17/21 | Voluntary dismissal |
| 19 | 21-16884 | 11/05/21 | 10/12/22 | 10/12/22 | Voluntary dismissal |
| 20 | 22-15065 | 01/14/22 | 02/28/22 | 02/28/22 | Voluntary dismissal |
| 21 | 22-15369 | 03/11/22 | 10/12/22 | 10/12/22 | Voluntary dismissal |
| 22 | 22-15570 | 04/19/22 | 08/17/22 | 08/17/22 | Voluntary dismissal |
| 23 | 23-15755 | 05/17/23 | 09/26/24 | 10/18/24 | Vacated and Remanded |
| 24 | 23-2485 | 09/29/23 | 08/30/24 | 09/23/24 | Affirmed |
| 25 | 24-2263 | 04/11/24 | 05/30/25 | 06/23/25 | Dismissed for lack of jurisdiction; Judge Bress would affirm KJM on merits |
| 26 | 24-2938 | 05/08/24 | 05/27/25 | 06/18/25 | Dismissed |
| 27 | 24-3707 | 06/13/24 | 04/15/25 | 06/06/25 | Affirmed |
| 28 | 24-4023 | 07/01/24 | 03/19/25 | 04/10/25 | Affirmed in part, Vacated in part, and Remanded |
| 29 | 25-2920 | 05/06/25 | Opening brief due 8/25/25; motion to consolidate filed | | |

| | | | | | |
|---|---|---|---|---|---|
| | | | 7/23/25; motion to extend time to file opening brief filed 8/15/25 | | |
| 30 | 25-4400 | 07/16/25 | Opening brief due 10/6/25; motion to consolidate filed 7/23/25; amended notice of appeal received 8/13/25 | | |

| Filing Number | Court of Appeals Docket Number | Type of Filing | Date Docketed | Date of Disposition | Disposition |
|---|---|---|---|---|---|
| 1 | 92-70244 | Emergency Mandamus/Request for Stay | 04/22/92 | 04/23/92 | Denied |
| 2 | 96-70640 | Petition for Writ of Mandamus | 08/08/96 | 12/24/96 | Denied |
| 3 | 18-72816 | Petition for Writ of Mandamus | 10/16/18 | 10/18/18 | Withdrawn |
| 4 | 19-71493 | Emergency Petition for Writ of Mandamus | 06/14/19 | 06/19/19 | Denied |

*All appeals and mandamus petitions were filed by defendants unless otherwise noted

**Chart includes all appeals filed by plaintiffs or defendants in this action since its inception. Chart does not include appeals filed from orders by the three-judge court convened by order of

Chief Judge Schroeder on July 23, 2007, ECF No. 2328, nor does it include appeals filed by individuals or entities other than plaintiffs or defendants.

***Motion to consolidate appeals 29 and 30 filed July 23, 2025.

# Attachment B

**CHART 1: FILL RATES FROM MAY 2024-APRIL 2025 (Compliant Levels in Black; Noncompliant Levels in Red)**

|  | Psychiatrists | Psychologists | Social Workers | Medical Assistants | Recreation Therapists |
|---|---|---|---|---|---|
| May 2024 | 87% | 60% | 76% | 64% | 87% |
| June 2024 | 85% | 61% | 77% | 73% | 87% |
| July 2024 | 91% | 63% | 83% | 55% | 95% |
| Aug 2024 | 91% | 62% | 84% | 58% | 98% |
| Sep 2024 | 89% | 63% | 87% | 59% | 99% |
| Oct 2024 | 93% | 64% | 91% | 62% | 101% |
| Nov 2024 | 90% | 64% | 90% | 64% | 99% |
| Dec 2024 | 92% | 66% | 92% | 67% | 98% |
| Jan 2025 | 90% | 64% | 92% | 59% | 96% |
| Feb 2025 | 86% | 64% | 91% | 60% | 96% |
| Mar 2025 | 89% | 66% | 93% | 65% | 97% |
| Apr 2025 | 90% | 66% | 94% | 67% | 98% |

ECF No. 8305 at 5-9; ECF No. 8345 at 5-9; ECF No. 8384 at 5-9; ECF No. 8413 at 5-9; ECF No. 8450 at 5-9; ECF No. 8477 at 5-9; ECF No. 8508 at 5-9; ECF No. 8533 at 5-9; ECF No. 8559 at 5-9; ECF No. 8585 at 7-11; ECF No. 8621 at 6-10; ECF No. 8656 at 6-10.

**CHART 2: FILL RATES MAY 2025-JUNE 2025 (Compliant Levels in Black; Noncompliant Levels in Red**

|  | Psychia-trists | Chief and Senior Psychology Positions | Supervisory Social Worker Positions | Primary Clinicians | Recreation Therapists | Tele-Presenter Positions |
|---|---|---|---|---|---|---|
| May 2025 | 92% | 82% | 95% | 76% | 96% | 70% |
| June 2025 | 88% | 83% | 89% | 77% | 97% | 72% |

ECF No. 8690 at 7-12; ECF No. 8715 at 7-12; Jun. 30, 2025 Stip. & Order, ECF No. 8688.

**CHART 3: CDCR PIP FILL RATES NOVEMBER 2024-JUNE 2025 (Compliant Levels in Black; Noncompliant Levels in Red**

|  | Psychiatrists | Psychologists | Social Workers | Recreation Therapists | Medical Assistants |
|---|---|---|---|---|---|
| Nov 2024 | 72% | 68% | 63% | 82% | --- |
| Dec 2024 | 74% | 59% | 65% | 85% | --- |
| Jan 2025 | 74% | 61% | 68% | 87% | --- |

| | | | | | |
|---|---|---|---|---|---|
| Feb 2025 | **73%** | **57%** | **65%** | **81%** | --- |
| Mar 2025 | **75%** | **58%** | **67%** | **88%** | --- |
| Apr 2025 | **81%** | **60%** | **72%** | **92%** | --- |
| May 2025 | **77%** | **59%** | **69%** | **95%** | --- |
| June 2025 | **81%** | **62%** | **82%** | **101%** | --- |

ECF No. 8508 at 11-15; ECF No. 8533 at 11-15; ECF No. 8559 at 11-15; ECF No. 8585 at 13-17; ECF No. 8621 at 12-16; ECF No. 8656 at 12-16; ECF No. 8690 at 14-18; ECF No 8715 at 13-17.

# Attachment C

# COLETTE S. PETERS

## HIGHLIGHTS OF QUALIFICATIONS _____

- Experienced executive with proven ability to lead change, strengthen organizational performance, and effectively partner to achieve results while addressing highly complex issues.
- Effective at building rapport and trust through transparency, clear communication, and authentic engagement.
- Results-oriented, strategic thinker, skilled at empowering decision-making.
- Accomplished in working across functions, cultures, and diverse groups to build coalitions and achieve a shared purpose while solving complex problems.

## PROFESSIONAL EXPERIENCE _____

**United States Department of Justice, Federal Bureau of Prisons, Washington, DC**                    **2022-2025**
*Director*

*Responsibilities*

- Appointed by the U.S. Attorney General to lead the Federal Bureau of Prisons, one of the largest law enforcement components of the Department of Justice and the nation's largest correctional agency.
- Upheld the constitution while achieving the agency's dual-purposed mission to foster a humane and secure environment and ensure public safety by preparing individuals for successful reentry into our communities.
- Oversaw the complex operations of the Bureau with nearly 40,000 employees and managing to more than an $8 billion budget.
- Responsible for the care and custody of approximately 150,000 adults housed in 122 federal prisons, 178 community-based facilities and on home confinement managing to all of their physical, behavioral health, and programmatic needs.
- Educated and informed Congress of the long-standing challenges at the Bureau in order to garner policy support and additional funding to improve recruitment and retention as well as the agency's long-standing $3 billion maintenance and repair backlog.
- Through our National Gang Unit, Counter Terrorism Unit and Intelligence Office, collaborated with federal and local law enforcement to gather intelligence and ensure safe and secure prisons and communities around the globe.
- Worked closely with our National Union Leadership to ensure appropriate resources were available to our employees.

**Colette S. Peters**                                                                                                    **-2-**

*Accomplishments*

- Improved our recruitment and retention efforts and after decades of stagnant and declining employee base moved overall staffing levels from 85% to 93%

- Established a 5, 10 and 15 year plan to manage the $3 billion maintenance and repair backlog which plagues the FBOP, leaving employees and adults in their care working and living in dilapidated facilities.

- Collaborated with the Office of the Inspector General and the Government Accountability Office to hold people accountable and root out misconduct. Inherited the agency during a time of great turmoil including allegations of inhumane and criminal activity.

- Created a National Chief Inspector that internally mirrors the work of the Office of the Inspector General and uses data to get out in front of culture decline, contraband, and criminal misconduct.

- Launched an effective communication strategy that brought transparency to the agency and built up trust with the Justice Department, Congress, the media, stakeholders, and advocates.

- Implemented significant cultural changes and created better working environments and safer prisons through the principles of normalcy and humanity.

- Improved the use of evidence-based practices to address individual criminal risk factors and to implement programs, policies, and procedures.

- Created a National Chief of Employee Wellness and expanded employee wellness activities and resources to combat the low average life expectancy of 58 years of age and negative physical and behavior health that contribute to that outcome.

**Oregon Department of Corrections, Salem, Oregon**                                                              **2012-2022**
*Director*

*Responsibilities*

- Appointed by the Governor and confirmed by the Senate to lead the state agency responsible for providing custody, rehabilitation, and treatment services. DOC employed 4,700 employees and operated with a $2 billion budget.

- Oversaw the operations and policies of an evidenced-based corrections agency with 12,000 people in 14 state prisons and individuals on supervision in two state-run county community corrections offices.

- Developed effective partnerships with individual state-funded county community corrections agencies that manage the local supervision of more than 32,000 people on probation, parole, and post-prison supervision.

- Advocated for public safety reform, justice reinvestment, and practices that increased and enhanced adult in custody's engagement with family and friends.

- Worked collaboratively with external partners and labor unions to promote public safety by holding people accountable for their actions and to reduce the risk of future crime and victimization.

**Colette S. Peters**                                                                                          -3-

*Accomplishments*

- Implemented significant cultural changes and improved outcomes through the use of research and data to drive decision-making, improve outcomes, increase agency efficiency and effectiveness, and promote employee wellness both in Oregon, nationally, and internationally.

- Improved the use of evidence-based practices to address individual criminal risk factors and to implement programs, policies, and procedures.

- Improved organizational outcomes regarding the operation of safe and secure prisons, accountability, and rehabilitation.

- Ensured those in custody received appropriate interventions based on risk and need so they returned home, became tax-paying citizens, and productive members of their families and communities.

- Enrolled the agency in the Amend Program at the University of California San Francisco, together studied the Norwegian model, and ultimately developed the "Oregon Way." The goal to improve employee health and wellness, and reduce the use of segregation, by transforming prison environments for those who live and work in prison as well as community corrections interactions through the concepts of normalization and humanization.

- Implemented a performance-based management system that created increased transparency and accountability.

- Increased employee awareness of wellness issues impacting those doing corrections work.  Lead national efforts to increase awareness of the detriment of corrections work and push for employee wellness resources.

**Oregon Youth Authority, Salem, Oregon**                                                        2009-2012
*Director*

*Responsibilities*

- Appointed by the Governor and confirmed by the Senate to lead the state agency responsible for providing custody, rehabilitation and treatment services to youth ages 12 through 24 who committed crimes prior to their 18th birthday. At the time OYA employed approximately 1,100 employees and operated with a $312.1 million budget. The agency served approximately 2,000 youth.

- Provided oversight of 11 close custody youth correctional facilities with capacity to serve 900 youth. Oversaw community services provided to approximately 1,100 youth through statewide parole and probation services, youth foster care, residential services, and individualized treatment services tailored to meet the needs of youth committed to OYA.

- Appointed by the Governor to serve as a member of the Juvenile Corrections Forecast Advisory Committee and the Governor's Re-Entry Council.

*Accomplishments*

- Rebuilt the agency's reputation internally and externally with all stakeholders. Inherited the agency during turbulent times during great scrutiny following corruption findings.

- One of the first agencies in the country to implement Positive Youth Development theory.

- Ensured that services provided to youth are fully coordinated and integrated throughout the state's juvenile justice and social service systems.

**Colette S. Peters**                                                                                                      -4-

**Oregon Department of Corrections, Salem, Oregon**                                                    2006-2008
*Assistant Director for the Public Services Division and Inspector General*

### *Responsibilities*

- Shared the department's responsibility for more than 14,000 adults housed statewide in 14 state prisons, as well as 35,000 people on supervision. At the time, the biennial budget was $1.2 billion, DOC had 4,400 employees and hundreds of contractors and volunteers.

- Served as a cabinet-level member of the DOC Policy Group.  Contributed to the long-range strategic planning and operational management of the Department.

- As Inspector General, Supervised the Department's Chief Investigators responsible for the Special Investigations and Security Threat Management units. Provided the agency oversight function with administrative review of Discrimination Complaint Appeals, Use of Force Actions, and Disciplinary Hearings.

    As Legislative Director, supervised the Administrator of Public Affairs and collaboratively advised the Governor's Office, DOC Director and Deputy Director, Policy Group and other public safety stakeholders on potential and actual legislation as well as possible impacts on the Department and its programs.

- Planned, designed, developed, and coordinated agency strategies statewide to educate the legislature, news media, opinion leaders, the general public, and all stakeholders regarding the mission and activities of the Department. This includes overall mission and direction of the agency, daily operations, contract operations, crisis control, and creating and promoting a unified Department image and public policy.

- Collaborated with union leadership, and all stakeholders to provide information and receive feedback around department strategy, budget planning, employee issues, and other related matters.

### *Accomplishments*

- Provided agency-assists, including an investigation of OYA, resulting in corruption findings.

- Successfully lead an outstanding group of managers and employees within six offices of the division. The division provided direction, planning, open communication and accountability to and for DOC's internal and external stakeholders in an efficient manner.

**Oregon Department of Corrections, Salem, Oregon**                                                    2004-2006
*Director of Public Affairs*

### *Responsibilities*

- Approved rules, policies, and procedures, developed the Department's strategic plan, developed performance measures, prepared and helped manage the department's $1.2 billion budget, established objectives and strategies in support of the Department's mission and the Oregon Accountability Model. Worked with DOC institutions and other public safety entities to develop and implement statewide plans of action. Represented the Department in local, state, regional and national forums.

- Advised DOC Director and fellow Policy Group and executive team members on potential and actual legislation and possible impacts on the Department and its programs.  Served as principle liaison with the Legislative Assembly, The Governor's Office and the Department of Justice.

**Colette S. Peters**                                                                                           **-5-**

*Accomplishments*

▪ Successfully worked to bring stakeholders together to resolve complex and often highly charged and complex issues.

**Colorado Legislative Council, Denver, Colorado**                                                    **1998-2003**
*Research Associate*

*Responsibilities*

⬜ Provided nonpartisan research, analysis and recommendations to Colorado legislators with an expertise in criminal justice, public safety, public and state departmental policy, pending legislation, fiscal notes, fiscal and budget items, capital construction requests, and the Colorado Department of Corrections bed needs.

⬜ Staffed the House and Senate Judiciary Committees and the Capital Development Committee.

⬜ Intimately understood and applied state and federal criminal laws in research and decision-making.

Analyzed state departments' annual reports and budget requests including capital construction requests.

⬜ Researched and subsequently wrote publications, such as *An Overview of Community-Based Corrections in Colorado,* and conducted studies. One study focused on criminal restitution in Colorado and involved working closely with a task force made up of experts in the field.

**Victim Assistance Unit (VAU), Denver Police Department, Colorado**                       **1995-1998**
*Victim Advocate and Crisis Mediator*

*Responsibilities*

⬜ Provided crisis intervention and victim advocacy on crime and disaster scenes aiding victims, both crime and non-crime related. Coordinated on-scene with various law enforcement agencies including local police, sheriff, and fire departments, the Bureau of Alcohol Tobacco and Firearms, and the FBI.

⬜ Managed 10 VAU employees who responded on crime scenes after-hours.

⬜ Worked within the felony arraignment courtroom to assist in upholding the domestic violence statutes and the Crime Victim Rights Act by representing victims and the Police Department, interpreting, and applying statutes, making bond recommendations to the presiding judge, and ensuring the issuance of statutorily mandated restraining orders.

*Accomplishments*

⬜ Developed a new branch of the VAU within the Denver Fire Department, Fire Investigation Bureau to serve arson victims' crisis needs more effectively and efficiently. Secured funding, established operating procedures, trained VAU team members and fire department personnel, and coordinated operations and administration.

⬜ Trained police department cadets on victim-related issues. Developed a VAU training program including curriculum, classroom instruction, on-scene drills, and external department rotations.

⬜ Developed and conducted extensive assessment of the VAU to evaluate the effectiveness of the unit.

**Breck Preparatory School, Minneapolis, Minnesota**                                  1994-1995
*Assistant to the Director of the Lower School*

*Accomplishments*

- Improved curriculum organization, worked with behavioral issues, planned activities, and collaborated with the academics to efficiently manage the preparatory school.

**Freeport West, Inc.; Legacy Shelter for Boys, Minneapolis, Minnesota**                    1994
*Youth Counselor*

*Responsibilities*

- Counseled youth with criminal behavior histories and monitored their living environment. Collaborated with the youth, their probation officers, psychologists, psychiatrists, and families to enhance their future.

**St. John's University, Collegeville, Minnesota  1993-1994**
*Assistant Coordinator, Learning Enhancement Service*

*Responsibilities*

- Coordinated details for various activities and events and managed the $500,000 budget for the learning enhancement at the College of St. Benedict and St. John's University. Ensuring ongoing professional development of all academics.

**Mount Carmel High School, Belize, Central America**                                        1993
*Teacher*

*Responsibilities*

- Taught English and reading in a small village on the border of Guatemala to 50 environmentally challenged High School students.

**Youth Homes of Mid-America, Johnston, Iowa**                                               1992
*Youth Counselor Responsibilities*

- Collaborated with psychiatrists, psychologists, probation officers, and caseworkers. Worked direct care, case management, and supervised youth.

## PROFESSIONAL AFFILIATIONS _____

**American Correctional Association (ACA)**
Member, 2012 – Present
- Chair, Staff Wellness Committee, 2015 - Present
- Co-Chair, Professional Development Committee, 2019 - Present

**Association of Women Executives in Corrections (AWEC)**
Member, 2012 - Present
- Wellness Committee Consultant

**Correctional Leaders Association (CLA) formerly (ASCA)** Member,
2012 - 2022
- Vice President, 2018 - 2020
- Treasurer, 2016 - 2018
- Northwest Regional Representative, 2014 – 2016

**Council on Criminal Justice (CCJ)**
Advisory Board Trustee, 2019 - Present
- Member National Commission on COVID-19 and Criminal Justice

**DPSST Law Enforcement Memorial Board**
Member, 2012 – 2022
- Chair, January 2021 - 2022

**Governor's Re-Entry Council**
Member, 2009 - 2022
- Chair, 2012 - Present

**Governor's Prison Population Forecast Advisory Committee**
Member, 2012 - 2022

**International Corrections and Prisons Association**
Member, 2017 - Present

**National Institute of Corrections Advisory Board**
Appointed Member by USAG Eric Holder, 2013 - 2025
- Advisory Board Chairperson, June 2018 - 2022
- Subcommittee on Wellness Chairperson, January - June 2015

**Oregon Department of Public Safety Standards and Training (DPSST) Board** Member,
2012 - 2022

**PDX BizWomen**
Member, 2019 - 2022

**Past memberships include:**

**Colette S. Peters**                                                                 -8-

Children's Justice Alliance Board of Directors, Council of Juvenile Correctional Administrators (CJCA) Board, Secretary, Positive Youth Outcomes Committee, Chair, Governor's Commission on Public Safety, Juvenile Corrections Forecast Advisory Committee, Juvenile Justice Leadership Network, Center for Juvenile Justice Reform, Georgetown University, Juvenile Justice System Symposium Steering Committee, Legislature's Full-Day Kindergarten Implementation Committee, National Partnership for Juvenile Services Editorial Board, National Center for Youth in Custody and Oregon Juvenile Department Directors Association Executive Committee, The Equitas Project, National Advisor.

## PROFESSIONAL AWARDS

**Michael Francke Career Achievement Award Recipient**
2020
- The national award is named after the late director of the Oregon corrections department who was murdered outside his office in Salem on Jan. 17, 1989. It was created to recognize a Director who has given exceptional service to their agency or agencies in honor and memory of Francke. Director Francke was a visionary man and an outstanding correctional director. He put Oregon on the path to becoming a progressive, cutting-edge agency, making advancements, and leading the way in all areas of corrections. He was a progressive leader whose legacy has and will forever influence future generations of corrections professionals striving to make a difference. And, his untimely death serves as a solemn reminder of the dangers that those of us in corrections and public safety face every day.

## PUBLICATIONS

*"Lack of healthier food alternatives can compromise inmate health,"* Firth, Caislin L., Drach, Linda, Maher, Julie E., and Peters, Colette S., *American Journal of Public Health*, June 2015.

*"Juvenile recidivism - Measuring success or failure: Is there a difference?"* Peters, Colette S., and Myrick, Shannon, *Corrections Today*, February/March 2011.

*"Police Decision Making: A Justice-Theoretical Model"*
Smith, Michael R., and Peters, Colette S., *American Society of Criminology*, November 1996.

## EDUCATION

**Master's Degree in Criminal Justice**
Graduate School of Public Affairs, University of Colorado, Denver, Colorado

**Bachelor of Arts in Psychology**
College of Saint Benedict, Saint Joseph, Minnesota
*International Study - History, Arts, and Language in Greece, Turkey, and Italy*

# Attachment D

# WILLIAM W. LOTHROP

Wesley Chapel, Florida

✉ Bill1001@icloud.com

## EXECUTIVE SUMMARY

Accomplished correctional executive with over 32 years of progressive leadership within the Federal Bureau of Prisons, including tenure as Deputy Director appointed by the U.S. Attorney General. Demonstrated expertise in high-level corrections administration, public safety policy, crisis response, and institutional reform. Adept in managing large-scale federal operations, overseeing multi-billion-dollar budgets, and leading diverse, multidisciplinary teams across the country. Recognized for pioneering strategic initiatives that enhance operational efficiency, reduce recidivism, and drive sustainable system-wide reform.

## CORE COMPETENCIES

Executive Leadership & Organizational Strategy
Federal Law Enforcement Operations
Correctional Systems Reform & Innovation
Budget Oversight & Fiscal Accountability (>$8B)
Workforce Development & Talent Management
Emergency Preparedness & Crisis Leadership
Legislative Engagement & Government Affairs
Reentry Programming & Rehabilitation
Security Risk Assessment & Mitigation
Public Safety Program Implementation
Diversity, Equity & Inclusion Leadership
Interagency & Community Partnership Development

## PROFESSIONAL EXPERIENCE

### Deputy Director (Retired)

Federal Bureau of Prisons – Washington, D.C. | 03/2022 – 02/2025

- • Appointed by U.S. Attorney General to oversee strategic direction of 122 federal institutions and 38,000 employees.

- • Managed an $8 billion operating budget and guided reform-based transformation of national corrections operations.

- • Developed and executed national policy changes enhancing correctional programming, safety, and staff efficiency.

- • Led pandemic response coordination, minimizing service disruption while maintaining staff and inmate safety.

- • Represented the Bureau before Congressional members, DOJ leadership, and national task forces on criminal justice reform.

- • Spearheaded data-driven initiatives to measure program effectiveness and improve public accountability.

### Regional Director – Southeast Region

Atlanta, GA | 10/2021 – 02/2025

- • Directed operations for 20+ facilities, overseeing regional security, staffing, and compliance initiatives.

- • Decreased turnover through staff engagement programs and succession planning models.

- • Implemented regional disaster response strategies, including hurricane preparedness and pandemic protocols.

- • Improved institutional performance metrics through rigorous training, audits, and compliance enforcement.

### Warden (Senior Executive Service)

Phoenix, AZ | 11/2017 – 10/2021

- • Managed dual-complex facility operations (high-security male and low-security female populations).

- Supervised and provided training for medical crisis' and suicide prevention protocols.

- • Expanded reentry services and vocational training programs aligned with labor market needs.

- • Oversaw infrastructure modernization, surveillance upgrades, and pandemic resilience measures.

- • Improved safety and compliance by leading targeted staff development and oversight.

### Warden

Honolulu, HI | 04/2016 – 11/2017

- • Reinforced security and compliance in a complex correctional environment.

- • Strengthened community reentry partnerships for post-release employment and housing services.

- • Modernized facility emergency operations and engaged local authorities for mutual aid planning.

### Associate Warden

Victorville, CA | 01/2014 – 04/2016
Lompoc, CA | 07/2010 – 01/2014 |

- • Coordinated institutional audits and drove performance improvements in facility operations.

- • Acted as Warden during leadership transitions, ensuring continuity and operational integrity.

- • Implemented workforce development strategies and staff conflict resolution systems.

- Supervised medical and psychological care for an incarcerated population.

### Captain

Atwater, CA | 10/2007 – 07/2010
Englewood, CO | 11/2002 – 10/2007 |

- • Directed tactical response and facility-wide security operations.

- • Reduced contraband incidents by modernizing intelligence collection and surveillance protocols.

- • Enhanced staff training in use-of-force procedures and emergency drills, such as suicide prevention, medical crises, and response techniques.

- Supervised and trained a team officers and lieutenants in institutional operations, crisis negotiations, and advanced leadership skills.

### Lieutenant – Special Operations Response Team Leader

Raybrook, NY | 04/2000 – 11/2000

- • Led critical incident responses, including international treaty transfers and post-9/11 operations.

- Coordinated with federal marshals during inmate transfers, ensuring secure and efficient operations.

- • Trained rapid response teams for high-risk inmate scenarios.

- Conducted after-action reviews to revise procedures, contributing to decrease repeat incidences.

- Mentor, new officers and safety protocols and de-escalation techniques, improving team, cohesion, and performance.

### Correctional Officer

Lewisburg, PA | 11/1992 – 04/2000

- • Served in high-security environments; operator on Special Operations Response Team (SORT).

- Conducted daily security, inspections, identifying and mitigating risk such as contraband structural vulnerabilities.

- • Maintained order and safety through consistent enforcement of policies and procedures.

- Monitored and managed inmate activities across a population of 1500 enforcing regulations and reducing violations.

## EDUCATION

Architectural Engineering Studies
State University of New York – Orange | 1993–1994

Additional Executive Training:
- Department of Justice Senior Executive Leadership Program
- National Institute of Corrections Executive Leadership Program
- Emergency Management Institute – FEMA Executive Courses

## KEY ACHIEVEMENTS

- • Orchestrated nationwide reform initiatives enhancing inmate rehabilitation and agency efficiency.

- • Saved millions annually through strategic reallocation of resources and policy reform.

- • Elevated staff development programs; over 100 mentees promoted into leadership roles.

- • Delivered zero-casualty emergency operations across multi-state regions.

- • Authored internal policy manuals and federal guidelines on institutional safety and reform.

# Attachment E

**KATHLEEN TOOMEY**

**SUMMARY**
Skilled executive and attorney who excels at using innovation, creativity, research, and data analysis to solve complex organizational challenges. Over 10 years of experience managing operations at the most senior levels of legal and law enforcement organizations. Effective communicator who routinely engages with senior leaders, Congress, oversight entities, and stakeholders.

**PROFESSIONAL EXPERIENCE**
**United States Department of Justice (DOJ)**

**Associate Deputy Director**                    October 2023 – Present
Federal Bureau of Prisons

*With over 36,000 employees and an $8.7 billion annual budget, BOP is responsible for maintaining safe and secure facilities and providing reentry programming to more than 155,000 individuals in custody at 95 locations across the United States.*

Recruited to newly created leadership position to tackle chronic operational challenges, including a severe staffing shortage, a $3 billion modernization and repair backlog, and significant oversight from Congress, DOJ Office of Inspector General, and Government Accountability Office (GAO). Oversee HR, Finance, Facilities, Procurement, IT, Congressional and Public Affairs, and Oversight.

- **Increased BOP staffing levels from 89% to 93% in 12 months**. Implemented new initiatives that resulted in net gain of 1200 new employees, the largest increase at BOP in over a decade.
- **Oversaw development of Five-Year Capital Investment Plan** to address $3 billion modernization and repair backlog.
- **Reduced FY2024 expenditures by $400M** to absorb unfunded mandates, including 5% pay raise.
- **Created and led multi-disciplinary team to address widespread criticisms of conditions at Metropolitan Detention Center (MDC) Brooklyn**. In 12 months, significantly increased staffing and employee compensation, launched a telehealth initiative, and completed extensive facility upgrades, resulting in decreased uses of force, inmate-on-inmate violence, and use of overtime.
- **Increased effectiveness of First Step Act (FSA) implementation** by establishing dedicated office to foster internal coordination and maximize use of $409 million in dedicated funding**. In first year, FSA office increased investment in medication assisted treatment for opioid use disorder, residential reentry centers, programming, and maintenance and repair of programming space.

**SKILLS**
- Solving Complex Organizational Problems
- Organizational Transformation
- Change Management
- Public Speaking
- Employee Development and Training
- Oversight
- Risk Management

**EDUCATION**
- **Juris Doctorate**, *cum laude*, Boston College Law School, Boston, MA 1999
- **Bachelor of Arts**, American University, Washington, DC 1992

**BAR MEMBERSHIP**
- Admitted to practice law in District of Columbia and Massachusetts since 1999

1

**Executive Secretary**                                September 2022 – September 2023
Office of the Executive Secretariat

Served as DOJ's first Executive Secretary. Responsible for evaluating OES on behalf of Deputy Attorney General and recommending a plan to dramatically improve its ability to provide professional services to Department leadership.

- Developed proposal to transform OES from a small correspondence office to a standalone component reporting directly to the Office of the Deputy Attorney General. Incorporated customer and employee interviews, external benchmarking, data analysis, and historical research.
- Led execution of plan to establish OES as a stand-alone component. Coordinated with Department leadership to obtain approval from Office of Management and Budget and Congress.
- Restructured OES staff to support plan execution. Grew OES from 21 to 32 positions in six months.

**Senior Counsel**                                        May 2021 – August 2022
**Acting Chief of Staff**                                      May – July 2022
Office of the Deputy Attorney General

Led five-person team responsible for analyzing complex management challenges across the Department and recommending innovative approaches to address those challenges. As Acting Chief of Staff, advised Deputy Attorney General on range of issues involving management, policy, Congressional and public affairs. Led hiring process for new Director of the Federal Bureau of Prisons.

**Director of Operational Management**                        August 2016 - May 2021
**Chief of Staff**                                          April 2014 - June 2017
Civil Rights Division

Responsible for strategic and operational management of 700+ person law enforcement organization with budget of ~$170 million. Advised Assistant Attorney General on legal, operational, and management issues, including restructuring Division activities and sections to promote strategic priorities, responding to significant oversight matters, and managing CRT relationships with internal and external stakeholders. Developed and executed plan to consolidate 500 employees from four buildings to a single facility, saving $55M over 10 years.

**PREVIOUS EXPERIENCE**

**Civil Rights Division, US Department of Justice**
Deputy Director, Professional Development                        11/2008 - 4/2014
Senior Trial Attorney, Employment Litigation Section            02/2001 - 11/2008

**Webster, Fredrickson & Brackshaw**
Associate                                                  10/1999 – 01/2001

2

# Attachment F

# RESUMÉ
## MARTIN N. HOSHINO

---

## PROFESSIONAL EXPERIENCE:

ADMINISTRATIVE DIRECTOR
*Judicial Council of California – October 2014 to Present*

Lead and execute the policy direction of the Judicial Council—the policymaking body for California's courts—to improve the statewide administration of justice in the largest court system in the nation. Serve as principal advisor to the Chief Justice and the council on major policy and operations issues affecting the court system and access to justice.

Initiate, direct, and lead statewide programs and initiatives that provide support to all levels of court to improve and enhance services that meet the diverse current and future needs of court users and ensure accountability for the effective and efficient use of public resources.

Serve as primary administrative advocate for the judicial branch. Engage and build support and consensus on judicial branch issues and reforms among the leadership of the judicial branch and the state executive and legislative branches and key justice system partners and stakeholders.

Oversee and provide the highest-level policy, strategic, operational, and programmatic leadership for the Judicial Council's staff organization serving courts, justice partners, and the public in the areas of: criminal and civil justice; fiscal, human resources, legal, and technology services; audits; court construction and facilities management; judicial and court administrator education; research; public affairs and governmental affairs.

Major Accomplishments
Working with California's Chief Justice and the Judicial Council governing body on foundational issues of equal access to justice: Advanced pretrial detention reform to help correct socioeconomic inequities inherent in a money bail system; expedited a rule of court to notify those with traffic tickets that they can appear for arraignment and trial without deposit of bail; and supported development of a statewide ability-to-pay calculator for courts relative to fines and fees.

In the area of civil justice reform: extended court interpreter services for critical civil cases; and doubled state funding to expand self-help services for unrepresented litigants.

Placed a heightened focus on statewide court data reporting and analytics as a means to improve court operations and strengthen advocacy for judicial branch priorities.

Spearheaded a multi-year budget strategy to secure adequate, stable, and sustainable funding for the judicial branch, including working to shift the branch from unstable and

1

# MARTIN N. HOSHINO

declining revenue sources such as criminal fines/fees/assessments, and securing a series of General Fund increases resulting in $3.4 billion in new funding for trial courts between 2013–14 and 2022–23, and for the first time, increasing the average funding for all trial courts from 55 percent of workload need in 2012–13 to 92 percent in 2022.

## UNDERSECRETARY

Operations

California Department of Corrections and Rehabilitation (CDCR) – March 2013 to September 2013. Oversee and direct the activities and operations of the department's $10 billion budget, 60,000 employees, 34 prisons, fire camps, juvenile facilities, in state and out of state contract facilities, field offices, parole programs, rehabilitation programs, 120,000 offenders and 50,000 parolees. Formulate, advocate and implement statewide criminal justice policies and initiatives in collaboration with other state/local/federal agencies, the state Legislature and state/federal courts.

In collaboration with the Undersecretary, Administration and Offender Services, plan, organize, and direct all California Department of Corrections and Rehabilitation (CDCR) operational and administrative functions and services for offenders committed to the state, including adult inmates and juvenile wards; adult and juvenile parolees; and various other functions. Organize, and direct all of CDCR administrative and offender services, including the Division of Administrative Services (Budgets, Fiscal, Accounting, Human Resources, Procurement, Regulations and Policy); Correctional Health Care Services; Internal Oversight; Facility Planning, Construction and Management; Labor Relations; Enterprise Information Services; Research, Internal Audits and Internal Affairs; and various other functions.

Organize the directors, assistant secretaries, and others, as appropriate, to support and coordinate the daily operations of the Department; formulate and oversee the implementation of the Department's organizational development and strategic plans; advise the Secretary and Governor on major policy, program, and organizational issues, and represent the Secretary on administrative matters with the Legislature, Governor's Cabinet, Department of Finance, other state and federal agencies, local government, and constituent groups; represent the Secretary on fiscal and other administrative policy matters in responding to press inquiries, the State Legislature, and other public

2

## MARTIN N. HOSHINO

inquiries; and, on behalf of the Department, negotiate agreements and commit the Department to action within the limits of statutory and administrative authority.

Major Accomplishments:

Played a central leadership role in Public Safety Realignment reforms to close the revolving door of low-level inmates cycling in and out of state prisons (by safely reducing the number of inmates in the state's 34 prisons from 176,000 to 123,000 and parole population from 130,000 to 35,000 in 24 months); creating a blueprint to revert use of prison gyms, classrooms, and dayrooms to their intended purpose of offender services, education and rehabilitation; and solving CDCR's $750 million recurring structural deficit.


UNDERSECRETARY

Administration and Offender Services

California Department of Corrections and Rehabilitation – May 2011 to March 2013

Develop, organize, and direct all California Department of Corrections and Rehabilitation (CDCR) operational and administrative functions and services for offenders committed to the state, including adult inmates and juvenile wards; adult and juvenile parolees; and various other functions.  Organize and direct all of CDCR administrative and offender services, including the Division of Administrative Services (Budgets, Fiscal, Accounting, Human Resources, Procurement, Regulations, and Policy); Correctional Health Care Services; Internal Oversight; Facility Planning, Construction and Management; Labor Relations; Enterprise Information Services; Research, Internal Audits, and Internal Affairs; and various other functions.

Organize the directors, assistant secretaries, and others, as appropriate, to support and coordinate the daily operations of the Department; formulate and oversee the implementation of the Department's organizational development and strategic plans; advise the Secretary on major policy, program, and organizational issues, and represent the Secretary on administrative matters with the Legislature, Governor's Cabinet, Department of Finance, other state and federal agencies, local government, and constituent groups; represent the Secretary on fiscal and other administrative policy matters in responding to press inquiries, the State Legislature, and other public

3

# MARTIN N. HOSHINO

inquiries; and, on behalf of the Department, negotiate agreements and commit the Department to action within the limits of statutory and administrative authority.

EXECUTIVE DIRECTOR

Board of Parole Hearings

California Department of Corrections and Rehabilitation – February 2008 to May 2011

Manage and direct the Board of Parole Hearings operations and personnel, including Commissioners, Deputy Commissioners, peace officers, psychologists, attorneys, and support staff (approximately 520 employees, $115 million budget, 4 parole regions, 20 plus locations).  Manage California's program for hearing adult parole violations (approximately 90,000 annually), life term prisoner suitability hearings (approximately 5,000 annually), sexually violent predator screenings, mentally disordered offender hearings, and civil addict program.

Organize functions and coordinate activities with Federal, State, and local agencies. Develop and implement parole system reforms and remedial plans ordered in Rutherford/Lugo and Valdivia class actions.

Administer and coordinate California's Foreign Prisoner Transfer program with the United States Department of Justice.  Coordinate regulatory actions and pardons, commutations, and sentence recall recommendations with Board Commissioners.

ASSISTANT SECRETARY, CHIEF AND ASSISTANT DIRECTOR

Office of Internal Affairs

California Department of Corrections and Rehabilitation – November 2003 to February 2008

Oversee, manage, and direct a statewide internal affairs and employee discipline program consisting of approximately 140 employees (peace officers and administrative staff) with a budget of $16.5 million.  Provide central oversight of internal affairs investigations and disciplinary matters conducted at 33 prisons, 8 juvenile facilities, 4 parole regions, and 50 fire and conservation camps.  Serve as top management advisor

# MARTIN N. HOSHINO

on employee misconduct and discipline issues for the Secretary, other executives, and managers for a department of 60,000 employees, of which 32,000 are sworn peace officers.

Develop, manage, and implement statewide employee disciplinary reforms to restore integrity and fairness to the department's internal justice system as ordered by the Federal Court and Special Master in Madrid v. Woodford (post Powers Remedial Plan). The Madrid class action and federal oversight was terminated as a result.

CHIEF ASSISTANT INSPECTOR GENERAL

California Office of the Inspector General – August 2000 to November 2003

Manage a statewide public safety and regulatory compliance program of high interest. Advise the Inspector General (OIG) and executive management staff on all policy decisions and issues related to the office. Provide policy direction and define scope of audits, investigations, and reviews. Supervise and provide strategic advice on the most sensitive and controversial audits and investigations performed by the office. Review laws, policies, regulations, and procedures affecting the functions of the office.

Coordinate the daily internal activities of the Office of Inspector General and liaison with the Governor's office staff, legislative bodies, media, employee labor unions, and interest groups.

Coordinate interagency activities with the Department of Corrections, California Youth Authority, Board of Prison Terms, Youthful Offender Parole Board, Board of Corrections, Prison Industry Authority, Correctional Peace Officers Standards and Training, other law enforcement agencies, and other government regulatory agencies. Serve as department's Ethics Officer.

ASSISTANT INSPECTOR GENERAL

California Office of the Inspector General – June 1999 to August 2000

Assist management staff in planning, recruiting, and staffing a major expansion of the independent Office of the Inspector General. Develop and revise OIG statutory authorities and mandates and shepherd same through the California Legislature. Create,

5

oversee, and implement the programs and procedures to fulfill the responsibilities of the OIG. Advise the Inspector General and management team members on policy and program issues emanating from the operation of the OIG and departments of the California Youth and Adult Correctional Agency. Coordinate and direct all external affairs and legislative activities.

## PROJECTS MANAGER

California State Controller's Office – December 1996 to June 1999

For the Administration Division – Fiscal and Business Operations, provide advice and consultative services to the Controller, Deputy Controllers, and key staff members on current issues, technological changes and business trends affecting the operational work environment and functions in the areas of lease management, facility negotiations, space utilization, and communications. Implement the Controller's statewide reorganization and consolidation project.

## AGENCY TELECOMMUNICATIONS REPRESENTATIVE

California State Controller's Office – 1992 to 1996

In Administrative Services, serve as departmental authority on delivery of services and systems for operational and long range communications requirements and objectives. Manage and provide oversight for deployment and use of the department's communication networks.

## STAFF ANALYST

California State Controller's Office – 1988 to 1992

Provide analytical support for general administrative functions.

# Martin N. Hoshino

EDUCATION:

M.A. University of California, Davis, 1990 – Political Science

B.A.  Lewis and Clark College, OR, 1986 – Political Science

MEMBERSHIPS, ACTIVITIES, AFFILIATIONS  formerly, or presently:

Conference of State Court Administrators Board 2018 – present Vice President

Board of Directors, National Center for State Courts, 2022 to Present

National Task Force on Bail Reform, Fines, Fees, and Assessments – Co-Chair

Child Welfare Council

Governor's Appointment with Senate Confirmation – 2013

Governor's Appointment with Senate Confirmation – 2011

Governor's Appointment with Senate Confirmation – 2008

Governor's Appointment – 2006

Governor's Appointment – 2005

Governor's Appointment – 2003

Information Technology Executive of the Year for Leadership and Innovation

Governor and Chief Justice's California Trial Court Funding Workgroup

Technology Services Board

California Information Technology Advisory Board

California Rehabilitation Oversight Board

California Victims Advisory Board

Association of Parole Authorities International

Association of Inspectors General

# Martin N. Hoshino

American Correctional Association

CDCR Executive Emergency Management Committee, Chair

Prison Industries Board, Interim Chair

Chief Negotiator, Plata vs. Brown Transition

Peace Officer, PC 830.2, State of California

Trainer and Lecturer,  Internal Affairs Investigators and Employment Law Attorneys

8