| | |
|---|---|
| ROB BONTA, State Bar No. 202668<br>Attorney General of California<br>NEAH HUYNH<br>(Acting) Senior Assistant Attorney General<br>DAMON MCCLAIN, State Bar No. 209508<br>Supervising Deputy Attorney General<br>ELISE OWENS THORN, State Bar No. 145931<br>NAMRATA KOTWANI, State Bar No. 308741<br>Deputy Attorneys General<br>  1300 I Street, Suite 125<br>  P.O. Box 944255<br>  Sacramento, CA 94244-2550<br>  Telephone: (916) 210-7318<br>  Fax: (916) 324-5205<br>  E-mail: Elise.Thorn@doj.ca.gov<br>*Attorneys for Defendants* | HANSON BRIDGETT LLP<br>LAWRENCE M. CIRELLI, SBN 114710<br>PAUL B. MELLO, SBN 179755<br>SAMANTHA D. WOLFF, SBN 240280<br>KAYLEN KADOTANI, SBN 294114<br>DAVID CASARRUBIAS-GONZÁLEZ, SBN 321994<br>MOLLIE H. LEVY, SBN 333744<br>425 Market Street, 26th Floor<br>San Francisco, California 94105<br>Telephone: 415-777-3200<br>Pmello@hansonbridgett.com<br>*Attorneys for Defendants* |

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>    Plaintiffs,<br><br>v.<br><br>GAVIN NEWSOM, et al.<br><br>    Defendants. | Case No. 2:90-CV-00520- KJM-SCR<br><br>**JOINT STATUS REPORT IN RESPONSE TO SEPTEMBER 29, 2025 MINUTE ORDER**<br><br>Judge: Hon. Kimberly J. Mueller |

On September 29, 2025, this Court issued a Minute Order directing the parties to file a joint status report "informing the court of their views, jointly or separately, of the import of the report given the current posture of this case." ECF No. 8781. The parties met and conferred on October 3, 2025, and shared their respective positions, which are detailed below.

## DEFENDANTS' POSITION

Defendants have been transparent with this Court and Plaintiffs' counsel with respect to their retention of a team of nationally-recognized experts to conduct an objective, independent evaluation of the Mental Health Services Delivery System (MHSDS). Defendants have consistently informed the Court that they have not predetermined any particular use for the report beyond a self-assessment, but did reserve the right to use the report in litigation if necessary and appropriate. *See, e.g.*, ECF Nos. 7883 at 2:16-17; 7885-1 at 4; 8110 at 5 n.2; 8144 at 5:22-6:3. Because the report evaluated every aspect of CDCR's MHSDS using a robust and time-consuming methodology, the report was only just completed and finalized last month. The timing of the report's completion coincided with the appointment of the Receiver in this case by sheer happenstance.

The report is detailed and thorough in its evaluation—even comparing the MHSDS to other correctional systems, nationwide correctional standards, and community standards—and no similar report has ever been prepared in this case. As a result, now that the Receiver has assumed authority over the operation of CDCR's MHSDS from Defendants, Defendants wanted the Receiver to have the benefit of the work that has already been completed, and which Defendants would have used in running CDCR's MHSDS if they still retained authority over the system. Given how comprehensive the report is, and the fact that the Receiver is in the process of refining her Plan, Defendants provided a link to the report to the Court in the hopes that Ms. Peters might find the report helpful in developing her Plan and perhaps even expedite the process. In the interest of transparency, Defendants wanted to ensure that Plaintiffs and the Court also were aware of and able to access the report.

During the parties' meet and confer discussion, Plaintiffs requested that Defendants withdraw their Notice of Compliance with Section VI of Amended Order Setting Out Powers and

Duties of Receiver (Notice) (ECF No. 8778) from the docket and refile the Notice without inclusion of a link to the report.[1]  Though the legal basis for this request remains unclear[2], this request is improper for two reasons.  First, this Court has emphasized the importance of transparency in this case.  *See, e.g.*, ECF No. 5928 at 12:10-13; 6427 at 34:20-22; 6806 at 5:26-6:2.  Defendants' disclosure of the expert report was consistent with—and in furtherance of—the Court's admonishments concerning transparency.  It was also consistent with Defendants' ongoing efforts to keep the Court and parties apprised of the work the experts have performed, as Defendants have done from the very beginning.  ECF Nos. 7885-1 at 3-4, 6853 at 29:1-3.

Second, as Defendants indicated in the Notice and reiterated to Plaintiffs several times during the course of the meet and confer, the report was shared as an informational tool that may be considered or used by the Receiver at her discretion.  Defendants' Notice did not seek any relief from this Court or ask the Receiver to take any action based on the expert report.  To the extent Plaintiffs request that the Court strike the Notice, or seek any other relief from the Court by way of this filing, such a request would be inconsistent with the Court's order directing the parties to file this joint status report to provide their views "of the import of the report given the current posture of this case." (ECF No. 8781.)  Any such effort by Plaintiffs would also be at odds with the Receiver's desire for the parties to "turn toward constructive, forward-looking implementation and away from litigation."  ECF No. 8722 at 8.

**CERTIFICATION**

Counsel for Defendants certify that they have reviewed the following orders in the preparation of this filing: ECF Nos. 5928, 6427, 6794, 6806, 7003, 7880, 7918, 8029, 8144, ,

---

[1] As the Notice indicates, Defendants, their employees and agents, and certain other state agencies have all been informed of their duty and obligation to fully cooperate with the Receiver and her staff in the discharge of her duties; inclusion of a link to a report does not change this fact.

[2] During the meet and confer, Plaintiffs initially cited to ECF No. 7003 as the basis for this request.  When counsel for Defendants noted that ECF No. 7003 prohibits the parties from "seeking relief" without first filing a request to do so, and that Defendants did not seek any relief in their Notice and do not now seek any relief, Plaintiffs indicated that the legal basis for their request stems from comments this Court made during a hearing, but did not provide a citation to those comments or specify the nature of the comments.

8752, 8753, 8754, 8755, 8757, 8765, 8781.

## **PLAINTIFFS' POSITION**

On September 25, 2025, Defendants filed a three-page document styled as a Notice of Compliance with Section VI of Amended Order Setting Out Powers and Duties of Receiver. *See* ECF No. 8778 (hereafter "Notice"). The first two sentences of this Notice state that, consistent with the Court's September 5, 2025 Order, Defendants informed certain state agencies and all personnel within Defendants' own offices and departments of their respective obligations to cooperate fully with the Receiver in the discharge of her duties. *See id.* at 1-2; Sept. 5, 2025 Order, ECF No. 8765 at 8. The remainder of the Notice, which has nothing whatsoever to do with the September 5 or any other Order, directs "the Receiver and her team" to a 659-page report entitled "Systemwide Mental Healthcare Study" prepared by Defendants' litigation consultants at VJRS/Falcon, Inc (hereafter "Falcon Report or "Report"). ECF No. 8778 at 2-3.

The Court should strike Defendants' September 25 Notice and order Defendants to re-file their Notice without the improper reference to the Falcon Report, which has no import whatsoever at this stage in the case.[3] The Report, and the related Notice, are not relevant to any pending case matter and are "precisely the type of extraneous material" the Court intended for its December 24, 2020 Order to "ke[ep] out of the record." *See* Dec. 24, 2020 Order, ECF No. 7003; Oct. 7, 2021 Tr., ECF No. 7345 at 40:24 – 41:1. Nothing before the Court requires the Falcon experts' testimony, and it would be improper for Defendants to file a litigation expert report on the docket regardless, as such reports are not evidence. Moreover, Plaintiffs have had no opportunity to test the veracity of the Report through expert disclosures, depositions, or any other discovery.

But even a cursory review of the Report shows it is unreliable and inherently suspect on its face. The Report's conclusion that Defendants are complying with the existing *Coleman* remedy

---

[3] Plaintiffs were in the midst of preparing a request for leave to file a motion to strike seeking this relief when the Court issued its minute order requiring the instant joint status report. Should the Court require a formal motion to strike, Plaintiffs request that the Court treat this status report as a request for leave to file such a motion and grant that request.

is premised on old data, uses a "proprietary" formula the Report does not disclose, *see* Report at 28,[4] and squarely contradicts Defendants' own remediated data, the Special Master's fully vetted findings, and the Court's own factual findings in support of its decision to appoint the Receiver, which Defendants did not appeal.  *See* Aug. 27, 2025 Appointment Order, ECF No. 8752.  Further, the Report recycles arguments this Court has already rejected, urges actions that have already been taken, and threatens to undermine the receivership and this Court's orders.  Defendants' request that the Receiver consider what is effectively an expert witness report in support of modification or termination of the *Coleman* remedy, without filing a motion, is a dangerous distraction from the Receiver's court-ordered mission to durably implement the settled remedy.

## I. THE FALCON REPORT IS IRRELEVANT AND POTENTIALLY DAMAGING TO THE RECEIVERSHIP, AND SHOULD BE STRICKEN.

When this Court appointed a receiver just over one month ago, it confirmed that the primary goal of the Receivership is to "fully implement[] the court-approved and court-ordered remedies in this case."  Sept. 5, 2025 Amended Order, ECF No. 8765 at 2; *see also* Aug. 27, 2025 Action Plan Order, ECF No. 8753 at 3 (further confirming that "the parties must be willing to focus on implementing existing remedies and ensuring they are durable," and that "the Receiver must have 'the resources necessary to implement the *Coleman* remedies,'" quoting Receiver's Action Plan, ECF No. 8722 at 16).  The Falcon Report is an expensive distraction and diversion, which in no way "aids in [the Receiver and her team's] efforts" in this case.  ECF No. 8778 at 3.  Defendants' request that the Receiver stop her work to review and consider the more than 650-page Report and its numerous recommendations for radical changes to the *Coleman* remedial requirements at the outset of the receivership represents yet another attempt by Defendants to relitigate the scope of the existing *Coleman* remedy.

Defendants commissioned the Falcon Report to support their longstanding litigation position that various *Coleman* remedial requirements are unnecessary to cure the underlying

---

[4] Pincites to the Falcon Report refer to the Report's internal pagination.

constitutional violations in this case and should therefore be modified or terminated. *See* March 6, 2024 Order, ECF No. 8144 at 6-8, *appeal dismissed*, *Coleman v. Newsom*, No. 24-2263, 2025 WL 1540354 (9th Cir. May 30, 2025); *see also id.* at *2 (Bress, J., dissenting) (agreeing that "one of the purposes of the tours is to collect evidence for the State to decide whether to file a termination motion"); April 21, 2023 Letter from Paul Mello to Special Master, ECF No. 7885-1 at 3-4 (explaining that "Defendants may, in the future, take action to terminate or modify all or parts of this case – or none at all – pending the experts' determination and recommendation(s)").

To this end, the Report briefly analyzes Defendants' compliance with "the Program Guide" as a whole between 2019 and 2022, without identifying which provisions of the remedy the Falcon consultants concluded were compliant and which were not, *see* Report at 79-93, and without acknowledging Elizabeth Falcon's previous sworn testimony that on-site tours, patient interviews, and observation of treatment sessions – which never occurred – are essential to an accurate study, *see* Declaration of Elizabeth Falcon, ECF No. 7884 ¶¶ 7, 9. The report then devotes hundreds of pages to comparisons of Defendants' court-ordered remedial policies, with which the record shows they are wildly non-compliant, with various "nationwide standards," "community standards," and selected correctional and "community" mental health policies[5] from other jurisdictions—nearly all of which the Report concludes are less demanding than the purportedly "impractical" and "excessive" remedial requirements in this case. *See* Report at 115-556, 557-58. In doing so, the Report repeatedly argues that Defendants' non-compliance with court-ordered staffing and suicide-prevention requirements should be excused because of the alleged impossibility of compliance, without disclosing that the Court already expressly overruled or otherwise rejected these arguments. *See* Section II, *supra*. The Report concludes with a series of recommended modifications to the *Coleman* remedy, including "revis[ing] the 2009 Staffing Plan"

---

[5] The Report acknowledges that the Falcon consultants relied on public records requests, nearly half of which did not even elicit a response, to identify correctional policies for purposes of comparison, and that "data quality varied" as a result of this unreliable methodology. *See* Report at 20-21 & fn. 15. The experts also abandoned a formal methodology for selecting comparator states in favor of an ad hoc approach when they did not like the results of the initial method. Report at 47-48.

to "consider the current availability of mental health clinicians and providers both in California and across the nation," and "align[ing]" the Program Guide "with reasonable mental health standards established by national and community guidelines," Report at 557-59.  The Falcon Report, in other words, amounts to a more than 650-page request to fundamentally upend the settled remedial policies in this case, premised on a misleading presentation of outdated data from as much as six years ago that contradicts the findings of the Special Master, Defendants' own remediated data indicators, and the findings of this Court.

This is a major distraction from the Receiver's obligation to implement the *existing* court-ordered remedy with urgency and durability.  *See* Sept. 5, 2025 Amended Order, ECF No. 8765 at 2.  Serious consideration of the dense, over 650-page Report would require substantial time and effort on the Receiver's part and would divert critical resources and attention away from the establishment and implementation of the receivership itself and the rapidly approaching deadlines in the Receiver's court-approved Action Plan.  *See generally* Receiver's Action Plan, ECF No. 8722; Aug. 27, 2025 Action Plan Order, ECF No. 8753.  Defendants had numerous opportunities over the course of many years to submit argument and evidence in support of modifications to the remedy, but they chose not to do so.  According to the Report itself, the Falcon study has been available, at least in draft form, since "the second quarter of 2024"—that is, approximately 18 months before the Receiver's appointment.  Report at 78.  Even though Defendants had this draft report in hand, they never provided notice that the Report was forthcoming, including in the period after the Court announced its intention to appoint a Receiver, during the Receiver's four-month development of the Action Plan, or in the period during which the Court expressly invited the parties to comment on or object to the Action Plan.  Nor did Defendants ever object to the Action Plan's stated, focused goal of implementing the existing remedies in the case.

Defendants' decision to file the Report on the docket now, one month *after* the Receiver's appointment, represents an attempt to informally erode the settled remedy via the Receiver, rather than moving formally before the Court.  This is fundamentally inconsistent with the Court's receivership orders.  *See* Aug. 27, 2025 Action Plan Order, ECF No. 8753 at 3 (parties must "focus on implementing existing remedies and ensuring they are durable").  And it is damaging to

the receivership itself because of the likelihood the Report will mislead the public, Defendants' employees, and the Legislature about the status of remediation of the constitutional violations at issue in this case and the need for additional funds and resources to implement the Receiver's Action Plan expeditiously.  As a result, Defendants' filing appears also to violate the Court's direction that all Defendants, as well as their agents, employees, and counsel, refrain from "thwart[ing] or delay[ing] the Receiver's performance of her duties under this order," which is punishable through civil contempt.  Sept. 5, 2025 Amended Order, ECF No. 8765 at 8.

This Court previously announced that it would "strike from the record all suggestions for court action presented under the guise of status reports and other documents the court deems non-responsive to its orders."  Dec. 24, 2020 Order, ECF No. 7003 at 1.  At Defendants' request, the Court has stricken evidence filed by Plaintiffs that was not relevant to the litigation.  *See, e.g.*, Oct. 7, 2021 Tr., ECF No. 7345 at 36:24 – 41:13 (striking DSH hospital-wide staffing data as non-responsive and unrelated to any pending or contemplated litigation in the case).  The Court should do the same here.  If Defendants genuinely believe that the Report justifies changes to *Coleman* remedies, they must seek leave to file a motion to modify or terminate those remedies.  Instead, Defendants ask the Receiver to consider hundreds of pages of analysis that is irrelevant to (and manifestly incompatible with) the Receiver's effective performance of her duties, that was prepared by Defendants' own litigation consultants for the purpose of attacking the same remedies the Receiver was appointed to implement, and that Plaintiffs had no opportunity to rebut through expert discovery or any other means.  This is precisely the type of improper "suggestion[] for court action presented under the guise of [a] status report[]" that this Court previously ordered the parties not to file.  Dec. 24, 2020 Order, ECF No. 7003 at 1.  And given the current posture of this case, the Falcon Report itself is "precisely the type of extraneous material" the Court determined must be "kept out of the record."  *Id.*; Oct. 7, 2021 Tr., ECF No. 7345 at 40:24 – 41:1.  The Court should strike Defendants' Notice from the record and order them to re-file a version that omits all but the first paragraph.  The Court should also confirm that the Receiver has complete discretion to ignore the Report, in whole or in part, and to require the production of underlying data and methodology as a condition for considering any part of the Report for any purpose.

## II. THE FALCON REPORT IS FUNDAMENTALLY UNRELIABLE.

Defendants have not moved for any relief which calls for expert testimony, but even if they had done so it would still be improper for Defendants to file the Report and related commentary on the docket. The Report itself is inadmissible hearsay and is premised on methodologies that are neither reliable nor transparent. Moreover, because Defendants did not provide Plaintiffs with the expert disclosures and discovery that would ordinarily be required by Rule 26, Plaintiffs have had no opportunity to test the veracity of the Report's claims through expert depositions or any other means. Under these circumstances, it is inappropriate for Defendants to ask the Court or the Receiver to consider the Falcon Report for any purpose.

Defendants' request is particularly concerning given several apparent serious methodological flaws in the Report. The Report concludes that "CDCR demonstrates strong compliance with MHSDS [Program Guide] Requirements," Report at 557, but this conclusion is premised on outdated data from 2019 through 2022—meaning the data, which includes the aberrative COVID pandemic years, may or may not reflect current conditions in CDCR, even if it is accurate. Report at 79. Even more troubling, the accuracy of the data cannot be verified because it was derived from a "proprietary" and confidential "chart review tool" consisting of hundreds of individual "evaluative items" that purportedly mirror Program Guide requirements but are not identified in the Report. *Id*. at 28, 79-93. The Report does not identify which of these hundreds of "evaluative items" showed compliance and which did not, or how compliance was defined and assessed with regard to individual items. Instead, the Report aggregates the results of these "proprietary" chart reviews into a single, system-wide compliance rate for the Program Guide as a whole, without weighting the individual items, explaining how the items measured were selected, or explaining how the experts determined how to measure each remedial requirement. *Id.* at 83.

This lack of transparency makes the Report fundamentally unreliable, especially given Defendants' history of providing selective and/or misleading data to the Court and the Special Master. *See generally Coleman v. Newsom*, 424 F. Supp. 3d 925 (E.D. Cal. 2019). Indeed, the Report completely ignores CDCR's remediated compliance indicators—which the parties and the

Special Master spent nearly half a decade rebuilding together in order to ensure their accuracy, transparency, and reliability—in favor of hundreds of unidentified "evaluative items" that not been disclosed or subjected to any scrutiny whatsoever.

The Report is also seriously misleading insofar as it ignores that the 2009 Staffing Plan itself was premised on a thorough analysis of other states' correctional mental health systems, *see* Oct. 10, 2017 Order, ECF No. 5711 at 16, and recommends numerous staffing measures that CDCR has already implemented, such as expansions of telemental health and approved clinical classifications, *compare* Report at 15, *with* Aug. 27, 2024 Order, ECF No. 8376; Apr. 1, 2025 Order, ECF No. 8587; Apr. 7, 2025 Order, ECF No. 8593; Aug. 27, 2025 Hybrid Work Policy Order, ECF No. 8756.  Most troublingly, the Report fails to disclose that the Court has already considered and expressly overruled many of the Report's opinions and recommendations.  In its June 2024 Contempt Order, for example, the Court thoroughly rejected a virtually identical argument that compliance with the 2009 Staffing Plan is impossible, *see* June 25, 2024 Order, ECF No. 8291 at 63-64, and the Ninth Circuit expressly affirmed that holding, *see Coleman v. Newsom*, 131 F.4th 948, 959-61.  The Court has similarly rejected several of the same objections to Mr. Hayes' suicide-prevention recommendations that are repeated essentially verbatim in the Report.  *Compare* Report at 535-36, 538, 540, 548-49, *with* ECF No. 8179 at 20-21, 29-30, 50-51; ECF No. 8180-3 at ¶¶ 12, 15, 21; Sept. 30, 2024 Tr., ECF No. 8473 at 15:25 - 16:10, 18:12 - 21:14, 31:4-10.  Defendants should not be permitted to interfere with the Receiver's efforts by casually lobbing a misleading and fundamentally unreliable expert report that characterizes existing court-ordered staffing levels and suicide-prevention requirements as wasteful and unnecessary, while ignoring CDCR's persistently high suicide rate and decades of woefully inadequate care and willful non-compliance.  This may lead clinicians to ignore the court-ordered measures, making it even harder for Receiver to bring the State into compliance.  If the Report remains on the docket through Defendants' Notice, the record will also be muddied because these clearly rejected objections will remain as purportedly legitimate criticisms of Mr. Hayes' methodology and the staffing requirements developed by Defendants themselves.

**CONCLUSION**

Defendants' decision to withhold their experts' Report until after the Receiver developed her Action Plan, and to then introduce the expert report in an unrelated pleading without moving the Court for any relief, confirms that the Report is a distraction and diversion, designed to impede and interfere with the remedial work in this case. Important work needs to be done to complete numerous unfinished, court-ordered components of the *Coleman* remedy, including filling urgently needed clinical staffing vacancies, implementing decades-old suicide prevention requirements, and completing CQIT. Devoting any of the Receiver's valuable time and resources to this massive, adversarial, and nonobjective expert report, at this time, would only further harm the Plaintiff class.

The Report has no import whatsoever at this juncture in the case, as it does not bear on pending litigation and strikes at the heart of the Receiver's mandate. The Court should strike Defendants' Notice and order it refiled with just the current version's first paragraph. The Court should also confirm that the Receiver may, at her discretion, ignore or delay consideration of the Report, in whole or in part, and require that Defendants produce the underlying data, documentation, methodology, and communications on which the Report's conclusions are based, as a condition of her consideration of a recommendation.

**CERTIFICATION**

Plaintiffs' counsel certifies that he reviewed the following orders in preparing this filing: ECF Nos. 7002, 7003, 7345, 7897, 8029, 8144, 8291, 8376, 8587, 8593, 8752, 8753, 8754, 8756, 8765, 8781.

///
///
///
///
///
///
///

| | | |
|---|---|---|
| 1 | DATED: October 6, 2025 | ROB BONTA<br>Attorney General of California |
| 2 | | |
| 3 | | |
| 4 | | By: _____*/s/ Damon McClain*_____<br>DAMON MCCLAIN<br>Supervising Deputy Attorney General<br>ELISE OWENS THORN<br>Deputy Attorney General<br>*Attorneys for Defendants* |
| 7 | | |
| 8 | DATED: October 6, 2025 | HANSON BRIDGETT LLP |
| 10 | | By: _____*/s/ Samantha Wolff*_____<br>LAWRENCE M. CIRELLI<br>PAUL B. MELLO<br>SAMANTHA D. WOLFF<br>*Attorneys for Defendants* |
| 14 | DATED: October 6, 2025 | ROSEN BIEN GALVAN & GRUNFELD LLP |
| 16 | | By: */s/ Alexander Gourse*<br>Alexander Gourse<br>*Attorneys for Plaintiffs* |