**Receiver's Plan for Resumption of Field Monitoring, CQIT Testing, and Development of a Rigorous and Sustainable Quality Assurance Program**

On October 31, 2025, the Court granted the Receiver's request for an additional two weeks to "gather more information and develop a proposed plan for 'efficiently and effectively carry[ing] out ongoing field monitoring in the state's prisons . . . . [and] deployment of CQIT in the next round of monitoring.'" ECF No. 8805 at 1 (citing August 27, 2025 Order at 7, ECF No. 8573). The Court granted the Receiver's request after concluding that the Receiver and the Special Master had reached an impasse that prevented them from submitting a joint plan pursuant to the August 27 Order. *See id.*

The resumption of field monitoring in early 2026 and the rollout and testing of CQIT are related, but distinct, activities. The Receiver will assume responsibility for field monitoring which was previously conducted by the Office of the Special Master (OSM). The Receiver will develop a field audit process to assess CDCR's compliance with Program Guide requirements until the court approves CDCR to resume self-monitoring. CQIT -- the Continuous Quality Improvement Tool – is the tool that will allow CDCR to ultimately take responsibility for self-monitoring. The court has stressed in multiple orders that adoption of a quality assurance program, including full implementation of CQIT, is essential to allowing CDCR to self-monitor. *See e.g.,* ECF No. 6996 at 7-8 (CQIT's function in facilitating "defendants' assumption of responsibility for self-monitoring the adequacy of mental health care" is "as essential to the constitutional remedy as are individual components measured by CQIT.") Effective self-monitoring must be in place to end court oversight. *See* ECF No. 8752 at 9-10 (*citing* ECF No. 7847 at 5). Therefore, the Receiver's plan must address resumption of monitoring (via field audits) in the short term with integration of CQIT into the field auditing process as quickly as possible.

In developing this plan, the Receiver considered the well-known and contentious history around CQIT and data remediation. As discussed in the Action Plan, there is a profound lack of trust in this case. Over the years, the absence of trust has undermined collaboration among the plaintiffs, defendants, and OSM. The norm in *Coleman* has been to approach change with suspicion and hostility and engage in extended discussion and analysis before anything can move

forward. This atmosphere must change as it makes it challenging to balance the sense of urgency required by the Action Plan and the court with development of a CQIT rollout and evaluation process that is thoughtful, transparent, and informed by meaningful input from the parties. Based on our ongoing interactions with both parties, we are optimistic that they are open to moving toward a more constructive posture.

Finally, this plan also incorporates the Receiver's focus on shifting the culture of CDCR vis-à-vis the *Coleman* remedies from one that primarily measures outputs to one that prioritizes identifying challenges and implementing meaningful solutions—solutions that lead to improved patient care, safer prisons, better work environments for employees, and enhanced employee retention and recruitment. This type of culture shift should encourage employees to feel empowered to identify challenges, believe that their input will be valued, and have a meaningful opportunity to propose solutions and process improvements that they believe will meaningfully improve patient care. These changes will provide a solid foundation for sustainable quality assurance.

**Receiver's Plan**

The plan identifies actions that the Receiver must take to resume field monitoring, test CQIT, and fully implement Action Plan Goal 5, *Complete Development and Implementation of a Quality Assurance Program*. Following is a description of the required actions and an implementation timeline for the period December 1, 2025 through December 31, 2026.

**Actions Required to Resume Field Monitoring and Test CQIT in 2026**

There are some critical actions that the Receiver must complete in order to begin field audits and CQIT testing in 2026.

1. **Hire a team to conduct field auditing on behalf of the Receiver**.

    As the Special Master has announced his resignation, the Receiver must identify and hire a team of individuals who can begin conducting field audits in early 2026. The Receiver will consider members of the Special Master's team as well as outside experts with relevant

2

experience in auditing, corrections, mental health, and institutional reform to become part of the team.

The Receiver expects to hire a Senior Advisor responsible for quality assurance. The Senior Advisor will be responsible for the short- and long-term actions delineated in this plan and will lead a multi-disciplinary team of auditors, analysts, and subject matter experts. The Senior Advisor will implement Goal 5 of the Action Plan in a manner that facilitates seamless transition back to CDCR at the end of the Receivership. *See* Action Plan at 14. This includes focusing on actionable, time-bound solutions which cannot include prolonged analysis or delays and must include engaging in constructive dialogue and collaboration with a goal of achieving forward-looking change and full implementation of the Program Guide. *Id.* at 3 and 16. The Senior Advisor will be personally and substantially engaged in development of a robust quality assurance program, including participating in field audits.

2. **Roll out KPIs and complete follow-up activities related to data remediation**.

The Special Master has completed his part of the data remediation process with significant assistance from the *Plata* Receiver. More than 250 KPIs are now supported by remediated data and extensive documentation. The Receiver needs to address several issues related to data remediation as part of her broader efforts to test CQIT. This is necessary because KPIs are incorporated into CQIT and play a role in field auditing. The Receiver must:

- Roll out KPIs to employees and parties and ensure that they have the necessary training to access and use KPIs and related documentation. While CDCR has updated KPIs throughout the data remediation process, it was unable to provide comprehensive access to or training for employees until the Special Master verified that the data remediation process was complete. Now that data remediation is complete, the Receiver will conduct end-user testing to ensure that KPIs function as intended. In addition, she needs to provide employees with training so that they understand what has changed and how to enter data consistent with updated requirements. Moreover, counsel for the parties will need training on how to access and use the remediated KPIs and related documentation.

3

- Address questions and concerns from the parties about the remediated KPIs. Since the final stages of the data remediation process involved participation only from OSM and the *Plata* Receiver, the parties will need an opportunity to use the new system so that they can learn how it works and raise any questions or concerns about the remediated KPIs and related documentation. Consistent with the Action Plan, the Receiver will work to resolve concerns informally with the goal of avoiding unnecessary litigation.
- Complete a small number of indicators that could not be finished within the court-ordered deadlines. There are a few remaining indicators that require the Receiver to finalize certain policies so that they can be completed.

3. **Update the CQIT Guidebook**.

All auditors will be using CQIT and will need written guidance on how the system works, what issues to assess, and how to enter data. The CQIT Guidebook, which is designed for this purpose, was last updated several years ago. The Receiver will oversee updates to the Guidebook to ensure that it is consistent with current policies and incorporates changes made during data remediation. Completing a comprehensive update to the Guidebook and training auditors on its use will take several months.

**Actions Required to Build a Sustainable Quality Assurance Program**

Action Plan Goal 5 describes key actions that the Receiver plans to take to ensure that there is a sustainable quality assurance process for MHSDS. Since August 1, the Receiver has learned new information that will inform her approach to implementing Goal 5. The following provides a more fulsome description of how the Receiver will implement Goal 5.

1. **Adopt a comprehensive field auditing program that provides rigorous and accurate assessment of institutions accompanied by meaningful and actionable recommendations.** The Receiver will adopt a comprehensive field auditing program that includes internal audits by MHSDS and independent audits by the Receiver's team. The Receiver's goals for the comprehensive field auditing program are:
    - Continue to assess CDCR's compliance with *Coleman* remedies using independent audits conducted by the Receiver's team. These audits will replace the monitoring previously

4

conducted by the OSM.  The Receiver will design this process to ensure that audit standards are transparent and known to all institutions and employees.  Moreover, she will establish timeframes for providing recommendations to institutions and parameters for report content and length.  The Receiver anticipates that these steps will provide meaningful oversight of mental health care delivery while helping to move institutions toward increased compliance through timely feedback and actionable recommendations.

- Ensure that CDCR develops an effective field auditing program that will enable it to eventually resume self-monitoring.  As part of developing an effective field auditing program, the Receiver will relaunch internal CQIT audits to assess institutional compliance with *Coleman* remedies.  This will require development of written guidance, training, and other resources for auditors as well as creation of standards for production of audit reports.  It will also require development of an efficient process for the Receiver's audit team to verify internal audit results.  Over time, the Receiver anticipates that these steps will contribute to building a strong audit program that provides reliable, trusted, accurate, and timely assessments of CDCR's compliance with court-ordered remedies.

- Oversee adoption of audit standards, methodologies, guides, and procedures to support transparent, timely, accurate audits of CDCR's compliance with the Program Guide and other court-ordered remedies.  These materials and resources will be used by MHSDS auditors and Receiver team auditors.

- Adopt new pre- and post-field auditing processes that prioritize proactive engagement by institutions in the field audit process.  These processes will require institutions to use KPIs and other data to prepare for audits and anticipate issues that are likely to be identified during audits.

- Establish new processes for reviewing institution corrective action plans (CAPS) and performing follow-up field visits, when needed, to ensure that audit recommendations have been addressed.  Again, these processes will be consistently used in all field audits, whether the CAPS resulted from an audit conducted by MHSDS or the Receiver's team.

- Develop a process for reducing the scope and or frequency of audits based on the sustained compliance by an institution.  This will allow the Receiver to focus resources

5

on areas of greatest need while incentivizing institutions to improve and subsequently maintain compliance levels with Program Guide requirements.

- Determine how and when audit results will be reported to the parties and the public. The Receiver will develop a process for timely sharing audit results with the parties. In addition, the Receiver will determine how best to share audit information with the public since audit reports will no longer be filed with the court.

2. **Test CQIT through field audits to ensure that it functions as intended and provides reliable data for quality assurance purposes.** As part of the comprehensive field auditing process described above, the Receiver will test the functionality and reliability of CQIT. In order to build a sustainable quality assurance process that is trusted by the parties and the court, it is essential that:

   - CQIT is tested by MHSDS internal auditors and the Receiver's audit team. Therefore, both groups of auditors will use CQIT as part of the Receiver's comprehensive field auditing process.

   - Auditors are provided with the appropriate documentation and training to ensure that they can use CQIT properly. This includes entering data and information accurately. The Receiver will update CQIT documentation and training as part of the CQIT testing process. When the Receiver's audit team reviews the results of internal audits, it will assess the CQIT data entered by internal auditors to ensure that it complies with audit requirements.

   - KPIs used as part of the CQIT audit process are accurate and measure what was intended. The data remediation process was a significant step forward in strengthening the reliability of KPI data. Yet, testing is still needed to assess the accuracy and reliability of KPI data that is used in CQIT.

   - The CQIT testing process is informed by open, clear communications between the parties and the Office of the Receiver. The Receiver intends for this approach to facilitate the timely and effective resolution of any disagreements between the parties.

3. **Establish a data governance framework that promotes long-term accuracy and sustainability of KPIs which are central to the quality assurance process.** The adoption

of an effective and rigorous data governance process will be key to ensuring the long-term accuracy and durability of the KPIs and CQIT.  This will require the Receiver to:

- Develop a temporary process for assessing requests for changes to KPIs or remediated data while developing a permanent data governance framework.  (Such requests may come from defendants, plaintiffs, or the Receiver's team.)  A clear and effective process will help ensure the continued accuracy of CQIT data until a formal data governance process can be implemented.  Any process developed by the Receiver will account for seeking approval from the court as appropriate.
- Implement a data governance framework that supports long-term accuracy and sustainability of CDCR's quality assurance program.  The Receiver will assess data governance approaches used by other governmental agencies, healthcare providers, and correctional systems to identify those that best meet the needs of this case.
- Develop guidance and training for CDCR employees regarding their responsibilities as to data governance.  Guidance and training will be tailored to the specific duties and responsibilities of the covered employee and will be presented in plain language to facilitate compliance.

4. **Create tools, training, and resources needed to support a robust quality assurance program.**  CDCR employees will need tools, training, and resources to contribute to the quality assurance program.  Making data available in user-friendly formats will help build trust in the data and encourage employees to use it to improve patient care.  Moreover, the Office of the Receiver and counsel for both parties will need user-friendly reports, dashboards, and tools to access and use KPIs. This will require the Receiver to:
   - Develop user-friendly dashboards and reports for use by clinicians, the parties, and other stakeholders.
   - Assess user experience with dashboards and reports to continually improve those tools.  Identifying what tools and data are most and least helpful to clinicians and ensuring that those tools are user-friendly will make it easier for employees to use data to improve the quality of patient care.
   - Create training and information resources that help employees make effective use of data as part of their daily duties. The Receiver will focus on data literacy to encourage the use

of data in daily work and support development of a sustainable quality assurance program.

5. **Recommend Final KPIs and Compliance Thresholds to Court.** The Receiver must complete the KPI rollout and CQIT testing in order to recommend final indicators and compliance threshold to the court. Once the court approves final KPIs and compliance thresholds, the Receiver will incorporate those into its comprehensive field auditing processes.

**Receiver's Planned Actions Between December 1, 2025 and December 31, 2026**

The Action Plan originally assumed that the Receiver would be well-positioned to restart field auditing in early 2026 because the OSM monitors and experts would complete that work as part of the Office of the Receiver. With the change in circumstance created by the Special Master's resignation, the Receiver must adjust her plans and target timeframes.

The Receiver will shift from a focus on completing individual objectives to an iterative approach that allows her to advance several priorities – KPI rollout, resumption of field auditing, CQIT testing, and creation of tools, training, and resources -- concurrently.

Beginning in December 2025, the Receiver will work collaboratively with the parties and the Senior Advisor to select a small number of institutions and KPIs for auditing and testing in the first half of 2026. The three to five institutions selected for field auditing will represent different missions, locations, and compliance challenges. When selecting KPIs for testing, the Receiver will consider the parties' input along with the any challenges anticipated with testing specific indicators.

Once institutions and KPIs are selected, the Receiver will prioritize the following:

- Review of the selected KPIs in the rollout process. Both parties will need to review the selected KPIs and timely identify questions or concerns about the data or documentation supporting those KPIs.

- Training for staff on the selected KPIs. This will include explaining any changes made to the KPIs during the data remediation process and how those changes impact data entry and tracking in the field.
- Review of findings and recommendations from prior CQIT testing efforts. Previously, OSM and CDCR conducted field tests of CQIT. While these tests occurred several years ago, the Receiver will review the findings and recommendations to inform her field testing process.
- Update the portions of the CQIT Guidebook needed to audit the subject matter related to the selected KPIs. While updating the entire CQIT Guidebook will take months, limited updates focused on specific issues and KPIs should take much less time.
- Identify and train a small group of auditors who will be trained on how to field test the selected KPIs using the revised portions of the CQIT Guidebook.
- Using employee input and feedback, refining dashboards and reports for the selected KPIs.

Throughout 2026, the Receiver expects to refine the field auditing and CQIT/KPI testing processes. Moreover, as testing is completed for the initial group of institutions and KPIs, the Receiver plans to expand field auditing and testing throughout the year. She anticipates that the pace of field auditing and testing can be accelerated once the Senior Advisor is onboard.

**Target Completion Dates – December 1, 2025 through December 31, 2026**

At this point in time, the Receiver anticipates only minor changes to the target timelines approved in the Action Plan.

| Goal 5: Long-Term Actions Required to Build a Sustainable Quality Assurance Program | Action Plan | Date (Starting from November 1, 2025) | Revised or Additional Target Completion Date |
|---|---|---|---|
| **5.1 Recommend final CQIT indicators and thresholds to court** | | | |
| Develop and implement a plan to test CQIT | Within 12 months | November 2026 | No change |
| Recommend final indicators and compliance thresholds to Court | Within 18 months | April 2027 | No change |

9

| | | | |
|---|---|---|---|
| Complete development of user-friendly CQIT dashboards to monitor compliance.[1] | Within one year after court approval | April 2028 | No change |
| **5.2 Develop new processes for field monitoring and for recommending to the court that CDCR has fully implemented a remedy.** | | | |
| Implement a revised field monitoring process. | Within 180 days | April 2026 | **September 2026** |
| Implement a new process to guide institutions through the pre- and post-field monitoring process | Within 12 months | November 2026 | No change |
| Seek court approval for a process to recommend that CDCR has fully implemented a remedy | Within 12 months | November 2026 | No change |

---

[1] This deadline is for *completion* of new dashboards that show court-approved indicators and compliance thresholds. The Receiver anticipates making gradual improvements and changes to existing dashboards as part of the processes described above. That work will be ongoing in 2026.

10