UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN, et al.,

Plaintiffs,

v.

GAVIN NEWSOM, et al.,

Defendants.

No. 2:90-cv-0520 KJM SCR P

ORDER

On July 30, 2025, as part of his thirty-first round of monitoring in this action the Special Master filed a monitoring report on the delivery of inpatient mental health care to class members at three hospitals operated by the California Department of State Hospitals (DSH)[1] and psychiatric inpatient programs (PIPs) operated by the California Department of Corrections and Rehabilitation (CDCR) in five state prisons[2] (hereafter 31A Report). ECF No. 8712 at 7.[3] The 31A Report includes one recommendation for a court order. *Id*. at 186-87. On August 11, 2025, defendants filed objections to the 31A Report, ECF No. 8374, and with leave of court,

[1] Atascadero State Hospital (DSH-Atascadero or ASH); Coalinga State Hospital (DSH-Coalinga); and Patton State Hospital (DSH-Patton).

[2] California Medical Facility (CMF-PIP); California Health Care Facility (CHCF-PIP); Salinas Valley State Prison (SVSP-PIP); California Institution for Women (CIW-PIP); and San Quentin Rehabilitation Center (SQ-PIP).

[3] Citations to page numbers in documents filed in the Court's Electronic Case Filing (ECF) system are to page numbers assigned by ECF and located in the upper right hand corner of the page.

Aug. 29, 2025 Minute Order, ECF No. 8758, on September 11, 2025, plaintiffs filed a response to defendants' objections, ECF No. 8772. The court resolves defendants' objections in this order.

# I. INTRODUCTION

The Special Master's 31A Report is before the court at a significant transition point in this action. For thirty years, the court "has overseen defendants' efforts to fully and durably implement the court-ordered remedies necessary to deliver constitutionally adequate mental health care to the plaintiff class. . . ." Aug. 27, 2025 Order at 1, ECF No. 8752. In December 1995, "the court appointed a Special Master to 'provide expert advice to defendants' in their development of a plan to remedy the constitutional violations and, thereafter, '[t]o monitor defendants' implementation of and compliance with' any court-ordered remedial plan." *Id*. at 3 (quoting Dec. 11, 1995 Order of Reference at 3-4, ECF No. 640). On August 27, 2025, the court appointed a Receiver, effective September 1, 2025, to "exercise all powers vested by law in the Secretary of the CDCR as they related to the administration, control, management, operation, and financing of the CDCR Mental Health Services Delivery System (MHSDS) and provision of mental health services to class members." Sept. 5, 2025 Order at 3, ECF No. 8765. The Special Master prepared and filed the 31A Report prior to the court's appointment of the Receiver.

Six California state officials are defendants in this action: the Governor, the Director of the Department of Finance, the Director of the DSH, the CDCR Secretary, the CDCR Undersecretary for Health Care Services, and the CDCR Deputy Director of the Statewide Mental Health Program. Until now, "[t]he principal responsibilities of the special master, . . . , [have been] to provide expert advice to defendants to ensure that their decisions regarding the provision of mental health care to class members conforms to the requirements of the federal constitution and to advise the court regarding assessment of defendants' compliance with their constitutional obligations." Dec. 11, 1995 Order of Reference at 2, ECF No. 640.

The Receiver now stands in the shoes of defendant CDCR Secretary Macomber and has the responsibility to exercise all powers vested in the Secretary to complete full and durable implementation of the court-ordered and approved remedies in this case. She has authority over the other two CDCR defendants. "The authority the court has granted to the Receiver in this

action does not extend beyond the authority of the Secretary of CDCR", Oct. 28, 2025 Order at 3, ECF No. 8804, and, as relevant here, does not extend to the Department of State Hospital (DSH) defendant. At the same time, "[a]ll defendants," including DSH, are required to and acknowledge their obligation to "fully cooperate with the Receiver in the discharge of her duties. . . ." ECF No. 8765. The Receiver is an arm of a court, not a defendant; therefore, going forward appointment of the Receiver necessarily changes the Special Master's role in advising the CDCR defendants, and the court anticipates issuing an order clarifying the changed order shortly.

## II. LEGAL STANDARD

As still relevant here, paragraph C of the Order of Reference provides in relevant part:

> [A]ny compliance report of the special master filed in accordance with paragraph A(5) above shall be adopted as the findings of fact and conclusions of law of the court unless, within ten days after being served with the filing of the report, either side moves to object or modify the report. . . . The objecting party shall note each particular finding or recommendation to which objection is made, shall provide proposed alternative findings or recommendations, and may request a hearing before the court. Pursuant to Fed. R. Civ. P. 53(e) (2), the court shall accept the special master's findings of fact unless they are clearly erroneous.

Dec. 11, 1995 Order at 8, ECF No. 640. The court adopts the Special Master's findings of fact unless those findings are "clearly erroneous." *Id.* "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948) (quoted in *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573 (1985)).[4]

/////

[4] Defendants cite to their December 30, 2024 motion to modify the Order of Reference, in which they request an order modifying the standard of review applicable to the court's review of the Special Master's findings of fact. ECF No. 8731 at 4 n.2. The court stayed its resolution of that motion pending presentation of the Receivership Action Plan. Apr. 2, 2025 Order at 7, ECF No. 8589. The court continues to defer resolution of that motion pending completion of its review of the "focused plan" and any attendant "proposal regarding modifications to the Order of Reference" required by its August 27, 2025 order. *See* ECF No. 8753 at 4.

## III. DISCUSSION

### A. Previously Raised Objections

In their third objection, defendants "object to the Report's findings concerning the quality of care to the extent it includes the term 'inadequate' without additional markers of quality of care." ECF No. 8731 at 8. They raise a similar objection regarding "[t]he reporting on the quality of care at DSH." *Id*. at 9. In objection VI(B), defendants contend "[t]he Report expresses 'significant concerns with treatment planning at all three hospitals,' but fails to provide any nationally recognized objective measures or standards that the experts used to determine whether a treatment plan was 'effective' for the purposes of the Report." *Id*. at 18. Plaintiffs contend these objections are improperly raised because the court has previously overruled them multiple times. ECF No. 8772 at 5-7. Plaintiffs contend, correctly, that the court has in multiple orders overruled this objection. *See* May 16, 2024 Order at 5, ECF No. 8239, and orders cited therein.[5]

In objection V(A), defendants request that "fill rates reported for all PIP classifications" should "include registry staff to avoid imparting the false impression that the use of registry staff is somehow not compliance with staffing obligations." ECF No. 8731 at 14. Plaintiffs contend, correctly, that the court has previously rejected this defense objection because both the defendants and the Special Master report on "overall" or "functional" vacancy rates, which include registry staff in the calculation. ECF No. 8772 at 8 (citing ECF No. 8239 at 3-4). Specifically, the Special Master expressly includes contract clinicians in calculating "overall functional vacancy

/////

[5] Defendants acknowledge the court has overruled these objections multiple times, but assert they continue to raise them "to avoid waiver and maintain, on the record, their position that findings of "inadequacy" in this specific Report are not supported by the record." ECF No. 8731 at 8 n.3. The court has and continues to reject defendants' contention they must continue down this path, which wastes valuable court time and remedial effort. *Id*. at 4 n.3. Plaintiffs observe, here as well correctly, that the court has signaled it would impose sanctions on counsel who continue to file objections that fly in the face of multiple court orders. Defendants' current objections were filed prior to the court's order appointing the Receiver, which was based in part on more than a decade of contentious and wasteful litigation "plagu[ing] remediation." ECF No. 8752 at 20. Since that appointment, the trend appears toward a cessation of such disappointingly wasteful litigation. For that reason, the court will not issue an order to show cause why sanctions should not be imposed at this time.

rate(s)," *see* ECF No. 8712 at 45-50, and the court has expressly rejected an identical defense objection, *see* ECF No. 8239 at 3-4.

For the foregoing reasons, the court OVERRULES defendants' Objections III, V(A)[6], and VI(B).

**B. Other Objections**

**1. DSH Inpatient Beds**

Defendants object to the Special Master's use of the term "underutilization" and "plateaued" utilization with reference to DSH inpatient beds at various points in the 31A Report. ECF No. 8731 at 4. Defendants also object to the Special Master's recommendation that defendants formalize five trial processes initiated by defendants "to further *Coleman* patients' access to DSH programs," ECF No. 7969 at 6. ECF No. 8731 at 6-7. Defendants contend they are not required to fill a specific percentage of number of DSH inpatient beds, and that DSH beds are available only for class members who meet established "least restrictive housing" (LRH) requirements. ECF No. 8731 at 4-7. Plaintiffs contend the Report "accurately and appropriately captures the number of *Coleman* patients in DSH beds over the monitoring period," that appropriate use of DSH beds is critical to the remedy in this action, that defendants' disagreement with the Special Master overstates their success with improvements in timely transfers to inpatient care and elimination of waitlists, and that defendants' objections concerning the DSH trial processes "rely on misstated history of the case." ECF No. 8731 at 9-12.

The Director of DSH is a successor defendant to the Director of the former Department of Mental Health (DMH), joined as a defendant in 2006 based on the court's findings that the agency "plays a critical role in creating sustainable and effective solutions for inpatient care within" CDCR. June 28, 2006 Order at 2, ECF No. 1855. DSH continues to play a critical role in the delivery of inpatient care to class members, particularly through the availability of 256 low

[6] In Section V(A), defendants also suggest "it would be helpful for the Special Master to provide a summary of staff-to-patient ratios in the general staffing section of the Report" even while acknowledging that the Special Master included this information in the sections of the 31A Report covering each PIP. ECF No. 8731 at 14. To the extent this is an objection to the 31A Report, the court OVERRULES it as well.

custody inpatient beds at ASH. Throughout the remedial phase of this action, "the court has issued several orders requiring defendants to make the full complement of 256 ASH beds available to the plaintiff class. *See*, *e.g.*, May 23, 2007 Order, ECF No. 2236 at 4 & n.8; June 18, 2009 Order, ECF No. 3613 at 3-4; June 5, 2012 Order, ECF No. 4199 at 5 (deferring as premature defendants' request to reduce number of intermediate care beds available at ASH)." Apr. 24, 2020 Order at 2-3, ECF No. 6639.

It is settled that class member access "to the full complement of DSH hospital beds [is] an essential component of the Eighth Amendment remedy in this case." *Id*. at 7-8. Use of the full complement of 256 ASH beds allows "patients' access to their clinically and custodially appropriate least restrictive housing (LRH) – a very important concern from a therapeutic standpoint." ECF No. 5448 at 9, adopted in full without objection by Mar. 8, 2017 Order, ECF No. 5573. This use also has been key to reducing and eliminating long wait lists for inpatient care, *see*, *e.g.* Aug. 21, 2015 Order at 2, ECF No. 5543 (ordering defendants to "report to the court on whether regular and consistent use of the full complement of 256 beds at ASH designated for *Coleman* class members is sufficient to permanently eliminate the ongoing waitlist for inpatient mental health care. . . .").

At several critical junctures, "[d]eclining admissions and/or census" in inpatient beds designated for class members at Atascadero State Hospital (ASH), Sept. 13, 2021 Order at 9, ECF No. 7305, has been a red flag signaling possible inadequacies or lapses in processes for referring class members to necessary inpatient care. *See* Dec. 20, 2022 Order at 3, ECF No. 7688 (quoting Special Master's 29B Monitoring Report, ECF No. 7625 at 23 n.11). Defendants have conducted several assessments of unmet need for inpatient care over the history of this action that identified substantial unmet need for that care. *See* ECF No. 7305 at 4-12. The most recent Unmet Need Assessment (UNA) was conducted and completed in 2022 and 2023. *See* ECF No. 7865-2. Following a hearing on that report, the court found it "persuasive in its finding that CDCR has enough inpatient beds and mental health crisis beds (MHCBs) to meet class member need for

/////

/////

those levels of care." Nov. 15, 2023 Order at 3, ECF No. 8066. The court also found, however, that

> the UNA process identified some questions not intended to be answered by the UNA or the Report but nonetheless best addressed promptly in aid of a sustainable remedy. Those questions include why referrals to inpatient mental health care have not returned to the referral levels that preceded the onset of the COVID-19 pandemic; what lessons were learned during the UNA study about the impact of staffing shortages on access to care and interdisciplinary treatment team (IDTT) referral decisions; what are reason(s) for the significant number of inpatient referrals made outside the UNA process during Phase II of the UNA study; and whether patients whose UNA referrals were rejected by IDTTs were subsequently referred to inpatient care.

*Id*. at 4. The court made clear "the answers to those questions will aid defendants in assuring the remedial process for ensuring timely access to inpatient mental health care is fully and durably implemented." *Id*. The court did not make any specific orders but encouraged defendants to take initiative to voluntarily answer those questions, and to work collaboratively with the Special Master in doing so. *Id*.

Between October 2023 and June 2024, defendants implemented five "trial processes" aimed at assessing referrals of class members to DSH inpatient beds. ECF No. 8712 at 58-61. These processes were initiated in response to the court's plan to initiate enforcement proceedings on defendants' compliance with remedial requirements for timely transfer of inmates to higher levels of care, *see*, *e.g.*, Aug. 11, 2023 Order, ECF No. 7916, and to the court's November 15, 2023 Order. Ultimately, the court deferred further hearing on inpatient transfer timelines compliance in view of these new "trial processes." *See* Reporter's Transcript of Proceedings (RT 06/27/24) at 4-6, ECF No. 8315.

In January of this year, defendants informed plaintiffs and the Special Master "they had decided to make the trial process permanent and that they would draft a policy document and share it with the  parties regarding the trial process." *Id*. at 61. The Special Master reports his general support for the "trial processes" while noting some "lack of clarity and finality to" the processes; he reports that in April 2025 he urged defendants to "clarify [the] timeline for

/////

finalizing these processes and incorporate them into the memorandum of understanding [MOU] between CDCR and DSH." *Id*. at 62.[7]

Timely transfers to inpatient care are only one part of the relevant remedial equation here: Referrals to inpatient care must also be timely made for patients in need of that level of care, and the LRH process must be fully used.[8] Defendants recognized this when they presented new processes to assess and "increase access to DSH programs" in an effort to avoid enforcement proceedings. Viewed in the context of the foregoing history, the Special Master's reference to "underutilization" of ASH beds is not in error. Adoption of his recommendation that defendants be required to "finalize and issue any and all policies, memoranda, and procedures, including as necessary amendments to the existing Memorandum of Understanding (MOU) between CDCR and DSH regarding admission of Coleman class members to DSH programs" will not improperly expand the remedy in this case. The court will adopt the recommendation and refer timely implementation of the recommendation to the Receiver and the Director of DSH. The court OVERRULES Objections I and II.

**2. Deactivation of Inpatient Beds**

The court has referred "[a]ll questions presented by defendants' proposed deactivation of certain inpatient bed licenses . . . to the Receiver effective September 1, 2025." ECF No. 8752 at 24. The court anticipates approving the Receiver's proposal resolving these questions shortly. The court OVERRULES defendants' Objection IV for this reason.

**3. Monitoring of CDCR PIPs**

In Section V, defendants raise four additional objections to aspects of the Special Master's monitoring of and/or reporting on the CDCR PIPs. Specifically, defendants contend (1) the

---

[7] "The MOU is the inter-agency agreement under which CDCR and DSH carry out referral, transfer, and treatment of CDCR inmates in designated inpatient programs." ECF No. 5448 at 10.

[8] Defendants assert "the evidence shows that the beds are being fully utilized for the patients who can be appropriately and safely treated in DSH hospitals." ECF No. 8731 at 4-5. Defendants' reference to "evidence" appears to be to the results of the most recent UNA. *Id*. at 5. As noted, however, the UNA raised several questions about referrals, with the answers also bearing on whether ASH beds are in fact "being fully utilized for the patients who can be appropriated and safely treated" in those beds.

Special Master audited defendants' compliance with the policy for providing structured treatment in the PIPs before the policy was effective or compliance was required; (2) the Report fails to make clear that the Positive Behavioral Support Teams (PBST) Program is not part of the remedy in this case; (3) the death review process is outside the scope of the Special Master's monitoring and therefore statements regarding two death reviews should be stricken; and (4) the Report improperly suggests Enhanced Outpatient Program (EOP) patients should be placed in DSH beds. ECF No. 8731 at 14-16. Plaintiffs contend these objections are without merit and should be overruled. *See* ECF 8772 at 13-15.

a) Monitoring of Compliance with PIP Minimum Treatment Standards

On August 23, 2023, the court ordered defendants to "immediately implement" "minimum treatment standards requiring patients be offered 20 hours of *treatment* per week. . . ." Aug. 23, 2023 Order at 9-10, ECF No. 7924 (emphasis in original). Defendants appealed, and the United States Court of Appeals for the Ninth Circuit affirmed this court's order. Aug. 30, 2024 Order, ECF No. 8385. Defendants neither sought nor obtained a stay of the order during the pendency of their appeal. Nothing in the August 23, 2023 order authorized defendants to delay compliance with the PIP minimum standards for more than a year, and the Special Master did not err in monitoring their compliance with that order. The court summarily OVERRULES this objection.

b) Reporting on Use of PBSTs in CDCR PIPs

Defendants contend that the PBST Program used in CDCR PIPs is not part of the remedy in this case, that all references to the program should be removed from the Report, and that "all future monitoring of this issue should be discontinued." ECF No. 8731. Plaintiffs contend defendants do not point to any factual inaccuracies in the Report concerning PBSTs or to any place where the Special Master states PBSTs are required by the remedy. Plaintiffs contend the Special Master has reported on PBSTs in the past, and "is well within his authority to monitor and report on ways to improve the quality of care for class members." ECF No. 8772 at 4.

In the Report, the Special Master explains he has "previously reported [that] PBST intervention 'is clinically indicated for many *Coleman* class members," that "'defendants have recognized the need to provide positive behavior support services to *Coleman* class members for

many years',” and that he “has monitored utilization of PBSTs in each of his inpatient monitoring reports.” ECF No. 8712 at 20 (internal citations omitted). He explains his discussion of PBSTs is “consistent with his authority under the Order of Reference, to *advise* defendants and the Court that . . . implementation (or more efficacious implementation as the case may be) [of PBSTs] . . . would be an efficient, effective, and proved way to improve the quality of care delivered in these inpatient settings.” *Id.*

The Special Master's reporting on defendants' use of PBSTs in CDCR PIPs falls within his responsibility to provide expert advice to the CDCR defendants and the court concerning defendants' compliance with their constitutional obligations. *See* Order of Reference at 3, ECF No. 640. The Special Master's reporting and assessment of these programs aids assessment of the degree to which use of PBSTs helps to fulfill core remedial requirements. This reporting, which has now been included in several monitoring reports, is particularly important as the Receiver assumes responsibility for full and durable implementation of the remedy in this action. The court OVERRULES this objection as well.

c) Reporting on Two Death Reviews

Defendants contend the death review process is outside the scope of the Special Master's monitoring and therefore statements regarding two death reviews should be stricken. ECF No. 8731 at 15. Plaintiffs respond that the Special Master monitors the death review process in connection with his review of inmate suicides, and that defendants have not objected to this aspect of the monitoring before now. ECF No. 8772 at 15. Defendants have not presented any evidence that the facts reported by the Special Master are erroneous, and they present nothing that calls into question the Special Master's rationale for monitoring the death review process as part of his responsibility for monitoring inmate suicides. The court OVERRULES this objection.

d) Consideration of Placement of EOP Patients in DSH beds

Defendants object to the Special Master's suggestion, raised in a footnote in the report, that they consider use of DSH beds for mental health care for certain EOP patients. ECF No. 8731 at 14-16. The Special Master explains his suggestion as presented in aid of solutions to the ongoing effort to “find appropriate housing for class members at the EOP level of care.” ECF

No. 8712 at 183 n.41. Again, this suggestion falls within the scope of the Special Master's responsibilities under the Order of Reference. It too is valuable as the Receiver assumes responsibility for full remediation. The court OVERRULES this objection.

For the foregoing reasons, the court OVERRULES defendants' Objections V(B)-(D).

**4. Monitoring of DSH Programs**

a) DSH Interdisciplinary Treatment Team (IDTT) Process

Defendants object to the Special Master's finding that "required staff were present for 62 of 78 or 79 percent of reviewed IDTTs," ECF No. 8712 at 76, as well as his other findings that "required and/or expected staff members" or "critical staff" were missing in a certain percentage of IDTTs at the three state hospital programs, ECF No. 8712 at 92. Defendants assert the Report is in error here because it "incorrectly asserts that DSH is required to have specific members of the treatment team attend each IDTT" and thereby improperly imposes Program Guide requirements on DSH. ECF No. 8731 at 17. Defendants also point to the following language in the Report, added by the Special Master in response to defendants' objection in support of their contention the Special Master is

> attempt[ing] to create a requirement where none exists: "the language and spirit of the policy DSH relies on that the contributions of each IDTT member . . . are integral to effective treatment planning. In order to meaningfully contribute to treatment planning discussions with the patient that occur in these meetings, at minimum, team members must attend them. (Report at 25.)"

*Id*. at 17-18. In addition, defendants contend "the Report seems to imply that IDTT meetings are the only time communication and collaboration between a patient's treatment team members occurs" and ignores the fact that DSH IDTT team members talk regularly. *Id*. at 17.

Plaintiffs contend defendants do not attack the factual accuracy of the findings concerning IDTT attendance, and that the assertion the Special Master inappropriately imposes Program Guide requirements is unsupported because the Report specifically cites to the relevant DSH policy. ECF No. 8772 at 16. Plaintiffs also contend the Special Master is correct about the "text and spirit" of DSH policy because the IDTT meetings are the only time the patient is present with the clinical team. *Id*. at 17.

Defendants' objection here is without merit. The controlling DSH policy provides:

> The IDTT is comprised of the patient and those persons who work directly with each patient in the following service areas: psychiatry, psychology, social work, rehabilitation therapy, and nursing as well as any other person who is directly involved in the treatment of the patient.

ECF No. 8712 at 24 (quoting DHS Policy Directive 3607 (dated July 1, 2017), ECF No. 8712-1 at 33). The "persons who work directly with each patient" are the staff members who are "required and/or expected" to be part of a patient's IDTT. The Report identifies the percentage of these staff members who were missing from IDTT meetings at each hospital program. Defendants do not challenge this factual finding. Defendants' attempt to parse the language of the Report to suggest it rests on an asserted mandatory attendance requirement is misguided. The Special Master's advice to defendants that meaningful contributions to treatment planning are best made in the IDTT setting and, therefore, that team members "must" attend those meetings is advice to defendants and to the court about best practices in the Eighth Amendment context. It does not read a mandatory attendance requirement into controlling policy. The court OVERRULES this objection.

b) Individual Therapy

Defendants assert that "[a] frequent unfounded critique by the Special Master's experts is what they perceive as a lack of individualized treatment intervention." ECF No. 8731 at 20 (citing Report at 78, 94). They contend the "DSH model of treatment is primarily group therapy and use of psychiatric medications," that "individual treatment is not mandated" by the remedies in this action, and that "the core treatment guidelines (10 hours per week) approved by the Court, . . . , confirm that individual therapy is not part of the DSH remedial plan." *Id.* They argue that based on "empirical and national recognized norms" the group treatment model "is an appropriate and adequate form of treatment." *Id.* at 20-21. Plaintiffs say defendants' assertion that "'individual therapy is not part of the DSH remedial plan'" is "patently untrue," that the Report correctly states that individual therapy can be used to satisfy core treatment requirements, and that the Report is factually correct in its reporting on these numbers. ECF No. 8772 at 17. Plaintiffs also assert the court has previously rejected identical objections to the Special Master's critiques

of lack of individual treatment and alleged failure to rely on national standards and should do so here. *Id*. at 18.

The Program Guide expressly provides that for each patient admitted to an intermediate care facility (ICF) inpatient program

> an individualized treatment program is developed from a wide variety of treatment modalities **including group and individual psychotherapy**, medication management, depression and crisis management, training in daily living skills and interpersonal skills, substance abuse, management of assaultive behavior, supportive counseling, modification of maladaptive behaviors, and educational and vocational programs.

ECF No. 7333-1 at 113 (emphasis added). In 2023, the court found that

> [b]y 2020, DSH had developed a fully adequate CQI process, ECF No. 7625 at 29-30, which it still uses. Ex. A to Decl. of Galvan, ECF No. 7812-1. That process includes definitions of "core groups," "supplemental groups," **and "individual therapy"** and provides that patients will be offered 20 hours of *treatment* per week, at least ten hours of which are to be "core" treatment. ECF No. 7812-1 at 15.

Aug. 23, 2023 Order at 4, ECF No. 7924 (emphasis added). Specifically, the DSH CQI process provides in relevant part:

> 6.2 Summary of Treatment Hours
>
> All patients will be offered, on average, 20 hours of treatment each week. Of the 20 hours of offered treatment, at least 10 hours will be core treatment consisting of Core Groups, Individual Therapy or Clinical Contacts (as defined below).
>
> . . .
>
> **Individual Therapy** – Any therapeutic session where one clinician (psychiatrist, psychologist, social work or rehabilitation therapist) meets with one patient for more than 15 minutes. These sessions are goal directed and have specific desired outcomes. These sessions are part of the patient's treatment plan and are re-occurring. . . .

ECF No. 7625-1. Defendants' assertion that "the core treatment guidelines (10 hours per week) approved by the Court, . . . , confirm that individual therapy is not part of the DSH remedial plan," ECF No. 8772 at 20, is factually incorrect. The rest of defendants' objection proceeds from this misrepresentation. The court OVERRULES this objection.

/////

c) Non-Renewals of Involuntary Medication

Defendants object to examples cited in the Report of "a lack of a thorough rationale for non-renewal of involuntary medication (PC 2602)," contending "there is no statutory authority or DSH policy requiring that a clinical rationale be documented for non-renewal of a PC 2602." ECF No. 8731 at 21. Defendants also contend the Special Master has not monitored PC 2602 non-renewals before, *id*., and they "are concerned that this criticism will lead to an expansion of the remedy where there is no clinical or legal justification to do so," *id*. at 22. Plaintiffs contend defendants do not challenge the accuracy of the facts reported by the Special Master, and that he is fully authorized to "report his *accurate findings* regarding clinical documentation for non-renewals of medications." ECF No. 8772 at 18. Plaintiffs also note defendants did not object when the Special Master in 2022 reported positively that non-renewals were properly documented. *Id*.

Defendants do not contend that the facts reported by the Special Master are inaccurate and their assertion that the Special Master has not previously monitored non-renewals of involuntary medication is incorrect.[9] *See, e.g.*, ECF No. 8085 at 124 ("monitor's expert requested clarification of the non-renewal process, and whether a formal non-renewal notice was filed", 184 ("sufficient rationale" for non-renewal); ECF No. 7625 at 60, 143-44; ECF No. 7555 at 186 (one 2602 order not renewed); ECF No. 5156 at 281 (no explanation provided for decision to allow pending 2602 order to lapse). The court OVERRULES this objection.

d) DSH Case Reviews

Finally, defendants object to the Special Master's purported failure to consider document reviews submitted by DSH in response to certain individual case reviews in the draft Report. ECF No. 8731 at 22. Plaintiffs contend this objection is without merit because the draft Report was based on the documentation defendants had provided to the Special Master's team during the

[9] In some instances, the Special Master has reported that all PC 2602 orders were timely renewed, or that no 2602 petitions were renewed during the monitoring period. *See, e.g.,* ECF No. 5894 at 36, 122 (no petitions initiated or renewed at DSH-Coalinga during monitoring period); ECF No. 5156 at 102 ("[m]edication renewal orders routinely written for 45-days duration"). It is reasonable to infer inclusion of review of non-renewals even if the finding is there were none.

monitoring round, and the Special Master could not verify the DSH clinical assessments made "after-the-fact." ECF No. 8772 at 19. Plaintiffs contend the "objection should be overruled, and the Court should reject any effort to substitute the neutral, Court-appointed Special Master's judgment with the judgment of Defendants' own clinicians." *Id*. at 19-20.

Defendants misrepresent the Special Master's assessment of the clinical case reviews they presented in response to the draft Report. In particular, the Special Master states he "and his experts carefully reviewed DSH-defendants' objections and found no basis to change any of the overall findings regarding adequacy of care objected to by DSH." ECF No. 8712 at 33. The Special Master also notes

> the lack of electronic health records in the DSH facilities prohibits the Special Master's expert's ability to re-review the cases in question. Further, in some instances DSH appears to be relying on information not contained in the patients' medical record – even relying on CDCR records that postdated the review period for the respective cases to bolster their objections. . . . The Special Master's experts do not routinely rely on extraneous information outside of the patient's medical record (and not otherwise provided to the expert) in conducting these clinical case reviews.

ECF No. 8712 at 34. The Special Master did not fail to consider DSH's objections to certain clinical reviews; he considered them and determined they did not change the top line findings concerning adequacy of care. The court OVERRULES this objection.

## IV. CONCLUSION

For all the reasons explained above, the court finds defendants' objections to the 31A Report are without merit. As noted above, the Receiver has now been tasked with responsibility for full implementation of the remedy. The Special Master's guidance, based on thirty years of service in this action, is a valuable resource for the Receiver going forward.

In accordance with the above, IT IS HEREBY ORDERED that:

1. The Special Master's July 30, 2025 31st Round Monitoring Report Part A, ECF No. 8712, is ADOPTED in full; and
2. The Receiver and the Director of DSH shall work within their respective authorities, collaborating as necessary, to finalize and issue any and all policies, memoranda, and procedures regarding admission of *Coleman* class members to DSH programs based

on the five processes defendants have made permanent, including as by effecting amendments to the existing Memorandum of Understanding (MOU).

DATED: December 9, 2025.

UNITED STATES DISTRICT JUDGE