**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF CALIFORNIA**

**RALPH COLEMAN, et al.,**

**Plaintiffs,**

**vs.** **No. 2:90-cv-0520 KJM-SCR**

**GAVIN NEWSOM, et al.,**

**Defendants.**

# THE *COLEMAN* SPECIAL MASTER'S THIRTY-FIRST ROUND MONITORING REPORT - PART B

Matthew A. Lopes, Jr., Esq.
Special Master
PANNONE LOPES DEVEREAUX & O'GARA LLC
Northwoods Office Park, Suite 215-N
1301 Atwood Avenue
Johnston, RI 02908
(401) 824-5100
Fax: (401) 824-5123
December 15, 2025

## ACRONYMS AND ABBREVIATIONS

| | |
|---|---|
| 3CMS: | Correctional Clinical Case Management System |
| ADA: | Americans with Disabilities Act |
| ADL: | Activities of Daily Living |
| AGPA: | Associate Governmental Program Analyst |
| AIMS: | Abnormal Involuntary Movement Scale |
| APA: | American Psychological Association |
| ASP: | Avenal State Prison |
| AVSS: | Audio Visual Security System |
| BPH: | Board of Prison Hearing |
| C&PR: | Classification and Parole Representative |
| CAP: | Corrective Action Plan |
| CAT: | Chart Audit Tool |
| CBC: | Completed Blood Count |
| CBT: | Cognitive Behavioral Therapy |
| CC I: | Correctional Counselor I |
| CC II: | Correctional Counselor II |
| CCCMS: | Correctional Clinical Case Management System |
| CCI: | California Correctional Institution |
| CCHCS: | California Correctional Health Care Services |
| CCWF: | Central California Women's Facility |
| CDCR: | California Department of Corrections and Rehabilitation |
| CEO: | Chief Executive Officer |
| CHCA: | Correctional Health Care Administrator |
| CHCF: | California Health Care Facility |

| | |
|---|---|
| CHSA: | Correctional Health Services Administrator |
| CIM | California Institution for Men |
| CIT: | Crisis Intervention Team |
| CIW: | California Institute for Women |
| CMC: | California Men's Colony |
| CMF: | California Medical Facility |
| CMHPP: | Custody and Mental Health Partnership Plan |
| CMP: | Comprehensive Metabolic Panel |
| CNA: | Certified Nursing Assistant |
| COAC: | Clinical Operations Advisory Council |
| CPAP: | Continuous Positive Airway Pressure |
| CRC: | California Rehabilitation Center |
| CPR: | Cardiopulmonary Resuscitation |
| CSP/Corcoran: | California State Prison/Corcoran |
| CSP/LAC: | California State Prison/Los Angeles County |
| CSP/Sac | California State Prison/Sacramento |
| CSP/Solano: | California State Prison/Solano |
| CSATF: | California Substance Abuse Treatment Facility |
| CSR: | Classification Service Representative |
| CSW: | Clinical Social Worker |
| CTC: | Correctional Treatment Center |
| CTF: | Correctional Training Facility |
| DAPO: | Division of Adult Parole Operations |
| DAR: | Daily Activity Report |
| DBT: | Dialectical Behavior Therapy |

| | |
|---|---|
| DD1: | Developmental Disability 1 |
| DD2: | Developmental Disability 2 |
| DDP: | Developmental Disability Program |
| DNH: | Hearing Impaired |
| DOM: | Department Operations Manual |
| DOT: | Direct Observation Treatment |
| DPP: | Disability Placement Program |
| DSH: | Department of State Hospitals |
| DTS: | Danger to Self |
| ECT: | Electroconvulsive Therapy |
| EHRS: | Electronic Health Records System |
| EKG: | Electrocardiogram |
| EMRRC: | Emergency Medical Response Review Committee |
| EOP: | Enhanced Outpatient Program |
| EOP Mod: | Modified EOP Programming |
| EPRD: | Earliest Possible Release Date |
| ER: | Emergency Room |
| FBI: | Foreign Body Ingestion |
| FIT: | Focused Improvement Team |
| FLX: | Inpatient Flex Bed |
| FSP: | Folsom State Prison |
| FTE: | Full-Time Equivalent |
| GAD: | Generalized Anxiety Disorder |
| GAF: | Global Assessment of Functioning |
| GED: | General Education Development |

GIQ: Gender Identity Questionnaire

GOGI: Getting Out by Going In

GP: General Population

HCAQ: Health Care Access Quality Report

HCAU: Healthcare Access Unit

HCDOM: Health Care Department Data Warehouse

HCFIP: Health Care Facility Improvement Program

HCPOP: Health Care Placement Oversight Program

HDSP: High Desert State Prison

HIL: Heat Incident Log

HIV: Human Immunodeficiency Virus

HLOC: Higher Level of Care

HPI: History of Present Illness

HQIR: Health Care Incident Report

HPS: Health Program Specialist

HS: *hora somni*

Ht: Height

IAC: Inmate Advisory Counsel

ICC: Institutional Classification Committee

ICF: Intermediate Care Facility

ICU: Intensive Care Unit

IDST: Interdisciplinary Support Team

IDTT: Interdisciplinary Treatment Team

IERC: Institution Executive Review Committee

IEX: Indecent Exposure

| | |
|---|---|
| IMHPC: | Inpatient Mental Health Pre-Release Coordinator |
| IP: | Inmate Profile |
| IPOC: | Interdisciplinary Plan of Care |
| IPOC: | Individualized Plan of Care |
| IRU: | Inpatient Referral Unit |
| IST: | In-Service Training (unit) or Incompetent to Stand Trial |
| ISUDT: | Integrated Substance Use Disorder Treatment |
| KOP: | Keep on Person |
| KVSP: | Kern Valley State Prison |
| LAC: | Los Angeles County |
| LCSW: | Licensed Clinical Social Worker |
| LGB: | Local Governing Body |
| LMFT: | License Marriage Family Therapist |
| LOC: | Level of Care |
| LOP: | Local Operating Procedure |
| LPT: | Licensed Professional Therapist |
| LRH: | Least Restrictive Housing |
| LTSCC: | Long-Term Segregated Case Conference |
| LVN: | Licensed Vocational Nurse |
| MA: | Medical Assistant |
| MAPIP: | Medication Administration Process Improvement Program |
| MAT: | Medication-Assisted Treatment |
| MCA: | Medication Court Administrator |
| MCRP: | Male Community Reentry Program |
| MCSP: | Mule Creek State Prison |

| | |
|---|---|
| MERD: | Minimum Eligible Release Date |
| MFT: | Marriage and Family Therapist |
| MHA: | Mental Health Assessment |
| MHCB: | Mental Health Crisis Bed |
| MHMD: | Mental Health Medical Doctor |
| MHPS: | Mental Health Program Subcommittee |
| MHSDS: | Mental Health Services Delivery System |
| MOD: | Medical Officer of the Day |
| MSF: | Minimum Support Facility |
| MTP: | Master Treatment Plan |
| NA: | Nurse Administered |
| NDPF: | Non-Designated Program Facility |
| NDRH: | Non-Disciplinary Restricted Housing |
| NKSP: | North Kern State Prison |
| NKSP-RC: | North Kern State Prison-Reception Center |
| NLTG: | Nursing Led Treatment Groups |
| NOS: | Not Otherwise Specified |
| OC: | Oleoresin Capsicum spray |
| OHU: | Outpatient Housing Unit |
| OMD: | Offender Mental Health Disorder |
| OSS: | Office Services Supervisor |
| OT: | Office Technicians |
| PAC: | Patient Advisory Council |
| PBSP: | Pelican Bay State Prison |
| PBST: | Positive Behavioral Support Team |

| | |
|---|---|
| PC: | Primary Clinician |
| PCC: | Professional Clinical Counselors |
| PCP: | Patient Care Plan |
| PG: | Program Guide |
| PIP: | Psychiatric Inpatient Program |
| PIWP: | Performance Improvement Work Plan |
| PNP: | Psychiatric Nurse Practitioner |
| PREA: | Prison Rape Elimination Act |
| PRN: | *pro-re-nata* - As Needed |
| PRPA: | Pre-Release Planning Assessment |
| PSA: | Parole Services Associate |
| PSR: | Program Status Report |
| PSY: | Psychiatrist |
| PTSD: | Post-Traumatic Stress Disorder |
| PVSP: | Pleasant Valley State Prison |
| QIP: | Quality Improvement Plan |
| QIT: | Quality Improvement Team |
| QM: | Quality Management |
| QMC: | Quality Management Committee |
| R&R: | Receiving & Release |
| RC: | Reception Center |
| RCA: | Root Cause Analyses |
| RHU: | Restricted Housing Unit |
| RJD: | Richard J. Donovan Correctional Facility |
| RMC: | Risk Management Committee |

| | |
|---|---|
| ROI: | Releases of Information |
| RN: | Registered Nurse |
| RT: | Recreation Therapist/therapy |
| RVR: | Rules Violation Report |
| SCC: | Sierra Conservation Center |
| SHO: | Senior Hearing Officer |
| SIB: | Self-Injurious Behaviors |
| SMI: | Serious Mental Illness |
| SNY: | Special Needs Yard |
| SOMS: | Strategic Offender Management System |
| SPRFIT: | Suicide Prevention and Response Focused Improvement Team |
| SQ: | San Quentin Rehabilitation Center |
| SRA: | Suicide Risk Assessment |
| SRASHE: | Suicide Risk and Self-Harm Evaluation |
| SRE: | Suicide Risk Evaluation |
| SRMP: | Suicide Risk Management Program |
| SSI: | Supplemental Security Income |
| SSRI: | Selective Serotonin Reuptake Inhibitor |
| STA: | Structured Treatment Activity |
| STGs: | Security Threat Group |
| SVSP: | Salinas Valley State Prison |
| TABE: | Test of Adult Basic Education |
| TCMP: | Transitional Case Management Program |
| TFTs: | Thyroid Function Tests |
| TTM: | Therapeutic Treatment Module |

| | |
|---|---|
| TTA: | Triage and Treatment Area |
| UCC: | Unit Classification Committee |
| UMC: | Utilization Management Committee |
| VA: | Veterans Affairs |
| VSP: | Valley State Prison |
| WSP: | Wasco State Prison |
| Wt: | Weight |

# TABLE OF CONTENTS

ACRONYMS AND ABBREVIATIONS ........ i

THE COLEMAN SPECIAL MASTER'S THIRTY-FIRST ROUND MONITORING ........ 1

I. INTRODUCTION ........ 1

A. Overview of Recent Case Developments ........ 3

B. Discussion of Population Growth and Concerns with Inappropriate Housing ........ 8

C. Institutionalized Non-Compliance with the Court-Ordered Remedy Through the Use of Triage Plans ........ 13

D. Data Remediation ........ 18

II. SUMMARY OF THE SPECIAL MASTER'S FINDINGS ........ 20

A. Mental Health Vacancy Rates Overall and by Disciplines During the Thirty-First Monitoring Round ........ 20

B. Clinical Services and Programming ........ 28

C. Overall Quality of Care Reflected in Case Reviews ........ 42

D. MHSDS Patients in Restricted Housing ........ 56

E. Quality Management ........ 61

F. Access to Higher Levels of Care ........ 65

G. Custody and Mental Health Partnership Plan ........ 68

H. Review of the RVR Process ........ 78

I. Use of Force ........ 83

J. Program Access ........ 88

CONCLUSION ........ 97

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF CALIFORNIA**

**RALPH COLEMAN, et al.,**
**Plaintiffs,**

**vs.** **No. 2:90-cv-0520 KJM-SCR**

**GAVIN NEWSOM, et al.,**
**Defendants.**

**THE COLEMAN SPECIAL MASTER'S THIRTY-FIRST ROUND MONITORING REPORT - PART B**

## I. INTRODUCTION

In this Report, the *Coleman* Special Master presents his findings from monitoring tours of the California Department of Corrections and Rehabilitation's (CDCR's) mental health programs conducted in the following twenty-eight prisons: Avenal State Prison (ASP), California Correctional Institution (CCI), California Health Care Facility (CHCF), California Institution for Men (CIM), California Institution for Women (CIW), California Medical Facility (CMF), California Men's Colony (CMC), California Rehabilitation Center (CRC), California State Prison/Corcoran (CSP/Corcoran), California State Prison/Los Angeles County (CSP/LAC), California State Prison/Sacramento (CSP/Sac), California State Prison/Solano (CSP/Solano), California Substance Abuse Treatment Facility (CSATF), Correctional Training Facility (CTF), Central California Women's Facility (CCWF), FSP State Prison (FSP), High Desert State Prison (HDSP), Kern Valley State Prison (KVSP), Mule Creek State Prison (MCSP), North Kern State Prison (NKSP), Pelican Bay State Prison (PBSP), Pleasant Valley State Prison (PVSP), Richard J. Donovan Correctional Facility (RJD), Salinas Valley State Prison (SVSP), San Quentin Rehabilitation Center (SQ), Sierra Conservation Center (SCC), Valley State Prison (VSP), and Wasco State Prison (WSP).

While the Special Master has filed separate monitoring report installments covering CDCR's enhanced outpatient program (EOP) and correctional clinical case management system (3CMS) institutions for the two preceding monitoring rounds, this Report discusses the Special Master's findings from monitoring tours at all CDCR institutions with Mental Health Services Delivery System (MHSDS) programs. Similar to the format of recent monitoring reports, the focus areas for this review included: mental health staffing vacancies, quality management, assessment of quality of care in CDCR's mental health programs (including findings reflected in the monitor's expert's clinical case reviews), access to higher levels of care, Custody and Mental Health Partnership Plan (CMHPP), review of the rules violation report (RVR) and use of force processes, program access, and mental health patients housed in restricted housing settings.

The summaries of the monitoring focus areas appear below in Part II. Appendix A is comprised of institution-by-institution summaries of the monitor's findings concerning the respective monitoring tours. Appendix B is comprised of the Special Master's experts' clinical reviews of individual patient cases.

Overall, while delineating some grave remaining deficiencies, this report also provides some hopeful news. Understaffing among primary clinicians, while still problematic, is easing somewhat, aided by the addition of tele-mental health clinicians operating under the court-approved tele-mental health policy as well as recent success in hiring licensed marriage and family therapists (LMFTs). With a Receiver in place, especially one with the goal of "…eliminat[ing] the use of triage plans to the greatest extent possible," Receivership Action Plan, ECF No. 8722 at 21, and with the heavy lifting portion of data remediation completed, the potential for significant forward progress exists. No matter how well-intentioned an effort to mitigate the worst effects of inadequate staffing, triage plans ration the mental health treatment

provided to the *Coleman* class by fiat and ignore large portions of the Court-ordered remedy. Eliminating the use of these emergency measures would be a constructive place to start.

### A. Overview of Recent Case Developments

The time preceding distribution of this Report[1] was both prolific and highly consequential. In the 16 months since the Court's July 12, 2024 Order to Show Cause regarding appointment of a temporary receiver, the Special Master has filed **ten** substantive reports addressing defendants' compliance with critical aspects of the Court-ordered remedy in this matter.[2] These reports include comprehensive monitoring reports on CDCR's 3CMS institutions and inpatient programs, focused reviews of the department's newly activated EOP programs as well as its performance implementing the heat plan, multiple status reports on the lengthy data remediation project, and, critically, several reports from the Special Master's suicide prevention expert, Mr. Lindsay Hayes.

---

[1] In its August 27, 2025 Order approving the Receivership Action Plan, the Court ordered the Special Master "to aim to complete his full monitoring report by the end of November 2025." ECF No. 8753 at 7. The Special Master requested an extension of time until December 15, 2025 to complete this monitoring report, ECF No. 8819, which the Court granted in a subsequent order. *See* December 2, 2025 Order, ECF No. 8821 (directing the Special Master to "complete his Thirty-First Monitoring Report – Part B and provide it to the Court and Receiver by December 15, 2025").

[2] During this time, the Special Master filed a substantive report approximately every 52 days, reflecting a near constant pace of monitoring and reporting. *See* Thirtieth Round Monitoring Report - Part D, ECF No. 8359 (filed 8/16/2024); Data Remediation Status Report, ECF No. 8410 (filed 9/30/2024); Suicide Prevention Expert's Supplemental Report Regarding Measures 31 and 32, ECF No. 8475 (filed 11/25/2024); Thirty-First Round Focused Report on Heat Plan Implementation, ECF No. 8558 (filed 2/28/2025); Data Remediation Status Report, ECF No. 8624 (filed 5/1/2025); Thirty-First Round Focused Report on Newly Activated EOPs, ECF No. 8654 (filed 5/29/2025); Data Remediation Status Report, ECF No. 8697 (filed 7/11/2025); Thirty-First Round Monitoring Report – Part A Regarding Inpatient Programs, ECF No. 8712 (filed 7/30/2025); Suicide Prevention Expert's Second PIP Re-Audit Report, ECF No. 8766 (filed 9/8/2025); Suicide Prevention Expert's Seventh Re-Audit Report, ECF No. 8822 (filed 12/2/2025).

Suicide Prevention

During this time, the Special Master filed three reports addressing suicide prevention for patients receiving treatment in CDCR prisons and psychiatric inpatient programs (PIPs). ECF No. 8475, ECF No. 8766, and ECF No. 8822. As of the time of this writing, the Special Master's suicide prevention expert has found that CDCR has yet to fully implement eight suicide prevention measures related to the PIPs, ECF No. 8766 at 23, and 11 of 29 suicide prevention measures related to the prisons. ECF No. 8822 at 16.

Heat Plan

The Special Master filed a focused report concerning compliance with Heat Plan protocols designed to protect patients prescribed psychotropic medications that place them at increased risk for harm or death during times of excessive heat ECF No. 8558.

Although monitoring of this issue dates back to the earliest stages of this case, this focused review of defendants' implementation of the heat plan was animated by the "…excessive heat impacting the State of California during the 2024 heat season as well as specific 'concerning practices and policy violations' uncovered during monitoring of the newly-established EOP programs…," ECF No. 8558 at 4-5 (citing ECF No. 8359 at 44), as well as a *possible* heat-related death at CCWF. *Id.* at 12-15. The resulting review found that "[m]ore then three decades after the parties' stipulation to a heat plan remedy in this case, the risk of failing to adequately care for and monitor patients on heat-sensitive medications remains grave [footnote omitted]; and yet, defendants' consistent implementation of the heat plan requirements across CDCR in many ways remains elusive." *Id.* at 5.

Treatment Programs: 3CMS, EOP, and Inpatient

The Special Master also filed reports concerning the department's provision of mental health treatment in its 3CMS and inpatient psychiatric programs run by CDCR as well as those situated in the Department of state hospitals (DSH). *See generally* Thirtieth Round Monitoring Report – Part D, ECF No. 8359 (covering 3CMS institutions), and Thirty-First Round Monitoring Report – Part A, ECF No. 8712 (covering inpatient programs). Additionally, he filed a separate report concerning newly activated EOP programs. *See generally* Thirty-First Round Focused Monitoring Report on Newly Activated EOP Programs, ECF No. 8654.

The Special Master's findings contained in these reports arose in the context of ongoing lack of full compliance with court-ordered suicide prevention protocols, an unremitting increase in the EOP population, seemingly intractable deficits in mental health staffing levels eventually leading to the Court holding defendants in civil contempt, and defendants' pervasive use of "triage plans," which permit and indeed institutionalize non-compliance with the court-ordered remedy. These plans reflected the Department's self-assessment that it lacked sufficient mental health staff to meet all Program Guide requirements and instead needed to prioritize certain clinical tasks and/or the provision of treatment to some patients to the detriment of others.

The factual record outlined in these reports supplemented the record developed during hearings conducted by the Court and submissions by the parties to form the backdrop for a fundamental shift in the Court's Herculean efforts to move defendants towards compliance with its remedial orders and eventual removal of court oversight of defendants' mental health system. The Court:

- held the State in civil contempt of its staffing orders (ECF No. 8291);
- imposed fines stemming from that non-compliance (ECF No. 8116); and,

- following a comprehensive process lasting over a year that provided the parties with "….extensive opportunities to be heard," ECF 8752 at 10, the Court appointed a *Coleman* Receiver to "…provide leadership and executive management of mental health care with the goal of fully implementing the court-approved and court-ordered remediates in this case to provide constitutionally adequate mental health services to all class members as soon as practicable" ECF No. 8765 at 2.

In its order appointing the Receiver, the Court highlighted four critical areas of non-compliance noted in its July 12, 2024 Order To Show Cause concerning the potential appointment of a Receiver (ECF No. 8330 at 3):

(1) mental health staffing in institutional programs (ECF No. 8752 at 4),

(2) staffing and "other matters in CDCR PIPs" (*Id.* at 6),

(3) suicide prevention (*Id.* at 7), and

(4) the fact that "[f]ull data remediation is critical to finalization and implementation of CQIT and, more broadly, defendants' quality assurance process" [citations omitted] (*Id.* at 9).

The Court subsequently issued numerous orders approving the Receiver's Action Plan ECF No. 8722 and otherwise addressing the appointment, compensation, and powers and duties of the *Coleman* Receiver. In an amended order setting out the powers and duties of the Receiver (filed on September 5, 2025 ECF No. 8765, amending and superseding ECF No. 8754), the Court took into account defendants' request (ECF No. 8764) to remove the Receiver's authority over DSH.

Taken together, the Special Master's recent findings delineated themes revolving around three inseparable concerns: understaffing, the continued dramatic growth in the size of the EOP population, and widespread lack of compliance with critical aspects of the remedy.

First, CDCR's continued inability to meet the core obligation of reducing staffing vacancies for psychology and clinical social work positions to required levels was evident during the monitoring round. As of July 2023, the functional vacancy rate in the EOP programs reviewed was 45 percent for primary clinicians and nine percent for psychiatrists. ECF No. 8095 at 55. As of February 2024, the functional vacancy rate in the 3CMS programs reviewed was 35 percent for primary clinicians and four percent for psychiatrists. ECF No. 8359 at 30. As reported below, by September 2025, in the 28 CDCR institutions reviewed, the vacancy rate for primary clinicians had declined to 18 percent at the same time the department maintained a vacancy rate below ten percent for psychiatrists.

Second, CDCR continues to face challenges managing the unremitting increase in need for EOP[3] beds - the system's highest level of mental health treatment outside of the mental health crisis beds (MHCBs) or PIPs. As the Special Master has previously noted from the time of the Three-Judge Court proceeding in 2008 to the filing of his Thirtieth Round Monitoring Report, the overall CDCR population was reduced by 40 percent; during that same timeframe, the *Coleman* class declined by only 3.5 percent while the EOP population *increased* by 41 percent. *See* ECF 8654 at 28-29 referencing ECF No.8095 at 42-43.

These two factors, insufficient staffing in the context of a drastically increased EOP population, continued to be major drivers of defendants' poor compliance with multiple key Program Guide requirements, including the frequency and confidentiality of clinical contacts and interdisciplinary treatment team meetings (IDTTs), and minimum required levels of out of cell

[3] This increase is a primary reason the overall decrease in CDCR population driven by the population reduction required by the Three Judge Court has failed to significantly mitigate the negative effect of CDCR's staffing crisis in its mental health programs.

structured therapeutic activities. These deficiencies outlined in the Thirtieth Round Monitoring Report by and large continued to be present at the time of the current review.

The department's continued reliance on triage plans is both a result of and a contributing cause of the challenges outlined above. As of May 3, 2023, ten of the 15 institutions with EOP programs were operating under triage plans. As of July 31, 2023, these ten institutions were charged with providing treatment to just under half of the entire MHSDS population and over eight out of ten EOP patients. The results of the current review showed that 14 of 23 or 61 percent of all institutions treating mental health patients operated a triage plan.

While the specifics of triage plans vary, they all have one common thread - the facility determined what fundamental clinical services to provide based on current staffing levels (and, conversely, decided which patients will not receive certain treatment services). These court ordered requirements included minimum frequency of clinical contacts and IDTT meetings or minimal levels of out of cell structured activities. Meeting them would not ensure adequate clinical care but doing so does create the foundation that facilitates it. When these requirements are not consistently met, it is unsurprising that the quality of treatment would suffer. Unfortunately, the results of the Special Master's experts' review of over 800 patient records across institutions and levels of care showed a continuation of this problem and that only 30 percent (230/813) of patients received adequate mental health treatment.

**B. <u>Discussion of Population Growth and Concerns with Inappropriate Housing</u>**

In various reports filed over the past three years, the Special Master's reporting has revealed several overarching population trends:

- Significant reductions in the overall population of incarcerated persons housed in CDCR institutions;

- Modest reductions in the number of MHSDS participants generally and 3CMS population specifically; and
- Dramatic growth in the size of the EOP population.

As the Special Master's recent monitoring reports have made clear, CDCR has struggled to provide Program Guide-compliant mental health care to EOP patients as a result of the growth in this segment of the MHSDS population, reviving this Court's original concern that the "task" of administering correctional institutions while providing constitutionally adequate mental health services is "complicated by the fact that prisons have also become the repository of an enormous number of the state's mentally ill." However, as the Court emphasized then, "neither the dimension of the task, nor its difficulty, excuses compliance with a constitutional mandate." *See Coleman v. Wilson*, 912 F. Supp. 1282, 1299 (E.D. Cal. Sept. 13, 1995).

During the preceding monitoring round, the overall MHSDS population remained lower than it was at the time of the Three-Judge Court proceedings.[4] However, more recently, the MHSDS population has grown to 36,640 patients (as of September 29, 2025), surpassing the size of the MHSDS population at the time of the Three-Judge Court proceedings. Presently, the MHSDS population is five percent higher than at the time of the Three-Judge Court proceedings and grew nine percent since the filing of the Thirtieth Round Monitoring Report. In comparison, the overall CDCR population of 89,355 on September 24, 2025 decreased by nearly 43 percent

---

[4] After the *Coleman* and *Plata* Courts each determined that prison overcrowding was preventing delivery of constitutionally adequate care, the Ninth Circuit Court of Appeals empaneled a Three-Judge Court to preside over a trial regarding population reduction. The Three-Judge Court ordered defendants to reduce its population to no more than 137.5% of design capacity. Defendants appealed the Three-Judge Court decision to the United States Supreme Court, which affirmed: "This extensive and ongoing constitutional violation requires a remedy, and a remedy will not be achieved without a reduction in overcrowding. The relief ordered by the three-judge court is required by the Constitution and was authorized by Congress in the PLRA. The State shall implement the order without further delay." *Brown v. Plata*, 563 U.S. 493, 545.

since the Three-Judge Court proceedings and remained virtually unchanged (increasing by 138 incarcerated persons) compared to the Thirtieth Monitoring Round.[5]




As reflected in the chart below, CDCR's EOP population continued to grow during this monitoring round, with a population of nearly 8,000 EOP patients, an increase of 899 EOP patients since the filing of the Thirtieth Round Monitoring Report.[6] As of September 29, 2025, CDCR also reported housing 120 more EOP patients (7,989 patients) than capacity (7,869 beds). *See* MHSDS Management Information Summary (MIS) Report, uploaded to CDCR's Secure Website for Monthly Coleman Reports (reporting census data as of September 29, 2025),

---

[5] *Compare* CDCR Monthly Population Report as of September 24, 2025, available at https://www.cdcr.ca.gov/research/wp-content/uploads/sites/174/2025/09/Tpop1d250924.pdf (reporting total of 89,355 incarcerated persons housed in CDCR institutions) *with* Statement of Undisputed Facts Regarding Phase I Issues, ECF No. 3301 at 3 ("The total CDCR prisoner population housed in in-state institutions…was 156,352[]") *and* CDCR Monthly Population Report as of July 31, 2023, available at https://www.cdcr.ca.gov/research/wp-content/uploads/sites/174/2025/11/Tpop1d251112.pdf (reporting total of 89,217 incarcerated persons housed in CDCR institutions).

[6] *Compare* MHSDS Management Information Summary (MIS) Report, uploaded to CDCR's Secure website for Monthly Coleman Reports (reporting an EOP population of 7,989 patients as of September 29, 2025) *with* Joint List of Stipulated Facts (filed September 22, 2023), ECF No. 7956 at 7 (reporting EOP population of 7,090 as of July 31, 2023).

attached hereto as Exhibit A. Additionally, as of September 29, 2025, EOP patients comprised approximately 21 percent of CDCR's MHSDS population and nearly nine percent of CDCR's overall population. *See id.* In other words, *nearly one in ten incarcerated persons housed in CDCR institutions is an EOP patient*.




Finally, while the Special Master observed reductions in the size of the 3CMS population between the time of the Three-Judge Court proceedings and the Thirtieth Monitoring Round, this largest segment of the MHSDS population is now also growing. The current 3CMS census of 27,411 increased by 2,268 patients since the Thirtieth Round Monitoring Report.[7] In addition, as of September 29, 2025, CDCR reported housing 311 more 3CMS patients (27,411 patients) than capacity (27,100 beds). *See* MHSDS Management Information Summary (MIS) Report, uploaded to CDCR's Secure Website for Monthly *Coleman* Reports (reporting census data as of

[7] *Compare* MHSDS Management Information Summary (MIS) Report, uploaded to CDCR's Secure website for Monthly Coleman Reports (reporting an 3CMS population of 27,411 patients as of September 29, 2025) *with* Joint List of Stipulated Facts (filed September 22, 2023), ECF No. 7956 at 7 (reporting 3CMS population of 25,143 as of July 31, 2023).

September 29, 2025). The 3CMS population on September 29, 2025 represented 75 percent of the MHSDS population and over 30 percent of the total CDCR population. *See id.*




As most recently reported in the Special Master's Focused Monitoring Report on Newly Activated EOP Programs, ECF No. 8654, "the population growth [has] significantly impact[ed] the operation of CDCR's MHSDS and critically, reflects the increasing mental health acuity of the plaintiff class…" *See* ECF No. 8654 at 29. As discussed at length in this report, during the Thirty-First Monitoring Round, CDCR failed to provide Program Guide-compliant mental health care and struggled with the placement of patients in appropriate housing compatible with each patients' level of care.

Continuing practices identified in the Focused Monitoring Report, institutions responded to the lack of housing by inappropriately placing patients in non-traditional housing, including Boar od Prison Hearing (BPH) cells, dry-cells, and cells designated for alternative housing. In addition, CDCR regularly violated the Program Guide's requirement that CDCR house EOP patients separately from the general population in a designated housing unit. This mismanagement resulted in significant lapses in patient care and was observed to have subjected patients to an unacceptable risk of decompensation and related harm.

The most egregious circumstances were uncovered at SVSP, where the monitoring team discovered mental health patients housed in dry cells without a toilet or running water for several days. It was further discovered that neither mental health staff nor custody staff knew of their placement in these cells, and therefore, patients were left unsupervised and without necessary mental health treatment. On-site monitoring at CSP/LAC revealed similar conditions, with a significant population of Level IV EOP patients housed in overflow and non-traditional EOP housing. During the review period, eight patients per month were housed in holding cells which were ordinarily used for alternative housing but not suited for long-term housing of mental health patients. Moreover, custody staff, rather than leadership, directed movement of patients to clinically inappropriate housing, with custody and mental health leadership learning of the housing moves after the fact.

These appalling conditions exemplified CDCR's inability to appropriately house patients requiring residential treatment (i.e., EOP level of care) and underscored the continued need for independent, on-site monitoring of conditions in CDCR institutions.

### C. Institutionalized Non-Compliance with the Court-Ordered Remedy Through the Use of Triage Plans

The prevalence of triage plans implemented to address staffing shortages at various institutions within CDCR continued in the Thirty-First Round and served as an ongoing admission that understaffed programs were unable to comply with the minimum requirements of the court-approved remedial plan. With the prolonged deployment of these triage plans, one concern remained acutely palpable during the monitoring round: that CDCR must "not unilaterally rewrite the remedial plan to align with their current staffing capacity, under the guise of triage planning." ECF No. 8654 at 81. Expansion of this triaging practice continued from ten EOP programs in the Thirtieth Round (*See* ECF No. 8095 at 13), to include 14 institutions that

were operating under triage plans in the current round.[8] Overall, 14 of 23, or 61 percent of EOP institutions, and 50 percent of all institutions with mental health programs were operating under some form of triage plan during the review period. At the five non-EOP institutions,[9] it was reported that institutions were either not operating under a triage plan during the review period or the triage plans had been deactivated at the time of the site visit.

Although CDCR left each institution to develop its own triage plan based on the level of staffing shortages and the complexity of the mental health programs within each facility, institutionalized non-compliance with the remedial plan remained the common denominator. The resulting inadequacies in mental health care observed during the monitoring round were in no way a reflection of the dedication and the intense work being performed by the mental health clinicians and staff, but it further exposed the inability of the department to staff the mental health programs to the levels required by the 2009 staffing plan – a plan developed by CDCR to bring the department into compliance with the remedial plan.

As of September 29, 2025, the 14 EOP institutions operating under triage plans during the review period – CCI, CHCF, CIM, CMC, CMF, HDSP, KVSP, CSP/LAC, MCSP, PBSP, RJD, CSP/Sac, SATF and SVSP – collectively housed 59 percent of the department's MHSDS population and 82 percent of the statewide EOP population.[10] For the EOP population, the

[8] The 14 institutions with EOP programs include CCI, CHCF, CIM, CMC, CMF, HDSP, KVSP, CSP/LAC, MCSP, PBSP, RJD, CSP/Sac, SATF and SVSP.

[9] ASP, CTF, FSP, SCC, and CSP/Solano. FSP indicated only psychiatry initial assessments were triaged.

[10] Of the 36,640 MHSDS participants housed in CDCR institutions' collectively, CCI, CHCF, CIM, CMC, CMF, HDSP, KVSP, CSP/LAC, MCSP, PBSP, RJD, CSP/Sac, CSATF and SVSP housed 21,450 MHSDS participants. As of the same date, there were 7,975 EOP patients housed in CDCR institutions; together, these 14 institutions housed 6,562 EOP patients. *See Coleman*

statistics remained unchanged from the previous round where "four in five EOP patients were housed in institutions that, based on defendants' failure to provide necessary staff, were wholly unable to provide the mental health services they were entitled to under the Program Guide." *See* ECF No. 8095 at 36-37.

Even with the re-direction of clinical staff from lower acuity mental health populations to those patients at higher risk, institutions continued to provide less than the minimum level of treatment required by the Program Guide due to the severe staffing deficiencies and resulted in the expansion of staffing voids already plaguing those programs for the lower acuity populations. This shifting of resources did not result in the provision of adequate mental health treatment required by the remedial plan to the higher acuity population, despite the good intentions of leadership and line staff.

The severe staffing shortage manifested itself in various ways depending on the program and the treatment being provided. For EOP institutions, interference in the delivery of mental health care was exhibited through various modalities such as suspension and/or the prioritization of IDTTs.[11] Other mental health services affected included reductions in the number of treatment

---

Monthly Package Tab 6a, entitled "Summary of Mental Health Population by Institution and Level of Care," reporting data as of September 29, 2025, attached hereto as Exhibit A.

[11] *See, e.g.*, CHCF Institutional Summary (programming section, reporting, "Under the triage plan for Facilities C and D, primary clinicians were required to prioritize initial contacts, initial IDTTs, consults, discharge follow-ups and SREs while routine IDTTs were temporarily discontinued," and, "Under the triage plan for Facility E, primary clinicians were required to complete initial assessments, initial and annual IDTTs, consults, discharge follow-ups, and SRASHEs. Patients were seen for routine individual contacts monthly, while routine IDTTs were suspended for most patients."); CMF Institutional Summary (programming section, reporting, "The EOP program's triage plan prioritized certain IDTTs over others during the review period. According to a January 2023 letter circulated to staff, initial IDTTs were the highest priority, followed by patients with HLOC concerns, patients in the community re-entry program, and patients on EOP modified programming. Routine IDTTs that were not clinically indicated were suspended unless determined clinically necessary by an assigned clinician.");

hours per week and the diminishment of primary clinician routine contacts – both non-compliant with Program Guide requirements.[12]

The 3CMS programs were also not immune to the deleterious effects of the staffing deficiencies despite the minimal Program Guide requirements mandated for that population.[13] As stated previously, some staff were re-directed from the 3CMS programs to higher acuity patients to effectuate the triage plans, and thus caused voids in the treatment for those lower

---

CMC Institutional Summary (programming section, reporting "Since August of 2022 and throughout the review period, CMC had a triage plan in place that impacted mainline EOP patients who did not receive Program Guide required care. According to a memo issued in January 2025, primary clinician individual contacts or caseload groups were to be scheduled bi-weekly. IDTTs continued, with initial IDTTs and clinical need prioritized and routine IDTTs as the lowest priority."); CSP/Sac Institutional Summary (programming section, reporting, "CSP/Sac's EOP program utilized a triage plan during the review period that prioritized initial IDTT meetings while routine IDTT meetings were held every 180 days instead of every 90 days.").

[12] *See, e.g.*, CHCF Institutional Summary (programming section, reporting, "most EOP patients were scheduled for individual primary clinician and psychiatry contacts monthly, despite triage plan prioritization."); CMF Institutional Summary (quality management section, reporting, "the institution reduced expectations for weekly treatment hours offered in EOP form the Program Guide's required ten hours per week down to seven hours per week due to staffing constraints."); CMC Institutional Summary (programming section, reporting, "Since August of 2022 and throughout the review period, CMC had a triage plan in place that impacted mainline EOP patients who did not receive Program Guide Required care. According to a memo issued in January 2025, primary clinician individual contacts or caseload groups were to be scheduled bi-weekly."); SVSP Institutional Summary (programming section, reporting, "91 percent of eligible patients were not offered at least 10 hours of structured therapeutic activities weekly, on average."); CSP/Sac Institutional Summary (programming section, reporting, "The triage plan also directed primary clinicians to see EOP mainline patients every month rather than weekly."); MCSP Institutional Summary (programming section, reporting, "EOP patients were scheduled for monthly primary clinician contacts rather than weekly as required by the Program Guide.").

[13] The Program Guide requires primary clinicians to see EOP patients weekly and psychiatrists must see EOP patients at least monthly; treatment plans for EOP patients must be updated at least every 90 days. ECF No. 7333-1 at 59. In comparison, the Program Guide requires that psychiatrists and primary clinicians each see their patients at least every 90 days for routine contacts; treatment plans must be updated at least annually. *Id.* at 44, 48.

acuity patients. In short, 3CMS patients were placed at the end of the line when it came to the provision of mental health services in order to safeguard the even more vulnerable patients.[14]

The reductions in mental health services provided to the 3CMS population, in large part, mimicked those in the EOP programs. While some services were delayed, suspended, or simply not scheduled due to staffing shortages, the triage plans were applied to the 3CMS programs when necessary and resulted in treatment that did not meet Program Guide requirements. [15] With treatment in the RHUs prioritized at many institutions, the effects of staffing shortages were somewhat mitigated but remained pervasive.

---

[14] *See, e.g.*, CIM Institutional Summary (programming section, reporting, "The plan prioritized treatment by level of care with MHCB and crisis referrals taking priority, followed by EOP and 3CMS patients."); CCI Institutional Summary (programming section, reporting, "The critical staffing shortage was evident, as five different 3CMS clinicians were reassigned to provide coverage for the EOP program."); CSP/Sac Institutional Summary (programming section, reporting, "Mainline EOP services were given priority over 3CMS services as well.").

[15] *See* CHCF Institutional Summary (programming section, reporting, "The lack of mental health staff severely impacted access to and continuity of care for the 3CMS population. Under the 3CMS triage plan, the 3CMS program prioritized initial assessments, initial IDTTs, SREs and consults. Routine primary clinician contacts and routine IDTTs were backlogged for over one year at the time of the site visit and routine psychiatry contacts were often delayed."); CMF Institutional Summary (programing section, reporting, "Secondary to critical staffing levels, in May 2022, CMF implemented a triage plan for 3CMS patients that included the suspension of routine IDTTs for patients that were not clinically indicated, suspension of routine primary clinician contacts, and required CIT to respond to all emergent, urgent, or routine mental health referrals for the 3CMS patient population. Routine 3CMS primary clinician contacts were otherwise suspended during the review period."); CMC Institutional Summary (programming section, reporting, "Initial primary clinician assessments, initial and routine IDTT meetings, and routine primary clinician follow-up appointments for patients receiving psychotropic medication were not among the triage plan priorities."); SVSP Institutional Summary (programming section, reporting, "IDTTS for 3CMS were low priority in the institution's treatment hierarchy or triage plan.").

There were signs that the need for triage plans was beginning to wane with some institutions deactivating the triage plans with one institution excluding its EOP program from its plan, but the incremental progress was slow.[16]

**D. <u>Data Remediation</u>**

During the monitoring round, the Special Master also filed two status reports concerning the lengthy data remediation project, ECF No. 8624 and ECF No.8697, which is indispensable to the restoration of trust, and production of the transparent, reliable data required to reinvigorate the department's efforts to "…assume the mantle of ultimate responsibility for diagnosing of its own problems. . .  and create a quality improvement process that it can use to achieve and maintain compliance and move on to eventual removal from federal court oversight"  ECF No. 4205 at 74.

In his May 1, 2025 report (ECF No. 8624 at 25), the Special Master reported that data coordination with the *Plata* Receiver had resulted in remediation of all but 38 provisionally approved indicators[17]. In a June 11, 2025 order the Court adopted the Special Master's report in full, allowing an additional 30 days for "…the Special Master and his clinical experts, working exclusively with the *Plata* Receiver and his staff [to] complete final review…" of the remaining indicators ECF 8674 at 3. On July 11, 2025, the Special Master reported that the remaining provisionally approved indicators had been remediated, ECF 8697 at 9, with only some agreed-upon refinements remaining. *Id.* The Report noted continued development of a user-friendly dashboard, field testing of the indicators, the eventual settling by the court of compliance

[16] ASP deactivated its triage plan prior to the site visit, and Solano had discontinued its triage plan at the end of the review period.  At the time of the site visit at HDSP, the EOP program was no longer subject to the triage plan.

thresholds associated with the indicators and the development and implementation of a data governance structure as remaining tasks. *Id.* at 10.

On November 6, 2025, the Special Master's team informed the *Coleman* Receiver that as of October 31, 2025, the refinement work described in his July 11, 2025 data remediation report was completed with the exception of three issues, the resolution of which will be most appropriately left to the Receiver to implement.

With that, after more than five years of painstaking work by all stakeholders, any need for the Special Master's day-to-day involvement with data remediation had come to an end, paving the way for the next stages of development of a functional, transparent, and user-friendly data system, field testing of the indicators, and the eventual deployment of CQIT. Notably, prior to the data remediation process, the most recent pilot of CDCR's CQIT at ten institutions occurred in 2016. The reports produced during this pilot, while lengthy, contained a number of deficiencies, including the omission of certain subjects typically covered in the Special Master's monitoring reports, lack of discussion of systemic issues impacting delivery of mental health care across institutions, and failure to develop action items on critical areas. *See* ECF No. 5779 at 63.

## II. SUMMARY OF THE SPECIAL MASTER'S FINDINGS

### A. Mental Health Vacancy Rates Overall and by Disciplines During the Thirty-First Monitoring Round[18]

By September 2025, the 28 reviewed institutions reported improved mental health staffing vacancy rates compared to the preceding monitoring round, with the department maintaining a functional vacancy rate below ten percent among staff psychiatrists and an 18 percent functional vacancy rate among primary clinicians.[19] While the 18-percent functional vacancy rate among primary clinicians remained out of compliance with the Court's prior orders requiring a maximum vacancy rate of ten percent, it nonetheless represented a significant improvement from the preceding monitoring round, when more than a third of primary clinician positions were functionally vacant.

| Thirtieth Round Monitoring Report | Mental Health Staffing Vacancy Report | Psychiatry | Primary Clinicians |
|---|---|---|---|
| Part C (EOP Programs) | July 2023 | 9% | 41% |
| Part D (3CMS Programs) | February 2024 | 4% | 35% |

Psychiatry leadership positions, including the chief and senior psychiatrists, maintained functional vacancy rates of 32 and 64 percent, respectively. Inclusive of civil servant,

[18] All data (except for psych techs) reflects Defendants' September 2025 Monthly Mental Health Staffing Vacancy Reports (hereinafter "Defendants' Monthly Staffing Report"). Because psych tech data was not included in the monthly report, it was obtained from the individual institutional summaries for the Thirty-First Monitoring Round. Regarding staffing vacancy data reported in the individual institutional summaries.

[19] The Thirtieth Monitoring Round included separate reports for institutions with EOP and 3CMS programs. For institutions included in each respective monitoring report, the Special Master reported psychiatry and primary clinician functional vacancy rates, inclusive of civil servant, registry, and tele-mental health positions, as reflected in defendants' Monthly Staffing Reports for July 2023 and February 2024 and reproduced in the table included above. *See* Thirtieth Monitoring Round Report – Part C, ECF No. 8095 at 55, 58 *and* Thirtieth Monitoring Round Report – Part D, ECF No. 8359 at 46-48 and 51-52.

telepsychiatry, and psychiatric nurse practitioner (PNP) positions, staff psychiatrists held a 35 percent vacancy rate. Utilization of registry psychiatrists, which encompassed 31 percent of the 248.91 total filled staff psychiatry positions, reduced the functional vacancy rate to seven percent. Of the 19 institutions utilizing telepsychiatry, just three had vacancy rates greater than ten percent, while the overall telepsychiatry vacancy rate was three percent.

Inclusive of staff psychologists, telepsychologists, clinical social workers, tele-social workers, LMFTs, and professional clinical counselors (PCC), the primary clinician functional vacancy rate was 18 percent during the review period. There was a 17 percent functional vacancy rate for telepsychologist positions and a 13 percent functional vacancy rate for tele-social worker positions.

Additionally, the institutions reported an overall functional vacancy rate of one percent for recreation therapists, 19 percent for psych techs, and 17 percent for tele-presenters.

Chief Psychiatrists

In the 28 institutions, 19 chief psychiatrist positions were filled, reflecting a 32 percent vacancy rate. Chief psychiatrist positions were vacant at ASP, CCI, CCWF, CIM, CSP/Corcoran, NKSP, PBSP, VSP, and WSP. These positions were also vacant at ASP, CCI, CIM, NKSP, and PBSP in the Thirtieth Monitoring Round. *See* ECF No. 8095 at 55-56 *and* ECF No. 8359 at 46.

Senior Psychiatrists

There were 14 allocated senior psychiatrist positions, of which four were filled with one at CMC, one at CSP/Corcoran, one at RJD, and one at CSP/Sac, while a senior psychiatrist at SQ filled an unallocated position.

Staff Psychiatrists

The 28 institutions reported 180.1 allocated on-site civil servant staff psychiatry positions, of which 82.8 were filled for a 45 percent vacancy rate. The use of 77.76 registry staff reduced the functional vacancy rate to 11 percent.

Ten institutions, including CCWF, FSP, CSP/LAC, MCSP, NKSP, PVSP, SCC, CSP/Solano, SQ, and SVSP reported no functional vacancies for on-site staff psychiatrists, while an additional five institutions, including ASP, CIM, CTF, CSP/Sac, and WSP reported functional vacancy rates of less than ten percent.

There were four institutions, including CMF, CRC, RJD, and VSP, that were close to compliance with functional vacancy rates between 11 and 20 percent. Six institutions, including CCI, CHCF, CIW, CMC, CSP/Corcoran, and KVSP reported functional vacancy rates between 21 and 50 percent, while CSATF reported a functional vacancy rate of 74 percent.

Both HDSP and PBSP did not have any on-site staff psychiatrists at all.

Telepsychiatrists

Since the preceding monitoring round, CDCR has had success in filling allocated telepsychiatry positions, which has had a significant impact on the combined staff psychiatry vacancy rate coming into compliance with remedial requirements. *See* ECF No. 8359 at 49 (citing "[t]he Thirtieth Monitoring Round review revealed that, in contrast to the preceding monitoring round when there were more telepsychiatrists than allocated positions, CDCR had difficulty filling telepsychiatry positions at some institutions.").

For telepsychiatrists in the Thirty-First Round, there were 86.5 allocated positions across 19 institutions with 84.14 positions filled, marking a three percent overall vacancy rate.

Of the 19 institutions that utilized telepsychiatrists, 13, including CCI, CCWF, CHCF, CIM, CMC, CMF, CSP/LAC, MCSP, PBSP, PVSP, RJD, VSP, and WSP did not have any vacancies. Three other institutions had vacancy rates of less than ten percent, including HDSP, NKSP, and CSATF, while the remaining three institutions reported vacancy rates of 18 percent at CSP/Corcoran, 20 percent at KVSP, and 21 percent at SVSP.

Combined Staff Psychiatry Functional Vacancies

Inclusive of on-site staff psychiatrists, telepsychiatrists, and PNPs, the combined staff psychiatry functional vacancy rate was seven percent.

Chief Psychologists

There were two chief psychologists allocated to each of the 28 institutions; 49 were filled, resulting in a 13 percent vacancy rate. All 28 institutions filled at least one chief psychologist position, with 21 institutions filling both. The seven institutions that did not fill both positions included CIW, CRC, CTF, SCC, CSP/Solano, SQ, and VSP.

Senior Psychologists

At the 28 institutions, 177.25 of 223.5 authorized senior psychologist specialists and supervisor positions were filled for a 21 percent overall vacancy rate. Nine institutions, including CIW, CRC, CTF, FSP, NKSP, PVSP, SCC, CSP/Solano, and SQ, reported no senior psychologist vacancies, while CSP/LAC reported a vacancy rate of two percent. The remaining 18 institutions reported vacancy rates that ranged from 11 percent to 47 percent.

Staff Psychologists

Of the 224.6 staff psychologist allocations included in the September 2025 mental health staffing vacancy report, 220.6 were filled for a two percent vacancy rate. Twenty-six of the 28

institutions had no functional vacancies for their required allocations, while CHCF maintained a 15 percent vacancy rate and NKSP maintained a one percent vacancy rate.

Telepsychologists

There were 99 allocated telepsychologist positions across 19 institutions; 82.3 were filled for a 17 percent vacancy rate. Eight institutions filled all allocated positions, including at CCWF, CRC, HDSP, KVSP, NKSP, RJD, SVSP, and WSP. One institution, CMC, maintained a vacancy rate less than ten percent, while CCI, CHCF, CMF, CSP/Corcoran, CSP/LAC, MCSP, PBSP, PVSP, CSP/Sac, and CSATF maintained vacancy rates between 14 and 79 percent. There were nine institutions that did not utilize telepsychologists, including ASP, CIM, CIW, CTF, FSP, SCC, CSP/Solano, SQ, and VSP.

Social Workers

All 79.2 clinical social worker allocations included in the September 2025 mental health staffing vacancy report were filled with required staff. There were no vacancies at any of the 28 institutions.

Tele-Social Workers

There were 97 allocated tele-social worker positions across 21 institutions; 84.24 were filled for a 13 percent vacancy rate. Nine institutions, including ASP, CCWF, CSP/Corcoran, CRC, FSP, HDSP, CSP/LAC, PBSP, and RJD, filled all allocated positions. One institution, CMC, maintained a vacancy rate less than ten percent, while CCI, CHCF, CMF, KVSP, MCSP, PVSP, CSP/Sac, CSATF, SVSP, VSP, and WSP maintained vacancy rates between 20 and 50 percent. There were seven institutions that did not utilize tele-social workers, including CIM, CIW, CTF, NKSP, SCC, CSP/Solano, and SQ.

Combined Primary Clinician Vacancies

In addition to the positions specifically allocated as psychologist or social worker positions, there were also 657 primary clinician positions allocated across the 28 institutions reviewed in this report.

Inclusive of allocations for staff psychologists and clinical social workers, as well as allocations for primary clinicians, telepsychologists, and tele-social workers, there were 1,156.8 allocated primary clinician positions, of which 758.66 were filled, reflecting a 34 percent vacancy rate.[20] The use of 185.99 registry psychologists and clinical social workers reduced the primary clinician functional vacancy rate to 18 percent.

Four institutions, including CRC, NKSP, CSP/Solano, and SQ did not have any functional vacancies for primary clinicians, while nine institutions, including CCWF, CIW, CMC, CTF, FSP, CSP/LAC, RJD, SCC, and VSP, all maintained primary clinician functional vacancies of less than ten percent. Five institutions, including ASP, CMF, CSP/Corcoran, SVSP, and WSP were close to compliance with functional vacancy rates between 11 and 20 percent. However, ten institutions, including CCI, CHCF, CIM, HDSP, KVSP, MCSP, PBSP, PVSP, CSP/Sac, and CSATF maintained primary clinician functional vacancy rates between 21 and 40 percent.

Psych Techs

Twenty-five of the 28 institutions had 782.11 allocated psych tech positions, of which 615.57 were filled for a 21 percent vacancy rate. The use of 15 registry psych tech positions at CCWF, HDSP, CSP/LAC, and SQ reduced the functional vacancy rate to 19 percent.

[20] Filled positions included 270.9 staff psychologists, 272.55 clinical social workers, 82.3 telepsychologists, 84.24 tele-social workers, 41.15 MFTs, and 7.52 PCCs.

Nine institutions, including CCWF, CIW, CRC, NKSP, PBSP, PVSP, CSP/Sac, SCC, and CSP/Solano did not have functional vacancies among psych tech positions, while five institutions, including CHCF, CIM, KVSP, CSATF, and SQ all maintained functional vacancy rates of less than ten percent. Three institutions, including CMF, CSP/Corcoran, and MCSP, maintained functional vacancy rates between 11 and 20 percent. Five institutions, including CTF, HDSP, CSP/LAC, RJD, and SVSP maintained functional vacancy rates between 21 and 50 percent, while CCI had a psych tech functional vacancy rate of 79 percent.

There were no allocated or filled psych tech positions as ASP, CMC, or VSP.

Recreation Therapists

Of the 297.9 recreation therapists allocated across 24 institutions, 270 were filled for a nine percent vacancy rate. The use of 25.23 registry staff at CHCF, CIM, CMC, CMF, CSP/Corcoran, CSP/LAC, MCSP, NKSP, PVSP, RJD, CSATF, SQ, SVSP, and WSP, reduced the functional vacancy rate to one percent.

Eleven institutions, including CCWF, CHCF, CIM, CIW, CSP/Corcoran, NKSP, RJD, CSATF, CSP/Solano, SQ, and VSP had no functional vacancies for recreation therapists. Three additional institutions, including CMC, CMF, and PVSP, maintained a functional vacancy rate of less than ten percent.

Three institutions were close to compliance with functional vacancies of 11 percent at MCSP, 13 percent at CSP/Sac, and 15 percent at CSP/LAC. Seven institutions, including CCI, CRC, HDSP, KVSP, PBSP, SVSP, and WSP maintained functional vacancy rates between 22 and 50 percent.

Four institutions did not utilize recreation therapists, including ASP, CTF, FSP, and SCC.

Tele-Presenters[21]

Of the 213 tele-presenter allocations across 23 institutions, 165 were filled, reflecting a 23 percent vacancy rate. The use of 11.82 registry staff reduced the functional vacancy rate for tele-presenters to 17 percent. According to defendants' monthly staffing report, medical assistants filled all civil service and registry positions. There were no other civil service or registry classifications that performed full-time tele-presenter duties in September 2025.

Nine institutions - ASP, CCWF, CIM, CRC, FSP, CSP/LAC, MCSP, NKSP, and CSP/Sac - did not have any functional vacancies for tele-presenter positions. Two institutions, CHCF and WSP maintained functional vacancy rates of less than ten percent. There were seven institutions that were close to compliance with between an 11 and 20 percent functional vacancy rate, CMF, CSP/Corcoran, KVSP, PVSP, RJD, CSATF and VSP. There were also five institutions, including CCI, CMC, HDSP, PBSP, and SVSP, which maintained functional vacancy rates between 26 and 73 percent for tele-presenters.

Five institutions, including CIW, CTF, SCC, CSP/Solano, and SQ did not allocate any tele-presenter positions.

**Summary - Staffing**

Overall, the 28 institutions reported improved staffing levels compared to the Thirtieth Monitoring Round with psychiatrists reporting an overall functional vacancy rate of seven

[21] According to the Order modifying the 2009 Staffing Plan, ECF No. 8587, medical assistants were the preferred classification for tele-presenters, however both the court-approved telepsychiatry policy and CDCR's telemental health policy allow other classifications to act as tele-presenters as well. *See* ECF No. 7826-1 at 8 and ECF No. 8165-2 at 72. Under the Order modifying the staffing plan, the court applied the ten percent maximum vacancy rate to all tele-presenters, instead of medical assistant positions only. Importantly, only staff hired as full-time tele-presenters and assigned to the MHSDS program will be counted in the tele-presenter fill rate. All other mental health clinical positions that occasionally act as tele-presenters would not be counted in the tele-presenter fill rate.

percent and primary clinicians reporting an overall functional vacancy rate of 18 percent. Sustaining and building upon these improvements in staffing levels should position CDCR to reorient its MHSDS back to providing mental health care consistent with the requirements of the Program Guide, rather than the disjointed triage plan-driven approach to mental health service delivery observed in many institutions over the past three years.

### B. Clinical Services and Programming

Due to ongoing understaffing among mental health staff, defendants' MHSDS continued to rely heavily on triage plans, with nearly 60 percent of the MHSDS population and more than 80 percent of EOP patients residing in institutions that had active triage plans during the review period. These triage plans, which in essence authorize institutionalized non-compliance with critical components of the Program Guide setting forth minimum requirements for mental health care and treatment planning, have been in place in many institutions for at least the past three years. Notably, the onset of CDCR's use of triage plans in its understaffed institutions – disclosed to the Special Master for the first time in late 2022[22] – coincided with the post-COVID-19 pandemic "re-opening." *See* Twenty-Ninth Round Monitoring Report – Part C, ECF No. 7555 at 59 (referring to February 2021 re-opening). During the COVID-19 pandemic, mental health

---

[22] *See* Twenty-Ninth Round Monitoring Report – Part C, ECF No. 7715 at 33 ("As revealed at CDCR's Mental Health Leadership Conference on November 16, 2022, the dire state of CDCR's mental health staffing levels has led Mental Health leadership to authorize a 'patient triaging' process at twelve institutions. While the details of any statewide triaging process or any institutional triaging plans have not been shared with the Special Master, the Special Master's expert observes that this development most likely means CDCR is using its limited staff to attend to only the most critical patient needs. By pivoting to triaging patients, CDCR is tacitly acknowledging that many institutions' mental health staffing vacancies make it impossible to provide Program Guide-compliant mental health care to the entire MHSDS population. Without dramatic intervention, defendants will remain noncompliant with the Court's June 13, 2002 staffing order [requiring no more than ten percent vacancies among mental health staff], and patients will suffer.").

service delivery was seriously curtailed due to public health and movement restrictions. *See id.* at 47-52. Consequently, in some respects, the institutions with the largest MHSDS populations have been *operating in serious deviation from the court-ordered remedy for nearly six years*.[23]

Given the department's continued struggle to adequately staff its institutions and the resultant use of triage plans, the widespread non-compliance with clinical components of the court-ordered remedy observed during the review period was predictable. Indeed, during the review period, institutions struggled to offer minimum required hours of structured treatment in various treatment settings and failed to provide timely initial evaluations and routine clinical contacts in its mainline EOP and 3CMS settings. Similar to the preceding round, the redirection of the department's limited staffing resources to higher risk settings resulted in "MHCBs and restricted housing programs generally exhibit[ing] *relatively* better compliance for minimally required care," ECF No. 8095 at 67 (emphasis added), particularly with respect to treatment hours offered in EOP and 3CMS RHUs, as discussed below.

*Treatment Offered*

Institutions are required to offer EOP patients "at least ten hours per week of scheduled structured therapeutic activities," unless clinically contraindicated. ECF No. 7333-1 at 58 (PG 12-4-8). During the review period, eight of 21 EOP institutions, or 38 percent, offered at least ten hours of structured treatment per week to mainline EOP patients, as follows: CCWF, CHCF, CIW, PVSP, RJD, CSATF, SQ, and VSP. Thirteen EOP institutions, or 62 percent, failed to offer mainline EOP patients with the Program Guide required minimum of ten hours per week,

[23] *See generally* Twenty-Ninth Round Monitoring Report – Part C, ECF No. 7715 at 48-52 (discussing impacts of restrictions on provision of mental health treatment and movement secondary to COVID-19 pandemic observed during 29th Monitoring Round).

with three institutions (CRC, MCSP, and PBSP) nearly compliant,[24] as follows: CCI, CIM, CMC, CMF, CRC, CSP/Corcoran, HDSP, KVSP, CSP/LAC, MCSP, PBSP, CSP/Sac, and SVSP.

**Mainline EOP: Treatment Offered**

| Institution | Average Treatment Offered Hours Per Week |
|---|---|
| CCI | 5.9 |
| CCWF | 13.4 |
| CHCF | 11.6 |
| CIM | 7.2 |
| CIW | 12.9 |
| CMC | 7.9 |
| CMF | 6 |
| Corcoran | 8.6 |
| CRC | 9.7 |
| HDSP | 4.9 |
| KVSP | 5.3 |
| LAC | 6.3 |
| MCSP | 9.6 |
| PBSP | 9.3 |
| PVSP | 10.1 |
| RJD | 13.6 |
| SAC | 8.6 |
| SATF | 10.5 |
| SQ | 10 |
| SVSP | 5.2 |
| VSP | 13.3 |

EOP RHUs are also required to offer patients "at least ten hours per week of structured therapeutic activities," unless clinically contraindicated. ECF No. 8267-1 at 8 (RHU Policy). Among the nine institutions with EOP RHUs during the review period, six or 67 percent offered EOP RHU patients at least ten hours of structured therapeutic activities per week on average, as

[24] As depicted in the table, CRC, MCSP, and PBSP offered an average of 9.7, 9.6, and 9.3 hours of structured therapeutic activities per week to mainline EOP patients during the review period.

follows: CCWF, CIW, CMC, CSP/Corcoran, CSP/LAC, and RJD. The remaining three institutions – CMF, MCSP, and CSP/Sac— fell just short of compliance, respectively offering 9.7, 9.6, and 9.4 hours of structured therapeutic activities per week on average during the review period.

**EOP RHU: Treatment Offered**

| Institution | Average Treatment Offered Hours Per Week |
| --- | --- |
| CCWF | 10.2 |
| CIW | 12 |
| CMC | 13.9 |
| CMF | 9.7 |
| Corcoran | 10.3 |
| LAC | 11.7 |
| MCSP | 9.6 |
| RJD | 12.8 |
| CSP/Sac | 9.4 |

While mainline EOPs and EOP RHU programs are required to offer ten hours of structured therapeutic activities to patients per week, the 3CMS RHUs must offer 90 minutes per week of "confidential, structured group therapeutic activity weekly." ECF No. 8267-1 at 5 (RHU Policy). Of the 11 institutions that operated 3CMS RHU programs during the review period, six or 55 percent offered at least 90 minutes of structured therapeutic activities to 3CMS RHU patients, as follows: CIW, CSP/Corcoran, KVSP, PBSP, PVSP, and CSP/SAC. Two institutions – HDSP and SVSP – were not compliant with remedial requirements, while three institutions – CCWF, CSP/LAC, and CSATF— were nearly compliant, offering an average of 1.4, 1.3, and 1.4 hours of structured therapeutic activities to 3CMS RHU patients during the review period.

**3CMS RHU: Treatment Offered**

| Institution | Average Treatment Offered Hours Per Week |
|---|---|
| CCWF | 1.4 |
| CIW | 4 |
| Corcoran | 1.57 |
| HDSP | 1 |
| KVSP | 1.5 |
| LAC | 1.3 |
| PBSP | 1.6 |
| PVSP | 2 |
| CSP/Sac | 1.9 |
| SATF | 1.4 |
| SVSP | 0.1 |

*Individual Treatment*

There was also extensive non-compliance with Program Guide timeframes for initial evaluations and IDTT meetings in mainline EOP and 3CMS programs during the review period. The Program Guide requires that EOP patients receive initial psychiatry and primary clinician evaluations before the initial IDTT meeting and within 14 calendar days of arrival to the institution or level of care change. Initial IDTT meetings for mainline EOP patients must also be held within 14 days of arrival to the institution or level of care change.[25]

Among the 21 EOP institutions, initial psychiatry evaluations were timely provided to EOP patients at seven or 33 percent of institutions: CCWF, CIW, CRC, MCSP, PBSP, PVSP,

[25] *See* ECF No. 7333-1 at 57 (PG 12-4-7); *see also id.* at 641 (March 16, 2020 Memorandum, "REQUIREMENT FOR INITIAL CONTACTS TO BE COMPLETED PRIOR TO THE INTERDISCIPLINARY TREATMENT TEAM," providing: "IDTT members, specifically primary clinicians (PC) and psychiatrists (PSY), shall complete their initial PC and PSY contacts consistent with the Mental Health Services Delivery Program Guide timelines and prior to the initial IDTTs for all new intakes and all patient transfers.").

and VSP. Initial primary clinician evaluations were timely provided to EOP patients at nine or 43 percent of institutions: CCWF, CIW, CRC, MCSP, PBSP, PVSP, RJD, CSP/SAC, and VSP. Initial IDTT meetings for mainline EOP patients were timely at only four or 19 percent of EOP institutions: CCWF, CIW, HDSP, and MCSP. Notably, only three institutions—CCWF, CIW, and MCSP— provided timely initial psychiatry and primary clinician evaluations and timely initial IDTTs to mainline EOP patients during the review period.

**Mainline EOP: Timeliness of Initial Evaluations and IDTT Meetings**[26]

| Institution | Initial Psychiatry Evaluations | Initial PC Evaluations | Initial IDTT Meetings |
|---|---|---|---|
| CCI | NC | NC | NC |
| CCWF | C | C | C |
| CHCF | NC | NC | NC |
| CIM | NC | NC | NC |
| CIW | C | C | C |
| CMC | NC | NC | NC |
| CMF | NC | NC | NC |
| Corcoran | NC | NC | NC |
| CRC | C | C | NC |
| HDSP | NC | NC | C |
| KVSP | NC | NC | NC |
| LAC | NC | NC | NC |
| MCSP | C | C | C |
| PBSP | C | C | NC |
| PVSP | C | C | NC |
| RJD | NC | C | NC |
| CSP/Sac | NC | C | NC |
| SATF | NC | NC | NC |
| SQ | NC | NC | NC |
| SVSP | NC | NC | NC |
| VSP | C | C | NC |

[26] In the tables that follow, "C" represents a "compliant" finding (i.e. compliance of 90 percent or greater for the measure) and "NC" represents a "non-compliant" finding (i.e. compliance of 89 percent or below for the measure).

Mainline EOP routine clinical contacts and IDTT meetings were also largely non-compliant with Program Guide timeframes during the review period. The Program Guide requires mainline EOP patients to receive a routine clinical contact with the primary clinician "weekly,"[27] while psychiatrists are required to see mainline EOP patients at least monthly, or every 30 days. Routine IDTT meetings for mainline EOP patients must occur at least every 90 days. *See* ECF No. 7333-1 at 59 (PG 12-4-9).

Routine psychiatry contacts were timely conducted at only five or 24 percent of EOP institutions (CIW, CRC, PVSP, SQ, and SVSP), while routine primary clinician contacts were timely at nine institutions or 43 percent of EOP institutions (CCWF, CIM, CIW, CMC, CRC, PBSP, RJD, SQ, and VSP). Finally, routine IDTT meetings were timely conducted at six or 29 percent of EOP institutions (CCWF, CIW, PBSP, PVSP, and VSP). Notably, CRC and CIW were the only institutions to achieve compliance with Program Guide timeframes for routine clinical contacts and IDTT meetings in its mainline EOP.

**Mainline EOP: Timeliness of Routine Clinical Contacts and IDTT Meetings**

| **Institution** | **Routine Psychiatry Contacts** | **Routine PC Contacts** | **Routine IDTT Meetings** |
|---|---|---|---|
| **CCI** | NC | NC | NC |
| **CCWF** | NC | C | C |
| **CHCF** | NC | NC | NC |
| **CIM** | NC | C | NC |
| **CIW** | C | C | C |
| **CMC** | NC | C | NC |
| **CMF** | NC | NC | NC |
| **CSP/Corcoran** | NC | NC | NC |
| **CRC** | C | C | C |
| **HDSP** | NC | NC | NC |

[27] Consistent with an agreement among the data remediation stakeholders, "weekly," for purposes of measuring routine primary clinician contacts in mainline EOP settings, is defined as occurring once per calendar week with no more than ten calendar days between contacts.

| | | | |
|---|---|---|---|
| **KVSP** | NC | NC | NC |
| **CSP/LAC** | NC | NC | NC |
| **MCSP** | NC | NC | NC |
| **PBSP** | NC | C | C |
| **PVSP** | C | NC | C |
| **RJD** | NC | C | NC |
| **CSP/SAC** | NC | NC | NC |
| **CSATF** | NC | NC | NC |
| **SQ** | C | C | NC |
| **SVSP** | C | NC | NC |
| **VSP** | NC | C | C |

As further evidence of the detrimental impact of delivering mental health services under the department's triage plan regime, 3CMS programs were almost universally non-compliant with Program Guide timeframes for initial psychiatry and primary clinician evaluations and initial IDTT meetings. Initial primary clinician evaluations must occur within ten working days of referral to 3CMS or arrival at an institution, and initial psychiatry evaluations must occur before the initial IDTT meeting. Initial IDTT meetings are required within 14 working days of referral to 3CMS or arrival at a new institution. *See* ECF No. 7333-1 at 41, 43 (PG 12-3-8, 12-3-10); *see also id.* at 641.

For instance, only four or 14 percent of institutions (ASP, CHCF, MCSP, and NKSP) were compliant with Program Guide timeframes for initial psychiatry evaluations. No institution achieved compliance with Program Guide timeframes for initial primary clinician evaluations, while CIW was the only institution to comply with initial IDTT meeting timeframes.

**Mainline 3CMS: Timeliness of Initial Evaluations and IDTT Meetings**

| | Initial Psychiatry Evaluations | Initial PC Evaluations | Initial IDTT Meetings |
|---|---|---|---|
| **ASP** | C | NC | NC |
| **CCI** | NC | NC | NC |
| **CCWF** | NC | NC | NC |
| **CHCF** | C | NC | NC |
| **CIM** | NC | NC | NC |
| **CIW** | NC | NC | C |
| **CMC** | NC | NC | NC |
| **CMF** | NC | NC | NC |
| **CSP/Corcoran** | NC | NC | NC |
| **CRC** | NC | NC | NC |
| **CTF** | NC | NC | NC |
| **FSP** | NC | NC | NC |
| **HDSP** | NC | NC | NC |
| **KVSP** | NC | NC | NC |
| **CSP/LAC** | NC | NC | NC |
| **MCSP** | C | NC | NC |
| **NKSP** | C | NC | NC |
| **PBSP** | NC | NC | NC |
| **PVSP** | NC | NC | NC |
| **RJD** | NC | NC | NC |
| **CSP/SAC** | NC | NC | NC |
| **CSATF** | NC | NC | NC |
| **SCC** | NC | NC | NC |
| **CSP/Solano** | NC | NC | NC |
| **SQ** | NC | NC | NC |
| **SVSP** | NC | NC | NC |
| **VSP** | NC | NC | NC |
| **WSP** | NC | NC | NC |

There were higher rates of compliance with Program Guide timeframes for routine psychiatry and primary clinician contacts among mainline 3CMS programs, though roughly half of institutions still failed to satisfy minimum requirements during the review period. Fifteen of 28 institutions, or 54 percent of institutions, were compliant with Program Guide timeframes for routine psychiatry contacts, as follows: ASP, CCI, CCWF, CHCF, CIW, CMF, CRC, FSP,

MCSP, NKSP, PVSP, RJD, SCC, CSP/Solano, SQ, and WSP. Similarly, 13 of 28 institutions, or 46 percent of institutions, were compliant with Program Guide timeframes for routine primary clinician contacts, as follows: ASP, CIW, CRC, FSP, CSP/LAC, MCSP, NKSP, PVSP, RJD, SCC, CSP/Solano, SQ, and WSP. In contrast, reviewed data suggested institutions were compliant with Program Guide timeframes for annual 3CMS IDTTs, though data limitations may have impacted compliance rates.[28]

**Mainline 3CMS: Timeliness of Routine Clinical Contacts and IDTT Meetings**

| **Institution** | **Routine Psychiatry** | **Routine PC** | **Routine IDTT** |
|---|---|---|---|
| **ASP** | C | C | C |
| **CCI** | C | NC | C |
| **CCWF** | C | NC | C |
| **CHCF** | C | NC | C |
| **CIM** | NC | NC | C |
| **CIW** | C | C | C |
| **CMC** | NC | NC | C |
| **CMF** | C | NC | C |
| **Corcoran** | NC | NC | C |
| **CRC** | C | C | C |
| **CTF** | NC | NC | C |
| **FSP** | C | C | C |
| **HDSP** | NC | NC | C |
| **KVSP** | NC | NC | C |
| **LAC** | NC | C | C |
| **MCSP** | C | C | C |
| **NKSP** | C | C | C |
| **PBSP** | NC | NC | C |
| **PVSP** | C | C | C |
| **RJD** | C | C | NC |
| **CSP/Sac** | NC | NC | C |
| **SATF** | NC | NC | C |
| **SCC** | C | C | C |

[28] As noted in the institutional summaries, the appointments reports that generated these data did not include individuals that did not have completed contacts, such as those that were not scheduled. Therefore, these compliance rates do not account for patients who were never scheduled for a routine IDTT.

| | | | |
|---|---|---|---|
| **SOL** | C | C | C |
| **SQ** | C | C | C |
| **SVSP** | NC | NC | C |
| **VSP** | NC | NC | C |
| **WSP** | C | C | C |

*IDTT Quality*

Overall, the quality of IDTT meetings observed during the monitoring tours required significant improvement. The monitor's expert observed RHU IDTT meetings (inclusive of EOP and 3CMS RHUs) at 22 institutions and determined that treatment teams conducted adequate IDTT meetings at eight or 36 percent of observed institutions: CIW, CSP/LAC, MCSP, NKSP, PBSP, PVSP, CSATF, and VSP. Observed IDTT meetings were of variable quality at four institutions: CMF, CSP/Corcoran, KVSP, and SVSP. Ten or 45 percent of observed institutions conducted IDTT meetings determined to be of inadequate quality: CCI, CCWF, CIM, CMC, FSP, HDSP, RJD, CSP/Sac, CSP/Solano, and WSP.

Compared to the RHUs, IDTT meeting quality was slightly better in CDCR's MHCB, EOP, and 3CMS programs, though roughly half of observed IDTT meetings in these settings were determined to be of inadequate quality. The monitor's expert observed MHCB IDTT meetings at 17 institutions and determined that nine institutions, or 53 percent, conducted IDTT meetings of adequate quality, as follows: CCWF, CHCF, CIM, CIW, MCSP, RJD, CSP/Sac, SQ, SVSP. MHCB IDTT meetings at five institutions, or 29 percent of observed institutions were of inadequate quality, and three institutions conducted IDTT meetings of variable quality.

Of the mainline EOP IDTT meetings observed at 21 institutions, the monitor's expert determined that 11 institutions, or 52 percent conducted IDTT meetings of adequate quality, as follows: CCI, CCWF, CHCF, CIM, CMF, CSP/Corcoran, HDSP, PBSP, PVSP, SQ, and VSP. Mainline EOP IDTT meetings at seven institutions (CIW, CMC, CRC, RJD, CSP/Sac, CSATF,

and SVSP), or 33 percent were determined to be of inadequate quality. The remaining three institutions (KVSP, CSP/LAC, and MCSP) featured IDTT meetings of variable quality.

Finally, the monitor's expert observed mainline 3CMS IDTT meetings at 23 institutions and determined that 11 institutions, or 48 percent, conducted IDTT meetings of adequate quality, as follows: CCWF, CHCF, CMF, HDSP, MCSP, RJD, CSP/Sac, CSATF, CSP/Solano, SQ, and WSP. Mainline 3CMS IDTT meetings at nine institutions (CCI, CIM, CIW, CMC, CRC, CTF, FSP, KVSP, and SVSP), or 39 percent conducted IDTT meetings of inadequate quality, while IDTT meetings were of variable quality at three institutions (ASP, PVSP, and VSP).

**<u>Quality of IDTT Meetings Observed During Monitoring Tours</u>**

| | RHU | MHCB | Mainline EOP | Mainline 3CMS |
|---|---|---|---|---|
| **Adequate** | 36 % | 53% | 52% | 48% |
| **Inadequate** | 45% | 29% | 33% | 39% |
| **Variable** | 18% | 18% | 14% | 13% |

Similar to the preceding monitoring round, observed IDTT meetings held during on-site monitoring tours featured several common deficiencies across institutions that interfered with the quality and effectiveness of treatment planning. These on-site observations are largely consistent with the monitor's expert's findings from hundreds of individual clinical case reviews, summarized below.[29] At multiple institutions, treatment team discussions either inadequately addressed or failed to discuss treatment goals and interventions, case conceptualizations, and

[29] *See infra* Part C ("Similar to findings in the Thirtieth Monitoring Round, concerns included problems with scheduled IDTT meetings, case formulations inadequate to support treatment planning, treatment goals which did not align with patients' identified symptoms and/or treatment targets, treatment goals that were vague or lacked baseline assessments, treatment goals that were not updated despite changes in patients' clinical presentations since prior IDTTs, nonspecific treatment interventions, poor rationale for level of care assignment, and poor discharge criteria. Inadequate clinical summaries and lack of discussion about patient treatment progress were not noted with the frequency identified during the prior round.").

treatment progress. Inadequate discussions regarding rationale for LOC and HLOC considerations were also common, as was the lack of measurable treatment goals. In some institutions, there was evidence of a lack of collaboration among team members and failure to discuss basic elements of treatment planning, including patient history and diagnoses.

*Additional Concerning Trends*

The consequences of these lapses in care manifested beyond direct patient care in several ways. During the preceding review period, the Special Mater identified “an upsurge in crisis referrals, encompassing crisis intervention team responses, alternative housing placements, and MHCB referrals” as resulting from the understaffing crisis in CDCR institutions. ECF No. 8095 at 66. Moreover, during the Thirtieth Monitoring Round, the Special Master observed “an increase in behavioral concerns that resulted in program disruptions, restricted housing placements, including EOP patients in the EOP hub, and referrals for RVR mental health assessments.” *Id.*

These deeply concerning trends continued and, in some instances, worsened during the review period. For instance, as revealed in the table below, MHCB referrals increased by 25 percent compared to the Thirtieth Monitoring Round. Across 27 reviewed institutions,[30] MHCB referrals increased at 19 institutions and decreased at eight institutions.

---

[30] CCWF was excluded from this analysis as its MHCB was closed during the Thirtieth Round. As reported in the CCWF institutional summary, CCWF made 332 referrals to MHCB during the current review period.

**MHCB Referrals: Comparison to Thirtieth Round**

| Institution | 30th Round: MHCB Referrals | 31st Round: MHCB Referrals | Percent Increase/Decrease |
|---|---|---|---|
| **ASP** | 59 | 36 | -39.0% |
| **CCI** | 29 | 217 | 648.3% |
| **CHCF** | 76 | 104 | 36.8% |
| **CIM** | 95 | 51 | -46.3% |
| **CIW** | 106 | 174 | 64.2% |
| **CMC** | 365 | 366 | 0.3% |
| **CMF** | 228 | 181 | -20.6% |
| **CSP/Corcoran** | 598 | 448 | -25.1% |
| **CRC** | 109 | 143 | 31.2% |
| **CTF** | 53 | 71 | 34.0% |
| **FSP** | 25 | 27 | 8.0% |
| **HDSP** | 53 | 133 | 150.9% |
| **KVSP** | 199 | 727 | 265.3% |
| **CSP/LAC** | 1,447 | 1,356 | -6.3% |
| **MCSP** | 333 | 589 | 76.9% |
| **NKSP** | 250 | 260 | 4.0% |
| **PBSP** | 12 | 306 | 24.5 |
| **PVSP** | 74 | 108 | 45.9% |
| **RJD** | 936 | 735 | -21.5% |
| **CSP/SAC** | 284 | 156 | -45.1% |
| **CSATF** | 394 | 483 | 22.6% |
| **SCC** | 57 | 65 | 14.0% |
| **CSP/Solano** | 22 | 21 | -4.5% |
| **SQ** | 211 | 267 | 26.5% |
| **SVSP** | 72 | 543 | 654.2% |
| **VSP** | 123 | 208 | 69.1% |
| **WSP** | 312 | 380 | 21.8% |
| ***Total*** | ***6,522*** | ***8,155*** | ***25.0%*** |

Furthermore, as discussed in greater detail below, there were also significant increases in RVRs issued during the review period. Compared to the preceding monitoring round, the total number of RVRs issued increased by 28 percent. Moreover, the proportion of RVRs issued to MHSDS participants increased from 52 percent to 60 percent. Finally, RVRs issued to MHSDS

patients increased by 47 percent. *See infra* Part H. The increase in RVRs observed during the current review period came on the heels of significant increases observed during the Thirtieth Monitoring Round: There was a 45 percent increase in RVRs issued to class members at the EOP institutions and a 38 percent increase in RVRs to class members at the 3CMS institutions in the 30th Monitoring Round compared to the Twenty-Ninth Monitoring Round. Accordingly, the Special Master reiterates his "increasing[] concern[] about the disproportionate impact of defendants' disciplinary process on the seriously mentally ill members of the *Coleman* class." ECF No. 8095 at 51.

These trends in MHCB referrals and RVRs exacerbated the challenges facing mental health staff in the institutions and, indeed, demonstrate some of the ripple effects of the long-term understaffing crisis experienced in CDCR in recent years. Stemming these trends forthwith should better position CDCR to improve the quality and efficacy of mental health service delivery in its institutions.

**C. <u>Overall Quality of Care Reflected in Case Reviews</u>**

During the Thirty-First Monitoring Round, the delivery of adequate mental health care was reviewed across facilities through detailed healthcare record reviews. In addition to analyses of treatment planning, treatment delivery, and documentation, an overall assessment of the adequacy of mental health treatment was provided for each case reviewed. A total of 812 patient records were reviewed across levels of care, including 3CMS, 3CMS RHU, EOP, EOP RHU, MHCB, and within reception centers (RCs). Of the records reviewed, 239 patients, or 29 percent, were determined to have received adequate care. The remaining 573 patients, or 71 percent, were determined to have received care that was inadequate. The graph and tables that follow present the quality of care across the facilities reviewed.

As can be seen from these data, the only institutions where the quality of care was noted to be adequate in the majority of records reviewed were ASP, CRC, FSP, PBSP, PVSP, and RJD, representing less than a quarter (21 percent) of the 28 facilities reviewed this round.

| | ASP | CCI | CCWF | CHCF | CIM | CIW | CMC | CMF | COR | CRC | CTF | FSP | HDSP | KVSP |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Adequate** | 60% | 0% | 39% | 30% | 20% | 31% | 10% | 23% | 14% | 75% | 47% | 90% | 15% | 20% |
| **Inadequate** | 40% | 100% | 61% | 70% | 80% | 69% | 90% | 77% | 86% | 25% | 53% | 10% | 85% | 80% |

| | LAC | MCSP | NKSP | PBSP | PVSP | RJD | SAC | CSATF | SCC | SOL | SQ | SVSP | VSP | WSP | ALL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Adequate** | 16% | 17% | 20% | 64% | 57% | 68% | 0% | 13% | 40% | 27% | 47% | 0% | 15% | 33% | 30% |
| **Inadequate** | 84% | 83% | 80% | 36% | 43% | 33% | 100% | 87% | 60% | 73% | 53% | 100% | 85% | 67% | 70% |



**Concerns Across Levels of Care**

Across levels of care, the data revealed that the majority of patients were not receiving adequate care. The graph below demonstrates the rates of adequacy assessed by levels of care. Of note, five RC 3CMS and 15 RC EOP cases were reviewed. These 20 cases were aggregated into an assessment of the overall adequacy of care with the RCs.




To better understand these inadequacies, the case summaries were reviewed to identify specific concerns. Specifically, a third or more of the cases reviewed were determined to represent common concerns that likely require attention and corrective action.

For 269 patients receiving treatment at the 3CMS level of care whose records were reviewed, specific concerns were noted with regard to IDTT meetings held later than required or not held at all (98 cases, 36 percent), PC contacts not occurring as required by the Program Guide (96 cases, 36 percent), treatment contacts not assessed to meet the needs of the patient[31] (97 cases, 36 percent), and failure to document a treatment plan (85 cases, 32 percent).

[31] This finding represents a number of concerns related to the delivery of treatment and the timing of clinical contacts necessary to meet the patient's needs. Specifically, concerns identified in this category included patients not being seen prior to medication discontinuation or

For the 66 patients receiving services at the 3CMS RHU level of care whose cases were reviewed, common concerns included PC contacts not occurring as required by the Program Guide (36 cases, 55 percent), structured therapeutic activities not offered as required by the Program Guide (32 cases, 48 percent), IDTT meetings held later than required or not held at all (34 cases, 52 percent), treatment contacts not assessed to meet the needs of the patient (28 cases, 42 percent), case formulations inadequate to support treatment planning (22 cases, 33 percent), and treatment goals which were vague, lacked baseline assessments, or were not appropriate to the patient's needs or services available at the current level of care (22 cases, 33 percent).

For the 201 patients receiving treatment at the EOP level of care whose cases were reviewed, concerns were noted with regard to PC contacts not occurring as required by the Program Guide (94 cases, 47 percent), IDTT meetings held later than required or not held at all (78 cases, 39 percent), rationale for the patient's level of care being inadequate or not individualized (79 cases, 39 percent), treatment contacts not assessed to meet the needs of the patient (79 cases, 39 percent), psychiatry contacts not occurring as required by the Program Guide (76 cases 38 percent), the treatment plan not addressing the patient's reported symptoms and/or identified treatment targets (72 cases, 36 percent), the treatment plan not being updated when clinically indicated (68 cases, 34 percent), and treatment goals which were vague, lacked baseline assessments, or were not appropriate to the patient's needs or services available at the current level of care (65 cases, 32 percent).

Concerns identified in the cases of the 71 patients whose records were reviewed for treatment at the EOP RHU level of care included the treatment plan did not address the patient's

---

following significant medication changes, patients not being seen timely in response to referrals or healthcare requests, lack of use of a language interpreters when necessary, and failure to adequately address patients' frequent treatment refusals.

reported symptoms and/or identified treatment targets (37 cases, 52 percent), the treatment plan was not updated when clinically indicated (33 cases, 46 percent), the treatment interventions included on the treatment plan were vague, unrealistic given the setting or level of care, or were not documented (30 cases, 42 percent), diagnostic clarification or rationale to support diagnoses was needed (25 cases, 35 percent), lack of evidence that the treatment interventions included on the treatment plan were provided to the patient and/or the interventions provided were not linked to the treatment plan (24 cases, 34 percent), treatment contacts were assessed not to meet the needs of the patient (23 cases, 32 percent), and treatment goals which were vague, lacked baseline assessments, or were not appropriate to the patient's needs or services available at the current level of care (23 cases, 32 percent).

For the 185 patients whose records were reviewed at the MHCB level of care, identified concerns included case formulations inadequate to support treatment planning (90 cases, 49 percent), the treatment plan did not address the patient's reported symptoms and/or identified treatment targets (86 cases, 46 percent), treatment contacts assessed not to meet the needs of the patient (64 cases, 35 percent), diagnostic clarification or rationale to support diagnoses needed (62 cases, 34 percent), the treatment plan was not updated when clinically indicated (62 cases, 34 percent), treatment goals which were vague, lacked baseline assessments, or were not appropriate to the patient's needs or services available at the current level of care (60 cases, 32 percent), and a lack of continuity of care negatively affected the patient's treatment (60 cases, 32 percent).

Within the RC, 20 cases were reviewed and revealed concerns including rationale for the patient's level of care was inadequate or not individualized (11 cases, 55 percent), no treatment

plan being documented[32] (nine cases, 45 percent), inconsistencies found in documentation across IDTT members or within the same clinician/psychiatrist's documentation (eight cases, 40 percent), treatment goals which were vague, lacked baseline assessments, or were not appropriate to the patient's needs or services available at the current level of care[33] (seven cases, 35 percent), treatment contacts not assessed to meet the needs of the patient (seven cases, 35 percent), and criteria for discharging the patient to a lower level of care was not included or inadequate (seven cases, 35 percent).

**Concerns Across Institutions**

<u>Treatment Planning Concerns</u>

Treatment planning concerns were noted across institutions during the Thirty-First Monitoring Round. Similar to findings in the Thirtieth Monitoring Round, concerns included problems with scheduled IDTT meetings, case formulations inadequate to support treatment planning, treatment goals which did not align with patients' identified symptoms and/or treatment targets, treatment goals that were vague or lacked baseline assessments, treatment goals that were not updated despite changes in patients' clinical presentations since prior IDTTs, nonspecific treatment interventions, poor rationale for level of care assignment, and poor discharge criteria. Inadequate clinical summaries and lack of discussion about patient treatment progress were not noted with the frequency identified during the prior round.

---

[32] Treatment planning was assessed as the documented initial plan of care for patients assigned to the 3CMS EOP level of care (IDTT documentation not required) and formal IDTT documentation for patients placed at the EOP level of care in the RC.

[33] All seven of these individuals were placed at the RC EOP level of care where formal treatment planning is required. These seven individuals represented 47 percent of the 15 RC EOP cases reviewed.

*IDTT Meetings*

Across all 812 records reviewed, 233 cases, or 29 percent, did not have timely IDTT meetings or noted that IDTT meetings were not held when required. The lack of IDTT meetings or failure to complete timely IDTT meetings was noted to be especially problematic at SVSP (23 of 30 cases, 77 percent), NKSP (ten of 15 cases, 67 percent), KVSP (15 of 25 cases, 60 percent), CCI (12 of 20 cases, 60 percent), LAC (22 of 37 cases, 59 percent), CHCF (21 of 40 cases, 53 percent), CMC (16 of 40 cases, 40 percent), HDSP (16 of 40 cases, 40 percent), CSP/Sac (16 of 40 cases, 40 percent), RJD (14 of 40 cases, 35 percent), and MCSP (ten of 30 cases, 33 percent).

*Case Formulations*

The IDTT process requires development of a comprehensive case formulation, which outlines the predisposing, precipitating, perpetuating, and protective factors related to each patient's mental health symptoms and functioning. An adequate case formulation is necessary to develop an effective plan of treatment to address the patient's identified needs. Problems with inadequate case formulations were noted in 24 percent of the cases reviewed (191 of 812). Case formulations were noted to be problematic in the majority of cases reviewed at VSP (60 percent, 12 of 20 cases), at CSP/Sac (55 percent, 22 of 40 cases), and at NKSP (53 percent, eight of 15 cases). Other facilities also failed to consistently document adequate case formulations including CIM (37 percent, 11 of 30 cases), CIW (37 percent, or 13 of 35 cases), COR (34 percent, 12 of 35 cases), CMC (33 percent, 13 of 40 cases), CSATF (33 percent, ten of 30 cases), and SOL (33 percent, ten of 30 cases).

*Treatment Goals*

The treatment plan, as evidenced by the content of treatment goals listed within IDTT documentation, did not address the patient's reported symptoms and/or identified treatment

targets in 243 cases, or 30 percent of all the cases reviewed. This finding was noted to be especially concerning at COR (17 of 35 cases, 49 percent), CSP/Sac (17 of 40 cases, 43 percent), CIW (15 of 35 cases, 43 percent), CCI (eight of 20 cases, 40 percent), CIM (12 of 30 cases, 40 percent), CMC (16 of 40 cases, 40 percent), SVSP (12 of 30 cases, 40 percent), CSATF (11 of 30 cases, 37 percent), CRC (seven of 20 cases, 35 percent), and SQ (ten of 30 cases, 33 percent)

Additionally, the documented treatment goals were noted to be vague, lacked baseline assessments, or were not appropriate to the patient's needs or services available at the current level of care in 230 cases, or 28 percent of the 812 cases reviewed. This concern was noted to be problematic in 60 percent of records reviewed at CMF (18 of 30 cases), 50 percent of records reviewed at SOL (15 of 30 cases), 49 percent of records reviewed at LAC (18 of 37 cases), 48 percent of records reviewed at KVSP (12 of 25 cases), 47 percent of records reviewed at CSATF (14 of 30 cases), 45 percent of records reviewed at RJD (18 of 40 cases), 43 percent of records reviewed at CIM (13 of 30 cases), 40 percent of records reviewed at CCI (eight of 20 cases), 35 percent of records reviewed at CHCF (14 of 40 cases), and 33 percent of records reviewed at HDSP (13 of 40 cases) and WSP (ten of 30 cases).

Treatment goals were not updated despite changes in patients' clinical presentations since prior IDTT meetings at a number of facilities. Overall, this concern was noted in 26 percent of records reviewed (214 of 812 cases). This concern was especially problematic at CCI, where it was noted in the majority of records reviewed (75 percent, or 15 of 20 cases), and at KVSP, where it was noted in 56 percent of records reviewed (14 of 25 cases). This concern was also noted at CIM in 47 percent of records reviewed (14 of 30 cases) and 35 percent of records reviewed at CSP/Sac (14 of 40 cases) and LAC (13 of 37 cases). A third of the records reviewed

at CIW (12 of 35 cases), CMF (ten of 30 cases), and RJD (13 of 40 cases) were also found to have had updated treatment goals when clinically indicated.

*Planned Treatment Interventions*

Treatment plans include treatment interventions which direct patient care and support continuity of care across time and across clinical staff, especially when there are staffing shortages and high frequency of staff turnover. Nonspecific treatment interventions, a lack of appropriate treatment interventions, and even an absence of planned treatment interventions were noted as concerns in IDTT documentation. Overall, this concern was noted in 27 percent of the cases reviewed (220 of 812 cases). Institutions where this concern was noted to be especially problematic included CMF (47 percent, 14 of 30 cases), RJD (45 percent, 18 of 40 cases), CHCF (43 percent, 17 of 40 cases), LAC (43 percent, 16 of 37 cases), CCI (40 percent, eight of 20 cases), KVSP (40 percent, 10 of 25 cases), HDSP (38 percent, 15 of 40 cases), CSATF (37 percent, 11 of 30 cases), WSP (37 percent, 11 of 30 cases),

*Rationale for Level of Care and Discharge Criteria*

During IDTT meetings, the rationale for the patient's placement or retention at the current or planned level of care, along with clear criteria the patient needs to meet in order to be discharged from the current level of care, must be documented to develop targeted interventions and measure treatment progress. Across all records reviewed, the lack of adequate rationale for the patient's current or proposed level of care was found in 208 of the 812 cases reviewed (26 percent). Documentation at CTF was found to be lacking adequate level of care rationale in over half of the cases reviewed (53 percent, ten of 19 cases). Other institutions where this issue was noted included CCI (45 percent, nine of 20 cases), LAC (43 percent, 18 of 37 cases), VSP (40

percent, eight of 20 cases), RJD (38 percent, 15 of 40 cases), CIM (37 percent, 11 of 30 cases), and SOL (33 percent, ten of 30 cases).

Adequate discharge criteria were lacking in only 12 percent of cases across all records reviewed (95 of 812) but were found to be absent in 43 percent of the records reviewed at LAC (16 of 37 cases) and 40 percent of the records reviewed at RJD (16 of 40 cases).

Delivery of Treatment

During the record reviews, the monitor's expert noted patterns with regard to inadequate delivery of treatment across facilities, including a lack of patients being offered treatment as required by the Program Guide, an absence of documentation that the interventions outlined in treatment plans were being provided to patients, inadequate provision of treatment to meet the patients' needs, and the lack of confidential clinical contacts. On the positive side, concerns noted in the past related to a failure to follow up on issues noted in the healthcare record and poor continuity of care, while noted in some records, were not as pervasive as found in the previous round.

*Lack of Provision of Minimum Requirements*

Across institutions, there were a number of instances where patients were not seen as frequently as required by the Program Guide for individual psychiatric contacts, individual PC contacts, and/or the minimum number of structured therapeutic activities warranted by their level of care. Specifically, psychiatric contacts were not offered to patients as required in 200 of the 812 records reviewed (25 percent). This lack of minimum requirements being met with regard to psychiatric contacts was especially concerning at CCI (85 percent, 17 of 20 cases), HDSP (55 percent, 22 cases), KVSP (52 percent, 13 of 25 cases), and CSATF (50 percent, 15 of 30 cases).

Additionally, concerns were noted at LAC (38 percent, 14 of 37 cases), NKSP (33 percent, five of 15 cases), and SVSP (33 percent, ten of 30 cases).

With regard to PC contacts being offered to patients, 33 percent of all records reviewed (272 of 812) did not evidence the minimum requirements being met. Some facilities had this concern identified in over half of the records reviewed including at HDSP (78 percent, 31 of 40 cases), CHCF (75 percent, 30 of 40 cases), SVSP (73 percent, 22 of 30 cases), LAC (62 percent, 23 of 37 cases), KVSP (60 percent, 15 of 25 cases), and CSATF (53 percent, 16 of 30 cases). Concerns were also noted at CIM (47 percent, 14 of 30 cases), CSP/Sac (45 percent, 18 of 40 cases), CMF (43 percent, 13 of 30 cases), CCI (40 percent, eight of 20 cases), COR (40 percent, 14 of 35 cases), and MCSP (37 percent, 11 of 30 cases).

On a positive note, 40 percent of the records reviewed at ASP (four of ten) noted that patients were receiving clinical contacts more frequently than the minimum intervals required by the Program Guide.

At the levels of care where structured therapeutic activities were required (i.e., EOP, EOP RHU, and 3CMS RHU), problems were identified with minimums not being offered to patients in 24 percent of all records reviewed (82 of 338 cases). A majority of records reviewed did not include evidence of minimum hours being offered at CSP/Sac's 3CMS RHU (100 percent, ten of ten cases), HDSP's EOP (80 percent, eight of ten cases), CMF's EOP RHU (70 percent, seven of ten cases), HDSP's 3CMS RHU (70 percent, seven of ten cases), SVSP (67 percent, six of nine cases), CHCF's EOP (60 percent, six of ten cases), and LAC's 3CMS RHU and EOP (60 percent, six of ten cases).

*Treatment Interventions Linked to the Treatment Plan and Patients' Needs*

Across a number of facilities, it was noted that the treatment interventions included in patients' treatment plans were not documented as being provided to patients. Overall, this occurred in 204 of the 812 cases reviewed (25 percent). At individual facilities, the lack of provision of the interventions included on the treatment plan was found in 50 percent of records reviewed at CCI (10 of 20), 48 percent of records reviewed at CMC (19 of 40 cases), 45 percent of records reviewed at CCWF (22 of 43 cases) and VSP (nine of 20 cases), 40 percent of records reviewed at CIW (14 of 35 cases), 36 percent of records reviewed at KVSP (nine of 25 cases), and 33 percent of records reviewed at CSP/Sac (13 of 40 cases) and CIM (ten of 30 cases).

The monitor's expert noted a number of cases where the treatment team was not responsive to the needs of patients. Concerns identified in this category included patients not being seen prior to medication discontinuation or following significant medication changes, patients not being seen timely in response to referrals or healthcare requests, lack of use of a language interpreters when necessary, and failure to adequately address patients' frequent treatment refusals. Overall, this concern was identified in 37 percent of records reviewed (298 of 812 cases). At individual institutions, this concern was most problematic in over half of the records reviewed at CSP/Sac (65 percent, 26 of 40 cases), COR (60 percent, 21 of 35 cases), SOL (57 percent, 17 of 20 cases), CCI (55 percent, 11 of 20 cases), CIM (53 percent, 16 of 30 cases), NKSP (53 percent, eight of 15 cases), and KVSP (52 percent, 13 of 25 cases). Additionally, this issue was identified in a substantial percentage of records reviewed at SCC (50 percent, five of ten cases), MCSP and SQ (47 percent, 14 of 30 cases at each facility), CCWF (46 percent, 22 of 43 cases), VSP (45 percent, nine of 20 cases), LAC (43 percent, 16 of 37 cases),

SVSP (43 percent, 13 of 30 cases), WSP (40 percent, 12 of 30 cases), CMC (38 percent, 15 of 40 cases), and CSATF (37 percent, 11 of 30 cases).

*Lack of Confidentiality*

Clinical contacts are required to be provided in confidential settings, unless the patient refuses to be seen in private. While overall, lack of confidentiality secondary to issues other than patient refusal was not noted to be problematic (11 percent, 90 of 812 cases), there were facilities and programs where lack of confidentiality was noted frequently in the records reviewed. The majority of records reviewed at CCWF's MHCB (100 percent, ten of ten cases), CIM's MHCB (80 percent, eight of ten cases), SVSP's EOP (67 percent, six of nine cases), and LAC's EOP (60 percent, six of ten cases) noted nonconfidential contacts being offered to patients who had not refused privacy. Nonconfidential contacts were also noted to be occurring in a large percentage of records reviewed at CCI's EOP (50 percent, five of ten cases), PBSP's EOP (42 percent, six of 14 cases), PBSP's MHCB (40 percent, four of ten cases), and LAC's 3CMS RHU (40 percent, four of ten cases).

<u>Documentation Issues</u>

Initial primary clinician and/or initial psychiatric assessments were not updated or were not completed prior to a patient's initial IDTT meeting in a number of the records reviewed. Specifically, initial PC assessments were absent or deficient in 199 of 812 records reviewed (25 percent). This lack of adequate initial PC assessments was noted to be especially problematic at NKSP where it was noted in 67 percent of records reviewed (ten of 15 cases). Additionally, concerns were noted at COR (43 percent, 15 of 35 cases), CSP/Sac (43 percent, 17 of 40 cases), MCSP (43 percent, 13 of 30 cases), CCI (40 percent, eight of 20 cases), VSP (40 percent, eight of 20 cases), LAC (38 percent, 14 of 37 cases), CMF (37 percent, 11 of 30 cases), CHCF (33

percent, 13 of 40 cases), and CSATF (33 percent, 10 of 30 cases). Initial psychiatric assessments were not completed timely and/or adequately in 19 percent of records reviewed (153 of 812 cases). Facilities and levels of care where this was noted to be especially problematic included HDSP (100 percent of cases in the 3CMS RHU, ten of ten), NKSP (100 percent of cases in the 3CMS level of care, ten of ten), CCI (90 percent of cases at the EOP level of care, nine of ten), CSP/Sac (80 percent, eight of ten cases, in the EOP RHU and 50 percent, five of ten cases, in the 3CMS RHU), LAC (71 percent of cases at the 3CMS level of care, five of seven cases), PBSP (60 percent of cases in the MHCB, six of ten and 40 percent of cases at the 3CMS level of care, four of ten), KVSP (80 percent in the 3CMS RHU, four of five and 60 percent of cases at the EOP level of care, six of ten), and SATF (33 percent across all levels of care, 10 of 30 cases).

Lastly, diagnostic clarification or rationale to support diagnoses was lacking in a number of cases across institutions. This concern was noted to be particularly problematic at CIW (57 percent, 20 of 35 cases), CRC (55 percent, 11 of 20 cases), SVSP (50 percent, 15 of 30 cases), CSP/Sac (48 percent, 19 of 40 cases), VSP (45 percent, nine of 20 cases), CIM (40 percent, 12 of 30), CMC (38 percent, 15 of 40 cases), and 37 percent of records reviewed at SQ, and WSP (11 of 30 cases at each facility).

During the current round, concerns related to inadequate follow-up plans and documentation being copied and pasted across contacts were not found with the frequency identified in previous monitoring rounds.

**<u>Summary – Overall Quality of Care Reflected in Case Reviews</u>**

The review of 812 patient records across the 3CMS, 3CMS RHU, EOP, EOP RHU, and MHCB levels of care, as well as within the Reception Center, revealed that inadequate clinical

care was being provided to the majority of patients within CDCR across all levels of care and within the majority of institutions. While some areas which were noted to be problematic in the past were not identified with the frequency seen previously, a number of issues continued to be problematic and occurred with a frequency that requires corrective action.

**D. <u>MHSDS Patients in Restricted Housing</u>**

Similar to the Thirtieth Monitoring Round, inclusive of both EOP and 3CMS RHUs, staffing ratios for both psychiatrists and primary clinicians exceeded required staff-to-patient ratios at multiple institutions. Similarly, many psychiatry, primary clinician, and IDTT contacts continued to be noncompliant with Program Guide timeframes. However, on a more positive note, EOP RHUs were able to increase their offering of structured treatment and achieve compliance at six of nine institutions.

<u>EOP RHUs</u>

CDCR institutions had ten EOP restricted housing units; nine were open during the reporting period. The EOP RHU was closed at CHCF during the review period.

According to the staff-to-patient ratios from the 2009 staffing plan, psychiatrists who treat EOP patients in restricted housing must maintain a caseload of no more than 64 patients per psychiatrist, while primary clinicians who treat EOP patients in restricted housing must maintain a caseload of no more than 11 patients per clinician. *See* ECF No. 3693 at 19.

At six of the nine open EOP RHUs – CCWF, CIW, CMC, CMF, CSP/Corcoran, and MCSP, psychiatry caseloads were within the established ratio. CSP/LAC and CSP/Sac had psychiatrists with caseloads that exceeded the ratio, while caseloads for psychiatrists were not discernible at RJD. Regarding primary clinician caseloads, CCWF, CIW, and CMF reported caseloads were within the established ratio. Primary clinician caseloads exceeded the required staff-to-patient ratio at CMC, CSP/Corcoran, CSP/LAC, CSP/Sac, MCSP, and RJD.

Regarding individual treatment and IDTT meetings, the RHU Policy requires that all patients placed into EOP RHU receive an initial primary clinician evaluation within five days of arrival and an initial psychiatry evaluation within ten days of arrival and prior to the initial IDTT meeting. *See* RHU Policy at 5-6. The RHU Policy also requires that EOP RHU patients receive weekly primary clinician contacts and psychiatry contacts at least every 30 days. *See id.* at 7.

CIW and RJD indicated compliance with RHU Policy timeframes for initial psychiatry contacts, while CSP/Corcoran neared compliance at 87 percent. Six institutions – CMC, CMF, CRC, CSP/LAC, CSP/Sac, and MCSP were not compliant with required timeframes for initial psychiatry contacts. As for routine psychiatry contacts, CCWF, CIW, CSP/LAC, MCSP, and RJD reported compliance, while CMC and CMF approached compliance at 81 and 89 percent, respectively. CSP/Corcoran and CSP/Sac indicated noncompliance with RHU Policy timeframes for routine psychiatry contacts.

Three institutions – CIW, RJD, and CSP/Sac- reported compliance with RHU Policy timeframes for initial primary clinician evaluations. CMC and CSP/Corcoran each approached compliance at 83 percent, while CSP/LAC and MCSP indicated noncompliance with initial primary clinician evaluation timeframes. Eight institutions – CCWF, CIW, CMC, CMF, CSP/Corcoran, CSP/Sac, MCSP, and RJD were compliant with RHU Policy timeframes for routine primary clinician contacts, while CSP/LAC was noncompliant.

Only CIW reported compliance with RHU Policy timeframes for initial IDTT meetings. CMC and RJD were close to compliance at 87 percent, while four institutions – CMF, CSP/Corcoran, CSP/Sac, and MCSP were noncompliant. In addition, required staff attended initial IDTT meetings at six institutions – CIW, CMC, CSP/Corcoran, CSP/Sac, MCSP, and RJD.

The RHU Policy required that patients assigned to EOP RHU be offered a minimum of 20 hours of out-of-cell time each week, ten of which must be structured therapeutic activities unless clinically contraindicated while the remaining ten hours must be out-of-cell exercise, including supervised recreation therapy. *See* ECF No. 8355 at 7-17 (Restricted Housing Unit Program: Mental Health Services Policy, dated July 19, 2024 and effective August 1, 2024) (hereinafter "RHU Policy"). Six institutions – CCWF, CIW, CMC, CSP/Corcoran, CSP/LAC, and RJD offered patients a weekly average of ten hours of structured treatment. CMF, CSP/Sac, and MCSP neared compliance at 9.74, 9.4, and 9.61 hours, respectively.

<u>3CMS RHUs</u>

CDCR institutions operated 11 3CMS restricted housing units during the review period.

According to the staff-to-patient ratios from the 2009 staffing plan, psychiatrists who treat 3CMS patients in restricted housing must maintain a caseload of no more than 125 patients per psychiatrist, while primary clinicians who treat 3CMS patients in restricted housing must maintain a caseload of no more than 25 patients per clinician. *See* ECF No. 3693 at 14.

Five institutions – CCWF, CIW, CSATF, CSP/Corcoran, and SVSP reported psychiatry caseloads within the established ratio. Psychiatry caseloads at four institutions – CSP/LAC, CSP/Sac, PBSP, and PVSP exceeded established ratios. Primary clinician caseloads were within established ratios at CCWF, CIW, PVSP, and SVSP. Six institutions – CSATF, CSP/Corcoran, CSP/LAC, CSP/Sac, KVSP, and PBSP—reported primary clinician caseloads in excess of established ratios. Notably, RHU clinicians' caseloads were nevertheless described as overly burdensome due to the overall number of RHU patients receiving mental health services at HDSP.

Regarding timeliness of individual treatment, only CIW reported compliance with RHU Policy timeframes for initial psychiatry contacts; the remaining institutions – CCWF, CSATF, CSP/Corcoran, CSP/LAC, CSP/Sac, HDSP, KVSP, PBSP, PVSP, and SVSP- reported noncompliance. Six institutions – CIW, CSATF, CSP/Corcoran, HDSP, KVSP, and SVSP indicated compliance with required timeframes for routine psychiatry contacts. CCWF was close to compliance at 87 percent, while CSP/LAC, PBSP, and PVSP were noncompliant with RHU Policy timeframes for routine psychiatry contacts.

CIW and PVSP reported compliance for initial primary clinician contacts. The remaining institutions did not comply with RHU Policy timeframes for initial primary clinician contacts during the review period. Seven institutions – CCWF, CIW, CSATF, CSP/Sac, HDSP, PBSP, and PVSP were compliant with required timeframes for routine primary clinician contacts, while KVSP was close to compliance at 88 percent. CSP/Corcoran and CSP/LAC were noncompliant.

Of the seven institutions where initial IDTT meetings were assessed, CIW and CSP/Sac reported compliance required timeframes, while CSP/Corcoran, HDSP, PBSP, PVSP, and SVSP indicated noncompliance. Five institutions – CIW, CSP/LAC, HDSP, KVSP, and SVSP- reported compliance for timely routine IDTTs. CSP/Sac neared compliance at 86 percent, while CCWF, CSATF, CSP/Corcoran, PBSP, and PVSP reported noncompliance. Six institutions – CSP/Corcoran, CSP/Sac, HDSP, PBSP, PVSP, and SVSP reported compliance for required staff's attendance at initial IDTTs, while CIW indicated noncompliance.

The RHU Policy required that patients assigned to 3CMS RHU be offered a minimum of 20 hours of out-of-cell time each week, including 18.5 hours of recreational time outside the cell and 90 minutes of confidential, structured therapeutic activities. *See* ECF No. 8355 at 7-17

(Restricted Housing Unit Program: Mental Health Services Policy, dated July 19, 2024 and effective August 1, 2024) (hereinafter "RHU Policy").

Six institutions —CIW, CSP/Corcoran, CSP/Sac, KVSP, PBSP, and PVSP— reported compliance for the weekly offering of 90 minutes of structured treatment. Five institutions – CCWF, HDSP, CSP/LAC, CSATF, and SVSP—were not compliant with this requirement.

Non-Disciplinary Restricted Housing (NDRH)

MCSP was the only institution that timely transferred NDRH patients within 72 hours as required. Four institutions – CIM, CMC, CSATF, and CSP/Sac reported noncompliance for the timely transfer of NDRH patients. Patients required expedited transfers at CCWF, CMF, HDSP, PBSP, RJD, and SQ; however, timeliness could not be assessed. Five institutions – CCI, CSP/Corcoran, CSP/LAC, FSP, and KVSP- reportedly could not indicate the number of patients who were placed on NDRH status. Additionally, CIW, NKSP, and WSP placed patients on NDRH status; however, no patients required accelerated transfers. PVSP and SVSP provided information regarding NDRH patients, but there was no clear indication whether patients required accelerated transfers. Information was not reported for ASP, CHCF, CRC, CSP/Solano, CTF, SCC, and VSP.

**Summary – MHSDS Patients in Restricted Housing**

Although, the defendants' continued to have issues securing adequate staffing to satisfy Program Guide ratios, they were able to increase their offering of structured treatment for both EOP and 3CMS RHU patients, coming close to compliance for each institution. However, defendants continued to struggle to meet some basic requirements, which included patients receiving timely clinical contacts and IDTTs.

**E. Quality Management**

During the Thirty-First Monitoring Round, quality management processes and activities continued to function at the 28 CDCR institutions visited. Local governing bodies were in operation at CCWF, CHCF, CIW, CMC, CMF, CSP/Corcoran, CSP/LAC, CSP/Solano, HDSP, KVSP, MCSP, NKSP, PBSP, PVSP, RJD, SATF, SQ, SVSP, and WSP. With limited exceptions, local governing bodies met regularly during the review period. Quarterly meetings were held at CMF, CSP/LAC, CSP/Sac, KVSP, MCSP, NKSP, PBSP, PVSP, and SATF. Monthly meetings were conducted at CHCF, CIW, CMC, HDSP, SQ, and WSP. CCWF did not hold any local governing body meetings during the review period. Quorums were met consistently. Meeting minutes from each institution indicated discussion of relevant and appropriate topics, including credentialing privileges for staff, policy updates, and quality management program reports.

During the review period, monthly quality management committee meetings were held at ASP, CCI, CCWF, CHCF, CIM, CIW, CMC, CMF, CRC, CSP/Corcoran, CSP/LAC, CSP/Sac, CSP/Solano, CTF, FSP, HDSP, KVSP, MCSP, NKSP, PBSP, PVSP, RJD, SATF, SCC, SQ, SVSP, VSP, and WSP. Quality management committee meetings were well attended, with quorums regularly achieved at ASP, CCI, CCWF, CHCF, CIM, CMC, CRC, CSP/LAC, CSP/Sac, CTF, FSP, HDSP, KVSP, MCSP, NKSP, PBSP, RJD, SATF, SQ, VSP, and WSP. Reviewed meeting minutes revealed comprehensive agendas with mental health topics discussed as appropriate. Generally, quality management committee meeting minutes provided detailed information on each agenda item.

Mental health subcommittee meetings were scheduled monthly at all 28 reviewed institutions. Meeting attendance was good overall, with quorums regularly achieved at most institutions. Generally, institution subcommittee meeting minutes contained sufficient details,

reflecting discussion of agenda items. However, documentation of follow-up actions for identified issues varied across institutions.

Several institutions utilized corrective action plans (CAPs) and other performance improvement plans as part of their quality management process. CMC had performance improvement work plans focused on reducing the number of patient refusal forms that required correcting, strengthening the peer support specialist program, modifying MHCB doors to prevent "fishing," and examining the feasibility of installing a scanner in the MHCB to detect and intercept metal contraband upon patient admission. CMF implemented CAPs for technical errors in referrals and discharge documentation. At CSP/Sac, CAPs for RHU pre-screening completion and RHU general population screens were promising. Ongoing CAPs at NKSP involved recruitment for psychiatric staffing, access to confidential treatment space, reducing 3CMS patient stays in the reception center, reducing overstays in the MHCB, and improving structural protection from inclement weather for patients waiting in medication administration lines. CAPs at RJD targeted custodial movement of patients for appointments, health care first responders not being issued radios, porters unsupervised in certain areas, pharmacy facility concerns, emergency send-out transportation delays, and handling of protected confidential information, among others. SATF had a CAP related to low compliance for acceptable documentation for non-referrals to higher levels of care.

ASP initiated three quality improvement teams (QITs), not in response to any identified deficiencies, but to improve the overall quality of care to *Coleman* class members. One QIT was initiated to investigate patients with multiple conflicting mental health diagnoses, one was to improve treatment planning and documentation, and one was to address the intersection of mental health and chronic medical conditions. CCWF had a QIT focused on monitoring required

services in the EOP RHU. CMC had a long-standing RHU QIT that monitored core elements of RHU mental health and custody service delivery when data was available. A QIT at CMF addressed custody discharge check compliance issues. Several findings from CSP/LAC's EOP RHU QIT were appropriately elevated to the mental health subcommittee, however, performance plans were not developed. CSP/Sac chartered a green belt project focused on lipid monitoring for patients on antipsychotics during the reporting period that progressed and was closed out in January 2025. HDSP's focused improvement team (FIT) to improve EOP group programming functioned effectively to monitor and improve services during the review period. At MCSP, QIT projects included examining treatment hours offered to EOP patients, RHU pre-screening process, and suicide watch 1:1 improvement project. At NKSP, quality improvement plans (QIPs) focused on timeliness of completing mental health referrals for the reception center population, quality of primary clinician initial assessments, psychiatric response to medication nonadherence, timely completion of mental health diagnostic screenings, and timely transfer of 3CMS patients from the reception center to mainline housing. The first three QIPs successfully achieved compliance and were closed during the review period; the fourth and fifth did not achieve compliance and were ongoing. There were five QITs chartered at PVSP during the review period. PBSP did not have any QITs or FITs during the review period.

A review of meeting minutes showed EMRRCs were meeting during the review period at CCI, CHCF, CIM, CIW, CRC, FSP, PBSP, PVSP, RJD, and SATF. Institution EMRRCs met monthly, except for CIW and PBSP which met bimonthly and CCI, which began meeting twice monthly in April 2025. There were no reported problems with attendance. EMRRCs followed the standard statewide template. Agenda items included review of emergency transports, overdoses, suicide attempts, and emergency drills, emergency medical devices, among other

standard topics. Reviewed EMRRC meeting minutes were detailed and demonstrated comprehensive reviews of relevant cases.

Peer review activities varied across institutions. During the review period, peer review was conducted for psychiatrists at ASP, CCWF, CIW, CSP/Sac, CTF, HDSP, MCSP, NKSP, PBSP, RJD, SQ, SVSP, VSP, and WSP. No significant concerns or systemic issues were reported. Although KVSP provided documentation of scheduled dates for peer review for six psychiatrists, no information was provided demonstrating the reviews had occurred. While the methods varied, clinician peer review in some form was conducted at CIW, CMF, CSP/Sac, MCSP, and PBSP.

Although formal peer review was not completed at ASP, all primary clinicians met monthly for a consultive case discussion to obtain feedback and engage in clinical discussions to improve clinician performance and patient care. CTF clinicians participated in a peer consult group where they discussed treatment strategies, planning, and documentation requirements. No peer review for any discipline occurred at CCI, CHCF, PVSP, or SATF.

Information regarding quality management projects and findings were provided to line staff through their supervisors at CCWF, CSP/Sac, CSP/LAC, CMC, CTF, and SATF. At WSP, information from mental health subcommittee meetings was disseminated to line staff via staff meetings and email. At VSP, the methods of disseminating quality management information to line staff were not clear, and at HDSP, it was unclear whether supervisory and line staff were aware of program-specific performance data.

**<u>Summary – Quality Management</u>**

Quality management systems remained in place at the reviewed institutions with the required institutional committees functioning to varying degrees of effectiveness. Several

institutions were using CAPs, QITs, and other performance improvement plans to address identified issues related to the delivery of mental health care. Quality management systems were functioning well at ASP, CHCF, CIM, CIW, CTF, NKSP, PBSP, and RJD. CMF's quality management program made significant improvements from the preceding review period. The quality management program was adequate at CCWF, CRC, PVSP, and VSP. At CCWF, there was no evidence that work was done to identify the root causes of identified challenges. At VSP, improvements could be made to ensure the dissemination of information to line staff. CSP/Sac's quality management reporting structure and documentation practices were useful but limited, as staffing shortages prevented the initiation of quality improvement studies as needed or correcting identified deficiencies.

CMC's quality management reporting structure and processes required improvement. CSP/LAC's quality management processes were not adequate to meet the needs of the mental health program, as service delivery areas were monitored, but solutions were not identified. The quality improvement process at KVSP was inadequate as it lacked a mechanism to address deficiencies and track implementation of corrective measures.

**F. <u>Access to Higher Levels of Care</u>**

<u>Transfers to Inpatient Care</u>

<u>Transfers to Acute Inpatient Care</u>

The Program Guide requires that patients referred to acute inpatient care must be transferred within ten days of referral and 72 hours of bed assignment. *See* ECF No. 7333-1 at 19 (PG 12-1-16). Twenty institutions – CCWF, CHCF, CIM, CIW, CMF, CSATF, CSP/Corcoran, CSP/LAC, CSP/Sac, CSP/Solano, HDSP, KVSP, MCSP, NKSP, PBSP, RJD, SQ, SVSP, VSP, and WSP timely transferred patients to acute inpatient care within ten days of referral as required by the Program Guide. In addition, CMC was close to compliance, timely

transferring 89 percent of referred patients to acute care. The remaining institutions – ASP, CCI, CRC, CTF, FSP, PVSP, and SCC made no acute care referrals. Overall, transfers to acute inpatient care were compliant with Program Guide timeframes during the review period.

Transfers to Intermediate Inpatient Care

The Program Guide requires that patients referred to intermediate inpatient care must be transferred within 30 days of referral and 72 hours of bed assignment. *See* ECF No. 7333-1 at 19 (PG 12-1-16). Twenty-two institutions – CCWF, CHCF, CIM, CIW, CMC, CMF, CRC, CSATF, CSP/Corcoran, CSP/LAC, CSP/Sac, HDSP, KVSP, MCSP, NKSP, PBSP, PVSP, RJD, SQ, SVSP, VSP, and WSP timely transferred patients to intermediate inpatient care within 30 days of referral as required by the Program Guide. The remaining institutions – ASP, CCI, CTF, CSP/Solano, FSP, and SCC did not report any intermediate care referrals. Accordingly, transfers to intermediate inpatient care settings were compliant with Program Guide timeframes during the review period.

MHCBs

Transfers to MHCBs

The Program Guide requires transfers to MHCBs within 24 hours of referral. *See* 7333-1 at 75 (PG 12-5-4). Twenty-seven institutions – ASP, CCI, CCWF, CIM, CIW, CMC, CMF, CRC, CSATF, CSP/Corcoran, CSP/Sac, CSP/Solano, CTF, FSP, HDSP, KVSP, MCSP, NKSP, PBSP, PVSP, RJD, SCC, SQ, SVSP, VSP, WSP timely transferred patients to MHCBs within 24 hours of referral. CSP/LAC neared compliance with 88 percent of MHCB transfers being timely. As such, transfers to MHCBs were compliant with Program Guide timeframes during the review period.

MHCB Clinical Lengths of Stay

The Program Guide provides for a clinical length of stay of up to ten days in the MHCB. Of the 21 institutions with MHCBs during the review period, sixteen institutions – CCWF, CIM, CIW, CSATF, CSP/Corcoran, CSP/LAC, CSP/Sac, CSP/Solano, HDSP, KVSP, MCSP, NKSP, PBSP, RJD, SVSP, and WSP had average clinical lengths of stay of ten days or less. Four institutions – CHCF, CMC, CMF and SQ – reported average clinical lengths of stays of 11.6, 10.1, 10.8, and 12.4 days, respectively. Notably, PVSP's MHCB was closed during the review period.

Transfers to Restricted Housing Units

Patients at the EOP and 3CMS levels of care must be transferred to an EOP RHU or 3CMS RHU, respectively, within 30 calendar days from the date of initial placement in RHU, or within 30 calendar days from the date the patient was made EOP or 3CMS. *See* Cal. Code of Regs., tit. 15 §§ 3335.2 and 3335.3; *see also* ECF No. 8355 at 7-17 (Restricted Housing Unit Program: Mental Health Services Policy, dated July 19, 2024 and effective August 1, 2024) (hereinafter "RHU Policy").

Transfers to EOP RHU

Four institutions – CRC, FSP, SCC, and SQ timely transferred patients within 30 days to EOP RHUs during the review period. Ten institutions – CCWF, CHCF, CIW, CMC, CMF, CSP/Corcoran, CSP/LAC, CSP/Sac, MCSP, and RJD operated EOP RHUs and reported no patient placement delays. However, five institutions (CIM, CSATF, NKSP, PVSP, and VSP) were unable to achieve compliance with EOP RHU transfer timeframes, reporting timely transfers in 68, 22, 78, 68, and 66 percent of cases, respectively. Two of these institutions – CSATF and VSP—were also noncompliant with EOP RHU transfer timeframes during the

preceding monitoring round. ECF No. 8095 at 100. An additional six institutions – ASP, CCI, HDSP, KVSP, PBSP, and SVSP reportedly did not track the timeliness of EOP RHU transfer data, and WSP did not provide intelligible EOP RHU transfer data. CTF and CSP/Solano did not transfer any patients to an EOP RHU during the reporting period.

Transfers to 3CMS RHU

Seven institutions – ASP, CHCF, CRC, CSP/Solano, CTF, FSP, and SQ timely transferred patients within 30 days to 3CMS RHU's during the review period. Ten institutions – CCWF, CIW, CSATF, CSP/Corcoran, CSP/LAC, CSP/Sac, HDSP, KVSP, PBSP, and PVSP operated 3CMS RHU's and reported no patient placement delays. Similarly, SVSP operated a 3CMS RHU, however, no placement data was maintained or provided, and on-site staff indicated that placement delays were highly likely. CMC, MCSP, and VSP neared compliance for timely transfers to 3CMS RHUs at 84, 83, and 83 percent, respectively. Furthermore, another six institutions – CCI, CIM, CMF, NKSP, RJD, and SCC were unable to achieve compliance with timely transfers to 3CMS RHU's with a range of 42 to 80 percent compliance. WSP reportedly did not provide intelligible 3CMS RHU transfer data.

**Summary – Access to Higher Level of Care**

Overall, CDCR timely transferred patients to acute and intermediate inpatient care settings as well as MHCBs. However, the department continued to face challenges meeting Program Guide transfer timeframes for mental health patients placed in EOP and 3CMS RHU settings.

**G. Custody and Mental Health Partnership Plan**

Consistent with prior reviews of CMHPP at both the EOP and 3CMS levels of care, institutions were found to be in varying degrees of compliance with the individual components of the partnership plan. Repeated in this round were the staffing challenges institutions faced,

particularly mental health staff shortages that institutional leadership often associated with the ability to comply with the component parts of the plan. Additionally, the expansion of EOP programs throughout CDCRs institutions, already strained by staffing shortages, further tested the institutions' ability to comply with EOP-related components of the plan.

Alignment of Institutional CMHPP LOPs with Headquarters' Partnership Plan

The following LOPs were current and consistent with headquarters policy – ASP, CCI, CCWF, CHCF, CIM, CIW, CMC, CRC, CSATF, CSP/Corcoran, CSP/LAC, CSP/Sac, CSP/Solano, CTF, FSP, HDSP, KVSP, MCSP, NKSP, PBSP, PVSP, RJD, SCC, VSP, and WSP.

The LOPs for CMF, SQ, and SVSP had expired.

Executive Leadership Joint Rounding

Executive leadership joint rounding was reported to have occurred monthly at ASP, CCI, CCWF, CHCF, CIM, CIW, CMC, CMF, CSATF, CSP/Corcoran, CSP/LAC, CTF, FSP, KVSP, MCSP, NKSP, PBSP, PVSP, RJD, SCC, SQ, VSP, and WSP. At CRC, HDSP, and SVSP executive joint rounding occurred five of six months during the review period. At CSP/Sac rounding occurred four of six months.

Executive leadership joint rounding did not occur at CSP/Solano due to staffing shortages.

Required attendees were present at executive leadership joint rounding at ASP, CCI, CCWF, CHCF, CIM, CIW, CMC, CMF, CRC, CSATF, CSP/Corcoran, CSP/LAC, CTF, HDSP, KVSP, MCSP, NKSP, PBSP, PVSP, RJD, SCC, SQ, VSP, and WSP.

Of the 28 institutions reviewed, staff were interviewed as required during executive leadership joint rounding at 26 institutions including ASP, CCI, CCWF, CHCF, CIM, CIW,

CMC, CMF, CRC, CSATF, CSP/Corcoran, CSP/LAC, CTF, FSP, HDSP, KVSP, MCSP, NKSP, PBSP, PVSP, RJD, SCC, SQ, SVSP, VSP, and WSP.

As required, patients were interviewed during executive leadership joint rounding at 26 institutions, including at ASP, CCI, CCWF, CHCF, CIM, CIW, CMC, CMF, CRC, CSATF, CSP/Corcoran, CSP/LAC, CTF, FSP, HDSP, KVSP, MCSP, NKSP, PBSP, PVSP, RJD, SCC, SQ, SVSP, VSP, and WSP.

In addition, executive joint rounding was documented in the meeting notes for all executive staff meetings, quality management meetings, and mental health subcommittee meetings at ASP, CCI, CCWF, CHCF, CIM, CMC, CTF, HDSP, RJD, and WSP. ASP, CSP/Corcoran, FSP, KVSP, MCSP, NKSP, and PVSP reported that executive rounding was discussed at all quality management and mental health subcommittee meetings. At CIW executive rounding was not discussed during executive leadership meetings but was discussed during one quality management meeting and in all mental health subcommittee meetings. At CMF and CSATF, a discussion of executive rounding occurred only in mental health subcommittee meetings. CRC documented executive joint rounding in three of six quality management meetings and all six mental health subcommittee meetings, but not in executive team meeting notes. At CSP/LAC, rounding was discussed in all quality management meetings, but in only three months of the mental health subcommittee meetings; executive team meeting minutes were not provided for review.

Executive staff meeting minutes were provided by CSP/Sac, however they did not reflect a discussion of executive rounding. CSP/Sac did not report if executive rounding was discussed at quality management or mental health subcommittee meetings. At PBSP, executive rounding was discussed at all executive team meetings, three quality management meetings, and all mental

health subcommittee meetings. At SCC, rounding was discussed for two of six months of executive team meetings and at all quality management and mental health subcommittee meetings. At SQ executive rounding was discussed at all executive leadership and mental health subcommittee meetings, but not in quality management meetings. SVSP only discussed executive rounding in the quality management meetings. At VSP, executive rounding was discussed at all executive team meetings, at three quality management, and five mental health subcommittee meetings.

Huddles

The monitor reviewed huddle forms and/or observed huddles at 25 institutions, as follows: CCI, CCWF, CHCF, CIM, CIW, CMC, CMF, CRC, CSATF, CSP/Corcoran, CSP/LAC, CSP/Sac, CSP/Solano, FSP, HDSP, KVSP, MCSP, NKSP, PBSP, PVSP, RJD, SQ, SVSP, VSP, and WSP.

CMF, CSP/Sac, CSP/Solano, and PBSP reported using the specialized bed huddle forms in their MHCB. Huddle forms were reviewed for the second and third watch at CMF, CSP/Sac, CSP/Solano, and PBSP and staff generally attended huddles; occasionally, custody staff engagement was limited. Observed huddles in the MHCB at NKSP and reviewed huddle forms were compliant. At HDSP and WSP, huddles in the crisis bed occurred on second watch only. Observed MHCB huddles at CMF and CSP/Solano were attended by required staff but were not collaborative. Observed MHCB huddles at CSP/Sac and SQ were compliant as were reviewed huddle forms. Compliance with observed huddles and reviewed crisis bed huddle forms was mixed, particularly at HDSP and WSP where huddles did not occur at all during third watch.

Huddles observed and/or reviewed at CCWF, CIW, CMC, CSATF, CSP/Corcoran, FSP, NKSP, and SVSP were compliant with required staff in attendance. Observed huddles at CIM,

CRC, HDSP, MCSP, PBSP, and PVSP were also compliant, while an observed EOP huddle at RJD was not compliant.

Reviewed second and third watch huddles occurred consistently at CHCF, HDSP, KVSP, PVSP, SQ, and VSP with required staff in attendance.

CCI reported variable compliance with EOP huddles during the review period. Similarly reviewed huddle forms at CRC generally lacked pertinent detail and did not reflect an exchange of information.

Reviewed huddle forms at CMF revealed that custody did not attend any A unit huddles and attended just 50 percent of B unit huddles.

MCSP did not conduct any third watch huddles during the review period due to staffing shortages. CSP/LAC provided no huddle forms for review from any level of care, though an observed RHU huddle was adequate. At RJD, MHCB and EOP huddle forms were noncompliant, while RHU huddle forms reflected adequate staffing and patient discussion. Huddle forms at WSP were noncompliant.

CIM reported daily huddles were not occurring as required during the reporting period.

Weekly 3CMS Program Supervisory Meetings

Weekly 3CMS program supervisory meetings occurred as required at ASP, CIW, CMC, CSP/LAC, CTF, FSP, KVSP, MCSP, NKSP, PBSP, PVSP, RJD, SCC, and VSP. At CIM, CSP/Sac, CSP/Solano, SQ, and WSP weekly meetings occurred but the meeting notes were sparse.

At CHCF, weekly meetings occurred on Facility E four out of six months, however no documentation was provided for CHCF's remaining 3CMS programs. Documentation provided by CCI indicated weekly supervisory meetings occurred only five weeks of the reporting period.

At CRC, weekly supervisory meetings occurred 15 of 26 weeks on Facilities B, C, and D. Of the 14 weekly meetings held at FSP, seven or 50 percent did not include the staff required.

Meetings were not held in June, July, or August due to a lack of staff at SVSP. Meetings were inconsistent throughout the remaining months at SVSP. Weekly supervisory meetings were not held at CMF or CSATF due to staffing shortages. Weekly supervisory meetings did not occur at HDSP.

Monthly Joint Supervisory 3CMS Program Area Tours

Monthly joint supervisory 3CMS program area tours occurred as required at 18 of 28 institutions, specifically the following were compliant, ASP, CCWF, CIW, CMC, CRC, CSATF, CSP/Corcoran, CSP/Sac, FSP, KVSP, MCSP, NKSP, PBSP, PVSP, RJD, SCC, SQ and WSP.

At VSP, monthly program area tours occurred on B, C, and D Yards, but did not occur on A Yard. At CTF, program area tours occurred for five of six months on Central Facility and for two of six months on North Facility and at CHCF, program area tours occurred at different housing units on Facility E during each month of the reporting period. Monthly program tours at SVSP were held on Facility A two of six months of the review period and three of six months on Facility C. No tours occurred on Facility B.

Monthly program area tours did not occur at CCI, CSP/LAC or HDSP during the review period. Similarly, they did not occur at CMF or CSP/Solano during the review period due to staffing shortages.

3CMS Orientation Brochure

The 3CMS Orientation Brochure was available in English and Spanish and provided for review at all 28 institutions.

EOP Orientation Groups

EOP orientation groups were held regularly at CMC, CRC, CSP/LAC, KVSP, and PBSP.

RJD and VSP orientation groups were offered weekly, though data indicated low patient attendance. An observed EOP orientation group at VSP was led by a psychologist, sergeant, and two peer facilitators who covered the required content, and patients who attended reported the information was helpful. At CIW, EOP orientation groups were offered regularly, however, no patients attended; and at SQ, orientation groups were offered regularly but custody staff failed to participate. CIM offered groups for two of six months, however, a mental health facilitator did not participate. SVSP offered EOP groups regularly, however, custody and peer facilitators rarely participated and an observed EOP group at SVSP was facilitated solely by the psychologist.

Inmate Advisory Council

Inmate advisory council (IAC) meetings occurred as required at ASP, CCI, CCWF, CHCF, CIW, CMF, CRC, CSATF, CSP/Corcoran, CSP/Solano, CTF, FSP, KVSP, NKSP, PBSP, PVSP, SQ, and VSP. At SCC, the IAC met for all six months on Facilities A and B and on Facility C they met for four out of six months. The IAC at HDSP met four out of six months.

MCSP provided documentation the IAC met as required for all five facilities, but a mental health representative was only present at Facility C meetings. RJD documented that the IAC meetings occurred as required on Facility A, and for three of six months on Facility E, yet the institution was unable to report if IAC meetings occurred on Facilities B, C, or D.

The IAC at CSP/LAC met twice on Facility A, once on Facility C and D and three times in the MSF. At CSP/Sac, the IAC met sporadically on Facility A and B and more consistently on Facility C. WSP reported the IAC met quarterly instead of monthly.

At SVSP, the IAC met for four months on Facility D, three months on Facility A, and didn't meet on Facility B as no mental health staff were available. On Facility C, patients declined to attend five of six scheduled meetings.

There were no reported IAC meetings at CIM or CMC.

The IAC's convened monthly as required at 18 of 28 institutions and inconsistently at the remaining ten institutions for a compliance rate of 64 percent.

General topics discussed across IAC meetings included medical issues, program status reports (PSRs), the lack of confidentiality with cell-front contacts, access to higher levels of care, keep on person (KOP) medications, shower temperatures, drug use, clothing/linen supplies, visitor facilities, physical plant issues, worker wages, the California Model, Americans with Disabilities Act (ADA) concerns, pill lines, yard and dayroom schedules, tablet issues, yard equipment, wi-fi, broken ice machines, misters, water filters, and canteen.

<u>Staff Misconduct</u>

Staff misconduct data was reported for 25 of the 28 reviewed institutions. During the reporting period, there were a total of 40 staff misconduct complaints filed at ASP, four at CCI, 222 at CCWF, 214 at CHCF, 82 at CIM, 427 at CIW, 834 at CMF, 61 at CRC, 428 at CSATF, 1,065 at CSP/LAC, 21 at CSP/Sac, 359 at CSP/Solano, 32 at CTF, 46 at FSP, 543 at HDSP, 489 at KVSP, 425 at MCSP, 87 at NKSP, 180 at PBSP, 54 at PVSP, 103 at RJD, 58 at SCC, 618 at SVSP, 80 at SQ, and 132 at WSP for a total of 6,604 staff misconduct complaints. Notably, the number of staff misconduct complaints filed at CMF, CSP/LAC, and SVSP, accounted for 38 percent of the total. Concerningly, the institutions reported that of the 6,604 staff misconduct complaints, the status of 3,845 or 58 percent remained unknown or unresolved at the time of the site visit.

Institutional review of misconduct complaints against custody staff revealed there were 222 at CCWF, 61 at CRC, 835 at CSP/LAC, 341 at CSP/Solano, 27 at CTF, 543 at HDSP, 475 at KVSP, 166 at PBSP, 58 at SCC and 78 at SQ. There were no investigations of custody staff misconduct reported at CCI or CIW.

No information was reported or provided specifically identifying the misconduct complaints against custody, mental health or other staff at ASP, CHCF, CIM, CSATF, CSP/Sac, FSP, MCSP, NKSP, PVSP, SVSP, or WSP.

Regarding the number of staff misconduct complaints filed against mental health staff, institutions reported the following: four each at CCI, CCWF, and HDSP; 64 at CIW; 113 at CMF; 42 at CSP/LAC; seven at CSP/Solano; five at CTC; 14 at KVSP; two each at PBSP and SQ; and 103 at RJD. There were no misconduct complaints reported against mental health staff at CRC. SCC was unable to provide a total number of staff misconduct complaints filed against mental health staff.

No staff were reassigned due to misconduct complaints at CCI, CCWF, CHCF, CIM, CIW, CMF, CRC, CSATF, CSP/LAC, CSP/Sac, CSP/Solano, CTF, FSP, HDSP, KVSP, MCSP, NKSP, PBSP, RJD, SCC, SVSP, SQ, or WSP. At Avenal and PVSP, it was not noted if any staff were reassigned due to staff misconduct.

Annual Partnership Off-Post Training

Custody and mental health staff at ASP, CCI, CHCF, CMF, CSATF, CSP/Sac, CSP/Solano, FSP, HDSP, PVSP, RJD, SCC, SVSP, VSP, and WSP were compliant with annual partnership off-post training, with at least 90 percent of the staff attending. CIM reported that mental health staff were compliant with attendance at annual partnership off-post training, but

custody staff were not. At CMC, CRC, CSP/LAC, CTF, KVSP, MCSP, and NKSP, custody staff attendance at the training was in compliance, but mental health attendance was not.

Neither custody nor mental health staff attendance at annual partnership training was compliant at CCWF, CSP/Corcoran, or PBSP.

At CIW and SQ, compliance with attendance at annual partnership training could not be ascertained.

Of the 28 institutions reviewed for attendance at annual partnership training, custody staff at 22 institutions or 79 percent, were compliant, while the mental health staff at 16 institutions or 57 percent were compliant.

Quarterly Partnership Training

Attendance at quarterly partnership training could not be ascertained from the documentation provided by the institutions at CCI, CCWF, CHCF, CIM, CIW, CMC, CSP/Corcoran, CSP/LAC, CSP/Sac, KVSP, NKSP, PBSP, PVSP, RJD, SQ, VSP, and WSP.

SVSP reported attendance at quarterly partnership training was low and not held consistently across facilities.

CMF reported they did not run quarterly partnership training during the review period, while at MCSP it was reported that quarterly partnership training did not occur due to staffing shortages. Compliance with quarterly partnership training was not reported at CRC, CSATF, and HDSP.

Compliance with quarterly partnership training could not be ascertained at any of the 23 institutions where it was required.

**Summary – Custody Mental Health Partnership Plan**

Staffing shortages continued to challenge compliance in several areas of the custody and mental health partnership plan. For instance, institutions reported huddles, EOP orientation groups, quarterly partnership training, monthly joint supervisory 3CMS program area tours, and weekly 3CMS program supervisory meetings were all impacted by staffing shortages. Moreover, the increase in EOP programs throughout CDCR also impacted compliance levels for EOP focused components, such as EOP orientation groups and quarterly partnership training, with 35 percent and zero percent compliance ratings, respectively. Continued focus by mental health and custody leadership at both the local and headquarters level remains necessary for improved compliance.

Some components of the partnership plan were compliant throughout the 28 institutions reviewed. These areas included executive leadership joint rounding, availability of the 3CMS orientation brochure in English and Spanish, annual partnership off-post training, and staff transfers related to misconduct; additionally, LOPs were current across institutions with just a few exceptions. Institutions should remain steadfast in maintaining compliance in these areas while increasing focus and compliance levels for those underperforming components, notwithstanding the staffing challenges.

**H. Review of the RVR Process**

As reported above, there was a significant overall increase in the number of RVRs during the review period, a troubling continuation of a trend observed in recent years. During the preceding review period, a total of 56,683 RVRs were issued at EOP and 3CMS institutions,[34]

---

[34] *See* Thirtieth Round Monitoring Report – Part C, ECF No. 8095 at 114 (reporting a total of 31,341 RVRs issued at the 15 EOP institutions covered in the Part C report), and Thirtieth Round

with 52 percent of total RVRs issued to MHSDS patients.[35] During the current review period, a total of 72,771 RVRs were issued at the same 28 institutions, with 60 percent of total RVRs issued to MHSDS patients. This represents a 28 percent increase in total RVRs issued and a 47 percent increase in the issuance of RVRs for MHSDS patients since the preceding review period.

Compared to the preceding review period, institutions achieved a higher compliance rate for some measures surrounding the RVR processes. For example, 13 institutions returned mental health assessments in a timely manner, which was an increase from the preceding review period when only seven institutions achieved compliance with this measure. While this represented improved compliance, more than half of institutions still failed to complete mental health assessments in a timely manner during the review period.

Although there was compliance at some institutions for certain metrics, CDCR remained non-compliant for the implementation of the RVR process. Custody and mental health staff were not appropriately trained on the mental health assessment process at most institutions, many institutions could not provide requested data on key data points, and mental health assessments were non-compliant with respect to timeliness and confidentiality, and only approximately half of institutions were compliant with many metrics regarding the RVR hearing processes.

Custody staff training on the mental health assessment process yielded ten of 28 or 36 percent of institutions that were compliant (ASP, CCI, CCWF, CMF, CSP/Corcoran, CTF, FSP, NKSP, SCC, and VSP), seven that were not compliant (CIM, CRC, CSP/Solano, KVSP, MCSP,

---

Monitoring Report – Part D, ECF No. 8359 at 105 (reporting a total of 25,342 RVRs issued at the 13 3CMS institutions covered in the Part D report).

[35] During the Thirtieth Monitoring Round, CDCR issued 21,332 RVRs in EOP institutions, ECF No. 8095 at 114, and 8,142 RVRs in 3CMS institutions, ECF No. 8359 at 105, for a total of 29,474 RVRs issued to class members at the 28 institutions with mental health programs. This represented 52 percent of RVRs issued during the Thirtieth Monitoring Round.

RJD, and SVSP), and 11 that were unable to provide data as to whether custody staff training was compliant. At three institutions, CCI, CCWF, and CTF, 100 percent of custody staff completed training as required. However, CIW, CMC, CSP/LAC, CSP/Sac, CSATF, HDSP, PBSP, PVSP, RJD, SQ, SVSP, and WSP's lack of data could not allow for a determination of compliance to be made by the institution.[36]

Regarding mental health staff training on the mental health assessment process, 11 institutions, ASP, CCI, CHCF, CIM, CMF, CTF, MCSP, SCC, SVSP, VSP, and WSP, were in compliance, four institutions CRC, CSP/Solano, KVSP, NKSP, were not in compliance, and the remaining 13 institutions, CCWF, CIW, CMC, CSP/Corcoran, CSP/LAC, CSP/Sac, CSATF, FSP, HDSP, PBSP, PVSP, RJD, SQ, could not provide data as to whether the institution was in compliance with mental health assessment training for mental health staff. *See supra* note 38.

Seven institutions – CCI, CHCF, CIM, CTF, MCSP, SCC, and SVSP – achieved 100 percent compliance for training mental health staff who wrote mental health assessments.

Of the 72,771 RVRs issued at 28 institutions, 43,339 or 60 percent were issued to MHSDS patients. There were 151 RVRs issued to patients at the acute or intermediate levels of care,[37] 1,355 issued to MHCB patients, 10,747 issued to EOP patients, and 31,086 issued to 3CMS patients. Forty percent, or 29,432 RVRs were issued to non-MHSDS incarcerated persons.

---

[36] Regarding training data, consistent with prior reviews, some institutions reported the number of custody or mental health staff that completed training but did not report the number of staff *required* to complete training. Thus, a compliance percentage could not be calculated for these institutions.

[37] These 151 RVRs were issued to patients with either acute or intermediate mental health levels of care who were housed in outpatient programs awaiting transfer to inpatient programs.

Regrettably, none of the reviewed samples from the 28 institutions demonstrated compliance for custody staff timely requesting completion of mental health assessments. Thirteen institutions, CCI, CHCF, CIM, CMF, CRC, FSP, MCSP, NKSP, PVSP, SCC, SQ, VSP, and WSP complied with timeframes for mental health staff completion and return of mental health assessments to custody.

Of the 18 institutions with reported data, four institutions, ASP, CIM, CIW, and CRC reported completing the mental health assessment confidentially. The most often cited reasons for non-confidential mental health assessments included custody modified program, lack of availability of custody staff for transport, and patient refusals. Two institutions – CSATF and MCSP – completed 87 percent of mental health assessments in a confidential setting. Twelve institutions, CCI, CHCF, CMC, CMF, CSP/Corcoran, CSP/LAC, KVSP, NKSP, PBSP, PVSP, SCC, and WSP, completed less than 90 percent of reviewed mental health assessments in a confidential setting, while data regarding confidentiality was not provided for ten institutions.

A reviewed sample of adjudicated RVRs demonstrated that the senior hearing officer typically documented consideration of the mental health assessment at 17 institutions, namely, CCWF, CHCF, CIW, CMC, CMF, CSATF, CSP/LAC, CSP/Solano, CTF, FSP, HDSP, KVSP, PBSP, RJD, SCC, SQ, and VSP. This represents backsliding in institutional compliance compared to the preceding review, in which 21 institutions were compliant with this requirement.[38] Seven institutions, CRC, CSP/Corcoran, CSP/Sac, MCSP, NKSP, SVSP, and

[38] *See* Thirtieth Round Monitoring Report – Part C, ECF No. 8095 at 115 (reporting "the senior hearing officer typically documented consideration of the mental health assessment at 11 institutions..."), and Thirtieth Round Monitoring Report – Part D, ECF No. 8359 at 106-07 (reporting "[t]en institutions…achieved compliance with the senior hearing officer documenting consideration of the mental health assessment.").

WSP reported between 23 percent and 75 percent compliance, and four institutions reported under ten percent compliance.

The reviewed sample of RVRs indicated that 14 institutions – CCI, CHCF, CIM, CIW, CMC, CMF, CSATF, CSP/Solano, CTF, FSP, HDSP, MCSP, RJD, and VSP – were compliant with the senior hearing officer appropriately documenting penalty mitigation. The remaining 14 institutions were not compliant, although PBSP, and SQ were close with 89 and 87 percent compliance, respectively. The most common mitigations were no loss of yard, phone, or property. ASP did not report any documentation, although there was mitigation of phone privileges in all six reviewed samples, indicating further training may be necessary. At CIM, the senior hearing officer did not document consideration of mental health assessment information in any cases, even though penalties in all cases were mitigated as recommended on the mental health assessment form. This review indicates a need for the necessity of further and more effective training.

The sample of the classification committee consideration of mental health factors when assessing RHU terms yielded data that in seven out of 19 reviewed cases or 37 percent, the committee considered mental health factors when assessing RHU terms.

**Summary – RVR Process**

The data points that have been audited for several monitoring rounds continued to be noncompliant regarding mental health processes involved with RVRs for patients. The number of RVRs issued continued to rise throughout the 28 monitored institutions during the current round, and the percentage of RVRs issued to MHSDS patients continued to increase as well. Regarding individual metrics, custody and mental health staff training fell below compliance thresholds, as did the timeliness of custody referring mental health assessments to primary

clinicians, primary clinicians conducting confidential assessments and timely returning those assessments, as well as senior hearing officers utilizing and documenting their consideration of those assessments in their adjudication and mitigation of the RVR processes.

**I. Use of Force**

The Court ordered defendants to revise the use of force policies under the Special Master's supervision on April 10, 2014. ECF No. 5131 at 72. Following this directive, defendants completed and filed their updated use of force policies on August 1, 2014. ECF No. 5190. On August 11, 2014, the Court approved the revised policies. ECF No. 5196.

Training

The use of force policy requires training on the controlled and intermediate use of force for certain custody, mental health, nursing, and line staff. Of the 28 institutions with EOP programs, almost all (26) institutions were complaint with training custody staff regarding these policies. Specifically, there was 100 percent compliance at CCWF, CHCF, CMC, CRC, CSP/Corcoran, CSP/LAC, CSP/Sac, CSP/Solano, KVSP, NKSP, PVSP, SQ, and WSP. ASP, CCI, CIM, CIW, CMF, CSATF, FSP, MCSP, PBSP, RJD, SCC, and SVSP exceeded 95 percent compliance. CTF was at 91 percent compliance. HDSP and VSP were non-compliant at 85 and 41 percent, respectively. This represented an improvement compared to the preceding review period, when 22 of 28 institutions were compliant with use of force training for custody staff.[39]

[39] *See* Thirtieth Round Monitoring Report – Part C, ECF No. 8095 at 118 (reporting compliant rates of custody staff use of force training at 11 of 15 EOP institutions), and Thirtieth Round Monitoring Report – Part D, ECF No. 8359 at 108 (reporting compliant rates of custody staff training at 11 of 13 3CMS institutions).

Compared to the preceding review period, each of the 11 institutions compliant with use of force training for custody staff for the Thirtieth Monitoring Round remained in compliance, and the four non-compliant institutions achieved compliance during the current review period.

Regarding mental health staff use of force training, 20 of the 28 institutions reported compliance, including ASP, CCI, CHCF, CIM, CMC, CMF, CSATF, CSP/LAC, CSP/Sac, CSP/Solano, CTF, FSP, HDSP, KVSP, NKSP, PVSP, RJD, SCC, SQ, and WSP. This was a marked improvement compared to the preceding review, when only nine of 28 institutions were compliant with training of mental health staff regarding use of force.[40]

CCWF, CIW, CRC, CSP/Corcoran, MCSP, PBSP, SVSP, and VSP were not compliant with mental health staff completing use of force training, with each of these institutions achieving less than 50 percent compliance.

Based on the data provided, CDCR achieved near perfect compliance with custody use of force training. While rates of use of force training for mental health staff had improved compared to the preceding monitoring round, it is concerning that eight institutions were below 50 percent compliance for mental health staff.

Controlled Use of Force

During the review period, 16 institutions reported a total of 114 controlled use of force incidents. Fifteen of the institutions reported that MHSDS patients were involved in 97 controlled use of force incidents. There were seven at CCI, nine at CHCF, one at CIW, two at CMC, three at CMF, seven at CSATF, six at CSP/Corcoran, 27 at CSP/LAC, 15 at CSP/Sac,

[40] *See* ECF No. 8095 at 118-19 (reporting compliant rates of mental health staff use of force training at four of 15 EOP institutions), and ECF No. 8359 at 108 (reporting compliant rates of mental health staff use of force training at five of 13 3CMS institutions).

three at HDSP, eight at KVSP, four at MCSP, one at NKSP, and two each at SCC and SVSP. It was unclear whether RJD's controlled use of force incidents involved any MHSDS patients.

Of the sample of 43 controlled use of force incidents reviewed, 41 at CCI, CHCF, CIW, CMC, CMF, CSATF, CSP/Corcoran, CSP/LAC, CSP/Sac, HDSP, KVSP, MCSP, NKSP, and SVSP reflected compliance with the controlled use of force policy. While compliant, at CSP/LAC, there was a lack of clarity or details in the incident reports. The one non-compliant controlled use of force incident was at SCC where there was a failure to record the incident. This matter was reportedly resolved by providing additional training.

Immediate Use of Force

All 28 institutions had immediate use of force incidents; however, two institutions – CMF and SVSP – did not provide a breakdown of the number of incidents involving MHSDS patients. Of the 26 institutions that provided the total number of immediate use of force incidents involving mental health patients, there were 3,945 incidents.[41]

The monitor's review of immediate use of force incidents at the following 21 institutions indicated compliance with policy: ASP, CCI, CCWF, CHCF, CIM, CMC, CRC, CSATF, CSP/Sac, CSP/Solano, CTF, FSP, HDSP, NKSP, PBSP, PVSP, RJD, SCC, SQ, VSP, and WSP. Although the sample of immediate use of force incidents was compliant, the monitor identified concerns at ASP, KVSP, and WSP. At ASP, the patient was forced to the ground by staff after resisting the escort while cuffed behind the back. The monitor noted that there were other custody staff in proximity who could have aided in maintaining control of the incarcerated

[41] CMF reported the combined immediate use of force and non-use of force incidents during the review period for both MHSDS and non-MHSDS incarcerated individuals as 374. The delineation between MHSDS and non-MHSDS could not be ascertained. SVSP reported that there were 670 intermediate use of force incidents but did not specify the number of incidents involving MHSDS patients.

person without going to the ground, where there was a risk of injury to both custody staff and the incarcerated person.

At KVSP, the monitor found that there were minor policy violations. At WSP, the monitor found that several incident packages lacked details regarding de-escalation prior to the immediate use of force, and the patient and staff's interaction prior to the use of force.

Reviewed immediate uses of force involving MHSDS patients at the following seven institutions reflected policy violations and other concerns: CIW, CMF, CSP/Corcoran, CSP/LAC, KVSP, MCSP, and SVSP. Reviewed immediate use of force incidents at CIW revealed two incidents of concern. The first involved the use of two bursts of Oleoresin Capsicum (OC) spray within 35 seconds when a patient pulled restraint equipment into a therapeutic module and wrapped the equipment around her head. The second incident involved forced medication for a patient in a four-point restraint. The force was insufficient to allow nursing to inject the medications, and the patient was not properly covered by the safety smock.

At CMF, the reviewed immediate use of force was questionable; when the incarcerated person continued to resist after OC was utilized, the officer punched the incarcerated person twice in the "facial area." One reviewed immediate use of force incident at CSP/Corcoran was non-compliant due to the failure to file an incident report by the ordering clinician. KVSP's 12 immediate use of force incidents involving MHSDS patients revealed minor policy violations, including not wearing protective gear.

CSP/LAC had several non-compliant or concerning immediate use of force incidents. The monitor noted concerns with the report documentation and the lack of de-escalation efforts by staff, and custody staff quickly resorting to force. Examples included when a patient reached inside of a cast that was on his arm for an unknown object. While the staff appropriately used

physical force to stop the potential threat, the report did not say what, if anything, was inside of the patient's cast.

In another report, the patient was in a transport van and refused to exit the vehicle. Staff responded with physical force to stop the patient from hurting themselves as the patient placed the seat belt around their neck. Once the patient was out of the van, the patient became compliant and was approved for transfer to a higher level of mental health care. The patient was inappropriately issued an RVR for resisting a peace officer.

Another incident occurred where a patient being escorted back to their cell attempted to break away from the officer. The report was reviewed and closed, and no concerns were identified. Further, no de-escalation efforts were documented as taking place. In a different incident, no de-escalation efforts were documented when a patient was informed that a urine analysis sample was required for his PC 2602 involuntary medication.

At MCSP, there were three use of force incidents where de-escalation techniques may have avoided the use of force. Another incident involved an officer deploying a second burst of chemical agent in close proximity to the first while the incarcerated person was on the floor.

In two incidents at SVSP, patients were issued RVRs for incidents that occurred during medical emergencies. The first staff utilized force in the patient's cell to administer medication. In the second incident, the patient was found unresponsive. Following the administration of three doses of Narcan, the patient regained consciousness, as he was thrashing his body around and kicking. The monitor found the issuance of RVRs under these circumstances inappropriate.

**Summary – Use of Force**

All institutions, except HDSP and VSP, reported compliance for training custody staff on the use of force policy during the review period. For mental health staff training on use of force,

20 of 28 or 71 percent of institutions were compliant. The remaining eight institutions were under 50 percent compliance.

Of the 15 institutions reporting controlled use of force events involving MHSDS patients, 41 of the 43 reviewed events complied with the use of force policy. Noncompliance was due to failing to film an incident and improper categorization. The remaining 13 institutions did not have any controlled use of force incidents that involved MHSDS patients.

Except for CMF, all institutions reported immediate use of force incidents. Reviewed incidents showed that 21 institutions had incidents compliant with policy, but some reviewed incidents at the remaining seven institutions reflected policy violations or other concerns.

### J. Program Access[42]

Unchanged from previous monitoring rounds, MHSDS patients held fewer jobs and academic assignments than non-MHSDS incarcerated persons across the reviewed institutions.[43] EOP patients continued to hold the least number of jobs, and non-MHSDS incarcerated persons held the most. Likewise, MHSDS patients held fewer vocational and voluntary education assignments; again, non-MHSDS patients held the greatest number of those assignments. EOP patients held the least substance abuse treatment assignments; however, the percentage of 3CMS patients that held substance abuse treatment assignments matched that of non-MHSDS incarcerated persons. Receipt of milestone credits by eligible patients could not be determined due to the lack of data provided by CDCR. Overall, there were EOP and 3CMS patients housed out-of-level throughout the majority of institutions during the review period.

---

[42] The Special Master monitors program access pursuant to a March 2, 2015 Order granting final approval of the settlement agreement in *Hecker v. California Department of Corrections and Rehabilitation*. *See* ECF No. 5284 at 4.

[43] CTF did not provide usable data for any Program Access sections.

Job Assignments

At the 28 reviewed institutions, non-MHSDS incarcerated persons continued to hold more job assignments than MHSDS patients. All 21 institutions with EOP programs employed EOP patients; however, across all institutions, an average of only 18 percent of EOP patients held jobs, while 43 percent of non-MHSDS incarcerated persons at those same institutions held them. CRC, CCI, and CIM employed one, two, and three percent of the EOP population, respectively. At those same institutions, 70, 64, and 46 percent of non-MHSDS patients held job assignments. At CSP/Corcoran, MCSP, RJD, SVSP, SQ, and CSP/Sac, ten to 19 percent of EOP patients had job assignments, whereas at those same institutions, 30 to 45 percent of non-MHSDS patients held assignments. Six institutions—CHCF, CIW, CMF, CSATF, KVSP, and VSP—reported that 20 to 25 percent of EOP patients held job assignments while 30 to 44 percent of non-MHSDS incarcerated persons held assignments. At CMC, CCWF, HDSP, and CSP/LAC, 32 to 38 percent of EOP patients held job assignments; however, 40 to 55 percent of non-MHSDS incarcerated persons held job assignments.

For 3CMS programs across all institutions, 31 percent of 3CMS patients held job assignments. At those same institutions, 40 percent of non-MHSDS incarcerated persons held job assignments. At both NKSP and WSP, only six percent of 3CMS patients held job assignments, while 13 percent and 14 percent of non-MHSDS incarcerated persons held them. At nine institutions—ASP, CSP-Sac, CRC, KVSP, MCSP, PBSP, PVSP, SVSP, and SQ—20 to 29 percent of 3CMS patients held job assignments. At those same institutions, 30 to 79 percent of non-MHSDS incarcerated persons held job assignments. At another ten institutions-CCI, CHCF, CSP/LAC, CSATF, CSP/Corcoran, FSP, HDSP, RJD, CSP/Solano, and VSP-30 percent to 36 percent of 3CMS patients held job assignments; 30 to 64 percent of non-MHSDS incarcerated

persons held job assignments. Five institutions-CIM, CIW, CMC, CCWF, and SCC-reported 41 percent to 49 percent of 3CMS patients held job assignments, while 15 percent to 55 percent of non-MHSDS incarcerated persons held them. At CMF, 53 percent of 3CMS patients held job assignments, and 43 percent of non-MHSDS incarcerated persons held them.

Academic Assignments

Across all reviewed EOP institutions, 18 percent of EOP patients held academic assignments, while 37 percent of non-MHSDS incarcerated persons held them. At PBSP, no EOP patients held academic assignments, while 40 percent of non-MHSDS incarcerated persons held them. Similarly, at CRC, one percent of the EOP population held academic assignments compared to 66 percent of non-MHSDS incarcerated persons holding them. For HDSP, KVSP, PVSP, and WSP, one to five percent of EOP patients held academic assignments. At those same institutions, five to 28 percent of non-MHSDS incarcerated persons held them. At seven institutions-CHCF, CIM, CMC, CMF, CSP-Sac, MCSP, and SQ- 11 to 18 percent of EOP patients held academic assignments, though 13 to 41 percent of non-MHSDS incarcerated persons held assignments. At CCI, CIW, CSP/Corcoran, RJD, SVSP, and VSP, 20 to 29 percent of EOP patients held academic assignments; 31 to 61 percent of non-MHSDS incarcerated persons held them. At CSP/LAC, only 30 percent of EOP patients held academic assignments compared to 75 percent of non-MHSDS incarcerated persons, and at CSATF, 41 percent of EOP patients held assignments while 52 percent of non-MHSDS incarcerated persons held them. At CCWF the percentage of EOP patients holding academic assignments was greater than non-MHSDS incarcerated persons by four percent—34 percent versus 30 percent.

During the Thirty-First Monitoring Round, 3CMS patients also held fewer academic assignments than non-MHSDS incarcerated persons. Across all institutions, 27 percent of 3CMS

patients and 34 percent of non-MHSDS incarcerated persons held academic assignments. Less than five percent of 3CMS patients held academic assignments at NKSP and WSP; non-MHSDS incarcerated persons held five and 13 percent of academic assignments. At CHCF, CMF, KVSP, MCSP, and PVSP, 17 to 19 percent of 3CMS patients held academic assignments while 13 to 29 percent of non-MHSDS incarcerated persons held them. At eight institutions-ASP, CMC, CIM, FSP, HDSP, PBSP, CSP/Solano, and SCC-20 to 27 percent of 3CMS patients held academic assignments, whereas nine to 80 percent of non-MHSDS incarcerated persons held them (at ASP and PBSP, 80 and 40 percent of non-MHSDS incarcerated persons held academic assignments). Another seven institutions—CCI, CRC, CSATF, CCWF, RJD, SVSP, and VSP—reported 31 to 37 percent of 3CMS patients held academic assignments; 30 to 66 percent of non-MHSDS incarcerated persons held them. At the remaining five institutions—CSP/LAC, CSP-Sac, CIW, CSP/Corcoran, and SQ—40 to 47 percent of 3CMS patients held academic assignments. At those same institutions, 31 to 75 percent of non-MHSDS patients held assignments.

Vocational Assignments[44]

Vocational education assignments included carpentry, computer repair, heating, welding, plumbing, painting, electrical, HVAC, and other programs. Across all institutions, three percent of EOP patients held vocational education assignments, while ten percent of non-MHSDS patients held them. No EOP patients held vocational assignments at seven institutions CSP/LAC, CRC, CCWF, HDSP, PBSP, SVSP, and SQ. At those same institutions, one to seven percent of non-MHSDS held vocational assignments. At CMF, 27 percent of EOP patients held vocational education assignments, whereas 48 percent of non-MHSDS incarcerated persons held them. At the remaining 13 institutions—CCI, CMC, CSP-Sac, CHCF, CIM, CIW, CSATF,

[44] CTF, RJD and SQ did not provide usable data for calculation.

CSP/Corcoran, KVSP, MCSP, PVSP, VSP, and WSP—nine percent or less of EOP patients held vocational education assignments, while one to 63 percent of non-MHSDS incarcerated persons held them.

For 3CMS patients, nine percent held vocational education assignments, while 13 percent of non-MHSDS incarcerated persons held them. At four institutions-CMC, CIW, PVSP, and SCC-ten to 15 percent of 3CMS patients held vocational education assignments. At those same institutions, three to 12 percent of non-MHSDS incarcerated persons held assignments. Twenty-seven percent of 3CMS patients held vocational education assignments at ASP; however, 73 percent of non-MHSDS incarcerated persons held assignments. At CCI, 32 percent of 3CMS patients held vocational education assignments, while 63 percent of non-MHSDS incarcerated persons held them, and at CMF, 44 percent of 3CMS patients held vocational education assignments; 48 percent of non-MHSDS incarcerated persons held them. Less than ten percent of the 3CMS populations at CSP/LAC, CSP-Sac, CSATF, CIM, CCWF, CHCF, CSP/Corcoran, CRC, FSP, HDSP, KVSP, MCSP, NKSP, PBSP, CSP/Solano, SVSP, VSP, and WSP held vocational education assignments during the review period, while zero to 23 percent of non-MHSDS incarcerated persons held them.

Voluntary Education Assignments[45]

College courses offered to the incarcerated population are considered voluntary education assignments. During the Thirty-First Monitoring Round, no incarcerated persons were enrolled in voluntary education at CSATF. Across reviewed EOP institutions, six percent of EOP patients and 31 percent of non-MHSDS incarcerated persons were enrolled in voluntary education. At CCI and HDSP, no EOP patients were enrolled in voluntary education, while 70 percent and 35

[45] Usable data was not available for CSP/LAC, CSP/Sac, CTF, NKSP and RJD.

percent of non-MHSDS incarcerated persons were enrolled, respectively. At CHCF and PVSP, one EOP patient was enrolled. At another eight institutions—CIM, CMF, CRC, CCWF, KVSP, PBSP, SVSP, and SQ—one to ten percent of EOP patients were enrolled in voluntary education, while 15 percent to 75 percent of non-MHSDS incarcerated persons were enrolled. At MCSP and VSP, 16 percent and 11 percent of EOP patients were enrolled in voluntary education, respectively. At those same institutions, 25 percent and 32 percent of non-MHSDS incarcerated persons were enrolled. Twenty-two percent of EOP patients at CIW were enrolled in voluntary education; 35 percent of non-MHSDS incarcerated persons were enrolled, and at CMC, 31 percent of EOP patients were enrolled compared to 69 percent of non-MHSDS incarcerated persons.

Similarly, 3CMS patients held fewer voluntary education assignments than non-MHSDS incarcerated persons. Across all reviewed institutions, 21 percent of 3CMS patients were enrolled in voluntary education, whereas 31 percent of non-MHSDS incarcerated persons were enrolled. At four institutions—CMF, CSP/Corcoran, CHCF, and WSP—two percent or less of 3CMS patients were enrolled in voluntary education; zero to six percent of non-MHSDS incarcerated persons were enrolled at those same institutions. At another five institutions-KVSP, PVSP, SQ, CSP/Solano, and SVSP-11 to 14 percent of 3CMS patients were enrolled in voluntary education, while 11 to 25 percent of non-MHSDS incarcerated persons were enrolled. Seven institutions-ASP, CRC, FSP, HDSP, MCSP, PBSP, and VSP reported 20 to 29 percent of 3CMS patients enrolled in voluntary education, while 25 to 75 percent of non-MHSDS incarcerated persons were enrolled. At CCI, CMC, CIW, CCWF, and SCC, 30 to 38 percent of 3CMS patients were enrolled in voluntary education; 15 to 75 percent of non-MHSDS incarcerated persons were enrolled at those same institutions. At CIM, more 3CMS patients (44 percent) than

non-MHSDS incarcerated persons (41 percent) were enrolled in voluntary education during the review period.

Substance Abuse Treatment[46]

No MHSDS patients held a substance abuse treatment assignment at CMF, SVSP, or KVSP. Across EOP institutions, six percent of EOP patients held substance abuse treatment assignments, while 31 percent of non-MHSDS incarcerated persons held them. No EOP patients at CCI or PBSP held substance abuse treatment assignments, while 42 percent and 13 percent of non-MHSDS incarcerated persons held them, respectively. At ten institutions—CSP/LAC, CSP-Sac, CIM, CIW, CRC, CCWF, CSP/Corcoran, HDSP, MCSP, and PVSP—one to nine percent of EOP patients held substance abuse treatment assignments; one percent to 58 percent of non-MHSDS incarcerated persons held assignments at those same institutions. At CSATF, 16 percent of EOP patients and 16 percent of non-MHSDS incarcerated persons held substance abuse treatment assignments. Twenty-six percent and 25 percent of EOP patients at CHCF and SQ held substance abuse treatment assignments, whereas 19 percent and 11 percent of non-MHSDS incarcerated persons held them. At RJD, 31 percent of EOP patients held substance abuse treatment assignments, while 36 percent of non-MHSDS incarcerated persons held them.

During the Thirty-First Round Monitoring period, 16 percent of 3CMS patients and 16 percent of non-MHSDS incarcerated persons held substance abuse treatment assignments. At eight institutions—CSP/LAC, CSP-Sac, CIM, FSP, HDSP, NKSP, SCC, and CSP/Solano—one to eight percent of 3CMS patients held substance abuse treatment assignments; one to ten percent of non-MHSDS incarcerated persons also held them. At seven other institutions—CSATF, CCWF, CSP/Corcoran, MCSP, PBSP, PVSP, and SQ—11 to 19 percent of 3CMS patients held

[46] ASP and CMC did not provide usable data.

substance abuse treatment assignments, while seven to 16 percent of non-MHSDS incarcerated persons held them. At ASP, CRC, and RJD, 33 percent to 40 percent of 3CMS patients held substance abuse treatment assignments, whereas 36 percent to 58 percent of non-MHSDS incarcerated persons held them. At three institutions—CCI, CHCF, and CIW—more 3CMS patients held substance abuse treatment assignments than non-MHSDS incarcerated persons.

Milestone Credits

Patients who actively engage in or complete in-prison rehabilitation programs, including academic, substance abuse programs, and vocational education, could qualify for a reduction in their length of incarceration. Twenty-four of the 28 reviewed institutions did not report the total number of patients who were eligible for milestone credits. Therefore, it was impossible to measure the percentage of eligible MHSDS patients who earned milestone credits across institutions. CTF and SCC reported that milestone credits were not offered to MHSDS patients during the review period. ASP reported that 1,164 3CMS and 2,707 non-MHSDS incarcerated persons were eligible for milestone credits, though none received them. CCWF reported that 100 percent of eligible EOP and 3CMS patients earned milestone credits.

Out of Level Housing

For reviewed EOP institutions, 17 housed patients at a custody security level that was inconsistent with their housing classification score. Seven institutions-CSP/LAC, CHCF, CSP/Corcoran, HDSP, KVSP, PBSP, and RJD-housed less than ten percent of EOP patients at custody security levels that were inconsistent with their housing classification score. At five other institutions—CSP-Sac, CMF, CSATF, MCSP, and VSP—11 to 19 percent of EOP patients were housed outside of their housing level. At CIM and SQ, 23 percent and 26 percent of EOP patients were housed out-of-level, respectively, as were 30 percent of EOP patients at SVSP. At

CMC and PVSP, 41 percent and 47 percent of EOP patients were housed out of their housing classification scores.

For 3CMS patients, less than ten percent of patients were housed out-of-level at CHCF, KVSP, and RJD. Eleven institutions—CSP-Sac, CIM, SATF, CTF, CSP/Corcoran, FSP, HDSP, KVSP, SVSP, SQ, and WSP— one to 19 percent of 3CMS patients were housed at security levels inconsistent with their housing classification score. At five other institutions-CCI, CMC, CSP/LAC, CMF, and WSP, 21 percent to 28 percent of 3CMS patients were housed out of their housing classification scores. At PBSP, PVSP and CSP/Solano, 31 percent, 39 percent and 35 percent of 3CMS patients, respectively, were housed out of level. Forty-eight percent of 3CMS patients were also housed out of level at CMC during the review period.

ADA Reasonable Accommodation and Grievance Procedures

Twenty-seven of the 28 reviewed institutions indicated implementation of the Americans with Disabilities Act (ADA) reasonable accommodation and grievance procedures. CMF did not provide compliance data.

**Summary – Program Access**

Consistent with previous review periods, non-MHSDS persons maintained more job assignments than MHSDS patients during the Thirty-First Monitoring Round. Similarly, non-MHSDS incarcerated persons held more vocational education, voluntary education, and substance abuse treatment assignments, though the percentage of 3CMS patients that held substance abuse treatment assignments equaled that of non-MHSDS incarcerated persons.

CDCR did not provide the number of patients eligible to earn milestone credits; therefore, the percentages could not be calculated. Also, EOP and 3CMS patients were housed out-of-level at most reviewed institutions.

All reviewed institutions reported compliance with the implementation of the Americans with Disabilities Act (ADA) reasonable accommodation and grievance procedures.

## CONCLUSION

The Special Master submits this final installment of the Thirty-First Round Monitoring Report[47] at a consequential moment in this case. With a Receiver in place and a remediated mental health data system poised for field testing and deployment, there is some reason for optimism that a once elusive light at the end of the tunnel is coming into view.

This monitoring report, which indeed may be the last of its kind in *Coleman*, provides the Court and Receiver with another necessary ingredient to proceeding in an informed manner – an independent, neutral assessment of conditions in CDCR's prisons and defendants' progress toward implementing the Court-ordered remedy. Read in proper context, this report identifies challenges that continue to exist and must be confronted as well as opportunities that can be leveraged as the Receiver begins to implement the Receivership Action Plan.

While the sun may be setting on this part of the remedial phase of *Coleman*, the need for comprehensive and regular on-site monitoring has not abated. While there will be a shift toward self-monitoring as the Receiver implements her action plan, there will likely be a continued need for independent monitoring of a system of this size and complexity so long as federal court oversight is required. Indeed, some of the findings contained in this report emphasize the critical nature of the independent monitoring that has occurred in the case to date as well as the necessity of robust monitoring of conditions in the field going forward.

[47] Excluding this report, the Special Master has filed approximately 155 substantive reports since 1996. On average, the Special Master has filed a substantive report every 70 days since the commencement of the mastership.

For nearly six years, the department's mental health system has inarguably been operating in significant departure from the requirements of the court-ordered remedy. First in response to the threat to public health presented by the COVID-19 pandemic, then as a result of the understaffing crisis among primary clinicians, CDCR has permitted institutions to effectively redefine minimum requirements for delivery of mental health services.

Coinciding with the department's long-term use of triage plans to guide delivery of mental health services have been several notable developments and trends. First, the mental health population has grown, with now nearly 37,000 MHSDS participants, including close to 8,000 class members at the EOP level of care. As of the time of this writing, nearly one in ten incarcerated individuals housed in CDCR institutions is at the EOP level of care, CDCR's equivalent to a residential treatment setting. As the EOP population has grown, so has the number of EOP institutions, increasing from 15 to 21 institutions since the Thirtieth Monitoring Round, including some difficult to staff institutions in geographically remote locations.

With this significant EOP population increase, some institutions struggled to appropriately house class members. While the harm deriving from the inappropriate housing practices at SVSP and CSP/LAC is indisputable, a practice more common across institutions was the department's comingling of EOP patients with the general population in contravention of the Program Guide. As with the impact of long-term triage planning, the Special Master has been sounding the alarm on the dangers of this more pervasive housing practice for some time. The requirements of the Program Guide are not merely words on a page; nor did these requirements appear in the Program Guide by happenstance. The severity of their mental illness and accompanying deficits in functioning may put EOP patients at increased risk for victimization

when they are intermingled with the general population which in turn can interfere with the effective provision of treatment.

Coinciding with the relative dearth of mental health treatment provided to class members during the past two monitoring rounds, several other concerning trends have emerged. For instance, increased violence in the prisons substantially interfered with the delivery of mental health services at many institutions with mental health missions. Moreover, institutional staff across the system spoke to the widespread prevalence of illicit drugs in the institutions, further amplifying concerns regarding victimization of EOP patients on general population yards. Relatedly, RVRs have trended upward significantly for at least two monitoring rounds, and the proportion of RVRs issued to MHSDS participants has increased. Finally, as the department de-prioritized delivery of routine mental health services, crisis bed referrals have increased substantially.

All of these factors paint a picture of a mental health delivery system in dire need of intervention. The Receiver clearly recognizes the need to eliminate these triage plans to the greatest extent possible, and recent primary clinician vacancy data is cause for optimism that the Receiver is well-positioned to accomplish this objective. That said, the pervasive impact of the long-term use of triage planning strongly suggests the need to dedicate resources to re-orienting the delivery system, institutions, and staff to providing mental health services consistent with the minimum requirements of the Program Guide.

The Special Master would be remiss if he did not recognize the dedication and effort of his team members, who for almost 30 years have toured institutions and compiled reports at a blistering pace. These professionals have devoted many years of their careers to the cause of improving the delivery of mental health services to incarcerated persons housed in California

prisons. It is the Special Master's hope that these herculean efforts will not have been made in vain and instead will set the table for the Receiver to successfully implement her Action Plan and accomplish the long-overdue goal of ensuring members of the plaintiff class receive constitutionally adequate mental health services. The Special Master is forever grateful to his team for their contributions over many years.

That said, the Special Master offers no formal recommendations at this time.

Respectfully submitted,

*/s/ Matthew A. Lopes, Jr.*

Matthew A. Lopes, Jr.
Special Master

December 15, 2025

# EXHIBIT A

# MENTAL HEALTH SERVICES DELIVERY SYSTEM (MHSDS)
## MANAGEMENT INFORMATION SUMMARY (MIS) REPORT

**9/29/2025**

| Level of Care | Housing Program | MALES Capacity | MALES Census[1] | MALES Awaiting Placement[2] | FEMALES Capacity | FEMALES Census[1] | FEMALES Awaiting Placement[2] |
|---|---|---|---|---|---|---|---|
| **Correctional Clinical Case Management System (CCCMS)** | | **25,200** | **25,511** | | **1,900** | **1,900** | |
| CCCMS | Reception Center (RC) | | 1,743 | | | 248 | |
| | General Population (GP) | | 22,055 | | | 1,582 | |
| | Enhanced Outpatient Program (EOP) | | 115 | | | 0 | |
| | Mental Health Crisis Bed (MHCB) | | 10 | | | 0 | |
| | Psychiatric Inpatient Program (PIP) | | 2 | | | 1 | |
| | Specialized Medical Beds Housing | | 451 | | | 18 | |
| | Restricted Housing Unit CCCMS (RHC) | | 830 | | | 0 | |
| | Restricted Housing Unit EOP (RHE) | | 80 | | | 0 | |
| | Restricted Housing Unit GP (RHG) | | 225 | | | 51 | |
| | Non-Disciplinary Restricted Housing (NDRH) | | 0 | | | 0 | |
| **Enhanced Outpatient Program (EOP)** | | **7,644** | **7,815** | | **225** | **174** | |
| EOP | Reception Center (RC) | | 185 | | | 0 | |
| | General Population (GP) | | 64 | | | 32 | |
| | Enhanced Outpatient Program (EOP) | 6,951 | 6,470 | | 195 | 123 | |
| | Mental Health Crisis Bed (MHCB) | | 12 | | | 0 | |
| | Psychiatric Inpatient Program (PIP) | | 28 | | | 1 | |
| | Specialized Medical Beds Housing | | 267 | | | 7 | |
| | Restricted Housing Unit CCCMS (RHC) | | 91 | | | 0 | |
| | Restricted Housing Unit EOP (RHE) | | 626 | 75 | | 5 | 0 |
| | Restricted Housing Unit GP (RHG) | | 54 | | | 6 | |
| | Non-Disciplinary Restricted Housing (NDRH) | | 18 | | | 0 | |
| **Level of Care** | | **Capacity** | **Census[1]** | **Awaiting Placement[2]** | **Capacity** | **Census[1]** | **Awaiting Placement[2]** |
| **Mental Health Crisis Bed (MHCB)** | | **380** | **306** | **16** | **41** | **21** | **2** |
| **Intermediate Care Facility (ICF)** | | **908** | **634** | **44** | | | |
| Low Custody | | 370 | 206 | 21 | | | |
| | *Atascadero State Hospital (ASH)* | 256 | 142 | 13 | | | |
| | *Coalinga State Hospital (CSH)* | 50 | 45 | 5 | | | |
| | *California Medical Facility (CMF)* | 64 | 19 | 3 | | | |
| High Custody | | 538 | 428 | 23 | | | |
| | *California Health Care Facility (CHCF)* | 330 | 247 | 15 | | | |
| | *CMF Single Cells* | 62 | 53 | 7 | | | |
| | *CMF Multi Cells* | 20 | 9 | 0 | | | |
| | *Salinas Valley State Prison (SVSP) Single Cells*[6] | 82 | 80 | 1 | | | |
| | *SVSP Multi Cells*[6] | 44 | 39 | 0 | | | |
| **Flex Acute Psychiatric Program (APP) & ICF** | | **495** | **246** | **21** | **75** | **33** | **2** |
| *CHCF* | | 217 | 117 | 15 | | | |
| | Acute | | 117 | 15 | | | |
| | ICF-Hi (Single) | | 0 | 0 | | | |
| *CMF* | | 250 | 106 | 5 | | | |
| | Acute | | 73 | 5 | | | |
| | ICF-Hi (Single) | | 33 | 0 | | | |
| *SQ* | | 28 | 23 | 1 | | | |
| | Acute | | 6 | 0 | | | |
| | ICF-Hi (Single) | | 17 | 1 | | | |
| *California Men's Colony* | | 0 | 0 | 0 | | | |
| | Acute | | 0 | 0 | | | |
| | ICF-Hi (Single) | | 0 | 0 | | | |
| *California Institution for Women (CIW)* | | | | | 45 | 25 | 0 |
| | Acute | | | | | 1 | 0 |
| | ICF-Hi (Single) | | | | | 24 | 0 |
| *Patton State Hospital (PSH)* | | | | | 30 | 8 | 2 |
| | Acute | | | | | 0 | 0 |
| | ICF-Unlocked Dorms | | | | | 8 | 2 |
| **Penal Code 2974s (Parolees)**[5] | | | **0** | | | | |
| | Metro State Hospital (MSH) | | 0 | | | | |
| | Napa State Hospital (NSH) | | 0 | | | | |
| | Patton State Hospital (PSH) | | 0 | | | | |
| **TOTALS (excluding Parolees)** | | **34,627** | **34,512** | **156** | **2,241** | **2,128** | **4** |

| | Total Capacity | Total Census[1] | Total Awaiting Placement[2] | Total Over Timeframes[3] | CENSUS PERCENTAGES % MHSDS | CENSUS PERCENTAGES % CDCR[4] |
|---|---|---|---|---|---|---|
| CCCMS | 27,100 | 27,411 | | | 74.81% | 30.21% |
| EOP | 7,146 | 7,189 | | | 19.62% | 7.92% |
| RHU EOP | 723 | 800 | 75 | 20 | 2.18% | 0.88% |
| MHCB | 421 | 327 | 18 | 0 | 0.89% | 0.36% |
| PSYCHIATRIC INPATIENT | 1,478 | 913 | 67 | 1 | 2.49% | 1.01% |
| **GRAND TOTAL** | **36,868** | **36,640** | **160** | **21** | **100.00%** | **40.38%** |

[1] Census sources: SOMS for CCCMS, EOP; HEART for MHCB; RIPA reports for ICF, APP, and PIP programs.

[2] Awaiting Placement = The sum of patients waiting to be placed in a bed at a specific level of care. Those awaiting placement to ICF, APP, and PIP include referrals that have been custodially reviewed by HCPOP and are awaiting bed availability, inpatient program acceptance, or transfer to the inpatient program as of the reporting date (based on the Referrals to Inpatient Programs Application (RIPA)).

[3] Total Over Timeframes = The number of referrals that are beyond Mental Health Program Guide transfer timeframes: RHU EOP includes cases in non-hubs waiting > 30 days, MHCB includes referrals > 24 hours, Psychiatric Inpatient includes Intermediate referrals > 30 days and Acute referrals > 10 days.

[4] CDCR pop as of September 24, 2025 (OOR). Based on Total In-State Institution Population and CRPP Supervision.

[5] Census numbers are tracked and updated by Department of State Hospital (DSH).

[6] Census and Awaiting Placement counts include PC 1370 patients.