# APPENDIX A

# INSTITUTIONAL SUMMARIES

**APPENDIX A – 1**
**AVENAL STATE PRISON (ASP)**
Site Visit: July 10, 2025 – July 11, 2025
Review Period: December 1, 2024 – May 30, 2024

Census:

On July 11, 2025, ASP housed 4,082 incarcerated persons, which was an 11 percent decrease from the preceding review period. The 1,264 MHSDS patients represented 31 percent of the institution's total population and had decreased nine percent from the preceding review period.

The MHSDS population consisted of four mainline EOP patients and 1,260 mainline 3CMS patients.

Staffing:

The chief psychiatrist position was vacant. Although ASP had three allocated staff psychiatrist positions, four registry psychiatrists filled them. During the review period, one psychiatrist was unavailable due to contract issues, and another was in a 0.75 position, which prompted ASP to create a triage plan for psychiatry. That plan had been deactivated as of the time of the monitoring tour.

One of two chief psychologist positions was filled. That person worked at headquarters. The acting chief of mental health was a senior psychologist specialist but was acting as chief psychologist as of May 1, 2025.

Both senior psychologist specialist positions were filled. In addition to the one who was acting as chief of mental health, one served as suicide prevention and response focused improvement team (SPRFIT) coordinator.

Of the 7.5 allocated staff psychology positions, six were filled, leaving a 20 percent vacancy rate. A 0.75 registry psychologist filled an additional position, reducing the functional

vacancy rate to ten percent. There was one unlicensed psychologist who was supervised by an on-site licensed psychologist.

The one allocated supervising social worker position was filled. All eight allocated social worker positions were filled. One social worker was on long-term leave, and there was a 1.25 registry social worker. There were three unlicensed social workers who were supervised by a licensed clinical social worker on-site. Of the two allocated tele-social worker positions, 1.95 was filled, leaving a two percent vacancy rate.

One of the two allocated medical assistant positions assigned to tele-mental health was filled, leaving a 50 percent vacancy rate.

Although there were no allocated positions, ASP employed one recreation therapist.

For supervising registered nurses, 10.5 of 10.7 allocated positions were filled, leaving a two percent vacancy rate.

Of the 6.5 allocated MHSDS clerical positions, ten were filled, although two staff were on long-term leave. One of the 1.5 health program specialist (HPS) I positions was filled, but that staff member was on long-term leave creating a 100 percent functional vacancy rate. The one allocated HPS II position was filled.

For custody staff, the warden and chief deputy warden positions were filled, although the chief deputy warden was on special assignment creating one functional vacancy or 100 percent functional vacancy rate. Three of the four associate warden positions were filled; one associate warden was acting out of class, leaving a 50 percent functional vacancy rate. Three of the five captain positions were filled, but one was on long-term leave and one was acting out of class, leaving an 80 percent functional vacancy rate. Thirty-two of 34.6 or 92 percent of lieutenant

positions were filled; three lieutenants were on long-term leave, and one was acting out of class leaving a functional vacancy rate of 19 percent.

For sergeants, 75 of 75.8 positions were filled, but five sergeants were on extended leave and three were acting out of class, leaving 8.8 vacancies or a 12 percent functional vacancy rate. Twenty-six of 27 CC I positions were filled but one CC I was on an extended leave, and three officers were acting out of class, leaving five vacancies or a 19 percent functional vacancy rate. Nine of ten CC II positions were filled but three were acting out of class, leaving four functional vacancies or a 40 percent functional vacancy rate.

For correctional officers, 563 of 569.6 positions were filled; 36 officers were on long-term leave and four were acting out of class, leaving 46.6 functional vacancies or an eight percent functional vacancy rate.

Tele-Mental Health:

ASP did not use telepsychiatry.

The institution reported that only tele-social workers were allowed to telework. The acting chief of mental health had been advocating to extend a hybrid working schedule to retain on-site staff due to the remote location of ASP.

Staff Recruitment:

Mental health leadership attended regional staffing fairs, hosted students from Fresno State University and Alliant University, mentored practicum students, and utilized professional networks to recruit staff. The institution further reported participating in psychology internship programs with the American Psychological Association (APA) and headquarters. In addition, the recreational therapist recruited at Fresno State.

Mental health leadership offered tours and had candidates meet the team before being hired and attributed those efforts to the key to their success in hiring and retaining staff. ASP reported that the largest barrier to reaching appropriate staffing numbers at the institution was headquarters' staffing hiring matrix being continually six months behind population numbers, so the need for staff did not correlate with current patient numbers. The institution also lost candidates because of the long hiring processes at headquarters.

Mental health leadership reported that within the last year, hiring processes changed and interested candidates for clinician positions could only be asked three questions during the interview, and any candidate who arrived for an interview was to be offered a position, regardless of their response to the interview questions. This caused concern for ASP to maintain the longevity of their staff. Both regional and institution leadership reported that these instructions were part of a directive from headquarters human resources.

<u>Quality Management</u>:

ASP conducted monthly quality management committee (QMC) meetings; five were held during the review period. No meeting was held in December 2024; however, committee members reviewed the materials for the month electronically and provided feedback via email. During the remaining months, a quorum was achieved at each meeting. There was mental health representation every month. During each meeting, improvement projects were reviewed, along with system surveillance monitoring results provided by subcommittees, review and approval of local operating procedures, staffing discussions, patient input obtained during the month, and other announcements. The minutes reflected continuity across months and adequate review of identified concerns, improvement projects, and routine monitoring.

Mental health program subcommittee meetings were held monthly during the review period. Agenda items included improvement projects, system surveillance, program management, and open forum. A quorum was achieved at each meeting. The minutes reflected an active quality improvement and quality assurance program. Monitoring was comprehensive with deficiencies adequately discussed and remedies put forth. When necessary, improvement projects were initiated, and follow-up monitoring was adequate.

There were three QITs initiated during the review period. These were created not in response to any identified deficiencies but were undertaken in order to improve the overall quality of care provided to patients in the MHSDS. One QIT was initiated to investigate patients with multiple conflicting mental health diagnoses, one was to improve treatment planning and documentation, and the third was to address the intersection of mental health and chronic medical conditions. All QITs had appropriate charters with membership clearly indicated. Mental health leadership reported that every clinician working within MHSDS was assigned to a QIT or participated in other enrichment activities for the institution, such as providing training.

The Treatment Planning and Documentation QIT was activated on February 25, 2025, to improve the quality and standardization of the mental health master treatment plan documentation. The team met monthly, completed audits, and identified areas of deficiency, including lack of clear guidance from headquarters, which impacted the quality of treatment plan documentation. The team was investigating root causes of poorly documented treatment plans and next steps.

The Intersection of Mental Health and Chronic Medical Conditions QIT was activated on February 27, 2025, in accordance with the Complete Care Model. The focus of the QIT was to explore the impact of chronic medical conditions on mental health conditions. The goal was for

mental health clinicians to identify when a patient has a chronic medical condition, determine if the chronic medical condition was impacting their mental health symptoms, and incorporate this intersectionality into the patient's mental health treatment when appropriate. The team met monthly and identified issues to be addressed including knowledge deficits related to chronic medical issues. The team was investigating root causes and next steps.

The Multiple Conflicting Mental Health Diagnoses QIT was activated on February 25, 2025, to increase the accuracy of diagnostic documentation, improve continuity of care for mental health patients, and enhance diagnostic cohesion between mental health clinicians and psychiatrists. The team met monthly, completed audits, and learned that the problem was not as pervasive as initially thought. The plan was to educate staff and encourage interactive discussions regarding diagnostic formulations during IDTTs.

Psychiatry staff resumed internal peer review in the fourth quarter of 2024; however, it was placed on hold shortly thereafter due to the resignation of a regional staff member responsible for coordinating the peer review process according to the local operating procedure. Psychiatry peer review would resume when a new regional staff member had been appointed.

While primary clinicians did not complete formal peer review, all primary clinicians met monthly for a consultative case discussion. Each month, one clinician was assigned to present a challenging case and discussed the issues among their peer group to obtain feedback and engage in clinical discussions to improve patient care and clinician performance. This was identified as a model for other sites in lieu of formal peer review and to support collaborative, thoughtful patient care.

Overall, the quality management system at ASP was comprehensive and useful in supporting improvements in the delivery of mental health services.

Suicide Prevention:

The SPRFIT coordinator had been in the position since 2017. The steady leadership of the long-term SPRFIT was evident through the well-implemented suicide prevention program. ASP maintained a suicide prevention LOP that mirrored statewide policy and was in the process of revision at the time of the monitoring tour. The changes were minor and reflected additional staff available to conduct constant observation. Per the existing LOP, clinical staff were to inform a mental health supervisor when receiving an emergent referral. The supervisor was responsible for determining if the patient was on isolation/quarantine status. For those patients on isolation/quarantine status, clinicians were to see the patient via tele-mental health unless that was not clinically appropriate. In those cases, the patient was to be escorted to the TTA where they would be seen by the clinician. Patients not on the isolation/quarantine list were to be seen by the clinician in-person.

There were no completed suicides or serious self-harm/suicide attempts at ASP during the review period. However, there were three CAPs as a result of the regional SPRFIT coordinator tours in 2023 and 2024. All plans were completed and closed with no remaining CAPs open at ASP.

The SPRFIT coordinator noted that they were having some struggles with completion of the custody check documentation (Form 7497). Because there were not a lot of discharged patients or patients with MHCB rescissions, custody staff were less familiar with the process. While the custody checks were compliant, the supervisory review was not consistently completed. SPRFIT meeting minutes reflected this and the custody checks were the focus of a continuous quality improvement project. The statistics were impacted by the small size of cases. For example, in April 2025, only one packet was required, and it was completed with no

deficiencies for a compliance statistic of 100 percent. However, in January 2025 there was also only one packet required but it had deficiencies resulting in a compliance statistic of zero percent.

SPRFIT meeting minutes were comprehensive and reflected ongoing quality assurance and quality improvement efforts. During the review period, ASP focused on maintaining improvements in timely documentation and implementing improvements in safety planning documentation. Attendance at SPRFIT meetings was consistently strong with all necessary disciplines represented. During the monitoring tour, 11 housing units were audited and every one had a complete cutdown kit that had been appropriately inventoried. The SPRFIT at ASP functioned in a meaningful and significant way, impacting policy and operations positively.

Twenty-six of 27 mental health clinicians had completed the mentoring process for suicide risk assessments (SRAs). The remaining clinician finished the mentoring process shortly before the monitoring tour. Compliance with suicide risk assessment mentoring was 100 percent at the time of the monitoring tour. Of 775 custody staff required to attend the annual suicide prevention training, compliance was reported as 97 percent; there were 23 custody staff out on long-term leave who had not received the training. There were 139 medical staff required to attend suicide prevention training. Compliance with training completion was 93 percent for medical staff as ten staff members were either out on long-term leave or new employees who had not yet been trained.

Cardiopulmonary Resuscitation (CPR) training was completed by 97 percent of custody staff with the same 23 people unavailable for training due to their long-term leave. Nursing staff was 100 percent compliant with Basic Cardiac Life Support training during the review period. Safety planning training was completed by all clinicians and 25 of 29 clinicians or 86 percent of

mental health staff completed suicide risk and self-harm evaluation (SRASHE) training due to four new clinicians, two of whom were tele-mental health social workers.

<u>Medication Management</u>:

ASP provided medication administration process improvement program (MAPIP) results from December 1, 2024, to May 31, 2025, regarding compliance for psychiatric diagnostic monitoring and medication management.

ASP sustained compliance during the review period with obtaining medication consents and monitoring blood pressure for patients prescribed venlafaxine. The institution was noncompliant for six months with monitoring thyroid function tests with a median score of 58 percent. No electrocardiograms (EKGs) were documented during the monitoring period.

Diagnostic monitoring for patients prescribed atypical antipsychotics showed that ASP was compliant for six months with monitoring blood pressure, height, and weight. Abnormal Involuntary Movement Scale (AIMS) were compliant during the first three months. The last three months of the review period, the AIMS percentages were 50 percent, 78 percent and 83 percent, respectively. The thyroid function test was compliant one month during the review period and obtaining medication consents ASP was compliant four of the six months. No EKGs for patients on atypical antipsychotic medication were documented during this review period. ASP was compliant for five months for glucose monitoring, and three months for comprehensive metabolic panel (CMP), complete blood count (CBC) with platelets and lipids.

ASP was neither a clozapine initiation nor maintenance institution during the monitoring period. The institution reported no patients prescribed clozapine during the monitoring period or at the time of the monitoring tour.

For patients prescribed Depakote, ASP was compliant for five of the six months of monitoring with CBC with platelets, CMP, and obtaining medication consents and no report of patients on Depakote for one month. ASP was compliant with Depakote level draws for three months and zero and 50 percent compliance for the remaining two months of the review period.

For lamotrigine, the institution was compliant in obtaining medication consents for five of the six months with no patients on lamotrigine for one month.

Regarding lithium, the institution was compliant for four months with obtaining medication consents, and for three required months for thyroid monitoring with no patients requiring monitoring for the remaining months. EKGs were conducted one month, zero percent one month and no patients documented on lithium for four months. ASP reached compliance for two months and was noncompliant for four months with therapeutic medication levels. ASP reached compliance one month, zero percent one month and no documentation of patient requiring kidney function test for four months of the review period.

The institution was aware of the noncompliant metrics and developed improvement plans to address them. The reasons for the non-compliance were very well articulated and specific. However, the corrective action plans for all metrics not meeting compliance was to continue monitoring. Measurable goals should be documented with specific tasks for each discipline along with measurable goals and outcomes.

MAPIP medication administration metrics monitored essential aspects such as medication availability, continuity, preparation, and administration. ASP was compliant for six months with the following nursing metrics: continuity of medications upon parole/transfer to the community, observation of medication preparation at A.M. and P.M., observation of medication preparation at *hora somni* (HS), chronic care medications historical administration, and outpatient provider

new medication orders. ASP displayed compliance for all four months for continuity of medications with MHCB transfers, one month was 88 percent and one month there were no documented MHCB transfers. ASP was compliant for five months with continuity of medications upon transfers to receiving and release (R&R) with one month at 83 percent. ASP compliance for continuity of nurse administered (NA) and direct observation treatment (DOT) medications with intra-institutional transfers (excluding ASU/SHU/PSU) reported compliance at zero percent for two months and no documented transfer requiring NA/DOT meds during the remaining four months.

The institution was compliant for five months and was noncompliant for one month with a score of 89 percent for continuity of medications upon discharge/transfer from a community hospital and/or DSH.

ASP reported that 809 patients received medications prescribed at HS. The number of prescribed medications jumped exponentially from 6,097 in February 2025 to 11,375 in May 2025. ASP fully complied with the requirement to administer HS medications at 8:00 P.M. or later.

One patient transferred to ASP in March 2025 on an involuntary PC 2602 order. The patient was compliant and did not require a back-up order.

ASP reported that no patients were prescribed KOP by medical providers. All patients who were prescribed SSRIs or duloxetine, were in accordance with CDCR policy.

ASP's polypharmacy committee reviewed nineteen patients between July 2024 and May 2025. Six patients were prior to the review period, and two patients did not have a review date. All patients were at the 3CMS LOC and prescribed 10 or more medications. Two patients had KOP alerts for non-psychotropic medications. The review was conducted according the health

care department data warehouse (HCDOM). ASP had an overall average of 97 percent compliance with polypharmacy reviews. All patients had medications prescribed by a psychiatrist except for three.

There were 77 medication line audits performed during the reporting period and the institution noted two deficiencies. The two deficiencies identified were awnings for inclement weather on the yards and an officer inside the building during pill pass. The awnings were ordered in 2023 and were to be installed in December of 2025. The officer was talked to by Health Care Access about being outside to monitor the patients during medication pass according to documentation from staff. The audits indicated that the duration of the medication lines were within compliance with policy.

The institution denied any conflict between medication administration times and mental health programming.

Transfers:

The inpatient care coordinator was a senior psychologist specialist. This individual had been acting in the role since June 2025 and also oversaw quality management (QM) and acted as the backup SPRFIT coordinator.

There were no transfers to inpatient care during the review period.

There were four patients who were not referred to a higher level of care (HLOC) despite an indication to do so during the review period. All four records were reviewed, and documentation was adequate. In two of the cases, the patients' levels of care had been elevated to EOP prior to the actual IDTT meeting. As such, the IDTT determined that the patient's elevated level of care, now EOP, was adequate to meet the patients' needs and no additional referral to a higher level of care was indicated. ASP mental health leadership reported that they

educated staff about the need to conduct a formal IDTT in order to enact a level of care change, both to be in compliance with the Program Guide, but also to avoid having to document rationale for failing to refer a patient to a higher level of care, when in actuality, the patient was referred.

In the other two cases, patients triggered the need for a higher level of care review secondary to having received several RVRs in the previous three-month period. In both of the latter cases, the IDTTs adequately documented the rationale for not referring the patients to a higher level of care as well as the treatment enhancements that would be used to support the patients in avoiding further rules violations.

ASP made 36 MHCB referrals; 23 were admitted and 13 were rescinded. Of the 23 MHCB admissions, one or four percent took longer than 24 hours to transfer due to a late Prison Rape Elimination Act (PREA) report and then construction on the transport route. Of the 13 rescissions, two took longer than 24 hours to transfer from alternative housing. Reasons for delay in alternative housing included data entry errors that were subsequently fixed.

Eight patients were timely transferred from 3CMS to EOP level of care. Transfers were between nine and 49 days and averaged 20 days. Two of those patients transferred to MHCB and then to mainline EOP timely. EOP patients who were housed at ASP pending transfer to an EOP institution received minimum weekly confidential individual mental health appointments, confidential individual psychiatry appointments, and, if required, IDTT meetings. Also, patients were encouraged to attend all available educational and vocational activities while pending transfer.

Four 3CMS patients were timely transferred to minimum support facilities (MSFs) during the review period.

Three 3CMS patients timely transferred to a 3CMS RHU. They were all transferred within 24 hours, and between four hours and eight hours.

Programming:

Crisis Intervention Team:

There was not a crisis intervention team (CIT) in operation at ASP. Because of this, there was no CIT local operating procedure. Instead, ASP mental health had developed a three-month rotating schedule for a clinician of the day. The patient's assigned primary clinician was the preferred responder to any crisis calls. However, if the primary clinician was busy or not present, the referral became an emergent referral that was assigned to the clinician of the day.

If a mental health crisis occurred overnight, there was an on-call psychiatrist and a member of the nursing staff in the triage and treatment area (TTA) who assisted the psychiatrist in determining whether there needed to be a placement in alternative housing until that person could be seen by the emergency clinician first thing in the morning.

Alternative Housing:

ASP designated three cells in the housing outpatient housing unit (OHU) as the primary placement for patients referred to a MHCB pending transfer. If those cells were occupied, two additional cells could be utilized. ASP maintained a process for resolving placement if all five cells were occupied. That process included OHU nursing, mental health supervisor, medical provider, and custody to determine if a medical patient could be moved into one of the OHU dorm rooms. If there were no available options at ASP, the mental health supervisor was to immediately contact healthcare placement oversight program (HCPOP) and the regional mental health administrator. The patient was to remain under constant one-to-one observation until transfer or placement into an acceptable bed in the OHU.

The applicable local operating procedure (LOP) (OP 11, MHCB Referrals and Rescissions, August 2024) indicated that the job classifications utilized to provide that observation included in order of utilization: hospital aide, certified nursing assistant (CNA), licensed vocational nurse (LVN), registered nurse (RN), and correctional officer. However, when supervisory staff were queried regarding the hospital aide job classification listed in the policy, all agreed that there were no hospital aide positions. The chief of mental health updated the utilization list based on the April 14, 2025, memorandum from CCHCS updating the utilization order of observers (in order of utilization): CNA, licensed psychiatric technician, LVN, dental assistant (volunteers only), dental hygienist (volunteers only), RN, and then correctional officer. Mental health management reported that they would add an addendum to the 2024 LOP until it is revised.

3CMS:

The four 3CMS psychiatrists at ASP had caseloads of 217, 275, 350, and 356 patients, which brought two of the four within established caseload ratios. Of the 12 3CMS primary clinicians who carried caseloads, six had caseloads within the 1:97 caseload ratio, which ranged from nine to 82 patients and six had caseloads outside of the established ratios, ranging from 102 to 120 patients.

Primary clinicians also saw general population incarcerated persons when asked and when the parole board requested. These patients were not counted in caseload computations.

All clinicians were all involved with quality management activity or another special project within the institution.

IDTT meetings for 3CMS patients were observed to be appropriately structured and collaborative, with all required disciplines present. The team consistently reviewed relevant

clinical and psycho-social history, providing opportunities for patient input and revision of information as needed. Case conceptualization was appropriate for the IDTT setting, and psychiatric medications were reviewed and discussed with each patient. Diagnoses were clearly stated, supported by symptoms, and functional impairments—especially as related to functioning within the prison environment—were addressed. There were no noted disagreements between the primary clinician and psychiatrist regarding diagnosis, and histories of suicide attempts were reviewed with both the team and the patient.

Treatment planning was individualized but revealed a need for improvement. Goals articulated during the meetings were generic and often consisted of interventions—such as routine contacts, cognitive behavioral therapy (CBT), and teaching coping skills—rather than specific, measurable goals. These goals were only loosely tied to patients' symptoms and diagnoses. Interventions, aside from medication management (which was tailored to individual needs), were largely the same for all patients and described in vague, generic terms. Patients were informed they would be seen every 90 days or more often if requested or clinically indicated.

For initial IDTTs, patients' preferences regarding group participation were discussed, with referrals made accordingly. For routine IDTTs, group participation was not discussed. Safety planning was not addressed in the observed meetings, though histories of suicide attempts were consistently reviewed. Substance use was discussed as indicated. For patients nearing release, upcoming discharge dates were noted, but there was no substantive discussion of pre-release planning, aftercare, or relapse prevention.

The IDTT process was collaborative, with active participation from all team members. The correctional counselor (CC) I provided a report and engaged with the patient following the

primary clinician and psychiatrist's review and discussion. Justification for level of care was discussed for each patient, with all determined to remain at 3CMS. Overall, the meetings reflected strong team collaboration and thorough review of clinical information but would benefit from greater specificity and measurability in treatment goals, more individualized interventions, and more consistent attention to discharge and safety planning.

Four 3CMS IDTTs were scheduled in B Yard during the monitoring tour; three were observed, as one patient refused, and the meeting was rescheduled. The meeting room was adequate in terms of space and confidentiality. All required staff were present, though the assigned CC I was at training and coverage was provided by another CC I. All three observed meetings were routine annual reviews; one patient had recently changed yards and was new to the treatment team.

In all three meetings, the patient's psychosocial history was briefly discussed, and diagnoses were reviewed with consensus among team members and the patient. Current symptoms, functional deficits, and strengths were reviewed in each case. For the two patients prescribed psychotropic medications, medication regimens, efficacy, and side effects were discussed. The psychiatrist was engaged and provided information about the next scheduled visit. However, for the one patient not prescribed medications, the psychiatrist had not seen the patient within the required 90-day interval; the record indicated no psychiatric contact since December 2023.

Treatment plans were discussed in each meeting, but the discussions were superficial, with mention of targeted symptoms but no clear, objective, or measurable goals. Interventions were explicitly discussed in one case; in the other two, there was only vague discussion of support and frequency of planned contacts, with no clear articulation of clinical interventions to

be utilized. The availability of group programming was discussed in all meetings. A case formulation was presented in only one of the three meetings. The correctional counselor was engaged and provided useful information to patients. Level of care and rationale were discussed in two of the three cases. Two meetings felt rushed, as the primary clinician attempted to stay within a 15-minute timeframe, though the acting chief of mental health clarified that there was no expectation regarding meeting duration.

Initial IDTTs for 3CMS patients are required to occur within 14 working days of arrival to the institution or level of care change and annually thereafter. ECF No. 7333-1 at 43-44. The monitor randomly selected and reviewed the health care records of 30 3CMS patients to assess compliance with Program Guide timeframes for initial IDTT meetings during their stays. All 30 patients required initial IDTTs. Of the 30 reviewed initial IDTTs, 15 or 50 percent occurred timely within 14 calendar days or arrival or level of care change. All 30 were attended by all required staff and 29 or 97 percent were attended by the patients. No reason was reported for the one IDTT that was not attended by the patient.

To assess timeliness of routine 3CMS IDTT meetings, CDCR produced an appointments report that included individuals who were required to receive a routine IDTT during the review period. For the 989 patients in CDCR's appointments report for December 1, 2024 to May 30, 2025, there were 1,011 completed initial or routine IDTTs. When a patient had either an initial IDTT and a routine IDTT or more than one routine IDTT, timeliness in accordance with Program Guide requirements was able to be calculated. Of the 1,011 completed IDTTs, 30 contacts were for individuals who had at least two IDTTs (initial and routine or two routines). Of those 30, all

occurred within Program Guide timeframes. Of note, the report did not include individuals that did not have a completed IDTT, such as those that were not scheduled.[1]

A random sample of 30 patients were selected to verify consistency between the appointments report and clinical documentation in electronic health care records system (EHRS). Of the 30 contacts reviewed in EHRS, 29 or 97 percent were consistent with the appointments report. The one inconsistency was due to an IDTT that was documented in EHRS the day before it was documented in the appointments report.

Two recreational therapy (RT) groups—book club and meditation—were observed during the monitoring tour. Both sessions were well attended and skillfully facilitated, with patients demonstrating high levels of attentiveness and engagement throughout. The positive atmosphere and effective facilitation contributed to meaningful participation by all attendees.

Patients expressed appreciation for group opportunities but indicated a consistent desire for more clinical groups, especially those tailored to specific symptoms and coping strategies. The interest in expanding group programming was a consistent theme among interviewees.

The Program Guide requires that 3CMS patients are offered an initial psychiatry evaluation before their initial IDTT meeting. ECF No. 7333-1 at 34-50, 641. Thereafter, they are required to receive a routine psychiatric contact every 90 calendar days if the patient is prescribed a psychotropic medication. *Id.* at 44. Patients are also required to receive an initial primary clinician evaluation within ten working days of arrival and every 90 calendar days thereafter. *Id.* at 41, 48.

---

[1] The reviewed data captures the time between completed patient IDTTs but does not account for when patients were not scheduled for an initial or routine IDTT. Of note, the appointments report provided did not account for delays between appointments due to movements in or out of ASP.

The monitor randomly selected and reviewed the health care records of 30 3CMS patients to assess compliance with Program Guide timeframes for initial psychiatry evaluations during their stays. All 30 patients required initial psychiatry evaluations; all 30 timely occurred before the initial IDTT. Twenty-nine or 97 percent of the reviewed initial psychiatry evaluations were conducted in confidential settings. Telepsychiatry was not utilized for initial psychiatry evaluations.

To assess timeliness of routine psychiatry contacts, CDCR produced an appointments report that included individuals who were required to receive a routine psychiatry contact during the review period. For the 705 patients in CDCR's appointments report for December 1, 2024 to May 30, 2025, there were 1,696 completed and refused psychiatry contacts, 1,691 or 99 percent were confidential as reported by the institution. Reasons for non-confidential psychiatry contacts included cell front contacts and patients seen in therapeutic modules.

When a patient had more than one completed or refused contact, compliance with Program Guide timeframes was able to be calculated. Of the 1,696, 1,000 contacts were for individuals who were seen at least twice by the psychiatric provider. Of those 1,000 contacts, there were 90 or nine percent that occurred beyond Program Guide requirements with a range of 91 to 133 days. Of note, the report did not include individuals that did not have completed contacts.[2]

A sample of 30 patients were randomly selected to verify consistency between the appointments report and clinical documentation in EHRS. Of the 87 contacts reviewed in EHRS,

---

[2] Reviewed data captures the time between patient contacts but does not account for when patients were not seen or scheduled for a routine psychiatric contact. Of note, the appointments report provided did not account for delays between appointments due to movements in or out of ASP. Contact with the assigned psychiatrist was unable to be determined.

86 or 99 percent were consistent with the appointments report. The one outlier appeared to be a duplicate entry in the appointments report that was not documented in EHRS.

The monitor randomly selected and reviewed the health care records of 30 3CMS patients to assess compliance with Program Guide timeframes for initial primary clinician evaluations during their stays. All 30 patients required initial primary clinician evaluations. Of the 30 reviewed initial primary clinician evaluations contacts, 22 or 73 percent were completed within ten calendar days of arrival or change in level of care. All 30 reviewed initial primary clinician evaluations were conducted in a confidential setting. Tele-mental health was utilized for one initial primary clinician evaluation.

To assess timeliness of routine primary clinician contacts, CDCR produced an appointments report that included individuals who were required to receive a routine primary clinician contact during the review period. For the 1,063 patients in CDCR's appointments report for December 1, 2024 to May 30, 2025, there were 2,822 completed and refused primary clinician contacts, 2,816 or 99 percent were confidential as reported by the institution. Reasons for non-confidential primary clinician contacts included cell front and holding cell contacts.

When a patient had more than one completed or refused contact, compliance with Program Guide timeframes was able to be calculated. Of the 2,822, 1,768 contacts were for individuals who were seen at least twice by the primary clinician. Of those 1,768 contacts, four or 0.2 percent occurred beyond Program Guide requirements with a range of 91 to 95 days. Of note, the report did not include individuals that did not have completed contacts, such as those that were not scheduled.[3]

[3] The reviewed data captures the time between patient contacts but does not include patients who were not seen or scheduled for a routine contact with the primary clinician. Of note, the provided appointments report did not account for delays between appointments due to

A random sample of 30 patients were selected to verify consistency between the appointments report and clinical documentation in EHRS. Of the 83 contacts reviewed in EHRS, 79 or 95 percent were consistent with the appointments report; four or five percent had discrepancies. All discrepancies were due duplicate entries in the appointments report which were not found in EHRS and one appointments report entry that was missing in EHRS.

A total of 21 patients were interviewed regarding their mental health care experiences. The majority reported satisfaction with the mental health program and felt their needs were being met. All patients described seeing their assigned primary clinician at least every 90 days, with additional sessions available upon request. When the assigned primary clinician was unavailable, an alternate—consistently the same individual—provided coverage, helping to minimize disruption.

Interviewed patients reported having seen their psychiatrist within the last 60 days. Further, patients reported that encounters with both primary clinician and psychiatrist were conducted in confidential settings, and patients were satisfied with the privacy provided.

Patients reported annual attendance at IDTT meetings and were able to recall their most recent participation. They demonstrated familiarity with procedures for accessing mental health services in both emergency and non-emergency situations, citing the 7362 process and reporting no difficulties in obtaining assistance when needed. All patients participated in work or educational programming without any related issues.

Several patients expressed concern and confusion regarding what information board evaluators could access in their mental health records. One patient believed that being candid

---

movements in or out of ASP. Contact with the assigned primary clinician was unable to be determined.

with his primary clinician had negatively affected his board hearing outcome, resulting in a longer denial than typical. Others shared similar apprehensions about the potential impact of clinical disclosures on parole decisions.

While continuity of care was generally better at ASP than at other institutions, patients noted that it was common to experience a change in their assigned primary clinician on an annual basis. Because clinical contacts typically occurred every 90 days, several patients felt that by the time they had established trust with their clinician, a change would occur, requiring them to start over. This was described as frustrating and, for some, a barrier to progress.

Notably, patients were complimentary of their current assigned primary clinician, highlighting improvements in the consistency of care and a reduction in problems previously experienced with frequent changes in clinicians. This continuity was viewed as a significant positive development.

<u>Other Issues</u>:

<u>Pre-Release Planning</u>:

ASP had two pre-release coordinators, one licensed clinical social worker (LCSW) and one unlicensed clinical social worker (CSW) to provide pre-release planning services during the review period. ASP reported that they regularly released a large number of patients who required pre-release services. During the monitoring tour, only the CSW was present as the LCSW was on extended family leave. ASP had a local operating procedure dated September 2024 that was compliant with statewide policy. The pre-release coordinators met regularly with stakeholders including integrated substance use disorder treatment (ISUDT) and transitional case management program (TCMP) staff. These meetings were seen as beneficial in establishing and maintaining

positive relationships with others involved in the pre-release process (e.g., community supervision, community providers).

During the review period, the pre-release coordinators met with all mental health caseload patients with imminent release dates for pre-release planning purposes. They completed the "face sheet" section of pre-release documentation but also completed the pre-release assessment as this was a new form and process for primary clinicians. The pre-release coordinators believed that it was more efficient and beneficial for them to complete the assessment, and they would consult with the assigned primary clinician as necessary. In addition, non-MHSDS participants were able to receive pre-release planning services on a referral basis. The pre-release coordinators identified mental health participants requiring pre-release services by generating a weekly pre-release roster of patients scheduled to release within 90 days. Once participants were identified, they were ducated for an individual appointment to discuss and plan for their upcoming release. Follow-up appointments were provided based on individual need, self-referral/request, and primary clinician referral.

There were ten pre-release groups provided during the review period on A, B, C, E, and F Yards. At the time of the monitoring tour, there were six pre-release groups scheduled weekly, two on each of three yards (Facilities A, B, and C). These groups were 60 minutes in length over a period of seven weeks. No groups were provided on D Yard due to patient refusals/no-shows and a lack of sufficient people with impending releases. The groups were co-facilitated by the pre-release coordinators who used the statewide pre-release group curriculum and additional therapeutic materials. Interviewed patients reported concerns regarding their private mental health information being used by the BPH to deny release. One patient reported that his BPH psychological evaluation included information from the medical record that included details that

he had believed to have been private between him and his treatment team; he did not realize that his medical record was open to parole board review. Other patients reported that psychological assessments were completed every two to three years and did not reflect their full and current circumstances. Patients agreed that they had not been provided with informed consent regarding BPH evaluator access to their medical record. Local and regional staff were alerted to these concerns. There was no resolution regarding any existing policy around BPH access and informed consent process for participants in the MHSDS during the monitoring tour.

During the review period, 348 patients received pre-release planning services: 136 patients were paroled and 130 patients were released to probation. All patients were seen by the pre-release coordinator. TCMP provided services to 165 patients, with 22 patients having refused service. TCMP completed 125 Medi-Cal applications, six supplemental security income (SSI) applications, and one VA benefits application. A sample of medical records were reviewed for discharged patients and completed pre-release forms were located in all medical records.

Program Access:

a. Job and Program Assignments

On June 5, 2025, ASP reported that 1,537 job assignments were held by 317 or 21 percent of 3CMS patients and 1,220 or 79 percent of non-MHSDS incarcerated persons.

The 1,276 academic assignments were held by 255 or 20 percent of 3CMS patients, and 1,021 or 80 percent of the non-MHSDS population.

The 315 vocational education assignments were held by 84 or 27 percent of 3CMS patients and 231 or 73 percent of non-MHSDS incarcerated persons.

The 1,388 voluntary education assignments were held by 392 or 28 percent of 3CMS patients and 996 or 72 percent of non-MHSDS incarcerated persons.

The 626 substance abuse treatment assignments were held by 223 or 36 percent of 3CMS patients and 403 or 64 percent of non-MHSDS persons.

b. Milestone Credits

ASP reported that 1,164 3CMS patients and 2,707 non-MHSDS incarcerated persons were eligible to earn milestone credits; however, no MHSDS patients or non-MHSDS incarcerated persons earned milestone credits during the review period.

c. Out-of-Level Housing

ASP reported that 198 3CMS custody Level II patients were housed in Level I housing, 73 3CMS custody Level II patients were housed in Level III housing.

d. ADA Reasonable Accommodations and Grievance Procedures

ASP confirmed implementation and provided copies of the ADA reasonable accommodation operating procedure and the CDCR Form 1824 reasonable accommodation request process manual. The institution reported that all 986 custody and non-custody staff completed the "Reiteration of Reasonable Accommodation Requirements" training.

"C" Status:

The institution reported a total of 76 incarcerated persons on "C" status including 50 3CMS patients and 26 non-MHSDS incarcerated persons. A review of 12 classification chronos found all incarcerated persons were placed on "C" status as "Program Failure" due to receiving two or more RVRs within a 180-day period. Incarcerated persons on "C" status were allowed two hours of out of dorm time Monday through Friday. This time could be used to go to the yard, dayroom, or to take a shower. They were allowed one phone call per week. Incarcerated persons on "C" status were not allowed to possess a TV or radio, but were allowed to retain their tablet and report to all ducats.

Case-by-Case Reviews:

ASP did not have an RHU.

Mental Health Referrals:

During the review period, ASP made 1,767 mental health referrals, including 324 to psychiatry and 1,443 to primary clinicians. There were 163 emergent referrals, 210 urgent referrals, and 1,394 routine referrals. Over 97 percent of all responses to referrals were timely.

All interviewed custody staff members in 11 housing units had ready access to the MH-5 form and were knowledgeable of how and when to process it based on their independent observation of the patient.

Custody and Mental Health Partnership Plan:

The institution LOP was current with a last revision date of December 2024 and complied with statewide policy. ASP provided documentation of all six months of the review period of Executive Joint Rounding, QMC meeting minutes, mental health program subcommittee meetings, monthly IAC minutes, monthly supervisory tours, and weekly supervisor meetings. There were no minutes for the December 2024 mental health program subcommittee meeting, as it was conducted electronically. All documentation was on the required form and included detailed information from staff.

The Executive Joint Rounding forms reported a good working relationship between custody and mental health staff. Patient statements included how well mental health staff responded to requests, long pill wait lines, mental health staff leaving the institution, and drug abuse at the facility. Other than raising the concern of mental health staff leaving the institution, patients had positive statements regarding mental health staff. The monthly program tours by the supervising mental health provider and the facility sergeants were also completed as required.

Patients reported long wait times when seeing a psychiatrist, mental health staff were very helpful, ducats were being issued and honored without any problems, and that the temperature of the shower water was either too cold or too hot. The weekly huddle forms were completed for each facility as required by policy with staff noting patients acting bizarrely, patients returning from higher levels of care, and patients who received bad news.

The IAC meeting minutes noted discussions regarding shade structures (canopies) for the facilities in the December 2024 meeting and again in May 2025, with no final determination made. The IAC meeting minutes also noted lack of airflow in the housing units, and the institution adding additional fans in the housing units.

Regarding annual partnership training, the warden had not attended the training, and no data was provided regarding the chief deputy warden. For three correctional administrators, two captains, 32 lieutenants, 77 sergeants and 613 correctional officers, 100 percent attended the required annual training. All mental health staff including the chief psychologist, supervisor psychologists and psychiatrists, seven psychologists, and 12 social workers attended the training.

All interviewed patients identified custody staff as a significant issue. Patients believed that housing unit officers would benefit from additional training in working with individuals with mental illness and those prescribed psychotropic medications. Reports included experiences of provocation and harassment by some custody staff. Access to mental health care during crises was described as variable, depending on the officer involved. In some cases, patients felt compelled to claim suicidality to ensure access, which they feared could be interpreted as malingering.

The institution reported a total of 40 staff complaints were filed by MHSDS patients during the review period. Of the 40 complaints filed, 37 were filed by 3CMS patients, two by

EOP level of care patients and one by a MHCB level of care patient. The categories of the complaints included 19 that were referred to the hiring authority and no category was identified, seven for other misconduct, six for use of force, four for discrimination, two for integrity and one each for sexual misconduct and dishonesty. The decision taken on the 40 complaints included 24 identified staff misconduct, eight were denied, three redirected, four were rejected, and one was granted.

Heat Plan:

A total of 11 housing units were visited and 22 correctional officers were interviewed regarding their knowledge of the Heat Plan procedures. All 22 staff were knowledgeable of the three stages of the heat plan, cooling measures, the daily updated heat risk list, and signs and symptoms of heat illness. The inside temperature logs were current for all 11 housing units. During the monitoring tour, a Stage I heat alert was activated. The monitor confirmed the presence of heat risk incarcerated persons in three housing units to confirm staff had recalled heat risk patients to the housing unit. The monitor interviewed the heat risk patients and confirmed that they are recalled to their housing unit and that ice/water is provided in the housing unit on a consistent basis. Each housing unit had two coolers for ice/water that were filled each day with ice and water, regardless of the outside temperature and delivered to each housing unit daily.

The monitor attended the daily heat risk meeting, which was mandated if the outside temperature was expected to reach 100 degrees or higher. All the required staff were in attendance, action items were reviewed, and each program area reported out regarding any issues or concerns. During the meeting, no issues or concerns were identified. Meeting minutes were created and maintained.

The outside temperature was being recorded hourly in central control with the temperature probe located on the roof of the central control building.

Not all facilities had shade structures. Institution staff reported they were working on purchasing shade structures and had considered several options. There was no timeline identified as to when the shade structures would be placed on each facility.

The warden, chief deputy warden, three correctional administrators, two captains, 30 lieutenants and 74 sergeants all attended the required training. For correctional officers, 594 out of 613 or 97 percent attended the training. For mental health staff, the chief of mental health, and the four senior psychologists and psychiatrists attended the training, while six of seven psychologists or 86 percent attended the training. For social workers, eight out of 12 or 67 percent attended.

RVRs:

ASP issued 1,332 RVRs during the review period, of which a total of 592 or 44 percent were issued to MHSDS patients. Five were issued to MHCB patients, 587 were issued to 3CMS patients, and 740 or 55 percent were issued to non-MHSDS incarcerated persons.

Six RVRs were reviewed for compliance with policy guidelines. Of those, custody staff timely referred the RVR to mental health staff for competition of the mental health assessment (MHA) in two or 33 percent of cases. Mental health staff completed the MHA and timely returned it to custody staff in four or 67 percent of the cases. The four non-compliant referrals were made two to 11 days late. All six MHAs were completed in a private setting. Four of the reviewed MHAs recommended mitigation, and each cited the ability of the patients to have phone access to family. The senior hearing officer (SHO) did not mitigate the penalties in any of the four cases as recommended as the penalties included "C" status which restricts phone

privileges. It should be noted, however, that in all cases the documentation indicated that phone privileges were mitigated, which may reflect a training issue. The SHO did not provide an independent assessment of the MHAs in any of the cases reviewed; in each case, the same language in the MHA was used.

Staff assistants were required in three of reviewed cases and a staff assistant was assigned; however, all the patients refused their services. Patients timely received the required RVR documentation prior to the hearing in all six reviewed cases, and patients were present at all six hearings.

With regard to training, 682 of 690 or 99 percent of required custody staff completed the inmate disciplinary process MHA training. For mental health staff, 21 of 23 or 91 percent completed the required training. The remaining two clinicians were on long-term sick leave. All six reviewed MHAs were completed by clinicians who had attended the required MHA training.

The chief executive officer (CEO) reported that zero RVRs were written by health care providers since January 2025 and that there were zero instances of alternative behavior interventions. ASP reported that 176 of 193 or 91 percent of health care staff attended training on "Healthcare Providers Role in the RVR process."

<u>Use of Force</u>:

During the review period, ASP reported zero controlled and 63 immediate use of force incidents. Thirty-nine or 62 percent involved MHSDS patients and 24 or 38 percent involved non-MHSDS incarcerated persons. There were 93 non-use of force incidents, of which 74 or 80 percent involved non-MHSDS incarcerated persons and 19 or 20 percent involved MHSDS patients.

The monitor reviewed nine immediate use of force incidents for compliance with policy

guidelines. Seven of the nine had available video footage which was also reviewed. No excessive force was observed, however, there was a concern with one incident. In this incident the incarcerated person was forced to the ground by staff after resisting during the escort while cuffed behind the back. There were other custody staff in close proximity who could have assisted in maintaining control of the incarcerated person without going to the ground, where there was a risk of injury to both custody staff and the incarcerated person. In addition, five of the reviewed use of force incidents were the result of alleged use of K2 ("Spice") by patients. Video was available for four of these incidents and in each, the patient was clearly acting bizarre and had difficulty taking direction from staff.

Annual use of force training was attended by 708 of 729 or 97 percent of custody staff and 124 of 137 or 91 percent of mental health and medical staff, including the chief of mental health; all psychology, psychiatry, and social worker supervisors; six of seven psychologists; 11 of 12 social workers; and 102 of 113 nurses.

Lockdowns/Modified Programming:

The institution reported one PSR during the review period. The PSR was activated on March 27, 2025, and closed on March 28, 2025. The reason for the PSR was missing metal. There was no impact to mental health services as ducats were issued and patients were allowed to report to the ducat.

Access to Care:

A review of monthly Health Care Access Quality (HCAQ) reports from December 2024 through May 2025 reflected the issuance of 13,130 mental health ducats and add-on appointments, of which 11,814 or 90 percent were completed, and 1,316 or ten percent were not completed. Of the non-completed appointments, 100 percent were due to non-custody factors.

*Coleman* Postings:

All toured housing units contained up-to-date *Coleman* posters in English and Spanish.

**APPENDIX A – 2**
**CALIFORNIA CORRECTIONAL INSTITUTION (CCI)**
Site Visit: July 22, 2025 –July 24, 2025
Review Period: December 1, 2024 – May 30, 2025

Census:

On July 18, 2025, CCI housed 2,397 incarcerated individuals which was a 40 percent increase from the prior review period. *See* Thirtieth Round Monitoring Report – Part C, ECF No. 8359 at 176 (reporting institutional population of 1,708 incarcerated persons). The 1,178 MHSDS patients represented a 45 percent increase compared to the preceding review and comprised 49 percent of the institution's population. *Id*. (reporting MHSDS population of 644 patients)

Five EOP and 56 3CMS patients were housed in the general population RHU and pending transfer to EOP or 3CMS RHUs.

There were 123 mainline EOP and 993 mainline 3CMS patients. CCI did not operate an EOP during the previous monitoring round and the 3CMS population had increased by 66 percent. *Id*. One mainline EOP and six mainline 3CMS patients were in the OHU. In addition, one incarcerated person was in alternative housing.

Staffing:

CCI reported a significant increase in functional vacancies among psychiatrists but a notable decrease in functional vacancies among primary clinicians compared to the preceding review. *Compare* CCI Institutional Summary (staffing section, reflecting CCI's Thirty-First Round psychiatry functional vacancy rate of 31 percent and primary clinician functional vacancy rate of 14 percent) *to* ECF No. 8359 at 176-177 (reporting no functional vacancy rate for staff psychiatrists and a 42 percent functional vacancy rate for primary clinicians in the Thirtieth Round).

As of July 15, 2025, the chief psychiatrist position was vacant. All four staff psychiatrist positions were vacant; however, 1.75 contractors reduced the functional vacancy rate to 56 percent. The one telepsychiatry position was filled. Overall, CCI maintained a 31 percent functional vacancy rate for staff psychiatrists at the time of the site visit

Both chief psychologist positions were filled. Two senior psychologists filled the 1.5 allocated positions. All three senior psychologist specialist positions were filled. For staff psychologists, 4.5 of 11 positions were filled for a 59 percent vacancy rate; 0.5 contractors reduced the functional vacancy rate to 55 percent. Both telepsychologist positions were filled. Accounting for civil servant, registry, and tele-mental health psychology positions, there was an overall functional vacancy rate of 46 percent among psychologists.

No LMFT positions were allocated but one LMFT contractor was on staff.

The supervising social worker position was filled. Six clinical social workers and a seventh clinical social worker contractor filled the five allocated positions; 2.23 tele-social workers filled the two allocated positions.

Overall, CCI maintained a 14 percent functional vacancy rate for primary clinicians at the time of the site visit.

Two of four recreation therapist positions were filled.

Three of four medical assistant positions assigned to tele-mental health were filled for a 25 percent vacancy rate.

All 10.5 supervising RN positions were filled. One of four MHSDS RN positions were filled. The one CNA position was filled. Twenty-nine of 31 LVN positions were filled for a six percent vacancy rate; one was on long-term leave resulting in a ten percent functional vacancy rate.

Both senior psych tech positions were filled. Four of 19 psych tech positions were filled for a 79 percent vacancy rate; one was on long term leave increasing the functional vacancy rate to 84 percent.

For MHSDS clerical positions, 5.5 of 7.5 allocated positions were filled for a 27 percent vacancy rate. The OSS II position was filled. One of 1.5 allocated HPS I positions were filled for a 33 percent vacancy rate. The HPS II position was filled.

No staff were unlicensed.

As of July 15, 2025, for custody staff, the warden, chief deputy warden, all five associate wardens, all five captain positions were filled. Twenty-six of 26.2 lieutenant positions and 69 of 70 sergeant positions were filled for a one percent vacancy rate for each; two sergeants were acting out of class resulting in a four percent functional vacancy rate. Seventeen of 18 CCI positions were filled for a six percent vacancy rate; one CCI was acting out of class resulting in an 11 percent functional vacancy rate. Eight of nine CCII positions were filled for an 11 percent functional vacancy rate. For correctional officers, 586 of 588 positions were filled for a vacancy rate of less than one percent.

<u>Tele-Mental Health</u>:

One telepsychiatrist, two telepsychologists, and 2.23 tele-social-workers all served the 3CMS population; one tele-social worker provided EOP coverage as-needed, however the tele-social worker did not attend IDTTs during the review period. The statewide telepsychiatry hub also provided after-hours coverage.

MHSDS clerical staff and the HPS I worked hybrid schedules; no other staff teleworked.

<u>Staff Recruitment</u>:

Staff recruitment efforts consisted of the regional hiring unit helping to streamline the hiring process, increased marketing for *Coleman* classifications, hiring above minimum pay differentials and retention differentials, recruitment and retention bonuses, bonuses for providing in-person patient care, and payments for psychiatrists and psychologists who carry extra caseloads.

Notably, multiple areas across the facility were observed as unkempt and in desperate need of deep cleaning, a factor that has a critical impact on staff retention and recruitment. Limited hygiene products and basic toiletries were noted in multiple staff areas and staff had reportedly used their own cleaning items in the facility. Both in the housing units and in staff areas, trash, dirt, and generally unkept conditions were observed. Additionally, one of the treatment rooms in the RHU, typically used for mental health contacts, had what was observed to be bodily fluids on the floor that were not cleaned up for several days during the site visit.

Quality Management:

CCI maintained an active quality improvement program during the review period. Issues were investigated and appropriate corrective actions were taken to address identified issues. However, local governing body meetings were not conducted during the review period.

The Quality Management Committee (QMC) consistently achieved a quorum at monthly meetings held from December 2024 through May 2025. Meeting agenda topics covered local operating procedure updates, performance improvement work plans (PIWPs), program subcommittee reports that included mental health, and other program management topics such as CMHPP rounding, and patient advisory council (PAC).

The Mental Health Program Subcommittee (MHPS) met monthly and reported quarterly to the QMC, in both February and May 2025. For each MHPS meeting, a quorum, defined as the Chief of Mental Health and at least 50 percent of the required participants, was achieved.

The MHPS meeting minutes focused on several key areas, including updates on ongoing quality improvement projects such efforts to improve EOP group documentation and enhanced diagnostic monitoring of antipsychotic use and blood glucose levels. A "green belt" project launched in September 2024 aimed to improve EOP documentation by requiring clinicians to complete documentation before the end of their shifts, utilize checklists, maintain organized workspaces, engage in ongoing and cross-training, and schedule similar groups together. By January 2025, 96 percent of EOP documentation was completed correctly, and the project moved into the monitoring phase.

Another improvement project targeted diagnostic monitoring of antipsychotic medications and blood sugar, with the goal to have 90 percent or above of patients on antipsychotic medications with timely blood sugar monitoring. Compliance was 66 percent prior to the initiation of the project, improved to 77 percent in December 2024, but decreased to 61 percent by May 2025, with a six-month average of 67 percent. Although the project was marked as completed by January 2025, the project continued to be monitored due to instability in compliance, with plans to implement the revised desk procedures, visual aids, and automated warning system for labs. As of May 2025, these interventions were still pending implementation.

Additionally, a project on non-formulary medication prescribing by psychiatrists reported a six-month average of 7 percent with the goal to reduce this to below 3.6 percent. A kickoff meeting for this project was pending but had not occurred by the end of the review period.

While the EOP documentation greenbelt project appeared to be well implemented and monitored, the other projects such as diagnostic monitoring and prescribing non-formulary medication project would benefit from a clear timeline and action plan to implement improvements.

The MHPS meetings also reviewed system surveillance and program management reports, including RHU arrivals, compliance with RHU IDTTs prior to institution classification committee's (ICCs), adherence to RHU morning meetings, PC 2602 report logs, and joint rounding between custody and mental health staff.

Quarterly audits were also reported for IEX, CDCR 115-MH, RHU program compliance, and the use of CAT. The MHPS minutes also addressed performance reports and corrective action plans, reviewing both metrics that met targets and those that fell below. According to the May 2025 QMC mental health subcommittee report, 22 areas were reported to fall below targets including: treatment offered in the EOP, timely transfers, timely mental health referrals, appointments cancelled due to custody; timely psychiatric contacts, IDTT required staffing, timely completion of RHU pre-screen; timely RVR mental health assessment request, data entry (e.g., unresolved pending appointments); non-formulary by psychiatrist; diagnostic monitoring, timely response to non-critical non-adherence of psychiatric medications; and conducting RVRs in confidential space.

Draft minutes from May 2025 provided reasons for many of the targets in non-compliance such as staff shortages and absences and inaccurate data. Staff shortages were noted to contribute to the cancellation of EOP groups and the lack of psychiatrists were also identified as directly impacting initial psychiatric assessments prior to IDTTs. Unspecified data inaccuracies for timely IDTTs and psychiatrist's contacts, were noted to be impacting compliance data. Other

issues were identified without development of actionable plans. For example, late psychiatry referrals and primary clinician consults in the RHU averaged 77 percent compliance rate over a six-month period which was attributed to patient's not being checked in and out properly. Although the issue was noted to be raised at every staff meeting, staff indicated that the process takes too long to complete. There was no other reportable action plan to resolve the issue. Similarly, for appropriate attendees at IDTTs, the reason for low compliance was due to alternate psychiatrists being present, however no further solutions or action steps were provided.

The MHPS meetings also included specific updates on SPRFIT and EOP programs with particular emphasis on timely emergent and urgent referrals for risk of harm, suicide risk management program (SRMP) eligibility and enrollment, and timely completion of suicide watch rounds.

The emergency medical response review committee (EMRRC) met monthly from December 2024 through March 2025, and began meeting twice monthly in April 2025 with the chief of mental health or a designee. EMRCC conducted thorough reviews of emergency medical response activations and offsite transports, with detailed discussions documented in the minutes.

There were no QITs, or FITs reported during the review period, and no peer reviews were conducted at CCI for mental health disciplines, including psychiatry, psychology, and social work. Although the peer review policies were provided, CCI indicated that there were no peer review processes initiated during the review period due to chronically low psychiatric staffing.

Despite this, the committee meetings provided effective oversight, by tracking progress and identifying areas requiring further action which contributed to the ongoing improvement of mental health services at CCI.

Medication Management:

In assessing compliance for psychiatric diagnostic monitoring and medication management, CCI provided MAPIP results for the review period of December 1, 2024, to May 31, 2025.

CCI produced the four compliance metrics for monitoring antidepressants. CCI was compliant for six months monitoring blood pressures and EKGs were compliant for the one month EKGs were required. Thyroid monitoring and medication consent were not compliant during the six-month period.

Diagnostic monitoring for patients prescribed atypical antipsychotics contained 11 metrics. CCI reported measurements monitoring blood pressure, height and weight were compliant for all six months. Diagnostic monitoring of Abnormal Involuntary Movement Scale (AIMS), medication consent, Glucose, Complete Blood Count (CBC) with platelets, Comprehensive Metabolic Panel (CMP), Lipids and Thyroid testing were all non-compliant for the entirety of the review period. There were no documented required EKGS during the review period.

CCI was not an authorized clozapine initiation or maintenance facility during the monitoring period.

CCI indicated monitoring of Depakote, the mood-stabilizing medication requiring four metrics, met with fractured compliance. Patients requiring CBC with platelets, and CMP were compliant for two of the six months and the monitoring of therapeutic medication levels were non-compliant for all six months. Depakote medication consents were compliant for two months and were not compliant for the remaining four months.

CCI met compliance for the two months required medication consents for patients on

lamotrigine, the mood stabilizing medication which requires only one MAPIP metric.

CCI's diagnostic monitoring of patients on the mood stabilizer Lithium indicated kidney function testing was compliant for two of the six months, medication consents and EKGs one month, and therapeutic medication levels and thyroid monitoring were not compliant during the six-month review period.

Medication Administration

MAPIP medication administration metrics monitored essential aspects such as medication availability, continuity, preparation, and administration.

Monitoring medication continuity included the following six measures and outcomes: continuity of medication with intra-institutional transfer to ASU/SHU/PSU was compliant for six months, continuity of medication for discharge/transfer from a community hospital and/or DSH and upon parole/transfer to the community were compliant two of six months, continuity of medication upon inter-institutional transfer at R&R, NA/DOT meds with intra-institutional transfer (excluding ASU/SHU/PSU) and MHCB transfers were not compliant for any month during the review period.

PC 2602

MAPIP measures surrounded PC 2602 involuntary mediation orders. These include whether a court order was in the medical record, and whether a medication order for the PC 2602 medication was present. Neither metric met compliance at CCI during the review period.

Between December 2024 and May 2025 CCI completed 29 PC 2602 petitions. Twenty - two were renewals, six were non-renewals, one was initial non-emergent and withdrawn (not counted) and one was denied. During the review period, there was one patient who was non-compliant with a PC 2602 order; however, no use of force was required.

<u>AM, PM, HS Medication</u>

For medication management metrics of medication observations and administration for preparation of AM, PM and HS medication, administration of chronic care medication historical administration by a psychiatrist, outpatient new medication orders by a psychiatrist and outpatient new medication orders by a medical provider were noncompliant for all six months. Outpatient new medication orders by a medical prescriber was compliant for one month and noncompliant for the remaining five months.

Nursing documented that no CAPs or PIPs were initiated as a result of the audit. CCI did not state if any PIPs or CAPs were initiated for any medication management prior to the audit nor any documentation of or methodologies to improve medication management and diagnostic monitoring.

In the Thirtieth round report, CCI reported that 150 patients received 216 mental health HS medications; almost all doses were administered after 8 p.m. during the Thirtieth Round Monitoring Report. During this round, CCI reported a total of 1,978 patients receiving 3,124 ordered HS medications and 693 were not given after 8:00 p.m. which is a 1,219 percent increase in the number of patients previously receiving HS medications.

CCI does not have any local psychiatry leadership, therefore reporting and tracking prescriptions was difficult. CCI reported that psychiatrists follow the prescribing guidelines in the HCDOM.

CCI reported that bridge orders were from 14 to 30 days.

<u>KOP Medications</u>

No patients were prescribed selective serotine reuptake inhibitor (SSRI) KOP medications and there were 1,220 patients prescribed DOT psychotropic medications.

Polypharmacy Reviews

CCI completed polypharmacy reviews on 64 patients and 33 were reviewed during the review period and according to policy.

Nursing Audits

The facility reported 36 medication line audits during the reporting period; those audits indicated that all patients received their medications in less than 30 minutes unless there was a PSR requiring lockdown or modified programming. Patients in restricted housing and in the OHU received their medications cell front. CCI reported that protection from the elements was not provided on any yards during inclement weather; however, the audits were inconsistent. The measure for protection from inclement weather was checked "no" on some 2nd watch checklist and "yes" on others.

Due to multiple PSRs during the reporting period, custody officers accompanied nursing during medication administration, meaning confidentiality was not maintained. There were no reported barriers to patients receiving medications except for the multiple PSRs, or conflicts between medication distribution times and mental health programming.

Transfers:

CCI's inpatient coordinator was a senior psychologist specialist and had held the position for almost a year. She additionally served as DDP coordinator and previously worked at CSP/LAC as a line staff psychologist in the MHCB, EOP hub, and 3CMS program and DDP designee. The backup inpatient coordinator was also a senior psychologist specialist.

CCI maintained a significantly low inpatient referral rate since the new EOP program opened. There had only been one inpatient referral since March 2023 and only two EOP patients

had been referred for inpatient care since the EOP program opened in December 2023. *See* ECF No. 8654 at 85.

During the reporting period, there were no referrals to inpatient care and 207 instances of 173 patients considered for, but not referred to, inpatient care. According to the non-referral log, 123 of 207 or 59 percent of the patients who met the criteria for higher level of care were not referred due to ongoing treatment refusals. At the time of the site visit, no patients were pending transfer to inpatient care.

Regional staff who were newly assigned to the institution were aware of this unusually low referral rate and were closely monitoring it. Institutional staff cited the amount of paperwork for what they anticipated would be a rejection and the thirty-day transfer timeframe as factors that impacted the low referral rate. Staff reported that when patients decompensated, they were referred to the MHCB but staff were unaware that they could refer a patient to inpatient care directly.

Sustainable process reviews were required to audit higher level of care (HLOC) consideration documentation for quality and to measure the inter-rater reliability between the headquarters' reviewer and the institution's inpatient care coordinator. One major and one minor sustainable process review occurred during the reporting period. During quarter one, the institution's inpatient coordinator assessed 48 percent of documentation as "good" in contrast to 24 percent identified by headquarters staff. Reasons for unacceptable documentation included: insufficient narrative supporting non-referral, insufficient treatment interventions and documentation did not address the indicator-specific issue. During quarter two minor sustainable process review, inter-rater reliability between the institution's inpatient coordinator and headquarters staff improved, with both the inpatient coordinator and the headquarters reviewer

identifying that 28 percent of the cases had "good" documentation. Action plans were developed by the headquarters regional staff.

The monitor's expert reviewed a sample of ten cases of non-referral documentation. Consistent with headquarters and the inpatient coordinator's recent assessments, most non-referral rationales needed improvement, especially when the documented non-referral rationale did not consistently address the reason the patient was identified for a HLOC review.

Two patients' level of care was lowered from EOP to 3CMS without sufficient consultation with custody regarding the patient's functioning. Both patients were included in the non-referral log for a pattern of treatment refusals. Notably, one patient had been recently discharged from intermediate care facility (ICF) and was discharged to 3CMS at his initial EOP IDTT.

One reviewed case was particularly concerning as he was not timely identified for a HLOC referral. The record reflected that the patient was unable to function at his 3CMS level of care and was referred to EOP during his initial IDTT, however a referral to MHCB should have been considered. For reasons that were unclear, he remained in 3CMS and his mental status continued to decline. Another IDTT was held a month later and he was again inappropriately referred to EOP. Shortly after arrival to EOP, he was seen for an emergent consult and was referred to the MHCB.

Regarding continuity of care for discharged patients, the inpatient coordinator reported that at times, there was insufficient notification for patients who were discharged to the institution from inpatient level of care, particularly when a patient was discharged on a weekend. Given the short notice, the institution struggled to accommodate patient transfers on the same day and thus continuity of care needed improvement. A review of ten cases for patients who

were recently discharged from inpatient care revealed untimely IDTTs and primary clinician contacts after arrival. When IDTTs did occur, treatment planning was outdated and not in alignment with the patients discharge summary.

CCI made 217 MHCB referrals during the review period resulting in 127 admissions and 90 rescissions. Of the 217 patients referred to MHCBs, 216 had alternative housing stays of 24 hours or less. Of the 127 MHCB admissions, 124 or 98 percent transferred timely within 24 hours.

The institution was unable to indicate the number of EOP RHU patients who transferred to an EOP RHU timely during the reporting period. There were 112 patients transferred to 3CMS RHUs during the review period; 66 or 59 percent transferred timely. Delayed RHU transfers were due to the statewide PSRs, local PSRs, lack of available bed space, and a lack of staff to handle the increased demand.

Ninety-one patients' levels of care changed from EOP to 3CMS during the review period.

No patients transferred to an MSF.

Programming:

MHSDS Patients in Restricted Housing:

The RHU Policy requires that patients at a EOP or 3CMS level of care be transferred to an EOP or 3CMS RHU within 30 calendar days from the date of initial placement in RHU or within 30 calendar days in which the patient was made EOP or 3CMS. *See* Cal. Code of Regs., tit. 15 §§ 3335.2 and 3335.3; *see also* Restricted Housing Unit Program: Mental Health Services Policy, dated July 19, 2024 and effective August 1, 2024 (hereinafter "RHU Policy").

During the monitoring period, CCI operated a General Population RHU that housed 514 incarcerated persons including two MHCB patients with average lengths of stay of 10.5 days; 98

EOP patients with average lengths of stay of 20.6 days; 287 3CMS patients with average lengths of stay of 26 days; 126 general population (GP) individuals with average lengths of stay of 30.7 days; and one unclassified incarcerated person whose length of stay was 41 days.

On July 23, 2025, the GP RHU housed 81 individuals; this included seven EOP patients with average lengths of stay of 6.7 days and all of whom had been in the RHU for less than 30 days; 57 3CMS patients with average lengths of stay of 40 days and of whom 25 or 44 percent had been in the RHU for over 30 days; and 17 GP individuals with average lengths of stay of 58.6 days.

One psychiatrist, two clinical social workers, and an LMFT treated MHSDS patients while they awaited transfer from the GP RHU.

Eight observed IDTTs were all conducted in absentia due to patient refusals and beyond Program Guide timelines. All required staff were in attendance including a covering telepsychiatrist who had been assigned to cover IDTTs for RHU patients as the assigned psychiatrist has a day off on the day IDTTs were completed. The Regional psychologist was also in attendance. Psychiatric input was limited to identifying medication and an discussion of medication adherence. The correctional counselor was permanently assigned to IDTT coverage for all MHSDS patients. While he was not the patient's assigned counselor, his input was useful regarding case factors and reasons for delayed transfer.

The IDTTs were patient focused and treatment team members discussed each patient's case with kindness and compassion. It was clear that the staff cared about the patient and were invested in their treatment. However, the lack of basic clinical content during the discussions rendered the IDTTs inadequate. The staff did not indicate whether the IDTT was an initial or routine IDTT and current level of care was not stated. Mental health history, including relevant

clinical information such as a recent foreign body ingestion, was not discussed. While diagnosis was discussed, symptoms and functional impairment to support diagnosis was not discussed. Treatment goals were not clearly stated, and interventions were rarely identified. The patient's current level of care, higher level of care review and rationale for level of care was not discussed.

Group treatment was not conducted in the RHU.

Four 3CMS RHU patients and one EOP RHU patient were interviewed regarding individual treatment. Most patients were unclear if they had been seen by mental health staff and for those that were seen cell front, they were unable to recall if a confidential contact was offered. Patients indicated that they had not received orientation booklets. It was confirmed that the psychiatric technician had access to the booklets. The RHU Supervisor was aware and indicated that this would be resolved. One patient reported that he was seen in the no-contact room, but the broken phone made it difficult to hear his clinician. Mental health staff confirmed that there had been issues with the phones.

The treatment areas of choice for ease and convenience were the no-contact rooms. Of the nine no-contact rooms, only one room had a door on the clinician's side, thus any staff or peers in the vicinity could see the patient and hear the clinician's side of the conversation. Further, virtual court, which was recorded is held in a room in the same area. Lastly, without a door to block exterior noise, staff reported that they were distracted by noise from ISUDT programming and other inmates and staff in the vicinity. No-contact rooms were inaccessible on Friday afternoons due to visiting hours.

Lack of sufficient treatment space and staff were the primary barriers to treatment access in the RHU. Additional barriers were the one set of escort officers in the RHU. Additionally, staff reported utilizing a "confined to quarters" policy whereby patients who were placed into

RHU were confined to their assigned mainline cell until an RHU bed became available rather than placement in an intake cell. Staff reported that the duration of confinement in their mainline cell ranged from several hours to a full day.

Non-Disciplinary Segregation:

There were 41 MHSDS patients placed on non-disciplinary segregation during the review period, including 13 EOP and 28 3CMS patients. During the date of the site visit, there were no EOP and 24 mainline 3CMS patients placed on non-disciplinary segregation. The institution was unable to indicate the number of patients placed on NDS 200 status for accelerated transfer or placed on NDS 102 status for privileges and property without accelerated transfer.

EOP:

On December 18, 2023, CCI activated a new custody level IV EOP program with 80 beds in housing unit A7. *See* ECF No. 8654 at 31. By July 23, 2024, the number of beds increased to 120 double celled patient beds. *Id*. at 83. However, based on the number of patients on single-cell status during the focused EOP review period from January 1, 2024 to March 31, 2024, the institution reported an ongoing operational capacity of 75 patients. *Id*. Over a year later, on July 18, 2025, CCI reported housing 123 mainline EOP patients and averaged 143 patients during the review period. This sustained population increase from the initial mission change in December 2023 required CCI to activate housing unit A8 for housing the EOP population as well.

The institution indicated that the adjusted July 2025 EOP mental health staffing allocations were based on an anticipated census of 123 patients; 20 patients less than the average EOP census during the review period. The EOP program was thus staffed with 3.5 staff psychologists, two clinical social workers, and one registry psychiatrist. Additionally, 3CMS

clinicians and a tele-mental health clinician provided coverage for the EOP staff as needed but did not carry caseloads. No assigned EOP staff carried caseloads within required ratios.

Further, the institution reported that given the lack of clinical staff to support the growing EOP census, lack of adequate treatment space, and lack of custody staff, institutional leadership began to intermingle EOP and non-EOP patient groups on the yards, contrary to Program Guide requirements. See ECF No. 7331-1 at 51 (PG 12-4-1).

*Structured Treatment*

The Program Guide required that each EOP patient be offered at least ten hours per week of structured therapeutic activities. For patients who were determined by the treatment team to be clinically contraindicated for ten hours per week, the patient's IDTT was required to meet monthly to review and increase the amount of structured therapeutic activities or refer the patient to a higher level of care. *See* ECF No. 7333-1 at 58.

During the reporting period, CCI's EOP program was not compliant with the required offering of structured therapeutic activities to EOP patients. Across 3,064 total patient weeks, the institution scheduled 11.46 hours and offered patients 5.91 hours of weekly structured treatment, of which patients attended an average of 2.23 hours and refused an average of 3.83 hours per week. The institution reported that reasons for cancellations during the six-month review period included provider unavailability, custody modified programming, medication line delays, treatment space limitations, and scheduling conflicts with educational classes and work assignments. Moreover, EOP program staff reported that they have not been able to keep up with the large number of EOP patients that were transferred to CCI.

For patients on EOP modified programming, patients were scheduled for an average of 9.21 hours of structured treatment per week, offered an average of 2.75 hours of treatment per

week, attended virtually no treatment (0.04 hours of treatment per week) and refused an average of 2.71 hours of treatment per week. Similar to the mainline EOP program, CCI cancelled an average of 6.46 hours of structured treatment per week. Reasons for cancellations included those identified for the mainline EOP program, as noted above.

Mainline EOP patients reported being offered one or two structured therapeutic groups per week that were facilitated by the mental health clinician. However, the majority of structured treatment offered were recreation therapist.

*IDTTs*

The Program Guide required that a patient receive an initial IDTT within 14 calendar days of arrival to the institution and routine IDTTs every 90 days thereafter. *See id*. at 59; *see also id.* at 56-57 (noting patients may refuse to participate in IDTTs and requiring the primary clinician to document the same in treatment plan documentation). The required attendees include the patient's assigned primary clinician, assigned psychiatrist, assigned correctional counselor, and the patient themselves. *See id.* The IDTT should address treatment needs, develop treatment plans, assess treatment progress, and include pre-release and discharge planning. *See generally id*.

Five mainline EOP IDTTs were observed during the site visit. All five IDTTs were completed in a very competent manner and addressed each patient's treatment planning, needs, and progress appropriately. All required staff were present and fully participated in the treatment planning process.

The monitor randomly selected and reviewed the health care records of 30 mainline EOP patients to determine compliance with Program Guide timeframes for initial IDTTs. Of the 30 reviewed initial IDTTs, none occurred timely within 14 calendar days or arrival or level of care

change. Twenty-eight or 90 percent were attended by all required staff and 24 or 80 percent were attended by the patients. Reasons initial IDTTs were held *in absentia* included patient refusals.

To measure timeliness of routine IDTTs during the review period, CDCR produced an appointments report that included individuals who were required to receive a routine IDTT from December 1, 2024 to May 30, 2025. For the 188 patients in the appointments report, there were 232 completed initial or routine IDTTs. When a patient had either an initial IDTT and a routine IDTT or more than one routine IDTT, compliance with Program Guide timeframes was able to be calculated. Of the 232 completed IDTTs, 43 contacts were for individuals who had at least two IDTTs. Of those 43, the vast majority (33 or 77 percent) occurred beyond Program Guide requirements with a range of 91 days to 147 days.[4]

*Group Treatment*

Mainline EOP patients reported attending a caseload group once every other week. These groups generally had ten to 20 patients in attendance and attempted to provide structured treatment as opposed to a simple check-in group.

One clinical group was observed during the site visit which was very well run and compliant with clinical group treatment requirements. The group was facilitated by a primary clinician. Four patients were in attendance who all reported that the group was very useful. These patients reported that generally, all clinical groups that were facilitated by primary clinicians were very helpful. Patients did indicate that the high refusal rates for group treatment was partially due to non-EOP incarcerated individual participation in recreation therapy groups

[4] The EOP routine IDTT appointments report did not include individuals that did not have a completed IDTT, such as those that were not scheduled. The reviewed data captures the time between completed patient IDTTs but does not account for when patients were not scheduled for an initial or routine IDTT. Of note, the appointments report provided did not account for delays between appointments due to movements in or out of CCI.

during the review period. Patients stated that the recreation therapy groups were mostly sports-related and comprised of approximately half non-EOP individuals.

*Individual Treatment*

The Program Guide requires that patients are offered an initial psychiatrist evaluation before their initial IDTT and within 14 calendar days of arrival to the institution or level of care change. *See* ECF No. 7333-1 at 59. Thereafter they are required to receive a routine psychiatric contact every 30 calendar days. *Id*. Patients are also required to receive an initial primary clinician evaluation within 14 calendar days of arrival and weekly (i.e. once per calendar week with not more than ten calendar days between contacts) with either a primary clinician or in group psychotherapy with an individual contact every other week. *Id*.

The monitor randomly selected and reviewed the health care records of 30 mainline EOP patients to determine compliance with Program Guide timeframes for initial psychiatry evaluations. Of the 30 patients who required initial psychiatry evaluations, six or 20 percent timely occurred before the initial IDTT. Twenty-five or 83 percent of the reviewed initial psychiatry evaluations were conducted in confidential settings; the non-confidential contacts were due to patient refusal and modified program. Telepsychiatry was not utilized for initial psychiatry evaluations.

To measure timeliness of routine psychiatry contacts during the review period, CDCR produced an appointments report that included individuals who were required to receive a routine psychiatry contact from December 1, 2025 to May 31, 2025. For the 69 patients in CDCR's appointments report, there were 85 completed contacts. Of those, 72 or 85 percent were confidential as reported by the institution. Reasons for non-confidential psychiatry contacts included patients not showing for the contact and custody modified program. When a patient

had more than one completed contact, timeliness in accordance with Program Guide requirements was able to be calculated. Of the 85, 15 contacts were for individuals who were seen at least twice by the psychiatric provider. Of those 15 contacts, there were 10 or 67 percent that occurred beyond Program Guide requirements with a range of 31 to 162 days.[5]

The monitor randomly selected and reviewed the health care records of 30 mainline EOP patients to determine compliance with Program Guide timeframes for initial primary clinician evaluations. Of the 30 reviewed initial primary clinician evaluations, 15 or 50 percent were completed within 14 calendar days of arrival or change in level of care. Twenty-three or 77 percent of reviewed initial primary clinician evaluations were conducted in a confidential setting; non-confidential contacts were due to patient refusals and modified programming. Telehealth was utilized for nine or 30 percent of initial primary clinician evaluations.

To measure timeliness of routine primary clinician contacts during the review period, CDCR produced an appointments report that included individuals who were required to receive a routine primary clinician contact from March 1, 2025 to May 31, 2025. For the 188 patients in CDCR's appointments report, there were 877 completed and refused contacts. Of the 552 completed contacts, 306 or 55 percent were confidential as reported by the institution. Reasons for non-confidential primary clinician contacts included patient refusals, lack of available confidential space and custody escorts, and custody modified program. When a patient had more than one completed or refused contact, compliance with Program Guide timeframes was able to

[5] The EOP routine psychiatry appointments report did not include individuals that did not have completed contacts. Reviewed data captures the time between patient contacts but does not account for when patients were not seen or scheduled for a routine psychiatric contact. Of note, the appointments report provided did not account for delays between appointments due to movements in or out of CCI. Contact with the assigned psychiatrist was unable to be determined.

be calculated. Of the 877, 689 contacts were for individuals who were seen at least twice by the primary clinician. Of those 689 contacts, 274 or 40 percent occurred beyond Program Guide requirements with a range of 11 to 274 days.[6]

There were 552 completed individual PC contacts, of which four were completed in zero minutes, 395 were completed within 15 minutes, 116 were completed between 16 and 30 minutes, 31 were completed between 31 and 60 minutes, four were completed between 61 and 95 minutes, and two had documented durations greater than 95 minutes.

Patients reported access to the outdoor recreation yard five days per week.

There was inadequate treatment space to routinely offer confidential patient contacts during the review period. Many of the clinical contacts occurred in the building with healthcare access officers present. A privacy screen enclosure attempted to provide some confidentiality, but patients almost uniformly stated that this setting was not confidential and had a negative impact on their willingness to share relevant information with their primary clinician.

Patients reported understanding that the institution was lacking the staffing required to provide structured treatment as required during the review period and were complimentary of the staff's efforts to help. Interviewed patients reported meeting with the psychiatrist monthly and attended IDTTs generally every three months. Patients reported receiving all meals in their cells and identified multiple individuals who generally did not leave their cells and were in need of

[6] The EOP routine primary clinician appointments report did not include individuals that did not have completed contacts, such as those that were not scheduled. The reviewed data captures the time between patient contacts but does not include patients who were not seen or scheduled for a routine contact with the primary clinician. Of note, the provided appointments report did not account for delays between appointments due to movements in or out of CCI. Contact with the assigned primary clinician was unable to be determined.

more intensive mental health treatment. It was also reported that during custody modified programming periods, mental health rounds did not occur, which caused patients distress.

Multiple plant operations issues were noted in the EOP housing units, including a patient's toilet not flushing, a telephone not being operational, lack of televisions, and general lack of cleanliness in the housing units.

3CMS:

On the date of the site visit there were 993 mainline 3CMS patients, a population increase of 66 percent since the prior monitoring tour which occurred in November 2023. *See supra* p. _. During the review period, patients were housed on Facilities A, B, and C. The 3CMS program was served by one psychologist, two telepsychologists, one clinical social worker, three tele-social workers, one of which also provided coverage in the EOP program, and one telepsychiatrist. No 3CMS staff carried caseloads within required ratios.

The institution indicated staffing shortages and the insufficient physical treatment space as the primary barriers for 3CMS patient treatment during the review period. The critical staffing shortage was evident, as five different 3CMS clinicians were reassigned to provide coverage for the EOP program. There were only two on-site primary clinicians treating the 3CMS population with the rest of the treatment team using telehealth. These two on-site clinicians were required to respond to all in-person unplanned treatment including emergent, urgent, and some routine referrals.

Facility B, a Level IV high-acuity unit, was notably the most active unit, requiring staff to be redirected and to respond to frequent codes. Due to this staffing shortage, a triage plan was implemented, prioritizing emergent and urgent consults, followed by initial assessments and then

routine matters. In addition, for any available staff, the EOP program's needs typically took priority, followed by RHU and then 3CMS.

At the 3CMS level of care, tele-mental health services were provided in confidential offices on Facility C, including two office spaces for primary clinicians and one office space dedicated for psychiatry. Facility A had limited individual treatment space, while Facility B treatment areas were both limited and lacked confidentiality. On Facility B, two individual treatment rooms were shared with the RHU; one required the door to be propped open with a fan to circulate air, compromising confidentiality.

Confidential space for IDTTs was generally adequate on Facilities A and B, but loud hallway noise during Facility B IDTTs made it difficult to hear at times. Facility A IDTT space was similar, but no IDTT meetings were observed during the site visit. On Facility C, IDTTs were held in a program office divided by an accordion-style partition, with two CC Is working on the opposite side. Because the partition was not soundproof and staff could enter and exit the office space during IDTT meetings, the space did not meet confidentiality requirements.

*IDTTs*

IDTTs observed on Facility B revealed significant inconsistencies and areas in need of improvement. Seven IDTTs were observed, of which three IDTTs were held in absentia due to patient refusals. Although the IDTTS were all listed as initial IDTTS, patient arrivals ranged from March 18, 2025 to May 15, 2025, indicating significant delays. In addition, there were delays in IDTT start times resulted from logistical challenges like RHU IDTTs being scheduled same day, pill line schedules, and closed custody ("C" status) count. Additionally, the IDTTs for each program level were largely scheduled around the designated CC I's availability rather than patient or program needs, which may contribute to further delays and lack of continuity.

Although there were elements of the IDTT process that were positive, such as clear introductions, explanation of the purpose of the meeting, use of open-ended questions, collaboration of attendees, discussion of diagnoses and medications, providing patients with self-help group forms, and discussion of substance abuse, the overall quality of the IDTTs did not meet requirements. For example, in one IDTT, the presenting clinician admitted to being unfamiliar with some of the patients, and an alternate psychiatrist attended, with the team frequently learning about the patient for the first time during the meeting. Additionally, the treatment planning process lacked specificity and measurable goals. Furthermore, the patient's psychiatric history, functional impairments, and level of care justifications were also inconsistently addressed, and medication discussions routinely did not include the rationale for the prescribed psychiatric medications.

A 3CMS patients initial IDTT is required to occur within 14 working days of arrival to the institution or level of care change; and at least annually thereafter. *See* ECF No. 7333-1 at 43-44.

The monitor randomly selected and reviewed the health care records of 30 mainline 3CMS patients to determine compliance with Program Guide timeframes for initial IDTTs. Of the 30 reviewed initial IDTTs, none occurred timely within 14 calendar days or arrival or level of care change. Twenty-one or 70 percent were attended by all required staff and 14 or 47 percent were attended by the patients. Reasons initial IDTTs were held *in absentia* included patient refusals.

To measure timelines of routine IDTTs during the review period, CDCR produced an appointments report that included individuals who were required to receive a routine IDTT from December 1, 2024 to May 30, 2025. For the 509 patients included in the report, there were 616

completed initial or routine IDTTs. When a patient had either an initial IDTT and a routine IDTT or more than one routine IDTT, timeliness in accordance with Program Guide requirements was able to be calculated. Of the 616 completed IDTTs, eight contacts were for individuals who had at least two IDTTs. Of those eight, all occurred within Program Guide requirements.[7]

*Group Treatment*

Group treatment was not offered to 3CMS patients during the review period.

*Individual Treatment*

Patient interviews were conducted across all three 3CMS facilities. Patients on Facility C expressed satisfaction with their clinicians and confidentiality of individual sessions, though they preferred in-person contacts over telehealth. Patients also indicated that they did not feel individual therapy sessions were rushed and that they had time with their primary clinician. Psychiatry contacts for patients taking psychotropic medications were inconsistent, with some individuals seeing the psychiatrist more frequently due medication adjustments, while others reported long gaps between appointments.

Patients who had attended an IDTT were aware of their mental health goals. Most patients reported no issues with receiving their medications and found the 7362-process effective for accessing mental health services. However, some patient's expressed concerns about having to report suicidal ideation to receive immediate attention.

---

[7] The routine IDTT appointments report did not include individuals that did not have a completed IDTT, such as those that were not scheduled. Additionally, the reviewed data captures the time between completed patient IDTTs but does not account for when patients were not scheduled for an initial or routine IDTT. Of note, the appointments report provided did not account for delays between appointments due to movements in or out of CCI.

Patients on Facility B reported less consistent contact with their primary clinicians, with routine contacts often only occurring after submitting a 7362 request. In addition, access to patient medications was described as inconsistent, with reports of missed doses, skipped blocks, and significant delays, sometimes requiring multiple 7362 submissions for resolution.

Patients on Facility A expressed similar concerns about the delivery of their medications, particularly on third watch. Patients described instances of being let out for pill line then being told they were too late to receive their medications. Despite medication issues, most patients saw their clinicians every 90 days, typically via telehealth, and had no concerns about confidentiality. Access to IDTTs was inconsistent, as some patients were unaware of the process or experienced long periods of delay between meetings. Additional concerns included lack of communication during lockdowns, problems with obtaining tablets and headphones.

Ten individual patient cases were reviewed following their transition from EOP to 3CMS level of care. Of these, eight patients did not agree with the reduction in their level of care, despite ongoing non-participation in EOP programming. These eight patients demonstrated consistent pattern of poor adjustment, marked by frequent treatment refusals, medication non-compliance, and limited engagement with available mental health resources. Despite these challenges, the mental health team adequately responded to incidents timely and provided thorough assessments. The patient's behaviors were often assessed as attempts to influence housing assignments or to return to EOP, with the patients deemed not to need a higher level of care. In addition, staff monitored symptoms, safety, clinical needs, and made necessary treatment adjustments and referrals to specialized services such as ISUDT. Efforts to engage patients were ongoing, even though patients frequently refused.

The Program Guide requires that patients are offered an initial psychiatrist evaluation before their initial IDTT. *See* ECF No. 7333-1 at 34-50. Thereafter they are required to receive a routine psychiatric contact every 90 days if the patient is prescribed a psychotropic medication. *Id*. at 44. Patients are also required to receive a primary clinician evaluation within ten working days of arrival, *id.* at 41, and every 90 calendar days thereafter. *Id*. at 48.

The monitor randomly selected and reviewed the health care records of 30 mainline 3CMS patients to determine compliance with Program Guide timeframes for initial psychiatry evaluations. Of the 30 patients who required initial psychiatry evaluations, three or 10 percent timely occurred before the initial IDTT. Twenty-one or 70 percent of the reviewed initial psychiatry evaluations were conducted in confidential settings; the non-confidential contacts were due to patient refusals. Telepsychiatry was utilized for 17 or 57 percent of initial psychiatry evaluations.

To measure timelines of routine psychiatry contacts during the review period, CDCR produced an appointments report that included individuals who were required to receive a routine psychiatry contact from December 1, 2024 to May 31, 2025. For the 264 patients in CDCR's appointments report, there were 382 completed and refused contacts. Of the 368 completed contacts, 337 or 92 percent were conducted in a confidential setting. Reasons for non-confidentiality included patient refusals and mental health modified program. When a patient had more than one completed or refused contact, compliance with Program Guide timeframes was able to be calculated. Of the 382, 118 contacts were for individuals who were

seen at least twice by the psychiatric provider. Of those 118 contacts, there were 12 or 10 percent that occurred beyond Program Guide requirements with a range of 91 to 144 days.[8]

The monitor randomly selected and reviewed the health care records of 30 mainline 3CMS patients to determine compliance with Program Guide timeframes for initial primary clinician evaluations. Of the 30 reviewed initial primary clinician evaluations contacts, 18 or 60 percent were completed within 10 calendar days of arrival or change in level of care. Twenty-two or 73 percent of reviewed initial primary clinician evaluations were conducted in a confidential setting; non-confidential contacts were due to patient refusals and custody modified programming. Telehealth was utilized for seven or 23 percent of initial psychiatry evaluations.

To measure timelines of routine primary clinician contacts during the review period, CDCR produced an appointments report that included individuals who were required to receive a routine primary clinician contact from December 1, 2024 to May 31, 2025. For the 880 patients in CDCR's appointments report, there were 1,462 completed and three refused contacts. Of the 1,462 completed contacts, 984 or 67 percent were confidential. Reasons for non-confidentiality included patient refusal and lack of available confidential space and/or custody escorts.

When a patient had more than one completed or refused contact, timeliness in accordance with Program Guide requirements was able to be calculated. Of the 1,465 completed and refused contacts, 590 contacts were for individuals who were seen at least twice by the primary clinician. Of those 590 contacts, 77 or 13 percent occurred beyond Program Guide requirements with a

---

[8] The 3CMS routine psychiatry appointments report did not include individuals that did not have completed contacts. Additionally, reviewed data captures the time between patient contacts but does not account for when patients were not seen or scheduled for a routine psychiatric contact. Of note, the appointments report provided did not account for delays between appointments due to movements in or out of CCI. Contact with the assigned psychiatrist was unable to be determined.

range of 91 to 112 days.[9] Of the 1,462 completed individual primary clinician contacts, one was reported as occurring in less than zero minutes, there were 26 completed in zero minutes, 1,059 completed within 15 minutes, 279 completed between 16 and 30 minutes, 88 completed within 31 and 60 minutes, three completed within 61 and 95 minutes, and six completed in greater than 95 minutes.

Other Issues:

Pre-Release Planning:

CCI's pre-release planning LOP was consistent with headquarters' directive but last revised in January 2024 and, thus, not up to date.

The pre-release coordinator was a clinical social worker and the supervising pre-release coordinator was a psychologist. The pre-release coordinator "floated" coverage and provided backup services across CCI as needed which impacted their ability to attend to pre-release responsibilities. Notably, CCI maintained its own registry/database that a former HPS II developed which notified scheduling of appointments and relevant dates. While PRPA completion data was not provided, the pre-release coordinator indicated that the PRPAs were being completed for the most part and tracked locally on the CCI registry/database. Daily emails were sent between the pre-release coordinator and headquarters regarding changes of release dates.

---

[9] The routine primary clinician appointments report did not include individuals that did not have completed contacts, such as those that were not scheduled. Additionally, the reviewed data captures the time between patient contacts but does not include patients who were not seen or scheduled for a routine contact with the primary clinician. Of note, the provided appointments report did not account for delays between appointments due to movements in or out of CCI. Contact with the assigned primary clinician was unable to be determined.

Twenty-six EOP patients, 254 3CMS patients, and three GP individuals received pre-release planning appointments during the review period. Fifty-one patients were scheduled to release on post release community supervision/probation; of those 51 patients, five refused to sign ROI forms. Only 17 patients completed CAL-Id documentation; 15 were pending at the time of patient encounters; 41 were ineligible; and 29 were not completed.

TCMP screened 100 percent of eligible patients during the review period; 80 percent applied for Medi-Cal, ten percent applied for SSI, and one patient applied for VA benefits. Five percent were unavailable due to being out to court, medical reasons, or other unspecified reasons, and 15 percent refused services.

The number of patients within 120 days of their release date at the time of the site visit was not provided.

Pre-release groups met weekly on various yards throughout the review period.

Program Access:

a. Job and Program Assignments

On June 20, 2025, CCI reported that of 497 available jobs, 12 EOP patients or two percent of the EOP population held assignments, as did 167 3CMS patients or 34 percent of the 3CMS population, and 318 non-MHSDS patients or 64 percent of the non-MHSDS population held assignments.

Of 1,483 academic assignments, 36 EOP patients or two percent of the EOP population held academic assignments, 537 3CMS patients or 36 percent of the 3CMS population held academic assignments, and 910 non-MHSDS individuals or 61 percent of the non-MHSDS population held academic assignments. Notably, 32 of 36 or 89 percent of the academic

assignments held by EOP patients were re-entry; 3CMS patients re-entry assignments accounted for 310 of 537 or 58 percent of the assignments.

Of 128 vocational education assignments, seven EOP patients or five percent of the EOP population held vocational education assignments, 41 3CMS patients or 32 percent of the 3CMS population held vocational education assignments, and 80 non-MHSDS individuals or 63 percent of the non-MHSDS population held vocational education assignments.

Of the 60 voluntary education assignments, none were held by EOP patients, 18 3CMS patients or 30 percent of the 3CMS population held these assignments and 42 non-MHSDS individuals or 70 percent of the non-MHSDS population held voluntary education assignments.

Of the 174 substance abuse treatment assignments, none were held by EOP patients, 101 3CMS patients or 58 percent of the 3CMS population held assignments, and 73 non-MHSDS individuals or 42 percent of the non-MHSDS population held assignments.

b. Milestone Credits

CCI reported milestone credits were awarded to 50 EOP and 15 3CMS patients during the review period.

c. Out-of-Level Housing

As of June 20, 2025, the institution indicated that there were no EOP patients in out of level housing.

Thirteen custody Level I 3CMS patients were housed in Level II housing. Twenty-one custody Level II 3CMS patients were housed in Level III housing. One custody Level III 3CMS patient was placed in Level II housing. Nine custody Level III 3CMS patients were placed in Level IV housing. One hundred and twenty- four custody Level IV 3CMS patients were placed

in Level III housing; two Level IV 3CMS patients were placed in Level II housing. Eighty-one custody Level III patients were placed in Level II housing.

d. <u>ADA Reasonable Accommodations and Grievance Procedures</u>

CCI confirmed the implementation of the revised ADA accommodation and grievance process.

e. <u>Periodic Classification Score Reductions: EOP Patients</u>

The institution provided ten samples of CDCR Form 840's demonstrating that CCI was providing periodic classification score reductions for EOP patients during the review period.

<u>"C" Status</u>:

On July 18, 2025, no EOP and 41 3CMS patients were designated "C" status. Institutional leadership confirmed that 3CMS patients on "C" status were clustered in 3CMS housing along with other 3CMS patients not on "C" status.

<u>Case-by-Case Reviews</u>:

CCI reported no 150-day case reviews.

Sixty-four patients had RHU stays in excess of 30 days throughout the review period; no other information regarding 120-day pre-MERDs was provided.

<u>Mental Health Referrals</u>:

During the reporting period, CCI made 3,845 mental health referrals; there were 1,425 referrals to psychiatry and 2,420 referrals to primary clinicians. The 729 emergent referrals included 174 to psychiatry and 555 to primary clinicians. Of the 175 urgent referrals, 19 were to psychiatry and 156 were to primary clinicians. The 3,441 routine referrals included 1,232 to psychiatry and 2,209 to primary clinicians. For psychiatry, the institution reported 53 percent

compliance with emergent referrals, 32 percent compliance with urgent referrals, and 61 percent compliance with routine referrals. For primary clinicians, CCI reported 80 percent compliance with emergent referrals, 77 percent compliance with urgent referrals, and 74 percent compliance with routine referrals.

Custody and Mental Health Partnership Plan:

CCI's custody and mental health partnership plan LOP complied with statewide policy and was last updated in January 2025 and, thus, up to date.

Executive leadership joint rounding occurred during all six months of the review period including three times on facility A, twice on facility C, and once on facility B. Required staff attended the rounding for five of six months. Staff reported good morale overall, however, concerns were noted with PSRs, patients faking heart attacks to be seen by mental health or medical staff, and a desire for CCI to offer more programming. Incarcerated persons reported no barriers to accessing mental health services, physical plant issues, lack of timeliness for medical appointments, a desire for better continuity of care, and, notably in one instance, a patient cutting himself to get attention.

Executive joint rounding was discussed in only one of six months of executive staff meeting minutes and in minimal detail; for all six months of quality management committee minutes in significant detail; and for all six months of the mental health program subcommittee minutes in detail.

Monthly joint supervisory tours did not occur during the review period.

Provided documentation indicated that weekly 3CMS supervisory meetings occurred for only five weeks of the review period. Required staff attended but no other information was provided.

Approximately half of the required second and third watch mainline EOP huddles occurred throughout the review period. A review of the logbook indicated that the meeting was not scheduled at a consistent time. Staff reported that the meeting occurred based on staff availability. Second watch huddles on units A7 and A8 were observed. Required staff attended, collaborated appropriately, and reflected adequate knowledge of the challenges their patients faced, including patient decompensation, 3CMS patients housed with EOP patients, concerns regarding "boarding up," safety concerns about owing money. Custody staff provided minimal information, however did indicate that if a patient was evaluated for suicidal ideation, but it was determined that the patient was not suicidal and had instead requested mental health for a custody reason, the patient was given an RVR for unlawful influence by custody staff.

Introduction to EOP groups were not offered during the review period.

CCI distributed the 3CMS orientation brochure to new patients and provided copies in English and Spanish.

Inmate advisory council meeting minutes occurred for all six months on facility C, four months on facility A, and four months on facility B with all required members in attendance. Discussed topics included enhancing visitor facilities, canteen issues, clothing and linen supply issues, drug use, physical plant issues, and wi-fi expansion.

For staff misconduct complaints, there were four filed against mental health; the status of those complaints was not provided. No information regarding staff misconduct complaints against custody or medical staff was provided.

There were no investigations for misconduct towards a patient not initiated through the appeal process. No staff members were reassigned because of misconduct complaints.

The annual partnership off-post training was attended by 29 of 30 or 97 percent of mental health staff, 143 of 157 or 91 percent of nursing staff, and 655 of 669 or 94 percent of custody staff.

For quarterly roundtable training, CCI provided a list of names of individuals who attended during quarter two, and reported that mental health staff assigned to the EOP program all participated in the training, however compliance could not be ascertained.

Heat Plan:

CDCR required that each institution's heat plan local operating procedure incorporate the requirements of the March 27, 2025 Heat Plan and Updates memorandum. CCI's Heat Plan LOP, dated May 14 2025, complied with CDCR policy.

The 2025 Heat Plan and Updates memorandum required that each institution submit a Heat Plan Monthly Summary Report (Summary Report), signed by the warden and CEO, to headquarters each month from May 1 to October 31. The Heat Plan and Updates memorandum also required institutions to include with the monthly submission a Heat Incident Log documenting the number of patients who experienced a heat-related illness. The Heat Incident Log must include the patient's information and details regarding the heat-related illness.

The heat plan was in effect for one month of the reporting period, running from May 1, 2025 to May 31, 2025. During that time, CCI reported two stage I heat alerts, each occurring on May 30 and 31, 2025 respectively. Corresponding DARs reflected the accurate times of the heat alerts, however, the accommodations provided to heat risk patients were not documented as required by the LOP. CCI also reported one heat-related illness during the review period which involved a 3CMS patient. The patient was treated and returned to the housing unit.

The 2025 Heat Plan and Updates memorandum required all custody officers and

leadership staff to maintain knowledge of heat plan activation and act in accordance with the requirements of each stage. The monitor toured eleven housing units during the site visit, including A-5, A-6, A-7, A-8, B-5, B-6, B-7, B-8, C-1, C-2 and C-3. Twenty-one custody officers were interviewed and demonstrated adequate knowledge of heat plan policy and procedures, including identifying which temperatures activated the heat plan, custody responsibilities at each stage, and signs and symptoms of heat- related illness. Resources for staff regarding the heat plan were present at each post.

The policy also required that when the Heat Plan was in effect, institutional staff must generate and distribute daily a list of all incarcerated persons currently prescribed any of the designated Heat Alert Medications. Interviewed custody staff at CCI were familiar with this requirement, however, housing units B-5, B-6, and B-7 did not have an updated heat risk list. Custody attempted to access the report on strategic offender management system (SOMS) but were unable to locate it.

To ensure proper and accurate temperature recording, the Annual Heat Plan and Updates memorandum required the warden or his designee to ensure an accurate thermometer was in a central, heat-neutral location to monitor outside ambient air temperatures which must be recorded every hour, every day, from May 1 through October 31 of each year. Reviewed outdoor temperature logs from May, 2025 were properly completed. Additionally, the monitor reviewed the current outdoor temperature log which also complied with the 2025 Heat Plan and Updates memorandum's outdoor temperature requirements.

The warden or his designee is responsible for ensuring that inside air temperatures are measured in all non-air conditioned living areas that house heat-risk incarcerated persons. Temperatures must be taken at the highest non-air-conditioned location where heat-risk

incarcerated persons are housed and must be recorded every three hours. CCI provided indoor temperature logs from May of 2025 for all housing units. When reviewed, there were very few missing temperature readings found in the temperature logs from housing units.

Indoor thermometers were appropriately installed in the highest feasible location of each dayroom in all toured housing units. The thermometer in unit B6B was inoperable. Dayroom temperatures in all toured housing units measured between 79 and 81 degrees. The handheld temperature gauges in units B-7 and A-6 were inoperable.

The monitor reviewed temperature logs in all toured housing units. Log sheets were available on each post from July 1, 2025 and reflected numerous missing temperature readings in housing units A-5, A-6, A-7, A-8, B-5, B-6, and B-7.

In an effort to ensure that heat-risk incarcerated persons were afforded equal access to programs, services, and activities during extreme weather conditions, the 2025 Heat Plan and Updates memorandum required institutions to devise and include any reasonable accommodations provided to heat risk patients. All reasonable accommodations provided to heat-risk incarcerated persons during heat alert activation must be documented in the institution's Daily Activity Report (DAR). Staff reported offering heat-risk incarcerated persons additional dayroom during Stage I heat alerts; however, accommodations were not documented in the DARs as required.

Kitchen ice machines were observed and operable during the tour. Ice was also stored in each kitchen's freezer in anticipation of a Stage II heat alert. There were no sunshades available in any of the yards.

The 2025 Heat Plan and Updates memorandum required annual training on the

institution's Heat Plan. CCI reported that 637 of 639 or 99 percent of custody staff attended the training. For non-custody staff, 101 of 122 or 83 percent attended the training.

Due to the above-mentioned deficiencies, including failure to document the provision of adequate cooling measures, missing indoor temperature readings in seven housing units, broken handheld temperature gauges in two housing units, an inoperable thermometer in one housing unit, and the lack of heat risk lists in three housing units, CCI's implementation of the 2025 Heat Plan and Updates memorandum was not compliant during the review period.

RVRs:

CCI issued 4,066 RVRs during the review period, of which 2,669 or 66 percent were for MHSDS patients consisting of two for intermediate care patients, 24 for MHCB patients, 553 for EOP patients, and 2,090 for 3CMS patients. Non-MHSDS incarcerated individuals were issued 1,397 or 34 percent of RVRs.

Sixteen randomly selected RVRs issued to MHSDS patients were reviewed to assess compliance with policy guidelines. Of the sample reviewed, the mental health assessment (MHA) was timely requested in eight of 16, or 50 percent of cases and timely returned to custody in 15 of 16, or 94 percent of cases. Of the 16 MHAs reviewed, patients refused to be interviewed in 12 or 75 percent of the cases; two were completed confidentially and one was completed cell front. None of the reviewed MHAs recommended that the RVR be documented in an alternative manner. Staff assistants were appointed in 13 cases.

The primary clinician recommended penalty mitigation in all 16 cases and the SHO mitigated penalties in 15 or 94 percent of the cases. Four clinicians completed the 16 MHAs reviewed and none were trained. It should be noted that two of the clinicians who completed MHAs used the same language in each of the assessments recommending access to group

therapy, however group therapy is not within the scope of an RVR sanction. Additionally, each mental health assessment must be individualized to ensure that template based language is not used.

All required custody attended inmate disciplinary mental health assessment training during the review period. For clinical staff, CCI reported that "mental health clinicians are not required, enrolled or directed to take this training." A review of the excel spreadsheet provided by the regional custody staff indicated that four clinicians at CCI were trained.

The CEO reported that no RVRs were written by healthcare providers since January, 2025 and that there were no instances of alternative behavior interventions. CCI reported that 181 of 274 or 66 percent of health care staff attended training on "Healthcare Providers Role in the RVR process."

As a result of these identified concerns, CCI was not compliant with the RVR process during the review period.

Use of Force:

During the reporting period, there were 277 use of force incidents: seven controlled and 270 immediate incidents. The MHSDS patient population accounted for 250 or 90 percent of the uses of force.

Four controlled and five immediate use of force incidents were randomly selected to assess compliance with policy guidelines. The four controlled use of force incidents were cell extractions due to the patients' refusals to transfer to another housing unit or institution. All policy requirements for each controlled use of force incident were met, including appropriate cool down periods, mental health clinician intervention, video footage of the incident, multiple attempts to gain compliance with vocal orders, and nursing review for exposure to chemical

agents. Chemical agents were used in two of four incidents and the appropriate opportunities for decontamination were given.

All nine immediate use of force incidents reflected that custody staff used a reasonable and appropriate amount of force. The reviewed incidents included assaults between patients and other incarcerated individuals, as well as assaults on correctional staff. Reviewed body-worn camera video and advanced video security system video for all nine immediate uses of force incidents were consistent with the written reports and did not reveal any inappropriate uses of force.

CCI reported 209 non-use of force incidents, 40 or 19 percent involved MHSDS while 169 or 81 percent of the incidents involved non-MHSDS incarcerated persons.

For use of force policy training, 541 of 557 or 97 percent of custody staff, all mental health staff, and 23 nurses completed the training.

CCI was compliant with use of force requirements during the review period.

Lockdowns/Modified Programming:

Four local custody modified programming periods and one statewide PSR were initiated during the review period. Of the four local modified programming periods, one stemmed from multiple batteries on facility B and a subsequent facility search revealing missing metal. In this instance, seven individuals were identified and those specific individuals were placed on modified program for approximately 19 days. Another lasted 26 days on facility B after fights between rival STGs and an ensuing riot and weapons discovery. Another lasted 17 days for specific individuals on facility A after multiple fights, batteries, riots, and attempted homicides. The fourth lasted for seven days for all level III NDPF persons stemming from a riot, attempted murder, and weapons discovery on facility A. These modified programming periods resulted in

only priority ducats being honored, limited education, vocation, or DRP programs, and limited access to groups for the affected individuals.

From the end of the review period through the time of the monitoring tour, there was a modified programming period that lasted for 11 days for select individuals on facility A after a riot and an additional statewide PSR.

Access to Care:

A review of monthly Health Care Access Quality reports from December of 2024 through May of 2025 reflected the issuance of 35,343 mental health ducats and add-on appointments, of which 12,504 or 35 percent were completed, and 22,839 or 65 percent were not completed. Of the not completed appointments, 11,397 or 50 percent were refused by patients, 3,549 or 16 percent were not completed due to custody factors, and 7,893 or 34 percent were not completed due to non-custody issues. Notably, of the 3,549 incomplete ducats due to custody factors 2,939 were from March 2025.

*Coleman* Postings:

Coleman postings were not observed in several housing units in the institution: B Facility (units five and six), C Facility (units one, two or three), and B Facility unit 8.

**APPENDIX A – 3**
**CALIFORNIA HEALTH CARE FACILITY (CHCF)**
Site Visit: February 4, 2025 – February 7, 2025
Review Period: July 1, 2024 – December 31, 2024

Census:

On January 31, 2025, CHCF housed 1,802 incarcerated people, which was a 23 percent decrease from the previous review period. *See* ECF No. 8095 at 432. The mental health caseload population of 1,004 patients represented 56 percent of CHCF's total population and had decreased by 6.5 percent since the prior reporting round. *See id*.

There were 34 patients housed in the MHCB, including two intermediate care patients awaiting transfer to inpatient care.

There were 423 mainline EOP patients and 547 mainline 3CMS patients.

Staffing:

The chief psychiatrist position was filled. Both senior psychiatrist positions were vacant. Five of the 21.37 allocated staff psychiatrist positions were filled for a 77 percent vacancy rate, but use of 6.5 registry staff reduced the functional vacancy rate to 46 percent. Of the nine allocated telepsychiatry positions, 5.5 were filled leaving a 39 percent vacancy rate. One psychiatric nurse practitioner worked with 3CMS patients but was on leave until March 2025. Overall, there was a 46 percent functional vacancy rate for staff psychiatry positions during the review period.

Two chief psychologist positions were filled. Three of the 5.15 allocated senior psychologist supervisor positions were filled for a 41 percent vacancy rate. Nine of the 14 senior psychologist specialist positions were filled leaving a 36 percent vacancy rate. Two registry staff reduced the functional vacancy rate to 21 percent. Of the 38.75 allocated staff psychologist positions, 5.75 were filled, resulting in an 85 percent vacancy rate. With one staff psychologist

on long-term leave and 8.7 registry staff filling vacant positions, the functional vacancy rate for staff psychologists was 65 percent. One psychologist was unlicensed. Three of the four allocated telepsychologist positions were filled leaving a 25 percent vacancy rate. Overall, including on-site civil servant, registry, and telemental health positions, the functional vacancy rate among staff psychology positions was 62 percent.

The 0.6 supervising social worker position was vacant. Of the 10.3 allocated social worker positions, 5.25 were filled leaving a vacancy rate of 49 percent. There were two social workers on long-term leave and 3.3 contractors filled vacant positions, reducing the overall functional vacancy rate for social worker positions to 36 percent. Two social workers were unlicensed. One of the three tele-social worker positions were filled leaving a 67 percent vacancy rate. Overall, including on-site civil servant, registry, and telemental health positions, there was a 43 percent functional vacancy rate among social worker positions.

Considering both on-site and telemental health positions, there was a 57 functional vacancy rate for primary clinicians during the review period.

Fourteen of the 24.6 allocated recreation therapists were filled leaving a 43 percent vacancy rate. The addition of four registry positions reduced the functional vacancy rate to 27 percent.

Twelve of 16 medical assistants assigned to telepsychiatry were filled for a 25 percent vacancy rate.

Seventeen of 25.2 MHSDS clerical positions were filled leaving a 33 percent vacancy rate. One of 0.6 allocated office services supervisor (OSS) II positions were filled. Two of the 2.5 associate governmental program analyst (AGPA) positions were filled leaving a 20 percent

vacancy rate. Two of the allocated 1.5 HPS I positions were filled. The one correctional health services administrator (CHSA) position was filled as well.

Seventy of 79.6 supervising registered nursing positions were filled, leaving a 12 percent vacancy rate. Of the 424.75 allocated MHSDS registered nurse positions, 318 were filled leaving a 25 percent vacancy rate. With five registered nurses on long-term leave and 23 registry positions, the functional vacancy rate was reduced to 21 percent.

There were no allocated senior psych tech positions. Fifty-two of the 40.71 allocated psych tech positions were filled, however, 14 staff were on extended leave and two registry staff created a functional vacancy rate to two percent.

As for custody staffing, positions for the warden and chief deputy warden were filled. Two of the five associate warden positions were filled, reflecting a 60 percent vacancy rate, however, two of the vacant positions were filled with individuals acting out of class, reflecting a 20 percent functional vacancy rate. Three of the four captain positions were filled, while 29 of the 28.8 allocated lieutenant positions were filled. For sergeants, 79 of 75.8 positions were filled, however, there were two additional sergeants acting out of class reflecting 81 sergeants covering the 75.8 allocated positions.

Of the 18 allocated CC I positions, 21 were filled, while all ten CC II positions were filled as well. Additionally, there were 766.2 allocated correctional officer positions, of which 936 were filled with an additional two acting out of class. This reflected 171.8 custody officers staffed above the number of allocated positions at MCSP.

<u>Tele-Mental Health</u>:

CHCF used telepsychiatry at both the EOP and 3CMS levels of care but did not utilize telepsychiatry for MHCB patients. According to the staff-to-patient ratios from the 2009 staffing

plan and 2021 adjustments to the 2009 staffing plan, psychiatrists who treat mainline EOP patients must maintain a caseload of no more than 120 patients per psychiatrist and staff psychiatrists who treat 3CMS patients must maintain a caseload of no more than 280 patients per psychiatrist if the patient was prescribed medications and 675 patients if the patient was not prescribed medications.[10] *See* ECF No. 3693 at 12 and 6978-1 at 3. The two telepsychiatrists who treated EOP patients had caseloads of 71and 75 patients, while the three telepsychiatrists who covered the 3CMS program had caseloads of 132, 159, and 148.

The telemental health policy requires that telepsychiatrists treating EOP and 3CMS patients visit their assigned institution within 30 days of assignment and no less than annually thereafter. *See* ECF No. 8593. One of the two EOP telepsychiatrists was compliant for the initial visit, however, none of the 3CMS telepsychiatrists were compliant for the initial visit. Both EOP and 3CMS telepsychiatrists completed annual visits as required.

The institution reported tele-mental health was working well at CHCF during the review period.

Staff Recruitment:

Mental health leadership reported significant barriers to staff recruitment, including the lengthy hiring process, PIP staff pay increases, lower pay competitively, and poor location.

[10] The Program Guide requires that "[e]ach CCCMS inmate patient on psychiatric medication…be reevaluated by a psychiatrist a minimum of every 90 days regarding psychiatric medication issues." (Program Guide at 12-3-11). The 2009 Staffing Plan established a psychiatry staffing ratio for every 3CMS patient in the general population and did not distinguish between patients on medications and patients who were not. *See* ECF No. 3693 at 8. The Adjustments to the 2009 Staffing Plan, ECF No. 6978-1, which were approved by the Court on January 27, 2021 (*See* ECF No. 7035 at 2), established a new staffing ratio of 675 patients per psychiatrist for patients who are not on medications for six months or more. For the purpose of reporting compliance with staff-to-patient ratios, it was unclear whether the patient's included in each reported caseload were prescribed medications at the time of the site visit.

To overcome these barriers, during the review period, CHCF participated in local and multi-institution career fairs and held their own career fairs to recruit staff. In addition, CHCF indicated starting an APA internship program for social workers. The institution also offered tours to staff from other institutions who expressed an interest in employment at CHCF. In addition, CHCF mental health leadership reported that headquarters focused on emailing other government agencies about vacant positions and posted staff openings on the "Cal Careers" website.

Quality Management:

CHCF maintained a comprehensive quality management program during the review period.

The local governing body (LGB) met monthly with quorums achieved each month, and the minutes were reviewed and approved appropriately. Topics included general policy and procedure updates.

The QMC meetings occurred monthly, achieved quorums, and reviewed and approved meeting minutes as required. Mental health leadership reported on the CMHPP at every QMC meeting during the review period. Full reports from mental health leadership were only provided in the August and December 2024 meetings. The QMC reported having 38 benchmark metrics to measure program performance with ten metrics not meeting compliance, ten nearly meeting compliance, and 18 meeting compliance. Notable discussion topics also included after-hours MHCB referral data that was not entered timely.

The chief of mental health chaired the MHPS, which met monthly with quorums achieved and minutes taken and approved as required. The committee reports of meetings that took place during the review period were comprehensive and pertinent. The improvement

priorities and project pipeline items were discussed and evaluated. There were no major concerns with the items presented in the meetings.

The emergency medical response review committee met monthly during the review period. With respect to emergency medical responses for MHSDS patients, deficiencies identified included 911 response, timeliness of Narcan administration, and vital signs. There were no incidents identified due to the patients' mental illness.

During the review periods there were no studies, QITs or FITs conducted.

According to CHCF leadership, there were no peer review processes that occurred at CHCF during the review period in the MHCB due to all staff being registry.

Medication Management:

MAPIP tracked compliance with required diagnostic monitoring and medication administration during the review period. Diagnostic monitoring consisted of obtaining medication consents, as well as physical examinations, vital signs, and laboratory tests needed for the safer use of a given medication. Medication administration addressed the availability, continuity, and actual administration of medications. The threshold for MAPIP compliance was 90 percent.

MAPIP

CHCF provided MAPIP results for July 1, 2024 through December 31, 2024 regarding compliance for psychiatric diagnostic monitoring and medication management.

Antidepressant medications required four metrics: EKGs for patients taking tricyclic antidepressants (EKG); medication consents (Consent); thyroid function tests (TFTs); and obtaining blood pressure for patients taking venlafaxine (venla BP). CHCF was fully compliant with obtaining EKGs when required, and with monitoring blood pressure for patients prescribed

venlafaxine. CHCF was partially compliant with obtaining medication consents and monitoring thyroid function. CHCF had 21 months for which data were required, as not all months required metrics. When examined in aggregate, CHCF was compliant for fifteen, or 71 percent, of metric-months.




Atypical antipsychotics required the measurement of 11 metrics, including: abnormal involuntary movement scale (AIMS); blood pressure; glucose; complete blood count (CBC); comprehensive metabolic panel (CMP); EKG; height (Ht); lipids; medication consents; thyroid function tests; and weight (Wt). CHCF was fully compliant for monitoring blood pressure, glucose, height, and weight, and was fully non-compliant for monitoring AIMS and lipids. The institution was partially compliant with the remaining metrics, namely monitoring CBC, CMP, EKGs, TFTs, and obtaining medication consents. A total of 66 metric-months of data were required during the monitoring period. Of these, 47, or 71 percent were compliant.




Clozapine is a highly effective antipsychotic medication often used when patients are refractory to other antipsychotics. This medication carries a risk of serious, potentially fatal, side effects, and thus requires close monitoring with the same metrics used for antipsychotics as listed above. In accordance with statewide policy, CHCF initiated clozapine only in the MHCB and the PIP. CHCF reported three patients on clozapine outside of the PIP, at the EOP level of care. During the monitoring period, CHCF was not a clozapine-maintenance institution. It was unclear if these patients remained at CHCF, or whether they were in the process of transfer to a clozapine maintenance institution.

The institution was compliant for all required months with monitoring AIMS, blood pressure, CBC, EKG, TFTs, weight, and obtaining medication consents. The remaining metrics (glucose, CMP, height, and lipids) were partially compliant. When examined in total, 63 data points were required during the monitoring period. Of these, 58, or 92 percent, were compliant.




Carbamazepine and Depakote are mood stabilizers with four MAPIP requirements: CBC; CMP; medication level; and medication consent.

For carbamazepine, CHCF had no required CBC or CMP due during the monitoring period. CHCF had two required metric-months during the monitoring period; the institution was compliant with the one month of required medication consents, and non-compliant for the one month of monitoring therapeutic medication level. Thus, both compliance and non-compliance were 50 percent each with this small number of required metric-months.

Regarding Depakote, CHCF was not fully compliant with any metric, and was fully non-compliant with CMP and monitoring therapeutic medication levels. The institution was partially compliant with monitoring CBC and obtaining medication consents. CHCF had 24 required metric-months of data. The institution was compliant with two, or eight percent.




Lamotrigine is a mood stabilizing medication requiring only one MAPIP metric, namely obtaining medication consents. CHCF was compliant for the one month of required metrics.

The mood stabilizer lithium required five measures: medication consents; monitoring of kidney, thyroid function, and therapeutic medication levels; and EKGs. CHCF was not fully compliant with any metric and was fully non-compliant with monitoring therapeutic medication level and TFTs. The institution was partially compliant with monitoring CMP and EKGs, as well as obtaining medication consents. Of the total of 24 metric-months required, CHCF was compliant with six, or 25 percent.




When all required diagnostic monitoring data were examined, CHCF required 201 metric-months of diagnostic monitoring data. Of these, 130, or 65 percent, were compliant.

Medication Administration

Medication administration metrics of MAPIP monitored essential aspects such as medication availability, continuity, preparation, and administration. While the statewide MAPIP required 12 metrics, the metric for intra-institutional transfers to restricted housing (RHU), did not apply to CHCF during the reporting period, as the institution did not have an RHU; thus, CHCF had 11 required measures during the monitoring period.

Medication continuity included five measures, with the abbreviations used in the graphs in parentheses: transfers from other institutions arriving at receiving and release (R&R); intra-institutional transfers to non-RHU locations (Intra); MHCB transfers (MHCB); discharge from a community hospital or DSH (Outside Hospital); and upon parole or transfer to the community (Release).

MAPIP required prescriptions written at HS (*hora somni*, or bedtime) to be given on or after 8:00 P.M. (HS), while A.M. and P.M. medication doses must be given at least eight hours

apart. Other metrics evaluated whether chronic psychiatric medications were continued without interruption (Chronic), and whether new medications were administered as ordered, and in compliance with required timelines (New).

PC 2602 involuntary medication orders constituted the final subset of medication administration metrics. These included whether a court order (Court Order), and a medication order for the PC 2602 medication (Med Order) were present in the medical record.

The institution was fully compliant with parole or transfer to the community (Release), medications given at HS and at A.M. and P.M., chronic medications, new medications administered, and fully non-compliant with one metric, the presence of a PC 2602 medication order in the medical record (Med Order). The remaining metrics were partially compliant: transfers from other institutions arriving at receiving and release (R&R); intra-institutional transfers to non-RHU locations (Intra); MHCB transfers (MHCB); discharge from a community hospital or DSH (Outside Hospital); and the presence of a PC 2602 court order in the medical record (Court Order). These 11 metrics were required for the entire six-month reporting period and thus yielded 66 metric-months of data. CHCF was compliant for 43, or 65 percent.



CHCF monitored underperforming metrics and had CAPs for many of the nursing administration measures. These were discussed monthly in Medication Management Subcommittee. Refusals drove most of the deficient values. Cases of repeated medication refusals were referred for both psychiatry and nursing for follow-up.

Prescription Numbers in Medication Administration

CHCF did not report the number of patients receiving KOP mental health prescriptions.

CHCF reported that prescriptions were for a maximum of 180 days for 3CMS patients, and 90 days for EOP patients. Bridge medications were for a maximum of 30 days. Medication refills were sent to the psychiatrist for review one week prior to expiration. For patients leaving CDCR, CHCF followed statewide policy of dispensing a 60-day supply of medications. For verbal and telephone orders, nursing entered the order, and forwarded to the treating psychiatrist for review and signature. The institution did not specify the process for tracking the signature of verbal or telephone orders.

Medication Distribution

CHCF completed 30 medication line audits during the monitoring period, covering all yards requiring MAPIP-medication line monitoring. All showed compliance with policies regarding total duration of medication pass under two hours, and individual wait times under 30 minutes. CHCF did not report any conflicts between medication distribution and mental health programming.

Non-Formulary

CHCF reported an average non-formulary rate of approximately 19 percent during the monitoring period. This number included both PIP and non-PIP patients, as the institution reported it was not possible to separate these figures.

Polypharmacy

CHCF submitted polypharmacy data that was difficult to use and contained a mixture of reviews both inside and outside the review period; thus, it was not possible to determine the number of polypharmacy reviews required during the monitoring period. With rare exception, the polypharmacy reviews were completed in a timely manner.

HS Meds

At the time of the monitoring tour, CHCF reported that 543 patients received a total of 941 mental health medications. With rare exception, CHCF was compliant with the requirement to give these medications after 8:00 P.M.

PC 2602

CHCF submitted PC 2602 data that included both PIP and non-PIP patients. As of January 31, 2025, CHCF had 195 patients total who received PC 2602 involuntary medications. The institution reported filing 75 initial PC 2602 applications (41 emergent, and 34 non-emergent), and 120 renewal petitions; all petitions were granted. There were no planned non-renewals, petitions that expired due to administrative error, or petitions denied or withdrawn for non-clinical reasons. CHCF had clear policies and procedures regarding the initiation and use of involuntary medications, in accordance with statewide policies.

Barring other more pressing factors, use of force to administer PC 2602 medications should be controlled, rather than emergent. CHCF reported four uses of force to administer PC 2602 medications. Of these, two instances stated that the psychiatrist deemed that an emergency cell entry was required and thus were emergent. The remaining two incidents did not specifically state whether they were controlled or emergency uses of force; however, one of those resulted in the use of OC spray.

Medication Management Summary

Overall, CHCF displayed non-compliance with several key portions of medication management, including with diagnostic monitoring and medication administration; both areas were compliant for 65 percent of required monthly-metrics. Patient refusals were the main drivers of non-compliance. Areas of non-compliance were addressed by monthly medication management meetings. Issues including non-compliant metrics and the use of force for patients receiving PC 2602 medications require follow-up and continued monitoring.

Transfers:

Sustainable process reviews were required to audit higher level of care (HLOC) consideration documentation for quality and to measure the inter-rater reliability between the headquarters' reviewer and the institution's inpatient care coordinator. During the review period, one major (September 2024) and one minor sustainable process review (December 2024) were conducted in quarter three. The regional mental health director monitored the institution's mental health sub-committee reports for the major and minor site visits, and the regional senior psychologist specialist also conducted a major and minor site visit for quarters three and four. In the quarter three higher level of care documentation audit, CHCF identified cases as "good" in two of ten or 20 percent of reviewed cases and the regional mental health director identified cases as "good" in three of ten or 30 percent of cases. For the quarter four higher level of care documentation audit, three cases were reviewed, with CHCF identifying no cases as "good" and the regional staff identifying one or 33 percent of cases as "good" cases.

The type and degree of errors found varied, however notable findings included the decrease in quality of HLOC documentation from the third to the fourth quarter, lack of documentation of *Vitek* hearing information, and chronos were found in the EHRS under the

wrong title. However, there were improvements in the scanning of the due process chronos and timely submission of referrals. According to the Sustainable Process Reports, all findings were discussed with mental health leadership and corrections and plans were made to rectify the errors and to sustain improvements.

CHCF had three full-time inpatient coordinators. One had been serving in that role for 18 months, one started in December, 2024, and the third started two weeks prior to the site visit.

During the review period, there were 496 instances of 266 patients who were considered but not referred to inpatient care. Reasons for non-referral included crisis bed overstay, patients receiving too many RVRs, more than three crisis bed referrals or admissions in six months, and high treatment refusals.

CHCF referred 49 patients to acute care during the review period. Four referrals were rescinded, and none were rejected. No referrals to acute care were pending during the monitoring tour. Twenty of 45 reported referral packets were timely completed. All patients referred to acute care transferred timely within ten days.

There were 217 referrals to intermediate care. Nine referrals were rescinded and six were rejected. Sixty-one of the 217 reported referral packets were timely completed. Nearly all patients (196 of 197 or 99 percent) referred to intermediate care transferred timely within 30 days.

CHCF reported no *Vitek* hearings occurred during the review period.

Eight patients with complex medical needs were referred to inpatient care.

CHCF referred 104 patients to MHCBs during the review period, all of whom were held in alternative housing pending transfer. Of these 104 referrals, 46 or 46 percent were admitted and 58 were rescinded. Two or four percent of the 46 MHCB admissions took more than 24

hours to transfer. There were also six admissions to CHCF's MHCB from other institutions during the review period.

Six patients had three or more MHCB admissions.

CHCF reduced the levels of care for 16 patients from EOP to 3CMS.

All 22 patients who transferred to an RHU transferred timely. At the time of the site visit, there were no patients pending transfer to RHU.

There were no patients transferred to an MSF during the review period.

Programming:

Due to cited staffing deficiencies, CHCF maintained a triage plan for the EOP and 3CMS programs during the review period. Despite this, the chief of mental health maximized the use of scarce resources by implementing clear prioritization strategies. Under her direction, the institution aligned policies and practices more closely with Program Guide and statewide policy requirements and applied an evolving triage system that prioritized high risk patients, including those in the MHCB and higher risk mainline EOP.

MHSDS Patients in Restricted Housing:

The RHU at CHCF was not activated and, therefore, not operational during the review period. The institution anticipated a re-activation date of April 2025, despite staff concerns of the feasibility of opening an EOP RHU with the already limited staff at the institution.

During the review period, when patients required RHU placement, they were held in alternative housing cells until they were transferred to another institution. As indicated above and confirmed through staff and patient interviews, patients were typically transferred within one day of restricted housing placement. However, the mixing of RHU patients in the housing units with non-RHU patients impeded out-of-cell time and program availability for non-RHU patients

as they were required to return to their cell during RHU custody escorts. The mixing of the population was reported to be a concern for patients and mental health staff in these units.

MHCB:

CHCF's MHCB was located on units A1A and A1B during the review period. In October 2024, CHCF activated 15 additional beds to its existing 30-bed MHCB, bringing the total activated beds to 45 during the latter half of the review period.

On the date of the site visit, there were 34 patients housed in the MHCB, including two intermediate care patients awaiting transfer to inpatient care. The average monthly MHCB census ranged from 25 to 36 patients during the review period.

Despite the challenge of activating additional beds with limited staffing, leadership ensured that the MHCB remained appropriately staffed. The unit consistently utilized licensed and experienced providers, and leadership emphasized their commitment to maintaining adequate staffing coverage throughout the review period.

Documentation indicated that there were nine on-site psychiatrists, nine on-site psychologists, and three recreation therapists assigned to the MHCB during the review period. Five of the nine psychiatrists were assigned to only two days of MHCB coverage per week while one was assigned to just Fridays.

Leadership indicated that custody and mental health staff in the MHCB were increased on weekends, allowing IDTTs to occur on Saturdays and Sundays. This adjustment facilitated timely referrals to higher levels of care and ensured that discharges to less restrictive levels of care occurred without unnecessary delay.

Observed MHCB IDTTs reflected substantial improvement compared to the preceding review. *See generally* ECF No. 8095 at 444-48. The focus on quality improvement was evident

in the structure, collaboration, and overall effectiveness of the IDTTs. All required disciplines attended IDTTs, and nursing staff provided clinically relevant input regarding medical needs. The team consistently addressed all critical areas, and clinical decisions were justified with collaborative input from both staff and patients. Observations confirmed that the IDTTs functioned in a cohesive and clinically sound manner. Interventions utilized during IDTTs, including those utilized to confirm patients' discharge readiness, were excellent. IDTTs consistently discussed higher level of care indicators, and all patients that received IDTTs appeared to be placed in the appropriate level of care.

There were noted improvements with respect to the treatment teams' approach custody's use of restraints during patient escorts in the MHCB. Mental health leadership reported ongoing collaboration with custody leadership to align MHCB cuffing practices with policy, and both observations and review of documentation confirmed continued compliance with those requirements.

The monitor randomly selected and reviewed the healthcare records of 30 MHCB or crisis bed patients to assess compliance with Program Guide timeframes with initial and routine IDTTs during patient stays.

Thirty MHCB patients required initial IDTTs; and 100 percent of initial IDTTs reviewed occurred within 72 hours of arrival. The required assigned staff were present at only six of the 30, or 20 percent of the IDTTs reviewed. The assigned psychiatrist and / or psychologist were the most frequently substituted staff members. Patients attended 26 of 30 initial IDTTs with the remaining four patients refusing to attend.

Of the 35 required routine IDTTs, 29 or 83 percent occurred timely, or every seven calendar days following the initial IDTT. Fourteen or 40 percent of routine IDTTs had the

required assigned staff in attendance. The assigned psychiatrist and / or psychologist were the most frequently substituted staff members. An alternate psychiatrist and no correctional counselor attended one patient's IDTT. Of the 35 routine IDTTs reviewed, patients attended 34 or 97 percent.

MHCB patients had access to some group activities, though these opportunities were primarily limited to recreation therapy leisure sessions. Group facilitators generally invited up to five patients at a time after receiving clearance from the IDTT.

Patients reported positive interactions with staff during individual interviews and treatment team meetings. Both patients and staff indicated that individual contacts generally occurred in confidential rooms, unless patients refused or medical restrictions required cell-front contacts. Several patients expressed gratitude during interviews and IDTTs for the care they received during their stay.

Despite the improvements described above, the monitor's expert identified persistent problems with timely discharges and overall bed availability. Leadership reported that patients routinely remained in the MHCB following clinical discharge. These delays at times resulted in patients questioning their readiness for discharge, with some becoming more anxious over time, demonstrating reluctance or unwillingness to participate in assessments before leaving the unit, and, occasionally, contributing to new behavioral incidents or readmissions before leaving the unit. Leadership attributed the delays primarily to statewide bed shortages and the difficulty of finding appropriate placements. Unfortunately, efforts to resolve these problems through engagement with the classification and parole representative had produced minimal progress at the time of the visit.

The monitor randomly selected and reviewed the healthcare records of 30 MHCB or crisis bed patients to assess compliance with Program Guide timeframes for initial and routine psychiatry and primary clinician initial and routine contacts during patient stays. An institution was considered compliant if a patient was seen daily beginning the day after admission for an out-of-cell confidential contact (unless the patient refused) by the psychiatrist or psychologist, though on weekends the patient may be seen by the medical officer of the day (MOD) (12-5-13).

Thirty MHCB patients required initial psychiatry evaluations. Of those, 28 or 93 percent were timely, meaning they occurred before the initial IDTT and within 24 hours of arrival. Twenty-six occurred in a confidential setting with an additional two held at cell front due to patient refusal for a total of 28 or 93 percent compliance. Two initial psychiatric evaluations were not found. Telepsychiatry was not utilized for initial psychiatry contacts.

All thirty MHCB patients require two routine psychiatry contacts per week. There were 196 expected contacts, and 100 percent were timely. Of the 196 routine contacts reviewed, 90 occurred in a confidential setting while an additional 46 were held at cell front due to patient refusal for a total of 136 or 69 percent compliance. Reasons for non-confidential contacts included modified programming, medical restrictions or it was unknown. At CHCF, psychiatrists saw patients more frequently in the MHCB than the primary clinicians. Telepsychiatry was not utilized for routine psychiatry contacts.

Thirty MHCB patients required initial primary clinician evaluations; 24 or 80 percent were completed within 24 hours of arrival, one initial primary clinician evaluation was not found and the remaining five were not timely. Of the 29 initial primary clinician contacts reviewed, 20 were held in a confidential setting, while an additional two contacts were held at cell front due to

patient refusal for a total of 22 of 29 contacts or 76 percent compliance. There were no initial primary clinician evaluations utilizing Tele-Psychologists or Tele-Social Workers.

Thirty MHCB patients required routine primary clinician contacts. There were 90 expected contacts, and 85 or 94 percent were timely. Thirty-six routine primary clinician contacts occurred in a confidential setting, which included several contacts held at cell front that were reported as confidential. An additional 17 contacts occurred at cell front due to patient refusal for a total of 53 of 90 or 59 percent of routine contacts reported as conducted in a confidential setting. Reasons for routine contacts not occurring in a confidential setting included modified programming or it was unknown. A licensed clinician completed all reviewed routine contacts. Tele-psychologists or tele-social workers were not reported to be utilized for routine primary clinician contacts.

Treatment space in the MHCB included two large group rooms and two individual rooms per housing unit. IDTTs occurred in the large group rooms, while individual clinical contacts occurred in the individual rooms and in the group rooms when not occupied.

Seclusion and Restraint

CHCF reported no incidents of restraints or seclusion in the MHCB during the review period.

EOP:

As reported above, CHCF's mainline EOP population was 423 patients on the date of the site visit.

Mainline EOP patients were housed on Facilities C, D, and E during the review period. Each facility operated under a triage plan that was approved by CHCF leadership in October 2024.

On Facilities C and D, six psychiatrists were assigned to the EOP program while one onsite psychologist, two telepsychologists, and one social worker was assigned to both facilities. All primary clinicians that carried caseloads exceeded established ratios. Caseloads for psychiatrists on Facilities C and D were not discernable. There were also two social worker interns who completed patient rounds and provided additional support to the care team as needed. Under the triage plan for Facilities C and D, primary clinicians were required to prioritize initial contacts, initial IDTTs, consults, discharge follow-ups and SREs while routine IDTTs were temporarily discontinued. Special routine IDTTs and condemned patient IDTTs continued to occur on time. The triage plan also required that patients that were identified for level of care reduction to 3CMS were required to be seen in IDTT every 90 days.

On Facility E, one psychologist, one telepsychologist, six clinical social workers, and two tele-social workers were assigned to the Facility E EOP program. The number of psychiatrists assigned to the EOP program on Facility E was not discernable. All primary clinicians that carried caseloads exceeded established ratios. Under the triage plan for Facility E, primary clinicians were required to complete initial assessments, initial and annual IDTTs, consults, discharge follow-ups, and SRASHEs. Patients were seen for routine individual contacts monthly, while routine IDTTs were suspended for most patients. Primary clinicians were instructed to identify patients whose functional impairments have resolved and meet with them monthly in preparation for their discharge to a lower level of care. Similar to Facilities C and D's triage plans, patients that were identified for level of care reduction to 3CMS were seen in IDTT every 90 days.

Leadership indicated that across all three facilities, most EOP patients were scheduled for individual primary clinician and psychiatric contacts monthly, despite triage plan prioritization.

While the psychiatric contact scheduling met Program Guide requirements, monthly primary clinician contacts were not compliant with Program Guide requirement for weekly contacts.

*Structured Treatment*

The Program Guide required that each EOP patient be offered at least ten hours per week of structured therapeutic activities. *See* ECF No. 7333-1 at 58. For patients who were determined by the treatment team to be clinically contraindicated for ten hours of treatment activities per week, the primary clinician is required to present the case and recommended treatment program (i.e. EOP modified programming) to the IDTT for approval. If the patient's modified treatment program included a schedule of less than ten hours of treatment per week, the patient's IDTT was required to meet monthly to review the patient's treatment, increase the amount of structured therapeutic activities, or refer the patient to a higher level of care as clinically indicated. *Id*.

Excluding patients placed on modified EOP programming, patients were, on average, scheduled for 15.03 hours, offered 11.64 hours, attended 5.78 hours, and refused 5.99 hours of structured therapeutic activities weekly during the reporting period. On average, 3.42 hours of treatment were cancelled weekly. The reasons for treatment cancellations included weather, modified programming by custody, and staff absences. During the reporting period, 67 percent of EOP patients were offered at least 10 hours of structured therapeutic activities.

On average, patients placed on modified EOP programming were scheduled for 4.04 hours, offered 2.84 hours, attended 1.58 hours, refused 1.29 hours, and had 1.28 hours cancelled weekly, during the reporting period. The same reasons for cancellations were provided. During the review period, between 62 and 69 patients were placed on modified EOP programming during any given week. Records for five individuals noted to have been placed on modified EOP

programming were reviewed to determine treatment frequency outlined in their treatment plans. In all five cases, the patients' treatment plans made no reference to their modified EOP programming status and did not include specifics with regard to how the patients' treatment would be modified.

Reported concerns regarding access to structured treatment during the review period included competition for individual and IDTT treatment space in Facilities C and D, limited out-of-cell time for patients housed Facilities C and D due to housing with RHU patients awaiting transfer, staffing shortages resulting in a triage plan, and issues related to patients not receiving ducats on Facility E.

Specifically, on Facility E, patients reported that they do not always receive their ducats and custody staff would not let them leave the housing unit without ducats, despite custody officers having a list of patients' appointments any given day. The Senior Psychologist Supervisor reported that weekly meetings with custody leadership were adequately addressing these challenges.

*IDTTs*

Under the triage plan for EOP programs, initial IDTTs were prioritized. Generally, routine IDTTs were not held as required for EOP patients. EOP leadership reported that routine IDTTs were held when possible, but not often.

The monitor's expert observed six EOP IDTTs on Facility E. All meetings were held in the EOP programming building's IDTT room which was of adequate space and was sufficiently confidential. Required staff were present for the meetings in addition to registered nurses, medical assistants, and a senior psychologist supervisor. Of note, during three of the meetings, there were three medical assistants present in the room for each meeting. Mental health

leadership indicated that because all observed treatment teams included telemental health clinicians, the medical assistants were required to be present during all contacts.

All but one patient attended the observed IDTTs. Two of the meetings were initial IDTT meetings. It appeared in both cases that initial primary clinician and psychiatric assessments were completed prior to the meetings. There was also discussion during the meetings about referral to groups, including nursing led treatment groups (NLTGs). All six observed IDTTs included discussion of the patient's treatment history, case formulations, review of the patient's diagnosis, a discussion of symptoms, functional impairments, and substance use needs. Treatment goals were clearly articulated in all meetings as were the interventions to be provided to the patients to support these goals. The goals and interventions were appropriate to the patients' identified needs. All meetings were collaborative with evidence of quality participation by custody staff; however, in three of the meetings, the correctional counselor was not assigned to the patients.

While the level of care was discussed in all meetings, in one case, the justification for continuation of the patient at the EOP level of care was not explicitly mentioned. One identified concern was the lack of discussion about the specific content of the patients' groups and the impact of group programming on the patients' mental health needs and functioning. Only group attendance was discussed.

The Program Guide requires that EOP patients receive an initial IDTT within 14 days of arrival to the institution and a routine IDTT every 90 days thereafter. *See* ECF No. 7333-1 at 57, 59.

The healthcare records of 30 mainline EOP patients were randomly selected to assess compliance with Program Guide timeframes during their stays. Of the thirty patients who

required initial IDTTs, 19 or 63 percent occurred timely within 14 calendar days of arrival or level of care change. Of the 30 initial IDTTs, required staff attended 29 or 97 percent. Twenty-six or 87 percent were attended by the patients.

To measure timeliness of routine IDTTs during the review period, CDCR produced an appointments report that included individuals who were required to receive a routine IDTT from July 1, 2024 to December 31, 2024.[11] For the 212 patients in CDCR's appointments report, there were 249 completed and refused initial or routine IDTTs. When a patient had either a completed or refused initial IDTT and routine IDTT or more than one routine IDTT, compliance with accordance with Program Guide timeframes was able to be calculated. Of the 249 completed and refused IDTTs, 36 IDTTs were for individuals who had at least two IDTTs. Of those, there were eight or 22 percent that occurred beyond Program Guide requirements with a range of 91 and 149 days.

*Group Treatment*

There were no caseload groups or core clinical groups provided by primary clinicians during the reporting period. All EOP groups were facilitated by recreation therapists, psychiatric technicians, or nurses. Facility E patients were offered groups in an EOP programming building. The building had adequate space for group treatment and offered sufficient confidentiality. For patients housed on Facilities C and D, groups were offered in the facility's shared services group therapy area. The rooms in the area were adequate in size and offered sufficient confidentiality.

---

[11] The reviewed data in the mainline EOP routine IDTT appointments report captured the time between completed patient IDTTs but did not account for when patients were not scheduled for an initial or routine IDTT. Of note, the provided appointments report did not account for delays between appointments due to movements in or out of mainline EOP level of care.

The monitor's expert observed two recreation therapy groups offered to patients on Facilities C and D. Both groups started on time and lasted approximately 45 minutes. The rooms were confidential for sound and provided adequate space to accommodate the patients' wheelchairs and mobility equipment. One group was organized around patients creating a monthly newsletter that was distributed to patients and staff at CHCF. The newsletter had been provided in hard copy, but in January 2025, the newsletter became available to patients on their tablets. There were seven patients assigned to the group and three patients attended the observed session. The group session focused on an article written by one patient and a discussion about accompanying artwork and topics for future newsletters. The patients were engaged and interacted with each other and the recreation therapist. Overall, the group was adequate for EOP level of care patients and allowed for critical thinking, collaborative engagement, and social skill building. A review of documentation following the group revealed that it was sparse and generic.

Seven patients attended the second group, which focused on social skills/communication. The group activity was an interactive "murder mystery" game where the patients were provided with clues and the recreation therapist used a large whiteboard to facilitate the discussion and activity. The recreation therapist knew his patients well and the group members were highly engaged and actively participated in the discussion throughout the group session. The group was clinically appropriate for the population and members appeared to benefit from the cognitive exercises and social engagement.

Overall, while the observed groups were appropriate for EOP level of care patients, they were not clinical in nature. Further, it was reported that patients were enrolled in groups based

on the timing of the group and what was available or desired, rather than groups designed to address the patients' identified needs.

In addition to the recreation therapy groups, there were 121 NLTG groups conducted on second and third watch at CHCF during the review period. Of those 121 groups 81 were conducted in the outpatient units on Facility E. During the review period, 83 EOP patients attended NLTG groups.

The monitor's expert observed one NLTG group during the monitoring tour. The group was run by the RN and there were 11 attendees. The categories and topics were specific to understanding mental illness. The RN utilized the curriculum, asked open-ended questions, and garnered personalized experiences and answers. The patients intertwined previous classes with the current curriculum and were engaged the entire hour. Overall, the class was well conducted.

*Individual Treatment*

The Program Guide requires that patients are offered an initial psychiatrist evaluation before their initial IDTT and within 14 calendar days of arrival to the institution or level of care change. *See* ECF No. 7333-1 at 59. Thereafter they are required to receive a routine psychiatric contact every 30 calendar days. *Id*. Patients are also required to receive a primary clinician evaluation within 14 calendar days of arrival and weekly (i.e. once per calendar week with no more than ten calendar days between contacts) with either a primary clinician or in group psychotherapy with an individual contact every other week. *Id*.

Thirty mainline EOP patients who required initial psychiatry evaluations were randomly selected to assess compliance with Program Guide timeframes during their stays. For these 30 EOP patients, 23 or 77 percent of initial psychiatry evaluations timely occurred before the initial IDTT and within 14 calendar days of arrival or change in level of care. Twenty-nine or 97

percent were conducted in confidential settings; the one non-confidential contact was due to a patient refusal and resulted in a cell-front contact.

To measure timeliness of routine psychiatry contacts during the review period, CDCR produced an appointments report that included individuals who were required to receive a routine psychiatry contact from July 1, 2024 through December 31, 2024.[12] For the 424 patients in CDCR's appointments report, there were 2,050 completed and refused contacts. Excluding refusals, 1,871 or 94 percent of the 2,000 completed contacts were confidential. When a patient had more than one completed or refused contact, compliance with accordance Program Guide timeframes was able to be calculated. Of the 2,050 completed and refused contacts, 1,625 contacts were for individuals who were scheduled at least twice by the psychiatric provider. Of those 1,625 contacts, 310 or 19 percent occurred beyond Program Guide requirements with a range of 31 and 114 days.

Thirty mainline EOP patients who required initial primary clinician evaluations were randomly selected to assess compliance with Program Guide timeframes during their stays. For these 30 EOP patients, 22 or 73 percent of initial primary clinician evaluations were completed within 14 calendar days of arrival or change in level of care. Of the 30 initial primary clinician evaluations, 25 or 83 percent were conducted in a confidential setting. Non-confidential initial primary clinician evaluations stemmed from patient refusals and lack of confidential treatment space available.

[12] Reviewed data in the mainline EOP routine psychiatry appointments report captured the time between patient contacts but did not account for when patients were not seen or scheduled for a routine psychiatric contact. Of note, the provided appointments report did not account for delays between appointments due to movements in or out of mainline EOP. Contact with the assigned psychiatrist was unable to be determined.

To measure timeliness of routine primary clinician contacts during the review period, CDCR produced an appointments report that included individuals who were required to receive a routine primary clinician contact from July 1, 2024 through December 31, 2024.[13] For the 357 patients in CDCR's appointments report, there were 1,472 completed and refused individual contacts. Excluding refusals, 1,266 or 88 percent of the 1,445 completed contacts were confidential as reported by the institution. When a patient had more than one completed or refused contact, compliance with Program Guide timeframes was able to be calculated. Of the 1,472 completed and refused contacts, 1,114 contacts were for individuals who were seen at least twice by the primary clinician. Of those 1,114 contacts, 522 or 47 percent occurred beyond Program Guide requirements with a range of 11 and 78 days.

There were 1,445 completed individual primary clinician contacts, of which nine occurred in zero minutes, 576 occurred in less than 15 minutes, 638 occurred between 16 and 30 minutes, 197 occurred between 31 and 60 minutes, 17 occurred in between 61 and 95 minutes, and eight occurred in greater than 95 minutes.

There was mostly adequate treatment space available for the provision of mental health services to patients in the EOP at CHCF. EOP facilities had dedicated program space for group treatment that was confidential from other incarcerated persons. On Facility E, there was also dedicated office space within the EOP programming building available for individual sessions

[13] The mainline EOP routine primary clinician appointments report did not include individuals that did not have completed contacts, such as those that were not scheduled. The reviewed data captures the time between patient contacts but did not include patients who were not seen or scheduled for a routine contact with the primary clinician. Additionally, the provided appointments report did not account for delays between appointments due to movements in or out of EOP. Contact with the assigned primary clinician was unable to be determined. When primary clinician caseload groups were utilized to meet primary clinician contact requirements, verification that individual contacts with the assigned primary clinician and alternated with caseload groups with the assigned primary clinician was not conducted.

that was adequate and confidential. However, there were challenges with access to confidential office space for individual sessions and IDTT meetings on Facilities C and D with treatment space being used by other disciplines for non-treatment activities. Nursing staff were using the group and treatment rooms as breakrooms and correctional counselors were using treatment rooms as offices. These concerns had been raised to institutional leadership on multiple occasions with no actions taken to date.

Interviewed patients across all three facilities reported seeing their primary clinicians every two to three weeks on Facility E and every month on Facilities C and D, with patients describing contacts as sporadic. Some patients reported having only passing contact with their clinicians and not being seen for individual sessions in well over a month. It was also reported that contacts were often completed in the day room, yard, or at cell front without being offered a confidential session. Patients assigned telemental health clinicians reported being comfortable with their providers. While patients reported consistently seeing their assigned primary clinicians, it was reported that staff turnover impacted the ability to build adequate therapeutic rapport.

All but one patient reported seeing the psychiatrist monthly and in most cases the psychiatrist was seen via telepsychiatry. Patients did not have concerns with seeing the psychiatrist via this modality but a few mentioned feeling uncomfortable with the medical assistant in the room.

Most patients reported not having routine IDTT meetings. Patients reported between three and 12 months having passed between IDTT meetings. However, patients were generally aware of their treatment goals.

Concerningly, both staff and patients confirmed that patients on Facilities C and D were instructed *not* to use a mental health request form to ask to see their clinicians, but to instead let nursing staff know that they wanted to be seen. Patients reported that this system was ineffective and they were not being seen following a verbal request. Another concern included challenges with the ducat system. Patients reported that ducats were placed in the crack of their cell doors and that they did not always receive their ducats. They reported that when they asked custody staff about their assignments, custody were unwilling to share that information and told the patients that it was their responsibility to know their schedules and retain their ducats, even when the patients did not receive them.

<u>3CMS</u>:

CHCF's mainline 3CMS population was 547 patients on the date of the site visit.

During the review period, CHCF's mainline 3CMS program was severely understaffed, resulting in triage planning on Facilities A, C, D, and E. With almost all resources devoted to higher acuity patients in the MHCB and EOP programs, there were three primary clinicians, including one tele-social worker and two psychologists, treating the largest MHSDS population at the institution. One on-site psychologist was assigned to treat 3CMS patients on Facilities A, C, and D and carried a caseload of approximately 330 patients, over three times the established caseload ratio for primary clinicians.[14] On Facility E, an on-site psychologist and a tele-social worker carried a combined caseload of 220 patients. However, at the time of the monitoring tour, the on-site psychologist was on long-term leave and the tele-social worker was responsible for all 220 3CMS patients.

[14] Staff-to-patient ratios from the 2009 Staffing Plan and 2021 adjustments to the 2009 staffing plan required that primary clinicians who treat 3CMS patients maintain a caseload of 97 patients per clinician.

CHCF's 3CMS program also had four assigned telepsychiatrists during the review period and at the time of the site visit. The telepsychiatrists were not assigned to particular yards and, therefore, did not carry assigned caseloads.

The lack of mental health staff severely impacted access to and continuity of care for the 3CMS population. Under the 3CMS triage plan, the 3CMS program prioritized initial assessments, initial IDTTs, SREs, and consults. Routine primary clinician contacts and routine IDTTs were backlogged for over one year at the time of the site visit and routine psychiatry contacts were often delayed. Moreover, several patients reported needing to file requests to be seen by their psychiatrists.

*IDTTs*

The monitor's expert observed two 3CMS IDTTs on facility D during the site visit. Both were initial IDTTs with one patient present and the other refusing to attend. The required staff were present, including a primary clinician, telepsychiatrist, psychologist supervisor attending virtually, RN, and CC I. The primary clinician was not the assigned clinician for either patient and was usually assigned to the CHCF-PIP. The primary clinician facilitated both IDTTs and was very well prepared for each IDTT and had thoroughly reviewed both patients' clinical histories and current functioning. Both IDTTs met audit criteria and treatment planning was thorough and appropriate.

The individualized treatment plan for 3CMS patients must be completed within 14 working days of referral/arrival by the patient's primary clinician in consultation with the other IDTT members and annually thereafter. *See* ECF No. 7333-1 at 43-44. (PG 12-3-10).

The healthcare records of 30 mainline 3CMS patients were randomly selected to assess compliance with Program Guide timeframes during their stays. Of the thirty patients who

required initial IDTTs, 13 or 43 percent occurred timely within 14 working days of arrival or level of care change. All required staff were in attendance and patients attended 26 or 87 percent of reviewed IDTTs. Reasons initial IDTTs were held *in absentia* included patient refusals.

To measure timeliness of routine IDTTs during the review period, CDCR produced an appointments report that included individuals who were required to receive a routine IDTT from July 1, 2024 through December 31, 2024.[15] For the 202 patients in the appointments report, there were 216 completed initial and routine IDTTs. When a patient had more than one completed IDTT, compliance with Program Guide timeframes was able to be calculated. Of the 215 initial and routine IDTTs there were 16 incidents of individuals who were seen at least twice by the IDTT. Of those 16 IDTTs, all occurred within Program Guide timeframes.

A random sample of 30 patients was selected to verify consistency of appointment dates between the appointments report and clinical documentation in EHRS. All 55 contacts reviewed in EHRS were consistent with the appointments report.

*Group Treatment*

CHCF offered one anger management group to 3CMS patients on Saturday mornings but did not offer recreation therapy or clinical groups during the review period.

*Individual Treatment*

The Program Guide requires that patients are offered an initial psychiatrist evaluation before their initial IDTT. *See* ECF No. 7333-1at 34-50. Thereafter they are required to receive a

[15] The reviewed data in the mainline 3CMS routine IDTT appointments report captured the time between patient IDTTs but did not account for when patients were not seen or scheduled for an initial or routine IDTT. Of note, the provided appointments report did not account for delays between appointments due to movements in or out of 3CMS. The report did not include individuals that did not have a completed IDTTs.

routine psychiatric contact every 90 calendar days if the patient is prescribed psychotropic medication. *Id*. Patients are also required to receive a primary clinician evaluation within ten working days of arrival and every 90 calendar days thereafter. *Id*. at 41.

The healthcare records of 30 mainline 3CMS patients were randomly selected to assess compliance with Program Guide timeframes for initial psychiatry evaluations during their stays. Of the thirty patients who required initial psychiatry evaluations, 28 or 93 percent timely occurred before the initial IDTT. All 30 initial psychiatry evaluations were conducted in confidential settings. Telepsychiatry was utilized for 26 or 87 percent of initial psychiatry evaluations.

To measure timeliness of routine psychiatry contacts during the review period, CDCR produced an appointments report that included individuals who were required to receive a routine psychiatry contact from July 1, 2024 through December 31, 2024.[16] For the 462 patients in the appointments report, there were 1,150 completed and refused contacts, 1,108 or 94 percent were confidential as reported by the institution. When a patient had more than one completed contact, compliance with Program Guide timeframes was able to be calculated. Of the 1,150, 689 contacts were for individuals who were seen at least twice by the psychiatric provider. Of those 689 contacts, five (less than one percent) occurred beyond Program Guide requirements with a range of one and 153 days.

[16] The mainline 3CMS routine psychiatry appointments report did not include individuals that did not have completed contacts, such as those that were not scheduled in accordance with the institution's triage plan. The reviewed data captures the time between patient contacts but did not account for when patients were not seen or scheduled for a routine psychiatric contact. Of note, the provided appointments report did not account for delays between appointments due to movements in or out of 3CMS. Contact with the assigned psychiatrist was unable to be determined.

A random sample of 30 patients was selected to verify consistency of appointment dates between the appointments report and clinical documentation in EHRS. All 55 contacts reviewed in EHRS were consistent with the appointments report.

All 30 patients who required initial psychiatry evaluations also required initial primary clinician evaluations. Twenty-five or 83 percent of initial primary clinician evaluations were completed within ten working days of arrival or change in level of care. Twenty-six or 87 percent of initial primary clinician evaluations were conducted in a confidential setting; non-confidential contacts were due to medical restrictions and lack of available confidential space.

To measure timeliness of routine primary clinician contacts during the review period, CDCR produced an appointments report that included individuals who were required to receive a routine primary clinician contact from July 1, 2024 through December 31, 2024.[17] For the 497 patients in the appointments report, there were 807 completed and refused contacts, 589 or 73 percent were confidential as reported by the institution. When a patient had more than one completed contact, compliance with Program Guide timeframes was able to be calculated. Of the 807 completed and refused contacts, 313 contacts were for individuals who were seen at least twice by the primary clinician. Of those 313 contacts, 38 or 12 percent occurred beyond Program Guide requirements with a range of 1 and 161 days.

[17] The mainline 3CMS routine primary clinician appointments report did not include individuals that did not have completed contacts, such as those that were not scheduled. The reviewed data captured the time between patient contacts but did not include patients who were not seen or scheduled for a routine contact with the primary clinician. Additionally, the provided appointments report did not account for delays between appointments due to movements in or out of 3CMS. Contact with the assigned primary clinician was unable to be determined.

A random sample of 30 patients was selected to verify consistency between the appointments report and clinical documentation in EHRS. All 75 contacts reviewed in EHRS were consistent with the appointments report.

Interviewed 3CMS patients from Facilities C, D, and E reported inconsistent and delayed routine primary clinician contacts with several patients reporting that they had not seen their primary clinician in at least a year. Most patients could not recall the last time they were offered a routine IDTT and several reported being informed that their IDTTs were held in absentia and they were not notified. Patients also reported delays of three to four weeks in responses to Form 7362 requests and several patients reported having to go “man-down” to receive treatment.

Observed treatment space for 3CMS patients on Facilities C, D, and E each had one or two treatment rooms intended for individual contacts, groups, and IDTTs. The rooms were confidential for sound but included windows on the doors to each room. Although these rooms were intended for use by mental health staff, several mental health staff and the program supervisor reported that on several housing units, nursing staff and CC Is had claimed those spaces for their own use, including for use as break rooms or storage. The inappropriate use of these rooms would result in delays and cancellations of scheduled appointments and treatment activities.

<u>Other Issues</u>:

<u>Pre-Release Planning</u>:

A pre-release supervisor, two pre-release coordinators, two medical licensed clinical social workers, and an occupational therapist (OT) facilitated the pre-release program at CHCF during the review period. The pre-release supervisor and two pre-release coordinators were all LCSWs and began their positions in February, March, and May of 2024, respectively.

The pre-release LOP was comprehensive with the role and responsibilities of pre-release staff outlined appropriately.

For patients that were eligible for release within 90 days, there were 319 pre-release appointments scheduled with the pre-release coordinators.

TCMP reported that 107 patients, including 49 EOP and 58 3CMS, were offered services. Of the 107 patients, 99 patients or 93 percent of patients submitted applications. Seventy-four patients applied for SSI, seven refused, six patients applied for VA benefits, 11 were ineligible, and one on hold.

According to the documentation, during the review period, there were 267 patients that were eligible to complete a Cal-ID application, of which 146 completed the application, 20 were eligible but not interested, 76 did not complete the application, and 25 did not specify. There were 31 patients deemed ineligible.

During the review period, pre-release groups were only offered to EOP patients and in January 2025, pre-release groups were extended to the 3CMS population. Pre-release groups were offered to patients within one year of their release date to give patients an opportunity to understand the community and to discuss individual needs with their primary clinicians.

An observed EOP pre-release group was facilitated by one of the pre-release coordinators. The group had three EOP patients in attendance. The module was followed, two of the three patients read and gave their opinions, and the session was interactive. The previous week's topic was addiction and criminal thinking and a segway into the mental health module.

Unfortunately, there were scheduling conflicts with pre-release groups and ISUDT classes during the review period. Patients reported that they would be written up by custody

staff for not attending ISUDT class and would need to leave pre-release planning groups a half-hour early to make it to class on time.

Interviewed staff indicated that the pre-release team collaborated well together and were able to verbalize areas of need in the community for many of their patients, demonstrating a strong understanding of their patients.

The pre-release program held resource fairs for patients in the summer of 2024 with multiple outside vendors, including the Anti-Recidivism Coalition, Job Navigators, and Housing Authority. Self-help groups and testimonial discussions by past incarcerated persons were also offered to patients.

Program Access:

a. Job and Program Assignments

On January 22, 2025, CHCF reported that of 639 job assignments, 71 were held by EOP patients, representing 23 percent of the EOP population. The 3CMS patients held 169 job assignments, representing 30 percent of the 3CMS population, as did 370 non-MHSDS incarcerated persons or 30 percent of the non-MHSDS population.

The 368 academic assignments were held by 71 or 16 percent of EOP patients, 105 or 19 percent of 3CMS patients, and 192 non-MHSDS patients or 17 percent of the non-MHSDS population.

The 50 vocational education assignments were held by nine EOP patients or two percent of the EOP population, eleven 3CMS patients or two percent of the 3CMS population, and 30 non-MHSDS persons or three percent of the non-MHSDS incarcerated population.

Only one EOP and one 3CMS patient held voluntary education assignments. Non-MHSDS incarcerated persons did not hold voluntary education assignments.

The 481 substance abuse treatment assignments were held by 113 EOP patients or 26 percent of the EOP population, 157 3CMS patients or 28 percent of the 3CMS population, and 211 non-MHSDS incarcerated persons or 19 percent of non-MHSDS incarcerated population.

b. Milestone Credits

The institution reported awarding 450 milestone credits to EOP patients, three milestone credits to 3CMS patients, and nine milestone credits to MHCB patients.

c. Out-of-Level Housing

On January 22, 2025, CHCF reported that eleven EOP and 14 3CMS custody Level I patients were housed in Level II housing. Eleven EOP and one 3CMS custody Level III patients were housed in Level II housing. There was also one EOP custody Level IV patient in Level II housing.

d. ADA Reasonable Accommodations and Grievance Procedures

CHCF provided a memorandum dated October 28, 2022 and titled "Reiteration of Reasonable Accommodation Requirements". Training rosters reflecting attendance at the reasonable accommodation requirements training were also provided. As of the date of the site visit, 75 percent of CHCF mental health and custody staff had completed this online training.

e. Periodic Classification Score Reductions: EOP Patients

CHCF provided six completed CDCR Form 840s which reflected that the institution provided classification score reductions for EOP patients.

f. Unclothed Body Search

CHCF custody staff reported performing unclothed body searches during contraband searches and lockdowns in patient cells to ensure privacy. Unclothed body searches at CHCF were reported as "infrequent" due to the high acuity of medical and mental health conditions.

"C" Status:

During the review period, there were 48 incarcerated persons on "C" status at CHCF.

At the time of the monitoring tour, there were 11 incarcerated persons on "C" status at CHCF, including one in the MHCB, five mainline EOP patients, and five 3CMS patients. Case factors for "C" status placement included failure to work, refused to provide urine sample for drug testing, possession of a deadly weapon, and unauthorized possession of drug paraphernalia as well as being under the influence of a controlled substance.

Case-by-Case Reviews:

During the review period, CHCF reported that no patients met the criteria for a 150-day case review or a subsequent review.

Mental Health Referrals:

Overall, CHCF reported compliance with timely responding to psychiatry and primary clinician referrals. During the review period, CHCF made 1,828 mental health referrals; there were 397 referrals to psychiatry and 1,431 referrals to primary clinicians. There were 135 emergent referrals, 262 urgent referrals, and 1,431 routine referrals. As described below, with the exception of responses to urgent psychiatry referrals, responses to mental health referrals were timely during the review period.

For psychiatry referrals, CHCF timely responded to 11 of 12 or 92 percent of emergent referrals, 17 of 21 or 81 percent of urgent referrals, and 331 of 364 or 91 percent of routine referrals. For primary clinician referrals, CHCF timely responded to 116 of 123 or 94 percent of emergent referrals, 224 of 241 or 93 percent of urgent referrals, and 960 of 1,067 or 90 percent of routine referrals.

A total of eight correctional officers were interviewed regarding their understanding of the mental health referral process. All eight staff were knowledgeable of the process and how to get the referral form, a MH-5 to mental health staff.

Custody and Mental Health Partnership Plan:

The CMHPP LOP was current and last revised in January 2025. The LOP was consistent with statewide policy.

Executive joint rounding occurred in the MHCB and outpatient settings in five of six months of the review period, with rounding occurring in the PIP in September 2024. The appropriate staff conducted the executive joint rounding and documented interviews with custody staff and patients. Custody staff reported having a good working relationship with mental health staff and reported issues with adequate laundry and blankets in the MHCB on multiple occasions. Patients reported receiving ducats for mental health appointments, except in the MHCB. Other concerns raised included lack of job assignment for condemned patients, request for grief counseling, and more treatment for transgenders patients.

Executive staff meetings, QMC, and MHPS meeting minutes included discussion of executive joint rounding in all six months. Notably, MHPS minutes also included discussion of IAC meetings and quarterly round table training.

Reviewed second and third watch huddle forms for EOP housing units reflected that huddles occurred consistently as required during the review period. Two weeks of reviewed huddle forms were detailed and included adequate staff presence and discussion of pertinent information. Patients returning from higher levels of care, new patients in the unit, patients with medication changes, and staff taking time off or new staff in the unit were all documented with significant detail.

Weekly 3CMS Supervisor meetings occurred on Facility E for four out of six months of the review period. No documentation was provided for other 3CMS facilities. The documents provided complied with policy and the required staff were in attendance. The form included notations of patient property concerns, request(s) to transfer, patient decompensation concerns, and patients that were agitated.

Introduction to EOP groups were conducted twice weekly when new EOP patients were transferred to the institution. An assigned primary clinician, sergeant, and two peers facilitated the groups. During the review period, there were 41 patients who participated in the group. At the time of the monitoring tour, the group was not offered as there were no new EOP patients.

Monthly joint supervisory program area tours occurred on different housing units on Facility E during each month of the review period. Staff interviews reflected a good working relationship with mental health staff. Officers reported using the mental health call centers regularly when he had concerns of patient functioning in the housing units. Patients discussed having good access to programs when scheduled but felt distressed about safety in the housing units at times.

IAC meetings occurred in all six months of the review period on Facilities C, D, and E. MHSDS discussion topics included a request for misters, delay in housing unit officers unlocking doors to allow MHSDS patients into the unit during a stage I heat alert, broken ice machines, and ducats conflicting with mental health appointments. The appropriate executive staff were present with adequate discussion and resolution of issues raised during the meetings.

The institution provided a copy of the 3CMS orientation brochure. However, it was unclear whether this brochure was distributed to 3CMS patients during the review period.

CHCF reported a total of 214 staff misconduct allegation were filed by MHSDS patients during the review period. Of those, 142 were filed by EOP level of care patients, 60 by 3CMS patients and 12 by MHCB patients. The 214 allegations were filed by 102 different patients. There were no other investigations of staff misconduct initiated outside of the appeal process. No staff were reassigned because of a staff misconduct allegation.

The institution produced documentation indicating participation in quarterly roundtable training, however, the number of staff members who were required to attend the training was not indicated, therefore, compliance with staff attendance could not be assessed.

CHCF reported annual partnership training for custody and mental health staff. Although the training data was produced for the entire institution and could not separate the outpatient and PIP staff, all required mental health and custody staff attended the training as required.

Heat Plan:

CDCR required that each institution's heat plan LOP incorporate the requirements of the April 8, 2024, Heat Plan, Updates memorandum and Expectations memorandum. CHCF's heat plan LOP was last revised in May 2024 and was not compliant with the headquarters' directive as the LOP incorporated an outdated heat plan memorandum from 2019.

In addition to CDCR's 2024 Heat Plan and Updates memorandum, CDCR issued an Expectations Memo, dated August 2, 2024, delineating the specific responsibilities of the warden and CEO during heat events. These included daily meetings during days of anticipated heat advisories to address and manage heat alerts and related concerns. Minutes of Heat Plan Meetings were reviewed and reflected compliance with the Expectations Memorandum.

The 2024 Heat Plan and Updates memorandum required that each institution submit a Heat Plan Monthly Summary Report (Summary Report), signed by the warden and CEO, to

headquarters each month from May 1 to October 31. CHCF produced Summary Reports for July, August, September, and October of 2024 when the heat plan was active during the review period. The Summary Reports reflected there were 81 Stage I heat alerts and no Stage II or Stage III heat alerts during the four months. However, reviewed daily activity reports (DARs) for the four months indicated that there were only 80 Stage I heat alert activations during the four months.

The Heat Plan and Updates memorandum also required institutions to include with the monthly submission a Heat Incident Log documenting the number of patients who experienced a heat-related illness. There were no heat-related illnesses reported during the four months at CHCF.

The 2024 Heat Plan and Updates memorandum required all custody and leadership staff to maintain knowledge of heat plan activation and act in accordance with the requirements at each stage. Thirteen custody staff in eight different housing units were interviewed about their knowledge of and responsibilities in the event of an activation. Custody officers demonstrated adequate knowledge, including identifying which temperatures activated the heat plan, responsibilities at each stage, signs and symptoms of heat-related illness, and keeping a daily list of heat-risk list patients in the unit.

The Litigation Coordinator was interviewed about their role in the Heat Plan. They were knowledgeable of their role as Heat Plan Coordinator and stated that they have held the position for one year. Discrepancies found in the Monthly Summary report and in the DARs were discussed.

The Chief Nursing Executive was interviewed about the Heat Plan and the role of nursing and was very knowledgeable. They confirmed that there were no heat related illnesses during the Heat Plan period.

To ensure proper and accurate temperature recording, the Annual Heat Plan and Updates memorandum required the warden or their designee to ensure an accurate thermometer was in a central, heat-neutral location to monitor outside ambient air temperatures, which must be recorded every hour, every day, from May 1 through October 31 of each year. The outside thermometer was located in the central control booth at CHCF. Examined outdoor temperature logs were properly completed.

The warden or their designee was also responsible for ensuring that inside air temperatures were measured in all living areas without air conditioning that house heat-risk incarcerated persons. The institution indicated that all housing units were air conditioned throughout the review period. During the site visit working thermometers were observed in all toured housing units and custody officers were aware of the need to use them in the event of an air conditioning failure. CHCF's indoor temperature recording procedures complied with the 2024 Heat Plan and Updates memorandum.

In an effort to ensure that heat-risk incarcerated persons were afforded equal access to programs, services, and activities during extreme weather conditions, the 2024 Heat Plan and Updates Memorandum required institutions to devise and include any reasonable accommodations and alternatives to yard activities when revising their LOP. All reasonable accommodations provided to heat-risk incarcerated persons during heat alert activation must be documented in the institution's DAR. One hundred and seventy (170) DARs from all three watches during Stage I Heat Alerts were reviewed and indicated that heat-risk incarcerated

persons were offered accommodation during a Stage I heat alert activation. Minor discrepancies were discovered in ten or six percent of the DARs. No accommodation was documented in the Second Watch DARs for Stage I heat alerts on July 9, July 25, August 1, August 5, and August 6, 2025, and no accommodation was documented in the Third Watch DARs on July 15 and 23, 2025. On August 20, 2024, the institution changed the DAR form to include a section requiring watch commanders to document accommodation provided to heat risk patients during a heat alert. Laudably, following this change, compliance with documenting accommodations improved.

The 2024 Heat Plan and Updates memorandum required annual training on the institution's Heat Plan. CDCR provided training documentation for heat-related pathologies training as follows: 926 of 1,005 or 92 percent of custody staff and 1441 of 1778 or 81 percent of non-custody staff completed the training.

Overall, CHCF's implementation of the 2024 Heat Plan and Updates Memorandum was compliant during the review period. Custody staff were knowledgeable of heat plan policy and procedures. Outdoor and indoor temperatures were compliant and documentation of accommodation to heat risk patients was compliant.

<u>RVRs</u>:

CHCF reported 903 RVRs were issued during the review period. MHSDS patients were issued 653 or 72 percent of total RVRs. MHCB patients were issued 35 or four percent of RVRs, EOP patients were issued 383 or 42 percent of RVRs, 3CMS patients were issued 235 or 26 percent of RVRs, and general population incarcerated persons were issued 250 or 28 percent of RVRs.

The monitor reviewed 13 RVRs and the accompanying mental health assessment (MHA) for compliance with policy requirements. Custody staff timely referred the RVR to mental health staff in seven out of 13 or 54 percent of cases. Mental health timely completed and returned the MHA to custody staff in 12 of 13 or 92 percent of cases. Eight of 13 or 62 percent of reviewed MHAs were conducted in a confidential setting; reasons for non-confidentiality were patient refusals. A staff assistant was assigned in all 13 reviewed cases.

The SHO documented their consideration of the MHA information in 12 out of 13 or 92 percent of cases. In the one case where the SHO did not document their consideration, the SHO quoted the MHA without making any other statement about the information. The SHO mitigated the assessment of penalties in 12 cases where mitigation was recommended.

Two ICC chronos were reviewed regarding the assessment of an RHU term. In the two reviewed cases, the ICC chairperson documented their consideration of the MHA information in the assessment of the RHU term in compliance with policy.

At CHCF, MHAs were assigned to specific mental health staff rather than distributing the MHAs to all primary clinicians. The mental health staff assigned to MHAs attended the required training. For custody staff, all correctional administrators and captains attended the training, 25 of 29 or 86 percent of lieutenants, and 79 of 81 or 98 percent of sergeants attended the required training.

<u>Use of Force</u>:

CHCF reported 55 immediate use of force incidents and ten controlled use of force incidents. Of the 55 immediate uses of force, 47 or 85 percent involved MHSDS patients while nine of the ten controlled uses of force involved MHSDS patients.

Two controlled use of force incident reports involving MHSDS patients were reviewed. The two incidents involved the use of physical force and pepper spray. In both instances, de-escalation techniques were used by CHCF staff. Decontamination procedures for both patients and the premises were documented. Additionally, all policy requirements for each controlled use of force incident were met, including appropriate cool down periods, mental health clinician intervention, video footage of the incident, multiple attempts to gain compliance with vocal orders, and nursing review for exposure to chemical agents.

Six immediate use of force incident reports involving MHSDS patients were reviewed. Each of the incidents involved fighting between two patients and chemical agent were utilized to quell the incidents after verbal commands were given.

All custody staff and 95 percent of mental health and nursing staff at CHCF reported completion of the mandatory annual use of force training.

<u>Lockdowns/Modified Programming</u>:

CHCF reported one Modified Program incident during the review period that occurred on August 15, 2024, through August 19, 2024, in Facility E. The Program Status Report (PSR) indicated that the incident occurred following the discovery of dangerous contraband including manufactured weapons, controlled substances and damaged chain link fencing. The PSR indicated that only priority ducats were authorized.

<u>Access to Care</u>:

A review of CHCF's monthly Health Care Access Quality Reports from July 1, 2024, to December 31, 2024, reflected the issuance of 95,040 mental health ducats and add-on appointments, of which 34,924 or 37 percent were completed and 60,142 or 63 percent were not completed. Of the non-completed appointments, none were reportedly not completed due to

custody factors, 14 percent were due to non-custody factors, and 86 percent were due to patient refusals. Fifty-four (54) percent of all issued mental health ducats were patient refusals.

According to both custody and mental health leadership who had interviewed patients, the high refusal rate is due to the institution having several options for programs and groups and patients can afford to be selective in what they attend.

*Coleman* Postings:

There were current *Coleman* posters in English and Spanish posted in accessible areas in all toured housing units.

**APPENDIX A-4**
**CALIFORNIA INSTITUTION FOR MEN (CIM)**
Site Visit: June 10, 2025 – June 13, 2025
Review Period: November 1, 2025 – April 30, 2024

Census:

On June 6, 2025, CIM housed 2,260 incarcerated persons, which was a four percent decrease from the previous review period. *See* Thirtieth Round Monitoring Report – Part D, ECF No. 8359 at 124. The MHSDS population of 937 represented 41 percent of CIM's total population and had increased by 13 percent since the Thirtieth Round. *Id.*

The GP RHU housed five EOP and 16 3CMS patients awaiting transfer.

The MHCB housed 24 patients.

There were 150 mainline EOP patients, a decrease of 11 patients since the Thirty-First Round Focused Monitoring Report on Newly Activated EOP Programs. *See* ECF No. 8654 at 95. There were also 740 mainline 3CMS patients, which represented a five percent decrease compared to Thirtieth Monitoring Round. *See* ECF No. 8359 at 124.

There were two patients housed in the OHU.

Staffing:

Although the chief psychiatrist position was filled for five of six months of the review period, on May 21, 2025, the chief psychiatrist position was vacant. Four of seven psychiatry positions were filled for a 43 percent vacancy rate. Contractors filled 2.66 positions resulting in a functional vacancy rate of five percent. Two of three telepsychiatry positions were filled for a 33 percent vacancy rate. Inclusive of both on-site and telepsychiatry positions, the overall staff psychiatry functional vacancy rate was 13 percent.

Both chief psychologist positions were filled. Two of 2.5 senior psychologist positions were filled for a 20 percent vacancy rate. Three of four senior psychologist specialist positions

were filled for a 25 percent vacancy rate. Of 22.5 psychologist positions, 16 were filled for a 29 percent vacancy rate. Two psychologists were unlicensed.

The supervising social worker position was filled. Seven of ten social worker positions were filled for a 30 percent vacancy rate and two social workers were on long term leaves resulting in a 50 percent functional vacancy rate. All social workers were licensed.

Inclusive of staff psychologists and clinical social workers, the overall functional vacancy rate for primary clinicians was 35 percent.

Nine of 10.5 recreational therapist positions were filled for a 14 percent vacancy rate. The use of 3.94 contactors eliminated the vacancy rate.

Two of three medical assistant positions assigned to telepsychiatry were filled for a 33 percent vacancy rate.

Fifteen of 16 supervising RN positions were filled for a six percent vacancy rate. Of 71.21 RN positions, 64.21 RN positions were filled for a ten percent vacancy rate and two RNs were on long term leaves resulting in a 13 percent functional vacancy rate.

Of 21.2 CNA positions, 10.6 were filled for a 50 percent vacancy rate.

All 44 LVN positions were filled.

Both senior psych tech positions were filled. Thirty of 33.3 psych tech positions were filled for a ten percent vacancy rate.

Of 13.5 MHSDS clerical positions, 12.5 positions were filled for a seven percent vacancy rate.

One of two HPS I positions were filled for a 50 percent vacancy rate. The HPS II position was vacant. The OSS II position was filled. The AGPA position was filled.

Four of eight psychology interns and student assistant recreation therapist positions were filled for a 50 percent vacancy rate.

For custody staff, 765 of 795.6 positions were filled for a four percent vacancy rate. The warden position and the chief deputy warden position were filled by officers acting out of class. All six associate warden positions, four of five captain positions, 23 of 24.6 lieutenant positions, 77 of 78.6 sergeant positions, 18 of 19 CC I positions, and all eight CC II positions were filled. Regarding correctional officers, 627 of 652.4 positions were filled.

Tele-Mental Health:

Two telepsychiatrists provided services to 3CMS patients during the review period. There were no other allocated tele-mental health positions.

The senior psychologist specialists, MHSDS clerical staff, the AGPA, and the HPS I were allowed to telework one day per week.

Staff Recruitment:

Mental health leadership indicated that due to CIM's location, the institution did not have difficulty attracting potential hires. Furthermore, leadership reported that multiple interviews were recently held to fill vacancies, and additional positions would likely be filled within one to two months

Quality Management:

Despite limitations with quality management due to staffing issues, CIM had a robust quality management program, and routinely investigated under-performing metrics.

CIM did not have a Local Governing Body (LGB) during the review period.

The CEO served as chair of the QMC, which met monthly during the review period and attained quorums. Subcommittees reported on topics to the QMC for review. Regarding mental

health, minutes reflected discussion of relevant topics including compliance goal metrics and suicide prevention. The minutes were comprehensive in scope.

The MHPS met six times during the review period, with the chief of mental health serving as chair. Psychiatry was present for three meetings, with various positions including psychology leadership and an office technician as approved designees. Custody, nursing, psychology supervisors, and health information management routinely attended. Notes were comprehensive and documented the discussion of appropriate mental health issues. MHPS minutes also addressed underperforming metrics, EOP patients not receiving Program Guide required treatment, and issues with effective communication and suicide risk evaluations.

Chaired by the chief physician and surgeon, the EMRRC met monthly during the review period. A quorum was met for each meeting. The EMRRC followed the standard statewide template. The notes were comprehensive and addressed several areas of importance to mental health, including suicide attempts, treatment of opiate overdoses, and emergency transports to outside hospitals.

CIM also had an innovative standing monthly meeting which addressed under-performing medication management metrics. Attendees included mental health and nursing staff who performed in-depth analyses on cases that led to actionable items including determining why information was not populating into the registry.

<u>Medication Management</u>:

<u>MAPIP</u>

Statewide MAPIP monitored compliance with both diagnostic monitoring and medication administration. Diagnostic monitoring included obtaining medication consents, as well as any physical examination, vital signs, or laboratory tests needed for safer use medication use.

Medication administration monitored compliance with the availability, continuity, and actual administration of medications. CIM provided MAPIP results for November 1, 2024 through April 30, 2025 regarding compliance for psychiatric diagnostic monitoring and medication management. The compliance threshold for all metrics was 90 percent.

Diagnostic Monitoring

MAPIP antidepressant monitoring tracked four metrics, but CIM did not require EKGs for patients taking tricyclic antidepressants (EKG) during the review period. The remaining metrics included: medication consents (Consent); thyroid function tests (TFTs); and obtaining blood pressure for patients taking venlafaxine (venla BP). CIM was fully compliant with monitoring blood pressure for patients prescribed venlafaxine, and was partially compliant with obtaining medication consents and monitoring thyroid function. Of the total 18 required metric-months, 12, or 67 percent, were compliant.




Diagnostic monitoring for patients prescribed atypical antipsychotics required 11 metrics, including: AIMS; blood pressure; glucose; complete blood count (CBC); comprehensive metabolic panel (CMP); EKG; height (Ht); lipids; medication consents; thyroid function tests;

and weight (Wt). CIM was fully compliant for monitoring blood pressure, EKG, height, and weight, and fully non-compliant with thyroid function tests. The remaining metrics were partially compliant during the review period.




Of the 62 metric-months for which data was required, CIM reached compliance for 38, or 61 percent.

The lack of a chief or senior psychiatrist limited CIM being a designated authorized clozapine institution; however, they reported metrics for two clozapine measures, namely two months each of AIMS and TFT. The institution was compliant for all months.

Carbamazepine and Depakote are mood-stabilizing medications requiring four metrics: CBC; CMP; therapeutic medication level; and obtaining medication consents.

For carbamazepine, CIM was fully compliant for all required metric-months.




For Depakote, CIM was fully non-compliant with monitoring therapeutic medication levels, and partially compliant with other metrics.




Of the 24 required metric-months, CIM was compliant with seven, or 29 percent.

The mood stabilizer lamotrigine required one measure, namely obtaining medication consents. CIM was fully compliant for all five required metric-months.

The mood stabilizer lithium required monitoring kidney and thyroid functions, therapeutic medication levels, EKGs, and obtaining medication consents. CIM was fully

compliant with obtaining medication consents and monitoring thyroid function tests, and partially compliant with the remaining metrics.




CIM required 27 metric-months of data for lithium monitoring. Of these, the institution was compliant with 22 or 81 percent.

Overall, CIM required 146 metric-months of diagnostic monitoring data, of which 94 or 64 percent were compliant.

Medication Administration

Medication administration metrics monitored essential aspects such as medication availability, continuity, preparation, and administration. CIM had twelve required measures during the review period.

Monitoring medication continuity included the following six measures, followed by the abbreviations used in the graphs in parentheses: transfers from other institutions arriving at receiving and release (R&R); intra-institutional transfers to non-RHU locations (Intra); MHCB transfers (MHCB); intra-institutional transfers to restricted housing (RHU); discharge from a

community hospital or DSH (Outside Hospital); and upon parole or transfer to the community (Release).

MAPIP measures tracked compliance with the administration of medications given at *HS* (*hora somni*, or bedtime) which must be given on or after 8:00 P.M. (*HS*), and medications given in the A.M. and P.M. which must be given at least eight hours between doses (A.M./P.M.). Additionally, metrics evaluated whether chronic psychiatric medications were continued without interruption (Chronic), and whether new medications were administered as ordered, and in compliance with required timelines (New).

Finally, two MAPIP measures surrounded PC 2602 involuntary medication orders. These include whether a court order was in the medical record (Court Order), and whether a medication order for the PC 2602 medication was present (Med Order).

The institution was fully compliant with: intra-institutional transfers to non-RHU locations; intra-institutional transfers to restricted housing; parole or transfer to the community; *HS* medications; A.M./P.M. medications; chronic psychiatric medications; new medications; and the presence of a PC 2602 medication order in the chart. The remaining required metrics were all partially compliant.




These twelve measures resulted in 72 metric-months of data. Of these, 67, or 93 percent were compliant.

PC 2602

CIM reported five initial emergent and three initial non-emergent PC 2602 petitions, and three renewal petitions; none were denied or withdrawn. There was one reported use of force to administer PC 2602 medication. There were ten patients receiving PC 2602 medications at the time of the monitoring tour. No barriers were identified in the PC 2602 process, with the institution reporting that the process ran well. Hearings were held virtually.

HS Medications

CIM was overall compliant with the directive to administer medications at HS after 8 P.M.

Non-Formulary

CIM reported an average of 4.7 percent non-formulary medication during the review period.

Polypharmacy Reviews

With rare exception, CIM was compliant with conducting required polypharmacy reviews for patients on multiple medications which may contribute to increased medical risks.

Medication Lines

CIM audited all medication lines across second and third watch. The institution reported that all medication lines were compliant with the requirements of individual wait times under 30 minutes. Facilities B and C were compliant with the requirement of total medication line duration under two hours. Facility A consistently struggled with going over the two-hour mark. Nursing reported the reasons for this were increased volume of patients, issues with release from the housing units, and the need to halt yard movement.

The monitor's expert observed medication line on Facility A, which was quite busy, but ran smoothly. Patients had short wait times and were protected from the sun while waiting in line. Nursing staff on Facility C reported the lack of medication distribution within the EOP housing unit was a barrier to medication adherence. There were no issues with waiting areas during inclement weather. One tarp on Facility C was pending replacement by CIM.

While EOP patients were provided morning medications without GP/3CMS patients on the yard, this was not the case for the other medication distribution times.

Transfers:

During the review period, there were 485 instances of 243 patients who were considered for but not referred to a higher level of care. Quality of higher level of care documentation was problematic and may have contributed to the lack of referrals to higher levels of care.

Sustainable process reviews were required to audit higher level of care consideration documentation for quality and to measure the inter-rater reliability between the headquarters' reviewer and the institution's inpatient care coordinator. There was a major sustainable process

review in November 2024 which indicated that of the 49 randomly selected cases for review, a headquarters reviewer found that 31 or 63 percent were unacceptable, with 20 cases found unacceptable due to insufficient narrative supporting non-referral, nine cases due to not addressing the indicator specific issue, and two cases due to insufficient documentation of treatment interventions. Documentation indicated that since sustainable process quarterly reviews began at CIM in 2024 and through the November 2024 review, the number of acceptable cases has not been greater than 47 percent.

A minor sustainable process review occurred in March 2025 as well. Twenty-four non-referral cases were selected for review for quality of documentation. The headquarters reviewer identified 15 or 63 percent as unacceptable while the inpatient coordinator found that 29 percent of the cases were unacceptable. Of the 15 cases that the headquarters reviewer found unacceptable, seven cases were due to an insufficient narrative supporting non-referral, three were due to the clinician not addressing the indicator specific issue (i.e., missed considerations), three were due to insufficient documentation of treatment interventions, and two were due to an indicator being incorrectly marked positive.

The monitor’s expert reviewed ten cases to assess appropriateness of nonreferral to higher level of care. While the monitor’s expert agreed with the decision to not refer in all cases, documentation was adequate in only four, or 40 percent, of cases.

At the time of the monitoring tour, there were four patients awaiting transfer to higher levels of care, including three patients referred to acute care and one patient referred to intermediate care.

During the review period, CIM referred 47 patients to acute care; 46 were accepted and one patient paroled. Forty-five of 46 patients timely transferred within ten days; one patient’s

transfer was delayed due to a medical hold. All referral packets were completed within two working days of identification.

CIM referred 29 patients to intermediate care; 26 referrals were accepted, one was rescinded, two were rejected. All 26 patients timely transferred within 30 days. All referral packets were reportedly completed within five working days of identification.

No patients with complex medical needs were transferred to inpatient care.

CIM made 51 MHCB referrals, of which 27 or 53 percent were rescinded. Of the 24 MHCB admissions, one patient was delayed due to a medical hold.

There were 148 instances among 142 patients transferring to a 3CMS RHU during the review period. Of the 148 instances, 117 or 79 percent transferred within 30 days of identification as required.

Forty-one EOP patients were referred to an EOP RHU; 28 or 68 percent were timely transferred, and five patients paroled. Reasons for delays included unavailable bed space and one patient being out to court.

During the review period, 40 patients had their level of care reduced from EOP to 3CMS.

Ten patients were transferred to an MSF during the review period.

The monitor’s expert’s review of patient records indicted a need for improvement in continuity of care following patient discharge. Six patients who returned to CIM from inpatient care from December 2024 through May 2025 were reviewed. One patient was immediately admitted to an MHCB the day after transfer, leaving five records for review. Three of the five patients did not receive a clinician-to-clinician contact and three did not receive a primary clinician initial assessment or initial IDTT. When initial assessments were completed, few providers integrated inpatient discharge documentation in initial assessments or treatment

planning. Four of the five patients returned to inpatient care within two months of placement into outpatient settings.

Programming:

Due to understaffing and the newly implemented EOP program that redirected staffing assignments to higher levels of care, including EOP and MHCB, the institution operated under a triage plan. The plan prioritized treatment by level of care with MHCB and crisis referrals taking priority, followed by EOP and 3CMS patients. The institution indicated that the low staffing levels were supplemented with registry staff when possible, but the institution reported difficulties with providing Program Guide-compliant care at times.

MHSDS Patients in Restricted Housing:

The institution did not operate an EOP or 3CMS RHU during the review period. All patients admitted to restricted housing were held in the general population (GP) RHU awaiting transfer during the review period.

The RHU Policy requires that patients at an EOP or 3CMS level of care be transferred to an EOP or 3CMS RHU within 30 calendar days from the date of initial placement in RHU or within 30 calendar days in which the patient was made EOP or 3CMS. *See* Cal. Code of Regs., tit. 15 §§ 3335.2 and 3335.3; *see also* Restricted Housing Unit Program: Mental Health Services Policy, dated July 19, 2024 and effective August 1, 2024 (hereinafter "RHU Policy"); 2021 Program Guide Update, ECF No. 7333-1 at 19. During the review period, there were 41 EOP patients housed in the GP RHU, of which 28 or 68 percent timely transferred within 30 calendar days. For the 148 instances of 142 3CMS patients housed in the GP RHU, 117 of 148 or 79 percent of transfers occurred within 30 calendar days as required.

The 2009 staffing plan requires that primary clinicians who treat MHSDS patients in a GP RHU must maintain a caseload of no more than 256 patients per clinician. *See* ECF No. 3693 at 26. There is no caseload requirement for psychiatrists in a GP RHU. While patients were awaiting transfer, there were two primary clinicians and one psychiatrist assigned to the GP RHU for two days per week. These clinicians did not carry caseloads due to the high patient turnover.

*Structured Treatment*

There were no structured treatment requirements for patients awaiting transfer from a GP RHU to an EOP or 3CMS RHU.

*IDTTs*

Four IDTT meetings were observed during the site visit. All required disciplines were present, but there were alternate primary clinicians participating. The assigned psychiatrist and psychiatric technician were present, but the correctional counselor was not the assigned counselor. Three of the observed IDTTs were for EOP patients, two of which were initial IDTTs, and one was a routine IDTT. The patient seen for a routine IDTT had been in the RHU since April 2025. The CC I noted that the patient was endorsed to KVSP's EOP mainline program once his minimum eligible release date (MERD) from his disciplinary term expired. Notably, the patient was not endorsed to an EOP RHU as required by the RHU Policy.

The correctional counselor participated spontaneously during the IDTT meeting and provided substantive input to the patients. The psychiatrist was also very responsive to the patients concerns and reported symptoms. However, the IDTT meetings overall were not sufficiently collaborative nor were participating staff knowledgeable about the patients. Discussion of treatment goals and interventions from each discipline were lacking as well. The

treatment team also did not engage in adequate discussions regarding consideration of referrals to higher levels of care, treatment progress and goals, or treatment interventions including the function of group therapy.

*Group Treatment*

Because the institution experienced difficulties in transferring patients to the appropriate RHU settings, CIM began providing some group therapy opportunities to patients. However, group treatment space was a significant issue. There was one room used for group treatment, but its capacity was four patients. No treatment groups were observed during the site visit due to lack of attendance. However, the recreation therapist indicated that it was rare to only have one patient and noted that other groups had at least two participants that morning. Patients indicated that they did not find the group treatment helpful although they reported that they would sometimes attend just to get out of their cells.

*Individual Treatment*

A review of the RHU weekly activity report for 38 patients housed in the GP RHU for one full week from January 20, 2025 through January 26, 2025 indicated that all 38 patients were offered at least 20 hours of out-of-cell time, showers every other day, and one phone call per week. Compliance above 95 percent was also reported for the weeks of February 10, 2025, March 3, 2025, and April 21, 2025.

Four ICC meetings were observed during the site visit concerning one EOP patient and three 3CMS patients. Two patients were placed in the GP RHU due to enemy concerns; one patient was retained pending transfer, and one patient was retained pending investigation. None of the patients were eligible for NDRH status.

MHSDS patients awaiting transfer in the GP RHU received crank radios and ear buds upon arrival. Once the patient was seen by ICC and retained in RHU, the patient would be issued their personal property within a week. However, for patients transferring from CRC, a close-by institution that did not have an RHU, property issuance took several weeks.

Non-Disciplinary Segregation:

During the review period there were seven instances of six MHSDS patients identified as NDS. Three patients were approved for expedited transfer within 72 hours, however none of the three patients were transferred out of RHU timely. The transfer timelines were six days, 11 days and 15 days respectfully.

While on site, the RHU staff provided a list of two patients designated as NDS, one as of April 17, 2025, and the other as of May 22, 2025. The list did not indicate the dates in which the patients were provided their property.

MHCB:

CIM operated a 34-bed MHCB during the review period with an average daily census of 28 patients. The average monthly census included 28 patients in November 2024, 30 patients in December 2024, 28 patients in both January 2025 and February 2025, 24 patients in March 2025, and 27 patients in April 2025.

MHCB clinical lengths of stay averaged 8.6 days, with 12 percent of patients having clinical stays exceeding ten days. Physical stays averaged 10.6 days; approximately 30 percent of patients had physical stays that were longer than ten days. Discharge delays were typically due to impairment/dysfunction, safety concerns, and medical holds. Ten MHCB patients were admitted to the MHCB three or more times.

The 2009 staffing plan requires that psychiatrists who treat MHCB patients maintain a caseload of no more than 10 patients per psychiatrist, while primary clinicians who treat MHCB patients must maintain a caseload of no more than 10 patients per 1.18 full-time equivalent staff psychologists and no more than 50 patients per LCSW. *See* ECF No. 3693 at 22. There were three psychiatrists, six psychologists, two psychologist intern, and a clinical social worker that treated MHCB patients. Two of three psychiatrists maintained caseloads within required ratios while all six psychologists and two psychologist interns also maintained caseloads within required ratios. The clinical social worker floated coverage with the EOP program and did not carry an MHCB caseload.

*IDTTs*

Four routine MHCB IDTTs were observed during the site visit. All required staff were in attendance and participated appropriately. One treatment plan involved referral to acute inpatient care. Another treatment plan involved referral to mainline EOP. The IDTTs involved minimal discussion regarding therapy issues that may contribute to the higher level of care recommendations. The IDTT process was adequate, however the quality of the IDTTs had much room for improvement.

Thirty randomly selected MHCB patients required initial IDTTs, all of which occurred within 72 hours of arrival. In addition, 15 or 50 percent of initial IDTTs had the required staff in attendance. Notably, the registered nurse was absent for 15 initial IDTTs. Patients attended 24 or 80 percent of initial IDTTs. Reasons initial IDTTs were held in absentia included patient refusals.

Twenty-eight randomly selected MHCB patients required routine IDTTs. There were 29 expected routine IDTTs. Of those, 28 or 97 percent occurred timely, or every seven calendar

days following the initial IDTT. Patients attended 25 or 86 percent of routine IDTTs. Required staff attended 15 or 52 percent of routine IDTTs. Notably, the registered nurse was absent for 14 routine IDTTs. Reasons routine IDTTs were held in absentia included patient refusals.

Recreational therapists provided group therapy for MHCB patients at least twice per week.

Individual Treatment

Records of 30 randomly selected MHCB patients were reviewed to assess compliance with Program Guide timeframes for initial psychiatry evaluations. Of those, 29 or 97 percent had a timely initial psychiatry evaluation meaning it occurred before the initial IDTT and within 24 hours of arrival. Thirteen or 43 percent of initial psychiatry evaluations occurred in a confidential setting. Reasons for non-confidentiality included patient refusals, modified programming, and unavailable custody escorts. Telepsychiatry was not utilized for initial psychiatry contacts.

Records of 29 randomly selected MHCB patients were reviewed to assess compliance with Program Guide requirements for twice weekly routine psychiatry contacts. There were 60 expected timeframes, all of which occurred timely. Of the 60 reviewed routine contacts, 37 or 62 percent occurred in a confidential setting. Reasons for non-confidentiality included patient refusals and modified programming. Telepsychiatry was not utilized for routine psychiatry contacts.

Records of 30 randomly selected MHCB patients were reviewed to assess compliance with Program Guide timeframes for initial primary clinician evaluations. All 30 patients received initial primary clinician evaluations within 24 hours of arrival as required. Of the 30 initial primary clinician contacts reviewed, 14 or 47 percent were held in a confidential setting. Reasons reported for non-confidentiality included patient refusals and modified programming.

Records of 30 randomly selected MHCB patients were reviewed to assess compliance with Program Guide requirements for daily contact with a primary clinician or psychiatrist. An institution is considered compliant if a patient was seen daily beginning the day after admission for an out-of-cell confidential contact (unless the patient refused) by the psychiatrist or psychologist, though on weekends the patient may be seen by the medical officer of the day (MOD). ECF No. 7333-1 at 83-84 (PG 12-5-12). There were 143 expected timeframes, 85 or 59 percent were timely. Of the 143 reviewed contacts, 97 or 68 percent were conducted confidentially. Reasons for non-confidentiality included patient refusals, unavailable custody escorts, and modified programming.

MHCB patients were offered outdoor recreation daily for two hours in a group yard setting adjacent to the MHCB unless they were maximum security patients, who were transported to walk-a-alone yards. Showers were offered three times per week and telephone calls every other day.

Seclusion and Restraint:

One patient was restrained during the review period for about six hours. There was an additional incident of either seclusion or restraint, however the documentation was not specific. This incident lasted for three hours and 41 minutes.

Each MHCB patient was reviewed during the monitoring tour for the required restraint review chrono and found each patient had a current restraint review document posted on the room door. Each document was signed by a sergeant and clearly indicated if restraints were required. MHCB officers indicated that they were aware of the restraint policy for MHCB patients and that restraints could be placed on a patient based on the patient’s current presentation or at a provider’s request.

EOP:

On February 12, 2024, 150 Level II EOP beds were activated on Facility C in the Alpine building. *See* ECF No. 8654 at 31. By July 9, 2024, the number of beds increased to 200 and CIM's population included 161 mainline EOP patients. *See id*. at 95. As of June 6, 2025, there were 150 mainline EOP patients at CIM.

The 2009 staffing plan requires that psychiatrists who treat mainline EOP patients maintain a caseload of no more than 120 patients per psychiatrist, while primary clinicians who treat mainline EOP patients must maintain a caseload of no more than 26 patients per clinician. *See* ECF No. 3693 at 17. All available on-site psychiatrists and telepsychiatrists treated EOP patients during the review period according to the institution's triage plan prioritization structure. However, no psychiatrist or telepsychiatrist carried a specific EOP patient caseload. For primary clinicians, three psychologists, one psychologist intern, and two clinical social workers treated the EOP population. Two of three psychologists carried caseloads of 27 and 31 patients, which exceeded established ratios, while one psychologist and the psychologist intern carried compliant caseloads of 17 and four patients, respectively. The two clinical social workers carried caseloads of 24 and 29 patients, respectively. Both were licensed.

*Structured Treatment*

The Program Guide required that each EOP patient be offered at least ten hours per week of structured therapeutic activities. *See* ECF No. 7333-1 at 58. For patients who were determined by the treatment team to be clinically contraindicated for ten hours of treatment activities per week, the primary clinician is required to present the case and recommended treatment program (i.e., EOP modified programming) to the IDTT for approval. If the patient's modified treatment program included a schedule of less than ten hours of treatment per week, the

patient's IDTT was required to meet monthly to review and increase the amount of structured therapeutic activities or refer the patient to a higher level of care as clinically indicated. *Id*.

Excluding patients on EOP modified programming, between October 28, 2024, and April 30, 2025, patients on average were scheduled for 9.9 hours, offered 7.2 hours, attended 4.5 hours; and refused 2.7 hours of structured treatment per week. An additional average of 2.9 hours were cancelled per week. Cancelled treatment was attributed to modified programming.

For patients on EOP modified programming between October 28, 2024, and April 30, 2025, patients were scheduled for an average of 9.6 hours, offered 6.5 hours, attended 2.1 hours, and refused 4.4 hours of treatment per week. An additional average of 3.6 hours were cancelled per week. At the time of the site visit, there were three patients on EOP modified programming.

*IDTTs*

Four routine IDTTs were observed during the site visit with required staff in attendance, though an assigned psychiatrist and assigned psychologist were not present for two IDTTs, respectively. Concerns that were identified during the focused monitoring tour regarding the IDTT meeting room were still persistent during the current site visit. *See generally* ECF No. 8654 at 102-103. Specifically, the metal plates that were placed in the door jams to prevent the treatment room door from automatically locking were preventing the door from fully closing, which compromised confidentiality of the IDTT meeting. *Id*. Though staff reported that they could not hear the meetings taking place, the room was not fully confidential. Additionally, previously identified hallway noise continued to occur and disrupt the meetings. *Id*. at 102.

Nonetheless, the observed IDTTs were collaborative with all participants actively engaged and focused on patient care. Discussion included the patient's current symptoms, diagnosis, treatment progress, treatment goals and programming. Overall, IDTTs were adequate

with a need for improvement with discussion of treatment interventions (excluding medications), and level of care rationales. Staff reported that patients were assigned to various clinical tracks (depression, anxiety, trauma) for group programming although there was minimal discussion regarding group assignment rationale.

The Program Guide requires that EOP patients receive an initial IDTT within 14 calendar days of arrival to the institution and a routine IDTT every 90 days thereafter. *See* ECF No. 7333-1 at 57, 59.

Thirty patients who required initial IDTTs had their health care records reviewed to determine compliance with Program Guide timeframes. None of the 30 reviewed initial IDTTs occurred within 14 calendar days of arrival or level of care change. Required staff attended 20 or 67 percent and patients attended 12 or 40 percent. Reasons initial IDTTs were held *in absentia* included patient refusals and no explanation given.

For the 250 patients in CDCR's appointments report, there were 392 completed and refused routine IDTTs. When a patient had either a completed or refused initial IDTT and a routine IDTT or more than one routine IDTT, timeliness in accordance with Program Guide requirements was able to be calculated. Of the 390 IDTTs that were completed, 143 were for individuals who had at least two IDTTs. Of those, 49 or 34 percent were not compliant with Program Guide timeframes. Of note, the report did not include individuals that did not have a completed IDTT, such as those that were not scheduled.

*Group Treatment*

The majority of mental health groups were recreational in nature. Clinical groups included mood management, coping skills, introduction to EOP, self-help, dialectical behavior therapy (DBT) and stress management.

A recreation therapist group, two clinical groups and an NLTG were observed during the site visit; all four groups were adequate. Overall, participants were attentive with some more actively engaged than others. The recreation therapist group was excellent and comparable to a clinical group. The NLTG read information from a handout on emotional resilience and while the process needed improvement, useful information was imparted. A caseload group utilized a handout to provide education on coping skills for anger. Of note the clinician was not the assigned provider for some patients. A DBT group utilized reading material to facilitate active discussion on distress tolerance skills.

Even though patients resided in the unit where groups were held, observed groups started approximately 15 to 20 minutes late. Patients attributed this to delays in being released from their cells.

At the time of the site visit, six EOP groups (substance use, anger management, family and other relationships, self-discovery and values) were co-led by a clinician and a 3CMS peer. The peer had no history of EOP participation. These concerns were raised with institutional leadership during the site visit.

Since the previous site visit, group treatment space was no longer readily accessible for unsupervised patients to socialize or use drugs in when groups were not scheduled. *See* ECF No. 8654 at 111.

Sixteen patients were interviewed after four observed groups. Overall, patients were satisfied with their mental health care and reported good access to their mental health provider.

Patients requested more clinically focused groups; a goal of the mental health department once fully staffed.

*Individual Treatment*

The Program Guide requires that patients are offered an initial psychiatrist evaluation before their initial IDTT and within 14 calendar days of arrival to the institution or level of care change. *See* ECF No. 7333-1 at 57. Thereafter they are required to receive a routine psychiatric contact every 30 calendar days. *Id*. at 59. Patients are also required to receive a primary clinician evaluation within 14 calendar days of arrival and weekly (i.e. once per calendar week with no more than ten calendar days between contacts) with either a primary clinician or in group psychotherapy with an individual contact every other week. *Id*. at 57, 59.

Thirty patients were randomly selected to have their health care records reviewed for compliance with timely initial psychiatry and primary clinician contacts during the review period. All 30 patients required initial psychiatry evaluations; seven or 23 percent timely occurred before the initial IDTT. Twenty or 67 percent of the reviewed initial psychiatry evaluations were conducted in confidential settings; the non-confidential contacts were due to patient refusals. Telepsychiatry was utilized for two initial psychiatry evaluations.

For the 225 patients in CDCR's appointments report covering patients who received at least one routine psychiatry contact during the review period, there were 814 total completed and refused contacts. Of the 673 that were completed, 661 or 98 percent were reported as being conducted in a confidential setting. When a patient had more than one completed contact, compliance with Program Guide timeframes was able to be calculated. Of the 661 completed contacts, 590 were for individuals who were seen at least twice by a psychiatric provider. Of those 590 contacts, 104 or 18 percent of contacts were completed beyond the Program Guide

required timeframes. Of note, the report did not include individuals that did not have complete contacts, such as those that were not scheduled in accordance with the institution's triage plan.

All 30 patients who required initial psychiatry evaluations also required initial primary clinician evaluations. Of the 30 reviewed initial primary clinician evaluations, 13 or 43 percent were completed within 14 calendar days of arrival or change in level of care. Seventeen or 57 percent were conducted in a confidential setting; non-confidential contacts were due to patient refusals and custody modified programming. Tele-mental health was not utilized for initial primary clinician evaluations.

For the 214 patients in CDCR's appointments report covering patients who received at least one routine primary clinician contact during the review period, there were 1,704 total completed and refused contacts. Of the 1,703 that were completed, 1,213 or 71 percent were reported as being conducted in a confidential setting. When a patient had more than one completed contact, compliance with Program Guide timeframes was able to be calculated. Of the 1,703 completed contacts, 1,491 were for individuals who were seen at least twice by a primary clinician provider. Of those 1,491 contacts, 112 or eight percent of contacts were completed beyond the Program Guide required timeframes. Of note, the report did not include individuals that did not have completed contacts, such as those that were not scheduled in accordance with the institution's triage plan.

Of the 1,703 completed routine primary clinician contacts, 21 contacts were reported to have been completed in zero minutes, 634 were completed within 15 minutes, 353 lasted between 16 and 30 minutes, 670 lasted between 31 and 60 minutes, 18 lasted between 61 and 95 minutes, and seven were completed in greater than 95 minutes.

During the site visit, mental health leadership reported that they were in the initial stages of implementing the Alpine Leadership Program which was modeled after a similar program in RJD's EOP program. The goal was to select high functioning EOP patients to provide support to EOP peers in the housing unit. Prior to implementation, selected EOP patients would receive leadership training.

During the review period, Facility C housed EOP, 3CMS, and non-MHSDS patients. Although EOP patients were housed in a separate unit with only EOP patients, there were multiple instances where EOP patients interacted with 3CMS and non-MHSDS patients, in violation of Program Guide requirements. *See generally* ECF No. 7331-1 at 51 (PG 12-4-1). Specifically, EOP and non-EOP patients attended yard together which created tension among the incarcerated population. Staff reported that EOP patients had access to drugs more easily resulting in patient relapse. Staff reported that patients were routinely given a welcome package of drugs upon arrival to the yard to secure drug debts. Patients reported that they were perceived as troublemakers whenever the yard went down due to an incident. This created tension between the EOP, 3CMS, and general populations.

The institution did not have a step-down program during the review period.

Treatment space included seven usable clinician offices for primary clinician contacts. When office space was unavailable, clinicians would utilize group rooms, however this would often disrupt group treatment schedules or reduce the amount of groups offered to patients on a given day.

There were also concerns of patients incessantly knocking on treatment room doors and entering clinician offices without permission. This was extremely disruptive to individual patient treatment and presented a substantial safety risk to staff. These behaviors persisted despite

signage indicating that treatment was in session and out-of-bounds warnings painted on the ground.

3CMS:

CIM housed 3CMS patients on Facilities A, B, and C during the review period. There were 740 mainline 3CMS patients at the time of the site visit. the institution was unable to indicate the total or average 3CMS patient census during the review period.

The staff-to-patient ratios from the 2009 Staffing Plan and 2021 adjustments to the 2009 staffing plan required that staff psychiatrists who treat 3CMS patients maintain a caseload of 280 patients per psychiatrist if the patient was prescribed medications and 675 patients if the patient was not prescribed medications.[18] *See* ECF No. 3693 at 12 and 6978-1 at 3. Staff-to-patient ratios from the 2009 Staffing Plan required that primary clinicians who treat 3CMS patients maintain a caseload of 97 patients per clinician. *See* ECF No. 3693 at 12. Like the EOP program, all available on-site and telepsychiatrists treated 3CMS patients during the review period according to the triage plan. However, no psychiatrist or telepsychiatrist carried a 3CMS patient caseload. There were three psychologists and four clinical social workers who treated 3CMS patients during the review period. None of the three psychologists and two of four social workers carried caseloads between 125 and 161 patients which exceeded established ratios.

[18] The Program Guide requires that "[e]ach CCCMS inmate patient on psychiatric medication…be reevaluated by a psychiatrist a minimum of every 90 days regarding psychiatric medication issues." (Program Guide at 12-3-11). The 2009 Staffing Plan established a psychiatry staffing ratio for every 3CMS patient in the general population and did not distinguish between patients on medications and patients who were not. See ECF No. 3693 at 8. The Adjustments to the 2009 Staffing Plan, ECF No. 6978-1, which were approved by the Court on January 27, 2021 (See ECF No. 7035 at 2), established a new staffing ratio of 675 patients per psychiatrist for patients who are not on medications for six months or more. For the purpose of reporting compliance with staff-to-patient ratios, it was unclear whether the patient's included in each reported caseload were prescribed medications at the time of the site visit.

*IDTTs*

Two 3CMS IDTT meetings were observed on Facility A and three on Facility C during the site visit. The two IDTTs on Facility A were both adequate. Both patients attended, and the IDTTs contained all required staff including telepsychiatry. Discussions were collaborative and demonstrated in depth knowledge of each patient. All required treatment planning topics were thoroughly reviewed with multiple opportunities afforded to the patient for input.

While three IDTTs observed on Facility C displayed some positive aspects, all three were inadequate. The positive aspects included adequate staff and patient attendance, patient-centered discussions with good interdisciplinary collaboration, as well as consistent discussion of patient diagnosis and a complete review of current and past medications. The psychiatrist provided clinically meaningful input and was not simply relegated to medication management. However, the negative aspects included rare discussion of treatment goals or treatment planning, no case conceptualizations, and the primary clinician and CC I did not have computer access in the small room, which limited the ability to review patient records and other relevant custody information when patients had questions.

The individualized treatment plan for 3CMS patients must be completed within 14 working days of referral/arrival by the patient's primary clinician in consultation with the other IDTT members and annually thereafter. *See* ECF No. 7333-1 at 43-44. (PG 12-3-10)

Thirty patients who required initial IDTTs had their health care records reviewed to determine compliance with Program Guide timeframes. Of the 30 reviewed initial IDTTs, seven or 23 percent occurred within 14 calendar days or arrival or level of care change. Required staff attended 29 or 97 percent and patients attended 28 or 93 percent of cases. Reasons initial IDTTs were held *in absentia* were due to patient refusals.

For the 500 patients in CDCR's appointments report, there were 526 completed and refused routine IDTTs. When a patient had either a completed or refused initial IDTT and a routine IDTT or more than one routine IDTT, compliance with Program Guide timeframes was able to be calculated. Of the 525 IDTTs that were completed, 29 were for individuals who had at least two IDTTs. Of those, all were compliant with Program Guide timeframes. Of note, the report did not include individuals that did not have a completed IDTT, such as those that were not scheduled.

A random sample of 30 patients was selected to verify consistency between the appointments report and clinical documentation in EHRS. Of the 32 contacts reviewed, 31 or 97 percent were consistent with the appointments report.

*Group Treatment*

While not required by the Program Guide, CIM offered some group treatment for 3CMS patients during the review period. Most of these groups were NLTG, peer-led, or recreation therapy groups. The monitor's expert attended an innovative clinical group for veterans. The patients were active, engaged, and had clearly done research on the issues under discussion. The issues were more organizational such as creating programs within CIM, rather than clinically focused on mental health issues in the veteran population. One observed NLTG group discussed physical health issues and followed the statewide curriculum. The patients were actively engaged and appeared interested in the material.

*Individual Treatment*

The Program Guide requires that patients are offered an initial psychiatrist evaluation before their initial IDTT. *See* ECF No. 7333-1 at 34-50, 641. Thereafter they are required to

receive a routine psychiatric contact every 90 calendar days if the patient is prescribed a psychotropic medication. *Id*. at 44; *see also supra* p. _ n. _. Patients are also required to receive a primary clinician evaluation within ten working days of arrival and every 90 calendar days thereafter. *Id*. at 41, 48.

Thirty patients who required initial psychiatry evaluations had their health care records reviewed to determine compliance with Program Guide timeframes. All 30 patients required initial psychiatry evaluations; 15 or 50 percent timely occurred before the initial IDTT. Twenty-six or 87 percent of the reviewed initial psychiatry evaluations were conducted in confidential settings; the non-confidential contacts were due to patient refusals. Telepsychiatry was utilized for 21 or 70 percent of initial psychiatry evaluations.

For the 563 patients in CDCR's appointments report covering patients who received at least one routine psychiatry contact during the review period, there were 1,060 total completed and refused contacts. Of the 1,030 that were completed, 1,005 or 98 percent were reported as being conducted in a confidential setting. When a patient had more than one completed contact, compliance with Program Guide timeframes was able to be calculated. Of the 1,030 completed contacts, 499 were for individuals who were seen at least twice by a psychiatric provider. Of those 499 contacts, 486 or 97 percent of contacts were completed beyond the Program Guide required timeframes. Of note, the report did not include individuals that did not have complete contacts, such as those that were not scheduled in accordance with the institution's triage plan.

A random sample of 30 patients was selected to verify consistency between the appointments report and clinical documentation in EHRS. Of the 69 contacts reviewed, all were consistent with the appointments report.

All thirty patients who required initial psychiatry evaluations also required initial primary clinician evaluations during the review period. Of the 30 reviewed initial primary clinician evaluations, nine or 30 percent were completed within 10 calendar days of arrival or change in level of care. Two reviewed initial primary clinician evaluations were conducted in a confidential setting; non-confidential contacts were due to patient refusals.

For the 730 patients in CDCR's appointments report covering patients who received at least one routine primary clinician contact during the review period, there were 1,448 total completed and refused contacts. Of the 1,438 that were completed, 1,372 or 95 percent were reported as being conducted in a confidential setting. When a patient had more than one completed contact, compliance with Program Guide timeframes was able to be calculated. Of the 1,438 completed contacts, 723 were for individuals who were seen at least twice by a primary clinician provider. Of those 723 contacts, 123 or 17 percent of contacts were completed beyond the Program Guide required timeframes. Of note, the report did not include individuals that did not have completed contacts, such as those that were not scheduled in accordance with the institution's triage plan.

Of the 1,438 completed routine primary clinician contacts, six contacts were reported to have been completed in zero minutes, 242 were completed within 15 minutes, 383 lasted between 16 and 30 minutes, 615 lasted between 31 and 60 minutes, 141 lasted between 61 and 95 minutes, and 62 were completed in greater than 95 minutes.

A random sample of 30 patients was selected to verify consistency between the appointments report and clinical documentation in EHRS. Of the 66 contacts reviewed, 64 or 97 percent were consistent with the appointments report, while two dates in the appointments report did not have corresponding clinical documentation in EHRS.

3CMS patients reported being pleased with the mental health treatment that they received at CIM. Patients reported generally seeing their clinicians on-time and were aware of how to alert mental health staff if any concerns arose.

<u>Other Issues</u>:

<u>Pre-Release Planning</u>:

The CIM pre-release planning LOP was revised in April 2024.

The pre-release coordinator recently began the position approximately six weeks prior to the site visit. He was assisted by another LCSW, and one office tech who was designated to assist in the program. The pre-release coordinator indicated receiving training through headquarters within two weeks of starting the position. The pre-release coordinator did not have a caseload but completed PC 2602s.

CIM conducted weekly pre-release groups. Specifically, pre-release groups were held for two hours on Facility A and one hour each on Facilities B and C during the review period. On Facility A, there was a pre-release group for English speaking patients for one hour and a one-hour group for Spanish speaking patients.

Following feedback during the Thirtieth Round site visit concerning pre-release documentation and information tracking practices, CIM created a corrective action plan (CAP). *See* ECF No. 8359 at 141-142. As part of a CAP, CIM tracked the completion of face sheets, consents to release information, and contacts. Compliance with completion of face sheets increased from 47 percent to 93 percent. Completion rates for consents for release of information increased from 26 percent to 97 percent. Completion rates for contacts with patients for pre-release assessment purposes increased from 31 percent to 47 percent.

The process for completion of pre-release duties at CIM included the pre-release team running daily reports to track and monitor patients with impending release dates. The pre-release coordinator then completed the mental health pre-release preliminary information form in the medical record and initiated an order for the primary clinician to complete the pre-release planning assessment (PRPA). Release of information forms were initiated by the pre-release coordinator, but the primary clinician would obtain the patient's signature.

The pre-release coordinator reported good communication with TCMP staff and a good relationship with custody staff. The pre-release coordinator participated in weekly ISUDT pre-release calls and in headquarters' monthly pre-release meetings.

TCMP reported meeting with 51 EOP and 78 3CMS patients during the review period. One hundred percent of patients were screened for TCMP benefits and 123 or 95 percent of patients submitted applications. Applications for Medi-Cal were submitted for 121 or 94 percent of patients, while SSI applications were submitted on behalf of 55 or 43 percent of eligible patients, and VA applications were submitted for two patients.

<u>Program Access</u>:

a. <u>Job and Program Assignments</u>

CIM reported that its 990 job assignments were held by five EOP patients or three percent of the EOP population, 344 3CMS patients or 45 percent of the 3CMS population, and 641 non-MHSDS individuals or 46 percent of the non-MHSDS incarcerated population.

The 560 academic assignments were held by 29 EOP patients or 18 percent of the EOP population, 205 3CMS patients or 27 percent of the 3CMS population, and 326 non-MHSDS individuals or 23 percent of the non-MHSDS incarcerated population.

Of the 125 vocational education assignments, four EOP patients or three percent of the EOP population held these assignments, as did 39 3CMS patients or five percent of the 3CMS population, and 82 non-MHSDS patients or six percent of the non-MHSDS incarcerated population.

The 922 voluntary education assignments were held by 16 EOP patients or ten percent of the EOP population, 336 3CMS patients or 44 percent of the 3CMS population, and 570 non-MHSDS individuals or 41 percent of the non-MHSDS incarcerated population.

The 40 substance abuse treatment assignments were held by seven EOP patients or four percent of the EOP population, 14 3CMS patients or two percent of the 3CMS population, and 19 non-MHSDS individuals or one percent of the non-MHSDS incarcerated population.

b. Milestone Credits

CIM reported that 77 EOP and 12 3CMS patients earned milestone credits during the review period.

c. Out-of-Level Housing

CIM reported that 22 EOP and 71 3CMS custody Level II patients were in Level I housing. There were 13 EOP and 38 3CMS custody Level II patients in Level III housing.

d. ADA Reasonable Accommodations and Grievance Procedures

CIM provided an updated reference training manual for ADA accommodations as well as attendance sheets for training on accommodations and grievance procedures.

e. Periodic Classification Score Reductions: EOP Patients

CIM provided copies of CDCR Form 840s that indicated that it was providing periodic classification score reductions for EOP patients.

f. Unclothed Body Search

The monitor interviewed custody staff regarding the unclothed body search procedure. The staff were able to articulate the policy and knew when an unclothed body search was required. Staff identified multiple locations where unclothed body searches are conducted. All were adequately private and safe for staff and patients.

"C" Status:

The institution reported a total of 74 patients were placed on "C" status during the review period, including 20 or 27 percent who were in the MHSDS. The institution provided copies of 20 classification chronos for review. In four cases, the patient's level of care was not identified within the chrono and three were identified as EOP level of care and the remaining were 3CMS level of care. For the three EOP level of care patients, the classification chrono did not include a referral to IDTT as required by CDCR policy, 3044(f)(2)(K). In 17 cases, the reason for "C" status was program failure for receiving two or more RVRs within a 180 period of time.

All patients on "C" status remained in their same housing units and were not clustered during the review period.

There were noted discrepancies between the institution's "C" status LOP, the DOM, and Title 15 regulations with respect to patients' personal property. The LOP indicated that once a patient was placed on C status, the patient was required to turn entertainment appliances in for disposal. The department operations manual (DOM) and Title 15 required institutions to store the disallowed property at the institution pending removal from "C" status and also noted that this only applied to property that was received after the patient was placed into "C" status.

Case-by-Case Reviews:

CIM reported that six patients met the requirement for 120-day pre-minimum eligibility release date (MERD) reviews. All patients had timely ICCs. Three patients had their MERDs suspended and were released back to CIM mainline; close custody was continued for one of these patients. Two patients received 90-day extensions, and their maximum custody was continued; and one of these patients was referred to CSR for review. The remaining patient was retained pending RVR adjudication.

One patient met the requirement for 150-day reviews. The patient reportedly had timely ICCs. The patient was released prior to their associate director review.

Mental Health Referrals:

CIM reported an overall compliance rate of 80 percent for timely responding to mental health referrals during the review period. Neither psychiatry nor primary clinicians were compliant with timely responding to emergent, urgent, or routine mental health referrals during the review period. Notably, primary clinician routine referrals and urgent referrals were close to compliance at 88 and 84 percent, respectively.

The institution reported that mental health referrals were untimely due to errors stemming from providers incorrectly closing consults or multiple orders being created for the same patient contact.

Each reviewed housing unit was able to produce an MH-5 form and were able to articulate the process to get the form to mental health staff in a timely manner. All staff had submitted an MH-5 in the past and reported mental health staff followed up with the patient.

Custody and Mental Health Partnership Plan:

The institution LOP was current with a last revision date of January 2025. However, the LOP was deficient as it did not address second and third watch huddles in the EOP level of care housing unit.

Executive joint rounding occurred in each month of the review period and substantive information was included in the QMC and MHPS meeting minutes. Executive rounding was mentioned in the warden's meeting minutes but did not include any substantive details. In rounding forms, mental health staff reported concerns with substance abuse in the housing units and indicated having a good working relationship with custody staff. Patients indicated the need for more recreation therapy groups, climate-controlled housing, and reported poor water pressure in the showers. Patients also reported that mental health staff cared about them and were very helpful.

The institution was not completing daily huddles as required during the review period. Of the few reviewed huddle forms, mental health staff attendance was adequate however there was no custody staff indicated on the form. Topics included patients returning from higher levels of care, new patients to the unit, and relevant patient histories including when patients had more than three MHCB placements in the past four months.

Huddles on second and third shift were observed during the site visit. The huddles were attended by custody and multiple mental health staff. Discussion was facilitated by the EOP supervisor. While all content areas on the huddle form were not reviewed, the custody and mental health staff spontaneously discussed patient and unit concerns.

Weekly 3CMS supervisory meetings occurred as required during the review period. Reviewed meeting forms did not include any detailed information and were often left blank. When forms were filled out, they included minimal information about alternative housing

placements and single-cell status requests. There were several references to patients exhibiting bizarre or unusual behaviors and actions taken by staff to address those issues. There was adequate attendance by the program supervisor and the program sergeant.

EOP orientation groups began in April 2025 with a total of 14 EOP patients scheduled during the months of April and May. Groups were facilitated by a custody officer and peer support. Mental health staff reported that patients were scheduled consecutively for the four groups, however a review of scheduled patients indicated that no patient was scheduled for more than two groups, despite remaining at the facility.

Regarding quarterly round table training the CHM also reported non-compliance in several areas for the fourth quarter of 2024 and the first quarter of 2025. The areas that held quarterly training as required were the MHCB during the first quarter of 2025 and for the RHU in the fourth quarter of 2024. However, in the first quarter of 2025 in the EOP, only three custody staff attended the training on second watch, while in the RHU for the fourth quarter of 2024 only one mental health staff member attended the training.

Regarding annual CMHPP training the institution reported 100 percent compliance for the one chief psychologist, one chief of mental health, and the three supervising psychologists or psychiatrists. Nineteen of 22 psychologists, three of four psychiatrists, and ten of 11 social workers attended the training. For custody staff, the one warden, three captains, 23 lieutenants and 75 sergeants all attended the training. Four of five correctional administrators and 317 of 649 correctional officers attended.

The institution reported that no staff were re-directed as a result of a staff complaint. During the review period, a total of 82 staff complaints were filed by 51 MHSDS patients. The 82 staff complaints included 41 referred to hiring authority or local designed investigator , 14 for

use of force, eight for integrity/dishonesty, three for retaliation, and 16 for other. Of the 82 staff complaints filed, 74 had an action taken by the office of grievance (OOG). Staff misconduct was found in 56 or 68 percent of complaints, while ten were denied and eight were rejected or redirected.

Heat Plan:

CDCR required that each institution's heat plan LOP incorporate the requirements of the most recent Heat Plan and Updates memorandum. CIM's heat plan LOP had a last revision date of May 2025, and was up to date with statewide policy, specifically requirements outlined in the March 27, 2025, memorandum titled, "2025 Annual Heat Plan and Update."

The 2025 Heat Plan and Updates memorandum required that each institution submit a Heat Plan Monthly Summary Report (Summary Report), signed by the warden and CEO, to headquarters each month from May 1 to October 31. The review period did not include any months where the statewide heat plan was in effect, therefore there were no monthly summary reports or heat-related illness logs submitted to headquarters.

The 2024 Heat Plan and Updates memorandum required all custody officers and leadership staff to maintain knowledge of heat plan activation and act in accordance with the requirements of each stage. Twenty-one custody staff were interviewed regarding their knowledge of heat plan policy and procedures. All interviewed staff were knowledgeable about the heat plan and their responsibilities at each stage. Each housing unit had a current list of patients on heat-risk medications that was updated daily.

To ensure proper and accurate temperature recording, the annual Heat Plan and Updates Memorandum required the warden or his designee to ensure an accurate thermometer was placed in a central, heat-neutral location to monitor outside ambient air temperatures which must be

recorded every hour, every day, from May 1 through October 31 of each year. The review period did not include any months where the statewide heat plan was in effect, therefore outdoor air temperatures were not recorded during the review period.

The warden or his designee is also responsible for ensuring that inside air temperatures are measured in all non-airconditioned living areas that house heat-risk incarcerated persons. Temperatures must be taken at the highest non-air-conditioned location where heat-risk incarcerated persons are housed and must be recorded every three hours. The review period did not include any months where the statewide heat plan was in effect, therefore indoor air temperatures were not recorded during the review period. Indoor thermometers were observed on the highest tier where patients were housed and appeared to measure the ambient air temperature of the housing unit as required. Inside air temperatures were reported to have been recorded both in an automated system and through a paper log. Air conditioning units were installed in housing units A2, A3, and A7 during the review period.

In an effort to ensure that heat-risk incarcerated persons were afforded equal access to programs, services, and activities during extreme weather conditions, the 2024 Heat Plan and Updates memorandum required institutions to devise and include any reasonable accommodation and alternatives to yard activities when revising their LOP. All reasonable accommodation provided to heat-risk incarcerated persons during heat alert activation must be documented in the institution's DAR as well. The review period did not include any months where the statewide heat plan was in effect, therefore daily activity reports were not reviewed for accommodations offered during heat alerts.

The 2024 Heat Plan and Updates memorandum required annual training on the institution's Heat Plan. For custody staff, the warden and the chief deputy warden, all five

correctional administrators, two of three captains, 22 of 23 lieutenants, 68 of 75 sergeants, and 582 of 649 custody staff attended the training. For mental health staff, both chiefs of psychiatry and psychology, two senior psychologist, one supervising social worker, 19 psychologists, seven social workers, and four psychiatrists attend the required training.

RVRs:

The institution reported a total of 1,002 RVRs were issued during the review period. Of the 651 that were issued to MHSDS patients, nine were issued to acute or intermediate care patients, 48 or five percent to MHCB patients, 182 or 18 percent to EOP patients, 412 or 41 percent to 3CMS patients, and 351 to non-MHSDS incarcerated individuals.

Thirteen RVRs and the enclosed mental health assessments (MHA) were reviewed for compliance with policy. Custody staff referred the RVR to mental health staff for completion of the MHA within policy timelines in eight of 13 or 62 percent of cases. Mental health staff completed the MHA and returned it to custody staff within timelines in 12 of 13 cases or 92 percent of cases. All MHAs were completed by staff who had attended the required training. The assignment of a staff assistant was 100 percent compliant. The MHA was conducted in a confidential setting in 12 of 13 cases with one patient refusing the interview.

The senior hearing officer (SHO) did not document their consideration of the MHA information in any cases. The SHOs only repeated the language used in the MHA form and did not state their consideration of the information. However, the SHOs mitigated penalties in all thirteen cases as recommended on the MHA form.

Regarding custody staff training the warden and chief deputy warden had not attended the training, three of five correctional administrators, all three captains, 13 of 23 lieutenants, and 58 of 75 sergeants attended.

During the site visit, mental health staff reported feeling pressured by custody staff to write RVRs for patients for a variety of behaviors. CIM had implemented requirements within a January 8, 2025 memorandum titled "Limiting Licensed Health Care Staff Access to Rules Violation Reports" which directs health care staff to document IPs behavior on an 837-C form and if an RVR was warranted then a custody staff member would write the RVR, not the health care staff. The memorandum was not clear as to who the author of the RVR would be.

The institution implemented training within 90 days of implementation of the memorandum to all health care staff but custody staff were not trained on these requirements. The institution produced a report of staff that attended the required training. There was a total of 305 health care staff that had received the training, including 13 recreation therapists, eight social workers, eight psychiatrists, four senior psychologists, four psychologist interns, two senior psychiatric technician, two chief psychologists, one senior psychologist-supervisor, one supervising social worker and one psychologist.

Use of Force:

The institution reported there were no controlled use of force incidents and 25 immediate use of force incidents during the review period. There were 23 MHSDS patients involved in the 25 immediate use of force incidents.

Five immediate use of force incidents were reviewed for compliance with policy. CIM custody staff did not utilize body worn cameras or audio-visual security system (AVSS) at CIM. In review of the five immediate use of force incidents, no policy violations or concerns were noted.

Regarding training, both the chief psychiatrist and chief psychologist attended as well as two of three supervising psychologists and psychiatrists, four psychiatrists, seven social workers,

and 17 of 19 psychologists. For custody staff, the warden, chief deputy warden, three captains, 23 lieutenants, 75 sergeants, four of five correctional administrators, and 624 of 649 correctional officers attended the use of force training.

Lockdowns/Modified Programming:

There was one period of modified programming on December 23, 2025. The PSR on Facility A was issued due to 27 incarcerated individuals identified as having symptoms of norovirus. The PSR was in place until January 2, 2025, and impacted all incarcerated persons on Facility A. During the PSR, incarcerated persons were issued priority ducats and mental health staff conducted rounds in the housing units.

During the site visit, on June 12, 2025, Facility C was placed on modified program due to the re-direction of custody staff for medical transports. Custody supervisors reported the facility may have a modified program once every six months as a result of custody staff re-direct. Patients were allowed to report to their mental health ducats which was observed by the monitor.

Access to Care:

A review of monthly Health Care Access Quality reports from November 2024 through April 2025 reflected the issuance of 95,789 mental health ducats and add-on appointments. Of those, 83,891 or 88 percent were completed, and 11,898 or 12 percent were not completed. Of the non-completed appointments, 115 were due to custody factors, 8,997 or 76 percent were due to non-custody factors, and 2,786 or 23 percent were due to patient refusals.

*Coleman* Postings:

The *Coleman* Poster, in English and Spanish were found in 11 of the twelve housing units visited.

**APPENDIX A – 5**
**CALIFORNIA INSTITUTION FOR WOMEN (CIW)**
Site Visit: March 3, 2025 – March 6, 2025
Review Period: August 1, 2024 – January 31, 2025

Census:

On February 28, 2025, CIW housed 1,207 incarcerated individuals (excluding the PIP) which was a 29 percent increase from the prior review period. The 743 MHSDS patients represented 62 percent of the population and was a 50 percent increase from the prior review period.

The MHCB housed three MHSDS patients. No patients were in alternative housing.

Two EOP patients and 15 3CMS patients were housed in the EOP and 3CMS RHUs, respectively.

The 68 mainline EOP and 655 mainline 3CMS patients represented significant increases of 66 and 59 percent from the prior review period, respectively. Four mainline EOP and five mainline 3CMS patients were housed in the OHU.

No MHSDS patients were classified as non-designated segregation.

Staffing:

As of February 26, 2025, the chief psychiatrist position was filled. The senior psychiatrist position was vacant. Three of 6.9 staff psychiatry positions were filled for a 57 percent vacancy rate; 4.1 contractors reduced the functional vacancy rate to zero.

Telepsychiatry was not utilized.

One of two chief psychologist positions were filled. Three senior psychologists filled the 1.5 allocated positions. Three of 3.5 senior psychologist specialist positions were filled for a 14 percent vacancy rate. For staff psychologists, 14 of 15.4 positions were filled for a nine percent

vacancy rate; a 0.91 contractor reduced the functional vacancy rate to three percent. Three psychologists were unlicensed.

The 0.8 supervising social worker position was vacant. Nine social workers filled the 8.9 allocated positions; 1.56 contractors were staffed as well. Four social workers were unlicensed.

Nine of 9.5 recreation therapist positions were filled for a five percent vacancy rate.

All ten supervising RN positions, all 20 MHSDS RN positions, both LVN positions, and all 23 CNA positions were filled.

Both senior psych tech and all 62 psych tech positions were filled.

The OSS II position, all four AGPA positions, the HPS I and HPS II positions, and the CHSA positions were all filled.

For custody staff, the warden position was vacant; the chief deputy warden and all four associate warden positions were filled; two of four captain positions were filled; 21 of 23.4 or 90 percent of lieutenant positions were filled for a ten percent vacancy rate; 54 of 60.6 or 89 percent sergeant positions were filled for an 11 percent vacancy rate; nine of ten CCI positions were filled; eight of 8.5 or 94 percent of CCII positions were filled for a six percent vacancy rate; and 403 of 404.6 or 99 percent of correctional officer positions were filled.

Tele-Mental Health

CIW did not utilize telepsychiatrists, telepsychologists, or tele-social workers as line staff. At the time of the site visit, three telepsychiatrists from the statewide hub provided after-hours coverage; four additional telepsychiatrists from the statewide hub provided after-hours coverage in the six months preceding the site visit.

Telework:

The senior psychologist specialist teleworked two days per week, most MHSDS clerical staff teleworked one to three days per week, and most line staff teleworked one day per month.

Staff Recruitment:

Staff recruitment and retention efforts included increased marketing, hiring above minimum, and streamlining the hiring process for mental health staff; an incremental percentage retention bonus starting at one percent of annualized salary and increasing to seven percent; 15 percent of base salary recruitment and retention bonuses for on-site psychiatry; and extra payment for psychiatrists and psychologists who worked additional caseloads.

Quality Management:

CIW maintained an active quality improvement program. Issues were investigated and appropriate corrective actions were taken to address any identified issues.

Local Governing Body meetings were held monthly with quorums achieved for each session. The meetings covered staff credentialing and privileging, the California Department of Public Health (CDPH) site visit CAP for custody training, updates from the Joint Commission, healthcare policies and procedures, other statewide policy updates, and peer review outcomes.

The QMC successfully achieved a quorum for January 2025; however, from August through December 2024, documentation did not identify whether a quorum was reached and only nine of 18 QMC members were noted to be in attendance. Meeting agenda topics covered PIWPs, updates from the EMRRC, and quarterly subcommittee reports on mental health, medical, dental, nursing, patient safety, the patient advisory council, and resource management. Other areas discussed included infection prevention and control, utilization management (UMC), medication management, the Environment of Care (EOC), and the ISUDT. CIW conducted

PIWPs prioritizing integrated substance use disorder treatment, employee wellness, job satisfaction, and staffing, the California Model, new levels of care (carry over from 2023), RVRs (green belt project), scheduling, and access to care.

The MHPS met monthly and reported quarterly to the QMC. A quorum was achieved for each MHPS meeting except September 2024; the chief of mental health was recorded as present but less than 50 percent of the nine required participants attended.

MHPS meeting minutes revealed productive sessions with comprehensive agendas and thorough documentation; agendas included systems surveillance, a QIP or work improvement opportunity, and a review of surveys, audits, and compliance activities.

In August 2024, the MHPS reported benchmark metrics and the Joint Commission concerns to the QMC. Key areas of focus included addressing risk mitigation strategies related to patient care, ensuring timely mental health referrals, and standardizing treatment progress assessments. Furthermore, updates on the Curriculum Review Committee indicated proactive steps toward enhancing group therapy offerings. The MHPS minutes referenced three PIWPs consisting of a goal of reducing RVRs for MHSDS patients by 25 percent, improving the quality of EOP treatment groups, and increasing treatment hour compliance to an initial target of 85 percent; however, the projects for reducing RVRs and improving EOP group treatment quality were ultimately placed on hold and CIW's MHPS decided to focus their efforts on increasing treatment hour compliance. Meeting notes indicated that several projects and assessments, such as SRE expectations, were also on hold without resolution pending training.

The November 2024 updates from the MHPS highlighted key areas of focus and improvements, including the identification of new quality problems related to Curriculum Review Committee and HLOC processes and outcome measures for mental health patients.

Evaluations revealed issues with court-ordered treatment minimums, leading to an adjustment of group session times to one hour rather than 45 minutes, effective November 12, 2024, to improve compliance. The HLOC process showed improvement from 70 to 95 percent in the last quarter with the new HQ feedback process and the audit process goal was to stabilize at least 85 percent compliance within the next three to nine months. Ongoing discussions with HQ were focused on aggregating interdisciplinary/individualized plans of care (IPOCS) and training development, while an audit was underway until updates were finalized. Lastly, the Curriculum Review Committee was set to meet in December 2024 to evaluate RHU group curriculum standards and review survey outcomes.

The EMRRC met bimonthly. Minutes demonstrated comprehensive reviews and documented discussions of relevant cases including emergency medical response activations and transport outside the facility. Required monthly didactic drills for all watches completed for four of six months of the review period.

CIW had an active peer review process for various mental health disciplines. During the review period, peer reviews conducted at CIW for psychiatry, psychology, and social work revealed that 40 psychiatry reviews were completed for eight providers, with no significant concerns reported. Furthermore, six psychologists peer-reviewed 30 charts, revealing no deficiencies. Additionally, ten charts were reviewed for two social workers, which also showed no deficiencies.

Overall, CIW's Quality Management program was adequate and useful in that each committee shared their progress and identified issues requiring follow-up actions, contributing to ongoing improvements for mental health.

Medication Management:

CIW provided MAPIP results for August 1, 2024 through January 31, 2025 regarding compliance for psychiatric diagnostic monitoring and medication management. Significant improvement in achieving compliance for the 40 required measures for diagnostic monitoring was achieved as compared to the previous monitoring period. In general, with some exceptions, compliance during the monitoring period was present for metrics specific to the use of antidepressant medications, antipsychotic medications (including Clozaril) and carbamazepine. Partial compliance was present for metrics relevant to the use of Depakote, Lamotrigine, and lithium.

CIW was a clozapine initiation and maintenance facility. In accordance with statewide policy, outpatient clozapine initiations were only performed in the MHCB.

For medication management metrics reported by mental health headquarters, CIW was compliant for six months with the following metrics: continuity of NA/DOT medications with intra-institutional transfers (excluding restricted housing locations); continuity of medications with intra-institutional transfers to restricted housing (RHU); observation of medication preparation and administration at HS; medication administration of chronic medications; observation of medication preparation and administration for A.M. and P.M. medications, and new medications administered.

Furthermore, partial compliance for medication management metrics was revealed during the monitoring period for the following metrics: continuity of medications with intra-institutional transfers arriving at receiving and release (R&R); continuity of medications for Mental Health Crisis Bed transfers (MHCB); continuity of medications for discharge from a community hospital or DSH (Outside Hospital); Continuity of medications upon parole or release (Release); medication compliance with PC 2602 court order in the medical record (Court Order).

Issues regarding partial compliance with the above metrics were reportedly related to incarcerated persons not attending pill lines for their medications and/or refusing their medications.

CIW had an active medication management committee that met monthly to review MAPIP metrics and medication administration practices. Monthly medical line audits were reviewed by this committee that included 130 medication line audits during the monitoring period. CIW reported that there were no deviations from policy identified with individual wait times exceeding 30 minutes, or total medication line duration greater than two hours.

There were 236 patients prescribed 403 psychiatric HS medications.

As of February 25, 2025, there were 39 patients on PC 2602 with a total of 23 at levels of care other than PIP. CIW reported 100 percent compliance with incarcerated persons taking their PC 2602 medications.

During the review period, prescriptions written by psychiatrists for nonformulary medications ranged from 3.8 percent to 5.1 percent of all prescriptions written by psychiatrists during the reporting period.

CIW has made significant improvements since the previous site visit in the context of medication management and medication administration processes. A medication management subcommittee and a nursing medication subcommittee were very active in reviewing, monitoring, and attempting to correct medication management/administration issues.

Transfers:

CIW's inpatient coordinator had held the position for over ten years and also served as a backup line psychologist and provided backup to the mental health program as needed. The backup inpatient coordinator was the PIP senior psychologist specialist.

During the review period, there were 22 acute care and seven intermediate care referrals, resulting in 18 acute and seven intermediate care admissions; three acute referrals were rejected and one acute care referral was rescinded. All referrals were timely submitted to inpatient referral unit (IRU) and all admissions were timely.

The institution produced documentation indicating all 33 inpatient referrals from the review period were for patients with complex medical needs.[19]

No information on *Vitek* hearings was provided.

CIW made 174 MHCB referrals during the review period, all of which resulted in admissions; 171 or 98 percent occurred timely. Two of the three delayed MHCB admissions were due to the patient being sent out for medical care, and the third was due to the patient having a medical hold.

CIW operated both EOP and 3CMS RHUs; accordingly, there were no placement delays into either.

Twenty-eight patients' levels of care changed from EOP to 3CMS during the review period.

No patients were transferred to an MSF during the review period.

CIW had no patients awaiting transfer to an inpatient setting at the time of the site visit. The inpatient coordinator maintained a log of inpatient referrals that included all required information and appeared to be accurate. The Special Master's expert review of the ten most recent cases of patients referred to a psychiatric inpatient setting revealed that patients were placed in the MHCB where they received adequate services while awaiting transfer in all cases.

[19] CDCR's methodology for reporting patients with complex medical needs was revised after the CIW site visit; accordingly, data sets for the same from subsequent site visits were significantly lower.

For one patient, a pending referral to PSH was delayed secondary to health concerns; ultimately, the patient was placed at CIW's PIP so that both her medical and psychiatric needs could be addressed. The care for this patient was adequate.

During the review period there were 120 instances of 59 patients considered for but not referred to a higher level of care. Ten patients' records were reviewed to assess the quality of the rationale for non-referral as well as the treatment modifications planned to mitigate the need for a HLOC. All ten cases had adequate rationales for non-referral and sufficient treatment modifications were planned. Documentation was impressive and thoughtful, and clinicians frequently went beyond the patient's self-report and considered broader case conceptualizations. The cases selected for review additionally included multiple instances of sustainable process triggers. Each entry included an updated understanding of the patient given recent events and modified treatment interventions. Overall, decisions not to transfer patients to a higher level of care when indicators were present and appropriate treatment modifications were adequately documented.

A minor sustainable process visit was completed in October 2024 covering July 1, 2024 to September 30, 2024. The report indicated that the higher level of care considerations were adequately documented for 95 percent of cases reviewed, a sizable increase from the 77 percent found during the previous quarter and the first time CIW was above 85 percent since the first quarter of 2022. The one unacceptable case had an insufficient narrative supporting the non-referral. There were no discrepancies noted between the inpatient coordinator and the headquarters reviewer.

The sustainable process report and local MHPS minutes referred to an ongoing improvement project addressing deficiencies in documentation of HLOC considerations. The

sustainable process report referenced a required CAP needed to address the improvement plan including a timeframe for the monitoring period, identification of a threshold for compliance, and identified trends affecting sustainability. CIW responded with minutes from the September MHPS meeting which included a timeframe (three months), a threshold for compliance (85 percent), and identified specific staff members who were producing inadequate documentation despite repeated training as a trend. These staff members were relocated to other programs within the institution and were monitored, while training was provided for all staff working within the EOP on October 22, 2024 regarding HLOC considerations documentation. Further, a review of the local HLOC audits during the reporting period revealed that HLOC documentation audits were consistently above 85 percent during the reporting period, indicating achieved and sustained compliance. Furthermore, all eight cases selected for review of the non-referral IDTTs demonstrated consistency between the master treatment plan and documentation in the healthcare record over the previous 30 days. A review of the referral and non-referral logs found timely referrals to the IRU and a substantial increase in non-referrals over the previous quarter but in line with the same time period from the year prior.

The sustainable process was functioning properly at CIW and supported demonstrable improvement regarding non-referrals over the past year.

There were no reported issues related to proper notification of patients returning from inpatient settings. Records of ten patients who were most recently discharged from an inpatient setting were reviewed to determine if continuity of care was achieved. Five patients were discharged from CIW's PIP and five were discharged from PSH. For the patients who were discharged from the CIW PIP, clinician-to-clinician contacts were evidenced in all cases reviewed; in one instance, the EOP supervisor attended the patient's discharge IDTT in the PIP.

For PSH discharges, however, it was unclear whether clinicians attempted to contact the treatment team at PSH in four out of the five cases reviewed; one patient's record included a note that attempts were made to contact PSH clinicians with no success. In four cases, clinicians documented that the patient's discharge documentation from PSH was reviewed. In one case, there was no evidence that a clinician-to-clinician contact was attempted or that the discharge documentation was reviewed. For all ten patients, there was variability regarding integration of information from the patient's recent inpatient stay into the patient's initial treatment plan upon return to the EOP level of care. Specifically, there were six cases (three discharged from the PIP and three discharged from PSH) where the initial IDTT documentation referenced the patient's recent inpatient placement and integrated information from that stay into the patient's treatment plan. In three of these cases, the integration was present but minimal. The remaining four cases had little to no evidence that the patient's inpatient stay was integrated into the current treatment plan.

Overall, improvements in the integration of a patient's recent inpatient placement into the current treatment plan was needed for patients returning to CIW. Even when the patient's recent inpatient placement was referenced in treatment plan documentation, evidence of continuity of care was often minimal.

Programming:

Patients in Restricted Housing:

*EOP RHU*

EOP RHU staff consisted of one psychiatrist who also served the 3CMS RHU population, one psychologist who also served the 3CMS RHU population, one LCSW, a recreational therapist, and a psychiatric technician. Although not part of the allocated mental

health staffing, pre-doctoral interns and psychology and social worker practicum students received training and supervision and provided mental health services at CIW; at the time of the site visit, one practicum student provided a weekly mental health group in the EOP RHU. All applicable staff carried caseloads within established ratios.

The EOP RHU had capacity for 20 patients. During the review period, the EOP RHU census ranged from zero to four; the EOP RHU had no patients during the review period until September 9, 2024.

Treatment space for EOP RHU patients was a short, covered walk from the EOP RHU housing unit and was adequate with respect to size and confidentiality. There were two group rooms, each of which had five therapeutic modules. In both group rooms, four of five therapeutic modules were aligned in a single row due to size constraints which impeded patient-to-patient interactions except through side-by-side communication. None of the therapeutic modules could accommodate a wheelchair. Air quality, lighting, and privacy were appropriate, though the ambient temperature was uncomfortably cool.

Staff reported that one to four patients attended each group; two attended on average. Windows provided visual access to these group rooms, but the rooms were adequate with respect to sight and sound confidentiality. Ceiling cameras were present, but the senior psychologist supervisor reported that they had no audio capability. The same building had an IDTT meeting room with a therapeutic module, computer access, and sufficient capacity to accommodate a full treatment team. Two individual offices equipped with therapeutic modules were allocated to the psychiatrist and assigned PC; patients were seen in these rooms. Patients reported that these encounters were confidential. Three additional offices housed the senior psychologist supervisor, recreational therapist, and PC who floated between EOP RHU and 3CMS RHU patients.

Two initial and one routine EOP RHU IDTT meetings were observed. Patients and required staff attended all three meetings. Each patient was placed in the therapeutic module with a clear view of all treatment team members. Custody staff wearing body cameras turned them off during the IDTT meeting. For all three patients, IDTT discussion was collaborative, clinically appropriate, respectful, and encouraging towards the patient. In each IDTT, the patient's psychiatric history, case conceptualization, psychotropic medications, diagnoses, symptoms, functional impairments, and treatment needs were reviewed and adequately discussed. Collaborative goal setting occurred with each patient, and the identification of treatment goals was clear in all three meetings. Custody participation was excellent. Treatment goals were measurable in two of the three meetings. Master treatment plans were not discussed, but all three patients had individualized master treatment plans; however, one of these master treatment plans was not updated to reflect the patient's response to treatment.

CIW provided data for out-of-cell structured therapeutic activities for the last 17 weeks of the review period for EOP RHU patients which indicated weekly averages of 12.06 hours offered and 10.95 hours attended, respectively; weekly averages of offered structured therapeutic activities ranged from 10.13 to 14.98 hours. Cancellations of scheduled treatment were caused by a medical emergency, a fog watch, and an institutional power outage and mass casualty drill, among other reasons. During the review period, 7.9 percent of scheduled therapeutic activities in the EOP RHU were cancelled. All 28 eligible EOP RHU patients were offered at least ten hours of structured therapeutic activities weekly during the review period. No EOP RHU patients refused 50 percent or more of offered treatment during the review period; overall treatment refusal rates averaged nine percent.

A behavioral incentive program designed to support EOP RHU treatment engagement was fully implemented in September 2023. Incentives in this program included access to a loaner television, the ability to participate in weekly popcorn and movie nights, and opportunities to purchase candy and hygiene supplies through earned incentive points. Observations of patients during groups indicated that the incentive program was effective and that patients eagerly anticipated being able to "shop" with their incentive points.

Use of modified EOP programming (EOP Mod) status was rare and clinically driven when used in the RHU; only one EOP RHU patient was on EOPMod status during the review period. The rationale for the same was explained to the patient and documented with adequate rationale. The patient received the care required by the treatment plan and was released from RHU prior to their 30-day IDTT being required.

Structured treatment for EOP RHU patients included groups addressing coping skills, journaling, interpersonal effectiveness, leisure skills, medication management, self-esteem, social skills, substance use, and trauma-informed art, among other topics. The EOP RHU did not utilize caseload groups. The EOP RHU group scheduled provided during the site visit confirmed that 13 one hour-long groups were offered each week.

An observed EOP RHU recreational therapy group with two patients started on time and, overall, was excellent. The recreational therapist used a board game to engage patients in active problem-solving, collaboration, reality testing, concentration, and improving social skills. The group was highly interactive, respectful, rewarding, calming, and beneficial for the patients, both of whom suffered from significant psychiatric symptoms and functional impairments.

A trauma-informed art therapy group was provided in the EOP RHU on a volunteer basis by a contractor who provided mainline groups elsewhere in CIW. It was reported that the

contractor was fully credentialled to provide this group, that patients were eager to participate in the group, and staff reported that patients benefited significantly from the group. However, the contractor was not credentialed to document in the health record and did not have access to the health record; accordingly, no progress notes were documented for patients' participation in this group, but patients' attendance was recorded and credited to them through the EOP RHU senior psychologist supervisor. Mental health leadership reported that the contractor communicated patient concerns promptly to treatment team members through email and mental health staff saw those patients quickly. Notably, mental health leadership also reported that patients revealed more about themselves in this group because they knew there would be no documentation in the health record regarding their self-disclosures.

Two EOP RHU patients were interviewed in a group setting. They reported seeing their assigned psychiatrist and assigned PC regularly, that they had not had encounters with alternate mental health staff substituting for their assigned staff, and that encounters were consistently confidential. They additionally reported being seen in IDTT meetings regularly. Access to mental health staff was consistently prompt and mental health staff were reportedly kind, reliable, and did not over-medicate them. The two patients felt comfortable asking custody staff to connect them with mental health staff when needed. Furthermore, their IDTT meetings occurred before their ICC meetings, they had extensive daily access to yard and out-of-cell therapeutic activities, had daily psychiatric technician contacts, and had access to in-cell therapeutic activities such as anger management psychoeducational packets. Both patients also had access to a hand-cranked radio and reported good reception and one had a television while the other was in the process of obtaining one. They were not able to log into or use their e-tablets in EOP RHU.

Three ICCs for EOP RHU patients were observed, each of which had all required ICC members in attendance. The mental health clinician checked in with each patient and asked appropriate questions. The ICC chairperson's decisions reflected consideration of the mental health input.

Two weeks of Automated Restricted Housing Records for ten EOP RHU patients were reviewed, which reflected weekly offerings of ten hours of yard, three showers, phone calls, and linen exchanges.

*3CMS RHU*

3CMS RHU staff consisted of the same psychiatrist who also served the EOP RHU population and two psychologists, one of whom also served the EOP RHU population. Non-MHSDS incarcerated persons housed in RHU lived in the same unit; the unit had a total combined capacity of 197 incarcerated individuals. All but three cells in the unit had double-celling capacity; at the time of the site visit, all 3CMS RHU patients were single-celled.

Treatment space was minimally adequate to inadequate in the 3CMS RHU building. There was one individual office and one IDTT meeting room with adequate confidentiality and computer access. Both locations were equipped with a therapeutic module; wall and ceiling cameras in these rooms did not have audio capability. Patient contacts typically occurred in these rooms which were appropriate and generally adequate; however, when there were three or more mental health professionals in the building and both the IDTT meeting room and the mental health office were already occupied, patients were seen in one of seven therapeutic modules spaced across the common area. Two modules were ADA compliant. Custody officers reported that privacy screens on wheels were put in place when patients were seen in these modules.

However, patients could be seen by other incarcerated individuals from their cells, and the privacy screens provided little protection for audio confidentiality.

3CMS RHU groups were held in the common area and enclosed on three sides by privacy screens; the semi-circle of chairs was visible from much of the second tier and not confidential with respect to sound. The stationary custody camera mounted nearest the restart chairs did not have audio capability, but another custody camera located approximately 40 feet away from the restart chairs did.

One initial and one routine IDTT meeting were observed for 3CMS RHU patients. Required staff attended both IDTTs; the routine IDTT was held in absentia. Although the IDTT meeting room was equipped with a therapeutic module, patients attending IDTT meetings were instead seated in a chair while handcuffed from behind reportedly because a custody officer always stood next to the patient throughout the IDTT meeting. Custody staff wearing body cameras turned their cameras off during the IDTT meetings.

Both IDTT meetings were collaborative and reviewed the patient's diagnosis, response to treatment, functional impairments, group participation, substance use, and treatment needs. Psychotropic medications were identified and discussed with the patient or, when held in absentia, with the treatment team. Custody participation was excellent. For both patients, IDTT discussions of case conceptualization were more clinically relevant than the documented case formulations. The initial IDTT meeting included a discussion of the groups to which the patient was referred as well as the provision of in-cell psychoeducational and therapeutic materials. For both patients, discussions focused on appropriate and patient-specific treatment goals but did not identify measurable long-term goals or provide a comprehensive itemization of the interventions that were being provided to each patient. Master treatment plans were not developed or

discussed for either patient. The patients' level of care was adequately discussed and justified; the patient who refused to attend the IDTT meeting was appropriately referred to a higher level of care due to psychotic symptoms and treatment refusal.

The 3CMS RHU PC estimated that approximately ten to 15 percent of 3CMS RHU IDTTs were held in absentia due to patient refusals. During the observed IDTT meeting held in absentia, the treatment team appropriately determined that a cell-front IDTT meeting was not helpful because the patient was already aware of the plan to increase their level of care, was suffering from psychotic symptoms with lack of insight that made it unlikely that the patient would benefit from discussion, and because the discussion would not be confidential.

Data for out-of-cell structured therapeutic activities for the entire 26-week review period for 3CMS RHU patients indicated weekly averages of 4.05 hours of structured treatment offered and 3.19 hours of structured treatment attended. Weekly averages ranged from 1.67 to 7.08 hours for structured therapeutic activities offered; groups were offered at least once per week throughout the review period. An active program of in-cell therapeutic activities was in place and a comprehensive log for the provision of in-cell therapeutic activities was maintained throughout the review period. Between one and 37 packets were provided each month; these therapeutic materials addressed at least 15 different topics including anger, anxiety, bereavement, forgiveness, grief, health relationships, parenting, self-love, and trauma.

The mental health groups offered to 3CMS RHU patients at the time of the site visit covered topics including anger management, coping skills, medication management, and self-esteem. One of these groups was scheduled Mondays through Thursdays for 90 minutes. At the time of the site visit, each 3CMS RHU patient was assigned to just one group per week; group sizes ranged from two to five patients. In contrast, during the review period, many 3CMS RHU

patients attended two or more 90-minute groups weekly. Patients who attended their assigned mental health group were permitted to participate in an hour-long incentive group provided by recreational therapists on Fridays. The incentive group reinforced treatment participation through a variety of relaxing recreational activities.

The initial portion of a 3CMS RHU medication management group with one patient was observed; the two other patients assigned to the group did not attend. A psychiatric technician led the group and provided the patient with multiple medication-specific information sheets; the psychiatric technician also had access to the health record and opened it to the patient's medication administration record to identify the medications the patient was receiving and the patient's medication adherence. Information, such as that pertaining to medication side effects and non-pharmacological interventions to address anxiety symptoms, was presented in language that was easily understood by the patient. However, the patient felt the content of the group was not meeting her treatment needs and requested transfer to a different group; the psychiatric technician was respectful of this request, used appropriate conversational language with the patient, and remained engaged. Overall, group content and facilitation were adequate.

One 3CMS RHU patient was interviewed. She reported seeing her assigned RHU clinician and psychiatrist in accordance with Program Guide timeframes and that contacts were confidential. Her RHU IDTT meeting occurred prior to her ICC meeting and the patient had an excellent understanding of the purpose of the IDTT and her treatment plan. She reported that she received daily cell-front contacts from the psychiatric technician, had daily access to the yard for multiple hours at a time seven days per week, and that she had access to in-cell therapeutic activities, a radio, and a television. Her tablet was functional but did not provide access to phone calls and email given her RHU status. The patient entered RHU on February 24, 2025, and was

provided with her first group ten days later, on March 6, 2025; reasons for this delay were unclear.

The monitor observed four ICCs for 3CMS RHU patients, during which required staff attended, the clinician asked patients appropriate questions, and mental health's input was adequately considered.

Unclothed body searches in the 3CMS RHU were performed in therapeutic treatment modules (TTMs) surrounded by coverings, which were easily transportable and covered the TTM in its entirety, ensuring adequate privacy. Custody staff indicated that if a TTM was unavailable, the unclothed body search was performed in the patient's cell.

Non-Disciplinary Restricted Housing (NDRH):

During the review period, 12 patients were placed on NDS/NDRH 102 status, including three EOP patients and nine 3CMS patients, none of whom qualified for NDS 200.

MHCB:

The institution operated a ten-bed licensed MHCB. Six beds were ADA compliant. All beds had the appropriate, approved mattresses. Walker unit additionally had 19 unlicensed beds for MHCB overflow. Flex beds were not used in the MHCB.

MHCB staff consisted of one psychiatrist, two licensed psychologists, and one unlicensed psychologist. All applicable staff carried caseloads within established ratios.

CIW admitted 223 patients to the MHCB during the review period. The daily census averaged ten patients. Clinical lengths of stay averaged 7.3 days; 18 or eight percent of clinical stays exceeded ten days. Physical stays averaged 8.3 days; 30 or 13 percent of physical stays exceeded ten days. Reasons for delays included patients refusing to transfer, safety concerns, danger to self, and medical holds.

Eight patients had three or more admissions to the MHCB during the review period.

The conference room offered adequate space for confidential patient contacts. Recreational therapy–which generally occurred in the day room–and out-of-cell activities were offered to MHCB patients daily (one hour per day) once the IDTT approved such activities. Once approved by the IDTT, MHCB patients also had daily access to an outside yard for one hour per day.

Clinically meaningful discharge summaries were completed timely based on review of five randomly selected patients from the MHCB during the monitoring period.

Three IDTT meetings for four patients were observed during the site visit. Required staff were present for each, the conference room utilized had adequate space and provided appropriate confidentiality, IDTT members had adequate access to electronic medical records, and interdisciplinary discussion was adequate as well.

Accordingly, the treatment provided in the MHCB met Program Guide requirements.

Seclusion and Restraint

The correctional treatment center (CTC) had one restraint and one seclusion room; the seclusion room had not been used for at least several years. Given that the seclusion room was very small in size and had a "floor drain" for toileting purposes, not using this room for seclusion purposes was appropriate.

There were 12 uses of restraints for mental health purposes involving nine patients during the monitoring period. The duration of each episode ranged from approximately one to 4.75 hours. Restraints for clinical purposes in the MHCB were infrequently used and reviewed on a regular basis. Accordingly, restraints were used in a clinically appropriate manner.

CIW also had a use of restraints committee that met monthly to review all uses of restraints

that were used for clinical reasons. The committee also reviewed compliance with the restraint and seclusion policy.

EOP:

CIW's EOP program housed patients with security levels I through IV and had a capacity of 91 beds with an average census of 65 patients during the reporting period. All EOP patients were housed with other EOP patients during the reporting period, with the only exceptions being medical placements within the CTC or OPHU, quarantine placements for COVID isolation, and temporary isolation placement for precautionary medical reasons. No EOP patients were placed in overflow housing during the reporting period. While housed separately, EOP patients attended programing with individuals in general population for jobs, education, and substance use treatment programs. Additionally, EOP patients had access to their own recreation yard but were also able to go to the mainline yard for recreation at any time and went to mainline dining for all meals as no meals were provided to patients within the EOP unit. Correctional officers working on the EOP housing unit reported that the EOP patients went to the general population dining hall for meals in advance of all other incarcerated individuals at CIW, except for some other subgroups in general population such as insulin-dependent diabetic patients or individuals with priority ducats. EOP patients briefly overlapped with other units arriving to the dining area; patient interviews and record reviews indicated that some patients were anxious about attending meals in general population and occasionally avoided going to meals as a result. This lack of separation between EOP and general population was not in keeping with Program Guide requirements. *See* Program Guide 12-4-1, 12-4-4, and 12-4-21. Moreover, EOP staff (in addition to staff and patients throughout the institution) reported that CIW's drug epidemic

significantly impeded treatment and that incarcerated persons who overdosed were frequently placed in the EOP and then preyed upon lower functioning patients.

Mainline EOP staff consisted of two psychiatrists, one licensed psychologist, one unlicensed psychologist, two licensed clinical social workers, one unlicensed social worker, and two pre doc interns; all applicable staff had caseloads within established ratios.

CIW's EOP program had a step-down program for patients transitioning from EOP to the 3CMS level of care called the Soft-Landing Program (SLP).[20] The SLP's description included individual and group services provided for patients to support the transition to the 3CMS level of care. During the review period, 24 patients were enrolled in the SLP; record reviews for four of these patients revealed that none received the services outlined in the description of the program during the reporting period. SLP groups were not offered to patients while at the EOP level of care; however, one patient had a soft-landing clinician present at their EOP discharge IDTT, one patient had weekly SLP contacts after transitioning to 3CMS (but those visits stopped without an IDTT), and one patient was offered one SLP group once in the 3CMS program. At the time of the monitoring tour, the EOP supervisor reported that a clinician was recently assigned as the "soft landing clinician," was offering a weekly group to EOP patients, and was serving as the patients' assigned PC upon transition to the 3CMS program.

Group space consisted of five rooms all of which were in the EOP housing unit. Four were adequate regarding sound confidentiality and three of these four afforded adequate site confidentiality as well; one room, which once served as the dining area for EOP patients, had a

[20] Notably, CIW was not one of the three institutions CDCR identified as a "test project" site in its "Enhanced Outpatient Program to Correctional Clinical Case Management System Step Down" memorandum. *See* Special Master's Thirty-First Round Focused Monitoring Report on Newly Activated EOP Programs, ECF No. 8654 at 41-42; *see also* ECF No. 8654-1 at 104-06.

large window which allowed full visual access into the room. Most group rooms were non-therapeutic and inadequate for clinical services due to disrepair and clutter; both patients and staff commented on CIW's disregard for EOP patients given the poor physical plant. In addition to the group rooms, the day room had a visible area where the ceiling had fallen due to water damage and the shower area designated for disabled patients was out of service due to an ongoing plumbing issue.

Individual treatment was provided in staff offices in the Special Care Unit (SCU) which were adequate regarding confidentiality and space; however, staff reported that all offices were occupied and that there were concerns about where additional staff would be placed when hired. The room used to conduct IDTTs was adequate regarding sound confidentiality; however, there was a large window which allowed full view of the room from the hallway. The room was small and cramped when staff and the patient were present, resulting in the patient being closest to the door and a large table obstructing staff's ability to leave the room quickly if needed; staff reported feeling unsafe in the room with certain patients.

Accordingly, while the treatment space for groups and individual programming was sufficient with respect to size and confidentiality, group spaces were in disrepair and cluttered and the room used for IDTTs was not of sufficient size to support the entire team safely during meetings.

Seven IDTT meetings for EOP patients were observed on-site, consisting of five initial IDTTs for patients returning from inpatient settings (i.e., CIW PIP, PSH, and MHCB), one initial IDTT for a patient returning from court, and one routine IDTT held to consider the patient for a higher level of care. All meetings included the required staff, with one meeting including the EOP supervisor providing coverage for the patient's assigned PC. The correctional counselor

appeared to be newly assigned to the EOP program. In addition to the required staff, the small space additionally included the presence of a custody officer, sergeant, and recreational therapist. A medical student and a psychology intern were also present for some of the meetings as observers.

The IDTTs were not clinically adequate. There was minimal discussion of the patients' histories, including little to no discussion about the treatment received by the patient during recent inpatient placements. In one case, it was made clear that discussion of the patient's recent crisis bed placement was potentially triggering and, therefore, avoided; yet, in the other cases, it was a clear lapse in continuity of care to have omitted discussion of these recent placements and changes in the patient's presentation and treatment needs since they were last in the EOP. Only one of the meetings included a case conceptualization discussion. None of the meetings included a discussion of the patient's diagnosis. Functional impairments were occasionally mentioned, but only vaguely and with generic descriptions. Only one of the meetings discussed measurable and objective treatment goals; the remainder included either no mention of treatment goals or vague references to treatment targets (e.g, anxiety, sobriety, depression, impulsivity) without any identified goals related to these targets. The only explicit interventions mentioned during the meetings were medications, which the psychiatrists consistently asked the patients to identify and provide rationale for their use. Otherwise, there were generic references to groups and individual contacts without discussion of what these sessions would address or achieve.

Safety plans were reviewed when relevant in all cases but one in which the patient was recently discharged from MHCB secondary to suicidal ideation, which was a clinically significant omission. Three of the meetings included clear discussion of the patient's EOP level of care with adequate rationale for the placement, while in the other meetings there was no

discussion about the patient's level of care or rationale for the placement. In the one case where the patient's level of care was being increased, the preceding discussion–which included a review of the progress the patient had made in treatment–did not directly support the decision for the inpatient referral. A review of the patient's record revealed clear rationale for the referral and there was adequate evidence of collaboration with the patient regarding the decision to refer her to PSH.

On the positive side, most meetings included a review of the patients' participation in groups, discussion of substance use needs, transition/pre-release planning, and quality participation by custody and classification staff. For the one patient who was being removed from the SRMP, the discussion adequately supported the removal. All meetings were collaborative and demonstrated caring and supportive relationships among the team and patients. It was evident that the PCs and psychiatrists knew their patients and that patients felt understood and cared for by their teams.

Overall, the IDTT process needed improvement; staff could benefit from training on the important elements of treatment planning and supervision to assist them in conducting adequate meetings.

During the reporting period, 92 percent of eligible EOP patients (i.e., not EOPMod) were offered at least 10 hours of structured therapeutic activities; the most frequent reasons patients were not offered ten hours of treatment were medical appointments, placement on quarantine/isolation, and housing changes where patients were unenrolled from EOP when temporarily moved to another unit like the CTC, MHCB, or RHU.

Excluding patients placed on EOPMod, patients were, on average, scheduled for 15.58 hours, offered 12.91 hours, attended 8.9 hours, and refused 4.03 hours of structured therapeutic

activities weekly during the reporting period. On average, 2.5 hours of treatment were cancelled weekly. The reasons provided for treatment cancellations included modified programming by custody with occasional cancellations due to weather. EOPMod patients were, on average, scheduled for 9.64 hours, offered 7.13 hours, attended 4.81 hours, refused 2.32 hours, and had 2.38 hours cancelled weekly during the reporting period; the same reasons for cancellations were provided.

During the reporting period, between one and four patients were on EOPMod status during any given week. Records for five EOPMod status patients were checked to determine if patients were receiving treatment at the frequency outlined in their treatment plans. In four of the cases reviewed, the parameters for EOPMod were specified in the patients' treatment plans and their treatment was modified accordingly. Patient progress under the modified plans was explicitly discussed in subsequent treatment plans in three of the cases.

Overall, patients were provided with structured therapeutic activities in keeping with Program Guide requirements, while improvements in clearly documenting the parameters of patient's modified status and progress toward returning to full programming was needed.

No PC caseload groups were offered to patients during the reporting period as all patients were being seen weekly for individual therapeutic contacts with their assigned PCs.

Groups were offered to patients in ten-week cycles. A review of the schedules over the reporting period through the date of the monitoring tour revealed that the availability of core clinical groups steadily increased over time; there were consistently between 52 and 60 groups offered to patients each week and the percentage of core clinical groups increased from 29 percent in August 2024 to 43 percent by the time of the site visit. Additionally, the group schedule included a weekly community meeting and two groups that were offered to patients as

part of an incentive program; patients with more than 80 percent group attendance during the week were provided with opportunities to attend a movie, interact with dogs, or both. The EOP supervisor explained that patients were also provided with "points" for group attendance, medication adherence, and appropriate behavior on the unit. These points could be exchanged for items from an "incentive store."

The monitor's expert observed a community meeting and two clinical groups. The community meeting was open to all EOP patients and was held in the dayroom on the housing unit. Approximately 35 patients attended though some left during the meeting. The meeting was facilitated by a peer from the general population and a psychiatric technician. The EOP supervisor, unit officers, and a medication nurse were also present and participated. The meeting consisted of announcements and a time for questions. Patients discussed the lack of cleanliness on the unit–especially in the showers–and the fact that the ADA shower was continually broken. Patients were informed that there would be a change in the psychiatrist assigned to the EOP program and several patients expressed frustration with having to start over with a new provider. Concerningly, following the meeting, a correctional officer openly announced that a patient needed to go to the medication window to receive her "PC2602 meds" to the entire room; the patient expressed anger at the fact that the correctional officer shared her private information with the group. Overall, the meeting was appropriate for the EOP population; however, training with the correctional staff regarding confidentiality and interpersonal communication with EOP patients was indicated.

The monitor's expert observed a clinical group focused on the Dialectical Behavioral Therapy (DBT) skill of interpersonal effectiveness. Eleven patients were enrolled in the group; seven attended. The group started on time. This was the first group of the ten-week cycle and,

thus, included an overview of what would be covered in the coming weeks as well as the rules of conduct during the group which were provided by the patients. Patients were engaged and interacted with each other as well as with the psychologist facilitating the group. The group was appropriate for the EOP level of care and clinically relevant.

Another clinical group, facilitated by a clinical social worker called "Coping with Music," was observed. Fifteen of the 19 patients enrolled in the group were present. The content of the group was explained to the patients and the rules of group conduct were reviewed. Patients engaged in journaling, reading an article on the positive effects of listening to music, and interacting with each other. The group appeared appropriate for the patients and, while it had the potential to be clinically relevant, it was an introductory session which did not include much clinical content.

One observation noted during both groups was the frequent announcements made by the correctional officers on the unit over a loudspeaker. The announcements were loud and occurred multiple times throughout the day, making group discussions impossible until the announcements ended; consequently, they were disruptive to the group sessions and happened multiple times throughout both groups.

Overall, the observed groups appeared appropriate and clinically useful despite the poor physical conditions of the rooms and the frequent interruptions from announcements.

Approximately 20 patients receiving services at the EOP level of care were interviewed. Patients generally reported having weekly contacts with their PCs and monthly contacts with their psychiatrists in confidential settings; having several different PCs given frequent staffing changes which they felt made it difficult to engage in meaningful treatment over time; experiencing medication changes without being seen by their psychiatrists, though record

reviews for these patients did not corroborate such reports; being offered at least ten hours of treatment groups weekly and finding the groups engaging and helpful; having access to their clinicians during crises, though some stated that correctional officers did not always contact mental health staff when asked but instead instructed patients to complete healthcare request forms; appropriate handling of heat alerts; and attending IDTT meetings at least every three months and knowing their treatment goals. Some patients expressed concerns about a correctional officer from the unit being present during IDTT meetings which they felt violated confidentiality. Additionally, several patients reported having jobs on the unit and attending school in general population. When asked about their biggest concerns regarding the EOP program, many patients mentioned the poor physical conditions of the unit, inadequate cleaning of the unit (specifically the shower areas), correctional officers having too much knowledge about their mental health needs and not keeping that information confidential, having to go to meals in general population, mental health staff not completing adequate RVR mental health assessments, and frequent clinician and psychiatrist changes. Patients also reported having water in their cells due to plumbing issues. Positive aspects of the program included the incentive store, arts and crafts groups, and useful programming.

3CMS:

Mainline 3CMS staff consisted of three psychiatrists, two licensed psychologists, one unlicensed psychologist, two licensed clinical social workers, and two unlicensed social workers. All applicable staff carried caseloads within established ratios.

All 3CMS patients resided exclusively with other 3CMS patients. Housing units remained unlocked during the day.

For mainline 3CMS initial PC contacts, 828 of 839 or 97 percent complied with Program Guide timelines during the review period; delays ranged from one to 19 days. For mainline 3CMS routine PC contacts, 15,182 of 15,199 or 99.8 percent complied with Program Guide timelines; delays ranged from one to 28 days. For mainline 3CMS initial psychiatry contacts, 915 of 1,073 or 85 percent complied with Program Guide timelines during the review period; delays ranged from one to 346 days. For mainline 3CMS routine psychiatry contacts, 9,896 of 11,642 or 85 percent complied with Program Guide timelines during the review period; delays ranged from one to 292 days.

Group and individual treatment spaces were separate from patient housing units. The group treatment room was in the medical building; this space was well lit and confidential. Treatment team meetings and individual PC contacts occurred in the 3CMS trailer.

Although the IDTTs appeared confidential, 3CMS staff noted that the walls were thin and that, if an individual contact occurred next door during the IDTT, the noise would carry over, compromising the confidentiality of the spaces. In addition, staff reported that the office space's tile floor was damaged, which the monitor observed in addition to insects, dirty mops and ceiling vents, numerous doors in disrepair, and broken window blinds. Staff also reported that the halls were too small to accommodate wheelchairs and a lack of supplies including journals for patients, toner for the copier, and pens for staff.

During the monitoring tour, the monitor's expert observed 11 IDTTs; four were held in absentia. All were conducted in an adequately confidential treatment room in the 3CMS mental health trailer. Treatment team members had access to personal laptops and the required and assigned staff attended all IDTTs except for one in which an alternate PC attended.

The treatment team was collaborative, demonstrated knowledge of their patients, and actively involved their patients in the treatment planning process. Patients' diagnoses were typically discussed along with overall goals, mental health focus, prescribed medications, and additional services available such as education, employment, or substance use groups. Treatment providers engaged the patient by asking open-ended questions, validating concerns, and offering recommendations to patients as needed. However, certain areas required improvement, including reviewing patient's psychiatric histories, identifying specific symptoms and functional impairments, developing case formulations with measurable treatment goals as well as therapeutic interventions (in addition to medications reported), barriers to treatment, and clarifying discharge criteria for retention at current levels of care. Notably, patients in attendance were relatively stable and knew how to submit a 7362 mental health request if needed. Although the IDTTs were meaningful, improvements were needed in these areas and, thus, the IDTTs overall were inadequate.

Although not required, 3CMS patients were offered a variety of groups in the summer, fall, and spring which provided a variety of psycho-educational, clinical, and recreational groups.

Groups observed during the site visit were mostly facilitated by a recreational therapist but were more clinical than recreational or leisure groups. Four patients attended the *Healthy Boundaries* group and six attended in the *Know Thyself* group; both groups were clinically adequate, meaningful, and aligned with the group topic. Patients were engaged as demonstrated by reading topic handouts to other group members, answering relevant questions posed by the facilitator, and following along with the slides or handouts.

Fifteen 3CMS patients were also interviewed, nine of which were interviewed after the observed groups.

All patients reported meeting with their clinician face-to-face in confidential settings and most reported that their PC contacts timely occurred every 90 days or more frequently, if needed, by submitting a 7362 healthcare request (locally referred to as a "co-pay"). Routine psychiatry appointments varied among patients, ranging from every two weeks during medication adjustments to every 90 days, eight weeks, six months, or even once a year, depending on individual needs. Patients indicated they understood the process for requesting a psychiatric appointment when necessary. Additionally, most patients remembered when their last contacts with their assigned psychiatrist and primary care providers occurred and noted that these contacts were helpful. Patients also reported attending their IDTTs, understanding their treatment goals, and finding IDTTs beneficial.

Concerns raised during patient interviews primarily related to continuity of care and how patient-provider assignments were made, which reportedly contributed to frequent provider turnover, impeding continuity of care. Multiple patients raised these concerns; one patient, for example, noted that she received a new clinician every eight weeks and had over ten different PCs assigned to her in the past three years. This patient reported that the constant PC changes were "re-traumatizing" to her and compelled her to avoid PC contacts; accordingly, she preferred to attend groups which were more consistent and stable.

Furthermore, patients reported that PC contacts were sometimes short in duration and more like a "check-in." One patient reported having a short check-in with her PC when she initially transferred to 3CMS but reported understanding that she would need to file a 7362 request to be seen for a longer session. Another patient stated that, upon transfer to the 3CMS program, she did not have a clinical contact for close to two months.

Regarding groups, patients reported being assigned to two groups per week and having no issue receiving groups that they were interested in. Patients also reported finding the groups helpful and the most consistent in providing mental health education and support.

Mental health leadership at CIW identified the high volume of referrals as a potential barrier to timely PC and IDTT contacts; for instance, CIW received 30 new patients in December 2024, ten to 15 in January, and ten to 15 in February. Regarding patient refusals for PC contacts or IDTT meetings, leadership suggested that they could be due to an error in the EHRS system, the patient's mood, the weather, or other factors; however, the supervisor indicated that, if a patient missed an appointment, clinicians typically found someone in the housing unit to ensure patient safety and reschedule with the patient. Patients' continuity of care concerns were attributed to staff turnover, temporary use of registry staff, staff movement, and hiring delays for new staff. In addition to staffing challenges, leadership further reported that CIW's 3CMS program experienced difficulties from the increasing patient population. Another challenge was the lack of treatment space, where some staff and interns had offices in the converted old cells in the Walker building.

<u>Other Issues:</u>

<u>Pre-Release Planning</u>:

The pre-release planning LOP was last updated in September 2024 and aligned with headquarters directive. CIW had one pre-release coordinator supervisor who was a licensed clinical social worker and two pre-release coordinators, one of whom was a licensed clinical social worker who provided full-time pre-release services to 3CMS patients and the other a clinical social worker who provided part-time pre-release services two days a week to EOP

patients. Both pre-release coordinators were employed at CIW for multiple years and had recently been given the pre-release coordinator positions.

The pre-release coordinator supervisor reported that staffing was a barrier for pre-release planning during the review period; one clinician provided pre-release services to the entire population which limited group offerings and the tracking of local logs. However, she explained that, at the time of site visit, the program was fully staffed; logs were up-to-date and groups had been running for each level of care since December 2024.

CIW tracked patients who required pre-release planning at 60 and 90 days from release. Once the 60 days from release list is generated the pre-release coordinator reviewed patient information to ensure that the information was correct regarding patient status for benefits and to determine whether an ROI is needed based on the patients' type of release. The 90 days from release list was reportedly generated weekly. The pre-release coordinators would circulate this list to primary clinicians and psychiatry; also, orders would be placed for PCs and psychiatry would place their own orders. Additionally, the pre-release coordinators would start their Pre-release planning assessment (PRPA) process once the 90 days list was generated. Notably, PCs had 60 to 70 days to complete their portion of pre-release duties and psychiatry had 70 to 80 days to complete their portion of pre-release duties once the 90-day list was produced.

The pre-release coordinator's attend numerous meetings including PRPA Prep meetings, bi-weekly ISUDT pre-release meetings, monthly pre-release coordinator meetings, monthly pre-release coordinator meetings at CIW, CCAT meetings as necessary, MHCB IDTTs if patients are releasing within 60 days or less, and bi-monthly prison to community meetings.

Pre-release groups were offered once a week for both 3CMS and EOP patients at the time of the site visit. However, pre-release groups were not held during the review period due to

staffing limitations. A 3CMS pre-release group was observed during the site visit. The group was facilitated by the institutional mental health pre-release coordinator (IMHPC). Four patients were assigned to the group but only two attended; one was released the week prior and the other had a conflicting medical appointment. The IMHPC utilized pre-release modules focused on budgeting and money management and fostered engagement through reading aloud and posing questions, making the session interactive. Overall, the group provided meaningful discussions that aligned with the group topic.

TCMP caseworkers provided pre-release benefit assistance to all eligible inmates within 120 days of release. All 165 patients who were within 120 days of release were screened for TCMP services; 140 or 85 percent submitted Medi-Cal benefit applications, 18 or 11 percent submitted SSI benefit applications, and one submitted a veterans affairs (VA) benefit application. The pre-release coordinator supervisor reported having a great working relationship with the TCMP caseworkers. She further explained that two TCMP case workers worked on-site and daily communications typically occurred between the two disciplines.

Program Access:

a. Job and Program Assignments

As of February 4, 2025, CIW reported that 506 job assignments were held by 13 or 20 percent of EOP patients, 288 or 42 percent of 3CMS patients, and 205 or 38 percent of non-MHSDS incarcerated persons.

The 444 academic assignments were held by 13 or 20 percent of EOP patients, 267 or 42 percent of 3CMS patients, and 164 or 31 percent of non-MHSDS incarcerated persons.

The 126 vocational education assignments were held by one or two percent of EOP patients, 83 or 12 percent of 3CMS patients, and 42 or 12 percent of non-MHSDS incarcerated persons.

The 419 voluntary education assignments were held by 14 or 22 percent of EOP patients, 217 or 31 percent of 3CMS patients, and 188 or 35 percent of non-MHSDS incarcerated persons.

The 226 substance abuse treatment assignments were held by one or two percent of EOP patients, 155 or 22 percent of 3CMS patients, and 70 or 13 percent of non-MHSDS incarcerated persons.

b. Milestone Credits

CIW reported that 40 EOP and 13 3CMS patients were awarded milestone credits but did not indicate how many patients were eligible for the credits.

c. Out-Of-Level Housing

CIW reported that no patients were housed out-of-level during the review period.

d. ADA Reasonable Accommodation and Grievance Procedure

The institution confirmed implementation of the revised ADA accommodations, grievance procedures, and appeals process and provided a copy of the LOP. Review of a random sample of five reasonable accommodation requests for MHSDS patients reflected that the requests were related mostly to health care appliances and medical issues. CIW supplied training records on Interacting with Incarcerated Persons with Disabilities by 1,056 custody and non-custody staff.

e. Periodic Classification Score Reductions: EOP Patients

Seven CDCR 840 forms were reviewed which indicated that classification score reductions were provided to EOP patients and updated consistent with CDCR policy.

"C" Status:

On February 28, 2025, 17 incarcerated persons were designated "C" status; none were MHSDS patients.

Case by Case Reviews:

No patients satisfied the criteria for 150-day reviews.

Six patients met the criteria for 120-day pre-MERD reviews including one 3CMS and five EOP patients; one patient required an initial review, and the remaining patients required subsequent reviews. Two patients were released from the RHU to mainline, two patients were retained pending transfer, and the other two patients were retained pending RVR adjudication. Five patients were pending CSR review, and one patient had their CSR review. Each patient received timely ICCs and 120-day pre-MERD reviews. Three patients were eligible for NDRH status.

Mental Health Referrals:

During the review period, CIW reported 1,798 mental health referrals consisting of 469 to psychiatry and 1,329 to primary clinicians.

There were 140 emergent, 344 urgent, and 1,314 routine referrals. For emergent referrals, two of four psychiatry referrals and 112 of 136 or 82 percent of primary clinician referrals were responded to timely; for urgent referrals, 38 of 50 or 76 percent of psychiatry referrals and 250 of 294 or 85 percent of primary care referrals were responded to timely; and for

routine referrals, 360 of 415 or 87 percent of psychiatry referrals and to 814 of 899 or 91 percent of primary clinician referrals were responded to timely.

Interviewed custody officers knew to refer patients to mental health when a patient exhibited bizarre or unusual behavior. Reviewed MH-5 forms in the housing units were current.

<u>Custody and Mental Health Partnership Plan</u>:

CIW's custody and mental health partnership plan LOP was last updated in December 2024 and, thus, up to date, and aligned with headquarters' directive.

Executive leadership joint rounding occurred during all six months of the review period with required staff in attendance for each. All required housing units were rounded. Rounding forms reported staff concerns with patient substance use, positive morale and relations between mental health and custody staff, custody staffing shortages, physical plant issues including with RHU cell doors, patients timely receiving their ducats, and inconsistent custody staffing. Executive leadership joint rounding was not mentioned in executive staff meeting minutes for one of six months in the quality management committee meeting minutes, and in sufficient detail for all six months in the mental health program subcommittee meeting minutes.

Monthly joint supervisory tours occurred during all six months of the review period with required staff in attendance and in all required housing units. However, reviewed documentation for only one month reflected substantive discussion of the tours. During that one month, staff concerns with substance abuse and strategies for further collaboration between mental health and custody staff were discussed, as were patient concerns with what were perceived as negative connotations of receiving mental health care.

Weekly 3CMS supervisory meetings occurred weekly throughout the review period with required staff in attendance. Patient admissions and returns from higher levels of care were

frequently noted, though documentation was otherwise minimal; a death in the PIP, medication issues, and patients exhibiting unusual or bizarre behaviors were concisely noted.

Second and third watch huddle forms were provided for the review period for the MHCB, EOP and 3CMS RHUs, and mainline EOP programs. Reviewed forms reflected occurrence of the huddles with required staff in attendance at all levels of care throughout the review period.

A combined EOP RHU and mainline EOP huddle was observed. All required staff attended. EOP RHU mental health, nursing, and custody staff displayed a positive, collaborative working relationship and familiarity with all of their patients.

A 3CMS RHU huddle was observed as well with required custody and mental health staff in attendance in attendance as well as medical staff and a mental health staff member attending remotely. The huddle started on time, was well-organized and efficient, addressed required elements, and demonstrated fluid interdisciplinary communication that appeared to be characteristic of the treatment team's interactions; it was clear that custody and mental health staff knew their patients and collaborated effectively.

Introduction to EOP groups were offered weekly throughout the review period; however, no patients enrolled.

CIW distributed the 3CMS orientation brochure to new patients and provided a copy of the same.

Inmate advisory council meeting minutes were provided for all six months throughout the review period with required members in attendance. Discussed topics included patient concerns with the KOP medication window being closed, confidentiality regarding medications being discussed in medication lines, painting additional murals, shower temperatures, staff concerns with contacting patients' families when appropriate, and tablet issues.

There were 427 staff misconduct complaints filed during the review period, including nine filed against dental staff, 354 against medical staff, and 64 against mental health staff. Of the 427 complaints, 371 were closed and four were canceled.

One investigation for misconduct towards a patient was not initiated through the appeal process. No staff members were reassigned because of misconduct complaints.

Annual partnership off-post training and quarterly roundtable training attendance could not be ascertained from the data provided.

Heat Plan:

Overall, CIW's implementation of the 2024 Heat Plan and Updates memorandum was adequate.

CDCR required that each institution's heat plan local operating procedure incorporate the requirements of the April 8, 2024 Heat Plan and Updates memorandum. CIW's heat plan LOP was updated in May 2024 and not only comported with headquarters' directive but contained requirements that exceeded those delineated in the Heat Plan and Updates memorandum.

In addition to CDCR's 2024 Heat Plan and Updates memorandum, CDCR issued an Expectations Memo, dated August 2, 2024, delineating the specific responsibilities of the warden and CEO. These included daily meetings during days of anticipated heat advisories to address and manage heat alerts and related concerns. CIW's daily heat meeting minutes from July and August of 2024 documented CIW leadership tours of housing units and program areas to monitor heat and heat plan compliance, the status of ice machines, air-conditioned cooling areas, air conditioning maintenance issues, and refreshments provided to both staff and the incarcerated population to assist with cooling measures. Daily ice and cold water were also authorized year-round.

The 2024 Heat Plan and Updates memorandum required that each institution submit a Heat Plan Monthly Summary Report (Summary Report), signed by the warden and CEO, to headquarters during heat plan months. CIW produced Summary Reports for each month of the review period indicating 46 stage I, nine stage II, and one stage III heat alert during the review period.

The summary reports for August and September of 2024 were reviewed and compared with the corresponding DARs and temperature logs. Various discrepancies were noted including the times of heat alerts in summary reports not matching temperature logs and summary reports not documenting heat alerts otherwise captured in temperature logs.

The Heat Plan and Updates memorandum also required institutions to include with the monthly submission a Heat Incident Log documenting the number of patients who experienced a heat-related illness. The Heat Incident Log must include the patient's information and details regarding the heat-related illness. CIW reported one heat-related illness during the review period on September 30, 2024 in the RHU. The Heat Incident Log indicated that the patient was evaluated in the RHU, but the ultimate disposition of the patient and the clinician's name and title were not completed on the log.

Due to the discrepancies in the Summary Reports in August and September, lack of medical rounds forms being submitted as required during the two stage III heat alerts, and the incomplete heat incident log form, the Summary Reports were not compliant with the 2024 Heat Plan and Updates memorandum.

The 2024 Heat Plan and Updates memorandum required all custody officers and leadership staff to maintain knowledge of heat plan activation and act in accordance with the requirements of each stage. All 15 interviewed custody staff were familiar with the stages of the

heat plan, their responsibilities at each stage, and symptoms of heat-related illnesses. Each housing unit also produced indoor temperature logs as required.

The 2024 Heat Plan and Updates memorandum also required that, when the heat plan was in effect, institutional staff must generate and distribute daily a list of all incarcerated persons prescribed heat alert medications. Interviewed custody staff produced the most up-to-date heat-risk incarcerated persons list and indicated that it was updated daily.

Accordingly, CIW's custody staff interviews and heat-risk patient lists complied with the requirements of the 2024 Heat Plan and Updates memorandum during the site visit.

To ensure proper and accurate temperature recording, the Annual Heat Plan and Updates memorandum required the warden or his designee to ensure an accurate thermometer was in a central, heat-neutral location to monitor outside ambient air temperatures which must be recorded every hour, every day, from May 1 through October 31 of each year; CIW's LOP went beyond these requirements and mandated that outdoor temperatures be recorded in the central control tower every hour year-round. Reviewed temperature logs were properly completed and reflected hourly temperature recordings. The monitor toured Tower One and observed a fixed temperature device affixed to the outside of the tower and a log of recorded hourly temperatures. The institution's outdoor temperature recording procedures, therefore, complied with the 2024 Heat Plan and Updates memorandum.

The warden or his designee is also responsible for ensuring that inside air temperatures are measured in all non-airconditioned living areas that house heat-risk incarcerated persons. Temperatures must be taken at the highest non-air-conditioned location where heat-risk incarcerated persons are housed and must be recorded every three hours. All toured housing units had working thermometers and officers were also equipped with handheld thermometers

and reviewed temperature logs were completed appropriately, thus demonstrating compliance with the 2024 Heat Plan and Updates memorandum.

To ensure that heat-risk incarcerated persons were afforded equal access to programs, services, and activities during extreme weather conditions, the 2024 Heat Plan and Updates memorandum required institutions to devise and include any reasonable accommodations and alternatives to yard activities when revising their LOP. All reasonable accommodations provided to heat-risk incarcerated persons during heat alert activation must be documented in the institution's DARs. While custody staff reported providing dayroom to heat-risk incarcerated persons during heat alerts, instances of reasonable accommodations were not consistently documented in the DARs; 22 of 48 or 46 percent of the watches in August and eight of 24 or 33 percent of the watches in September did not document reasonable accommodations to heat risk patients during heat alerts. Additionally, the DARs on third watch did not consistently document heat alerts or deactivation times for heat alerts that were activated on the previous watch.

Regarding the provision of cooling measures during heat alerts, custody staff reported providing coolers of ice and water for heat-risk incarcerated persons each day year-round. Coolers with ice water were observed in toured housing units and interviewed patients indicated that ice and cold water were available daily. Observed ice machines in the central kitchen and the EOP SCU were operational. The medication distribution area provided a large, shaded structure for patients waiting to receive prescriptions.

Given offerings of accommodations were not consistently documented in the DARs during heat alerts, CIW was not compliant with this aspect of 2024 Heat Plan and Updates memorandum.

The 2024 Heat Plan and Updates memorandum required annual heat plan training for custodial and clinical staff by the In-Service Training Officer. CIW reported that 457 of 466 or 98 percent of custody staff members and 221 of 249 or 89 percent of the required non-custody staff attended the heat pathologies training

Based on the foregoing, CIW's implementation of the 2024 Heat Plan and Updates Memorandum was adequate given custody officers' knowledge of the heat plan and their responsibilities, compliance with indoor and outdoor temperature monitoring procedures, compliance with daily heat plan meetings during heat advisories, and compliance with heat pathology training and despite deficiencies regarding documenting accommodations provided to heat risk patients and heat alerts on all watches in the DARs.

RVRs:

CIW issued 2,401 RVRs during the review period, of which 1,774 or 74 percent were issued to MHSDS patients. Specifically, seven RVRs were issued to acute care patients, 33 were issued to intermediate care patients, 28 were issued to MHCB patients, 69 were issued to EOP patients, and 1,637 were issued to 3CMS patients.

The monitor reviewed 30 RVRs to assess compliance with remedial requirements. Custody staff timely referred the MHA to mental health staff within two days in nine or 30 percent of reviewed cases. Mental health staff timely completed and returned the MHA to custody within eight days in 25 or 83 percent of reviewed cases. The senior hearing officer documented consideration of the mental health assessment in all 30 cases. Patients had confidential mental health assessment interviews in 27 or 90 percent of cases. Staff assistants were assigned in 16 or 53 percent of cases.

Mental health staff recommended mitigation in all 30 reviewed cases and the SHO mitigated the penalty in each case. The most frequent assessment recommendation concerning mitigation was no loss of phone calls, which 67 percent of assessments recommended.

None of the mental health assessments recommended alternative discipline due to patients' mental illness significantly contributing to the behavior documented in the RVR. Rather, mental health staff indicated that mental health may have contributed to the behavior that led to the RVR in 22 or 73 percent of reviewed cases.

As for mental health assessment training, CIW reported that three chief deputy wardens, five correctional administrators, three CC IIIs, three CC Is, two captains, 20 lieutenants, 54 sergeants, and 322 correctional officers attended the training. As for mental health staff, one senior psychologist specialist, two social workers, one senior psych tech, two psych techs, one RN, seven CNAs, and four psychology interns completed the training.

Use of Force:

CIW reported one controlled and 59 immediate uses of force during the review period; the one controlled and 55 of 59 or 93 percent of immediate use of force incidents involved MHSDS patients. Ten of the immediate uses of force involved the use of chemical agents; four involved a combination of physical strengths and holds with the use of chemical agents; one involved a combination of physical strengths and holds with the use of the handheld baton and chemical agent; and 40 involved physical strengths and holds only.

The monitor reviewed the one controlled and 16 immediate uses of force involving MHSDS patients. The controlled use of force occurred in the MHCB and involved physical strength and holds. Three of the reviewed immediate incidents involved the use of OC spray; in each case, proper decontamination protocols were followed for patients and the premises.

While no incidents revealed excessive force, concerns were noted in two incidents. In one incident, two blasts of OC spray were deployed within 35 seconds in violation of policy when a patient pulled restraint equipment into a therapeutic module and wrapped them around her neck. The other incident involved a four-point restraint and forced medication; the force applied was insufficient for nursing staff to safely inject the medication. In addition, the patient was not covered by the safety smock; the Velcro on the product was absent.

Use of force training was attended by 145 of 438 or 33 percent of mental health and nursing staff and 482 of 497 or 97 percent of custody staff.

Lockdowns/Modified Programming:

No program lockdowns or modified programming periods were initiated from the start of the review period through the time of the site visit.

Access To Care:

CIW provided monthly Health Care Access Quality reports from August 1, 2024 through January 31, 2025. Of 13,413 total issued mental health ducats and add-on appointments, 9,965 or 74 percent were completed and 3,448 or 28 percent were not completed. Of the non-completed appointments, two percent was due to custody factors, 66 percent were due to non-custody factors, and 32 percent were due to patient refusals.

*Coleman* Posters:

English and Spanish *Coleman* posters were observed in all toured housing units.

**APPENDIX A-6**
**CALIFORNIA MEDICAL FACILITY (CMF)**
Site Visit: January 28, 2025 – January 31, 2025
Review Period: June 1, 2024 – November 30, 2024

Census:

As of January 24, 2025, CMF housed 1,691 incarcerated persons, which was a four percent increase from the previous reporting period. *See* Thirtieth Round Monitoring Report – Part C, ECF No. 8095 at 308. There were 978 MHSDS patients, which represented 58 percent of CMF's population and had increased six percent increase from the preceding review period. *Id*.

The MHCB housed 18 patients. There were 22 MHSDS patients in restricted housing, including 15 EOP RHU patients and seven 3CMS RHU patients.

The 429 mainline EOP patients had increased by one percent since the previous review period, while the 495 mainline 3CMS patients reflected an 18 percent increase from the prior round. *See id*.

Staffing:

CMF continued to report significant functional vacancies among psychiatrists and primary clinicians in the Thirty-First Round. *Compare infra* p. _ (reflecting CMF's Thirty-First Round psychiatry functional vacancy rate of 33 percent and primary clinician functional vacancy rate of 43 percent) *to* ECF No. 8095 at 308-309 (reporting functional vacancy rates of 12 percent for psychiatrists and 63 percent for primary clinicians in the Thirtieth Round). As of January 24, 2025, staffing for the MHSDS program at CMF was as follows:

The chief psychiatrist position was filled.

The senior psychiatrist position was vacant.

Two of 9.3 staff psychiatrist positions were filled, leaving a 78 percent vacancy rate. Registry staff filled an additional 6.22 positions, reducing the on-site staff psychiatrist functional

vacancy rate to 12 percent. Two of six telepsychiatrist positions were also filled, leaving a 67 percent vacancy rate. Overall, CMF reported a 33 percent functional vacancy rate among staff psychiatry positions during the review period.

The two chief psychologist positions were filled. The 5.25 senior psychologist positions were vacant. Four of 6.1 senior psychologist specialist positions were filled, leaving a 34 percent vacancy rate. Of the 33.6 staff psychologist positions, 10.5 were filled, leaving a 69 percent vacancy rate. Contract staff filled an additional 4.73 positions, reducing the on-site functional vacancy rate to 55 percent. Two of four telepsychologist positions were filled, leaving a 50 percent vacancy rate. Overall, CMF reported a 54 percent functional vacancy rate for staff psychologist positions during the review period.

The supervising social worker position was vacant. Of 10.1 clinical social worker positions, five were filled, resulting in a 50 percent vacancy rate. One staff member was on long-term leave and registry staff filled an additional 2.32 positions, leaving a functional vacancy rate of 37 percent. Three of four tele-social worker positions were filled, leaving a 25 percent vacancy rate. Overall, CMF reported a 34 percent functional vacancy rate for clinical social workers during the review period.

CMF also employed five Licensed Marriage and Family Therapists as primary clinicians during the review period. Including these filled LMFT positions, there was an overall functional vacancy rate of 39 percent among primary clinician positions.

For recreation therapists, 15.25 of 21 positions were filled, resulting in a 21 percent vacancy rate. Contract staff filled an additional 3.87 positions, reducing the functional vacancy rate to 14 percent.

The senior psych tech position was filled. Of 46 psych tech positions, 41 were filled, leaving an 11 percent vacancy rate. Two staff were out on long-term leave, increasing the functional vacancy rate to 15 percent.

Of the 14 medical assistant positions assigned to tele-mental health, 11 were filled, leaving a 21 percent vacancy rate. Registry staff filled an additional 0.73 position, leaving a 16 percent functional vacancy rate.

Twenty-three of 27.2 supervising registered nurse positions were filled, indicating a 15 percent vacancy rate.

Of 118.65 registered nurse positions, 110 were filled, leaving an eight percent vacancy rate. All 75.17 LVN positions were filled, however, four staff were on long-term leave leaving a five percent functional vacancy rate.

Twenty-five of 27.2 CNA positions were filled, leaving an eight percent vacancy rate. One staff member was on long-term leave, resulting in a 12 percent functional vacancy rate.

The 0.8 OSS II position and both CHCA positions were vacant. The 1.8 AGPA and two HPS I positions were filled. For MHSDS clerical staff, 16 of 20.6 positions were filled, resulting in a 22 percent vacancy rate.

Regarding custody staffing, positions for the warden, chief deputy warden, and all five associate wardens were filled. The six captain positions, 27 of 30.2 lieutenant positions, and 79 of 86 sergeant positions were also filled. The 24 CC I and 14 CC II positions were filled. Of 731.4 correctional officer positions, 710 were filled; 36 staff were on long-term leave, resulting in an eight percent functional vacancy rate.

Tele-Mental Health:

CMF used telepsychiatry for its EOP RHU, mainline EOP and mainline 3CMS patients, but not in the MHCB. During the review period, four telepsychiatrists worked in the EOP program, one treated patients in both the EOP RHU and 3CMS RHU, and two treated patients in the 3CMS program. Additionally, during the review period CMF utilized a telepsychologist and tele-social worker to treat EOP patients and a tele-social worker to treat 3CMS patients.

Four senior psychologist specialists teleworked during the review period. The institution indicated that three senior psychologist specialists worked two days on-site and two days of telework, while the other senior psychologist specialist worked three days onsite with one day of telework. Other clerical and administrative staff also teleworked three days per week and worked on-site for two days.

Staff Recruitment:

CMF continued to struggle with mental health staffing vacancies and their impact on the institution's ability to provide adequate mental health care during the review period. *See* ECF No. 8095 at 310. The institution reported making some progress but at a slow pace. The institution reported utilizing billboards and attending hiring fairs to advertise its open positions.

As a result of the pervasive staffing vacancies over multiple monitoring rounds, *see* ECF No. 8095 at 310 and ECF No. 7715 at 178-179, CMF had adopted a "triage and rounding" model to provide basic treatment for the MHSDS population. *See* ECF No. 8095 at 310. Each program within the institution had developed its own modified treatment model based upon the limited resources available.[21] Since that time, the institution's efforts to remove each program

[21] Triage plans were implemented in each program area at CMF on the following dates: MHCB on September 5, 2023; EOP RHU (formerly ASU EOP Hub) on July 12, 2022; EOP program on January 9, 2023; and 3CMS program on May 31, 2022.

from the treatment modification models or triage plans continued to be a challenge given the staffing shortages and lack of supervisory staff. To address the supervisor shortage, CMF reported that line staff that demonstrated leadership potential were encouraged to pursue supervisory positions. As a result, in January 2025 the institution began onboarding three appointed staff, two out of class senior psychologist supervisors and one senior psychologist specialist. As part of their ongoing efforts to hire mental health staff, CMF reported that interviews were held as soon as candidate pools were provided.

Although not part of the allocated mental health staffing, the resumption of a psychology internship program represented a significant step forward for CMF as well. The program resumed at CMF in the fall of 2024 after a seven year hiatus. The CMF internship site is part of a consortium internship accredited by the American Psychological Association. There were four internship positions at the time of the site visit, all of which were filled. Record reviews and on-site observations confirmed that the interns were providing appropriate services to EOP RHU patients.

Quality Management:

The institution's quality management program made significant improvements from the prior round including the resumption of QIT and FITs with appropriate staff representation and clinical audits to monitor compliance trends.

Local Governing Body (LGB) meetings occurred quarterly at CMF during the review period. Meeting minutes from July and October revealed efforts to address the institutional staffing shortages and SRE compliance. Other agenda items included the mental health internship program, staff recruitment projects including using an electronic billboard, and the expansion of tele-mental health.

Reviewed QMC meeting minutes from June through November 2024 also reflected discussion of staffing challenges and compliance metrics but inconsistent consideration of MHPS-specific issues such as the modified treatment programs. Notable agenda items included clinical evaluation and mental health referral compliance, factors that impacted overall compliance rates, emergency management review committee topics, and medication management subcommittee topics.

The Mental Health Program Subcommittee (MHPS) held monthly meetings from June to November 2024 with quorums consistently met, allowing for decision-making throughout the review period. Issues discussed included timely mental health referrals, discharge follow-ups, and suicide risk evaluation compliance. There was also discussion of safety planning documentation gaps and new SPRFIT forms.

Triage planning was also a significant discussion topic in MHPS meetings. Reviewed minutes reflected that there were discussions related to understaffing and its impact on treatment hours and program implementation. Minutes also reflected that the institution reduced expectations for weekly treatment hours offered in EOP from the Program Guide's required ten hours per week down to seven hours per week due to staffing constraints.

CAPS were also implemented for technical errors in referrals and discharge documentation, while a QIT addressed custody discharge check compliance issues.

Audits monitored compliance trends, though in some cases, including safety planning, follow-up lacked comprehensive documentation and occasionally lacked trend analysis. Audits also focused on SRE compliance, custody discharge checks, higher level of care (HLOC) referrals, and medication management. Although sound methodologies were used, delays

occurred due to staffing shortages. Results from these audits informed corrective actions such as clinician training on HLOC documentation.

Peer review processes remained informal due to the absence of a finalized statewide policy. Reviews emphasized qualitative improvements such as mentoring programs aimed at improving SRE compliance.

Mental health leadership's monitoring of certain medication management and Program Guide requirements resulted in the initiation of two CAPs during the review period. The CAPs included RCA processes for medication errors and adjustments to treatment hour goals.

Quality management information was disseminated through executive rounding, training sessions, and subcommittee discussions.

Medication Management:

CMF provided MAPIP results for June 1, 2024 through November 30, 2024 regarding compliance for psychiatric diagnostic monitoring and medication management.

Overall, CMF displayed non-compliance with several key portions of medication management, including with diagnostic monitoring and medication administration. For diagnostic monitoring, 203 metric-months were required, of those, 125 or 62 percent were compliant. For medication administration measures, 72 metric-months were required, of those 36 or 50 percent were compliant. Patient refusals were the main drivers of non-compliance; however, evidence of investigation into other factors was not provided. On a positive note, CMF had detailed policies and procedures surrounding the use of PC 2602 medications, and reported good collaboration between psychiatry, nursing, and custody in PC 2602-related matters.

Diagnostic monitoring for patients prescribed atypical antipsychotics required the measurement of 11 metrics, including: abnormal involuntary movement scale (AIMS); blood

pressure; glucose; complete blood count (CBC); comprehensive metabolic panel (CMP); EKG; height; lipids; medication consents; thyroid function tests; and weight. A total of 65 metric-months of data were required during the review period. Of these, 41, or 63 percent were compliant. CMF was fully compliant for all six months with monitoring blood pressure, glucose, height, and weight, and was fully non-compliant for all six months for lipids and TFTs. The institution was partially compliant with the remaining metrics, namely monitoring AIMS (one of six months), CBC (five of six months), CMP (four of six months), EKGs (three of five months), and obtaining medication consents (four of six months).

**<u>Atypical Antipsychotic Monitoring Metrics at CMF</u>**




Antidepressant medications required four metrics: EKGs for patients taking tricyclic antidepressants; medication consents; thyroid function tests; and obtaining blood pressure for patients taking venlafaxine. As not all metrics required measuring each month, CMF had 21 months for which data were required. When examined in aggregate, CMF was compliant for fifteen, or 71 percent, of metric-months. Specifically, CMF was fully compliant for all three months with obtaining EKGs when required, and with monitoring blood pressure for patients

prescribed venlafaxine for all six months. CMF was partially compliant with obtaining medication consents (five of six months) and monitoring thyroid function (one of six months).

**Antidepressant Monitoring Metrics at CMF**




CMF was a clozapine-maintenance institution. Clozapine is a highly effective antipsychotic medication often used when other antipsychotics have not provided sufficient clinical benefit. This medication carries a risk of serious, sometimes fatal, side effects, and thus requires close monitoring with the same metrics used for antipsychotics as listed herein. As of January 28, 2025, there were 30 non-PIP patients at CMF who were prescribed clozapine.[22] There were 64 data points required during the review period at CMF. Of these, 52 or 81 percent were compliant. Specifically, the institution was compliant for all six required months with monitoring blood pressure, CBC, EKG, and height and weight. CMF was also compliant for all four required months for monitoring TFTs. The remaining metrics (AIMS, glucose, CMP, lipids, and obtaining medication consents) were partially compliant. Specifically, for AIMS, the

[22] In accordance with statewide policy, CMF initiated clozapine only in the MHCB and the PIP. However, this review only encompassed review of clozapine administration requirements in the MHCB.

institution was compliant for three of six months, for CMP, the institution was compliant for four of six months, for lipids, the institution was compliant for three of six months, and for obtaining medication consents, the institution was compliant for three of six months. Nursing monitored patients weekly as required, and alerted psychiatrists of any concerns.

**Clozapine Monitoring Metrics at CMF**




The mood stabilizers carbamazepine and Depakote required four metrics: CBC, CMP, medication level, and medication consent. For carbamazepine, a total of six metric months were required during the review period, of which three were compliant. CMF was partially compliant with CMP (two of three months) and monitoring therapeutic medication levels (one of two months) but noncompliant for the one required month of monitoring CBC. There were no required medication consents due.

**Carbamazepine Monitoring Metrics at CMF**




For Depakote, CMF had 24 required metric months of data of which four or 17 percent were compliant. CMF was partially compliant with monitoring CBC (one of six months), therapeutic medication levels (one of six months), and obtaining medication consents (two of six months) while noncompliant with CMP (none of the six required months).

**Depakote Monitoring Metrics at CMF**



Lamotrigine is a mood stabilizing medication which requires only obtaining medication consents. CMF was compliant for the one month of required metrics.

The mood stabilizer lithium required five measures: medication consents, monitoring of kidney, thyroid function, and therapeutic medication levels, and EKGs. Of the total of 22 metric-months required, CMF was compliant with nine, or 41 percent. CMF was fully compliant with three months of monitoring CMP and one month of monitoring EKGs. The remaining three metrics (monitoring medication levels, obtaining medication consents, and monitoring thyroid function) were partially compliant. Specifically, for two of six months for monitoring medication levels, one of six months for obtaining medication consent, and two of six months for monitoring thyroid function.

**Lithium Monitoring Metrics at CMF**




CMF did not report CAPS to address the deficient metrics in diagnostic monitoring. Reasons for underperformance were reported as patient factors such as refusals, however the specific reasons for underperforming metrics were not explicitly discussed. The institution

reported that it educated psychiatrists and nurse practitioners on required monitoring and ordering laboratory and related studies.

Medication Administration Metrics

Medication administration metrics of MAPIP monitored essential aspects such as medication availability, continuity, preparation, and administration. CMF had 12 required measures during the review period.

Medication continuity included six measures, transfers from other institutions arriving at receiving and release (R&R); intra-institutional transfers to non-RHU locations (Intra); MHCB transfers (MHCB); intra-institutional transfers to restricted housing (RHU); discharge from a community hospital or DSH (Outside Hospital); and upon parole or transfer to the community (Release).

MAPIP measures tracked the compliance of administering of medications given at HS (*hora somni*, or bedtime) which must be given on or after 8:00 P.M. (HS), and medications given in the A.M. and P.M. which must be given at least eight hours between doses (A.M./P.M.). Other metrics evaluated whether chronic psychiatric medications were continued without interruption (Chronic), and whether new medications were administered as ordered, and in compliance with required timelines (New).

PC 2602 involuntary medication orders were the final subset of medication administration metrics. These included whether a court order (Court Order), and a medication order for the PC 2602 medication (Med Order) were present in the medical record.

The institution was fully compliant for all six required months with medications given at HS, chronic medications, and new medications administered, and fully non-compliant for all six required months with transfers from other institutions arriving at receiving and release, discharge

from a community hospital or DSH (Outside Hospital), and medications given in the A.M. and P.M.

CMF was partially compliant for the six required months with six metrics: intra-institutional transfers to non-RHU locations (Intra) (three of six months); MHCB transfers (MHCB) (one of six months); intra-institutional transfers to restricted housing (RHU) (two of six months); parole or transfer to the community (Release) (five of six months); the presence of a PC 2602 court order (three of six months), and the presence of a PC 2602 medication order in the medical record (four of six months).

**Monitoring Medication Administration Compliance at CMF**




Similar to the reasons given for underperforming medication management metrics, CMF reported that patient refusals were the main drivers of non-compliance; however, there were no breakdowns of these numbers.

Prescription Numbers/Medication Administration

CMF did not report the number of MHSDS patients receiving medications, or the total number of medications prescribed by psychiatrists.

Regarding KOP medications, 25 patients received 26 prescriptions. While 18 were in accordance with policy regarding the medication type SSRI/duloxetine, eight deviated from said policy. The most concerning deviations were one prescription each for a beta-blocker (a blood pressure medication often used in psychiatry to treat side effects to medication, or for anxiety), and donepezil (a medication traditionally used for cognitive issues such as dementia). Both medications can be quite serious in overdose, including a risk of death. CDCR policy requires that only patients at the 3CMS level of care receive KOP medications. The level of care for these patients were not provided, and thus accordance with policy could not be assessed.

CMF reported that prescriptions were for a maximum of 180 days. For patients leaving CDCR, CMF followed statewide policy of dispensing a 60-day supply of medications, barring any safety risks of doing so. For verbal and telephone orders, nursing entered the order, and forwarded to the treating psychiatrist for review and signature. The institution did not specify the process for tracking signing verbal or telephone orders.

Medication Administration

CMF completed 54 medication line audits during the review period. All showed compliance with policies regarding total duration of medication pass under two hours. CMF reported that there were no conflicts between medication distribution and mental health programming.

Non-Formulary

CMF reported an average non-formulary rate of approximately 10.9 percent during the review period.

Polypharmacy

CMF had 897 required polypharmacy reviews during the review period. With rare exception, these were completed in a timely manner.

HS Meds

During the monitoring tour, CMF reported that 709 patients received a total of 1,246 prescriptions written at HS. With rare exceptions, CMF was compliant with the requirement to give these medications after 8:00 P.M.

PC 2602

As of January 28, 2025, CMF had 66 patients outside of the PIP who received PC 2602 involuntary medications. The institution reported filing 16 initial PC 2602 applications (13 emergent, and three non-emergent), and 50 renewal petitions; all petitions were granted. There were no planned non-renewals, petitions that expired due to administrative error, or petitions denied or withdrawn for non-clinical reasons.

CMF had clear policies and procedures regarding the initiation and use of involuntary medications. These were in accordance with statewide policies.

The medication court administrator and the chief psychiatrist denied any challenges with interfacing with the Office of Legal Affairs, the Office of Administrative Hearings, or the Administrative Law Judge. Leadership reported excellent collaboration between psychiatry, nursing, and custody on matters related to involuntary medications.

Transfers:

Sustainable process reviews were required in order to audit higher level of care (HLOC) consideration documentation for quality and to measure the inter-rater reliability between the headquarters' reviewer and the institution's inpatient care coordinator.

CMF completed one third quarter major sustainable process review in October 2024. Regional staff conferenced with the CMF HLOC team to review and evaluate the data review processes and results, the MHPS meeting minutes, Acute-ICF Referral and Non-Referral reports, and the consistency audit. Twenty-four cases were reviewed; nine of which involved a disagreement between CMF's inpatient coordinator and the headquarters reviewer. In eight of those nine cases, the inpatient coordinator found the case "good," and the headquarters reviewer found it unacceptable. In five of the eight disputed cases, the headquarters reviewer purportedly reviewed the wrong form. The headquarters reviewer found an additional six cases unacceptable during their review. Of the 14 total cases found by the headquarters reviewer to be unacceptable, six were due to the wrong form being reviewed; four were due to insufficient treatment intervention documentation; three were due to insufficient narrative supporting non-referral, including not establishing a nexus between the narrative and the intervention; and one was due to missing documentation, specifically missing the positive consideration. Of the 14 cases found unacceptable, seven were due to quality versus seven due to error.

CMF utilized two inpatient coordinators; both were senior psychologist specialists and had held their respective positions for approximately four years. In addition to their respective responsibilities, each also indicated completing line staff duties as needed.

During the review period, there were 660 instances of 362 patients considered for but not referred to inpatient care. Reasons for non-referral were not provided.

There were 40 acute care and 79 intermediate care referrals. All 40 acute care referrals resulted in timely transfers. Of the 79 intermediate care referrals, 63 were accepted, 14 were rescinded, and two were rejected; all 63 accepted referrals resulted in timely transfers and all rescissions and rejections were within timelines as well. The inpatient coordinators noted that

CMF's high rate of compliance with transfer timelines was partly attributable to their positive relationships with medical and clinical staff and their years of experience at CMF.

One patient with complex medical needs was referred to intermediate care during the review period; this referral was ultimately rescinded.

At the time of the monitoring tour, no patients were pending transfer to inpatient care.

No data regarding *Vitek* hearings was provided.

CMF reported multiple problems in the acceptance and return of patients from higher levels of care. For DSH transfers, CMF reported frequent rejections when compared to PIP referrals. Reported reasons included custodial factors, substance use, or RVRs. Staff reported that the recent least restrictive housing (LRH) process had not resulted in an increased acceptance rate to DSH. Moreover, CMF reported that they did not receive regular notice of discharges from PIP or DSH. Patients returned to CMF without notice, often requiring CIT activation due to emerging crises at time of arrival in R&R. The institution reported that through a team approach between mental health and nursing, no five-day follow-ups were missed due to these unexpected returns. CMF reported they had raised this issue to headquarters staff and IRU.

CMF admitted 522 patients to its MHCB during the review period. Additionally, CMF referred 181 patients to outside MHCBs, resulting in 139 admissions and 42 recissions. Of the 181 referrals to outside MHCBs, eight or four percent resulted in alternative housing stays beyond 24 hours; reasons for delays were not provided.

There were no placement delays for EOP or 3CMS patients placed into the institution's respective EOP and 3CMS RHUs. Nine patients transferred to 3CMS RHUs at other institutions during the review period; seven or 78 percent transferred timely. Both delays were due to lack of available bus seats.

Nine patients' levels of care changed from EOP to 3CMS during the review period.

Thirty-five 3CMS patients were transferred to MSFs during the review period.

Programming:

MHSDS Patients in Restricted Housing:

CMF operated two restricted housing units (RHU) during the review period, including a 3CMS RHU located in housing unit I-3 and an EOP RHU located in housing unit M-3. Non-MHSDS patients were housed in the 3CMS RHU during the review period as well.

As of January 24, 2025, there were 37 incarcerated persons in CMF's EOP and 3CMS RHUs. Of these, 22 or 59 percent were MHSDS patients; 15 were EOP RHU patients and seven were 3CMS RHU patients.

The EOP RHU failed certification in May 2024 and was officially closed for new EOP admissions from July 2024 through October 2024. The EOP RHU continued to fail hub certification until passing in November 2024. During this time, EOP admissions continued and at least three mainline EOP patients at CMF were transferred to the institution's own EOP RHU. Additionally, data provided during the site visit indicated that the EOP RHU census rose by 13 patients between July 1, 2024 and August 1, 2024. On average, 24 EOP patients were in restrictive housing at the first of each month during the review period.

Allocated mental health positions in the RHU EOP were fully staffed throughout the review period, except for the senior psychologist supervisor position shared between the EOP RHU and 3CMS RHU. This position was vacant for more than a year and throughout the review period but had been filled through reallocation of existing staff two weeks prior to the site visit.

According to the staff-to-patient ratios from the 2009 staffing plan, psychiatrists who treat EOP patients in restricted housing must maintain a caseload of no more than 64 patients per

psychiatrist, while primary clinicians who treat EOP patients in restricted housing must maintain a caseload of no more than 11 patients per clinician. *See* ECF No. 3693 at 19. For psychiatrists who treat 3CMS patients in restricted housing must maintain a caseload of no more than 125 patients per psychiatrist, while primary clinicians who treat 3CMS patients in restricted housing must maintain a caseload of no more than 25 patients per clinician. *See id*. at 14.

The institution utilized a telepsychiatrist to treat both EOP RHU and 3CMS RHU patients. This telepsychiatrist maintained a caseload consistent with the RHU census, which at the time of the site visit included 15 EOP RHU and seven 3CMS RHU patients and also maintained a caseload of 20 EOP patients. *See supra* p. _.

Mental health leadership reported that primary clinician positions in the RHUs were subject to significant turnover and use of registry staff during the review period. There were four primary clinicians; two psychologists and two LCSWs who treated both EOP and 3CMS RHU patients. One psychologist maintained a caseload of 12 patients while the other did not carry a caseload. Similarly, one LCSW maintained a caseload of 12 patients while the other did not carry a caseload. There were also two recreation therapists in the RHUs and two interns assigned to the EOP RHU with a caseload of two patients each.

Despite the lack of staffing vacancies in the RHUs, the institution operated the EOP RHU program under a triage plan during the review period through October 2024. The triage plan was reported to be fluid and adjusted as the EOP RHU census, staffing, and as patient treatment needs fluctuated. The most recent version of the triage plan, developed in July 2022, assigned recreation therapists to complete high-treatment refuser contacts and suspended weekly QIT meetings. In October 2024, the EOP RHU program modifications were lifted due to improved stability of primary clinician staffing.

CMF leadership reported that a formal triage plan was not developed for the 3CMS RHU.

*Structured Treatment*

The Restricted Housing Unit Program: Mental Health Services Policy, dated July 19, 2024 and effective August 1, 2024 (hereinafter "RHU Policy") requires that EOP RHU patients be offered at least ten hours of structured therapeutic activities each week. *See* RHU Policy at 8. CMF was unable to provide complete data for the review period regarding the number of structured therapeutic hours offered to EOP RHU patients per week due to the conversion from ASU to RHU classification. Data for 23 weeks of the review period indicated that EOP RHU patients were offered an average of 9.74 hours of structured treatment per week but offered at least ten hours of structured treatment in 13 or 57 percent of reviewed weeks. Across the 23 weeks, patients attended 4.84 weekly hours of structured treatment and refused 4.9 hours on average. Monthly data indicated improvement in providing required structured therapeutic activities during the final two months of the review period.

According to RHU certification reports, reasons for eligible patients being offered less than ten weekly hours of treatment included scheduling and data entry errors, conflicting mental health and medical appointments, conflicting yard and mental health treatment time, scheduling patients into multiple groups at the same time, scheduling EOP RHU patients to attend groups that were only offered to CMF-PIP patients, modified programming triggered in part by the heat plan, and staff absences or unavailability. Patients reported that groups were cancelled when only one patient wanted to attend. CMF mental health leadership confirmed that such cancellations had occurred but the issue had been addressed; it was reported that groups were now held when only one patient attends.

The number of EOP RHU patients on modified programming during the review period ranged between zero and six. There was only one patient on EOP modified programming housed in the EOP RHU at the time of the site visit. These patients were required to receive weekly primary clinician contacts, daily psychiatric technician or primary clinician rounds, and an IDTT meeting every 30 days. During the review period, patients on EOP modified programming were offered a weekly average of 1.60 hours of structured treatment, attended an average of 0.62 hours, and refused an average of 0.98 hours.

Mental health leadership reported that, during the review period, efforts had been made to reduce the number of patients on EOP modified programming. Mental health staff were instructed not to place patients on EOP modified programming solely because the patients preferred not to attend groups; staff were instructed that EOP modified programming status required a clinically appropriate rationale. This effort reduced the number of patients assigned to EOP modified programming but at least temporarily increased the number of treatment refusals.

The Restricted Housing Unit Program: Mental Health Services Policy, dated July 19, 2024 and effective August 1, 2024 (hereinafter "RHU Policy") requires that 3CMS RHU patients be offered 90 minutes of structured therapeutic activities each week. *See* RHU Policy at 5. On average, each 3CMS RHU patient at CMF was offered 0.19 weekly hours of structured treatment and attended an average of 0.18 hours of treatment during the review period.

*IDTTs*

The monitor's expert observed both EOP RHU IDTT meetings that were scheduled during the monitoring tour. The IDTT meeting space was confidential with adequate sound privacy. Large windows into the room from the hallway were not an impediment to visual privacy, as patient movement on the hallway was tightly controlled. The room was large enough

to hold the team and the patient in a therapeutic module and arranged so that the patient could readily see and communicate with all staff, including the telepsychiatrist. Computers were available to treatment team members. The institution reported that the ceiling camera's audio capability was not connected.

One of the two EOP RHU IDTT meetings was held in absentia because the patient refused to attend. An alternate for the assigned primary clinician presented the case. All other required staff were in attendance. The second IDTT meeting included the patient and all required staff. The psychiatrist joined by telepsychiatry for both meetings.

Both EOP RHU IDTT meetings included discussion of the patient's psychiatric and recent psychosocial history, the patient's diagnosis, psychotropic medications, substance use history, group attendance and medication adherence, and a rationale for level of care. Case conceptualizations were not clearly discussed for either patient, and in the second IDTT meeting the diagnosis of unspecified anxiety disorder did not accord with the patient's observed symptoms. Functional impairments were adequately addressed in one of the IDTT meetings. The IDTT meeting held in absentia noted that the patient had met his treatment goals but did not identify those goals, and the patient was unanimously recommended for step down to 3CMS. The correctional counselor's participation was appropriate.

Because no IDTT meetings were scheduled for EOP RHU patients on modified programming, five patient records were reviewed to assess the quality of IDTTs and treatment planning documentation, and to determine if patients received the treatment required by the treatment plan. Treatment plans did not identify the type of group programming the patient needed, did not identify daily clinical contacts or recreational therapy encounters at the cell front as alternatives to group programming, and only rarely identified improvement in treatment

engagement or group participation as a goal. In one case, a patient's treatment plan indicated he was to be offered two groups per week, but there was no documentation that any groups were offered for more than four months after the treatment plan was formulated.

Only one IDTT meeting for a 3CMS RHU patient was scheduled during the site visit, but the patient was transferred to another facility before the IDTT meeting occurred. Because no 3CMS RHU IDTT meetings could be observed, three 3CMS RHU patient records were reviewed. IDTT meetings were usually attended by required staff, apart from a missing senior psychologist supervisor; patients attended three of the four IDTT meetings reviewed. Identification and provision of in-cell therapeutic activities was not referenced in IDTT documentation. Treatment plans required improvement, as evidenced by long-term goals that were poorly specified, not measurable, or simply missing.

*Group Treatment*

At the time of the monitoring tour, the EOP RHU schedule indicated that a total of 42 hour-long structured groups were scheduled each week. Of these, 34 or 81 percent were recreational therapy groups, and eight or 19 percent were clinician-led groups. Recreational therapy group topics included sports, health habits, cinema therapy, music, and a "to be determined" topic, which reflected placeholders for groups that will be offered once the EOP RHU census increased. Clinician-led group topics included symptom management for patients with serious mental illness, substance use disorders, stress and anxiety reduction, and mental health education. Leadership indicated that because the EOP RHU census was low and there was sufficient primary clinician staff, the RHU would rely on individual primary clinician contacts rather than clinical caseload groups.

Group treatment space was adequate for the RHU EOP and RHU 3CMS patients.

Only one clinician-led group was scheduled during the monitoring tour. Both scheduled patients refused to attend, and the group was cancelled.

The monitor's expert observed two EOP RHU recreational therapy groups, each with three patients in attendance. Patients were placed in therapeutic modules during both groups. One recreational therapy group focused on healthy habits and was well run, clinically appropriate, relevant for the patients involved, and highly interactive. Of concern, only one patient was scheduled for this group; scheduling challenges and custody escort confusion resulted in two additional patients being placed into the group room and then participating in the group.

The other observed recreational therapy group consisted of cinema therapy in which a portion of a 1968 Clint Eastwood western, *Hang 'Em High*, was shown. CMF reported that cinema therapy is used to manage symptoms of anxiety, depression, stress, and trauma. During the observed group, the recreational therapist occasionally interrupted movie viewing to ask patients questions about what was happening in the plot, but most of the group session was silent except for the movie. Patients remained alert, but their experience of the movie was unclear. There was no discussion of mental health needs, symptoms, skill building, or other clinically relevant topics.

*Individual Treatment*

The RHU Policy requires that all patients placed into EOP RHU receive a primary clinician evaluation within five days of arrival, a psychiatry evaluation prior to the IDTT and within ten days of arrival. *See* RHU Policy at 5-6. The RHU Policy also requires that EOP RHU patients receive weekly primary clinician contacts and psychiatry contacts every 30 days. *See id.* at 7.

The records of 14 mainline EOP patients were reviewed to assess compliance with RHU Policy timeframes during the review period.[23] All 14 patients required initial psychiatry evaluations; nine or 64 percent timely occurred before the initial IDTT. Eleven or 79 percent of the reviewed initial psychiatry evaluations were conducted in confidential settings. Non-confidential contacts were due to custody modified programming and patient refusals. Telepsychiatry was utilized for seven or 50 percent of initial psychiatry evaluations.

To measure timeliness of routine psychiatry contacts during the review period, CDCR produced an appointments report that included individuals who were required to receive a routine IDTT from June 1, 2024 through November 30, 2024. For the 38 patients in CDCR's appointments report, there were 93 completed and refused contacts; 69 or 74 percent were confidential as reported by the institution. When a patient had more than one completed or refused contact, compliance with RHU Policy timeframes was able to be calculated. Of the 93 contacts, 55 were for individuals who were seen at least twice by the psychiatric provider. Of those 55 contacts, 49 or 89 percent occurred timely and six or 11 percent occurred beyond RHU Policy requirements with a range of two to 37 days beyond timeframes. Of note, the report did not include individuals that did not have completed contacts. Reviewed data captures the time between patient contacts but does not account for when patients were not seen or scheduled for a routine psychiatric contact. Further, the appointments report did not account for delays between appointments due to movements in or out of the RHU or EOP level of care. Contact with the assigned psychiatrist was unable to be determined.

---

[23] Due to CMF's EOP RHU being closed to intake from July 2024 through October 2024, the sample size was reduced from 30 to 14 patients.

Thirty patients were randomly selected to verify consistency between the appointments report and clinical documentation in EHRS. Of the 69 contacts reviewed in EHRS, 67 or 97 percent were consistent with the appointments report; one contact had no EHRS documentation and the other was a duplicate entry.

All 14 patients that required initial psychiatry evaluations also required initial primary clinician evaluations. Of the 14 reviewed initial primary clinician contacts, six or 43 percent were completed within five calendar days of arrival or change in level of care. Six or 43 percent of reviewed initial primary clinician evaluations were conducted in a confidential setting. Non-confidential contacts were due to patient refusals.

To measure timeliness of routine primary clinician contacts during the review period, CDCR produced an appointments report that included individuals who were required to receive a routine primary clinician contact from June 1, 2024 through November 30, 2024. For the 30 patients in CDCR's appointments report for September 1, 2024 through November 30, 2024[24], there were 178 completed and refused contacts; 90 or 51 percent were confidential as reported by the institution. When a patient had more than one completed or refused contact, compliance with RHU Policy timeframes was able to be calculated. Of the 178 total contacts, 148 were for individuals who were seen at least twice by the primary clinician. Of those 148 contacts, 139 or 94 percent occurred timely; nine or six percent occurred beyond RHU Policy requirements with a range of three to 138 days beyond timeframes. Of note, the report did not include individuals that did not have completed contacts, such as those that were not scheduled. Additionally, the reviewed data captured the time between patient contacts, but did not include patients who were

[24] Data regarding EOP RHU primary clinician contacts for the first three months of the review period was not provided.

not seen or scheduled for a routine contact with the primary clinician. The provided appointments report did not account for delays between appointments due to movements in or out of the RHU EOP. Contact with the assigned primary clinician was unable to be determined. When primary clinician caseload groups were utilized to meet primary clinician contact requirements, verification that individual contacts with the assigned primary clinician alternated with caseload groups with the assigned primary clinician was not conducted.

Of the 178 completed contacts, eight were completed in zero minutes, 125 were completed within 15 minutes, 31 were completed between 16 and 30 minutes, two were completed between 31 and 60 minutes, one was completed between 61 and 95 minutes, and 11 were completed in greater than 95 minutes.

All 30 patients were selected to verify consistency between the appointments report and clinical documentation in EHRS. Of the 103 contacts reviewed in EHRS, 101 or 98 percent were consistent with the appointments report; two contacts were missing EHRS documentation.

Both the telepresenter and the telepsychiatrist briefly discussed the use of tele-mental health in the RHU. The telepsychiatrist reported that tele-mental health connectivity and equipment functioned without interruption or challenges and had been free of technical challenges for the last year. Connectivity and visibility were sufficient to complete assessments for the potential of abnormal involuntary movements. She indicated that the only clinical challenge to using telepsychiatry equipment arose when patients experienced paranoia regarding the use of the equipment, but that this occurred rarely and could usually be overcome through discussion with the patient. Both the telepresenter and telepsychiatrist indicated that use of telepsychiatry was effective in treating RHU 3CMS and RHU EOP patients at CMF.

Six EOP RHU patients were interviewed in two group settings. Most patients reported that they saw their assigned primary clinician and assigned psychiatrist at least as frequently as required. Use of a non-assigned clinician or psychiatrist to provide coverage for regularly scheduled appointments was reported to be rare. Patients reported that they attended IDTT meetings every 90 days, but few patients were aware of their treatment goals. Patients were aware of how to obtain assistance in the event of a mental health emergency. They reported that they benefited from mental health services but that there was a need for additional interactive "talk" groups. They acknowledged receiving in-cell therapeutic activities during groups that they could bring back to their cells and use later. Patients reported that their ICC meeting occurred prior to their IDTT meeting.

Individual treatment space was adequate for the EOP RHU and 3CMS RHU patients.

Three initial and four subsequent ICC were observed during the monitoring tour. Required staff were in attendance for all seven committee meetings. Three patients had been placed in restricted housing for safety concerns; two patients had their MERDs suspended and were released from restricted housing, and the two remaining patients were retained pending the completion of an investigation. Two patients were eligible for NDS status, and one was assigned NDS status during the ICC.

Forty weeks of reviewed 114-As for the offering of yard, showers, linen exchange, and telephone calls revealed the offering of weekly, yard, showers, linen exchanges, and telephone calls which was compliant with required policy.

<u>Non-Disciplinary Segregation</u>:

At the time of the monitoring tour, three patients were placed on NDS status; of those three, only one patient was NDS 200 status for accelerated transfer. During the review period,

17 patients were placed on NDS status; of those, three patients were NDS 200 and required expedited transfer, and the remaining 14 patients were NDS 102 status for privileges and property but not considered for accelerated transfer.

MHCB:

The MHCB maintained 50 active beds across two housing units with 25 beds in each unit.

As of January 29, 2025, there were 23 total MHCB patients; 12 patients housed in Unit A and 11 patients housed in Unit B. During the review period, the average daily census was 38 patients. There were sixteen patients who had three or more MHCB stays during the review period.

There were 522 MHCB admissions to the CMF MHCB during the review period; 179 or 34 percent resulted in clinical lengths of stay beyond ten days and 293 or 56 percent resulted in physical lengths of stay beyond ten days. Physical lengths of stay averaged 12.6 days and ranged from one to 82 days. Mental health leadership attributed the excessive MHCB clinical stays to a lack of timely IDTTs to discharge the patients.

During the review period, the MHCB lacked the required staff to provide adequate care, with mental health leadership reporting that at times the MHCB was only staffed with between one and three clinicians for the entire program. This resulted in triage planning including offering primary clinician contacts every other day as opposed to daily, offering IDTTs on a priority basis with initial IDTTs first, followed by discharge, and then routine treatment team meetings. The triage plan also included limited weekend treatment with no IDTTs and psychiatry contacts limited to emergent consults, initial assessments, and individual contacts in the lowest priority level. Leadership reported that it had escalated the staffing issue to

headquarters to consider reducing the number of available MHCB beds, however this did not occur.

At the time of the monitoring tour, the program was no longer on a triage plan as the program had increased their staffing levels due to staff redirection and additional hires. Documentation indicated that at the time of the monitoring tour, there were six psychiatrists and seven psychologists assigned to the MHCB, all of whom maintained variable caseloads.

No cells were redlined at the time of the monitoring tour. The institution reported that when an issue arose with a room needing repair, there was a rapid response by facilities. In terms of access, the institution reported that two MHCB beds were wheelchair-accessible (DPW), while all rooms were open for patients with occasional wheelchair use (DPO).

Regarding treatment space, there were two confidential offices on each side of the unit, for a total of four. Two of these offices were not available during IDTTs. All rooms had TTMs for patients on maximum custody, or for those whom mental health deemed needed placement for clinical reasons. Otherwise, patients sat in a chair outside of the TTM.

The monitor's expert observed three complete, and one partial MHCB IDTTs during the site visit. The one partial IDTT was incomplete due to an institution-wide situation that had arisen. The IDTT room was small but appropriate for a treatment team meeting. It had adequate light and was at a comfortable temperature. All required participants were present. Each patient was present during their respective IDTT as were the required staff members.

While the psychiatric evaluations were timely and occurred prior to the initial IDTT, a different psychiatrist frequently did the assessment compared to the psychiatrist present in IDTT. The team was collaborative and clearly had strong interpersonal working relationships.

IDTT quality varied based on the primary clinicians presenting cases. The monitor's expert observed four IDTTs over two days with two different primary clinicians. On the first day, the primary clinician identified the symptoms which aligned with the reported diagnoses for each patient. However, on the second days of observed IDTTs, the primary clinician did not state the diagnosis, and thus it was unclear if the patients' symptoms matched the diagnoses. There was an unclear link between each patient's symptoms and functional impairments. All observed cases lacked case conceptualizations and formulations.

While the team on the first day of observed IDTTs did not formally review higher level of care indicators in a systematic way, they reviewed several germane aspects including the number of MHCB admissions for each patient, the number of RVRs that patients had been issued, and any relevant suicidal or self-injurious history.

On the second day of observed IDTTs, the treatment team displayed fundamental inadequacies. Treatment goals were not meaningfully discussed. Interventions were discussed only in broad terms such as "coping skills." Concerning deficiencies regarding two of the most important aspect of MHCB IDTTs, namely discussions around level of care and safety were particularly concerning. When a patient requested a referral to a PIP, the primary clinician stated that the IDTT meeting was not the place to discuss the patient's level of care. The primary clinician discussed that the need for a referral to PIP would be assessed during his MHCB stay. The same patient reported that he had overdosed on oxcarbazepine, a medication used for mood stabilization. The patient stated that he underwent a medical evaluation, but this information was not apparently known by the psychiatrist or the primary clinician. Custodial matters were well addressed in all observed IDTTs. MHCB staff reported consistent coverage for the MHCB CC I.

The CC I was particularly helpful to the IDTT process and addressed privilege groups, showers, and telephone calls for each patient.

The monitor randomly selected and reviewed the healthcare records of 30 MHCB patients to assess compliance with Program Guide timeframes during their stays.

All thirty MHCB patients required initial psychiatry evaluations. Of those, 28 or 93 percent were timely initial psychiatry assessments, meaning they occurred before the initial IDTT and within 24 hours of arrival. Two initial psychiatry assessments did not occur. Twenty-four of 28 or 86 percent were conducted in a confidential setting. Reasons indicated for non-confidential contacts included patient refusals while one contact did not give a reason. Telepsychiatry was not reported as utilized for initial psychiatry contacts.

All thirty MHCB patients require two routine psychiatry contacts per week. There were 137 expected contacts, of which 134 or 98 percent were timely. Of the 135 routine contacts reviewed, 108 were reported as being conducted in a confidential setting. Additional reasons for non-confidential routine psychiatry contacts included patient refusals, modified programming, or reported to be cell front "as planned." Telepsychiatry was not reported as utilized for routine psychiatry contacts.

All thirty MHCB patients required initial primary clinician assessments; six or 20 percent were completed within 24 hours of arrival, while eight or 27 percent of initial primary clinician assessments were missing. Of the 22 required initial primary clinician contacts that occurred, 17 or 57 percent were held in a confidential setting. Reasons for nonconfidential contacts included patient refusals, modified programming, and cell front "as planned." There was no initial primary clinician assessments reported utilizing tele-psychologists or tele-social workers.

These thirty MHCB patients also required routine primary clinician contacts. An institution was considered compliant if a patient was seen daily beginning the day after admission for an out-of-cell confidential contact (unless the patient refused) by the psychiatrist or psychologist, though on weekends the patient may be seen by the medical officer of the day (MOD). *See* ECF No. 7333-1 at 84 (PG 12-5-13). There were 142 expected contacts, of which 111 or 78 percent were timely. Of the 113 contacts reviewed, 78 or 69 percent were conducted confidentially. Reasons for nonconfidentiality included patient refusals, modified programming, or cell front "as planned." Of the 113 routine primary clinician contacts reviewed, 17 or 15 percent of the contacts were completed by unlicensed clinicians. Tele-mental health was not utilized for routine primary clinician contacts.

The same thirty MHCB patients also required initial IDTTs; and 18 or 60 percent occurred within 72 hours of arrival. The required assigned staff were present at only four of 30, or 13 percent of the initial IDTTs reviewed. The assigned psychologist or psychiatrist were the most frequently substituted staff members, with the assigned psychologist at only seven of 30, or 23 percent and the assigned psychiatrist at 12 of 30 or 40 percent of initial IDTTs. Patients attended 28 of 30, or 93 percent of initial IDTTs, and the remaining two patients refused to attend.

Of the 33 required routine IDTTs, 19 or 66 percent occurred timely, or every seven calendar days following the initial IDTT. Two or seven percent of routine IDTTs had the required assigned staff in attendance. The assigned psychologist or psychiatrist were the most frequently substituted staff members, with the assigned psychologist at only seven of 29, or 24 percent and the assigned psychiatrist at 13 of 29 or 45 percent of routine IDTTs. No psychiatrist

attended one of the 29 routine IDTTs reviewed. Of the 29 routine IDTTs reviewed, patients attended 100 percent.

The MHCB offered patients shower, yard, dayroom, and phone calls in accordance with policy.

Seclusion and Restraint:

The institution had a total of four restraint and four seclusion cells. The restraint rooms had toilets and sinks, while the seclusion rooms had grates on the floor. All appeared in good working order. Mental health and custody demonstrated clear understanding about the use of mechanical restraints within the MHCB.

During the review period, there were five instances where either restraints or seclusion were utilized. These incidents ranged from 48 minutes to four hours and 55 minutes. CMF reported that in two incidents, appropriate documentation for the use of restraints was not created and training was provided thereafter. Furthermore, documentation was not completed for one incident because staff were not familiar with the restraint policy; training was provided for the staff involved on the restraint policy, and a general communication was sent out to all nursing staff regarding the restraint policy.

EOP:

CMF's mainline EOP population was 429 patients on the date of the site visit, an increase of one percent from the prior monitoring round. *See* ECF No. 8095 at 308. Patients were housed in eight housing units across four facilities, including Facilities L-2, L-3, M-1, M-2, N-1, N-2, and N-3, while OHU EOP patients were housed in G-2.

There were three on-site psychiatrists and four telepsychiatrists who treated EOP patients during the review period; all but one telepsychiatrist maintained caseloads within the 120

patient-per-clinician ratio and one on-site psychiatrist did not carry a caseload at all. The one telepsychiatrist who exceeded caseload requirements maintained a caseload of 125 patients. Notably, one on-site psychiatrist also assisted in the MHCB but did not carry an MHCB caseload and one telepsychiatrist also maintained a caseload of 22 RHU patients.

The institution also indicated that there were four on-site psychologists, three of which carried caseloads in excess of the 26 patient-per-clinician ratios with 36, 36, and 88 patients respectively. A telepsychologist also carried a caseload of 35 patients and a senior psychologist supervisor also carried a caseload of five patients. There were also three on-site LCSW's and one tele-social worker; all four maintained caseloads that exceeded caseload ratio requirements.

Five LMFT's administered clinical groups in the EOP program and did not carry caseloads during the review period, while 17 recreation therapists provided recreational groups to EOP patients.

As a result of low staffing levels which prevented the institution from providing Program Guide compliant mental health care to the EOP population during the review period, CMF's EOP program continued with its triage plan that was initially implemented in 2023, which effectively suspended several court-ordered treatment standards. Although caseloads for primary clinicians remained relatively low under the triage plan, routine IDTTs and routine primary clinician contacts for mainline EOP patients remained suspended during the review period. Additionally, the required average amount of structured treatment offered to mainline EOP patients was lowered from ten to seven hours. Thus, the triage plan was intended to enable staff to allocate treatment resources to initial and discharge IDTTs, alternative programming evaluations, and weekly or biweekly routine primary clinician contacts for patients included in the SRMP, DD3 designation, or those that required higher clinical needs as determined by the IDTT.

*Structured Treatment*

The Program Guide required that each EOP patient be offered at least ten hours per week of structured therapeutic activities. If a patient was scheduled for less than ten hours per week, the patient's IDTT was required to meet monthly to review and increase the amount of structured therapeutic activities or refer the patient to a higher level of care. *See* ECF No. 7333-1 at 55-59. The institution indicated that during the review period, EOP patients were scheduled for an average of 7.42 hours of structured treatment per week and offered an average of 5.95 hours per week, while patients attended an average of 3.83 hours of structured treatment per week. CMF indicated that an average of 1.84 hours per week were cancelled and an average of 2.22 hours per week were refused. Notably, the amount of offered structured activities fell below the amount required by the Program Guide and the EOP program's own triage plan during the review period.

*IDTTs*

The Program Guide required that EOP patients receive an initial IDTT within 14 calendar days of arrival to the institution and routine IDTTs every 90 days thereafter. *See id*. at 59. The required attendees include the patient's assigned primary clinician, assigned psychiatrist, assigned correctional counselor, and the patient themselves. *See id.* The IDTT should address treatment needs, develop treatment plans, assess treatment progress, and include pre-release and discharge planning. *See generally id*.

The EOP program's triage plan prioritized certain IDTTs over others during the review period. According to a January 2023 letter circulated to staff, initial IDTTs were the highest priority, followed by patients with HLOC concerns, patients in the community re-entry program, and patients on EOP modified programming. Routine IDTTs that were not clinically indicated were suspended unless determined clinically necessary by an assigned clinician.

Observed mainline EOP IDTTs were compliant with Program Guide requirements during the review period. Three ML EOP IDTTs were observed. All required staff were present. Treatment plans were thoroughly reviewed and relevant clinical and psychosocial histories were discussed. Patients provided input on programming, medications, and custody concerns. Diagnoses were clearly stated, supported by symptoms, and functional impairments were addressed. Diagnostic discrepancies, if present, were resolved collaboratively. The team appropriately discussed what the patients were working on in treatment, and how the program was addressing their needs. Initial IDTTs included group referrals, while reviews addressed group participation and progress. Safety planning, substance use, transition/pre-release planning, and level of care changes were discussed as needed. The process was collaborative, with constructive custody participation and team input.

The Program Guide requires that EOP patients are required to receive an initial IDTT within 14 calendar days of arrival or level of care change and a routine IDTT every 90 calendar days. *See* ECF No. 7333-1 at 59

The records of 30 mainline EOP patients were reviewed to assess compliance with Program Guide timeframes during the review period. All 30 patients required initial IDTTs. Of the 30 reviewed initial IDTTs, 4 or 13 percent occurred timely within 14 calendar days of arrival or level of care change. Required staff attended 23 or 77 percent and while patients attended 25 or 83 percent of reviewed cases. The initial IDTTs that were held *in absentia* were due to patient refusals and custody modified program.

To measure timeliness of routine IDTTs during the review period, CDCR produced an appointments report that included individuals who were required to receive a routine IDTT from June 1, 2024, through November 30, 2024. For the 237 patients in CDCR's appointments report,

there were 267 completed and refused initial or routine IDTTs. When a patient had either a completed or refused initial IDTT and a routine IDTT or more than one routine IDTT, compliance with Program Guide timeframes was able to be calculated. Of the 267 completed and refused IDTTs, 31 contacts were for individuals who had at least two IDTTs (initial and routine or two routines). Of those 267, there were 8 or 31 percent that occurred beyond Program Guide requirements with a range of 91 and 112 days. Of note, the report did not include individuals that did not have a completed or refused IDTT, such as those that were not scheduled. Additionally, the reviewed data captures the time between completed patient IDTTs but does not account for when patients were not scheduled for an initial or routine IDTT. The appointments report did not account for delays between appointments due to movements in or out of the mainline EOP program.

A random sample was selected to verify consistency between the appointments report and clinical documentation in EHRS. Of the 39 contacts reviewed in EHRS, 38 or 97 percent were consistent with the appointments report; one or 3 percent had discrepancies. Discrepancies included the date the patient was seen was different than the date the note was entered.

*Group Treatment*

To facilitate clinical groups, the institution utilized five LMFTs and utilized 17 recreation therapists during the review period. During the review period, mainline EOP programming group sizes had returned to normal capacity since COVID-19 restrictions limited group sizes and included mixed EOP unit cohorts in designated programming areas. Reviewed topics for clinical groups were appropriate to address a variety of clinical needs in an EOP setting. NLTGs covered topics related to general and mental health and health risk education.

The monitor's expert observed one clinical EOP group. The room was spacious, had plenty of light, and at a comfortable temperature. There was some sound from music from the adjoining room indicating confidentiality concerns. There was a significant delay in starting the group as only one patient was present for the first twenty minutes before two additional patients arrived. This was reportedly due to issues with patient movement.

The group facilitator was an LMFT who reviewed information from prior lessons, which also afforded the opportunity to gauge the patients' retention of information. The patients understood the prior material. The information presented was appropriate for the patients' clinical status. The group was well-run, with the group facilitator ensuring participation from all attendees.

Interviewed patients reported overall being pleased with CMF's EOP program and group treatment curriculum. Group participants reported seeing their primary clinician every two weeks with alternating caseload groups in between clinician contacts. One patient expressed that most groups were leisure in nature and would prefer more clinically focused groups. He reported voicing his concerns but was told that clinical groups were limited due to staffing levels at the institution.

*Individual Treatment*

The EOP program's implementation of a triage plan had a significant impact on individual treatment provided to mainline EOP patients during the review period. According to the triage plan circulated to staff in January 2023 (and in effect continuously since the preceding review, *see* ECF No. 8095 at 328), the EOP program adopted a "group based model of care" with routine clinician appointments for "stable patients" by request. For patients in the SRMP program, those who were on EOP modified programming, and patients classified at DD2 or

DD3, one-to-one patient appointments continued to occur as required. The triage plan also required that mental health supervisors conduct rounds in each EOP housing unit on a weekly basis to check in with patients and "elevate" patients to receive a routine contact as needed. In addition, recreation therapists were also encouraged to report to clinicians regarding any concerns or if they believe a patient may be decompensating, despite not having the required clinical ability to make that determination.

The Program Guide requires that patients are offered an initial psychiatrist evaluation before their initial IDTT and within 14 calendar days of arrival to the institution or level of care change. *See* ECF No. 7333-1 at 59. Thereafter they are required to receive a routine psychiatric contact every 30 calendar days. *Id*. Patients are also required to receive a primary clinician evaluation within 14 calendar days of arrival and weekly (i.e. every ten calendar days) with either a primary clinician or in group psychotherapy with an individual contact every other week. *Id*.

The records of 30 mainline EOP patients were reviewed to assess compliance with Program Guide timeframes during the review period. All 30 patients required initial psychiatry evaluations; 23 or 77 percent timely occurred before the initial IDTT. Twenty-four or 80 percent of reviewed initial psychiatry evaluations were conducted in confidential settings. Telepsychiatry was utilized for 20 or 67 percent of initial psychiatry evaluations.

To measure timeliness of routine psychiatry contacts during the review period, CDCR produced an appointments report that included individuals who were required to receive a routine psychiatry contact from June 1, 2024 through November 30, 2024. For the 484 patients in CDCR's appointments report, there were 2,460 completed and refused contacts, 2,206 or 90 percent of the completed contacts were confidential as reported by the institution. When a

patient had more than one completed or refused contact, timeliness in accordance with Program Guide requirements was able to be calculated. Of the 2,460, 1,977 contacts were for individuals who were scheduled at least twice by the psychiatric provider. Of those 1,977 contacts, there were 477 or 24 percent that occurred beyond Program Guide requirements with a range of 31 and 162 days between contacts. Reviewed data captures the time between patient contacts but does not account for when patients were not seen or scheduled for a routine psychiatric contact. Of note, the appointments report did not account for delays between appointments due to movements in or out of ML EOP. Contact with the assigned psychiatrist was unable to be determined.

A sample of 30 patients was randomly selected to verify consistency between the appointments report and clinical documentation in EHRS. Of the 113 contacts reviewed in EHRS, 112 or 99 percent were consistent with the appointments report. Only one had a discrepancy due to no progress note found in the patient's record.

The same 30 patients who required initial psychiatry evaluations also required initial primary clinician evaluations. Of the 30 reviewed initial primary clinician evaluations, 16 or 53 percent were completed within 14 calendar days of arrival or change in level of care. Nineteen or 63 percent reviewed initial primary clinician evaluations were conducted in a confidential setting. Non-confidential contacts were due to patient refusals. Telehealth was used in eleven or 36 percent of reviewed contacts.

To measure timeliness of routine primary clinician contacts during the review period, CDCR produced an appointments report that included individuals who were required to receive a routine primary clinician contact. For the 50 patients in CDCR's appointments report for June 1 through November 31, 2024, there were 250 completed and refused contacts. 147 or 76 percent

of the completed contacts were confidential as reported by the institution. When a patient had more than one completed or refused contact, timeliness in accordance with Program Guide requirements was able to be calculated. Of the 250, 200 contacts were for individuals who were seen at least twice by the primary clinician. Of those 250 contacts, there were 117 or 59 percent that occurred beyond Program Guide requirements with a range of 11 and 35 days.

There were 193 completed individual primary clinician contacts, of which 65 were completed within 15 minutes, 44 were completed in between 16 and 30 minutes, 56 were completed in between 31 and 60 minutes, 16 were completed in between 61 and 95 minutes, and 12 were completed in greater than 95 minutes.

A random sample of 30 patients was selected to verify consistency between the appointments report and clinical documentation in EHRS. Of the 70 contacts reviewed in EHRS, 66 or 94 percent were consistent with the appointments report; 4 or 6 percent had discrepancies. Discrepancies included no medical note or the note was entered on the following day

3CMS:

There were 495 3CMS patients housed at CMF on the date of the site visit; an increase of 75 patients from the prior reporting round. *See* ECF No. 8095 at 308.

Two telepsychiatrists treated all 3CMS patients and carried caseloads of 189 and 271 patients respectively. During the review period an on-site psychiatric nurse practitioner also treated 3CMS patients but their caseload varied. One tele-social worker and one on-site psychologist also treated 3CMS patients and carried caseloads of 48 and 187 patients respectively.

Secondary to critical staffing levels, in May of 2022, CMF implemented a triage plan for 3CMS patients that included the suspension of routine IDTTs for patients that were not clinically

indicated, suspension of routine primary clinician contacts, and required the CIT to respond to all emergent, urgent, or routine mental health referrals for the 3CMS patient population. *See* ECF No. 8095 at 332 (Thirtieth Round Monitoring Report, noting issuance of this same May 2022 memorandum). The triage plan also required all patient care to be completed by the assigned psychiatry staff. Of note, the on-site primary clinician for the entire 3CMS program worked to complete initial and discharge IDTTs and provided some routine contacts to higher acuity patients and when prompted through the mental health referral process. Routine 3CMS primary clinician contacts were otherwise suspended during the review period.

During the monitoring tour, the monitor's expert observed two IDTT meetings. Both were conducted in confidential settings with no interruptions or presence from custody staff. Required participants, including the psychiatrist, primary clinician, and correctional counselor, attended each session. In one IDTT, the primary clinician participated via tele-mental health, while in the other meeting, the psychiatrist attended virtually. The IDTTs were collaborative and appropriately addressed pertinent issues, with relevant input by all participants. However, due to staffing limitations, treatment plans were not individualized and primarily focused on medication adherence and maintaining stability.

Patients' care and treatment plans were thoroughly reviewed, with relevant clinical and psycho-social histories discussed. Patients provided input on programming, medications, and custody concerns. Diagnoses were clearly stated, supported by symptoms, and functional impairments were addressed. Diagnostic discrepancies, if present, were resolved collaboratively. The team appropriately discussed if treatment was adequately addressing the patients' clinical needs. Safety planning, substance use, transition/pre-release planning, and LOC changes were discussed as needed.

Overall, the observed IDTTs were collaborative, with constructive custody participation. No significant gaps in information or adherence to Program Guide criteria were observed.

A patient's initial IDTT is required to occur within 14 calendar days of arrival to the institution or level of care change as well; and every 90 days thereafter. *See* ECF No. 7333-1 at 34.

The records of 30 mainline EOP patients were reviewed to assess compliance with Program Guide timeframes during the review period. All 30 patients required initial IDTTs. Of the 30 reviewed initial IDTTs, six or 20 percent occurred timely within 14 calendar days or arrival or level of care change. Required staff attended 28 or 93 percent and patients attended 21 or 70 percent. Reasons initial IDTTs were held *in absentia* included patient refusals.

To measure timeliness of routine IDTTs during the review period, CDCR produced an appointments report that included individuals who were required to receive a routine IDTT from June 1, 2024 through November 30, 2024. For the 199 patients included in the report, there were 207 completed initial or routine IDTTs. When a patient had either an initial IDTT and a routine IDTT or more than one routine IDTT, compliance with Program Guide timeframes were able to be calculated. Of the 207 completed IDTTs, nine contacts were for individuals who had at least two IDTTs. Of those nine, all occurred within Program Guide required timelines. Of note, the report did not include individuals that did not have a completed IDTT, such as those that were not scheduled. Additionally, the reviewed data captured the time between completed patient IDTTs but does not account for when patients were not scheduled for an initial or routine IDTT. The provided appointments report also did not account for delays between appointments due to movements in or out of CMF.

No group therapy or NLTGs were offered to 3CMS patients at CMF.

The Program Guide requires that patients are offered an initial psychiatrist evaluation before their initial IDTT. *See* ECF No. 7333-1 at 34-50. Thereafter they are required to receive a routine psychiatric contact every 90 calendar days if the patient is prescribed a psychotropic medication. *Id*. Patients are also required to receive a primary clinician evaluation within 14 calendar days of arrival and every 90 calendar days thereafter. *Id*.

The records of 30 mainline EOP patients were reviewed to assess compliance with Program Guide timeframes during the review period. All 30 patients required initial psychiatry evaluations; 20 or 67 percent timely occurred before the initial IDTT. Twenty-eight or 93 percent of the reviewed initial psychiatry evaluations were conducted in confidential settings; the non-confidential contacts were due to patient refusals. Telepsychiatry was utilized for 18 or 60 percent of initial psychiatry evaluations.

To measure timeliness of routine psychiatry contacts, CDCR produced an appointments report that included individuals who were required to receive a routine psychiatry contact during the review period. For the 529 patients in CDCR's appointments report, there were 1,164 completed and refused contacts. Of the 942 completed contacts, 886 or 94 percent were confidential as reported by the institution. Reasons for non-confidential psychiatry contacts included lack of available confidential space and patient refusals. When a patient had more than one completed or refused contact, compliance with Program Guide timeframes was able to be calculated. Of the 1,164 contacts, 636 or 55 percent of contacts were for individuals who were seen at least twice by a psychiatric provider. Of those 636 contacts, 38 or six percent occurred beyond Program Guide requirements with a range of 91 to 167 days between contacts. Of note, the report did not include individuals that did not have completed contacts. Additionally, reviewed data captures the time between patient contacts but does not account for when patients

were not seen or scheduled for a routine psychiatric contact. The appointments report provided did not account for delays between appointments due to movements in or out of -CMF. Contact with the assigned psychiatrist was unable to be determined.

All 30 patients who required initial psychiatry evaluations also required initial primary clinician evaluations. Of the 30 reviewed initial primary clinician evaluations, 11 or 37 percent were completed within 10 calendar days of arrival or change in level of care. Twenty-six or 87 percent were conducted in a confidential setting. Nonconfidential contacts were due to patient refusals. Telehealth was utilized for three or 10 percent of initial psychiatry evaluations.

To measure timeliness of routine primary clinician contacts, CDCR produced an appointments report that included individuals who were required to receive a routine primary clinician contact during the review period. For the 245 patients in CDCR's appointments report, there were 336 completed and refused contacts. Of the 323 completed contacts, 247 or 76 percent were confidential as reported by the institution. Reasons for non-confidential primary clinician contacts included lack of available confidential space and patient refusals. When a patient had more than one completed or refused contact, compliance with Program Guide timeframes was able to be calculated. Of the 336, 91 contacts were for individuals who were seen at least twice by the primary clinician. Of those 91 contacts, 18 or 20 percent occurred beyond Program Guide requirements with a range of 91 to 112 days between contacts. Of note, the report did not include individuals that did not have completed contacts, such as those that were not scheduled. Additionally, the reviewed data captures the time between patient contacts but does not include patients who were not seen or scheduled for a routine contact with the primary clinician. Of note, the appointments report did not account for delays between

appointments due to movements in or out of CMF. Contacts with the assigned primary clinician were unable to be determined.

Of the 323 completed primary clinician contacts, two were completed in zero minutes, 84 were completed within 15 minutes, 144 were completed between 16 and 30 minutes, 52 were completed between 31 and 60 minutes, 16 were completed in between 61 and 95 minutes, and 25 were completed in greater than 95 minutes.

Interviewed 3CMS patients indicated that despite not receiving routine primary clinician contacts, requests for routine care were typically answered within a few hours. Patients expressed satisfaction with their psychiatric care and noted that their visits with psychiatrists were confidential.

<u>Other Issues</u>:

<u>Pre-Release Planning</u>:

CMF allocated 1.9 staff for pre-release planning at the institution, however staffing shortages only allowed for one full-time LCSW to serve as the pre-release coordinator for both the outpatient and inpatient programs.

During the review period, CMF provided pre-release planning services to 20 MHCB, 68 EOP, and 61 eligible 3CMS patients. No pre-release planning groups were offered during the review period due to staffing shortages. However, at the time of the site visit, there were two pre-release groups that were offered to EOP patients on Fridays. The groups were facilitated by a registry LMFT.

There were two TCMP staff assigned to the institution. One had recently started in the position and was in training at the time of the monitoring tour. The TCMP supervisor reported a good working relationship with CMF, with effective communication, and no barriers to

connecting with patients prior to their release. During the review period, TCMP screened 44 EOP and 52 3CMS patients for eligibility of benefits. Of those 96 patients, 73 applied for Medi-Cal. There were 61 patients eligible to apply for SSI; 50 applied. Five of six eligible patients applied for VA benefits.

Program Access:

a. Job and Program Assignments

CMF reported that 283 academic assignments were held by 70 or 15 percent of EOP patients, 91 or 17 percent of 3CMS patients, and 122 or 13 percent of non-MHSDS incarcerated persons.

The 796 job assignments were held by 116 or 25 percent of EOP patients, 282 or 53 percent of 3CMS patients, and 398 or 43 percent of non-MHSDS incarcerated persons.

The 795 vocational education assignments were held by 124 or 27 percent of EOP patients, 234 or 44 percent of 3CMS patients, and 437 or 48 percent of non-MHSDS incarcerated persons.

The 35 voluntary education assignments were held by three or one percent of EOP patients, nine or two percent of 3CMS patients, and 23 or three percent of non-MHSDS incarcerated persons.

Only eight or one percent of non-MHSDS incarcerated persons had a substance abuse treatment assignment.

b. Milestone Credits

CMF reported that EOP patients received 374 credits and 69 credits were pending. 3CMS patients were awarded 205 credits and 19 credits were pending. Non-MHSDS patients

were awarded 351 credits and 33 credits were pending. CMF did not provide the number patients that were eligible to earn milestone credits.

c. Out-of-Level Housing

CMF reported that 12 3CMS and 16 EOP custody Level II patients were in Level I housing, and one 3CMS and one EOP custody Level III patients were in Level I housing. There were 59 3CMS and 20 EOP custody Level III patients in Level II housing. There was one 3CMS and 13 EOP custody Level II patients in Level III housing. There were also seven EOP custody Level II patients in Level IV housing and 50 3CMS and one EOP custody Level III patients in Level IV housing.

d. ADA Reasonable Accommodations and Grievance Procedures

CMF did not provide a reference training manual for ADA accommodations and attendance sheets for both reasonable accommodations and grievance procedure trainings. The institution reported that there was no code available to pull the training data.

e. Periodic Classification Score Reductions: EOP Patients

CMF did not provide CDCR Form 840s.

f. Unclothed Body Search

CMF's LOP regarding unclothed body searches was in compliance with CDCR policy. Custody staff further reported that unclothed body searches were conducted outside of the patient's cell in a confidential area using privacy screens. Staff were knowledgeable of the unclothed body search policy and its implementation.

"C" Status:

As of January 24, 2025, 22 patients were placed on C-status. Thirty-seven patients were placed on C-status during the review period.

Case-by-Case Reviews:

CMF reported three patients meeting the criteria for long term case conference reviews. The reviews were timely and appropriate action was taken to move the patients out of RHU.

Mental Health Referrals:

During the reporting period, CMF made 1,028 mental health referrals; there were 273 referrals to psychiatry and 755 referrals to primary clinicians. CMF was only compliant with timely responding to emergency primary clinician referrals during the review period. For emergent referrals, staff timely responded to six of 13 or 46 percent of emergency primary clinician referrals and 238 of 264 or 90 percent of emergent psychiatry referrals. For urgent referrals, staff timely responded to 121 of 163 or 74 percent of urgent primary clinician referrals and five of 10 urgent psychiatry referrals. For routine referrals, staff timely responded 293 of 328 or 89 percent of primary clinician referrals and to 202 of 250 or 81 percent of routine psychiatry referrals.

Custody and Mental Health Partnership Plan:

CMF's CMHPP LOP generally complied with statewide policy but was last updated in March 2022 and, thus, not up to date.

Executive leadership joint rounding forms were produced for each month of the reporting period; rounded facilities included an unspecified 3CMS yard in June, an unspecified EOP yard in July, the PIP in August and October, the RHU in September, and EOP unit N3 in November. Produced rounding forms indicated that required staff attended and that staff and patients were interviewed each month. Staff reports were typically brief; no significant concerns and positive working relationships between custody and mental health were noted. Patients similarly reported

positive relations with mental health and custody staff and feeling comfortable reporting mental health issues or crises; patient concerns regarding overly long medication lines were noted.

CMF did not maintain executive staff meeting agendas. Quality management committee meeting minutes were provided for each month of the review period but did not mention or discuss joint rounding; mental health subcommittee meeting minutes were provided for each month of the reporting period and joint rounding was discussed in detail in all meetings.

Huddle sheets from the MHCB for June and EOP RHU for August, July, and November were produced. Review of these forms indicated that daily huddles occurred as required during those months in the EOP RHU and that custody and mental health staff attended nearly all–but not all–huddles; custody staff did not attend one huddle in each of the three months and a medical assistant attended in place of mental health staff for six huddles in November. The specialized huddle forms were used in the MHCB for June; review of the same reflected that huddles occurred daily with required staff in attendance.

The monitor observed an MHCB third watch huddle. Eleven staff members, including mental health, nursing, and custody, attended. The huddle was not collaborative and most attending staff did not participate; staff who did participate exhibited adequate knowledge of the patients. Specific patient issues were discussed and new arrivals and information regarding the same were discussed as well. The standardized huddle form was not followed. A and B unit huddle forms for second and third watch from the previous week were reviewed. Custody did not attend nearly any A unit huddles and approximately half of the B unit huddles.

Monthly joint supervisory tours and weekly 3CMS supervisory meetings did not occur during the review period; mental health leadership attributed this to lack of supervisory staff.

Introduction to EOP groups were offered every Wednesday during the review period. They were led by a recreational therapist and three to four patients.

CMF distributed the 3CMS orientation brochure to new patients and provided a copy of the same.

Inmate advisory council meeting minutes were produced for each month of the review period. The meetings were held on unit B3 and available to all incarcerated persons at CMF. Mental health issues were not discussed at any meetings; discussion topics included the high rate of medical appointment refusals, wheelchair repair issues, worker wage increases, and laundry issues.

There were 834 staff misconduct complaints filed during the review period, including 113 against mental health staff, 629 against medical staff, and 29 against dental staff. By the end of the review period, 767 of these complaints were closed; the rest were pending a form of review or canceled. There were no investigations for misconduct towards a patient initiated outside of the appeal process. No staff members were reassigned because of misconduct complaints.

CMF reported that 147 of 166 or 89 percent of mental health staff and 762 of 797 or 96 percent of custody staff attended the annual partnership off-post training.

Quarterly roundtable training did not occur at CMF during the review period.

<u>Heat Plan</u>:

On the date of the site visit, the monitor reviewed CMF's policies procedures, and implementation of CDCR's 2024 Heat Plan and Updates memorandum, dated April 8, 2024.

CMF's heat plan LOP was last revised in August 2024 and incorporated the requirements of the April 8, 2024 Heat Plan and Updates memorandum.

The 2024 Heat Plan and Updates memorandum required that each institution submit a Heat Plan Monthly Summary Report (Summary Report), signed by the warden and CEO, to headquarters each month from May 1 to October 31. The heat plan was in effect from June through October during the review period. Summary reports from that time reflected that there were 79 Stage I, 19 Stage II, and one Stage III heat alert.

The Heat Plan and Updates memorandum also required institutions to include with the monthly submission a Heat Incident Log documenting the number of patients who experienced a heat-related illness. The patient's information and details regarding the heat-related illness must also be documented in a Heat Incident Log maintained by the institution. One patient was reported to have experienced a heat related illness during that timeframe. Proper documentation for this incident was completed.

The 2024 Heat Plan and Updates memorandum required all custody officers and leadership staff to maintain knowledge of heat plan activation and act in accordance with the requirements of each stage. The policy also required that when the Heat Plan was in effect, institutional staff must generate and distribute *daily* a list of all incarcerated persons currently prescribed any of the designated Heat Alert Medications. Eleven officers across six housing units were interviewed and demonstrated adequate knowledge of the heat plan policy and their responsibilities during the different stages of activation. Each officer produced the correct copy of the heat risk patient list as required.

To ensure proper and accurate temperature recording, the Annual Heat Plan and Updates memorandum required the warden or his designee to ensure an accurate thermometer was placed in a central, heat-neutral location to monitor outside ambient air temperatures, which must be recorded every hour, every day, from May 1 through October 31 of each year. Although the

thermometer used to record outside air temperatures was not observed, 30 reviewed outside temperature log forms reflected adequate outdoor temperature recording practices.

The warden or his designee was also responsible for ensuring that inside air temperatures were measured in all non-airconditioned living areas that house heat-risk incarcerated persons. Temperatures must be taken at the highest non-air-conditioned location where heat-risk incarcerated persons are housed and must be recorded every three hours. All toured housing units had wall mounted thermometers that appeared to be in working order and located in a proper location. Each housing unit also maintained a hand-held temperature gauge to monitor in-cell air temperatures as needed. A review of 30 indoor temperature logs across five housing units reflected generally adequate indoor temperature recording practices, however indoor temperature logs for housing units H-1, H-2, N-1, and J-3 on July 1, 2024 indicated that indoor temperatures were taken from the correctional officer's office and not from a thermometer placed at the highest non-air conditioned location.

In an effort to ensure that heat-risk incarcerated persons were afforded equal access to programs, services, and activities during extreme weather conditions, the 2024 Heat Plan and Updates memorandum required institutions to devise and include any reasonable accommodations and alternatives to yard activities when revising their LOP. All reasonable accommodations provided to heat-risk incarcerated persons during heat alert activation must be documented in the institution's Daily Activity Report (DAR). For days in which a Stage I heat alert occurred, the DAR was reviewed for compliance with policy requirements. Although each reviewed DAR stated that alternative activities were offered, no DAR included details of the accommodation offered to patients during a heat alert.

The 2024 Heat Plan and Updates memorandum required annual training on the institution's Heat Plan, including measures when heat stress symptoms are identified and/or reported, to be provided to custodial and clinical staff by the In-Service Training Officer. CMF indicated that 719 of 795 or 90 percent of custody staff and 130 of 131 or 99 percent of non-custody staff completed the required heat pathologies training for the prior year.

RVRs:

CMF issued 768 RVRs to incarcerated persons during the review period, including 56 issued to MHCB patients, 214 to EOP level of care patients, 266 to 3CMS patients, and 232 to non-MHSDS incarcerated persons.

Thirteen RVRs issued to MHSDS patients were reviewed for compliance with policy requirements. In the reviewed cases, custody staff timely referred the mental health assessment (MHA) to mental health staff in four of 13 or 30 percent of cases and mental health staff timely completed and returned the MHA to custody staff in 12 of 13 or 92 percent of cases. The MHA interview was conducted in a confidential setting in eight of 13 or 62 percent of cases; reasons for non-confidentiality included patient refusals. There were no cases where the MHA recommended alternate discipline based on the patient's mental illness strongly influencing the behavior documented in the RVR.

The MHAs were written in simple language that was easily understood and proved useful as the SHO documented consideration of the MHA in 12 of 13 or 92 percent of cases. The SHO also mitigated penalties in all 13 instances.

Regarding training, 104 of 109 or 95 percent of custody staff attended the required MHA training. CMF assigned MHAs to specific mental health clinicians during the review period, each of which had attended the training as required.

Use of Force:

CMF reported three controlled and 374 combined immediate use of force and non-use of force incidents during the review period for both MHSDS and non-MHSDS incarcerated individuals; the number of use of force and non-use of force incidents, or the delineation between MHSDS and non-MHSDS incarcerated persons, could not be ascertained from the data provided.

Sixteen immediate and all three controlled use of force incidents were selected to assess compliance with policy guidelines. Reviewed incidents included batteries on correctional officers, batteries on other incarcerated persons, threats of self-harm, and resisting correctional officers during transport; these incidents resulted in the use of physical strengths and holds to restrain the incarcerated individuals and the use of OC pepper spray. Proper decontamination measures were offered to the effected individuals in each reviewed instance.

However, one reviewed incident revealed questionable force used by the correctional officer. In that instance, OC pepper spray was used to subdue an incarcerated person who was resisting transport. Officers then attempted to physically restrain the incarcerated person who continued to resist; consequently, a correctional officer punched the incarcerated person twice in the “facial area.”

The annual use of force training was attended by 774 of 798 or 97 percent of custody staff and all 47 applicable mental health staff.

Lockdowns/Modified Programming:

The institution reported there were no program lockdowns or modified programming during the review period.

Access to Care:

A review of monthly Health Care Access Quality reports from June 2024 through November 2024 reflected the issuance of 161,744 mental health ducats and add-on appointments, of which 78,850 or 49 percent were completed, and 82,894 or 51 percent were not completed. Of the non-completed appointments, zero were reportedly not completed due to custody factors, 47,484 or 57 percent were due to non-custody factors, and 35,410 or 43 percent were due to patient refusals.

*Coleman* Postings:

All toured housing units contained *Coleman* posters in English and Spanish in areas accessible to patients.

**APPENDIX A – 7**
**CALIFORNIA MEN'S COLONY (CMC)**
Site Visit: May 6, 2025 – May 8, 2025
Review Period: October 1, 2024 – March 31, 2025

Census:

On May 2, 2025, CMC housed 2,205 incarcerated persons, a decrease of 30 percent from the preceding monitoring period. The mental health caseload population of 1,280 patients constituted 58 percent of CMC's total population, a four percent decrease from the preceding monitoring period.

The MHCB housed 32 patients.

There were 531 mainline EOP and 610 mainline 3CMS patients.

The RHU population included 107 MHSDS patients, 86 EOP and 21 3CMS. 21 EOP and three 3CMS patients were NDS.

Staffing:

Positions for the chief psychiatrist and senior psychiatrist were filled.

Seven of 15.5 psychiatry positions were also filled, for a 55 percent vacancy rate. Registry staff filled 7.5 positions, reducing the functional vacancy rate to six percent.

All 2.5 telepsychiatry positions were filled.

Both chief psychologist positions were filled; one served as the chief of mental health.

Of seven senior psychologist supervisor positions, 5.5 were filled for a vacancy rate of 21 percent, but one supervisor was on long-term leave for a 36 percent functional vacancy rate. All seven senior psychologist specialist positions were filled.

Of 44 staff psychology positions, 22 were filled, for a 50 percent vacancy rate. Contractors filled an additional 11.2 positions leaving a 25 percent functional vacancy rate. Two of the three tele-psychologist positions were filled, leaving a 33 percent vacancy rate.

CMC also had four psychology interns who were supervised by seven clinical supervisors. Additionally, there were five unlicensed psychologists working at CMC during the review period.

Four of the eight medical assistant assigned to tele-mental health positions were filled leaving a 50 percent vacancy rate. This was reduced to a 13 percent functional vacancy rate with the addition of three contractors.

Although they had no allocated LMFT positions, CMC had 4.2 on-site registry LMFT positions filled.

The supervising social worker position was filled. Thirteen of 13.5 social worker positions were filled, and there was also one registry social worker, leaving zero vacancies. These social workers teleworked work one half day per week. There were also four unlicensed social workers. Three of four tele-social worker positions were filled, leaving a vacancy rate of 25 percent.

Of 26.5 recreation therapist positions, 22.5 were filled and two were on long-term leave, for a 15 percent vacancy rate, but four contractors lowered the functional vacancy rate to eight percent. Recreation therapists teleworked two to four hours per week for LMS training and curriculum development.

The OSS II position, the 2.5 HPS I positions and one HPS II position were filled, although there was no allocation for the HPS II position. The AGPA position was filled, as was one of two CHSA positions. Of the 25 office technician positions, 22.5 were filled and two staff were on long-term leave for an 18 percent functional vacancy rate.

As for custody staffing, positions for the warden, chief deputy warden, and the four associate wardens were filled. Four of five captain positions were filled, and one lieutenant was

acting out of class, leaving no vacancy. Although 26 of 27 lieutenant positions were filled, two lieutenants were on long term leave and one was acting out-of-class in other positions, leaving a 15 percent functional vacancy rate. Fifty-eight of 67.6 sergeant positions were filled, but seven sergeants were either acting out-of-class in other positions or on extended leaves, reflecting a 13 percent functional vacancy rate. Nineteen of 21 CC I positions were filled, and there were no functional vacancies due to officers acting out of class. All nine CC II positions were filled. All 503.4 positions for correctional officers were filled; however, 20 correctional officers were either on extended leave or acting out of class, leaving a five percent functional vacancy rate.

Tele-Mental Health:

CMC's 2.5 telepsychiatry positions were filled. One telepsychiatrist had a full-time EOP patient caseload, and another had a full-time 3CMS caseload. A half-time telepsychiatrist covered PC 2602 involuntary medications. Further, the telepsychiatry pool provided on-call coverage for nights, weekends, and holidays. The week prior to the site visit, CMC added a 3CMS telepsychiatrist to replace one of the telepsychiatrists who was retiring.

CMC's two telepsychologist positions were filled with one having a full-time EOP patient caseload and one having a full-time 3CMS caseload.

Three full-time tele-social workers had full-time EOP caseloads.

In addition, CMC allowed its senior psychologist specialist to telework two days per week and social workers, recreation therapists, and office staff to telework multiple days per week.

Staff Recruitment:

CMC was assisted by the regional hiring unit to streamline the hiring process through increased marketing and hiring above the minimum step for mental health staff. Also,

headquarters job fairs have been an additional recruitment tool. It usually took three months from an applicant's hiring date to when they would start working at the institution. CMC had an accredited internship program, and those interns were recruited to work at CMC. CMC's chief psychologist also conducted tours for interested students, friends, and family as well as speaking with college students in social work and psychologist programs.

CMC reported difficulty recruiting on-site civil service psychiatrists as people left to go to registry with higher pay scales. CMC also attributed difficulty in recruiting to the high cost of living. Further CMC reported the disincentive to promote to leadership positions due to little to no monetary benefit to promoting for leadership positions despite the increased responsibility, monitoring, and oversight that was now required across mental health programs.

Quality Management:

The CEO chaired the local governing body, which met monthly. Local governing body meeting minutes indicated that the chief of mental health and either the chief psychiatrist or a senior psychiatrist supervisor attended each meeting; in addition, the chief psychologist attended four of six meetings. A quorum was reached in each meeting. Meeting minutes reflected approval of reappointments and clinical privileging for providers, approval of updated and new policies, and extensive quality management program reports.

With the exceptions of privileging and reappointment approvals, most content of local governing body minutes was copied directly and without modification from minutes for the quality management committee meetings held immediately prior to the local governing body meetings. Minutes indicated that each local governing body meeting, like each quality management committee meeting, lasted 90 minutes. During on-site interviews with mental health leaders, it was reported that local governing body meetings typically lasted only ten to 15

minutes and that the local governing body only briefly reviewed and approved quality management committee activities; the local governing body did not review quality management program reports in detail. When the monitor's expert pointed out that the minutes suggested otherwise and made it difficult to distinguish the activities of the local governing body from those of the quality management committee, CMC mental health leadership agreed to review and correct the process of developing minutes for local governing body minutes.

The CEO also chaired the quality management committee, which met monthly immediately preceding the local governing body. Quorums were consistently achieved at each meeting. Meeting minutes reflected policy approvals, quality management program committee reports, performance improvement work plans (PIWPs), and Lean Six Sigma improvement projects. Mental health program subcommittee findings, quality improvement priorities, and program updates were reported once a quarter, and executive joint rounding for the custody and mental health partnership plan were reported in detail each month. Additional reporting from other committees, morbidity and mortality findings, patient safety, medication management, and other quality improvement projects were documented in detail each month. Many of these areas had a direct or indirect bearing on mental health services. Quality management committee meeting minutes provided strong evidence of a robust multidisciplinary quality management program, with appropriate prioritization and integration of mental health service delivery areas into overall quality assurance and quality improvement efforts.

The mental health program subcommittee was chaired by the chief of mental health and co-chaired by the chief psychologist. The mental health subcommittee met monthly throughout the review period and achieved quorums for all meetings. Minutes covered topics such as survey analysis for evaluating risk (SAFER) metrics, SPRFIT findings, mental health program updates,

Program Guide compliance by level of care, sustainable process tours, the custody and mental health partnership plan, CMC's developmental disability program, patient safety concerns, peer reviews, staffing, policy updates, higher level of care referrals, medication administration process improvement project metrics, and corrective action plans.

Performance metrics were routinely monitored and reported for mainline and EOP RHU contacts, mainline and 3CMS RHU contacts, DSH/PIP returns, confidentiality of encounters, and adequacy of documentation regarding higher level of care considerations. Data for 3CMS RHU contacts were incomplete or missing. During the site visit, mental health leadership reported that systemic challenges in pulling accurate data from On Demand had begun when CDCR transitioned from administrative segregation unit reporting to RHU reporting, and that these challenges persisted up through the time of the site visit. It was reported that the CDCR data analysts had developed a temporary RHU report for CMC in an attempt to improve accessibility and accuracy of data, but that this report was not accurate. As a result, staff at CMC attempted to provide monthly RHU data for IDTTs, individual contacts, and suicide risk evaluations through a manual record review process. This process was labor-intensive and not always timely.

Routine monitoring reported in mental health subcommittee minutes indicated consistent noncompliance with Program Guide requirements for timely mainline 3CMS initial primary clinician contacts, timely mainline 3CMS routine primary clinician contacts, timely mainline 3CMS initial IDTT meetings, and timely mainline 3CMS routine IDTT meetings. Routine monitoring reported in the subcommittee minutes also indicated the percentages of 3CMS IDTT meetings attended by required staff; minutes did not include the data underlying these percentages. The subcommittee monitoring data indicated that required 3CMS IDTT staffing was consistently noncompliant, with a six-month average of 44 percent compliance.

Subcommittee monthly monitoring for mainline EOP services also confirmed noncompliance with Program Guide requirements during the review period for treatment offered, treatment attended, and timely IDTT meetings. Overall adequacy of higher level of care documentation ranged from 41 to 66 percent compliance or a six-month average of 54 percent. Confidentiality of primary clinician and psychiatric contacts was reported to be noncompliant for some programs across multiple months. For example, primary clinician contacts with 3CMS patients in RHU were confidential only between 38 and 78 percent of the time during five of the six months in the review period.

Other CAT quality assurance studies continued to be optional throughout the review period. During the review period, performance improvement work plans (PIWPs) impacting mental health services focused on reducing the number of patient refusal forms that required correcting and strengthening the peer support specialist program. In addition, PIWPs focused on modifying MHCB cell doors by adding plastic at the bottom to prevent "fishing," and examining the feasibility of installing a low dose scanner in the MHCB to detect and intercept metal contraband upon patient admission and thereby prevent its use in self-injurious behavior during MHCB care. A Lean Six Sigma project focused successfully on reducing CIT activations for issues that did not result in placement at a higher level of care or did not require placement in mental health care. Most of these CIT activations were found to involve individuals in RHU who were seeking to avoid RHU housing, responding to custody issues, attempting to avoid transfer, or attempting to obtain a housing change.

CMC had a long-standing RHU quality improvement team (QIT). The QIT was chaired by the supervising psychiatric social worker and was composed of the associate warden, facility captain, RHU supervisor, and program supervisor. Minutes indicated that the QIT met weekly

during the review period and monitored core elements of RHU mental health and custody service delivery when data were available. Performance indicators included the percentages of patient contacts that were confidential, the percentages of patients offered required hours of structured treatment activities, mental health staffing and caseload ratios, the number of patients participating in the suicide risk management program, and the delivery of nursing-led treatment groups. Minutes indicated that mental health contacts in the RHU were confidential between 39 and 68 percent, or on average 55 percent of the time. Minutes also repeatedly indicated that no barriers to confidentiality were identified. The repeated finding that no barriers to confidentiality were identified month after month indicated that the RHU QIT did not support a quality improvement process for this area. It suggested that nonconfidential mental health contacts in the RHU had come to be accepted as the norm.

Supervisory staff were provided with results of quality assurance monitoring and in turn conveyed these results to line staff during weekly supervisory and other staff meetings. Additionally, the quality management specialist notified specific staff of results when individual performance concerns were identified through quality assurance monitoring.

Local CMC policies and procedures governing peer review for the correctional treatment center, licensed psychologists, social workers, psychiatrists, and psychiatric nurse practitioners were current and consistent with statewide policy. CMC was previously paired with CSP/Sac for the completion of peer reviews. However, at the time of the site review CMC was no longer paired with another institution, and CMC did not conduct any primary clinician peer reviews during 2024 or 2025 up to the site visit date. A resumption date for primary clinician peer review had not been established by CDCR.

Biannual peer reviews for psychiatrists were required in April and October of each year. The most recent psychiatric peer reviews were completed in October 2024 and included all 15 filled positions. While no significant concerns or systemic issues were reported, three psychiatrists were found to be deficient on two or more peer review measures. Individualized follow-up on these findings was undertaken for each psychiatrist with these peer review findings.

By mid-March, 2025, a chair for the inpatient psychologist peer review had been selected, with the goal of completing MHCB psychologist peer reviews soon. Psychologist peer reviews had not yet begun at the time of the site visit.

Overall, CMC's quality management reporting structure and processes required improvement. Local governing body minutes did not accurately reflect the duration or content of meetings. Some quality assurance data were missing or unreliable, and quality improvement efforts for identified but correctable challenges, such as providing confidential mental health contacts in the RHU, were lacking. Corrective action plans that consisted of triage priorities due to staffing shortages did not function as quality improvement tools.

Medication Management:

CMC reported that there were "technical issues" with OnDemand, which impaired the ability to track compliance. This included reported compliance regarding obtaining lipid tests, medication consents, data specific to PC 2602s and EKGs.

MAPIP

CMC reported that there are several challenges associated with individual MAPIP measures. Specifically, patient refusals were included in non-compliance measures, some measures have consistently low denominators due to factors such as few patients are due monthly, and over the reporting period, there have been several errors in the QM data presented.

As a result, CMC reported that the MAPIP data presented is not entirely reliable. As an attempt to rectify unreliable data, the senior psychiatrist reviews MAPIP data almost weekly and acts on the data presented accordingly. Also, a reminder email about MAPIP guidelines was sent to psychiatrists in March 2025.

CMC provided MAPIP results for October 1, 2024 through March 31, 2025 regarding compliance for psychiatric diagnostic monitoring and medication management.

For required antidepressant monitoring of the four metrics, CMC indicated compliance for six months for medication consents and monitoring blood pressure for patients taking venlafaxine. Partial compliance was present for thyroid monitoring. Data was not provided specific to obtaining EKGs.

Diagnostic monitoring for patients prescribed atypical antipsychotics was the most intricate, containing 11 metrics. CMC was compliant for all six months of the reporting period for monitoring blood pressure, AIMS testing, height, weight and obtaining medication consents. Partial compliance during the monitoring period was present for thyroid function, glucose, comprehensive metabolic panel (CMP), lipids, EKGs, and CBC with platelets.

CMC was not an authorized clozapine initiation or maintenance facility, but the MAPIP dashboard indicated a few months of clozapine metrics. CMC staff had no explanation except that it could be consistent with QM dashboard inaccuracies.

For patients prescribed carbamazepine, CMC incomplete data during the monitoring period for obtaining blood levels, CBCs and CMPs.

Regarding Depakote, there was compliance for obtaining medication consent for and CMPs. Partial compliance was present for therapeutic medication level monitoring and obtaining CBCs.

For lamotrigine, CMC reported compliance for the one metric of obtaining medication consents for five months.

As for lithium, partial compliance was present for all metrics including obtaining EKGs medication consents, kidney function tests, blood level monitoring and thyroid laboratory tests.

Medication Administration

Medication administration occurred on the yards for mainline EOP and 3CMS LOC and cell front for RHU, MHCB, and alternative housing patients. For those inmates receiving medications on the yard, there is an awning to protect the patients from inclement weather at the pill call window itself. However, there is no protection from elements while the patients are waiting in line.

During the monitoring period, CMC reported that there were not any modified programming (i.e., full lockdowns) that would adversely affect incarcerated persons being able to get their scheduled medications through the medication room although the process might be slightly delayed.

For the medication administration metrics reported by mental health headquarters, CMC was compliant for six months for observation of medication preparation HS and AM and PM, chronic care medications historical administration (psychiatrist), outpatient provider new medication orders, and medication compliance with PC 2602 (court order and med order).

CMC was close to being compliant for the following four metrics: continuity of NA/DOT meds with intra-institutional transfers (excluding ASU/SHU/ /PSU), continuity of meds: discharge/transfer from a community hospital and/or DSH, continuity of meds with intra-institutional transfer to ASU/SHU/PSU, and continuity upon parole/transfer to community.

Partial compliance was present when measuring continuity of meds upon inter-institutional transfer to R&R, and continuity of meds: mental health bed crisis that transfers.

PC 2602 Issues

During the reporting period, 216 patients at CMC received PC 2602 medications. There were 47 emergency PC 2602 petitions initiated with all granted, 26 nonemergency PC 2602 petitions initiated and granted, 143 renewal petitions initiated and granted, three court orders with a nonrenewal form filed, and 64 PC 6202 court orders that expired without a nonrenewal form filed.

There were no PC 2602 Use of Force Incidents during reporting period.

Non-formulary

Approximately 15.5 % of prescriptions written by psychiatrists were for nonformulary medications at CMC.

KOP Medications

There were 64 KOP prescriptions for SSRIs and SSRIs written by a psychiatrist during the monitoring period. Fifty-three of these medications were for melatonin.

Polypharmacy

There were 235 patients receiving polypharmacy.

Transfers:

CMC had two inpatient care coordinators who conducted monthly audits of higher level of care referrals and non-referral documentation. The institution participated in a major and minor sustainable process audit during the review period.

Sustainable process audits ensure that higher level of care documentation provides adequate clinical justification for non-referrals and development of individualized clinical interventions when referral indicators are elevated. At the time of the minor sustainable process

tour in January 2025, while there was a slight improvement in compliance (49 percent) for acceptable non-referral documentation to a higher level of care from the major sustainable process tour in November 2024 (41 percent), compliance remained well below an acceptable threshold. Unacceptable documentation was due to insufficient interventions, missing documentation, insufficient narrative supporting non-referral, incorrect higher level of care form review, no clinical opinion regarding reason for treatment refusal and documentation did not address the indicator. Training was recommended to improve documentation.

Ten health care records for patients on the non-referral log at least three times were selected to review non-referral rationale and treatment modifications. Rationale for non-referral needed improvement in the majority of reviewed cases due to insufficient data to support the rationale (impression management), lack of clear rationale or insufficient rationale (new to the MHCB). Rationale often narrowly focused on the referral indicator without full consideration of the patient's clinical history. Overall, treatment modifications included evidence-based treatment interventions, although identified interventions were not regularly utilized during clinician contacts.

Regional staff reported that they were working with the institution inpatient coordinators to increase involvement in the referral process to ensure timeliness and appropriateness of referrals. Health care records for the ten most recent acute or intermediate care admissions were reviewed for appropriateness. With the exception of one case, referral documentation was comprehensive and individualized. The outstanding case would have benefitted from more specific detail which was located in inpatient consult documentation. Overall, treatment planning pending inpatient transfer was individualized to patient's needs with variable inclusion

of evidence-based interventions. Consideration of an expedited referral was warranted for one patient.

During the monitoring tour, the institution provided a list of nine patients most recently discharged during the review period. Cases were reviewed to assess continuity of care. CMC primary clinicians routinely initiated contact with inpatient care providers, five of which did not receive a response. Overall, continuity of care needed improvement. Specifically, initial assessments and the initial IDTT included varying detail regarding the patient's discharge from a higher level of care. Documentation ranged from inadequate (copying of outdated documentation from a previous MHCB admission, a brief reference that the patient had been discharged from HLOC) to an adequate summary of the course of treatment. Relatedly, treatment planning that followed had varying degrees of continuity from inpatient to outpatient care. For example, one patient reported anxiety regarding the discharge but a treatment goal for anxiety was not established during the CMC IDTT. For the six patients that were placed in EOP RHU following inpatient discharge, it was unclear if they were prepared to manage this high-risk environment prior to discharge. Of concern, one patient was admitted to C yard overflow instead of the designated EOP yard. Regional staff reported that they were working on continuity of care for inpatient discharges.

During the review period, there were 1,050 instances of a total of 451 patients who were considered for, but not referred to, higher levels of care.

CMC referred 57 patients to acute care; 53 were accepted and four were rejected. Forty-six of 57 or 81 percent of referral packets were timely completed within two working days of identification. Fifty-one or 89 percent of patients timely transferred within ten days. Reasons that patients did not timely transfer included *Vitek* hearing dates.

CMC referred 62 patients to intermediate care; 57 were accepted, one was rescinded, and four were rejected. Fifty-four of 62 or 87 percent of intermediate care referral packets were timely completed within five working days of identification. All 62 patients timely transferred within 30 days.

No patients with complex medical needs were transferred to inpatient care.

*Vitek* hearings were held for 14 patients. No patients prevailed.

During the monitoring tour, one patient was awaiting transfer to intermediate care and remained within transfer timeframes. Additionally, six patients were awaiting acceptance, three acute and three intermediate care. All six were within transfer timelines.

CMC made 366 MHCB referrals; 271 were admitted and 95 were rescinded. Of the 271 MHCB admissions, three or one percent took longer than 24 hours to transfer. Reasons for delay included a medical hold, and two patients who were not delayed, but were transferred to inpatient flex beds within the appropriate timeframe. SOMS did not track transfer to I FLEX beds, although CDCR was working on correcting that.

Of the 51 3CMS patients who were referred to 3CMS RHU 43 were timely placed in CMC's 3CMS RHU in 30 days and eight patients were overdue by an average of 2.3 days. Reported reasons for delays included patients who were transferred to different facilities to go out to court and patients who were retained for enemy concerns.

CMC operated an EOP RHU. Patients are first evaluated by a psych tech and then they are sent over to the unit. In the RHU, a psych tech sees patients within 24 hours.

During the review period, 27 patients' level of care was reduced from EOP to 3CMS. One patient retuned to EOP within two days and five patients returned to the MHCB within three days to three months.

Five 3CMS patients were placed in an MSF during the review period.

Programming:

MHSDS Patients in Restricted Housing:

For the RHU program, there were 1.75 psychiatrists. In addition, there was one psychiatrist who floated between the MHCB and RHU. There were also three full-time psychologists, 1.15 psychologists, 1.2 psychologists, 1.25 psychologists, and two 0.5 psychologists as well as two full-time social workers and five recreation therapists.

While CMC had been functioning on a triage plan, it did not apply to the EOP RHU. Staff there continued to attempt to see patients in accordance with Program Guide requirements.

Facility B housed the RHU. CMC did not have a designated 3CMS RHU but was an EOP RHU. Treatment space was appropriate with four group spaces holding eight treatment modules in each for a total of 32 patients who could be treated at the same time across all rooms and four confidential offices with one treatment module in each. Staff reported that they believed that space was sufficient.

The EOP RHU held two huddles per day, one during second and one during third watch. Following each huddle, psych techs would complete rounds in the unit so that patients were observed via cell front rounding twice per day.

The average length of stay for EOP RHU patients was 45.6 days with a range of one to 294 days. The average length of stay for 3CMS RHU patients was 5.5 days with a range of one to 150 days. Interviewed patients complained about the lack of assistance from custody officers. For example, several patients said that the officers had not told mental health staff that the patients needed to see them and would not bring requested forms that patients could not access without staff assistance (e.g., grievance forms). When questioned further, patients noted that

some officers were appropriate while others would provoke the EOP patients. All patients agreed that additional training for the officers would be beneficial. These complaints were shared with mental health staff who confirmed the complaints. Patients recommended having cameras in the RHU believing this would reduce custody staff's negative or provocative interactions.

During the review period, CMC offered an average of 13.85 hours of structured therapeutic activity per week. Patients attended an average of 5.17 hours of structured therapeutic activity per week, for a refusal rate of 63 percent. There was an average of 1.38 hours of structured therapeutic activity cancelled per week. For patients on EOP modified program, CMC offered an average of 1.79 hours of structured therapeutic activity per week, while patients attended .32 hours of structured therapeutic activity per week (82 percent refusal rate). There was an average of .59 hours of structured therapeutic activity per week cancelled for patients on modified program. CMC offered one treatment group per week for 3CMS patients in addition to the treatment groups offered for EOP patients.

Ten IDTT meetings were observed during the monitoring tour, three routine and seven initials. Seven IDTTs were for EOP patients, the remaining three were for 3CMS patients and were all initial IDTTs. All required disciplines were present. Typically, the treating psychiatrist and primary clinician were present with a correctional counselor, senior psychologist supervisor, and the senior psych tech. Each IDTT was timely and generally providers had completed their initial evaluations prior to the initial IDTTs. The treatment team knew their patients well and were client-focused and respectful in their communications with the patients.

The quality of the IDTT varied by provider. Most team members did not participate spontaneously, even when a patient was asking a question specific to that discipline (e.g.,

medical/nursing, psychotropic medication issues), instead waiting until the IDTT facilitator (primary clinician or supervisor) called on them. Despite the length of time spent with each patient, the IDTT did not cover critical components of treatment planning such as specific updated treatment goals and interventions. While there was some cursory mention of level of care, EOP RHU IDTTs should engage in more thorough discussions regarding positive indicators for consideration of referral to a higher level of care, the clinical rationale for non-referral, and updated treatment modifications to address the specific positive criteria. In addition, there were discrepancies in diagnostic impressions within the treatment team that were not properly discussed and resolved, resulting in a negative impact on treatment overall. For example, one patient was believed to have a psychotic disorder according to the primary clinician, while psychiatry believed it was a mood disorder. This was not reconciled during the IDTT. However, in one case where there was diagnostic discrepancy, the treatment plan was adjusted to include additional assessment for diagnostic clarification. That IDTT was a model for how diagnostic discrepancies should be addressed in IDTT.

The treatment team did not address progress toward existing treatment goals during routine IDTTs. Instead, many goals and interventions remained the same even if the patient appeared to have improved. Also, patients should understand the purpose of specific individual and group interventions and how they may benefit the patient. This was particularly important for treatment refusers. Several patients with poor treatment participation were reviewed in IDTT but the interventions were not updated to reflect the lack of progress and were not always practical for someone refusing treatment. Behavior plans and systems of reinforcement were clinically indicated but not discussed by the treatment teams.

The monitor randomly selected and reviewed the health care records of 30 EOP RHU patients to assess compliance with Program Guide timeframes during their stays. All 30 patients required initial IDTTs. Of the 30 reviewed initial IDTTs, 26 or 87 percent occurred timely within ten calendar days of arrival or level of care change. All 30 were attended by all required staff and 22 or 73 percent were attended by the patients. Reasons initial IDTTs were held in absentia included patient refusals.

For the 280 patients in CDCR's appointments report for October 1, 2024 to March 3, 2025, there were 468 completed initial or routine IDTTs. When a patient had either an initial IDTT and a routine IDTT or more than one routine IDTT, compliance with Program Guide timeframes was able to be calculated. Of the 468 completed IDTTs, 189 contacts were for individuals who had at least two IDTTs (initial and routine or two routines). Of those 189, 135 or 71 percent occurred past Program Guide timeframes. Of note, the report did not include individuals that did not have a completed IDTT, such as those that were not scheduled.[25]

Based on a review of the group schedule, the EOP RHU offered 46 treatment groups per week. These groups were primarily provided by recreational therapists (RTs). There were two clinician-led groups. Patients indicated that groups often started late due to escort issues. This was confirmed by mental health staff and on-site observations.

Two treatment groups were observed during the monitoring tour. One RT group was observed though attendance was poor. Four patients were eventually present for part of the group, but one patient was almost 15 minutes late. Another patient requested to go back to his

[25] The reviewed data captures the time between completed patient IDTTs but does not account for when patients were not scheduled for an initial or routine IDTT. Of note, the appointments report provided did not account for delays between appointments due to movements in or out of CMC.

cell, leaving just three patients to meaningfully participate. The RT facilitated the group well, encouraging less talkative patients. The second group was a clinician-led LGBTQ-specific closed group that staff and patients reported had a waitlist in the RHU. This group was extremely well-facilitated with significant meaningful discussion and significant patient candor. The facilitator was skilled and the patients clearly trusted their facilitator. During interviews, each of these patients discussed how significant this treatment group was in their institutional adjustment and overall mental health status. The difference in patient engagement between the two groups was significant.

Interviewed patients requested greater variety in their treatment groups and more clinician-led groups. They recommended developing a reinforcement system so that if they attended most of their groups and otherwise adhered to RHU rules, they could be rewarded with, for instance, full length movies. CMC EOP RHU clearly had a significant refusal rate at 63 percent and patients reported that the greatest reason for their refusals was boredom with the group or group subject matter.

CMC may benefit from convening a focused improvement team (FIT) to address the high refusal rate. In addition, CMC RHU should consider identifying and acquiring additional relevant group therapy resources that could be used by RTs to address different clinical needs and to inject greater variety into the offered treatment groups. Additional clinician-led treatment groups are also strongly encouraged as patients reported preferring more of those groups and clearly benefitted from the observed clinician group.

The monitor randomly selected and reviewed the health care records of 30 EOP RHU patients to assess compliance with Program Guide timeframes during their stays. All 30 patients required initial psychiatry evaluations; 19 or 63 percent timely occurred before the initial IDTT.

Twenty-one or 70 percent of the reviewed initial psychiatry evaluations were conducted in confidential settings; non-confidential contacts were due to patient refusals and custody modified program. Telepsychiatry was not utilized for any initial psychiatry evaluations.

For the 197 patients in CDCR's appointments report for October 1, 2024 to March 31, 2025, there were 430 completed contacts. Of the 430 contacts, 201 or 47 percent were confidential as reported by the institution. Reasons for non-confidential psychiatry contacts included patient refusal.

When a patient had more than one completed contact, compliance with Program Guide timeframes was able to be calculated. Of the 430 contacts, 234 were for individuals who were seen at least twice by the psychiatric provider. Of those 234 contacts, there were 45 or 19 percent that occurred beyond Program Guide requirements with a range of 31 to 115 days. Of note, the report did not include individuals that did not have completed contacts.[26]

The monitor randomly selected and reviewed the health care records of 30 EOP RHU patients to assess compliance with Program Guide timeframes during their stays. All 30 patients required initial primary clinician evaluations. Of the 30 reviewed initial primary clinician contacts, 25 or 83 percent were completed within five calendar days of arrival or change in level of care. Twenty-one or 70 percent of reviewed initial primary clinician evaluations were conducted in a confidential setting; non-confidential contacts were due to patient refusals and planned cell front contacts.

[26] Reviewed data captures the time between patient contacts but does not account for when patients were not seen or scheduled for a routine psychiatric contact. Of note, the appointments report provided did not account for delays between appointments due to movements in or out of CMC. Contact with the assigned psychiatrist was unable to be determined.

For the 169 patients in CDCR's appointments report for January 1, 2025 to March 31, 2025, there were 968 completed and refused contacts. Of the 967 completed contacts, 634 or 66 percent were confidential as reported by the institution. Reasons for non-confidential primary clinician contacts included patient refused confidential contact, confidential space was not available, and custody escorts were unavailable.

When a patient had more than one completed or refused contact, compliance with Program Guide timeframes was able to be calculated. Of the 968 contacts, 800 were for individuals who were seen at least twice by the primary clinician. Of those 800 contacts, 42 or five percent occurred beyond Program Guide timeframes with a range of 11 to 48 days. Of note, the report did not include individuals that did not have completed contacts, such as those that were not scheduled.[27]

There were 967 completed individual primary clinician contacts. Of note, the range of incidents greater than 96 minutes was 1,465.

Radios were available and issued to patients per policy. Additionally, patients were allowed to retain their tablet upon placement into RHU if they were from CMC. If the new RHU patient was from another institution, the patient would not have a tablet and staff reported it would take approximately one week to have one issued to them. In the meantime, RHU custody staff had radios and earbuds available to be issued to the new arrivals. The monitor observed

---

[27] The reviewed data captures the time between patient contacts but does not include patients who were not seen or scheduled for a routine contact with the primary clinician. Of note, the provided appointments report did not account for delays between appointments due to movements in or out of CMC. Contact with the assigned primary clinician was unable to be determined.

radios and earbuds in the RHU housing unit. Interviews of custody staff in the RHUs indicated they were aware of and adhered to CDCR policy regarding unclothed body searches.

The RHU Sergeant reported that third watch weekend correctional officers were recently removed resulting in more difficulty in reaching the 20 hours of out-of-cell time.

The monitor reviewed ARHR data for the weeks of December 23-29, 2024, and February 10-16, 2025, for the RHU. The first report was titled "RHU Weekly Activity Audit Compliance" and the second report was titled "Unit Summary" report, which is a listing by patient name and CDCR number of each activity offered for the week.

Regarding the offering of 20 hours of out-of-cell time for the week of December 23-29, 2024, the RHU weekly compliance report indicated 74.6 percent compliance. For the week of February 10-16, 2025, the RHU weekly compliance report indicated 93.4 percent compliance with offering 20 hours of out-of-cell time.

For the offering of at least three showers per week, the December 2024 RHU weekly compliance report indicated 98.7 percent compliance, while the detailed Unit Summary report showed 93.3 percent compliance. For the week of February 10-16, 2025, the RHU weekly compliance report reported 100 percent compliance, while the detailed Unit Summary report indicated 94.2 percent compliance. For the offering of one phone call per week, the December 23-29, 2024 RHU compliance report showed 59.4 percent compliance and for the week of February 10-16, 2025, it reported 75 percent compliance.

<u>Non-Disciplinary Segregation</u>:

The institution provided a list of NDS patients from the review period listing 32 incarcerated persons and the date they became NDS. Seven patients were identified as out to court placements, one pending completion of an investigation, and 24 patients were pending

transfer. A total of 18 patients, excluding patients identified as out to court had been pending transfer for more than 30 days.

At the time of the monitoring tour, the NDS list included 26 MHSDS patients including three 3CMS patients, two intermediate care patients and 21 EOP patients. Two patients were identified as approved for expedited transfer. One patient was transferred within 72 hours and the other patient was transferred past the 72-hour transfer timeline.

MHCB:

CMC's licensed CTC housed 50 patients in two housing units (25 beds per unit) to include 12 beds on B Side that were considered Inpatient Flex (I-Flex) and could be converted to acute or intermediate level of care at any time. None of the MHCBs were flexed during the review period. None of the beds were redlined during the monitoring tour. A Side and B Side each had one restraint room and one seclusion room. A Side and B Side each had five ADA-compliant cells. There was adequate space to offer confidential patient contacts in the CTC.

The CTC staffed one psychiatrist, one primary clinician, who both also covered the MHCB, and four recreation therapists. In the MHCB, there were 6.25 psychiatrists, ten full-time psychologists, three 0.75 psychologists, one 0.5 psychologist, and one 0.2 psychologist.

The two psychiatrists in the MHCB who had caseloads were within established ratios. Psychologists covering the MHCB all had caseloads within ratios, as did MHCB social workers.

The main staffing issue involved the staff's variable schedules that included four ten-hour days, five eight-hour days and three ten-hour days. Such scheduling practices resulted in continuity of care issues. For example, as evidenced by review of EHRs, a patient could be seen by five to seven different primary clinicians over a two-week period of time, which was similar to continuity of care issues with their psychiatrist.

The average daily census during the review period was 38 patients in October 2024, 41, in November and December 2024, 42 in January and February 2025, and 36 in March 2025. The census on May 6, 2025, was 37 patients. During the review period, MHCB patients had an average clinical length of stay of 10.1 days and a physical length of stay of 12.2 days.

During the review period there were three patients who had five MHCB placements, three patients had four MHCB placements and eight patients had three MHCB placements. Most discharged patients were removed timely from the MHCB unit. Delayed transfers were generally due to a variety of custody issues such as safety issues.

Patients were generally offered one recreational group treatment per weekday inside the CTC and two hours of outdoor recreational therapy in the outside individual exercise yard per day that was supervised by a recreational therapist.

For the offering of at least three showers per week, one phone call per week and ten hours of out-of-cell time, the monitor reviewed two random weeks of ARHR data from the review period – December 23-29, 2024, and February 10-16, 2025. For the week of December 23, 2024, the offering of out-of-cell time was 7.1 percent compliant with a range of zero to 19 hours. For the offering of showers, compliance was 60.5 percent with a range of zero to four showers offered. For the offering of at least one phone call per week compliance was 92 percent. For the week of February 10, 2025, the offering of out-of-cell time was 4.1 percent compliant. For the offering of showers compliance was at 48.5 percent and for the offering of at least one phone call per week, compliance was 57.1 percent.

Based on observation and information reported by both mental health and custody staff, patients were being offered out-of-cell time, showers, and phone calls consistent with Program

Guide guidelines. However, custody staff was not adequately documenting the offering of out-of-cell time, showers, or phone calls to MHCB patients.

Property, bedding, mechanical restraint (cuffing), and movement restrictions were reviewed timely and relaxed when appropriate. The MHCB sergeant completed the required mechanical restraint review form at the time of placement and as needed during the patient's stay.

The monitor's expert observed a total of 14 IDTTs in the CTC during the monitoring tour. All the required disciplines were present with most of the team members providing input. However, due to the team members' different work schedules, the patient's assigned clinicians were not always present in the IDTT. Treatment plans were discussed as were discharge planning.

An identified issue was that all patients were placed in the therapeutic modules regardless of their custody classification. However, non-max custody patients were not cuffed and the door was left open. The problem with such arrangement was, depending on where the team members were sitting, visibility of the patient was poor. This issue was discussed with staff, who provided some history regarding this issue.

The monitor randomly selected and reviewed the health care records of 30 MHCB patients to assess compliance with Program Guide timeframes during their stays. All 30 patients required initial IDTTs; and 100 percent of the 30 initial IDTTs reviewed occurred within 72 hours of arrival. All required assigned staff were present at only six, or 20 percent of the initial IDTTs reviewed. The assigned psychiatrist and/or psychologist were the most frequently substituted staff members. Patients attended 27 of 30 initial IDTTs with the remaining three patients refusing to attend for 90 percent compliance.

Of the 48 required routine IDTTs, 47 or 98 percent occurred timely, or within seven calendar days following the initial IDTT. Seventeen or 36 percent of routine IDTTs had the required assigned staff in attendance. The assigned psychiatrist and/or psychologist were the most frequently substituted staff members. Of the 47 routine IDTTs reviewed, patients attended 40 or 85 percent.

Thirty MHCB patients required initial psychiatry evaluations. Of those, 27 or 90 percent were timely assessments, meaning they occurred before the initial IDTT and within 24 hours of arrival. Twenty-one were reported as conducted in a confidential setting with an additional four held at cell front due to patient refusal for a total of 25 or 83 percent compliance. One third of the initial psychiatry contacts were reported to have occurred in a dayroom, group room, holding cell or TTM, rather than a clinician's office. One initial psychiatric assessment was not found. Reasons for non-confidential contacts included patient refusal or were unknown. Telepsychiatry was not utilized for initial psychiatry contacts.

All thirty MHCB patients required two routine psychiatry contacts per week. There were 116 expected contacts; all were timely. Of the 116 routine contacts reviewed, 66 were reported as being conducted in a confidential setting, while an additional 25 were held at cell front due to patient refusal for a total of 91 or 78 percent compliance. Reasons for non-confidential contacts included unavailable treatment space, or it was unknown. On four occasions psychiatrists reported contacts held at bedside or cell front as confidential. Telepsychiatry was not utilized for routine psychiatry contacts.

Thirty MHCB patients required initial primary clinician assessments; 28 or 93 percent were completed within 24 hours of arrival, and one initial primary clinician assessment was not found. Of the 29 initial primary clinician contacts reviewed, 18 were held in a confidential

setting, while an additional six contacts were held at cell front due to patient refusal for a total of 24 contacts or 83 percent compliance. Other than patient refusals, reasons for non-confidential initial primary clinician contacts were not reported. There were no initial primary clinician assessments reported utilizing tele-psychologists or tele-social workers.

Thirty MHCB patients required routine primary clinician contacts. An institution was considered compliant if a patient was seen daily beginning the day after admission for an out-of-cell confidential contact by the psychiatrist or psychologist (unless the patient refused), though on weekends the patient may be seen by the medical officer of the day. There were 225 expected contacts, and 223 or 99 percent were timely. One hundred forty-one routine primary clinician contacts occurred in a confidential setting, with an additional 50 contacts were held at cell front due to patient refusal for a total of 191 or 85 percent compliance. Reasons for routine contacts not occurring in a confidential setting included modified programming or it was not reported. Four primary clinician contacts reviewed and reported as confidential occurred at cell front or the patient's bedside. A licensed clinician completed 184, or 83 percent of the reviewed routine contacts, while the remaining 39 or 17 percent were not completed by a licensed clinician. Tele-psychologists or tele-social workers were not reported to be utilized for routine primary clinician contacts.

During March 2025, the mental health program subcommittee performed an audit specific to compliance with Program Guide requirements regarding contact compliance and IDTT meeting attendance. Data for March 2025 showed six of seven requirements at goal. SRE, MHCB daily provider contacts, initial and routine IDTT, initial psychiatry and routine psychiatry contacts, were above compliance. The IDTT required staffing metric, was non-compliant at 31 percent, a slight decrease from 30 percent in the prior month.

<u>Seclusion and Restraint</u>:

During the review period, there was no use of either the restraint rooms or the seclusion rooms.

<u>EOP</u>:

Mainline EOP patients were housed in D Facility in buildings 7 and 8. Since 2023, whenever the EOP population has exceeded the 550-patient capacity, any overflow patients were housed on C Facility, a 3CMS yard with both GP and 3CMS patients. Four interviewed patients reported that prior to transfer to D Facility, they resided on C Facility with a range between a week and four months following admission to CMC. During the entrance meeting, it was reported that as of two weeks prior to the monitoring tour there were no overflow patients. Staff reported that C Facility patients received individual treatment on the housing unit on C Facility and were able to attend group treatment on D Facility between 9 a.m. and noon.

For the EOP program, there were 6.75 psychiatrists, and one 0.75 telepsychiatrist as well as nine psychologists, a 0.8 psychologist, one tele-psychologist, two full-time LMFTs, one 0.95 LMFT, one 0.8 psychologist that was shared with the CTC, six social workers, three tele-social workers, and 15 recreation therapists.

The psychiatrists covering EOP had caseloads within established ratios. Of the 28 primary clinicians covering the mainline EOP program, 24 had reported caseloads with nine or 38 percent of caseloads over 26 patients and up to 34 patients.

Since August of 2022 and throughout the review period, CMC had a triage plan in place that impacted mainline EOP patients who did not receive Program Guide required care. According to a memo issued in January 2025, primary clinician individual contacts or caseload groups were to be scheduled bi-weekly. IDTTs continued, with initial IDTTs and clinical need

prioritized and routine IDTTs as the lowest priority. As staffing improved, the triage plan was adjusted according to a memo issued in April 2025. Primary clinicians were directed to resume weekly patient contacts. Timely IDTTs resumed with a plan to catch up on outstanding routine IDTTs. Data provided by the institution indicated that 307 routine IDTTs were outstanding between 2021 and 2025 with the majority due between 2023 through 2025. One initial IDTT was outstanding. Mental health leadership anticipated that outstanding IDTTs would be caught up by early June 2025. There was no direction regarding group treatment in the memo.

CMC reported that during the review period, excluding patients on modified EOP, on average, mainline EOP patients were scheduled for 10.7 hours weekly STA, however, 29 percent of these patients were scheduled less than ten hours weekly. On average, patients were offered 7.9 hours weekly of STA; on average 5.3 hours weekly was attended. On average, patients refused 2.8 hours weekly and 3.4 hours were canceled weekly.[28] Custody cancellations which accounted for two percent of cancellations during the review period were due to modified programming.

For patients on modified EOP, on average, patients were scheduled ten hours weekly STA; offered seven hours weekly; attended 4.2 hours weekly and refused 2.9 hours weekly.[29] There were 3.4 hours canceled weekly. At the time of the monitoring tour, there were 17 patients on modified treatment plans.

The use of triage plans impacted compliance with Program Guide requirements. Mental health program subcommittee meeting minutes from February 2025 indicated that primary

---

[28] The monitor's expert brought minor inconsistencies in the reported data to the attention of institution staff, who submitted a ticket to the IT department to address the issue.

[29] The monitor's expert brought minor inconsistencies in the reported data to the attention of institution staff, who submitted a ticket to the IT department to address the issue.

clinician contacts were noncompliant at 58 percent. Initial IDTTs were 71 percent compliant and routine IDTTs were at 23 percent with the attendance of required staff noncompliant at 26 percent.

The monitor's expert observed 15 IDTTs completed by three different treatment teams on D Facility. Five were conducted in absentia. Eleven of the 15 IDTTs were routine. All staff were in attendance. The psychiatric provider covered for nine of 11 patients. Staff attributed the absence of the assigned psychiatric provider to staff absences/leave, staff redirection to the MHCB or EOP RHU and scheduling challenges. Correctional counselors were attentive with variable input that was more useful when the counselor was assigned to the patient. Three different nurses who were actively engaged with each patient represented each team. When tele-mental health was utilized, the room layout allowed all participants and the patient to see the provider on the computer screen. Overall, the process was collaborative, and staff were empathic with good rapport across IDTTs. A strength was the use of psychometric assessment tools to assess patients' symptomology and progress in treatment.

IDTTs were presented by nine different clinicians who knew their patients very well. The quality of discussed content varied with clinician level of experience, with some stronger than others, and all but one assessed as inadequate. Except for one IDTT, presentation of relevant clinical and psych-social history was limited and there was minimal discussion of progress since the previous IDTT for routine IDTTs. Case conceptualization was rarely discussed. There was a need for improved provider collaboration. Psychiatric input was variable but generally limited to medication names, side effects and rationale. Clinical support for diagnosis was not clear. Symptoms were frequently discussed in generic terms, such as "anxiety" or "depression" and did not provide sufficient clinical rationale for diagnosis.

Relatedly, functional deficits were not discussed. When evident, diagnostic discrepancy was not resolved, likely in part due to a covering psychiatrist. When stated, patients agreed with treatment goals which were objective and measurable. Treatment interventions were stated although rarely evidence-based. Group attendance was variably stated and at times, appropriately targeted as a treatment goal. Group participation and relationship to treatment goals was not discussed. EOP level of care was continued for each patient and while appropriate, the decision was not a team discussion and needed individualized rationale.

The monitor randomly selected and reviewed the health care records of 21 mainline EOP patients to assess compliance with initial IDTT Program Guide timeframes during their stays. All 21 patients required initial IDTTs. Of the 30 reviewed initial IDTTs, 13 or 62 percent occurred timely within 14 calendar days or arrival or level of care change. Nineteen or 90 percent were attended by all required staff and 18 or 86 percent were attended by the patients. The reasons the initial IDTT was held in absentia included one was scheduled during close custody count time, and there were missing contacts.

For the 345 patients in CDCR's appointments report for October 1, 2024 to March 31, 2025, there were 400 completed initial or routine IDTTs. When a patient had either an initial IDTT and a routine IDTT or more than one routine IDTT, compliance with Program Guide timeframes was able to be calculated. Of the 400 completed IDTTs, 59 contacts were for individuals who had at least two IDTTs (initial and routine or two routines). Of those 59, 19 or 32 percent occurred beyond Program Guide timeframes. Of note, the report did not include individuals that did not have a completed IDTT, such as those that were not scheduled.[30]

[30] The reviewed data captures the time between completed patient IDTTs but does not account for when patients were not scheduled for an initial or routine IDTT. Of note, the appointments

Regional staff expressed concern regarding the scheduling of group treatment. Staff reported and provided documentation that indicated that during the past 12 months, 48 percent of mainline EOP patients were not scheduled for ten hours of treatment. With training and regional staff oversight, scheduled treatment had improved. Specifically, data provided during the monitoring tour indicated that for the month of March, scheduled treatment was at 50 percent and increased to 81 percent for the month of April. Between April 1, 2025, and May 7, 2025, treatment scheduled was at 91 percent.

Observed treatment space was confidential, and patients confirmed that doors were completely closed. Staff reported sufficient individual treatment space and meeting with patients in their offices. However, it was reported that more group space was needed for the active group schedule.

Group treatment was primarily offered by recreation therapists. To prioritize confidential group rooms for clinical groups, recreational therapy groups were offered on the yard or in the gym. Thus, while rare, when there was inclement weather, yard groups were canceled.

The monitor's expert partially observed two clinician-led coping groups attended by five and nine patients respectively; both were assessed as adequate. The patients read from a handout and discussed content in a meaningful way with the group leader and with each other. A NLTG on MRSA was observed and assessed as appropriate. The group leader led an interactive discussion with patients who were attentive and engaged. The group was psycho-educational with knowledge assessed throughout the group.

---

report provided did not account for delays between appointments due to movements in or out of CMC.

Twenty-five patients were interviewed after group observations. Overall, patients were satisfied with treatment and indicated that they were able to access mental health care as needed. There were complaints about the group room being warm and stuffy and a need for variety in group curricula.

The monitor randomly selected and reviewed the health care records of 21 mainline EOP patients to assess initial psychiatric evaluation compliance with Program Guide timeframes during their stays. All 21 patients required initial psychiatry evaluations; 11 or 52 percent timely occurred before the initial IDTT. Nineteen or 90 percent of the reviewed initial psychiatry evaluations were conducted in confidential settings; the non-confidential contacts were due to patient refusals and missing contacts. Telepsychiatry was utilized for three or 14 percent of initial psychiatry evaluations.

For the 688 patients in CDCR's appointments report for October 1, 2024 to March 31, 2025, there were 3,536 completed and refused contacts. Of the 3,509 completed contacts, 3,461 or 99 percent were confidential as reported by the institution. Reasons for non-confidential psychiatry contacts included unavailable confidential space and custody escorts and patient did not show for the scheduled contact.

When a patient had more than one completed or refused contact, compliance with Program Guide timeframes was able to be calculated. Of the 3,536 contacts, 2,874 contacts were for individuals who were seen at least twice by the psychiatric provider. Of those 2,874 contacts, there were 2,792 or 97 percent that occurred beyond Program Guide timeframes with a range of

11 to 119 days. Of note, the report did not include individuals that did not have completed contacts.[31]

The monitor randomly selected and reviewed the health care records of 21 mainline EOP patients to assess compliance of initial primary clinician evaluations with Program Guide timeframes during their stays. All 21 patients required initial primary clinician evaluations. Of the 30 reviewed initial primary clinician evaluations contacts, 17 or 81 percent were completed within 14 calendar days of arrival or change in level of care. Eighteen or 86 percent of reviewed initial primary clinician evaluations were conducted in a confidential setting; non-confidential contacts were due to patient refusals and custody modified programming. Tele-mental health was utilized for one initial primary clinician evaluation.

For the 137 patients in CDCR's appointments report for January 1, 2025 to March 31, 2025, there were 1,057 completed and refused contacts. Of the 731 completed contacts, 530 or 73 percent were confidential as reported by the institution. Reasons for non-confidential primary clinician contacts included patient refused confidential contact and confidential space was not available.

When a patient had more than one completed or refused contact, compliance with Program Guide timeframes was able to be calculated. Of the 1,057 contacts, 921 were for individuals who were seen at least twice by the primary clinician. Of those 921 contacts, 41 or four percent occurred beyond Program Guide timeframes with a range of 11 to 75 days. Of note,

[31] Reviewed data captures the time between patient contacts but does not account for when patients were not seen or scheduled for a routine psychiatric contact. Of note, the appointments report provided did not account for delays between appointments due to movements in or out of CMC. Contact with the assigned psychiatrist was unable to be determined.

the report did not include individuals that did not have completed contacts, such as those that were not scheduled.[32]

Staff reported rampant substance use, primarily “spice,” on the yard which led to an increase in safety concerns, disciplinary reports, RHU placements and MHCB admissions.

Three tele-mental health clinicians and one telepsychiatrist who provided care to mainline EOP patients were interviewed. All reported that they felt integrated into their treatment teams and were able to access each other and on-site staff as needed. They appropriately discussed referring patients to on-site providers when virtual services were clinically contraindicated. They felt supported by both institutional and off-site tele-mental health supervisors. They reported that the medical assistant (MA) was not in the treatment room with them. Clinicians reported that they were adjusting to the resumption of providing care in accordance with the Program Guide which had resulted in increased workload due to the transition from bi-weekly contacts to weekly contacts and catching up on overdue IDTTs. Of concern, they reported that as staffing had increased, there had been a need to share office space which had posed some challenges. This was brought to the attention of the chief of tele-mental health. Clinicians also raised a concern that a covering psychiatrist and/or covering correctional counselor at IDTT poses a barrier to collaborative treatment planning.

The monitor attended a morning huddle in the D Facility program office. The huddle was well attended by the multi-disciplinary treatment team. The discussion was open and relevant. During the discussion, custody staff discussed the prevalence of “spice” use throughout the

[32] The reviewed data captures the time between patient contacts but does not include patients who were not seen or scheduled for a routine contact with the primary clinician. Of note, the provided appointments report did not account for delays between appointments due to movements in or out of CMC. Contact with the assigned primary clinician was unable to be determined.

institution and the danger that it has presented to both incarcerated persons and staff. It was reported that there have been multiple overdoses. Additionally, it was reported that users became combative and/or present as psychotic after using. It should be noted that the monitor smelled spice while touring the facility housing units. It was particularly noticeable in the RHU. Concerningly, the odor of spice did not instigate investigation by present staff, including supervisors.

The institution reported that all mainline EOP patients were currently housed on Facility D as of two weeks before when the overflow housed on Facility C were transferred from the facility. It was reported that EOP patients housed in overflow housing programmed with Facility D EOP patients. To attend group treatment, these patients had to exit Facility C's general population yard and walk to Facility D. EOP staff reported occasional issues with some custody officers who were not regularly assigned to gate coverage and would not allow EOP patients to enter Facility D for treatment. EOP staff indicated that they felt comfortable discussing these issues with custody staff when they occurred and they would be resolved. EOP staff also indicated that a primary clinician had been assigned to Facility C for the overflow EOP population. Custody staff reported that a new systemwide directive was to take effect on Monday May 12, 2025 requiring a daily yard recall at 1:15 p.m. until after shift change due the increase in violence.

<u>3CMS</u>:

In the 3CMS program (which included both East and West yards), there were 2.25 telepsychiatrists, and one additional psychiatrist who floated between the MHCB and 3CMS program. Additionally, there was one psychologist, one social worker, one full-time telepsychologist and one half-time psychologist, who was borrowed from WSP. Additionally,

there was one tele-social worker, 1.25 LMFT (works 50 hours per week), and one recreation therapist. Both the 3CMS and EOP programs shared four MAs and three CNAs as telepresenters.

The on-site psychiatrist's caseload in mainline 3CMS was within caseload ratio. However, the telepsychiatrist covering 3CMS had a caseload of 349, which exceeded the 2009 Staffing Plan ratio of 1:225.[33] Three of the 4.5 or 67 percent of primary clinicians covering the mainline 3CMS program had caseload ratios above the established ratio. Clinicians who were over caseload ratios had caseloads of 101-106 patients.

During and following the review period and at the time of the monitoring tour, 3CMS services were provided under a triage plan due to critical mental health staff vacancies. Updates to the triage plan were communicated in three memoranda dated June 27, 2024, January 28, 2025, and March 3, 2025. The three memoranda reflected changes in staffing vacancies, with mainline 3CMS vacancy rates reported as 67 percent, 45 percent, and 45 percent, respectively, across the three dates. While minor clarifications were made in the successive memoranda, there were no substantive changes in the 3CMS triage plan during or following the review period. The 3CMS triage plan consisted of a set of nine treatment priorities for primary clinicians. It also noted that psychiatric staff would prioritize seeing 3CMS patients receiving psychotropic medications, followed by non-medicated patients referred by primary clinicians.

The nine treatment priorities in 3CMS care for primary clinicians reflected prioritization of crisis interventions, routine consults and referrals, clinical contacts with new arrivals slotted for the fire camp, mental health rules violation report assessments, and mental health

[33] The ratio for mainline 3CMS patients off medications for at least six months is 1:675, ECF No. 6978-1 at 3, though the proportion of this telepsychiatrist's patients not prescribed medications was not discernable.

assessments of grievances, among other priorities. Initial primary clinician assessments, initial and routine IDTT meetings, and routine primary clinician follow-up appointments for patients receiving psychotropic medication were not among the triage plan priorities.

During the review period, the mainline 3CMS population at CMC rose from 456 in mid-October, 2024, to 597 in mid-March, 2025. Mental health leadership reported that in the last year CMC was designated as a hub for camp-eligible incarcerated individuals and that 3CMS patients became eligible for placement in minimum support facilities, including fire camps. Both developments resulted in an increase of 3CMS patients at CMC during the review period, including an increase in the 3CMS census at Facility M from 26 patients in October 2024 to 45 patients in April 2025.

Nursing-led treatment groups were held in the dining room area, with custody staff present and observing. In addition to the presence of custody staff, the physical features of the dining room were not optimal for mental health groups. These included fixed seating, with four chairs around each stationary metal table, frequent loud overhead announcements, and predictably wet floors, because the dining area was cleaned and mopped immediately prior to the beginning of nursing-led treatment groups.

Observed 3CMS IDTT meetings at CMC indicated that quality was variable and in need of improvement. Staff appeared in need of training in developing and communicating measurable treatment plans as a central component and core purpose of the IDTT meeting. The monitor's expert observed one routine and seven initial 3CMS IDTT meetings on Facility C. On the first day of observation, one IDTT meeting could not be held as scheduled because custody staff were completing an incident debriefing following a fatal overdose in Facility C earlier that morning, and patient movement was halted during the debriefing. On the second day of

observation, the treatment team experienced a 20- to 25-minute delay between IDTT meetings due to difficulties in locating the patient.

All observed IDTTs were attended by the patient, a telepsychiatrist, a primary clinician, and a correctional counselor, but the telepsychiatrist and correctional counselor were often covering for assigned treatment team members, and in several cases the telepsychiatrist, who was new to the facility, had not yet met the patients. It was evident that the treatment team was not accustomed to using the large tele-mental health unit for IDTT meetings. Previously, the team had been using a small laptop or tablet, which did not permit the telepsychiatrist to see the room and all participants.

A discussion of the patient's case conceptualization was absent from all eight observed IDTT meetings, and identification of the patient's diagnosis was missing in half the meetings. Discussion of treatment goals was vague in six IDTT meetings and absent in two IDTT meetings, and identification of objective, measurable, patient-specific goals was absent. Treatment interventions were discussed only with respect to psychotropic medications and/or frequency of scheduled contacts. Correctional counselor input was minimal and required prompting from the clinician. However, the IDTT meetings were collaborative and included appropriate reviews of medications, functional impairments, treatment responses, and level of care. In four cases, the treatment team determined to move patients up to EOP level of care, and in each case, these referrals were clinically appropriate.

Follow-up record review for the observed Facility C IDTT meetings confirmed that all seven initial IDTT meetings were overdue, while the routine IDTT meeting was on time. Initial IDTT meetings were three weeks to six months late, an unsurprising finding given the facility's 3CMS triage plan and primary clinician vacancies. The quality of treatment plans varied by

clinician, but in general the written treatment plans were clearer, more measurable, and more specific than the discussions held in the IDTT meetings. Specificity of primary clinician interventions was a strength in these treatment plans; failure to include psychiatric interventions was a weakness. Fuller discussion of the written treatment plans during the IDTT meetings was needed, and it was unlikely that any of the patients attending these meetings understood the structure and details of their planned treatment.

Four initial 3CMS IDTT meetings were also observed on Facility M. In each case, the patient and correctional counselor attended in person, and the primary clinician and psychiatrist attended via tele-mental health. The telepsychiatrist who participated was not the patient's assigned psychiatrist. Although a full-sized tele-mental health unit had been ordered for the Facility M IDTT room, it was not yet available, and the team relied on a small screen placed on the table in front of the patient. The primary clinician's eye contact with the patient was poor. It was evident the primary clinician was looking at a second screen to review documentation and to document the IDTT meeting, and much of the time her gaze was averted from the patient to this second screen. The IDTT room in which the patient and correctional counselor sat was small but confidential; staff had compensated for the overly intense central heating from a ceiling vent by opening two windows to the outdoors.

All four IDTT meetings were marked by excellent input from the correctional counselor, who provided encouragement, clarification, and patient-specific case management in a supportive and professional manner. The meetings were collaborative across disciplines and with the patient, and transition/pre-release planning as well as the patient's level of care were adequately discussed. Diagnoses, medications, psychiatric history, substance use history, symptoms, and functional impairments were also adequately identified and discussed. However,

there was inadequate discussion of patient case conceptualization, treatment goals, and treatment interventions outside of psychotropic medications. Consistent with their own requests, two of the four patients were discontinued from 3CMS care during their IDTT meetings. In both instances, discontinuation of routine mental health care appeared clinically appropriate.

Follow-up record reviews for the observed Facility M IDTT meetings confirmed that three of four meetings were noncompliant with Program Guide timeliness requirements. The three overdue IDTT meetings were late by one month, five months, and seven months. Appropriately, treatment plans were not developed for the two patients who were discontinued from 3CMS care. However, in neither case had any treatment plan been previously developed at CMC. The treatment plans developed for the two patients who remained in 3CMS care were generic, with goals that were not framed in easily measurable terms.

The monitor randomly selected and reviewed the health care records of 30 mainline 3CMS patients to assess compliance with Program Guide timeframes during their stays. All 30 patients required initial IDTTs. Of the 30 reviewed initial IDTTs, one occurred timely within 14 calendar days of arrival or level of care change. Nineteen or 63 percent were attended by all required staff and 18 or 60 percent were attended by the patients. Reasons initial IDTTs were held in absentia included one patient no-show.

For the 219 patients in CDCR's appointments report, there were 226 completed routine IDTTs. When a patient had either a completed or refused initial IDTT and a routine IDTT or more than one routine IDTT, compliance with Program Guide timeframes was able to be calculated. Of the 226 IDTTs that were completed, ten were for individuals who had at least two IDTTs. Of those, all were compliant with Program Guide timeframes. Of note, the report did

not include individuals that did not have a completed IDTT, such as those that were not scheduled.[34]

Of the 226 completed routine IDTTs, there were no IDTTs completed in zero minutes, 182 completed within 15 minutes, 40 lasted between 16 and 30 minutes, and four lasted between 31 and 60 minutes.

A random sample of 30 patients was selected to verify consistency between the appointments report and clinical documentation in EHRS. Of the 32 contacts reviewed, all were consistent with the appointments report.

At the beginning of the review period, recreational therapy groups were offered to 3CMS patients, but no clinician-led groups could be provided due to staffing vacancies and limited group room space. During the review period, clinician- and intern-led groups began to be offered to 3CMS patients, including a sex offender treatment group, an LGBTQ+ group, and two DBT-informed drop-in groups focused on skills acquisition.

Beginning in early 2025, ten one-hour-long NLTGs were offered weekly to 3CMS patients, or two each weekday. At the time of the monitoring tour, 19 mainline 3CMS patients were enrolled in one to six NLTGs. NLTGs addressed life skills, mental health and wellness, physical health and wellness, substance use, and transitional planning. It was reported that enrollment was low and still growing because the NLTGs were new to the 3CMS population. Mental health leadership reported that they were pleased with the NLTGs and believed they contributed significantly to participants' well-being; mental health leaders also had confidence

[34] The reviewed data captures the time between patient contacts but does not include patients who were not seen or scheduled for a routine contact with a psychiatrist, primary clinician, or IDTT. Of note, the provided appointments report did not account for delays between appointments due to movements in or out of 3CMS level of care. Contact with the assigned psychiatrist or primary clinician was unable to be determined.

that nurse facilitators in these groups would promptly refer any patient in need of additional mental health care. A life skills nursing-led group was observed on Facility C and consisted of two 3CMS patients and two registered nurse facilitators. The group effectively engaged both patients and was interactive, patient-specific, clinically appropriate, and uplifting for the patients.

One to two 3CMS recreational groups were offered in Facilities A, B, and C each weekday. These groups were held on the outdoor yard due to lack of other treatment space and involved walking, playing enrichment or trivial pursuit games, and other exercise activities. Several additional community-based volunteer-led groups and activities were also made available to 3CMS patients and general population incarcerated individuals.

Patients receiving 3CMS care and housed in Facilities A, B, and C had to be seen in their respective facilities, and quality management minutes indicated that lengthy waits, lack of treatment space, and relocation time within CMC negatively impacted the timeliness of individual encounters.

The monitor randomly selected and reviewed the health care records of 30 mainline 3CMS patients to assess compliance with Program Guide timeframes during their stays. All 30 patients required initial psychiatry evaluations; 15 or 50 percent timely occurred before the initial IDTT. Twenty-eight or 93 percent of the reviewed initial psychiatry evaluations were conducted in confidential settings; the non-confidential contacts were due to missing contacts. Telepsychiatry was utilized for 11 or 37 percent of initial psychiatry evaluations.

For the 458 patients in CDCR's appointments report covering patients who received at least one routine psychiatry contact during the review period, there were 727 total completed and refused contacts. Of the 708 that were completed, 673 or 95 percent were reported as being conducted in a confidential setting. When a patient had more than one completed contact,

compliance with Program Guide timeframes was able to be calculated. Of the 708 completed contacts, 270 were for individuals who were seen at least twice by a psychiatric provider. Of those 270 contacts, 99 or 37 percent of contacts were completed beyond the Program Guide required timeframes. Of note, the report did not include individuals that did not have complete contacts, such as those that were not scheduled in accordance with the institution's triage plan.[35]

Of the 708 completed routine psychiatry contacts, no contacts were reported to have been completed in zero minutes, 321 were completed within 15 minutes, 365 lasted between 16 and 30 minutes, 39 lasted between 31 and 60 minutes, and two were completed between 61 and 95 minutes.

A random sample of 30 patients was selected to verify consistency between the appointments report and clinical documentation in EHRS. Of the 55 contacts reviewed, all were consistent with the appointments report.

The monitor randomly selected and reviewed the health care records of 30 mainline 3CMS patients to assess compliance with Program Guide timeframes during their stays. All 30 patients required initial primary clinician evaluations. Of the 30 reviewed initial primary clinician evaluation contacts, six or 20 percent were completed within ten calendar days of arrival or change in level of care. Twenty-five or 83 percent of reviewed initial primary clinician evaluations were conducted in a confidential setting; non-confidential contacts were due to missing contacts and one refusal. Tele-mental health was utilized for six or 20 percent of initial primary clinician evaluations.

---

[35] The reviewed data captures the time between patient contacts but does not include patients who were not seen or scheduled for a routine contact with a psychiatrist, primary clinician, or IDTT. Of note, the provided appointments report did not account for delays between appointments due to movements in or out of 3CMS level of care. Contact with the assigned psychiatrist or primary clinician was unable to be determined.

For the 540 patients in CDCR's appointments report covering patients who received at least one routine primary clinician contact during the review period, there were 1,058 total completed and refused contacts. Of the 1,039 that were completed, 956 or 92 percent were reported as being conducted in a confidential setting. When a patient had more than one completed contact, compliance with Program Guide timeframes was able to be calculated. Of the 1,039 completed contacts, 519 were for individuals who were seen at least twice by a primary clinician provider. Of those 519 contacts, 427 or 82 percent of contacts were completed beyond the Program Guide required timeframes. Of note, the report did not include individuals that did not have completed contacts, such as those that were not scheduled in accordance with the institution's triage plan.[36]

Of the 1,039 completed routine psychiatry contacts, no contacts were reported to have been completed in zero minutes, 338 were completed within 15 minutes, 466 lasted between 16 and 30 minutes, 199 lasted between 31 and 60 minutes, 32 lasted between 61 and 95 minutes, and four were completed in greater than 95 minutes.

A random sample of 30 patients was selected to verify consistency between the appointments report and clinical documentation in EHRS. Of the 64 contacts reviewed, 61 or 95 percent were consistent with the appointments report, while three dates in the appointments report did not have corresponding clinical documentation in EHRS.

The monitor's expert reviewed a list of all EOP patients who were transferred to 3CMS care during the review period. The report indicated that a total of 27 EOP patients had

[36] The reviewed data captures the time between patient contacts but does not include patients who were not seen or scheduled for a routine contact with a psychiatrist, primary clinician, or IDTT. Of note, the provided appointments report did not account for delays between appointments due to movements in or out of 3CMS level of care. Contact with the assigned psychiatrist or primary clinician was unable to be determined.

transferred to 3CMS care during the six-month review period. Of these, three or 11 percent required a return to a higher level of care within two weeks of moving to 3CMS care.

Records for ten of these patients, including the three who required a rapid return to a higher level of care, were reviewed to assess the quality of documentation, clinical appropriateness of the transition to a lower level of care, and the outcome of this transition. Documentation regarding the clinical rationale for patient transfer from EOP to 3CMS care was adequate in five of the ten records reviewed; the remaining records contained inadequate discussion of the risks, benefits, and alternatives to changing the patient's level of care and/or did not adequately discuss any potential rationales for retaining the patient in EOP care. Even when the rationale for transferring the patient to 3CMS care was adequately documented, there were negative outcomes. Externalities, including patient substance use, peer deaths, patient safety concerns, and patient transfers, in combination with ongoing patient symptoms, were associated with relatively rapid negative clinical outcomes for at least four of the ten patients.

Furthermore, 3CMS care for these patients was often deficient. Only two of the ten patients transferred from EOP to 3CMS care received an initial primary clinician assessment following transfer to 3CMS care, and 3CMS IDTT meetings were not held for four of the ten patients who remained in 3CMS care at least 14 days following transfer from EOP care. As of late May, 2025, one of the ten patients had not seen a primary clinician since December 5, 2024 or a psychiatrist since November 22, 2024. Due to staffing vacancies, the 3CMS treatment teams appeared ill-equipped to support patient stability and transition from EOP care when patients presented with complex symptoms or behavior problems.

Eight 3CMS patients on Facility B were interviewed. Most reported that they were seen confidentially every 90 days by a primary clinician and if they were taking psychotropic

medications, every 90 days by a psychiatrist. Two patients indicated that they did not like tele-mental health appointments because they felt impersonal, and most patients indicated that they were seen by different primary clinicians and different psychiatrists on each visit. Patients perceived the lack of consistency in treatment staff from session to session as a barrier to self-disclosure and treatment progress.

Several Facility B patients reported that they had been housed at CMC for months but had not yet attended an initial IDTT, and most patients did not have a good understanding of their treatment plan. However, they reported that they had good access to mental health staff through the health services request system and that requests to be seen were responded to in a timely manner. They reported that they would feel comfortable speaking to custody staff if they felt an urgent or emergent need for mental health assistance. Almost all patients had jobs, and two were in education programs. They indicated that the recreational therapy groups were a strength and indicated that there was a need for in-cell psychoeducational or treatment packets that could be completed in a self-paced manner. They also confirmed that the prevalence and negative consequences of illicit substance use had increased over the last year.

The monitor's expert interviewed 12 3CMS patients on Facility C. Consistent with pre-monitoring tour data and case reviews, patients reported that they were regularly seen by a psychiatrist, sometimes in person and sometimes by tele-mental health, but that contacts with their primary clinician were infrequent, with contacts occurring every six months or even less frequently. They had praise for the 3CMS groups that had recently started on Facility C. Patients indicated that these group sessions were helpful because groups required engagement and exchange of ideas and experiences. In contrast, they described individual contacts as repetitive, with the same questions being asked and answered without feeling that therapeutic

progress being made. Patients reported a strong need for more frequent, more in-depth nonpharmacological treatment for their issues as well as greater availability of mental health groups. They stated that there were long waits for responses to health care service requests and that these requests were the primary means by which they were seen.

Several 3CMS clinical staff members were interviewed individually prior to or following IDTT meetings and while touring treatment space. Staff reported that there was insufficient treatment space for 3CMS care, that recreational therapy equipment including new tabletop games were needed, and that illicit substance use, particularly spice and methamphetamine use, had increased significantly in the last year. The increase in substance use was reported to have been particularly significant on Facility C, and it resulted in multiple overdoses, drug debts with attendant safety concerns and violence, crisis intervention team activations, and crisis bed placements.

Primary clinician vacancies over the last several years were reported to be the most significant barrier to providing quality mental health care. At one point, there was only one primary clinician assigned to the 3CMS population, resulting in a caseload of over 500 patients. Conversely, the more recent reduction in primary clinician vacancies was reported to be the most important factor in providing clinically appropriate care to the 3CMS population. The clinician who previously served more than 500 patients reported that her caseload included 110 patients at the time of the monitoring tour.

When asked about the institutional culture and custody support for mental health services, some staff reported that custody staff were collaborative, supportive, and treated patients with respect and dignity. Other staff noted that a culture change for the worse had evolved after most of CMC West Facility was closed. Officers previously assigned to the West

Facility transferred to the main campus and were unprepared to interact with patients suffering from severe mental illness. This development coincided with significant mental health staff vacancies and with systemic reductions in RHU use.

Staff involved in the provision of telepsychiatry and tele-mental health services reported that tele-mental health equipment ran smoothly, without technical problems, that they had ready access to patients and other treatment team members, and that custody staff were helpful in ensuring patients appeared for scheduled appointments. Telepresenters typically remained with the patient during telepsychiatry encounters but left the room during telepsychology encounters. However, when two telepsychiatry or tele-mental health clinics were operating simultaneously and there was only one telepresenter to run both clinics, the telepresenter placed herself in the hallway between the two clinic rooms, so that both patients could be observed.

Other Issues:

Pre-Release Planning:

There was 1.0 FTE assigned to the pre-release coordinator position according to mental health leadership at the time of the monitoring tour. However, another position was assigned to provide backup for pre-release planning but that person's primary duties focused on the PC 2602 medication process. The current pre-release coordinator and backup only began their current roles two weeks before the monitoring tour and as a result were unable to describe activities during the review period. Despite the recent assignment of the primary and backup pre-release coordinators, they had already received headquarters' training in the process and related forms and were knowledgeable about the various forms, different county standards and resources available.

CMC provided a current LOP, 3030 Pre-Release Planning for Patients Participating in the Institution's Mental Health Services Delivery System for review during the monitoring tour.

During the monitoring tour, the primary and backup pre-release coordinators held a training for all staff to familiarize primary clinicians and psychiatrists with the updated pre-release process. This training was observed by the monitor's expert and regional mental health staff and found to be very helpful. The training was well-organized and contained important information for clinicians regarding changes in form completion and the process.

The pre-release coordinators were forthcoming that there was a significant backlog in completion of the assessments and necessary documents. This was true for EOP and 3CMS patients. The pre-release coordinator expected it to take a few months to clear the backlog.

One of the challenges facing the pre-release coordinator was the lack of standardization across counties. For example, they explained that Sacramento County would not provide housing in advance of release. The patient being released would have to physically appear at the appropriate office during regular work hours. Consequently, someone releasing on a Friday with limited funds may have to release without lodging and live in a shelter or on the street until the following Monday. Alameda County used electronic filing but charged five dollars to submit an application. In contrast, Kern County allowed electronic submission free. Most other counties used postal or paper mail with no fees but the pre-release coordinator worried about the lack of confirmation that they'd received the information.

There were no pre-release groups at the time of the monitoring tour. There had been one pre-release group reported during the review period provided to EOP patients. The pre-release coordinator reported that there were plans to begin two EOP groups utilizing a recreational therapist and peer support specialists from the Peer Support Program.

The clinician-to-clinician handoff for releasing patients had been completed via tele-mental health with the pre-release coordinator and community provider. The pre-release coordinators reported that the correctional counselors were responsible for assisting patients with obtaining their California identification necessary to receive services.

In summary, pre-release planning at CMC was problematic during the review period due to staffing changes and the lack of an assigned pre-release coordinator. There was only one group offered for part of the review period. CMC acknowledged that they had fallen behind in timely completion of pre-release assessments, applications, and documentation, but had recently assigned a full-time pre-release coordinator with a backup. The assigned coordinator and backup were quite knowledgeable and clearly committed to eliminating backlog and providing ongoing pre-release services to 3CMS and EOP patients.

CMC had one assigned TCMP case manager and two assigned parole assistants. The pre-release coordinator reported good communication with both TCMP and custody staff.

TCMP reported meeting with 143 patients, including 51 EOP and 92 3CMS patients during the review period. Overall, benefit applications were submitted for 127 or 89 percent of the patients. Thirteen patients refused TCMP services; others had access to other services. Medi-Cal applications were submitted for 127 or 88 percent of patients, and SSI applications were submitted for 46 of 48 or 96 percent of eligible patients. There were also applications for veterans' benefits for five potentially eligible applicants, of which two were pending, one patient was previously determined to be eligible, one refused, and the remaining patient was denied eligibility. Identification cards were issued to 54 patients. Correctional staff in the Receiving and Release area reported patients released without a Cal ID were routinely provided with a laminated photo identification card.

Program Access:

a. Job and Program Assignments

On April 3, 2025, CMC reported that of the 1,089 available job assignments, 254 patients or 38 percent of the EOP population held job assignments, 298 patients or 49 percent of the 3CMS population held job assignments, and 537 incarcerated persons or 55 percent of the non-MHSDS population held job assignments.

For the 403 academic assignments, CMC reported that 86 patients or 13 percent of the EOP population held academic assignments, 162 patients or 27 percent of the 3CMS population held academic assignments, and 155 incarcerated persons or 16 percent of the non-MHSDS population held academic assignments.

Regarding the 189 vocational educational assignments, CMC reported that 32 patients or five percent of the EOP population held assignments, 82 patients or 14 percent of the 3CMS population held assignments, and 75 incarcerated persons or eight percent of the non-MHSDS population held vocational educational assignments.

For the 1,085 voluntary educational assignments, CMC reported that 205 patients or 31 percent of the EOP inmate population, 214 patients or 35 percent of the 3CMS population, and 666 incarcerated persons or 69 percent of the non-MHSDS population held voluntary educational assignments.

There were 143 substance abuse treatment assignments available. EOP patients held 42 or six percent of assignments, 3CMS patients held 48 or eight percent, and MHSDS inmates held 53 or five percent of substance abuse treatment assignments.

b. Milestone Credits

CMC was unable to provide earned milestone credit information in the format requested.

c. Out-of-Level Housing

On April 17, 2025, 14 Level I EOP patients were housed in Level II housing. 12 EOP and 40 3CMS Level III patients were housed in Level I housing. 25 Level I 3CMS patients were housed in Level II housing; 136 Level III EOP and 150 Level III 3CMS were housed in Level II housing. There were 56 Level IV EOP and 81 Level IV 3CMS in Level III housing.

d. ADA Reasonable Accommodations and Grievance Procedures

CMC provided a spreadsheet documenting staff training for a training entitled, "interacting with incarcerated persons with disabilities" for custody and mental health staff.

e. Periodic Classification Score Reductions: EOP Patients

The monitor requested the most recent reclassification scoresheets for ten EOP level of care patients. The scoresheets provided covered the most recent year of incarceration including both positive and negative classification score adjustments. Two out of the ten scoresheets increased the patient's classification score while eight reduced the patient's overall classification score. None of the scoresheet adjustments changed the patient's custody level.

"C" Status:

The institution LOP regarding "C" status was current. CMC reported a total of 18 incarcerated persons were on "C" status at the time of the monitoring tour. The monitor reviewed 16 of the ICC chronos that placed the incarcerated person on "C" status. Of the 16 cases reviewed, 13 or 81 percent were in the MHSDS. The action to place an incarcerated person on "C" status by ICC was in compliance with CDCR policy, however the ICC chrono did not include a referral for the four EOP level of care patients to IDTT for a program review as required by Title 15.

Interviews with housing unit custody staff and facility sergeants indicated each housing unit had a current list of incarcerated persons on “C” status and that incarcerated persons were allowed to report to their scheduled appointments. Incarcerated persons were allowed out-of-cell time from 900 hours to 1300 hours each day, however no night yard was allowed. Incarcerated persons on “C” status were retained in their current housing when placed on “C” status, however a sergeant advised the monitor that a plan was in place to move all on “C” status to housing unit B-6 second floor within the next several weeks.

Case-by-Case Reviews:

The institution provided a list of the Long-Term Segregation Case Conference (LTSCC) reviews that occurred during the review period. There was a total of 31 LTSCC reviews with all attended by the required CDCR staff including the associate director. All 31 patients were retained in RHU with instructions to return to LTSCC within 30, 60, or 90 days. CDCR policy memorandum dated July 20, 2023, states that the LTSCC shall determine if the incarcerated person demonstrates an ongoing security risk that threatens the institution safety and security. However, the monitor noted that the LTSCC case notes did not include a statement as to this determination or what action was required/needed prior to the next LTSCC.

The institution reported a total of 81 pre-MRD reviews were conducted during the review period. The reviews were generally conducted in a timely manner. Review of a sampling of chronos showed the ICC took appropriate action to assess, impose and suspend the RHU term and request the patient be transferred out of the RHU and to a mainline placement, as appropriate.

Mental Health Referrals:

CMC reported an overall compliance rate of 91 percent for timely responding to mental health referrals. During the review period, CMC made 1,919 mental health referrals. There were 302 referrals to psychiatry and 1,617 referrals to primary clinicians, including PREA referrals. In total for psychiatry, there were two emergent, ten urgent, and 290 routine referrals. Overall, there were 439 emergent, 289 urgent, and 865 routine referrals to primary clinicians.

For emergent referrals, CMC responded timely to one or 50 percent of psychiatry referrals and 395 or 90 percent of primary clinician referrals.

For urgent referrals, there were timely responses to five of ten or 50 percent of psychiatry referrals and to 263 of 289 or 91 percent of primary clinician referrals.

For routine referrals, there were timely responses to 215 of 239 or 90 percent of psychiatry referrals, 42 of 51 or 84 percent of psychiatry RHU referrals as well as 558 of 620 or 90 percent of routine primary clinician referrals and 235 of 245 or 96 percent of RHU routine primary clinician referrals.

Custody and Mental Health Partnership Plan:

The institution local operating procedure (LOP) was current with a last revision date of December 2024. The LOP was consistent with statewide policy.

The institution was 100 percent compliant with conducting monthly executive joint rounding for each month of the review period. The required attendees were present and the required form utilized. CMC also tracked the location of the required executive joint rounding for each program area to ensure compliance with policy. The results of the rounding were reported at the warden's executive staff meeting. In general, the information documented on the rounding forms was positive from both staff and incarcerated persons. Incarcerated persons

reported positive interaction with their clinicians and did not report issues with custody staff. Minutes from the institution mental health subcommittee and quality management committee indicated that executive joint rounding was also presented and discussed at each committee meeting.

Regarding the required Monthly Joint Supervisory Program Area Tours and the 3CMS Weekly Mental Health Huddle Report for the 3CMS supervisors, the institution provided documentation and a tracking process to ensure compliance. These required meetings were consistently reported out at the mental health subcommittee meeting and the quality management committee meeting. The documentation was thorough with staff completing each section of the required forms with information obtained via staff and patient interviews. As reported in the executive joint rounding documents, staff and incarcerated persons responses to the form's questions were generally positive.

Mental health huddles in the MHCB, EOP RHU and the EOP housing units were consistently held with required staff in attendance. The institution's quality management committee meeting minutes also tracked and reported on compliance with this requirement. Compliance ranged from 100 percent in the MHCB, to 93 percent in the mainline EOP. The monitor observed huddles in the MHCB and mainline EOP. The required staff were in attendance and the required form was used. In the MHCB, three custody staff were present and were active participants in the discussion regarding new arrivals, discharges, and current behaviors. In the mainline EOP, the required staff were in attendance, including three correctional staff who were engaged in the discussion. Participants interacted with ease and all spontaneously participated. For the large EOP population at CMC it was surprising that few patients were discussed. Further, a patient that was observed in IDTT earlier in the week would

have been appropriate to discuss but was not. The huddled discussion could be improved with additional training.

Annual CMHPP training was attended by the warden, chief deputy warden, and 100 percent of the captains, lieutenants, and sergeants. Three of four or 75 percent of correctional administrators attended and 485 of 503 or 96 percent of correctional officers attended. For mental health staff, the chief psychiatrist and two chief psychologists attended the trainings as well as 26 psychologists, 12 social workers, 21 recreational therapists, 13 senior psychologists and seven senior psychiatrists.

The institution provided data on the number of mental health and custody staff who attended the required quarterly round table trainings for the fourth quarter of 2024 and the first quarter of 2025 by program area. Overall, attendance at the required round table training was non-complaint for custody staff, based on the low numbers that attended the training. For the fourth quarter of 2024, a total of 87 staff attended the training, which included both second and third watch staff. In the RHU, 11 mental health staff and 13 custody staff attended. In the MHCB, 14 mental health staff and ten custody staff attended, while in mainline EOP, 33 mental health staff and six custody staff attended. For the first quarter of 2025 a total of 106 staff attended the training for second and third watches. In the RHU, 16 mental health staff and eight custody staff attended. In the MHCB, 28 mental health staff and two custody staff attended, while in mainline EOP, 41 mental health staff and 11 custody staff attended.

Introduction to EOP groups were held during five of the six months during the review period and offered to 31 patients. Ten or 32 percent of these patients were offered the full curriculum of four groups. Groups were scheduled on Mondays and thus were unable to be observed during the monitoring tour. Data provided did not include the date the patient was

eligible for the group to assess timeliness of the offered group, however a sample of reviewed cases indicated that the first group was generally offered within a month of admission to EOP. For the majority of reviewed groups, required facilitators were in attendance.

The institution had the required EOP brochure available and distributed a copy to EOP patients.

Heat Plan:

CDCR required that each institution's heat plan local operating procedure incorporate the requirements of the April 8, 2024 Heat Plan and Updates memorandum. CMC's heat plan LOP was last updated on April 25, 2024 and conformed to required policy. A September 9, 2024 addendum to the LOP added additional non-airconditioned locations within CMC for monitoring including the barbershop area, Facility M dorms, tv areas and recreation classrooms in the firehouse. During the monitoring tour, CMC also provided the newly reviewed 2025 Heat Plan LOP dated April 30, 2025 which also conformed to required policy.

CDCR issued an Expectations Memo, dated August 2, 2024, delineating the specific responsibilities of the warden and CEO. These included daily meetings during days of anticipated heat advisories to address and manage heat alerts and related concerns. CMC reported that no daily meetings were held during the review period as the heat index did not reach 100 degrees.

The 2024 Heat Plan and Updates memorandum required that each institution submit a Heat Plan Monthly Summary Report (Summary Report), signed by the warden and CEO, to headquarters each month from May 1 to October 31. The heat plan was in effect for one month of the review period, October 1, 2024 to October 31, 2024. The Summary Report for October, 2024 reflected that there were two Stage I heat alerts, one Stage II heat alert, and zero Stage III

heat alerts. Daily Activity Reports (DARs) supported the Summary Reports and included the exact time each Stage I heat alert went into effect, however, there was no deactivation time noted for the Stage I heat alert that occurred on October 2, 2025. The Stage II heat alert was noted in the corresponding DAR; however, the deactivation time was not noted. CMC was not compliant with the 2024 Heat Plan and Updates memorandum as the deactivation times were not noted on the DARs.

CMC reported no heat-related illnesses during the review period.

The 2024 Heat Plan and Updates memorandum required all custody officers and leadership staff to maintain knowledge of heat plan activation and act in accordance with the requirements of each stage. The monitor interviewed 32 custody officers in 17 housing units and program areas units on Facilities A, B, C, D, M, and the CTC; all interviewed custody staff demonstrated adequate knowledge of the heat plan policy and procedures. Each post had resources in the area on the heat plan which staff referred to when questioned.

The policy also required that when the Heat Plan was in effect, institutional staff must generate and distribute daily a list of all incarcerated persons currently prescribed any of the designated Heat Alert Medications. Facilities A-2 and A-3 did not have lists on any of the three floors of the unit. Housing unit D-8's list was dated the previous day. Housing unit B-3 and M Facility had a "Heat Medication Registry" list on each officer's post that included the specific type of medication the patient was on, the prescriber and the end date of the medication instead of the "Custody Heat Medication Report." The sergeant reported that he had obtained the list from the shared drive. This error was addressed with CMC leadership as custody staff should not possess a list of patients with their specific medication identified. The absence of heat risk

lists in several areas was concerning. Additionally, the type of medication prescribed to patients should not be distributed to custody staff.

To ensure proper and accurate temperature recording, the Annual Heat Plan and Updates memorandum required the warden or his designee to ensure an accurate thermometer was placed in a central, heat-neutral location to monitor outside ambient air temperatures, which must be recorded every hour, every day, from May 1 through October 31 of each year. CMC East Watch office staff recorded outside air temperatures during the review period. The monitor observed the outside thermometer and noted that outside temperature logs were properly completed every hour. Reviewed DARs were consistent with outside temperature logs and supported the activation of Stage I heat alerts. The institution's outdoor temperature recording procedures complied with the 2024 Heat Plan and Updates memorandum.

The warden or his designee was also responsible for ensuring that inside air temperatures were measured in all non-airconditioned living areas housing heat-risk incarcerated persons. Temperatures must be taken at the highest non-airconditioned location where heat-risk incarcerated persons were housed and must be recorded every three hours. Of concern to the monitor during the two prior and current round monitoring tours was the location of thermometers. Each housing unit contained three floors. Antiquated mercury thermometers were placed at the custody officer's station, which was at the top of the staircase and had air flow near it due to its location. When asked, custody officers did not have any other, hand-held mechanism to measure the temperature down the halls where the cells were located. They reported relying on fans and cold showers to accommodate rising temperatures.

The October 2024 indoor temperature logs were reviewed and no discrepancies were noted. During the monitoring tour, temperature logs were reviewed beginning on May 1, 2025.

Missed temperature entries were noted in the Program Sergeant's office, A-2, A-3, D-7 and D-8 temperature logs. CMC was not compliant with indoor temperature recording procedures in accordance with the 2024 Heat Plan and Updated memorandum.

In an effort to ensure that heat-risk incarcerated persons were afforded equal access to programs, services, and activities during extreme weather conditions, the 2024 Heat Plan and Updates memorandum required institutions to devise and include any reasonable accommodations and alternatives to yard activities when revising their LOP. All reasonable accommodation provided to heat risk incarcerated persons during heat alert activation must be documented in the institution's Daily Activity Report as well.

Coolers for ice and water distribution were observed in all toured housing units. All observed ice machines were working during the monitoring tour. Patients reported access to cool drinking water. CMC staff reported offering patients access to cold water and ice following a Stage I heat alert and offered heat risk incarcerated persons alternative yard time, including night yard and additional dayroom activities if custody staffing allowed. The institution's DARs did not document accommodations provided to heat risk patients during heat alerts that occurred on October 2 and 3, 2024. CMC's offering of and documenting reasonable accommodations was not compliant with the 2024 Heat Plan and Updates memorandum.

The 2024 Heat Plan and Updates memorandum required annual training on the institution's Heat Plan, including measures when heat stress symptoms are identified and/or reported, to be provided to custodial and clinical staff by the In-Service Training Officer. CMC was compliant with Heat Pathology training. Heat pathologies training was completed by 593 of 597 or 99 percent of custody staff members including, all six correctional administrators including the warden and chief deputy warden, all four captains, 26 of 28 lieutenants, 68 of 69

sergeants, and 454 of 455 custody officers. Heat pathologies training was completed by 131 of 139 or 94 percent of clinical staff and nurses including 73 of 81 nurses, all 12 social workers, all six psychiatrists, all 19 psychologists, and all 17 chiefs and supervisors of psychologists, psychiatrists, and social workers.

Overall, the institution's implementation of the 2024 Heat Plan and Updates memorandum was not compliant during the review period. The DARs did not document the specific accommodations provided to heat risk patients during heat alerts or deactivation times for heat alerts. Additionally, housing units on A-2 and A-3 did not have the daily custody heat risk list of heat risk patients. Housing unit D-8's heat risk list was not current and B and M Facilities were using the Heat Medication Registry list. Lastly, the placement of thermometers in the Facility units may not accurately reflect the inside temperature where the incarcerated persons are housed. Staff knowledge of heat plan requirements, training, and outdoor temperature monitoring was compliant.

RVRs:

The institution reported a total of 1,664 RVRs issued during the review period. A total of 1,250 or 75 percent of all RVRs were issued to MHSDS patients. Five percent were issued to patients at the inpatient level of care, nine to acute or intermediate level of care patients and 92 to MHCB patients. Five hundred two, or 30 percent of RVRs were issued to EOP patients, 647 or 39 percent to 3CMS patients and 414 or 25 percent to non-MHSDS incarcerated persons.

The monitor reviewed 23 RVRs for compliance with policy. Custody staff timely requested the mental health assessment in 14 or 61 percent of cases. Mental health staff timely completed the mental health assessment in 19 or 83 percent of cases. Nine mental health assessments, or 39 percent were completed by staff that had not attended the required training.

The mental health assessment was conducted in a private setting in 15 cases and the patient refused the interview or a confidential setting in eight cases. The senior hearing officer documented their consideration of the mental health assessment information in 21 or 91 percent of cases. The senior hearing officer mitigated penalties based on the mental health assessment in 19 of the 20 cases where mitigation was recommended or 95 percent of the time.

Three ICC chronos were reviewed for the assessment of an RHU term as a result of a finding of guilty on an RVR. All three ICC chronos included a statement that the mental health assessment information was considered in the assessment of the RHU term.

Regarding mental health assessment training for custody staff, the chief deputy warden, four correctional administrators, four captains, 26 lieutenants and 58 sergeants attended the required training. For mental health staff, a total of 62 staff attended the required training including two chief psychologists, 30 psychologists, 14 senior psychologists, 14 social workers, and two LMFTs.

Use of Force:

CMC reported two controlled use of force and 65 immediate use of force incidents during the review period. Sixty-five or 88 percent of immediate uses of force involved MHSDS patients. There were also 155 non-use of force incidents, of which 128 or 83 percent involved MHSDS patients.

The monitor reviewed the two controlled use of force incidents including the video recording. Both incidents involved MHSDS patients and were compliant with policy and procedure.

The monitor reviewed 14 immediate use of force incidents. All were in compliance with CDCR policy. Video was not available for any of the incidents. Concerningly, five of the

incidents involved using OC on MHSDS patients who were self-injuring. Based on that and the number of immediate use of force incidents during the review period that involved MHSDS patients, staff may benefit from de-escalation techniques training.

The monitor reviewed the timeliness of the Institution Executive Review Committee's (IERC) review of use of force incidents. Title 15 requires use of force incidents to be presented to the IERC with 30 days of the incident. However, a memorandum was provided dated October 3, 2023, extending that timeframe to 60 days. For the two controlled use of force incidents during the review period, both incidents were closed and reviewed timely. For immediate use of force incidents, 37 of 75 or 50 percent were closed and 38 of 75 or 50 percent were open. Of the closed use of force incidents, 36 or 97 percent were reviewed timely.

Of the open use of force incidents, 17 or 23 percent were at the executive level of review pending RVR or DA action, 15 or 20 percent were referred to the Allegation Inquiry Management System (AIMS) for investigation, and three or four percent were at the IERC level of review. The 38 open use of force incidents were between 61 and 210 days beyond the review requirement.

CMC reported 100 percent compliance for completion of use of force training by the warden, six correctional administrators, five captains, 29 lieutenants, 62 sergeants, and 485 custody officers. Training for clinicians was completed by 160 of 173 or 92 percent of the staff including the chief psychiatrist, all 14 senior psychiatrists and psychologists, all ten psychiatrists, 18 of 20 social workers, the registry psychiatrist, all 42 psychologists, and 42 of 49 or 86 percent of psychiatric technicians.

Lockdowns/Modified Programming:

CMC reported zero program lockdowns during the review period.

Access to Care:

CMC provided monthly health care access quality reports for October 2024 through March 2025. Of 101,215 total issued mental health ducats and add on appointments, 66,113 or 65 percent were completed and 35,102 or 35 percent were not completed. Of the non-completed appointments, 0.25 percent were due to custody factors, nine percent were due to non-custody factors including cancelled appointments, and 26 percent were due to patient refusals.

*Coleman* Postings:

*Coleman* postings in both English and Spanish were observed in all housing units toured.

**APPENDIX A – 8**
**CALIFORNIA REHABILITATION CENTER (CRC)**
Site Visit: August 18, 2025 – August 21, 2025
Review Period: December 1, 2024 – May 30, 2025

Census:

On August 15, 2025, CRC's total population was 2,721, an 11 percent decrease from the preceding monitoring tour. *See* ECF No. 8085 at 303. The MHSDS population of 1,074 patients represented 39 percent of CRC's total population and had increased 18 percent increase compared to the preceding monitoring tour. *Id*. The MHSDS population included 63 mainline EOP and 1,011 3CMS patients.

Staffing:

The chief psychiatrist position was filled, and five psychiatrists filled 4.5 positions.

One of two chief psychologist positions was filled. The chief psychologist served as the chief of mental health. Of the 1.5 allocated senior psychologist positions, two were filled. All three allocated senior psychologist specialist positions were filled.

Of the 10 allocated staff psychologist positions eight were filled, reflecting a 20 percent vacancy rate. Three staff psychologists were unlicensed and were supervised by an onsite senior psychologist specialist.

A 0.64 full-time equivalent tele-psychologist filled the one allocated telepsychologist position, resulting in a 36 percent vacancy rate. Overall, accounting for on-site and tele-mental health positions, there was a 21 functional vacancy rate among staff psychology positions.

The one supervising social worker position was filled. Thirteen social workers filled the 10.5 allocated positions. Two social workers were unlicensed and supervised by an onsite licensed social worker. Of the two allocated tele-social worker positions, 1.95 were filled

resulting in a three percent vacancy rate. Overall, there were no vacancies among social worker positions.

Both recreation therapist positions were filled.

All 10.7 allocated supervising registered nurse positions were filled. Of the 37 allocated MHSDS registered nurse positions 32.1 were filled resulting in a vacancy rate of 15 percent. Of the 43.7 licensed vocational nurse positions, 40.5 were filled leaving a two percent functional vacancy rate.

One allocated psych tech position was filled. Both allocated MHSDS clerical positions were also filled. The OSS II, CHCA, and one of two HPS I positions were filled.

For custody staff, the warden and chief deputy warden positions were filled, however the chief deputy warden was acting out of class. Two of three associate warden positions were filled; however, the vacant position was filled with an individual acting out of class thereby eliminating the functional vacancy. Two of four allocated captain positions were filled resulting in a 50-percent vacancy rate. However, one vacancy was filled by an individual acting out of class, which reduced the functional vacancy rate to 25 percent.

Twenty-one of the 24.6 lieutenant positions were filled resulting in a 15 percent vacancy rate. However, three additional lieutenants acted out of class, reducing the functional vacancy rate to two percent. Forty-eight of 52 sergeant positions were filled resulting in an eight percent vacancy rate. However, four vacancies were filled with sergeants acting out of class, eliminating the functional vacancy rate.

Of the 548.8 allocated correctional officer positions, 532 were filled, twenty-three were on long term leave, and one individual acted out of class resulting in 38.8 functional vacancies or a seven percent functional vacancy rate.

Tele-Mental health:

The institution did not have an established telepsychiatrist position during the reporting period. Headquarters-based telepsychiatry provided after hours coverage as needed. There was one telepsychologist, however their caseload was not discernable.

During the review period and at the time of the site visit, telework was not allowed for on-site clinicians. The senior social worker supervisor, two psychologist supervisors, three senior psychologist specialists, one AGPA, six OSS I, and one CHSA were allowed to telework two days per week.

Staff Recruitment:

Prior to the news of the institution's closing, mental health leadership reportedly relied on word-of-mouth for applications as well as hiring unlicensed applicants; both have been successful. Barriers to recruitment included the length of time to process and hire staff, lack of telework opportunities, and competitive salaries.

Leadership indicated that the institution is scheduled to close by September 2026. Staffing transfers were a major concern among the 144 current mental health staff at CRC. It was reported that staff transfers from CRC to other institutions were only permitted within the same county, meaning the only applicable facility for an existing CRC staff member to transfer is Ironwood State Prison, which does not carry an MHSDS mission. Although CIM and CIW are geographically close in distance to CRC, these two institutions are not in the same county, therefore it was reported that staff could not transfer to either institution but would be required to apply for a vacant position.

Quality Management:

CRC's quality management program was adequate during the review period. Documentation was thorough, areas in need of attention were identified, and appropriate interventions were developed.

CRC did not have a local governing body, as there were no licensed inpatient units at the facility.

The Quality Management Committee (QMC) met monthly during the review period and achieved quorums at each meeting. Monthly discussion topics included MAPIP benchmark metrics and performance reports, Mental Health Program Subcommittee (MHPS) improvement projects, structured treatment offerings, and program updates, including CMHPP joint executive rounding. Notably, there was evidence of active discussion of EOP patient requests for more group treatment and, relatedly, the feasibility of treatment space to offer the additional group treatment.

The MHPS met monthly during the review period with quorums achieved for each meeting. Covered issues included system surveillance, CMHPP, surveys and audits that measured compliance for training, SPRFIT report, performance report, peer review, inpatient referrals and non-referrals, inpatient audit, health care access report, CHSA report, nursing report, parole planning, and IDTT updates. Documentation consistently provided a thorough summary of each topic. Overall, appropriate follow-up was documented for identified issues.

The MHPS discussed relevant issues during the QMC every other month when assigned to present. Overall, documentation was thorough.

Emergency Medical Response Review Committee (EMRRC) met monthly during the review period as well. Discussion topics included 911 activations, code calls for disruptive patients, and custody escort procedures.

No additional studies, QITs or FITs were completed.

Two rounds of psychiatry peer review were conducted with CIM prior to the start of the review period.

Suicide Prevention:

CRC reported no suicide attempts or serious self-harm incidents during the monitoring period.

A regional SPRFIT coordinator's review of CRCT was completed in April 2025. The headquarters report identified issues similar to those identified by the Special Master's monitor during the current review, evincing an intact quality assurance program related to suicide prevention and response. SPRFIT meeting minutes were reviewed and evidenced adequate identification of most issues in need of attention, adequate plans to address those issues, and follow-up to ensure that action plans were completed and sustained.[37] The exception was identification of generic documentation in five-day follow-up notes during the current review that was not identified during routine audits at the institutional level.

CRC was no longer receiving transfers due to the pending closure of the institution and therefore, no intake screenings were observed during the site visit.

One hundred records were reviewed to determine if suicide risk evaluations (SREs) were completed when patients expressed suicidal ideation or otherwise indicated that they may be dangerous to themselves during the reporting period. The sample included all 25 emergent psychiatry referrals, 35 emergent primary clinician referrals, 20 urgent psychiatry referrals, and 20 urgent primary clinician referrals. Of the 100 records reviewed, 62 included instances where

[37] Pursuant to the limited review of suicide prevention practices at facilities not assessed by the Special Master's suicide prevention expert, this review did not include the five-step review of SPRFIT utilized by the Special Master's expert.

the referral was related to the patient being a danger to self (DTS). Of those 62 cases, 55 or 89 percent included a completed SRE. The SPRFIT committee identified this issue of SREs not being completed consistently when a patient was referred for being a DTS during the monitoring period and it was reportedly being addressed.

Medication Management:

CRC provided MAPIP results from December 1, 2024 to May 31, 2025 regarding compliance for psychiatric diagnostic monitoring and medication management.

For required monitoring of the four metrics for antidepressants, CRC was compliant for six months with obtaining medication consents, and for monitoring blood pressure of patients prescribed venlafaxine. EKGs were required for one month and was compliant; however, CRC was only compliant one month of monitoring of thyroid testing.

Diagnostic monitoring for patients prescribed atypical antipsychotics contained 11 metrics. CRC was compliant for six months with testing blood pressure, glucose, height and weight and the one-month EKGs were required. Complete blood count with platelets, CMP, and obtaining medication consents were compliant five of the six months. The institution was compliant for all four required months of monitoring the Abnormal Involuntary Movement Scale (AIMS), and lipid monitoring compliance for two of the six months. Thyroid testing was not compliant.

There were no patients on carbamazepine or clozapine; however, in the month of May 2025 CRC documented 100 percent compliance for clozapine lipid monitoring.

CRC was not a clozapine initiation or maintenance institution. No patients were prescribed clozapine during the monitoring period or at the time of the site visit; however as previously stated there was monitoring of lipids for a patient on clozapine.

For patients prescribed Depakote, the mood-stabilizing medication requiring four monitoring metrics, CRC was compliant for six months with obtaining medication consents, CBC with platelets and CMP, with therapeutic mediation level compliant four of the six months.

For the mood stabilizing medication lamotrigine, the institution was compliant in obtaining medication consents for the two of the required months.

The mood stabilizer lithium required medication consents and monitoring of kidney and thyroid function, EKG, and therapeutic medication levels. CRC was compliant for all required months in obtaining medication consents and EKGs; additionally, they were compliant with monitoring therapeutic medication levels three of the four required months, thyroid testing four of the five required months and kidney function testing two of the four required months.

Medication Administration

CRC was compliant for six months with all continuity of medication measures, which include, inter-institutional transfers at R&R, continuity of NA and DOT medications with intra-institutional transfers (excluding ASU/SHU/PSU), continuity of medications upon parole/transfer to the community, continuity of meds during MHCB transfer, and continuity of meds during discharge/transfers from community hospitals and/or DSH. There were no PC 2602 court ordered medication orders to monitor during the review period.

As CRC did not have a reception center or an RHU, no data was required for continuity of medications at reception center or continuity of medications with intra-institutional transfer to ASU/SHU/PSU.

CRC reported that prescriptions were provided for a maximum of 180 days.

Bridge orders were provided for 15 to 30 days.

MAPIP measures tracked compliance with the administration of medications given at HS (*hora somni*, or bedtime) which must be given on or after 8:00 P.M. (HS), and medications given in the A.M. and P.M. which must be given at least eight hours between doses (A.M./P.M.). Medication observation of preparing AM, PM and HS medications were compliant for all six months. Medication preparation for chronic care historical medications by a psychiatrist or medical provider, and administration of outpatient new orders by psychiatrists or medical providers were also compliant for all six months.

CRC reported 251 patients were prescribed N/A or DOT medications.

CRC reported that 951 (if no patients were duplicates) patients were prescribed HS medications. With rare exceptions, CRC was compliant with the requirement to administer HS medications at 8:00 P.M. or later. Cases in which HS medications were not administered timely were reportedly due to patient refusal.

<u>KOP Medications</u>

CRC reported 827 patients who were prescribed 1,675 psychiatric medications. Of those, 44 patients were prescribed KOP medications. CRC reported that all patients receiving SSRIs or duloxetine were in accordance with policy.

<u>Polypharmacy Reviews</u>

CRC reported 75 CCCMS and four EOP patients had polypharmacy reviews and all were completed timely. If any psychiatric medications were involved, psychiatrists were required to review the list and to complete the justification information.

Nursing Audits

The institution conducted 96 medication line audits during the reporting period, and the audits indicated that all patients received their medications in less than 30 minutes and all were under two hours. CRC reported no conflicts between medication administration and mental health programming.

Transfers:

CRC's inpatient coordinator was a senior psychologist specialist, in the role informally since July of 2024 and formally since July of 2025. This individual also served as the developmental disability program (DDP) coordinator. The backup inpatient coordinator was a senior psychologist specialist, also responsible for SPRFT and the training coordinator for mental health staff.

During the review period, there were 36 instances of patients who were considered but not referred to a higher level of care.

Sustainable process reviews were required to audit higher level of care (HLOC) consideration documentation for quality and to measure the inter-rater reliability between the headquarters' reviewer and the institution's inpatient coordinator. During the review period, there was one minor sustainable process review in quarter one and one major sustainable process review in quarter two. In January 2025, during quarter one, a random sample of 11 non-referred HLOC consideration cases were reviewed by the headquarters reviewer for the quality of documentation. The headquarters reviewer found 82 percent of these cases had "good" documentation, a significant improvement from 65 percent in the last quarter. Reviewed documentation did not indicate the inpatient coordinator's findings from the quarter one review, therefore interrater reliability could not be assessed.

In the quarter two review, a random sample of ten non-referred HLOC consideration cases were reviewed by the institution's inpatient coordinator and the headquarters reviewer for the quality of documentation. CRC's inpatient coordinator identified 80 percent of cases as "good" documentation and the headquarters reviewer identified 60 percent of cases as "good" documentation.

A review of the non-referral log indicated the following indicators as precipitants for higher level of care review: three or more MHCB admissions in the previous six months, three or more RVRs in the past three months and poor treatment attendance. In the majority of cases, the log lacked specificity regarding dispositions. Specifically, dispositions were frequently described as "not changed."

Ten healthcare records were randomly selected to assess clinical documentation of non-referral rationale and treatment modifications. For the majority of reviewed cases, clinical documentation of non-referral rationale and treatment modifications was thorough, individualized and appropriate. The two cases that were not appropriate lacked specificity regarding the indicator precipitating higher level of care review (three or more MHCB referrals in six months). Concerningly, in both of these cases the individuals were prematurely discharged to the 3CMS level of care.

CRC made no referrals to acute care during the review period.

There were three referrals to intermediate care; all referral packets were timely completed within five working days of identification. All patients timely transferred to intermediate care within 30 days.

There were two *Vitek* hearings during the review period; neither patient prevailed.

No patients were awaiting intermediate care transfer during the site visit.

There were no referrals to inpatient care for patients with complex medical needs.

There were no patients discharged from an inpatient facility to CRC during the review period.

CRC made 143 referrals to MHCBs; 117 or 82 percent were admitted and 26 or 18 percent were rescinded. The 117 MHCB referrals were admitted to MHCBs at CIM, SVSP, and LAC. All but three of the referrals were transferred timely within 24 hours. Documentation indicated these delayed transfers were due to patient refusal to transfer.

CRC transferred one patient to an EOP RHU within 30 days as required.

At the time of the monitoring tour, there were two patients waiting to transfer to an EOP RHU. One patient had been waiting one day and the other for seven days. CRC transferred 43 3CMS patients to an RHU during the review period.

During the review period, levels of care for seven patients were changed from 3CMS to EOP. CRC reported that all patients requiring an EOP level of care were immediately and timely transferred to the institution's EOP program.

During the review period, levels of care for 20 patients were reduced from EOP to 3CMS.

<u>Programming:</u>

CRC did not maintain an RHU or MHCB during the review period.

<u>Crisis Intervention Team:</u>

CRC's CIT was comprised of a mental health clinician, a supervising registered nurse or designee, and a correctional lieutenant or designee. All mental health staff were trained to complete CITs as needed. Crisis response was provided every day from 7:00 A.M. to 10:00

P.M.; outside of these hours, referrals were directed to the on-call psychiatrist or headquarters-based tele-psychiatrist on Wednesday and Saturday nights.

When clinicians received a crisis call, they individually responded, triaged the matter, and contacted other disciplines based on the nature of the crisis. This resulted in a modified CIT response, in that the full CIT team was only activated after an initial review by a clinician. It was reported that the number of crises calls remained low with few that required resolution by custody staff.

CRC reported 16 CIT activations during the review period, including seven for safety concerns, three for reports of suicide ideation, one for a report of a conflict with custody staff, and five for other non-specified reasons. Every chart was reviewed to determine whether SRASHEs were completed as required. In all cases where patients expressed suicidal thoughts or behaviors, SRASHEs were completed. Following CIT activation, four patients were transferred to MHCBs, ten were moved to different housing at CRC, and two were returned to the same housing unit.

During the monitoring tour, there were no CIT activations and thus none were observed. CRC's CIT was adequate in terms of response times, members of the CIT team, completion of necessary risk assessments and other documentation, as well as clear rationale for team decisions to resolve the crises.

Alternative Housing:

During the review period, 143 referrals were made to alternative housing, 117 of which resulted in MHCB admissions. Twenty-six referrals were rescinded. All rescinded referrals resulted in patients being held in alternative housing for less than 24 hours. Of the 117 patients admitted to an MHCB, none were in an alternative housing cell for more than 24 hours, but three patients were not placed in an MHCB within 24 hours. One patient was held in an alternative

housing cell for 15.7 hours, yet transportation to the MHCB required 12.1 hours. Similarly, the other two patients were in alternative housing for nearly 21 hours and the transportation time exceeded five hours resulting in total time in excess of 24 hours before arrival at the MHCB.

CRC utilized alternative housing cells within the TTA. Two of the cells were newly renovated. All cells included a bed, mattress, toilet, sink, and no visible tie-off points. The newly renovated cells included separate anterooms equipped with computer terminals for the assigned observers.

Records of 25 patients who were placed in alternative housing secondary to DTS during the reporting period were reviewed. Ten records were for patients whose referral to MHCB was rescinded and 15 were for patients who were ultimately transferred to an MHCB. An SRE was completed in all records reviewed. In 24 of the 25 or 96 percent of the cases, the SRE quality was adequate. In the one case where the content was determined to be inadequate, there was poor justification for the risk level documented. Of the ten patients whose referrals were rescinded, only two, or 20 percent, had adequate safety plans documented. The inadequate safety plans included copied documentation across multiple fields or the plan involved external factors only, without evidence of how the patient could behave or use social supports to decrease suicide risk. Of those ten cases, two patients expressed safety concerns and were transferred to another facility the same day. Of the eight remaining cases, only one had adequate five-day follow-up documentation. The remaining seven cases included non-individualized five-day follow-up documentation that was copied across days and included the same verbiage across a number of different patients.

Clinical staff could benefit from supervisory review of safety planning and individualization of five-day follow-up documentation.

EOP:

CRC opened a mainline EOP program on July 8, 2024 with 40 EOP beds. *See* ECF No. 8654 at 32. By October 2024, the number of beds doubled to 80 total beds. *See id*. On the date of the site visit, CRC's mainline EOP patient population was 63 patients, 13 fewer patients than the preceding monitoring tour in October 2024. *See* ECF No. 8654 at 113.

EOP patients resided on Facility D in a designated housing unit, located steps away from the building where mental health programming occurred. However, placement on Facility D also resulted in EOP patients co-mingling with 3CMS and general population patients in direct conflict with Program Guide requirements.[38] The EOP Supervisor reported that co-mingling resulted in increased access to and use of illicit substances. No patients were housed in overflow or atypical housing at the time of the review or during the review period.

For overall EOP treatment space, there was not enough space for individual patient contacts but sufficient space for confidential group treatment. Specifically, there were three confidential offices for six providers including five clinicians and a psychiatrist.

*Structured Treatment*

The Program Guide required that each EOP patient be offered at least ten hours per week of structured therapeutic activities. *See* ECF No. 7333-1 at 58. For patients who were determined by the treatment team to be clinically contraindicated for ten hours of treatment activities per week, the primary clinician is required to present the case and recommended treatment program (i.e. EOP modified programming) to the IDTT for approval. If the patient's modified treatment program

[38] The Program Guide requires that the EOP program "is characterized by a separate housing unit and structured activities for mentally ill inmate-patients who, because of their illness, experience adjustment difficulties in a General Population (GP) setting, yet are not so impaired as to require 24-hour inpatient care." ECF No. 7331-1 at 51 (PG 12-4-1).

included a schedule of less than ten hours of treatment per week, the patient's IDTT was required to meet monthly to review the patient's treatment, increase the amount of structured therapeutic activities, or refer the patient to a higher level of care as clinically indicated. *Id*.

Between November 25, 2024 and May 31, 2025, excluding EOP modified programming patients, the institution reported that on average, patients were scheduled for 14.1 hours, offered 9.7 hours, attended 6.9 hours, and refused three hours of structured treatment per week. The institution cancelled 4.6 hours per week. Cancelled treatment was attributed to custody modified programming.

During the same time period, on average, patients on EOP modified programming patients were scheduled for 9.3 hours, offered 6.5 hours, attended 1.6 hours, and refused 4.8 hours per week. The institution cancelled 2.9 hours per week.

Excluding EOP modified patients, for each month during the review period, fifty percent of EOP patients were offered less than the required minimum hours weekly of structured treatment. EOP Supervisors believed this was an underestimate of their performance given the reported issues with the structured treatment metric reporting inaccurate information at times. Staff attributed non-compliance to scheduling errors, conflicting programming, staff absences and custody modified programming. EOP Supervisors closely monitored these factors and reasonable interventions to address were implemented.

*IDTT's*

The Program Guide requires that EOP patients receive an initial IDTT within 14 days of arrival to the institution and a routine IDTT at least every 90 days thereafter. *See* ECF No. 7333-1 at 57, 59. The required attendees include the patient's assigned primary clinician, assigned psychiatrist, assigned correctional counselor, and the patient. *See id*. The IDTT should address

treatment needs, develop treatment plans, assess treatment progress, and include pre-release and discharge planning as necessary. *See generally id.*

One initial and one routine mainline EOP IDTT were observed during the site visit. The room was confidential, spacious, and the temperature was appropriate. Required staff were in attendance and had access to computers.

The primary clinician led the IDTT with input from the psychiatrist, nurse, and CC I. The patient was given an opportunity to speak during the meeting as well. A strength of the IDTTs was the therapeutic alliance between attendees and the patient as well as respect, patience and empathy evidenced by staff during patient interactions. Providers appropriately discussed the patient's recent and current symptoms and functioning. However, the discussion of clinical information needed improvement. Discussion of psycho-social history and case conceptualization was also needed. Treatment goals were discussed in general terms with variable discussion of interventions and diagnosis. Additionally, while each attendee participated, the overall process was not collaborative, as each participant had individual discussions with the patient rather than a cohesive discussion about relevant topics related to the treatment plan. Providers were able to answer patient questions with clear and targeted language to help the patient understand easier.

The patients were continued in the EOP level of care, although this was not explicitly stated nor was rationale provided.

The monitor randomly selected and reviewed the healthcare records of 30 mainline EOP patients to assess compliance with Program Guide timeframes during their stays. All 30 patients required initial IDTTs. Of the 30 reviewed initial IDTTs, 22 or 73 percent occurred timely

within 14 calendar days or arrival or level of care change. All 30 were attended by all required staff and the patients.

To measure timeliness of routine IDTTs during the review period, CDCR produced an appointments report that included individuals who were required to receive a routine IDTT.[39] For the 124 patients in CDCR's appointments report for December 1, 2024 to May 30, 2025, there were 208 completed initial or routine IDTTs. When a patient had either an initial IDTT and a routine IDTT or more than one routine IDTT, timeliness in accordance with Program Guide requirements was able to be calculated. Of the 208 completed IDTTs, 84 contacts were for individuals who had at least two IDTTs (initial and routine or two routines). Of those 84, two or one percent occurred 161 days beyond Program Guide requirements.

*Group Treatment*

CRC had an active group treatment program which was primarily clinically focused. EOP Supervisors reported that three groups were facilitated between 9:00 a.m. and 2:00 p.m., which totaled 18 hours daily. At the time of the site visit, twenty-five groups or 21 percent of the 118 offered groups were led by recreation therapists. Clinicians led 93 or 79 percent of clinical groups. Group topics included parenting skills, illness management and recovery, coping and problem solving, substance abuse, stages of change, positive psychology and several included evidence-based treatments such as dialectical behavior therapy, acceptance and commitment therapy or START now. NLTGs were not offered during the review period due to staffing shortages.

---

[39] The reviewed data in the mainline EOP routine IDTT appointments report captured the time between completed patient IDTTs but did not account for when patients were not scheduled for an initial or routine IDTT. Of note, the appointments report provided did not account for delays between appointments due to movements in or out of CRC.

The monitor's expert observed two primary clinician caseload groups and a coping skills group determined them to be adequate. Caseload groups were clinically driven and focused on education about symptoms and management of anxiety including cognitive behavior therapy, distraction, and mindfulness. Each patient was provided with a handout. One group was interactive while the other group was primarily didactic. The coping skills group was co-led by a clinician and an EOP supervisor. Patients were attentive and engaged in discussing positive mentors during their childhood.

Introduction to EOP groups were offered during the review period to sixty patients, 34 of whom were scheduled for the four group modules. A small sample of patients were offered less than the four modules during the review period. A review of their healthcare records indicated that patients remained in EOP at CRC and were able to be scheduled for the group, therefore it was unclear why these patients were not offered the four modules during the reporting period.

Reviewed Introduction to EOP clinical documentation indicated that required facilitators (clinician, peer, and custody staff) were present for all but one group between January 2025 and May 2025. Of note, in some cases, there was no corresponding documentation in EHRS for patients who were listed on the Introduction to EOP group appointments report. For these cases, the appointments report indicated that the patient refused the group but there was no clinical documentation in the healthcare record to support the refusal.

*Individual Treatment*

The Program Guide requires that patients are offered an initial psychiatrist evaluation before their initial IDTT and within 14 calendar days of arrival to the institution or level of care change. *See* ECF No. 7333-1 at 59. Thereafter they are required to receive a routine psychiatric contact every 30 calendar days. *Id*. Patients are also required to receive a primary clinician

evaluation within 14 calendar days of arrival and weekly (i.e. once per calendar week with no more than ten calendar days between contacts) with either a primary clinician or in group psychotherapy with an individual contact every other week. *Id*.

The monitor randomly selected and reviewed the healthcare records of 30 mainline EOP patients to assess compliance with Program Guide timeframes during their stays. All 30 patients required initial psychiatry evaluations; 28 or 93 percent timely occurred before the initial IDTT. Twenty-nine or 97 percent of the reviewed initial psychiatry evaluations were conducted in confidential settings; the non-confidential contact was due to a missing contact. Telepsychiatry was utilized for one initial psychiatry evaluation.

The monitor randomly selected and reviewed the healthcare records of 30 mainline EOP patients to assess compliance with Program Guide timeframes during their stays. All 30 patients required initial primary clinician evaluations. Of the 30 reviewed initial primary clinician evaluations contacts, all 30 were completed within 14 calendar days of arrival or change in level of care. Twenty-nine or 97 percent of reviewed initial primary clinician evaluations were conducted in a confidential setting the non-confidential contact was due to a missing contact. Telepsychiatry was utilized for one initial psychiatry evaluation.

To measure timeliness of routine psychiatry contacts during the review period, CDCR produced an appointments report that included individuals who were required to receive a routine psychiatry contact.[40] For the 114 patients in CDCR's appointments report for December

[40] Reviewed data from the mainline EOP routine psychiatry contacts report captured the time between patient contacts but did not account for when patients were not seen or scheduled for a routine psychiatric contact. Of note, the appointments report provided did not account for delays between appointments due to movements in or out of CRC. Contact with the assigned psychiatrist was unable to be determined. Additionally, the report did not include individuals that did not have completed contacts.

1, 2024 to May 30, 2025, there were 431 completed and refused contacts. Of the 430 completed contacts, 425 or 99 percent were confidential as reported by the institution. Reasons for non-confidential psychiatry contacts were not documented (other than to note the group occurred on the yard). When a patient had more than one completed or refused contact, timeliness in accordance with Program Guide requirements was able to be calculated. Of the 431, 318 contacts were for individuals who were seen at least twice by the psychiatric provider. Of those 318 contacts, there were 17 or five percent that occurred beyond Program Guide requirements with a range of 31 to 100 days.

To measure timeliness of routine primary clinician contacts during the review period, CDCR produced an appointments report that included individuals who were required to receive a routine primary clinician contact.[41] For the 104 patients in CDCR's appointments report for December 1, 2024 to May 30, 2025, there were 933 completed and refused contacts. Of the 503 completed contacts, 498 or 99 percent were confidential as reported by the institution. Reasons for non-confidential primary clinician contacts included patient refusals and lack of available confidential space. When a patient had more than one completed or refused contact, timeliness in accordance with Program Guide requirements was able to be calculated. Of the 933, 829 contacts were for individuals who were seen at least twice by the primary clinician. Of those 829 contacts, 22 or three percent occurred beyond Program Guide requirements with a range of 11 to 28 days. Of note, the report did not include individuals that did not have completed contacts, such as those that were not scheduled.

[41] The reviewed data in the mainline EOP routine primary clinician contacts report captured the time between patient contacts but did not include patients who were not seen or scheduled for a routine contact with the primary clinician. Of note, the provided appointments report did not account for delays between appointments due to movements in or out of CRC. Contact with the assigned primary clinician was unable to be determined.

There were 503 completed individual PC contacts, of which two were completed in zero minutes, 315 were completed in under 15 minutes, 149 were completed between 16 and 30 minutes, 36 were completed between 31 and 60 minutes, and one was completed between 61 and 95 minutes.

A majority of interviewed EOP patients were satisfied with mental health care at CRC. While most liked the active group schedule, some patients were mixed about the exercise groups. Patients reported that they were referred to groups based on discussions around what their interests were, consistent with the monitor's expert's observation in an IDTT. During both group interviews, patients raised concerns about the pending CRC closure and reported feeling anxious, uncertain, and confused about the closure. A higher functioning group of patients was less satisfied with the program. Specifically, some described their primary clinician contacts as "rushed" and comparable to a "check-in," and estimated that contacts lasted 5-10 minutes. Several patients that received psychiatric medications reported mixed experiences with the psychiatrist. Overall, the patients reported that despite their feelings that officers "brushed" them off when they requested something, they reported that officers contact mental health appropriately in an emergency. One patient reported that an officer minimized a peer's self-injurious behavior.

<u>3CMS:</u>

Four psychiatrists and nine primary clinicians treated the mainline 3CMS program during the review period. The staff-to-patient ratios from the 2009 Staffing Plan and 2021 adjustments to the 2009 staffing plan required that staff psychiatrists who treat 3CMS patients maintain a caseload of 280 patients per psychiatrist if the patient was prescribed medications and 675

patients if the patient was not prescribed medications.[42] *See* ECF No. 3693 at 12 and 6978-1 at 3.

All four psychiatrists-maintained caseloads between 159 and 172, all within established ratios. Of the nine primary clinicians, all but one with a caseload of 107, were within the established case load ratio of 97 patients.

Mental health staff providing 3CMS services had adequate office space for individual contacts, IDTT meetings and groups.

*IDTTs*

The monitor's expert observed ten mainline 3CMS IDTTs and found them to be inadequate. Five of the meetings were initial IDTTs, four were routine IDTTs, and one was scheduled to discuss discharging the patient from MHSDS. None of the observed meetings included both the patient's assigned psychiatrist and assigned primary clinician and one meeting included neither the assigned psychiatrist nor the assigned primary clinician. In that meeting, none of the members of the treatment team had met the patient previously despite the patient recently discharging from the MHCB. In each of the observed IDTT meetings, however, there was sufficient evidence that staff had reviewed relevant records and patient histories prior to the

[42] The Program Guide requires that "[e]ach CCCMS inmate patient on psychiatric medication…be reevaluated by a psychiatrist a minimum of every 90 days regarding psychiatric medication issues." (Program Guide at 12-3-11). The 2009 Staffing Plan established a psychiatry staffing ratio for every 3CMS patient in the general population and did not distinguish between patients on medications and patients who were not. *See* ECF No. 3693 at 8. The Adjustments to the 2009 Staffing Plan, ECF No. 6978-1, which were approved by the Court on January 27, 2021 (See ECF No. 7035 at 2), established a new staffing ratio of 675 patients per psychiatrist for patients who are not on medications for six months or more. For the purpose of reporting compliance with staff-to-patient ratios, it was unclear whether the patient's included in each reported caseload were prescribed medications at the time of the site visit.

meetings. The correctional counselor present at the meetings was not assigned to any of the patients and in most of the meetings provided minimal input.

While the meetings were collaborative and consistently reviewed patient functioning, program participation, and discussed patient symptoms, a number of required elements were missing from the meetings. None of the observed meetings included discussion of treatment goals or specific interventions to be provided to the patient. Some meetings identified symptoms that were being targeted in treatment but without indication of how symptoms were being addressed in treatment or what treatment progress would look like. None of the meetings included case formulations and diagnoses were rarely stated or discussed. Only two of the observed meetings included discussion of the patient's level of care along with rationale. One of those meetings included discussion of the patient's removal from MHSDS and was adequately justified. For patients who were approaching release from custody, pre-release planning was discussed. Additionally, pamphlets explaining the MHSDS were provided to all patients who were in attendance for their initial IDTT meetings.

The individualized treatment plan for 3CMS patients must be completed within 14 working days of referral/arrival by the patient's primary clinician in consultation with the other IDTT members and annually thereafter. *See* ECF No. 7333-1 at 43 (PG 12-3-10).

The monitor randomly selected and reviewed the healthcare records of 30 mainline 3CMS patients to assess compliance with Program Guide timeframes during their stays. All 30 patients required initial IDTTs. Of the 30 reviewed initial IDTTs, 10 or 33 percent occurred timely within 14 calendar days or arrival or level of care change. Twenty-eight or 93 percent were attended by all required staff and 29 or 97 percent were attended by the patients. There was no reason given for the patient's initial IDTT absence.

To measure timeliness of routine IDTTs during the review period, CDCR produced an appointments report that included individuals who were required to receive a routine IDTT.[43] For the 824 patients in CDCR's appointments report for December 1, 2024 to May 30, 2025, there were 851 completed and refused initial or routine IDTTs. When a patient had either an initial IDTT and a routine IDTT or more than one routine IDTT, timeliness in accordance with Program Guide requirements was able to be calculated. Of the 851, 33 contacts were for individuals who had at least two IDTTs (initial and routine or two routines). Of those 33, none occurred beyond Program Guide requirements.

A random sample of 30 patients was selected to verify consistency of information contained in the appointments report and clinical documentation in EHRS. Of the 31 contacts reviewed in EHRS, all were consistent with the appointments report.

*Group Treatment*

During the review period, groups were offered every weekday to 3CMS patients, ranging from two to six groups being offered each day. Topics included anger management, mood management, coping skills, interpersonal relationships, leisure activities, rational behavior and decision making, managing depressive mood, and discharge planning.

Group cycles were twelve weeks long, and a new cycle started the week of the site visit. The new schedule included 21 groups each week, all of which were facilitated by clinical staff. Patients were provided with a list of all available groups to review with their primary clinicians in order to enroll in groups. Group offerings were also discussed in some of the observed IDTTs

[43] The mainline 3CMS routine IDTT appointments report did not include individuals that did not have a completed IDTT, such as those that were not scheduled. The reviewed data captured the time between completed patient IDTTs but did not account for when patients were not scheduled for an initial or routine IDTT. Of note, the appointments report provided did not account for delays between appointments due to movements in or out of CRC.

during the site visit. It was reported that there was no waitlist for groups. The rooms used for groups were adequate in size and afforded confidentiality.

The monitor's expert observed three groups during the monitoring tour. One group was entitled, "Life Skills" with three of five scheduled patients in attendance. A fourth patient arrived for the group but decided not to remain once he learned that it was not mandatory and he would not be receiving milestone credits for attending. The group started later than scheduled as patients arrived over a span of ten minutes. The group consisted of a clinician reading material about stress triggers and mindfulness, followed by discussion among the group and relaxation breathing exercises. Patients were engaged in the material and the group content was clinically relevant.

Another group entitled, Conflict Resolution/Assertiveness, was observed. Seven of the eight patients scheduled for the group were in attendance. A psychologist facilitated the group that included engaging and clinically relevant content.

The final group observed was entitled, "Acceptance and Commitment Therapy (ACT) Group" and all eight scheduled patients were in attendance. The group was facilitated by a social worker who reviewed written materials related to ACT and engaged the group members in reflective discussions about the content. Overall, the observed groups were clinically meaningful and well-facilitated.

There were no NLTGs offered to 3CMS patients.

*Individual Treatment*

The Program Guide requires that patients are offered an initial psychiatrist evaluation before their initial IDTT. *See* ECF No. 7333-1 at 34-50. Thereafter they are required to receive a routine psychiatric contact at least every 90 calendar days if the patient is prescribed a

psychotropic medication. *Id*. Patients are also required to receive an initial primary clinician evaluation within 10 working days of arrival and at least every 90 calendar days thereafter. *Id*. at 41, 48.

The monitor randomly selected and reviewed the healthcare records of 30 mainline 3CMS patients to assess compliance with Program Guide timeframes during their stays. All 30 patients required initial psychiatry evaluations; 17 or 57 percent timely occurred before the initial IDTT. Twenty-two or 73 percent of the reviewed initial psychiatry evaluations were conducted in confidential settings; the non-confidential contacts were due to missing contacts. Telepsychiatry was utilized for eight or 27 percent of initial psychiatry evaluations.

To measure timeliness of routine psychiatry contacts during the review period, CDCR produced an appointments report that included individuals who were required to receive a routine psychiatry contact during the review period.[44] For the 805 patients in CDCR's appointments report for December 1, 2024 to May 30, 2025, there were 1,673 completed and refused contacts, of which 1,668 or 99 percent were confidential as reported by the institution. Reasons for non-confidential psychiatry contacts included patient refusals, custody modified program, and medical restrictions due to public health issues. When a patient had more than one completed or refused contact, compliance with Program Guide timeframes was able to be calculated. Of the 1,673, 874 contacts were for individuals who were seen at least twice by the

[44] The mainline 3CMS routine psychiatry contact appointments report did not include individuals that did not have completed contacts. Reviewed data captured the time between patient contacts but did not account for when patients were not seen or scheduled for a routine psychiatric contact. Of note, the appointments report provided did not account for delays between appointments due to movements in or out of CRC. Contact with the assigned psychiatrist was unable to be determined.

psychiatric provider. Of those 874 contacts, there were eight or one percent that occurred beyond Program Guide requirements with a range of 91 to 154 days.

A sample of 30 patients was randomly selected to verify consistency between the appointments report and clinical documentation in EHRS. Of the 67 contacts reviewed in EHRS, 60 or 90 percent were consistent with the appointments report; seven or ten percent had discrepancies. Discrepancies were due to duplicate entries and entries without documentation.

The monitor randomly selected and reviewed the healthcare records of 30 mainline 3CMS patients to assess compliance with Program Guide timeframes during their stays. All 30 patients required initial primary clinician evaluations. Of the 30 reviewed initial primary clinician evaluations contacts, 21 or 70 percent were completed within 10 calendar days of arrival or change in level of care. Twenty-eight or 93 percent of reviewed initial primary clinician evaluations were conducted in a confidential setting; non-confidential contacts were due to missing contacts. Telehealth was utilized for nine or 30 percent of initial psychiatry evaluations.

To measure timeliness of routine primary clinician contacts during the review period, CDCR produced an appointments report that included individuals who were required to receive a routine primary clinician contact.[45] For the 1,095 patients in CDCR's appointments report for December 1, 2024 to May 30, 2025, there were 2,186 completed and refused contacts, of which 1,874 or 86 percent were confidential as reported by the institution. Reasons for non-confidential

[45] The mainline 3CMS routine primary clinician appointments report did not include individuals that did not have completed contacts, such as those that were not scheduled. The reviewed data captured the time between patient contacts but did not include patients who were not seen or scheduled for a routine contact with the primary clinician. Of note, the provided appointments report did not account for delays between appointments due to movements in or out of CRC. Contact with the assigned primary clinician was unable to be determined.

primary clinician contacts included patient refusals, lack of available confidential space, and medical restrictions due to public health issues. When a patient had more than one completed or refused contact, compliance with Program Guide timeframes was able to be calculated. Of the 2,186, 1,098 contacts were for individuals who were seen at least twice by the primary clinician. Of those 1,098 contacts, 45 or four percent that occurred beyond Program Guide requirements with a range of 91 to 146 days.

There were 2,179 completed individual PC contacts, of which four were completed in zero minutes, 762 were completed in under 15 minutes, 792 were completed between 16 and 30 minutes, 475 were completed between 31 and 60 minutes, 117 were completed between 61 and 95 minutes, and 36 lasted longer than 95 minutes.

Interviewed 3CMS patients all reported seeing their primary clinicians and psychiatrists as required with some reporting that they have seen their primary clinicians more frequently than every 90 days. Patients reported that they occasionally see a clinician other than their assigned primary clinician and a few reported having changes in clinicians over the previous year. Patients were aware of how to request to be seen outside of their scheduled appointments, yet some reported that correctional staff did not facilitate ready access to mental health staff during times of need.

Patients reported having access to mental health groups, education, jobs, and other programming on a routine basis. Some patients reported being aware of their treatment goals, while others were not aware of the focus of their treatment. The one patient who reported taking medications that made him sensitive to heat stated that he was not provided with ice when he requested it. Three of the patients reported that custody staff were disrespectful and did not consistently act professionally with the incarcerated population. For example, they stated that

officers would take privileges away from a group of incarcerated individuals in response to misbehavior of a single individual, to cause retaliation toward the individual who misbehaved.

Some of the patients reported apprehension about the upcoming closure of the institution and noted that they expected negative consequences resulting in lack of access to mental health groups at other institutions, having to start over with new clinicians, and an overall lack of programming at other institutions resulting in long waitlists.

Overall, mental health services provided to patients at the 3CMS level of care was compliant and, in many cases, exceeded the requirements of the Program Guide. Staff could benefit from additional training in conducting IDTT meetings and drafting treatment plans.

Other Issues:

Pre-Release Planning:

Two LCSWs were assigned full-time to pre-release planning. CRC reported that it is one of the largest releasers of mental health patients in California. In addition to appointments, patients were offered walk-in opportunities to address their pre-release concerns. The coordinators maintained an information board for patients with relevant services and resources that could also be reviewed from an accessible area in Facility B.

There were 306 patients including 275 3CMS and 31 EOP patients scheduled to be released during the review period; all were screened for services. To complete the PRPA, the pre-release coordinator drafted the first section with the patient and then alerted the patient's primary clinician to complete the second part with the patient within 60 to 90 days of release. In addition to completing the PRPA, the pre-release coordinator facilitated transportation chronos, the release of information for counties to begin their planning, and connected patients to the TCMP coordinator for any further services needed.

During the review period 281 or 92 percent of the patients had applications submitted to Medi-Cal, 33 or eleven percent had applications submitted to SSI, and 8 or three percent had applications submitted for veteran's services. Nine patients refused services, 14 reported access to other insurance coverage and two were unavailable due to being out to court or medical.

Two weekly pre-release groups were offered during the review period. They utilized a pre-release state curriculum and ran continuously to allow patient placement at any time.

CRC's pre-release programming was compliant during the review period.

Program Access:

a. Jobs and Program Assignments

On June 16, 2025, CRC reported that of 803 available jobs, ten EOP patients or one percent of the EOP population, 235 3CMS patients or 29 percent of the 3CMS population, and 558 non-MHSDS incarcerated persons or 70 percent of the non-MHSDS population held job assignments.

For the 1,170 academic assignments, 16 EOP patients or one percent of the EOP population, 388 3CMS patients or 33 percent of the 3CMS population, and 766 non-MHSDS patients or 66 percent of the non-MHSDS population held them.

Of the 137 vocational education assignments, no EOP patients, 43 3CMS patients or four percent of the 3CMS population, and 94 non-MHSDS individuals or six percent of the non-MHSDS population held them.

Of 644 voluntary education assignments, three EOP patients or one percent of the EOP population, 157 3CMS patients or 24 percent of the 3CMS population, and 484 non-MHSDS patients or 75 percent of the non-MHSDS population held them.

For the 367 substance abuse treatment assignments, eight EOP patients or two percent of the EOP population, 147 3CMS patients or 40 percent of the 3CMS population, and 212 non-MHSDS patients or 58 percent of non-MHSDS individuals held them.

b. Milestone Credits

CRC did not report milestone credit data in the format requested. However, the institution did indicate that 38 EOP patients, 11 3CMS patients, and no non-MHSDS patients were awarded milestone credits during the review period.

c. Out-of-Level Housing

As of June 20, 2025, twelve EOP patients and 101 custody Level I 3CMS patients were in custody Level II housing, and three custody Level III EOP patients and 101 3CMS patients were in custody Level II housing.

d. ADA Reasonable Accommodation and Grievance Procedure

CRC provided a copy of the CDCR Reasonable Accommodation Request Process manual and produced training rosters confirming the implementation of the revised process.

e. Periodic Classification Score Reductions: EOP Patients

CRC provided CDCR Form 840s demonstrating of classification score reductions for EOP patients.

"C" Status:

During the review period, CRC placed 167 individuals on "C" status, including eight EOP patients, 89 3CMS patients, and 79 non-MHSDS incarcerated persons. At the time of the site visit, there were four EOP patients and no 3CMS patients on "C" status. A review of four classification chronos revealed that placement was due to receiving two or more RVRs within 180-day period for reasons related to possession of drugs or drug paraphernalia.

CRC produced an LOP which governed the location of "C" status patients in a specific housing unit in the patients assigned yard. Because CRC is dormitory housing, "C" status patients moved around freely in the dorm, were allowed to make phone calls, and access the yard for one hour daily.

Mental Health Referrals:

CRC reported 1,174 mental health referrals during the review period; there were 274 referrals to psychiatry and 900 referrals to primary clinicians. There were 92 emergent, 164 urgent, and 918 routine referrals. Responses to emergent and urgent referrals were not timely, while responses to routine referrals were compliant. Specifically, there were timely responses to 68 percent of the emergent psychiatry referrals and 72 percent of the emergent primary clinician referrals. For urgent referrals, there were timely responses to 78 percent of psychiatry referrals, and 82 percent of primary clinician referrals. Routine referrals reflected compliance as there were timely responses to 93 percent of psychiatry referrals, and 92 percent of primary clinician referrals. CRC reported that the late referrals were due to data entry errors with placing orders for appointments after the patient was seen. The data entry issues were reported to headquarters.

Custody and Mental Health Partnership Plan:

CRC's custody and mental health partnership LOP was last revised on December 5, 2024 and aligned with headquarters' directive.

Executive leadership joint rounding occurred during five of six months of the review period, with no executive joint rounding occurring in January 2025. During each month, executive joint rounding occurred on an EOP and 3CMS facility. Leadership staff interviewed both custody and clinical staff as well as patients during each month of rounding and noted their findings on the required form. Mental health and custody staff indicated good collaboration with

no issues in getting patients to their appointments on time and working together when responding to urgent and emergent issues. Patients reported receiving their ducats and having positive relationships with mental health staff. However, patients also reported concerns with not receiving tablets, issues with receiving milestone credits, and a few concerns with disrespect by custody staff.

Executive rounding was not included in the executive meeting minutes during the review period. Additionally, executive rounding was only discussed in QMC meetings when the MHPS presented the results, which were in December 2024, February 2025, and April 2025. Executive rounding was discussed in all MHPS meetings.

CRC provided daily huddle forms on the EOP housing unit for second and third watches during the review period. The reviewed huddle forms consistently lacked pertinent detail and did not reflect the exchange of information. A huddle was also observed during the site visit and included a collaborative conversation with the exchange of information from all involved parties. Topics discussed included new patients to the units, any reported incidents, and any patients who exhibited unusual behaviors. A copy of the huddle form was placed in a three-ring binder in the officer's station, however, the patients discussed during the huddle were not documented on the form.

All weekly 3CMS supervisory huddle forms were reviewed for compliance with Program Guide requirements during the review period. CRC was not compliant with the required weekly 3CMS supervisory meetings. Of the 26 required weeks, meetings occurred during 15 weeks on Facility B, 15 weeks on Facility C, and 15 weeks on Facility D. All reviewed forms lacked detail and did not demonstrate a substantive discussion of relevant topics. Like the preceding

review periods, responses routinely indicated little, if any, pertinent information. *See* ECF No. 8359 at 333. Additionally, not all required staff signed the huddle forms.

The institution held monthly joint supervisory area program tours during all six months of the review period with the required staff in attendance. All facilities were toured monthly as required. Rounding forms indicated that mental health clinicians received timely referrals from custody staff, and patients reported receiving their ducats on time. Patients also stated they had no issues with staff responding to crises.

CRC produced a copy of the 3CMS orientation brochure in English and Spanish and indicated that it was distributed to new 3CMS patients following the initial primary clinician evaluation. The brochures were also observed at the IDTTs and were handed out to patients routinely.

CRC complied with the monthly IAC meetings requirement; they were held on all facilities during all months of the review period. The meetings were held jointly with mental health and medical staff, and discussions included influenza and covid quarantines, dental, indigent supplies, night yard and lower bunk request process. The required staff and patients were present for each meeting.

Introduction to EOP groups were offered during the reporting period. Group content and frequency complied with CMHPP requirements.

During the review period, MHSDS patients made 61 allegations of staff misconduct against custody staff, of which 51 were pending, eight were denied, and two were rejected. There were no allegations of staff misconduct against mental health staff during the review period.

There was one investigation for misconduct towards a patient that was initiated outside of the appeals process. The institution did not provide any further information. No staff members were reassigned because of misconduct complaints.

For the annual off-post training, 620 of 648 or 96 percent of custody staff and 103 of 131 or 79 percent of nursing and mental health staff completed the training in the 12 months prior to the monitoring tour.

Overall, CRC was noncompliant with Custody and Mental Health Partnership Plan. This was based upon the lack of pertinent detail in daily EOP huddles and only 15 of 26 weeks or 58 percent of 3CMS weekly supervisory meetings being held.

Heat Plan:

CDCR required that each institution's heat plan local operating procedure incorporate the requirements of the March 27, 2025 Heat Plan and Updates memorandum. CRC's heat plan local operating procedure (LOP) was last revised on April 10, 2025 and complied with CDCR policy.

The 2025 Heat Plan and Updates memorandum required that each institution submit a Monthly Summary Report (Summary Report), signed by the warden and CEO to headquarters each month from May 1 to October 31. CRC produced a Summary Report for May of 2025, the only month that the heat plan was active during the review period, which reflected that there were seven Stage I heat alerts, seven Stage II heat alerts, and two Stage III heat alerts.

The 2025 Heat Plan and Updates memorandum also required institutions to include with the monthly submission a Heat Incident Log documenting the number of patients who experienced a heat-related illness. The Heat Incident Log must include the patient's information and details regarding the heat-related illness. CRC reported one heat-related illness. The patient

reported heat exhaustion, was treated with hydration, and returned to the unit. The institution's Summary Report and heat incident log were compliant with the 2025 Heat Plan and Updates memorandum.

The 2025 Heat Plan and Updates memorandum further required all custody officers and leadership staff to maintain knowledge of heat plan activation and act in accordance with the requirements of each stage. Ten custody staff across eight housing units and the tower where outdoor temperatures are recorded were interviewed with staff demonstrating adequate knowledge of heat plan policy and procedure.

The policy also required that when the Heat Plan was in effect, institutional staff must generate and distribute daily a list of all incarcerated persons currently prescribed any of the designated Heat Alert Medications. The heat-risk incarcerated persons list was updated daily as required in all toured housing units.

To ensure proper and accurate temperature recording, the annual heat plan required the warden or his designee to ensure an accurate thermometer was in a central, heat-neutral location to monitor outside ambient air temperatures, which must be recorded every hour, every day, from May 1 through October 31 of each year. CRCs outside thermometer was located outside of Tower 5 and measured the outside air temperature for the entire institution year-round. Outside temperature logs were completed hourly as required. The outside patrol sergeant was responsible for auditing the Tower 5 temperature log sheets daily before the completion of each shift.

The warden or his designee was also responsible for ensuring that inside air temperatures were measured in all non-airconditioned living areas that house heat-risk incarcerated persons. Temperatures must be taken at the highest non-air-conditioned location where heat-risk

incarcerated persons are housed and must be recorded every three hours. The EOP housing unit at CRC was air-conditioned at the time of the site visit. Seven 3CMS housing units were toured. Observed indoor thermometers in all units were in working order and were in the highest feasible location inside the housing units. Interviewed custody staff reported taking indoor temperatures every three hours year-round and recording them on the indoor temperature log. Reviewed logs revealed that officers were recording temperatures as required. The housing facility sergeants were responsible for auditing the temperature log daily during each shift.

In an effort to ensure that heat-risk incarcerated persons were afforded equal access to programs, services, and activities during extreme weather conditions, the 2025 Heat Plan and Updates memorandum required institutions to devise and include any reasonable accommodations and alternatives to yard activities when revising their LOP. All reasonable accommodations provided to heat-risk incarcerated persons during heat alert activation must be documented in the institution's Daily Activity Report (DAR). Reviewed DARs indicated that heat-risk incarcerated persons were offered dayroom and programming privileges during Stage I heat alert activation. Observed coolers of ice and water were offered to patients inside the dayrooms during Stage II and Stage III alerts. The institution also used a flag system from Tower 5 to alert heat-risk incarcerated persons to a Stage I heat alert activation. Additionally, yard was offered every evening for heat risk patients during the heat season.

The 2025 Heat Plan and Updates memorandum required annual training on the institution's Heat Plan, including measures when heat stress symptoms are identified and/or reported, to be provided to custodial and clinical staff by the In-Service Training Officer. CRC reported completion of the heat-related pathologies training by 496 of 637 or 78 percent of custody staff and 84 of 115 or 73 percent of medical and mental health staff.

Interviewed housing unit staff were knowledgeable of heat plan policy and procedures, recorded temperatures appropriately, provided adequate accommodation and adequate cooling measures. Therefore, notwithstanding noncompliance with heat plan related training, CRC's implementation of the 2025 Heat Plan was compliant during the review period.

RVRs:

CRC issued 1,778 RVRs during the review period, including 997 or 56 percent to MHSDS patients and 781 or 44 percent to non-MHSDS incarcerated individuals. Eight RVRs were issued to patients awaiting MHCB transfer, 96 to EOP patients, 893 to 3CMS patients, and 781 to non-MHSDS patients.

Twenty-two randomly selected RVRs issued to MHSDS patients were reviewed to assess compliance with policy guidelines. Of the sample reviewed, the MHA was timely requested in nine or 41 percent of cases and timely completed and returned to custody in twenty or 91 percent of the cases. Of the 22 MHAs reviewed, all were completed privately and no patients refused an MHA. None of the reviewed MHAs recommended that the RVR be documented in an alternative manner.

There were no instances where the patient's mental illness was found to have "strongly influenced" the behavior documented in the RVR. However, one of the MHAs indicated that the patient's mental health contributed to the behavior that led to the RVR. The SHO documented consideration of the mental health assessment in 14 of 22 or 64 percent of cases; the SHO copied and pasted the language from the MHA. The primary clinician recommended penalty mitigation in 12 cases; the SHO mitigated penalties consistent with the clinician's recommendation in all 12 cases.

Of the reviewed RVRs, staff assistants were appointed in eight cases. All patients received the required RVR documentation prior to the hearing and patients were present at all hearings.

As for attendance at the annual disciplinary process mental health assessment training, 377 of 576 or 65 percent of custody staff and one of 38 or three percent of required mental health staff completed the training. All health care staff attended the training regarding their role in the RVR process. There were no RVRs written by health care staff during the review period.

CRC was noncompliant with RVRs based on the low percentage of attendance at the MHA training by both custody and mental health staff, the lack of timely requests for MHAs and the SHO's failure to document their consideration of the MHA.

Use of Force:

CRC reported zero controlled and 72 immediate uses of force incidents during the review period; 38 or 54 percent involved MHSDS patients and 33 or 46 percent involved non-MHSDS patients.

Ten immediate uses of force incidents were selected to assess compliance with policy guidelines. The reviewed incidents included threats against staff, battery on incarcerated individuals, and fighting. All ten incidents reflected that custody staff used a reasonable and appropriate amount of force, including physical strength and holds and pepper spray. Appropriate decontamination was afforded for all patients as needed. Therefore, CRC's use of force was deemed adequate.

CRC reported that the warden, chief deputy warden, all three correctional administrators, all three captains, all 26 lieutenants, 50 of 54 or 93 percent of sergeants, and 525 of 543 or 97 percent of all correctional officers completed the annual use of force training. For medical and

mental health staff, only 30 of 125 or 24 percent attended the annual training. None of the four chiefs and supervisors of mental health completed the training. Only one of nine or 10 percent of psychologists, and five of 16 or 31 percent of social workers completed the training. For nursing, 23 of 95 or 24 percent attended the training.

Lockdowns/Modified Programming:

There were four instances of modified programming at CRC during the review period. On December 18, 2024, four dormitories, including Dorms 212, 304, 305 and 410 were quarantined for seven days due to an incarcerated person testing positive for influenza. On January 22, 2025, two dormitories, including Dorms 307 and 308, were quarantined for five days after an patient tested positive for influenza. On January 24, 2025, two dormitories, including Dorms 208 and 407 were place on quarantine for eleven days after a patient tested positive for Covid-19. On January 30, 2025, Dorms 212, 304, 305, and 410 were placed on quarantine for 17 days after an IP tested positive for influenza.

During these modified programs, patients were fed in the units, escorted last for medication, and escorted to all medical and mental health ducats last.

Access to Care:

A review of monthly reports from December 2024 through May 2025 reflected the issuance of 27,734 mental health ducats and add-on appointments; 24,661 or 89 percent were completed, and 3,073 or 111 percent were not completed. Of the non-completed appointments, seven percent were due to custody factors, 58 percent were due to non-custody factors, and 35 percent were due to patient refusals.

*Coleman* Postings:

All toured housing units contained *Coleman* posters in English and Spanish in areas accessible to patients.

**APPENDIX A – 9**
**CALIFORNIA STATE PRISON/CORCORAN (CSP/Corcoran)**
Site Visit: March 11, 2025 – March 14, 2025
Review Period: August 1, 2024 – January 31, 2025

Census:

As of March 7, 2025, CSP/Corcoran housed 2,621 incarcerated persons, representing a 22 percent decrease from the preceding review. The MHSDS population of 1,273 decreased 20 percent compared to the preceding review yet still represented a higher proportion of the institution's population (49 percent) compared to the preceding review (47 percent).

The MHCB housed ten patients.

There were 160 mainline EOP patients, an eight percent decrease from the preceding review period.

The 826 mainline 3CMS patients reflected a 26 percent decrease since the prior review period.

The MHSDS RHU population was 275 patients, including 87 EOP RHU patients and 188 3CMS RHU patients.

Staffing:

The chief psychiatrist position was vacant. The senior psychiatrist position was filled. Of 5.5 psychiatry positions, one was filled for an 82 percent vacancy rate. The use of 3.5 registry psychiatrists reduced the functional vacancy rate to 18 percent.

The 4.5 telepsychiatry positions were filled.

Overall, the staff psychiatry functional vacancy rate (accounting for civil servants, registry, and telepsychiatry positions) was 10 percent.

Both chief psychologist positions were filled. All four senior psychologist supervisor positions were filled. Three of 4.5 senior psychologist specialist positions were also filled

reflecting a 33 percent vacancy rate. Six of 28 psychology positions were filled, for a 79 percent vacancy rate. However, two psychologists were on extended leaves. The use of 8.5 contractors reduced the psychology functional vacancy rate to 55 percent. Three psychologists were unlicensed.

One of three tele-psychologist positions were filled for a 67 percent vacancy rate.

Overall, the staff psychologist functional vacancy rate (accounting for on-site civil service, registry, and tele-mental health positions) was 56 percent.

The supervising social worker position was filled. Of 11.5 social worker positions, nine were filled for a 22 percent vacancy rate. However, 6.2 contractors eliminated the social worker functional vacancy rate. Four social workers were unlicensed.

All 3.55 tele-social worker positions were filled.

Overall, accounting for on-site civil service, registry, and tele-mental health positions, there were no vacancies among social worker positions.

All ten recreation therapist positions were filled.

All four senior psych tech positions were filled. Fifty-nine of 74 psych tech positions were also filled, for a 20 percent vacancy rate.

All 23 supervising registered nurse positions were filled. Both MHSDS registered nurse positions were filled.

Of 19.2 CNA positions, 13 were filled, for a 32 percent vacancy rate. Seventy-five of 76.2 LVN positions were filled reflecting a vacancy rate of two percent. MAs assigned to tele-mental health filled nine of ten positions for a ten percent vacancy rate.

All 15.5 mental health clerical positions were filled.

The OSS II position and AGPA position were filled. Both HPS I positions were filled. In addition, a non-allocated HPS II position was filled. The CHSA position was vacant.

As for custody staffing, the warden and chief deputy warden's positions were filled as well as all seven associate warden positions. All 19 CC I positions were filled, as were 13 of 13.5 CC II positions, five of six captains, 34 of 36.2 lieutenants, 88 of 88.2 sergeants, and all 800 correctional officers.

The institution assigned unlicensed staff at CSP/Corcoran a clinical supervisor. Supervision included weekly one-to-one meetings and weekly staff meetings. Supervision of unlicensed clinicians was conducted primarily by current CSP/Corcoran staff; however in one case, a clinician was supervised by a former CDCR employee who left to work for another agency yet continued supervising unlicensed staff at CSP/Corcoran. CSP/Corcoran has volunteered to participate in a Regional Internship Consortium and hopes to attract unlicensed candidates but the problem of finding one of the few licensed staff who had capacity to provide supervision may be problematic going forward.

Tele-Mental Health:

Four telepsychiatrists provided services for 3CMS patients and had caseloads of 91, 116, 282, and 354 patients respectively. Telepsychiatry also offered after-hours coverage based on provider availability. The institution reported two telepsychiatrists had been reassigned to other institutions during the past year.

Telepsychiatry provided 180 hours of service to 3CMS patients per week. Telepsychology provided 40 hours of service to 3CMS patients per week. Tele-social workers provided 160 hours of service to EOP patients per week.

In addition, CSP/Corcoran permitted telework for MHSDS clerical staff three days per week.

Staff Recruitment:

The institution reported increasing marketing efforts for mental health positions, implementing mid-step hiring practices, offering recruitment and retention differential bonuses, with the addition of offering hiring benefits for psychiatry in-person patient care, and allowing additional payment to psychiatry and psychology staff who worked additional caseloads.

Quality Management:

Mental health program subcommittee (MHPS) meetings occurred monthly during the review period. Quorums were met for every month except August 2024. Committees routinely covered: improvement work, system surveillance, program administration, and open forum. Routine reporting of pertinent program metrics was useful, however there was room for improvement. While discussion of non-compliant areas generally included an explanation of deficiencies, there was limited follow-up to address the root of identified problems. As an example, documentation of frequency of use of force calls was generally noted as on par in comparison to comparable timeframes, but the institution missed an opportunity to investigate factors or trends to lower use of force incidents.

MHPS documentation was focused on metrics but did not specifically discuss the impact of understaffing on access to care as identified during the monitoring tour.

Quality Management Committee meeting minutes indicated integration of the MHPS committee. Specifically, both committees tracked psychiatric medication refusals, psychiatric non-formulary and timely urgent and emergent mental health referrals. MHPS committee trends were not included in Local Governing Body committee documentation.

No QITs, FITs or other studies were completed during the monitoring period.

Medication Management:

Statewide MAPIP monitored compliance with both diagnostic monitoring and medication administration. Diagnostic monitoring included obtaining medication consents, as well as any physical examination, vital signs, or laboratory tests needed for safer use medication use. Medication administration monitored compliance with the availability, continuity, and actual administration of medications. The compliance threshold for all metrics was 90 percent.

MAPIP

CSP/Corcoran provided MAPIP results for August 1, 2024-January 31, 2025 regarding compliance for psychiatric diagnostic monitoring and medication management.

MAPIP antidepressant monitoring tracked four metrics, including: EKGs for patients taking tricyclic antidepressants (EKG); medication consents (Consent); thyroid function tests (TFTs); and obtaining blood pressure for patients taking venlafaxine (venla BP). CSP/Corcoran was fully compliant with monitoring blood pressure for patients prescribed venlafaxine, fully non-compliant with monitoring TFTs, and was partially compliant with obtaining medication consents and EKGs.




Of the total 20 required metric-months, nine, or 45 percent, were compliant, with 11, or 55 percent, non-compliant.

Diagnostic monitoring for patients prescribed atypical antipsychotics required 11 metrics, including: AIMS; blood pressure; glucose; complete blood count (CBC); comprehensive metabolic panel (CMP); EKG; height (Ht); lipids; medication consents; thyroid function tests; and weight (Wt).

CSP/Corcoran was fully compliant for monitoring blood pressure, height, and weight, and fully non-compliant with AIMS, lipids, and TFTs; the remaining metrics were partially compliant during the review period.




Of the 63 metric-months for which data was required, CSP/Corcoran reached compliance for 31, or 49 percent, and was non-compliant for 32, or 51 percent.

Clozapine is an atypical antipsychotic frequently used when other medications fail. CSP/Corcoran was a clozapine maintenance institution during the monitoring period. At the time of the monitoring tour, 11 patients received this medication. Due to the increased risk of potentially fatal side effects, the medication requires close monitoring of the same categories as listed for atypical antipsychotics. The institution had no required EKGs during the monitoring period.

CSP/Corcoran was fully compliant with blood pressure, CBC, height, and weight, while the remaining metrics were partially compliant.




Of the 53 metric-months for which data was required, CSP/Corcoran reached compliance for 40, or 75 percent, and was non-compliant for 13, or 25 percent.

Carbamazepine and Depakote are mood-stabilizing medications requiring four metrics: CBC; CMP; therapeutic medication level; and obtaining medication consents. For carbamazepine, CSP/Corcoran had no required medication levels or consents required. The institution was fully non-compliant with CMP and was partially compliant with CBC.



Of the four required metric months, CSP/Corcoran was compliant for one, or 25 percent, and non-compliant for three, of 75 percent.

For Depakote, CSP/Corcoran was partially compliant with all metrics.




Of the 24 required metric-months, CSP/Corcoran was compliant with seven, or 29 percent, and non-compliant with 17, or 71 percent.

The mood stabilizer lamotrigine required one measure, namely obtaining medication consents. The institution had no required metrics during the monitoring period.

The mood stabilizer lithium required monitoring kidney and thyroid functions, EKGs, therapeutic medication levels, and obtaining medication consents. CSP/Corcoran had no required EKGs, and was fully compliant with CMP. The institution was partially compliant with the remaining metrics.




CSP/Corcoran required 20 metric-months of data. Of these, the institution was compliant with eight, or 40 percent, and non-compliant with 12, or 60 percent.

When examined *in toto*, CSP/Corcoran required 184 metric-months of diagnostic monitoring data. Of these, 96, or 52 percent, were compliant, while 88, or 48 percent, were non-compliant.



Medication Administration

MAPIP medication administration metrics monitored essential aspects such as medication availability, continuity, preparation, and administration. CSP/Corcoran had 12 required measures during the monitoring period.

Monitoring medication continuity included the following seven measures, followed by the abbreviations used in the graphs in parentheses: continuity of medications for transfers from other institutions arriving at receiving and release (R&R); intra-institutional transfers to non-RHU locations (Intra); MHCB transfers (MHCB); intra-institutional transfers to restricted housing (RHU); discharge from a community hospital or DSH (Outside Hospital); and upon parole or transfer to the community (Release).

MAPIP measures tracked compliance with the administration of medications given at HS (*hora somni*, or bedtime) which must be given on or after 8:00 P.M. (HS), and medications given in the A.M. and P.M. which must be given at least eight hours between doses (A.M./P.M.). Additionally, metrics evaluated whether chronic psychiatric medications were continued without interruption (Chronic), and whether new medications were administered as ordered, and in compliance with required timelines (New).

Finally, MAPIP measures included two related PC 2602 involuntary medication matters. These included whether a court order was in the medical record (Court Order), and whether a medication order for the PC 2602 medication was present (Med Order).

The institution was fully compliant with chronic care medications, and fully non-compliant with medication continuity for MHCB transfers, and A.M./P.M. medications. CSP/Corcoran was partially compliant with all other remaining metrics.




These 12 measures resulted in 72 metric-months of data. Of these, 26, or 36 percent were compliant, and 46, or 64 percent, were non-compliant.




PC 2602

CSP/Corcoran faced challenges in producing clear PC 2602 data, including the number of petitions filed. At the time of the monitoring tour, 45 patients received PC 2602 mediations.

Polypharmacy

CSP/Corcoran was overall compliant with completing required polypharmacy reviews.

Medication Lines

Nursing staff conducted medication line audits across all yards on second and third watches during the monitoring period. All were compliant with the requirement to have individual patient wait times under 30 minutes, and total duration of medication line under two hours. CSP/Corcoran denied any conflicts between medication distribution times and mental health programming.

HS Medications

CSP/Corcoran was overall compliant with the directive to administer medications at HS after 8 P.M.

Non-Formulary

CSP/Corcoran did not report the average rate of non-formulary medication use during the monitoring period.

Transfers:

At the time of the monitoring tour, CSP/Corcoran's inpatient coordinator had held the position for three months.

During the review period, there were 634 instances of 302 patients who were considered for, but not referred to, higher levels of care.

CSP/Corcoran referred 26 patients to acute care; 24 were accepted, one was rescinded, and one was rejected. Transfers to acute care were compliant with Program Guide timeframes during the review period, with 23 of 24 or 96 percent of patients transferred within ten days. Reasons for the delay included medical concerns. All referral packets were completed within two working days of identification.

CSP/Corcoran referred 20 patients to intermediate care; 14 referrals were accepted and six were rescinded. All 14 patients timely transferred within 30 days. All referral packets were completed within five working days of identification as required.

The institution did not provide data regarding *Vitek* hearings.

Forty-four patients with complex medical needs were transferred to inpatient care.

CSP/Corcoran made 448 MHCB referrals, of which 163 or 36 percent were rescinded. During the review period, transfers to MHCB were compliant with Program Guide timeframes, with only six of 285 MHCB, or two percent, of admissions taking longer than 24 hours to transfer. Documentation provided by the institution noted the delayed transfers were related to self-harm and danger to self-concerns but did not otherwise indicate these transfers qualified under court-approved exceptions to the 24-hour MHCB transfer timeframe.

The institution had both a 3CMS RHU and EOP RHU and patients were reportedly placed to each unit timely.

CSP/Corcoran did not track the number of patients whose level of care was reduced from EOP to 3CMS or increased from 3CMS to EOP.

One 3CMS patient and one general population incarcerated person whose level of care was changed to 3CMS were timely transferred to an MSF.

<u>Programming</u>:

<u>MHSDS Patients in Restricted Housing</u>:

<u>EOP RHU</u>

During the review period, there were 289 patients placed in the EOP RHU. Patients' lengths of stay in EOP RHU ranged from one to 240 days and averaged 56 days.

Psychiatrists serving the EOP RHU had caseloads within established ratios. *See* ECF No. 3693 at 19. However, three EOP RHU primary clinicians had caseloads in excess of established ratios.

The RHU Policy required that patients assigned to an EOP RHU be offered a minimum of twenty-hours of out-of-cell time reach week, ten of which must be structured therapeutic activities unless clinically contraindicated while the remaining ten must be out-of-cell exercise, including supervised recreation therapy. *See* The Restricted Housing Unit Program: Mental Health Services Policy, ECF No. 8267-1.

During the review period, EOP RHU patients (not including those on a modified treatment plan) were scheduled for an average of 12.1 hours, offered an average of 10.3 hours, attended an average of 3.7 hours, and refused an average of 6.6 hours of structured treatment per week. Accordingly, the institution was compliant with RHU policy requirements regarding offering of structured treatment during the review period.

The monitor's expert observed ten EOP RHU IDTT meetings. Quality varied considerably among the four providers. One provider delivered exemplary performance and should serve as a model or trainer for peers; two were adequate, and one tele-health provider demonstrated significant deficiencies highlighting the need for additional training in suicide risk management, RVR assessment practices, and clinical documentation.

The tele-mental health provider failed to recognize heightened suicide risk associated with RHU placement and phone restrictions, rendering a recently implemented MHCB discharge safety plan ineffective. They also lacked understanding of their responsibility to provide input and recommendations for RVR evaluations. The supervisor was uncertain whether the tele-mental health provider received RVR MHA training due to tele-mental health providers being

supervised by offsite management and reportedly poor communication between on-site and remote supervisors.

Aside from the tele-mental health concerns, in-person IDTT teams at times demonstrated strong collaboration, ensuring diagnostic consistency and inclusive decision-making. The EOP RHU IDTT process showed improvement compared to prior monitoring rounds. The attending EOP RHU supervisor effectively prompted staff to share relevant information and to revise treatment plans when indicated. However, tele-mental health staff operating under separate supervision lacked this oversight, which may be the reason for their poorer performance and apparent lack of critical CDCR knowledge (e.g., RVR MHA assessment process).

The RHU Policy requires an initial IDTT for EOP RHU patients before the initial ICC and not later than ten calendar days after arrival. ECF No. 8355 at 6.

The monitor randomly selected and reviewed the healthcare records of 30 EOP RHU patients to assess compliance with Program Guide timeframes for initial IDTTs during their stays. All 30 patients required initial IDTTs. Of the 30 reviewed initial IDTTs, 22 or 73 percent occurred timely within ten calendar days or arrival or level of care change. All were attended by required staff and 13 or 43 percent were attended by the patients. Reasons initial IDTTs were held *in absentia* included patient refusals.

All scheduled groups were facilitated by RTs and generally were scheduled to last two hours. No clinician-led groups were provided, including caseload groups.

The monitor's expert observed an anger management group facilitated by an RT, which was structured with the use of materials. While the RT demonstrated a very positive attitude, effectively managed disruptive behaviors, and engaged participants, it was clear that they required additional clinical training and resources. The monitor's expert noted that the group was

useful for out-of-cell time engagement, but additional training and resources were indicated to ensure accurate information was being provided for clinical value. For example, instead of focusing on avoiding certain feelings, the group facilitator should have focused on healthy expression of emotions and how to cope with difficult emotions in different situations. This was especially necessary in the EOP RHU considering most patients in the unit required new skills to prevent future incidents resulting in a return to the RHU.

The RHU Policy requires that all patients placed into EOP RHU receive an initial primary clinician evaluation within five calendar days of arrival and an initial psychiatry evaluation prior to the IDTT and within ten calendar days of arrival. *See* RHU Policy at 5-6. The RHU Policy also requires that EOP RHU patients receive weekly primary clinician contacts and psychiatry contacts at least every 30 days. *See id*. at 7.

The monitor randomly selected and reviewed the healthcare records of 30 EOP RHU patients to assess compliance with Program Guide timeframes for initial psychiatry contacts during their stays. All 30 patients required initial psychiatry evaluations; 26 or 87 percent timely occurred within ten calendar days after arrival and before the initial IDTT. ECF No. 8267-1 at 6. Eight or 27 percent of the reviewed initial psychiatry evaluations were conducted in confidential settings; non-confidential contacts were due to patient refusals and custody modified program. Telepsychiatry was not utilized for any initial psychiatry evaluations.

To measure timelines of routine clinical contacts during the review period, CDCR produced an appointments report that included individuals who were required to receive a routine psychiatry contact between August 1, 2024 and January 31, 2025.

Regarding routine psychiatry contacts, for the 146 patients in CDCR's appointments report for August 1, 2024 to January 31, 2025, there were 353 completed and refused contacts.

Of the 352 completed contacts, 147 or 42 percent were confidential as reported by the institution. Reasons for non-confidential psychiatry contacts included mental health and custody modified program, and patient refusals.

When a patient had more than one completed or refused contact, compliance with Program Guide timeframes was able to be calculated. ECF No. 8267-1 at 8 (requiring psychiatry evaluation "at least every 30 calendar days" in EOP RHU settings). Of the 353, 207 contacts were for individuals who were seen at least twice by the psychiatric provider. Of those 207 contacts, there were 45 or 22 percent that occurred beyond Program Guide requirements with a range of 31 to 110 days between contacts. Of note, the report did not include individuals that did not have completed contacts.

The monitor randomly selected and reviewed the healthcare records of 30 EOP RHU patients to assess compliance with Program Guide timeframes for initial primary clinician contacts during their stays. All 30 patients required initial primary clinician evaluations. Of the 30 reviewed initial primary clinician contacts, 25 or 83 percent were completed within five calendar days of arrival or change in level of care. ECF No. 8267-1 at 6. Four or 13 percent of reviewed initial primary clinician evaluations were conducted in a confidential setting; non-confidential contacts were due to patient refusals.

Regarding routine primary clinician contacts, for the 135 patients in CDCR's appointments report for August 1, 2024 to January 31, 2025, there were 789 completed contacts. Of the 789 completed contacts, 313 or 40 percent were confidential as reported by the institution. Reasons for non-confidential primary clinician contacts included patient refused or not showing for the confidential contact.

When a patient had more than one completed or refused contact, compliance with Program Guide timeframes was able to be calculated. ECF No. 8267-1 at 8 (requiring "weekly" PC contact in EOP RHU). Of the 789, 655 contacts were for individuals who were seen at least twice by the primary clinician. Of those 655 contacts, 32 or five percent occurred beyond Program Guide requirements with a range of 11 to 48 days. Of note, the report did not include individuals that did not have completed contacts, such as those that were not scheduled.

Of the 789 completed individual PC contacts, most (511) were documented with a duration between one and 15 minutes; 20 contacts were documented with a duration of zero minutes, 134 with a duration between 16-30 minutes, 98 with a duration between 31-60 minutes, and 26 with a duration longer than 60 minutes.

Regarding the offering of out of cell time, the monitor reviewed weekly summary reports and a "RHU Weekly Activity Audit Compliance" report for four random weeks during the review period. The data reflected significant discrepancies between the weekly summary reports and the RHU Weekly Activity Audit Compliance report with respect to the number of incarcerated persons listed as housed in EOP RHU for at least seven days. Due to the inconsistent reporting of patients in RHU for the seven-day period, the monitor could not rely upon the data as being accurate for reporting of out of cell time. The lack of reliability in the reporting of out of cell data was concerning and requires attention going forward.

The EOP RHU consistently offered showers, clothing and linen exchange per policy. However, the institution's offering of phone calls was compliant in only one of four reviewed weeks.

The monitor's expert conducted interviews following group sessions and completed tier walks focusing on EOP RHU patients with the longest stays in the RHU. The housing officer

was well-informed about the unit population and promptly identified these individuals. The unit remained calm throughout observations. No acute decompensation or need for a higher level of care was identified. Patients consistently expressed satisfaction with mental health services but requested more in-cell materials, clinician-led groups, and access to licensed providers.

During staff interviews, RTs questioned why they were excluded from IDTTs despite providing all or nearly all group treatment for RHU and ML EOP patients. Although the Program Guide does not list RTs as required IDTT members, their participation would provide valuable patient-specific insight considering they spend significantly more time with the patients and are now solely responsible for all structured programming hours. A review of RT group notes during IDTT would be useful; however, the RT group documentation currently lacks meaningful detail for IDTT consideration. Though there are many group notes in the chart, the vagueness of the content which primarily focuses on group topic and whether a patient was present limits the team's ability to make informed treatment decisions.

A significant concern emerged during interviews with mental health staff. EOP tele-mental health providers reported being unable to call housing unit officers for collateral information due to phone line restrictions that block external calls. This issue severely limits offsite providers' ability to obtain essential patient information from custody staff, especially when their patients refuse appointments. CDCR leadership must investigate and correct this deficiency immediately, as routine collateral contact with housing officers is a minimum expectation for safe and effective treatment, especially in the RHU EOP where there tend to be higher refusal rates. Onsite EOP providers reported consistent communication with housing unit officers, reviews of 114 logs, in person assessments of patient behaviors in the cell and cell conditions—all practices that leadership emphasized tele-providers have been unable to perform.

The monitor interviewed eight custody staff in the two 3CMS RHUs and the one EOP RHU regarding unclothed body search policy and procedures, issuance of a radio and earbuds as well as access to a tablet. These offers were able to articulate the unclothed body search policy and how it applied in multiple scenarios. Additionally, staff reported and the monitor's observation of patient rooms confirmed that new arrivals into an RHU from CSP/Corcoran arrived with their issued tablet, and a radio and earbuds were offered. New arrivals from other institutions did not arrive with their tablet. For these patients, RHU staff at CSP/Corcoran initiated a request for a tablet and reported it took from a couple of days to a couple of weeks to issue the tablet.

<u>3CMS RHU</u>

The 3CMS RHU treated 677 patients during the review period, with an average length of stay of 68 days and a range of one to 284 days.

Psychiatrists serving the 3CMS RHU had caseloads within established ratios. However, two 3CMS RHU primary clinicians had caseloads in excess of established ratios.

The RHU Policy requires patients housed in 3CMS RHU to be offered 20 hours of out-of-cell activities per week, including 18.5 hours per week of recreation time outside their cell and 90 minutes of "confidential, structured therapeutic activity each week." ECF No. 8267-1 at 6.

During the review period, on average, 3CMS RHU patients were scheduled for 2.2 hours, offered 94 minutes, attended 44 minutes, and refused 49 minutes of structured therapeutic activity each week. Accordingly, the institution was compliant with RHU Policy requirements for offering structured therapeutic activities.

Interviewed 3CMS RHU patients reported being offered weekly group sessions, which they could attend voluntarily. The monitor's expert observed an 3CMS RHU group session led

by a recreation therapist, who engaged patients meaningfully with relevant topics tailored to their mental health needs.

As reported above, due to the inconsistent reporting of patients in RHU for the seven-day period, the monitor could not rely upon the data as being accurate for reporting of out of cell time. However, the institution's offering of showers, clothing and linen exchange was consistently over 90 percent of the eight weeks reviewed. The offering of phone calls was compliant for four of the eight reviewed weeks.

The monitor's expert attended IDTTs for 3CMS RHU patients; all were initial IDTTs. Relevant clinical and psycho-social histories were reviewed comprehensively. Case conceptualization was appropriate to the scope of the meeting, with psychiatric medications discussed thoroughly for each patient. Diagnoses were clearly stated and supported by symptom presentations, which justified diagnostic decisions. Functional impairments related to Activities of Daily Living (ADLs) and abilities were discussed in detail. Diagnostic agreement between the PC and psychiatrist was achieved without significant discrepancies after collaborative review. Goals were clearly stated, objective, measurable, realistic, and aligned well with each patient's treatment needs. Interventions such as group participation and individual contacts were clearly outlined and appropriately matched to patient needs.

Safety planning and substance use issues were addressed thoroughly for each patient as relevant. Transition planning—including pre-release considerations—was reviewed where applicable. These IDTTs demonstrated a high degree of treatment planning individualization.

The collaborative nature of the process was evident throughout the meeting. Custody participation was active and appropriate. The CC1 provided relevant information regarding custody status, housing arrangements, release dates, and other logistical details. The treatment

team conducted discussions regarding level of care placement efficiently for each patient without excessive detail.

The RHU Policy requires an initial IDTT for 3CMS RHU patients before the initial ICC and not later than ten calendar days after arrival. RHU Policy at 5. Thereafter, routine IDTTs are required every 90 days. *Id.*

The monitor randomly selected and reviewed the healthcare records of 30 3CMS RHU patients to assess compliance with Program Guide timeframes for initial IDTTs during their stays. All 30 patients required initial IDTTs. Of the 30 reviewed initial IDTTs, none occurred timely within 10 calendar days of arrival or level of care change. All IDTTs were attended by required staff, and 18 or 60 percent were attended by the patients. Initial IDTTs were held *in absentia* due to patient refusals.

To assess compliance with RHU Policy timeframes for routine IDTTs, the monitor reviewed CDCR's appointments report for patients who had completed IDTTs during the review period. For the 353 patients in CDCR's appointments report, there were 457 completed routine IDTTs. When a patient had either a completed or refused initial IDTT and a routine IDTT or more than one routine IDTT, timeliness in accordance with Program Guide requirements was able to be calculated. Of the 457 IDTTs that were completed, 105 were for individuals who had at least two IDTTs. Of those, 47 or 45 percent were not compliant with Program Guide timeframes. Of note, the report did not include individuals that did not have a completed IDTT, such as those that were not scheduled.

The RHU Policy requires that all patients placed into 3CMS RHU receive an initial primary clinician and psychiatry evaluations within ten days of arrival and prior to the initial

IDTT. RHU Policy at 4. The RHU Policy also requires that 3CMS RHU patients receive weekly primary clinician contacts and psychiatry contacts every 90 days. *See id*.

The monitor randomly selected and reviewed the healthcare records of 30 3CMS RHU patients to assess compliance with Program Guide timeframes for initial psychiatry and primary clinician contacts during their stays.

All 30 patients required initial psychiatry evaluations; 20 or 67 percent timely occurred before the initial IDTT. Twenty-five or 83 percent of the reviewed initial psychiatry evaluations were conducted in confidential settings; non-confidential contacts were due to patient refusal and cell front contacts. Telepsychiatry was utilized for all initial psychiatry evaluations.

To assess compliance with RHU Policy timeframes for routine psychiatry and primary clinician contacts, the monitor reviewed CDCR's appointments report for patients who received at least one routine contact during the review period. For the 215 patients in CDCR's appointments report covering patients who received at least one routine psychiatry contact during the review period, there were 507 total completed and refused contacts. Of the 402 that were completed, 231 or 57 percent were reported as being conducted in a confidential setting. When a patient had more than one completed contact, compliance with Program Guide timeframes was able to be calculated. Of the 402 completed contacts, 293 were for individuals who were seen at least twice by a psychiatric provider. Of those 293 contacts, three or one percent of contacts were completed beyond the Program Guide required timeframes. Of note, the report did not include individuals that did not have complete contacts, such as those that were not scheduled in accordance with the institution's triage plan.

Likewise, all 30 patients required initial primary clinician evaluations. Of the 30 reviewed initial primary clinician contacts, 24 or 80 percent were completed within 10 calendar

days of arrival. Seventeen or 57 percent of reviewed initial primary clinician evaluations were conducted in a confidential setting; non-confidential contacts were due to patient refusals and modified programming. For the 258 patients in CDCR's appointments report covering patients who received at least one routine primary clinician contact during the review period, there were 931 total completed and refused contacts. Of the 930 that were completed, 308 or 33 percent were reported as being conducted in a confidential setting. When a patient had more than one completed contact, compliance with Program Guide timeframes was able to be calculated. Of the 930 completed contacts, 674 were for individuals who were seen at least twice by a primary clinician provider. Of those 674 contacts, 526 or 78 percent of contacts were completed beyond the Program Guide required timeframes. Of note, the report did not include individuals that did not have completed contacts, such as those that were not scheduled in accordance with the institution's triage plan.

Of the 930 completed routine primary clinician contacts, 48 contacts were reported to have been completed in zero minutes, 598 were completed within 15 minutes, 122 lasted between 16 and 30 minutes, 120 lasted between 31 and 60 minutes, 31 lasted between 61 and 95 minutes, and 11 were completed in greater than 95 minutes.

Non-Disciplinary Segregation:

CSP/Corcan reported that there was no available tracking log to capture NDRH status for the review period. Notably, the institution provided a list of 163 patients who were considered for NDRH status during the reporting period, but final decisions were not provided.

MHCB

CSP/Corcoran operated a 24-bed MHCB within the licensed CTC. Additionally, 6 beds were redlined. The MHCB's daily census averaged 19 patients during the review period.

MHCB clinical lengths of stay averaged 8.3 days, with approximately 15 percent of patients having clinical stays exceeding ten days. Physical stays averaged 9.2 days; approximately 25 percent of patients had physical stays that were longer than ten days. Administrative discharge delays were reportedly due to safety concerns and medical holds.

One MHCB psychiatrist had a patient caseload that exceeded required ratios; caseloads for primary clinicians were within established ratios.

Fifteen patients were admitted to the MHCB three or more times during the review period.

Ten weeks of CDC 114-A data indicated that patients were offered the following weekly as required: three showers, linen exchanges, clothing exchanges, and phone calls.

The Program Guide requires initial evaluations to be completed within 24 hours of admission to a MHCB. Thereafter, patients must be seen daily by either the psychiatrist or psychologist. At least twice weekly, the psychiatrist must evaluate the patient.
The monitor randomly selected and reviewed the healthcare records of 30 MHCB patients to assess compliance with Program Guide timeframes for initial and routine psychiatry contacts.

Thirty MHCB patients required initial psychiatry evaluations. Of those, 30 or 100 percent were timely, meaning they occurred before the initial IDTT and within 24 hours of arrival. Sixteen or 53 percent were reported as conducted in a confidential setting. Telepsychiatry was not utilized for initial psychiatry contacts.

All thirty MHCB patients require two routine psychiatry contacts per week. There were 90 expected contacts, and 88 or 98 percent were timely. Of the 90 routine contacts reviewed, 40 were reported as being conducted in a confidential setting while an additional 47 were held at

cell front due to patient refusal for a total of 87 or 97 percent compliance. Telepsychiatry was not utilized for routine psychiatry contacts.

Thirty MHCB patients required initial primary clinician assessments; 29 or 97 percent were completed within 24 hours of arrival, four initial primary clinician assessments were not found. Of the 30 initial primary clinician contacts reviewed, 19 were held in a confidential setting, while additional single contacts were held at cell front, bedside or "as planned" due to patient refusal for a total of 30 contacts or 100 percent compliance. There were no initial primary clinician assessments reported utilizing Tele-Psychologists or Tele-Social Workers.

Thirty MHCB patients required routine primary clinician contacts. An institution was considered compliant if a patient was seen daily beginning the day after admission for an out-of-cell confidential contact by the psychiatrist or psychologist (unless the patient refused), though on weekends the patient may be seen by the medical officer of the day (MOD) (12-5-13). There were 224 expected contacts, and 220 or 98 percent were timely. One hundred and two routine primary clinician contacts occurred in a confidential setting, with an additional 118 contacts held at cell front due to patient refusal for a total of 220 or 98 percent compliance. Reasons for routine contacts not occurring in a confidential setting included modified programming, confidential treatment space was unavailable, or "as planned." A licensed clinician completed all reviewed routine contacts. Tele-psychologists or tele-social workers were not reported to be utilized for routine primary clinician contacts.

Thirty MHCB patients required initial IDTTs; and 97 percent of the 30 initial IDTTs reviewed occurred within 72 hours of arrival. The required assigned staff were present at 28 of the 30, or 93 percent of the initial IDTTs reviewed. Patients attended 21 of 30 initial IDTTs with

the remaining nine patients refusing to attend or due to modified programing for 100 percent compliance.

Of the 36 required routine IDTTs, 34 or 94 percent occurred timely, or within seven calendar days following the initial IDTT. Thirty-five or 97 percent of routine IDTTs had the required assigned staff in attendance. Of the 36 routine IDTTs reviewed, patients attended 30 or 83 percent.

EOP:

During the review period, the institution reported an average census of approximately 170 mainline EOP patients housed in building 3B01. Overflow patients were housed in building 3B02 during the review period, with the exception of November 2024 through early January 2025. In addition, patients released from EOP RHU were housed in building 3A05 while awaiting transfer to their endorsed institution.

Three mainline EOP primary clinicians had caseloads that exceeded established ratios.

*Structured Treatment*

The Program Guide required that each EOP patient be offered at least ten hours per week of structured therapeutic activities. *See* ECF No. 7333-1 at 58. For patients who were determined by the treatment team to be clinically contraindicated for ten hours of treatment activities per week, the patient's IDTT was required to meet monthly to review the patient's treatment, increase the amount of structured therapeutic activities, or refer the patient to a higher level of care as clinically indicated. *Id.*

During the review period, EOP patients were scheduled for an average of 14 hours and offered an average of 8.6 hours of structured treatment per week. On average, patients refused four hours of structured treatment each week and six hours of structured treatment were

cancelled. Accordingly, the institution's offering of structured therapeutic activities was not compliant with Program Guide requirements during the review period.

During the review period, patients on EOPMod status were scheduled for an average of nine hours and offered an average of 5.3 hours of structured treatment weekly. On average, these patients refused 3.2 hours of structured treatment each week and 4.7 hours of structured treatment were cancelled.

*IDTTs*

The monitor's expert observed four EOP IDTTs during the monitoring tour. These observed IDTTs provided a thorough review of patients' clinical presentations, psycho-social histories, and concerns. While the discussions were comprehensive, the case conceptualization process was excessively detailed and lengthy, resulting in only four patients being covered during the two-and-a-half-hour session. Notably, only two of these patients were present at the meeting. This extended discussion raised concerns about its impact on other therapeutic activities, especially given staffing constraints.

Psychiatric medications were reviewed in detail, with discussions focusing on their effectiveness. Progress since the last treatment plan was also addressed, alongside current diagnoses and symptoms, which were clearly stated and supported by symptom presentation. Functional impairments were discussed thoroughly, and diagnostic discrepancies between the Primary Clinician (PC) and psychiatrist were addressed collaboratively.

Treatment goals were identified for each patient but lacked measurability. Interventions such as group assignments and individual session frequencies were clearly stated and aligned with patient needs and treatment goals. Group participation was reviewed for relevant patients,

and treatment plans were individualized to address specific symptoms, progress, functioning, and safety planning.

Substance use issues were thoroughly reviewed for each patient. Transition planning—including pre-release, parole planning, discharge planning, and relapse prevention—was discussed as relevant to individual cases. Custody participation was limited; while the CC1 responded to questions regarding patient status (e.g., Rules Violation Reports), their engagement otherwise remained minimal. Lengthy discussions about Level of Care (LOC) placement occasionally exceeded necessary detail.

The Program Guide requires that EOP patients receive an initial IDTT within 14 days of arrival to the institution and a routine IDTT every 30 days thereafter. *See* ECF No. 7333-1 at 59. The monitor randomly selected and reviewed the healthcare records of 30 mainline EOP patients to assess compliance with Program Guide timeframes for initial IDTTs during their stays. All 30 patients required initial IDTTs. Of the 30 reviewed initial IDTTs, 21 or 70 percent occurred timely within 14 calendar days or arrival or level of care change. Twenty-eight or 93 percent were attended by all required staff and 25 or 83 percent were attended by the patients. Reasons initial IDTTs were held *in absentia* included patient refusals and modified programming.

For the 234 patients in CDCR's appointments report for August 1, 2024 through January 31, 2025, there were 375 completed and refused initial or routine IDTTs. When a patient had either a completed or refused initial IDTT and a routine IDTT or more than one routine IDTT, compliance with Program Guide timeframes was able to be calculated. Of the 375, 142 contacts were for individuals who had at least two IDTTs (initial and routine or two routines). Of those 375, there were 60 or 42 percent that occurred beyond Program Guide requirements with a range

of 91 and 168 days between contacts. Of note, the report did not include individuals that did not have a completed or refused IDTT, such as those that were not scheduled.

The Program Guide requires that patients are offered an initial psychiatrist evaluation before their initial IDTT and within 14 calendar days of arrival to the institution or level of care change. *See* ECF No. 7333-1 at 59. Thereafter they are required to receive a routine psychiatric contact every 30 calendar days. *Id*. Patients are also required to receive a primary clinician evaluation within 14 calendar days of arrival and weekly (i.e. once per calendar week not to exceed ten calendar days between contacts) with either a primary clinician or in group psychotherapy with an individual contact every other week. *Id*.

The monitor randomly selected and reviewed the healthcare records of 30 mainline EOP patients to assess compliance with Program Guide timeframes for initial psychiatry and primary clinician contacts during their stays. All 30 patients required initial psychiatry evaluations; 25 or 83 percent timely occurred before the initial IDTT. Twenty-seven or 90 percent of the reviewed initial psychiatry evaluations were conducted in confidential settings. The non-confidential contacts were due to patient refusal; otherwise, reasons for non-confidentiality were not documented. Telepsychiatry was not utilized for initial psychiatry evaluations.

To measure timeliness of routine psychiatry contacts, CDCR produced an appointments report that included individuals who were required to receive a routine psychiatry contact during the review period. For the 214 patients in CDCR's appointments report for August 1, 2024 through January 31, 2025, there were 746 completed and refused contacts, of which 566 or 76 percent of the completed contacts were confidential as reported by the institution. When a patient had more than one completed or refused contact, compliance with Program Guide timeframes was able to be calculated. Of the 746 completed and refused contacts, 533 contacts were for

individuals who were scheduled at least twice by the psychiatric provider. Of those 533 contacts, there were 245 or 46 percent that occurred beyond Program Guide requirements with a range of 31 and 96 days between contacts.

The same 30 patients also required initial primary clinician evaluations. Of the 30 reviewed initial primary clinician evaluations, twenty-six or 87 percent were completed within 14 calendar days of arrival or change in level of care. Twenty or 67 percent of reviewed initial primary clinician evaluations were conducted in a confidential setting; non-confidential contacts were due to patient refusals and modified programming contacts. Telepsychiatry was utilized for 14 or 47 percent of initial psychiatry evaluations.

To measure timeliness of routine primary clinician contacts, CDCR produced an appointments report that included individuals who were required to receive a routine primary clinician contact during the review period. For the 184 patients in CDCR's appointments report for August 1, 2024 through January 31, 2025, there were 1,552 completed and refused routine primary clinician contacts, of which 1,031 or 66 percent were confidential as reported by the institution. When a patient had more than one completed or refused contact, compliance with Program Guide timeframes was able to be calculated. Of the 1,552 routine primary clinician contacts, 1,369 contacts were for individuals who were seen at least twice by the primary clinician. Of those 1,552 contacts, there were 183 or 13 percent that occurred beyond Program Guide requirements with a range of 11 and 57 days between contacts.

There were 1,534 completed routine primary clinician contacts. Twenty-three routine primary clinician contacts were documented with a duration of zero minutes, 909 with a duration between one and 15 minutes, 370 with a duration between 16-30 minutes, 199 with a duration

between 31-60 minutes, 18 with a duration between 61-95 minutes, and 15 with a duration greater than 96 minutes.

3CMS:

Treatment spaces for 3CMS patients were conducive to their purpose and protected confidentiality. Both individual and group treatment areas were observed to maintain visual and sound privacy during patient contacts.

Understaffing was a significant impediment to delivery of mental health care to 3CMS patients. While required individual contacts were not always provided, recreation therapists stepped in to offer activity groups to fill service gaps. This workaround demonstrates an effort to mitigate the impact of staffing challenges but did not fully address the need to provide mental health care consistent with the requirements of the Program Guide.

Tele-mental health services also presented challenges. Staff expressed concerns about tele-mental health providers being paid more than on-site clinicians and avoiding the in-person requirements associated with working inside the prison environment. This disparity reportedly caused frustration among on-site staff and may have contributed to morale issues.

Initial IDTTs for 3CMS patients are required to occur within 14 working days of arrival to the institution or level of care change and annually thereafter. *See* ECF No. 7333-1 at 43-44. The monitor randomly selected and reviewed the healthcare records of 30 mainline 3CMS patients to assess compliance with Program Guide timeframes for initial IDTT meetings during their stays. All 30 patients required initial IDTTs. Of the 30 reviewed initial IDTTs, eight or 27 percent occurred timely within 14 calendar days or arrival or level of care change. All were attended by all required staff and 13 or 43 percent were attended by the 5 patients. Reasons initial IDTTs were held *in absentia* included patient refusals and modified programming.

To measure timeliness of routine IDTT meetings, CDCR produced an appointments report that included individuals who were required to receive a routine IDTT meeting during the review period. For the 609 patients in CDCR's appointments report for August 1, 2024 to January 31, 2025, there were 645 completed and refused initial or routine IDTTs. When a patient had either an initial IDTT and a routine IDTT or more than one routine IDTT, compliance with Program Guide timeframes was able to be calculated. Of the 643 completed IDTTs, 39 contacts were for individuals who had at least two IDTTs (initial and routine or two routines). Of those 39, all occurred within Program Guide requirements. Of note, the report did not include individuals that did not have a completed IDTT, such as those that were not scheduled.

A random sample of 30 patients was selected to verify consistency between the appointments report and clinical documentation in EHRS. Of the 30 contacts reviewed in EHRS, 100 percent were consistent with the appointments report.

The Program Guide requires that patients are offered an initial psychiatrist evaluation before their initial IDTT. *See* ECF No. 7333-1 at 34-50, 641. Thereafter they are required to receive a routine psychiatric contact every 90 calendar days if the patient is prescribed a psychotropic medication. *Id*. at 44. Patients are also required to receive a primary clinician evaluation within ten working days of arrival and every 90 calendar days thereafter. *Id*. at 41, 48.

The monitor randomly selected and reviewed the healthcare records of 30 mainline 3CMS patients to assess compliance with Program Guide timeframes for initial evaluations during their stays. All 30 patients required initial psychiatry evaluations, of which, 15 or 50 percent timely occurred before the initial IDTT. Twenty-one or 67 percent of the reviewed initial psychiatry evaluations were conducted in confidential settings; non-confidential contacts were

due to patient refusals. Telepsychiatry was utilized for ten or 33 percent of initial psychiatry evaluations.

To measure timeliness of routine psychiatry contacts, CDCR produced an appointments report that included individuals who were required to receive a routine psychiatry contact during the review period. For the 565 patients in CDCR's appointments report for August 1, 2024 to January 31, 2025, there were 1,149 completed and refused contacts, 927 or 88 percent were confidential as reported by the institution. Reasons for non-confidential psychiatry contacts included contacts that occurred in the holding cell, cell front, day room, and on the yard.

When a patient had more than one completed or refused contact, compliance with Program Guide timeframes was able to be calculated. Of the 1,149, 585 contacts were for individuals who were seen at least twice by the psychiatric provider. Of those 585 contacts, there were 106 or 18 percent that occurred beyond Program Guide requirements with a range of 91 to 163 days. Of note, the report did not include individuals that did not have completed contacts.

A sample of 30 patients was randomly selected to verify consistency between the appointments report and clinical documentation in EHRS. Of the 62 contacts reviewed in EHRS, 100 percent were consistent with the appointments report.

The same 30 patients that required initial psychiatry evaluations also required initial primary clinician evaluations. Of the 30 reviewed initial primary clinician evaluations contacts, 20 or 67 percent were completed within 14 calendar days of arrival or change in level of care. Twelve or 40 percent of reviewed initial primary clinician evaluations were conducted in a confidential setting; non-confidential contacts were due to patient refusals.

To measure timeliness of routine primary clinician contacts, CDCR produced an appointments report that included individuals who were required to receive a routine primary

clinician contact during the review period. For the 738 patients in CDCR's appointments report for August 1, 2024 to January 31, 2025, there were 1,242 completed and refused contacts, 649 or 52 percent were confidential as reported by the institution. Reasons for non-confidential primary clinician contacts included patient refusal, lack of available confidential space, and medical restrictions due to public health issues.

When a patient had more than one completed or refused contact, compliance with Program Guide timeframes was able to be calculated. Of the 1,242, 506 contacts were for individuals who were seen at least twice by the primary clinician. Of those 506 contacts, 135 or 26 percent occurred beyond Program Guide requirements with a range of 91 to 161 days between contacts. Of note, the report did not include individuals that did not have completed contacts, such as those that were not scheduled.

There were 1,239 completed individual PC contacts. Most contacts (905) were documented with a duration between one and 15 minutes, while eight contacts were documented with a duration of zero minutes. In addition, 224 contacts were documented with a duration between 16 and 30 minutes, 87 with a duration between 31 and 60 minutes, nine with a duration between 61 and 95 minutes, and six with a duration over 96 minutes.

A random sample of 30 patients was selected to verify consistency between the appointments report and clinical documentation in EHRS. Of the 59 contacts reviewed in EHRS, 55 or 93 percent were consistent with the appointments report; four or seven percent had discrepancies. All discrepancies were due to an absence of documentation in EHRS.

Other Issues:

Pre-Release Planning:

The pre-release planning LOP was dated September 2019, however, the institution provided a copy of the August 2023 pre-release memo released by headquarters which superseded the local 2019 pre-release policy. CSP/Corcoran had two pre-release coordinators. Both were licensed social workers who had been in the pre-release position for a month at the time of the monitoring tour. One carried a small caseload in addition to their pre-release responsibilities, and the other provided group treatment but did not carry a caseload. Due to understaffing, pre-release groups were stopped in 2022 and had not resumed since.

CSP/Corcoran tracked patients who required pre-release planning at 60 and 90 days from release. Pre-release coordinators completed ROIs, pre-release planning assessments, provided information to patients releasing counties and communicated with TCMP caseworkers regarding patient benefits. The pre-release coordinators attended bi-weekly ISUDT pre-release meetings, monthly pre-release coordinator meetings, and additional meetings concerning pre-release services as necessary.

TCMP caseworkers reportedly provided pre-release benefit assistance to all eligible inmates within 120 days of release. Of the 130 patients who were within 120 days of release, all 130 or 100 percent were screened for TCMP services; 120 or 92 percent submitted Medi-Cal benefit applications, 43 or 33 percent submitted SSI benefit applications, and no patient submitted a VA benefit application.

Program Access:

a. Job and Program Assignments:

On February 26, 2025, CSP/Corcoran reported that 982 job assignments were held by 31 or 12 percent of EOP patients, 333 or 32 percent of 3CMS patients and 618 or 44 percent of non-MHSDS incarcerated persons.

The 1,360 academic assignments were held by 57 or 22 percent of EOP patients, 490 or 47 percent of 3CMS patients and 813 or 58 percent of non-MHSDS incarcerated persons.

The 223 vocational education assignments were held by 23 or nine percent of EOP patients, 79 or eight percent of 3CMS patients, and 121 or nine percent of non-MHSDS incarcerated persons.

The 405 substance abuse treatment assignments were held by 23 or nine percent of EOP patients, 156 or 15 percent of 3CMS patients, and 226 or 16 percent of non-MHSDS incarcerated persons.

The 34 voluntary education assignments were held by nine or one percent of 3CMS patients and 25 or two percent of non-MHSDS patients.

b. Milestone Credits:

CSP/Corcoran reported that 285 EOP patients received milestone credits, 13 had credits pending, and one had credits voided during the review period. Among 3CMS patients, 576 were awarded milestone credits and 16 had credits pending. Regarding non-MHSDS patients, 787 were awarded milestone credits, 48 had credits pending, and one had voided.

c. Out-of-Level Housing:

The institution reported that no Level I 3CMS or EOP patients were housed in Level II housing. Thirteen EOP and 36 3CMS and 36 non-MHSDS custody Level II patients were in Level III housing. Fifty-six Level III 3CMS patients were in Level IV housing.

d. ADA Reasonable Accommodations and Grievance Procedures:

CSP/Corcoran provided a copy of the ADA reasonable accommodation operating procedure which was in compliance with statewide policy.

e. Periodic Classification Score Reductions: EOP Patients:

The institution did not provide information regarding periodic classification score reductions.

f. Unclothed Body Search:

The institution's LOP regarding unclothed body searches was compliant with CDCR policy. EOP RHU staff further reported that unclothed body searches were conducted outside of the patient's cell in a confidential area using privacy screens. In addition, interviewed staff were knowledgeable of the unclothed body search policy.

"C" Status:

One hundred and forty-three patients were placed on "C" status during the review period. At the time of the monitoring tour, 47 patients were on "C" status.

Case-by-Case Reviews:

The institution reported a total of eleven cases where the patient was retained in RHU for 150 days or longer and a long-term segregated case conference was conducted. Nine of the patients were retained in RHU due to a pending RVR or District Attorney decision to prosecute. Two patients were identified as having been in RHU for more than 30 consecutive months and were retained in RHU. The monitor reviewed the ICC chronos for these two patients which

indicated they were retained in RHU by order of the Departmental Review Board due to extensive behavior issues.

Regarding the 120-day case by case review, the institution reported 61 MHSDS patients meeting criteria. Of the 61 MHSDS patients, 27 were at the EOP level of care and 34 were at the 3CMS level of care. A total of 55 MHSDS patients were retained in RHU after their maximum release date (MRD) was reached pending transfer. Of the 55 patients retained in RHU after their MRD two patients were granted NDS status.

Overall, CSP/Corcoran was in compliance with policy regarding timely review, however, the retention of so many patients in the RHU after the expiration of the MRD should be addressed.

Mental Health Referrals:

CSP/Corcoran reported an overall compliance rate of 84 percent for timely responding to mental health referrals. Psychiatry responded timely to emergent mental health referrals. Primary clinician routine referrals were close to compliance at 88 percent. Psychiatry responses to urgent and routine referrals were untimely, as were primary clinician responses to emergent and urgent referrals.

Custody and Mental Health Partnership Plan:

CSP/Corcoran's CMHPP LOP complied with statewide policy and was most recently revised in October 2024.

Executive leadership joint rounding occurred every month during the review period. Documentation indicated that required staff attended executive leadership joint rounding, and staff and patients were interviewed. Staff did not report any concerns involving specific patients, but custody officers noted the poor durability of hand crank radios for newly arrived patients.

Patients reported receiving their ducats timely and no issues with canteen or access to laundry. However, some patients mentioned issues with receiving property, and the health care captain was reportedly going to follow up with each patient.

CSP/Corcoran was unable to provide executive staff meeting agendas. Monthly QMC and MHPS meeting minutes were provided as required and each discussed joint rounding in detail.

Monthly joint supervisory program area tours occurred for all six months on Facilities A and B. Required staff attended each tour. Staff noted concerns regarding inadequate custody staffing which impacted programming. Patients noted maintenance-related concerns such as the swamp coolers being defective, false alarms occurring frequently which stopped programming and yard, also the yard on Facility B was reportedly shut down at 1330 hours on Mondays and Tuesdays, and one patient indicated that he had not received a tablet after a month and was told that tablets were in short supply likely related to contract disputes.

Huddles were observed during the site visit and were attended by required staff. The huddles were informative and collaborative. Reviewed huddle forms from the review period were adequate with required staff in attendance.

CSP/Corcoran distributed the 3CMS orientation brochure to new patients and provided a copy of the same.

Inmate advisory council meeting minutes were produced for each month of the review period. Agenda items included technology updates, education updates, tablet content, television issues, plant operation updates, peer support and specialist program updates, and concerns related to video visits, law library, and kitchen concerns.

No staff members were reportedly reassigned due to misconduct complaints.

Quarterly roundtable training attendance sheets were provided but the total number of staff who were required to complete the training and who actually completed the training could not be ascertained.

Annual partnership off-post training was attended by 88 of 102 or 86 percent of mental health and 49 of 1,132 or four percent of custody staff.

Heat Plan:

CSP/Corcoran's heat plan LOP was current and complied with CDCR policy, most recently revised in April 2024. During the review period, the heat plan was in effect during August, September and October 2024. There were 67 Stage I heat alerts and no Stage II or Stage III heat alerts during the review period. No patients experienced heat-related illnesses during the review period.

A total of 14 custody officers were interviewed regarding their knowledge of the institution heat plan requirements, and all demonstrated basic knowledge of the heat plan and its requirements.

All housing unit thermometers appeared to be in good working order and were located in appropriate locations.

A review of the inside and outside temperature logs for August, September and October 2024 indicated they were consistent with the monthly summary memorandum sent to headquarters.

The institution did not provide documentation regarding heat plan-related training.

Overall, notwithstanding the lack of training compliance data noted above, the institution demonstrated compliance with heat plan requirements during the review period.

RVRs:

The institution reported issuing a total of 2,074 RVRs during the review period. Of that total, 1,497 or 72 percent of all RVRs were issued to MHSDS patients including three to patients at the acute level of care, three to patients at the ICF level of care, 111 to MHCB patients, 358 to EOP patients, and 1,022 to 3CMS patients. As MHSDS patients made up 49 percent of the total institution population, patients were issued RVRs disproportionately to their proportion of the population.

The institution reported that there were no MHAs where the clinician determined the patient's behavior was "strongly influenced" by their mental illness. The monitor reviewed sixteen RVRs for compliance with remedial requirements. Custody staff referred the RVR to mental health staff within required timelines in nine out of sixteen cases or 56 percent of the time. For the seven cases that were late, the number of days overdue ranged from one to eight days late. Mental health staff competed the MHA and returned the form to custody staff timely in 13 out of 16 cases or 81 percent of the time. For the three MHAs that were late, the number of days overdue ranged from two to eight days late.

The MHAs were completed in confidential settings in three of sixteen cases and eleven patients refused the interview. Additionally, in two cases the reason stated for not completing the MHA in a confidential setting was due to lack of available escort officer. The MHAs were generally informative, however in several cases the responses were repetitive with the same penalty mitigations recommended. In one case, the MHA recommended the patient be allowed to participate in mental health treatment; however, access to mental health treatment cannot be restricted as part of the penalty if the patient is found guilty of an RVR s the necessity of this recommendation was unclear and concerning. A staff assistant was assigned in 100 percent of

the cases according to policy. The senior hearing officer (SHO) documented their consideration of the MHA information in 12 out of 16 cases. Four cases were not compliant because the SHO quoted the response from question three or question four on the MHA form and made no other statement. The SHO mitigated the penalties in nine out of sixteen cases and the remaining seven cases the MHA did not recommend mitigation.

The monitor's expert identified significant concerns with mental health provider involvement in the RVR process. One tele-mental health provider's patients had been discharged from the MHCB with a safety plan relying primarily on family phone calls. After placement in RHU, the patient's phone privileges were suspended, invalidating the safety plan. The tele-mental health provider reported providing input via email about the influence of mental illness on behavior but was not involved in developing recommendations for the hearing officer. The RVR MHA evaluator also failed to include recommendations, leaving the safety plan unmodified despite the patient's reported increase in depression related to isolation and loss of contact with family. No documentation in the patient's record confirmed the tele-provider's email or communication with the RVR MHA evaluator; only a checkbox indicated consultation. This lack of collaboration underscores the need for standardized RVR training and documentation requirements for all providers, including those delivering services via tele-health.

Regarding training, the warden and chief deputy warden attended the training, six out of seven correctional administrators attended, 100 percent of the captains and lieutenants attended, as well as 81 out of 88, or 92 percent of sergeants. The institution reported conflicting information regarding training of mental health staff. Mental heath staff reported that supervisors decided to train staff within their program but did not communicate with other programs to ensure the training was standardized or utilized the approved lesson plan.

Additionally, the monitor was provided training records for BET code 11058854, "Clinician Decision Making for RVR Mental Health Assessment-MH." This data showed 23 mental health staff attended including eleven psychologists, five social workers, five senior psychologists, one supervising psychiatric social worker, and one chief psychologist. However, in review of the 16 RVR MHAs, the forms were completed by staff who had not attended the required training. Of the 16 MHAs reviewed a total of two were completed by mental health staff that attended the required training.

Overall, the institution struggled with processing RVRs in a timely manner, training was non-compliant for mental health staff, MHAs were not completed by staff that had attended the required training, SHOs did not consistently document their consideration of the MHA information, and mental health patients receive a disproportionate amount of RVRs as compared to non-MHSDS patients.

Use of Force:

The institution reported six controlled use of force and 235 immediate use of force incidents during the review period.

All six controlled use of force incident reports were reviewed. Four of the six incidents were for the administration of PC 2602 medications. The remaining two were for refusal to exit a holding cell and for refusal to exit the MHCB to return to RHU. Cool down periods were provided, and custody and clinical staff agreed upon the time when to end the cool down period and initiate use of force. In all six controlled use of force incidents, RVRs were issued for either resisting a peace officer, obstructing a peace officer in the performance of their duty, or battery on a peace officer causing serious injury. In all controlled use of force cases, the application of force adhered to policy, however the issuance of RVRs in all cases for the administration of PC

2602 medication is questionable per Tile 15 section 3317.2, which prohibits issuance of an RVR where "the behavior occurred in connection with a cell extraction for the administration of involuntary medication, as defined in Penal Code Section 2602…." Cal. Code of Reg. Tit. 15 § 3317.2(a)(1). Moreover, none of the incident report summary statements for these four controlled uses of force documented that force was required to administer PC 2602 medication. Limiting the summary statement to indicate that the incarcerated person battered staff or obstructed staff during the controlled use of force is not a complete or accurate reporting of why force was necessary.

The monitor reviewed eight use of force videos, including four controlled and four immediate use of force incidents. The monitor did not observe any violation of use of force policy, however in one controlled use of force incident, the video showed the patient on a bed, custody staff were not observed using any force or the patient physically resisting. Correctional officers assisted the patient from the bed to a standing position, the nurse administered the PC 2602 medication via injection, and custody staff assisted the patient back onto a bed. The monitor did not view the assistance by custody staff to assist the patient stand and return to a bed as a use of force and should not have been reported as such. The four immediate use of force videos reviewed found the force used was necessary based on the patients' actions.

The monitor reviewed 12 immediate use of force incident reports including two that stated "agitation protocol" was ordered by clinical staff and immediate extraction and administration of medication was performed. However, one incident report did not contain a report by the ordering clinician. In the other incident report, the patient was being transferred to a higher level of care and was cell extracted to facilitate the transfer.

Regarding attendance of staff at annual use of force training, the one warden, one chief deputy warden and the five captains all attended the required training. Six out of the seven correctional administrators or 86 percent attended, 100 percent of the 34 lieutenants, 88 sergeants and 800 officers attended. The institution reported that five out of 37 or 14 percent of mental health supervisors, five out of 23 or 22 percent of psychologists, one out of 13 or seven percent of psychiatrists, and four out of 22 or 18 percent if social workers attended training.

Overall, the application of force was in compliance with requirements. However the articulation of why force was required in the incident report summary statements and the issuance of RVR's in controlled use of force for the application of PC 2602 medication were in conflict with the requirements of Title 15, as noted above. Additionally, mental health staff attendance of mandatory use of force training was non-compliant.

Lockdowns/Modified Programming:

During the review period the institution had one program status report (PSR) on facility 3B from January 21, 2025, through January 31, 2025. The PSR was instituted due to increased drug related incidents. The institution conducted a facility-wide search for drugs, drug paraphernalia and other contraband. During the PSR all incarcerated persons were to be escorted, priority ducts were honored, and mental health group activity continued in the facility gymnasium.

Overall, the institution was compliant with policy, as mental health ducats continued to be honored during the PSR.

Access to Care:

A review of monthly Health Care Access Quality reports from August 2024 through January 2025 reflected the issuance of 64,162 mental health ducats and add-on appointments, of

which 19,248 or 30 percent were completed, and 44,915 or 70 percent were not completed. Of the non-completed appointments, less than one percent were reportedly not completed due to custody factors, 69 percent were due to non-custody factors, and 31 percent were due to patient refusals.

Physical Plant Issues:

There were significant physical plant issues including water leaking into cells and dayroom, cold showers, and mold growing in cells. The institution informed the monitor that the hot water system at CSP/Corcoran was more than 30 years old and had broken multiple times over the past year. The institution submitted a major capital outlay request to replace the entire hot water system approximately two years ago. Headquarters has reportedly not approved the project.

Regarding the water leaks into cells and dayrooms, plant operations staff advised the monitor that roof repairs had been requested and there are multiple phases over a number of years to make repairs on all housing units. EOP RHU patients were moved from 3A03 to 3A04 due to the extensive leaks in 3A03, and it was noted that the 3A03 roof was being repaired during the monitoring tour.

Regarding mold in cells, plant operations staff reported when they were aware of an alleged mold issues. The issue of mold is a byproduct of the leaking roofs and should be resolved once all the roofs are fixed. Plant operations staff did not indicate if mold had been found when they had tested.

*Coleman* Postings:

There were *Coleman* posters in English and Spanish in all visited housing units.

**APPENXIX A – 9**
**CALIFORNIA STATE PRISON/CORCORAN (CSP/Corcoran)**
Site Visit: March 11, 2025 – March 14, 2025
Review Period: August 1, 2024 – January 31, 2025

Census:

As of March 7, 2025, CSP/Corcoran housed 2,621 incarcerated persons, representing a 22 percent decrease from the preceding review. The MHSDS population of 1,273 decreased 20 percent compared to the preceding review yet still represented a higher proportion of the institution's population (49 percent) compared to the preceding review (47 percent).

The MHCB housed ten patients.

There were 160 mainline EOP patients, an eight percent decrease from the preceding review period.

The 826 mainline 3CMS patients reflected a 26 percent decrease since the prior review period.

The MHSDS RHU population was 275 patients, including 87 EOP RHU patients and 188 3CMS RHU patients.

Staffing:

The chief psychiatrist position was vacant. The senior psychiatrist position was filled. Of 5.5 psychiatry positions, one was filled for an 82 percent vacancy rate. The use of 3.5 registry psychiatrists reduced the functional vacancy rate to 18 percent.

The 4.5 telepsychiatry positions were filled.

Overall, the staff psychiatry functional vacancy rate (accounting for civil servants, registry, and telepsychiatry positions) was 10 percent.

Both chief psychologist positions were filled. All four senior psychologist supervisor positions were filled. Three of 4.5 senior psychologist specialist positions were also filled

reflecting a 33 percent vacancy rate. Six of 28 psychology positions were filled, for a 79 percent vacancy rate. However, two psychologists were on extended leaves. The use of 8.5 contractors reduced the psychology functional vacancy rate to 55 percent. Three psychologists were unlicensed.

One of three tele-psychologist positions were filled for a 67 percent vacancy rate.

Overall, the staff psychologist functional vacancy rate (accounting for on-site civil service, registry, and tele-mental health positions) was 56 percent.

The supervising social worker position was filled. Of 11.5 social worker positions, nine were filled for a 22 percent vacancy rate. However, 6.2 contractors eliminated the social worker functional vacancy rate. Four social workers were unlicensed.

All 3.55 tele-social worker positions were filled.

Overall, accounting for on-site civil service, registry, and tele-mental health positions, there were no vacancies among social worker positions.

All ten recreation therapist positions were filled.

All four senior psych tech positions were filled. Fifty-nine of 74 psych tech positions were also filled, for a 20 percent vacancy rate.

All 23 supervising registered nurse positions were filled. Both MHSDS registered nurse positions were filled.

Of 19.2 CNA positions, 13 were filled, for a 32 percent vacancy rate. Seventy-five of 76.2 LVN positions were filled reflecting a vacancy rate of two percent. MAs assigned to tele-mental health filled nine of ten positions for a ten percent vacancy rate.

All 15.5 mental health clerical positions were filled.

The OSS II position and AGPA position were filled. Both HPS I positions were filled. In addition, a non-allocated HPS II position was filled. The CHSA position was vacant.

As for custody staffing, the warden and chief deputy warden's positions were filled as well as all seven associate warden positions. All 19 CC I positions were filled, as were 13 of 13.5 CC II positions, five of six captains, 34 of 36.2 lieutenants, 88 of 88.2 sergeants, and all 800 correctional officers.

The institution assigned unlicensed staff at CSP/Corcoran a clinical supervisor. Supervision included weekly one-to-one meetings and weekly staff meetings. Supervision of unlicensed clinicians was conducted primarily by current CSP/Corcoran staff; however in one case, a clinician was supervised by a former CDCR employee who left to work for another agency yet continued supervising unlicensed staff at CSP/Corcoran. CSP/Corcoran has volunteered to participate in a Regional Internship Consortium and hopes to attract unlicensed candidates but the problem of finding one of the few licensed staff who had capacity to provide supervision may be problematic going forward.

Tele-Mental Health:

Four telepsychiatrists provided services for 3CMS patients and had caseloads of 91, 116, 282, and 354 patients respectively. Telepsychiatry also offered after-hours coverage based on provider availability. The institution reported two telepsychiatrists had been reassigned to other institutions during the past year.

Telepsychiatry provided 180 hours of service to 3CMS patients per week. Telepsychology provided 40 hours of service to 3CMS patients per week. Tele-social workers provided 160 hours of service to EOP patients per week.

In addition, CSP/Corcoran permitted telework for MHSDS clerical staff three days per week.

Staff Recruitment:

The institution reported increasing marketing efforts for mental health positions, implementing mid-step hiring practices, offering recruitment and retention differential bonuses, with the addition of offering hiring benefits for psychiatry in-person patient care, and allowing additional payment to psychiatry and psychology staff who worked additional caseloads.

Quality Management:

Mental health program subcommittee (MHPS) meetings occurred monthly during the review period. Quorums were met for every month except August 2024. Committees routinely covered: improvement work, system surveillance, program administration, and open forum. Routine reporting of pertinent program metrics was useful, however there was room for improvement. While discussion of non-compliant areas generally included an explanation of deficiencies, there was limited follow-up to address the root of identified problems. As an example, documentation of frequency of use of force calls was generally noted as on par in comparison to comparable timeframes, but the institution missed an opportunity to investigate factors or trends to lower use of force incidents.

MHPS documentation was focused on metrics but did not specifically discuss the impact of understaffing on access to care as identified during the monitoring tour.

Quality Management Committee meeting minutes indicated integration of the MHPS committee. Specifically, both committees tracked psychiatric medication refusals, psychiatric non-formulary and timely urgent and emergent mental health referrals. MHPS committee trends were not included in Local Governing Body committee documentation.

No QITs, FITs or other studies were completed during the monitoring period.

Medication Management:

Statewide MAPIP monitored compliance with both diagnostic monitoring and medication administration. Diagnostic monitoring included obtaining medication consents, as well as any physical examination, vital signs, or laboratory tests needed for safer use medication use. Medication administration monitored compliance with the availability, continuity, and actual administration of medications. The compliance threshold for all metrics was 90 percent.

MAPIP

CSP/Corcoran provided MAPIP results for August 1, 2024-January 31, 2025 regarding compliance for psychiatric diagnostic monitoring and medication management.

MAPIP antidepressant monitoring tracked four metrics, including: EKGs for patients taking tricyclic antidepressants (EKG); medication consents (Consent); thyroid function tests (TFTs); and obtaining blood pressure for patients taking venlafaxine (venla BP). CSP/Corcoran was fully compliant with monitoring blood pressure for patients prescribed venlafaxine, fully non-compliant with monitoring TFTs, and was partially compliant with obtaining medication consents and EKGs.




Of the total 20 required metric-months, nine, or 45 percent, were compliant, with 11, or 55 percent, non-compliant.

Diagnostic monitoring for patients prescribed atypical antipsychotics required 11 metrics, including: AIMS; blood pressure; glucose; complete blood count (CBC); comprehensive metabolic panel (CMP); EKG; height (Ht); lipids; medication consents; thyroid function tests; and weight (Wt).

CSP/Corcoran was fully compliant for monitoring blood pressure, height, and weight, and fully non-compliant with AIMS, lipids, and TFTs; the remaining metrics were partially compliant during the review period.




Of the 63 metric-months for which data was required, CSP/Corcoran reached compliance for 31, or 49 percent, and was non-compliant for 32, or 51 percent.

Clozapine is an atypical antipsychotic frequently used when other medications fail. CSP/Corcoran was a clozapine maintenance institution during the monitoring period. At the time of the monitoring tour, 11 patients received this medication. Due to the increased risk of potentially fatal side effects, the medication requires close monitoring of the same categories as listed for atypical antipsychotics. The institution had no required EKGs during the monitoring period.

CSP/Corcoran was fully compliant with blood pressure, CBC, height, and weight, while the remaining metrics were partially compliant.




Of the 53 metric-months for which data was required, CSP/Corcoran reached compliance for 40, or 75 percent, and was non-compliant for 13, or 25 percent.

Carbamazepine and Depakote are mood-stabilizing medications requiring four metrics: CBC; CMP; therapeutic medication level; and obtaining medication consents. For carbamazepine, CSP/Corcoran had no required medication levels or consents required. The institution was fully non-compliant with CMP and was partially compliant with CBC.



Of the four required metric months, CSP/Corcoran was compliant for one, or 25 percent, and non-compliant for three, of 75 percent.

For Depakote, CSP/Corcoran was partially compliant with all metrics.




Of the 24 required metric-months, CSP/Corcoran was compliant with seven, or 29 percent, and non-compliant with 17, or 71 percent.

The mood stabilizer lamotrigine required one measure, namely obtaining medication consents. The institution had no required metrics during the monitoring period.

The mood stabilizer lithium required monitoring kidney and thyroid functions, EKGs, therapeutic medication levels, and obtaining medication consents. CSP/Corcoran had no required EKGs, and was fully compliant with CMP. The institution was partially compliant with the remaining metrics.




CSP/Corcoran required 20 metric-months of data. Of these, the institution was compliant with eight, or 40 percent, and non-compliant with 12, or 60 percent.

When examined *in toto*, CSP/Corcoran required 184 metric-months of diagnostic monitoring data. Of these, 96, or 52 percent, were compliant, while 88, or 48 percent, were non-compliant.



Medication Administration

MAPIP medication administration metrics monitored essential aspects such as medication availability, continuity, preparation, and administration. CSP/Corcoran had 12 required measures during the monitoring period.

Monitoring medication continuity included the following seven measures, followed by the abbreviations used in the graphs in parentheses: continuity of medications for transfers from other institutions arriving at receiving and release (R&R); intra-institutional transfers to non-RHU locations (Intra); MHCB transfers (MHCB); intra-institutional transfers to restricted housing (RHU); discharge from a community hospital or DSH (Outside Hospital); and upon parole or transfer to the community (Release).

MAPIP measures tracked compliance with the administration of medications given at HS (hora somni, or bedtime) which must be given on or after 8:00 P.M. (HS), and medications given in the A.M. and P.M. which must be given at least eight hours between doses (A.M./P.M.). Additionally, metrics evaluated whether chronic psychiatric medications were continued without interruption (Chronic), and whether new medications were administered as ordered, and in compliance with required timelines (New).

Finally, MAPIP measures included two related PC 2602 involuntary medication matters. These included whether a court order was in the medical record (Court Order), and whether a medication order for the PC 2602 medication was present (Med Order).

The institution was fully compliant with chronic care medications, and fully non-compliant with medication continuity for MHCB transfers, and A.M./P.M. medications. CSP/Corcoran was partially compliant with all other remaining metrics.




These 12 measures resulted in 72 metric-months of data. Of these, 26, or 36 percent were compliant, and 46, or 64 percent, were non-compliant.




PC 2602

CSP/Corcoran faced challenges in producing clear PC 2602 data, including the number of petitions filed. At the time of the monitoring tour, 45 patients received PC 2602 mediations.

Polypharmacy

CSP/Corcoran was overall compliant with completing required polypharmacy reviews.

Medication Lines

Nursing staff conducted medication line audits across all yards on second and third watches during the monitoring period. All were compliant with the requirement to have individual patient wait times under 30 minutes, and total duration of medication line under two hours. CSP/Corcoran denied any conflicts between medication distribution times and mental health programming.

HS Medications

CSP/Corcoran was overall compliant with the directive to administer medications at HS after 8 P.M.

Non-Formulary

CSP/Corcoran did not report the average rate of non-formulary medication use during the monitoring period.

Transfers:

At the time of the monitoring tour, CSP/Corcoran's inpatient coordinator had held the position for three months.

During the review period, there were 634 instances of 302 patients who were considered for, but not referred to, higher levels of care.

CSP/Corcoran referred 26 patients to acute care; 24 were accepted, one was rescinded, and one was rejected. Transfers to acute care were compliant with Program Guide timeframes during the review period, with 23 of 24 or 96 percent of patients transferred within ten days. Reasons for the delay included medical concerns. All referral packets were completed within two working days of identification.

CSP/Corcoran referred 20 patients to intermediate care; 14 referrals were accepted and six were rescinded. All 14 patients timely transferred within 30 days. All referral packets were completed within five working days of identification as required.

The institution did not provide data regarding *Vitek* hearings.

Forty-four patients with complex medical needs were transferred to inpatient care.

CSP/Corcoran made 448 MHCB referrals, of which 163 or 36 percent were rescinded. During the review period, transfers to MHCB were compliant with Program Guide timeframes, with only six of 285 MHCB, or two percent, of admissions taking longer than 24 hours to transfer. Documentation provided by the institution noted the delayed transfers were related to self-harm and danger to self-concerns but did not otherwise indicate these transfers qualified under court-approved exceptions to the 24-hour MHCB transfer timeframe.

The institution had both a 3CMS RHU and EOP RHU and patients were reportedly placed to each unit timely.

CSP/Corcoran did not track the number of patients whose level of care was reduced from EOP to 3CMS or increased from 3CMS to EOP.

One 3CMS patient and one general population incarcerated person whose level of care was changed to 3CMS were timely transferred to an MSF.

Programming:

MHSDS Patients in Restricted Housing:

EOP RHU

During the review period, there were 289 patients placed in the EOP RHU. Patients' lengths of stay in EOP RHU ranged from one to 240 days and averaged 56 days.

Psychiatrists serving the EOP RHU had caseloads within established ratios. *See* ECF No. 3693 at 19. However, three EOP RHU primary clinicians had caseloads in excess of established ratios.

The RHU Policy required that patients assigned to an EOP RHU be offered a minimum of twenty-hours of out-of-cell time reach week, ten of which must be structured therapeutic activities unless clinically contraindicated while the remaining ten must be out-of-cell exercise, including supervised recreation therapy. *See* The Restricted Housing Unit Program: Mental Health Services Policy, ECF No. 8267-1.

During the review period, EOP RHU patients (not including those on a modified treatment plan) were scheduled for an average of 12.1 hours, offered an average of 10.3 hours, attended an average of 3.7 hours, and refused an average of 6.6 hours of structured treatment per week. Accordingly, the institution was compliant with RHU policy requirements regarding offering of structured treatment during the review period.

The monitor's expert observed ten EOP RHU IDTT meetings. Quality varied considerably among the four providers. One provider delivered exemplary performance and should serve as a model or trainer for peers; two were adequate, and one tele-health provider demonstrated significant deficiencies highlighting the need for additional training in suicide risk management, RVR assessment practices, and clinical documentation.

The tele-mental health provider failed to recognize heightened suicide risk associated with RHU placement and phone restrictions, rendering a recently implemented MHCB discharge safety plan ineffective. They also lacked understanding of their responsibility to provide input and recommendations for RVR evaluations. The supervisor was uncertain whether the tele-mental health provider received RVR MHA training due to tele-mental health providers being

supervised by offsite management and reportedly poor communication between on-site and remote supervisors.

Aside from the tele-mental health concerns, in-person IDTT teams at times demonstrated strong collaboration, ensuring diagnostic consistency and inclusive decision-making. The EOP RHU IDTT process showed improvement compared to prior monitoring rounds. The attending EOP RHU supervisor effectively prompted staff to share relevant information and to revise treatment plans when indicated. However, tele-mental health staff operating under separate supervision lacked this oversight, which may be the reason for their poorer performance and apparent lack of critical CDCR knowledge (e.g., RVR MHA assessment process).

The RHU Policy requires an initial IDTT for EOP RHU patients before the initial ICC and not later than ten calendar days after arrival. ECF No. 8355 at 6.

The monitor randomly selected and reviewed the healthcare records of 30 EOP RHU patients to assess compliance with Program Guide timeframes for initial IDTTs during their stays. All 30 patients required initial IDTTs. Of the 30 reviewed initial IDTTs, 22 or 73 percent occurred timely within ten calendar days or arrival or level of care change. All were attended by required staff and 13 or 43 percent were attended by the patients. Reasons initial IDTTs were held *in absentia* included patient refusals.

All scheduled groups were facilitated by RTs and generally were scheduled to last two hours. No clinician-led groups were provided, including caseload groups.

The monitor's expert observed an anger management group facilitated by an RT, which was structured with the use of materials. While the RT demonstrated a very positive attitude, effectively managed disruptive behaviors, and engaged participants, it was clear that they required additional clinical training and resources. The monitor's expert noted that the group was

useful for out-of-cell time engagement, but additional training and resources were indicated to ensure accurate information was being provided for clinical value. For example, instead of focusing on avoiding certain feelings, the group facilitator should have focused on healthy expression of emotions and how to cope with difficult emotions in different situations. This was especially necessary in the EOP RHU considering most patients in the unit required new skills to prevent future incidents resulting in a return to the RHU.

The RHU Policy requires that all patients placed into EOP RHU receive an initial primary clinician evaluation within five calendar days of arrival and an initial psychiatry evaluation prior to the IDTT and within ten calendar days of arrival. *See* RHU Policy at 5-6. The RHU Policy also requires that EOP RHU patients receive weekly primary clinician contacts and psychiatry contacts at least every 30 days. *See id*. at 7.

The monitor randomly selected and reviewed the healthcare records of 30 EOP RHU patients to assess compliance with Program Guide timeframes for initial psychiatry contacts during their stays. All 30 patients required initial psychiatry evaluations; 26 or 87 percent timely occurred within ten calendar days after arrival and before the initial IDTT. ECF No. 8267-1 at 6. Eight or 27 percent of the reviewed initial psychiatry evaluations were conducted in confidential settings; non-confidential contacts were due to patient refusals and custody modified program. Telepsychiatry was not utilized for any initial psychiatry evaluations.

To measure timelines of routine clinical contacts during the review period, CDCR produced an appointments report that included individuals who were required to receive a routine psychiatry contact between August 1, 2024 and January 31, 2025.

Regarding routine psychiatry contacts, for the 146 patients in CDCR's appointments report for August 1, 2024 to January 31, 2025, there were 353 completed and refused contacts.

Of the 352 completed contacts, 147 or 42 percent were confidential as reported by the institution. Reasons for non-confidential psychiatry contacts included mental health and custody modified program, and patient refusals.

When a patient had more than one completed or refused contact, compliance with Program Guide timeframes was able to be calculated. ECF No. 8267-1 at 8 (requiring psychiatry evaluation "at least every 30 calendar days" in EOP RHU settings). Of the 353, 207 contacts were for individuals who were seen at least twice by the psychiatric provider. Of those 207 contacts, there were 45 or 22 percent that occurred beyond Program Guide requirements with a range of 31 to 110 days between contacts. Of note, the report did not include individuals that did not have completed contacts.

The monitor randomly selected and reviewed the healthcare records of 30 EOP RHU patients to assess compliance with Program Guide timeframes for initial primary clinician contacts during their stays. All 30 patients required initial primary clinician evaluations. Of the 30 reviewed initial primary clinician contacts, 25 or 83 percent were completed within five calendar days of arrival or change in level of care. ECF No. 8267-1 at 6. Four or 13 percent of reviewed initial primary clinician evaluations were conducted in a confidential setting; non-confidential contacts were due to patient refusals.

Regarding routine primary clinician contacts, for the 135 patients in CDCR's appointments report for August 1, 2024 to January 31, 2025, there were 789 completed contacts. Of the 789 completed contacts, 313 or 40 percent were confidential as reported by the institution. Reasons for non-confidential primary clinician contacts included patient refused or not showing for the confidential contact.

When a patient had more than one completed or refused contact, compliance with Program Guide timeframes was able to be calculated. ECF No. 8267-1 at 8 (requiring "weekly" PC contact in EOP RHU). Of the 789, 655 contacts were for individuals who were seen at least twice by the primary clinician. Of those 655 contacts, 32 or five percent occurred beyond Program Guide requirements with a range of 11 to 48 days. Of note, the report did not include individuals that did not have completed contacts, such as those that were not scheduled.

Of the 789 completed individual PC contacts, most (511) were documented with a duration between one and 15 minutes; 20 contacts were documented with a duration of zero minutes, 134 with a duration between 16-30 minutes, 98 with a duration between 31-60 minutes, and 26 with a duration longer than 60 minutes.

Regarding the offering of out of cell time, the monitor reviewed weekly summary reports and a "RHU Weekly Activity Audit Compliance" report for four random weeks during the review period. The data reflected significant discrepancies between the weekly summary reports and the RHU Weekly Activity Audit Compliance report with respect to the number of incarcerated persons listed as housed in EOP RHU for at least seven days. Due to the inconsistent reporting of patients in RHU for the seven-day period, the monitor could not rely upon the data as being accurate for reporting of out of cell time. The lack of reliability in the reporting of out of cell data was concerning and requires attention going forward.

The EOP RHU consistently offered showers, clothing and linen exchange per policy. However, the institution's offering of phone calls was compliant in only one of four reviewed weeks.

The monitor's expert conducted interviews following group sessions and completed tier walks focusing on EOP RHU patients with the longest stays in the RHU. The housing officer

was well-informed about the unit population and promptly identified these individuals. The unit remained calm throughout observations. No acute decompensation or need for a higher level of care was identified. Patients consistently expressed satisfaction with mental health services but requested more in-cell materials, clinician-led groups, and access to licensed providers.

During staff interviews, RTs questioned why they were excluded from IDTTs despite providing all or nearly all group treatment for RHU and ML EOP patients. Although the Program Guide does not list RTs as required IDTT members, their participation would provide valuable patient-specific insight considering they spend significantly more time with the patients and are now solely responsible for all structured programming hours. A review of RT group notes during IDTT would be useful; however, the RT group documentation currently lacks meaningful detail for IDTT consideration. Though there are many group notes in the chart, the vagueness of the content which primarily focuses on group topic and whether a patient was present limits the team's ability to make informed treatment decisions.

A significant concern emerged during interviews with mental health staff. EOP tele-mental health providers reported being unable to call housing unit officers for collateral information due to phone line restrictions that block external calls. This issue severely limits offsite providers' ability to obtain essential patient information from custody staff, especially when their patients refuse appointments. CDCR leadership must investigate and correct this deficiency immediately, as routine collateral contact with housing officers is a minimum expectation for safe and effective treatment, especially in the RHU EOP where there tend to be higher refusal rates. Onsite EOP providers reported consistent communication with housing unit officers, reviews of 114 logs, in person assessments of patient behaviors in the cell and cell conditions—all practices that leadership emphasized tele-providers have been unable to perform.

The monitor interviewed eight custody staff in the two 3CMS RHUs and the one EOP RHU regarding unclothed body search policy and procedures, issuance of a radio and earbuds as well as access to a tablet. These offers were able to articulate the unclothed body search policy and how it applied in multiple scenarios. Additionally, staff reported and the monitor's observation of patient rooms confirmed that new arrivals into an RHU from CSP/Corcoran arrived with their issued tablet, and a radio and earbuds were offered. New arrivals from other institutions did not arrive with their tablet. For these patients, RHU staff at CSP/Corcoran initiated a request for a tablet and reported it took from a couple of days to a couple of weeks to issue the tablet.

<u>3CMS RHU</u>

The 3CMS RHU treated 677 patients during the review period, with an average length of stay of 68 days and a range of one to 284 days.

Psychiatrists serving the 3CMS RHU had caseloads within established ratios. However, two 3CMS RHU primary clinicians had caseloads in excess of established ratios.

The RHU Policy requires patients housed in 3CMS RHU to be offered 20 hours of out-of-cell activities per week, including 18.5 hours per week of recreation time outside their cell and 90 minutes of "confidential, structured therapeutic activity each week." ECF No. 8267-1 at 6.

During the review period, on average, 3CMS RHU patients were scheduled for 2.2 hours, offered 94 minutes, attended 44 minutes, and refused 49 minutes of structured therapeutic activity each week. Accordingly, the institution was compliant with RHU Policy requirements for offering structured therapeutic activities.

Interviewed 3CMS RHU patients reported being offered weekly group sessions, which they could attend voluntarily. The monitor's expert observed an 3CMS RHU group session led

by a recreation therapist, who engaged patients meaningfully with relevant topics tailored to their mental health needs.

As reported above, due to the inconsistent reporting of patients in RHU for the seven-day period, the monitor could not rely upon the data as being accurate for reporting of out of cell time. However, the institution's offering of showers, clothing and linen exchange was consistently over 90 percent of the eight weeks reviewed. The offering of phone calls was compliant for four of the eight reviewed weeks.

The monitor's expert attended IDTTs for 3CMS RHU patients; all were initial IDTTs. Relevant clinical and psycho-social histories were reviewed comprehensively. Case conceptualization was appropriate to the scope of the meeting, with psychiatric medications discussed thoroughly for each patient. Diagnoses were clearly stated and supported by symptom presentations, which justified diagnostic decisions. Functional impairments related to Activities of Daily Living (ADLs) and abilities were discussed in detail. Diagnostic agreement between the PC and psychiatrist was achieved without significant discrepancies after collaborative review. Goals were clearly stated, objective, measurable, realistic, and aligned well with each patient's treatment needs. Interventions such as group participation and individual contacts were clearly outlined and appropriately matched to patient needs.

Safety planning and substance use issues were addressed thoroughly for each patient as relevant. Transition planning—including pre-release considerations—was reviewed where applicable. These IDTTs demonstrated a high degree of treatment planning individualization.

The collaborative nature of the process was evident throughout the meeting. Custody participation was active and appropriate. The CC1 provided relevant information regarding custody status, housing arrangements, release dates, and other logistical details. The treatment

team conducted discussions regarding level of care placement efficiently for each patient without excessive detail.

The RHU Policy requires an initial IDTT for 3CMS RHU patients before the initial ICC and not later than ten calendar days after arrival. RHU Policy at 5. Thereafter, routine IDTTs are required every 90 days. *Id.*

The monitor randomly selected and reviewed the healthcare records of 30 3CMS RHU patients to assess compliance with Program Guide timeframes for initial IDTTs during their stays. All 30 patients required initial IDTTs. Of the 30 reviewed initial IDTTs, none occurred timely within 10 calendar days of arrival or level of care change. All IDTTs were attended by required staff, and 18 or 60 percent were attended by the patients. Initial IDTTs were held *in absentia* due to patient refusals.

To assess compliance with RHU Policy timeframes for routine IDTTs, the monitor reviewed CDCR's appointments report for patients who had completed IDTTs during the review period. For the 353 patients in CDCR's appointments report, there were 457 completed routine IDTTs. When a patient had either a completed or refused initial IDTT and a routine IDTT or more than one routine IDTT, timeliness in accordance with Program Guide requirements was able to be calculated. Of the 457 IDTTs that were completed, 105 were for individuals who had at least two IDTTs. Of those, 47 or 45 percent were not compliant with Program Guide timeframes. Of note, the report did not include individuals that did not have a completed IDTT, such as those that were not scheduled.

The RHU Policy requires that all patients placed into 3CMS RHU receive an initial primary clinician and psychiatry evaluations within ten days of arrival and prior to the initial

IDTT. RHU Policy at 4. The RHU Policy also requires that 3CMS RHU patients receive weekly primary clinician contacts and psychiatry contacts every 90 days. *See id*.

The monitor randomly selected and reviewed the healthcare records of 30 3CMS RHU patients to assess compliance with Program Guide timeframes for initial psychiatry and primary clinician contacts during their stays.

All 30 patients required initial psychiatry evaluations; 20 or 67 percent timely occurred before the initial IDTT. Twenty-five or 83 percent of the reviewed initial psychiatry evaluations were conducted in confidential settings; non-confidential contacts were due to patient refusal and cell front contacts. Telepsychiatry was utilized for all initial psychiatry evaluations.

To assess compliance with RHU Policy timeframes for routine psychiatry and primary clinician contacts, the monitor reviewed CDCR's appointments report for patients who received at least one routine contact during the review period. For the 215 patients in CDCR's appointments report covering patients who received at least one routine psychiatry contact during the review period, there were 507 total completed and refused contacts. Of the 402 that were completed, 231 or 57 percent were reported as being conducted in a confidential setting. When a patient had more than one completed contact, compliance with Program Guide timeframes was able to be calculated. Of the 402 completed contacts, 293 were for individuals who were seen at least twice by a psychiatric provider. Of those 293 contacts, three or one percent of contacts were completed beyond the Program Guide required timeframes. Of note, the report did not include individuals that did not have complete contacts, such as those that were not scheduled in accordance with the institution's triage plan.

Likewise, all 30 patients required initial primary clinician evaluations. Of the 30 reviewed initial primary clinician contacts, 24 or 80 percent were completed within 10 calendar

days of arrival. Seventeen or 57 percent of reviewed initial primary clinician evaluations were conducted in a confidential setting; non-confidential contacts were due to patient refusals and modified programming. For the 258 patients in CDCR's appointments report covering patients who received at least one routine primary clinician contact during the review period, there were 931 total completed and refused contacts. Of the 930 that were completed, 308 or 33 percent were reported as being conducted in a confidential setting. When a patient had more than one completed contact, compliance with Program Guide timeframes was able to be calculated. Of the 930 completed contacts, 674 were for individuals who were seen at least twice by a primary clinician provider. Of those 674 contacts, 526 or 78 percent of contacts were completed beyond the Program Guide required timeframes. Of note, the report did not include individuals that did not have completed contacts, such as those that were not scheduled in accordance with the institution's triage plan.

Of the 930 completed routine primary clinician contacts, 48 contacts were reported to have been completed in zero minutes, 598 were completed within 15 minutes, 122 lasted between 16 and 30 minutes, 120 lasted between 31 and 60 minutes, 31 lasted between 61 and 95 minutes, and 11 were completed in greater than 95 minutes.

<u>Non-Disciplinary Segregation</u>:

CSP/Corcan reported that there was no available tracking log to capture NDRH status for the review period. Notably, the institution provided a list of 163 patients who were considered for NDRH status during the reporting period, but final decisions were not provided.

<u>MHCB</u>

CSP/Corcoran operated a 24-bed MHCB within the licensed CTC. Additionally, 6 beds were redlined. The MHCB's daily census averaged 19 patients during the review period.

MHCB clinical lengths of stay averaged 8.3 days, with approximately 15 percent of patients having clinical stays exceeding ten days. Physical stays averaged 9.2 days; approximately 25 percent of patients had physical stays that were longer than ten days. Administrative discharge delays were reportedly due to safety concerns and medical holds.

One MHCB psychiatrist had a patient caseload that exceeded required ratios; caseloads for primary clinicians were within established ratios.

Fifteen patients were admitted to the MHCB three or more times during the review period.

Ten weeks of CDC 114-A data indicated that patients were offered the following weekly as required: three showers, linen exchanges, clothing exchanges, and phone calls.

The Program Guide requires initial evaluations to be completed within 24 hours of admission to a MHCB. Thereafter, patients must be seen daily by either the psychiatrist or psychologist. At least twice weekly, the psychiatrist must evaluate the patient.
The monitor randomly selected and reviewed the healthcare records of 30 MHCB patients to assess compliance with Program Guide timeframes for initial and routine psychiatry contacts.

Thirty MHCB patients required initial psychiatry evaluations. Of those, 30 or 100 percent were timely, meaning they occurred before the initial IDTT and within 24 hours of arrival. Sixteen or 53 percent were reported as conducted in a confidential setting. Telepsychiatry was not utilized for initial psychiatry contacts.

All thirty MHCB patients require two routine psychiatry contacts per week. There were 90 expected contacts, and 88 or 98 percent were timely. Of the 90 routine contacts reviewed, 40 were reported as being conducted in a confidential setting while an additional 47 were held at

cell front due to patient refusal for a total of 87 or 97 percent compliance. Telepsychiatry was not utilized for routine psychiatry contacts.

Thirty MHCB patients required initial primary clinician assessments; 29 or 97 percent were completed within 24 hours of arrival, four initial primary clinician assessments were not found. Of the 30 initial primary clinician contacts reviewed, 19 were held in a confidential setting, while additional single contacts were held at cell front, bedside or "as planned" due to patient refusal for a total of 30 contacts or 100 percent compliance. There were no initial primary clinician assessments reported utilizing Tele-Psychologists or Tele-Social Workers.

Thirty MHCB patients required routine primary clinician contacts. An institution was considered compliant if a patient was seen daily beginning the day after admission for an out-of-cell confidential contact by the psychiatrist or psychologist (unless the patient refused), though on weekends the patient may be seen by the medical officer of the day (MOD) (12-5-13). There were 224 expected contacts, and 220 or 98 percent were timely. One hundred and two routine primary clinician contacts occurred in a confidential setting, with an additional 118 contacts held at cell front due to patient refusal for a total of 220 or 98 percent compliance. Reasons for routine contacts not occurring in a confidential setting included modified programming, confidential treatment space was unavailable, or "as planned." A licensed clinician completed all reviewed routine contacts. Tele-psychologists or tele-social workers were not reported to be utilized for routine primary clinician contacts.

Thirty MHCB patients required initial IDTTs; and 97 percent of the 30 initial IDTTs reviewed occurred within 72 hours of arrival. The required assigned staff were present at 28 of the 30, or 93 percent of the initial IDTTs reviewed. Patients attended 21 of 30 initial IDTTs with

the remaining nine patients refusing to attend or due to modified programing for 100 percent compliance.

Of the 36 required routine IDTTs, 34 or 94 percent occurred timely, or within seven calendar days following the initial IDTT. Thirty-five or 97 percent of routine IDTTs had the required assigned staff in attendance. Of the 36 routine IDTTs reviewed, patients attended 30 or 83 percent.

EOP:

During the review period, the institution reported an average census of approximately 170 mainline EOP patients housed in building 3B01. Overflow patients were housed in building 3B02 during the review period, with the exception of November 2024 through early January 2025. In addition, patients released from EOP RHU were housed in building 3A05 while awaiting transfer to their endorsed institution.

Three mainline EOP primary clinicians had caseloads that exceeded established ratios.

*Structured Treatment*

The Program Guide required that each EOP patient be offered at least ten hours per week of structured therapeutic activities. *See* ECF No. 7333-1 at 58. For patients who were determined by the treatment team to be clinically contraindicated for ten hours of treatment activities per week, the patient's IDTT was required to meet monthly to review the patient's treatment, increase the amount of structured therapeutic activities, or refer the patient to a higher level of care as clinically indicated. *Id.*

During the review period, EOP patients were scheduled for an average of 14 hours and offered an average of 8.6 hours of structured treatment per week. On average, patients refused four hours of structured treatment each week and six hours of structured treatment were

cancelled. Accordingly, the institution's offering of structured therapeutic activities was not compliant with Program Guide requirements during the review period.

During the review period, patients on EOPMod status were scheduled for an average of nine hours and offered an average of 5.3 hours of structured treatment weekly. On average, these patients refused 3.2 hours of structured treatment each week and 4.7 hours of structured treatment were cancelled.

*IDTTs*

The monitor's expert observed four EOP IDTTs during the monitoring tour. These observed IDTTs provided a thorough review of patients' clinical presentations, psycho-social histories, and concerns. While the discussions were comprehensive, the case conceptualization process was excessively detailed and lengthy, resulting in only four patients being covered during the two-and-a-half-hour session. Notably, only two of these patients were present at the meeting. This extended discussion raised concerns about its impact on other therapeutic activities, especially given staffing constraints.

Psychiatric medications were reviewed in detail, with discussions focusing on their effectiveness. Progress since the last treatment plan was also addressed, alongside current diagnoses and symptoms, which were clearly stated and supported by symptom presentation. Functional impairments were discussed thoroughly, and diagnostic discrepancies between the Primary Clinician (PC) and psychiatrist were addressed collaboratively.

Treatment goals were identified for each patient but lacked measurability. Interventions such as group assignments and individual session frequencies were clearly stated and aligned with patient needs and treatment goals. Group participation was reviewed for relevant patients,

and treatment plans were individualized to address specific symptoms, progress, functioning, and safety planning.

Substance use issues were thoroughly reviewed for each patient. Transition planning—including pre-release, parole planning, discharge planning, and relapse prevention—was discussed as relevant to individual cases. Custody participation was limited; while the CC1 responded to questions regarding patient status (e.g., Rules Violation Reports), their engagement otherwise remained minimal. Lengthy discussions about Level of Care (LOC) placement occasionally exceeded necessary detail.

The Program Guide requires that EOP patients receive an initial IDTT within 14 days of arrival to the institution and a routine IDTT every 30 days thereafter. *See* ECF No. 7333-1 at 59. The monitor randomly selected and reviewed the healthcare records of 30 mainline EOP patients to assess compliance with Program Guide timeframes for initial IDTTs during their stays. All 30 patients required initial IDTTs. Of the 30 reviewed initial IDTTs, 21 or 70 percent occurred timely within 14 calendar days or arrival or level of care change. Twenty-eight or 93 percent were attended by all required staff and 25 or 83 percent were attended by the patients. Reasons initial IDTTs were held *in absentia* included patient refusals and modified programming.

For the 234 patients in CDCR's appointments report for August 1, 2024 through January 31, 2025, there were 375 completed and refused initial or routine IDTTs. When a patient had either a completed or refused initial IDTT and a routine IDTT or more than one routine IDTT, compliance with Program Guide timeframes was able to be calculated. Of the 375, 142 contacts were for individuals who had at least two IDTTs (initial and routine or two routines). Of those 375, there were 60 or 42 percent that occurred beyond Program Guide requirements with a range

of 91 and 168 days between contacts. Of note, the report did not include individuals that did not have a completed or refused IDTT, such as those that were not scheduled.

The Program Guide requires that patients are offered an initial psychiatrist evaluation before their initial IDTT and within 14 calendar days of arrival to the institution or level of care change. *See* ECF No. 7333-1 at 59. Thereafter they are required to receive a routine psychiatric contact every 30 calendar days. *Id*. Patients are also required to receive a primary clinician evaluation within 14 calendar days of arrival and weekly (i.e. once per calendar week not to exceed ten calendar days between contacts) with either a primary clinician or in group psychotherapy with an individual contact every other week. *Id*.

The monitor randomly selected and reviewed the healthcare records of 30 mainline EOP patients to assess compliance with Program Guide timeframes for initial psychiatry and primary clinician contacts during their stays. All 30 patients required initial psychiatry evaluations; 25 or 83 percent timely occurred before the initial IDTT. Twenty-seven or 90 percent of the reviewed initial psychiatry evaluations were conducted in confidential settings. The non-confidential contacts were due to patient refusal; otherwise, reasons for non-confidentiality were not documented. Telepsychiatry was not utilized for initial psychiatry evaluations.

To measure timeliness of routine psychiatry contacts, CDCR produced an appointments report that included individuals who were required to receive a routine psychiatry contact during the review period. For the 214 patients in CDCR's appointments report for August 1, 2024 through January 31, 2025, there were 746 completed and refused contacts, of which 566 or 76 percent of the completed contacts were confidential as reported by the institution. When a patient had more than one completed or refused contact, compliance with Program Guide timeframes was able to be calculated. Of the 746 completed and refused contacts, 533 contacts were for

individuals who were scheduled at least twice by the psychiatric provider. Of those 533 contacts, there were 245 or 46 percent that occurred beyond Program Guide requirements with a range of 31 and 96 days between contacts.

The same 30 patients also required initial primary clinician evaluations. Of the 30 reviewed initial primary clinician evaluations, twenty-six or 87 percent were completed within 14 calendar days of arrival or change in level of care. Twenty or 67 percent of reviewed initial primary clinician evaluations were conducted in a confidential setting; non-confidential contacts were due to patient refusals and modified programming contacts. Telepsychiatry was utilized for 14 or 47 percent of initial psychiatry evaluations.

To measure timeliness of routine primary clinician contacts, CDCR produced an appointments report that included individuals who were required to receive a routine primary clinician contact during the review period. For the 184 patients in CDCR's appointments report for August 1, 2024 through January 31, 2025, there were 1,552 completed and refused routine primary clinician contacts, of which 1,031 or 66 percent were confidential as reported by the institution. When a patient had more than one completed or refused contact, compliance with Program Guide timeframes was able to be calculated. Of the 1,552 routine primary clinician contacts, 1,369 contacts were for individuals who were seen at least twice by the primary clinician. Of those 1,552 contacts, there were 183 or 13 percent that occurred beyond Program Guide requirements with a range of 11 and 57 days between contacts.

There were 1,534 completed routine primary clinician contacts. Twenty-three routine primary clinician contacts were documented with a duration of zero minutes, 909 with a duration between one and 15 minutes, 370 with a duration between 16-30 minutes, 199 with a duration

between 31-60 minutes, 18 with a duration between 61-95 minutes, and 15 with a duration greater than 96 minutes.

3CMS:

Treatment spaces for 3CMS patients were conducive to their purpose and protected confidentiality. Both individual and group treatment areas were observed to maintain visual and sound privacy during patient contacts.

Understaffing was a significant impediment to delivery of mental health care to 3CMS patients. While required individual contacts were not always provided, recreation therapists stepped in to offer activity groups to fill service gaps. This workaround demonstrates an effort to mitigate the impact of staffing challenges but did not fully address the need to provide mental health care consistent with the requirements of the Program Guide.

Tele-mental health services also presented challenges. Staff expressed concerns about tele-mental health providers being paid more than on-site clinicians and avoiding the in-person requirements associated with working inside the prison environment. This disparity reportedly caused frustration among on-site staff and may have contributed to morale issues.

Initial IDTTs for 3CMS patients are required to occur within 14 working days of arrival to the institution or level of care change and annually thereafter. *See* ECF No. 7333-1 at 43-44. The monitor randomly selected and reviewed the healthcare records of 30 mainline 3CMS patients to assess compliance with Program Guide timeframes for initial IDTT meetings during their stays. All 30 patients required initial IDTTs. Of the 30 reviewed initial IDTTs, eight or 27 percent occurred timely within 14 calendar days or arrival or level of care change. All were attended by all required staff and 13 or 43 percent were attended by the 5 patients. Reasons initial IDTTs were held *in absentia* included patient refusals and modified programming.

To measure timeliness of routine IDTT meetings, CDCR produced an appointments report that included individuals who were required to receive a routine IDTT meeting during the review period. For the 609 patients in CDCR's appointments report for August 1, 2024 to January 31, 2025, there were 645 completed and refused initial or routine IDTTs. When a patient had either an initial IDTT and a routine IDTT or more than one routine IDTT, compliance with Program Guide timeframes was able to be calculated. Of the 643 completed IDTTs, 39 contacts were for individuals who had at least two IDTTs (initial and routine or two routines). Of those 39, all occurred within Program Guide requirements. Of note, the report did not include individuals that did not have a completed IDTT, such as those that were not scheduled.

A random sample of 30 patients was selected to verify consistency between the appointments report and clinical documentation in EHRS. Of the 30 contacts reviewed in EHRS, 100 percent were consistent with the appointments report.

The Program Guide requires that patients are offered an initial psychiatrist evaluation before their initial IDTT. *See* ECF No. 7333-1 at 34-50, 641. Thereafter they are required to receive a routine psychiatric contact every 90 calendar days if the patient is prescribed a psychotropic medication. *Id*. at 44. Patients are also required to receive a primary clinician evaluation within ten working days of arrival and every 90 calendar days thereafter. *Id*. at 41, 48.

The monitor randomly selected and reviewed the healthcare records of 30 mainline 3CMS patients to assess compliance with Program Guide timeframes for initial evaluations during their stays. All 30 patients required initial psychiatry evaluations, of which, 15 or 50 percent timely occurred before the initial IDTT. Twenty-one or 67 percent of the reviewed initial psychiatry evaluations were conducted in confidential settings; non-confidential contacts were

due to patient refusals. Telepsychiatry was utilized for ten or 33 percent of initial psychiatry evaluations.

To measure timeliness of routine psychiatry contacts, CDCR produced an appointments report that included individuals who were required to receive a routine psychiatry contact during the review period. For the 565 patients in CDCR's appointments report for August 1, 2024 to January 31, 2025, there were 1,149 completed and refused contacts, 927 or 88 percent were confidential as reported by the institution. Reasons for non-confidential psychiatry contacts included contacts that occurred in the holding cell, cell front, day room, and on the yard.

When a patient had more than one completed or refused contact, compliance with Program Guide timeframes was able to be calculated. Of the 1,149, 585 contacts were for individuals who were seen at least twice by the psychiatric provider. Of those 585 contacts, there were 106 or 18 percent that occurred beyond Program Guide requirements with a range of 91 to 163 days. Of note, the report did not include individuals that did not have completed contacts.

A sample of 30 patients was randomly selected to verify consistency between the appointments report and clinical documentation in EHRS. Of the 62 contacts reviewed in EHRS, 100 percent were consistent with the appointments report.

The same 30 patients that required initial psychiatry evaluations also required initial primary clinician evaluations. Of the 30 reviewed initial primary clinician evaluations contacts, 20 or 67 percent were completed within 14 calendar days of arrival or change in level of care. Twelve or 40 percent of reviewed initial primary clinician evaluations were conducted in a confidential setting; non-confidential contacts were due to patient refusals.

To measure timeliness of routine primary clinician contacts, CDCR produced an appointments report that included individuals who were required to receive a routine primary

clinician contact during the review period. For the 738 patients in CDCR's appointments report for August 1, 2024 to January 31, 2025, there were 1,242 completed and refused contacts, 649 or 52 percent were confidential as reported by the institution. Reasons for non-confidential primary clinician contacts included patient refusal, lack of available confidential space, and medical restrictions due to public health issues.

When a patient had more than one completed or refused contact, compliance with Program Guide timeframes was able to be calculated. Of the 1,242, 506 contacts were for individuals who were seen at least twice by the primary clinician. Of those 506 contacts, 135 or 26 percent occurred beyond Program Guide requirements with a range of 91 to 161 days between contacts. Of note, the report did not include individuals that did not have completed contacts, such as those that were not scheduled.

There were 1,239 completed individual PC contacts. Most contacts (905) were documented with a duration between one and 15 minutes, while eight contacts were documented with a duration of zero minutes. In addition, 224 contacts were documented with a duration between 16 and 30 minutes, 87 with a duration between 31 and 60 minutes, nine with a duration between 61 and 95 minutes, and six with a duration over 96 minutes.

A random sample of 30 patients was selected to verify consistency between the appointments report and clinical documentation in EHRS. Of the 59 contacts reviewed in EHRS, 55 or 93 percent were consistent with the appointments report; four or seven percent had discrepancies. All discrepancies were due to an absence of documentation in EHRS.

Other Issues:

Pre-Release Planning:

The pre-release planning LOP was dated September 2019, however, the institution provided a copy of the August 2023 pre-release memo released by headquarters which superseded the local 2019 pre-release policy. CSP/Corcoran had two pre-release coordinators. Both were licensed social workers who had been in the pre-release position for a month at the time of the monitoring tour. One carried a small caseload in addition to their pre-release responsibilities, and the other provided group treatment but did not carry a caseload. Due to understaffing, pre-release groups were stopped in 2022 and had not resumed since.

CSP/Corcoran tracked patients who required pre-release planning at 60 and 90 days from release. Pre-release coordinators completed ROIs, pre-release planning assessments, provided information to patients releasing counties and communicated with TCMP caseworkers regarding patient benefits. The pre-release coordinators attended bi-weekly ISUDT pre-release meetings, monthly pre-release coordinator meetings, and additional meetings concerning pre-release services as necessary.

TCMP caseworkers reportedly provided pre-release benefit assistance to all eligible inmates within 120 days of release. Of the 130 patients who were within 120 days of release, all 130 or 100 percent were screened for TCMP services; 120 or 92 percent submitted Medi-Cal benefit applications, 43 or 33 percent submitted SSI benefit applications, and no patient submitted a VA benefit application.

Program Access:

a. Job and Program Assignments:

On February 26, 2025, CSP/Corcoran reported that 982 job assignments were held by 31 or 12 percent of EOP patients, 333 or 32 percent of 3CMS patients and 618 or 44 percent of non-MHSDS incarcerated persons.

The 1,360 academic assignments were held by 57 or 22 percent of EOP patients, 490 or 47 percent of 3CMS patients and 813 or 58 percent of non-MHSDS incarcerated persons.

The 223 vocational education assignments were held by 23 or nine percent of EOP patients, 79 or eight percent of 3CMS patients, and 121 or nine percent of non-MHSDS incarcerated persons.

The 405 substance abuse treatment assignments were held by 23 or nine percent of EOP patients, 156 or 15 percent of 3CMS patients, and 226 or 16 percent of non-MHSDS incarcerated persons.

The 34 voluntary education assignments were held by nine or one percent of 3CMS patients and 25 or two percent of non-MHSDS patients.

b. Milestone Credits:

CSP/Corcoran reported that 285 EOP patients received milestone credits, 13 had credits pending, and one had credits voided during the review period. Among 3CMS patients, 576 were awarded milestone credits and 16 had credits pending. Regarding non-MHSDS patients, 787 were awarded milestone credits, 48 had credits pending, and one had voided.

c. Out-of-Level Housing:

The institution reported that no Level I 3CMS or EOP patients were housed in Level II housing. Thirteen EOP and 36 3CMS and 36 non-MHSDS custody Level II patients were in Level III housing. Fifty-six Level III 3CMS patients were in Level IV housing.

d. ADA Reasonable Accommodations and Grievance Procedures:

CSP/Corcoran provided a copy of the ADA reasonable accommodation operating procedure which was in compliance with statewide policy.

e. Periodic Classification Score Reductions: EOP Patients:

The institution did not provide information regarding periodic classification score reductions.

f. Unclothed Body Search:

The institution's LOP regarding unclothed body searches was compliant with CDCR policy. EOP RHU staff further reported that unclothed body searches were conducted outside of the patient's cell in a confidential area using privacy screens. In addition, interviewed staff were knowledgeable of the unclothed body search policy.

"C" Status:

One hundred and forty-three patients were placed on "C" status during the review period. At the time of the monitoring tour, 47 patients were on "C" status.

Case-by-Case Reviews:

The institution reported a total of eleven cases where the patient was retained in RHU for 150 days or longer and a long-term segregated case conference was conducted. Nine of the patients were retained in RHU due to a pending RVR or District Attorney decision to prosecute. Two patients were identified as having been in RHU for more than 30 consecutive months and

were retained in RHU. The monitor reviewed the ICC chronos for these two patients which indicated they were retained in RHU by order of the Departmental Review Board due to extensive behavior issues.

Regarding the 120-day case by case review, the institution reported 61 MHSDS patients meeting criteria. Of the 61 MHSDS patients, 27 were at the EOP level of care and 34 were at the 3CMS level of care. A total of 55 MHSDS patients were retained in RHU after their maximum release date (MRD) was reached pending transfer. Of the 55 patients retained in RHU after their MRD two patients were granted NDS status.

Overall, CSP/Corcoran was in compliance with policy regarding timely review, however, the retention of so many patients in the RHU after the expiration of the MRD should be addressed.

Mental Health Referrals:

CSP/Corcoran reported an overall compliance rate of 84 percent for timely responding to mental health referrals. Psychiatry responded timely to emergent mental health referrals. Primary clinician routine referrals were close to compliance at 88 percent. Psychiatry responses to urgent and routine referrals were untimely, as were primary clinician responses to emergent and urgent referrals.

Custody and Mental Health Partnership Plan:

CSP/Corcoran's CMHPP LOP complied with statewide policy and was most recently revised in October 2024.

Executive leadership joint rounding occurred every month during the review period. Documentation indicated that required staff attended executive leadership joint rounding, and staff and patients were interviewed. Staff did not report any concerns involving specific patients,

but custody officers noted the poor durability of hand crank radios for newly arrived patients. Patients reported receiving their ducats timely and no issues with canteen or access to laundry. However, some patients mentioned issues with receiving property, and the health care captain was reportedly going to follow up with each patient.

CSP/Corcoran was unable to provide executive staff meeting agendas. Monthly QMC and MHPS meeting minutes were provided as required and each discussed joint rounding in detail.

Monthly joint supervisory program area tours occurred for all six months on Facilities A and B. Required staff attended each tour. Staff noted concerns regarding inadequate custody staffing which impacted programming. Patients noted maintenance-related concerns such as the swamp coolers being defective, false alarms occurring frequently which stopped programming and yard, also the yard on Facility B was reportedly shut down at 1330 hours on Mondays and Tuesdays, and one patient indicated that he had not received a tablet after a month and was told that tablets were in short supply likely related to contract disputes.

Huddles were observed during the site visit and were attended by required staff. The huddles were informative and collaborative. Reviewed huddle forms from the review period were adequate with required staff in attendance.

CSP/Corcoran distributed the 3CMS orientation brochure to new patients and provided a copy of the same.

Inmate advisory council meeting minutes were produced for each month of the review period. Agenda items included technology updates, education updates, tablet content, television issues, plant operation updates, peer support and specialist program updates, and concerns related to video visits, law library, and kitchen concerns.

No staff members were reportedly reassigned due to misconduct complaints.

Quarterly roundtable training attendance sheets were provided but the total number of staff who were required to complete the training and who actually completed the training could not be ascertained.

Annual partnership off-post training was attended by 88 of 102 or 86 percent of mental health and 49 of 1,132 or four percent of custody staff.

Heat Plan:

CSP/Corcoran's heat plan LOP was current and complied with CDCR policy, most recently revised in April 2024. During the review period, the heat plan was in effect during August, September and October 2024. There were 67 Stage I heat alerts and no Stage II or Stage III heat alerts during the review period. No patients experienced heat-related illnesses during the review period.

A total of 14 custody officers were interviewed regarding their knowledge of the institution heat plan requirements, and all demonstrated basic knowledge of the heat plan and its requirements.

All housing unit thermometers appeared to be in good working order and were located in appropriate locations.

A review of the inside and outside temperature logs for August, September and October 2024 indicated they were consistent with the monthly summary memorandum sent to headquarters.

The institution did not provide documentation regarding heat plan-related training.

Overall, notwithstanding the lack of training compliance data noted above, the institution demonstrated compliance with heat plan requirements during the review period.

RVRs:

The institution reported issuing a total of 2,074 RVRs during the review period. Of that total, 1,497 or 72 percent of all RVRs were issued to MHSDS patients including three to patients at the acute level of care, three to patients at the ICF level of care, 111 to MHCB patients, 358 to EOP patients, and 1,022 to 3CMS patients. As MHSDS patients made up 49 percent of the total institution population, patients were issued RVRs disproportionately to their proportion of the population.

The institution reported that there were no MHAs where the clinician determined the patient's behavior was "strongly influenced" by their mental illness. The monitor reviewed sixteen RVRs for compliance with remedial requirements. Custody staff referred the RVR to mental health staff within required timelines in nine out of sixteen cases or 56 percent of the time. For the seven cases that were late, the number of days overdue ranged from one to eight days late. Mental health staff competed the MHA and returned the form to custody staff timely in 13 out of 16 cases or 81 percent of the time. For the three MHAs that were late, the number of days overdue ranged from two to eight days late.

The MHAs were completed in confidential settings in three of sixteen cases and eleven patients refused the interview. Additionally, in two cases the reason stated for not completing the MHA in a confidential setting was due to lack of available escort officer. The MHAs were generally informative, however in several cases the responses were repetitive with the same penalty mitigations recommended. In one case, the MHA recommended the patient be allowed to participate in mental health treatment; however, access to mental health treatment cannot be restricted as part of the penalty if the patient is found guilty of an RVR s the necessity of this recommendation was unclear and concerning. A staff assistant was assigned in 100 percent of

the cases according to policy. The senior hearing officer (SHO) documented their consideration of the MHA information in 12 out of 16 cases. Four cases were not compliant because the SHO quoted the response from question three or question four on the MHA form and made no other statement. The SHO mitigated the penalties in nine out of sixteen cases and the remaining seven cases the MHA did not recommend mitigation.

The monitor's expert identified significant concerns with mental health provider involvement in the RVR process. One tele-mental health provider's patients had been discharged from the MHCB with a safety plan relying primarily on family phone calls. After placement in RHU, the patient's phone privileges were suspended, invalidating the safety plan. The tele-mental health provider reported providing input via email about the influence of mental illness on behavior but was not involved in developing recommendations for the hearing officer. The RVR MHA evaluator also failed to include recommendations, leaving the safety plan unmodified despite the patient's reported increase in depression related to isolation and loss of contact with family. No documentation in the patient's record confirmed the tele-provider's email or communication with the RVR MHA evaluator; only a checkbox indicated consultation. This lack of collaboration underscores the need for standardized RVR training and documentation requirements for all providers, including those delivering services via tele-health.

Regarding training, the warden and chief deputy warden attended the training, six out of seven correctional administrators attended, 100 percent of the captains and lieutenants attended, as well as 81 out of 88, or 92 percent of sergeants. The institution reported conflicting information regarding training of mental health staff. Mental heath staff reported that supervisors decided to train staff within their program but did not communicate with other programs to ensure the training was standardized or utilized the approved lesson plan.

Additionally, the monitor was provided training records for BET code 11058854, "Clinician Decision Making for RVR Mental Health Assessment-MH." This data showed 23 mental health staff attended including eleven psychologists, five social workers, five senior psychologists, one supervising psychiatric social worker, and one chief psychologist. However, in review of the 16 RVR MHAs, the forms were completed by staff who had not attended the required training. Of the 16 MHAs reviewed a total of two were completed by mental health staff that attended the required training.

Overall, the institution struggled with processing RVRs in a timely manner, training was non-compliant for mental health staff, MHAs were not completed by staff that had attended the required training, SHOs did not consistently document their consideration of the MHA information, and mental health patients receive a disproportionate amount of RVRs as compared to non-MHSDS patients.

Use of Force:

The institution reported six controlled use of force and 235 immediate use of force incidents during the review period.

All six controlled use of force incident reports were reviewed. Four of the six incidents were for the administration of PC 2602 medications. The remaining two were for refusal to exit a holding cell and for refusal to exit the MHCB to return to RHU. Cool down periods were provided, and custody and clinical staff agreed upon the time when to end the cool down period and initiate use of force. In all six controlled use of force incidents, RVRs were issued for either resisting a peace officer, obstructing a peace officer in the performance of their duty, or battery on a peace officer causing serious injury. In all controlled use of force cases, the application of force adhered to policy, however the issuance of RVRs in all cases for the administration of PC

2602 medication is questionable per Tile 15 section 3317.2, which prohibits issuance of an RVR where "the behavior occurred in connection with a cell extraction for the administration of involuntary medication, as defined in Penal Code Section 2602…." Cal. Code of Reg. Tit. 15 § 3317.2(a)(1). Moreover, none of the incident report summary statements for these four controlled uses of force documented that force was required to administer PC 2602 medication. Limiting the summary statement to indicate that the incarcerated person battered staff or obstructed staff during the controlled use of force is not a complete or accurate reporting of why force was necessary.

The monitor reviewed eight use of force videos, including four controlled and four immediate use of force incidents. The monitor did not observe any violation of use of force policy, however in one controlled use of force incident, the video showed the patient on a bed, custody staff were not observed using any force or the patient physically resisting. Correctional officers assisted the patient from the bed to a standing position, the nurse administered the PC 2602 medication via injection, and custody staff assisted the patient back onto a bed. The monitor did not view the assistance by custody staff to assist the patient stand and return to a bed as a use of force and should not have been reported as such. The four immediate use of force videos reviewed found the force used was necessary based on the patients' actions.

The monitor reviewed 12 immediate use of force incident reports including two that stated "agitation protocol" was ordered by clinical staff and immediate extraction and administration of medication was performed. However, one incident report did not contain a report by the ordering clinician. In the other incident report, the patient was being transferred to a higher level of care and was cell extracted to facilitate the transfer.

Regarding attendance of staff at annual use of force training, the one warden, one chief deputy warden and the five captains all attended the required training. Six out of the seven correctional administrators or 86 percent attended, 100 percent of the 34 lieutenants, 88 sergeants and 800 officers attended. The institution reported that five out of 37 or 14 percent of mental health supervisors, five out of 23 or 22 percent of psychologists, one out of 13 or seven percent of psychiatrists, and four out of 22 or 18 percent if social workers attended training.

Overall, the application of force was in compliance with requirements. However the articulation of why force was required in the incident report summary statements and the issuance of RVR's in controlled use of force for the application of PC 2602 medication were in conflict with the requirements of Title 15, as noted above. Additionally, mental health staff attendance of mandatory use of force training was non-compliant.

Lockdowns/Modified Programming:

During the review period the institution had one program status report (PSR) on facility 3B from January 21, 2025, through January 31, 2025. The PSR was instituted due to increased drug related incidents. The institution conducted a facility-wide search for drugs, drug paraphernalia and other contraband. During the PSR all incarcerated persons were to be escorted, priority ducts were honored, and mental health group activity continued in the facility gymnasium.

Overall, the institution was compliant with policy, as mental health ducats continued to be honored during the PSR.

Access to Care:

A review of monthly Health Care Access Quality reports from August 2024 through January 2025 reflected the issuance of 64,162 mental health ducats and add-on appointments, of

which 19,248 or 30 percent were completed, and 44,915 or 70 percent were not completed. Of the non-completed appointments, less than one percent were reportedly not completed due to custody factors, 69 percent were due to non-custody factors, and 31 percent were due to patient refusals.

Physical Plant Issues:

There were significant physical plant issues including water leaking into cells and dayroom, cold showers, and mold growing in cells. The institution informed the monitor that the hot water system at CSP/Corcoran was more than 30 years old and had broken multiple times over the past year. The institution submitted a major capital outlay request to replace the entire hot water system approximately two years ago. Headquarters has reportedly not approved the project.

Regarding the water leaks into cells and dayrooms, plant operations staff advised the monitor that roof repairs had been requested and there are multiple phases over a number of years to make repairs on all housing units. EOP RHU patients were moved from 3A03 to 3A04 due to the extensive leaks in 3A03, and it was noted that the 3A03 roof was being repaired during the monitoring tour.

Regarding mold in cells, plant operations staff reported when they were aware of an alleged mold issues. The issue of mold is a byproduct of the leaking roofs and should be resolved once all the roofs are fixed. Plant operations staff did not indicate if mold had been found when they had tested.

*Coleman* Postings:

There were *Coleman* posters in English and Spanish in all visited housing units.

**APPENDIX A – 10**
**CALIFORNIA STATE PRISON/ LOS ANGELES COUNTY (CSP/LAC)**
Site Visit: April 1, 2025 – April 4, 2025
Review Period: September 1, 2024 – February 28, 2025

The Special Master completed a focused review at CSP/LAC from December 17, 2024 to December 19, 2024 and a second comprehensive monitoring tour from April 1, 2025 to April 4, 2025. During these reviews, the Special Master's monitors observed a highly problematic correctional environment that included frequent modified programming due to custody staffing shortages and statewide directives, inappropriate housing of MHSDS patients, and security risks related to unlocked cell doors, all of which combined with clinical staffing vacancies, significantly disrupted the provision of Program Guide compliant mental health care to patients at CSP/LAC.

Although the statewide lockdowns at all Level IV facilities, including CSP/LAC, undoubtably exacerbated program and yard closures in the Spring of 2025, custody staffing concerns played a significant role in causing additional program and yard closures during the review period. Of the 30,909 incomplete ducats from September 2024 through February 2025 that were identified as due to custodial factors, 9,321 or 30 percent were not completed due to insufficient custody staff at the facility and 17,651 or 57 percent were due to custody modified programming. The remaining 13 percent were due to unidentified custody factors. *Id.*

These modified programming periods, whether due to the statewide lockdown or lack of custody staffing, caused patients to remain in their cells for extended periods of time and resulted in very limited programming or yard for a significant portion of the MHSDS population. Relatedly, the number of RVRs and use of force incidents increased from the prior monitoring round.

During the review period, the institution's EOP population swelled with an average census of 626 patients: four shy of the institutional capacity of 630 Level IV EOP patients. As a result, the institution began placing EOP patients into an overflow housing unit on a different facility than the Level IV EOP housing units on Facility D. This housing unit, located on Facility C-5, did not have treatment space which forced all mental health appointments, yard, and recreation therapy opportunities to take place on Facility D. This required interfacility custody escorts for all mental health ducats and yard offerings for every patient housed in EOP overflow, which posed an additional burden on the already insufficient number of custody staff.

During the Special Master's focused site visit on December 17, 2024, the institution reported that there were 53 mainline EOP patients housed in the EOP overflow on Facility C-5. Concerningly, leadership indicated that the facility had just begun offering structured programs and mental health groups to the overflow population *the day prior* on December 16, 2024, and that all individual mental health treatment had been completed cell-side due to the lack of custody staffing available for escort.

In addition to the concerning number of EOP patients in overflow housing and the very limited treatment and out-of-cell activities offered, the institution indicated that a significant number of MHSDS patients were also housed in clinically inappropriate housing across the institution for extended periods of time and therefore could not be tracked to provide mental health care services. According to MHPS minutes, between 20 and 50 patients at any given time were housed in buildings that were not appropriate for their level of care.

Reviewed holding cell logs on Facility D, which were intended for alternative housing placement, indicated that at least eight patients per month were housed in holding cells from January 2025 through March 2025 due to "lack of housing" rather than for its intended purpose.

Leadership indicated that custody staff in housing units, rather than leadership, would transfer these patients to clinically inappropriate housing. Custody and mental health leadership learned of these housing changes after the fact, forcing manual reviews to identify the location of MHSDS patients. This challenge persisted through the review period up to the time of the monitoring tour.

Regarding security issues, the institution reported that in Facility D-4, patients were able to bypass the individual cell door locking devices. This caused patients to be able to open their cell doors at will, presenting substantial security risks to the staff and patient population. Despite plant operations staff resolving the issue in February 2025, this ultimately contributed to the lack of appropriate housing for the patient population.

Census:

On March 28, 2025, CSP/LAC housed 3,082 incarcerated individuals which was a 17 percent increase from the prior review period. *See* Thirtieth Round Monitoring Report – Part C, ECF No. 8095 at 699 ("[o]n August 11, 2023, CSP/LAC housed 2,629 incarcerated persons"). The 1,792 MHSDS patients represented 58 percent of the institution's population and was a 26 percent increase from the prior review period. *Id.*

There were four patients housed in MHCB, and two patients were in alternative housing.

Eighty-two EOP patients were housed in the EOP RHU and 110 3CMS patients in the 3CMS RHU.

There were 586 mainline EOP and 917 mainline 3CMS patients; the EOP population was comparable to the prior review period while the 3CMS population increased by 42 percent. *Id.* One mainline EOP patient was housed in the OHU and three mainline 3CMS patients were non-disciplinary segregation.

Ninety-one 3CMS patients were housed in the MSF.

<u>Staffing</u>:

As of April 2, 2025, the chief psychiatrist position was filled. The senior psychiatrist supervisor position was vacant. Six of 13.5 staff psychiatrist positions were filled for a 56 percent vacancy rate; seven contractors–some of whom worked part-time–filled a combined 6.5 positions reducing the functional vacancy rate to seven percent. The one telepsychiatry position was filled. Inclusive of on-site and telepsychiatry positions, the overall staff psychiatry functional vacancy rate at CSP/LAC was seven percent.

Both chief psychologist positions were filled. For senior psychologists, 5.75 of 7.5 positions were filled for a 23 percent vacancy rate. All seven senior psychologist specialist positions were filled. For staff psychologists, 19.25 of 43.5 positions were filled for a 56 percent vacancy rate; one was on long term leave while the utilization of 11.15 contractors reduced the functional vacancy rate to 30 percent. Two of six telepsychologist positions were filled for a 67 percent vacancy rate. Inclusive of on-site and tele-mental health positions, there was an overall 37 percent functional vacancy rate among staff psychologist positions.

The supervising social worker position was filled. For social workers, 7.5 of 18.5 positions were filled for a 59 percent vacancy rate; two contractors reduced the functional vacancy rate to 49 percent. One of three tele-social worker positions was filled for a 67 percent vacancy rate. Accounting for on-site and tele-mental health positions, there was an overall functional vacancy rate of 51 percent among social worker positions.

Six LMFTs were also on staff; the number of allocated LMFT positions was not provided.

Inclusive of both on-site and tele-mental health positions, the functional vacancy rate for primary clinician positions was 33 percent. Thirteen psychologists and four social workers were unlicensed.

Thirteen of 22.5 recreation therapist positions were filled for a 42 percent vacancy rate; four contractors reduced the functional vacancy rate to 24 percent.

Both senior psych tech positions were filled. Thirty-five of 64.61 psych tech positions were filled for a 46 percent vacancy rate; four contractors reduced the functional vacancy rate to 40 percent.

Four of nine medical assistant (MA) positions assigned to tele-mental health were filled for a 56 percent vacancy rate. For MA positions not assigned to tele-mental health, fifteen of 23.4 medical and mental health MA positions were filled for a 36 percent vacancy rate; one contractor reduced the functional vacancy rate to 32 percent.[46]

For CNAs, 9.44 of 22.44 positions were filled for a 58 percent vacancy rate; 21 contractors reduced the functional vacancy rate to zero.

For LVNs, 29.4 of 39.16 positions were filled; 12 contractors reduced the functional vacancy rate to zero.

For SRN IIs, 15.2 of 19.2 positions were filled for a 21 percent vacancy rate; the SRN III position was filled; and 66.75 of 73.35 RN positions were filled for a nine percent vacancy rate and the use of five contractors reduced the functional vacancy rate to two percent.

Two nurse practitioners filled the one allocated position.

The public health nurse II position was filled.

One of two nurse instructor positions were filled.

[46] CSP/LAC was unable to parse medical assistants that were not assigned to the MHSDS.

Two OSS Is filled the one allocated position. The AGPA position was filled as well. Two of three HPS I positions were filled for a 33 percent vacancy rate. The CHSA position was vacant.

As of March 24, 2025, for custody staff, the warden, chief deputy warden, and all six associate warden positions were filled. All six captains were filled. Thirty-five lieutenants filled the 31 allocated positions; three were on long term leave. Seventy-six of 78 sergeant positions were filled for a three percent vacancy rate; six were on long term leave resulting in a 10 percent functional vacancy rate. Nineteen of 26 CCI positions were filled for a 27 percent vacancy rate. Ten of 11 CCII positions were filled for a nine percent vacancy rate; one individual was on long term leave for an 18 percent functional vacancy rate. For correctional officers, 706 individuals filled the 702 positions; however, 67 correctional officers were on long term leave for an eight percent vacancy rate.

Tele-Mental Health:

One telepsychiatrist provided services to the EOP population; this individual was a PC 2602 specialist. Two telepsychologists provided services to the 3CMS population. One tele-social worker provided services to the EOP population. Telework was not offered to on-site staff.

The tele-mental health policy required that telepsychiatrists treating EOP and 3CMS patients visit their assigned institution within 30 days of assignment and no less than annually thereafter. *See* ECF No. 8593. All telepsychiatrists, telepsychologists, and tele-social workers were compliant with annual visits to the institution.

Two tele-mental health primary clinicians indicated excellent communication and collaboration with on-site clinical staff. There was regular communication with the on-site

psychiatrists on their individual treatment teams and strong support from her tele-mental health presenter and supervisors. The tele-mental health clinician who conducted RVR mental health assessments reported no barriers to collateral contacts with onsite staff for these evaluations. Minor connectivity challenges and glitches in tele-mental health technology occurred when they first started working, but these were quickly resolved and had not reoccurred.

The clinicians also reported that they had not experienced any patient reluctance to utilize tele-mental health for assessments and treatment. Each saw between six and eight patients a day. While institutional lockdowns had slowed the escort of patients to the tele-mental health appointments, both reported that they continued to see the same number of patients during the lockdown that they had seen prior to the lockdown.

Staff Recruitment:

The institution reported that staff recruitment efforts consisted of the regional hiring unit streamlining the hiring process for *Coleman* classifications, increased marketing for *Coleman* classifications, hiring above minimum, pay differentials, recruitment and retention bonuses, in-person direct patient care bonuses, and payments for psychiatrists and psychologists who carried additional caseloads.

Quality Management:

Local governing body meetings occurred quarterly at CSP/LAC during the review period. There were two meetings held; both achieved quorums. Reviewed meeting minutes reflected discussion of previous action items, leadership appointments, policies and procedures review including the development of a new local operating procedures for safety planning and custody reporting of patient safety concerns, resource allocation and fiscal management, and performance improvement areas. Action items included follow-up on construction of ADA-compatible rooms

in the CTC, follow-up on safety smock and blanket accountability, development of a weekly rounding tool for the CTC, and addressing high resource utilization required for multiple 1:1 medical watches on the CTC. Overall, meeting minutes indicated that the local governing body achieved intended objectives.

The quality management committee met monthly and achieved quorums during the review period. Meeting minutes encompassed discussion of quality improvement projects and performance improvement work plans, system surveillance and quality concerns, program management including local operating procedures and audit schedules, high risk patients, subcommittee reports, morbidity and mortality reviews, executive rounding, and action items. Minutes reflected attention to priority quality management issues such as timely access to mental health care, adequacy of mental health care, multidisciplinary collaboration, custody staffing shortages, medication management, and patient safety. The QMC monitored institutional performance against multiple benchmarks and implemented several corrective action plans (CAPs). The trends identified in the mental health program subcommittee were raised in quality management committee documentation. However, no performance improvement initiatives were developed for these identified challenges in the delivery of mental health care.

The mental health program subcommittee met monthly throughout the monitoring period and achieved quorums for all meetings. Minutes indicated that the subcommittee monitored multiple performance challenges in mental health care delivery throughout the review period. Discussion topics included timely referrals, access to care, findings from the EOP RHU quality improvement team, challenges in collecting accurate data regarding mental health access to care and delivered treatment, noncompliance with new 3CMS RHU requirements, limitations in EOP group treatment space, impact of staffing vacancies on access to care and performance metrics,

cancellation of mental health groups, a performance improvement work plan for MHCB discharge custody checks completion, custody transferring patients out of crisis beds before the patients are clinically discharged through the IDTT process, implementation of behavior modification plans, SPRFIT data audit results, PIP admissions and discharges, responding to patient grievances, staff development, and suicide reviews. Challenges in the accuracy of certain data were repeatedly noted in the minutes.

Mental health program subcommittee action items included implementation of a process to ensure all individuals housed in RHU and enrolled in the DDP were seen weekly by mental health, obtaining access to education space to run mental health groups, correcting the EHRS template for group entries, updating the SAFER matrix, and determining whether a psychiatric nurse can complete the same assessments as a psychologist.

Mental health program subcommittee minutes reflected the existence of several concerns which persisted through the time of the monitoring tour. These included but were not limited to challenges in the quality of IDTT documentation, providing timely mainline EOP care, tracking the location of MHSDS patients within the facility. In particular, patients housed in Facility A, building 4 and Facility C, building 5, were noted as having not received mental health services secondary to intrafacility transfers. There was little evidence that corrective action plans or performance improvement initiatives were discussed or implemented.

No focused improvement teams operated at CSP/LAC during the review period. An EOP RHU quality improvement team met monthly during the review period. Several EOP RHU quality improvement team findings were appropriately elevated to the mental health program subcommittee. However, performance improvement plans were not developed.

During the review period and at the time of the site visit, peer review occurred only for psychiatrists providing care in the MHCB.

Clinical leadership including senior psychologist supervisors had access to the On Demand dashboard and used it regularly to monitor the delivery of care. It was reported that most mental health staff had not been trained in using On Demand and may not know of its existence. Modifications and expansions of On Demand capabilities were reported to occur without announcement or explanation from CDCR headquarters, resulting in confusion and frustration among clinical leaders at CSP/LAC. The accuracy of On Demand data was reported to be a long-standing challenge exacerbated by the recent transition from administrative segregation processes to restrictive housing processes. Data entry errors were reported to be common, and as noted earlier, mental health program subcommittee minutes repeatedly indicated challenges in data integrity. Access to quality assurance data was adequate.

Mental health staff were provided with quality management findings through supervision meetings, and that it was the responsibility of supervisors to communicate these results to staff.

Overall, CSP/LAC's quality management processes were not adequate to meet the needs of the mental health program. While most mental health service delivery areas were monitored, solutions were not identified, therefore quality assurance was unreliable.

Medication Management:

MAPIP

CSP/LAC provided MAPIP results for September 1, 2024 through February 28, 2025 regarding compliance for psychiatric diagnostic monitoring and medication management.

The MAPIP metrics in compliance specific to psychotropic medications during the monitoring period included continuity of meds upon parole/transfer to the community,

medication compliance with PC 2602 for both court ordered and medication ordered for four out of five months, obtaining blood pressure for patients receiving venlafaxine, obtaining blood pressure for patients receiving antipsychotic medications, lipid monitoring for patients receiving antipsychotic medications, and obtaining waits for patients receiving antipsychotic medications.

All the other MAPIP metrics were in partial compliance during the monitoring period.

Medication management subcommittee minutes for the monitoring period were reviewed. It was clear that this committee regularly reviewed the various MAPIP measures and were attempting to correct compliance issues. Partial compliance for many of these metrics was due to a multitude of factors including patient refusals, custody and healthcare staff shortages and inadequately implemented operational processes.

CSP/LAC was not a clozapine initiation or maintenance facility during the review period.

Medication Administration

A process was developed and implemented for observation of security of administration of medication areas, medication storage and medication administration during pill lines. It apparently was not uncommon for patients to refuse medications or to refuse to attend pill line. When there were delays in pill pass, the morning program was impacted. However, there was no other reported impact. Pill pass occurred in the housing units in D yard as there were clinics in each building. Protective measures were taken during inclement weather and/or pill pass was done at housing unit podiums.

PC 2602 Issues

During the monitoring period, 153 patients were receiving PC 2602 medications. The treating psychiatrist did not renew PC 2602 orders for three of these patients. Two of the patients

paroled during the monitoring period. Seventy-three patients had their PC 2602's renewed during the monitoring period, seven patients had an initial emergent PC 2602 initiated and one patient had an initial nonemergent PC 2602 initiated. Eight patients had the PC 2602 either withdrawn or denied. Eighty-two had their PC 2602's initiated at LAC.

There were zero non-compliant PC 2602 patients during the review period. All instances of non-compliance with critical medications were reviewed.

Non-Formulary

On September 2024, CSP/LAC prescribed non-formulary psychiatric medication at a rate of 5.7% (CCHCS categorizes anything above 5.5% as not at goal). The non-formulary measure increased to not at goal range due to influx of EOP patients on non-formulary medications from other facilities. Once patients were prescribed non-formulary psychiatric medication there was often difficulties in weaning them off to safely discontinue. The Chief Psychiatrist and his team worked to safely discontinue non-formulary medications to more strictly adhere to the CCHCS Drug Formulary policy, and in doing so decreased CMC's non-formulary medication prescribing rate to 4.5% (within near goal range and 50% lower than statewide average).

KOP Medications

During September 2024 LAC's KOP prescribing rate for all eligible medications was 88%. Since then, CSP/LAC implemented an auditing schedule where providers were sent recurring drilldowns of patients who were non-adherent to their nurse administered medications so they may evaluate the patient's medication regimen and make appropriate changes to safely prescribe the medication as KOP wherever possible. After six months of this process in place, the KOP prescribing rate for eligible medications increased to 91%, matching the average statewide metric.

SSRIs

Medical primary care providers did not prescribe SSRI's. CSP/LAC did not have any patients on SSRI's at the time of the site visit.

Medication Management Summary

As documented in the MAPIP dashboard, numerous compliance issues existed regarding medication management. These issues were being regularly reviewed by the medication management subcommittee at CSP/LAC, which was attempting to implement corrective actions.

Transfers:

CSP/LAC's inpatient coordinator had held the position for approximately five years. She additionally served as a supervisor for interns and occasionally provided ISUDT training. She previously served as the SPRFIT coordinator and as an MHCB and RHU EOP clinician. The backup inpatient coordinator was also a psychologist and primarily worked in quality management; other specialists also performed backup duties as needed.

During the review period, there were 22 acute care and 12 intermediate care referrals, resulting in 20 acute and nine intermediate care admissions. One intermediate care referral was rejected, one acute and two intermediate care referrals were rescinded, and one acute care patient paroled. All admissions were timely.

No inpatient referrals were for patients with complex medical needs.

During the review period, there were 776 instances of 544 patients considered for, but not referred to, inpatient care.

No information on *Vitek* hearings was provided.

At the time of the site visit, no patients were pending transfer to inpatient care.

CSP/LAC made 1,356 MHCB referrals during the review period resulting in 201 admissions and 1,155 rescissions; 102 of the referrals resulted in admissions to CSP/LAC's MHCB and 99 were transferred to other MHCBs. Of the 1,356 patients referred to MHCBs, 19 or one percent resulted in alternative housing stays beyond 24 hours. Of the 201 MHCB admissions, 24 or 12 percent transferred beyond 24 hours.

CSP/LAC had EOP and 3CMS RHUs. There were no placement delays for either.

Seventy-four patients' levels of care changed from EOP to 3CMS during the review period.

Sixty-three patients were admitted to the CSP/LAC MSF during the review period; none of the referrals originated from CSP/LAC.

Sustainable process reviews were required to audit higher level of care (HLOC) consideration documentation for quality and to measure the inter-rater reliability between the headquarters' reviewer and the institution's inpatient care coordinator. During the review period there was one major sustainable process review completed in October 2024 that covered a review period of July 1, 2024 to September 30, 2024. Thirty-seven cases were reviewed during that period with CSP/LAC's inpatient coordinator finding 51 percent of cases acceptable while the headquarters reviewer finding 46 percent of cases acceptable. There was disagreement in two cases, however the interrater reliability between the inpatient coordinator and headquarters had increased from the prior review with CSP/LAC reporting 36 percent of acceptable cases and headquarters reporting 29 percent of acceptable cases.

Programming:

During the review period through the time of the monitoring tour, CSP/LAC operated under a triage plan due to critical staff shortages. The triage plan consisted of a list of six

treatment areas organized by level of priority. Crisis calls and alternative housing evaluations were given the highest priority, followed by MHCB care, RHU EOP care, RHU 3CMS care, mainline EOP care, and finally mainline 3CMS at the lowest level of priority. The triage plan did not include any information regarding the allocation of mental health staff to or the prioritization of tasks within a given level of care. Beyond prioritization, it provided no structure or specific direction to mental health staff regarding the delivery of services.

Mental health leadership indicated that the lack of specific steps and processes in the triage plan was by design, because the number of patients at a given level of care, the location of these patients, and the number of mental health staff available on any given day varied significantly and was unpredictable. Mental health supervisors made determinations each morning as to how available mental health staff should spend their time and sent emails instructing staff how to prioritize their day based on the specific conditions. These conditions and specific priorities were reported to change on a daily and sometimes hourly basis. As a result, scheduled appointments were often postponed or cancelled due to prioritization of crisis calls and suicide risk evaluations.

While this approach maximized flexibility in available mental health resources on any given day, the absence of a specific, structured plan both reflected and perpetuated a reactive, crisis-driven approach to mental health care at CSP/LAC.

<u>MHSDS Patients in EOP Restricted Housing</u>:

The EOP RHU was located on Facility D in building five with overflow housing located on Facility A in building four.

There were 382 patients placed into the institution's EOP RHU during the reporting period. Lengths of stay for all patients could not be determined, however the institution

indicated that there were 42 EOP RHU patients with lengths of stay beyond 90 days. On the date of the site visit, there were 82 EOP patients housed in CSP/LAC's EOP RHU. The lengths of stay for these patients also could not be determined.

According to the staff-to-patient ratios from the 2009 staffing plan, psychiatrists who treat EOP patients in restricted housing must maintain a caseload of no more than 64 patients per psychiatrist, while primary clinicians who treat EOP patients in restricted housing must maintain a caseload of no more than 11 patients per clinician. *See* ECF No. 3693 at 19. For the EOP RHU, two psychiatrists and six primary clinicians carried caseloads. One of two psychiatrists and two of six primary clinicians had caseloads within established ratios.

*Structured Treatment*

The RHU Policy required that patients assigned to EOP RHU be offered a minimum of 20 hours of out-of-cell time each week, ten of which must be structured therapeutic activities unless clinically contraindicated, while the remaining ten hours must be out-of-cell exercise, including supervised recreation therapy. *See* ECF No. 8355 at 7-17 (Restricted Housing Unit Program: Mental Health Services Policy, dated July 19, 2024 and effective August 1, 2024) (hereinafter "RHU Policy"). From August 26, 2024, to February 28, 2025, EOP RHU patients were offered a weekly average of 11.68 hours, attended a weekly average of 5.5 hours, and refused a weekly average of 6.23 hours of structured therapeutic activities. Each week, 4.75 hours of treatment were cancelled during the review period.

*IDTTs*

Three EOP RHU IDTTs were observed during the site visit. All patients were in attendance and required staff were present. The team conducted a comprehensive review of the patients' diagnoses, goals, medications, substance use (history and current), treatment adherence, level of

care, time in the RHU, privileges, safety concerns, and suicidal ideation. The psychiatrist was particularly thorough regarding issues related to sleep and medication effectiveness.

*Group Treatment*

In the EOP RHU, groups ran daily, and approximately six group rooms were available at any scheduled time. Most groups were facilitated by recreation therapists during the review period. Mental health leadership indicated that clinician-led groups were limited to Mondays and Fridays due to staffing shortages. There were five group treatment rooms on Facility D, each with eight therapeutic treatment modules. All group rooms appeared confidential.

Two groups were observed, each facilitated by a recreation therapist. Four patients attended the first group with the facilitator initiating an icebreaker exercise to garner patient interaction. The facilitator posed mindfulness-related questions and distributed a handout to help patients follow along. The group was clinically appropriate. Most patients were engaged, although the facilitator, having recently returned from leave, was not yet familiar with the patients in attendance. Nonetheless, the patients appeared to benefit from the discussion, exploring ways to practice mindfulness, answering trivia questions about the topic, reflecting on one thing they learned, and sharing coping skills, along with the reasons for their song choices at the end of the group.

The relapse prevention group was observed in the new mental health building, facilitated by a recreation therapist. The building featured generous treatment space for groups with ample natural light from skylights. Seven patients attended the group. The therapist read trivia questions, and several of the patients were engaged in answering them. While the patients actively participated, the clinical value of the activity was questionable as it did not explicitly address mental health needs, symptoms, skill building, or other clinically relevant topics.

*Individual Treatment*

Treatment space for individual contacts on Facility D was inadequate. An open space surrounded on three sides by eight-foot barriers had been created in the common area of building five for IDTTs. While the two ceiling cameras did not have audio capability, the meeting space could be seen from portions of the upper tier of the housing unit and was not private. Eight holding cells were spaced about two feet apart in two groups of four and were reportedly used frequently for suicide risk evaluations. The holding cells were old, discolored, not ADA-compliant, and not confidential with respect to either sight or sound. The overall unit was unkempt, dirty, and occupied by pigeons.

The RHU Policy requires that all patients placed into EOP RHU receive a primary clinician evaluation within five calendar days of arrival and a psychiatry evaluation prior to the IDTT and within ten calendar days of arrival. *See* RHU Policy at 5-6. The RHU Policy also requires that EOP RHU patients receive weekly primary clinician contacts and psychiatry contacts every 30 days. *See id*. at 7.

Thirty EOP RHU patients who required initial psychiatry evaluations during the reporting period were randomly selected for review. Of the 30 patients, four transferred before timeline requirements expired while two did not receive an initial psychiatry evaluation at all during their stays. Of the 24 patients who received an initial psychiatry evaluation, 18 or 75 percent were timely and 18 or 75 percent occurred in a confidential setting. Non-confidential contacts were due to insufficient custody staffing and patient refusals.

To measure timeliness of routine psychiatry contacts during the review period, CDCR produced an appointments report that included individuals who were required to receive a

routine psychiatry contact.[47] For the 201 patients in CDCR's appointments report for September 1, 2024 to February 28, 2025, there were 374 completed contacts. Of the 372 completed contacts, 251 or 67 percent were confidential as reported by the institution. Reasons for non-confidential psychiatry contacts included patient not showing for the contact, mental health modified program, and custody modified program. When a patient had more than one completed contact, compliance with Program Guide timeframes was able to be calculated. Of the 372 completed contacts, 172 contacts were for individuals who were seen at least twice by the psychiatric provider. Of those 172 contacts, there were 15 or nine percent that occurred beyond Program Guide requirements with a range of 31 to 129 days.

The 30 random EOP RHU patients who required initial psychiatry evaluations also required initial primary clinician evaluations during the reporting period. Of the 30 patients, three transferred before timeline requirements expired while 15 did not receive an initial primary clinician evaluation at all. Of the 12 patients who received an initial primary clinician evaluation, six or 50 percent were timely while five or 42 percent occurred in a confidential setting. Non-confidential contacts were due to patient refusals and custody modified programming.

To measure timeliness of routine primary clinician contacts during the review period, CDCR produced an appointments report that included individuals who were required to receive a

[47] The EOP RHU routine psychiatry appointments report did not include individuals that did not have completed contacts. Reviewed data captured the time between patient contacts but did not account for when patients were not seen or scheduled for a routine psychiatric contact. Of note, the appointments report provided did not account for delays between appointments due to movements in or out of -LAC. Contact with the assigned psychiatrist was unable to be determined.

routine primary clinician contact.[48] For the 103 patients in CDCR's appointments report for September 1, 2024 to February 28, 2025, there were 174 completed and refused contacts. Of the 167 completed contacts, 148 or 89 percent were confidential as reported by the institution. Reasons for non-confidential primary clinician contacts included patient refused confidential contact, patient initiated an unplanned contact and mental health modified program. When a patient had more than one completed or refused contact, timeliness in accordance with Program Guide requirements was able to be calculated. Of the 174, 71contacts were for individuals who were seen at least twice by the primary clinician. Of those 71 contacts, 36 or 49 percent occurred beyond Program Guide requirements with a range of 11 to 65 days.

There were 167 completed individual PC contacts, of which one lasted zero minutes, 66 lasted in 15 minutes or less, 80 lasted between 16 and 30 minutes, and 20 lasted between 31 and 60 minutes.

The institution produced two conflicting EOP RHU weekly activity audit compliance reports for the week of November 11, 2024. The first report indicated that CSP/LAC was 96.7 percent compliant with the offering of of-of-cell time, 96.7 percent compliant with the offering of showers, and 100 percent compliant with the offering of weekly phone calls. However, in review of a more detailed report that included individual patients and their activity, out-of-cell time was not offered to 11 patients reflecting 88 percent compliance and a minimum of three showers were not offered to eight patients during the examined week resulting in 91 percent

[48] The EOP RHU routine psychiatry appointments report did not include individuals that did not have completed contacts, such as those that were not scheduled. The reviewed data captures the time between patient contacts but does not include patients who were not seen or scheduled for a routine contact with the primary clinician. Of note, the provided appointments report did not account for delays between appointments due to movements in or out of LAC. Contact with the assigned primary clinician was unable to be determined.

compliance. This data inconsistency was also found in the December 2024 and January 2025 data provided by the institution.

The monitor observed ICC meetings on April 3, 2025, in the EOP RHU for six patients, of which five were initial reviews and one was a subsequent review. All six patients were retained in RHU with five retained pending conclusion of investigations into the patient's claimed safety concerns and one was retained pending an RVR for battery on a peace officer. All required staff were in attendance including the warden, CC II, captain and mental health staff. However, the mental health staff asked each patient one question about if anything would prevent them from participating in the committee meeting. This was inadequate. Additionally, one patient requested single cell status due to mental health concerns and his PTSD. The CC I stated the patient did not meet criteria for single cell as he was not the victim of an in-cell assault. There was no request for input from the mental health clinician present, and none was provided.

<u>MHSDS Patients in 3CMS Restricted Housing</u>:

There were 351 patients placed into 3CMS RHU during the review period. Lengths of stay ranged from one to 298 days with 25 patients housed longer than 90 days. At the time of the site visit, there were 110 3CMS RHU patients.

According to the staff-to-patient ratios from the 2009 staffing plan, psychiatrists who treat 3CMS patients in restricted housing must maintain a caseload of no more than 125 patients per psychiatrist, while primary clinicians who treat 3CMS patients in restricted housing must maintain a caseload of no more than 25 patients per clinician. *See* ECF No. 3693 at 14. For the 3CMS RHU, one psychiatrist and five primary clinicians carried caseloads. The psychiatrist's

caseload exceeded established ratios, while four of five primary clinicians had caseloads within established ratios.

*Structured Treatment*

The RHU Policy required that patients assigned to 3CMS RHU be offered a minimum of 20 hours of out-of-cell time reach week, including 18.5 hours of recreational time outside the cell and 90 minutes of confidential, structured therapeutic activities. *See* ECF No. 8355 at 7-17 (Restricted Housing Unit Program: Mental Health Services Policy, dated July 19, 2024 and effective August 1, 2024) (hereinafter "RHU Policy"). During the review period, 3CMS RHU patients, on average, were scheduled for 1.55 hours, offered 1.27 hours, attended 0.32 hours, and refused 0.94 hours of weekly structured treatment. The institution cancelled an average of 0.28 hours of weekly treatment as well.

*IDTTs*

The monitor's expert observed seven 3CMS RHU IDTTs during the monitoring tour. Three patients were in attendance with three patients refusing and one patient transferred out of restricted housing. The three patients who refused IDTTs had their treatment plans reviewed *in absentia*. All required members of the treatment team were present.

The IDTT meetings were thorough and collaborative. The patients' relevant clinical and psycho-social history, diagnoses, and medications were reviewed, as well as their treatment goals. Patients were invited to discuss their own goals for treatment. The primary clinician reviewed the interventions being utilized specific to each patient, such as DBT and group therapy. The CC I spent time with each patient and thoroughly reviewed their RVRs and prison behavior, as well as any transfer requests. The psychiatric technician contributed relevant

medical information. Finally, the level of care determination was discussed before each patient was dismissed from the meeting.

The RHU Policy requires an initial IDTT for 3CMS RHU patients before the initial ICC and not later than ten calendar days after arrival. RHU policy at 5. Thereafter, routine IDTTs are required every 90 days. *Id*.

The monitor randomly selected and reviewed the healthcare records of 30 3CMS RHU patients to assess compliance with RHU policy timeframes during their stays. For the 241 patients in CDCR's appointments report, there were 261 completed and refused routine IDTTs. When a patient had either a completed or refused initial IDTT and a routine IDTT or more than one routine IDTT, timeliness in accordance with Program Guide requirements was able to be calculated. Of the 259 IDTTs that were completed, 21 were for individuals who had at least two IDTTs. Of those, two or 10 percent were not compliant with Program Guide timeframes. Of note, the report did not include individuals that did not have a completed IDTT, such as those that were not scheduled.

Of the 259 completed routine IDTTs, there were three IDTTs completed in zero minutes, 225 completed within 15 minutes, 30 lasted between 16 and 30 minutes, and one lasted between 31 and 60 minutes.

*Group Treatment*

Groups therapy was offered to 3CMS RHU patients during the review period. The RHU group rooms were situated in the older "Z" building, which featured skylights in the cells to allow natural light. One group room was observed with seven therapeutic modules arranged in a semicircle, facing the front to facilitate patient engagement. The room temperature was suitable, and the room was adequately lit. However, it was dusty with trash found under some furniture.

Confidentiality was maintained, as external noise was minimal when the door was closed. Six patients attended the session. The session was led by an engaging recreational therapist who indicated that they would show a video titled "Cage or Rage" as part of the anger management series, followed by an open discussion. This allowed the group to engage with topics/themes that arose for the group while discussing the scheduled topic. The facilitator knew some patients, but two patients were relatively new to the unit.

The video featured incarcerated individuals in a federal prison and focused on causes and management of anger and aggression. The discussion that followed engaged patients as they talked about anger and coping skills, with some participating more actively than others. Although discussions occasionally veered off topic, the facilitator was able to redirect the conversation back to anger. The content of the group was clinically appropriate, addressing coping mechanisms for anger, particularly in an institutional context. The facilitator also provided handouts to patients that appeared to be word finds and crossword puzzles.

*Individual Treatment*

The RHU Policy requires that all patients placed into 3CMS RHU receive an initial psychiatry evaluation prior to the IDTT and within ten days of arrival. . *See* RHU Policy at 4. The RHU Policy also requires that 3CMS RHU patients receive weekly primary clinician contacts and psychiatry contacts every 90 days. *See id*.

Thirty 3CMS RHU patients who required initial psychiatry evaluations during the reporting period were randomly selected for review. Of the 30 random patients, four transferred before timeline requirements expired while three did not receive an initial psychiatry evaluation at all during their stays. Of the 23 patients who received an initial psychiatry evaluation, eight or

35 percent were timely and six or 26 percent occurred in a confidential setting. Non-confidential contacts were due to patient refusals.

To measure timeliness of routine psychiatry contacts during the review period, CDCR produced an appointments report that included individuals who were required to receive a routine psychiatry contact.[49] For the 60 patients in CDCR's appointments report from September 1, 2024 to February 28, 2025, there were 66 total completed and refused contacts. Eighteen or 27 percent were reported as being conducted in a confidential setting. When a patient had more than one completed contact, timeliness in accordance with Program Guide requirements was able to be calculated. Of the 66 completed contacts, seven were for individuals who were seen at least twice by a psychiatric provider. Of those seven contacts, two or 29 percent of contacts were completed beyond the Program Guide required timeframes.

The 30 random 3CMS RHU patients who required initial psychiatry evaluations also required initial primary clinician evaluations during the reporting period. Of the 30 patients, four transferred before timeline requirements expired while 16 did not receive an initial primary clinician evaluation at all. Of the 10 patients who received an initial primary clinician evaluation, eight or 80 percent were timely while five or 50 percent occurred in a confidential setting. Non-confidential contacts were due to patient refusals and staffing shortages.

To measure timeliness of routine primary clinician contacts during the review period, CDCR produced an appointments report that included individuals who were required to receive a

[49] The 3CMS RHU routine psychiatry contacts report did not include individuals that did not have complete contacts, such as those that were not scheduled in accordance with the institution's triage plan. The reviewed data captured the time between patient contacts but did not include patients who were not seen or scheduled for a routine contact with a psychiatrist, primary clinician, or IDTT. Of note, the provided appointments report did not account for delays between appointments due to movements in or out of 3CMS level of care or RHU placement. Contact with the assigned psychiatrist or primary clinician was unable to be determined.

routine primary clinician contact. For the 79 patients in CDCR's appointments report covering patients who received at least one routine primary clinician contact from September 1, 2024 to February 28, 2025, there were 99 total completed and refused contacts. Of the 97 that were completed, 25 or 26 percent were reported as being conducted in a confidential setting. When a patient had more than one completed contact, compliance with Program Guide timeframes was able to be calculated. Of the 97 completed contacts, 21 were for individuals who were seen at least twice by a primary clinician provider. Of those 21 contacts, 18 or 86 percent of contacts were completed beyond the Program Guide required timeframes.

Of the 97 completed routine psychiatry contacts, 80 were completed within 15 minutes, 14 lasted between 16 and 30 minutes, two lasted between 31 and 60 minutes, and one lasted between 61 and 95 minutes.

Non-Disciplinary Restricted Housing:

There were 12 EOP RHU patients classified as NDRH. For CCCMS RHU there were 24 patients identified as NDRH. The number of patients who were designated as accelerated transfer or the number of patients that were designated to receive privileges and property were unable to be determined.

MHCB:

There were 102 patients admitted to the CSP/LAC's 12-bed MHCB during the review period. The average monthly census was eight patients, with an average of seven patients in September 2024, nine patients in October 2024, eight patients in November 2024, nine patients in December 2024, six patients in January 2025, and seven patients in February 2025.

According to the staff-to-patient ratios from the 2009 staffing plan, psychiatrists who treat MHCB patients must maintain a caseload of no more than 10 patients per psychiatrist, while

primary clinicians who treat MHCB patients must maintain a caseload of no more than 10 patients per 1.18 full-time equivalent staff psychologists. *See* ECF No. 3693 at 22. The one on site psychiatrist and three on site psychologists all had caseloads within established ratios during the review period. Tele-mental health was not utilized during the review period.

Observed MHCB IDTTs during the site visit were inadequate, primarily due to the supervisor's inappropriate efforts to control the discussion and outcomes despite the attempts of other members to provide input and alternative suggestions. While all required team members were present and contributed at points to the discussion, the MHCB supervisor controlled all interactions with patients and ultimately decided the outcomes for each patient presented. This supervisor utilized a highly antagonistic tone, dismissed patients' reported experiences, many of which staff confirmed as factual, minimized clinical risks, and abruptly moved to discharge patients without establishing sufficient evidence of clinical readiness or allowing the direct care providers to build a case for or against discharge.

The monitor's expert also found that case presentations were severely lacking, and no case conceptualizations were provided. The IDTT did not discuss whether patients met higher level of care referral indicators or progress toward established goals. Apart from the psychiatrist, who discussed medication changes and patient responses, treatment plans were not reviewed during the meeting to determine whether they had been implemented effectively, whether goals were met, or whether treatment plans required modification. Discharge recommendations were not sufficiently justified, and in one case the decision to retain or discharge was not discussed at all.

The supervisor also frequently asserted that patients did not meet criteria for MHCB admission, claiming they were feigning illness and threatening suicide for secondary gain;

however, the supervisor did not provide evidence or consider the legitimacy of the safety concerns and the potential impact on risk of suicide, self-harm, and psychiatric decompensation.

These factors appeared to discouraged full participation by other team members and potentially risked premature discharge decisions without adequate clinical justification. The lack of structured case presentations, treatment plan reviews, progress discussions, and review of HLOC referral indicators further reflected systemic deficiencies in MHCB treatment planning and clinical oversight.

The MHCB IDTT is composed of the assigned psychiatrist, assigned primary clinician, nursing staff, correctional counselor, and the patient (if clinically and custodially appropriate and absent a refusal). *Id.* at 83.

The Program Guide requires initial IDTTs in MHCBs to occur within 72 hours of the patient's admission and at least every seven days following the initial IDTT. ECF No. 7333-1 at 83-84 (PG 12-5-12). Thirty patients' healthcare records were reviewed to determine compliance with Program Guide timeframes during their stays. Thirty MHCB patients required initial IDTTs; all 30, or 100 percent occurred within 72 hours of arrival. In addition, all 30, or 100 percent of IDTTs had the required staff in attendance. Patients attended 28 or 93 percent of initial IDTTs, while two or seven percent of IDTTs were held *in absentia* due to patient refusals.

Twenty-eight MHCB patients required routine IDTTs. There were 28 expected routine IDTTs for the 28 patients. Of the 28 reviewed routine IDTTs, 27 or 96 percent occurred timely, or every seven calendar days following the initial IDTT. All 28 or 100 percent of routine IDTTs had the required staff in attendance. Of the 28 routine IDTTs reviewed, patients attended 27 or 96 percent of the time, and the IDTT held *in absentia* was due to patient refusal.

Groups were offered to MHCB patients depending on their treatment plan, however documentation regarding frequency and amount of group offerings was unavailable.

Two patients had been in the MHCB for at least seven days at the time of the monitoring tour, and their records were reviewed for to assess the offering of out of cell time (yard or dayroom), showers and a phone calls. One of the two patients had not been offered 10 hours of out of cell with 9.5 hours being offered. Both patients were offered at least three showers and both were offered at least six or opportunities to use the phone.

Thirty MHCB patients required initial psychiatry evaluations. Of those, 30, or 100 percent had a timely initial psychiatry evaluation meaning it occurred before the initial IDTT and within 24 hours of arrival. Nineteen or 63 percent of initial IDTTs occurred in a confidential setting. Reasons reported for non-confidentiality included patient refusals and in some cases were not documented. Telepsychiatry was not utilized for initial psychiatry contacts.

All thirty MHCB patients required two routine psychiatry contacts per week. There were 149 expected contacts with 100 percent timely compliance. ECF No. 7333-1 at 85 (PG 12-5-14). Of the 149 reviewed routine contacts, 72 or 48 percent of routine psychiatry contacts occurred in a confidential setting. Reasons reported for non-confidentiality included patient refusals, medical restrictions, modified programming, or were otherwise not documented. Telepsychiatry was not utilized for these initial psychiatry contacts.

Thirty MHCB patients required initial primary clinician evaluations; 18 or 60 percent were completed within 24 hours of arrival. Of the 30 initial primary clinician contacts reviewed, 12 or 40 percent were held in a confidential setting. Reasons reported for non-confidentiality included patient refusals, unavailable confidential space, and cell front contacts. There were no initial contacts reported utilizing tele-mental health.

Thirty MHCB patients required routine primary clinician contacts. An institution is considered compliant if a patient was seen daily beginning the day after admission for an out-of-cell confidential contact (unless the patient refused) by the psychiatrist or psychologist, though on weekends the patient may be seen by the medical officer of the day (MOD). ECF No. 7333-1 at 84(PG 12-5-13). There were 90 expected contacts, 43, or 48 percent were timely. Of the 90 expected contacts, 40 or 44 percent were conducted in a confidential setting. Reasons for non-confidentiality included patient refusals, unavailable confidential space, and cell front contacts.

Seclusion and Restraint:

During the review period, CSP/LAC recorded one incident of seclusion and no incidents of restraints.

The institution's MHCB did not complete the required restraint status review for any patients housed in the MHCB. The unit correctional officers were able to clearly articulate the criteria as to when restraints would be allowed or required. However, the sergeant's review and determination if restraints were necessary for non-maximum custody patients was not occurring.

EOP:

At the time of the site visit, there were 586 mainline EOP patients housed on Facilities D1, D2, D3, and D4, with overflow housing on Facility C5. The institution indicated that during the reporting period, the average patient census of 626 was four patients shy of institutional capacity of 630 Level IV EOP patients.

EOP overflow housing on Facility C5 was used consistently throughout the review period. The institution indicated that 55 patients were housed in overflow during the review period with an average length of stay of 34 days.

According to the staff-to-patient ratios from the 2009 staffing plan, psychiatrists who treat mainline EOP patients must maintain a caseload of no more than 120 patients per psychiatrist, while primary clinicians who treat mainline EOP patients must maintain a caseload of no more than 26 patients per clinician. *See* ECF No. 3693 at 17. During the review period, five psychiatrists and 16 primary clinicians carried mainline EOP caseloads. Four of the five psychiatrists had caseloads within established ratios, while all 16 primary clinician caseloads exceeded established ratios.

*Structured Treatment*

The Program Guide required that each EOP patient be offered at least ten hours per week of structured therapeutic activities. *See* ECF No. 7333-1 at 58. For patients who were determined by the treatment team to be clinically contraindicated for ten hours of treatment activities per week, the primary clinician is required to present the case and recommended treatment program (i.e. EOP modified programming) to the IDTT for approval. If the patient's modified treatment program included a schedule of less than ten hours of treatment per week, the patient's IDTT was required to meet monthly to review and increase the amount of structured therapeutic activities or refer the patient to a higher level of care as clinically indicated. *Id*.

The institution indicated that mainline EOP patients were scheduled for an average of 13.48 hours, offered 6.34 hours, attended 2.35 hours, and refused 4.22 hours of weekly structured therapeutic activities during the review period. An additional average of 7.33 hours of weekly structured treatment was cancelled by the institution. CSP/LAC indicated that 53 percent of all cancelled treatment was due to custody factors, four percent was due to cancelled weather, with the remainder cancelled due to custody modified programming.

Patients on EOP modified programming were scheduled for an average of 12.43 hours, offered 5.73 hours, attended 1.9 hours, and refused 4.05 hours of weekly structured therapeutic activities during the review period. An average of 6.77 hours of weekly structured treatment was cancelled by the institution. CSP/LAC indicated the same reasons for cancellations of EOP modified programming during the review period.

*IDTTs*

The monitor's expert observed 16 mainline EOP IDTT meetings during the monitoring tour; all were located on Facility D with one located in overflow housing on Facility C5. Six patients declined to attend their IDTT meetings, and a seventh IDTT meeting for the patient housed in overflow was held *in absentia* because the patient could not be escorted to Facility D IDTT meeting. Five of the 16 observed meetings were initial IDTT meetings, and three of these were conducted i*n absentia*, while nine were routine IDTT meetings with four held *in absentia*.

The IDTT meeting room was confidential, well illuminated, and adequately arranged. Staff reported that the room became overly warm as the day progressed, and they attributed this to the facility having not yet switched from heating to air conditioning. Each team member had access to a laptop or stationary computer

IDTT meetings were scheduled for 15-minute durations, and the first meeting started late due to custody-related delays. Required treatment staff were present in ten of the 16 IDTTs; alternate staff were present for the remaining six meetings. In at least one case, neither the psychiatrist nor the primary clinician had met the patient prior to the IDTT meeting.

During the IDTT meetings, the treatment team consistently identified the patient's diagnosis, current psychotropic medications, history of mental health care within CDCR, and custodial information. When multiple or conflicting psychiatric diagnoses were present,

discussion included the need for clarification and in one case resulted in resolution of the diagnoses. All IDTT meetings held with the patient were collaborative and supportive, and all IDTT meetings demonstrated good multidisciplinary collaboration. Correctional counselor input was excellent.

However, even brief psychosocial histories and case formulations were missing from IDTT discussions. Treatment goals were not discussed or discussed only vaguely or indirectly in 12 of 16 IDTT meetings. One primary clinician modeled excellent engagement in this area for the remaining four IDTT meetings. This clinician collaborated with each patient to identify a patient-specific, objective, measurable, and achievable treatment goal, explained specific interventions to the patient, and discussed the rationale for the patient's level of care. In each of these cases, treatment goals and interventions were clinically appropriate and well-articulated.

All 16 patients were retained at the EOP level of care. The appropriateness of the patient's level of care was discussed in nine of 16 meetings. Higher level of care considerations were not discussed in any IDTT meeting.

Only one of the 16 records included an updated, adequate master treatment plan that was consistent with IDTT discussions. In 11 of 16 records, there was no master treatment plan developed at all.

High rates of refusals for IDTT meetings were reported by staff, with patient safety concerns, avoidance of unclothed body searches, and avoidance of handcuffs required for escorting being cited as the primary motivations for refusals. There was also no further information provided for the individual who did not receive his scheduled IDTT because he was housed in the EOP overflow.

The Program Guide requires that EOP patients receive an initial IDTT within 14 calendar days of arrival to the institution and a routine IDTT every 90 days thereafter. *See* ECF No. 7333-1 at 57, 59.

Thirty patients who required initial IDTTs during the review period were randomly selected for review of compliance with Program Guide requirements. Of the 30 patients, seven transferred before the required timeline expired and one did not receive an initial IDTT. Of the 22 reviewed patients who received an initial IDTT, 13 or 59 percent occurred timely. Patients were present in ten cases. Reasons for absences were due to patients being housed in Facility C-5 EOP overflow, custody modified programming, and patient refusals. All reviewed IDTTs included the required staff.

To measure timeliness of routine IDTTs during the review period, CDCR produced an appointments report that included individuals who were required to receive a routine IDTT.[50] For the 752 patients in CDCR's appointments report for September 1, 2024 through February 28, 2025, there were 880 completed initial or routine IDTTs. When a patient had either a completed initial IDTT and a routine IDTT or more than one routine IDTT, compliance with Program Guide timeframes was able to be calculated. Of the 880, 132 contacts were for individuals who had at least two IDTTs (initial and routine or two routines). Of those 880, there were 50 or 38 percent that occurred beyond Program Guide requirements with a range of 91 and 175 days between IDTTs.

---

[50] The mainline EOP routine IDTT appointments report did not include individuals that did not have a completed or refused IDTT, such as those that were not scheduled. The reviewed data captured the time between completed patient IDTTs but did not account for when patients were not scheduled for an initial or routine IDTT. Of note, the provided appointments report did not account for delays between appointments due to movements in or out of mainline EOP.

A random sample was selected to verify consistency between the appointments report and clinical documentation in EHRS. Of the 35 contacts reviewed in EHRS, all had consistent dates with the appointments report.

*Group Treatment*

Mainline EOP patients received insufficient opportunities for group treatment at CSP/LAC. During the review period, EOP patients were triaged with the lowest functioning EOP patients given the highest priority for mental health treatment, including group priority. According to leadership, low functioning EOP patients were offered activities of daily living (ADL) groups twice per week while higher functioning patients were offered an EOP caseload group biweekly.

However, recreation therapy (RT) groups were consistently offered to EOP patients during the review period when lockdowns did not occur. Each RT group was led by two recreation therapists when offered. Unfortunately, there were high refusal rates for RT groups due to patients not finding the groups to be engaging, and because patients were uncomfortable being in large groups, some of which had capacities of 60 to 90 patients. The CSP/LAC major sustainability report also indicated that staffing shortages resulted in decreased ability to offer RT groups, and that many patients did not attempt to attend groups because so many groups were cancelled.

NLTG groups were held on Facility D on Monday through Friday during the review period with discussion topics including transitional planning, physical health and wellness, mental health and wellness, substance use, and life skills. Groups were held in the Facility D education building and were scheduled for one hour each day. There were 245 patients who completed an NLTG group during the review period.

At the time of the site visit, all EOP groups were on hold due to the statewide and institutional lockdowns, therefore no groups were observed.

For treatment space, RT groups were held in the Facility D gym and visiting rooms during the review period. However, it was reported that RT groups in the gym were frequently cancelled or stopped early due to crisis patients being placed in one of the 15 holding cells located in the gym. The Facility D visiting room was large and confidential, with adequate lighting and furniture. Ceiling cameras were reported to have no audio capabilities.

When offered, clinical groups were held in the education building along with NLTGs during the review period. However, at the time of the monitoring tour, a large space in the vocational program building was used for mental health groups. The room was bare with inadequate furniture. Because this area was located outside of Facility D and close to the perimeter of the prison, patients were subject to unclothed searches prior going to this area. For this reason, and because EOP patients were often not comfortable in large groups, refusals were reportedly high for any mental health groups held in this area.

Facility C, building 5, had no dedicated mental health treatment space within the unit. Prior to the institutional lockdown in place at the time of the monitoring tour, EOP patients in Facility C, building 5, would require custody escort to Facility D for treatment. However, after treatment resumed on Facility C on December 16, 2024, patients received group treatment in the Facility C visiting room as well as Facility D. This room was almost identical to the Facility D visiting room. Like those in the Facility D visiting room, ceiling cameras in the Facility C visiting room were reported to have no audio capabilities.

*Individual Treatment*

Individual treatment for mainline EOP patients at CSP/LAC was a major concern during the review period with staffing shortages and custody modified programming having detrimental effects on the provision of Program Guide compliant mental health care to the EOP population.

The Special Master conducted a focused site visit of the institution from December 17, 2024 to December 19, 2024 after reports that patients on Facility D were not being offered confidential clinician contacts or adequate group treatment and EOP overflow patients on Facility C were held for months in punitive conditions with no access to yard, little to no day room, minimal cell-front therapy, and no group treatment.

On December 13, 2024 and just prior to the Special Master's site visit, CDCR indicated that CSP/LAC was closed to intake of new EOP patients "unless the patient has no alternative housing options." *See* December 13, 2024 Letter from S. Thind to Special Master Lopes, attached hereto as Exhibit _.

On December 17, 2024, there were 53 mainline EOP patients housed in the EOP overflow on Facility C-5. Leadership indicated that the facility had just begun offering structured programs and mental health groups to the overflow population the day prior to the Special Master's focused site visit, however individual treatment continued to be provided at cell-front as Facility C-5 did not have a dedicated mental health treatment space. Custody staff in the unit reported that cell-front individual treatment was driven by a lack of custody staff available to escort Facility C EOP overflow patients to Facility D.

During the December site visit, institutional leadership outlined plans to mitigate the use of EOP overflow. The stated goal was to continue with meetings held weekly at the institution and monthly with headquarters staff to resolve the overflow issues as well as access to yard and

dayroom. Headquarters leadership also indicated that a plan was being developed to convert one yard at the institution to a Level III non-designated programming facility (NDPF) to allow CSP/LAC to retain patients who had a reduction in custody from Level IV to Level III, with the ultimate hope of reducing transfers. Additionally, there was consideration to changing another yard to a Level II NDPF after May 1, 2025.

By April 2025, CSP/LAC relocated nearly all long-term EOP patients out of the Facility C-5 overflow. Only two longer term patients continued to reside in Facility C-5 during the April 2025 visit. Both patients had declined transfer to a different housing unit, citing ongoing violence and reported drug trafficking on Facility D despite its potential for greater programming and services. However, reviewed documentation confirmed that these two patients still lacked access to out-of-cell individual contacts and routine out-of-cell time, including yard and dayroom. Custody staff attributed these restrictions to their custody classification, noting that these patients were difficult to place based on multiple custody factors.

Following the Special Master's first site visit and throughout the review period, staffing shortages and modified programming periods continued and were cited as the main reason for patients continuing to receive cell-front contacts throughout the EOP program. Patients were seen confidentially in mental health offices only for initial assessments, suicide risk evaluations, PREA evaluations, and mental health assessments following the issuance of an RVR.

Staffing shortages led to an overwhelming workload for existing on-site staff who were primarily responsible for emergent and urgent referrals in addition to their assigned caseloads, while their telehealth counterpart were limited to the number and types of evaluations that they conducted daily. For example, during periods of limited movement secondary to modified

programming, crisis calls were frequent, however tele-mental health providers were unable to assist staff in these instances, further increasing workloads for on-site staff.

For individual treatment, the Program Guide requires that patients are offered an initial psychiatrist evaluation before their initial IDTT and within 14 calendar days of arrival to the institution or level of care change. *See* ECF No. 7333-1 at 57. Thereafter they are required to receive a routine psychiatric contact every 30 calendar days. *Id*. at 59. Patients are also required to receive a primary clinician evaluation within 14 calendar days of arrival and weekly (i.e. once per calendar week with no more than ten calendar days between contacts) with either a primary clinician or in group psychotherapy with an individual contact every other week. *Id*. at 57, 59.

Thirty mainline EOP patients who required initial psychiatry evaluations during the reporting period were randomly selected for review to assess compliance with Program Guide requirements. Seven transferred before the required time period expired. Of the 23 patients who received an initial psychiatry evaluation, 16 or 70 percent were timely while 15 or 65 percent occurred in a confidential setting. Non-confidential contacts were due to patient refusals and custody modified programming.

To measure timeliness of routine psychiatry contacts during the review period, CDCR produced an appointments report that included individuals who were required to receive a routine psychiatry contact.[51] For the 799 patients in CDCR's appointments report for September 1, 2024 through February 28, 2025, there were 2,701 completed and refused contacts, 1,343 or 50 percent of the completed contacts were confidential as reported by the institution.

[51] Reviewed data captures the time between patient contacts but did not account for when patients were not seen or scheduled for a routine psychiatric contact. Of note, the provided appointments report did not account for delays between appointments due to movements in or out of ML EOP. Contact with the assigned psychiatrist was unable to be determined.

When a patient had more than one completed or refused contact, compliance with Program Guide timeframes was able to be calculated. Of the 2,701, 1,906 contacts were for individuals who were scheduled at least twice by the psychiatric provider. Of those 2,701 contacts, there were 756 or 40 percent that occurred beyond Program Guide requirements with a range of 31 and 143 days between contacts.

A sample of 30 patients was randomly selected to verify consistency between the appointments report and clinical documentation in EHRS. Of the 106 contacts reviewed in EHRS, 98 or 92 percent were consistent with the appointments report; eight or eight percent had discrepancies. Discrepancies included clinical notes that were not entered due to refusal or clinical notes entered on a different date.

The 30 mainline EOP patients who required initial psychiatry evaluations also required initial primary clinician evaluations during the reporting period. Of the 30 patients, seven transferred before the required timeline expired and three did not receive an initial primary clinician evaluation at all. Of the 20 reviewed patients who received an initial primary clinician evaluation, 15 or 75 percent occurred timely and one or five percent occurred in a confidential setting. Non-confidential contacts were due to patient refusals and custody modified programming.

To measure timeliness of routine primary clinician contacts during the review period, CDCR produced an appointments report that included individuals who were required to receive a routine primary clinician contact.[52] For the 717 patients in CDCR's appointments report for

[52] The reviewed data captured the time between patient contacts but did not include patients who were not seen or scheduled for a routine contact with the primary clinician. Of note, the provided appointments report did not account for delays between appointments due to movements in or out of mainline EOP. Verified contact with the assigned primary clinician was unable to be determined. When primary clinician caseload groups were utilized to meet primary clinician

September 1, 2024 through February 28, 2025, there were 3,327 completed and refused contacts. Forty-six or 4 percent of the completed contacts were confidential as reported by the institution. When a patient had more than one completed or refused contact, compliance with Program Guide timeframes was able to be calculated. Of the 3,327, 2,613 contacts were for individuals who were seen at least twice by the primary clinician. Of those 3,327 contacts, there were 1,620 or 62 percent that occurred beyond Program Guide requirements with a range of 11 and 70 days between contacts.

There were 1,284 completed individual primary clinician contacts, of which 57 were completed in zero minutes, 1,195 were completed in under 15 minutes, 21 were completed in 16 to 30 minutes, four were completed in 31 to 60 minutes, one was completed in 61-95 minutes, and six were completed in greater than 95 minutes.

A random sample of 30 patients was selected to verify consistency between the appointments report and clinical documentation in EHRS. Of the 116 contacts reviewed in EHRS, 101 or 87 percent were consistent with the appointments report; 17 or 15 percent had discrepancies. Discrepancies included clinical notes not entered, entered on a different date, or missing.

Treatment space for mainline EOP patients in Facility D was inadequate. Mental health offices for individual encounters, the IDTT room, group rooms, and the tele-mental health room in Facility D were confidential but insufficient in number to accommodate EOP treatment needs given the size of the EOP population and the mental health staff allocated to care for this

contact requirements, verification that individual contacts with the assigned primary clinician and alternated with caseload groups with the assigned primary clinician was not conducted.

population. Thirteen mental offices, including one dedicated to tele-mental health services, were available for mental health clinicians and psychiatrists.

3CMS:

Mainline 3CMS patients were typically housed on Facilities A, B, and C during the review period.

The staff-to-patient ratios from the 2009 Staffing Plan[53] required that staff psychiatrists who treat 3CMS patients maintain a caseload of 280 patients per psychiatrist if the patient was prescribed medications and 675 patients if the patient was not prescribed medications.[54] *See* ECF No. 3693 at 12 and 6978-1 at 3. For mainline 3CMS, three psychiatrists and four primary clinicians carried caseloads. Two of three psychiatrists carried caseloads within established ratios. However, no primary clinicians carried caseloads within established ratios.

Due to the ongoing modified programming period taking place at the institution during the monitoring tour, 3CMS treatment, including IDTT meetings and group treatment was unable to be observed.

---

[53] This reference to the ratios contained in the 2009 Staffing Plan includes the 2021 adjustments to the 2009 Staffing plan with respect to 3CMS psychiatry ratios for patients not prescribed psychiatric medication. *See generally* ECF No. ECF No. 6978-1 (defendants' proposed revisions to the 2009 Staffing Plan); January 27, 2021 Order, ECF No. 7035 (approving defendants' proposed revisions to the 2009 Staffing Plan).

[54] The Program Guide requires that "[e]ach CCCMS inmate patient on psychiatric medication…be reevaluated by a psychiatrist a minimum of every 90 days regarding psychiatric medication issues." (Program Guide at 12-3-11). The 2009 Staffing Plan established a psychiatry staffing ratio for every 3CMS patient in the general population and did not distinguish between patients on medications and patients who were not. See ECF No. 3693 at 8. The Adjustments to the 2009 Staffing Plan, ECF No. 6978-1, which were approved by the Court on January 27, 2021 (See ECF No. 7035 at 2), established a new staffing ratio of 675 patients per psychiatrist for patients who are not on medications for six months or more. For the purpose of reporting compliance with staff-to-patient ratios, it was unclear whether the patient's included in each reported caseload were prescribed medications at the time of the site visit.

According to the institution, during the review period, 3CMS patients were only offered NLTG groups discussing topics including transitional planning, physical health and wellness, mental health and wellness, substance use, and life skills. Groups were held Monday through Friday on Facilities C and D. The institution indicated that 75 3CMS patients participated in NLTG groups during the review period.

The individualized treatment plan for 3CMS patients must be completed within 14 working days of referral/arrival by the patient's primary clinician in consultation with the other IDTT members and annually thereafter. *See* ECF No. 7333-1 at 43-44. (PG 12-3-10).

Thirty randomly selected patients who required initial IDTTs during the review period were selected for review of compliance with Program Guide requirements. Of the 30 patients, two transferred before the required timeline expired and 20 did not receive an IDTT. None of the eight patients received an initial IDTT within Program Guide timeframes. Patients were present in five cases. Reasons for absences were due to custody modified programming and patient refusals. Seven of eight IDTTs included the required staff; the CC I was not present for one reviewed meeting.

To measure timeliness of routine IDTTs during the review period, CDCR produced an appointments report that included individuals who were required to receive a routine IDTT.[55] For the 111 patients in CDCR's appointments report for September 1, 2024 to February 28, 2025, there were 114 completed initial or routine IDTTs. When a patient had either an initial IDTT and a routine IDTT or more than one routine IDTT, compliance with Program Guide timeframes was

[55] The mainline 3CMS routine IDTT appointments report did not include individuals that did not have a completed IDTT, such as those that were not scheduled. The reviewed data captures the time between completed patient IDTTs but does not account for when patients were not scheduled for an initial or routine IDTT. Of note, the appointments report provided did not account for delays between appointments due to movements in or out of CSP/LAC.

able to be calculated. Of the 114 completed IDTTs, three contacts were for individuals who had at least two IDTTs (initial and routine or two routines). Of those three, all occurred within Program Guide requirements.

The Program Guide requires that patients are offered an initial psychiatrist evaluation before their initial IDTT. *See* ECF No. 7333-1 at 34-50, 641. Thereafter they are required to receive a routine psychiatric contact every 90 calendar days if the patient is prescribed a psychotropic medication. *Id*. at 44. Patients are also required to receive a primary clinician evaluation within ten working days of arrival and every 90 calendar days thereafter. *Id*. at 41, 48.

Thirty mainline 3CMS patients who required initial psychiatry evaluations during the reporting period were randomly selected for review to assess compliance with Program Guide requirements. Two transferred before the required time period expired and three patients never received an initial psychiatry evaluation or initial IDTT at CSP/LAC. All 25 mainline 3CMS patients received an initial psychiatry evaluation before their initial IDTT, however 17 patients did not receive an initial IDTT. Of the 25 patients who received an initial psychiatry evaluation, 11 or 44 percent occurred in a confidential setting. Reasons for non-confidentiality included custody modified programming.

To measure timeliness of routine psychiatry contacts during the review period, CDCR produced an appointments report that included individuals who were required to receive a routine psychiatry contact.[56] For the 616 patients in CDCR's appointments report for September

[56] The mainline 3CMS routine psychiatry appointments report did not include individuals that did not have completed contacts. Reviewed data captured the time between patient contacts but did not account for when patients were not seen or scheduled for a routine psychiatric contact. Of note, the appointments report provided did not account for delays between appointments due

1, 2024 to February 28, 2025, there were 828 completed and refused contacts. Of the 816 completed contacts, 503 or 61 percent were confidential as reported by the institution. Reasons for non-confidential psychiatry contacts included custody modified program, confidential space was unavailable, mental health modified program, and patient refusal. When a patient had more than one completed or refused contact, timeliness in accordance with Program Guide requirements was able to be calculated. Of the 828, 213 contacts were for individuals who were seen at least twice by the psychiatric provider. Of those 213 contacts, there were 109 or 51 percent that occurred beyond Program Guide requirements with a range of 91 to 164 days between contacts.

The 30 mainline 3CMS patients who required initial psychiatry evaluations also required initial primary clinician evaluations during the reporting period. Of the 30 patients, two transferred before the required timeline expired and six did not receive an initial primary clinician evaluation at all. Of the 22 reviewed patients who received an initial primary clinician evaluation, none occurred within ten working days of arrival and 12 of 22 or 55 percent occurred in a confidential setting. Non-confidential contacts were due to lack of available custody escorts, patient refusals, and custody modified programming.

To measure timeliness of routine primary clinician contacts during the review period, CDCR produced an appointments report that included individuals who were required to receive a routine primary clinician contact.[57] For the 206 patients in CDCR's appointments report for

---

to movements in or out of CSP/LAC. Contact with the assigned psychiatrist was unable to be determined.

[57] The mainline 3CMS routine primary clinician appointments report did not include individuals that did not have completed contacts, such as those that were not scheduled. The reviewed data captured the time between patient contacts but did not include patients who were not seen or scheduled for a routine contact with the primary clinician. Of note, the provided appointments

September 1, 2024 to February 28, 2025, there were 313 completed and refused contacts. Of the 263 completed contacts, 189 or 72 percent were confidential as reported by the institution. Reasons for non-confidential primary clinician contacts included patient refused confidential contact, confidential space was not available, and custody modified program. When a patient had more than one completed or refused contact, compliance with Program Guide timeframes was able to be calculated. Of the 313, 107 contacts were for individuals who were seen at least twice by the primary clinician. Of those 107 contacts, nine or eight percent occurred beyond Program Guide requirements with a range of 91 to 168 days between contacts.

There were 263 completed individual PC contacts, of which 166 lasted under 15 minutes, 78 lasted between 16 and 30 minutes, 18 lasted between 31 and 60 minutes, and one lasted between 61 and 95 minutes.

Other Issues:

Pre-Release Planning:

CSP/LAC operated without a permanent pre-release coordinator during the monitoring period due to staffing shortages. However, using an acting pre-release coordinator, the institution still obtained pre-release reports to track patient release dates. The primary clinicians would then help patients secure releases of information (ROI) for community treatments, to arrange transportation, and to address Cal IDs. The acting pre-release coordinator also collaborated with correctional counselors, parole officers, and TCMPs as necessary.

At the time of the monitoring tour, pre-release groups were not occurring due to the statewide custody modified programming. However, during the review period, pre-release

---

report did not account for delays between appointments due to movements in or out of CSP/LAC. Contact with the assigned primary clinician was unable to be determined.

groups were scheduled for Tuesday mornings for mainline EOP participants only, while no pre-release groups were offered to 3CMS patients.

The acting pre-release coordinator noted concerns about notice of release dates sent to the institution and recalled multiple instances of individuals given notice of release with less than a week to get prepared. Additional barriers to the pre-release program included limited staffing to assist high acuity patients understand documents that they were required to sign for ROI and Cal ID. When patients refused to sign documents, the coordinator's ability to reach out to the patient again was limited due to her caseload.

The acting pre-release coordinator reported that currently all pre-release assessments were up to date, with no backlog, thanks to previous coordinators who had completed them promptly. The TCMP maintained offices within the institution, employing two TCMP providers and additional staff members to facilitate pre-release groups and backups.

During the review period, TCMP documentation indicated that 138 patients were offered services, including 37 EOP and 101 3CMS patients. Out of these, there were 124 patients, or 90 percent who applied. One hundred twenty applied for Medi-Cal, fifty-three patients applied for SSI, and one applied for VA benefits. Four patients did not apply for benefits as they had access to other insurance, three patients were unavailable, and seven patients refused services.

Program Access:

a. Job and Program Assignments

On March 19, 2025, CSP/LAC reported that 1,278 job assignments were held by 215 EOP patients or 32 percent of the EOP population, 376 3CMS patients or 33 percent of the 3CMS population, and 687 non-MHSDS individuals or 51 percent of the non-MHSDS incarcerated population.

The 1,684 academic assignments were held by 200 EOP patients or 30 percent of the EOP population, 477 3CMS patients or 41 percent of the 3CMS population, and 1,007 non-MHSDS individuals or 75 percent of non-MHSDS incarcerated population.

The 22 vocational education assignments were held by no EOP patients, 18 3CMS patients or two percent of the 3CMS population, and four non-MHSDS incarcerated persons.

The 33 substance abuse treatment assignments were held by four EOP patients or one percent of the EOP population, seven 3CMS patients or one percent of the 3CMS population, and 22 non-MHSDS individuals or two percent of non-MHSDS incarcerated population.

b. Milestone Credits

CSP/LAC was unable to report the number of patients who were eligible to earn milestone credits. Nonetheless, they reported that 279 EOP and 109 3CMS patients and 477 non-MHSDS incarcerated persons, earned the credits.

c. Out-of-Level Housing

CSP/LAC reported that 27 3CMS custody Level I patients were in Level III housing. Thirty-six 3CMS custody Level II patients were in Level I housing, 48 3CMS custody Level II patients were in Level III housing, and two EOP and one 3CMS custody Level II patients were in Level IV housing. Thirteen EOP and 28 3CMS custody Level III patients were in Level IV housing. There were also 52 3CMS custody Level III patients in Level IV housing.

d. ADA Reasonable Accommodations and Grievance Procedures

CSP/LAC provided a copy of the ADA reasonable accommodation operating procedure and was in compliance with statewide policy.

e. Periodic Classification Score Reductions: EOP Patients

The institution was unable to provide documentation regarding periodic classification reduction scores for EOP patients during the review period.

f. Unclothed Body Search

CSP/LAC's LOP regarding unclothed body searches was in compliance with CDCR policy. EOP RHU staff further reported that unclothed body searches were conducted outside of the patient's cell in a confidential area using privacy screens. Staff were knowledgeable of the unclothed body search policy and how CSP/LAC implemented it.

"C" Status:

On March 27, 2025, 78 MHSDS patients were designated "C" status. This included two EOP RHU patients, two 3CMS RHU patients, two EOP and seven 3CMS sensitive needs yard (SNY) patients, 37 mainline EOP patients, and 28 mainline 3CMS patients.

Case-by-Case Reviews:

The institution provided reports for each month of the review period regarding the long-term segregated case conference (LTSCC) reviews. The data provided indicated that for the month of September 2024, there were eight patients who met the criteria of being retained in RHU for at least 150 days and should have been reviewed in a LTSCC. The information provided did not indicate if a LTSCC was completed in one case, two cases were reviewed by LTSCC in a timely manner, four cases were late, and one case was pending. For November 2024 the report listed four patients retained in RHU longer than 150 days. Two of the cases were compliant with the LTSCC requirement and two cases did not indicate if an LTSCC had occurred. For December 2024 the report listed five patients retained to RHU longer than 150

days. Two of the cases were compliant with the LTSCC requirement and three cases were not documented as being reviewed by LTSCC.

Mental Health Referrals:

CSP/LAC indicated that during the reporting period, the institution prioritized urgent and emergent referrals. Given the high volume of these referrals and alternative housing placements/contacts, CSP/LAC indicated that it did not have the staffing resources to address routine referrals. Documents indicated that the institution triaged and attempted to address factors that needed the attention of clinicians (i.e. loss, bad news, etc.) and there were a high number of RVRs and grievances clinicians were also asked to complete.

There were 4,413 mental health referrals during the review period, of which 1,152 were referrals to psychiatry and 3,261 were referrals to primary clinicians. Of the 4,413 total mental health referrals, CSP/LAC was compliant with timely response to 2,105 or 48 percent.

Of the 1,152 total psychiatry referrals, there was a timely response to 410 or 36 percent of referrals. The institution was compliant with 84 percent of emergent psychiatry referrals, 25 percent of urgent psychiatry referrals, and 31 percent of routine psychiatry referrals.

Of the 3,261 total primary clinician referrals, there was a timely response to 1,695 or 52 percent of referrals. The institution was compliant with 69 percent of emergent referrals, 74 percent of urgent referrals, and 32 percent of routine referrals.

Custody and Mental Health Partnership Plan:

CSP/LAC's custody and mental health partnership plan LOP complied with statewide policy and was up to date.

Executive leadership joint rounding occurred with required staff in attendance during all six months of the review period on facilities D, B, A, 3CMS RHU, an unspecified 3CMS facility,

and the EOP RHU. Staff reported concerns with staffing shortages, poor staff morale due to ongoing incidents of violence, specific patient concerns, and positive relations between mental health and custody; notably, only custody staff members were interviewed for multiple months due to staffing shortages. The incarcerated population reported satisfaction with the mental health services provided and a desire for more recreational programming. Executive joint rounding was discussed in detail for all six months of quality management committee minutes and three of six months of mental health program subcommittee minutes; executive staff meeting minutes were not provided.

Monthly joint supervisory tours did not occur during the review period.

Weekly 3CMS supervisory meetings occurred weekly throughout the review period on facilities A, B, and C. However, documentation typically provided little to no further information than specific patients exhibiting unusual or bizarre behavior.

MHCB, EOP RHU, 3CMS RHU, and mainline EOP huddle forms were not provided. An observed RHU EOP huddle was attended by required staff. The unit sergeant and a custody officer provided high quality, detailed information regarding patients of concern, and it was evident that they knew the individuals housed in the unit. The primary clinician did an excellent job eliciting and sharing information, and mental health-custody interactions in the huddle were organic, engaged, clinically meaningful, and effective.

Introduction to EOP groups were offered weekly throughout the review period; 19 patients enrolled during the review period.

CSP/LAC distributed the 3CMS orientation brochure to new patients and provided a copy of the same.

The IAC met twice on facility A, twice on facility B, once on facility C, once on facility D, and three times on the MSF during the review period. Discussed topics included physical plant issues and progress regarding the same, kitchen and canteen issues, proposed modifications to visitation policies, implementation of the California model, changes to custody levels of specific yards and related transfers and endorsement concerns, and tablet issues.

For staff misconduct complaints, one was filed against dental staff which was closed by the time of reporting; 167 against medical staff of which 130 were closed and 37 were still pending different forms of review; 42 against mental health staff of which 21 were closed, one was canceled, and 20 were pending different forms of review; and 835 against custody staff of which 39 were rejected, one was labeled "time expired," and the status of the rest were not provided.

CSP/LAC was unable to provide the number of investigations for misconduct towards a patient initiated outside of the appeal process. No staff members were reassigned because of misconduct complaints.

The annual partnership off-post training was attended by 182 of 247 or 74 percent of required mental health staff and 793 of 866 or 92 percent of custody staff.

Quarterly roundtable training attendance could not be ascertained from the documentation provided.

Heat Plan:

CDCR required that each institution's heat plan LOP incorporate the requirements of the most recent Heat Plan and Updates memorandum. CSP/LAC's heat plan LOP was current and complied with CDCR policy; it was last revised in January 2025.

The 2024 Heat Plan and Updates memorandum required that each institution submit a Heat Plan Monthly Summary Report (Summary Report), signed by the warden and CEO, to headquarters each month from May 1 to October 31. The heat plan was in effect during September and October 2024 of the review period. There were 23 Stage I heat alerts, and zero, Stage II or Stage III heat alerts during the review period.

The Heat Plan and Updates memorandum also required institutions to submit a monthly Heat Incident Log documenting the number of patients who experienced a heat-related illness. The Heat Incident Log must include the patient's information and details regarding the heat-related illness. Two patients experienced heat-related illnesses during the review period. The incidents were appropriately documented.

The 2024 Heat Plan and Updates memorandum required all custody officers and leadership staff to maintain knowledge of heat plan activation and act in accordance with the requirements of each stage. The monitor interviewed 12 officers from Facilities A, B, C, D and MHCB regarding their knowledge of the institution heat plan requirements, and they all demonstrated a basic knowledge of the heat plan. Several officers reported being unaware of responsibilities when a patient reports that their cell is too hot. Staff did indicate that they would let the patients out of the cell and offer a cold shower in that event.

To ensure proper and accurate temperature recording, the annual Heat Plan and Updates Memorandum required the warden or his designee to ensure an accurate thermometer was placed in a central, heat-neutral location to monitor outside ambient air temperatures which must be recorded every hour, every day, from May 1 through October 31 of each year. Reviewed outdoor temperature logs were recorded every hour as required. On days when a heat alert was activated,

the exact start and end times were written directly on the form. Outside temperatures that exceeded 90 degrees were also highlighted.

The warden or his designee is also responsible for ensuring that inside air temperatures are measured in all non-airconditioned living areas that house heat-risk incarcerated persons. Temperatures must be taken at the highest non-air-conditioned location where heat-risk incarcerated persons are housed and must be recorded every three hours. Reviewed indoor temperature logs were recorded properly every three hours. There were also annotations about Stage I heat alerts taking place outside including the exact time of those alerts. There also appeared to be additional signatures on the page reflecting quality assurance checks by supervisory staff.

In an effort to ensure that heat-risk incarcerated persons were afforded equal access to programs, services, and activities during extreme weather conditions, the 2024 Heat Plan and Updates memorandum required institutions to devise and include any reasonable accommodation and alternatives to yard activities when revising their LOP. All reasonable accommodations provided to heat-risk incarcerated persons during heat alert activation must be documented in the institution's DAR as well. Although the reviewed DARs evidenced exact times of heat alert activation, the reports did not indicate the alternative accommodations offered to patients.

The 2024 Heat Plan and Updates memorandum required annual training on the institution's Heat Plan. For custody staff, the Warden, Chief Deputy Warden, three correctional administrators, three of six of captains, nine of 35 lieutenants, 34 of 77 sergeants, and 300 of 705 correctional officers attended the required training. For mental health staff, the chief of mental health, chief of psychology, and chief of psychiatry, all supervisors and staff psychologists, 37

psychiatrists, no psychiatric nurse practitioners, and 121 of 199 nurses attended the required training.

RVRs:

The institution reported a total of 4,843 RVRs were issued during the review period including four issued to acute care patients, four to ICF patients, 160 to MHCB patients, 1,367 to EOP patients, 2,143 to 3CMS patients, and 1,165 to non-MHSDS patients. A total of 3,678 RVRs, or 76 percent of all RVRs issued during the reporting period, were issued to MHSDS patients.

The monitor reviewed 29 RVRs for compliance with policy. Custody referred the RVR to mental health staff within policy timelines in 11 of 29 or 38 percent of cases. The range of lateness was between one and 13 days late. Mental health completed the MHA and returned it to custody staff within policy timelines in 21 of 29 or 72 percent of cases. The MHA was conducted in a private setting in 12 cases and the patient refused the interview in six cases. In the remaining eleven cases, the MHA stated that the reason for not offering a confidential setting was due to staff shortages, patients being on suicide watch, and custody modified program. The senior hearing officer (SHO) documented consideration of the MHA in 27 out of 29 or 93 percent of RVRs. The two cases where the SHO did not document their consideration, the SHO discussed language from the MHA related to penalty mitigation. The SHO mitigated penalties based on recommendations in the MHA in 19 of 26 or 73 percent of cases where mitigation was recommended. In the seven cases where recommended mitigation was not given, the SHO justified the penalty stating that the patient had to be held accountable for their actions.

Regarding RVR MHA training for custody staff, the one warden and one chief deputy warden attended, four of the six correctional administrators, two of the six captains, 10 of the 35

lieutenants, and 28 of the 77 sergeants attended the training. For mental health staff, a total of 42 staff attended the required one-time training including 28 psychologists, nine social workers and five LMFTs.

<u>Use of Force</u>:

The institution reported a total of 30 controlled use of force incidents and 674 immediate use of force incidents during the review period. Of the 674 immediate use of force incidents, 609 involved MHSDS patients.

The monitor reviewed the timeliness of the Institution Executive Review Committee's (IERC) review of use of force incidents. Title 15 requires use of force incidents to be presented to IERC within 30 days of the incident. However, a memorandum dated October 3, 2023, extended that timeframe to 60 days. For the six controlled use of force incidents in the MHCB during the review period, zero were closed and five exceeded the 60-day timeframe. The five incidents were five to 90 days past the 60-day timeframe. For all 30 controlled use of force incidents, 13 were closed, 10 were at executive level of review, six were at level I or level II of review and one was reported as open. Of the 17 controlled use of force incidents that remain pending at some level of review, 16 were more than 60 days from the date of the incident and not within policy timelines.

For immediate use of force incidents involving MHSDS patients, 290 or 48 percent were either closed or noted as review completed, 252 or 41 percent were at some level of review, and 67 or 11 percent were reported as being open.

The monitor reviewed the incident reports of six controlled use of force incidents and viewed the video recording of five of the six incidents. The monitor did not find any unnecessary or excessive use of force violations. All policy requirements for each controlled use

of force incident were met, including appropriate cool down periods, mental health clinician intervention, video footage of the incident, multiple attempts to gain compliance with vocal orders, and nursing review for exposure to chemical agents.

However, issues were identified regarding the lack of clarity or lack of details within the incident reports and the issuance of inappropriate RVRs. For example, in one case, the report indicated physical force was used, however, the two officers stated they did not use any physical force. During a PC 2602 involuntary medication cell extraction, the patient refused an order for an unclothed body search and refused to be placed into restraints. Title 15 § 3317.2 states that an RVR shall not be issued for a cell extraction for the administration of involuntary medication, unless it is a Division A1 offense. The patient was issued an RVR for resisting a peace officer, a Division D offense.

The monitor reviewed fourteen immediate use of force incidents which included physical force, MK-9 streamer and MK-9 foam. No immediate use of force videos were reviewed. The monitor noted concerns with the report documentation and the lack of de-escalation efforts by staff and custody staff quickly resorting to force. As an example, a patient was attending ICC, received bad news and began to reach inside of a cast that was on his arm for an unknow object. Staff correctly used physical force to stop the potential threat. However, the report fails to state what if anything was actually inside of the patient's cast. In another report, the patient was in a transport van and refused to exit the vehicle. The patient placed the seat belt around their neck and staff responded with physical force to stop the patient from hurting themselves. Once the patient was out of the van, the patient became compliant and was approved for transfer to a higher level of mental health care. The patient was issued an RVR for resisting a peace officer, which may not comply with Title 15 § 3317.2.

In an additional report, the patient was loitering on the tier following medication pass when all patients were instructed to return to their cell. Staff approach the patient and order him to be restrained, which he complied and begin to escort him to his assigned cell. During the escort the patient attempted to break away from the officer. The report was reviewed and closed and no concerns were identified. However, concerningly, there were no de-escalation efforts documented as taking place. In a different incident, no de-escalation efforts were documented when a patient was informed that a urine analysis sample was required for his PC 2602 involuntary medication.

Regarding attendance of custody staff at the annual use of force training, the warden, chief deputy warden, six correctional administrators, and six captains all attended. For lieutenants 33 of 35 attended, 74 of 77 sergeants attended and 657 of 705 correctional officers attended. For mental health staff, the three chiefs and six supervisors and the 18 psychologists attended. The institution reported 50 psychiatrists attended the training, however the institution also reported zero psychiatrist were in the job classification. For social workers, all eight in the job classification attended the training.

There were no identified excessive or unnecessary use of force incidents, however the number of immediate use of force incidents indicated the need for greater utilization of de-escalation techniques during the review period.

Lockdowns/Modified Programming:

Four modified programming periods were initiated during the review period, ranging from five days to six weeks in duration. The modified programming periods stemmed from overall increases in violence, an attempted homicide on a correctional officer, a riot, and an in-cell homicide. Three of the modified programming periods resulted in only priority ducats being

honored. One modified programming period, which stemmed from a riot and lasted for five days, did not impact mental health services. The modified programming period that stemmed from the in-cell homicide ran into the statewide PSR.

Reviewed DARS for Facility D from December 2, 2024 through December 8, 2024 indicated that six of the seven days included either suspended or modified programming on the yard due to custody staffing vacancies. Anywhere from three to eleven staff were vacant from their positions during this reviewed week. The DARS were not specific as to which activities were modified.

Access to Care:

A review of monthly Health Care Access Quality reports from September 2024 to February 2025 reflected the issuance of 164,677 mental health ducats and add-on appointments, of which 30,773 or 19 percent were completed, and 133,874 or 81 percent were not completed. Of the not completed appointments, 50,808 or 38 percent were refused by patients, 30,909 or 23 percent were not completed due to custody factors, and 52,157 or 39 percent were not completed due to non-custody issues. For the 30,909 appointments not completed due to custody factors, 9,321 or 30 percent were due to insufficient custody staff, 17,651 or 57 percent were due to modified programming, and 3,937 or 13 percent were due to other custody reasons.

Minimum Support Facility:

There were 91 3CMS patients housed in the MSF at the time of the site visit. During the review period, 63 3CMS patients were admitted to the MSF; none of the referrals originated from CSP/LAC.

*Coleman* Postings:

*Coleman* postings were observed in all toured housing units during the site visit.

**APPENDIX A – 11**
**CALIFORNIA STATE PRISON/SACRAMENTO (CSP/Sac)**
Site Visit: April 22, 2025 – April 25, 2025
Review Period: September 1, 2024 – February 28, 2025

Census:

On April 18, 2025, CSP/Sac housed 2,092 incarcerated individuals, which was a 42 percent increase from the prior review period. *See* Thirtieth Round Monitoring Report – Part C, ECF No. 8095 at 381. The 1,330 MHSDS patients represented 64 percent of the institution's population and was a 29 percent increase from the prior review period.

The MHCB housed nine MHSDS patients. No patients were in alternative housing.

There were 163 EOP patients housed in the EOP RHU, of which 12 were NDS and 96 3CMS patients in the 3CMS RHU, of which 29 were NDS.

There were 622 mainline EOP and 440 mainline 3CMS patients; the EOP and 3CMS populations increased by 14 and 175 percent, respectively, from the preceding review period.

Staffing:

The chief psychiatrist and senior psychiatrist positions were filled. All 15.5 staff psychiatrist positions were filled. CSP/Sac did not have any allocated telepsychiatry positions.

The two chief psychologist positions were filled. Seven of eight senior psychologist positions were filled, leaving a 13 percent vacancy rate. Six of seven senior psychologist specialist positions were filled; one staff was on long-term leave, leaving a 29 percent functional vacancy rate. Of the 52 staff psychologist positions, 26 were filled, leaving a 50 percent vacancy rate; 3.5 staff were on long-term leave and contract staff filled an additional 7.25 positions, leaving a 43 percent functional vacancy rate. Two of four telepsychologist positions were filled, leaving a 50 percent vacancy rate.

The supervising social worker position was filled. Of the 14 social worker positions, 12.25 were filled, leaving a 13 percent vacancy rate. One staff was on long-term leave and contract staff filled an additional 1.25 positions, leaving a functional vacancy rate of 11 percent. Three of four tele-social worker positions were filled, leaving a 25 percent vacancy rate.

CSP/Sac employed 4.25 Licensed Marriage and Family Therapists during the review period.

Inclusive of on-site and tele-mental health positions, the functional vacancy rate for primary clinicians was 30 percent.

There were 28.5 recreation therapists who filled the 25 recreation therapist positions, 2.5 staff were on long-term leave.

The four psych tech positions were filled.

Of the eight medical assistant positions assigned to telemental health, two were filled, leaving a 75 percent vacancy rate.

Nineteen of 23 MHSDS clerical positions were filled, leaving a 17 percent vacancy rate. The OSS II position was vacant. The AGPA position was filled by two AGPAs. Of the 2.5 HPS I positions, two were filled, leaving a 20 percent vacancy rate. The HPS II position was filled. The four registered nurse positions were filled

For custody staffing, the warden, chief deputy warden, and six associate warden positions were all filled. The six captain and 32.8 lieutenant positions were also filled. Of the 81.8 sergeant positions, 80 were filled, as were 13 of 17 CC I and 15 of 15.5 CC II positions. All 706.8 correctional officer positions were filled.

Tele-Mental Health:

Telepsychiatry was not available during the review period or at the time of the site visit except for after hours on-call coverage. There was a 50 percent vacancy rate among telepsychologists and 25 percent vacancy rate among tele-social workers during the review period.

The vacancy rate for medical assistants assigned to tele-mental health was 75 percent. This was identified as a major obstacle to providing timely tele-mental health care during the review period, however CSP/Sac had taken steps to fill six positions at the time of the monitoring tour.

No on-site staff clinicians otherwise teleworked during the review period.

Five telemental health clinicians were interviewed virtually. Two of these clinicians provided services to 3CMS patients, two provided services to mainline EOP patients, and the fifth provided transgender assessments.

The tele-mental health clinicians reported that they were able to provide effective care for their patients. Each clinician worked from home and had full-time schedules consisting of four ten-hour days each week. Their patient encounters were confidential and indicated that the tele-presenter was not in the room with the patient during the encounter.

However, they also reported several impediments to the efficient and effective delivery of care. Clinicians reported that connectivity challenges were intermittent but persistent and interfered with communicating with patients. This challenge was observed during an EOP IDTT meeting, resulting in the clinician's visual and audio input freezing on the screen. The problem was also observed to a limited degree during the interview with choppy or discontinuous input

from one of the clinicians. These connectivity challenges continued despite requests for assistance from the CDCR information technology team.

One of the telemental health clinicians reported that plexiglass between the patient and the telemental health camera created glare and reflections that impeded clear visual access to the patient. When patients refused scheduled appointments, the tele-presenter brought the tablet to the patient's cell front for a wellness check. Telemental health clinicians reported that it was not possible to see and hear the patient at the same time during wellness checks, because they were conducted with the cell door closed. The telehealth tablet had to be pressed close to the door crack for the clinician to be able to hear the patient and then moved to the door window for the clinician to be able to see and be seen by the patient. The reasons the cell door remained shut for the telehealth wellness check were unclear.

The tele-mental health clinicians reported that due to staffing vacancies there were insufficient numbers of tele-presenters. Only one tele-presenter was available for two or three telemental health clinicians and schedules were not synchronized. Tele-presenters worked five eight-hour days a week as opposed to the four ten-hour days and therefore tele-mental health clinicians could not hold patient appointments between 3:00 pm and 5:00 pm each day. While clinicians reported using this time to write progress notes and other health record documentation, the limitation on seeing patients was not optimal or intentional.

<u>Licensed Marriage and Family Therapists</u>:

CSP/Sac began utilizing LMFTs in September 2024 and reported experiencing several challenges with the integration of LMFT contractors. Those challenges included most LMFTs preferring part-time work; the inability of some to master essential skills, such as using the EHRS; and a lack of specialized training in forensic settings. The institution reported a total of

five LMFTs had failed to successfully integrate into the program since recruiting efforts began. Two quit during the first week of training, one failed to appear for training, one quit within the first month citing safety concerns, and another was asked not to return due to an inability to perform essential functions

Staff Recruitment:

CSP/Sac provided a list of staff recruitment initiatives implemented by CCHCS Human Resources including hiring above minimum, increased marketing, recruitment and retention pay differential and various bonuses.

Quality Management:

The CEO served as chair of the local governing body. Quarterly local governing body meeting minutes indicated that a quorum was reached in each meeting. Meeting minutes reflected approval of providers for clinical privileging, correctional treatment center policy updates including those for mental health services, and physical plant improvements. Meeting minutes indicated that the local governing body achieved intended objectives.

The quality management committee (QMC) was chaired by the CEO, met monthly during the review period, and achieved quorums at each meeting. Meeting minutes encompassed discussion of access to care, subcommittee reports and system surveillance, quality improvement initiatives, local operating procedures, the mental health-custody partnership, and action items. Minutes reflected attention to priority quality management issues in mental health, including the amount of treatment offered, suicide prevention efforts, and adherence with clozapine monitoring guidelines.

The mental health program subcommittee was chaired by the chief of mental health, met monthly throughout the reporting period, and achieved quorums for all meetings. Meeting

minutes covered key topics including quality improvement work, performance challenges identified through system surveillance, local operating procedures, staffing, training, corrective action plans, and action items. Minutes were detailed and indicated that the subcommittee closely monitored significant mental health service performance measures. Metrics included the number of RVR mental health assessments (MHA), crisis calls, and suicide risk evaluations completed each month, among other indicators. The number of self-injurious behaviors and the percentage of treatment refused were also routinely monitored.

Challenges in the delivery of mental health services were identified in the MHPS minutes and in CAPs. In advance of the site visit, CSP/Sac produced eight undated CAPs that included monthly program data for the six-month review period. Data from six CAPs confirmed consistent noncompliance with Program Guide requirements for timely IDTT meetings, required staff in attendance at IDTT meetings, timely primary clinician contacts, amount of treatment offered, and timely RVR MHAs.

Apart from some improvement in timeliness of RVR MHAs, there were no trends in approvement in these areas. CSP/Sac implemented a performance improvement work plan in September 2024 to address noncompliance, and overall improvement was attributed to improvements in notifications, a shift to advance scheduling of patients for these assessments, and designation of specific staff to the assessment process.

Barriers to improvement in other areas were identified as staffing vacancies and turnover, unexpected staff absences, population violence, the volume of patient RVRs, custody-imposed program modifications, and increases in patient acuity, crisis calls, and treatment refusals. Custody and mental health staff reported that illicit substance use was prevalent within the

incarcerated population at CSP/Sac, contributing to patient acuity, crisis calls and crisis bed placements, patient concerns with safety, and treatment refusals.

CAPs for RHU pre-screening completion and RHU general population screens were promising. In October 2024, an RHU pre-screening workgroup was convened with the chief psychologist, suicide prevention coordinator, nursing staff, and custody staff as participants. The workgroup met monthly to identify causes of and solutions for noncompliance with RHU pre-screenings. Changes in information flow, closer monitoring, and staff training resulted in significant improvement in completing RHU pre-screening.

Mental health program subcommittee minutes and CAPs revealed thorough awareness of performance deficiencies and limitations in addressing those deficiencies without sufficient staffing. Mental health leaders at CSP/Sac had full appreciation of these challenges. Challenges and trends identified in the mental health program subcommittee were raised in quality management committee minutes.

Overall, CSP/Sac's quality management reporting structure and documentation practices were useful but limited. Quality audits of suicide risk assessments and safety plans were suspended as of September 26, 2024. Due to staffing shortages, only mandatory mental health audits were completed during the review period. Also, primarily due to staffing shortages, the mental health quality improvement program lacked the ability to initiate quality improvement studies as needed or correct deficiencies already identified through routine quality assurance. These were significant limitations throughout the review period and at the time of the site visit.

Supervisory staff were provided with results of quality assurance monitoring and in turn conveyed these results to line staff during weekly supervisory and other staff meetings.

Additionally, the quality management specialist notified specific staff of results when individual performance concerns were identified through quality assurance monitoring.

Local operating procedures governing peer review for licensed psychologists, social workers, psychiatrists, and psychiatric nurse practitioners were current and consistent with statewide policy. CSP/Sac was paired with CMC for the completion of peer reviews. However, external peer review was placed on hold in May 2019.

Except for mental health staff in the CTC, internal peer review was suspended across all programs at CSP/Sac. A civil service psychologist was assigned as the peer review chair for CTC clinicians, and two other peer review committee members participated. According to documentation provided, the peer review chair and both committee members attended one peer review committee meeting, but minutes were not prepared. In May 2024, six MHCB clinicians underwent internal peer review. This cycle of peer review was completed in June 2024, and results were reported to the mental health quality management subcommittee. It was reported that no deficiencies were found.

Medication Management:

MAPIP tracked compliance with diagnostic monitoring and medication administration. Diagnostic monitoring included obtaining medication consents, as well as any physical examination, vital signs, or laboratory tests needed for a medication. Medication administration addressed the availability, continuity, and actual administration of medications. CSP/Sac provided MAPIP results for September 1, 2024 through February 28, 2025 regarding compliance for psychiatric diagnostic monitoring and medication management. The threshold for compliance was 90 percent.

Diagnostic Monitoring:

The monitoring of antidepressant medications required four metrics: EKGs for patients taking tricyclic antidepressants (EKG); medication consents (Consent); thyroid function tests (TFTs); and obtaining blood pressure for patients taking venlafaxine (venla BP). CSP/Sac was fully compliant with monitoring blood pressure for patients prescribed venlafaxine, and fully non-compliant for obtaining medication consents and monitoring thyroid function. The institution was partially compliant with obtaining required EKGs.




As not all metrics required measuring each month, CSP/Sac had 20 months for which data were required. When examined in aggregate, CSP/Sac was compliant for seven, or 35 percent, of metric-months.

The diagnostic monitoring for patients prescribed atypical antipsychotics required the measurement of 11 metrics, including: AIMS; blood pressure; glucose; complete blood count (CBC); comprehensive metabolic panel (CMP); EKG; height (Ht); lipids; medication consents; thyroid function tests; and weight (Wt). CSP/Sac was fully compliant for monitoring blood pressure and weight, and was fully non-compliant for AIMS, glucose, lipids, and obtaining

medication consents. The institution was partially compliant with the remaining metrics, namely CBC, CMP, EKGs, height, and TFTs.




A total of 64 metric-months of data were required during the monitoring period. Of those, 24, or 37 percent were compliant.

While clozapine is a highly effective antipsychotic medication which may benefit patients who did not benefit from other medications, the risk of serious, sometimes fatal, side effects, requires close monitoring with the same metrics used for antipsychotics as listed above. The institution was compliant for all required months with monitoring blood pressure, height, and weight, and was non-compliant for all required months of monitoring thyroid tests. The remaining metrics (AIMS, glucose, CBC, CMP, EKG, lipids, and obtaining medication consents) were partially compliant. In accordance with statewide policy, CSP/Sac initiated clozapine only in the MHCB. CSP/Sac was a clozapine-maintenance institution. Nursing monitored patients weekly, and alerted psychiatrists for any concerns. As of February 28, 2025, there were 19 patients at CSP/Sac on clozapine.




When examined in total, 54 data points were required during the monitoring period. Of those, 40, or 74 percent, were compliant.

The mood stabilizers carbamazepine and Depakote required four metrics: CBC; CMP; medication level; and medication consent. For carbamazepine, CSP/Sac only required two months of monitoring therapeutic medication level (for which it was compliant for one month, and non-compliant for one month), and one month of medication consents with which it was not compliant. In total, CSP/Sac was compliant with one of the three, or 33 percent, of the metric-months. Given the small number of cases, no accompanying graph is attached.

Regarding Depakote, CSP/Sac was compliant with all required months of monitoring CBC and was non-compliant for all required months of monitoring therapeutic medication levels. The institution was partially compliant with monitoring CMP and obtaining medication consents.




CSP/Sac had 22 required metric-months of data. The institution was compliant with seven, or 32 percent.

Lamotrigine is a mood stabilizing medication which requires only one MAPIP metric, namely obtaining medication consents. Of the five months for which data were required, CSP/Sac was compliant with four, or 80 percent of months.

Lithium is a mood stabilizer which required medication consents, monitoring of kidney and thyroid function, EKGs, and therapeutic medication levels. CSP/Sac was not fully compliant for any of these five metrics. The institution was fully non-compliant for all required months of EKGs and therapeutic medication level monitoring. The remaining three metrics (CMP, obtaining medication consents, and monitoring thyroid function) were partially compliant.




Of the total of 26 metric-months required, CSP/Sac was compliant with five, or 19 percent.

When all required diagnostic monitoring data were examined, CSP/Sac required 194 metric-months of diagnostic monitoring data. Of these, 88, or 45 percent, were compliant. CSP/Sac reported that reasons for under-performing diagnostic monitoring metrics included patient factors such as refusals, as well as institutional and staffing factors. With refusals excluded, CSP/Sac reported that the primary deficiency was the lack of support staff for psychiatry. No MA positions were authorized for CSP/Sac psychiatry. A request for a registry MA position to assist was denied. The institution reported that without this support staffing, it was unlikely that they would reach compliance with required MAPIP measures.

Medication Administration:

MAPIP medication administration metrics monitored essential aspects such as medication availability, continuity, preparation, and administration. CSP/Sac had 12 required measures during the reporting period.

Monitoring medication continuity included six measures: transfers from other institutions arriving at receiving and release (R&R); intra-institutional transfers to non-RHU locations (Intra); MHCB transfers (MHCB); intra-institutional transfers to restricted housing (RHU); discharge from a community hospital or DSH (Outside Hospital); and upon parole or transfer to the community (Release).

MAPIP measures tracked the compliance of administering of medications given at HS (hora somni, or bedtime) which must be given on or after 8:00 P.M. (HS), and medications given in the A.M. and P.M. which must be given at least eight hours between doses (A.M./P.M.). Other metrics evaluated whether chronic psychiatric medications were continued without interruption, and whether new medications were administered as ordered, and in compliance with required timelines.

The final set of germane MAPIP measures surrounded PC 2602 involuntary medication orders. These included whether a court order and a medication order for the PC 2602 medication were present in the medical record.

The institution was not fully compliant with any metric. CSP/Sac was non-compliant for all months with eight metrics: transfers from other institutions arriving at receiving and release; intra-institutional transfers to non-RHU locations; MHCB transfers; discharge from a community hospital or DSH; medications given at HS; medications given in the A.M. and P.M.; chronic medications; and new medications administered. CSP/Sac was partially compliant with four metrics: intra-institutional transfers to restricted housing; parole or transfer to the community; the presence of a PC 2602 court order, and the presence of a PC 2602 medication order in the medical record.




All 12 metrics were required for the entire six-month period, yielding 72 metric-months of data. Of these, 12, or 17 percent, were compliant.

CSP/Sac investigated the reasons for non-compliance with these metrics. Most medication continuity measures were driven by patient refusal. For discharges to the community, two patients drove 60 percent of the non-compliance. For the metrics around HS and A.M./P.M. medication administration, most were due to patient refusal; however, for A.M./P.M., 58 percent were due to refusal, with 41 percent listed as "completed" but still marked non-compliant. This was due to modified programs and lockdowns, as medications were passed at cell front.

For the related metrics surrounding PC 2602 medications, errors were caused by changes to the electronic medical record, leading to psychiatrists not designating the order as a PC 2602 medication. A recent fix now alerted the psychiatrist of this.

CSP/Sac reported that psychiatrists prescribed 2,622 medications. The number of patients was not specified. Of these, 16 were KOP medications. All were in accordance with policy regarding the medication type SSRI/duloxetine, and only for 3CMS patients. CSP/Sac

reported that prescriptions were for a maximum of 180 days. For patients leaving CDCR, CSP/Sac followed statewide policy of dispensing a 60-day supply of medications, barring any safety risks of doing so. For verbal and telephone orders, nursing entered the order and forwarded to the treating psychiatrist for review and signature.

Medication Administration:

CSP/Sac completed 48 medication line audits during the reporting period. All showed compliance with policies about individual wait times being under 30 minutes, and total duration of the medication pass under two hours duration.

CSP/Sac reported collaboration with nursing, patients, physicians, and custody to minimize the impact of medication administration on programming. As one example, patients with job assignments requiring an early start time were prioritized for medication line.

The institution denied any issues with patients not having protection from the elements while waiting in line. On C-yard, medication distribution rooms were all indoors.

CSP/Sac reported an average non-formulary rate of approximately 17 percent during the reporting period.

The institution completed 1,573 of the 1,836, or 86 percent, of timely polypharmacy reviews required.

CSP/Sac reported that 407 MHSDS patients received a total of 16,462 medication doses at HS. The number of HS medications was not specified. With rare exception, CSP/Sac was compliant with the requirement to give medications at HS at 8:00 P.M. or later.

The institution reported filing 16 initial PC 2602 applications (eight each of emergent, and non-emergent) and 123 renewal petitions. There were two planned non-renewals, and no

petitions expired due to administrative error. No petitions were denied or withdrawn for non-clinical reasons.

A CC II served as the Medication Court Administrator (MCA) for approximately five months, which accounted for approximately 90 percent of their job. Additional responsibilities included running reports, long-term segregation case conferences, and reasonable accommodation panel meetings. The institution denied any challenges in interfacing with the Office of Legal Affairs, the Office of Administrative Hearings, or the Administrative Law Judge. All hearings were conducted virtually. While CSP/Sac reported that it is the expectation that the MCA at each institution monitor movement and transfers daily and notify the MCA at the receiving institution, CSP/Sac did not report if this occurred. No petitions lapsed while the patient was receiving treatment at DSH. CSP/Sac reported one controlled use of force to administer PC 2602 medications.

In summary, CSP/Sac displayed non-compliance with several key portions of medication management, including with diagnostic monitoring and medication administration. For diagnostic monitoring, 45 percent of required monthly metrics were compliant. For medication administration measures, 17 percent of monthly metrics were compliant. On a positive note, the institution investigated under-performing metrics and determined that many of the MAPIP-measures were driven by patient refusal; however, the institution did not have a clear plan to address this barrier to care.

<u>Transfers</u>:

CSP/Sac had two inpatient coordinators. Both covered for line staff, specialists, and supervisors as needed. No formal backup inpatient coordinator was appointed though specialists

were available to provide coverage. The inpatient coordinators noted positive relations with HCPOP and IRU.

During the review period, there were 1,009 instances of 592 patients considered for, but not referred to, inpatient care.

CSP/Sac made 47 acute and 41 intermediate care referrals resulting in 38 acute and 32 intermediate care admissions, five acute and five intermediate care rescissions, and four acute and four intermediate care rejections. All admissions were timely.

No information on *Vitek* hearings was provided.

No inpatient referrals were for patients with complex medical needs.

At the time of the site visit, two patients were pending transfer to intermediate care; both were within transfer timelines.

Sustainable process reviews were required to audit higher level of care (HLOC) consideration documentation for quality and to measure the inter-rater reliability between the headquarters' reviewer and the institution's inpatient care coordinator. Pre-site documentation indicated CSP/Sac has remained below 85 percent for sustainable process audits since 2020. During the fourth quarter of 2024, a headquarters audit of higher level of care non-referral documentation was at 59 percent, in comparison to 76 percent for inpatient coordinator audits of the same documents. Specifically, of the 54 reviewed cases, 32 cases were identified as "good" and 22 were "unacceptable." Cases were assessed as unacceptable due to missing documentation, clinical inconsistencies, insufficient treatment interventions and insufficient narrative supporting non-referral. An appropriate action plan was developed; although until inpatient coordinators can fully return their attention to inpatient coordinator responsibilities, sustained implementation of action steps is unlikely.

Inpatient coordinators reported that when reviewing higher level of care non-referral rationale, they focus on non-referral rationale and do not review other clinical documentation. This narrow focus does not allow for an independent review of the patient's history to assess appropriateness of non-referral.

With a few exceptions, the non-referral log was complete. A sample of ten patients from the non-referral log was reviewed to assess adequacy of non-referral rationale and treatment modifications. All met non-referral criteria between January and February 2025 with eight patients on the log at least three times and two patients on the log twice. Rationale for non-referral varied by provider with some providing appropriate and thoughtful clinical rationale and the majority providing factors (incidents, data) that were either suggestive of non-rationale or provided insufficient detail without clearly explaining the reason for non-rationale.

A sample of ten cases was reviewed to assess the provision of care for patients awaiting bed placement. This included the three patients referred to inpatient care and awaiting bed placement at the time of the site visit and seven patients who were referred for inpatient care in February. Excluding the two patients who were referred for PC 1370, referral documentation was thorough.

Inpatient care coordinators reported that advance notification for inpatient returns and communication regarding patients who were returned on suicide watch was insufficient. A sample of ten health care records for patients who returned to CSP/Sac was selected to review continuity of care. Overall, continuity of care for patients discharged from inpatient care to CSP/Sac was inadequate. Five of ten reviewed cases had clinician-to-clinician contact and a comprehensive transfer summary to aid in treatment planning. Regardless of whether the transfer summary or clinician-to-clinician contact occurred, there was a lack of sufficient

information regarding the patient's inpatient treatment in initial IDTT and provider initial assessment documentation to direct treatment planning.

Overall, despite the need for improvement in documentation the inpatient referral process was reasonable and would be improved with training and mentoring inpatient coordinators once they can fully return to their roles. As noted during the site visit, there were multiple patients who were more appropriate for the personality disorder program versus an inpatient placement.

CSP/Sac made 156 referrals resulting in admissions to its own MHCB during the review period; all admissions were timely. Additionally, 212 referrals were made to outside MHCBs resulting in 135 admissions and 77 rescissions; 130 or 96 percent of transfers to outside MHCBs timely occurred and 76 or 99 percent of rescinded referrals occurred within 24 hours of alternative housing placement. Reasons for transfer delays included patients being out to court and untimely clinician-to-clinician contacts occurring due to holidays.

CSP/Sac had EOP and 3CMS RHUs; accordingly, there were no placement delays for either.

Twenty-six patients' levels of care changed from EOP to 3CMS during the review period.

No patients were transferred to an MSF during the review period.

<u>Programming</u>:

Mental health leadership reported that due to institution-wide staffing shortages, CSP/Sac had operated under a triage plan for mental health services. The triage plan prioritized responding to crisis calls, emergent and urgent referrals, and the delivery of care in MHCB and EOP RHU. Mainline EOP services were given priority over 3CMS services as well. During the reporting period, the triage plan was modified more than once in response to changing populations at various levels of care and variable staff shortages.

CDCR regional mental health leadership informally reviewed CSP/Sac's triage plan approximately once a quarter. These reviews were initiated to support the CSP/Sac mental health teams and based on the quality of the triage plan, appeared to be successful. The specificity of the triage plan and the tasks to which it gave priority provided clear guidance for treatment staff.

MHSDS Patients in EOP Restricted Housing:

CSP/Sac's EOP RHU was located on Facility A in housing units A-1, A-2, and A-5.

During the review period, there were 541 patients housed in the EOP RHU at CSP/Sac with an average length of stay of 83.76 days and a range of zero to 291 days. As of April 18, 2025, there were 163 EOP patients housed in the EOP RHU.

According to the staff-to-patient ratios from the 2009 staffing plan, psychiatrists who treat EOP patients in restricted housing must maintain a caseload of no more than 64 patients per psychiatrist, while primary clinicians who treat EOP patients in restricted housing must maintain a caseload of no more than 11 patients per clinician. *See* ECF No. 3693 at 19. During the review period, there were three psychiatrists of which one carried a caseload that exceeded established ratios with 68 patients. For primary clinicians, there were eight psychologists and three clinical social workers, all of which carried caseloads of 16 patients which exceeded established ratios. One social worker was unlicensed. There was also an LMFT who carried a caseload of 16 patients as well.

*Structured Treatment*

The RHU Policy required that patients assigned to EOP RHU be offered a minimum of 20 hours of out-of-cell time reach week, ten of which must be structured therapeutic activities unless clinically contraindicated while the remaining ten hours must be out-of-cell exercise,

including supervised recreation therapy. *See* ECF No. 8355 at 7-17 (Restricted Housing Unit Program: Mental Health Services Policy, dated July 19, 2024 and effective August 1, 2024) (hereinafter "RHU Policy").

Excluding EOP modified programming patients, EOP RHU patients were offered a weekly average of 9.4 hours, refused 7.8 hours, and attended 1.6 hours of structured treatment. The institution did not provide responsive data regarding the number of patients who were eligible but not offered at least ten hours of structured therapeutic activities. Treatment refusals remained a chronic problem at CSP/Sac. Patients reported that barriers to treatment included the lack of detail regarding the reason for the ducat, use of leg irons, group time conflicting with yard time, not liking the group leader or group topic, and symptoms of mental illness.

Four patients on EOP modified programming were offered a weekly average of 6.7 hours of structured treatment and refused 5.9 hours of structured treatment during the review period. Patients attended less than an hour of treatment per week on average. At the time of the site visit, staff reported that there were no patients on EOP modification.

*IDTTs*

The triage plan implemented during the review period impacted IDTTs significantly. Specifically, routine IDTTs were scheduled every six months which was well was past Program Guide requirements.[58] Further, the triage plan required that clinicians were assigned no more than five IDTTs per week regardless of the number of IDTTs that were due.

---

[58] The RHU Policy requires that "[t]he treatment plan shall be reviewed by the IDTT 60 calendar and 120 calendar days after arriving at RHU and at least every 90 calendar days thereafter or whenever a significant change in the patient's functioning requires a change in the treatment plan." See ECF No. 8355 at 7-17

During the site visit, 15 IDTT meetings were observed; the majority of which were initial IDTTs. Required participants were in attendance. IDTTs were presented by eight different clinicians. Two IDTTs were presented by a covering clinician. Across IDTTs, correctional counselor input was minimal; licensed professional therapist (LPT) input was rare for A1 and A2 and limited for A5 patients.

IDTTs were assessed as inadequate. While the strength of the IDTTs was staff professionalism and level of rapport with patients, collaborative treatment discussion was insufficient. Specifically, relevant psycho-social and clinical information such as treatment needs, current symptoms and impact on functioning to support stated diagnoses and direct treatment planning was not sufficiently discussed. Case conceptualization was rare. Psychiatric medication was discussed. Higher level of care indicators and rationale for level of care, when discussed was in general terms. Objective but generic treatment goals were stated, but were primary clinician driven without psychiatric collaboration.

Patients in attendance were agreeable to stated goals but it was unclear that the patient had input into goal development. The basic review of patient information made it difficult to determine if goals were appropriately individualized for patient's treatment needs including safety planning and substance use. Interventions to assist with goal attainment were rarely discussed. Safety concerns were not appropriately discussed for the multiple patients who were in EOP RHU for safety concerns.

Overall, the IDTT process was not collaborative. Dialogue with the patient was primarily from the clinician and supervisor with input from others when called upon. Further, there were two complex cases where coordinated care between the psychiatrist and primary clinician was needed but did not occur. In one case the providers had different clinical assessments of the

patient's symptoms and need for medication but there was no discussion on how to move forward such as a joint meeting with the patient. In another case, the providers were on the same page around the patient's clinical needs and cognitive decline, however they had different perspectives on a plan with no clear resolution.

*Group Treatment*

During the site visit, group attendance was low. Custody staff reported that when there were not enough patients in attendance for an assigned group room, patients were moved to groups to which they were not originally assigned. Patients reported that this re-assignment practice was a barrier to attendance.

Groups were offered by recreation therapists (RT). Three groups were partially observed during the site visit and assessed as adequate. RTs were respectful and patients were actively engaged in group content which used media and discussion for socialization and educational purposes.

*Individual Treatment*

The RHU Policy requires that all patients placed into EOP RHU receive a primary clinician evaluation within five calendar days of arrival and a psychiatry evaluation prior to the IDTT and within ten calendar days of arrival. *See* RHU Policy at 5-6. The RHU Policy also requires that EOP RHU patients receive weekly primary clinician contacts and psychiatry contacts every 30 days. *See id*. at 7.

The monitor randomly selected and reviewed the health care records of 30 EOP RHU patients to assess compliance with Program Guide timeframes during their stays. All 30 patients required initial psychiatry evaluations; 21 or 70 percent of reviewed initial evaluations occurred before the initial IDTT. Two or seven percent of the reviewed initial psychiatry evaluations were

conducted in confidential settings; the non-confidential contacts were due to patient refusals and modified programming. Telepsychiatry was not utilized for any psychiatry evaluations.

For the 321 patients in CDCR's appointments report for September 1, 2024 through February 28, 2025, there were 871 completed and refused contacts, 46 or five percent of the completed contacts were confidential. When a patient had more than one completed or refused contact, timeliness in accordance with Program Guide requirements was able to be calculated. Of the 871, 551 contacts were for individuals who were scheduled at least twice by the psychiatric provider. Of those 551 contacts, there were 123 or 22 percent that occurred beyond Program Guide requirements with a range of 31 and 121 days.[59]

All 30 patients who required an initial psychiatry evaluation also required initial primary clinician evaluations. Twenty-eight or 93 percent of initial primary clinician evaluations contacts were completed within five calendar days of arrival or change in level of care. Four or 13 percent of reviewed initial primary clinician evaluations were conducted in a confidential setting; non-confidential contacts were due to patient refusals and modified programming.

For the 356 patients in CDCR's appointments report for September 1, 2024 through February 28, 2025, there were 2,239 completed and refused contacts. 463 or 21 percent of the completed contacts were confidential. When a patient had more than one completed or refused contact, timeliness in accordance with Program Guide requirements was able to be calculated. Of the 2,239, 1,884 contacts were for individuals who were seen at least twice by the primary

[59] Reviewed data captured the time between patient contacts but did not account for when patients were not seen or scheduled for a routine psychiatric contact. Of note, the provided appointments report did not account for delays between appointments due to movements in or out of EOP RHU. Contact with the assigned psychiatrist was unable to be determined.

clinician. Of those 1,884 contacts, there were 74 or four percent that occurred beyond Program Guide requirements with a range of 11 and 66 days.[60]

There were 2,213 completed individual primary clinician contacts. Of note, the only incident greater than 96 minutes was 106 minutes.

The EOP RHU had adequate, confidential, designated individual and group treatment space that was located in a different building, requiring patients to be escorted across the yard. Consistent with staff reports, interviewed patients stated that the unclothed body search prior to the escort from the housing unit to the treatment center was a barrier to treatment attendance.

MHSDS Patients in 3CMS Restricted Housing:

The 3CMS RHU was also located on Facility A and had an average census of 83 patients and ranged from 74 to 95 patients. At the time of the monitoring tour, there were 83 3CMS patients in the 3CMS RHU and an additional 13 3CMS RHU patients were housed in an EOP RHU due to bed unavailability.

According to the staff-to-patient ratios from the 2009 staffing plan, psychiatrists who treat 3CMS patients in restricted housing must maintain a caseload of no more than 125 patients per psychiatrist, while primary clinicians who treat 3CMS patients in restricted housing must maintain a caseload of no more than 25 patients per clinician. *See* ECF No. 3693 at 14. One psychiatrist and two primary clinicians provided RHU 3CMS services at the time of the site visit and carried caseloads that exceeded the established ratios.

[60] The reviewed data captured the time between patient contacts but did not include patients who were not seen or scheduled for a routine contact with the primary clinician. Of note, the provided appointments report did not account for delays between appointments due to movements in or out of EOP RHU. Verified contact with the assigned primary clinician was unable to be determined. When primary clinician caseload groups were utilized to meet primary clinician contact requirements, verification that individual contacts with the assigned primary clinician alternated with caseload groups with the assigned primary clinician was not conducted.

*Structured Treatment*

The RHU Policy required that patients assigned to 3CMS RHU be offered a minimum of 20 hours of out-of-cell time each week, including 18.5 hours of recreational time outside the cell and 90 minutes of confidential, structured therapeutic activities. *See* ECF No. 8355 at 7-17 (Restricted Housing Unit Program: Mental Health Services Policy, dated July 19, 2024 and effective August 1, 2024) (hereinafter "RHU Policy"). The institution indicated that 3CMS RHU patients were scheduled for an average of 3.06 hours, offered 1.93 hours, attended 0.55 hours and refused 1.37 hours of structured treatment per week. Additionally, 1.13 hours were cancelled per week on average.

*IDTTs*

Three initial IDTT meetings were observed for 3CMS RHU patients. The IDTT room was adequate in size, availability of computers, ambient temperature, and confidentiality. An overhead camera affixed to the ceiling did not have audio capability. Two of the three patients remained cuffed from behind during the IDTT meetings; all three patients were escorted by two officers who remained standing on either side of the patient throughout the meeting. IDTT meetings started on time.

Patients and required staff were present for each meeting, and all three IDTTs met Program Guide requirements for timeliness. Two of the three patients had attended their ICC meetings the day prior to the IDTT meeting, and none of the patients had an initial primary clinician assessment. Timely initial psychiatric assessments had been completed prior to the IDTT meetings. In all three IDTT meetings, patient diagnoses, medications, and treatment goals were discussed. The meetings lacked adequate specificity and measurability of treatment goals in two of the three meetings, and functional impairments were not discussed in any of the

meetings. The CC I's input was good in one of the meetings, and the treatment team was internally collaborative. However, these IDTT meetings were short and in two of the three meetings provided only a cursory discussion of the patient's treatment needs and goals. Case conceptualization was discussed in one meeting and resulted in improved diagnostic accuracy. Discussion of case formulation was lacking or inadequate in the other two meetings. Follow-up record review confirmed the presence of a written treatment plan with measurable goals and specific interventions that were appropriate for the patient's needs in all three cases. However, one of these patients was receiving ongoing psychiatric care, and this was not reflected in the treatment plan.

The RHU Policy requires that 3CMS RHU patients receive an initial IDTT within 10 calendar days of arrival and every 90 days thereafter. *See* ECF No. 8355 at 13-4.

The monitor randomly selected and reviewed the health care records of 30 3CMS RHU patients to assess compliance with Program Guide timeframes during their stays. All 30 patients required initial IDTTs. All 30 initial occurred timely within ten calendar days or arrival or level of care change. Required staff were in attendance for all 30 IDTT meetings and patients were in attendance for 13 or 43 percent of meetings. Reasons initial IDTTs were held in absentia included patient refusals.

For the 209 patients in CDCR's appointments report, there were 237 completed routine IDTTs and no refusals. When a patient had either a completed or refused initial IDTT and a routine IDTT or more than one routine IDTT, timeliness in accordance with RHU Policy requirements was able to be calculated. Of the 237 IDTTs that were completed, 29 were for individuals who had at least two IDTTs. Of those, four or 14 percent were not compliant with

RHU Policy timeframes. Of note, the report did not include individuals that did not have a completed IDTT, such as those that were not scheduled.[61]

A random sample of 30 patients were selected to verify consistency between the IDTT meeting dates listed in the appointments report and clinical documentation in EHRS. Of the 31 contacts reviewed, 30 were consistent with the appointments report. The one contact listed the wrong date in EHRS.

*Group Treatment*

3CMS RHU groups were scheduled back-to-back on Friday mornings. Consistent with the results from case reviews, mental health leadership confirmed that these groups were facilitated by recreational therapists. Case reviews indicated that patients were offered these groups about once per month.

*Individual Treatment*

The RHU Policy requires that all patients placed into 3CMS RHU receive a primary clinician evaluation within ten days of arrival and an initial psychiatry evaluation prior to the IDTT and within ten days of arrival. *See* RHU Policy at 4. The RHU Policy also requires that 3CMS RHU patients receive weekly primary clinician contacts and psychiatry contacts every 90 days. *See id.*

The monitor randomly selected and reviewed the health care records of 30 3CMS RHU patients who required an initial psychiatry evaluation to assess compliance with RHU Policy timeframes during their stays. Of the 30 reviewed patients, 23 or 77 percent received an initial

---

[61] The IDTT appointments report did not include individuals that did not have a completed IDTT, such as those that were not scheduled. Additionally, the reviewed data captured the time between completed patient IDTTs but did not account for when patients were not scheduled for an initial or routine IDTT. The appointments report did not account for delays between appointments due to movements in or out of 3CMS level of care or RHU placement.

psychiatry evaluation timely and before the initial IDTT. Two or seven percent were conducted in confidential settings; the non-confidential contacts were due to patient refusals and modified programming. Telepsychiatry was not utilized for any psychiatry evaluations.

For the nine patients in CDCR's appointments report covering patients who received at least one routine psychiatry contact during the review period, all nine contacts were completed. None were reported as being conducted in a confidential setting. When a patient had more than one completed contact, timeliness in accordance with RHU Policy requirements was able to be calculated, however there were no patients with more than one completed routine psychiatry contact. Of note, the report did not include individuals that did not have complete contacts, such as those that were not scheduled in accordance with the institution's triage plan.[62] All nine patient contacts listed in EHRS were consistent with CDCR's appointments report.

The monitor randomly selected and reviewed the health care records of 30 3CMS RHU patients who required an initial primary clinician evaluation to assess compliance with RHU Policy timeframes during their stays. One patient did not receive an initial primary clinician evaluation, while 23 or 77 percent were completed within ten calendar days of arrival or change in level of care. Ten or 33 percent of reviewed initial primary clinician evaluations were conducted in a confidential setting; non-confidential contacts were due to patient refusals.

For the 122 patients in CDCR's appointments report covering patients who received at least one routine primary clinician contact during the review period, there were 338 total completed and no refused contacts. Of the 338 that were completed, 71 or 21 percent were

[62] Reviewed data captured the time between patient contacts but did not account for when patients were not seen or scheduled for a routine psychiatric contact. Of note, the provided appointments report did not account for delays between appointments due to movements in or out of 3CMS level of care or RHU placement. Contact with the assigned psychiatrist was unable to be determined.

reported as being conducted in a confidential setting. When a patient had more than one completed contact, timeliness in accordance with RHU Policy requirements was able to be calculated. Of the 338 completed contacts, 217 were for individuals who were seen at least twice by a primary clinician. Of those 217 contacts, 199 or 92 percent of contacts were completed beyond the RHU Policy required timeframes. Of note, the report did not include individuals that did not have completed contacts, such as those that were not scheduled in accordance with the institution's triage plan.[63]

Of the 338 completed routine primary clinician contacts, no contacts were reported to have been completed in zero minutes, 278 were completed within 15 minutes, 30 lasted between 16 and 30 minutes, 28 lasted between 31 and 60 minutes, one lasted between 61 and 95 minutes, and one was completed in greater than 95 minutes.

A random sample of 30 patients were selected to verify consistency between the appointments report and clinical documentation in EHRS. Of the 59 reviewed contacts, 58 or 98 percent were consistent with the appointments report. The one contact that was inconsistent lacked documentation of the contact in EHRS.

The institution provided two reports to demonstrate compliance with the offering of out of cell time, showers and phone calls for two random weeks during the review period, one in December 2024 and one in February 2025. The reports included all four buildings which housed EOP and 3CMS RHU patients. The first report was titled "RHU Weekly Activity Audit

[63] The reviewed data captured the time between patient contacts but did not include patients were not seen or scheduled for a routine contact with the primary clinician. Of note, the provided appointments report did not account for delays between appointments due to movements in or out of 3CMS level of care or RHU placement. Contact with the assigned primary clinician was unable to be determined.

Compliance" and the second report was a detailed list of patients housed in the RHU for the entire seven days.

Regarding the required offering of 20 hours of out-of-cell time, for the examined week in December 2024, only housing unit A-2, an EOP RHU unit, was not compliant. For the examined week in February 2025, only housing unit A-5 and the 3CMS RHU were not compliant. For the offering of showers at least every other day, during the reviewed week in December 2024, only housing units A2 and A5, both EOP RHU units, were not compliant. For the reviewed week in February 2025, all RHU housing units were compliant. Regarding the offering of phone calls, no housing unit was compliant for December 2024 or February 2025.

It was also reported that there was a facility-wide shortage of electronic tablets for the incarcerated population due to the transition between CDCR's old and new contracts for this service and equipment. Radios were available and issued to patients as required. Additionally, patients were allowed to retain their tablet upon placement into RHU if they were from CSP/Sac. If the new RHU patient was from another institution, the patient would not have a tablet, and it would take one to three weeks to have one issued to them.

Mental health treatment space for 3CMS RHU patients was adequate. Three offices, each with a therapeutic module, were available for individual treatment encounters. One of these offices contained telemental health equipment, but telemental health equipment was not being used at the time of the site visit. A group room with seven start-up chairs, adequate lighting and space, and access to a large television screen, was available but in disarray when toured. A large therapeutic module was also stored in this room. It was confidential and otherwise adequate.

Non-Disciplinary Restricted Housing (NDRH):

The institution provided point in time data as to which RHU patients were designated NDRH. In interviews with RHU custody staff, they were aware of which patients were NDRH and what privileges NDRH designation allowed.

The institution indicated there were 12 EOP RHU patients on NDRH status with seven additional patients pending ICC decisions. Two EOP RHU patients were identified as NDRH 200 which require an expedited transfer. Both patients were not transferred within 72 hours as required.

There were 26 3CMS RHU patients on NDRH status with two identified as NDS 200 requiring expedited transfer. One of two patients were transferred within timelines. A total of six patients were pending a director review board action, five patients were pending completion of an investigation, and ten patients were pending CSR endorsement.

MHCB:

Similar to the prior round, the MHCB was located in two separate buildings on Facility A. The facility had 13 beds in CTC I and 11 in CTC II. However, CTC I was closed for modifications/retrofit in November 2024. There were no overflow or flex beds during the review period. There were two identified ADA rooms within CTC-II.

There was a total of 181 patients admitted to the MHCB during the review period, including 156 from CSP/Sac. The average clinical length of stay was 8.9 days, and the average physical length of stay was 11.9 days. A total of 80 patients remained in the MHCB longer than ten days with the longest at 31 days.

At the time of the site visit, there were nine patients housed in CTC-II. The average daily census for each month during the review period was, 8.7 patients in September, 9.5 patients in

October, 10.2 patients in November, nine patients in December, 9.2 patients in January, and 9.8 patients in February. CTC-I was closed for modifications/retrofit in November 2024 and had a census of 10.4 patients in September 2024 and 8.7 patients in October 2024.

A total of 16 patients had three or more MHCB admissions during the review period. Two patients had five admissions, one patient had four admissions, and 13 patients had three admissions.

According to the staff-to-patient ratios from the 2009 staffing plan, psychiatrists who treat MHCB patients must maintain a caseload of no more than 10 patients per psychiatrist, while primary clinicians who treat MHCB patients must maintain a caseload of no more than 10 patients per 1.18 full-time equivalent staff psychologists. *See* ECF No. 3693 at 22. There were three psychiatrists and two psychologists who treated MHCB patients during the review period. There were also four psychiatrists who provided weekend coverage on a rotating basis as well. No clinician carried caseloads due to the significant patient turnover.

The monitor's expert attended IDTTs that involved treatment planning for three patients. All the required clinicians and custody staff were present. The treatment plan was discussed as was whether a higher level of care was clinically indicated. The psychiatrist, primary clinician, recreational therapist, nurse, and correctional counselor all provided input during the IDTT. One of the IDTTs excluded the patient due to his agitated behavior prior to the IDTT. One patient was in cuffs during the IDTT for reasons not clear to the clinical staff despite being a mainline EOP patient.

Thirty MHCB patients required initial IDTTs; 29, or 97 percent occurred within 72 hours of arrival. In addition, 24, or 80 percent of IDTTs had the required staff in attendance, while six or 20 percent did not. The correctional counselor was always the assigned staff member missing.

Patients attended 21 or 70 percent of initial IDTTs, while eight or 27 percent of IDTTs were held in absentia and the patient's attendance in one IDTT could not be determined. Reasons initial IDTTs were held in absentia included patient refusals.

There were 33 expected routine IDTTs for the 30 patients. Of the 33 routine IDTTs required, 32 or 97 percent received them timely, or every seven calendar days following the initial IDTT. Thirty or 91 percent of routine IDTTs had the required staff in attendance. The assigned correctional counselor was the staff member replaced by an alternate. Of the 33 routine IDTTs reviewed, patients attended 23 or 70 percent of the time. Patient refusal was the primary reason routine IDTTs were held in absentia.

Thirty MHCB patients required initial psychiatry evaluations. Of those, 30, or 100 percent had a timely initial psychiatry evaluation, meaning it occurred before the initial IDTT and within 24 hours of arrival. Thirteen occurred in a confidential setting and 11 took place at cell front due to the patient's refusal for a total of 24 or 80 percent. Reasons reported for non-confidentiality included modified program or no reason was noted. Telepsychiatry was not utilized for initial psychiatry contacts.

All thirty MHCB patients required two routine psychiatry contacts per week. There were 172 expected contacts with 100 percent timely compliance. Of the 172 reviewed routine contacts, 111 or 65 percent took place in a confidential setting, while 61 or 35 percent did not. Aside from modified programming, no additional reasons were noted for non-confidential psychiatry contacts. Telepsychiatry was reported as utilized for only one routine psychiatry contact during the period reviewed.

Staff reported that most patients admitted did not need admission for mental health reasons but instead reported various custody concerns such as not receiving their property in a

timely manner, safety concerns, or issues with cellmates, etc. These phenomena appeared to reflect the significantly increased numbers of daily mental health referrals, which were reported to be mainly occurring during non-business hours (i.e., at night). This issue has been reviewed via a QI process, which has not come up with a remedy.

Regarding the offering of out-of-cell time, showers, and phone calls, a total of six weeks of daily activity logs were reviewed for three MHCB patients. A minimum of ten hours of out of cell time was offered to the patients four of the six weeks reviewed or 67 percent of the time. There was no dayroom space in the MHCB. Staff explained that yard was offered to MHCB patients only on second watch and only on the weekend as the individual yard holding cells were shared with A-5 EOP RHU patients. One individual yard enclosure was used on Facility A. CSP/Sac staff also reported that due to a budget shortfall, CDCR headquarters directed institutions to not offer third watch yard. Three or more showers were offered in five of six or 83 percent of weeks and phone calls were offered one to seven times per week.

<u>Seclusion and Restraint</u>:

The MHCB sergeant completed the restraint review for all arrivals with the patients' restraint status clearly documented on each patient's door. The institution had one designated clinical restraint/seclusion room. CSP/Sac reported one patient was place in clinical restraints during the review period for self-injurious behavior. The patient was in clinical restraints for seven hours.

<u>EOP</u>:

CSP/Sac continued to provide EOP services on Facilities A and B during the review period.

Mainline EOP patients were housed on Facility A in units three, four, six, and seven. Facility A also housed the EOP and 3CMS RHU populations.

Facility B housed Level II patients housed in housing units one, two, three, and four, while Level IV patients were housed in units five, six, seven, and would soon include housing unit eight. While staff believed that there was sufficient treatment space to provide care for the additional patients, the facility did not appear to have sufficient mental health staff. There were three primary clinicians, all tele-mental health, to cover all patients on Facility B. Despite the mission change, no additional staff had been allocated and no staff had been redirected to assist with intake.

According to the staff-to-patient ratios from the 2009 staffing plan, psychiatrists who treat mainline EOP patients must maintain a caseload of no more than 120 patients per psychiatrist, while primary clinicians who treat mainline EOP patients must maintain a caseload of no more than 26 patients per clinician. *See* ECF No. 3693 at 17. Six psychiatrists served the EOP population; all six had caseloads within established ratios. For primary clinicians, two psychologists, one telepsychologist, four social workers (two of whom were unlicensed), and one tele-social worker carried caseloads exceeding established ratios. One LMFT and four psychology interns also served the EOP population. The LMFT and two of the psychology interns did not carry a caseload; two interns had caseloads of ten patients each.

CSP/Sac's EOP program utilized a triage plan during the review period that prioritized initial IDTT meetings while routine IDTT meetings were held every 180 days instead of every 90 days. The triage plan also directed primary clinicians to see EOP mainline patients every month rather than weekly.

*Structured Treatment*

The Program Guide required that each EOP patient be offered at least ten hours per week of structured therapeutic activities. *See* ECF No. 7333-1 at 58. For patients who were determined by the treatment team to be clinically contraindicated for ten hours of treatment activities per week, the primary clinician is required to present the case and recommended treatment program (i.e. EOP modified programming) to the IDTT for approval. If the patient's modified treatment program included a schedule of less than ten hours of treatment per week, the patient's IDTT was required to meet monthly to review and increase the amount of structured therapeutic activities, or refer the patient to a higher level of care as clinically indicated. *Id*.

Excluding EOP modified programming patients, mainline EOP patients were scheduled for an average of 15.82 hours, offered 8.6 hours, attended 2.93 hours, and refused 5.8 hours of structured treatment per week. An additional average of 7.5 hours of treatment was cancelled per week during the reporting period.

Patients indicated that high refusal rates were due to a significant number of recreation therapy groups rather than clinical groups.

Review of medical records revealed that recreation therapists were conducting frequent cell-front rounds to "provide additional weekly individual RT contacts" and to identify patients in acute distress. Unfortunately, these contacts were being documented on group notes in EHRS as individual "full session attendance" of 30 to 90 minutes when in actuality the patients were seen just briefly seen at cell front and provided with in-cell activities. This appeared to be occurring primarily during lockdown/modified program periods. The regional chief psychologist clarified that while recreation therapists were using group notes to document cell front rounding, the calculation of structured therapeutic was not based on the group notes.

*IDTTs*

IDTTs were observed on Facility A during the monitoring tour. There were 14 IDTTs scheduled for the day, three of which were initial IDTTs. The IDTT list regularly indicated the routine IDTTs as "180-day IDTTs," consistent with the triage plan. Four patients were seen in IDTT.

The treatment team did not start on time due to medication pass running behind. All required personnel were present, although the psychiatrist was not always the treating psychiatrist and CC I was not always the assigned CC I. However, psychiatry had clearly reviewed the patient record and could provide helpful information to the patient. The CC I was well-informed, had a comforting presence and way of interacting with the patients, demonstrated concern for their well-being, and provided valuable information to the patients and treatment team. The treatment team was not collaborative and did not typically interact. The supervisor facilitated the treatment team meetings and informed the patients generally who was present . It was structured so that the CC I began with pertinent information about the patient and then the primary clinician began talking to the patient. Psychiatry did not spontaneously participate unless called upon.

The quality of the IDTTs varied by provider, but there was limited historical information presented, no case conceptualization, erratic discussion of pertinent factors such as forced medication orders, no team discussion regarding level of care even when considerations for HLOC were present, and little discussion regarding actual treatment planning. It appeared that the treatment team was not fully invested in all aspects of the treatment plan.

On Facility B, there were 18 IDTTs scheduled for the day, 17 of which were initial IDTTs. One routine IDTT that had been due in December 2024 was scheduled as well. The

monitor's expert observed a total of ten IDTTs, three of which were held in absentia and facilitated by intern primary clinicians. The primary clinicians who were not interns in EOP B IDTT were present via telehealth equipment. The connection was problematic with delays and sensitivity to other sounds in the room which would interfere with the ability to hear the tele-clinician. The connectivity problems caused the assigned primary clinician to appear disconnected from the conversation in the room as they could not always hear the patient or what was discussed in the IDTT room. One tele-mental health provider repeatedly interrupted an extremely distraught patient during very sensitive moments of disclosure that prevented his full disclosure and made it appear that he was not being fully understood. It was quite problematic and interfered with the efficacy of the IDTT overall.

The observed IDTTs on Facility B had all required personnel present, but at times the assigned primary clinician or psychiatrist was not present. Psychiatry appeared to know the patients well even when not assigned to them and knew when the patient would be seen individually by their assigned psychiatrist. The primary clinicians did not know the patients as well and had not always met with the patients prior to the IDTT. Initial assessments were not consistently completed prior to the IDTT and the few reviewed appeared to be primarily completed through record review.

The IDTTs observed in EOP B were lengthy, averaging 35 to 40 minutes per patient, which raised concerns given the number of IDTTs on the daily list. Despite the length of these IDTTs, the treatment team continued to struggle with case conceptualizations, specific treatment goals, collaboration amongst team members, and appropriate discussion regarding current level of care and any indicators for consideration of referral to a higher level of care. While the

quality of the treatment team did vary by provider, most providers did discuss the patient strengths and goals in general.

The Program Guide requires that EOP patients receive an initial IDTT within 14 calendar days of arrival to the institution and a routine IDTT every 90 days thereafter. *See* ECF No. 7333-1 at 57, 59.

The monitor randomly selected and reviewed the health care records of 30 mainline EOP patients to assess compliance with Program Guide timeframes during their stays. All 30 patients required initial IDTTs. Two initial IDTTs were overdue and never occurred. Of the 28 reviewed initial IDTTs, 24 or 86 percent occurred timely within 14 calendar days of arrival or level of care change. Required staff attended all 30 IDTT meetings and patients attended 12 or 43 percent. Reasons initial IDTTs were held in absentia included patient refusals and modified programming.

For the 657 patients in CDCR's appointments report, there were 751 completed routine IDTTs. When a patient had more than one completed IDTT, timeliness in accordance with Program Guide requirements was able to be calculated. Of the 751 completed IDTTs, 98 were for individuals who had at least two IDTTs. Of those, 37 or 38 percent exceeded Program Guide timeframes. Of note, the report did not include individuals that did not have a completed IDTT, such as those that were not scheduled in accordance with the institution's triage plan.[64]

[64] The IDTT appointments report did not include individuals that did not have a completed IDTT, such as those that were not scheduled. Additionally, the reviewed data captures the time between completed patient IDTTs but does not account for when patients were not scheduled for an initial or routine IDTT. The appointments report did not account for delays between appointments due to movements in or out of EOP.

*Group Treatment*

There was one clinician-led treatment group provided to patients on Facility A and several intern-led treatment groups provided to patients on Facility B during the review period. Otherwise, all treatment groups were facilitated by recreation therapists, which at times did not provide groups with curriculum that met structured treatment requirements.

The monitor's expert observed one clinician-led treatment group and one intern-led treatment group during the site visit, and they were well-facilitated with engaged patients. It was clear that these types of treatment groups were valuable to the patients and that they enjoyed them. Patients who were interviewed after group were particularly complimentary to the clinician on Facility A and described in detail how the group and clinician had helped them cope with their mental health symptoms and prison adjustment.

EOP staff indicated that the maximum number of patients allowed per group was 16. This was a large group size which would make management of a group more challenging, particularly with more impaired patients.

*Individual Treatment*

The Program Guide requires that patients are offered an initial psychiatrist evaluation before their initial IDTT and within 14 calendar days of arrival to the institution or level of care change. *See* ECF No. 7333-1 at 57. Thereafter they are required to receive a routine psychiatric contact every 30 calendar days. *Id*. at 59. Patients are also required to receive a primary clinician evaluation within 14 calendar days of arrival and weekly (i.e. once per calendar week with no more than ten calendar days between contacts) with either a primary clinician or in group psychotherapy with an individual contact every other week. *Id*. at 57, 59.

The monitor randomly selected and reviewed the health care records of 30 mainline EOP patients to assess compliance with Program Guide timeframes during their stays. All 30 patients required initial psychiatry evaluations; 25 or 83 percent timely occurred before the initial IDTT. Seven or 23 percent were conducted in confidential settings; the non-confidential contacts were due to patient refusals, unavailable custody escorts, and modified programming.

For the 744 patients in CDCR's appointments report covering patients who received at least one routine psychiatry contact during the review period, there were 2,707 total completed and refused contacts. Of the 2,680 that were completed, 515 or 19 percent were conducted in a confidential setting. When a patient had more than one completed contact, timeliness in accordance with Program Guide requirements was able to be calculated. Of the 2,680 completed contacts, 1,966 were for individuals who were seen at least twice by a psychiatric provider. Of those 1,966 contacts, 538 or 27 percent of contacts were completed beyond the Program Guide required timeframes. Of note, the report did not include individuals that did not have complete contacts, such as those that were not scheduled in accordance with the institution's triage plan.[65]

The monitor randomly selected and reviewed the healthcare records of 30 mainline EOP patients to assess compliance with Program Guide timeframes during their stays. All 30 patients required initial primary clinician evaluations. Twenty-seven or 90 percent of initial primary clinician evaluations were completed within 14 calendar days of arrival or change in level of care. Eight or 27 percent of the reviewed initial primary clinician evaluations were conducted in

[65] The mainline EOP routine psychiatry appointments report did not include individuals that did not have complete contacts. Reviewed data captures the time between patient contacts but does not account for when patients were not seen or scheduled for a routine psychiatric contact. Additionally, the provided appointments report did not account for delays between appointments due to movements in or out of EOP. Contact with the assigned psychiatrist was unable to be determined.

confidential settings; the non-confidential contacts were due to patient refusals and modified programming.

For the 636 patients in CDCR's appointments report covering patients who received at least one routine primary clinician contact during the review period, there were 2,305 total completed and refused contacts. Of the 2,257 that were completed, 657 or 29 percent were conducted in a confidential setting. When a patient had more than one completed contact, timeliness in accordance with Program Guide requirements was able to be calculated. Of the 2,257 completed contacts, 1,672 were for individuals who were seen at least twice by a primary clinician provider. Of those 1,672 contacts, 860 or 51 percent of contacts were completed beyond the Program Guide required timeframes. Of note, the report did not include individuals that did not have completed contacts, such as those that were not scheduled in accordance with the institution's triage plan.[66]

Of the 2,257 completed routine primary clinician contacts, 61were reported to have been completed in zero minutes, 1,796 were completed within 15 minutes, 234 lasted between 16 and 30 minutes, 154 lasted between 31 and 60 minutes, six lasted between 61 and 95 minutes, and six were completed in greater than 95 minutes.

Interviews of patients and staff indicated that when modified programming occurred, patients were frequently seen cell front. EOP patients who were on orientation status were also frequently seen cell front, indicating that they had not received a ducat or were not allowed to

[66] The mainline EOP routine primary clinician appointments report did not include individuals that did not have completed contacts, such as those that were not scheduled. The reviewed data captures the time between patient contacts but does not include patients were not seen or scheduled for a routine contact with the primary clinician. Additionally, the provided appointments report did not account for delays between appointments due to movements in or out of EOP. Contact with the assigned primary clinician was unable to be determined.

attend their individual therapeutic session. Regional custody staff indicated that patients were not cleared for group treatment participation until after their IDTT. However, individual ducats for their initial assessments and individual therapy reportedly were allowed.

There were no on-site primary clinicians and three tele-mental health providers on Facility B, which meant that other staff, not assigned to Facility B, had to be redirected for any onsite tasks. EOP telehealth services were provided appropriately on each facility with the patient having good access to the telehealth screen directly. The medical assistants assigned to tele-mental health were also observed to leave patients alone in the room but were nearby and readily available for assistance in the case of technical problems.

Clinical activities such as IDTT and treatment groups frequently did not occur on time. This was due in part to disturbances that would occur and stop movement, many of which were observed on both yards during the site visit. However, morning medication pass also frequently delayed the start of activities, with the schedule becoming more challenging as the day went on.

Patients complained about frequent changes in their primary clinicians and psychiatrists which was supported by medical record review although it appeared most significant for primary clinicians. There were significant problems with continuity of care which was attributed by management to staffing deficiencies. A record review revealed one patient had been seen by four different primary clinicians in a three-month period. Patients also reported that their treatment groups were merged at times, and this was confirmed by staff. Reasons included inadequate attendance and staff absence.

3CMS:

During the review period, there was an average of 496 patients enrolled in mainline 3CMS care at CSP/Sac, with monthly averages ranging from 453 to 523 patients. 3CMS patients were housed on facilities A, B, and C, during the review period.

The staff-to-patient ratios from the 2009 Staffing Plan and 2021 adjustments to the 2009 staffing plan required that staff psychiatrists who treat 3CMS patients maintain a caseload of 280 patients per psychiatrist if the patient was prescribed medications and 675 patients if the patient was not prescribed medications.[67] *See* ECF No. 3693 at 12 and 6978-1 at 3. Staff-to-patient ratios from the 2009 Staffing Plan required that primary clinicians who treat 3CMS patients maintain a caseload of 97 patients per clinician. *See* ECF No. 3693 at 12. As of the date of the site visit, there were two tele-social workers and two on-site psychiatrists treating patients across all three facilities. The psychiatrists were the only clinicians to carry caseloads within required ratios.

The institution reported several changes in 3CMS primary clinician staffing during the review period with primary clinicians being continuously redirected to supplement staffing deficiencies in other areas throughout the institution. At one point during the beginning of the review period, there was no full-time clinicians assigned to Facility C at all. This forced

[67] The Program Guide requires that "[e]ach CCCMS inmate patient on psychiatric medication…be reevaluated by a psychiatrist a minimum of every 90 days regarding psychiatric medication issues." (Program Guide at 12-3-11). The 2009 Staffing Plan established a psychiatry staffing ratio for every 3CMS patient in the general population and did not distinguish between patients on medications and patients who were not. See ECF No. 3693 at 8. The Adjustments to the 2009 Staffing Plan, ECF No. 6978-1, which were approved by the Court on January 27, 2021 (See ECF No. 7035 at 2), established a new staffing ratio of 675 patients per psychiatrist for patients who are not on medications for six months or more. For the purpose of reporting compliance with staff-to-patient ratios, it was unclear whether the patient's included in each reported caseload were prescribed medications at the time of the site visit.

leadership to take on caseloads whenever possible and implement changes to the triage plan to adapt to patient needs.

With respect to 3CMS services, the current triage plan capped the number of IDTT meetings to five per clinician each week. Beginning on January 8, 2025, clinicians stopped completing initial IDTT meetings for patients with MHCB and alternative housing management recissions due to high volumes.

*IDTTs*

The monitor's expert observed two initial IDTT meetings for Level II 3CMS patients in Facility B. The meeting room had adequate size, computer access, lighting, and confidentiality with respect to sight and sound. An overhead camera affixed to the ceiling did not have audio capability. Both meetings were attended by required staff, including the telemental health primary clinicians.

Staff reported that tele-mental health connectivity in the IDTT room automatically stopped after 40 minutes, requiring staff to log back in after losing connection. This problem first began about six months prior to the site visit and had not yet been addressed. The tele-mental health tablet used during the observed IDTT meetings did not permit the telemental health clinician to see anyone except the patient, and as a result, on occasion, coordinating discussion among team members was challenging.

The IDTT meetings started on time with respect to the day's meeting schedule, but both were more than one month late with respect to Program Guide timeliness requirements. In both meetings, the patient's diagnosis, symptoms, medications, functional challenges, strengths, short- and long-term treatment goals, and level of care were identified and adequately discussed. The patient's plan of treatment was clearly articulated. Interactions were collaborative and

therapeutic, and correctional counselor input was appropriate. Each IDTT meeting lasted approximately 45 minutes, was unhurried and patient-centered, and provided adequate opportunities for the patient to ask questions and articulate treatment needs and goals. The assigned psychiatrist was a careful listener and appropriately scheduled one of the patients for a follow-up encounter after the patient reported new symptoms suggesting an unrealistic paranoid process. Two expected elements of IDTT discussion, psychosocial histories and case conceptualizations, were cursory or missing, but the IDTT meetings were otherwise well done.

Despite clear discussion of treatment goals and interventions during the IDTT meetings, a review of records following the IDTTs revealed that a written treatment plan was not developed for one patient. For the other patient, the written treatment plan accurately reflected portions of the IDTT discussion, included measurable short- and long-term goals, and identified specific interventions. However, it did not include psychiatric care, which was an essential element in this patient's treatment.

The individualized treatment plan for 3CMS patients must be completed within 14 working days of referral/arrival by the patient's primary clinician in consultation with the other IDTT members and annually thereafter. *See* ECF No. 7333-1 at 43-44. (PG 12-3-10)

The monitor randomly selected and reviewed the health care records of 30 mainline 3CMS patients to assess compliance with Program Guide timeframes during their stays. All 30 patients required initial IDTTs. Only one or three percent of initial IDTTs occurred timely within 14 calendar days or arrival or level of care change. Six initial IDTTs were overdue and never occurred. Required staff attended all 30 and patients attended 15 or 63 percent of IDTT meetings. Reasons initial IDTTs were held in absentia included patient refusals and modified programming.

For the 243 patients in CDCR's appointments report, there were 244 completed routine IDTTs. When a patient had more than one completed IDTT, timeliness in accordance with Program Guide requirements was able to be calculated. Of the 244 IDTTs, two were for individuals who had at least two IDTTs. Of those, both were compliant with Program Guide timeframes. Of note, the report did not include individuals that did not have a completed IDTT, such as those that were not scheduled in accordance with the institution's triage plan.[68]

*Group Treatment*

At the time of the site visit and throughout the reporting period, no mental health groups or nursing led treatment groups were offered to mainline 3CMS patients except pre-release groups facilitated by a designated recreational therapist on Tuesdays for Facility B patients and Thursdays for Facility C patients. It was reported that attempts were made to enroll patients in this group beginning six months prior to their CDCR release, but that unexpected releases sometimes resulted in patients joining the group closer to their release date. The group was designed with 18 one-hour modules, and the pre-release coordinator attended group sessions on occasion.

The Program Guide requires that patients are offered an initial psychiatrist evaluation before their initial IDTT. *See* ECF No. 7333-1 at 34-50, 641. Thereafter they are required to receive a routine psychiatric contact every 90 calendar days if the patient is prescribed a psychotropic medication. *Id*. at 44; *see also supra* p. _ n. _. Patients are also required to receive

[68] The reviewed data captures the time between completed patient IDTTs but does not account for when patients were not scheduled for a routine IDTT. Of note, the provided appointments report did not account for delays between appointments due to movements in or out of mainline 3CMS level of care.

a primary clinician evaluation within ten working days of arrival and every 90 calendar days thereafter. *Id.* at 41, 48.

The monitor randomly selected and reviewed the health care records of 30 mainline 3CMS patients to assess compliance with Program Guide timeframes during their stays. All 30 patients required initial psychiatry evaluations; 16 or 53 percent of initial psychiatry evaluations timely occurred before the initial IDTT. One initial psychiatry evaluation was overdue and never occurred. Eleven or 38 percent of initial psychiatry evaluations were conducted in confidential settings.

For the 317 patients in CDCR's appointments report covering patients who received at least one routine psychiatry contact during the review period, there were 483 total completed and refused contacts. Of the 458 that were completed, 138 or 30 percent were conducted in a confidential setting. When a patient had more than one completed contact, timeliness in accordance with Program Guide requirements was able to be calculated. Of the 458 completed contacts, 167 were for individuals who were seen at least twice by a psychiatric provider. Of those 167 contacts, 32 or 19 percent of contacts were completed beyond the Program Guide required timeframes. Of note, the report did not include individuals that did not have complete contacts, such as those that were not scheduled in accordance with the institution's triage plan.[69]

The monitor randomly selected and reviewed the health care records of 30 mainline 3CMS patients to assess compliance with Program Guide timeframes during their stays. All 30 patients required initial primary clinician evaluations. Six or 20 percent of initial primary

---

[69] Reviewed data captured the time between patient contacts but does not account for when patients were not seen or scheduled for a routine psychiatric contact. Of note, the appointments report did not account for delays between appointments due to movements in or out of mainline 3CMS. Contact with the assigned psychiatrist was unable to be determined.

clinician evaluations contacts were completed within ten calendar days of arrival or change in level of care. One initial primary clinician evaluation was overdue and never occurred. Twenty-three or 79 percent of initial primary clinician evaluations were conducted in a confidential setting; non-confidential contacts were due to patient refusals and modified programming.

For the 468 patients in CDCR's appointments report covering patients who received at least one routine primary clinician contact during the review period, there were 860 total completed and refused contacts. Of the 830 that were completed, 575 or 69 percent were reported as being conducted in a confidential setting. When a patient had more than one completed contact, timeliness in accordance with Program Guide requirements was able to be calculated. Of the 830 completed contacts, 394 were for individuals who were seen at least twice by a primary clinician provider. Of those 394 contacts, 103 or 26 percent of contacts were completed beyond the Program Guide required timeframes. Of note, the report did not include individuals that did not have completed contacts, such as those that were not scheduled in accordance with the institution's triage plan.[70]

Of the 830 completed routine primary clinician contacts, 153 were reported to have been completed in zero minutes, 429 were completed within 15 minutes, 162 lasted between 16 and 30 minutes, 73 lasted between 31 and 60 minutes, eight lasted between 61 and 95 minutes, and five were completed in greater than 95 minutes.

Records for ten patients that experienced a level of care change from EOP to 3CMS were reviewed to assess the quality of documentation, clinical appropriateness of the transition to a

[70] The reviewed data captures the time between patient contacts but does not include patients were not seen or scheduled for a routine contact with the primary clinician. Of note, the appointments report did not account for delays between appointments due to movements in or out of mainline 3CMS. Verified contact with the assigned primary clinician was unable to be determined.

lower level of care, and the outcome of this transition. Documentation regarding the clinical rationale for patient transfer from EOP to 3CMS care was adequate in nine of the ten records and deficient in one record. The change in level of care appeared clinically appropriate for all ten patients, and six of the ten patients were not prescribed any psychotropic medications at the time of transfer. Eight of the ten patients requested the lower level of care.

Although documentation of the rationale for transferring the patients from EOP to 3CMS care was usually adequate, record reviews identified multiple documentation challenges in other areas. Challenges included failure to update the treatment plan at the time the patient was being discharged from EOP care, late or missing initial primary clinician assessments once the patient transitioned to 3CMS care, late and/or deficient initial psychiatric assessments in 3CMS care, and missing, late, and/or deficient treatment plans in 3CMS care.

Treatment space in all three facilities was adequate during the review period. Generally, patients on Facility A were seen in the mental health treatment center, though when they could not be seen there, they used an office located between buildings one and two on Facility A which was adequate for both the patient and clinician. Similar configurations of treatment space for 3CMS care were present in Facilities B and C, with two mental health offices in Facility B and three in Facility C. Office spaces for individual encounters were adequately confidential.

<u>Other Issues</u>:

<u>Pre-Release Planning</u>:

CSP/Sac had a pre-release coordinator assigned full-time to release planning activities. There was also an recreation therapist who facilitated pre-release planning groups. The pre-release coordinator’s supervisor was the only backup in her absence. She had been the pre-release coordinator for over three years and was very knowledgeable regarding the process and

requirements. The pre-release coordinator met with the patients to complete the pre-release planning assessment in its entirety. She maintained a network of community resources and regularly provided updated information to the recreation therapist to provide to patients. It was the pre-release coordinator who completed any necessary release of information consent forms.

The pre-release coordinator regularly provided updates to the patient's primary clinician regarding the patient's status and tasks completed by the pre-release coordinator. Treatment plans were also audited to ensure that pre-release planning goals were ordered as a way to track patient progress and in an effort to increase their inclusion in current treatment plans.

The pre-release coordinator worked closely with all stakeholders and regularly attended the statewide monthly release planning meeting. Job responsibilities also included confirming that releasing patients had a medication supply order from their psychiatrists prior to release. For continuity of care, when a patient was transferred to another institution prior to release, the pre-release coordinator would communicate to the receiving facility's pre-release coordinator.

During the review period there were five pre-release groups offered at each yard. Most releases occurred from Facility B, in part due to the large number of Level II patients. As a result, there were two TCMP personnel assigned to that yard. One pre-release group consisting of four 3CMS patients was observed in the Facility B gym. While the group space was confidential, air fans made it difficult to hear, and the seating arrangement, which was fixed with four unmovable seats around metal tables, was not optimal for group discussion. Nevertheless, the recreational therapist was highly interactive, provided individualized attention and information to each participant, and rapidly developed empathic rapport even though this was the first time any of the participants had attended the group. The statewide pre-release group

curriculum was used effectively, and participants had the opportunity to have their questions answered.

Ten cases of patients who had been released during the review period were randomly selected to examine pre-release documentation and services provided. There was documentation for all but one patient of pre-release group participation. While the treatment plans for those patients did not consistently note pre-release planning as a treatment target area and progress notes from primary clinician contacts did not document review of pre-release issues typically, these patients did have completed pre-release evaluations and documentation of contact with the patient by the pre-release coordinator and pre-release coordinator communications with community linkage when indicated. There was also documentation found in all but two cases of TCMP documentation.

Despite some challenges due to inadequate staffing, the pre-release program at CSP/Sac continued to function well, primarily due to the knowledge and commitment of the pre-release coordinator. However, with continued staffing challenges and an increasing EOP census at CSP/Sac, it was unclear if that could be maintained moving forward.

Program Access:

a. Job Assignments:

On March 6, 2025, CSP/Sac's 537 job assignments were held by 129 EOP patients or 17 percent of the EOP population, 127 3CMS patients or 24 percent of the 3CMS population, and 281 non-MHSDS individuals or 35 percent of the non-MHSDS population.

The 684 academic assignments were held by 126 EOP patients or 16 percent of the EOP population, 228 3CMS patients or 43 percent of the 3CMS population, and 330 non-MHSDS patients or 41 percent of the non-MHSDS population.

Of the 105 vocational education assignments, 17 EOP patients or two percent of the population were assigned, 26 3CMS patients or five percent of the 3CMS population, and 62 non-MHSDS incarcerated individuals or eight percent of non-MHSDS incarcerated population.

As for the 185 assignments to substance abuse treatment, 67 EOP patients or nine percent of the EOP population, 42 3CMS patients or eight percent of the 3CMS population held such assignments, as did 76 non-MHSDS patients or ten percent of the non-MHSDS population.

b. Milestone Credits:

CSP/Sac reported that on March 28, 2025, milestone credits were issued to 232 EOP patients, six 3CMS patients. No credits were issued to non-MHSDS incarcerated individuals.

c. Out-of-Level Housing:

CSP/Sac reported that on March 10, 2025 one EOP and 35 3CMS custody Level I patients were in Level II housing. Additionally, three Level I EOP patients were housed in Level IV housing. There were 13 EOP and four 3CMS Level III patients in Level IV housing. There were 26 3CMS Level III patients housed in Level II housing. Lastly, 64 Level IV EOP patients were housed in Level II housing.

d. ADA Reasonable Accommodation and Grievance Procedure:

CSP/Sac submitted a memorandum dated September 13, 2024 that highlighted training provided on the screening of grievances, allegations of staff misconduct and reasonable accommodation requests effective on August 31, 2024. CSP/Sac also provided a report dated April 8, 2025 that indicated 881 employees completed the online course on "Offender Grievance and Appeal Overview 2024." Staff indicated that the reasonable accommodations and grievance procedures were current with the last update occurring in 2017.

e. Periodic Classification Score Reductions/EOP Patients:

CSP/Sac provided five completed CDCR 840 forms that reflected classification score reductions for EOP patients.

f. Unclothed Body Search:

CSP/Sac provided an operational procedure dated February 2, 2025 which addressed unclothed body searches in restricted housing. Unclothed body searches are required prior to exiting the cell for yard. Interviewed custody officers in the EOP hub and CTC units explained that unclothed body searches were conducted prior to patients exiting the unit. Officers reported that unclothed body searches were normally completed in the cell or an alternative holding cell and that privacy linen carts were also used when appropriate. Additionally, metal detectors were routinely used to aid each unclothed body search to ensure safety for patients and staff. Privacy screens were present and being utilized during the tour of the units.

"C" Status:

On April 18, 2025, 31 EOP and three 3CMS patients were designated "C" status. Reviewed classification chronos revealed that 25 EOP and two 3CMS patients on "C" status had received multiple serious RVRs within 180 days.

Case-by-Case Reviews:

The institution provided Long-Term Segregation Case Conference (LTSCC) review reports for each month of the review period. The data provided indicated that for September 2024, there were nine patients who met the criteria of being retained in RHU for at least 150 days and required an LTSCC. The information provided included the LTSCC chrono listing the staff who attended, and the action taken by the committee. The reviewed chronos showed that required CDCR staff were present. In all cases the LTSCC chrono stated the patient would be

retained in RHU for an additional 90 days. The LTSCC did not articulate the reason why retention was necessary or what action needed to be completed within the next 90-days in any of the reviewed chronos. For the month of October 2024 there were 24 patients reviewed by the LTSCC committee. In November there were 13 LTSCC patients, December there was 21, in January there was 23 and in February there was 32.

Mental Health Referrals:

CSP/Sac reported 6,407 total mental health referrals, including 3,732 emergent, 74 urgent, and 2,599 routine referrals. There were 843 referrals to psychiatry and 4,561 primary care clinician referrals. For emergent psychiatry referrals, two referrals were not timely, while 1,141 of 1,157 or 99 percent of emergent primary clinician referrals were timely. There was only one untimely urgent psychiatry referral, while 28 of 38 or 74 percent of urgent primary clinician referrals were timely. For routine referrals, there were timely responses to 335 of 363 or 92 percent of psychiatry referrals and 700 of 771 or 91 percent of routine primary clinician referrals.

CSP/Sac reported that the CIT was not active during the reporting period.

Custody and Mental Health Partnership Plan:

CSP/Sac's custody and mental health partnership plan LOP dated March 2024, complied with statewide policy.

Executive joint rounding was not completed in October and November 2024. A review of executive joint rounding forms revealed however, that rounding was otherwise completed in September and December through February across all programs during the reporting period.

Warden's executive staff meeting minutes were produced for each month of the review period, September 2024 through February 2025 but did not reference executive joint rounding.

Reviewed EOP RHU huddle documentation for the month of February 2025 was non-compliant with CMHPP requirements. First, separate huddle documentation was not completed for each RHU housing unit for both second and third watch. Instead, completed documentation combined all housing units and was labeled "Facility A-RHU" or "A1, A2, A5, A8." This same document also included both second and third watch instead of separate documentation for each shift. Required participants were frequently not in attendance, particularly for third watch. The approved huddle form was not utilized. Lastly, patients who met criteria for collaborative discussion during the huddle were listed on the form but there was no indication of discussion regarding the patient.

The monitor observed a huddle on third watch in the MHCB. All required staff were in attendance. The specialized bed complete care model form was used, which was appropriate. The nurse reviewed all patients currently housed in the MHCB. Mental health staff were engaged in the huddle and provided relevant information. The one custody representative, a correctional officer, provided limited information only when asked a specific question. Overall, the huddle was adequate.

Weekly 3CMS supervisory huddle forms were reviewed for Facilities A, B, and C. All reviewed forms included the required signatures from both the program sergeant and mental health program supervisor. The only item regularly noted on the huddle reports was patient arrivals and departures. With limited exception, there were no further details or additional discussion of relevant topics. For Facility B, patients returning from higher levels of care were also discussed when applicable.

Regarding monthly joint supervisory 3CMS program area tours, provided documentation indicated C-3 was toured in September 2024, C-1 in October 2024, B-1 in November 2024, B-3

and B-4 in December 2024, C-1 in January 2025, and C-3 and C-4 in February 2025. Required staff attended all tours and no significant concerns were noted.

The institution reported there were no introduction to EOP groups during the review period.

During the review period Inmate Advisory Council meetings were held sporadically on Facility A and Facility B, but continuously on Facility C. Facility A provided documentation for two meetings; Facility B provided documentation for three. Facility C provided meeting notes for every month except December. Discussed topics included visitation, peer support program, canteen, and the denial of religious items among other issues.

Regarding staff misconduct complaints, during the review period, there were 715 staff misconduct complaints filed by a total of 205 patients. One patient filed a total of 228 complaints, another patient filed 17. Of the 715 complaints filed, 82 were filed by 3CMS level of care patients, 623 by EOP level of care patients and ten by MHCB level of care patients. Of the 715 staff misconduct complaints filed, 169 were for integrity, 157 were referred to the hiring authority or LDI, 108 were for use of force, 80 for staff sexual misconduct, 74 for other misconduct, 39 for discrimination or harassment, 39 for dishonesty, 37 for retaliation, seven for code of silence, two screen-outs, one for property and two were not identified. The resolution of the filed complaints included 664 that were identified as staff misconduct, 40 had no decision noted, six were denied, four were redirected, and one was reassigned.

There were 21 investigations for misconduct toward a patient not initiated through the appeal process. No mental health staff were moved to another post because of a staff misconduct complaint.

The institution provided names of staff who attended quarterly round table training but did not track staff who were not trained; accordingly, compliance could not be assessed.

For annual partnership off-post training during the last 12 months, CSP/Sac reported that the three mental health chiefs and all eight mental health supervisors completed the training. Thirteen of 15 psychiatrists, 24 of 26 psychologists, and all 12 social workers also completed the training. For nursing staff, 85 of 86 attended the training. As for custody staff, the warden, six associate wardens, six captains, 30 lieutenants, and 28 correctional counselors all attended the training. Seventy-nine of 80 sergeants and 761 of 773 correctional officers also attended the training.

Heat Plan:

CDCR required that each institution's heat plan local operating procedure incorporate the requirements of the April 8, 2024 Heat Plan and Updates memorandum. CSP/Sac's heat plan LOP was last updated on August 23, 2024 and conformed to required policy.

In addition to CDCR's 2024 Heat Plan and Updates memorandum, CDCR issued an Expectations Memo, dated August 2, 2024, delineating the specific responsibilities of the warden and CEO. These included daily meetings during days of anticipated heat advisories to address and manage heat alerts and related concerns. During the site visit, the monitor reviewed minutes of five daily meetings (September 4, 5 and October 1, 2, and 3, 2024). The warden was not in attendance for any of the meetings. It was reported that he was away from the facility on special assignment. Updates were provided regarding heat related concerns on the facilities, education centers, treatment areas, visiting areas, and kitchens.

The 2024 Heat Plan and Updates memorandum required that each institution submit a Heat Plan Monthly Summary Report (Summary Report), signed by the warden and CEO, to

headquarters each month from May 1 to October 31. CSP/Sac produced Summary Reports for September and October, 2024 which reflected that there were 24 Stage I heat alerts, nine Stage II heat alerts, and three Stage III heat alerts during the two months of the reporting period when the plan was active. Daily Activity Reports (DARs) supported the Summary Reports and included the exact time each Stage I heat alert went into effect. Three of six Stage II heat alerts were noted in the DARs for September. None of the stage II heat alerts were noted in the DARs for October. None of the three noted Stage III heat alerts were noted in the DARs in September.

These discrepancies were addressed with on-site leadership who explained that CSP/Sac required temperatures to be taken in non-housing areas including the PIA Laundry and visiting areas. All the Stage II and III heat alerts noted in the Summary Reports were in non-housing areas; eight were noted to be in the laundry area and one was in Facility B visiting room. In each of these cases, action was taken to remove incarcerated persons from the areas when present, however, no documented medical rounds were conducted. Onsite leadership indicated that they would address the tracking of non-housing areas during the upcoming heat season.

The Heat Plan and Updates memorandum also required institutions to include with the monthly submission a Heat Incident Log documenting the number of patients who experienced a heat-related illness. The Heat Incident Log must include the patient's information and details regarding the heat-related illness. CSP/Sac reported no heat-related illnesses during the review period.

The 2024 Heat Plan and Updates memorandum required all custody officers and leadership staff to maintain knowledge of heat plan activation and act in accordance with the requirements of each stage. The monitor interviewed 23 custody officers in 14 housing units on Facilities A, B, C, and the CTC. All interviewed custody staff demonstrated adequate

knowledge of the heat plan policy and procedures. Each post had resources in the office on the heat plan. There were no reported issues with the execution of responsibilities during any heat plan activation.

To ensure proper and accurate temperature recording, the Annual Heat Plan and Updates memorandum required the warden or his designee to ensure an accurate thermometer was placed in a central, heat-neutral location to monitor outside ambient air temperatures, which must be recorded every hour, every day, from May 1 through October 31 of each year. CSP/Sac central control staff recorded outside air temperatures during the review period. The monitor observed the outside thermometer and noted that outside temperature logs were properly completed every hour. Reviewed DARs were consistent with outside temperature logs and supported the activation of Stage I heat alerts.

The warden or his designee was also responsible for ensuring that inside air temperatures were measured in all non-airconditioned living areas housing heat-risk incarcerated persons. Temperatures must be taken at the highest non-airconditioned location where heat-risk incarcerated persons were housed and must be recorded every three hours. Digital thermometers were used to record all indoor temperatures at CSP/Sac. The temperature probes were placed in the highest feasible locations in each toured dayroom. It was noted that the institution completed its plan to place individual temperature probes in each housing unit, accessible in control rooms through Bluetooth capabilities.

September and October 2024 indoor temperature logs were reviewed, and discrepancies were noted. A total of 33 missed temperature readings were noted in the following housing units in September: A5, A7, B2, B5 through B8, C3 through C7, and CTC-1. A total of 106 temperature readings were missed in the following housing units in October: A7, A8, B1 through

B8, C1, C3 through C6, and CTC-1. In addition, ten temperature readings did not include a signature by staff in units B2 on October 11 and 31, 2024.

Concerningly, temperature logs submitted from Unit C7 between September 22-28, 2024, Unit C3 between October 1-6, 2024 and from unit B8 between October 1-27, 2024 appeared to have been completed by one person on each of the dates. The suspect temperature sheets were provided to on-site leadership for review.

In an effort to ensure that heat-risk incarcerated persons were afforded equal access to programs, services, and activities during extreme weather conditions, the 2024 Heat Plan and Updates memorandum required institutions to devise and include any reasonable accommodations and alternatives to yard activities when revising their LOP. All reasonable accommodations provided to heat-risk incarcerated persons during heat alert activation must be documented in the institution's DAR as well. CSP/Sac staff reported offering patients access to cold water and ice following a Stage I heat alert and offered heat-risk incarcerated persons alternative yard time, including night yard and additional dayroom activities if custody staffing allowed. The institution's DARs indicated these accommodations were provided to heat risk patients during heat alerts.

Coolers for ice and water distribution were observed in all toured housing units. All observed ice machines were working during the site visit.

The 2024 Heat Plan and Updates memorandum required annual training on the institution's Heat Plan. Heat pathologies training was completed by 604 of 751 or 80 percent of custody staff and 360 or 517 or 70 percent of clinical staff and nurses.

<u>RVRs</u>:

The institution reported a total of 2,116 RVRs issued during the review period including eight issued to acute level of care patients, two to ICF level of care patients, 85 to MHCB patients, 1,335 to EOP patients, 366 to 3CMS patients and 320 to non-MHSDS incarcerated persons. A total of 1,796 RVRs or 85 percent of all RVRs were issued to MHSDS patients.

The monitor reviewed 22 RVRs for compliance with policy. Custody staff timely referred the mental health assessment to mental health staff within two days in 13 or 59 percent of reviewed cases. Mental health staff timely completed and returned the assessment to custody within eight days in 14 or 64 percent of reviewed cases. The senior hearing officer documented consideration of the mental health assessment in five or 23 percent of reviewed cases.

Mental health staff recommended mitigation in 20 of reviewed cases and the senior hearing officer mitigated the penalty pursuant to the assessment in 17 or 85 percent of the cases. In three cases where the penalty was not mitigated the senior hearing officer indicated that the patient had to be held accountable for their actions.

Regarding mental health assessment training for custody staff, the chief deputy warden, six captains, four of the six correctional administrators, 32 of 33 lieutenants, and 73 of 80 sergeants attended the training. For mental health staff, a total of 63 staff attended the required one-time training including two chief psychologists, 44 psychologists, 14 social workers and three LMFTs.

<u>Use of Force</u>:

CSP/Sac reported 15 controlled use of force incidents during the review period, all of which involved MHSDS patients. There were 439 immediate use of force incidents during the review period; 407 or 93 percent involved MHSDS patients.

The monitor reviewed three controlled and 13 immediate use of force incidents. All incidents were determined to be in compliance with CDCR policy and procedure, however, in one case, the level of force used may have been more than necessary to control the patient. The patient in this case was in restraints, escorted to a new cell, and was refusing to enter the cell. The officer gave two directives to the patient to enter the cell and then forced the patient to the floor. Little to no de-escalation techniques were utilized and the patient could have been placed against the wall pending additional assistance from nearby staff. The officer's report indicated that the patient resisted his hands on escort, however, that resistance, which was difficult to view on the captured video, appeared to be minimal. The actions taken in this instance could have caused serious injuries to both the patient and the officer.

The monitor reviewed the timeliness of the IERC review of use of force incidents. Title 15 requires use of force incidents to be presented to IERC within 30 days of the incident. The monitor was provided a memorandum dated October 3, 2023, extending that timeframe to 60 days. For the 15 controlled use of force incidents during the review period, nine were closed and six were open with the review suspended for investigation. The six open incidents were between 45 and 180 days beyond the required timeline.

For immediate use of force incidents, 258 or 59 percent were either closed or noted as review completed, 58 or 13 percent were at the executive level of review, 62 or 14 percent were at Level I or Level II of review, and 56 or 13 percent were reported as being open. Eighty-nine or 20 percent were open with the review suspended for investigation including those referred to the Allegation Inquiry Management System (AIMS). The 89 open incidents were between 61 and 150 days beyond the required timeline.

CSP/Sac reported that the warden and chief deputy warden attended use of force training. The five correctional administrators, eight captains, 32 lieutenants, 80 of 81 sergeants, and 755 of 761 correctional officers also attended the training. For mental health staff, the three chief psychologists and psychiatrists attended the training, as did 11 of 12 supervisor psychologists, psychiatrists, and social workers, 23 psychologists, 13 psychiatrists, 15 social workers, 53 of 61 nurses, 18 of 21 recreational therapists, and 111 of 122 staff holding other positions.

Program Lockdowns/Modified Programming:

Five modified programming periods were initiated during the review period. All five lasted between 12 and 18 days and stemmed from ongoing violence between STGs and individual incarcerated persons or against staff. There were three modified programming periods on Facility C, one on Facility B, and one on Facility A. Documentation indicated that none of the PSRs affected mental health programming.

Access to Care:

A review of CSP/Sac's monthly health care access quality reports from September 2024 through February 2025 indicated there were a total of 106,078 mental health ducats and add on appointments. Of this number, 22,513 or 22 percent were completed. An additional 82,565 or 78 percent of the ducats were not completed. Of the appointments that were not completed, 12 percent were due to custody reasons, 20 percent were due to non-custody reasons, and 68 percent were due to patient refusals.

*Coleman* Posters:

Current *Coleman* posters in English and Spanish were observed in all toured housing units.

**APPENDIX A – 12**
**CALIFORNIA STATE PRISON/SOLANO (CSP/Solano)**
Site Visit: February 11, 2025 – February 13, 2025
Review Period: July 1, 2024 – December 31, 2024

Census:

On February 7, 2025, CSP/Solano housed 3,854 incarcerated individuals which was comparable to the prior review period. The 675 MHSDS patients represented 18 percent of the institution's population and decreased by 14 percent compared to the preceding review.

The MHCB housed one patient.

There was one mainline EOP and 660 mainline 3CMS patients. The mainline 3CMS population decreased by 12 percent since the preceding review. An additional 13 3CMS patients were pending transfer to a 3CMS RHU.

No MHSDS patients were in non-designated segregation.

Staffing:

The chief psychiatrist position was filled. Three of 3.5 psychiatry positions were filled for a 14 percent vacancy rate. One staff was on long-term leave and a contractor filled 0.77 position, leaving a 21 percent functional vacancy rate.

CSP/Solano did not have any allocated telepsychiatry positions.

One of two chief psychologist positionswas filled. The one senior psychologist position and one of two senior psychologist specialist positions were filled. For staff psychologists, 5.5 of 8.5 positions were filled for a 35 percent vacancy rate; one staff psychologist was on long-term leave, increasing the functional vacancy rate to 47 percent.

The supervising social worker position was filled, as were six of seven clinical social workers positions reflecting a 14 percent vacancy rate.

The recreation therapist position was filled.

The senior psych tech position was vacant. All 7.1 psych tech positions were filled.

Five of 6.5 MHSDS clerical positions were filled, leaving a 23 percent vacancy rate.

The OSS II position was filled. The CHSA position and the 1.5 HPS I positions were vacant. CSP/Solano had an HPS II on staff but no allocated position; mental health leadership reported that this position was funded by the vacant allocated CHSA position.

For supervising registered nurses, 10.5 of 10.7 positions were filled for a two percent vacancy rate. Thirty-eight of 41.9 LVN positions were filled for a nine percent vacancy rate; one LVN was on long-term leave for a functional vacancy rate of 12 percent. The 1.2 CNA positions were filled.

As for custody staffing, 783 of 787 positions were filled for a 0.5 percent vacancy rate. Filled positions included the warden and chief deputy warden, three of six associate wardens, four of six captains, 25 of 26 lieutenants, 59 of 65.2 sergeants, 21 of 28 CC Is, nine CC IIs, and all 642.8 correctional officer positions.

Telemental Health:

CSP/Solano did not utilize telepsychiatry during the review period or at the time of the site visit except for after hours on-call coverage. No tele-mental health services were provided.

Telework:

At the time of the site visit, one senior psychologist specialist periodically worked on a hybrid schedule consisting of two eight-hour shifts at home in a five-day work week. The institution reported that, in July 2024, opportunities for mental health management staff to work from home one day a week were discontinued by headquarters.

Staff Recruitment:

CSP/Solano reported that they had added three psychologists and three social workers to their staff as of mid-November 2024; at the time of the site visit, the institution was waiting on final approval for another .50 psychologist position for the MHCB and to move a LCSW to an unlicensed psychologist position.

Quality Management:

A quorum was met for monthly MHPS meetings according to reviewed minutes. The committee routinely reviewed approval of previous meeting minutes; items from quality management and other committees; previous action items; clinical contact timeliness; performance report; priority indicator CAPs; psychiatry dashboard review; quality management updates; effective communication audits; coordinator reports; LOP updates; CMHPP updates; staffing resources; and open forum. In October 2024, documentation of the agenda changed to match the format used by the QMC. Topics included approval of monthly minutes; improvement work; system surveillance; program administration; open forum; and meeting wrap-up. Overall, documentation summarized deficient areas and the corresponding actions plans were variable.

Mental health leadership attended the QM and LGB committee meetings. Overall, high-level, pertinent concerns discussed by the MHPS were brought to the QMC and LGB.
The institution chartered a green belt project focused on lipid monitoring for patients on antipsychotics during the reporting period that progressed and was closed out in January 2025. No other studies, QITs or FITs were chartered during the review period.

Medication Management:

MAPIP measured compliance with required diagnostic monitoring and medication administration. Diagnostic monitoring included obtaining medication consents, as well as physical examinations, vital signs, and laboratory tests needed for the safer use of a given medication. Medication administration addressed the availability, continuity, and actual administration of medications. The threshold for MAPIP compliance was 90 percent.

MAPIP

CSP/Solano provided MAPIP results for July 1, 2024 through December 31, 2024 regarding compliance for psychiatric diagnostic monitoring and medication management.

Antidepressant medications required four metrics, with the abbreviations in parentheses used in the graphs below: EKGs for patients taking tricyclic antidepressants (EKG); medication consents (Consent); thyroid function tests (TFTs); and obtaining blood pressure for patients taking venlafaxine (venla BP). CSP/Solano was fully compliant with monitoring blood pressure for patients prescribed venlafaxine, and partially compliant with obtaining medication consents and monitoring thyroid function. No EKGs were required during the monitoring period.




CSP/Solano had 18 months for which data were required (metric-months). When examined in aggregate, CSP/Solano was compliant for ten, or 56 percent, of metric-months, and non-compliant with eight, or 44 percent.




Atypical antipsychotics required the measurement of 11 metrics, including: AIMS; blood pressure; glucose; complete blood count (CBC); comprehensive metabolic panel (CMP); EKG; height (Ht); lipids; medication consents; thyroid function tests; and weight (Wt).

CSP/Solano was fully compliant for monitoring blood pressure, glucose, height, and weight, and obtaining EKGs, when required. The institution was partially compliant with the remaining metrics, namely monitoring AIMS, CBC, CMP, lipids, TFTs, and obtaining medication consents.




A total of 61 metric-months of data were required during the monitoring period. Of these, 45, or 74 percent were compliant, while 16, or 26 percent, were non-compliant.




CSP/Solano was not a clozapine initiation or maintenance facility. There were no patients on clozapine during the monitoring period, nor at the time of the site visit.

Carbamazepine and Depakote are mood stabilizers with four MAPIP requirements: CBC; CMP; medication level; and medication consent. No patients on carbamazepine required MAPIP measures during the review period.

Regarding Depakote, CSP/Solano was partially compliant with the four required metrics.



CSP/Solano had 21 required metric-months of data. The institution was compliant with 10, or 48 percent, and non-compliant with 11, or 52 percent.




Lamotrigine is a mood stabilizing medication requiring only one MAPIP metric, namely obtaining medication consents. CSP/Solano was compliant for the one required month. Given this small number, no accompanying graph is submitted.

The mood stabilizer lithium required five measures: monitoring of kidney, thyroid function, and therapeutic medication levels; and obtaining medication consents and EKGs. CSP/Solano was fully compliant with CMP (which includes kidney function), monitoring therapeutic medication level, and obtaining medication consents, and partially compliant with monitoring TFTs. No EKGs were required during the monitoring period.




Of the eight metric-months required, CSP/Solano was compliant with seven, or 88 percent, and non-compliant with one, or 13 percent.




CSP/Solano had 109 metric-months of total required diagnostic monitoring data. Of these, 73, or 67 percent, were compliant, and 36, or 33 percent, were non-compliant.

The institution reported that their psychiatrists followed "community standards" instead of MAPIP requirements for thyroid tests, required for several medication classes. They reported that regional leadership was aware of this deviation from required monitoring.




Medication Administration

MAPIP monitored essential aspects of medication administration, such as medication availability, continuity, preparation, and administration. While the statewide MAPIP required 12 metrics, the metrics for PC 2602 court orders, and medication orders in the chart were not requiring during the monitoring period. Thus, CSP/Solano had ten required measures during the monitoring period.

Medication continuity included five measures, with the abbreviations used in the graphs in parentheses: transfers from other institutions arriving at receiving and release (R&R); intra-institutional transfers to non-RHU locations (Intra); MHCB transfers (MHCB); discharge from a community hospital or DSH (Outside Hospital); and upon parole or transfer to the community (Release).

MAPIP required prescriptions written at HS (*hora somni*, or bedtime) to be given on or after 8:00 P.M. (HS), while A.M. and P.M. medication doses must be given at least eight hours apart. Other metrics evaluated whether chronic psychiatric medications were continued without interruption (Chronic), and whether new medications were administered as ordered, and in compliance with required timelines (New).

The institution was one fully compliant one of these ten metrics, namely parole or transfer to the community (Release). CSP/Solano was fully non-compliant with transfers from other institutions arriving at receiving and release (R&R); medications given at HS and at A.M. and P.M., and chronic medications. The remaining metrics were partially compliant: intra-institutional transfers to non-RHU locations (Intra); MHCB transfers (MHCB); transfers to restricted housing (RHU); discharge from a community hospital or DSH (Outside Hospital); and new psychiatrist medication orders (New).



CSP/Solano had 56 metric-months of required medication administration data. CSP/Solano was compliant for 14, or 25 percent, and non-compliant for 42, or 75 percent, of these required metric-months.




CSP/Solano monitored underperforming metrics, had CAPs for many of them, and established workgroups including healthcare and custody staff to address relevant measures.

Prescription Numbers/Medication Administration

CSP/Solano reported that 355 patients were prescribed psychotropic medications, all of which were NA or DOT. Per the chief psychiatrist's directive, psychiatry did not write for KOP medications. The reason for this was to "facilitate safe and effective psychotropic medication delivery and management."

CSP/Solano reported that prescriptions were for a maximum of 180 days. Bridge medications were for a maximum of 30 days, and 60 days for patients releasing from CDCR. For verbal and telephone orders, nursing confirmed and entered the order, and it was sent to psychiatry for review and signature. Psychiatry reported that each psychiatry provider closely

monitored their verbal orders, and signed them within 48-hours, or no later than the next business day. The institution did not specify a formal process for tracking the signature of verbal or telephone orders.

Medication Administration

CSP/Solano completed 48 medication line audits during the monitoring period, covering all yards requiring MAPIP-medication line monitoring. All showed compliance with policies regarding total duration of medication distribution under two hours, and individual wait times under 30 minutes. CSP/Solano did not report any conflicts between medication distribution and mental health programming.

Non-Formulary

CSP/Solano reported an average non-formulary rate of approximately 6.5 percent during the monitoring period.

Polypharmacy

CSP/Solano's rate of completed polypharmacy reviews steadily increased from July 2024 (64 percent) to December 2024 (100 percent), yielding a six-month average of 88 percent.

HS Meds

At the time of the monitoring tour, CSP/Solano reported that 289 patients received a total of 701 mental health medications at HS. All were compliant with the requirement to offer these medications after 8:00 P.M.

PC 2602

CSP/Solano submitted two initial emergent PC 2602 petitions, with both patients transferring prior to the administrative law judge hearings. There were no non-emergent, renewals, withdrawn petitions, or cases lost to follow up for administrative reasons. There were no uses of force to administer involuntary medications. At the time of the site visit, CSP/Solano had zero cases under a PC 2602 order. The institution denied any challenges with the PC 2602 process.

CSP/Solano displayed areas of relative strength (monitoring of antipsychotics and lithium, as well as parole medications, and duration of medication lines); however, several areas of non-compliance with key portions of medication management merited close consideration. When examined *in toto*, CSP/Solano was 67 percent compliant and 33 percent non-compliant with medication monitoring, and 25 percent compliant and 75 percent non-compliant with medication administration metrics. Some areas of non-compliance were addressed by joint meetings between healthcare and custodial staff. While patient refusals were the main drivers of non-compliance, CSP/Solano knowingly deviated from certain required MAPIP monitoring, citing community standards, despite a directive stating that MAPIP measures are the "minimum monitoring requirements" (see Memorandum dated March 19, 2025, entitled "Update to Medication Administration Process Improvement Program Requirements," from Drs. Mehta and Brizendine). In contrast to other institutions who encouraged psychiatrists to prescribe medications KOP, where appropriate, CSP/Solano did not permit this, citing concerns for the safe and effective use of medication. Additional monitoring of CSP/Solano to evaluate progress towards compliance with medication management requirements is warranted.

Transfers:

CSP/Solano's mental health chief served as the inpatient coordinator and had done so for approximately seven years; there was no backup inpatient coordinator. The chief/inpatient coordinator reported positive relations with IRU and HCPOP.

Mental health staff did not routinely address HLOC considerations in observed 3CMS and MHCB IDTTs. Treatment planning for non-referrals also needed improvement, as clinical rationales and treatment modifications were typically absent or inadequate. In at least one case, a referral to inpatient care was indicated for the patient, but the MHCB treatment team did not refer him and noted that the "home" institution could refer the patient; there was also no documentation of a warm handoff to the sending facility's mental health staff so that they could initiate a referral. This resulted in a preventable delay for the patient's proper referral and placement in inpatient treatment without clinical justification.

During the review period, there were 23 acute care and no intermediate care referrals. All 23 referral packets were submitted timely to IRU. Of the 23 acute care referrals, 22 resulted in admissions and one referral was rejected; all 22 patients transferred timely. All 23 referrals were for patients with complex medical needs.

During the review period, there were 84 instances of 58 patients considered for, but not referred to, inpatient care.

No data regarding *Vitek* hearings was provided.

At the time of the site visit, no patients were pending transfer to inpatient care.

CSP/Solano made 21 MHCB referrals during the review period resulting in 18 MHCB admissions and three rescissions; 15 admissions were to the on-site MHCB and three were to MHCBs at other institutions. Of the 21 referrals, two patients took longer than 24 hours from the

time of alternative housing placement to transfer; these transfers exceeded 24 hours by 37 minutes and three hours, respectively. Both delays stemmed from the patients having "significant impairment/dysfunction."

Of the three rescinded MHCB referrals, one resulted in an alternative housing stay that was three days and 18 hours beyond 24 hours due to the patient having a medical hold.

There were no EOP RHU and 44 3CMS RHU transfers, of which 40 or 91 percent were timely; the four delayed transfers ranged from three to 19 days beyond timeframes.

Twelve patients were transferred to EOP programs during the review period; ten or 83 percent transferred timely. The two delayed transfers were two and three days late, respectively.

Thirty 3CMS patients transferred to MSFs during the review period.

Programming:

According to on-site leadership, a triage plan, developed in June 2023, remained in effect through the reporting period. The plan prioritized mental health consults, referrals, initial intake evaluations, initial IDTTs, and MCRP referrals. Due to improved staffing levels, the plan was discontinued in December 2024. Data provided in advance of the site visit, confirmed by mental health leadership, indicated that there were no outstanding mental health contacts or IDTTs.

Restricted Housing Unit:

CSP/Solano maintained a General Population RHU (GP RHU).

The RHU Policy requires that patients at a 3CMS level of care be transferred to a 3CMS RHU within 30 calendar days from the date of initial placement in RHU or within 30 calendar days in which the patient was made EOP or 3CMS. *See* Cal. Code of Regs., tit. 15 §§ 3335.2 and 3335.3; *see also* Restricted Housing Unit Program: Mental Health Services Policy, dated July 19, 2024 and effective August 1, 2024 (hereinafter "RHU Policy"). At the time of the site

visit, there were 13 patients pending transfer to a 3CMS RHU; however, transfer timelines for these 13 patients were not discernable.

During the site visit, the monitor's expert observed three initial IDTTs for three 3CMS patients housed in the RHU. They were held in a dayroom that had temporary walls erected but no “ceiling,” rendering the space nonconfidential. The unit was noisy and distracting for patients.

The assigned primary clinician, an alternate psychiatrist, a CCI and a psych tech were present for all three IDTTs. The IDTTs were facilitated by the primary clinician and generally included a stated diagnosis and review of current medications, but there was very little discussion of treatment or how the treatment or medications would help the patient manage symptoms or improve their level of functioning; instead, the primary clinician reiterated Program Guide requirements (e.g., we will meet weekly). The treatment teams did not present case conceptualizations for the patients or provide baseline information for symptoms that were targeted in treatment. Treatment objectives were typically vaguely referenced, not operationalized, and did not include objective indicators of treatment progress or lack thereof. As patients were required to be transferred relatively quickly from this GP RHU, the treatment plans should have focused on short-term treatment goals, such as RHU adjustment and indicated treatment prior to transfer. Accordingly, these IDTTs were inadequate.

MHCB:

CSP/Solano’s MHCB operated within the 15-bed CTC and had nine dedicated beds.

There were 103 patients admitted to the MHCB during the review period. The average length of stay was 14 days and ranged from one to 75 days. The daily census averaged seven patients. No patient had three or more admissions. Clinical lengths of stay averaged 8.7 days;

approximately 29 percent of patients' clinical stays exceeded ten days. Physical stays averaged 10.4 days; approximately 47 percent of patients' physical stays exceeded ten days.

Discharge delays were typically due to concerns stemming from danger to self or others, significant impairment and dysfunction, and medical concerns.

The MHCB had limited space; the allocated mental health space was shared with other staff which mental health staff reported made it difficult to utilize. The multipurpose room–a large room with a treatment module–was used for IDTTs, meetings, and office space. Despite the physical plant issues, patients were typically offered confidential contacts; reasons for non-confidential contacts included patient refusals, power outages, program modifications, and lack of available space.

Continuity of care was a significant problem in the MHCB. The treatment team at intake was often not the treatment team at the seven-day or discharge IDTT, which contributed to extended clinical stays as patients would stabilize and be ready for discharge by day three or four but remain in the MHCB until day eight, nine, or ten. While this was due in part to staffing shortages that had reportedly improved, extended clinical lengths of stay continued through December 2024. Treatment plans did not indicate the clinical rationale for maintaining MHCB LOC for cases when the length of stay exceeded 10 days. The facility was unable to fully explain the delays in transfer. A review of the referral log indicated that at least one-third (16 of 48) had been referred to the acute inpatient LOC. A sample of those cases were reviewed and approximately half of the patients met criteria for referral to inpatient care earlier in their admission but the treatment team waited to refer the patient. This was again likely due to staffing shortages and rotating treatment teams.

While the mechanical restraint use memorandum was compliant with statewide policy, case reviews indicated that the rationales for use of mechanical restraints (i.e. cuffing) were not sufficiently specific and treatment plans did not address the underlying behaviors. When the treatment team was questioned, they indicated that the MHCB sergeant may place the patient into restraints. Otherwise, treatment team members were not able to articulate their role in that process, though they did report that the use of mechanical restraints was reviewed during the initial IDTT. However, the monitor's expert found that IDTT consideration of mechanical restraint utilization was not always documented in the medical record.

One discharge IDTT was observed. All required disciplines were present. The patient, who had been referred from SQ due to self-injury and suicidal ideation, was seated uncuffed despite a recent RVR for exposing himself, suggesting to the monitor's expert that the MHCB was working to minimize the use of mechanical restraints (notwithstanding the concerns with IDTT involvement and documentation noted above). The IDTT addressed relevant psychosocial historical information, but did not present a case conceptualization. The treatment team was not collaborative; instead, each discipline took a turn when called upon to provide information or ask the patient if they had any questions for them. The nursing representative talked about the patient rather than directly to the patient. The team only vaguely discussed HLOC considerations and safety planning was referenced but not adequately reviewed. The IDTT did not discuss problem areas that would be a focus of treatment, treatment interventions, or treatment goals. This was consistent with treatment planning in general in the MHCB, in that treatment plans were often vague, included a significant amount of copy and paste or prior information, and were not individualized to the patient's status and needs. These treatment plans

were rarely updated and typically carried over treatment plans from prior levels of care that were not relevant to the MHCB setting.

The Program Guide requires initial IDTTs to be completed within 72 hours of arrival and routine IDTTs to occur at least weekly thereafter. ECF No. 7331-1 at 83. The monitor randomly selected and reviewed the healthcare records of 30 MHCB patients to assess compliance with Program Guide timeframes during their stays. These 30 MHCB patients required initial IDTTs, all of which occurred within 72 hours of arrival as required. In addition, all reviewed IDTTs had the necessary staff in attendance, however, the required *assigned* staff were present at only three or 10 percent of the initial IDTTs reviewed. The assigned psychiatrist and / or psychologist were the most frequently substituted staff members. Patients attended 29 or 97 percent of initial IDTTs, leaving one patient who refused to attend.

Of the 31 required routine IDTTs, 19 or 61.3 percent occurred timely, or every seven calendar days following the initial IDTT. All IDTTs had the required staff in attendance, however, only 11 or 35.5 percent of routine IDTTs had the required *assigned* staff in attendance. Again, the psychiatrist or psychologist were the most likely staff member replaced by an alternate. Of the 31 routine IDTTs reviewed, patients attended 100 percent of the time.

Patients were generally offered confidential contacts, but those contacts more closely resembled brief "check ins" as opposed to therapeutic contacts. The only treatment provided in the MHCB that could be identified in patient records was medication management.

MHCB patients were offered yard, weekly showers, linen exchanges, clothing exchanges, and phone calls consistent with Program Guide requirements.

The Program Guide requires initial evaluations to be completed within 24 hours of admission to MHCB. Thereafter, patients must be seen daily by either the psychiatrist or psychologist. At least twice weekly, the psychiatrist must evaluate the patient.

The monitor randomly selected and reviewed the healthcare records of 30 MHCB patients to assess compliance with Program Guide timeframes during their stays. Thirty MHCB patients required initial psychiatry evaluations. Of those, 30, or 100 percent were timely initial psychiatry evaluations meaning they occurred before the initial IDTT and within 24 hours of arrival. Twenty-four were conducted in a confidential setting, with an additional two held cell-front due to refusal for a total of 26 or 86.6 percent compliance. Reasons indicated for non-confidentiality were either unknown or "as planned." Telepsychiatry was not reported as utilized for initial psychiatry contacts.

All 30 MHCB patients required two routine psychiatry contacts per week. Each of the 130 expected contacts were timely. Of the 130 reviewed routine contacts, 85 were conducted in confidential settings with an additional 11 held at cell-front due to refusals for a total of 96 or 73.8 percent compliance. Aside from patient refusals, additional reasons for non-confidential initial psychiatry evaluations included modified programming or a lack of available confidential space. Telepsychiatry was not reported as utilized for routine psychiatry contacts.

Thirty MHCB patients required initial primary clinician evaluations; 29, or 96.6 percent were completed within 24 hours of arrival, one could not be found. Of the 30 required initial primary clinician contacts, 29 were available for review, of which 27 were held in a confidential setting and one additional contact held at cell-front due to refusal, resulting in a compliance rate of 28 or 93.3 percent. Aside from patient refusals, additional reasons for non-confidential

contacts were not reported. There were no initial contacts reported utilizing Tele-Psychologists or Tele-Social Workers.

Finally, all 30 MHCB patients required routine primary clinician contacts. An institution is considered compliant if a patient was seen daily beginning the day after admission for an out-of-cell confidential contact (unless the patient refused) by the psychiatrist or psychologist, though on weekends the patient may be seen by the medical officer of the day (MOD) (PG 12-5-13). There were 97 expected contacts, and 90, or 92.7 percent were timely. Sixty-eight were conducted in a confidential setting with an additional 11 contacts held cell-front due to patient refusal for a total of 79 or 81.4 percent. Aside from patient refusals, the reasons for non-confidentiality were lack of available custody escorts, modified programming or was otherwise not documented.

<u>Seclusion and Restraint</u>:

No patients were placed in clinical restraints or seclusion during the reporting period.

<u>3CMS</u>:

Level III 3CMS patients resided on A and B yards, and Level II 3CMS patients were housed on C and D yards. Primary clinicians were assigned to each yard and patients were assigned to clinician's caseloads utilizing the last two digits of the patient's CDCR identification number. This assignment process contributed to disruptions in continuity of care during the review period due to the reassignment of cases to new clinicians. Consistent with case review findings, consistently providing psychiatric care was reported to be a challenge during the review period. Like primary clinicians, the three psychiatrists were assigned patients by yard and rotated coverage for the RHU. At the time of the site visit, staff reported that disruptions to continuity of care among primary clinicians had improved.

Observed treatment space on Facilities A and B was confidential. Patient contacts with psychiatric staff and primary clinicians occurred in office space with solid walls and a solid door. Facility A patients reported that, at times, confidentiality was impacted when the office door was left ajar.

*IDTTs*

The monitor's expert observed five 3CMS IDTTs, in which patients attended four of five observed IDTTS. Of the IDTTs that patients attended, two were initial IDTTs and two were routine IDTTs. For two of these IDTTs, the room was confidential and required staff were in attendance. IDTTs were led by two different clinicians; both were capable but one was particularly effective. However, psychiatry input was minimal. The correctional counselor routinely discussed program participation, behavior changes, concrete ways to improve behavior, and encouragement to motivate the patient to engage in prosocial behavior which marked a strength of the IDTT. Discussion between each staff member and the patient was respectful and appropriate. While staff initiated discussion directly with the patient with an eye toward the patient's success, there was minimal collaboration among staff members.

During all observed IDTTs, relevant clinical information including symptoms, functioning, psychiatric medication, diagnosis and case conceptualization were reviewed succinctly and usefully for treatment planning purposes. With one exception, measurable and objective treatment goals with targeted, evidence-based treatment interventions were reviewed. In one of the routine IDTTs, the correctional counselor's input was excellent, and she devoted much time to providing detailed explanations in response to the patient's questions. Two patients were discharged from 3CMS with appropriate rationale and transition planning. For two patients that remained in 3CMS, the plan to continue 3CMS level of care was reviewed although

rationale was not discussed. One patient was transferring to A yard–a designated honor yard–and was appropriately prepared for a change in providers. Overall, IDTTs were adequate with room for improvement regarding clinical rationales for diagnosis and continuation of 3CMS level of care, as well as collaboration between staff.

Initial IDTTs for 3CMS patients were required to occur within 14 working days of arrival to the institution or level of care change, and at least annually thereafter. *See* ECF No. 7333-1 at 43-44. All 30 patients required initial IDTTs. Of the 30 reviewed initial IDTTs, four or 13 percent occurred timely within 14 calendar days or arrival or level of care change. Twenty-nine or 97 percent were attended by all required staff and 20 or 67 percent were attended by the patients. Reasons initial IDTTs were held *in absentia* included patient refusals and ICCs scheduled at same time as patient's IDTT.

To measure timeliness of routine IDTTs during the review period, CDCR produced an appointments report that included individuals who were required to receive a routine IDTT from July 1, 2024 through December 31, 2024.[71] For the 453 patients in the appointments report, there were 470 completed and refused initial or routine IDTTs. When a patient had either an initial IDTT and a routine IDTT or more than one routine IDTT, timeliness in accordance with Program Guide requirements was able to be calculated. Of the 470 completed and refused IDTTs, 20 contacts were for individuals who had at least two IDTTs (initial and routine or two routines). Of those 20, all occurred within Program Guide requirements.

---

[71] The routine 3CMS IDTT appointments report did not include individuals that did not have a completed IDTT, such as those that were not scheduled. Additionally, the reviewed data captured the time between completed patient IDTTs but did not account for when patients were not scheduled for an initial or routine IDTT. Of note, the appointments report provided did not account for delays between appointments due to movements in or out of CSP/Solano.

*Individual Treatment*

The Program Guide requires that patients are offered an initial psychiatrist evaluation before their initial IDTT. *See* ECF No. 7333-1 at 34-50. Thereafter they are required to receive a routine psychiatric contact every 90 calendar days if the patient is prescribed a psychotropic medication. *Id*. Patients are also required to receive a primary clinician evaluation within ten working days of arrival and at least every 90 days thereafter. *Id*.

Thirty patients who required initial psychiatry evaluations were randomly selected to determine compliance with Program Guide timelines. All 30 patients required initial psychiatry evaluations; eight or 27 percent timely occurred before the initial IDTT. Twenty-three or 77 percent of the reviewed initial psychiatry evaluations were conducted in confidential settings; the non-confidential contacts were due to patient refusals. Telepsychiatry was utilized for one initial psychiatry evaluation.

To measure timeliness of routine psychiatry contacts during the review period, CDCR produced an appointments report that included individuals who were required to receive a routine psychiatry contact from July 1, 2024 through December 31, 2024.[72] For the 390 patients in the appointments report, there were 886 completed and refused contacts. Of the 878 completed contacts, 775 or 88 percent were confidential as reported by the institution. Reasons for non-confidential psychiatry contacts included custody escorts unavailable, mental health program modified, and patient refusal resulting in cell front contact.

[72] The mainline 3CMS routine psychiatry appointments report did not include individuals that did not have completed contacts. Reviewed data captured the time between patient contacts but did not account for when patients were not seen or scheduled for a routine psychiatric contact. Of note, the appointments report provided did not account for delays between appointments due to movements in or out of CSP/Solano. Contact with the assigned psychiatrist was unable to be determined.

When a patient had more than one completed or refused contact, timeliness in accordance with Program Guide requirements was able to be calculated. Of the 886 completed and refused contacts, 498 contacts were for individuals who were seen at least twice by the psychiatric provider. Of those 498 contacts, there were 18 or 3.6 percent that occurred beyond Program Guide requirements with a range of 91 to 104 days.

All 30 patients required initial primary clinician evaluations. Of the 30 reviewed initial primary clinician evaluations contacts, 11 or 37 percent were completed within 10 calendar days of arrival or change in level of care. Twenty-five or 83 percent of reviewed initial primary clinician evaluations were conducted in a confidential setting; non-confidential contacts were due to patient refusals and public health restrictions. Telehealth was not utilized for initial psychiatry evaluations.

To measure timeliness of routine primary clinician contacts during the review period, CDCR produced an appointments report that included individuals who were required to receive a routine primary clinician contact from July 1, 2024 through December 31, 2024.[73] For the 799 patients in the appointments report, there were 2,224 completed and refused contacts. Of the 2,169 completed contacts, 1,931, or 89 percent were confidential as reported by the institution. Reasons for non-confidential primary clinician contacts included confidential space was not available, custody escorts were not available, custody modified program, and mental health modified program.

[73] The mainline 3CMS routine primary clinician appointments report did not include individuals that did not have completed contacts, such as those that were not scheduled. The reviewed data captured the time between patient contacts but did not include patients who were not seen or scheduled for a routine contact with the primary clinician. Of note, the provided appointments report did not account for delays between appointments due to movements in or out of CSP/Solano. Contact with the assigned primary clinician was unable to be determined.

When a patient had more than one completed or refused contact, timeliness in accordance with Program Guide requirements was able to be calculated. Of the 2,224, 1,430 contacts were for individuals who were seen at least twice by the primary clinician. Of those 1430 contacts, 79 or six percent occurred beyond Program Guide requirements with a range of 91 to 171 days.

There were 2,169 completed individual PC contacts, of which one was completed in less than zero minutes, 32 were completed in zero minutes, 470 were completed in less than 15 minutes, 575 were completed between 16 and 30 minutes, 885 were completed between 31 and 60 minutes, 171 were completed between 61 and 95 minutes, and 35 were completed in greater than 95 minutes.

Of 40 randomly selected Level III patients (20 each from A and B yards), six patients attended interviews. Patients reported that provider contacts were timely or more frequently than required on B yard. Overall, patients reported that providers were responsive to their needs and were satisfied with the support provided by clinicians and discussions regarding ways to manage their symptoms. They requested more clinician contacts and access to clinical groups. One patient attended recreational therapy groups and noted improved communication skills. Four of six patients were aware of treatment goals and IDTT purpose. Patients on A yard reported that a clinician offered them an opportunity to refuse IDTT in advance.

Consistent with Health Care Access Quality reports, staff reported that refusals had increased due to prison politics and that increased violence–particularly on B yard–was an barrier to accessing mental health care; staff reported seeing patients at cell front when the yard was closed but that patients were resistant to these contacts due to risk of harm by other incarcerated persons.

Staff also reported a pattern of patients being placed on sleep medications at county jails which resulted in MHSDS placement at reception centers and, ultimately, an increase in the 3CMS caseload. Consequently, even when the issue resolved, the patient was referred for placement in the MHSDS "out of an abundance of caution." Staff reported that some patients were not aware they were in the MHSDS upon arrival to CSP/Solano.

Treatment space for Level II patients housed on facilities C and D included a meeting room used for IDTT meetings, recreational therapy groups, and individual primary clinician contacts. This room was confidential with adequate lighting and seating. Three additional offices were available for individual encounters with primary clinicians and psychiatrists; these were also confidential and adequate.

Two rooms with cubicles were used for mental staff offices and individual clinical contacts. In both rooms, up to two patients were being seen simultaneously. Consistent with patient reports, the cubicle spaces were not confidential with respect to sound, despite use of white noise machines, and when two patients are seen at the same time in either one of these rooms, they can overhear the other's treatment session. Mental health staff use individual offices or the IDTT room for patient encounters whenever these spaces were available and only used the cubicle spaces as a last resort. Because all primary clinicians and psychiatrists work ten-hour shifts four days per week, staff reported that private office space was available for patient encounters on Mondays and Fridays.

One clinician-led "personal transformation" mental health group was offered for part of the review period and concluded in mid-October 2024. Recreational therapy groups were also offered and in operation during part of the review period. At the time of the site visit, a recreational therapist provided recreational therapy groups to Level III patients on facility A and

two recreational therapy groups to Level II patients on facility B; no recreational therapy groups were available for 3CMS Level II patients on facilities C and D. Waitlist information for recreational therapy groups was not provided. Nursing-led treatment groups were not offered.

Interviewed 3CMS patients consistently reported that they consistently saw their assigned primary clinician, assigned psychiatrist, and IDTT in accordance with required timelines and more frequently as needed. Use of alternate primary clinicians or psychiatrists was reportedly rare, though primary clinician turnover was reportedly frequent during the review period. Patients also reported that contacts were confidential with respect to sight and sound except for those held in cubicles when more than one patient was present in the same room, as discussed above.

Few patients were aware of their own treatment plan goals, and several patients reported that there was a lack of individualization in their treatment plan. Patients were typically aware of how to access mental health services through a health care request but indicated there were few options for obtaining immediate or emergent care other than "going man down" or reporting suicidal or homicidal ideation. Several patients reported that, when they submitted urgent or emergent mental health care requests including health care requests that indicated suicidal ideation, they typically waited at least 72 hours before they received a response. One patient reported refusing medications three times in a row to obtain a faster mental health response. Several patients also complained that custody and mental health staff responses to mental health emergencies were punitive and included being placed in handcuffs, restrictive housing, holding cells, or publicly escorted back and forth between their housing unit and healthcare in handcuffs, and placed in safety smocks. These patients reported reluctance to disclose symptoms or distress out of fear of undergoing these interventions again.

Patients on heat medications were aware of institutional practices when heat alerts were put into effect. They reported, however, that heat mitigation interventions were not helpful and "made everything worse" because yard and canteen access was curtailed but patients were still required to stand in the heat for medication administration lines.

Several patients reported having jobs and few reported participating in education.

Patients indicated that the mental health program was helpful in providing them with a place to communicate about symptoms, stress, and life issues. They also praised the reliability of follow-up appointments with both their primary clinician and their psychiatrist but reported a need for more mental health and recreational therapy groups and more frequent individual contacts.

Other Issues:

Pre-Release Planning:

The pre-release coordinator was a social worker who also managed a patient caseload as a primary clinician. Every two weeks, the pre-release coordinator received notice from headquarters of patients scheduled for release and had the ability to run additional reports if needed. CSP/Solano provided a list of 65 3CMS patients who received pre-release planning services during the review period. Pre-release planning assessments were completed by the patient's primary clinician. However, no pre-release planning groups were offered due to staffing shortages.

Two TCMP benefit workers were assigned to the institution. Staff had access to confidential interview space. The TCMP supervisor reported a good working relationship with CSP/Solano and no barriers connecting with patients prior to their release. During the review period, TCMP screened 70 3CMS patients for eligibility of benefits. Of those, 47 applied for

Medi-Cal; seven patients had access to other insurance. All four patients eligible to apply for SSI completed applications. The sole potential patient for VA benefits applied and was denied eligibility.

Program Access:

a. Jobs and Program Assignments

As reflected below, 3CMS patients were by and large offered job and program assignments at rates consistent with non-MHSDS incarcerated persons during the review period. On January 17, 2025, CSP/Solano reported that, of 1,444 available jobs, 242 3CMS patients or 34 percent of the 3CMS population and 1,202 or 37 percent of the non-MHSDS population held job assignments.

The 904 academic assignments were held by 161 or 23 percent of 3CMS patients and 743 or 23 percent of the non-MHSDS population.

The 74 vocational education assignments were held by six or one percent of 3CMS patients and 68 or two percent of non-MHSDS individuals.

The 445 voluntary education assignments were held by 77 or 11 percent of 3CMS patients and 368 or 11 percent of the non-MHSDS population.

The 297 substance abuse treatment assignments were held by 55 or eight percent of 3CMS patients and 242 or seven percent of non-MHSDS individuals.

b. Milestone Credits

CSP/Solano did not produce this data in a reportable format.

c. Out-of-Level Housing

As of January 22, 2025, there were 21 3CMS custody Level I and 31 3CMS custody Level III patients in Level II housing; and two 3CMS custody Level I, 37 3CMS custody Level II, and 139 3CMS custody Level IV patients in Level III housing.

d. ADA Reasonable Accommodation and Grievance Procedures

CSP/Solano provided a copy of the CDCR Reasonable Accommodation Request Process manual and produced training rosters for custody and mental health staff.

"C" Status:

On February 7, 2025, 20 incarcerated persons were designated "C" status; none were MHSDS patients.

Case-by-Case Reviews:

No MHSDS patients required case-by-case reviews during the reporting period.

Mental Health Referrals:

During the reporting period, there were 840 mental health referrals, including 174 referrals to psychiatry and 666 referrals to primary clinicians. There were 19 emergent, 62 urgent, and 759 routine referrals. There were timely responses to five of six or 83 percent of emergent psychiatry referrals and all 15 emergent primary clinician referrals; nine of ten or 90 percent of urgent psychiatry referrals and 46 of 52 or 88 percent of urgent primary clinician referrals; and 146 of 158 or 92 percent of routine psychiatry referrals and 577 of 601 or 96 percent of routine primary clinician referrals.

Custody and Mental Health Partnership Plan:

CSP/Solano's custody and mental health partnership plan LOP complied with statewide policy and was last updated in February 2024.

Executive leadership joint rounding and monthly joint supervisory tours, and quarterly round table training did not occur during the review period due to mental health and custody staffing shortages.

MHCB huddle sheets were produced for second and third watch for each day of the review period. The specialized bed huddle report was utilized. Required staff generally attended, though custody staff occasionally was absent. Review of MHCB huddle forms from the week preceding the site visit revealed that mental health staff was frequently absent from third watch huddles.

An observed MHCB huddle was attended in-person by 14 mental health, medical, and custody staff members; additional staff attended remotely. While the specialized huddle report was utilized, this huddle was not collaborative. One member of nursing staff read off the patient information and medical history for the six medical and one mental health patient, while the other attending staff rarely spoke; the two custody officers did not participate aside from being asked if they had anything to add.

Weekly 3CMS supervisory meetings occurred every Wednesday virtually each week of the review period with required staff in attendance. However, meeting notes were typically sparse and reported the following, verbatim: "NO POTENTIAL/BARRIERS TO ACCESS WITHIN 7 DAYS" and "NO SIGNIFICANT ISSUES AFFECTING CCCMS PROGRAMS."

CSP/Solano distributed the 3CMS orientation brochure to new patients and provided English and Spanish copies of the same.

Inmate advisory council meeting minutes were produced for each month of the review period. Discussed topics included medical issues such as access to eyeglasses and other medical equipment, access to higher levels of care, and access to canteen.

There were 359 staff misconduct complaints filed during the review period consisting of seven against mental health staff, 341 against medical staff, and 11 against dental staff. Of those 359 complaints, 292 were closed and the remaining 67 were pending further review or closure or were awaiting approval for closure.

Three investigations for misconduct towards a patient were initiated outside of the appeal process. No staff members were reassigned because of misconduct complaints.

Two hundred fifty one of 260 or 97 percent of mental health staff and 1,003 of 1,092 or 92 percent of custody staff attended the annual partnership off-post training.

Heat Plan:

CDCR required that each institution's heat plan LOP incorporate the requirements of the most recent Heat Plan and Updates memorandum. CSP/Solano's heat plan LOP was up to date and followed headquarters' directive.

The 2024 Heat Plan and Updates memorandum required that each institution submit a Heat Plan Monthly Summary Report (Summary Report), signed by the warden and CEO, to headquarters each month from May 1 to October 31. The heat plan was in effect from July through October of the review period and there were 64 stage I, 40 stage II, and eight stage III heat alerts.

The Heat Plan and Updates memorandum also required institutions to submit a monthly Heat Incident Log documenting the number of patients who experienced a heat-related illness. The Heat Incident Log must include the patient's information and details regarding the heat-related illness. No patients experienced heat-related illness during the review period.

The 2024 Heat Plan and Updates memorandum required all custody officers and leadership staff to maintain knowledge of heat plan activation and act in accordance with the

requirements of each stage. Interviewed custody staff demonstrated an adequate understanding of heat plan policies and procedures. They generally recalled all three stages of the heat plan, and all were aware of patients who were prescribed heat-sensitive medications; while the vast majority reported that this list was updated daily, a select few incorrectly indicated it was updated weekly.

To ensure proper and accurate temperature recording, the annual Heat Plan and Updates Memorandum required the warden or his designee to ensure an accurate thermometer was placed in a central, heat-neutral location to monitor outside ambient air temperatures which must be recorded every hour, every day, from May 1 through October 31 of each year. Reviewed outside temperature logs included appropriate temperature recordings every hour with highlights indicating when a heat alert went into effect. There were also annotations on all heat logs indicating the exact time that a Stage I heat alert went into effect and when it was deactivated.

The warden or his designee is also responsible for ensuring that inside air temperatures are measured in all non-airconditioned living areas that house heat-risk incarcerated persons. Temperatures must be taken at the highest non-air-conditioned location where heat-risk incarcerated persons are housed and must be recorded every three hours. Reviewed indoor temperature logs indicated accurate and appropriate indoor temperature recordings every three hours as required. There were highlights for each building number and timeframe which a Stage II or Stage III heat alert occurred. All observed thermometers were appropriately located and in working order. In an effort to ensure that heat-risk incarcerated persons were afforded equal access to programs, services, and activities during extreme weather conditions, the 2024 Heat Plan and Updates memorandum required institutions to devise and include any reasonable accommodation and alternatives to yard activities when revising their LOP. All reasonable

accommodation provided to heat-risk incarcerated persons during heat alert activation must be documented in the institution's DAR as well. Reviewed DARs indicated exact times of Stage I and II heat alerts, including the location of Stage II heat alerts but did not discuss accommodations offered to patients during the heat alert.

The 2024 Heat Plan and Updates memorandum required annual training on the institution's Heat Plan. The required heat-related pathologies training was attended by 122 of 138 or 88 percent of required mental health and 693 of 716 or 97 percent of required custody staff.

RVRs:

CSP/Solano issued 3,077 RVRs during the review period; 715 or 23 percent were issued to MHSDS patients, consisting of two to acute care patients, ten to MHCB patients, two to EOP patients, and 701 to 3CMS patients.

The monitor's review of 15 RVRs to assess compliance with CDCR policy revealed significant concerns with timeliness of RVR reviews. Custody staff timely referred the mental health assessment to mental health staff within two days in five or 33 percent of reviewed cases. Mental health staff timely completed and returned the assessment to custody within eight days in four or 27 percent of reviewed cases. The senior hearing officer documented consideration of the mental health assessment in all reviewed cases.

Mental health staff recommended mitigation in ten or 67 percent of reviewed cases and the SHO mitigated the penalty pursuant to the assessment in nine of ten cases; for one case, the SHO explained that the patient was found guilty and lost their yard privileges because mental health and DDP did not contribute to their actions that led to the RVR.

No mental health assessments recommended alternative discipline due to patients' mental health significantly contributing to the behavior documented in the RVR. Similarly, mental health assessments explained that mental health did not contribute to the behavior that led to the RVR.

Mental health assessment training was attended by 11 of 14 or 79 percent of required mental health staff and 85 of 95 or 89 percent of required custody staff; the warden and chief deputy warden's attendance was not reported.

Use of Force:

During the review period, CSP/Solano reported no controlled and 135 immediate use of force incidents; 70 or 52 percent of immediate uses of force involved MHSDS patients.

The majority of use of force incidents related to fighting between or among incarcerated persons. Review of 18 immediate use of force incidents revealed compliance with applicable policy, including, for instance, proper decontamination in cases where oleoresin capsicum was utilized.

The mandatory use of force training was attended by 121 of 132 or 92 percent of required mental health staff and all required custody staff.

Lockdowns/Modified Programs:

No program lockdowns or modified programming periods were initiated from the start of the review period through the time of the site visit; however, regional staff and headquarters reported serious issues with gang violence stemming from internal politics within different security threat groups.

Access To Care:

A review of monthly Health Care Access Quality reports from July through December 2024 reflected the issuance of 7,055 mental health ducats and add-on appointments; 5,405 or 77 percent were completed and 1,650 or 23 percent were not completed. Of the non-completed appointments, zero were due to custody factors, 1,039 or 63 percent were due to non-custody factors, and 778 or 47 percent were due to patient refusals. This marked a notable increase from the preceding review period when only eight percent of non-completed appointments were due to patient refusals.

*Coleman* Posters:

All toured housing units contained current *Coleman* postings in English and Spanish.

**APPENDIX A – 13**
**CALIFORNIA SUBSTANCE ABUSE TREATMENT FACILITY (CSATF)**
Site Visit: May 20, 2025 – May 22, 2025
Review Period: October 1, 2024 – March 31, 2025

Census:

On May 16, 2025, CSATF housed 5,374 incarcerated persons, which was a 17 percent increase from the prior review period. *See* Thirtieth Round Monitoring Report – Part C, ECF No. 8095 at 269. The 3,026 MHSDS patients represented 56 percent of the institution's total population and was a 26 percent increase from the previous review period. *Id*.

There were 14 patients in the MHCB and no patients in alternative housing.

There were 90 total MHSDS patients housed in the 3CMS RHU; two were EOP patients and 88 were 3CMS patients.

The 586 mainline EOP patients was a 14 percent increase from the prior round while the 2,323 mainline 3CMS patients was a 28 percent increase from the prior round. *Id*.

There were 13 unidentified MHSDS patients in mismatched housing who were awaiting transfer.

Staffing:

The chief psychiatrist position was filled. One of six staff psychiatry positions were filled for an 83 percent vacancy rate. The use of 1.29 registry staff reduced the functional vacancy rate for staff psychiatrists to 62 percent. Of the 12 telepsychiatry positions, 11.5 were filled, leaving a four percent vacancy rate. Inclusive of both on site, registry, and telepsychiatry positions, the overall staff psychiatry functional vacancy rate was 23 percent.

Both chief psychologist positions were filled. Six of the seven senior psychologist positions were filled leaving a 14 percent vacancy rate. Five of the 6.5 allocated senior psychologist specialist positions were filled leaving a 23 percent vacancy rate. With one staff

member on long-term leave, the functional vacancy rate increased to 38 percent. Of 45.5 staff psychology positions, 9.5 were filled leaving a 79 percent vacancy rate. The addition of 3.04 registry staff reduced the functional vacancy rate to 72 percent. Four psychologists were unlicensed. One of the four telepsychologist positions was filled, leaving a 75 percent vacancy rate. Inclusive of on-site and telepsychology positions, the overall psychologist functional vacancy rate was 73 percent.

Of the two allocated supervising social worker positions, 1.5 was filled for a 25 percent vacancy rate. With a 0.5 full-time equivalent staff member on long-term leave, the functional vacancy rate was increased to 50 percent. Seventeen of 23.5 social worker positions were filled for a 28 percent vacancy rate. The addition of 3.6 registry staff reduced the functional vacancy rate to 12 percent. Five of six tele-social worker positions were filled leaving a 17 percent vacancy rate. 13 social workers were unlicensed. Overall, the functional vacancy rate for staff social worker positions was 13 percent.

Inclusive of staff psychologists, clinical social workers, and tele-mental health positions, the overall primary clinician functional vacancy rate was 50 percent.

Fifteen recreation therapists covered 21.5 positions resulting in a 30 percent vacancy rate. With the addition of 1.64 registry staff, the functional vacancy rate was reduced to 23 percent.

Two of three senior psych tech positions were filled leaving a 33 percent vacancy rate.

Of the 50.5 psych tech positions, 49.5 were filled for a two percent vacancy rate.

Ten of 20 medical assistant positions assigned to tele-mental health were filled.

Twenty-two of 23 supervising registered nurse positions were filled, reflecting a four percent vacancy rate. Four of six registered nurse positions were filled for a 33 percent vacancy rate.

Of 30.5 MHSDS clerical positions, 29 were filled for a five percent vacancy rate. Two staff were on long-term leave, which increased the functional vacancy rate to 11 percent.

Both OSS II positions were filled, as were 4.5 of five HPS I positions and the HPS II position.

As for custody, the warden and chief deputy warden's positions were filled with administrators acting out of class. All seven associate warden positions were filled, however one associate warden was on long term leave and four associate wardens were acting out of class in a different position, resulting in a functional vacancy rate of 71 percent.

All eight captain positions were filled, however three captains were acting out of class in a different position, resulting in a functional vacancy rate of 38 percent. For lieutenant positions, 41 of 42.8 positions were filled resulting in four percent vacancy rate. With three lieutenants on long-term leave and an additional lieutenant acting out of class in a different position, the functional vacancy rate was increased to 14 percent. Of the 101.8 sergeant positions, 97 were filled for a five percent vacancy rate. With eight sergeants on long-term leave, the functional vacancy rate for sergeant positions increased to 13 percent.

There were 43 CC I positions of which 35 were filled resulting in a 19 percent vacancy rate. One CC I was on long-term leave, increasing the functional vacancy rate to 21 percent. All 13 CC II positions were filled. For custody officers, 872 officers filled 826.6 positions. However, 55 officers were on long-term leave and seven were acting out of class in a different position, which created a functional vacancy rate of two percent.

Tele-Mental Health:

At CSATF, telepsychiatry was used in all four programming areas, including the 3CMS RHU, MHCB, mainline EOP, and mainline 3CMS.

The tele-mental health policy required that telepsychiatrists treating EOP and 3CMS patients visit their assigned institution within 30 days of assignment and no less than annually thereafter. *See* ECF No. 8593. All telepsychiatrists visited the institution in person as required after their date of hire and within the last year.

There were no other staff that teleworked during the review period.

Staff Recruitment:

CSATFs mental health leadership reported regional hiring fairs as a good source of recruitment for the institution. In addition, CSATF also utilized the National Health Care Loan Repayment Program to attracted staff. Reported barriers to staff recruitment included CSATF's remote location, its large size compared to institutions nearby, and non-competitive wages when compared to private mental health treatment options.

The institution also utilized unlicensed primary clinicians to fill staffing vacancies during the review period. CSATF continued to allow 13 psychologists and social workers to oversee the unlicensed staff which included one hour of individual supervision each week for unlicensed psychologist and two hours of individual supervision each week for every unlicensed social worker. Licensed staff who volunteered to supervise unlicensed staff received a pay differential for taking on the supervisory role but they did not receive a reduced caseload.

Quality Management:

CSATF's local governing body (LGB) met quarterly during the review period, in December 2024 and March 2025. The LGB was responsible for ensuring statewide compliance with Title 22 regulations including CTC policies and procedures and credentialing of health care staff. For the December meeting, a quorum was achieved along with appropriate approval of minutes without modifications. Regulations and credentialing were discussed and approved.

CSATF's quality management committee (QMC) met monthly and minutes were submitted for October 2024 through March 2025. Other than the February 2025 meeting in which attendees were not identified, all reviewed QMC meeting minutes indicated that it attained quorums, were approved, and adequately referenced discussions about barriers to care, medication management, dashboard compliance indicators, various audits, and status reports from scheduled subcommittee reports. Other topics that did not meet Program Guide requirements or dashboard thresholds were presented to the committee, discussed, and followed up at subsequent meetings.

The mental health program subcommittee (MHPS) met monthly and submitted reports to the QMC on a quarterly basis. Minutes reflected the attainment of quorums and discussion of relevant topics. The content was quite dense; including dashboard results, memos sent to staff and leadership from the last meetings. For the tables, reports, and dashboards presented at each meeting, most concluded with statements about continuing to report on the findings rather than plans to address the issues.

However, there were some quality management plans to address identified issues during the review period. The RHU reports established goals for OTs and supervisor to oversee and monitor initial and "special" IDTT meetings (IDTT meetings for higher level of care consideration). Additionally, there was a CAP to address concerns raised in quarter four and quarter one sustainable process reports that discussed low compliance for acceptable documentation for non-referrals to higher levels of care. CSATF monitored and reported on the regional CAP progress monthly.

Other topics included the lack of routine assessments while utilizing triage plan due to staffing shortages. SREs and discharge custody check forms were also consistently discussed, reviewed, and monitored during CSATFs' meetings.

CSATF's staff reported that QMC and MHPS reports were shared with staff during supervisory and all staff meetings.

There were no specific CSATF QITs, FITs, or workgroups developed or implemented during the review period.

Emergency Medical Response and Rescue Committee (EMRRC) met monthly, quorums were achieved, and minutes were approved. The focus of the committee was to ensure timely responses to medical and mental health responses and ensure proper training was provided. The minutes reflected response times, training sessions and whether goals were met, responsible parties, and training needed. The type of emergency response was easily identified but whether the patient was in the MHSDS was not identifiable from the meeting minutes.

CSATF did not conduct peer reviews during the review period or at the time of the site visit.

Medication Management:

CSATF provided MAPIP results for October 1, 2024, through March 30, 2025, regarding compliance for psychiatric diagnostic monitoring and the management of medication continuity, observation and administration.

CSATF was noncompliant for all six months of diagnostic monitoring for patients prescribed antidepressants for EKGs, med consents and thyroid monitoring; however, CSATF was compliant for six months with blood pressures for patients on venlafaxine.

Diagnostic monitoring for patients prescribed atypical antipsychotics showed that CSATF was compliant with checking blood pressure, height, weight, and EKGs for all six months of the review period. The institution was compliant with obtaining medication consents for two of the six months. There was compliance for three of six months for obtaining complete blood count (CBC) and comprehensive metabolic panels (CMP). However, CSATF was not compliant for six months with obtaining Abnormal Involuntary Movement Scale (AIMS) measure, glucose monitoring, thyroid tests and lipid monitoring.

CSATF was not an authorized clozapine initiation or maintenance facility; however, CSATF documented their compliance at 100 percent for all Clozapine measures (AIMS, glucose, CBC, CMP, EKG, Height, lipids, med consent and thyroid testing), for the month of January 2025 and lipid monitoring at 100 percent also in February 2025. For the remaining months, CSATF did not document whether monitoring was needed or required for clozapine.

For patients prescribed carbamazepine, CSATF was compliant for obtaining medication consents, CMP, CBC, and levels at 100 percent for the one required month. For the remaining five months, there were no patients requiring monitoring according to CSATF documentation.

CMP documentation for patients prescribed Depakote was compliant for three months, CBC with platelets for two months, med consents for one month, and no compliance for six months with Depakote levels.

For lamotrigine, the institution reported compliance for obtaining medication consents for four months.

As for lithium, CSATF reported compliance for three months for medication consents and EKGs, two months for thyroid test, and one month for kidney function tests and lithium levels.

Psychiatry documented underperforming metrics and, in summary, planned to retrain on the specific metrics and to maintain continuous monitoring. It was unclear if this included all psychiatrists and when monitoring would begin and end. Nursing PIPs or CAPs were not found.

For nursing medication management metrics, CSATF was non-compliant for all six months with continuity of medications upon transfers to R&R, intra-institutional transfers (excluding ASU/SHU/PSUs), MHCB transfers, inter institutional transfer to ASU/SHU/PSU, and discharge/transfers community hospitals and/or DSH. CSATF was compliant for continuity of medications for four of the six months for patients paroling or transferring to the community.

Monitoring PC 2602 involuntary med court orders were compliant at 100 percent for all six months and compliance for PC 2602 involuntary med orders were achieved two of the six months. Observation of preparation of medication for AM, PM, and HS meds were non-compliant for the six-month period. Medication administration of historical chronic care medications prescribed by a psychiatrist was compliant four of the six months, same measure for medical providers was compliant two of the six months, monitoring of medication administration for newly ordered outpatient medications prescribed by a psychiatrist were compliant two months of the six months and same measure for medical providers was not compliant for the six months.

As for prescribing practices, CSATF psychiatrists reported all followed the HCDOM guidelines.

CSATF was not a Clozapine initiating or maintenance institution; however, with permission from the Statewide Chief psychiatrist initiation of Clozaril could occur. In December 2024, a patient requested to restart Clozaril, CSATF received permission and began the patient

on Clozaril. Once the patient was stable, the patient was transferred to a higher LOC in January 2025.

CSATF did not submit information on the number of patients who were prescribed Keep on Person (KOP) medications during the review period or at the time of the site visit.

There were 108 pill line audits within two months (February and March 2025) when CSATF exceeded the two-hour period due to the conversion of a yard from a level three yard to a level four yard in February and in March due to multiple modified programs or lockdowns per PSRs. Individual patient wait times remained between five and eight minutes during normal pill lines. CSATF did not indicate any issues with medication lines conflicting with mental health programming.

CSATF's report of number of patients on HS was 1,576 patients who were prescribed 256 medications.

CSATF has no KOP SSRI medications prescribed by a medical provider.

CSATF reported that there were 16 emergent, 17 non-emergent initial PC 2602 petitions filed during the review period, 65 renewals and 28 petitions expired without a notice of non-renewal. Psychiatry also stated that the seven flags for "No" medications ordered as PC 2602 orders were in error. After reviews on the chart, psychiatry stated they were in compliance. It is unclear if this issue was resolved.

The average non-formulary prescriptions written at CSATF during the six-month period was 10.6. There was no supervision required for non-formulary prescribed medications.

<u>Transfers</u>:

Sustainable process reviews were required to audit higher level of care (HLOC) consideration documentation for quality and to measure the inter-rater reliability between the

headquarters' reviewer and the institution's inpatient care coordinator. Sustainable process reviews completed during the monitoring period related to documentation supporting non-referrals and adequate documentation of treatment modifications. The findings showed improvements during the reporting period, but rates continued to fall below expectations. CSATF reported that during the fourth quarter of 2024, the inpatient coordinator found adequate non-referral documentation in 59 percent of cases, while headquarters' staff found 47 percent of cases had acceptable documentation. In the first quarter of 2025, the inpatient coordinator found 78 percent of cases had adequate documentation, while headquarters' staff found 72 percent of cases reviewed had adequate documentation. Findings revealed insufficient rationale supporting the non-referrals, no clinical opinion provided for patients' failure to attend programming, insufficient treatment modifications, documentation not addressing the patients' behavior or identified issue, and documentation errors regarding the patients' current level of care. There were also times when the inpatient coordinator received the wrong higher level of care form.

As part of the current review, the monitor's expert reviewed ten records for patients who experienced a higher level of care nonreferral. The documented nonreferral rationales for these ten patients was generally inadequate and not supported by the patient's history and recent behavior. In more than one case, the patient's behavior reflected decompensation as evidenced by increased impulsivity, disorganization, or violence toward others, yet rationale for not referring to a higher level of care was based on the patient's adequate hygiene and ability to attend meals. Additionally, some cases included rationale that the patient's behavior was "volitional" implying that if the patient was making inappropriate choices, this somehow evidenced psychiatric stability. In about half of the cases, the interventions that were documented to support the patient at the current level of care were adequate; however, given the

staffing shortage and the intensity of the interventions outlined, there was little likelihood of the interventions being implemented. There was also minimal use of collaborative safety planning to support reductions in self-injury and statements of suicidal intention when environmental concerns were the target of these behaviors.

CSATF's inpatient coordinator held this position for two years.

During the review period, there were 624 instances of 386 patients who were considered for, but not referred to, higher levels of care. Provided reasons for non-referrals included patients being unable to attend groups specifically due to symptoms related to schizophrenia and paranoia; however, these patients were willing/able to participate in the other services offered by mental health.

CSATF referred 20 patients to acute care and all 20 were accepted. All 20 patients timely transferred within ten days. All referral packets were completed within two working days of identification.

CSATF referred 25 patients to intermediate care; 21 referrals were accepted, one was rescinded, two were rejected, and one patient paroled. All 21 patients timely transferred within 30 days. All referral packets were completed within five working days of identification.

No patients with complex medical needs were transferred to inpatient care.

CSATF made 483 MHCB referrals, of which 243 or 50 percent were rescinded. Of the 240 MHCB admissions, 19 or eight percent took longer than 24 hours to transfer. The reasons for the high percentage of recissions included patients being placed in alternative housing after hours and later being returned to their housing units the next morning following their face-to-face evaluation.

3CMS patients who were referred to 3CMS RHU were placed in CSATF's 3CMS RHU timely, however the institution did not track intra-institutional transfers.

There were 149 instances for a total of 119 patients who transferred to an EOP RHU during the review period. Of the 149 instances, 33 or 22 percent transferred within 30 days of identification. Reasons for delays included patients refusing to transfer and EOP overflow.

Seven patients were transferred to an MSF.

During the reporting period, 43 patients' level of care was reduced from EOP to 3CMS.

The records for the ten patients most recently referred to an inpatient setting were reviewed to assess the IDTT documentation related to the referral and whether the treatment provided to the patient awaiting transfer was adequate. In all ten cases reviewed, the patients were placed in the MHCB while awaiting transfer and IDTT documentation was found to be remarkably similar and formulaic. The clinicians appeared to use the higher level of care section to outline the treatment that would be provided to the patient while awaiting transfer rather than the treatment plan. The language in the higher level of care sections was the same across patients with no individualization. In most cases, the treatment plan section of the document was blank. There were no goals nor interventions listed. None of the cases appeared to warrant an expedited transfer. Documentation by clinicians providing treatment while the patient was awaiting transfer was variable. In some cases, the clinicians' documentation reflected appropriate attempts at providing treatment to stabilize the patient and in other cases, the documentation did not acknowledge the pending transfer or patient's level of instability warranting transfer. Psychiatric documentation revealed adequate assessment, treatment, and planning in most cases reviewed.

Following discharge from an inpatient setting, CSATF primary clinicians were expected to complete a clinician-to-clinician contact with the inpatient primary clinician as well as review the discharge summary so that findings could be integrated into the patient's treatment plan. A review of the minutes from MHPS meetings revealed that during the monitoring period, clinicians did not consistently complete clinician-to-clinician contacts and did not consistently evidence integration of discharge summaries into the patient's initial treatment plan upon return to CSATF. It was reported that through training and the use of prompts, rates of compliance were increasing in recent months. The inpatient coordinator reported that while there has been some improvement, clinicians required on-going reminders. A system has been created to notify and remind staff of these responsibilities; however, the inpatient coordinator noted that the compliance was often clinician-dependent in that some individuals were better at fulfilling these responsibilities than others.

The monitor's expert reviewed the ten most recent cases of patients who returned to CSATF after discharge from an inpatient setting. Seven of ten included evidence of a clinician-to-clinician contact, yet not all included clinically relevant documentation relating to the patient's recent inpatient stay. Only two of the ten patients' records evidenced adequate integration of the patient's discharge summary into the initial treatment plan.

Overall, compliance with clinical expectations related to inpatient transfers was not adequate. First, rationale for non-referrals and documentation of treatment modifications to be implemented in lieu of referral needed improvement. Additionally, the ability of staff to provide documented treatment modifications was limited by inadequate staffing. Second, treatment plans for patients referred to inpatient settings were formulaic and not individualized. Lastly, integration of treatment and recommendations following patients' recent discharges from

inpatient settings was not adequately integrated into patients' initial treatment plans upon their return to CSATF.

Programming:

The institution utilized a triage plan for all programming since May 2023. Effective April 9, 2025, the institution modified the triage plan to prioritize emergent and urgent consults, suicide risk evaluations, five-day follow-ups, initial primary clinician contacts and IDTTs, followed by routine primary clinician appointments and IDTTs.

CSATF indicated that it continued to monitor and report on these measures monthly in the MHPS meeting as well as in weekly leadership huddles. CSATF staff were provided training on the updated triage plan at the monthly mental health departmental meeting which took place on April 9, 2025.

MHSDS Patients in Restricted Housing:

CSATF operated a 3CMS RHU on Facility A during the review period.

There were 639 incarcerated persons housed in CSATF's 3CMS RHU during the monitoring period which included three acute care patients, six intermediate care patients, six MHCB patients, 73 EOP patients, six EOP modified programming patients, and 414 3CMS patients. Average lengths of stay could not be discerned.

At the time of the site visit, there were 104 incarcerated individuals housed in the 3CMS RHU, 90 of which were MHSDS patients, including two EOP patients and 88 3CMS patients.

According to the staff-to-patient ratios from the 2009 staffing plan, psychiatrists who treat 3CMS patients in restricted housing must maintain a caseload of no more than 125 patients per psychiatrist, while primary clinicians who treat 3CMS patients in restricted housing must maintain a caseload of no more than 25 patients per clinician. *See* ECF No. 3693 at 14.

CSATF's 3CMS RHU staffing included a telepsychiatrist who maintained a caseload of 89 patients and five primary clinicians, three of which carried caseloads within required ratios. Caseloads exceeded required ratios by one and four patients respectively.

The clinicians' availability varied throughout each week as three primary clinicians were full-time and two were part-time positions. The 3CMS RHU program had the most staffing on Wednesdays and Thursdays, with telepsychiatry available Tuesdays through Fridays.

*Structured Treatment*

The RHU Policy required that patients assigned to 3CMS RHU be offered a minimum of 20 hours of out-of-cell time reach week, including 18.5 hours of recreational time outside the cell and 90 minutes of confidential, structured therapeutic activities. *See* ECF No. 8355 at 7-17 (Restricted Housing Unit Program: Mental Health Services Policy, dated July 19, 2024 and effective August 1, 2024) (hereinafter "RHU Policy"). From September 30, 2023, to March 31, 2024, patients in the 3CMS RHU were scheduled for an average of 1.98 hours per week of structured treatment activities (STAs). However, they were offered 1.42 hours and attended an average of 0.60 hours of STAs during the review period. Of the scheduled time, 0.55 hours were lost due to cancellations, while 0.82 hours were attributed to patient refusals.

*IDTTs*

During the site visit, nine initial RHU 3CMS IDTT meetings, with one conducted in *absentia*. Patients were remained restrained when placed in the therapeutic treatment module (TTM) for the IDTT meetings. The physical environment was conducive to the meetings, offering adequate space, lighting, and temperature, while ensuring patient confidentiality.

All required participants, including the assigned primary clinician, assigned psychiatrist, CC I, a psychiatric technician, and the mental health supervisor, were present for each meeting.

All staff had access to computers, and while the tele-psychiatrist was clearly audible to the team through a monitor, its positioning directly in front of the patient's TTM allowed the patient to see the psychiatrist. However, this setup prevented the team from viewing the tele-psychiatrist and vice versa during IDTTs.

Although the IDTTS varied among the primary clinicians, overall, the IDTT meetings were generally adequate, with several strengths noted. The IDTT process was collaborative, with clinicians taking time to explain information and answer patient questions. Key components of the treatment plans were consistently addressed, including patient identifying information and case conceptualization, psychiatric history, diagnoses, medications, overall treatment goals, interventions to be utilized as well sufficient input from each participant including the psychiatric technician and the CC I. The IDTTS also reviewed the patient's RVRs and SRMP status. Another notable strength was the supervisor’s proactive approach to addressing potential substance use treatment needs for patients. When substance-related issues were observed, the supervisor made suggestions for patients to submit medical requests to participate in the ISUDT program, which would provide additional support using cognitive behavioral therapy. Additionally, at the conclusion of each IDTT, the team was asked for their opinions regarding the patient's 3CMS level of care. This practice demonstrated effective team collaboration.

Despite addressing critical aspects of treatment planning, inconsistencies among clinicians highlight several areas for improvement. There is a need for more consistent and in-depth discussions on patient symptoms justifying patient’s diagnoses and discussion of patients progress toward treatment objectives since the patient’s last treatment plan. Additionally, some clinicians did not include measurable goals in team discussions, which are essential for providing

patients with concrete objectives and tracking the effectiveness of treatment interventions. Additionally, although the team provided consensus for maintaining patients in 3CMS level of care, clear justification for level of care and specific discharge criteria were omitted.

Also, when providing case conceptualizations to the team and the patient, rather than focusing on specific founders of psychological theories or the use of complex psychological jargon, discussions should focus on general case conceptualizations that patients can easily understand.

Following the site visit, a review of IDTT documentation for the nine observed IDTT meetings revealed significant discrepancies between treatment team discussions and master treatment plan documentation, with several clinicians failing to complete critical sections, set measurable goals, or update plans to reflect current discussions. Key elements such as discharge criteria and justification for maintaining patients at the current level of care were often omitted except for two cases completed by the licensed social workers. While the licensed clinical social worker's documentation appeared to align with discussions during treatment meetings, the inconsistencies found in the remainder of the master treatment plans pose a risk of fragmenting the delivery of mental health treatment for patients in the 3CMS RHU. This misalignment can lead to inefficient use of resources, increased risk of clinical errors, and compromised patient outcomes, as essential treatment strategies are not effectively communicated or implemented across providers if not documented in the EHRS. Ensuring comprehensive and accurate documentation is crucial to maintaining continuity of care. Given these inconsistencies and inadequate documentation, the CSATF 3CMS RHU IDTT treatment planning process is rendered essentially meaningless, as the discussions fail to translate into actionable treatment plans.

*Group Treatment*

According to CSATF's 3CMS RHU group schedule, five groups were offered throughout the day beginning at 7:15 A.M. with the last group starting at 2:45 P.M., with ten patients assigned to each group. The supervisor clarified that the recreation therapist conducted groups on the same topic throughout the week, facilitating the same session multiple times per day, and topics changed weekly. During the week of the site visit, groups included watching a video about stress, followed by a discussion, and a movie. The same group was conducted throughout the day at each of the five scheduled group times.

The observed group discussed stress and coping strategies. The video was concise, engaging, and effectively used humor to convey the message about the impact of stress. The recreation therapist also engaged the patients by asking questions about their thoughts on the video and sharing personal experiences from other positions she held to discuss ways of managing stress. Although the RT did not call on patients by name, the patients were actively involved in the discussion. Additionally, after two or three questions were posed, the group was eager to watch a Spider-Man video, which was then shown for 20 minutes at the end of the session.

Following the group, ten patients were interviewed following their participation in the RHU groups. All patients reported enjoying the groups while in the RHU, as it allowed them to participate in programming. Patients reported attending 90-minute sessions weekly, either on Monday or Tuesday. These sessions provided a valuable opportunity for patients to interact with others and engage in group therapeutic activities. The patients stated that attending the group was the only activity that made them feel normal and that getting out of their cells to watch something was a welcome relief, especially for those who did not have televisions, radios, or

fully functional tablets. Overall, although not led by a clinician, the group provided balanced psycho-educational and leisure/recreational activity to patients to learn coping skills to manage stress.

RHU EOP patients awaiting transfer to an EOP RHU institution attended one 90-minute group session each week. At the time of the site visit, there were two RHU EOP patients housed in the CSATF RHU, and they were assigned to either a Monday or a Tuesday 90-minute group, attended alongside the RHU 3CMS patients.

In the group room, patients are secured to desks arranged in a semicircle, a layout that facilitates interaction among peers while allowing for clear observation of the facilitator. The physical environment of both the group room and the IDTT space is conducive to effective communication, providing adequate space, lighting, and temperature control. While a window in the door permits visual monitoring by custody for safety, the room was private as to sound and maintained patient confidentiality.

*Individual Treatment*

The RHU Policy requires that all patients placed into 3CMS RHU receive a primary clinician evaluation within ten days of arrival and an initial psychiatry evaluation prior to the IDTT and within ten days of arrival. *See* RHU Policy at 4. The RHU Policy also requires that 3CMS RHU patients receive weekly primary clinician contacts and psychiatry contacts every 90 days. *See id*.

Thirty 3CMS RHU patients who required initial psychiatry evaluations during the reporting period were randomly selected for review with RHU Policy requirements. Of the 30 random patients, four transferred before timeline requirements expired while seven did not receive an initial psychiatry evaluation at all during their stays. Of the 19 patients who received

an initial psychiatry evaluation, nine or 47 percent were timely and 12 or 63 percent occurred in a confidential setting. Reasons for non-confidentiality included patient refusals.

To measure timeliness of routine psychiatry contacts during the review period, CDCR produced an appointments report that included individuals who were required to receive a routine IDTT during the review period. For the 79 patients who received at least one routine psychiatry contact, there were 125 total completed and refused contacts. Of the 124 that were completed, 104 or 84 percent were conducted confidentially. Of the 124 completed contacts, 47 were for individuals who were seen at least twice by a psychiatric provider. All 47 contacts were completed within RHU Policy required timeframes. Of note, the report did not include individuals that did not have complete contacts, such as those that were not scheduled in accordance with the institution's triage plan.

The 30 random 3CMS RHU patients who required initial psychiatry evaluations also required initial primary clinician evaluations during the reporting period. Of the 30 patients, four transferred before timeline requirements expired. Of the 26 patients who received an initial primary clinician evaluation, 17 or 65 percent were timely while 16 or 62 percent occurred in a confidential setting. Reasons for non-confidentiality included patient refusals.

For the 170 patients in CDCR's appointments report covering patients who received at least one routine primary clinician contact during the review period, there were 724 total contacts; all were completed. Of the 724 completed contacts, 321 or 44 percent were conducted confidentially. Of the 724 completed contacts, 555 were for individuals who were seen at least twice by a primary clinician provider. Of those 555 contacts, 11 or two percent of contacts were completed beyond the RHU Policy required timeframes. Of note, the report did not include

individuals that did not have completed contacts, such as those that were not scheduled in accordance with the institution's triage plan.

Of the 724 completed routine primary clinician contacts, six contacts were reported to have been completed in zero minutes, 458 were completed within 15 minutes, 131 lasted between 16 and 30 minutes, 115 lasted between 31 and 60 minutes, 12 lasted between 61 and 95 minutes, and two were completed in greater than 95 minutes.

For the 260 patients in CDCR's appointments report, there were 282 completed and refused routine IDTTs. When a patient had either a completed or refused initial IDTT and a routine IDTT or more than one routine IDTT, timeliness in accordance with Program Guide requirements was able to be calculated. Of the 282 IDTTs that were completed, 23 were for individuals who had at least two IDTTs. Of those, six or 26 percent were not compliant with Program Guide timeframes. Of note, the report did not include individuals that did not have a completed IDTT, such as those that were not scheduled.

The institution indicated that the 3CMS RHU did not offer generalized in-cell therapeutic activities during the review period. However, the documentation noted that in-cell therapeutic activities were tailored to the patient's treatment plan and provided by the patient's primary clinician. Activities include journaling and self-help workbook exercises. Additionally, psychiatric technicians distributed handouts that include positive coping techniques during daily rounds. As noted above, patients reported consistently receiving in-cell activities, during psychiatric technician rounds and journals and other therapeutic activities from their primary clinicians.

Ten weeks of reviewed 114-A's revealed the offering of at least 18.5 hours of recreational time outside the cell, and the offering of three weekly showers, weekly linen exchanges and clothing exchanges, and multiple phone calls.

The treatment space for RHU patients is located within a separate designated RHU building which also had space designated for the mental health clinicians to share, IDTT and ICC treatment space, and the RHU group room. The RHU medical unit, located in a building directly behind the RHU, provided additional treatment space for individual one-on-one interactions in one of two interview-style rooms. This setup consists of two separate rooms (one for the clinician and one for the patient) separated by a glass pane, allowing the patient and clinician to speak freely in a confidential space while still maintaining safety. However, one of the designated rooms required repair. These individual one-on-one private interview rooms appeared to provide adequate size and confidentiality for patient interactions.

RHU mental health leadership identified significant obstacles to effective treatment for patients in RHU, primarily due to limited space. With only one of the two interview rooms available due to ongoing repairs, one-to-one patient contacts have been adversely affected.

To address these space-related issues, RHU mental health leadership implemented a scheduling system to optimize clinician access to treatment spaces, utilizing telepsychiatry rooms for individual sessions when not in use, and utilizing other spaces for one-to-one primary clinician contacts. Furthermore, some clinicians even extended their hours to accommodate additional patient sessions.

In addition, to treatment space concerns, the current scheduling of group therapy sessions exclusively on Mondays and Tuesdays presented significant challenges, particularly considering the high patient volume within the RHU. Mental health leadership in the RHU expressed a need

to expand the availability of group sessions to better meet patient needs, especially for EOP patients given that at one point there were 16 EOP patients in the RHU.

Interviewed patients indicated that out-of-cell time varied by tier, with most experiencing 15-20 hours of out-of-cell time per week. Yard was typically offered Monday through Saturday for three hours each day. Although some patients reported receiving three hours daily, others expressed concerns about limited access to outdoor time, particularly for those on G tier, as they were often scheduled very early in the morning which resulted in missed opportunities.

Concerns regarding treatment by custody staff emerged during interviews. During an IDTT meeting, a patient reported that custody staff did not collect completed grievance forms (CDCR Form 602s) as required. Furthermore, a patient in the RHU for non-disciplinary reasons expressed significant distress, linking his housing conditions to a decline in his mental well-being. He reported a lack of access to personal property and an inability to use phone or messaging services, which he considers vital for his mental health support.

<u>Non-Disciplinary Segregation</u>:

CSATF reported that 14 patients were designated NDRH 102 and 41 patients were NDRH 200. Of the 41 NDRH 200 patients who required expedited transfer, only 24 patients or 59 percent of patients transferred with the 72-hour timeframe.

<u>MHCB</u>:

CSATF operated a 20-bed MHCB within the licensed CTC.

The MHCB's daily census averaged 17 patients. MHCB clinical lengths of stay averaged 9.6 days, with approximately 22 percent of patients having clinical stays exceeding ten days. Physical stays averaged 11.7 days; approximately 47 percent of patients had physical stays that

were longer than ten days. Discharge delays were typically due to safety concerns, medical holds, patient refusals to transfer, and patients being out to medical centers.

Five MHCB patients were admitted to the MHCB three or more times.

According to the staff-to-patient ratios from the 2009 staffing plan, psychiatrists who treat patients in the MHCB must maintain a caseload of no more than 10 patients per psychiatrist, while clinical psychologists must maintain a caseload of no more than 18 patients per 1.18 full-time equivalent psychologist, and LCSW's must maintain a caseload of no more than 50 patients per LCSW. *See* ECF No. 3693 at 22. Except for the psychiatrist at CSATF, who maintained a caseload of 15 patients, all five primary clinicians maintained caseloads within required ratios for their respective positions.

Seven IDTT meetings were observed during the site visit. All required IDTT members attended; psychiatrists participated remotely without technical issues. The teams consistently reviewed background information, treatment goals, planned interventions, medication adherence, observation levels, and safety considerations. However, IDTT meetings did not consistently link discharge decisions to treatment or discharge goals, and diagnostic justifications were frequently missing. The IDTTs discussed discharge readiness and provided numerous recommendations for patients to consider post-discharge; however, the discharges lacked justification and the list of discharge verbal "should" recommendations were often so extensive that patients would have benefitted from written summaries. Safety plans were referenced but not provided to patients at discharge.

On the first day of observation, one of the four IDTT meetings was especially inefficient and functioned more as a clinical assessment rather than a treatment-planning discussion. The monitor also identified a high-risk new arrival whose verbal statements required immediate

follow-up. The subsequent three IDTTs demonstrated significant improvement in structure, collaboration, and clinical focus, though continued training was indicated to improve discharge justifications and linkage to individualized objectives. The level of care selected at the time of discharge also was not justified. Of note, IDTTs did not discuss out-of-cell time or whether patients were offered or participated as part of their treatment plan.

The IDTTs routinely discussed positive higher-level-of-care indicators, and the discussions were collaborative. There were no clinical concerns with the IDTTs higher level of care referral decisions during IDTT observation but did note the absence of justification for discharging patients to 3CMS versus EOP level of care.

The monitor randomly selected and reviewed the healthcare records of 30 MHCB or crisis bed patients to assess compliance with Program Guide timeframes during their stays. All thirty patients required initial IDTTs; 23 or 77 percent occurred within 72 hours of arrival. In addition, all 30 initial IDTTs had the required staff in attendance. Patients attended 29 or 97 percent of initial IDTTs. Reasons the initial IDTT was held in absentia was not provided.

Of the 30 reviewed patients, twenty-six required routine IDTTs. There were 31 expected routine IDTTs. Of the 31 reviewed routine IDTTs, 23 or 74 percent occurred timely, or every seven calendar days following the initial IDTT. All 31 had the required staff and patients in attendance.

The same 30 patients also required initial psychiatry evaluations. Of those, all 30 received a timely initial psychiatry evaluation meaning it occurred before the initial IDTT and within 24 hours of arrival. Twenty-two or 73 percent of evaluations occurred in a confidential setting. Reasons reported for non-confidentiality included patient refusals. Telepsychiatry was utilized for 12 or 40 percent of initial psychiatry contacts.

All 30 MHCB patients required two routine psychiatry contacts per week. There were 105 expected contacts, and all occurred timely. Of the 105 reviewed routine contacts, 62 or 59 percent occurred in a confidential setting. Reasons reported for non-confidentiality included patient refusals and modified programming. Telepsychiatry was utilized for 31 or 30 percent of routine psychiatry contacts.

These 30 patients also required initial primary clinician contacts. Of the 30 patients, 27 or 90 percent were completed within 24 hours of arrival. Twenty-three or 77 percent were held in a confidential setting. Reasons reported for non-confidentiality included patient refusals and modified programming. There were no initial contacts reported utilizing Tele-Clinicians.

The same 30 MHCB patients required routine primary clinician contacts as well. An institution is considered compliant if a patient was seen daily beginning the day after admission for an out-of-cell confidential contact (unless the patient refused) by the psychiatrist or psychologist, though on weekends the patient may be seen by the medical officer of the day (MOD). *See* ECF No. 7333-1 at 84. (PG 12-5-13). There were 179 expected timeframes, 122, or 68 percent were timely. Of the 179 reviewed contacts, 77 or 43 percent were conducted in a confidential setting. Reasons for non-confidentiality included patient refusals, medical restrictions, unavailable custody escorts, and modified programming.

Reviewed CDC 114-A data indicated that all patients were not being offered day room or yard. However, interviewed custody officers explained that patients were routinely allowed access to out-of-cell activities. Furthermore, CDC 114-A data revealed patients were offered the following weekly, three showers, linen exchanges, clothing exchanges, and two or more phone calls.

Confidential treatment space within the MHCB remained a significant concern, consistent with prior rounds. Nursing staff reported concerning persistent laundry shortages, resulting insufficient blankets and undergarments for patients. Providers reported issuing extra safety smocks to compensate for the lack of blankets.

Overall, while CSATF continued to operate under severe staffing constraints, they appropriately prioritized critical-care functions within available resources in the MHCB. Further, documentation did not demonstrate that patients were offered sufficient out-of-cell time, nor was this discussed during observed IDTTs. Notably, IDTT quality improved on the second day of observation following feedback, but systemic issues in treatment planning, documentation, restraint, and use of force practices required corrective interventions. Training, supervision, and consistent interdisciplinary oversight remain necessary to ensure compliance with Program Guide requirements.

Seclusion and Restraint:

During this review period, CSATF reported seven restraint incidents involving seven patients and two seclusion incidents involving two patients. Documentation review revealed inaccuracies and inadequate clinical detail regarding attempted interventions prior to restraints and planned use of force events for involuntary medication administration.

Two of the seven restraint events were documented as exceeding the four-hour limit—one by 12 minutes and another by 2 hours and 24 minutes. However, subsequent record review determined that one entry was inaccurate; the actual restraint lasted less than four hours.

Both cases demonstrated deficient clinical documentation including a lack of pre-emptive interventions to prevent escalation, restraints, and use of force. Providers involved in these use of force related restraint incidents required additional training to ensure consistent

implementation of least-restrictive interventions and accurate documentation with clear justifications to support decisions to restrain and use force when deemed necessary.

EOP:

Mainline EOP patients were housed on Facilities F and G during the review period, in three specific housing units – Unit F3 and Unit G1, which housed only EOP patients, and Unit G3, which included both EOP and 3CMS patients. In G3, the building had four separate sections with EOP patients housed in Section B and C and 3CMS patients housed in Section A and D.

Across all three units, the program had a capacity of 660 patients with 264 beds in F3 and G1, respectively, and 132 beds in G3. All mainline EOP patients were housed in six-bed dormitories. The institution indicated that EOP patients on all three facilities attended yard, education, jobs, medical clinics, and religious services with non-EOP incarcerated individuals.[74]

For staffing in the EOP program, housing unit G1 had one psychologist, six full-time social workers, and one social worker who split time between the mainline EOP unit and 3CMS RHU. Housing unit G3 utilized two psychologists, one on-site social worker, and one tele-social worker. Housing unit F3 utilized a half-time psychologist and five social workers. Four psychiatrists treated patients across all three facilities.

According to the staff-to-patient ratios from the 2009 staffing plan, psychiatrists who treated mainline EOP patients must maintain a caseload of no more than 120 patients per psychiatrist, while primary clinicians who treat mainline EOP patients must maintain a caseload

[74] The intermingling of EOP and 3CMS patients during structured activities violated the Program Guide requirement that EOP patients' program separately. *See* 2021 Program Guide Update, ECF No. 7331-1 at 51 (PG 12-4-1) ("The [EOP] program is characterized by a separate housing unit and *structured activities* for mentally ill inmate-patients who, because of their illness, experience adjustment difficulties in a General Population (GP) setting, yet are not so impaired as to require 24-hour inpatient care." (emphasis added)).

of no more than 26 patients per clinician. *See* ECF No. 3693 at 17. Two of four psychiatrists exceeded caseload ratios with 140 and 265 patients respectively. For primary clinicians, two maintained caseloads within required ratios while the remaining primary clinicians had caseloads between 28 and 50 patients.

During the site visit, CSATF did not have a step-down program for EOP patients transitioning to lower levels of care, yet it was frequently reported that EOP patients were also housed in non-EOP housing. On May 20, 2025, there were 19 EOP patients housed on Facilities C, D, and E. The EOP supervisors reported that placements in Facilities C, D, and E were primarily related to safety and enemy issues which prevented individuals from being housed on one of the three EOP units, an increase in points requiring a move to a Level III or Level IV facility, or increases in level of care to EOP for patients who were housed in Level III or Level IV facilities. All patients housed on these units were reportedly waiting for transfers to appropriate institutions.

As far as treatment of these individuals, none of the patients housed in non-EOP units received group programming. Instead, many of the patients were placed on EOP modified programming status, were seen weekly by their primary clinicians, and had monthly IDTT meetings. The data provided for the 19 patients housed on C, D, and E Yards at the time of site visits indicated that 15 or 79 percent of them were placed on EOP modified programming status. The chief of mental health reported that clinicians were being asked not to automatically change patients' level of care to EOP modified programming simply because groups were not being provided, but instead, they were asked to place the patient at the most appropriate level of care for their needs.

*Structured Treatment*

The Program Guide required that each EOP patient be offered at least ten hours per week of structured therapeutic activities. *See* ECF No. 7333-1 at 58. For patients who were determined by the treatment team to be clinically contraindicated for ten hours of treatment activities per week, the primary clinician is required to present the case and recommended treatment program (i.e. EOP modified programming) to the IDTT for approval. If the patient's modified treatment program included a schedule of less than ten hours of treatment per week, the patient's IDTT was required to meet monthly to review and increase the amount of structured therapeutic activities, or refer the patient to a higher level of care as clinically indicated. *Id*.

Excluding patients placed on EOP modified programming, patients were, on average, scheduled for 15.02 hours, offered 10.54 hours, attended 6.21 hours, and refused 4.41 hours of structured therapeutic activities weekly during the reporting period. On average, 4.47 hours of treatment were cancelled weekly. The reasons provided for treatment cancellations included weather, modified programming, and other cancellations by custody for unknown reasons. Overall, 61 percent of EOP patients were offered at least 10 hours per week of structured treatment during the monitoring period. CSATF reported that clinician and recreation therapist shortages, not having enough available space to hold groups simultaneously, and conflicting appointment/programs contributed to patients being offered fewer than 10 hours weekly. Reasons for patient refusals included lack of variety in groups, inaccessibility of exercise groups for those with physical limitations, and groups being held outdoors.

On average, patients placed on EOP modified programming were scheduled for an average of 4.08 hours, offered 1.42 hours, attended 0.94 hours, refused 0.68 hours, and had 2.8 hours cancelled, weekly, during the reporting period. The same reasons for cancellations were

provided. The data revealed that during the reporting period, between 11 and 17 patients were placed on EOP modified programming status on any given week.

Records of five patients on EOP modified programming status during the reporting period were reviewed to determine whether patients were being provided with the treatment modifications outlined in their treatment plans. None of the treatment plans for these patients included specified treatment modifications. Two cases mentioned that EOP modified programming was necessary as the patients were not housed on EOP yards and thus could not be offered EOP group programming. The other three cases offered no justification for the modified program. Three of the five patients were offered monthly IDTTs. These EOP modified programming patients were noted to be attending between 85 and 100 percent of the treatment offered, which ranged from 0.21 to 4.28 hours per week.

*IDTTs*

Thirteen IDTT meetings were observed during the site visit including four IDTT meetings on G3, four meetings on F3, and five meetings on G1.

Although all required IDTT members were present for each meeting, in only two of the observed meetings the assigned psychiatrist was in attendance and in all but one meeting the assigned CC I was not in attendance. In several instances, the lack of coverage by assigned providers and counselors required patient questions and concerns to be deferred to the patient's assigned staff member, delaying access to useful information for the IDTT to consider.

The IDTT rooms on G1 and G3 were of adequate size and provided for adequate sound confidentiality; however, both rooms were fully visible by patients and staff in the dayroom. The configuration of the chairs in the rooms allowed for the patient's face to be visible by IDTT members, but not others outside of the room. The room used for F3 IDTT meetings was

temporary due to maintenance in the unit. The temporary room was cramped in size and did not allow the telepsychiatrist to see anyone but the patient. Additionally, the staff members present at the meeting could not see the telepsychiatrist. This presented several challenges, including the psychiatrist asking questions which had already been answered and making it difficult to hear the psychiatrist at times.

While meetings varied depending on the staff present, the meetings consistently included a brief psychosocial history, discussion of the patient's diagnoses, medications, current symptoms, and some mention of treatment goals. In almost all cases, there was clear evidence of the patient's familiarity with the primary clinician and other team members and collaborative interaction with the patient during the meetings. The treatment goals were somewhat vague at times and when measurable goals were discussed there was often a lack of baseline ratings provided. Interventions beyond psychotropic medications were rarely mentioned and when they were mentioned, they were appropriate to the patient's needs. Functional impairments and patient strengths were not consistently mentioned, and it was not always clear as to what progress the patient had made in treatment and what the ongoing barriers were to the patient's successful attainment of treatment goals. Lastly, discussion of the clinical rationale for the patient's need for the EOP level of care was generally inadequate, beyond the primary clinician confirming a consensus that the patient would remain in the EOP.

The correctional counselor present for the meetings on F3 was disengaged and when he did participate, his comments were concerning. As an example, an IDTT was observed for a patient who was clearly in need of mental health services secondary to delusional ideas and thought disorganization and who the team agreed needed to remain at the EOP level of care. The correctional counselor made a comment to the patient that given his points, the patient was

eligible for transfer to a minimum support facility where he could secure an earlier release, but that the patient would need to drop down to the 3CMS level of care. The correctional counselor appeared to be encouraging the patient to remove himself from the EOP level of care, despite clear indication and consensus among the team, that the patient needed to remain at the EOP level of care.

Overall, IDTT meetings lacked adequate discussion of objective, realistic, and measurable treatment goals and included little discussion about interventions being provided to patients to support their attainment of these goals, or rationale of the need for the EOP level of care. Further, the lack of assigned staff at the meetings resulted in issues needing to be deferred. The meeting were collaborative and engaging; however, with clear evidence of supportive therapeutic relationships between the patients and their assigned primary clinicians.

The Program Guide requires that EOP patients receive an initial IDTT within 14 calendar days of arrival to the institution and a routine IDTT every 90 days thereafter. *See* ECF No. 7333-1 at 57, 59.

Thirty mainline EOP patients who required initial IDTTs were randomly selected for review to assess compliance with Program Guide requirements. Of the 30 patients, three transferred before the required timeline expired. Of the 27 reviewed patients who received an initial IDTT, 23 or 85 percent occurred timely. Patients were present in 22 or 81 percent of cases. Reasons for absences were due to patient refusals. All 27 reviewed IDTTs included the required staff.

To measure timeliness of routine IDTTs during the review period, CDCR produced an appointments report that included individuals who were required to receive a routine IDTT during the review period. For the 754 patients in CDCR's appointments report, there were 1,375

completed routine IDTTs and no refusals. When a patient had either a completed or refused initial IDTT and a routine IDTT or more than one routine IDTT, timeliness in accordance with Program Guide requirements was able to be calculated. Of the 1,375 completed IDTTs, 624 were for individuals who had at least two IDTTs. Of those, 167 or 27 percent were not compliant with Program Guide timeframes. Of note, the report did not include individuals that did not have a completed IDTT, such as those that were not scheduled.

*Group Treatment*

Group schedules for the reporting period were provided by unit. All groups offered to patients were recreational in nature and offered either inside or outdoors. During each three-month cycle, “specialty” groups were offered to patients including topics such as art, chess, life skills, and coping skills. Recreation therapists were not offering psychoeducational groups or groups with mental health topics. Patients on some units were also offered a group called, GOGI (Go In to Go Out) which was co-facilitated by a certified peer to help patients prepare for living a life without crime.

For the group cycle being offered at the time of the site visit, patients living on Units F3 and G3, which were under construction for air conditioning installation, were offered limited specialty groups and up to 60 patients at a time from these units were being taken to the gymnasium for two groups lasting two hours each.

Interviews with patients revealed frustration over the lack of clinical programming and the nature of the groups being offered. Across all three units, patients consistently reported that the groups primarily focused on physical exercise, making them inaccessible to patients with physical limitations. Further, patients reported that even when their physical health allowed for

participation, activities like pickleball and ping pong, allowed only four individuals to participate and all the other patients to serve as spectators.

During the site visit, two EOP groups were observed: one in the gym on facility F and another in the G3 building. The recreational group on facility F was the four-hour group mentioned above and aimed to include EOP patients from G1, G3, and F3; however, an alarm in G1 delayed the arrival of patients from that housing unit. Those who attended the gym had access to various activities, including two pickleball courts, two ping pong tables, chess, arts and crafts, and dominoes. Custody and recreation therapist staff actively engaged with the patients; for instance, two custody officers played pickleball with two EOP patients. The patients appeared engaged and enjoyed the activities, however, not all of the patients in the gym were engaged.

The Life Skills group observed on G3 was held in the day room, facilitated by a recreation therapist. The group watched a narration of the "Seven Signs That You Are About to Begin the Best Stage of Your Life" by Carl Jung. Patient attendance varied from four to six patients initially but dwindled to two by the end, as patients could come and go at will. One participant in the first row engaged and spoke directly to the recreation therapist. The setting was not conducive to the video or group discussion, as there were several distractions, including noise from the surrounding environment. The topic was also abstract and complex for the patients' level of care. The video described symbolism and metaphors, which could lead to misinterpretation or make it difficult for EOP patients to grasp the concepts.

NLTGs were offered daily to EOP patients, and 302 individual patients were enrolled in NLTGs during the monitoring period.

Introduction to EOP groups were not offered during the reporting period or during the site visit secondary to staffing shortages.

*Individual Treatment*

The Program Guide requires that patients are offered an initial psychiatrist evaluation before their initial IDTT and within 14 calendar days of arrival to the institution or level of care change. *See* ECF No. 7333-1 at 57. Thereafter they are required to receive a routine psychiatric contact every 30 calendar days. *Id*. at 59. Patients are also required to receive a primary clinician evaluation within 14 calendar days of arrival and weekly (i.e. once per calendar week with no more than ten calendar days between contacts) with either a primary clinician or in group psychotherapy with an individual contact every other week. *Id*. at 57, 59.

Thirty mainline EOP patients who required initial psychiatry evaluations during the reporting period were randomly selected for review to assess compliance with Program Guide requirements. Three transferred before the required time period expired. Of the 27 patients who received an initial psychiatry evaluation, 24 or 89 percent were timely while 26 or 96 percent occurred in a confidential setting. The reasons for non-confidentiality included a patient refusal.

To measure timeliness of routine psychiatry contacts during the review period, CDCR produced an appointments report that included individuals who were required to receive a routine psychiatry contact during the review period.[75] For the 707 patients in CDCR's appointments report covering patients who received at least one routine psychiatry contact during

[75] The reviewed data captured the time between patient contacts but did not include patients who were not seen or scheduled for a routine contact with a psychiatrist, primary clinician, or IDTT. Of note, the provided appointments report did not account for delays between appointments due to movements in or out of EOP level of care. When primary clinician caseload groups were utilized to meet primary clinician contact requirements, verification that individual contacts with the assigned primary clinician and alternated with caseload groups with the assigned clinician was not conducted. Contact with the assigned psychiatrist was also unable to be determined.

the review period, there were 2,447 total completed and refused contacts. Of the 2,382 that were completed, 2,305 or 97 percent were conducted in a confidential setting. When a patient had more than one completed contact, timeliness in accordance with Program Guide requirements was able to be calculated. Of the 2,382 completed contacts, 1,743 were for individuals who were seen at least twice by a psychiatric provider. Of those 1,743 contacts, 785 or 45 percent of contacts were completed beyond the Program Guide required timeframes. Of note, the report did not include individuals that did not have complete contacts, such as those that were not scheduled in accordance with the institution's triage plan.

The 30 mainline EOP patients who required initial psychiatry evaluations also required initial primary clinician evaluations during the reporting period. Of the 30 patients, three transferred before the required timeline expired and one was missing. Of the 26 reviewed patients who received an initial primary clinician evaluation, 19 or 73 percent occurred timely and 25 or 96 percent occurred in a confidential setting. It was unclear why the one patient had a nonconfidential primary clinician evaluation.

For the 665 patients in CDCR's appointments report covering patients who received at least one routine primary clinician contact during the review period, there were 6,297 total completed and refused contacts. Of the 6,064 that were completed, 5,655 or 93 percent were reported as being conducted in a confidential setting. When a patient had more than one completed contact, timeliness in accordance with Program Guide requirements was able to be calculated. Of the 6,064 completed contacts, 5,635 were for individuals who were seen at least twice by a primary clinician provider. Of those 5,635 contacts, 650 or 12 percent of contacts were completed beyond the Program Guide required timeframes. Of note, the report did not

include individuals that did not have completed contacts, such as those that were not scheduled in accordance with the institution's triage plan.

Of the 6,064 completed routine psychiatry contacts, 51 contacts were reported to have been completed in zero minutes, 1,244 were completed within 15 minutes, 1,211 lasted between 16 and 30 minutes, 3,511 lasted between 31 and 60 minutes, 30 lasted between 61 and 95 minutes, and 17 were completed in greater than 95 minutes.

One primary clinician was assigned to see all EOP patients not housed on EOP units and provided weekly individual treatment sessions for these patients. There were reportedly no challenges with space on these units; however, as noted above, the patients who were interviewed reported that contacts were often provided at cell front.

Patients from all three facilities were interviewed during the site visit. Overall, patients reported seeing their assigned primary clinicians regularly. Assigned psychiatrists were seen monthly. Generally, patients reported being offered confidential sessions consistently although one patient expressed concern about the presence of the medical assistant during sessions with the telepsychiatrist. Most patients reported having IDTT meetings every 90 days. Some patients, but not all, reported being aware of their treatment goals.

The current treatment space allotted for each EOP unit was barely adequate to accommodate individual treatment sessions and groups and with the staffing increasing, space was increasingly limited. In addition to the overall spacing challenges, air conditioning installation on Unit F3 and Unit G3 made the small and large group rooms unable to be used, resulting in all group programming for these units being required to be held elsewhere in the facility. The spaces, when in use, appeared to offer adequate sound confidentiality, yet the group rooms were fully visible from the day room. The windows in the doors of the individual

treatment rooms being used by mental health staff were painted on the lower half, offering visual confidentiality.

Generally, patients did not report challenges accessing mental health staff during emergencies; however, patients on G3 reported that correctional officers on first and third shift were not willing to respond to requests unless patient reported suicidal ideation. Patients reported that all groups offered were recreational in nature and, as mentioned above, expressed concerns about the physical requirements of most groups.

Patients on G3 and F3 expressed additional concerns about the correctional officers assigned to the units, remarking that the officers needed more training on how to interact with patients who have mental illness. Patients on G3 reported that the weekend prior to the site visit, the correctional officers put the unit on lockdown so they could have a barbeque in the yard. Several patients also reported concerns with the clinician who completed mental health assessments for RVRs, reporting that the documentation of the assessments was inaccurate and did not reflect the content of the discussions they had with this clinician. Patients reported that the assessments did not sufficiently explain the role that their mental illness played in the rule violation.

Overall, the services provided to patients at the EOP level of care was not adequate. Patients were not receiving individual primary clinician contacts in accordance with requirements, they were not offered groups with adequate clinical content, observed IDTTs were inadequate, and IDTT meetings were not consistently attended by assigned psychiatrists and correctional counselors. On the positive side, patients reported having good relationships with their assigned clinicians and having access to other programming including jobs, education, and groups offered through nursing and ISUDT.

<u>3CMS</u>:

Patients in the 3CMS program at CSATF were housed on all facilities during the review period.

The staff-to-patient ratios from the 2009 Staffing Plan and 2021 adjustments to the 2009 staffing plan required that staff psychiatrists who treat 3CMS patients maintain a caseload of 280 patients per psychiatrist if the patient was prescribed medications and 675 patients if the patient was not prescribed medications.[76] *See* ECF No. 3693 at 12 and 6978-1 at 3. For primary clinicians, staff-to-patient ratios from the 2009 Staffing Plan required that primary clinicians who treat 3CMS patients maintain a caseload of 97 patients per clinician. *See* ECF No. 3693 at 12.

Four of the six psychiatrists who treated 3CMS patients had caseloads of 300, 364, 513, 641 which exceeded the limit of 280. None of the nine 3CMS primary clinicians had caseloads within the required ratio and ranged from 147 to 321 patients.

IDTTs were observed on Facilities C and D during the site visit. All required staff were present, which included in-person psychiatry, telepsychiatry, tele-mental health primary clinicians, tele-presenters, and CC Is. All IDTT space was adequate on both yards.

---

[76] The Program Guide requires that "[e]ach CCCMS inmate patient on psychiatric medication…be reevaluated by a psychiatrist a minimum of every 90 days regarding psychiatric medication issues." (Program Guide at 12-3-11). The 2009 Staffing Plan established a psychiatry staffing ratio for every 3CMS patient in the general population and did not distinguish between patients on medications and patients who were not. See ECF No. 3693 at 8. The Adjustments to the 2009 Staffing Plan, ECF No. 6978-1, which were approved by the Court on January 27, 2021 (See ECF No. 7035 at 2), established a new staffing ratio of 675 patients per psychiatrist for patients who are not on medications for six months or more. For the purpose of reporting compliance with staff-to-patient ratios, it was unclear whether the patient's included in each reported caseload were prescribed medications at the time of the site visit.

The Facility C IDTT meetings were efficiently run and met all Program Guide requirements including patient participation in goal development and interventions based on the agreed upon diagnosis and symptomatology of the patients.

On Facility D, the tele-mental-health primary clinician's screen froze multiple times during the IDTTs. The primary clinician consistently missed discussion of functional impairments, pertinent goals, interventions, and level of care discussions. Despite this, the primary clinician demonstrated great rapport with the patients and was empathetic when patients participated in discussions.

The individualized treatment plan for 3CMS patients must be completed within 14 working days of referral/arrival by the patient's primary clinician in consultation with the other IDTT members and annually thereafter. *See* ECF No. 7333-1 at 43-44. (PG 12-3-10).

Thirty mainline 3CMS patients who required initial IDTTs during the review period were randomly selected for review to assess compliance with Program Guide requirements. Of the 30 patients, two transferred before the required timeline expired and five did not receive an IDTT at all. Only five of the 23 or 22 percent of reviewed patients received an initial IDTT within Program Guide timeframes. Patients were present in 17 cases. Reasons for absences were due to patient refusals. All 23 reviewed cases included the required staff.

To measure timeliness of routine IDTTs during the review period, CDCR produced an appointments report that included individuals who were required to receive a routine IDTT.[77] For the 1,179 patients in CDCR's appointments report for October 1, 2024 to March 31, 2025,

---

[77] The reviewed data captures the time between completed patient IDTTs but does not account for when patients were not scheduled for an initial or routine IDTT. Of note, the appointments report provided did not account for delays between appointments due to movements in or out of CSATF.

there were 1,218 completed and refused initial or routine IDTTs. When a patient had either an initial IDTT and a routine IDTT or more than one routine IDTT, timeliness in accordance with Program Guide requirements was able to be calculated. Forty-nine initial and refused contacts were for individuals who had at least two IDTTs (initial and routine or two routines). None of the contacts were over program guide timelines. Of note, the report did not include individuals that did not have a completed IDTT, such as those that were not scheduled.

There were no groups offered to the 3CMS patients during the review period.

The Program Guide requires that patients are offered an initial psychiatrist evaluation before their initial IDTT. *See* ECF No. 7333-1 at 34-50, 641. Thereafter they are required to receive a routine psychiatric contact every 90 calendar days if the patient is prescribed a psychotropic medication. *Id*. at 44; *see also supra* p. _ n. _. Patients are also required to receive a primary clinician evaluation within ten working days of arrival and every 90 calendar days thereafter. *Id*. at 41, 48.

Thirty mainline 3CMS patients who required initial psychiatry evaluations during the reporting period were randomly selected for review to assess compliance with Program Guide requirements. Two transferred before the required time period expired and nine patients never received an initial psychiatry evaluation or initial IDTT at CSATF. Of the 19 patients who received an initial psychiatry evaluation, nine or 47 percent received it before their initial IDTT. However, two of those patients did not receive an initial IDTT at all. Of the 19 patients who received an initial psychiatry evaluation, 17 or 89 percent occurred in a confidential setting. Reasons for non-confidentiality included patient refusals.

For the 1,174 patients in CDCR's appointments report for October 1, 2024 to May 31, 2025 who required routine psychiatry contacts, there were 2,246 completed and refused contacts,

1,874 or 83 percent were confidential as reported by the institution. Reasons for non-confidential psychiatry contacts included patients being seen in the day room and cell front. When a patient had more than one completed or refused contact, timeliness in accordance with Program Guide requirements was able to be calculated. Of the 2,246, 1,078 contacts were for individuals who were seen at least twice by the psychiatric provider. Of those 1,078 contacts, there were 235 or 22 percent that occurred beyond Program Guide requirements with a range of 91 to 175 days. Of note, the report did not include individuals that did not have completed contacts.

The 30 mainline 3CMS patients who required initial psychiatry evaluations also required initial primary clinician evaluations during the reporting period. Of the 30 patients, two transferred before the required timeline expired and five did not receive an initial primary clinician evaluation at all. Of the 23 reviewed patients who received an initial primary clinician evaluation, seven or 30 percent occurred within ten working days of arrival and 19 of 23 or 83 percent occurred in a confidential setting. Reasons for non-confidentiality included patient refusals.

For the 1,311 patients in CDCR's appointments report for October 1, 2024 to March 31, 2025 who required routine primary clinician contacts, there were 1,936 completed and refused contacts. 1,701 or 88 percent of the completed contacts were confidential as reported by the institution. Reasons for non-confidential primary clinician contacts included contacts completed cell front, in holding cells and in the day room. When a patient had more than one completed or refused contact, timeliness in accordance with Program Guide requirements was able to be calculated. Of the 1,936, 637 contacts were for individuals who were seen at least twice by the

primary clinician. Of those 637 completed or refused contacts, 118 or 19 percent occurred beyond Program Guide requirements with a range of 91 to 171 days.

There were 1,930 completed individual primary clinician contacts, of which 29 lasted zero minutes, 1,138 lasted under 15 minutes, 510 lasted between 16 and 30 minutes, 227 lasted between 31 and 60 minutes, 21 lasted between 61 and 95 minutes, and five lasted in greater than 95 minutes.

Patients were interviewed across three separate facilities and reported that there was a significant number of modified programming periods/program lockdowns during the review period. They indicated that after their initial contact with their primary clinician, they did not see them again. This would force patients to go "man down" to receive mental health attention. There were also complaints of not receiving timely mental health services after submitting 7362s and patients decompensating with no custody, nursing, or mental health supports. Patients would report to clinicians about other patients that viewed as decompensating and needing further attention from mental health staff.

Interviewed mental health staff who treated 3CMS patients were knowledgeable, respectful of their colleagues and patients, and stated that they would like to provide more services, but the number of program lockdowns/modified programming had a significant impact on treatment. Custody officers reported that the lockdown periods caused additional violence and an increase in drug use.

<u>Other Issues</u>:

<u>Pre-Release Planning</u>:

CSATF provided a pre-release planning LOP revised in February of 2025. CSATF leadership reported that the assigned pre-release coordinator was on long term sick leave and the

previous pre-release coordinator resigned in March 2025. The current Chief Psychologist oversaw the pre-release program. Due to the lack of a permanently assigned coordinator, face-to-face contacts and groups were not feasible.

There were 82 established pre-release appointments scheduled during the review period, however information regarding the contents of the appointments and whether patients attended was not discernable. Some patients were seen more than once. CSATF was unable to provide data for the number of patients who were required to receive or were provided with pre-release planning assessments (PRPA).

The institution indicated that seventy patients received Cal-IDs during the reporting period. However, the institution was unable to indicate how many patients were required to receive a Cal-ID, how many were eligible, how many were accepted, or how many refused.

For patients within 120 days of release, there were 217 patients scheduled from May 5, 2025, to September 2, 2025.

According to a report, there were 547 patients released on probation and 424 patients paroled from CSATF. A total of 535 of 547 ROIs were signed during the review period.

Cal/AIMS' ISUDT resource RNs also provided pre-release services to patients receiving Medi-Cal services.

During the review period, TCMP screened 360 MHSDS patients, of which 118 were EOP patients and 242 were 3CMS patients.

Four hundred fifty-four or 79 percent of patients' submitted benefits applications. Three hundred and nineteen patients submitted applications for Medi-Cal and 14 had access to other insurances, one was ineligible, seven were late, or unavailable and 19 refused services.

One hundred and thirty-two patients applied for SSI, four had no qualifying disabilities, one was ineligible, and seven refused services. Three applied for VA benefits.

Program Access:

a. Job and Program Assignments

On April 11, 2025, CSATF reported that, of 1,946 available job assignments, 142 EOP patients, or 24 percent of the EOP population, held them. For 3CMS patients, 721 3CMS patients or 30 percent of the 3CMS population held job assignments, and for non-MHSDS incarcerated persons, 1,083 or 44 percent of the non-MHSDS population held job assignments.

For the 2,314 academic assignments, CSATF reported that 242 EOP patients or 41 percent of the EOP population held these assignments, as did 805 3CMS patients or 34 percent of the 3CMS population, and 1267 or 52 percent of the non-MHSDS population.

The 230 vocational education assignments were held by three EOP patients or one percent of the EOP population, 95 3CMS patients or four percent of the 3CMS population, and 132 non-MHSDS patients or five percent of the non-MHSDS population.

No patients or non-MHSDS incarcerated persons held voluntary education assignments.

Of 812 substance abuse treatment assignments, 98 EOP patients or 16 percent of EOP patients held them, as did 317 3CMS patients or 13 percent of 3CMS patients, and 397 or 16 percent of the non-MHSDS population.

b. Milestone Credits

CSTAF reported that milestone credits were awarded to 76 EOP patients, 48 3CMS patients, and five non-MHSDS patients during the reporting period. The number of patients who required milestone credits was not provided.

c. Out-of-Level Housing

CSATF reported that 72 EOP and 65 3CMS custody Level I patients were placed in Level II housing. Further, one EOP and four 3CMS custody Level II patients were in Level III housing, while nine 3CMS custody Level II patients were in Level IV housing. There were also 30 EOP and 111 3CMS custody Level III patients in Level II housing, and no EOP and 13 3CMS custody Level III patients in Level IV housing. Further, there was one EOP custody Level IV patients in Level II housing, and four EOP and 196 3CMS custody Level IV patients in Level III housing.

d. ADA Reasonable Accommodations and Grievance Procedures

CSATF provided a copy of the CDCR Form 1824 reasonable accommodation request process manual and confirmed implementation of the revised ADA accommodation, grievance procedures, and appeals process. CSATF also provided Operational Procedure 403, Disability Placement Program as well as Operational Procedure 554 Reasonable Accommodations Provide Through the Reasonable Accommodations Panel Process. Training rosters for Interacting with Incarcerated Persons with Disabilities and Reasonable Accommodation Requirements were provided. CSATF also provided five Health Services Encounters documenting functional evaluations on EOP patients with accommodation recommendations.

e. Periodic Classification Score Reductions: EOP Patients

CSATF provided numerous classification score reductions for EOP patients for the review period.

f. Unclothed Body Search

Unclothed body searches in RHU were routinely completed upon a patient's departure from their cell and were performed inside their cell prior to exiting. Officers indicated that to

ensure patient privacy, the officer conducting the unclothed body search stood in front of the cell window to restrict vision into the cell. However, it should be noted that the unclothed body searches were conducted in front of the patient's cellmate, and, therefore, were not private. Hand-held metal detection devices were also used regularly. Custody officers indicated turning off their body cameras during the searches.

"C" Status:

CSATF reported that there are currently 106 "C" Status patients including three MHCB patients, two EOP patients, 78 3CMS patients and 23 general population incarcerated persons.

During the reporting period, CSATF reported that 316 3CMS patients were on "C" status. "C" Status patients were clustered together in one building on each facility except for Facility F and Facility G. The clustering of "C" Status patients is not the result of any formal documentation, but it is an informal local practice to segregate and cluster patients who are on "C" Status. Case factors for current "C" status included receiving more than two RVRs in the past 6 months including failure to work, fighting, refusing to accept assigned housing, being under the influence of an intoxicant, possession of dangerous contraband, and disobeying an order.

EOP and 3CMS patients on "C" Status in Facilities F and G programmed the same as all other mainline EOP and 3CMS patients under the triage plan.

Case-by-Case Reviews:

During the site visit, there were two 3CMS patients who were housed in RHU for longer than 150 days. CSATF appropriately completed case-by-case reviews and long-term segregated case reviews. The case notes reflected attendance by all required members.

Mental Health Referrals:

During the review period, CSATF made 6,686 mental health referrals; there were 2,023 referrals to psychiatry and 4,663 referrals to primary clinicians. There were 672 emergent referrals, 464 urgent referrals, and 5,550 routine referrals.

Overall, CSATF reported noncompliance for timely responding to urgent and routine psychiatry referrals, and to routine referrals to primary clinicians; there was only compliance for timely responding to emergent and urgent referrals to primary clinicians.

Specifically, 132 of 140 or 94 percent of emergent psychiatry referrals had timely responses and there were timely responses to 493 of 519 or 95 percent of emergent primary clinician referrals. For urgent referrals, there were timely responses to 27 of 38 or 71 percent of psychiatry referrals; however, 325 of 349 or 93 percent of urgent referrals to primary clinicians had timely responses. Routine referrals reflected noncompliance; there were timely responses to 996 of 1,632 or 61 percent of psychiatry referrals and 1,498 of 3,257 or 46 percent of primary clinician referrals.

CSATF reported reasons for untimely referrals included a lack of timely notification by nursing staff, incorrect check-in and out times by clinicians, and mental health medical doctors (MHMDs) placing incorrect orders. CSATF planned on better collaborating with nursing regarding proper notification of referrals and provided training to mental health staff on the proper inputting of orders.

Custody and Mental Health Partnership Plan:

The institution's CMHPP LOP was current, had been revised in June 2024, and complied with statewide operating policy.

CSTAF conducted executive leadership joint rounding during all six months of the review period. Reviewed documentation demonstrated attendance by required custody and mental health leadership at the rounding. The rounding reports indicated positive relationships between mental health and custody staff, the need for more space and mental health staff, and specific patient concerns were noted. Patients had consistently positive responses about mental health treatment and the need for additional mental health staff.

CSTAF reported that joint rounding was not discussed in executive staff meetings. However, the institution revealed that joint rounding was discussed in the monthly mental health program subcommittee meetings. Review of mental health subcommittee meeting minutes included summaries of executive rounding for all six reviewed meetings.

The monitor reviewed huddle reports for the MHCB and Facilities A, G and F. Required staff attended huddles and the appropriate huddle form was utilized.

Huddles took place in the RHU mental health clinician's office with mental health clinicians, the mental health supervisor, a custody sergeant, and a psychiatric technician in attendance. The huddle was led by the mental health supervisor, who discussed patients on 5-day follow-up, new arrivals to the RHU, patients experiencing behavioral issues and concerns, whether any patients received any bad news, and the most recent information regarding at-risk patients in the RHU among other agenda items. The huddle was collaborative, involving the mental health supervisor, custody, and psychiatric technician, who discussed observations and concerns about patients in the RHU.

The monitor observed the MHCB's daily morning huddle. Attendance was strong across disciplines except for psychiatry. The huddles demonstrated effective collaboration and produced actionable discussions that informed safety considerations and care planning.

CSATF reported that due to staff shortages related to 3CMS supervisors being on long term sick leave throughout the review period, weekly 3CMS supervisory meetings did not occur since January 17, 2025. The institution also reported that management was working to ensure that these meetings were completed moving forward by looking into other available options within the mental health leadership team.

The monthly joint supervisory 3CMS program area tours were consistently conducted. Reviewed documentation reflected adequate interviews of staff and patients.

CSTAF provided 3CMS orientation brochures in English and Spanish.

CSTAF provided inmate advisory council (IAC) meeting minutes for all six months of the review period. IAC minutes were provided for each Facility, patient members and not CDCR staff, prepared the minutes.

During the review period, 245 patients filed 428 staff complaints. Of these 428, 420 or 98 percent of complaints were due to staff misconduct allegations, three were due to offender services, three were due to administrative actions, one was due to offender activities, and one was due to case records and classifications. Of these, 311 or 73 percent of the staff allegations were found to be guilty of staff misconduct, 39 or nine percent were denied or rejected, 16 or four percent were redirected or reassigned, seven were granted, one had no jurisdiction, and 54 were still awaiting a decision. Notably, CSTAF reported that no mental health staff were moved to another post as a result of an MHSDS patient filing a mental health staff misconduct compliant.

CSATF provided a spreadsheet for partnership training for the entire institution including both mental health and custody staff. CSATF reported that 1,544 staff members required this training and 1,480 or 96 percent of required staff attended.

Heat Plan:

CDCR required that each institution's heat plan local operating procedure incorporate the requirements of the March 27, 2025 Heat Plan and Updates memorandum. CSATF provided the heat plan LOP dated April 28, 2024 which conformed to required policy.

In addition to CDCR's 2025 Heat Plan and Updates memorandum, CDCR issued an Expectations Memo, dated August 2, 2024, delineating the specific responsibilities of the warden and CEO. These included daily meetings during days of anticipated heat advisories to address and manage heat alerts and related concerns. During the site visit, the monitor reviewed minutes of five daily meetings, which occurred on July 23, July 25, August 1, October 3 and October 4, 2024. Minutes reflected updates regarding heat related concerns on each facility including tour dates by leadership, inspection of cooling equipment and supplies, and cell temperature checks.

The 2025 Heat Plan and Updates memorandum required that each institution submit a Heat Plan Monthly Summary Report (Summary Report), signed by the warden and CEO, to headquarters each month from May 1 to October 31. The heat plan was in effect for only October of the review period. CSATF produced an October of 2024 summary report which reflected that there were nine Stage I and zero Stage II or Stage III heat alerts during the month when the plan was active. Reviewed daily activity reports (DARs) were inconsistent with the monthly summary report as only seven Stage I heat alerts were noted in the October 2024 DARs. A review of the outside temperature logs which were consistent with the monthly summary reports, revealed that Stage I heat alerts that occurred on October 3 and 4, 2024 were not documented in the respective DARs.

The Heat Plan and Updates memorandum also required institutions to include with the monthly submission a Heat Incident Log documenting the number of patients who experienced a

heat-related illness. The Heat Incident Log must include the patient's information and details regarding the heat-related illness. CSATF reported no heat-related illnesses during the review period.

The 2025 Heat Plan and Updates memorandum required all custody officers and leadership staff to maintain knowledge of heat plan activation and act in accordance with the requirements of each stage. Thirty-two custody officers were interviewed in 17 housing units on Facilities A, B, C, D, E, G and the RHU; all interviewed custody staff demonstrated adequate knowledge of the heat plan policy and procedures. Each post had resources in the office on the heat plan requirements.

The policy also required that when the Heat Plan was in effect, institutional staff must generate and distribute daily a list of all incarcerated persons currently prescribed any of the designated Heat Alert Medications. Every visited post had an updated list of patients on the heat risk list.

To ensure proper and accurate temperature recording, the Annual Heat Plan and Updates memorandum required the warden or his designee to ensure an accurate thermometer was placed in a central, heat-neutral location to monitor outside ambient air temperatures, which must be recorded every hour, every day, from May 1 through October 31 of each year. CSATF central control staff recorded outside air temperatures during the review period. The monitor observed the outside digital thermometer and noted that it was installed under the lip of the roof line outside of the central control area. The officer in central control reported that it was difficult to see the temperature during hours of darkness.

It was noted that the current location may not be an accurate reflection of the outside temperature as the heat alerts at CSP/Corcoran, which is in close proximity to CSATF, were

consistently called hours before CSATF. Specifically, Stage I heat alerts were called at CSP/Corcoran on May 10, 2025 at 10:31 A.M. but not until 11:58 A.M. at CSATF, and on May 16, 2025 at 11:30 A.M. but not until 2:44 P.M. at CSATF.

Outside temperatures were not recorded on October 1, 2024 and an additional 20 outside temperature readings were not logged on the outside temperature record in October. The monitor reviewed the outside temperature log in central control during the site visit; thirteen temperature readings were missed on May 14, 2025 and two were missed on May 3, 2025.

The warden or his designee was also responsible for ensuring that inside air temperatures were measured in all non-airconditioned living areas housing heat-risk incarcerated persons. Temperatures must be taken at the highest non-airconditioned location where heat-risk incarcerated persons were housed and must be recorded every three hours. A combination of digital and analog thermometers was used to record all indoor temperatures at CSATF. The devices were placed in the highest feasible locations in each toured dayroom and housing pod as required.

The October 2024 indoor temperature logs were reviewed and overall were compliant with only minor deficiencies noted. The May 2025 logs were also reviewed while on site which reflected compliance as well.

In an effort to ensure that heat-risk incarcerated persons were afforded equal access to programs, services, and activities during extreme weather conditions, the 2024 Heat Plan and Updates memorandum required institutions to devise and include any reasonable accommodations and alternatives to yard activities when revising their LOP. All reasonable accommodation provided to heat-risk incarcerated persons during heat alert activation must be documented in the institution's Daily Activity Report as well.

CSTAF indicated that they did not record the accommodations offered to patients for canceled yard activities due to heat alert activations and also reported that they would do so at the beginning of the new heat season in May of 2025. Facility DARs were reviewed for Stage I heat alerts that occurred on May 10, 11, and 16, 2025. Accommodations for heat risk patients were not consistently noted on any facilities' DARs. Additionally, the Stage I heat alerts were also not documented in the DARs in Facilities A, B, and G.

Staff reported offering patients access to cold water and ice, showers and additional dayroom access following Stage I heat alerts. All observed ice machines were working during the site visit.

The 2024 Heat Plan and Updates memorandum required annual training on the institution's Heat Plan, including measures when heat stress symptoms are identified and/or reported, to be provided to custodial and clinical staff by the In-Service Training Officer. Heat pathologies training was completed by 946 of 1014 or 93 percent of custody staff members and 205 of 229 or 90 percent of clinical staff and nurses.

The monitor met with the Heat Plan Coordinator to discuss heat plan implementation. The associate warden (AW) of health care reported that they were currently revising the DARs to improve compliance with documenting accommodations provided to heat risk patients. The AW also reported that air-conditioning is currently being installed in the EOP group rooms in F and G facilities because those areas have been historically problematic with high temperatures. The project is expected to be completed in September of 2025. Lastly, the AW reported that plans were underway to automate the temperature logs to an electronic record.

Overall, the institution's implementation of the 2024 Heat Plan and Updates memorandum was not compliant during the review period. These findings were based on the

location and accuracy of the outdoor thermometer, and missed outdoor temperature recordings. Additionally, the DARs did not document the specific accommodations provided to heat risk patients during heat alerts in October of 2024 and May 2025. Lastly, the monthly summary reports were inconsistent with the respective DARs, which compromised the reliability of the information presented to headquarters. Of note, staff knowledge of heat plan requirements, indoor temperature monitoring, and training on heat plan was compliant.

RVRs:

CSATF issued 3,968 RVRs during the review period, of which 2,878 or 73 percent were issued to MHSDS patients. Specifically, 13 RVRs were issued to acute care patients, two were issued to intermediate care patients, 85 were issued to MHCB patients, 475 were issued to EOP patients, and 2,303 were issued to 3CMS patients.

The monitor reviewed 30 RVRs to assess compliance with CDCR policy. Custody staff timely referred the mental health assessment (MHA) to mental health staff within two days in ten or 33 percent of reviewed cases. Mental health staff timely completed and returned the assessment to custody within eight days in eight or 27 percent of reviewed cases. The senior hearing officer documented consideration of the mental health assessment in all reviewed cases.

Mental health staff recommended mitigation in five or 17 percent of reviewed cases and the SHO mitigated the penalty pursuant to the assessment in all five cases. The most frequent assessment recommendation concerning mitigation was property, which 60 percent of assessments recommended.

Twenty-seven or 90 percent of patients were assigned staff assistants. Twenty-six or 87 percent of patients had confidential mental health assessments.

Four mental health assessments explained that mental health contributed to the behavior in the RVR, but the SHO decided to hold the patient accountable based on a preponderance of evidence.

As for mental health assessment training, CSATF provided spreadsheets for staff who attended the training. However, these spreadsheets did not contain position titles or specific distinctions of whether the staff listed were mental health or custody staff members.

Use of Force:

CSATF reported seven controlled use of force incidents during the review period all of which involved MHSDS patients. There were 264 immediate use of force incidents during the review period; 262 or 99 percent involved MHSDS patients. Physical force was used in 157 incidents; OC was used in 73 incidents; 40mm was used in ten incidents, MEB was used in one incident, and a combination of tactics were used in 23 of the use of force incidents. Resisting a peace officer was the reason force was utilized in 102 incidents, battery and assaults on staff was 51, and to cease patient self- injurious behavior, use of force was used eight times.

The monitor reviewed five controlled and 12 immediate use of force incidents including available video surveillance. All incidents were compliant with CDCR policy; however, concerns were noted in four incidents where de-escalation techniques could have been used to avoid further force.

The monitor reviewed the timeliness of the Institution Executive Review Committee (IERC), review of use of force incidents. Title 15 requires use of force incidents to be presented to IERC within 30 days of the incident. However, the monitor was provided a memorandum dated October 3, 2023, extending that timeframe to 60 days. All seven controlled use of force incidents were closed and six were open within the review requirement.

For immediate use of force incidents, 169 or 64 percent were either closed or noted as review completed, 10 or four percent were at the executive level of review, 62 or 14 percent were at Level I or Level II of review, and 56 or 21 percent were reported as being open. Ninety-five or 36 percent were not closed as the use of force review was suspended including those referred to the Allegation Inquiry Management System (AIMS) for investigation. The 95 suspended review incidents were between 45 and 240 days beyond review requirements.

CSATF reported that the chief deputy warden attended use of force training. All six correctional administrators, all eight captains, 39 of 41 lieutenants, 92 of 97 sergeants, and 838 of 875 correctional officers attended the training. The warden's training information was not provided. For mental health staff, all both chief psychologists and psychiatrists attended the training, as did all 8 supervisor psychologists, psychiatrists, and social workers, 15 of 16 psychologists, all 12 psychiatrists, 20 of 22 social workers, and 81 of 86 nurses.

The number of immediate uses of force incidents on MHSDS patients indicates a potential lack of de-escalation by staff. Additional training on de-escalation techniques and working with the mentally ill offender may be beneficial. The institution is not reviewing and closing use of force incidents within the required timeframe.

<u>Lockdowns/Modified Programming</u>:

During the review period, there were ten modified programming periods ranging from three to 24 days in duration. Reasons for modified programming included increased violence and STG attacks on staff, unaccounted for metal objects, increased finding of manufactured weapons, significant number of uses of force in a short period of time, a significant amount of controlled substances found in a short period of time, and conversion of Facility C to a sensitive needs yard. During these modified programming periods, dayroom activities, recreation,

education, ISUDT, and phone calls were ceased or limited. In cell feeding was ordered and medication was dispensed at the cell front. Priority ducats were authorized.

Access to Care:

A review of CSATF's monthly Health Care Access Quality Reports from October 1, 2024, to March 31, 2025, reflected the issuance of 190,213 mental health ducats and add-on appointments, of which 88,917 or 47 percent were completed and 101,296 or 53 percent were not completed. Of the non-completed appointments, 2,339 or two percent were reportedly not completed due to custody factors, 38,161 or 38 percent were due to non-custody factors, and 60,796 or 60 percent were due to patient refusals.

The chief of mental health reported that the missed appointments due to non-custody factors included patients refusing the first appointment and they would have to be rescheduled outside of the appropriate time frame and due to lack of staffing. Further, during the reporting period there were few recreational therapists which created large-numbered groups which had to be cancelled when therapists called in sick.

*Coleman* Postings:

Current *Coleman* postings in English and Spanish were observed in all toured housing units.

**APPENDIX A – 14**
**CORRECTIONAL TRAINING FACILITY (CTF)**
Site Visit: February 25, 2025 – February 27, 2025
Review Period: July 1, 2024 – December 31, 2024

Census:

On February 25, 2025, CTF housed 4,176 incarcerated persons, which was a one percent increase from the previous reporting period. *See* Thirtieth Round Monitoring Report – Part D, ECF No. 8359 at 338 (reporting institutional population of 4,127 incarcerated persons). The 873 MHSDS patients represented a one percent decrease compared to the preceding review and comprised 21 percent of CTF's population. *Id*. (reporting MHSDS population of 885 patients).

There were three EOP mainline patients awaiting transfer.

The 866 mainline 3CMS patients reflected a two percent decrease since the previous reporting period. *Id.* An additional four 3CMS patients were housed in RHU awaiting transfer.

Staffing:

The chief psychiatrist position remained filled. Staff psychiatry positions decreased by one FTE since the preceding review. *Id.* (reflecting CTF's Thirtieth Round 3.5 staff psychiatry positions). Of 2.5 staff psychiatrist positions, one was filled for a 60 percent vacancy rate. However, the use of 2.25 contractors reduced the psychiatry functional vacancy rate to zero percent.

One of two chief psychologist positions were filled, reflecting no change since the previous review. The senior psychologist position and both senior psychologist specialist positions remained filled.

Psychologist positions decreased by 1.0 FTE since the previous review. *Id.* Six of seven psychology positions were filled, for a 14 percent vacancy rate. The use of 0.75 contractors

reduced the psychology functional vacancy rate to four percent. One psychologist was unlicensed.

The supervising social worker position was filled. Social worker positions decreased by 1.0 FTE since the previous review. *Id.* Of 6.5 social worker positions, 4.5 were filled for a 31 percent vacancy rate. However, 0.25 contractors decreased the social worker functional vacancy rate to 27 percent. One social worker was unlicensed.

At the time of the site visit, two clinical supervisors were responsible for supervising the two unlicensed CTF staff members.

The senior psych tech position was filled. Of 3.5 psych tech positions, 2.5 were also filled. This reflected a vacancy rate increase of 29 percent from the previous review. *Id*.

MHSDS clerical positions decreased 1.0 FTE since the previous review. *Id* at 339. All 5.5 mental health clerical positions were filled.

The OSS II and 1.5 HPS I positions were filled. While CTF did not have an allocated HPS II position one was employed.

The CHCA position was vacant.

For custody staff, the warden and chief deputy warden positions were filled, as were three of four associate wardens' positions, and five of six captains' positions. Positions were also filled for 27 CC Is and nine of ten CC IIs, all 27 lieutenants, 60 of 61.4 sergeants, and 536 of 552.4 correctional officers. Overall, for custody staff, 670 of 688.8 positions were filled for a three percent vacancy rate.

<u>Tele-Mental Health</u>:

CTF did not utilize tele-mental health.

Telework:

CTF permitted telework for both senior psychologist specialists, all 5.5 MHSDS clerical staff, and the HPS II for one day per week. The HPS I was allowed to telework two days per week.

Staff Recruitment:

Staff reported that the 15 percent pay differential offered by neighboring institution SVSP-PIP remained an obstacle to CTF's mental health staffing recruitment and retention. CTF reported a loss of 32 percent of their primary clinicians to the SVSP-PIP. Additionally, the higher registry pay rate at SVSP-PIP further affected CTF's ability to fill multiple registry tickets.

During the review period, CTF also pursued dual appointment positions resulting in a 0.25 social worker and 1.0 psychologist appointment.

Quality Management:

CTF maintained a well-functioning quality management program during the review period.

CTF did not have a Local Governing Body (LGB). During the review period, CTF's Quality Management Committee (QMC) met monthly; no meetings were canceled, and a quorum was met at each meeting. The MHPS reported to the QMC quarterly and provided reports in September 2024 and December 2024. Identified trends and problem areas included MHSDS patient backlog, SRE mentoring, RHU policies, timely medication disbursements, and timely mental health referrals. Of particular focus for auditing during the review period were IDTTs and treatment plans and PC caseloads and scheduling. Audit results were regularly presented to the program supervisors, who then disseminated the information to line staff. CTF

supervisors used a mentoring approach and on-the-job training to address errors. CTF supervisors provided more intensive one-on-one training when failures were evident and repetitive.

There were no QITs, FITs, CAPS, or PIWPs during the review period or at the time of the site visit.

CTF Psychiatry Peer Review was performed internally. While there was no primary care provider peer review during the review period or at the time of the site visit, CTF clinicians participated in a peer consult group where they discussed treatment strategies, treatment planning, and documentation requirements. The process was reportedly qualitative for both disciplines.

During the review period and at the time of the site visit, the quality management program also included a weekly backlog meeting and a separate "pre-MHPS" meeting. Both meetings were attended by the chief of mental health, quality management supervisor, 3CMS program supervisors, OTs, and health program specialist (HPS) staff.

The Mental Health Program Subcommittee (MHPS) met monthly and achieved quorums during the review period; meetings were attended by the required voting members or their designees. Reviewed meeting minutes indicated that overall, CTF's MHPS meetings were comprehensive and adequately addressed the relevant issues affecting the mental health program at CTF.

During the review period, the MHPS regularly reviewed relevant compliance measures and performance reports, including mental health staffing, the mental health backlog, timely medication disbursements, SREs, timely mental health referrals, timely mental health follow-ups, and medication refusals. The MHPS also analyzed access to care data, continuity of care data,

and the Custody/Mental Health Partnership Plan compliance. Action plans were developed and updated at each meeting to address and mitigate barriers to compliance for identified problems and/or deficiencies. Information from the MHPS meetings was disseminated to staff via program supervisors. Further, the MHPS addressed salient issues identified by the Special Master's experts. MHPS meeting minutes also included discussion of the RHU and policies to ensure clinician coverage and huddle attendance by custody and mental health.

Medication Management:

MAPIP monitored compliance with diagnostic monitoring and medication administration. Diagnostic monitoring included obtaining medication consents, as well as any physical examination, vital signs, or laboratory tests needed for safer use of a medication. Medication administration audited compliance with the availability, continuity, and actual administration of medications. The compliance threshold was 90 percent.

MAPIP

CTF provided MAPIP results for July 1, 2024 through December 31, 2024 regarding compliance for psychiatric diagnostic monitoring and medication management.

MAPIP antidepressant monitoring tracked four metrics, but CTF did not require one metric during the reporting period, namely EKGs for patients taking tricyclic antidepressants (EKG). The remaining metrics included: medication consents (Consent); thyroid function tests (TFTs); and obtaining blood pressure for patients taking venlafaxine (venla BP). CTF was fully compliant with obtaining medication consents, and monitoring blood pressure for patients prescribed venlafaxine, and was partially compliant with monitoring thyroid function. Of the total 18 required metric-months, 13, or 72 percent, were compliant, with five, or 28 percent, non-compliant.




Diagnostic monitoring for patients prescribed atypical antipsychotics required 11 metrics, including: AIMS; blood pressure; glucose; complete blood count (CBC); comprehensive metabolic panel (CMP); EKG; height (Ht); lipids; medication consents; thyroid function tests; and weight (Wt). CTF was fully compliant for monitoring blood pressure, height, and weight. The remaining metrics were partially compliant during the review period. No EKGs were required during the review period.




Of the 60 metric-months for which data was required, CTF reached compliance for 45, or 75 percent, and was non-compliant for the remaining 15, or 25 percent.

CTF had no required MAPIP data for the antipsychotic medication clozapine, or the mood stabilizing medications carbamazepine and lamotrigine.

Depakote was a mood-stabilizing medication requiring four metrics: CBC; CMP; therapeutic medication level; and obtaining medication consents. CTF was fully compliant for obtaining medication consents, and partially compliant for the other three metrics.




When examined in the aggregate, 24 metric-months were required. Of these, CTF was compliant for 18, or 75 percent, and non-compliant for six, or 25 percent.

The mood stabilizer lithium required monitoring kidney and thyroid functions, EKGs, therapeutic medication levels, and EKGs. CTF was partially compliant with monitoring therapeutic medication levels and thyroid function, and obtaining medication consents. No monitoring of kidney functions or EKGs were required during the monitoring period.




CTF required 12 metric-months of data. Of these, the institution was compliant with seven, or 58 percent, and non-compliant with five, or 42 percent.

When examined in toto, CTF required 114 metric-months of diagnostic monitoring data. Of these, 83, or 73 percent, were compliant, while 31, or 27 percent, were non-compliant.



Medication Administration

MAPIP medication administration metrics monitored essential aspects such as medication availability, continuity, preparation, and administration. CTF had ten required measures during the monitoring period.

Monitoring medication continuity included the following six measures, followed by the abbreviations used in the graphs in parentheses: transfers from other institutions arriving at receiving and release (R&R); intra-institutional transfers to non-RHU locations (Intra); MHCB transfers (MHCB); intra-institutional transfers to restricted housing (RHU); discharge from a community hospital or DSH (Outside Hospital); and upon parole or transfer to the community (Release).

MAPIP measures tracked compliance with the administration of medications given at HS (*hora somni*, or bedtime) which must be given on or after 8:00 P.M. (HS), and medications given in the A.M. and P.M. which must be given at least eight hours between doses (A.M./P.M.). Additionally, metrics evaluated whether chronic psychiatric medications were continued without interruption (Chronic), and whether new medications were administered as ordered, and in compliance with required timelines (New).

CTF reported that the two MAPIP measures monitoring PC 2602-related metrics were not required during the monitoring period; however, this information was confusing and could not be reconciled with information obtained at the time of the site visit, which is explained further below. The institution was fully compliant with medications at time of release, HS medications, and chronic psychiatric medications. The remaining required metrics were all partially compliant.




These ten measures resulted in 58 metric-months of data. Of these, 36, or 62 percent were compliant, and 22, or 38 percent, were non-compliant. CTF performed extensive drilldowns to explore underperforming metrics, with the vast majority driven by patient refusal, with late administration of medications a much less-frequent cause. CTF reported that drill downs on these metrics showed the main cause was patient refusal, and thus no CAPs or PIPs were initiated; however, this neglected the point of addressing the underlying reasons for refusals.



PC 2602 Issues

CTF submitted confusing data regarding PC 2602 monitoring. CTF reported 18 patients received PC 2602 medications during the monitoring period, yet also stated that no PC 2602 data was required. One initial emergency petition was submitted and was approved. There were no initial non-emergency or renewal petitions submitted, nor any planned non-renewals. CTF reported one PC 2602 was ordered without filing a non-renewal form; the institution did not state further details about this case. There were no patients receiving PC 2602 medications at the time of the monitoring tour.

HS Medications

CTF was overall compliant with the directive to administer medications at HS after 8 P.M.

Non-Formulary

CTF reported an average of 9.3 percent non-formulary medication during the monitoring period.

Polypharmacy Reviews

With rare exception, CTF was compliant with conducting required polypharmacy reviews for patients on multiple medications which may contribute to increased medical risks.

Nursing Audits

CTF audited all medication lines across second and third watch. The institution reported that all medication lines were compliant with the requirements of individual wait times under 30 minutes, and total medication line duration under two hours. CTF reported that one medication window on North A had an awning, while obtaining one for North B was in process.

Medication Management Summary

CTF displayed multiple strengths in medication management, demonstrating an overall compliance rate for diagnostic monitoring of 83 percent. Challenges with compliance for medication administration was 62 percent. While patient refusals drove most of this noncompliance, CTF failed to investigate and address the issues underlying the rate of refusals. PC 2602 data was confusing and could not be reconciled.

Transfers:

CTF's inpatient coordinator was a staff psychologist who had held that position for five years. The inpatient coordinator also served as the SPRFIT coordinator, EOP coordinator, training coordinator, and alternative housing coordinator.

During the review period, there were no inpatient care referrals, nor any patients considered for, but not referred to, inpatient care. At the time of the site visit, no patients were pending transfer to inpatient care.

CTF made 71 MHCB referrals during the review period resulting in 33 admissions and 38 rescissions. Of the 71 referrals, all complied with the 24-hour alternative housing stay requirement. Of the 33 MHCB transfers, 32, or 97 percent, were timely transferred within 24 hours; the one delayed transfer was two hours late due to the receiving institution needing to make medical accommodations for a CPAP machine.

The Special Master's expert reviewed a random sample of rescinded referrals to MHCBs. Most of these referrals were for patients who had been found unresponsive by staff and experienced an altered level of consciousness. Overdose was suspected, and patients were transported to the community emergency room (ER) unless the patient refused. Staff provided a July 1, 2020 local memorandum directing CTF medical, mental health, and custody staff to

ensure that any serious overdose by an incarcerated person, mental health caseload or not, required a face-to-face evaluation by licensed mental health staff prior to discharge to custody. The patient must be kept on constant (one-to-one) observation until that evaluation occurs. Patients who overdosed after hours were placed in alternative housing, resulting in a referral to the MHCB. A review of those cases indicated that during completion of the SRE the following day, the patient often denied suicidal intent, was found to be at current low risk, was returned to housing, and the referral was rescinded.

While review of these cases indicated that patients were appropriately not referred to the MHCB, it highlighted the concern with mental health staff responding to patients at high risk for overdosing due to a history of multiple overdoses. The review included multiple cases where 3CMS patients had repeated suspected overdoses, some with increasing frequency, but were not seen by their treatment team or considered for higher level of care or additional treatment. For example, one reviewed patient had at least one overdose per month at the end of the review period. Despite this, his treatment plan was never updated, IDTT never met to review his case and coordinate care with medical and ISUDT, and the patient was never considered for a higher level of care. It was unclear if mental health staff was informed when a patient required multiple medical interventions due to a loss of consciousness, though the information was typically available in the chart. There was no formal notification to mental health staff of patient overdose. For these cases, it is recommended that mental health crisis responders review the medical records to identify the number of suspected overdoses over the last six to 12 months and incorporate those into an updated assessment of the patient and not just a narrowly focused SRE in those cases.

All 21 3CMS RHU transfers were timely and no CTF patients transferred to an EOP RHU.

Three patients transferred to EOP programs during the review period and all three transferred timely.

Seven 3CMS patients transferred to MSFs during the review period.

Programming:

There was no formal triage plan at CTF at the time of the site visit or during the review period.

3CMS:

On February 25, 2025, CTF's 3CMS population was 869. Primary clinician caseloads in Facilities A and B were above the maximum permitted by the Program Guide with caseloads ranging from 101 to 126, while primary clinician caseloads in Facility C fell within 3CMS staffing ratio requirements.

One psychiatrist covered RHU patients and mainline 3CMS patients in Facility C (central CTF facility); two psychiatrists covered mainline 3CMS patients in Facilities A and B (north CTF facility). The chief psychiatrist also provided coverage on Fridays for Facility C 3CMS patients; he reported that he did so because the assigned contract psychiatrist was feeling overwhelmed. While psychiatry caseloads fell well within staffing ratio requirements, psychiatrists providing services for 3CMS patients in Facilities A and B had caseloads that were more than twice that of the psychiatrist providing services for patients in Facility C. It was not immediately clear how many 3CMS patients were prescribed psychotropic medications. The January 2025 staffing allocation for CTF provided for an additional 0.5 FTE psychiatrist, yet to be hired.

*IDTTs*

The Program Guide requires that a patient receive an initial IDTT within 14 calendar days of MHSDS placement or arrival to the institution and at least annually thereafter. *See* ECF No. 7333-1 at 43-44; *see also id.* at 42 (noting patients may refuse to participate in IDTT's and requiring the primary clinician to document the same in the treatment plan documentation). The required attendees include the patient's assigned primary clinician, assigned psychiatrist, correctional counselor and the patient. *See id.* The IDTT should address treatment needs, develop treatment plans, assess treatment progress, and include pre-release and discharge planning. *See generally id*.

The monitor's expert observed five annual IDTT meetings in the north CTF facility; three were for patients from Facility A and two were for patients from Facility B. The patient and required staff attended four of the five IDTT meetings; the fifth IDTT meeting was attended by the patient and required staff, with the exception that an alternate for the assigned psychiatrist attended. The IDTT meeting room was confidential, was adequate for team meetings, and provided access to computers for purposes of reviewing records and documenting the meeting.

IDTT meetings in the north CTF facility were consistently collaborative and therapeutic, and patients spontaneously reported their comfort with and enjoyment in working with the primary clinicians and psychiatrists. Patient input was encouraged in all five IDTT meetings. However, required elements for annual IDTT meetings were only inconsistently completed. For example, the case conceptualization was articulated in only one IDTT meeting, psychiatric history was briefly reviewed in two meetings but not the other three, functional impairments were identified in two meetings, and formal psychiatric diagnoses were discussed for only three of the patients. Methodical review of the patient's treatment plan, the interventions provided,

and the patient's specific progress towards measurable treatment goals was missing from IDTT discussions. Use of interdisciplinary plans of care (IPOCs) were mentioned in passing in two of the IDTT meetings. The potential need for group treatment was not discussed in any meeting. In contrast, the patient's psychotropic medications were consistently identified, and each patient's level of care was discussed and justified. Correctional counselor input into the meetings was positive and encouraging to patients, but otherwise relatively minimum.

While IDTT meetings for Facility A and B patients were warm and supportive towards the patient, required structural elements of the IDTT meeting were missing, and it was therefore not surprising to learn during patient interviews that almost no patient knew what their treatment plan or treatment goals were. Each of these IDTT meetings lasted ten to 15 minutes, but the primary clinician informed the Special Master's expert that the observed IDTT meetings "were more drawn out" than is usually the case, and that they were deliberately made slower and longer because the Special Master's expert was observing the meetings.

As noted above, treatment planning and IDTT meeting deficiencies were identified by the MHPS, and training was underway at the time of the site visit.

The monitor randomly selected and reviewed the healthcare records of 30 mainline 3CMS patients to assess compliance with Program Guide timeframes during their stays.

All 30 patients required initial IDTTs. Nine, or 30 percent, of initial IDTTs occurred timely within 14 calendar days or arrival or level of care change. All 30 were attended by all required staff and 29, or 97 percent, were attended by the patients. Reasons initial IDTTs were held *in absentia* included patient refusal.

The reviewed data captured the time between completed patient IDTTs but did not account for when patients were not scheduled for an initial or routine IDTT. Of note, the

appointments report provided did not account for delays between appointments due to movements in or out of CTF.

For the 624 patients in CDCR's appointments report from July 1, 2024 to December 31, 2024, there were 635 completed initial or routine/annual IDTTs. When a patient had either an initial IDTT and a routine IDTT or more than one routine IDTT, timeliness in accordance with Program Guide requirements was able to be calculated. Of the 635 completed IDTTs, 16 contacts were for individuals who had at least two IDTTs (initial and routine or two routines). Of those 16, all occurred within Program Guide requirements. Of note, the report did not include patients who did not have a completed IDTT, such as those who were not scheduled.

The monitor's expert interviewed 27 3CMS patients during the site visit. Patients housed in Facilities A and B in the north CTF facility reported that IDTT meetings were perfunctory and short, with routine IDTT meetings lasting about five minutes. They indicated that the meetings did not involve actual treatment planning or patient input into their treatment plans. Only one patient interviewed was aware of his treatment goals. Several patients indicated that they did not know the intended purpose of IDTT meetings.

*Group Treatment*

CTF did not provide treatment groups to 3CMS patients during the review period; this included no mental health groups, no nursing-led treatment groups, and no pre-release groups. No groups were scheduled for the future. Staff reported that the biggest obstacle to providing group therapy was group space; however, the Special Master's experts noted that available space was not properly utilized. And at times, space was available to mental health but not utilized.

Further, while the chief of mental health indicated that CTF hired a recreation therapist (RT) to begin mental health groups in a few months, it appeared that CTF clinicians were not

motivated to provide groups. During the interviews, staff repeatedly noted the challenges that adding even one weekly group to their schedules would cause. Several primary clinicians reported that the Program Guide and dashboard created "disincentives" to provide group therapy as it is not tracked or monitored via the dashboard or on-demand reports for 3CMS patients. Consequently, the time they spent preparing and providing group treatment would not be counted and help them maintain status as green or compliant. The focus on compliance numbers versus the clinical needs of patients was concerning.

*Psychiatry Contacts*

The Program Guide requires that patients be offered an initial psychiatrist evaluation before their initial IDTT. See ECF No 7333-1 at 34-50. Thereafter, they are required to receive a routine psychiatric contact every 90 days if the patient is prescribed a psychotropic medication. *Id*. at 44. Patients are also required to receive a primary clinician evaluation within ten working days of arrival, *id*. at 41, and every 90 calendar days thereafter. *Id.* at 48.

The monitor randomly selected and reviewed the healthcare records of 30 mainline 3CMS patients to assess compliance with Program Guide timeframes during their stays.

All 30 patients required initial psychiatry evaluations; 26, or 87 percent, of initial psychiatry evaluations timely occurred before the initial IDTT. All 30 initial psychiatry evaluations were conducted in confidential settings. Telepsychiatry was not utilized for any initial psychiatry evaluations.

Reviewed data captured the time between patient contacts but did not account for when patients were not seen or scheduled for a routine psychiatric contact. Of note, the provided appointments report did not account for delays between appointments due to movements in or out of CTF, thus contact with the assigned psychiatrist was unable to be determined.

For the 615 patients in CDCR's appointments report for July 1, 2024 to December 31, 2024, there were 1,276 completed and refused contacts. Of the 1,252 completed contacts, 1,249 or 99 percent were confidential as reported by the institution. Reasons for non-confidential psychiatry contacts included unavailable confidential space, patient refused the contact, and patient did not show due to a schedule conflict.

When a patient had more than one completed or refused contact, timeliness in accordance with Program Guide requirements was able to be calculated. Of the 1,276 contacts, 665 contacts were for individuals who were seen at least twice by the psychiatrist. Of those 665 contacts, 584, or 88 percent, occurred timely and 81, or 12 percent, occurred beyond Program Guide requirements with a range of 91 to 119 days. Of note, the report did not include patients who did not have completed contacts.

The monitor randomly selected and reviewed the healthcare records of 30 mainline 3CMS patients to assess compliance with Program Guide timeframes during their stays.

All 30 patients required initial primary clinician evaluations. Twenty-five, or 83 percent, of initial primary clinician evaluations contacts were completed within ten calendar days of arrival or change in level of care. Twenty-seven or 90 percent of initial primary clinician evaluations were conducted in a confidential setting; non-confidential contacts were due to patient refusals.

The reviewed data captured the time between patient contacts but did not include patients who were not seen or scheduled for a routine contact with the primary clinician. Of note, the provided appointments report did not account for delays between appointments due to movements in or out of CTF. Contact with the *assigned* primary clinician was unable to be determined from the provided data.

For the 910 patients in CDCR's appointments report from July 1, 2024 to December 31, 2024, there were 2,097 completed and refused primary clinician routine contacts. Of the 2,087 completed contacts, 2,064 or 99 percent were confidential as reported by CTF. Reasons for non-confidential primary clinician contacts included patient refused confidential contact and confidential space was not available.

When a patient had more than one completed or refused contact, timeliness in accordance with Program Guide requirements was able to be calculated. Of the 2,097, 1,194 contacts were for patients who were seen at least twice by the primary clinician. Of those 1,194 contacts, 1,061, or 89 percent, occurred timely and 133, or 11 percent, occurred beyond Program Guide requirements with a range of 91 to 156 days. Of note, the report did not include patients who did not have completed contacts, such as those that were not scheduled.

Of the 2,087 completed individual primary clinician contacts, two were completed in zero minutes, 262 lasted between one and 15 minutes, 464 lasted between 16 and 30 minutes, 1,028 lasted between 31 and 60 minutes, 234 lasted between 61 and 95 minutes and 97 lasted greater than 96 minutes. Of note, the range of incidents greater than 96 minutes was 97 to 224.

The chief of mental health reported that it was more difficult to keep current with initial assessment appointments than with follow-up appointments because initial assessments required more time to complete. More recently, the influx of new 3CMS transfers into CTF had diminished, and it was reported that an improvement in timeliness of initial assessments had been achieved as a result. It was reported that the mental health team formally reviewed backlogged appointments every two weeks to ensure overdue appointments were addressed appropriately.

Interviewed patients from the CTF north facility reported that they saw their primary clinicians and psychiatrists once every 90 days but not more frequently and stated that their contacts did not last more than five minutes with no substantive conversations. Similarly, these patients complained that psychiatric appointments were very brief, focused solely on medications, and dismissive of patient requests for more information regarding the rationale for medication selection. Patients from the north facility also reported that the psychiatrist had all patients for the day's clinic called to the waiting area at once resulting in hours long wait times in the heat.

In contrast, patients from the central CTF facility (Facility C) reported that they spent 25-45 minutes with their psychiatrist and up to an hour with their primary clinician. Patients in Facility C reported that they were called publicly for mental health appointments in a manner that announced the appointment to their peers and that negative political consequences could occur if their receipt of mental health services became known.

Patients from Facilities A, B, and C expressed the need for more mental health clinicians to provide more substantive, and less hurried, appointments. and that mental health clinicians sometimes behaved in a manner that was hurried, pressured, and overwhelmed. Patients reported a strong need for high-quality, more frequent primary clinician encounters, and they frequently reported that once-a-month sessions would be very helpful during times of stress. Patients serving indeterminate life sentences reported that anticipating, preparing for, and attending parole board hearings was intensely stressful and that there were too few mental health clinicians to provide adequate counseling and support for parole board hearings. Patients from all three facilities reported that custody staff needed more mental health training and more sensitivity to

mental health problems. They stated that officers could be dismissive or suspicious when approached with a request to see mental health staff.

Three patients from the north CTF facility had recently begun to receive 3CMS services; they reported that they were not provided with an orientation brochure at the time they started services. None of the patients interviewed had recently transitioned from EOP to 3CMS level of care. In each interview group, several patients reported they were enrolled in education or had a job.

Patients reported that, due to budget cuts, multiple jobs for incarcerated people at CTF had been discontinued, and they remained unassigned or working their old jobs on a volunteer basis.

Other Issues:

Pre-Release Planning:

CTF's pre-release planning local operating procedure was updated in October 2024 and aligned with headquarters' directive.

CTF's pre-release coordinator was a licensed clinical social worker who provided part-time pre-release services three days a week, serving facilities A, B, and C. The pre-release coordinator was employed at CTF for three years and pre-release coordinator for two years. The pre-release coordinator did not carry a caseload of patients during the review period.

CTF tracked patients who required pre-release planning at 60 and 90 days from release by the daily review of pre-release reports, SOMS, and the CCHCS tracker for upcoming releases and BOP grants. During the review period, there were 48 patients who were within 90 days of release and required pre-release planning, and all 48 reported received pre-release planning

meetings and/or pre-release interviews. Notably, the pre-release coordinator explained that their local log would soon capture patients within 80 days of release and not the typical 60 days.

There was no pre-release groups offered during the review period.

The pre-release coordinator monitored the ISUDT pre-release agenda, scheduled and held meetings for incarcerated persons releasing within 60 days, maintained data regarding upcoming releases, orders placed, date of contact, and follow-up needs. The pre-release coordinator also conducted patient interviews, completed pre-release planning assessments, signed ROIs, made referrals for mental health case management programs, helped with alternative transportation, and reviewed pre-release data in SOMS daily.

CTF staff reported that TCMP caseworkers provided pre-release benefit assistance to all eligible patients within 120 days of release. Of the 78 patients who were within 120 days of release during the review period, all 78 were screened for TCMP services; 65, or 83 percent, submitted Medi-Cal benefit applications, none submitted SSI benefit applications, and one patient submitted a VA benefit application. The pre-release coordinator reported a great relationship with the TCMP caseworkers, communicating at least twice a week.

Program Access

a. Job and Program Assignments

The data provided by CTF for job and program assignments appeared faulty and no comparisons could be made.

b. Milestone Credits

CTF reported that the institution did not have an EOP program, and thus, milestone implementation was not applicable.

c. Out-of-Level Housing

CTF reported that 87 3CMS custody Level I patients, 50 3CMS custody Level III patients, and three 3CMS custody Level IV patients were placed in Level two housing.

d. ADA Reasonable Accommodation and Grievance Procedure

CTF confirmed the implementation of the revised ADA accommodation and grievance policy.

C-Status:

Eleven patients were placed on C-status during the reporting period and there were eight patients on C-status at the time of the site visit.

Case-by-Case Reviews:

CTF reported no 150-day case reviews during the reporting period.

Two patients met the criteria for 120-day pre-MERD reviews; each patient was pending classification service representative (CSR) review and RVR adjudication. Both patients received timely ICCs and 120-day pre-MERD reviews. Neither patient was eligible for non-designated restricted housing status.

Mental Health Referrals:

During the reporting period, CTF made 1,623 mental health referrals; there were 213 referrals to psychiatry and 1,410 referrals to primary clinicians. The 146 emergent referrals included five to psychiatry and 141 to primary clinicians. Of the 233 urgent referrals, four were to psychiatry and 229 were to primary clinicians. The 1,244 routine referrals included 204 to psychiatry and 1,040 to primary clinicians. For psychiatry, the institution reported 60 percent compliance with emergent referrals, 50 percent compliance with urgent referrals, and 89 percent compliance with routine referrals. For primary clinicians, CTF reported percent compliance with

emergent referrals, 86 percent compliance with urgent referrals, and 89 percent compliance with routine referrals.

CTF indicated that reasons for delays included, inheriting overdue referrals from other institutions, scheduling issues, staff redirects impacting patient referrals, patient transfers, and clerical errors such as canceling orders instead of voiding them.

Custody and Mental Health Partnership Plan:

CTF's custody and mental health partnership plan LOP complied with statewide policy and was last updated in May 2024 and current.

Executive leadership joint rounding occurred during all six months of the review period and on Facilities Central, North, and South, as required. All required staff were present during each session. The executive rounding team interviewed both staff and patients and reported their findings on the appropriate form. Interviewed patients indicated familiarity with how to access mental health services and overall satisfaction with mental health services.

Executive joint rounding was discussed in detail for all six months of the warden's executive staff, quality management committee, and mental health program subcommittee meeting minutes.

Monthly joint supervisory tours occurred on central facility for five of six months and north facility for two of six months of the review period. Staff reported positive working relations between mental health and custody, substance abuse concerns, and specific patient issues and transfers. Patients on north facility reported knowing how to access mental health services when needed and a desire for more groups; patients were not interviewed on central facility according to the provided documentation.

Weekly 3CMS supervisory meetings occurred weekly in central and north facilities in accordance with policy throughout the review period.

An observed weekly 3CMS supervisory meeting was attended by required staff, including the program supervisor, one sergeant from all three yards, and one lieutenant. Attending staff collaborated and exhibited adequate knowledge of their patients and their issues. Discussed topics included patients' levels of care changes and MHCB returns, patients who had received bad news, patients partaking in hunger strikes, the effects of modified programming, and physical plant issues.

CTF distributed the 3CMS orientation brochure to new patients and provided a copy of the same to the monitor.

Inmate advisory council meeting minutes occurred once or twice monthly on central and north facilities throughout the review period, with the required members in attendance.

During the review period, there were five staff misconduct complaints filed against mental health staff; four were closed by the time of document production. There were also 27 filed against custody staff during the review period; one was rejected and the status of the other 26 was reported by staff as unknown.

There were no investigations for misconduct towards a patient not initiated through the appeal process. No staff members were reassigned because of misconduct complaints.

Eighty-three of 95, or 87 percent, of required mental health staff and 584 of 606, or 96 percent, of required custody staff attended the annual partnership off-post training.

Quarterly roundtable training was attended by 201 of 229, or 88 percent, of required mental health and nursing staff and 603 of 639, or 94 percent, of required custody staff.

Heat Plan:

CDCR required that each institution's heat plan local operating procedure incorporate the requirements of the May, 2024 Heat Plan and Updates Memorandum. CTF's heat plan LOP was current and complied with CDCR policy.

The 2024 Heat Plan and Updates memorandum required that each institution submit a Heat Plan Monthly Summary Report (Summary Report), signed by the warden and CEO, to headquarters each month from May 1 to October 31. The Heat Plan and Updates Memorandum also required institutions to include with the monthly submission a Heat Incident Log documenting the number of patients who experienced a heat-related illness. The Heat Incident Log must include the patient's information and details regarding the heat-related illness.

The heat plan was in effect for four months during the review period. During that time, CTF reported five Stage I heat alerts, two Stage II heat alerts, and zero Stage III heat alerts. No patients experienced heat-related illnesses during the review period.

The 2024 Heat Plan and Updates Memorandum required all custody officers and leadership staff to maintain knowledge of heat plan activation and act in accordance with the requirements of each stage. The monitor toured central unit B, central unit G, the RHU, north unit B, and north unit A during the site visit. Twelve officers were interviewed and demonstrated adequate knowledge of heat plan policy and procedures.

The policy also required that when the Heat Plan was in effect, institutional staff must generate and distribute daily a list of all incarcerated persons currently prescribed any of the designated Heat Alert Medications. Except for officers in the RHU and north unit B, interviewed custody staff were familiar with this requirement.

To ensure proper and accurate temperature recording, the Annual Heat Plan and Updates Memorandum required the warden or designee to ensure an accurate thermometer was in a central heat-neutral location to monitor outside ambient air temperatures, which must be recorded every hour, every day from May 1 through October 31 of each year. Reviewed outdoor temperature logs were maintained and properly completed during July, August, September, and October 2024.

The warden or designee is responsible for ensuring that inside air temperatures are measured in all non-air-conditioned living areas that house heat-risk incarcerated persons. Temperatures must be taken at the highest non-air-conditioned location where heat risk incarcerated persons are housed and must be recorded every three hours. CTF provided indoor temperature logs for all units, which reflected compliance with this requirement. Further, indoor thermometers were appropriately installed, in working order, and in the highest feasible locations in all toured housing units.

In an effort to ensure that heat-risk incarcerated persons were afforded equal access to programs, services, and activities during extreme weather conditions, the 2024 Heat Plan and Updates Memorandum required institutions to devise and include any reasonable accommodations provided to heat risk patients.

The 2024 Heat Plan and Updates Memorandum required annual training on the institution's Heat Plan. CTF reported that 100 percent of custody staff, including one warden, one chief deputy warden, three correctional administrators, six captains, 24 lieutenants, 48 sergeants, and 460 correctional officers, received the required training.

Regarding mental health staff training, the chief of psychology/mental health did not attend the training, one of two, or 50 percent, of supervisor psychologists attended training, one

of four, or 25 percent, of psychiatrists attended training, two of eight, or 25 percent, of social workers attended training, three of nine, or 33 percent, of psychologists attended training, two of eight, and 36 of 105, or 34 percent, of nurses attended training.

<u>RVRs</u>:

CTF issued 1,224 RVRs during the review period, including 386, or 32 percent, to MHSDS patients and 838, or 68 percent, to non-MHSDS incarcerated persons; those 386 RVRs were issued to three MHCB patients, two EOP patients, and 381 3CMS patients.

The monitor reviewed 11 randomly selected RVRs to assess compliance with CDCR policy. No cases were documented in an alternative manner. Of the 11 reviewed RVRs, custody staff timely referred the MHA to mental health staff in five of 11, or 45 percent, of the cases. Mental health staff timely completed and returned the assessment to custody in nine of 11, or 82 percent, of cases. The SHO documented consideration of the assessment in all reviewed cases. The clinician recommended penalty mitigation in eight of 11, or 73 percent, of reviewed RVRs; the SHO mitigated the penalty in all eight instances. RHU terms were assessed for one of the reviewed RVRs; this was the only RHU term assessed for a patient during the review period.

MHA training was attended by all required custody and mental health staff.

<u>Use of Force</u>:

CTF reported no controlled and eight immediate use of force incidents involving MHSDS patients during the review period. The data provided by the institution did not allow for an analysis regarding use of force incidents involving mental health patients versus non-mental health patients. The monitor reviewed all eight immediate use of force incident reports involving MHSDS patients; each revealed appropriate uses of force, including physical force to restrain patients, use of chemical agents, and baton strikes. Proper decontamination measures were

utilized in each instance where chemical agents were deployed, and all patients requiring medical treatment after the use of force received the necessary treatment and were released.

The mandatory use of force training was attended by 39 of 43, or 91 percent, of required mental health staff and 568 of 578, or 98 percent, of required custody staff.

Lockdowns/Modified Programs:

Two modified programming periods were initiated during the review period. One stemmed from an institution-wide contraband search and lasted ten days; the other stemmed from a riot on Facility D and lasted four days. Mental health programming was not affected in either instance. No additional lockdowns or modified programming periods were initiated from the end of the review period until the time of the site visit.

Access to Care:

Provided Monthly Health Care Access Quality reports from July 2024 through December 2024 only contained information regarding incidents where custody did not escort patients during an emergency incident.

Placement of 3CMS patients in Minimum Support Facilities:

CTF's MSF remained closed during the review period and at the time of the site visit.

*Coleman* Posters:

All toured housing units contained *Coleman* posters in English and Spanish.

**APPENDIX A – 15**
**CENTRAL CALIFORNIA WOMEN'S FACILITY (CCWF)**
Site Visit: April 29, 2025 – May 2, 2025
Review Period: September 1, 2024 – February 28, 2025

Census:

On April 25, 2025, CCWF housed 1,974 incarcerated persons, which was a 15 percent decrease from the prior review period. *See* Thirtieth Round Monitoring Report – Part C, ECF 8095 at 663 (reporting total population 2,310 incarcerated persons). The 1,328 MHSDS patients represented 67 percent of the institution's total population and was a six percent decrease from the previous review period. *Id*. (reporting MHSDS population of 1,418 MHSDS patients).

The reception center housed 174 3CMS patients but CDCR was unable to provide the actual number of RC RHU patients.

There were four patients in the MHCB and no patients in alternative housing.

Six EOP patients and 46 3CMS patients were housed in the RHU.

There were 98 mainline EOP patients and 969 mainline 3CMS patients housed at the institution with 30 incarcerated persons who were pending initial assessments to determine their level of care.

At the time of the site visit there were 42 3CMS patients and five EOP patients on "C" status in the "C" status unit on A Yard.

Staffing:

The chief psychiatrist position was vacant. Of the six staff psychiatry positions, 5.5 were filled and the use of one contractor reduced the functional vacancy rate to negative eight percent. There were two telepsychiatrists who filled the three allocated positions resulting in a 33 percent functional vacancy rate. Overall, including on-site and telepsychiatry positions, the psychiatry vacancy rate was six percent.

Both chief psychologist positions were filled and two of the 2.5 allocated senior psychologist positions were filled leaving a 20 percent functional vacancy.

Two of the 3.5 allocated senior psychologist specialist positions were filled leaving a 43 percent vacancy rate.

Of 20.5 staff psychology positions, 12.25 were filled and the addition of a .75 contractor reduced the functional vacancy rate to 37 percent. Two psychologists were unlicensed. Two of the four telepsychologist positions were filled for a functional vacancy rate of 50 percent. All nine allocated medical assistants assigned to telemental health were filled with one on long-term leave which was mitigated by the use of a contractor.

One of 1.5 supervising social worker positions was filled for a 33 percent vacancy rate. There were 19 social workers at the institution for the 16.5 allocated social worker positions. Six social workers were unlicensed.

Although there were no allocated marriage and family therapist (MFT) position at the institution, CCWF filled registry positions with MFTs with one having a 3CMS caseload and the other having an EOP caseload.

Overall, inclusive of on-site and telemental health positions, the primary clinician functional vacancy rate was 19 percent.

Eleven recreational therapists covered the 6.5 allocated positions.

One of three senior psych tech positions were filled leaving a 67 percent vacancy rate.

Of 29.2 psych tech positions, 27.2 were filled for a vacancy rate of seven percent. One psych tech was on long-term leave and three of the allocated positions were filled with registry staff resulting in no functional vacancies.

Of the 16.2 supervising registered nurse positions, 15 were filled with two on long term leave, resulting in a 20 percent functional vacancy rate. All five registered nurse positions were filled.

Of the 15 MHSDS clerical positions, 13 were filled for a 13 percent vacancy rate.

The one OSS II position was filled, as were two of the 2.5 HPS I positions and the one HPS II position.

Regarding custody staff, the warden and chief deputy warden positions were filled. All five associate warden positions were filled, with one associate warden on long term leave and one position being filled with a captain acting out of class. Five of six captain positions were filled, and one was filled with a lieutenant acting out of class. Twenty-four of 27, or 89 percent, of lieutenant positions were filled with one lieutenant on long term leave and one sergeant acting out of class.

For sergeants, 61 of 63 positions were filled with five sergeants on extended leave and one CCI acting out of class leaving six functional vacancies and a functional vacancy rate of ten percent. All ten CCII and all 19 CCI positions were filled with one CCI on extended leave.

For correctional officers, 462 officers covered 412 positions with 31 officers on long term leave.

CCWF custody leadership reported many custody callouts at different times of the month due to officers taking vacation and holiday time. On the first day of the site visit, there was only one custody officer in each housing unit on two of the four yards.

Because of transports, custody officers were also missing from the units routinely.

CCWF produced daily activity reports (DARs) documenting the same; on numerous days in April 2025, the DARs reported modified programming based on lack of custody on many yards.

Custody leadership further reported that, at any given time, ten to 20 custody staff were redirected to transportation duties for off-site medical transports, further exacerbating the custody staffing shortage.

Moreover, the entire institution had been on "modified programming" for an unspecified time period due to staffing shortages although no PSRs were filed.

Tele-Mental Health:

Two telepsychiatrists provided services to 3CMS patients housed in the reception center and in restricted housing. Telepsychiatry was used in the EOP program only to cover for psychiatrists who were on vacation. CCWF reported that one telepsychologist and one tele-social worker provided services for mainline 3CMS patients, and one telepsychologist served the RC 3CMS population. Telepyshciatrists and telepsychologists reported working from home as well as in the Fresno hub. It was reported that all tele-mental health clinicians visited the institution upon being hired as well as throughout the year as required.

Staff Recruitment:

The chief of mental health reported that CCWF recruited through word of mouth and by participating in the regional CDCR hiring fairs.

Quality Management:

There were no local governing body meetings held at CCWF during the monitoring period.

The were two major sustainable process reviews and one minor review completed during the monitoring period. The reviews found that mental health subcommittee minutes were posted later than required to SharePoint and did not consistently include whether a quorum was achieved for the meetings. Further, discussion of timely inpatient transfers was not documented. It was also noted that IDTT meetings did not consistently meet criteria. Higher level of care documentation was noted as insufficient across all review periods, with lack of adequate discussion of the patients' needs and justification for level of care decisions. Regional staff noted that some of these deficiencies were reportedly due to the lack of an Inpatient Coordinator (IPC) to review the documentation. However, Regional staff noted that the requirements have been long-standing, and staff should be able to meet requirements without oversight and corrective action by the IPC.

Monthly Quality Management Committee (QMC) meeting minutes for the monitoring period recorded that all meetings were held and scheduled, and a quorum was met for each meeting. Topics covered each month included performance improvement work plans (PIWPs), heat plan, emergency medical response, subcommittee quarterly reports, program management, local operating procedure approval, action items, and open forum. In the October minutes, it was noted that the report from the Mental Health Program Subcommittee (MHPS) was inaccurate and did not include information about the MHPS but instead included information from another subcommittee from a prior meeting. This was concerning for two reasons. First, the Chief Executive Officer who signed the minutes did not realize that the content was inaccurate and second, during the November meeting, the QMC approved the October minutes with none of the members raising concerns about the content and demonstrates a lapse in the process of reviewing

minutes prior to approval. Other than the problem with the minutes noted in October, the remainder of the minutes reflected an adequate quality improvement program.

Mental Health Program Subcommittee meeting minutes were reviewed for the monitoring period. Meetings were held each month, and all meetings achieved a quorum. However, no psychiatrist was present for the meetings in September 2024, January 2025, and February 2025 and the minutes did not clearly indicate that a quorum had been achieved. Meetings were structured around the same topics each month including system surveillance, corrective action plans, non-automated monitoring metrics, improvement priorities, executive leadership rounding, review of local operating procedures, program status reports including inpatient referrals and non-referrals, follow-up on action plans initiated by Regional staff, training, patient safety, the EOP RHU quality improvement team (QIT) findings, 3CMS RHU monitoring, SPRFIT reporting, CIT reporting, MHCB monitoring, DDP program, reception center monitoring, health care access monitoring, mainline EOP monitoring, mainline 3CMS monitoring, involuntary medication monitoring, peer review, psychiatry performance metrics, staffing, and overall quality management updates. The minutes reflected discussion of identified issues and appropriate action being taken to address identified deficiencies. There was limited evidence of audits being completed beyond routine monitoring of key performance indicators taken from the On-Demand dashboard. In a few instances, including IDTT required staff attendance, findings were dismissed as data errors and were not addressed further. This was concerning as there was no evidence that a review of actual staff attendance at IDTTs was completed to determine if a problem existed beyond dismissing them as data errors.

Timely response to referrals was noted as an ongoing concern and a corrective action plan was in place to address the issue. While monthly reports appeared to identify the causes of

the delays, the corrective actions did not appear to adequately address the causes. Additional causes were identified and addressed over time and in the last few months of the reporting period. Timely referrals were at the required threshold for five consecutive months. However, timely psychiatric contacts in 3CMS were noted as problematic and a workgroup was initiated to address the issue. Overall, the content and documentation from the meeting appeared adequate.

There was one QIT in effect at CCWF which was chartered in 2014 and focused on monitoring of required services within the EOP RHU. Minutes from weekly meetings during the monitoring period were reviewed and revealed that all required services were being monitored including yard hours; showers; structured treatment hours; cell front contacts with rationale; barriers and remedies; sustainability and quality improvement; therapeutic treatment module (TTM) inspections and climate control; and length of stay reviews for individual in RHU longer than 90 days. For most topics, monitoring appeared adequate and indicated little need for corrective action. The exception was related to cell front contacts which was noted as "compliant" and the discussion under each item was largely unchanged week to week, often lacking a specific review of the actual reasons for cell front contacts but instead providing a generic list of why contacts were "likely" to have been provided cell front. When the data for cell front contacts was reviewed, it was noted that a number of contacts were routine and the reason for the cell front contact was noted as "as planned" which was not a sufficient rationale, as no routine clinical contacts should be planned to occur at cell front. Additionally, the rationale did not correspond to the generic list of "likely" reasons provided week to week in meeting minutes.

Record reviews completed for the current monitoring period revealed that the vast majority of primary clinician contacts were held cell front, with almost all indicating that the

patient declined an out of cell visit. Yard time and shower accessibility was not consistently available each week, but the data was reliably reported during the following meeting. While most weeks reported that adequate structured treatment was offered, due to modified programming secondary to a power outage, the required number of treatment hours were not offered to patients during the week of November 18-24, 2024.

Local and statewide policies related to peer review were provided. CCWF has not started a peer review process for MHCB psychologists despite the unit reopening in October 2023 due to frequent turnover and the use of registry staff. Psychiatry peer review was initiated in 2023, and three reviews had been completed. Proof of practice was provided and appeared adequate with the most recent reviews completed in November 2024. There was no evidence provided for a local peer review committee meeting occurring as required.

It was reported that findings from the Mental Health Program Subcommittee and weekly findings from monitoring of the dashboard were shared with staff through their supervisors. Each week, the Health Program Specialist sent an email to all supervisors with the finding for the previous week with a reminder to share with staff. It was not clear from the interviews on site whether staff were routinely accessing the quality management information.

Overall, the quality management program at CCWF was mostly adequate; however, there were a few instances when engaging in root cause analyses (informal or formal) appeared necessary to better understand identified challenges, yet there was no evidence that work was done to identify the root causes resulting in prolonged, ongoing challenges.

<u>Medication Management</u>:

Statewide MAPIP monitored compliance with both diagnostic monitoring and medication administration. Diagnostic monitoring included obtaining medication consents, as well as any

physical examination, vital signs, or laboratory tests needed for safer use medication use. Medication administration monitored compliance with the availability, continuity, and actual administration of medications. The compliance threshold for all metrics was 90 percent.

MAPIP

CCWF provided MAPIP results for September 1, 2024 through February 28, 2025 regarding compliance for psychiatric diagnostic monitoring and medication management.

MAPIP antidepressant monitoring tracked four metrics, including: EKGs for patients taking tricyclic antidepressants (EKG); medication consents (Consent); thyroid function tests (TFTs); and obtaining blood pressure for patients taking venlafaxine (venla BP). CCWF was fully compliant with obtaining EKGs, and monitoring blood pressure for patients prescribed venlafaxine, and was partially compliant with obtaining medication consents and monitoring thyroid function. Of the total 18 required metric-months, 14, or 78 percent, were compliant, with four, or 22 percent, non-compliant.




Diagnostic monitoring for patients prescribed atypical antipsychotics required 11 metrics, including: AIMS; blood pressure; glucose; complete blood count (CBC); comprehensive metabolic panel (CMP); EKG; height (Ht); lipids; medication consents; thyroid function tests;

and weight (Wt). CCWF was fully compliant for monitoring blood pressure, glucose, CBC, CMP, height, and weight. The remaining metrics were partially compliant during the review period.




Of the 66 metric-months for which data was required, CCWF reached compliance for 56, or 85 percent, and was non-compliant for 10, or 15 percent.

Clozapine is an atypical antipsychotic frequently used when other medications fail. Due to the increased risk of potentially fatal side effects, the medication requires close monitoring of the same categories as listed for atypical antipsychotics. CCWF did exceptionally well with all metrics fully compliant, except for EKGs, which was partially compliant.




Of the 36 metric-months for which data was required, CCWF reached compliance for 35, or 97 percent, and was non-compliant for one, or three percent.

Carbamazepine and Depakote are mood-stabilizing medications requiring four metrics: CBC; CMP; therapeutic medication level; and obtaining medication consents. For carbamazepine, CCWF was fully compliant with monitoring CBC, CMP, and obtaining medication consents, and partially compliant for monitoring therapeutic medication levels.




Of the 13 required metric-months, CCWF was compliant with 11, or 85 percent, and non-compliant with two, or 15 percent.

For Depakote, CCWF was partially compliant for all metrics.




Of the 24 required metric-months, CCWF was compliant with 13, or 54 percent, and non-compliant with 11, or 46 percent.

The mood stabilizer lamotrigine required one measure, namely obtaining medication consents. Of the six required months, CCWF was compliant for four, or 67 percent, and non-compliant for two, or 33 percent. Given the small number of data, no accompanying graph is submitted.

The mood stabilizer lithium required monitoring kidney and thyroid functions, EKGs, therapeutic medication levels, and obtaining medication consents. CCWF was fully non-compliant with monitoring therapeutic medication levels, and partially compliant with the remaining metrics.



CCWF required 29 metric-months of data. Of these, the institution was compliant with eight, or 28 percent, and non-compliant with 21, or 72 percent.

When examined *in toto*, CCWF required 192 metric-months of diagnostic monitoring data. Of these, 141, or 73 percent, were compliant, while 51, or 27 percent, were non-compliant.

Medication Administration

MAPIP medication administration metrics monitored essential aspects such as medication availability, continuity, preparation, and administration. CCWF had 13 required measures during the monitoring period.

Monitoring medication continuity included the following seven measures, followed by the abbreviations used in the graphs in parentheses: continuity of medications at Reception Centers (RC); transfers from other institutions arriving at receiving and release (R&R); intra-institutional transfers to non-RHU locations (Intra); MHCB transfers (MHCB); intra-institutional transfers to restricted housing (RHU); discharge from a community hospital or DSH (Outside Hospital); and upon parole or transfer to the community (Release).

MAPIP measures tracked compliance with the administration of medications given at HS (*hora somni*, or bedtime) which must be given on or after 8:00 P.M. (HS), and medications given in the A.M. and P.M. which must be given at least eight hours between doses (A.M./P.M.). Additionally, metrics evaluated whether chronic psychiatric medications were continued without interruption (Chronic), and whether new medications were administered as ordered, and in compliance with required timelines (New).

Finally, MAPIP measures included two related PC 2602 involuntary medication matters. These included whether a court order was in the medical record (Court Order), and whether a medication order for the PC 2602 medication was present (Med Order).

The institution was fully compliant with medications at time of release, and chronic care medications. CCWF was fully non-compliant with: reception center; R&R; intra-institutional transfers excluding RHU; MHCB transfers; HS, and A.M./P.M. medications. The remaining metrics were partially compliant.




These thirteen measures resulted in 78 metric-months of data. Of these, 30, or 38 percent were compliant, and 48, or 62 percent, were non-compliant.

Clozapine

Clozapine was a CDCR-approved clozapine institution. As of April 25, 2025, three patients were prescribed clozapine at CCWF.

PC 2602 Issues

CCWF reported that 44 patients received PC 2602 medications during the monitoring period. The institution filed 11 initial emergency, seven initial non-emergency, and ten renewal petitions; all were granted. There were no planned non-renewals, nor any cases lost due to administrative error. At the time of the monitoring tour, 26 patients received PC 2602 medications. There were no barriers reported in the PC 2602 process. One patient was non-compliant with receiving PC 2602 medications; however, no use of force was required.

<u>HS Medications</u>

CCWF was overall compliant with the directive to administer medications at HS after 8 P.M.

<u>Non-Formulary</u>

CCWF reported an average of approximately 12 percent non-formulary medication use during the monitoring period.

<u>Polypharmacy Reviews</u>

With rare exception, CCWF was compliant with conducting required polypharmacy reviews for patients on multiple medications which may contribute to increased medical risks.

<u>Nursing Audits</u>

CCWF conducted 48 medication line audits, across all yards. All were compliant with individual wait times under 30 minutes. In October 2024, patients on "C" yard received their medications in the housing units, due to a shortage of custodial staff. There were no reported conflicts between medication administration and mental health programming.

<u>Transfers</u>:

The inpatient coordinator at CCWF was a senior psychologist specialist who had volunteered for the part time position.

During the review period, there were a total of 200 non-referrals for 107 patients.

CCWF referred seven patients to acute care; six were accepted and one was rejected. All six patients timely transferred within ten days. All referral packets were reportedly completed within two working days of identification.

CCWF referred 13 patients to intermediate care; nine were accepted, three were rescinded, and one was rejected. All nine patients timely transferred within 30 days. All referral packets were reportedly completed within five working days of identification.

No patients with complex medical needs were transferred to inpatient care.

CCWF made 332 MHCB referrals; 153 were admitted and 179 were rescinded. Of the 153 MHCB admissions, 12 or eight percent took longer than 24 hours to transfer. Reasons for delays included patient's refusal to transfer, safety concerns, and one patient who was out at a hospital.

3CMS patients who were referred to 3CMS RHU reportedly were timely placed in CCWF's 3CMS RHU.

EOP patients who were referred to EOP RHU reportedly were timely placed in CCWF's EOP RHU.

During the reporting period, the level of care for 67 patients was reduced from EOP to 3CMS.

No patients were placed in an MSF during the review period.

No patients were referred to inpatient level of care and awaiting bed placement at the time of the site visit.

A review of healthcare records for the ten most recent patients returning from acute/intermediate care indicated that five out of ten cases/discharge summaries referenced inpatient primary clinician to outpatient primary clinician contact, while four healthcare records noted that although primary clinician contact was sought, the inpatient discharge summary was reviewed and stated that there was sufficient information in the discharge note to maintain

continuity of care. Specific documentation of primary clinician-to-primary clinician contact, or a review of inpatient discharge summaries was not located in one out of the ten cases reviewed.

Overall, the discharge summaries were useful, but there were two areas for improvement. One summary advised implementing monthly IDTTs during the patient's EOP placement; however, this was not mentioned or included in the patient's treatment plan. Another summary recommended addressing the patient's substance use issues, but this suggestion was also absent from the treatment plan targets.

Programming:

Reception Center:

CCWF received 1,251 reception center patients during the review period. Overall, lengths of stays averaged 43 days. The average length of stay for EOP patients was 4.9 days and 48 days for 3CMS patients with a range from less than one day to 172 days for EOP patients and less than one day to 72 days for 3CMS patients. Notably, once reception center patients were identified as requiring EOP level of care, they were quickly moved to EOP mainline housing where EOP staff became responsible for all programming.

The Program Guide requires that "[a]ll EOP designated inmate-patients shall be transferred to a treatment setting within 60 days of level of care designation, or 30 days of such designation if clinically indicated. All [3CMS] designated inmate-patients, with the exception of parole violators with 90 days or fewer to parole, shall be transferred to a mainline institution within 90 days of level of care designation or 60 days of such designation, if clinically indicated." See ECF No. 7333-1 at 30-31 (PG 12-2-9).

Patients were being seen for mental health services in the reception center in confidential settings. There were no reported problems in meeting requirements for timely mental health

screenings. At the time of the site visit, there was one patient who had not been seen timely for the mental health screening or for an initial MHA secondary to having been placed in the TTA for medical needs.

Initial MHAs, psychiatric appointments, and other primary clinician contacts were held in the A Yard programming building which had adequate office space and was sufficiently confidential. Due to the frequent alarms on the yard which resulted in movement being suspended, clinicians often did not see patients during these times as custody staff did not allow movement.

Lastly, NLTGs were held in group rooms on the RC housing units. These rooms were of sufficient size and offered adequate confidentiality. No mental health groups were offered to RC patients.

The "C" status unit was opened on A Yard. As the RHU was already housed on A Yard, the addition of having all C-status patients housed on the yard since March 2025 significantly increased the number of alarms resulting in yard closures. This negatively impacted access to care. Additionally, the RC clinicians were responsible for providing coverage for on-call duties, five-day follow-up contacts, and medical huddles in the TTA, all of which had increased in either number or duration since March 2025.

*RC EOP Patients*

The one EOP psychiatrist had a caseload that was within the established ratio. The five primary clinicians who treated RC EOP patients and mainline EOP patients were all within established caseload ratios.

The Program Guide requires that "[r]eception [c]enters housing inmate-patients requiring EOP level of care shall provide structured therapeutic activities...[and] all sites will provide

opportunities for a minimum of one hour per day, five days per week, of out-of-cell therapeutic activities." *See* ECF No. 7333-1 at 29 (PG 12-2-8).

CCWF reported that when patients were identified as requiring mental health services at the EOP level of care, they were quickly transferred to the mainline EOP unit to ensure the provision of appropriate clinical services. This was supported by the data provided. The exceptions to this process occurred under two circumstances, involving three patients, during the reporting period.

The data for these three patients indicated that they did not receive the required amount of structured programming while they remained housed in the RC. On average, these patients were offered less than one hour of structured therapeutic activities weekly, specifically 0.67 hours. The maximum number of hours offered to any single patient was 1.5 hours per week. A review of the data revealed that all offered treatment was in the form of individual primary clinician contacts with no group treatment scheduled or offered. Overall, of the four EOP patients housed in the RC for over two weeks, they were not provided with at least one hour of out-of-cell structured treatment daily for five days as required.

There were no patients on EOPMod status in the RC during the monitoring period and no RC EOP patients were designated as high refusers.

There were no IDTT meetings held in the RC for EOP patients during the site visit.

*RC 3CMS Patients*

The caseloads for the two 3CMS psychiatrists were within the established ratios. Eight primary clinicians treated RC 3CMS patients and all maintained appropriate caseloads.

Patients placed at the 3CMS level of care within the RC were provided with group treatment through the provision of NLTGs. There were 25 NLTGs scheduled for patients in the

reception center weekly covering substance use, expressive groups, life skills and physical health and wellness topics. No mental health clinical or recreational groups were provided in the RC.

There were no IDTT meetings held for 3CMS patients in the RC during the site visit.

*RC RHU Patients*

Provided data indicated that there were 25 patients placed within the RHU while in the reception center during the reporting period. For the RC 3CMS patients housed in the RHU, the average length of stay was 24.1 days, ranging from less than one day to 92 days.

Overall, the services provided to MHSDS patients housed in the RC appeared adequate; however, there were limitations related to the offering of adequate treatment hours to EOP patients who remained in the RC beyond two weeks.

Patients in Restricted Housing:

CCWF placed a total of 320 patients in the RHU during the review period; the average monthly census was 39 and ranged between 30 and 46 MHSDS patients. Stays averaged 33 days and ranged from one to 304 days. Seven EOP patients' stays exceeded 90 days. Reasons given for lengths of stay included departmental review board, pending adjudication of RVR, serving an active RHU term, and postponed RVR hearing.

A telepsychiatrist who provided services in the RHU was within case load ratios. Both the two RHU EOP and four RHU 3CMS primary clinicians were also within caseload ratios.

All EOP and 3CMS patients in the RHU were housed across two wings within the same housing unit, not separated by level of care, and interspersed among non-MHSDS patients. It was reported that the two units were interchangeable, and individuals were not housed on one unit or the other for any particular reason. Treatment space within the RHU building was limited to three individual treatment rooms and a room for IDTTs. Each of the three individual

treatment rooms included small holding modules in the rooms where patients were secured during individual contacts, with a space outside the holding module for the clinician to sit. None of these spaces were in keeping with requirements for Therapeutic Treatment Modules (TTMs). Each small room had a door with a narrow window for visibility. Although the individual treatment rooms were adequate with regard to confidentiality, they were not clean, the metal of the modules was rusty, and it was reported that the rooms were extremely hot in the summer months and the doors were often left open, thereby compromising confidentiality. The rooms were inadequate for conducting therapeutic contacts. The room for IDTT meetings was small and filled with equipment and cabinets, making it not conducive to therapeutic interactions, but allowed for sufficient confidentiality.

Groups for both EOP and 3CMS patients housed in the RHU were provided in a dedicated group room within the EOP programming building (Building 704) on A Yard. The room had seven restart chairs, was adequate in size and offered adequate confidentiality.

Unclothed body searches occur every time a patient comes in or out of the RHU for any reason. Also, searches can happen at any time custody officers believe that a patient is carrying contraband, such as when a patient returns from yard. Searches were conducted either in the shower or in a bathroom with one female custody officer.

*EOP RHU*

The CCWF EOP RHU had a capacity for ten patients. While it was reported that the EOP population in RHU rarely exceeded seven patients, a population of more than seven patients caused challenges with group scheduling given the limited number of restart chairs available in the group room. During the reporting period, the number of EOP patients in the RHU ranged from two to five patients each week.

During the monitoring period, EOP patients housed in the RHU were scheduled on average 11.26 hours of structured therapeutic activities per week. On average, patients were offered 10.19 hours, attended 6.31 hours, and refused 3.88 hours weekly. It was reported that on average, just under an hour of groups was cancelled each week. The only reasons provided for group cancellations were related to custody and included four instances where custody cancelled a single patient's group participation. There were three days during the reporting period when all groups were cancelled due to modified programming as a result of a power outage. Patients and staff reported that refusals were due to lack of motivation and interest on the part of patients. None of the patients reported concerns with unclothed body searches, other security procedures (e.g., cuffs), the length of groups (i.e., three to four hours), or group content as being a factor in refusals. Record reviews revealed that a few patients found the length of group sessions (three to four hours) was too lengthy and chose not to attend as a result.

CCWF reported that 100 percent of patients who were eligible for full programming were offered at least ten hours of structured therapeutic activities weekly during the reporting period. However, the data revealed that there were three patients who were not offered ten hours of structured therapeutic activities during one week of the reporting period. No patients in the RHU were on modified EOP programming during the monitoring period.

At the time of the site visit, all groups offered to EOP patients in the RHU were provided by a single recreational therapist. Groups were offered three days per week. On two days during the week, groups were offered for three consecutive hours and on the third day, the group was four hours long. The recreational therapist and an EOP patient interviewed reported that the lack of custody escorts was an impediment to timely groups. Every EOP RHU patient needed to be escorted by two correctional officers from the RHU building to the EOP programming building,

one patient at a time. This process could take up to five minutes per patient, resulting in groups starting between 15 to 45 minutes after the scheduled start time.

During the site visit, a three-hour group was scheduled to begin at 11:00 a.m. but the first patient did not arrive until 11:45 a.m. due to a shortage of custody escorts. No other patients arrived for the group. The recreational therapist explained that during the three-to-four-hour group period during the day, activities changed each hour. The first hour was typically dedicated to covering a mental health topic, followed by an art session, and then a music or video session. The Special Master's expert observed the mental health section of the group process and found the discussion to be appropriate to the needs of the single patient present for the group. The discussion was engaging and clinically relevant. A second group, which was attended by only two patients, was briefly observed as well. The group included the patient was had been present at the prior meeting, and one other patient. This group also began over 30 minutes later than scheduled due to a lack of available custody staff.

The Special Master's expert spoke with a sergeant and correctional officer on the unit to inquire about access to yard time. They reported that yard times were strictly scheduled given the security needs of the unit and patients could not go to yard outside their scheduled time. If patients refused to go to group, they could not access the yard instead, as this was not their scheduled time for yard.

There were no EOP RHU IDTT meetings scheduled during the site visit. A review of data revealed that no EOP RHU IDTTs, individual contacts or psychiatry contacts were overdue.

Overall, the EOP RHU program was meeting Program Guide requirements regarding the offering of structured therapeutic activities; however, the quality of groups and individual primary clinician contacts was not in keeping with the needs of patients. Specifically, there were

no therapeutic or core clinical groups being offered by clinicians, and a review of the data revealed that during the reporting period, nine out of 46 individual primary clinician contacts offered to EOP RHU patients (less than 20 percent) were provided in a confidential location. While it was documented that most patients refused out of cell contacts, there was minimal documented effort to engage patients in active treatment activities and it did not appear that patients refused psychiatric contacts with the same frequency, although that data was not available.

The RHU certified for each month of the review period, reporting compliance above 90 percent for all assessed areas.

The RHU Policy requires that all patients placed into EOP RHU receive a primary clinician evaluation within five days of arrival and a psychiatry evaluation prior to the IDTT and within ten days of arrival. *See* RHU Policy at 5-6. The RHU Policy also requires that EOP RHU patients receive weekly primary clinician contacts and psychiatry contacts every 30 days. *See id.* at 7.

For the nine patients in CDCR's appointments report for September 1, 2024 through February 28, 2025, there were 24 completed contacts, 19 or 79 percent of the completed contacts were confidential as reported by the institution. When a patient had more than one completed or refused contact, timeliness in accordance with Program Guide requirements was able to be calculated. Of the 24 contacts, 15 were for individuals who were scheduled at least twice by the psychiatric provider. Of those 24 contacts, only one or seven percent occurred beyond Program Guide requirements with a range of 31 and 32 days.

For the 11 EOP patients in CDCR's appointments report for September 1, 2024 through February 28, 2025, there were 46 completed contacts. Nine or 20 percent of the completed

contacts were confidential as reported by the institution. When a patient had more than one completed or refused contact, timeliness in accordance with Program Guide requirements was able to be calculated. Of the 46, 35 contacts were for individuals who were seen at least twice by the primary clinician. Of those 46 contacts, there were three or nine percent that occurred beyond Program Guide requirements with a range of 19 and 25 days.

There were 46 completed individual PC contacts. Thirty-seven contacts were completed within 15 minutes, five contacts were completed between 16 and 30 minutes, three contacts were completed between 31 and 60 minutes, and one contact was completed between 61 and 95 minutes. Of note, there were no incidents greater than 96 minutes.

*3CMS RHU*

Pursuant to the schedule provided by CCWF, there were six 90-minute groups scheduled to be held weekly in the RHU for patients receiving services at the 3CMS level of care. This number of groups was required in order to provide groups to patients given the limited size of the group room which could only accommodate seven patients. At the time of the site visit, there were 46 patients receiving services at the 3CMS level of care in the RHU. With a maximum number of seven patients per group, at least six groups would be required to accommodate all patients in at least one group.

On average during the monitoring period, 3CMS patients in the RHU were scheduled for 1.95 hours weekly, offered 1.38 hours, attended 0.75 hours, and refused 0.63 hours. It was reported that 0.55 hours of structured therapeutic activities were cancelled on average each week during the monitoring period.

All groups for 3CMS patients in the RHU were facilitated by a single social worker who was assigned to facilitate groups within the RHU and carried a reduced caseload. Enrollment in

the groups was determined solely by custody staff based on scheduling and security needs. The size of the group varied week-to-week and ranged from as few as two people to as many as seven. The social worker who facilitated groups reported that custody staff considered enemy concerns and other factors in deciding which patients could go to groups at a particular time. The 3CMS RHU group topics included anxiety management, anger management, depression management, and parole planning yet none of these corresponded to the actual topic discussed during any group session according to the social worker. The social worker who facilitated groups reported that topics for each day's group were not pre-planned but were instead based on whatever issues were the top priority among the members for each group session. It was unclear how the social worker was able to develop group curricula based on this method.

The 3CMS RHU groups were held in building 705, meaning the patients were strip searched, shackled on their wastes and legs and escorted from the RHU to the group. The title of the group was pre-release; however, the LCSW conducting the group stated that was a title given to the group by custody, and the clinician based the group on the patient's needs. Two groups were scheduled; however, the patients refused the afternoon group. Three patients attended the morning group. The clinician had excellent rapport with the patients, discussed concepts from the previous group, actively listened, gave objective advice, ignored bad behavior and maintained control of the group. The group was scheduled for ninety minutes; however, it took 30 minutes to escort the three patients to the group. The group title was Anger Management, and a short anger management video clip was played. The clinician stopped the video and allowed the patients to discuss individual feelings when anger negatively impacted their lives and interventions to mitigate impulsive negatives feeling when angered. Another video clip was

shown about boundaries and discussed. The group was well conducted, and the patients reported that the group was beneficial.

Overall, services provided to 3CMS patients in the RHU were mostly adequate; however, as noted with EOP RHU patients, the vast majority of primary clinician contacts were conducted cell front. Data revealed that 46 out of 254 contacts, or 18 percent, were completed in a confidential location during the monitoring period. There was limited documented evidence of attempts to engage patients more fully in individual treatment and the clinical content of groups was not organized and did not support continuity in content from week to week.

An RHU afternoon huddle was observed and included a primary clinician, psychiatric technician, and sergeant. They reviewed newly placed patients, any patients with behavioral issues, and any other relevant considerations, including concerns with recent medication changes and ongoing medication non-adherence issues. The discussion was collaborative and adequate.

There were 11 IDTT meetings scheduled for 3CMS patients in the RHU during the site visit. The Special Master’s expert arrived at the IDTT meeting room six minutes after the scheduled start time and two IDTTs had already been completed without the patients present and a third was being conducted. It was reported that the patients had refused to attend. The remaining eight IDTT meetings were observed and were completed in less than one hour. The room for the IDTT meetings was cramped and filled with furniture, computer screens, and eight staff members including three primary clinicians, the RHU supervising psychologist, the IPC, a psychiatric technician, a correctional counselor, and a recreational therapist. The psychiatrist attended via a tablet. It was unclear why the recreational therapist was present, as he only provided groups to EOP patients and none of the scheduled IDTTs were for EOP patients.

The quality of the IDTT meetings was inadequate. The meetings were disorganized and did not cover the topics required during IDTT meetings. Seven of the eight meetings were held without the patients present. It was reported that the patients refused to attend, yet these refusals appeared to be obtained at some point earlier in the day, as patients were not invited to attend during the meetings and none of the IDTT members left the room at any point to attempt to engage patients. Most meetings did not include discussions of the patient's clinical history, case conceptualizations, functional impairments, treatment needs, treatment goals, planned interventions beyond medications, or considerations for levels of care. In two of the cases, the IDTT decided to remove the patients from MHSDS without the patient present and in one case, without having discussed the decision with the patient prior to the meeting. In fact, during the IDTT for this patient, the primary clinician, who was covering for the patient's assigned clinician, stated that she would speak with the patient after the IDTT to see if the patient agreed to be removed from MHSDS and if the patient did not agree, the patient would be retained at the 3CMS level of care. Follow up indicated the patient was removed from MHSDS. Clinical rationale for the decisions to remove both of these patients were absent from the discussion, with the rationale being based on the patients' refusal to engage with clinicians and psychiatrists. Consideration of the patients' functioning, treatment course, reasons for being placed in MHSDS, ongoing symptoms, or other clinical considerations were not reviewed. In neither case did the teams review or discuss whether or not the patients' disengagement might indicate a need for a higher level of care.

Similarly, when decisions were made to retain the patients at the 3CMS level of care, there was rarely discussion about their ongoing clinical needs or consideration about the adequacy of the 3CMS level of care to meet their needs.

One IDTT included mention of one measurable treatment goal, yet no interventions were discussed to assist the patient in meeting the goal. Two other meetings included a mention of vague goals without discussion of how goal achievement would be measured or what clinical interventions would be provided to support the patients in meeting those goals. In several cases, there was discussion about what medications were prescribed for the patient and the symptoms being targeted by the medications. In most cases, the patients' diagnoses were listed but rarely discussed, so the consensus of the team could not be ascertained. In three cases, the primary clinicians questioned the diagnoses on record and brief discussions were had. In one case, the primary clinician noted an absence of symptoms related to the patient's diagnoses of schizoaffective disorder and commented that the patient may not have this disorder, only to be reminded by the psychiatrist that the patient was prescribed five medications which were controlling the symptoms. In the other two cases, there were brief discussions about the patients' symptoms and presentations, with diagnostic ideas being presented but not conclusions. In neither case was it clear what the team believed the patients' appropriate diagnoses to be.

One concerning finding was related to a patient who had engaged in self-injurious behavior twice in the week prior to the IDTT meeting. While this patient's IDTT was not observed by the Special Master's expert as the meeting was apparently conducted and completed during the six minutes prior to the Special Master's expert's arrival, the documentation from the IDTT meeting was reviewed. The IDTT documentation made no mention of the patient's recent self-injury and in fact, included text copied from an initial assessment conducted with the patient in January 2025 with the only update being a short phrase noting the fact that the patient was placed in the RHU. Additionally, while suicide risk evaluation updates were completed for the patient following both incidents of self-injury, no safety plan was created with the patient despite

clear indication that the behavior was enacted to influence the patient's environment (i.e., housing change). This lack of appropriate safety planning and treatment planning results in harm to the patient by increasing the risk of self-injurious behavior occurring again.

All psychiatric services provided to patients in the RHU were provided through telepsychiatry. The RHU supervisor reported that this was problematic in managing the RHU patient population day-to-day. Specifically, the supervisor reported that when on-site psychiatrists were assigned to the RHU, they could be contacted in real time to assist with patient needs on the units, including making immediate contact with patients to quickly resolve issues before crises developed. This option was no longer available and requests to have patients be seen by telepsychiatrists required submission of a formal order in EHRS with patients scheduled and seen at a later date. At times this resulted in an escalation of patient behavior requiring crisis intervention and/or frequent patient refusals when the psychiatrist attempted to see the patient at a later time. In these instances, either the patient no longer wanted to see the psychiatrist for the issue that arose days earlier, or the patient was frustrated by the lack of timely response by the psychiatrist.

All telepsychiatrist contacts with patients in the RHU were facilitated by a medical assistant who remained in the room during contacts. There were no reported problems with connectivity. Additionally, the assigned telepsychiatrist was available to complete initial assessments and attend IDTT routinely.

For the 134 patients in CDCR's appointments report for September 1, 2024 to February 28, 2025, there were 174 completed initial or routine IDTTs. When a patient had either an initial IDTT and a routine IDTT or more than one routine IDTT, timeliness in accordance with Program Guide requirements was able to be calculated. Of the 174 completed IDTTs, 41 contacts were

for individuals who had at least two IDTTs (initial and routine or two routines). Of those 41, 31 or 76 percent, occurred past Program Guide requirements with a range of 31 to 147 days. Of note, the report did not include individuals that did not have a completed IDTT, such as those that were not scheduled.

For the 42 patients in CDCR's routine psychiatry appointments report for September 1, 2024 to February 28, 2025, there were 72 completed and refused contacts. Of the 64 completed contacts, 45 or 70 percent were confidential as reported by the institution. Reasons for non-confidential psychiatry contacts included patient refusals and patient no shows.

For the 71 patients in CDCR's appointments report for routine primary clinician contacts for December 1, 2024 to February 28, 2025, there were 246 completed contacts. Of the 246 completed contacts, 46 or 19 percent were confidential as reported by the institution. Reasons for non-confidential primary clinician contacts included patient refused confidential contact and confidential space not available.

When a patient had more than one completed contact, timeliness in accordance with Program Guide requirements was able to be calculated. Of the 246, 176 contacts were for individuals who were seen at least twice by the primary clinician. Of those 176 contacts, 14 or eight percent occurred beyond Program Guide requirements with a range of 11 to 50 days. Of note, the report did not include individuals that did not have completed contacts, such as those that were not scheduled.

There were 246 completed individual completed primary clinician contacts. One contact was completed in zero minutes, 175 contacts were completed between one and 15 minutes, 34 contacts were completed between 16 and 30 minutes, 28 were completed between 31 and 60

minutes, six contacts were completed between 61 and 95 minutes and two contacts were completed longer that 96 minutes.

Overall, mental health services within the RHU were not adequate. While the patients received the required number of treatment hours, the content of groups for EOP patients did not include clinical interventions by a mental health professional and the placement of 3CMS patients into groups was variable and decided unilaterally by custody staff. While individual sessions were confidential when patients attended, the space in which individual contacts were provided on the RHU was non-therapeutic and likely impacted patients' decisions not to attend session out of cell. Lastly, and most seriously, the IDTT meetings were deficient and inadequate to meet the needs of MHSDS patients housed in the RHU. Psychiatric services appeared adequate.

Non-Disciplinary Restricted Housing (NDRH):

During the review period, three 3CMS patients were on NDRH status, and one patient required an expedited transfer.

MHCB:

There was one psychiatrist who provided treatment in the MHCB as well as for both EOP and 3CMS patients in the skilled nursing facility. The psychiatrist had a caseload of 24 patients which exceeded the required ratio. The two MHCB psychologists had caseloads within the established caseload ratios.

The MHCB's daily census averaged 6.7 patients. MHCB clinical lengths of stay averaged 9.1 days, with approximately 13 percent of patients having clinical stays exceeding ten days. MHCB physical lengths of stay averaged ten days with approximately 18 percent of

patients having physical lengths of stay longer than ten days. Reasons for administrative discharge delays included safety concerns, medical holds, and patients refusing to transfer.

There were six patients admitted to the MHCB three or more times.

Review of the 114-A's indicated that patients were offered at least two phone calls per week, two or more showers per week, weekly clothing and linen exchanges, and were receiving a range of 2.25 to 11.75 hours of out-of-cell time per week.

While closed from November 2021 through October 2023, the CCWF MHCB had reopened since the time of the preceding monitoring round. CCWF operated an eight-cell, 12-bed MHCB. While some cells could potentially be double-celled, in practice this was rarely done, due to a combination of clinical and custodial factors, resulting in a typical maximum occupancy of eight patients. As of April 29, 2025, the MHCB contained four patients, with another patient in RHU on MHCB status, who was refusing to transfer. Treatment space included one confidential office, with an ADA-compliant TTM, when required.

While the MHCB currently had 1.0 FTE registry psychiatrist, that contract was slated to end in July 2025. In speaking with the psychiatrist, the reason for the non-renewal of this contract was for personal reasons, not related to CDCR. CCWF noted this departure will require redirecting of one of the four staff psychiatrists to the MHCB, which will impact other programs. In terms of PCs, CCWF MHCB had 1.0 full time-psychologist, 0.7 FTE registry, and 0.5 FTE unlicensed psychologist, who had a waiver from the California Department of Public Health.

Additionally, CCWF had a Skilled Nursing Facility (SNF) with a census of 17, including Coleman class members (13 3CMS and three EOP). The MHCB psychiatrist and the two RTs also provided coverage for the SNF. In terms of PC coverage, a PC from one of the yards covered most cases, with two more acute cases handled by the MHCB psychologists.

*IDTTs*

The CCWF MHCB had six IDTTs scheduled during the monitoring tour. The monitor's expert observed four of these, on April 30, 2025, May 1, 2025, and May 2, 2025. One IDTT occurred prior to arrival, and the monitor's expert stepped out for the remaining IDTT, as it was deemed in the best clinical interest of the patient. All IDTTs were adequate. The IDTTs started on time, without significant delays between patients. The room was appropriate for the stated purpose, with adequate light and was at a comfortable temperature. All required participants were present and had computer access. The assigned PC, psychiatrist, and CC I were present. The CC I was the assigned counselor for the MHCB. They provided useful information in addressing custodial concerns, and issues affecting an upcoming release date. Additional attendees included the inpatient coordinator and the unit custodial officer. The patients sat in a chair outside of the TTM. The psychiatrist and the PC had evaluated the patients prior to the IDTT.

The PC presented information which allowed for a clear, clinical picture of the patient. The psychiatrist was actively involved, instead of simply relegated to speaking about medication management. The team clearly knew their patients. Of particular note, the team was trauma-informed and noted issues particularly germane to female incarcerated persons. The team was empathic, patient-centered, and the patients were given adequate time to express themselves. In one case, due to the severity of the patient's mental health challenges, the IDTT was appropriately truncated, and the patient excused; however, a robust conversation occurred among the treatment team. The team gave an appropriate provisional diagnosis. With limitations based on the clinical status of the patient, the IDTT discussed reasonable, time-limited, goals which were appropriate for the patient's presentation.

Health care records for thirty randomly selected MHCB patients were selected and reviewed to assess compliance with Program Guide timelines for the provision of care.

Thirty randomly selected MHCB patients required initial IDTTs; 29, or 97 percent, occurred within 72 hours of arrival. All reviewed IDTTs had the required staff in attendance. Patients attended 24, or 83 percent, of initial IDTTs but others were held in absentia due to patient refusals.

Of the 32 required routine IDTTs, 23, or 72 percent, occurred timely every seven calendar days following the initial IDTT. One hundred percent of the routine IDTTs had the required staff in attendance. Patients attended the IDTTs one hundred percent of the time.

*Group Treatment*

While not required by the Program Guide, the CCWF MHCB ran groups Monday through Friday, for one hour. The group observed contained three participants. The initial portion, while the RTs were setting up, allowed for socialization and use of the telephone and kiosks. The group itself was an exercise group, with modifications based on the mobility status of the patients. Participants were engaged and actively participated in the activity. The RTs displayed a useful mixture of fluidity, but with appropriate limit-setting and redirection, when required.

For those patients on maximum custody status, the MHCB had two walk-alone yards, allowing for outdoor time. The walk-alone yards did not afford protection from the elements; however, staff reported that a request was made to see if such protection could be obtained. Additionally, this patio had tables to be used for outdoor time for patients not on maximum custody status.

During the workweek, the MHCB team, including mental health, nursing, and custody, performed morning rounds on each patient. This occurred just prior to the morning huddle. On April 30, 2025, the monitor's expert observed the morning MHCB huddle. All required participants were present and actively contributed to the discussion. All team members provided input into safety issues. Medication and medical issues were appropriately addressed. Custody provided helpful information and observations.

*Involuntary Medications*

The MHCB treatment team appropriately considered the need for involuntary medications. Psychiatry addressed pertinent issues surrounding this. Nursing and psychiatry staff denied any challenges with obtaining custody assistance when emergency medications were required.

CCWF reported that admission to CIW-PIP was sometimes delayed, pending a PC 2602 referral. In one example, CIW reportedly told CCWF to consider placing the patient in the MHCB and change the non-emergent application to an acute, despite the non-emergent hearing being the following day.

*Individual Treatment*

Health care records for 30 randomly selected MHCB patients were selected and reviewed to assess compliance with Program Guide timelines for the provision of care.
Thirty random patients' healthcare records were selected to assess compliance with Program Guide timeframes for psychiatry and primary clinician contacts during their stays.

Thirty MHCB patients required initial psychiatry evaluations. Each of the patients had a timely initial psychiatry evaluation, meaning it occurred before the initial IDTT and within 24 hours of arrival. Twenty-nine, or 97 percent, were conducted in a confidential setting which

included 26 held at bedside, two at cell front and one in a group room, as reported by CDCR. Reasons for non-confidentiality were unknown. Telepsychiatry was utilized five times for initial contacts.

All 30 MHCB patients require two routine psychiatry contacts per week. There were 198 expected contacts, and 198 or 100 percent were timely. Of the 198 routine contacts reviewed, 196 were reported as being conducted in a confidential setting which were either held at cell front, bedside, group room or office for a total of 196 or 99 percent compliance as reported by CDCR. One reason for non-confidential routine psychiatry contacts was reported to be cell front "as planned." At CCWF, psychiatrists saw patients more frequently in the MHCB than the primary clinicians. Telepsychiatry was reportedly utilized 25 times for routine psychiatry contacts.

Thirty MHCB patients required initial primary clinician assessments within 24 hours of arrival. No initial primary clinician assessments were found.

Thirty MHCB patients required routine primary clinician contacts. An institution was considered compliant if a patient was seen daily beginning the day after admission for an out-of-cell confidential contact (unless the patient refused) by the psychiatrist or psychologist, though on weekends the patient may be seen by the medical officer of the day (MOD) (12-5-13). There were 266 expected contacts, and 235, or 88 percent, were timely. All 235 of contacts reviewed were reported as conducted in a confidential setting, which included held at cell front, bedside, group room or office as reported by CDCR. Tele-psychologists or tele-social workers were not utilized for routine primary clinician contacts.

<u>Seclusion and Restraint</u>

The institution provided their LOP governing the use of seclusion and restraint within the MHCB. The policy was in line with Program Guide requirements. The institution reported no seclusions or restraints during the monitoring period, with the last prior seclusion or restraint several years ago.

<u>EOP</u>:

One psychiatrist provided treatment for all mainline EOP patients as well as RC patients with a caseload within the established caseload ratio.

There were five primary care clinicians for mainline EOP. All had caseloads within the established caseload ratios.

During the review period the EOP program at CCWF had a maximum capacity of 120 patients and averaged approximately 100 patients. The EOP clinical staff consisted of the EOP program supervisor, two psychiatrists, two licensed psychologists, three LCSWs, one LMFT, and six RTs. The psychiatrists at CCWF were on-site. EOP patients were housed on B-yard in building 508. The EOP treatment clinic was on A-yard in the same building as RHU.

Treatment spaces for EOP patients were adequate and one EOP primary clinician had their own office where they saw patients for 1:1 contacts, which provided adequate confidentiality.

There were two group treatment rooms in the EOP clinic. The group treatment rooms could accommodate up to 15 patients, provided audio confidentiality, and were at the end of the hallway with little to no passing foot traffic. The RTs and program supervisor reported the RTs often compete for space to run their groups and on several days per week they use the visiting area and housing unit day room.

The monitor's expert observed 12 EOP IDTTs. The IDTTs were well staffed and included the primary clinician, psychiatrist, EOP program supervisor, RT, psych tech, inpatient/SPRFIT coordinator, and CC I. The treatment team was very collaborative, and each member actively participated. The discussion flowed naturally, and the treatment team demonstrated strong rapport with the patients and with each other. The IDTTs were comprehensive and each IDTT was 20-30 minutes in length, and all were adequate and met audit criteria.

The Program Guide requires that EOP patients receive an initial IDTT within 14 days of arrival or level of care change and a routine IDTT every 30 days thereafter. *See* ECF No. 7333-1 at 59.

The healthcare records of 30 mainline EOP patients were randomly selected to assess compliance with Program Guide timeframes for initial IDTTs. Of the thirty patients who required initial IDTTs, 29, or 97 percent, occurred timely within 14 days of arrival or level of care change. All 30 IDTTs were attended by a full complement of required staff members and all but one IDTT were attended by the patients. That one patient was out to court.

To measure timeliness of routine IDTTs during the review period, CDCR produced an appointments report that included individuals who were required to receive a routine IDTT from September 2024 through February 2025. For the 181 patients in CDCR's appointments report, there were 319 completed routine IDTTs and no refusals. When a patient had either an initial IDTT and a routine IDTT or more than one routine IDTT, timeliness in accordance with Program Guide requirements was able to be calculated. Of the 319 routine IDTTs that were completed, four, or five percent, were not compliant with Program Guide timeframes.

During the review period, mainline EOP patients were offered on average of 13.93 of STAs hours per week, attended on average 7.39 hours per week, refused on average 6.98 hours per week, and on average 2.69 hours per week were cancelled. Only three mainline EOP patients were offered fewer than ten hours per week of STAs at the time of the site visit. They were offered an average of 9.68, 9.67, and 6.5 hours per week.

There were five patients placed on EOPMod during the review period. They were offered on average 2.52 hours per week, attended on average 1.86 hours per week, refused on average .66 hours per week, and on average .26 hours per week were cancelled.

EOP patients were offered four clinical groups which were appropriate for the EOP population, and the patients were assigned and placed in groups within 14 days of their arrival to the program. The monitor's expert observed five groups which included including an Intro to EOP group, two clinical groups, and two RT groups. The clinical groups were well facilitated, clinically appropriate, and the group members actively participated and appeared to benefit from the group content and psychoeducation. The RT groups were a CALM group and Art Expressions group. The CALM group involved watching a movie. The Art Expression group was held in the dayroom of the housing unit. The RT provided the patients with drawing materials, but the activity was not organized or actively facilitated.

The Introduction to EOP group was facilitated by a primary clinician, peer support individual, an RT, and a custody Sergeant. The primary clinician, RT, and peer support individual were active in facilitating the group and responding to patient questions about the program. The custody sergeant did not participate. The group was adequate and appeared to benefit the patients.

EOP patients were offered several other therapeutic and rehabilitative activities including ISUDT, CCTRP, NLTGs, education, and jobs. CCWF offered 21 NLTG groups for EOP patients. There were 109 unique EOP patients enrolled in the NLTGs. Due to the conflicting times groups were conducted, NLTGs were not observed on the yard. Nursing leadership stated there were no groups for "C" status patients.

It was reported that frequent alarms prevented EOP patients from being able to attend treatment with all EOP treatment activities significantly affected by the alarms. EOP primary clinicians reported they frequently went to the housing unit on B-yard to provide 1:1 contacts when they could not get their patients to the treatment building. They also reported that when there was not a trained EOP custody officer in the housing unit, there were more frequent refusals because there was less encouragement to attend treatment. The EOP program supervisor described frequent incidents where lower functioning patients were manipulated and victimized by higher functioning patients who were likely inappropriate for EOP, making the lower functioning patients afraid to leave the housing unit.

The Program Guide requires that patients are offered an initial psychiatrist evaluation before their initial IDTT and within 14 calendar days of arrival to the institution or level of care change. *See* ECF No. 7333-1 at 59. Thereafter they are required to receive a routine psychiatric contact every 30 calendar days. *Id*. Patients are also required to receive a primary clinician evaluation within 14 calendar days of arrival and weekly (i.e. every ten calendar days) with either a primary clinician or in group psychotherapy with an individual contact every other week. *Id*.

Thirty mainline EOP patients who required initial psychiatry evaluations were randomly selected to assess compliance with Program Guide timeframes for initial psychiatry contacts

during their stays. For these 30 EOP patients, 27 or 90 percent had a timely initial psychiatry evaluation meaning it occurred before the initial IDTT and within 14 calendar days of patient arrival or a change in the level of care. Twenty-six, or 87 percent, were conducted in a confidential setting. Reasons for non-confidentiality included patient refusals and missing contacts. Telepsychiatry was not utilized for initial psychiatry evaluations.

To measure timeliness of routine psychiatry contacts during the review period, CDCR produced an appointments report that included individuals who were required to receive a routine psychiatry contact from September 2024 through February 2025. For the 138 patients in CDCR's appointments report, there were 354 completed and refused contacts, 323 or 93 percent were conducted in a confidential setting. When a patient had more than one completed or refused contact, timeliness in accordance with Program Guide requirements was able to be calculated. Of the 347 completed contacts, 217 were for individuals who were seen at least twice by the psychiatric provider. Of those 217 contacts, there were 165, or 76 percent, that occurred beyond Program Guide requirements.

For the thirty randomly selected EOP patients that required initial primary clinician evaluations, 28, or 93 percent, were completed within 14 calendar days of arrival or a change in level of care. Twenty-four, or 80 percent, of initial primary clinician evaluations were conducted in a confidential setting. Documentation indicated non-confidential contacts were due to patient refusals and missing contacts. No initial primary clinician evaluations were conducted utilizing tele-mental health.

To measure timeliness of routine primary clinician contacts during the review period, CDCR produced an appointments report that included individuals who were required to receive a routine primary clinician contact from September 2024 through February 2025. For the 137

patients in the appointments report, there were 1,057 completed and refused contacts, of which 820, or 78 percent, were confidential. When a patient had more than one completed or refused contact, timeliness in accordance with Program Guide requirements was able to be calculated. Of the 1,056 completed contacts, 921 contacts were for individuals who were seen at least twice by the primary clinician. Of the 921 total number of contacts, there were 41, or four percent, that occurred beyond Program Guide requirements.

There were 1,056 completed individual PC contacts of which nine were listed as occurring in less than zero minutes, 15 were reported to have been completed in less zero minutes, 388 were completed within 15 minutes, 329 were completed between 16 to 30 minutes, 313 were completed between 31 to 60 minutes, one was completed between 61 to 95 minutes, and one was completed in greater than 95 minutes.

<u>3CMS</u>:

Three mainline 3CMS psychiatrists provided treatment for patients with caseloads between 215 and 412 and only one of the psychiatrists had a caseload within the established ratio. CCWF does not track psychiatrist's caseloads whose patients were not on medication for six months.

There were ten primary care clinicians and eight had caseloads above the established caseload ratio.

The 3CMS program is staffed by psychiatrists, a psychologist, clinical social workers, a marriage and family therapist, recreational therapists, occupational therapists, and medical assistants. Staffing documentation provided prior to the site visit indicated that 3CMS staffing was distributed across disciplines as follows: one tele-social worker, one tele-psychologist, a

marriage and family therapist, an occupational therapist, two recreational therapists, two medical assistants, six clinical social workers, and three psychiatrists.

It was reported that the pre-release programs were fully staffed with ten social workers/clinicians and 2.5 FTE on-site psychiatrists.

The primary clinicians managed caseloads ranging from 107 to 113, which were manageable. One clinician had a smaller caseload due to also working on the Crisis Intervention Team after 5:00 pm.

While on-site, weekly huddles were observed for the D and C Yards, which demonstrated familiarity with patients and enhancing collaborative efforts.

It was reported that the primary barrier to timely mental health treatment for patients at 3CMS is the difficulty of getting the patients to their appointments on time due to insufficient custody staff. With only two officers supervising 200 patients per unit, frequent alarms and yard shutdowns, coupled with staffing shortages stemming from officers' absences, often leaving units with just one officer. This led to programming delays, further compromising patients' ability to attend scheduled appointments and significantly impeding their access to necessary programming.

Patients on closed custody status (also known as "C" status," "C/C status," and now referred to as "ACT") were housed in Building 503, as of March 4, 2025. "C" status patients were flagged by custody for frequently refusing treatment or assignments, and or causing frequent alarms. Patients could be placed on "C" status for anywhere from 90 to 180 days, during which their privileges were revoked. At that time, with this new unit, clinicians were pulled in different directions. They were having to meet with patients on their caseloads on "C" status in Building 503, and it was reported that the custody partnership was not happening.

One 3CMS clinician reported that patients assigned to C-status received minimal treatment, even less than patients housed in the RHU. Additionally, the 3CMS clinician also noted an uptick in consult requests, often multiple per week for a single patient. Due to numerous complaints regarding mental health staff, clinicians had recently received a directive that required "all consults" to be addressed on the same day, further pressuring the clinicians and potentially interfering with primary clinicians to complete other duties, such as one-on-one primary clinician contacts.

Building 812 housed the 3CMS mental health treatment area, which included group therapy spaces and mental health offices. The treatment rooms were well-lit, comfortable, and spacious, ensuring confidentiality for IDTT meetings and group sessions.

During the site visit, observations of IDTT meetings for patients located in B, C, and D Yards were conducted, with one patient from A Yard also present. Of the 11 IDTTs observed, three IDTTs had all participants present in person, while one included a social worker participating virtually, and seven had a psychiatrist participating virtually. The providers participating through telehealth remained easily visible and audible throughout the IDTTs. Each in-person provider utilized their computers effectively during the IDTT proceedings.

Although the observed IDTTs were generally adequate, their quality varied among clinicians and sometimes lacked key components. Of the 11 observed IDTTs, three included all assigned providers, while the remaining seven had an alternate psychiatrist present; one patient was noted to have not been assigned a psychiatrist at the time of the IDTT. Out of the 11 observed IDTTs, three were held in absentia, and three focused on patients preparing for transfer to FRCP or impending parole within two weeks.

The IDTT team collaborated effectively, with all participants actively supporting each patient, answering questions, and providing education. Patient inquiries were addressed, and clinicians and the CCI displayed genuine compassion in their interactions, demonstrating a strong rapport with most patients.

Most IDTTs included essential elements, such as the patient's psychiatric history, diagnosis, prescribed medications, and treatment targets, along with their current classes/work/substance use programming. However, certain areas were not consistently addressed. Eight out of 11 cases failed to include specific measurable goals for monitoring during primary clinician contacts. While general interventions like meetings with the primary clinician, psychiatrist, or attendance at programs were discussed, seven out of eleven cases omitted specific therapeutic interventions to be utilized to help patients achieve their goals. Additionally, three of the eleven cases did not adequately address symptoms supporting the patient's diagnoses.

Initial IDTTs for 3CMS patients are required to occur within 14 calendar days of arrival to the institution or level of care change and annually thereafter. *See* ECF No. 7333-1 at 44.

Thirty patients who required initial IDTTs were randomly selected to determine compliance with Program Guide timelines. Of the 30 patients, six, or 20 percent, occurred timely within 14 calendar days of arrival or level of care change. Twenty, or 67 percent, were attended by all required staff and ten, or 33 percent, were attended by the patients. Reasons initial IDTTs were held *in absentia* included patient refusals, missing contacts and conflicting appointments.

To measure timeliness of routine IDTTs during the review period, CDCR produced an appointments report that included individuals who were required to receive a routine IDTT from

September 2024 through February 2025. Of note, the appointments report did not account for delays between appointments attributable to movements in and out of CCWF. For the 735 patients in CDCR's appointments report, there were 782 completed initial or routine IDTTs. When a patient had either a completed initial IDTT and a routine IDTT or more than one routine IDTT, timeliness in accordance with Program Guide requirements was able to be calculated. Of the 782 completed IDTTs, 49 contacts were for individuals who had at least two IDTTs. Of those 49, all occurred within Program Guide requirements.

A random sample was selected to verify consistency of appointment dates as reported in the appointments report and the presence of clinical documentation in EHRS. Of the 33 contacts reviewed in EHRS, 27, or 82 percent, were consistent with the appointments report.

The Program Guide requires that patients are offered an initial psychiatrist evaluation before their initial IDTT. *See* ECF No. 7333-1 at 34-50. Thereafter they are required to receive a routine psychiatric contact every 90 calendar days if the patient is prescribed psychotropic medication. *Id*. Patients are also required to receive a primary clinician evaluation within 14 calendar days of arrival and every 90 calendar days thereafter. *Id*.

Thirty patients who required initial psychiatry evaluations were randomly selected to determine compliance with Program Guide timelines. Of the 30 patients, six, or 20 percent, occurred timely before the initial IDTT. Seventeen, or 57 percent, of the reviewed initial psychiatry evaluations were conducted in confidential settings. Non-confidential contacts were due to patient refusals and missing contacts. Telepsychiatry was utilized for six, or 20 percent, of initial psychiatry evaluations. Contact with the assigned clinician could not be determined.

To measure timeliness of routine psychiatry contacts during the review period, CDCR produced an appointments report that included individuals who were required to receive a

routine psychiatry contact from September 2024 through February 2025. For the 804 patients in CDCR's appointments report, there were 1,692 completed and refused contacts, 1,109, or 65 percent, of the completed contacts were confidential as reported by the institution. Reasons for non-confidential psychiatry contacts included patients seen bedside, in the day room or on the yard.

When a patient had more than one completed or refused contact, timeliness in accordance with Program Guide requirements was able to be calculated. Of the 1,692 completed contacts, 890 contacts were for individuals who were scheduled at least twice by the psychiatric provider. Of those 890 contacts, 76 or nine percent occurred beyond Program Guide requirements.

A sample of 30 patients was randomly selected to verify consistency between the appointments report and clinical documentation in EHRS. Of the 62 contacts reviewed, 58, or 94 percent, were consistent with the appointments report. Inconsistencies included possible duplicate posting of appointments in the report that were not duplicated in EHRS.

Thirty patients who required initial primary clinician evaluations were randomly selected to determine compliance with Program Guide timelines. Of the 30 reviewed initial primary clinician evaluations contacts, seven, or 23 percent, were completed within ten calendar days of arrival or change in level of care. Twenty-one, or 70, percent of reviewed initial primary clinician evaluations were conducted in a confidential setting. Non-confidential contacts were due to patient refusals and missing contacts. Telemental health was not utilized.

To measure timeliness of routine primary clinician contacts during the review period, CDCR produced an appointments report that included individuals who were required to receive a routine primary clinician contact from September 2024 through February 2025. For the 1,033 patients in the appointments report, there were 2,291 completed or refused contacts with 786, or

58 percent, of the completed contacts being confidential as reported by the institution. Reasons for non-confidentiality included patient refusing confidential contacts, confidential space not available, and custody and mental health modified programming.

When a patient had more than one completed or refused contact, timeliness in accordance with Program Guide requirements was able to be calculated. Of the 2,291 contacts, 1,261 contacts were for individuals who were seen at least twice by the primary clinician. Of those 1,261 contacts, 212, or 17 percent, occurred beyond Program Guide requirements with a range of 91 and 165 days.

There were 2,260 completed individual PC contacts, of which 55 were documented as lasting than zero minutes, 926 were completed in under 15 minutes, 602 were completed between 16 and 30 minutes, 522 were completed between 31 and 60 minutes, 135 were completed between 61 and 95 minutes, and 20 were documented as occurring 96 minutes or longer.

A random sample of 30 patients was selected to verify consistency of appointment dates as reported in the appointments report and the presence of clinical documentation in EHRS. Of the 88 contacts reviewed in EHRS, 84, or 95 percent, were consistent with the appointments report; four, or five percent, had discrepancies which included some appointments report entries that were not documented in EHRS.

Regarding group treatment, mainline 3CMS patients were offered groups during the review period. There were three to four groups offered each day, with five to ten patients assigned to each group. Recreational therapists reported that only one group currently had a waitlist. Additionally, nurse-led groups were also available during the review period.

During the site visit, two recreational therapists actively engaged with patients and facilitated group sessions that included groups focused on coping skills, social skills, EOP transitions, DDP, creative arts, music appreciation, palliative care, leisure awareness, meditation, and life without parole/lifer group. The 3CMS supervisor, a licensed clinical social worker, facilitated a group that provided additional support to peer support providers in their roles and included both GP and 3CMS patients.

Observation of group sessions showed that groups started and ended on time. However, during the site visit, the monitor expert attempted to attend the EOP Transitions group, which was specifically designed for patients transitioning from EOP to 3CMS. The group had four assigned patients, but no patients were present. It was subsequently learned that two patients had transferred/paroled, and two patients had been absent for several weeks.

Two recreational therapists facilitated an art and expression group, and they were well-prepared and established a strong rapport with the participants in the group.

One of the recreational therapists facilitated the Leisure and Activity group, which was attended by two patients who had started the group two weeks prior.

Overall, the group topics were appropriate for the target population and aligned with the planned topics; however, the actual content of observed groups was recreational in nature.

During patient interviews, most patients interviewed requested more groups, such as the Art Expression group, which currently had a waitlist at the time of the site visit.

<u>Other Issues</u>:

<u>Pre-Release Planning</u>:

The pre-release supervisor and the pre-release coordinator over C and D Yards reported on the pre-release program. The pre-release program collaborated with Cal-AIM since April 2025.

There was one pre-release coordinator supervisor overseeing a pre-release coordinator over the RC, one pre-release coordinator over the EOP and skilled nursing facility (SNF) unit, and one pre-release coordinator over the C and D Yards.

The duties of the pre-release coordinators included but were not limited to, conducting the pre-release planning assessments, face to face contacts, assessing the patient's ability to navigate the public transit systems, the possibility of a 5150 evaluation, PC 2602, patient's housing requests and needs. The pre-release coordinator would also coordinate with TCMP, the division of rehabilitative program (DRP) and parole service associate (PSA) who were responsible for providing Cal-ID through the Automated Reentry Management System (ARMS) database where information was stored. The pre-release coordinators met with ISUDT weekly and attended monthly meetings with headquarters.

There was no pre-release groups provided to MHSDS patients during the review period. as they had only begun in January 2025 and were conducted on Mondays by a recreational therapist and offered to all MHSDS patients.

During the review period, there were 182 patients who paroled, and 246 patients released to probation. There were 195 Cal IDs provided to patients during the review period. The pre-release coordinator was unable to provide the number of pre-release planning assessments conducted in the review period, but stated most, if not all, assessments were conducted unless the patient was released early.

The pre-release coordinator reported having good rapport with all disciplines.

The TCMP documentation reported 318 3CMS and 42 EOP patients were screened during the reporting period. Nineteen patients refused TCMP services; 28 patients had access to other resources, and seven were unavailable or ineligible. Applications for Medi-Cal were submitted for 306, or 85 percent, of patients, while SSI applications were submitted on behalf of 75 or 20.8 percent of eligible patients. There were three patients who applied for veterans' benefits.

Program Access:

a. Job and Program Assignments:

CCWF reported that 951 job assignments were held by 34 or 37 percent of EOP patients, 544 or 44 percent of 3CMS patients, and 373 or 51 percent of non-MHSDS incarcerated persons.

The 711 academic assignments were held by 32 or 34 percent of EOP patients, 459 or 37 percent of 3CMS patients, and 220 or 30 percent of non-MHSDS incarcerated persons.

Of the 120 vocational education assignments, none were held by EOP patients, 92 or eight percent of 3CMS patients held them, as did 28 or four percent of non-MHSDS incarcerated persons.

The 807 voluntary education assignments were held by two or two percent of EOP patients, 470 or 38 percent of 3CMS patients, and 335 or 45 percent of non-MHSDS incarcerated persons.

The 214 substance abuse treatment assignments were held by seven or eight percent of EOP patients, 153 or 12 percent of 3CMS patients, and 54 or seven percent of non-MHSDS incarcerated persons.

b. Milestone Credits

CCWF reported that 66 EOP and 17 3CMS patients who were eligible to earn milestone credits earned them.

c. Out-of-Level Housing

CCWF reported that there was no out-of-level housing as all housing levels resided together.

d. ADA Reasonable Accommodation and Grievance Procedure

CCWF provided an updated reference training manual for ADA accommodations, as well as attendance sheets for training on accommodation and grievance procedures. CDCR regional team reported that they were unable to disaggregate the data in order to compile training percentages.

e. Periodic Classification Score Reductions: EOP Patients

CCWF provided copies of CDCR Form 840s that indicated that it was providing periodic classification score reductions for EOP patients.

f. Unclothed Body Search:

Unclothed body searches occurred every time an incarcerated person enters or leaves the institution. Searches were conducted three at a time in one room with privacy screens separating the persons who were being searched. Female custody officers conducted the searches.

"C" Status:

It was reported that incarcerated individuals placed on "C" status were being housed in Unit 503 in A Yard. Custody staff reported that the reason for placing incarcerated individuals designated as "C" status together on a single unit was due to the institution's layout and inability to monitor the limited privileging.

Incarcerated individuals were first moved into this unit as a result of being placed on "C" status on March 10, 2025. A local procedure entitled, "Accountability, Change and Transformation (ACT) Program" was provided which indicated approval signatures from the

Chief Executive Officer dated April 23, 2025, and the Warden dated April 28, 2025, one day before the Special Master's team site visit.

The chief of mental health reported that she advised the institutional leadership about the problems that had occurred in the past when "C" status patients were housed together on a single unit.

This local procedure resulted in the segregation of individuals on "C" status into a single housing unit (Unit 503) where patients were required to wear pink jumpsuits, allowed limited property, no family visits, restricted tablet content including no communication via email and video calls, one phone call per week only with pre-approval, no packages, and tens hours of exercise per week. Despite the fact that nearly 90 percent (40 of 46) of these individuals were on the mental health caseload, there appeared to have been no consideration of the impact on mental health and behavior needs of the population.

Unlike placement in the RHU, there was no requirement for a pre-placement screening to be completed before placement in this restricted and isolating setting, nor was there a requirement for an initial primary clinician assessment, an initial psychiatric assessment, or an initial IDTT meeting upon placement in this location for patients at the 3CMS level of care[78]. Additionally, there was no requirement for 3CMS patients in the ACT program to receive daily rounding by a psychiatric technician, individual primary clinician contacts every week, a 90-minutes of confidential structured group therapeutic activity weekly, or 18.5 hours per week of recreational time outside their cells, all of which were currently required for patients at the 3CMS level of care while in the RHU. Further, while the local procedure stated that 3CMS

---

[78] Title 15 and local procedure required an IDTT for EOP level of care patients placed on "C" status.

patients would continue to have access to mental health programming, this was not the practice. As mainline 3CMS programming was offered on B Yard, patients confined to the ACT program could not access programming on B Yard. Mental health appointments were poorly tracked, and conflicting statements came from custody, mental health, and 3CMS patients about access to mental health services. There were no staffing allocations for mental health staff to provide services to mainline 3CMS patients on A Yard nor on Unit 503 specifically.

Further, the placement of all incarcerated individuals on "C" status within a single housing unit routinely disrupted programming for all incarcerated individuals on A Yard and negatively impacted access to care beyond the individuals on "C" status. It was observed and reported during the site visit that multiple alarms were activated daily on the unit housing "C" status individuals. These alarms required available custody staff to report to the unit, essentially closing down programming until resolution of the crisis which necessitated the alarm. A Yard also housed the RHU, a medical clinic, and the Reception Center, which had their own share of emergencies resulting in yard closures. Taken together, the housing of these three populations on a single yard resulted in over 200 alarms during the month of the site visit, significantly and seriously impacting the delivery of mental health services to patients on A Yard. Moreover, the mainline EOP programming building was located on A Yard, while the mainline EOP patients were housed on B Yard. When there were alarms and closures on either yard, mainline EOP patients could not access mental health services as both groups and individual sessions were provided in the EOP programming building on A Yard. This programming building was also where groups were provided to RHU patients and alarms resulted in cancelled treatment hours for RHU patients as well.

Lastly, the constant alarms, emergencies, and disruptions in care increased the workload for the clinical staff working in the reception center who were responsible for responding to crisis calls for "C" status patients. The telepsychiatrists assigned to the RHU and RC also reported being asked to provide services to patients on "C" status, impacting their ability to provide routine care to their assigned patients. Both on-site and remote clinical staff expressed serious concerns about the negative impact of this housing unit on access to care for all mental health patients at CCWF.

The monitoring team did not have an opinion about the "C" status but had concerns about the segregation nature of the unit where they were housed, the length of isolation and further the demeaning act of having the patients wear pink letting all know they were program failures.

Case by Case Reviews:

CCWF reported that 11 patients met the requirement for 120-day pre-MERD reviews. All patients had timely ICCs, and seven patients required CSR review. Seven patients received extensions due to pending RVR adjudications or investigations and four patients were released back to their respective mainline housing placements. None of the patients qualified for NDRH status.

Three patients met the requirement for 150-day reviews. One patient was retained pending a 30-day review, one patient was retained for 60 days pending DRB referral, and the remaining patient was retained for 30 days pending RVR adjudication. One patient was pending transfer.

Mental Health Referrals:

CCWF reported an overall compliance rate of 85 percent for timely responding to mental health referrals. Primary clinicians responded timely to emergent and urgent mental health

referrals with compliance rates of 92 percent and 90 percent respectively. Notably, primary clinician routine referrals were close to compliance at 89 percent. Psychiatry did not respond timely to emergent, urgent, or routine mental health referrals with compliance rates of zero percent (only one emergent referral), 53 percent and 70 percent respectively. A work group had been created to address untimely MHMD initial psychiatry appointments in mainline 3CMS. As part of this mission, the group had looked at demands versus resources and found that the MHMD staffing allocation for CCWF was as not sufficient; as such, the MHMD staffing allocation may also be affecting timely response to MHMD referrals.

Mental health referrals were tracked in EHRS using both digital and paper tracking at CCWF.

Custody and Mental Health Partnership Plan:

CCWF's custody and mental health partnership plan LOP complied with statewide policy and was revised in November 2024.

Executive leadership joint rounding occurred every month during the review period. The rounding forms produced indicated that required staff attended and staff and patients were interviewed.

Executive staff meeting agendas indicated that individual staff reported out regarding their specific titles/positions. Monthly QMC and MHPS meeting minutes were provided as required and each discussed joint rounding in detail.

Monthly joint supervisory program area tours occurred for all six months on Facilities A, B, C, and D. Required staff attended each tour. Staff noted concerns about individual patients. Patients noted maintenance-related concerns such as the need for a new roof and bad air quality

on Facility B, good relationships with custody staff, yet some patients mentioned issues with custody staff who were covering certain units.

Huddles were observed during the site visit and were attended by required staff. The huddles were marginally collaborative and informative. Reviewed huddle forms from the review period were adequate with required staff in attendance.

CCWF distributed the 3CMS orientation brochure to new patients and provided a copy of the same.

Inmate advisory council meeting minutes were produced for each month of the review period. Agenda items included, technology updates, the need for new materials, issues regarding yard or dayroom times, feedback regarding the timelines for new additions such as furniture or structures, etc.

The institution reported that there were 222 custody and four mental health staff misconduct allegations during the review period. Patient allegations included unprofessional staff conduct, integrity, retaliation, discrimination or harassment, sexual misconduct, dishonesty, use of force, code of silence, safety concerns, and other misconduct. No staff were reassigned due to a patient complaint.

Quarterly roundtable training attendance sheets were reportedly not tracked locally.

Annual partnership off-post training was attended by 239 of 279, or 86 percent, of mental health and 527 of 594, or 89 percent, of custody staff.

<u>Heat Plan</u>:

Review of CCWF's heat plan LOP indicated compliance with April 8, 2024 headquarters' directive.

The heat plan was in effect for the months of September 2024 and October 2024 during which corresponding Monthly Summary Reports reported 24 Stage I, but no Stage II or III heat alerts. No patients were reported to have experienced heat-related illnesses during the review period.

Interviewed custody officers in 13 housing units varied in their level of knowledge about heat plan protocols and their responsibilities at the three respective heat plan stages with officers in D yard having to be prompted by the monitor to respond accurately. Working thermometers were visible in toured housing units. Per LOP M0129, the first watch commander sent out the patient heat medication list every day. Heat logs and patient heat medication lists were appropriately visible in all yards except D yard. CCWF provided a sample of indoor and outdoor heat logs which were completed appropriately.

CCWF custody officers reported that depending on available staff and the housing unit's equipment, during Stage II heat alerts, large fans were set up to blow air directly down hot unit halls to cool off patients, while cell doors were kept open to allow the breeze to enter. Custody officers also reported that per a July 12, 2024 memorandum, cooling stations and the expansion of available ice water to all incarcerated persons were offered during State II and Stage III heat alerts.

CCWF reported annual mandatory heat-related pathologies training was attended by 178 or 88 percent of custody staff and 178 of 234 or 76 percent of mental health staff.

<u>RVRs</u>:

CCWF issued 4,382 RVRs during the review period, of which 3,547, or 81 percent, were issued to MHSDS patients. Specifically, four RVRs were issued to intermediate care patients, 25

were issued to MHCB patients, 279 were issued to EOP patients, and 3,239 were issued to 3CMS patients.

The monitor reviewed 21 RVRs to assess compliance with CDCR policy. Custody staff timely referred the MHA to mental health staff within two days in ten, or 48 percent, of reviewed cases. Mental health staff timely completed and returned the assessment to custody within eight days in 17, or 81 percent, of reviewed cases. The senior hearing officer documented consideration of the MHA in all reviewed cases.

Mental health staff recommended mitigation in four, or 19 percent, of reviewed cases and the SHO mitigated the penalty pursuant to the assessment in three of four cases. The most frequent assessment recommendation concerning mitigation was no loss of yard, which 75 percent of assessments recommended.

None of the MHAs recommended alternative discipline due to patients' mental illness significantly contributing to the behavior documented in the RVR. Rather, one MHA explained that mental health and developmental disability/cognitive symptoms contributed to the behavior in the RVR, but the SHO decided to find the patient guilty due to the nature of the offense.

As for MHA training, the warden, two correctional administrators, two CC Is, two CC IIIs, 19 lieutenants, 52 sergeants, and 340 correctional officers received the training. All custody staff positions were reportedly 100 percent compliant with training aside from correctional officers of which 340 of 380, or 89 percent, received the training. Notably, 34 additional (not included in the 340) correctional officers were reportedly in the process of completing the training.

CCWF did not provide training data for mental health staff.

Use of Force:

CCWF reported that there were no controlled use of force incidents involving MHSDS patients during the review period. There were 276 immediate use of force incidents involving MHSDS patients during the reporting period.

Fourteen reviewed immediate uses of force involving MHSDS patients were found to be in compliance with CDCR policy.

As for attendance at the required use of force training, the warden, chief deputy warden, and four correctional administrators, four captains, 25 lieutenants, 62 sergeants, all attended the required training, as did 449 of 450 correctional officers. For mental health staff, the training was attended by one of 15 psychologists, one of 11 psychiatrists, and four of 20 social workers, and two of 28 Sr. PTs/PTs.

Lockdowns/Modified Programming:

CCWF did not have any PSR's during the reporting period.

Access to Care:

A review of CCWF's monthly Health Care Access Quality Reports from September 1, 2024, to February 28, 2025, reflected the issuance of 52,522 mental health ducats and add-on appointments, of which 38,741, or 74 percent, were completed and 13,781, or 26 percent, were not completed. Of the non-completed appointments, 347, or three percent, were reportedly not completed due to custody factors, 8,035, or 58 percent, were due to non-custody factors, and 5,399, or 39 percent, were due to patient refusals.

*Coleman* Postings:

There were *Coleman* postings in every toured housing unit in both Spanish and English.

**APPENDIX A – 16**
**FOLSOM STATE PRISON (Folsom)**
Site Visit: March 25, 2025 – March 27, 2025
Review Period: August 1, 2024 – January 31, 2025

Census:

On March 25, 2025, Folsom housed 2,801 incarcerated individuals, a negligible increase (less than one percent) compared to the preceding review. *See* Thirtieth Round Monitoring Report – Part D, ECF No. 8359 at 365. However, the 615 MHSDS patients represented a 56 percent increase from the preceding monitoring round; these 615 patients comprised 22 percent of the institution's population. *Id*.

There were 411 mainline 3CMS patients, 190 3CMS patients housed in the MSF, and 14 3CMS patients in the RHU awaiting transfer.

Staffing:

The chief psychiatrist position was filled. There were no functional vacancies among staff psychiatrist positions as Folsom had one allocated staff psychiatrist position and 3.5 psychiatrists working on staff. One psychiatrist was on long term leave.

Folsom did not have any allocated telepsychiatry positions.

Two of 2.5 chief psychologist positions were filled leaving a 20 percent vacancy rate. The senior psychologist and two senior psychologist specialist positions were filled. Of the seven staff psychologist positions, four were filled, leaving a 43 percent vacancy rate.

The supervising social worker position was filled. Of 4.5 social worker positions, four were filled leaving an 11 percent vacancy rate. The tele-social worker position was vacant. Overall, accounting for on-site and tele-mental health positions, there was a 27 percent functional vacancy rate among social worker positions.

One recreation therapist filled the 0.5 allocated recreation therapist position.

The senior psych tech position was filled. Three of 3.5 psych tech positions were filled, leaving a 14 percent vacancy rate.

Two of three MHSDS clerical positions were filled, leaving a 33 percent vacancy rate. The OSS II, HPS I, and HPS II positions were all filled.

The 11 supervising registered nurse positions were filled. Of 21 LVN positions, 20 were filled; a contractor filled the additional position. The CNA position was filled.

As for custody staffing, the warden position was filled. The chief deputy warden position was vacant. The four associate warden positions were filled; one associate warden was acting out of class, leaving one functional vacancy. The five captain positions, 23 of 25.6 lieutenant positions, and 56 of 60.8 sergeant positions were filled. Fifteen of 19 CC I and 9 CC II positions were also filled; two CC IIs were acting out of class, leaving two functional vacancies. All 438.8 correctional officer positions were filled.

<u>Tele-Mental Health</u>:

Telepsychiatry was not utilized during the review period except for after hours on-call coverage. There was no telepsychiatrist on staff during the monitoring period or at the time of the site visit.

Folsom did not have any tele-mental health providers at the time of the monitoring tour. The allocated tele social worker position was vacant. None of the clinicians worked a hybrid schedule that included off-site telework.

<u>Staff Recruitment</u>:

Folsom provided a list of staff recruitment initiatives implemented by CCHCS Human Resources including hiring above minimum, increased marketing, recruitment and retention pay differential and various bonuses.

Quality Management:

A Local Governing Body committee was not required during the review period.

The Quality Management Committee (QMC) met monthly during the review period and quorums were achieved at each meeting. The CEO served as the chairperson of the QMC, and a senior psychologist specialist was the facilitator. Mental health leadership attended monthly as a voting member.

A review of the monthly meeting minutes revealed the QMC agenda included discussion of improvement projects, integrated substance use disorder treatment (ISUDT) reports, subcommittee reports, including mental health program sub-committee (MHPS), suicide prevention & response focus improvement team (SPRFIT), emergency medical response review committee (EMRRC), Patient Safety, Nursing Program, Medication Management, Dental Program, Institutional Utilization Management, and custody and mental health partnership program (CMHPP) audits. The QMC minutes were comprehensive and outlined interventions when needed. The quarterly report by the MHPS to the QMC during the review period included discussion of non-compliant metrics for initial psychiatry contacts due to the increased number of 3CMS patients in the MSF. Further, the EMMRC's quarterly report covered the death of a patient in September and the faulty AED machine, indicating the SPRFIT would monitor efforts to repair the machine.

The MHPS was chaired by the chief of mental health, met monthly during the review period, and achieved quorums at each meeting. The MHPS reported to the QMC quarterly. During the review period there were three acting chiefs of mental health; the current chief of mental health started in January 2025. The MHPS discussion topics included a review of prior meeting minutes, action items, peer and supervisory reviews, improvement priorities, LOPs,

staffing, training, program functioning, review of caseloads, CMHPP, custody updates, and SPRFIT reports and audits. The meetings also addressed metrics and internal improvement teams addressed the areas needing improvement.

The EMRRC met monthly and reported to the QMC quarterly during the review period. The meetings were jointly chaired by nursing and the chief physician and surgeon. Mental Health representation included the chief of mental health and the chief psychiatrist. Topics followed the statewide template and included approval of prior meeting minutes and review of transports, overdoses, suicide attempts, emergency medical devices, and drills. The EMRCC reviewed a suicide by hanging that occurred on September 22, 2024. The incarcerated person who died by suicide was not an MHSDS participant and reportedly had no history of mental health treatment in CDCR. In addition, with respect to the death of patient who died at the hospital, the EMRCC noted a concern with an AED machine that needed recalibration. Finally, during the review period there were multiple altered levels of consciousness (ALOC) emergency episodes; however, it was unclear if due to medical emergency i.e., hyperglycemia, or overdose or psychosis.

The were no QITs, FITs, or studies during the monitoring period.

<u>Medication Management</u>:

CDCR's MAPIP monitored compliance with diagnostic monitoring and medication administration.

<u>MAPIP</u>

Folsom provided MAPIP results from August 1, 2024, to January 31, 2025, regarding compliance for psychiatric diagnostic monitoring and medication management.

Antidepressant monitoring tracked a total of four metrics with two being compliant during the review period. Folsom demonstrated compliance for six months with obtaining medication consents and for monitoring blood pressure for patients prescribed venlafaxine. Folsom was not compliant for the six months of the review period for thyroid test monitoring. EKG monitoring was compliant for one of the six months.

Diagnostic monitoring for patients prescribed atypical antipsychotics contained 11 metrics. Folsom was compliant for six months for eight metrics including the Abnormal Involuntary Movement Scale (AIMS), blood pressure, glucose monitoring, height, weight, medication consents, complete Blood Count (CBC) with platelets, and Comprehensive Metabolic Panel (CMP); additionally, Folsom was compliant for three months of EKG monitoring; compliant two of the six months for thyroid tests; and lipid monitoring did not reach compliance any of the six months.

The chief psychiatrist reported Folsom was not a Clozaril institution negating the need to report; however, there were reports of patients on clozapine. For those patients on clozapine, the same 11 metrics used for antipsychotics are measured due to the risk of serious, sometimes fatal, side effects of the use of this drug.

Folsom was compliant for six months for monitoring AIMS, glucose, CBCs, CMPs, height, weights, blood pressure, and lipids. Folsom was not compliant with their monitoring of EKGs, thyroid testing, and medication consents during the monitoring period.

For patients prescribed carbamazepine, the mood-stabilizing medication, four metrics were measured for compliance: CBC, CMP, medication level, and medication consent. Folsom was not compliant for any of these metrics with three of the six months compliant for CMPs, one

month compliant for CBCs, and noncompliance for the review period for medication consents and medication levels.

For patients prescribed Depakote, the mood-stabilizing mediation requiring the same four metrics as carbamazepine, Folsom was noncompliant for all required months of monitoring for CBC with platelets, therapeutic medication levels, and CMPs. Obtaining medication consents was compliant for two of the three months that required measurement.

For lamotrigine, the mood-stabilizing medication which required only one MAPIP metric, Folsom was compliant in obtaining medication consents for all six months.

The mood stabilizer lithium required medication consents, and monitoring of kidney and thyroid function, EKG, and therapeutic medication levels. Folsom was fully compliant with monitoring and obtaining kidney function tests, partially compliant for four of the six months for obtaining EKGs, three months for obtaining medication consents, and non-compliant for all six months for therapeutic mediation level and thyroid monitoring.

The chief psychiatrist performed a detailed analysis of underperforming diagnostic metrics, showing the reason for most underperforming measures was due to the small number patients on the psychotropic medications, along with invalid testing, provider oversight.

<u>Medication Administration</u>

Monitoring medication continuity included the following six measures. Folsom was complaint for continuity of medication for patients paroling/transferring to the community. Folsom was noncompliant for six months with the following continuity of medications measures: continuity of medications upon inter-institutional transfer at R&R, meds with intra-institutional transfer (excluding ASU/SHU/PSU), MHCB transfers, intra-institutional transfers to ASU/SHU/PSU, and discharge from community hospitals and/or DSH.

Folsom reported that 213 patients (if patients are not duplicated) received psychiatric medications prescribed at HS.

PC 2602

Folsom was compliant with PC 2602, involuntary medication court orders three of the six months and compliant for two of the six months for PC 2602 med orders.

Folsom did not report filing any PC 2602 petitions or having any patients receiving involuntary PC 2602 medications during the monitoring period or at the time of the site visit. The chief psychiatrist reported that when they have a patient on a PC 2602 order they utilize CSP/SAC's court officer and their resources.

KOP Medications

Folsom reported 213 patients who were prescribed psychiatric medications. Folsom reported there were 51 patients prescribed DOT SSRIs.

The maximum length of bridge orders was not specified.

Nursing Audits

Nursing was non-compliant for all six months with observation of medication preparation for A.M., P.M. and HS medications. Folsom was compliant during the six-month review period with medication administration for historical administration of chronic care medications by psychiatrists and medical providers. Folsom was not compliant for new outpatient orders by psychiatrists and medical providers. There were no specific PIP or CAPs from nursing addressing non-compliant measures.

Medication line audits demonstrated compliance with both policies of individual patient wait time of less than 30 minutes and total duration of medication line under two hours. Medication lines did not interfere with mental health programming.

During inclement weather, medication lines were moved to take place inside the clinics. The chief psychiatrist was actively working with nursing to provide more medication passes in the clinics. Medications in RHU were dispensed at cell front.

Transfers:

Folsom did not refer any patients to acute care or intermediate care during the review period. In addition, no patients with complex medical needs were transferred to inpatient care during the review period.

Folsom made 27 referrals to MHCB for 26 patients. All transfers were completed timely within 24 hours to outside MHCBs. No patients had three or more MHCB admissions during the review period.

There were 162 instances in which 153 patients were transferred to a 3CMS RHU during the review period. Of the 162 instances, 155 or 96 percent of patients transferred within 30 days of identification. Reasons for delays included patients being out to court and lack of available housing. In addition, one EOP patient was referred to a EOP RHU and transferred timely within 30 days of identification.

During the reporting period, one patient’s level of care was reduced from EOP to 3CMS. One hundred and twenty patients increased their level of care from 3CMS to EOP during the review period; and all 120 patients transferred to an EOP program within 60 days of becoming EOP.

Twenty-one patients were referred to an MSF during the review period, including one EOP patient and 20 3CMS patients. Two patients were referred to Folsom’s MSF and the remaining patients were referred to outside MSFs. There were six patients included on the FOLSOM non-referral log for higher levels of care. However, four of the six had their levels of

care elevated from 3CMS to EOP, leaving just two who were not actually referred. The monitor's expert reviewed those two cases and determined the patients were appropriately not referred to a HLOC.

Programming:

Mental health staff reported that prison "politics" or pressure from STG members to not access mental health services or talk to mental health staff represented a barrier to care. Further, staff reported that patients were reluctant to talk with them for fear of being seen as collaborating with staff and ultimately assaulted by their peers who classified them as "snitches." Folsom's mental health leadership reported that several EOP MSF patients awaiting transfer had been assaulted. Mental health leadership initiated a general population guidance and resource center (GP GRC) to reduce the stigma surrounding accessing mental health services. It was staffed with a supervising social worker and primary clinician who provided seminars or education sessions on mental health wellness, group therapy, and brief individual contacts. During the review period, they provided two seminars on suicide awareness and provided other outreach (e.g., maintaining a mental health booth during the relay for life).

MHSDS Patients in Restricted Housing:

Folsom operated a non-MHSDS RHU during the review period. As a result, all MHSDS patients had to be transferred to 3CMS RHU or EOP RHU, depending on their level of care, within 30 days from the date of initial placement. *See* Cal. Code of Regs., tit. 15 §§ 3335.2 and 3335.3; *see also* ECF No. 8355 at 7-17 (Restricted Housing Unit Program: Mental Health Services Policy, dated July 19, 2024 and effective August 1, 2024) (hereinafter "RHU Policy"). As indicated, the one EOP patient and 96 percent of 3CMS patients timely transferred to EOP and 3CMS RHU's during the review period.

Because of the number of MHSDS patients in the RHU at any given time, Folsom assigned a PC and psychiatrist to the unit. The RHU psychiatrist and primary clinician had two separate confidential office spaces that included individual treatment modules to facilitate treatment in a confidential setting. IDTTs were held in a multipurpose room that connected to those two offices. The space was generally confidential, but staff could potentially travel through the room, though this did not occur during IDTTs observed by the monitor's expert.

The monitor's expert observed five IDTTs, though two were held in absentia due to patient refusal. All patients were in RHU for safety concerns and most had no disciplinary history and had originally been endorsed to the Folsom MSF. Because these patients had open cases that required additional casework, they were placed into the Folsom general population until that casework could be completed according to custody staff. However, staff reported that the prison "politics" resulted in most of those patients believing that they were at risk on the yard, similarly to patients who had previously been on an SNY and would then "lock up" or report safety concerns and be placed into the RHU. Staff reported that these types of cases had been increasing recently and had increased the RHU population.

Unfortunately, during observed IDTTs, the treatment teams did not discuss specific treatment targets and treatment goals, if discussed, were vague and subjective (e.g., decrease anxiety from a 3 to a 2). The treatment interventions to be utilized and their purpose were not discussed beyond patients being encouraged to participate in RT activities to manage stress.

For multiple reviewed cases for the Folsom RHU, the treatment plan did not include anything or very little in the actual treatment plan box in the current form. In fact, prior treatment plans from different treatment settings were often just maintained despite the clinically significant stressor of RHU and different treatment setting. While psychiatry initial intake

assessments were adequate, the PC initial intake assessments included a significant amount of copy and pasted content from prior assessments or notes, were sometimes difficult to determine what if any information was new and provided minimal to no new relevant clinical information. Treatment plans were also typically inadequate, often including little if any relevant information. As their initial placement, treatment plans needed to include short-term targets of treatment, interventions to be used, and treatment goals pending transfer, at a minimum. Based on the factors noted above, RHU IDTTs were non-compliant of Program Guide requirements.

A review of 3CMS RHU patients' 114-As throughout the review period reflected compliance with weekly offering of the required hours of out-of-cell time, in addition to three showers, one phone call, and one linen exchange.

Folsom's LOP regarding unclothed body searches complied with statewide policy. Staff confirmed that unclothed body searches were conducted in cells, with custody officers standing outside of the cell examining the patient.

The monitor observed eight RHU ICCs, including some for 3CMS patients. All were attended by required staff consisting of the warden, psychologist, CC I, CC II, and five custody staff including one sergeant and unit captains. The attending staff demonstrated a collaborative relationship and extensive knowledge of each incarcerated individual and the psychologist participated adequately. Patient history, pending RVRs and transfers, and LRH were thoroughly discussed with each patient. The warden made custody decisions with all case factors and the desires of the patients included, confirmed whether each individual had any questions, confirmed that each patient understood the outcome of their ICC, and discussed their rights to appeal the decisions made. The observed RHU ICCs were compliant.

Non-Disciplinary Segregation:

Folsom did not track NDS patients and was unable to provide data regarding NDS patients during the review period.

Crisis Intervention Team:

Folsom did not operate a CIT during the review period or at the time of the monitoring tour. Crisis calls were addressed through a variety of methods that have been in place for several years. During regular business hours, clinicians respond to crisis calls from their own caseload. There was a clinician of the day who can respond if the PC is away from the institution or otherwise unable to respond.

After regular business hours, there was an on-call list that utilized psychiatry primarily, though primary clinicians occasionally volunteered to take crisis calls to lessen the load on psychiatry. The on-call clinicians/psychiatrists would respond to any planned uses of force, crisis calls/emergent referrals, PREA incidents and five-day follow-ups. Because there were no weekend clinicians, the on-call clinicians also came in on the weekends to complete five-day follow-ups, emergent and urgent referrals, and sign off on any 24-hour wellness custody checks. This list and contact information were also provided to the TTA so that they can contact the on-call clinicians when needed.

3CMS:

All mental health clinical staff at Folsom worked on-site during the review period and at the time of the monitoring tour. The staff-to-patient ratios from the 2009 Staffing Plan and 2021 adjustments to the 2009 staffing plan required that staff psychiatrists who treat 3CMS patients maintain a caseload of 280 patients per psychiatrist if the patient was prescribed medications and

675 patients if the patient was not prescribed medications.[79] *See* ECF No. 3693 at 12 and 6978-1 at 3. The staff to patient ratios from the 2009 Staffing Plan and 2021 adjustments to the 2009 staffing plan required that primary clinicians who treat 3CMS patients maintain a caseload of 97 patients per clinician. *Id*. At Folsom, 3CMS psychiatry caseloads ranged between 68-288 patient and 3CMS PC caseloads ranged between 29-110 patients.

Patients housed in the main prison facility received mental health services on the third floor of the clinic, which had a dedicated mental health hallway and included individual PC and psychiatrist offices for each clinician, a RT office/group room, and another group room that was also used for IDTTs. The group room could accommodate 12-15 participants. All treatment spaces were appropriately confidential for sound privacy. Since the previous round site visit, Folsom stopped using incarcerated persons as maintenance workers in the mental health spaces, which resulted in improved visual confidentiality and increased treatment attendance.

Overall, the treatment spaces at Folsom were adequate and appropriate for clinical services.

There was one patient recently discharged from EOP to 3CMS. He remained stable and did not require any increased clinical support or return to higher level of care.

---

[79] The Program Guide requires that "[e]ach CCCMS inmate patient on psychiatric medication…be reevaluated by a psychiatrist a minimum of every 90 days regarding psychiatric medication issues." (Program Guide at 12-3-11). The 2009 Staffing Plan established a psychiatry staffing ratio for every 3CMS patient in the general population and did not distinguish between patients on medications and patients who were not. *See* ECF No. 3693 at 8. The Adjustments to the 2009 Staffing Plan, ECF No. 6978-1, which were approved by the Court on January 27, 2021 (*See* ECF No. 7035 at 2), established a new staffing ratio of 675 patients per psychiatrist for patients who are not on medications for six months or more. For the purpose of reporting compliance with staff-to-patient ratios, it was unclear whether the patient's included in each reported caseload were prescribed medications at the time of the site visit.

*IDTTs*

The monitor's expert observed 24 3CMS IDTTs, including a mix of initial and annual IDTTs. Generally, the IDTTs were not adequate, but the majority of patients were stable and expressed satisfaction with their mental health programs and treatment. There were several repeated deficiencies across most IDTTs. The patients' diagnoses were usually not clearly stated and there was a persistent failure to identify and discuss clear treatment goals and specific treatment interventions. The IDTTs were not collaborative and there was little to no interdisciplinary discussion during the meeting. Several initial IDTTs occurred without completed initial PC or psychiatry assessments. CC1 participation was limited to reading the patient's conviction and RVR histories and current disciplinary status. Despite patient stability and satisfaction, the IDTTs and treatment planning were inadequate.

The Program Guide requires initial IDTT for 3CMS patients to occur within 14 calendar days of arrival to the institution or level of care change and annually thereafter. *See* ECF No. 7333-1 at 44.

Initial IDTTs for 3CMS patients are required to occur within 14 working days of arrival to the institution or level of care change and annually thereafter.

The monitor randomly selected and reviewed the healthcare records of 30 mainline 3CMS patients to assess compliance with Program Guide timeframes during their stays. All 30 patients required initial IDTTs. Of the 30 reviewed initial IDTTs, nine or 30 percent occurred timely. Twenty-nine or 97 percent were attended by all required staff and 27 or 90 percent were attended by the patients. Reasons initial IDTTs were held *in absentia* included custody modified program and patients did not attend.

To measure timeliness of routine IDTTs during the review period, CDCR produced an appointments report that included individuals who were required to receive a routine IDTT during the review period. For the 532 patients in CDCR's appointments report for August 1, 2024 to January 31, 2025, there were 570 completed initial or routine IDTTs. When a patient had either an initial IDTT and a routine IDTT or more than one routine IDTT, timeliness in accordance with Program Guide requirements was able to be calculated. Of the 570 completed IDTTs, 39 contacts were for individuals who had at least two IDTTs (initial and routine or two routines). Of those 39, all occurred within Program Guide requirements. Of note, the report did not include individuals that did not have a completed IDTT, such as those that were not scheduled.

*Groups*

3CMS patients in the main prison facility were offered clinical and RT groups during the review period and at the time of the monitoring tour. Patients were assigned to groups via referral from their PC or treatment teams. Primary clinicians and Folsom's sole RT facilitated groups. Group topics were appropriate for the population and included DBT, Mood Management, CBT, Grief and Loss, Parenting, and Virtual Reality. Demand for groups was very high and waitlists often over one year long. The RT at FOLSOM was clinically skilled and developed thoughtful and intentional programs for the patients.

The monitor's expert observed a Stress Management group facilitated by an RT. Three patients attended and the group was very well facilitated and organized. The RT introduced a complex board game and the patients were highly engaged in the activity. The game incorporated various cognitive and executive functioning skills and was appropriate for the population and purpose. The RT was very interactive and obviously passionate about the work.

Folsom provided some NLTGs, though there was no dedicated staff. Folsom conducted two diabetic groups on Tuesdays and Friday. The maximum number of patients was 10 with an average attendance of 6 patients.

Patients on the MSF yard were not offered groups due to lack of appropriate group space.

*Individual Treatment*

The Program Guide requires that patients are offered an initial psychiatrist evaluation before their initial IDTT. *See* ECF No. 7333-1 at 44-50, 641. Thereafter, routine psychiatric contacts are required at least every 90 calendar days if the patient is prescribed a psychotropic medication. *Id*. at 44. Patients are also required to receive an initial primary clinician evaluation within ten working days of referral/arrival and every 90 calendar days thereafter. *Id*. at 41, 48.

The monitor randomly selected and reviewed the healthcare records of 30 mainline 3CMS patients to assess compliance with Program Guide timeframes during their stays. All 30 patients required initial psychiatry evaluations; 14 or 47 percent timely occurred before the initial IDTT. Fourteen or 47 percent of the reviewed initial psychiatry evaluations were conducted in confidential settings; the non-confidential contacts were due to custody modified programming. Telepsychiatry was not utilized for initial psychiatry evaluations.

To measure timeliness of routine psychiatry contacts during the review period, CDCR produced an appointments report that included individuals who were required to receive a routine psychiatry contact during the review period. For the 340 patients in CDCR's appointments report for August 1, 2024 to January 31, 2025, there were 693 completed and refused contacts. Of the 688 completed contacts, 682 or 99 percent were confidential as reported by the institution. Non-confidential psychiatry contacts were reported due to patient refusals.

When a patient had more than one completed or refused contact, compliance with Program Guide timeframes was able to be calculated. Of the 693 completed or refused contacts, 355 contacts were for individuals who were seen at least twice by the psychiatric provider. Of those 355 contacts, 17 or five percent occurred beyond Program Guide requirements with a range of 91 to 126 days. Of note, the report did not include individuals that did not have completed contacts.

The monitor randomly selected and reviewed the healthcare records of 30 mainline 3CMS patients to assess compliance with Program Guide timeframes during their stays. All 30 patients required initial primary clinician evaluations. Of the 30 reviewed initial primary clinician evaluations contacts, 10 or 33 percent were completed within 10 calendar days of arrival or change in level of care. Twenty-eight or 93 percent of reviewed initial primary clinician evaluations were conducted in a confidential setting; non-confidential contacts were due to custody modified programming. Telehealth was not utilized for initial psychiatry evaluations.

To measure timeliness of routine primary clinician contacts, CDCR produced an appointments report that included individuals who were required to receive a routine primary clinician contact during the review period. For the 628 patients in CDCR's appointments report for August 1, 2024 to January 31, 2025, there were 1,400 completed contacts. Of the 1,400 completed contacts, 1,374 or 98 percent were confidential as reported by the institution. Reasons for non-confidential primary clinician contacts included patient refusals, custody modified program, lack of available confidential space, and public health restrictions.

When a patient had more than one completed or refused contact, compliance with Program Guide timeframes was able to be calculated. Of the 1,400, 773 contacts were for

individuals who were seen at least twice by the primary clinician. Of those 773 contacts, five or 0.6 percent occurred beyond Program Guide requirements with a range of 91 to 141 days. Of note, the report did not include individuals that did not have completed contacts, such as those that were not scheduled.

Interviewed clinical staff reported positive working relationship with custody staff and an institutional culture that supported patient access to programming and mental health treatment. Further, they reported that priority ducats were honored without issue, even during a recent lockdown. Overall, interviewed clinical staff reported high morale among staff and feeling supported by supervisory staff. Staff reported an ongoing problem with drugs on the yard, treatment space challenges, understaffing, and a concerns with the slow hiring process to fill vacant mental health positions.

*Placement of 3CMS Patients into Minimum Support Facilities*

According to custody staff at the MSF, there were 306 incarcerated persons housed in the MSF on March 25, 2025, and 190 or 63 percent of the MSF population were 3CMS patients. The 3CMS patient population on medication had significantly increased. Custody staff reported that there were not enough regular officers for this population increase; however, institutional leadership was reportedly supportive and provided additional staff when needed. Custody staff in the MSF also stated that due to the change in population over the past year, training was needed and ongoing with the current custody officers on how to work with mentally ill patients. Further, the institution recently initiated its incarcerated persons advisory committee, with the first meeting scheduled for March 26, 2025. Staff thought the advisory committee would be helpful and would benefit patients and staff.

Treatment spaces on the MSF yard were adequate for individual contacts and IDTTs. IDTTs were provided in a confidential office in the administration building. The space was adequate for IDTT purposes. There were also two individual office spaces available in the MSF clinic which were dedicated for mental health clinicians. In addition, staff reported the institution was in the process of converting a room in the library into a treatment group space.

The monitor's expert observed 16 3CMS IDTTs in the MSF facility. All observed IDTTs were inadequate. Each IDTT took approximately five to eight minutes to complete. Although the providers clearly cared about their patients and were passionate about their work, the MSF IDTTs shared many of the same deficiencies as the main facility IDTTs. For instance, the IDTTs were not collaborative, treatment goals were not clearly provided, there were numerous missed opportunities for the treatment team to engage with the patients and address inconsistencies or contradictions in their chart and presentation, several patients did not have initial assessments prior to their initial IDTT, and functional impairments were not discussed. It was also concerning that many of the patients were due for release or parole within three to six months and there was no discussion regarding pre-release planning.

According to psychiatrist staff, a triage process for initial assessments based on patient acuity was developed. However, due to a backlog in completing initial assessments, it was reported that some patients paroled prior to their initial assessments.

Division of Rehabilitative Program (DRP) groups were offered five days a week equaling 20 hours of groups per week in the MSFs. Eight patients were interviewed and six of the eight were 3CMS patients. These patients reported seeing their clinicians and psychiatrist timely and knew how to request additional time if needed. Patients reported the average length of clinical or psychiatric sessions to be between 20 to 30 minutes. The patients viewed custody as too strict at

times but respectful, reported nursing lines were too long, with some reporting a desire to get off of their medications so they would not have to wait in the rain for meds. These 3CMS patients were unaware of the DRP groups. The patients reported concerns with violence on the yard and two of the six were silent when asked about drugs while the four patients reported violence was worse at other institutions.

According to headquarters/regional custody leadership, there were approximately nine positions for incarcerated persons at the local Firehouse. Of the incarcerated persons working at the local Folsom Firehouse at the time of the site visit, none were 3CMS. Custody staff reported there were currently six positions filled by general population incarcerated persons and there were no barriers precluding MSF 3CMS patients from interviewing. However, the patients' earliest possible release date (EPRD) was relevant as there were training, competency activities and other considerations which would preclude a patient close to release from qualifying.

There was a total of 40 patients receiving DOT/NA medications and 46 patients receiving KOP medications. Interviewed nursing staff confirmed patient reports that med lines were long (lasting as long as two and a half hours) due to the DOT/NA and the number of patients on Suboxone.

<u>Other Issues</u>:

<u>Pre-Release Planning</u>:

The IMHPC coordinator was a full time licensed clinical social worker (LCSW). Pre-release groups were not conducted during the review period. However, beginning February 1, 2025, the IMHPC was able to redirect his efforts and focus 100 percent of his time on pre-release planning duties; pre-release groups began that same month.

At the time of the monitoring tour, the IMHPC conducted one pre-release group, which the monitor observed. The IMHPC used the HQ curriculum provided by the Statewide Mental Health Pre-Release Coordinator. There were three group participants. Five patients had been scheduled to attend; however, one did not show and the other was set to arrive just as the group was ending. The patients talked about their personal values and beliefs, how to assess them, and their importance. All patients participated fully, taking turns reading aloud and sharing their thoughts on each of the topics discussed. All seemed to be excited about the prospect of their upcoming release, and they discussed some of the tools and coping skills they had acquired which would help them to navigate life outside of prison.

The IMHPC reported that during the review period, PRPAs were conducted for all patients being released between 45 to 60 days (or earlier) prior to the patient's scheduled release date. This was accomplished by weekly and sometimes daily contact with the correctional counselor and classification and parole representative (C&PR). The PRPA first page was entered into the EHRS and face-to-face appointments were scheduled and conducted by the IMHPC.

Of 121 patients, 80 or 66 percent of ROIs were obtained, 14 or 12 percent of patients refused, and 27 or 22 percent were not obtained.

There were 289 patients who had pre-release planning and who were scheduled to be released with 90 days or fewer during the review period. Of those 289 patients, 198 patients were released from Folsom, 80 patients had not been released, and 11 patients were released from other institutions.

Folsom reported 196 Cal-IDs were offered to patients during the review period. The number of refusals and number of ineligible patients were not reported.

TCMP offered benefit screening services to 150 MHSDS patients; 129 or 86 percent submitted benefit applications for Medi-Cal, nine or six percent had access to other insurances, one was unavailable, and 11 or 7.3 percent refused. Fourteen or 9.3 percent applied for SSI, three applied for VA services, one patient already had VA benefit, and one patient was ineligible. The IMHPC worked well with the mental health and custody leadership and was knowledgeable, creative, and aware of the needs of the patients prior to release and was working with leadership to expand the pre-release program.

Program Access:

a. Job and Program Assignments

Folsom reported that, as of December 7, 2023, 1,086 job assignments were held by 201 or 33 percent of the 3CMS population, and 885 or 40 percent of non-MHSDS incarcerated persons.

The 690 academic assignments were held by 124 or 21 percent of 3CMS patients and 566 or 26 percent of non-MHSDS incarcerated persons.

Of the 222 vocational education assignments, 17 or three percent of 3CMS patients held them, as did 205 or nine percent of non-MHSDS incarcerated persons.

The 906 voluntary education assignments were held by 132 or 22 percent of 3CMS patients and 774 or 35 percent of non-MHSDS incarcerated persons.

The 247 substance abuse treatment assignments were held by 45 or eight percent of 3CMS patients and 202 or nine percent of non-MHSDS incarcerated persons.

b. Milestone Credits

During the review period, FOLSOM reported 274 3CMS patients and 1,766 non-MHSDS incarcerated individuals were awarded Milestone Credits.

c. Out-of-Level Housing

On December 22, 2023, Folsom reported that 65 3CMS custody Level II patients were in Level I housing, 53 3CMS custody Level I and eight 3CMS custody Level III patients were in Level II housing, and two 3CMS custody Level II were in Level III housing. Fourteen custody Level IV patients were in Level III housing.

d. ADA Reasonable Accommodations and Grievance Procedures

The institution provided an internal memorandum providing direction for custody staff interacting with disabled incarcerated persons, attendance sheets for training on accommodations and grievance procedures, and an updated reference training manual for ADA accommodations.

e. Unclothed Body Search

Custody officers in RHU conducted unclothed body searches every time a patient exited their cell. The search was completed in the cell before the patient left.

MSF unclothed body searches were conducted every time a patient returned from their work assignment. Privacy screens were used as two patients were searched at the same time.

Officers in Receiving and Returning conducted unclothed body searches whenever a patient left the institution before transport.

"C" Status:

As of March 20, 2025, 24 3CMS patients were designated "C" status. Their classification chronos revealed designations due to patients receiving two serious RVRs within 180 days and deemed program failures for reasons including patients in possessions of a controlled substance and battery on a prisoner. There were 43 3CMS patients on "C" status during the review period.

Case-by-Case Reviews:

The institution reported that no patient met the requirements for 150-day reviews or 120-day pre-MERD reviews.

Mental Health Referrals:

Folsom reported an overall compliance rate of 89 percent for timely responding to mental health referrals. Psychiatry timely responded to emergent and urgent mental health referrals and primary clinicians timely responded to urgent and routine mental health referrals. Responses to routine mental health referrals were noncompliant for both psychiatry (79 percent) and primary clinicians (76 percent). Folsom reported that referrals were likely untimely due to consult orders being cancelled or discontinued instead of being voided, errors logging the contacts into EHRS, and the increased MSF intake impacted routine psychiatry mental health referrals.

Custody and Mental Health Partnership Plan:

The institution's CMHPP LOP was compliant with statewide policy and current, most recently revised in March 2025. Executive leadership joint rounding occurred monthly during the review period and utilized the correct form. Reviewed rounding documentation revealed staff reporting a good working relationship between custody and mental health staff, good morale, the need for more treatment/clinical space, staff concerns with spice usage, and patient concerns. The joint rounding documentation also revealed patients reported receiving ducats, feeling comfortable reaching out to staff during a crisis, and having a good relationship with staff.

Quality management committee and mental health subcommittee minutes identified executive leadership joint rounding as a standing agenda item. Folsom did not provide minutes from the warden's executive staff meetings. However, the institution reported that joint rounding was not discussed at the warden's executive staff meetings.

An observed RHU huddle was well-attended by clinical staff and was clinically useful. Custody staff attended and offered valuable feedback. The appropriate huddle form was utilized.

Reviewed documentation indicated that Folsom conducted monthly joint supervisory 3CMS program area tours for all six months of the review period on all facilities, as well as weekly 3CMS supervisory meetings. Nonetheless, reviewed documentation included feedback regarding patients of concern, odd or unusual behavior, medication concerns, drug related issues, patients reporting positive interactions with staff, and staff indicating positive relationships between custody and mental health.

The institution provided a copy of the 3CMS orientation brochure in both English and Spanish.

Folsom conducted inmate advisory council (IAC) meetings monthly. Agenda items included the peer support program, quarantine procedures, relay for life updates, updates from Men's Advisory Council (MAC), Dexcom updates, and tablet issues.

Patients filed 46 grievances during the review period. The institution reported that there were no investigations of staff misconduct towards a patient not initiated through the appeal process during the reporting period. In addition, there were zero staff who were moved to another post as the result of a staff misconduct complaint.

As for attendance at the mandatory CMHPP off-post training, the institution reported attendance by all custody and mental health staff.

<u>Heat Plan</u>:

CDCR required that each institution's heat plan LOP incorporate the requirements of the most recent Heat Plan and Updates memorandum. The institution provided the August 2, 2024 Expectations Relative to Institutional Oversight of Heat Plan Operations along with the 2024

Heat Plan and Updates Memorandum. The institution's heat plan was current with a last revision date of April 2024.

The 2024 Heat Plan and Updates memorandum required that each institution submit a Heat Plan Monthly Summary Report (Summary Report), signed by the warden and CEO, to headquarters each month from May 1 to October 31. During the review period, there were 47 Stage I, six Stage II, and no Stage III heat alerts.

The Heat Plan and Updates memorandum also required institutions to submit a monthly Heat Incident Log documenting the number of patients who experienced a heat-related illness. The Heat Incident Log must include the patient's information and details regarding the heat-related illness. There were no heat-related illnesses during the review period.

The 2024 Heat Plan and Updates memorandum required all custody officers and leadership staff to maintain knowledge of heat plan activation and act in accordance with the requirements of each stage. Fifteen custody staff from five different housing units were interviewed regarding heat plan requirements; all staff were knowledgeable of the heat plan's policies and requirements. In most toured housing units, staff hung Heat Plan expectations beside the heat logs for reference.

To ensure proper and accurate temperature recording, the annual Heat Plan and Updates Memorandum required the warden or his designee to ensure an accurate thermometer was placed in a central, heat-neutral location to monitor outside ambient air temperatures which must be recorded every hour, every day, from May 1 through October 31 of each year. A reviewed sample of outdoor temperature logs revealed that temperatures were recorded every hour as required.

The warden or his designee is also responsible for ensuring that inside air temperatures are measured in all non-airconditioned living areas that house heat-risk incarcerated persons. Temperatures must be taken at the highest non-air-conditioned location where heat-risk incarcerated persons are housed and must be recorded every three hours. A reviewed sample of indoor temperature logs indicated that indoor temperatures were taken every three hours from thermometers placed in the appropriate locations as required.

In an effort to ensure that heat-risk incarcerated persons were afforded equal access to programs, services, and activities during extreme weather conditions, the 2024 Heat Plan and Updates memorandum required institutions to devise and include any reasonable accommodation and alternatives to yard activities when revising their LOP. All reasonable accommodation provided to heat-risk incarcerated persons during heat alert activation must be documented in the institution's DAR as well. On days in which a heat alert was activated, custody staff indicated offering alternative yard times in the DARs. Custody staff would offer patients an early morning yard time on days when a heat alert was anticipated. The institution also indicated that due to the physical plant design, Folsom was unable to provide day room access to non-MSF patients who were prescribed heat-risk medications. Patients were instead provided with showers and telephone access.

The 2024 Heat Plan and Updates memorandum required annual training on the institution's Heat Plan. All 584 custody staff and 86 of 88 or 98 percent of mental health staff attended required heat plan training.

RVRs:

Folsom issued 1,724 RVRs during the review period, of which 660 or 38 percent were issued to MHSDS patients. Specifically, four RVRs were issued to MHCB patients, 17 were issued to EOP patients, and 639 were issued to 3CMS patients.

The monitor reviewed 21 RVRs to assess compliance with remedial requirements. Custody staff timely referred the mental health assessment to mental health staff within two days in nine or 43 percent of reviewed cases. Mental health staff timely completed and returned the assessment to custody within eight days in all 21 reviewed cases. The SHO documented consideration of the mental health assessment in all reviewed cases.

Mental health staff recommended mitigation in 17 or 81 percent of reviewed cases and the SHO mitigated the penalty pursuant to the assessment in all 17 cases. The most frequent assessment recommendation concerning mitigation was no loss of phone calls, which 88 percent of assessments recommended.

None of the mental health assessments recommended alternative discipline due to patients' mental illness significantly contributing to the behavior documented in the RVR. However, three mental health assessments explained that mental health contributed to the behavior in the RVR, but the SHO decided to hold the patient accountable regardless of their mental illness, generally explaining that the patients were aware of their behaviors.

As for mental health assessment training, Folsom did not provide data regarding whether the warden or chief deputy warden attended this mandated training. The training was attended by three of four correctional administrators, two captains, 23 lieutenants, 54 of 55 sergeants, and 388 of 398 correctional officers. For mental health, the chief of mental health, two psychiatrists, one senior social worker, and two licensed clinical social workers attended the training.

Additionally, Folsom reported that one chief psychiatrist, three senior psychologists, four psychologists, and two clinical social workers attended the training in previous years.

Use of Force:

Folsom reported no controlled and 58 immediate use of force incidents during the review period. Of the 32 immediate incidents involving MHSDS patients, 28 had completed the use of force review process and were closed. Eleven closed immediate use of force incidents were reviewed; all complied with policy. Reviewed video footage and incident packets included incidents where patients were fighting with other patients, resulting in staff using MK-9 spray, 4 mm rounds and appropriate physical force.

Use of force training was attended by 563 of 578 or 97 percent of custody staff and 63 of 68 or 93 percent of mental health staff.

Lockdowns/Modified Programming:

Folsom reported that there was no program status reports during the review period.

Access to Care:

A review of the institution's monthly Health Care Access Quality reports from August 2024 through January 2025 indicated a total of 7,632 issued mental health ducats and add-on appointments, of which 6,561 or 86 percent were completed and 1,071 or 14 percent were not completed. Of the non-completed appointments, all 1,071 were due to non-custody factors; notably, no patient refusals were reported for the entire review period.

*Coleman* Postings:

The monitor observed *Coleman* postings in English, but not Spanish, in the MSF day room. However, posters in Spanish were placed in the day room before the end of the site visit. All other toured housing units had clearly visible posters in both English and Spanish.

**APPENDIX A – 17**
**HIGH DESERT STATE PRISON (HDSP)**
Site Visit: August 26, 2025 – August 28, 2025
Review Period: November 1, 2024 – April 30, 2025

Census:

On August 22, 2025, HDSP housed 2,371 incarcerated individuals which was comparable to the prior review period. The 1,097 MHSDS patients represented 46 percent of the institution's population and had increased by 50 percent compared to the prior review period.

The MHCB housed nine MHSDS patients, two of which were pending acute referral. No patients were in alternative housing.

There were 51 3CMS patients in the 3CMS RHU. There also were 18 EOP patients housed in the RHU pending transfer to an EOP RHU. Eight EOP and eight 3CMS patients were on non-disciplinary segregation status.

There were 77 mainline EOP and 834 mainline 3CMS patients; the 3CMS population had increased by 19 percent from the prior review period. Two mainline EOP and ten mainline 3CMS patients were in the OHU. An additional 108 3CMS patients were housed in the MSF.

Staffing:

HDSP has historically experienced great difficulty in hiring and retaining qualified mental health providers. This remained the case during the monitoring period and at the time of the site visit. These staffing challenges presented enormous obstacles to providing adequate mental health treatment at the EOP and MHCB LOC and directly contributed to barriers to care. Patients were left to decompensate without adequate treatment and while referrals to HLOC had increased, there were still numerous cases where the patient was not referred at all or not referred timely. CDCR and HDSP are encouraged to consider closing those programs until HDSP can be appropriately staffed with qualified mental health providers.

As of June 5, 2025, the chief psychiatrist position was filled. The senior psychiatrist supervisor position was vacant. The one staff psychiatry position was vacant, but the use of a 0.5 FTE registry psychiatrist reduced the functional vacancy rate to 50 percent; an additional registry psychiatrist was scheduled to start in the coming months. Regarding telepsychiatry, 5.13 of 6.5 positions were filled for a 21 percent vacancy rate. Accounting for on-site and telepsychiatry positions, there was a 25 percent functional vacancy rate among staff psychiatry positions.

Both chief psychologist positions were filled at the time of the site visit, as were two of the 2.5 senior psychologist positions for a 20 percent functional vacancy rate. Two of 3.5 senior psychologist specialist positions were filled for a 43 percent vacancy rate. For staff psychologists, three of 15 positions were filled for an 80 percent vacancy rate. Seven telepsychologists filled five allocated positions. Accounting for on-site and tele-mental health positions, there was a 50 percent vacancy rate among staff psychologist positions.

The supervising social worker position was vacant during the review period but had been filled by the time of the monitoring tour. Two recent retirements rendered all of the of 8.5 social worker positions vacant. The use of one registry position reduced the functional vacancy rate to 88 percent. Five tele-social workers filled four positions. Accounting for on-site and tele-mental health positions, there was a 52 percent functional vacancy rate among social worker positions.

The one allocated marriage and family therapist position was vacant.

Overall, there was a 52 percent functional vacancy rate among positions eligible to serve as primary clinician.

Four of 11 MA positions assigned to tele-mental health were filled for a 64 percent vacancy rate; four registry staff reduced the functional vacancy rate to 27 percent.

Three of five RT positions were filled for a 40 percent vacancy rate.

For supervising RN positions, 12.2 of 13.2 were filled for an eight percent vacancy rate; by the time of the site visit, two had retired and a third was working out of class resulting in a functional vacancy rate of 30 percent. Two of three MHSDS RN positions were filled for a 33 percent vacancy rate; at the time of the site visit, all three positions were filled.

The senior psych tech position was filled. For psych techs, five of 17.7 positions were filled for a 72 percent vacancy rate and an additional eight contractors reduced the functional vacancy rate to 27 percent.

Forty of 49.2 LVN positions were filled for a 19 percent vacancy rate; seven were on long-term leave but the use of 11 contractors resulted in a functional vacancy rate of 11 percent. At the time of the site visit, four were on long-term leave and the use of seven contractors resulted in a 13 percent functional vacancy rate.

Eight of 12 MHSDS clerical positions were filled for a 33 percent vacancy rate.

The OSS II position was filled. Two of 2.5 HPS I positions were filled for a 20 percent vacancy rate. No HPS II position was allocated but one was on staff working a limited term. The CHSA position was vacant; this position converted to the HPS II position. One Staff Security Analyst ("SSA") was on staff as well.

One psychologist assigned to the 3CMS program was unlicensed.

As of June 5, 2025 for custody staff, the warden, chief deputy warden, all five associate wardens, and all six captain positions were filled; one captain was on long-term leave and another was acting out of class resulting in a 33 percent functional vacancy rate. For lieutenants, 29 of 30.4 positions were filled for a five percent vacancy rate. Sixty-eight of 79 sergeant positions were filled for a 14 percent vacancy rate; three sergeants were acting out of class

resulting in an 18 percent functional vacancy rate. Seventeen of 20 CCI positions were filled for 15 percent vacancy rate; two CCIs were acting out of class resulting in a 25 percent functional vacancy rate. All ten CCII positions were filled; one was on long-term leave resulting in a ten percent functional vacancy rate. For correctional officers, 679.2 of 692.4 positions were filled for a two percent vacancy rate; eight were on long term leave resulting in a three percent functional vacancy rate.

Tele-Mental Health:

Aside from telepsychiatry, telepsychology, and tele-social work, the chief psychiatrist worked entirely remotely; the chief psychologist and senior psychologist specialist, MHSDS clerical staff, OSS II, HPS I, and HPS II all teleworked one day per week.

Staff Recruitment:

Staff recruitment and retention efforts included the Regional Hiring Unit streamlining the hiring process for *Coleman* classifications; increased marketing for *Coleman* classifications; hiring above minimum; pay differentials for staff that provide direct patient care for more than 50 percent of the pay period; incremental retention bonuses; recruitment and retention bonuses for in-person psychiatric direct patient care; and payments for psychiatrists and psychologists who work additional caseloads.

Quality Management:

The local governing body met monthly during the review period, was chaired by the CEO, and achieved quorums at each meeting. Apart from the December 9, 2024 meeting, the chief of mental health and/or a senior psychologist specialist as the approved designee attended each meeting. Minutes for the six local governing body meetings documented the review and approval of mandatory monthly CTC subcommittee meeting minutes, including the CTC

medication management subcommittee, the CTC patient care policy subcommittee, and the CTC specialized beds subcommittee. These monthly CTC subcommittees consistently achieved quorums and reflected active policy revision, quality assurance, and performance improvement efforts. Local governing body minutes also reflected the privileging and credentialing of CTC providers, review and approval of annual updates to local operating procedures, CTC policies and procedures chapters, and custody, medical, and mental health policies and procedures. . Apart from review of relevant subcommittee minutes and approval of annual updates to policies, no mental health issues were discussed in local governing body meetings. Instead, minutes routinely indicated that there were no mental health issues to bring forward.

During the review period, the QMC met monthly and consistently achieved quorums. The CEO chaired the QMC. During the November and December 2024 QMC meetings, required mental health leaders were absent. Except for these months, the chief of mental health and/or a senior supervising psychologist attended QMC meetings as a voting committee member and an approved designee, respectively. Meeting minutes reported on the status of current quality improvement projects, new quality problems identified through system surveillance, program administration, and approval of policies and local operating procedures.

Regrettably, the QMC meeting minutes provided only a cursory review of mental health quality assurance and quality improvement activities and status of the mental health program. Both the January 2025 and the April 2025 QMC minutes indicated that there were no mental health corrective action plans or improvement projects at HDSP, and that no priority indicators as identified by CDCR headquarters were out of compliance. Important mental health quality improvement efforts, including efforts to expand available EOP group programming, improve the

efficiency of mental health services in RHU 3CMS, and decrease the backlog of mental health RVR assessments, were not documented in QMC minutes.

In contrast, detailed reports from the medication management, specialized beds, patient care policy, medical program, institutional utilization management, patient safety, and emergency medical responsive review subcommittees, as well as from the patient advisory council, were documented monthly in the QMC minutes. When applicable, the QMC also reviewed ISUDT, joint custody-mental health rounding, and the facility's heat plan, among other areas. Improving timeliness in emergency medical responses represented a major focus of QMC performance improvement efforts during the review period.

The mental health program subcommittee met monthly during the review period and consistently achieved quorums. The chief of mental health chaired this subcommittee with the SPRFIT coordinator serving as an alternate chair. The chief psychiatrist attended four of the six meetings, each time as a non-voting guest. When a new chief psychologist was hired in April 2025, she joined the MHPS as a non-voting guest. Minutes discussed agenda items such as performance challenges identified through dashboard data, performance report indicators, psychotropic medication monitoring, access to care barriers, HLOC referrals, compliance with effective communication documentation requirements, patient grievances, the custody-mental health partnership, EOP group programming, involuntary medication, backlogs in RVR MHA, approval of annual revisions to mental health policies and local operating procedures, safety concerns, and staffing.

MHPS monthly minutes consistently included a review of medication monitoring and other performance indicators. The institutional dashboard results for medication monitoring indicated significant noncompliance across most indicators during the six-month review period.

Performance for each indicator was typically reported as an institution-wide aggregate rather than by LOC or location. Among other performance indicators that were noncompliant with Program Guide requirements, the MHPS minutes indicated that, averaged over the six-month review period on an institution-wide basis, 77 percent of mental health referrals, 61 percent of MHCB daily provider contacts, 62 percent of primary clinician contacts, 72 percent of psychiatric contacts, 51 percent of IDTT meetings, and 46 percent of mental health RVR assessments were completed timely. During the review period, compliance with mental health referrals and RVR assessments improved significantly, but overall performance remained deficient on average.

Apart from reviewing dashboard compliance figures for RHU pre-screenings and RHU GP screenings, the MHPS minutes did not reflect any specific RHU 3CMS compliance data. Similarly, there was almost no quality assurance data available specific to the mainline 3CMS or EOP programs, and only limited quality assurance data available specific to MHCB care. As noted, quality assurance data were instead pooled across program and LOC and reported as aggregated results; with minor exceptions, program-specific performance data were not reported. MHPS meeting minutes did reflect discussion of the custody-mental health partnership, including the success of RHU huddles and, on an anecdotal basis, improvement in the delivery of mental health services on the RHU once these services were relocated to the primary care clinic adjacent to the RHU building.

Apart from monitoring automated performance assurance data and record reviews assessing compliance with *Armstrong* and *Clark* requirements for effective communication documentation, no patient record audits were conducted during the review period. A notation included with the November 2024 mental health program subcommittee minutes indicated that

staffing vacancies made it difficult to form quality improvement workgroups or teams. As a result, the chief of mental health assumed responsibility for certain quality improvement projects. At the time of the site visit, it was reported that HDSP was in the process of rebuilding the quality management team, and that training had been provided to a recently hired health program specialist. Staffing challenges and turnover during the review period contributed to limitations in the quality management program.

Despite challenges in assembling quality improvement workgroups, three SPRFIT quality improvement projects had been identified, and two of these were in process during the review period and at the time of the monitoring tour. A process redesign quality improvement project, focused on improving supervisory review of five-day follow-ups, was identified in September 2022 and still ongoing at the time of the site visit. A second process redesign quality improvement project, focused on improving timely completion of RHU pre-placement screens, was identified in January 2023 and still ongoing. Reported compliance data for RHU pre-placement screens rose from 89 percent in November 2024 to 92 percent in December 2024 and January 2025, but it then fell to 77 percent by April 2025. A third project, focused on improving 30-minute custody checks following patient discharge from MHCB care, was on hold until completion and analysis of the supervisory review of five-day follow-ups. Need for improvement in office 30-minute checks was also first identified in September 2022, but the project had not been initiated at the time of the monitoring tour.

Additionally, a multidisciplinary Focused Improvement Team (FIT) functioned throughout the review period, with a goal of improving EOP group programming. The FIT was chaired by the chief of mental health and included the chief executive officer, a senior psychologist specialist, recreational therapists, a correctional counselor, nursing leadership and

other nursing staff, and custody staff. The FIT initiated an incentive program to encourage patient participation in group programming. It also oversaw the implementation of additional NLTGs, three Community Resources Management groups, and an ISUDT group on the EOP. The FIT functioned effectively to monitor and improve EOP services during the review period.

A new quality improvement project was identified during the final month of the review period, when the chief of mental health indicated that mental health appointment cancellations and timely mental health referrals were not improving at an adequate rate.

During the review period and at the time of the site visit, no peer reviews were conducted for psychologists or social workers, and the facility did not partner with another institution for peer review. HDSP was awaiting statewide direction and updated statewide policy for these peer reviews, and the institution provided statewide CDCR peer review policies for primary clinicians dating to 2015. No local operating procedures for primary clinician peer reviews had been developed at the time of the site visit. HDSP did engage in psychiatric peer reviews during the monitoring period, and the facility produced a September 14, 2022 statewide psychiatry peer review policy. Biannual peer review for three psychiatrists was most recently completed in March 2025, with no significant concerns reported. One of the telepsychiatrists who provided services to patients in Facilities C and D was assigned as chair for the peer review process.

Overall, quality management documentation confirmed ongoing quality assurance monitoring for the mental health program on an institution-wide basis but not on a program-specific basis. Very limited reporting of mental health program performance was conveyed to the QMC, and almost none was conveyed to the local governing body. There was evidence of sporadic quality improvement efforts, but these efforts, including the three SPRFIT improvement projects, were not reported in QMC or LGB meetings. Only the RHU 3CMS group

programming FIT was routinely reported in the MHPS meeting minutes. In general, mental health program challenges and improvements were not adequately communicated up through the organizational chain of command, at least as documented in GMC and LGB minutes. It was unclear whether supervisory and line staff were aware of program-specific performance data.

Medication Management:

[*The monitor's expert's review of medication management data remains ongoing.*]

Transfers:

HDSP's inpatient coordinator was a senior psychologist specialist who was also the QM specialist. He has held the role of inpatient coordinator for approximately a year and a half. The backup inpatient coordinator had been at HDSP for 12 years, was also a senior psychologist specialist, and additionally served as the suicide prevention coordinator, training coordinator, DDP coordinator, and worked in the MHCB as a primary clinician.

During the review period, there were 19 acute and ten ICF referrals; the 19 acute referrals resulted in 18 admissions and one rejection while the ten ICF referrals resulted in eight admissions, one rescission, and one rejection. Seventeen of 19 acute care and all ten ICF referral packets were completed by IRU timely. All acute and ICF referrals resulted in timely admissions, rejections, and rescissions.

There were 150 instances of 94 patients considered for, but not referred to, inpatient care. No referrals were for patients with complex medical needs and, at the time of the monitoring, two patients were pending transfer to inpatient care.

HDSP made 133 MHCB referrals during the review period resulting in 129 admissions and four rescissions; 109 admissions were to HDSP's MHCB and 20 admissions were to MHCBs

at other institutions. Of the 133 referrals, all resulted in alternative housing stays of less than 24 hours and all admissions were timely.

While HDSP kept weekly logs of patients pending transfer to EOP RHUs, they did not track timeliness of those transfers for the review period.

HDSP operated a 3CMS RHU; accordingly, there were no placement delays to that setting.

Seventeen patients transferred from the EOP to 3CMS program during the review period.

There were 326 3CMS patients that transferred to the MSF during the review period.

The institution made 19 referrals to acute care and ten referrals to intermediate care during the review period. There were 150 occasions when a patient was seen by IDTT and met at least one criterion for consideration of referral to HLOC but was not referred.

The institution's HLOC referral process was complicated by its inability to provide Program Guide compliant mental health treatment to patients, particularly those in the EOP and/or with acute exacerbations of their illnesses. It appeared that staff made referral decisions based on expectations of care in EOP rather than the reality of minimal and inadequate treatment there. For example, one patient had arrived at HDSP EOP from California Medical Facility (CMF) acute inpatient program. The patient was on a forced medication order and had a history of suicidality resulting in frequently being housed in inpatient care (MHCB/crisis and acute) since 2023 per the chart. Documentation indicated that despite his poor functioning, he was not referred to intermediate inpatient treatment despite clear clinical indicators that he required more intensive treatment than the HDSP EOP could provide. Patients were typically not offered more than two groups per week and this was clearly inadequate to address this patient's long-standing functional impairments. Following numerous MHCB admissions, the patient was eventually

referred to intermediate inpatient treatment though he had to experience multiple exacerbations of his illness prior to that referral.

There were two sustainable process reviews completed at HDSP during the review period, one during the fourth quarter of 2024 and one during the first quarter of 2025. These reviews highlighted the significant problems with the HLOC review and referral process. HLOC forms from HDSP were of poor quality based on the headquarters (HQ) sustainability audit. Of 17 cases reviewed during quarter four, none were considered adequate by the HQ reviewer. That had improved in the first quarter of 2025 with 36 percent of 14 completed HLOC forms considered adequate. Interrater reliability between the HDSP IPC and HQ sustainability reviewer was also poor. In quarter four, while the HQ sustainability process reviewer found no HLOC forms adequate, the HDSP inpatient coordinator found 29 percent to be adequate. This had improved in the first quarter of 2025 with HQ finding 36 percent adequate to the IPC finding of 43 percent adequate.

This monitor's expert reviewed ten charts as a sample of non-referrals that had been reviewed as part of the monthly HLOC audit by the inpatient coordinator. Some of these cases were during the timeframe of the two sustainability audits. Fifty-percent (five of ten) were determined to have inadequate clinical rationales for non-referral and/or treatment modifications. This was due in part to the failure to update the rationale and treatment modifications (frequent use of cut and paste) as well as not providing sufficient detail in treatment modifications or non-referral rationale. At least three of the cases reviewed were ultimately referred to a HLOC. However, those patients met criteria for referral earlier and their access was unnecessarily delayed. A significant challenge to the institution's treatment teams was the lack of adequate services in the EOP. Treatment modifications were often not realistic given the lack of mental

health services available at HDSP to those patients that required more intensive treatment. In addition, at least two patients only appeared on the sustainability process list because they had been in the HDSP MHCB for ten or more days. According to documentation, those patients only remained in the MHCB due to staffing limitations and difficulty holding necessary discharge IDTT meetings. Therefore, staffing limitations were causing at least some patients to remain in the MHCB for non-clinical reasons.

The inpatient coordinator explained that the staffing challenges at HDSP made the coordinator role more difficult. For instance, mental health staff had not been using the sustainable process report, and new staff, including tele-mental health providers, required orientation and training on the process. At the time of the monitoring tour, the IPC was providing the sustainable process report to clinicians weekly to facilitate their use of the report. The IPC and regional staff had provided multiple training sessions to mental health staff regarding utilization of the sustainable process report and expectations regarding referrals to HLOC. The IPC was also trying to attend more IDTTs to provide feedback to staff and to monitor the process. Treatment plans/HLOC forms were reviewed on the same day to identify any weaknesses so that the documents could be revised.

The regional sustainability process audits found that while HDSP included HLOC referrals and information in the mental health quality management subcommittee, that data was inconsistent with the on-demand report. The IPC was tasked with completing a validation process to reconcile the reports. Consistency across data tracking systems had improved in the first quarter of 2025 following the reconciliation process. The regional sustainability process audit report indicated that all IPCs were asked to continue to reconcile on-demand with their tracking and correct any errors. The reviews also found that of 16 cases reviewed across both

quarters, only half (50 percent) were internally consistent. This was consistent with this expert's review that found the clinical documentation of treatment needs and positive criteria did not support the disposition of the case; specifically, clinical documentation supported referral, but the patient was not referred.

Observed IDTTs across program areas were found to not address HLOC criteria and considerations adequately. Treatment plans were often inadequate and contributed to patients receiving inadequate treatment due to their lack of specificity and likely delayed identification of patients in need of a HLOC. Treatment teams required additional training in treatment planning, practical interventions given staffing limitations, and the HLOC process.

When patients were referred, packets were not consistently completed timely. HDSP documentation noted that delays were due to staffing issues and workload. Again, the staffing obstacles at HDSP were clearly having a negative impact on patients' access to adequate treatment and necessary levels of care. Action plans were established for each area of deficiency. Based on observations during the monitoring tour, regional staff are encouraged to continue to monitor the HLOC process closely and provide remedial training where needed.

Programming:

MHSDS Patients in Restricted Housing:

3CMS RHU:

During the review period, the RHU housed 323 MHSDS patients, including three acute care, 13 ICF, seven MHCB, 67 EOP, and 233 3CMS patients. The average length of stay for MHSDS patients who were housed in the RHU during the review period was 44 days and ranged from one to 302 days. At the time of the site, the RHU had a total census of 109 including 21 EOP patients and 55 3CMS patients.

At the time of the monitoring tour, a full-time senior psychologist served as RHU supervisor. There were three full-time primary clinicians dedicated to providing mental health services to patients in the RHU, two of whom were tele-mental health psychologists. The third primary clinician, a registry social worker, provided services on-site.

Each RHU primary clinician carried mixed caseloads that included both EOP patients housed in RHU awaiting transfer and 3CMS RHU patients. The institution reported that the mixture of EOP and 3CMS patients on each clinician's caseload facilitated equitable workloads across clinicians. However, RHU clinicians' caseloads were nevertheless described as overly burdensome due to the overall number of RHU patients receiving mental health services. The RHU supervisor reported that there was need for a fourth full-time clinician to ensure that RHU services were delivered as required and that mental health staff did not become overburdened.

To support continuity of care, mental health patients placed in RHU were followed by their mainline telepsychiatrists. No psychiatrist was allocated exclusively to RHU services, and all psychiatric care in the RHU was provided through telepsychiatry. Dedicated telepresenters facilitated these encounters. During the review period up through the time of the monitoring tour, telepresenters remained out of the room during the mental health encounter. This practice was confirmed by observation during the monitoring tour.

Twelve weeks of reviewed 114-As revealed the offering of at least ten weekly hours of yard, and the offering of three weekly showers, weekly linen exchanges and clothing exchanges, and phone calls.

Data regarding the number of individuals in RHU overflow at the first of each month was not provided as the institution reportedly had no system in place to track RHU overflow. The institution reported that HDSP had required RHU overflow capacity for over a year, and that one

of the primary factors contributing to this need were EOP patients placed in RHU and awaiting transfer to an RHU or mainline EOP.

A second factor contributing for RHU overflow was the limited number of ADA-compliant RHU cells as only two of the RHU cells in Facility Z could accommodate wheelchairs. Neither had been modified to function as an intake cell, and none of the RHU intake cells could accommodate wheelchair-dependent patients or were ADA-compliant. Because accommodations for disabilities take precedence over intake, mental health patients placed in RHU who also require wheelchairs are not placed in RHU intake cells. The institution reported that monitoring of these patients during the first few days of RHU placement was not enhanced.

Efforts to reduce RHU overflow were reported to be ongoing. Mental health leadership reported that additional ICC meetings were scheduled to facilitate release of individuals from RHU, particularly when RHU was at or beyond capacity. Nevertheless, the RHU supervisor reported that RHU overflow in Facility D, Building 8, had been as high as ten to 20 incarcerated individuals during the review period, and that some individuals in RHU overflow were receiving mental health services. It was not possible to confirm this report due to the lack of an ongoing tracking system for RHU overflow.

As tele-mental health services became increasingly available at HDSP during the review period, individual treatment provided to 3CMS RHU patients was moved from smaller mental health offices located within the RHU building to two larger tele-mental health offices in the primary care clinic building adjacent to the RHU. In terms of space and lighting, the new tele-mental health offices represented significant improvements over the small mental health offices that had been used previously within the RHU. However, sound confidentiality of the new tele-

mental health offices needed improvement; a tele-mental health encounter occurring during the monitoring tour was easily overheard in the hallway outside of the office.

*IDTTs*

Three initial IDTT meetings were observed for EOP patients housed in RHU. The IDTT meeting room was adequate in size, lighting, and confidentiality. A ceiling-mounted security camera reportedly did not have audio capacity. However, the use and placement of tele-mental health equipment within the room made it difficult for patients to see and be seen by on-site staff who participated in the IDTTs. Using tele-mental health equipment, the assigned telepsychiatrist and telepsychologist attended each of the three IDTT meetings, along with a correctional counselor, the RHU supervisor, and a psychiatric technician, who participated in person. The telepsychiatrist and telepsychologist could see each other and the patient, and were visible to the patient, through the tele-mental health equipment. However, the telepsychiatrist and telepsychologist were unable to see the rest of the treatment team in the room.

Two of the three IDTTs were held *in absentia* due to the patients' refusals; the third patient was placed in a TTM for the duration of the IDTT. The three IDTTs were conducted with intentional focus on efficiency and timeliness, an effort that at times interfered with therapeutic rapport and communication with the patient. While team members were familiar with the patients and had made determinations regarding the patients' treatment needs, key elements of treatment planning were missing from IDTT discussions. The patients' functional impairments and psychotropic medications were consistently identified, but treatment goals were stated in only generalized and non-individualized terms. Measurable and patient-specific treatment goals and non-pharmacological treatment interventions were not discussed. Assignment to EOP groups was not discussed, and the reasons for the patients' refusal to participate in IDTT

meetings was not discussed in either of the two IDTTs held *in absentia*. The patients' diagnoses and levels of care were only discussed in two of the three meetings, and treatment progress was discussed in only one of the IDTTs.

Follow-up review of IDTT documentation for the three patients indicated that case formulations were generic and not patient- or symptom-specific. Patient strengths and verbalized treatment goals were documented in a cursory manner for two of the three patients. For all three patients, master treatment plans were either not developed at all or not updated from plans developed at other institutions months earlier. The rationale for retaining the patient in the EOP level of care was not documented for two of the three patients.

Seven initial IDTT meetings were observed for 3CMS RHU patients. A laptop was used in combination with the tele-mental health unit to provide tele-mental health staff with video into the IDTT room, as it was reported that the video component of the telehealth unit was malfunctioning. With these exceptions, there were no technical difficulties in the use of telehealth equipment, including no interruptions or delays in audiovisual fidelity.

The observed 3CMS RHU IDTTs were attended by required mental health staff. In addition to the telepsychiatrists and telepsychologists, IDTTs were attended in person by the RHU supervisor, psychiatric technician, and a correctional counselor. The social worker participated in three of the seven IDTTs, and the telepsychologists each participated in two of the seven IDTTs. Five of seven patients attended their IDTT meeting, while two IDTTs were held *in absentia* due to the patients' refusals. Patients who attended were placed in a TTM for the duration of their IDTT meeting, and one of the TTMs was large enough to accommodate patients who used wheelchairs. 3CMS RHU IDTT meetings were held in the same room where IDTT meetings were held for EOP patients in RHU.

The quality of IDTT discussions varied by primary clinician. In general, psychiatric input was collaborative, professional, and kind across all four telepsychiatrists. Patients' psychotropic medications were consistently identified, with appropriate inquiries into the patients' responses and possible side effects. Additionally, primary clinicians were familiar with their patients' histories and had formed opinions about the patients' treatment needs. However, only one primary clinician discussed specific, nonpharmacological interventions with the patient; this discussion was absent in five IDTT meetings. Individualized, objective, and measurable treatment goals were not discussed in four IDTTs, referrals to groups were not discussed in five IDTTs, and reasons for participation refusal were not discussed in the two IDTTs that were held in absentia. Psychiatric diagnoses were not mentioned in one of the seven IDTTs.

One of the telepsychologists evidenced a highly collaborative and engaging therapeutic rapport. However, it was clear in other cases that the primary clinicians felt pressure to complete IDTT meetings within the 15 minutes that were allotted for each patient. It was important to acknowledge that this pressure was real, insofar as telepsychiatrists and tele-mental health clinicians needed to know in advance when they would be expected to join and leave IDTT meetings through tele-mental health. In some of the observed IDTTs, the focus on efficient time use resulted in a pre-determined, almost mechanical approach to completing the IDTT discussion. More than one patient exhibited nonverbal signs of displeasure and disengagement with the team, as if they did not feel heard. In general, greater emphasis on collaborative partnership with the patient and on key elements of the treatment planning process was needed.

Follow-up review of IDTT documentation for the seven patients indicated that the quality of case formulations varied significantly by primary clinician. Most case formulations were generic and did not address psychiatric symptoms. Patient strengths were frequently

documented in a cursory manner, and, with one exception, master treatment plans were missing, not updated, or inadequate in specificity and measurability of treatment goals and/or treatment interventions. In addition, one of the seven patients was discharged from 3CMS LOC, and this discharge appeared clinically appropriate.

The RHU Policy requires an initial IDTT for 3CMS RHU patients before the initial ICC and not later than ten calendar days after arrival. RHU Policy at 5. Thereafter, routine IDTTs are required every 90 days. *Id.*

The monitor randomly selected and reviewed the healthcare records of 30 3CMS RHU patients to assess compliance with RHU policy timeframes during their stays. All 30 patients required initial IDTTs. Of the 30 reviewed initial IDTTs, none occurred timely within 10 calendar days or arrival or level of care change. Ten or 33 percent of IDTTs were attended by all required staff and six or 20 percent were attended by the patients. Reasons initial IDTTs were held *in absentia* included patient refusals.

To measure timeliness of routine 3CMS RHU IDTT meetings, CDCR produced an appointments report that included individuals who were required to receive a routine IDTT meeting during the review period. For the 85 patients in CDCR's appointments report, there were 87 completed routine IDTTs; there were no refusals. When a patient had either an initial IDTT and a routine IDTT or more than one routine IDTT, compliance with Program Guide timeframes was able to be calculated. Of the 87 completed IDTTs, three were individuals who had at least two IDTTs. Of those, all were compliant with Program Guide timeframes. Of note, the report did not include individuals that did not have a completed IDTT, such as those that were not scheduled.

*Structured Treatment*

The RHU Policy required that patients assigned to a 3CMS RHU be offered a minimum of 20 hours of out-of-cell time each week, including 18.5 hours of recreational time outside the cell and 90 minutes of confidential, structured therapeutic activities. *See* ECF No. 8355 at 7-17 (Restricted Housing Unit Program: Mental Health Services Policy, dated July 19, 2024 and effective August 1, 2024) (hereinafter "RHU Policy").

Between October 28, 2024 and April 30, 2025, the institution offered an average of one hour of structured treatment to 3CMS RHU patients per week. On average, 3CMS RHU patients refused an average of 0.6 hours of offered treatment and attended 0.4 hours of structured treatment each week.

*Group Treatment*

Although not observed during the monitoring tour, three 90-minute RT groups were scheduled weekly for EOP patients housed in RHU. The group room was adequate in size and confidentiality. A wall-mounted camera provided custody surveillance but did not have audio capacity. The room had eight start-up chairs and thus could accommodate up to eight patients in each group session.

Group programming for 3CMS RHU patients was held in a dedicated group room with eight restart chairs. This was the same group room used for EOP patients held in RHU. At the time of the monitoring tour, two 90-minute group sessions were scheduled each week for 3CMS RHU patients. Because the group room could hold only eight patients at a time, the group schedule permitted a maximum of 16 RHU 3CMS patients to receive a 90-minute group each week. As a result, most 3CMS RHU patients were not offered a 90-minute group as required by the Program Guide. Notably, the HDSP triage plan did not modify the requirement for 3CMS RHU group programming. The challenge in providing required 3CMS RHU group

programming appeared to be related to understaffing and diversion of staffing resources to EOP patients.

When both 3CMS RHU groups were held, they occurred back-to-back on Wednesdays. However, the RT assigned to provide 3CMS RHU group programming reported that it was common for the two group sessions to be combined into a single 90-minute session due to relatively low patient attendance.

The monitor's expert observed a 3CMS RHU group attended by five patients. Custody officers individually escorted handcuffed patients to the group room and then secured each patient to a restart chairs. The group started 35 minutes late but was effective and engaging once it was initiated. An ice-breaking exercise entitled "Rules for being a Sports Fan" was successful in engaging the patients in discussion but contained misogynist and sexist language that was not clinically appropriate for incarcerated patients.

The RT used a highly engaging treatment style to encourage patient participation which was well received by the patients. Apart from portions of the ice-breaker exercise, content of the group was clinically appropriate. It was clear that the RT was well-prepared, professional, and skilled. He used structured exercises to engage patients in thinking about their loyalties, values, goals, and behaviors, topics that were particularly relevant to the five patients who participated. Content and pace were consistent with patients' ability to process the material.

*Individual Treatment*

Under the triage plan, 3CMS RHU patients were expected to be seen every other week, scheduling of initial IDTT meetings was prioritized over scheduling of routine IDTTs, huddles were paused on weekends, and the quarterly roundtable meetings were paused. These modifications were in place throughout the review period and up through the time of the

monitoring tour. Although consideration had been given to discontinuing triage plan elements for the 3CMS RHU program, the modifications continued due to concerns that the new SNY yard would result in increased RHU admissions and further overwhelm RHU clinicians.

Mental health leadership reported that HDSP did not monitor and report timeliness of mental health services separately for 3CMS RHU patients. Instead, HDSP aggregated these data with quality assurance data for mainline mental health services. This report was consistent with quality assurance data provided in mental health program subcommittee minutes. Mental health leaders described a careful, two-person, double-checked process of checking, ordering, and scheduling mental health encounters and IDTTs for RHU patients. However, they also noted that, during the review period, there had been a failure to schedule routine IDTTs for RHU 3CMS patients and that initial IDTTs for RHU 3CMS patients were postponed because there was insufficient staffing to complete initial psychiatric assessments for these patients in a timely manner.

The RHU Policy requires that all patients placed into 3CMS RHU receive an initial primary clinician evaluation within ten days of arrival and an initial psychiatry evaluation prior to the IDTT and within ten days of arrival. *See* RHU Policy at 4. The RHU Policy also requires that 3CMS RHU patients receive weekly primary clinician contacts and psychiatry contacts every 90 days. *See id*.

The monitor randomly selected and reviewed the healthcare records of 30 3CMS RHU patients to assess compliance with RHU policy timeframes for initial psychiatry evaluations during their stays. All 30 patients required initial psychiatry evaluations; five occurred timely and before the initial IDTT, while six did not occur at all. Of the 24 reviewed cases, 22 or 92

percent were conducted in confidential settings; non-confidential contacts were due to patient refusals. Telepsychiatry was utilized for all initial psychiatry evaluations.

To assess compliance with RHU Policy timeframes for routine psychiatry contacts, CDCR produced an appointments report for patients who were required to receive at least one routine psychiatry contact during the review period. For the 23 patients in CDCR's appointments report, there were 26 total completed and refused contacts. Of the 19 that were completed, 16 or 84 percent were reported as being conducted in a confidential setting. When a patient had more than one completed contact, compliance with Program Guide timeframes was able to be calculated. Of the 19 completed contacts, four were for individuals who were seen at least twice by a psychiatric provider. All were completed within Program Guide timeframes. Of note, the report did not include individuals that did not have complete contacts, such as those that were not scheduled in accordance with the institution's triage plan.

The same randomly selected 30 patients who required initial psychiatry evaluations also required initial primary clinician evaluations. Of the 30 reviewed initial primary clinician contacts, six or 20 percent were completed within 10 calendar days of arrival or change in level of care while nine did not occur at all. Of the 21 reviewed cases, 12 or 57 percent were conducted in a confidential setting; non-confidential contacts were due to patient refusals. Twelve or 40 percent of contacts utilized tele-mental health.

To assess compliance with RHU Policy timeframes for routine primary clinician contacts, CDCR produced an appointments report for patients who were required to receive at least one routine primary clinician contact during the review period. For the 91 patients in CDCR's appointments report, there were 210 total completed and refused contacts. Of the 210 that were completed, 116 or 55 percent were reported as being conducted in a confidential setting. When a

patient had more than one completed contact, compliance with RHU Policy timeframes was able to be calculated. Of the 210 completed contacts, 120 were for individuals who were seen at least twice by a primary clinician provider. Of those 120 contacts, no contacts were completed beyond the Program Guide required timeframes. Of note, the report did not include individuals that did not have completed contacts, such as those that were not scheduled in accordance with the institution's triage plan.

Of the 210 completed routine primary clinician contacts, one contact was reported to have been completed in zero minutes, 124 were completed within 15 minutes, 49 lasted between 16 and 30 minutes, 30 lasted between 31 and 60 minutes, one lasted between 61 and 95 minutes, and five were completed in greater than 95 minutes.

The monitor's expert attended the RHU huddle and observed that all required staff were present, with all attendees signing the huddle form in accordance with policy. A review of the huddle log book revealed regular signatures documenting staff attendance, although some entries reflected only one staff person present rather than the full required complement. The RHU huddle demonstrated appropriate collaboration, with meaningful interaction between the MHPC and psych tech throughout the discussion.

Five 3CMS RHU patients were interviewed as a group. Only one of the patients reported satisfaction with mental health services. Other interview participants indicated that mental health services were inadequate, that more group programming and in-cell therapeutic activities were needed, and that they did not feel listened to by their assigned mental health team. All five participants reported that the institutional culture was abusive and dangerous, and that, with occasional exceptions, custody staff could not be approached when patients had need for

immediate mental health assistance. Only one patient knew that he had a treatment plan and what it entailed.

Four of the five patients interviewed expressed anger about the conditions of confinement at HDSP. Their concerns included limitations on telephone calls and commissary purchases, inability to access electronic tablets and other property, insufficient meals, absence of personal television sets, lack of meaningful daytime activity, allegedly verbally abusive custody staff, and high levels of violence. Because he found the HDSP RHU environment so aversive, one patient reported that he did not want to speak with mental health staff through telehealth, because he was certain that tele-mental health staff would not understand how difficult the environment was to tolerate. The patient reported that he routinely refused telepsychiatry and tele-mental health clinician appointments as a result.

The monitor observed eight ICCs including three initial ICCs and five subsequent ICCs. Required staff and patients were in attendance for all ICCs. Two patients were released back to mainline housing, four patients received an extension due to awaiting RVR adjudication, and the remaining two patients received an extension due to safety and enemy concerns. One patient was eligible for NDS status but did not require expedited transfer.

Non-Disciplinary Segregation:

During the review period, 53 MHSDS patients were on NDRH status. Five patients required expedited transfer. At the time of the monitoring tour, 16 patients were on NDRH status and only one patient required expedited transfer.

MHCB:

HDSP maintained a ten bed MHCB during the review period. Staffing in the MHCB was concerning. There were two telepsychiatrists; one reportedly provided 150 hours per month to

the MHCB while also functioning as the chief psychiatrist. The second telepsychiatrist provided 43 hours per month and rounded out daily coverage. There was a senior psychologist specialist who was noted to provide 150 hours of service per month in the MHCB, but was also the SPRFIT coordinator, training coordinator, DDP coordinator, and inpatient coordinator backup in addition to treating patients in the MHCB. It was not clear from data or interviews how much time each actually spent with staff and patients in the MHCB given their many other duties. The HDSP MHCB also had an recreation therapist 25 hours per month.

Despite the chief psychiatrist and senior psychologist specialist being reported as assigned to the MHCB, review of medical records revealed that there was little continuity in care through much of the review period. Patients were typically seen by different psychiatrists, and several were not seen by a primary clinician except for the initial assessment and for discharge suicide risk assessments. Documentation of contacts indicated that the only treatment provided was occasional contact with the RT for recreational activities and medication management with the psychiatrist. This may explain why in numerous cases, the patient was readmitted within days of their discharge.

Mental health management at HDSP recognized that staffing vacancies negatively impacted their ability to meet Program Guide requirements. They reported that they had been functioning under a formal triage plan. The EOP had been excluded from the triage plan shortly before the monitoring tour. While the MHCB and emergent referrals were reportedly prioritized, a significant portion of medical records reviewed indicated that it was not unusual for patients to remain in the MHCB longer than clinically indicated due to staffing challenges that negatively impacted their ability to have treatment team meetings, particularly the discharge treatment team meeting.

There were ten patients who had three or more MHCB referrals/admissions during the review period.

The MHCB's daily census averaged eight patients during the review period. MHCB clinical lengths of stay averaged 7.3 days, with approximately 21 percent of patients having clinical stays exceeding ten days. A sample of those cases were reviewed, and documentation attributed extended stays to the inability to hold a discharge IDTT due to insufficient staff rather than clinical indications. Physical stays averaged 8.5 days; approximately 28 percent of patients had physical stays that were longer than ten days. Reasons for delays included safety concerns and medical holds.

Five patients were admitted to the MHCB three or more times during the review period.

Two weeks of 114-A data for 81 MHCB patients revealed that patients were offered yard daily for a minimum of two hours. Patients were also offered, multiple showers, weekly linen and clothing exchanges, and phone calls.

*IDTTs*

The monitor's expert observed IDTT meetings during the monitoring tour. Those meetings were well-facilitated. However, treatment plans were not developed in collaboration with the team and typically did not reflect actual treatment delivered beyond medication management. Documentation revealed that at times, patients with safety concerns were seen only as seeking secondary gain through reports of suicidality without a comprehensive assessment or reviewing the safety concerns in the context of the patient's mental illness (e.g., due to paranoia, excessive anxiety) and how that could elevate the patient's risk of self-harm. Treatment plans were not updated over the course of the patient's admission, even for those patients who remained beyond ten days.

The Program Guide requires initial MHCB IDTT meetings to be completed within 72 hours of arrival and routine IDTT meetings to occur at least weekly thereafter. ECF No. 7333-1 at 83. The monitor randomly selected and reviewed the healthcare records of 30 MHCB patients to assess compliance with Program Guide timeframes for initial and routine IDTT meetings during their stays. These 30 MHCB patients required initial IDTTs, of which 22 or 73 percent occurred within 72 hours of arrival. Assigned staff were present at 19 of 30, or 63 percent of the initial IDTTs reviewed. The assigned psychologist and / or psychiatrist were the most frequently substituted staff members. Patients attended 100 percent of initial IDTTs.

These same patients also required routine IDTTs during their MHCB stays. Of the 30 required routine IDTTs, 29 or 97 percent occurred timely, or every seven calendar days following the initial IDTT. Twenty-one or 70 percent of routine IDTTs had the required assigned staff in attendance. The assigned psychologist and / or psychiatrist were the most frequently substituted staff members. An alternate psychiatrist and psychologist and no correctional counselor or nurse attended one patient's IDTT. Of the 30 routine IDTTs reviewed, patients attended 100 percent.

The Program Guide requires initial evaluations to be completed within 24 hours of admission to MHCB. Thereafter, patients must be seen daily by either the psychiatrist or psychologist. At least twice weekly, the psychiatrist must evaluate the patient.

The monitor randomly selected and reviewed the healthcare records of 30 MHCB patients to assess compliance with Program Guide timeframes for initial and routine psychiatry and primary clinician contacts. Thirty MHCB patients required initial psychiatry evaluations. Of those, 23 or 77 percent were timely, meaning they occurred before the initial IDTT and within 24 hours of arrival. Twenty-seven or 90 percent were reported as conducted in a confidential setting.. Telepsychiatry was utilized for all initial psychiatry contacts.

All thirty MHCB patients require two routine psychiatry contacts per week. There were 104 expected contacts, and 103 or 99 percent were timely. Of the 103 routine contacts reviewed, 98 or 95 percent were reported as being conducted in a confidential setting.. At HDSP, psychiatrists saw patients more frequently in the MHCB than the primary clinicians. Telepsychiatry was utilized for all routine psychiatry contacts.

Thirty MHCB patients required initial primary clinician evaluations; 14 or 47 percent were completed within 24 hours of arrival, while six or 20 percent were not documented in the patient record. Of the 24 required initial primary clinician contacts reviewed, 23 or 96 percent were held in a confidential setting. Tele-mental health was not utilized for initial primary clinician assessments.

Thirty MHCB patients required routine primary clinician contacts. An institution was considered compliant if a patient was seen daily beginning the day after admission for an out-of-cell confidential contact (unless the patient refused) by the psychiatrist or psychologist, though on weekends the patient may be seen by the medical officer of the day (MOD). *See* ECF No. 7333-1 at 84 (PG 12-5-13). There were 116 expected contacts, of which 38 or 33 percent were timely. Thirty-one or 27 percent occurred in a confidential setting. Tele-mental health was not utilized for routine primary clinician contacts.

HDSP had a long history of challenges with operating its MHCB. The difficulty with maintaining sufficient qualified stable staffing in the unit had been a primary obstacle to patients receiving necessary mental health treatment in the MHCB. Review of patient MHCB records revealed that they were not being seen daily for assessment and therapeutic intervention as required nor was there continuity of care. There were significant deficiencies with the utilization of seclusion and completion of necessary documentation, as reported below. Patients remained

in the MHCB beyond what was clinically indicated due to staffing problems. Defendants were strongly encouraged to consider closing the MHCB at HDSP until inadequate staffing levels have been fully resolved.

Seclusion and Restraint:

There were no incidents of restraint during the review period.

The seclusion log indicated two instances of seclusion involving two different patients, one for two hours and one for 79 minutes. The patient who remained in seclusion for two hours had engaged in self-harm and was moved to a safety cell in the MHCB. While there was an order initiating seclusion that included observation level and frequency of offering fluid, there was no order terminating seclusion and no associated progress note. The patient was under constant observation while on seclusion status. During that time, he was observed by staff to be having a seizure. The patient was taken to an outside hospital and then returned to the MHCB that evening.

The other patient identified in the seclusion log had been disruptive, knocking on the glass on his cell door, stating that he would break the glass if not given a second food tray. When staff explained that breaking the glass was not in his best interest and that he would not receive a second tray, the patient removed his clothing and tied it around his neck. An emergency response was initiated, and the patient was placed into a safety cell. There was no order for placement into seclusion nor was there an order to release the patient. There was also no documentation from nursing regarding observations of the patient during that time. The patient was seen by the telepsychiatrist who noted that the patient no longer required safety cell placement but did not include an order for release.

HDSP MHCB staff were commended on their ability to deescalate these situations to prevent the need for restraints. However, documentation for seclusion was problematic and requires remediation. While patients in the MHCB were basically all secluded since they were alone in their cells, placement in the safety cell for seclusion was more restrictive than being in their actual rooms. Documentation of criteria for placement and removal from seclusion, alternative interventions implemented prior to seclusion, and ongoing monitoring were absent or inadequate.

EOP:

Two primary clinicians, one psychiatrist, and one tele-mental health psychologist provided services to EOP patients.

EOP patients were housed on Complex 2, Facility D1. The EOP yard opened on January 28, 2024. EOP patients received mental health services in the mental health clinic that was also on D-Yard. Each PC had an individual office space to provide individual contacts and the offices provided appropriate confidentiality. There were two group rooms in the clinic with ample space and sound confidentiality. One of the group rooms was also used for IDTTs. Staff reported the limited number of group treatment spaces impacted the number of groups they were able to run. Staff also anticipated the treatment space problem worsening as Level IV SNY GP and 3CMS patients began programming and competing for the limited group spaces. Leadership reported the chapel would be made available to GP patients for groups which would improve treatment space options for EOP programming. Overall, the observed treatment spaces provided appropriate confidentiality and were adequate, but providing more treatment space options for EOP groups would be beneficial. Staff reported no issues or barriers to confidential PC and psychiatry contacts.

*Structured Treatment*

The Program Guide required that each EOP patient be offered at least ten hours per week of structured therapeutic activities. *See* ECF No. 7333-1 at 58. For patients who were determined by the treatment team to be clinically contraindicated for ten hours of treatment activities per week, the primary clinician is required to present the case and recommended treatment program (i.e. EOP modified programming) to the IDTT for approval. If the patient's modified treatment program included a schedule of less than ten hours of treatment per week, the patient's IDTT was required to meet monthly to review and increase the amount of structured therapeutic activities, or refer the patient to a higher level of care as clinically indicated. *Id.*

During the review period, mainline EOP patients were offered an average of 4.92 hours of structured therapeutic activities per week, attended 3.65 hours per week, and 1.65 hours per week were cancelled. Documentation indicated the institution had limited success increasing the amount of offered structured therapeutic activities in the weeks before the monitoring tour, but even with these improvements, the institution was unable to offer ten hours per week as required. Staff and patients reported the primary obstacles to providing more STAs to EOP patients were understaffing and limited treatment spaces. Staff and patients also reported that although treatment refusals had been relatively minimal over the review period and immediately prior to the monitoring tour, they anticipated increased refusals as SNY 3CMS and GP IPs continued to arrive in Facility D.

There were four patients on EOPMod status during the review period. EOPMod patients were offered 3.72 hours of STAs per week, attended 2.87 hours, and 1.44 hours per week were cancelled.

*IDTTs*

The monitor's expert observed four routine EOP IDTTs. The IDTTs were well staffed and patients attended each IDTT. The chief of mental health reported there were no significant barriers to timely initial and routine IDTTs and that the entire EOP team usually attended. The chief of mental health, telepsychiatrist, PCs, CC1, RN, and RT attended the IDTTs. The chief of mental health facilitated the IDTTs and provided on-the-job training to a new primary clinician. The IDTTs were generally adequate and included a thorough case conceptualization, individualized treatment planning, and measurable treatment goals for each patient. Interventions were appropriate and each patient's group attendance was reviewed. The IDTTs were collaborative and level of care was discussed and justified for each patient. The CC1 was remarkably skilled and had excellent rapport with the patients.

Although generally adequate overall, each of the observed IDTTs lacked one or more key components. Three of four IDTTs did not include discussion of the psychiatric history for the patient. In two IDTTs, there was no discussion of pre-release or transition planning despite the patients' upcoming parole dates and during one IDTT the patient's medications were not identified. These deficiencies did not appear to significantly impact overall treatment planning or the patient's experience.

The Program Guide requires that EOP patients receive an initial IDTT within 14 calendar days of arrival to the institution and a routine IDTT every 90 days thereafter. *See* ECF No. 7333-1 at 57, 59.

The monitor randomly selected 30 EOP patient records to assess compliance with Program Guide timeframes for initial IDTTs during their stays. Of the 30 randomly selected patients' records, all 30 received a timely initial IDTT. Required staff were present in 19 or 63 percent of reviewed records. Twenty-five or 83 percent of patients attended their IDTTs.

To measure timeliness of routine IDTT meetings, CDCR produced an appointments report that included EOP patients who were required to receive a routine IDTT during the review period. For the 118 patients in CDCR's appointments report for November 1, 2024 to April 30, 2025, there were 177 completed initial or routine IDTTs. When a patient had either an initial IDTT and a routine IDTT or more than one routine IDTT, timeliness in accordance with Program Guide requirements was able to be calculated. Of the 177 completed IDTTs, 60 were for individuals who had at least two IDTTs. Of those 60, 28 or 47 percent occurred past Program Guide requirements. Of note, the report did not include individuals that did not have a completed IDTT, such as those that were not scheduled.

*Group Treatment*

At the time of the monitoring tour, all group treatment was cancelled due to a program status report.

During the review period and at the time of the monitoring tour, EOP patients were offered a total of 31 different groups consisting of mental health groups, NLTGs, CRM, and CBI groups. Patients were assigned to groups at their initial IDTT. Mental health groups were primarily RT groups and were offered daily during weekdays. Group topics included social skills, coping, life skills, and current events. The only core clinical group offered to EOP patients was the START NOW group which was offered once per week. At the time of the monitoring tour, there were 16 patients enrolled in the START NOW group.

Mental health staff and patients reported significant concerns that EOP and 3CMS/GP patients were programming together for CBI groups and classes and would be forced to comingle in the patio area where most of the medical and mental health treatment and programming offices were located. This comingling of EOP patients with 3CMS patients and non-MHSDS

incarcerated persons was in violation of the Program Guide. *See* ECF No. 7331-1 at 51 (PG 12-4-1, requiring "separate housing unit and structured activities" for EOP patients including "alternative educational, work, and recreational opportunities specifically provided for inmate-patients whose mental illness precludes their placement and participation in the GP programs.").

*Individual Treatment*

The Program Guide requires that EOP patients are offered an initial psychiatrist evaluation before their initial IDTT and within 14 calendar days of arrival to the institution or level of care change. *See* ECF No. 7333-1 at 57. Thereafter they are required to receive a routine psychiatric contact every 30 calendar days. *Id*. at 59. Patients are also required to receive a primary clinician evaluation within 14 calendar days of arrival and weekly (i.e. once per calendar week with no more than ten calendar days between contacts) with either a primary clinician or in group psychotherapy with an individual contact every other week. *Id*. at 57, 59.

The monitor randomly selected 30 EOP patient records to assess compliance with Program Guide timeframes for initial psychiatry evaluations during their stays. Thirty patients required initial psychiatry evaluations, of which 18 or 60 percent were conducted timely. Of the 30 charts reviewed, 28 were conducted in a confidential setting.

To assess compliance with Program Guide timeframes for routine psychiatry contacts, CDCR produced an appointments report including EOP patients that were required to receive a routine psychiatry contact during the review period. For the 101 patients in CDCR's appointments report, there were 292 completed and refused contacts. Of the 227 completed contacts, 205 or 90 percent were confidential. Reasons for non-confidential psychiatry contacts included patient refusal, custody modified program, and provider-initiated unplanned contact with patient.

When a patient had more than one completed or refused contact, compliance with Program Guide timeframes was able to be calculated. Of the 292 completed and refused contacts, 191 were for individuals who were seen at least twice by the psychiatric provider. Of those 191 contacts, there were 101 or 53 percent that occurred beyond Program Guide requirements with a range of 31 to 106 days between contacts. Of note, the report did not include individuals that did not have completed contacts.

The monitor randomly selected 30 EOP patient records to assess compliance with Program Guide timeframes for initial primary clinician evaluations during their stays. Thirty patients required initial primary clinician evaluations, of which 19 or 70 percent were conducted timely and 26 or 93 percent were conducted in a confidential setting.

To assess compliance with Program Guide timeframes for routine primary clinician contacts, CDCR produced an appointments report including EOP patients that were required to receive a routine primary clinician contact during the review period. For the 91 patients in CDCR's appointments report, there were 429 completed and refused contacts. Of the 379 completed contacts, 348 or 92 percent were confidential as reported by the institution. Reasons for non-confidentiality included patient refused confidential contact and confidential space was not available.

When a patient had more than one completed or refused contact, compliance with Program Guide timeframes was able to be calculated. Of the 429 completed and refused contacts, 339 contacts were for individuals who were seen at least twice by the primary clinician. Of those 339 contacts, 180 or 53 percent occurred beyond Program Guide requirements with a range of 11 to 63 days. Of note, the report did not include individuals that did not have completed contacts, such as those that were not scheduled.

The monitor's expert conducted cell front interviews with five EOP patients. All five patients reported positive experiences and good rapport with their clinical teams and reported they receive timely, confidential contacts. Further, these patients reported that individual contacts did not feel rushed, and their clinicians cared about their wellbeing and progress. The patients described the RT groups as repetitive and more focused on recreation (art, games, etc.) than clinical topics. They requested more variety within RT groups and more core clinical group offerings.

Several patients reported difficulties with some of the COs assigned to the EOP housing unit. They elaborated that several COs were not trained to work with the EOP population and that patients experienced frequent verbal abuse, delayed emergency and "man-down" responses, and not being let out of their cells for ducated appointments. Finally, all five patients also expressed significant fear and anxiety in response to the incoming SNY transfers and the potential for increased exploitation, victimization, and violence.

<u>3CMS:</u>

Two primary clinicians, 4.5 psychologists, and seven tele-mental health providers provided services to 3CMS patients.

*IDTTs*

The monitor's expert observed 18 3CMS IDTTs for patients housed on A, B, and C Yards. The observed IDTTs were adequate and met Program Guide requirements. Required staff and patients attended all IDTTs. In each meeting, the psychiatrist, primary clinician, and CCI attended and participated. Each patient's primary clinician led the IDTTs in a confidential space. For each observed IDTT, the treatment team utilized a collaborative approach with all attendees participating meaningfully. The primary clinician provided appropriate clinical and psychosocial

histories in A Yard, but history was reviewed only briefly at the C Yard meeting. Case conceptualizations for each patient, and diagnoses, functional impairments, and safety concerns were discussed for each patient. Additionally, discussion of medications was appropriate, and LOC discussion and justification was provided for each patient. Furthermore, goals were discussed and relevant for each patient's clinical presentation, but interventions were less clear, and often simply stated that the patient would learn coping skills.

A concerning interaction took place with one patient when he was told by the CC1 that a decision would be made at his upcoming committee meeting regarding an RVR from May 2024. The CC1 mentioned that he could potentially be placed on "C" status, and the patient appeared surprised. He argued persistently but respectfully, was clearly upset and asked to leave the meeting. He was not given permission to leave for a few minutes while the staff tried to explain the situation further and calm him, which did not appear to be effective. After he left the meeting, the regional administrator spoke to him and made an additional request for the patient's primary clinician to talk with him again later the same day.

Initial IDTTs for 3CMS patients are required to occur within 14 working days of arrival to the institution or level of care change and annually thereafter. *See* ECF No. 7333-1 at 43-44.

The monitor randomly selected 30 3CMS patient records to assess compliance with Program Guide timeframes for initial IDTT meetings during their stays. Of the 30 patients, 18 or 60 percent of initial IDTTs were timely. Of those, required staff attended 17 or 94 percent and patients attended 16 or 89 percent of reviewed initial IDTT meetings.

To measure timeliness of routine IDTT meetings, CDCR produced an appointments report that included individuals who were required to receive a routine IDTT meeting during the review period. For the 621 patients in CDCR's appointments report, there were 646 completed

routine IDTTs and two refusals. When a patient had either a completed or refused initial IDTT and a routine IDTT or more than one routine IDTT, compliance with Program Guide timeframes was able to be calculated. Of the 648 IDTTs that were completed and refused, 31 were for individuals who had at least two IDTTs. Of those, all were compliant with Program Guide timeframes. Of note, the report did not include individuals that did not have a completed IDTT, such as those that were not scheduled.

*Individual Treatment*

The Program Guide requires that patients are offered an initial psychiatrist evaluation before their initial IDTT. *See* ECF No. 7333-1 at 34-50, 641. Thereafter they are required to receive a routine psychiatric contact every 90 calendar days if the patient is prescribed a psychotropic medication. *Id*. at 44. Patients are also required to receive a primary clinician evaluation within ten working days of arrival and every 90 calendar days thereafter. *Id*. at 41, 48.

The monitor randomly selected 30 3CMS patient records to assess compliance with Program Guide timeframes for initial psychiatry evaluations during their stays. Thirty patients required initial psychiatry evaluations, of which three of ten percent were conducted timely.

To measure timeliness of routine psychiatry contacts, CDCR produced an appointments report that included individuals who were required to receive a routine psychiatry contact during the review period. For the 838 patients in CDCR's appointments report covering patients who received at least one routine psychiatry contact during the review period, there were 1,298 total completed and refused contacts. Of the 1,220 that were completed, 1,210 or 99 percent were conducted in a confidential setting. When a patient had more than one completed contact, compliance with Program Guide timeframes was able to be calculated. Of the 1,298 completed

and refused contacts, 462 were for individuals who were seen at least twice by a psychiatric provider. Of those 462 contacts, 95 or 21 percent of contacts were completed beyond the Program Guide required timeframes. Of note, the report did not include individuals that did not have complete contacts, such as those that were not scheduled in accordance with the institution's triage plan.

The monitor randomly selected 30 3CMS patient records to assess compliance with Program Guide timeframes for initial primary clinician evaluations during their stays. Thirty patients required initial primary clinician evaluations, of which one or three percent were timely.

To measure timeliness of routine primary clinician contacts, CDCR produced an appointments report that included individuals who were required to receive a routine primary clinician contact during the review period. For the 874 patients in CDCR's appointments report, there were 1,343 total completed and refused contacts. Of the 1,341 that were completed, 1,236 or 92 percent were conducted in a confidential setting. When a patient had more than one completed contact, compliance with Program Guide timeframes was able to be calculated. Of the 1,343 completed and refused contacts, 471 were for individuals who were seen at least twice by a primary clinician provider. Of those 471 contacts, 102 or 22 percent of contacts were completed beyond the Program Guide required timeframes. Of note, the report did not include individuals that did not have completed contacts, such as those that were not scheduled in accordance with the institution's triage plan.

Of the 1,341 completed routine primary clinician contacts, 30 were reported to have been completed in zero minutes, 885 were completed within 15 minutes, 286 lasted between 16 and

30 minutes, 123 lasted between 31 and 60 minutes, 14 lasted between 61 and 95 minutes, and three were completed in greater than 95 minutes.

Nine A Yard 3CMS patients were interviewed regarding the 3CMS program. The patients knew what an IDTT was when explained and thought they had been at a treatment team meeting within the past six months. None of the patients knew what their treatment plan goals were. All patients stated they had been seen by their psychiatrist within the past month and could recall their last MHPC visit within the past six months. Most patients knew their primary clinician and reported they were consistent.

The patients reported that clinical contacts were consistently provided in a confidential setting. All patients indicated they knew how to access mental health services for both emergencies and non-emergencies. Groups were not generally available to 3CMS patients, as they were not required for this LOC.

All interviewed patients stated that their primary clinician was responsive and listened to them adequately, and that most of their mental health needs were adequately met. Patients reported that mental health staff quickly responded to their requests. However, a common complaint was that they felt medications were offered more readily than other solutions that they believed would be more helpful, though they did not offer specific alternatives.

All patients interviewed reported that they did not have reliable access to programming or jobs and must endure long waiting periods to get them. They complained that the facility locks them down every Wednesday and Thursday on their specific yard, preventing them from attending programming on those days.

<u>Other Issues:</u>

<u>Pre-Release Planning</u>:

The HDSP pre-release planning LOP was last revised in August 2023 and thus not up to date.

The Institutional Mental Health Pre-Release Coordinator (IMHPC) was a tele-mental health provider.

HDSP reported that patients who required pre-release planning received services such as face to face meetings with clinicians for the completion of pre-release planning assessments and completion of ROIs, as well as resources for their commitment county and when applicable for their approved out of county or state residence or their approved program county.

HDSP conducted weekly pre-release groups. Specifically, pre-release groups were held for one hour and a half on Facilities B, D, and M.

TCMP reported meeting with six EOP and 217 3CMS patients during the reporting period. One hundred percent of patients were screened for TCMP benefits and 198 or 89 percent of patients submitted applications. Applications for Medi-Cal were submitted for 193 or 87 percent of patients, while SSI applications were submitted on behalf of 22 or ten percent of eligible patients, and an VA application was submitted for one patient.

Program Access:

a. Job and Program Assignments

As of August 27, 2025, HDSP reported that the 881 job assignments were held by 31 or 31 percent of EOP patients, 328 or 32 percent of 3CMS patients, and 522 or 40 percent of non-MHSDS incarcerated persons.

The 562 academic assignments were held by one EOP patient, 232 or 22 percent of 3CMS patients, and 329 or 26 percent of non-MHSDS incarcerated persons.

The 97 vocational education assignments were held by no EOP patients, 46 or four percent of 3CMS patients, and 51 or four percent of non-MHSDS incarcerated persons.

The 656 voluntary education assignments were held by no EOP patients, 211 or 20 percent of 3CMS patients, and 445 or 35 percent of non-MHSDS incarcerated persons.

The 189 substance abuse treatment assignments were held by two EOP patients, 80 or eight percent of 3CMS patients, and 107 or eight percent of non-MHSDS incarcerated persons.

b. Milestone Credits

HDSP reported that 47 EOP and one 3CMS patients were awarded milestone credits but did not indicate how many patients were eligible for the credits.

c. Out-of-Level Housing

On May 15, 2025, HDSP reported that one EOP, 67 3CMS, and 49 non-MHSDS custody Level I incarcerated persons were in Level II housing and two 3CMS and four non-MHSDS custody Level I incarcerated persons were in Level III housing; 70 3CMS and 129 non-MHSDS custody Level II incarcerated persons were in Level III housing; and three EOP, nine 3CMS and 47 custody Level III incarcerated persons were in Level IV housing.

d. ADA Reasonable Accommodations and Grievance Procedures

The institution confirmed implementation of the revised ADA accommodations, grievance procedures, and appeals process and provided a copy of the desk reference manual. A roster of staff who had enrolled in and completed the offender grievance and appeal process training was also provided.

e. Periodic Classification Score Reductions: EOP Patients

HDSP provided CDCR Form 840 reclassification scoresheets for four patients demonstrating that they were providing periodic classification score reductions for EOP patients.

f. Unclothed Body Search

Patients were subjected to unclothed body searches prior to leaving their cells which the escorting officer conducted in the privacy of the patients' cell or in a holding cell. Metal detectors were also utilized during the search.

"C" Status:

As of August 21, 2025, three EOP patients, 41 3CMS patients, and 19 GP incarcerated persons were designated "C" status. Institutional leadership confirmed that 3CMS patients on "C" status were clustered in 3CMS housing along with other 3CMS patients not on "C" status.

Case-by-Case Reviews:

HDSP reported that seven patients met the requirement for 150-day reviews. Two patients received 30-day extensions, and five patients received 90-day extensions; mental health found all seven patients not at risk for decompensation due to further segregated housing and patients had timely ICCs.

HDSP provided information for 22 patients that satisfied the criteria for the 120-day pre-MERD review. Twenty-one patients received timely ICCs and the remaining patient's initial ICC was delayed due to being out to court. Sixteen cases were referred to the CSR for review. Two patients were held beyond their MERDs due to localized safety concerns.

Mental Health Referrals:

During the review period, HDSP reported 2,954 mental health referrals, including 879 referrals to psychiatry and 2,079 to primary clinicians.

There were 427 emergent, 254 urgent, and 2,262 routine referrals. For emergent referrals, the institution timely responded to one of four psychiatry referrals and 367 of 423 or 87 percent of primary clinician referrals. The institution responded timely to 24 of 32 or 75 percent

of urgent psychiatry referrals and 188 of 222 or 85 percent of urgent primary care referrals. The institution responded timely to 567 of 830 or 68 percent of routine psychiatry referrals and 1,230 of 1,432 or 86 percent of routine primary clinician referrals.

Custody and Mental Health Partnership Plan:

HDSP's CMHPP LOP complied with statewide policy and was last updated in April 2025 and, thus, up to date.

Executive leadership joint rounding occurred during five of six months of the review period on Facilities A, B, and D and the MHCB. Required staff attended each rounding that occurred. Staff reported positive staff morale, concerns with specific patients, EOP patients being assaulted, and occasional issues with pill lines; patients reported not receiving all of their ducats or their mental health treatment, recreation therapy, education, visiting, religious services, or canteen, praise for specific EOP staff members, and concerns with yard frequently being recalled.

Executive joint rounding was mentioned in executive staff meeting and QMC minutes for all five months during which the rounding occurred, though no detail was provided. Mental health program subcommittee minutes for all five months where the rounding occurred included detailed discussion.

Monthly joint supervisory tours and weekly 3CMS supervisory meetings did not occur during the review period.

Daily second and third watch mainline EOP and RHU huddles occurred nearly every day throughout the review period; MHCB huddles only occurred on second watch. Mental health staff attended all huddles while custody staff was occasionally absent.

The monitor observed one mainline EOP huddle on Facility D. The monitor attended in person while most staff attended remotely. Required staff attended and the mental health representatives reflected knowledge and familiarity with their patients; custody staff, however, did not participate even when prompted by mental health staff.

Introduction to EOP groups were not offered during the review period.

HDSP distributed the 3CMS orientation brochure to new patients and provided a copy of the same.

Inmate advisory council meeting minutes were provided for four of six months. Discussed topics included issues with canteen, physical plant, laundry, and pill lines, appointment refusals, Wi-Fi connectivity and tablets, and a desire for better food options and water filters.

Regarding staff misconduct complaints, 543 were filed against custody staff; 45 were rejected but the status of the rest was unknown. Four were filed against mental health staff and all four were closed by the time of monitoring tour.

No investigations for misconduct towards a patient were initiated outside of the appeal process and no staff members were reassigned due to misconduct complaints.

The annual partnership off-post training was attended by all required mental health staff and 684 of 709 or 96 percent of required custody staff.

Quarterly roundtable training did not occur during the review period.

Heat Plan:

HDSP's heat plan LOP was last revised in April 2024 and complied with CDCR policy. The heat plan was not in effect during the reporting period.

Interviewed officers from Facilities A, B, C, and D, the RHU, MSF, and MHCB, were compliant with their knowledge of the heat plan. Each officer had access to heat plan resources that displayed the heat plan policy and procedures, and all officers were able to recall each stage of the heat plan. Additionally, officers routinely reported that the list for patients who were prescribed heat-sensitive medications was updated daily and was able to produce current lists.

Observed digital thermometers were located near the second tier or directly outside of the control booth located on the second tier of each unit; all thermometers were in working order.

Additionally, officers had updated heat temperature logs as the monitoring tour occurred during a month where the heat plan was in effect.

As for heat plan training, the training was attended by the warden, the chief deputy warden, all five correctional administrator's, all seven captains, all 29 lieutenants, all 69 sergeants, and all 613 correctional officers. For mental health, both chiefs of psychology, mental health, and psychology attended the training. The supervising psychologist, psychiatrist, or social worker did not attend the training. Additionally, all eight psychologists, all five psychiatrists, all eight social workers, and 92 of 100 nurses, also attended the training.

<u>RVRs:</u>

HDSP issued 2,726 RVRs during the review period, of which 1,713 or 63 percent were issued to MHSDS patients. Specifically, nine RVRs were issued to acute care patients, two were issued to ICF patients, 60 were issued to MHCB patients, 167 were issued to EOP patients, and 1,475 were issued to 3CMS patients.

The monitor reviewed 27 RVRs to assess compliance with CDCR policy. Custody staff timely referred the MHA to mental health staff within two days in six or 22 percent of reviewed cases. Mental health staff timely completed and returned the assessment to custody within eight

days in 11 or 41 percent of reviewed cases. The senior hearing officer documented consideration of the MHA in all reviewed cases.

Mental health staff recommended mitigation in 18 or 67 percent of reviewed cases and the SHO mitigated the penalty pursuant to the assessment in 17 or 94 percent of cases. The most frequent assessment recommendation concerning mitigation was no loss of property, which 78 percent of assessments recommended.

Two MHAs explained that mental health contributed to the behavior in the RVR, and one explained that DDP could have attributed to the behavior in the RVR. Nevertheless, the SHO found each patient guilty.

MHA training was attended by the chief deputy administrator, four correctional administrators, one CC I, two captains, 13 lieutenants, 29 sergeants, and 272 correctional officers. HDSP did not provide training data for mental health staff. However, one senior psychologist supervisor, one psychologist, two telepsychologists, and one social worker were previously trained and completed RVR MHAs.

Use of Force:

During the review period, there were three controlled and 209 immediate use of force incidents involving 318 MHSDS patients.

The monitor conducted a paper and video review for eight immediate uses of force. This review revealed that all such incidents complied with CDCR policy.

The immediate uses of force mainly addressed patients fighting with one another.

HDSP reported compliance for both custody and mental health staff attending required use of force training. The warden attended the training, as did the chief deputy warden, all five correctional administrators, five of seven captains, all 70 sergeants, all 29 lieutenants, and 572 of

662 correctional officers. For mental health staff, the training was attended by the two chiefs of psychology or mental health, one supervisory psychologist, psychiatrist or social worker, all eight psychologists, all five psychiatrists, all six social workers, and 85 of 86 senior psych techs.

Program Lockdowns/Modified Programming:

Seven local modified programming periods and one statewide PSR were initiated during the review period. They ranged from five to 19 days; two ran into the statewide PSR. There were four on Facility C, two on Facility D, and one on Facility A. The modified programming periods stemmed from threats to staff and batteries, missing metal, homicides of incarcerated persons, various instances on violence within 60-day spans on particular yards, drugs and weapons discoveries, overdoses, and violence between rival STGs and, occasionally, between certain STGs and EOP patients. Access to mental health care was reportedly not affected in any PSR.

Three local modified programming periods and an additional statewide PSR were initiated from the end of the review period through the time of the monitoring tour. One lasted for three days on Facility A due to missing metal; one lasted for ten days on Facility D stemming from ongoing violence between rival STGs and against staff as well as the discovery of weapons; and one was in effect on Facility D during the monitoring tour stemming from a riot. Group and yard access was limited but access to mental healthcare was not otherwise affected.

Access to Care:

HDSP provided monthly Health Care Access Quality reports from November 1, 2024 through April 30, 2025. Of 20,058 total issued mental health ducats and add-on appointments, 13,358 or 67 percent were completed and 6,700 or 33 percent were not completed. Of the non-

completed appointments, 36 or 0.5 percent were due to custody factors, 3,044 or 45 percent were due to non-custody factors, and 3,620 or 54 percent were due to patient refusals.

*Coleman Postings:*

*Coleman* posters in both English and Spanish were observed in all toured housing units.

**APPENDIX A – 18**
**KERN VALLEY STATE PRISON (KVSP)**
Site Visit: June 3, 2025 – June 5, 2025
Review Period: November 1, 2024 – April 30, 2025

Census:

On May 30, 2025, KVSP housed 3,101 incarcerated individuals which was a 16 percent increase from the prior review period. *See* Thirtieth Round Monitoring Report – Part C, ECF No. 8095 at 505. The 1,671 MHSDS patients represented 54 percent of the institution's population and had increased by 28 percent from the prior round.

The MHCB housed seven patients. One EOP patient was in alternative housing.

There were 172 MHSDS patients housed in KVSP's 3CMS RHU, 132 of which were 3CMS patients and 40 were EOP patients awaiting transfer to an EOP RHU.

There were 284 mainline EOP and 1,143 mainline 3CMS patients; the EOP population increased by 68 percent from the Thirtieth Round while the 3CMS population increased by 23 percent. *Id*. Three of these mainline EOP and five of these mainline 3CMS patients were housed in the OHU. An additional 64 3CMS patients were housed in the MSF.

Staffing:

As of May 16, 2025, the chief psychiatrist position was filled. The senior psychiatrist supervisor position was vacant. One of 5.5 staff psychiatry positions were filled for an 82 percent vacancy rate; utilization of 4.25 registry staff reduced the functional vacancy rate to five percent. Three of five telepsychiatry positions were filled for a 40 percent vacancy rate. The one psychiatric nurse practitioner position was filled. Inclusive of on-site psychiatrists, telepsychiatry, and the psychiatric nurse practitioner, the functional vacancy rate for staff psychiatrists was 20 percent.

Both chief psychologist positions were filled. One of 4.5 senior psychologist positions were filled for a 78 percent vacancy rate. Two of five senior psychologist specialist positions were filled for a 60 percent vacancy rate. For staff psychologists, 12 of 27.5 positions were filled for a 56 percent vacancy rate; one contractor reduced the functional vacancy rate to 53 percent. Four of six telepsychologist positions were filled for a 33 percent vacancy rate, though one telepsychologist resigned during the site visit while another telepsychologist went out on planned maternity leave during the site visit for a functional vacancy rate of 66 percent. Inclusive of on-site and tele-mental health positions, there was a 55 percent functional vacancy rate among psychologist positions.

Two supervising social workers filled the one allocated position. Similarly, 12.5 social workers filled the 12 allocated positions, though one social worker gave their resignation during the site visit for a functional vacancy rate of four percent. Two of four tele-social worker positions were also filled for a 50 percent vacancy rate. Inclusive of on-site and tele-mental health positions, there was a 16 percent functional vacancy rate among social worker positions. In addition, two social workers, one of whom served the RHU and the other the 3CMS program, were unlicensed.

Two LMFTs were on staff though no LMFT positions were allocated.

Inclusive of on-site, tele-mental health, and LMFT positions, the overall primary clinician functional vacancy rate was 38 percent.

Eight of 15 medical assistant positions assigned to tele-mental health were filled for a 47 percent vacancy rate.

Eight of 11.5 recreation therapist positions were filled for a 30 percent vacancy rate.

Fourteen of 15.2 supervising RN positions were filled for an eight percent vacancy rate. Six of seven MHSDS RN positions were filled for a 14 percent vacancy rate. All five CNA positions were vacant.

The senior psych tech position was filled. For psych techs, 32.75 of 36.29 positions were filled for a ten percent vacancy rate.

The OSS I position was filled. Three of the 3.5 HPS I positions were filled for a 14 percent vacancy rate. The HPS II position was filled.

For custody staff, the warden, chief deputy warden, all six associate wardens, and all six captain positions were filled. For lieutenants, 30 of 31.4 positions were filled for a four percent vacancy rate; one individual on long term leave and another acting out of class resulted in a functional vacancy rate of 11 percent. Eighty-nine of 92.4 sergeant positions were filled for a four percent vacancy rate; 11 sergeants were on long term leave resulting in a 16 percent functional vacancy rate. Twenty-two of 24 CCI positions were filled for an eight percent vacancy rate; one CCI was on long term leave, and another was acting out of class resulting in a 17 percent functional vacancy rate. Eight of 11 CCII positions were filled for a 27 percent vacancy rate. For correctional officers, 831 correctional officers filled the 811 allocated positions; however, 93 correctional officers were on long term leave, and two others were acting out of class, resulting in a nine percent functional vacancy rate.

Tele-Mental Health:

Three of five telepsychiatry positions were filled for a 40 percent vacancy rate. Four of six telepsychologist positions were filled for a 33 percent vacancy rate. Two of four tele-social worker positions were also filled for a 50 percent vacancy rate. All telepsychiatrists, telepsychologists, and two of the four tele-social workers served the 3CMS population; the other

two tele-social workers served the EOP population. After-hours telepsychiatry coverage was provided from the statewide hub.

The OSS I and the three HPS Is teleworked one day per week; mental health staff did not otherwise telework.

Telehealth providers supplemented services at KVSP, but leadership and line staff expressed strong concerns about their effectiveness. On-site staff described inefficiencies caused by frequent yard shutdowns, alarms, program interruptions, and delays in tele-mental health schedules. Leadership and staff also emphasized inequities between on-site and tele-mental health providers. On-site clinicians faced greater safety risks, heavier workloads, and mandatory shifts, while tele-mental health providers reportedly selected their schedules, set workload caps, and faced fewer institutional demands. Leadership noted that tele-mental health providers often started seeing their first patient after 9:00 A.M., were unable to see patients during program interruptions or in the final hours of their shifts due to scheduling conflicts with medical assistants, and occupied scarce office space without maximizing patient contacts.

Leadership also cited difficulties with oversight, as tele-mental health providers reported to supervisors outside the institution. This limited the chief of mental health's authority to address performance concerns. In one reported incident, a tele-mental health provider observed a patient in medical distress but did not initiate a medical referral. When contacted, the tele-mental health supervisor responded that the matter was not within mental health's scope. According to institutional leadership, the lack of intervention resulted in an adverse patient outcome. In another reported incident, a tele-mental health provider failed to appropriately intervene when a patient reported suicidal intent, cut on themselves during the tele-mental health

contact, and engaged in a subsequent act of self-harm upon being cleared for return to their housing unit.

Overall, the combination of increased census, limited staffing, low morale, burnout, and strained provider relationships threatened staff retention and compromised the timeliness and quality of service delivery throughout the review period and at the time of the site visit. Although leadership attempted to prioritize critical services, systemic issues in staffing and telehealth practices contributed to gaps in care, intensified competition for limited treatment space, and placed additional pressure on onsite staff, who managed larger caseloads, worked longer hours, assumed greater risks, and at times extended their shifts to cover telehealth refusals.

Staff Recruitment:

Staff recruitment and retention efforts included the regional hiring unit streamlining the hiring process for *Coleman* classifications; increased marketing for *Coleman* classifications; hiring above minimum; pay differentials for staff that provide direct patient care for more than 50 percent of the pay period; incremental percentage retention bonuses; recruitment and retention bonuses for in-person psychiatric direct patient care; and payments for psychiatrists and psychologists who work additional caseloads.

Quality Management:

There were two local governing body meetings held during the monitoring period, which took place in December 2024 and March 2025. Neither meeting discussed issues related to the MHSDS at KVSP. The December meeting included no mental health representatives, and the March meeting included the chief of mental health who attended virtually.

Monthly quality management committee (QMC) meetings held during the review period included discussion of improvement projects, system surveillance and quality concerns, custody report, operational procedure review, audits and surveys, subcommittee reports, and new business. A quorum was achieved for every meeting, and the chief of mental health, chief psychologist, or both were present for every meeting. Overall, the minutes provided detailed information about the findings of each agenda item, but there were no action items in any of the minutes. Items, regardless of findings, continued to be monitored and/or reported with minimal to no evidence of actions being taken to address deficiencies. When mental health reports were presented, they mirrored the content of the MHPS and did not add any additional recommendations or action steps.

Mental health program subcommittee (MHPS) meetings were held each month of the review period. A quorum was met for each meeting; however, there was no psychiatrist present for the February 2025 meeting, and the inpatient coordinator was not present for the meeting in March 2025. Agenda items each month included a review of improvement priorities, policy and practice updates, the mental health performance report, CAT summary, MHSDS program reports including peer review, SPRFIT reports, inpatient transfers, DDP, training compliance, scheduling, pre-release planning, custody and mental health partnership, custody updates, operational procedures updates, and review of statewide quality management memos.

MHPS minutes included detailed data but provided little information on what actions were being taken to address ongoing identified concerns. While many of the performance issues were secondary to staffing shortages, other identified issues including the need to update the LOP related to transgender services and the problems identified by the greenbelt project

discussed below, were not resolved and there was no mention of what the challenges were in completing these projects.

With regard to peer review and the CAT summary, no data or detailed information was provided during the monitoring period other than comments about supervisors continuing to perform reviews. It was reported that CAT audits were suspended at the direction of headquarters. All auditing being done by supervisors, chiefs, and regionals included routine quality audits without a formal tool or data collection process, and results were not reported routinely.

There were no QITs or FITs during the monitoring period.

KVSP provided information on one quality improvement project during the reporting period addressing the monitoring of blood sugar levels among patients on antipsychotic medications. The project was described as a "greenbelt" project initiated in July 2024 with the goal of improving compliance with blood sugar monitoring for patients on antipsychotic medications to 90 percent by January 2025. Reasons for noncompliance included psychiatric providers failing to order baseline and routine labs as well as patient refusals. Training for staff and letters to patients were recommended to increase compliance. The project was discontinued in December 2024 without clear rationale. It was reported that training was provided to medical assistants and that the issue would be monitored by the analyst going forward. Subsequent minutes revealed that blood sugar was part of routine monitoring and showed no improvement in the following months.

Information provided regarding the peer review process included a spreadsheet of six psychiatrists listed with scheduled review dates but no evidence that these reviews were completed. Local operating procedures were provided for the peer review of psychiatrists,

licensed clinicians in outpatient and unlicensed settings, and within the licensed MHCB. The LOPs appeared adequate. KVSP reported that they were in the planning phase for implementation of a peer review process. Delays in implementation were secondary to staffing shortages. They reported a plan to begin the process in June 2025.

Overall, the mental health quality improvement process at KVSP was inadequate. While a number of issues and items were being tracked and monitored related to the delivery of mental health services, there was little to no evidence of an active quality improvement process designed to address deficiencies and track implementation of corrective measures.

Medication Management:

KVSP provided MAPIP results from November 1, 2024 through April 30, 2025 for compliance with psychiatric diagnostic monitoring and medication management. Except for three metrics (obtaining blood pressures for incarcerated patients prescribed venlafaxine; obtaining height for incarcerated persons prescribed antipsychotic medications; and obtaining weight for incarcerated persons receiving antipsychotic medications) the other 26 metrics specific to the prescription of antidepressant medications, antipsychotic medications, carbamazepine, Depakote, and/or lithium were in partial compliance. KVSP was not a designated Clozaril institution.

For medication management metrics reported by mental health headquarters, KVSP was compliant for six months for continuity of medications upon parole/transfer to the community. Partial compliance was present for all the other metrics reported by headquarters.

KVSP's action plan to correct the partial compliance findings essentially remained unchanged during the monitoring period.

KVSP reported the CAP for the MAPIP measures remained unchanged because it accurately addressed the root issues and outlined reasonable steps that could be taken by staff. KVSP continued to follow the plan by consistently educating patients, providing necessary information, and offering education regarding the importance of medication adherence and attending diagnostic appointments. However, despite these efforts, it remained the patients' legal and medical right to choose whether to participate in their treatment plan. As such, the outcome is ultimately dependent on patient compliance, and the current plan reflects the limitations of what staff can control.

Compliance barriers with diagnostic monitoring were primarily due to patients exercising their right to refuse diagnostic tests, including lab draws. Medical assistants ensured psychiatry providers were informed in advance of any required diagnostic exams due. Providers then placed the necessary orders and educated patients on the importance of completing these exams. However, patients do not always follow through. Providers continued to place new orders as needed in hopes the patient would eventually comply.

Regarding medication management, during the reporting period there were 1,177 patients prescribed psychotropic medications, while the total number of psychotropic medication prescriptions was 2,820. The number of patients prescribed psychotropic medications at HS (*hora somni*, or bedtime) was 300, while the total number psychotropic medications prescribed at HS was 994. There was no data available for patients prescribed psychotropic medications KOP. KVSP reported no use of force associated with the administration of psychotropic medications.

There were 193 patients during the monitoring period who received psychotropic medications via a PC 2602 order. All court-ordered medications were initiated at KVSP. There were 30 emergency PC 2602 petitions initiated; all were granted. There were 19 non-emergency

PC 2602 petitions initiated and all were granted. There were 144 PC 2602 renewal petitions filed and granted. There were seven PC 2602 petitions with a non-renewal form filed and 63 PC 2602 court orders that expired without a non-renewal form.

During the reporting period, all CDCR Level IV yards were placed on a modified program, which resulted in cell front distribution of medications, rather than distribution through medication lines. KVSP reported that patients did not miss medication doses or laboratory monitoring during the modified program. Although the statewide modified program concluded on April 1, 2025, KVSP extended its modified program until April 7, 2025.

Nonformulary prescriptions during the monitoring period averaged 6.4 percent of the total prescriptions prescribed by psychiatrists.

Summary

Medication management and medication administration issues were present at KVSP. Staff reported the issues were predominantly related to patient "no-shows" and "refusals." It is unlikely that these reasons were the sole causes of KVSPs medication management and administration issues.

Transfers:

A minor sustainable process review was completed in October 2024 and a major review was completed in February 2025. Both reviews found that staff were not documenting rationale or treatment modifications for non-referrals in at least 85 percent of cases. The actions put into place in October 2024 were not effective in creating improvements. Additionally, challenges were noted related to continuity of care for patients returning from inpatient settings, especially related to timely initial mental health evaluations, clinician-to-clinician contacts, and initial IDTT meetings. Regional staff also noted problems with clinicians failing to update routine

documentation, including IDTT documentation, resulting in internal inconsistencies and no clinical updates from prior contacts.

KVSP's inpatient coordinator was a psychologist who had held the role of inpatient coordinator for seven years. His other duties included PC 2602 coordinator, training coordinator, and backup SPRFIT coordinator. There was no backup inpatient coordinator.

During the review period, there was one acute and three intermediate care referrals resulting in admissions in all four instances. All four referrals were timely submitted to IRU and all four admissions were also timely. Notably, these four referrals marked a sharp decrease from the 30 referrals made during the previous round. *See* ECF No. 8095 at 514-515. On-site staff attributed this to new clinicians not knowing their patients very well; drug debts and safety issues drawing so much attention that decompensating patients weren't being seen; administrative issues such as lack of staffing and statewide PSRs; safety concerns and custody staff redirects making it difficult for clinicians to physically enter housing units; lack of treatment space; and staff not wanting to submit the referral packet knowing that it will just get rejected.

There were 674 instances of 415 patients considered for, but not referred to, inpatient care.

There were no referrals for patients with complex medical needs and on May 30, 2025, no patients were pending transfer to inpatient care.

IDTT non-referral documentation suggested treatment teams applied an excessively high threshold for initiating referrals, and that IDTT non-referral rationales were routinely inadequate or not provided at all due to staff failures to accurately discuss and document the presence of positive referral indicators during IDTT. Additionally, reviewed non-referral documentation for patients with positive indicators reflected that enhanced treatment plans, required when patients

with positive referral indicators are not referred, often failed to address the referral concern directly. Further, when treatment plans were enhanced, subsequent progress notes rarely showed evidence that enhanced interventions were implemented. As a result, patients at risk of further decompensation did not consistently receive care at the appropriate level or adequate care in lieu of a referral when providers were unable to build a strong case for a higher level of care admission.

In contrast to the sharp reduction in referrals to acute and intermediate care and compared to the 199 MHCB referrals reported at KVSP during the Thirtieth Round, MHCB referrals in the Thirty-First round increased by 265 percent. *See* ECF No. 8095 at 515. During the review period, KVSP made 727 MHCB referrals resulting in 231 admissions and 496 rescissions; 100 admissions were to KVSP's MHCB and 131 admissions were to MHCBs at other institutions. Of the 727 referrals, 717 or 99 percent resulted in alternative housing stays of less than 24 hours. Of the 231 MHCB admissions, 216 or 94 percent timely occurred within 24 hours; staff attributed delays to occasional difficulties with making clinician-to-clinician contacts.

Regrettably, KVSP did not track patient transfers to EOP RHUs for the review period. However, an on-demand report regarding EOP RHU transfers indicated that 13 of 26 or 50 percent of EOP RHU transfers were timely.

KVSP had an on-site 3CMS RHU; accordingly, there were no placement delays.

KVSP did not track patients transferred from the EOP to 3CMS program during the review period.

Sixty-one 3CMS patients transferred to the MSF during the review period.

Following discharge from an inpatient setting, KVSP primary clinicians were expected to complete a clinician-to-clinician contact with the inpatient primary clinician as well as review

the discharge summary so that findings could be integrated into the patient's treatment plan. The ten most recent cases of patients who returned to KVSP after discharge from an inpatient setting were reviewed. Three of the ten records included evidence of a clinician-to-clinician contact, and an additional three records documented attempted contacts that were not completed. The completed contacts included evidence of useful content, and the three attempted contacts included documentation that the discharge summaries included adequate information to ensure continuity of care. Yet only three of nine patients' records evidenced adequate integration of the patient's discharge summary into the initial treatment plan.[80]

Overall, continuity of care for patients returning from inpatient stays was inconsistent and generally inadequate during the review period.

Programming:

Since the Twenty-Ninth Monitoring Round through the present, KVSP has experienced multiple significant increases in its level IV EOP population without corresponding increases in staffing or treatment space.[81] This expansion strained the institution's capacity to deliver Program Guide services in outpatient programs.

KVSP appropriately prioritized staffing for the MHCB and crisis response team. However, leadership acknowledged that the rapid increase in level IV EOP patients negatively

[80] One patient returned to CDCR ten days prior to this report and an initial IDTT meeting had not yet been completed.

[81] *Compare* the Special Master's Twenty-Ninth Round Monitoring Report – Part C, ECF No. 7715 at 543 (reporting 135 mainline EOP patients on April 5, 2022) to the Special Master's Thirtieth Round Monitoring Report – Part C, ECF No. 8095 at 505 (reporting 169 mainline EOP patients on June 9, 2023), the Special Master's Thirty-First Round Focused Monitoring Report on Newly Activated EOP Programs, ECF No. 8654 at 141 (reporting 247 mainline EOP patients on July 15, 2024), (reporting 284 mainline EOP patients on May 30, 2025).

affected outpatient services and reduced staff's ability to meet minimum Program Guide requirements.

As a result, the institution implemented a staffing-based triage framework that prioritized critical tasks, including CIT and alternative housing, emergent and urgent primary clinician referrals, MHCB contacts, and contact for higher risk patients, while delaying routine contacts for treatment and monitoring. Although this approach preserved coverage for the most urgent needs, it further reduced access to consistent mental health care. Unfortunately, this triage plan created a continuous cycle of increased crisis calls, alternative housing, and MHCB placements for those at the bottom of the triage plan, further diverting resources away from mainline treatment and reducing staff treatment capacity even further.

Signs of staff burnout, compassion fatigue, and low morale were reported and observed on site. Level IV clinicians questioned continuing to work in a high-risk environment without incentives, and several reported considering telework positions. Supervisors expressed concern about sustaining staff commitment considering these challenges. Staff burnout was also evident in clinical documentation, as providers at times expressed their own personal frustrations in alternative housing and crisis documentation resulting in inappropriate statements and minimization of patient risk.

MHSDS Patients in Restricted Housing:

KVSP operated a 3CMS RHU and a general population (GP) RHU during the review period. The GP RHU was used for 3CMS RHU overflow as necessary.

As of the time of the monitoring tour, there were 132 3CMS RHU patients and 40 EOP RHU patients awaiting transfer. During the reporting period, the RHU housed a total of 867

MHSDS patients, including eight acute patients, 14 intermediate care patients, five MHCB patients, 269 EOP RHU, and 576 3CMS RHU patients.

The average length of stay for all MHSDS patients who were housed in the 3CMS RHU during the review period was 37.92 days.

According to the staff-to-patient ratios from the 2009 staffing plan, psychiatrists who treat 3CMS patients in restricted housing must maintain a caseload of no more than 125 patients per psychiatrist, while primary clinicians who treat 3CMS patients in restricted housing must maintain a caseload of no more than 25 patients per clinician. *See* ECF No. 3693 at 14. Staffing for the 3CMS RHU included an on-site psychiatrist, an on-site psychologist, a telepsychologist, a supervising LCSW, three LCSWs, one unlicensed CSW, one tele-social worker, a recreation therapist, and a registry PNP. Regarding patient caseloads, the on-site psychologist and telepsychologist each carried caseloads of 23 patients, the four on-site social workers carried caseloads of 20, 24, 26, and 29 patients respectively, the tele-social worker carried a caseload of 29 patients, and the PNP carried a caseload of 145 patients. Therefore, three of seven primary clinicians and the PNP carried caseloads that exceeded established ratios.

*Structured Treatment*

The RHU Policy required that patients assigned to 3CMS RHU be offered a minimum of 20 hours of out-of-cell time each week, including 18.5 hours of recreational time outside the cell and 90 minutes of confidential, structured therapeutic activities. *See* ECF No. 8355 at 7-17 (Restricted Housing Unit Program: Mental Health Services Policy, dated July 19, 2024 and effective August 1, 2024) (hereinafter “RHU Policy”).

During the review period, patients housed in 3CMS RHU were scheduled for a weekly average of 2.3 hours, offered 1.54 hours, attended 0.92 hours, and refused 0.64 hours of

structured treatment per week. The institution also cancelled an average of 0.76 hours of structured treatment per week. Unfortunately, overflow patients housed in GP RHU were not offered the required structured treatment due to a lack of treatment space. Despite not receiving the required amount of structured treatment, RHU leadership indicated that patients housed in the RHU overflow continued to receive primary clinician contacts and in-cell activities through the recreation therapist (RT). The recreation therapists would meet with 3CMS RHU patients housed in the RHU overflow unit to provide additional one-to-one contact and in-cell activities.

*IDTTs*

The monitor's expert observed four 3CMS RHU IDTTs during the monitoring tour. The IDTT meetings were conducted in a dedicated treatment space located in 3CMS RHU, which was observed to be adequate in terms of space, lighting, temperature, and layout. Although there were two treatment modules in the room, patients sat in a chair in front of the treatment team for the duration of the meeting which fostered a collaborative environment for all participants.

Staffing for three of the four observed IDTTs included a primary clinician, the assigned PNP, the CCI, a psychiatric technician, and the RHU supervising social worker. Due to a primary clinician's absence, some cases were presented by the RHU supervisor.

Each of the four observed IDTTs were collaborative, with each discipline actively contributing to the treatment planning process. Discussions consistently included a review of the patient's psychiatric and substance use history; patient's diagnosis with associated symptoms; functional impairments; history of RVRs; reasons leading to RHU placement; treatment targets, justification for current level of care, and upcoming interdisciplinary classification committee meetings. The PNP addressed the patient's medications, adherence, and side effects, while the CCI and psych tech also provided relevant information. The RHU supervisor frequently

followed up with additional details and asked patients clarifying questions to ensure their understanding of treatment goals. Despite this, two of the four meetings included general treatment targets without including specific measurable goals to track patient progress while housed in the RHU.

However, subsequent review of the patients' treatment plans documented in the healthcare record revealed discrepancies between the observed meetings and the written record. One of the four modified treatment plans included treatment targets not specifically mentioned in the IDTT and did not include the specific goal discussed in IDTT. Although the treatment plan included measurable goals, interventions were vague, and the modified treatment plan included factually incorrect information, such as that the meeting was held in absentia, when the patient was present at IDTT. Additionally, three of the four treatment plans omitted essential information regarding discharge criteria and justification for retention at the current level of care. One modified treatment plan omitted multiple critical areas including the patient's verbalized goals, strengths, learning preferences, treatment targets, interventions, and progress, rendering the treatment planning process ineffective.

Overall, while the IDTTs demonstrated effective collaboration and engagement during meetings, there were notable gaps in ensuring that documentation accurately reflected the treatment planning process. Inconsistencies between observed discussions and the written modified treatment plans, as well as omissions of critical information, rendered some of the IDTTs ineffective and created potential barriers to continuity of care.

*Group Treatment*

During the monitoring tour, group therapy for 3CMS patients in the RHU was scheduled twice daily, from 11:30 AM to 1:00 PM and again from 1:30 PM to 3:00 PM, three days a week.

According to the RHU supervisor, each patient is assigned to one 90-minute group session per week. The process for group assignment was initiated shortly after a patient's arrival in the unit, with the goal of having them attend their first group by the following Friday.

During the monitoring tour, the only group offered to 3CMS patients was entitled "Coping Skills." The facilitating RT indicated that this group utilized curriculum from a Getting Out by Going In (GOGI) book. Documentation provided prior to the site visit listed a diverse range of potential group topics for 3CMS RHU patients. Potential topics included Depression Management, Anxiety Management, Social and Life Skills, Relaxation and Mindfulness, Victim Awareness, Grief and Loss, and Transgender Support, among others.

The group treatment space for patients housed in 3CMS RHU was adequate in terms of size, lighting, and temperature, ensuring a confidential environment for sessions. The group room was equipped with eight chairs arranged in a semicircle, allowing for organized participation, with patients being cuffed to the chairs for security. Notably, accommodation was made for a patient in a wheelchair, enabling their inclusion in group activities. In addition, the RHU supervisor indicated that Therapeutic Treatment Modules (TTMs) were being considered for the group room, as patients have expressed interest in these modules to be able to use their hands more freely during groups session without the need for handcuffs.

EOP patients housed in the 3CMS RHU were scheduled for six hours of group treatment per week, consisting of four 1.5 hour groups. According to the Recreational Therapist (RT), the group curriculum for both EOP and 3CMS patients follows the Getting Out by Going In (GOGI) workbook, with topics running on an approximately six-week cycle before repeating. The topics for both populations were often aligned.

The monitor's expert observed an Anger Management group session for EOP patients housed in the 3CMS RHU awaiting transfer to EOP RHU. Four patients attended the session which centered on a lesson about anger and forgiveness. The RT, who was bilingual, was able to engage Spanish-speaking patients, one of whom did not speak English. The RT led a discussion, reflecting on the sections that were read. Following the discussion, an "Anger Diary" worksheet was distributed to each patient to document a personal incident involving anger, identifying their triggers, warning signs, and how they managed the situation. The RT facilitated a follow-up discussion, allowing each patient to share their reflections. Nevertheless, the group was provided meaningful therapeutic discussions that were overall adequate.

In addition to group therapy, all patients were reportedly offered handouts to complete independently in their cells with assistance from the RT. Documentation also indicated that primary clinicians would also offer in-cell curriculum to work on between one-on-one sessions with the primary clinician by using interactive journals designed to help patients develop coping strategies for managing specific mental health symptoms.

*Individual Treatment*

The RHU Policy requires that all patients placed into 3CMS RHU receive a primary clinician evaluation within ten days of arrival and an initial psychiatry evaluation prior to the IDTT and within ten days of arrival. *See* RHU Policy at 4. The RHU Policy also requires that 3CMS RHU patients receive weekly primary clinician contacts and psychiatry contacts every 90 days. *See id*.

Thirty 3CMS RHU patients who required initial psychiatry evaluations during the review period were randomly selected for assessment of compliance with Program Guide timeframes. Of the 30 patients, two transferred before the timeframe expired while two did not receive an

initial psychiatry evaluation during their stays. Of the 26 patients who received an initial psychiatry evaluation, five or 19 percent were timely and six or 23 percent occurred in a confidential setting. Reasons for non-confidentiality included patient refusals.

To measure timeliness of routine psychiatry contacts during the review period, CDCR produced an appointments report that included individuals who were required to receive a routine psychiatry contact during the review period.[82] For the 85 patients in the appointments report covering patients who received at least one routine psychiatry contact during the review period, there were 120 total completed and refused contacts. Of the 115 that were completed, 38 or 33 percent were reported as being conducted in a confidential setting. When a patient had more than one completed contact, timeliness in accordance with Program Guide requirements was able to be calculated. Of the 115 completed contacts, 36 were for individuals who were seen at least twice by a psychiatric provider. Of those 36 contacts, all were completed within the Program Guide required timeframes.

The 30 random 3CMS RHU patients who required initial psychiatry evaluations also required initial primary clinician evaluations during the reporting period. Of the 30 patients, two transferred before timeframe requirements expired while five did not receive an initial primary clinician evaluation at all. Of the 23 patients who received an initial primary clinician evaluation, ten or 43 percent were timely while 13 or 56 percent occurred in a confidential setting. Reasons for non-confidentiality included patient refusals and staffing shortages.

[82] The 3CMS RHU routine psychiatry appointments report did not include individuals that did not have complete contacts, such as those that were not scheduled in accordance with the institution's triage plan. The reviewed data captured the time between patient contacts but did not include patients who were not seen or scheduled for a routine contact with a psychiatrist, primary clinician, or IDTT. Of note, the provided appointments report did not account for delays between appointments due to movements in or out of 3CMS level of care or RHU placement. Contact with the assigned psychiatrist or primary clinician was unable to be determined.

To measure timeliness of routine primary clinician contacts during the review period, CDCR produced an appointments report that included individuals who were required to receive a routine primary clinician contact from February 2025 through April 2025.[83] For the 420 patients in CDCR's appointments report, there were 2,203 total completed and refused contacts. Of the 2,192 that were completed, 460 or 21 percent were reported as being conducted in a confidential setting. When a patient had more than one completed contact, compliance with Program Guide timeframes was able to be calculated. Of the 2,192 completed contacts, 1,784 were for individuals who were seen at least twice by a primary clinician provider. Of those 1,784 contacts, 220 or 12 percent were completed beyond the Program Guide required timeframes.

Of the 2,192 completed routine primary clinician contacts, 18 were reported to have been completed in zero minutes, 1,796 were completed within 15 minutes, 250 lasted between 16 and 30 minutes, 112 lasted between 31 and 60 minutes, eight lasted between 61 and 95 minutes, and eight were completed in longer than 95 minutes.

Review of a sample of ARHR data for 20 weeks for MHSDS 3CMS RHU patients revealed the offering of patients at least 23.5 weekly hours of yard and at least three weekly showers for 19 of 20 or 95 percent of examined weeks. There were weekly linen exchanges during six of 20 or 30 percent of examined weeks.

Interviewed patients generally reported receiving confidential weekly one-on-one meetings with their primary clinician outside of their cells in confidential space. Contact with

---

[83] The 3CMS RHU routine primary clinician appointments report did not include individuals that did not have complete contacts, such as those that were not scheduled in accordance with the institution's triage plan. The reviewed data captured the time between patient contacts but did not include patients who were not seen or scheduled for a routine contact with a psychiatrist, primary clinician, or IDTT. Of note, the provided appointments report did not account for delays between appointments due to movements in or out of 3CMS level of care or RHU placement. Contact with the assigned psychiatrist or primary clinician was unable to be determined.

psychiatric providers was reported to be significantly less frequent, ranging from once every three to four months for a long-term patient to no contact at all for newer arrivals. All patients confirmed they knew how to access mental health services if needed.

Patients indicated that they attended one 90-minute group per week and that once the eight available chairs were filled for the group, the other patients scheduled for that day must wait for the next session.

Patients also reported several procedural and systemic deficiencies. All interviewed patients stated they did not receive orientation flyers or pamphlets upon arrival in the RHU. Delays in receiving personal property, such as TVs, radios, or tablets, were also raised by some patients who reported waiting weeks for these items. One patient reported being discouraged by a CCI from attending his ICC as he was told that his term would be extended regardless of his attendance, despite wanting to attend.

Non-Disciplinary Restricted Housing (NDRH):

KVSP did not track NDRH for the review period.

MHCB:

During the review period, KVSP operated a 12-bed MHCB with an average daily census of ten patients. On the date of the site visit, there were seven patients housed in the MHCB.

Clinical lengths of stay averaged 9.9 days, while 26 percent of patients' clinical stays exceeded ten days. Thirteen percent of patients physically discharged more than 72 hours after clinical discharge. Staff attributed these delays to RHU beds being full, modified programming, and difficulty finding beds for patients with single-cell designation. Physical stays averaged 11.5 days with approximately 43 percent of patients' physical stays exceeding ten days and ranging from 11 to 46 days.

Four patients were admitted to the MHCB three or more times during the review period.

There were four psychologists, one LCSW, one recreational therapist, two psychiatrists (one of whom was a 0.5 FTE), and one supervising social worker who served the MHCB. According to staff-to-patient ratios from the 2009 staffing plan, psychiatrists who treated MHCB patients must maintain a caseload of no more than 10 patients per psychiatrist, while primary clinicians who treat MHCB patients must maintain a caseload of no more than 10 patients per 1.18 full-time equivalent. See ECF No. 3693 at 22. All clinician caseloads were within required ratios during the review period.

The monitor's expert observed five MHCB IDTTs during the monitoring visit, each with required staff in attendance who provided meaningful input. The quality of IDTT discussions had improved significantly since the previous monitoring round. See ECF No. 8095 at 520-523. All critical areas were covered except for appropriate attention to higher level of care considerations and level of care rationales in general. The MHCB supervisor was quick to appropriately prompt staff and ask follow-up questions when indicated to cover any missed areas.

Despite improvements in MHCB IDTT quality, the monitor's expert identified serious concerns regarding higher level of care referral practices, including inadequate higher level of care non-referral rationales. IDTT discussions and documentation revealed vague, clinically inappropriate, or unrelated rationales for non-referrals, even when positive referral indicators were present and patients were not improving despite extended lengths of stay and multiple modifications to treatment interventions.

Two patients in the MHCB during the monitoring tour were identified as requiring higher level of care referrals much sooner in their admission. One patient had remained in MHCB for

23 days, while another had remained 36 days in a severely decompensated state. Although the latter patient was eventually referred on day 29, the referral had not been accepted as of June 4, 2025. In response, the IDTT reported that they had well-intended plans for stabilization instead of initiating an acute care referral; however, the patient should have been referred when clinically indicated and then if improvements occurred based upon those interventions, the patient could be rescinded prior to admission.

Another reported reason for delaying referrals to higher levels of care was staff and leadership's perceived systemic challenges with the Inpatient Referral Unit (IRU). Staff reported that IRU reviewers had recently increased scrutiny of referrals, including messages to MHCB staff discouraging intermediate care referrals and suggesting that acute care referrals would be more successful from an MHCB setting. Leadership suggested that staff at times rescinded or avoided referrals in response to such questioning, instead focusing their efforts on improving patients' functioning through revised treatment plans or extended stays in the MHCB.

The Program Guide requires initial IDTTs in MHCBs to occur within 72 hours of the patient's admission and at least every seven days following the initial IDTT. ECF No. 7333-1 at 83-84 (PG 12-5-12). The MHCB IDTT is composed of the assigned psychiatrist, assigned primary clinician, nursing staff, correctional counselor, and the patient (if clinically and custodially appropriate and absent a refusal). *Id.* at 83.

The monitor randomly selected and reviewed the healthcare records of 30 MHCB patients to assess compliance with the Program Guide timeframes for initial and routine IDTT meetings during their stays. These 30 MHCB patients required initial IDTTs, of which 100 percent occurred within 72 hours or arrival, and had all required staff in attendance. Patients

attended 24 or 80 percent of initial IDTTs, while the reasons IDTTs were held in absentia included patient referrals and cell front contacts.

Twenty-eight of these same patients also required 37 routine IDTTs, of which 35 or 95 percent occurred timely or every seven calendar days following the initial IDTT. All 37 routine IDTTs had the required staff in attendance. Patients attended 34, or 92 percent of the routine IDTTs, with patient refusal, the primary reason a routine IDTT was held in absentia.

The Program Guide requires initial psychiatric and primary clinician evaluations to be completed prior to the initial IDTT and within 24 hours of admission. Thereafter, patients must be seen daily by either the psychiatrist or psychologist. At least twice weekly the psychiatrist must evaluate the patient.

The healthcare records of the same 30 patients were reviewed to assess compliance with the Program Guide timeframes for initial and routine psychiatry and primary clinician contacts. All thirty patients required initial psychiatry evaluations, of whom 28 or 93 percent had a timely initial psychiatry evaluation. Twenty of 67 percent of initial psychiatry evaluations occurred in a confidential setting. Reasons for non-confidentiality included patient refusals and cell front contacts. Telepsychiatry was used for two initial psychiatry contacts.

All thirty patients require two routine psychiatry contacts per week. Of the 144 expected contacts all were timely, while 36 or 25 percent occurred in a confidential setting. Reasons reported for non-confidential contacts included patient refusals and cell front contacts. Telepsychiatry was utilized for one routine psychiatry contact.

Of the 30 patients who required initial primary clinician evaluations. 23 or 77 percent occurred within 24 hours of arrival, while 22 or 72 percent were held in a confidential setting. Reasons for non-confidential appointments included patient refusals.

These same 30 patients' healthcare records were reviewed for compliance with required routine primary clinician contacts. Of the 134 reviewed contacts, 66 or 49 percent were timely and 80 or 60 percent were conducted in a confidential setting. Reasons for non-confidentiality included patient refusals and cell front contacts.

MHCB patients were offered dayroom, yard, and recreational therapy contacts. Review of NCAT data for MHCB patients further revealed that patients were offered three or more showers, two linen exchanges, two clothing exchanges, and phone calls weekly.

Seclusion and Restraint:

During the review period, two MHCB patients required seclusion orders, and no patients required restraints. Documentation for seclusion incidents showed no overt concerns.

EOP:

KVSP reported that its EOP program had a capacity of 384 patients across three housing units, and patients were routinely held in non-EOP housing units awaiting transfer into an EOP program. On average, the EOP population was 300 patients during the monitoring period. In addition to designated units, EOP patients were housed in nine different housing units throughout the institution, yet these placements were not considered to be overflow housing as they were not due to EOP being over capacity, but were secondary to other reasons including enemy concerns, unavailable space in the EOP program, and patient refusal to move to designated EOP buildings.

As of May 16, 2025, four psychologists, four tele-psychologists, one LCSW, one tele-social worker, five recreational therapists, one staff psychiatrist, and one registry psychiatrist were assigned to the mainline EOP program; one tele-psychologist resigned and another went out on planned leave during the site visit.

According to the staff-to-patient ratios from the 2009 staffing plan, psychiatrists who treat mainline EOP patients must maintain a caseload of no more than 120 patients per psychiatrist, while primary clinicians who treat mainline EOP patients must maintain a caseload of no more than 26 patients per clinician. *See* ECF No. 3693 at 17. Notably, no staff members who treated EOP patients during the review period carried caseloads within established ratios.

As discussed in further detail below, services provided to patients at the EOP level of care were inadequate during the review period. Patients were not being seen as required by their primary clinicians, they were not being offered at least ten hours of structured therapeutic activities weekly, the space for treatment was inadequate, the institution experienced frequent and lengthy lockdowns inhibiting access to care and observed IDTTs did not demonstrate sufficient treatment planning.

*Structured Treatment*

The Program Guide required that each EOP patient be offered at least ten hours per week of structured therapeutic activities. *See* ECF No. 7333-1 at 58. For patients who were determined by the treatment team to be clinically contraindicated for ten hours of treatment activities per week, the primary clinician is required to present the case and recommended treatment program (i.e. EOP modified programming) to the IDTT for approval. If the patient's modified treatment program included a schedule of less than ten hours of treatment per week, the patient's IDTT was required to meet monthly to review and increase the amount of structured therapeutic activities, or refer the patient to a higher level of care as clinically indicated. *Id*.

Excluding patients placed on EOP modified programming, patients were, on average, scheduled for 9.33 hours, offered 5.25 hours, attended 2.18 hours, and refused 3.13 hours of structured therapeutic activities weekly during the reporting period. On average, 4.27 hours of

treatment were cancelled weekly. It was reported that 42 percent of EOP appointments were cancelled by custody. The reasons provided for treatment cancellations included weather, modified programming, and other cancellations by custody.

During the review period, between four and 11 percent of EOP patients were offered at least ten hours per week of structured treatment each month for a total of nine percent of patients overall being offered at least ten hours of structured therapeutic activities. This percentage increased to just over 12 percent in May 2025.

KVSP reported that they were unable to offer the required number of treatment hours due to the number of patients who required treatment, size of caseloads, limited space, and staffing shortages. Additionally, statewide and institution-wide lockdowns adversely impacted the ability to provide required care. KVSP reported that during times of extended lockdown, patients were provided with in-cell activities.

Efforts to increase patient access to programming included expanding the size of groups to accommodate more patients, increasing access to non-mental health groups provided through the division of rehabilitative program (DRP), using EOP supervisors to supplement caseloads, adding tele-mental health staff, and active staff recruitment.

On average, patients placed on EOP modified programming were scheduled for 8.7 hours, offered 4.66 hours, attended 1.91 hours, refused 2.75 hours, and had 4.15 hours cancelled weekly, during the reporting period. The same reasons for cancellations were provided.

During the review period, five patients were placed on EOP modified programming status. Each of these patients' records were reviewed to determine whether patients were being provided with the treatment modifications outlined in their treatment plans. None of the patients' treatment plans provided information as to what modified programming included and thus

adherence to the plans could not be determined. Only one patient's treatment plan included a rationale for placement on modified programming which was due to the patient being housed outside of an EOP unit without access to EOP programming. Three of the patients had monthly IDTT meetings as required. One patient did not have monthly meetings, and the other only had a single IDTT meeting at KVSP before being transferred.

*IDTTs*

The monitor's expert observed six IDTT meetings during the monitoring tour. Observed IDTTs included the required staff; however, the assigned psychiatrist was not consistently present for the meetings and in some cases, the psychiatrist had not previously met the patient. Patients were present for five meetings, and one was completed in absentia secondary to patient refusal.

Case conceptualizations, functional impairments, barriers to treatment progress, and rationale for retaining patients at the EOP level of care were not consistently covered. While decisions to retain the patients at the EOP level of care were made by consensus, there was no discussion regarding the rationale for retaining the patient at the EOP level of care. This stemmed directly from the lack of discussion regarding functional impairments and barriers to treatment progress.

Treatment goals were referenced in most meetings and were typically objective and measurable. Treatment interventions, while mentioned, were often vague and generic. The impact of the patient's current treatment, including recreational therapy groups, was mentioned only in terms of percentage of groups attended rather than how the treatment was assisting the patient in meeting treatment goals. Psychiatric input was superficial. Discussions of diagnoses, current symptoms, and psychotropic medications occurred during most meetings. Quality

custody participation was noted in most meetings. Patients were actively engaged in the IDTT meetings and seemed to be invested in their care. Patients were aware of their diagnoses and psychotropic medications.

The Program Guide requires that EOP patients receive an initial IDTT within 14 calendar days of arrival to the institution and a routine IDTT every 90 days thereafter. *See* ECF No. 7333-1 at 57, 59.

Thirty mainline EOP patients who required initial IDTTs during the reporting period were randomly selected for review to assess compliance with Program Guide requirements. Of the 30 patients, eight transferred before the required timeline expired and two did not receive an IDTT at all. Of the 20 reviewed patients who received an initial IDTT, 17 or 85 percent occurred timely. Patients were present in 16 or 80 percent of cases. Initial IDTTs held in absentia were due to patient refusals. All reviewed IDTTs included the required staff.

To measure timeliness of routine IDTTs during the review period, CDCR produced an appointments report that included individuals who were required to receive a routine IDTT appointment.[84] For the 478 patients in CDCR's appointments report, there were 720 completed routine IDTTs. When a patient had either a completed or refused initial IDTT and a routine IDTT or more than one routine IDTT, compliance with Program Guide timeframes was able to be calculated. Of the 720 IDTTs that were completed, 244 were for individuals who had at least

[84] The reviewed data captures the time between patient contacts but does not include patients who were not seen or scheduled for a routine contact with a psychiatrist, primary clinician, or IDTT. Of note, the provided appointments report did not account for delays between appointments due to movements in or out of EOP level of care. When primary clinician caseload groups were utilized to meet primary clinician contact requirements, verification that individual contacts with the assigned primary clinician and alternated with caseload groups with the assigned clinician was not conducted. Contact with the assigned psychiatrist was also unable to be determined.

two IDTTs. Of those, 110 or 45 percent were not compliant with Program Guide timeframes. Of note, the report did not include individuals that did not have a completed IDTT, such as those that were not scheduled.

A random sample of 30 patients were selected to verify consistency in appointment dates between the appointments report and clinical documentation in EHRS. Of the 47 contacts reviewed, 46 or 98 percent were consistent with the appointments report. The one contact listed the wrong date in EHRS.

*Group Treatment*

The EOP group schedule was created every 12 weeks and included all structured treatment offered to EOP patients residing in EOP buildings. Patients were divided into cohorts and attended groups together, as a cohort, throughout the week.

In addition to groups being offered by cohort, there were 12 "stand alone" groups and DRP groups offered to select patients, not according to their assigned cohorts. It was reported that DRP programming was accessible to 64 patients at any time. Supervised recreational yard time was provided every third morning to each housing unit, as housing units were not allowed to be in the yard together during supervised recreational time. The group schedule included several topics offered by recreational therapists including rational behavior and decisions, anger management, stress management, leisure expression, social skills/communication, depression management, mood management, life skills, coping, and critical thinking.

NLTGs were offered three to five times daily, and DRP groups were offered three days per week and were scheduled for two hours. Stand-alone groups included EOP orientation, coping skills, and a discharge planning group, all offered by recreational therapists.

KVSP reported that primary clinicians offered caseload groups to patients in November and December of 2024 but did not offer caseload groups in 2025 due to the size of caseloads and a lack of space available for caseload groups.

The monitor's expert observed three groups during the monitoring tour. The introduction to EOP group was scheduled for 15 patients, but only five attended. The group started 20 minutes late and was facilitated by an RT and a current EOP patient. There was no primary clinician and custody staff representation during the group as required by the CMHPP. The group was scheduled for one hour. While the recreation therapist attempted to cover the material in the group, the attendees appeared distracted and discussed topics of concern including lack of recreational time and lack of recreational movies. One patient perseverated on the fact that his physical safety was at risk now that he had been enrolled in EOP and stated that other incarcerated individuals told him he would be assaulted if he returned to a general population yard. This patient was loud, distracting, and disruptive to the group, resulting in one member leaving early, and causing another to be visibly distressed during the session.

A group entitled mood management was also observed. The group began 15 minutes later than scheduled and included 14 of the 22 patients who were enrolled. The group took place in the gym with the recreation therapist sitting in an elevated workstation overseeing the ground floor, while an officer was standing by the door. The patients were engaged in several activities including weightlifting, playing basketball, watching television, and sitting together talking. Two patients appeared to be isolating themselves away from the others. The recreation therapist reported that there were two handouts available on the podium regarding mindfulness and exercise. Although the recreation therapist reported that patients were able to manage their moods through socializing and sports, it was unclear how this group related to "mood

management." While the space was adequate to accommodate the patients and the activities, the group was not structured but instead appeared to be unstructured leisure time.

Finally, a group listed on the schedule as Rational Behavior and Decisions was observed. The room was adequate to accommodate the eight patients who attended but could not accommodate any more attendees. The group started 15 minutes later than scheduled. Each patient was provided with a book regarding positive decision-making tools and took turns reading about a specific tool and then discussing its application. Patients were engaged and interactive. The content and the structure were appropriate to the population and appeared useful to those who attended.

EOP patients reported being offered two to four groups per week. These reports were confirmed through review of group schedules. Patients also reported that groups were sometimes shortened to 15- or 20-minute sessions due to delays in arrival to groups and alarms. The observed groups all started later than scheduled. Patients reported variable satisfaction with the group offerings, as some patients appreciated the structured groups while others wanted more leisure and incentive groups like watching movies.

*Individual Treatment*

The Program Guide requires that patients are offered an initial psychiatrist evaluation before their initial IDTT and within 14 calendar days of arrival to the institution or level of care change. *See* ECF No. 7333-1 at 57. Thereafter they are required to receive a routine psychiatric contact every 30 calendar days. *Id*. at 59. Patients are also required to receive a primary clinician evaluation within 14 calendar days of arrival and weekly (i.e. once per calendar week with no more than ten calendar days between contacts) with either a primary clinician or in group psychotherapy with an individual contact every other week. *Id*. at 57, 59.

Thirty mainline EOP patients who required initial psychiatry evaluations during the reporting period were randomly selected to assess compliance with Program Guide requirements. Eight patients transferred before the required time period expired. Of the 22 patients who received an initial psychiatry evaluation, 13 or 59 percent were timely while ten or 45 percent occurred in a confidential setting. Reasons for non-confidentiality included patient refusals, lack of custody escorts, and custody modified programming.

To measure timeliness of routine psychiatry contacts, CDCR produced an appointments report that included individuals who were required to receive a routine psychiatry appointment during the review period. For the 280 patients in CDCR's appointments report, there were 532 total completed and refused contacts. Of the 462 that were completed, 261 or 56 percent were reported as being conducted in a confidential setting. When a patient had more than one completed contact, compliance with Program Guide timeframes was able to be calculated. Of the 462 completed contacts, 254 were for individuals who were seen at least twice by a psychiatric provider. Of those 254 contacts, 107 or 42 percent of contacts were completed beyond the Program Guide required timeframes. Of note, the report did not include individuals that did not have complete contacts, such as those that were not scheduled in accordance with the institution's triage plan.

A random sample of 30 patients were selected to verify consistency of appointment dates between the appointments report and clinical documentation in EHRS. Documentation for all 53 contacts reviewed in EHRS was consistent with the information contained in the appointments report.

The 30 mainline EOP patients who required initial psychiatry evaluations also required initial primary clinician evaluations during the reporting period. Of the 30 patients, eight

transferred before the required timeline expired. Of the 22 reviewed patients who received an initial primary clinician evaluation, 14 or 64 percent occurred timely and 13 or 59 percent occurred in a confidential setting. Reasons for non-confidentiality included patient refusals and custody modified programming.

To measure timeliness of routine primary clinician contacts, CDCR produced an appointments report that included individuals who were required to receive a routine primary clinician appointment during the review period. For the 462 patients in CDCR's appointments report covering patients who received at least one routine primary clinician contact during the review period, there were 3,396 total completed and refused contacts. Of the 3,393 that were completed, 1,466 or 43 percent were reported as being conducted in a confidential setting. When a patient had more than one completed contact, compliance with Program Guide timeframes was able to be calculated. Of the 3,393 completed contacts, 2,936 were for individuals who were seen at least twice by a primary clinician provider. Of those 2,936 contacts, 2,577 or 88 percent of contacts were completed beyond the Program Guide required timeframes. Of note, the report did not include individuals that did not have completed contacts, such as those that were not scheduled in accordance with the institution's triage plan.

Of the 3,393 completed routine psychiatry contacts, 21 contacts were reported to have been completed in zero minutes, 2,736 were completed within 15 minutes, 462 lasted between 16 and 30 minutes, 156 lasted between 31 and 60 minutes, 10 lasted between 61 and 95 minutes, and eight were completed in greater than 95 minutes.

A random sample of 30 patients were selected to verify consistency between the appointments report and clinical documentation in EHRS. Documentation for all 105 contacts reviewed in EHRS were consistent with the information contained in the appointments report.

KVSP reported that they did not have a formal step-down program for patients transitioning from the EOP to 3CMS level of care; however, it was reported that custody staff work with patients transitioning to 3CMS who want to complete groups cycles in which they were enrolled prior to the level of care change. This typically involved patients remaining within the EOP program to complete group cycles after being decreased to the 3CMS level of care.

During patient interviews, it was reported that patients were seen routinely by their assigned primary clinicians and psychiatrists rather than covering providers. Additionally, patients reported that contacts were routinely held in confidential settings when the facility was not on lock down status, and that sessions were of sufficient length to address their needs. A few patients reported being uncomfortable with tele-mental health contacts as they did not trust that the electronic platform was secure. Patients reported attending IDTT meetings every 90 days, yet many reported that they did not feel adequately prepared for the meeting, and many feared being "kicked out of EOP" by being reduced to the 3CMS level of care without warning. Patients reported knowing their treatment goals, but it did not appear that patients believed these goals were tied to their stay in EOP.

Many patients complained about the frequent lockdowns within the institution and noted that the EOP programs were being modified when events happened elsewhere in the institution. Patients reported problems with laundry and access to canteen during lockdowns, as well as during other times. There were reports of some challenges accessing groups and other programs as the lists provided to the officers on the housing units did not correspond to the lists that mental health staff were using and did not match patient ducats.

The EOP supervisor was interviewed regarding the services provided to patients at the EOP level of care. The supervisor reported that the barriers to providing adequate care included

staffing vacancies, limited space for groups and individual sessions, the large EOP population, and the frequent lockdowns accompanied by a lack of availability of custody staff to escort primary clinicians to see patients cell front on the housing units.

Patients who failed to show for appointments or who could not be seen secondary to lockdowns could not be routinely monitored through cell-front contacts as custody staff were required to escort primary clinicians during cell-front contacts at KVSP and custody staff were not available to provide escorts, especially during times of heightened security.

Lack of designated treatment spaces was a barrier to meeting treatment guidelines with the expanded EOP population. The treatment building, which included four group rooms and six offices to provide individual treatment, had been sufficient in the past, when patients were housed in a single EOP building. When the program expanded to a second building, space became a challenge. When the EOP program was expanded to a third housing unit, increasing the original EOP population by 68 percent, the building was no longer sufficient. Of note, the four group rooms were being used to provide all groups to EOP patients including recreational therapy groups, nursing led treatment groups, and cognitive behavioral interventions provided through DRP. KVSP mental health leadership requested modular office space so that current office space could be converted into treatment space, yet funding for these projects was not approved.

Space for group and individuals contacts was sufficient with regard to confidentiality. There was a camera mounted in the ceiling of the group rooms, and the sergeant confirmed that the cameras did not include audio, and the videos were only accessible to lieutenants. Group rooms were on the smaller side and could not comfortably or safely accommodate more than ten patients, provided none of the patients were in wheelchairs or using walkers.

<u>3CMS</u>:

3CMS patients were housed on Facilities B, C, D, and M during the review period. On the date of the site visit, there were 1,143 3CMS patients, reflecting a 23 percent increase since the Thirtieth Round. *See* ECF No. 8095 at 505.

The staff-to-patient ratios from the 2009 Staffing Plan and 2021 adjustments to the 2009 staffing plan required that staff psychiatrists who treat 3CMS patients maintain a caseload of 280 patients per psychiatrist if the patient was prescribed medications and 675 patients if the patient was not prescribed medications.[85] *See* ECF No. 3693 at 12 and 6978-1 at 3. As of May 16, 2025, one registry psychologist, one registry LMFT, one telepsychologist, three LCSWs, one unlicensed social worker, two registry psychiatrists, two telepsychiatrists, one PNP, one senior psychologist supervisor (who did not carry a caseload) were assigned to the mainline 3CMS program; one of the LCSWs submitted their resignation during the site visit. The two registry psychiatrists and two telepsychiatrists carried caseloads within established ratios; the 3CMS primary clinicians did not.

Staff retention in the 3CMS program was a concern throughout the review period as staff were consistently reassigned to higher level of care programs due to the institution's triage plan. Prior to the hiring of two new clinicians in January and February 2025, the 3CMS program was

[85] The Program Guide requires that "[e]ach CCCMS inmate patient on psychiatric medication…be reevaluated by a psychiatrist a minimum of every 90 days regarding psychiatric medication issues." (Program Guide at 12-3-11). The 2009 Staffing Plan established a psychiatry staffing ratio for every 3CMS patient in the general population and did not distinguish between patients on medications and patients who were not. See ECF No. 3693 at 8. The Adjustments to the 2009 Staffing Plan, ECF No. 6978-1, which were approved by the Court on January 27, 2021 (See ECF No. 7035 at 2), established a new staffing ratio of 675 patients per psychiatrist for patients who are not on medications for six months or more. For the purpose of reporting compliance with staff-to-patient ratios, it was unclear whether the patient's included in each reported caseload were prescribed medications at the time of the site visit.

operating on a modified programming to address these staffing deficiencies. With improved staffing, IDTT meetings and routine primary clinician contacts have resumed per Program Guide requirements. Despite these gains, the supervisor noted there is still a backlog, and concerningly, clinicians sometimes "stacked" routine contacts with SREs to meet timeliness metrics.

During the monitoring tour, the 3CMS supervisor identified several barriers to patient access to care, including lack of treatment space, patients refusing contact because they prefer to choose their clinician (e.g., a patient requesting only female staff); fears that leaving their single cell might result in searches (especially for those using substances); and safety concerns of being around other patients in the dayroom. Further compounding these challenges, officers and clinicians were often diverted to respond to drug overdoses and reports of “chest pains,” further delaying treatment. Incidents of violence were also reported to have disrupted patient care by triggering institutional alarms that require 3CMS assigned custody officers to respond, causing delays in treatment programming.

The monitor’s expert observed eight 3CMS IDTTs on Facilities B and D during the site visit. Three clinicians facilitated the eight observed IDTTs, of which four were held in absentia on D Yard and one on B Yard.

The meetings took place in small, crowded program offices on each yard. The rooms contained multiple tables with computer monitors, as well as primary clinician laptops making it difficult to have direct view of all participants. Although there was visibility through a window paneled door, the room was confidential as to sound. At one point, ten people were present in the room, including the patient, causing the space to become crowded and warm.

Overall, IDTT meetings across both Facilities B and D revealed significant issues, primarily a disconnect between clinical IDTT discussions and documentation of the treatment

team meeting. While Facility D IDTTs included the required staff, the assigned clinicians were not always present. The team generally worked collaboratively during IDTT meetings that included reporting patient's psychiatric history, general treatment targets, psychiatric medications, functional impairments, and whether patient had difficulties adjusting to RHU in the past due to mental health concerns. When a patient had a tele-mental health primary clinician, the computer monitor was placed directly in front of the patient, ensuring clear visibility and audibility. The facilitating telepsychologist demonstrated good rapport and presented information clearly to the one patient who attended in person.

Although generally collaborative, there were inconsistencies across IDTTs noted and key components of treatment planning were often omitted from IDTT discussion, including discussion of specific measurable goals, diagnosis supported by symptom justification, and case conceptualizations. It was also noted that custody modified programming restricted many initial assessments of 3CMS patients, leading primary clinicians to rely on chart reviews. However, reviewed documentation typically lacked essential elements, such as a thorough case conceptualization, identification of functional impairments, and specific measurable treatment goals.

This pattern of documentation issues was consistent across other observed cases, where modified treatment plans either included treatment targets not discussed in the meeting, contained goals that had not been updated and, in one instance, had not been revised since the year prior, despite a collaborative meeting with the patient. Ultimately, the pervasive disconnect between clinical discussion and the official record rendered the IDTT process on this yard clinically ineffective.

A veterans' group was the only 3CMS group offered, which served approximately 60-70 incarcerated people. The group was open to all veterans, including non-MHSDS patients, and was facilitated by two full-time primary clinicians who were also responsible for "Case Manager on Call" duties. General population veterans met together on Facilities A and B, while those from the EOP and 3CMS programs met together in a combined group scheduled on Fridays. Although EOP patients did not attend this group with general population patients, the intermingling of EOP and 3CMS patients during structured activities violated the Program Guide requirement that EOP patients' program separately. *See* 2021 Program Guide Update, ECF No. 7333-1 at 51 (PG 12-4-1) ("The [EOP] program is characterized by a separate housing unit and *structured activities* for mentally ill inmate-patients who, because of their illness, experience adjustment difficulties in a General Population (GP) setting, yet are not so impaired as to require 24-hour inpatient care." (emphasis added)).

Initial IDTTs for 3CMS patients are required to occur within 14 working days of arrival to the institution or level of care change and annually thereafter. *See* ECF No. 7333-1 at 43-44.

Thirty mainline 3CMS patients who required initial IDTTs during the review period were randomly selected to assess compliance with Program Guide requirements. Of the 30 patients, nine transferred before the required timeline expired and nine did not receive an initial IDTT. Only two of the 12 or 17 percent of patients received an initial IDTT within Program Guide timeframes. Patients were present in six cases. Reasons for absences were due to custody staff unavailability and patient refusals. All 12 reviewed cases included the required staff.

To measure timeliness of routine IDTTs, CDCR produced an appointments report that included individuals who were required to receive a routine IDTT during the review period.[86] For the 324 patients in CDCR's appointments report for April 1, 2024 to November 30, 2025, there were 330 completed initial or routine IDTTs. When a patient had either an initial IDTT and a routine IDTT or more than one routine IDTT, timeliness in accordance with Program Guide requirements was able to be calculated. Eight of the 330 contacts were for individuals who had at least two IDTTs (initial and routine or two routines); none occurred beyond Program Guide timeframes.

The Program Guide requires that patients are offered an initial psychiatrist evaluation before their initial IDTT. *See* ECF No. 7333-1 at 34-50, 641. Thereafter they are required to receive a routine psychiatric contact every 90 calendar days if the patient is prescribed a psychotropic medication. *Id*. at 44. Patients are also required to receive a primary clinician evaluation within ten working days of arrival and every 90 calendar days thereafter. *Id*. at 41, 48.

Thirty mainline 3CMS patients who required initial psychiatry evaluations during the reporting period were randomly selected for review to assess compliance with Program Guide requirements. Nine transferred before the required time period expired and three patients never received an initial psychiatry evaluation at KVSP. Sixteen of the 18 or 89 percent of mainline 3CMS patients who received an initial psychiatry evaluation, received it before their initial IDTT. However, five of those patients did not receive an initial IDTT at all. Of the 18 patients

[86] The reviewed data captures the time between completed patient IDTTs but does not account for when patients were not scheduled for an initial or routine IDTT. Of note, the appointments report provided did not account for delays between appointments due to movements in or out of KVSP.

who received an initial psychiatry evaluation, nine or 50 percent occurred in a confidential setting. Reasons for non-confidentiality included custody modified programming, patient refusals, and lack of custody escorts.

To measure timeliness of routine psychiatry contacts during the review period, CDCR produced an appointments report that included individuals who were required to receive a routine psychiatry appointment.[87] For the 787 patients in CDCR's appointments report for November 1, 2024 to April 30, 2025, there were 1,401 completed and refused contacts. Of the 1,301 completed contacts, 720 or 55 percent were confidential as reported by the institution. Reasons for non-confidential psychiatry contacts included patient refusals, custody, and mental health modified programs. When a patient had more than one completed or refused contact, compliance with Program Guide timeframes was able to be calculated. Of the 1,401 contacts, 617 or 44 percent of contacts were for individuals who were seen at least twice by the psychiatric provider. Of those 617 contacts, 154 or 25 percent occurred beyond Program Guide requirements with a range of 91 to 168 days between contacts.

The 30 mainline 3CMS patients who required initial psychiatry evaluations also required initial primary clinician evaluations during the reporting period. Of the 30 patients, nine transferred before the required timeline expired and nine did not receive an initial primary clinician evaluation. Of the 12 reviewed patients who received an initial primary clinician evaluation, two or 17 percent occurred within ten working days of arrival and eight of 12 or 67

[87] The reviewed data captures the time between completed patient contacts but does not account for when patients were not scheduled for a routine contact. Of note, the appointments report provided did not account for delays between appointments due to movements in or out of KVSP. Contact with the assigned psychiatrist was unable to be determined.

percent occurred in a confidential setting. Reasons for non-confidentiality included patient refusals.

To measure timeliness of routine primary clinician contacts, CDCR produced an appointments report that included individuals who were required to receive a routine primary clinician appointment during the review period.[88] For the 983 patients in CDCR's appointments report for November 1, 2024 to April 30, 2025, there were 1,277 completed and refused contacts. Of the 1,254 completed contacts, 373 or 29 percent were confidential as reported by the institution. Reasons for non-confidential primary clinician contacts included patient refusals and custody and mental health modified programs. When a patient had more than one completed or refused contact, compliance with Program Guide timeframes was able to be calculated. Of the 1,277, 299 contacts were for individuals who were seen at least twice by the primary clinician. Of those 299 contacts, 167 or 56 percent occurred beyond Program Guide requirements with a range of 91 to 162 days between contacts.

A review of ten patients who had transferred from EOP to 3CMS during the review period revealed three patients who had subsequently expressed suicidal ideation or related behaviors. In one case, the patient's distress was linked to receiving news after his transfer to 3CMS of a sibling's passing, which prompted a referral to the MHCB. The other two cases appeared to reflect challenges with adjustment, as the patients did not agree with the change in their level of care; in one of these situations, repeated expressions of suicidal ideation were

[88] The mainline 3CMS routine primary clinician appointments report did not include individuals that did not have completed contacts, such as those that were not scheduled. The reviewed data captures the time between patient contacts but does not include patients who were not seen or scheduled for a routine contact with the primary clinician. Of note, the provided appointments report did not account for delays between appointments due to movements in or out of KVSP. Contact with the assigned primary clinician was unable to be determined.

observed, although these were typically coupled with alternative explanations for their statements rather than a clear intent to act. Overall, these findings suggest that while a small subset of patients displayed episodes of heightened distress following the transition from EOP to 3CMS, most patients were discharged without significant concerns necessitating a higher level of care referral.

Interviewed patients on Facilities C and D reported being offered primary clinician contacts every 90 days but did raise confidentiality concerns as one-on-one sessions were often held in a predominantly glass-walled office visible to both staff and incarcerated persons. In addition, the frequent turnover of clinicians further discouraged patients from engaging in treatment, as a patient reported that they are often asked to discuss their traumatic histories every few months with someone new, a factor that has led some patients to avoid individual contacts altogether. One patient noted that his one-on-one primary clinician contact often lasted only five minutes and was not beneficial.

Challenges were also noted with the "ducat" appointment notification system. Some patients reported not receiving timely notifications that they had appointment. In some instances, patients received notifications as early as 8:00 A.M. indicating that they have a mental health appointment, but they may not be escorted to their appointment until noon, leaving them to wait in their cells for extended periods of time. Some patients reported not receiving a ducat at all but later being told that they had missed an appointment, resulting in inaccurate documentation as treatment-refusals.

Concerns were also raised about medication distribution, with reports of inconsistent timing and unreliable delivery during lockdowns; patients were sometimes instructed to take morning and evening medications simultaneously or at inappropriate times.

Despite concerns with access to yard, lack of groups, and lack of access to therapeutic activities on tablets, patients were familiar with the process of completing a 7362 form to access mental health services, and many maintained work or school schedules. In addition, patients on Facility C noted that having peer support specialists available, especially on weekends, have been particularly helpful in assisting them with their mental health needs.

Other Issues:

Pre-Release Planning:

KVSP's pre-release supervisor and the pre-release coordinator covered the pre-release program for the entire institution during the review period. The current LOP was provided and was consistent with headquarters directives.

The pre-release coordinator was responsible for conducting the first section of the pre-release planning assessments, face to face contacts with patients, assessing the patient's ability to navigate public transit systems, PC 2602 needs, patient's housing requests and needs, and TCMP coordination. The coordinator was also responsible for coordinating with the DRP and parole service associate (PSA) who were responsible for providing Cal-ID through the Automated Reentry Management System (ARMS) database where information was stored.

The pre-release coordinators met with ISUDT bi-weekly and attended monthly meetings with headquarters. At the time of the site visit, there were 107 patients within 120 days of parole. The pre-release coordinator reported a very high rate of patient engagement with pre-release services.

During the review period, KVSP reported 60 caseload patients who paroled, and 67 patients released to probation. Due to a staffing issue, there was no data collected regarding refusal to sign a ROI. KVSP did not maintain data regarding the number of patients seen for

CAL-ID services or their outcomes. The institution was unable to provide the number of pre-release planning assessments conducted in the review period, but reported most if not all assessments were conducted unless the patient was released early.

At the time of the monitoring tour, the pre-release coordinator was working with 102 patients who were within 120 days from release.

There were three pre-release groups provided for EOP patients during the review period. The pre-release groups were titled, "Discharge Planning" and priority was given to patients paroling within the calendar year. If there was available space, all EOP patients were welcome to attend.

The TCMP documentation reported that 14 EOP and 123 3CMS patients were screened during the review period. As for various benefits applications, 127 were submitted on behalf of 137 patients. Four patients refused TCMP services, five patients had access to other resources, and one was unavailable. Applications for Medi-Cal were submitted for 127 or 93 percent of patients, while SSI applications were submitted on behalf of 17 or 94.4 percent of eligible patients. No patients applied for veterans' benefits.

The pre-release program coordinators collaborated with Cal-AIM starting in early 2025. The coordination efforts included warm-handoffs from the pre-release team and Cal-AIM's nursing coordinators collaboratively providing community services to the patients. KVSP reported that coordination efforts occurred with over 150 patients since the collaboration with Cal-AIM began.

Program Access:

a. Job and Program Assignments

As of May 6, 2025, KVSP reported that 923 job assignments were held by 71 EOP patients or 21 percent of the EOP population, 341 3CMS patients or 25 percent of the 3CMS population, and 511 non-MHSDS individuals or 34 percent of the non-MHSDS incarcerated population.

The 701 academic assignments were held by ten EOP patients or three percent of the EOP population, 258 3CMS patients or 19 percent of the 3CMS population, and 433 non-MHSDS individuals or 29 percent of the non-MHSDS incarcerated population.

The 184 vocational education assignments were held by three EOP patients or one percent of the EOP population, 74 3CMS patients or five percent of the 3CMS population, and 107 non-MHSDS individuals or seven percent of the non-MHSDS incarcerated population.

The 562 voluntary education assignments were held by two EOP patients or one percent of the EOP population, 192 3CMS patients or 14 percent of the 3CMS population, and 368 non-MHSDS patients or 25 percent of the non-MHSDS incarcerated population.

The six substance abuse treatment assignments were held by six non-MHSDS individuals or less than one percent of the non-MHSDS incarcerated population.

b. Milestone Credits

KVSP reported that 137 EOP and 16 3CMS patients were awarded milestone credits but did not indicate how many patients were eligible for the credits.

c. Out-of-Level Housing

On May 15, 2025, KVSP reported that 12 3CMS custody Level I patients, were in Level IV housing; 22 3CMS Level II patients were in Level IV housing; and five EOP, and 15 3CMS, Level III patients were in Level IV housing.

d. ADA Reasonable Accommodations and Grievance Procedures

The institution confirmed implementation of the revised ADA accommodations, grievance procedures, and appeals process and provided a copy of the desk reference manual. A roster of staff who had enrolled in and completed the offender grievance and appeal process training was also provided.

e. Periodic Classification Score Reductions: EOP Patients

KVSP was unable to provide any related documents or data.

"C" Status:

On May 30, 2025, 45 MHSDS patients were designated "C" status; this included six EOP and 39 3CMS patients.

Case-by-Case Reviews:

KVSP reported that two 3CMS patients required a long-term segregated case conference. One case conference was completed timely, and one was completed more than 20 days late. An audit was conducted, and the auditor then determined the patient should remain in RHU. Document review for the long-term segregation case conferences revealed that both cases reflected consideration of mental health information about the decision to retain the patient in segregated housing.

KVSP reported that five patients met the requirement for 120-day pre-MERD reviews. All patients had timely ICCs, and three patients required CSR review. Four patients received

extensions due to pending RVR adjudication or investigation, and one patient was released back to their respective mainline housing placements. None of the patients qualified for NDRH status.

Mental Health Referrals:

During the review period, KVSP reported 4,680 mental health referrals (excluding PREA consults) consisting of 1,629 to psychiatry and 3,051 to primary clinicians.

There were 1,015 emergent, 408 urgent, and 3,257 routine referrals. For emergent referrals, 187 of 197 or 95 percent of psychiatry referrals and 752 of 818 or 92 percent of primary clinician referrals were timely; for urgent referrals, 63 of 75 or 84 percent of psychiatry referrals and 250 of 333 or 75 percent of primary care referrals were timely; and for routine referrals, 1,175 of 1,357 or 87 percent of psychiatry referrals and 1,593 of 1,900 or 84 percent of primary clinician referrals were timely.

Custody and Mental Health Partnership Plan:

KVSP's custody and mental health partnership plan LOP complied with statewide policy and was last updated in September 2024 and, thus, up to date.

Executive leadership joint rounding occurred during all six months of the review period in the MHCB twice, the 3CMS RHU three times, and once on 3CMS Facility A. Required staff attended each rounding. Staff reported positive relations between custody and mental health staff, the high influx of RHU admissions, issues with the group treatment room in the 3CMS RHU, and requests for treatment modules in the MHCB; patients reported comfortability accessing mental health services, overall satisfaction with the mental health program, and receiving ducats timely.

The institution indicated that executive joint rounding was discussed in all six months of executive staff meeting minutes, however the actual minutes were not provided, and for all six

months for quality management committee and mental health program subcommittee minutes in sufficient detail.

Monthly joint supervisory tours occurred during each month of the review period on facilities A, B, C, and D with required staff in attendance. Staff reported positive relations between mental health and custody, physical plant issues, patient movement issues, and concerns with staffing shortages; incarcerated persons reported timely receiving ducats and getting to appointments, physical plant issues, a desire for more groups, and generally liking their primary clinicians.

Weekly 3CMS supervisory meetings occurred throughout the review period with required staff in attendance. One 24-hour threat assessment was noted for one week but, otherwise, no other information was disclosed.

Daily second and third watch RHU and mainline EOP huddles typically occurred throughout the review period with required staff in attendance. MHCB huddle forms were not provided.

Introduction to EOP groups were offered weekly throughout the review period and at the time of the site visit; 106 patients attended this group during the review period.

KVSP distributed the 3CMS orientation brochure to new patients and provided English and Spanish copies of the same.

Inmate advisory council meeting minutes occurred for all six months on facilities A, B, C, and D and for two months in the MSF. Discussed topics included issues related to ongoing PSRs, issues with ducats stemming from the PSRs, ongoing interest in peer support training, concerns with non-confidentiality of cell-front contact, EOPs being "housed on the yard" which

"impact(ed) programming," and concerns with 3CMS patients causing problems on the MSF Yard.

Regarding staff misconduct complaints, during the review period, 14 were filed against mental health of which ten were closed and 475 filed against custody staff; 34 of those 475 or seven percent were rejected, and the statuses of the remaining 441 or 93 percent were unknown.

There were no investigations into misconduct towards a patient that was initiated outside of the appeal process, and no staff members were reassigned because of misconduct complaints.

The annual partnership off-post training was attended by 185 of 223 or 83 percent of required mental health staff and 930 of 998 or 93 percent of required custody staff.

KVSP provided the names of staff who attended quarterly roundtable training during the review period but was unable to provide which staff had not received the training; accordingly, compliance could not be ascertained.

Heat Plan:

CDCR required that each institution's heat plan LOP incorporate the requirements of the most recent Heat Plan and Updates memorandum. Review of KVSP's heat plan LOP indicated compliance with headquarters' directive.

The 2024 Heat Plan and Updates memorandum required that each institution submit a Heat Plan Monthly Summary Report (Summary Report), signed by the warden and CEO, to headquarters each month from May 1 to October 31. The heat plan was not in effect during the reporting period.

The 2024 Heat Plan and Updates memorandum required all custody officers and leadership staff to maintain knowledge of heat plan activation and act in accordance with the requirements of each stage. Although not in effect during the monitoring period, the heat plan

was in effect during the monitoring tour. Interviewed custody staff in the RHU and MHCB demonstrated adequate knowledge of heat plan policy and responsibilities at each stage. An updated, printed copy of the heat-risk medication list was available for reference as well. Officers on Facilities A, B, C, and D demonstrated varying knowledge of heat plan policy and procedures. It was clear that staff were not well versed in their responsibilities at each stage of activation but were able to describe which events triggered heat alerts.

To ensure proper and accurate temperature recording, the annual Heat Plan and Updates Memorandum required the warden or his designee to ensure an accurate thermometer was placed in a central, heat-neutral location to monitor outside ambient air temperatures which must be recorded every hour, every day, from May 1 through October 31 of each year. Outdoor air temperatures were properly recorded on the date of the site visit.

The warden or his designee is also responsible for ensuring that inside air temperatures are measured in all non-airconditioned living areas that house heat-risk incarcerated persons. Temperatures must be taken at the highest non-air-conditioned location where heat-risk incarcerated persons are housed and must be recorded every three hours. The MHCB was air conditioned and therefore did not require temperature recording. Temperature logs on Facilities A and B were properly recorded with thermometers placed in the correct locations. However, reviewed Facility C and D indoor temperature logs for the dates of the site visit were concerning. Officers on Facility C were only sporadically filling in their temperature logs throughout the day. While in one unit on Facility D, the temperature logs were completed for two days *into the future* for that particular housing unit. This echoed similarly concerning findings in the Special Master's Focused Heat Plan Report whereby custody officers at KVSP produced retroactively

completed temperature logs filled in from memory after stating the previous day that they were not aware of the requirements to record temperatures. *See* ECF No. 8558 at 35.

In an effort to ensure that heat-risk incarcerated persons were afforded equal access to programs, services, and activities during extreme weather conditions, the 2024 Heat Plan and Updates memorandum required institutions to devise and include any reasonable accommodation and alternatives to yard activities when revising their LOP. All reasonable accommodation provided to heat-risk incarcerated persons during heat alert activation must be documented in the institution's DAR as well. The institution was unable to provide DARs evidencing the offering of accommodations during heat alerts.

The 2024 Heat Plan and Updates memorandum required annual training on the institution's Heat Plan. Of 147 of 171 or 86 percent of mental health staff completed heat pathologies training as well as all 779 of custody staff.

RVRs:

KVSP issued 3,753 RVRs during the review period, of which 2,565 or 68 percent were issued to MHSDS patients, including one RVR issued to an acute care patient, 64 to MHCB patients, 645 to EOP patients, and 1,855 to 3CMS patients.

Review of 20 RVRs issued to MHSDS patients revealed that custody timely referred the MHA to mental health staff in 11 of 20 or 55 percent of cases; late referrals ranged from three to 15 days. Mental health staff timely completed and returned the assessment to custody in 13 of 20 or 65 percent of cases; one late return was 43 days late. The MHA was confidentially completed 55 percent of the time, with the patient refusing a confidential assessment on nine or 45 percent of cases.

Patients were assigned a staff assistant in each case, although one patient refused the staff assistant after it was assigned. The senior hearing officer (SHO) documented consideration of the patients' mental health information in all of the reviewed RVRs. The SHO mitigated a penalty assessment based on the mental health recommendation in two of the three cases where the assessment recommended mitigation.

For required MHA training, all correctional administrators and 739 out of 835 or 89 percent of correctional officers completed the training, while the chief psychiatrist and chief psychologist, one of two supervisor psychologists, one of two senior psychologist specialists, one of two supervising social worker, two of 19 psychologists, four of 17 social workers, and one of seven RTs completed the training.

Use of Force:

KVSP reported eight controlled uses of force incidents involving two RHU EOP patients, two RHU 3CMS patients, one MHCB patient, and three mainline 3CMS patients. There were also 364 immediate uses of force, of which 337 or 93 percent involved MHSDS patients.

Review of three controlled uses of force revealed that all policy requirements were met including appropriate cool down periods, mental health clinician intervention, video footage of the incident, multiple attempts to gain compliance with vocal orders, and nursing review for exposure to chemical agents. None of the controlled uses of force were a result of administering PC 2602 medications.

Review of 12 immediate use of force episodes involving MHSDS patients revealed minor policy violations including not wearing protective gear.

KVSP reported 100 percent compliance for attendance at the mandatory use of force

training by the warden, the chief deputy warden, six correctional administrators, 30 lieutenants, and 85 sergeants. Further, five of six captains attended the training, as did almost all (773 of 777) correctional officers. As for mental health staff, the training was attended by the chiefs of psychology and mental health, and both supervisory psychiatrists, psychologists, and social workers. Further, all 19 psychologists attended the training, all 51 licensed vocational nurses and 60 registered nurses attended as did the three psychiatrists and all 17 social workers.

Lockdowns/Modified Programming:

From the start of the review period through the time of the site visit, KVSP was frequently placed on modified programming due primarily to ongoing violence between incarcerated individuals and against custody officers, as well as substance abuse issues and overdoses.

Eight local modified programming periods and a statewide PSR were initiated during the review period, consisting of five on Facility C, two on Facility B, and one on Facility D. The modified programming periods ranged from three days to nearly one month; most lasted multiple weeks. Notably, two stemmed from attempted homicides against correctional officers; one of these attempted homicides occurred on Facility B wherein three assailants attempted homicide on two correctional officers.

There were also five modified programming periods initiated from end of review period through the time of the monitoring tour, consisting of three on Facility C, one on Facility B, and one on Facility D. Two of the three on Facility C stemmed from attempted murders or attacks on correctional officers, and the one on Facility B stemmed from the homicide of an incarcerated person. Furthermore, during the monitoring tour, another attempted homicide occurred on Facility C; the victim had to be airlifted off the yard to receive further medical care.

Access to Care:

KVSP provided monthly Health Care Access Quality reports from November 1, 2024 through April 30, 2025. Of 62,162 total issued mental health ducats and add-on appointments, 21,541 or 35 percent were completed, and 40,621 or 65 percent were not completed. Of the non-completed appointments, 10,034 or 25 percent were due to custody factors, 16,048 or 40 percent were due to non-custody factors, and 14,539 or 35 percent were due to patient refusals.

*Coleman* Postings:

All toured housing units on A, B, and C Yards contained the current *Coleman* postings in English and Spanish in areas that were accessible to patients. Several housing units in D Yard did not have the required posters. The health care captain was working to have those posters affixed in the units.

**APPENDIX A – 19**
**MULE CREEK STATE PRISON (MCSP)**
Site Visit: February 18, 2025 – February 21, 2025
Review Period: July 1, 2024 – December 31, 2024

Census:

On February 14, 2025, MCSP housed 3,811 incarcerated persons, which was virtually unchanged compared to the preceding monitoring round. *See* ECF No. 8095 at 186. The population of 2,242 MHSDS patients represented 59 percent of the institution's population and had decreased negligibly (by only 5 patients) since the Thirtieth Round. *Id.*

There were no patients in the MHCB. There were 93 MHSDS patients housed in the EOP RHU; 62 were EOP RHU patients and 31 were 3CMS RHU patients awaiting transfer.

There were 735 mainline EOP patients, a two percent increase since the preceding site visit. *Id.* The 1,408 3CMS mainline population remained virtually unchanged compared to the preceding review. *Id*.

There were six additional MHSDS patients labeled as "Mismatch Housing [with] MHI."

Staffing:

The chief psychiatrist position was filled, as was the senior psychiatrist position. Of the nine allocated staff psychiatrist positions, 4.5 were filled resulting in a 50 percent vacancy rate. The use of five registry staff positions, while accounting for one position on long term leave, resulted in a six percent functional vacancy rate. There were 6.5 allocated telepsychiatry positions of which six were filled leaving an eight percent vacancy rate.

Accounting for staff psychiatrists and telepsychiatrists, the overall staff psychiatrist functional vacancy rate was six percent during the site visit.

Both chief psychologist positions were filled; one served as the chief of mental health. There were 7.5 allocated senior psychologist positions of which six were filled for a 20 percent

vacancy rate. Similarly, there were 7.5 allocated senior psychologist specialist positions of which six were filled for a 20 percent vacancy rate. Of the 45 staff psychologist positions, six were filled, leaving an 87 percent vacancy rate. Five registry positions reduced the functional vacancy rate to 76 percent. There were four telepsychologist positions that were filled as well.

The supervising social worker position was filled. Out of 20.5 allocated social worker positions, 8.25 were filled leaving a 60 percent vacancy rate. The use of 2.25 registry staff reduced the social worker functional vacancy rate to 49 percent. There were four allocated tele-social worker positions filled, however one position was on long term leave, resulting in a functional vacancy rate of 25 percent. Two tele-social workers were unlicensed.

Although there were no allocations, one registry licensed marriage and family therapist position was filled.

Accounting for staff psychologists, telepsychologists, clinical social workers, tele-social workers, and the one licensed marriage and family therapist, the overall functional vacancy rate for primary clinicians at MCSP was 60 percent.

Twenty of the 26 allocated recreation therapy positions were filled, resulting in a 23 percent vacancy rate. Registry staff filled 3.5 positions, although one was on long-term leave, reducing the functional vacancy rate to 13 percent.

The CHSA position was vacant. The AGPA position was filled, as were all four HPS I and the one HPS II positions. One of the 1.5 allocated OSS II positions were filled.

Both senior psych tech positions were filled. Of the 63.2 psych tech positions, 50.72 were filled reflecting a 20 percent vacancy rate. There were four registry staff and four staff on long-term leave reflecting no change in the functional vacancy rate.

Twenty-four of 28 MSHDS clerical staff positions were filled resulting in a 14 percent vacancy rate. One staff member on long-term leave increased the functional vacancy rate to 15 percent.

Eight of the 15 allocated medical assistant positions were filled for a 47 percent vacancy rate. The addition of five registry staff reduced the functional vacancy rate to 13 percent.

For supervising registered nurses, 21.5 of the 21.7 allocated positions were filled. One staff member was on long-term leave, resulting in a six percent functional vacancy rate.

For the 11.11 MHSDS registered nurse positions, 10.11 were filled for a nine percent vacancy rate. For the 64.72 LVN positions, 49.12 were filled for a 24 percent vacancy rate. The use of seven registry staff reduced the functional vacancy rate to 13 percent. All 1.2 CNA staff positions were filled.

As for custody positions, the warden and chief deputy warden positions were filled. Five of the six associate warden positions were filled and all seven captain positions were filled. Thirty of the 30.8 lieutenant positions were filled and 79 of 80.4 sergeant positions were filled. Thirty-one of 32 CC I positions were filled and 10 of 11 CC II positions were filled. For custody officers, 694.8 of 707.2 positions were filled, indicating a 12.4 percent vacancy rate.

Tele-Mental Health:

There were six telepsychiatrists, four telepsychologists, and four tele-social workers who treated MHSDS patients during the review period. All telemental health positions were only assigned to MCSP and treated both EOP and 3CMS patients. Additionally, all telemental health positions visited MCSP in-person within 30 days of assignment and at appropriate times throughout the year.

The six senior psychologist specialists teleworked two days per week. In addition, 24 clerical staff worked remotely two days weekly, as did the OSS II, AGPA, HPS I, and HPS II positions.

Staff Recruitment:

MCSP reported using the regional hiring unit to assist in streamlining the hiring process for mental health staff. Support also came from regional hiring fairs during the review period.

Quality Management:

MCSP maintained a robust quality management and improvement process during the review period that attempted to address issues with the delivery of mental healthservices.

The Local Governing Body (LGB) held two quarterly meetings during the review period, one in July 2024 and one in October 2024. Quorums were met and agendas included topics related to delivery of mental health services, such as provider credentialing, MHCB data, HCAU reports, and peer review. However, trends that were documented in mental health quality management subcommittee meeting minutes, including quality improvement projects relevant to mental health, were not documented in LGB meetings.

The quality management committee (QMC) met monthly during the review period with a quorum in attendance at each meeting. Covered MHSDS topics included updates regarding improvement project, local operating procedures, executive rounding, SPRFIT, medication management, patient safety issues, emergency medical response, RHU pre-screening process, mental health performance reports, MHCB updates, audits, surveys and inspections, and inmate advisory council. Reasonable actions were taken, and appropriate follow-up occurred for identified issues. The overall usefulness of the QMC meeting documentation was noteworthy.

Trends that were documented in mental health quality management subcommittee meeting minutes were raised in QMC documentation.

Mental health program subcommittee (MHPS) meetings were held on a monthly basis and quorums were met for all meetings during the review period. Standing agenda items included access to care, executive rounding, CMHPP, program administration, training, health information management, CTC, psychiatry program, suicide prevention, FIT, PIP-psychiatric inpatient program, MHCB program, alternative housing, and CIT reports. The institution indicated that mental health performance report indicators were audited and sent to program supervisors for review and follow up throughout the month. Supervisors continued to ensure staff were informed of errors and issues and corrections were made if applicable and reported issues in program memos, as needed. An MHPS meeting was observed during the site visit. The meeting was well organized and consistent with the process documented in prior meeting minutes.

Quality improvement teams (QITs) and focused improvement teams (FITs) were appropriately utilized and helpful. Quality improvement areas of focus included RHU pre-screening process, EOP treatment hours offered, medication non-adherence, functional staffing and triage plans, custody and mental health partnership plan, heat plan, MHCB admissions, and RVRs. During the monitoring period, quality improvement team projects included examining treatment hours offered to EOP patients, RHU prescreening process, and suicide watch 1:1 improvement project. The EOP RHU FIT met weekly and discussed yard and shower data, primary clinician contacts, reasons for cell-front contacts, and barriers to care that impacted the EOP RHU population.

Psychiatry peer review was completed biannually at MCSP. Peer review information from January 1, 2024 through June 30, 2024 was reviewed and completed on July 26, 2024. Eighty-one charts were reviewed by 15 psychiatrists. No significant findings were identified.

Clinician peer review in the MHCB was conducted quarterly. In the fourth quarter of 2024, documentation was reviewed across three licensed psychologists. No significant findings were identified. Staff reported that all peer review meeting minutes were submitted to the MHPS.

Medication Management:

MAPIP tracked compliance with diagnostic monitoring and medication administration. Diagnostic monitoring consisted of obtaining medication consents, as well as any physical examination, vital signs, or laboratory tests needed to monitor a given medication. Medication administration addressed the availability, continuity, and actual administration of medications. The threshold for compliance for all metrics was 90 percent.

MAPIP

MCSP provided MAPIP results for July 1, 2024 through December 31, 2024 regarding compliance for psychiatric diagnostic monitoring and medication management.

The monitoring of antidepressant medications required four metrics: EKGs for patients taking tricyclic antidepressants (EKG); medication consents (Consent); thyroid function tests (TFTs); and obtaining blood pressure for patients taking venlafaxine (venla BP). MCSP was fully compliant with obtaining medication consents, and for monitoring blood pressure for patients prescribed venlafaxine, and fully non-compliant for monitoring thyroid function. The institution was partially compliant with obtaining required EKGs. As not all metrics required

measuring each month, MCSP had 23 months for which data were required (metric-months). When examined in aggregate, MCSP was compliant for 15, or 65 percent of metric months.

**Antidepressant Medication Monitoring Metrics at MCSP**




The diagnostic monitoring for patients prescribed atypical antipsychotics required the measurement of 11 metrics, including: abnormal involuntary movement scale (AIMS); blood pressure; glucose; complete blood count (CBC); comprehensive metabolic panel (CMP); EKG; height (Ht); lipids; medication consents; thyroid function tests; and weight (Wt). MCSP was fully compliant for monitoring AIMS, blood pressure, glucose, height, and weight, and was fully non-compliant for TFTs. The remaining metrics, namely CBC, CMP, EKG, lipids, and obtaining medication consents were all partially compliant. A total of 66 metric-months of data were required during the monitoring period. Of these, 53, or 80 percent were compliant.

**Atypical Antipsychotics Monitoring Metrics at MCSP**




MCSP was a clozapine-maintenance institution. While clozapine is a highly-effective antipsychotic medication which may benefit patients refractory to other medications, the risk of serious, sometimes fatal, side effects, requires close monitoring with the same metrics used for antipsychotics as listed above. In accordance with statewide policy, MCSP initiated clozapine only in the MHCB. At the time of the monitoring tour, there were 64 patients on clozapine.

For clozapine monitoring metrics, the institution was compliant for all required months with monitoring blood pressure, glucose, CBC, CMP, EKG, height, lipids, and weight. All remaining metrics (AIMS, medication consents, and TFTs) were partially compliant. When examined in total, 64 data points were required during the monitoring period. Of these, 61, or 95 percent, were compliant.

**Clozapine Monitoring Metrics at MCSP**




The mood stabilizers carbamazepine and Depakote required four metrics: CBC; CMP; medication level; and medication consent.

For carbamazepine, the institution was fully compliant with obtaining medication consents, with the three-remaining metrics (CBC, CMP, and medication level) meeting partial compliance. In total, MCSP was compliant with 11 of the 14, or 79 percent, of metric-months.

**Carbamazepine Monitoring Metrics at MCSP**



Regarding Depakote, none of the four required metrics were compliant throughout the review period. Monitoring therapeutic medication level was non-compliant for all required months, with CBC, CMP, and medication consents being partially compliant. MCSP had 24 required metric-months of data. The institution was compliant with seven, or 29 percent, and non-compliant with 17, or 71 percent.

**Depakote Monitoring Metrics at MCSP**




Lamotrigine is a mood stabilizing medication which requires only one MAPIP metric, namely obtaining medication consents. MCSP was compliant with all three months of required data.

Lithium is a mood stabilizer which required medication consents, monitoring of kidney and thyroid function, EKGs, and therapeutic medication levels. The institution had no required EKGs during the monitoring period. MCSP was fully compliant with all required months of CMP and obtaining medication consents. The institution was partially compliant with monitoring therapeutic medication level. Of the 20 metric-months required, MCSP was compliant with nine, or 45 percent, and non-compliant with 11, or 55 percent.

**Lithium Monitoring Metrics at MCSP**




When all required diagnostic monitoring data were examined, MCSP required 214 metric-months of diagnostic monitoring data, of which 159, or 74 percent, were compliant. The institution performed robust analyses for under-performing metrics during the review period. The vast majority of these were related to patient refusal, with psychiatrists not ordering laboratory studies as an additional cause. The chief psychiatrist and an HPS I monitoring MAPIP met with and educated the staff psychiatrists on the need for compliance with these measures. Notably, the dedication of the chief psychiatrist and his team was commendable during the review period. While there were still remaining areas of non-compliance, these would likely have been amplified without their dedication and oversight.

Medication Administration

MAPIP medication administration metrics monitored essential aspects such as medication availability, continuity, preparation, and administration. MCSP had 12 required measures during the monitoring period.

Monitoring medication continuity included six measures: transfers from other institutions arriving at receiving and release (R&R); intra-institutional transfers to non-RHU locations

(Intra); MHCB transfers (MHCB); intra-institutional transfers to restricted housing (RHU); discharge from a community hospital or DSH (Outside Hospital); and upon parole or transfer to the community (Release).

MAPIP measures tracked the compliance of administering of medications given at HS (*hora somni*, or bedtime) which must be given on or after 8:00 P.M. (HS), and medications given in the A.M. and P.M. which must be given at least eight hours between doses (A.M./P.M.). Other metrics evaluated whether chronic psychiatric medications were continued without interruption (Chronic), and whether new medications were administered as ordered, and in compliance with required timelines (New).

The final set of germane MAPIP measures surrounded PC 2602 involuntary medication orders. These included whether a court order (Court Order), and a medication order for the PC 2602 medication (Med Order) were present in the medical record.

The institution was fully compliant with medications given at HS, upon release, and for chronic administration of psychiatric medications. MCSP was non-compliant for all months with three metrics: transfers from other institutions arriving at receiving and release (R&R); intra-institutional transfers to non-RHU locations (Intra); and administration of A.M./P.M. medications.

MCSP was partially compliant with six metrics: transfers to MHCB (MHCB); intra-institutional transfers to restricted housing (RHU); continuation of medications from an outside hospital or DSH (Outside Hospital); new psychiatric medication orders (New); the presence of a PC 2602 court order (Court) and medication order in the medical record (Med Order).

All 12 metrics were required for the entire six-month period, yielding 72 metric-months of data. Of these, 32 or 49 percent, were compliant.

**Medication Administration Compliance Metrics at MCSP**




MCSP investigated the reasons for non-compliance with these metrics. Most medication continuity measures were driven by patient refusal. The institution had conducted a PIPW, with the resultant data currently under analysis.

Prescription Numbers/Medication Administration

MCSP reported that psychiatrists prescribed 2,622 medications. The number of patients was not specified. Of these, two were KOP medications. In deviation from policy, both medications were antipsychotics. This was raised with the chief psychiatrist and was rectified while on-site. MCSP reported that prescriptions were for a maximum of 180 days. Bridge prescriptions were given for up to 30 days. For patients leaving CDCR, MCSP followed statewide policy of dispensing a 60-day supply of medications, barring any safety risks of doing so. For verbal and telephone orders, nursing entered the order and forwarded to the treating psychiatrist for review and signature.

Medication Administration

MCSP completed 60 medication line audits during the monitoring period. All showed compliance with policies regarding individual wait times being under 30 minutes, and total duration of the medication pass under two hours duration.

MCSP reported collaboration among nursing staff, patients, physicians, and custody to minimize the impact of medication administration on programming. OTs scheduled patients around medication distribution times. Additionally for RHU and facility D patients attending groups during noontime medication distribution received their medications before or after group.

MCSP denied any issues with patients not having protection from the elements while waiting in line. During inclement weather, patients on facilities A, B, and C were given ponchos, while patients in facilities D and E received their medications in dining rooms. EOP patients received their medications within the housing units.

Non-Formulary

MCSP reported an average non-formulary rate of 4.7 percent during the monitoring period.

Polypharmacy

MCSP completed polypharmacy reviews for 632 patients, with the vast majority being timely and compliant for required elements such as EKG monitoring.

HS Medications

MCSP reported that 683 MHSDS patients received a total of 2,080 prescriptions, and 117,507 doses at HS. With rare exception, MCSP was compliant with the requirement to give medications at HS at 8:00 P.M. or later.

PC 2602

At the time of the monitoring tour, 121 patients were prescribed PC 2602 involuntary medications. The institution reported filing 16 initial PC 2602 applications (eight each of emergent, and non-emergent) and 105 renewal petitions; all petitions were granted. There were no planned non-renewals, nor any petitions which expired due to administrative error. The institution denied any challenges in interfacing with the Office of Legal Affairs, the Office of Administrative Hearings, or the Administrative Law Judge. MCSP reported one controlled use of force to administer PC 2602 medications.

The supervisor on facility A reported challenges with multidisciplinary coordination of responses when patients refused their PC 2602 medications. She reported that she created a template and a distribution list to remedy the coordination issues which appeared to be effective.

While MCSP displayed non-compliance with several aspects of medication management, the institution had a robust monitoring process which attempted to address barriers. MCSP determined that most noncompliance with the MAPIP-measures were driven by patient refusal; however, the efficacy of their interventions met with limited success.

Transfers:

A major sustainable process review from the fourth quarter of 2024 was reviewed. Significant improvement was noted in the quality and the inter-rater reliability between the headquarters reviewer and the inpatient coordinator. The major sustainable process review also included observed IDTTs in the MHCB, EOPs, and RHU.

A minor sustainable process review report from the third quarter of 2024 was reviewed. There were significant issues identified in the audits regarding HLOC consideration

documentation for quality and inter-rater reliability between the headquarters reviewer and the inpatient coordinator.

During the current review period, 859 patients were considered, but not referred to a higher level of care. Documented triggers for higher level of care consideration included patients receiving too many RVRs, more than three crisis bed referrals or admissions within a six month period, and high treatment refusals.

MCSP referred 28 patients to acute care, of which 26 were accepted, one was rescinded, and one was rejected. Twenty-five or 96 percent of patients timely transferred within ten days. One patient was not timely because the patient refused transport.

MCSP referred 18 patients to intermediate care; 16 were accepted and two were rejected. All patients transferred timely within 30 days.

No patients with complex medical needs were transferred to inpatient care.

MCSP made 589 MHCB referrals; 134 were admitted and 455 were rescinded. Of the 134 MHCB admissions, two or one percent took longer than 24 hours to transfer. Reasons for delays included patient's refusing to transfer and a patient was out to an off-site hospital.

EOP patients who were referred to EOP RHU were reportedly transferred to MCSP's own EOP RHU in a timely manner, however MCSP was unable to indicate the number of patients transferred during the review period.

Of the 363 3CMS patients who were referred to 3CMS RHU, 300 were transferred timely. Overdue transfers ranged from 1 to 72 days.

There were 76 EOP patients who experienced a level of care change to 3CMS.

Fifteen 3CMS patients were transferred to the MSF during the review period.

Programming:

MHSDS Patients in Restricted Housing:

During the review period, MCSP maintained a 196 bed EOP RHU located on Facility C in building 12 with overflow housed in building 13. At the time of the site visit, the RHU census reflected that there were 120 incarcerated individuals, including 62 EOP RHU patients and 31 3CMS RHU patients awaiting transfer.

A total of 13 EOP RHU patients were housed in the RHU for greater than 90 days at the time of the site visit. The range of EOP RHU length of stays was one to 475 days for EOP RHU patients and zero to 72 days for 3CMS RHU patients. Additionally, due to space limitations on the date of the site visit there were nine patients held in RHU intake cells greater than 72 hours.

There was one psychiatrist with a compliant caseload of 64 patients and treated all patients housed in the EOP RHU. See ECF No. 3693 at 19. There were also five primary clinicians, including two on-site psychologists, one telepsychologist, and two clinical social workers. Of the five primary clinicians, four including both on-site psychologists and both clinical social workers exceeded the established caseload ratio of 11 patients. *See id*. Of note, one clinical social worker and one psychologist each exceeded the patient caseload by one patient respectively. There was also one additional psychologist who did not carry a caseload and floated coverage between the EOP RHU and the MHCB.

The EOP RHU passed EOP hub certification in all six months of the review period.

An EOP RHU FIT was observed during the site visit. The meeting was facilitated by the EOP RHU supervisor and included line staff, medical assistants, and custodial leadership. The meeting addressed germane topics covering both clinical and custody matters. The team clearly knew their program and the patients and displayed strong collaboration.

*Structured Treatment*

The RHU Policy required that patients assigned to an EOP RHU be offered a minimum of twenty-hours of out-of-cell time reach week, ten of which must be structured therapeutic activities unless clinically contraindicated while the remaining ten must be out-of-cell exercise, including supervised recreation therapy. *See* The Restricted Housing Unit Program: Mental Health Services Policy, dated July 19, 2024 and effective August 1, 2024 (hereinafter "RHU Policy"). During the review period, patients housed in the EOP RHU were scheduled for a an average of 15.97 hours, offered an average of 9.61 hours, and attended an average of 4.78 hours of structured treatment per week. Reasons for low patient attendance included frequent cancellations and patient refusals.

*IDTTS*

Five EOP RHU IDTTs were observed during the site visit, including four initial IDTTs and one routine IDTT; all were adequate and complied with Program Guide requirements. All required members were present, except the patient in one case as he refused. Two cases had telemental health clinicians; however, one tele-mental health clinician visited the institution during the time of the monitoring tour and attended the IDTTs in person. The tele-mental health clinician that attended virtually made meaningful contributions to the IDTT process but participated via a tablet rather than the standard tele-mental health equipment. The tablet did not disrupt the discussion or cause any technological concerns.

The IDTTs displayed multiple strengths. Initial assessments were generally completed prior to IDTT. The meetings were patient-centered, collaborative, and contained good discussions of symptoms and diagnoses. Psychiatric input was robust and not relegated simply to medication-related issues. The team actively discussed higher level of care indicators.

However, the IDTTs displayed limitations as well. The correctional counselor started each of the discussions, with some clinicians expounding upon additional legal issues rather than mental health discussions. While safety planning was generally discussed, it was not done so in a comprehensive manner.

*Group Treatment*

Due to staffing shortages, all groups were facilitated by recreation therapists rather than primary clinicians. One RHU group was observed with anger management as the group topic. While five patients were scheduled, only one patient was present. The room was large and appropriate for the purpose. While the topic of anger management was appropriate, the topic was more appropriate for a primary clinician-facilitated group, rather than a recreation therapist.

*Individual Treatment*

The RHU Policy requires that all patients placed into EOP RHU receive a primary clinician evaluation within five days of arrival and a psychiatry evaluation prior to the IDTT and within ten days of arrival. *See* RHU Policy at 5-6. The RHU Policy also requires that EOP RHU patients receive weekly primary clinician contacts and psychiatry contacts every 30 days. *See id.* at 7.

Fifteen EOP RHU patients were randomly selected to assess compliance with Program Guide timeframes for initial psychiatry evaluations during their stays. Seven of 15 or 47 percent were completed within ten calendar days of arrival or level of care change and 12 of 15 or 80 percent were conducted in a confidential setting.

To measure timelines of routine psychiatry contacts during the review period, CDCR produced an appointments report that included individuals who were required to receive a routine psychiatry contact from July through December 2024. For the 136 patients in the

appointments report, there were 298 completed and refused contacts; of the 296 completed contacts, 150 or 51 percent were confidential as reported by the institution. When a patient had more than one completed or refused contact, timeliness in accordance with Program Guide requirements was able to be calculated. Of the 296 completed contacts, 160 contacts were for individuals who were seen at least twice by the psychiatric provider. Of those 160 contacts, two or one percent occurred beyond Program Guide requirements, ranging from 49 to 140 days.[89]

Fifteen EOP RHU patients were randomly selected to assess compliance with Program Guide timeframes for initial primary clinician evaluations during their stays. Four of 15 or 27 percent were completed within ten calendar days of arrival or level of care change and all 15 were conducted in a confidential setting.

To measure timelines of routine primary clinician contacts during the review period, CDCR produced an appointments report that included individuals who were required to receive a routine primary clinician contact from October through December 2024. For the 131 patients in the appointments report, there were 672 completed and refused contacts; 129 or 19 percent were conducted in a confidential setting. When a patient had more than one completed or refused contact, timeliness in accordance with Program Guide requirements was able to be calculated. Of the 672 completed contacts, 541 contacts were for individuals who were seen at least twice by

[89] The routine psychiatry contacts appointments report did not include individuals that did not have completed contacts. Additionally, reviewed data captured the time between patient contacts, but does not account for when patients were not seen or scheduled for a routine psychiatric contact. The appointments report did not account for delays between appointments due to movements in or out of the EOP RHU. Contact with the assigned psychiatrist was unable to be determined.

the primary clinician. Of those 541 contacts, 13 or two percent occurred beyond Program Guide requirements with a range of 11 to 82 days.[90]

For the 672 completed individual primary clinician contacts, 573 were completed in less than 15 minutes, 65 were completed between 16 to 30 minutes, 21 were completed between 31 to 60 minutes, 11 were completed between 61 to 95 minutes and two were documented as lasting more than 95 minutes.

In the RHU, individual treatment occurred in a separate building that was attached to the housing unit. Patients were not required to submit to an unclothed body search prior to treatment. There were seven treatment offices and three group rooms. Staff reported that this was sufficient space when the RHU census was lower but noted that a higher patient census required extensive coordination. Two offices were equipped with telemental health equipment. Offices included designated ADA-compliant TTMs.

MCSP's ICC meetings generally followed policy requirements for mental health involvement in the ICC process and followed RHU policy guidelines. Monitors observed nine total ICC meetings involving five EOP patients and four 3CMS patients. All required staff were present, including staff from CHCF as it did not have an RHU and had referred the patient to MCSP due to a PREA allegation. The 3CMS patients were awaiting transfer to a 3CMS RHU as required by policy.

---

[90] The routine primary clinician contacts report did not include individuals that did not have completed contacts, such as those that were not scheduled. Additionally, the reviewed data captured the time between patient contacts, but does not include patients were not seen or scheduled for a routine contact with the primary clinician. The appointments report did not account for delays between appointments due to movements in or out of the EOP RHU. Contact with the assigned primary clinician was unable to be determined. When primary clinician caseload groups were utilized to meet primary clinician contact requirements, verification that individual contacts with the assigned primary clinician and alternated with caseload groups with the assigned primary clinician was not conducted.

Four weeks of data from the Automated Restricted Housing Report was produced for patients with stays of seven full days. For out-of-cell time, patients were offered a range of 20 to 44 hours of out-of-cell time during the week of September 30, 2024; a range of 21 to 46 hours of out-of-cell time during the week of October 14, 2024; a range of 16 to 43 hours for the week of November 25, 2024, and a range of 17 to 53 hours for the week of December 9, 2024. Only three patients were offered less than 20 hours of out of cell time over the four weeks reviewed. Although the institution was compliant with the minimum offering of out-of-cell activities during the review period, the institution appeared to document offering of a uniquely high amount of out-of-cell time.

Patients are required to be offered a shower every other day during the review period. ARHR data reflected that patients were offered three to five showers per week across the four reviewed weeks, which was compliant with policy. Similarly, the offering of phone calls once per week and clothing/linen exchange once per week were compliant with required policy.

Notwithstanding that the institution offered just under the required amount of structured treatment, the institution's EOP RHU was compliant with required policies and Program Guide requirements during the review period.

Non-Disciplinary Restricted Housing (NDRH):

MCSP indicated that there were 18 NDRH patients housed in the RHU during the review period. For patients who required expedited transfer, all patients were transferred within 72 hours as required. Information regarding compliance with transfer timeframes for NDRH patients who did not require an expedited transfer were not provided.

MHCB:

MCSP operated an eight bed MHCB in addition to a restraint room and a seclusion room. Flex beds were not used in the MHCB during the review period. With the exception of an additional confidential treatment space for individual assessments and treatment, there were no physical plant changes in the MHCB cells since the prior reporting round.[91] The institution also indicated that there were plans to renovate two CTC patient cells to be ADA compliant.

There were 143 patients admitted to MCSP's MHCB during the review period. The average daily census during the review period was seven patients. Four patients had lengths of stay greater than ten days. The average physical length of stay in the MHCB following clinical discharge was 1.3 days with a maximum stay of 11.8 days following clinical discharge. The average patient census per month ranged from six to eight patients during the review period.

Continuing a trend from the prior monitoring round, there were a significant number of patient referrals to MHCB that were rescinded prior to admission during the review period. *See* ECF No. 8095 at 199 (citing "MCSP referred 333 patients to MHCBs during the review period. Of those, 195 or 59 percent, were admitted and the remaining 138 or 41 percent were rescinded."). During the Thirty-First Round, there were 587 patients referred to the MHCB, of which 143 or 24 percent were admitted and 444 or 76 percent were rescinded. The large increase in rescissions was reportedly due to the lack of crisis intervention team (CIT) involvement in

[91] See ECF No. 8095 at 204 stating that "[t]he MHCB rooms contained a concrete slab with a mattress and a toilet/sink combo unit. The MHCB cells were not wheelchair accessible. Although the path of travel to the cells was wheelchair accessible and the doors were wide enough for wheelchair access, the combo unit toilets were not the required height, the sinks were not designed for wheelchair-user access, and none of the cells had the required 60-inch turning radius for wheelchair users."

responding to emergency referrals and patients indicating safety issues rather than mental health concerns.

The monitor's expert observed four IDTTs in the MHCB. All required staff were present. The IDTTs were confidential, conducted in an adequate space with a comfortable room temperate and had sufficient lighting. Two patients had been evaluated by the psychiatrist and primary clinician prior to the IDTT. The other two patients were admitted the evening prior to the IDTT so discussion was based upon a review of patient records prior to the meeting. Each patient's treatment plan was discussed with reasonable interdisciplinary discussions during each. Additional discussions during IDTT included approvals for yard and phone privileges during each patient's stay in the MHCB which was consistent with the institution's MHCB LOP.

Thirty randomly selected MHCB patients required initial IDTTs; 29, or 97 percent occurred within 72 hours of arrival; all reviewed IDTTs had the required staff in attendance. Patients attended 24 or 83.3 percent of initial IDTTs. Documentation indicated initial IDTTs were held in absentia due to patient refusals.

Of the thirty randomly selected patients who required routine IDTTs, 26 or 87 percent received them every seven calendar days following the initial IDTT. All 30 routine IDTTs had the required staff in attendance. Patients attended the IDTT in 27 of 30 or 90 percent of reviewed IDTTs. Patient refusal was the primary reason routine IDTTs were held in absentia.

Overall, IDTTs conducted in the MHCB were compliant with required policy.

Thirty random patients' healthcare records were selected to assess compliance with Program Guide timeframes for psychiatry and primary clinician contacts during their stays.

Thirty MHCB patients required initial psychiatry evaluations. Of those, 28, or 93.3 percent had a timely initial psychiatry evaluation meaning it occurred before the initial IDTT and

within 24 hours of arrival. Sixteen, or 53.3 percent were conducted in a confidential setting. Reasons for non-confidentiality included patient refusals.

All thirty MHCB patients require two routine psychiatry contacts per week. All 135 expected contacts occurred timely. Of the 135 reviewed routine contacts, 50 or 37 percent were conducted in confidential settings. Reasons for non-confidential contacts included patient refusals, medical restrictions, safety concerns, or a patient's agitated state.

Thirty MHCB patients required initial primary clinician evaluations; 28, or 93.3 percent were completed within 24 hours of arrival. Of the thirty initial primary clinician contacts reviewed, 20 or 66.6 percent were held in a confidential setting. Documentation indicated that contacts were held in non-confidential settings due to patient refusals and safety concerns.

Thirty MHCB patients required routine primary clinician contacts. An institution is compliant if a patient was seen daily beginning the day after admission for an out-of-cell confidential contact (unless the patient refused) by the psychiatrist or psychologist, though on weekends the patient may be seen by the medical officer of the day. *See* ECF No. 7333-1 at 84. There were 91 expected contacts, 90, or 99 percent were timely. Forty-six, or 51 percent were conducted in a confidential setting. Reasons for non-confidentiality included patient refusals, safety concerns, or modified programming.

During a patient's stay in MCSP's MHCB, patients are offered out-of-cell time for yard, showers, and telephone calls throughout the week and including weekends. A recreation therapist indicated that he worked with custody staff to encourage patients to come to yard, use the telephone and participate in other recreation activities, including offering the use of a tablet, if it was found safe to do so. There were two programming cells in the recreation yard, which did not meet the standards for a therapeutic treatment module.

Two patient's records were reviewed to determine if out-of-cell time, showers, and phone calls were offered to MHCB patients during their stays. Though out-of-cell activities were offered on a case-by-case basis, the institution's LOP requires the offering of at least three weekly showers and at least one phone call. For one patient who had been housed in the MHCB for five full days, the patients record reflected that he was offered 1.5 hours of out-of-cell time each day for four of the five days, and offered a shower and phone call each day. The second reviewed patient was in the MHCB for six full days and was offered 1.5 hours of out-of-cell time each day for three of the five days. The patient was also offered a shower and telephone call on each day.

Overall, Program Guide requirements were met at MCSP's MHCB during the review period.

<u>EOP</u>:

MCSP's mainline EOP population was 735 patients on the date of the site visit.

Mainline EOP patients were housed on Facilities A, B, and D during the review period. Facility A operated a custody level IV program, Facility B operated a custody level III program, and Facility D operated a custody level II program. For treatment during the review period, each facility operated under its own individualized triage plan that did not comply with Program Guide requirements.

Facility A's triage plan was last updated in October 2024 and indicated that mental health staff had combined caseloads of EOP and 3CMS patients. EOP patients were scheduled for monthly primary clinician contacts rather than weekly as required by the Program Guide. *Id*. Only patients on the suicide risk management program (SRMP) list were seen weekly. Consults, patients pending transfer to higher levels of care, patients on the SRMP list, and those clinically

indicated as needing more frequent contacts were prioritized. IDTTs were not held in accordance with Program Guide requirements. Specifically, routine IDTTs were not scheduled and were rarely held. Instead, higher level of care referrals, initial IDTTs, level of care changes, SRMP placement or removal decisions, male community re-entry program, IEX, C-Status, and housing status IDTTs were scheduled. EOP huddles were scheduled once daily.

On Facility B, the triage plan was last updated in November 2024 and indicated that initial primary clinician assessments were completed as a progress note rather than clinicians using the required PowerForm. Initial IDTTs as well as IDTTs for patients on C-Status, level of care changes, ICF referrals, housing reviews, and SRMP placement and removal recommendations were scheduled. EOP modified programming patients were scheduled for IDTT reviews every six months. Otherwise, routine IDTTs were not scheduled. Routine primary clinician contacts were scheduled every six weeks and patients on the SRMP list or on modified program were scheduled monthly. Consults, five-day follow-ups, and SRASHEs were prioritized. Only morning huddles were held.

On Facility D, the triage plan was last updated in September 2024. Routine primary clinician contacts were not occurring weekly as required, but were instead scheduled monthly, with patients in the SRMP seen biweekly and patients with pending ICF referrals seen weekly. Only morning huddles were held. Routine, DDP, EOP modified programming, and SRMP IDTTs were held quarterly. Suicide prevention consults were prioritized.

According to the staff-to-patient ratios from the 2009 staffing plan, psychiatrists who treat mainline EOP patients must maintain a caseload of 120 patients per psychiatrist, while primary clinicians who treat mainline EOP patients must maintain a caseload of 26 patients per clinician. *See* ECF No. 3693 at 17.

On Facility A there were four on-site psychiatrists, one of which was on long-term leave, and one telepsychiatrists who treated mainline EOP patients. Two on-site psychiatrists carried caseloads within required ratios, while the other on-site psychiatrist floated coverage and did not carry a caseload. The telepsychiatrist maintained a caseload within the required ratio. Three on-site psychologists treated mainline EOP patients as well; one maintained a caseload ratio within required limits, while two exceeded caseload ratios with 28 and 33 patients respectively. There were two tele-psychologists who treated mainline EOP patients as well. Both exceeded established ratios with 29 and 34 patients respectively. Consistent with Facility A's triage plan, no clinician or psychiatrist carried a caseload of *only* EOP patients.

On Facility B, three on-site psychiatrists and two telepsychiatrists treated mainline EOP patients and maintained caseloads within required ratios. There were also two on-site psychologists who treated mainline EOP patients; one carried a caseload of 64 patients which exceeded the required ratios while the other was a new hire and did not yet maintain a caseload. There were four on-site clinical social workers; one was unlicensed. Three of the four clinical social workers carried caseloads that exceeded required ratios while the fourth floated coverage. One LMFT also carried a caseload that exceeded the established ratio for a primary clinician.

There were two on-site psychiatrists and one telepsychiatrist who treated mainline EOP patients on Facility D. The on-site psychiatrists maintained caseloads within required ratios while the telepsychiatrist exceeded the required ratio by four patients. One on-site psychologist treated mainline EOP patients and exceeded the established caseload ratio. Additionally, one on-site clinical social worker exceeded the required caseload ratio while four tele-social workers, one of which was on leave, exceeded caseload ratio requirements.

*Structured Treatment*

The Program Guide required that each EOP patient be offered at least ten hours per week of structured therapeutic activities. *See* ECF No. 7333-1 at 58. For patients who were determined by the treatment team to be clinically contraindicated for ten hours of treatment activities per week, the primary clinician is required to present the case and recommended treatment program (i.e. EOP modified programming) to the IDTT for approval. If the patient's modified treatment program included a schedule of less than ten hours of treatment per week, the patient's IDTT was required to meet monthly to review the patient's treatment, increase the amount of structured therapeutic activities, or refer the patient to a higher level of care as clinically indicated. *Id*.

Excluding patients placed on EOP modified programming, across all three mainline EOP programs at MCSP, patients were scheduled for an average of 13.75 hours, offered an average 9.64 hours, attended 4.24 hours, and refused 5.49 hours of structured treatment per week during the review period. On average, 4.55 hours of treatment were cancelled weekly.

Treatment cancellations were noted to be due to weather, custody modified programming, and staffing shortages. Specifically, the institution reported that there were not enough recreational therapists to provide indoor recreational therapy when access to outdoor space was cancelled by custody. This was concerning given that the institution also reported there to be at least six recreation therapists assigned to each facility with an EOP program.

Significantly, patients on Facility A reported that they were intentionally only attending just over half of the recreation group treatment offered because they believed that patients who attended less than half of offered recreation groups and those who attended too many recreation groups were removed from the EOP program entirely. This was confirmed by the Facility A and

B EOP supervisor who reported that the IDTTs were systematically reviewing high refusers along with those attending treatment consistently for appropriateness of a level of care reduction.

Institutional data indicated that during the reporting period, between five and 12 patients were placed on EOP modified programming on any given week. On average, patients placed on EOP modified programming were scheduled for an average of 10.3 hours, offered an average of 5.74 hours, attended an average of 1.95 hours, refused an average of 4.1 hours of weekly structured treatment. Patients had 5.11 hours of weekly structured treatment cancelled on average during the reporting period. Reasons for cancellations were similar to those provided for mainline EOP programming.

Records for five individuals noted to be on EOP modified programming were reviewed to assess their treatment plans. In all five cases, the patients' treatment plans clearly referred to their EOP modified programming status and included specifics about how the patients' treatment would be modified. In four of the five cases, the modifications were implemented, and patient treatment progress was assessed in routine IDTT meetings held every 90 days. For one patient, there was no evidence that the interventions listed on the treatment plan to support the patient in increasing treatment participation were implemented and the patient was seen for a routine IDTT meeting after six months. Additionally, despite no change in treatment participation, the treatment plan was not updated.

*IDTTs*

Two mainline EOP IDTTs were observed on Facility A during the site visit. All required staff were in attendance. Case conceptualizations and treatment formulations were created and treatment team participants tied them to treatment goals. Interventions to accomplish those goals were also discussed in detail for the EOP patients. The meetings included good patient

participation as they were included in each decision about the treatment teams goals and interventions. Overall, the IDTTs on Facility A were conducted well and compliant with Program Guide requirements.

Six IDTTs were observed for mainline EOP patients receiving treatment on Facility B during the site visit. Three were initial IDTTs and three were routine IDTTs for level of care change considerations. The meeting space was adequate to size and confidentiality and all meetings included required staff and patient attendance except one. The EOP supervisor was present during each treatment team meeting as well. The patients assigned correctional counselor was not present for any of the meetings.

Three of the meetings included adequate discussion of the patient's clinical history; however, the history was provided before two of the patients were in the room. For the other three patients, there was an inadequate discussion of the patient's clinical history. Case formulations were provided in four of the cases, but twice they were without the patient in the room. There was evidence that for the three patients having initial IDTTs, initial clinician and psychiatric assessments had been completed. Psychiatric medications and diagnoses were explicitly discussed in all meetings and the patient's reported symptoms supported the diagnoses. There was adequate discussion of the rationale for diagnoses during the meetings.

All meetings included a discussion of patient strengths and functional impairments. In only two of the six meetings was there explicit discussion of treatment goals that were objective, measurable, and realistic. Two of the meetings included vague goals and two meetings included no discussion of treatment goals for the patients to achieve. When goals were discussed, they were appropriate to the patient's needs. In all but two cases, when interventions were discussed,

they were vague (e.g., monitor, increase contacts) and did not include the use of evidence-based interventions.

None of the initial IDTTs included discussion of which groups patients would be expected to attend. All IDTTs reviewed the patient's percentage of group participation; however, none of the meetings discussed how the patient's participation in groups impacted their treatment goals. This was specifically concerning given reports that treatment teams were directed to consider reducing the patient's level of care if the patient's record reflected a lack of participation in structured treatment. Safety planning was only discussed in two of the six observed meetings as was patients' substance use history and treatment.

Meetings were variable with regard to collaboration. While all five meetings where the patient was present engaged the patient in discussions, only one was truly collaborative.

All but one meeting included a discussion of the patient's level of care and in four cases, the rationale provided for the level of care change or rationale for retention at the EOP level of care was provided. In one case, neither the level of care nor rationale were mentioned.

Overall, two of the observed meetings were assessed to be adequate, with the remaining four being inadequate with regard to the expectations of an IDTT meeting.

Six routine IDTTs held on Facility D were observed. Required staff and patients were present for all meetings except one. The participating psychiatrist was a telepsychiatrist for all six patients while a tele-social worker was the participating primary clinician for two patients. The space for the meeting was adequate with regard to sound confidentiality; however, it was fully visible to other patients and staff who were waiting outside the room. In five of the cases, the patient's psychiatric and social history along with a case conceptualization was discussed

without the patient in the room. While most of the discussions were adequate, the patient would have benefited from inclusion in the discussion.

Psychiatric medications, the patient's diagnosis, and the symptoms that supported the diagnoses were discussed with staff engaging the patient to ensure that the medications, their symptom targets, and the diagnoses were understood. Functional impairments and patient strengths were discussed in the meetings. In all but one meeting, treatment goals were clearly articulated and were objective, measurable and appeared to be in keeping with the patient's needs. In one case, no treatment goals were discussed. Interventions were vaguely mentioned without specifics regarding evidence-based modalities or how the interventions would support the patient goals.

Only three of the six treatment plans appeared to be individualized to the patient's needs. The others were generic and formulaic. While safety planning was discussed when indicated in two cases, in one case of a patient who had been placed at the MHCB level of care secondary to thoughts of suicide in November, the IDTT did not discuss his safety plan. Substance use history and treatment were not adequately reviewed for most patients. All of the meetings were assessed to be collaborative with adequate custody participation. All meetings included a discussion of the patient's level of care, but two meetings did not include adequate discussion of the rationale for continuation at the EOP level of care.

The Program Guide requires that EOP patients receive an initial IDTT within 14 days of arrival to the institution and a routine IDTT every 90 days thereafter. *See* ECF No. 7333-1 at 59.

The healthcare records of 30 mainline EOP patients were randomly selected to assess compliance with Program Guide timeframes for initial IDTTs during their stays. Of the thirty patients who required initial IDTTs, 27 or 90 percent occurred within 14 calendar days or arrival

or a level of care change. Required staff attended 29 or 97 percent of initial IDTTs. Patients attended 17 or 57 percent of initial IDTTs. Reasons initial IDTTs were held *in absentia* included patient refusals and modified programming. Of note, the Program Guide requires attendance of the assigned psychiatrist and primary clinician at both initial and routine IDTTs; however, this assignment was not clearly discernable for all cases.

To measure timeliness of routine IDTTs during the review period, CDCR produced an appointments report that included individuals who were required to receive a routine IDTT from July through December 2024. For the 721 patients in CDCR's appointments report, there were 971 completed initial or routine IDTTs. When a patient had either an initial IDTT and a routine IDTT or more than one routine IDTT, timeliness in accordance with Program Guide requirements was able to be calculated. Of the 971, 252 contacts were for individuals who had at least two IDTTs (initial and routine or two routines). Of those 252, there were 130 or 52 percent that occurred beyond Program Guide requirements with a range of 0 and 161 days.[92]

Thirty patients were selected to verify consistency of appointment dates as reported in the appointments report and the presence of clinical documentation in EHRS. Of the 59 contacts reviewed, all were consistent with the appointments report.

*Groups*

Due to limited staffing, MCSP did not offer caseload or clinical groups to EOP patients during the review period. Groups consisted of nursing-led treatment groups (NLTG) and

[92] The IDTT appointments report did not include individuals that did not have a completed IDTT, such as those that were not scheduled. Additionally, the reviewed data captures the time between completed patient IDTTs but does not account for when patients were not scheduled for an initial or routine IDTT. The appointments report did not account for delays between appointments due to movements in or out of EOP.

recreation therapy groups. There was also no introduction to EOP group offered during the review period or at the time of the site visit due to staffing shortages.

Recreation therapy groups were facilitated by the recreation therapists on each yard with approximately half of groups being offered in treatment rooms and the other half being offered as outside recreation. Groups were not assigned according to clinical needs during the review period, but rather according to a 12-week schedule. Patients were offered the opportunity to select one "special" group (e.g, music, art) of their choice, but otherwise patients and clinicians had no input into group schedules. This group assignment system often resulted in the same patients being together in groups throughout the 12-week period.

Custody staff monitoring the yard were often redirected on Facility A which contributed to the limited offering of outside recreation groups. To address these concerns, a quality improvement plan was initiated to address the custodial impact on patient access to care across the entire institution, which resulted in a sharp decrease in cancellations of yard from a high of 31 percent in October to a low of one percent in December.

Two recreation therapy groups were observed, one on Facility A and one on Facility D. The Facility A group had adequate space and confidentiality. The group was titled Mood Management and three patients were in attendance. The group reviewed ways that patients could stay positive in their daily lives. Two patients were engaged with the facilitator, were respectful of each other, and remained on topic. The recreation therapist attempted to engage the other patient, who was attentive but did not wish to participate verbally. Overall, the group was appropriate for patients at the EOP level of care.

The group on Facility D was held in a group room in the housing unit that had sound confidentiality, however it was cramped and fully visible to other patients in the day room. The

group was listed on the schedule as a social skills group, yet the observed content appeared to be an unstructured discussion of current events. The group included eleven patients with a range in functioning, such that two patients monopolized the conversations, while many remained disengaged and/or distracted. The recreation therapist noted that several of the topics were anxiety-provoking but did not attempt to diffuse patients anxiety or engage in any skill building during the session. There was also no attempt to bring patients into the discussion other than the two who were actively engaging. This group was inadequate to meet the needs of patients at the EOP level of care, especially given the varied functional levels of participants.

MCSP began to use nursing-led treatment groups (NLTG) in 2022. For EOP patients, groups were led by RNs and the topics included substance abuse and a grief and loss series. During the monitoring tour, the monitor's expert observed NLTG's on Facility D. Five patients attended the group which focused on substance abuse treatment and utilized the ISUDT curriculum. The nurse asked questions about participants experience with loss due to overdose during the group. The nurse listened intently and empathized with each patient about their loss. The nurse also asked the patients about ways in which substance use shows up as a problem at MCSP. The discussion involved how nurses administer fentanyl patches to patients and how fentanyl is used outside of a prison setting.

The second observed NLTG group was taught by a floating nurse that appeared familiar with the patients attending the group. There were six patients in attendance and the discussion topic was about grief. The nurse stood during a majority of the group and walked around to discuss what grief and loss meant with each participant. The nurse then discussed the curriculum and how the curriculum tied to the previous group's discussion and how it will tie to the next group's discussion topic.

Overall, both observed groups utilized the applicable NLTG curriculum and group leaders were engaged for the entire hour. Although scheduling of groups was not based upon clinical need but on the decisions of an office technician without clinician or patient input, observed NLTGs were compliant with required policies.

*Individual Treatment*

The Program Guide requires that patients are offered an initial psychiatrist evaluation before their initial IDTT and within 14 calendar days of arrival to the institution or level of care change. *See* ECF No. 7333-1 at 59. Thereafter they are required to receive a routine psychiatric contact every 30 calendar days. *Id*. Patients are also required to receive a primary clinician evaluation within 14 calendar days of arrival and weekly (i.e. every ten calendar days) with either a primary clinician or in group psychotherapy with an individual contact every other week. *Id*.

Thirty mainline EOP patients who required initial psychiatry evaluations were randomly selected to assess compliance with Program Guide timeframes for initial psychiatry contacts during their stays. For these thirty EOP patients, 29 or 97 percent had a timely initial psychiatry evaluation meaning it occurred before the initial IDTT and within 14 calendar days of patient arrival or a change in the level of care. Twenty-eight, or 93 percent were conducted in a confidential setting. Reasons for non-confidentiality included patient refusals. Telepsychiatry was utilized for 15 initial psychiatry evaluations.

To measure timeliness of routine psychiatry contacts during the review period, CDCR produced an appointments report that included individuals who were required to receive a routine psychiatry contact from July through December 2024. For the 947 patients in CDCR's appointments report, there were 5,243 completed and refused contacts, 4,052 or 77 percent were

conducted in a confidential setting. When a patient had more than one completed or refused contact, timeliness in accordance with Program Guide requirements was able to be calculated. Of the 5,243, 4,299 contacts were for individuals who were seen at least twice by the psychiatric provider. Of those 4,299 contacts, there were 484 or 11 percent that occurred beyond Program Guide requirements.[93]

A sample of 30 patients was randomly selected to verify consistency between the appointments report and clinical documentation in EHRS. Of the 115 contacts reviewed in EHRS, 113 or 98 percent were consistent with the appointments report; two included no clinical note found in EHRS.

For the thirty randomly selected EOP patients that required initial primary clinician evaluations, all 30 were completed within 14 calendar days of arrival or a change in level of care. Seventeen, or 57 percent of initial primary clinician evaluations were conducted in a confidential setting. Documentation indicated non-confidential contacts were due to patient refusals; where refusals were not indicated, documentation did not indicate a reason for the non-confidential contact. No initial psychiatry evaluations were conducted utilizing tele-mental health.

To measure timeliness of routine primary clinician contacts during the review period, CDCR produced an appointments report that included individuals who were required to receive a routine primary clinician contact from October through December 2024. For the 799 patients in the appointments report, there were 2,478 completed and refused contacts, 1,488 or 60 percent

---

[93] The mainline EOP routine psychiatry appointments report did not include individuals that did not have complete contacts. Reviewed data captures the time between patient contacts but does not account for when patients were not seen or scheduled for a routine psychiatric contact. Additionally, the provided appointments report did not account for delays between appointments due to movements in or out of EOP. Contact with the assigned psychiatrist was unable to be determined.

were confidential. When a patient had more than one completed or refused contact, timeliness in accordance with Program Guide requirements was able to be calculated. Of the 2,478, 1,682 contacts were for individuals who were seen at least twice by the primary clinician. Of those 1,682 total number of completed/refused contacts, there were 1,349 number or 80 percent that occurred beyond Program Guide requirements.[94]

There were 2,478 completed individual PC contacts of which 11 lasted zero minutes, 1,636 lasted less than 15 minutes, 581 lasted 16 to 30 minutes, 210 lasted 31 to 60 minutes, 24 lasted 61 to 95 minutes, and three lasted longer than 95 minutes.

A random sample of 30 patients was selected to verify consistency between the appointments report and clinical documentation in EHRS. All 96 reviewed contacts were consistent with the appointments report.

Interviewed patients reported that when they were seen for appointments in the programming building, contacts were confidential. A number of patients reported that scheduled primary clinician and psychiatric appointments were occasionally held either at cell front or at the tables in the dayroom with other patients in the area. A few patients also expressed confidentiality concerns with the presence of the tele-presenter during telemental health appointments.

[94] The mainline EOP routine primary clinician appointments report did not include individuals that did not have completed contacts, such as those that were not scheduled. The reviewed data captures the time between patient contacts but does not include patients were not seen or scheduled for a routine contact with the primary clinician. Additionally, the provided appointments report did not account for delays between appointments due to movements in or out of EOP. Contact with the assigned primary clinician was unable to be determined. When primary clinician caseload groups were utilized to meet primary clinician contact requirements, verification that individual contacts with the assigned primary clinician and alternated with caseload groups with the assigned primary clinician was not conducted.

All interviewed patients reported receiving only recreation therapy groups and all reported that the content did not sufficiently address their mental health needs. A number of patients reported that the title of the groups did not correspond to the content being offered and in a number of cases, the content of the group was dictated by patient consensus and not the group facilitator. Others felt that the recreational groups were supportive of their mental health needs and provided structure to their weeks.

Some patients reported delayed responses to requests to see a mental health clinician, and in some cases that custody staff were not contacting mental health. Three patients reported that they were engaged in self-injury, were assessed by mental health staff, and returned to their housing units without adequate intervention. This resulted in one patient engaging in self-injurious behavior twice in one week. A safety plan was completed for this individual but there was no evidence that the patient was seen or scheduled for an IDTT meeting as planned.

3CMS:

MCSP's mainline 3CMS population was 1,408 on the date of the site visit.

3CMS patients were housed on all facilities, including the MSF during the review period. Significant staffing shortages were noted on each facility which had a direct impact on the staff-to-patient ratios as well as access to and quality of mental health care provided to patients. It was clear that a majority of staffing resources were devoted to the EOP program, including most staff members splitting caseload assignments between levels of care. Additionally, aside from Facility A, there was only two primary clinicians who treated all 3CMS patients across Facilities B, C, D, and E, a significant undertaking that resulted in each clinician carrying a caseload of 453 and 521 patients, respectively.

The staff-to-patient ratios from the 2009 Staffing Plan and 2021 adjustments to the 2009 staffing plan required that staff psychiatrists who treat 3CMS patients maintain a caseload of 280 patients per psychiatrist if the patient was prescribed medications and 675 patients if the patient was not prescribed medications.[95] *See* ECF No. 3693 at 12 and 6978-1 at 3. All psychiatrists at MCSP who treated 3CMS patients maintained caseloads of 280 patients or less, indicating compliance with both requirements.

Staff-to-patient ratios from the 2009 Staffing Plan[96] required that primary clinicians who treat 3CMS patients maintain a caseload of 97 patients per clinician. *See* ECF No. 3693 at 12 and 6978-1 at 3. On Facility A, there were three on-site staff psychologists and two telepsychologists. The on-site staff psychologists all maintained 3CMS caseloads within the required ratios. Of the two telepsychologists, one maintained a caseload within required ratios while the other maintained a caseload of 101 3CMS patients. On Facilities B, C, and the MSF, there was one on-site primary clinician that carried a caseload of 521 3CMS patients, more than five times the required staffing ratio of 97 patients. Facilities D and E each shared an on-site

---

[95] The Program Guide requires that "[e]ach CCCMS inmate patient on psychiatric medication…be reevaluated by a psychiatrist a minimum of every 90 days regarding psychiatric medication issues." (Program Guide at 12-3-11). The 2009 Staffing Plan established a psychiatry staffing ratio for every 3CMS patient in the general population and did not distinguish between patients on medications and patients who were not. See ECF No. 3693 at 8. The Adjustments to the 2009 Staffing Plan, ECF No. 6978-1, which were approved by the Court on January 27, 2021 (See ECF No. 7035 at 2), established a new staffing ratio of 675 patients per psychiatrist for patients who are not on medications for six months or more. For the purpose of reporting compliance with staff-to-patient ratios, it was unclear whether the patient's included in each reported caseload were prescribed medications at the time of the site visit.

[96] This reference to the ratios contained in the 2009 Staffing Plan includes the 2021 adjustments to the 2009 Staffing plan with respect to 3CMS psychiatry ratios for patients not prescribed psychiatric medication. *See generally* ECF No. ECF No. 6978-1 (defendants' proposed revisions to the 2009 Staffing Plan); January 27, 2021 Order, ECF No. 7035 (approving defendants' proposed revisions to the 2009 Staffing Plan).

staff psychologist as well. This clinician maintained a caseload of 453 patients, almost five times the required staffing ratio for primary clinicians.

*IDTTs*

Three 3CMS IDTTs were observed on Facility A during the site visit, including one initial and two routine IDTTs. All required staff were in attendance. The initial IDTT was held in abstentia, however it was noted that the patient had been in the 3CMS program at MCSP for more than a year prior to receiving his first IDTT. The institution indicated that the patient was continuously out-to-court and upon each return would require a SRASHE to be completed. The patient's arrival and LOC placement since his incarceration were discussed but the patient's goals and interventions were not discussed because they had not been formulated. Concerningly, the psychiatrist stated the patient was only on Vistaril and had not yet met with the patient. Otherwise, this IDTT was appropriately presented. The two other 3CMS IDTTs were presented and all salient points were discussed except for appropriate level of care. These two IDTTs were adequate.

Four routine IDTTs were observed on Facility E during the site visit. The required staff were in attendance, including the supervising mental health clinician. Patients were in attendance for all but one IDTT as the patient was held in RHU. The mental health clinician facilitated the IDTTs and introduced the team and explained the purpose of the IDTTs. The CC I spoke first by discussing the patients' age, test of adult basic education (TABE) score, custody level, education or work history, and any relevant disciplinary action. The primary clinician then asked the patients about any current mental health concerns and alluded to strategies discussed earlier in the week. The tele-psychiatrist saw the three patients prior to the IDTT and asked about each individual's medication, side effects, need to adjust medication, and the next

psychiatrist appointment. One of the patients was unaware of his treatment plan or goals. When discussing the case conceptualizations and treatment plan with the supervising mental health clinician, the supervisor stated these were routine IDTTs and no other explanation was given.

Initial IDTTs for 3CMS patients are required to occur within 14 calendar days of arrival to the institution or level of care change and annually thereafter. *See* ECF No. 7333-1 at 49.

Thirty patients who required initial IDTTs were randomly selected to determine compliance with Program Guide timelines. Of the 30 patients, ten or 33 percent occurred timely within 14 calendar days of arrival or level of care change. All 30 were attended by all required staff and 13 or 43 percent were attended by the patients. Reasons initial IDTTs were held *in absentia* included patient refusals.

To measure timeliness of routine IDTTs during the review period, CDCR produced an appointments report that included individuals who were required to receive a routine IDTT from July through December 2024. For the 264 patients in CDCR's appointments report, there were 268 completed routine IDTTs. When a patient had either a completed routine IDTT and more than one routine IDTT, timeliness in accordance with Program Guide requirements was able to be calculated. Of the 268 routine IDTTs, four contacts were for individuals who had at least two routine IDTTs. Of those four, all occurred within Program Guide requirements.[97]

A random sample was selected to verify consistency of appointment dates as reported in the appointments report and the presence of clinical documentation in EHRS. All 33 contacts reviewed in EHRS were consistent with the appointments report.

---

[97] The reviewed data captures the time between completed patient IDTTs but does not account for when patients were not scheduled for a routine IDTT. Of note, the provided appointments report did not account for delays between appointments due to movements in or out of mainline 3CMS.

*Individual Treatment*

The Program Guide requires that patients are offered an initial psychiatrist evaluation before their initial IDTT. *See* ECF No. 7333-1 at 34-50. Thereafter they are required to receive a routine psychiatric contact every 90 calendar days if the patient is prescribed a psychotropic medication. *Id*. Patients are also required to receive a primary clinician evaluation within 14 calendar days of arrival and every 90 calendar days thereafter. *Id*.

Thirty patients who required initial psychiatry evaluations were randomly selected to determine compliance with Program Guide timelines. Of the 30 patients, all timely occurred before the initial IDTT. Twenty-one or 70 percent of the reviewed initial psychiatry evaluations were conducted in confidential settings. Non-confidential contacts were due to patient refusal, unavailable custody escort, unavailable space; otherwise, reasons for non-confidentiality were not documented. Telepsychiatry was utilized for 12 initial psychiatry evaluations.

To measure timeliness of routine psychiatry contacts during the review period, CDCR produced an appointments report that included individuals who were required to receive a routine psychiatry contact from July through December 2024. For the 1,188 patients in CDCR's appointments report, there were 2,750 completed contacts, 2,116 or 77 percent of the completed contacts were confidential as reported by the institution. When a patient had more than one completed contact, timeliness in accordance with Program Guide requirements was able to be calculated. Of the 2,750 completed contacts, 1,568 contacts were for individuals who were scheduled at least twice by the psychiatric provider. Of those 1,568 contacts, there were 71 or five percent that occurred beyond Program Guide requirements.[98]

[98] Reviewed data captured the time between patient contacts but does not account for when patients were not seen or scheduled for a routine psychiatric contact. Of note, the appointments

A sample of 30 patients was randomly selected to verify consistency between the appointments report and clinical documentation in EHRS. Of the 58 contacts reviewed, 57 or 98 percent were consistent with the appointments report; one or two percent had discrepancies. Discrepancies included no clinical documentation for the completed contact.

Thirty patients who required initial primary clinician evaluations were randomly selected to determine compliance with Program Guide timelines. Notably, four initial primary clinician evaluations were overdue and never occurred. Of the 26 reviewed initial primary clinician evaluations, 13 or 50 percent were completed within ten calendar days of arrival or change in level of care. Thirteen or 50 percent of reviewed initial primary clinician evaluations were conducted in a confidential setting. Non-confidential contacts were due to patient refusals and modified programming; otherwise, reasons for non-confidentiality were not documented. Telepsychiatry was not utilized.

To measure timeliness of routine primary clinician contacts during the review period, CDCR produced an appointments report that included individuals who were required to receive a routine primary clinician contact from July through December 2024. For the 894 patients in the appointments report, there were 1,361 completed contacts. Seven hundred and eighty-six or 58 percent of the completed contacts were confidential as reported by the institution. When a patient had more than one completed or refused contact, timeliness in accordance with Program Guide requirements was able to be calculated. Of the 1,361 contacts, 469 contacts were for individuals who were seen at least twice by the primary clinician. Of those 469 contacts, there

---

report did not account for delays between appointments due to movements in or out of mainline 3CMS. Contact with the assigned psychiatrist was unable to be determined.

were 46 or ten percent that occurred beyond Program Guide requirements with a range of 91 and 166 days.[99]

There were 1,361 completed individual PC contacts, of which ten were documented as lasting zero minutes, 903 occurred in under 15 minutes, 318 occurred between 16 and 30 minutes, 119 occurred between 31 and 60 minutes, nine occurred between 61 and 95 minutes, and two were documented as occurring 96 minutes or longer.

A random sample of 30 patients was selected to verify consistency of appointment dates as reported in the appointments report and the presence of clinical documentation in EHRS. Of the 49 contacts reviewed in EHRS, 47 or 96 percent were consistent with the appointments report; two or four percent had discrepancies with supporting no clinical documentation for an appointment date produced in the appointments report.

3CMS patients were interviewed across Facilities A, C, D, and the MSF during the site visit. Eighteen 3CMS patients reported seeing their clinicians at least once in the last six months, six EOP patients reported seeing their clinician at least once in the last three months, while six reported not seeing their clinicians at all. All patients taking medication reported seeing their psychiatrist in person or via tele-psychiatry at least once a month.

The overall consensus from discussions with patients was that under the triage plans, there were minimal mental health services with the exception of psychiatry. Patients stated it would sometimes require a patient to go “man down” to get mental health services.

---

[99] The reviewed data captures the time between patient contacts but does not include patients were not seen or scheduled for a routine contact with the primary clinician. Of note, the appointments report did not account for delays between appointments due to movements in or out of mainline 3CMS. Verified contact with the assigned primary clinician was unable to be determined.

Other Issues:

Pre-Release Planning:

The pre-release coordinator offered pre-release planning services via tele-mental health beginning in October 2024. After the previous pre-release coordinator's departure in October 2023, the regional staff assisted with pre-release services for approximately one year and did not maintain face-to-face contact with any pre-release patients.

According to regional staff, many pre-release services were provided sporadically during the one-year gap in service due to time constraints and other required duties of the regional staff and leadership. Prior to the hiring of the new pre-release coordinator, regional staff did not provide direct patient services. Instead, pre-release staff conducted data collection via SOMS and EHRS chart review to complete the required PRPA sections, referred the patients to the primary clinician to conduct face to face appointments and to complete the remainder of the PRPA, spoke with other programs as needed, and tracked patients. Following the hiring of the new pre-release coordinator, face-to-face assessments and follow-up appointments resumed while utilizing the medical assistant. Pre-scheduled appointments and priority ducats were used as much as possible, however custody modified programming affected many face-to-face appointments. The pre-release coordinator indicated that they would still receive contact information for parole and probation and community based mental health clinics from regional staff.

There was an on-site supervising psychiatric social worker who also supported the current tele-mental health pre-release coordinator. This supervising psychiatric social worker was familiar with pre-release coordination at MCSP.

A review of the local operating procedures (LOP) for pre-release services indicated that the coordinator was required to assign the PRPA to the primary clinician to be completed within 90 days from release for EOP patients and 120 days from release for 3CMS patients. All MHSDS patients were required to receive a transportation chrono if needed, 30 days prior to release. Release of information (ROI) requests were required to be discussed with patients during the assessment as well. The pre-release coordinator indicated that the institution has followed the LOP since she was hired.

Pre-release groups did not occur during the review period and were not occurring during the monitoring tour due to the transition to tele-mental health.

The institution indicated that there were 177 patients who paroled or were released on probation during the review period. Fifty-eight patients paroled and 119 were released on probation. The transitional case management program (TCMP) reported providing services to MCSP patients over the reporting period for 164 patients, including 65 EOP and 99 3CMS patients. One hundred and thirty-seven patients or 84 percent applied for Medi-Cal, SSI, VA benefits, or had some other insurance.

Both the pre-release coordinator and the supervising psychiatric social worker viewed the pre-release program as a success based upon patient feedback and recent accomplishments. Two patients who were scheduled for the pre-release program were interviewed during the site visit. Although neither patient reported being seen by a clinician since entering the program, a review of each patients' chart indicated that both patients were seen by the tele-mental health pre-release coordinator, given packets by the medical assistant, and had follow-up appointments.

Program Access:

a. Job and Program Assignments

On January 31, 2025, MCSP reported that of 1,187 available jobs, 81 EOP patients, or 10 percent of the EOP population, held job assignments. For 3CMS patients, 417 or 28 percent of the 3CMS population held job assignments, and for non-MHSDS incarcerated persons, 689 or 43 percent of the non-MHSDS population held job assignments.

For the 766 academic assignments, 137 or 17 percent of the EOP population held these assignments. For 3CMS patients, 280 or 19 percent of the 3CMS population held academic assignments, and for non-MHSDS, 349 or 22 percent of the non-MHSDS population held these assignments.

Of 243 vocational education assignments, 22 or three percent of the EOP population held assignments, as did 99, or seven percent of the 3CMS population, and 122 or eight percent of the non-MHSDS population.

Of 849 voluntary education assignments, 128 or 16 percent of the EOP population held assignments, as did 317 or 21 percent of the 3CMS population, and 404 or 25 percent of the non-MHSDS population.

Of 349 substance abuse treatment assignments, 67 or eight percent of the EOP population, 162 or eleven percent of the 3CMS population, and 120 or eight percent of the non-MHSDS population held assignments.

b. Milestone Credits

MCSP reported that 515 EOP patients and 18 3CMS patients earned milestone credits during the review period. The institution also indicated that limitations in offered group

treatment impacted the ability of patients to earn credits. Of note, MCSP did not provide the information in the requested format.

c. Out-of-Level Housing

MCSP reported that 9 EOP and six 3CMS custody Level I patients were placed in Level II housing. One 3CMS custody Level I patient was placed in Level III housing. There were thirteen 3CMS custody Level II patients in Level I housing, 29 EOP and 86 3CMS custody Level II patients in Level III housing. Further, there were two EOP and six 3CMS custody Level III patients in Level II housing, and four EOP and seven 3CMS custody Level III patients in Level IV housing. Additionally, there was two EOP custody Level IV patient in Level II housing, and 97 EOP and 148 3CMS custody Level IV patients in Level III housing.

d. ADA Reasonable Accommodations and Grievance Procedures

MCSP provided training rosters and attendance sheets that demonstrated compliance with the implementation and reiteration of reasonable disability accommodation requirements, grievance procedures, and appeal processes.

e. Periodic Classification Score Reductions: EOP Patients

MCSP provided 10 completed CDCR 840 forms that reflected classification score reductions for EOP patients.

f. Unclothed Body Search

MCSP custody staff reported performing unclothed body searches in private areas in all toured housing units. The monitors confirmed that these areas were private and suitable for unclothed body searches during the site visit.

<u>"C" Status</u>:

During the review period, there were 159 incarcerated persons on "C" status at MCSP. At the time of the monitoring tour, there were 47 incarcerated persons on "C" status at MCSP, including 24 mainline EOP patients, and 23 3CMS patients. The EOP patients were on "C" status for an average of 61 days with ranges of one to 128 days. The 23 3CMS patients were on "C" status for an average of 70 days with a range from one to 148 days.

Case factors for "C" status placement included receiving more than two RVRs in the past 6 months for failure to work and refusal of housing assignment.

<u>Case-by-Case Reviews</u>:

MCSP provided documentation of three patients' long term segregated case conference (LTSCC) reviews. The documentation provided did not clearly identify the date for the patients' initial placement in RHU or the due date for the patients' 150-day LTSCC reviews. The documentation did include the required headquarters and institution staff. The reason for retention in RHU was noted in two out of three cases as pending RVR hearing, which was postponed by the patient.

A total of 58 MHSDS patients had a 120-day pre-MERD review with ICC releasing 12 patients from RHU. The remaining patients were retained in RHU.

MCSP reported that 38 MHSDS patients were retained in RHU past their MERD pending transfer to their endorsed institution. The institution was unable to indicate how long these patients waited for transfer.

<u>Mental Health Referrals</u>:

MCSP made 5,600 mental health referrals during the reporting period. Of those, there were 1,155 referrals to psychiatry and 4,445 referrals to primary clinicians. MCSP was 95

percent compliant with psychiatry responses to all referrals. Specifically, MCSP responded to 50 of 55 or 91 percent of emergent psychiatry referrals, 15 of 17 or 88 percent urgent psychiatry referrals, and 1,030 of 1,083 or 95 percent of routine psychiatry referrals during the review period. The institution was also 96 percent compliant with timely responding to primary clinician referrals. Specifically, primary clinicians responded to 1,016 of 1,062 or 96 percent of emergent referrals, 219 of 246 or 89 percent of urgent referrals, and 3,019 of 3,137 or 96 percent of routine referrals during the review period.

Custody and Mental Health Partnership Plan:

The institution's custody and mental health partnership plan LOP was current, last revised in March 2024, and consistent with statewide policy.

MCSP conducted executive joint rounding for all six months of the review period, including twice on Facility A, once on Facility B, once on Facility D, once in the MHCB, and once in the EOP RHU. The appropriate staff conducted the executive joint rounding and documented interviews with custody staff and incarcerated persons. The custody staff reported having a good working relationship with mental health staff and identified concerns with high staff vacancy rates for custody and mental health staff as well as program closures. Patients raised concerns with lack of treatment, modified programs, and reported that ducats were being issued on a regular basis.

MCSP did not keep executive staff meeting minutes or agendas, however all six months of QMC and MHPS meeting minutes reflected compliance with discussion of executive joint rounding.

MCSP did not conduct third watch huddles during the review period due to staffing vacancies. Huddles were conducted on second watch. Required custody and mental health staff

attended the observed MHCB huddle. The huddle was very thorough with detailed discussion of each patient. However, in review of two weeks' worth of huddle reports from December 2024, the documentation was significantly lacking. The reviewed huddle forms did not document the attendance of custody staff and had only minor notations regarding patients housed in the unit. Additionally, huddle reports were missing for Saturdays and Sundays for the two weeks of huddle reports reviewed.

Huddles in the EOP facilities were also reviewed. The required staff were consistently in attendance, with only one of 43 huddle reports lacking the required custody staff. However, the reviewed reports contained limited notations of MHSDS patients' issues. When notations were included, they were related to suicide concerns, patients in need of higher level of care, and bad news. The EOP RHU huddle reports also included a separate report that was detailed as to each MHSDS patient, if they were involved in any incidents, PREA allegations, patients on suicide precaution, and pending transfers.

Weekly 3CMS supervisory meetings occurred as required on each facility and were attended by the required staff. The required form was use and documentation included relevant information regarding patients who had a level of care change, and staff vacancy issues.

MCSP reported EOP orientation groups were not offered during the review period due to staffing shortages.

Monthly joint supervisory program tours occurred in all six months of the review period for all 3CMS facilities. The required staff were present and the required form was used. Concerns on each facility included mental health referrals, custody staffs' lack of de-escalation training, and requests for more one-on-one mental health appointments. The forms also

documented good working relationship between custody and mental health staff and their concern about the high staffing vacancy rate.

The IAC meetings minutes were provided for the review period for all five facilities. However, mental health staff only appeared to be present on Facility C. The IAC meetings were only held approximately 50 percent of the time as the IAC did not have any issue to discuss. For the meetings that were held, the issues included mental health and custody staff vacancies, lack of treatment groups, and informing the MHSDS population of the expansion of tele-mental health services.

The institution provided a copy of the 3CMS orientation brochure. However, it was unclear whether this brochure was distributed to 3CMS patients during the review period.

There were 425 staff misconduct allegations filed by MHSDS patients during the review period. Of those, 217 were filed by EOP level of care patients, 203 by 3CMS patients and five by MHCB patients. The 425 allegations were filed by 213 different patients. Additionally, 19 investigations for staff misconduct towards patients were initiated outside of the incarcerated person grievance process. A total of 80 grievances were filed regarding use of force, 57 for discrimination or harassment, 37 for integrity, 29 for sexual misconduct 21 for retaliation, and ten for dishonesty. No staff were reassigned because of a staff misconduct allegation.

MCSP reported they did not complete the Quarterly Round Table training due to staff shortages.

MCSP reported annual partnership training for custody and mental health staff. Regarding custody, 766 of 827 or 93 percent of custody staff were in attendance, while 164 of 234 or 70 percent of mental health staff attended the training.

The institution did not include the executive joint rounding in executive meeting minutes, quarterly round table training was not completed, third watch huddles were not conducted, and MCSP did not offer introduction to EOP groups. Therefore, the institution was not compliant with the custody and mental health partnership plan during the review period.

Heat Plan:

Overall, MCSP's implementation of the current Heat Plan and Updates memorandum and Expectations Relative to Institutional Oversight of Heat Plan Operations memorandum (Expectations Memorandum) were not compliant during the review period.

CDCR required that each institution's heat plan LOP incorporate the requirements of the most recent Heat Plan and Updates memorandum. However, MCSP provided a Department Operations Manual Supplement for heat plan pathologies that was last updated in August 2024 instead of a local operating procedure. The Supplement did not include references to the current Heat Plan and Updates memorandum or Expectations Memorandum and was therefore not compliant.

In addition to CDCR's 2024 Heat Plan and Updates memorandum and as discussed above, CDCR issued an Expectations Memorandum, dated August 2, 2024, delineating the specific responsibilities of the warden and CEO. These included daily meetings during days of anticipated heat advisories to address and manage heat alerts and related concerns. MCSP held daily heat-risk meetings during heat plan months regardless of anticipated heat advisories. Minutes of heat plan meetings were reviewed and were compliant with the Expectations Memorandum.

The 2024 Heat Plan and Updates memorandum required that each institution submit a Heat Plan Monthly Summary Report (Summary Report), signed by the warden and CEO, to

headquarters each month from May 1 to October 31. MCSP produced Summary Reports for July, August, September, and October of 2024. The Summary Reports reflected there were 81 Stage I heat alerts, eight Stage II heat alerts, and two Stage III heat alerts during the four months.

However, inconsistencies were noted in the summary reports as a review of the indoor temperature logs indicated that temperatures in unit C11 reached over 95 degrees three times on July 6, July 7 and July 10, 2024, when Stage III heat alerts were only recorded in the summary reports as occurring twice. Twenty-seven Stage I alerts were reported in August, however 26 were reported in the temperature log. In September, 18 Stage I alerts were reported in the Summary Report, however 19 were recorded in the outdoor temperature log. Outdoor temperature logs indicated nine Stage I alerts in October of 2024 however, the Summary Report indicated eight. These inconsistencies compromised the reliability of the information contained in the Monthly Summary Reports.

Daily Activity Reports (DARs) were also inconsistent with monthly summary reports. Reviewed DARs for all four months indicated one Stage II alert and no Stage III alerts. In addition, the DARs did not consistently indicate the time that each heat alert went into effect, including the specific location and temperature at activation, as well as when nursing staff completed medical rounds during Stage III alerts.

Given these inconsistencies, the institution was not compliant with providing accurate monthly summary reports during the review period.

The Heat Plan and Updates memorandum also required institutions to submit a monthly Heat Incident Log documenting the number of patients who experienced a heat-related illness. The Heat Incident Log must include the patient's information and details regarding the heat-related illness. MCSP reported one heat-related illnesses during the review period on July 5,

2024. Concerningly, the DAR on July 8, 2024 noted a medical emergency activated at 1537 for heat exhaustion. This incident was not reported in the Heat Incident Log.

Additionally, nursing staff were required to conduct and document medical rounds during a Stage III heat alert. The required forms were completed for the Stage III alert on July 10, 2024, however medical rounds forms were not submitted for Stage III alerts on July 6 and July 7, 2024. The Chief of Nursing was interviewed about the discrepancy and indicated that the rounds were not completed on those dates because the Stage III alert was not reported to medical staff.

Due to the failure to conduct medical rounds during two Stage III heat alerts, MCSP was not compliant with the 2024 Heat Plan and Updates memorandum and more concerningly put patients in grave risk of danger by not completing required rounds when temperatures exceeded 95 degrees in the housing units.

The 2024 Heat Plan and Updates memorandum required all custody officers and leadership staff to maintain knowledge of heat plan activation and act in accordance with the requirements of each stage. The monitor interviewed fifteen custody officers in eight housing units on Facilities A through E. Interviewed staff members were generally knowledgeable of the Heat Plan and their responsibilities during a heat alert.

To ensure proper and accurate temperature recording, the annual Heat Plan and Updates Memorandum required the warden or his designee to ensure an accurate thermometer was placed in a central, heat-neutral location to monitor outside ambient air temperatures which must be recorded every hour, every day, from May 1 through October 31 of each year. Outside temperatures at MCSP were recorded by central control during the review period. The institution's outdoor temperature recording procedures complied with the 2024 Heat Plan and Updates memorandum.

The warden or his designee is also responsible for ensuring that inside air temperatures are measured in all non-airconditioned living areas that house heat-risk incarcerated persons. Temperatures must be taken at the highest non-air-conditioned location where heat-risk incarcerated persons are housed and must be recorded every three hours. Temperature logs were provided for July, August, September and October of 2024 and were reviewed by the monitor. Concerningly, temperature logs in Unit 11 on July 4, July 6, July 7, July 8, July 9 and July 12, 2024 recorded temperatures above ninety degrees, however, the corresponding DARs did not document a Stage II activation. The September temperature logs indicated that 89 temperature recordings were missed in Units 5, 6, 7, 9 and 18. Temperature logs in October were noncompliant with a total of 212 missed temperature readings in Units 1, 2 3, 4, 5 12, 13, 14, 15 and 18. The institution's indoor temperature recording procedures were not compliant with the 2024 Heat Plan and Updates memorandum.

In an effort to ensure that heat-risk incarcerated persons were afforded equal access to programs, services, and activities during extreme weather conditions, the 2024 Heat Plan and Updates memorandum required institutions to devise and include any reasonable accommodation and alternatives to yard activities when revising their LOP. All reasonable accommodation provided to heat-risk incarcerated persons during heat alert activation must be documented in the institution's DAR as well. MCSP's DARs did not consistently indicate whether heat-risk incarcerated persons were offered specific accommodations during a heat alert activation.

Interviewed staff reported providing heat risk incarcerated persons with additional dayroom and access to cold water, additional showers, and ice upon request. All observed ice machines on each facility were in working order.

The 2024 Heat Plan and Updates memorandum required annual training on the institution's Heat Plan. Heat-related pathologies training was completed by 368 or 44 percent of custody staff members. Heat-related pathologies training was completed by 209 of 317 or 66 percent of clinical staff and nurses as well. Therefore, MCSP was not compliant with heat-related pathologies training requirements during the review period.

RVRs:

The institution reported 3,720 RVRs were issued during the review period including 61 or two percent issued to MHCB patients, 1,015 or 27 percent to EOP patients, 1,756 or 47 percent to 3CMS patients, and 888 or 24 percent to non-MHSDS incarcerated persons. A total of 2,832 RVRs were issued to MHSDS patients, representing 76 percent of all RVRs issued during the review period.

The monitor reviewed 23 RVRs and accompanying mental health assessments (MHA) for compliance with policy. Custody staff timely referred the RVR to mental health staff for completion of an MHA in five of 23 or 27 percent of cases. Mental health completed the MHA and timely returned it to custody staff in 22 of 23 or 96 percent of cases. The MHAs were completed in a private setting in 87 percent of cases with three MHAs completed at cell front due to the institution being on lockdown. The MHA information was thorough and useful for the senior hearing officer (SHO). It was noted that many MHAs included statements about the incarcerated persons use of illicit drugs as the reason for the patient's behavior and that the behavior was not driven by the patient's mental illness.

The assignment of a staff assistant was 100 percent compliant. The SHO documented their consideration of the MHA information in 15 of 23 or 65 percent of cases reviewed. In the eight cases where the SHO did not document their consideration of the MHA, the SHO quoted

the clinician's response in the MHA without any other statement as to their consideration of the information. The SHO mitigated the assessment of penalties in all 21 cases where mitigation was recommended. A review of two ICCs regarding the assessment of an RHU term were reviewed and found to be compliant with policy as the ICC chairperson documented their consideration of the MHA information in the assessment of the RHU term.

Regarding attendance at required RVR training, 59 of 125 or 47 percent of required custody staff were in attendance, while all 14 required mental health staff attended. MCSP utilized a system of assigning specific clinicians to complete RVR MHAs rather than assigning the RVR MHAs to all clinical staff.

Overall, the institution was not compliant with RVR process requirements during the review period.

Use of Force:

MCSP reported four controlled and 349 immediate uses of force during the review period.

The four controlled uses of force involved MHSDS patients; two involved the use of pepper spray and two involved physical force. Of the 349 immediate uses of force, 325 or 93 percent involved MHSDS patients. Physical force was used in 159 of the cases, OC grenade was used in 119 of the cases, 35 included the use of the 40 mm launcher, 12 included the baton and 62 involved a combination of use of force options. There was one reported use of force to administer involuntary medications. There were also 246 incidents of non-use of force, of which 204 or 83 percent involved MHSDS patients.

The monitor reviewed the four controlled use of force incidents that occurred during the review period and one controlled use of force that occurred on February 1, 2025, which was

outside of the review period. The four controlled uses of force incidents that occurred during the review period were compliant with CDCR policy requirements, however the one that was viewed outside of the review period was not compliant.

The one noncompliant controlled use of force incident was reviewed, and several concerns were noted. The incident occurred on February 1, 2025. Concerns included that the patient was reported to have asthma and yet was cleared by a nurse for use of chemical agents. The patient was initially observed in his cell with a manufactured weapon, however, he relinquished the weapon before the controlled use of force. The patient was observed to have been paranoid and/or under the influence of a substance and had difficulty focusing. Four applications of OC were deployed: two applications of OC MK-9 and two applications of MK-9 streamer. The second and fourth applications were done within two minutes of the previous applications, which is not in compliance with use of force training. It appeared that staff had difficulty applying restraints when they entered the cell. After the patient was taken out of the cell and brought down from the second tier for assessment, he became unresponsive and a nurse directed staff to initiate CPR. CPR was delayed by approximately one minute. A 911 call was delayed and did not occur until after chest compressions commenced. At the time of the site visit, the incident remained open. It was recommended that CDCR complete its internal review, initiate an investigation and take corrective action in an expedited manner.

The monitor also randomly selected 39 immediate use of force incidents to review. Based upon the video surveillance footage for 24 of these incidents, 20 were deemed compliant with CDCR policy. In three of the incidents, de-escalation techniques may have avoided the use of force. Concerningly, in one of the immediate uses of force incidents, one of the officers

deployed a second burst of chemical agent in close proximity to the first while the incarcerated person was on the floor.

Given the high percentage of use of force incidents on the MHSDS population, additional training on employing de-escalation techniques and working with the mentally ill offender may be warranted.

MCSP reported that three percent of mental health and health care staff completed the required use of force training. As for custody staff, 96 percent completed the required use of force training. However, neither the warden nor the chief deputy warden completed the training.

Lockdowns/Modified Programming:

MCSP reported five instances of custody modified programming during the review period. There were 80 total days of modified programming in which Facility A was effected each time. It was clear that modified programming effected the delivery of mental health care as only priority ducats were recognized, IDTTs were cancelled, there was controlled movement for all tasks, including medication administration and feeding, and suspension of recreation group therapy.

On August 28, 2024 Facility A was placed on Modified Program for 30 days due to a critical staff shortage to better support facility operations and programming. Staff in Facility A were restricted from redirect assignments away from the facility. Cell feeding and controlled medication as well as modifications to programming, dayroom and yard activities were reported. Facility A was cleared to return to normal program on September 26, 2024.

On September 27, 2024 Facilities A, B, and C were placed on modified program for seventeen days due to an increase in violent incidents and an excessive number of weapons discovered in Facility A. Searches in Facility A by staff from Facilities B and C were initiated.

Facility A was restricted from recreation, work, phones, canteen, dayroom, education, ISUDT, and packages. On October 14, 2024, all facilities were returned to normal operations. In Facilities B and C, yard and dayroom access was modified to evening only.

On October 29, 2024 Facility A was placed on Modified Program for 15 days due to an increase in violent incidents and excessive number of weapons. Facility A was restricted from education, ISUDT, dayroom, recreation, canteen, and phone. On November 12, 2024, the Facility returned to normal operations.

On November 18, 2024 Facilities A, B, and C were placed on Modified Program for three days to conduct Restricted Housing searches due to the use and discovery of weapons. Priority ducats were authorized. Yard and dayroom were modified to evenings. On November 20, 2024, the Facilities were returned to normal operations.

On December 14, 2024 the entire institution was placed on Modified Program for 10 days due to a Norovirus Outbreak to support cleaning and to slow the transmission. Cell feeding and controlled medication were reported. Priority ducats were authorized. On December 23, 2024 the institution was returned to normal operations.

Interviewed patients reported that Facility A was frequently locked down which negatively impacted their ability to access care. Patients reported that priority ducats were not consistently recognized when there were security issues on other housing units.

The Facility A supervisor reported that drug use on A Yard was extremely problematic and mostly consisted of "spice" which resulted in unpredictable and often violent behavior. She also reported an increase in violence on Facility A, which resulted in a number of problems including mental health staff not feeling safe on the yard, lack of access to holding cells for individuals in crisis secondary to the cells being used for patients awaiting RHU placement,

increased calls for crisis intervention secondary to drug debts, and cancellation of IDTT meetings and groups secondary to lockdowns.

Access to Care:

A review of MCSP's monthly Health Care Access Quality Reports from July 1, 2024 to November 30, 2024 reflected the issuance of 218,940 mental health ducats and add-on appointments, of which 80,882, or 37 percent, were completed and 138,058, or 63 percent, were not completed. Of the appointments that were not completed, five percent were due to custodial reasons, 14 percent were due to non-custodial reasons, and 81 percent were due to patient refusals.

Minimum Support Facility:

There were 38 3CMS patients housed in MCSP's MSF during the review period. However, there were several concerns related to mental health patients being housed on the facility, including issues with treatment space and medication management. Specifically, clinicians utilized the dayroom for clinical contacts and custody was rarely notified when mental health providers planned to make contact with the patients. Additionally, nursing staff reported there were two patients placed in the MSF that were on DOT/NA medications and not KOP medications. It was unclear why a patient was not put on KOP medications before the transfer to the MSF. Five 3CMS patients in the MSF were interviewed. Four patients stated they benefitted from the mental health program even though none of the patients knew the name of their clinician but had contact at least once in the past six months.

*Coleman* Postings:

All toured housing units contained current *Coleman* postings in English and Spanish.

**APPENDIX A – 20**
**NORTH KERN STATE PRISON (NKSP)**
Site Visit: July 29, 2025 – August 1, 2025
Review Period: December 1, 2024 – May 30, 2025

Census:

On July 25, 2025, NKSP housed 2,205 incarcerated individuals which was a 24 percent decrease from the prior review period. *See* Thirtieth Round Monitoring Report – Part D, ECF No. 8359 at 428 (reporting total population of 2,892 incarcerated persons). The 964 MHSDS patients represented 44 percent of the institution's population and was a 17 percent increase from the prior review period. *Id*. (reporting MHSDS population of 826 patients).

Nine patients were housed in the MHCB, and one incarcerated person was in alternative housing.

Five EOP patients were housed in the general population (GP) RHU pending transfer to an EOP RHU. Twenty-two 3CMS patients were housed in the GP RHU pending transfer to a 3CMS RHU.

There was one mainline EOP patient, 48 mainline 3CMS patients, 68 RC EOP patients, 689 RC 3CMS patients, and121 3CMS patients housed in the MSF.

Staffing:

As of June 16, 2025, the chief psychiatrist position was vacant and had been for years. *See* Twenty-Ninth Round Monitoring Report – Part D, ECF No. 7716 at 176. All five staff psychiatrist positions were vacant; 4.38 contractors reduced the functional vacancy rate to 12 percent. There were 4.5 telepsychiatrists filling the five allocated positions resulting in a 10 percent vacancy rate. Overall, including on-site and telepsychiatry positions, the psychiatry functional vacancy rate was 11 percent.

Both chief psychologist and both senior psychologist positions were filled. One of two senior psychologist specialist positions were filled. For staff psychologists, 5.5 of 27.5 positions were filled for an 80 percent vacancy rate; 5.5 contractors reduced the functional vacancy rate to 60 percent. Two of five telepsychologist positions were filled for a 60 percent vacancy rate. Overall, including on-site and tele-mental health positions, the psychology functional vacancy rate was 60 percent. Eleven medical assistants assigned to tele-mental health filled the ten allocated positions; one additional registry position was filled as well.

The supervising social worker position was filled. Fourteen social workers and an additional 1.25 contractors filled the 10.5 allocated positions. There were 4.55 tele-social workers filling the three allocated positions. Accordingly, there were no functional vacancies among social worker positions.

Overall, inclusive of on-site and tele-mental health positions, the primary clinician functional vacancy rate was 29 percent. One psychologist and six social workers were unlicensed.

Two of four recreation therapist positions were filled; one contractor reduced the functional vacancy rate to 25 percent.

The supervising RN position was filled. All ten MHSDS RN positions, all 11 CNAs, and the LVN position were all filled.

All 13 psych tech positions were filled.

All 11.5 MHSDS clerical positions, the OSS II position, both HPS I positions, and the HPS II positions were filled.

As of June 16, 2025, for custody staff, the warden, chief deputy warden, all six associate wardens, and all five captain positions were filled. Twenty-five of 25.2 lieutenant positions were

filled for a one percent vacancy rate; three lieutenants were on long-term leave resulting in a 13 percent vacancy rate. Sixty-six sergeants filled the 62 allocated positions; two were on long-term leave. All 42 CC I positions were filled; one was on long-term leave and two were acting out of class resulting in a seven percent vacancy rate. All 11 CC II positions were filled; one was on long-term leave and one was acting out of class resulting in an 18 percent functional vacancy rate. For correctional officers, 613 individuals filled the 531 allocated positions; 23 individuals on long-term leave and three individuals acting out of class still left this position well in excess of allocations.

Tele-Mental Health:

One tele-social worker provided pre-release services and one telepsychiatrist served the mainline 3CMS population; the remaining 3.5 telepsychiatrists, two telepsychologists, and 3.55 tele-social workers served the RC 3CMS population. The statewide telepsychiatry hub also provided after-hours coverage. MHSDS clerical staff, the HPS Is, and the HPS II worked hybrid schedules; no other staff teleworked.

Staff Recruitment:

Staff recruitment and retention efforts included the regional hiring unit streamlining the hiring process for *Coleman* classifications; increased marketing for *Coleman* classifications; hiring above minimum; pay differentials for staff that provide direct patient care for more than 50 percent of the pay period; incremental percentage retention bonuses; recruitment and retention bonuses for in-person psychiatric direct patient care; and payments for psychiatrists and psychologists working additional caseloads.

Quality Management:

During the review period, the local governing body met twice for quarterly meetings in December 2024 and March 2025, as well as once in January 2025 for a special meeting to approve credentialing privileges for CTC staff. The CEO chaired and the health program manager III for quality management facilitated the local governing body. A quorum was reached for all three meetings, although the chair was absent from the December 2024 and March 2025 meetings. Mental health participation in the local governing body meetings varied with the chief of mental health attending all three meetings and frequent attendance by the chief psychologist and a supervising psychiatrist.

Local governing body minutes reflected approval of revisions to CTC policy and LOPs for mental health processes, monitoring of monthly CTC mental health admissions, CTC unusual occurrences, and, during the January 2025 meeting, approval of CTC staff credentialing privileges. No action items were developed. Aside from CTC admissions and staff credentialing, no mental health issues were discussed during these meetings.

The quality management committee met monthly during the review period. Like the local governing body, the quality management committee was chaired by the CEO and facilitated by the heath program manager III for quality management. The chief of mental health was a voting committee member and attended each quality management committee meeting except the May 28, 2025 meeting, when the chief psychologist attended in his place. A quorum was achieved for each meeting.

Minutes documented review of quality improvement work, system surveillance subcommittee reports, program administration including review and approval of revisions to LOPs, the custody and mental health partnership, and morbidity and mortality reviews, including

the challenge of illicit substance use by the NKSP population. During the review period, quality assurance and quality improvement projects focused on timely administration of medications for newly admitted CTC patients, hunger strike monitoring, access to care, various aspects of medical and dental care, and emergency medical responses. Reports from and actions taken by the mental health program subcommittee (MHPS) were appropriately elevated and discussed in quality management committee meetings. These included status updates on a blackbelt project to improve timeliness of 3CMS patient transfers from the reception center to mainline housing, along with quality improvement projects focused on timely completion of mental health diagnostic screenings and quality of primary clinician initial assessments.

Additionally, the QMC routinely monitored completion of scheduled healthcare appointments, including mental health ducats. However, according to QMC minutes, successful completion of mental health ducats was not the subject of a quality improvement initiative as the QMC's routine monitoring indicated ducat completion increased from 67 percent in December 2024 to 81 percent in May 2025.

The MHPS was chaired by the chief of mental health and facilitated by a HPS I. The committee met monthly during the review period and achieved a quorum at each meeting. The chief psychiatrist position remained vacant throughout this period, and a psychiatrist consistently attended as an approved designee. Minutes reflected performance of active quality improvement projects and system surveillance data from automated dashboard metrics for multiple areas, including services for MHSDS patients in the RC, mainline, and RHUs, medication administration, MHCB care, suicide risk evaluations, crisis intervention team responses, patient safety concerns, required psychiatric responses to patient medication nonadherence, alternative housing placements, and SPRFIT findings. Program administration topics were also discussed.

These included approval of local operating procedures, quality management report changes, custody and mental health partnership issues, staffing, training, clozapine, and mental health peer review.

In the December 2024, February 2025, and April 2025 mental health program subcommittee minutes, it was reported that automated data were lacking for RHU mental health metrics, including timely completion of 3CMS RHU and EOP RHU initial and routine psychiatric appointments and timely completion of 3CMS RHU and EOP RHU initial and routine IDTT meetings. Mental health staff reported that RHU data from OnDemand had not been reliable since the CDCR transition from administrative segregation units to RHU, and that as a result she was manually computing compliance with RHU program guide requirements.

Interestingly, April 22, 2025 MHPS minutes documented striking improvements in compliance with RHU program guide requirements between February 2025 and March 2025. Specifically, the minutes indicated that, across these two months, compliance with timely completion of initial psychiatric assessments for 3CMS RHU rose from zero to 100 percent compliance. In the same period, compliance with timely completion of initial IDTT meetings for RHU 3CMS patients rose from 16 percent to 95 percent, and compliance with routine psychiatric follow-up appointments rose from 20 percent to 100 percent. Notwithstanding reports of automated RHU mental health metrics being unreliable, and reports that these measures needed to be manually calculated, the institution was unable to provide the factors which led to the reported significant improvements during this period.

Outside of RHU mental health services, mental health quality improvement projects focused on five major areas during the review period: timeliness of completing mental health referrals for the reception center population, quality of primary clinician initial assessments,

psychiatric response to medication nonadherence, timely completion of mental health diagnostic screenings, and timely transfer of 3CMS patients from the reception center to mainline housing. The first three projects successfully achieved compliance and were closed during the review period, while the fourth and fifth quality improvement projects did not reach compliance levels and were ongoing at the end of the review period.

Mental health corrective action plans included several ongoing initiatives that were implemented following the previous rounds' findings. The ongoing corrective action plans related to recruitment for psychiatric staffing, access to confidential treatment space, reducing 3CMS patient stays in the RC, reducing overstays in MHCB care, and improving structural protection from inclement weather for patients waiting in medication administration lines. Additional corrective action plans focused on suicide prevention areas, including safety planning and documentation of rationale for the level of observation and issue provided to patients requiring suicide precautions or suicide watch.

One black belt quality improvement project approved in January 2025 was discontinued in March 2025 without completion. This project entailed working with the Los Angeles County Jail to ensure that mental health records were received at NKSP from the jail on the same day as the patient's transfer from the jail to NKSP. The March 2025 mental health program subcommittee minutes indicated that this project was discontinued due to unforeseen barriers with Los Angeles County.

Other chart audit tool (CAT) quality assurance studies continued to be optional throughout the review period. There were no active quality improvement teams (QITs) or functional improvement teams (FITs) during the review period.

Mental health supervisory staff at NKSP reported that they had ongoing access to CDCR dashboard data and used this data weekly or daily to monitor performance and identify priorities.

During the review period and at the time of the site visit, NKSP did not conduct peer reviews for primary clinicians and was awaiting statewide direction and updated statewide policy for these peer reviews. However, NKSP did engage in biannual psychiatric peer review, and in January 2025, the facility updated a local operating procedure governing psychiatry peer review. This procedure was consistent with statewide policy and approved by the mental health program subcommittee and the quality management committee.

Overall, the mental health quality management program was robust and effective. It resulted in the identification of performance challenges, the development of successful corrective action plans, and ongoing monitoring to ensure quality improvements were maintained. The major challenge in quality improvement, in addition to staffing vacancies that limited the institution's capacity to improve performance, was the inconsistent availability of reliable data for RHU mental health services.

Medication Management:

NKSP provided MAPIP results from December 1, 2024 to May 31, 2025 regarding compliance for psychiatric diagnostic monitoring and medication management.

For required monitoring of antidepressants, NKSP was compliant for six months with monitoring thyroid function tests and blood pressure for patients prescribed venlafaxine. NKSP was compliant with obtaining EKGs for two of three months and with obtaining medication consents for five of six months.

Diagnostic monitoring for patients prescribed atypical antipsychotics showed that NKSP was compliant for six months with obtaining blood pressure, height, weight, glucose,

CBC with platelets, CMP, and thyroid function tests. NKSP was compliant for the five required months with obtaining EKGs. The institution was compliant for five months and was noncompliant for one month with performing the AIMS examination. NKSP was compliant for three months and was noncompliant for three months with monitoring lipid panels.

For patients prescribed carbamazepine, NKSP was compliant for the three required months of monitoring CBC and CMP and was compliant for the two required months of obtaining medication consents. The institution was compliant for one of the two required months with monitoring therapeutic medication levels.

NKSP was compliant with clozapine monitoring that included four months of compliance with lipid monitoring; three months of compliance with AIMS examinations, blood pressure, height, and weight; two months of compliance with glucose monitoring, CMP, and EKGs; and one month of compliance with obtaining medication consents. NKSP was compliant for one of two months for monitoring CBCs.

NKSP was not a designated clozapine initiation or maintenance institution; however, as a reception center, the institution continued clozapine for those patients entering CDCR who were prescribed that medication. The institution had a process for the continuation of patients prescribed clozapine that entailed R&R nursing staff identifying those patients and notifying nursing, pharmacy, and psychiatry. The patient was then brought to the TTA for stat laboratory studies, and a psychiatric evaluation would be completed within 72 hours. Additionally, the patient would be placed on a medical hold to prevent inadvertent transfer to a non-clozapine designated institution. NKSP reported that one patient was prescribed clozapine at the time of the site visit; however, information was not provided regarding the

total number of patients prescribed clozapine during the monitoring period. NKSP had a quality assurance committee that included the necessary participants to monitor all relevant facets of clozapine treatment at the institution that should meet at least quarterly.

For patients prescribed Depakote, NKSP was compliant for six months with monitoring CMP. The institution was compliant for five months and was noncompliant for one month with obtaining medication consents; was compliant four months and noncompliant two months for obtaining CBC with platelets; and was noncompliant all six months with obtaining Depakote medication levels.

For lamotrigine, the institution was compliant in obtaining medication consents for the five required months.

Regarding patients prescribed lithium, the institution was compliant for five months and was noncompliant for one month with performing EKGs and medication consents. NKSP was compliant for three months and was noncompliant for three months with thyroid monitoring; was compliant for two months and was noncompliant for four months with monitoring kidney function tests; and was compliant for one month and was noncompliant for five months with obtaining lithium medication levels.

For medication management metrics reported by mental health headquarters, NKSP was compliant for six months with continuity of medications upon parole/transfer to the community. NKSP was compliant for five months and was noncompliant for one month with continuity of medications with intra-institutional transfer to ASU/SHU/PSU and with outpatient provider new medication orders. NKSP was compliant for four months with chronic care medications historical administration and was noncompliant for two months. NKSP was compliant for two months and was noncompliant for four months with continuity

of medications upon discharge/transfer from a community hospital and/or DSH. The institution was compliant for three months and was noncompliant for three months with observation of medication preparation at HS. NKSP was compliant for one month and was noncompliant for five months with continuity of medications with MHCB transfers.

The institution was fully noncompliant with the following measures: continuity of medications upon arrival at reception center; continuity of medications upon inter-institutional transfer at R&R; continuity of NA and DOT medications with intra-institutional transfers (excluding ASU/SHU/PSU), and observation of medication preparation at A.M. and P.M.

Regarding the measure of continuity of medications upon arrival at the reception center; NKSP reported continued and ongoing efforts to address noncompliance that included quality assurance interventions and additional R&R staffing.

NKSP provided information that indicated that 356 prescriptions for psychiatric medications were provided by psychiatry as DOT. NKSP reported that no patients were prescribed SSRI medications prescribed by a medical provider by DOT. NKSP did not report details regarding KOP medications, including the number of patients prescribed KOP medications, the level of care of patients prescribed KOP medications, and the types of KOP medications prescribed. For those reasons, it was impossible to determine the degree of compliance with existing policies.

NKSP reported that psychiatric medications were prescribed for a maximum of 360 days which greatly exceeded the policy of a maximum of 180 days. Bridge orders were provided for up to 30 days. For verbal and telephone orders, the nursing staff was required

to "read back" the order to the prescriber.

The institution conducted 72 medication line audits during the reporting period. Audits indicated that all patients received their medications in less than 30 minutes. The duration of medication lines was under two hours.

NKSP reported that protection from the elements was provided while medications were administered; however, there was no protection for patients waiting in the medication line. They reported that patients were released to medication administration rooms in small groups to reduce the length of exposure during inclement weather. NKSP noted that healthcare and custody staff discussed protection from inclement weather in A, B, and D facilities; however, the requirement of line of sight for the tower officers resulted in continued deficiency.

NKSP reported an average non-formulary rate of less than three percent during the monitoring period.

NKSP reported that 1,000 patients received HS medications. With rare exception, NKSP was compliant with the requirement to administer HS medications at 8:00 P.M. or later.

NKSP was compliant for the required two months for the related medication administration metrics of compliance with the presence of a current PC 2602 court order for involuntary medications present in the EHRS and with the presence of a current physician's order in the EHRS for medication to be given per PC 2602 court order.

During the monitoring period, six patients received involuntary PC 2602 medications that were initiated at NKSP; at the time of the monitoring visit, there were two patients receiving PC 2602 medications. The institution submitted six initial emergent petitions; no

petitions were withdrawn or denied. NKSP reported one controlled use of force incident to administer PC 2602 medications that occurred in the MHCB on May 8, 2025. The institution reported that a psychiatrist initiating a PC 2602 petition sent the information to a senior psychologist who served as the MCA.

Transfers:

NKSP's inpatient coordinator was a senior psychologist specialist and had held the position for approximately four years. She also served as the SPRFIT coordinator and medical care assistant for 2602s. She began working in CDCR in 2018 as a line psychologist. There was no backup inpatient coordinator.

During the review period, there were 23 acute and three intermediate care referrals resulting in 22 acute and one intermediate care admissions, one acute care rejection, one intermediate care rescission, and one intermediate care rejection. All admissions were timely.

There were 112 instances of 71 patients considered for, but not referred to, inpatient care. No referrals were for patients with complex medical needs. On July 26, 2025, no patients were pending transfer to inpatient care.

NKSP made 260 MHCB referrals during the review period resulting in 132 admissions and 128 rescissions. Of the 132 admissions, 47 were to NKSP's MHCB and 85 were to outside MHCBs. One referral which was ultimately rescinded resulted in an alternative housing stay exceeding 24 hours. Of the 132 MHCB admissions, 127 or 96 percent occurred timely within 24 hours.

The RHU Policy requires that patients at an EOP or 3CMS level of care be transferred to an EOP RHU or 3CMS RHU within 30 calendar days from the date of initial placement in RHU or within 30 calendar days in which the patient was made EOP or 3CMS. *See* Cal. Code of

Regs., tit. 15 §§ 3335.2 and 3335.3; *see also* Restricted Housing Unit Program: Mental Health Services Policy, dated July 19, 2024 and effective August 1, 2024 (hereinafter "RHU Policy"); 2021 Program Guide Update, ECF No. 7333-1 at 19. Of the 79 RC EOP patients admitted to the RHU during the review period, 43 or 54 percent transferred to EOP RHU timely. For mainline EOP patients admitted to the RHU during the review period, nine patients transferred to EOP RHUs; seven or 78 percent transferred timely.

With respect to 3CMS RHU transfers, 88 of 208 or 42 percent of 3CMS patients admitted to the GP RHU transferred timely to a 3CMS RHU during the review period. The institution was not compliant with 3CMS RHU transfers during the review period due to NKSP's former short-term restricted housing (STRH) unit converting to a GP RHU. As staff continued to house 3CMS and RC 3CMS patients in the GP RHU rather than transfer them in accordance with policy, patients were often held beyond the 3CMS RHU transfer timelines.

There were 258 patients transferred to EOP programs during the review period; 192 or 74 percent transferred timely.

There were 104 patients whose levels of care changed from EOP to 3CMS during the review period.

There were 342 patients transferred to an MSF.

Programming:

Reception Center:

The reception center achieved a significant milestone by eliminating its backlog of initial assessments for the first time in several years. In addition, during the review period, there were 5,478 initial mental health screenings performed; 5,248 or 96 percent timely occurred within

seven days of arrival at the reception center. *See* ECF No. 7333-1 at 25. Mental health diagnostic screening assessments were also completed timely during the review period.

The Program Guide requires that "[a]ll EOP designated inmate-patients shall be transferred to a treatment setting within 60 days of level of care designation, or 30 days of such designation if clinically indicated. All [3CMS] designated inmate-patients, with the exception of parole violators with 90 days or fewer to parole, shall be transferred to a mainline institution within 90 days of level of care designation or 60 days of such designation, if clinically indicated." *See* ECF No. 7333-1 at 30-31 (PG 12-2-9).

Inclusive of patients admitted prior to the start of the review period, the RC EOP housed 776 individuals throughout the review period; 140 or 18 percent exceeded the 60-day transfer timeline, and the average length of stay was 43.2 days. The RC 3CMS housed 4,162 individuals throughout the review period; 867 or 21 percent exceeded the 90-day transfer timeline, and the average length of stay was 91.3 days. The RC GP housed 6,281 individuals during the review period; their average length of stay was 44.7 days.

On July 25, 2025, three or four percent of the 68 individuals housed in the RC EOP exceeded the 60-day transfer timeline, and 14 or two percent of the 689 individuals housed in the RC 3CMS exceeded the 90-day transfer timeline.

*RC EOP Patients*

The RC EOP program had one LCSW and two unlicensed social workers as well as one telepsychiatrist during the review period. According to the staff-to-patient ratios from the 2009 staffing plan, psychiatrists who treat RC EOP patients must maintain a caseload of no more than 120 patients per psychiatrist, while primary clinicians who treat RC EOP patients must maintain a caseload of no more than 18 patients per clinician. *See* ECF No. 3693 at 19. All three primary

clinicians exceeded established ratios while the psychiatrist's caseload was within established ratios.

The Program Guide required that "[r]eception [c]enters housing [patients] requiring EOP level of care shall provide structured therapeutic activities...[and] all sites will provide opportunities for a minimum of one hour per day, five days per week, of out-of-cell therapeutic activities." *See* ECF No. 7333-1 at 29 (PG 12-2-8). The institution indicated that from November 25, 2024 through May 31, 2025, RC EOP patients, on average, were scheduled for 5.75 hours, offered 5.19 hours, attended 3.52 hours, and refused 1.67 hours of weekly structured treatment. Additionally, an average of 0.49 hours of weekly structured treatment was cancelled.

Unfortunately, during the review period, it was discovered that nursing staff and recreation therapists were delivering in-cell work packets to RC EOP patients but documenting providing one-hour treatment sessions to the patients. Record reviews through the date of the site visit confirmed that this practice continued from the beginning of the review period through at least July 25, 2025. Regional leadership confirmed this practice and indicated speaking with local leadership about this issue.

The Program Guide requires that "[i]nitial treatment planning must be developed and regular treatment must be provided for all inmate-patients who are identified as requiring mental health services…Treatment plans must address basic issues of adjustment, access to care, monitoring of medication continuity, and clinical pre-release or parole planning." *See* ECF No. 7333-1 at 29 (PG 12-2-8). There were significant deficiencies in observed RC EOP IDTT meetings while on site. Clinicians consistently omitted critical areas such as higher level of care considerations and non-referral rationales, even when prompted by supervisors. Treatment plans were often unrelated to patients' presenting problems. Concerns were raised during IDTTs

without a plan for further investigation or follow-up (e.g., need to DDP reassessment). This pattern highlighted the need for a more robust training and oversight strategy to improve the consistency, quality, and sustainability of IDTT discussions, rather than relying on the supervisor's prompts which inconsistently yielded the intended result.

Observed RC EOP group treatment was impressive both in quality, content, and structure during the site visit. However, it was noted that NLTGs frequently did not occur during the review period. Leadership attributed these cancellations to uncoordinated staffing absences in which back up coverage was not arranged.

The Program Guide requires that "[i]nmate-patients who require [EOP] level of care shall be seen by the [primary clinician] weekly and shall be evaluated by a psychiatrist at least monthly regarding psychiatric medication issues." *See id.*

To measure timeliness of routine RC psychiatry contacts during the review period, CDCR produced an appointments report that included individuals who were required to receive a routine RC psychiatry appointment.[100] For the 193 patients in CDCR's appointments report for December 1, 2024 through May 31, 2025, there were 282 completed and refused contacts, 270 or 96 percent of the completed contacts were confidential as reported by the institution. When a patient had more than one completed or refused contact, timeliness in accordance with Program Guide requirements was able to be calculated. Of the 282 contacts, 89 were for individuals who were scheduled at least twice by the psychiatric provider. Of those 282 contacts, there were

[100] Reviewed data captured the time between patient contacts but did not account for when patients were not seen or scheduled for a routine psychiatric contact. Of note, the provided appointments report did not account for delays between appointments due to movements in or out of RC EOP. Contact with the assigned psychiatrist was unable to be determined.

seven or eight percent that occurred beyond Program Guide requirements with a range of 31 and 71 days.

To measure timeliness of routine RC primary clinician contacts during the review period, CDCR produced an appointments report that included individuals who were required to receive a routine RC primary clinician appointment.[101] For the 174 patients in CDCR's appointments report for December 1, 2024 through May 31, 2025, there were 540 completed contacts. Four hundred forty-six or 83 percent of the completed contacts were confidential as reported by the institution. When a patient had more than one completed or refused contact, timeliness in accordance with Program Guide requirements was able to be calculated. Of the 540 contacts, 368 were for individuals who were seen at least twice by the primary clinician. Of those 368 contacts, there were 11 or 3 percent that occurred beyond Program Guide requirements with a range of 11 to 82 days between contacts.

There were 540 completed individual primary clinician contacts, of which two were completed in zero minutes, 287 were completed within 15 minutes, 222 were completed in 16 to 30 minutes, 27 were completed in 31 to 60 minutes, and two were completed in 61 to 95 minutes.

Concerningly, individual treatment for patients identified as RC EOP "outliers" was significantly limited as compared to other RC EOP patients during the review period as these

[101] The appointments report captured the time between patient contacts but did not include patients were not seen or scheduled for a routine contact with the primary clinician. Of note, the provided appointments report did not account for delays between appointments due to movements in or out of RC EOP. Verified contact with the assigned primary clinician was unable to be determined. When primary clinician caseload groups were utilized to meet primary clinician contact requirements, verification that individual contacts with the assigned primary clinician and alternated with caseload groups with the assigned primary clinician was not conducted.

"outlier" patients were housed in locations scattered across 3CMS housing units throughout the institution. Custody staff confirmed that outlier patients were programming in housing units alongside RC 3CMS patients, which raised concern about the potential for victimization among this vulnerable population.[102]

Institutional leadership indicated attempting to work with the classification and parole representative to expedite "outlier" transfers; however, the institution was unable to produce a list of the number or exact housing location of these "outlier" patients – suggesting that NKSP did not adequately track or monitor its RC EOP "outlier" patients.

The RC EOP program relied heavily on telepsychiatry but continued to provide primary clinician sessions in person. Although most interviewed RC EOP patients reported no concerns about the quality of tele-mental health or the reliability of equipment, one patient described the experience as "speaking to a robot".

Since the last monitoring round, NKSP implemented new clinical space on Facility D in November 2024 and on Facility B in January 2025. These spaces significantly improved access to confidential or semi-private treatment areas compared to prior reliance on sessions conducted in housing units. At the time of the visit, both clinics were fully operational, staffed with designated healthcare access officers, and supported by supervisory oversight that ensured consistent use of space and timely custody escorts. However, despite these improvements, it was

[102] The intermingling of EOP and 3CMS patients during structured activities violated the Program Guide requirement that EOP patients' program separately. *See* 2021 Program Guide Update, ECF No. 7331-1 at 51 (PG 12-4-1) ("The [EOP] program is characterized by a separate housing unit and *structured activities* for mentally ill inmate-patients who, because of their illness, experience adjustment difficulties in a General Population (GP) setting, yet are not so impaired as to require 24-hour inpatient care." (emphasis added)).

reported that custody staff in two housing units continued to resist clinic access, which interfered with patients' attendance at appointments and completion of treatment sessions.

*RC 3CMS Patients*

The staff-to-patient ratios from the 2009 Staffing Plan required that staff psychiatrists who treat RC 3CMS patients maintain a caseload of 200 patients per psychiatrist. *See* ECF No. 3693 at 13. For primary clinicians who treat RC 3CMS patients, the 2009 Staffing Plan requires that clinicians maintain a caseload of 80 patients per clinician. *See id*. The RC 3CMS program was staffed with 11 licensed psychologists, one of whom also served the MHCB; one unlicensed psychologist; 12 LCSWs; one unlicensed social worker; and eight psychiatrists covering 4.5 full-time equivalent positions. One psychiatrist also served the RHU and one also served the mainline 3CMS program.

The Program Guide indicates that "[patients] who require [3CMS] level of care shall be seen by the [primary clinician] within 30 days of placement in [3CMS] and at least every 90 days thereafter while at the RC, or more often if clinically indicated. These [patients] shall also be evaluated by a psychiatrist a minimum of every 90 days regarding psychiatric medication issues." *See* ECF No. 7333-1 at 29. Overall, reviewed data indicated that NKSP was compliant with the provision of individual treatment to the RC 3CMS patients during the review period.

Thirty RC 3CMS patients were randomly selected to review compliance with initial primary clinician timeframes during their stays. Of the 30 RC 3CMS patients who required an initial primary clinician evaluation, one patient was moved to RHU prior to the 30-day deadline. Of the 29 patients who received an evaluation, 27 or 93 percent timely occurred within 30 days of placement into 3CMS and 28 or 97 percent occurred in a confidential setting. One patient

refused a confidential evaluation. Twelve of the 29 or 41 percent of evaluations occurred via tele-mental health.

To measure timeliness of routine RC 3CMS primary clinician contacts during the review period, CDCR produced an appointments report that included RC 3CMS individuals who were required to receive a routine primary clinician contact.[103] For the 406 patients included in the report for December 1, 2024 to May 30, 2025, there were 425 completed or refused routine primary clinician contacts. Of those, 379 or 89 percent were conducted in a confidential setting. When a patient had more than one completed or refused contact, timeliness in accordance with Program Guide requirements was able to be calculated. Of the 425 contacts, 20 were for individuals who were scheduled at least twice by the primary clinician. Of those 20 contacts, none occurred beyond Program Guide timeframes. Additionally, of the 425 contacts, three were completed in zero minutes, 332 were completed within 15 minutes, 37 were completed in between 16 and 30 minutes, four were completed in between 31 and 60 minutes, and three were completed in between 61 and 95 minutes.

To measure timeliness of routine RC 3CMS psychiatry contacts during the review period, CDCR produced an appointments report that included RC 3CMS individuals who were required to receive a routine psychiatry contact.[104] For the 644 patients included in the report for

---

[103] The RC 3CMS routine primary clinician appointments report captured the time between patient contacts but did not include patients who were not seen or scheduled for a routine contact with the primary clinician. The provided appointments report did not account for delays between appointments due to movements in or out of RC 3CMS. Verified contact with the assigned primary clinician was unable to be determined.

[104] Reviewed data captured the time between patient contacts but did not account for when patients were not seen or scheduled for a routine psychiatric contact. Of note, the provided appointments report did not account for delays between appointments due to movements in or out of RC 3CMS. Contact with the assigned psychiatrist was unable to be determined.

December 1, 2024 to May 30, 2025, there were 1,048 completed or refused routine primary clinician contacts. Of those, 1,016 or 97 percent were conducted in a confidential setting. When a patient had more than one completed or refused contact, timeliness in accordance with Program Guide requirements was able to be calculated. Of the 1,048 contacts, 405 were for individuals who were scheduled at least twice by the patients' psychiatrist. Of those 405 contacts, there were 11 or one percent that occurred beyond Program Guide timeframes.

Patients in Restricted Housing:

Reception Center and mainline patients who required RHU placement were housed in the institution's GP RHU while awaiting transfer.

The GP RHU housed 567 individuals during the review period; their average length of stay was 63.9 days. On July 31, 2025, the GP RHU housed one MHCB patient, six EOP patients, 26 3CMS patients, and 68 GP incarcerated individuals. The MHCB patient's length of stay was less than a day; the six EOP patients' average lengths of stay were 11.5 days and ranged from less than a day to 27 days; the 26 3CMS patients' average lengths of stay were 19.7 days and ranged from less than a day to 70 days, while the 68 GP incarcerated individuals average lengths of stay were 93.6 days and ranged from less than a day to 404.7 days.

Treatment concerns were noted with RC 3CMS RHU patients being retained in the GP RHU pending completion of RC processing – particularly when processing could take anywhere from 60 to 90 days. NKSP had assigned two primary clinicians to the RHU, one psychologist and one social worker. While psychiatric services had been provided via telepsychiatry during the monitoring period, an onsite psychiatrist had been assigned three days per week to the RHU shortly before the site visit.

The monitor's expert observed three initial IDTTs during the monitoring tour. All required staff were present. Both the assigned primary clinician and psychiatrist had seen and assessed the patients prior to the IDTT, and the entire team was familiar with each patient's individual case details and mental health problem areas. The team was clearly committed to the patients' success. For example, a patient with poor medication compliance who was beginning to decompensate was housed in the GP RHU. The psychiatrist saw the patient frequently, discussing his psychotropic medications and educating the patient on the importance of taking his medications. This included modifying the dosing schedule to facilitate compliance. The psychiatrist would return to the unit, even if assigned elsewhere, during medication administration times to be present when the patient received his psychotropic medications to facilitate compliance and enhanced monitoring.

Overall, IDTTs in the GP RHU were comprehensive and clinically meaningful. Providers spoke about mental health treatment in a meaningful way and specifically addressed targets of treatment, treatment goals, and specific interventions to address those treatment areas. The treatment teams were more comprehensive in reviewing significant clinical factors. All members of the treatment team participated meaningfully, though the supervisor did need to prompt team members to speak at times .

Despite these positive aspects of the observed treatment team meetings, there remained some opportunities for improvement. Specifically, the team was encouraged to speak more slowly to patients and utilize language more appropriate to the patient's TABE score. Some treatment team members did not always speak directly to the patient or simply read from their notes. It would facilitate therapeutic rapport and patient engagement if the team slowed down and spoke directly to the patient while regularly checking in with patient throughout the

treatment team meeting to be sure that they understand what is being addressed and ensure effective communication was utilized.

While not required in GP RHU, the institution has continued to offer one treatment group per week for 3CMS and one per day for EOP patients awaiting transfer in RHU. EOP treatment groups were facilitated by the LPTs while 3CMS were facilitated by the clinicians. No EOP treatment groups could be observed during the site visit due to patient refusal; staff reported that the high refusal rate was not unusual.

Treatment space remained a significant issue for the RHU. There was inadequate space to provide clinically necessary treatment to patients in confidential areas and to meet Program Guide requirements for EOP and 3CMS patients. There was a small multipurpose room with a table, chairs, and computer terminals that was used for IDTT meetings and ICC. There were no treatment modules, so the space was rarely utilized.

The only other confidential space was another multipurpose room that was used by nursing/LPTs and for providing treatment groups. Yet there were only three treatment modules in that room, severely limiting the ability to provide the necessary amount of group treatment for EOP and 3CMS patients. There was no other confidential space.

There were several modules lined up in the dayroom against the wall under the control booth officer. There was no sight or sound privacy from peers and custody. Custody staff would place rolling separators between the modules to improve sound privacy, but the modules were inadequate and not considered confidential. However, utilization of those modules reflected the RHU treatment team's effort to see patients outside of their cells and use space as effectively as possible.

Overall, despite the collegiality and professionalism of the RHU team, space limitations caused serious challenges in access to mental health treatment for existing class members while they awaited transfer. Many patients were seen at cell front who had not refused a confidential visit due to these space issues. The treatment team was committed to providing adequate treatment, but because of multiple necessary uses for those rooms (e.g., ISUDT, nursing assessments), confidential space was not always available. Staff were doing the best that they could with the available space, but significant limitations remained, underscoring the need to transfer patients in accordance with the Program Guide's established timeframes.

Non-Disciplinary Restricted Housing (NDRH):

NKSP indicated that it did not have any incarcerated persons identified as NDRH during the review period.

MHCB:

NKSP's MHCB had ten beds during the review period. On July 25, 2025, nine of the ten MHCB beds were filled.

The MHCB was staffed with two psychiatrists and three psychologists, one of whom also served the RC 3CMS.

There were 149 admissions during the review period and the MHCB had an average daily census of eight patients. Of the 149 admissions, 143 had clinically discharged and 142 had physically discharged by the end of the review period. Clinical lengths of stay for the 149 patients averaged eight days; approximately ten or seven percent of patients' clinical stays exceeded ten days. Of the 143 patients who clinically discharged, 17 or 12 percent physically discharged more than 72 hours after clinical discharge. Physical stays averaged nine days and ranged from zero to 23 days; 36 or 24 percent of physical stays exceeded ten days.

Six patients were admitted to the MHCB three or more times during the review period.

*IDTTs*

Thirty MHCB patients required initial IDTTs, all of which occurred within 72 hours of arrival. The required assigned staff were present at only six of the 30, or 20 percent of the initial IDTTs reviewed. The assigned psychiatrist or psychologist were the most frequently substituted staff members. Patients attended 28 of 30 or 93 percent of initial IDTTs with the remaining two patients refusing to attend.

Of the 33 required routine IDTTs, 32 or 97 percent occurred timely, or within seven calendar days following the initial IDTT. Ten or 30 percent of routine IDTTs had the required assigned staff in attendance. The assigned psychiatrist or psychologist were the most frequently substituted staff members. Of the 33 routine IDTTs reviewed, patients attended 32 or 97 percent.

*Individual Treatment*

Thirty MHCB patients required initial psychiatry evaluations. Of those, 21 or 70 percent occurred before the initial IDTT and within 24 hours of arrival. Two initial psychiatric assessments did not occur. Twenty-three were reported as conducted in a confidential setting. Reasons for non-confidentiality included patient refusals. Telepsychiatry was not utilized for initial psychiatry contacts.

All thirty MHCB patients require two routine psychiatry contacts per week. There were 185 expected contacts, all of which were timely. Of the 185 routine contacts reviewed, 148 were conducted in a confidential setting. Reasons for non-confidential contacts included patient refusals, modified programming, unavailable treatment space, or for unknown reasons. Telepsychiatry was not utilized for routine psychiatry contacts.

Thirty MHCB patients required initial primary clinician assessments; 26 or 87 percent were completed within 24 hours of arrival, while four initial primary clinician assessments did not occur. Of the 26 initial primary clinician contacts reviewed, 22 were held in a confidential setting. Reasons for non-confidentiality included patient refusals. There were no initial primary clinician assessments reported utilizing tele-psychologists or tele-social workers.

Thirty MHCB patients required routine primary clinician contacts. An institution was considered compliant if a patient was seen daily beginning the day after admission for an out-of-cell confidential contact by the psychiatrist or psychologist (unless the patient refused), though on weekends the patient may be seen by the medical officer of the day (MOD). *See* ECF No. 7333-1 at 84 (PG 12-5-13). There were 152 expected contacts, and 151 or 99 percent were timely. Eighty-five routine primary clinician contacts occurred in a confidential setting. Reasons for routine contacts not occurring in a confidential setting included patient refusals, modified programming, confidential treatment space was unavailable, or for unknown reasons. A licensed clinician completed all reviewed routine contacts. Tele-psychologists or tele-social workers were not utilized for routine primary clinician contacts.

Provided documentation indicated that MHCB patients were offered dayroom and yard throughout the review period.

<u>3CMS</u>:

The mainline 3CMS program was staffed by two LCSWs, two unlicensed social workers, and one psychiatrist who also treated the RC 3CMS population. Both tele-primary clinicians and telepsychiatry also provided services to the ML 3CMS program at the time of the monitoring tour but also served the RHU and RC at various times throughout the review period.

The staff-to-patient ratios from the 2009 Staffing Plan and 2021 adjustments to the 2009 staffing plan required that staff psychiatrists who treat 3CMS patients maintain a caseload of 280 patients per psychiatrist if the patient was prescribed medications and 675 patients if the patient was not prescribed medications.[105] *See* ECF No. 3693 at 12 and 6978-1 at 3. Staff-to-patient ratios from the 2009 Staffing Plan required that primary clinicians who treat 3CMS patients maintain a caseload of 97 patients per clinician. *See* ECF No. 3693 at 12. Due to significant population transitions ongoing in Facilities A and M, the social workers were not assigned patient caseloads. Formal caseloads were anticipated to be assigned after Facilities A and M completed their population transitions.

According to the mental health program subcommittee minutes, during the review period the 3CMS population in Facility A steadily declined. In December 2024, 102 mainline 3CMS patients were housed Facility A. By May 2025, this census dropped to 83, and on July 25, 2025, there were only 48 mainline 3CMS patients in Facility A. It was reported that Facility A was being converted from a Level III to a Level II yard, which was resulting in Level III mainline 3CMS patients being transferred elsewhere. Once this conversion is completed, the mainline 3CMS population is expected to grow substantially. The senior psychologist supervisor for the

[105] The Program Guide requires that "[e]ach CCCMS inmate patient on psychiatric medication…be reevaluated by a psychiatrist a minimum of every 90 days regarding psychiatric medication issues." (Program Guide at 12-3-11). The 2009 Staffing Plan established a psychiatry staffing ratio for every 3CMS patient in the general population and did not distinguish between patients on medications and patients who were not. See ECF No. 3693 at 8. The Adjustments to the 2009 Staffing Plan, ECF No. 6978-1, which were approved by the Court on January 27, 2021 (See ECF No. 7035 at 2), established a new staffing ratio of 675 patients per psychiatrist for patients who are not on medications for six months or more. For the purpose of reporting compliance with staff-to-patient ratios, it was unclear whether the patient's included in each reported caseload were prescribed medications at the time of the site visit.

mainline 3CMS program reported that the institution expects a total of 900 Level II incarcerated individuals to be housed in Facility A by August 2025.

In contrast, there were notable increases in the mainline 3CMS population in Facility M between November and December 2024, when it rose from 116 patients to 171 patients. According to QMC minutes, this surge coincided with the closure of Facility C and the transfer of some 3CMS patients from Facility C to Facility M. Thereafter, the 3CMS population on Facility M decreased through May 2025, when 100 mainline 3CMS patients were housed in Facility M. Since then, this population has rebounded in size, with 121 patients on Facility M as of July 25, 2025 and more expected soon.

Due to scheduling, there was no opportunity to observe IDTT meetings on Facility A during the site visit.

Thirty mainline 3CMS patients who required initial IDTTs during the review period were randomly selected for review to assess compliance with Program Guide requirements. Of the 30 patients who required initial IDTTs, 11 or 37 percent received one within 14 days of arrival or level of care change. One patient did not receive an initial IDTT at all. Of the 29 patients who did receive an initial IDTT, patients were present for 20 or 69 percent of IDTTs and required staff were present for all 29.

To measure timeliness of routine IDTTs during the review period, CDCR produced an appointments report that included individuals who were required to receive a routine IDTT.[106] For the 255 patients in CDCR's appointments report for December 1, 2024 to May 30, 2025,

[106] The reviewed data captured the time between completed patient IDTTs but did not account for when patients were not scheduled for an initial or routine IDTT. Of note, the appointments report provided did not account for delays between appointments due to movements in or out of NKSP.

there were 267 completed initial or routine IDTTs. When a patient had either an initial IDTT and a routine IDTT or more than one routine IDTT, timeliness in accordance with Program Guide requirements was able to be calculated. Of the 267 completed IDTTs, 11 contacts were for individuals who had at least two IDTTs (initial and routine or two routines). Of those 11, all occurred within Program Guide requirements. Of note, the report did not include individuals that did not have a completed IDTT, such as those that were not scheduled.

Although no mental health groups or nursing lead groups were offered to mainline 3CMS patients during the review period, a mainline 3CMS social worker offered a non-mental health, general population group on Facility A during site visit. According to the social worker, this was one of many general population groups held in the Facility A gym. Several 3CMS patients attended this group and reported praise for its content and facilitator.

Thirty mainline 3CMS patients who required initial psychiatry evaluations during the reporting period were randomly selected for review to assess compliance with Program Guide requirements. Of the 30 reviewed patients, 27 or 90 percent received it before their initial IDTT as required. One patient did not receive an initial psychiatry evaluation at all. All 29 patients received a confidential initial psychiatry evaluation.

To measure timeliness of routine psychiatry contacts during the review period, CDCR produced an appointments report that included individuals who were required to receive a routine psychiatry contact.[107] For the 162 patients in CDCR's appointments report for December 1, 2024 to May 30, 2025, there were 323 completed and refused contacts. Of the 315 completed

[107] Reviewed data captured the time between patient contacts but did not account for when patients were not seen or scheduled for a routine psychiatric contact. Of note, the appointments report provided did not account for delays between appointments due to movements in or out of NKSP. Contact with the assigned psychiatrist was unable to be determined.

contacts, 291 or 92 percent were confidential as reported by the institution. Reasons for non-confidential psychiatry contacts included confidential space unavailable, restrictions due to public health concerns, and patient refusals. When a patient had more than one completed or refused contact, compliance with Program Guide timeframes was able to be calculated. Of the 323 completed and refused contacts, 162 were for individuals who were seen at least twice by the psychiatric provider. Of those 162 contacts, there were 10 or six percent that occurred beyond Program Guide requirements with a range of 91 to 112 days. Of note, the report did not include individuals that did not have completed contacts.

The 30 mainline 3CMS patients who required initial psychiatry evaluations also required initial primary clinician evaluations during the reporting period. Of the 30 patients, 19 or 63 percent received a primary clinician evaluation within ten days of arrival or level of care change. Twenty-nine of 30 or 97 percent of reviewed patients received their evaluation in a confidential setting. The one patient refused a confidential setting due to work scheduling conflicts.

To measure timeliness of routine primary clinician contacts during the review period, CDCR produced an appointments report that included individuals who were required to receive a routine primary clinician contact.[108] For the 227 patients in CDCR's appointments report for December 1, 2024 to May 30, 2025, there were 575 completed and refused contacts. Of the 565 completed contacts, 544 or 96 percent were confidential as reported by the institution. Reasons for nonconfidential primary clinician contacts included patient refusals. When a patient had more than one completed or refused contact, compliance with Program Guide timeframes was

[108] The reviewed data captured the time between patient contacts but did not include patients who were not seen or scheduled for a routine contact with the primary clinician. Of note, the provided appointments report did not account for delays between appointments due to movements in or out of NKSP. Contact with the assigned primary clinician was unable to be determined.

able to be calculated. Of the 575 completed and refused contacts, 348 contacts were for individuals who were seen at least twice by the primary clinician. Of those 348 contacts, two or 0.5 percent occurred beyond Program Guide requirements with a range of 91 to 92 days. Of note, the report did not include individuals that did not have completed contacts, such as those that were not scheduled.

There were 565 completed individual PC contacts, of which five occurred in zero minutes, 290 occurred within 15 minutes, 67 occurred in between 16 and 30 minutes, 130 occurred in between 31 and 60 minutes, 72 occurred in between 61 and 95 minutes, and one occurred in greater than 95 minutes.

Interviewed patients on Facilities A and M praised the mental health services at NKSP. Patients reported that they were seen timely and confidentially, were not rushed by clinicians or psychiatrists, and felt heard when they spoke. Patients remarked that mainline 3CMS clinicians were approachable and accessible, even outside scheduled appointment times, and would try to help as much as possible. The senior primary clinician assigned to 3CMS care, received praise from patients on both Facilities as a careful listener and problem-solver. Patients also reported that responses to health care requests were prompt, often occurring within two days, and that they could be seen more frequently than once every 90 days if they desired and needed extra support.

Patients reported that there was a robust self-help program at NKSP. Some patients on Facility M complained about the lack of educational, pre-release, and peer support programming as well as a lack of jobs. On Facility A, patients reported that they would feel comfortable approaching custody staff to seek immediate contact with mental health staff in case of a crisis. Patients on Facility M were less comfortable in approaching custody, and one patient asserted

that custody officers were dismissive and instructed him to complete a health care request form rather than extend an effort to connect the patient with mental health staff.

Most patients had a general understanding of IDTT meetings, but very few had specific knowledge of their treatment plan or even that they had a treatment plan. On both Facility A and Facility M, patients were aware of heat alert procedures and indicated that ice water and fans were made available.

<u>Other Issues</u>:

<u>Pre-Release Planning</u>:

NKSP's pre-release planning LOP was consistent with headquarters' directive and last revised in March 2025 and, thus, up to date.

During the review period, 699 pre-release planning appointments were held for three patients at the acute level of care, three MHCB patients, 60 EOP patients, 609 3CMS patients, 11 general population individuals, and 13 unspecified incarcerated persons. There were 375 patients scheduled to release on probation; of those, 254 or 68 percent signed ROI forms. Eighty-eight patients completed CAL-ID documentation; 19 were issued, five applications were pending, 31 refused to apply, seven applications were returned, 24 applications were denied, one was pending disposition, and one was held in trust.

TCMP screened all 47 EOP and 409 3CMS eligible patients during the review period. Of those 456 patients, 404 or 89 percent submitted applications, 28 or six percent had access to other insurance, one was labeled a "county incarcerated person," two were unavailable due to late referrals, seven or two percent were unavailable due to being out to court, medical reasons, or other reasons, and 14 or three percent refused services. Of the 456 eligible patients, 401 or 88 percent applied for Medi-Cal; of the 66 patients eligible for SSI, 64 or 97 percent applied; and of

the nine eligible for VA benefits, six or 67 percent applied. Five percent were unavailable due to being out to court, medical reasons, or other reasons, and 15 percent refused services.

There were 329 patients within 120 days of their release date at the time of the site visit.

Pre-release groups met weekly on each yard throughout the review period.

The monitor found that NKSP's pre-release planning program demonstrated strong performance. One full-time pre-release planner provided individualized, timely reentry support and offered well-structured group programming that appeared useful and relevant to the patient population. The planner effectively triaged complex cases and devoted more attention to individuals with heightened needs. This staff member demonstrated a high level of commitment, as discharges were tracked even on her scheduled days off.

At the time of the visit, NKSP was in the process of adding a full-time tele-mental health clinician with reentry experience to balance the caseload of the current pre-release planner. Leadership anticipated that, with this additional staffing, the pre-release planner would expand services from the current 30-day pre-release window to 60–90 days prior to release.

Program Access:

a. Job and Program Assignments

On June 11, 2025, NKSP reported that 254 job assignments were held by 57 3CMS patients or six percent of the 3CMS population and 197 non-MHSDS individuals or 13 percent of non-MHSDS incarcerated population.

The 231 academic assignments were held by 34 3CMS patients or four percent of the 3CMS population, and 197 incarcerated individuals or 13 percent of non-MHSDS incarcerated population.

The 22 vocational education assignments were held by one 3CMS patient or less than one percent of the 3CMS population, and 24 non-MHSDS individuals or two percent of non-MHSDS incarcerated population.

The 120 substance abuse treatment assignments were held by 39 3CMS patients or four percent of the 3CMS population, and 81 non-MHSDS patients or five percent of non-MHSDS incarcerated population.

b. Milestone Credits

NKSP was unable to report the number of patients who were eligible to earn milestone credits. Nonetheless, they reported that 11 EOP patients, 145 3CMS patients, and 582 non-MHSDS incarcerated persons, earned the credits.

c. Out-of-Level Housing

NKSP reported that 37 3CMS and 22 non-MHSDS custody Level I patients were in Level II housing. Thirteen 3CMS and 37 non-MHSDS custody Level III patients were in Level IV housing. Thirteen EOP and 28 3CMS custody Level III patients were in Level IV housing.

d. ADA Reasonable Accommodations and Grievance Procedures

NKSP provided a copy of the ADA reasonable accommodation operating procedure, which was in compliance with statewide policy.

e. Unclothed Body Search

NKSP's LOP regarding unclothed body searches was in compliance with CDCR policy. Staff further reported that unclothed body searches were conducted outside of the patient's cell in a confidential area using privacy screens. Staff were knowledgeable of the unclothed body search policy and how NKSP implemented it.

"C" Status:

The institution reported a total of 11 patients on C-status at the time of the site visit. Of the 11, six were 3CMS patients and five were GP incarcerated individuals. Leadership indicated that C-status patients were all housed in unit A4A, however there was no requirement in the LOP for a specific housing unit.

The LOP stated that C-status patients were offered ten hours of exercise in an outdoor or covered enclosure. Additionally, the LOP was inconsistent regarding phone calls. In one section it states C-status patients will be allowed one phone call at least once every week, while the next section states that telephone calls are only allowed in an emergency.

The officer in unit A4A was interviewed and stated that C-status patients were not allowed to possess any electronics, including a tablet, however during heat risk months they were allowed to retain their fan, if they had one. Additionally, the officer stated that C-status patients were offered ten hours of out of cell time weekly, but that was not documented for each patient. Showers were available during the patients' out of cell time. Patients were also escorted to all ducats, if it was not during their regular out-of-cell time. C-status patients were not required to wear specific clothing.

A review of six committee actions placing 3CMS patients on C-status indicated they were deemed to be a "program failure" due to receiving two or more RVRs within a 180-day period of time. All the committee actions were within CDCR policy.

During the review period there were 54 patients placed on C-Status including one EOP patient. The patient was placed on C-status on March 4, 2025, and per CDCR policy was required to have an IDTT to address the C-status restrictions. This patient did not have a timely IDTT as the IDTT did not occur until May 15, 2025. The monitor also noted that the patient's C-status ended on May 2, 2025.

NKSP was generally noncompliant with C-status requirements. The LOP required updating regarding the grouping of C-status patients in unit A4A, clarify the access to telephone calls, and schedule an IDTT for EOP patients in a timely manner when placed on C-Status.

Case-by-Case Reviews:

The institution provided 22 ICC chronos indicating completion of the required pre-MRD review. Of the 22 patients, two were non-MHSDS, five were at the EOP level of care and 15 were at the 3CMS level of care. Of the 22 patients, 15 were retained in RHU pending completion of the RVR process and seven patients had their RHU term suspended and were released from RHU.

Regarding long-term segregated case conferences (LTSCC), the institution provided documentation of one patient who had been in RHU for 249 days. This individual was not a CDCR incarcerated person. The institution completed an LTSCC for this individual and he was retained in RHU.

Mental Health Referrals:

During the review period, NKSP reported 8,232 mental health referrals (excluding PREA referrals) consisting of 3,095 to psychiatry and 5,137 to primary clinicians. Overall, 7,148 of the 8,232 or 87 percent of referrals were completed timely.

There were 375 emergent, 571 urgent, and 7,286 routine referrals. For emergent referrals, 12 of 15 or 80 percent of psychiatry referrals and 312 of 360 or 87 percent of primary clinician referrals were timely; for urgent referrals, 40 of 45 of 89 percent of psychiatry referrals and 463 of 526 or 88 percent of primary clinician referrals were timely; and for routine referrals, 2,399 of 3,035 or 79 percent of psychiatry referrals and 3,922 of 4,251 or 92 percent of primary clinician referrals were timely.

A total of eight housing units and 15 staff were interviewed regarding their understanding of the MH-5 mental health referral process. All 15 staff were knowledgeable of the process, when and how to fill out the form, and how to get the form to mental health staff in a timely manner. All eight housing units had MH-5 forms readily available.

Custody and Mental Health Partnership Plan:

The institution LOP was current with a last revision date of March 2025 and was consistent with statewide policy.

The institution provided documentation of the required joint executive rounding during the review period. The documents indicated good overall communication between custody and mental health staff with positive reviews from interviewed patients regarding the MHSDS at the institution.

Discussion of executive joint rounding results did not occur in the warden's executive meeting. The QMC and MHPS meeting minutes were in compliance with the reporting of executive joint rounding including the information received during these executive rounds.

Daily huddles in the MHCB and EOP housing units were compliant on second and third watches during the review period. Thirty-eight huddle reports were reviewed and consistently noted that both custody and mental health staff were in attendance. The required huddle form was being used and completed with some notations regarding discharged and admitted patients. Other than new discharges and admissions of patients, the forms included very limited notations regarding patients receiving bad news, and patients exhibiting bizarre or unusual behavior. The monitor attended a second watch huddle in RHU and a third watch huddle in MHCB. Both huddles used the required form and staff were in attendance. The discussions were informative with all staff participating.

Weekly 3CMS supervisory meeting, the 3CMS monthly supervisor tours, and the monthly IAC meetings occurred as required, with very few missed meetings during the review period. Reviewed forms reflected compliance with policy requirements including discussion of mental health topics at the IAC meetings.

Regarding annual CMHPP training, the institution reported one hundred percent compliance for correctional staff, reporting the warden, six correctional administrators, five captains, 24 lieutenants, 67 sergeants and 597 correctional officers attended the annual training. For mental health staff, two chief psychologist, three senior psychologists or senior psychiatrists, twelve psychologists, eight psychiatrists, and 21 social workers attended the required annual training.

Round table training was not compliant. The provided documentation included fourth quarter 2024 and first quarter 2025 training for RHU and MHCB on second watch only; no third watch documentation was provided. In the RHU, the fourth quarter 2024 training documents included 15 custody and five mental health staff in attendance while in the first quarter of 2025, there were14 custody and four mental health staff in attendance. In the MHCB, for the fourth quarter of 2024, four mental health and one custody officer attended and for the first quarter of 2025, two mental health and two officers attended.

Introduction to EOP groups were not conducted, as reported by the institution.

The institution reported a total of 87 staff complaints were filed by a total of 55 MHSDS patients during the review period. Of the 87 complaints filed, 71 were filed by 3CMS patients and 15 by EOP patients and one by an MHCB patient. The categories of the complaints included 49 that were referred to the hiring authority and no category was identified, 13 related to use of force, ten related to integrity, four related to other misconduct, three related to sexual

misconduct, three related to discrimination, two related to dishonesty, and one related to property; two were uncategorized. The decision taken on the 87 complaints included 45 identified as staff misconduct, 27 were denied, six were reassigned, five were re-directed and four had no action.

NKSP's CMHPP was generally compliant with policy requirements, with the exception of quarterly round table training as an inadequate number of staff attended and no third watch documentation was provided.

Heat Plan:

CDCR required that each institution's heat plan LOP incorporate the requirements of the most recent Heat Plan and Updates memorandum. NKSP's heat plan LOP was current and complied with CDCR policy; it was last revised in December 2024.

The 2024 Heat Plan and Updates memorandum required that each institution submit a Heat Plan Monthly Summary Report (Summary Report), signed by the warden and CEO, to headquarters each month from May 1 to October 31. The heat plan was in effect during May 2025 of the review period. There were seven Stage I heat alerts, and zero Stage II or Stage III heat alerts during the review period.

The Heat Plan and Updates memorandum also required institutions to submit a monthly Heat Incident Log documenting the number of patients who experienced a heat-related illness. The Heat Incident Log must include the patient's information and details regarding the heat-related illness. No patients experienced heat-related illnesses during the review period.

The 2024 Heat Plan and Updates memorandum required all custody officers and leadership staff to maintain knowledge of heat plan activation and act in accordance with the requirements of each stage. A total of 20 officers were interviewed regarding their knowledge of

heat plan requirements. All demonstrated a basic knowledge of the heat plan and their responsibilities at each stage.

To ensure proper and accurate temperature recording, the annual Heat Plan and Updates Memorandum required the warden or his designee to ensure an accurate thermometer was placed in a central, heat-neutral location to monitor outside ambient air temperatures which must be recorded every hour, every day, from May 1 through October 31 of each year. Reviewed temperature logs reflected appropriate temperature recording practices every hour.

The warden or his designee is also responsible for ensuring that inside air temperatures are measured in all non-airconditioned living areas that house heat-risk incarcerated persons. Temperatures must be taken at the highest non-air-conditioned location where heat-risk incarcerated persons are housed and must be recorded every three hours. All housing unit thermometers appeared to be in good working order and were located at the correct heights. With the exception of one officer who pre-signed several entries on a temperature log prior to the actual time the temperature was taken, all reviewed temperature logs reflected appropriate temperature recording practices every three hours as required. The pre-signed temperature log was addressed with custody leadership on the monitoring tour.

In an effort to ensure that heat-risk incarcerated persons were afforded equal access to programs, services, and activities during extreme weather conditions, the 2024 Heat Plan and Updates memorandum required institutions to devise and include any reasonable accommodation and alternatives to yard activities when revising their LOP. All reasonable accommodation provided to heat-risk incarcerated persons during heat alert activation must be documented in the institution's DAR as well. Reviewed DARs noted the specific times of activation and deactivation of the heat alerts but did not indicate whether any accommodations were offered to

heat-risk patients. However, in practice, NKSP was extremely pro-active in their heat alert planning. Igloo coolers with ice and water were provided to each housing unit prior to any heat activation protocol and this continued throughout each day in which the heat plan was in effect. This process was seen in all the housing units visited.

The 2024 Heat Plan and Updates memorandum required annual training on the institution's Heat Plan. Regarding training, the warden, chief deputy warden, six correctional administrators, three out of six captains, nine out of 35 lieutenants, 34 out of 77 sergeants, and 300 out of 705 or 43 percent of correctional officers attended the required training.

For mental health staff, the chief psychologist, all psychiatrist and psychologist supervisors, and staff psychologists attended the training, as well as 37 psychiatrists, no psychiatric nurse practitioners, 8 of 13 social workers, and 121 of 199 nurses attended the required training.

RVRs:

During the review period, NKSP issued 1,919 RVRs, of which 39 were issued to acute or MHCB patients, 73 were issued to EOP patients, 732 were issued to 3CMS patients and 1,057 were issued to non-MHSDS incarcerated individuals. Of the 1,919 total RVRs, 844 or 44 percent were issued to MHSDS patients.

The monitor reviewed thirteen RVRs and related mental health assessments (MHA) to assess compliance with policy. Custody staff referred the RVR to mental health staff within policy timelines in two of 13 or 15 percent of cases. The range of days overdue was one to 11 days. Mental health staff completed the MHA and timely returned it to custody staff in 12 of 13 or 92 percent of cases. All patients were assigned a staff assistant per policy. The MHA was

completed in a private setting in eight of 13 cases with three patients refusing the interview, while two interviews were conducted in a non-private setting due to no available private space.

The senior hearing officer (SHO) documented their consideration of MHA input in six of 13 or 46 percent of cases. In the non-compliant RVRs the SHO cut and pasted the MHA responses in the hearing documentation. The SHOs mitigated penalties in eight of ten RVRs where mitigation was recommended. In two cases the SHO documented their disagreement with the recommended mitigation and assessed a loss of phone privileges for 30 and 60 days respectively.

Regarding training, all six correctional administrators, five captains, 23 lieutenants and 57 sergeants attended the required training. The warden and chief deputy warden had not attended the training. For mental health staff, two chief psychologists, three senior psychologists or senior psychiatrists, and ten psychologists attended the required training. Eleven out of 13 or 86 percent of the MHAs reviewed were completed by staff who had attended the required training.

Regarding the January 8, 2025, memorandum titled, "Limited Licensed Healthcare Staff Access to Rules Violation Reports," the institution provided training data for healthcare staff. The institution reported 21 psych techs, two senior psychologists, ten psychologists, ten psychiatrists, and two chief psychologists attended the training. The institution's CEO stated no RVRs have been written by mental healthcare staff.

<u>Use of Force</u>:

The institution reported one controlled use of force and 128 immediate use of force incidents. A total of six MHCB patients were involved in a use of force incident in addition to 29 EOP patients, 158 3CMS patients, and 171 general population incarcerated individuals.

The monitor reviewed the incident report and video for the controlled use of force incident that occurred on May 8, 2025. The incident involved an acute care patient who was refusing their PC 2602 involuntary medication. The patient was in a holding cell in the CTC during the incident. Staff completed an adequate cooldown period; multiple attempts were made by custody and mental health staff to gain the patient's compliance for the injection. The patient continued to refuse, and a controlled use of force was initiated. Physical force was used to gain control of the patient and medical staff administered the injection. No RVR was issued as a result of the use of force. A review indicated that all controlled use of force requirements were met including video footage of the incident and nursing review for exposure to chemical agents.

The monitor also reviewed nine immediate use of force incidents and viewed four AVSS videos. All immediate use of force incidents were found to be in compliance with CDCR use of force policy.

Regarding training, the institution reported that all custody classifications attended the required use of force training, including the warden, chief deputy warden, six correctional administrators, five captains, 23 lieutenants, 67 sergeants, and 598 correctional officers. For mental health staff, the institution also reported 100 percent compliance with mental health staff attending the required training.

Lockdowns/Modified Programming:

The institution reported they had no program lockdowns during the review period.

Access to Care:

NKSP provided monthly Health Care Access Quality reports from December 1, 2024 to May 30, 2025. Of the 32,350 total issued mental health ducats and add-on appointments, 23,494 or 73 percent were completed, and 8,856 or 27 percent were not completed. Of the non-

completed appointments, none across the six-month review period were due to custody factors, 5,642 or 64 percent were due to non-custody factors, and 3,214 or 36 percent were due to patient refusals.

*Coleman* Postings:

All toured housing units contained the current *Coleman* postings in English and Spanish in areas that were accessible to patients.

**APPENDIX A – 21**
**PELICAN BAY STATE PRISON (PBSP)**
Site Visit: May12, 2025 – May 16, 2025
Review Period: October 1, 2024 – March 31, 2025

Census:

On May 9, 2025, PBSP housed 1,977 incarcerated persons, which was a 25 percent increase from the preceding review. *See* Thirtieth Round Monitoring Report – Part D, ECF No. 8359 at 220 (reporting total population of 1,581 incarcerated individuals). The MHSDS population of 778 represented 47 percent of PBSP's total population and had increased by 119 percent since the preceding review. *See id.* (reporting MHSDS population of 422).

The MHSDS population included 79 mainline EOP patients and 620 mainline 3CMS patients; the 3CMS population had increased by 76 percent compared to the preceding review. *See id.* (reporting mainline 3CMS population of 353 patients).

The 3CMS RHU housed nine EOP patients and 63 3CMS patients.

The MHCB housed seven patients.

Staffing:

As of April 5, 2025, the chief psychiatrist position remained vacant, as it had been for more than a decade. Thirtieth Round Monitoring Report – Part D, ECF No. 8359 at 220. The 0.5 psychiatry position was vacant.

All five telepsychiatry positions were filled. Registry staff filled an additional 1.5 telepsychiatry positions. Overall, accounting for on-site and telepsychiatry positions, there were no vacancies among staff psychiatry positions.

Both chief psychologist positions were filled. One of two senior psychologist positions was filled, as were two of three senior psychologist specialist positions.

Of 9.5 psychologist positions, 5.5 were filled for a 42 percent vacancy rate. The use of contractors filled an additional 1.25 positions, and one psychologist was on extended leave, leaving a functional vacancy rate of 39 percent. Three psychologists were unlicensed.

Four of eight telepsychology positions were filled for a 50 percent vacancy rate. Contractors filled 0.5 telepsychology position resulting in a functional vacancy rate of 44 percent.

Overall, accounting for on-site and tele-mental health positions, there was a 41 percent functional vacancy rate among staff psychologist positions.

The supervising social worker position was filled. Six of 6.5 social worker positions were filled for an eight percent vacancy rate. The use of 1.25 contractors eliminated the vacancy rate. Four social workers were unlicensed.

Both of the tele-social worker positions were filled.

Overall, there were no functional vacancies among social worker positions.

Accounting for psychology and social worker positions, there was an overall 25 percent functional vacancy rate among primary clinician positions.

Two of eight MA positions were filled for a 75 percent vacancy rate.

Three of 4.5 recreational therapist positions were filled for a 33 percent vacancy rate.

All four RN positions were filled. Fourteen of 16 CNA positions were filled for a 12 percent vacancy rate. The LVN position was filled.

All three senior psych tech positions were filled. All ten psych tech positions were filled.

Eight of ten MHSDS clerical positions were filled for a 20 percent vacancy rate.

Of the two HPSI positions, 1.5 were filled for a vacancy rate of 25 percent. The OSS II position was filled.

The HPSII and CHSA positions were vacant.

Regarding custody staff, 662 of 665.4 positions were filled for a one percent vacancy rate. The warden position and the chief deputy warden position were filled. Four of five associate warden positions, all five captain positions, 26 of 26.6 lieutenant positions, 62 of 63.6 sergeant positions, all 15 CC I positions, and all nine CC II positions were filled. For correctional officers, 539 of 539.2 positions were filled.

Tele-Mental Health:

Telepsychiatry provided services to MHCB, EOP, and 3CMS patients. Three telepsychiatrists provided services to 3CMS patients. In addition, two telepsychiatrists provided services to EOP and MHCB patients, respectively.

In addition, MHSDS clerical staff were allowed to work five days per week remotely.

Staff Recruitment:

PBSP reported that the department had implemented initiatives to assist with staff recruitment, including the regional hiring expediting the hiring process for the *Coleman* classifications. The institution also indicated increasing marketing efforts for *Coleman* classifications, implementing mid-step hiring practices, offering recruitment and retention differentials as well as annual bonuses. In addition, the institution reported offering incentives for in-person patient care and allowing additional payment to psychiatry and psychology staff who worked additional caseloads. Unfortunately, leadership explained that the recruitment efforts were not successful in ameliorating this institution's longstanding struggles to recruit and retain mental health professionals and, further, that there was a serious need for additional staff.

Quality Management:

PBSP had an adequate quality management system in place to address issues related to mental health treatment during the review period.

During the review period, the local governing body met quarterly and achieved a quorum at all meetings. Reviewed meeting minutes reflected the discussion of committee appointments, CTC privileging, licensing, program subcommittee reports, backlog status, pharmacy updates, PIWPs, policies and procedures, disaster drills, budgetary issues, and audits.

The quality management committee met monthly and achieved a quorum at all meetings. Meeting minutes were comprehensive and useful in content. Regular agenda items included review of key indicators, health care access unit reports, program subcommittee reports, joint executive rounding, suicide prevention, training, out of compliance measures, quality improvement projects, and changes to LOPs. The minutes consistently reflected that all performance measures were being constantly monitored, with deficiencies being addressed through the appropriate subcommittees. Additional items discussed during QMC meetings included the heat plan operational directive update, influenza vaccine clinic, upcoming OIG inspection, upcoming EOP minor sustainable process visit, and DDP joint compliance review. No mental health program recommendations were noted during the review period.

The mental health subcommittee met monthly during the review period and consistently achieved a quorum. The chief of mental health served as chairperson. Meeting minutes covered topics including emerging trends, incident reports, performance reports, results of RVR audits, custody and mental health partnership plan, audits, approval of local operating procedures, suicide prevention, peer reviews, staffing, staff training, survey analysis for evaluating risk

(SAFER) metrics, and higher level of care referrals. There were no recommendations to the QMC. The mental health program did not have any PIWPs during the review period.

PBSP did not have any QITs or FITs during the review period.

The EMRRC met twice monthly and attained quorums. The EMRRC followed the standard statewide template. Reviewed meeting notes were comprehensive and addressed several areas of importance to mental health, including suicide attempts, treatment of opiate overdoses, and emergency transports to outside hospitals.

PBSP local policies and procedures governing peer review for the correctional treatment center, licensed psychologists, social workers, psychiatrists, and psychiatric nurse practitioners were consistent with statewide policy. PBSP complied with timely peer review for MHCB psychiatrists and psychologists. All reviewed clinicians were reported to have met the standard of care. The institution reported that the reviewer discussed the results with the clinician; however, no minutes were provided for the mental health peer review committees. No trends were identified. Outpatient peer review remained on hold.

Medication Management:

PBSP provided MAPIP results from October 1, 2024, to March 31, 2025, regarding compliance for psychiatric diagnostic monitoring and medication management.

Diagnostic monitoring for patients prescribed atypical antipsychotics demonstrated that PBSP was compliant for all six months for blood pressure, height, weight, and EKGs when required. Complete Blood Count (CBC) with platelets and Comprehensive Metabolic Panel (CMP) were compliant two of the six months, medication consents and glucose monitoring were compliant one of the six months, with the Abnormal Involuntary Movement Scale (AIMS) and thyroid monitoring was non-compliant for all six months.

PBSP was not a clozapine initiation or maintenance facility during the monitoring period. The facility reported no patients prescribed clozapine during the monitoring period or at the time of the monitoring tour; however, PBSP documented 100 percent compliance for clozapine glucose, lipid and CMP monitoring in March 2025, and height in November of 2024. There were no documented required monitoring of AIMS, blood pressure, CBC, EKGs, medication consents, thyroid test monitoring or weights for patients on clozapine.

For required monitoring of antidepressants, the institution reported noncompliance for six months with obtaining medication consents and thyroid function tests and reported compliance for all six months for monitoring blood pressure for patients taking venlafaxine. PBSP reported that EKGs were required during the monitoring period for one month.

For patients prescribed carbamazepine, PBSP was compliant for the one required month with obtaining levels and CBCs. PBSP reported that no CMP, and medication consents, were required during the reporting period.

Regarding Depakote, PBSP was compliant for four of the six required months in obtaining medication consents and three of six months with monitoring CBC with platelets, one of the required five months for CMP monitoring and compliant one of six months for the monitoring of Depakote levels.

For lamotrigine, the institution was compliant for obtaining medication consents for the three of four required months.

Regarding lithium, PBSP was compliant for two of the five required months with obtaining medication consents. For checking kidney function tests and EKGs PBSP was compliant for two of four required months. Compliance was obtained for three of five required

months for thyroid testing and non-compliant for obtaining lithium levels for five required months.

For nursing medication management metrics, beginning with continuity of medications - PBSP was compliant for five of six months with continuity of N/A/DOT medications with intra-institutional transfer to restricted housing (RHU). PBSP was non-compliant all six months with continuity of medications upon inter-institutional transfer at R&R; compliant for two of four months for continuity of medications with intra-institutional transfers to non-RHU locations, compliant one of six months for MHCB transfers, two of four months when transferring from a community hospital or DSH and compliant with continuity of medications when paroling or transferring to the community.

Medication compliance with PC 2602 court orders were achieved three of six months, and compliance with PC 2602 medication orders were achieved three of four months required. Observation of medication preparation HS was compliant all six months and observed preparations of A.M. and P.M. medications were non-compliant all six months. Observation of chronic care medications historical administration by psychiatrists and medical providers were compliant all six months; and compliant five of six months for outpatient new medication orders prescribed by a psychiatrist and compliant for four of six months for medical providers prescribing new outpatient orders.

Transfers:

The institution's inpatient coordinator was a senior psychologist specialist who had held the role of inpatient coordinator since October 2024. Her other duties included sustainable process auditing, DDP, special evaluations, and gender dysphoria evaluations. She previously served as a clinical psychologist at PBSP for 15 years. The backup inpatient coordinator was the

senior psychologist supervisor and previously served as the inpatient coordinator for nearly six years. The inpatient coordinator attributed the institution's success with meeting required inpatient transfer timeframes to good communication and low volume of referrals. She further noted occasional pushback from IRU or on rare occasions from the PIPs themselves but, for the most part, reported positive working relationships with HCPOP, IRU, and the PIPs.

During the review period, there were seven acute and two intermediate care referrals resulting in six acute and one intermediate care admissions. All admissions were timely. In addition, one referral to acute care and one referral to intermediate care were rescinded.

There were 328 instances of 131 patients considered for, but not referred to, inpatient care. No referrals were for patients with complex medical needs. On May 15, 2025, one patient had been pending transfer to acute care for fewer than ten days.

PBSP made 306 MHCB referrals during the review period resulting in 256 admissions and 50 rescissions. Of the 256 admissions, 57 admissions were to MHCBs at other institutions. Of the 306 referrals, 300 or 98 percent resulted in alternative housing stays of less than 24 hours. Of the 256 MHCB admissions, 234 or 91 percent timely occurred within 24 hours.

The institution did not track compliance with Program Guide timeframes for transfers to EOP RHUs during the review period. The institution had an on-site 3CMS RHU there were reportedly no placement delays.

Thirty-five patients transferred from the EOP to 3CMS program during the review period.

There were 125 3CMS patients transferred to the MSF during the review period.

<u>Programming:</u>

<u>MHSDS Patients in Restricted Housing</u>:

<u>3CMS RHU</u>

The RHU Policy required that patients assigned to a 3CMS RHU be offered a minimum of 20 hours of out-of-cell time each week, including 18.5 hours of recreational time outside the cell and 90 minutes of confidential, structured therapeutic activities. *See* ECF No. 8355 at 7-17 (Restricted Housing Unit Program: Mental Health Services Policy, dated July 19, 2024 and effective August 1, 2024) (hereinafter "RHU Policy").

Between September 30, 2024 and March 31, 2025, on average, 3CMS RHU patients were offered 1.6 hours, attended 0.7 hours, and refused 0.9 hours of structured therapeutic activities per week.

*IDTTs*

The monitor's expert observed 11 3CMS RHU IDTT meetings, which were attended by all required disciplines. The psychiatrist and psychologist each participated via tele-mental health, while two social workers, the social work supervisor, a psych tech, and the CC II were present in person. The assigned primary clinicians and psychiatrist attended for all patients.

Four patients attended their IDTT meetings in person, while seven cases were reviewed *in absentia* due to patient refusals. The team conducted the *in absentia* IDTT meetings with the same level of thoroughness as in-person reviews. Each discussion was led by the assigned primary clinician, with active participation from all team members, including questions and input from each discipline. The RHU staff appeared to have very good working relationships, and I noted that custody and mental health personnel communicated well and demonstrated effective integration of their roles in the monitoring and care of patients in restricted housing.

The IDTTs addressed patient functioning, progress toward treatment goals, barriers to care, case formulation, LOC justification, medication management, and participation in

programming. Patients present for the IDTT were offered opportunities to ask questions and provide input regarding their goals and treatment plans.

The meeting space was adequate for confidentiality. After patients were escorted in by an officer, the officer remained standing behind the patient throughout the meeting. The psychologist lost connection for approximately five minutes due to a technical issue with the tele-mental equipment, but this did not appear to significantly disrupt the proceedings.

No barriers to staff attendance, patient participation (aside from refusals), or timely IDTTs were noted. The team demonstrated familiarity with both present and absent patients, and their discussions were thorough. However, while staff consistently discussed treatment goals with patients and solicited their input, most interviewed patients were unable to identify their goals, indicating a need for clearer communication of treatment planning to patients.

Overall, the team's approach was collaborative and comprehensive, with room for improvement in ensuring patients understand their treatment goals.

The RHU Mental Health Policy requires initial IDTT meetings in 3CMS RHU to occur before the initial ICC and within ten calendar days of arrival. RHU Policy at 5. Routine IDTT meetings are required every 90 calendar days following the initial IDTT. *Id.*

The monitor randomly selected and reviewed the healthcare records of 30 3CMS RHU patients to assess compliance with Program Guide timeframes for initial IDTTS during their stays. All 30 patients required initial IDTTs. Of the 30 reviewed initial IDTTs, six or 20 percent occurred timely within ten calendar days or arrival or level of care change. Twenty-eight or 93 percent of IDTTs were attended by all required staff and 15 or 50 percent were attended by the patients. Initial IDTTs were held *in absentia* due to patient refusals.

To measure timeliness of routine 3CMS RHU IDTT meetings, CDCR produced an appointments report that included individuals who were required to receive a routine IDTT meeting during the review period. For the 155 patients in CDCR's appointments report, there were 209 completed and refused routine IDTTs. When a patient had either a completed or refused initial IDTT and a routine IDTT or more than one routine IDTT, compliance with RHU Policy timeframes was able to be calculated. Of the 208 IDTTs that were completed, 55 were for individuals who had at least two IDTTs. Of those, 44, or 80 percent were not compliant with RHU Policy timeframes. Of note, the report did not include individuals that did not have a completed IDTT, such as those that were not scheduled.

*Group Treatment*

During the monitoring tour, the monitor's expert observed a symptom management group in the 3CMS RHU, attended by three 3CMS patients. The group session was held in an adequate, confidential space and focused on strategies for managing psychiatric symptoms. The group content was clinically appropriate for the population. No environmental or custody-related disruptions were noted during the session. Patients confirmed that weekly groups were consistently offered, and the group observed was consistent with policy requirements for 3CMS RHU programming.

The monitor's expert interviewed three participating patients regarding their access to and experience with mental health services in the 3CMS RHU. All three reported weekly sessions with their primary clinician and monthly by the psychiatrist and were aware of the process for requesting additional mental health visits via the 7362 form. However, each patient expressed a desire for more one-on-one time with mental health staff. Patients reported that they had adequate access to yard and showers. When asked about their treatment plan goals, patients

indicated awareness but were vague in describing specific objectives, suggesting a need for clearer communication or engagement regarding individualized treatment planning. All patients described mental health staff as respectful and helpful and did not identify any barriers to care or complaints regarding staff behavior.

*Individual Treatment*

The RHU Policy requires that all patients placed into 3CMS RHU receive an initial primary clinician evaluation within ten days of arrival and an initial psychiatry evaluation prior to the IDTT and within ten days of arrival. *See* RHU Policy at 4. The RHU Policy also requires that 3CMS RHU patients receive weekly primary clinician contacts and psychiatry contacts every 90 days. *See id*.

The monitor randomly selected and reviewed the healthcare records of 30 3CMS RHU patients to assess compliance with Program Guide timeframes during their stays. All 30 patients required initial psychiatry evaluations; 16 or 53 percent timely occurred before the initial IDTT. Of the 27 reviewed cases, 24 or 89 percent were conducted in confidential settings; non-confidential contacts were due to patient refusals. Telepsychiatry was utilized for all initial psychiatry evaluations.

To measure timeliness of routine psychiatry contacts, CDCR produced an appointments report that included individuals who were required to receive a routine psychiatry contact during the review period. For the 70 patients in CDCR's appointments report covering patients who received at least one routine psychiatry contact during the review period, there were 126 total completed and refused contacts. Of the 123 that were completed, 94 or 76 percent were conducted in a confidential setting. When a patient had more than one completed contact, compliance with RHU Policy timeframes was able to be calculated. Of the 123 completed

contacts, 57 were for individuals who were seen at least twice by a psychiatric provider. Of those 57 contacts, 21 or 37 percent of contacts were completed beyond the RHU Policy required timeframes. Of note, the report did not include individuals that did not have complete contacts, such as those that were not scheduled in accordance with the institution's triage plan.

All 30 patients who required initial psychiatry evaluations also required initial primary clinician evaluations. Of the 30 reviewed initial primary clinician contacts, 24 or 80 percent were completed within ten calendar days of arrival or change in level of care. Seventeen or 57 percent of reviewed initial primary clinician evaluations were conducted in a confidential setting; non-confidential contacts were due to patient refusals and modified programming.

To measure timeliness of routine primary clinician contacts, CDCR produced an appointments report that included individuals who were required to receive a routine primary clinician contact during the review period. For the 117 patients in CDCR's appointments report covering patients who received at least one routine primary clinician contact during the review period, there were 758 total contacts; all were completed. Of the 758 completed contacts, 291 or 38 percent were conducted in a confidential setting. When a patient had more than one completed contact, compliance with RHU Policy timeframes was able to be calculated. Of the 758 completed contacts, 642 were for individuals who were seen at least twice by a primary clinician. Of those 642 contacts, 15 or two percent of contacts were completed beyond the RHU Policy required timeframes. Of note, the report did not include individuals that did not have completed contacts, such as those that were not scheduled in accordance with the institution's triage plan.

Of the 758 completed routine primary clinician contacts, five contacts were reported to have been completed in zero minutes, 555 were completed within 15 minutes, 132 lasted

between 16 and 30 minutes, 57 lasted between 31 and 60 minutes, eight lasted between 61 and 95 minutes, and one was completed in greater than 95 minutes.

The monitor observed nine ICCs, all of which were attended by required staff. Two patients were eligible for NDS 200 status, two patients were eligible for NDS 102 status, and one was assigned NDS status during the ICC. All nine patients had been placed in restricted housing for safety or enemy concerns; aside from the two patients who were eligible for NDS 200 status, the remaining seven patients were retained pending the completion of an investigation.

Twenty-two weeks of reviewed 114-As revealed the offering of at least ten weekly hours of yard, and the offering of three weekly showers, weekly linen exchanges and clothing exchanges. Patients were offered multiple phone calls a week.

Non-Disciplinary Restricted Housing:

As of May 9, 2025, a total of 17 patients were on NDRH status including four EOP patients and 13 3CMS patients. One EOP patient was NDRH 200 and all the remaining patients did not qualify for expedited transfer or were pending safety investigations.

MHCB:

PBSP's MHCB had ten licensed MHCB beds and one unlicensed bed. All ten licensed beds were full on May 15, 2025.

Mental health leadership reported that MHCB caseload ratios varied because MHCB clinicians provided coverage on different days and did not have permanent caseloads.

The MHCB's daily census averaged 8.6 patients during the review period. Clinical lengths of stay averaged 7.4 days; approximately 19 percent of patients' clinical stays exceeded ten days. Physical stays similarly averaged 7.5 days with approximately 19 percent of patients'

physical stays exceeding ten days. Three patients physically discharged more than 72 hours after clinical discharge.

Twenty-seven patients were admitted to the MHCB three or more times during the review period.

*IDTTs*

The Program Guide requires initial MHCB IDTT meetings to occur within 72 hours of arrival and routine IDTTs at least weekly thereafter. ECF No. 7333-1 at 83-84 (PG 12-5-12). Thirty MHCB patients required initial IDTTs; 29 or 97 percent occurred within 72 hours of arrival. In addition, 21 or 70 percent of initial IDTTs had the required staff in attendance. Notably, the RN was absent for all nine IDTTs. Patients attended 26 or 87 percent of initial IDTTs. Initial IDTTs were held in absentia due to patient refusals.

All 30 MHCB patients required routine IDTTs. There were 31 expected routine IDTTs. Of the 31 reviewed routine IDTTs, all 31 occurred timely, or every seven calendar days following the initial IDTT. Eighteen or 58 percent of routine IDTTs had the required staff in attendance. Notably, the RN was absent for the other 13 IDTTs. Of the 31 routine IDTTs reviewed, patients attended 30 or 97 percent of the time. Patient refusal was the reason the routine IDTT was held in absentia.

*Individual Treatment*

The Program Guide requires initial psychiatry and primary clinician evaluations to occur within 24 hours of admission to MHCB. The monitor randomly selected and reviewed the healthcare records of 30 MHCB patients to assess compliance with Program Guide timeframes for initial evaluations during their stays.

Thirty MHCB patients required initial psychiatry evaluations. Of those, 27 or 90 percent had a timely initial psychiatry evaluation meaning it occurred before the initial IDTT and within 24 hours of arrival. Twenty-four or 80 percent of initial psychiatry evaluations occurred in a confidential setting. Reasons reported for non-confidentiality included patient refusals. Telepsychiatry was utilized for all 30 initial psychiatry contacts.

Thirty MHCB patients required initial primary clinician evaluations; 29 or 97 percent were completed within 24 hours of arrival. Of the 30 initial primary clinician contacts reviewed, 21 or 70 percent were held in a confidential setting. Reasons reported for non-confidentiality included patient refusals, unavailable confidential space, and modified programming. There were no initial contacts reported utilizing tele-mental health.

The Program Guide also requires MHCB patients to be assess daily by either the treating psychiatrist or psychologist. ECF No. 7333-1 at 84 (PG 12-5-13). Further, the assigned psychiatrist is required to evaluate each MHCB patient twice weekly. *Id.* at 85 (PG 12-5-14).

Twenty-nine MHCB patients required two routine psychiatry contacts per week. There were 70 expected contacts with 99 percent timely compliance. Of the 70 reviewed contacts, 61 or 87 percent occurred in a confidential setting. Contacts were held in non-confidential settings due to patient refusal. Telepsychiatry was utilized for all 70 routine psychiatry contacts.

Thirty MHCB patients required routine primary clinician contacts. There were 182 expected timeframes, 133, or 73 percent were timely. Of the 182 reviewed contacts, 80 or 44 percent were conducted in a confidential setting. Reasons for non-confidentiality included patient refusals, lack of available confidential space or custody escorts, and modified programming.

MHCB patients were offered dayroom, yard, and recreational therapy contacts. Two weeks of CDC 114-A data for 39 MHCB patients further revealed that patients were offered three or more showers, two linen exchanges, two clothing exchanges, and phone calls weekly.

Seclusion and Restraint:

PBSP reported that clinical restraints and seclusion were not utilized during the review period.

EOP:

The EOP census at the time of the monitoring tour was 79 patients, as reported above. Two telepsychologists, one unlicensed psychologist, one social worker, and one telepsychiatrist were assigned to the EOP program. The unlicensed psychologist and LCSW had caseloads within established ratios while the two telepsychologists and telepsychiatrist had caseloads exceeding established ratios.

During the review period and monitoring tour, EOP patients at PBSP were housed in Building B1 which was designated as a Level IV EOP. Building B1 had a maximum capacity of 128 beds and Building B2 was used for overflow. At the time of the monitoring tour, the PBSP Chief Psychologist was acting as the EOP program supervisor and was reportedly being considered to fill the supervisor position on a permanent basis.

Treatment and services were provided in the EOP treatment building located near the EOP housing unit. Clinicians also had access to a "swing space" and annex resulting in eight total individual offices. The monitor's expert observed adequate treatment spaces in the EOP treatment building including four individual offices that provided adequate privacy, a sound confidential group room with capacity for 12-15 patients, and a day room with game tables and a

TV. The individual and group treatment spaces were sound confidential from custody but not necessarily sight confidential from other patients.

*Structured Treatment*

The Program Guide required that each EOP patient be offered at least ten hours per week of structured therapeutic activities. *See* ECF No. 7333-1 at 58. For patients who were determined by the treatment team to be clinically contraindicated for ten hours of treatment activities per week, the primary clinician is required to present the case and recommended treatment program (i.e. EOP modified programming) to the IDTT for approval. If the patient's modified treatment program included a schedule of less than ten hours of treatment per week, the patient's IDTT was required to meet monthly to review and increase the amount of structured therapeutic activities, or refer the patient to a higher level of care as clinically indicated. *Id*.

EOP patients were scheduled for an average of 14.7 hours of structured therapeutic activities, offered 9.3 hours per week, attended 5.3 hours per week, and refused four hours per week; 4.7 hours of structured therapeutic activities were cancelled per week. The primary reason for cancellations was custody modified programming.

Between four and 11 patients were on EOPMod status during each week of the review period. The monitor's expert interviewed several patients, all of whom reported they were offered weekly 1:1 contacts with their primary clinician in a confidential setting, but that groups were heavily impacted by scheduling issues, custody modified programming, and lack of staff.

*IDTTs*

The monitor's expert observed nine EOP IDTTs during the monitoring tour, which were appropriately staffed by the patient's primary clinician, the telepsychiatrist, tele-presenter, RT, RN, CC I, the PBSP education coordinator, and Chief Psychologist/Program Supervisor. The

patient was present for eight of nine IDTT meetings. One initial IDTT meeting in particular was inadequate and lacked individualized treatment goals and interventions and it was unclear whether the initial primary clinician evaluation had been completed. The remaining IDTT meetings were generally very well organized and facilitated and most met audit criteria. Treatment planning involved the patients and was collaborative, individualized, and appropriate.

The Program Guide requires that EOP patients receive an initial IDTT within 14 calendar days of arrival to the institution and a routine IDTT every 90 days thereafter. *See* ECF No. 7333-1 at 57, 59.

The monitor randomly selected and reviewed the healthcare records of 30 mainline EOP patients to assess compliance with Program Guide timeframes for IDTTs during their stays. All 30 patients required initial IDTTs. Of the 30 reviewed initial IDTTs, 22 or 73 percent occurred timely within 14 calendar days or arrival or level of care change. All 30 were attended by required staff and 20 or 67 percent were attended by the patients. Reasons initial IDTTs were held *in absentia* included patient refusals and custody modified programming.

To measure timeliness of routine EOP IDTT meetings, CDCR produced an appointments report that included individuals who were required to receive a routine IDTT during the review period. For the 144 patients in CDCR's appointments report, there were 245 completed routine IDTTs. When a patient had a completed initial IDTT and a routine IDTT or more than one routine IDTT, compliance with Program Guide timeframes was able to be calculated. Of the 245 IDTTs that were completed, 103 were for individuals who had at least two IDTTs. Of those, nine or nine percent were not compliant with Program Guide timeframes. Of note, the report did not include individuals that did not have a completed IDTT, such as those that were not scheduled.

*Group Treatment*

EOP patients were offered clinician-led mental health groups, RT groups, and NLTGs. There were significantly more RT groups offered than clinical groups due to the shortage of primary clinicians. Group topics included introduction to EOP, symptom management, life skills, stress management, and recreational therapy. Groups were scheduled in three-hour blocks with RT groups from 7:45 am-10:45 am and clinical groups from 11:45 am-2:45 pm. Two of the weekly clinical groups were facilitated by a primary clinician. Notably, the anticipated length of the group sessions (three hours) was very difficult for most EOP patients to tolerate.

EOP patients were offered four NLTG groups per day that included several mental health related topics. The interviewed patients reported satisfaction with the quality and subject matter of the NLTGs.

The monitor's expert observed two clinician-led groups and one RT group. The overall quality of the clinical groups depended heavily upon the primary clinician facilitating the group. The Life Skills clinical group facilitated by a social worker was clinically appropriate and useful for the patients. The social worker had excellent rapport with patients and was obviously passionate about the work. The Symptom Management Group was facilitated by a different primary clinician and was inadequate. The group start time was delayed by one full hour due to count and medication pass. It was scheduled for 10:45 am and began at 11:45 am. The group was not well facilitated and included very limited content related to the group topic. Instead, the patients played a problem-solving game and while the process was interactive, there was little to no clinical focus and no psychoeducation about symptom management. The facilitator had difficulty maintaining group boundaries and keeping the members on topic. The RT group was also delayed and began 45 minutes after the scheduled start time. Delays were reportedly caused

by a yard alarm and restricted movement. This group was well facilitated and organized. The patients performed an art-based activity that required engagement with the facilitator and each other. The patients were engaged throughout the observation and appeared to benefit.

*Individual Treatment*

The Program Guide requires that EOP patients are offered an initial psychiatrist evaluation before their initial IDTT and within 14 calendar days of arrival to the institution or level of care change. *See* ECF No. 7333-1 at 57. Thereafter they are required to receive a routine psychiatric contact every 30 calendar days. *Id*. at 59. Patients are also required to receive a primary clinician evaluation within 14 calendar days of arrival and weekly (i.e. once per calendar week with no more than ten calendar days between contacts) with either a primary clinician or in a group setting with an individual contact every other week. *Id*. at 57, 59.

The monitor randomly selected and reviewed the healthcare records of 30 mainline EOP patients to assess compliance with Program Guide timeframes for initial psychiatry evaluations during their stays. All 30 patients required initial psychiatry evaluations; 29 or 97 percent timely occurred before the initial IDTT. Twenty-one or 70 percent of the reviewed initial psychiatry evaluations were conducted in confidential settings; the non-confidential contacts were due to patient refusals and custody modified programming. Telepsychiatry was utilized for 100 percent of initial psychiatry evaluations.

To measure timeliness of routine psychiatry contacts, CDCR produced an appointments report that included EOP patients who were required to receive a routine psychiatry contact during the review period. For the 99 patients in CDCR's appointments report, there were 245 total completed contacts. Of the 245 completed contacts, 193 or 79 percent were reported as being conducted in a confidential setting. When a patient had more than one completed contact,

compliance with Program Guide timeframes was able to be calculated. Of the 245 completed contacts, 148 were for individuals who were seen at least twice by a psychiatric provider. Of those 148 contacts, 45 or 30 percent of contacts were completed beyond the Program Guide required timeframes. Of note, the report did not include individuals that did not have completed contacts, such as those that were not scheduled as a result of the institution's triage plan.

The same 30 patients who required initial psychiatry evaluations also required initial primary clinician evaluations. Of the 30 reviewed initial primary clinician evaluations contacts, 27 or 90 percent were completed within 14 calendar days of arrival or change in level of care. Nineteen or 63 percent of reviewed initial primary clinician evaluations were conducted in a confidential setting; non-confidential contacts were due to patient refusals. Tele-mental health was utilized for seven or 23 percent of initial primary clinician evaluations.

To measure timeliness of routine primary clinician contacts, CDCR produced an appointments report that included EOP patients who were required to receive a routine primary clinician contact during the review period. For the 110 patients in CDCR's appointments report, there were 862 total completed contacts. Of the 862 completed contacts, 560 or 65 percent were reported as being conducted in a confidential setting. When a patient had more than one completed contact, compliance with Program Guide timeframes was able to be calculated. Of the 862 completed contacts, 753 were for individuals who were seen at least twice by a primary clinician. Of those 753 contacts, 25 or three percent of contacts were completed beyond the Program Guide required timeframes. Of note, the report did not include individuals that did not have completed contacts, such as those that were not scheduled as a result of the institution's triage plan.

Of the 862 completed routine primary clinician contacts, three contacts were reported to have been completed in zero minutes, 439 were completed within 15 minutes, 328 lasted between 16 and 30 minutes, 85 lasted between 31 and 60 minutes, and seven lasted between 61 and 95 minutes.

During interviews, patients and mental health staff reported several obstacles to consistent and adequate care. First, all of the patients interviewed by the monitor's expert reported dissatisfaction with tele-mental health, explaining that they found it difficult to establish rapport and trust with the provider through a video screen. Patients reported fewer concerns with telepsychiatry because those sessions were generally focused on medication management, but active therapy and processing were severely impacted and patients were reluctant or unable to establish rapport with the tele-mental health primary clinician. Further, the lack of wireless internet connectivity in the housing units, was very concerning and had a significant impact on treatment in light of the institution's relatively heavy reliance on tele-mental health care. Several tele-mental health providers and tele-presenters reported being unable to provide clinical contacts or cell front check-ins due to poor wireless connectivity on the housing units.

Staff and patients reported that group times were often significantly delayed due to numerous overlapping scheduling conflicts including morning yard, medication pass, NLTGs, and morning groups with similar start times. Further, staff and patients reported that these scheduling conflicts contributed to patient refusals. Custody movement restrictions also delayed patients and contributed to group start delays.

<u>3CMS</u>:

The staff-to-patient ratios from the 2009 Staffing Plan and 2021 adjustments to the 2009 staffing plan required that staff psychiatrists who treat 3CMS patients maintain a caseload of 280

patients per psychiatrist if the patient was prescribed medications and 675 patients if the patient was not prescribed medications.[109] *See* ECF No. 3693 at 12 and 6978-1 at 3. Staff-to-patient ratios from the 2009 Staffing Plan required that primary clinicians who treat 3CMS patients maintain a caseload of 97 patients per clinician. *See* ECF No. 3693 at 12.

Five 3CMS primary clinicians and two 3CMS psychiatrists had caseloads that exceeded staff-to-patient ratios.

*IDTTs*

Initial IDTTs for 3CMS patients are required to occur within 14 working days of arrival to the institution or level of care change and annually thereafter. *See* ECF No. 7333-1 at 43-44.

The monitor randomly selected and reviewed the healthcare records of 30 mainline 3CMS patients to assess compliance with Program Guide timeframes for initial IDTTs during their stays. All 30 patients required initial IDTTs. Of the 30 reviewed initial IDTTs, none occurred timely within 14 calendar days or arrival or level of care change. Required staff attended 17 or 57 percent of IDTTs; the custody counselor was missing in 10 IDTTs. Patients were in attendance for 14 or 47 percent of IDTTs. Reasons initial IDTTs were held *in absentia* included patient refusals and custody modified program.

[109] The Program Guide requires that "[e]ach CCCMS inmate patient on psychiatric medication…be reevaluated by a psychiatrist a minimum of every 90 days regarding psychiatric medication issues." (Program Guide at 12-3-11). The 2009 Staffing Plan established a psychiatry staffing ratio for every 3CMS patient in the general population and did not distinguish between patients on medications and patients who were not. See ECF No. 3693 at 8. The Adjustments to the 2009 Staffing Plan, ECF No. 6978-1, which were approved by the Court on January 27, 2021 (See ECF No. 7035 at 2), established a new staffing ratio of 675 patients per psychiatrist for patients who are not on medications for six months or more. For the purpose of reporting compliance with staff-to-patient ratios, it was unclear whether the patient's included in each reported caseload were prescribed medications at the time of the site visit.

To measure timeliness of routine 3CMS IDTT meetings, CDCR produced an appointments report that included individuals who were required to receive a routine IDTT during the review period. For the 659 patients in CDCR's appointments report, there were 690 completed routine IDTTs and no refusals. When a patient had either a completed or refused initial IDTT and a routine IDTT or more than one routine IDTT, compliance with Program Guide timeframes was able to be calculated. Of the 690 IDTTs that were completed, 34 were for individuals who had at least two IDTTs. Of those, all were compliant with Program Guide timeframes. Of note, the report did not include individuals that did not have a completed IDTT, such as those that were not scheduled.

A random sample of 30 patients was selected to verify consistency between the appointments report and clinical documentation in EHRS. Of the 33 contacts reviewed, all were consistent with information contained in the appointments report.

*Individual Treatment*

The Program Guide requires that patients are offered an initial psychiatrist evaluation before their initial IDTT. *See* ECF No. 7333-1 at 34-50, 641. Thereafter they are required to receive a routine psychiatric contact every 90 calendar days if the patient is prescribed a psychotropic medication. *Id*. at 44. Patients are also required to receive an initial primary clinician evaluation within ten working days of arrival and every 90 calendar days thereafter. *Id*. at 41, 48.

The monitor randomly selected and reviewed the healthcare records of 30 mainline 3CMS patients to assess compliance with Program Guide timeframes for initial psychiatry evaluations during their stays. All 30 patients required initial psychiatry evaluations; 11 or 37 percent timely occurred before the initial IDTT. Twenty-eight or 97 percent of the 29 reviewed

cases were conducted in confidential settings; the non-confidential contact was due to a patient refusal. Telepsychiatry was utilized for all initial psychiatry evaluations.

To measure timeliness of routine psychiatry contacts, CDCR produced an appointments report that included individuals who were required to receive a routine psychiatry contact during the review period. For the 458 patients in CDCR's appointments report covering patients who received at least one routine psychiatry contact during the review period, there were 687 completed contacts. Of those, 683 or 99 percent were reported as being conducted in a confidential setting. When a patient had more than one completed contact, compliance with Program Guide timeframes was able to be calculated. Of the 687 completed contacts, 231 were for individuals who were seen at least twice by a psychiatric provider. Of those 231 contacts, 71 or 31 percent of contacts were completed beyond the Program Guide required timeframes. Of note, the report did not include individuals that did not have complete contacts, such as those that were not scheduled as a result of the institution's triage plan.

A random sample of 30 patients was selected to verify consistency between information contained in the appointments report and clinical documentation in EHRS. Of the 54 contacts reviewed, all were consistent with information contained in the appointments report.

The same 30 patients who required initial psychiatry evaluations also required initial primary clinician evaluations. All 30 patients required initial primary clinician evaluations. Of the 30 reviewed initial primary clinician evaluations contacts, nine or 30 percent were completed within 10 calendar days of arrival or change in level of care. Twenty-eight or 93 percent of reviewed initial primary clinician evaluations were conducted in a confidential setting; reasons for non-confidential contacts included custody modified programming. Tele-mental health was utilized for 16 or 53 percent of initial primary clinician evaluations.

To measure timeliness of routine primary clinician contacts, CDCR produced an appointments report that included individuals who were required to receive a routine primary clinician contact during the review period. For the 677 patients in CDCR's appointments report, there were 1,110 completed contacts. Of the 1,110 completed contacts, 1,074 or 97 percent were reported as being conducted in a confidential setting. When a patient had more than one completed contact, compliance with Program Guide timeframes was able to be calculated. Of the 1,110 contacts, 436 were for individuals who were seen at least twice by a primary clinician provider. Of those 436 contacts, 137 or 31 percent were completed beyond the Program Guide required timeframes. Of note, the report did not include individuals that did not have completed contacts, such as those that were not scheduled as a result of the institution's triage plan.

Of the 1,110 completed routine primary clinician contacts, three contacts were completed in zero minutes, 526 were completed within one to 15 minutes, 374 lasted between 16 and 30 minutes, 190 lasted between 31 and 60 minutes, 14 lasted between 61 and 95 minutes, and three were completed in greater than 95 minutes.

A random sample of 30 patients was selected to verify consistency between the appointments report and clinical documentation in EHRS. Of the 64 contacts reviewed, 62 or 97 percent were consistent with the appointments report, while two entries in the appointments report did not have corresponding clinical documentation in EHRS.

During the monitoring tour, five 3CMS patients housed on D Yard were interviewed regarding their experiences with mental health services and access to programming. Patients reported that they saw their primary clinicians confidentially; however, a recent large influx of 3CMS patients had created a significant backlog, resulting in lengthy intervals between mental health visits that often exceeded the required 90 days. Although patients could request additional

visits, they felt that routine contact was not frequent enough to meet their needs. Psychiatric appointments occurred every 90 days, were conducted virtually, and patients saw their assigned psychiatrist. No concerns were raised regarding the physical environment or confidentiality of treatment spaces.

Patients described mental health staff as helpful advocates who listened attentively to their concerns, though they noted that staff had limited ability to effect broader institutional changes. All patients reported receiving IDTTs, but most could not clearly articulate their treatment plan goals.

Patients described difficulty accessing ISUDT programming due to long waitlists and expressed a general desire for more group programming and therapeutic activities. While all patients reported good access to job assignments, they noted limited access to vocational programs, particularly those offering gate pass opportunities. There were no concerns about access to yard, showers, or in-cell activities, and no barriers to these basic services were identified.

Interviewees reported that custody staff frequently did not respond appropriately to their needs and, in some cases, mocked patients with mental illness. Patients felt that the mental health of the population was negatively affected by the presence of individuals with poorly managed symptoms, and several believed that more patients should be referred to EOP.

<u>Other Issues</u>:

<u>Pre-Release Planning</u>:

PBSP reported that the Mental Health Pre-Release Coordinator responsibilities were shifted among three staff members (two licensed social workers and one supervising psychiatric social worker) during the reporting period due to staffing shortages. Furthermore, PBSP

reportedly requested an additional tele-mental health social worker whose sole responsibility would be to fill the role of the pre-release coordinator which would allow the institution to clear any backlogs and would help the PBSP be compliant with the offering of pre-release services.

Similar to the previous reporting period, PBSP was unable to offer pre-release groups due to staffing shortages.

TCMP reported there were 213 patients who were eligible for release and may have required TCMP services, including 205 3CMS patients and eight EOP patients. Ninety-nine percent of patients were screened for TCMP services, and 185 patients or 87 percent submitted applications. TCMP data indicated that Medi-Cal applications were submitted for 184 or 86 percent of the patients released. Twenty-nine patients who were eligible for SSI, submitted applications. In addition, one patient submitted an application for Veterans' benefits.

Program Access:

a. Job and Program Assignments

On April 21, 2025, PBSP reported that seven EOP patients or six percent of the EOP population, 168 3CMS patients or 20 percent of the 3CMS population, and 359 non-MHSDS incarcerated persons or 33 percent of non-MHSDS population held jobs.

No EOP patients held academic assignments. However, 195 3CMS patients or 23 percent of the 3CMS population, and 432 non-MHSDS incarcerated persons or 40 percent of the non-MHSDS population held academic assignments.

No EOP patients held vocational assignments. Thirty-seven 3CMS patients or four percent of the 3CMS population, and 80 non-MHSDS incarcerated persons or seven percent of the non-MHSDS population held vocational assignments.

Two EOP patients or two percent of the EOP population held voluntary education assignments, as did 193 3CMS patients or 23 percent of the 3CMS population and 298 non-MHSDS incarcerated persons or 27 percent of the non-MHSDS population.

No EOP patients held substance abuse assignments. One hundred and forty-seven 3CMS patients or 17 percent of the 3CMS population and 144 non-MHSDS incarcerated persons or 13 percent of non-MHSDS population held substance abuse assignments.

b. Milestone Credits

PBSP reported that 117 EOP, 488 3CMS patients, and 729 non-MHSDS incarcerated persons earned the milestone credits during the review period.

c. Out-of-Level Housing

As of April 17, 2025, PBSP reported that one EOP and 58 3CMS custody Level II patients were in Level I housing. There were 52 3CMS custody Level I patients in Level II housing. There were also one EOP and 73 3CMS custody Level II patients in Level III housing. Additionally, there was one EOP and seven 3CMS custody Level IV patients in Level III housing. Furthermore, there were two 3CMS custody Level II patients in Level IV housing.

d. ADA Reasonable Accommodations and Grievance Procedures

PBSP provided a copy of the ADA reasonable accommodation operating procedure.

e. Unclothed Body Search

All staff were knowledgeable on the proper procedures and locations for unclothed body searches.

"C" Status:

Fifty-two patients including 14 EOP and 38 3CMS patients were placed on "C" status during the review period. Twenty patients including two MHCB, three EOP, and 15 3CMS patients were placed on "C" status at the time of the monitoring tour.

Case-by-Case Reviews:

PBSP reported that 112 patients met the requirement for 120-day pre-MERD reviews. All patients reportedly had timely ICCs, and 57 patients required CSR review. Fifty-two patients were released at their pre-MERD review.

Of the patients eligible for 150-day reviews, seven patients were awaiting RVR adjudication, five patients were pending DA review, two patients were awaiting DA acceptance, eight patients were retained for 90-day extensions, six patients were transferred to different institutions, two patients were pending transfer due to safety concerns, and three patients were released back to their housing units.

Mental Health Referrals:

PBSP reported an overall compliance rate of 83 percent for timely responding to mental health referrals. Neither psychiatry nor primary clinicians responded timely to emergent, urgent or routine mental health referrals. Notably, primary clinician responses to emergent, urgent, and routine referrals were close to compliance at 89, 85, and 85 percent, respectively. Psychiatry responses to mental health referrals did not exceed 79 percent, with timely responses to 79 percent of emergent, 71 percent of urgent, and 76 percent of routine referrals. The institution reported that mental health referrals were untimely due to errors stemming from providers incorrectly closing consults.

Custody and Mental Health Partnership Plan:

PBSP's custody and mental health partnership plan LOP complied with statewide policy and was last updated in April 2025 and, thus, up to date.

Executive leadership joint rounding occurred during all six months of the review period in the MHCB, MSF, GP RHU, RHU, EOP 2W, and A Yard 3CMS. Required staff attended each rounding. Staff reported that morale was "alright" and otherwise noted positive relations between custody and mental health, as well as requests for additional staffing and newer computers. Incarcerated persons reported delays in receiving mental health ducats but otherwise general satisfaction with the mental health care they received.

Executive joint rounding was discussed in all six months of executive staff meeting minutes and two of six months of QMC meeting minutes, though generally with little detail provided. Detailed discussion of executive joint rounding was included for all six months of mental health program subcommittee minutes.

Monthly joint supervisory tours occurred in the GP RHU Yard in October, B1 in November, the MSF and GP RHU Yard in December, the RHU in January, D Yard in February, and the MSF and A Yard in March; required staff attended each tour. Staff reported positive relations between mental health and custody, patients transitioning well from EOP to 3CMS programming, concerns with substance abuse on various housing units, and the difficulties posed by the statewide PSR. Incarcerated persons reported a desire for more frequent mental health appointments, feeling comfortable informing staff of mental health crises, and concerns related to population increases.

Provided documentation indicated that weekly 3CMS supervisory meetings occurred throughout the review period with required staff in attendance but disclosed no other information.

Daily second and third watch MHCB, RHU, and mainline EOP huddles occurred nearly every day throughout the review period. Mental health staff attended all huddles while custody staff was occasionally absent. The monitor's expert observed huddles in the MHCB and RHU during the monitoring tour. An observed MHCB huddle had all required staff in attendance, including mental health, custody, and nursing. The specialized bed huddle form was utilized. Mental health and nursing staff discussed the patients thoroughly and reflected an adequate knowledge of their patients. Custody contributions were minimal, however.

The monitor's expert observed an RHU Huddle. The RHU primary clinician, a sergeant, psych tech, and RT (on Teams) attended the huddle. The primary clinician and sergeant were knowledgeable about the caseload and noteworthy patients. The overall huddle was adequate as important information and concerns were communicated and addressed appropriately.

Introduction to EOP groups were offered weekly throughout the review period and twice per week at the time of the monitoring tour. Fifty-nine patients attended this group throughout the review period.

PBSP distributed the 3CMS orientation brochure to new patients and provided a copy of the same.

Inmate advisory council meeting minutes occurred for all six months on Facility A, five of six months on Facility B, all six months on Facility D, five of six months on the EOP facility, three of six months on the MSF, and three of six months on the GP RHU. Discussed topics included issues with laundry, Wi-Fi connectivity and tablets, appliances such as lamps, receiving

supplies such as razors, toothbrushes, and toilet paper, and officers on third watch harassing patients; a desire for more yard equipment and job assignments; the installation of grab bars and steps; and a proposed barbecue event.

For staff misconduct complaints, there were two filed against mental health, 12 against medical, and 166 filed against custody staff during the review period. Both complaints against mental health and nine of 12 against medical staff were closed by the time of monitoring tour; the status of complaints against custody staff was not provided.

Forty-six investigations for misconduct towards a patient were initiated outside of the appeal process. No staff members were reassigned because of misconduct complaints.

The annual partnership off-post training was attended by 18 of 24 or 75 percent of required mental health staff and 405 of 463 or 87 percent of required custody staff.

PBSP provided the names of staff who attended quarterly roundtable training during the review period but was unable to provide which staff had not received the training; accordingly, compliance could not be ascertained.

Heat Plan:

PBSP's heat plan LOP was revised in May 2024 and complied with CDCR policy. The heat plan was in effect for one month of the reporting period. There were no Stage I, Stage II, or Stage III heat alerts. No patients experienced heat-related illness during the review period.

Interviewed officers from Facilities A, B, and D, the RHU, and MHCB, exhibited varying levels of knowledge of heat plan requirements. For example, a small number of officers could recall all three levels of the heat plan. However, the majority could not recall all three levels of the heat plan and required prompting. On a positive note, each officer had heat plan resources that displayed the heat plan policy and procedures, but it was clear that the majority were not

sufficiently familiar with the heat plan. Additionally, multiple officers reported that the list of patients who were prescribed heat-sensitive medications was updated weekly; however, this list is required to be updated daily and some officers did not know to reference this list if a heat alert was activated. Officers often explained that due to the local weather it was very unusual for a heat stage to be activated which explained why officers may not be familiar with the policy.

Observed thermometers were non-digital thermometers which were located near the second tier of each unit and all thermometers were in working order. While these thermometers appeared to be in good working order, they should have been placed higher in the units; all were placed midway of the walls versus higher points. In addition, the institution reported ordering handheld thermometers to enable temperature measurement in cells.

RVRs:

PBSP issued 1,736 RVRs during the review period, of which 1,078 or 62 percent were issued to MHSDS patients. Specifically, two RVR were issued to acute care patients, 58 were issued to MHCB patients, 223 were issued to EOP patients, and 795 were issued to 3CMS patients.

The monitor reviewed 22 RVRs to assess compliance with CDCR policy. Custody staff timely referred the MHA to mental health staff within two days in 12 or 55 percent of reviewed cases. Mental health staff timely completed and returned the assessment to custody within eight days in 13 or 59 percent of reviewed cases. The senior hearing officer documented consideration of the MHA in all reviewed cases. Eighteen or 82 percent of patients had confidential interviews.

Thirteen or 59 percent of patients were assigned a staff assistant. Mental health staff recommended mitigation in 18 or 82 percent of reviewed cases and the SHO mitigated the

penalty pursuant to the assessment in 16 or 89 percent of reviewed cases. The most frequent assessment recommendation concerning mitigation was no loss of phone calls, which 61 percent of assessments recommended.

One MHA recommended alternative discipline due to the patient's mental illness significantly contributing to the behavior documented in the RVR. The SHO documented the RVR in an alternative manner by reducing it to a counselling chrono. Additionally, ten MHAs explained that mental health contributed to the behavior in the RVR, however, the SHO decided to hold the patients' accountable due to the preponderance of the evidence.

The MHA training was attended by 679 custody staff members including the chief deputy warden, four correctional administrators, five CC Is, two CC IIIs, six captains, 24 lieutenants, 66 sergeants, and 571 correctional officers. For mental health staff, one chief psychologist, two senior psychologists, one psychologist, and one social worker attended the training. Information regarding the total number of staff members who were required to attend the training was not provided and, as a result, compliance could not be ascertained..

Use of Force:

PBSP reported no controlled and 133 immediate use of force incidents involving MHSDS patients during review period. Eleven reviewed immediate use of force incident reports revealed reasonable force used in each instance. Reviewed video footage for two of those 11 incidents was blurry and, thus, inconclusive; all other incident reports and AVSS footage requested by the monitor could not be provided due to those incidents still being under investigation.

The 11 reviewed incident revealed that uses of force included firing non-lethal rounds, spraying OC pepper spray, baton strikes, physical force and holds, and stemmed incarcerated persons fighting and attempted homicides, punching or spitting on correctional officers, refusing

to transfer, and attempting suicide. Proper decontamination measures were offered each time OC pepper spray was used.

The mandatory use of force training was attended by 51 of 116 or 44 percent of required mental health staff and 613 of 644 or 95 percent of required custody staff.

Lockdowns/Modified Programming:

Three modified programming periods were initiated during the review period, including two on Facility B lasting 12 and eight days, respectively, and one on Facility A lasting eight days. The modified programming periods stemmed from incarcerated persons attacking a correctional officer, multiple incidents of violence in a short time span on Facility A, and the discovery of pieces of metal requiring facility-wide searches. In each instance, mental health programming was limited to urgent/emergent clinical services and priority ducats.

PBSP was also one of the institutions affected by the March 2025 statewide PSR.

Two additional modified programming periods were initiated after the review period. They lasted 11 and eight days on Facilities B and A, respectively, and stemmed from searches being required after metal went missing and manufactured weapons were discovered. Mental health programming was again limited to urgent/emergent clinical services and priority ducats.

Access to Care:

A review of monthly Health Care Access Quality reports from October 2024 through March 2025 reflected the issuance of 65,793 mental health ducats and add-on appointments, of which 50,235 or 76 percent were completed, and 15,558 or 24 percent were not completed. Of the non-completed appointments, 1,345 or nine percent were due to custody factors, 6,881 or 44 percent were due to non-custody factors and 7,332 or 47 percent were due to patient refusals.

*Coleman* Postings:

All inspected units had *Coleman* posters posted in plain view in both English and Spanish.

**APPENDIX A - 22**
**PLEASANT VALLY STATE PRISON (PVSP)**
Site Visit: July 8, 2025 – July 9, 2025
Review Period: December 1, 2024 – May 30, 2025

Census:

On July 3, 2025, PVSP housed 2,894 incarcerated individuals, a 13 percent increase since the previous monitoring period. *See* ECF No. 8359 at 295 (reporting a population of 2,566 incarcerated individuals as of the Thirtieth Round Monitoring Report). The 917 MHSDS patients represented had increased by 89 percent compared to the preceding review, *see id.*, and represented 32 percent of the institution's population.

Since the preceding monitoring round, the institution activated a mainline EOP, which had a census of 154 mainline EOP patients. There were also 621 mainline 3CMS patients, 69 3CMS MSF patients, 71 MHSDS patients in the RHU, and two RC patients who were in the process of being moved to a mainline yard at the time of the monitoring tour.

Staffing:

The chief psychiatrist position was filled. One of the three staff psychiatrist positions was filled for a 67 percent vacancy rate which was reduced with a 1.75 registry psychiatry staff for an eight percent functional vacancy rate. Two allocated telepsychiatry positions were filled, as were the six medical assistant positions assigned to telehealth. Accounting for all on-site and telepsychiatry positions, there was an overall functional vacancy rate of five percent among staff psychiatry positions.

The two chief psychologist positions were filled. Two of the 3.5 allocated senior psychologist positions were also filled representing a 43 percent vacancy rate.

Of the 10.5 allocated staff psychologist positions, 2.5 were filled reflecting a 76 percent vacancy rate; one unlicensed psychologist was on long-term leave resulting in nine vacancies

and a functional vacancy rate of 86 percent. The unlicensed psychologist was supervised by a senior psychologist. Of the three allocated telepsychologist positions, five staff were working full-time at PVSP. Accounting for on-site and tele-mental health positions, there was a 52 percent functional vacancy rate among psychology positions.

The one allocated supervising social worker position was filled. Five social workers filled the 5.5 allocated positions for a ten percent vacancy rate. Four of the social workers were unlicensed and they were supervised by a supervising psychiatric social worker, all of whom were onsite. All three allocated tele-social worker positions were filled at the time of the site visit. Accounting for on-site and tele-mental health positions, there was a six percent functional vacancy rate among social worker positions.

Overall, there was a 34 percent functional vacancy rate among primary clinician positions.

Four of the 4.5 recreation therapist positions were filled leaving an 11 percent vacancy rate.

All six allocated MHSDS registered nurse positions were filled as was the one allocated LVN position.

All 15 psych tech positions were filled.

Seven of the eight MHSDS clerical positions were filled for a 13 percent vacancy rate; however, two were on long-term leave for a 23 percent functional vacancy rate.

The OSS II position was filled. Two staff members filled the 1.5 HPSI position. Further, there was no allocation for the HPSII position, but one staff member filled that position.

The CHSA position was not filled.

Regarding custody staff, the warden, chief deputy warden, four associate warden, and six captain positions were all filled. Of the 29 lieutenant positions, 27 were filled leaving two vacancies and one staff member on long-term leave, resulting in a ten percent functional vacancy rate.

Sixty-seven of 74 allocated sergeant positions were filled for a nine percent vacancy rate. However, two staff were on long-term leave, and four were acting out of class leaving an 18 percent functional vacancy rate.

Nineteen of 21 CCI positions were filled leaving a 10 percent vacancy rate. All nine CCII positions were filled.

Of the 692 allocated correctional officer positions, 693 were filled. Fifteen were on long term leave, and nine were acting out of class leaving a three percent functional vacancy rate.

<u>Tele-Mental Health</u>:

Four MHSDS clerical workers teleworked during the review period with variable schedules depending on the coverage they provided. Three senior psychologist specialists teleworked one day per week; the one licensed social worker and two recreational therapists teleworked 0.5 days per week and one day per month; the four unlicensed social workers teleworked four hours per week; and the HPS I and HPS II teleworked three days per week.

<u>Staff Recruitment</u>:

CDCR regional mental health held hiring fairs to hire staff for PVSP. The chief of mental health reported attending all hiring fairs as well as the APA virtual hiring fair to hire onsite staff.

Mental health leadership maintained relationships with Alliance University and accepted one practicum student each year at PVSP. Also, as part of the Northern Consortium, two interns worked at PVSP with the inpatient care coordinator supervising them.

PVSP mental health leadership reported recent success in hiring unlicensed staff, with three unlicensed social workers and one unlicensed psychologist hired in the last year. However, the institution also reported challenges retaining unlicensed staff upon receipt of their license and subsequent departure to higher paying positions.

Reported barriers to recruitment included low pay compared to potential employers in the community and poor working conditions for clinicians, including lack of private office space and malfunctioning air conditioning.

Quality Management:

Two local governing body meetings were held during the review period, during which quorums were achieved and mental health was represented. The only items discussed during the meetings were local operating procedures and policies, which were reviewed and approved.

QMC meetings were held every month of the monitoring period, and a quorum was achieved for each meeting with at least one mental health representative at each meeting. Agendas for the QMC meetings included the status of current improvement projects, system surveillance, LOP review and approval, scheduled audits, announcements, open forum, and review of new improvement projects and action items. The minutes included descriptions of projects, findings, and plans being taken by subcommittees and workgroups. The committee appeared to appropriately track the status of routine system surveillance as well as improvement projects.

MHPS meetings were held monthly during the review period and achieved quorums. Topics discussed during each meeting were current improvement projects, status of prior action items, system surveillance, corrective action plans, CMHPP, executive rounding, SPRFIT,

inpatient coordinator report, training, improvement priorities, program administration issues, and new action items.

In December 2024, there were a number of challenges noted with the provision of routine mental health services, especially within the EOP. The issues were related to understaffing as well as the significant (400 patients) increase in the 3CMS population. Improvements were realized over the course of the review period. The only area that continued to have challenges throughout the review period was routine primary clinician contacts within the EOP.

SPRFIT identified challenges with patients being enrolled in the SRMP when eligible across the review period and urgent/emergent referrals for danger to self being completed timely in December 2024, which were attributed to duplicate and/erroneous entries. Rates improved over the course of the review period for urgent/emergent referral response times but not SRMP enrollment. Clinicians were encouraged to review charts to determine SRMP eligibility.

There were five formal Quality Improvement Teams (QIT) chartered during the review period. One QIT targeted improvement in the completion of suicide watch rounds. During the review period, the targeted threshold was met and sustained for three consecutive months, so the QIT was closed in May. The close-out checklist was completed appropriately. There was also a QIT chartered through SPRFIT to address custody checks following discharge from MHCB or inpatient settings. The QIT was active only during December and January, when thresholds were met, and the project was discontinued.

A third QIT was ongoing since prior to the review period and focused on the treatment attended by 3CMS patients in the RHU. The QIT had been chartered to create improvements in attendance, but as there was no requirement for patient attendance, the QIT was closed in February 2025. A fourth QIT was a yellow belt quality improvement project focused on

supporting patients to "Do One Thing" to improve their health and wellness. The project aimed to get incarcerated individuals to do one thing per week for their own wellness and sustain those activities for three months. The institution reported that the project was a success.

Lastly, there was a QIT enacted to prepare for the opening of the EOP program which was maintained to monitor full implementation. The plan was to identify adequate treatment space, develop a treatment schedule that follows policy and procedure to offer ten or more hours of structured treatment, assign three primary clinicians and three recreational therapists to EOP, and complete a relevant Local Operating Procedure to ensure compliance in treatment offered, treatment scheduled, and treatment attended by incarcerated persons in EOP. By the end of February 2025, only vacancies remained outstanding. All other goals were met, and compliance indicators were showing late initial IDTTs and not meeting expectations with regard to routine primary clinician contacts and routine psychiatry contacts.

Peer review local policies were consistent with statewide expectations. PVSP had no primary clinician peer reviews during the monitoring period as the CTC remained closed. Psychiatry peer review was not completed during the review period, and no rationale for the lack of psychiatry peer review was provided.

The EMRRC committee met monthly during the review period. A quorum was achieved at each meeting, and mental health staff were consistently present. Improvement projects, system surveillance, suicide attempts, deaths, overdoses, and emergency response activation were monitored each month along with case reviews. Of note, there was a death by suicide in April 2025. One concern identified during the internal review of the case was the fact that a ligature was still tied around the patient's neck when he arrived at the TTA.

A review of the suicide case review from the death revealed four recommendations for QIPs. They included the fact that no suicide risk evaluation was completed prior to the patient being released from alternative housing, no safety plan was completed prior to release from alternative housing, five-day follow-ups failed to address the patient's need for a safety plan, and delay in completion of the self-harm power form. All QIPs were completed and closed in February 2025.

Overall, PVSP had an adequate quality management system in place, which identified concerns, implemented plans to correct concerns, and monitored compliance with goals over time. There was also an active quality improvement process in place to create positive change within the MHSDS at PVSP.

Medication Management:

Upon opening the EOP unit in August 2024, EOP patients were expected to go to the mainline medication line for medications. High refusal rates and increased utilization of MHCB placements were noted. A workgroup was created to address this issue and noted that the refusal rate for medications by EOP patients had risen to 14 percent in November 2024. In mid-February, the decision was made to move the medication pass for EOP patients into the housing unit. At that time, refusal rates dropped to seven percent and referrals to MHCB were noted to have decreased as well.

However, in early June 2025, institutional health care leadership determined that medication passes on the housing unit were a violation of HCDOM policy and, accordingly, medication passes were resumed off the unit in the mainline medication pass. During the monitoring tour, the psychiatric technicians, EOP supervisor, CMH, and custody staff all reported that medication refusal rates were higher since the move back to general population.

Institutional health care leadership disputed this, citing but not producing data suggesting there were no significant changes in medication non-adherence. During patient interviews, patients reported that they were less likely to take medications secondary to the change in the medication pass location. Additionally, some patients reported anxiety while others reported long medication lines (e.g., 30 to 60 minutes) in the heat.

Transfers:

The institution had one inpatient care coordinator, a senior psychologist specialist. The inpatient care coordinator also served as the SPRFIT coordinator backup, was responsible for providing annual suicide prevention training and EHRS training for all staff, and clinically supervised practicum students. The inpatient care coordinator had been in the position since August 2024.

Documentation indicated and the institution acknowledged the higher level of care process to be a weak area that required significant attention. The inpatient care coordinator's audits of the treatment plan higher level of care section for patients who were identified but not referred indicated that PVSP requires significant remedial training on the correct completion of the higher level of care form. Audit findings ranged from a low of 7 percent (3 of 42) to a high of 52 percent for acceptable documentation of clinical rationales for non-referral and treatment modifications.

The monitor's expert reviewed a sample of non-referred patients and found that the inadequate documentation and lack of utilization of the "sustainable process" report contributed to at least three patients not being timely and properly considered for a referral to a higher level of care when that level of care was clinically indicated. Relatedly, higher level of care considerations were not routinely addressed in observed IDTTs suggesting that staff were still

not routinely using the sustainable process report for IDTTs. Observed treatment teams continued to fail to properly document adequate clinical rationales for non-referral and treatment modifications. Clinicians/IDTTs frequently used cut and paste, failing to modify treatment plans when indicated based on patient progress or lack thereof. Moreover, higher level of care treatment modifications did not adequately address the positive criteria.

Sustainable process reviews were required to audit higher level of care consideration documentation for quality and to measure the inter-rater reliability between the headquarters' reviewer and the institution's inpatient care coordinator. Regional mental health staff completed two sustainability audits during the review period and were providing extensive training and support to PVSP regarding the sustainability process and referrals to higher level of care. The first sustainable process audit occurred in November 2024, though the institution provided only an action plan spreadsheet without a written narrative of the audit's results, precluding further analysis. The sustainability audit completed in April 2025 (with a review period of January 1 through March 31, 2025) confirmed significant problems with the higher level of care process at PVSP continued, including poor documentation and inadequacies in appropriately addressing higher level of care in IDTT meetings. Additional action items were opened including requiring treatment teams to submit the higher level of care documentation prior to IDTT to allow for supervisory review and correction.

During the review period, there were 153 instances of a total of 117 patients who were considered for, but not referred to, higher levels of care.

There were no patients referred to acute care during the monitoring period. PVSP referred seven patients to intermediate care; all were accepted. All seven patients timely transferred within 30 days as required.

No patients with complex medical needs were transferred to inpatient care.

During the review period, there were three patients returned to PVSP from inpatient treatment between January 1 and March 31, 2025. Prior to that time period, there was no process at PVSP for tracking patients returning from inpatient treatment and no data provided. For the three returned in the first quarter of 2025, all received timely suicide risk assessments, clinician to clinician contact, and five-day follow-up contacts.

There were 108 MHCB referrals during the review period; 93 referrals resulted in admission and 15 referrals were rescinded. Of the 93 MHCB admissions, two or two percent took longer than 24 hours to transfer. Both patients' admissions were one hour overdue. Of the 15 rescissions, four or 27 percent took longer than 24 hours to transfer from alternative housing. Reasons for delay in transfer from alternative housing included a patient receiving care at an outside hospital, and data entry errors. The inpatient care coordinator reported providing extensive training to clinicians to assist in correcting errors in higher levels of care data entry.

The RHU Policy requires that patients at a [EOP or 3CMS level of care] be transferred to an [EOP or 3CMS RHU] within 30 calendar days from the date of initial placement in RHU or within 30 calendar days in which the patient was made EOP or 3CMS. *See* Cal. Code of Regs., tit. 15 §§ 3335.2 and 3335.3; *see also* Restricted Housing Unit Program: Mental Health Services Policy, dated July 19, 2024 and effective August 1, 2024 (hereinafter "RHU Policy"); 2021 Program Guide Update, ECF No. 7333-1 at 19. All 60 3CMS patients who were referred to 3CMS RHU were timely placed in PVSP's 3CMS RHU. At the time of the monitoring tour, there were three EOP patients pending transfer to an EOP RHU. All three were beyond transfer timelines due to lack of available beds. Patients were seen by the MHPC on a weekly basis,

received at least 90 minutes of structured group psychotherapy per week, received recreation therapy handouts for in-cell use, and saw their MHMD monthly until transfer to an EOP RHU.

Of the 41 EOP patients who were referred to EOP RHU during the review period, 28 were reportedly transferred timely.

During the reporting period, 13 patients' level of care was reduced from EOP to 3CMS.

Ten 3CMS patients were placed in MSF during the review period.

Overall, the level of care process at PVSP was broken. While staffing challenges have been a significant contributor, PVSP must address the deficiencies in this area. The institution should consider training new staff on the higher level of care process and supervisors should monitor all IDTTs for utilization of the sustainable process report, IDTT outcome regarding level of care, and adequacy of treatment modifications during the actual IDTT meeting.

Programming:

MHSDS Patients in Restricted Housing:

3CMS RHU:

The psychiatrist had an RHU caseload of 130, which slightly exceeded the established caseload ratio by five patients. The three primary clinicians assigned to the 3CMS RHU had caseloads within the established caseload ratios. Two of the three primary clinicians were tele-mental health providers.

Staff working in the RHU reported an increase in the acuity of mental health patients since the opening of the EOP at PVSP. The shortage of EOP RHU beds statewide resulted in EOP patients remaining in the 3CMS RHU for longer periods of time, requiring increased staff attention. This was challenging given the limited number of correctional officers available to

escort patients to individual sessions, which were held outside of the RHU building, in a medical area.

The RHU Policy required that patients assigned to a 3CMS RHU be offered a minimum of 20 hours of out-of-cell time each week, including 18.5 hours of recreational time outside the cell and 90 minutes of confidential, structured therapeutic activities. *See* ECF No. 8355 at 7-17 (Restricted Housing Unit Program: Mental Health Services Policy, dated July 19, 2024 and effective August 1, 2024) (hereinafter "RHU Policy").

Between November 25, 2024 and May 31, 2025, on average, 3CMS RHU patients were offered two hours, attended one hour, and refused one hour of structured therapeutic activities per week.

The monitor's expert observed IDTTs in the 3CMS RHU, wherein patients were consistently invited to participate in their IDTT meetings. Each patient was asked to share their goals, report on their symptoms and functioning, and discuss their response to any prescribed medications. Patient concerns raised during the meetings were addressed by the team, ensuring that individuals' perspectives were incorporated into treatment discussions.

Treatment goals were stated for each patient, but these goals tended to be vague and lacked measurable objectives. While the team identified follow-up items and assigned responsibilities for these tasks, there was room for improvement in articulating specific, actionable, and measurable treatment goals. Higher level of care issues were reviewed as part of the meetings, but no referrals were made or required during the review period.

No barriers to effective IDTT functioning were observed in these 3CMS RHU IDTT meetings. Staff and patients did not express concerns or suggestions for improvement; however, the supervising staff member contributed to the process by asking clarifying questions and

suggesting interventions to enhance treatment planning. Overall, the RHU IDTT meetings were conducted in accordance with expectations, with strong participation from all disciplines and a focus on patient engagement and follow-up. Continued attention to the clarity and measurability of treatment goals is recommended to further strengthen the IDTT process.

The RHU Mental Health Policy requires initial IDTT meetings in 3CMS RHU to occur before the initial ICC and within ten calendar days of arrival. *See* ECF No. 8355 at 12 (Restricted Housing Unit Program: Mental Health Services Policy, dated July 19, 2024 and effective August 1, 2024). Routine IDTT meetings are required every 90 calendar days following the initial IDTT. *See Id at 13.*

The monitor randomly selected and reviewed the healthcare records of 30 RHU CMS patients to assess compliance with Program Guide requirements for initial IDTTs. All 30 patients required initial IDTTs and 23 or 77 percent timely occurred within ten calendar days of arrival or level of care change. All 30 IDTTs were attended by the required staff and 11 or 37 percent were attended by patients. The reasons initial IDTTs were held in absentia was due to patient refusal or no show.

To measure timeliness of routine 3CMS RHU IDTT meetings, CDCR produced an appointments report that included individuals who were required to receive a routine IDTT meeting during the review period. For the 169 patients in CDCR's appointments report for December 1, 2024 to May 30, 2025, there were 219 completed initial or routine IDTT meetings. When a patient had either an initial IDTT meeting and a routine IDTT meeting, or more than one routine IDTT meeting, timeliness in accordance with Program Guide requirements was able to be calculated. Of the 219 completed IDTT meetings, 49 contacts were for individuals who had at least two IDTT meetings (initial and routine or two routines). Of those, 43 or 88 percent

occurred past Program Guide requirements. Of note, the report did not include individuals that did not have a completed IDTT meeting, such as those that were not scheduled.

The monitor's expert observed an RT group in 3CMS RHU attended by six patients. The facilitator offered participants a choice of activities, including watching a segment of a movie and participating in a brief origami exercise. The session was structured to encourage engagement and provide opportunities for creative expression and relaxation. Throughout the session, all patients participated appropriately and appeared engaged with both the recreational and therapeutic elements of the activities. The recreation therapist maintained a supportive and inclusive environment, ensuring that each patient had the opportunity to contribute to the group and make choices regarding the activities. The physical setting allowed for adequate participation, and no barriers such as restraints or environmental limitations were observed.

Following the group session, the monitor's expert interviewed participants to further assess their experiences and perspectives. Patients reported general satisfaction with the session, with several participants noting that the opportunity to choose activities and engage in hands-on tasks was both enjoyable and beneficial. Patients reported feeling comfortable in the group setting and appreciated the chance to interact with peers in a positive environment. Suggestions for future sessions included incorporating a wider variety of activities and continuing to allow patient choice in session structure.

Overall, the group therapy session observed in the RHU was conducted in accordance with program expectations, with effective facilitation by the recreation therapist and active patient participation. The session contributed positively to patient engagement and provided a supportive context for therapeutic interaction.

*Individual Treatment*

The RHU Policy requires that all patients placed into 3CMS RHU receive an initial primary clinician evaluation within ten days of arrival and an initial psychiatry evaluation prior to the IDTT and within ten days of arrival. *See* RHU Policy at 4. The RHU Policy also requires that 3CMS RHU patients receive weekly primary clinician contacts and psychiatry contacts every 90 days. *See id at 12*.

The monitor randomly selected the healthcare records of 30 RHU 3CMS patients to assess compliance with Program Guide timeframes for initial psychiatry evaluations during their stay. All 30 patients required initial psychiatry evaluations; 25 or 83 percent timely occurred before the initial IDTT. Eleven or 37 percent of the reviewed initial psychiatry evaluations were conducted in confidential settings. Non-confidential evaluations were due to patient refusals. Telepsychiatry was utilized for two initial psychiatry evaluations.

To measure timeliness of routine psychiatry contacts, CDCR produced an appointments report that included individuals who were required to receive a routine psychiatry contact during the review period. For the 67 patients in CDCR's appointments report for December 1, 2024 to May 30, 2025, there were 104 completed contacts, 38 or 37 percent were confidential as reported by the institution. Reasons for non-confidential psychiatry contacts included weather and patient refusal of a confidential contact.

When a patient had more than one completed contact, compliance with Program Guide timeframes was able to be calculated. Of the 104 completed contacts, 36 were for individuals who were seen at least twice by the psychiatric provider. Of those 36 contacts, 16 or 44 percent occurred beyond Program Guide requirements with a range of 31 to 114 days between contacts. Of note, the report did not include individuals that did not have completed contacts and did not include patients who refused contacts.

The monitor randomly selected and reviewed the healthcare records of 30 RHU 3CMS patients to assess compliance with Program Guide timeframes for initial primary clinician evaluations. All 30 patients required initial primary clinician evaluations. Of the 30 patients reviewed, 28 or 93 percent were timely completed. Thirteen or 43 percent of reviewed initial primary clinician evaluations were conducted in a confidential setting, non-confidential evaluations were due to patient refusals and custody modified programming. Telehealth was utilized for ten or 33 percent of initial primary clinician evaluations.

To measure timeliness of routine primary clinician contacts, CDCR produced an appointments report that included individuals who were required to receive a routine primary clinician contact during the review period. For the 103 patients in CDCR's appointments report for December 1, 2024 to May 30, 2025, there were 567 completed and refused contacts. Of the 566 completed contacts, 187 or 33 percent were confidential as reported by the institution. Reasons for non-confidential primary clinician contacts were not documented other than to note the contact occurred cell front or on the yard.

When a patient had more than one completed or refused contact, timeliness in accordance with Program Guide requirements was able to be calculated. Of the 567 completed or refused contacts, 464 contacts were for individuals who were seen at least twice by the primary clinician. Of those 464 contacts, nine or two percent occurred beyond Program Guide requirements with a range of 11 to 57 days between contacts. Of note, the report did not include individuals that did not have completed contacts, such as those that were not scheduled.

There were 566 completed individual primary clinician contacts. Most contacts (400) were documented with a duration between one and 15 minutes; 46 contacts were documented with a duration between 16 and 30 minutes, 90 contacts between 31 and 60 minutes, and 28

between 61 and 95 minutes. In addition, two contacts were documented with a duration of zero minutes.

The RHU Policy required that patients assigned to a 3CMS RHU be offered a minimum of 20 hours of out-of-cell time each week, including 18.5 hours of recreational time outside the cell and 90 minutes of confidential, structured therapeutic activities. *See* ECF No. 8355 at 7-17 (Restricted Housing Unit Program: Mental Health Services Policy, dated July 19, 2024 and effective August 1, 2024) (hereinafter "RHU Policy").

The monitor reviewed three random weeks of ARHR data regarding the offering of out of cell time, showers, and phone calls. These data indicated compliance with the offering of 20 hours of out-of-cell time, three showers, and one phone call each week for patients placed in 3CMS RHU for at least one week.[110] The RHU staff issued radios and ear buds to new arrivals and had a supply of them available in the unit.

The RHU identified and clearly marked RHU intake cells. At the time of the monitoring tour, there were two patients in intake cells, both of which had notices on their cell door as to the date of arrival, the 72-hour expiration date and the 21-day expiration date. The RHU staff reported they moved patients out of the intake cells at the 72-hour mark in order to maintain open intake cells.

---

[110] The ARHR used to determine compliance was the "RHU Weekly Activity Audit Compliance" report. This is a summary report for the identified housing unit, for a selected week and the activities recorded by correctional staff in the RHU. As it was explained to the monitor, an IP would be included in the denominator as being present for the entire week if custody staff had recorded the IP was offered 21 meals. The monitor had concerns with this data logic as it was dependent on custody staff recording 21 separate events in the ARHR and that this may not provide a true reflection of the IPs presence or absence from the RHU for the week. A more reliable method would be via SOMS and the IPs physical movement out of RHU (i.e., released from RHU, paroled, transferred to another institution, out to court, or out to outside hospital.) The documentation in SOMS as to the actual physical presence of the IP at the institution and on RHU status would be considered more reliable than the recording of twenty-one meals in a week.

A review of five RHU IPs was reviewed for timeliness of the issuance of property after arrival in RHU. Per the SOMS property record, all five patients had allowable property issued within eight days of arrival into the PVSP RHU.

Non-Disciplinary Restricted Housing (NDRH):

Regarding NDS for MHSDS patients, the institution reported that during the review period there were six MHSDS incarcerated persons identified as NDRH. Two remained on NDRH status during the site visit. One was pending the Department Review Board since January 23, 2025; the second was pending since February 13, 2025. For the remaining four, the transfer timelines were 27 days (two cases), 45 days and 93 days respectfully.

MHCB:

The mental health crisis bed was closed during the entire review period.

EOP:

PVSP housed all EOP patients in unit D4, which had a capacity of 178 patients. No EOP patients were housed in non-EOP housing. Over the course of the review period, the census averaged between 130-150 EOP patients. At the time of the monitoring tour, there were six full-time clinicians (four on-site and two tele-mental health), three full-time recreational therapists, 1.25 psychiatrists, and one full-time supervising psychiatric social worker I assigned to the EOP. The EOP supervisor noted that initial scheduling challenges with tele-mental health had recently improved with arrangements made whereby tele-mental health leadership has taken responsibility for providing coverage when tele-mental health clinicians take time off and communication about time off has improved.

EOP patients programmed with non-EOP individuals on the yard as well as during medical appointments, and medication passes. PVSP did not have a step-down program for EOP patients during the review period.

According to the staff-to-patient ratios from the 2009 staffing plan, psychiatrists who treat mainline EOP patients must maintain a caseload of 120 patients per psychiatrist, while primary clinicians who treat mainline EOP patients must maintain a caseload of 26 patients per clinician. *See* ECF No. 3693 at 17. The two psychiatrists who had caseloads in EOP were within established caseload ratios. Three of the six EOP primary clinicians had caseloads above the established ratios. Three EOP primary clinicians were within established caseload ratios. Two of the six primary clinicians were tele-mental health providers.

There were two group therapy rooms and four individual treatment rooms available for treatment of EOP patients. One group room, which was on the EOP housing unit, also served as the IDTT room and was available for individual sessions. The room was of adequate size for the IDTT meetings but was a small space for a group. The room provided for adequate confidentiality; however, it was reported that patients and officers would often interrupt IDTT meetings by knocking on the door, compromising confidentiality. The other group room was the gymnasium which was not confidential. Of two individual treatment rooms located on the EOP housing unit, one was small and cramped but provided adequate confidentiality and the other was large with adequate space and confidentiality; however, the second room was previously used as a dog grooming room and continued to hold odors from that previous purpose. The two tele-mental health offices at the back of the gym were of adequate size and afforded confidentiality, yet it was reported that the hard-wired tele-mental health connection in one of the rooms was non-operable at the time of the site visit.

*Structured Treatment*

The Program Guide required that each EOP patient be offered at least ten hours per week of structured therapeutic activities. *See* ECF No. 7333-1 at 58. For patients who were determined by the treatment team to be clinically contraindicated for ten hours of treatment activities per week, the primary clinician is required to present the case and recommend a treatment program (i.e. EOP modified programming) to the IDTT for approval. If the patient's modified treatment program included a schedule of less than ten hours of treatment per week, the patient's IDTT was required to meet monthly to review and increase the amount of structured therapeutic activities or refer the patient to a higher level of care as clinically indicated. *Id*.

Overall, 62 percent of EOP patients were offered at least ten hours of structured therapeutic activities during the monitoring period. EOP patients were scheduled for an average of 13.57 structured treatment hours weekly. On average, patients were offered 10.1 hours, attended 4.69 hours, and refused 5.48 hours each week during the monitoring period. On average, 3.21 hours of structured treatment was cancelled weekly during the monitoring period.

During the review period, there were only two weeks when a single patient was placed on EOP modified programming status. That patient was offered 7.75 hours of structured treatment, attended less than one hour, and refused an average of 6.77 hours across those two weeks. There were 6.75 hours cancelled during that two-week period, on average. The same reasons for cancellations were provided. This patient's healthcare record was reviewed to better understand the use of EOP modified programming in this case. The patient arrived at PVSP already on EOP modified program status. There was no evidence to support the rationale for the patient's placement on modified EOP programming, nor discussion of what modifications were made to

the patient's program in the period from his arrival at PVSP in August 2024 through his removal from modified programming in December 2024.

The institution reported challenges with providing required treatment hours to patients, attributing these challenges to limited treatment space and staffing vacancies. Corrective actions taken to address these issues included working with the facility leadership to identify additional space, having staff work on weekends to maximize the use of available space, optimizing the group scheduling process, prioritizing groups for patients who do not have job assignments, and continuing recruitment of staff. At the time of the site visit, plans to implement a new group schedule and make use of additional space were being made for August 2025.

*IDTTs*

Three IDTT meetings were observed on site, one was a routine IDTT meeting and two were initial IDTT meetings, yet both patients had recently returned from MHCB stays and had previously been placed at PVSP, so they were known to the treatment team. The meetings included the patients' assigned primary clinician and assigned psychiatrist, along with another primary clinician, the CCI, a recreational therapist, a certified nursing assistant (CNA) supporting the psychiatrist, and the EOP supervisor. The room was of adequate size and afforded adequate confidentiality. Patients were present for two of the meetings, but one patient refused to attend. These IDTT meetings included most required elements. Diagnostic formulations were reported to be provisional for all three patients without any discussion among the group about what was being considered or not yet met in terms of diagnostic criteria. The psychiatrist did not provide input during any of the meetings regarding diagnoses. Patients' functional impairments and strengths were discussed in the meetings; however, there was limited discussion

about the patient's progress in treatment or the current barriers to the patients achieving necessary progress toward treatment goals in two of the three meetings.

All meetings included identification of reasonable and measurable treatment goals which were appropriate to the patients' needs. One primary clinician clearly identified interventions that were to be provided to the patient in support of treatment goals, but the other clinician did not identify specific interventions. The recreational therapist was active during the meetings, providing feedback about the patients' participation in groups and identifying how different groups could provide support for the patients. Psychiatric input was minimal but adequate. The psychiatrist did not identify medications by name, but described them by class, clarifying with each patient that the medications were or were not working as well as asking about side effects.

Safety plans were explicitly reviewed with the two patients who had them. Two of the patients had upcoming release dates and release planning was discussed but not identified as a formal treatment goal for either patient. The correctional counselor provided input into all meetings, reviewing the programs available to the patients, including waitlist information regarding educational programs and jobs. The meetings were generally collaborative. All meetings concluded with agreement that the patients should remain at the EOP level of care but in only one case was the rationale clearly stated. Overall, the observed IDTT meetings were adequate.

The Program Guide requires that EOP patients receive an initial IDTT meeting within 14 calendar days of arrival to the institution and a routine IDTT meeting every 90 days thereafter. *See* ECF No. 7333-1 at 57, 59.

The monitor randomly selected and reviewed the healthcare records of 30 EOP patients to assess compliance with Program Guide timeframes for initial IDTTs during patient stays.

Regarding initial IDTTs, 30 patients required them and 26 or 87 percent occurred timely. Twenty-nine or 97 percent were attended by all required staff, while patients attended 26 or 87 percent of the initial IDTTs reviewed. The reasons IDTTs were held in absentia included patient refusals, custody modified program, and medical isolation due to public health restrictions.

To measure timeliness of routine IDTT meetings, CDCR produced an appointments report that included individuals who were required to receive a routine IDTT meeting during the review period. For the 250 patients in CDCR's appointments report from December 1, 2024 through May 30, 2025, there were 384 completed and refused initial or routine IDTT meetings. When a patient had either a completed or refused initial IDTT meeting and a routine IDTT meeting, or more than one routine IDTT meeting, timeliness in accordance with Program Guide requirements was able to be calculated. Of the 384 completed and refused IDTT meetings, 135 were for individuals who had at least two IDTT meetings. Of those 135 IDTT meetings, there were six or four percent that occurred beyond Program Guide requirements with a range of 91 and 95 days between IDTT meetings. Of note, the report did not include individuals that did not have a completed or refused IDTT meeting, such as those that were not scheduled.

During the review period, EOP patients were offered recreational therapy groups, caseload groups, and nursing led treatment groups (NLTGs). Recreational therapy groups were two hours in length and offered to patients five times each week. Patients were reportedly placed into cohorts of 30 patients and assigned to groups accordingly. Given the size of the EOP population and the limited space for groups, two cohorts were combined for each group offered, resulting in group sizes of up to 60 patients facilitated by two recreational therapists. Caseload groups were offered to patients every other week by their primary clinicians. NLTGs were offered to EOP patients every weekday, at least six times per day. During the review period, 220

unique patients were enrolled in NTLGs and 4,193 NTLG appointments were scheduled for EOP patients.

The monitor's expert observed two RT groups during the monitoring tour. One was entitled, "Cognitive Skills" and included 30 patients seated in a semi-circle. The group started with seven patients reading quotes provided by the recreational therapists and describing what the quotes meant to the individual patient. There was no discussion about the quotes. Then, a song was played for patients to listen to without the written lyrics being provided, and then the song was replayed with the lyrics provided. Given the loud air conditioning system, it was challenging to hear anything being said. The utility of the group was limited by its size and the noise in the large open space. The group was not clinically relevant for patients and it was unclear how it supported cognitive skills.

A recreational group in the yard was also observed. It included two cohorts and two RTs. Patients "signed in" with the recreational therapists and engaged in walking, exercise, or other activities outside. Two patients were playing bocce with the recreational therapists. The group was obviously leisure in nature and for most patients, the time was unstructured.

When patients and staff were asked about the high rate of patient refusals for groups, a number of reasons were reported. They included the length of groups, the non-clinical nature of the groups, the required walking distance to the gym to attend groups, and the heat outdoors. The biggest obstacles to providing more meaningful groups to patients was a lack of staff and a lack of space.

*Individual Treatment*

The Program Guide requires that patients are offered an initial psychiatrist evaluation before their initial IDTT meeting and within 14 calendar days of arrival to the institution or level

of care change. *See* ECF No. 7333-1 at 57. Thereafter they are required to receive a routine psychiatric contact every 30 calendar days. *Id*. at 59. Patients are also required to receive a primary clinician evaluation within 14 calendar days of arrival and weekly (i.e. once per calendar week with no more than ten calendar days between contacts) with either a primary clinician or in group psychotherapy with an individual contact every other week. *Id*. at 57, 59.

The monitor randomly selected and reviewed the healthcare records of 30 EOP patients to assess compliance with Program Guide timeframes for initial psychiatry evaluations during patient stays. All 30 patients required initial psychiatry evaluations and 29 or 97 percent timely occurred. Twenty-one of 70 percent of the reviewed initial psychiatry evaluations occurred in a confidential setting. The reasons evaluations were non-confidential included patient refusals and medical restrictions due to COVID-19. Telepsychiatry was not utilized for initial psychiatry evaluations.

To measure timeliness of routine psychiatry contacts, CDCR produced an appointments report that included individuals who were required to receive a routine psychiatry contact during the review period. For the 223 patients in CDCR's appointments report from December 1, 2024 through May 30, 2025, there were 786 completed and refused contacts, 566 or 72 percent of the completed contacts were confidential as reported by the institution. When a patient had more than one completed or refused contact, timeliness in accordance with Program Guide requirements was able to be calculated. Of the 786 contacts, 564 were for individuals who were scheduled at least twice by the psychiatric provider. Of those 786 contacts, there were 28 or four percent that occurred beyond Program Guide requirements with a range of 31 and 99 days.

The monitor randomly selected and reviewed 30 EOP patients to assess compliance with Program Guide timeframes for initial primary clinician evaluations during patient stays. All 30

patients required initial primary clinician evaluations, and all were timely completed. Twenty-nine or 97 percent of reviewed primary clinician evaluations were conducted in a confidential setting. The reason the primary clinician evaluation occurred in a non-confidential setting was the result of patient refusal and custody modified programming. Telehealth was utilized for four or 13 percent of initial primary clinician evaluations.

To measure timeliness of routine primary clinician contacts, CDCR produced an appointments report that included individuals who were required to receive routine primary clinician contacts during the review period. For the 206 patients in CDCR's appointments report, there were 1,290 completed and refused contacts, of which 871 or 68 percent were confidential as reported by the institution. When a patient had more than one completed or refused contact, timeliness in accordance with Program Guide requirements was able to be calculated. Of the 1,290 completed and refused contacts, 1,084 contacts were for individuals who were seen at least twice by the primary clinician. Of those 1,290 contacts, there were 328 or 25 percent that occurred beyond Program Guide requirements with a range of 11 and 28 days between contacts.

There were 1,012 completed individual primary clinician contacts. Most contacts (597) were documented with a duration between one and 15 minutes; 56 were documented with a duration between 16 and 30 minutes, 95 with a duration between 31 and 60 minutes, 27 with a duration between 61 and 95 minutes, and ten with a duration over 96 minutes. Thirty contacts were documented with a duration of zero minutes.

There were eight peer support specialists (PSSs) at PVSP, all of them were assigned to the EOP. Three of them had previously been treated at the EOP level of care. At the time of the monitoring tour, the PSSs were not assigned any specific duties but instead were instructed to simply be present on the EOP housing unit to familiarize themselves with the patients. They had

been visiting the unit for three weeks. The EOP supervisor reported that initially the custody staff on the EOP were not comfortable with the PSSs having access to the unit at any time but they were growing more comfortable with the process. One interviewed PSS reported having completed extensive training and was proud to be able to provide support to patients on the EOP unit. At the time of the interview, he was working with an EOP patient on a relapse prevention plan related to substance use, as the EOP patient had a parole date within the next year.

Nine EOP patients were interviewed in small groups during the site visit. All patients reported seeing their primary clinicians weekly, either individually or in caseload groups. Meetings with the primary clinicians were noted to be confidential, but one patient reported a concern about the presence of a telepresenter during tele-mental health contacts. He reported that he was able to ask the telepresenters to leave the room. Psychiatric contacts were held at least monthly with a number of patients reporting seeing the psychiatrist more frequently as needed. Patients reported being offered groups for two hours each day, but a number noted that they did not attend secondary to the walk to the gym, the heat outside, and the limited utility of the recreational groups in assisting with their mental health needs. Three of the patients who were interviewed were primarily Spanish-speaking and noted that some of the groups were offered in Spanish as the recreational therapists spoke Spanish. One patient reported that there had been challenges with groups being held at conflicting times, such as the NLTGs being held at the same time as recreational therapy groups. The EOP supervisor noted that while conflicting groups had been a problem in the past, the issues were mostly resolved.

One patient reported that in addition to experiencing excessive heat in his room, that ice water was not routinely available on the unit during heat alerts; however, the Special Master's monitor did not note high temperatures in patients' rooms on the unit and there was no Stage two

heat alert during 2025 requiring water to be available on the unit. That patient did report that when it was excessively hot outdoors, recreational therapists provided packets for patients to review in their cells when they could not attend groups in the yard. Another patient expressed concerns about hygiene on the unit and the availability of cleaning supplies. That patient also complained that pillows and pen fillers were not available on the unit. When asked, custody staff reported that cleaning supplies were available, but pillows were not standard issue for patients and pen fillers were not currently available as the unit issued over 1,000 pen fillers and they have all been used and no more were available at that time.

Staff working in the EOP reported an increase in medication refusals with medications no longer being provided in the EOP housing unit. Patients were reporting anxiety about going to mainline to take medications. Additionally, staff reported that a shade structure placed in the yard for EOP patients to stand under during medication pass was moved to cover the general population/3CMS medication line, leaving EOP patients exposed to the sun. Staff also expressed concern about the lack of space for EOP treatment as well as the mold, pests, and heat within the EOP housing unit.

Overall, the EOP provided marginally adequate care to patients. The biggest challenges were the provision of meaningful groups, the lack of experience among the mostly unlicensed primary clinicians regarding treatment planning and working with seriously mentally ill patients, space, and staffing challenges.

<u>3CMS</u>:

The staff-to-patient ratios from the 2009 Staffing Plan and 2021 adjustments to the 2009 staffing plan required that staff psychiatrists who treat 3CMS patients maintain a caseload of 280 patients per psychiatrist if the patient was prescribed medications and 675 patients if the patient

was not prescribed medications.[111] *See* ECF No. 3693 at 12 and 6978-1 at 3. Staff-to-patient ratios from the 2009 Staffing Plan required that primary clinicians who treat 3CMS patients maintain a caseload of 97 patients per clinician. *See* ECF No. 3693 at 12.

The two 3CMS psychiatrists had caseloads within established caseload ratios. Three of six 3CMS primary clinicians had caseloads within the established caseload ratios. However, three primary clinicians had caseloads above the established caseload ranging from 111 – 195 patients. In addition, four of the six primary clinicians were tele-mental health providers.

*IDTTs*

During the monitoring tour, the monitor's expert observed four initial IDTT meetings for 3CMS patients across multiple units. Both IDTT rooms were notably small and crowded, even with only the treatment team present, which impacted comfort and ease of participation.

The assigned primary clinician and psychiatrist were present for all observed IDTT meetings. However, the first IDTT meetings began without the CCI present due to a scheduling conflict with custody committee, which had been moved to the same day. As a result, CCI coverage was provided on a rotating basis, and in one case, a CCI arrived partway through the meeting but was not the assigned staff. The primary clinician explained that this scheduling

---

[111] The Program Guide requires that "[e]ach CCCMS inmate patient on psychiatric medication…be reevaluated by a psychiatrist a minimum of every 90 days regarding psychiatric medication issues." (Program Guide at 12-3-11). The 2009 Staffing Plan established a psychiatry staffing ratio for every 3CMS patient in the general population and did not distinguish between patients on medications and patients who were not. *See* ECF No. 3693 at 8. The Adjustments to the 2009 Staffing Plan, ECF No. 6978-1, which were approved by the Court on January 27, 2021 (See ECF No. 7035 at 2), established a new staffing ratio of 675 patients per psychiatrist for patients who are not on medications for six months or more. For the purpose of reporting compliance with staff-to-patient ratios, it was unclear whether the patient's included in each reported caseload were prescribed medications at the time of the site visit.

conflict has been an ongoing challenge, particularly as the psychiatrist was only available that day.

The psychiatrist had not previously seen the patients for an initial assessment, but the primary clinician had. The team functioned cohesively and collaboratively, with a comprehensive history of each patient presented. However, treatment was not discussed, and higher level of care was not reviewed during these meetings. The psychiatrist engaged with patients regarding medication management, but aside from this, there was little substantive discussion of treatment, with only vague references to Program Guide requirements (e.g., "see you every 3 months").

Across all observed IDTT meetings, patients were present and invited to provide input regarding their symptoms and goals. When concerns were raised, staff either addressed them during the meeting or indicated they would be followed up at a later time. This approach supported patient engagement and ensured their perspectives were incorporated.

The monitor's expert identified significant opportunities for improvement. Treatment plan goals and objectives were not clearly articulated and lacked measurable criteria. In many cases, goals were generic and not consistently tied to patient symptoms or diagnoses. Diagnoses were discussed with some, but not all, patients, resulting in inconsistency. The team did not consistently review or update treatment plans based on current clinical information for every patient. To improve the IDTT process, the institution should consider standardizing the articulation of treatment plan goals to ensure they are individualized and measurable, ensuring diagnoses are consistently reviewed and discussed with each patient, and address room size and scheduling issues to support full team participation and effective discussion.

Initial IDTT meetings for 3CMS patients are required to occur within 14 working days of arrival to the institution or level of care change and annually thereafter. *See* ECF No. 7333-1 at 43-44.

The monitor randomly selected and reviewed the healthcare records of 30 mainline 3CMS patients to assess compliance with Program Guide timeframes for initial IDTTs during patient stays. All 30 patients required initial IDTTs and 19 or 63 percent timely occurred. Of the 30 initial IDTTs reviewed, the required staff attended all, and the patients were present at 25 or 83 percent. The reasons initial IDTTs were held in absentia included patient refusals.

To measure timeliness of routine IDTT meetings, CDCR produced an appointments report that included individuals who were required to receive a routine IDTT meeting during the review period. For the 723 patients in CDCR's appointments report, there were 726 completed routine IDTT meetings. When a patient had either a completed or refused initial IDTT meeting and a routine IDTT meeting, or more than one routine IDTT meeting, compliance with Program Guide timeframes was able to be calculated. Of the 753 IDTT meetings, 39 were for individuals who had at least two IDTT meetings. Of those, all 39 were compliant with Program Guide timeframes. Of note, the report did not include individuals that did not have a completed IDTT meeting, such as those that were not scheduled in accordance with the institution's triage plan.

Of the 753 completed routine IDTT meetings, eight were reported to have been completed in zero minutes, 717 were completed within 15 minutes, 18 lasted between 16 and 30 minutes, seven lasted between 31 and 60 minutes, two lasted between 61 and 95 minutes, and one was documented with a duration of more than 95 minutes.

A random sample of 30 patients was selected to verify consistency between the appointments report and clinical documentation in EHRS. Of the 34 contacts reviewed, all 34 were consistent with the appointments report.

*Individual Treatment*

The Program Guide requires that patients are offered an initial psychiatrist evaluation before their initial IDTT meeting. *See* ECF No. 7333-1 at 34-50, 641. Thereafter they are required to receive a routine psychiatric contact every 90 calendar days if the patient is prescribed a psychotropic medication. *Id*. at 44. Patients are also required to receive a primary clinician evaluation within ten working days of arrival and every 90 calendar days thereafter. *Id*. at 41, 48.

The monitor randomly selected and reviewed the healthcare records of 30 mainline 3CMS patients to assess compliance with the Program Guide timeframes for initial psychiatry evaluations. All 30 patients required initial psychiatry evaluations and 26 or 87 percent were timely. Twenty-seven or 90 percent of the reviewed initial psychiatry evaluations were conducted in a confidential setting. The reason initial psychiatry evaluations were held in a non-confidential setting were due to patient refusals. Telepsychiatry was utilized for 16 or 53 percent of initial psychiatry evaluations.

To measure timeliness of routine psychiatry contacts, CDCR produced an appointments report that included individuals who were required to receive a routine psychiatry contact during the review period. For the 619 patients in CDCR's appointments report covering patients who received at least one routine psychiatry contact during the review period, there were 1,206 total completed and refused contacts. Of the 1,116 that were completed, 1,050 or 94 percent were reported as being conducted in a confidential setting. When a patient had more than one

completed contact, compliance with Program Guide timeframes was able to be calculated. Of the 1,116 completed contacts, 590 were for individuals who were seen at least twice by a psychiatric provider. Of those 590 contacts, 11 or two percent of contacts were completed beyond the Program Guide required timeframes. Of note, the report did not include individuals that did not have complete contacts, such as those that were not scheduled in accordance with the institution's triage plan.

A random sample of 30 patients was selected to verify consistency between the appointments report and clinical documentation in EHRS. Of the 69 contacts reviewed, 66 or 96 percent were consistent with the appointments report.

The monitor randomly selected and reviewed the healthcare records of 30 mainline 3CMS patients to assess compliance with Program Guide timeframes for initial primary clinician evaluations during patient stays. Of the 30 required primary clinician evaluations, 21 or 70 percent were timely or within ten calendar days of arrival or change in level of care. Twenty-five or 83 percent of initial primary clinician evaluations reviewed were conducted in a confidential setting. Non-confidential contacts were due to patient refusals. Telehealth was utilized for 20 or 67 percent of initial primary clinician evaluations.

To measure timeliness of routine primary clinician contacts, CDCR produced an appointments report that included individuals who were required to receive a routine primary clinician contact during the review period. For the 804 patients in CDCR's appointments report, there were 1,519 total completed and refused contacts. Of the 1,480 that were completed, 1,285 or 87 percent were reported as being conducted in a confidential setting. When a patient had more than one completed contact, compliance with Program Guide timeframes was able to be calculated. Of the 1,480 completed contacts, 720 were for individuals who were seen at least

twice by a primary clinician provider. Of those 720 contacts, seven or one percent of contacts were completed beyond the Program Guide required timeframes. Of note, the report did not include individuals that did not have completed contacts, such as those that were not scheduled in accordance with the institution's triage plan.

Of the 1,480 completed routine primary clinician contacts, 25 were reported to have been completed in zero minutes, 735 were completed within 15 minutes, 564 lasted between 16 and 30 minutes, 149 lasted between 31 and 60 minutes, four lasted between 61 and 95 minutes, and three were completed in greater than 95 minutes.

A random sample of 30 patients was selected to verify consistency between the appointments report and clinical documentation in EHRS. Of the 61 contacts reviewed, 57 or 93 percent were consistent with the appointments report.

The monitor's expert conducted interviews with five 3CMS patients to assess their experiences receiving mental health services at the institution. All patients reported seeing their psychiatrist and primary clinician at least every 90 days, with the option to request additional sessions as needed. Both psychiatric and primary clinician encounters were delivered via tele-mental health, and patients indicated that these interactions were helpful and supportive. Continuity of care was noted as a positive aspect, with patients expressing appreciation for regularly seeing their assigned primary clinician. Despite this, patients had only a vague understanding of their treatment goals and were generally unsure about the specific contents of their treatment plans. There was little awareness of individualized objectives or how their treatment plans were developed or updated. None of the patients reported specific barriers to accessing mental health support, and all understood the process for requesting additional sessions if needed.

Overall, patient feedback reflected satisfaction with individual clinician encounters but highlighted limited engagement with treatment planning.

Interviewed staff reported that drug use was a significant issue at the facility. Staff also reported an uptick in medication refusals based on the aforementioned changes to the medication administration process. Finally, staff expressed concern with the condition of the institution, including concerns with mold, air circulation, treatment space, as well as the delayed response to the presence of rodents.

Minimum Support Facility:

PVSP provided the updated LOP for Correctional Clinical Case Management System Level of Care and Minimum Support Facilities. Regarding MSF training for mental health staff, both chief psychologists, four of seven clinical social workers, all eight psychologists, six of seven senior psychologists completed the requisite training. The one supervising psychiatric social worker did not complete the training. Regarding MSF staff training for custody staff, all six captains, the chief deputy administrator, all five correctional administrators, 16 of 19 CCIs, ten of ten CCIIs, both CCIIIs, all 28 Lieutenants, and 58 of 67 correctional sergeants completed the requisite training.

Other Issues:

Pre-Release Planning:

PVSP did not have a dedicated pre-release coordinator during the monitoring round. There were six weeks in early 2025 when an unlicensed psychologist was completing some pre-release requirements but for the majority of the review period, a statewide pre-release planning coordinator at headquarters provided extensive support and assistance to PVSP. Primary clinicians were responsible to complete the assessment and release of information (ROI) forms.

Because of the lack of an onsite pre-release coordinator, there were no pre-release groups during the review period.

Due to the lack of a dedicated coordinator, PVSP had a backlog for completion of necessary forms and assessments. In September 2024, the statewide pre-release coordinator began to provide support to PVSP to address the backlog. This continued to the time of the site visit, though mental health leadership reported that they hoped to have a dedicated pre-release coordinator by July 31, 2025. Until then, the statewide coordinator was responsible for running the pre-release report weekly. The statewide coordinator also completed transportation orders to the classification and parole representative (C&PR). In addition, the statewide coordinator also provided regular lists to the Chief of Psychiatry to facilitate completion of the mental health pre-release psychiatric powerform. Finally, the statewide coordinator had provided multiple training sessions to PVSP staff and remained a support to primary clinicians who had questions.

Two hundred and eighty-nine MHSDS patients (3CMS and EOP) received pre-release services from the transitional case management program (TCMP). These services included 242 submitted applications for services: 236 applications for Medi-Cal, 38 for SSI, and eight for VA services. Two hundred and fifty of these patients receiving services were participants at the 3CMS level of care with 39 at the EOP level of care.

Provision of pre-release planning services was deficient during the review period, primarily due to the lack of staff. It is critical that PVSP correct these deficiencies and provide comprehensive pre-release services as required by statewide policy.

Program Access:

a. Job and Program Assignments

PVSP reported that 830 job assignments were held by 14 EOP patients or eight percent of the EOP population, 161 3CMS patients or 21 percent of the 3CMS population, and 655 or 32 percent of the non-MHSDS population were assigned jobs. The 716 academic assignments were held by eight EOP patients or five percent of the EOP population, 137 or 18 percent of the 3CMS patients, and 571 or 28 percent were held by non-MHSDS incarcerated persons. The 259 vocational assignments were held by one EOP patient, 76 3CMS patients or ten percent of the 3CMS population, and 182 non-MHSDS incarcerated persons or nine percent of the non-MHSDS population. The 417 voluntary education assignments were held by one EOP patient, 81 or 11 percent of the 3CMS patients and 335 or 16 percent of non-MHSDS. The 380 substance abuse treatment assignments were held by six EOP patients or four percent of the EOP population, 92 3CMS patients or 12 percent of the 3CMS population, and 282 non-MHSDS incarcerated persons or 14 percent of the non-MHSDS population.

b. Milestone Credits

PVSP reported they awarded EOP patients 97 milestone credits, 3CMS patients 556 milestone credits, and non-MHSDS incarcerated persons 1,706 Milestone Completion Credits.

c. Out-of-Level Housing

As of June 20, 2025, regarding EOP level of care patients, 29 Level I patients were in Level II housing, and 44 Level III patients were in Level II housing.

Among 3CMS patients, PVSP reported that four Level I patients were in Level III housing, and 39 were in Level II housing. There were 38 custody Level II patients in Level I

housing, and 63 were in Level III housing. Forty-four Level III patients were in Level II housing, and 55 Level IV patients were in Level III housing.

d. ADA Reasonable Accommodations and Grievance Procedures

The institution provided data regarding attendance for training on accommodations and grievance procedures indicating ten mental health staff attended the training in March 2025 and that 36 mental health staff attended grievance and appeal overview training in 2024.

e. Unclothed Body Search

The monitor interviewed custody staff in the RHU regarding the unclothed body search policy and practice. The five RHU custody staff interviewed were knowledgeable of the policy and were able to clearly articulate how the policy was put into practice at PVSP RHU.

"C" Status:

The institution reported a total of 115 incarcerated persons on C-status at the time of the monitoring tour. Of that total, 33 or 28 percent were at the 3CMS level of care. The institution LOP was provided and indicated that incarcerated persons placed on C-status were moved to one designated housing unit on each facility and provided out of cell time (yard or dayroom) Monday through Friday for two hours each day. Incarcerated persons on C-status were not allowed to retain a TV or radio but were allowed to retain their tablet. The ability to make a phone call was disabled on the tablet during their time on C-status. Phone calls were only allowed on an emergency basis with approval by the facility lieutenant. C-status IPs were allowed to report to all ducats, including mental health appointments un-escorted. C-status IPs were not required to wear different clothing.

A review of ten committee actions regarding C-status indicated that they were deemed to be a "program failure" due to receiving two or more RVRs within a 180-day period of time. One

committee action placed the IP on work group A1 and privilege group C and not C/C, which allowed the IP to remain in their assignment and earn a reduction in their sentence.

Case-by-Case Reviews:

The monitor reviewed two ICC actions regarding pre-MERD consideration. Both ICC actions were held within approximately 90 days of the MERD. The ICC suspended the remaining RHU terms and referred the incarcerated persons for transfer, retaining them in RHU pending transfer.

The institution provided three ICC chronos indicating completion of the required case-by-case review at approximately 90 days in RHU. All three were retained in RHU with a pending MERD or an assessed and imposed MERD and were referred for a Long-Term Segregation Case Conference (LTSCC).

Regarding LTSCC reviews, the institution did not provide a copy of the actual LTSCC document that should be retained in the IPs SOMS record. The institution provided a copy of the LTSCC worksheet, which was not a final determination nor did it identify the actual participants in the LTSCC review. All LTSCC worksheets recommended retention in RHU for an additional 60 to 90 days.

Mental Health Referrals:

During the review period, PVSP made 1,524 mental health referrals, including 636 to psychiatry and 888 to primary clinicians. Psychiatry responded timely to eight of nine emergent, four of six urgent, and 599 of 621 or 96 percent of routine psychiatry referrals. Primary clinicians responded timely to 111 of 125 or 88 percent of emergent, 84 of 97 or 87 percent of urgent, and 641 of 666 or 96 percent of routine referrals.

Custody and Mental Health Partnership Plan:

The institution's CMHPP LOP was most recently revised as of February 2025 and was consistent with statewide policy. The institution provided documentation of the 3CMS weekly Supervisors meeting, the 3CMS monthly supervisor tours and the monthly meeting with the patient advisory council. All documentation was competed with annotations regarding staff and patient interviews. The documents indicated overall good communication between custody and mental health staff and patient interviews indicating general satisfaction with the delivery of mental health services. Patient interviews reflected a desire for additional opportunities for group treatment, the need for additional EOP treatment space and EOP patients expressing interest in being housed in the MSF.

The institution provided a copy of each QMC and MHPS meeting minutes for the review period. The QMC and MHPS meeting minutes reflected appropriate reporting of Executive Joint Rounding that occurred during the month including the information received during executive rounds. The information obtained via staff and patient interviews included concerns with rodents in the housing units, lack of response to patient crises, and lack of space for EOP groups. Staff reported that communication between mental health and custody staff was very good. Finally, custody leadership was tasked with remedying the absence of signatures on the 3CMS Weekly Supervisor meeting documents.

Daily huddles in EOP housing were compliant on second and third watches during the review period. The monitor reviewed 30 huddle reports during the review period. The documents provided consistently demonstrated both custody and mental health staff in attendance, the required huddle form was being used and completed with notations regarding transfers from higher level of care, patients new to the unit, patients with bizarre behavior, changes in medication and bad news.

One EOP morning huddle was observed. It included an unlicensed social worker, a sergeant, a correctional officer, the EOP supervisor, and two psychiatric technicians. The huddle followed the structured format and discussions demonstrated familiarity with the patients and collaboration among the members. For the patients identified as currently struggling psychiatrically, a plan was put in place to communicate concerns to the psychiatrist and assigned primary clinicians to address these concerns and for custody and psych techs to monitor these patients more closely. The psych techs reported an increase in medication noncompliance among patients secondary to changes in the medication pass process in June 2025.

Regarding annual CMHPP training, the institution reported one hundred percent compliance with the warden, chief deputy warden, five correctional administrators, six captains and 67 sergeants attending. For lieutenants 26 out of 27 or 96 percent and 681 out of 682 or 99.8 percent of correctional officers attended. Regarding mental health staff attending the annual CMHPP training, one hundred percent of the two Chiefs, four supervisors, seven psychologists, eight psychiatrists, and six social workers attended the required training.

Round table training was not in compliance. The documentation provided included Fourth Quarter training for RHU and First Quarter training for EOP housing. The RHU training documents regarding second watch included three custody staff and four mental health staff. For third watch, there were eight custody staff in attendance and one mental health staff. For the EOP housing training, one mental health staff and two custody staff attended on second watch. On third watch, one mental health staff attended and two custody staff. These numbers, for the RHU and EOP appear low based on the number of staff that were assigned to these areas.

Introduction to EOP groups were not conducted during the review period.

The institution reported a total of 54 staff complaints were filed by MHSDS patients during the review period. Of the 54 complaints filed, 36 were filed by 3CMS patients and 18 by EOP patients. The categories of the complaints included 35 that were referred to the hiring authority and no category was identified, five were for use of force, four for retaliation, four for integrity, three for other misconduct, two for sexual misconduct and one for religious practices. The decision taken on the 54 complaints included 21 identified staff misconduct, 15 were denied, two were rejected, two were re-directed, and 14 were unavailable.

With the exception of Quarterly Round Table training, the institution's implementation of the CMHPP was compliant during the review period.

Heat Plan:

CDCR required that each institution's heat plan local operating procedure incorporate the requirements of the 2025 Annual Heat Plan and Updated memorandum. The Plan requires daily meetings when the expected temperature is expected to reach 100 degrees or higher. PVSP's heat plan local operating procedure was revised in May 2025 and was compliant with the 2025 Heat Plan and Updated memorandum. Documentation reflected tours of the all yards in the facility occurred as well as a review of the cooling equipment, water fountains, showers and heat logs in the units. The minutes documented tracking of maintenance issues.

The 2025 Heat Plan and Updated memorandum required that each institution submit a Heat Plan Monthly Summary Report, signed by the warden and CEO, to headquarters each month from May 1 to October 31. PVSP produced a Summary Report for May, which reflected that there were nine Stage I heat alerts, and no Stage II or Stage III heat alerts during the review period. Examined daily activity reports (DARs) and daily heat logs for May were consistent with the Summary Report.

The Heat Plan and Updated memorandum also required institutions to include with the monthly submission a Heat Incident Log documenting the number of patients who experienced a heat-related illness. The Heat Incident Log must include the patient's information and details regarding the heat-related illness. PVSP reported no heat-related illnesses during the reporting period.

The 2025 Heat Plan and Updated memorandum required all custody officers and leadership staff to maintain knowledge of heat plan activation and act in accordance with the requirements of each stage. Fourteen housing units including the EOP housing unit (D-4) were toured and 25 custody officers were interviewed about the plan. Custody officers on Facilities A, B, C, D, and the MSF demonstrated adequate knowledge of the Heat Plan. The policy also required that when the Heat Plan was in effect, institutional staff must generate and distribute daily a list of all incarcerated persons currently prescribed any of the designated Heat Alert Medications. All custody staff were aware of the daily requirement and were able to provide the most current heat-risk incarcerated persons list during the interview.

To ensure proper and accurate temperature recording, the Annual Heat Plan and Updated memorandum required the warden or his designee to ensure an accurate thermometer was placed in a central, heat-neutral location to monitor outside ambient air temperatures, which must be recorded every hour, every day, from May 1 through October 31 of each year. The outside temperatures were measured by the central control sergeant and properly recorded in the appropriate form during the review period.

The warden or his designee is also responsible for ensuring that inside air temperatures are measured in all non-airconditioned living areas that house heat-risk incarcerated persons. Temperatures must be taken at the highest non-air-conditioned location where heat-risk

incarcerated persons are housed and must be recorded every three hours. The monitor observed appropriately placed working thermometers in all toured housing units. Additionally, secondary temperature probes were placed in all housing units except the MSF. These probes were placed in the housing unit pipe chase and registered temperatures from every cell's vent and provided readings for all cells within the designed ventilation system. The probes were connected to a monitor located at the officer's station. When interviewed, staff uniformly indicated that they look at both temperatures and log the highest. This was viewed as a best practice.

The monitor used a Protmex handheld temperature meter and compared the temperature readings in all toured housing units and all were within one degree. Additionally, all indoor temperature logs were viewed in all toured housing units. No discrepancies were noted.

In an effort to ensure that heat-risk incarcerated persons were afforded equal access to programs, services, and activities during extreme weather conditions, the 2025 Heat Plan and Updated memorandum required institutions to devise and include any reasonable accommodations and alternatives to yard activities when revising their LOP. All reasonable accommodations provided to heat-risk incarcerated persons during heat alert activation must be documented in the institution's Daily Activity Reports (DARs).

Reviewed DARs reflected that PVSP staff offered dayroom to heat-risk incarcerated persons as an accommodation during Stage I heat alert activations. Additionally, PVSP staff indicated that ice and cold water were provided in all housing units during Stage II heat alerts and that showers and cell doors were opened for heat risk patients. The monitor observed working ice machines in the kitchen areas, water containers, fans, and water fountains on all facilities.

During the tour of the facility yards, it was observed that sunshades were in disrepair. It was reported that several had been ruined by gusts of wind and that PVSP was in the process of reviewing more durable options to replace the existing structures in the med line areas.

The 2025 Heat Plan and Updated memorandum required annual training on the institution's Heat Plan, including measures when heat stress symptoms are identified and/or reported, to be provided to custodial and clinical staff by the In-Service Training Officer. Of the 817-custody staff required to take the training, 814 or 99.6 percent attended. For mental health staff, all chiefs, Seniors and Supervisors of psychology, psychiatry, and social workers attended the training as did all six social workers, five of nine psychologists. The psychiatrist did not attend. For nurses, 71 of 80 or 89 percent attended the training.

Overall, PVSP's implementation of the 2025 Heat Plan and Updated memorandum was compliant during the review period.

RVRs:

PVSP reported a total of 1,717 RVRs were issued during the review period. Of that total, one was issued to an ICF level of care patient, 11 to MHCB level of care patients, 89 to EOP level of care patients, and 560 to CCCMS level of care patients. A total of 661 RVRs were issued to MHSDS patients or 38 percent of the total number of RVRs issued.

The monitor reviewed twelve RVRs and MHAs for compliance with policy. Custody staff referred the RVR to mental health staff within policy timelines in six out of twelve cases or 50 percent of the time. The range of the referral being late was one to nine days late. Mental health staff completed the MHA and returned it to custody staff timely in all 12 cases or 100 percent. The patients were assigned a staff assistant per policy. The MHA was completed in a private setting in seven out of 12 cases. In the five cases that were not completed in a private

setting, the patient refused the interview. The senior hearing officer (SHO) did not document their consideration of the MHA input in any case. In most RVRs, the SHO cut and pasted the response to question three or four in the hearing documentation with no statement of their consideration. The SHOs mitigated penalties in five out of the six RVRs where mitigation was recommended. The one case where the MHA recommended mitigation was not followed, the SHO stated that due to the patient's behavior the assessment of 30 days of loss of dayroom was for the safety of the housing unit staff.

In two MHAs, the clinician recommended mitigation of continued access to mental health treatment. This recommendation was not consistent with policy as access to mental health treatment cannot be impacted as part of a RVR penalty. This indicates additional training should be provided to clinicians who complete the MHA forms. Additionally, one MHA was completed by an unlicensed clinical social worker, who had not attended the training according to the document provided by the institution.

Regarding training, the one chief deputy warden, five correctional administrators, six captains, 27 lieutenants and 67 sergeants attended the required training. For mental health staff, two chief psychologist, four psychologists and two senior psychologists attended the required training.

Regarding the January 8, 2025, memorandum titled, "Limited Licensed Healthcare Staff Access to Rules Violation Reports," the institution provided training data for healthcare staff. The institution reported 15 psych. techs, eight senior psychologists, five psychologists, five psychiatrists, two chief psychologists, and one chief psychiatrist attended the training. In interview with the institution CEO, the CEO stated no RVRs have been written by mental healthcare staff nor has any part of the required process been initiated.

Overall, the institution's RVR practices were not compliant with remedial requirements during the review period. Custody staff did not refer the RVR to MH staff in a timely manner, and the SHOs did not adequately document their consideration of the MHA information but rather quoted the MHA statements. Additionally, in two MHAs, the mental health staff recommended inappropriate mitigation stating the patient be allowed access to mental health treatment. The SHO cannot limit or restrict the patient's access to mental health treatment as part of any disciplinary action.

Use of Force:

PVSP reported no controlled use of force incidents and 238 immediate use of force incidents during the review period. Of these, 68 or 29 percent involved MHSDS patients. The monitor reviewed six immediate uses of force incidents including available video surveillance. All but one incident was captured on the surveillance system. All incidents were determined to be in compliance with CDCR policy and procedure.

The monitor reviewed the timeliness of the Institution Executive Review Committee (IERC), review of use of force incidents. Title 15 requires use of force incidents to be presented to IERC within 30 days of the incident. For immediate use of force incidents, 78 or 33 percent were either closed or noted as review completed, 14 or six percent were at the executive level of review, 62 or 26 percent were at Level I or Level II of review, and 56 or 23 percent were reported as being open. Two were not closed as the use of force review was suspended and referred to the Allegation Inquiry Management System (AIMS) for investigation. The 27 incidents that were not closed were 60 to 210 days beyond the review requirement.

PVSP reported all required custody staff attended use of force training. For mental health and nursing staff, 111 of 112.5 or 99 percent attended the training.

Overall, the institution's use of force practices were compliant with remedial requirements during the review period.

Lockdowns/Modified Programming:

The institution reported one program status report (PSR) occurred during the review period. The PSR started on May 25, 2025, and ended on June 9, 2025, on Facility A impacting all housing units on that facility due to a riot involving 60 incarcerated persons. According to the PSR, all health care ducats were issued and honored including mental health ducats. Medication pass was completed in the housing units at the officer podium.

Access to Care:

A review of PVSP's monthly Health Care Access Quality reports from December of 2024 through May of 2025 indicated 27,450 issued mental health ducats and add-on appointments, of which 17,159 or 63 percent were completed and 10,462 or 37 percent were not. Of the non-completed appointments, 3,112 or 24 percent were not completed due to non-custody factors, and 9,704 or 76 percent were not completed due to patient refusals.

*Coleman* Postings:

All toured housing units contained *Coleman* posters in English and Spanish in areas accessible to patients.

**APPENDIX A – 23**
**RICHARD J. DONOVAN CORRECTIONAL FACILITY (RJD)**
Site Visit: January 21, 2025 – January 25, 2025
Review Period: June 1, 2024 – November 30, 2024

Census:

As of January 17, 2025, RJD's total population was 3,183 incarcerated persons, which was a ten percent increase from the previous round. *See* Thirtieth Round Monitoring Report – Part C, ECF No. 8095 at 146. There were 1,916 MHSDS patients, representing 60 percent of RJD's total population and a four percent decrease from the Thirtieth Monitoring Round. *Id.*

RJD's MHCB housed ten patients.

There were 80 MHSDS patients in restricted housing, which included 63 EOP RHU patients and 17 3CMS RHU patients awaiting transfer.

There were 845 mainline EOP patients and 975 mainline 3CMS patients, reflecting an 11 percent increase and nine percent decrease from the Thirtieth Monitoring Round, respectively.

There were also six MHSDS patients identified as "mismatch housing [with] MHI".

Staffing:

The chief and senior psychiatrist positions were filled. Of 14.5 staff psychiatry positions, seven were filled, for a 52 percent vacancy rate. The use of 6.38 contractors reduced the staff psychiatry functional vacancy rate to eight percent. Both telepsychiatry positions were filled.

Accounting for on-site psychiatry staff (civil service and registry) and telepsychiatry staff, there was an overall functional vacancy rate of seven percent among staff psychiatry positions.

Both chief psychologist positions were filled. Eight of 8.5 senior psychologist supervisor positions were filled leaving a six percent vacancy rate. Seven of 8.5 senior psychologist specialist positions were also filled reflecting an 18 percent vacancy rate. Twenty-six of 52 staff

psychologist positions were filled, for a 50 percent vacancy rate. One staff psychologist was on extended leave, while the use of 16.7 contractors reduced the staff psychologist functional vacancy rate to 20 percent. Eleven staff psychologists were unlicensed. The three telepsychologist positions were filled.

Accounting for on-site psychologists and tele-mental health providers, there was an overall functional vacancy rate of 19 percent among staff psychology positions.

The supervising social worker position was filled. Of 22 clinical social worker positions, 8.5 were filled for a 61 percent vacancy rate. The use of 11 contractors decreased the clinical social worker functional vacancy rate to 11 percent. Five clinical social workers were unlicensed. Of the three tele-social worker positions, one was filled for a 67 percent vacancy rate.

Accounting for on-site social workers and tele-mental health providers, there was an overall functional vacancy rate of 18 percent among clinical social worker positions.

Of 30 recreation therapist positions, 28 were filled, indicating a seven percent vacancy rate; one contractor filled an additional position which reduced the functional vacancy rate to three percent.

Both senior psych tech positions were filled. Forty-three of 71.7 psych tech positions were also filled, for a 40 percent vacancy rate. Four psych techs were on extended leave and four contractors filled four vacant positions reflecting no change in the vacancy rate.

Of 23.7 supervising registered nurse positions, 22.5 were filled with a five percent vacancy rate; however, one supervising registered nurse was on extended leave leaving a nine percent functional vacancy rate.

Of 82.6 MHSDS registered nurse positions, 73 were filled for a 12 percent vacancy rate. Contractors filled five positions, and one nurse was on extended leave reflecting a functional vacancy rate of seven percent.

Of 11.8 CNA positions, 11.6 were filled, for a two percent vacancy rate. Registry CNAs filled 11 additional positions.

Forty-eight of 58.3 LVN positions were filled reflecting a vacancy rate of 18 percent. Contractors reportedly filled 28 additional positions, eliminating the functional vacancy rate.

Medical assistants assigned to tele-mental health providers filled three of eight positions for a 63 percent vacancy rate; contractors filled three additional position leaving a functional vacancy rate of 25 percent.

Of 29.5 mental health clerical positions, 21.5 were filled, for a 27 percent vacancy rate. One mental health clerical staff member was on long term leave leaving a functional vacancy rate of 31 percent.

The 1.5 OSS II positions and 1.5 AGPA positions were filled. Two of four HPS I positions were filled for a vacancy rate of 50 percent. The CHSA position was vacant.

As for custody staffing, the warden and chief deputy warden's positions were filled, as were all six associate wardens' positions, and all seven captains' positions. Positions were also filled for 26 of 28 CC Is, all four CC IIs, 38 of 40.8 lieutenants, 105 of 109 sergeants, and 910 of 965 correctional officers.

At the time of the site visit, 20 clinical supervisors were responsible for supervising 33 unlicensed clinical interns and post-doctorate fellows, namely, five doctoral students, 11 unlicensed psychologists, 12 psychology interns, and five unlicensed social workers.

Supervision included the review of clinical notes, individual treatment supervision, supervised IDTTs, and weekly group meetings.

Tele-Mental Health:

There were two telepsychiatrists, three telepsychologists, and one tele-social worker who treated MHSDS patients at RJD during the review period. Whether any clinician completed the required on-site visits during the review period could not be ascertained.

The telepsychiatrists at RJD provided services to mainly 3CMS patients, however it was common that the telepsychiatrists would be assigned to cover EOP consultations or carry a small EOP caseload on occasion. The 2009 Staffing Plan required that staff psychiatrists who treat 3CMS patients maintain a caseload ratio of 280 patients per psychiatrist if the patient was prescribed medications and 675 patients if the patient was not prescribed medications.[112] *See* ECF No. 3693 at 12 and 6978-1 at 3. One telepsychiatrist maintained a 3CMS caseload of 222 patients, while the other telepsychiatrist maintained a caseload ratio of 616 patients.

There were also three telepsychologists at RJD who primarily treated 3CMS patients. Two telepsychologists carried caseloads while the third completed gender affirming surgery evaluations and did not carry a caseload. The staff-to-patient ratios from the 2009 Staffing Plan require that staff psychologists who treated mainline 3CMS patients maintain a caseload ratio of

[112] The Program Guide requires that "[e]ach CCCMS inmate patient on psychiatric medication…be reevaluated by a psychiatrist a minimum of every 90 days regarding psychiatric medication issues." (Program Guide at 12-3-11). The 2009 Staffing Plan established a psychiatry staffing ratio for every 3CMS patient in the general population and did not distinguish between patients on medications and patients who were not. See ECF No. 3693 at 12. The Adjustments to the 2009 Staffing Plan, ECF No. 6978-1, which were approved by the Court on January 27, 2021 (See ECF No. 7035 at 2), established a new staffing ratio of 675 patients per psychiatrist for patients who are not on medications for six months or more.

97 patients per primary clinician. *See id*. Each telepsychologist exceeded established caseload ratios with 127 and 143 patients respectively.

RJD also employed one licensed tele-social worker who treated 3CMS patients and maintained a caseload of 49 patients which was within the required caseload ratio for a primary clinician. *See id*.

Tele-mental health clinicians at RJD completed a myriad of mental health services, including individual therapy, completion of initial assessments, MTPs, IDTTs, completion of emergent, urgent, and routine consults, completion of SREs, and completion of safety plans when indicated. The institution reported that no tele-mental health clinician facilitated group treatment.

RJD permitted telework for all senior psychologist specialists and two staff psychologists for one day per week. Additionally, MHSDS clerical, AGPA, and HPS I staff members were required to work three to five days on site and were allowed to telework for the remainder of the week.

Staff Recruitment:

RJD reported that CCHCS had implemented initiatives to assist with staff recruitment. On June 5, 2023, CCHCS developed the regional hiring unit to help streamline the hiring process for the mental health clinician classifications with a focus on expediting the hiring process. RJD reported that CCHCS increased marketing efforts for these mental health clinician classifications, implemented mid-step hiring practices, offered recruitment and retention differentials as well as annual bonuses. In addition, CCHCS offered hiring benefits for psychiatry in-person patient care and allowed additional payment to psychiatry and psychology staff who worked additional caseloads.

However, despite progress with staffing since the prior round, RJD leadership reported that clinician turnover remained high. ECF No. 8095 at 146-147 (including tele-mental health positions, the psychiatrist functional vacancy rate at RJD in the Thirtieth Monitoring Round was two percent while the primary clinician functional vacancy rate was 28 percent). Notably, twelve long-term civil service clinicians left RJD within the last seven months, largely due to telehealth opportunities and cost-of-living concerns in the region.

Quality Management:

Overall, the institution maintained a comprehensive quality improvement program with few changes since the last reporting period.

RJD did not provide the local governing body's minutes.

The quality management committee (QMC) convened monthly. Although a quorum was noted for each of the meetings, during the June 2024 QMC meeting, the attending participants were not identified. The reviewed committee meeting minutes reflected comprehensive agendas and thorough documentation. Agenda topics included Performance Improvement Work Plans (PIWPs) related to mental health including a ducat project, one-to-one suicide watch issue order, and offsite projects, such as a specialty scheduling project, and specialty services refusal project. In addition, subcommittee updates were addressed with regional correctional action plans, local operating procedures updates, and quality management support unit leadership updates.

The mental health program subcommittee (MHPS) met six times during the review period. The chief of mental health and the chief psychiatrist were identified as committee co-chairs. A quorum was reached for each meeting. Reviewed minutes indicated productive meetings with good attendance from required staff. Agenda topics were comprehensive, including mental health improvement plans focused on diagnostic monitoring of patients

prescribed select high-risk medications, timely IDTT meetings, and timely primary clinician contacts. Agenda items also included a review of acute and intermediate care referrals to inpatient care, peer review, the custody and mental health partnership plan, crisis intervention team (CIT), patient safety, general population (GP) patients on medications, safety planning to reduce suicide risk, including a to monitor new safety planning efforts, healthcare grievance reports, MHSDS COVID phases, mental health staffing shortages, and the impact of the custody modified program on the MHSDS.

Additionally, access to care was discussed, with a focus on the shortage of custody staffing and its impact on patient's access to confidential appointments. There was also noted discussion of treatment hours affected by custody modified programming, RHU EOP Hub certification, and medication management issues, including compliance with PC 2602 and clozapine diagnostic monitoring. Appropriate follow-up and actions were taken as necessary for identified issues, and overall documentation was useful and informative.

In addition to the warden's ducat project and one-to-one suicide watch issue orders, quality improvement projects at RJD addressed various issues, including timely psychiatry EOP routine contacts, timely medication continuity following community hospital returns, the Higher Level of Care (HLOC) project, and suicide precautions.

RJD corrective action plans targeted concerns about custodial movement of patients for appointments, healthcare first responders not being issued radios; porters unsupervised in certain areas, pharmacy facility concerns, emergency send-out transportation delays, medical storage, handling of protected confidential information, supply of Form 7362 for housing units, suicide watch protocols, and custody discharge checks.

The Emergency Medical Response Review Committee met monthly. The reviewed minutes demonstrated comprehensive reviews of relevant cases, including emergency medical response activations and transport outside the facility, with documented discussions.

RJD did not conduct QIT/FITs during the review period.

According to the documentation provided, RJD did not conduct a social worker or psychology peer review while waiting for further directives regarding the peer review process. However, four rounds of psychiatry peer reviews were conducted (July and November 2023, March and June 2024). During the June 2024 round, 16 staff participated, and 80 charts were reviewed, which resulted in 100 % meeting the standards of the completed peer review.

Medication Management:

CDCR's MAPIP monitored two overarching categories, namely diagnostic monitoring and medication administration. In broad terms, diagnostic monitoring included obtaining medication consents, as well as any physical examination, vital signs, or laboratory tests needed to minimize medication risks. Medication administration audited compliance with the availability, continuity, and actual administration of medications. RJD provided MAPIP results from June 1, 2024 through November 30, 2024. To be compliant, each category must meet the 90 percent threshold during this review period.

Overall, RJD's medication management displayed many limitations in both diagnostic monitoring and medication administration; these limitations translated directly into risk of patient harm, such as medication toxicity and gaps in medication treatment. However, the institution also had strengths, including overall compliance with medication line duration, administration of HS medications after 8:00 P.M., and good tracking of both clozapine and PC 2602 cases—critically important given that patients receiving these medications were frequently

the ones with the greatest level of psychiatric impairment. RJD leadership was aware of their deficiencies and had taken some actions, such as counseling of individual psychiatrists. Continued monitoring of these interventions are required to ensure both interval improvement and its sustained durability.

Diagnostic Monitoring

For required monitoring of antidepressants, four metrics were required: EKGs for patients taking tricyclic antidepressants (EKG); medication consents; thyroid function tests; and obtaining blood pressure for patients taking venlafaxine. While each metric was assessed across a six-month period, not all metrics were required each month. Out of the total 23 required metric-months, ten, or 43 percent, were compliant. Of the four metrics, the monitoring of blood pressure for patients taking venlafaxine was fully compliant for all six months of the review period, while thyroid function tests were fully non-compliant for the six-month review period. The remaining two metrics were partially compliant with EKGs compliant for two of five months and medication consents compliant for two of six months.

**Antidepressant Monitoring Metrics at RJD**



Diagnostic monitoring for patients prescribed atypical antipsychotics required 11 metrics. These included: AIMS, blood pressure, glucose, CBC, CMP, EKG, height, lipids, medication consents, thyroid function tests, and weight. Of the total 65 metric-months of data required, 44, or 68 percent, were compliant. Of these, all required months for blood pressure, CBC, height, and weight were compliant. Lipid monitoring was non-compliant for all months, with the remaining metrics meeting partial compliance. Specifically, glucose and CMP were compliant for five of six months, medication consents were compliant for four of six months, EKG was compliant for four of five months, while AIMs and thyroid function tests were compliant for one of six months, respectively.

**Atypical Antipsychotic Monitoring Metrics at RJD**




While clozapine is an atypical antipsychotic, it is measured separately due to its elevated medical risks and resultant required closer monitoring. Of the total 58 metric-months, 50, or 86 percent, were compliant. Of the 11 metrics, RJD was fully compliant with four, including blood pressure, glucose, CBC, and weight, while all others displayed partial compliance. Specifically, height and lipids were compliant for five of six months, respectively, AIMS and medication

consents were compliant for three of five months, respectively, EKG was compliant for three of four months, and TFTs were compliant for one of two months.

**<u>Clozapine Monitoring Metrics at RJD</u>**




RJD had only two metric-months of required monitoring for the mood stabilizer carbamazepine. They were compliant for the one month of obtaining medication consents, and non-compliant for the one month of monitoring therapeutic medication levels. No monitoring of CBC or CMP was required.

Depakote is a mood stabilizing medication with required metrics of medication consents, CBC, CMP, and therapeutic medication levels. Of the total 24 metric-months of required data, six, or 25 percent, were compliant. RJD was not fully compliant with any of these individual measures. RJD was fully non-compliant for CBC and CMP, with medication consents compliant for five of six months and therapeutic medication levels compliant for one of six months.

**Depakote Monitoring Metrics at RJD**




The mood stabilizer lamotrigine only required medication consents; the institution was compliant for all three required months.

Lithium is a mood stabilizing medication, requiring medication consents, and monitoring of kidney and thyroid function, EKG, and therapeutic medication levels. Of the 25 metric-months of required data, 13, or 52 percent, were compliant. RJD was fully compliant with monitoring kidney function and EKGs, fully non-compliant with measuring therapeutic medication levels, and achieved compliance in four of six months for medication consents and two of six months for monitoring thyroid function tests.

**Lithium Monitoring Metrics at CMF**




During the review period, RJD carried out a PIWP for diagnostic monitoring of psychiatric medications. Psychiatry leadership monitored individual psychiatrists and counseled those with lower-performing metrics. RJD found that the results of the clozapine registry were inaccurate; this was reported to headquarters in July 2024. The institution expected increased patient adherence with the transition of Facility C from a level IV to a level III facility. One additional barrier was that custody was not consistently encouraging patients to comply with laboratory ducats.

While the progress seen was admirable, with overall compliance reaching the 90 percent threshold for August through October 2024, these numbers were a total measure of compliance, with some common metrics (e.g. height, weight, and blood pressure) diluting the smaller number but critically important labs (e.g. monitoring therapeutic medication levels in patients taking lithium).

Medication Administration

Medication administration metrics monitored critical aspects such as medication availability, continuity, preparation, and administration.

Those monitoring medication continuity include the following six measures: transfers from other institutions arriving at receiving and release (R&R); intra-institutional transfers to non-RHU locations; MHCB transfers; intra-institutional transfers to RHU; discharge from a community hospital or DSH; and upon parole or transfer to the community.

Additional MAPIP measures tracked the appropriate administration of medications given at HS (*hora somni*, or bedtime) which must be given on or after 8:00 P.M. (HS), and medications given in the A.M. and P.M. which must be given at least eight hours between doses. Metrics also evaluated whether chronic psychiatric medications were continued without interruption, and whether new medications were administered as ordered, and in compliance with required timelines.

The final germane MAPIP measures surrounded PC 2602 involuntary medication orders. These include whether a court order was in the medical record, and whether a medication order for the PC 2602 medication was present.

These 12 measures monitored for the six-month review period yielded 72 metric-months of data. When examined in aggregate, RJD was compliant for 20, or 28 percent.

Specifically, RJD was fully compliant with one measure (the presence of a court order in the medical record). The institution was fully non-compliant with six: transfers from other institutions arriving at receiving and release; intra-institutional transfers to non-RHU locations; MHCB transfers; discharge from a community hospital or DSH; medications given at HS; medications given in the A.M. and P.M.; and new medications administered. Intra-institutional transfers to RHU were compliant for one of six months, upon parole or transfer to the community was compliant for five of six months, chronic psychiatric medications that were

continued without interruption were compliant for three of six months, and whether a medication order for the PC 2602 medication was present was compliant for five of six months.

**<u>Monitoring Medication Administration Compliance at RJD</u>**




RJD reported that prescriptions were for a maximum of 180 days. For verbal and telephone orders, nursing had to "read back" the order, then the order was sent to the psychiatrist for co-signature. The institution did not specify the process for tracking signing verbal or telephone orders.

RJD did not report details surrounding KOP medications, such as the number of patients, the medication, and the level of care. Thus, it was not possible to verify compliance with established policies.

RJD reported that 1,153 patients were prescribed 1,269 psychiatric medications at HS. RJD was generally compliant with the requirement to administer medications at HS at 8:00 P.M. or later.

RJD did not report the average non-formulary rate for psychiatric medications during the monitoring period.

In accordance with statewide policy, RJD initiated clozapine within the MHCB. Additionally, it was a clozapine-maintenance institution. At the time of the monitoring tour, RJD reported 21 patients were prescribed clozapine.

At the time of the monitoring tour, 119 patients received PC 2602 involuntary medications. There were 13 initial emergent, 14 initial non-emergent, and 100 renewal petitions filed; all were granted. There were no cases of planned non-renewal, nor any cases of PC 2602 orders which lapsed due to administrative reasons.

Policy requires a patient's individual wait time for medications to be no more than 30 minutes, and the total duration of medication line to not exceed two hours. The institution reported 60 medication line audits during the reporting period. Individual wait times were in compliance for 59, or 98 percent of cases; the reason for the one audit out of compliance was not reported. Medication lines were under two hours in total duration.

Nursing audits reported small awnings over the medication pass window, but patients did not have protection from the elements while waiting in line. Audits also reported a lack of custody officer, as required by policy, in two pods of a housing unit. RJD did not report any conflict between medication administration and mental health programming.

RJD was generally compliant with required polypharmacy reviews.

<u>Transfers</u>:[113]

During the review period, there were 966 instances of 526 patients who were considered for, but not referred to, higher levels of care.

[113] The higher level of care (HLOC) transfers report provided by CDCR was inconsistent with the local institutional transfer log. As the inpatient coordinator felt that the local institutional transfer log was the most accurate, the monitor relied on this information. RJD's inpatient coordinator has held her position for over one year.

RJD referred 24 patients to acute care; 23 were accepted and one was rescinded. All 23 patients timely transferred within ten days. All referral packets were completed within two working days of identification.

RJD referred 48 patients to intermediate care; 42 referrals were accepted, five were rescinded, and one was rejected. All 42 patients transferred timely within 30 days. All referral packets were completed within five working days of identification.

There were 12 *Vitek* hearings for four acute and eight intermediate care patients. Data concerning each *Vitek* hearings' timeliness was not provided. No patients prevailed.

No patients with complex medical needs were transferred to inpatient care.

As compared to RJD's 936 MHCB referrals in the Thirtieth Monitoring Round, RJD made 735 MHCB referrals in the Thirty-First Round, of which 478 or 65 percent were rescinded. *See* ECF No. 8095 at 155 ("RJD made 936 MHCB referrals, of which 703 or 75 percent were rescinded."). Of the 257 MHCB admissions, nine or four percent took longer than 24 hours to transfer. The institution reported that the high percentage of recissions was due to patients reporting suicidal ideation during third watch. When assessed, telepsychiatry would take a conservative approach in referring patients to the MHCB because the telepsychiatrists were unable to conduct a face-to-face evaluation. These evaluations would routinely take place the next morning by an onsite clinician. During the face-to-face evaluation, it was often determined that the patient had made a statement about suicidal ideation for the purposes of affecting their housing placement or related to safety concerns. The clinician would typically find these reasons inadequate and did not meet the criteria for MHCB placement, resulting in a recission.

Five patients had three or more MHCB admissions.

There were 270 patients who transferred to a 3CMS RHU during the review period. Of the 270 patients, 217 or 80 percent transferred within 30 days of identification. Reasons for delays were due to patients who were out to court, the BPH schedule preventing patient transfer, and temporary medical holds.

EOP patients who were referred to EOP RHU were reportedly placed in RJD's EOP RHU in a timely manner.

During the reporting period, 44 patients' level of care was reduced from EOP to 3CMS. Twenty-three patients increased their level of care from 3CMS to EOP during the review period.

Programming:

MHSDS Patients in Restricted Housing:

RJD operated a restricted housing unit (RHU) for general population (GP) RHU and EOP RHU patients during the review period. As of January 17, 2025, RJD's GP RHU population was 40 incarcerated persons while the EOP RHU population was 80 patients that included 63 EOP patients and 17 3CMS patients awaiting transfer to a 3CMS RHU. During the review period, RJD's 63 bed EOP RHU averaged a census of 62 patients and ranged between 51 and 76 patients. The average length of stay for EOP RHU patients was 40 days and ranged between one and 569 days.

Although the institution's EOP RHU bed capacity was 63 patients, leadership indicated that the housing design capacity of 100 beds in each of units six and seven allowed the institution to house overflow RHU patients if necessary. If further overflow beds were needed, RJD utilized an additional 34 beds in unit eight.

The EOP RHU was located on Facility B in housing unit six and seven. It was unclear whether the institution activated the 34-bed overflow housing unit during this time period.

There were two psychiatrists who treated MHSDS patients in restricted housing. One treated only EOP RHU patients while the other treated 3CMS patients awaiting transfer. Caseloads for these psychiatrists were not discernable.

RJD allowed clinical psychology interns and psychology post-doctorate fellows to treat EOP RHU patients in addition to on-site clinical psychologists during the review period. There were three clinical psychology interns and one psychology post-doctorate fellow that carried caseloads within established ratios of 11 patients per primary clinician. *See* ECF No. 3693 at 19. There were also seven clinical psychologists who treated both EOP RHU and 3CMS RHU patients; four did not carry caseloads, two carried caseloads within established ratios, and one carried a caseload of 13 patients which exceeded the established ratio by two patients.

Three clinical social workers treated EOP RHU and 3CMS RHU patients during the review period and did not carry caseloads. There were seven HCA officers in the RHU healthcare clinic, including one for the EOP clinic and six for escorts.

Like the prior reporting period, RJD continued to assign newly hired mental health staff to the RHU while also requiring them to work weekend shifts during the review period. The monitor's expert continued to express concerns to leadership about overreliance on inexperienced and unlicensed clinicians in restricted housing due to the population's high-risk nature. The monitor's expert reiterated that this staffing model may be effective if strong leadership and adequate supervisory oversight were consistently present.

However, in its current form, the staffing model remains concerning. With prompt intervention to ensure new RHU providers receive Program Guide training, consistent supervisory presence, shadowing with in-person feedback for improved care quality, and the

development of skills to navigate frequent unexpected obstacles to care that exist in these units, the staffing model could be effective.

The EOP RHU passed EOP Hub Certification in four of six months of the review period, including June, July, September, and November 2024. Reviewed documentation indicated that RJD failed EOP Hub Certification in August 2024 due to observed IDTTs that lacked discussion of measurable treatment goals and did not complete timely Guard One welfare checks. RJD failed EOP Hub Certification in October 2024 due to observed IDTTs that lacked discussion of measurable treatment goals and untimely mental health referral response.

The RHU Policy requires that each patient housed in the EOP RHU must be offered at least ten hours of structured therapeutic activities per week unless clinically contraindicated. *See* Restricted Housing Unit Program: Menal Health Services Policy, dated July 19, 2024 and effective August 1, 2024 (hereinafter "RHU Policy"). During the review period, EOP patients housed in the RHU were offered an average of 12.83 structured treatment hours per week which was compliant with policy requirements. However, structured treatment offered to 3CMS RHU patients was not compliant as the 3CMS patients that were housed in RJD's EOP RHU and awaiting transfer were offered an average of 0.31 hours of structured treatment per week. Notably, the RHU Policy does not speak to treatment requirements for 3CMS patients awaiting transfer from an EOP RHU to a 3CMS RHU, therefore treatment of 3CMS patients housed in an EOP RHU was assessed using EOP RHU requirements during the monitoring tour. This lack of offered structured treatment was particularly concerning given that only 80 percent of 3CMS RHU patients transferred timely during the review period. Ten IDTTs, involving nine EOP RHU patients and one 3CMS RHU patient, were observed during the site visit. Overall, despite the required staff attending, the observed IDTTs in the EOP RHU were inadequate.

The monitor identified several key areas requiring prompt intervention including that the IDTTs lacked collaborative information exchange and failed to reference critical clinical data essential for effective care planning. The treatment team also did not review or reference critical collateral information, including recent inpatient admissions and risk factors for suicide or self-harm. Other identified deficiencies during the RHU IDTTs included inaccurate Program Guide information shared with new staff, poor attention to level of care considerations and rare attention to measurable goals. Most IDTTs resembled individual presentations of each providers' assessments and brief check-in findings rather than a forum for interdisciplinary and collaborative care planning discussions.

Discrepancies among IDTT members remained unaddressed during the meetings, resulting in inconsistent care planning, including conflicting diagnoses and case formulations that were presented but not resolved or discussed. There were also observed deficiencies in goal development, specifically that care plans lacked individualization and details necessary for tracking treatment progress.

The physical setup of the IDTT meetings included desks that were configured in a classroom style where members faced the backs of others. This hindered interdisciplinary engagement and collaborative communication. At times, it did not appear as though each team member had been listening to one another based on their failures to resolve or even discuss discrepant information. Additionally, the psych techs, who were likely the most familiar with the patients, were not consistently included in discussions, nor was their input considered during decision-making processes where one provider often determined next steps in care.

While recreation therapy groups in the RHU were leisure-focused, there were some clinician- and intern-led groups that focused on core clinical topics. Attendance at clinician-led groups was generally low during the review period.

A coping skills group facilitated by a psychology intern and attended by six patients was observed in RHU during the monitoring tour. The patients were placed in therapeutic treatment modules arranged in a semi-circle so each participant could view the facilitator. Handouts were utilized to introduce the patients to the cycle of avoidance, and patients were encouraged to participate. However, one patient was reluctant to participate, only answering one question by reading the handout title at the end. Notwithstanding this, the group was adequate.

The RHU Policy requires that all patients placed into EOP RHU receive a primary clinician evaluation within five days of arrival, a psychiatry evaluation prior to the IDTT and within ten days of arrival. *See* RHU Policy at 5-6. The RHU Policy also requires that EOP RHU patients receive weekly primary clinician contacts and psychiatry contacts every 30 days. *See id.* at 7.

The monitor randomly selected and reviewed the healthcare records of 30 EOP RHU patients to assess compliance with Program Guide timeframes for initial primary clinician contacts during patient stays. All 30 patients required initial primary clinician evaluations, one evaluation was overdue and did not occur. Of the 29 reviewed initial primary clinician evaluations, 100 percent were timely. Thirteen or 45 percent of reviewed initial primary clinician contacts were due to patient refusals.

To measure timeliness of routine primary clinician contacts during the review period, CDCR produced an appointments report that included individuals who were required to receive a routine primary clinician contact from September through November 2024. For the 104 patients

in CDCR's appointments report for September through November 2024, there were 878 completed and refused contacts. Excluding refusals, 385 or 44 percent of the completed contacts were confidential as reported by the institution. When a patient had more than one completed or refused contact, timeliness in accordance with Program Guide requirements was able to be calculated. Of the 878 contacts, 774 were for individuals who were seen at least twice by the primary clinician. Of those 774 contacts, there were 14 or two percent that occurred beyond Program Guide requirements with a range of 11 and 66 days. Of note, the reviewed data captures the time between patient contacts but does not include patients that were not seen or scheduled for a routine contact with the primary clinician. Additionally, the provided appointments report did not account for delays between appointments due to movements in or out of EOP RHU. Verified contact with the assigned primary clinician was unable to be determined. When primary clinician caseload groups were utilized to meet primary clinician contact requirements, verification that individual contacts with the assigned primary clinician and alternated with caseload groups with the assigned primary clinician was not conducted.

Of the completed individual primary clinician contacts, seven lasted zero minutes, 520 lasted under 15 minutes, 166 lasted between 16 and 30 minutes, 153 lasted between 31 and 60 minutes, 20 lasted between 61 and 95 minutes, and four lasted 96 minutes or longer.

A random sample of 30 patients were selected to verify consistency between the appointments report and clinical documentation in EHRS. All 82 reviewed contacts were consistent with the appointments report.

The monitor randomly selected and reviewed the healthcare records of 30 EOP RHU patients to assess compliance with Program Guide timeframes for initial psychiatry evaluations during patient stays. All 30 patients required initial psychiatry evaluations; 28 or 93 percent

timely occurred before the initial IDTT. Notably two initial psychiatry evaluations were overdue and never occurred. Six of 21 percent of the reviewed initial psychiatry evaluation occurred in a confidential setting. Non-confidential contacts were due to patient refusals and cell front contacts. Telepsychiatry was not utilized for any initial psychiatry evaluations.

To measure timeliness of routine psychiatry contacts during the review period, CDCR produced an appointments report that included individuals who were required to receive a routine primary clinician contact from July through November 2024. For the 137 patients in CDCR's appointments report, there were 456 completed and refused contacts. Excluding refusals, 85 or 19 percent of completed contacts were conducted in a confidential setting. When a patient had more than one completed or refused contact, timeliness in accordance with Program Guide requirements was able to be calculated. Of the 456 completed and refused contacts, 319 were for individuals who were scheduled at least twice by the psychiatric provider. Of those 319 contacts, there were 20 or six percent that occurred beyond Program Guide requirements with a range of 31 and 126 days. Of note, reviewed data captures the time between patient contacts, but does not account for when patients that were not seen or scheduled for a routine psychiatric contact. Additionally, the provided appointments report did not account for delays between appointments due to movements in or out of EOP RHU. Contact with the assigned psychiatrist was unable to be determined.

A sample of 30 patients was randomly selected to verify consistency between the appointments report and clinical documentation in EHRS. Of the 107 contacts reviewed in EHRS, all 107 were consistent with the appointments report. However, the appointments report counted two contacts twice, which ultimately meant that there was a total of 105 contacts.

The monitor randomly selected and reviewed the healthcare records of 30 EOP RHU patients to assess compliance with Program Guide timeframes with initial IDTTs during patient stays. All 30 patients required initial IDTTs, of which 28 were able to be reviewed. Notably two initial IDTTs were overdue and never occurred. Of the 28 reviewed initial IDTTs, 26 or 87 percent were timely. All 28 were attended by the required staff and 16 or 57 percent were attended by the patients. IDTTs were held in absentia due to patient refusals.

Compliance with routine RHU IDTTs could not be calculated with the appointments report.

The RHU Policy requires that EOP RHU patients be offered twenty hours per week of out-of-cell activities including at least ten hours of out-of-cell exercise and ten hours of structured therapeutic activities. Two weeks of activity logs for EOP RHU patients housed in Facility B7 were selected to determine compliance with RHU Policy requirements. From October 7, 2024 through October 13, 2024, there were 71 patients housed in the EOP RHU, 52 of which were present for seven full days. Fifty-one of 52 or 98 percent of patients were offered at least ten hours per week of out-of-cell exercise. All 52 patients were offered three showers per week, one weekly linen exchange, and at least one telephone call. Similarly, from October 14, 2024 through October 20, 2024, all 46 patients housed in the unit for at least seven calendar days were offered at least ten hours per week of out-of-cell exercise. Forty-four of 46, or 96 percent of patients were offered at least three showers per week, while all patients were offered one weekly linen exchange, and at least one telephone call.

RJD's ICC process generally followed policy requirements with respect to mental health involvement but did not follow RHU policy guidelines regarding transfer timeframes. Monitors observed twelve total ICC meetings at RJD; there were two separate ICC meetings being held at

the same time with monitors present for each meeting. For each, all required staff were present including the warden or facility captain acting as committee chair, CC I and II, custody representative, and a mental health clinician. Notably, the mental health clinician was an intern and post-doctorate fellow.

The ICC meetings included both MHSDS and non-MHSDS incarcerated individuals. The mental health clinician began each meeting by discussing mental health concerns with every incarcerated person, and reviewed each MHSDS patient's mental health programming history, medication administration history, activities of daily living, group participation, and whether long-term placement would exacerbate or otherwise effect mental health related symptoms. Unfortunately, the committee's decision for some patients did not reflect consideration of the patient's mental health history, as discussed in greater detail below.

There were notable concerns with a 3CMS patient who presented for an initial classification committee meeting and was retained on a 171-day extension with a minimum eligible release date in July 2025. The committee cited three pending RVR's for battery on a peace officer within one week. When the patient requested to be transferred to a different RHU, the Warden indicated that the patient would stay at RJD to serve the RHU term. This was a violation of multiple aspects of the RHU Policy, including that a pending RVR cannot impede or delay the transfer of a patient to a 3CMS or EOP RHU and that the 3CMS patient housed in the EOP RHU must be transferred to a 3CMS RHU within 30 days. *See* Cal. Code of Regs., tit.15 §§ 3335.2; *see also* ECF No. 8355 at 5 (RHU Transfer Timeline Exceptions) and Restricted Housing Unit Program: Mental Health Services Policy, dated July 19, 2024 and effective August 1, 2024.

In addition, inaccurate information was raised in multiple observed classification meetings concerning EOP patients during the site visit, particularly with patients whose health record indicated that they had been refusing their medications, when it was determined that they did not. Additional concerns were raised with a patient indicating that he had been placed into RHU for three months before receiving an initial committee meeting.

Although mental health considerations did not appear to have been included in the ICC's placement decisions, the warden demonstrated a good understanding of mental health's role in the ICC process by asking each patient if they understood the ICC process, the committee's decision and reasons for the decision, and whether the patient knew how to submit a 7362 form. A patient became suicidal and homicidal following the ICC's decision which resulted in the mental health clinician promptly requesting that the patient be evaluated by a clinician on-site immediately following the committee meeting.

Non-Disciplinary Restricted Housing:

There were no patients placed on non-disciplinary restricted housing during the site visit. During the review period there were 63 patients placed into NDRH; 20 of which were EOP, 27 were 3CMS, and 16 were general population. Of the 63 patients placed into NDRH, two were identified for accelerated transfer. RJD was unable to provide documentation indicating that they transferred within 72 hours of endorsement as required. Staff reported that patients were granted appropriate privileges and property during the review period, however they were unable to produce documentation confirming the same.

During observed ICCs, there were two patients considered for NDRH privileges; only one patient was granted NDRH. Both patients received their ICC within ten days as required but were not given a priority hearing. The first patient was not granted NDRH due to an extensive

disciplinary history with three pending RVRs. It was unclear if the captain completed an administrative review. The second patient was retained in RHU with a pending RVR in October 2024. He was granted NDRH privileges and identified as NDRH 200 which required expedited transfer. It was clear that the captain had completed an administrative review and consulted with the Warden. Least restrictive housing alternatives were discussed with the patient, including reasons for retention in RHU. However, privileges and property were not discussed.

MHCB:

RJD operated a 14-bed MHCB within the licensed CTC.

The MHCB's daily census averaged 13 patients. MHCB clinical lengths of stay averaged 8.8 days, with 17 percent of patients having clinical stays exceeding ten days. Physical stays averaged 12.4 days with 46 percent of patients having physical stays that were longer than ten days. Administrative discharge delays were typically due to safety concerns, medical holds, patient refusals to transfer, and transportation logistics.

Five MHCB patients were admitted to the MHCB three or more times during the review period. It was unclear whether these patients were referred to higher levels of care.

Similar to the previous reporting period, MHCB patients were neither offered dayroom nor yard due to custody staff allocation issues. However, patients were provided with recreational therapy three times per week for one hour per session.

Two weeks of CTC 114-A data was reviewed for a total of 19 MHCB patients which revealed that patients were offered at least three showers per week, two linen exchanges per week, two clothing exchanges per week, and three phone calls per week.

Three IDTTs were observed in the MHCB during the site visit. Required staff and the patients were present for all three meetings. The IDTT room was adequate and confidential.

Relevant clinical and psychosocial history was discussed and included good group collaboration and patient involvement. Patient diagnoses were also discussed and agreeable across all disciplines. Treatment goals and interventions were discussed in adequate detail. Custody participation was also helpful to the process.

Thirty MHCB patients' healthcare records were randomly selected to assess compliance with Program Guide timeframes during their stay in RJD's MHCB during the review period. All 30 MHCB patients who required initial IDTTs occurred within 72 hours of arrival. Of the 30 initial IDTTs reviewed, seven or 23 percent of IDTTs had the required staff in attendance. The assigned psychiatrist or primary clinician were most frequently replaced by alternate staff members. Patients attended 29 of the reviewed initial IDTTs with one patient refusing to attend the IDTT resulting in 100 percent compliance.

These 30 patients also required a routine IDTT during their respective MHCB stays. There were 51 expected routine IDTTs for the 30 patients. Of the 51 routine IDTTS required, 42 or 82 percent received them timely, or every seven calendar days following the initial IDTT. Thirty or 59 percent of reviewed routine IDTTs had the required staff in attendance. The assigned psychiatrist or primary clinician were the staff members most frequently replaced by alternates. Of the 51 routine IDTTs reviewed, patients attended 44 or 86 percent. IDTTs were generally held in absentia due to patient refusal.

The same 30 patients who required initial and routine IDTTs also required initial and routine psychiatry contacts. Of the 30 patients, 29 or 96.6 percent had a timely initial psychiatry evaluation meaning it occurred before the initial IDTT and within 24 hours of arrival. One patient's initial psychiatry assessment could not be found. Of the 29 reviewed cases, 21 or 72 percent of initial psychiatry assessments occurred in a confidential setting. Reasons reported for

non-confidentiality included modified programming, the lack of available treatment space or no reason was noted.

All 30 MHCB patients require two routine psychiatry contacts per week. Of the 133 expected contacts, all occurred within required timeframes. Of the 133 routine contacts reviewed, 104 or 78 percent occurred in a confidential setting. Modified programming, medical restrictions and lack of treatment space were among the reasons noted for non-confidential psychiatry contacts.

These 30 reviewed patients also required initial and routine primary clinician contacts during the review period. All 30 initial primary clinician contacts occurred timely or within 24 hours of arrival. Of the 30 initial primary clinician contacts reviewed, 23 or 77 percent were conducted in a confidential setting. Modified programming was the primary reason for non-confidential contacts.

The 30 reviewed patients also required daily clinical contacts. An institution was considered compliant if a patient was seen daily beginning the day after admission for an out-of-cell confidential contact (unless the patient refused) by the psychiatrist or psychologist, though on weekends the patient may be seen by the medical officer of the day. ECF No. 7333-1 at 84. Of the 150 expected contacts, 145 or 97 percent were timely and 89 or 59 percent were conducted in a confidential setting. Reasons for non-confidentiality included modified programming or a lack of available treatment space.

Tele-mental health was not used in the MHCB during the review period.

Although the MHCB did not offer patients yard or dayroom access and were 82 percent compliant with providing routine IDTTs, the MHCB was otherwise compliant with Program Guide requirements during the review period.

Seclusion and Restraint:

There was one incident involving the use of restraints during the reporting period. The incident lasted for 52 minutes. Documentation regarding the use of restraints on the patient was appropriate. There were no seclusion incidents during the review period.

EOP:

RJD's mainline EOP patient population was 845 patients on the date of the site visit, an increase of 81 patients, or 11 percent, from the prior monitoring round.

RJD housed EOP patients on Facility's A, C, and E during the review period. Though EOP patients shared a yard with non-EOP patients, they reportedly did not attend yard or live with other non-EOP patients and only attended religious services, completed education assignments, work, special events, and attended peer-to-peer programs with non-EOP patients.

Facility A was a non-designated yard that housed EOP patients in housing units one and two with overflow housing in unit three. The EOP program regularly exceeded the 300-patient capacity with an average of 315 patients and range of 302 to 324 patients during the review period. The institution reported that while patients were housed in overflow, they received an assigned primary clinician and completed programming as required. The institution used daily email circulation to ensure tracking of patients housed in overflow.

Facility C was a non-designated yard as well that housed EOP patients in units 14 and 15. The EOP program did not exceed the 300-patient program capacity with an average of 228 patients and range of 132 to 295 patients during the review period.

Facility E housed EOP patients in 6-person dorm settings in housing unit 23. The EOP population did not exceed the 264-patient program capacity with an average of 244 patients and range of 232 to 256 patients during the review period. Individuals in the EOP and non-EOP

program were integrated during programming activities, including education, work, community resource activities, canteen, and yard.

RJD experienced significant mental health staffing shortages that directly impacted EOP programming during the review period. As a result, RJD's EOP program operated on a modified triage plan on Facilities A, C, and E – all of which housed EOP patients. The institution indicated that under the triage plan, higher acuity patients were prioritized and would be the first to receive initial psychiatry and primary clinician contacts and IDTTs.

There were eight psychiatrists who treated EOP patients during the review period; one carried a caseload of 137 patients which exceeded the established ratio of 120 patients per clinician and an additional psychiatrist treated both EOP and 3CMS patients and carried a caseload of 18 EOP and 151 3CMS patients. *See* ECF No. 3693 at 17. There were two additional psychiatrists who floated between facilities and did not carry caseloads.

Like in the RHU, clinical psychology interns and post-doctorate fellows treated EOP patients in addition to on-site clinical psychologists during the review period. There were nine clinical psychology interns and four psychology post-doctorate fellows across the three EOP facilities; all carried caseloads within the established ratio of 26 patients per primary clinician. *See* ECF No. 3693 at 17. There were also 18 on-site psychologists who treated EOP patients as well, two carried caseloads that exceeded established ratios with 27 and 89 patients each.

There were 13 clinical social workers who treated EOP patients during the review period; all carried caseloads within established ratios. Additionally, three LMFTs and one licensed professional clinical counselor facilitated EOP groups during the review period.

*Structured Treatment*

The Program Guide required that each EOP patient be offered at least ten hours per week of structured therapeutic activities. If the patient was scheduled for less than ten hours of treatment activities per week, the patient's IDTT was required to meet monthly to review the patient's treatment, increase the amount of structured therapeutic activities, or refer the patient to a higher level of care as clinically indicated. *See* ECF No. 7333-1.

Like the previous reporting round, RJD was unable to provide the amount of structured treatment activity hours by EOP yard/program, as this data was provided for the entire program. Aggregated data from May 27, 2024 to November 30, 2024, indicated that patients across RJD's entire mainline EOP program were scheduled for an average of 17.43 hours of structured therapeutic activities per week and offered an average of 13.56 hours of structured therapeutic activities weekly; an increase of 2.56 hours since the prior reporting period. See ECF No. 8095 at 168. Patients attended an average of 6.48 hours per week, refused an average of 7.25 hours per week, while the institution cancelled an average of 4.2 hours per week.

From May 27, 2024 through November 30, 2024, approximately 19 patients per week were designated for EOP modified programming. The number of patients who were designated as EOP modified ranged from 18 to 23 patients per week. EOP modified patients were scheduled for an average of 8.42 hours per week and offered an average of 6.4 hours per week. Of those hours offered, patients attended an average of 2.5 hours per week. Patients who were designated as EOP modified should have received increased individual contacts and monthly IDTT reviews. *See* ECF No. 7333-1 at 58. However, a review of two EOP Modified patients revealed that monthly IDTT meetings occurred, but the patients did not receive additional individual contacts.

*IDTTs*

Seven mainline EOP IDTTs were observed on Facility A and three mainline EOP IDTTs were observed on Facility C during the site visit. Although a representative from each discipline was present for all IDTTs on all facilities, the patient's assigned providers were not always present. Patients were present in all but two IDTTs, one on each facility. While clinicians generally demonstrated a strong familiarity with their patients, improvement was needed in certain areas, particularly in case formulation, identifying measurable treatment goals, identifying interventions including specific group referrals, and level of care rationale.

On Facility A, one clinician faced challenges in pronoun usage despite the supervisor's feedback, which may have negatively impacted effective communication with the patient. In addition, during another patient's IDTT meeting, the primary clinician, who had met the patient once for his initial evaluation, read the treatment plan to the patient rather than facilitating an active discussion with the patient to build further rapport and elicit the patient's engagement in the treatment planning process.

It was noted that in Facility A's IDTTs, the supervising psychologist effectively addressed the deficient gaps in IDTTs by soliciting patient input and defining the specific, measurable treatment goals. She would also clarify the level of care considerations with the patient as well.

Interviews with IDTT staff participants revealed that staffing issues at RJD had impacted IDTTs, particularly on Facility A. The CC I was not the patient's assigned counselor throughout the meetings. It was also noted that the assigned psychiatrist had limited availability due to her three-day work schedule and being assigned to the MHCB, further complicating the ability for her to be present at IDTTs for the mainline EOP program. To mitigate this challenge, arrangements were made for the assigned psychiatrist to attend IDTTs for one hour, supplemented by an alternate psychiatrist to cover the remaining cases.

IDTTs on Facility C revealed similar staffing concerns as the IDTTs were covered by alternate primary clinicians. In addition to the same concerns identified in Facility A's IDTTs, at times, specific psychiatric medications were not described during Facility C IDTTs.

Overall, IDTTs lacked the required staff presence but participants were still able to demonstrate a strong familiarity with their patients. Areas that needed the most improvement were noted in the case formulation, identifying measurable treatment goals, identifying interventions including specific group referrals, and level of care rationale. Although supervisors were in all observed IDTTs and made sure that any deficiencies in the IDTT were resolved with the patient present, it was unclear if the supervisor was always present for IDTT meetings during the review period. Notwithstanding the supervisors ensuring that deficiencies were resolved during observed treatment team meetings, RJD was not compliant with IDTTs during the review period.

The Program Guide requires that EOP patients receive an initial IDTT within 14 calendar days of arrival or level of care change and a routine IDTT every 90 calendar days. *See* ECF No. 7333-1 at 59.

The monitor randomly selected 30 EOP patient records to assess for compliance with Program Guide timeframes for initial IDTTs during patient stays. Of the 30 randomly selected patients' records the required assigned staff were documented as present at 25 or 83 percent. The most frequently substituted staff members were the psychiatrist or CC I. Patients attended 25, or 83 percent of the IDTTs reviewed.

To measure timeliness of routine IDTTs during the review period, CDCR produced an appointments report that included individuals who were required to receive a routine IDTT from June to November 2024. For the 995 patients in the appointments report, there were 1,576

completed initial or routine IDTTs. When a patient had either an initial IDTT and a routine IDTT or more than one routine IDTT, timeliness in accordance with Program Guide requirements was able to be calculated. Of the 1,576, 583 contacts were for individuals who had at least two IDTTs (initial and routine or two routines). Of those (number of IDTTs), there were 532 or 91 percent that occurred beyond Program Guide requirements with a range of 90 and 165 days. Of note, the report did not include individuals that did not have a completed IDTT, such as those that were not scheduled. Additionally, the reviewed data captured the time between completed patient IDTTs but does not account for when patients were not scheduled for an initial or routine IDTT. The provided appointments report did not account for delays between appointments due to movements in or out of EOP.

A random sample of 30 IDTTs was reviewed to verify consistency between the appointments report and clinical documentation in EHRS. Of the 32 contacts reviewed in EHRS, 31 or 97 percent were consistent with the appointments report; one or three percent had discrepancies, including no corresponding clinical documentation in EHRS.

*Group Treatment*

RJD offered clinical groups and nursing-led treatment groups to EOP patients on all three EOP facilities during the review period.

Clinical groups occurred daily and included EOP caseload groups with the patient's assigned primary clinician, introduction to EOP group, and groups related to stress management, coping skills, mindfulness, social skills, positive thinking, anger management, dialectical behavioral therapy, inspiration and motivation, mood management, personal insight, restorative justice, and raised flower bed projects.

Nursing-led treatment groups included substance use, mental health & wellness, physical health and wellness, expressive, life skills, transition planning, community meetings, and Striving to Achieve Rewards (STAR) groups that included karaoke, bingo, pinochle, video games, movies, sports discussion, art, and animal therapy. Furthermore, there were general education groups, substance abuse programming, recreational therapy, and job opportunities available to satisfy the structured treatment requirements.

Group treatment spaces were in treatment buildings separate from patient housing. The treatment buildings were easily accessible to EOP patients housed in Facilities A and C.

Although clinical group spaces in Facility A were generally confidential, individual offices were in the center of the building which required staff to walk through group treatment space to access their offices. In addition, recreational group treatment space on Facility A was surrounded by half-wall partitions that enclosed only a portion of the space. There were no doors, and these spaces were not confidential.

There were five group treatment rooms on Facility C, which were confidential and soundproof. Group rooms in Facility C were kept at a cold temperature which required some patients to wear coats and long-sleeved shirts to groups.

During the site visit, the monitor’s experts attended one group on Facility A, three on Facility C, and two on Facility E.

The observed group on Facility A was a primary clinician EOP caseload group with nine patients in attendance. The group focused on various personality styles with an emphasis on coping mechanisms. The primary clinician was engaged with each patient during the group process which led to a very well-run group.

The EOP caseload group on Facility C was facilitated by the psychologist with six patients in attendance. The group provided more of an opportunity for the patients to not only check in on how they were managing but also explore patient experiences, which were used to tie in themes such as individual coping skills and benefits of having future goals while engaging each patient and validating their experiences.

The symptom management and mood management groups on Facility C were facilitated by a licensed professional clinical counselor and an LMFT, respectively, with four patients in attendance for each. A slide presentation and other visual aids, such as handouts, were provided to patients to foster discussion and engagement among the participants. For the symptom management group, the clinician facilitated a group about managing the emotions of anxiety and anger by learning coping skills. The facilitator used slides for the mood management group and began with a "question of the day," reminding the group of the therapeutic relationship and establishing boundaries. Additionally, patients were engaged, two sign language interpreters were available to assist a deaf participant, and technology was employed to facilitate communication with a Spanish-speaking individual.

The monitor's expert observed two EOP groups on Facility E, one of which was a caseload group and the other was a recreation therapy led group. Both groups were appropriately tailored to the needs of the patients, and while enhanced structure and clinical content was needed, the patients reported benefitting from the two groups.

The monitor's expert noted that on Facility E, there was an overreliance on recreation therapists, with many patients describing groups as non-substantive leisure sessions rather than clinical groups. However, the monitor's expert was informed that clinicians continued to

facilitate their caseload groups on Facility E and that interns were in the process of planning groups specific to patients' requests, including a 12-week parenting class.

EOP step down groups were also implemented on Facility E for a smooth transition from EOP to 3CMS. Staff expressed confidence that with the EOP stepdown groups, their EOP patients would receive clinically indicated contacts in the 3CMS program as opposed to the minimum requirement of every 90 days.

*Individual Treatment*

The Program Guide requires that patients are offered an initial psychiatrist evaluation before their initial IDTT and within 14 calendar days of arrival to the institution or level of care change. *See* ECF No. 7333-1 at 59. Thereafter they are required to receive a routine psychiatric contact every 30 calendar days. *Id*. Patients are also required to receive a primary clinician evaluation within 14 calendar days of arrival and weekly (i.e. every ten calendar days) with either a primary clinician or in group psychotherapy with an individual contact every other week. *Id*.

The monitor randomly selected 30 EOP patient records to assess compliance with Program Guide timeframes for initial psychiatry evaluations, of which 24 of 30 patients, or 80 percent reviewed received initial evaluations. Of the 24 initial psychiatric evaluations reviewed, 19 or 79 percent were timely and 22 or 92 percent occurred in a confidential setting.

To measure timeliness of routine psychiatry contacts during the review period, CDCR produced an appointments report that included individuals who were required to receive a routine psychiatry contact from June through November 2024. For the 1,064 patients in CDCR's appointments report, there were 5,177 completed and refused contacts, 3,535 or 68 percent were confidential as reported by the institution. When a patient had more than one

completed or refused contact, timeliness in accordance with Program Guide requirements was able to be calculated. Four thousand, one hundred and sixteen of the 5,177 contacts were for individuals who were seen at least twice by the psychiatric provider. Of those 5,177 contacts, there were 726 or 18 percent that occurred beyond Program Guide requirements with a range of 31 and 139 days. Of note, the report did not include individuals that did not have completed contacts. Additionally, the reviewed data captured the time between patient contacts but does not account for when patients were not seen or scheduled for a routine psychiatric contact. The provided appointments report did not account for delays between appointments due to movements in or out of EOP. Contact with the assigned psychiatrist was unable to be determined.

Thirty patients were randomly selected to verify consistency between the appointments report and clinical documentation in EHRS. Of the 90 contacts reviewed in EHRS, 85 or 94 percent were consistent with the appointments report; five contacts or six percent had discrepancies, including no corresponding clinical documentation in EHRS.

The monitor randomly selected 30 EOP patient records to assess compliance with Program Guide timeframes for initial primary clinician evaluations. Of the 30 patients reviewed 28 or 93 percent had documented initial primary clinician assessments. All 28 completed initial assessments found were timely, and 26 or 93 percent of the completed assessments occurred in a confidential setting.

To measure timeliness of routine primary clinician contacts during the review period, CDCR produced an appointments report that included individuals who were required to receive a routine primary clinician contact from June through November 2024. For the 939 patients in the appointments report, there were 11,191 completed and refused contacts, 3,218 or 29 percent were

confidential as reported by the institution. When a patient had more than one completed or refused contact, timeliness in accordance with Program Guide requirements was able to be calculated. Of the 11,191, 10,255 contacts were for individuals who were seen at least twice by the primary clinician. Of those 11,191 contacts, there were 713 or 7 percent that occurred beyond Program Guide requirements with a range of 11 and 77 days.

Of note, the report did not include individuals that did not have completed contacts, such as those that were not scheduled. The reviewed data captures the time between patient contacts but did not include patients who were not seen or scheduled for a routine contact with the primary clinician. Additionally, the appointments report did not account for delays between appointments due to movements in or out of EOP. Contact with the assigned primary clinician was unable to be determined. When primary clinician caseload groups were utilized to meet primary clinician contact requirements, verification that individual contacts with the assigned primary clinician and alternated with caseload groups with the assigned primary clinician was not conducted.

There were 4,370 completed individual primary clinician contacts. Of those, one was listed as occurring in less than zero minutes, 41 occurred in zero minutes, 2,119 occurred within 15 minutes, 1,299 occurred between 16 and 30 minutes, 822 occurred between 31 and 60 minutes, 67 occurred between 61 and 95 minutes, and 21 occurred in greater than 95 minutes.

A random sample of 30 patients was selected to verify consistency between the appointments report and clinical documentation in EHRS. Of the 117 contacts reviewed in EHRS, 106 or 91 percent were consistent with the appointments report; 11 or 9 percent had discrepancies. The 11 discrepancies were for caseload groups where there was no note.

Patient interviews generally reflected that patients were receiving timely primary clinician and psychiatry contacts during the review period. Most patients noted meeting with their primary clinician weekly, either in one-on-one sessions or alternating group settings. All patients on Facility C indicated that they had face-to-face appointments with their psychiatrist at least once every 30 days rather than through telepsychiatry. Some patients reported telepsychiatry in Facility A but reported that face-to-face contact was preferred due to having a better connection and not having an additional tele-presenter present. In addition, patients reported attending their IDTTs, finding them beneficial, and understanding their treatment goals. The patients also reported understanding the process of accessing mental health when needed.

Patients indicated typically attending groups, and one patient reported that if he were to miss a group, it would be due to a conflicting activity, such as in the canteen. An additional patient returning from MHCB reported not being assigned to groups for weeks, not being on “the list” for recreational therapy and not having access to a tablet for months. Patients on Facility C reported not receiving 10 hours of structured treatment during the review period and reported not consistently receiving ducats for recreational therapy yards. Other patients across both facilities shared that they had access to an open yard, but the yard included individuals not in the EOP.

Medication administration emerged as a critical concern during EOP patient interviews, particularly for those patients prescribed PRN medications. Patients also reported that yard lockdowns prevented medication distribution and caused long delays.

Drug use. and altercations as a result were a common theme across all patient interviews. Patients also reported issues with custody staff engaging in dismissive or hostile behavior, including ignoring altercations and using derogatory language about patients’ mental health

issues. Specific concerns were raised about ducat distribution practices and the lack of envelopes for indigent patients, which affected timely legal correspondence.

3CMS:

RJD's mainline 3CMS patient population was 980 patients on the date of the site visit: a decrease of 96 patients from the prior monitoring round. All 3CMS patients were housed on all facilities during the review period.

RJD leadership acknowledged that ongoing staffing difficulties continued to impact overall service delivery, resulting in triaged services provided to 3CMS patients. They reported the addition of telemental health staff, interns and practicum students, and registry staff had been helpful in reducing the backlog of overdue IDTTs and contacts and providing more timely services overall. However, interviewed patients reported that the 3CMS program staff was a revolving door of primary clinicians which made it impossible to establish consistent rapport and felt that this issue would increase the likelihood of refusing clinical contacts.

There was one on-site psychiatrist who treated 3CMS patients during the review period. The psychiatrist carried a caseload of 151 3CMS patients and assisted in treating EOP patients with a caseload of 18 EOP patients. There were two telepsychiatrists who also treated 3CMS patients and carried caseloads of 222 patients and 616 patients respectively.

There were six on-site clinical psychologists that treated 3CMS patients during the review period. Three carried caseloads within established ratios while one carried a caseload of 198 patients; more than double the established ratio of 97 patients per primary clinician. *See* ECF No. 3693 at 12. Two on-site psychologists did not carry caseloads and provided supplemental coverage across different facilities. There were also two telepsychologists who

carried 3CMS patient caseloads; both of which exceeded established ratios with 127 and 143 patients respectively.

There were two clinical social workers who treated 3CMS patients; one carried a caseload which exceeded the established ratio of 97 patients per clinician. *See id*. There was also one tele-social worker who carried a 3CMS patient caseload of 49 patients.

*IDTTs*

The monitor's expert observed IDTTs for patients housed in each mainline 3CMS facility during the site visit. The observed IDTTs generally included appropriate treatment planning and collaboration between providers including the CC I, but the IDTTs did not always meet Program Guide requirements and IDTTs held *in absentia* were often rushed and incomplete.

Four 3CMS IDTTs were observed on Facility A. The IDTTs were attended by the senior psychologist supervisor, primary clinician, telepsychiatrist (and telepresenter), and CC I. The telepsychiatrist was present via laptop. A correctional officer was also present for close custody patients. The IDTTs observed on Facility A were adequate and met Program Guide audit criteria. The team demonstrated collaborative treatment planning, and the patients were highly involved in their IDTTs. CC I participation was limited but adequate.

Eight 3CMS IDTTs were observed on Facility B. Seven of the eight IDTTs were initial IDTTs. The IDTTs were held in the Facility B chapel, which lacked confidentiality. The IDTTs were attended by the senior psychologist supervisor, primary clinician, telepsychiatrist (and telepresenter) via laptop, and CC I. The CC I was present for all but the last IDTT due to a scheduling conflict. IDTTs on Facility B were conducted well and included appropriate discussion and treatment planning for the patients. Clinical histories and diagnoses were discussed, and patient goals were considered. Overall, the IDTTs were adequate.

Unfortunately, there were observed problems with confidentiality of IDTT treatment space on Facility B during the site visit. Facility B IDTTs were held in the chapel and at several points during ongoing IDTTs, a patient or incarcerated person walked into the chapel and had to quickly exit when they realized a meeting or IDTT was occurring. Also, the custody officer who was calling patients for their IDTTs was constantly walking into and out of the chapel and a rear office during the IDTTs which was both distracting and negatively affected the confidentiality of the IDTTs.

The monitor's expert observed 3CMS IDTTs on Facility C. One IDTT was held *in absentia* due to patient refusal. The primary clinician was present via tele-mental health using a laptop. The tele-mental health primary clinician was very knowledgeable about RJD as she had previously worked onsite at the facility prior to transferring to tele-mental health. Treatment goals and interventions were discussed, and the CC I participated in the process. Accordingly, these IDTTs were adequate.

Eight 3CMS IDTTs were observed on Facility D. Seven of eight were annual IDTTs. The IDTTs were attended by the senior psychologist supervisor, primary clinician, telepsychiatrist, CC I, and telepresenter. Two IDTTs were provided by an on-site primary clinician and six were provided via a tele-mental health primary clinician. The IDTTs provided by the on-site primary clinician were adequate and met Program Guide audit criteria. The primary clinician provided one initial and one annual IDTT and the IDTTs included appropriate patient histories, diagnoses, and collaborative treatment planning.

There were connectivity problems with the tele-mental health primary clinician during IDTTs. The telepsychiatrist was present on the screen using a telehealth kit, however, the telepresenter did not know how to add the tele-mental health primary clinician to the large screen

simultaneously with the telepsychiatrist. As a result, the tele-mental health primary clinician was present via a laptop which had connectivity and bandwidth problems during several IDTTs.

During one IDTT, the connection with the tele-mental health primary clinician was lost for approximately two minutes and the primary clinician missed the psychiatrist's discussion about the patient's medications. The IDTTs that were facilitated by the tele-mental health primary clinician were inadequate for Program Guide audit criteria and lacked several key aspects. For example, the tele-mental health primary clinician often did not state the patient's diagnoses, did not provide the patient's clinical or psychiatric history, did not clearly state treatment goals, and often conflated goals with interventions.

Eleven IDTTs were observed on Facility E during the site visit. Attendance included the senior psychologist supervisor, primary clinician, telepresenter, onsite psychiatrist, and CC I. The on-site primary clinician facilitated four IDTTs while the tele-mental health primary clinician facilitated seven IDTTs. The tele-mental health primary clinician had excellent visual and audio connectivity and was very engaged with a demonstrated knowledge of her patients. Four of the IDTTs with the tele-mental health primary clinician were provided *in absentia* due to patient refusals. The IDTTs included individualized and generally appropriate treatment planning and excellent collaboration between providers. The patients appeared to benefit significantly from treatment, however, the majority of IDTTs did not meet Program Guide audit criteria. Several IDTTs lacked a clearly stated diagnoses and psychiatric medications were not always specifically identified. Several IDTTs also lacked specific interventions and the IDTTs conducted *in absentia* were rushed through.

A patient's initial IDTT is required to occur within 14 calendar days of arrival to the institution or level of care change as well; and every 365 days thereafter. *See* ECF No. 7333-1 at 44.

The monitor randomly selected the healthcare records of 30 3CMS patients to assess compliance with Program Guide requirements for initial IDTTs. Of the 30 patient records reviewed initial IDTTs were found to have occurred in 29 cases, while one patient's IDTT was not found due to medical hospitalization. Nineteen or 66 percent of the 29 initial IDTTs reviewed were timely and had the required assigned staff present in accordance with the Program Guide requirements. The most frequently substituted staff members were the psychiatrist and primary clinician. Patients attended 23 of the 29, or 80 percent of the IDTTs reviewed.

To measure timeliness of routine IDTTs during the review period, CDCR produced an appointments report that included individuals who were required to receive a routine IDTT from June through November 2025. For the 834 patients included in the report, there were 868 completed initial or routine IDTTs. When a patient had an initial IDTT and a routine IDTT or more than one routine IDTT, timeliness in accordance with Program Guide requirements was able to be calculated. Of the 868 completed and refused IDTTs, 39 contacts were for individuals who had at least two IDTTs (initial and routine or two routines). Of those 39, nine or 23 percent did not occur within Program Guide requirements. Reasons included custody escorts were unavailable, custody modified program, patients did not show for appointments, and COVID-19 restrictions prevented the movement of patients.

Of note, the report did not include individuals that did not have a completed IDTT, such as those that were not scheduled. Additionally, the reviewed data captures the time between completed patient IDTTs but does not account for when patients were not scheduled for an initial

or routine IDTT. The appointments report provided did not account for delays between appointments due to movements in or out of RJD.

A random sample of 30 patients was selected to verify consistency between the appointments report and clinical documentation in EHRS. All 32 reviewed contacts were consistent with the appointments report.

*Group Treatment*

At RJD, 3CMS patients on Facilities A, B, C, and E were not offered clinically based groups during the review period or during the site visit. Patients on those facilities were offered NLTG groups, but only one 3CMS patient attended NLTGs consistently. On Facility D, 3CMS patients were offered clinically based groups during the review period and at the time of the site visit. Groups were assigned during IDTTs and there was a significant waitlist for all clinical groups. Practicum students and/or interns facilitated the groups. Several patients reported they did not know mental health groups were available for 3CMS patients on Facility D. Group topics were appropriate and included Anger Management, Stress Management, Victim Empathy, and Pre-Release.

The monitor's expert observed a Stress Management group on Facility D. A practicum student facilitated the group. The group started approximately five minutes late while waiting for participants to arrive. The group included five participants and was very well facilitated. The participants appeared to benefit significantly from the interactions and skills they learned from the facilitator. Overall, the group was excellent and the practicum student facilitating the group was enthusiastic and appeared to enjoy the work. She knew her patients very well and had established very good rapport with the group.

*Individual Treatment*

The Program Guide requires that patients are offered an initial psychiatrist evaluation before their initial IDTT. *See* ECF No. 7333-1 at 34-50. Thereafter they are required to receive a routine psychiatric contact every 90 calendar days if the patient is prescribed a psychotropic medication. *Id*. Patients are also required to receive a primary clinician evaluation within 14 calendar days of arrival and every 90 calendar days thereafter. *Id*.

The monitor randomly selected the healthcare records of 30 3CMS patients to assess compliance with Program Guide requirements for initial psychiatry contacts. Of the 30 records reviewed, initial psychiatric evaluations were found for 27 or 90 percent. Twenty, or 74 percent of the 27 initial psychiatric evaluations reviewed were timely. Twenty-three of 27, or 85 percent of contacts occurred in a confidential setting. Reasons reported for non-confidentiality included patient refusals or no shows. Telepsychiatry was utilized for seven or 26 percent of initial psychiatry evaluations reviewed.

To measure timeliness of routine psychiatry contacts during the review period, CDCR produced an appointments report that included individuals who were required to receive a routine psychiatry contact from June through November 2024. For the 675 patients in CDCR's appointments report, there were 1,558 completed and refused contacts. Of those, 1261 or 81 percent were conducted in a confidential setting. Reasons for non-confidentiality included custody modified programming, and mental health modified programming.

When a patient had more than one completed or refused contact, timeliness in accordance with Program Guide requirements was able to be calculated. Of the 1,558, 886 contacts were for individuals who were seen at least twice by the psychiatric provider. Of those 866 contacts, there were 19 or two percent that occurred beyond Program Guide requirements with a range of 91 to

162 days. Of note, the report did not include individuals that did not have completed contacts. Additionally, reviewed data captured the time between patient contacts but does not account for when patients were not seen or scheduled for a routine psychiatric contact. Of note, the appointments report provided did not account for delays between appointments due to movements in or out of RJD. Contact with the assigned psychiatrist was unable to be determined.

A sample of 30 patients was randomly selected to verify consistency between the appointments report and clinical documentation in EHRS. All 77 reviewed contacts were consistent with the appointments report.

The monitor reviewed the healthcare records of 30 3CMS patients to assess compliance with Program Guide requirements for initial primary clinician evaluations. Of the 30 patients' records reviewed, initial primary clinician evaluations were timely in 20 or 67 percent. Twenty-six of 30, or 87 percent occurred in a confidential setting. Patient refusal was the reason reported for non-confidential initial primary clinician evaluations.

To measure timeliness of routine primary clinician contacts during the review period, CDCR produced an appointments report that included individuals who were required to receive a routine primary clinician contact from June through November 2024. For the 1,158 patients in the appointments report, there were 2,952 completed and refused contacts. Of the 2,926 completed contacts, 2,241 or 77 percent were conducted in a confidential setting. Reasons for non-confidentiality included custody modified program, mental health modified program, and custody escorts were unavailable.

When a patient had more than one completed or refused contact, timeliness in accordance with Program Guide requirements was able to be calculated. Of the 2,952, 1,801 contacts were

for individuals who were seen at least twice by the primary clinician. Of those 1,801 contacts, 116 or six percent occurred beyond Program Guide requirements with a range of 91 to 147 days. Of note, the report did not include individuals that did not have completed contacts, such as those that were not scheduled. Additionally, the reviewed data captured the time between patient contacts but does not include patients who were not seen or scheduled for a routine contact with the primary clinician. The provided appointments report did not account for delays between appointments due to movements in or out of RJD. Contact with the assigned primary clinician was unable to be determined.

Of the 2,926 completed primary clinician contacts, 16 lasted zero minutes, 1,545 lasted within 15 minutes, 1,011 lasted between 16 and 30 minutes, 339 lasted between 31 and 60 minutes, 36 lasted between 61 and 95 minutes, and five lasted longer than 95 minutes.

A random sample of 30 patients was selected to verify consistency between the appointments report and clinical documentation in EHRS. Of the 70 contacts reviewed, 69 or 99 percent were consistent with the appointments report, while one did not have corresponding clinical documentation in EHRS.

The monitor's expert observed mainline 3CMS treatment spaces on Facilities A, B, C, D, and E. Patients reported they are offered confidential settings for clinical contacts, IDTTs, and groups. Treatment spaces were generally adequate across all facilities with the exceptions of Facilities A and B. Facilities C, D, and E provided confidential spaces for IDTTs, groups, and individual contacts that were sight and sound confidential from other patients and sound confidential from custody.

The monitor's expert interviewed 3CMS patients on Facilities A, C, D, and E. Patients at each facility endorsed similar concerns regarding the 3CMS program. Although most patients

reported they were offered primary clinician contacts at least once every 90 days, patients across these facilities reported that treatment was "inconsistent to nonexistent" given the frequent rotation of registry primary clinicians and lack of available treatment groups.

Patients also expressed discouragement that EOP patients were given incentives to program and felt that they would respond to treatment better with these incentives.

Significantly, patients reported having trouble establishing rapport with primary clinicians via tele-mental health versus in-person contacts and that primary clinician and psychiatrist changes were often unannounced. Many patients also reported difficulty building rapport with tele-mental health providers as it seemed like they were only interested in checking boxes next to questions. The majority of patients also expressed the desire for consistent therapy to process trauma and improve their mental health but felt this was impossible given the infrequent primary clinician contacts and frequent primary clinician rotations.

Other Issues:

Pre-Release Planning:

The pre-release planning local operating procedure was last updated in September 2024 and aligned with headquarters directive. RJD's pre-release coordinator was a supervising social worker who has been employed at RJD for eight years and pre-release coordinator for five years.

During the review period, RJD tracked patients who required pre-release planning at 60 and 90 days from release by obtaining a report from SOMS every day. During the review period there were 106 patients who were within 90 days of release and required pre-release planning; 90 of which completed at least one pre-release planning meeting and 83 attended at least one pre-release group.

When a patient entered the pre-release program, the pre-release coordinator would make an initial contact and explain the process and answer any initial questions. Once the initial pre-release planning contact was completed, the assigned clinician completed the pre-release planning assessment (PRPA). RJD was unable to indicate the number of patients who received a PRPA during the review period.

After the PRPA was completed, the pre-release coordinator reported finding next steps for patients after release which included contacting state probation departments, behavioral health centers, and enrolling patients in the STOP program which helps patients find adequate housing following release.

The pre-release coordinator collaborated with patients' mental health treatment teams to ensure the team has information related to the patient's release date, county of release, supervision status, active detainers, warrants, and any other status that may impact release, as well as updates on their TCMP benefits. The program analyst sent out weekly emails to the mental health treatment teams concerning this information and related psychiatry information as well.

Pre-release groups were facilitated twice weekly on Facilities A, D, and E and completed a 12-week program cycle. Patients were automatically enrolled in pre-release group treatment 30 days from release. Pre-release groups were facilitated by clinical social workers, psychologists, and psychology practicum students. Group curriculum included psychoeducation on re-entry processes, community resource support, problem solving, quality of life, and goal setting. Adequate group treatment space was reported on all facilities with pre-release groups.

TCMP caseworkers at RJD were contracted through the University of California at San Diego and provided pre-release benefit assistance to all eligible inmates within 120 days of

release. TCMP caseworkers assisted patients with Medi-Cal, SSI, VA benefit applications, and HIV/AIDS case management services during the review period. Of the 168 patients who were within 120 days of release, 151 or 89 percent were screened for TCMP services; 150 or 89 percent submitted Medi-Cal benefit applications, 94 or 56 percent submitted SSI benefit applications, and three or two percent submitted VA benefit applications. RJD kept consistent communication with the TCMP caseworkers on behalf of patients and followed up for patients who may have missed benefit applications due to lockdowns, MHCB or RHU transfer, or mental health refusals.

Notably, the pre-release coordinator indicated hosting a pre-release fair every year which was aimed at offering community resources to patients scheduled for release in the upcoming year. The fair is designed to provide patients with experience and exposure to resources outside of prison as they prepare to reintegrate into the community.

Program Access:

a. Job and Program Assignments

As of December 26, 2024, RJD reported that the 1,241 job assignments were held by 235 or 25 percent of EOP patients, 452 or 45 percent of 3CMS patients, and 554 or 44 percent of non-MHSDS incarcerated persons. The 1,241 job assignments reported in the Thirty-First Monitoring Round was a 25 percent decrease from the preceding monitoring round.[114]

The 1,578 academic assignments were held by 426 or 46 percent of EOP patients, 522 or 52 percent of 3CMS patients, and 630 or 50 percent of non-MHSDS incarcerated persons.

Vocational or voluntary education was not available at RJD during the review period.

[114] In the Thirtieth Monitoring Round, RJD reported 1,655 job assignments offered to incarcerated individuals. ECF No. 8095 at 175.

The 389 substance abuse treatment assignments were held by 119 or 13 percent of EOP patients, 131 or 13 percent of 3CMS patients, and 139 or 11 percent of non-MHSDS incarcerated persons.

b. Out-of-Level Housing

RJD reported that 16 EOP and 45 CCCMS custody Level I patients were housed in Level II housing. One Level I EOP patient was housed in Level III housing. RJD reported 46 EOP and 16 CCCMS custody Level II patients were housed in Level III housing.

c. ADA Reasonable Accommodations and Grievance Procedures

RJD provided an updated reference training manual for ADA accommodation and grievance procedure, while providing attendance sheets documenting staff training.

d. Periodic Classification Score Reductions: EOP Patients

RJD provided CDCR Form 840s demonstrating that RJD was providing periodic classification score reductions for EOP patients.

e. Unclothed Body Search

RJD provided the updated operations manual that contained the unclothed body search policy. Custody officers reported that unclothed body searches are performed in private areas. Search areas were checked for privacy screens in several housing units, and they were present. Concerningly, it was reported during staff interviews that clinicians in Facility A have been exposed to unclothed body searches during the review period as the searches were not conducted in a private area as required.

"C" Status:

Eighty-four patients were placed on C-status during the review period. Twenty-one patients were on C-status at the time of the monitoring tour.

Case-by-Case Reviews:

RJD reported that 175 EOP patients met the requirement for case-by-case reviews; however, it could not be ascertained whether patients received the required 150-day reviews or 120-day pre-MERD reviews. These patients' stays in maximum custody ranged from one to 618 days.

All patients either had timely ICCs or were scheduled for ICC. Thirty-five patients were pending RVR adjudication or investigation, three patients were out to court, five patients were awaiting chairmen review, and the remaining patients were either pending further review, or they were awaiting transfer. CSR review resulted in SHU terms for 16 patients. Seventeen patients completed pre-MERDs. Six patients received medical holds.

Mental Health Referrals:

RJD reported an overall compliance rate of 81 percent for timely responding to mental health referrals. However, neither psychiatrists nor primary clinicians achieved compliance with timely responding to emergent, urgent or routine mental health referrals. Notably, psychiatrists' timely response to emergent referrals and routine referrals were close to compliance at 89 and 87 percent, respectively. While primary clinician's timely response to emergent referrals and urgent referrals were close to compliance at 87 and 85 percent, respectively. Mental health leadership explained that referrals were likely untimely due to staffing constraints.

Mental health referrals were tracked in EHRS using both digital and paper tracking at RJD. The institution triaged referral responses based on the time of discovery of the mental health referrals rather than following Program Guide requirements of timely response. Regarding digital tracking, the institution sent out consults to the primary clinician referral request queue, where referral requests were reviewed daily by schedulers and triaging

psychologists who were normally senior psychologist specialists. Program supervisors were then alerted for any urgent or emergent referrals.

For paper tracking, patients had designated areas where they could utilize drop boxes for their request. RJD required office technicians to pick up CDCR 7362 forms during their daily rounds from nursing staff. Nursing staff conducted reviews during initial triage for any referrals with any indication of suicidal ideation. Once collected, all the forms were then scanned and reviewed daily by RJD triage staff, where orders were then placed regarding the patients' specific needs. Additionally, MH-5 forms were submitted by custody staff to the MH-5 referral email which was triaged daily by clinicians who placed digital orders regarding each submission.

<u>Custody and Mental Health Partnership Plan</u>:

RJD's custody and mental health partnership LOP was last revised in August 2024 and was aligned with headquarters directive.

Executive leadership joint rounding occurred during all six months of the review period and occurred on Facilities A through D and the MHCB, as required. Rounding forms indicated that all required staff were present during each session. The executive rounding team interviewed both staff and patients and reported their findings on the appropriate form. In the MHCB, interviewed patients and mental health staff reported good relations with custody. However, in Facility A, mental health staff reported security concerns with patients lingering in out-of-bounds areas and patient appointments not being scheduled on time, which caused confusion among mental health and custody staff. There were also reported concerns about custody staff being dismissive when mental health was inside the housing units. Good custody and mental health relations were reported on Facilities B through D and included discussions about how to resolve issues with yard and group time conflicting. Staffing was a common

concern among both custody and mental health staff, which facilitated thoughtful interdisciplinary problem-solving discussions.

Executive rounding forms were submitted as attachments to the executive meeting minutes and quality management committee minutes during the review period. The institution was unable to produce executive or quality management meeting minutes that included a description of the findings in sufficient detail. Executive rounding findings were noted in the mental health program subcommittee meeting minutes but did not include sufficient detail or reflect that the information was disseminated to stakeholders.

Reviewed MHCB huddle logs for three full weeks were all completed on "Training Participation Sign-In Sheets" and did not include any discussion topics or patient information. There was no mental health or patient-related detail and did not provide any evidence of comprehensive or collaborative discussion.

One full week of second watch RHU huddle forms were reviewed for compliance with policy requirements. All reviewed huddle forms reflected adequate staff attendance including the mental health RHU program sergeant, at least one primary clinician, at least one recreation therapist, at least one psychiatric technician, and at least one staff psychiatrist. Critical patient information was written on the huddle forms and included patients returning from higher levels of care and staff assignments for five-day follow-ups, new patient arrivals from mainline programs, due dates for initial evaluations, and daily schedules for high refusers. Overall, although the forms contained electronic signatures, the forms were very detailed and organized and reflected strong collaboration between all participants. The monitor was unable to attend an RHU huddle during the site visit.

Three full weeks of second and third watch huddle forms for mainline EOP housing units were reviewed for compliance with custody and mental health partnership requirements during the review period. Reviewed huddle forms included detailed information regarding patient movement, concerning events in the housing unit, including patient disciplinary concerns, modified programming, and five-day follow-ups. For each reviewed huddle there was insufficient staff as only the program sergeant and mental health program supervisor were present. Additionally, the huddle forms were not signed and included type written names of the attendees.

An observed second watch huddle was consistent with the reviewed huddle forms from the review period. The EOP supervisor and program sergeant were the only two staff present. Discussion topics included five-day follow-ups, new patients, patients that left the institution, laundry concerns, and other patient-related concerns. The huddle evidenced comprehensive and very collaborative discussion.

During the staff meeting with clinicians, it was reported that huddles are not held on both the second and third watch, are not well attended by custody, and there was little custody participation. Problems with custody culture were also reported by clinicians.

RJD also conducted weekly 3CMS supervisory meetings between the mental health program supervisor and the program sergeant on all 3CMS yards during the review period. The weekly 3CMS supervisory meetings occurred in 88 of the 96 or 92 percent of required weeks. Except for Facility E, all documentation and signatures were typed and included very little information. Specifically, for patients who were new to the unit and had issues or concerns, the reports indicated the patient's name but did not include descriptive details of the behavior or evidence of collaborative or comprehensive discussion. Facility E's huddle forms were

handwritten and included sufficient detail to reflect a comprehensive discussion of required topics.

EOP orientation group participation was low during the review period. Of the 203 patients offered EOP orientation group, 88 or 43 percent attended the group. Groups were facilitated on Facilities A, C, and E by either a senior psychologist, psychologist, or clinical social worker during the review period and included patient group leaders as well. The monitor attempted to observe an EOP orientation group, but the group did not occur due to lack of patient participation. The institution was unable to provide documentation related to group curriculum.

Monthly joint supervisory program area tours occurred on all facilities during the reporting period. The joint supervisory program area tours occurred in 29 of 30 examined months with a captain on Facility A cancelling September's rounding for unknown reasons. Touring forms were typed out and did not include a physical signature in Facilities A, C, or E while Facilities B and D were handwritten and included staff signatures. Most touring forms included one or two worded responses to reflect staff and patient answers to questions, while the captain answered questions on behalf of staff in Facility D's July joint supervisory tour. The forms did not indicate that a comprehensive or collaborative discussion occurred during any joint supervisory tour.

Documentation reflected that IAC meetings occurred during all six months of the review period on Facility A while only occurring in June, August, September and October on Facility E. The institution was unable to indicate whether IAC meetings occurred on Facilities B, C, or D during the review period. Reviewed IAC meeting minutes from Facility's A and E indicated very brief, if any, discussion of mental health related topics and discussed recreation therapy updates,

including sports-related competitions, updates on broken fixtures throughout the institution, and supplies concerns.

The institution provided a copy of the 3CMS orientation brochure that was reportedly distributed to new 3CMS patients.

During the review period, 71 patients filed 449 allegations of staff misconduct against custody staff including eight for code of silence, 22 for sexual harassment, 25 for dishonesty, 27 for integrity, 47 for discrimination, 51 for retaliation, 74 for use of force, and 203 for other reasons not specifically identified. There were two cases of staff misconduct not initiated through the appeals process. There were no staff who moved to another post as a result of a staff misconduct complaint.

There were also 103 allegations of staff misconduct made against mental health staff during the review period. Allegations included medication issues, disagreements with treatment, disagreements with level of care, disagreements with the assigned provider, allegations of deliberate indifference, program exclusion, and rude or unprofessional conduct. One instance resulted in intervention, while 64 complaints resulted in no intervention, and 33 were rejected. The remaining complaints were not resolved.

For quarterly round table training, 145 custody staff did not attend as required, however 65 or 45 percent were on long-term leave. Of the 80-custody staff who were required to attend the training but have not done so, 11 were contractors, one was a CC II, and 68 were custody officers.

For annual off-post training, RJD reported that 1,065 of 1,127 or 94 percent of custody staff and 155 of 167 or 93 percent of non-custody staff completed the training.

Heat Plan:

RJD's heat plan LOP was revised in April 2024 and was compliant with the 2024 Heat Plan and Updates Memorandum. The heat plan was in effect from June through October during the review period. During that time, monthly summary reports indicated that there were nine Stage I heat alerts and no Stage II or Stage III heat alerts. However, reviewed daily activity reports (DARs) indicated that there was one Stage II heat alert on September 8, 2024. There was one heat related incident reported during the review period on September 9, 2024, on an EOP patient housed in the MHCB.

For the nine Stage I heat alerts reported during the review period, DARs from these dates were reviewed to assess compliance with policy requirements. The DARs did not consistently report on the start and end times of heat alerts and did not document the offering of reasonable accommodations to heat risk patients. Notably, the accommodation boxes were checked "not applicable" on each of the reviewed DARs.

A review of the Second and Third Watch DARs for September 8, 2024, when a Stage II heat alert was reported, indicated that ice water and cold showers were provided to patients as accommodations to heat risk patients as required by the 2024 Heat Plan and Updates Memorandum.

Review of indoor and outdoor temperature logs from June through October 2024 indicated several missed temperature readings which were not compliant with the 2024 Heat Plan and Updates memorandum.

Fourteen custody officers from seven different housing units were interviewed about their knowledge of heat plan policy and procedures. Ten of fourteen or 71 percent were knowledgeable about the heat plan and their responsibilities during activation. Notably, officers in units A1 and A2 were not familiar with how often the heat risk patient list was distributed,

who records the outdoor temperatures, how often indoor and outdoor temperatures are required to be logged and could not provide examples of heat stress symptoms in patients.

The litigation coordinator and acting chief nursing executive were interviewed regarding their responsibilities with the heat plan at RJD. The litigation coordinator indicated that she has been bringing heat plan issues to the warden's meeting and addressing them with facility captains. The acting chief nursing executive was knowledgeable about the heat plan and the roles of both custody and nursing staff. The chief nursing executive indicated that one heat-related illness was reported in September and was able to describe the actions that were taken by nursing.

The annual mandatory heat related pathologies training in 2024 was attended by 374 of 381 or 98 percent of custody staff and all mental health and nursing staff.

Due to discrepancies noted between the monthly summary reports and DARs, insufficient staff knowledge of heat plan policy and procedures, and missing temperature recordings in both indoor and outdoor temperature logs, RJD was not compliant with the 2024 Heat Plan and Updates Memorandum or CDCR's Expectations Relative to Institutional Oversight of Heat Plan Operations memorandum.

RVRs:

RJD issued 3,085 RVRs during the review period, of which 2,525 or 82 percent were issued to MHSDS patients. Specifically, two RVRs were issued to acute care patients, two were issued to intermediate care patients, 106 were issued to MHCB patients, 1,278 were issued to EOP patients, and 1,137 were issued to 3CMS patients.

The monitor reviewed 28 RVRs to assess compliance with CDCR policy. Custody staff timely referred the mental health assessment to mental health staff within two days in nine or 32

percent of reviewed cases. Mental health staff timely completed and returned the assessment to custody within eight days in 18 or 64 percent of reviewed cases. The senior hearing officer documented consideration of the mental health assessment in all reviewed cases.

Mental health staff recommended mitigation in 21 or 75 percent of reviewed cases and the SHO mitigated the penalty pursuant to the assessment in all 21 cases. The most frequent assessment recommendation concerning mitigation was no loss of phone calls, which 90 percent of assessments recommended.

None of the mental health assessments recommended alternative discipline due to patients' mental illness significantly contributing to the behavior documented in the RVR. Rather, seven mental health assessments explained that mental health contributed to the behavior in the RVR, but the SHO decided to hold the patient accountable regardless of their mental illness, generally explaining that the patients were aware of their behaviors.

As for mental health assessment training, RJD did not provide data regarding whether the warden or chief deputy warden attended this mandated training. The training was attended by three of four correctional administrators, the one captain did not attend, six of nine lieutenants, and 28 of 29 sergeants. RJD did not provide training data for mental health staff.

Use of Force:

RJD followed established department policy and procedure for all use of force incidents and did not maintain a local operating procedure.

During the review period, there were 275 use of force incidents, including 264 immediate and 11 controlled uses of force. For immediate use of force, 157 or 59 percent involved EOP patients, 72 or 27 percent involved 3CMS patients, and 35 involved patients who were

designated as inpatient. The institution was unable to indicate the level of care for the patients involved in the 11 controlled use of force incidents.

Twenty immediate use of force incident packages involving MHSDS patients were selected to assess compliance with policy guidelines. Of the twenty reviewed incidents all clearly articulated the justification for the immediate use of force and reflected that custody staff used a reasonable and appropriate amount of force, including physical strength and holds, 40-millimeter direct impact launcher, OC spray, and MK9 streamers. For incidents that involved chemical agents, appropriate decontamination was afforded as required.

Video of five immediate use of force incidents were reviewed. Though policy requirements regarding the immediate use of force were met, in four of the incidents, additional de-escalation training techniques could have been used more appropriately. It was also reported that several use of force incident reports were not closed due to allegations of staff misconduct. Concerningly, these investigations were significantly backlogged at RJD.

One controlled use of force incident from the review period was closed and available for review. The incident involved two EOP patients who refused to exit their cell for transfer to a different institution. All controlled use of force policy requirements were met, including multiple mental health clinicians being present, video surveillance footage of the incident, appropriate cool down period, multiple attempts by custody and mental health staff to gain the patients compliance with vocal orders, and nursing review to confirm that the patient was not a high risk for exposure to chemical agents. The institution attempted to use multiple different clinicians to gain the patient's compliance but were unsuccessful. The use of chemical agents including an OC grenade was used to quell the incident, which resulted in patient compliance with custody

orders without the use of physical force. Appropriate decontamination was afforded with fresh air and a cold shower.

RJD indicated that 1,053 of 1,056 or 99 percent of custody staff and all 39 non-custody staff completed the required use of force training in 2024.

Lockdowns/Modified Programming:

The institution indicated that there were no program lockdowns, shutdowns, or modifications to mental health programming on any facility during the reporting period. However, from December 30, 2024 to January 10, 2025, RJD implemented a program lockdown on all facilities, excluding RHU, due to increasing levels of violence, specifically an attempted murder of a peace officer and multiple aggravated batteries on peace officers. Emergent consults were conducted in the MHSDS building for urgent and emergent referrals only. Recreational therapy was suspended for all EOP programs and medication administration was conducted using controlled movement on all yards.

Access to Care:

A review of RJD's monthly Health Care Access Quality reports from June through October 2024 indicated that a total of 200,226 mental health ducats and add on appointments were issued, of which 81,701 or 41 percent were completed, and 118,525 or 59 percent were not completed. Of the not completed appointments, three percent were not completed due to custody factors, 15 percent were not completed due to non-custody issues, and 82 percent were not completed due to patient refusals.

The associate warden of health care access was interviewed regarding the high number of patient refusals and reports that ducats were passed out to each other by other patients. The associate warden indicated that approximately 80 percent of the refused mental health

appointments were recreational therapy appointments. When discussing the reports that ducats were passed out by other patients, he indicated that following an investigation, it was determined that patients would search for and take their own ducats while they were being sorted and that he addressed the proper method for ducat delivery with custody staff. Leadership also confirmed that custody officers were now required to document the distribution of each ducat to its respective patient. Mental health staff also reported that patients had indicated not receiving ducats at times or that their cell door was not opened to enable them to attend appointments.

Between May 26, 2025 and June 2, 2025, RJD implemented a pilot program for recreation therapy ducats whereby EOP patients would no longer receive a ducat for recreation therapy the night before the scheduled session. According to staff, this pilot had reduced the number of ducats the third watch housing unit staff were required to distribute by 300 to 400 per day. The institution had trained custody and recreation therapy staff and shared information with the patient population through memos and notices on their tablets.

*Coleman* Postings:

There were *Coleman* postings in English and Spanish in appropriate areas of all toured housing units.

**APPENDIX A – 24**
**SALINAS VALLEY STATE PRISON (SVSP)**
Site Visit: January 14, 2025 – 17, 2025
Review Period: June 1, 2024 – November 30, 2024

Dangerous Housing Practices

The monitoring tour at Salinas Valley State Prison (SVSP) revealed some of the most egregious, dangerous conditions for members of the plaintiff class in recent monitoring history. While SVSP has faced significant challenges providing adequate mental health care historically, the state of affairs at SVSP during this monitoring tour was far beyond the Special Master's worst-case expectations for this long-troubled prison. Institutional (and headquarters) leadership's apparent ignorance of the inhumane conditions in which these seriously mentally ill class members were housed during the monitoring tour and, in some cases, the obvious signs of patient decompensation and harm, was all the more astonishing.

Prior to the monitoring tour, the Special Master was aware of concerns regarding improper housing of some EOP patients at SVSP (and other institutions) due to the growth in the EOP population and resultant strain on EOP bed capacity. For instance, prior to the monitoring tour, the Special Master's monitoring of CDCR's Mental Health Headquarters revealed Level III EOP housing at SVSP was 95 percent filled, with 17 patients housed in non-EOP beds as of January 6, 2025. More concerning, Level IV EOP housing was at 144 percent of bed capacity, with 49 patients in non-EOP beds as of the same date.

SVSP leadership reported that several non-EOP units on D Yard, including D-2, D-3, D-6, and D-8, were used as EOP housing at the time of the monitoring tour. Leadership also informed the monitoring team that the institution utilized a closed unit on D-Yard (D-7) as EOP housing during the review period, but such use had ceased by the time of the monitoring tour. Because D-7 was closed, patients' housing was not accurately documented in SOMs but was

reported to show the patients housed in R&R. *See infra* p. _. Moreover, mental health leadership acknowledged that some patients had been housed in holding cells typically used for patients waiting to attend their Board of Parole Hearings (BPH), referred to as "BPH cells," during the review period. However, at the time of the entrance meeting, mental health leadership reported, to their knowledge, there were no longer patients housed in BPH cells. During the entrance meeting all of the custody staff present, including managers remained silent regarding the housing of patients in BPH cells.

SVSP patients interviewed during the monitoring tour had a starkly different – and more disturbing– account of housing conditions for some MHSDS patients at the time of the monitoring tour. During patient interviews, one 3CMS patient from D Yard spontaneously reported that upon admission to the institution, he slept on an *outside "mini-yard" without a bed* because he would not accept housing. Regional staff described these yards as open-air areas with a concrete floor and high walls that do not allow for custodial visibility. EOP patients housed on D Yard reported that they had observed peers sleeping outside, for days at a time, as recently as January 15, 2025, during the past month. They also reported that peers had slept in BPH, R&R and the sallyport. During the staff meeting, three different clinicians reported that they heard directly from at least two patients who stated they slept outside.

On Wednesday, January 15, 2025, the Special Master's expert was made aware of a crisis intervention team being called to assess a patient being housed in a BPH cell. Several members of the monitoring team, along with the SVSP Chief of Mental Health and a Regional Lieutenant, went to observe this patient and the housing situation.

Alarmingly, it was discovered that nine individuals were being housed in BPH cells across all four yards at SVSP. Many of these patients had been housed in these cells for multiple

days and were indeed in these cells on Tuesday, January 14, 2025 when the Special Master's team was informed that no patients were housed in BPH cells.

Upon further inspection, the monitoring team discovered a number of these BPH cells were dry cells, meaning that the individuals housed in them had no access to water or toilets. Further, individuals housed in these cells were provided with a mattress on the floor and some bedding. Some, but not all, of the patients in these cells were monitored by custody staff and it was unclear if these patients were being monitored by medical staff. Mental health staff were unaware of the patients in these cells and thus these patients were not monitored by mental health staff.

There was no tracking/logging being completed of these patients, such that access to water, meals, toilets, medication, and showers was unknown. The patients' ability to access prescribed medications and other necessary healthcare services was not known and could not be determined because health care staff was not timely notified of the housing changes. The patients had not been seen by mental health staff since their placement in these cells, which for at least one patient, was determined to have been over one week.

Eight of the nine individuals in the BPH cells were *Coleman* class members. Five were assigned to the EOP level of care, three were assigned to the 3CMS level of care, and one individual was not a class member. One of the 3CMS patients was suffering from severe diarrhea, which put him at high risk. In addition, the monitor's expert observed signs suggesting this patient was experiencing dehydration. This patient was housed alone in an area behind three closed doors without custody monitoring. *This patient's situation put their health and safety in serious jeopardy*.

Further, one of the EOP patients was determined to have arrived at SVSP on January 7, 2025 and did not have a housing assignment within the facility. He had been housed in a BPH cell for eight days at the time of the site visit. The patient was assessed by the monitor's expert from a distance, as he was in a cell with open bars, had cups of collected liquid in the cell that he claimed were poison, and was threatening violence. The patient appeared to be severely decompensated. A review of the patient's healthcare record revealed that his last contact with a qualified mental health professional occurred on December 31, 2024 at his cell front at Pleasant Valley State Prison. Documentation at that time noted a cluttered cell, labile mood and affect, agitated behavior, and paranoid thoughts. This patient required immediate referral to a Mental Health Crisis Bed (MHCB) and fortunately he was transferred to an MHCB later that same day.

Upon discovery, this dangerous and inhumane situation was immediately reported to the Chief Deputy Warden with a strong recommendation to move all patients to safe and humane housing locations immediately given the harm that had already occurred and the continuing clear and apparent risk of housing patients in these locations without staff supervision.

Upon returning to the facility the morning of January 16, 2025, no patients were observed to be housed in BPH cells.

An additional housing-related concern related to EOP patients was that they were being housed with non-EOP individuals, which is in violation of Chapter 4 of the Program Guide, requiring separate housing units for class members at the EOP level of care. *See* Program Guide 12-4-1, 12-4-4, and 12-4-21. EOP patients were housed in general population housing, and some were sharing cells with non-EOP individuals. This was occurring on housing units D-2, D-6, D-8, A-1, and A-3. None of these units were designated as EOP units or EOP overflow housing.

These serious and significant housing concerns occurred despite the Special Master's recommendation to close SVSP to EOP transfers following the last monitoring visit in 2023, repeated requests by defendants' Regional Mental Health team to cease transfers to SVSP for EOP and 3CMS patients, and the fact that SVSP was officially closed to transfer for EOP patients at the time of the site visit.

Moreover, given the demonstrated lack of tracking and monitoring of inhumanely housed MHSDS patients and either institutional leadership's ignorance of the housing situation at SVSP, or failure to report the situation at the time of the entrance meeting, it is unclear how much longer these dangerous conditions would have been allowed to continue but for the Special Master's monitoring tour.[115]

Given the severity of these findings, the Special Master sent a small monitoring team back to SVSP on April 29, 2025 to specifically monitor and assess the housing concerns revealed during the January monitoring tour. At the time of the April 29, 2025 re-visit, CDCR reported and the monitoring team confirmed that no incarcerated persons were housed in BPH cells. Moreover, CDCR reported that no incarcerated persons had been housed in BPH cells since the

[115] On January 23, 2025, CDCR's Office of Legal Affairs sent a letter to the Special Master outlining the "immediate action" CDCR took "to correct the identified issues" from the monitoring tour. Letter from Nicholas Weber, Esq., CDCR Office of Legal Affairs, to Special Master Lopes (January 23, 2025), attached hereto as Exhibit _. CDCR acknowledged that it was in fact the Special Master's monitoring team that "alerted SVSP, regional, and headquarters staff that several incarcerated persons were housed in SVSP's Board of Parole Hearing (BPH) holding cells." *Id.* at 1. While the Special Master appreciates CDCR's efforts to rehouse these individuals by the morning of January 16, 2025, it must be noted that CDCR regional mental health staff had been pleading for assistance from headquarters to address the housing problems at SVSP for at least one month prior to the Special Master's monitoring tour. There is simply no excuse for the conditions discovered at SVSP during this monitoring round. The Special Master urges the Receiver to focus efforts and resources on SVSP, to the extent practicable, for the safety of the thousands of class members who reside there.

January 2025 monitoring tour and, at that time, "there [were] no completed investigations, reports, or corrective actions plans to share" with the Special Master.

Census:

On January 16, 2025, SVSP housed 2,328 incarcerated individuals (excluding PIP patients). The 1,252 non-PIP MHSDS patients represented 54 percent of the institution's population.

The MHCB housed eight patients. No patients were in alternative housing.

There were 288 mainline EOP patients, representing a 24 percent increase compared to the preceding review. The mainline 3CMS population of 836 patients had decreased by 20 percent compared to the preceding review. The RHU population consisted of an additional 22 EOP and 84 3CMS patients.

No MHSDS patients were in non-disciplinary segregation.

Provided documentation accounted for an additional 14 MHSDS patients, including one ICF patient housed in the CTC, 11 EOP patients housed in ICF pending physical discharge, and two patients without designated housing whose levels of care were not specified; documentation indicated that those two patients were "presumably in R&R."

Staffing:

The institution reported combined mental health staffing data for both the prison and PIP. As of January 2, 2025, both chief psychiatrist positions were filled. Neither of the two allocated senior psychiatrist positions were filled. Two of 14 staff psychiatry positions were filled for an 86 percent vacancy rate; the use of nine contractors resulted in a functional vacancy rate of 21 percent.

Four of five allocated telepsychiatry positions were filled for a 20 percent vacancy rate; one of 11 allocated positions for medical assistants assigned to telepsychiatry was filled for a 91 percent vacancy rate.

Overall, the staff psychiatry functional vacancy rate (accounting for civil servants, registry, and telepsychiatry positions) was 21 percent.[116]

Two of three chief psychologist positions were filled for a 33 percent vacancy rate. Of the five allocated senior psychologist supervisor positions, 1.5 were filled for a 70 percent vacancy rate. Ten of 10.5 senior psychologist specialist positions were filled for a five percent vacancy rate; three senior psychologist specialists were unlicensed. For staff psychologists, three of 35.5 positions were filled for a 92 percent vacancy rate; 13 contractors reduced the functional vacancy rate to 55 percent.[117]

The 1.5 supervising social worker positions were filled. Additionally, 11.5 of the 21 social worker positions were filled for a 45 percent vacancy rate; 4.5 contractors reduced the

[116] As noted, these figures combine staffing vacancy data for the prison and the PIP. CDCR's Monthly Mental Health Staffing Vacancy Report for January 2025 indicated no functional vacancies among staff psychiatrists. ECF No. 8559 at 5.

[117] As noted, these figures combine staffing vacancy data for the prison and the PIP. CDCR's Monthly Mental Health Staffing Vacancy Report for January 2025 indicated a 52 percent functional vacancy rate among staff psychologists. ECF No. 8559 at 6.

functional vacancy rate to 21 percent.[118] None of the three allocated tele-social worker positions were filled.[119]

While no MFT positions were allocated, one was staffed.

Nine of 23 recreation therapist positions were filled for a 61 percent vacancy rate; one contractor reduced the functional vacancy rate to 57 percent.[120]

Thirty-nine of 39.5 supervising RN positions were filled for a one percent vacancy rate. Of 132.8 allocated MHSDS RN positions, 95.6 were filled for a 27 percent vacancy rate; six contractors reduced the functional vacancy rate to 23 percent.

Fifteen of 104 CNA positions were filled for an 86 percent vacancy rate; nine contractors reduced the functional vacancy rate to 77 percent. Of 73.8 LVN positions, 30.1 were filled for a 59 percent vacancy rate; ten contractors reduced the functional vacancy rate to 46 percent.

For psych techs, 26.8 of 53.1 positions were filled for a 50 percent vacancy rate. Two of four senior psych tech positions were filled.

One of two OSS II positions were filled. Five of seven AGPA positions were filled for a 29 percent vacancy rate. Both HPS I positions were vacant. The CHSA position was filled.

---

[118] The produced and reported staffing data was from January 2, 2025, as indicated above. However, SVSP noted that three new clinical social workers began working on-site the day before the site visit and that one clinical social worker was promoted to a headquarters role days before the site visit; accordingly, at the time of the site visit, 13.5 of 21 social worker positions were filled for a 36 percent vacancy rate and 4.5 contractors reduced the functional vacancy rate to 14 percent.

[119] As noted, these figures combine staffing vacancy data for the prison and the PIP. CDCR's Monthly Mental Health Staffing Vacancy Report for January 2025 indicated 21 percent functional vacancy rate among clinical social worker positions. ECF No. 8559 at 7.

[120] As noted, these figures combine staffing vacancy data for the prison and the PIP. CDCR's Monthly Mental Health Staffing Vacancy Report for January 2025 indicated a 44 percent functional vacancy rate among recreation therapist positions. ECF No. 8559 at 8.

With respect to custody staff, as of January 7, 2025, the warden and chief deputy warden positions were vacant but filled by individuals acting out of class. All six associate warden positions were filled; an additional individual was acting out of class. Five of six captain positions were filled; two individuals acting out of class resulted in no functional vacancies. Twenty-six of 30.4 lieutenant positions were filled for an 86 percent vacancy rate; two individuals acting out of class reduced the functional vacancy rate to eight percent. Seventy-nine of 87.6 sergeant positions were filled for a 10 percent vacancy rate; four sergeants were on long term leave and an additional four were acting out of class.

Nineteen of 22 CCI positions were filled for a 14 percent vacancy rate; five individuals acting out of class resulted in no functional vacancies. All 12 CCII positions were filled and an additional CCII was acting out of class.

For correctional officers, 730 of 741.6 positions were filled for a two percent vacancy rate; 48 individuals on long term leave increased the functional vacancy rate to eight percent.

Telemental Health:

Tele-mental health services were provided to the mainline EOP and mainline 3CMS programs, respectively, as follows: 120 and 200 hours per week for telepsychiatry; 20 and 60 hours per week for telepsychology; and 40 and 80 hours per week for tele-social work.

Telework:

During the review period, psychiatrists and PCs did not engage in telework (aside from tele-mental health providers).

Staff Recruitment:

SVSP worked with the Regional Hiring Unit to increase marketing for *Coleman* classifications, mental health recruitment and retention bonuses, additional pay differentials for

psychiatrists providing on-site services, and additional pay for psychiatrists or psychologists who worked additional caseloads.

Quality Management

Monthly mental health program subcommittee (MHPS) documentation indicated that quorums were met during the review period. Standard topics included: action item list; improvement projects and pipeline items; staffing; performance reports; AQR-AW report; nursing report; system surveillance/performance; program supervisor report; inpatient coordinator report; SVSP DDP population; *Clark* performance report; SPRFIT report; training coordinator report; chief psychiatrist report; chief psychologist report; surveys and audits; policy and procedures; and open discussion.

MHPS documentation needed improvement. Specifically, some sections remained unchanged across the six-month review period. Other sections were overly brief with an indication that the topic was discussed and referred the reader to an attachment; discussion details were not clear and action plans were not developed when needed. The status of Headquarters' CAPs was not consistently reported. Across the review period, there was a focus on custody inpatient housing discharge follow-ups although there was no progress during the review period. Of note, the institution continued to utilize an 80 percent compliance threshold thus issues between 80 and 90 percent compliant, such as SRE mentoring, were not considered for action plans. Persistent deficiencies in access to care continued to be secondary to years-long staffing shortages.

Action was not routinely taken for identified issues. For example, when a pattern of deficiencies was documented regarding RHU pre-placement evaluations, the response was training. In another example regarding diagnostic monitoring, the reader was referred to an

attachment with documentation of refusals (October 2024). The apparent conclusion was that refusals contributed to non-compliance, however, not only is that not clearly stated but there was no plan to address refusals. In contrast, during preceding months there was an indication of new arrivals without orders and need for communication between the provider and scheduler (August 2024) with no documented follow up.

Of concern, issues that were identified during the preceding Special Master's site visit were not targeted by the MHPS committee. Despite documentation in CMHPP executive rounds (July and August 2024) that ducatting was a problem for D Yard EOP and 3CMS patients, there was no action plan developed by the MHPS. Additionally, documentation of frequent alarms during the review period were not sufficiently addressed. There was also no discussion regarding options (e.g., unit rounds, increase group programming) to address prolonged delays and, in some cases, absence of patient care due to prolonged understaffing. Lastly, housing concerns for EOP patients were not addressed.

While mental health participated in the QMC and mental health content was documented, few issues raised on MHPS were in QMC documentation. Similarly, overall mental health documentation in LGB monthly meeting minutes was limited to local operating procedure review, upcoming audits, and privileging and credentialing. Improved integration of MHPS and institutional quality management oversight committees was needed.

The institution reported that peer review was not conducted for psychologists or social workers and "remains suspended except where required by Joint Commission." MHPS documentation indicated that peer reviews were conducted for psychiatrists in October 2024.

There was no documentation of minutes of psychiatry peer review processes and the social worker and psychologist peer review process was on hold based on a headquarters directive.

As with the previous site visit, no QITs or FITs were chartered during the period.

Mental Health leadership reported that with ongoing staffing shortages, dashboard status was not routinely addressed. This approach was an attempt to minimize staff feeling overwhelmed and to reduce burnout. The primary level of care that was targeted has been the MHCB. It was reported that initial assessments have improved and were close to compliant.

Medication Management:

CDCR's MAPIP monitored compliance with diagnostic monitoring and medication administration. Diagnostic monitoring included obtaining medication consents, as well as any physical examination, vital signs, or laboratory tests needed for a medication. Medication administration audited compliance with the availability, continuity, and actual administration of medications. Categories must meet the 90 percent threshold to be compliant.

MAPIP

SVSP provided MAPIP results for June 1, 2024 through November 30, 2024 regarding compliance for psychiatric diagnostic monitoring and medication management.

Antidepressant monitoring tracked four metrics, with the abbreviations used in the graphs below in parentheses: EKGs for patients taking tricyclic antidepressants (EKG); medication consents (Consent); thyroid function tests (TFTs); and obtaining blood pressure for patients taking venlafaxine (venla BP). SVSP was fully compliant with EKG and monitoring blood pressure for patients prescribed venlafaxine, and was non-compliant with monitoring thyroid function tests. The institution was partially compliant with obtaining medication consents.




While each metric was assessed across a six-month period, not all metrics were required each month. Out of the total 21 required metric-months, 12, or 57 percent, were compliant, with nine, or 43 percent, non-compliant.

The diagnostic monitoring for patients prescribed atypical antipsychotics was the most intricate, containing 11 metrics. These included: Abnormal Involuntary Movement Scale (AIMS); blood pressure; glucose; complete blood count (CBC); comprehensive metabolic panel (CMP); EKG; height (Ht); lipids; medication consents; thyroid function tests; and weight (Wt). SVSP was fully compliant for monitoring blood pressure, height, and weight. The institution was non-compliant for monitoring AIMS and lipids. The remaining metrics were partially compliant during the review period.




Of the 65 metric-months for which data was required, SVSP reached compliance for 35, or 54 percent, and was non-compliant for the remaining 30, or 46 percent.

Clozapine is a highly effective antipsychotic medication which may prove beneficial even in patients who have been refractory to other medications. Due to the risk of serious, sometimes fatal, side effects, its use requires close monitoring with the same metrics used for antipsychotics as listed above. There were no required EKGs during the monitoring period. Of the remaining ten metrics, SVSP was fully compliant with blood pressure, glucose, CBC, CMP, height, lipids, thyroid function, and weight. The remaining two metrics, namely AIMS and medication consent, were partially compliant. During the monitoring period, SVSP was not a clozapine-maintenance institution. At the time of the monitoring tour, SVSP had no patients outside of the PIP prescribed clozapine.




Of the 56 metric-months, 53, or 95 percent were compliant, with three, or five percent, being non-compliant.

Carbamazepine is a mood-stabilizing medication requiring four metrics: CBC, CMP, medication level, and medication consent. Each metric required one month of reporting, and SVSP was compliant with all four metric-months.

Depakote is a mood-stabilizing medication requiring the same four metrics as carbamazepine. SVSP was fully non-compliant with CBC, CMP, and therapeutic medication level. The institution was partially compliant for one of six required months of obtaining medication consents.




When examined in aggregate, 24 metric-months were required. Of these, SVSP was compliant for one, or four percent, and non-compliant for 23, or 96 percent.

Lamotrigine is a mood stabilizing medication which requires only one MAPIP metric, namely obtaining medication consents. SVSP was compliant for both required months.

The mood stabilizer lithium required medication consents, and monitoring of kidney and thyroid function, EKG, and therapeutic medication levels. SVSP was fully compliant with monitoring kidney function, and obtaining EKGs; however, the institution was fully non-compliant with monitoring therapeutic medication level and thyroid function. SVSP was partially compliant with obtaining required medication consents.




SVSP required 27 metric-months of data. Of these, the institution was compliant with 13, or 48 percent, and non-compliant with 14, or 52 percent.

When examined *in toto*, SVSP required 199 metric-months of diagnostic monitoring data. Of these, 120, or 60 percent, were compliant, while 79, or 40 percent, were non-compliant.

<u>Medication Administration</u>

MAPIP medication administration metrics monitored essential aspects such as medication availability, continuity, preparation, and administration. SVSP had 12 required measures during the monitoring period.

Monitoring medication continuity included the following six measures, followed by the abbreviations used in the graphs in parentheses: transfers from other institutions arriving at receiving and release (R&R); intra-institutional transfers to non-RHU locations (Intra); MHCB transfers (MHCB); intra-institutional transfers to restricted housing (RHU); discharge from a community hospital or DSH (Outside Hospital); and upon parole or transfer to the community (Release).

MAPIP measures tracked compliance with the administration of medications given at HS (hora somni, or bedtime) which must be given on or after 8:00 P.M. (HS), and medications given in the A.M. and P.M. which must be given at least eight hours between doses (A.M./P.M.). Additionally, metrics evaluated whether chronic psychiatric medications were continued without interruption (Chronic), and whether new medications were administered as ordered, and in compliance with required timelines (New).

Finally, MAPIP measures surrounded PC 2602 involuntary medication orders. These include whether a court order was in the medical record (Court Order), and whether a medication order for the PC 2602 medication was present (Med Order).

The institution was fully compliant with two metrics—medications upon parole or release (Release) and the presence of a PC 2602 court order in the medical record (Court Order). SVSP was fully non-compliant with nine: transfers from other institutions arriving at receiving and release (R&R); intra-institutional transfers to non-RHU locations (Intra); MHCB transfers (MHCB); RHU; discharge from a community hospital or DSH (Outside Hospital); medications given at HS; medications given in the A.M. and P.M.; chronic medications; and new medications administered. The presence of a PC 2602 medication order in the medical record was partially compliant.




These twelve measures each required data for the entire six-month review period, thus yielding 72 metric-months. Of these, 15, or 21 percent were compliant, and 57, or 79 percent, were non-compliant.

<u>PC 2602 Issues</u>

The monitor's expert discovered a multitude of barriers spanning multiple steps in the PC 2602 process. SVSP reported custodial challenges transporting patients to their administrative law judge hearings—a serious issue, raising both clinical and due process concerns. Pharmacy also contributed to barriers in the dispensing of medications. Under PC 2602, psychiatrists may order up to 72-hours of emergency medications, without an *ex parte* order; however, pharmacy was reticent to dispense the medications without a formal court order in the chart. Barriers continued in the administration of involuntary medications. Nursing and custodial staff had reluctance to administer involuntary medications without seeing the application for or the granting of the judicial order.

The institution had two MCAs, both working in the role in a part-time capacity. Other responsibilities included group scheduling and monitoring STEPS in the PIP. One coordinator largely covered the PIP, while the other one covered outpatient and MHCB programs.

During the monitoring period, 70 patients received PC 2602 medications. There were nine emergency initial, eight non-emergency initial, and 53 renewal petitions filed; all were granted. There were no planned non-renewals, nor any cases which lapsed due to administrative error.

Non-Formulary

SVSP did not report the rate of non-formulary usage during the monitoring period.

KOP Medications

Per CDCR policy, psychiatrists were allowed to prescribe SSRIs, the SNRI duloxetine, and melatonin as KOP for appropriate patients at the 3CMS level of care. SVSP reported a total of 57 patients were prescribed 140 medications as KOP. Of these, only two were in accordance with policy for type of medication (one each for an SSRI and melatonin). The remaining medications largely included vitamin and mineral supplements. One prescription was for the medication propranolol, a medication generally used to treat high blood pressure but used in psychiatry for anxiety or movement side effects to antipsychotic medications; the medication is potentially fatal in overdose. This issue was addressed with leadership while onsite. The level of care was not specified, and thus compliance with this aspect of policy could not be assessed.

Polypharmacy Reviews

With rare exception, SVSP was compliant with conducting required polypharmacy reviews for patients on multiple medications which may contribute to increased medical risks.

Nursing Audits

SVSP completed medication line audits for all yards and all shifts. No deviations from policy were identified with individual wait times exceeding 30 minutes, or total medication line duration greater than two hours.

Medication Management Summary

SVSP displayed multiple challenges in compliance with policies surrounding diagnostic monitoring and medication administration. Issues were particularly problematic with certain medications, such as Depakote which only had four percent compliance with required MAPIP metrics. Depakote has myriad serious side effects, such as lowering platelets (responsible for blood clotting) and liver injury; thus, the lack of compliance carries genuine risk of patient harm. The barriers surrounding the PC 2602 process required immediate correction. These barriers included custody not escorting patients to their PC 2602 hearings before the administrative law judge, as well as reluctance or refusal to dispense or administer the medication. Patients receiving PC 2602 medications are among the most psychiatrically impaired patients in the CDCR system. These deficiencies must be immediately corrected. Medication administration measures were particularly concerning, especially for continuity of medications for patients moving to another yard, RHU, from the MHCB, or the PIP/DSH. Many of these transitions represent periods of increased stress and psychiatric vulnerability. Thus, continuity of medications is of the utmost importance. Additionally, psychiatrists deviated from policy in writing for certain medications as KOP, including ones potentially fatal in the event of an overdose.

Relative areas of strength include the monitoring of the kidney function and EKGs of patients taking lithium, and polypharmacy reviews. The institution did well overall with

monitoring clozapine; however, it is not a designated clozapine maintenance institution, and thus largely reflect patients treated in the PIP-setting.

Transfers:

Sustainable process reviews were required to audit higher level of care (HLOC) consideration documentation for quality and to measure the inter-rater reliability between the headquarters' reviewer and the institution's inpatient care coordinator. During the monitoring period, SVSP underwent two major sustainability reviews in May 2024 and November 2024, and a minor sustainability review in August 2024. These reviews noted declining levels of acceptable documentation. While overall good concordance was obtained, the minor sustainability audit noted a discrepancy between what the institution perceived as acceptable documentation for non-referral (50 percent) and what headquarters found (28 percent). Staffing issues undergirded most of the reported deficiencies.

SVSP's inpatient coordinator held the position since April 11, 2024, and was previously a PIP clinician providing services to patients at the intermediate level of care. There was no formally assigned backup, but the chief psychologist provided backup as needed.

SVSP reported 283 instances for 196 unique patients of non-referral for higher levels of care during the review period. Audit results by the inpatient coordinator showed rates of acceptable documentation surrounding higher level of care indicators and non-referral rationales ranged from 61 to 80 percent. Notable deficiencies included lack of detailed and individualized goals, and the need for additional details on how patients were functioning and why they did not require a higher level of care. Audits from September 2024 and October 2024 did not include comments on why documentation was inadequate.

The monitor's expert reviewed ten randomly selected charts from the non-referral log. While the monitor's expert agreed with the clinical decision for non-referral in all cases, the documented rationale for non-referral was adequate in two, or twenty percent, of cases, and inadequate in eight, or eighty percent.

During the review period, there were 20 acute care and 46 intermediate care referrals, resulting in 18 acute and 43 intermediate care admissions. All admissions were completed within Program Guide-required timeframes. The inpatient coordinator noted that the lower PIP census (compared to prior monitoring rounds) positively contributed to transfer timeframe compliance. One acute and one intermediate care referral were rescinded, and one acute and two intermediate care referrals were rejected. The rescinded acute care referral was rescinded 178 days after the referral was made and, thus, was 168 days late; however, this patient had complex medical needs and required extensive medical evaluation. He eventually was diagnosed with dementia at which time the referral was rescinded. No other patients referred to inpatient care had complex medical needs.

At the time of the site visit, no patients were pending transfer to inpatient care.

No *Vitek* hearings were held during the review period.

SVSP made 543 MHCB referrals during the review period resulting in 176 admissions and 367 rescissions; 70 of these admissions were to the SVSP MHCB and 106 were to MHCBs at other institutions. Twelve, or seven percent of MHCB admissions occurred beyond 24 hours of alternative housing placement; 11 of these were admissions to other institutions. Reasons for delayed placements included lack of available bed space or otherwise were not provided.

SVSP did not track RHU transfers during the review period or at the time of the site visit. With respect to patients being moved to the on-site 3CMS RHU, no data was maintained or

provided, though on-site staff indicated that placement delays were highly likely. Transfers to EOP RHUs at other institutions also were not tracked in any capacity for the review period. Remarkably, on-site staff indicated that they were unaware that this data needed to be tracked. On-site staff indicated that these transfers were most likely beyond Program Guide timeframes as well, largely due to lack of available mental health RHU bed space across CDCR. As of January 14, 2025, SVSP's RHU census indicated that 22 EOP patients were awaiting transfer; ten or 45 percent had already been housed in the RHU for over 30 days and, thus, were beyond Program Guide timeframes.

SVSP also did not track patients whose level of care changed from EOP to 3CMS during the review period.

Two 3CMS patients were transferred to the Folsom MSF during the review period.

<u>Programming</u>:

<u>MHSDS Patients in Restricted Housing</u>:

<u>3CMS RHU</u>

During the review period, SVSP operated a 3CMS RHU. There were 154 patients in the RHU during the reporting period, with a length of stay from one day to 334 days and an average length of stay of 37 days. There were 20 non-MHSDS patients in the RHU during the reporting period. The length of stay was between one and 42 days with an average length of stay of eight days.

As of January 14, 2025, there were 106 incarcerated individuals housed in the RHU, including 22 EOP patients, 80 3CMS patients, and four GP incarcerated persons.

SVSP's 3CMS RHU LOP was up to date. EOP patients were being housed in the 3CMS RHU, and SVSP followed the 3CMS LOP regarding EOP patients.

SVSP reported there were Max custody overflow patients housed in A Yard approximately two months prior to the monitoring tour, but the use of A Yard for overflow reportedly ceased upon an arrangement with CSP/Corcoran to accept Max custody patients in that institution's RHU.

The three PCs and telepsychiatrist serving both the EOP and 3CMS RHU populations had caseloads within established ratios.

*Structured Treatment*

The RHU Policy required that patients assigned to 3CMS RHU be offered a minimum of 20 hours of out-of-cell time reach week, including 18.5 hours of recreational time outside the cell and 90 minutes of confidential, structured therapeutic activities. *See* ECF No. 8355 at 7-17 (Restricted Housing Unit Program: Mental Health Services Policy, dated July 19, 2024 and effective August 1, 2024) (hereinafter "RHU Policy"). The institution reported provided 0.1 hours of structured treatment to 3CMS RHU patients during the review period.

*IDTTs*

Five 3CMS RHU patients were scheduled for IDTTs during the monitoring tour. Two patients were rescheduled due to the absence of a primary clinician. One of the three remaining IDTTs was held in absentia. All required participants were in attendance except for nursing. The telepsychiatrist participated virtually and the tele presenter was also present along with a clinical supervisor. The primary clinician discussed the purpose of the IDTT and put the patients at ease and engaged appropriately with the patients. However, the patients' coping skills or lack thereof were not discussed or tied to past or current behaviors; neither the patient's current level of care nor consideration of a change in level of care was discussed in one case. Goals were discussed in both cases and interventions related to development of coping skills were stated but

the patient was not asked what coping skills currently worked or if current interventions worked at all. The telepsychiatrist and CCI engaged without prompting and gave the patients information on next appointment or committee meeting dates and asked discipline specific questions.

All 30 patients required initial IDTTs. Of the 12 reviewed initial IDTTs, none occurred timely within ten calendar days or arrival or level of care change. Notably, 18 initial IDTTs were overdue and never occurred. All 12 were attended by all required staff and six or 50 percent were attended by the patients. Reasons initial IDTTs were held *in absentia* included patient refusals.

For the 59 patients in CDCR's appointments report, there were 84 completed routine IDTTs. When a patient had either a completed or refused initial IDTT and a routine IDTT or more than one routine IDTT, timeliness in accordance with Program Guide requirements was able to be calculated. Of the 84 IDTTs that were completed, 26 were for individuals who had at least two IDTTs. Of those, only one was not compliant with Program Guide timeframes. Of note, the report did not include individuals that did not have a completed IDTT, such as those that were not scheduled.

*Group Treatment*

SVSP reported that due to staffing shortages, groups were not available to patients housed in the RHU during the review period. SVSP reported in their answers to the document request that they do not maintain logs or reports for proof of practice that the assigned psychiatrist or primary clinicians met with patients for individual contacts during the reporting period.

According to custody staff, most of the cells and patients were doubled celled. Accordingly, interviewed mental health staff indicated it was difficult to ask or discuss mental health concerns cell-side due to lack of confidentiality. Mental health leadership acknowledged the Program Guide required offering of group treatment weekly; however, the current group room was reportedly not safe due to the ease escape from the treatment chairs causing patients to refuse group. Moreover, the room was also used as storage and sometimes for individual contacts. Mental health leadership also reported that groups would not occur until it was safe to do so.

Both radios and ear buds were present, and officers reported distributing them to incarcerated persons who were permitted to have them.

*Individual Treatment*

The RHU Policy requires that all patients placed into 3CMS RHU receive a primary clinician evaluation within ten days of arrival and an initial psychiatry evaluation prior to the IDTT and within ten days of arrival. *See* RHU Policy at 4. The RHU Policy also requires that 3CMS RHU patients receive weekly primary clinician contacts and psychiatry contacts every 90 days. *See id.*

The monitor randomly selected and reviewed the healthcare records of 30 3CMS RHU patients to assess compliance with Program Guide timeframes for initial psychiatry contacts during their stays.[121] All 30 patients required initial psychiatry evaluations; four or 15 percent of reviewed initial evaluations timely occurred before the initial IDTT. Notably, four initial

---

[121] The reviewed data captures the time between patient contacts but does not include patients who were not seen or scheduled for a routine contact with a psychiatrist, primary clinician, or IDTT. Of note, the provided appointments report did not account for delays between appointments due to movements in or out of 3CMS level of care or RHU placement. Contact with the assigned psychiatrist or primary clinician was unable to be determined.

psychiatry evaluations were overdue and never occurred. Fourteen or 54 percent of the reviewed initial psychiatry evaluations were conducted in confidential settings; the non-confidential contact was due to patient refusal. Telepsychiatry was utilized for all 26 initial psychiatry evaluations.

For the 59 patients in CDCR's appointments report covering patients who received at least one routine psychiatry contact during the review period, there were 84 total completed and refused contacts. Of the 84 that were completed, 41 or 49 percent were reported as being conducted in a confidential setting. When a patient had more than one completed contact, timeliness in accordance with Program Guide requirements was able to be calculated. Of the 84 completed contacts, 26 were for individuals who were seen at least twice by a psychiatric provider. Of those 26 contacts, one or four percent of contacts were completed beyond the Program Guide required timeframes. Of note, the report did not include individuals that did not have complete contacts, such as those that were not scheduled in accordance with the institution's triage plan.

All 30 patients required initial primary clinician evaluations. Of the 26 reviewed initial primary clinician evaluations contacts, three or 12 percent were completed within ten calendar days of arrival or change in level of care. Notably, four initial primary clinician evaluations were overdue and never occurred. Twelve or 46 percent of reviewed initial primary clinician evaluations were conducted in a confidential setting; non-confidential contacts were due to patient refusals.

For the six patients in CDCR's appointments report covering patients who received at least one routine primary clinician contact during the review period, there were six total completed contacts. Five of six or 83 percent were reported as being conducted in a confidential

setting. The appointments report indicated that no patient had more than one completed contact, therefore routine primary clinician timelines could not be calculated. Of note, the report did not include individuals that did not have completed contacts, such as those that were not scheduled in accordance with the institution's triage plan.

Of the six completed routine psychiatry contacts, no contacts were reported to have been completed in zero minutes, one contact was completed within 15 minutes, one lasted between 16 and 30 minutes, two lasted between 31 and 60 minutes, and two lasted between 61 and 95 minutes.

Non-Disciplinary Segregation:

There were 40 incarcerated persons on NDS status in RHU at the time of the monitoring tour.

MHCB:

The MHCB contained nine operating beds at the time of the monitoring tour. At the time of the monitoring tour, one room had been redlined for approximately one month due to a broken camera.

The MHCB had a clinical director who had been on the job for four weeks; however, this individual had extensive experience working in the SVSP PIP. MHCB staff included one registry psychiatrist who was assigned to the unit for 50 hours monthly, two registry psychologists who were assigned to the unit for 160 hours monthly who provided care to patients in the CTC and occasionally assisted with CIT overage, and one RT who provided care to patients in the CTC for 160 hours monthly. Tele-mental health was reportedly not utilized in the MHCB during the review period.

On January 15, 2025, the MHCB census was seven patients. During the review period, there were 112 admissions to the MHCB; the average daily census was eight patients. MHCB patients' clinical lengths of stay averaged 8.5 days; the maximum clinical stay was 32 days. Twenty-one patients' MCHB clinical stays exceeded ten days. The average patient's physical length of stay was 11.6 days, with psychical stays of 48 or 43% of patients exceeding ten days.

*IDTTs*

The monitor's expert observed the one IDTT scheduled during the monitoring tour. While the room was appropriate for the purpose, it did not contain a TTM; staff reported that patients on maximum custody status had 2:1 custodial escorts. The room had adequate light and was at a comfortable temperature. All required participants were present, had computers, and actively used them. The one patient was presented in absentia, due to being at a dental appointment. The PC and the psychiatrist clearly knew the patient. The team was in agreement with the decision to discharge to the EOP level of care. Overall, the IDTT was adequate.

A random sample of patient records was reviewed to assess compliance with Program Guide timeframes for MHCB IDTTs. Fifteen MHCB patients required initial IDTTs; 13, or 87 percent occurred within 72 hours of arrival; all required staff were in attendance. Patients attended 93 percent of initial IDTTs. Reasons initial IDTTs were held in absentia included patient refusal.

Thirteen patients required routine IDTTs. Fifteen or 94 percent of routine IDTTs were timely, or every seven calendar days following the initial IDTT. All IDTTs had the required staff in attendance. Patients attended 88 percent of routine IDTTs. Reasons routine IDTTs were held in absentia included safety concerns and no reason was provided for one patient.

Of note, the Program Guide requires attendance of the assigned psychiatrist and primary clinician at both initial and routine IDTTs, however assignment was not clearly discernable for all cases.

Interviewed staff reported that out-of-cell activities were offered based on medical orders. Further, outside yard was offered on days when patients were not in the day room. A review of patients' charts revealed that showers, linens, phone calls were not offered as required on a regular basis; nor were the required yard hours or out of cell time. There were no documented reasons for these deficiencies.

While the treatment team reported a close working relationship among disciplines, including with custody, the monitor's expert had serious concerns. The serious issues surrounding PC 2602 issues were outlined above. The major sustainable process report from November 2024 noted deteriorating relationships between custody and mental health. This included direct patient impacts such as patients having unauthorized items in their cell, with custody declining to identify who allowed this, and refusing to remove the unordered property. This issue is of the utmost concern, given the potential for harm to self or others with unauthorized property. This issue must be rectified immediately and will require close monitoring on subsequent monitoring site visits.

Concerns regarding bed and treatment space reported in the preceding round continued through the time of the monitoring tour. The lack of available housing on the yard posed significant challenges to the MHCB, which resulted in direct patient impact. For instance, due to the lack of available cells on the yards, SVSP deviated from policy requirements of holding a patient's cell for ten days upon transfer to the MHCB, which resulted in patients not having housing when they were discharged from MHCB. This was one contributing factor to a

protracted length of time for one patient on discharge status in the MHCB. As of January 10, 2025, this patient had been on discharge status for 46 days, due to difficulty with housing placement.

*Individual Treatment*

The monitor randomly selected and reviewed the healthcare records of 15 MHCB patients to assess compliance with Program Guide timeframes during their stays.

Initial evaluations were compliant if the assessment occurred within 24 hours of admission. Initial IDTTs were timely if completed within 72 hours of arrival. Initial appointments should be held in a confidential space and the psychiatrist, primary clinician, CCII and patient should be present at IDTTs. The Program Guide also requires that MHCB patients' "condition shall be assessed and monitored daily by the treating clinician, either a psychiatrist or psychologist." Program Guide 12-5-13. The "assigned psychiatrist shall evaluate each MHCB inmate-patient individually at least twice weekly to address psychiatric medication issues." Program Guide 12-5-14.

Fifteen MHCB patients required initial psychiatry evaluations. Of those, 13, or 87 percent had a timely initial psychiatry evaluation meaning it occurred before the initial IDTT and within 24 hours of arrival. Fourteen, or 93 percent were conducted in a confidential setting. Reasons for non-confidentiality were not documented other than to note the contact occurred at cell front. Telepsychiatry was not utilized for this sample of patients.

Fifteen MHCB patients required two routine psychiatry contacts per week. There were 76 expected contacts, all of which were timely. Of the 76 reviewed routine contacts, 73, or 96 percent were conducted in confidential settings. Reasons for non-confidentiality were not

documented other than to note the contact occurred at cell front. Telepsychiatry did not conduct routine psychiatry contacts.

Fifteen MHCB patients required initial primary clinician evaluations; 15, or 100 percent were completed within 24 hours of arrival. Eight, or 53 percent of initial primary clinician contacts were conducted in a confidential setting. Reasons for non-confidentiality included unavailable confidential space and modified programming. No initial contacts were conducted via tele-mental health.

Fifteen MHCB patients required routine primary clinician contacts. An institution is considered compliant if a patient was seen daily beginning the day after admission for an out-of-cell confidential contact (unless the patient refused) by the psychiatrist or psychologist, though on weekends the patient may be seen by the medical officer of the day (MOD) (12-5-13). There were 34 expected contacts, 18, or 53 percent were timely. Notably, two patients required routine contacts which were overdue or did not occur. Of the contacts that occurred, nine, or 28 percent were conducted in a confidential setting. Reasons for non-confidentiality included patient refusals, unavailable custody escorts, unavailable confidential space, modified programming, medical restrictions, and cell front contacts. No routine contacts were conducted via tele-mental health.

Seclusion and Restraint

There was one restraint room and three seclusion rooms, all of which were clean and in working order. The seclusion room had a grate in the floor to use as a toilet. Restraints were in place and conformed to statewide policy. The restraint room also had a toilet. Staff reported that the restraint room had not been used in quite some time.

There were no restraint incidents during the review period. There were three seclusion episodes during the reporting period. The monitor's expert reviewed these three cases; the use of seclusion as the least restrictive alternative was well-justified.

EOP

The EOP was housed in the A and D Yards at SVSP. A Yard was a Level III yard and included a single housing unit (A-5) designed for EOP patients. Level IV EOP patients were housed in housing unit D-3, with overflow patients housed in D-4. EOP patients were not only housed on these three housing units, but were also being housed in general population housing, including D-2, D-6, D-8, A-1, and A-3. All EOP patients shared recreation yards with general population, as there were no designated EOP recreation areas on A or D Yards. Further, it was reported and corroborated that EOP patients were sharing cells with non-EOP patients in general population. The EOP supervisor confirmed that EOP patients were being housed in general population housing units, with none of the safety protocols in place, such as razor exchange. As a result, she reported having to monitor housing rosters to determine if/when higher risk patients were being housed in general population and advocating for them to be re-housed on A-5.

According to the staff-to-patient ratios from the 2009 staffing plan, psychiatrists who treat mainline EOP patients must maintain a caseload of no more than 120 patients per psychiatrist, while primary clinicians who treat mainline EOP patients must maintain a caseload of no more than 26 patients per clinician. See ECF No. 3693 at 17. Regrettably, all mainline EOP PC caseloads exceeded established ratios. For psychiatry, one of two on-site psychiatrists and the telepsychiatrist serving the mainline EOP population had caseloads within established ratios.

At the time of the monitoring tour, the EOP was following a treatment hierarchy (also known as a triage plan) in an attempt to prioritize mental health services given the serious and ongoing staffing vacancies. This hierarchy was implemented by schedulers rather than clinicians. Specifically, each day's assignments were scheduled based on the hierarchy and provided to clinicians to complete.

In addition to the concerns with ducatting noted herein, the EOP supervisor noted a sharp increase in substance use on A Yard with such severity that Narcan was available in the yard on open tables (which the monitor's expert confirmed through observation), and many staff carried Narcan while on shift. Patients also reported significant drug use among patients housed in the EOP building.

*Structured Treatment*

EOP patients were, on average, scheduled for 10.39 hours of structured therapeutic activities, offered 5.2 hours, had 5.45 hours of cancelled, refused 3.05 hours, and attended 2.28 hours weekly during the reporting period. SVSP reported that 14 percent of structured therapeutic activities were cancelled due to custody reasons. There was no information provided about the frequency or reasons for other cancellations.

During the reporting period, 91 percent of eligible patients were not offered at least 10 hours of structured therapeutic activities weekly, on average. This ranged from 84 to 96 percent of patients who were not offered at least ten hours of STAs between June to November 2024. SVSP reported that threat assessments/modified custody programming; mass institution-wide searches, custody vacancies, and mental health vacancies were the primary reasons why adequate programming was not offered to EOP patients during the reporting period.

Fifteen patients were assigned to modified EOP status (EOPMod) during the review period. Those patients were, on average, scheduled for 9.76 hours of STAs, offered 5.3 hours, had 4.89 hours cancelled, refused 3.47 hours, and attended 1.9 hours weekly. A review of records for these 15 patients revealed that none of the patients were offered weekly contacts, and monthly IDTT meetings were not held in keeping with the expectations for EOPMod status.

Overall, SVSP was not offering structured treatment activities in keeping with requirements for EOP or EOPMod patients.

*IDTTs*

The Program Guide requires that EOP patients receive an initial IDTT within 14 calendar days of arrival to the institution and a routine IDTT every 90 days thereafter. See ECF No. 7333-1 at 57, 59.

There were 15 scheduled IDTTs on A Yard for EOP patients, of which the monitor's expert observed five IDTTs facilitated by two different PCs; one of the five observed IDTTs was held in absentia. The first PC knew the patients and had an easy rapport. The PC discussed the patient's history of substance use, self-harm, higher LOC placement and RVRs, lack of participation in groups and medications; however, there was no discussion of specific goals and interventions or whether to retain the patient in their current LOC. The second PC was thorough in the case conceptualization and the interconnection between past and current behaviors and appropriate and inappropriate behaviors and coping skills. The patient was included in interventions that would assist in changing behaviors. The patient agreed to try the new interventions and was asked to repeat their understanding of what was discussed. The patient's LOC was also discussed.

The monitor randomly selected and reviewed the healthcare records of 30 mainline EOP patients to assess compliance with Program Guide timeframes for initial IDTTs during their stays. All 30 patients required initial IDTTs. Of the 30 reviewed initial IDTTs, two or seven percent occurred timely within 14 calendar days or arrival or level of care change. All 30 were attended by all required staff and 20 or 67 percent were attended by the patients. Reasons initial IDTTs were held *in absentia* included patient refusals, CIT activation, and modified programming.

For the 244 mainline EOP patients in CDCR's appointments report between June 1, 2024 – November 30, 2024, there were 275 completed initial or routine IDTTs. When a patient had either a completed or refused initial IDTT and a routine IDTT or more than one routine IDTT, timeliness in accordance with Program Guide requirements was able to be calculated. Of the 275 completed IDTTs, 30 contacts were for individuals who had at least two IDTTs (initial and routine or two routines). Of those 30 IDTTs, 12 or 40 percent occurred beyond Program Guide requirements with a range between 91 and 140 days.

*Group Treatment*

On A Yard, groups were offered Mondays through Fridays. Of the 76 hour-long groups included on the schedule at the time of the monitoring tour, 22 of these groups, or 28 percent, were "yard groups" offered to 30 patients at a time. Thirteen groups, or 17 percent, were core clinical groups facilitated by psychologists including non-violent communication, suicide risk management, substance use, parenting, anger management, social skills, distress tolerance, anxiety, posttraumatic stress disorder, and the introduction to EOP group. The remaining 43 groups were offered by recreational/rehabilitation therapists and included generic titles such as "Rec Therapy" and "Social Skills." While these latter groups were not observed, patients

reported that they included watching movies, playing video games, listening to music, and engaging in some discussions.

The monitor's expert observed one core clinical group offered by a psychologist who worked part time at SVSP and provided group treatment only. A substance use group which had 12 patients scheduled, was attended by a single patient who arrived 10 minutes after the scheduled group start time. The content included discussion of a treatment workbook and was adequate given that there was only one participant; however, the patient's thinking evidenced delusions and psychotic process, making engagement difficult.

The monitor's expert observed a recreational therapy group attended by four of twelve scheduled patients. The RT was engaging and respectful with patients and created an easy and congenial environment. Group members were attentive and engaged with the Jenga game which prompted members to respond to a question when the selected a Jenga piece. This approach required self-awareness and thoughtful engagement with peers and the RT. This adequate, clinically appropriate group targeted and met patients' social skills needs.

Nursing-led therapeutic groups (NTLGs) were offered 26 times per week to EOP patients on A Yard and 25 times per week to EOP patients on D Yard. All groups had a capacity of 15 patients and were scheduled for one hour. Topics included physical health, substance abuse, transitional planning, life skills, mental health, and expressive groups.

Overall, group treatment space was sufficient and confidential, yet there appeared to be a number of barriers to patients attending treatment including institutional factors such as the failure to recognize ducats as sufficient to allow patients to attend group sessions, competing interests at the same time as groups, and drug use. Patients reported that the ducatting system was not fully reliable as they did not always receive ducats. Patients and staff reported there

were times that patients were not let out of their cells for appointments despite having a ducat. Relatedly, when patients told an officer they had a ducat, they were told that no one called for them so without the call, a ducat was irrelevant. Other ways they learned of appointments was through an overhead announcement or an officer calling their housing unit. Concerns with ducatting were identified during executive leadership joint rounds for at least two months (July and August 2024 on D Yard) during the monitoring period, however these concerns continued through the time of the monitoring tour.

*Individual Treatment*

The Program Guide requires that patients are offered an initial psychiatrist evaluation before their initial IDTT and within 14 calendar days of arrival to the institution or level of care change. See ECF No. 7333-1 at 57. Thereafter they are required to receive a routine psychiatric contact every 30 calendar days. Id. at 59. Patients are also required to receive a primary clinician evaluation within 14 calendar days of arrival and weekly (i.e. once per calendar week with no more than ten calendar days between contacts) with either a primary clinician or in group psychotherapy with an individual contact every other week. Id. at 57, 59.

The monitor randomly selected and reviewed the healthcare records of 30 mainline EOP patients to assess compliance with Program Guide timeframes for *initial* psychiatry contacts during their stays. All 30 patients required initial psychiatry evaluations; 15 or 50 percent timely occurred before the initial IDTT. Fifteen or 50 percent of the reviewed initial psychiatry evaluations were conducted in confidential settings; the non-confidential contact was due to patient refusal, modified programming, and cell front contacts. Telepsychiatry was utilized for 11 or 37 percent of initial psychiatry evaluations.

Regarding *routine* psychiatry contacts, of 375 patients in CDCR's appointments report between June 1, 2024 – November 30, 2024, there were 1,718 completed and refused contacts. Excluding refusals, 983 or 60 percent of 1,650 completed contacts were confidential as reported by the institution. When a patient had more than one completed or refused contact, timeliness in accordance with Program Guide requirements was able to be calculated. Of the 1,718 completed and refused contacts 1,343 contacts were for individuals who were scheduled at least twice by the psychiatric provider. Of those 1,343 contacts, 130 or ten percent occurred beyond Program Guide requirements with a range of 31 and 174 days.

The monitor randomly selected and reviewed the healthcare records of 30 mainline EOP patients to assess compliance with Program Guide timeframes for *initial* primary clinician contacts during their stays. All 30 patients required initial primary clinician evaluations. Of the 30 reviewed initial primary clinician evaluations contacts, nine or 30 percent were completed within 14 calendar days of arrival or change in level of care. Fifteen or 50 percent of reviewed initial primary clinician evaluations were conducted in a confidential setting; non-confidential contacts were due to patient refusals and modified programming contacts.

Regarding *routine* primary clinician contacts, for the 222 patients in CDCR's appointments report for September 1, 2024 – November 30, 2024, there were 430 completed individual primary clinician contacts. As reported by the institution, 301 or 70 percent of the completed contacts were confidential. When a patient had more than one completed contact, timeliness in accordance with Program Guide requirements was able to be calculated. Of the 430 completed contacts, 208 contacts were for individuals who were seen at least twice by the primary clinician. Of those 208 contacts, 138 or 66 percent were completed beyond Program Guide requirements with a range of 11 and 78 days.

Nine patients receiving mental health services at the EOP level of care on A Yard were interviewed. Most reported their assigned psychiatrist was a telepsychiatrist and several patients commented that they believed the presence of telepresenters made them feel less comfortable talking with the psychiatrist than they would be without the telepresenter in the room. Overall, patients reported being seen consistently by their psychiatrist every 30 days. Most patients reported seeing their assigned MHPC every two to three weeks, with some patients reporting monthly contacts. Two patients reported not having an initial IDTT for months following their arrival, which the monitor's expert confirmed through record review. For the patients who reported having had an IDTT, a few were aware of their treatment goals. In addition, patients reported delays in being seen by mental health staff in response to both urgent and routine requests. Patients reported that groups were primarily recreational in nature, and they had problems accessing the groups due to frequent lockdowns and alarms, conflicting appointments, as well as not being allowed to leave the housing unit. Most patients reported being offered groups three to five days each week, with two to three groups being available to them daily. Patients stated that they would like to see more substantive groups and other programming beyond recreational therapy. Patients also reported feeling supported by mental health staff. Patients from the A Yard EOP who were interviewed reported that the EOP unit was plagued with excessive drug use and violence, such that it was preferable to live in general population housing.

*IDTTs*

The monitor's expert attended six IDTT meetings on D Yard. All meetings were held in a room of adequate space which ensured confidentiality. Required staff were present and patients attended all but one meeting. The meetings were collaborative with the patient and other

members of the treatment team engaged in discussions. In all meetings, the patient's psychiatric and social history was reviewed, along with the patient's diagnoses, and current functional impairments. The participation of the correctional counselor was adequate. Treatment plans were rarely discussed in the meetings and there was little mention of objective and measurable treatment goals. Interventions were discussed generally, including medications, groups, and individual sessions but the interventions were not clearly tied to the patient's mental health needs. Treatment progress and barriers to treatment were occasionally discussed. In two of the meetings, the patients' levels of care were changed: one patient was discharged to the 3CMS level of care, and one was referred to the inpatient level of care. In both cases, the discussions were collaborative and included clear rationale for the level of care changes. For patients remaining at the EOP level of care; however, there was rarely discussion about the rationale for retaining the patient at this level of care.

In one meeting, there was a serious concern noted that a patient's medications had been discontinued. The discussion revealed that the patient had been prescribed non-formulary medications and that those medications were discontinued because the institution could not have more than three percent of patients on non-formulary medications. The psychiatrist explained to the patient that the three percent allocation for the facility was "taken up" by patients on non-formulary long acting injectables, making it impossible for the psychiatrist to prescribe oral non-formulary medications for the patient. Following the meeting, the monitor's expert inquired further about this issue. The psychiatrist reported that the chief psychiatrist was clear that no more than three percent of the patients at the facility could be prescribed non-formulary medication and that the chief psychiatrist had discontinued patients' medications without consulting with the prescribing psychiatrist or meeting with the patient. In this patient's case, the

non-formulary medication had been prescribed and justified during the patient's most recent inpatient stay.

Overall, IDTTs on D Yard, while collaborative and inclusive of discussions regarding patient functioning and engagement in treatment, failed to provide rationale for the patient's EOP placement or to adequately address treatment planning. Specifically, treatment plans were not individualized and did not include objective and measurable goals.

*Group Treatment*

The group schedule for D Yard included 61 groups offered Monday through Friday. Of these groups, 18 sessions, or 30 percent, were yard groups. There was one clinical group on the schedule, a Dialectical Behavior Therapy group, offered by a psychologist. The remaining 42 groups were offered by recreational therapists.

The monitor's expert attended a group scheduled to be anger management, but the recreational therapist changed the topic to look at whether happiness was a choice. One of 11 scheduled patients attended and arrived on time. The patient and the recreational therapist reported that this was somewhat typical and reported that patients were not allowed to leave the housing unit for groups unless the custody officer in the mental health building called the officer in the tower on the housing unit to report that patients had a group scheduled. As confirmed by mental health staff and a correctional counselor, this was true even when patients were issued a priority ducat for the group session. Specific problems accessing groups from housing unit D-3 were noted. Notwithstanding these concerns regarding access to groups and ducatting, the group was adequate and the recreational therapist did an excellent job of attempting to engage the patient and keep the discussion on topic.

Fifteen patients were randomly selected for patient interviews with six in attendance. Patients reported ongoing delays in primary clinician contacts which they described as "stressful" and "hopeless." It was stated that infrequent contacts impacted the development of trust, necessary for a meaningful therapeutic contact. They reported having "no one to talk to" when "going through things" and that they "just deal with it," noting it's been like this "for years." They reported delays in requests to see mental health with some having received no response. Patients reported variable timeliness with IDTTs with some long past due and some having been estimated as timely. Patients reported that they had access to three to four RT groups, primarily yard groups. Patients reported NLTGs were beneficial but expressed concern that they were not always notified if the groups were occurring or canceled. Patients also reported that the lack of programming resulted in increased substance use, behavioral problems, gang activity and medication misuse; spontaneously stating that they were "suffering." Relatedly, they reported that when in need of emergency mental health, custody response varied.

<u>3CMS</u>

3CMS patients resided on the institution's four yards, A, B, C, D. At the time of the monitoring tour, staffing was limited for the large 3CMS population. Specifically, there was one clinician assigned to A Yard and two clinicians assigned to D Yard. At the time of the monitoring tour there were no clinicians assigned to B or C Yards. During the review period, a clinician was assigned to B Yard three days a week but had recently been assigned to assist with 1370 evaluations at the PIP. C Yard did not have a clinician assigned to the yard for the duration of the review period.

The staff-to-patient ratios from the 2009 Staffing Plan and 2021 adjustments to the 2009 staffing plan required that staff psychiatrists who treat 3CMS patients maintain a caseload of 280

patients per psychiatrist if the patient was prescribed medications and 675 patients if the patient was not prescribed medications. *See* ECF No. 3693 at 12 and 6978-1 at 3. Staff-to-patient ratios from the 2009 Staffing Plan required that primary clinicians who treat 3CMS patients maintain a caseload of 97 patients per clinician. *See* ECF No. 3693 at 12. All mainline 3CMS PC caseloads exceeded established ratios. Both telepsychiatrists and the one on-site psychiatrist serving the mainline 3CMS population had caseloads within established ratios.

Consistent with patient reports, observed treatment space was confidential.

SVSP provided 3CMS orientation brochure which was written in both English and Spanish.

*IDTTs*

IDTTs for 3CMS were low priority in the institution's treatment hierarchy (or triage plan). Of the four yards with 3CMS patients, IDTTs were only held on D Yard during the site visit. Of the four observed IDTTs that were scheduled beyond Program Guide requirements, two were routine and two were initial. Three patients were continued at 3CMS level of care and one was discharged to general population.

All required participants were in attendance and participated, though there were multiple missed opportunities by the supervisor to address deficiencies. The assigned primary clinician and psychiatrist attended virtually. Consistent with provider report, it was apparent that providers had appropriate communication and a good working relationship. Overall, the atmosphere was pleasant and respectful, and the empathic staff allowed patients time to talk. However, the IDTT process was not consistently collaborative.

For instance, there was a dearth of discussion of basic clinical information during IDTTs including relevant psycho-social history and case conceptualization. Psychiatric medications,

diagnosis and functioning were not consistently discussed. Symptoms were discussed in generic terms and discussion about treatment planning and goals was vague with no clear indication of that treatment goals were objective, measurable, or developed collaboratively with the patient. Progress in treatment was not discussed and there was no psychiatric input. There was no discussion of interventions other than psychiatric medication. Continuation of level of care was intermittently stated without clear rationale.

Of concern, one patient made two suicidal references during IDTT. Of concern, neither provider nor supervisor queried these statements. Relatedly, the only stated plan to follow-up with the patient (in a "couple" of months) was made by the primary clinician. As the IDTT was coming to a close, having given ample time for staff to address the patient's suicidal statements, the monitor's expert asked the patient to clarify the suicidal references. Only then were the patient's statements assessed and addressed by providers with a plan for follow-up with the primary clinician sometime during the week of January 13, 2025. Of note, as of January 20, 2025, there was no documentation that the patient had been seen for an updated risk assessment.

A total of 13 patients from all four yards were interviewed, with the majority (six) from C Yard. Of the thirteen interviewees, three patients from different yards were referred for a mental health contact by the monitor's expert, an indication that patient's needs were not currently met by the mental health program.

Overall, patients reported regular contact with the psychiatrist and estimated that appointments occurred within the previous three months. Consistent with the triage plan and EHRS record reviews, 3CMS patients reported that access to the primary clinician was often delayed and newly admitted patients reported long delays for primary clinician initial assessments. There were multiple reports that for those who submitted a request to see mental

health, there were long delays and some never had a mental health contract. The majority of interviewed patients could not recall when they last had IDTT. Patients on D Yard stated that custody “tried to divert us from talking to mental health” and “no one cares…no help here” and stated that peers were using drugs to “numb” themselves.

The individualized treatment plan for 3CMS patients must be completed within 14 working days of referral/arrival by the patient’s primary clinician in consultation with the other IDTT members and annually thereafter. *See* ECF No. 7333-1 at 43-44. (PG 12-3-10). The monitor randomly selected and reviewed the healthcare records of 30 mainline 3CMS patients to assess compliance with Program Guide timeframes for initial IDTTs during their stays. All 30 patients required initial IDTTs. Of the ten reviewed initial IDTTs none occurred timely within 14 calendar days or arrival or level of care change. Notably, 20 initial IDTTs were overdue and never occurred. All ten were attended by all required staff and four or 40 percent were attended by the patients. Reasons initial IDTTs were held in absentia included patient refusals.

Regarding routine IDTTs, of 734 patients in CDCR’s appointments report for June 1, 2024 to November 30, 2024, there were 776 completed initial or routine IDTTs. When a patient had either an initial IDTT and a routine IDTT or more than one routine IDTT, timeliness in accordance with Program Guide requirements was able to be calculated. Of the 776 completed IDTTs, 45 were for individuals who had at least two IDTTs (initial and routine or two routines). Of those 45, all occurred within Program Guide requirements. Of note, the report did not include individuals that did not have a completed IDTT, such as those that were not scheduled.

*Group Treatment*

Mental health groups were not facilitated for 3CMS patients at the institution. Documentation provided in advance of the site visit indicated that NLTG data was not tracked for 3CMS patients.

*Individual Treatment*

The Program Guide requires that patients are offered an initial psychiatrist evaluation before their initial IDTT. *See* ECF No. 7333-1 at 34-50, 641. Thereafter they are required to receive a routine psychiatric contact every 90 calendar days if the patient is prescribed a psychotropic medication. *Id*. at 44. Patients are also required to receive a primary clinician evaluation within ten working days of arrival and every 90 calendar days thereafter. *Id*. at 41, 48.

The monitor randomly selected and reviewed the healthcare records of 30 mainline 3CMS patients to assess compliance with Program Guide timeframes for initial psychiatry contacts during their stays. All 30 patients required initial psychiatry evaluations; two or nine percent of reviewed initial psychiatry evaluations timely occurred before the initial IDTT. Notably, eight initial psychiatry evaluations were overdue and never occurred. Sixteen or 73 percent of the reviewed initial psychiatry evaluations were conducted in confidential settings; the non-confidential contact was due to patient refusal, modified programming, and cell front contacts. Telepsychiatry was utilized for all 22 initial psychiatry evaluations.

Regarding routine psychiatry contacts, of 804 patients in CDCR’s appointments report for June 1, 2024 to November 30, 2024, there were 1,692 completed and refused contacts, 1,109 or 65 percent were confidential as reported by the institution. Reasons for non-confidential psychiatry contacts included lack of available confidential space.

When a patient had more than one completed or refused contact, timeliness in accordance with Program Guide requirements was able to be calculated. Of the 1,692 contacts, 890 were for individuals who were seen at least twice by the psychiatric provider. Of those 890 contacts, 149 or 17 percent occurred beyond Program Guide requirements, with a range of 91 to 149 days overdue. Of note, the report did not include individuals that did not have completed contacts.

The monitor randomly selected and reviewed the healthcare records of 30 mainline 3CMS patients to assess compliance with Program Guide timeframes for initial psychiatry contacts during their stays. All 30 patients required initial primary clinician evaluations. Notably, 12 initial primary clinician evaluations were overdue and never occurred. Of the 18 reviewed initial primary clinician evaluations contacts, none were completed within ten calendar days of arrival or change in level of care. Eleven or 61 percent of reviewed initial primary clinician evaluations were conducted in a confidential setting; non-confidential contacts were due to patient refusals, yard, day room, and cell front contacts.

Regarding routine primary clinician contacts, of 264 patients in CDCR's appointments report for June 1, 2024 to November 30, 2024, there were 368 completed and refused routine primary clinician contacts. Of the 363 completed contacts, 231 or 64 percent were confidential as reported by the institution. Reasons for non-confidential primary clinician contacts included patient refused confidential contact, custody and mental health modified program.

When a patient had more than one completed or refused contact, timeliness in accordance with Program Guide requirements was able to be calculated. Of the 368, 106 contacts were for individuals who were seen at least twice by the primary clinician. Of those 106 contacts, 26 or 25 percent occurred beyond Program Guide requirements with a range of 91 to 146 days

overdue. Of note, the report did not include individuals that did not have completed contacts, such as those that were not scheduled.

There were 363 completed individual PC contacts. Nine contacts had a duration of zero minutes; 201 contacts had a duration of one to 15 minutes; 83 contacts had durations between 16-30 minutes; 64 contacts had durations between 31-60 minutes; and six contacts had a duration of greater than 60 minutes, including one with a duration of 11,530 minutes, indicating a likely data error.

A total of 13 patients from all four yards were interviewed, with the majority (six) from C Yard. Of the 13 interviewees, three patients from different yards were referred for a mental health contact by the monitor's expert, an indication that patient's needs were not currently met by the mental health program. Overall, patients reported regular contact with the psychiatrist and estimated that appointments occurred within the previous three months. Consistent with the triage plan and EHRS record reviews, 3CMS patients reported that access to the primary clinician was often delayed and newly admitted patients reported long delays for primary clinician initial assessments. There were multiple reports that for those who submitted a request to see mental health, there were long delays and some never had a mental health contract. The majority of interviewed patients could not recall when they last had IDTT. Patients on D Yard stated that custody "tried to divert us from talking to mental health" and "no one cares…no help here" and stated that peers were using drugs to "numb" themselves.

Other Issues:

Pre-Release:

SVSP's institution mental health pre-release coordinator (IMHPC) position was vacated on January 13, 2024, one day before the monitoring tour. There was no back-up; however, on January 16, 2024, a person was identified as a possible candidate for the IMHPC position.

During the review period, documentation showed that pre-release groups were conducted from June 4, 2024 – August 29, 2024, by a RT, from September 5 through September 19, 2024, no groups were conducted and from September 24, 2024, through November 28, 2024, groups were taught by a RT. The groups used the statewide pre-release curriculum.

The documentation showed assessment were begun on some but not all patients due to change in release date, cancelation, refusals or other reasons. According to the documentation there were 128 patients with 90 days or less and had PC contact or a note regarding pre-release. Sixty-nine patients had an appointment, 31 patients' first page of their PRPA was completed, nine were OHMD, seven were seen by the IMHPC at their previous institutions, seven were chart reviews or seen cell-side due to PSRs or refusals, one was an update, two were notes only, one had a MEPD and one was a chart review without a PRPA.

Mental health leadership reported that TCMP staff was responsive. According to the TCMP data, during the review period there were 70 patients interviewed: 50 were 3CMS patients and 20 were EOP patients. All 70 patients were screened. Sixty-three applications were submitted for services, two patients had access to other insurance, two were ineligible (holds), one was unavailable due to out to court or medical and two refused services. Of the 70 applicants, two 3CMS patients and nine EOP patients submitted applications for SSI and one of

the eleven patients was ineligible. One patient submitted an application for VA benefits. There was no data on Cal-ID.

Program Access:

a. Job and Program Assignments

On January 7, 2025, SVSP's 605 job assignments were held by 29 EOP patients, 200 3CMS patients, and 376 non-MHSDS incarcerated persons.

The 666 academic assignments were held by 76 EOP patients, 258 3CMS patients, and 332 non-MHSDS incarcerated persons.

No incarcerated persons had vocational education assignments.

The 398 voluntary education assignments were held by nine EOP patients, 157 3CMS patients, and 232 non-MHSDS incarcerated persons.

No incarcerated persons had substance abuse treatment assignments.

b. Milestone Credits

SVSP was unable to report how many EOP or 3CMS patients or non-MHSDS incarcerated persons were eligible for milestone credits, or who earned the credits.

c. Out-of-Level Housing

On December 27, 2024, SVSP reported that one non-MHSDS custody Level I incarcerated person, as well as 24 EOP and 56 3CMS custody Level II patients, were in Level III housing; three 3CMS and 13 non-MHSDS custody Level II patients and incarcerated persons were in Level IV housing; 15 EOP, 31 3CMS, and 80 custody Level III patients and incarcerated persons were in Level IV housing; and 48 EOP, 68 3CMS, and 40 non-MHSDS custody Level IV patients and incarcerated persons were in Level III housing.

d. ADA Reasonable Accommodation and Grievance Procedure

SVSP provided a roster of staff who had enrolled in and completed the offender grievance and appeal process training.

e. Periodic Classification Score Reductions: EOP Patients

SVSP provided CDCR Form 840s demonstrating that they were providing periodic classification score reductions for EOP patients.

f. Unclothed Body Search

Unclothed body searches were conducted in accordance with the current LOP. Custody staff reported they take place when patients arrive in RHU. Custody staff also reported patients were searched upon return from a medical appointment or anytime where an RHU custody officer had not had continuous custody over the patient. Patients were searched in their cell or in a wet cell. Custody reported that searches were always done privately and prosthetics were removed and checked. The monitor observed the wet cell and there was the ability for privacy.

"C" Status:

As of January 10, 2025, 29 incarcerated persons were designated "C" status; this included five EOP patients, 23 3CMS patients, and one non-MHSDS incarcerated person. Review of classification chronos for the 28 MHSDS patients revealed that 24 or 86 percent received multiple serious RVRs within 180 days and, thus, were deemed program failures. "C" Status patient data for the review period was not provided.

g. Case-by-Case Reviews

Document production for case-by-case reviews was sparse. The institution C&PR informed the regional mental health administrator that the documents regarding patients who were housed in administrative segregation for longer than 150 days were not able to be provided.

After further investigation, during the review period, there were ten patients who were housed in the administrative segregation for longer than 150 days had case-by-case reviews. One patient was there on NDS status. LTCC's recommended a 90-day extension in all case-by-case reviews. Patients were in housed in the RHU from 156 to 340 days.

The C&PR informed the regional mental health administrator that SVSP does not track 120-MERD reviews.

h. Mental Health Referrals:

During the review period, SVSP made 4,924 mental health referrals; there were 398 referrals to psychiatry and 4526 to primary clinicians. Overall, SVSP reported 51 percent compliance for timely responding to these referrals.

Specifically, for the 1,117 emergent referrals there was 92 percent compliance for timely responding to the 12 emergent psychiatry referrals, and 87 percent compliance for timely responding to 1,105 emergent primary clinician referrals.

For the 581 urgent referrals, SVSP reported 47 percent compliance for timely responding to 34 psychiatry referrals and 77 percent compliance for timely responding to 547 urgent primary clinician referrals.

As for the 3,191 routine referrals, there was 83 percent compliance for timely responding to the 286 psychiatry referrals, 47 percent compliance for the 66 psychiatry referrals in the RHU, 33 percent compliance for the 2,442 primary clinician referrals, and 13 percent compliance for the 397 primary clinician referrals in the RHU.

Twenty correctional officers in housing units RHU, A-5, B-5, B-3, C-1, C-3, D-3 and D-4 were able to articulate when they would submit a MH-5 form, how to get it to mental health staff, and were able to produce a paper copy or electronic copy of the form.

Custody and Mental Health Partnership

The SVSP LOP had not been updated within the past year with a last revision date of April 2023, however it was consistent with CDCR policy.

SVSP provided documentation regarding five out of six months of executive joint rounding. During the rounding, incarcerated persons voiced concerns regarding ducats and mental health and custody staff reported having a good working relationship. The results of the executive joint rounding were not discussed in the warden's executive staff meetings during the entire review period. The QMC meeting minutes included a discussion of the executive joint rounding in all six-monthly meeting minutes.

The quarterly round table training was completed during the second and third quarters of 2024 in some but not all required programs. Second quarter training was completed in Facility D, RHU and the CTC however it was not conducted in Facility A. During the third quarter, training was completed in Facility D, the CTC and Facility A; however, it was not conducted in the RHU. Additionally, the number of custody and mental health staff attending was exceptionally low during both quarters.

The monitor observed a third watch huddle on Facility A which was well attended by custody and mental health staff. The discussion was thorough, and staff discussed specific patients utilizing the huddle report as a guide.

The monitor reviewed documentation for 3CMS weekly supervisor meetings for Facility A. No weekly supervisor meetings were held in June, July, or August due to lack of staff. For Facility A, of the 14 weeks when a meeting was held the required staff, a sergeant and a mental health supervisor, were present seven out of 14 weeks or 50 percent of the time. It was noted that a correctional officer was present when a sergeant did not attend. For Facility C and D

meetings were not held in June, July, August, part of September and October. Documentation was provided for three weekly meetings held. All three meetings were attended by a sergeant and a mental health supervisor.

SVSP provided documentation regarding IAC meetings on all four facilities. On Facility A, the monthly meetings were not held three out of the six months review period; mental health issues were discussed during the three meetings that were held on Facility A. On Facility B, no meetings were held as there were no mental health supervisors. For Facility C, five out of six months the IAC members declined to meet with staff and the one meeting that was held no mental health supervisor attended. On Facility D, the monthly meetings were not held two out of the six months due to no mental health supervisor and once due to a PSR. The issues discussed by the IAC on Facility A included the hiring of a new mental health supervisor, EOP overflow on Facility A and the housing of EOP patient with general population and 3CMS patients. On Facility C, the IAC discussed mental health staffing, milestone credits, NLTGs and problems with ducats.

Monthly 3CMS program tours were held on Facility A during two of the six-month review period. On Facility B, no tours were completed. On Facility C, tours occurred three out of the six-month review period. During the three tours, patients declined to speak with staff. On Facility D, tours occurred four out of the six-month review period. During the four tours that did occur, patients raised concern about ducats not being issued or honored, delay in access to care on third watch and not being released for appointments due to alarms.

SVSP provided data regarding the introduction of EOP groups. According to the data provided 114 patients were enrolled in the introduction to EOP groups during the review period. The average time between the patient's date of arrival and the first date the patient was scheduled

for the introduction to EOP group was 20.5 days with a range of four to 84 days. An introduction to EOP group was observed on Facility A. Of the 12 scheduled patients, three attended. The three patients arrived at variable times and the group started 20 minutes late. There was no peer co-facilitator during the group. The psychologist reported that a peer co-facilitator was scheduled to assist but rarely came to the session and no custody staff had ever been present for the introduction to EOP group. The content of the group was adequate but could have been improved by the presence of a peer co-facilitator and a custody representative.

Regarding attendance at the CMHPP annual training, the five captains, six correctional administrators and 26 lieutenants attended the training. Of the 75 sergeants, 71 attended or 95 percent and 577 out of 682 correctional offices attended or 85 percent. For mental health staff, substantial compliance was met in that 100 percent of the chief psychiatrist, chief psychologist, clinical social workers, recreational therapist, senior psychologist, and staff psychologist attended the annual training.

Regarding staff complaints, MHSDS patients filed 618 staff complaints during the review period. EOP patients filed 244, 3CMS filed 353 and MHCB patients filed 21. A total of 200 MHSDS patients filed the 618 complaints. Of the 618 complaints filed, 175 were referred to the hiring authority, 142 were related to the use of force, 45 were alleging staff sexual misconduct and 42 alleged unspecified misconduct. The data provided by SVSP did not include information as to the outcome of the allegations. No staff were moved from their assigned post as a result of a staff misconduct allegation being filed.

<u>Heat Plan</u>:

The SVSP Heat Plan LOP was current and consistent with CDCR headquarters policy memorandum requirements.

The heat plan was in effect for five months, of the reporting period: June, July, August, September, and October 2024. With the exception of October 2024, there were disparities between the monthly heat risk report and the DARs for each of the five months. The discrepancies in four out of the five monthly reports and the supporting DARs was concerning. In addition, the DARs did not indicate any reasonable accommodations were offered as a result of a stage I heat alert as required. There were zero stage II and stage III heat alerts and there were zero patients reported to be suffering from heat illness during the review period.

The monitor visited eight housing units and interviewed 14 correctional officers regarding their knowledge of the heat plan requirements. Eleven out of the 14 staff interviewed were knowledgeable of the heat plan requirements, including heat risk signs and symptoms, requirement of daily patient heat risks lists and how to find the list and when temperatures were required to be taken inside the housing unit.

One noted concern was the placement of the temperature probe in each housing unit. The inside temperature probe was found to be right outside the control booth window, which is an air-conditioned space. If the control booth window was open, the air from the control booth could result in inaccurate temperature readings inside the housing unit. It is recommended that SVSP move the inside temperature probe away for the control booth window and into an area that could not be impacted by an air-conditioner.

As for annual heat related pathologies training the one chief psychiatrist attended the training, two of the three staff psychiatrists or 66 percent attended the training, six out of the ten senior psychologists attended or 60 percent, one of three psychologists attended or 33 percent, six of 11 social workers or 55 percent attended, and six out of nine recreation therapists attended. The warden, chief deputy warden and five captains all attended the required training. Four out of

six correctional administrators or 66 percent attended, 19 out of 26 lieutenants or 73 percent, 47 out of 75 sergeants attended or 67 percent and 418 out of 682 correctional officers attended or 61 percent.

Overall, the institution was not compliant with all required heat plan policies, specifically, the lack of annual heat risk training, the location of the inside temperature probe next to an air-conditioned space, lack of documentation of the offering of reasonable accommodations as a result of Stage I heat alerts, and the inaccurate reporting to headquarters regarding the number of Stage I heat alerts.

RVRs:

SVSP issued a total of 3,382 RVRs during the review period including 2,209 or 65 percent to MHSDS patients and 1,173 to non-MHSDS incarcerated persons. There were 76 RVRs issued to MHCB patients, 642 issued to EOP patients and 1,491 issued to 3CMS patients. The monitor reviewed 19 RVRs to assess compliance with CDCR policy. None of the reviewed RVRs recommended alternative discipline. During the review period, the institution reported zero MHA's recommended alternative discipline.

Custody staff timely referred the mental health assessment (MHA) to mental health staff in four out of 19 RVRs or 21 percent. The range of late referrals was one to 19 days. Mental health staff timely completed the MHA and returned the MHA to custody staff in two out of the 19 cases or 11 percent. The range of late return of MHAs to custody was four to 49 days. The senior hearing officer (SHO) documented consideration of the mental health assessment in six out of the 19 cases reviewed or 32 percent. In the 13 cases where the SHO did not document their consideration, the SHO quoted the response to question 3 on the MHA form and did not

state any consideration of this information. The MHA recommended mitigation of penalties in ten out of the19 cases reviewed. The SHO mitigated the assessed penalties in eight out of the ten cases or 80 percent of the time. The assignment of a staff assistant was compliant with CDCR Regulations.

SVSP reported that mental health assessment training was attended by the five captains and six correctional administrators, 18 out of 26 lieutenants or 69 percent, and 41 out of 75 sergeants or 55 percent. Four mental health staff attended the training, and all MHAs were completed by one of the four trained staff members.

The monitor also reviewed three ICC chronos regarding the assessment of a restricted housing unit (RHU) term as a result of a guilty finding on an RVR. Of the three cases reviewed, two out of three or 66 percent the ICC clearly documented their consideration of the MHA information in assessing the RHU term. In the one non-complaint case, the ICC noted that the MHA information was considered during the RVR hearing process, but it did not state that the information was also used by ICC during the assessment the RHU term.

Overall, the institution was non-compliant with RVR policy requirements. The non-compliance rating is based on the fact zero MHAs identified a patient's mental illness significantly contributed to the behavior out of a total of 2,209 RVRs issued to MHSDS patients. Additionally, the lack of compliance with custody referring the RVR to mental health staff timely and mental health staff completing the MHA and returning it to custody staff timely.

Use of Force:

SVSP reported four controlled use of force incidents and 670 immediate use of force incidents which involved 684 MHSDS patients and 69 non-MHSDS incarcerated persons.

The monitor reviewed two controlled UOF incidents. The review of the two controlled use of force incidents indicated compliance with CDCR policy.

The monitor reviewed eight immediate use of force incidents and noted the following concerns. In one incident force was used to provide a patient a physician ordered emergency medication. As staff entered the patient's cell, the patient resisted staff. Staff used physical force to hold the patient down as nursing staff provided the emergency medication via an injection. The patient was subsequently written an RVR for resisting staff. Title 15 section 3317.2 states in part that an RVR would not be issued if the behavior was in connection with a "cell extraction for administration of involuntary medication." Cal. Code Regs. Tit. 15 § 3317.2(a)(a). Because the patient was not extracted from the cell but held down by staff while *remaining in the cell* for the administration of emergency medications, there may not have been a technical policy violation as the patient was not removed from the cell. However, the clear intent of Title 15 is to not penalize a patient who requires emergency medication via issuance of an RVR if they resist staff during the application of the emergency medication, and the practice noted here was inconsistent with that intent. The second concern was an incarcerated person was found to be unresponsive. Three doses of Narcan were administered by staff and the patient regained consciousness. However, as the patient regained consciousness, he was thrashing his body around and kicking. Staff used physical force to control the patient's movements resulting in the issuance of an RVR for resisting staff. The monitor found the issuance of an RVR for a patient under these circumstances inappropriate as it would appear the patient was not in control of their body as they regain consciousness.

SVSP reported completion of the use of force annual training by the warden, chief deputy warden, the five captains, the six correctional administrators, and the 26 lieutenants. For

sergeants 72 out of 75 or 96 percent, and 638 out of 682 correctional officers or 94 percent attended the training. For mental health staff, a total of six staff attended the required training, five social workers, and one psychologist.

Lockdown/Modified Programs:

Ten modified programming periods were initiated during the review period, including two in June, two in July, one in August, two in September, two in October, and one in November, and ranging from three to 14 days. These modified programming periods were initiated due to contraband and weapons searches; searches stemming from homicides of incarcerated persons, attempted homicides against incarcerated perso ns and correctional officers; and batteries against correctional officers and other incarcerated persons. One three-day modified programming period was institution-wide; otherwise, there was one modified programming period in the RHU, five on B Yard, and three on D Yard.

Notably, B Yard was on modified programming at the time of the site visit due to an attempted homicide occurring the day before the site visit.

Access to Care:

A review of SVSP's monthly Health Care Access Quality Reports from June 2024 through November 2024 reflected the issuance of 132,579 mental health ducats and add-on appointments, of which 54,868 or 41 percent were completed and 77,711 or 59 percent were not completed. Of the non-completed appointments, 876 or one percent was due to custody factors, 38,348 or 49 percent were due to non-custody factors and 38,487 or 50 percent were due to patient refusals.

*Coleman* Posting:

*Coleman* posters in both English and Spanish were observed in all toured housing units.

**APPENDIX A – 25**
**SAN QUENTIN REHABILITATION CENTER (SQRC)**
Site Visit: April 15, 2025 – April 18, 2025
Review Period: September 1, 2024 – February 28, 2024

Census:

On April 11, 2025, SQRC housed 2,803 incarcerated persons, which was a 27 percent decrease since the prior review period. *See* Thirtieth Round Monitoring Report – Part C, ECF No. 8095 at 583 (reporting total population of 3,818 incarcerated persons). The 1,138 MHSDS patients represented 41 percent of the institution's population and was a 26 percent decrease from the previous reporting period. *Id.* (reporting MHSDS population of 1,532 MHSDS patients).

The MHCB housed seven patients. There were 18 MHSDS patients in the RHU; nine were EOP RHU and nine were 3CMS RHU patients.

There were 225 mainline EOP patients, which was a seven percent decrease since the preceding monitoring tour. *Id.* The 886 mainline 3CMS patients were a 30 percent decrease compared to the preceding review. *Id.*

There were two patients whose housing could not be determined.

Staffing:

The chief psychiatrist position was filled, as was the senior psychiatrist supervisor position. All 7.8 staff psychiatry positions were filled.

One of two chief psychologist positions was filled.

The 2.7 senior psychologist positions were filled for an 11 percent vacancy rate. Four of the 4.2 senior psychologist specialist positions were also filled for a five percent vacancy rate.

Of 21.3 allocated staff psychologist positions, 18.8 were filled for a 12 percent vacancy rate. Registry filled two positions, but two staff were on long term leave, keeping the functional vacancy rate at 12 percent. SQRC reported that two psychologists were in the hiring process at

the time of the monitoring tour. One psychologist specialist and three staff psychologists were unlicensed.

The marriage and family therapist position was filled with registry staff.

The professional clinical counsellor position was vacant.

The supervising clinical social worker position was filled. Of the 12.8 allocated social worker positions, 10.8 were filled leaving a 16 percent vacancy rate which was reduced to an eight percent vacancy rate with the addition of one registry staff. One social worker was unlicensed.

All eight RT positions were filled, and an additional 5.2 positions were staffed.

Of the 20.5 supervising RN positions, 19.5 were filled leaving a five percent vacancy rate. Of the 83 allocated MHSDS RN positions, 64 were filled with staff, and an additional five were filled with registry staff, although there was one person on long term leave, leaving an 18 percent functional vacancy rate.

Of the 67 LVN allocated positions, 47 were filled, creating a 30 percent vacancy rate. Thirteen registry staff lowered that rate to 16 percent, with four staff members on long-term leave. Seven out of the nine CNA positions were filled, leaving a 22 percent vacancy rate, which was reduced to 11 percent with the addition of one registry employee.

All three senior psych tech positions were filled. Of 42 psych tech positions, 38 were filled leaving a ten percent vacancy rate which was reduced by one with registry staff. However, four staff members were on long-term leave, leaving a functional vacancy rate of 17 percent.

One of 1.5 OSS II positions was filled, leaving a 33 percent vacancy rate. Two of the 2.5 HPS I positions were filled, leaving a 20 percent vacancy rate for that position.

Regarding custody positions, 987 custody staff filled 893.8 allocated positions. The warden position was filled. The chief deputy warden position was filled with an associate warden acting out of class. All six associate warden positions were filled, one with a captain acting out of class. Similarly, all six captain positions were filled, one with a lieutenant acting out of class. Thirty of the 35.6 lieutenant positions were filled, with a 19 percent functional vacancy due to one staff member on long term leave. Of the 75 sergeant positions, 76 were filled. However, six staff were on long-term leave leaving five vacancies or a seven percent functional vacancy rate. Of 739.2 custody officer positions, 840 were filled, but 40 custody officers were on extended leave.

Telemental Health:

SQRC did not utilize telepsychiatry. However, in June 2024, SQRC implemented a hybrid work schedule for EOP primary clinicians due to limited office space for confidential sessions. Consequently, half of the primary clinicians worked from home on a given day and were expected to engage in non-clinical duties including preparing materials for IDTT meetings, updating documentation, completing training, and placing orders. Confidential sessions were conducted on-site. SQRC leadership did not permit providers to conduct therapy or psychiatry services remotely via tele-mental health, stating that the modality was not appropriate for their population.

Staff Recruitment:

SQRC continued its psychiatry training program to include increased partnering with academic psychiatry programs, in addition to the ongoing 25-year partnership with the UCSF psychiatry fellowship program. At the time of the monitoring tour, two forensic psychiatrist fellows and one UCSF student were being supervised by the chief psychiatrist.

SQRC expanded its APA-accredited psychology training program for psychology interns and added three additional post-doctoral unlicensed psychology positions to the mental health program at the time of the monitoring tour. SQRC reported that practicum students, post-doctoral students, and an RT intern were permitted to observe the work that was taking place at SQRC.

One barrier to retaining staff was the high cost of living. The Chief of Mental Health reported that depending on the salary of the staff member, some staff lived two hours away from the institution, creating a retention challenge.

Quality Management:

The Local Governing Body (LGB) met monthly, was chaired by the healthcare CEO, and achieved a quorum at each meeting with mental health representation in attendance. Topics discussed included: reports to the California Department of Public Health; licensing and privileging; status of repairs; and review and approval of LOPs. The minutes were comprehensive and contained appropriate and useful information.

The QMC met monthly, was chaired by the CEO, and attained quorum at all meetings. Mental health was present in all meetings. Topics discussed included: approval of previous minutes; CEO updates; discussion of the various areas which report to QMC; patient safety; EMRRC; review of mental health data, with emphasis on areas not at goal; and process improvement work plans. Mental health was well-integrated, with minutes reflecting appropriate discussion of germane topics.

The MHSPS occurred monthly, was jointly chaired by the Chief of Mental Health and the Chief Psychiatrist and attained a quorum for each meeting. Topics included: approval of prior meeting's minutes; discussion of population trends by level of care; relevant custodial reports

and the CMHPP; reports by nursing, psychiatry, training and assessment team; completion of RVR MHAs; discussion of individual programs; uses of force; inpatient referrals; suicide prevention training; and relevant issues to report to the QMC. The team discussed relevant issues and barriers to progress towards compliance with required metrics. Minutes were appropriate, cogent, and comprehensive.

SQRC's psychiatrists had a robust inpatient and outpatient peer review process, and all providers were reviewed. There were minutes and reports to the mental health subcommittee as required. Psychologists and social workers did not conduct a peer review process as they were awaiting direction from headquarters.

Medication Management:

Statewide MAPIP monitored compliance with both diagnostic monitoring and medication administration. Diagnostic monitoring included obtaining medication consents, as well as any physical examination, vital signs, or laboratory tests needed for safer medication use. Medication administration monitored compliance with the availability, continuity, and actual administration of medications. The compliance threshold for all metrics was 90 percent.

MAPIP

SQRC provided MAPIP results for September 1, 2024, through February 28, 2025, regarding compliance for psychiatric diagnostic monitoring and medication management.

The monitoring of antidepressant medications required four metrics: EKGs for patients taking tricyclic antidepressants (EKG); medication consents (Consent); thyroid function tests (TFTs); and obtaining blood pressure for patients taking venlafaxine (venla BP). SQRC was fully compliant with monitoring blood pressure for patients prescribed venlafaxine, fully non-

compliant with monitoring TFTs, and was partially compliant with obtaining EKGs and medication consents.




Of the 20 required metric-months, nine, or 45 percent, were compliant, with 11, or 55 percent non-compliant.

Diagnostic monitoring for patients prescribed atypical antipsychotics required 11 metrics, including: AIMS; blood pressure; glucose; complete blood count (CBC); comprehensive metabolic panel (CMP); EKG; height (Ht); lipids; medication consents; thyroid function tests; and weight (Wt). SQRC was fully compliant for monitoring blood pressure, EKGs, and weight; the remaining metrics were partially compliant during the review period.




Of the 63 metric-months for which data was required, SQRC reached compliance for 43, or 68 percent, and was non-compliant for 20, or 32 percent.

Clozapine is an atypical antipsychotic frequently used when other medications fail. Due to the increased risk of potentially fatal side effects, the medication requires close monitoring of the same categories as listed for atypical antipsychotics. SQRC did exceptionally, well with all metrics fully compliant, except for EKGs, which was partially compliant. Clozapine was a CDCR-approved clozapine institution. At the time of the monitoring tour, four patients were prescribed this medication.




Of the 57 metric-months for which data was required, SQRC reached compliance for 56, or 98 percent, and was non-compliant for one, or two percent.

Carbamazepine and Depakote are mood-stabilizing medications requiring four metrics: CBC; CMP; therapeutic medication level; and obtaining medication consents. For carbamazepine, SQRC was fully compliant with all measures (six metric-months).



For Depakote, SQRC was fully compliant with monitoring CMP, and partially compliant for the remaining metrics. Of the 23 required metric-months, SQRC was compliant with 18, or 78 percent, and non-compliant with five, or 22 percent.




The mood stabilizer lamotrigine required one measure, namely obtaining medication consents. Of the six required months, SQRC was compliant for five, or 83 percent, and non-compliant for one, or 17 percent. Given the small number of data, no accompanying graph is submitted.

Lithium is a mood stabilizer which required monitoring kidney and thyroid functions, EKGs, therapeutic medication levels, and obtaining medication consents. SQRC was fully compliant with obtaining medication consents, and partially compliant with the remaining metrics.




SQRC required 27 metric-months of data. Of these, the institution was compliant with 17, or 63 percent, and non-compliant with ten, or 37 percent.

When examined *in toto*, SQRC required 200 metric-months of diagnostic monitoring data. Of these, 153, or 76 percent were compliant, while 47, or 24 percent were non-compliant.




Psychiatry reported that underperforming metrics were largely due to missing laboratory studies and medication consent forms. Additional metrics were impacted by recent changes to MAPIP compliance rules; both leadership and line staff were now trained on the rules.

Medication Administration

MAPIP medication administration metrics monitored essential aspects such as medication availability, continuity, preparation, and administration. SQRC had 13 required measures during the review period.

Monitoring medication continuity included the following seven measures, followed by the abbreviations used in the graphs in parentheses: continuity of medications at Reception Centers (RC); transfers from other institutions arriving at receiving and release (R&R); intra-institutional transfers to non-RHU locations (Intra); MHCB transfers (MHCB); intra-institutional transfers to restricted housing (RHU); discharge from a community hospital or DSH (Outside Hospital); and upon parole or transfer to the community (Release).

MAPIP measures tracked compliance with the administration of medications given at HS (*hora somni*, or bedtime) which must be given on or after 8:00 P.M. (HS), and medications given in the A.M. and P.M. which must be given at least eight hours between doses (A.M./P.M.). Additionally, metrics evaluated whether chronic psychiatric medications were continued without interruption (Chronic), and whether new medications were administered as ordered, and in compliance with required timelines (New).

Finally, MAPIP measures included two related PC 2602 involuntary medication matters. These included whether a court order was in the medical record (Court Order), and whether a medication order for the PC 2602 medication was present (Med Order).

The institution was fully compliant with intra-institutional transfers excluding RHU; medications at time of release; HS medications; A.M./P.M. medications; chronic care medications; new medication orders; and having a PC 2602 Court order in the chart. SQRC was partially compliant with all other remaining metrics.

These 13 measures resulted in 75 metric-months of data. Of these, 63, or 84 percent were compliant, and 12, or 16 percent were non-compliant.




Medication Administration

SQRC conducted 108 medication line audits during the review period. All were compliant with the requirement to have individual patient wait times under 30 minutes, and total duration of medication line under two hours.

SQRC denied any conflicts between medication distribution times and mental health programming. The institution denied systemic issues while patients waited in line. Most medication lines were indoors. Since the preceding monitoring round, awnings were installed over the outdoor medication administration windows.

Non-Formulary

SQRC did not report the average rate of non-formulary medication use during the review period.

Polypharmacy

SQRC was compliant for five of six months with completing polypharmacy reviews.

HS Medications

SQRC was overall compliant with the directive to administer medications at HS after 8:00 P.M.

PC 2602

SQRC filed 13 initial (four emergent and nine non-emergent) PC 2602 petitions, and eight renewal petitions; all were granted. Three cases were not renewed, based on the psychiatrist's clinical determination. One other petition was withdrawn, as the patient paroled prior to the hearing. Hearings were conducted remotely, with the patient's counsel onsite. At the time of the monitoring tour, SQRC had 12 patients who received PC 2602 medications.

SQRC had a robust relationship with local forensic fellowship programs, with the fellows completing the majority of PC 2602 applications, with review by the attending psychiatrist. The chief psychiatrists reported the valuable learning and recruitment opportunities that relationships with academic institutions provided.

The medication court administrator (MCA) role was filled by a SSA in a limited-term position. The chief psychiatrist reported how helpful it was to have support staff assigned directly to them, rather than a general allocation to mental health. The MCA reported delays in notification for patients transferring to SQRC while either under a PC 2602 order, or in the process of filing for one. This necessitated the MCA running a report regularly in order to reduce the chance of missing a PC 2602 patient. No petitions were missed during the review period.

Electroconvulsive Therapy

In close collaboration with regional and headquarters' leadership, SQRC was able to establish a process to obtain electroconvulsive therapy (ECT) for appropriate patients. While the process had been used at the PIP, the process would allow for MHCB patients as well, if needed.

Transfers:

Sustainable process reviews were required to audit higher level of care (HLOC) consideration documentation for quality and to measure the inter-rater reliability between the headquarters reviewer and the institution's inpatient care coordinator.

SQRC underwent one minor sustainable process review during the review period. SQRC displayed a low rate of acceptable documentation for rationale for HLOC consideration, with headquarters' review showing a 34 percent agreement, while SQRC showed 66 percent. This did not show meaningful improvement from prior sustainable process reviews. The minor sustainable process identified three patients of concern, and recommended that each patient receive an IDTT to evaluate the appropriate LOC. All three patients were returned to IDTT. Of the three, two patients transferred to other institutions. For the one patient who was at SQRC EOP, the IDTT determined that EOP was the correct level of care.

The inpatient coordinator position was held by a senior psychologist specialist who had been in that position for approximately four months at the time of the monitoring tour. This individual also served as training coordinator and maintained a caseload of one Spanish speaking acute care patient.

While SQRC reported a collaborate relationship with both regional staff and IRU, SQRC outlined several barriers with DSH. They reported pushback from DSH referrals, especially surrounding issues of substance abuse or RVRs. The difference in opinion on RVRs included

relatively minor infractions such as not getting up for count. Senior leadership reported delays of up to two weeks to get a response on referrals. Additionally, SQRC reported that attempts to coordinate with DSH were often met with silence, or questions as to why the team was reaching out, as the information could be obtained in the discharge summary.

SQRC provided an illustrative example of these challenges. One patient with a lengthy MHCB stay was accepted by ASH on April 14, 2025. ASH reportedly told SQRC not to arrange transport due to lack of bed space. Nursing followed up on this and was reportedly told that the patient could be transported the following week. The monitor's expert noted concerns with this, as there appeared to be substantial availability of *Coleman*-designated beds at ASH. Notably, a submission to the Court on April 15, 2025, reflecting bed space from March 24, 2025 reflected 118 *Coleman*-designated beds available at ASH.

During the review period, there were 209 instances of 125 patients who were considered for, but not referred to, HLOC. Reasons for non-referral included scheduling conflicts, dealing with grief due to personal relationships, issues receiving ducats, issues with medications affecting sleep, and because it was justifiable due to the patient's specific circumstances to leave the patient in their LRH placement.

SQRC referred 13 patients to acute care. All 13 were accepted and transferred timely within ten days. Each referral packet was completed within two working days of identification.

All 38 patients referred to intermediate care were accepted and transferred timely within 30 days. Each referral packet was completed within five working days of identification.

Data regarding *Vitek* hearings was not provided.

One SQRC patient with complex medical needs was transferred to inpatient care.

SQRC referred 267 patients to the MHCB; 232 were admitted, 33 were rescinded, and two were pending. All 232 patients were transferred timely within 24 hours.

Fourteen patients had three or more MHCB placements.

There were seven instances where a total of six patients were required to transfer to a 3CMS RHU during the review period. Each patient was transferred within 30 days of identification.

Seven EOP patients were referred and timely transferred to an EOP RHU.

Eight patients' levels of care changed from EOP to 3CMS.

No 3CMS patients transferred to an MSF.

Programming:

MHSDS Patients in Restricted Housing:

At the time of the monitoring tour, there were 18 MHSDS patients in the GP RHU as SQRC did not maintain a designated EOP RHU or 3CMS RHU during the review period. The RHU Policy requires that patients in EOP and 3CMS LOC be transferred to an EOP and 3CMS RHU, respectively, within 30 calendar days from the date of initial placement in RHU or within 30 calendar days in which the patient was made EOP or 3CMS. *See* Cal. Code of Regs., tit. 15 §§ 3335.2 and 3335.3; *see also* Restricted Housing Unit Program: Mental Health Services Policy, dated July 19, 2024 and effective August 1, 2024 (hereinafter "RHU Policy"); 2021 Program Guide Update, ECF No. 7333-1 at 19. There were 44 EOP and 75 3CMS patients housed in the SQRC GP RHU during the review period. However, compliance with transfer timeframes to appropriate MHSDS RHU settings could not be ascertained based on the data provided by the institution.

The RHU Policy required that patients assigned to EOP RHU be offered a minimum of 20 hours of out-of-cell time reach week, ten of which must be structured therapeutic activities unless clinically contraindicated while the remaining ten hours must be out-of-cell exercise, including supervised recreation therapy. *See* ECF No. 8355 at 7-17 (Restricted Housing Unit Program: Mental Health Services Policy, dated July 19, 2024 and effective August 1, 2024) (hereinafter "RHU Policy"). While awaiting transfer, EOP RHU patients were offered five hours of group treatment and one primary clinician contact per week.

Regarding 3CMS RHU patients, the RHU Policy required that the patients be offered a minimum of 20 hours of out-of-cell time reach week, including 18.5 hours of recreational time outside the cell and 90 minutes of confidential, structured therapeutic activities. *See* ECF No. 8355 at 7-17 (Restricted Housing Unit Program: Mental Health Services Policy, dated July 19, 2024, and effective August 1, 2024) (hereinafter "RHU Policy"). The 3CMS RHU patients were offered 120 minutes of group treatment and one primary clinician contact per week until transfer.

Six weeks of reviewed 114-As revealed the offering of at least ten weekly hours of yard, and the offering of three weekly showers, weekly linen exchanges and clothing exchanges. Most patients were offered multiple calls a week. Instead of telephone calls, some patients made calls on their tablets.

<u>Non-Disciplinary Restricted Housing</u>:

During the reporting period, four patients were designated as NDRH, including one EOP and three 3CMS patients. Three patients were NDRH 102 and one patient was NDRH 201.

<u>MHCB</u>:

SQRC operated a 40-flex bed MHCB/PIP program, with an allotment of 12 MHCB beds and 28 PIP beds at the time of the monitoring tour. The unit also contained ten dedicated medical CTC beds. Patients received MHSDS services in the medical beds when necessary.

Similar to the preceding review period, the MHCB shared mental health staff with the PIP. Overall staff assigned to the MHCB and PIP included four psychiatrists, four psychologists, three social workers, and three RTs. The MHCB's LOP was current and consistent with headquarters' policy.

During the review period, there were 103 admissions to the MHCB comprised of 95 patients. The MHCB had an average daily census of 9.7 patients. MHCB clinical stays averaged 12.4 days. Forty-seven MHCB stays exceeded ten days; the maximum clinical stay was 142 days. MHCB physical stays averaged 17.4 days and ranged from zero to 143 days. Sixty-nine MHCB physical stays exceeded ten days. These extended stays in MHCB were attributed to certain patients requiring additional time in MHCB due to their respective medications, other patients requiring DRB review, as well as delays in the LRH process.

*IDTTs*

The monitor's expert observed one scheduled IDTT during the monitoring tour, which was exceptional. The IDTT meeting started on time and the room was appropriate for the stated purpose, with adequate light and at a comfortable temperature. All required participants were present and had computer access. The patients sat in a chair outside of the TTM. The primary clinician presented information which created a clear clinical picture of the patient, with diagnoses clearly stated. In addition, the psychiatrist was actively involved and collaborated with IDTT members to appropriately resolve a mismatch between a diagnosis and prescribed

medication. IDTT members were emphatic, clearly knew their patients, and appropriately permitted patients adequate time to express themselves and participate in the process. The CC I present was the assigned counselor for the MHCB and provided appropriate input. The IDTT discussed reasonable, time-limited, goals which were appropriate for the patient's presentation. The team adequately addressed relevant safety planning issues. The team referred the patient to the acute level of care, which appeared clinically appropriate.

The Program Guide requires initial IDTT meetings in MHCB to occur within 72 hours of admission and routine IDTTs at least weekly thereafter. ECF No. 7333-1 at 83-84 (PG 12-5-12). The monitor randomly selected and reviewed the healthcare records of 30 MHCB patients to assess compliance with Program Guide timeframes for initial and routine IDTT meetings during their stays.

Thirty MHCB patients required initial IDTTs, 29 of which, or 97 percent occurred within 72 hours of arrival as required. All required assigned staff were present at only nine of the 30, or 30 percent of the initial IDTTs reviewed. The assigned psychiatrist and / or psychologist were the most frequently substituted staff members, while nursing was present at only eight, or 27 percent of initial IDTTs. Patients attended 28 of 30, or 93 percent of initial IDTTs.

Of the 45 required routine IDTTs for these same 30 patients, 40 or 89 percent occurred timely, or within seven calendar days following the initial IDTT. Nineteen or 42 percent of routine IDTTs had the required assigned staff in attendance. Of the 45 IDTTs reviewed, nursing was not present at 21 or 47 percent. The assigned psychiatrist was the most frequently substituted staff members. Of the 47 routine IDTTs reviewed, patients attended 41 or 91 percent.

*Individual Treatment*

The Program Guide requires initial psychiatry and primary clinician evaluations to occur within 24 hours of admission to MHCB. The monitor randomly selected and reviewed the healthcare records of 30 MHCB patients to assess compliance with Program Guide timeframes for initial psychiatry and primary clinician evaluations during their stays.

Thirty MHCB patients required initial psychiatry evaluations. Of those, 24 or 80 percent were timely, meaning they occurred before the initial IDTT and within 24 hours of arrival. Documentation for four initial psychiatric assessments could not be found. Twenty-two were reported as conducted in a confidential setting; in addition, one assessment was held at cell front due to patient refusal.

Thirty MHCB patients required initial primary clinician assessments; 15 or 50 percent were completed within 24 hours of arrival, and documentation for five initial primary clinician assessments was not found. Of the 25 initial primary clinician contacts reviewed, 21 were held in a confidential setting, while one contact was held at cell front due to patient refusal. Other than patient refusals, reasons for non-confidential initial primary clinician contacts were not reported.

The Program Guide also requires MHCB patients to be assessed daily by either the treating psychiatrist or psychologist. ECF No. 7333-1 at 84 (PG 12-5-13). Further, the assigned psychiatrist is required to evaluate each MHCB patient twice weekly. *Id.* at 85 (PG 12-5-14).

All thirty MHCB patients require two routine psychiatry contacts per week. There were 172 expected contacts, and 169 or 98 percent were timely. Of the 172 routine contacts reviewed, 98 were reported as being conducted in a confidential setting while an additional 57 were held at

cell front due to patient refusal. Reasons for non-confidential contacts included medical restrictions, patient refusal, or was otherwise not documented.

Thirty MHCB patients required routine primary clinician contacts. There were 186 expected contacts, and 124 or 67 percent were timely. One hundred eighteen routine primary clinician contacts occurred in a confidential setting, with an additional 41 contacts held at cell front due to patient refusal. Reasons for routine contacts not occurring in a confidential setting included unavailable confidential treatment space or it was not reported.

In addition, two weeks of CDC 114-A data for 12 MHCB patients revealed that patients were offered three or more showers, linen and clothing exchanges, and multiple phone calls weekly.

Seclusion and Restraint:

The institution provided their LOP governing the use of seclusion and restraint within the MHCB, which was in line with Program Guide requirements. While the institution reported no incidents of seclusions or restraints during the review period, the staff was knowledgeable about the process for both. In an example of best practice, SQRC conducted patient simulations for urgent and emergent situations, including the use of seclusion and restraint. They also included situations such as danger to self, such as headbanging, hanging, and biting self to the point of bleeding.

EOP:

SQRC's mainline EOP population was 225 patients at the time of the monitoring tour.

The 2009 staffing plan requires psychiatrists who treat mainline EOP patients to maintain a caseload of no more than 120 patients per psychiatrist, while primary clinicians who treat mainline EOP patients must maintain a caseload of no more than 26 patients per clinician. *See*

ECF No. 3693 at 17. Both psychiatry and primary clinician caseloads for EOP patients were within required caseload ratios. Mainline EOP primary clinician caseloads ranged from 19 to 22. With sufficient staffing in place, clinicians and supervisors reported that they were able to develop and implement innovative initiatives as well as support custody in implementing California Model programs.

As noted above, mental health leadership implemented a hybrid work schedule in which clinicians worked from home while remaining on call for half their daily shift and attending to direct patient care responsibilities during the other half. While this hybrid schedule allowed for consistent morning and afternoon coverage, some mainline EOP patients reported that the arrangement disrupted continuity of care, particularly when they could not access their assigned clinician during a crisis or to prevent a crisis. However, leadership reported that the full-time floating clinician typically responded to mainline EOP crises in those situations.

*Structured Treatment*

The Program Guide requires that each EOP patient be offered at least ten hours per week of structured therapeutic activities. *See* ECF No. 7333-1 at 58. For patients who were determined by the treatment team to be clinically contraindicated for ten hours of treatment activities per week, the primary clinician is required to present the case and recommended treatment program (i.e. EOP modified programming) to the IDTT for approval. If the patient's modified treatment program included a schedule of less than ten hours of treatment per week, the patient's IDTT is required to meet monthly to review and increase the amount of structured therapeutic activities or refer the patient to a higher level of care as clinically indicated. *Id.*

At the time of the monitoring tour, SQRC maintained adequate staffing levels to provide the required mainline EOP services in a timely manner. Hours of structured therapeutic activities

were scheduled and offered to meet minimum Program Guide requirements during the review period. However, the monitor's expert expressed great concern that leadership estimated more than 50 percent of individual contacts for mainline EOP patients were completed in dorm dayrooms without sound privacy, as this presented concerns for patient safety, information accuracy, therapeutic value, and adverse outcomes.

*IDTTs*

The monitor's expert observed several mainline EOP IDTTs, which took place in a large confidential room and were of impressive quality. The mainline EOP IDTT meetings were attended by 13 staff members from multiple disciplines, including psychiatry, primary clinicians, a mental health supervisor, a counselor, a nursing supervisor, a custody captain, and adjunctive care providers. The observed IDTT meetings fulfilled their intended purpose by engaging in collaborative discussions that addressed diagnoses, case conceptualizations, treatment planning, LOC, barriers to progress, and pre-release planning. Nursing and custody staff provided relevant information for each patient, and patients were given the opportunity to ask questions of each discipline.

Clinicians consistently checked in with patients throughout the IDTT process to ensure understanding, agreement, and to invite additional information for consideration. The teams demonstrated familiarity with their patients, ensured effective communication, and addressed challenging topics, including involuntary medication, in a calm and supportive manner. Psychiatrists discussed medications in appropriate detail, referencing prior medications that had been ineffective, as well as current medications, adherence, response, and potential side effects. Patients were reminded to self-monitor for specific side effects.

IDTTs confirmed that orientation groups began almost immediately upon arrival and continued until the initial IDTT. At the initial IDTT, treatment teams reviewed available group tracks with each patient, and patients were able to select courses with recommendations from the team. The IDTTs demonstrated consistent collaboration in determining group assignments and job assignments.

Overall, the functioning of the IDTTs reflected strong interdisciplinary collaboration and some best practices. The monitor's expert's only concern was the potential for patients to become overwhelmed by the number of staff in the room, as reviewed patients were surrounded by local staff seated along the three walls in front of them. At a minimum, SQRC was encouraged to check in with patients prior to and throughout the IDTT meetings to assess their comfort with such a large group, but the expert did note that nearly all attendees brought value to the planning discussion and familiarity with all mainline EOP patients does allow for greater care continuity when it was necessary to cover or change caseloads.

The Program Guide requires that EOP patients receive an initial IDTT within 14 calendar days of arrival to the institution and a routine IDTT every 90 days thereafter. *See* ECF No. 7333-1 at 57, 59.

The monitor randomly selected and reviewed the healthcare records of 30 mainline EOP patients to assess compliance with Program Guide timeframes for initial IDTT meetings during their stays. All 30 patients required initial IDTTs. Of the 30 reviewed initial IDTTs, 18 or 60 percent occurred timely within 14 calendar days or arrival or level of care change. Twenty-five or 83 percent were attended by all required staff, and nineteen or 63 percent were attended by the patients. Reasons initial IDTTs were held *in absentia* included patient refusals and missing contacts.

To measure timeliness of routine EOP IDTT meetings, CDCR produced an appointments report that included individuals who were required to receive a routine IDTT during the review period. For the 361 patients in CDCR's appointments report for September 1, 2024 to February 28, 2025, there were 585 completed initial or routine IDTTs. When a patient had either an initial IDTT and a routine IDTT or more than one routine IDTT, timeliness in accordance with Program Guide requirements was able to be calculated. Of the 585 completed IDTTs, 224 contacts were for individuals who had at least two IDTTs (initial and routine or two routines). Of those 224, 89 or 40 percent occurred within Program Guide requirements. Of note, the report did not include individuals that did not have a completed IDTT, such as those that were not scheduled.

Thirty patients were selected to verify consistency of the appointment dates as reported in the appointments report and the presence of clinical documentation in EHRS. Of the 56 contacts reviewed in EHRS, 54 or 96 percent were consistent with the appointments report; two or four percent had discrepancies. Discrepancies included the appearance of "double entries" in the appointments report that were not present in the documentation section of EHRS.

*Group Treatment*

While most groups were led by RTs, clinicians facilitated at least one or two groups per week. Some interviewed mainline EOP patients also reported participating in up to three hours of ISUDT programming per week. The recently implemented START program group met twice weekly and was generally cofacilitated by two clinicians; however, only one clinician was present during group observation. The START group highlighted the need for some additional training to improve the quality and fulfill its intended purpose; however, the monitor's expert noted that the group was well attended.

Patients confirmed that EOP orientation groups started almost immediately and remained in place until their initial IDTT, at which point groups tailored to their mental health needs were assigned. Patients provided only positive feedback about the clinician-led groups, expressing a desire for more groups focused on their treatment needs and board of prison (BPH) hearing preparation. While three of 15 interviewed patients reported a lack of structure and engagement during recreation yard groups, the remaining 12 patients reported structured yard activities with direct engagement by RTs. One patient described a specific RTs as the "best" among mental health staff based on their consistent availability and engagement.

SQRC activated a large group treatment space since the previous monitoring visit. While this allowed for larger groups, the location was at an entrance where staff frequently locked and unlocked doors to access their office spaces, which resulted in frequent disruptions. Patients became distracted during groups and at times required redirection.

*Individual Treatment*

The Program Guide requires that EOP patients are offered an initial psychiatrist evaluation before their initial IDTT and within 14 calendar days of arrival to the institution or level of care change. *See* ECF No. 7333-1 at 57. Thereafter they are required to receive a routine psychiatric contact every 30 calendar days. *Id*. at 59. Patients are also required to receive a primary clinician evaluation within 14 calendar days of arrival and weekly (i.e. once per calendar week with no more than ten calendar days between contacts) with either a primary clinician or in group psychotherapy with an individual contact every other week. *Id*. at 57, 59.

Thirty mainline EOP patients who required initial psychiatry evaluations were randomly selected to assess compliance with Program Guide timeframes for initial psychiatry contacts during their stays. Of the 30 patients, 23 or 77 percent timely occurred before the initial IDTT.

Fifteen or 50 percent of the reviewed initial psychiatry evaluations were conducted in confidential settings; the non-confidential contacts were due to patient refusals and missing contacts. Telepsychiatry was not utilized for initial psychiatry evaluations.

To measure timeliness of routine psychiatry contacts during the review period, CDCR produced an appointments report that included individuals required to receive a routine psychiatry contact during the review period. For the 364 patients in CDCR's appointments report, there were 1,594 completed and refused contacts. Of the 1,585 completed contacts, 277 or 17 percent were confidential as reported by the institution. Reasons for non-confidential psychiatry contacts included custody modified program, custody escorts unavailable, confidential space unavailable, and patient refusal.

When a patient had more than one completed or refused contact, compliance with Program Guide timeframes could be calculated. Of the 1,594, 1,230 contacts were for individuals who were seen at least twice by the psychiatric provider. Of those 1,230 contacts, 85 or seven percent that occurred beyond Program Guide requirements with a range of 31 to 140 days.[122] Of note, the report did not include individuals that did not have completed contacts.

Thirty random patients were selected to verify consistency between the appointments report and clinical documentation in EHRS. Of the 114 contacts reviewed in EHRS, 113 or 99 percent were consistent with the appointments report; one or one percent had discrepancies.

[122] The mainline EOP routine psychiatry appointments report did not include individuals that did not have complete contacts. Reviewed data captures the time between patient contacts but does not account for when patients were not seen or scheduled for a routine psychiatric contact. Additionally, the provided appointments report did not account for delays between appointments due to movements in or out of EOP. Contact with the assigned psychiatrist was unable to be determined.

Discrepancies included lack of documentation in EHRS to support one entry in the appointments report.

Thirty randomly selected EOP patients required initial primary clinician evaluations. Of the 30 reviewed initial primary clinician evaluations contacts, 25 or 83 percent were completed within 14 calendar days of arrival or change in level of care. Sixteen or 53 percent of reviewed initial primary clinician evaluations were conducted in a confidential setting; non-confidential contacts were due to patient refusals and missing contacts.

To measure timeliness of routine primary clinician contacts during the review period, CDCR produced an appointments report that included individuals required to receive one from December 2024 to February 2025. For the 323 patients in CDCR's appointments report, there were 2928 completed and refused contacts. Of the 2,919 completed contacts, 1,240 or 42 percent were confidential as reported by the institution. Reasons for non-confidential primary clinician contacts included patient refused confidential contact, confidential space was not available, and weather-related issues.

When a patient had more than one completed or refused contact, compliance with Program Guide timeframes was able to be calculated. Of the 2,928, 2,605 contacts were for individuals who were seen at least twice by the primary clinician. Of those 2,605 contacts, 98 or four percent occurred beyond Program Guide requirements with a range of 11 to 38 days. Of note, the report did not include individuals that did not have completed contacts, such as those that were not scheduled.

A random sample of 30 patents was selected to verify consistency between the appointments report and clinical documentation in EHRS. Of the 116 contacts reviewed in EHRS, 112 or 96 percent were consistent with the appointments report; four or four percent had

discrepancies. All discrepancies were the result of an entry in the appointments reports not being found in the documentation section of EHRS.

SQRC continued to experience significant physical plant challenges. Workspace was insufficient for the number of staff, and confidential treatment areas for patient care and assessments resulted in more than half of individual contacts occurring in nonconfidential settings. As noted, leadership implemented the hybrid work model partly in response to these space constraints.

Furthermore, leadership estimated that, despite efforts to maximize the use of the few treatment spaces available for mainline EOP contacts, including by implementing the hybrid work schedule, the space limitations were so significant that an estimated 50 percent of individual mainline EOP patient encounters occurred non-confidentially in the dayroom of dorms, which the monitor's expert found offered no privacy at all. With so few tables and no barriers to enhance privacy in the dorm housing units, patients were standing or seated just feet away from dayroom tables where individual contacts occurred.

The use of tables in the dayrooms of the dorms for individual mental health encounters was even more concerning after hearing from patients, staff, and leadership that there were two units with serious custody culture issues and alleged drug dealings which compromised patients' sense of safety, exacerbated their symptoms, and resulted in increased fear of disclosing sensitive information.

Further, some patients feared their disclosures, if overheard, might lead to transfer out of SQRC. Mental health staff also perceived that transfers were being used as a punitive measure (highlighting two specific mainline EOP housing units in particular), and multiple staff members

including direct care providers and RVR MHA assessors reported that there was no consultation with mental health staff prior to placing these patients on transfer lists.

Leadership confirmed that they shared the same concerns regarding space issues and the lack of sufficient confidential individual treatment space on the mainline EOP yard. Leadership also reported ongoing efforts with custody staff and headquarters to identify alternatives; however, despite SQRC constructing a new large building for California Model programs, leadership confirmed that no space within that project had been allocated for mental healthcare.

Three patients from Housing Unit 2 on H Yard and reported that the officers on that yard mistreat them regularly by calling them culturally inappropriate names, ripping and throwing away their family photos, and making fun of their interests, such as playing guitar. In addition, mental health staff responsible for RVRs brought up the issue of officers abusing the RVR process and targeting specific patients in two of the H-block housing units, noting that it was easy to track and that patients routinely reported unfair treatment by the same officers assigned to those two housing units. This was also confirmed by a mainline EOP primary clinician, as well as a PIP staff member who attended the outpatient staff's meeting. Notably, one staff member became visibly upset with tears after hearing other staff report the same concerns patients had been sharing with them during inpatient admissions.

The monitor's expert recommended further investigation into the allegations regarding custody culture due to the risk of creating an environment where the highest acuity patients in the outpatient setting live in fear and may be unjustly punished through the RVR and transfer process. The monitor also recommended having leadership meet with line staff who work with patients in the EOP program either directly or indirectly (e.g., through the RVR MHA Process and PIP admissions) to ensure they understand how to report these allegations in real time.

3CMS:

The 2009 Staffing Plan requires staff psychiatrists who treat 3CMS patients maintain a caseload of no more than 280 patients per psychiatrist if the patient was prescribed medications and 675 patients if the patient was not prescribed medications.[123] *See* ECF No. 3693 at 12 and 6978-1 at 3. Psychiatry caseloads for 3CMS patients ranged between one and 192 for patients who took medication making them all within the 1:280 caseload ratios. If the added 120,121, and 125 non-medication patients were factored into each caseload, each of the three 3CMS psychiatrists would exceed appropriate caseload ratios.

Staff-to-patient ratios from the 2009 Staffing Plan required that primary clinicians who treat 3CMS patients maintain a caseload of 97 patients per clinician. *See* ECF No. 3693 at 12. Primary clinician caseload ratios for 3CMS patients were between one patient and 90 patients, indicating compliance.

*IDTTs*

The monitor's expert observed initial and routine IDTT meetings attended by all required disciplines. The primary clinician, patient and on-site psychiatrist collaboratively discussed diagnoses, status of treatment goals including barriers to progress, and further development of individualized treatment goals and interventions. The CC I was engaged and knowledgeable.

---

[123] The Program Guide requires that "[e]ach CCCMS inmate patient on psychiatric medication…be reevaluated by a psychiatrist a minimum of every 90 days regarding psychiatric medication issues." (Program Guide at 12-3-11). The 2009 Staffing Plan established a psychiatry staffing ratio for every 3CMS patient in the general population and did not distinguish between patients on medications and patients who were not. See ECF No. 3693 at 8. The Adjustments to the 2009 Staffing Plan, ECF No. 6978-1, which were approved by the Court on January 27, 2021 (See ECF No. 7035 at 2), established a new staffing ratio of 675 patients per psychiatrist for patients who are not on medications for six months or more. For the purpose of reporting compliance with staff-to-patient ratios, it was unclear whether the patient's included in each reported caseload were prescribed medications at the time of the monitoring tour.

The IDTT meetings were well planned and well conducted. However, there was a need for additional discussion of group treatment assignments.

The Program Guide requires an initial 3CMS IDTT meeting to be completed within 14 working days of referral/arrival and routine IDTT meetings annually thereafter. *See* ECF No. 7333-1 at 43-44 (PG 12-3-10). The monitor randomly selected and reviewed the healthcare records of 30 mainline 3CMS patients to assess compliance with Program Guide timeframes during their stays. All 30 patients required initial IDTTs. Of the 30 reviewed initial IDTTs, 11 or 37 percent occurred timely within 14 calendar days or arrival or level of care change. Twenty-five or 83 percent were attended by all required staff and 16 or 53 percent were attended by the patients. Reasons initial IDTTs were held *in absentia* included patient refusals and patient no-shows.

To measure timeliness of routine 3CMS IDTT meetings, CDCR produced an appointments report that included individuals who were required to receive a routine IDTT during the review period. For the 533 patients in CDCR's appointments report, there were 560 completed and refused routine IDTTs. When a patient had either a completed or refused initial IDTT and a routine IDTT or more than one routine IDTT, compliance with Program Guide timeframes was able to be calculated. Of the 541 IDTTs that were completed, 29 were for individuals who had at least two IDTTs. Of those, all were compliant with Program Guide timeframes. Of note, the report did not include individuals that did not have a completed IDTT, such as those that were not scheduled.

Of the 541 completed routine IDTTs, there were three IDTTs completed in zero minutes, 500 completed within 15 minutes, 20 lasted between 16 and 30 minutes, eight lasted between 31 and 60 minutes, three lasted between 61-95 minutes, and seven lasted longer than 95 minutes.

A random sample of 30 patients was selected to verify consistency between the appointments report and clinical documentation in EHRS. Of the 33 contacts reviewed, all were consistent were consistent with the appointments report.

*Group Treatment*

Groups were provided for 3CMS patients. All 3CMS groups provided were conducted by recreational therapists (RT). The groups observed were well attended and received.

*Individual Treatment*

The Program Guide requires that patients are offered an initial psychiatrist evaluation before their initial IDTT. *See* ECF No. 7333-1 at 34-50, 641. Thereafter they are required to receive a routine psychiatric contact every 90 calendar days if the patient is prescribed a psychotropic medication. *Id*. at 44. Patients are also required to receive a primary clinician evaluation within ten working days of arrival and every 90 calendar days thereafter. *Id*. at 41, 4.

SQRC reported that compliance for psychiatry initial contacts was 55 percent and routine contacts was 97 percent. Psychiatry leadership stated the initial psychiatry contact percentages were low during the review period due to the loss of a staff member who previously notified the psychiatrist of patients' arrival. Patients not on medications were missed. Psychiatry leadership stated that this problem was rectified in January 2025. All psychiatrists were now notified when any MHSDS patients (on medications and not on medications) arrived at R&R.

The monitor randomly selected and reviewed the healthcare records of 30 3CMS patients to assess compliance with Program Guide timeframes for initial psychiatry evaluations during their stays. All 30 patients required initial psychiatry evaluations; 11 or 37 percent timely occurred before the initial IDTT. Nineteen or 63 percent of the reviewed initial psychiatry evaluations were conducted in confidential settings; the non-confidential contacts were due to

patient refusals and missing contacts. Telepsychiatry was utilized for one initial psychiatry evaluations.

To measure timeliness of routine psychiatry contacts, CDCR produced an appointments report that included individuals who were required to receive a routine psychiatry contact during the review period. For the 648 patients in CDCR's appointments report covering patients who received at least one routine psychiatry contact during the review period, there were 1,489 completed and refused contacts. Of the 1,400 that were completed, 1,358 or 97 percent were reported as being conducted in a confidential setting. When a patient had more than one completed contact, timeliness in accordance with Program Guide requirements was able to be calculated. Of the 1,400 completed contacts, 843 were for individuals who were seen at least twice by a psychiatric provider. Of those 843 contacts, 19 or two percent of contacts were completed beyond the Program Guide required timeframes. Of note, the report did not include individuals that did not have complete contacts, such as those that were not scheduled in accordance with the institution's triage plan.

Of the 1,400 completed routine psychiatry contacts, 12 contacts were reported to have been completed in zero minutes, 231 were completed within 15 minutes, 870 lasted between 16 and 30 minutes, 260 lasted between 31 and 60 minutes, 22 were completed between 61 and 95 minutes, and five were completed in longer than 95 minutes. A random sample of 30 patients was selected to verify consistency between the appointments report and clinical documentation in EHRS. Of the 73 contacts reviewed, 69 or 95 percent were consistent with the appointments report.

The monitor randomly selected and reviewed the healthcare records of 30 3CMS patients to assess compliance with Program Guide timeframes for initial primary clinician evaluations

during their stays. All 30 patients required initial primary clinician evaluations. Of the 30 reviewed initial primary clinician evaluations contacts, 15 or 50 percent were completed within 10 calendar days of arrival or change in level of care. Twenty-three or 77 percent of reviewed initial primary clinician evaluations were conducted in a confidential setting; non-confidential contacts were due to missing contacts. Telehealth was not utilized for initial psychiatry evaluations.

To assess timeliness of routine primary clinician contacts, CDCR produced an appointments report that included individuals who were required to receive a routine primary clinician contact during the review period. For the 1,025 patients in CDCR's appointments report covering patients who received at least one routine primary clinician contact during the review period, there were 3,610completed and refused contacts. Of the 3,395 that were completed, 3,224 or 95 percent were reported as being conducted in a confidential setting. When a patient had more than one completed contact, timeliness in accordance with Program Guide requirements was able to be calculated. Of the 3,395 completed contacts, 2,590 were for individuals who were seen at least twice by a primary clinician provider. Of those 2,590 contacts, 152 or six percent of contacts were completed beyond the Program Guide required timeframes. Of note, the report did not include individuals that did not have completed contacts, such as those that were not scheduled in accordance with the institution's triage plan.[124]

Of the 3,395 completed routine primary clinician contacts, 29 contacts were reported to have been completed in zero minutes, 357 were completed within 15 minutes, 1,088 lasted

[124] The reviewed data captures the time between patient contacts, but does not include patients were not seen or scheduled for a routine contact with the primary clinician. Of note, the appointments report did not account for delays between appointments due to movements in or out of mainline 3CMS. Verified contact with the assigned primary clinician was unable to be determined.

between 16 and 30 minutes, 1,763 lasted between 31 and 60 minutes, 132 lasted between 61 and 95 minutes, and 26 were completed in greater than 95 minutes.

Staff and patients both reported that individual psychiatry and primary clinician contacts were typically confidential, except when the patient refused. Clinicians reported adequate treatment space except in H unit. The 3CMS program supervisor reported good staff morale, and cohesive treatment teams.

Interviewed patients were very satisfied with their clinicians and psychiatrists' services and the amount of time spent during the sessions. Additionally, there were no patient concerns with medications or medication lines. The monitor's expert observed a noon medication line on West block where all five rights were conducted properly and custody observed. There were concerns with the number of people on Suboxone, making the morning lines longer. The nursing leadership monitored the lines and planned to look at specific patients and a particular yard to share the findings with medical and mental health leadership. There were concerns with custody attitudes and disrespect from a few custody officers but not all.

Other Issues:

Pre-Release Planning:

There were five institutional mental health pre-release coordinators at SQRC. The IMHPC duties were split between pre-release coordinator duties and high-risk referrals. The five pre-release coordinators reported to different staff disciplines, and there was no one plan for the entire facility.

There were no pre-release groups offered to the 3CMS patients during the review period. There was an informal well-run discharge planning meeting facilitated by an RT for 3CMS patients; however, it started April 2025 and was not established as a formal pre-release group for

this population and not conducted by a LCSW. Leadership was in the process of identifying a clinician to offer pre-release groups to 3CMS patients.

Between September 2, 2024, and April 25, 2025, there were 187 patients being paroled directly from SQRC with a release date within 60 days. Of the 187 patients, three patients were at the ICF LOC, six were in the MHCB, 76 at the EOP LOC, and 102 at the 3CMS LOC. During the review period, the pre-release coordinator reported that SQRC released 96 patients to probation. Of those 96 patients, eight patients refused to sign a ROI, two patients were out to court, and one patient did not require completion of a ROI. The pre-release coordinator was unable to provide the number of pre-release planning assessments conducted in the review period.

The pre-release coordinator and TCMP staff participated in weekly ISUDT pre-release calls. The pre-release coordinator also participated in headquarters' monthly pre-release meetings. The pre-release coordinator reported having good rapport with all disciplines.

The TCMP documentation reported meeting with 85 EOP and 13 3CMS patients during the review period. As for various benefits' applications, 182 were submitted on behalf of 212 or 69.7 percent of patients. Twelve patients refused TCMP services; five patients had access to other resources, and 47 were unavailable to TCMP staff. Applications for Medi-Cal were submitted for 147 patients, while SSI applications were submitted on behalf of 49 or 96 percent of eligible patients; two patients refused or were ineligible. In addition, there were three patients who applied for veterans' benefits.

Program Access:

a. Job and Program Assignments

SQRC reported that its 783 job assignments were held by 40 or 16 percent of EOP patients, 211 or 23 percent of 3CMS patients, and 532 or 30 percent of non-MHSDS incarcerated persons.

The 1,061 academic assignments were held by 28 or 11 percent of EOP patients, 364 or 40 percent of 3CMS patients, and 669 or 39 percent of non-MHSDS incarcerated persons.

Of the 30 vocational education assignments, none were held by EOP patients, but nine or ten percent of 3CMS patients held them, as did 21 or one percent of non-MHSDS incarcerated persons.

The 399 voluntary education assignments were held by 13 or five percent of EOP patients, 130 or 14 percent of 3CMS patients, and 256 or 15 percent of non-MHSDS incarcerated persons.

The 426 substance abuse treatment assignments were held by 62 or 25 percent of EOP patients, 169 or 19 percent of 3CMS patients, and 195 or 11 percent of non-MHSDS incarcerated persons.

b. Milestone Credits

SQRC reported that 197 EOP and two 3CMS patients who were eligible to earn milestone credits earned the credit. The institution further reported that during the reporting period they were unable to implement more milestone groups as the clinicians who were trained to provide these groups had left CDCR and SQRC was waiting to hear from headquarters regarding new training programs in which SQRC clinicians could take part.

c. Out-of-Level Housing

SQRC reported that 40 EOP and 49 3CMS custody Level I patients were in Level II housing. There were 14 EOP and 64 3CMS custody Level III patients in Level II housing, and five EOP and four 3CMS custody Level IV patients in Level II housing.

d. ADA Reasonable Accommodations and Grievance Procedures

SQRC provided an updated reference training manual for ADA accommodations as well as attendance sheets for training on accommodation and grievance procedures.

e. Periodic Classification Score Reductions: EOP Patients

SQRC provided copies of CDCR Form 840s that indicated that it was providing periodic classification score reductions for EOP patients.

f. Unclothed Body Search

Patients were subjected to unclothed body searches prior to leaving their respective cells which the escorting officer will conduct in the privacy of the patients' cell. Patients were required to hand their clothing to the escorting officer and then submit to an unclothed body search which the escorting officer would then search for the patients' clothing and their person. Patients were also subjected to a clothed body search prior to entering the unit which was then followed by an unclothed body search which the escorting officer conducts once the patient was placed in a holding cell and after the restraint equipment was removed.

"C" Status:

SQRC reported that on April 11, 2025, there were 65 patients on "C" status including 28 EOP and 37 3CMS patients. SQRC reported that they could not produce "C" status patents for the reporting period.

The supervisor did not indicate any significant access to care barriers except complaints from a patient housed in Badger unit on "C" status who allegedly reported not being ducated or

released by custody to attend required mental health groups or groups. Custody staff stated patients were released for high priority ducats. It was unclear whether patients were released for groups since all 3CMS groups were RT run.

The institution reported there were approximately 35 to 45 "C" status patients housed in the Badger unit, and on April 15, 2025, 30 of the "C" status incarcerated persons were 3CMS patients.

Patients at the 3CMS LOC and on "C" status reported not receiving the same benefits as RHU inmates (20 hours of out of cell time) and stated it was severe and punitive. The patients also reported being housed on "C" status for refusing housing due to age, sexual orientation and safety.

The 3CMS supervisor was concerned with the lack of activities afforded the "C" status patients and provided RT services daily for GP and 3CMS patients as of August of 2024.

The congregating of all "C" status incarcerated persons occurred over a year ago. Previously, patients on "C" status stayed in their housing units and certain privileges were removed based on Title 15. According to custody, due to the layout of SQRC it was unmanageable to monitor privilege reduction and the decision was made to move all incarcerated persons on C status to one unit. Mental Health planned to continue to monitor if 3CMS patients were attending all priority ducated mental health services and to provide RT groups and other activities as needed.

<u>Case-by-Case Reviews</u>:

SQRC reported that no patients met the requirement for 150-day reviews.

Ten patients met the requirement for 120-day pre-MERD reviews. All patients either had timely ICCs or were scheduled for ICC. Five patients were pending RVR adjudication or

investigation, one patient was out to court, and four patients had their MERDs suspended. Three patients had CSR reviews.

Mental Health Referrals:

SQRC reported an overall compliance rate of 92 percent for timely responding to mental health referrals. Psychiatry and primary clinicians responded timely to emergent and urgent mental health referrals. Notably, psychiatry routine referrals were close to compliance at 88 percent. However, primary clinician routine referrals were not compliant at 73 percent.

The institution reported that mental health referrals were paper referrals which were collected from the housing units by clinic RNs and were then reviewed at respective huddles. Mental health referrals were triaged as emergent, urgent, and routine by the High-Risk Team daily. Mental health referrals were then scanned into the EHRS's 7362/MH-5 pool and available for review in patient charts. However, there were no protocols or safeguards in place if forms were lost.

Custody and Mental Health Partnership Plan:

SQRC's custody and mental health partnership LOP was created in April 2023 and complied with statewide operating policy.

Executive leadership joint rounding occurred during all six months of the review period, including in the PIP for three months, H unit for two months, and the AC unit for one month. Reviewed documentation indicated attendance by required custody and mental health leadership during the rounding. Staff reported concerns with staffing levels, treatment space, outdated furniture, requests for new printers, staff feeling safer due to custody officers being placed in H unit in the mental health area. Patients reported positive staff relationships and long waitlists for programming.

Executive staff meetings were held each month during the reporting period. Meeting minutes indicated required staff were in attendance, and agenda items included unit reports from the respective staff.

Executive joint rounding was a standing mental health program subcommittee agenda item for every reviewed month besides December; minutes included summaries of executive rounding for all reviewed months.

Reviewed huddle reports were adequate and showed that the required staff attended. The monitor observed an MHCB huddle which was well attended and featured an in-depth synopsis for each MHCB patient. Mental health staff displayed a high level of collaboration; however, custody staff participation was nonexistent.

SQRC reportedly conducted weekly 3CMS supervisory meetings, but reviewed reports contained minimal information, and typically only referenced one patient of concern or one patient with an occasional medication concern.

Monthly joint supervisory 3CMS program area tours were conducted each month during the review period. Documentation showed adequate staff and patient interviews.

EOP orientation groups were reportedly offered on a weekly basis on Friday mornings, custody did not participate in any intro to EOP groups and reasons for the same were not provided.

SQRC provided inmate advisory council (IAC) meeting minutes for all six months of the review period. IAC patient members created the agenda and prepared the meeting minutes. The meeting minutes did not address whether staff were in attendance.

During the review period, patients filed 80 staff complaints including two complaints for mental health staff and 78 complaints for custody staff. No custody or mental health staff were redirected to another position due to a complaint.

The warden, chief deputy warden, six correctional administrators, 36 CC Is, CC IIs, and CC IIIs, six captains, 29 lieutenants, 73 sergeants, and 779 correctional officers attended the annual partnership off-post training. For mental health staff, four chiefs of psychology, mental health, and psychiatry, seven supervisors of psychology, psychiatry, and social work, 24 psychologists, ten psychiatrists, 12 social workers, and 231 of 232 nursing staff attended the training.

SQRC provided quarterly round table training sign in sheets for the third quarter of 2024 and the fourth quarter of 2024 and the start of 2025. It could not be determined whether all of the required staff attended the training.

Heat Plan:

The heat plan was in effect during two months of the monitoring round.

CDCR required that each institution's heat plan LOP incorporate the requirements of the most recent Heat Plan and Updates memorandum. SQRC's institution LOP was up-to-date and complied with headquarters directive.

In addition to CDCR's 2024 Heat Plan and Updates memorandum and as discussed above, CDCR issued an Expectations Memorandum, dated August 2, 2024, delineating the specific responsibilities of the warden and CEO. These included daily meetings during days of anticipated heat advisories to address and manage heat alerts and related concerns.

The 2024 Heat Plan and Updates memorandum required that each institution submit a Heat Plan Monthly Summary Report (Summary Report), signed by the warden and CEO, to

headquarters each month from May 1 to October 31. SQRC did not provide a monthly heat report for September. For October 2024, SQRC reported four Stage I heat alerts, three Stage II heat alerts and no Stage III heat alerts.

The Heat Plan and Updates memorandum also required institutions to submit a monthly Heat Incident Log documenting the number of patients who experienced a heat-related illness. The Heat Incident Log must include the patient's information and details regarding the heat-related illness. No patients were reported to have experienced heat-related illness during the review period.

The 2024 Heat Plan and Updates memorandum required all custody officers and leadership staff to maintain knowledge of heat plan activation and act in accordance with the requirements of each stage. The monitor interviewed officers from H Yard, North, South, and West Blocks. Interviewed officers were all familiar with the heat plan's requirements with prompting. Some units had additional Heat Plan resources that officers utilized as needed. Officers understood the need for daily updated lists for patients on heat medications and knew how to access the list on their computers. Further, the CC II who was escorting the monitor informed all units that it was his responsibility to get those daily updated lists to each unit.

To ensure proper and accurate temperature recording, the annual Heat Plan and Updates Memorandum required the warden or his designee to ensure an accurate thermometer was placed in a central, heat-neutral location to monitor outside ambient air temperatures which must be recorded every hour, every day, from May 1 through October 31 of each year. There were operable thermometers in all facilities, with one exception. The thermometer on the fifth tier of Donner housing unit was reading a temperature ten degrees lower than all other fifth tier thermometers that were viewed. The CC II responsible for heat plan monitoring was going to

have that thermometer replaced before May 1, 2025. Further, there was no thermometer to read outside temperatures and the officer in Wall Post 1, which was where those readings were to take place, did not know that was his responsibility. The CC II and wall post officer began taking the necessary steps to obtain a thermometer and temperature logs so that outside temperatures could be taken, recorded, and given to the watch commander. The October monthly Heat Plan report listed the boiler house as the location of the outside thermometer during the review period.

The warden or his designee is also responsible for ensuring that inside air temperatures are measured in all non-airconditioned living areas that house heat-risk incarcerated persons. Temperatures must be taken at the highest non-air-conditioned location where heat-risk incarcerated persons are housed and must be recorded every three hours. Interviewed staff confirmed that this occurred.

In an effort to ensure that heat-risk incarcerated persons were afforded equal access to programs, services, and activities during extreme weather conditions, the 2024 Heat Plan and Updates memorandum required institutions to devise and include any reasonable accommodation and alternatives to yard activities when revising their LOP. All reasonable accommodations provided to heat-risk incarcerated persons during heat alert activation must be documented in the institution's DAR as well. Officers in all dorms reported that patients were permitted to remain in the day room, or at their programming area if it was cool, during heat alerts. Interviewed officers on all yards reported appropriate access to ice and cool drinking water for patients during heat season.

The 2024 Heat Plan and Updates memorandum required annual training on the institution's Heat Plan. SQRC reported that 328 of 404 or 81 percent of mental health staff and 848 of 895 or 95 percent of custody staff were compliant with heat pathologies' training.

<u>RVRs</u>:

SQRC issued 1,684 RVRs during the review period, of which 1,137 or 68 percent were issued to MHSDS patients including seven to acute care patients, 17 intermediate care patients, 34 MHCB patients, 495 EOP patients, and 584 3CMS patients.

The monitor reviewed 29 RVRs to assess compliance with CDCR policy. Custody staff timely referred the MHA to mental health staff within two days in seven or 24 percent of reviewed cases. Mental health staff timely completed and returned the assessment to custody within eight days in 26 or 90 percent of reviewed cases. The senior hearing officer documented consideration of the MHA in all reviewed cases.

Mental health staff recommended mitigation in 15 or 52 percent of reviewed cases and the SHO mitigated the penalty pursuant to the assessment in 13 or 87 percent of cases. The most frequent assessment recommendation concerning mitigation was no loss of yard, which 47 percent of assessments recommended.

None of the MHAs recommended alternative discipline due to patients' mental illness significantly contributing to the behavior documented in the RVR. Rather, three MHAs explained that mental health contributed to the behavior in the RVR, but the SHO decided to find the patient guilty.

As for MHA training, two chief psychologists, two senior psychologists, two psychologists, and one social worker attended the training. The training was attended by the warden, six correctional administrators, four CC Is, one CC III, six captains, 27 lieutenants, 64 sergeants, and 561 correctional officers.

<u>Use of Force</u>:

SQRC reported that there was no controlled use of force incidents during the review period. There were 33 immediate uses of force, involving 15 EOP and three 3CMS patients. Nine immediate uses of force incidents were reviewed and were found to be in compliance with CDCR policy. Seven immediate use of force videos were reviewed during monitoring tour and custody officers utilized appropriate force and allowed patients to decontaminate after the use of OC spray and grenades.

As for attendance at the required use of force training, the warden, chief deputy warden, six correctional administrators, six captains, 29 lieutenants, 73 sergeants, and 779 correctional officers attended the required training. For mental health staff, the training was attended by four chiefs of psychology, mental health, and psychiatry, 24 psychologists, ten psychiatrists, 12 social workers, and 231 of 232 nursing staff.

Lockdowns/Modified Programming:

SQRC reported there were no lockdowns or incidents of modified programming during the reporting period.

Access to Care:

Review of SQRC's monthly Health Care Access Quality reports from September 2024 through February 2025 indicated the issuance of 136,183 mental health ducats and add-on appointments, of which 92,090 or 68 percent were completed, and 44,093 or 32 percent were not completed. Of the non-completed appointments, 453 or one percent were not completed due to custody-factors, 14,639 or 33 percent were due to non-custody factors, and 29,001 or 66 percent were due to patient refusals.

*Coleman* Postings:

There were visible *Coleman* postings in English and Spanish throughout all toured housing units.

**APPENDIX A – 26**
**SIERRA CONSERVATION CENTER (SCC)**
Site Visit: June 16, 2025 – June 18, 2025
Review Period: November 1, 2024 – April 30, 2024

Census:

On June 13, 2025, SCC housed 3,968 incarcerated persons, which was a 6.8 percent decrease from the prior review period. *See* ECF 8359 at 199 (reporting total incarcerated persons population was 4,258). The 232 MHSDS patients represented six percent of the institution's total population and was an 8.3 percent decrease from the previous review period. *Id.* (reporting MHSDS population of 253 patients).

The 232 total MHSDS population consisted of two mainline EOP patients, 211 mainline 3CMS patients representing a 12 percent decrease compared to the prior reporting period, and 19 3CMS RHU patients compared to the 12 3CMS patients housed in administrative segregation last monitoring round. *Id.*

Staffing:

The chief psychiatrist position and senior psychiatrist supervisor position were both filled. The one allocated staff psychiatrist position was vacant. Although there was no allocation for a psychiatric nurse practitioner, SCC has one registry staff filling this position.

One of two chief psychologist positions were filled for a 50 percent vacancy rate. The one senior psychologist position was filled.

Both senior psychologist specialist positions were filled.

All four staff psychology positions were filled.

Both allocated social worker positions were filled. One was unlicensed and supervised by the regional social worker.

The one allocated recreation therapist position was filled.

The four allocated psych tech positions were filled.

The supervising registered nurse position and the MHSDS registered nurse position were both filled.

One of the two MHSDS clerical positions were filled. The HPS I positions and the HPS II positions were filled.

As for custody, the warden and chief deputy warden's positions were filled but the chief deputy was on long term leave leaving a vacancy for that position. All four associate warden positions were filled, with one associate warden on long term leave and one associate warden acting out of class leaving two functional vacancies for a 50 percent functional vacancy rate. Four of the seven captain positions were filled leaving three vacancies for a 43 percent functional vacancy rate. Twenty-two of 23, or 96 percent, of lieutenant positions were filled with one lieutenant on long term leave and one acting out of class leaving three positions vacant for a 13 percent functional vacancy rate.

For sergeants, 46 of 51 positions were filled, but two sergeants were on extended leave and four were acting out of class leaving 11 vacancies for a 22 percent functional vacancy rate. Twenty-seven of 29 CC I positions were filled but one CC I was on an extended leave, and two officers were acting out of class leaving five vacancies for a 17 percent functional vacancy rate. All 13 CC II positions were filled but two were acting out of class leaving two vacancies for a 15 percent functional vacancy rate.

For correctional officers, all 384 positions were filled. However, 13 officers were acting out of class leaving 13 vacancies for a three percent functional vacancy rate.

Telemental Health:

SCC only uses telepsychiatry for nighttime telepsychiatry from 6:00 p.m. to 6:30 a.m. everyday.

SCC reported that only clerical staff worked remotely.

Staff Recruitment:

Recruitment efforts consisted of the chief of mental health attending staffing fairs and personally recruiting the RHU clinician.

The chief of mental health also reported that the largest barrier to staffing included the remote location of SCC and the pay differential between community practice versus state practice. The lengthy process of hiring, which can take up to two months, led some candidates to take other jobs so the institution lost those potential hires.

Quality Management:

A quorum was met during all monthly mental health program subcommittee (MHPS) meetings during the review period. The subcommittee routinely covered program compliance, CMHPP, policy updates/procedure changes, staffing and hiring, quality management, effective communication, improvement priorities/project pipeline, CAT, patient safety, suicide prevention, staff training and inpatient referrals.

Overall, MHPS documentation was useful. The committee appropriately determined the origin of program metrics that were below compliance. However, there was room for improvement in the action plan for RHU pre-screen deficiencies.

During the one month when MHPS documentation was included in the quality management committee documentation, pertinent deficient metrics during the previous month

were included. A multi-disciplinary discussion was needed, given the number of deficient RHU pre-screens and the role of nursing staff in the assessment.

During the site visit, the Special Master's team identified issues related to access to care that had not been documented in quality management forums including CMHPP activities. These issues included emergency mental health self-referrals, emergent primary clinician referrals and timely arrival to scheduled appointments. These areas warranted a multi-disciplinary workgroup. Additional areas for consideration were the increase in violence and substance use at the institution.

Sustainable process audits were not required and not conducted during the review period.

The institution did not have a local governing body.

As with the previous site visit, no QITs or FITs were chartered during the review period and no additional audits were completed.

Suicide Prevention:

The uicide prevention report includes the Suicide Prevention Focused Improvement Team (SPRFIT), Receiving and Release (R&R), Psych Tech (PT) rounds, training and alternative housing. The SPRFIT Coordinator has served as the coordinator for a year and a half along with being the inpatient coordinator, DDP coordinator and training coordinator.

The minutes from November 2024 through April 2025 were provided. A quorum was achieved at each meeting, and minutes were approved without modifications.

Substantive topics discussed with measurable corrective action plans were safety plan documentation for rescinded MHCB for danger to self and lack of completed pre-screens of RHU patients (the pre-screen lacked the 7219-body chart). The problematic areas and follow-up were thorough and discussed until resolved. The specific topics discussed during the monthly

meetings were R&R screens, suicide risk management program, patients on suicide watch/precaution, psych tech rounds, deaths/suicides, and trainings along with IAC meetings and SRE mentors.

The nursing indicator that did not meet compliance during the review was the RHU prescreening. The percentage for the RHU prescreening was 84 percent according to nursing, and the reason was the lack of 7219 chart documentation. Training on this deficiency was conducted for the identified staff.

For mental health staff, headquarters requested monthly self-auditing of all mental health clinicians not completing a safety plan for patients released from an MHCB. The trainings and audits were discussed and monitored during the monthly SPRFIT meeting as documented in the minutes.

Other areas needing improvement were timely urgent and emergent referrals for DTS. The compliance rates were as follows: November 2024, 67 percent, December 2024, 88 percent, and 100 percent reported in the remaining months during the reporting period. There were explanations for the low indicator scores, measurable CAPs or follow up.

According to nursing, there were three self-harm incidents reported during the review period and 66 reported suicide watches. There were no suicides reported during the review period.

The MHCB Alternative Housing LOP was revised on April 2025 and signed by the chief of mental health and CEO on April 29, 2025 and then by the Warden on May 6, 2025. The MHCB Referral/Alternative Housing Admission Procedure did not identify the specific locations and cells used at SCC for alternative housing. The RHU was mentioned but the designated cells assigned as alternative housing cells within the unit were not identified. The Incarcerated

Persons Bad News LOP was revised and signed by the chief of mental health and the CEO in September 2024. The Suicide Response and Prevention LOP was revised in September and signed in October 2024 by the chief of mental health and CEO.

The SPRFIT LOP was revised and signed by the CMF and CEO in January of 2025.

During the site visit, 19 incarcerated persons were scheduled to arrive at the institution on June 17, 2025. The intake process was seamless.

The R&R nurse's intake process included explaining the orientation booklet in English and Spanish if needed. There was confidentiality and the nurse asked all the required questions. When asking about bad news, the nurse elaborated and asked about court, family, cellmates and other interactions that could be perceived as bad news.

Trainings were reviewed with the SPRFIT coordinator and nursing. The SPRFIT coordinator reported that as of January 2025, headquarters put certain SPRFIT trainings on hold while the training was being revised.

During the review period, 100 percent of required staff received safety planning training and the 7-hour SRE training within the last 2 years.

The institution was compliant with SRE Mentor Program training.

Nursing reported 100 percent of staff were up to date with CPR training during the review period although nursing and custody are included in the same compliance rate statistic by the SPRFIT. According to the SPRFIT minutes, 96 percent of nursing/custody staff were CPR trained in November 2024, 98 percent in December 2024, 98 percent in January 2025, 57 percent in February 2025, 63.9 percent in March 2025 and 24.6 percent in April 2025. It was unclear how SCC tracked and calculated nursing and custody CPR trainings together and when the

annual period begins and ends. Nursing CPR training was different from custody CPR training and should have been tracked separately.

According to the SPRFIT minutes, staff who attended Annual IST Suicide Prevention training during the review period had compliance rates of 89 percent in November 2024, 95 percent in December 2024, 99 percent in January 2025, nine percent in February 2025, 11 percent in March 2025, 24.6 percent in April 2025. It is unclear how these percentages were calculated and when the annual period began and ended. There was a footnote that stated, "[t]his is a continuous measure as employees were required to attend during different months of the year."

The psych tech rounds and huddles were adequate. The psych tech conducted daily rounds simultaneously with the administration of medication. The rounds included most areas of inquiry from the daily rounds form, including current suicide risk.

The huddle participants consisted of mental health, psych techs and custody staff. There was one patient on suicide watch awaiting transfer to the MHCB. There were two patients waiting to see the psychiatrist for medication adjustments and multiple 3CMS patients requesting answers about their transfer to a 3CMS RHU.

Medication Management:

Statewide MAPIP monitored compliance with both diagnostic monitoring and medication administration. Diagnostic monitoring included obtaining medication consents, as well as any physical examination, vital signs, or laboratory tests needed for safer medication use. Medication administration monitored compliance with the availability, continuity, and actual administration of medications. SCC provided results from November 1, 2024, to April 30, 2025, regarding compliance for psychiatric diagnostic monitoring and nursing medication management.

For required monitoring of antidepressants, SCC reported 100 percent compliance for obtaining medication consents and monitoring blood pressure for patients who were prescribed venlafaxine. There was compliance for one month and non-compliance for five months with percentages between 50 percent and 85 percent for monitoring thyroid function tests. No EKGs were documented.

Glucose monitoring, CBC with platelets and CMP were compliant for five of the six months in the review period, and there were no EKGs documented. The institution reported compliance with lipid monitoring twice in the six-month review period.

SCC was not a clozapine initiation or maintenance facility. No patients were prescribed clozapine at SCC during the reporting period or the site visit. There was no documentation of patients prescribed Carbamazepine or Lamotrigine during the review period.

Diagnostic monitoring for patients who were prescribed atypical antipsychotics indicated that SCC was compliant for all six months of the review period for Abnormal Involuntary Movement Scale (AIMS), blood pressure, weight, and medication consents. The institution was compliant for five months and noncompliant for one month for monitoring glucose, complete blood count (CBC) with platelets, comprehensive metabolic panel (CMP), and height. There was compliance for two of the six months with monitoring lipids and four of the six months for thyroid monitoring. There were no documented EKGs during the review period.

For patients prescribed Depakote, Depakote levels were 100 percent compliant for one month, and there were no documented patients on Depakote for the remaining five months. CBC with platelets and CMP for patients on Depakote was 100 percent compliant for three months, and there were no documented patients on Depakote for the remaining three months. However, there were no consents for one month and no documentation of required consents for the

remaining months.

Regarding lithium, SCC reported noncompliance for each of the six months of the review period.

Medication administration metrics monitored essential aspects such as medication availability, continuity, preparation, and administration.

For nursing medication management metrics, SCC was compliant for five months with continuity of medications upon parole/transfer to the community, and discharge/transfer from a community hospital and/or DSH. Continuity with medication with intra-institutional transfer to ASU/SHU/PSU and continuity of nurse administered (NA) and direct observed therapy (DOT) medications with intra-institutional transfers (excluding ASU/SHU/PSU) were compliant for two months. Compliance was achieved for one of five months for continuity of mental health crisis bed transfers. The institution was noncompliant for continuity for meds upon inter-institutional transfer at R&R was not achieved during the six-month review period.

Observation and medication management measures of compliance are as follows – Observed medication preparation and administration of HS, AM and PM medications were above 90 percent for the six months during the review period. Medication administration for chronic care medication historical administration by psychiatrist reached compliance for the six months, along with medication administration by outpatient psychiatrist for new medication orders. Medication administration for chronic care medication historical administration by medical providers was compliant for five months, and outpatient medical providers prescribing new medications were compliant for four of the six months.

SCC psychiatry and nursing summarized the reasons for not meeting compliance for certain measures. Corrective action plans or performance improvement plans were not initiated.

Psychiatry leadership reported the reasons for the diagnostic monitoring noncompliance during the review period was due to the small "n", meaning one or two patient refusals or no show negatively impacted the measure due to the small number of patients on the antidepressant or atypical antipsychotic medications. Psychiatry also reported that the lipid monitoring and thyroid monitoring tests were timely for one and two patients during different months, however, their data was not captured on the dashboard.

Nursing documented the reasons for each measure not meeting compliance. The reasons given were patient refusals, vaccines not given timely, scheduling conflict, patients arriving on ten or more medications, late administration of medication, receipts not scanned timely, medications picked up after the due dates and problems with QM accurately reporting data on the dashboard. The reasons for the non-compliance were clearly stated and nursing reported that each compliance incidence was addressed on a case-by-case basis but did not document the interventions to rectify the non-compliances, timeliness, training/education of staff or patients or if interdisciplinary interventions were employed or required.SCC reported that there were 30 patients on NA/DOT medications.

Psychiatric prescriptions were ordered for a maximum 180 days, with bridge orders provided until the next psychiatry appointment.

There were 28 medication line audits which revealed an average patient wait time of four minutes, and no conflict with scheduling. SCC's non-formulary rate averaged 2.1 percent during the review period.

The institution conducted polypharmacy reviews on 16 patients between June 2024 and May 2025 – with psychiatry reviews documented for all except for four patients.

One hundred and fifty-one patients were prescribed a total of 197 medications written at

HS.

There were no SCC patients who received PC 2602 involuntary medications during the review period or at the time of the site visit and no documentation of any petitions submitted.

Transfers:

SCC's inpatient coordinator also served as the DSH coordinator, DDP coordinator, SPRFIT coordinator, training coordinator, and worked in quality management as well. She held the role of inpatient coordinator since her arrival at SCC in the fall of 2023 and previously served as inpatient coordinator at CSP/Sac and at DVI from 2012 through 2020. The inpatient coordinator could not recall there being an inpatient referral since she started at the institution in the Fall of 2023. There were no inpatient referrals during the review period and none pending at the time of the site visit.

SCC made 65 MHCB referrals during the review period resulting in 50 admissions and 15 rescissions. All 65 referrals resulted in alternative housing stays under 24 hours and all 50 admissions timely occurred within 24 hours.

Five patients transferred to EOP RHUs during the review period and all transferred timely.

Forty-four patients transferred to 3CMS RHUs during the review period and 28 of 44, or 64 percent, transferred timely.

Six patients were transferred to EOP programs during the review period.

Five 3CMS patients were transferred to the WSP MSF during the review period.

Healthcare records for the four patients on the non-referral log were reviewed. One patient's level of decompensation warranted MHCB level of care instead of EOP level of care to which he had been referred. One patient appeared to be erroneously on the non-referral log as

his level of care had been appropriately increased from 3CMS to EOP. Non-referral rationale for the remaining two patients needed improvement and individualized treatment modifications.

Programming:

3CMS:

The staff-to-patient ratios from the 2009 Staffing Plan and 2021 adjustments to the 2009 staffing plan required that staff psychiatrists who treat 3CMS patients maintain a caseload of 280 patients per psychiatrist if the patient was prescribed medications and 675 patients if the patient was not prescribed medications. *See* ECF No. 3693 at 12 and 6978-1 at 3.

Staff-to-patient ratios from the 2009 Staffing Plan required that primary clinicians who treat 3CMS patients maintain a caseload of 97 patients per clinician. See ECF No. 3693 at 12. Since SCC had no staff psychiatrist, the one psychiatric nurse practitioner handled all MHMD patients and was within the appropriate caseload ratio. All nine 3CMS primary clinicians had caseloads within the 1:97 caseload ratio with caseloads ranging from 21 to 60 patients.

The majority of 3CMS patients were housed on C Yard, a Level III yard, which was under modified programming as a result of the statewide PSR at the time of the visit. A small group of less than 25 patients resided on B Yard. Treatment space was observed to be confidential.

*IDTTs*

During the site visit, no IDTTs were due and none were scheduled.

Staff and patients reported that primary clinician contacts occurred more often than the 90 days required by the Program Guide. This was confirmed by healthcare record reviews where contacts that went above the Program Guide requirement occurred in rare instances on a weekly basis, and more frequently occurred monthly or bi-monthly.

*Group Treatment*

The facility had an active group program with the majority of groups facilitated by a recreational therapist (RT). Four RT groups were held four days a week and topics included anger management, anxiety/depression, art, cognitive restructuring or prosocial transition, communication, conflict resolution, criminal thinking, post-traumatic stress disorder, self-mastery/life management and victim mentality. A social worker facilitated a group at least weekly. Topics included positive psychology, violence reduction and drop-in psycho-educational groups. Non-MHSDS patients could also request groups.

No groups were held during the site visit due to the statewide PSR.

*Individual Treatment*

The individualized treatment plan for 3CMS patients must be completed within 14 working days of referral/arrival by the patient's primary clinician in consultation with the other IDTT members and annually thereafter. *See* ECF No. 7333-1 at 43-44. (PG 12-3-10). The monitor randomly selected and reviewed the healthcare records of 30 mainline 3CMS patients to assess compliance with Program Guide timeframes during their stays.

All 30 patients required initial IDTTs. Of the 30 reviewed initial IDTTs, 11, or 37 percent, occurred timely within 14 calendar days of arrival or level of care change. All 30 were attended by all required staff and 25, or 83 percent, were attended by the patients. Reasons for initial IDTTs being held *in absentia* included patient refusals and a patient did not have the appropriate clothing to attend the appointment.

For the 187 patients in CDCR's appointments report, there were 206 completed and routine IDTTs. Of the 206 IDTTs that were completed, 21 were for individuals who had at least two IDTTs. Of those, all were compliant with Program Guide timeframes. Of note, the report

did not include individuals that did not have a completed IDTT, such as those that were not scheduled.

Of the 206 completed routine IDTTs, there were two IDTTs completed in zero minutes, 174 completed within 15 minutes, 26 lasted between 16 and 30 minutes, and four lasted between 31 and 60 minutes, and one over 95 minutes.

A random sample of 30 patients was selected to verify consistency between the appointments report and clinical documentation in EHRS. Of the 34 contacts reviewed, all were consistent with the appointments report.

The Program Guide requires that patients are offered an initial psychiatrist evaluation before their initial IDTT. *See* ECF No. 7333-1 at 34-50, 641. Thereafter they are required to receive a routine psychiatric contact every 90 calendar days if the patient is prescribed a psychotropic medication. *Id*. at 44. Patients are also required to receive a primary clinician evaluation within ten working days of arrival and every 90 calendar days thereafter. *Id*. at 41, 48.

All 30 patients required initial psychiatry evaluations; 23, or 77 percent, timely occurred before the initial IDTT. Twenty-seven or 90 percent of the reviewed initial psychiatry evaluations were conducted in confidential settings; no reason was reported for non-confidential contacts. Telepsychiatry was not utilized for initial psychiatry evaluations.

For the 179 patients in CDCR's appointments report covering patients who received at least one routine psychiatry contact during the review period, all 303 contacts were completed contacts. Of the 303 completed contacts, 287, or 95 percent, were reported as being conducted in a confidential setting. When a patient had more than one completed contact, timeliness in accordance with Program Guide requirements was able to be calculated. Of the 303 completed

contacts, 125 were for individuals who were seen at least twice by a psychiatric provider. Of those 125 contacts, two, or two percent, of contacts were completed beyond the Program Guide required timeframes. Of note, the report did not include individuals that did not have complete contacts, such as those that were not scheduled in accordance with the institution's triage plan.

All 30 patients required initial primary clinician evaluations. Of the 30 reviewed initial primary clinician contacts, 17, or 57 percent, were completed within 10 calendar days of arrival or change in level of care. Twenty-six, or 87 percent, of reviewed initial primary clinician evaluations were conducted in a confidential setting; there were no reasons reported for the non-confidential settings except for one contact which was a patient refusal. Telehealth was not utilized for initial primary clinician evaluations.

Of the 303 completed routine psychiatry contacts, no contacts were reported to have been completed in zero minutes, 65 were completed within 15 minutes, 94 lasted between 16 and 30 minutes, 127 lasted between 31 and 60 minutes, and 17 were completed between 61 and 95 minutes.

A random sample of 30 patients was selected to verify consistency between the appointments report and clinical documentation in EHRS. Of the 58 contacts reviewed, all were consistent with the appointments report.

For the 270 patients in CDCR's appointments report covering patients who received at least one routine primary clinician contact during the review period, there were 953 total completed and refused contacts. Of the 950 that were completed, 848, or 89 percent, were reported as being conducted in a confidential setting. When a patient had more than one completed contact, timeliness in accordance with Program Guide requirements was able to be calculated. Of the 950 completed contacts, 684 were for individuals who were seen at least twice

by a primary clinician provider. Of those 684 contacts, seven, or one percent, of contacts were completed beyond the Program Guide required timeframes. Of note, the report did not include individuals who did not have completed contacts, such as those that were not scheduled in accordance with the institution's triage plan.

Of the 950 completed routine primary clinician contacts, two contacts were completed in zero minutes, 325 were completed within 15 minutes, 292 lasted between 16 and 30 minutes, 271 lasted between 31 and 60 minutes, 58 lasted between 61 and 95 minutes, and two were completed in greater than 95 minutes.

A random sample of 30 patients was selected to verify consistency between the appointments report and clinical documentation in EHRS. Of the 107 contacts reviewed, 106, or 99 percent, were consistent with the appointments report, while one of the dates in the appointments report did not have corresponding clinical documentation in EHRS.

Seventeen randomly selected patients from B and C Yards were interviewed. Overall, patients were satisfied with the quality of mental health care. Patients requested unscheduled access to mental health staff, such as office hours or an open line.

Patients reported difficulty accessing mental health for an emergency and a few patients reported that when requesting a mental health referral via custody staff during an emergency, they had to say they were suicidal. At times they were faced with a response by custody that questioned their seriousness, a response which could serve as a disincentive for patients to request mental health services. Other patients reported a need to escalate their behavior and 'go man down,' which did not always result in a mental health referral. As an example, a patient who "threatened to go man down" was discussed during an observed weekly 3CMS supervisory meeting. The sergeant reported that the patient had been assessed by nursing and was not

referred to mental health. Shortly thereafter, the patient tied a sheet around his neck which resulted in the use of OC spray and a resulting MHCB admission.

To a lesser extent, but nonetheless still concerning, other patients reported submitting a 7362 for mental health emergencies which could delay needed care.

The last access concern was reported across patient interviews where interviewees expressed concern that some patients who exhibited odd or unusual behavior were not timely identified or referred to mental health. This concern was discussed with the chief of mental health and the inpatient coordinator.

Some patients reported that they experienced inappropriate responses from custody staff regarding participation in the MHSDS. For example, one patient reported that when in route to a mental health appointment an officer asked where he was going. The patient responded that he was going to a mental health appointment and the officer's response was "you need it."

While the majority of patients on C Yard reported that they were released in advance of their appointments and arrived for appointments on time, both custody staff and patients reported that missing the release time or tower release times impeded or delayed arrival to scheduled appointments. B Yard patients reported that they were often late to their appointments due to waiting at the gate or a delay in release time.

As with other institutions, it was reported that substance abuse impacted programming through increased violence and overdoses.

As of June 17, 2025, there were 22 3CMS patients housed in the RHU. Seven 3CMS RHU patients were placed in treatment modules for interviews. Six patients were housed in the RHU since April 2025 and one patient since May 2025. The patients voiced their frustration

with their therapist's lack of knowledge about transfer and not investigating the reason for not being transferred in the last three months.

The monitor's expert questioned custody and was told that there was a riot in April and the investigation was not completed and SCC, along with the rest of the state, was under a PSR since June 13, 2025, and until the cell searches and investigations were completed on both, transfers would not occur.

Two patients in the RHU were scheduled for an IDTT on June 18, 2025, and both IDTTs were observed. All required staff and patients were present. The patients' biopsychosocial profile were presented along with the patients' diagnoses and prescribed medications. Goals were discussed along with agreed upon interventions tied to the diagnoses and patients' behaviors and symptoms. All staff engaged the patient in the discussion of medication and custody concerns and planned to meet the patients after the IDTT and asked that the patients come to a confidential space to discuss medications and custody questions.

<u>Other Issues</u>:

<u>Pre-Release Planning:</u>

Due to illness, the pre-release coordinator had very limited time to meet with the monitoring team. The majority of the information presented in the report was from the documents provided, as the interview with the coordinator lasted less than five minutes.

SCC had a dedicated LCSW to support the pre-release program along with a secondary LCSW who carried a caseload. There were 11 formally structured pre-release groups offered during the review period.

According to the pre-release coordinator's report, the groups were offered but the attendance was extremely low.

The pre-release coordinators' duties included, but were not limited to, mandatory monthly statewide meetings, bi-monthly ISUDT pre-release meetings for patients on MAT, face-to face contact and review of patients recommended for prison release from the Board of Parole Hearing.

The pre-release local operating procedure (LOP) was revised in April 2024 and signed by the chief of mental health, the warden and CEO on May 1, 2024. Substantive information regarding parole, probation, release of information, completion of the pre-release planning assessment between 45 to 60 days prior to release, a face-to-face appointment between 30 to 45 days prior to release was included in the LOP.

According to the documents, patients who received pre-release planning and required completion of the pre-release planning assessments (PRPA), were not tracked and could not be reported. However, this information was reported during the last site visit in 2023.

According to the documents, there were 26 patients who had a release date within 120 days from the date of the site visit.

Data regarding documentation for releases of information was unclear.

There were 28 patients screened by TCMP. Of the 28 3CMS patients, 18 patient, or 64.3 percent, submitted applications, eight patients, or 28.6 percent, were unavailable and two, or 7.1 percent, refused.

Eighteen patients, or 64.3 percent, of the 28 patients applied for Medi-Cal and zero patients applied for SSI or VA benefits.

According to the documents, there were 1,266 incarcerated persons released from SCC, and 1,260 incarcerated persons were offered screening for Cal-IDs. Six of the 1,266 patients were out to court when released and were not offered screening.

Program Access:

a. Job and Program Assignments

SCC reported that 660 job assignments were held by 96, or 41 percent, of 3CMS patients, and 564, or 15 percent, of non-MHSDS incarcerated persons.

The 388 academic assignments were held by 51, or 22 percent, of 3CMS patients, and 337, or nine percent, of non-MHSDS incarcerated persons.

Of the 150 vocational education assignments, 36, or 15 percent, of 3CMS patients held them, as did 114, or three percent, of non-MHSDS incarcerated persons.

The 673 voluntary education assignments were held by 84, or 36 percent, of 3CMS patients, and 588, or 15 percent, of non-MHSDS incarcerated persons.

The seven substance abuse treatment assignments were held by one 3CMS patient and six non-MHSDS incarcerated persons.

b. Milestone Credits

SCC reported that they did not offer milestone credits as they did not have an EOP program.

c. Out-of-Level Housing

SCC reported that six 3CMS level I patients and four level III patients were in level II housing. There was one level I EOP patient in level III housing, and one level IV EOP patient in level III housing. There were three level I 3CMS patients in level III housing, and 48 level IV 3CMS patients in level III housing. The CDCR regional custody administrator reported that each incarcerated person was placed with an override or was awaiting a transfer endorsement or referral. After review, all endorsements and casework were appropriate.

d. ADA Reasonable Accommodation and Grievance Procedure

SCC provided an updated reference training manual for ADA accommodations as well as attendance sheets for training on accommodation and grievance procedures.

e. Periodic Classification Score Reductions: EOP Patients

SCC was not an EOP facility.

"C" Status:

SCC reported there were 28 "C" status patients including seven 3CMS patients and 21 GP incarcerated persons. During the reporting period, SCC reported that three 3CMS patients were on "C" status . "C" status patients were clustered together in one building on facilities B and C. The clustering of "C" status patients was not the result of any formal documentation but was reported to be an informal local practice to cluster patients so that custody officers can easily track their yard and other privileges. It was also reported by SCC custody leadership that "C" status patients in B yard would be inappropriately mixing with other incarcerated persons in the dorm setting of B yard if they weren't clustered together in housing that is not a dorm setting. Case factors for current "C" status included receiving more than two RVRs in the past six months including failure to work, absence from work, fighting, and assault on a peace officer.

SCC mental health leadership reported that 3CMS patients on "C" status programmed the same as all other mainline 3CMS patients.

Case-by-Case Reviews:

SCC had no patients who required either 150-day case reviews or the 90-day MERD reviews.

Mental Health Referrals:

During the review period, SCC made 936 mental health referrals with 121

referrals to psychiatry and 815 referrals to primary clinicians. There were 121 emergent referrals, 152 urgent referrals, and 663 routine referrals.

Overall, SCC reported compliance for timely responding to emergent, urgent and routine psychiatry referrals, and urgent and routine primary clinician referrals. There was non-compliance for timely responding to emergent primary clinician referrals.

Specifically, 16 of 17, or 94 percent, of emergent psychiatry referrals had timely responses. For emergent primary clinician referrals, 77 of 102, or 75 percent, were compliant. For urgent psychiatry referrals, all five psychiatry referrals were compliant. One-hundred thirty seven of 143, or 96 percent, urgent referrals to primary clinicians were compliant. There were timely responses to 97 of 99, or 98 percent, of routine psychiatry referrals and 395 of 399, or 99 percent, of routine primary clinician referrals.

Custody and Mental Health Partnership Plan:

SCC's custody and mental health partnership plan LOP complied with statewide policy and was last updated in October 2024.

Executive leadership joint rounding occurred during all six months of the review period on Facilities B and C and in the RHU. Rounding forms indicated generally positive relations between custody and staff, however there were indications about patients disliking a newly hired custody officer, concerns with patients having PTSD related to firefights, and a desire from staff for telehealth.

Executive joint rounding was discussed in detail for two of six months of executive staff meetings; the minutes for the other four months were not produced due to staff turnover. Executive joint rounding was discussed in detail for all six months of quality management committee and mental health program subcommittee meeting minutes.

Monthly joint supervisory tours occurred for all six months of the review period on Facilities B and C with required staff in attendance for each tour. Staff reported substance abuse concerns and overdoses, specific patient mental health concerns, collaborative relationships between custody and mental health staff. Patients reported general satisfaction with the mental health services provided although sometimes they received the wrong ducats and custody officers were occasionally insensitive towards mental health concerns.

Weekly 3CMS supervisory meetings occurred weekly throughout the review period. Required staff typically attended and patients returning from higher levels of care or exhibiting unusual or bizarre behavior were noted. An observed weekly 3CMS supervisory meeting was observed as well. The meeting was attended by the program supervisor and sergeant; they knew their patients very well, clearly had great rapport, and were extremely collaborative. They noted one issue from earlier that day wherein a patient attempted suicide by tying a sheet around their neck and threatening staff. They also noted patient reports of tablets getting shut off and staff reports of the statewide PSR upsetting patients. Fentanyl and spice overdoses were also reportedly highly prevalent.

SCC distributed the 3CMS orientation brochure to new patients and provided English and Spanish copies of the same.

The Facility A and B IAC met for all six months of the review period and the Facility C IAC met for four of the six months. Meeting minutes indicated patient concerns with low blanket and pillow inventory, grievances with canceled food sales, concerns with 602 grievances and the staff misconduct process, issues with tablet functionality, general population and mental health incarcerated persons living together on certain yards, a mental health awareness program, and art competitions resulting in lost and missing supplies.

SCC was unable to provide staff misconduct complaints filed against mental health staff. There were 58 filed against custody staff; four had been rejected but the status of the rest were unknown.

There were no investigations for misconduct towards a patient not initiated through the appeal process. No staff members were reassigned because of misconduct complaints.

All required mental health staff and 806 of 811, or 99 percent, of custody staff attended the annual partnership off-post training.

SCC was unable to provide which staff had not completed the quarterly roundtable training and, thus, compliance could not be ascertained.

Heat Plan:

The updated LOP followed the statewide LOP for heat plan. In addition, SCC produced memorandum number 170425 which delineated ice distribution measures during stage one heat alerts.

As the review period was outside of the months of heat plan, no MSRs were produced.

All interviewed housing officers knew the stages of the heat plan and understood how to access cool water and ice for patients. Patients on heat medication were allowed to remain in the day room when Stage I was activated. Further, officers logged temperatures appropriately from analog thermometers on the highest tier of the unit. Of note, the thermometers were old and behind caging material which made them very difficult to read without a flashlight. Custody officers in one unit put in a request for digital thermometers and the statewide mental health compliance captain reported that if the digital, wifi thermometer pilot program was successful at the pilot institutions, all institutions would receive digital thermometers. However, the

institution's health care captain reported that this institution loses power often and he would like to keep the analog thermometers as back up.

The heat litigation coordinator reported reviewing the heat logs, monitoring the monthly summary reports, and coordinating DARs when the heat plan was activated.

The warden, chief deputy warden, all four correctional administrators, all four captains, all 54 lieutenants, all 87 sergeants, and 620 of 623, or 99 percent, of correctional officers completed the annual heat pathologies training course. All mental health staff, including nursing, completed the required training.

RVRs:

SCC issued 5,833 RVRs during the review period, including 507, or nine percent, to MHSDS patients and 5,326, or 91 percent, to non-MHSDS incarcerated persons; those 507 RVRs were issued to 16 MHCB patients, two EOP patients, and 489 3CMS patients.

The monitor reviewed ten RVRs to assess compliance with CDCR policy. MHAs were timely requested in seven, or 70 percent, of cases and timely completed and returned to custody in all ten cases. Seven, or 70 percent, were completed confidentially. No reviewed MHAs indicated that patients' mental illnesses strongly influenced the behavior; accordingly, no RVRs required documentation in an alternative manner. Two MHAs indicated that patients' mental health contributed to the behavior which led to the RVR.

The SHO documented consideration of the clinician's MHA in all ten reviewed cases. The reviewing clinicians recommended penalty mitigation in three, or 30 percent, of cases; of those three, the SHO mitigated penalties in one instance. There were also three other instances where a clinician did not recommend penalty mitigation and the SHO mitigated penalties anyways. SHU terms were assessed in four of ten, or 40 percent, of reviewed incidents.

MHA training was attended by all required mental health staff and 767 of 779, or 98 percent, of required custody staff.

Use of Force:

SCC reported two controlled and 134 immediate uses of force during the review period; both controlled and 32 of the 134, or 24 percent, of the immediate uses of force involved MHSDS patients. One controlled and 13 immediate use of force incident packets were reviewed to assess compliance with policy guidelines, as well as video footage for 11 immediate use of force incidents. The video footage of the one controlled incident had no handheld camera footage and no actual footage of the force being applied; training was conducted as a result.

All 11 reviewed incident packets and AVSS footage for ten of the 11 reviewed incidents revealed no concerns. AVSS footage for one reviewed incident, however, revealed possible excessive force by the officer wherein an officer threw eight punches at an incarcerated person. The incarcerated person initially battered the officer by throwing his tray of food in the officer's face while in the dining hall; the officer, however, threw punches at the incarcerated individual, chased that individual, and continued throwing punches at that individual while the incarcerated individual was covering his own head and not attacking back. Documentation of the executive review process was provided substantiating that the incident had been closed.

The annual use of force training was attended by 770 of 776, or 99 percent, of custody staff and all applicable mental health staff.

Lockdowns/Modified Programming:

One modified programming period was initiated during the review period. The PSR was initiated on Facility C after two riots occurred in two days as well as an increase in the discovery of weapons, physical altercations, and incarcerated persons possessing and under the influence of

controlled substances in the 30 days preceding the riots. The modified programming period lasted 14 days and mental health programming was not affected.

At the time of the site visit, Facility C was also under modified programming as a result of the statewide PSR for level III and level IV yards which went into effect on June 12, 2025. Priority ducats were honored, but groups were not meeting.

Access to Care:

A review of SCC's monthly Health Care Access Quality Reports from November 1, 2024, to April 30, 2025, reflected the issuance of 5,619 mental health ducats and add-on appointments, of which 4,579, or 81 percent, were completed and 1,040, or 19 percent, were not completed. Of the non-completed appointments, 94, or nine percent, were reportedly not completed due to custody factors, 586, or 56 percent, were due to non-custody factors, and 360, or 35 percent, were due to patient refusals. Mental health leadership reported that when the institution went on modified programming, mental health ducats were not able to be completed due to staff not being able to go cell front to see patients accounting for some of the non-custody factors for non-completed ducats.

*Coleman* Postings:

*Coleman* postings in both Spanish and English were seen in each housing unit's main yard. Specific housing units did not have posters in their day rooms. On-site custody staff reported that although custody staff replenish posters regularly, patients take the posters for personal use as soon as they were posted and it was difficult to keep the posters in place.

**APPENDIX A – 27**
**VALLEY STATE PRISON (VSP)**
Site Visit: March 18, 2025 – March 21, 2025
Review Period: August 1, 2024 – January 31, 2025

Census:

On March 14, 2025, VSP housed 3,039 incarcerated persons which was comparable to the prior review period. S*ee* Thirtieth Round Monitoring Report – Part C, ECF No. 8095 at 346. (reporting VSP population of 3,024 incarcerated persons during the Thirtieth Monitoring Round). The MHSDS population of 1,298 patients represented 43 percent of the institution's population and was a four percent decrease from the prior review period. *See* Thirtieth Round Monitoring Report – Part C, ECF No. 8095 at 346. (reporting VSP population of 1,355 MHSDS patients during the Thirtieth Monitoring Round)

There were 288 mainline EOP and 992 mainline 3CMS patients; two of these EOP and 13 of these 3CMS patients were housed in the OHU.

One patient was housed in alternative housing, 16 MHSDS patients were housed in RHU, and one additional incarcerated person's level of care was unclassified.

Staffing:

As of March 5, 2025, the chief psychiatrist position was vacant and had been since 2021. For staff psychiatry, the one on-site allocated position was filled by two registry psychiatrists (accounting for 1.31 positions) who maintained low or no caseloads and were used for institution-wide coverage, including for patients who refused telepsychiatry.

All six allocated telepsychiatry positions were filled. Overall, accounting for on-site and telepsychiatry positions, there were no vacancies among staff psychiatry positions.

All six medical assistant positions were filled.

One of two chief psychologist positions were filled by the chief of mental health. All three senior psychologist supervisor positions were filled. Four of 4.5 senior psychologist specialist positions were filled for an 11 percent vacancy rate.

Of the 20.5 allocated staff psychologist positions, 17.5 were filled for a 15 percent vacancy rate.

The supervising social worker position was filled, as were 14 of 14.5 social worker positions reflecting a three percent vacancy rate; two social workers were unlicensed. Three social work interns were staffed as well.

Ten recreation therapists filled the 8.5 allocated positions.

The senior psych tech position was filled.

The OSS II, 2.5 HPS Is, HPS II, and AGPA positions were all filled. The CHSA position was vacant.

All 13.5 mental health clerical positions were filled.

As for custody staffing, on February 20, 2025, the warden position was filled by VSP's chief deputy warden acting out of class. The chief deputy warden and all four associate warden positions were filled. The four captain positions were filled; one was filled with staff acting out of class, and another was on long-term leave, reflecting a 50 percent functional vacancy rate. Twenty-two of 25 lieutenant positions were filled for a 12 percent vacancy rate; two lieutenants were on long-term leave, and one was acting out of class resulting in a 16 percent functional vacancy rate.

Fifty-five of 60.4 allocated sergeant positions were filled for a nine percent vacancy rate; three were on long-term leave, and two were acting out of class resulting in a 12 percent functional vacancy rate.

Twenty-five of the 26 allotted CCI positions were filled for a four percent vacancy rate; one was on long-term leave and two were acting out of class resulting in a 15 percent functional vacancy rate.

All nine CC II positions were filled; one was on long-term leave and another was acting out of class resulting in a 22 percent functional vacancy rate.

VSP reported that 469.8 correctional officers filled 428.8 allocated positions; 28 were on long-term leave and seven were acting out of class.

<u>Telemental Health</u>:

Similar to the preceding review, telepsychiatry provided the vast majority of VSP's psychiatry services during the review period. The three EOP and three 3CMS full-time telepsychiatrists had visited the institution during the prior three months reflecting compliance with policy. These telepsychiatrists typically worked from home; one reported working from a hub. They worked with treatment teams and custody staff, frequently consulted with each other for continuity of care and to share best practices, and rarely encountered technology issues.

<u>Telework</u>:

The two registry psychiatrists did not carry caseloads and worked on a hybrid schedule. Additionally, the three senior psychologists worked a hybrid schedule of three days on-site and one day off-site per week; the four senior psychologist specialists worked two days on-site and two days off-site per week; all MHSDS clerical staff, HPS I staff, and HPS II staff worked four days on-site and one day off-site weekly; and the AGPA worked three days on-site and two off-site per week.

<u>Staff Recruitment</u>:

VSP's recruiting efforts included posting staff openings on the state's "Cal Careers" website and participating in various career fares and a psychology internship program in partnership with the APA through which interns were considered for employment at VSP.

<u>Quality Management</u>:

VSP held monthly QMC meetings during the review period, which included discussion of improvement initiatives, system surveillance, policy review and approval, approval of subcommittee minutes, and an open forum. While a quorum was achieved at each meeting, there was no representation by psychiatry at any of the meetings and the September 2024 meeting also had no mental health representative. Data from the MHPS were reviewed quarterly, including October 2024 and January 2025; overall, these minutes were adequate and reflected a functioning quality improvement system.

The MHPS reported to the QMC. Meetings were held monthly, and quorums were achieved, yet no psychiatrist was present for any of the meetings. The MHPS had quality improvement projects aimed at addressing cancelled treatment hours, ordering Depakote levels, lipid monitoring, and routine monitoring of several performance measures during the monitoring period.

The psychologist overseeing the mental health quality management processes noted that the team continued to monitor several areas and responded proactively when concerns were identified. Specifically, quality management staff routinely monitored daily and weekly reports, addressing any noted concerns directly or with applicable psychiatrists or clinicians to ensure adherence to expectations and avoid sub-threshold findings in monthly data.

Sustainable process reviews were required to audit higher level of care (HLOC) consideration documentation for quality and to measure the inter-rater reliability between the headquarters' reviewer and the institution's inpatient care coordinator. No studies or audits occurred during the monitoring period beyond routine monitoring of automated metrics and sustainable process audits. There was a multidisciplinary workgroup monitoring health care incident reports (HQIRs) to identify and intervene when potential issues were identified; while not a formal study, the group worked to ensure that patterns did not develop into systemic problems. The methods for disseminating information from quality management meetings to line staff were not clear; the quality management psychologist reported that no regular staff meetings occurred and, while it was expected that supervisors would share relevant information with staff, no mechanism was in place to ensure the same.

Peer review was completed in November 2024 with eight out of eight psychiatrists reviewed; no significant concerns were identified.

Overall, the mental health quality management process was adequate; however, improvements could be made to ensure the inclusion of a psychiatric provider and dissemination of information to line staff.

Suicide Prevention:

During the monitoring tour, there were no opportunities to observe the intake screening process. Data indicated that approximately 57 individuals arrived at VSP during December 2024 and 49 arrived during January 2025. Review of 20 patient health records randomly selected from this period confirmed the presence of timely initial health screenings in which all mental health questions were documented.

Monthly SPRFIT data for the review period indicated nursing intake screenings were conducted appropriately 100 percent of the time. However, SPRFIT meeting minutes for December 2024 indicated that a regional audit found that not all mental health questions were asked by nurses during the screenings. A CAP was developed that required nursing managers to audit and assess the completeness of ten intake screenings each month. Auditing began in February 2025 and results were not available at the time of the monitoring tour.

With respect to RHU intake, at the time of the monitoring tour, incarcerated persons new to RHU were placed in one of the four retrofitted RHU intake cells on Facility A, building four. Overflow cells for new RHU intakes rarely needed to be used and, typically, one or two RHU intake cells were occupied. All RHU intake and overflow cells were empty when toured on March 18, 2025. The RHU sergeant reported that the use of RHU intake cells was carefully monitored through SOMS to ensure individuals were not removed from intake cells prior to 72 hours after arrival. The retrofitted RHU intake cells were suicide resistant. The psych tech reported that, prior to individuals being placed into an RHU intake cell, two books were placed in the cell and individuals could exchange these books weekly during library time on Mondays. Individuals new to RHU also receive an orientation packet, weekly menus with word search, sudoku, and crossword puzzles. Other mental health packets are available upon request.

Daily psych tech rounds occurred each morning in the RHU for all individuals in the RHU using the Guard One tracking system; rounds were documented in the EHRS only for MHSDS patients. While documentation for February 2025 indicated 100 percent compliance with psych techs completing rounds on all individuals in RHU each day, review of psych tech rounds for ten patients placed in RHU during the review period found that three or 30 percent were missing documentation of these rounds for one or two days. Additionally, psych tech

rounds for five of these patients indicated a status for medication adherence that was inconsistent with the corresponding entry in the medical administration record. Two of the ten patients in this sample had significant behaviors noted in their rounds that involved self-injury or smearing feces. These behaviors were not reflected in IDTT meetings that occurred later the same day, suggesting either challenges in communication between the psych tech and the rest of the treatment team or challenges in IDTT meeting documentation.

The RHU psych tech on duty at the time of the monitoring tour reported that custody officers did not accompany her on mental health rounds but were immediately available from the open common area where they were stationed and had full view of the rounds. She reported that she felt very safe in RHU and while conducting rounds. If she had concerns about an individual who was not receiving mental health services, the psych tech referred the individual to a mental health clinician and developed a progress note to document her concerns and the referral.

With respect to suicide risk assessments, SPRFIT data indicated that 98 percent of suicide risk evaluations were completed timely during the review period. A review of 40 patient records with emergent or urgent referrals for suicidal ideation or behavior found suicide risk evaluations completed as required for 36 or 90 percent of patients. Three or eight percent of the 40 patients had safety plans developed at the time of the SRE; only one of the three safety plans was adequate.

The SPRFIT coordinator reported that formal training on the new SRE form, which had been in use since late 2024, had not yet been finalized and distributed to institutions. The audit evaluating SRE quality had been suspended since the new SRE form was put in place, and no formal evaluation of the quality of new SREs had been conducted at VSP as of the time of the monitoring tour.

Consistent with statewide policy and the LOP, patients were placed in temporary holding cells for no longer than four hours. Temporary holding cell logs for Facility A during January 2025 indicated 14 temporary holding cell placements; the longest any individual remained in a temporary holding cell was two hours and 20 minutes with an average length of one hour and five minutes.

The monitor reviewed documentation for 30 discharge custody checks completed during the review period. Both pages of the discharge custody check forms were completed in at least 90 percent of reviewed cases.

During the review period, VSP's SPRFIT was composed of the SPRFIT coordinator who chaired SPRFIT meetings, the chief of mental health, a psychiatrist, a supervising RN, a unit supervisor, the CHSA, the inpatient coordinator, and the health care access captain. Approved designees attended when voting committee members were absent and between seven and 13 additional non-voting guests attended each meeting. SPRFIT monthly meeting minutes during the review period indicated that quorums were obtained for each meeting except for the October 2024 meeting when no psychiatrist attended.

Meeting minutes[125] included discussion of improvement projects, system surveillance data, suicide prevention program administration topics, and detailed review of serious suicide attempts and suicides of former VSP patients when the suicide occurred soon after transfer from VSP.

CAPs and quality improvement plans developed during 2023 and 2024 addressed emergency medical response, use of previous documentation without updates, premature 3CMS

---

[125] The January 28, 2025 suicide at VSP occurred after the January 2025 SPFIT meeting and was, therefore, not reflected in the January 2025 SPFIT meeting minutes.

discharge, nursing responses to patient health services requests, safety planning, scheduling and conducting timely initial and follow-up primary clinician and psychiatric appointments, and ensuring that multidisciplinary communication was documented in the health record and not just in emails.

Enrolling eligible patients in the suicide risk management program was noted to be a persistent challenge due to systemic tracking issues in OnDemand. The problem was initially submitted for correction in March 2024 and elevated to CDCR headquarters quality management in December 2024. SPRFIT minutes indicated that the issue with OnDemand tracking was occurring statewide. SPRFIT data for the review period indicated that, on average, only 56 percent of eligible patients were enrolled in the suicide risk management program.

Overall, although the SPRFIT was robust, additional SPRFIT monitoring of the completion and accuracy of psych tech rounds in the RHU was needed.

Records of ten additional patients placed in alternative housing during the review period due to danger to self were randomly selected and reviewed for the presence and quality of SREs. All ten received timely and adequate SREs. Five were admitted to MHCB care, and the MHCB referral was rescinded for five patients. Safety plans were developed for only two of the five rescinded patients; both safety plans were of poor quality and inadequate to meet the patients' treatment needs. SPRFIT meeting minutes for December 2024 indicated a regional audit similarly found that safety plans for rescinded MHCB referrals were not consistently completed or were of inadequate quality when completed. VSP developed a CAP–its second for 2024 on this topic–which included provision of an hour-long refresher training to the CIT on January 28, 2025 and monthly auditing of ten safety plans beginning in February 2025. Content of the safety

planning training was excellent but, with 49 high-density slides, it was unlikely that the hour devoted to the training was adequate.

The SPRFIT coordinator reported that the volume of self-injurious behaviors at VSP doubled from 2023 to 2024 (though the typical severity of these behaviors remained low) and was attributable to two factors: first, an increased presence and use of illicit substances at VSP led to an increase in drug debts and self-injury was utilized to transfer to an MHCB and postpone or avoid paying these debts; second, a recent change in RHU policy prohibited custody from placing individuals in RHU pending an investigation for safety concerns so incarcerated persons were turning to self-injury as a strategy to achieve transfer.

Fifty-two incidents of self-harm involving 36 individuals occurred during the review period, including one suicide. Of the 52 incidents, two or four percent involved patients on MHCB status in alternative housing, 29 or 56 percent involved EOP patients, 18 or 34 percent involved 3CMS patients, and three or six percent involved GP individuals who were not receiving mental health services. One incident resulted in death, another in severe injury, three in moderate injury, 37 or 71 percent in minor injury, and ten or 19 percent in no apparent injury. Eight or 15 percent of incidents resulted in medical care at an outside hospital, 19 or 36 percent resulted in a MHCB referral, three or six percent resulted in a transfer to a different custody housing program, and 22 or 42 percent resulted in a return to the previously assigned housing program.

The suicide at VSP involved a 3CMS patient and occurred on January 28, 2025. This was the first suicide at VSP since April 20, 2023, when another 3CMS patient died by suicide. The final case review for January 28, 2025 death occurred on March 11, 2025. Three quality

improvement plans were developed by CDCR headquarters which were received by VSP the week prior to the site visit and had not yet been implemented.

Medication Management:

CDCR's MAPIP monitored compliance with diagnostic monitoring and medication administration. Diagnostic monitoring included obtaining medication consents, as well as any physical examination, vital signs, or laboratory tests needed for a medication. Medication administration audited compliance with the availability, continuity, and actual administration of medications. Categories must meet the 90 percent threshold to be compliant.

MAPIP

VSP provided MAPIP results for August 1, 2024 through January 31, 2025 regarding compliance for psychiatric diagnostic monitoring and medication management.

Diagnostic monitoring for patients prescribed antipsychotics showed that VSP was compliant during the review period for obtaining blood pressure, blood glucose, height, comprehensive metabolic panel (CMP), complete blood count (CBC) with platelets, lipids, weight, medication consents and Abnormal Involuntary Movement Scale (AIMS) testing. VSP was compliant for four months for EKGs. There was partial compliance during the monitoring period for obtaining thyroid function tests.

VSP was not an authorized clozapine initiation or maintenance facility during the review period. No VSP patients were prescribed clozapine during the site visit.

For required monitoring of antidepressants, VSP reported compliance for six months for medication consents and for blood pressure monitoring for patients prescribed venlafaxine. There was partial compliance for obtaining thyroid function tests. Data was not present for obtaining EKGs.

Carbamazepine is a mood-stabilizing medication requiring four metrics: CBC, CMP, medication level, and medication consent. VSP provided incomplete data for carbamazepine.

Depakote is a mood-stabilizing medication requiring the same four metrics as carbamazepine. For patients prescribed Depakote, there was partial compliance for all the relevant metrics.

Lamotrigine is a mood stabilizing medication which requires only one MAPIP metric, namely obtaining medication consents. The mood stabilizer lithium required medication consents, and monitoring of kidney and thyroid function, EKG, and therapeutic medication levels. Regarding lamotrigine and lithium, VSP reported incomplete data regarding the relevant metrics except compliance was present for obtaining lithium consents for five of the six months of the monitoring period.

During the review period, VSP had instituted some processes to improve the MAPIP measures. MAs sent out a weekly report to all psychiatrists regarding labs, EKG's, consents, and polypharmacy reviews that needed to be completed within the next month. The number of patients being measured was small and refusals made up approximately half of the late labs. VSP was currently working on monitoring this measure and discovering ways to improve.

VSP also reported that their compliance rates were adversely affected by the new MAPIP guidelines that were released during August 2024 which changed various laboratory metrics. At the time of the site visit, there were two Green Belt projects (lipid monitoring and Depakote monitoring) and one Quality Improvement project (AIMS) were in process.

The VSP medication management subcommittee met on a monthly basis during the monitoring period and was very diligent in reviewing, monitoring and correcting medication

management issues. A nursing subcommittee also reviewed and monitored relevant nursing medication metrics, which included monthly online wait time audits.

Medication Administration

MAPIP medication administration metrics monitored essential aspects such as medication availability, continuity, preparation, and administration. For medication management metrics reported by mental health headquarters, VSP was compliant for six months for continuity of medications upon inter-institution transfer at receiving and release, continuity of nurse administered (NA) and direct observed therapy (DOT) medications with intra-institutional transfers (excluding ASU/SHU/PSU), medication continuity following discharge/transfer from a community hospital and/or DSH, upon parole/transfer to the community, observation of medication preparation and administration HS, chronic care medications historical administration, for observation of medication preparation, administration AM and PM and outpatient provider new medication orders. There was compliance for four months for continuity of medications for MHCB transfers, and three months of compliance with intra-institutional transfer to ASU/SHU/PSU.

Medications were received from a window on the yard on Facility B, C, and D. For those incarcerated persons receiving their medications and yard, there was an awning over two of the medication windows. The two other awnings needed to be repaired due to recent weather damage. There was a large steel frame canopy in the vicinity of the medication windows for patients to wait under if they choose to.

RHU distributes medications cellfront. EOP, buildings A1 and A2 have medication distribution lines in the housing unit

There were 1877 DOT/NA medications for 787 patients.

MAPIP measures tracked compliance with the administration of medications given at HS (*hora somni,* or bedtime) which must be given on or after 8:00 P.M. (HS), and medications given in the A.M. and P.M. which must be given at least eight hours between doses (A.M./P.M.). Additionally, metrics evaluated whether chronic psychiatric medications were continued without interruption (Chronic), and whether new medications were administered as ordered, and in compliance with required timelines (New). There were 358 patients prescribed mental health HS medications. A significant number of HS meds were given prior to 8:00 PM.

<u>PC 2602 Issues</u>

During the site visit, 23 patients were prescribed PC 2602 involuntary medications. PC 2602 data relevant to the monitoring period was as follows: During the monitoring period, 50 patients received PC 2602 medications. Of them, nine emergency petitions were initiated and granted and 11 non-emergency PC 2602 petitions were initiated and granted. VSP filed 30 petitions for renewal and each was granted. Five PC 2602 had a non-renewal form filed and ten expired without a non-renewal form filed.

<u>Non-Formulary</u>

The average percentage of non-formulary medications was 9.5 percent during the monitoring period.

At the time of the site visit there were four polypharmacy reviews overdue (with due dates outside of the review period). During the review period, there were 177 reviews completed. All polypharmacy reviews were done in population management, which occurs every two weeks, ensuring that they are for the most part completed timely.

The average percentage of non-formulary medications was 9.5 percent during the monitoring period.

KOP Medications

Per CDCR policy, psychiatrists were allowed to prescribe SSRIs, the SNRI duloxetine, and melatonin as KOP for appropriate patients at the 3CMS level of care. There were 89 non-SSRI medications prescribed as KOP. Of them, 84 were melatonin. Three KOP medications were Biotin mouth wash prescribed KOP for convenience.

Summary

VSP has a robust management subcommittee and nursing subcommittee that reviews, monitors, and attempts to correct medication management/administration issues. Related to new MAPIP guidelines, VSP experienced some compliance issues regarding medication management. However, in general VSP's medication management processes were functioning well.

Transfers:

VSP's inpatient coordinator was a senior psychologist specialist who had been at VSP for approximately three and a half years and served as inpatient coordinator for approximately two years.

During the review period, VSP made one acute and 15 intermediate care referrals resulting in one acute and 11 intermediate care admissions, and four intermediate care rescissions. All admissions were timely.

No inpatient referrals were for patients with complex medical needs.

During the review period, there were 123 instances of 82 patients considered for, but not referred to, inpatient care.

During the review period, VSP conducted monthly audits of the records of patients who were identified as needing consideration for a higher level of care but not referred. In August, compliance ranged from 87 to 100 percent, with deficiencies including documentation that was

not updated, insufficient exploration of the patient's refusal to attend treatment, insufficient rationale for non-referral, failure to address triggering factors, and contradictions in documentation. The audit results noted that, in August and September, there were instances where IDTTs had failed to recognize a HLOC trigger and were required to complete a "corrective" IDTT. The monitor's expert found evidence of corrective IDTT documentation in patient records.

Ten patients' records were reviewed to assess the quality of the rationale for non-referral as well as the treatment modifications planned to mitigate the need for HLOC. In six of the cases reviewed, the rationale for non-referral was adequate and sufficient treatment modifications were planned. One case included contradictory information in the rationale for non-referral, including that the patient's mental illness was a factor in his frequent RVRs, but later documenting that his mental illness was not a contributing factor. Two cases included multiple instances of non-referral without sufficient updating of the language in the patients' treatment plans supporting the rationale for non-referral and treatment modifications. The fourth case did not include adequate treatment modifications given the patient's identified needs. Several patients were flagged for frequent MHCB admissions which appeared to be initiated to influence the patient's housing or address safety concerns. A number of these cases did not include provisions within the patients' safety plans to address this issue despite an indication to do so.

Overall, decisions not to transfer patients to a higher level of care when indicators were present were generally documented adequately and appropriate treatment modifications were generally included in patients' treatment plans. On the other hand, the lack of updated documentation for patients with ongoing triggers for consideration for higher levels of care,

internally inconsistent documentation in one case, and one case of inadequate treatment modifications was concerning. There was also a failure to use safety planning adequately to support behavior change.

A major sustainable process visit was completed in September 2024 which covered April 1 to June 30, 2024. The associated report referenced one discrepancy between VSP and headquarters' HLOC audits; VSP found 93 percent of the cases acceptable and headquarters found 89 percent (one fewer case) acceptable. The discrepancy was due to the rationale not being updated in a subsequent treatment plan, yet regional staff found the case to be in line with VSP's findings given that the interventions were updated appropriately. Further, headquarters staff identified several quality issues in IDTT documentation and instructed VSP supervisors to review the findings with individual clinicians.

Accordingly, the sustainable process was functioning adequately at VSP.

The Special Master's expert reviewed the nine cases of patients who were recently referred for transfer to a psychiatric inpatient setting. Eight of the nine cases included modifications or enhancements to treatment that would be provided to the patient while awaiting inpatient transfer. In seven of the eight cases with enhancements listed on the patients' treatment plans, the treatment enhancements were followed, and the patient received appropriate care while awaiting transfer; in one case, the plan was for the primary clinician to see the patient twice weekly until he transferred, but this did not occur.

Overall, patients awaiting transfer to inpatient settings did not experience unnecessary delays, and eight of nine patients whose cases were reviewed received adequately enhanced treatment while awaiting transfer.

No issues were reported regarding proper notification of patients returning from inpatient settings. Records of nine patients who were most recently discharged from an inpatient setting were reviewed to determine if continuity of care was achieved; clinician-to-clinician contacts were completed in seven of nine or 78 percent of cases. All but one of the completed clinician-to-clinician contacts was conducted by a VSP psychologist who was not the patient's assigned primary clinician. In one case where no contact was completed, an attempt to conduct a clinician-to-clinician contact with a DSH clinician was documented, but the contact was not completed secondary to no response from the DSH clinician. In two of the nine cases reviewed, the patient's treatment course and ongoing needs identified during the inpatient stay were not properly integrated into the patient's treatment plan upon return to VSP. Overall, the documentation of these contacts was mostly superficial and indicated a need to review the discharge summary for more complete information.

Overall, VSP IDTTs were generally integrating information from patients' recent inpatient placements into their treatment plans upon return to VSP. Improvement in clinician-to-clinician contact documentation would help enhance the integration of patients' ongoing treatment needs; the patient's VSP primary clinician completing the contact would be helpful as well.

No information on *Vitek* hearings was provided.

VSP made 208 MHCB referrals during the review period resulting in 128 admissions and 80 rescissions; 126 of 128 or 98 percent of admissions and 76 of 80 or 95 percent of rescissions timely occurred within 24 hours of alternative housing placement. Reasons for transfer delays were not provided.

Twenty-three of 35 or 66 percent of patients timely transferred to EOP RHUs and 64 of 77 or 83 percent of patients timely transferred to 3CMS RHUs; most delays stemmed from enemy concerns and non-designated programming facility failures.

Seventy-seven patients' levels of care changed from EOP to 3CMS during the review period.

Four patients were transferred to an MSF during the review period.

Programming:

MHSDS Patients in Restricted Housing:

The RHU had 44 cells and a total capacity of 88 incarcerated persons. At the time of the monitoring tour, five EOP and 11 3CMS patients were housed in the RHU. The RHU Policy requires that patients at a EOP and 3CMS level of care be transferred to an EOP and 3CMS RHU, respectively, within 30 calendar days from the date of initial placement in RHU or within 30 calendar days in which the patient was made EOP or 3CMS. *See* Cal. Code of Regs., tit. 15 §§ 3335.2 and 3335.3; see also Restricted Housing Unit Program: Mental Health Services Policy, dated July 19, 2024 and effective August 1, 2024 (hereinafter "RHU Policy"); 2021 Program Guide Update, ECF No. 7333-1 at 19. All patients had been in the RHU for fewer than 30 days except one patient who was under a medical hold. An additional 3CMS patient housed in the RHU had been out to court for months.

*IDTTs*

Two initial IDTT meetings for 3CMS patients were observed. The room was cramped, as it had a large table covered with computers which limited visibility. Required staff, as well as a supervising social worker and psych tech, were present, though the attending telepsychiatrist was

not the one assigned to the patients. Further, the position of the laptop used to facilitate telepsychiatry participation prevented treatment team members from seeing each other.

The content of the meetings met expectations and included a discussion of the patients' histories, diagnoses, medications, functional impairments, levels of care and justifications for the same, treatment needs, treatment goals, and specific interventions to be used with the patients. Both plans were individualized, and discussions were collaborative. On the other hand, case formulations and engagement by the correctional counselor could have been better. Overall, the IDTTs were adequate.

*Individual Treatment*

For all RHU patients, initial primary clinician assessments were completed on the Monday following their arrival, initial IDTTs were held on Wednesdays, and ICC meetings were held on Thursdays.

Crisis Intervention Team:

Consistent with the previous monitoring round, a senior psychologist supervisor oversaw VSP's CIT process with the help of two psychologists, two social workers, and one office technician. The CIT medical representative was any nursing staff member trained in CIT procedures.

VSP's CIT LOP was dated July 2024 and, thus, up to date and adhered to statewide policies. While it stated that the CIT operated daily from 7:00 A.M. and 8:00 P.M. except for on Wednesdays when it operated between 7:00 A.M. and 5:00 P.M, at the time of the monitoring tour the CIT operated 8:00 A.M. and 9:00 P.M. daily except Wednesdays when it operated until 5:00 P.M. Mental health crises outside of these hours were covered by the night shift telepsychiatrist.

Not all urgent or emergent mental health referrals resulted in CIT activation; the CIT communicated daily with the treatment teams in Facility A and, on that basis, clinical judgment was used to determine whether the entire CIT needed to be activated or whether a mental health contact could sufficiently respond to the crisis. Such determinations included consideration of the nature of the crisis, how well known the patient was, and whether a clinician had already been working closely with the patient, among other factors.

There were 146 CIT activations during the reporting period resulting in 65 MHCB placements, 59 patients returning to the same housing, and 22 patients moving to different housing. Of the 65 MHCB placements, 59 or 91 percent were primarily determined to be mental health in nature and six were a combination of mental health and custody concerns. All 59 patients returned to their housing and all 22 moved to different housing had mental health issues primarily or in combination with custody concerns.

VSP was unable to provide response times for CIT activations.

Interviewed custody officers were familiar with both the electronic and paper versions of the MH-5 form and appropriately knew when to use the form to access mental health services for incarcerated persons in their units.

Alternative Housing:

VSP's alternative housing LOP was dated January 2025 and designated cells in Facility A, building three as the first choice for alternative housing. Cells in Facility A, building four were designated as the second choice for alternative housing. Additional alternative housing cells were designated in the OHU for patients housed in those units. Both buildings with alternative housing cells had confidential treatment space in the program office.

Despite the LOP, the alternative housing cells in Facility A, building three had not been used in more than a year and were empty at the time of the site visit; these cells were rarely used during the previous monitoring round as well. During the monitoring tour, each cell had an electrical socket and included a desk and bunk bed around which ligatures could be tied. Accordingly, these cells were far from suicide resistant.

The five designated cells in Facility A, building four were in active use as alternative housing, with one to two individuals typically placed in these cells each day. They were suicide resistant and identical in configuration and features to the RHU intake cells. The concrete bunks were provided with suicide-resistant mattresses which were present despite the cells being empty of people.

Except for misidentifying the cells to be prioritized as alternative housing, VSP's alternative housing LOP provided a clear set of procedures that were reflected in practice and was otherwise consistent with statewide procedures.

According to the *alternative housing QIT log*, almost all alternative housing placements during the review period occurred on Facility A, building four; only one occurred on Facility A, building three. The average length of stay in alternative housing was half a day.

During the site visit, one patient was briefly placed in an alternative housing cell in building four before being transported to CHCF for MHCB placement due to danger to self. OnDemand data indicated that the patient was in transit to CHCF within two and a half hours of the MHCB referral being placed. This patient also received a timely and adequate suicide risk evaluation.

EOP:

According to the staff-to-patient ratios from the 2009 staffing plan, psychiatrists who treat mainline EOP patients must maintain a caseload of no more than 120 patients per psychiatrist, while primary clinicians who treat mainline EOP patients must maintain a caseload of no more than 26 patients per clinician. See ECF No. 3693 at 17. EOP staff consisted of three telepsychiatrists, all of whom carried caseloads within established ratios, and seven psychologists and three social workers, all of whom carried caseloads within established ratios except for one psychologist who exceeded ratios by one patient.

VSP reported that all EOP patients were housed with other EOP patients during the reporting period aside from medical placements in the OHU, patients placed in the RHU awaiting transfer, and quarantine/isolation placements. EOP patients attended programing with general population individuals for jobs, education, and substance use treatment programs, though some jobs and educational programs did not require EOP patients to program with non-EOP patients. EOP patients only attended recreation with other EOP patients.

VSP was piloting the START NOW program[126] for patients with mood dysregulation, impulsivity (including self-injurious behavior), aggression, addiction, or interpersonal discord; the first cohort completed the group on March 3, 2025.

Overall, there were no reported concerns with barriers to care aside from increased drug use resulting in patients not coming to treatment or arriving for sessions under the influence.

---

[126] The START NOW program is part of CDCR's Plan to Provide Treatment for MHSDS Patients with Personality Disorders. *See* ECF No. 8209 at 16-19 (defendants' plan, attached to the parties' April 19, 2024 Joint Report); *see also* November 15, 2023 Order, ECF No. 8066 at 5 (ordering that the parties meet and confer under the supervision of the Special Master to discuss "more prompt development of programs for class members with personality disorders including a possible pilot program…").

Treatment space for individual and group treatment for patients in the EOP afforded sufficient confidentiality in most locations though there was barely adequate regarding quantity; some rooms were also too small to accommodate a large number of patients. Nine spaces were available for groups including a room on each housing unit, three mental health group rooms in a designated programming space, a program room, the restricted housing visiting area, the GP visiting area, and the gym. The three rooms in the designated program area and the program room had staff offices connected to the group space. This resulted in staff walking through the areas during groups, disrupting the process, and briefly violating confidentiality. Individual sessions were completed in staff offices, which were adequate regarding size and confidentiality.

One additional concern regarding confidentiality was noted during the site visit. An officer was stationed near the group rooms; however, instead of making rounds, this officer sent a peer support person to each room approximately ten minutes after the start of each group to get an attendance list from the group facilitator. This not only disrupted the group process but also compromised the confidentiality of the group discussion and provided an incarcerated peer with information about other patients' mental health programming. When questioned about this process, the officer reported that he was not routinely assigned to this position and was unaware of why the process worked the way it did. Staff additionally reported safety concerns with groups being held in these locations secondary to the limited presence of custody staff.

*Structured Treatment*

The Program Guide required that each EOP patient be offered at least ten hours per week of structured therapeutic activities. *See* ECF No. 7333-1 at 58. For patients who were determined by the treatment team to be clinically contraindicated for ten hours of treatment activities per week, the primary clinician is required to present the case and recommended

treatment program (i.e. EOP modified programming) to the IDTT for approval. If the patient's modified treatment program included a schedule of less than ten hours of treatment per week, the patient's IDTT was required to meet monthly to review and increase the amount of structured therapeutic activities or refer the patient to a higher level of care as clinically indicated. *Id*.

During the reporting period, 89 percent of eligible EOP patients (not EOPMod) were offered at least ten hours of structured therapeutic activities. Excluding EOPMod patients, patients were, on average, scheduled for 17.19 hours, offered 13.32 hours, attended 9.31 hours, and refused 4.11 hours of structured therapeutic activities weekly during the reporting period. On average, 4.03 hours of treatment were cancelled weekly. The reasons provided for treatment cancellations included modified programming by custody, cancellations due to weather, and staff absences as noted above.

On average, patients placed on EOPMod were scheduled for 12.47 hours, offered 8.99 hours, attended 5.96 hours, refused 3.04 hours, and had 4.11 hours cancelled on average weekly during the reporting period. During the reporting period, between two and seven patients were placed on EOPMod status on any given week.

Records for five individuals on EOPMod status were reviewed to determine if patients were receiving treatment at the frequency outlined in their treatment plans. In three cases, the rationale for use of EOPMod was not explicitly documented. In two cases, it was not clear what modifications were made to the patients' programs, as treatment hours were not specified in the treatment plan. In two other cases, the modifications were clear and the treatment plans were updated appropriately. All five patients had monthly IDTTs in keeping with Program Guide requirements.

Overall, patients were provided with structured therapeutic activities in keeping with Program Guide requirements. Improvements in clearly documenting the rationale and parameters of patients' modified status and progress toward returning to full programming were needed.

*IDTTs*

The monitor's expert observed four initial and three routine EOP IDTTs during the monitoring tour. The meetings were held in a room with adequate confidentiality and adequate space; however, the room had one large table covered with computers and computer monitors blocking the staff's view of the patient and the patient's view of staff. There was also a large telehealth screen in the room visible to the patient and staff. All staff had access to computers; however, for a few of the meetings, access to EHRS was problematic which delayed the start of these meetings and forced staff to share computers or rely on their notes. While required staff were present during the meeting, the telepsychiatrists were not assigned to the patients; in one case, the telepsychiatrist noted that the patient was assigned to an on-site psychiatrist given his difficulty in trusting services provided via telepsychiatry.

An EOP supervisor, an inpatient coordinator psychologist, or both were present for the IDTTs. Patients attended all observed meetings as well. The content of these meetings was impressive and comprehensive. Patient histories were reviewed along with medications, functional impairments, diagnoses, treatment needs, measurable treatment goals, treatment interventions, and discussion of group participation, as well as substance use, transition planning, and safety planning when clinically indicated. In all cases, treatment plans were individualized to the patient and included quality participation by the correctional counselors. The level of care and related rationale were discussed adequately. Lastly, during the three meetings in which the

patient had recently returned from an inpatient setting, the patient's course of treatment and ongoing needs were reviewed. The only element absent from most meetings was case formulations. Additionally, in two of the observed meetings, collaboration with the patient could have been better. In one case, the primary clinician used excessive jargon and acronyms without clarifying that the patient understood the terms; in the other case, the primary clinician appeared to talk "at" the patient rather than engaging in a collaborative discussion.

Overall, the IDTT process for EOP patients at VSP was more than adequate and reflected thoughtful and engaged staff who collaborated with the patient in developing a clear treatment plan. The only improvements needed were attendance at the meetings by the patients' assigned psychiatrists, case formulations, and better collaboration in a few cases.

The Program Guide requires that EOP patients receive an initial IDTT within 14 calendar days of arrival to the institution and a routine IDTT every 90 days thereafter. *See* ECF No. 7333-1 at 57, 59. The monitor randomly selected and reviewed the healthcare records of 30 mainline EOP patients to assess compliance with Program Guide timeframes for initial IDTTs during their stays.

All 30 patients required initial IDTTs. Of the 30 reviewed initial IDTTs, 22 or 73 percent occurred timely within 14 calendar days or arrival or level of care change. All were attended by required staff and 28 or 93 percent were attended by the patients. The initial IDTTs that were held *in absentia* were due to patient refusals.

To measure timeliness of routine IDTTs, CDCR produced an appointments report that included individuals who were required to receive a routine IDTT during the review period. For the 424 patients in CDCR's appointments report, there were 784 completed routine IDTTs and no refusals. When a patient had either a completed or refused initial IDTT and a routine IDTT or

more than one routine IDTT, compliance with Program Guide timeframes was able to be calculated. Of the 784 completed IDTTs, 361 were for individuals who had at least two IDTTs. Of those, 30 or eight percent were not compliant with Program Guide timeframes. Of note, the report did not include individuals that did not have a completed IDTT, such as those that were not scheduled.

*Group Treatment*

Primary clinicians offered caseload groups during the reporting period. Patients reported that individual sessions alternated with caseload groups weekly and that the caseload groups were often check-ins and did not include relevant clinical interventions; most patients reported a preference for individual sessions.

A review of the January 2025 group schedule revealed the availability of core clinical groups, recreational therapy, and NLTGs. Approximately 38 percent of groups on the schedule were core clinical groups. In addition, four to five NLTGs were offered to EOP patients on weekdays on A yard and one group was offered daily on the OHU. Topics included physical health, mental health, substance use, life skills, and transition planning.

The monitor's expert observed five group sessions, consisting of two recreational therapy groups, two core clinical groups, and an Introduction to EOP group.

One recreational group was a yard group which consisted of two recreational therapists checking patients in and then leaving the patients to do whatever they liked for the hour. There was no supervised activity or patient monitoring. When the recreational therapists were asked why there was no structured activity, they reported that the terrain on the yard was uneven and therefore they could not safely engage patients in activities on the yard. They also mentioned that recent violence within the institution made group activities unsafe. When asked about how

they were documenting patient participation in the group without an organized or structured activity, they reported that they could see much of what was happening standing in a single location and observing patients. Patients reported frustration with the lack of organized yard groups. This group was wholly inadequate.

The other recreational group observed was a movie group during which patients watched a movie. Twenty-four patients were enrolled and seven attended; the space would have been wholly inadequate had all 24 patients attended. Other than a brief discussion at the start of the group to determine which movie the patients wanted to watch, there was no other engagement about the movie's content. This group was also disrupted twice by staff; during the first ten minutes of the group, a peer support person entered the room to collect the attendance information from the facilitator and, at another point, a staff member walked through the room on the way to an office.

A "gratitude" group, which was facilitated by a pre-doctoral psychology intern and designated as a core clinical group, was observed. Fourteen of 15 enrolled patients attended; the final patient arrived for the group but noted that the room was too crowded and decided not to stay. The group involved a review of the previous group session's journaling homework and then watching a few education videos on neuroplasticity and gratitude. After each video, the facilitator asked if anyone had questions but did not engage in further discussion or elicit further discussion about the content. At the end of the session, the facilitator elicited input from all participants about something they were grateful for and then ended group without any summary or integration of the session's content. Similar to the other groups observed in this area, a peer support person disrupted the discussion by coming into the room approximately ten minutes into the group and taking a list of the patients in the group from the facilitator who reported to the

peer, by name, the individual who chose not to remain for the session and why they left the group.

An Introduction to EOP group was also observed. Five patients were present as well as a psychologist, two peer facilitators, and a sergeant who arrived ten minutes after the group began. All facilitators were engaged in the discussion and provided valuable input into the topic being discussed. Overall, the required information was provided.

The Special Master's expert also observed a session of the START NOW group which was part of the pilot programming designed to provide group programming to patients with personality disorders. *See supra* note _. Six patients and two psychologists facilitated the group. The group was in its final week and patients were reviewing the positive and negative aspects of the group as well as recommendations for the future. The successes described by the patients in the group were impressive. One patient reported not engaging in self-harm for four months; another reported not having received an RVR for seven months; and one other patient reported receiving treatment which actually met his needs for the first time since being incarcerated decades earlier. As it relates to this group, the patients and facilitators wholly engaged in meaningful and clinically relevant discussions.

Overall, the observed recreational groups were inadequate and did not meet the needs of the patients in terms of therapeutic utility or engagement in leisure skill development; documentation of the yard group was inaccurate and generic; and the core clinical groups were appropriate and clinically useful to the patient population although more direct solicitation of patient involvement could have been useful in the gratitude group and the Introduction to EOP group.

*Individual Treatment*

The Program Guide requires that patients are offered an initial psychiatrist evaluation before their initial IDTT and within 14 calendar days of arrival to the institution or level of care change. *See* ECF No. 7333-1 at 57. Thereafter they are required to receive a routine psychiatric contact every 30 calendar days. *Id*. at 59. Patients are also required to receive a primary clinician evaluation within 14 calendar days of arrival and weekly (i.e. once per calendar week with no more than ten calendar days between contacts) with either a primary clinician or in group psychotherapy with an individual contact every other week. *Id*. at 57, 59.

The monitor randomly selected and reviewed the healthcare records of 30 mainline EOP patients to assess compliance with Program Guide timeframes for initial evaluations during their stays. All 30 patients required initial psychiatry evaluations; 29 or 97 percent timely occurred before the initial IDTT. All reviewed initial psychiatry evaluations were conducted in confidential settings. Telepsychiatry was utilized for all initial psychiatry evaluations.

The same 30 patients also required initial primary clinician evaluations. Of the 30 reviewed initial primary clinician evaluations contacts, 28 or 93 percent were completed within 14 calendar days of arrival or change in level of care. All reviewed initial primary clinician evaluations were conducted in a confidential setting; non-confidential contacts were due to patient refusals and modified programming contacts.

To measure timeliness of routine psychiatry and primary clinician contacts during the review period, CDCR produced an appointments report that included individuals who were required to receive a routine contact. For the 408 patients in CDCR's appointments report covering patients who received at least one routine psychiatry contact during the review period, there were 1,732 total completed and refused contacts. Of the 1,559 that were completed, 1,557

or 99 percent were reported as being conducted in a confidential setting. When a patient had more than one completed contact, timeliness in accordance with Program Guide requirements was able to be calculated. Of the 1,559 completed contacts, 1,325 were for individuals who were seen at least twice by a psychiatric provider. Of those 1,325 contacts, 683 or 52 percent of contacts were completed beyond the Program Guide required timeframes. Of note, the report did not include individuals that did not have complete contacts, such as those that were not scheduled.

For the 347 patients in CDCR's appointments report covering patients who received at least one routine primary clinician contact during the review period, there were 3,584 total completed and refused contacts. Of the 3,434 that were completed, 2,870 or 84 percent were reported as being conducted in a confidential setting. When a patient had more than one completed contact, compliance with Program Guide timeframes was able to be calculated. Of the 3,434 completed contacts, 3,238 were for individuals who were seen at least twice by a primary clinician provider. Of those 3,238 contacts, 161 or five percent of contacts were completed beyond the Program Guide required timeframes. Of note, the report did not include individuals that did not have completed contacts, such as those that were not scheduled.

The monitor's expert interviewed 15 EOP patients. They reported having weekly contacts with their assigned primary clinicians, with individual contacts every two weeks and caseload groups offered in between. Most patients reported that they did not find the caseload groups helpful but, rather, were superficial check-ins without clinical substance. Patients reported that their assigned primary clinicians changed frequently which disrupted continuity of care and made it difficult to engage in meaningful treatment. All patients reported that primary clinician contacts were confidential. Some patients expressed concerns that their clinicians

inappropriately shared private information with custody staff, with one patient reporting that a custody staff member knew information that the patient had only shared with his clinician. All patients reported receiving psychiatric services through telepsychiatry monthly and seeing the same psychiatrist most months with occasional coverage by alternative psychiatrists. Most patients reported that they did not consider their telepsychiatry contacts to be confidential due to the presence of a medical assistant.

All patients reported attending an IDTT meeting every 90 days, but, consistent with the monitor's expert observations, many reported that a different telepsychiatrist than their assigned one was typically present. Patients also reported being aware of their treatment goals generally, being enrolled in at least ten hours of groups each week and finding the core clinical groups helpful, frustration with one of the outdoor recreation groups (discussed above) that they called a "walking group," a desire to engage in structured activities on the yard, and that a Friday group in the gym was often cancelled.

Furthermore, patients from both EOP housing units reported that the correctional officers on their units, while consistently assigned there, needed training for how to work with individuals who had serious mental illnesses, as they did not always contact mental health clinicians when patients expressed the need to see their clinicians. Despite the presence of psych techs on the unit, welfare checks were reportedly not completed, which was problematic given the high levels of drug use on the units. Many patients expressed fears about being "kicked out" of EOP without consent, anxiety prior to every IDTT meeting because they were not sure what the outcome would be, and that they did not always get clear information about level of care considerations during individual contacts with their primary clinicians.

Accordingly, while patients reported that the required elements of the EOP program were being delivered, they conveyed that they were not satisfied with the program and had negative input about the program overall.

A group of staff members were interviewed on-site and reported overall dissatisfaction with the mental health program at VSP and that the mental health program was able to deliver quality care "despite" the environment. Staff reported an increase in violence–including assaults on correctional and mental health staff–and drug use stemming from a recent influx of youthful offenders not designated for a Level II facility and using drugs and engaging in violence at higher rates than other incarcerated individuals, as well as a sense of a decrease in custody presence on the yards. They also reported that patients were inappropriately being made EOP and staff felt helpless to change patients to a more appropriate level of care. Further, staff expressed that the California Model removed the ability to use restrictive housing and, thus, made the facility less safe.

<u>3CMS</u>:

The staff-to-patient ratios from the 2009 Staffing Plan and 2021 adjustments to the 2009 staffing plan required that staff psychiatrists who treat 3CMS patients maintain a caseload of 280 patients per psychiatrist if the patient was prescribed medications and 675 patients if the patient was not prescribed medications. See ECF No. 3693 at 12 and 6978-1 at 3.

Staff-to-patient ratios from the 2009 Staffing Plan required that primary clinicians who treat 3CMS patients maintain a caseload of 97 patients per clinician. See ECF No. 3693 at 12.

3CMS staff consisted of three telepsychiatrists, all of whom carried caseloads exceeding established ratios by a range of 55 to 78 patients; six psychologists, all of whom carried caseloads within established ratios; and five social workers, three of whom carried caseloads

exceeding established ratios by 12 or 13 patients each. Two additional social workers served as pre-release coordinators and did not carry caseloads.

VSP was not using any triage plans for mental health services during or following the review period.

Most mental health offices were in the infirmary or visiting building. Each 3CMS housing unit had an office adjacent to the dayroom dedicated to individual primarily clinician contacts. These offices were adequately confidential with respect to sound but not sight; large windows in the office doors permitted incarcerated individuals to look inside.

The Facility C and D IDTT rooms were spacious but poorly lit. In each room, two fly traps hung from the ceiling with dead flies glued to them and an 18-inch high, black, wooden partition made it difficult for staff and patients to see each other and, thus, unnecessarily separated staff from the patient. Telepsychiatry equipment, which included a large screen, provided adequate visual and audio connectivity for the telepsychiatrist, patient, and rest of the IDTT team. The Facility B IDTT room was brighter, cleaner, free of flies and fly traps, and lacked the intrusive black barrier; however, computer monitors functioned as a visual partition separating the patient from staff, and staff had to peer over the monitors to see patients. All three IDTT rooms were confidential with respect to sight and sound and had ceiling cameras that were not equipped with microphones.

Treatment space was limited and leadership reported that it would be insufficient once primary clinician vacancies were filled. One of the group rooms was reportedly too hot during the summer to be used for mental health treatment; multiple requests for a cooling system for this area had not been fulfilled due to budgetary constraints.

*IDTTs*

The monitor's expert observed two initial and nine routine IDTTs during the monitoring tour. IDTT meetings for patients who primarily spoke Spanish were conducted in both Spanish and English to ensure all participants understood the content. The care and patience exhibited by primary clinicians and psychiatrists who engaged in translating was commendable, and these patients appeared to have no difficulty understanding what was said.

All meetings were attended by the patient and required staff. The psychiatrist participated through telepsychiatry equipment with no technological difficulties. Unlike during the previous site visit, there were no intrusions into the IDTT meetings by custody staff. The meetings were collaborative, multidisciplinary, and included some of the required discussion elements. Correctional counselors provided positive, encouraging input to the patients.

However, case conceptualizations were not clearly articulated in six of the 11 observed IDTT meetings, diagnoses were not identified in two meetings, specific treatment goals were not identified in seven meetings, non-pharmacological interventions were identified in only two meetings, and master treatment plans were not explicitly discussed in any of the meetings. IDTT discussion for one patient indicated that he had met all treatment goals and that the treatment team kept him in 3CMS care solely to monitor his symptoms; there was no attempt to develop a new treatment goal or identify active interventions. Discussion of psychiatric care and psychotropic medications were thorough and psychiatric interventions were the only interventions that were reliably identified.

Review of patient records following the IDTT meetings revealed that no master treatment plan was developed for three patients. The master treatment plans that were developed were deficient and lacked measurable goals and, in one case, lacked any type of treatment goal and often identified interventions vaguely. Psychiatric care was thoroughly discussed in the IDTT

meetings but not integrated into any of the applicable master treatment plans. These plans were not always individualized. Furthermore, the wording of master treatment plans was identical or nearly identical for multiple patients.

Three of the 11 patients were discontinued from 3CMS care at the time of the IDTT meeting. In each case, the patient's care was carefully reviewed, the patient had been stable for a minimum of six months without psychotropic medications, the discontinuation of 3CMS care had been requested by the patient, and the discontinuation appeared clinically appropriate. Each of these patients was reminded that they could continue to access mental health services by submitting a request.

Initial IDTTs for 3CMS patients are required to occur within 14 working days of arrival to the institution or level of care change and annually thereafter. *See* ECF No. 7333-1 at 43-44. The monitor randomly selected and reviewed the healthcare records of 30 mainline 3CMS patients to assess compliance with Program Guide timeframes for initial IDTTs during their stays. All 30 patients required initial IDTTs. Of the 30 reviewed initial IDTTs, two or seven percent occurred timely within 14 working days or arrival or level of care change. All 30 were attended by all required staff and 27 or 90 percent were attended by the patients. Reasons initial IDTTs were held *in absentia* included patient refusals and modified programming.

To measure timeliness of routine IDTTs during the review period, CDCR produced an appointments report that included individuals who were required to receive a routine IDTT. For the 763 patients in CDCR's appointments report for August 1, 2024 to January 31, 2025, there were 787 completed and refused initial or routine IDTTs. When a patient had either an initial IDTT and a routine IDTT or more than one routine IDTT, timeliness in accordance with Program Guide requirements was able to be calculated. Of the 787 completed and refused IDTTs, 26

contacts were for individuals who had at least two IDTTs (initial and routine or two routines). Of those 26, all occurred within Program Guide requirements. Of note, the report did not include individuals that did not have a completed IDTT, such as those that were not scheduled.

*Group Treatment*

With respect to groups, VSP ran eight sex offender treatment groups during the review period though only three at the time of the site visit due to losing a sex offender treatment provider. These groups were available to the GP and 3CMS populations and reportedly had extensive waiting lists.

Outside of the three sex offender treatment groups, one additional mental health group was offered to 3CMS patients by the time of the site visit, representing a significant reduction from the 11 to 13 provided weekly during the previous round. The single group offered to 3CMS patients focused on anger management and was observed during the site visit. This group took place in the visiting room which had a ceiling camera with a microphone and large glass windows along the interior wall that permitted incarcerated individuals to look inside. The group was clinically appropriate, the primary clinician leading the group was skilled, and seven of the eight attending patients actively participated. Engaged patients exhibited clear knowledge of the group curriculum content, which included demonstration of anger management skills in real time.

*Individual Treatment*

The Program Guide requires that patients are offered an initial psychiatrist evaluation before their initial IDTT. *See* ECF No. 7333-1 at 34-50, 641. Thereafter they are required to receive a routine psychiatric contact every 90 calendar days if the patient is prescribed a psychotropic medication. *Id*. at 44; *see also supra* p. _ n. _. Patients are also required to receive

a primary clinician evaluation within ten working days of arrival and every 90 calendar days thereafter. *Id*. at 41, 48.

The monitor randomly selected and reviewed the healthcare records of 30 mainline 3CMS patients to assess compliance with Program Guide timeframes for initial psychiatry and primary clinician evaluations during their stays. All 30 patients required initial psychiatry evaluations; 22 or 73 percent timely occurred before the initial IDTT. All reviewed initial psychiatry evaluations were conducted in confidential settings and all used telepsychiatry.

The same 30 patients also required initial primary clinician evaluations. Of the 30 reviewed initial primary clinician evaluations contacts, 20 or 67 percent were completed within ten working days of arrival or change in level of care. All reviewed initial primary clinician evaluations were conducted in a confidential setting. Telehealth was utilized for three or ten percent of initial psychiatry evaluations.

To measure timeliness of routine psychiatry and primary clinician contacts during the review period, CDCR produced an appointments report that included individuals who were required to receive a routine contact.

For the 858 patients in CDCR's appointments report for August 1, 2024 to January 31, 2025, there were 1,499 completed and refused psychiatry contacts, 1,448 or 96 percent were confidential as reported by the institution. Reasons for non-confidential psychiatry contacts included patient refusals. When a patient had more than one completed or refused contact, compliance with Program Guide timeframes was able to be calculated. Of the 1,499, 642 contacts were for individuals who were seen at least twice by the psychiatric provider. Of those 642 contacts, there were 266 or 41 percent that occurred beyond Program Guide requirements with a range of 91 to 146 days. Of note, the report did not include individuals that did not have

completed contacts. A sample of 30 patients was randomly selected to verify consistency between the appointments report and clinical documentation in EHRS. Of the 59 contacts reviewed in EHRS, 100 percent were consistent with the appointments report.

For the 1,128 patients in CDCR's appointments report for August 1, 2024 to January 31, 2025, there were 2,590 completed and refused primary clinician contacts, 2,501 or 97 percent were confidential as reported by the institution. Reasons for non-confidential primary clinician contacts included unavailable confidential space, custody modified program, and patient did not show up for a scheduled contact.

When a patient had more than one completed or refused contact, timeliness in accordance with Program Guide requirements was able to be calculated. Of the 2,590, 1,465 contacts were for individuals who were seen at least twice by the primary clinician. Of those 1,465 contacts, 201 or 14 percent occurred beyond Program Guide requirements with a range of 91 to 161 days. Of note, the report did not include individuals that did not have completed contacts, such as those that were not scheduled.

There were 2,551 completed individual PC contacts. Of these, 35 were documented as being completed in zero minutes, 714 were completed between one and 15 minutes, 746 were completed between 16 and 30 minutes, 762 were completed between 31 and 60 minutes, 267 were completed between 61 and 95 minutes, and 27 were documented as lasting more than 96 minutes.

The monitor's expert interviewed 33 3CMS patients from facilities B and C. Most reported seeing their primary clinicians and, if they were taking psychotropic medications, their psychiatrists once every 90 days. While patients reported they saw their assigned primary clinician and psychiatrist rather than an alternate, they noted frequent turnover in the assigned

primary clinician and reported that this was a barrier to developing trust and making progress in treatment. Patients reported that individual sessions with primary clinicians lasted as long as an hour or more or as short as ten minutes, depending on the clinician; some patients reported that clinicians cut sessions short because they had too much to do. Psychiatric appointments were reportedly brief and focused primarily on psychotropic medications. In contrast to psychiatrists' perceptions, many patients expressed discomfort with the presence of a telepresenter in the room and felt uncomfortable asking the telepresenter to leave. Additionally, turnover in telepresenters was problematic as it required patients to adjust and adapt to a new person. Except for the presence of a telepresenter, patients reported that individual encounters with psychiatrists and primary clinicians were confidential.

Patients indicated that they attended their IDTT meetings annually, though a minority were not aware of what an IDTT meeting was. Only a few reported knowing their identified treatment goals and most indicated that they had not heard of their treatment plan and did not know what it said. Patients reported feeling unprepared for their IDTT meetings and did not know how to participate in the meeting; they described IDTT meetings as check-ups or check-ins as opposed to collaborative treatment planning meetings. In contrast to what was observed during the site visit, several patients reported that IDTT meetings were short and perfunctory. Other patients reported discomfort with the correctional counselor's presence in the IDTT meeting and did not appear to understand their role in mental health care.

A small minority of patients reported they were satisfied with the care their primary clinician provided, while most patients who were interviewed reported dissatisfaction and indicated that their individual sessions were short, perfunctory, and superficial. Patients repeatedly indicated that the quality of care depended on the clinician involved.

Patients reported a need for more frequent and longer individual sessions with their primary clinicians, more mental health groups, and for in-cell therapeutic activities such as journals, puzzles, and psychoeducational materials; they reported being told that such materials were not available for 3CMS patients at VSP.

One of the patients interviewed had recently transferred from the EOP to 3CMS program. He reported that the transition was difficult due to the limited treatment available. In another interview group, a patient reported that patients were discharged from EOP care prematurely.

A few patients reported that access to urgent or emergent mental health care was difficult and delayed and that they had to go "man down" or stop taking medications to be seen. Patients reported that custody staff do not believe in the California Model or care about mental health problems, that mental health treatment and custody management of patients who voiced suicidal ideation was punitive, and that the *Coleman* treatment requirements might "look good on paper" but did not translate into quality care at VSP.

Patients in all three interview groups reported that the heat plan was implemented effectively at VSP; this was one area for which patients unanimously commended the institution for timely and effective interventions.

Patients consistently reported that illicit substance use was highly disruptive to the facility, programming, and their own sense of safety. Multiple patients reported that they actively avoided certain situations and certain other incarcerated people and no longer went out on the yard due to the prevalence of substance use. They identified Spice as the predominant illicit substance and described its use at VSP as "rampant." Older 3CMS patients with indeterminate life sentences expressed concern that the prevalence of illicit substance use in the facility would interfere with their ability to meet parole board expectations.

Interviewed telepsychiatry staff reported that they had ready access to the treatment teams, excellent collaboration and communication with each other and with medical and custody staff, and being proud of their work. Five of the six psychiatrists worked from home and the sixth worked from a telepsychiatry hub. They reported coming on site at required intervals and staying for an entire day while on site. The telepsychiatrists reported that these visits were helpful in building therapeutic rapport with patients and developing or maintaining relations with other staff on site. Consistent with what was observed in IDTT meetings, they also reported good video and audio fidelity and that gaps in connectivity were rare and quickly fixed.

The telepsychiatrists reported that they each had an assigned telepresenter and, in contrast to patient reports, that the presence of the telepresenter during the session did not appear to bother patients or be disruptive to care. On rare occasions, patients ask for the telepresenter to excuse themselves; these requests were honored. They also reported very few patient refusals; most were the result of a conflict between the patient's work schedule and appointment and this conflict was easily resolved by rescheduling the telepsychiatry appointment outside of the patient's work hours.

<u>Other Issues:</u>

<u>Pre-Release Planning</u>:

VSP's pre-release planning LOP was consistent with headquarters' directive and last revised in August 2024 and, thus, up to date.

VSP had two pre-release coordinators. One primarily handled the EOP population and had been at VSP since 2021 while the other primarily handled the 3CMS population and had been at VSP since 2019. Both were LCSWs and served as clinicians prior to their roles as pre-release coordinators. Neither carried a caseload but provided coverage for line staff as needed.

Fifty-nine EOP and 125 3CMS patients received pre-release planning appointments during the review period. Twenty-three EOP and 46 3CMS patients were released to probation during the review period; of those, 18 EOP and 34 3CMS patients signed ROIs while three EOP and 11 3CMS patients refused to sign. Of the 59 EOP patients who received pre-release planning services, 30 or 51 percent completed CAL-Id documentation; 14 were ineligible, eight refused, and no information was provided for seven. Of 125 3CMS patients, 40 completed CAL-Id documentation, 36 were denied, 25 were ineligible, 12 refused to complete the documentation, four failed to complete the documentation, and no information was provided for the remaining eight.

One TCMP case worker had an office at VSP. Of the 59 EOP and 125 3CMS patients–or 184 MHSDS patients–TCMP screened 100 percent; 166 or 90 percent applied for Medi-Cal, 87 or 47 percent applied for SSI, and five or three percent applied for VA benefits.

Eighty-one patients were within 120 days of their release date at the time of the monitoring tour.

Pre-release groups met every Wednesday at 9:00 A.M. throughout the review period. An observed pre-release group was led by both pre-release coordinators and attended by four patients. Communication strategies and methods were discussed. All four patients participated adequately. The group concluded with a preview of the following week's discussion topics.

Program Access:

a. Job and Program Assignments

VSP reported that the 1,083 job assignments were held by 62 EOP patients or 21 percent of the EOP population, 332 3CMS patients or 32 percent of the 3CMS population, and 689 or 38 percent of the non-MHSDS population.

The 1,290 academic assignments were held by 59 or 20 percent of EOP patients, 438 or 42 percent of 3CMS patients, and 793 or 44 percent of non-MHSDS incarcerated persons.

The 240 vocational education assignments were held by two EOP or one percent of the EOP population, 80 or eight percent of the 3CMS population, and 158 or nine percent of non-MHSDS persons.

The 916 voluntary education assignments were held by 32 or 11 percent EOP patients, 305 or 29 percent of 3CMS patients, and 579 or 32 percent non-MHSDS persons.

b. Milestone Credits

VSP was unable to indicate how many MHSDS patients were awarded milestone credits or were eligible for the same.

c. Out of Level Housing

On February 18, 2025, VSP reported 24 EOP and 40 3CMS custody Level I patients and nine EOP and 88 3CMS custody Level III patients were in Level II housing, as well as two custody Level IV 3CMS patients in Level II housing.

d. ADA Reasonable Accommodations and grievances Procedures

VSP provided CDCR's grievance/reasonable accommodation request form, an internal memorandum providing instructions to custody staff for completing grievances and requests for reasonable accommodations, and a memorandum reviewing key highlights from recent training regarding the screening of grievances, allegations of staff misconduct, and reasonable accommodation requests effective August 31, 2024.

e. Periodic Classification Score Reductions: EOP Patients

VSP provided CDCR form 840s demonstrating the provision of periodic classification score reductions for EOP patients during the reporting period.

f. Unclothed Body Search

Unclothed body searches took place in the RHU every time a patient left his cell, returned from a medical appointment, or was discharged from the unit. One custody officer stood at the door of the shower where the searches occurred to ensure confidentiality.

"C" Status:

During the review period, there were 49 incarcerated persons on "C" status; their levels of care were not provided. At the time of the visit, one EOP and 14 3CMS patients were on "C" status; case factors for patients deemed program failures included failure to work, being under the influence of an intoxicant, and theft of state property.

Case-by-Case Reviews:

There were no case-by-case reviews during the reporting period.

Mental Health Referrals:

During the review period, VSP made 2,157 mental health referrals. There were 492 referrals to psychiatry and 1,656 referrals to primary clinicians, excluding PREA referrals. Overall, there were 203 emergent, 184 urgent, 1,761 routine referrals to primary clinicians, and seven urgent and two routine PREA referrals.

For emergent referrals, VSP responded timely to 100 percent of psychiatry referrals and 172 of 191 or 90 percent of primary clinician referrals. For urgent referrals, there were timely responses to nine of 15 or 60 percent of psychiatry referrals and to 152 of 169 or 90 percent of primary clinician referrals. For routine referrals, there were timely responses to 423 of 465 or 91 percent of psychiatry referrals and to 1,156 of 1,296 or 89 percent of routine primary clinician referrals.

Custody and Mental Health Partnership Plan:

VSP's custody and mental health partnership plan LOP complied with statewide policy and was last updated in January 2025 and, thus, up to date.

Executive leadership joint rounding occurred during all six months of the review period on units A1 and A2, B1, B2, B3, B4, C3 and C4, and D3. Required staff attended each rounding. Staff reported positive relations between custody and mental health staff and strategies for managing patients who were not programming; incarcerated persons reported general satisfaction with the mental health services and receiving mental health ducats timely, though also reported a desire for more job assignments.

Executive joint rounding was discussed in detail for all six months of executive staff meeting minutes, for three of six months for quality management committee minutes, and five of six months in the mental health program subcommittee minutes.

Monthly joint supervisory tours occurred on B, C, and D yards for each month of the review period with required staff in attendance; they did not occur on A yard. Staff and patients again reported a generally effective mental health program and positive relations between mental health and custody staff.

Weekly 3CMS supervisory meetings occurred weekly throughout the review period on B, C, and D yards with required staff in attendance. New patient arrivals, patient concerns, and barriers to care were discussed appropriately. A meeting was observed on Facility D with the senior psychologist supervisor and facility sergeant in attendance and in accordance with policy. The huddle was effective, efficient, and collaborative, which resulted in clear multidisciplinary communication. Clinically relevant developments were carefully discussed. A 3CMS patient who had come to the attention of both custody and mental health staff earlier in the day due to

out-of-character behavior was also thoroughly discussed; this patient was placed in alternative housing and transferred to MHCB care later in the day.

Daily second and third watch mainline EOP huddle forms were provided for the review period. Reviewed huddle forms indicated that huddles generally occurred daily with required staff in attendance. An observed EOP huddle was also attended by required staff and utilized the proper huddle form. Attending staff were collaborative and discussed patient issues thoroughly, including medical emergencies, behavioral problems, and ongoing substance abuse issues.

Introduction to EOP groups were offered weekly throughout the review period, though provided data indicated that patients only enrolled during one month. A group was also observed during the site visit. The group was facilitated by a psychologist, two peer facilitators of which one was a patient receiving EOP services, and a sergeant. The required content was covered and one patient reported that the information received was helpful for navigating the EOP program as well as VSP more broadly.

VSP distributed the 3CMS orientation brochure to new patients and provided English and Spanish of the same.

Inmate advisory council meeting minutes occurred on facilities B, C, and D for all six months and Facility A for five of six months of the review period. Discussed topics included ADA-related concerns, pill line concerns, medical and cleaning supplies shortages, and better management of EOP kick-outs.

There were 91 staff misconduct complaints filed against custody staff during the review period; the status of those complaints, or any complaints filed against mental health or medical staff, was not provided.

No investigations for misconduct towards a patient were not initiated through the appeal process. No staff members were reassigned because of misconduct complaints.

Of 1,349 required staff, 1,292 or 96 percent attended the annual partnership off-post training; a breakdown by staff classification was not provided.

VSP provided the names of staff who attended quarterly roundtable training but was unable to provide which staff had not received the training; accordingly, compliance could not be ascertained.

Heat Plan:

The heat plan was in effect during three months of the review period. The institution's heat plan LOP was up-to-date and complied with headquarters' directive. VSP reported 50 Stage I and no Stage II or III heat alerts. No patients were reported to have experienced heat-related illnesses.

Interviewed officers were all familiar with the heat plan's requirements, had daily updated lists of patients on heat medications on hand, and knew how to access the list on their computers. All thermometers on all toured facilities and the central outside thermometer were operable. Temperature readings were taken and logged appropriately. Officers reported that patients were permitted to remain in the day room during heat alerts and also requested the installation of ice machines on the housing units.

VSP reported that all required mental health staff and all required custody staff except for one captain attended the heat pathologies training.

RVRs:

VSP issued 2,086 RVRs during the review period, including 1,161 or 56 percent to MHSDS patients and 925 or 44 percent to non-MHSDS incarcerated persons; those 1,161 RVRs

were issued to three intermediate care patients, 21 MHCB patients, 164 EOP patients, and 973 3CMS patients.

The monitor reviewed 14 RVRs to assess compliance with CDCR policy, comprised of two MHCB, five EOP, and seven 3CMS patients. No cases were documented in an alternative manner. Of the 14 reviewed RVRs, custody staff timely referred the mental health assessment to mental health staff in three of 14 or 21 percent of cases. Mental health staff timely completed and returned the assessment to custody in 13 of 14 or 93 percent of cases. The SHO documented consideration of the assessment in all reviewed cases. The clinician recommended penalty mitigation in 10 of 14 or 71 percent of reviewed RVRs; the SHO mitigated the penalty in all 10 instances. RHU terms were assessed for six of the 14 or 43 percent of reviewed RVRs; 14 total RHU terms were assessed for patients during the review period.

VSP reported that mental health assessment training was attended by 662 of 680 or 97 percent of custody staff and all required mental health staff.

Use of Force:

VSP reported no controlled and 38 immediate use of force incidents involving MHSDS patients during review period. The monitor review 12 immediate use of force incident reports and each revealed appropriate uses of force, including physical force to restrain patients, use of chemical agents, and baton strikes. Proper decontamination measures were utilized in each instance where chemical agents were deployed. Reviewed video footage for six of those 12 incidents also revealed appropriate uses of force.

The mandatory use of force training was attended by 56 of 166 or 34 percent of required mental health staff and 233 of 530 or 44 percent of required custody staff

Lockdowns/Modified Programming:

Two modified programming periods were initiated during the review period. One stemmed from an institution-wide contraband search and lasted ten days; the other stemmed from a riot on Facility D and lasted four days. Mental health programming was not affected in either instance. No additional lockdowns or modified programming periods were initiated from the end of the review period through the site visit.

Access To Care:

Review of VSP's monthly Health Care Access Quality reports from August 2024 through January 2025 indicated the issuance of 103,385 total mental health ducats and add-on appointments; 66,490 or 64 percent were completed and 36,895 or 36 percent were not completed. Of the non-completed appointments, seven percent were not completed due to custody factors, 25 percent were not completed due to non-custody factors, and 68 percent were not completed due to patient refusals.

*Coleman* Posters:

VSP had updated English and Spanish *Coleman* postings in every toured housing unit.

**APPENDIX A-28**
**WASCO STATE PRISON (WSP)**
Site Visit: August 5, 2025 – August 7, 2025
Review Period: December 1, 2024 – May 30, 2025

Census:

On August 1, 2025, WSP housed 3,955 incarcerated individuals, a 44 percent increase since the previous monitoring period. *See* Thirtieth Round Monitoring Report – Part D, ECF No. 8359 at 391.

The 1,734 MHSDS patients represented 44 percent of the institution's population, a 54 percent increase since the Thirtieth Round Monitoring Report. *Id.*

The MHSDS reception center (RC) population included 1,332 patients of which 131 were RC EOP and 1,201 were RC 3CMS.

The institution's general population (GP) RHU housed no RC MHSDS patients and 28 3CMS RHU patients.

There were five patients housed in the MHCB and three patients in OHU.

There were 180 mainline 3CMS patients and an additional 189 mainline 3CMS patients housed in the MSF.

Staffing:

The chief psychiatrist and senior supervisor psychiatrist positions were vacant. Of the 7.5 allocated staff psychiatrist positions, 3.5 were filled for a 53 percent vacancy rate. The use of five registry psychiatrists eliminated the functional vacancy rate. Of the three allocated telepsychiatry positions, 3.5 were filled. Inclusive of both on-site and telepsychiatry positions, there were no staff psychiatry vacancies.

One of the two chief psychologist positions were filled. One of 2.5 senior psychologist supervisor positions were filled for a 60 percent vacancy rate. Both allocated senior psychologist

specialist positions were filled. Of the 32.5 allocated staff psychologist positions, nine were filled reflecting a 72 percent vacancy rate. The use of 10.25 registry staff and dual appointments reduced the functional vacancy rate to 41 percent. Two psychologists were unlicensed and were appropriately supervised by licensed on-site clinicians. Of the four allocated telepsychologist positions, 1.5 were filled leaving a 63 percent vacancy rate.

Two supervising social workers filled the one allocated position. For the 14.5 allocated clinical social worker positions, 15.5 were filled. One clinical social worker was on long-term leave and there were an additional 1.67 registry social workers which eliminated the functional vacancy rate. Six social workers were unlicensed and were appropriately supervised by licensed clinicians. Of the three allocated tele-social worker positions, 1.5 were filled for a 50 percent vacancy rate.

Although there were no allocated positions a 0.75 full-time equivalent professional clinical counselor position was filled.

Overall, inclusive of on-site and tele-mental health positions as well as the professional clinical counselor position, the primary clinician functional vacancy rate was 27 percent.

Nine of ten MAs assigned to tele-mental health were filled for a ten percent vacancy rate. One registry staff eliminated the functional vacancy rate.

One of 4.5 recreation therapist positions was filled for a 78 percent vacancy rate. The functional vacancy rate was reduced to 56 percent with the addition of one registry staff.

Six of the 8.71 allocated MHSDS RN positions were filled for a 31 percent vacancy rate. Forty-seven of the 47.79 allocated LVN positions were filled leaving a two percent vacancy rate.

Sixteen of the 17.7 allocated psych tech positions were filled leaving a ten percent vacancy rate. However, two positions were on long-term leave, which increased the functional vacancy rate to 21 percent.

Of the 12.5 allocated MHSDS clerical positions, 14.5 were filled, however one was on long-term leave.

The OSS II position was filled. Two of the 2.5 allocated HPS I positions were filled and the HPS II position was filled.

For custody staff, the warden and chief deputy warden positions were filled. Five of six associate warden positions were filled, and six captains filled five allocated positions. All 25 lieutenant positions were filled. All 63 sergeant positions were filled; however, one sergeant was on long term leave. All 44 CCI positions were filled, with one staff member on long-term leave. Of the 11 allocated CC II positions, 12 were filled. Of the ten allocated CC III positions, 11 were filled, however one was acting out of class in a different position. For correctional officers, 739 officers filled 584 positions. Thirty were on long term leave and 12 were acting out-of-class in different positions.

Tele-Mental Health:

All 3.5 telepsychiatrists who treated RC 3CMS and mainline 3CMS patients at WSP were hired and supervised by headquarters during the review period. There were 1.5 telepsychologists and 1.5 tele-social workers at WSP during the review period. All three primary clinicians treated RC 3CMS and mainline 3CMS patients.

Staff Recruitment:

Mental health leadership reported partnering with headquarters and mental health regional teams towards successful recruitment efforts. Local mental health leadership worked

with regional staff to create local hiring panels once candidates were identified. WSP also actively participated in regional hiring events.

Barriers to recruitment included candidates' lack of desire to work in a correctional environment, higher paying jobs that were perceived as less dangerous, and telework options throughout the community. Notably, the location of WSP was a reported concern for many candidates as well.

Quality Management:

The Local Governing Body (LGB) meetings were held monthly, and quorums were achieved at each meeting. The LGB meetings focused on approval of local operating procedures, credentialing, and open forum for discussion of any salient issues including upcoming holidays, facility events, and upcoming external audits and site visits.

The Quality Management Committee (QMC) met monthly throughout the review period and quorums were achieved at each meeting. The MHPS reported its metrics to the QMC on a quarterly basis. Review of QMC minutes indicated each meeting included an open forum for the MHPS and other subcommittees to raise salient issues and concerns. Notably, the mental health work plan for treatment offered was discussed at each QMC meeting.

The MHPS met monthly, and a quorum was achieved at each meeting. Voting members of the MHPS included the acting chief of mental health/chief psychologist, the associate warden of health care operations, the chief nurse executive, the inpatient coordinator, a HPS II, SPRFIT coordinator, and a health records technician II. Non-voting guests often included the CEO, chief support executive, supervisory psychiatric social workers, senior psychologist specialist for quality management, and various office technicians. The meeting minutes were thorough, and the documentation appeared useful to address deficiencies and problem areas.

System surveillance and program administration were addressed at each meeting. System surveillance included the current mental health dashboard and mental health performance review, custody issues, the mental health RC program, the RHU Program, mainline and RC 3CMS and EOP program reports, psychiatry and medication, RVR assessments, mental health referrals, the MHCB program, the SPRFIT program, and data entry errors. Program administration including LOP approvals, staffing/resources, audits, custody and mental health partnership plan (CMHPP), ISUDT, and the health care facility improvement program (HCFIP). Several problem areas were discussed at each meeting including timely transfers from RC to 3CMS or EOP programs, treatment offered, data entry errors regarding appointments and referrals, RVR assessment deficiencies, and consistent delays in placement of 3CMS patients in a 3CMS RHU.

The MHPS also tracked program compliance for each mental health program, RHU morning huddle compliance, staffing, and the CMHPP. The meeting minutes included explanations, remedies, action plans to address deficiencies and improve metrics, and the current status of each identified problem area. Several areas were routinely audited for compliance including peer review, quality of DDP documentation, indecent exposure and RVR quarterly audits, and HCFIP.

There were no active QIPs or FITs during the review period or the site visit but there was a MH Work Plan in place to improve Treatment Offered metrics.

Information from the MHPS meetings was disseminated to line staff via staff meetings and emails.

Peer review at WSP was limited to psychiatry with no other clinical disciplines participating during the review period. Peer review was performed locally and there was no

paired institution. There were no peer review activities during the review period. The most recent peer review was conducted in July 2025.

Medication Management:

CDCR's MAPIP monitored compliance with diagnostic monitoring and medication administration. Diagnostic monitoring included obtaining medication consents, as well as any physical examination, vital signs, or laboratory tests needed for a medication. Medication administration audited compliance with the availability, continuity, and actual administration of medications. Categories must meet the 90 percent threshold to be compliant.

MAPIP

WSP provided MAPIP results from December 1, 2024 to May 31, 2025 regarding compliance for psychiatric diagnostic monitoring and medication management.

For required monitoring of antidepressants, the institution was compliant for six months with obtaining blood pressure for patients prescribed venlafaxine. WSP was compliant for five of six months with obtaining medication consents. The institution was compliant for one of three required months with obtaining EKGs. WSP was noncompliant all six months for thyroid monitoring.

Diagnostic monitoring for patients prescribed atypical antipsychotics showed that WSP was compliant for six months with blood pressure, glucose, CBC with platelets, CMP, height, and weight. NKSP was compliant for five months and was noncompliant for one month for AIMS examinations and obtaining medication consents. WSP was compliant for one month and was noncompliant for five months with obtaining EKGs and lipid monitoring. WSP was noncompliant all six months for thyroid monitoring.

Carbamazepine is a mood-stabilizing medication requiring four metrics: CBC, CMP,

medication level, and medication consent. For patients prescribed carbamazepine, WSP was compliant for the one required month for monitoring CMP and obtaining medical consents. They were noncompliant for the one required month for obtaining carbamazepine medication levels. CBC with platelets were not required during the monitoring period.

WSP was not a clozapine initiation or maintenance institution. There were no patients who were prescribed clozapine during the review period nor at the time of the site visit.

Depakote is a mood-stabilizing medication requiring the same four metrics as carbamazepine. For patients prescribed Depakote, WSP was compliant for six months with monitoring CBC with platelets. The institution was compliant for five months and was noncompliant for one month with obtaining medication consent and CMP. WSP was noncompliant for six months with monitoring therapeutic medication levels.

Lamotrigine is a mood stabilizing medication which requires only one MAPIP metric, namely obtaining medication consents. For lamotrigine, the institution was compliant for four of the five required months and with obtaining medication consents.

Regarding lithium, the institution was compliant for five months and was noncompliant for one month with obtaining medication consents. WSP was compliant for three months and was noncompliant for three months with monitoring kidney function tests and thyroid monitoring. WSP was compliant for one month and was noncompliant for two months for obtaining EKGs. WSP was noncompliant for six months with monitoring therapeutic medication levels.

<u>Medication Administration</u>

For medication management metrics reported by mental health headquarters, WSP

was compliant for five months and was noncompliant for one month with continuity of medications upon parole/transfer to the community. The institution was compliant for four months and was noncompliant for two months with intra-institutional transfer to ASU/SHU/PSU. The institution was compliant for one month and was noncompliant for five months with continuity of medications upon discharge/transfer from a community hospital and/or DSH. WSP was noncompliant for six months for the following: continuity of medications upon arrival to reception centers, continuity of medications upon inter-institutional transfer at R&R, continuity of medications upon inter-institutional transfers (excluding ASU/SHU/PSU), continuity of medications with MHCB transfers, observation of medication preparation HS, observation of medication preparation AM and PM, chronic care medications historical administration, and outpatient provider new medication orders.

WSP performed analyses of underperforming metrics and found that most were due to patient refusals and no-shows. Despite multiple MAPIP measures that were noncompliant, the CAP stated that there was no action in progress which indicated that the noncompliant issues were not addressed.

WSP stated that they were without a chief psychiatrist for most of the review period; consequently, they reported that they had difficulty collecting and confirming standardized data. WSP provided information that indicated that 124 MHSDS patients were prescribed NA/DOT psychiatric medications. No information was provided regarding patients prescribed psychiatric medications by KOP. WSP reported that medical providers did not prescribe SSRI medications. The total number of psychiatric prescriptions was not provided in a readily usable format. WSP reported that prescriptions were provided for a maximum of 180 days according to the HCDOM; however, WSP subject matter experts reported that

bridge orders were provided from 90 to 120 days. For verbal and telephone orders, the nursing staff was required to "read back" the order to the prescriber who was required to sign the order within 48 hours. The institution did not specify the process for tracking whether verbal or telephone orders were signed.

Forty-four pill line observations were conducted monthly during the reporting period. The audits indicated compliance with the policy that all patients received their medications in less than 30 minutes, and the total duration of medication lines was under two hours.

WSP reported no “excessive wait times” for pill lines and stated that there were no reported issues with the waiting areas for the pill lines during inclement weather; however, no additional information was provided.

WSP reported an average nonformulary rate of 9.9 percent during May 2025 that was significantly greater than their goal of less than 3.6 percent.

WSP reported that 2037 patients received medications prescribed at HS. WSP was compliant with the requirement to administer HS medications at 8:00 P.M. or later.

At the time of the site visit, one patient was receiving involuntary PC 2602 medications. WSP reported that nine petitions were initiated during the review period that included one emergent petition, four non-emergent petitions, and three renewal petitions that were initiated. One non-emergent petition was withdrawn by the receiving PIP upon transfer there. No petitions were denied or lost to follow-up. There were no use of force incidents associated with the administration of PC 2602 medications. WSP reported that a psychiatrist initiating a PC 2602 petition sent the information to a senior psychologist who served as the MCA.

<u>Transfers</u>:

WSP's inpatient coordinator held the position for over three years.

During the review period, there were 85 instances involving 67 patients who were considered for, but not referred to, higher levels of care.

WSP referred 16 patients to acute care; 15 were accepted and one was rescinded. All 15 patients timely transferred within ten days. All referral packets were completed within two working days of identification.

WSP referred five patients to intermediate care; four referrals were accepted, and one was rescinded. All four patients timely transferred within 30 days. All referral packets were completed within five working days of identification.

One patient with complex medical needs was transferred timely to inpatient care.

WSP made 380 MHCB referrals, of which 31 or eight percent were rescinded. Of the 349 MHCB admissions, two or one percent took longer than 24 hours to transfer.

There were 324 RC EOP patients transferred to mainline EOP programs, of which 41 or 12 percent were expedited and transferred within 30 days. An additional 102 or 31 percent of RC EOP patients were transferred between 31 and 60 days and 181 or 57 percent of RC EOP patients were transferred beyond 60 days.

There were 1,867 RC 3CMS patients transferred to mainline 3CMS programs, of which 601 or 32 percent of patients were expedited transfers within 60 days, 969 or 52 percent of patients were transferred between 61 and 90 days, and 298 or 16 percent of patients were transferred beyond 90 days.

Like the prior round, WSP did not track non-RC patients (i.e., mainline EOP or mainline 3CMS patients) who were transferred to mainline EOP programs. *See* ECF No. 8359 at 400.

WSP did not provide intelligible EOP RHU or 3CMS RHU transfer data.

Three-hundred and seventy-eight patients were placed in the MSF during the reporting period.

Fifty-three patients had their level of care reduced from EOP to 3CMS during the review period.

Programming:

Reception Center

During the reporting period, 4,875 patients were processed through WSP's reception center and had a total of 5,207 stays. Of those 5,207 stays, 693 were EOP patients, and 4,514 were 3CMS patients. At the time of the site visit, 125 EOP and 1,204 3CMS patients were housed in the reception center.

WSP conducted 6,567 initial MH screenings during the monitoring period. Of those, 6,524, or 99 percent, were screened within the Program Guide timeframe requirements.

The institution also indicated that 3,459 or 53 percent of patients screened positive for mental health related concerns. Of those 3,459 patients, 3,441 or 99 percent of these patients received a fully psychological evaluation within 18 calendar days of arrival. Additionally, 2,328 or 35 percent of patients who were screened during the review period were placed in MHSDS.

*RC EOP Patients*

During the review period, the average RC EOP weekly census was 123 patients per week. On August 1, 2025, there were 131 RC EOP patients housed at WSP.

Until December 31, 2024, RC EOP patients were housed in Facility B at WSP. After the first of the year, patients were transferred to Facility D in buildings three and four. However, since the relocation, RC EOP patients were housed in mixed housing units with RC 3CMS

patients. During the site visit, one toured housing unit included 69 RC EOP patients and nine RC 3CMS patients.

The Program Guide requires that "[a]ll EOP designated inmate-patients shall be transferred to a treatment setting within 60 days of level of care designation, or 30 days of such designation if clinically indicated." *See* ECF No. 7333-1 at 30-31 (PG 12-2-9). WSP reported that 382 RC EOP patients transferred during the review period. Two hundred and five or 54 percent of RC EOP patients transferred timely within the required 60 days. These RC EOP patients had an average length of stay of nine days beyond the required 60-day transfer standard. Reasons for delays were not provided.

The institution revealed that during the site visit, 16 RC EOP patients held at WSP had exceeded the 60-day transfer deadline. These RC EOP patients had an average length of stay of 11 days beyond the required 60-day transfer deadline. Reasons for delays were not provided.

Seven primary clinicians and two psychiatrists provided services to RC EOP patients during the review period. According to the staff-to-patient ratios from the 2009 staffing plan, psychiatrists who treat RC EOP patients must maintain a caseload of no more than 120 patients per psychiatrist, while primary clinicians who treat mainline EOP patients must maintain a caseload of no more than 18 patients per clinician. *See* ECF No. 3693 at 19. Both psychiatrists and five of seven primary clinicians carried caseloads within established ratios. The two primary clinicians exceeded the ratio by one patient each.

The Program Guide required that "[r]eception [c]enters housing [patients] requiring EOP level of care shall provide structured therapeutic activities...[and] all sites will provide opportunities for a minimum of one hour per day, five days per week, of out-of-cell therapeutic activities." *See* ECF No. 7333-1 at 29 (PG 12-2-8). The institution indicated that during the

monitoring period, patients were offered an average of 5.2 hours of structured treatment per week with an average range of 2.86 to 6.09 hours per week. Quality improvement minutes indicated that compliance with structured treatment requirements offered to RC EOP patients ranged from 24 percent complaint to 70 percent from December 2024 to April 2025. There was significant improvement noted from March 2025 to April 2025 related to the increased number of group rooms available to the RC population.

The Program Guide requires that "[i]nitial treatment planning must be developed and regular treatment must be provided for all inmate-patients who are identified as requiring mental health services…Treatment plans must address basic issues of adjustment, access to care, monitoring of medication continuity, and clinical pre-release or parole planning." *See* ECF No. 7333-1 at 29 (PG 12-2-8).

Nine RC EOP IDTTs were observed during the site visit. Assigned psychiatrists and primary clinicians were not always present due to reported Program Guide timeframe requirements. Several scheduled IDTTs occurred before the patients' initial primary clinician and psychiatry evaluations. Observed IDTTs frequently did not focus on preparing patients for their transfer to a mainline EOP program. The IDTT participants did not focus on long-term treatment goals for the patients, reportedly due to the frequent short stays at the reception center. The clinicians asked the patient to summarize their mental health history instead of a treatment team member summarizing the relevant history for the team. This was particularly concerning given that a majority of the IDTTs did not include assigned treatment team members who would benefit from an accurate summation of past treatment histories. Treatment plans were often not discussed with the patient. Overall, observed RC EOP IDTTs were very problematic due to the

frequent use of non-assigned clinicians and the lack of long-term treatment planning that extends beyond the reception center.

Group treatment for RC EOP patients included Nursing-Led Therapeutic Groups (NLTGs), recreation therapy groups, and clinician led mental health groups during the review period. Two NLTGs were observed during the site visit which focused on medication management. There were ten patients per group. The groups were facilitated well with enthusiastic participation from patients. The activity and group topic was clinically appropriate and appeared to meet the needs of the patients in attendance. The group facilitator appeared to observe and assess patients during the group, which allowed for continued participation from all.

Two recreation groups were observed as well. Both groups involved patients discussing a current event and watching a movie which related to those events. Group discussion occurred after the movie as well, which encouraged patients to interact with each other with great discussion from different perspectives. Group participants were engaged in thoughtful conversation and appeared to appreciate the movie.

The Program Guide requires that "[i]nmate-patients who require [EOP] level of care shall be seen by the [primary clinician] weekly and shall be evaluated by a psychiatrist at least monthly regarding psychiatric medication issues." *See id*.

To measure timeliness of routine RC psychiatry contacts during the review period, CDCR produced an appointments report that included individuals who were required to receive a routine RC psychiatry appointment.[127] For the 245 patients in CDCR's appointments report

[127] Reviewed data captured the time between patient contacts but did not account for when patients were not seen or scheduled for a routine psychiatric contact. Of note, the provided appointments report did not account for delays between appointments due to movements in or out of RC EOP. Contact with the assigned psychiatrist was unable to be determined.

covering patients who received at least one routine psychiatry contact during the review period, there were 364 total completed and refused contacts. Of the 356 that were completed, 333 or 94 percent were reported as being conducted in a confidential setting. When a patient had more than one completed contact, timeliness in accordance with Program Guide requirements was able to be calculated. Of the 356 completed contacts, 120 were for individuals who were seen at least twice by a psychiatric provider. Of those 120 contacts, 19 or 16 percent of contacts were completed beyond the Program Guide required timeframes.

To measure timeliness of routine RC primary clinician contacts during the review period, CDCR produced an appointments report that included individuals who were required to receive a routine RC primary clinician appointment.[128] For the 299 patients in CDCR's appointments report covering patients who received at least one routine primary clinician contact during the review period, there were 1,231 total completed and no refused contacts. Of the 1,231 that were completed, 973 or 79 percent were reported as being conducted in a confidential setting. When a patient had more than one completed contact, timeliness in accordance with Program Guide requirements was able to be calculated. Of the 1,231 completed contacts, 932 were for individuals who were seen at least twice by a primary clinician provider. Of those 932 contacts, 87 or nine percent of contacts were completed beyond the Program Guide required timeframes.

[128] The appointments report captured the time between patient contacts but did not include patients were not seen or scheduled for a routine contact with the primary clinician. Of note, the provided appointments report did not account for delays between appointments due to movements in or out of RC EOP. Verified contact with the assigned primary clinician was unable to be determined. When primary clinician caseload groups were utilized to meet primary clinician contact requirements, verification that individual contacts with the assigned primary clinician and alternated with caseload groups with the assigned primary clinician was not conducted.

Of the 1,231 completed routine primary clinician contacts, ten contacts were reported to have been completed in zero minutes, 587 were completed within 15 minutes, 502 lasted between 16 and 30 minutes, 330 lasted between 31 and 60 minutes, 12 lasted between 61 and 95 minutes, and two were completed in greater than 95 minutes.

Although RC EOP patients were transferred to a different facility during the review period, the institution utilized the treatment space on Facility B for group treatment and IDTT meetings. Following this activation in March 2025, the amount of offered structured treatment to patients increased substantially.

*RC 3CMS Patients*

The staff-to-patient ratios from the 2009 Staffing Plan required that staff psychiatrists who treat RC 3CMS patients maintain a caseload of 200 patients per psychiatrist. *See* ECF No. 3693 at 13. For primary clinicians who treat RC 3CMS patients, the 2009 Staffing Plan requires that clinicians maintain a caseload of 80 patients per clinician. *See id*. Seventeen primary clinicians and nine psychiatrists provided services to RC 3CMS patients during the review period. Caseload ratios for these clinicians were not discernable.

The Program Guide indicates that "[patients] who require [3CMS] level of care shall be seen by the [primary clinician] within 30 days of placement in [3CMS] and at least every 90 days thereafter while at the RC, or more often if clinically indicated. These [patients] shall also be evaluated by a psychiatrist a minimum of every 90 days regarding psychiatric medication issues." *See* ECF No. 7333-1 at 29.

To measure timeliness of routine psychiatry contacts during the review period, CDCR produced an appointments report that included individuals who were required to receive routine

psychiatry contacts.[129] For the 661 patients in CDCR's appointments report for the review period, there were 1,384 completed and refused contacts. Of the 838 completed contacts, 816 or 97 percent were confidential as reported by the institution. Reasons for non-confidential psychiatry contacts were not provided. When a patient had more than one completed or refused contact, timeliness in accordance with Program Guide requirements was able to be calculated. Of the 1,384 completed and refused contacts, 726 were for individuals who were seen at least twice by the psychiatric provider. Of those 726 contacts, there were three or less than one percent that occurred beyond Program Guide timeframes.

To measure timeliness of routine primary clinician contacts during the review period, CDCR produced an appointments report that included individuals who were required to receive a routine primary clinician contact.[130] For the 596 patients in CDCR's appointments report, there were 964 completed and refused contacts. Of the 649 completed contacts, 536 or 83 percent were conducted in a confidential setting. Reasons for non-confidentiality were not provided. When a patient had more than one completed or refused contact, compliance with Program Guide timeframes was able to be calculated. Of the 964 contacts, 371 were for individuals who

[129] The RC 3CMS routine psychiatry appointments report did not include individuals that did not have completed contacts. Reviewed data captured the time between patient contacts but did not account for when patients were not seen or scheduled for a routine psychiatric contact. Of note, the appointments report provided did not account for delays between appointments due to movements in or out of WSP. Contact with the assigned psychiatrist was unable to be determined.

[130] The RC 3CMS routine primary clinician appointments report did not include individuals that did not have completed contacts, such as those that were not scheduled. The reviewed data captured the time between patient contacts but did not include patients who were not seen or scheduled for a routine contact with the primary clinician. Of note, the provided appointments report did not account for delays between appointments due to movements in or out of WSP. Contact with the assigned primary clinician was unable to be determined.

were seen at least twice by a primary clinician. Of those 371 contacts, five or one percent occurred beyond program guide timeframes.

MHSDS Patients in Restricted Housing:

Reception Center and mainline patients who required RHU placement were housed in the GP RHU while awaiting transfer.

There were 627 incarcerated individuals housed in the GP RHU during the review period, of which 284 or 45 percent were MHSDS patients. There were 12 acute or intermediate care patients, seven MHCB, 72 EOP, and 193 MHSDS patients.

The RHU Policy requires that patients at an EOP or 3CMS level of care be transferred to an EOP or 3CMS RHU within 30 calendar days from the date of initial placement in RHU or within 30 calendar days in which the patient was made EOP or 3CMS. *See* Cal. Code of Regs., tit. 15 §§ 3335.2 and 3335.3; *see also* Restricted Housing Unit Program: Mental Health Services Policy, dated July 19, 2024 and effective August 1, 2024 (hereinafter "RHU Policy"); 2021 Program Guide Update, ECF No. 7333-1 at 19. At WSP, the average lengths of stay for MHSDS patients while housed in the GP RHU was 55 days with a range of zero to 364 days. At the time of the site visit, there were no EOP patients and 29 3CMS patients housed in RHU.

The 2009 staffing plan requires that primary clinicians who treat MHSDS patients in a GP RHU must maintain a caseload of no more than 256 patients per clinician. *See* ECF No. 3693 at 26. Mental health staff fluctuated in the GP RHU during the review period with one registry psychiatrist who also treated mainline and RC patients, two LCSWs, and one psychologist who was also assigned to diagnostics. Caseloads for primary clinicians were not discernable.

*Structured Treatment*

There were no structured treatment requirements for patients awaiting transfer from a GP RHU to an EOP or 3CMS RHU.

*IDTTs*

Eight RHU IDTTs were observed during the site visit. Seven were initial IDTTs and three were held in absentia due to patient refusal. The IDTTs were provided in adequate space that was confidential, and correct staff were present with computer access. The treatment team was familiar with their patients and the initial clinical assessments were completed prior to IDTT. All of the patients had their IDTT prior to ICC and custody participation was adequate. None of the observed IDTTs met audit criteria. None of the IDTTs included the patient's psychiatric history or a case conceptualization. Safety planning and substance abuse were not discussed although several patients had substance use disorder diagnoses in their history. Treatment planning was not individualized, and each patient was provided with the same generalized treatment goals. Each patient was told they would receive weekly primary clinician contacts, psychiatry if needed, daily psych tech rounds, and groups. No specific clinical interventions were provided.

In the RHU, groups were offered to EOP and 3CMS patients daily with 3CMS groups running in the morning and EOP groups in the afternoons. 3CMS groups were facilitated by psych techs and recreation therapists and ran for 90 minutes with topics including mood management and copying. Staff reported that group attendance was often poor due to prison politics and STG concerns.

Required ICC members attended all six observed ICCs. The ICCs included five 3CMS patients and one non-MHSDS incarcerated person. The mental health clinician asked each

patient various questions pertaining to the status of their mental health and whether each individual understood how to contact mental health if needed. The ICC chairperson's decisions indicated adequate consideration of the mental health input and the patient's disciplinary history. Three patients were released from restricted housing and the remaining three incarcerated persons were retained in the unit due to pending RVRs and investigations.

The monitor reviewed two weeks of 114-As for ten EOP RHU patients. The 114-As reflected the offering of ten weekly hours of yard, showers were offered at least three times weekly, phone calls and linen exchanges were also offered weekly.

<u>Non-Disciplinary Segregation</u>:

Two patients were designated as NDS during the review period. Neither were designated for expedited transfer but did receive property and privileges on the day that ICC approved NDS status.

<u>MHCB</u>:

WSP operated a six bed MHCB within the licensed CTC.

The MHCB's daily census averaged four patients. There were 75 MHCB admissions during the reporting period. MHCB clinical lengths of stay averaged 7.9 days, with approximately four percent of patients having clinical stays exceeding ten days. Physical stays averaged 10.5 days; approximately 33 percent of patients had physical stays that were longer than ten days. Reasons for the delays were typically due to intermediate care transfer delays regarding bed availability. The census on the day of arrival was six patients.

Sixteen MHCB patients were admitted to the MHCB three or more times.

According to the staff-to-patient ratios from the 2009 staffing plan, psychiatrists who treat MHCB patients must maintain a caseload of no more than 10 patients per psychiatrist, while

primary clinicians who treat MHCB patients must maintain a caseload of no more than 10 patients per 1.18 full-time equivalent staff psychologists. *See* ECF No. 3693 at 22. There was one psychiatrist and five psychologists who treated MHCB patients during the review period. Caseloads were not discernable.

Two weeks of CDC 114-A data for ten MHCB patients revealed that patients were offered the following weekly, three or more showers, linen exchanges, clothing exchanges, phone calls, and at least two daily hours of yard time.

Seclusion and Restraint:

There were two instances of seclusion and no restrain incidents. The two seclusion incidents lasted two hours and nine minutes and four hours and ten minutes respectively. Reasons for seclusion included each patient exhibiting self-injurious behaviors.

3CMS:

Housing for mainline 3CMS patients was on Facility A and the minimum support facility (MSF). As of August 1, 2025, there were 180 mainline 3CMS patients housed on Facility A and an additional 189 mainline 3CMS patients housed in the MSF.

The staff-to-patient ratios from the 2009 Staffing Plan and 2021 adjustments to the 2009 staffing plan required that staff psychiatrists who treat 3CMS patients maintain a caseload of 280 patients per psychiatrist if the patient was prescribed medications and 675 patients if the patient was not prescribed medications.[131] *See* ECF No. 3693 at 12 and 6978-1 at 3. Staff-to-patient

---

[131] The Program Guide requires that "[e]ach CCCMS inmate patient on psychiatric medication…be reevaluated by a psychiatrist a minimum of every 90 days regarding psychiatric medication issues." (Program Guide at 12-3-11). The 2009 Staffing Plan established a psychiatry staffing ratio for every 3CMS patient in the general population and did not distinguish between patients on medications and patients who were not. See ECF No. 3693 at 8. The Adjustments to the 2009 Staffing Plan, ECF No. 6978-1, which were approved by the Court on January 27, 2021 (See ECF No. 7035 at 2), established a new staffing ratio of 675 patients per

ratios from the 2009 Staffing Plan required that primary clinicians who treat 3CMS patients maintain a caseload of 97 patients per clinician. *See* ECF No. 3693 at 12. Two psychiatrists and two primary clinicians provided services to 3CMS patients during the review period. The two psychiatrists carried caseloads of 184 patients and the two primary clinicians carried caseloads of 175 and 193 patients, respectively.

*IDTTs*

Eight mainline 3CMS IDTTs were observed during the site visit. The patients' assigned psychiatrist, primary clinicians, and CC I were in attendance. The meeting room was sufficiently confidential and had adequate space. Throughout the eight meetings, the team collaboration was exceptional. The team involved each patient in discussion of goals and treatment interventions and were very conversational with each patient when discussing rationales for treatment interventions. All eight patients saw a psychiatrist and clinician for their initial assessments prior to the IDTT. Diagnoses were discussed among the treatment team and agreed upon. Each patient's appropriate psychosocial history was also discussed. The treatment team was very specific for each patient with discussion of symptoms related to patient diagnoses and level of care rationales.

The individualized treatment plan for 3CMS patients must be completed within 14 working days of referral/arrival by the patient's primary clinician in consultation with the other IDTT members and annually thereafter. *See* ECF No. 7333-1 at 43-44. (PG 12-3-10)

Thirty mainline 3CMS patients who required initial IDTTs during the reporting period were randomly selected for review to assess compliance with Program Guide requirements. Of

---

psychiatrist for patients who are not on medications for six months or more. For the purpose of reporting compliance with staff-to-patient ratios, it was unclear whether the patient's included in each reported caseload were prescribed medications at the time of the site visit.

the 30 reviewed initial IDTTs, three or 10 percent occurred within 14 calendar days or arrival or level of care change. Required staff attended 29 or 97 percent and patients attended 26 or 87 percent of IDTTs. Reasons initial IDTTs were held *in absentia* included patient refusals.

To measure timeliness of routine IDTTs during the review period, CDCR produced an appointments report that included individuals who were required to receive a routine IDTT.[132] For the 421 patients in CDCR's appointments report for December 1, 2024 to May 30, 2025, there were 426 completed initial or routine IDTTs. When a patient had either an initial IDTT and a routine IDTT or more than one routine IDTT, timeliness in accordance with Program Guide requirements was able to be calculated. Of the 426 completed IDTTs, six contacts were for individuals who had at least two IDTTs (initial and routine or two routines). Of those six, all occurred within Program Guide requirements. Of note, the report did not include individuals that did not have a completed IDTT, such as those that were not scheduled.

*Group Treatment*

Group treatment was not offered to mainline 3CMS patients during the review period.

*Individual Treatment*

The Program Guide requires that patients are offered an initial psychiatrist evaluation before their initial IDTT. *See* ECF No. 7333-1 at 34-50, 641. Thereafter they are required to receive a routine psychiatric contact every 90 calendar days if the patient is prescribed a psychotropic medication. *Id.* at 44. Patients are also required to receive a primary clinician

[132] The reviewed data captured the time between completed patient IDTTs but did not account for when patients were not scheduled for an initial or routine IDTT. Of note, the appointments report provided did not account for delays between appointments due to movements in or out of NKSP.

evaluation within ten working days of arrival and every 90 calendar days thereafter. *Id.* at 41, 48.

Thirty mainline 3CMS patients who required initial psychiatry evaluations during the reporting period were randomly selected for review to assess compliance with Program Guide requirements. Of the 30 patients, three or 10 percent occurred before the initial IDTT. Twenty-six or 87 percent of the reviewed initial psychiatry evaluations were conducted in confidential settings; the non-confidential contacts were due to patient refusals. Telepsychiatry was utilized for three or 10 percent of initial psychiatry evaluations.

To measure timeliness of routine psychiatry contacts during the review period, CDCR produced an appointments report that included individuals who were required to receive a routine psychiatry contact.[133] For the 281 patients in CDCR's appointments report for December 1, 2024 to May 30, 2025, there were 546 completed and refused contacts. Of the 539 completed contacts, 538 or one percent were confidential as reported by the institution. Reason for the non-confidential psychiatry contact was that the patients refused part of the contact. When a patient had more than one completed or refused contact, timeliness in accordance with Program Guide requirements was able to be calculated. Of the 546 contacts, 266 were for individuals who were seen at least twice by the psychiatric provider. Of those 266 contacts, there were five or two percent that occurred beyond Program Guide requirements with a range of 91 to 147 days. Of note, the report did not include individuals that did not have completed contacts.

[133] Reviewed data captured the time between patient contacts but did not account for when patients were not seen or scheduled for a routine psychiatric contact. Of note, the appointments report provided did not account for delays between appointments due to movements in or out of NKSP. Contact with the assigned psychiatrist was unable to be determined.

The 30 mainline 3CMS patients who required initial psychiatry evaluations also required initial primary clinician evaluations during the reporting period. Of the 30 reviewed initial primary clinician evaluations contacts, eight or 27 percent were completed within 10 calendar days of arrival or change in level of care. Fourteen or 47 percent were conducted in a confidential setting; non-confidential contacts were due to patient refusals. Telehealth was not utilized.

To measure timeliness of routine primary clinician contacts during the review period, CDCR produced an appointments report that included individuals who were required to receive a routine primary clinician contact.[134] For the 370 patients in CDCR's appointments report for December 1, 2024 to May 30, 2025, there were 621 completed contacts. Of the 621 total completed contacts, 460 or 74 percent were confidential as reported by the institution. Reasons for non-confidential primary clinician contacts included patient refused confidential contact and confidential space was not available. When a patient had more than one completed, timeliness in accordance with Program Guide requirements was able to be calculated. Of the 621 contacts, 255 were for individuals who were seen at least twice by the primary clinician. Of those 255 contacts, all occurred within Program Guide requirements. Of note, the report did not include individuals that did not have completed contacts, such as those that were not scheduled.

There were 621 completed individual primary clinician contacts, of which 399 were completed within 15 minutes, 124 were completed in 16 to 30 minutes, 96 were completed in 31 to 60 minutes, and two were completed in 61 to 95 minutes.

---

[134] The reviewed data captured the time between patient contacts but did not include patients who were not seen or scheduled for a routine contact with the primary clinician. Of note, the provided appointments report did not account for delays between appointments due to movements in or out of NKSP. Contact with the assigned primary clinician was unable to be determined.

Interviewed mainline 3CMS patients did not report concerns with mental health services at WSP. Patients expressed seeing their assigned primary clinicians and psychiatrists regularly and also indicated knowing how to reach them if they experienced any concerns. Patients did express wanting to engage in group treatment that was otherwise not offered. There were some concerns with laundry not being collected for a month on Facility A during the review period. However, this was resolved prior to the site visit.

Other Issues:

Pre-Release Planning:

The pre-release coordinator was a licensed clinical social worker who worked at WSP for 15 years. Over the last 18 months, the pre-release coordinator no longer carried a case load.

The pre-release coordinator worked with internal and external agencies, including county mental health providers, probation, the Division of Adult Parole Operations (DAPO), and other community or state programs as needed. The coordinator attended local meetings every two weeks to discuss all patients who were paroling within 120 days and attended monthly state pre-release meetings along with weekly meeting with the ISUDT and TCMP.

The coordinator reported that he met with patients at least once between 60 and 90 days before release. If the patient requested more meetings, the coordinator provided follow-up meetings.

There were no pre-release groups at WSP during the review period. The pre-release coordinator stated that individual contacts were more productive than groups.

The coordinator reported completing the pre-release program assessment (PRPA) with both 3CMS and EOP patients.

Three TCMP caseworkers were contracted to work with patients. The coordinator reported the contractors were responsive and worked well with clinical staff. TCMP screened 570 MHSDS patients during the review period. Of the 570 patients, 514 or 90 percent submitted applications for services. Five hundred and seven patients submitted applications for VA benefits as well.

Of the 529 incarcerated persons released to probation during the review period, 426 ROIs were signed during the review period. Eighty -six incarcerated persons did not sign the ROI.

Program Access:

a. Job and Program Assignments

On June 20, 2025, WSP reported that 110 3CMS patients or six percent of the 3CMS population, and 321 non-MHSDS incarcerated individuals, or 14 percent of non-MHSDS incarcerated population held jobs.

Thirty-five academic assignments were held by two percent of 3CMS patients and 115 incarcerated individuals or five percent of non-MHSDS incarcerated population.

Vocational assignments were held by 16 3CMS patients or one percent of the 3CMS population and 65 incarcerated individuals or three percent of the non-MHSDS incarcerated population.

Thirty-five 3CMS patients, or one percent of the 3CMS population and 122 non-MHSDS patients or six percent of the non-MHSDS incarcerated population held voluntary assignments.

b. Milestone Credits

WSP reported EOP patients earned three milestone credits and 3CMS patients earned 163 milestone credits.

c. Out-of-Level Housing

As of June 20, 2025, 76 custody Level I and ten custody Level III 3CMS patients were in Level II housing, and 17 custody Level III 3CMS patients were in Level IV housing.

d. ADA Reasonable Accommodations and Grievance Procedures

WSP provided a copy of the CDCR Reasonable Accommodation Request Process manual and produced training rosters for custody and mental health staff.

e. Unclothed Body Search

Interviewed RHU custody staff explained that unclothed body searches were conducted within holding cells or in a private area utilizing privacy screens. They indicated metal detectors were utilized to assist with unclothed body searches.

"C" Status:

The institution reported a total of 133 patients on "C" status during the reporting period including one EOP, 45 3CMS, and 87 non-MHSDS incarcerated individuals.

There were no EOP patients and 23 3CMS patients on "C" status at the time of the site visit. A review of 15 classification chronos revealed placement on "C" status was due to receiving two or more RVRs within a 180-day period for reasons including illegal possession of a cellular device, refusal to work, battery on a prisoner, possession of a controlled substance and being under the influence of an intoxicant.

"C" status patients remained in their own housing units except on Facility A where "C" status patients were clustered together. However, the institution indicated that clustering was being dismantled due to the large influx of incarcerated persons who required those cells for orientation purposes.

Case-by-Case Reviews:

There were four patients who required 150-day case reviews, three of four received extensions ranging from 60 to 90 days. The one patient did not yet receive his 150-day review. For the three patients who received a review, a primary clinician, psychiatrist, and correctional counselor was present in the decision-making process.

Seven patients required 120-day pre-MERD reviews. Three received a CSR review prior to the expiration of the MERD. All seven reviewed chronos indicated that mental health staff provided input into each decision to hold patients in RHU.

Mental Health Referrals:

WSP reported an overall compliance rate of 81 percent for timely responding to MH referrals. Psychiatry and primary clinicians responded timely to emergent and urgent MH referrals. Reasons for delays included staffing shortages/call outs, incorrect orders, cancellation by psychiatry, patient refusals, unavailable treatment space, equipment issues and incorrectly checking in and out of the orders.

WSP reported that when officers received emergent and urgent consults, they contacted the mental health office. After business hours, officers would call one of the crisis team members or email the MH-5 to a CIT distribution email list for triaging. If the MH-5 was a routine consult, then it was routed through institutional mental health mailbox located in the TTA and the nursing trailer.

Custody and Mental Health Partnership Plan:

WSP's custody and mental health partnership plan LOP complied with statewide policy and was up to date.

Executive leadership joint rounding occurred with required staff in attendance during all six months of the review period in the MHCB, Facility D, Facility A, the MSF, and Facility C. Programs that experienced executive leadership joint rounding included the MHCB program, RC EOP program, RC 3CMS program, and mainline 3CMS program. Staff reported that with Facility B closing, staff morale is lower as more patients were moved into each housing unit to accommodate. Staff collaboration was strong in the MHCB. Mainline and RC patients reported regular meetings with their clinicians and reported good interactions with custody staff.

Wardens' minutes reflected discussion of the executive joint rounding but did not provide any details about the results of the rounding. QMC minutes also discussed the executive joint rounding but provided very little detail or information. Results of rounding were attached as exhibits the MHPS minutes, however details were not summarized in the meeting minutes during the review period.

The monthly supervisor program tours occurred as required with staff and patient interviews indicating that there were no barriers to mental health care. Patient interviews noted no issues with receiving ducats, and that MH staff were responsive to their needs. One concern noted was the length of time patients remained in the RC pending transfer to their endorsed institution.

Weekly 3CMS supervisory meetings occurred on all facilities that housed 3CMS patients as required, however documentation was bleak and did not include any detail which would indicate that comprehensive discussion of 3CMS patients occurred. Although the forms were signed by appropriate staff, many sections were left blank across multiple weeks with one big bold statement written across the form that no issues were reported.

Regarding huddles, WSP was required to conducts huddles in the MHCB, RHU and mainline EOP housing. The institution reported that on September 12, 2024, regional staff advised that the MHCB no longer had to conduct third watch huddles seven days a week due to the “robust second watch huddles.”

The institution provided huddle reports for the MHCB, RHU, and EOP housing. Across all months of the review period, several daily huddle reports were not provided. In the RHU, there were two missing huddles in December 2024 and for missing huddles in May. In the MHCB, there were 14 missing huddles in December 2024

Of the 33 huddle reports reviewed, issues were consistently noted with documenting new patients to the unit and listing patients with expiring medications. In 11 of 33 huddle reports reviewed, no information or statements were made on the huddle report.

IAC meetings were held quarterly and not monthly during the review period. Of the two quarterly meeting minutes reviewed, one meeting included a mental health staff member and both meetings did not discuss any mental health issues.

EOP orientation groups were not completed during the review period.

WSP distributed the 3CMS orientation brochure to new patients and provided a copy of the same.

The institution reported 100 percent compliance for both mental health and custody staff in the annual CMHPP training.

Regarding quarterly round table training, the institution provided documentation for RHU, RC EOP, and the MHCB for the fourth quarter of 2024, and the first and second quarters of 2025. The meetings and lesson plan followed policy, however the number of staff in attendance in some areas appeared low in some instances and higher in others. The number of staff that were required

to attend the training was not indicated, therefore compliance with staff attendance could not be discerned.

A total of 132 staff complaints were filed by 82 patients. Of the staff complaints filed, MHCB patients filed six, EOP patients filed 27, and 3CMS patients filed 99. Of the 132 staff complaints filed, 63 were referred to the hiring authority or locally designated investigator, 23 were for use of force, 12 for integrity, 12 for misconduct, nine for discrimination, six for retaliation, two for dishonesty and five were not identified. The resolution of the complaints filed included 86 where staff misconduct was identified, 27 were denied, ten had no decision noted, six were redirected, two had time expired, and one was rejected.

There were no other investigations of staff for misconduct towards a patient not initiated through the appeal process. There were no staff redirected to another post as a result of an MHSDS patient filing a staff misconduct complaint.

Heat Plan:

CDCR required that each institution's heat plan LOP incorporate the requirements of the most recent Heat Plan and Updates memorandum. The institution's LOP was in line with the 2024 and 2025 Heat Plan and Updates memorandums.

The 2024 Heat Plan and Updates memorandum required that each institution submit a Heat Plan Monthly Summary Report (Summary Report), signed by the warden and CEO, to headquarters each month from May 1 to October 31. The heat plan was only in effect in May 2025 of the review period. The May 2025 monthly summary report indicated that 12 Stage I and no Stage II or Stage III heat alerts occurred.

The Heat Plan and Updates memorandum also required institutions to submit a monthly Heat Incident Log documenting the number of patients who experienced a heat-related illness.

The Heat Incident Log must include the patient's information and details regarding the heat-related illness. There were no heat related illnesses reported in May 2025.

The 2024 Heat Plan and Updates memorandum required all custody officers and leadership staff to maintain knowledge of heat plan activation and act in accordance with the requirements of each stage. Twenty-seven correctional officers across 13 housing units were interviewed regarding knowledge of heat plan procedures. All interviewed officers were knowledgeable of the heat plan policy and their responsibilities at each stage of activation. Interviewed officers on Facility C were unable to produce an up-to-date list of patients who were prescribed heat-risk medications. They reported being unaware that the list was updated daily.

To ensure proper and accurate temperature recording, the annual Heat Plan and Updates Memorandum required the warden or his designee to ensure an accurate thermometer was placed in a central, heat-neutral location to monitor outside ambient air temperatures which must be recorded every hour, every day, from May 1 through October 31 of each year. Outdoor temperature logs were recorded every hour as required with the thermometer probe placed on the roof of the central control building. When the temperature reached a Stage I heat alert, officers recorded the exact time that the temperature reached 90 degrees on the form as well.

The warden or his designee is also responsible for ensuring that inside air temperatures are measured in all non-airconditioned living areas that house heat-risk incarcerated persons. Temperatures must be taken at the highest non-air-conditioned location where heat-risk incarcerated persons are housed and must be recorded every three hours. Indoor thermometers were recently moved on Facility A to a higher location to achieve a more accurate temperature readings, however the thermometers were not visible to control officers who took the temperatures. This required officers on the ground to relay information to the control officers.

In situations where there were no officers on the ground to help relay the information, staff indicated recording temperatures based on feel. Reviewed indoor temperature logs were completed as required during the review period with very few missed temperature recordings.

In an effort to ensure that heat-risk incarcerated persons were afforded equal access to programs, services, and activities during extreme weather conditions, the 2024 Heat Plan and Updates memorandum required institutions to devise and include any reasonable accommodation and alternatives to yard activities when revising their LOP. All reasonable accommodation provided to heat-risk incarcerated persons during heat alert activation must be documented in the institution's DAR as well. Institutional leadership acknowledged deficiencies with proper DAR completion related to heat plan requirements during the review period. As a result, staff were re-trained on the 2025 Annual Heat Plan and Updated memorandum and leadership provided a list of training attendees.

The 2024 Heat Plan and Updates memorandum required annual training on the institution's Heat Plan. For custody staff, the warden, chief deputy warden, all five correctional administrators, all six captains, all 24 lieutenants, 58 of 59 sergeants, and all 671 correctional officers attended the training. For mental health staff, the chief of mental health, both senior psychologist specialists, one of two senior psychiatric social workers, seven of nine psychiatrists, 11 of 18 psychologists, and 17 out of 19 social workers attended the training. For nursing staff, 99 of 139 nurses attended the training attended the required training.

RVRs:

WSP reported a total of 3,808 rule violation reports (RVR) were issued during the review period. Of that total, acute or MHCB patients were issued 30 or one percent, EOP patients were issued 120 or three percent, 3CMS patients were issued 1,678 or 44 percent, and non-MHSDS

general population individuals were issued 1,980 or 52 percent of RVRs. A total of 1,828 or 48 percent of all RVRs were issued to MHSDS patients.

The monitor reviewed ten RVRs and included mental health assessments (MHA) for compliance with policy. Custody staff timely referred the RVR to mental health staff in five of ten or 50 percent of cases. The range of the referral being late was one to five days late. Mental health staff completed the MHA and timely returned it to custody staff in nine of ten or 90 percent of cases. All patients were assigned a staff assistant per policy. The MHAs were completed in a private setting in six of ten cases with three interviews not occurring in a private location due to limited treatment space. One case did not state a reason.

The senior hearing officer (SHO) documented their consideration of the MHA in five of ten cases. In the five cases where the MHA was not considered, the SHO cut and pasted the responses from the MHA form in the hearing documentation with no statement of their consideration. The SHOs mitigated penalties in seven of ten RVRs where mitigation was recommended.

Regarding training, the warden, one chief deputy warden, five correctional administrators, five captains, 24 lieutenants, and 59 sergeants attended the required training. For mental health staff, nine out of ten MHAs reviewed were completed by a clinician who had attended the required training. One MHA was completed by a clinician not trained.

Regarding the January 8, 2025, memorandum titled, “Limited Licensed Healthcare Staff Access to Rules Violation Reports”, the institution provided training data for healthcare staff. The institution reported 21 psych techs, two senior psychologists, ten psychologists, ten psychiatrists, and two chief psychologists attended the training.

Use of Force:

The institution reported no controlled and 213 immediate use of force incidents during the review period. A total of one acute patient, eight MHCB patients, 33 EOP patients, and 302 3CMS patients experienced a use of force incident.

The incident involving an acute care patient involved the patient's refusal of PC 2602 involuntary medication. The patient was compliant in receiving the injection when the patient suddenly began to batter multiple staff. Physical force was used to gain control of the patient and an RVR was issued to the patient for battery on staff. The incident was also referred to the district attorney.

The monitor reviewed 15 immediate use of force incidents and viewed video footage for four. All the incident packages and videos reviewed were in compliance with CDCR policy. However, several of the incident packages were lacking details regarding de-escalation prior to the immediate use of force, as well as the patient's and staff's interaction prior to the use of force.

Both custody and mental health staff were 100 percent compliant with attending the mandatory use of force training.

Lockdowns/Modified Programming:

There was one PSR which lasted 13 days due to the rise in violence incidents on Facility A and a reported homicide that had occurred in Facility A on March 14, 2025. During the PSR, multiple searches were completed, and drugs and weapons were retrieved. All movement was controlled, and escorts were required. Yard and day room activities were suspended. Showers were offered by one cell at a time. Mental healthcare services were impacted but priority ducats

were allowed with medication distribution occurring at cell front, and CDCR form 7362s being accepted at the housing unit.

Access to Care:

A review of monthly Health Care Access Quality reports from December 2024 through May 2025 reflected the issuance of 143,575 mental health ducats and add-on appointments; of those, 103,160 or 72 percent were completed and 40,415 or 28 percent were not completed. Of the 40,415 non-completed appointments, 69 or less than one percent was not completed due to custody factors, 29,364 or 73 percent were not completed due to non-custody factors and 10,982 or 27 percent were not completed due to patient refusals.

*Coleman* Postings:

*Coleman* postings were observed in all toured housing units during the site visit.